U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB – 5 2021

CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

[UNDER SEAL]                    §
                                §
            Plaintiffs,         §
                                §
v.                              §
                                §
[UNDER SEAL]                    §
                                §
            Defendants.         §
                                §
                                §
                                §
                                §
                                §
                                §
                                §

**2 – 21 CV – 022 – Z**

Civil Action No. _____

**COMPLAINT FOR DAMAGES
UNDER THE FEDERAL
FALSE CLAIMS ACT AND
VARIOUS STATE FALSE
CLAIMS ACTS**

**FILED IN CAMERA AND
UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)**

**DO NOT ENTER INTO PACER**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| *ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| THE STATE OF LOUISIANA, | § | Civil Action No. _____ |
| *ex rel.* ALEX DOE, Relator, | § | |
| | § | **COMPLAINT FOR DAMAGES** |
| | § | **UNDER THE FEDERAL FALSE** |
| Plaintiffs, | § | **CLAIMS ACT AND STATE** |
| | § | **FALSE CLAIMS ACTS** |
| v. | § | |
| | § | **FILED IN CAMERA AND** |
| PLANNED PARENTHOOD | § | **UNDER SEAL PURSUANT TO** |
| FEDERATION OF AMERICA, INC., | § | **31 U.S.C. § 3730(b)** |
| PLANNED PARENTHOOD GULF | § | |
| COAST, INC., PLANNED | § | **DO NOT ENTER INTO PACER** |
| PARENTHOOD OF GREATER | § | |
| TEXAS, INC., PLANNED | § | |
| PLANNED PARENTHOOD SOUTH | § | |
| TEXAS, INC., PLANNED | § | |
| PARENTHOOD CAMERON | § | |
| COUNTY, INC., PLANNED | § | |
| PARENTHOOD SAN ANTONIO, | § | |
| INC., | § | |
| | § | |
| Defendants. | § | |

Relator Alex Doe ("Relator") brings this lawsuit on behalf of the United States of America (the "United States"), the State of Texas, and the State of Louisiana (collectively the "Plaintiff States"), against Defendants Planned Parenthood Federation of America, Inc., Planned Parenthood Gulf Coast, Inc., Planned Parenthood of Greater Texas, Inc., Planned Parenthood South Texas, Inc., Planned

Parenthood Cameron County, Inc., and Planned Parenthood San Antonio, Inc., (collectively "Defendants" or "Planned Parenthood") for treble damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001 *et seq.* ("TMFPA"), and the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:437.1 *et seq.* ("LMAPIL").

## INTRODUCTION

1.      This is a civil fraud action brought on behalf of the United States and the States of Texas and Louisiana against Planned Parenthood to recover damages and civil penalties owed to the United States and the Plaintiff States as the result of Planned Parenthood having presented false or fraudulent claims for payment or approval under the Medicaid program, and having concealed or improperly avoided an obligation to repay money wrongfully obtained under the Medicaid program.

2.      Planned Parenthood owns and operates abortion facilities and health clinics in Texas and Louisiana with the purported purpose of providing medical services, delivering pharmaceuticals, providing counseling and educational services and materials for family planning and family planning preventative care, and providing medication and surgical abortions. Planned Parenthood and its clinics are grantees of state and federal funds provided through state programs and/or directly through federal programs, including the Medicaid program.

3.      From at least 2010 and continuing through 2020, Planned Parenthood Defendants presented or caused to be presented thousands of false or fraudulent

3

claims for payment for Medicaid services, received millions of dollars of payments from state and federal funds for these false or fraudulent Medicaid claims, and failed to report and pay to the government the money that Planned Parenthood received from these false claims after it knew or should have known that it was not entitled to keep the money.

4.      Relator learned from an undercover investigation that Planned Parenthood had violated and was continuing to violate numerous medical and ethical standards and state and federal laws that relate to the provision of medical services in a safe, legal, and ethical manner. Relator also learned through the undercover investigation that Planned Parenthood had engaged in a pattern or practice of submitting false or fraudulent claims for payment or approval under the Medicaid program while failing to meet several material conditions for payment.

5.      Relator contacted federal and state law enforcement and government officials and provided material non-public information and evidence of Planned Parenthood's violations of medical and ethical standards and state and federal laws. Based on the information and evidence provided by Relator, the Plaintiff States determined that Planned Parenthood was not qualified to participate in the Medicaid program under applicable state and federal laws governing provider qualifications. The Plaintiff States informed Planned Parenthood of their determination that Planned Parenthood was not qualified to participate in the Medicaid program and that its enrollment would be terminated.

6.      Planned Parenthood failed to contest the Plaintiff States' determinations through state administrative proceedings granted under the Medicaid Act by the States to allow providers to dispute an incorrect or unfounded disqualification. Planned Parenthood's termination from the Louisiana Medicaid program became final under state law on or about October 15, 2015. Planned Parenthood's termination from the Texas Medicaid program became final under state law on January 19, 2017.

7.      Planned Parenthood filed lawsuits in federal courts in Louisiana and Texas challenging the Plaintiff States' determination that Planned Parenthood was not a qualified provider under the Medicaid statutes and regulations and disputing the information and evidence that Relator had obtained and provided to the Plaintiff States. The federal district courts in Louisiana and Texas issued preliminary injunctions on Planned Parenthood's claims.

8.      Planned Parenthood continued to submit claims for payment for Medicaid services even after the Plaintiff States had informed Planned Parenthood that they were not qualified to provide Medicaid services or receive payments of state or federal funds under the Medicaid program. The Plaintiff States were forced to continue making payments to Planned Parenthood for these claims pursuant to the preliminary injunctions. Thus, Planned Parenthood continued to submit claims for payments for Medicaid services while the Louisiana and Texas lawsuits were pending and received millions of dollars of payments of state and federal funds under the

5

Medicaid program *after* the Plaintiff States had disqualified and terminated them from the Medicaid program.

9.      On January 17, 2019, the United States Court of Appeals for the Fifth Circuit vacated the preliminary injunction in the Texas case and discussed the information and evidence that Relator had provided to the States from the undercover investigation showing numerous violations of medical and ethical standards and state and federal laws, which the Plaintiff States had relied upon in determining that Planned Parenthood was not qualified to participate in the Medicaid program. Judge Jones wrote separately to say that a prior decision in the Louisiana case was wrongly decided and the Court should grant *en banc* review to reconsider it. On February 4, 2019, the *en banc* Fifth Circuit agreed to rehear the case on its own motion.

10.      On November 23, 2020, the *en banc* Fifth Circuit vacated the preliminary injunction in the Texas case, and reversed the Louisiana case. Seven judges in the majority wrote separately, affirming Texas' determination that Planned Parenthood was not a qualified provider based on the information that Relator had provided to the state and federal governments.

11.      Planned Parenthood therefore became aware no later than November 23, 2020 that it had knowingly presented or caused to be presented millions of dollars of false or fraudulent claims for payment or approval under the Medicaid program. From at least January 2010 through 2015, Planned Parenthood violated the FCA, TMFPA, and LMAPIL by submitting claims and receiving payments from the United States and the Plaintiff States for Medicaid services while failing to comply with

material requirements placed on Medicaid providers by the law. And every claim that Planned Parenthood submitted after its disqualification in 2015 or 2016 was a false or fraudulent claim that resulted in an overpayment of federal and state funds to Planned Parenthood. Planned Parenthood violated the FCA, TMFPA, and LMAPIL by failing to report or repay to the United States or the Plaintiff States within the statutorily required time period the overpayments that it had received under the Medicaid program.

12.     Relator learned that Planned Parenthood submitted claims and received payments from the federal government and the Plaintiff States of millions of dollars in state and federal Medicaid funds to which they are not entitled. Upon information and belief, Planned Parenthood did not report or return any of these funds to the United States or the Plaintiff States after it became aware, or should have become aware, it had an obligation to do so within the statutorily required time period. Prior to filing this lawsuit, Relator notified federal and state authorities of Planned Parenthood's illegal conduct. Planned Parenthood's violations of the FCA, TMFPA, and LMAPIL – by submitting false or fraudulent claims for payment under the Medicaid program, and by failing to return overpayments – were publicly unknown at this time and at the time this lawsuit was filed.

PARTIES

13.     Relator Alex Doe is a citizen of the United States and a resident of the State of California. From 2013 to 2015, Relator conducted an extensive undercover investigation of Planned Parenthood, including its medical services, abortion

7

services, compliance with state and federal laws, fetal tissue donation and research program, internal business practices, corporate structure and affiliation, finances, and other information. Relator brings this action based on direct, independent, unique, and personal knowledge obtained during and after the investigation of Planned Parenthood. Relator voluntarily disclosed this information to the United States and the Plaintiff States prior to public disclosure and before filing this action.

14.     Relator has already experienced harassment, threats, intimidation, and retaliation, including retaliation by Planned Parenthood, and thus reasonably fears further harassment, threats, intimidation, and retaliation if Relator's identity is disclosed publicly in connection with this lawsuit. Thus, Relator intends to shortly file a motion for protective order to permit Relator to proceed in this case under a pseudonym and to allow safe disclosure of Relator's identity to other counsel in this case.

15.     Defendants Planned Parenthood Federation of America, Planned Parenthood Gulf Coast, Inc., Planned Parenthood of Greater Texas, Inc., and Planned Parenthood South Texas, are a system of affiliated entities operating as and collectively referred to herein as "Planned Parenthood." Planned Parenthood provides women's health services and abortion services at clinics in the State of Texas and the State of Louisiana, including Medicaid services that are the subject of this action.

16.     Defendant Planned Parenthood Federation of America, Inc. ("PPFA") is a New York corporation that has over 50 affiliate organizations that provide health care services and abortion services in every State, including the other Defendants in

this case. PPFA provides significant monetary support to these affiliates as well as other types of support and control, such as directives, marketing, communications, requirements, standards, policies, and accreditation for affiliates providing medical care, insurance coverage, legal counsel and representation, and direct support for the provision of healthcare services.

17.    PPFA maintains its executive and corporate administrative offices at 123 Williams Street, Tenth Floor, New York City, New York.

18.    Defendant Planned Parenthood Gulf Coast, Inc. ("PPGC") is a Texas corporation and an affiliate of PPFA that provides health services and abortion services at clinics in the State of Texas and health services at two clinics in the State of Louisiana. PPGC and its clinics are grantees or recipients of federal funds provided through Texas and Louisiana programs and/or provided directly through United States programs.

19.    PPGC maintains its executive and corporate administrative offices at 4600 Gulf Freeway, Houston, Texas, and provides medical services at the following clinics: (1) Fannin Clinic in Houston, Texas; (2) Greenbriar Clinic in Stafford, Texas; (3) 1960 Clinic in Houston, Texas; (4) Southwest Clinic in Houston, Texas; (5) Lufkin Clinic in Lufkin, Texas; (6) Bryan Clinic in Bryan, Texas; (7) Huntsville Clinic in Huntsville, Texas; (8) Greenspoint Clinic in Houston, Texas; (9) Dickinson Clinic in Dickinson, Texas; (10) Rosenberg Clinic in Rosenberg, Texas; (11) Baton Rouge Clinic in Baton Rouge, Louisiana; and (12) New Orleans Clinic in New Orleans, Louisiana.

20.     Defendant Planned Parenthood of Greater Texas, Inc. ("PPGT") is a Texas corporation and an affiliate of PPFA that provides women's health services and abortion services at clinics in the State of Texas. PPGT and its clinics are grantees or recipients of federal funds provided through Texas and Louisiana programs and/or provided directly through United States programs.

21.     PPGT maintains its executive and corporate administrative offices at 7424 Greenville Avenue, Dallas, Texas, and provides medical services at the following clinics: (1) Addison Health Center in Addison, Texas; (2) Arlington Health Center in Arlington, Texas; (3) Bedford Health Center in Bedford, Texas; (4) Cedar Hill Health Center in Cedar Hill, Texas; (5) North Dallas Shelburne Health Center in Dallas, Texas; (6) South Dallas Surgical Health Services Center in Dallas, Texas; (7) Lubbock Health Center in Lubbock, Texas; (8) Southeast Fort Worth Health Center in Fort Worth, Texas; (9) Southwest Fort Worth Health Center in Fort Worth, Texas; (10) Southwest Fort Worth Surgical Health Services Center in Fort Worth, Texas; (11) Mesquite Health Center in Mesquite, Texas; and (12) Plano Health Center in Plano, Texas.

22.     Defendant Planned Parenthood of South Texas, Inc. is a Texas corporation and affiliate of PPFA that is a parent corporation of three other corporations, Defendant Planned Parenthood Cameron County, Defendant Planned Parenthood San Antonio (hereinafter referred to collectively as "PPST"), and Planned Parenthood South Texas Surgical Center, which provides women's health services and abortion services at clinics in the State of Texas. PPST and its clinics are grantees

10

or recipients of federal funds provided through Texas and Louisiana programs and/or provided directly through United States programs.

23.     PPST maintains its executive and corporate administrative offices at 2140 Babcock Road, San Antonio, Texas and provides medical services at the following clinics: Planned Parenthood-Harlingen in Harlingen, Texas; Planned Parenthood-Southeast in San Antonio, Texas; Planned Parenthood-San Pedro 150 in San Antonio, Texas; Planned Parenthood-San Pedro in San Antonio, Texas, Planned Parenthood-Northeast in San Antonio, Texas; Planned Parenthood-Marbach in San Antonio, Texas; Planned Parenthood-South Texas Medical Center in San Antonio, Texas; and Planned Parenthood-Brownsville in Brownsville, Texas.

### JURISDICTION & VENUE

24.     This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345 because this civil action arises under the laws of the United States and the United States is a real party in interest.

25.     Relator brings this action under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, to recover treble damages, civil penalties, and costs of suit, including reasonable attorneys' fees and expenses. Relator brings this action and his claims on behalf of the United States pursuant to 31 U.S.C. §§ 3730(b) and 3730(e)(4), and Relator has satisfied all conditions precedent to his participation as Relator. Pursuant to 31 U.S.C. § 3730(e)(4)(A), the allegations contained herein have not been publicly disclosed as defined by the federal False Claims Act, or alternatively, Relator

11

qualifies as an "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).

26.     Relator has voluntarily provided to the Attorney General of the United States and the Acting United States Attorney for the Northern District of Texas, prior to filing this Complaint, a statement of substantially all material evidence and information in Relator's possession related to the claims. Because the statement includes attorney-client communications and work product of Relator's attorneys and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in this litigation, Relator understands this disclosure to be confidential and privileged.

27.     This Court has jurisdiction over Relator's state law claims pursuant to 31 U.S.C. § 3732(b) because those claims arise from the same transaction or occurrence as Relator's claims under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

28.     Additionally, this Court has supplemental jurisdiction over Relator's state law claims pursuant to 28 U.S.C § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution as Relator's claims under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

29.     Pursuant to the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.102(a), and the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:439.1(D)(2), Relator has provided to the Attorneys General of Texas and Louisiana prior to filing this Complaint, a statement of substantially all material

evidence and information in Relator's possession related to the claims. Because the statement includes attorney-client communications and work product of Relator's attorneys and is submitted to the Attorneys General in their capacity as potential co-counsel in this litigation, Relator understands this disclosure to be confidential and privileged.

30.     Personal jurisdiction and venue are proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a), because one or more of the Defendants may be found in, resides in, or transacts business, or has committed any act proscribed by 31 U.S.C. §§ 3729 *et seq.* in this judicial district. Specifically, at all times material and relevant, one or more of the Defendants did transact and do business at several abortion clinics or health clinics located within the Northern District of Texas.

31.     Under 31 U.S.C. § 3730(b)(2), this Complaint is to be filed in-camera and remain under seal for a period of sixty (60) days and shall not be served on Defendants until the Court so orders. The federal government may elect to intervene and proceed with this lawsuit within sixty (60) days after it receives both the Complaint and the material evidence known to Relator at the time of his filing, establishing the existence of the false claims. The Plaintiff States may elect to intervene and proceed with this lawsuit within sixty (60) days after it receives both the Complaint and the material evidence known to Relator at the time of his filing, establishing the existence of the false claims.

## FACTS

**A. The Medicaid Program and State Administration**

32.     Pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, the Medicaid Program ("Medicaid") was established in 1965 as a joint federal and state program to provide financial assistance to individuals with low incomes to enable them to receive medical care. Under Medicaid, each State establishes its own eligibility standards, provider qualifications, and program administration in accordance with certain federal statutory and regulatory requirements. The State pays the healthcare providers for services rendered to Medicaid recipients, with the state obtaining the federal share of the Medicaid payments from accounts that draw on the United States Treasury. *See generally* 42 C.F.R. §§ 430.0-.30.

33.     Under Title XIX of the Social Security Act, each state must establish an agency to administer its Medicaid program according to federal guidelines. Texas administers its Medicaid program through the Health and Human Services Commission. Louisiana administers its Medicaid program through the Department of Health and Hospitals.

34.     Federal law regarding Medicaid funding requires States receiving such funds to adopt State plans for medical assistance that contain specified content and are approved by the Secretary of the Health and Human Services. Federal law expressly restricts those entities qualified to provide Medicaid-covered family planning services to entities that are eligible for payments under a State Medicaid plan.

14

35.     Each State has broad discretion to implement the Medicaid Act, as well as broad authority to define provider qualifications and to exclude providers on that basis. If a provider is qualified to participate in a State Medicaid plan, it may submit claims for reimbursement by the State for services provided to Medicaid recipients.

36.     Consistent with federal law, and to ensure the safety of its Medicaid recipients, Texas and Louisiana law impose rigorous standards and requirements on Medicaid providers. Both Texas and Louisiana require Medicaid providers to comply with federal and state laws and regulations and to ensure that its employees and agents provide services in compliance with accepted medical and ethical standards as a condition of receiving Medicaid reimbursements.

**i.      Texas Medicaid Program - Provider Qualifications**

37.     According to the Texas Health and Human Services Commission ("HHSC"), which oversees the Texas Medicaid Program, medical providers who desire to be eligible for Medicaid payments must complete a Texas Medicaid Provider Enrollment Application and enter into a written agreement with the State. Federal Medicaid regulations likewise require such an agreement and mandate that all Texas providers must revalidate their enrollment in the Texas Medicaid Program every three or five years based on provider type. Thus, Planned Parenthood was required, as a condition of enrollment and participation in the Texas Medicaid Program, to enter into a written HHSC Medicaid Provider Agreement ("Texas Provider Agreement"), and to periodically revalidate its enrollment.

15

38.     By signing the Texas Provider Agreement, a provider certifies its understanding of and willingness to comply with the terms of the Agreement, as well as its understanding that concealment of a material fact or pertinent omissions may constitute fraud and may be prosecuted under applicable federal and state law. The provider further certifies its understanding and agreement that any falsification, omission, or misrepresentation in connection with the application for enrollment or with claims filed may result in all paid services declared as an overpayment. And the provider certifies and agrees that it has an affirmative duty to refund any overpayments, duplicate payments and erroneous payments that are paid to the provider by Medicaid as soon as such payment is discovered or reasonably should have been known.

39.     The Texas Provider Agreement incorporates by reference the Texas Medicaid Provider Procedures Manual ("Texas Provider Manual") and mandates that providers comply with all requirements of the Provider Manual, as well as all state and federal laws governing or regulating Medicaid. The Texas Provider Manual mandates that providers are responsible for the delivery of healthcare services in accordance with accepted medical community standards.

40.     By signing the Texas Provider Agreement and enrolling in the Texas Medicaid Program, Planned Parenthood certified that it understood and would comply with all the requirements thereof.

### ii.   Louisiana Medicaid Program - Provider Qualifications

41.    According to the Louisiana Department of Health ("LDH"), which oversees the Louisiana Medicaid Program, medical providers who desire to be eligible for Medicaid reimbursements must complete a Louisiana Medicaid Provider Enrollment Packet and enter into a written agreement with the state. Federal Medicaid regulations likewise require such an agreement and mandate that all Louisiana providers must revalidate their enrollment in the Louisiana Medicaid Program every three or five years based on provider type. Thus, Planned Parenthood was required, as a condition of enrollment and participation in the Louisiana Medicaid Program, to enter into a written Louisiana Provider Agreement ("Louisiana Provider Agreement"), and to periodically revalidate its enrollment.

42.    The Louisiana Provider Agreement mandates that providers comply with all federal or state laws, regulations, policies, rules, criteria, or procedures, applicable to the Louisiana Medicaid Program.

43.    By signing the Louisiana Provider Agreement, a provider certifies its understanding of and willingness to comply with the terms of the Agreement and all policies and regulations. The provider further certifies its understanding that payment and satisfaction of all claims submitted to the Louisiana Medicaid Program will be paid and satisfied from federal and state funds, and that any false claims, statements or documents, or concealment of a material fact, may be prosecuted under applicable federal and state laws including the provisions of the federal FCA and any Louisiana laws and rules pertaining to civil or criminal penalties for false claims and

statements. The provider also agrees to report and refund any discovered overpayments within sixty (60) days of discovery.

44.     The Louisiana Medicaid Services Manual ("Louisiana Provider Manual") contains additional information to which all enrolled providers must adhere, and the terms and conditions for a provider to participate in the Louisiana Medicaid Program.

45.     The Louisiana Provider Manual provides that in order to receive reimbursement for healthcare services provided to Medicaid recipients, the provider must be enrolled to participate in the Louisiana Medicaid Program, meet all licensing and/or certification requirements inherent to the healthcare profession, and comply with all other requirements in accordance with all federal and state laws and Louisiana Bureau of Health Services Financing policies. The Louisiana Provider Manual further provides that when enrolled in the Louisiana Medicaid Program, a provider agrees to abide by all applicable state and federal laws and regulations and policies established by the federal Centers for Medicare and Medicaid Services ("CMS") and LDH. It also informs providers that they are responsible for knowing the terms of the Louisiana Provider Agreement, program standards, statutes and penalties for violations.

46.     By signing the Provider Agreement and enrolling in the Louisiana Medicaid Program, Planned Parenthood certified that it understood and would comply with all the requirements thereof.

### B. Federal False Claims Act

47.     The FCA, 31 U.S.C. §§ 3729 *et seq.*, reflects Congress's goal to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), *available at* 1986 U.S.C.C.A.N. 5266. The FCA establishes civil penalties and treble damages liability for an individual or entity that knowingly makes, uses, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). An individual or entity violates this provision of the FCA by making an implied false certification if it submits a claim for payment and knowingly fails to disclose its noncompliance with a statutory, regulatory, or contractual requirement that renders the individual's representations about its services misleading.

48.     The FCA also establishes civil penalties and treble damages liability for an individual or entity that knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G). An "obligation" under the FCA includes the "retention of any overpayment." *Id.* § 3729(b)(3).

49.     Section 6402(a) of the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010), amended the Social Security Act by adding new provisions that address what constitutes an overpayment under the FCA in the context of a federal health care program. Under this section, an overpayment is defined as "any funds that a person receives or retains under Title XVIII or XIX to which the person, after applicable reconciliation, is not entitled." *See*

42 U.S.C. § 1320a-7k(d)(4)(B). In addition, this provision specifies in relevant part that an "overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified." *Id.* § 1320a-7k(d)(2). Failure to return an overpayment within 60 days after the date on which the overpayment was identified constitutes a reverse false claim actionable under the FCA. 31 U.S.C. § 3729(a)(1)(G).

50.    The FCA also imposes liability on an individual or entity who conspires to commit a violation of the FCA. *Id.* § 3729(a)(1)(C).

51.    An individual or entity that violates the FCA is liable for a civil penalty of at least $5,500 and no more than $11,000 for each claim or overpayment, plus damages of three times the amount of each claim or overpayment. *Id.* § 3729(a)(1).

**C. Texas Medicaid Fraud Prevention Act**

52.    The TMFPA establishes a cause of action for false claims in the Texas Medicaid Program. Tex. Hum. Res. Code §§ 36.001 *et seq.* The TMFPA provides that the Texas Attorney General or a private citizen may prosecute cases under the TMFPA in the name of the State of Texas. *Id.* § 36.101.

53.    The TMFPA establishes civil penalties and treble damages liability for an individual or entity that knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized. *Id.* § 36.002(2).

54.    The TMFPA also establishes civil penalties and treble damages liability for an individual or entity that knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact

concerning (A) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, or (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program *Id.* § 36.002(4).

55.     The TMFPA was amended in 2013 to mirror 31 U.S.C. § 3729(a)(1)(G) and establishes civil penalties and treble damages liability for an individual or entity that knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state under the Medicaid program. Tex. Hum. Res. Code § 36.002(12). Failure to return any overpayment within 60 days after the date on which the overpayment was identified constitutes a reverse false claim actionable under the TMFPA. *Id.* The amendments to the TMFPA also impose liability on an individual or entity who conspires to commit a violation of the TMFPA. *Id.* § 36.002(9).

56.     An individual or entity that violates the TMFPA is liable for a civil penalty of at least $5,500 and no more than $11,000 for each claim or overpayment, plus damages of three times the amount of each claim or overpayment. *Id.* § 36.052(3)(B).

**D. Louisiana Medical Assistance Programs Integrity Law**

57.     The Louisiana Medical Assistance Programs Integrity Law ("LMAPIL") establishes a cause of action for false claims in the Louisiana Medicaid Program. La. Rev. Stat. §§ 46:438.1, .3. The LMAPIL provides that the Louisiana Attorney General

or a private citizen may prosecute cases under the LMAPIL in the name of the State of Louisiana. *Id.* §§ 46:438.3, 439.1.

58.    The LMAPIL establishes civil penalties and treble damages liability for an individual or entity that knowingly presents or causes to be presented a false or fraudulent claim. *Id.* §§ 46:438.3(A), 438.6(B).

59.    The LMAPIL establishes civil penalties and treble damages liability for an individual or entity that knowingly conceals, avoids, or decreases an obligation to pay or transmit money or property to the medical assistance programs. *Id.* § 46:438.3(C). Failure to return any overpayment within 60 days after the date on which the overpayment was identified constitutes a reverse false claim actionable under the LMAPIL. *Id.* § 46:438.3(C).

60.    The LMAPIL also imposes liability on an individual or entity who conspires to commit a violation of the LMAPIL. *Id.* § 46:438.3(D).

61.    An individual or entity that violates the LMAPIL is liable for a civil penalty of at least $5,500 and no more than $11,000 for each claim or overpayment, plus damages of three times the amount of each claim or overpayment. *Id.* § 46:438.6.

**E. Planned Parenthood's Fraudulent Claims**

    i.    **Relator's Investigation Uncovers Planned Parenthood's Violations of Federal and State Law and Medical and Ethical Standards.**

62.    Based on information Relator obtained while investigating the issue of fetal tissue research, Relator believed that Planned Parenthood was providing fetal

22

tissue from the abortions they perform to researchers and/or tissue procurement companies.

63.     Upon information and belief, around twenty years ago, some Planned Parenthood abortion clinics began providing fetal tissue to researchers and/or procurement companies, including Planned Parenthood clinics in Kansas, California, and Texas.

64.     From 2013 to 2015, Relator conducted an undercover investigation to determine whether Planned Parenthood's fetal tissue procurement practices were continuing, and if they were legal and/or ethical.

65.     As part of the journalistic investigation, Relator and others attended abortion-related conferences and met with Planned Parenthood officials to discuss fetal tissue procurement. The investigators told Planned Parenthood officials they were representatives of a tissue procurement company modeled after companies that had done business with Planned Parenthood affiliates and sold fetal tissue obtained from Planned Parenthood. During these interactions, the investigators wore hidden cameras to record the candid statements of Planned Parenthood officials regarding these activities. The information described below in ¶¶ 66-78 was uncovered during the investigation.

66.     These conversations revealed that PPFA officials as well as officials at individual PPFA affiliates were eager to obtain fetal tissue for procurement companies, and that PPFA officials expected monetary payments in return.

67.     During one lunch meeting, a PPFA official and abortion doctor joked that she "want[ed] a Lamborghini" when discussing the amount of money the procurement company would pay for each fetal specimen Planned Parenthood obtained. She haggled over the price offered, saying that seemed low and that she "would have to see what others were getting" before agreeing. She also discussed the possibility of modifying second-trimester abortion procedures to be "less crunchy" in order to obtain more intact specimens.

68.     During another lunch meeting with investigators, another PPFA official and abortion doctor discussed modifying second-trimester abortion procedures to obtain more intact specimens in greater detail: "So then you're just kind of cognizant of where you put your graspers, you try to intentionally go above and below the thorax, so that, you know, we've been very good at getting heart, lung, liver, because we know that, so I'm not gonna crush that part, I'm going to basically crush below, I'm gonna crush above, and I'm gonna see if I can get it all intact."

69.     During most second-trimester abortion procedures, the dilation-and-evacuation method is used. That abortion method requires the doctor to use forceps to tear the fetus's body into pieces, which results in the fetus's death. For example, the doctor will reach into the uterus with the forceps and grasp some portion of the fetus—an arm or a leg, for instance. The doctor will then use force to pull the forceps out of the mother. The mother's cervix often creates traction with the rest of the fetus, which results in the limb grasped by the forceps to be torn away from the rest of the

fetus's body. If there is greater dilation of the cervix, that traction is absent, meaning that a pull of the forceps may result in delivery of the whole fetus.

70.     As a result, some doctors use a feticide, most commonly a drug called digoxin, to cause the fetus's death before it is extracted. This helps to ensure that a fetus that may come out intact is not born alive and so that the doctor does not violate the federal Partial-Birth Abortion Ban, which prohibits killing a live fetus that has been delivered past a certain anatomical point. But digoxin compromises fetal tissue, so if the tissue is intended to be used in research, digoxin may not be used. Thus, the more intact a fetus intended to be used in research is when it is extracted from the womb, the greater the chance the fetus is alive when that happens.

71.     Babies born at only 21 weeks' gestation have survived. However, abortion is legal in Texas until 22 weeks' gestation (or 20 weeks post-fertilization). *See* Tex. Health & Safety Code § 171.044.

72.     After meeting officials from PPGC at conferences and discussing the procurement company's interest in obtaining fetal tissue from PPGC's abortions and PPGC's interest in providing it, Relator and other investigators were invited in April 2015 to meet in person with PPGC's Research Director, Melissa Farrell, to discuss the possibility of entering into an agreement to provide fetal tissue from second-trimester abortions.

73.     The investigators recorded their meetings with Farrell and PPGC's abortion clinic Administrator Tram Nguyen.

74.   Farrell told investigators that their abortion doctors had participated in fetal tissue research and collected their own specimens. She identified a particular PPGC abortion doctor who would collect fetal tissue for her own research while performing abortions at PPGC. Farrell stated that the doctor would look at the patient schedule and pick the patients she wanted staff to get to consent to donate fetal tissue based on whether she could use the fetal tissue for her research. This doctor would collect her own specimens during the abortion and take the fetal tissue "home with her in her cooler."

75.   Farrell told investigators that researchers and abortion doctors working at PPGC have targeted specific portions of fetal tissue and that PPGC's doctors are willing to alter abortion procedures to obtain better research specimens. For instance, Farrell stated that PPGC can get "creative" in performing the abortion procedure to obtain more intact liver, thymus, and neural (brain) tissue. She explained that PPGC was willing to explore how it could increase the chances of obtaining intact fetal specimens by altering the abortion procedure and confirmed that when abortion doctors in the past have needed an intact specimen, they can "make it happen." After discussing how changes to the abortion procedure should protect patient safety, Farrell also stated that abortion procedures have been altered in the past when their doctors have been involved in research: "Because some of our doctors in the past have [had] projects, and they're collecting the specimens so they do it in a way that they get the best specimen. So I know it can happen." She also said PPGC can be "flexible to do whatever" in terms of an abortion procedure.

76.   Nguyen also confirmed that PPGC could obtain intact liver, thymus, and neural tissue specimens. She stated, while laughing, that although PPGC doctors must sign a form stating that they did not "intend" to complete the abortion procedure by removing an intact fetus (because of the state and federal laws prohibiting partial-birth abortions), PPGC could nevertheless provide intact fetal specimens. During a conversation regarding what factors contribute to obtaining an intact thymus, Nguyen explained that obtaining intact specimens depends on the amount of cervical dilation PPGC can achieve and the patient's pain tolerance. Nguyen stated that PPGC has done things that other people are "not necessarily comfortable with" in the context of fetal-tissue procurement. Nguyen also explained that these "other things" create more risk. Nevertheless, Nguyen explained PPGC was willing to take this risk because "it is for a good cause."

77.   When asked whether PPGC's doctors were experienced enough to provide intact fetal specimens, both Farrell and Nguyen confirmed that two particular PPGC doctors could alter the procedure to meet researchers' requests. Nguyen stated that these doctors are experienced in this area because they both have research backgrounds and one is actively engaged in research. Farrell also discussed "alter[ing] PPGC's "process" to obtain "intact fetal cadavers" that will provide more than once specimen for research—for example, one fetus providing neural tissue as well as liver and thymus. PPGC officials told Relator that PPGC doctors do not use digoxin in their abortion procedures.

78.     Farrell asserted that even though PPGC is "already set up" to do the fetal-tissue procurement, "we will definitely need to work out, you know, something in terms of covering additional costs for additional . . . things related to it." Farrell explained how she uses a contract's language to make it seem that payments are going only to "administrative costs" rather than a *quid pro quo* payment for fetal specimens, which she admitted is "touchy" under federal law: "I'm very particular about working with the language of the budget and contract to where the language is specific to covering the administrative costs and not necessarily the per specimen. Because that borders on some language in the federal regs, it's a little touchy." Yet Farrell agreed that researchers would not want to pay for unusable fetal specimens, and so PPGC's payment structure could be tied to successfully obtaining the desired fetal tissue while disguising the *quid pro quo*. Farrell discussed how she creates a profit margin in a budget, and how researchers can incentivize PPGC employees to enroll patients to donate fetal tissue through buying meals for the staff as a bonus and listing it under the nebulous category of "meeting cost." Farrell made PPGC's financial interest in its fetal tissue provision clear, despite their nonprofit status, when she replied to the investigator's statement, "I just don't want it to turn into a situation where it's not financially beneficial for you," by explaining, "We definitely want to do that. Because that's what staff and management need to see."

79.     Believing these statements provided evidence of wrongdoing, Relator provided the entire unedited video footage of these meetings to government officials and law enforcement entities, including the Texas Attorney General beginning in

28

June 2015. This footage, with redactions to protect patient privacy, is now available on the Fifth Circuit's website. *See Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 382 n.10 (5th Cir. 2020) (Elrod, J., concurring).

80.    The information about Planned Parenthood's activities uncovered by Relator's investigation prompted investigations by the U.S. House of Representatives, the U.S. Department of Justice, the FBI, and by the State of Texas.

81.    Relator began releasing some of the undercover videos to the public via YouTube on July 14, 2015. Relator posted both summary video reports and the full footage of the conversations with Planned Parenthood officials. On August 4, 2015, Relator posted a summary report and full footage of the conversations with PPGC officials.

82.    Based in part on PPGC's statements in the undercover videos, LDH notified PPGC on September 15, 2015 that PPGC would be excluded from the Louisiana Medicaid program because the State had determined PPGC was not a qualified Medicaid provider. *See* Exhibit A.

83.    PPGC did not challenge this determination in state administrative proceedings. The termination became final under state law on October 15, 2015. *See id.*

84.    Based on PPGC's statements in the undercover videos, the Texas Office of the Inspector General (OIG) sent an initial notice of termination to PPGC, PPGT, and PPST on October 15, 2015. *See* Exhibit B. The letter stated that the video

29

provided evidence that PPGC had violated state and federal law, and PPGC and its affiliates PPGT and PPST were therefore unqualified to provide Medicaid services in Texas.

85.     PPGC, PPGT, and PPST did not challenge this initial determination in state administrative proceedings.

86.     Both Farrell and Nguyen were promoted to executive Vice President positions at PPGC after the release of the videos. Nguyen is still employed at PPGC. Farrell was employed by PPGC until late 2019, when she began working in senior leadership at a nearby clinical research and tissue procurement company. Planned Parenthood has never disclaimed Farrell and Nguyen's statements on the video. And additional information uncovered as a result of Relator's undercover investigation showed that Farrell's statements about PPGC's history with fetal tissue procurement were true.

87.     In 2010 and 2011, PPGC agreed to provide fetal tissue to NIH-funded researchers from the University of Texas Medical Branch ("UTMB"). In exchange for providing the tissue, which PPGC would obtain by getting abortion patients to donate it, UTMB paid Planned Parenthood approximately $21,000.

88.     The doctor named by Farrell as a doctor who would obtain her own tissue samples for her research while performing abortions at PPGC was a researcher involved in the UTMB study.

89.     In 2013, PPGC began negotiating with Baylor College of Medicine to provide second-trimester fetal cadavers for a research study. In particular, the

researcher wanted liver, thymus, CD34+ hematopoietic stem cells, lungs, kidneys, and skin tissue from second-trimester fetuses.

90.    PPGC and Baylor negotiated over the terms of the contract and the financial compensation that would be provided. PPGC backed out of the negotiations after official investigations were prompted by the videos released from Relator's investigation.

91.    After further investigation, including close review of the undercover video, a transcript of the video, information provided in a referral from the U.S. House of Representatives Select Investigative Committee and in their Final Report, and consultation with a medical expert, OIG sent a final notice of termination to PPGC, PPGT, and PPST on December 20, 2016. *See* Exhibit C.

92.    PPGC, PPGT, and PPST never contested the termination in state administrative proceedings. The termination became final under Texas law on January 19, 2017. *See id.*

93.    The notice explained several ways Texas had concluded that PPGC had violated federal and state law and medical and ethical standards and explained that state law permitted the termination of affiliates of entities that had engaged in such wrongdoing, which meant that PPGT and PPST would also be terminated. *See id.*

94.    Some of those regulations forbid researchers from taking "part in any decisions as to the timing, method, or procedures used to terminate [a] pregnancy made solely for the purposes of the research." 42 U.S.C. § 289g-1(c)(4); *see also* 45 C.F.R. § 46.204(i). The undercover video footage obtained by Relator showed that

PPGC has permitted doctors involved in fetal-tissue research to perform abortions to secure that fetal tissue. *See* ¶ 74; Exhibit C.

95.    Other regulations expressly forbid the alteration of the timing or method of an abortion for research purposes. *See* 42 U.S.C. § 289g-1(b)(2)(A)(ii). Many statements in the video indicate that PPGC doctors had done this. For example, Farrell stated that researchers connected to PPGC have targeted specific fetal tissue in the past and that PPGC is willing to alter the abortion procedures to meet the needs of those researchers. *See* ¶¶ 75-77; Exhibit C.

96.    Still other regulations also prohibit the receipt of valuable consideration in exchange for fetal tissue. *See* 42 U.S.C. § 289g-2(a); Tex. Penal Code § 48.03(b). Farrell's discussion of the financial arrangements that would need to be made for PPGC to provide the fetal tissue to the procurement company and discussion of what she has done in the past indicates that PPGC has and will accept compensation above reimbursement for costs in providing fetal tissue, and that PPGC transfers fetal tissue in exchange for valuable consideration as a *quid pro quo* disconnected from any legally reimbursable costs. *See* ¶ 78; Exhibit C.

97.    Other laws and regulations prohibit misrepresentations to law-enforcement officials. *See, e.g.*, Tex. Penal Code § 37.08; 1 Tex. Admin. Code §§ 371.1603(g)(5), 371.1661(8); 42 U.S.C. § 1320a-7(b)(16). The OIG received evidence from the U.S. House of Representatives Select Investigative Panel which documented a visit by the Texas Ranger Division of the Texas Department of Public Safety and discussions relating to PPGC's transactions with a researcher who was interested in

obtaining fetal tissue. The U.S. House Panel's evidence shows that PPGC, at that time, had been informed that the BCM's Independent Review Board had approved the researcher's fetal-tissue research proposal, but PPGC's General Counsel told the Texas Rangers that approval had not yet been obtained. *See* Exhibit C.

98.     As a condition of participating as a Medicaid provider in the Texas Medicaid program, Planned Parenthood agreed to comply with the requirements in Title 1, Part 15, Chapter 371 of the Texas Administrative Code, the Texas Medicaid Provider Procedures Manual, and all state and federal laws governing or regulating Medicaid. As a condition of participation as a Texas Medicaid provider, Planned Parenthood also agreed that failing to comply with any applicable law, rule, or policy of the Medicaid program, or permitting circumstances that potentially threaten the health or safety of patients would be grounds for disqualification.

99.     The findings outlined in the Texas termination letter and reflected in the undercover video obtained by Relator, and which were never contested by Planned Parenthood in state administrative proceedings related to the termination, are sufficient to implicate Planned Parenthood's provision of Medicaid services in a safe, competent, legal, and ethical manner. *See Kauffman*, 981 F.3d at 379-81 (Elrod, J., joined by Jones, Smith, Willett, Ho, Duncan, and Engelhardt, JJ., concurring); *see also id.*at 386 (agreeing as to PPGC) (Higginson, J., joined by Stewart and Costa, JJ., concurring in part). That is a condition of remaining eligible to participate in the Medicaid program.

100. Further information uncovered in, or as a result of, Relator's investigation shows that PPFA directed and participated in its affiliates' wrongdoing.

101. As Farrell stated in the video, PPFA policies, including those on research programs and fetal tissue donation, apply to all affiliates. PPFA approves all affiliate research programs and research contracts. PPFA also sets the medical standards and guidelines each affiliate is required to comply with. PPFA also requires all affiliates to perform abortions.

102. PPFA has made false statements to government investigators regarding Planned Parenthood's participation in fetal tissue harvesting. During the Senate Judiciary Committee's investigation, PPFA stated that only four of its affiliates—all in California—had engaged in fetal-tissue donation between 2010 and 2015 and received funds in exchange. But PPGC participated in the UTMB study and received approximately $21,000 in payments.

103. PPFA's written policies and forms show that it violated the ethical principle of informed consent in its affiliates' fetal tissue procurement activities. PPFA policies told doctors that they must attest that no "substantive" alterations to abortion procedures may be made to obtain fetal-tissue samples. *Cf.* 42 U.S.C. § 289g-1(b)(2)(A)(ii) ("no alteration"). But the patient consent form states that "*no changes will be made to the abortion procedure.*" In addition, PPFA's mandated fetal tissue donation consent form tells patients that fetal tissue has been used to cure illnesses like AIDS, cancer, and Parkinson's disease. But Planned Parenthood admitted under oath that these claims are misleading.

104.   PPFA continues to falsely claim Relator's undercover videos are misleading, deceptive, and/or heavily edited, despite having never offered any evidence showing that to be the case. Upon information and belief, PPFA has instructed its affiliates to do so as well.

ii.   **Planned Parenthood failed to disclose noncompliance with Medicaid Provider Qualification Requirements**

105.   As set forth above, PPGC began violating federal and state law in at least 2010-2011, when PPGC began provided fetal tissue to UTMB. During that time, PPGC permitted a researcher to perform abortions to harvest fetal tissue for her own research, failed to disclose the abortion provider's interest in the tissue to patients, used PPFA's inadequate and misleading patient consent form to induce women to donate fetal tissue, and transferred the fetal tissue to UTMB for valuable consideration. PPGC never disclosed these violations of law to HHS, HHSC, nor LDH, yet PPGC continued to certify it was in compliance with all state and federal laws and regulations every time it submitted a Medicaid claim for reimbursement, and each year it re-enrolled as a Medicaid provider.

106.   As of September 2015, PPGC was aware that Louisiana had determined that it was not qualified and would be terminated from the Louisiana Medicaid program because of the evidence obtained by Relator. PPGC did not challenge that termination in state administrative procedures, and it became final on October 15, 2015. Yet PPGC continued to submit Medicaid claims for reimbursement, and continued to certify that it was in compliance with all state and federal laws and

regulations every time they submitted Medicaid claims for reimbursement and each time they re-enrolled as a Medicaid provider, despite their disqualification.

107.   As of October 2015, PPGC, PPGT, and PPST were aware that Texas had initially determined they were not qualified and would be terminated from the Texas Medicaid program because of the evidence obtained by Relator. PPGC, PPGT, and PPST did not challenge this initial decision, yet continued to certify that they were in compliance with all state and federal laws and regulations every time they submitted Medicaid claims for reimbursement, and each time they re-enrolled as a Medicaid provider.

108.   As of December 2016, PPGC, PPGT, and PPST were aware that they had been terminated from the Texas Medicaid program. PPGC, PPGT, and PPST did not challenge that termination in state administrative procedures, and it became final on January 19, 2017. Yet PPGC, PPGT, and PPST continued to submit Medicaid claims for reimbursement, and continued to certify that they were in compliance with all state and federal laws and regulations every time they submitted Medicaid claims for reimbursement and each time they re-enrolled as a Medicaid provider, despite their disqualification.

### iii.    Planned Parenthood failed to report or repay overpayments

109.   Federal courts in Texas and Louisiana entered temporary restraining orders followed by preliminary injunctions which required Texas and Louisiana to retain PPGC, PPGT, and PPST as Medicaid providers pending final resolution of Planned Parenthood's federal lawsuits against Texas and Louisiana, despite their

final disqualification under state law. The Fifth Circuit vacated the preliminary injunction in the Texas case on November 23, 2020.

110. All monies received by PPGC, PPGT, and PPST under the injunctions are overpayments because PPGC, PPGT, and PPST were not qualified providers and were thus not entitled to the money. The Medicaid statutes and regulations require providers to report and pay to the government any overpayments.

111. Relator learned that Planned Parenthood did not report or return any of these funds to the United States or the Plaintiff States after it became aware, or should have become aware, it had an obligation to do so within the statutorily required time period. Specifically, Planned Parenthood did not report or repay the money it had received while it was disqualified within 60 days of November 23, 2020, the date it became aware, or should have become aware, of the overpayments.

112. Upon information and belief, Planned Parenthood still has not reported the overpayment, nor repaid any of these funds.

## CAUSES OF ACTION

### Count I: Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

113. The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

114. The False Claims Act imposes liability upon any person who knowingly presents or causes to be presented false claims for payment or approval to the United States government. 31 U.S.C. § 3729(a)(1)(A). When such false claims are discovered by private citizens, the False Claims Act allows those citizens to bring an action on

behalf of the United States against the perpetrators. 31 U.S.C. § 3730(b)(1). Relator

brings this action pursuant to 31 U.S.C. § 3730(b)(1) and has provided a Disclosure

Statement to the United States in compliance with § 3730(b)(2).

115.    Through their conduct, the Planned Parenthood Defendants knowingly

submitted, or caused to be submitted, false claims for payment, as set forth above, in

violation of 31 U.S.C. § 3729(a)(1)(A). By submitting Medicaid claims for payment for

women's health services, the Planned Parenthood Defendants represented that they

had complied with core state and federal Medicaid requirements, specifically (1) that

the Planned Parenthood Defendants were "qualified" under state and federal law to

provide medical services in a safe, legal, and ethical manner, and (2) that the Planned

Parenthood Defendants had not violated any medical or ethical standards or state or

federal laws in its provision of medical services. By submitting Medicaid claims that

conveyed this information without disclosing their violations of medical and ethical

standards and state and federal laws, the Planned Parenthood Defendants' claims

constituted misrepresentations.

116.    These undisclosed violations were material to the Plaintiff States'

decisions to pay the Planned Parenthood Defendants' Medicaid claims. The Planned

Parenthood Defendants knew or reasonably should have known that the Plaintiff

States would deny their Medicaid claims and terminate their enrollment in the

Medicaid program if they disclosed the violations. When Relator provided information

to the United States and the Plaintiff States disclosing the Planned Parenthood

Defendants' violations of medical and ethical standards and state and federal laws,

the Plaintiff States determined that the Planned Parenthood Defendants were not qualified to provide Medicaid services and terminated their enrollment in the Medicaid program.

117.    By reason of the Planned Parenthood Defendants' actions, the United States, the State of Texas, and the State of Louisiana have incurred and continue to incur damages.

## Count II: Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

118.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

119.    The False Claims Act imposes liability upon any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G). When such false claims are discovered by private citizens, the False Claims Act allows those citizens to bring an action on behalf of the United States against the perpetrators. 31 U.S.C. § 3730(b)(1). Relator brings this action pursuant to 31 U.S.C. § 3730(b)(1) and has provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).

120.    Through their conduct, the Planned Parenthood Defendants have received and retained millions of dollars of Medicaid overpayments to which Planned Parenthood is not entitled because their terminations became final on October 15,

39

2015 in Louisiana, and January 19, 2017 in Texas. Planned Parenthood waived administrative review of the termination decisions and failed otherwise contest the States' decisions in administrative proceedings. Thus, once the Fifth Circuit issued its November 23, 2020 opinion vacating the preliminary injunction requiring Texas to keep Planned Parenthood in its Medicaid program and overruling the decision upholding the preliminary injunction requiring Louisiana to keep Planned Parenthood in its Medicaid program, Planned Parenthood determined or should have determined that it improperly received Medicaid overpayments. Planned Parenthood has knowingly and improperly avoided its obligation to return the overpayments to the United States, the State of Texas, the State of Louisiana.

121.   By reason of the Planned Parenthood Defendants' actions, the United States, the State of Texas, and the State of Louisiana have incurred and continue to incur damages.

### Count III: Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code § 36.001 *et. seq.*

122.   The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

123.   The Texas Medicaid Fraud Prevention Act imposes liability upon an individual or entity who: (1) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized; (2) knowingly makes, causes to be made, induces, or seek to induce the making of a false statement or misrepresentation of material fact concerning (a) the conditions or operation of a facility in order that the facility may qualify for

40

certification or recertification required by the Medicaid program, or (b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program; and/or (3) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state under the Medicaid program. Tex. Hum. Res. Code §§ 36.002(2), (4), (12).

124.    Relator brings this action in accordance with the civil action *qui tam* provision in Tex. Hum. Res. Code §§ 36.101 and .102 and has complied with all requirements therein.

125.    Through their conduct, the Planned Parenthood Defendants have knowingly concealed or failed to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized, as set forth above, in violation of Tex. Hum. Res. Code § 36.002(2).

126.    Through their conduct, the Planned Parenthood Defendants have knowingly made, caused to be made, induced, or sought to induce the making of a false statement or misrepresentation of material fact concerning (a) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, or (b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program, as set forth above, in violation of Tex. Hum. Res. Code § 36.002(4).

41

127.   Through their conduct, the Planned Parenthood Defendants have knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the state under the Medicaid program, as set forth above, in violation of Texas Human Resources Code § 36.002(12).

128.   By reason of the Planned Parenthood Defendants' actions, the State of Texas has incurred and continues to incur damages.

### Count IV: Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. § 46:437.1 *et. seq.*

129.   The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

130.   The Louisiana Medical Assistance Programs Integrity Law imposes liability for an individual or entity who: (1) knowingly presents or causes to be presented a false or fraudulent claim; and/or (2) knowingly conceals, avoids, or decreases an obligation to pay or transmit money or property to the medical assistance programs. La. Rev. Stat. § 46:438.3(A), (C).

131.   Relators bring this action in accordance with the civil action *qui tam* provision in La. Rev. Stat. §§ 46:439.1-.2 and have complied with all requirements therein.

132.   Through their conduct, the Planned Parenthood Defendants have knowingly presented, or caused to be presented, false or fraudulent claims to the State of Louisiana, as set forth above, in violation of La. Rev. Stat. § 46:438.3(A).

133.   Through their conduct, the Planned Parenthood Defendants have knowingly concealed, avoided, or decreased an obligation to pay or transmit money

or property to the medical assistance programs, as set forth above, in violation of Louisiana Revised Statute § 46:438.3(C).

134.   By reason of the Planned Parenthood Defendants' actions, the State of Louisiana has incurred and continues to incur damages.

## Count V: Conspiracy to Commit Health Care Fraud
### 18 U.S.C. § 1347, Tex. Hum. Res. Code § 36.002(9), La. Rev. Stat. § 46.438.3(D)

135.   The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

136.   A person engages in conspiracy to commit health care fraud if (1) two or more persons made an agreement to commit health care fraud; (2) the person knew the unlawful purpose of the agreement; and (3) the person joined in the agreement willingly, with the intent to further the unlawful purpose.

137.   PPFA, PPGT, PPST, and PPGC, through its agents, employees, and subsidiaries, knowingly and willingly agreed that PPGT, PPST, and PPGC would engage in the fraudulent acts described above and continue submitting claims for reimbursement by Texas Medicaid, and that PPGC would continue submitting claims for reimbursement by Louisiana Medicaid, despite committing acts that materially disqualified them from receiving Medicaid funds.

138.   PPFA, PPGT, PPST, and PPGC, through its agents, employees, and subsidiaries, knowingly and willingly agreed that PPGT, PPST, and PPGC would retain overpayments received despite their termination from the Texas and Louisiana Medicaid programs, and despite their statutory obligation to return overpayments.

43

## PRAYER FOR RELIEF

WHEREFORE, Relator prays that this Court enter judgment against the Defendants as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States as a result of the unlawful acts of Defendants complained of herein, as provided by the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*;

(b) That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented or caused to be presented to the United States;

(c) That the State of Texas be awarded damages in the amount of each payment provided to Defendants under the Medicaid program as a result of the unlawful acts complained of herein, plus two times the damages sustained by the State of Texas as a result of such unlawful acts, as provided by the TMFPA, Tex. Hum. Res. Code §§ 32.001 *et seq.*, and 36.052(a) and (b);

(d) That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented or caused to be presented to the State of Texas;

(e) That the State of Louisiana be awarded damages in the amount of each payment provided to Defendants under the Medicaid program as a result of the unlawful acts complained of herein, plus two times the damages sustained by the State of Louisiana as a result of such unlawful acts, as provided by the LMAPIL, La. Rev. Stat. §§ 46:438.3, *et seq.*;

(f) That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented or caused to be presented to the State of Louisiana;

(g) That pre- and post-judgment interest be awarded along with reasonable attorney fees, costs, and expenses incurred by Relator in bringing and prosecuting this case;

(h) That the Court grant permanent injunctive relief to prevent any recurrence of the federal and state false claims and Medicaid fraud violations for which redress is sought in this Complaint;

(i) That Relator Alex Doe be awarded the maximum amount allowed pursuant to the federal False Claims Act, the Texas Medicaid Fraud Prevention Act, and the Louisiana Medical Assistance Programs Integrity Law; and

(j) That this Court award such other and further relief as it deems equitable, just, and proper.

Respectfully submitted this 5th day of February, 2021.

/s/ Andrew B. Stephens
ANDREW B. STEPHENS*
Texas Bar No. 24079396
andrew@hackerstephens.com

HEATHER GEBELIN HACKER**
Texas Bar No. 24103325
heather@hackerstephens.com

HACKER STEPHENS LLP
108 Wild Basin Rd. South, Suite 250
Austin, Texas 78746
(512) 399-3022 (phone)

Attorneys for Relator Alex Doe

*Leave requested to proceed without local
counsel

**Application for admission to the Northern
District of Texas pending

# EXHIBIT

# A



Bobby Jindal
GOVERNOR

Kathy H. Kliebert
SECRETARY

### State of Louisiana
### Department of Health and Hospitals
Office of the Secretary

September 15, 2015

Planned Parenthood
ATTN:Melaney Linton
4018 Magazine Street
New Orleans, LA 70115

**Certified Mail, Return Receipt Requested (7012 2210 0001 6260 0080)**

Re:     Termination / Revocation of Louisiana Medicaid Provider Agreement
        Provider Number 91338

Dear Mrs. Linton:

Based on the initial findings of Louisiana's investigation into Planned Parenthood Gulf Coast (PPGC), you are hereby notified that the Department of Health and Hospitals (DHH) is hereby terminating / revoking the PPGC provider agreement referenced above. This action is being taken pursuant to La. R.S. 46:437.11 and 46:437.14. This action will take effect following final determination, judgment, completion, withdrawal from, or termination of all administrative and/or legal proceedings in this matter. Such proceedings include, but are not limited to, informal hearings, administrative appeals, appeals for judicial review, appellate judgments, and/or denials of writ applications.

Specifically, it is clear that PPGC entered into a Federal False Claims Act settlement signed on July 25, 2013, by Melaney A. Linton, President and CEO of PPGC agreeing to pay $4,300,000 to the United States who "contend[ed] that PPGC submitted false claims." Settlement Agreement, *Reynolds v. Planned Parenthood Gulf Coast*, No. 9:09-cv-124 (E.D. TX, Lufkin Div.)(July 25, 2013). In accordance with the Louisiana Administrative Code, Title 50, this is a violation. Further, under that same administrative code, PPGC had an affirmative duty to inform BHSF in writing of this violation. Since DHH, through BHSF, was not informed within ten (10) working days of when the provider knew or should have known of the violation, this constitutes a separate violation. Also under consideration in our departmental proceedings are provider audits and federal false claims cases against Planned Parenthood of America (PPFA) affiliates. Included among these are pending federal false claims cases against PPGC, one in which the presiding judge found that the information already provided "allows the court to draw the reasonable inference that Planned Parenthood knowingly filed false claims." Memorandum Opinion and Order at 17, *Carroll v. Planned Parenthood Gulf Coast*, 4:12-cv-03505 (S.D. TX, Houston Div.) (May 14, 2014). Providers and providers-in-fact are required to ensure that all their agents and affiliates are in compliance with all federal and state laws as well as rules, policies and procedures of the Medicaid program. PPGC and its parent organization PPFA has failed to do so and has failed to notify DHH of violations and misconduct by affiliates and providers-in-fact. These are also violations of La. Admin. Code, Title 50.

15-30987.357

Further, in regard to the Center for Medical Progress (CMP) videos, DHH reviewed responses received from PPGC via letters dated July 24, 2015, and August 14, 2015, from Melaney Linton in response to DHH letters dated July 15, 2015, and August 4, 2015.  After said review, DHH believes that PPGC misrepresented its actions therein and had contradictions within the body of the letter and with the statements and admissions made in the CMP videos, including but not limited to the video released on August 4, 2015 and taped in April of this year, containing conversations with PPGC senior management, including the PPGC director of research and PPCFC facility director.

According to La. R.S. 46:437.11(D)(2), the Secretary may terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding.  The Department determines that PPGC currently fits within this statute due to the investigations of PPGC by both DHH and the Louisiana Office of Inspector General. DHH expressly reserves the right to amend this notice and to terminate your provider agreement immediately and without written notice based on the further findings of the pending investigations by any department of Louisiana, any other State or state agency, or the pending investigations in the congressional committees.  DHH has elected to provide PPGC with full due process rights as mentioned above and will not pursue immediate termination pursuant to this notice.

According to 46:437.14(A)(1), DHH may deny or revoke enrollment in the Medicaid program in cases of misrepresentation.  As alleged above, DHH believes PPGC's responses to inquiries, when compared to clear representations in various videos, rises to the level of misrepresentation. Further, according to La. R.S. 46:437.14(A)(10) and (12), DHH may move to revoke enrollment if a provider is found in violation of licensing or certification conditions or professional standards relating to the licensure or certification of health care providers or the required quality of goods, services, or supplies provided.  Also, a provider agreement can be revoked for failure to meet any condition of enrollment.  As a Medicaid provider, PPGC is charged with maintaining compliance with all state statutes, rules and regulations, including the Louisiana Administrative Code mentioned above.  PPGC's actions mentioned above are clear violations of applicable administrative code provisions and are clear violations of the statutes mentioned.  Based on the conduct described, the above provider number is hereby being terminated / revoked.

You are entitled to an administrative review of this action and it is suspensive if you avail yourself of same.  Initially, you should request an Informal Hearing at which you are entitled to both present information in writing or orally, present documents, and to further inquire as to the reasons for our determination.  You must make your request for an Informal Hearing in writing and within fifteen (15) calendar days (including Saturdays and Sundays) of receipt of this notice. Your written request should be sent to:

Louisiana DHH, Office of Secretary<br>
P.O. Box 3836<br>
Baton Rouge, Louisiana 70821

You may be represented by an attorney or authorized representative at the Informal Hearing. Your attorney or authorized representative must file a written notice of representation identifying himself by name, address, and telephone number at the address given above.

Following the Informal Hearing you will receive a written Notice of the Results of the Informal Hearing from which you are entitled to seek an appeal before the Division of Administrative Law. This hearing will also be suspensive in nature. Your request for Administrative Appeal must be in writing and set out the reasons for which you are seeking an appeal and the basis upon which you disagree with the results of the Informal Hearing. All requests for an Administrative Appeal must be received within thirty (30) calendar days (including Saturdays and Sundays) of the receipt of this notice. Request for Administrative Appeal must be sent to the address given below.

Division of Administrative Law – HH Section
P.O. Box 4189
Baton Rouge, Louisiana  70821-4189
Phone (225) 342-0443
Fax (225) 219-9823

You may be represented by an attorney or authorized representative at the Administrative Appeal. Your attorney or authorized representative must file a written notice of representation identifying himself by name, address, and telephone number at the address above.

You may choose to forego the Informal Hearing and instead request an Administrative Appeal of this action. If you choose this alternative, please follow the procedure described above for scheduling an Administrative Appeal.

If you do not request an Informal Hearing or an Administrative Appeal, your termination will become effective thirty (30) days (including Saturdays and Sundays) from the date of your receipt of this letter.

If you have any questions regarding this correspondence, you may contact Stephen R. Russo, Executive Counsel, at (225) 342-1115.

Sincerely,

*Kathy Kliebert*

Kathy Kliebert, Secretary
Louisiana Department of Health and Hospitals

Cc: Planned Parenthood Gulf Coast

15-30987-359



Bobby Jindal
GOVERNOR

Kathy H. Kliebert
SECRETARY

### State of Louisiana
Department of Health and Hospitals
Office of the Secretary

September 15, 2015

Planned Parenthood
ATTN: Melaney Linton
3955 Government Street, Suite 2
Baton Rouge, Louisiana 70806

**Certified Mail, Return Receipt Requested (7012 2210 0001 6260 0097)**

Re:    Termination / Revocation of Louisiana Medicaid Provider Agreement
Provider Number 133689

Dear Mrs. Linton:

Based on the initial findings of Louisiana's investigation into Planned Parenthood Gulf Coast (PPGC), you are hereby notified that the Department of Health and Hospitals (DHH) is hereby terminating / revoking the PPGC provider agreement referenced above. This action is being taken pursuant to La. R.S. 46:437.11 and 46:437.14. This action will take effect following final determination, judgment, completion, withdrawal from, or termination of all administrative and/or legal proceedings in this matter. Such proceedings include, but are not limited to, informal hearings, administrative appeals, appeals for judicial review, appellate judgments, and/or denials of writ applications.

Specifically, it is clear that PPGC entered into a Federal False Claims Act settlement signed on July 25, 2013, by Melaney A. Linton, President and CEO of PPGC agreeing to pay $4,300,000 to the United States who "contend[ed] that PPGC submitted false claims." Settlement Agreement, *Reynolds v. Planned Parenthood Gulf Coast*, No. 9:09-cv-124 (E.D. TX, Lufkin Div.)(July 25, 2013). In accordance with the Louisiana Administrative Code, Title 50, this is a violation. Further, under that same administrative code, PPGC had an affirmative duty to inform BHSF in writing of this violation. Since DHH, through BHSF, was not informed within ten (10) working days of when the provider knew or should have known of the violation, this constitutes a separate violation. Also under consideration in our departmental proceedings are provider audits and federal false claims cases against Planned Parenthood of America (PPFA) affiliates. Included among these are pending federal false claims cases against PPGC, one in which the presiding judge found that the information already provided "allows the court to draw the reasonable inference that Planned Parenthood knowingly filed false claims." Memorandum Opinion and Order at 17, *Carroll v. Planned Parenthood Gulf Coast*, 4:12-cv-03505 (S.D. TX, Houston Div.) (May 14, 2014). Providers and providers-in-fact are required to ensure that all their agents and affiliates are in compliance with all federal and state laws as well as rules, policies and procedures of the Medicaid program. PPGC and its parent organization PPFA has failed to do so and has failed to notify DHH of violations and misconduct by affiliates and providers-in-fact. These are also violations of La. Admin. Code, Title 50.

Bienville Building • 628 N. 4th Street • P.O. Box 629 • Baton Rouge, Louisiana 70821-0629
Phone #: 225/342-9509 • Fax #: 225/342-5568 • WWW.DHH.LA.GOV
"An Equal Opportunity Employer"

Further, in regard to the Center for Medical Progress (CMP) videos, DHH reviewed responses received from PPGC via letters dated July 24, 2015, and August 14, 2015, from Melaney Linton in response to DHH letters dated July 15, 2015, and August 4, 2015. After said review, DHH believes that PPGC misrepresented its actions therein and had contradictions within the body of the letter and with the statements and admissions made in the CMP videos, including but not limited to the video released on August 4, 2015 and taped in April of this year, containing conversations with PPGC senior management, including the PPGC director of research and PPCFC facility director.

According to La. R.S. 46:437.11(D)(2), the Secretary may terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding. The Department determines that PPGC currently fits within this statute due to the investigations of PPGC by both DHH and the Louisiana Office of Inspector General. DHH expressly reserves the right to amend this notice and to terminate your provider agreement immediately and without written notice based on the further findings of the pending investigations by any department of Louisiana, any other State or state agency, or the pending investigations in the congressional committees. DHH has elected to provide PPGC with full due process rights as mentioned above and will not pursue immediate termination pursuant to this notice.

According to 46:437.14(A)(1), DHH may deny or revoke enrollment in the Medicaid program in cases of misrepresentation. As alleged above, DHH believes PPGC's responses to inquiries, when compared to clear representations in various videos, rises to the level of misrepresentation. Further, according to La. R.S. 46:437.14(A)(10) and (12), DHH may move to revoke enrollment if a provider is found in violation of licensing or certification conditions or professional standards relating to the licensure or certification of health care providers or the required quality of goods, services, or supplies provided. Also, a provider agreement can be revoked for failure to meet any condition of enrollment. As a Medicaid provider, PPGC is charged with maintaining compliance with all state statutes, rules and regulations, including the Louisiana Administrative Code mentioned above. PPGC's actions mentioned above are clear violations of applicable administrative code provisions and are clear violations of the statutes mentioned. Based on the conduct described, the above provider number is hereby being terminated / revoked.

You are entitled to an administrative review of this action and it is suspensive if you avail yourself of same. Initially, you should request an Informal Hearing at which you are entitled to both present information in writing or orally, present documents, and to further inquire as to the reasons for our determination. You must make your request for an Informal Hearing in writing and within fifteen (15) calendar days (including Saturdays and Sundays) of receipt of this notice. Your written request should be sent to:

Louisiana DHH, Office of Secretary
P.O. Box 3836
Baton Rouge, Louisiana 70821

You may be represented by an attorney or authorized representative at the Informal Hearing. Your attorney or authorized representative must file a written notice of representation identifying himself by name, address, and telephone number at the address given above.

Following the Informal Hearing you will receive a written Notice of the Results of the Informal Hearing from which you are entitled to seek an appeal before the Division of Administrative Law. This hearing will also be suspensive in nature. Your request for Administrative Appeal must be in writing and set out the reasons for which you are seeking an appeal and the basis upon which you disagree with the results of the Informal Hearing. All requests for an Administrative Appeal must be received within thirty (30) calendar days (including Saturdays and Sundays) of the receipt of this notice. Request for Administrative Appeal must be sent to the address given below.

Division of Administrative Law – HH Section
P.O. Box 4189
Baton Rouge, Louisiana 70821-4189
Phone (225) 342-0443
Fax (225) 219-9823

You may be represented by an attorney or authorized representative at the Administrative Appeal. Your attorney or authorized representative must file a written notice of representation identifying himself by name, address, and telephone number at the address above.

You may choose to forego the Informal Hearing and instead request an Administrative Appeal of this action. If you choose this alternative, please follow the procedure described above for scheduling an Administrative Appeal.

If you do not request an Informal Hearing or an Administrative Appeal, your termination will become effective thirty (30) days (including Saturdays and Sundays) from the date of your receipt of this letter.

If you have any questions regarding this correspondence, you may contact Stephen R. Russo, Executive Counsel, at (225) 342-1115.

Sincerely,

Kathy Kliebert, Secretary
Louisiana Department of Health and Hospitals

Cc: Planned Parenthood Gulf Coast



Bobby Jindal
GOVERNOR

Kathy H. Kliebert
SECRETARY

### State of Louisiana
Department of Health and Hospitals
Office of the Secretary

September 15, 2015

Planned Parenthood
ATTN: Melaney Linton
4600 Gulf Hwy.
Houston, TX 77023

**Certified Mail, Return Receipt Requested (7012 2210 0001 6260 0073)**

Re:     Termination / Revocation of Louisiana Medicaid Provider Agreement
        Provider Number 45802

Dear Mrs. Linton:

Based on the initial findings of Louisiana's investigation into Planned Parenthood Gulf Coast
(PPGC), you are hereby notified that the Department of Health and Hospitals (DHH) is hereby
terminating / revoking the PPGC provider agreement referenced above. This action is being
taken pursuant to La. R.S. 46:437.11 and 46:437.14. This action will take effect following final
determination, judgment, completion, withdrawal from, or termination of all administrative
and/or legal proceedings in this matter. Such proceedings include, but are not limited to,
informal hearings, administrative appeals, appeals for judicial review, appellate judgments,
and/or denials of writ applications.

Specifically, it is clear that PPGC entered into a Federal False Claims Act settlement signed on
July 25, 2013, by Melaney A. Linton, President and CEO of PPGC agreeing to pay $4,300,000 to
the United States who "contend[ed] that PPGC submitted false claims." Settlement Agreement,
*Reynolds v. Planned Parenthood Gulf Coast*, No. 9:09-cv-124 (E.D. TX, Lufkin Div.)(July 25,
2013). In accordance with the Louisiana Administrative Code, Title 50, this is a violation.
Further, under that same administrative code, PPGC had an affirmative duty to inform BHSF in
writing of this violation. Since DHH, through BHSF, was not informed within ten (10) working
days of when the provider knew or should have known of the violation, this constitutes a
separate violation. Also under consideration in our departmental proceedings are provider audits
and federal false claims cases against Planned Parenthood of America (PPFA) affiliates.
Included among these are pending federal false claims cases against PPGC, one in which the
presiding judge found that the information already provided "allows the court to draw the
reasonable inference that Planned Parenthood knowingly filed false claims." Memorandum
Opinion and Order at 17, *Carroll v. Planned Parenthood Gulf Coast*, 4:12-cv-03505 (S.D. TX,
Houston Div.) (May 14, 2014). Providers and providers-in-fact are required to ensure that all
their agents and affiliates are in compliance with all federal and state laws as well as rules,
policies and procedures of the Medicaid program. PPGC and its parent organization PPFA has
failed to do so and has failed to notify DHH of violations and misconduct by affiliates and
providers-in-fact. These are also violations of La. Admin. Code, Title 50.

15-31087.363

Further, in regard to the Center for Medical Progress (CMP) videos, DHH reviewed responses received from PPGC via letters dated July 24, 2015, and August 14, 2015, from Melaney Linton in response to DHH letters dated July 15, 2015, and August 4, 2015. After said review, DHH believes that PPGC misrepresented its actions therein and had contradictions within the body of the letter and with the statements and admissions made in the CMP videos, including but not limited to the video released on August 4, 2015 and taped in April of this year, containing conversations with PPGC senior management, including the PPGC director of research and PPCFC facility director.

According to La. R.S. 46:437.11(D)(2), the Secretary may terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding. The Department determines that PPGC currently fits within this statute due to the investigations of PPGC by both DHH and the Louisiana Office of Inspector General. DHH expressly reserves the right to amend this notice and to terminate your provider agreement immediately and without written notice based on the further findings of the pending investigations by any department of Louisiana, any other State or state agency, or the pending investigations in the congressional committees. DHH has elected to provide PPGC with full due process rights as mentioned above and will not pursue immediate termination pursuant to this notice.

According to 46:437.14(A)(1), DHH may deny or revoke enrollment in the Medicaid program in cases of misrepresentation. As alleged above, DHH believes PPGC's responses to inquiries, when compared to clear representations in various videos, rises to the level of misrepresentation. Further, according to La. R.S. 46:437.14(A)(10) and (12), DHH may move to revoke enrollment if a provider is found in violation of licensing or certification conditions or professional standards relating to the licensure or certification of health care providers or the required quality of goods, services, or supplies provided. Also, a provider agreement can be revoked for failure to meet any condition of enrollment. As a Medicaid provider, PPGC is charged with maintaining compliance with all state statutes, rules and regulations, including the Louisiana Administrative Code mentioned above. PPGC's actions mentioned above are clear violations of applicable administrative code provisions and are clear violations of the statutes mentioned. Based on the conduct described, the above provider number is hereby being terminated / revoked.

You are entitled to an administrative review of this action and it is suspensive if you avail yourself of same. Initially, you should request an Informal Hearing at which you are entitled to both present information in writing or orally, present documents, and to further inquire as to the reasons for our determination. You must make your request for an Informal Hearing in writing and within fifteen (15) calendar days (including Saturdays and Sundays) of receipt of this notice. Your written request should be sent to:

Louisiana DHH, Office of Secretary
P.O. Box 3836
Baton Rouge, Louisiana 70821

You may be represented by an attorney or authorized representative at the Informal Hearing. Your attorney or authorized representative must file a written notice of representation identifying himself by name, address, and telephone number at the address given above.

Following the Informal Hearing you will receive a written Notice of the Results of the Informal Hearing from which you are entitled to seek an appeal before the Division of Administrative Law. This hearing will also be suspensive in nature. Your request for Administrative Appeal must be in writing and set out the reasons for which you are seeking an appeal and the basis upon which you disagree with the results of the Informal Hearing. All requests for an Administrative Appeal must be received within thirty (30) calendar days (including Saturdays and Sundays) of the receipt of this notice. Request for Administrative Appeal must be sent to the address given below.

Division of Administrative Law – HH Section
P.O. Box 4189
Baton Rouge, Louisiana  70821-4189
Phone (225) 342-0443
Fax (225) 219-9823

You may be represented by an attorney or authorized representative at the Administrative Appeal. Your attorney or authorized representative must file a written notice of representation identifying himself by name, address, and telephone number at the address above.

You may choose to forego the Informal Hearing and instead request an Administrative Appeal of this action. If you choose this alternative, please follow the procedure described above for scheduling an Administrative Appeal.

If you do not request an Informal Hearing or an Administrative Appeal, your termination will become effective thirty (30) days (including Saturdays and Sundays) from the date of your receipt of this letter.

If you have any questions regarding this correspondence, you may contact Stephen R. Russo, Executive Counsel, at (225) 342-1115.

Sincerely,

Kathy Kliebert, Secretary
Louisiana Department of Health and Hospitals

Cc:  Planned Parenthood Gulf Coast



**Bobby Jindal**
GOVERNOR

**Kathy H. Kliebert**
SECRETARY

### State of Louisiana
Department of Health and Hospitals
Office of the Secretary

September 15, 2015

Planned Parenthood
ATTN: Melaney Linton
4018 Magazine Street
New Orleans, LA 70115

**Certified Mail, Return Receipt Requested (7012 2210 0001 6260 0066)**

Re:   Termination / Revocation of Louisiana Medicaid Provider Agreement
       Provider Number 133673

Dear Mrs. Linton:

Based on the initial findings of Louisiana's investigation into Planned Parenthood Gulf Coast (PPGC), you are hereby notified that the Department of Health and Hospitals (DHH) is hereby terminating / revoking the PPGC provider agreement referenced above.  This action is being taken pursuant to La. R.S. 46:437.11 and 46:437.14.  This action will take effect following final determination, judgment, completion, withdrawal from, or termination of all administrative and/or legal proceedings in this matter.  Such proceedings include, but are not limited to, informal hearings, administrative appeals, appeals for judicial review, appellate judgments, and/or denials of writ applications.

Specifically, it is clear that PPGC entered into a Federal False Claims Act settlement signed on July 25, 2013, by Melaney A. Linton, President and CEO of PPGC agreeing to pay $4,300,000 to the United States who "contend[ed] that PPGC submitted false claims."  Settlement Agreement, *Reynolds v. Planned Parenthood Gulf Coast*, No. 9:09-cv-124 (E.D. TX, Lufkin Div.)(July 25, 2013). In accordance with the Louisiana Administrative Code, Title 50, this is a violation. Further, under that same administrative code, PPGC had an affirmative duty to inform BHSF in writing of this violation.  Since DHH, through BHSF, was not informed within ten (10) working days of when the provider knew or should have known of the violation, this constitutes a separate violation.  Also under consideration in our departmental proceedings are provider audits and federal false claims cases against Planned Parenthood of America (PPFA) affiliates. Included among these are pending federal false claims cases against PPGC, one in which the presiding judge found that the information already provided "allows the court to draw the reasonable inference that Planned Parenthood knowingly filed false claims."  Memorandum Opinion and Order at 17, *Carroll v. Planned Parenthood Gulf Coast*, 4:12-cv-03505 (S.D. TX, Houston Div.) (May 14, 2014). Providers and providers-in-fact are required to ensure that all their agents and affiliates are in compliance with all federal and state laws as well as rules, policies and procedures of the Medicaid program. PPGC and its parent organization PPFA has failed to do so and has failed to notify DHH of violations and misconduct by affiliates and providers-in-fact. These are also violations of La. Admin. Code, Title 50.

15-30987-366

Further, in regard to the Center for Medical Progress (CMP) videos, DHH reviewed responses received from PPGC via letters dated July 24, 2015, and August 14, 2015, from Melaney Linton in response to DHH letters dated July 15, 2015, and August 4, 2015. After said review, DHH believes that PPGC misrepresented its actions therein and had contradictions within the body of the letter and with the statements and admissions made in the CMP videos, including but not limited to the video released on August 4, 2015 and taped in April of this year, containing conversations with PPGC senior management, including the PPGC director of research and PPCFC facility director.

According to La. R.S. 46:437.11(D)(2), the Secretary may terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding. The Department determines that PPGC currently fits within this statute due to the investigations of PPGC by both DHH and the Louisiana Office of Inspector General. DHH expressly reserves the right to amend this notice and to terminate your provider agreement immediately and without written notice based on the further findings of the pending investigations by any department of Louisiana, any other State or state agency, or the pending investigations in the congressional committees. DHH has elected to provide PPGC with full due process rights as mentioned above and will not pursue immediate termination pursuant to this notice.

According to 46:437.14(A)(1), DHH may deny or revoke enrollment in the Medicaid program in cases of misrepresentation. As alleged above, DHH believes PPGC's responses to inquiries, when compared to clear representations in various videos, rises to the level of misrepresentation. Further, according to La. R.S. 46:437.14(A)(10) and (12), DHH may move to revoke enrollment if a provider is found in violation of licensing or certification conditions or professional standards relating to the licensure or certification of health care providers or the required quality of goods, services, or supplies provided. Also, a provider agreement can be revoked for failure to meet any condition of enrollment. As a Medicaid provider, PPGC is charged with maintaining compliance with all state statutes, rules and regulations, including the Louisiana Administrative Code mentioned above. PPGC's actions mentioned above are clear violations of applicable administrative code provisions and are clear violations of the statutes mentioned. Based on the conduct described, the above provider number is hereby being terminated / revoked.

You are entitled to an administrative review of this action and it is suspensive if you avail yourself of same. Initially, you should request an Informal Hearing at which you are entitled to both present information in writing or orally, present documents, and to further inquire as to the reasons for our determination. You must make your request for an Informal Hearing in writing and within fifteen (15) calendar days (including Saturdays and Sundays) of receipt of this notice. Your written request should be sent to:

Louisiana DHH, Office of Secretary<br>
P.O. Box 3836<br>
Baton Rouge, Louisiana 70821

15-30987.367

You may be represented by an attorney or authorized representative at the Informal Hearing. Your attorney or authorized representative must file a written notice of representation identifying himself by name, address, and telephone number at the address given above.

Following the Informal Hearing you will receive a written Notice of the Results of the Informal Hearing from which you are entitled to seek an appeal before the Division of Administrative Law. This hearing will also be suspensive in nature. Your request for Administrative Appeal must be in writing and set out the reasons for which you are seeking an appeal and the basis upon which you disagree with the results of the Informal Hearing. All requests for an Administrative Appeal must be received within thirty (30) calendar days (including Saturdays and Sundays) of the receipt of this notice. Request for Administrative Appeal must be sent to the address given below.

Division of Administrative Law – HH Section
P.O. Box 4189
Baton Rouge, Louisiana 70821-4189
Phone (225) 342-0443
Fax (225) 219-9823

You may be represented by an attorney or authorized representative at the Administrative Appeal. Your attorney or authorized representative must file a written notice of representation identifying himself by name, address, and telephone number at the address above.

You may choose to forego the Informal Hearing and instead request an Administrative Appeal of this action. If you choose this alternative, please follow the procedure described above for scheduling an Administrative Appeal.

If you do not request an Informal Hearing or an Administrative Appeal, your termination will become effective thirty (30) days (including Saturdays and Sundays) from the date of your receipt of this letter.

If you have any questions regarding this correspondence, you may contact Stephen R. Russo, Executive Counsel, at (225) 342-1115.

Sincerely,

Kathy Kliebert, Secretary
Louisiana Department of Health and Hospitals

Cc: Planned Parenthood Gulf Coast

Bienville Building • 628 N. 4th Street • P.O. Box 629 • Baton Rouge, Louisiana 70821-0629
Phone #: 225/342-9509 • Fax #: 225/342-5568 • WWW.DHH.LA.GOV
"An Equal Opportunity Employer"

# EXHIBIT

# B





# OFFICE OF INSPECTOR GENERAL

TEXAS HEALTH & HUMAN SERVICES COMMISSION

STUART W. BOWEN JR.
INSPECTOR GENERAL

October 19, 2015

#### **** NOTICE OF TERMINATION ****

*Via Regular Mail and CMRRR No. 7015 1730 0000 9397 2194*

Planned Parenthood of Greater Texas / Planned Parenthood of North Texas / Planned Parenthood
of Texas
Registered Agent: Kenneth Lambrecht
7424 Greenville Ave.
Suite 206
Dallas, Texas 75231-4534

Re:    Planned Parenthood of Greater Texas / Planned Parenthood of North Texas / Planned
       Parenthood of Texas
       TPI Numbers:  1272197-03, 1272197-07, 1272197-10, 2999112-01, 2999112-02,
       2999112-03, 2999112-05, 2999112-08, 2999112-09, 3147803-01, 3150484-01, 3150385-
       01, 3159402-01, 1272197-05, 1272197-02, 1364812-13, 1364812-06, 1122699-01,
       1122699-06, 1131914-07, 1131914-05, 1131914-08, 1131914-06

Dear Provider:

Your receipt of this Notice of Termination effects a process to end your enrollment in the Texas
Medicaid program. *See* 1 TEX. ADMIN. CODE § 371.1703(e) (2014).  We have begun terminating
your enrollment because, based on the evidence outlined below, you are liable, directly or by
affiliation, for a series of serious Medicaid program violations.  The State has determined that
you and your Planned Parenthood affiliates are no longer capable of performing medical services
in a professionally competent, safe, legal, and ethical manner.

Your termination and that of all your affiliates will not affect access to care in this State because
there are thousands of alternate providers in Texas, including federally qualified health centers,
Medicaid-certified rural health clinics, and other health care providers across the State that
participate in the Texas Women's Health Program and Medicaid. Our women's health programs,
mostly State-funded since 2013, have increased overall funding for women's health services and
access to these services for women across the State.

Therefore, in connection with this Notice of Termination and out of respect for the patients who
otherwise would receive Medicaid services from you and your affiliates, the State of Texas

17-50282.1202

Notice of Termination
October 19, 2015
Page 2

requests your cooperation in informing all clients and potential clients about alternatives where they can obtain Medicaid services from providers in good standing with the State. HHSC staff will provide you with information you can share regarding those Medicaid providers.

## I. FINDINGS SUPPORTING TERMINATION

We have determined the bases for your termination are as follows:

A. Earlier this year, Planned Parenthood Gulf Coast (PPGC) committed and condoned numerous acts of misconduct captured on video that reveal repeated program violations and breach the minimum standards of care required of it as a Medicaid enrollee. PPGC is being terminated from the program because of these program violations, which include, but are not limited to, the following:

   1. The videos indicate that PPGC follows a policy of agreeing to procure fetal tissue even if it means altering the timing or method of an abortion. These practices violate accepted medical standards, as reflected in federal law, and are Medicaid program violations that justify termination. *See* 42 U.S.C. § 289g-1; 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

   2. PPGC failed to prevent conditions that would allow the spread of infectious diseases among employees, as well as patients and the general public. Specifically, it allowed individuals posing as commercial buyers of fetal body parts to handle bloody fetal tissue while wearing only gloves. PPGC did not comply with mandatory "universal precautions," including the use of "protective barriers," required whenever anyone handles "blood," "non-intact skin," and "body fluids." *See* 25 TEX. ADMIN. CODE § 139.49; *see also* 29 CFR § 1910.1030. These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

   3. PPGC staff were not trained in infection control and barrier precautions with regard to the handling of fetal blood and tissue or they failed to comply with the minimum standards that mandatory training requires with regard to these critical public health and safety issues. *See* 25 TEX. ADMIN. CODE § 139.49(b)(3). These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

As a Planned Parenthood affiliate, you have agreed to abide by mandatory medical and operational standards established by the Planned Parenthood Federation of America (PPFA) located in Washington, D.C. You are a legal affiliate of the PPFA and of all similarly situated Planned Parenthood providers in Texas.

Our rules provide that if you are affiliated with a provider that commits program violations subjecting it to enrollment termination, then you, as an affiliate, are

Notice of Termination
October 19, 2015
Page 3

subject to the same enrollment termination. *See* 1 TEX. ADMIN. CODE §
371.1703(c)(7).

The definitions section of our rule substantiates the conclusion that you are an
affiliate of PPGC. It provides that an enrolled provider is an affiliate of another
enrolled provider if it "shares any identifying information, including … corporate
or franchise name." You share such identifying information with PPGC and are
thus subject to termination. *See* 1 TEX. ADMIN. CODE § 371.1607(3)(I).

Our decision to terminate all affiliates in Texas finds support in the extensive video
evidence filmed at PPGC and other Parenthood affiliates across the country,
including video footage of the Medical Director of PPFA who appears to not only
condone such program violations but also endorse them. This suggests that the
program violations recorded at PPGC reflect PPFA national policy or accepted
practice, which explains in part their widespread occurrence across the country
among Planned Parenthood affiliates.  As an affiliate of PPGC, you are now being
terminated from the Medicaid program.   *See* 1 Tex. Admin. Code Sec.
371.1703(c)(7).

B. My office has information suggesting that fraud and other related program
violations have been committed by a number of Planned Parenthood affiliates
enrolled in the Medicaid program in Texas. For example, there is reliable
information indicating a pattern of illegal billing practices by Planned
Parenthood affiliates across the State.

Our prima facie case of fraud is supported by related cases involving
fraudulent practices identified by Whistleblowers from inside the Texas
Planned Parenthood network. These Whistleblowers alleged in federal court
that Planned Parenthood encourages employees to knowingly file false claims.
*See, e.g,* Settlement Agreement, *Reynolds v. Planned Parenthood Gulf Coast*,
No. 9:09-cv-124 (E.D. Tex. July 25, 2013) (lawsuit by a health care assistant
who worked at Planned Parenthood Gulf Coast for 10 years alleging Medicaid
fraud); Memorandum Opinion and Order, *Carroll v. Planned Parenthood Gulf
Coast*, 4:12-cv-03505 (S.D. Tex. May 14, 2014) (lawsuit by a former accounts-
receivable manager at Planned Parenthood Gulf Coast alleging Medicaid
fraud).

In *Reynolds*, a Planned Parenthood Whistleblower alleged sufficient evidence
of fraud to assure the federal court handling the matter that the case was worth
pursuing, after which Planned Parenthood promptly settled the lawsuit for $4.3
million. Furthermore when the United States Department of Justice (DOJ)
announced the 2013 settlement in *Reynolds*, it openly and compellingly
criticized PPGC for "abuse of programs that are extremely important to the
well-being of many American women." Further, the DOJ was "particularly
grateful to the Whistleblower" who came forward for revealing that PPGC had

Notice of Termination
October 19, 2015
Page 4

> billed the Texas Medicaid program, Title XX, and the Women's Health
> Program "for items and services that were either medically unnecessary or
> were never actually provided."

> The varied program violations by Planned Parenthood revealed in these two
> federal cases and the information my office has recently received regarding
> similar program violations supports this Notice of Termination. *See* 1 Tex.
> Admin. Code § 371.1653. As per Paragraph A, *supra*, your affiliation with
> Planned Parenthood entities in Texas about which there is reliable evidence of
> fraud and other program violations substantiates your termination as an
> enrollee in the Medicaid program. *See* 1 TEX. ADMIN. CODE §§ 371.1703(c)(6),
> (c)(7), and (c)(8).

## II. PROCESS

You may request an Informal Resolution Meeting (IRM) with my legal staff to discuss the
findings in this Notice of Termination. If you wish to pursue an IRM, you must file a written
request with my office on or before the 30th calendar day from the date you received this Notice
of Termination.

Your request for an IRM must:

1. Be sent by certified mail to my office at the address specified below;
2. Include a statement as to the specific issues, findings, and legal authority in the Notice of
   Termination with which you disagree; and
3. Be signed by you or your attorney.

In the alternative, you may submit, within 30 calendar days of receipt of this Notice, any
documentary evidence and written argument regarding whether this Notice of Termination is
warranted. *See* 1 TEX. ADMIN. CODE § 371.1613 (d). You must state the specific issues, findings,
and legal authority that support your contention that this Notice is improper.

In the further alternative, you may both request an IRM and submit documentary evidence and
written argument to contest this Notice of Termination.

## III. FINAL TERMINATION

If you fail to respond to this Notice of Termination within 30 calendar days of receipt, then we
will issue a Final Notice of Termination. Alternatively, if the IRM fails to resolve the case, then
we will similarly issue a Final Notice of Termination. You have 15 days after receipt of the Final
Notice of Termination to request an administrative hearing to appeal the Final Notice before an
Administrative Law Judge at the Texas Health and Human Services Commission.

A. The effective date of your final termination from the Medicaid program will be either:

Notice of Termination
October 19, 2015
Page 5

1. Upon the expiration of 15 calendar days after receipt of the Final Notice of Termination, if you do not timely request an administrative hearing before HHSC; or

2. The date of any final order issued by an HHSC Administrative Law Judge affirming the Final Notice of Termination.

B. Once the Final Notice of Termination becomes effective, the following events immediately occur:

1. Your enrollment in the Medicaid program terminates;

2. Your Texas Provider Identification Number is revoked; and

3. Your enrollment in the Medicaid program of any other state may be subject to revocation.

If, after your termination from the Texas Medicaid program, you wish to enter the program again, you must apply for re-enrollment.

## NOTICE

**IF YOU DO NOT RESPOND TO THIS NOTICE WITHIN 30 CALENDAR DAYS FROM THE DATE YOU RECEIVED IT, WE WILL ISSUE A FINAL NOTICE OF TERMINATION.**

Requests for an IRM and/or the provision of additional documentary evidence and written argument should be mailed via certified mail to the following address:

Texas Health and Human Services Commission
Office of Inspector General
Mail Code 1358
P.O. 85200
Austin, Texas 78708-5200

Respectfully yours,

Stuart W. Bowen, Jr.

# EXHIBIT

# C



# OFFICE OF INSPECTOR GENERAL

TEXAS HEALTH & HUMAN SERVICES COMMISSION

STUART W. BOWEN, JR.
INSPECTOR GENERAL

December 20, 2016

##### \*\*\*\*\* FINAL NOTICE OF TERMINATION OF ENROLLMENT \*\*\*\*\*

*Via First Class Mail and CMRRR Nos. 7011 2970 0004 0129 1228, 7011 2970 0004 0129 1235, 7011 2970 0004 0129 1242, 7011 2970 0004 0129 1259, 7011 2970 0004 0129 1266 and 7011 2970 0004 0129 1273*

Planned Parenthood Gulf Coast
Registered Agent: Melaney Linton
4600 Gulf Freeway
Houston, Texas 77023-3548

Planned Parenthood of Greater Texas / Planned Parenthood of North Texas
Registered Agent: Kenneth Lambrecht
7424 Greenville Avenue, Suite 206
Dallas, Texas 75231-4534

Planned Parenthood San Antonio / Planned Parenthood South Texas Surgical Center / Planned Parenthood Association of Cameron and Willacy County
Registered Agent: Jeffrey Hons
2140 Babcock Road
San Antonio, Texas 78229-0000

Re:    Planned Parenthood Final Notice of Termination

Dear Provider:

## I. FINAL NOTICE OF TERMINATION

This notice is to inform you that the Texas Health and Human Services Commission's Office of Inspector General (HHSC-IG) is hereby terminating the enrollment of the following providers and associated Texas Provider Identification (TPI) numbers from the Texas Medicaid program: Planned Parenthood Gulf Coast, Planned Parenthood of Greater Texas, Planned Parenthood of North Texas, Planned Parenthood San Antonio, Planned Parenthood South Texas Surgical Center, and Planned Parenthood Association of Cameron and Willacy County (hereafter Planned Parenthood, you, or your). 1 Tex. Admin. Code § 371.1703(e) (2016). *See* Attachment A for list of TPI numbers. Because of the violations listed below, HHSC-IG finds that you are not qualified

17-50282.1209

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page 2 of 6

to provide medical services in a professionally competent, safe, legal and ethical manner under the relevant provisions of state and federal law pertaining to Medicaid providers.

The basis for your termination and the termination of your affiliates stems from an extensive undercover video obtained by the Center for Medical Progress at the Planned Parenthood Gulf Freeway facility in April 2015, which contains evidence that Planned Parenthood violated state and federal law. The evidence arises from detailed discussions with the Planned Parenthood Gulf Coast's staff. In addition, the United States House of Representatives' Select Investigative Panel (House Investigative Panel) uncovered evidence consistent with and supportive of this termination.[1]

The unedited video footage indicates that Planned Parenthood follows a policy of agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion. These practices violate accepted medical standards, as reflected in federal and state law, and are Medicaid program violations that justify termination. *See* 42 U.S.C. § 289g-1; 42 U.S.C. § 289g-2; 1 Tex. Admin. Code § 371.1659(2) and (6); 1 Tex. Admin. Code § 371.1661; 1 Tex. Admin. Code § 371.1703(c)(6); 1 Tex. Admin. Code § 371.1605(a); 1 Tex. Admin. Code § 371.1603(g)(5) and (7). The HHSC-IG's Chief Medical Officer reviewed the video and concluded that your willingness to engage in these practices violates generally accepted medical standards, and thus you are not qualified to provide medical services in a professionally competent, safe, legal and ethical manner.

The video reveals numerous violations of generally accepted standards of medical practice. Examples include:

1. a history of deviating from accepted standards to procure samples that meet researcher's needs;

2. a history of permitting staff physicians to alter procedures to obtain targeted tissue samples needed for their specific outside research;

3. a willingness to convert normal pregnancies to the breech position to ensure researchers receive intact specimens;

4. an admission that "we get what we need to do to alter the standard of care where we are still maintaining patient safety, still maintaining efficiency in clinic operations, but we integrate research into it";

5. an admission that Planned Parenthood gets requests for "information from our study sponsor on what data they need that is not our standard of care," and that you provide what

---

[1] On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel, a bipartisan panel, to conduct a full and complete investigation of the medical practices of abortion providers and the practices of entities that procure and transfer fetal tissue. On December 1, 2016, the Investigative Panel referred its evidence to the Texas Attorney General.

17-50282.1210

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page 3 of 6

      is needed by creating a separate research protocol or template that can include medically unnecessary testing; and

6. a willingness to charge more than the costs incurred for procuring fetal tissue.

In addition, HHSC-IG has evidence that you engaged in misrepresentations about your activity related to fetal tissue procurements, as revealed by evidence provided by the House Investigative Panel. These misrepresentations show that you are not qualified to provide medical services in a professionally competent, safe, legal and ethical manner, and thus they support this termination. *See* 1 Tex. Admin. Code § 371.1661; 1 Tex. Penal Code § 37.08; 1 Tex. Admin. Code § 371.1603(g)(6); 42 U.S.C. § 1320a-7(b)(5); 42 U.S.C. § 1320a-7(b)(16); 1 Tex. Admin Code § 371.1651(15); 1 Tex. Admin. Code § 371.1655(7); 1 Tex. Admin. Code. § 371.1655(24); 1 Tex. Admin. Code § 371.1605(a).

In the *HHSC Medicaid Provider Agreement*, you agreed to comply with all of the requirements in Title 1, Part 15, Chapter 371 of the Texas Administrative Code, the Texas Medicaid Provider Procedures Manual, and all state and federal laws governing or regulating Medicaid. You further acknowledged in that agreement that failing to comply with any applicable law, rule, or policy of the Medicaid program or permitting circumstances that potentially threaten the health or safety of a client would be grounds for termination of your enrollment.

Your misconduct is directly related to whether you are qualified to provide medical services in a professionally competent, safe, legal and ethical manner. Your actions violate generally accepted medical standards, as reflected in state and federal law, and are Medicaid program violations that justify termination.

HHSC-IG rules provide that if you are affiliated with a provider that commits a program violation subjecting it to enrollment termination, then the affiliate is also subject to enrollment termination. *See* 1 Tex. Admin. Code §371.1703(c)(7); 1 Tex. Admin. Code §371.1605(a). Furthermore, the video and other evidence provide numerous indicia of affiliation, including:

1. common identifying information among affiliates;

2. individual providers working across affiliates;

3. a requirement that affiliates follow protocols and procedures prescribed by the Planned Parenthood Federation of America;

4. a requirement that affiliates report research studies to the Planned Parenthood Federation of America;

5. Planned Parenthood Federation of America provides for the legal review of research contracts;

6. Planned Parenthood Federation of America requires training for affiliates;

7. Planned Parenthood Federation of America provides certification of affiliates;

17-50282.1211

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page 4 of 6

8.  Planned Parenthood Federation of America centralizes the oversight, use, and review of research projects; and

9.  Planned Parenthood affiliates may use research agreements at one affiliate to facilitate additional research at other affiliates.

## II. SCOPE OF TERMINATION

The termination of your enrollment means that:

1.  Your contract with the Texas Medicaid program will be nullified on the effective date of the termination. 1 Tex. Admin. Code § 371.1703(g)(1);

2.  The TPI Number(s) related to your contract will become ineffective on the effective date of the termination;

3.  No items or services furnished under your TPI will be reimbursed by the Medicaid program, after your enrollment is terminated. 1 Tex. Admin. Code § 371.1703(g)(2);

4.  You will be required to re-enroll in the Texas Medicaid program, if you wish to participate as a Texas Medicaid provider. 1 Tex. Admin. Code § 371.1703(g)(3);

5.  Your enrollment or contract in the Medicare program may be subject to termination. 1 Tex. Admin. Code § 371.1703(g)(4);

6.  Your enrollment or contract in the Medicaid program of any other state may be subject to termination. *Id.*; and

7.  This termination will remain in effect until such time as you re-enroll and are approved to participate as a Texas Medicaid provider.

## III. APPEAL PROCESS

You may appeal this enrollment termination. In order to do so, **HHSC-IG must <u>receive</u> a written request from you asking for an administrative hearing before HHSC's appeals division on or before the 15th calendar day from the date you receive this notice.** 1 Tex. Admin. Code § 371.1703(f)(2).

All submissions, including your request for an administrative hearing, should be mailed to:

Texas Health and Human Services Commission
Office of Inspector General
Mail Code 1358
P.O. Box 85200
Austin, Texas 78708-5200

17-50282.1212

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page 5 of 6

Pursuant to 1 Tex. Admin. Code §§ 371.1615(b)(2) and (4), any request for an administrative hearing must:

1. be sent by certified mail to the address specified above;

2. include a statement as to the specific issues, findings, and/or legal authority in the notice letter with which you disagree;

3. state the bases for your contention that the specific issues or findings and conclusions of HHSC-IG are incorrect;

4. be signed by you or your attorney; and

5. arrive at the address specified above on or before the 15th calendar day from the date you receive this Final Notice of Termination.

**IF HHSC-IG DOES NOT RECEIVE A WRITTEN RESPONSE TO THIS NOTICE WITHIN 15 CALENDAR DAYS FROM THE DATE YOU RECEIVE IT, YOUR FINAL NOTICE OF TERMINATION WILL BE UNAPPEALABLE.**

## IV. TERM OF ENROLLMENT TERMINATION

The effective date of this enrollment termination depends upon whether you choose to appeal:

- If you do not request a hearing as discussed above, the effective date of your enrollment termination will be the 30th calendar day following your receipt of this Final Notice of Termination. 1 Tex. Admin. Code §§ 371.1615(c), 371.1617(a)(1), 371.1703(g)(8); or

- If you request an administrative hearing, then the effective date will be the date the administrative law judge's decision to uphold your enrollment termination becomes final. 1 Tex. Admin. Code § 371.1703(g)(7).

This enrollment termination is permanent. If you want to participate as a provider in the Texas Medicaid program in the future, you will be required to submit a new provider enrollment application. 1 Tex. Admin. Code § 371.1703(g)(3).

Respectfully yours,

Stuart W. Bowen, Jr.
Inspector General

Attachment

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page 6 of 6

## Attachment A

These are the TPIs that Texas Medical Health Partnership reports as affiliated with Planned
Parenthood and which are believed to be active:
2164345-01, 2164360-01, 1269599-06, 1269599-07, 1269599-10, 1269599-11, 2187189-01,
2815037-01, 2815060-01, 1126104-02, 1126104-04, 1126104-06, 1126104-07, 1126104-08,
1126104-09, 1126104-14, 3035461-01, 0834095-01, 0834095-02, 0834095-04, 1126104-05,
1126104-10, 1126104-11, 1126104-12, 1122699-01, 1122699-06, 1272197-02, 1272197-03,
1272197-05, 1272197-07, 1272197-10, 1272197-12, 1364812-06, 1364812-13, 2999112-01,
2999112-02, 2999112-03, 2999112-05, 2999112-08, 2999112-09, 3147803-01, 3150385-01,
3150484-01, 3159402-01, 2100489-01, 2120669-01, 2121964-01, 2096414-01, 2103566-01,
2109696-01, 3353781-01, 1373391-01, 1373391-10, 1373391-04, 1373391-11, 1373391-12,
2866873-01

17-50282.1214

JS 44 (Rev. 10/20) - TXND (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America ex rel Alex Doe; State of Texas ex rel Alex Doe; State of Louisiana ex rel Alex Doe

## DEFENDANTS

Planned Parenthood Federation of America, et al.

(b) County of Residence of First Listed Plaintiff _____
   *(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
   *(IN U.S. PLAINTIFF CASES ONLY)*
   NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
        THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Hacker Stephens LLP, 108 Wild Basin Road South, Suite 250, Austin, Texas 78746, (512) 569-0543

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[x] 1   U.S. Government
        Plaintiff

[ ] 2   U.S. Government
        Defendant

[ ] 3   Federal Question
        *(U.S. Government Not a Party)*

[ ] 4   Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                 *and One Box for Defendant)*

|                          | PTF | DEF |                                                      | PTF | DEF |
|--------------------------|-----|-----|------------------------------------------------------|-----|-----|
| Citizen of This State    | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - | of Property 21 USC 881 | [ ] 423 Withdrawal | [x] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Product Liability | [ ] 690 Other | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability | [ ] 367 Health Care/ | | | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability | [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine | Injury Product | | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product | Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | [ ] 371 Truth in Lending | Act | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability | [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal | Property Damage | Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury | [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury - | Product Liability | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ | Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer. w/Disabilities - | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| | Other | [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

[x] 1   Original
        Proceeding

[ ] 2   Removed from
        State Court

[ ] 3   Remanded from
        Appellate Court

[ ] 4   Reinstated or
        Reopened

[ ] 5   Transferred from
        Another District
        *(specify)*

[ ] 6   Multidistrict
        Litigation -
        Transfer

[ ] 8   Multidistrict
        Litigation -
        Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 USC 3729(a)

Brief description of cause:
Qui tam case for recovery of damages under federal and state false claims acts for Medicaid fraud.

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION
    UNDER RULE 23, F.R.Cv.P.

DEMAND $
$500,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
February 5, 2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ Andrew B. Stephens

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____