# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX DOE, Relator, | § § § | |
| | § | |
| THE STATES OF TEXAS, *ex rel.* ALEX DOE, Relator, | § § § | |
| | § | |
| THE STATE OF LOUISIANA, e*x rel.* ALEX DOE, Relator, | § § § | |
| Plaintiffs, | § § | Civil Action No. 2-21-CV-022-Z |
| v. | § § | |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD GULF COAST, INC., PLANNED PARENTHOOD OF GREATER TEXAS, INC., PLANNED PARENTHOOD SOUTH TEXAS, INC., PLANNED PARENTHOOD CAMERON COUNTY, INC., PLANNED PARENTHOOD SAN ANTONIO, INC., | § § § § § § § § § § § | |
| Defendants. | § § | |

## STATE OF TEXAS'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

<div align="right">Page</div>

Table of Authorities ..................................................................................................iv

Summary ..................................................................................................................1

Factual and Procedural Background ........................................................................1
    A.   Planned Parenthood failed to follow the process
        Prescribed by Texas law to appeal from the decision
        By HHSC to terminate Defendants' Medicaid provider
        Contract. Instead, Planned Parenthood sought an end-round
        By suing first in federal court and later in Texas state
        Court.  Both courts have now ruled and it is far too
        Late for Planned Parenthood to revive its long
        Extinguished administrative remedies ......................................................1

Standard of Review ..................................................................................................3

Argument ..................................................................................................................3
    I.   The doctrine of judicial estoppel does not apply ......................................5
        A.  Texas's prior statements were not clearly inconsistent
            with its position in the complaint ......................................................6
            1   Texas has <u>never</u> taken the position that Planned
               Parenthood was relieved of its obligation to repay
                funds received after its final and unappealable termination
               from Medicaid..............................................................................6
            2   Texas's position has consistently been that, by
               operation of Texas law, Planned Parenthood's
                termination from Medicaid was final and
                unappealable no later than February 1, 2017 ................................7
        B.  Texas did not successfully persuade the Fifth
            Circuit court in its prior filing ............................................................8

    II.   Texas's complaint plausibly pleads the elements of a
        violation of section 36.002(12) of the TMFPA ......................................10
        A.   Texas plausibly pleads that Planned Parenthood
            had an obligation to pay or transmit money to the
            state under the Medicaid program ......................................................11
        B.   Texas plausibly pleads that Defendants "knowingly
            and improperly" avoided their obligation to refund
            the $10 million paid by Texas Medicaid after

Planned Parenthood's final termination from
the program ...................................................................................14

C.   "Materiality" is not an element of an unlawful act
under the TMFPA section 36.002(12) claim in this
case; Texas has no obligation to plead or prove
that Defendants' avoidance of their obligation to
refund the $10 million overpayment was "material"
to anything; and *Escobar* does not apply to the TMFPA....................................16

D.   Texas's claims should not be dismissed under rule 9(b) ..................................19

E.   The court has original subject matter jurisdiction
over Texas's state law claim and the TMFPA's
action bar does not apply in this case .................................................................21

Conclusion ....................................................................................................................23

Certificate of Service....................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 663 (2009) ............................................................3

*Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 145, (1919) ...............................12

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................1

*Cicalese*, 924 F.3d at 768 ............................................................10

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 135 S. Ct. 2028, 2033, 192 L. Ed. 2d 35 (2015) ............................................................17

*Ex parte Lincoln Gas & Elec. Light Co.*, 256 U.S. 512, 41 S. Ct. 558, 65 L. Ed. 1066 (1921) ............................................................12

*Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) ............................5

*Hooper v. Lockheed Martin Corp.*, 688 F.3d 1017, 1050 (9th Cir. 2012) ............................14

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir. 2007) ............................9

*In re Xerox Corp.*, 555 S.W.3d 518 (Tex. 2018) ............................................................4, 19

*Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) ............................10

*Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F.Supp.3d 370 (S.D.N.Y. 2015) ............................12, 14

*Heckman v. Williamson Cty.*, 369 S.W.3d 137, 166–67 (Tex. 2012) ............................23

*Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417 (5th Cir. 2001) ............................10

*Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C. Cir. 1980) ............................9

*Lippincott v. Whisenhunt*, 462 S.W.3d 507 (Tex. 2015) (per curiam) ............................17

*Maharaj v. Bankamerica Corp.*, 128 F.3d 94 (2d Cir. 1997) ............................9

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ............................28

*Mitchell v. Riegel Textile, Inc.*, 259 F.2d 954, 955 (1958) ............................12

*National Kidney Patients Ass'n v. Sullivan,* 958 F.2d 1127
(294 U.S. App. D.C. 269, 1992) ...................................................13

*Nazari v. State*, 561 S.W.3d 495 (2018) ......................................19

*New Hampshire v. Maine* 532 U.S. 742 (2001 ...........................5, 9

*Piper Jaffray & Co. v. Omni Surgical, LLC*, No. A-14-CV-814-LY,
2015 WL 3687946, at *6 (W.D. Tex. June 12, 2015)..................10

*Planned Parenthood of Greater Tex. Family Planning & Preventative
Health Services, Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020)....................9, 13

*Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500 (Tex. 2012) ..................18

*St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425 (5th Cir. 2000) ........10

*Taylor v. U.S. Treasury Dep't*, 127 F.3d 470, 475 (5th Cir. 1997) ...........13, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .................3

*TGSNOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432 (Tex. 2011)............18

*True v. Robles*, 571 F.3d 412 (5th Cir. 2009)..................................3

*Turner v. Pleasant*, 663 F.3d 770 (5th Cir. 2011) ......................1

*United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 371 (5th Cir. 2017) .........19

*U.S. ex rel. Govindarajan v. Dental Health Programs*, 2020 WL 3064712, *7
(ND Texas, June 8, 2020) ..................................................18

*United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) ...........19

*U.S. ex rel. Hamilton v. Yavapai Cmty. Coll. Dist.*, No. 12 Civ.
08193(PCT)(PGR), 2015 WL 1522174, at *3 (D.Ariz. Apr. 2, 2015).........14, 15

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*,
519 F.App'x 890, 893 n.3 (5th Cir. 2013) .................................20

*United States v. Bestfoods*, 524 U.S. 51, 64- 65 (1998) ...............20

*United States v. Hook*, 195 F.3d at 306 ..............................................................................9

*United States v. Lakeshore Med. Clinic, Ltd.,* No. 11 Civ. 00892, 2013
    WL 1307013, at *4 (E.D.Wis. Mar. 28, 2013)..................................................15

*United States v. C.I.T. Constr. Inc.*, 944 F.2d 253 (C.A.5 1991) .......................................9

*United States ex rel Ormsby v. Sutter Health* 444 F.Supp.3d 1010
    (N.D. Cal. 2020) ................................................................................................11

*Universal Health Services, Inc. v. Escobar*, 577 U.S. 1214 (2016) ........................... passim

*Universal Health Services, Inc. v. United States*, 579 U.S. 176 S. Ct. 1989,
    195 L. Ed. 2d 348 (2016) ..................................................................................16

*Vander Zee v. Reno*, 73 F.3d 1365 (5th Cir.1996)...........................................................10

*Woodford v. Ngo*, 548 U.S. 81 (2006) ....................................................................... 13, 14

**Statutes**

31 U.S.C. § 3729(b)(4) ....................................................................................................18

Tex. Hum. Res. Code. Ann. § 36.001(7-a)(D) ...............................................................11

Tex. Hum. Res. Code § 36.113(a) ...................................................................................22

Tex. Hum. Res. Code § 36.0011(a)(1)-(3) ......................................................................14

Tex. Hum. Res. Code § 36.001(5-a) ................................................................................18

Tex. Hum. Res. Code § 36.1021 ......................................................................................17

TMFPA section 36.002(12) ....................................................................................... passim

**Regulations and Rules**

Fed. R. Civ. P. 9(b) .........................................................................................................20

1 Tex. Admin. Code § 371.1617(a)(1.................................................................................8

1 Tex. Admin. Code § 371.1655(4) ........................................................................... passim

1 Tex. Admin. Code § 371.1617(a)(1) ...........................................................................3, 4

1 Tex. Admin. Code § 371.1655................................................................................9

1 Tex. Admin. Code § 371.1703...........................................................................4, 12

**Other Authorities**

TMPPM

## SUMMARY

Courts view Rule 12(b)(6) motions to dismiss with disfavor and they are rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (internal citation and quotation marks omitted). This case is no exception to the general rule. The Court should deny Defendants' motion to dismiss because the Texas complaint in intervention alleges sufficient facts to create the reasonable inference that Defendants are liable under the Texas Medicaid Fraud Prevention Act ("TMFPA"). *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (where court did not "require heightened fact pleadings of specifics, but only enough facts to state a claim to relief that is plausible on its face").

## FACTUAL AND PROCEDURAL BACKGROUND

**A. Planned Parenthood failed to follow the process prescribed by Texas law to appeal from the decision by HHSC to terminate Defendants' Medicaid provider contracts.   Instead, Planned Parenthood sought an end-around by suing first in federal court and later in Texas state court.   Both courts have now ruled and it is far too late for Planned Parenthood to revive its long extinguished administrative remedies.**

Texas incorporates by reference the factual and procedural background as set forth in the Complaint in Intervention, at 2 to 6. Docket No. 22 at 2-6.   By Defendants' own admission, they failed to exercise their administrative remedies to appeal from the final notice of termination (FNOT) letters issued by HHSC-OIG in December 2016. Docket No. 51 at 4.   Therefore, Planned Parenthood's terminations are final and unappealable under Texas law.  Instead of following the requirements of Texas law, Defendants sought relief, first in the Western District of Texas, and later in the state district court of Travis County, Texas.   Although both courts temporarily prevented Texas from implementing the final and unappealable terminations, the federal injunction and the state TRO are now vacated. *See Planned Parenthood of Greater Tex. Family Planning & Preventative*

*Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 350 (5th Cir. 2020); *See also* Exh. A, Travis County District Court Order Denying Mandamus and Injunctive Relief.

In her letter to the parties explaining the rationale for her decision, the state court judge wrote: "However, [Planned Parenthood] selected the federal courts as the forum to contest the merits of their claims, and they are now not able to revive their administrative remedies *as the deadline to seek that relief has long since passed*." Exh. B at 2, Ltr. dated Mar. 10, 2021, from Hon. J. Livingston to T. Watkins and B. Walton (emphasis added). Planned Parenthood admits it did not appeal from the state court's March 12, 2021, final order. Mot. to Dismiss, at 7.

Texas Medicaid paid Planned Parenthood approximately $10 million for services delivered to Medicaid patients between, February 1, 2017 (the date by which Defendants' terminations were final and unappealable) and March 12, 2021 (the date of the state court's final order).

Defendants cannot not seriously contest the procedural facts set out in Texas's Complaint. Most are expressly admitted by Defendants in their Motion to Dismiss. *See* Docket No. 51, Mot. to Dismiss, generally. The only questions presented in the Texas Complaint are: (1) whether the Defendants are obligated to refund to Texas Medicaid the $10 million paid to Planned Parenthood during the time period after Defendants' terminations were final and unappealable by Texas law; and (2) whether Defendants knowingly and improperly avoided their obligation to refund that money. *See* Tex. Hum. Res. Code § 36.002(12).

If the answers to these questions are "yes" and "yes" then Defendants are liable to the State for the civil remedies prescribed by section 36.052 of the TMFPA. Tex. Hum Res Code. § 36.052.

For these reasons, and for the additional reasons stated below, Texas has stated a claim for relief that is plausible on its face, and the Court should deny Defendants' motion to dismiss. *See Twombly*, 550 U.S. at 570.

## STANDARD OF REVIEW

When considering a defendant's 12(b)(6) Motion to Dismiss, a court must accept "all well-pleaded facts as true" and view "those facts in the light most favorable to the plaintiff." *See True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009). It is well established that "[c]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss[.]" *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 663, 678(2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 at 570). This standard is met where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Id. at 678 (citing Twombly, 550 U.S. at 556).* More specifically, the complaint must contain "allegations plausibly suggesting" an entitlement to relief. *Twombly*, 550 U.S. at 557.

## ARGUMENT

Based on the *Twombly* analysis, the State should prevail on Defendants' Motion to Dismiss because the State has alleged facts plausibly suggesting an entitlement to relief. *Twombly*, 550 U.S. at 557. Under the TMFPA, a defendant who commits an unlawful act is liable to the State of Texas for civil remedies for each unlawful act, in some instances, without regard to whether that violation

resulted in "any loss to the Medicaid program." *In re Xerox Corp.*, 555 S.W.3d 518, 533 (Tex. 2018) (citing Tex. Hum. Res. Code § 36.052(a)(1)).

By operation of law, Defendants were effectively terminated from Texas Medicaid, at the latest, by February 1, 2017, by which date they had failed to pursue and exhaust their administrative remedies. Docket No. 22 at 16. Consequently, Defendants were not entitled to retain reimbursements from Texas Medicaid for services delivered on or after February 1, 2017—the date by which Defendants were no longer eligible Medicaid providers by operation of Texas law. Defendants are obligated to repay to Texas Medicaid any dollars they received in reimbursements for services delivered when they were no longer eligible Medicaid providers under Texas law. *See* 1 Tex. Admin. Code §§ 371.1655(4); 371.1703; 371.1705(e)(5); *see also* Docket No. 22 (Exh. 2 and Exh. 3).

Defendants received approximately $10 million in reimbursements from Texas Medicaid for services delivered when they were no longer eligible Medicaid providers by operation of Texas law. Docket No. 22 at 16. Planned Parenthood was obligated to repay these overpayments within 60 calendar days of identifying them. 1 Tex. Admin. Code § 371.1655(4). At the latest, Defendants knew, or should have known, as of March 12, 2021—the date of the final state court order—that their last attempt for relief from the requirements of Texas law had failed. Exh. B. Consequently, Defendants were obligated to refund the $10 million in reimbursements to which they were not entitled within 60 days of March 12, 2021, or by not later than May 12, 2021. 1 Tex. Admin. Code § 371.1655(4). However, to this day, Planned Parenthood has not paid any of the $10 million back to Texas Medicaid. Docket No. 22 at 6.

## I.     The doctrine of judicial estoppel does not apply.

In their Motion, Defendants argue that Texas is barred by the doctrine of judicial estoppel from asserting: (1) that Defendants have an obligation to repay to Texas Medicaid dollars they received in reimbursements after February 1, 2017, and (2) that Defendants were terminated from Texas Medicaid not later than February 1, 2017, as a matter of Texas law. Defendants argue that these statements are "inconsistent" with positions Texas took in prior pleadings, and, therefore, the Court should dismiss the Texas claims. Docket No 51 at 10-11.

The doctrine of judicial estoppel prevents litigants from asserting claims in a court proceeding that are directly contrary or clearly inconsistent with statements made in a previous proceeding. *See New Hampshire v. Maine* 532 U.S. 742, 750-751 (2001) (citations omitted); *See also Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003). In *New Hampshire v. Maine*, the Supreme Court provided the three factors that typically determine whether the doctrine applies: (1) whether the party's later position is "clearly inconsistent" with the party's earlier position; (2) "whether the party was successful in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled;'" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, at 750-751.

The Fifth Circuit specified that "[i]n this Circuit, 'two bases for judicial estoppel' must be satisfied before a party can be estopped. *Hall*, 327 F.3d at 396. First, it must be shown that 'the position of the party to be estopped is clearly inconsistent with its previous one; and [second,] that party must have convinced the court to accept that previous position.'" *Id.* In this case, both analysis

5

of the factors and consideration of the context in which the State made its prior arguments establish that the doctrine of judicial estoppel does not apply. *See Id. at* 750-751.

### A. Texas's prior statements were not clearly inconsistent with its position in the complaint.

#### 1. Texas has <u>never</u> taken the position that Planned Parenthood was relieved of its obligation to repay funds received after its final and unappealable termination from Medicaid.

Planned Parenthood has misconstrued and taken out of context Texas's statements in prior proceedings in a failed attempt to support its judicial estoppel argument. For example, Defendants erroneously contend that Texas "acknowledged" that Planned Parenthood does not have an obligation to repay Medicaid dollars it received after its terminations became final and unappealable no later than February 1, 2017, purportedly because Texas previously stated that the preliminary injunction issued by the United States District Court for the Western District of Texas compelled the State to retain Defendants as Medicaid providers. *See* Docket No. 51, at 11-12. This argument is wrong because it misleadingly conflates two separate and distinct issues.

In a motion filed in the Fifth Circuit in 2019 to stay the federal district court's injunction, Texas outlined the procedural history of this case and noted that, in January 2017, the state was forced to retain Planned Parenthood as a Medicaid provider under the federal district court's injunction and would be irreparably harmed unless the injunction was stayed. Exh. C at 3, Mot. to Stay the District Courts Injunction Pending En Banc Consideration. Planned Parenthood now attempts to change that statement into an "acknowledgment" that Planned Parenthood is not obligated to repay money it received from Texas Medicaid after its final and unappealable termination from the program. However, Texas's mere statement of the effect of the federal district court's injunction does not equate to an "acknowledgment" that Planned Parenthood is not

obligated to repay reimbursements received after termination if the federal court injunction was lifted. In fact, to this day, Texas has <u>never</u> taken the position that Planned Parenthood is excused from the obligated to repay funds it received after its final termination from the Texas Medicaid program. Planned Parenthood's assertion, reached by flawed reasoning, was simply not Texas's position.

Instead, Texas's position continues to be that *because* it was forced to keep paying Planned Parenthood after it was terminated by operation of law, Planned Parenthood has an obligation to repay that money, since the federal district court's injunction and the subsequent state court TRO have been vacated. Docket No. 22 at 17.

> **2. Texas's position has consistently been that, by operation of Texas law, Planned Parenthood's termination from Medicaid was final and unappealable no later than February 1, 2017.**

Planned Parenthood further argues that Texas "changed" its previous position based on two quotes from Texas's Response in Opposition to Original Petition for Writ of Mandamus ("Texas's Mandamus Response") in the state court proceedings. Docket No. 51 at 12. In context, however, those quotes support the fact that Texas has maintained the same position throughout the proceedings in this case *and* in the prior federal and state court proceedings. That consistent position is that while Texas was enjoined **as a matter of <u>fact</u>** from implementing Planned Parenthood's termination from Medicaid until the state court TRO was lifted in 2021, ***as a matter* of Texas <u>law</u>**, the Defendants' termination was final and unappealable no later than February 1, 2017. Exh. D, Texas's Mandamus Response at 6-7. For example, in its Mandamus Response, Texas argued:

> Thus, on December 15, 2020, there was no longer an injunction prohibiting HHSC from **implementing** the termination of Planned Parenthood's Medicaid provider agreements. Because the terminations were set to take effect in January 2017 **under state law**, the terminations became immediately effective once the mandate issued.

Exh. D Texas's Mandamus Response at 6-7 (emphasis added). Texas's brief continued, "[a]fter the Fifth Circuit vacated the injunction, there was nothing barring **the effectiveness** of the terminations or preventing HHSC from proceeding to **fully** implement them." *Id.* at 13 (emphasis added). Thus, Texas's arguments that it should not be precluded from fully **implementing** Planned Parenthood's final and unappealable termination from Medicaid are not a departure from Texas's consistently held position that as **a matter of Texas law**, Planned Parenthood was finally terminated as a provider from Medicaid no later than February 1, 2017.

Indeed, Texas repeatedly affirmed that consistently held position in the same response from which Planned Parenthood selected quotes to argue that Texas changed its position. For example, the cited Texas brief states:

- "Thus, under Texas administrative law, a Medicaid provider who receives a final notice that its contract will be terminated has 15 days from receipt of the Final Notice to request an administrative appeal. Otherwise, the termination becomes final 30 days from receipt of the Final Notice." Exh. D at 4.

- "In accordance with Texas law, the termination from Medicaid became final as a matter of law 30 days from the date the notice was received, which would have been in January 2017. *See* 1 Tex. Admin. Code § 371.1617(a)(1)." Exh. D at 5.

- "Although the termination was final as a matter of state law in January 2017, Respondents were prevented from giving it effect by a federal-court injunction." Exh. D at 6.

- "The agreements were terminated as a matter of law as a result of the December 2016 Final Notice." Exh. D at 13.

**B. Texas did not successfully persuade the Fifth Circuit court in its prior filing.**

Even if Texas's position in prior proceedings was inconsistent with the position Texas now takes in this proceeding—which it is not—Texas was not successful in persuading the Fifth Circuit to accept its arguments. The Fifth Circuit did not grant the relief requested by Texas's Motion to

Stay the District Court's Injunction Pending En Banc Consideration. Therefore, the Fifth Circuit did not accept Texas's previous position—inconsistent with Texas's current position or not—and that previous position does not preclude Texas from arguing a different position here.[1] As the Supreme Court held: "Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity." *New Hampshire v. Maine*, 532 U.S. at 750 (citing *United States v. C.I.T. Constr. Inc.*, 944 F.2d 253, 259 (C.A.5 1991)); *see also United States v. Hook, 195 F.3d 299, 306 (7th Cir. 1999*; *Maharaj v. Bankamerica Corp., 128 F.3d 94, 98 (2d Cir. 1997)*; *Konstantinidis v. Chen,. 626 F.2d 933, 939 (D.C. Cir. 1980)*.

Finally, for all of the reasons discussed above, Texas has neither sought, nor obtained an unfair advantage; nor have the Defendants been unfairly prejudiced by Texas's arguments. *New Hampshire*, 532 U.S. at 750; *see also Hall*, 327 F.3d at 396. Dismissal on the grounds of judicial estoppel should be denied. **Texas's complaint plausibly pleads the elements of a violation of section 36.002(12) of the TMFPA.**

---

[1] The Fifth Circuit and the state court both ultimately ruled in favor of Texas on other grounds. *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Services, Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020) (Finding the district court strayed from the record, applied the wrong legal standard, and failed to follow proper procedures in issuing its injunction. The panel's decision declared the injunction invalid and established that Planned Parenthood was not likely to prevail on the merits.) *See also* Exh. A (Travis County District Court's final order denying Planned Parenthood's request for mandamus relief and lifting the TRO). *See also* Exh. B Ltr. dated Mar. 10, 2021, from Hon. J. Livingston to T. Watkins and B. Walton (the court found that a pending federal court case or injunction does not toll the deadline to administratively appeal a termination from Medicaid).

To defeat a motion to dismiss for failure to state a claim under Rule 12(b)(6), "the plaintiff must plead enough facts to state a claim to relief that is plausible on its face." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal marks omitted) (citing *Twombly*, 550 U.S. at 570). This Court must accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001) (citing *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 440 n.8 (5th Cir. 2000)). As the Fifth Circuit held:

> The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim. Thus, the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint.

*Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (citing *Vander Zee v. Reno*, 73 F.3d 1365, 1368 (5th Cir. 1996)).

Here, Planned Parenthood asks the court to consider fact questions beyond the scope of a Motion to Dismiss and attempts to get a ruling on the merits. *See Cicalese*, 924 F.3d at 768 (holding that scrutinizing factual allegations is "more suited to the summary judgment phase."); *see also Piper Jaffray & Co. v. Omni Surgical, LLC*, No. A-14-CV-814-LY, 2015 WL 3687946, at *6 (W.D. Tex. June 12, 2015) (stating that factual arguments are not a proper ground for dismissal under 12(b)(6)). Texas's pleadings sufficiently lay out facts that state a claim to relief that is plausible on its face. Docket No. 51 at 13-19. While Planned Parenthood factually disputes each element of the TMPFA violation alleged in Texas's complaint, the fact remains that the State has pleaded facts giving rise to a TMFPA violation.  For that reason, the Court should deny Defendants' Motion to Dismiss. Nonetheless, Texas addresses Planned Parenthood's disputes of fact as follows:

II.   Texas's complaint plausibly pleads the elements of a violation of
      Section 36.001(12) of the TMFPA

   **A. Texas plausibly pleads that Planned Parenthood had an obligation to pay or transmit money to the state under the Medicaid program.**

Defendants' argument that they do not have an obligation to repay Texas for Medicaid payments they received between 2017 and 2021 incorporates the same flawed assertations they raise in their judicial estoppel argument. Planned Parenthood erroneously suggests that Texas admitted that Defendants did not have an obligation, because Texas stated in its complaint that it was enjoined from implementing the final termination of Planned Parenthood's Medicaid provider agreements from January 2017 to December 2020. Docket No. 51 at 14. However, Texas's acknowledgement of the fact that it was first enjoined by the federal court and later restrained by the state court does not amount to an admission that Texas has no recourse to recover dollars paid to Planned Parenthood after its terminations were final and unappealable under Texas law.

A person commits an unlawful act as defined under the TMFPA, if the person: "**knowingly and improperly avoids** or decreases **an obligation to pay or transmit money** or property **to this state under the Medicaid program**."  Tex. Hum. Res. Code § 36.002(12) (emphasis added).

An obligation is "an established duty, whether or not fixed, arising from the retention of an overpayment." Tex. Hum. Res. Code. Ann. § 36.001(7-a)(D). Allegations that an overpayment is identified, and not reported or returned, are sufficient to plead that an obligation exists. *United States ex rel Ormsby v. Sutter Health* 444 F.Supp.3d 1010, 1080-1081 (N.D. Cal. 2020)(motion to dismiss denied where "plaintiffs sufficiently pleaded that reviewers 'identified' overpayments to Sutter and PAMF and triggered their 60-day-return obligation under § 1320a-7k(d)(2)(A). The plaintiffs also allege that Sutter and PAMF did not report or return the overpayments within 60 days of their being

identified"). An overpayment is 'identified' when the 'provider' is put on notice of a potential overpayment, rather than the moment when an overpayment is conclusively ascertained. *Kane ex rel. U.S. v. Healthfirst, Inc.,* 120 F.Supp.3d 370, 387-88 (S.D.N.Y. 2015).

The Planned Parenthood providers entered into provider agreements with Texas Medicaid in which they represented to Texas that they would comply with the requirements of the Provider Manual and applicable state and federal law. Exh. E, example HHSC Medicaid Provider Agreement. The Provider Manual states that a provider whose Medicaid credentials are terminated is no longer a "qualified" provider and is no longer eligible to seek or receive reimbursement from Medicaid. 1 Tex. Admin. Code § 371.1705(e)(5); *See also* Docket No. 22 at 8. The Provider Manual further states that a provider who receives reimbursement from Texas Medicaid to which it is not entitled is obligated to remit the payments back to the State. *See* Exh. E; *see also* Exh. F (excerpts from Texas Medicaid Provider Procedures Manual), Introduction and § 1.10; *see also* 1 Tex. Admin. Code § 371.1703; Docket No. 22 at 8.

By deliberately choosing to bypass their available administrative remedies and instead seek extraordinary relief from the courts, Defendants assumed the risk of having to repay funds they received after they were terminated from Medicaid if their efforts to obtain extraordinary relief failed. *See Mitchell v. Riegel Textile, Inc.*, 259 F.2d 954, 955 (1958) ("[T]he 'principle, long established and of general application, that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby. This right, so well founded in equity, has been recognized in the practice of the courts of common law from an early period'") (quoting *Arkadelphia Milling Co. v. St.*

*Louis Sw. Ry. Co.,* 249 U.S. 134, 145, (1919)); *Ex parte Lincoln Gas & Elec. Light Co.,* 256 U.S. 512, 41 S. Ct. 558, 65 L. Ed. 1066 (1921).

More specifically, the D.C. Circuit in *National Kidney Patients Ass'n v. Sullivan* held that HHS could apply its recoupment procedures in seeking refund of overpayments made under a subsequently invalidated injunction. 958 F.2d 1127(1992). The facts in *National Kidney Patients* are analogous to the situation here.  In *National Kidney Patients*, as in this case, the government was enjoined, for a period of time, from reimbursing a provider at a lower reimbursement rate.  *Id.* at 1129. In *National Kidney Patients*, as in this case, that injunction was later vacated.  *Id.*; *see also Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 350 (5th Cir. 2020) (en banc) (held, in a unanimous opinion, that the district court's preliminary injunction enjoining Texas from enforcing its termination of Planned Parenthood's Medicaid provider agreements was unlawful). In *National Kidney Patients*, the D.C. Circuit held that Defendants were subject to HHS's recoupment procedures as soon as the injunction against it was lifted. Just as in *Sullivan*, Defendants here should not be able to hide behind the vacated federal injunction and vacated state-court TRO to avoid their obligation to refund to Texas the $10 million in reimbursements received while those subsequently-invalidated measures were in place.

Defendant's attempts to use federal and state courts to avoid the consequences of disregarding state administrative deadlines undermines one of the fundamental purposes of requiring exhaustion of administrative remedies—to discourage disregard of the agency's procedures. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (Exhaustion of administrative remedies serves two main purposes: to protect administrative agency authority and to promote efficiency.); *See also Taylor v. U.S. Treasury Dep't*, 127 F.3d 470, 475 (5th Cir. 1997)("The jurisprudential exhaustion doctrine is

a 'long settled rule of judicial administration [which mandates] that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'"). As in the cases above, this Court should not reward Defendants' decision to side-step the doctrine of exhaustion of administrative remedies. *See Woodford* at 89; *see also Taylor* at 475.

**B. Texas plausibly pleads that Defendants "knowingly and improperly" avoided their obligation to refund the $10 million paid by Texas Medicaid after Planned Parenthood's final termination from the program.**

Defendants next argue that Texas's complaint fails to allege that they "knowingly" avoided an obligation. *See* Docket No. 51 at 16. "The plain meaning of 'avoid' includes behavior where an individual is put on notice of a potential issue, is legally obligation to address it, and does nothing." *Kane ex rel.* F.Supp.3d 370, at 394. Under the TMFPA "a person acts 'knowingly' with respect to information if the person: (1) has knowledge of the information; (2) acts with conscious indifference to the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." Tex. Hum. Res. Code § 36.0011(a)(1)-(3). Specific intent by the defendant to commit an unlawful act is not required. *Id.* at 36.0011(b); *see also U.S. ex rel. Hamilton v. Yavapai Cmty. Coll. Dist.*, No. 12 Civ. 08193(PCT)(PGR), 2015 WL 1522174, at *3 (D.Ariz. Apr. 2, 2015) (holding "the 'knowing' scienter needed for a violation of the FCA may be established not only though a showing of actual knowledge of the falsity of a claim, but also through a showing of deliberate indifference or reckless disregard of whether the claim is false") (citing *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1017, 1050 (9th Cir. 2012)).

An overpayment is 'identified' when the 'provider' is put on notice of a potential overpayment, rather than the moment when an overpayment is conclusively ascertained. *Kane* 120 F.Supp.3d at 387-88. If a defendant intentionally refuses to investigate the possibility of an

overpayment, "it may have unlawfully avoided an obligation to pay money to the government." *Id.* at 394 (citing *United States v. Lakeshore Med. Clinic, Ltd.,* No. 11 Civ. 00892, 2013 WL 1307013, at *4 (E.D.Wis. Mar. 28, 2013)).

Here, Texas pleaded facts that establish not only that Defendants had notice of the obligation, but also that they acted with conscious indifference or reckless disregard of the obligation. Defendants were first put on notice of a potential issue of overpayment when they received their final termination letters in December 2016. See Exh. G. Per their provider agreements, the Provider Manual, and Texas regulations, Defendants should have known that they were required to repay any payments received after their terminations were final and unappealable under Texas law. Exh. E; *see also* 1 Tex. Admin. Code § 371.1655(4).

To obtain the preliminary injunction in the Western District of Texas in 2017, Defendants argued to that court that they would be terminated from Medicaid as a result of the FNOT letters. Exh. H at 11. The fact that Planned Parenthood told the federal district court it would be terminated in January 2017 as a result of the December 2016 FNOT letters demonstrates that Planned Parenthood knew the December 2016 FNOT letters were effective to terminate its contracts.

Planned Parenthood was put on notice *again*, in March 2021, when the Travis County District Court denied Planned Parenthood's Motion for Preliminary Injunction and dismissed its request for mandamus relief. Exh. A. And there can be no dispute that Planned Parenthood was put on notice of its obligation to repay its overpayments when Texas filed its Complaint in Intervention in this case in January 2022.

Planned Parenthood's choice to rely on the federal district court's injunction and the TRO issued by the Travis County District Court, and to not investigate the possibility that it would be

2a415d63ab6d2a4a

obligated to repay reimbursements it received after its final termination from Texas Medicaid itself establishes the scienter needed to prove an unlawful act under the TMPFA.  Tex. Hum Res. Code § 36.0011; *see also U.S. ex rel. Hamilton v. Yavapai Cmty. Coll. Dist.,* No. 12 Civ. 08193(PCT)(PGR), 2015 WL 1522174, at *3 (D.Ariz. Apr. 2, 2015) (construing identical scienter standard under the FCA).

Per the plain language of the TMFPA and the authorities cited above, Texas's Complaint sufficiently alleges that Planned Parenthood was put on notice in 2016 that it faced a potential issue of overpayments; that it had an obligation to repay reimbursements it received between February 1, 2017, and March 12, 2021, after its terminations were final and unappealable by operation of Texas law; and yet, Planned Parenthood deliberately chose to do nothing.

**C. "Materiality" is not an element of an unlawful act under the TMFPA section 36.002(12) claim in this case; Texas has no obligation to plead or prove that Defendants' avoidance of their obligation to refund the $10 million overpayment was "material" to anything; and *Escobar* does not apply to the TMFPA.**

Defendants mistakenly rely on the federal FCA case *Escobar,*[2] but cite to no TMFPA cases, as support for the argument that the "complaint does not plausibly plead materiality" under the relevant TMFPA provision. Mot. to Dismiss, at 18-19 ("C. The Complaint Does Not Plausibly Plead Materiality"). However, "materiality" is not an element of the clause of TMFA § 36.002(12) that is asserted by Texas in this case. Tex. Hum. Res. Code § 36.002(12). As a result, even if Defendants' application of *Escobar* here is proper—and it is not—Texas does not have to plead "materiality" in its complaint.

TMFPA Subsection 12 reads:

A person commits an unlawful act if the person: . . .

---

[2] *Universal Health Services, Inc. v. United States ex rel. Escobar*, 577 U.S. 1214 (2016).

(12) Knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals **or knowingly and improperly avoids** or decreases **an obligation to pay or transmit money** or property **to this state under the Medicaid program**

Tex. Hum. Res. Code § 36.002(12) (highlighting and bold added).

As shown in bold above, the elements of the highlighted TMFPA unlawful act alleged by Texas in this case under subsection 36.002(12) of the TMFPA are: (1) the existence of an obligation to pay money to the State under the Medicaid program; (2) that the Defendant "knowingly and improperly" avoids. The State and Relator must prove the required elements by a preponderance of the evidence. Tex. Hum. Res. Code § 36.1021. The words "material" and "materiality" are not part of the plain language of the highlighted TMFPA subsection 36.002(12) violation at issue in this case.

Because the legislature did not include the word "material" in the text of subsection (12) alleged in this case, the State and Relator have no obligation to plead or prove that Defendants' conduct was "material" to anything. The Court should reject Defendants' invitation to rewrite the TMFPA to add "material" or "materiality" or any other words not included by the Texas legislature, and to require the state to plead or prove any element which is not part of the TMFPA claims at issue. *See Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015) (per curiam) ("A court may not judicially amend a statute by adding words that are not contained in the language of the statute. Instead, it must apply the statute as written."); *see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 575 U.S. 768, 774, 135 S. Ct. 2028, 2033, 192 L. Ed. 2d 35 (2015) ("The problem with this approach is the one that inheres in most incorrect interpretations of statutes: It asks us

to add words to the law to produce what is thought to be a desirable result. That is Congress's province.").

Even if "materiality" is an element of the TMFPA 36.002(12) unlawful act alleged here (which it is not), *Escobar* is still not instructive. FCA "materiality" is different from TMFPA "materiality." This difference is fundamentally part of the plain text—the statutes have different definitions of "material." The TMFPA defines "material" as "having a natural tendency to influence or to be capable of influencing" (Tex. Hum. Res. Code § 36.001(5-a)); the FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, **the payment or receipt of money or property**," thereby, unlike in the TMFPA, tying the concept of "materiality" directly to the payment of claims (31 U.S.C. § 3729(b)(4) (emphasis added)). *Escobar*'s analysis of what is "material" is based on the FCA definition of that term, applying to "the payment or receipt of money or property," which is different from the definition of "material" in the TMFPA, as written by the Texas Legislature. *See TGSNOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen.") Because of the differences between the "material" definitions in the two statutes, and the *Escobar*/FCA focus on the submission of false or fraudulent claims, the TMFPA and not *Escobar* controls in TMFPA cases.[3]

---

[3] As the Texas Supreme Court held, if federal and Texas statutes "employ materially different language," then "the language of our [Texas] statutes controls the outcome." *Xerox*, 555 S.W.3d 518, 535 (Tex. 2018)(interpreting the remedies under the TMFPA, and citing *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d at 516 (Tex. 2012) for the holding that "textual distinctions between parallel state and federal statutes cannot be ignored even when the Legislature intended the statutes to be correlated when possible"); *see also United States ex rel. Govindarajan v. Dental Health Programs*, 2020 WL 3064712, *7 (ND Texas, June 8, 2020) (citing *Xerox* for the holding that when the language between the FCA and TMFPA is "unrelated," in the Northern District's words,

Defendants' complaint that HHSC-OIG made no effort to recoup the overpayment is unavailing for the additional reason that they are attempting to shift blame for their unlawful acts to the State. Controlling Texas Supreme Court precedent interpreting the TMFPA prohibits Defendants' attempt to avoid liability by pointing the finger at the State. *See Nazari v. State*, 561 S.W.3d 495, 497 (2018) (holding in a TMFPA case that Medicaid provider Defendants were not permitted to assert counterclaims against the State to offset statutory liability); *Xerox*, 555 S.W.3d at 520 (holding that *Xerox* Defendants were not permitted to designate responsible third parties under the TMFPA).

**D. Texas's claims should not be dismissed under rule 9(b).**

Planned Parenthood claims that Texas's Complaint does not meet the requirements of Rule 9(b) in its claims against Planned Parenthood Federation of America (PPFA).

When a complaint alleges fraud, it must "state with particularity the circumstances constituting fraud" pursuant to Rule 9(b). *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). This typically requires "details such as the time and place of the false representations." *United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 371 (5th Cir. 2017). However, the Fifth Circuit has clarified that the "time, place, contents, and identity standard is not a straitjacket." *See id.* at 372 (quoting *Grubbs*, 565 F.3d at 190). The application of Rule 9(b) must be "context specific" and "flexible" "to achieve the remedial purpose of the [FCA]." *See Grubbs*,

---

"the TMFPA's plain language controls."). *Escobar* itself emphasizes the distinction between the "material" definitions in the FCA and TMFPA. The *Escobar* Court held the FCA's "focus remains on those who present or directly induce the submission of false or fraudulent claims." *Escobar*, 579 U.S. at 182 (citing 31 U.S.C. § 3729(a)). The TMFPA's focus, at least with the term "material," is not the same because the TMFPA's definition of "material" does not include "the payment or receipt of money or property."

565 F.3d at 190. "Depending on the claim, a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard – it depends on the elements of the claim at hand." *Id.* at 188 (internal citations omitted). The standard for pleading fraud rests somewhere between the Rule 8 pleading standard and the traditional Rule 9(b) pleading standard. *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F.App'x 890, 893 n.3 (5th Cir. 2013). *See also United States ex rel. Grubbs*, 565 F.3d at 189 ("claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme."). Knowledge, intent, and state of mind "may be alleged generally." Fed. R. Civ. P. 9(b).

Texas's complaint states that PPFA is a New York corporation that has over 50 affiliate organizations that provide health care services and abortion services in every State, including the other Defendants in this case. *See* Docket No. 22 at 10.

The Supreme Court has established that a parent corporation may be held liable for its subsidiaries acts when "alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management," and when the parent has interfered with the subsidiaries' operations in a way that surpasses the control exercised by a parent as an incident of ownership. *See*, *e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 64- 65 (1998).

PPFA directed and participated in Defendants' wrongdoing which led to their termination from the Medicaid Program. PPFA also worked with the other Defendants in this case to continue submitting claims for reimbursement by Texas Medicaid despite being terminated under Texas law. And when the state court lifted its TRO, PPFA agreed with the other Defendants in this case to retain overpayments despite Defendants' terminations and statutory obligation to repay the

overpayments. 1 Tex. Admin. Code § 371.1605(b)("All persons and affiliates who participate in the Medicaid and other HHS programs are required to know . . . federal and state law, including rules and regulations, that govern Medicaid . . . the portions of the Texas Medicaid Provider Procedures Manual regarding the services that the person provides . . . the contents of any provider enrollment agreement or application").

PPFA interferes with the operations of other Defendants in this case in a way that surpasses the control exercised by a parent as an incident of ownership. *See* Docket No. 2 at 8-9. PPFA provides significant monetary support to its affiliates as well as other types of support and control, such as directives, marketing, communications, requirements, standards, policies, and accreditation for affiliates providing medical care, insurance coverage, legal counsel and representation, and direct support for the provision of healthcare services. *See* Docket No. 2 at 8-9.

PPFA also requires that affiliates report research studies to PPFA, provides legal review of research contracts, and approves all affiliate research programs and research contracts. *See* Docket No. 2 at 34; *see also* Exh. G. PPFA also sets training and certification requirements for their affiliates and sets medical standards and guidelines each affiliate is required to comply with. *See* Exh. G. In short, PPFA is liable for the conduct of the other Planned Parenthood Defendants.

### E. The court has original subject matter jurisdiction over Texas's state law claim and the TMPFA's action bar does not apply in this case.

Relator's suit alleges both Texas state TMFPA claims, as well as federal FCA claims. Planned Parenthood asks the court to dismiss Texas's TMFPA claims based on a hypothetical situation in which Relator's claims under the FCA are dismissed. However, even if Relator's case is dismissed by the court, the court still has discretion to exercise jurisdiction over any remaining state law claims, including Texas's TMFPA claims. 28 U.S.C § 1367(c) "The district courts **may** decline

to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction, . . ." (emphasis added).

Planned Parenthood claims that an uncurable defect is created by the Government Action Bar of the FCA, unless Relator's complaint is dismissed. Docket 51, at 21-23. Planned Parenthood borrows language from an entirely different statute—the FCA—and attempts to apply it to the TMFPA. However, the TMPFA has its own government action bar, which applies here. Tex. Hum. Res. Code § 36.113(a) ("A person may not bring an action under this subchapter that is based on allegations or transactions that are the subject of a civil suit or an administrative penalty proceeding in which the state is already a party"). The TMFPA's provision does not apply for two reasons: (1) Relator is an "original source;" and (2) the Texas Attorney General has exercised its statutory veto and opposed dismissal.

Relator asserts he is an "original source" and is therefore exempt from the government action bar. *See generally* Relator's Response in Opposition to Defendants' Motion to Dismiss. See also, Hum. Res. Code § 36.113(b) (An "original source" is an individual who "prior to a public disclosure under this subsection, has voluntarily disclosed to the state the information on which allegations or transactions in a claim are based.").

Furthermore, the Attorney General can oppose the court dismissing an action under TMFPA § 36.113(b), and if the Attorney General does so, then § 36.113(b) cannot be the basis of a dismissal. Section 36.113(b) gives the Attorney General veto power over dismissal under that section. TMFPA § 36.113(b) reads, in part: "The court shall dismiss an action or claim under [the TMFPA], unless opposed by the attorney general, . . ." The Texarkana Court of Appeals called this provision, a "statutory veto" and held that the State's opposition to a dismissal under 36.113(b)

rendered a motion to dismiss moot. *See In re Shire PLC*, 633 S.W.3d 1, 28 (Tex. App.—Texarkana 2021, orig. proceeding [mand. denied]) (in this mandamus action, the court held it "need not determine whether the trial court erred by denying Shire's motion to dismiss on public disclosure grounds because the State's opposition has rendered that ground moot.") (citing *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 166–67 (Tex. 2012)). The Attorney General opposes dismissal based on TMFPA § 36.113(b), therefore this case cannot be dismissed under that provision.

## CONCLUSION

For the foregoing reasons, Texas prays this Court deny Defendant's motion to dismiss. Should the Court grant the Motion, Texas respectfully requests that any dismissal be without prejudice, and that Texas be permitted to amend its Complaint.

Dated:  March 11, 2022

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN E. COWLES**
Deputy Attorney General for Civil Litigation

*/s/ Raymond Charles Winter*
**RAYMOND CHARLES WINTER**
Chief, Civil Medicaid Fraud Division
Texas Bar No. 21791950

**AMY SNOW HILTON**
Assistant Attorney General
General Litigation Division

23

State Bar No. 24097834

**HALIE E. DANIELS**
Assistant Attorney General
General Litigation Division
State Bar No. 24100169

Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667
Raymond.Winter@oag.texas.gov
Amy.Hilton@oag.texas.gov
Halie.Daniels@oag.texas.gov

**ATTORNEYS FOR STATE OF TEXAS**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2022 a true and correct copy of the foregoing document was served on the following persons via electronic mail:

| | |
|---|---|
| Yolonda Y. Campbell<br>Trial Attorney<br>Civil Division, Fraud Section<br>U.S. Department of Justice<br>Yolonda.y.campbell@usdoj.gov<br><br>Scott Hogan<br>Civil Chief<br>United States Attorney's Office<br>Northern District of Texas<br>Scott.Hogan@usdoj.gov<br><br>Nicholas J. Diez<br>Assistant Attorney General<br>Medicaid Fraud Control Unit<br>Office of Attorney General Jeff Landry<br>Attorney General of Louisiana<br>DiezN@ag.louisiana.gov<br><br>Andrew B. Stephens | **ATTORNEYS FOR PLANNED PARENTHOOD:**<br><br>Christopher M. Odell<br>SBN 24037205<br>Arnold & Porter Kaye Scholer LLP<br>700 Louisiana Street, Suite 4000<br>Houston, TX 77002-2755<br>Christopher.Odell@arnoldporter.com<br><br>Craig D. Margolis<br>Arnold & Porter Kaye Scholer LLP<br>601 Massachusetts Ave, NW<br>Washington, DC 2001-3743<br>Craig.Margolis@arnoldporter.com<br><br>Tirzah Lollar<br>Arnold & Porter Kaye Scholer LLP<br>601 Massachusetts Ave, NW<br>Washington, DC 2001-3743 |

24

| | |
|---|---|
| Heather Gebelin Hacker<br>Hacker Stephens, LLP<br>108 Wild Basin Road South, Suite 250<br>Austin, Texas 78746<br>Counsel for Relator<br>Andrew@HackerStephens.com<br>Heather@HackerStephens.com | Tirzah.Lollar@arnoldporter.com<br><br>Murad Hussain<br>Arnold & Porter Kaye Scholer LLP<br>601 Massachusetts Ave, NW<br>Washington, DC 2001-3743<br>murad.hussain@arnoldporter.com<br><br><br>Ryan Patrick Brown<br>Blackburn & Brown LLP<br>1222 S. Fillmore St.<br>Amarillo, TX 79101<br>Brown@BlackburnBrownlaw.com |

*/s/ Raymond C. Winter*
**RAYMOND C. WINTER**
Chief, Civil Medicaid Fraud Division

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, §<br>*ex rel.* ALEX DOE, Relator, §<br> §<br>THE STATE OF TEXAS, §<br>*ex rel.* ALEX DOE, Relator, §<br> §<br>THE STATE OF LOUISIANA, §<br>*ex rel.* ALEX DOE, Relator, §<br> §<br>　　　Plaintiffs, §<br> §<br>v. §<br> §<br>PLANNED PARENTHOOD §<br>FEDERATION OF AMERICA, INC. §<br>PLANNED PARENTHOOD GULF §<br>COAST, INC., PLANNED §<br>PARENTHOOD OF GREATER §<br>TEXAS, INC., PLANNED §<br>PARENTHOOD SOUTH TEXAS, §<br>INC., PLANNED PARENTHOOD §<br>CAMERON COUNTY, INC., §<br>PLANNED PARENTHOOD SAN §<br>ANTONIO, INC., §<br> §<br>　　　Defendants. § | Civil Action No. 2:21-CV-00022-Z |

## [PROPOSED] ORDER

Having considered Defendants' Combined Motion to Dismiss the State of

Texas' Complaint in Intervention (Dkt. 50) and Memorandum in Support of

Defendants Combined Motion to Dismiss State of Texas' Complaint in Intervention (Dkt. 51), it is **HEREBY ORDERED** that the Defendants' Combined Motion to Dismiss the State of Texas' Complaint in Intervention is **DENIED**.

Signed on this ____ day of _____, 2022

_____
Matthew J. Kacsmaryk
United States District Judge

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* ALEX DOE, Relator, | § § § § | |
| THE STATES OF TEXAS,<br>*ex rel.* ALEX DOE, Relator, | § § § | |
| THE STATE OF LOUISIANA,<br>*ex rel.* ALEX DOE, Relator, | § § § | Civil Action No. 2-21-CV-022-Z |
| Plaintiffs, | § § § | |
| v. | § § | |
| PLANNED PARENTHOOD FEDERATION<br>OF AMERICA, INC., PLANNED<br>PARENTHOOD GULF COAST, INC.,<br>PLANNED PARENTHOOD OF GREATER<br>TEXAS, INC., PLANNED PARENTHOOD<br>SOUTH TEXAS, INC., PLANNED<br>PARENTHOOD CAMERON COUNTY,<br>INC., PLANNED PARENTHOOD SAN<br>ANTONIO, INC., | § § § § § § § § § § | |
| Defendants. | § § | |

**STATE OF TEXAS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# EXHIBIT A

Velva L. Price
District Clerk
Travis County
D-1-GN-21-000528
Alexus Rodriguez

CAUSE NO. D-1-GN-21-000528

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| PLANNED PARENTHOOD OF | § | |
| GREATER TEXAS FAMILY PLANNING | § | |
| AND PREVENTATIVE HEALTH | § | |
| SERVICES, INC., PLANNED | § | |
| PARENTHOOD OF GREATER TEXAS, | § | TRAVIS COUNTY, TEXAS |
| INC., PLANNED PARENTHOOD SAN | § | |
| ANTONIO, PLANNED PARENTHOOD | § | |
| CAMERON COUNTY, PLANNED | § | |
| PARENTHOOD SOUTH TEXAS | § | |
| SURGICAL CENTER, and PLANNED | § | |
| PARENTHOOD GULF COAST, | § | |
| | § | |
| *Relators.* | § | 261ST JUDICIAL DISTRICT |

**ORDER DENYING ORIGINAL PETITION FOR WRIT OF MANDAMUS AND
APPLICATION FOR INJUNCTIVE RELIEF**

On this date the Court considered the Original Petition for Writ of Mandamus filed by Relators Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc., Planned Parenthood of Greater Texas, Inc., Planned Parenthood San Antonio, Planned Parenthood Cameron County, Planned Parenthood South Texas Surgical Center, and Planned Parenthood Gulf Coast (collectively "Relators"). Relators also applied for injunctive relief as part of their Petition. After considering the briefing submitted by the parties on both the application for injunctive relief and the request for writ of mandamus, and also considering the evidence and argument presented by the parties during a hearing on the application for a temporary injunction, the Court finds that Relators' requests for

injunctive relief and for a writ of mandamus are not meritorious and should be denied.

**IT IS THEREFORE ORDERED** that all of Relators' claims against Respondents Sylvia Hernandez Kauffman, Inspector General; the Office of Inspector General; Cecile Erwin Young, Executive Commissioner of Texas Health and Human Services Commission; and Texas Health and Human Services Commission (collectively "Respondents") in the above-styled cause are hereby **DISMISSED WITH PREJUDICE**.

This is a final judgment that completely disposes of all claims between all parties to this action.

SIGNED on this the ___12th___ day of _____ March ___, 2021.

_____
**DISTRICT JUDGE LORA LIVINGSTON**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 51418408
Status as of 3/16/2021 9:04 AM CST

Associated Case Party: Planned Parenthood of Greater Texas Family Planning and Preventative Health Serv

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Timothy P.Ribelin | | tim.ribelin@huschblackwell.com | 3/12/2021 10:47:10 AM | SENT |
| Thomas H.Watkins | | tom.watkins@huschblackwell.com | 3/12/2021 10:47:10 AM | SENT |
| Samuel Rajaratnam | | Sammy.Rajaratnam@huschblackwell.com | 3/12/2021 10:47:10 AM | SENT |
| Michael Crowe | | Michael.Crowe@huschblackwell.com | 3/12/2021 10:47:10 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Cynthia Givens | | cynthia.givens@Huschblackwell.com | 3/12/2021 10:47:10 AM | SENT |
| Tamera Martinez | | tamera.martinez@oag.texas.gov | 3/12/2021 10:47:10 AM | SENT |
| Elizabeth Spivey | | Elizabeth.Spivey@huschblackwell.com | 3/12/2021 10:47:10 AM | SENT |
| Cathy Werner | | Catherine.Werner@huschblackwell.com | 3/12/2021 10:47:10 AM | SENT |

Associated Case Party: Texas Health and Human Services Commission

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Benjamin Walton | | benjamin.walton@oag.texas.gov | 3/12/2021 10:47:10 AM | SENT |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX DOE, Relator, | § § § § |
| THE STATES OF TEXAS, *ex rel.* ALEX DOE, Relator, | § § § |
| THE STATE OF LOUISIANA, *ex rel.* ALEX DOE, Relator, | § § § Civil Action No. 2-21-CV-022-Z |
| Plaintiffs, | § § |
| v. | § § |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD GULF COAST, INC., PLANNED PARENTHOOD OF GREATER TEXAS, INC., PLANNED PARENTHOOD SOUTH TEXAS, INC., PLANNED PARENTHOOD CAMERON COUNTY, INC., PLANNED PARENTHOOD SAN ANTONIO, INC., | § § § § § § § § § § § |
| Defendants. | § |

**STATE OF TEXAS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# EXHIBIT B

3/10/2021 4:36 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-21-000528
Alexus Rodriguez

**261ST DISTRICT COURT**

**LORA J. LIVINGSTON**
Judge
(512) 854-9309

BRENT D. MCCABE
Staff Attorney
(512) 854-9625

RANDALL LARUE
Judicial Executive Assistant
(512) 854-9337

TRAVIS COUNTY COURTHOUSE
P. O. BOX 1748
AUSTIN, TEXAS 78767
FAX (512) 854-9332

RUBEN TAMEZ
Court Clerk
(512) 854-9457

LA SONYA GAY
Official Court Reporter
(512) 854-9331

March 10, 2021

Thomas H. Watkins
Husch Blackwell LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701
**Via email: tom.watkins@huschblackwell.com**

Benjamin S. Walton
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
**Via email: benjamin.walton@oag.texas.gov**

Re: Cause No. D-1-GN-21-000528; *In re: Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc.*; in the 53rd District Court of Travis County, Texas

Dear Counsel:

I have considered Relators' Application for Temporary Mandatory Injunction and response, Petition for Writ of Mandamus and briefs in support of and in response to the Petition, evidence, and arguments of counsel and hereby deny the Application and the Petition for Writ of Mandamus.

Undoubtedly, the history between these parties is, at best, complex. The motives and merits of the termination of essential health services are hotly contested. The allegations of the Relators raise significant concerns and could not be more serious. For example, it is alleged that the State sought the terminations for purely political motives and without regard for the health and safety of the patients served by these medical providers. The State's justification for their action has been attacked and there is some evidence that the justification is faulty as it is apparently based solely on a series of discredited and debunked videos. These allegations are supported by the rulings in the federal court's preliminary injunction which found that the OIG's grounds for termination lacked any factual support. These issues relate to the merits of the termination and will resolved in the federal litigation and are thus, not before me in these state court proceedings.

In this case, Relators seek a mandamus compelling Respondents "to issue a proper notice of termination that complies with 1 Tex. Admin. Code § 371.1703(e)" and declarations that "(1)HHSC and the OIG cannot terminate Providers from the Medicaid program without proper notice under the Texas Administrative Code; and (2) that the January 4, 2021 letter from HHSC to Providers does not constitute proper notice of termination under the Texas Administrative Code." Therefore, the question before this Court is limited to a determination of the available administrative remedy, if any, Relators are entitled to, following the lifting of the federal court's

Unofficial copy Travis Co. District Clerk Velva L. Price

preliminary injunction. In that context, Relators cite no authority for the proposition that a court injunction requires the OIG to re-notice its termination; that a pending federal court case or injunction tolls the deadline to administratively appeal the termination; or that it can now challenge the propriety of the December 20, 2016, termination letter in a state administrative proceeding. The evidence does not support a finding that Respondents withdrew or abandoned their December 20, 2016, termination, or a finding that the December 15, 2020, and January 4, 2021, letters qualify as new terminations. Therefore, I cannot find that Relators are entitled to the mandamus relief they seek. Relators' Petition for Writ of Mandamus and Application for Temporary Injunction are denied.

This decision is not made lightly. In the light of the ongoing public health crisis, the risks of the individual losing health care and medical attention requires increased attention and scrutiny. The facts underlying the termination in this case give me great pause. However, Relators selected the federal courts as the forum to contest the merits of their claims, and they are now not able to revive their administrative remedies as the deadline to seek that relief has long since passed. The merits of their claims must be determined by the federal courts.

Now that you have my ruling, Mr. Walton is directed to prepare an order, circulate it as to form, and submit it for signature at your earliest convenience. If you have any questions, please contact my Staff Attorney, Brent McCabe.

Sincerely,

Lora L. Livingston
Judge, 261st District Court

cc:  Ms. Velva L. Price, Travis County District Clerk

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 51358333
Status as of 3/12/2021 8:21 AM CST

Associated Case Party: Planned Parenthood of Greater Texas Family Planning and Preventative Health Serv

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Timothy P.Ribelin | | tim.ribelin@huschblackwell.com | 3/10/2021 4:36:36 PM | SENT |
| Thomas H.Watkins | | tom.watkins@huschblackwell.com | 3/10/2021 4:36:36 PM | SENT |
| Samuel Rajaratnam | | Sammy.Rajaratnam@huschblackwell.com | 3/10/2021 4:36:36 PM | SENT |
| Michael Crowe | | Michael.Crowe@huschblackwell.com | 3/10/2021 4:36:36 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Cynthia Givens | | cynthia.givens@Huschblackwell.com | 3/10/2021 4:36:36 PM | SENT |
| Tamera Martinez | | tamera.martinez@oag.texas.gov | 3/10/2021 4:36:36 PM | SENT |
| Elizabeth Spivey | | Elizabeth.Spivey@huschblackwell.com | 3/10/2021 4:36:36 PM | SENT |
| Cathy Werner | | Catherine.Werner@huschblackwell.com | 3/10/2021 4:36:36 PM | SENT |

Associated Case Party: Texas Health and Human Services Commission

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Benjamin Walton | | benjamin.walton@oag.texas.gov | 3/10/2021 4:36:36 PM | SENT |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX DOE, Relator, §§§ | |
| THE STATES OF TEXAS, *ex rel.* ALEX DOE, Relator, §§§ | |
| THE STATE OF LOUISIANA, *ex rel.* ALEX DOE, Relator, §§§ | Civil Action No. 2-21-CV-022-Z |
| Plaintiffs, § | |
| v. § | |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD GULF COAST, INC., PLANNED PARENTHOOD OF GREATER TEXAS, INC., PLANNED PARENTHOOD SOUTH TEXAS, INC., PLANNED PARENTHOOD CAMERON COUNTY, INC., PLANNED PARENTHOOD SAN ANTONIO, INC., §§§§§§§§§§ | |
| Defendants. § | |

## STATE OF TEXAS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# EXHIBIT C

No. 17-50282

# In the United States Court of Appeals for the Fifth Circuit

PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING
AND PREVENTATIVE HEALTH SERVICES, INC., ET AL.;

*Plaintiffs-Appellees*,

*v.*

CHARLES SMITH, IN HIS OFFICIAL CAPACITY AS EXECUTIVE COM-
MISSIONER OF HHSC, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division,
No. 1:15-cv-01058

## MOTION TO STAY THE DISTRICT COURT'S
INJUNCTION PENDING EN BANC CONSIDERATION

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

KYLE D. HAWKINS
Solicitor General
kyle.hawkins@oag.texas.gov

HEATHER GEBELIN HACKER
Assistant Solicitor General

ANDREW B. STEPHENS
Assistant Attorney General

*Counsel for Appellants*

# Table of Contents

Table of Authorities ..................................................................ii

Introduction .......................................................................... 1

Background ........................................................................... 2

Argument .............................................................................. 3

    I. In Declaring the Injunction Unlawful, This Court Has Already Decided That the State Will Succeed on the Merits of its Appeal. ............................................................................ 5

    II.The Plaintiffs Will Not Be Irreparably Harmed Absent a Stay. ........ 5

    III.    No Other Parties Will Be Irreparably Harmed. ......................... 7

    IV.    The State Will Be Irreparably Harmed Absent a Stay, and the Public Interest Favors Texas's Ability to Terminate Provider Agreements with an Organization That No Longer Is Qualified Under the Texas Medicaid Program. ......................................... 9

Conclusion ........................................................................... 12

Certificate of Conference ........................................................... 13

Certificate of Service ............................................................... 13

Certificate of Compliance ........................................................... 14

i

# Table of Authorities

**Page(s)**

**Cases**

*Barber v. Bryant,*
    833 F.3d 510 (5th Cir. 2016) ....................................................7

*Barsky v. Bd. of Regents of Univ. of N.Y.,*
    347 U.S. 442 (1954)................................................................10

*City of El Cenizo v. Texas,*
    No. 17-50762, 2017 WL 4250186 (5th Cir. Sept. 25, 2017)
    (per curiam) ...........................................................................4

*City of Meridian v. Algernon Blair, Inc.,*
    721 F.2d 525 (5th Cir. 1983) ....................................................7

*Deerfield Med. Ctr. v. City of Deerfield Beach,*
    661 F.2d 328 (5th Cir. 1981) ....................................................7

*Dennis Melancon, Inc. v. City of New Orleans,*
    703 F.3d 262 (5th Cir. 2012) ....................................................7

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) ..............................................................10

*Maryland v. King,*
    567 U.S. 1301 (2012) (Roberts, C.J., in chambers)..................10

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) (Rehnquist, J., in chambers)..................10

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................*passim*

*ODonnell v. Goodhart,*
    900 F.3d 220 (5th Cir. 2018)....................................................7

*Planned Parenthood of Greater Tex. Surgical Health Servs. v.*
    *Abbott,*
    734 F.3d 406 (5th Cir. 2013)................................................4, 5

*Planned Parenthood of Gulf Coast, Inc. v. Gee,*
    862 F.3d 445 (5th Cir. 2017) .................................................................. 1, 2

*Veasey v. Abbott,*
    870 F.3d 387 (5th Cir. 2017) (per curiam) ...................................... 4, 9, 10

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) .................................................................................. 10

**Statutes**

42 U.S.C.A.
    § 1396a(a)(9)(A) ...................................................................................... 10
    § 1396a(a)(9)(B)....................................................................................... 10
    § 1396a(a)(23) ............................................................................... 1, 2, 3, 11

**Other Authorities**

Fed. R. App. P. 8(a)(2)........................................................................... 1, 4

## Introduction

The district court entered a preliminary injunction to prevent a Texas agency from terminating the Medicaid provider agreements of Texas Planned Parenthood affiliates. This Court has now held, in a unanimous judgment, that the district court's preliminary injunction is unlawful. *See* App. 29. The Court explained that the district court applied the wrong legal standard, and that its "procedure was incompatible with the proper standard." *See* App. 22-29. Further, the district court improperly considered materials outside the record. *See* App. 22, 23, 27, 29. For these reasons, the Court held that "the basis for [the] preliminary injunction cannot be sustained." App. 29.

The State has now sought en banc review of an antecedent question: Whether the qualified-provider provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(23), allows private individuals to bring an action to challenge a state agency's determination that a service provider is not "qualified" under that statute. The State has asked the en banc Court to overrule *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. 2017).

Whether and how the en banc Court chooses to resolve that threshold question cannot rehabilitate the district court's manifestly unlawful injunction. The State therefore moves the Court to stay that injunction pending resolution of the pending petition for rehearing en banc and any related proceedings that might follow. *See* Fed. R. App. P. 8(a)(2). In light of the panel's decision unequivocally declaring the injunction unlawful, a stay is easily warranted. *See Nken v. Holder*, 556 U.S. 418 (2009).

## Background

In early 2015, over eight hours of undercover video was filmed at Planned Parenthood Gulf Coast's facility in Houston, Texas. ROA.5846-6208 (video transcript); ROA at DX-2 (video footage). This video footage demonstrated violations of accepted medical and ethical standards in numerous ways, and the Texas Health and Human Services Commission Office of Inspector General (OIG) determined that Texas Planned Parenthood affiliates could no longer could serve as qualified providers in the Texas Medicaid program. *See* ROA.1210-11. As a result, OIG terminated their provider agreements. ROA.1209-14.

The Texas Planned Parenthood affiliates ("Provider Plaintiffs") and several individual plaintiffs brought suit to challenge that termination. Following a hearing, ROA.22-23, the district court below determined that the plaintiffs had satisfied the criteria necessary to obtain a preliminary injunction blocking the termination, ROA.3776-3819. The State appealed, raising two main issues: first, that the plaintiffs lack a private right of action; and second, that the district court's injunction was unlawful. *See* App. 12.

The panel determined that under *Gee*, 862 F.3d at 459-60, the individual plaintiffs have a private right of action under 42 U.S.C. § 1396a(a)(23), and that it was "constrained" by *Gee*'s conclusion, App. 2. But the panel vacated the injunction, holding that the district court abused its discretion by reviewing OIG's termination decision de novo, rather than under arbitrary-and-ca-

pricious review, and by considering evidence outside of the administrative rec-ord. App. 17, 29. The court remanded the case to the district court for appli-cation of the correct standard to the evidence in the administrative record alone. App. 29. Judge Jones wrote a separate concurrence to outline the rea-sons that *Gee*'s holding was incorrect, and requested rehearing en banc to "re-consider whether Section 1396a(a)(23) creates a private right of action on be-half of Medicaid patients to challenge the termination of their providers' con-tracts by the States." App. 36 (Jones, J., concurring). The State has requested en banc review for the same issue.

Under the district court's injunctive relief, which was issued in January 2017, the State has been forced to retain the Provider Plaintiffs as qualified Medicaid providers and allow them to provide medical services to Texas Med-icaid recipients. ROA.3776-3819. Under the injunction, the State has already been forced to pay the Provider Plaintiffs millions of dollars in Medicaid ser-vice reimbursement funds. *See* ROA.4315 (in 2016, Texas paid approximately $3.4 million to the Provider Plaintiffs in Medicaid reimbursements).

## Argument

The Court should stay the district court's injunction pending the resolu-tion of the en banc petition and any subsequent related proceedings. "An ap-pellate court's power to hold an order in abeyance while it assesses the legality of the order has been described as 'inherent.'" *Nken*, 556 U.S. at 426 (citation omitted). The Supreme Court has set out a four-part test for assessing whether to stay a district court order pending appeal. *See id.*; *Veasey v. Abbott*,

870 F.3d 387, 391 (5th Cir. 2017) (per curiam). The first consideration is "whether the stay applicant has made a strong showing that he is likely to succeed on the merits." *Nken*, 556 U.S. at 426. The second is "whether the applicant will be irreparably injured absent a stay." These first two factors "are the most critical." *Id*. at 434. Less "critical," but still relevant, are "whether issuance of the stay will substantially injure the other parties interested in the proceeding," and "where the public interest lies." *Id*. at 426; *see also City of El Cenizo v. Texas*, No. 17-50762, 2017 WL 4250186, at *1-2 (5th Cir. Sept. 25, 2017) (per curiam) (adopting *Nken* four-part test).

In light of the panel decision declaring the district court's preliminary injunction unlawful, the injunction should be stayed while further appellate proceedings unfold. In particular, the panel's decision declaring the injunction invalid establishes that the State—not plaintiffs—are likely to prevail on the merits. Plaintiffs face no irreparable harm if the district court's unlawful order is stayed. No other parties face irreparable injury. And the public interest squarely lies with allowing Texas to immediately remove an unethical and unqualified provider from its Medicaid program.[1]

---

[1] Fed. R. App. P. 8(a)(2) allows the State to seek a stay in this Court where moving in the district court "would be impracticable." *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410-11 (5th Cir. 2013). That standard is met here because this Court already has exercised its appellate jurisdiction and determined that the district court's injunction is unlawful. In addition, the Court is currently considering the State's pending petition to rehear a portion of this case en banc. Under these circumstances, this Court is best positioned to determine whether to stay the district court's unlawful injunction pending the remainder of any appellate proceedings. *See id.* (staying district court's injunction pending appeal despite no request for stay in the district court).

## I. In Declaring the Injunction Unlawful, This Court Has Already Decided That the State Will Succeed on the Merits of its Appeal.

The panel decision already held the district court's injunction is unlawful. The district court strayed from the record, applied the wrong legal standard, and failed to follow proper procedures. *See* App. 22-29. This Court has thus already established not just that the State is *likely* to succeed on the merits of its appeal, but rather, that the State *has succeeded* and *will continue to succeed* in establishing that the injunction cannot stand. *See Nken*, 556 U.S. at 426. As this "most critical" factor is now conclusively resolved, the Court should not permit a clearly unlawful injunction to persist any longer. *See id.*[2]

## II. The Plaintiffs Will Not Be Irreparably Harmed Absent a Stay.

The district court's injunction was issued on behalf of the individual plaintiffs only. ROA.3796, 3932. Even if plaintiffs could make a "strong showing that their interests would be harmed by staying the injunction, given the State's likely success on the merits, this is not enough, standing alone, to outweigh the other factors." *Abbott*, 734 F.3d at 419.

But there is no evidence in the record that the individual plaintiffs will be unable to receive medical care at the facility of their choice if the State ceases to provide Medicaid payments to the Provider Plaintiffs—especially when these providers have not stated that they will refuse to serve these individuals

---

[2] Even if the district court had applied the correct legal standard, the plaintiffs still could not prevail. The only probative evidence in the administrative record is the undercover videos, and that evidence leaves no doubt that the State's termination decision was proper. *See* App. 7-10.

or individuals similarly situated if they do not receive Medicaid reimbursement. Thus, the individual plaintiffs cannot establish irreparable harm. *See Nken*, 556 U.S. at 426.

At the preliminary-injunction hearing, Planned Parenthood Greater Texas (PPGT) CEO Ken Lambrecht testified that their doors will stay open even if they do not get Medicaid funds from Texas. ROA.4124. Planned Parenthood South Texas (PPST) CEO Jeffrey Hons was asked directly whether PPST will provide care to Medicaid patients even if Medicaid funds are withheld, and he refused to give a yes or no answer:

> Q. So you will be able to provide care for some of the individuals if Medicaid funds are withheld?
>
> A. We'll just have to wait and see, won't we?

ROA.4297. The Provider Plaintiff CEOs have, at most, testified that they might have to make changes to their operations if their Medicaid provider agreements are terminated. ROA.4114, 4133-34, 4302. That is not enough to establish that the individual plaintiffs will actually suffer irreparable harm should Provider Plaintiffs' termination from Texas Medicaid become effective.

Because this Court has already declared that the State succeeds on the merits of its appeal, and because no individual plaintiff will suffer irreparable harm from a stay of the injunction, the two "most critical" *Nken* factors conclusively favor the State. 556 U.S. at 426; *see also ODonnell v. Goodhart*, 900

F.3d 220, 223 (5th Cir. 2018) ("The first two factors are the most critical." (citing *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016)).

## III. No Other Parties Will Be Irreparably Harmed.

Nor is there any evidence in the record to demonstrate that Provider Plaintiffs will suffer irreparable harm if the district court's improper preliminary injunction is stayed pending en banc resolution. If the Provider Plaintiffs are terminated from the Texas Medicaid program, they may experience lower revenue, but this Court has squarely held that such "monetary injury" does not support injunctive relief. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."); *City of Meridian v. Algernon Blair, Inc.*, 721 F.2d 525, 529 (5th Cir. 1983) (same). The fact that an economic injury may be rectified weighs "heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012).

That is especially so where, as here, Medicaid plays an insignificant role in the Provider Plaintiffs' finances. In 2013, PPGT had total revenue of $33,922,566 and net assets of $41,839,154. ROA.8688. PPGT received $950,000 in reimbursements from Texas Medicaid in 2016. ROA.4123-24. In 2013, PPST had total revenue of $4,252,525 and net assets of $3,749,103. ROA.8295. PPST received $350,000 in reimbursements from Texas Medicaid in 2016. ROA.4289. In 2013, PPGC had total revenue of $19,667,024 and net assets of $43,548,729. ROA.7966. In 2016, the total revenue for PPGC's

research department alone was $2.5 million dollars—more than the $2.2 million that they received that year in reimbursements from Texas Medicaid. ROA.4236, 4135.

Nothing in the record suggests that the loss of this revenue would leave Provider Plaintiffs wholly unable to continue their operations. In fact, Provider Plaintiffs have insisted in sworn testimony that the opposite is true. *See* ROA.4114, 4133-34, 4302 (testimony of Provider Plaintiff CEOs that at most, they might change their operations if their Medicaid provider agreements are terminated); ROA.4124 (testimony that Planned Parenthood Greater Texas will remain in operation even without Texas Medicaid funds).

Nor will Medicaid patients be left without available providers for the services they seek. In Texas, there are 141,000 providers enrolled in the Medicaid program, including 29,000 primary-care physicians and over 3,300 obstetrician/gynecologists. ROA.4511, 4515. These other providers together perform 99.7% of all Medicaid services in the State. ROA.4518.

There are also other health programs funded by the State that Medicaid recipients may participate in. Texas spends an additional $210 million annually on women's-health programs that cover family-planning services for individuals between the ages of 15 and 64, depending on the program. ROA.4442, 4446. In 2016, Texas women's-health programs served approximately 363,000 women. ROA.4446. The providers in these programs offer the same services as Planned Parenthood clinics, including pelvic exams, contracep-

tives, sexually-transmitted-infection screenings, and breast- and cervical-cancer screenings and diagnostic tests. ROA.4443-44. These programs also provide additional services to care for conditions found to affect reproductive health and not provided by Planned Parenthood, such as the screening, diagnosis, and treatment of hypertension, cholesterol, and diabetes. ROA.4444. Provider Plaintiffs are thus not necessary to providing services to Medicaid recipients, and in fact, nearly all Medicaid recipients are already receiving services elsewhere, *see* ROA.4518. No irreparable harm will result from termination of Provider Plaintiffs' Medicaid provider agreements.

## IV. The State Will Be Irreparably Harmed Absent a Stay, and the Public Interest Favors Texas's Ability to Terminate Provider Agreements with an Organization That No Longer Is Qualified Under the Texas Medicaid Program.

By contrast, both the State and Medicaid recipients will suffer irreparable harm if the State is forced to continue complying with an unlawful injunction. And keeping the invalid injunction in place is contrary to the public's interest. "Because the State is the appealing party, its interest and harm merge with that of the public." *Veasey*, 870 F.3d at 391 (citing *Nken*, 556 U.S. at 435).

Unless the preliminary injunction is stayed, the State will be forced to keep the Provider Plaintiffs as Medicaid providers, despite the State's determination that they violated medical and ethical standards, *see* ROA.1209-14, which is likely to be upheld, *see* p.7 n.2 *supra*. When a State is enjoined from enforcing the law, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey*, 870 F.3d at 391

(citing *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers));

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)

(Rehnquist, J., in chambers). Medical providers hold a special position of trust

in our society and therefore must adhere to the highest standards of account-

ability. A medical provider that is willing to transgress medical and ethical

standards should not continue to receive the benefit of state or federal monies,

and staying the preliminary injunction will allow the State to fulfill its obliga-

tion under federal law and protect the integrity of the Medicaid program,

which is in the public's interest. *See* 42 U.S.C.A. § 1396a(a)(9)(A), (B); *see*

*also Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("There can be no doubt

the government 'has an interest in protecting the integrity and ethics of the

medical profession.'" (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731

(1997)); *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954) (the

State has "legitimate concern for maintaining high standards of professional

conduct" in the practice of medicine).

In addition to the irreparable harm of being unable to protect the integrity

of the Medicaid program, and potential harm to Medicaid recipients who may

receive services from an unqualified, unethical provider, the State will also be

forced continue to pay the Provider Plaintiffs for Medicaid services provided

until the petition for rehearing en banc is resolved. Based on the current rate

of requests for reimbursement, that could total an additional 1.7 million dollars

for every six months the Provider Plaintiffs remain forcibly qualified Medicaid

providers. *See, e.g.*, ROA.4315 (in 2016, Texas paid approximately $3.4 million to the Provider Plaintiffs in Medicaid reimbursements).

There is no justification for continuing to prevent the State from terminating these providers when this Court has already determined that the district court's preliminary-injunction order was improper. *See* App. 29. The State's petition for rehearing en banc, just like Judge Jones's request for rehearing in her concurrence, *see* App. 36, asks the Court to review the issue of whether there is a private right of action under the qualified-provider provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(23). Whether and how the Court might resolve that issue cannot rehabilitate the district court's manifestly unlawful injunction, and thus, the injunction should be stayed to prevent continuing harm to the State, Medicaid recipients, and the public's interest.

## Conclusion

This Court should grant the State's motion and stay the district court's preliminary injunction pending resolution of the petition for en banc review and any subsequent related proceedings.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Kyle D. Hawkins
Kyle D. Hawkins
Solicitor General

Heather Gebelin Hacker
Assistant Solicitor General

Andrew B. Stephens
Assistant Attorney General

*Counsel for Appellants*

## CERTIFICATE OF CONFERENCE

Prior to filing, my office conferred with Jennifer Sandman and Thomas Watkins, counsel for Appellees. Ms. Sandman stated that Appellees oppose this motion and will be filing a written opposition.

/s/ Kyle D. Hawkins
KYLE D. HAWKINS

## CERTIFICATE OF SERVICE

On February 1, 2019, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Kyle D. Hawkins
KYLE D. HAWKINS

## Certificate of Compliance

This Motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2729 words, excluding the parts of the brief exempted by Rule 27(a)(2)(B); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Kyle D. Hawkins
Kyle D. Hawkins

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 17, 2019

Lyle W. Cayce
Clerk

No. 17-50282

PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING
AND PREVENTATIVE HEALTH SERVICES, INC; PLANNED
PARENTHOOD SAN ANTONIO; PLANNED PARENTHOOD CAMERON
COUNTY; PLANNED PARENTHOOD GULF COAST, INC; PLANNED
PARENTHOOD SOUTH TEXAS SURGICAL CENTER; JANE DOE #1;
JANE DOE #2; JANE DOE #4; JANE DOE #7;
JANE DOE #9; JANE DOE #10; JANE DOE #11,

            Plaintiffs - Appellees

v.

CHARLES SMITH, in his official capacity as Executive Commissioner of
HHSC; SYLVIA HERNANDEZ KAUFFMAN, in her official capacity as
Acting Inspector General of HHSC,

            Defendants - Appellants

Appeal from the United States District Court
for the Western District of Texas

Before JOLLY, JONES, and HAYNES[1], Circuit Judges.

EDITH H. JONES, Circuit Judge:

The Texas Health and Human Services Commission's Office of Inspector
General ("OIG") sought to terminate the Medicaid provider agreements of
Planned Parenthood affiliates throughout the state. The agency based this

---

[1] Judge Haynes concurs in the judgment only.

No. 17-50282

decision largely on undercover video footage of graphic discussions with Planned Parenthood personnel concerning the prospective sale of liver, thymus, and neural tissue from fetuses aborted during the second trimester of pregnancy. The videos justified terminating the affiliates' provider agreements, the agency contended, because they indicated noncompliance with accepted medical and ethical standards. Three Planned Parenthood affiliates ("Provider Plaintiffs") and several Medicaid beneficiaries ("Individual Plaintiffs") sought a preliminary injunction against the termination decision. The district court held that the Individual Plaintiffs possessed a private right of action under the "qualified-provider" provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(23), and issued a preliminary injunction preventing Texas from terminating Medicaid funding to the Planned Parenthood facilities statewide. The state agency has appealed.

We are constrained to affirm the district court's conclusion that the plaintiffs possess a private right of action, as held by this court in *Planned Parenthood Gulf Coast v. Gee*, 862 F.3d 445 (5th Cir. 2017) (hereafter, "*Gee*") (*cert denied*, 139 S. Ct. 408). But Judge Jones, in a separate concurrence, urges rehearing en banc on that issue, which has divided the appellate courts. We vacate the preliminary injunction and remand for the district court to limit its review to the agency record under an arbitrary-and-capricious standard.

## I. BACKGROUND

### A. Planned Parenthood Affiliates

The Provider Plaintiffs operate health centers and provide family planning services to about 12,500 Medicaid patients and the general public. Planned Parenthood Gulf Coast ("PPGC") runs seven health centers in the Houston area. Planned Parenthood Greater Texas ("PPGT") and Planned

No. 17-50282

Parenthood South Texas ("PPST")[2] operate an additional 23 health centers.  As affiliates of Planned Parenthood Federation of America ("PPFA"),  they must adhere to various organizational standards  to use the Planned Parenthood name and trademark.

Among the Provider Plaintiffs, only PPGC has sold fetal tissue for use in outside research.[3]  Melissa Farrell has served as PPGC's Research Director since 2006.  In this role, she provides information about PPGC's services to outside researchers, develops budgets and contracts, and facilitates Institutional Review Board ("IRB") submissions.  Ms. Farrell has been involved in several outside studies involving fetal tissue research.  In 2006, PPGC participated in a first-trimester fetal tissue study.  A second study, conducted in conjunction with the University of Texas Medical Branch in Galveston ("UTMB"), ran from 2010 to 2011 and concerned first-trimester placental tissue.

To facilitate these studies, Ms. Farrell stated that she would modify certain clinical procedures and require consent from the abortion patients whose procedures yielded fetal tissue.  Both studies required that fetal tissue be processed and packaged following the abortions.   The UTMB study additionally required PPGC to use a sterile process to collect the placental

---

[2] PPST is technically an umbrella organization comprising three other named plaintiffs: Planned Parenthood Cameron County, Planned Parenthood San Antonio, and Planned Parenthood South Texas Surgical Center.

[3] PPGC itself does not technically provide abortions.  But an affiliated entity—located in the same building as PPGC's headquarters and called Planned Parenthood Center For Choice ("PPCFC")—does provide abortions.  PPGC's own research department handles all of PPCFC's research agreements because PPCFC has no separate research department or personnel of its own.  The district court pretermitted the question whether PPGC and PPCFC were effectively a single organization.

No. 17-50282

tissue after the abortion.  Dr. Regan Theiler, a researcher involved in the UTMB project, also performed abortions at PPGC's facility.

Ms. Farrell communicated with Baylor College of Medicine regarding another fetal tissue donation project from 2013 through 2015.  They discussed IRB approval, next steps, and draft contract terms, but no contract or budget was finalized.

**B.  Undercover Videos and Ensuing Investigations**

In 2015, the Center for Medical Progress ("CMP"), a pro-life organization, released more than eight hours of undercover videos disclosing conversations held at the PPGC headquarters.  In the CMP videos, two individuals posed as representatives from a fetal tissue procurement company.  They claimed to be interested in purchasing liver, thymus, and neural tissue from fetuses aborted during the second trimester of pregnancy.  Ms. Farrell features prominently in the video, as she discusses the possibility of a research partnership, provides a tour of PPGC's surgical facilities, and displays tissue samples from recently aborted fetuses.



Dr. Tram Nguyen, the director of PPGC's abortion facility, confirmed many of Ms. Farrell's statements.

4

No. 17-50282

The release of these graphic videos prompted federal and state investigations into numerous Planned Parenthood affiliates. The Harris County District Attorney, the Texas Rangers, and the Houston Police Department investigated but brought no charges. Likewise, the Texas Attorney General's Office, the Texas Department of State Health Services, and the Texas Health and Human Services Commission conducted investigations.

Additionally, the U.S. House of Representatives formed a Select Investigative Panel ("Select Panel") to investigate abortion providers' medical practices involving fetal tissue procurement. Representative Marsha Blackburn of Tennessee, a Republican, was named Chair of the bipartisan Select Panel. In December 2016, Blackburn emailed the Texas Attorney General Ken Paxton evidence the Select Panel had gathered about PPGC and asked Texas to investigate possible violations of Tex. Penal Code § 48.02, which prohibits the purchase and sale of human organs, and Tex. Penal Code § 37.08, which prohibits making a false report to a law enforcement officer.

## C. Termination of Medicaid Provider Agreements

As participants in the Texas Medicaid program,[4] the Provider Plaintiffs and each of their related health centers signed Medicaid provider agreements and agreed to comply with all Texas Medicaid policies and applicable state and federal regulations. The Provider Plaintiffs received $3.4 million from Texas Medicaid funds.[5] Texas Health and Human Services Commission Office of Inspector General ("OIG" or "the agency") oversees compliance with state

---

[4] Texas Medicaid only pays for abortions under narrow circumstances—specifically, when a woman's life is in danger or for victims of rape and incest.

[5] This amount is a smidgen of the three affiliates' combined revenues of approximately $57 million in 2013.

No. 17-50282

Medicaid policies and may conduct investigations and terminate Medicaid provider agreements for noncompliance.

OIG may terminate a Medicaid provider agreement when "prima facie evidence" establishes that a provider has committed a "program violation" or is "affiliated with a person who commits a program violation." 1 Tex. Admin. Code § 371.1703(c), (c)(6)-(8). A "program violation" includes any violation of federal law, state law, or the Texas Medicaid program policies. For instance, as explained in the Texas Medicaid Provider Procedures Manual, a provider violates Texas Medicaid rules if it fails to offer health services in accordance with "accepted medical community standards." *See* 1 Tex. Admin. Code § 371.1659(2).

In October 2015, OIG sent each Provider Plaintiff a Notice of Termination, stating that each was "no longer capable of performing medical services in a professionally competent, safe, and legal manner." The Notice listed the bases for termination and stated that, unless the Provider Plaintiffs responded within 30 days, a Final Notice of Termination would issue.

Instead of responding to the Notice and pursuing administrative and state judicial avenues of relief, the Provider Plaintiffs sued in federal court to block the termination. The Individual Plaintiffs—Texas Medicaid beneficiaries who have received services from the Provider Plaintiffs—joined in this challenge. On the state agency's motion, the district court stayed the proceedings for almost a year pending a Final Notice of Termination. OIG sent the Final Notice on December 20, 2016.

The Final Notice states that the Inspector General had determined that the Provider Plaintiffs were "not qualified to provide medical services in a professionally competent, safe, legal and ethical manner under the relevant provisions of state and federal law pertaining to Medicaid providers." The

6

No. 17-50282

Final Notice bases this conclusion on the CMP videos and evidence provided by the Select Panel. The Final Notice states that the Inspector General consulted with the Chief Medical Officer, who reviewed the evidence and concluded that PPGC had violated "generally accepted medical standards, and thus [was] not qualified to provide medical services."

The Final Notice then specifies the "numerous violations of generally accepted standards of medical practice" established by the CMP video, including "a history of deviating from accepted standards to procure samples that meet researcher[s'] needs" and "a history of permitting staff physicians to alter procedures to obtain targeted tissue samples needed for their specific outside research." The Final Notice also states that evidence establishes that PPGC engaged in misrepresentations regarding fetal tissue procurement. The Final Notice concludes that under OIG's regulations, affiliates of a terminated entity are also subject to termination. *See* 1 Tex. Admin. Code § 371.1703(c)(7).

### D. Court Proceedings

After reviewing the Final Notice, the plaintiffs filed an amended complaint and a new motion for a preliminary injunction. The district court conducted a three-day evidentiary hearing, during which it reviewed the CMP videos and heard testimony from medical and ethics experts on both sides. The plaintiffs offered testimony of the Provider Plaintiffs' CEOs, Ms. Farrell, and PPGC's Medical Director. The agency offered testimony of the Inspector General, OIG's Chief Medical Officer, an expert in obstetrics and gynecology, and a bioethics expert.

Much of the evidentiary hearing consisted of review and analysis of clips from the CMP videos. The agency focused on evidence that PPGC had violated federal regulations relating to fetal tissue research by altering abortion procedures for research purposes or allowing the researchers themselves to be

No. 17-50282

involved in performing abortions to harvest their preferred tissue samples. *See* 42 U.S.C. § 289g-1(c)(4) (requiring researchers to certify that they "had no part in any decisions as to the timing, method, or procedures used to terminate the pregnancy made solely for the purposes of the research"); 45 C.F.R. § 46.204(i) (for research involving pregnant women or fetuses, requiring that "[i]ndividuals engaged in the research will have no part in any decisions as to the timing, method, or procedures used to terminate a pregnancy"); 42 U.S.C. § 289g-1(b)(2)(A)(ii) (requiring researchers to certify that "no alteration of the timing, method, or procedures used to terminate the pregnancy was made solely for the purposes of obtaining the tissue"). The plain purposes of the regulations are to prevent conflicts of interest between the researcher and patients and to eliminate any temptation to place research studies above the patients' medical needs. In addition to federal regulations, state regulations authorize sanctions for providers who fail to adhere to "accepted medical community standards." *See* 1 Tex. Admin. Code § 371.1659(2).

Various of Ms. Farrell's statements were offered as evidence that PPGC had violated or is willing to violate these standards. For example, at one point in the video, Ms. Farrell responds to questions about whether PPGC has "physicians who would be able to change the procedure a bit" for research purposes, and Ms. Farrell says, "Yep." She then adds:

> Yes. And it will depend. Obviously the change in the procedure will have to be where it's not going to put the patient at more risk . . . prolong the procedure putting her at more risk, and altering the procedure where we leave content in the patient, which obviously we're trying to get . . . and that's something we'll have to discuss, you know, with the docs . . . and see how they can do it. Because some of our[] doctors in the past have projects, and they're collecting the specimens so they do it in a way that they get the best specimen. So I know it can happen.

No. 17-50282

Later in the video, Ms. Farrell identifies Dr. Theiler, a participant in the
UTMB study, as someone who would be a good reference. She explains:

> Yeah. So she knows what's involved in modifying what we need to
> do to get you the specimens that are intact because she's done it.
> . . . And she was doing those here.

Dr. Nguyen confirmed that the PPGC abortion facility can obtain intact liver
and thymus. The doctor stated, sarcastically, that while federal law
(prohibiting partial birth abortions) restricts a facility from intentionally
retrieving an intact fetus, PPGC can make it happen by signing a form that
they did not so "intend." Nguyen also stated that obtaining intact specimens
of liver, thymus, and neural tissue depends upon the amount of cervical
dilation of the patient and the patient's pain tolerance. The doctor noted risks
associated with fetal tissue procurement that PPGC is willing to take because
"it is for a good cause." The doctor acknowledged that two particular PPGC
doctors can alter the abortion procedure to meet a researcher's request.
Relying on these statements, others like them, and their expert testimony, OIG
sought to justify its termination decision.

The plaintiffs' live witnesses, on the other hand, denied that PPGC ever
altered abortion procedures for research purposes. Ms. Farrell herself testified
that, in the videos, she was actually discussing changes to clinical operations
and not changes to the abortion procedures themselves.

Following the hearing, the district court issued a memorandum and
order granting the plaintiffs' motion for a preliminary injunction. The district
court held that the Individual Plaintiffs possessed a private right of action to
challenge OIG's termination decision. Analyzing OIG's evidence of PPGC's
program violations, the district court credited the plaintiffs' self-justifying
explanations. The court found that even in the light most favorable to the
agency, the videotaped discussions were ambiguous and open to interpretation.

9

No. 17-50282

The district court stated, inaccurately, that the CMP video had not been authenticated and suggested that it may have been edited.[6] The district court also noted that neither the Inspector General nor the Medical director had expert knowledge concerning abortion procedures. And the court discounted Ms. Farrell's videotaped statements because she claimed on the witness stand that she really had no personal knowledge of the medical aspects of abortion procedures and had never even been in the room when an abortion was performed.

While the court felt free to credit all of the trial testimony from the Provider Plaintiffs—none of which had been offered during the state administrative procedures—the court bound the IG solely to the administrative record and expressly refused to consider any support for termination "not included in the Final Notice and not part of the Inspector General's termination decision." Having thus narrowed the evidence, the court concluded that OIG "did not have prima facie . . . evidence, or even a scintilla of evidence, to conclude the bases of termination set forth in the Final Notice merited finding the Plaintiff Providers were not qualified." The agency timely appealed.

## II.  STANDARD OF REVIEW

"A preliminary injunction is an 'extraordinary remedy.'" *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). "To be entitled to a

---

[6] In fact, the record reflects that OIG had submitted a report from a forensic firm concluding that the video was authentic and not deceptively edited. And the plaintiffs did not identify any particular omission or addition in the video footage. Moreover, the district court also suggested that there was no evidence that any of PPGC's research was federally funded, so the regulations relied on by OIG might be inapplicable. But the record actually establishes that the UTMB study was funded by the National Institute of Health.

No. 17-50282

preliminary injunction, the applicants must show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Tex. Med. Providers Performing Abortion Servs. v. Lakey,* 667 F.3d 570, 574 (5th Cir. 2012) (brackets and citations omitted). The party seeking preliminary injunctive relief must clearly carry the burden of persuasion on all four elements. *Id.* This court "review[s] a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo.*" *Texans for Free Enter.*, 732 F.3d at 537. When a court applies incorrect legal principles, it abuses its discretion. *See Atchafalaya Basinkeeper v. United States Army Corps of Engineers*, 894 F.3d 692, 696 (5th Cir. 2018).

## III. DISCUSSION

The following discussion demonstrates that the district court erred in evaluating the evidence *de novo*, in its peculiarly asymmetrical way, rather than under the arbitrary and capricious standard, and in applying *Gee's* reasoning to its determination of a "qualified" provider in this context. For those reasons, the court erred legally and Appellees are unable to show a likelihood of success on the merits of their claim. Accordingly, it is unnecessary for us to address the other elements of preliminary injunctive relief.

The Medicaid program exemplifies cooperative federalism—a partnership between federal and state agencies to provide medical services to needy individuals. The federal government shares the costs of funding the program with participating states. *Atkins v. Rivera*, 477 U.S. 154, 156–57, 106 S. Ct. 456, 2458–59 (1986). In exchange for federal funds, the states must

No. 17-50282

"agree[] to spend them in accordance with congressionally imposed conditions." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S Ct. 1378, 1382 (2015).

Under the Medicaid Act's "qualified-provider" provision, "[a] State plan for medical assistance must . . . provide that [ ] any individual eligible for medical assistance . . . may obtain such assistance from any institution . . . qualified to perform the service or services required . . . who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23). The Supreme Court has held that this provision "gives recipients the right to choose among a range of qualified providers, without government interference." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785, 100 S. Ct. 2467, 2475 (1980).

Relying on this court's decision in *Gee*, the district court concluded that the "qualified-provider" provision grants the Individual Plaintiffs a right of action to challenge OIG's termination of the Provider Plaintiffs' Medicaid agreements. 862 F.3d 445 (5th Cir. 2017). The district court then issued a preliminary injunction against the agency after holding that the plaintiffs met the criteria for extraordinary relief.

On appeal, OIG raises two principal arguments: the plaintiffs lack a private right of action because *Gee* does not control this case; and the district court abused its discretion in concluding that the plaintiffs were likely to succeed on the merits of their challenge because, *inter alia*, the court erroneously applied *de novo* review in evaluating OIG's termination decision instead of limiting its review to the agency record under the deferential arbitrary-and-capricious standard.

## A. Private Right of Action

In *Gee*, a divided panel of this court held that, under some circumstances, 42 U.S.C. § 1396a(a)(23) can afford Medicaid beneficiaries a private right of action to challenge a state's erroneous termination of Medicaid provider

12

No. 17-50282

agreements. This "free choice of provider" provision mandates that "any individual eligible for medical assistance…may obtain such assistance from any institution…or person, qualified to perform the service or services required…." *Gee* involved a decision by the Louisiana Department of Health and Hospitals ("LDHH") to terminate the Medicaid provider agreements of two PPGC-affiliated clinics operating in Louisiana. 862 F.3d at 450–52. Although the OIG, as will be seen, attempts to distinguish *Gee,* we are constrained to follow that decision as the law of this circuit.

In *Gee,* LDHH advanced three reasons for terminating the provider agreements: (1) PPGC's settlement of several qui tam False Claims Act lawsuits, in which PPGC disclaimed all liability; (2) unspecified misrepresentations by PPGC in its letters to LDHH; and (3) a pending investigation of PPGC by LDHH and the Louisiana Office of Inspector General. *See id*. at 453. As in this case, PPGC and several Medicaid beneficiaries bypassed state administrative procedures and sued LDHH under 42 U.S.C. § 1983, arguing that PPGC's clinics were, in fact, "qualified" and that LDHH had failed to identify any valid ground under federal or state law for terminating the two clinics. The *Gee* majority agreed.

The court held, joining the Sixth, Seventh, and Ninth Circuits, that Section 1396a(a)(23) can provide Medicaid beneficiaries with a right of action to challenge a state's termination decision that is unrelated to a provider's qualifications. *See id*. at 462.[7] The court relied on the definition of "qualified"

---

[7] *See Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012); *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006). After *Gee* was issued, the Eighth Circuit held that Section 1396a(a)(23) does *not* afford a private right of action. *See Planned Parenthood of Ark. & E. Okla. v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017). Then the Tenth Circuit joined the circuit majority in affirming a private right of action. *Planned Parenthood of Kansas and Mid-Missouri v. Andersen*, 882 F.3d 1205 (10th Cir. 2018).

No. 17-50282

cited by other circuits: "[t]o be 'qualified' in the relevant sense is to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." *See id*. at 462 (quoting *Planned Parenthood of Ind.*, 699 F.3d at 978). The court then determined that none of LDHH's asserted justifications for terminating the Medicaid provider agreements implicated whether the health clinics were "qualified" under this definition. *See id*. at 470.

OIG argues that *Gee* is distinguishable. Specifically, the agency suggests that *Gee* must be narrowly construed to prevent conflict with the Supreme Court's decision in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S. Ct. 2467 (1980). In *O'Bannon*, the Supreme Court held that patients lacked a private right of action under Section 1396a(a)(23) to challenge the state agency's termination of a nursing home's Medicaid provider agreements for failure to meet statutory and regulatory standards. The Court asserted that the Medicaid Act "clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified." *Id*. at 785, 100 S. Ct at 2475. Consequently, under Section 1396a(a)(23), a patient "has no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified." *Id*. at 786, 100 S. Ct at 2476.

Over a cogent dissent by Judge Owen, s*ee* 862 F.3d at 475 (Owen, J., dissenting), the *Gee* majority distinguished *O'Bannon* for two reasons. First, the majority stated that *O'Bannon* involved a due process challenge whereas the *Gee* plaintiffs "assert[ed] the violation of a substantive right." *Id*. at 460. Second, the majority asserted that, in *O'Bannon*, the state had "decertified" the nursing center, whereas in *Gee,* "there was no decertification decision." *Id*.

No. 17-50282

at 461. "When, as here, a state terminates only a Medicaid provider agreement, independent of any action to enforce statutory and regulatory standards, *O'Bannon* is inapposite." *Id.*

OIG focuses on the majority's second reason for distinguishing *O'Bannon*—the absence of a "decertification decision" by LDHH. OIG emphasizes that LDHH had "conceded that [the clinics were] competent to provide the relevant medical services" and had not sought to decertify the health centers beyond ejecting them from the Medicaid program. *Id.* at 466. Thus, LDHH admitted that its termination of the clinics' Medicaid provider agreements was "independent of any action to enforce statutory or regulatory standards." 862 F.3d at 461. Texas, however, has not conceded that the Provider Plaintiffs are "qualified" in any way. Moreover, unlike LDHH, the OIG's termination action is predicated on specific findings that federal and state statutory and regulatory standards have been violated. In other words, the plaintiffs in this case are doing precisely what *O'Bannon* disallowed— challenging the merits of a state agency's decertification decision.

The *Gee* majority indeed indicated several times that the plaintiffs were not contesting the "the merits of [LDHH's] decertification decision." 862 F.3d at 461. But we are unpersuaded by the distinction urged by the state. The *Gee* majority states that "it bears repeating that LDHH has *conceded* that PPGC is competent to provide the relevant medical services to any and all *non-Medicaid patients*." 862 F.3d at 466 (emphasis added). Although the *Gee* majority acknowledged that LDHH's justifications for termination "might well relate to a provider's qualifications," the state had "taken *no action* to revoke PPGC's

No. 17-50282

license and has not called into question any qualification that enables PPGC to offer medical care generally." 862 F.3d at 469 (emphasis in original).[8]

Here, there is far stronger evidence in support of OIG's termination decision than the justifications offered by LDHH, but there is also no evidence that the state of Texas questions the competence of the Provider Plaintiffs or that it has taken steps to prevent the Provider Plaintiffs from offering medical care to non-Medicaid patients. In the end, the plaintiffs' claim here is roughly the same as it was in *Gee*: the state agency violated the "qualified provider" provision by excluding them from the Medicaid program for reasons allegedly unrelated to whether they are "capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." OIG's attempt to distinguish *Gee* regarding an implied individual claim is unavailing.

This does not mean, of course, that the agency's *O'Bannon*-based arguments are frivolous. Seven judges on this circuit joined a dissent from the denial of rehearing en banc focused on the conflict with *O'Bannon*. *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 876 F.3d 699, 700 (5th Cir. 2017) (Elrod, J., dissenting from denial of rehearing en banc) (explaining that *Gee* "is directly at odds with the Supreme Court's holding in *O'Bannon*"). But this panel lacks authority to contradict the current law of the circuit.

### B. Likelihood of Success on the Merits

*Gee* controls this appeal as to the plaintiffs' right of action but the plaintiffs, and to an extent the district court, suggest that this case is merely *Gee* redux. That is incorrect. In *Gee*, the state agency's purported justifications

---

[8] *See also* 862 F.3d at 476–77 (Owen, J., dissenting) (characterizing the majority opinion as holding, "whenever a State terminates a provider's Medicaid agreement, regardless of the grounds for termination, a patient may sue to contest the termination, unless the State also precludes the provider from providing services or care to all patients, not just Medicaid recipients.").

No. 17-50282

for termination were tantamount to contending that a provider can be excluded "simply because state law says so," 862 F.3d at 466, or that a state can "simply label[ ] any exclusionary rule as a 'qualification'" to circumvent Section 1396a(a)(23)'s requirements. *Id*. at 466 (quoting *Planned Parenthood of Ind.*, 699 F.3d at 980). OIG, however, based its termination decision on, *inter alia*, a record of incriminating admissions by PPGC's own personnel that show, the agency contends, a failure to comply with federal regulations or, at the very least, a failure to comply with the ethical standards that Texas requires of Medicaid providers.

It is true that the district court purported to find "not . . . even a scintilla of evidence" impugning PPGC's qualifications. But this occurred only after the district court credited the plaintiffs' witnesses' self-serving testimony about their videotaped statements, while asymmetrically refusing to consider OIG's post-termination evidence. None of the plaintiffs' evidence, moreover, was ever presented to the agency through the standard administrative procedures or judicial review required by the Medicaid statutes.

OIG challenges the district court's procedures as facially inequitable. But the agency's principal argument on appeal is that the district court abused its discretion by reviewing the agency's decision *de novo* instead of under the deferential arbitrary-and-capricious standard required by this court's decision in *Abbeville General Hospital v. Ramsey*, 3 F.3d 797 (5th Cir. 1993). We agree that *Abbeville*'s analysis applies here: a state agency's decision terminating a Medicaid provider agreement—and the agency's determination that the provider is not "qualified"—should be reviewed like any other administrative case—on the record that was made before the agency and under the arbitrary-and-capricious standard.

No. 17-50282

However, before explaining the appropriate standard of review, it is first necessary to clarify how *Gee*'s analysis of the "qualified-provider" requirement applies to state agencies like OIG. We then explain why the district court had to review the agency's decision under the more deferential standards.

### 1. The meaning of "qualified"

The Medicaid Act itself does not define what it means for a provider to be "qualified to perform the service or services required." 42 U.S.C. § 1396a(a)(23). But "Medicaid regulations allow states to set reasonable standards relating to the qualifications." *Gee*, 862 F.3d at 462 (quoting 42 C.F.R. § 431.51(c)(2)). And *Gee* emphasized that "states retain broad authority to define provider qualifications and exclude providers on that basis." *Id.* at 465; *see also Detgen ex rel. Detgen v. Janek*, 752 F.3d 627, 631 (5th Cir. 2014) (explaining that states possess "broad discretion to implement the Medicaid Act"). Nevertheless, *Gee* held that a state's discretion is "circumscribed by the meaning of 'qualified' in this context." 862 F.3d at 465.

Rather than offer a comprehensive definition of what it means for a provider to be "'qualified' in this context," *Gee* instead relied on a general definition used by several other circuits. *See id.* at 462. This definition of "qualified," which LDHH never challenged, is "capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." *See id.* at 462 (quoting *Planned Parenthood of Ind.*, 699 F.3d at 978). Absent further explanation, this broad statement could unduly circumscribe an agency's ability to "define provider qualifications and exclude providers on that basis," *Gee*, 862 F.3d at 465, and it conflicts with other Medicaid statutory provisions and with the interpretation of federal funding statutes.

First, the word "capable" must be construed with reference to the limiting terms "competence," "safety," "legality," and "ethics." Being "capable

No. 17-50282

of" providing health services is not the same as being "qualified" to do so. Being "capable of" denotes merely the ability to perform a function.[9] In contrast, being "qualified" means "[h]aving qualities or possessing accomplishments which fit one for a certain . . . function" and, often, it means that this *fitness* is "officially recognized."[10] If being merely "capable" of providing health services—say, safely—were the standard for being a "qualified" provider, a Medicaid provider could challenge its termination by showing that it *could* have acted safely—even if it seriously or frequently failed to do so. A state agency should not have to show that a provider is *incapable* of operating appropriately to hold a provider accountable under the "qualified-provider" provision. None of the cases that have relied on the general definition of "qualified" have indicated otherwise.

Similarly, courts may not interpret *Gee* to hold that a Medicaid provider must be considered "qualified" until the state has totally barred that provider from serving the public. A literal understanding of "capable of performing the needed medical services" could lead to that interpretation, as could several of the *Gee* majority's statements in dicta. *See, e.g.*, *id.* at 465 ("While as a general rule a state may terminate a provider's Medicaid agreements for reasons bearing on that provider's general qualification to provide medical services, we are not aware of any case that holds a state may do so while continuing to license a provider's authorization to offer those same services to non-Medicaid patients."). But any such requirement would hamstring state agencies like

---

[9] *See* The Oxford English Dictionary (online ed. 2018), available at http://www.oed.com/view/Entry/27354?redirectedFrom=capable#eid.

[10] *See* The Oxford English Dictionary (online ed. 2017), available at http://www.oed.com/view/Entry/155867?rskey=k2PgDU&result=1&isAdvanced=false#eid.

No. 17-50282

OIG that have no authority to decertify health care providers generally. The Provider Plaintiffs' Texas medical licenses are regulated by the Texas Medical Board, which is a separate agency operating under separate statutory authority. *See* Tex. Occ. Code §§ 151.003(2), 152.001(a). And to the extent the Provider Plaintiffs or their affiliated health clinics are abortion providers, they are separately licensed by the Texas Department of State Health Services. *See* 25 Tex. Admin. Code § 139.1(a). Moreover, if Louisiana's failure to revoke the health clinics' licenses were dispositive, the *Gee* majority would not have needed to review LDHH's justifications for termination at all. In sum, a state's decision to revoke a health care provider's license may be sufficient, but it is not necessary in order for a state to exclude a provider from the Medicaid program.

Second, requiring a state to decertify a provider entirely before jettisoning it from the Medicaid program would also conflict with the Medicaid Act's provision of numerous grounds on which the Secretary of the Department of Health and Human Services ("HHS") or a state can or must exclude a Medicaid provider from the program. *See* 42 U.S.C. §§ 1396a(p)(1) – (3), 1320a-7. Indeed, the general exclusionary provision in Section 1396a(p)(1) authorizes a state to disqualify a provider for many reasons unrelated to violations that would require the provider to cease operating entirely. Suspension from another state health care program, for example, is one of many statutory bases upon which the Medicaid Act allows a state to exclude a provider. *See id.* § 1320a-7. The applicable regulations amplify that "a State may exclude an individual or entity . . . for any reason for which the Secretary could exclude that individual or entity from participation in Federal health care programs" and "[n]othing contained in this part should be construed to limit a State's own authority to exclude an individual or entity from Medicaid for any reason or

No. 17-50282

period authorized by State law." 42 C.F.R. § 1002.3(a)-(b). *Gee* also recognized that "[s]tates undoubtedly must be able to terminate provider agreements in cases of criminal activity, fraud and abuse, and other instances of malfeasance." 862 F.3d at 469. The Medicaid Act's comprehensive regulatory framework nowhere suggests that a provider may only be disqualified once it is deemed unfit to provide care for the general public.

Third, because the Medicaid program transfers funds to states on conditions, a "clear statement" of any mandatory condition is required by *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), and OIG's interpretation and implementation of the regulations is valid unless "plainly prohibited" by the statute. *Detgen ex rel. Detgen v. Janek,* 752 F.3d at 631. As noted above, states have definitional latitude, and there is no federal definition of "qualified provider."

In light of this analysis, *Gee*'s holding that a state may not exclude a Medicaid provider for "reasons *unrelated* to that provider's qualifications." 862 F.3d at 462 (emphasis in original), is best read to mean that a state agency's justifications for terminating a provider must actually implicate whether the provider operates in a "safe, legal, and ethical manner" under state and federal law. A state cannot exclude a provider "for no reason at all." *Id.* at 468. Nor can a state "simply label[] any exclusionary rule a 'qualification'" and then contend a provider is unqualified on that basis. *Id.* at 469 (quoting *Planned Parenthood of Ind.*, 699 F.3d at 978). Thus, the Seventh and Ninth Circuits found violations of the "qualified-provider" requirement where states excluded providers merely because they provided abortions. As *Gee* explained, "a state may not exclude a provider simply based on the scope of the services it provides." 862 F.3d at 469.

No. 17-50282

To comply with *Gee,* a state agency undertaking to decide that a Medicaid provider is not "qualified" should identify regulations concerning the "safe, legal, and ethical manner" of furnishing healthcare services and point to evidence of the provider's violations. As reflected in the *Gee* majority's analysis, this should be an easy standard for the state to meet in most cases. *See id.* at 468 ("[W]e reiterate for emphasis the unique circumstances of the instant case.").

### 2. Arbitrary and Capricious Review

With the governing legal standard in mind, we turn to the proper standard of judicial review. OIG contends that the district court erred procedurally by applying *de novo* review and allowing the plaintiffs to offer evidence outside the administrative record, because this court held in *Abbeville* that the "substantive adequacy and reasonableness" of a state agency's findings in administering the Medicaid Act should be reviewed by courts "using the arbitrary and capricious standard of review." 3 F.3d at 803–04. Although the district court did not specify the standard of judicial review, the court clearly did not defer to OIG's findings. Instead, the court distinguished the state's findings at every opportunity. And by considering and crediting the plaintiffs' post-termination evidence, while expressly discrediting the state's witnesses, the court did not limit its review to the agency record. This procedure violates *Abbeville*'s requirements.

In *Abbeville*, this court held that the deferential arbitrary-and-capricious standard applies to a state agency's rate-setting action under the Medicaid Act's Boren Amendment. *Abbeville*, 3 F.3d at 802. Federal courts are accustomed to applying the "deferential" standard to the actions of federal agencies under the Administrative Procedure Act. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658, 127 S. Ct. 2518, 2529 (2007);

22

No. 17-50282

5 U.S.C. § 706(2)(A).  Under this deferential standard, an agency's finding may only be overturned if it fails to satisfy "minimum standards of rationality." *La. Envt'l Action Network v. U.S. E.P.A.*, 382 F.3d 575, 582 (5th Cir. 2004). Courts accordingly may consider only "whether the agency action 'bears a rational relationship to the statutory purposes' and [whether] there [is] 'substantial evidence in the record to support it." *Id*. at 582 (quoting *Tex. Oil & Gas Ass'n v. U.S. E.P.A.*, 161 F.3d 923, 934 (5th Cir. 1998) (quoting *Mercy Hosp. of Laredo v. Heckler*, 777 F.2d 1028, 1031 (5th Cir.1985))).  Arbitrary and capricious review is conducted on the basis of the agency record alone. *Luminant Generation Co. v. U.S. EPA*, 675 F.3d 917, 925 (5th Cir. 2012) (internal citation omitted).

*Abbeville*'s application of this deferential standard to a *state* agency was not novel; indeed, the court referred to the applicability of this standard as an "indisputable proposition" supported by a "litany of cases."  *See Abbeville*, 3 F.3d at 802 & n.6 (citing cases); *see also Miss. Hosp. Ass'n, Inc. v. Heckler*, 701 F.2d 511, 517 (5th Cir. 1983) (reviewing state agency's Medicaid reimbursement plan under the arbitrary-and-capricious standard).  *Abbeville* clarified that whether a state had complied with the Medicaid Act's procedural requirements was subject to *de novo* review.  *Id*. at 802.[11]  However, once a state agency complies with any required Medicaid procedures, "a presumption of regularity and [a] deferential standard attaches" to the agency's decision. *Id*. at 804.

---

[11] In *Abbeville*, itself, the state agency "admit[ted] . . . that it conducted no studies and made no efforts to" make the required findings. *Id*. at 806.  For this reason, the court reversed the agency's reimbursement plan for procedural noncompliance without applying arbitrary and capricious review. *Id*. at 810.

No. 17-50282

The plaintiffs argue that *Abbeville* is inapposite because the instant case does not actually involve the appeal of an agency decision; rather, it is "a statutory claim under the Medicaid Act giving rise to a right of action in federal court under §[ ]1983." The plaintiffs contend that there is "no case law imposing arbitrary-and-capricious review on such a claim." The plaintiffs are mistaken. *Abbeville* itself involved a Section 1983 action seeking to enforce *statutory* rights. *See Abbeville*, 3 F.3d at 801 ("The Hospitals filed a § 1983 action against the Secretary of LDHH and other agency officials, claiming their actions deprived them of rights secured under the Boren Amendment.").[12] Other courts have likewise concluded that the review of state Medicaid decisions as applied to individual plaintiffs in Section 1983 cases is governed by the arbitrary and capricious standard. *See Smith v. Rasmussen*, 249 F.3d 755, 760 (8th Cir. 2001); *Brown v. Day*, 434 F.Supp.2d 1035, 1041 (D. Kan. 2006).

Contrary to the plaintiffs' assertion, moreover, this case plainly involves judicial review of an agency action. Here, OIG, the state agency empowered to investigate violations of the Medicaid program and terminate providers for noncompliance, decided to exclude the Provider Plaintiffs after finding evidence that they had violated various medical and ethical standards. The plaintiffs have sought judicial review of that termination decision. The plaintiffs' challenge is functionally equivalent to any other appeal of an agency decision. To hold that the plaintiffs' challenge could receive review in federal court without the deference due in a case brought by the Provider Plaintiffs directly would be to elevate patients' rights beyond the complex federal-state cooperative and enforcement structure of the Medicaid statute itself. Put

---

[12] Similarly, *Miss. Hosp. Ass'n.* does not cite Section 1983 but must also have been brought to enforce federal law under that provision.

otherwise, had the Secretary of HHS excluded the Provider Plaintiffs, there is no question that its decision would be subject to arbitrary and capricious review.[13]   And put otherwise again, the result the Individual Plaintiffs obtained goes far beyond their personal claims to be treated by the Provider Plaintiffs, as it prevents the state from denying millions in state funds to those entities;  this result cannot be proportional to the litigation of an individual claim, but must arise from wholesale review of agency action toward the Providers.

The plaintiffs next contend that *Gee* precludes the application of arbitrary-and-capricious review in this context because *Gee* reviewed LDHH's termination decision *de novo*.  Had *Gee* addressed this question and applied *de novo* review, we might be bound to do likewise.  But *Gee* never addressed nor was it required to or even asked to address the applicable standard of review. LDHH's grounds for terminating the health clinics amounted to no more than unsupported suspicions of misconduct.  Unlike in this case, LDHH had done no factfinding and conceded that the providers were "qualified."   Thus, although *Gee* did not address *Abbeville*, it is consistent with the prior decision's requirements: as in *Abbeville,* the lack of findings rendered the LDHH decision subject to de novo review.  This stands in stark contrast to the present case in which OIG made findings.

Further, not one of the circuits that have recognized a private right of action under Section 1396a(a)(23) has intimated that an arbitrary-and-capricious standard would be inappropriate.  In *Planned Parenthood of Indiana* and *Betlach*, the Seventh and Ninth Circuits had no need to address

---

[13] *See* 5 U.S.C. § 706(2)(A); *see also Nursing Ctr. v. U.S. Dep't of Health & Human Servs.*, 606 F. App'x 164, 167 (5th Cir. 2015) (reviewing whether Secretary's decision imposing sanctions on Medicaid provider was arbitrary and capricious).

No. 17-50282

this question because they dealt only with state laws, not agency decisions, that blocked Medicaid funding for abortion providers.  *See* 699 F.3d at 967; 727 F.3d at 962.  Likewise, the underlying issue in the Sixth Circuit's *Olszewski* decision was whether HHS reasonably construed the Medicaid Act's phrase "medical devices" to include "incontinence products."  442 F.3d at 465.[14] The state agency's determination was not properly at issue.  Additionally, the Tenth Circuit's decision in *Andersen* largely parrots *Gee* in its rejection of a state agency's termination decision and likewise does not discuss the standard of review.  882 F.3d at 1236.

The plaintiffs next argue that the deferential standard is inappropriate because the Individual Plaintiffs, as Medicaid beneficiaries, have no administrative remedy and thus cannot develop the administrative record.[15] The plaintiffs also point out that *Gee* held that the plaintiffs "are not subject to . . . any administrative exhaustion requirement."  *Gee*, 862 F.3d at 455.  That is true.  But the absence of an exhaustion requirement does not mean there can be no consequences for the provider's decision to ignore the prescribed administrative process.  The absence of an exhaustion requirement does not entitle plaintiffs to *de novo* review of OIG's factual findings and conclusions.

Indeed, it is a feature—not a bug—of the arbitrary-and-capricious standard that it incentivizes providers to use the state administrative appeal process required by the Medicaid Act itself.  *See* 42 U.S.C. § 1396a(a)(4);

---

[14] The court applied *Chevron* deference to HHS's construction of the act and found it reasonable. *Id.* at 470.

[15] The Individual Plaintiffs, of course, serve here as the Providers' litigation proxies, and the Providers had ample opportunity to develop the administrative record.  If this deficiency ultimately operates to the detriment of the Individual Plaintiffs, *O'Bannon* recognized that Medicaid beneficiaries might well have a cause of action against their Providers for becoming decertified.  447 U.S. at 787, 100 S. Ct. at 2476.

No. 17-50282

42 C.F.R. § 1002.213 ("Before imposing an exclusion under § 1002.210, the State agency must give the individual or entity the opportunity to submit documents and written argument against the exclusion."). It is highly doubtful that Congress intended a loophole whereby providers could use patients as litigation proxies to avoid the state's remedial procedures and develop separate, potentially conflicting judicial standards of compliance. Requiring arbitrary and capricious review that is limited to the administrative record encourages Medicaid providers to pursue a state's administrative-hearing procedures in order to develop the administrative record in their favor.[16]

In an effort to apply rather than distinguish *Abbeville*, the plaintiffs alternatively contend that the district court did no more than the federal court in that case and simply disregarded OIG findings that were not "*bona fide*" or "supported by some minimum quantum of evidence." *Abbeville*, 3 F.3d at 804, 805. As explained above, however, *Abbeville* was reviewing LDHH's procedural compliance with Medicaid standards, not its substantive compliance.

In any event, there is no question that the OIG here made factual findings after viewing the videos and related evidence. On the basis of the administrative record—not the *post hoc* justifications offered by plaintiffs' witnesses in the district court—the OIG determined that video discussions "centered on clinic processes and tissue packaging rather than the abortion procedure itself; the video featured repeated discussion about the position of

---

[16] In this way, requiring the deferential standard of review could ameliorate what some members of this court saw as negative consequences of the *Gee* decision. *See Gee*, 876 F.3d at 702 (Elrod, J., dissenting from denial of rehearing en banc) ("Disqualified providers can now circumvent state law because the panel majority opinion deems it unnecessary to have a final administrative determination so long as there are patients to join a lawsuit filed in federal court.").

No. 17-50282

the fetus in the uterus, the risk to the patient, and the patient's pain tolerance."
The OIG further concluded, based on the videos, that the Provider Plaintiffs at
a minimum violated federal standards regarding fetal tissue research and
standards of medical ethics by allowing doctors to alter abortion procedures to
retrieve tissue for research purposes or allowing the researchers themselves to
perform the procedures.  The plaintiffs' briefing with regard to the substance
of the discussions contained in the videos (as opposed to their trial witnesses'
post hoc justifications) is curiously silent.

The plaintiffs finally insinuate that arbitrary and capricious review
should not apply because OIG has insufficient expertise to determine the
qualifications of abortion providers.  On this point, the district court was also
dismissive, suggesting that the Inspector General and OIG's Chief Medical
Officer were insufficiently informed regarding how to perform abortions.  We
reject this argument.  OIG is the agency that the state of Texas has empowered
to investigate and penalize Medicaid program violations.  The agency is in the
business of saying when providers are qualified and when they are not.  That
the Chief Medical Officer is a surgeon—and not himself an abortion provider—
does not mean that he deserves no deference when deciding whether a provider
has failed to meet the medical and ethical standards the state requires.[17]  It is
even odder to claim that federal judges, who have no experience in the

---

[17] Here, it seems necessary to consider the appropriate deference owed to OIG outside
the abortion context.  It is certainly inappropriate "to bend the rules when any effort to limit
abortion, or even to speak in opposition to abortion, is at issue."  *Whole Woman's Health v.
Hellerstedt*, 136 S. Ct. 2292, 2321 (2016) (Thomas, J., dissenting) (quoting *Stenberg v.
Carhart,* 530 U.S. 914, 954, 120 S. Ct. 2597, 2621 (2000) (Scalia, J., dissenting)).  To bend the
rules here would be particularly imprudent.  Had OIG terminated the Medicaid provider
agreements of any other type of health care provider, the incongruity of allowing that
provider to use patient litigation proxies to avoid administrative review and receive *de novo*
review in federal court would be obvious and unacceptable.

No. 17-50282

regulations and ethics applicable to Medicaid or medical practice, much less in regard to harvesting fetal organs for research, should claim superior expertise.

In sum, the district court erred by giving no deference to OIG's factual findings and by accepting evidence beyond the agency record. The arbitrary and capricious standard applies to review of the record alone. [18]

## CONCLUSION

For these reasons, we must affirm that the Individual Plaintiffs possess a private right of action. However, because the district court apparently conducted *de novo* review of the OIG's decision, and its procedure was incompatible with the proper standard, the basis for its preliminary injunction cannot be sustained. Whether plaintiffs might establish a likelihood of success on the merits depends on application of the arbitrary and capricious standard to the administrative record alone.

We **VACATE** the preliminary injunction and **REMAND** for the district court to limit its review to the agency record under an arbitrary-and-capricious standard.

---

[18] A separate issue raised by Planned Parenthood is whether OIG could terminate Medicaid funding for all of the Provider Plaintiffs where only one, PPGC, has engaged in or contemplated fetal tissue research. State regulations authorizing action against "affiliates" of a provider are at issue. This issue becomes relevant and must be reconsidered by the district court if, on remand, it upholds the OIG's termination decision against PPGC.

29

No. 17-50282

EDITH H. JONES, Circuit Judge, concurring:

The panel agrees that the *Gee* decision is binding law for our circuit at present, but I urge reconsideration en banc. *Gee* is inconsistent with *O'Bannon,* and it makes no practical sense to hold that a Medicare provider charged with misfeasance by state regulating authorities may simply bypass state procedures, which are required by the Medicaid statute, and use patients as stalking horses for federal court review of its status. That the arbitrary and capricious standard of review governs such review in federal court is a second-best solution to the legal necessity of aligning our precedent with the Supreme Court's holding. Finally, despite being litigated with the trappings of the abortion debate, this is fundamentally a statutory construction case, not an abortion case. *Gee v. Planned Parenthood of Gulf Coast, Inc.,* 139 S. Ct. 408, 409 (2018) (dissenting from denial of certiorari).

Prudential and practical objections may be made to this recommendation. From a prudential standpoint, the Supreme Court denied certiorari in *Gee* in the past month, and this court rejected en banc reconsideration of the decision in 2017. Therefore, it would follow, the states of this circuit should be bound by judicial inertia to a plainly incorrect statutory interpretation. Pragmatically, there is no harm, no foul, because the nature of arbitrary and capricious review ought ordinarily shield the decisions of state authorities who claim evidentiary and legal support when attempting to sanction or terminate provider status. In my view, none of these rationales suffices.

Start with this evenly divided court's denial of en banc reconsideration. *See Planned Parenthood of Gulf Coast v. Gee,* 876 F.3d 699 (5th Cir. 2017) (Elrod, J., dissenting). At the time of that denial, the *Gee* decision claimed support from three other circuits, but the Eighth Circuit had rejected the

No. 17-50282

creation of a patient's implied private right of action under Section 1396a(a)(23). *Compare Planned Parenthood of Ariz., Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012); *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006) (all finding a private right of action), *with Does v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017) (rejecting a private right of action). Importantly, however, this court's even split indicated our recognition that the statutory interpretation issue posed in *Gee* is seriously debatable. A refusal to vote a case en banc under such circumstances is a victory of sorts for the panel decision, but it reflects no endorsement by the majority of active judges. Reconsidering the en banc decision, especially in light of the Supreme Court's recent action, would secure a clear majority decision on this surely recurring issue.

In December 2018, the Supreme Court declined certiorari in *Gee* and the Tenth Circuit's *Andersen* decision, both of which implied a patient's private right of action to challenge Medicaid providers' regulatory terminations. *See Planned Parenthood of Kansas v. Andersen,* 882 F.3d 1205 (2018). A conflict exists with the Eighth Circuit's contrary holding, yet the Supreme Court left in place the circuit conflict. It is a fair bet that the Court's avoidance indicates considerable uncertainty about the statutory issue. To restore the uniformity of federal law, the conflict must eventually be addressed. Until that happens, three different courses of action are afforded to Medicaid providers in different states. In states where no circuit court decision has approved private plaintiffs' ability to challenge the providers' sanctions, the providers must repair to Medicaid-required state administrative and judicial procedures. In the Tenth Circuit, providers may use private plaintiffs' federal court suits, level of federal review undetermined, as an alternative to undergoing state-crafted

31

No. 17-50282

procedures. And in this circuit, providers have alternative recourse to private plaintiffs' suits under the arbitrary and capricious standard of review. Tens of thousands of provider entities are subject to the Medicaid program's detailed scheme of integrated federal and state regulation.

That Planned Parenthood providers achieved recognition of implied private plaintiffs' actions should not detract from the program-wide uncertainty spawned by this circuit conflict. Equally to the point, the lower courts remain obliged to undertake careful statutory review while the issue is undecided, especially if the statute, properly construed, offers providers no alternative federal court remedy. The Court's denial of certiorari, in other words, strengthens the propriety of this court's reconsidering *Gee* en banc.

The pragmatic argument for denying en banc relief would seem to include two parts. This court's adoption of the deferential arbitrary and capricious standard means that state authorities will ordinarily be able to defend their program termination decisions successfully in federal court, reducing the friction between federal courts and state Medicaid administrators. Thus, it would be argued, the cost of reconsidering *Gee*, especially if *Gee* was correctly decided, is higher than the cost of federal litigation pending a definitive Supreme Court decision. But there is a second wrinkle here in that whether to apply an arbitrary and capricious standard is a *res nova* decision by this panel made necessary by *Gee*. The parties strenuously disputed the standard of review. As long as a circuit split persists, other courts weighing in on the standard of review may disagree with this panel's decision. Following the *Gee* case thus entails ongoing legal uncertainty.

Another pragmatic consideration, however, favors en banc reconsideration: the complexity and cost to state agencies that administer and regulate Medicaid. The program is already one of the most expensive

No. 17-50282

components of state budgets. Regulating providers comprises comprehensive federal and state medical, and ethical dictates as well as parameters for facilities that provide patient care. Authorizing lawsuits by patients to challenge their providers' terminations burdens state agencies with redundant and intrusive oversight while the high cost of federal litigation displaces more efficient uses of state resources. As Justice Thomas also noted in his dissent from denial of cert., "the looming potential for complex litigation inevitably will dissuade state officials from making decisions that they believe to be in the public interest." 139 S. Ct. at 409. State courts, moreover, are well suited to handle these cases based on their more intimate familiarity with the agencies, the regulation of the practice of medicine, and state administrative law—as was contemplated in the Medicaid statutes' prescription of coordinate state responsibilities for the program. If *Gee* is incorrect, these practical costs will be avoided.

Having explained why there should be no impediment to our rehearing this case en banc in order to reconsider *Gee,* I repeat briefly the arguments that others have fulsomely developed. *Gee* is inconsistent with the Supreme Court's decision in *O'Bannon* and in tension with numerous other provisions of the Medicaid statute.

Judge Owen, dissenting in *Gee*, argued that *O'Bannon* precluded the individual plaintiffs' assertion of a private right of action to challenge LDHH's termination decision. *See* 862 F.3d at 475 (Owen, J., dissenting). The majority opinion asserted that in *O'Bannon,* "the patient-plaintiffs' injuries were alleged to stem from a deprivation of due process rights," and "[i]n contrast, the Individual [*Gee*] Plaintiffs here assert the violation of a substantive right." *Id.* at 460(citations omitted). Judge Owen pointed out the fundamental logical flaw with this reasoning: the majority "fail[s] to appreciate that there is no

33

No. 17-50282

right to due process unless there is a substantive right that may be vindicated if adequate process is accorded." 862 F.3d at 475. The majority completely missed the dissent's primary point that *O'Bannon* rejected the notion that Section 1396a(a)(23) creates any substantive liberty or property right. *Id.* at 476.

Judge Owen criticized the majority's broad assertion that only a total termination of a Medicaid provider from all medical services would render the provider "unqualified" for purposes of Section 1396a(a)(23). She cited, *inter alia,* Section 1396a(p)(1), a provision that authorizes a state to "exclude any...entity [from Medicaid] for any reason for which the Secretary could exclude the...entity from participation in [several federal programs listed]." And she referenced multiple other reasons justifying state termination decisions under the Medicaid statute itself. *Id.* at 477.

Judge Owen also rebutted the majority's claim that in *O'Bannon*, the state had "*totally*" decertified the nursing center, whereas in *Gee,* "there was no decertification decision." *Id.* at 472. The majority concluded, "[w]hen, as here, a state terminates only a Medicaid provider agreement, independent of any action to enforce statutory and regulatory standards, *O'Bannon* is inapposite." *Id.* The majority's error was a "shaky" basis for distinguishing the Supreme Court precedent, according to Judge Owen, because the Court never specified that the nursing home had been totally decertified by the state. 862 F.3d at 483.

Six other judges on this circuit found Judge Owen's dissent sufficiently persuasive to join a dissent from the denial of rehearing en banc. *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 876 F.3d 699, 700 (5th Cir. 2017) (Elrod, J., dissenting from denial of rehearing en banc) (explaining that *Gee* "is directly at odds with the Supreme Court's holding in *O'Bannon*"). And Judge

No. 17-50282

Elrod's dissent added that "the panel majority opinion's reasoning is not only at odds with *O'Bannon* but also with the entirety of the statutory framework in 42 U.S.C. Section 1396a." 876 F.3d at 701.

There are other reasons for rejecting *Gee*. The Eighth Circuit held in even more detail, albeit in a split decision, that Section 1396a(a)(23) confers no private right of action on patients concerning the termination of a Medicaid provider's state agreement, because to do so would place that provision in conflict with related Medicaid provisions. *See Does v. Gillespie*, 867 F.3d 1034, 1041–1043 (8th Cir. 2017) (referring to the lack of an *individual* entitlement conferred by the provision itself and 82 related provisions governing State duties to the federal program; the availability of other means to enforce the State's obligations under the Medicaid Act and the resulting likelihood of conflict between the implied individual remedy and a provider's administrative and state judicial remedies; and the "aggregate" or "substantial compliance" nature of the federal government's oversight duties). All of these structural indications, Judge Colloton explained, conflict with the requirement set out in *Gonzaga v. Doe,* that a plaintiff relying on federal law to underpin a Section 1983 case must show that "Congress clearly intended to create an enforceable federal right." *Does,* 867 F.3d at 1039 (citing *Gonzaga Univ. v. Doe,* 536 U.S. 273, 283, 122 S. Ct. 2268 (2002)).[1]

In *Andersen*, Judge Bacharach dissented on the basis that Section 1396a(a)(23) does not "unambiguously" provide an implied private right of action, contrary to *Gonzaga*, because any "right" conferred on patients in that provision conflicts with the state's broad rights under Medicaid "to

---

[1] Judge Shepherd, concurring in the Eighth Circuit decision, echoed Judge Owen's sentiments about *O'Bannon* as an independent ground for rejecting plaintiffs' implied private right of action.

No. 17-50282

exclude an individual or entity from Medicaid for any reason or period authorized by State law." 42 C.F.R. § 1002.3(b), interpreting 42 U.S.C. § 1396a(p)(1). *Andersen,* 882 F.3d 1205, 1243–45 (10th Cir. 2018). Judge Bacharach would accordingly distinguish between situations where a state attempted to prohibit all Medicaid funding to abortion providers (contrary to law) and situations like that in *Andersen,* and in this case, where neutral regulations were violated by the providers.

Finally, Justice Thomas and two colleagues noted the "significant implications" of the question "whether Medicaid recipients have a private right of action to challenge a State's determination of 'qualified' Medicaid providers" under Section 1396a(a)(23) and Section 1983. *Gee*, 139 S. Ct. at 408. Justice Thomas noted the threats to state administration of Medicaid programs, not only from the financial burdens of litigation and deterrence of sound management decisions, but also because private patients' suits "give Medicaid providers 'an end run around the administrative exhaustion requirements in [the] state's statutory scheme.'" *Id*. at 409, (quoting 876 F.3d at 702 (Elrod, J., dissenting)).

Given the still-unsettled state of the law and the absence of precedential or pragmatic disincentives to rehearing en banc, these persuasive arguments deserve the attention of our full court. I respectfully request rehearing en banc to reconsider whether Section 1396a(a)(23) creates a private right of action on behalf of Medicaid patients to challenge the termination of their providers' contracts by the States.

Case: 17-50282    Document: 00514818737    Page: 1    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 1 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 98 of 290    PageID 874



**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**PLANNED PARENTHOOD OF GREATER
TEXAS FAMILY PLANNING AND
PREVENTATIVE HEALTH SERVICES, INC.,
PLANNED PARENTHOOD SAN ANTONIO,
PLANNED PARENTHOOD CAMERON
COUNTY, PLANNED PARENTHOOD SOUTH
TEXAS SURGICAL CENTER, PLANNED
PARENTHOOD GULF COAST, INC., and JANE
DOES ##1, 2, 4, 7, 9–11 on Their Behalf and on
Behalf of All Others Similarly Situated,**
          **Plaintiffs,**

-vs-
                                        **Case No. A-15-CA-1058-SS**

**CHARLES SMITH, Executive Commissioner,
Texas Health and Human Services Commission,
and STUART W. BOWEN, JR., Inspector
General, Texas Health and Human Services
Commission, Office of Inspector General,**
          **Defendants.**

---

## O R D E R

      BE IT REMEMBERED on the 17th, 18th, and 19th days of January 2017, the Court held a

hearing in the above-styled cause, and the parties appeared in person or through counsel. This case

concerns a § 1983 suit brought by five Texas Planned Parenthood health care providers (Provider

Plaintiffs) and seven known but anonymized Jane Does (Individual Plaintiffs) (collectively,

Plaintiffs). Plaintiffs sue Defendants Charles Smith and Stuart Bowen, Jr. in their official capacities

as Executive Commissioner and Inspector General of the Texas Health and Human Services

Case: 17-50282     Document: 00514818737     Page: 2     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 2 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 99 of 290   PageID 875

Commission (HHSC), challenging HHSC's decision to terminate its Medicaid provider agreements with Provider Plaintiffs.

Before the Court are Plaintiffs' Motion for a Preliminary Injunction [#58], HHSC's Response [#70] in opposition, Plaintiffs' Letter Brief [#91] in support, HHSC's Letter Brief [#92] in opposition, Plaintiffs' Proposed Findings of Fact and Conclusions of Law [#93] in support, and HHSC's Proposed Findings of Fact and Conclusions of Law [#94] in opposition.[1] Having reviewed the documents, the evidence presented at the hearing, the arguments of counsel, the relevant law, and the file as a whole, the Court now enters the following opinion and orders.

## Introduction

A secretly recorded video, fake names, a grand jury indictment, congressional investigations—these are the building blocks of a best-selling novel rather than a case concerning the interplay of federal and state authority through the Medicaid program. Yet, rather than a villain plotting to take over the world, the subject of this case is the State of Texas's efforts to expel a group of health care providers from a social health care program for families and individuals with limited resources.

Stalling for nearly a year after issuing an initial notice of termination, HHSC reinitiated its efforts to terminate Planned Parenthood health care providers from the Texas Medicaid program. Following extensive investigations, the Inspector General's reasons for termination constituted unsubstantiated and indeterminate allegations, including a "policy of agreeing to" and a

---

[1] There are also three other pending motions in this case. First, Plaintiffs filed a motion to certify class, but a ruling on this motion is postponed until it is fully briefed. *See* Mot. Certify Class [#9]. Because the motion does not specify whether it is opposed or unopposed and this case was stayed, the Court will allow HHSC seven days to respond to the motion to certify. Second, HHSC filed a motion to seal [#71], which the Court GRANTS. Third, HHSC filed a motion to dismiss, which only became ripe three days ago and the Court has yet to fully examine. *See* Mot. Dismiss [#95].

Case: 17-50282    Document: 00514818737    Page: 3    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 3 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 100 of 290    PageID 876

"willingness" to violate medical and ethical standards. Without any evidence indicating an actual program violation warranting termination, the Inspector General nevertheless acted to terminate one of the Provider Plaintiffs from the Texas Medicaid program and sought to terminate the other Provider Plaintiffs by extension. After reviewing the evidence currently in the record, the Court finds the Inspector General, and thus HHSC, likely acted to disenroll qualified health care providers from Medicaid without cause. Such action would deprive Medicaid patients of their statutory right to obtain health care from their chosen qualified provider. The deprivation of that right is an irreparable injury in and of itself but could also disrupt the care of the 12,500 Texas Medicaid patients receiving services from Planned Parenthood.

In sum, the Individual Plaintiffs have established entitlement to a preliminary injunction by proving a substantial likelihood of success on the merits, an irreparable injury, and both the balance of harms and public interest favor granting the injunction. The Court therefore grants Plaintiffs' motion for a preliminary injunction to preserve its ability to render a meaningful decision on the merits.

## Background

### I.    Parties

### A.    Provider Plaintiffs

The five Provider Plaintiffs in this suit are all nonprofit organizations domiciled in Texas providing services both through the Medicaid Program and to the general public.

Planned Parenthood Gulf Coast (PPGC), the Provider Plaintiff central to this case, is headquartered in Houston and operates seven health centers throughout the Houston area. Pls.' Hr'g Ex. 65 (Linton Decl.) ¶ 3. Another Provider Plaintiff, Planned Parenthood Greater Texas, Inc.

Case: 17-50282      Document: 00514818737      Page: 4      Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 4 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 101 of 290   PageID 877

(PPGT), is headquartered in Dallas and operates seventeen health centers in Addison, Arlington, Austin, Bedford, Cedar Hill, Dallas, Denton, Fort Worth, Plano, Lewisville, Mesquite, Paris, Tyler, and Waco. Pls.' Hr'g Ex. 40 (Lambrecht Decl.) ¶ 3. The final three Provider Plaintiffs, Planned Parenthood Cameron County, Planned Parenthood San Antonio, and Planned Parenthood South Texas Surgical Center, are all entities under the umbrella of Planned Parenthood South Texas (PPST). Pls.' Proposed Findings [#93] ¶ 3. PPST operates six health centers offering services to Medicaid patients. *Id.*

In total, PPGC, PPGT, and PPST provide Medicaid services at thirty health centers across Texas. *Id.* ¶ 4. Approximately 12,500 Texas Medicaid patients receive services from Planned Parenthood. Hr'g Tr. Vol. 3 at 14:5–10. Specializing in reproductive and sexual health, these clinics offer Medicaid patients contraception and contraceptive counseling, breast cancer screening, cervical cancer screening and treatment, sexually transmitted disease (STD) testing and treatment, pregnancy testing and counseling, as well as other services. Mot. Prelim. Inj. [#58] at 5. In the Texas Medicaid program, only the Provider Plaintiffs are labeled as family planning specialists. Hr'g Tr. Vol. 3 at 17:10–17.

In addition to reproductive health care, the Provider Plaintiffs offer other limited primary care services because their patients may not see other doctors. Hr'g Tr. Vol. 1 at 209:1–210:6. The Provider Plaintiffs strive to accommodate low-income patients who may face additional barriers to health care access, such as child care or inflexible work schedules, by offering evening and weekend hours, walk-in appointments, short wait times, bilingual staff or translation services, and same-day contraceptive services. *Id.* at 19:23–20:19; Mot. Prelim. Inj. [#58] at 5–6.

-4-

Case: 17-50282     Document: 00514818737     Page: 5     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 5 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 102 of 290   PageID 878

While PPGC, PPGT, and PPST are separate organizations, they are all affiliates, of the Planned Parenthood Federation of America (PPFA). Mot. Prelim. Inj. [#58] at 4. PPFA is a membership organization that develops medical and organizational standards to which its affiliates must adhere in order to operate under the Planned Parenthood name and use the Planned Parenthood mark. *Id.* There are approximately fifty-six affiliates across the county. *Id.*

The facts of this case primarily focus on PPGC, the only Provider Plaintiff to participate in fetal tissue research. While PPGC itself does not perform abortions, its related entity, Planned Parenthood Center For Choice (PPCFC) does perform abortions. *Id.* at 16. PPGC's headquarters and a health care clinic are located in the same building in Houston as PPCFC. Hr'g Tr. Vol. 1 at 120:20–121:9. While PPGC and PPCFC were originally one entity, the entities separated in 2005 as a condition of PPGC receiving funding it no longer receives. Hr'g Tr. Vol. 1 at 38:8–13. Most significantly here, PPGC's research department handles any research requests or agreements that involve PPCFC because PPCFC has no research department or separate personnel of its own.[2] *Id.* at 64:12–65:13.

**B.     Individual Plaintiffs**

The Individual Plaintiffs are all Texas residents insured through Medicaid. A brief introduction to each Jane Doe plaintiff, anonymized to protect their identities, provides context for this suit.

---

[2] At this stage of the lawsuit, the Court declines to determine whether PPCG and PPCFC are separate entities or are effectively one organization. Instead, the Court assumes, without deciding, the actions of PPCFC can be considered the actions of PPGC. Rather than attempt to distinguish between the actions of PPGC and PPCFC for purposes of this motion for a preliminary injunction, the Court will only refer to PPGC for the remainder of this order.

Case: 17-50282     Document: 00514818737     Page: 6     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 6 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 103 of 290   PageID 879

Doe # 1 lives in San Antonio and has been a patient at a variety of the health centers under PPST's umbrella since she was seventeen. Pls.' Hr'g Ex. 94 (Doe # 1 Decl.) ¶ 2. Now thirty-three, she has obtained a spectrum of services from PPST health centers including annual exams, STD screening, birth control, pregnancy tests, and general reproductive care. *Id.* ¶ 5. Doe # 1 wishes to continue receiving health care from PPST because she would not know where to go if she could not get care from Planned Parenthood, cannot afford to pay out of pocket, and fears she will end up at a health center where it is difficult to schedule appointments or where she will not like how she is treated. *Id.* ¶ 7.

Doe # 2 is an eighteen-year-old patient of a Planned Parenthood health center under PPST. Pls.' Hr'g Ex. 96 (Doe # 2 Decl.) ¶¶ 1–2. She is a full-time student in a pre-medical program and has a two-year-old son. *Id.* ¶ 3. She relies on her Planned Parenthood health center for STD screening, pregnancy testing, and birth control. *Id.* ¶ 4. She does not know if she could obtain the same services from another provider or if she would be comfortable with another provider. *Id.* ¶ 6.

Doe # 4 has thrombocytopenia, a shortage of blood platelets. Pls.' Hr'g Ex. 97 (Doe # 4 Decl.) ¶ 2. As a result of her condition, she is prone to excessive bleeding. *Id.* When her prior OB/GYN provider prescribed a drug that had to be injected to treat her condition but could not do the injections himself, she turned to PPGC. *Id.* ¶ 5. Doe # 4 now visits PPGC every three months for her injections as well as for other treatments. *Id.* ¶ 6. She wishes to continue her care with PPGC in light of her positive experience, especially considering the long waits she faced with other providers. *Id.*

Twenty-six-year-old Doe # 7 is a single mother who tries to get all her health care from a Planned Parenthood health center under PPST. Pls.' Hr'g Ex. 99 (Doe # 7 Decl.) ¶¶ 1–2, 8. She

Case: 17-50282    Document: 00514818737    Page: 7    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 7 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 104 of 290    PageID 880

sometimes visits her Planned Parenthood health center as a walk-in patient, but if she calls for an appointment her Planned Parenthood center is usually able to fit her in the same day. *Id.* ¶ 6. She feels less comfortable talking to other doctors about women's reproductive issues and wishes to continue to get the services she needs through PPST. *Id.* ¶¶ 7, 9.

Doe # 9 has a four-year-old son, is a part-time student, and works part-time. Pls.' Hr'g Ex. 100 (Doe # 9 Decl.) ¶ 2. She visits a PPGC health center for well-woman exams, STD testing, and birth control. *Id.* ¶ 3. She appreciates that PPGC treats Medicaid patients the same as patients with private insurance. *Id.* ¶ 4. She previously saw another provider who accepted Medicaid, but the wait times for that provider ranged up to two hours. *Id.* ¶ 5. Doe # 9 has found it difficult to find a good provider who will take Medicaid patients and worries she will be unable to find another provider in light of her commitments to her son, school, and work. *Id.* ¶ 7. She would prefer to remain with PPGC which has her medical history and has earned her trust. *Id.* ¶ 8.

Doe # 10 is an Austin resident who grew up in the foster care system. Pls.' Hr'g Ex. 102 (Doe # 10 Decl.) ¶¶ 1, 3. Doe # 10 was raped and had a negative experience with the doctor who examined her afterward. *Id.* ¶ 5. As a result, she is very nervous in a health center. *Id.* She wishes to continue her care with PPGT because she is comfortable with the doctors there and PPGT is flexible with scheduling. *Id.* ¶¶ 7–8. She and her younger sister do not know where they would go for health care if PPGT was not an option. *Id.* ¶¶ 9–10.

Doe # 11, now twenty-four, has been a patient of a PPST health center since she was fifteen. Pls.' Hr'g Ex. 104 (Doe # 11 Decl.) ¶¶ 1–2. While she briefly went to another provider when her Planned Parenthood health center was closed, she returned to her Planned Parenthood health center

Case: 17-50282    Document: 00514818737    Page: 8    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 8 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 105 of 290   PageID 881

when it reopened because it had all her medical records and she was more comfortable there. *Id.* ¶ 5.

She also appreciates the reproductive health education Planned Parenthood provided her. *Id.* ¶ 7.

## C.    HHSC

Defendant Charles Smith is the Executive Commissioner of HHSC and Defendant Stuart

Bowen is the Inspector General of HHSC (Inspector General). The Inspector General consulted with

his organization's Chief Medical Officer in deciding to terminate the Provider Plaintiffs from the

Texas Medicaid Program, but the ultimate decision to terminate was made by the Inspector General

individually. Hr'g Tr. Vol 2 at 18:24–20:15, 88:8–13.

## II.    The Texas Medicaid Program

In Texas, there are approximately 4.3 million people enrolled in Medicaid. Hr'g Tr. Vol. 3

at 6:15–17. In order for a health care provider to serve these patients through the Medicaid program,

it must execute a HHSC Medicaid Provider Agreement (Provider Agreement), which lays out the

responsibilities and obligations of a Texas Medicaid provider. Hr'g Tr. Vol. 2 at 11:3–10. By signing

a Provider Agreement, a provider agrees to comply with all the requirements of the Provider Manual,

a document describing Texas Medicaid program policies, as well as state and federal law. Defs.'

Hr'g Ex. 21 (Provider Agreement) at 1. A provider also agrees to ensure all its employees and agents

comply with such requirements. *Id.* All of the Provider Plaintiffs involved in this lawsuit executed

a Provider Agreement. Hr'g Tr. Vol. 2 at 11:24–12:2.

Section 6 of a Provider Agreement indicates the circumstances under which a Provider

Agreement may be terminated:

> [E]xclusion from participation in Medicare, Medicaid, or any other publically funded
> health-care program; loss or suspension of professional license or certification; any
> circumstance resulting in ineligibility to participate in Texas Medicaid; and failure

Case: 17-50282    Document: 00514818737    Page: 9    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 9 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 106 of 290    PageID 882

> to comply with the provisions of this Agreement or any applicable law, rule or policy
> of the Medicaid program; and any circumstances indicating that the health or safety
> of clients is or may be at risk.

Provider Agreement at 13. The Provider Manual supplies additional guidance on the rules governing Texas Medicaid providers. For instance, "[i]t is a violation of Texas Medicaid rules when a provider fails to provide health care services or items to Medicaid clients in accordance with accepted medical community standards . . . ." Defs.' Hr'g Ex. 20 (Provider Manual) at 13. Simply put, any violation of federal law, state law, or the Texas Medicaid program policies is a basis for termination, commonly referred to as a program violation. *See* Hr'g Tr. Vol. 2 11:3–23.

Under Texas law, the Inspector General is charged with enforcing the rules of the Mediciaid program. 1 TEX. ADMIN. CODE § 371.1603. Such enforcement authority includes the ability to expel a provider from enrollment in the Texas Medicaid program. *Id.* Specifically, the Inspector General may terminate a provider's participation in the Texas Medicaid program when the Inspector General establishes by prima facie evidence the provider committed a program violation, is affiliated with a provider that commits a program violation, or commits an act for which sanctions, damages, penalties, or liability could be assessed by the Inspector General. *Id.* § 371.1703©.

In terms of substantive coverage, Texas does not pay for abortions for women insured by Medicaid except in extremely narrow circumstances. Lambrecht Decl. ¶ 6.

In addition to Medicaid, Texas oversees other state health programs such as the Healthy Texas Women Program, the Family Planning Program, and the Breast and Cervical Cancer Screening Program. Hr'g Tr. Vol. 2 at 135:10–15.

Case: 17-50282    Document: 00514818737    Page: 10    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 10 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 107 of 290   PageID 883

### III.    Research Activities of the Provider Plaintiffs

PPGC has an internal department devoted to research, headed by Research Director Melissa Farrell (Ms. Farrell). Pls.' Hr'g Ex. 225 (Farrell Decl.) ¶ 2. Ms. Farrell worked as a nurse for two years in labor and delivery and pre-natal care before becoming the research coordinator at Baylor College of Medicine. *Id.* ¶ 1. In 2006, she became the research director at PPGC. *Id.* She has never witnessed an abortion or even been in the room when an abortion was performed. Hr'g Tr. Vol. 1 at 64:2–11.

The PPGC research department is involved in approximately twenty projects a year, responsible for coordinating and managing research-related activities between PPGC and third-parties. *Id.* The majority of research projects facilitated by PPCG's research department concern family planning services. *Id.* Such projects have included developing new forms of STD screening and treatment, advances in emergency contraception, and an HPV vaccine. *Id.*

When PPGC receives a request for a research partnership, Ms. Farrell works with the researchers to gather information and learn whether PPGC could participate. Pls.' Hr'g Ex. 108 (Fine Decl.) ¶ 23. Ms. Farrell's role includes providing researchers with information about PPGC's services and facilities, developing a budget, negotiating a contract, facilitating Institutional Review Board (IRB) submissions and approval, and guiding internal approval processes. Farrell Decl. ¶¶ 4–5. As part of this process, she consults with other staff members from PPGC to evaluate whether the research request is feasible and what operational changes and additional training would be required. Fine Decl. ¶ 23. Before any research project can begin, it must be approved by PPGC's medical director, the CEO, and PPFA. *Id.* If a project is approved, Ms. Farrell coordinates staff training and clinical logistics. Hr'g Tr. Vol. 1 at 78:21–79:14.

Case: 17-50282     Document: 00514818737     Page: 11     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 11 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 108 of 290   PageID 884

While PPGC is not currently involved with any fetal tissue studies or fetal tissue donation, it has facilitated fetal tissue donation in the past. Fine Decl. ¶ 10. Since 2006, PPGC has been involved in two research projects relating to fetal tissue. Farrell Decl. ¶¶ 9–10; Hr'g Tr. Vol. 1 at 74:23–75:12. The first study, in progress when Ms. Farrell arrived at PPGC in 2006, concerned first-trimester fetal tissue. Hr'g Tr. Vol. 1 at 75:2–3. The second study, running from 2010 to 2011, concerned first-trimester placental tissue. Farrell Decl. ¶ 9. During Ms. Farrell's tenure as research director PPGC has not engaged in research on or the donation of fetal tissue obtained from second-trimester abortions. Farrell Decl. ¶ 10.

When the prior studies relating to fetal tissue received all the required approvals, Ms. Farrell integrated each study into the clinical procedures of an abortion. In a typical procedure modified for research, a patient would receive a consultation and ultrasound and would be walked through the abortion consent process. Hr'g Tr. Vol. 1 at 76:16–77:1. The doctor would then determine the abortion method entirely based on the gestational age of the embryo or fetus without considering whether the patient was interested in donating fetal tissue. Fine Decl. ¶ 17.

Donation of fetal tissue was not discussed until after the woman completed all consents necessary for the abortion. Hr'g Tr. Vol. 1 at 77:4–13. A separate research consent process would then be undertaken. Id. at 76:22–77:3. If a patient consented to donate fetal tissue, a separate file and chart with the patient's research profile was created. Id. The doctor was not involved in obtaining a patient's consent to participate in fetal tissue donation and was not informed whether a particular patient agreed to donate tissue. Id. at 77:21–78:13, 177:1–6; Fine Decl. ¶ 22. The separate research file was delivered to a laboratory where all fetal tissue would be evaluated after a procedure. Hr'g Tr. Vol. 1 at 78:3–13.

-11-

Case: 17-50282    Document: 00514818737    Page: 12    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 12 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 109 of 290    PageID 885

After an abortion, the doctor would then be asked to sign off on a form indicating no change was made to the timing, method, or procedure of the abortion for fetal tissue tagged for research. *Id.* at 78:9–13. After the doctor's signature was obtained, the fetal tissue would be processed and packaged according to research needs.

The most recent study concluded in 2011 and was conducted in conjunction with the University of Texas Medical Branch in Galveston (UTMB). Farrell Decl. ¶ 10. It concerned the collection of first-trimester placental tissue from women who consented and required PPGC to use a sterile process to collect the placental tissue after the abortion. *Id.*; Hr'g Tr. Vol. 1 at 79:15–81:17.

As part of the contract between UTMB and PPGC, UTMB agreed to reimburse PPGC twenty-five dollars "for staff time expense involved in obtaining consent" for up to 500 patients and $1,500 for expenses related to a specific training necessary for the research. Pls.' Hr'g Ex. 239 (Tissue Supply Agreement and Amendment) at 1. Once the study began, the agreement was amended, however, to account for costs related to the length of time required to obtain consent, the sterile procedures, the collection of a maternal blood draw, and an administrative fee. *Id.* at 3–4; Hr'g Tr. Vol. 1 at 84:7–85:22. Under the amended agreement, UTMB reimbursed PPGC $50 per patient consent and $100 per consent for the combination of the sterile process and maternal blood draw; UTMB also reimbursed a one-time $2,000 fee for surgical services, research management, oversight, and storage. Hr'g Tr. Vol. 1 at 85:21–86:22. In total, UTMB reimbursed PPGC slightly less than $10,000. *Id.* at 87:3–6. Ms. Farrell testified that amount did not fully reimburse PPGC for all of its expenses in light of administrative and staff time devoted to the research partnership. *Id.* at 87:7–23.

One of PPGC's physicians who performed abortions was also an investigator on the research side for the UTMB project. *Id.* at 77:14–16.

-12-

Case: 17-50282     Document: 00514818737     Page: 13     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 13 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 110 of 290   PageID 886

Neither PPGT, its related entity that performs abortions, nor PPST participates or previously participated in fetal tissue research or a donation program. Lambrecht Decl. ¶ 6; Pls.' Hr'g Ex. 92 (Hons Decl.) ¶ 7.

## IV.     Center for Medical Progress Videos

On April 9, 2015, Ms. Farrell conducted a site visit with two individuals purporting to be representatives of a tissue procurement company. Farrell Decl. ¶¶ 6–7. The two individuals, however, were not tissue procurement representatives but were affiliated with the Center for Medical Progress (CMP), an anti-abortion organization. *Id.* Using fake names, the two anti-abortion activists attended PPFA conferences and portrayed themselves as starting a company interested in connecting Planned Parenthood health centers with research studies. *Id.* In response to an email from these activists, Ms. Farrell arranged the site visit to PPGC's headquarters. *Id.*

During the site visit, one of the activists secretly videotaped conversations with Ms. Farrell and the tour of the PPGC facility she provided. *See* Defs.' Hr'g Ex. 2 (CMP Video). Ms. Farrell also arranged for the anti-abortion activists to meet with the Ambulatory Surgical Center (ASC) Director and to take a tour of the surgical facilities. *Id.* While touring the surgical facilities, the activists asked to see an example of fetal tissue and the hosts obliged. *Id.* All of these interactions were covertly recorded, netting over eight hours of undercover video. *Id.*

A few months later, CMP released a series of undercover videos, including the one filmed at PPGC's headquarters, purportedly showing Planned Parenthood and its affiliates were contracting to sell aborted human fetal tissue and body parts. Mot. Prelim. Inj. [#58] at 7. The release of the videos prompted a number of federal and state investigations concerning Planned Parenthood organizations.

Case: 17-50282     Document: 00514818737     Page: 14     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 14 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 111 of 290   PageID 887

In Texas, the Harris County District Attorney, together with the Texas Rangers and the Houston Police Department, investigated PPGC. Mot. Prelim. Inj. [#58-1] Ex. 2C (Harris County District Attorney Press Release). The investigation found no wrongdoing by PPGC, but the grand jury indicted the two anti-abortion activists who created the videos. *Id.* These charges were eventually dismissed. Linton Decl. ¶ 25 n.1. During the same period, the Texas Attorney General's Office, Texas Department of State Health Services, and HHSC all conducted their own investigations. *Id.* ¶¶ 27–30. Aside from HHSC's allegations with respect to the Texas Medicaid program, the record includes no additional findings of wrongdoing from the investigations and no efforts to revoke any license or qualification of the Plaintiff Providers.

## V.   Proposed Research Project with Baylor College of Medicine

Starting in 2013, a researcher from Baylor College of Medicine (Baylor) approached PPGC to explore a new fetal tissue donation project. Farrell Decl. ¶ 36. Ms. Farrell, the Baylor researcher, and a research coordinator from Baylor corresponded for nearly a year concerning the potential project. *Id.*

In mid-November of 2014, the research coordinator from Baylor emailed Ms. Farrell. Pls.' Hr'g Ex. 198 (Nov. 17, 2014) at 2. The title of the email included the phrase "IRB Approval Obtained" and indicated "[Baylor] heard back from the IRB today and like we discussed, the study does not constitute human subject[] research." *Id.* Ms. Farrell responded to the email "Thank you!" *Id.* at 1. The next email in the chain, from the Baylor researcher, asked about next steps "[n]ow that we have approval for these studies . . . ." *Id.*

Following the November 2014 email chain, both Baylor and PPGC continued to discuss the project, exchanging a draft contract. *See* Pls.' Hr'g Exs. 205 (May 21, 2015 Emails), 206 (Jun. 22,

Case: 17-50282     Document: 00514818737     Page: 15     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 15 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 112 of 290   PageID 888

2015 Emails). On July 7, 2015, Ms. Farrell asked the Baylor team to "insert any language that is pertinent to the project" into the contract and emphasized "that if this study involves DNA, isolation of cell lines, etc…[sic] the IRB approval and ICF need to specify this. I don't have a recollection that DNA research was your projected plan." Pls.' Hr'g Ex. 207 (July 7, 2015 Emails) at 1.

No site visit concerning the potential project was ever conducted. Farrell Decl. ¶¶ 38–39. No contract or budget was ever finalized or approved by PPGC or PPFA. *Id.*

After the release of the CMP videos, the Baylor researcher emailed Ms. Farrell to ask if "[i]n light of recent events," they needed to make other changes to the contract. Pls.' Hr'g Ex. 214 (Oct. 13, 2015 Email to PPGC). Nearly a month later, Ms. Farrell responded, clarifying that there was no valid contract and "PPGC will not commit to engage in any fetal tissue research endeavors at this time." Pls.' Notice Filing [#81-12] Ex. K (Nov. 4, 2015 Email to Baylor) at 2.

## VI.    Congressional Investigation

In the wake of several Congressional committee investigations following the release of videos by CMP, the Select Investigative Panel (Select Panel) was formed by the House of Representatives and tasked with investigating fetal tissue donation practices. Defs.' Hr'g Ex. 61 (Select Panel Report) at 2–3. Representative Marsha Blackburn of Tennessee, a Republican, was named Chair of the Select Panel. *Id.* In addition to the Chair, seven Republicans and six Democrats were selected to serve on the Select Panel. *Id.* at 3.

On December 1, 2016, Representative Blackburn emailed Ken Paxton, the Attorney General of Texas, a letter describing evidence the Select Panel had gathered concerning PPGC. Defs.' Hr'g Ex. 68 (Referral Letter). Representative Blackburn claimed PPGC had violated two specific laws:

Case: 17-50282     Document: 00514818737     Page: 16     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS     Document 100     Filed 02/21/17     Page 16 of 42
Case 2:21-cv-00022-Z     Document 62     Filed 03/11/22     Page 113 of 290     PageID 889

Texas Penal Code § 48.02, prohibiting the purchase and sale of human organs, and Texas Penal Code § 37.08, prohibiting a false report to a law enforcement officer. *Id.* at 1, 10.

Representative Blackburn concluded her letter, "Based on the facts outlined above and the supporting documentation, I urge your office to conduct a thorough investigation into whether PPGC violated these statutes, and, if you agree that such violations occurred, to take all appropriate action." *Id.* at 11. Representative Blackburn signed the letter with her name and title as Chairman of the Select Panel. *Id.* No other Select Panel member signed the letter. *See id.*

On December 30, 2016, the Select Panel issued a final report. *See* Select Panel Report. Only Representative Blackburn's name and the seven Republican panel members' names appear in the author block of the final report. *Id.*

## VII.     Procedural History of this Suit

### A.     October 2015 Termination Letter

On October 19, 2015, HHSC issued a "Notice of Termination" to each of the Provider Plaintiffs. *E.g.*, Mot. Prelim. Inj. [#58-1] Ex.1A (Initial Notice). The Initial Notice "effect[ed] a process to end [the Provider Plaintiffs'] enrollment in the Texas Medicaid program." *Id.* (citing 1 TEX. ADMIN. CODE § 371.1703(e)).[3] Plaintiffs filed suit, seeking a temporary restraining order or, alternatively, a preliminary injunction. Compl. [#1] at 19.

Although the Initial Notice warned the Provider Plaintiffs their Provider Agreements would be terminated fifteen days following receipt of a Final Notice of Termination, HHSC claimed the

---

[3] The Initial Notice alleged four bases for termination: video evidence indicating (1) a policy of agreeing to procure fetal tissue "even if it means altering the timing or method of an abortion"; (2) failure to prevent conditions allowing the spread of infectious diseases; and (3) inadequate training for infection control and barrier precaution in handling fetal blood and tissue; as well as (4) prior *qui tam* litigation. *See* Initial Notice.

Case: 17-50282     Document: 00514818737     Page: 17     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 17 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 114 of 290   PageID 890

lawsuit was premature as it had not yet actually decided termination was in order. Defs.' Ltr. Br.

[#38] (citing Initial Notice). In light of HHSC's representation, the Court stayed the case pending

the issuance of a final termination notice. Ord. of Jan. 27, 2016 [#42]. The case remained dormant

for nearly a year. *See* Mot. Prelim. Inj. [#58] at 14.

**B.      December 2016 Termination Letter**

On December 20, 2016, more than a year after the Initial Notice had been issued, HHSC sent

a Final Notice of Termination (Final Notice) to each of the Provider Plaintiffs. Pls.' Hr'g Ex. 1 (Final

Notice) at 1. The Final Notice informed the Provider Plaintiffs that the Inspector General "finds you

are not qualified to provide medical services in a professionally competent, safe, legal and ethical

manner under . . . state and federal law pertaining to Medicaid providers." *Id.* at 1–2.

The Final Notice cites three sources of evidence for the Inspector General's conclusions: the

video footage obtained by CMP (CMP Video), discussions with PPGC staff, and evidence uncovered

by the Select Panel. *Id.* at 2. According to the Final Notice, "the unedited video footage indicates that

Planned Parenthood follows a policy of agreeing to procure fetal tissue, potentially for valuable

consideration, even if it means altering the timing or method of an abortion." *Id.* The Final Notice

also states the Inspector General consulted with his agency's Chief Medical Officer, who reviewed

the video and concluded the Plaintiff Providers' "willingness to engage in these practices violates

generally accepted medical standards . . . ." *Id.*

Summarizing the evidence from the CMP Video, the Final Notice enumerates alleged

violations of generally accepted standards of medical practice:

1.      a history of deviating from accepted standards to procure samples that meet
        researcher's needs;

-17-

Case: 17-50282     Document: 00514818737     Page: 18     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 18 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 115 of 290   PageID 891

2.    a history of permitting staff physicians to alter procedures to obtain targeted tissue samples needed for their specific outside research;

3.    a willingness to convert normal pregnancies to the breech position to ensure researchers receive intact specimens;

4.    an admission that "we get what we need to do to alter the standard of care where we are still maintaining patient safety, still maintaining efficiency in clinic operations, but we integrate research into it";

5.    an admission that Planned Parenthood gets requests for "information from our study sponsor on what data they need that is not our standard of care," and that [Planned Parenthood] provides what is needed by creating a separate research protocol or template that can include medically unnecessary testing; and

6.    a willingness to charge more than the costs incurred for procuring fetal tissue.

*Id.*

In addition to alleging violations of medical and ethical standards, the Final Notice indicates the Inspector General relied on evidence from the Select Panel that Planned Parenthood "engaged in misrepresentations about [its] activity related to fetal tissue procurements . . . ." *Id.* at 3. While the Final Notice primarily outlines bases for termination pertaining to PPGC, it also notes "if you are affiliated with a provider that commits a program violation subjecting it to enrollment termination, then the affiliate is also subject to enrollment termination." *Id.* The Final Notice then outlines indicia of affiliation. *Id.*

With the Provider Plaintiffs' termination from Medicaid set to take place thirty days after the receipt of the Final Notice, Plaintiffs filed an amended complaint and a new motion for a preliminary injunction to prevent termination. Am. Compl. [#76]; Mot. Prelim. Inj. [#58]. Starting January 17, 2017, this Court held a three-day evidentiary hearing on Plaintiffs' motion for injunctive relief. At the conclusion of the evidentiary hearing, the Court entered an order prohibiting the termination of

Case: 17-50282    Document: 00514818737    Page: 19    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 19 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 116 of 290   PageID 892

the Plaintiff Providers' enrollment in Medicaid until February 21, 2017. Ord. of Jan. 19, 2017 [#84] at 2. The Court also requested letter briefs and authorized the parties to file findings of fact and conclusions of law. *Id.* Both parties have done so.

### Analysis

### I.    Legal Standard for Injunctive Relief

A preliminary injunction is an "extraordinary equitable remedy." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). In essence, "[t]he purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 627 (5th Cir. 1985) (citation omitted).

The Court may issue such relief only if the movant establishes "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jackson Women's Health Org.,* 760 F.3d at 452 (citation and internal quotation omitted). Because preliminary injunctions are extraordinary remedies, the movant must "clearly carr[y] the burden of persuasion on all four requirements." *PCI Transp. Inc. v. Fort Worth & W.R.R. Co.,* 418 F.3d 535, 545 (5th Cir. 2005) (citation and internal quotation omitted).

### II.    Application

### A.    Substantial Likelihood of Success on the Merits

Plaintiffs bring this suit based on rights secured by the federal Medicaid statute and the United States Constitution. Am. Compl. [#76] ¶¶ 86–89. Yet, Plaintiffs seek a preliminary injunction

-19-

Case: 17-50282    Document: 00514818737    Page: 20    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 20 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 117 of 290    PageID 893

solely via their federal Medicaid statutory claim, not the constitutional claim. See Mot. Prelim. Inj. [#58] at 22–32. Specifically, Plaintiffs allege a violation of 42 U.S.C. § 1396a(a)(23)(A), which states, "[A]ny individual eligible for medical assistance may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . and who undertakes to provide him such services . . . ." Plaintiffs allege HHSC violated this provision, referred to as the free-choice-of-provider requirement, because the Provider Plaintiffs are qualified and willing to undertake family planning services.

The Court briefly addresses the issue of standing before examining the merits of Plaintiffs' Medicaid Act claim.

## I.  Standing

The Fifth Circuit's recent opinion in *Planned Parenthood of Gulf Coast v. Gee* provides the guidance for a § 1983 action alleging a violation of Medicaid's free-choice-of-provider requirement. 837 F.3d 477 (5th Cir. 2016). In *Gee*, the Fifth Circuit affirmed the district court's holding that the Medicaid's free-choice-of-provider requirement creates a private right enforceable under § 1983 and the individual plaintiffs met their burden to show entitlement to a preliminary injunction. *Id.* at 487, 502. Thus, this Court looks both to the Fifth Circuit's *Gee* opinion as well as to the district court's opinion in the same case, *Planned Parenthood Gulf Coast, Inc. v. Kliebert,* 141 F. Supp. 3d 604 (M.D. La. 2015).

HHSC raises the issue of standing, emphasizing the Fifth Circuit is still considering whether to grant en banc review of the *Gee* opinion. Defs.' Proposed Findings [#94] at 45 n. 6. HHSC refuses to concede § 1396a(a)(23) provides a private right of action for individuals and also argues providers do not have a right of action under the same provision. *Id.*

Case: 17-50282     Document: 00514818737     Page: 21     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 21 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 118 of 290   PageID 894

Although the Fifth Circuit may grant en banc review, the *Gee* opinion currently stands as the authority in the Fifth Circuit. In *Gee*, the Fifth Circuit "join[ed] every other circuit to have addressed this issue to conclude that § 1396a(a)(23) affords the Individual Plaintiffs a private right of action under § 1983." 837 F.3d at 489. Thus, this Court, heeding the Fifth Circuit's unqualified statement from *Gee*, finds the Individual Plaintiffs in this case have a right of action under § 1396a(a)(23).

Moreover, just as the district court in *Kliebert* concluded, this Court finds if either the Individual Plaintiffs or the Provider Plaintiffs prevail on the merits, "the same remedy—a permanent injunction—would be due and any potential action by [HHSC] would be similarly affected." 141 F. Supp. 3d at 636. The Court need not conclude all Plaintiffs have a substantial likelihood of prevailing on the Medicaid Act claim for a preliminary injunction to issue at this time. *Id.* at 636. If Plaintiffs satisfy the elements needed to show a substantial likelihood of success on the Individual Plaintiffs' § 1396a(a)(23) claim only, so long as the other factors are met, a preliminary injunction is appropriate. *See id.* Accordingly, because this Court finds the Individual Plaintiffs have a right of action, it need not decide whether the Provider Plaintiffs also have such a right, either on their own behalf or on the behalf of their patients. *See id.*

**ii.     Medicaid Act Claim**

"Medicaid is a cooperative program between the federal government and the states in which the federal government gives financial assistance to states to provide medical services to Medicaid-eligible individuals." *Gee,* 837 F.3d at 489. Through Medicaid, the federal government and participating states share health care costs. *Id.* at 489 (citing *Atkins v. Rivera,* 477 U.S. 154, 156–57 (1986)). The federal government provides the states with federal funding, and "[i]n return participating States are to comply with the requirements imposed by the [Medicaid] Act and by the

Case: 17-50282    Document: 00514818737    Page: 22    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 22 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 119 of 290   PageID 895

Secretary of Health and Human Services." *Id.* (internal quotation marks omitted). In other words, "Medicaid offers the States a bargain: Congress provided federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions." *Id.* (quoting *Armstrong v. Exceptional Child Ctr., Inc.,* 135 S.Ct. 1378, 1382 (2015) (Scalia, J.) (plurality opinion) (internal quotation marks omitted)).

This case concerns the contours of Medicaid's mandated free-choice-of-provider requirement. As the Supreme Court explained, the free-choice-of-provider requirement "gives recipients the right to choose among a range of qualified providers, without government interference." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785 (1980). While the Medicaid statute does not define the term "qualified," the Fifth Circuit interpreted qualified in the Medicaid context to mean "to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." *Gee,* 837 F. 3d at 495 (internal quotation marks omitted) (quoting *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health,* 699 F.3d 962, 978 (7th Cir. 2012)).

Within the federal Medicaid scheme, states may exclude providers on the grounds provided under § 1396a(p)(1) of the Medicaid Act and on analogous state grounds relating to provider qualification. *Id.* at 495. Therefore, while a state retains broad authority to define provider qualifications and to exclude providers who are not qualified, that authority is limited by the meaning of qualified as it relates to the ability to perform medical services. *Id.*

Previously, the Fifth Circuit rejected Louisiana's asserted bases for terminating PPGC—two *qui tam* claims, unspecified misrepresentations, and a pending investigation—because they did not relate to PPGC's qualifications. *Id.* at 495–96. In particular, Louisiana failed to show how its

Case: 17-50282     Document: 00514818737     Page: 23     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 23 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 120 of 290   PageID 896

grounds for termination even related to PPGC's qualifications. *Id.* The Fifth Circuit implied that in order to survive a § 1396a(a)(23) challenge, a state's basis for denying a Medicaid beneficiary their chosen provider requires "factual support or linkage" between the grounds for termination and the provider's qualifications. *Id.* at 499.

Under Texas law, the Inspector General may terminate a provider's enrollment in Medicaid if the Inspector General establishes by prima facie evidence the provider committed a program violation, is affiliated with a provider that commits a program violation, or commits an act for which sanctions, damages, penalties, or liability could be assessed by the Inspector General. 1 TEX. ADMIN. CODE § 371.1703©. Prima facie evidence in this context is defined as evidence "sufficient to establish a fact or raise a presumption unless disproved."*Id.* § 371.1(62). Thus, in order for the Inspector General to terminate a provider, he must have evidence sufficient to establish the provider or its affiliate committed a program violation, i.e. a violation of state law, federal law, or Texas Medicaid policies. *See id.* § 371.1703©.

Additionally, both federal and Texas law require a provider be given notice of termination, which must describe the reasons for termination. *See, e.g.*, 42 U.S.C. § 1320a-7 (requiring "reasonable notice" before termination); 42 U.S.C. § 405(b) (mandating the notice include a "discussion of the evidence" and the "reason or reasons upon which [termination] is based"); 1 TEX. ADMIN. CODE § 371.1703(f) (requiring a provider be given notice of termination as part of due process); *Id.* 371.1703(e) (mandating notice of termination include "the basis for termination").

Case: 17-50282     Document: 00514818737     Page: 24     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 24 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 121 of 290   PageID 897

Consequently, the Court will not consider bases for termination not included in the notice of termination.[4]

It is undisputed the Inspector General individually made the decision to terminate the Plaintiff Providers' enrollment in Medicaid and the Final Notice sets forth the bases for that decision. Hr'g Tr. Vol. 2 at 88:2–16, 18:8–14. Thus, the Court looks to see whether the Inspector General had prima facie evidence sufficient to conclude the bases of termination set forth in the Final Notice merited finding the Plaintiff Providers were not qualified.

The Inspector General had three overarching bases for termination: (1) video evidence indicating PPGC violated medical and ethical standards; (2) evidence PPGC misrepresented activity related to fetal tissue procurement; and (3) evidence the other Provider Plaintiffs were affiliated with PPGC. *See* Final Notice; Hr'g Tr. Vol. 2 at18:11–22:7, 31:6–35:9, 37:16–41:4.[5]

In short, the Court finds the Inspector General did not have any factual support to conclude the bases of termination set forth in the Final Notice merited finding the Plaintiff Providers were not qualified. Rather, in light of the current record, it appears the termination decision had nothing to do with the Provider Plaintiffs' qualifications. As a result, the Court finds the Individual Plaintiffs met their burden of proof showing a substantial likelihood of success on the merits of their claim under § 1396a(a)(23).

---

[4] In its pleadings and at the evidentiary hearing, HHSC alleged bases for termination such as the Provider Plaintiffs' failure to obtain informed consent, but, as discussed above, the Court will not consider reasons for termination not included in the Final Notice and not part of the Inspector General's termination decision. *See, e.g.,* Defs.' Resp. [#70] at 13–14; Hr'g Tr. Vol. 1 at 129:17–132:6.

[5] Notwithstanding the Inspector General's sworn testimony he reviewed the Select Panel's report in making the decision to terminate the Provider Plaintiffs from Texas Medicaid, Hr'g Tr. Vol. 2 at 35:12–36:21, the Court notes the Select Panel's report was published on December 30, 2016, ten days after the Inspector General sent the Final Notice to the Provider Plaintiffs. *See* Select Panel Report. Additionally, the validity of the Select Panel Report remains in question as six out of the thirteen committee members declined to endorse the report. *see id.*

Case: 17-50282     Document: 00514818737     Page: 25     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 25 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 122 of 290   PageID 898

a.      *Video evidence indicating PPGC violated medical and ethical standards*

In essence, the Inspector General alleges the CMP Video demonstrates PPGC violated medical and ethical standards in three ways. First, the Inspector General concluded, based on consultation with HHSC's Chief Medical Officer, the CMP Video shows PPGC has "a history of" altering and "a willingness" to alter abortion procedures for research purposes. *See* Final Notice at 2; Hr'g Tr. Vol. 2 at 28:22–31:24. Second, the Inspector General determined the CMP Video demonstrates researchers at PPGC performed and possibly altered abortions to procure fetal tissue for their own research. *See* Final Notice at 2; Hr'g Tr. Vol. 2 at 31:25–33:1. And third, the Inspector General found PPGC had "a willingness" to profit from procuring fetal tissue. *See* Final Notice at 3; Hr'g Tr. Vol. 2 at 28:22–32:21. After reviewing the CMP Video in its entirety and considering the Inspector General's testimony, the Court finds there is no evidence in the record PPGC violated any medical or ethical standard.

As a threshold matter, the CMP Video is the only evidence the Inspector General relied upon to conclude PPGC violated medical and ethical standards. *See* Hr'g Tr. Vol. 2 at 28:22–32:21 (reviewing the video clips the Inspector General relied upon to conclude PPGC violated ethical and medical standards). While the Chief Medical Officer did provide the Inspector General with his opinion, that opinion was only offered as an analysis of what the CMP Video showed, not whether a violation occurred. *Id.* at 18:24–20:8.

Ultimately, the quality and strength of the evidence the CMP Video provides is suspect. While the record shows the Inspector General knew there were multiple versions of the video available on the internet, Hr'g Tr. Vol. 2 at 24:7–5, HHSC offered no evidence the Inspector General

Case: 17-50282    Document: 00514818737    Page: 26    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 26 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 123 of 290    PageID 899

took steps to authenticate the CMP Video he relied upon or verify it had not been altered.[6] Indeed, HHSC offered no evidence to authenticate the CMP Video at all.

Despite concerns about the authenticity of the video, the Court nevertheless examines the CMP Video to evaluate whether it provided the Inspector General with prima face evidence to conclude PPGC violated medical and ethical standards. To summarize the CMP Video for those not blessed with eight free hours to watch it, the vast majority of the footage concerns conversations between Ms. Farrell and the two anti-abortion activists during the April 9, 2015 site visit. CMP Video at 7:41:15–13:57:03, 14:30:03–14:49:50.[7] A thirty-minute section of the CMP Video features a tour of the Ambulatory Surgical Center (ASC), which includes conversations with the ASC Director and Ms. Farrell and a visit to a laboratory. *Id.* at 13:57:03–14:28:30.

Turning now to the first allegation—PPGC has both a history of altering and a willingness to alter abortion procedures for research purposes—the Court finds the Inspector General had no evidence to support this allegation. In particular, the Inspector General had no evidence any PPGC doctor altered an abortion procedure and the video he relied upon, the CMP Video, features unclear and ambiguous dialogue, statements by Ms. Farrell who had no personal knowledge of abortion procedures, and conversations exploring theoretical possibilities.

Most significantly, the Inspector General admitted he had no evidence any PPGC doctor altered the medical procedure of an abortion, for research purposes or for any other reason, when he

---

[6]  HHSC only offers evidence that other versions of the CMP Video posted on YouTube were verified as authentic by independent digital forensic professionals. Resp. [#70] at 21. As the Inspector General testified he did not rely on videos available via YouTube, the authentication of such videos is not relevant here. *See* Hr'g Tr. Vol. 2 at 24:7–25:25.

[7]  The Court uses the time stamps from the CMP Video to reference sections of footage.

Case: 17-50282      Document: 00514818737      Page: 27      Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 27 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 124 of 290   PageID 900

issued the Final Notice (nor did he have such evidence at the hearing). Hr'g Tr. Vol. 2 at 50:14–21, 69:17–70:13.

Rather, in support of his determination, the Inspector General pointed to CMP Video clips he claims show Ms. Farrell admitted PPGC doctors previously altered abortion procedures. Hr'g Tr. Vol. 2 at 29:1–31:24 (citing CMP Video at 7:59:00–8:00:43, 8:00:54–8:01:50); see also Defs.' Ltr. Br. [#92] at 2–5 (citing CMP Video at 8:04:08–8:05:35, 8:11:25–8:11:53, 11:59:30–12:01:40). After reviewing these clips in the context of the full video, the Court notes the conversations in the CMP ideo shift quickly between discussing changes to clinical processes necessary to incorporate research into a health center's operations and discussing changes to the medical procedures of abortion. Even viewing these conversations in the light most favorable to the Inspector General, the Court sees nothing more than confused and ambiguous dialogue, open to interpretation. *Compare* Pls.' Ltr. Br.[#91] *with* Defs.' Ltr. Br. [#93] (citing the same or adjacent clips of the CMP Video for opposite propositions).

In addition to Ms. Farrell's statements captured in the CMP Video, the Inspector General indicated he relied on the section of the CMP Video depicting the tour of the ASC. Hr'g Tr. 2 29:1–31:24 (citing CMP Video at 13:56:54–13:59:10, 14:03:11–14:03:50, 14:17:03–14:17:55, 14:20:10–14:20:56, 14:24:57–14:25:26). HHSC argues this section of the CMP Video demonstrates PPCG doctors altered abortion procedures to remove intact fetuses, or would be willing to do so, for research. Plaintiffs, however, offer the uncontradicted testimony of Dr. Fine, an experienced OB/GYN who has performed numerous abortions, that it is always clinically desirable to remove the fetus as intact as possible to minimize entries into the uterus. Hr'g Tr. Vol. 1 at 156:17–157:3.

Case: 17-50282    Document: 00514818737    Page: 28    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 28 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 125 of 290    PageID 901

By comparison, the Inspector General, a lawyer with no medical training, testified he relied on the Chief Medical Officer, to determine if the CMP Video included any medically unethical conduct. Hr'g Tr. Vol. 2 at 6:19–7:19, 19:3–20:15, 58:16–25. Yet, the Chief Medical Officer, an orthopedic surgeon who practices sports medicine, admitted he would have to defer to an OB/GYN to evaluate abortion procedures. *Id.* at 91:18–93:2. He also admitted that he and the Inspector General would have a similar understanding of the abortion terms and procedures discussed in the CMP Video, the understanding of a lay person. *Id.*

Furthermore, the Court discounts the secretly recorded statements by Ms. Farrell, especially as the CMP Video repeatedly shows Ms. Farrell had no personal knowledge of the medical aspects of abortion procedures or PPGC's abortion procedures. For example, Ms. Farrell simply shrugged when asked if PPGC's doctors could convert a fetus to breech position and later indicated she would have to ask why converting to breech would be medically necessary. CMP Video at 8:05:23–8:06:00, 11:53:53–11:54:45. Similarly, when confronted with questions from the anti-abortion activists concerning potential changes to abortion procedures, Ms. Farrell admitted she was unsure how the gestational age for a fetus is determined or how second-trimester procedures differ. *E.g.*, CMP Video at 11:50:39–11:54:35. While Ms. Farrell previously worked as a nurse, she has never seen an abortion performed or even been in the room when an abortion was performed. Hr'g Tr. Vol. 1 at 64:2–11.

Rather, Ms. Farrell's day-to-day role involves managing clinical operations and is unrelated to the medical procedures of abortion. Farrell Decl. ¶¶ 4–5. Statements from the CMP Video demonstrate how Ms. Farrell indicated she would have to discuss changes to medical procedures with the doctors. *See, e.g.*, CMP Video at 8:01:25–8:01:34; 8:05:16–8:05:42. Plaintiffs also

Case: 17-50282    Document: 00514818737    Page: 29    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 29 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 126 of 290    PageID 902

emphasize that the site visit featured in the video is only a preliminary step in a research partnership; more approval, from senior clinical staff and PPFA, would be required before any research project could be undertaken. Hr'g Tr. Vol. 1 at 161:7–12; Fine Decl. ¶ 23. After evaluating the CMP Video, PPGC's prior research partnerships, and Ms. Farrell's experience, it appears more likely Ms. Farrell believed she was discussing changes to clinical operations rather than changes to the medical procedures of abortion. *See, e.g.*, Hr'g Tr. Vol. 1 91:5–92:14, 97:4–15.

The theoretical nature of the conversations recorded in the CMP Video further undermines the support for the Inspector General's allegation. The last study even relating to fetal tissue ended in 2011. Farrell Decl. ¶ 9. During that study, PPGC abortion doctors were unaware of whether a patient consented to donate fetal tissue. PPGC clinical staff maintained separate files for a patient's clinical information and any research involvement. Hr'g Tr. Vol. 1 at 76:22–77:3. Doctors were not involved in obtaining a patient's consent for donation. Hr'g Tr. Vol. 1 at 77:21–78:13, 177:1–6; Fine Decl. ¶ 22.

Overall, the context of the CMP Video eliminates the plausibility of interpreting it to show PPGC had a history of and willingness to alter the medical aspects of abortion procedures. Viewing the evidence holistically, the Court concludes the Inspector General had no evidence indicating PPGC ever altered an abortion procedure or would be willing to do so.

Evaluating the Inspector General's second allegation—the CMP Video demonstrates researchers at PPGC performed abortions to procure fetal tissue, possibly altering procedures, for their own research—the Court finds this allegation similarly unsupported by evidence. As discussed above, the Inspector General had no evidence any PPGC doctor ever altered an abortion procedure, for research or for any other purpose. And, again, there is no evidence any PPGC doctor ever knew

-29-

Case: 17-50282    Document: 00514818737    Page: 30    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 30 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 127 of 290    PageID 903

if a patient consented to donate to research. Consequently, there is no evidence a PPGC doctor could have altered an abortion procedure for research purposes.

But the Court also notes the Inspector General had no evidence a researcher who performs abortions and collects the fetal tissue after the procedure for her own research purposes violates medical or ethical standards. HHSC cites three sections of federal law as evidence PPGC violated medical and ethical standards, but there is no indication these sections apply to the studies in which PPGC participated. HHSC cites no other source for the medical or ethical standards PPCG allegedly violated. *See* Defs.' Proposed Findings [#94] at ¶¶ 24–28.

Specifically, HHSC cites 45 C.F.R. § 46.204 as prohibiting researchers from performing abortions and collecting fetal tissue for their own research. Resp. [#70] at 11; Defs.' Proposed Findings [#94] at ¶ 24. This regulation, however, imposes a condition on federal funding for research on fetuses in utero, not research performed on tissue collected after an abortion. *See* § 46.204; Consolidated Appropriations Act, Pub. L. No. 111-117, § 509(a)(2), 123 Stat. 3034, 3280–81 (2010) ("None of the funds made available in this Act may be used for— . . . research in which a human a human embryo . . . [is] knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in utero under 45 C.F.R. § 46.204(b) . . . ."); *see also* Hr'g Tr. Vol. 3 at 39:25–40:18. Furthermore, HHSC does not contend the Inspector General had any evidence the studies with which PPGC partnered received federal funding.

HHSC also cites 42 U.S.C. § 289g-1(c)(4) and (b)(2)(C)(I) as evidence a researcher cannot play a role in the decision to terminate a pregnancy and must disclose if she has an interest in research conducted with the tissue. Defs.' Proposed Findings [#94] at ¶¶ 25–26. Yet, again, these two sections pertain to conditions on federal research funding. *See* 42 U.S.C. § 289g-1(a)(1).

Case: 17-50282     Document: 00514818737     Page: 31     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 31 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 128 of 290   PageID 904

Relatedly, the two prior studies PPGC engaged in received IRB approval, which means an IRB panel validated the studies' plans for managing legal and ethical issues. Hr'g Tr. Vol. 1 at 75:13–76:15. The Inspector General presented no evidence suggesting the IRB review and approval was insufficient. In conclusion, the Court finds the Inspector General had little to no evidence a doctor who performed abortion procedures and subsequently conducted research on the tissue collected violated medical or ethical standards.

Finally, the Court examines the Inspector General's third allegation for how PPGC violated medical and ethical standards—PPGC had "a willingness" to profit from procuring fetal tissue. As an initial matter, the Court is unconvinced mere willingness, without any evidence of attempt, is enough to deprive a Medicaid beneficiary of the right to her otherwise qualified provider. *See Gee*, 837 F.3d at 495, 499 (warning that a state cannot simply label an exclusionary rule as a qualification). The Inspector General offered no evidence indicating PPGC ever made a profit from procuring fetal tissue for research. Specifically, the Inspector General could not point to a single payment PPGC ever received that exceeded its expenses incurred. Instead, the Inspector General again relied on the conversations between Ms. Farrell and the two anti-abortion activists from the CMP Video. The Inspector General testified Ms. Farrell's use of the term "financially beneficial" led him to conclude PPGC was willing to procure fetal tissue for valuable consideration. Hr'g Tr. Vol. 2 at 34:2–12. Yet, it is undisputed that it is a financial benefit to receive reimbursement for actual, reasonable expenses. Hr'g Tr. Vol. 2 at 75:1–75:10. And no PPGC employee, in the CMP Video or otherwise, represented that PPGC sought to make a profit on fetal tissue research. *Id.* at 74:15–25.

-31-

Case: 17-50282     Document: 00514818737     Page: 32     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 32 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 129 of 290   PageID 905

Therefore, to summarize, the Inspector General relied on an unauthenticated video and the advice of an orthopedic surgeon to conclude PPGC violated medical and ethical standards related to abortion procedures. The video in question offers, at most, theoretical conversations concerning what might be possible in a research partnership between a health care provider and a tissue procurement company. The Inspector General had no evidence any PPGC doctor ever altered an abortion procedure, for research or for any other purpose. The Inspector General also possessed no evidence any researcher ever knowingly performed or altered an abortion to procure fetal tissue for his or her own research. And even if a doctor did collect fetal tissue for her own research after performing an abortion, the Inspector General had no evidence such activity violates medical or ethical standards. Lastly, the Inspector General possessed no evidence PPGC ever profited, or even sought to profit, from procuring fetal tissue. Thus, the Court finds there is no factual support in the record for the conclusion PPGC violated medical and ethical standards or would be willing to do so.

      *b.*     *Evidence PPGC misrepresented activity related to fetal tissue procurements*

The Final Notice stated the Inspector General had evidence the Provider Plaintiffs "engaged in misrepresentations about your activity related to fetal tissue procurements, as revealed by evidence provided by the [Select Panel]." Final Notice at 3. At the evidentiary hearing, the Inspector General testified he only considered evidence of one alleged misrepresentation in making his termination decision: evidence a Texas Ranger was told the IRB had not yet approved a proposed research project between Baylor and PPGC. Hr'g Tr. Vol. 2 at 36:12–21, 51:6–14.

Under Texas law, "[a] person commits an offense if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to: . . . [a law enforcement employee] conducting the investigation . . . ." TEX. PENAL CODE § 37.08(a).

Case: 17-50282    Document: 00514818737    Page: 33    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 33 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 130 of 290   PageID 906

Such an offense is a program violation. *See* Provider Agreement at 13 (indicating the failure to follow any applicable law is grounds for termination from Texas Medicaid).

In determining PPGC made a misrepresentation, the Inspector General relied on the letter Representative Blackburn emailed the Attorney General of Texas. Hr'g Tr. Vol. 2 at 34:18–35:7 (discussing the Referral Letter). That letter called the Inspector General's attention to an email chain between Ms. Farrell and the Baylor researchers where the subject line included "IRB approval obtained." *Id.* The Referral Letter cited the email chain and a subsequent report by a Texas Ranger issued as part of the investigations into PPCG. Referral Letter at 7–9 (discussing Defs.' Hr'g Ex. 79 (Email Chain) and Defs.' Hr'g Ex. 81 (Texas Ranger Report)). The Texas Ranger Report states, "The Institutional Review Board had not yet given approval for the Baylor [study]." Texas Ranger Report at 4.

While the Inspector General reviewed the Referral Letter and the documents it cites, specifically the Email Chain and the Texas Ranger Report, the Inspector General conducted no additional interviews or investigations of the alleged misrepresentation. Hr'g Tr. Vol. 2 at 52:2–10. Yet, the Inspector General acknowledged he did not know whether the statement indicating the Baylor study had not yet obtained IRB approval was a mistake or misrepresentation. Hr'g Tr. Vol. 2 at 52:1–23. Admittedly, he had no evidence on whether the statement's speaker had the required intent to deceive.[8] *Id.*

At the same time, evidence in the record suggests IRB approval for the Baylor study, in truth, may not have been obtained or it was at least reasonable to believe IRB approval had not been

---

[8] The Court is also unconvinced the Inspector General had any evidence showing the statement concerning IRB approval for the Baylor study was material to a criminal investigation. *See* TEX. PENAL CODE § 37.08(a); Hr'g Tr. Vol. 2 at 53:5–54:6.

Case: 17-50282     Document: 00514818737     Page: 34     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 34 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 131 of 290   PageID 907

secured. Pls.' Hr'g Ex. 207 (July 7, 2015 Emails) at 1 (indicating IRB approval would have to specify if the study involved DNA). Given the lag in negotiations following the initial IRB approval in November 2014, the fact a contract had not yet been confirmed in July 2015, and the lack of clarity on the study's details, an additional IRB approval process could have been necessary. *See* Farrell Decl. ¶ 38 (noting the IRB process is an ongoing process requiring annual re-submission and additional approvals when project modifications are made).

Without any evidence that a single allegedly incorrect statement was a misrepresentation rather than a mistake, the Court finds it likely the Inspector General did not have sufficient evidence to conclude PPGC made a misrepresentation.

    *c.*    *Evidence the other Provider Plaintiffs were affiliated with PPGC*

Most importantly, to find the Provider Plaintiffs, other than PPGC, should be terminated from Texas's Medicaid program because of their affiliation with PPGC, the Inspector General needed prima facie evidence PPGC committed a violation. *See* 1 TEX. ADMIN. CODE § 371.1703(c). Yet, as discussed above, the Inspector General had no evidence PPGC violated any medical or ethical standards and no evidence PPGC engaged in misrepresentations. Thus, the Inspector General had no evidence the other Provider Plaintiffs could be terminated on the basis of affiliation. However, even if the Inspector General could establish prima facie evidence PPGC committed a violation, the Inspector General would likely be unable terminate the other Provider Plaintiffs' enrollment in Medicaid on the basis of affiliation alone.

To reiterate, the Fifth Circuit confirmed states retain board authority to define provider qualifications and to exclude providers on that basis, but that authority is limited by the meaning of qualified. *Gee,* 837 F.3d at 495. The Fifth Circuit has expressly defined qualified in the Medicaid

Case: 17-50282      Document: 00514818737      Page: 35      Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 35 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 132 of 290   PageID 908

context as meaning "capable of performing the needed medical services in a professionally
competent, safe, legal, and ethical manner." *Id.*

The Final Notice relies on indicia of affiliation such as "common identifying information,"
"individual providers working across affiliates,"[9] and the Provider Plaintiffs' relationship with PPFA
to find all the Provider Plaintiffs are affiliates. Thus, applying this line of logic, the Inspector General
concluded if one Planned Parenthood provider could be terminated from Medicaid, all Planned
Parenthood providers could be terminated as affiliates. Hr'g Tr. Vol. 2 at 38:23–41:3.

Yet, indicia of affiliation are likely unconnected to a provider's qualifications to provide
medical services. *See id.* at 492–95 (discussing the scope of a state's ability to set reasonable
standards related to a provider's qualifications). Excluding a provider from Medicaid as not
qualified, if the provider is otherwise legally qualified to provide the required medical services
within the state, violates Medicaid patients' statutory right to obtain medical care from the qualified
provider of their choice. *Id.* at 493 (citing *Planned Parenthood of Ind.,* 699 F.3d at 968 (7th Cir.
2012) and *Planned Parenthood of Ariz. Inc. v. Beadlike,* 727 F.3d 960, 970 (9th Cir. 2013)). HHSC's
expansion of a state's power to exclude qualified providers because of organizational associations
would likely eviscerate the free-choice-of-provider requirement as an exclusionary rule unrelated to
qualification. *See id.* at 494 (restating the principle that allowing a state to define qualified for its
own purposes would destroy a Medicaid patient's right to choose his or her own qualified provider).

Generally, Medicaid's statutory scheme suggests the "individual or entity" a state may
exclude must be the same individual or entity the state determines is not qualified to provide medical

---

[9] HHSC identified one doctor who worked at two different Provider Plaintiffs but there is no evidence this
doctor ever worked at more than one provider at the same time. Hr'g Tr. Vol 2 at 80:7–81:17.

Case: 17-50282    Document: 00514818737    Page: 36    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 36 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 133 of 290    PageID 909

services. 42 U.S.C. § 1396a ("[A] State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary could exclude *the* individual or entity from participation in a program . . . .") (emphasis added); *see also Planned Parenthood Se., Inc. v. Bentley,* 141 F. Supp. 3d 1207, 1223 (M.D. Ala. 2015) (similarly holding the entity a state may exclude from Medicaid must be the same entity the state determines is unqualified and not an affiliate).

In contrast, HHSC argues federal law permits the termination of entities based on their affiliation, citing 42 C.F.R. § 1001.1001(a)(i)©. Defs.' Proposed Findings [#94] at ¶ 47. In relevant part, § 1001.1001(a) provides the following:

(1) The [Office of the Inspector General] may exclude an entity if:

(i) A person with a relationship with such entity—

. . .

© Has been excluded from participation in Medicaid or any of the State health care programs, *and*

(ii) Such person—

(A)(1) Has a direct or indirect ownership interest (or any combination thereof) of 5 percent or more in the entity;

(2) Is the owner of a whole or part interest in any mortgage, deed of trust, note or other obligation secured (in whole or in part) by the entity or any of the property assets thereof, in which whole or part interest is equal to or exceeds 5 percent of the total property and assets of the entity;

(3) Is an officer or director of the entity, if the entity is organized as a corporation;

(4) Is partner in the entity, if the entity is organized as a partnership;

(5) Is an agent of the entity; or

Case: 17-50282    Document: 00514818737    Page: 37    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS    Document 100    Filed 02/21/17    Page 37 of 42
Case 2:21-cv-00022-Z    Document 62    Filed 03/11/22    Page 134 of 290    PageID 910

(6) Is a managing employee, that is, an individual (including a general manager, business manager, administrator or director) who exercises operational or managerial control over the entity or part thereof, or directly or indirectly conducts the day-to-day operations of the entity or part thereof, or

(B) Was formerly described in paragraph (a)(1)(ii)(A) of this section, but is no longer so described because of a transfer of ownership or control interest to an immediate family member or a member of the person's household . . . .

(emphasis added).[10]

The Court disagrees with HHSC's interpretation. Section 1001.1001(a)(i)© allows discretionary exclusion of an entity in a narrow circumstance, when a sanctioned person has an ownership or control interest in the entity or is an officer, director, agent, or managing employee of the entity. In such a situation the individual is an alter ego of the entity. Here, the Provider Plaintiffs are separate entities, with no evidence of an ownership or control interest. Consequently, the Court holds the Inspector General would likely be unable to terminate the other Provider Plaintiffs' enrollment in Medicaid on the basis of affiliation alone.

### d.    HHSC's Course of Conduct

Plaintiffs offer evidence HHSC seeks to terminate the Provider Plaintiffs for reasons other than their qualifications.

Most significantly, Plaintiffs emphasize how HHSC began its effort to terminate the Provider Plaintiffs from the state's Medicaid system in the fall of 2015 with the Initial Notice. *See* Initial Notice [#58-1]. The Inspector General even admitted he had not reviewed the CMP Video before the Initial Notice was issued. Hr'g Tr. Vol. 2 49:2–15. Only after Plaintiff filed this suit to challenge termination did HHSC concede it was not ready to move forward with termination. Mot. Prelim. Inj.

------

[10] HHSC misquotes 42 C.F.R. § 1001.1001(a)(1)(i)©, neglecting the "and" emphasized above and failing to explore how the other requirements of the section apply. *See* Defs.' Proposed Findings [#94] at ¶ 47.

Case: 17-50282     Document: 00514818737     Page: 38     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 38 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 135 of 290   PageID 911

[#58] at 2. Despite being unwilling to proceed with termination, HHSC did not rescind the Initial Notice, causing this case to languish on this Court's docket for over a year. *Id.*

When HHSC ultimately decided to issue the Final Notice, it did so five days before Christmas, forcing Plaintiffs to renew their efforts to challenge termination in the middle of the holiday season.[11] *Id.* Without explanation, the Final Notice abandons the majority of the bases for termination alleged in the Initial Notice and asserts new grounds for termination. *Compare* Initial Notice *with* Final Notice.

In addition, the general lack of evidence supporting the Inspector General's termination decision, discussed above, implies HHSC seeks to terminate the Provider Plaintiffs for reasons other than their qualifications.[12] Moreover, there is no evidence in the record of any effort to revoke the license or any other qualification needed to render medical services of any Provider Plaintiff. *See Gee,* 837 F.3d at 499 (considering the fact Louisiana made no effort to revoke the license of PPGC or limit its entitlement to render medical services to the general population as evidence the termination decision had nothing to do with PPGC's qualifications).

The Individual Plaintiffs have met their burden to establish a likelihood of success on the merits. The Inspector General did not have prima facie of evidence, or even a scintilla of evidence, to conclude the bases of termination set forth in the Final Notice merited finding the Plaintiff

---

[11] Almost simultaneously with HHSC's issuance of the Final Notice, the Texas Department of State Health Services adopted new rules restricting disposal methods for fetal tissue; the new rules were published on December 9, 2016, and intended to take effect on December 18th. *See* Mot. Prelim. Inj., *Whole Woman's Health et al. v. Hellerstedt,* No. 1:16-cv-01300 (W.D. Tex. Dec. 12, 2016), ECF No. 6. The Court notes the coincidental timing of the Final Notice and the intended effective date of fetal tissue disposal rules.

[12] It appears the letter to the Texas Attorney General recommending further investigation of Planned Parenthood was sent by Representative Blackburn in her individual capacity, *see* Referral Letter at 11, and only half of the Select Panel is recognized in the author block of the Report. *See* Select Panel Report.

Case: 17-50282     Document: 00514818737     Page: 39     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 39 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 136 of 290   PageID 912

Providers were not qualified. The Inspector General relied on an unauthenticated video and the advice of an orthopedic surgeon to conclude PPGC violated medical and ethical standards related to abortion procedures. Likewise, the Inspector General concluded PPGC made a misrepresentation following the identification of a single allegedly incorrect statement, without any evidence the statement was a misrepresentation rather than a mistake. Simply put, the Inspector General did not have any basis to conclude PPGC warranted termination from the Medicaid program as unqualified.

Even if the Inspector General could establish by prima facie evidence PPGC was unqualified, the Inspector General would likely be unable terminate the other Provider Plaintiffs' enrollment in Medicaid because organizational affiliation is unrelated to fitness to provide medical services. Finally, the evidence currently in the record implies HHSC was motivated by reasons other than qualifications to terminate the Provider Plaintiffs from Medicaid.  For all these reasons, the Court holds the Individual Plaintiffs are substantially likely to succeed in showing HHSC violated their rights under § 1396a(a)(23).

**B.      Threat of Irreparable Injury**

HHSC argues the Individual Plaintiffs will not be harmed because they can seek medical care through other Medicaid providers and through Texas's other health care programs such as Texas Healthy Women. Defs.' Proposed Findings [#94] at ¶¶ 14–18, 58–59. HHSC's argument fails to appreciate that § 1396a(a)(23) provides Medicaid beneficiaries the right to their chosen qualified provider, not just access to any qualified provider.

In *Gee*, the Fifth Circuit concluded the district court did not err in finding the individual plaintiffs would be irreparably harmed if they were unable to receive medical care from the qualified Medicaid provider of their choice. 837 F.3d at 500–01.The same reasoning applies here. Each of the Individual Plaintiffs submitted a declaration stating her preference for continuing to receive health care

Case: 17-50282     Document: 00514818737     Page: 40     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 40 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 137 of 290   PageID 913

from her chosen Planned Parenthood provider. The declarations collectively show the Individual Plaintiffs do not know where they would get the same kind and quality of care, each citing the nonjudgmental service the Provider Plaintiffs offer, the flexible hours, and the short wait times.

Consequently, because the Individual Plaintiffs in this case would be deprived of their legal right to the qualified health care provider of their choice, the Court finds the Individual Plaintiffs would suffer an irreparable injury if not granted a preliminary injunction.

## C.   Threatened Injury Outweighs Alleged Harms to Texas

On one side of the harm scale, HHSC claims denying the injunction is necessary to protect patients, and granting the injunction would allow an unqualified provider to continue "engag[ing] in behavior that violates medical and ethical standards." Resp. [#70] at 40. However, as discussed above, the current record does not include sufficient evidence to support Texas's claim PPGC violated any ethical and medical standards. There is also no claim the other Provider Plaintiffs violated any standards.

On the other side of the scale, as previously stated, the Individual Plaintiffs have proven a substantial likelihood of success on their claim terminating the Provider Plaintiffs from Medicaid violates their right to their chosen provider and would cause irreparable harm. If the termination were allowed to proceed, the Individual Plaintiffs would, at minimum, see their health care disrupted.

This Court is not convinced all of the Provider Plaintiffs' patients would be able to quickly and easily find new providers if they were prevented from seeing their chosen provider, a harm in and of itself. Terminating the Provider Plaintiffs would eliminate thirty health centers across Texas from the Medicaid program. These centers are the only family planning specialists in the state and provide a wide variety of services in a manner specifically designed to be convenient for vulnerable populations.

Case: 17-50282     Document: 00514818737     Page: 41     Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 41 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 138 of 290   PageID 914

For these reasons, the Court holds injuries suffered by the Individual Plaintiffs outweigh any harm to HHSC.

**D.     Public Interest Favors Injunction**

Finally, like the district court in *Kliebert*, this Court finds an injunction in this case serves the public interest by ensuring Medicaid recipients in Texas will continue to have access to medical care at their chosen providers. 141 F. Supp. 3d at 651. Because HHSC's termination of the Provider Plaintiffs' provider agreements likely violates federal law, there is no legitimate public interest in allowing Texas to complete its planned terminations based on the current facts. *See Gee*, 837 F.3d at 502. Instead, the public interest favors enforcing the Individual Plaintiffs' rights and avoiding disrupting the health care of some of Texas's most vulnerable individuals.

**E.     No Bond Required**

Federal Rule of Civil Procedure 65 allows a court to "issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A court may waive this requirement, however, at its discretion. *See, e.g.*, *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

Here, HHSC requested a bond, arguing if it were enjoined from terminating the Provider Plaintiffs' enrollment in Medicaid then it would have to continue to reimburse Planned Parenthood. Resp. [#70] at 41–42. HHSC contends forcing the continuation of payment would be a violation of Texas's authority over the Medicaid program within its borders. *Id.*

Regardless of whether this Court enjoined the termination of the Provider Plaintiffs, Texas would still have an obligation to reimburse some providers for the services the Individual Plaintiffs and other Medicaid beneficiaries require. The Court therefore finds the injunction will not harm

-41-

Case: 17-50282    Document: 00514818737    Page: 42    Date Filed: 02/01/2019
Case 1:15-cv-01058-SS   Document 100   Filed 02/21/17   Page 42 of 42
Case 2:21-cv-00022-Z   Document 62   Filed 03/11/22   Page 139 of 290   PageID 915

Texas's budget. Furthermore, as noted above, Texas does not have an interest in administering the state's Medicaid program in a manner that violates federal law. As a result, the Court finds no reason to require Plaintiffs to provide security for the preliminary injunction.

## Conclusion

Because the Individual Plaintiffs have met their burden on the elements for a preliminary injunction, the Court GRANTS Plaintiffs' Motion for a Preliminary Injunction. With this injunction, the Court preserves its ability to render a meaningful decision on the merits.

Accordingly,

IT IS ORDERED that Plaintiffs' Motion for a Preliminary Injunction [#58] is GRANTED;

IT IS FURTHER ORDERED that Defendants, their employees, agents, and successors, and all others acting in concert or participating with them are PRELIMINARILY ENJOINED from terminating the Provider Plaintiffs' Medicaid Provider Agreements. No bond is required. The preliminary injunction will remain in force until further ordered; and

IT IS FINALLY ORDERED that the parties confer and submit a proposed scheduling order specifying the time period requested for necessary discovery for the Court's consideration within THIRTY (30) DAYS from the entry of this order. The Court will then schedule a trial date. A form scheduling order is available at http://www.txwd.uscourts.gov/USDC%20Rules/StandingOrders/Austin/sched-ss.pdf.

SIGNED this the ___21st___ day of February 2017.

_Sam Sparks_

SAM SPARKS
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* ALEX DOE, Relator,<br><br>THE STATES OF TEXAS,<br>*ex rel.* ALEX DOE, Relator,<br><br>THE STATE OF LOUISIANA,<br>*ex rel.* ALEX DOE, Relator,<br><br>    Plaintiffs,<br><br>v.<br><br>PLANNED PARENTHOOD FEDERATION<br>OF AMERICA, INC., PLANNED<br>PARENTHOOD GULF COAST, INC.,<br>PLANNED PARENTHOOD OF GREATER<br>TEXAS, INC., PLANNED PARENTHOOD<br>SOUTH TEXAS, INC., PLANNED<br>PARENTHOOD CAMERON COUNTY,<br>INC., PLANNED PARENTHOOD SAN<br>ANTONIO, INC.,<br><br>    Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 2-21-CV-022-Z |

## STATE OF TEXAS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# EXHIBIT D

Velva L. Price
District Clerk
Travis County
D-1-GN-21-000528
Alexus Rodriguez

CAUSE NO. D-1-GN-21-000528

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| PLANNED PARENTHOOD OF | § | |
| GREATER TEXAS FAMILY PLANNING | § | |
| AND PREVENTATIVE HEALTH | § | |
| SERVICES, INC., PLANNED | § | |
| PARENTHOOD OF GREATER TEXAS, | § | TRAVIS COUNTY, TEXAS |
| INC., PLANNED PARENTHOOD SAN | § | |
| ANTONIO, PLANNED PARENTHOOD | § | |
| CAMERON COUNTY, PLANNED | § | |
| PARENTHOOD SOUTH TEXAS | § | |
| SURGICAL CENTER, and PLANNED | § | |
| PARENTHOOD GULF COAST, | § | |
| | § | |
| *Relators.* | § | 261ST JUDICIAL DISTRICT |

---

**RESPONSE IN OPPOSITION TO ORIGINAL PETITION FOR WRIT OF
MANDAMUS, APPLICATION FOR TEMPORARY RESTRAINING ORDER,
TEMPORARY MANDATORY INJUNCTION, AND PERMANENT
MANDATORY INJUNCTION**

---

Respondents Sylvia Hernandez Kauffman, Inspector General; the Office of

Inspector General; Cecile Erwin Young, Executive Commissioner of Texas Health and

Human Services Commission; and Texas Health and Human Services Commission

(collectively "Respondents") file this Response in Opposition to the Original Petition

for Writ of Mandamus, Application for Temporary Restraining Order, Temporary

Mandatory Injunction, and Permanent Mandatory Injunction (the "Petition")

recently filed by the following Relators: Planned Parenthood of Greater Texas Family

Planning and Preventative Health Services, Inc., Planned Parenthood of Greater

Texas, Inc., Planned Parenthood San Antonio, Planned Parenthood Cameron County,

Planned Parenthood South Texas Surgical Center, and Planned Parenthood Gulf Coast (collectively "Planned Parenthood").

## I.  INTRODUCTION

Planned Parenthood's lawsuit is a transparent and meritless attempt to revive the state administrative process that it deliberately abandoned four years ago. Planned Parenthood was duly notified of its termination from the Medicaid program in 2016. But rather than invoke the administrative process to review that decision, Planned Parenthood chose only to file suit in federal court. Having lost most of its claims there, it now attempts to manufacture a controversy where none exists so it can avail itself of the administrative process that it allowed to expire long ago. Its claim lacks any basis in law or fact. The Court should deny Planned Parenthood's request for a temporary injunction.

## II.  BACKGROUND

### A.    Legal Framework

Under the federal Medicaid Act, States use federal and state funds to reimburse healthcare providers' costs in providing medical care to certain categories of individuals. *See NFIB v. Sebelius*, 567 U.S. 519, 575 (2012). As a condition of participating in Medicaid, States must provide an administrative process for providers to challenge their exclusion or termination from the Medicaid program. 42 C.F.R. §§ 1002.210, 1002.213. Texas has done so. Section 32.034(a) of the Texas Human Resources Code requires "reasonable notice and an opportunity for hearing

if one is requested" before a Medicaid contract is terminated. And the Texas Administrative Code sets out the requirements for a termination notice:

(1) a description of the termination;

(2) the basis for the termination;

(3) the effect of the termination;

(4) the duration of the termination;

(5) whether re-enrollment will be required after the period of termination; and

(6) a statement of the person's right to request an informal resolution meeting or an administrative hearing regarding the imposition of the termination unless the termination is required under 42 C.F.R. § 455.416.

1 Tex. Admin. Code § 371.1703(e).

A provider may request an administrative hearing upon receipt of a final notice of termination. *Id.* § 371.1615(b)(2). But the provider does not have unlimited time to act—the request for a hearing must be received within 15 days after the provider received its final notice:

A person may request an administrative hearing after receipt of a final notice of termination in accordance with § 371.1615 of this subchapter (relating to Appeals) unless the termination is required under 42 C.F.R. § 455.416. The OIG must receive the written request for a hearing no later than the 15 days after the date the person receives the notice.

*Id.* § 371.1703(f)(2).

If the provider does not timely request an administrative hearing, the termination becomes "final and unappealable." *Id.* § 371.1615(c). Specifically, the termination becomes "final" 30 calendar days after service of the final notice if no request for appeal has been timely received. *Id.* § 371.1617(a)(1); *see also id.* § 371.1703(g)(8) ("Unless otherwise provided in this section, the termination becomes

final as provided in § 371.1617(a) of this subchapter (relating to Finality and Collections).").

Thus, under Texas administrative law, a Medicaid provider who receives a final notice that its contract will be terminated has 15 days from receipt of the Final Notice to request an administrative appeal. Otherwise, the termination becomes final 30 days from receipt of the Final Notice.

**B.    The December 2016 Final Notice of Termination**

On December 20, 2016, the Office of Inspector General ("OIG") sent a Final Notice of Termination of Enrollment to the Planned Parenthood entities who are plaintiffs here. PP Ex. B (the "December 2016 Final Notice").[1] As explained in the Final Notice, OIG was terminating the contracts based on evidence showing Planned Parenthood was not qualified to provide medical services in a professionally competent, safe, legal, and ethical manner. *Id.* at 1-4. The Final Notice emphasized the 15-day deadline to appeal OIG's decision in bold, stating:

> You may appeal this enrollment termination. In order to do so, **HHSC-OIG must receive a written request from you asking for an administrative hearing before HHSC's appeals division on or before the 15th calendar day from the date you receive this notice.** 1 Tex. Admin. Code § 371.1703(f)(2).

*Id.* at 4. The Final Notice included the mailing address for HHSC-OIG, as well as instructions regarding what the request for an administrative hearing must contain. *Id.* at 4-5. The Final Notice then repeated the deadline:

---

[1] For clarity of reference, Respondents will cite Exhibits attached to Planned Parenthood's Petition as "PP Ex." and will cite Exhibits attached to this Response as "Resp. Ex."

**IF HHSC-OIG DOES NOT RECEIVE A WRITTEN RESPONSE TO THIS NOTICE WITHIN 15 CALENDAR DAYS FROM THE DATE YOU RECEIVE IT, YOUR FINAL NOTICE OF TERMINATION WILL BE UNAPPEALABLE.**

*Id.* at 5.

According to declarations filed in federal district court, the Planned Parenthood entities received the Final Notice as early as December 22, 2016, and no later than December 28, 2016. Resp. Ex. 1 (Planned Parenthood federal declarations) at 2 ¶ 2, 3 ¶ 23, 6 ¶ 34, 10 ¶ 15. Thus, under the law described above regarding the 15-day limit on appealing the termination decision some Planned Parenthood providers had until January 6, 2017, to request an administrative hearing, and others had until January 12, 2017. *See* 1 Tex. Admin. Code § 371.1703(f)(2). None of them did. Thus, in accordance with Texas law, their terminations from Medicaid became final as a matter of law 30 days from the date they received the notice: January 21, 2017 for some, and January 27, 2017 for others. *See* 1 Tex. Admin. Code § 371.1617(a)(1).

**C.    The Federal Lawsuit**

Despite being notified of their administrative-appeal options, Planned Parenthood, joined by multiple Jane Does, chose to seek relief only in federal district court, claiming they could challenge OIG's decision under the Medicaid Act. *See Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Smith*, No. 1:15-CV-01058-SS (W.D. Tex.). In their motion for a preliminary injunction, they advised the district court that they needed relief by January 21, 2017, as the termination would take effect that day. Resp. Ex. 2 (Planned Parenthood

federal motion) at 32 ("if Defendants' termination is allowed to take effect (which without order from this Court it will on January 21)"); *see also id.* at 3, 19 (stating Planned Parenthood would have to turn away patients as soon as January 21, 2017).

On January 19, 2017, the district court entered an order that "temporarily enjoined" HHSC and OIG "from terminating the [Planned Parenthood] Plaintiffs' Medicaid provider agreements until February 21, 2017." Resp. Ex. 3 (federal district court order) at 2. On February 21, 2017, the district court preliminarily enjoined HHSC and OIG "from terminating the [Planned Parenthood] Plaintiffs' Medicaid Provider Agreements." *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 1000 (W.D. Tex. 2017). Planned Parenthood did not seek, nor did the district court order, any alteration, stay, or tolling of its state-law administrative deadlines, including the express deadline for requesting an administrative appeal, which had already passed regardless.

The State appealed the injunction to the Fifth Circuit and, following en banc review, the court vacated the district court's preliminary injunction. *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 350 (5th Cir. 2020) (en banc). That decision took effect on December 15, 2020, when the Fifth Circuit's mandate issued, vacating the preliminary injunction. Resp. Ex. 4 (Fifth Circuit mandate). Thus, on December 15, 2020, there was no longer an injunction prohibiting HHSC from implementing the termination of Planned Parenthood's Medicaid provider agreements. Because the

terminations were set to take effect in January 2017 under state law, the terminations became immediately effective once the mandate issued.

**D.      The January 2021 Letter**

Once the termination of a Medicaid contract is final, there is still a practical process for implementing or carrying out the termination that takes time. For example, billing programs must be updated to stop paying bills submitted by the terminated entities after a particular date. Also, Managed Care Organizations ("MCOs") must be notified, so they can begin helping clients transition to new providers. Various other logistical procedures require time and effort before a termination becomes fully implemented as a matter of practical reality.

On December 14, 2020, one day before the Fifth Circuit's mandate issued, Planned Parenthood sent a letter to HHSC making two requests: (1) that it be allowed to remain in Medicaid, and (2) that it be given a 6-month grace period to transition its patients to new providers. PP Ex. C. HHSC responded to Planned Parenthood's requests in a letter dated January 4, 2021. PP Ex. E (the "January 2021 letter"). In it, HHSC (1) denied Planned Parenthood's request to remain in the Medicaid program, (2) advised Planned Parenthood that it could no longer accept new Medicaid clients, and (3) permitted a 1-month grace period, until February 3, 2021, to allow Planned Parenthood's patients to transition to new Medicaid providers. *Id.* at 1-2. It also advised Planned Parenthood that patients who were members of an MCO would be notified by their MCO of the need to transition to a new provider. *Id.* at 2.

E.    **Current Lawsuit**

On February 3, 2021, the last day of the grace period, Planned Parenthood filed this mandamus action against Respondents. Planned Parenthood argued that the January 2021 letter was the real termination letter and that it did not comply with the relevant administrative requirements. Planned Parenthood therefore asks the Court to issue a writ of mandamus, compelling Respondents to issue a new Final Notice of Termination so that Planned Parenthood may take the administrative appeal that it chose not to take in December 2016.

## III.  ARGUMENT & AUTHORITIES

Despite receiving a Final Notice of Termination over four years ago (December 2016) and being notified over four weeks ago that the grace period would end on February 3 (the January 2021 letter), Planned Parenthood waited until February 3 to file its petition for mandamus and request for a TRO and temporary injunction. Its arguments lack merit, and its dilatory conduct should not be rewarded.

To obtain a temporary injunction, Planned Parenthood must plead and prove three elements: (1) a cause of action against Respondents; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Planned Parenthood is not entitled to relief, as demonstrated by its own evidence.

A.    **Cause of action**

A court may issue mandamus relief to compel a public official to perform a ministerial act. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 793 (Tex. 1991).

Planned Parenthood asks the Court to issue a writ of mandamus commanding Respondents to issue a letter terminating it (again) from the Medicaid program. Pet. at 15-16. Termination notices are issued by OIG, 1 Tex. Admin. Code § 371.1703(a), yet Planned Parenthood has joined HHSC and Executive Commissioner Young as Respondents, Pet. ¶¶ 7-8. Planned Parenthood has not identified any ministerial duty which HHSC or Executive Commissioner Young has failed to perform. Thus, Planned Parenthood has not stated a cause of action against HHSC or Executive Commissioner Young.

## B.    Probable right to the relief sought

To be entitled to mandamus relief, Planned Parenthood must show that Respondents failed to perform a ministerial act—not an act that involves the use of discretion. *Anderson*, 806 S.W.2d at 793. Moreover, Planned Parenthood must demonstrate that it diligently sought mandamus relief and did not sleep on its rights. *Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993). Planned Parenthood has failed at all levels.

### 1.    Planned Parenthood complains about discretionary acts.

"An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion." *Anderson*, 806 S.W.2d at 793. On the face of relevant regulations, whether to terminate the contract of a Medicaid provider is a discretionary act. As the regulations provide, "OIG *may* terminate" a provider's contract. 1 Tex. Admin. Code § 371.1703(a) (emphasis added); *see also id.* § 371.1703(c)(6), (7) ("OIG *may*

terminate") (emphasis added). Thus, Planned Parenthood's demand that OIG send it a termination notice refers to a discretionary duty, not a ministerial one.

Planned Parenthood argues that it may demand the issuance of a new, compliant notice because the December 2016 Final Notice "failed to accurately reflect" the description, effect, and duration of the termination as required by the Texas Administrative Code. Pet. ¶ 31 (citing 1 Tex. Admin. Code § 371.1703(e)). Not only are such charges baseless, *see infra* section III.B.2.b, but they also do not demonstrate a failure to perform a ministerial duty. At most, Planned Parenthood's claim that the December 2016 Final Notice "fail[s] to accurately reflect" certain issues reveals a disagreement over the language used to explain the description, effect, and duration of the termination. But the regulations do not "spell out" the specific words that must be used such that "nothing is left to the exercise of discretion." *See Anderson*, 806 S.W.2d at 793. OIG was free to choose the language it used to comply with the law.

This is not an instance in which Respondents failed to send any notice at all before terminating Medicaid contracts. As Planned Parenthood's own federal filings show, it was fully aware that the December 2016 Final Notice would effectively terminate its Medicaid provider agreements. Resp. Ex. 1 at 2 ¶ 2, 3 ¶ 23, 5 ¶ 2, 6 ¶ 34, 8 ¶ 2, 10 ¶ 14. Planned Parenthood's only claim now is that the December 2016 Final Notice was not "accurately" worded, which identifies nothing more than a discretionary act. Thus, this claim of Planned Parenthood does not show that Respondents failed to perform a ministerial act.

2.       **The December 2016 Final Notice met all legal standards.**

Even if Planned Parenthood were complaining about a ministerial act (which it is not), it would still not be entitled to relief because it can point to no legal deficiency in the December 2016 Final Notice. Respondents properly terminated Planned Parenthood's provider agreements through the December 2016 Final Notice, and Planned Parenthood has no colorable argument to the contrary. Its arguments about HHSC statements in 2021 do not change the legal effect of the Final Notice from 2016. Planned Parenthood's provider agreements were terminated as a matter of law and cannot be revived by this lawsuit.

a.       **The December 2016 Final Notice satisfies section 371.1703(e).**

Planned Parenthood's argument that the December 2016 Final Notice failed to meet the relevant legal requirements is noticeably short on facts and law. Set next to the requirements, the Final Notice plainly and amply passes legal muster.

| Elements of Final Notice from § 371.1703(e) | December 2016 Final Notice (PP Ex. B) |
|---|---|
| A description of the termination | Pages 1-2, explaining that OIG is terminating specific Medicaid provider agreements because of its conclusion that the providers were not qualified to provide services in a professionally competent, safe, legal, and ethical manner |
| The basis for the termination | Pages 1-4, describing the program violations committed by Planned Parenthood and the affiliation of other providers that warrant termination |
| The effect of the termination | Page 4, numbered list stating what specifically will happen as a result of the termination |

| The duration of the termination | Page 5, stating that "[t]his enrollment termination is permanent" |
| Whether enrollment will be required | Page 5, stating that "[i]f you want to participate as a provider in the Texas Medicaid program in the future, you will be required to submit a new provider enrollment application" |
| A statement of the person's right to request an informal resolution meeting or an administrative hearing regarding the imposition of the termination | Pages 4 & 5, entitled "Appeal Process," and describing the process and timing of any appeal |

Planned Parenthood has no grounds to argue that the December 2016 Final Notice was in any way insufficient. Indeed, to obtain a preliminary injunction in 2017, Planned Parenthood told a federal court that it would be terminated from Medicaid as a result of the Final Notice. Resp. Ex. 1 at 2 ¶ 2, 3 ¶ 23, 5 ¶ 2, 6 ¶ 34, 8 ¶ 2, 10 ¶ 15. Those admissions conclusively demonstrate that Planned Parenthood (1) knew the December 2016 Final Notice was effective to terminate its contracts and (2) voluntarily chose not to appeal the Final Notice. Had Planned Parenthood chosen to request an administrative appeal, the termination would not have become effective in January 2017, as Planned Parenthood told the federal court it would be. If Planned Parenthood would have timely filed a written request for an administrative hearing, the effective date of termination [would have been] the date the hearing officer's or administrative law judge's decision to uphold the termination [became] final." *See* 1 Tex. Admin. Code § 371.1703(g)(7). The fact that Planned Parenthood told the federal court it would be terminated in January 2017 as a result of the December 2016 Final Notice means that Planned Parenthood both understood the legal effect of the Final Notice and decided not to seek an administrative appeal.

As explained above, Planned Parenthood had 15 days from receipt of the December 2016 Final Notice to request an administrative appeal. 1 Tex. Admin. Code § 371.1703(f)(2). Otherwise, the termination would become final in 30 days. *Id.* § 371.1617(a)(1). Planned Parenthood chose not to request an administrative hearing, those deadlines passed, and the termination became final as a matter of law in January 2017. But for the federal-court injunction, Planned Parenthood would have ceased receiving Medicaid reimbursements in 2017. After the Fifth Circuit vacated the injunction, there was nothing barring the effectiveness of the terminations or preventing HHSC from proceeding to fully implement them.

###### b.   Planned Parenthood's contrary arguments lack merit.

Planned Parenthood essentially ignores the December 2016 Final Notice and instead argues that (1) the January 2021 letter from HHSC was the real, noncompliant termination notice, and (2) a notification from HHSC to MCOs undermines HHSC's position. Neither argument has any merit.

As to Planned Parenthood's argument that the January 2021 letter was not a Final Notice, Respondents agree—because the January 2021 letter did not need to be a notice of termination, was not intended to be such, and does not even purport to be such on its face. As demonstrated in Planned Parenthood's own exhibits, the January 2021 letter was sent in response to Planned Parenthood's request that it be allowed to remain in Medicaid or else be given a lengthy grace period. PP Exs. C, E.[2] HHSC

---

[2] These exhibits also demonstrate that Planned Parenthood understood the December 2016 Final Notice terminated its Medicaid contracts—there would have been no need

was under no obligation to reply to Planned Parenthood's request but chose to do so anyway. Its decision to confirm that Planned Parenthood would no longer be in Medicaid and to extend a one-month grace period did not magically reinstate the provider agreements, nor could it possibly have done so. The agreements were terminated as a matter of law as a result of the December 2016 Final Notice. Nothing Planned Parenthood requested and nothing Respondents said in response could undo that.

Planned Parenthood also points to a notice that HHSC sent to the MCOs advising them that Planned Parenthood would be terminated as of January 4, 2021, with a 30-day grace period. PP Ex. G.[3] This simple notice to MCOs was part of HHSC's practical efforts to implement the termination of Planned Parenthood, but it could not have had and was not intended to have any legal effect on the actual termination of Planned Parenthood, which had already become effective long before HHSC took the practical step of communicating that termination to the MCOs.

### 3.    Planned Parenthood's delay renders relief unavailable.

Finally, Planned Parenthood's inexplicable and lengthy delay in seeking mandamus relief from the December 2016 Final Notice makes such relief inappropriate. Mandamus is an extraordinary remedy that is not issued as a matter of right, but at the discretion of the court. *Callahan v. Giles*, 137 Tex. 571, 575, 155

_____

to ask to remain in Medicaid or for a grace period had Planned Parenthood believed the December 2016 Final Notice was ineffective.
[3] The MCO notice incorrectly stated January 4, "2020" instead of "2021," PP Ex. G, but there is no question that the intended date was 2021.

S.W.2d 793, 795 (1941). That discretion is largely controlled by equitable principles, including the fundamental concept that "[e]quity aids the diligent and not those who slumber on their rights." *Rivercenter Assocs.*, 858 S.W.2d at 367 (quoting *Callahan*, 137 Tex. at 576, 155 S.W.2d at 795).

In *Rivercenter Associates*, the Texas Supreme Court denied mandamus because the party waited over four months before seeking relief. *Id.* at 367-68. Only a few months ago, the Court denied mandamus because the party waited ten weeks. *In re Hotze*, No. 20-0739, 2020 WL 5919726, at *2-3 (Tex. Oct. 7, 2020). Planned Parenthood waited **over four years**, until the eve of the expiration of the grace period when many patients had likely been transitioned to new providers, to assert for the first time ever that the December 2016 Final Notice was somehow defective. Such an inexcusable and gargantuan delay renders mandamus relief unavailable.

This is especially true given that Planned Parenthood had a state administrative process available to it to challenge any deficiency in the December 2016 Final Notice. But it had to act within 15 days of receipt of the Final Notice. 1 Tex. Admin. Code §§ 371.1615(b)(2), 371.1703(f)(2). Planned Parenthood chose not to do so. Allowing it to raise any alleged deficiencies by mandamus, four years after its administrative-appeal deadline expired, would create a loophole in the exhaustion-of-administrative-remedies doctrine. A party could ignore all administrative deadlines and simply file a mandamus action at some point in the future based on a perceived flaw in the agency's process. This undermines one of the fundamental purposes of requiring exhaustion—to discourage disregard of the agency's

procedures. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Mandamus should not be used to avoid the consequences of missing (deliberately, here) state administrative deadlines.

**C.      Probable, imminent, and irreparable injury in the interim.**

Planned Parenthood has not shown any probable, imminent, or irreparable injury to itself. The main injury about which Planned Parenthood complains is that it believes some of its patients might not have transitioned to a new Medicaid provider yet. PP Ex. K ¶¶ 8, 10; PP Ex. L ¶¶ 11-13; PP Ex. M ¶¶ 8-10. But its evidence consists largely of vague hearsay, speculation, and a news article in which people hypothesize what "may" happen, while doing nothing to determine what "will" happen. *Id.* There is no evidence of how many women would be impacted, especially given that Planned Parenthood and the MCOs spent the month of January (the one-month grace period) transitioning patients to new providers.

Regardless, any alleged injury to remaining clients who perhaps have not yet been transferred to a new provider is plainly not an irreparable injury to *Planned Parenthood*. At most, Planned Parenthood claims that it will lose money and that its "mission" will be impacted by its inability to serve Medicaid clients. Pet. ¶ 49. But the Planned Parenthood entities are not-for-profit organizations, PP Ex. K ¶ 2; PP Ex. L ¶ 2; PP Ex. M ¶ 2, and there is no evidence that the termination of their Medicaid contracts will cause them financial difficulties. Furthermore, Planned Parenthood points to no law that a general sense of "mission" can possibly support an irreparable injury.

## IV.  CONCLUSION

Planned Parenthood received ample notice of termination as required by law over four years ago. There is no basis in law or fact to revive those administrative proceedings at this late date. Planned Parenthood cannot show that it meets *any* of the required elements for obtaining the extraordinary mandamus relief it seeks, meaning that temporary injunctive relief should be denied.

For all the foregoing reasons, as well as any additional reasons that may be presented at a hearing on Planned Parenthood's request for a temporary injunction, Respondents request this Court to deny Planned Parenthood's request for a temporary injunction, deny all Planned Parenthood's requests for other relief, and dismiss the Petition with prejudice.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief - General Litigation Division

_____*/s/ Benjamin S. Walton*_____
**BENJAMIN S. WALTON**
Texas Bar No. 24075241
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 – Phone
(512) 320-0667 – Fax
benjamin.walton@oag.texas.gov

***Counsel for Respondents***

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was served on February 23, 2021, via the court's e-service system on the following counsel of record:

Thomas H. Watkins
HUSCH BLACKWELL LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456 – Phone
(512) 479-1101 – Fax
tom.watkins@huschblackwell.com

**_Counsel for Relators_**

_____/s/ Benjamin S. Walton_____
**BENJAMIN S. WALTON**
Assistant Attorney General

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Tamera Martinez on behalf of Benjamin Walton
Bar No. 24075241
Tamera.martinez@oag.texas.gov
Envelope ID: 50844897
Status as of 2/24/2021 7:00 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Cynthia Givens | | cynthia.givens@Huschblackwell.com | 2/23/2021 6:13:57 PM | SENT |
| Elizabeth Spivey | | Elizabeth.Spivey@huschblackwell.com | 2/23/2021 6:13:57 PM | SENT |
| Cathy Werner | | Catherine.Werner@huschblackwell.com | 2/23/2021 6:13:57 PM | SENT |
| Tamera Martinez | | tamera.martinez@oag.texas.gov | 2/23/2021 6:13:57 PM | SENT |

Associated Case Party: Planned Parenthood of Greater Texas Family Planning and
Preventative Health Serv

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Timothy P.Ribelin | | tim.ribelin@huschblackwell.com | 2/23/2021 6:13:57 PM | SENT |
| Thomas H.Watkins | | tom.watkins@huschblackwell.com | 2/23/2021 6:13:57 PM | SENT |
| Samuel Rajaratnam | | Sammy.Rajaratnam@huschblackwell.com | 2/23/2021 6:13:57 PM | SENT |
| Michael Crowe | | Michael.Crowe@huschblackwell.com | 2/23/2021 6:13:57 PM | SENT |

Associated Case Party: Texas Health and Human Services Commission

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Benjamin Walton | | benjamin.walton@oag.texas.gov | 2/23/2021 6:13:57 PM | SENT |

Resp. Ex. 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

PLANNED PARENTHOOD OF
GREATER TEXAS FAMILY PLANNING
AND PREVENTATIVE HEALTH
SERVICES, INC., et al.,

          Plaintiffs,

   v.

CHARLES SMITH, Executive
Commissioner, Texas Health and Human
Services Commission, et al.,

          Defendants.

No. 1:15-CV-01058

DECLARATION OF KEN LAMBRECHT IN SUPPORT OF
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION

Ken Lambrecht declares the following:

1.    I am President and CEO of Planned Parenthood of Greater Texas, Inc., as well as of its related entity, Plaintiff Planned Parenthood of Greater Texas Family Planning and Preventative Health Services. For the sake of simplicity I will refer to both collectively as "PPGT." I am responsible for the management of these organizations and therefore am familiar with our operations and finances, including the services we provide and the communities we serve. I submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.

2.    As is explained more fully below, the Texas Health and Human Services Commission ("HHSC") notified PPGT on December 22, 2016, that it intends to terminate PPGT's Medicaid contract, and that termination may be effective as early as January 21, 2017.



23.     Approximately fourteen months later and having heard nothing further from HHSC after submitting the documents described above, on December 20, 2016, HHSC sent PPGT a Final Notice of Termination, which was received on December 22, 2016. *See* Ex. B (hereinafter "Final Notice").



I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 29, 2016

Ken Lambrecht

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING AND PREVENTATIVE HEALTH SERVICES, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> CHARLES SMITH, Executive Commissioner, Texas Health and Human Services Commission, et al., <br><br> Defendants. | No. 1:15-CV-01058 |

**DECLARATION OF MELANEY LINTON IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING**
**ORDER AND PRELIMINARY INJUNCTION**

Melaney Linton declares the following:

1.     I am President and CEO of Plaintiff Planned Parenthood Gulf Coast, Inc. ("PPGC"). I am responsible for the management of PPGC and therefore am familiar with our operations and finances, including the services we provide and the communities we serve. I submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.

2.     As is explained more fully below, the Texas Health and Human Services Commission ("HHSC") is attempting to terminate PPGC's involvement in the Medicaid program as of January 21, 2016. ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████████████

34.     On December 28, 2016, PPGC received a Final Notice of Termination ("Final Notice") (attached as Exhibit I) purporting to complete the process that was begun 14 months ago (though it had received a copy earlier through counsel).

██   ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

██   ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

██   ██████████████████████████████████████



I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 30, 2016

/s/ Melaney Linton
Melaney Linton

Unofficial copy Travis Co. District Clerk Velva L. Price

18

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING AND PREVENTATIVE HEALTH SERVICES, INC., et al., | |
| Plaintiffs, | |
| v. | No. 1:15-CV-01058 |
| CHARLES SMITH, Executive Commissioner, Texas Health and Human Services Commission, et al., | |
| Defendants. | |

**DECLARATION OF JEFFREY HONS IN SUPPORT OF
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

Jeffrey Hons declares the following:

1.      I am President and CEO of Plaintiff Planned Parenthood South Texas. I am also

President and Board Chair of the three subsidiaries of Plaintiff Planned Parenthood South Texas

that provide Medicaid services: Planned Parenthood San Antonio, Planned Parenthood Cameron

County, and Planned Parenthood South Texas Surgical Center. (For simplicity, I will refer to

these subsidiaries, collectively, as PPST.) I am responsible for the management of these

organizations, and therefore am familiar with our operations and finances, including the services

we provide and the communities we serve. I submit this declaration in support of Plaintiffs'

Motion for a Temporary Restraining Order and Preliminary Injunction.

2.      As is explained more fully below, due to the actions of the Texas Health and

Human Services Commission ("HHSC"), PPST will no longer be able to participate in the

Medicaid program as of January 21, 2017. ████████████████████████



15.     Approximately fourteen months later and having heard nothing further from

HHSC after submitting the documents described above, on December 20, 2016, HHSC sent

PPST three identical Final Notices of Termination, which were received on December 22, 2016.

*See* Exhibit B (hereinafter "Final Notice").



I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 30, 2016

_____
Jeffrey Hons

Unofficial copy Travis Co. District Clerk Velva L. Price

11

Resp. Ex. 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

PLANNED PARENTHOOD OF GREATER
TEXAS FAMILY PLANNING AND
PREVENTATIVE HEALTH SERVICES,
INC., et al.,

              Plaintiffs,

    v.                             No. 1:15-CV-01058

CHARLES SMITH, Executive
Commissioner, Texas Health and Human
Services Commission, et al.,

              Defendants.

## APPLICATION AND MEMORANDUM OF LAW IN SUPPORT THEREOF FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs hereby apply for a temporary restraining order and preliminary injunction.

## INTRODUCTION

This case challenges the Texas Health and Human Services Commission's ("HHSC")

politically-driven campaign to terminate the Medicaid provider contracts of Planned Parenthood

of Greater Texas Family Planning and Preventative Health Services ("PPGT"); Planned

Parenthood San Antonio, Planned Parenthood Cameron County, and Planned Parenthood South

Texas Surgical Center (collectively, "PPST"); and Planned Parenthood Gulf Coast, Inc.

("PPGC") (collectively, "Planned Parenthood Providers" or "Provider Plaintiffs").

Through Medicaid, the Provider Plaintiffs provide critically needed family planning and

other preventative health services, 90% federally funded, to nearly 11,000 low-income Texas

residents each year, including the individual Doe Plaintiffs.

In October 2015, without prior warning, HHSC issued termination letters to the Provider

Plaintiffs (who are the only Planned Parenthood Providers in Texas), relying primarily on

deceptively edited and misleading YouTube videos made by a radical anti-abortion group with ties to violent extremists, videos that have been widely debunked and that are wholly irrelevant to four out of the five Provider Plaintiffs. HHSC also relied on a prior settlement of qui tam litigation, again, by only one of the providers (PPGC), even though the settlement contained no admission of liability and also contained an *agreement* by Texas that it would not seek to use the litigation as a basis to exclude PPGC from Medicaid.

Perhaps aware of its failure to identify any legitimate basis for the terminations, after Plaintiffs filed suit seeking a TRO and/or preliminary injunction from this Court, HHSC backtracked, taking the position that it did not yet know if it would terminate the Provider Plaintiffs. But it did not rescind the pending termination letters, instead promising ongoing investigations. Without further contacting the Provider Plaintiffs about this, fourteen months later, on December 20, 2016 HHSC issued a final notice of termination. Despite this lengthy delay and supposed ongoing investigation, HHSC makes only vague allegations–all about PPGC–that seem to relate almost entirely to the same YouTube video HHSC cited last October.

Defendants' unprecedented and indefensible actions show these terminations to be nothing more than a politically motivated witch hunt and the culmination of a concerted effort over more than a decade to come between the Provider Plaintiffs and the thousands of low-income patients they serve for a variety of family planning and sexual health needs. Indeed, Texas is not the first state to try to exclude Planned Parenthood entities from the Medicaid program. Louisiana, Alabama, Arkansas, Kansas, and Mississippi have each tried to terminate or exclude Planned Parenthood organizations from their Medicaid programs, for reasons that overlap heavily with those asserted here by Texas. But courts have unanimously prevented these terminations and agreed that preventing Medicaid enrollees from obtaining care from the

qualified provider of their choice violates federal law, and that an injunction is warranted to permit Medicaid enrollees to continue receiving services from Planned Parenthood health centers. Indeed, a unanimous three-judge panel of the Fifth Circuit has already rejected an attempted termination of PPGC–the only Provider Plaintiff here claimed to have done anything wrong–based on the same video at issue in this case. *See Planned Parenthood of Gulf Coast Inc. v. Gee*, 837 F.3d 477 (5th Cir. 2016) (affirming preliminary injunction of termination of PPGC).

Without an order from this Court before January 21, 2017, the Doe Plaintiffs and the Provider Plaintiffs' other patients not only will have their rights under federal law violated but also lose access to their provider of choice, will find their medical care interrupted, and, in many cases, will be left with few or no adequate alternative providers. The Provider Plaintiffs will also be irreparably harmed since the loss of Medicaid funds will significantly impact their operating budgets as well as their mission to provide health services to low-income patients.

This Court should enter a preliminary injunction or, in the alternative, a temporary restraining order ("TRO") to prevent these irreparable harms.

## STATEMENT OF FACTS

I.     **The Provider Plaintiffs' Participation in the Texas Medicaid Program and Role in Providing Needed Services in Texas**

Texas has some of the most stringent Medicaid requirements in the country: in addition to having a low income, an individual must also meet a special characteristic, such as having dependent children or a disability, to be eligible for Medicaid. For example, a woman with dependent children qualifies for Medicaid only if she has an income up to 15% of the federal poverty level, which amounts to an annual household income of $3756 for a family of three. Decl. of Ken Lambrecht in Supp. of Pls.' Appl. for TRO and Prelim. Inj. ¶ 35, attached hereto as Ex.1 of App. I (hereinafter "Lambrecht Decl."). Caring for Medicaid-insured patients is central

to the Provider Plaintiffs' broader mission of protecting and improving the health and welfare of underserved individuals.

The Provider Plaintiffs provide Medicaid services across the state of Texas at thirty health centers. In 2015, Plaintiffs served nearly 11,000 Medicaid patients. Plaintiffs offer patients a range of family planning and other health services at these centers, including physical exams, contraception (including long-term contraception) and contraceptive counseling, screening for breast cancer, screening and treatment for cervical cancer, testing for certain sexually transmitted infections ("STIs"), pregnancy testing and counseling, and certain procedures including biopsies and colposcopies. Medicaid does not pay for abortions for Texas women except if their lives are in danger or if they are victims of rape or incest.

The Plaintiffs providing these services—PPST, PPGT, and PPGC—are wholly separate organizations from each other, with no overlap whatsoever in ownership, control, operations, personnel, or finances. Lambrecht Decl. ¶ 29; Decl. of Melaney Linton in Supp. of Pls.' Appl. for TRO and Prelim. Inj. ¶ 17, Ex. 2 of App. I ("Linton Decl."); Decl. of Jeffrey Hons in Supp. of Pls.' Appl. for TRO and Prelim. Inj. ¶ 18, Ex. 3 of App. I ("Hons Decl."). The only legal relationship between them is that each is a member of Planned Parenthood Federation of America ("PPFA"), a membership organization that promulgates medical and other standards to which members (known as "affiliates") must adhere in order to operate under the name "Planned Parenthood" and otherwise use the Planned Parenthood mark. Lambrecht Decl. ¶ 28; Linton Decl. ¶ 16; Hons Decl. ¶ 20. Provider Plaintiffs are not affiliates, subsidiaries, parents, employees, contractors, vendors, or agents of one another. Lambrecht Decl. ¶ 28; Hons Decl. ¶ 20. There are fifty-six Planned Parenthood affiliates across the country, each with its own board, CEO, and management structure, and each with control of its own finances and operations.

Lambrecht Decl. ¶ 29; Linton Decl. ¶ 17; Hons Decl. ¶ 21. Each also maintains its own protocols,

procedures, and policies. Lambrecht Decl. ¶ 32; Hons Decl. ¶ 23.

The Provider Plaintiffs have a unique position in the Medicaid provider network. Unlike

community health providers, they specialize in family planning and sexual health. As specialists,

they use up-to-date technology and evidence-based practices and devote substantial time and

resources to patient education. Lambrecht Decl. ¶¶ 7, 9; Linton Decl. ¶¶ 46-48; Hons Decl. ¶¶

27-28; *see also* Decls. of Jane Does 1 ¶5; 2 ¶5; 4 ¶5; 7 ¶¶ 5, 7 (Exs. 5-9 of App. I).

Patients also choose the Provider Plaintiffs because they are known and trusted for non-

judgmental care related to family planning, STIs, and other reproductive health issues, which

involve topics that can be sensitive for patients. Lambrecht Decl. ¶ 8; Linton Decl. ¶ 48; Hons

Decl. ¶ 32; Doe 7 ¶ 5, 7; Doe 10 ¶ 6. Many individuals who receive other health care from

community care providers or other Medicaid providers choose the Provider Plaintiffs for their

reproductive health care because of privacy concerns and because they fear being judged by

other providers. Lambrecht Decl. ¶ 8; Linton Decl. ¶ 48; Hons Decl. ¶ 32; Doe 7 ¶ 7; Doe 10 ¶ 5.

This is critically important, because patients may forego family planning care altogether if they

do not find a provider that makes them comfortable. Lambrecht Decl. ¶ 8; Doe 2 ¶ 6; Doe 7 ¶ 9;

Doe 10 ¶¶ 7, 9.

The Provider Plaintiffs have designed their services around the reality that low-income

patients often have very little time to devote to their own health care and face such additional

barriers as competing childcare and work obligations, limited transportation resources, limited

English proficiency, and often inflexible and/or unpredictable work schedules. Lambrecht Decl.

¶ 10; Linton Decl. ¶ 49; Hons Decl. ¶ 27; Doe 1 ¶ 5; Doe 9 ¶ 7; Doe 10 ¶ 8. To ensure that these

patients have access to family planning services, the Provider Plaintiffs offer evening and

5

Saturday hours; next-day or walk-in appointments, flexible scheduling, short wait-times, and same-day contraceptive services, including for long-acting contraception, so that patients only need to make one trip to the health center. Lambrecht Decl. ¶ 10; Linton Decl. ¶ 49; Hons Decl. ¶ 27; Doe 1 ¶ 6; Doe 7 ¶ 6; Doe 10 ¶ 8. The Provider Plaintiffs also have bilingual staff or translator services available at all times. Lambrecht Decl. ¶ 10; Linton Decl. ¶ 50; Hons Decl. ¶ 27. In addition, many of the Provider Plaintiffs' health centers are located in areas that have been designated as underserved, where patients are most in need of these services. Lambrecht Decl. ¶ 47; Linton Decl. ¶ 45; Hons Decl. ¶ 31.

## II.   Efforts to Defund Planned Parenthood Organizations, in Texas and Nationally

Because Planned Parenthood organizations either provide abortion or are related to other Planned Parenthood organizations that do so, politicians and private groups opposed to safe and legal abortion have waged a long campaign to exclude them from a variety of publicly-funded healthcare programs. For some time now, Texas has been ground zero of that campaign.

Even though the Provider Plaintiffs are leading providers of family planning and preventive health services in Texas, Texas has long sought to terminate them from all publicly-funded health programs for reasons unrelated to quality of care and regardless of the cost to patients or even to the state budget. Starting in 2003, the Texas legislature enacted several funding restrictions aimed at preventing providers associated with abortion from participating in any publicly-funded family planning programs. Lambrecht Decl. ¶ 11.

As Attorney General, now-Governor Greg Abbott issued the interpretations HHSC relied on in its 2012 rule excluding all Planned Parenthood organizations from the Women's Health Program ("WHP"), which is 90% federally funded and at one point enrolled over 150,000 Texas women. Lambrecht Decl. ¶ 12. At the time, Planned Parenthood providers served approximately

6

45% of WPH enrollees. *Id.* Texas was so determined to defund the Planned Parenthood Plaintiffs that it did so in violation of federal law, which means that the state has had to forgo over $30 million in federal family planning funds each year since 2013, creating instead the wholly state-funded Texas Women's Health Program ("TWHP"). Lambrecht Decl. ¶ 13. And the legislature was so determined to defund the Planned Parenthood Plaintiffs at any cost that it included a "poison pill" provision dissolving TWHP in the event a court held Planned Parenthood organizations entitled to participate in that program. *Id.* Instead of viewing the massive loss of federal WHP funds as a public health crisis, Governor Abbott celebrated the state's role in "ensuring that Planned Parenthood is closing down clinics across the state of Texas." *Id.* ¶ 14.

Until now, Medicaid was the only public health program from which Texas had not yet excluded the Planned Parenthood Providers. Then, starting in July 2015, a radical anti-abortion group, the Center for Medical Progress ("CMP"), released a series of videos, including one taken at a PPGC affiliate headquarters. CMP, which opposes *all* safe and legal abortion and has ties to violent extremists, obtained this footage under false pretenses by masquerading as a biotechnology company. Linton Decl. ¶ 6. CMP repeatedly baited Planned Parenthood staff and spliced together heavily edited footage to try to create an appearance of wrongdoing in connection with some affiliates' facilitation of tissue donation for research purposes. *Id.* ¶ 8.

CMP's videos do not show any violations of the law or other applicable standards by Planned Parenthood organizations. To the contrary, leading medical organizations, including the American Congress of Obstetricians and Gynecologists, the American Public Health Association, and the New England Journal of Medicine, have called the CMP-created videos what they are—baseless attacks—and continue to strongly support Planned Parenthood organizations as providing high-quality, essential health services to millions of underserved women and men

annually. *See* George P. Topulous, M.D. et al., *Editorial, Planned Parenthood at Risk*, 373 N. Eng. J. Med. 963 (Sept. 3, 2015); Letter from Am. C. Nurse-Midwives et al. to Hon. Mitch McConnell, Majority Leader, U.S. S., and Hon. John Boehner, Speaker, U.S. H.R. (Aug. 3, 2015),http://www.midwife.org/acnm/files/ccLibraryFiles/Filename/000000005551/ProviderLette ronPlannedParenthood.pdf. Following the release of the videos, officials in thirteen states– including Texas–launched investigations and all of them fully vindicated Planned Parenthood, finding no evidence of wrongdoing.  Eight other states have declared that there was not sufficient evidence to waste government resources on such an investigation.[1]

Despite the fraudulent nature of the videos, state government officials—all of whom also oppose safe and legal abortion—have pounced on the videos as an excuse to exclude Planned Parenthood from participation in public health programs. This movement, which started in Arkansas, Utah, Alabama, and Louisiana, reached Texas last October.[2]

A.    **HHSC's Attempts to Terminate the Provider Plaintiffs from the Medicaid Program**
       **1.   First Notice of Termination**

On October 19, 2015, without prior warning, HHSC sent a letter titled "Notice of Termination" to each Provider Plaintiff terminating its Medicaid provider numbers, to be effective fifteen days after the receipt of a final notice of termination. Notice, attached as Ex. A to Decls. of Lambrecht, Linton, and Hons. Each stated: "The State has determined that you . . . are no longer capable of performing medical services in a professionally competent, safe, and legal manner," and that "[i]f you fail to respond to this Notice of Termination within 30 calendar days of receipt, then we will issue a Final Notice of Termination." Notice of Termination

---

[1] *See* Laura Bassett, A Year After "Baby Parts" Videos, *Planned Parenthood is Taking its Victory Lap*, Huffington Post (July 18, 2016), http://www.huffingtonpost.com/entry/planned-parenthood-baby-parts-legacy_us_5787a724e4b03fc3ee4f7fed.
[2] Following Texas, there have been similar efforts in Kansas, Mississippi, Ohio, and Florida.

(emphasis in original).  While sent to all of the Provider Plaintiffs, those Notices focus entirely on (false) allegations against Plaintiff PPGC and Planned Parenthood's national office, PPFA.  The Notices claimed four bases for terminating PPGC from the Medicaid program (though the State now has abandoned three of the four), none of which were sustainable grounds for terminating PPGC—much less PPST and PPGT.

On November 23, 2015, Plaintiffs filed this litigation and moved for a TRO and/or preliminary injunction to ensure that Medicaid patients, including the Doe Plaintiffs, could continue receiving services at the Provider Plaintiffs. Compl. for Injunctive and Declaratory Relief–Class Action, (ECF No. 1); Appl. And Mem. Of Law in Supp. Thereof for TRO and Prelim. Inj., (ECF No. 5.2). Perhaps aware that the terminations lacked any plausible basis, HHSC reversed course and took the position that it had not yet determined whether it would terminate the Provider Plaintiffs from Medicaid despite having issued a "Notice of Termination" to each. Given HHSC's inaction, the Court dismissed the pending preliminary injunction motion, and postponed the hearing that had been scheduled.  *See* Alexa Ura and Edgar Walters, *After Sound and Fury, Planned Parenthood Still Funded*, Texas Trib., (Dec. 12 2015), https://www.texastribune.org/2015/12/12/past-efforts-cast-doubt-states-fight-planned-paren/; Proposed Order, (ECF No. 42).  HHSC did not, however, rescind the pending termination letters; rather, the State promised further investigations in order to reach its stated goal of ensuring no Medicaid funds go to Planned Parenthood. *See LIFE Initiative*, Abbott–Governor, https://www.gregabbott.com/life-initiative/ (Dec. 29, 2016) ("As Planned Parenthood is investigated, Governor Greg Abbott has announced the "LIFE Initiative" to protect the unborn and prevent the sale of baby body parts . . . . Funding for Planned Parenthood [will be] COMPLETELY ELIMINATED.") (emphasis in original); Statement by Att'y Gen. Ken Paxton,

(Jan. 25, 2016), http://ow.ly/X1op307y8jJ ("The state's investigation of Planned Parenthood is ongoing."); Governor Abbott Statement on Planned Parenthood Investigation, (Jan. 25, 2016) http://ow.ly/Q0zj307y8gZ ("[HHSC]'s Inspector General and the Attorney General's office have an ongoing investigation into Planned Parenthood's actions . . . . The State of Texas will continue to protect life.").

### 2. The Intervening Year

Indeed, in the 17 months since the CMP videos came out, "investigations" of Planned Parenthood have been unrelenting–and yet have yielded no evidence of actual wrongdoing.

#### (a) Texas State investigations

The day after the CMP video concerning PPGC came out, Lieutenant Governor Dan Patrick directed the Harris County District Attorney to initiate a criminal investigation. *Governor Dan Patrick Asks Harris County D.A. To Immediaely Open Criminal Investigation of Planned Parenthood in Texas,* Lieutenant Governor of Texas—Dan Patrick, (Aug. 5, 2015), http://ow.ly/KwWY307y8tt. The District Attorney (a Republican appointee) conducted a thorough joint investigation, together with the Texas Rangers and the Houston Police Department; this investigation (with which PPGC cooperated in full) included hours of interviews with PPGC staff members, a two-hour tour of the PPGC health center where the fraudulent video was taken, the production and review of over 800 pages of documents from PPGC, and the review of what PPGC believes was the unedited version of the CMP video. Linton Decl. ¶ 24.  On January 26, 2016, the District Attorney announced: "For more than two months, the 232nd Grand Jury extensively reviewed the joint investigation into allegations of misconduct by PPGC [and] cleared PPGC of breaking the law." Harris County DA Press

Release, Jan 25, 2016.  Instead, the grand jury indicted two of the anti-abortion extremists who created the videos. *Id*. [3]

Nor was this the only Texas investigation.  To the contrary, in the months and weeks following the CMP videos the Attorney General's office, DSHS, and HHSC all conducted separate, overlapping investigations, with which PPGC and the other Provider Plaintiffs cooperated fully, making employees available to speak with Attorney General's office and DHSS officials during health center inspections; making documents available for inspection on short notice; and producing documents to all three entities, for a total of thousands of pages of documents on topics encompassing fetal tissue donation, fetal tissue disposal, Medicaid billing, vendor arrangements, patient consent forms, organizational charts, and communications with the fictitious biotechnology company.  Lambrecht Decl. ¶¶ 19-21; Linton Decl. ¶¶ 27-30; Hons Decl. ¶¶11-13.  These investigations started immediately after the release of the first CMP video (which did not even involve any Texas Planned Parenthood entity), and continued even after HHSC issued the October 2015 Notice of Termination. Lambrecht Decl. ¶ 18; Linton Decl. ¶ 27; Hons Decl. ¶¶10,13. [4]

### (b) Congressional investigations

Four Congressional Committees—the House Energy and Commerce, Judiciary, and Oversight and Government Reform Committees, and the Senate Judiciary Committee—have also launched their own investigations and requested a broad range of information from PPFA and

---

[3] While those charges were eventually dismissed on technical legal grounds, one of the extremists remains under investigation elsewhere. Linton Decl. ¶ 10, n. 1.

[4] PPGC believes that near the beginning of these multiple investigations, the Attorney General obtained what purports to be an unedited version of the CMP tape fraudulently taken at its health center.  PPGC requested a copy from the Attorney General, both directly and through counsel, but was advised it was being withheld pursuant to the Attorney General's pending investigation. Linton Decl. ¶ 31.

Planned Parenthood affiliates, including the Provider Plaintiff. In response, PPFA and Planned Parenthood affiliates voluntarily produced over 25,000 pages of documents and made members of their staffs from across the country available for interviews with Congressional staff. PPFA's CEO, Cecile Richards, testified for almost five hours in front of the House Oversight and Government Reform Committee. Letter from Democratic Members, Select Investigative Panel ("Select Panel") to Blackburn (Jan. 21, 2016),https://schakowsky.house.gov/uploads/2016-01 21%20SP%20Dems%20Letter%20to%20Chair.pdf. After this lengthy testimony and review of thousands of pages of documents, Jason Chaffetz, the chair of the House Oversight and Government Reform Committee admitted: "Was there any wrongdoing? I didn't find any."[5] The investigations by these Committees have found no wrongdoing by the Provider Plaintiffs. [6]

In October 2015, while Planned Parenthood organizations were still in the process of turning over documents to Congress, the House of Representatives formed and tasked yet another committee, which according to its website is known informally as the "Select Panel on Infant Lives", with investigating Planned Parenthood and its tissue donation practices. Planned Parenthood once again fully cooperated with the Select Panel, voluntarily producing documents and members of its staff for interviews.

As the Democrat minority members of the Select Panel made clear in their December 2016 report, the Select Panel majority has used the committee "as a political weapon to punish women, their doctors, and researchers," "adopt[ed] McCarthy-era tactics to demand names and bully witnesses," "conducted an end-to-end attack on fetal tissue donation and women's health

---

[5] Jennifer Bendery, *GOP Probe Into Planned Parenthood Funding Comes Up Empty*, The Huffington Post (Oct. 12, 2015), http://www.huffingtonpost.com/entry/jason-chaffetz-planned-parenthood-funding_us_5616ed01e4b0dbb8000de134.
[6] While Representative Charles Grassley, the chair of the Senate Judiciary Committee, wrote a letter suggesting further investigation of four Planned Parenthood affiliates, the Provider Plaintiffs were not among them.   Linton Decl. ¶32.

care," and "abused congressional authority and made repeated inflammatory claims of criminal misconduct in continued reliance on the discredited Daleiden/CMP videos and without any actual evidence of wrongdoing." Report of the Democratic Members, *Setting the Record Straight: The Unjustifiable Attack on Women's Health Care and Life-Saving Research*, at 1-2 (Dec. 2016) (executive summary), available at https://selectpaneldems-energycommerce.house.gov/news/press-releases-in-the-news/2016-12-05-democrats-release-select-investigative-panel-report (hereinafter "Minority Report").[7]

After considering the exhaustive documentary and testimonial evidence supplied by Planned Parenthood entities and others involved in the research process, the minority members found that "the key concern for [Planned Parenthood] providers is always patient safety, and they do not alter the timing or method of abortions . . . to enhance fetal tissue donation," and that "Planned Parenthood affiliates do not profit and actually lose money when they facilitate fetal tissue donation, as do other clinics." *Id*. at 2 (further detailed at 46–70).

Nonetheless, on December 1, 2016, Representative Marsha Blackburn, the chair of the Select Panel, sent a letter to Texas attorney general Ken Paxton, urging his office to conduct an investigation into whether PPGC violated Texas law in connection with its facilitation of the

---

[7] Examples of the Select Panel's abuse of power include that they that they "denied Democrats access to Committee records, and held Republican-only negotiations, briefings, and interviews," *id*. at 7; failed to attend interviews that contradicted allegations of wrongdoing, *id*. at 7; and used unsourced and unverified documents, deceptively edited and misleading CMP videos, and misleading staff-created exhibits to question witnesses, *id*. at 73, 88–91. Equally disturbingly, the Select Panel majority has continually demanded that entities involved in fetal tissue research and donation "name names" of individuals involved–and then refused to safeguard the confidentiality of those names, and in some cases publicly released them, thereby endangering the safety of these individuals. *See id*. at 29–33. The Select Panel majority's continual flouting of proper procedure and complete disregard for the safety of researchers and clinicians seriously undermines the legitimacy of its investigation.

donation of fetal tissue.[8] *See* Letter from Marsha Blackburn, Chair, Select Panel, to Ken Paxton, Tex. Att'y Gen. (Dec. 1, 2016) (hereinafter "Blackburn Letter"), attached as Ex. H to Linton Decl.

While it is difficult to determine from the Blackburn Letter exactly what PPGC has allegedly done wrong, the Letter appears to suggest that the Attorney General should investigate whether PPGC violated a Texas statute forbidding transferring a human organ for valuable consideration (a charge already investigated by the Harris County District Attorney), as well as whether PPGC made unspecified misrepresentations to a law enforcement officer, apparently in connection with that same investigation. The Blackburn Letter relies primarily on supposed transcripts of CMP's widely debunked video, as well as on emails and other communications between PPGC and the public medical schools with which it had or considered research partnerships–most or all of which appear to have been available to the Harris County District Attorney as part of its investigation that resulted in the exoneration of PPGC and indictment of the CMP extremists who created the videos.  Linton Decl. ¶ 33.

### 3. The Final Notice of Termination

Shortly after the Blackburn Letter–and fourteen months after its initial, stalled attempt to terminate the Provider Plaintiffs from Medicaid–on December 20, 2016, HHSC issued a Final Notice of Termination ("Final Notice") to each provider.  Final Notice, attached as Ex. B to

---

[8] While the Final Notice describes the Blackburn Letter as the "bipartisan" Select Panel "refer[ing] to evidence" to the Attorney General, Final Notice n.1, the letter is only from Representative Blackburn and indeed, is contrary to the minority's conclusions (hence, not bipartisan).  Representative Blackburn is a strong opponent of abortion, who has consistently voted against embryonic stem cell research. *See* On The Issues, Marsha Blackburn on Abortion, available at http://www.ontheissues.org/House/Marsha_Blackburn.htm#Abortion; *see also* Editorial Board, *Enough Grandstanding on Fetal Tissue*, L.A. Times (Mar. 30, 2016), http://www.latimes.com/opinion/editorials/la-ed-0330-congressional-fetal-tissue-20160330-story.html (describing Blackburn as "an opponent of abortion rights who has worked hard to defund Planned Parenthood").

Decls. of Lambrecht and Hons; Ex. I to Linton Decl.  While the Final Notice sets forth the same

bases for termination as to each of the Provider Plaintiffs, its accusations all relate to the PPGC

CMP video taken, and thus appears to focus entirely on (false) allegations against Plaintiff

PPGC, as the purported basis for terminating all of the Provider Plaintiffs from Medicaid.  *Id.*

As noted above, following its long delay HHSC has now abandoned three of its four prior

bases for termination as untenable, [9] and while its Notice of Termination is not entirely clear, it

seems to have staked its claim on the theory that PPGC "follows a policy of agreeing to procure

fetal tissue, potentially for valuable consideration, even if it means altering the timing or method

of an abortion," and that "these practices violate accepted standards, as reflected in federal and

state law, and are Medicaid program violations that justify termination." [10]   Final Notice at 2. [11]

---

[9] Two of those abandoned bases related to supposed infection control and infection control
training violations purportedly seen in the CMP video. Notice of Termination at 2.  The third was
supposed "fraud and other related program violations" based on two *qui tam* False Claims Act
cases, one of which was pending at the time and the other had settled with no admission of
liability and *with an express agreement* by the State of Texas not to use the settlement as a basis
for termination from the Medicaid program.  *Id.* at 3; Reynolds Settlement Agreement, attached
as Ex. B to Linton Decl. in App. I. As detailed in Plaintiffs' prior motion for preliminary
injunction and supporting declarations, these accusations are baseless as both a legal and factual
matter, *see id*; Decl. of Paul Fine in Supp. of Pls.' first Appl. for TRO and Prelim. Inj., attached
as Ex. 4 in App. I, ECF No. 8-1 (Nov. 23, 2015); *see also Gee*, 837 F.3d at 496 (State "cannot
show that PPGC's settlement of *qui tam* FCA claims, in which it disclaimed all liability,
constitutes actual fraud or renders PPGC unqualified in some other way").

[10] The federal law Defendants cite is limited to HHS-funded research on "the transplantation of
human fetal tissue for therapeutic purposes," 42 U.S.C. § 289g-1, and does not apply to research
Planned Parenthood Center for Choice has done which has nothing to do with such
transplantation. Fine Decl. ¶ 13.

[11] The Final Notice also includes several additional, unclear examples of what HHSC claims are
violations of accepted standards of medical practice, including that PPGC has "a history of
deviating from accepted standards to procure samples that meet researcher's needs" and "a
history of permitting staff physicians to alter procedures to obtain targeted tissue samples needed
for their specific outside research," expressed a "willingness" to do so, and/or expressed a
willingness" to charge more than the costs incurred for procuring fetal tissue, among others.
Final Notice at 2.  Like the Final Notice's reference to unspecified "evidence" from the Select
Committee, Plaintiffs are unable to respond fully to these allegations at this time since they

To be clear, as discussed below, neither PPGC nor the related entity Planned Parenthood Center for Choice ("PPCFC") (which, unlike PPGC, provides abortions) has a policy of 'agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion," and neither alters the method of abortion in order to procure fetal tissue, or accept "valuable consideration" for doing so.[12]

While PPCFC is not currently involved in any fetal tissue donation and has not been for several years, it has facilitated such donation for a limited number of research projects in the past, most recently for a project requiring placental tissue at a major Texas public medical school and research institution. Decl. of Dr. Paul Fine ¶ 10, attached as Ex. 10 of App. I ("Fine Decl."). PPCFC's express policy forbids alteration of the timing or method of the abortion for the purpose of obtaining fetal tissue. Fine Decl. ¶¶ 13-14. Nor has there ever been a research request for intact tissue that would give the abortion-providing physician any reason to make such an adjustment. Fine Decl. ¶ 21. Indeed, at the time of the procedure, the physician commonly does not know whether a patient is a donor. Fine Decl. ¶ 22. Thus, in Dr. Fine's nineteen years as Medical Director, he has never made, nor heard of any physician providing abortion services at PPCFC making, any type of adjustment to the abortion procedure in order to facilitate tissue donation for research purposes. Fine Decl. ¶ 20. Nor has PPCFC ever accepted "valuable consideration" for tissue donation; to the contrary, it has only been reimbursed for permissible expenses incurred. Linton Decl. ¶ 37.

---

neither have the supposedly unedited version of the CMP video nor any other evidence upon which HHSC purports to rely.

[12] As set forth in greater detail in the declaration of Dr. Paul Fine, the Medical Director of PPGC and PPCFC, PPGC provides family planning services and other preventive care through the Medicaid program at seven health centers in the Houston metropolitan area; PPCFC provides abortion services in Houston at the PPCFC Ambulatory Surgical Center ("ASC") and does not provide services through the Medicaid program. Fine Decl. ¶ 1.

Yet Defendants' accusation regarding alteration of timing and method appear to be based solely on conversations depicted in the CMP video, in which anti-abortion activists posing as representatives from a fake tissue procurement company asked PPGC's Director of Research (who is not a physician) repeated questions about whether it would be possible to make alterations to increase the chances of obtaining tissue that would meet their supposed research needs. As the Director of Research appropriately noted, this is a question she would have to ask the doctors who would be performing the abortions. *Id.* Similarly, Defendants' accusations regarding "valuable consideration" and "a willingness to charge more than the costs incurred for procuring fetal tissue" appear to be based solely on these same conversations.

Indeed, after over a year of repeated investigations, it is not clear whether Defendants are taking the position that anyone at PPGC or PPCFC ever *actually* altered the timing or method of an abortion in order to facilitate fetal tissue donation, or received improper reimbursement for doing so–as opposed to their tortured theory that PPGC "follows a policy of agreeing" to facilitate such donation, and that its "willingness to engage in these practices" violates medical standards. Final Notice at 2. Such a policy or agreement, or "willingness," even if present (which it is not), is far from a showing that PPGC provided *medical services* in violation of accepted medical standards, as required by the termination provisions on which the Final Notice relies.[13]

---

[13] The Final Notice asserts that this "policy of agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion" is a Medicaid program violation that justifies termination pursuant to 1 Tex. Admin. Code § 371.1659(2) and (6), among others. Subsection 371.1659(2) authorizes sanctions if a Medicaid provider "fails to provide an item or service to a recipient in accordance with accepted medical community standards or standards required by statute, regulation, or contract." And Section 371.1659(6) authorizes sanctions if a Medicaid provider "fails to abide by applicable statutes and standards governing providers." Defendants identify only a supposed "policy" of PPGC (which does not exist)—not that any actual medical service was provided contrary to accepted medical standards (which it was not). *See* Fine Decl. ¶¶ 13-15, 20. Moreover, even if Defendants could identify that PPGC had such an abortion practice, it was not done by PPGC (which does not

Finally, the only other termination basis HHSC now asserts is unspecified "evidence that you engaged in misrepresentations about your activity related to fetal tissue procurement." Final Notice at 3. HHSC neither identifies the supposed misrepresentations nor offers any explanation of what this "evidence" is, beyond that it comes from the Select Panel discussed at Section II.A(2)(b), *supra*. Such cryptic and vague allegations cannot constitute a basis for termination.[14]

At any rate, as with everything else in the Final Notice, Defendants' allegations against PPGC, even if true, would have no bearing on whether PPST or PPGT are qualified to provide Medicaid services. HHSC's ambiguous and unsupported allegations against PPGC, and desperate effort to sweep in other Planned Parenthood organizations wholly unconnected to those allegations, only confirms that this is about politics, not the quality or integrity of Texas's Medicaid program. Texas has tried to cut reimbursements to Planned Parenthood organizations for non-abortion preventive health services for over a decade as part of an agenda to eliminate access to safe, legal abortion in the state, even before the witch-hunt of the last fourteen months began. While the administration now claims to be targeting the Provider Plaintiffs because they are supposedly not qualified providers, the Attorney General has admitted that, whatever the

---

provide abortions) or in the context of the Medicaid program (which generally does not cover abortions in Texas, 1 Tex. Admin. Code § 354.1167). The other provisions on which HHSC relies similarly each require some act done in violation of the provision's prohibition. *See, e.g.*, 42 U.S.C. § 289g-1 (pertaining to statement to be signed for certain fetal tissue donation); 42 U.S.C. § 289g-2 (prohibiting receipt of valuable consideration); 1 Tex. Admin. Code § 371.1661 (conviction of or engaging in certain criminal acts); 1 Tex. Admin. Code § 371.1703(c)(6) (termination for program violations); 1 Tex. Admin. Code § 371.1605(a) (holding provider responsible for "actions" or "omissions").

[14] This contentless accusation is in blatant violation of HHSC's obligations under 42 U.S.C. § 1320a-7(e),(f), which requires excluded providers be provided "reasonable notice" to the extent specified in the regulations and in 42 U.S.C. § 405(b). Reasonable notice under these provisions includes notice of "[t]he basis for the exclusion" and "a statement of the case . . . setting forth a discussion of the evidence" and the reasons upon which the Commissioner's determination was based. *See* 42 C.F.R. § 1001.2002(c)(1); 42 U.S.C. § 405(b); *see also* 1 Tex. Admin. Code § 371.1609(b) (requiring notice of "basis of the action"); 1 Tex. Admin. Code § 371.1703(e) (requiring notice include "basis for termination").

videos turn out to show or not show at the end of the day, "the true abomination in all this is the institution of abortion." Lambrecht Decl. ¶ 33 (quoting Attorney General statement).

### III.   The Impact of Defendants' Action on the Provider Plaintiffs and Their Patients

The Provider Plaintiffs' exclusion from Medicaid would have devastating consequences for them and their patients, including the Doe Plaintiffs as well as, more broadly, the nearly 11,000 Texas Medicaid patients who receive care through Planned Parenthood clinics each year.

Starting as soon as January 21, 2017, the Provider Plaintiffs will be forced to turn away these patients. Patients will see their care disrupted and will be deprived of their chosen provider. As noted above, patients choose Planned Parenthood Providers for various reasons; they trust them to provide high-quality, respectful care and can access their services more easily. Not only will patients lose their known and preferred provider, many will also face difficulties finding other providers who will see them, especially if they have a condition requiring urgent care. In part because of low reimbursement rates and onerous reimbursement policies, Texas suffers from a shortage of willing Medicaid providers. Lambrecht Decl. ¶ 38. Moreover, as noted above, many of the Provider Plaintiffs' clinics are located in underserved areas where their loss would be particularly harmful. *Id.* ¶ 47; Linton Decl. ¶ 45; Hons Decl. ¶ 31.

The shortage of willing Medicaid providers is exacerbated when it comes to family planning services. There is a serious, unmet need for publicly supported family planning services in Texas. For example, in 2014, an estimated 1,795,160 Texas women needed publicly supported contraceptive services and supplies. Lambrecht Decl. ¶ 40. Texas regularly ranks among the worst states for reproductive health. In 2010, 54% of pregnancies in Texas were unintended. *Id.* ¶ 39. The state has the fifth highest teen pregnancy rate nationally. *Id.* Texas's STI rates and rate of publicly funded unplanned births are higher than the national average. *Id.*

Indeed, the situation has worsened for people who depend on subsidized care—thanks to Texas's actions, which, as set forth above, were mainly intended to strip reimbursements from abortion providers and entities related to them. As a result of these actions, nearly 30,000 fewer patients accessed family planning services through TWHP in 2013, as compared to its predecessor in 2011. Lambrecht Decl. ¶ 41. And, according to recent research published in the *New England Journal of Medicine* and the journal *Contraception*, Texas saw a 35% decline in women using the most effective methods of birth control and a dramatic 27% spike in births among women who had previously used injectable contraception after Texas banned Planned Parenthood from TWHP in 2013. *Id* ¶ 42.  The unfortunate result of blocking access to care at Planned Parenthood resulted in the State serving 54% fewer patients. Another study in *American Economic Journal: Applied Economics* found significantly increased driving distances for patients, and corresponding significantly decreased rates of clinical breast exams, cervical cancer screenings, and even (for women with lower educational levels) secondary care such as mammograms (for which family planning organizations refer patients). *Id*. This time period also coincides with a near doubling of the rate of pregnancy-related deaths in Texas. *Id*. ¶ 43.  Even before Texas started cutting family planning funding and restricting the provider network, only about a third of reproductive-age women received adequate family planning services. Lambrecht Decl. ¶ 41.

Other Medicaid providers are already stretched thin; some only take pregnant Medicaid patients, and others have long wait-times (even when patients call with urgent symptoms). *Id.* ¶ 44; Linton Decl. ¶ 44; Hons Decl. ¶¶ 29–30; Doe 4 ¶ 6; Doe 9 ¶ 5. Many providers offer more limited services than the Provider Plaintiffs; for example, they do not offer LARCs, which are the most effective forms of birth control, or lifesaving cancer screening procedures. Lambrecht

Decl. ¶¶ 32–33; Hons Decl. ¶ 19; Doe 8 ¶ 6. Indeed, other Medicaid providers often refer their patients to the Provider Plaintiffs for those services. Lambrecht Decl. ¶ 44.

If the Provider Plaintiffs are forced to stop providing care in the Medicaid program, this situation will worsen. Women and men who are unable to obtain family planning care, or encounter delays in obtaining it, can face devastating consequences, including undetected cancers and diseases. Hons Decl. ¶ 30. Delays in obtaining contraception will result in unintended pregnancies, many of which may end in abortion. Lambrecht Decl. ¶ 48; Linton Decl. ¶ 51; Hons Decl. ¶ 33. The Provider Plaintiffs, for their part, will lose substantial reimbursements, forcing them to reduce services and hours and potentially close clinics. Lambrecht Decl. ¶¶ 5, 49; Linton Decl. ¶ 41; Hons Decl. ¶¶ 2, 34. They will also be prevented from fulfilling their mission to protect the health and well-being of underserved patients. Lambrecht Decl. ¶ 50; Linton Decl. ¶ 52; Hons Decl. ¶ 35.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction, or in the alternative, TRO. The standards for issuance of a TRO or a preliminary injunction are the same. The moving party must show "(1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury to the moving party; (3) the threatened injury outweighs any damages the injunction may cause defendant; and (4) the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). Courts faced with similar cases have uniformly held Planned Parenthood providers meet this standard when a state improperly terminates their Medicaid funding.

I.     **Plaintiffs Are Likely to Succeed on the Merits of their Federal Medicaid Claim.**

Defendants' attempt to terminate the Provider Plaintiffs from Medicaid violates the federal law guaranteeing a Medicaid patient's right to receive care from the qualified provider of her choice because HHSC has not identified any factually supported grounds for termination that relate to Provider Plaintiffs' competence to provide care for their patients. For this reason, termination of the Provider Plaintiffs from the Medicaid program would violate the right of their patients, including the Doe Plaintiffs.

A.     **The Medicaid Act Bars States from Excluding Providers for Reasons Unrelated to Their Competence to Provide Medicaid Services**

Medicaid is a cooperative federal-state program through which the federal government provides financial aid to states that furnish medical assistance to eligible low-income individuals. *See* 42 U.S.C. § 1396a *et seq.*; *Atkins v. Rivera*, 477 U.S. 154, 156 (1986). "State participation is voluntary; but once a State elects to join the program, it must administer a state plan that meets federal requirements." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004). "To qualify for federal assistance, a state must submit to the [federal government] and have approved a 'state plan' for 'medical assistance' that contains a comprehensive statement describing the nature and scope of the state's Medicaid program." *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 586 (5th Cir. 2004) (citations omitted). Texas participates in the Medicaid program and is therefore bound by all of its requirements.

One of these requirements is that the state plan "must provide" that "any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23)(A); *see also* 42 C.F.R. § 431.51(a)(1) (recipients "may obtain services from any qualified Medicaid provider that

undertakes to provide the services to them"); *see also* 42 C.F.R. § 431.51(b). This is known as the "Free Choice of Provider" requirement. *Id.* [15]

As the U.S. Supreme Court has explained, the Free Choice of Provider requirement gives beneficiaries "an absolute right" to choose any qualified provider "without government interference." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785 (1980). As the Fifth Circuit and two other federal courts of appeals have found, the Free Choice of Provider Requirement is "subject only to two limitations: (1) the provider is 'qualified to perform the service or services required' and (2) the provider 'undertakes to provide [the patient] such services.'" *Planned Parenthood Gulf Coast, Inc., v. Gee*, 83 F.3d 477, 489 (5th Cir. 2016), quoting *Planned Parenthood of Ariz., Inc. v. Betlach*, 727 F.3d 960, 969 (9th Cir. 2013), *cert. denied*, 136 S. Ct. 1283 (2014) (quoting 42 U.S.C. § 1396a(a)(23); *accord Planned Parenthood of Ind., Inc. v. Comm'r of Ind.*, 699 F.3d at 962, 42 C.F.R. § 431.51(b)(1). [16] Excluding "Planned Parenthood from Medicaid for a reason unrelated to its fitness to provide medical services[]

---

[15] This right is enforceable in a § 1983 action.  *See Gee*, 837 F.3d at 489 ("We begin by joining every other circuit to have addressed this issue to conclude that § 1396a(a)(23) affords the Individual Plaintiffs a private right of action under § 1983."); *Planned Parenthood of Betlach*, 727 F.3d at 963; *Comm'r of Ind.*, 699 F.3d at 968 968; *Harris v. Olszewski*, 442 F.3d 456, 459 (6th Cir. 2006); *Planned Parenthood Se., Inc. v. Bentley*, 141 F. Supp. 3d 1207, 1217 (M.D. Ala. 2015); *Planned Parenthood Ark. & E. Okla. v. Selig*, No. 4:15-cv-00566-KGB (E.D. Ark. Oct. 5, 2015) at 13–14; *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 637 (M. D. La. 2015); *Woman's Hosp. Found. v. Townsend*, No. 07-711-JJB-DLD, 2008 WL 2743284, at *8 (M.D. La. July 10, 2008).

[16] Indeed, Congress has singled out family planning services for special protections: although HHS is generally permitted to waive § 1396a(a)(23)(A) when allowing states to implement a primary care case-management system, *see* 42 U.S.C. § 1396n(b)(1), it may not do so for family planning services. 42 U.S.C. § 1396a(a)(23)(B) (mandating that "enrollment of an individual eligible for medical assistance in a primary care case-management system . . . a Medicaid managed care organization, or a similar entity *shall not* restrict the choice of the qualified person from whom the individual may receive [family planning] services") (emphasis added). Congress also signaled its particular interest in maximizing access to family planning services by providing 90% of the cost of these services, 42 U.S.C. § 1396b(a)(5), a higher percentage than many other services.

violat[es] its patients' statutory right to obtain medical care from the qualified provider of their

choice." *Comm'r of Ind.*, 699 F.3d 962, 968 (7th Cir. 2012); *Gee*, 837 F.3d at 493.

In *Gee*, the Fifth Circuit recently considered the Free Choice of Provider requirement in

the context of facts remarkably similar to those here: Louisiana's attempt to terminate PPGC (the

only Provider Plaintiff Texas even claims has done anything wrong) from its Medicaid program

based on the same CMP video Texas is relying on. *Gee*, 837 F.3d at 482. In affirming the district

court's grant of a preliminary injunction preventing termination, the Fifth Circuit noted that:

> These cases [*Comm'r of Ind.* and *Betlach*] stand for the general rule that a state
> may terminate a provider's Medicaid agreements for reasons bearing on that
> provider's qualification.  And "'qualified'" means "to be capable of performing
> the needed medical services in a professionally competent, safe, legal, and ethical
> manner.'"  . . .  To be sure, states retain broad authority to define provider
> qualifications and to exclude providers on that basis.  That authority, however, is
> limited by the meaning of "'qualified.'"

*Id*. at 495 (quoting *Indiana Comm'r*, 699 F.3d at 978); *accord Betlach*, 727 F.3d at 969.

Applying this analysis, the Fifth Circuit resoundingly rejected the State's asserted bases

for terminating PPGC, noting that neither "unspecified misrepresentations," nor a pending

investigation, nor settled *qui tam* cases, could render PPGC "unqualified" within the meaning of

the Free Choice of Provider requirement.  *Gee,* 837 F.3d at 495. Indeed, the Fifth Circuit noted, it

appeared that the State "has simply pasted the labels of 'fraud' and 'misrepresentations' on

PPGC's conduct," despite their being "devoid of any factual support or linkage," *id*. at 499, and

that such efforts "cannot insulate its actions from a §1396a(a)(23) [Free Choice of Provider]

challenge. If it were otherwise, states could terminate Medicaid providers with impunity and

avoid §1396a(a)(23)'s mandate altogether." *Id*.

Similarly, district courts in Arkansas, Alabama, Kansas, and Mississippi all recently

entered injunctions in other Planned Parenthood affiliates' favor in cases involving termination

of their provider agreements based on the same misleading and irrelevant videos at issue here. *Planned Parenthood Se., Inc. v. Bentley*, 141 F. Supp. 3d 1207 (M.D. Ala. 2015) (preliminarily enjoining termination of Planned Parenthood affiliate); Order, ECF No. 70 (Nov. 30, 2015) (entering permanent injunction); *Planned Parenthood Ark. & E. Okla. v. Selig*, No. 4:15-cv-00566-KGB (E.D. Ark. Oct. 5, 2015) (hereinafter, "Ark. PI Order") (preliminarily enjoining termination of Planned Parenthood affiliate) (App. II); *Planned Parenthood of Kansas & Mid-Missouri v. Mosier*, No. 16-2284-JAR-GLR, 2016 WL 3597457 (D. Kan. July 5, 2016) (same); *Planned Parenthood Se. v. Dzielak*, No. 3:16cv454-DPJFKB (S.D. Miss. Oct. 20, 2016) (permanently enjoining Mississippi statute disqualifying abortion providers from Medicaid participation) (App. III). And as noted above, Indiana and Arizona also tried to terminate Planned Parenthood organizations several years ago, and those efforts were rejected by the Seventh and Ninth Circuit Courts of Appeals, respectively. *See Comm'r of Ind.*, 699 F.3d 962; *Betlach*, 727 F.3d. These courts have unanimously held that states may exclude a provider from Medicaid only upon a valid determination that the provider is not "qualified to perform the service or services required." 42 U.S.C. § 1396a(a)(23).

**B.    Defendants Have Not Made A Factually Supported Determination That Any Provider Plaintiff Is "Unqualified"**

Faced with this clear and binding precedent, Defendants have scraped the bottom of the barrel to try to come up with a plausible reason why any Provider Plaintiff is not a qualified Medicaid provider. This effort is unsuccessful, as none of the proffered justifications for the termination withstand scrutiny. Despite fourteen months of nonstop "investigations" by multiple state and federal entities, Defendants are left with allegations against PPGC that are factually unsupported, legally inadequate, blatantly political, on all fours with those rejected in *Gee*, and at any rate wholly irrelevant to the qualifications of PPST and PPGT.

### 1. Defendants' Allegations Against PPGC Are Baseless.

As explained in detail above, *see* Section II.A of the Statement of Facts, *supra*, none of the claimed grounds for termination does anything to call into question the competence of PPGC or any other Provider Plaintiff to provide services in the Medicaid program.

There is simply no support in the Medicaid Act for the idea that a Medicaid provider can be terminated based on a YouTube video created by anti-abortion activists and purporting to show a "policy of agreeing" to procure fetal tissue by altering the timing or method of an abortion, "potentially for valuable consideration," when it is not even clear whether Defendants claim that PPCFC (much less PPGC) ever actually altered the timing or method of an abortion for this purpose, or accepted improper reimbursement for doing so. And this justification for termination is especially inadequate when this video – the supposedly unedited version of which the Attorney General has yet to provide to Plaintiffs – is the only "evidence" of wrongdoing Defendants can come up with after fourteen months of exhaustive investigation, and when PPGC has been cleared by the Harris County District Attorney of exactly the conduct they are accused of here. As the Fifth Circuit recognized in *Gee*, the State may not "paste the labels" of a basis for disqualification on PPGC, "devoid of any factual support or linkage," and be "insulate[d] from a [Free Choice of Provider] challenge.   If it were otherwise, states could terminate Medicaid providers with impunity and avoid § 1396a(a)(23)'s mandate altogether."  837 F.3d at 499.

Nor is there support in the Medicaid Act for the idea that a provider can be terminated based on unspecified "evidence" of unidentified "misrepresentations." Indeed, the Fifth Circuit has already expressly rejected this basis for termination. *Id*. at 497-98 ("[The State's] strategy to terminate PPGC's provider agreements before it can even identify a single misrepresentation does not pass muster.").

Taking a step back from the (wholly inadequate) specifics of HHSC's proffered bases for termination, it also bears noting that in *Gee* the Fifth Circuit found it significant that Louisiana's "course of conduct" leading up to the challenged termination – including an initial abortive attempt to terminate PPGC at-will, as well as anti-abortion, anti-Planned Parenthood statements by public officials – made clear that the termination decision "had nothing to do with PPGC's qualifications." *Id.* at 498-99. The same is true here, as set forth at Section II.A *supra;* if anything, the course of conduct leading up to Texas's Final Notice (including the 14-month hiatus in Texas's attempt to terminate the Provider Plaintiffs, as well as its abandonment of three out of four of its original bases for termination) is even more plainly political and results-driven.

In short, as the Fifth Circuit recognized in *Gee,* and as district courts across the country have recognized in blocking similar attempts to terminate Planned Parenthood entities from Medicaid in the wake of the CMP videos, if such transparently trumped-up justifications for termination were sufficient, the Free Choice of Provider provision would be meaningless.

   **2.    Even if True, Defendants' Allegations Would Not Provide a Valid Basis for Terminating PPGT and PPST**

With respect to PPGT and PPST, Defendants' actions are unlawful for an additional, independent reason: they are based solely on allegations against PPGC, an organization that is wholly separate from PPGT and PPST, with no overlap whatsoever in ownership or control.

Defendants assert that PPGT and PPST may be terminated based on allegations about PPGC simply because of alleged "indicia of affiliation." *See* Final Notice at 3. But Federal Medicaid law does not permit a provider to be excluded from a state Medicaid program due to actions of an entirely separate entity. This is clear from the text of 42 U.S.C. § 1320a-7(b)(6)(B), which allows for termination of "*any individual or entity* that the Secretary determines . . . has furnished or caused to be furnished items or services to patients . . . of a quality which fails to

meet professionally recognized standards of health care." (emphasis added).   Similarly, 42

U.S.C. § 1396a(p)(1) allows a state to terminate "any individual or entity . . . for any reason for

which the Secretary could exclude *the* individual or entity." (emphasis added).   By the plain

language of these provisions, the entity being terminated must be the same entity that furnished

or caused to be furnished the services that violate professionally recognized standards. As a

district court recently held rejecting a similar attempt to exclude a Planned Parenthood affiliate

from the Medicaid program, federal law permits no such guilt by association.  *See Bentley*, 141

F. Supp. 3d at 1223.

        This plain language reading of the federal for-cause provisions is reinforced by the

narrow federal provision permitting exclusion of a participant based on its relationship with

another participant subject to exclusion. *See* 42 U.S.C. § 1320a-7(b)(8) (allowing discretionary

exclusion of "[e]ntities controlled by a sanctioned individual" in the sense that that individual

"has a direct or indirect ownership or control interest," or "is an officer, director, agent, or

managing employee" of the entity); *see also Bentley*, 141 F. Supp. 3d at 1223 (discussing same).

        Not only is the federal "relationship" provision extremely narrow, applying only to

entities that are owned or controlled by sanctioned individuals, but Congress and HHS were very

specific about the types of ownership and control interests that support termination under 42

U.S.C. § 1320a-7(b)(8), none of which could remotely apply here. *See* 42 U.S.C. § 1320a-

7(b)(8)(A)(i)–(iii); 42 C.F.R. §1001.1001(a). As HHS explained, "[t]he purpose of this provision

is to ensure that the programs do not indirectly reimburse excluded individuals," not to punish

organizations for their associations, as Defendants attempt to do here. Health Care Programs:

Fraud and Abuse; Amendments to OIG Exclusion and CMP Authorities Resulting From Public

Law 100-93, 57 Fed. Reg. 3298, 3308-10 (Jan. 29, 1992).

Based on the Final Notice, Defendants appear to take the position that Texas law, unlike federal law, provides for termination of any organization that shares a name or other "indicia of affiliation" with an at-fault provider, without any need for a showing of ownership or control. [17] The provisions on which HHSC relies, recently written into Texas law by HHSC during the same period it was trying to exclude Planned Parenthood from other federally funded programs, allow the Office of the Inspector General ("OIG") to terminate the Medicaid provider agreement of a person, when the "OIG establishes . . . by prima facie evidence" that the person is "affiliated with a person who commits a program violation," 1 Tex. Admin. Code § 371.1703(c)(7), and defines "affiliate" as (among other factors) a person who "shares any identifying information with a person, including . . . corporate or franchise name." 1 Tex. Admin Code § 371.1(3)(I). [18] HHSC also relies on a general provision that states that "[a] Medicaid...provider is responsible for...the actions and omissions of the provider's affiliates, employees, contractors, vendors, and agents." *Id.* § 371.1605(a)(2).

This sweeping new ground for excluding providers, which to Plaintiffs' knowledge HHSC has never applied until now, cannot support PPGT's and PPST's termination because it is

---

[17] The claimed "indicia" in no way demonstrate common ownership or control. For instance, the allegations that PPFA affiliates, such as PPGT and PPST, must follow certain PPFA protocols and procedures—including registration and review of research projects and completing required trainings—as a condition of affiliation and accreditation, does not suggest that PPGC, PPST, or PPGT exert any control over *each other's* operations. *See* Lambrect Decl. ¶ 28; Hons Decl. ¶ 20. Further, neither PPGT nor PPST employs any person who also works for PPGC—let alone any person who exercises managerial or other control. *See* Lambrect Decl. ¶ 31; Hons Decl. ¶ 22.

[18] Prior to Oct. 14, 2012, the regulations defined "affiliate relationship" in the generally understood sense, as referring to providers who "share any of the following: e.g. tax identification numbers, social security numbers, bank accounts, telephone number, business location. (This is not an all inclusive list)." 1 Tex. Admin. Code § 371.1643(e)(1)(H) (as of Jan. 9, 2005; repealed Oct. 14, 2012). The rules also contained a matching general definition of "affiliates": "Persons associated with one another so that any one of them directly or indirectly controls or has the power to control another in whole or in part or meets any portion of the definition for 'Affiliate Relationship.'" 1 Tex. Admin. Code § 371.1601(2) (as of Jan. 9, 2005; repealed Oct. 14, 2012). The Provider Plaintiffs clearly do not meet these definitions.

squarely at odds with the federal free choice protection. As explained above, the free choice provision is stated in absolute and mandatory terms, and "exceptions . . . are narrow and specific," *Betlach*, 899 F. Supp. 2d at 883. As the Fifth Circuit recently explained, Defendants' "reading would render the free-choice-of-provider requirement 'self-eviscerating' because '[i]f states are free to set any qualifications they want—no matter how unrelated to the provider's fitness to treat Medicaid patients—then the free-choice-of-provider requirement could be easily undermined by simply labeling any exclusionary rule as a qualification.'" *Gee*, 837 F.3d at 494 (5th Cir. 2016) (quoting *Comm'r of Ind.*, 699 F.3d at 978); *see also Betlach*, 727 F.3d at 971 (rejecting Defendants' proposition that free choice provision "permits states self-referentially to impose for Medicaid purposes whatever standards for provider participation [they] wish[]").[19] Therefore, HHSC's application of its state regulation would violate the Free Choice of Provider requirement because, absent some overlap in ownership or control, whether PPGC has violated any Medicaid standards has no bearing whatsoever on the fitness of other Planned Parenthood affiliates to treat Medicaid patients—as they have done without issue for decades.

Indeed, remarkably, the majority of the supposed "indicia of affiliation" HHSC relies on do not even relate to Texas's own definition of "affiliate" – which (in addition to common identifying information) looks to such factors as having "a direct or indirect ownership interest . . . ."; holding a "mortgage, deed of trust . . . or other [secured] obligation;"; being able to "control or be controlled by" the entity; and being a "managing employee" or having "financial, managerial or administrative influence." 1 Tex. Admin. Code § 371.1(3). None of the supposed "indicia of affiliation" on which HHSC relies – such as a requirement that affiliates follow PPFA

---

[19] Texas's attempt to reach organizations that are wholly separate from any alleged wrongdoer goes far beyond even the Arizona restriction struck down in *Betlach*, which was narrowly defined *not* to reach related entities (but nonetheless was found to violate the free choice requirement). *See Betlach*, 727 F.3d at 974.

protocols and procedures, or register research projects, or that PPFA requires training for affiliates, Final Notice at 3 – fall into any of these categories.

It is noteworthy that at the time HHSC promulgated this new language, it claimed that it was intended only to track the narrow federal affiliation provision set forth above, which prohibits termination based solely on similarities between corporate names. 37 Tex. Reg. 7991, 7993 (Oct. 5, 2012), https://texashistory.unt.edu/ark:/67531/metapth288932/m1/176/.[20] Indeed, HHSC has taken this position more recently, stating: "An 'affiliate' is not a stranger to the provider but includes a person with a direct or indirect ownership interest, an officer, director, partner, manager or other person who controls the provider." Appellees' Br., *Harlingen Family Dentistry, P.C. v. Tex. Health & Human Servs. Comm'n*, No. 03-14-00069-CV, 2014 WL 4408008, at *48 (Tex. Ct. App. Aug. 22, 2014) (citing 1 Tex. Admin. Code § 371.1607)).

HHSC should, therefore, be taken at its word that the 2012 definition of affiliate does not "expand OIG's current and longstanding authority" or create any "substantive change." *Id.*[21] It should not be allowed to use its new language to do what it likely intended to do in the first

---

[20] HHSC made these assurances in response to the Texas Medical Association's concern that the rule could be read "to allow payment holds and other sanctions and penalties to be imposed on a person based solely on the actions of another," *id.* at 7991, and that, for the sake of fairness, "an affiliate should be under the control of a person for that person to be responsible," *id.* at 7993. This stated concern by a leading medical organization in Texas underscores how inappropriate it is for HHSC to exclude PPST and PPGT "based solely on" allegations against PPGC, an organization over which they have no control.

[21] HHSC's 2012 rule also should be read narrowly—so as not to sweep in PPGT and PPST— because HHSC has no statutory *authority* to redefine affiliate-based exclusion to extend beyond situations involving common control or ownership. *See* Tex. Hum. Res. Code § 32.047(b)(2) (authorizing HHSC only to adopt rules "prohibiting a person from participating in the medical assistance program as a health care provider . . . if the person . . . owns, controls, manages, or is otherwise affiliated with and has financial, managerial, or administrative influence over a provider who has been suspended or prohibited from participating in the program"). Indeed, this more limited concept of affiliate is the standard one, found in all other areas of Texas law (other than those involving Texas's zealous efforts to defund organizations associated with abortion). *See, e.g.*, Tex. Bus. Orgs. Code Ann. § 1.002(1); Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(1); *id.* § 74.001(a)(3).

place: terminate all Planned Parenthood providers from Medicaid—regardless of their actual conduct. Such as application would be in violation of federal law, which protects the Provider Plaintiffs' Medicaid patients' free choice of qualified provider. There can, therefore, be no question that HHSC's attempt to bootstrap its wrongful termination of PPGC onto the totally independent PPGT and PPST must fail.

\* \* \*

For all of the foregoing reasons, the Plaintiffs are likely to prevail on their claim that HHSC's termination of all three Provider Plaintiffs' violates federal law.

## II.   **Plaintiffs Face Irreparable Harm for Which There Is No Adequate Remedy at Law**

As is explained in Section III of the Statement of Facts, *supra*, if Defendants' termination is allowed to take effect (which without order from this Court it will on January 21), the Provider and Doe Plaintiffs will be irreparably harmed, along with all of the Provider Plaintiffs' other Medicaid patients. Not only will Defendants' actions violate the statutory right to free choice of family planning provider, but patients will have their care disrupted and face reduced access to family planning services.

These constitute irreparable injuries sufficient for an injunction. *See, e.g.*, *Gee*, 837 F.3d at 501 ("Because the individual Plaintiffs would otherwise be denied both access to a much needed medical provider and the legal right to the qualified provider of their choice, we agree that they will almost certainly suffer irreparable harm . . ."); *Mosier*, 2016 WL 3597457, at \*23 ("A disruption or denial of these patients' health care cannot be undone after a trial on the merits. The Court finds that Plaintiffs has [sic] shown irreparable harm to Medicaid patients who have chosen PPKM and PPSLR . . ."); *Bentley*, 141 F. Supp. 3d at 1225 ("Without the injunction, Doe would be forced to stop seeking services from a provider with whom she is comfortable, and she

might well not be able to identify another provider with whom she could forge such a relationship. Such an injury is clearly not susceptible to monetary relief."); *Kliebert*, 141 F. Supp. 3d at 649-650 (same); Ark. PI Order at 22 (same); *Comm'r of Ind.*, 794 F. Supp. 2d 912-913 (S.D. Ind. 2011) (same), *aff'd in part and rev'd in part on other grounds*, 699 F.3d 962 (7th Cir. 2012). [22]

In addition, the Provider Plaintiffs will suffer irreparable harm. As nonprofit healthcare provider dedicated to serving low-income communities, they rely on public funding, and loss of Medicaid funds will significantly impact their operating budgets, potentially requiring them to lay off employees, reduce hours, and close health centers. Loss of funding will also undermine their mission to provide care for underserved Texans. *See* Section III of the Statement of Facts, *supra*. These effects constitute irreparable harm. *Comm'r of Ind.*, 794 F. Supp. 2d at 912-13; *Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868, 886. [23]

## III.    The Balance of Harm Favors the Plaintiffs

While all of the Plaintiffs, as well as the Provider Plaintiffs' other patients, will suffer serious irreparable harm in the absence of an injunction, the state will suffer no injury at all. *Gee*, 837 F.3d at 501 ("LDHH simply does not have a legitimate interest in administering the state's Medicaid program in a manner that violates federal law."); *Mosier*, 2016 WL 3597457 at *24 ("[T]he risk of taxpayer harm is quite low as compared to the certain injury to Medicaid patients if the injunction does not issue—they will be unable to seek treatment from their providers of

---

[22] Indeed, as these cases also make clear, patients are irreparably injured when denied their chosen qualified provider regardless of whether adequate other family planning providers were available (which, as set forth above in Section IV of the Statement of Facts, *supra*, they are not). *See Comm'r of Ind.*, 699 F.3d at 981.

[23] Furthermore, because the Eleventh Amendment bars the Provider Plaintiffs from recovering lost Medicaid funds after the fact, *see Green v. Mansour*, 474 U.S. 64, 68 (1985), their financial losses cannot be compensated by money damages and would therefore be irreparable, *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n. 1 (5th Cir. 1989).

choice."); *see also* Ark. PI Order at 30. An injunction would simply require the state "to maintain the funding [it] ha[s] provided to Plaintiffs for years." *Marlo M. ex rel. Parris v. Cansler,* 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010).

## IV.    The Public Interest Is Served by the Issuance of an Injunction

Finally, preliminary injunctive relief should be granted because of the strong public interest in ensuring continued access to crucial health services, especially for the many underserved and low-income patients the Provider Plaintiffs serve. *Gee*, 837 F.3d at 502 ("[T]he public interest weighs in favor of preliminarily enforcing the Individual Plaintiffs' rights and allowing some of the state's neediest individuals to continue receiving medical care from a much needed provider."); *Mosier*, 2016 WL 3597457 at *25 ("The Court further finds that it is in the public's interest to ensure that the goals of Medicaid are served . . . Medicaid patients have the explicit right to seek family planning services from the qualified provider of their choice."); *New Orleans Home for Incurables, Inc. v. Greenstein ("NOHI")*, 911 F. Supp. 2d 386, 412; *Betlach*, 899 F. Supp. 2d at 887; *Kliebert*, 141 F. Supp. 3d at 650-651; *Bentley*, 141 F. Supp. 3d at 1226. Not only does the public have a strong interest in protecting access to health care, but that interest is particularly acute with respect to the neediest of its members who depend on publicly-funded programs. *See Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009), *vacated and remanded on other grounds,* 132 S. Ct. 1204 (2012).

## V.    The Injunction Should Issue Without Bond

Defendants will suffer no monetary injury if preliminary relief is issued. Texas already has undertaken to cover its share of the costs of family planning services for those individuals who meet the income requirements for Medicaid. Whether these individuals obtain these services at the Planned Parenthood Plaintiffs (their provider of choice) or elsewhere will have no effect

on Texas's budget. *See Mosier*, 2016 WL 3597457 at *25 ("The Court finds no evidence of financial harm to the State if the Court does not require a bond; the State would simply continue reimbursing the Plaintiff providers as it has before and since the termination decision, until a decision on the merits can be reached."); *NOHI*, 911 F. Supp. 2d at 413 ("DHH would have to pay the same amount for benefits of these patients regardless of who their Medicaid provider happens to be."). In the absence of monetary injuries, no bond should be required. *See Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir. 1996) (holding that the court "may elect to require no security at all") (internal quotations omitted); *Kliebert*, 141 F. Supp. 3d at 652 ("this Court sees no credible reason to force a bond's execution").

VI.    **The Court Should Enter Relief Permitting the Provider Plaintiffs to Remain in the Medicaid Program as to All of Their Patients, and Need Not Reach Class Certification to Do So**

Finally, Plaintiffs are entitled to an injunction barring Defendants from terminating the Planned Parenthood Plaintiffs' provider agreements, which will permit them to remain in Medicaid and serve all Medicaid-enrolled patients who seek care at their 30 health centers, while the litigation proceeds. *See Gee*, 837 F.3d at 502; *Comm'r of Ind.*, 699 F.3d 962; *Betlach*, 727 F.3d 960; *Mosier*, 2016 WL 3597457, at *26 ("Under the circumstances of this case, class certification is unnecessary in order to award relief to all Kansas Medicaid patients who obtain or seek to obtain covered health services from [Planned Parenthood]"); *Bentley*, 141 F. Supp. 3d at 1229 (reinstating provider agreements such that provider plaintiffs may be reimbursed for any eligible patient's care); *see also Planned Parenthood Se., Inc. v. Dzielak*, No. 3:16CV454-DPJ-FKB, 2016 WL 6127980, at *1 (S.D. Miss. Oct. 20, 2016) (entering declaratory judgment invalidating Mississippi statute excluding abortion providers from Medicaid); *but see* Ark. PI Order at 16–17 (requiring Plaintiffs to seek class certification as a condition of broad relief). This

is the appropriate remedy in light of the nature of the Medicaid program, in which any enrolled provider is reimbursed for covered services to *any* patient insured through Medicaid.[24]

Plaintiffs are entitled to an injunction barring termination of the Provider Plaintiffs' provider agreements and permitting them to continue serving all Medicaid patients for the additional reason that it is the only way to give meaningful relief to the Doe Plaintiffs. Absent such relief, there is a significant risk that lost revenue will force the Provider Plaintiffs to reduce hours and services, and potentially close clinics. This Court should enter injunctive relief as to the Planned Parenthood Plaintiffs' provider agreements in their entirety in order to give the Plaintiff Does the relief to which they are entitled. *See Khbet t*, 141 F. Supp. 3d at 652-53 ("If the Agreements are terminated, this facility would suffer significant financial loss and might have no choice but to close. In order the insure that meaningful relief is given to the Jane Doe Plaintiffs . . . the Court's preliminary injunction will extend to all [provider] agreements applicable to all Medicaid-enrolled patients."); *see also Hernandez v. Reno*, 91 F.3d 776, 781 (5th Cir. 1996) ("Class-wide relief may be appropriate in an individual action if such is necessary to give the prevailing party the relief to which he or she is entitled.").[25]

## CONCLUSION

For the foregoing reasons, Plaintiffs' application for a temporary restraining order and/or preliminary injunction should be granted.

---

[24] Indeed, in granting an injunction reinstating the provider agreements as to all Medicaid patients, the *Bentley* court noted the state's concern that restricting reimbursements to the named patient plaintiff would violate federal Medicaid law. *Bentley*, 141 F. Supp. 3d at n.12.

[25] Plaintiffs have moved for class certification out of an abundance of caution, to make certain that any relief entered will ensure that *all* of Provider Plaintiffs' existing and future Medicaid patients can continue to receive health care services from their provider of choice. But as the cases cited above make clear, class certification is not necessary as the appropriate relief to make the Doe Plaintiffs whole is to keep the Provider Plaintiffs in the Medicaid program.

Respectfully submitted the 30th day of December, 2015.

HUSCH BLACKWELL, L.L.P
BY: */s/ Thomas H. Watkins*
THOMAS H. WATKINS
Texas Bar No. 20928000
Email: Tom.Watkins@huschblackwell.com
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456
(512) 479-1101 (facsimile)

JENNIFER SANDMAN
PLANNED PARENTHOOD FEDERATION OF AMERICA
Email: Jennifer.Sandman@ppfa.org
123 William Street, 9th Floor
New York, N.Y. 10038
(212) 247-6811 (facsimile)

ALICE CLAPMAN *
RICHARD MUNIZ *
PLANNED PARENTHOOD FEDERATION OF AMERICA
Email: Alice.Clapman@ppfa.org
Email: Richard.Muniz@ppfa.org
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4862 (Alice Clapman)
(202) 973-4997 (Richard Muniz)
(202) 296-3480 (facsimile)

ATTORNEYS FOR PLAINTIFFS

* Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on this 30th day of December, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

Adam Arthur Biggs
Amanda J. Cochran-McCall
Shelley Dahlberg
Office of the Attorney General
300 W. 15th Street
Austin, TX 78701
Email: adam.biggs@oag.texas.gov
Email: amanda.cochran-mccall@texasattorneygeneral.gov

Andrew Bowman Stephens
Marc Edward Rietvelt
Office of the Attorney General of Texas
PO Box 12548 Capital Station
Austin, TX 78711
(512) 463-2120 (Andrew Bowman Stephens)
512-463-2120 (Marc Edward Rietvelt)
Fax: 512/320-0667
Email: andrew.stephens@texasattorneygeneral.gov
Email: marc.rietvelt@texasattorneygeneral.gov

BY: _/s/ Thomas H. Watkins_____
THOMAS H. WATKINS

**Resp. Ex. 3**



**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

PLANNED PARENTHOOD OF GREATER
TEXAS FAMILY PLANNING AND
PREVENTATIVE HEALTH SERVICES, INC.;
PLANNED PARENTHOOD SAN ANTONIO;
PLANNED PARENTHOOD CAMERON
COUNTY; PLANNED PARENTHOOD SOUTH
TEXAS SURGICAL CENTER; PLANNED
PARENTHOOD GULF COAST, INC.; and JANE
DOES ##1–10, on Their Behalf and on Behalf of
All Others Similarly Situated,

                    **Plaintiffs,**

-vs-                                              **Case No. A-15-CA-1058-SS**

CHRIS TRAYLOR, Executive Commissioner
Texas Health and Human Services Commission,
and STUART W. BOWEN, JR., Inspector
General, Texas Health and Human Services
Commission, Office of Inspector General,
                    **Defendants.**

---

## O R D E R

BE IT REMEMBERED on the 17th, 18th, and 19th days of January 2017, the Court held a hearing in the above-styled cause, and the parties appeared in person and through counsel. During the three-day hearing concerning Plaintiffs' request for injunctive relief, the parties called 14 witnesses and admitted 397 exhibits into evidence. One of the exhibits admitted, a key piece of evidence, features an eight-hour long video (the video).

The earliest opportunity for this Court to issue a complete ruling on the evidence presented at the hearing and the extensive pleadings in this case is February 21, 2017. In addition to this

Court's normal caseload, one of the heaviest weighted dockets in the country, this Court has not one but two motions for injunctive relief before it which implicate the State of Texas and health care providers offering gynecological services to women. Thus, to preserve the status quo while this the Court considers the evidence and aid it in deciphering the mountain of evidence, the Court issues the following orders confirming its oral pronouncement:

IT IS ORDERED that Defendants, their employees, agents, and successors, and all others acting in concert or participating with them are temporarily enjoined from terminating the Provider Plaintiffs' Medicaid provider agreements until February 21, 2017 at 5 p.m. CST;

IT IS FURTHER ORDERED that the parties shall submit letter briefs to the court providing the time stamps of the sections referenced in counsel's closing arguments; and

IT FINALLY ORDERED that the parties may submit additional briefing, including findings of fact and conclusions of law, no later than January 30, 2017.

SIGNED this the _19_ day of January 2017.

_Sam Sparks_

SAM SPARKS
UNITED STATES DISTRICT JUDGE

-2-

Resp. Ex. 4

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 1.**
**NEW ORLEANS, LA 70130**

December 15, 2020

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

No. 17-50282    Planned Parenthood of Grt TX, et al v.
Cecile Young, et al
USDC No. 1:15-CV-1058

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

Record/original papers/exhibits to be returned.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Mary Frances Yeager, Deputy Clerk
504-310-7686

cc:  Mr. Steven H. Aden
     Mr. Doris Bershteyn
     Mr. Michael Cantrell
     Ms. Thania Charmani
     Ms. Alice J. Clapman
     Mr. Roger K. Evans
     Mr. Adam Gustafson
     Mr. Kyle Douglas Hawkins
     Mr. Lawrence John Joseph
     Ms. Beth Ellen Klusmann
     Ms. Sophia Morris Mancall-Bitel
     Mr. Jonathan F. Mitchell
     Ms. Elizabeth Baker Murrill

Ms. Martha Jane Perkins
Ms. Jennifer Sandman
Ms. Elizabeth Anne  Molino Sauvigne
Ms. Hillary Schneller
Mr. Thomas Hart Watkins

Unofficial copy Travis Co. District Clerk Velva L. Price

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

No. 17-50282

———————

United States Court of Appeals
Fifth Circuit

**FILED**

November 23, 2020

Lyle W. Cayce
Clerk

PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING
AND PREVENTATIVE HEALTH SERVICES, INCORPORATED; PLANNED
PARENTHOOD SAN ANTONIO; PLANNED PARENTHOOD CAMERON
COUNTY; PLANNED PARENTHOOD GULF COAST, INCORPORATED;
PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER; JANE
DOE, I; JANE DOE 2; JANE DOE 4; JANE DOE 7;
JANE DOE 9; JANE DOE 10; JANE DOE 11,

Plaintiffs—Appellees,

v.

SYLVIA HERNANDEZ KAUFFMAN, in her official capacity as Inspector
General of HHSC; CECILE ERWIN YOUNG, in her official capacity as
Executive Commissioner of HHSC,

Defendants—Appellants.

———————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:15-CV-1058

———————

Before OWEN, Chief Judge, and JOLLY, JONES, SMITH, STEWART, DENNIS, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, COSTA, WILLETT, HO, DUNCAN, ENGELHARDT, Circuit Judges.*

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is VACATED.

IT IS FURTHER ORDERED that appellees pay to appellants the costs on appeal to be taxed by the Clerk of this Court.

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, SMITH, WILLETT, HO, DUNCAN, and ENGELHARDT, Circuit Judges, concurring.

JAMES C. HO, Circuit Judge, joined by STUART KYLE DUNCAN, Circuit Judge, concurring.

STEPHEN A. HIGGINSON, Circuit Judge, joined by STEWART and COSTA, Circuit Judges, concurring in part and dissenting in part, partially joined by DENNIS and GRAVES, Circuit Judges.

JAMES L. DENNIS, Circuit Judge, joined by JAMES E. GRAVES, Circuit Judge, dissenting.

---

* JUDGE OLDHAM is recused and did not participate in the decision. JUDGE WILSON joined the court after this case was submitted and did not participate in the decision.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX DOE, Relator, | § § § | |
| THE STATES OF TEXAS, *ex rel.* ALEX DOE, Relator, | § § § | |
| THE STATE OF LOUISIANA, *ex rel.* ALEX DOE, Relator, | § § § | Civil Action No. 2-21-CV-022-Z |
| Plaintiffs, | § § | |
| v. | § § | |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD GULF COAST, INC., PLANNED PARENTHOOD OF GREATER TEXAS, INC., PLANNED PARENTHOOD SOUTH TEXAS, INC., PLANNED PARENTHOOD CAMERON COUNTY, INC., PLANNED PARENTHOOD SAN ANTONIO, INC., | § § § § § § § § § § | |
| Defendants. | § | |

**STATE OF TEXAS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# EXHIBIT E

# HHSC Medicaid Provider Agreement

| Name of provider enrolling: |
|---|
| |

| Medicaid TPI: *(if applicable)* | Medicare provider ID number: *(if applicable)* |
|---|---|
| | |

**Physical address (where health care is rendered):** *Providers MUST enter the physical address where the services are rendered to clients. If the accounting, corporate, or mailing address is entered in this physical address field, the application may be denied.*

| Number | Street | Suite | City | State | ZIP |
|---|---|---|---|---|---|
| | | | | | |

**Accounting/billing address:** *(if applicable)*

| Number | Street | Suite | City | State | ZIP |
|---|---|---|---|---|---|
| | | | | | |

As a condition for participation as a provider under the Texas Medical Assistance Program (Medicaid), the Provider (Provider) agrees to comply with all terms and conditions of this Agreement.

## I.   ALL PROVIDERS

**1.1   Agreement and documents constituting Agreement.**

The current *Texas Medicaid Provider Procedures Manual* (Provider Manual) may be accessed via the internet at www.tmhp.com. Provider has a duty to become educated and knowledgeable with the contents and procedures contained in the Provider Manual. Provider agrees to comply with all of the requirements of the Provider Manual, as well as all state and federal laws governing or regulating Medicaid, and provider further acknowledges and agrees that the provider is responsible for ensuring that all employees and agents of the provider also comply. Provider agrees to acknowledge HHSC's provision of enrollment processes and authority to make enrollment decisions as found in Title 1, Part 15, Chapter 352 of the Texas Administrative Code. Provider is specifically responsible for ensuring that the provider and all employees and agents of the Provider comply with the requirements of Title 1, Part 15, Chapter 371 of the Texas Administrative Code, related to waste, abuse and fraud, and provider acknowledges and agrees that the provider and its principals will be held responsible for violations of this Agreement through any acts or omissions of the provider, its employees, and its agents. For purposes of this Agreement, a principal of the provider includes all owners with a direct or indirect ownership or control interest of five percent or more, all corporate officers and directors, all limited and non-limited partners, and all shareholders of a legal entity, including a professional corporation, professional association, or limited liability company. Principals of the provider further include managing employee(s) or agents who exercise operational or managerial control or who directly or indirectly manage the conduct of day-to-day operations.

**1.2   State and Federal regulatory requirements.**

1.2.1   By signing this Agreement, Provider certifies that the provider and its principals have not been excluded, suspended, debarred, revoked or any other synonymous action from participation in any program under Title XVIII (Medicare), Title XIX (Medicaid), or under the provisions of Executive Order 12549, relating to federal contracting. Provider further certifies that the provider and its principals have also not been excluded, suspended, debarred, revoked or any other synonymous action from participation in any other state or federal health-care program. Provider must notify the Health and Human Services Commission (HHSC) or its agent within 10 business days of the time it receives notice that any action is being taken against Provider or any person defined under the provisions of Section 1128(A) or (B) of the Social Security Act (42 USC §1320a-7), which could result in exclusion from the Medicaid program. Provider agrees to fully comply at all times with the requirements of 48 CFR, Ch. 3, relating to eligibility for federal contracts and grants.

1.2.2   Provider agrees to disclose information on ownership and control, information related to business transactions, and information on persons convicted of crimes in accordance with 42 CFR Part 455, Subpart B, and provide such information on request to the Texas Health and Human Services Commission (HHSC), Department of State Health Services (DSHS), Texas Attorney General's Medicaid Fraud Control Unit, and the United States Department of Health and Human Services. Provider agrees to keep its application for participation in the Medicaid program current at all times by informing HHSC or its agent in writing of any changes to the information contained in its application, including, but not limited to, changes in ownership or control, federal tax identification number, provider licensure, certification, or accreditation, phone number, or provider business addresses. Changes due to a change of ownership or control interest must be reported to HHSC or its designee within 30 days of the change. All other changes must be reported to HHSC or its designee within 90 days of the change.

Provider agrees to disclose all convictions of Provider or Provider's principals within ten business days of the date of conviction. For purposes of this disclosure, Provider must use the definition of "Convicted" contained in 42 CFR 1001.2, which includes all convictions, deferred adjudications, and all types of pretrial diversion programs. Send the information to the Texas Health and Human Services Commission's Office of Inspector General, P.O. Box 85211 – Mail Code 1361, Austin, Texas 78708. Fully explain the details, including the offense, the date, the state and county where the conviction occurred, and the cause number(s).

1.2.3   This Agreement is subject to all state and federal laws and regulations relating to fraud, abuse and waste in health care and the Medicaid program. As required by 42 CFR § 431.107, Provider agrees to create and maintain all records necessary to fully disclose the extent and medical necessity of services provided by the Provider to individuals in the Medicaid program and any information relating to payments claimed by the Provider for furnishing Medicaid services. On request, Provider also agrees to provide these records immediately and unconditionally to HHSC, HHSC's

agent, the Texas Attorney General's Medicaid Fraud Control Unit, the Texas Department of Family and Protective Services (DFPS), the Texas Department of State Health Services (DSHS) and the United States Department of Health and Human Services. The records must be retained in the form in which they are regularly kept by the Provider for a minimum of five years from the date of service (six years for freestanding rural health clinics and ten years for hospital based rural health clinics); or, until all investigations are resolved and closed, or audit exceptions are resolved; whichever period is longest. Provider must cooperate and assist HHSC and any state or federal agency charged with the duty of identifying, investigating, sanctioning, or prosecuting suspected fraud and abuse. Provider must also allow these agencies and their agents unconditional and unrestricted access to its records and premises as required by Title 1 TAC, §371.1667. Provider understands and agrees that payment for goods and services under this Agreement is conditioned on the existence of all records required to be maintained under the Medicaid program, including all records necessary to fully disclose the extent and medical necessity of services provided, and the correctness of the claim amount paid. If provider fails to create, maintain, or produce such records in full accordance with this Agreement, provider acknowledges, agrees, and understands that the public monies paid the provider for the services are subject to 100 percent recoupment, and that the provider is ineligible for payment for the services either under this Agreement or under any legal theory of equity.

1.2.4  The Texas Attorney General's Medicaid Fraud Control Unit, the Texas Health and Human Services Commission's Office of Inspector General, and internal and external auditors for the state and federal government may conduct interviews of Provider employees, agents, subcontractors, and their employees, witnesses, and clients without the Provider's representative or Provider's legal counsel present. Provider's employees, agents, subcontractors and their employees, witnesses, and clients must not be coerced by Provider or Provider's representative to accept representation from or by the Provider, and Provider agrees that no retaliation will occur to a person who denies the Provider's offer of representation. Nothing in this Agreement limits a person's right to counsel of his or her choice. Requests for interviews are to be complied with in the form and the manner requested. Provider will ensure by contract or other means that its agents, employees and subcontractors cooperate fully in any investigation conducted by the Texas Attorney General's Medicaid Fraud Control Unit or the Texas Health and Human Services Commission's Office of Inspector General or its designee. Subcontractors include those persons and entities that provide medical or dental goods or services for which the Provider bills the Medicaid program, and those who provide billing, administrative, or management services in connection with Medicaid-covered services.

1.2.5  Nondiscrimination. Provider must not exclude or deny aid, care, service, or other benefits available under Medicaid or in any other way discriminate against a person because of that person's race, color, national origin, gender, age, disability, political or religious affiliation or belief. Provider must provide services to Medicaid clients in the same manner, by the same methods, and at the same level and quality as provided to the general public. Provider agrees to grant Medicaid recipients all discounts and promotional offers provided to the general public. Provider agrees and understands that free services to the general public must not be billed to the Medicaid program for Medicaid recipients and discounted services to the general public must not be billed to Medicaid for a Medicaid recipient as a full price, but rather the Provider agrees to bill only the discounted amount that would be billed to the general public.

1.2.6  AIDS and HIV. Provider must comply with the provisions of Texas Health and Safety Code Chapter 85, and HHSC's rules relating to workplace and confidentiality guidelines regarding HIV and AIDS.

1.2.7  Child Support. (1) The Texas Family Code §231.006 requires HHSC to withhold contract payments from any entity or individual who is at least 30 days delinquent in court-ordered child support obligations. It is the Provider's responsibility to determine and verify that no owner, partner, or shareholder who has at least 25 percent ownership interest is delinquent in any child support obligation. (2) Under Section 231.006 of the Family Code, the vendor or applicant certifies that the individual or business entity named in the applicable contract, bid, or application is not ineligible to receive the specified grant, loan, or payment and acknowledges that this Agreement may be terminated and payment may be withheld if this certification is inaccurate. A child support obligor who is more than 30 days delinquent in paying child support or a business entity in which the obligor is a sole proprietor, partner, shareholder, or owner with an ownership interest of at least 25 percent is not eligible to receive the specified grant, loan, or payment. (3) If HHSC is informed and verifies that a child support obligor who is more than 30 days delinquent is a partner, shareholder, or owner with at least a 25 percent ownership interest, it will withhold any payments due under this Agreement until it has received satisfactory evidence that the obligation has been satisfied.

1.2.8  Cost Report, Audit and Inspection. Provider agrees to comply with all state and federal laws relating to the preparation and filing of cost reports, audit requirements, and inspection and monitoring of facilities, quality, utilization, and records.

**1.3  Claims and encounter data.**

1.3.1  Provider agrees to submit claims for payment in accordance with billing guidelines and procedures promulgated by HHSC, or other appropriate payer, including electronic claims. Provider certifies that information submitted regarding claims or encounter data will be true, accurate, and complete, and that the Provider's records and documents are both accessible and validate the services and the need for services billed and represented as provided. Further, Provider understands that any falsification or concealment of a material fact may be prosecuted under state and federal laws.

1.3.2  Provider must submit encounter data required by HHSC or any managed care organization to document services provided, even if the Provider is paid under a capitated fee arrangement by a Health Maintenance Organization or Insurance Payment Assistance.

1.3.3  All claims or encounters submitted by Provider must be for services actually rendered by Provider. Physician providers must submit claims for services rendered by another in accordance with HHSC rules regarding providers practicing under physician supervision. Claims must be submitted in the manner and in the form set forth in the Provider Manual, and within the time limits established by HHSC for submission of claims. Claims for payment or encounter data submitted by the provider to an HMO or IPA are governed by the Provider's contract with the HMO or IPA. Provider understands and agrees that HHSC is not liable or responsible for payment for any Medicaid-covered services provided under the HMO or IPA Provider contract, or any agreement other than this Medicaid Provider Agreement.

1.3.4  Federal and state law prohibits Provider from charging a client or any financially responsible relative or representative of the client for Medicaid-covered services, except where a co-payment is authorized under the Medicaid State Plan (42 CFR §447.20).

1.3.5    As a condition of eligibility for Medicaid benefits, a client assigns to HHSC all rights to recover from any third party or any other source of payment (42 CFR §433.145 and Human Resources Code §32.033). Except as provided by HHSC's third-party recovery rules (*Texas Administrative Code* Title 1 Part 15 Chapter 354 Subchapter J), Provider agrees to accept the amounts paid under Medicaid as payment in full for all covered services (42 CFR §447.215).

1.3.6    Provider has an affirmative duty to verify that claims and encounters submitted for payment are true and correct and are received by HHSC or its agent, and to implement an effective method to track submitted claims against payments made by HHSC or its agents.

1.3.7    Provider has an affirmative duty to verify that payments received are for actual services rendered and medically necessary. Provider must refund any overpayments, duplicate payments and erroneous payments that are paid to Provider by Medicaid or a third party as soon as any such payment is discovered or reasonably should have been known.

1.3.8    TMHP EDI and Electronic Claims Submission. Provider may subscribe to the TMHP Electronic Data Interchange (EDI) system, which allows the Provider the ability to electronically submit claims and claims appeals, verify client eligibility, and receive electronic claim status inquiries, remittance and status (R&S) reports, and transfer of funds into a provider account. Provider understands and acknowledges that independent registration is required to receive the electronic funds or electronic R&S report. Provider agrees to comply with the provisions of the Provider Manual and the TMHP EDI licensing agreement regarding the transmission and receipt of electronic claims and eligibility verification data. Provider must verify that all claims submitted to HHSC or its agent are received and accepted. Provider is responsible for tracking claims transmissions against claims payments and detecting and correcting all claims errors. If Provider contracts with third parties to provide claims and/or eligibility verification data from HHSC, the Provider remains responsible for verifying and validating all transactions and claims, and ensuring that the third party adheres to all client data confidentiality requirements.

1.3.9    Reporting Waste, Abuse and Fraud. Provider agrees to inform and train all of Provider's employees, agents, and independent contractors regarding their obligation to report waste, abuse, and fraud. Individuals with knowledge about suspected waste, abuse, or fraud in any State of Texas health and human services program must report the information to the Texas Health and Human Services Commission's Office of Inspector General. To report waste, abuse or fraud, go to **www.hhs.state.tx.us** and select "Reporting Waste, Abuse, or Fraud".  Individuals may also call the Office of Inspector General hotline (1-800-436-6184) to report waste, abuse or fraud if they do not have access to the Internet.

## II.    ADVANCE DIRECTIVES – HOSPITAL AND HOME HEALTH PROVIDERS

2.1    The client must be informed of their right to refuse, withhold, or have medical treatment withdrawn under the following state and federal laws:

(a)    The individual's right to self-determination in making health-care decisions;

(b)    The individual's rights under the Natural Death Act (Health and Safety Code, Chapter 166) to execute an advance written Directive to Physicians, or to make a non-written directive regarding their right to withhold or withdraw life-sustaining procedures in the event of a terminal condition;

(c)    The individual's rights under Health and Safety Code, Chapter 166, relating to written Out-of-Hospital Do-Not-Resuscitate Orders; and,

(d)    The individual's rights to execute a Durable Power of Attorney for Health Care under the Probation Code, Chapter XII, regarding their right to appoint an agent to make medical treatment decisions on their behalf in the event of incapacity.

2.2    The Provider must have a policy regarding the implementation of the individual's rights and compliance with state and federal laws.

2.3    The Provider must document whether or not the individual has executed an advance directive and ensure that the document is in the individual's medical record.

2.4    The Provider cannot condition giving services or otherwise discriminate against an individual based on whether or not the client has or has not executed an advance directive.

2.5    The Provider must provide written information to all adult clients on the provider's policies concerning the client's rights.

2.6    The Provider must provide education for staff and the community regarding advance directives.

## III.    STATE FUND CERTIFICATION REQUIREMENT FOR PUBLIC ENTITY PROVIDERS

3.1    Public providers are those that are owned or operated by a state, county, city, or other local government agency or instrumentality. Public entity providers of the following services are required to certify to HHSC the amount of state matching funds expended for eligible services according to established HHSC procedures:

(a)    School health and related services (SHARS)

(b)    Case management for blind and visually impaired children (BVIC)

(c)    Case management for early childhood intervention (ECI)

(d)    Service coordination for intellectual and developmental disabilities (IDD)

(e)    Service coordination for mental health (MH)

(f)    Mental health rehabilitation (MHR)

(g)    Tuberculosis clinics

(h)    State hospitals

## IV.    CLIENT RIGHTS

4.1    Provider must maintain the client's state and federal right of privacy and confidentiality to the medical and personal information contained in Provider's records.

4.2    The client must have the right to choose providers unless that right has been restricted by HHSC or by waiver of this requirement from the Centers for Medicare and Medicaid Services (CMS). The client's acceptance of any service must be voluntary.

4.3    The client must have the right to choose any qualified provider of family planning services.

**V.    THIRD PARTY BILLING VENDOR PROVISIONS**

5.1    Provider agrees to submit notice of the initiation and termination of a contract with any person or entity for the purpose of billing Provider's claims, unless the person is submitting claims as an employee of the Provider and the Provider is completing an IRS Form W-2 on that person. This notice must be submitted within five working days of the initiation and termination of the contract and submitted in accordance with Medicaid requirements pertaining to Third Party Billing Vendors. Provider understands that any delay in the required submittal time or failure to submit may result in delayed payments to the Provider and recoupment from the Provider for any overpayments resulting from the Providers failure to provide timely notice.

5.2    Provider must have a written contract with any person or entity for the purpose of billing provider's claims, unless the person is submitting claims as an employee of the Provider and the Provider is completing an IRS Form W-2 on that person. The contract must be signed and dated by a Principal of the Provider and the Biller. It must also be retained in the Provider's and Biller's files according with the Medicaid records retention policy. The contract between the Provider and Biller may contain any provisions they deem necessary but, at a minimum, must contain the following provisions:

(a)    Biller agrees they will not alter or add procedures, services, codes, or diagnoses to the billing information received from the Provider, when billing the Medicaid program.

(b)    Biller understands that they may be criminally convicted and subject to recoupment of overpayments and imposed penalties for submittal of false, fraudulent, or abusive billings.

(c)    Provider agrees to submit to Biller true and correct claim information that contains only those services, supplies, or equipment Provider has actually provided to recipients.

(d)    Provider understands that they may be criminally convicted and subject to recoupment of overpayments and imposed penalties for submittal of false, fraudulent, or abusive billings, directly or indirectly, to the Biller or to Medicaid or its contractor.

(e)    Provider and Biller agree to establish a reimbursement methodology to Biller that does not contain any type of incentive, directly or indirectly, for inappropriately inflating, in any way, claims billed to the Medicaid program.

(f)    Biller agrees to enroll and be approved by the Medicaid program as a Third Party Billing Vendor prior to submitting claims to the Medicaid program on behalf of the Provider.

(g)    Biller and Provider agree to notify the Medicaid program within five business days of the initiation and termination, by either party, of the contract between the Biller and the Provider.

**VI.    TERM AND TERMINATION**

6.1    If the correspondence/notice of enrollment from HHSC or its agent states a termination date, this Agreement terminates on that date with or without other advance notice of the termination date.

6.2    Provider may terminate this Agreement by providing at least 30 days written notice of intent to terminate.

6.3    HHSC has grounds for terminating this Agreement, including but not limited to, the circumstances listed below, and which may include the actions or circumstances involving the Provider or any person or entity with an affiliate relationship to the Provider:

(a)    the exclusion from participation in Medicare, Medicaid, or any other publically funded health-care program;

(b)    the loss or suspension of professional license or certification;

(c)    any failure to comply with the provisions of this Agreement or any applicable law, rule or policy of the Medicaid program;

(d)    any circumstances indicating that the health or safety of clients is or may be at risk;

(e)    the circumstances for termination listed in 42 C.F.R. § 455.416, as amended; and

(f)    the circumstances for termination listed in 1 T.A.C. §371.1703, as amended.

The Provider will receive written notice of termination, which will include the detailed reasons for the termination. The written notice of termination will also inform the Provider its due process rights.

6.4    HHSC may also cancel this Agreement for reasons, including but not limited to, the following:

(a)    upon further review of the Provider's application,  at any time during the term of this Agreement, HHSC or its agent, determines Provider is ineligible to participate in the Medicaid program; and the errors or omission cannot be corrected;

(b)    if the Provider has not submitted a claim to the Medicaid program for at least 24 months; and

(c)    any other circumstances resulting in Provider's ineligibility to participate in the Medicaid program.

The Provider will receive written notification of the cancellation of the Agreement and any rights to appeal HHSC's determination will be included.

**VII.    ELECTRONIC SIGNATURES**

7.1    Provider understands and agrees that any signature on a submitted document certifies, to the best of the provider's knowledge, the information in the document is true, accurate, and complete. Submitted documents with electronic signatures may be accepted by mail or fax when the sender has met the national and state standards for electronic signatures set by the Health and Human Services and the Texas Uniform Electronic Transactions Act (UETA).

7.2    Provider understands and agrees that both the provider and the provider's representative whose signature is on an electronic signature method bear the responsibility for the authenticity of the information being certified to.

**VIII.   COMPLIANCE PROGRAM REQUIREMENT**

8.1     By signing section VIII, Provider certifies that in accordance with requirement TAC 352.5(b)(11), Provider has a compliance program containing the core elements as established by the Secretary of Health and Human Services referenced in §1866(j)(9) of the Social Security Act (42 U.S.C. §1395cc(j)(9)), as applicable.

I attest that I have a compliance plan.   ☐ Yes   ☐ No

**IX.   INTERNAL REVIEW REQUIREMENT**

9.1     Provider, in accordance with TAC 352.5 (b)(1), has conducted an internal review to confirm that neither the applicant or the re-enrolling provider, nor any of its employees, owners, managing partners, or contractors (as applicable), have been excluded from participation in a program under Title XVIII, XIX, or XXI of the Social Security Act.

I attest that an internal review was conducted to confirm that neither the applicant or the re-enrolling provider nor any of its employees, owners, managing partners, or contractors have been excluded from participation in a program under the Title XVIII, XIX, or XXI of the Social Security Act.   ☐ Yes   ☐ No

**X.   PRIVACY, SECURITY, AND BREACH NOTIFICATION**

10.1    "Confidential Information" means any communication or record (whether oral, written, electronically stored or transmitted, or in any other form) provided to or made available to the Provider electronically or through any other means that consists of or includes any or all of the following:

(a)   Protected Health Information in any form including without limitation, Electronic Protected Health Information or Unsecured Protected Health Information (as defined in 45 CFR 160.103 and 45 CFR 164.402);

(b)   Sensitive Personal Information (as defined in Texas Business and Commerce Code section 521.002);

(c)   Federal Tax Information (as defined in IRS Publication 1075);

(d)   Personally Identifiable Information (as defined in OMB Memorandum M-07-16);

(e)   Social Security Administration data;

(f)   All information designated as confidential under the constitution and laws of the State of Texas and of the United States, including the Texas Health & Safety Code and the Texas Public Information Act, Texas Government Code, Chapter 552.

10.2    Any Confidential Information received by the Provider under this Agreement may be disclosed only in accordance with applicable law. By signing this agreement, the Provider certifies that the Provider is, and intends to remain for the term of this agreement, in compliance with all applicable state and federal laws and regulations with respect to privacy, security, and breach notification, including without limitation the following:

(a)   The relevant portions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. Chapter 7, Subchapter XI, Part C;

(b)   42 CFR Part 2 and 45 CFR Parts 160 and 164;

(c)   The relevant portions of The Social Security Act, 42 U.S.C. Chapter 7;

(d)   The Privacy Act of 1974, as amended by the Computer Matching and Privacy Protection Act of 1988, 5 U.S.C. § 552a;

(e)   Internal Revenue Code, Title 26 of the United States Code, including IRS Publication 1075;

(f)   OMB Memorandum M-07-16;

(g)   Texas Business and Commerce Code Chapter 521;

(h)   Texas Health and Safety Code, Chapters 181 and 611;

(i)   Texas Government Code, Chapter 552, as applicable; and

(j)   Any other applicable law controlling the release of information created or obtained in the course of providing the services described in this Agreement.

10.3    The Provider further certifies that the Provider will comply with all amendments, regulations, and guidance relating to those laws, to the extent applicable.

10.4    Provider will ensure that any subcontractor of Provider who has access to HHSC Confidential Information will sign a HIPAA-compliant Business Associate Agreement with Provider and Provider will submit a copy of that Business Associate Agreement to HHSC upon request.

**XI   PROVIDER'S BREACH NOTICE, REPORTING AND CORRECTION REQUIREMENTS**

11.1    For purposes of this section:

Breach has the meaning of the term as defined in 45 C.F.R. §164.402, and as amended.

Discovery/Discovered has the meaning of the terms as defined in 45 C.F.R. §164.410, and as amended.

11.2    Notification to HHSC

(a)   Provider will cooperate fully with HHSC in investigating, mitigating to the extent practicable and issuing notifications directed by HHSC, for any unauthorized disclosure or suspected disclosure of HHSC Confidential Information to the extent and in the manner determined by HHSC.

(b)   Provider's obligation begins at discovery of unauthorized disclosure or suspected disclosure and continues as long as related activity continues, until all effects of the incident are mitigated to HHSC's satisfaction (the "incident response period").

(c)   Provider will require that its employees, owners, managing partners, or contractors or subcontractors (as applicable), comply with all of the following breach notice requirements.

11.3   <u>Breach Notice</u>:

1.   Initial Notice.

(a)   For federal information, including without limitation, Federal Tax Information, Social Security Administration Data, and Medicaid Member Information, within the first, consecutive clock hour of discovery, and for all other types of Confidential Information not more than 24 hours after discovery, *or in a timeframe otherwise approved by HHSC in writing*, initially report to HHSC's Privacy and Security Officers via email at: privacy@HHSCC.state.tx.us and to the HHSC division responsible for this UMCC;

(b)   Report all information reasonably available to Provider about the privacy or security incident; and

(c)   Name, and provide contact information to HHSC for, Provider's single point of contact who will communicate with HHSC both on and off business hours during the incident response period.

11.4   <u>48-Hour Formal Notice</u>.

No later than 48 consecutive clock hours after discovery, or a time within which discovery reasonably should have been made by Provider, provide formal notification to HHSC, including all reasonably available information about the incident or breach, and Provider's investigation, including without limitation and to the extent available:

(a)   The date the incident or breach occurred;

(b)   The date of Provider's and, if applicable, its employees, owners, managing partners, or contractors or subcontractors discovery;

(c)   A brief description of the incident or breach; including how it occurred and who is responsible (or hypotheses, if not yet determined);

(d)   A brief description of Provider's investigation and the status of the investigation.

(e)   A description of the types and amount of Confidential Information involved;

(f)   Identification of and number of all individuals reasonably believed to be affected, including first and last name of the individual and if applicable the, legally authorized representative, last known address, age, telephone number, and email address if it is a preferred contact method, to the extent known or can be reasonably determined by Provider at that time;

(g)   Provider's initial risk assessment of the incident or breach demonstrating whether individual or other notices are required by applicable law or this DUA for HHSC approval, including an analysis of whether there is a low probability of compromise of the Confidential Information or whether any legal exceptions to notification apply;

(h)   Provider's recommendation for HHSC's approval as to the steps individuals and/or Provider on behalf of Individuals, should take to protect the Individuals from potential harm, including without limitation Provider's provision of notifications, credit protection, claims monitoring, and any specific protections for a legally authorized representative to take on behalf of an Individual with special capacity or circumstances;

(i)   The steps Provider has taken to mitigate the harm or potential harm caused (including without limitation the provision of sufficient resources to mitigate);

(j)   The steps Provider has taken, or will take, to prevent or reduce the likelihood of recurrence;

(k)   Identify, describe or estimate of the persons, workforce, subcontractor, or individuals  and any law enforcement that may be involved in the incident or breach;

(l)   A reasonable schedule for Provider to provide regular updates to the foregoing in the future for response to the incident or breach, but no less than every three (3) business days or as otherwise directed by HHSC, including information about risk estimations, reporting, notification, if any, mitigation, corrective action, root cause analysis and when such activities are expected to be completed; and

(m)   Any reasonably available, pertinent information, documents or reports related to an incident or breach that HHSC requests following discovery.

11.5   <u>Investigation, Response and Mitigation</u>.

(a)   Provider will immediately conduct a full and complete investigation, respond to the incident or breach, commit necessary and appropriate staff and resources to expeditiously respond, and report as required to and by HHSC for incident response purposes and for purposes of HHSC's compliance with report and notification requirements, to the satisfaction of HHSC.

(b)   Provider will complete or participate in a risk assessment as directed by HHSC following an incident or breach, and provide the final assessment, corrective actions and mitigations to HHSC for review and approval.

(c)   Provider will fully cooperate with HHSC to respond to inquiries and/or proceedings by state and federal authorities, persons and/or incident about the incident or breach.

(d)   Provider will fully cooperate with HHSC's efforts to seek appropriate injunctive relief or otherwise prevent or curtail such incident or breach, or to recover or protect any HHSC Confidential including complying with reasonable corrective action  or measures, as specified by HHSC in a Corrective Action Plan if directed by HHSC under the UCCM.

11.6.   <u>Breach Notification to Individuals and Reporting to Authorities</u>.

(a)   HHSC may direct Provider to provide breach notification to individuals, regulators or third-parties, as specified by HHSC following a breach.

(b)   Provider must obtain HHSC's prior written approval of the time, manner and content of any notification to individuals, regulators or third-parties, or any notice required by other state or federal authorities.  Notice letters will be in Provider's name and on Provider's letterhead, unless otherwise directed by HHSC, and will contain contact information, including the name and title of Provider's representative, an email address and a toll-free telephone number, for the Individual to obtain additional information.

(c)   Provider will provide HHSC with copies of distributed and approved communications.

(d)   Provider will have the burden of demonstrating to the satisfaction of HHSC that any notification required by HHSC was timely made.   If there are delays outside of Provider's control, Provider will provide written documentation of the reasons for the delay.

(e)   If HHSC delegates notice requirements to Provider, HHSC shall, in the time and manner reasonably requested by Provider, cooperate and assist with Provider's information requests in order to make such notifications and reports.

**XII    ACKNOWLEDGEMENTS AND CERTIFICATIONS**

12.1    By signing below, Provider acknowledges and certifies to all of the following:

(a)    Provider agrees to notify TMHP if the Provider files or is the subject of a bankruptcy petition. The Provider must provide TMHP and HHSC with notice of the bankruptcy no later than ten days after the case is filed. TMHP and HHSC also request notice of pleadings in the case.

(b)    Provider has carefully read and understands the requirements of this Agreement, and will comply.

(c)    Provider has carefully reviewed all of the information submitted in connection with its application to participate in the Medicaid program, including the provider information forms (PIF-1) and principal information form (PIF-2), and provider certifies that this information is current, complete, and correct.

(d)    Provider agrees to review and update any information in the application to maintain compliance with and eligibility in the Medicaid program and continued participation therein.

(e)    Provider agrees to inform HHSC or its designee in writing of any changes to the information contained in the application, whether such changes occur before or after enrollment. The written notification must be within 30 calendar days of any changes in the information due to a change in ownership or control interests, and within 90 days of all other changes to the information previously submitted.

(f)    Provider agrees and understands that HHSC or its agent may review Provider's application any time after the application has been accepted and for the term of this Agreement. Provider agrees and understands that upon review, HHSC or its designee may determine that the information contained therein does not meet the Medicaid program enrollment requirements and Provider may no longer be eligible to participate in the Program. Provider will have the opportunity to correct any errors or omissions as determined by HHSC or its agent. Provider agrees and understands that any errors or omissions that are not corrected or cannot be corrected will result in termination of this Agreement.

(g)    Provider understands that falsifying entries, concealment of a material fact, or pertinent omissions may constitute fraud and may be prosecuted under applicable federal and state law. Fraud is a felony, which can result in fines or imprisonment.

(h)    Provider understands and agrees that any falsification, omission, or misrepresentation in connection with the application for enrollment or with claims filed may result in all paid services declared as an overpayment and subject to recoupment, and may also result in other administrative sanctions that include payment hold, exclusion, debarment, termination of this Agreement, and monetary penalties.

(i)    Provider agrees to abide by all Medicaid regulations, program instructions, and Title XIX of the Social Security Act. The Medicaid laws, regulations, and program instructions are available through the Medicaid contractor. Provider understands that payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicaid.


Name of Applicant: _____

Applicant's Signature: _____    Date: _____

For applicants that are entities, facilities, groups, or organizations, and an authorized representative is completing this application with authority to sign on the applicant's behalf, the authorized representative must sign above and print their name and title where indicated below.

Representative's Name: _____

Representative's Position/Title: _____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX DOE, Relator, | § § § § | |
| THE STATES OF TEXAS, *ex rel.* ALEX DOE, Relator, | § § § | |
| THE STATE OF LOUISIANA, *ex rel.* ALEX DOE, Relator, | § § § | Civil Action No. 2-21-CV-022-Z |
| Plaintiffs, | § § § | |
| v. | § § | |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD GULF COAST, INC., PLANNED PARENTHOOD OF GREATER TEXAS, INC., PLANNED PARENTHOOD SOUTH TEXAS, INC., PLANNED PARENTHOOD CAMERON COUNTY, INC., PLANNED PARENTHOOD SAN ANTONIO, INC., | § § § § § § § § § § § | |
| Defendants. | § § | |

## STATE OF TEXAS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# EXHIBIT F



# Texas Medicaid
## Provider Procedures Manual

### March 2022

## Volumes 1 & 2



TEXAS
**Health and Human Services**

The Texas Medicaid & Healthcare Partnership (TMHP) is the claims administrator for Texas Medicaid
under contract with the Texas Health and Human Services Commission.

Section 7: Appeals

Appendix A: State, Federal, and TMHP Contact Information

Appendix B: HIV/AIDS

Appendix C: Acronym Dictionary

## Volume 2 - Provider Handbooks

*Ambulance Services Handbook*

*Behavioral Health and Case Management Services Handbook*

*Certified Respiratory Care Practitioner (CRCP) Services Handbook*

*Children's Services Handbook*

*Clinics and Other Outpatient Facility Services Handbook*

*Durable Medical Equipment, Medical Supplies, and Nutritional Products Handbook*

*Gynecological, Obstetrics, and Family Planning Title XIX Services Handbook*

*Health and Human Services Commission Family Planning Program Services Handbook*

*Healthy Texas Women Program Handbook*

*Home Health Nursing and Private Duty Nursing Services Handbook*

*Inpatient and Outpatient Hospital Services Handbook*

*Medicaid Managed Care Handbook*

*Medical and Nursing Specialists, Physicians, and Physician Assistants Handbook*

*Medical Transportation Program Handbook*

*Outpatient Drug Services Handbook*

*Physical Therapy, Occupational Therapy, and Speech Therapy Services Handbook*

*Radiology and Laboratory Services Handbook*

*School Health and Related Services (SHARS) Handbook*

*Telecommunication Services Handbook*

*Vision and Hearing Services Handbook*

## Introduction

## Texas Medicaid Administration

The Texas Medical Assistance (Medicaid) Program was implemented on September 1, 1967, under the provisions of Title XIX of the federal *Social Security Act* and Chapter 32 of the *Texas Human Resources Code*.

The state of Texas and the federal government share the cost of funding Texas Medicaid. The Health and Human Services Commission (HHSC), the single state Medicaid agency, is responsible for the Title XIX Program. The administration of the program is accomplished through contracts and agreements with the following:

- Medical providers

- Texas Medicaid & Healthcare Partnership (TMHP), the fee-for-service claims administrator

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- MAXIMUS, the enrollment broker

- Various managed care organizations (MCOs) and dental managed care organization (dental plans), that administer Medicaid Managed Care benefits.

- The Institute for Child Health Policy (ICHP), the quality monitor

- State agencies

Texas Medicaid providers are reimbursed for services through contracts with health-insuring contractors, fiscal agents, or direct vendor payments.

By signing an HHSC Medicaid Provider Agreement (through the enrollment process) and submitting Medicaid claims, each enrolled provider agrees to abide by the policies and procedures of Medicaid, published regulations, and the information and instructions in manuals, bulletins, and other instructional material furnished to the provider.

*Refer to:* "Appendix A: State, Federal, and TMHP Contact Information" (*Vol. 1, General Information*) for addresses and telephone numbers of HHSC and Department of State Health Services (DSHS) regional offices.

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

# SECTION 1: PROVIDER ENROLLMENT AND RESPONSIBILITIES

## TEXAS MEDICAID PROVIDER PROCEDURES MANUAL: VOL. 1

### MARCH 2022



TEXAS
Health and Human
Services

# SECTION 1: PROVIDER ENROLLMENT AND RESPONSIBILITIES

## Table of Contents

1.1     * Provider Enrollment .................................................. 5
    1.1.1    * Provider Enrollment Revalidation Requirements ................................. 5
    1.1.2    * NPI and Taxonomy Codes ................................................. 6
    1.1.3    * Online Enrollment ...................................................... 6
    1.1.4    * Provider Enrollment Identification .......................................... 7
       1.1.4.1    *Ordering- or Referring-Only Providers ................................... 9
       1.1.4.2    Ordering or Referring-Only Providers Participating in Other State Health-Care Programs ................................................ 10
       1.1.4.3    Interns and Medical Residents Who Order, Prescribe, or Refer .............. 10
    1.1.5    * Affordable Care Act of 2010 (ACA) Enrollment Requirements ................... 10
       1.1.5.1    *Provider Screening Requirement ....................................... 11
       1.1.5.2    *Provider Revalidation ................................................ 11
       1.1.5.3    *Application Fee ..................................................... 11
       1.1.5.4    Ordering- or Referring-Only Providers Search on the Online Provider Lookup (OPL) ....................................................... 11
    1.1.6    * Surety Bond Enrollment Requirement ...................................... 11
       1.1.6.1    Ambulance Providers ................................................. 12
    1.1.7    * Provider Enrollment Application Determinations.............................. 12
    1.1.8    Enrollment in Medicaid Managed Care Programs ............................... 13
    1.1.9    * Required Enrollment Forms ............................................... 13
       1.1.9.1    *Application Payment Form............................................ 14
       1.1.9.2    *HHSC Medicaid Provider Agreement .................................... 14
       1.1.9.3    *Owner/Creditor/Principal Entry ....................................... 14
       1.1.9.4    *Disclosure of Ownership and Control Interest Statement.................. 15
       1.1.9.5    Franchise Tax Account Status Page..................................... 15
       1.1.9.6    Certificate of Formation or Certificate of Filing/Articles or Certificate of Incorporation/Certificate of Fact ...................................... 15
       1.1.9.7    *Copy of License, Temporary License, or Certification ..................... 16
       1.1.9.8    Licensure Renewal ................................................... 17
       1.1.9.9    Medicare Participation ................................................ 17
       1.1.9.10    Group Information Changes ............................................ 18
1.2     Payment Information ...................................................... 18
    1.2.1    Using EFT ............................................................. 18
    1.2.2    Advantages of EFT....................................................... 18
    1.2.3    * EFT Enrollment Procedures............................................... 18
    1.2.4    * Receiving Paper Checks ................................................. 19
    1.2.5    Stale-Dated Checks ...................................................... 19
1.3     * Provider Deactivation/Disenrollment ...................................... 19
    1.3.1    Excluded Entities and Providers ........................................... 19
1.4     * Provider Reenrollment.................................................... 20
    1.4.1    * Medicare Number...................................................... 20
    1.4.2    * Provider Status (Individual, Group, Performing Provider, or Facility).............. 20

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

1.4.3    * Physical Address . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
1.4.4    * Change in Principal Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
1.5      * Change of Ownership Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
1.6      * Claims Filing During Enrollment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
1.7      Provider Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
     1.7.1    Compliance with Texas Family Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
         1.7.1.1    *Child Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
         1.7.1.2    Reporting Child Abuse or Neglect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
         1.7.1.3    Procedures for Reporting Abuse or Neglect . . . . . . . . . . . . . . . . . . . . . . . 22
         1.7.1.4    Procedures for Reporting Suspected Sexual Abuse . . . . . . . . . . . . . . . . . . 23
         1.7.1.5    Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
         1.7.1.6    Reporting Abuse and Neglect of the Elderly or Disabled . . . . . . . . . . . . . 24
         1.7.1.7    Procedures for Reporting Abuse or Neglect of the Elderly or Disabled . . . . . . 24
     1.7.2    * Maintenance of Provider Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
         1.7.2.1    *Contracted Provider Groups . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
         1.7.2.2    *NPI Verification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
         1.7.2.3    *Online Provider Lookup (OPL) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
         1.7.2.4    *Updating NPI and Taxonomy Codes . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
         1.7.2.5    *Updating Provider Specialty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     1.7.3    Retention of Records and Access to Records and Premises . . . . . . . . . . . . . . . . . . 28
         1.7.3.1    Payment Error Rate Measurement (PERM) Process . . . . . . . . . . . . . . . . . . 29
     1.7.4    Medicare Overpayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
     1.7.5    Credit Balance and Recovery Vendor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
     1.7.6    Release of Confidential Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
     1.7.7    Compliance with Federal Legislation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
     1.7.8    Tamper-Resistant Prescription Pads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
     1.7.9    Utilization Control — General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
     1.7.10    Provider Certification/Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
         1.7.10.1    Delegation of Signature Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
     1.7.11    Billing Clients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
         1.7.11.1    Client Acknowledgment Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
     1.7.12    * General Medical Record Documentation Requirements . . . . . . . . . . . . . . . . . . 36
     1.7.13    Informing Pregnant Clients About CHIP Benefits . . . . . . . . . . . . . . . . . . . . . . . . . 37
     1.7.14    Home Health Providers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
         1.7.14.1    Home Health Skilled Nursing and Home Health Aide (HHA) Services
                 Provider Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
     1.7.15    Private Duty Nursing (PDN) Providers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
     1.7.16    Certified Respiratory Care Practitioner (CRCP) Services . . . . . . . . . . . . . . . . . . . . . 40
     1.7.17    Physical, Occupational, and Speech Therapy Providers . . . . . . . . . . . . . . . . . . . . 40
         1.7.17.1    CCP Enrollment for Children's Services—20 Years of Age and Younger . . . . . 40
     1.7.18    * Children's Services Comprehensive Care Program (CCP) . . . . . . . . . . . . . . . . . . 41
     1.7.19    Attesting to Meaningful Use-Required Documentation for Texas Medicaid
         Electronic Health Record Incentive/Promoting Interoperability Program . . . . . . . . . 41
1.8      Computer-Based Training Courses for Providers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
1.9      Enrollment Criteria for Out-of-State Providers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
1.10     Medicaid Fraud, Waste, and Abuse Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
     1.10.1    Reporting Fraud, Waste, and Abuse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
     1.10.2    Suspected Cases of Provider Fraud, Waste, and Abuse . . . . . . . . . . . . . . . . . . . . 54
     1.10.3    Employee Education on False Claims Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . 54
     1.10.4    Managed Care Organization (MCO) Special Investigative Unit (SIU) . . . . . . . . . . . . . 54

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

Case 2:21-cv-00022-Z Document 162   Filed 03/11/22   Page 234 of 290   PageID 1010

**1.11**    **Texas Medicaid Limitations and Exclusions** ....................................... **55**

**1.12**    **\* Forms**........................................................................ **58**

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

TMHP must receive claims from out-of-state providers within 365 days from the date of service.

*Refer to:*   Subsection 10.2.1, "Prior Authorization" in the *Medical and Nursing Specialists, Physicians, and Physician Assistants Handbook* (*Vol. 2, Provider Handbooks*).

# 1.10   Medicaid Fraud, Waste, and Abuse Policy

The OIG has the responsibility to identify and investigate cases of suspected fraud, waste, and abuse in Medicaid and other health and human services programs. This responsibility, granted through state and federal law, gives the OIG the authority to pursue administrative sanctions and to refer cases to prosecutors, licensure and certification boards, and other agencies. Additionally, Texas Medicaid is required to disenroll or exclude any provider who has been disenrolled or excluded from Medicare or any other state health-care program.

Anyone participating in Texas Medicaid must understand the requirements for participation. Available methods both to learn and stay up to date on program requirements include the following:

- *Provider education.* Attendance at educational workshops and training sessions. Regular training opportunities are offered by TMHP.

- *Texas Medicaid publications.* These include the *Texas Medicaid Provider Procedures Manual* and banner messages, which are included in R&S Reports.

- *All adopted agency rules.* These include those related to fraud, waste, and abuse contained in 1 TAC Chapter 371.

- *State and federal law.* Statutes and other law pertinent to Texas Medicaid and fraud, waste, and abuse within Texas Medicaid.

In addition, providers are responsible for the delivery of health-care items and services to Medicaid clients in accordance with all applicable licensure and certification requirements and accepted health care professionals' community standards. Such standards include those related to medical record and claims filing practices, documentation requirements, and records maintenance. The TAC requires providers to follow these standards. For more information, consult 1 TAC §371.1659.

Texas Medicaid providers must follow the coding and billing requirements of the *Texas Medicaid Provider Procedures Manual* (TMPPM). However, if coding and billing requirements for a particular service are not addressed in the TMPPM, and if coding and billing requirements are not otherwise specified in program policy (such as in provider bulletins or banners), then providers must follow the most current coding guidelines. These include:

- CPT as set forth in the American Medical Association's most recently published "CPT books", "CPT Assistant" monthly newsletters, and other publications resulting from the collaborative efforts of American Medical Association with the medical societies.

- Healthcare Common Procedure Coding System (HCPCS) as developed and maintained by the federal government.

- National Correct Coding Initiative (NCCI), as set forth by the CMS and as explained in the NCCI Policy and Medicare Claims Processing Manuals. NCCI consists of procedure code combinations that a provider must not bill together. One of the codes in the pair is considered a part of the primary procedure and not reimbursable to the same provider on the same date of service.

*Exception:*   *NCCI outlines use of modifiers some of which are not currently recognized by Texas Medicaid. See the list of modifiers utilized by Texas Medicaid in subsection 6.3.5, "Modifiers" in "Section 6: Claims Filing" (Vol. 1, General Information).*

- *Current Dental Terminology* (CDT) as published by the American Dental Association (ADA).

- Other publications resulting from the collaborative efforts of the ADA with dental societies.

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- *International Classification of Diseases*, 10th Revision, Clinical Modification (ICD-10-CM).

- *Diagnostic and Statistical Manual of Mental Disorders* (DSM).

Failure to comply with the guidelines provided in these publications may result in a provider being found to have engaged in one or more program violations listed in 1 TAC §371.1659.

All providers are held responsible for any claims preparation or other activities that may be performed under the provider's authority. For example, providers are held responsible for any omissions and the accuracy of submitted information, even if those actions are performed by office staff, contractors, or billing services. This, however, does not absolve these other individuals for their participation in any documents provided to the state or designee with false, inaccurate, or misleading information; or pertinent omissions.

HHSC-OIG may impose one or any combination of administrative actions or administrative sanctions on Texas Medicaid providers or other persons when fraud, waste, or abuse is determined. Those who may be sanctioned include:

- Those furnishing services or items directly or indirectly.

- Those billing for services.

- Those violating any of the provisions delineated in this section.

- Affiliates of a provider or person violating any of the provisions delineated in this section.

Administrative sanctions include, without limitation:

- Exclusion from program participation for a specified period of time, permanently, or indefinitely. Anyone excluded from Texas Medicaid is also automatically excluded from all programs under Titles V and XX of the Social Security Act.

- Suspension of Medicaid payments (payment hold) to a provider.

- Recoupment of Medicaid overpayments, including any overpayments determined through statistical sampling and extrapolation.

- Restricted Medicaid reimbursement (specific services will not be reimbursed to an individual provider during the time the provider is on restricted reimbursement; however, reimbursement for other services may continue).

- Cancellation of the Medicaid provider agreement (however, a deactivation in accordance with the agreement itself is not considered a sanction).

- Exclusion or suspension under the authority of the CFR.

Administrative actions include:

- Amending a provider agreement so that it will deactivate on a specific date.

- Granting an agreement or transferring a provider to an agreement with special terms or conditions, including a probationary agreement.

- Required attendance at provider education sessions.

- Prior authorization of selected services.

- Pre-payment review.

- Post-payment review.

- Required attendance at informal or formal provider corrective action meetings.

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

Case 2:21-cv-00022-Z Document 162 Filed 03/11/22 Page 237 of 290 PageID 10118

- Submission of additional documentation or justification that is not normally required to accompany submitted claims. (Failure to submit legible documentation or justification requested will result in denial of the claim.)

- Oral, written, or personal educational contact with the provider.

- Posting of a surety bond or providing a letter of credit.

- Having a subpoena served to compel an appearance for testimony or the production of relevant evidence, as determined by the HHSC-OIG.

Anyone facing an administrative sanction has a right to formal due process. This formal due process may include a hearing before an administrative law judge. Conversely, anyone facing an administrative action is not entitled to formal due process. People who induce, solicit, receive, offer, or pay any remuneration (including, but not limited to, bribes, kickbacks, or rebates) directly or indirectly in relation to referrals, purchases, leases, or arrangements of services covered by Medicare or Texas Medicaid may be in violation of state statutes and guilty of a federal felony offense. State law also allows for the suspension of providers convicted of a criminal offense related to Medicare or Texas Medicaid. The commission of a felony in Medicaid or Medicare programs may include fines or imprisonment ranging from five years to life in prison. Examples of inducements include a service, cash in any amount, entertainment, or any item of value.

As stated in 1 TAC §§371.1651-371.1669, following is a nonexclusive list of grounds or criteria for the Inspector General's administrative enforcement and/or referral for criminal, civil, or licensure or certification investigation and judicial action regarding program violations by any provider or person. Violations result from a provider or person who knew or should have known the following were violations. The headings of each of the following groups are provided solely for organization and convenience and are not elements of any program violation.

1) Claims and Billing.

   a) Submitting or causing to be submitted a false statement or misrepresentation, or omitting pertinent facts when claiming payment under the Texas Medicaid or other HHS program or when supplying information used to determine the right to payment under the Texas Medicaid or other HHS program;

   b) Submitting or causing to be submitted a false statement, information or misrepresentation, or omitting pertinent facts to obtain greater compensation than the provider is legally entitled to;

   c) Submitting or causing to be submitted a false statement, information or misrepresentation, or omitting pertinent facts to meet prior authorization requirements;

   d) Submitting or causing to be submitted under Title XVIII (Medicare) or a state health-care program claims or requests for payment containing unjustified charges or costs for items or services that substantially exceed the person's usual and customary charges or costs for those items or services to the public or the private pay patients unless otherwise authorized by law;

   e) Submitting or causing to be submitted claims with a pattern of inappropriate coding or billing that results in excessive costs to the Texas Medicaid or other HHS program;

   f) Billing or causing claims to be filed for services or merchandise that were not provided to the recipient;

   g) Submitting or causing to be submitted a false statement or misrepresentation that, if used, has the potential of increasing any individual or state provider payment rate or fee;

   h) Submitting or causing to be submitted to the Texas Medicaid or other HHS program a cost report containing costs not associated with Texas Medicaid or other HHS program or not permitted by Texas Medicaid or other HHS program policies;

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

i) Presenting or causing to be presented to an operating agency or its agent a claim that contains a statement or representation that the person knows or should have known to be false;

j) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program for services or items furnished personally by, at the medical direction of, or on the prescription or order of a person who is excluded from Texas Medicaid, other HHS program, or Medicare or has been excluded from and not reinstated within Texas Medicaid, other HHS program, or Medicare;

k) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program for services or items that are not reimbursable by the Texas Medicaid or other HHS program;

l) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program for a service or item which requires a prior order or prescription by a licensed health-care practitioner when such order or prescription has not been obtained;

m) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program for an item or service substituted without authorization for the item or service ordered, prescribed or otherwise designated by the Texas Medicaid or other HHS program;

n) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program by a provider or person who is owned or controlled, directly or indirectly, by an excluded person; *and*

o) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program by a provider or person for charges in which the provider discounted the same services for any other type of patient.

2) Records and Documentation.

a) Failing to maintain for the period of time required by the rules relevant to the provider in question records and other documentation that the provider is required by federal or state law or regulation or by contract to maintain in order to participate in the Texas Medicaid or other HHS program or to provide records or documents upon request for any records or documents determined necessary by the Inspector General to complete their statutory functions related to a fraud and abuse investigation. Such records and documentation include, without limitation, those necessary:

i) To verify specific deliveries, medical necessity, medical appropriateness, and adequate written documentation of items or services furnished under Title XIX or Title XX;

ii) To determine in accordance with established rates appropriate payment for those items or services delivered;

iii) To confirm the eligibility of the provider to participate in the Texas Medicaid or other HHS program; e.g., medical records (including, without limitation, X-rays, laboratory and test results, and other documents related to diagnosis), billing and claims records, cost reports, managed care encounter data, financial data necessary to demonstrate solvency of risk-bearing providers, and documentation (including, without limitation, ownership disclosure statements, articles of incorporation, by-laws, and corporate minutes) necessary to demonstrate ownership of corporate entities; *and*

iv) To verify the purchase and actual cost of products;

b) Failing to disclose fully and accurately or completely information required by the Social Security Act and by 42 CFR Part 455, Subpart B; 42 CFR Part 420, Subpart C; 42 CFR §1001.1101; and 42 CFR Part 431;

c) Failing to provide immediate access, upon request by a requesting agency, to the premises or to any records, documents, and other items or equipment the provider is required by federal or state law or regulation or by contract to maintain in order to participate in the Texas Medicaid or other HHS program (see subparagraphs (a) and (b) of this paragraph), or failing to provide

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

records, documents, and other items or equipment upon request that are determined necessary by the Inspector General to complete their statutory functions related to a fraud and abuse investigation, including without limitation all requirements specified in 1 TAC §§371.1701, 371.1703, 371.1705, 371.1707, 371.1709, 371.1711, 371.1713, and 371.1715 of this subchapter. "Immediate access" is deemed to be within 24 hours of receiving a request, unless the requesting agency has reason to suspect fraud or abuse or to believe that requested records, documents, or other items or equipment are about to be altered or destroyed, thereby necessitating access at the actual time the request is presented or, in the opinion of the Inspector General, the request may be completed at the time of the request and/or in less than 24 hours;

d) Developing false source documents or failing to sign source documents or to retain supporting documentation or to comply with the provisions or requirements of the operating agency or its agents pertaining to electronic claims submittal; *and*

e) Failing as a provider, whether individual, group, facility, managed care or other entity, to include within any subcontracts for services or items to be delivered within Texas Medicaid all information that is required by 42 CFR §434.10(b).

3) Program-Related Convictions.

a) Pleading guilty or nolo contendere, agreeing to an order of probation without adjudication of guilt under deferred adjudication, or being a defendant in a court judgment or finding of guilt for a violation relating to performance of a provider agreement or program violation of Medicare, Texas Medicaid, other HHS program, or any other state's Medicaid program;

b) Pleading guilty or being convicted of a violation of state or federal statutes relating to dangerous drugs, controlled substances, or any other drug-related offense;

c) Pleading guilty of, being convicted of, or engaging in conduct involving moral turpitude;

d) Pleading guilty or being convicted of a violation of state or federal statutes relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct relating to the delivery of a health-care item or service or relating to any act or omission in a program operated or financed by any federal, state, or local government agency;

e) Being convicted in connection with the interference with or obstruction of any investigation into any criminal offense that would support mandatory exclusion under 1 TAC §371.1705 of this subchapter or any offense listed within paragraph (3) of this subsection regarding program-related convictions; *and*

f) Being convicted of any offense that would support mandatory exclusion under 1 TAC §371.1705 of this subchapter.

4) Provider Eligibility.

a) Failing to meet standards required for licensure, when such licensure is required by state or federal law, administrative rule, provider agreement, or provider manual for participation in the Texas Medicaid or other HHS program;

b) Being excluded, suspended or otherwise sanctioned within any federal program involving the provision of health care;

c) Being excluded, suspended or otherwise sanctioned under any state health-care program for reasons bearing on the person's professional competence, professional performance or financial integrity;

d) Failing to fully and/or correctly complete a Provider Enrollment Agreement, Provider Re-enrollment Agreement or other enrollment form prescribed by the relevant operating agency or its agent for enrollment; *and*

e) Loss or forfeiture of corporate charter.

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

5) Program Compliance.

   a) Failing to comply with the terms of the Texas Medicaid or other HHS program contract or provider agreement, assignment agreement, the provider certification on the Texas Medicaid or other HHS program claim form, or rules or regulations published by the Commission or a Medicaid or other HHS operating agency;

   b) Violating any provision of the Human Resources Code, Chapter 32 or 36, or any rule or regulation issued under the Code;

   c) Submitting a false statement or misrepresentation or omitting pertinent facts on any application or any documents requested as a prerequisite for the Texas Medicaid or other HHS program participation;

   d) Refusing to execute or comply with a provider agreement or amendments when requested;

   e) Failing to correct deficiencies in provider operations after receiving written notice of them from an operating agency, the commission or their authorized agents;

   f) Failing to abide by applicable federal and state law regarding handicapped individuals or civil rights;

   g) Failing to comply with the Texas Medicaid or other HHS program policies, published Texas Medicaid or other HHS program bulletins, policy notification letters, provider policy or procedure manuals, contracts, statutes, rules, regulations, or interpretation previously sent to the provider by an operating agency or the commission regarding any of the authorities listed above, including statutes or standards governing occupations;

   h) Failing to fully and accurately make any disclosure required by the Social Security Act, §1124 or §1126;

   i) Failing to disclose information about the ownership of a subcontractor with whom the person has had business transactions in an amount exceeding $25,000 during the previous 12 months or about any significant business transactions (as defined by HHS) with any wholly-owned supplier or subcontractor during the previous five years;

   j) Failing, as a hospital, to comply substantially with a corrective action required under the Social Security Act, §1886(f)(2)(B);

   k) Failing to repay or make arrangements that are satisfactory to the commission to repay identified overpayments or other erroneous payments or assessments identified by the commission or any Texas Medicaid or other HHS program operating agency;

   l) Committing an act described as grounds for exclusion in the Social Security Act, §1128A (civil monetary penalties for false claims) or §1128B (criminal liability for health care violations);

   m) Defaulting on repayments of scholarship obligations or items relating to health profession education made or secured, in whole or in part, by HHS or the state when they have taken all reasonable steps available to them to secure repayment;

   n) Soliciting or causing to be solicited, through offers of transportation or otherwise, Texas Medicaid or other HHS program recipients for the purpose of delivering to those recipients health-care items or services;

   o) Marketing, supplying or selling confidential information (e.g., recipient names and other recipient information) for a use that is not expressly authorized by the Texas Medicaid or other HHS program; *and*

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

    p) Failing to abide by applicable statutes and standards governing providers.

**Important:** *Providers must comply with their applicable licensing agency's laws and regulations, including any related to marketing and advertising, and any applicable state and federal laws and regulations, contractual requirements, and other guidance documents. Providers are encouraged to review the "Provider Marketing Guidelines," which are available on the HHs website at* www.hhs.texas.gov/services/health/medicaid-chip/provider-information/texas-medicaid-chip-communications-resources.

6) Delivery of Health-Care Services.

    a) Failing to provide health-care services or items to Texas Medicaid or other HHS program recipients in accordance with accepted medical community standards or standards required by statute, regulation, or contract, including statutes and standards that govern occupations;

    b) Furnishing or ordering health-care services or items for a recipient-patient under Title XVIII or a state health-care program that substantially exceed the recipient's needs, are not medically necessary, are not provided economically or are of a quality that fails to meet professionally recognized standards of health care; *and*

    c) Engaging in any negligent practice that results in death, injury, or substantial probability of death or injury to the provider's patients.

7) Improper Collection and Misuse of Funds.

    a) Charging recipients for services when payment for the services was recouped by the Texas Medicaid or another HHS program for any reason;

    b) Misapplying, misusing, embezzling, failing to promptly release upon a valid request, or failing to keep detailed receipts of expenditures relating to any funds or other property in trust for a Texas Medicaid or other HHS program recipient;

    c) Failing to notify and reimburse the relevant operating agency or the commission or their agents for services paid by the Texas Medicaid or other HHS programs if the provider also receives reimbursement from a liable third party;

    d) Rebating or accepting a fee or a part of a fee or charge for a Texas Medicaid or other HHS program patient referral;

    e) Requesting from a recipient in payment for services or items delivered within the Texas Medicaid or other HHS program any amount that exceeds the amount the Texas Medicaid or other HHS program paid for such services or items, with the exception of any cost-sharing authorized by the program; *and*

    f) Requesting from a third party liable for payment of the services or items provided to a recipient under the Texas Medicaid or other HHS program, any payment other than as authorized at 42 CFR §447.20.

8) Licensure Actions.

    a) Having a voluntary or involuntary action taken by a licensing or certification agency or board that requires the provider or employee to comply with professional practice requirements of the board after the board receives evidence of noncompliance with licensing or certification requirements; *and*

    b) Having its license to provide health care revoked, suspended, or probated by any state licensing or certification authority, or losing a license or certification, because of action based on assessment of the person's professional competence, professional performance, or financial integrity, non-compliance with Health and Safety Code, statutes governing occupations, or surrendering a license or certification while a formal disciplinary proceeding is pending before

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

licensing or certification authorities when the proceeding concerns the person's professional competence, professional performance, or financial integrity.

9) MCOs and Persons Providing Services or Items Through Managed Care.

> *Note:* *This paragraph includes those program violations that are unique to managed care; paragraphs (1) through (8) and (11) of this section also apply to managed care.*

a) Failing, as an MCO, or an association, group or individual health-care provider furnishing services through an MCO, to provide to recipient enrollee a health-care benefit, service or item that the organization is required to provide under its contract with an operating agency;

b) Failing, as an MCO or an association, group or individual health-care provider furnishing services through an MCO, to provide to an individual a health-care benefit, service or item that the organization is required to provide by state or federal law, regulation or program rule;

c) Engaging, as an MCO, in actions that indicate a pattern of wrongful denial or payment for a health-care benefit, service or item that the organization is required to provide under its contract with an operating agency;

d) Engaging, as an MCO, in actions that indicate a pattern of wrongful delay of at least 45 days or a longer period specified in the contract with an operating agency, not to exceed 60 days, in making payment for a health-care benefit, service or item that the organization is required to provide under its contract with an operating agency;

e) Engaging, as an MCO or an association, group or individual health-care provider furnishing services through managed care, in a fraudulent activity in connection with the enrollment in the organization's managed care plan of an individual eligible for medical assistance or in connection with marketing the organization's services to an individual eligible for medical assistance;

f) Discriminating against enrollees or prospective enrollees on any basis, including, without limitation, age, gender, ethnic origin or health status;

g) Failing, as an MCO, to comply with any term within a contract with a Texas Medicaid or other HHS program operating agency to provide healthcare services to Texas Medicaid or HHS program recipients; and

h) Failing, as an MCO, reasonably to provide to the relevant operating agency, upon its written request, encounter data and/or other data contractually required to document the services and items delivered by or through the MCO to Texas Medicaid or other HHS program recipients.

10) Cost-Report Violations.

a) Reporting noncovered or nonchargeable services as covered items; e.g., incorrectly apportioning or allocating costs on cost reports; including costs of noncovered services, supplies or equipment in allowable costs; arrangements between providers and employees, related parties, independent contractors, suppliers, and others that appear to be designed primarily to overstate the costs to the program through various devices (such as commissions or fee splitting) to siphon-off or conceal illegal profits;

b) Reporting costs not incurred or which were attributable to nonprogram activities, other enterprises or personal expenses;

c) Including unallowable cost items on a cost report;

d) Manipulating or falsifying statistics that result in overstatement of costs or avoidance of recoupment, such as incorrectly reporting square footage, hours worked, revenues received, or units of service delivered;

e) Claiming bad debts without first genuinely attempting to collect payment;

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

   f) Depreciating assets that have been fully depreciated or sold or using an incorrect basis for depreciation; *and*

   g) Reporting costs above the cost to the related party.

11) Kickbacks and Referrals.

   a) Violating any of the provisions specified in 1 TAC §371.1655 (30) of this subchapter relating to kickbacks, bribes, rebates, referrals, inducements, or solicitation;

   b) As a physician, referring a Texas Medicaid or other HHS program patient to an entity with which the physician has a financial relationship for the furnishing of designated health services, payment for which would be denied under Title XVIII (Medicare) pursuant to §1877 and §1903(s) of the Social Security Act (Stark I and II). Neither federal financial participation nor this state's expenditures for medical assistance under the state Medicaid plan may be used to pay for services or items delivered within the program and within a relationship that violates Stark I or II. The Commission hereby references and incorporates within these rules the federal regulations promulgated pursuant to Stark I and II, and expressly recognizes all exceptions to the prohibitions on referrals established within those rules;

   c) Failing to disclose documentation of financial relationships necessary to establish compliance with Stark I and II, as set forth in subparagraph (b) of this paragraph; *and*

   d) Offering to pay or agreeing to accept, directly or indirectly, overtly or covertly any remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered or enrolled as a provider or otherwise by a state health-care regulatory or health and human service agency.

Involvement in any of these practices may result in provider exclusion or suspension from Texas Medicaid. Providers are notified in writing of any actions taken as well as procedures for appeal and reinstatement. The written notification will specify the date on which Medicaid program participation may resume. The reinstated person may then apply for a contract or provider agreement.

Providers and individuals who have been excluded from Texas Medicaid may be reinstated only by HHSC-OIG. If HHSC-OIG approves an individual's request for reinstatement, a written notice will be sent to that individual. The provider must first be reinstated into Medicaid and receive written notification specifying the date on which Medicaid program participation may resume. Once the provider has been reinstated into Medicaid, the provider may then apply for a contract or provider agreement.

Full investigation of criminal Medicaid fraud is the MFCU's responsibility and may result in a felony or misdemeanor criminal conviction.

## 1.10.1    Reporting Fraud, Waste, and Abuse

Anyone with knowledge about suspected Medicaid fraud, waste, and abuse of provider services must report the information to the HHSC-OIG. To report fraud, waste, and abuse, visit https://oig.hhs.texas.gov/report-fraud-waste-or-abuse and select **IG's Fraud Reporting Form**. Fraud, waste, and abuse may also be reported by calling the OIG hotline at 1-800-436-6184. All reports of fraud, waste, and abuse received through either channel remain confidential.

HHSC-OIG encourages providers to voluntarily investigate and report fraud, waste, abuse, or inappropriate payments of Medicaid funds in their own office. Providers are required to report these activities to HHSC-OIG when identified. HHSC-OIG will work collaboratively with self-reporting providers. More information about provider self-reporting is available on the OIG website at https://oig.hhs.texas.gov/resources/information-providers.

CPT ONLY - COPYRIGHT 2021 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.



# TEXAS MEDICAID

## PROVIDER PROCEDURES MANUAL

### JANUARY 2016

## VOLUMES 1 & 2



The Texas Medicaid & Healthcare Partnership (TMHP) is the claims administrator for Texas Medicaid under contract with the Texas Health and Human Services Commission.

CMS-2321-P-00083-7 Document 69 Filed 09/11/22    Page 245 of 290  PageID 1021

# PRELIMINARY INFORMATION

## Table of Contents

**Welcome: Texas Medicaid Provider Procedures Manual** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

    **Copyright Acknowledgments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

    **Volume 1 - General Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

    **Volume 2 - Provider Handbooks** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

    **Medicaid Program Administration** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

# Welcome: Texas Medicaid Provider Procedures Manual

This manual is a comprehensive guide for Texas Medicaid providers. It contains information about Texas Medicaid fee-for-service benefits, policies, and procedures including medical, dental, and children's services benefits.

> **Refer to:** *The Medicaid Managed Care Handbook* (*Vol. 2, Provider Handbooks*) for information about the Medicaid Managed Care, which is administered by Texas Health and Human Services Commission (HHSC)-contracted managed care organizations (MCOs), dental managed care organizations, and behavioral health organizations (BHOs) across the state.

The *Texas Medicaid Provider Procedures Manual* is updated monthly on the TMHP website at www.tmhp.com to include revisions to policies and procedures that went into effect in the prior month. The manual is available in portable document format (PDF) as a complete book and as individual sections and handbooks. A hypertext markup language (HTML) version is also be available.

The current version of the manual always appears prominently on the Texas Medicaid Provider Procedures Manual web page. All previously published annual editions of the *Texas Medicaid Provider Procedures Manual* have been archived. Users can access the archives through links on the Texas Medicaid Provider Procedures Manual web page.

Providers can determine what has changed each month by following the Release Notes link on the Texas Medicaid Provider Procedures Manual web page. The release notes include the sections and handbooks that have changed for the current month and the nature of the changes. Most changes have been previously announced in news articles on the TMHP website, and, where appropriate, the release notes link to prior website articles.

Publishing the manual monthly has eliminated the need for the *Texas Medicaid Bulletin*, which was discontinued following the publication of the September/October 2012 *Texas Medicaid Bulletin*, No. 243. Special bulletins, such as the annual Healthcare Common Procedure Coding System (HCPCS) bulletin, which is published in January of each year, will continue to be published on an as-needed basis.

The *Texas Medicaid Provider Procedures Manual* is divided into two volumes as follows:

- Volume I: General Information

  Volume 1 applies to all health-care providers who are enrolled in Texas Medicaid and provide services to Texas Medicaid fee-for-service clients. The sections in Volume 1 include general information for enrolling in the program, receiving appropriate reimbursement, prior authorizations, claim submissions and appeals for services rendered.

- Volume 2: Provider Handbooks

  Each handbook in Volume 2 covers Medicaid policies, procedures, and claims filing requirements for specific products or services. Volume 2 includes the following handbooks:

  - *Ambulance Services Handbook*

  - *Behavioral Health, Rehabilitation, and Case Management Services Handbook*

  - *Children's Services Handbook*

  - *Clinics and Other Outpatient Facility Services Handbook*

  - *Durable Medical Equipment, Medical Supplies, and Nutritional Products Handbook*

  - *Expanded Primary Healthcare Program Handbook*

  - *Gynecological and Reproductive Health and Family Planning Services Handbook*

  - *Inpatient and Outpatient Hospital Services Handbook*

  - *Medicaid Managed Care Handbook*

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- *Medical and Nursing Specialists, Physicians, and Physician Assistants Handbook*
- *Medical Transportation Program Handbook*
- *Nursing and Therapy Services Handbook*
- *Radiology and Laboratory Services Handbook*
- *Telecommunications Services Handbook*
- *Vision and Hearing Services Handbook*

## Copyright Acknowledgments

Use of the AMA's copyrighted CPT® is allowed in this publication with the following disclosure:

> "Current Procedural Terminology (CPT) is copyright © 2015 American Medical Association. All rights reserved. No fee schedules, basic units, relative values, or related listings are included in CPT. The AMA assumes no liability for the data contained herein. Applicable Federal Acquisition Regulation System/Defense Federal Acquisition Regulation Supplement (FARS/DFARS) apply."

The American Dental Association requires the following copyright notice in all publications containing Current Dental Terminology (CDT) codes:

> "*Current Dental Terminology* (including procedure codes, nomenclature, descriptors, and other data contained therein) is copyright © 2013 American Dental Association. All rights reserved. Applicable FARS/DFARS apply."

Microsoft Corporation requires the following notice in publications containing trademarked product names:

"Microsoft® and Windows® are either registered trademarks or trademarks of Microsoft Corporation in the United States and/or other countries."

## Contents

## Volume 1 - General Information

Welcome

Contents

Introduction

Section 1: Provider Enrollment and Responsibilities

Section 2: Texas Medicaid Fee-for-Service Reimbursement

Section 3: TMHP Electronic Data Interchange (EDI)

Section 4: Client Eligibility

Section 5: Fee-for-Service Prior Authorizations

Section 6: Claims Filing

Section 7: Appeals

Appendices

Appendix A: State, Federal, and TMHP Contact Information

Appendix B: Vendor Drug Program

Appendix C: HIV/AIDS

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

Appendix D: Acronym Dictionary

## Volume 2 - Provider Handbooks

*Ambulance Services Handbook*

*Behavioral Health, Rehabilitation, and Case Management Services Handbook*

*Children's Services Handbook*

*Clinics and Other Outpatient Facility Services Handbook*

*Durable Medical Equipment, Medical Supplies, and Nutritional Products Handbook*

*Gynecological and Reproductive Health and Family Planning Services Handbook*

*Inpatient and Outpatient Hospital Services Handbook*

*Medicaid Managed Care Handbook*

*Medical and Nursing Specialists, Physicians, and Physician Assistants Handbook*

*Medical Transportation Program Handbook*

*Nursing and Therapy Services Handbook*

*Radiology and Laboratory Services Handbook*

*Telecommunication Services Handbook*

*Vision and Hearing Services Handbook*


## Introduction

## Medicaid Program Administration

The Texas Medical Assistance (Medicaid) Program was implemented on September 1, 1967, under the provisions of Title XIX of the federal *Social Security Act* and Chapter 32 of the *Texas Human Resources Code*.

The state of Texas and the federal government share the cost of funding Texas Medicaid. The Health and Human Services Commission (HHSC), the single state Medicaid agency, is responsible for the Title XIX Program. The administration of the program is accomplished through contracts and agreements with the following:

- Medical providers
- Texas Medicaid & Healthcare Partnership (TMHP), the fee-for-service claims administrator
- MAXIMUS, the enrollment broker
- Various managed care organizations (MCOs) and dental managed care organization (dental plans), that administer Medicaid Managed Care benefits.
- The Institute for Child Health Policy (ICHP), the quality monitor
- State agencies

Texas Medicaid providers are reimbursed for services through contracts with health-insuring contractors, fiscal agents, or direct vendor payments.

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

By signing an HHSC Medicaid Provider Agreement (through the enrollment process) and submitting Medicaid claims, each enrolled provider agrees to abide by the policies and procedures of Medicaid, published regulations, and the information and instructions in manuals, bulletins, and other instructional material furnished to the provider.

**Refer to:**   "Appendix A: State, Federal, and TMHP Contact Information" (*Vol. 1, General Information*) for addresses and telephone numbers of HHSC and Department of State Health Services (DSHS) regional offices.

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

# SECTION 1: PROVIDER ENROLLMENT AND RESPONSIBILITIES

## TEXAS MEDICAID PROVIDER PROCEDURES MANUAL: VOL. 1

### JANUARY 2016



# SECTION 1: PROVIDER ENROLLMENT AND RESPONSIBILITIES

## Table of Contents

1.1     **\* Provider Enrollment and Reenrollment** ........................................................ **4**
    1.1.1     NPI and Taxonomy Codes.......................................................... 5
    1.1.2     Online Enrollment ................................................................. 5
    1.1.3     Paper Application Enrollment ................................................... 6
    1.1.4     Provider Enrollment Identification ............................................. 6
         1.1.4.1     Ordering- or Referring-Only Providers .................................. 9
    1.1.5     Affordable Care Act of 2010 (ACA) Enrollment Requirements..................... 9
         1.1.5.1     Provider Screening Requirement .......................................... 10
         1.1.5.2     Provider Re-enrollment ................................................... 10
         1.1.5.3     Application Fee ........................................................... 10
         1.1.5.4     Ordering- or Referring-Only Providers Search on the Online Provider Lookup (OPL) ............................................................ 10
    1.1.6     Surety Bond Enrollment Requirement ........................................... 10
         1.1.6.1     Ambulance Providers ..................................................... 11
    1.1.7     Provider Enrollment Application Determinations ............................... 11
    1.1.8     Enrollment in Medicaid Managed Care Programs ................................. 12
    1.1.9     Required Enrollment Forms..................................................... 13
         1.1.9.1     Application Payment Form................................................. 13
         1.1.9.2     HHSC Medicaid Provider Agreement ........................................ 13
         1.1.9.3     Provider Information Form (PIF-1) ........................................ 14
         1.1.9.4     **\* Principal Information Form (PIF-2)** ................................... 14
         1.1.9.5     **\* Disclosure of Ownership and Control Interest Statement** ................ 15
         1.1.9.6     Internal Revenue Service (IRS) W-9 Form................................... 15
         1.1.9.7     Medicaid Audit Information Form .......................................... 15
         1.1.9.8     Corporate Board of Directors Resolution.................................. 15
         1.1.9.9     Franchise Tax Account Status Page........................................ 15
         1.1.9.10   Certificate of Formation or Certificate of Filing/Articles or Certificate of Incorporation/Certificate of Fact .................................... 15
         1.1.9.11   Copy of License, Temporary License, or Certification ..................... 16
         1.1.9.12   Federally Qualified Health Center Affiliation Affidavit ................... 16
         1.1.9.13   Physician's Letter of Agreement.......................................... 17
         1.1.9.14   Licensure Renewal ....................................................... 17
         1.1.9.15   Medicare Participation................................................... 17
         1.1.9.16   Group Information Changes ............................................... 18
1.2     **Payment Information** ........................................................ **18**
    1.2.1     Using EFT ...................................................................... 18
    1.2.2     Advantages of EFT.............................................................. 18
    1.2.3     EFT Enrollment Procedures ..................................................... 19
    1.2.4     Stale-Dated Checks ............................................................ 19
1.3     **Provider Deactivation/Disenrollment** ........................................... **19**
    1.3.1     **\* Excluded Entities and Providers** ......................................... 20
1.4     **Provider Reenrollment** ....................................................... **20**

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

Case 2:21-cv-00022-Z Document 62    Filed 03/11/22    Page 252 of 290    PageID 1028

1.4.1    Medicare Number . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
1.4.2    Provider Status (Individual, Group, Performing Provider, or Facility) . . . . . . . . . . . . . . . 20
1.4.3    Physical Address. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
1.4.4    Change in Principal Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**1.5**    **Change of Ownership Requirements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

**1.6**    **Provider Responsibilities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**
1.6.1    Compliance with Texas Family Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
1.6.1.1    Child Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
1.6.1.2    Reporting Child Abuse or Neglect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
1.6.1.3    Procedures for Reporting Abuse or Neglect. . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
1.6.1.4    Procedures for Reporting Suspected Sexual Abuse. . . . . . . . . . . . . . . . . . . . . . . 23
1.6.1.5    Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
1.6.1.6    Reporting Abuse and Neglect of the Elderly or Disabled. . . . . . . . . . . . . . . . . 24
1.6.1.7    Procedures for Reporting Abuse or Neglect of the Elderly or Disabled . . . . . . 25
1.6.2    Maintenance of Provider Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
1.6.2.1    NPI Verification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
1.6.2.2    Online Provider Lookup (OPL) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
1.6.2.3    Updating NPI and Taxonomy Codes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
1.6.2.4    Updating Provider Specialty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
1.6.3    <span style="color:red">* Retention of Records and Access to Records and Premises.</span> . . . . . . . . . . . . . . . . . . . . . 28
1.6.3.1    Payment Error Rate Measurement (PERM) Process . . . . . . . . . . . . . . . . . . . . . . 30
1.6.4    <span style="color:red">* Release of Confidential Information.</span> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
1.6.5    <span style="color:red">* Compliance with Federal Legislation</span> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
1.6.6    <span style="color:red">* Tamper-Resistant Prescription Pads.</span> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
1.6.7    Utilization Control — General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
1.6.8    <span style="color:red">* Provider Certification/Assignment</span> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
1.6.8.1    Delegation of Signature Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
1.6.9    Billing Clients. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
1.6.9.1    Client Acknowledgment Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
1.6.10    <span style="color:red">* General Medical Record Documentation Requirements</span> . . . . . . . . . . . . . . . . . . . . . . 36
1.6.11    Informing Pregnant Clients About CHIP Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**1.7**    <span style="color:red">**\* Electronic Health Records (EHR) Incentive Program**</span> . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**
1.7.1    Attesting to Meaningful Use: Required Documentation for Texas Medicaid
         EHR Incentive Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
1.7.2    How to Return an Electronic Health Records (EHR) Payment. . . . . . . . . . . . . . . . . . . . 40
1.7.3    EHR Notification and Appeal Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**1.8**    **Computer-Based Training Courses for Providers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**

**1.9**    <span style="color:red">**\* Enrollment Criteria for Out-of-State Providers**</span> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

**1.10**    <span style="color:red">**\* Medicaid Waste, Abuse, and Fraud Policy**</span> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **44**
1.10.1    Reporting Waste, Abuse, and Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
1.10.2    Suspected Cases of Provider Waste, Abuse, and Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . 53
1.10.3    Employee Education on False Claims Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
1.10.4    Managed Care Organization (MCO) Special Investigative Unit (SIU). . . . . . . . . . . . . . . 54

**1.11**    <span style="color:red">**\* Texas Medicaid Limitations and Exclusions**</span> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **54**

**1.12**    **Forms** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **58**

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- The services are medically necessary and one or more of the following exceptions for good cause exist and can be documented:

  - Texas Medicaid enrolled providers rely on the services provided by the applicant.

  - Applicant maintains existing agreements as a participating provider through one or more Medicaid managed care organizations (MCO) and enrollment of the applicant leads to more cost-effective delivery of Medicaid services.

- A laboratory may participate as an in-state provider under any program administered by a health and human services agency, including HHSC, that involves laboratory services, regardless of the location where any specific service is performed or where the laboratory's facilities are located if:

  - The laboratory or an entity that is a parent, subsidiary, or other affiliate of the laboratory maintains laboratory operations in Texas;

  - The laboratory and each entity that is a parent, subsidiary, or other affiliate of the laboratory, individually or collectively, employ at least 1,000 persons at places of employment located in this state; and

  - The laboratory is otherwise qualified to provide the services under the program and is not prohibited from participating as a provider under any benefits programs administered by a health and human services agency, including HHSC, based on conduct that constitutes fraud, waste, or abuse.

Out-of-state provides that seek enrollment under one or more of the above criteria must submit an enrollment application and be approved for enrollment.

TMHP must receive claims from out-of-state providers within 365 days from the date of service.

> **Refer to:** Subsection 10.2.1, "Prior Authorization" in the *Medical and Nursing Specialists, Physicians, and Physician Assistants Handbook (Vol. 2, Provider Handbooks).*

# 1.10    * Medicaid Waste, Abuse, and Fraud Policy

The OIG has the responsibility to identify and investigate cases of suspected waste, abuse, and fraud in Medicaid and other health and human services programs. This responsibility, granted through state and federal law, gives the OIG the authority to pursue administrative sanctions and to refer cases to prosecutors, licensure and certification boards, and other agencies. Additionally, Texas Medicaid is required to disenroll or exclude any provider who has been disenrolled or excluded from Medicare or any other state health-care program.

Anyone participating in Texas Medicaid must understand the requirements for participation. Available methods both to learn and stay up to date on program requirements include the following:

- *Provider education.* Attendance at educational workshops and training sessions. Regular training opportunities are offered by TMHP.

- *Texas Medicaid publications.* These include the *Texas Medicaid Provider Procedures Manual* and banner messages, which are included in R&S Reports.

- *All adopted agency rules.* These include those related to fraud, waste, and abuse contained in 1 TAC Chapter 371.

- *State and federal law.* Statutes and other law pertinent to Texas Medicaid and fraud, waste, and abuse within Texas Medicaid.

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

In addition, providers are responsible for the delivery of health-care items and services to Medicaid clients in accordance with all applicable licensure and certification requirements and accepted health care professionals' community standards. Such standards include those related to medical record and claims filing practices, documentation requirements, and records maintenance. The TAC requires providers to follow these standards. For more information, consult 1 TAC §371.1659.

Texas Medicaid providers must follow the coding and billing requirements of the *Texas Medicaid Provider Procedures Manual* (TMPPM). However, if coding and billing requirements for a particular service are not addressed in the TMPPM, and if coding and billing requirements are not otherwise specified in program policy (such as in provider bulletins or banners), then providers must follow the most current coding guidelines. These include:

- CPT as set forth in the American Medical Association's most recently published "CPT books", "CPT Assistant" monthly newsletters, and other publications resulting from the collaborative efforts of American Medical Association with the medical societies.

- Healthcare Common Procedure Coding System (HCPCS) as developed and maintained by the federal government.

- National Correct Coding Initiative (NCCI), as set forth by the CMS and as explained in the NCCI Policy and Medicare Claims Processing Manuals. NCCI consists of procedure code combinations that a provider must not bill together. One of the codes in the pair is considered a part of the primary procedure and not reimbursable to the same provider on the same date of service.

  *Exception:* NCCI outlines use of modifiers some of which are not currently recognized by Texas Medicaid. See the list of modifiers utilized by Texas Medicaid in subsection 6.3.5, "Modifiers" in Section 6, "Claims Filing" (*Vol. 1, General Information*).

- *Current Dental Terminology* (CDT) as published by the American Dental Association (ADA).

- Other publications resulting from the collaborative efforts of the ADA with dental societies.

- *International Classification of Diseases*, 9th Revision, Clinical Modification (ICD-9-CM).

- *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (DSM-IV-TR).

Failure to comply with the guidelines provided in these publications may result in a provider being found to have engaged in one or more program violations listed in 1 TAC §371.1659.

All providers are held responsible for any claims preparation or other activities that may be performed under the provider's authority. For example, providers are held responsible for any omissions and the accuracy of submitted information, even if those actions are performed by office staff, contractors, or billing services. This, however, does not absolve these other individuals for their participation in any documents provided to the state or designee with false, inaccurate, or misleading information; or pertinent omissions.

HHSC-OIG may impose one or any combination of administrative actions or administrative sanctions on Texas Medicaid providers or other persons when fraud, waste, or abuse is determined. Those who may be sanctioned include:

- Those furnishing services or items directly or indirectly.

- Those billing for services.

- Those violating any of the provisions delineated in this section.

- Affiliates of a provider or person violating any of the provisions delineated in this section.

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

Administrative sanctions include, without limitation:

- Exclusion from program participation for a specified period of time, permanently, or indefinitely. Anyone excluded from Texas Medicaid is also automatically excluded from all programs under Titles V and XX of the Social Security Act.

- Suspension of Medicaid payments (payment hold) to a provider.

- Recoupment of Medicaid overpayments, including any overpayments determined through statistical sampling and extrapolation.

- Restricted Medicaid reimbursement (specific services will not be reimbursed to an individual provider during the time the provider is on restricted reimbursement; however, reimbursement for other services may continue).

- Cancellation of the Medicaid provider agreement (however, a deactivation in accordance with the agreement itself is not considered a sanction).

- Exclusion or suspension under the authority of the CFR.

Administrative actions include:

- Amending a provider agreement so that it will deactivate on a specific date.

- Granting an agreement or transferring a provider to an agreement with special terms or conditions, including a probationary agreement.

- Required attendance at provider education sessions.

- Prior authorization of selected services.

- Pre-payment review.

- Post-payment review.

- Required attendance at informal or formal provider corrective action meetings.

- Submission of additional documentation or justification that is not normally required to accompany submitted claims. (Failure to submit legible documentation or justification requested will result in denial of the claim.)

- Oral, written, or personal educational contact with the provider.

- Posting of a surety bond or providing a letter of credit.

- Having a subpoena served to compel an appearance for testimony or the production of relevant evidence, as determined by the HHSC-OIG.

Anyone facing an administrative sanction has a right to formal due process. This formal due process may include a hearing before an administrative law judge. Conversely, anyone facing an administrative action is not entitled to formal due process. People who induce, solicit, receive, offer, or pay any remuneration (including, but not limited to, bribes, kickbacks, or rebates) directly or indirectly in relation to referrals, purchases, leases, or arrangements of services covered by Medicare or Texas Medicaid may be in violation of state statutes and guilty of a federal felony offense. State law also allows for the suspension of providers convicted of a criminal offense related to Medicare or Texas Medicaid. The commission of a felony in Medicaid or Medicare programs may include fines or imprisonment ranging from five years to life in prison. Examples of inducements include a service, cash in any amount, entertainment, or any item of value.

As stated in 1 TAC §§371.1651-371.1669, following is a nonexclusive list of grounds or criteria for the Inspector General's administrative enforcement and/or referral for criminal, civil, or licensure or certification investigation and judicial action regarding program violations by any provider or person. Violations result from a provider or person who knew or should have known the following were viola-

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

tions. The headings of each group listed below are provided solely for organization and convenience and are not elements of any program violation.

1) Claims and Billing.

   a) Submitting or causing to be submitted a false statement or misrepresentation, or omitting pertinent facts when claiming payment under the Texas Medicaid or other HHS program or when supplying information used to determine the right to payment under the Texas Medicaid or other HHS program;

   b) Submitting or causing to be submitted a false statement, information or misrepresentation, or omitting pertinent facts to obtain greater compensation than the provider is legally entitled to;

   c) Submitting or causing to be submitted a false statement, information or misrepresentation, or omitting pertinent facts to meet prior authorization requirements;

   d) Submitting or causing to be submitted under Title XVIII (Medicare) or a state health-care program claims or requests for payment containing unjustified charges or costs for items or services that substantially exceed the person's usual and customary charges or costs for those items or services to the public or the private pay patients unless otherwise authorized by law;

   e) Submitting or causing to be submitted claims with a pattern of inappropriate coding or billing that results in excessive costs to the Texas Medicaid or other HHS program;

   f) Billing or causing claims to be filed for services or merchandise that were not provided to the recipient;

   g) Submitting or causing to be submitted a false statement or misrepresentation that, if used, has the potential of increasing any individual or state provider payment rate or fee;

   h) Submitting or causing to be submitted to the Texas Medicaid or other HHS program a cost report containing costs not associated with Texas Medicaid or other HHS program or not permitted by Texas Medicaid or other HHS program policies;

   i) Presenting or causing to be presented to an operating agency or its agent a claim that contains a statement or representation that the person knows or should have known to be false;

   j) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program for services or items furnished personally by, at the medical direction of, or on the prescription or order of a person who is excluded from Texas Medicaid, other HHS program, or Medicare or has been excluded from and not reinstated within Texas Medicaid, other HHS program, or Medicare;

   k) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program for services or items that are not reimbursable by the Texas Medicaid or other HHS program;

   l) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program for a service or item which requires a prior order or prescription by a licensed health-care practitioner when such order or prescription has not been obtained;

   m) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program for an item or service substituted without authorization for the item or service ordered, prescribed or otherwise designated by the Texas Medicaid or other HHS program;

   n) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program by a provider or person who is owned or controlled, directly or indirectly, by an excluded person; *and*

   o) Billing or causing claims to be submitted to the Texas Medicaid or other HHS program by a provider or person for charges in which the provider discounted the same services for any other type of patient.

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

2) Records and Documentation.

    a) Failing to maintain for the period of time required by the rules relevant to the provider in question records and other documentation that the provider is required by federal or state law or regulation or by contract to maintain in order to participate in the Texas Medicaid or other HHS program or to provide records or documents upon request for any records or documents determined necessary by the Inspector General to complete their statutory functions related to a fraud and abuse investigation. Such records and documentation include, without limitation, those necessary:

        i) To verify specific deliveries, medical necessity, medical appropriateness, and adequate written documentation of items or services furnished under Title XIX or Title XX;

        ii) To determine in accordance with established rates appropriate payment for those items or services delivered;

        iii) To confirm the eligibility of the provider to participate in the Texas Medicaid or other HHS program; e.g., medical records (including, without limitation, X-rays, laboratory and test results, and other documents related to diagnosis), billing and claims records, cost reports, managed care encounter data, financial data necessary to demonstrate solvency of risk-bearing providers, and documentation (including, without limitation, ownership disclosure statements, articles of incorporation, by-laws, and corporate minutes) necessary to demonstrate ownership of corporate entities; *and*

        iv) To verify the purchase and actual cost of products;

    b) Failing to disclose fully and accurately or completely information required by the Social Security Act and by 42 CFR Part 455, Subpart B; 42 CFR Part 420, Subpart C; 42 CFR §1001.1101; and 42 CFR Part 431;

    c) Failing to provide immediate access, upon request by a requesting agency, to the premises or to any records, documents, and other items or equipment the provider is required by federal or state law or regulation or by contract to maintain in order to participate in the Texas Medicaid or other HHS program (see subparagraphs (a) and (b) of this paragraph), or failing to provide records, documents, and other items or equipment upon request that are determined necessary by the Inspector General to complete their statutory functions related to a fraud and abuse investigation, including without limitation all requirements specified in 1 TAC §§371.1701, 371.1703, 371.1705, 371.1707, 371.1709, 371.1711, 371.1713, and 371.1715 of this subchapter. "Immediate access" is deemed to be within 24 hours of receiving a request, unless the requesting agency has reason to suspect fraud or abuse or to believe that requested records, documents, or other items or equipment are about to be altered or destroyed, thereby necessitating access at the actual time the request is presented or, in the opinion of the Inspector General, the request may be completed at the time of the request and/or in less than 24 hours;

    d) Developing false source documents or failing to sign source documents or to retain supporting documentation or to comply with the provisions or requirements of the operating agency or its agents pertaining to electronic claims submittal; *and*

    e) Failing as a provider, whether individual, group, facility, managed care or other entity, to include within any subcontracts for services or items to be delivered within Texas Medicaid all information that is required by 42 CFR §434.10(b).

3) Program-Related Convictions.

    a) Pleading guilty or nolo contendere, agreeing to an order of probation without adjudication of guilt under deferred adjudication, or being a defendant in a court judgment or finding of guilt for a violation relating to performance of a provider agreement or program violation of Medicare, Texas Medicaid, other HHS program, or any other state's Medicaid program;

    b) Pleading guilty or being convicted of a violation of state or federal statutes relating to dangerous drugs, controlled substances, or any other drug-related offense;

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

c) Pleading guilty of, being convicted of, or engaging in conduct involving moral turpitude;

d) Pleading guilty or being convicted of a violation of state or federal statutes relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct relating to the delivery of a health-care item or service or relating to any act or omission in a program operated or financed by any federal, state, or local government agency;

e) Being convicted in connection with the interference with or obstruction of any investigation into any criminal offense that would support mandatory exclusion under 1 TAC §371.1705 of this subchapter or any offense listed within paragraph (3) of this subsection regarding program-related convictions; *and*

f) Being convicted of any offense that would support mandatory exclusion under 1 TAC §371.1705 of this subchapter.

4) Provider Eligibility.

a) Failing to meet standards required for licensure, when such licensure is required by state or federal law, administrative rule, provider agreement, or provider manual for participation in the Texas Medicaid or other HHS program;

b) Being excluded, suspended or otherwise sanctioned within any federal program involving the provision of health care;

c) Being excluded, suspended or otherwise sanctioned under any state health-care program for reasons bearing on the person's professional competence, professional performance or financial integrity;

d) Failing to fully and/or correctly complete a Provider Enrollment Agreement, Provider Re-enrollment Agreement or other enrollment form prescribed by the relevant operating agency or its agent for enrollment; *and*

e) Loss or forfeiture of corporate charter.

5) Program Compliance.

a) Failing to comply with the terms of the Texas Medicaid or other HHS program contract or provider agreement, assignment agreement, the provider certification on the Texas Medicaid or other HHS program claim form, or rules or regulations published by the Commission or a Medicaid or other HHS operating agency;

b) Violating any provision of the Human Resources Code, Chapter 32 or 36, or any rule or regulation issued under the Code;

c) Submitting a false statement or misrepresentation or omitting pertinent facts on any application or any documents requested as a prerequisite for the Texas Medicaid or other HHS program participation;

d) Refusing to execute or comply with a provider agreement or amendments when requested;

e) Failing to correct deficiencies in provider operations after receiving written notice of them from an operating agency, the commission or their authorized agents;

f) Failing to abide by applicable federal and state law regarding handicapped individuals or civil rights;

g) Failing to comply with the Texas Medicaid or other HHS program policies, published Texas Medicaid or other HHS program bulletins, policy notification letters, provider policy or procedure manuals, contracts, statutes, rules, regulations, or interpretation previously sent to the provider by an operating agency or the commission regarding any of the authorities listed above, including statutes or standards governing occupations;

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

h) Failing to fully and accurately make any disclosure required by the Social Security Act, §1124 or §1126;

i) Failing to disclose information about the ownership of a subcontractor with whom the person has had business transactions in an amount exceeding $25,000 during the previous 12 months or about any significant business transactions (as defined by HHS) with any wholly-owned supplier or subcontractor during the previous five years;

j) Failing, as a hospital, to comply substantially with a corrective action required under the Social Security Act, §1886(f)(2)(B);

k) Failing to repay or make arrangements that are satisfactory to the commission to repay identified overpayments or other erroneous payments or assessments identified by the commission or any Texas Medicaid or other HHS program operating agency;

l) Committing an act described as grounds for exclusion in the Social Security Act, §1128A (civil monetary penalties for false claims) or §1128B (criminal liability for health care violations);

m) Defaulting on repayments of scholarship obligations or items relating to health profession education made or secured, in whole or in part, by HHS or the state when they have taken all reasonable steps available to them to secure repayment;

n) Soliciting or causing to be solicited, through offers of transportation or otherwise, Texas Medicaid or other HHS program recipients for the purpose of delivering to those recipients health-care items or services;

o) Marketing, supplying or selling confidential information (e.g., recipient names and other recipient information) for a use that is not expressly authorized by the Texas Medicaid or other HHS program; *and*

p) Failing to abide by applicable statutes and standards governing providers.

***Important:*** *Providers must comply with their applicable licensing agency's laws and regulations, including any related to marketing and advertising, and any applicable state and federal laws and regulations, contractual requirements, and other guidance documents. Providers are encouraged to review the "Provider Marketing Guidelines," which are available on the TMHP website at www.tmhp.com.*

6) Delivery of Health-Care Services.

a) Failing to provide health-care services or items to Texas Medicaid or other HHS program recipients in accordance with accepted medical community standards or standards required by statute, regulation, or contract, including statutes and standards that govern occupations;

b) Furnishing or ordering health-care services or items for a recipient-patient under Title XVIII or a state health-care program that substantially exceed the recipient's needs, are not medically necessary, are not provided economically or are of a quality that fails to meet professionally recognized standards of health care; *and*

c) Engaging in any negligent practice that results in death, injury, or substantial probability of death or injury to the provider's patients.

7) Improper Collection and Misuse of Funds.

a) Charging recipients for services when payment for the services was recouped by the Texas Medicaid or another HHS program for any reason;

b) Misapplying, misusing, embezzling, failing to promptly release upon a valid request, or failing to keep detailed receipts of expenditures relating to any funds or other property in trust for a Texas Medicaid or other HHS program recipient;

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

c) Failing to notify and reimburse the relevant operating agency or the commission or their agents for services paid by the Texas Medicaid or other HHS programs if the provider also receives reimbursement from a liable third party;

d) Rebating or accepting a fee or a part of a fee or charge for a Texas Medicaid or other HHS program patient referral;

e) Requesting from a recipient in payment for services or items delivered within the Texas Medicaid or other HHS program any amount that exceeds the amount the Texas Medicaid or other HHS program paid for such services or items, with the exception of any cost-sharing authorized by the program; *and*

f) Requesting from a third party liable for payment of the services or items provided to a recipient under the Texas Medicaid or other HHS program, any payment other than as authorized at 42 CFR §447.20.

8) Licensure Actions.

a) Having a voluntary or involuntary action taken by a licensing or certification agency or board that requires the provider or employee to comply with professional practice requirements of the board after the board receives evidence of noncompliance with licensing or certification requirements; *and*

b) Having its license to provide health care revoked, suspended, or probated by any state licensing or certification authority, or losing a license or certification, because of action based on assessment of the person's professional competence, professional performance, or financial integrity, non-compliance with Health and Safety Code, statutes governing occupations, or surrendering a license or certification while a formal disciplinary proceeding is pending before licensing or certification authorities when the proceeding concerns the person's professional competence, professional performance, or financial integrity.

9) MCOs and Persons Providing Services or Items Through Managed Care.

> **Note:** *This paragraph includes those program violations that are unique to managed care; paragraphs (1) through (8) and (11) of this section also apply to managed care.*

a) Failing, as an MCO, or an association, group or individual health-care provider furnishing services through an MCO, to provide to recipient enrollee a health-care benefit, service or item that the organization is required to provide under its contract with an operating agency;

b) Failing, as an MCO or an association, group or individual health-care provider furnishing services through an MCO, to provide to an individual a health-care benefit, service or item that the organization is required to provide by state or federal law, regulation or program rule;

c) Engaging, as an MCO, in actions that indicate a pattern of wrongful denial or payment for a health-care benefit, service or item that the organization is required to provide under its contract with an operating agency;

d) Engaging, as an MCO, in actions that indicate a pattern of wrongful delay of at least 45 days or a longer period specified in the contract with an operating agency, not to exceed 60 days, in making payment for a health-care benefit, service or item that the organization is required to provide under its contract with an operating agency;

e) Engaging, as an MCO or an association, group or individual health-care provider furnishing services through managed care, in a fraudulent activity in connection with the enrollment in the organization's managed care plan of an individual eligible for medical assistance or in connection with marketing the organization's services to an individual eligible for medical assistance;

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

    f)   Discriminating against enrollees or prospective enrollees on any basis, including, without limitation, age, gender, ethnic origin or health status;

    g)   Failing, as an MCO, to comply with any term within a contract with a Texas Medicaid or other HHS program operating agency to provide healthcare services to Texas Medicaid or HHS program recipients; and

    h)   Failing, as an MCO, reasonably to provide to the relevant operating agency, upon its written request, encounter data and/or other data contractually required to document the services and items delivered by or through the MCO to Texas Medicaid or other HHS program recipients.

10) Cost-Report Violations.

    a)   Reporting noncovered or nonchargeable services as covered items; e.g., incorrectly apportioning or allocating costs on cost reports; including costs of noncovered services, supplies or equipment in allowable costs; arrangements between providers and employees, related parties, independent contractors, suppliers, and others that appear to be designed primarily to overstate the costs to the program through various devices (such as commissions or fee splitting) to siphon-off or conceal illegal profits;

    b)   Reporting costs not incurred or which were attributable to nonprogram activities, other enterprises or personal expenses;

    c)   Including unallowable cost items on a cost report;

    d)   Manipulating or falsifying statistics that result in overstatement of costs or avoidance of recoupment, such as incorrectly reporting square footage, hours worked, revenues received, or units of service delivered;

    e)   Claiming bad debts without first genuinely attempting to collect payment;

    f)   Depreciating assets that have been fully depreciated or sold or using an incorrect basis for depreciation; *and*

    g)   Reporting costs above the cost to the related party.

11) Kickbacks and Referrals.

    a)   Violating any of the provisions specified in 1 TAC §371.1655 (30) of this subchapter relating to kickbacks, bribes, rebates, referrals, inducements, or solicitation;

    b)   As a physician, referring a Texas Medicaid or other HHS program patient to an entity with which the physician has a financial relationship for the furnishing of designated health services, payment for which would be denied under Title XVIII (Medicare) pursuant to §1877 and §1903(s) of the Social Security Act (Stark I and II). Neither federal financial participation nor this state's expenditures for medical assistance under the state Medicaid plan may be used to pay for services or items delivered within the program and within a relationship that violates Stark I or II. The Commission hereby references and incorporates within these rules the federal regulations promulgated pursuant to Stark I and II, and expressly recognizes all exceptions to the prohibitions on referrals established within those rules;

    c)   Failing to disclose documentation of financial relationships necessary to establish compliance with Stark I and II, as set forth in subparagraph (b) of this paragraph; *and*

    d)   Offering to pay or agreeing to accept, directly or indirectly, overtly or covertly any remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered or enrolled as a provider or otherwise by a state health-care regulatory or health and human service agency.

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

Involvement in any of these practices may result in provider exclusion or suspension from Texas Medicaid. Providers are notified in writing of any actions taken as well as procedures for appeal and reinstatement. The written notification will specify the date on which Medicaid program participation may resume. The reinstated person may then apply for a contract or provider agreement.

Providers and individuals who have been excluded from Texas Medicaid may be reinstated only by HHSC-OIG. If HHSC-OIG approves an individual's request for reinstatement, a written notice will be sent to that individual. The provider must first be reinstated into Medicaid and receive written notification specifying the date on which Medicaid program participation may resume. Once the provider has been reinstated into Medicaid, the provider may then apply for a contract or provider agreement.

Full investigation of criminal Medicaid fraud is the MFCU's responsibility and may result in a felony or misdemeanor criminal conviction.

## 1.10.1    Reporting Waste, Abuse, and Fraud

Anyone with knowledge about suspected Medicaid waste, abuse, or fraud of provider services must report the information to the HHSC-OIG. To report waste, abuse, or fraud, visit www.hhs.state.tx.us and select **Reporting Waste, Abuse, and Fraud**. Waste, abuse, and fraud may also be reported by calling the OIG hotline at 1-800-436-6184. All reports of waste, abuse, or fraud received through either channel remain confidential.

HHSC-OIG encourages providers to voluntarily investigate and report fraud, waste, abuse, or inappropriate payments of Medicaid funds in their own office. Providers are required to report these activities to HHSC-OIG when identified. HHSC-OIG will work collaboratively with self-reporting providers. More information about provider self-reporting is available on the OIG website at https://oig.hhsc.texas.gov/providers.

## 1.10.2    Suspected Cases of Provider Waste, Abuse, and Fraud

HHSC-OIG is responsible for minimizing waste, abuse, and fraud by Medicaid providers. HHSC-OIG has established and continues to refine criteria for identifying cases of possible waste, abuse, or fraud and recouping provider overpayments. When HHSC-OIG identifies fraud, waste, and abuse, a case may be referred to the MFCU or Antitrust and Civil Medicaid Fraud Section, or result in administrative enforcement.

## 1.10.3    Employee Education on False Claims Recovery

United States Code (U.S.C.), Title 42, §1396a(a)(68) requires any entity that receives or makes annual Medicaid payments of at least $5,000,000 to establish written policies that provide detailed information about each employee's role in preventing and detecting waste, fraud, and abuse in federal health-care programs. These written policies, which must apply to all employees of the entity (including management) as well as the employees of any contractor or agent of the entity, must address:

- The federal False Claims Act (31 U.S.C. §§ 3729-3733).

- Administrative remedies for false claims and statements as provided in 31 U.S.C. §3802.

- Texas law relating to civil and criminal penalties for false claims (including Chapter 36 of the Human Resources Code; section 35A.02 of the Penal Code; Title 1, Chapter 371, Subchapter G of the TAC; and other applicable law).

- Whistleblower protections under the above laws (including section 36.115 of the Human Resources Code).

In addition, these written policies must include detailed provisions regarding the entity's policies and procedures for detecting and preventing fraud, waste, and abuse. The entity must also include a specific discussion of the following in all employee handbooks:

- The above laws

CPT ONLY - COPYRIGHT 2015 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* ALEX DOE, Relator, | § § § | |
| | § | |
| THE STATES OF TEXAS,<br>*ex rel.* ALEX DOE, Relator, | § § § | |
| | § | |
| THE STATE OF LOUISIANA,<br>*ex rel.* ALEX DOE, Relator, | § § § | Civil Action No. 2-21-CV-022-Z |
| | § | |
| Plaintiffs, | § | |
| v. | § § | |
| PLANNED PARENTHOOD FEDERATION<br>OF AMERICA, INC., PLANNED<br>PARENTHOOD GULF COAST, INC.,<br>PLANNED PARENTHOOD OF GREATER<br>TEXAS, INC., PLANNED PARENTHOOD<br>SOUTH TEXAS, INC., PLANNED<br>PARENTHOOD CAMERON COUNTY,<br>INC., PLANNED PARENTHOOD SAN<br>ANTONIO, INC., | § § § § § § § § § | |
| Defendants. | § § | |

## STATE OF TEXAS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# EXHIBIT G



# OFFICE OF INSPECTOR GENERAL

TEXAS HEALTH & HUMAN SERVICES COMMISSION

STUART W. BOWEN, JR.
INSPECTOR GENERAL

December 20, 2016

**\*\*\*\*\* FINAL NOTICE OF TERMINATION OF ENROLLMENT \*\*\*\*\***

*Via First Class Mail and CMRRR Nos. 7011 2970 0004 0129 1228, 7011 2970 0004 0129 1235, 7011 2970 0004 0129 1242, 7011 2970 0004 0129 1259, 7011 2970 0004 0129 1266 and 7011 2970 0004 0129 1273*

Planned Parenthood Gulf Coast
Registered Agent: Melaney Linton
4600 Gulf Freeway
Houston, Texas 77023-3548

Planned Parenthood of Greater Texas / Planned Parenthood of North Texas
Registered Agent: Kenneth Lambrecht
7424 Greenville Avenue, Suite 206
Dallas, Texas 75231-4534

Planned Parenthood San Antonio / Planned Parenthood South Texas Surgical Center / Planned Parenthood Association of Cameron and Willacy County
Registered Agent: Jeffrey Hons
2140 Babcock Road
San Antonio, Texas 78229-0000

Re:     Planned Parenthood Final Notice of Termination

Dear Provider:

## I.  FINAL NOTICE OF TERMINATION

This notice is to inform you that the Texas Health and Human Services Commission's Office of Inspector General (HHSC-IG) is hereby terminating the enrollment of the following providers and associated Texas Provider Identification (TPI) numbers from the Texas Medicaid program: Planned Parenthood Gulf Coast, Planned Parenthood of Greater Texas, Planned Parenthood of North Texas, Planned Parenthood San Antonio, Planned Parenthood South Texas Surgical Center, and Planned Parenthood Association of Cameron and Willacy County (hereafter Planned Parenthood, you, or your). 1 Tex. Admin. Code § 371.1703(e) (2016). *See* Attachment A for list of TPI numbers. Because of the violations listed below, HHSC-IG finds that you are not qualified

---

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **2** of **6**

to provide medical services in a professionally competent, safe, legal and ethical manner under the relevant provisions of state and federal law pertaining to Medicaid providers.

The basis for your termination and the termination of your affiliates stems from an extensive undercover video obtained by the Center for Medical Progress at the Planned Parenthood Gulf Freeway facility in April 2015, which contains evidence that Planned Parenthood violated state and federal law. The evidence arises from detailed discussions with the Planned Parenthood Gulf Coast's staff. In addition, the United States House of Representatives' Select Investigative Panel (House Investigative Panel) uncovered evidence consistent with and supportive of this termination.[1]

The unedited video footage indicates that Planned Parenthood follows a policy of agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion. These practices violate accepted medical standards, as reflected in federal and state law, and are Medicaid program violations that justify termination. *See* 42 U.S.C. § 289g-1; 42 U.S.C. § 289g-2; 1 Tex. Admin. Code § 371.1659(2) and (6); 1 Tex. Admin. Code § 371.1661; 1 Tex. Admin. Code § 371.1703(c)(6); 1 Tex. Admin. Code § 371.1605(a); 1 Tex. Admin. Code § 371.1603(g)(5) and (7). The HHSC-IG's Chief Medical Officer reviewed the video and concluded that your willingness to engage in these practices violates generally accepted medical standards, and thus you are not qualified to provide medical services in a professionally competent, safe, legal and ethical manner.

The video reveals numerous violations of generally accepted standards of medical practice. Examples include:

1. a history of deviating from accepted standards to procure samples that meet researcher's needs;

2. a history of permitting staff physicians to alter procedures to obtain targeted tissue samples needed for their specific outside research;

3. a willingness to convert normal pregnancies to the breech position to ensure researchers receive intact specimens;

4. an admission that "we get what we need to do to alter the standard of care where we are still maintaining patient safety, still maintaining efficiency in clinic operations, but we integrate research into it";

5. an admission that Planned Parenthood gets requests for "information from our study sponsor on what data they need that is not our standard of care," and that you provide what

---

[1] On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel, a bipartisan panel, to conduct a full and complete investigation of the medical practices of abortion providers and the practices of entities that procure and transfer fetal tissue. On December 1, 2016, the Investigative Panel referred its evidence to the Texas Attorney General.

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **3** of **6**

is needed by creating a separate research protocol or template that can include medically unnecessary testing; and

6. a willingness to charge more than the costs incurred for procuring fetal tissue.

In addition, HHSC-IG has evidence that you engaged in misrepresentations about your activity related to fetal tissue procurements, as revealed by evidence provided by the House Investigative Panel. These misrepresentations show that you are not qualified to provide medical services in a professionally competent, safe, legal and ethical manner, and thus they support this termination. *See* 1 Tex. Admin. Code § 371.1661; 1 Tex. Penal Code § 37.08; 1 Tex. Admin. Code § 371.1603(g)(6); 42 U.S.C. § 1320a-7(b)(5); 42 U.S.C. § 1320a-7(b)(16); 1 Tex. Admin Code § 371.1651(15); 1 Tex. Admin. Code § 371.1655(7); 1 Tex. Admin. Code. § 371.1655(24); 1 Tex. Admin. Code § 371.1605(a).

In the *HHSC Medicaid Provider Agreement*, you agreed to comply with all of the requirements in Title 1, Part 15, Chapter 371 of the Texas Administrative Code, the Texas Medicaid Provider Procedures Manual, and all state and federal laws governing or regulating Medicaid. You further acknowledged in that agreement that failing to comply with any applicable law, rule, or policy of the Medicaid program or permitting circumstances that potentially threaten the health or safety of a client would be grounds for termination of your enrollment.

Your misconduct is directly related to whether you are qualified to provide medical services in a professionally competent, safe, legal and ethical manner. Your actions violate generally accepted medical standards, as reflected in state and federal law, and are Medicaid program violations that justify termination.

HHSC-IG rules provide that if you are affiliated with a provider that commits a program violation subjecting it to enrollment termination, then the affiliate is also subject to enrollment termination. *See* 1 Tex. Admin. Code §371.1703(c)(7); 1 Tex. Admin. Code §371.1605(a). Furthermore, the video and other evidence provide numerous indicia of affiliation, including:

1. common identifying information among affiliates;

2. individual providers working across affiliates;

3. a requirement that affiliates follow protocols and procedures prescribed by the Planned Parenthood Federation of America;

4. a requirement that affiliates report research studies to the Planned Parenthood Federation of America;

5. Planned Parenthood Federation of America provides for the legal review of research contracts;

6. Planned Parenthood Federation of America requires training for affiliates;

7. Planned Parenthood Federation of America provides certification of affiliates;

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **4** of **6**

8.  Planned Parenthood Federation of America centralizes the oversight, use, and review of research projects; and

9.  Planned Parenthood affiliates may use research agreements at one affiliate to facilitate additional research at other affiliates.


## II. SCOPE OF TERMINATION

The termination of your enrollment means that:

1.  Your contract with the Texas Medicaid program will be nullified on the effective date of the termination. 1 Tex. Admin. Code § 371.1703(g)(1);

2.  The TPI Number(s) related to your contract will become ineffective on the effective date of the termination;

3.  No items or services furnished under your TPI will be reimbursed by the Medicaid program, after your enrollment is terminated. 1 Tex. Admin. Code § 371.1703(g)(2);

4.  You will be required to re-enroll in the Texas Medicaid program, if you wish to participate as a Texas Medicaid provider. 1 Tex. Admin. Code § 371.1703(g)(3);

5.  Your enrollment or contract in the Medicare program may be subject to termination. 1 Tex. Admin. Code § 371.1703(g)(4);

6.  Your enrollment or contract in the Medicaid program of any other state may be subject to termination. *Id*.; and

7.  This termination will remain in effect until such time as you re-enroll and are approved to participate as a Texas Medicaid provider.


## III. APPEAL PROCESS

You may appeal this enrollment termination. In order to do so, **HHSC-IG must <u>receive</u> a written request from you asking for an administrative hearing before HHSC's appeals division on or before the 15th calendar day from the date you receive this notice**. 1 Tex. Admin. Code § 371.1703(f)(2).

All submissions, including your request for an administrative hearing, should be mailed to:

> Texas Health and Human Services Commission
> Office of Inspector General
> Mail Code 1358
> P.O. Box 85200
> Austin, Texas 78708-5200

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **5** of **6**

Pursuant to 1 Tex. Admin. Code §§ 371.1615(b)(2) and (4), any request for an administrative hearing must:

1. be sent by certified mail to the address specified above;

2. include a statement as to the specific issues, findings, and/or legal authority in the notice letter with which you disagree;

3. state the bases for your contention that the specific issues or findings and conclusions of HHSC-IG are incorrect;

4. be signed by you or your attorney; and

5. arrive at the address specified above on or before the 15th calendar day from the date you receive this Final Notice of Termination.

**IF HHSC-IG DOES NOT RECEIVE A WRITTEN RESPONSE TO THIS NOTICE WITHIN 15 CALENDAR DAYS FROM THE DATE YOU RECEIVE IT, YOUR FINAL NOTICE OF TERMINATION WILL BE UNAPPEALABLE.**

## IV. TERM OF ENROLLMENT TERMINATION

The effective date of this enrollment termination depends upon whether you choose to appeal:

- If you do not request a hearing as discussed above, the effective date of your enrollment termination will be the 30th calendar day following your receipt of this Final Notice of Termination. 1 Tex. Admin. Code §§ 371.1615(c), 371.1617(a)(1), 371.1703(g)(8); or

- If you request an administrative hearing, then the effective date will be the date the administrative law judge's decision to uphold your enrollment termination becomes final. 1 Tex. Admin. Code § 371.1703(g)(7).

This enrollment termination is permanent. If you want to participate as a provider in the Texas Medicaid program in the future, you will be required to submit a new provider enrollment application. 1 Tex. Admin. Code § 371.1703(g)(3).

Respectfully yours,

Stuart W. Bowen, Jr.
Inspector General

Attachment

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **6** of **6**

Attachment A

These are the TPIs that Texas Medical Health Partnership reports as affiliated with Planned Parenthood and which are believed to be active:

2164345-01, 2164360-01, 1269599-06, 1269599-07, 1269599-10, 1269599-11, 2187189-01, 2815037-01, 2815060-01, 1126104-02, 1126104-04, 1126104-06, 1126104-07, 1126104-08, 1126104-09, 1126104-14, 3035461-01, 0834095-01, 0834095-02, 0834095-04, 1126104-05, 1126104-10, 1126104-11, 1126104-12, 1122699-01, 1122699-06, 1272197-02, 1272197-03, 1272197-05, 1272197-07, 1272197-10, 1272197-12, 1364812-06, 1364812-13, 2999112-01, 2999112-02, 2999112-03, 2999112-05, 2999112-08, 2999112-09, 3147803-01, 3150385-01, 3150484-01, 3159402-01, 2100489-01, 2120669-01, 2121964-01, 2096414-01, 2103566-01, 2109696-01, 3353781-01, 1373391-01, 1373391-10, 1373391-04, 1373391-11, 1373391-12, 2866873-01

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX DOE, Relator, | § § § | |
| | § | |
| THE STATES OF TEXAS, *ex rel.* ALEX DOE, Relator, | § § § | |
| | § | |
| THE STATE OF LOUISIANA, *ex rel.* ALEX DOE, Relator, | § § § | Civil Action No. 2-21-CV-022-Z |
| | § | |
| Plaintiffs, | § | |
| v. | § § | |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD GULF COAST, INC., PLANNED PARENTHOOD OF GREATER TEXAS, INC., PLANNED PARENTHOOD SOUTH TEXAS, INC., PLANNED PARENTHOOD CAMERON COUNTY, INC., PLANNED PARENTHOOD SAN ANTONIO, INC., | § § § § § § § § § § § | |
| Defendants. | § | |

**STATE OF TEXAS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# EXHIBIT H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

<table>
<tr>
<td>

PLANNED PARENTHOOD OF GREATER
TEXAS FAMILY PLANNING AND
PREVENTATIVE HEALTH SERVICES, INC.;
PLANNED PARENTHOOD SAN ANTONIO;
PLANNED PARENTHOOD CAMERON
COUNTY; PLANNED PARENTHOOD
SOUTH TEXAS SURGICAL CENTER;
PLANNED PARENTHOOD GULF COAST,
INC.; and JANE DOE #1; JANE DOE #2;
JANE DOE #3; JANE DOE #4; JANE DOE #5;
JANE DOE #6; JANE DOE #7; JANE DOE #8;
JANE DOE #9; and JANE DOE #10, on their
behalf and on behalf of all others similarly
situated,

                Plaintiffs,

    v.

CHRIS TRAYLOR, Executive Commissioner,
Texas Health and Human Services Commission,
and STUART W. BOWEN, JR., Inspector
General, Texas Health and Human Services
Commission, Office of Inspector General,

                Defendants.

</td>
<td>

No.   1:15-CV-01058

</td>
</tr>
</table>

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF—CLASS ACTION

Plaintiffs, by and through their attorneys, and on behalf of all members of the class, bring

this Complaint against the above-named Defendants and their employees, agents, delegates, and

successors in office, in their official capacity, and in support thereof state the following:

### INTRODUCTORY STATEMENT

1.      This civil action is brought pursuant to 42 U.S.C. § 1983 to vindicate rights

secured by the federal Medicaid statutes as well as the U.S. Constitution.

2.      Plaintiffs Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc. ("PPGT"); Planned Parenthood San Antonio ("PPSA"), Planned Parenthood Cameron County ("PPCC"), Planned Parenthood South Texas Surgical Center ("PPSTSC") (together with PPSA and PPCC, "PPST"); and Planned Parenthood Gulf Coast, Inc. ("PPGC") (collectively, "Provider Plaintiffs") provide critically needed family planning and preventive health services to thousands of women and men in underserved areas of Texas through the Medicaid program. For several decades, the Provider Plaintiffs have been trusted Medicaid providers for tens of thousands of Texans.

3.      As is required by federal law, Medicaid enrollees may seek services from a participating provider of their choice and have those services covered by Medicaid. Plaintiffs Jane Doe #1 through #10 ("Patient Plaintiffs") are such women—patients of Provider Plaintiffs who are enrolled in Medicaid and who prefer Provider Plaintiffs to other Medicaid providers. Texas Medicaid does not pay for abortions except in extremely narrow circumstances.

4.      On October 21, 2015, without giving any warning or expressing any previous concerns about Provider Plaintiffs' qualifications to participate in the Medicaid program, the Office of Inspector General of the Texas Health and Human Services Commission ("HHSC") notified the Provider Plaintiffs by Notices of Termination ("Notices") that HHSC was terminating Provider Plaintiffs' Medicaid provider agreements, effective fifteen days after forthcoming Final Notices of Termination. The Notices state that these terminations are based on information that one of the Planned Parenthood organizations (PPGC): 1) "follow[ed] a policy of agreeing to procure fetal tissue even if it means altering the timing or method of an abortion"; 2) failed to comply with universal precautions for the safe handling of bodily tissue and fluid by "allow[ing] individuals posing as commercial buyers of fetal body parts to handle bloody fetal

2

tissue while wearing only gloves"; 3) failed to train staff on such precautions; and 4) had billed

Medicaid for services that were unnecessary or had not occurred.

5.      Each of these allegations is false. In addition, each is wholly irrelevant to

Plaintiffs PPGT and PPST and to their qualifications as Medicaid providers.

6.      Plaintiffs seek declaratory and injunctive relief to protect Patient Plaintiffs' and

other class members' access to—and the Provider Plaintiffs' own ability to provide—these

critical medical services. Defendants' actions violate Section 1396a(a)(23) of Title 42 of the

United States Code ("Medicaid freedom of choice provision") because, by barring the Provider

Plaintiffs from the Medicaid program, Defendants prevent Provider Plaintiffs' patients, including

Plaintiffs Jane Doe #1 through #10, from receiving services from their qualified, willing provider

of choice. Defendants' actions further impermissibly single out Plaintiffs for unfavorable

treatment without adequate justification, in violation of the equal protection clause of the

Fourteenth Amendment.

7.      Unless enjoined, the termination of Provider Plaintiffs' Medicaid provider

agreements will take effect as early as December 8, depending on exactly when HHSC issues its

Final Notices of Termination, immediately disqualifying Provider Plaintiffs from providing basic

and preventive health care services to over 13,500 Texas women and men who depend on

Provider Plaintiffs for that care. Defendants' actions will cause significant and irreparable harm

to Provider Plaintiffs and to their Medicaid patients, including Plaintiffs Jane Doe #1 through

#10, who will lose their provider of choice, will find their family planning services interrupted,

and in many cases will be left with reduced access to care.

## JURISDICTION AND VENUE

8.      Subject-matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and

1343.

9.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C.

§§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the

general legal and equitable powers of this Court.

10.     Venue in this judicial district is proper under 28 U.S.C. § 1391.

## THE PARTIES

**A.      Plaintiffs**

11.     Planned Parenthood of Greater Texas Family Planning and Preventative Health

Services, Inc. is a Texas not-for-profit corporation, headquartered in Dallas. PPGT and its

predecessor organizations have provided high-quality care to Medicaid beneficiaries in Texas for

decades. PPGT provides family planning and other preventive health services to Medicaid

beneficiaries at seventeen health centers in Texas: in Addison, Arlington, Austin, Bedford, Cedar

Hill, Dallas, Denton, Fort Worth, Plano, Lewisville, Mesquite, Paris, Tyler, and Waco. PPGT

offers Medicaid patients a range of family planning and other health services at these centers,

including physical exams, contraception (including long-acting reversible contraception or

"LARC") and contraceptive counseling, clinical breast exams, screening and treatment for

cervical cancer, testing for sexually transmitted infections ("STIs"), pregnancy testing and

counseling, and certain procedures including biopsies and colposcopy. In 2014, PPGT provided

over 10,000 visits to over 5000 patients enrolled in the Texas Medicaid program, including over

2800 visits to provide or remove LARCs and over 2800 well women exams. PPGT brings this

action on behalf of itself and its patients.

12.     Planned Parenthood San Antonio, Planned Parenthood Cameron County, and

Planned Parenthood South Texas Surgical Center, not-for-profit corporations headquartered in

San Antonio, are subsidiaries of Planned Parenthood South Texas, Inc. PPST and its predecessor

organizations have provided high-quality care to Medicaid beneficiaries in Texas for decades.

PPST provides family planning and other preventive health services to Medicaid beneficiaries at

six health centers in Texas in Brownsville, Harlingen, and San Antonio. PPST offers Medicaid

patients a range of family planning and other health services at these centers, including physical

exams, contraception (including LARC) and contraceptive counseling, screening for breast

cancer, screening and treatment for cervical cancer, screening for STIs, pregnancy testing and

counseling, and certain procedures including biopsies and colposcopy. In 2014, PPST provided

over 3000 visits to over 1900 patients enrolled in the Texas Medicaid program, including over

1800 exams, over 900 LARCs, over 1400 STI tests (including nearly 600 HIV tests), and over

600 visits to provide hormonal contraception. PPST brings this action on behalf of itself and its

patients.

13.     Planned Parenthood Gulf Coast, Inc. is a Texas not-for-profit corporation,

headquartered in Houston. PPGC and its predecessor organizations have provided high-quality

care to Medicaid beneficiaries in Texas for decades. PPGC provides family planning and other

preventive health services to Medicaid beneficiaries at seven health centers in the Houston

Metropolitan area. PPGC offers Medicaid patients a range of family planning and other health

services at these centers, including physical exams, contraception (including LARC) and

contraceptive counseling, screening for breast cancer, screening and treatment for cervical

cancer, screening for STIs, pregnancy testing and counseling, and certain procedures including

biopsies and colposcopy. In 2014, PPGC provided over 9000 visits to over 6500 patients enrolled

in the Texas Medicaid program, including over 11,900 STI tests (including nearly 2000 HIV screenings), over 2200 well women exams, over 4600 units of LARCs, and over 1100 visits for oral contraception.

14.     PPGC does not provide abortions. PPGC has a facilities and services agreement with a separate organization, Planned Parenthood Center for Choice, Inc. ("PPCFC"), which does. PPCFC rents space in a building owned by PPGC and operates the PPCFC Ambulatory Surgical Center.  PPGC and PPCFC share a president and CEO, but each organization has its own board of directors, bylaws, and staff. PPGC brings this action on behalf of itself and its Texas patients.

15.     Plaintiff Jane Doe #1, a Texas resident and Medicaid patient, obtains her reproductive health care at various PPST health centers and desires to continue to do so.  She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPST.

16.     Plaintiff Jane Doe #2, a Texas resident and Medicaid patient, obtains her reproductive health care at PPST's Marbach health center and desires to continue to do so. She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPST.

17.     Plaintiff Jane Doe #3, a Texas resident and Medicaid patient, obtains her reproductive health care at PPGT's North Austin health center and desires to continue to do so. She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPGT.

18.     Plaintiff Jane Doe #4, a Texas resident and Medicaid patient, obtains her reproductive health care at PPGC's Prevention Park health center and desires to continue to do

6

so.  She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPGC.

19.     Plaintiff Jane Doe #5, a Texas resident and Medicaid patient, obtains her reproductive health care at PPGT's Waco health center and desires to continue to do so.  She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPGT.

20.     Plaintiff Jane Doe #6, a Texas resident and Medicaid patient, obtains her reproductive health care at PPGT's North Austin health center and desires to continue to do so. She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPGT.

21.     Plaintiff Jane Doe #7, a Texas resident and Medicaid patient, obtains her reproductive health care at PPST's Marbach health center and desires to continue to do so.  She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPST.

22.     Plaintiff Jane Doe #8, a Texas resident and Medicaid patient, obtains her reproductive health care at PPGC's Greenspoint health center and desires to continue to do so. She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPGC.

23.     Plaintiff Jane Doe #9, a Texas resident and Medicaid patient, obtains her reproductive health care at PPGC's Greenspoint health center and desires to continue to do so. She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPGC.

24.     Plaintiff Jane Doe #10, a Texas resident and Medicaid patient, obtains her

reproductive health care at PPGT's North Austin health center and desires to continue to do so.

She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries

who obtain, or who seek to obtain, covered health care services at PPGT.

25.     Plaintiffs Jane Doe #1 through #10 appear pseudonymously because of the private

and personal nature of the medical care that they receive at Provider Plaintiffs, and their desire

not to have that information become public in order for them to assert their legal rights.

**B.     Defendants**

26.     Chris Traylor is Executive Commissioner of HHSC, and in that role, governs

HHSC, which is the state agency that administers Texas's Medicaid program and has notified the

Provider Plaintiffs that it intends to terminate their provider agreements. Defendant Traylor is

sued in his official capacity, as are his employees, agents, and successors in office.

27.     Stuart W. Bowen, Jr. is Inspector General of HHSC, whose office—the Office of

Inspector General—is a division within HHSC. Defendant Bowen notified Provider Plaintiffs

that he intended to terminate their provider agreements on behalf of HHSC.  Defendant Bowen is

sued in his official capacity, as are his employees, agents, and successors in office.

## THE MEDICAID PROGRAM

**A.     The Medicaid Statute**

28.     The Medicaid program, established under Title XIX of the Social Security Act of

1935, 42 U.S.C. § 1396 *et seq*., pays for medical care for eligible needy people. A state may elect

whether or not to participate; if it chooses to do so, it must comply with the requirements

imposed by the Medicaid statute and by the Secretary of the U.S. Department of Health and

Human Services ("HHS") in her administration of Medicaid. *See generally* 42 U.S.C.

§ 1396a(a)(1)–(83).

29.    To receive federal funding, a participating state must develop a "plan for medical

assistance" and submit it to the Secretary of HHS for approval. 42 U.S.C. § 1396a(a).

30.    Among other requirements, the State plan must provide that: "[A]ny individual

eligible for medical assistance . . . may obtain such assistance from any institution, agency,

community pharmacy, or person, qualified to perform the service or services required . . . who

undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23)(A).

31.    Congress has singled out family planning services for special additional

protections to ensure freedom of choice, specifically providing that, with respect to these

services and with certain limited exceptions not applicable here, "enrollment of an individual

eligible for medical assistance in a primary care case-management system . . . , a medicaid

managed care organization, or a similar entity shall not restrict the choice of the qualified person

from whom the individual may receive services…" 42 U.S.C. § 1396a(a)(23)(B).

32.    The federal government reimburses the state of Texas 90% of expenditures

attributable to offering, arranging, and furnishing family planning services and supplies in

Medicaid. 42 U.S.C. § 1396b(a)(5).

**B.      Implementation of the Medicaid Act**

33.    For decades, the Centers for Medicare & Medicaid Services ("CMS"), the agency

within HHS that administers Medicaid (and its predecessor organization), has repeatedly

interpreted the "qualified" language in Section 1396a(a)(23) to prohibit states from denying

access to a provider for reasons unrelated to the ability of that provider to perform Medicaid-

covered services or to properly bill for those services, including reasons such as the scope of the

medical services that the provider chooses to offer.

34.     CMS has explained that "[t]he purpose of the free choice provision is to allow

[Medicaid] recipients the same opportunities to choose among available providers of covered

health care and services as are normally offered to the general population." Ctrs. for Medicare &

Medicaid Servs., CMS Manuals Publication #45, State Medicaid Manual § 2100.

35.     Consistent with this understanding, CMS has a long history of rejecting state

plans that seek to limit the type of provider that can provide particular services. *See, e.g.*, 53 Fed.

Reg. 8699-03 (Mar. 16, 1988) (noting rejection of a state plan that would limit providers to

"private nonprofit" organizations); 67 Fed. Reg. 79121 (Dec. 27, 2002) (noting disapproval of a

state plan amendment that would have limited "beneficiary choice . . . by imposing standards that

are not reasonably related to the qualifications of providers").

36.     More recently, CMS rejected an Indiana plan that barred state agencies from

contracting with or making grants to any entities that perform abortion because it violated the

Medicaid freedom of choice provision. Letter from Donald M. Berwick, Adm'r, CMS, to Patricia

Casanova, Dir., Ind. Off. of Medicaid Pol'y and Plan. (June 1, 2011),

http://www.politico.com/static/PPM169_110601_indiana_letter.html.

37.     Moreover, even though CMS is permitted to waive § 1396a(a)(23) in

demonstration projects approved under Social Security Act § 1115, CMS repeatedly rejects state

requests to do so for family planning services, including twice in the last year and a half: first in

Pennsylvania, *see* Letter from Marilyn Tavenner, Adm'r, CMS, to Beverly Mackereth, Sec'y, Pa.

Dep't of Pub. Welfare (Aug. 28, 2014), http://www.medicaid.gov/Medicaid-CHIP-Program-

Information/By-Topics/Waivers/1115/downloads/pa/pa-healthy-ca.pdf ("No waiver of freedom

10

of choice is authorized for family planning providers."); and more recently in Iowa, *see* Letter

from Manning Pellanda, Dir., CMS Div. of State Demonstrations and Waivers, to Julie

Lovelady, Interim Medicaid Dir., Iowa Dep't of Human Servs. (Feb. 2, 2015),

http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-

Topics/Waivers/1115/downloads/ia/wellness-plan/ia-wellness-plan-current-appvl-02022015.pdf

("No waiver of freedom of choice is authorized for family planning providers.").

### HHSC'S EFFORTS TO TERMINATE PROVIDER PLAINTIFFS

38.     On October 19, 2015, without prior warning, HHSC sent a letter to each of the

Provider Plaintiffs (received by each on October 21) terminating their Medicaid provider

agreements, to be effective fifteen days after the receipt of a Final Notice of Termination.

Although sent to each provider Plaintiff, the letters focus entirely on (false) allegations against

Plaintiff PPGC and against a separate organization with which Plaintiffs associate, Planned

Parenthood Federation of America ("PPFA").

**A.     PPGC Allegations**

39.     Defendants claim four bases justifying PPGC's termination from the Medicaid

program. None of these supposed bases undermines PPGC's competence to provide care in the

Medicaid program—much less the competence of PPGT and PPST—and none is sustainable.

40.     First, PPGC's Notice of Termination claims that heavily edited and misleading

videos produced by the radical anti-abortion group Center for Medical Progress ("CMP")

indicate that PPGC "follow[s] a policy of agreeing to procure fetal tissue even if it means

altering the timing or method of an abortion," and that "these practices violate accepted medical

standards, as reflected in federal law, and are Medicaid program violations that justify

termination." Neither PPGC nor its related entity PPCFC (which, unlike PPGC, provides

abortions) has any such policy. PPGC does not provide abortions, and does not participate in any

fetal tissue donation. PPCFC is not currently involved in any way with fetal tissue donation and

has not been for several years, and its policies expressly forbid alteration of the timing or method

of the abortion for the purpose of obtaining the fetal tissue.

41.     Second, the Notice of Termination claims, again based on a CMP video, that

PPGC has "failed to prevent conditions that would allow the spread of infectious diseases among

employees, as well as patients and the general public," and specifically, "allowed individuals

posing as commercial buyers of fetal body parts to handle bloody fetal tissue while wearing only

gloves," in violation of "mandatory 'universal precautions,' including the use of 'protective

barriers,'" required when infectious materials are handled. These accusations appear based on a

portion of the video in which one of the anti-abortion activists posing as a representative from a

fake tissue procurement company was permitted to examine fetal tissue in a lab at PPCFC. The

precautions taken met the requirements of universal/standard precautions.

42.     Third, the Notice of Termination also asserts that the video reflects that staff

"were not trained in infection control and barrier precautions with regard to the handling of fetal

blood and tissue or they failed to comply with the minimum standards that mandatory training

requires." No further information is given about the nature of the supposed deficiency. At

PPCFC, staff receive appropriate training on infection control, including on blood-borne

pathogens and appropriate barrier protections, as required by its own policies and by the

licensure requirements for ambulatory surgical centers.

43.     Fourth, the Notice of Termination also asserts that Defendants "ha[ve]

information suggesting that fraud and other related program violations have been committed by a

number of Planned Parenthood affiliates enrolled in the Medicaid program in Texas, including

[PPGC]." In addition to unspecified "information that my office has recently received," HHSC

cites two court cases as "proof" that PPGC is guilty of illegal billing practices – the *Reynolds*

case, *Reynolds v. Planned Parenthood Gulf Coast*, No. 9:09-cv-124 (E.D. Tex.),  and the *Carroll*

case, *Carroll v. Planned Parenthood Gulf Coast*, No. 4:12-cv-03505 (S.D. Tex.).

44.     With respect to HHSC's statement that it is acting on allegations related to

*Reynolds*, it is expressly barred from doing so. *Reynolds* was a meritless lawsuit against PPGC

that both Texas and the federal government declined to join, settled with no admission of

wrongdoing for practical reasons, including concern about patient confidentiality being

compromised if the case proceeded. As part of the settlement, Texas expressly "agree[d] to

release and refrain from instituting, directing or maintaining any action seeking permissive

exclusion from the Texas Medicaid Program against PPGC for the Covered Conduct."

45.     The sole other "information" Defendants offer to support their fraud accusation is

the existence of the *Carroll* case, an open case in which, again, both Texas and the federal

government declined to join, and there has been no admission or finding of wrongdoing.

46.     None of the grounds asserted by Defendants relate at all to PPGC's competence to

provide care in the Texas Medicaid program.

47.     On information and belief, Defendants' bases for terminating PPGC's provider

agreements are highly irregular and have not been applied to any other Medicaid provider.

48.     Absent an injunction from the Court, Defendants will terminate PPGC's provider

agreements on or about December 8, 2015.

**B.     PPGT and PPST Allegations**

49.     HHSC's main stated reason for terminating contracts with PPGT and PPST is that

they are allegedly affiliated with PPGC.

13

50.     PPGT and PPST are wholly separate corporations from each other and from

PPGC. They share no ownership interests; nor do they share any control over the delivery of

health services at the various health centers each corporation operates, personnel, or finances.

51.     HHSC also indicates that it is terminating Provider Plaintiffs, in part, because of

their association with PPFA, which HHSC suggests has some "national policy" of condoning

"program violations." PPFA maintains no such policy.

52.     Provider Plaintiffs are not subsidiaries of PPFA. Rather, PPFA is a membership

organization that promulgates medical and other standards to which members (known as

"affiliates"), such as PPGT, PPST, and PPGC, must adhere to operate under the name "Planned

Parenthood" and otherwise use the Planned Parenthood service mark.  PPFA does not provide

medical services or operate health centers.

53.     There are fifty-nine Planned Parenthood affiliates across the country, each with its

own board, CEO, and management structure, and each with control of its own finances and

operations.

54.     Absent an injunction from the Court, Defendants will terminate PPGT's and

PPST's provider agreements on or about December 8, 2015.

### THE IMPACT OF DEFENDANTS' ACTIONS ON PROVIDER PLAINTIFFS AND THEIR PATIENTS

55.     The need for publicly supported family planning services is great in Texas, which

regularly ranks among the worst states for reproductive health care.  In 2010, 54% of

pregnancies in Texas were unintended., *St. Facts About Unintended Pregnancy: Tex.* (2014),

GUTTMACHER INST., https://www.guttmacher.org/statecenter/unintended-pregnancy/TX.html

(hereafter "State Facts: Texas"). Texas is tied for the third highest teen pregnancy rate among the

fifty states.  Kathryn Kost & Stanley Henshaw, *U.S. Teenage Pregnancies, Births and Abortions,*

*2010: Nat'l and St. Trends by Age, Race and Ethnicity* 4 (2014), Guttmacher Inst.,

http://www.guttmacher.org/pubs/USTPtrends10.pdf.  73.7% of Texas's unplanned births are

publicly funded, which is higher than the national average of 68%. State Facts: Texas. Texas also

has high and rising STIs rates. Chlamydia and gonorrhea rates in Texas are well above the

national average. Moreover, the number of reported gonorrhea, chlamydia, and syphilis cases has

increased consistently since 2010. Ctrs. for Disease Control & Prevention, *Sexually Transmitted*

*Disease Surveillance 2014*, at 81–82, 93–94, 107–08 (2015),

http://www.cdc.gov/std/stats14/surv-2014-print.pdf.

      56.     In 2013, an estimated 3,190,970 Texas women needed contraceptive services and

supplies. Of these, 1,774,240 women (55.6%) needed publicly supported services., Jennifer L.

Frost, et al., *Contraceptive Needs and Servs., 2013 Update* at 19 (July 2014), Guttmacher Inst.,

http://www.guttmacher.org/pubs/win/counties/pdf/contraceptive-needs-2013.pdf.

      57.     Only the most needy individuals in Texas are eligible to receive Medicaid

coverage.  In addition to having a low-income, an individual must also meet a special

characteristic, such as being pregnant or having a disability, to be eligible for Medicaid.

      58.     In recent years, the provider network available to Texas Medicaid patients has

declined, to just over 30% of practicing physicians as of 2012. *Drop In Physician Acceptance of*

*Medicaid, Medicare Patients* (2012), Tex. Med. Ass'n,

http://www.texmed.org/template.aspx?id=24764.

      59.     Even if other providers were available, patients insured through Medicaid choose

Provider Plaintiffs based on a number of factors that are generally not available at other

providers. With its evidence-based practices and up-to-date technology, Provider Plaintiffs are

known as providers of high-quality medical care. Many individuals who receive other health care

through community care providers or other Medicaid providers choose to have a separate

provider such as Provider Plaintiffs for their reproductive health care because they are concerned

about their privacy and because they fear being judged by other providers.

60.    In addition, many low-income patients have unique scheduling constraints

because they are juggling inflexible work schedules, childcare obligations, transportation

challenges, and lack of childcare resources. To ensure that these patients have access to family

planning services, Provider Plaintiffs offer extended hours. In addition, Provider Plaintiffs space

patient appointments so as to minimize wait times. They also offer same-day birth control shots,

birth control implants, and intrauterine devices, so that patients only need to make one trip to a

health center to obtain their contraceptive method of choice. Provider Plaintiffs have either a

full-time Spanish speaker on staff or translator services available to non-English speaking

patients at all times.

61.    Defendants' actions will deprive all of Provider Plaintiffs' Medicaid patients,

including Plaintiffs Jane Doe #1 through #10, of access to the high-quality, specialized care that

Provider Plaintiffs provide.

62.    All Patient Plaintiffs rely on Provider Plaintiffs as the providers they can turn to

for critical medical care and for prompt, efficient, and compassionate services. If Provider

Plaintiffs are eliminated from Medicaid, Plaintiffs Jane Doe #1 through #10, and other class

members, will be prevented from receiving services from their provider of choice, will have their

health care interrupted, and may encounter difficulties finding alternative care.

63.    In 2014, PPGT's reimbursements for providing these critical health services to

low-income patients totaled 5% of its overall revenue.

16

64.     In 2014, PPST's reimbursements for providing these critical health services to low-income patients totaled 10% of its overall revenue.

65.     In 2014, PPGC's reimbursements for providing these critical health services to low-income patients totaled over 20% of its Texas revenue.

66.     Without this revenue, Provider Plaintiffs may be unable to continue to provide services in the same manner and may be forced to lay off staff members, reduce hours, or close a health center. If a health center closes, this will affect not only the Medicaid patients at that health center, but all of the patients who seek reproductive health care at that health center.

## CLASS ALLEGATIONS

67.     This lawsuit is properly maintained as a class action under Federal Rules of Civil Procedure 23(b)(1)(B) and (b)(2).

68.     The class consists of all Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at Provider Plaintiffs.

69.     Although the precise size of the class is unknowable, as alleged in Paragraphs 11, 12, and 13 above, Provider Plaintiffs provided covered health care services to over 13,500 Medicaid patients in 2014.  Therefore, the approximate size of the class is 13,500 individuals.

70.     Plaintiffs Jane Doe #1 through #10 are adequate class representatives because they, like other members of the class, are Texas residents and Medicaid patients who obtain their reproductive health care at Provider Plaintiffs' health centers and desire to continue to do so. Unless Defendants are enjoined, class representatives and class members will suffer the same injury and resulting harm:  they will be unable to obtain health care services at the provider of their choice. As a result, many of Provider Plaintiffs' Medicaid patients, including Plaintiffs Jane Doe #1 through #10 and other class members, who already have few or no alternative options,

will find it difficult or impossible to access the reproductive and other health care services they need.

71.     Defendants' actions—terminating Provider Plaintiffs from the Medicaid program—apply generally to the class, such that both declaratory and injunctive relief is appropriate for all members of the class.

72.     Class members raise the same questions of law, including whether Defendants' termination of Provider Plaintiffs' Medicaid provider agreements violates the Medicaid freedom-of-choice provision, 42 U.S.C. § 1396a(a)(23), and the Fourteenth Amendment, such that, as a practical matter, adjudication of their claims would be dispositive of the interests of the other class members.

## CLAIMS FOR RELIEF

### CLAIM I—MEDICAID ACT (TITLE XIX OF SOCIAL SECURITY ACT)

73.     Plaintiffs hereby incorporate Paragraphs 1 through 72 above.

Defendants' actions violate Section 1396a(a)(23) of Title 42 of the United States Code by denying Provider Plaintiffs' patients, including the Plaintiffs Jane Doe #1 through #10, the right to choose any willing, qualified health care provider in the Medicaid program.

### CLAIM II—FOURTEENTH AMENDMENT EQUAL PROTECTION

74.     Plaintiffs hereby incorporate Paragraphs 1 through 72 above.

75.     Defendants' actions violate Plaintiffs' rights by singling them out for unfavorable treatment without adequate justification.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

76.     Order that this action be maintained as a class action pursuant to Federal Rule of

Civil Procedure 23(b)(1)(B) and/or 23(b)(2);

77.     Issue a declaratory judgment that Defendants' actions violate the Medicaid Act;

78.     Issue a declaratory judgment that Defendants' actions violate the Fourteenth

Amendment;

79.     Issue temporary, preliminary, and permanent injunctive relief, without bond,

enjoining Defendants and their agents, employees, appointees, delegates, or successors from

terminating, or threatening to terminate Provider Plaintiffs' Medicaid provider agreements;

80.     Grant Plaintiffs attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988;

and,

81.     Grant such further relief as this Court deems just and proper.


Respectfully submitted the 23rd day of November, 2015.


                            HUSCH BLACKWELL, L.L.P
                            BY: /s/ Thomas H. Watkins
                            THOMAS H. WATKINS
                            Texas Bar No. 20928000
                            Email: Tom.Watkins@huschblackwell.com
                            111 Congress Avenue, Suite 1400
                            Austin, Texas 78701
                            (512) 472-5456
                            (512) 479-1101 (facsimile)

                            JENNIFER SANDMAN *
                            PLANNED PARENTHOOD FEDERATION OF AMERICA
                            Email: Jennifer.Sandman@ppfa.org
                            434 West 33rd Street
                            New York, NY 10001

19

(212) 261-4584
(212) 247-6811 (facsimile)

ALICE CLAPMAN *
RICHARD MUNIZ * [θ]
PLANNED PARENTHOOD FEDERATION OF AMERICA
Email: Alice.Clapman@ppfa.org
Email: Richard.Muniz@ppfa.org
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4862 (Alice Clapman)
(202) 973-4997 (Richard Muniz)
(202) 296-3480 (facsimile)

ATTORNEYS FOR PLAINTIFFS

* Application for admission *pro hac vice* pending
[θ] Practicing under supervision of lawyers
   admitted in DC.