IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 2:21-CV-022-Z |
| | § | |
| PLANNED PARENTHOOD FEDERATION | § | |
| OF AMERICA INC., *et al.*, | § | |
| | § | |
| Defendants, | § | |

## OPINION AND ORDER

Before the Court are Defendants'[1] Combined Motions to Dismiss Relator's Complaint (ECF No. 48) and Combined Motion to Dismiss the State of Texas's Complaint in Intervention (ECF No. 50) (collectively "Motions"). Having considered the Motions and relevant law, the Court finds the Motions should be and are hereby **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** dismissal only of Relator's federal conspiracy to commit health-care fraud claim and **DENIES** dismissal of Relator's and Texas's remaining claims.

### BACKGROUND

From 2013 to 2015, Relator Alex Doe ("Relator") conducted an undercover journalistic investigation to determine whether Planned Parenthood and its affiliates were providing fetal tissue collected from abortions to researchers and tissue procurement companies. ECF No. 2 at 23, ¶¶ 64–65. Relator's investigation revealed Planned Parenthood officials who were willing to (1) obtain fetal tissue in exchange for money and/or (2) modify abortion procedures to obtain

---

[1] Defendants are Planned Parenthood Federation of America, Inc., Planned Parenthood Gulf Coast, Inc., Planned Parenthood of Greater Texas, Inc., Planned Parenthood of South Texas, Inc., Planned Parenthood of Cameron County, Inc., and Planned Parenthood of San Antonio, Inc. The Court will refer to all Planned Parenthood entities as "Defendants" collectively.

1

more intact tissue specimens — in violation of federal and state laws. *Id.* at 23–28, ¶¶ 66–78. In June 2015, Relator provided video footage of those meetings with Planned Parenthood officials to the Attorney General of Texas. *Id.* at 28–29, ¶ 79. The information Relator uncovered prompted the United States House of Representatives, United States Department of Justice, Federal Bureau of Investigation, and State of Texas to investigate Planned Parenthood and its affiliates. *Id.* at 29, ¶ 80. In July 2015, Relator released footage of the Planned Parenthood meetings to the public via YouTube. *Id.* at 29, ¶ 81.

Based in part on the video evidence and information Relator provided, the States of Louisiana and Texas terminated various Planned Parenthood affiliates from their respective state Medicaid programs. On September 15, 2015, Louisiana notified Planned Parenthood Gulf Coast, Inc. ("PPGC") that it would be excluded from the State's Medicaid program. Louisiana did so because the State determined PPGC was not a qualified Medicaid provider. *Id.* at 29, ¶ 82; *see also Id.*, Ex. A. PPGC did not pursue a challenge of the termination by a state administrative proceeding. The termination became final on October 15, 2015. *Id.* at 29, ¶ 83. That same day, the Office of the Inspector General of Texas ("OIG") sent initial notices of termination from the Texas Medicaid program to Planned Parenthood of Greater Texas, Inc. ("PPGT"), Planned Parenthood of South Texas, Inc. ("PPST"), and PPGC. *Id.*, Ex. B. PPGT, PPST, and PPGC did not challenge the initial determinations by a state administrative proceeding. *Id.* at 30, ¶ 85. On December 20, 2016, OIG sent final notices of termination to the three affiliates. *Id.*, Ex. C. The three entities did not contest the terminations by a state administrative proceeding. *Id.* The terminations became final on January 19, 2017. *Id.* at 31, ¶ 92.

In response, Planned Parenthood entities filed lawsuits in Texas and Louisiana federal courts challenging Texas's and Louisiana's termination decisions. *Id.* at 5, ¶ 7. Those courts issued preliminary injunctions in the Planned Parenthood entities' favor. *Id.* Under the preliminary injunctions, Planned Parenthood continued to submit payment claims for Medicaid services *Id.* at 5, ¶ 8. The injunctions required Texas and Louisiana to continue to make such payments. *Id.* On January 17, 2019, a Fifth Circuit panel vacated the preliminary injunction in the Texas case. *Id.* at 6, ¶ 9. On November 23, 2020, the Fifth Circuit sitting *en banc* affirmed vacating of the preliminary injunction in the Texas case, reversed the Louisiana case, and affirmed Texas's determination that Planned Parenthood was not a qualified provider. *Id.* at 6, ¶ 10.

On February 5, 2021, Relator filed the instant *qui tam* action against Defendants. Relator seeks civil penalties and treble damages under the False Claims Act ("FCA"), the Texas Medicaid Fraud Prevention Act ("TMFPA"), and the Louisiana Medical Assistance Programs Integrity Law ("LMAPIL") on behalf of the United States, Texas, and Louisiana. *See generally id.* On November 1, 2021, Texas notified the Court of its election to intervene in the suit. *See generally* ECF No. 16. On November 3, 2021, the United States declined to intervene. *See generally* ECF No. 18. Louisiana has neither elected nor declined to intervene. The Court notes that Louisiana may "intervene and proceed with the qui tam action in the district court at any time during the qui tam action proceedings." LA. REV. STAT. § 46:439.1(F).

On January 6, 2022, Texas filed its Complaint in Intervention, and Relator requested that the United States District Clerk issue summons. *See* ECF Nos. 22, 25. On January 12, 2022, the Court ordered the case unsealed, and the Clerk issued summons to Defendants. ECF Nos. 27, 28, 30. Defendants subsequently filed the motions before the Court today.

ANALYSIS

Defendants ask the Court to dismiss Relator's Complaint — or parts of it — for five reasons: First, Relator fails to plausibly plead the elements of an FCA violation in accordance with Federal Rule of Civil Procedure 12(b)(6). ECF No. 49 at 26. Second, Relator fails to plead fraud with particularity as required by Rule 9(b). *Id.* at 39. Third, the so-called "public-disclosure bar" prohibits Relator's FCA claims. *Id.* at 19; *see also* 31 U.S.C. § 3730(e)(4)(A) (detailing public-disclosure bar). Fourth, Rules 9(b) and 12(b)(6), state public-disclosure bars, and Texas's "government-action bar" preclude Relator's state-law claims. ECF No. 49 at 44; *see also* TEX. HUM. RES. CODE § 36.113(a). Fifth, the Court should dismiss Relator's federal conspiracy to commit health-care fraud claim because "[a] private party has no right to enforce federal criminal statutes." *Balawajder v. Jacobs*, No. 99-211-50, 2000 U.S. App. LEXIS 40044, at *1 (5th Cir. June 14, 2000) (per curiam); *see also Bass Angler Sportsman Soc'y v. U.S. Steel Corp.*, 324 F. Supp. 412, 415 (D. Ala. 1971), *aff'd*, 447 F.2d 1304 (5th Cir. 1971); ECF No. 49 at 45.

Defendants also ask the Court to dismiss Texas's Complaint for four reasons: First, Defendants argue the State is judicially estopped from pursuing its claims. ECF No. 51 at 18. Second, Texas fails to plead elements of a "reverse" TMFPA violation under Rule 12(b)(6). *Id.* at 21. Third, Texas fails to plead fraud with particularity — as required by Rule 9(b) — in its claim against Planned Parenthood Federation of America, Inc. ("PPFA") *Id.* at 27. Fourth, the Court lacks original subject-matter jurisdiction and should decline to exercise supplemental jurisdiction. *Id.* at 29.

## A. Relator's and Texas's Complaints Comply with Rule 12(b)(6)

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff

4

must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *In re Katrina*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555). "The 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Id.* (quoting *Martin K. Eby Constr. Co., Inc. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

A court should first "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* When "well-pleaded factual allegations" exist, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This standard of "plausibility" is not necessarily a "probability requirement," but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-

specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### 1. Relator plausibly pleads the elements of a reverse false claim under the FCA, TMFPA, and LMAPIL.

Defendants argue Relator fails to plausibly plead the elements of a "reverse false claim." Specifically, Defendants assert Relator failed to plead that Defendants "knowingly" avoided or decreased their obligations. The FCA imposes liability on any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The TMFPA makes it unlawful to "knowingly conceal[] or knowingly and improperly avoid[] or decrease[] an obligation to pay or transmit money or property to [the State of Texas] under the Medicaid program." TEX. HUM. RES. CODE § 36.002(12). And the LMAPIL states, "[n]o person shall . . . knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs." LA. REV. STAT. § 46:438.3(C).

a. *Relator plausibly pleads an "obligation."*

The FCA, TMFPFA, and LMAPIL all define an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. 3729(b)(3); *see also* TEX. HUM. RES. CODE § 36.001(7-a) (substantially similar); LA. REV. STAT. § 46:437.3(16) (substantially similar). Relevant to the FCA — however — the Patient Protection and Affordable Care Act ("ACA") provides another definition of "overpayment." The ACA defines an overpayment to include "[a]ny funds that a person receives or retains under subchapter XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such subchapter." 42 U.S.C. § 1320a-7k(d)(4)(B).

Under the ACA, an overpayment must be reported and returned within "60 days after the date on which the overpayment was identified" or "the date any corresponding cost report is due, if applicable." *Id.* § 1320a-7k(d)(2). A failure to return an overpayment within 60 days constitutes a "reverse false claim" actionable under the FCA. *Id.* § 1320a-7k(d).

Relator's Complaint alleges the following:

- Relator's undercover investigation revealed Defendants' fetal tissue procurement practices violated state and federal laws. ECF No. 2 at 23–28, ¶¶ 66–78;

- Texas and Louisiana terminated Defendants from the States' Medicaid programs based on Relator's investigation. *Id.* at 29–30, ¶¶ 82–83, 85; *Id.*, Ex. C;

- PPGC was aware it had been terminated from the Louisiana Medicaid program by September 2015 and continued to submit Medicaid claims to Louisiana for reimbursement "despite their disqualification." *Id.* at 36, ¶ 106;

- PPGC, PPGT, and PPST were aware of their final terminations from the Texas Medicaid program on January 19, 2017 and continued to submit Medicaid claims to Texas for reimbursement "despite their disqualification." *Id.* at 36, ¶ 108;

- Planned Parenthood and its affiliates filed lawsuits in Texas and Louisiana federal courts, which issued preliminary injunctions requiring those States to retain PPGC, PPGT, and PPST as Medicaid providers pending final resolution of the suits. *Id.* at 36, ¶ 109;

- On November 23, 2020, the Fifth Circuit vacated the preliminary injunction issued against Texas and overruled the decision upholding the preliminary injunction issued against Louisiana. *Id.* at 36,40, ¶¶ 109, 120;

- "All monies received by PPGC, PPGT, and PPST under the injunctions are overpayments because PPGC, PPGT, and PPST were not *qualified* providers and were thus not entitled to the money." *Id.* at 37, ¶ 110 (emphasis added); and

- "Specifically, Planned Parenthood did not report or repay the money it had received while it was disqualified within 60 days of November 23, 2020, the date it became aware, or should have become aware, of the overpayments." *Id.* at 37, ¶ 111.

Defendants argue Relator fails to plead the existence of an obligation because the series of injunctions prevented terminations from occurring. Defendants rely on *Wenner v. Texas Lottery*

*Commission* for the proposition that the injunctions maintained the status quo and prevented the existence of any obligation. 123 F.3d 321 (5th Cir. 1997)

*Wenner* addressed Congress's enactment of legislation requiring state lottery tickets to be bought in the state hosting the lottery. *Id.* at 323. A Pennsylvania corporation obtained a preliminary injunction against the legislation. *Id.* During the injunctive period, the plaintiff bought a winning Texas lottery ticket. *Id.* In January 1995, the Texas Lottery Commission refused to honor the plaintiff's claim to the prize. *Id.* In February 1995, the Pennsylvania court rejected the Pennsylvania corporation's challenge and dissolved the injunction. *Id.* at 324. The Third Circuit affirmed. *Id.* The plaintiff then filed suit in Texas. *Id.* He sought a judgment declaring his winning ticket — purchased while the preliminary injunction was in effect — valid. The Fifth Circuit held the ticket was valid and the contract arising from it enforceable. *Id.* at 327.

The *Wenner* decision — however — is distinguishable from this action. Specifically, *Wenner* "did not involve the overpayment of government funds, the obligation to repay government funds, or the right to recover overpayment." ECF No. 61 at 17 (citing generally to *Wenner*). American jurisprudence recognizes the "principle, long established and of general application, that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby." *Arkadelphia Milling Co. v. St. Louis S.W. Ry. Co.*, 249 U.S. 134, 145 (1919). Courts across the country have relied on this longstanding principle to hold that a party may be liable for funds received under a court order or injunction later vacated. *See, e.g.*, *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1327–28 (11th Cir. 2016) (holding — after reversing injunction preventing health-care provider's termination — the government could try to recover payments made pursuant to injunction); *Nat'l Kidney Patients Assoc. v. Sullivan*, 958 F.2d 1127, 1127–28 (D.C. Cir. 1992)

8

(holding Medicaid provider may be liable for failing to repay government funds obtained under vacated injunction); *Md. Dep't Hum. Res. v. U.S. Dep't Agric.*, 976 F.2d 1462, 1467 (4th Cir. 1992) (holding injunction cannot deprive government of right to seek statutorily provided remedies to recoup improperly paid funds); Douglas Laycock, *Federal Interference with State Prosecutions: The Need for Prospective Relief*, 1977 SUP. CT. REV. 193, 209 (1977) ("The interlocutory injunction is not a complete remedy . . . . If the final judgment holds the statute valid, dissolves the interlocutory injunction, and denies permanent relief, state officials would be free to prosecute any violation within that limitations period."). Applying these principles to Relator's Complaint, Defendants' argument fails. Relator's Complaint alleges Texas and Louisiana were required to retain PPGC, PPGT, and PPST as Medicaid providers and to make payments under federal and state-court injunctions, those injunctions were vacated, and Defendants never reported or repaid the money it received during the injunctive period within 60 days of the date they learned of overpayments. Accordingly, Relator plausibly pleads the existence of an obligation.

b. *Relator plausibly pleads "knowingly."*

Under the FCA, a person acts "knowing" or "knowingly" when he (1) "has actual knowledge of the information"; or (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The TMFPA and LMAPIL define "knowingly" in substantially similar ways. *See* TEX. HUM. RES. CODE. § 36.0011(a); LA. REV. STAT. 46:437.3(11). The terms "knowing" and "knowingly" do not require "proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B). When pleading fraud, knowledge "may be alleged generally." FED. R. CIV. P. 9(b).

Relator alleges Defendants knowingly avoided their repayment obligations after Texas and Louisiana notified Defendants of their termination from the Medicaid programs. Relator also

9

alleges Defendants knew they improperly received Medicaid overpayments. Relator's Complaint is replete with such allegations:

- Louisiana issued termination decisions on September 15, 2015, with an effective date of October 15, 2015, which Defendants did not administratively appeal. ECF No. 2 at 29, ¶¶ 82–83; *see also Id.*, Ex. A;

- Texas issued termination decisions on December 20, 2016, with an effective date of January 19, 2017, which Defendants did not administratively appeal. *Id.* at 31 and 36, ¶¶ 91, 92, 108; *see also Id.*, Ex. C;

- On November 23, 2020, the Fifth Circuit vacated the preliminary injunctions requiring retention of Defendants in the Medicaid programs, and Defendants knew or should have known they received overpayments. *Id.* at 37, 39–40, ¶¶ 110, 111, and 120;

- In their Medicaid provider agreements with both Texas and Louisiana Defendants certified they would "comply with the terms of the Agreement and all policies and regulations." *Id.* at 16–17, ¶¶ 38, 43;

- A provider who signs the Texas Provider Agreement "certifies its understanding of and willingness to comply with the terms of the Agreement" including that "any falsification, omission, or misrepresentation in connection with . . . claims filed may result in all paid services declared as an overpayment." *Id.* at 16, ¶ 38;

- By signing the Agreement, the provider also "agrees that it has an affirmative duty to refund any overpayments, duplicate payments, and erroneous payments that are paid to the provider by Medicaid as soon as such payment is discovered or reasonably should have been known." *Id*;

- A provider who signs the Louisiana Provider Agreement "certifies its understanding of and willingness to comply with the terms of the Agreement and all policies and regulations . . . and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable federal and state laws. . ." *Id.* at 17, ¶ 43; and

- A provider who signs the agreement "also agrees to report and refund any discovered overpayments within sixty (60) days of discovery." *Id.*

Defendants argue the effective date of the terminations from the Medicaid programs did not occur until March 2021 because it was "objectively reasonable for Affiliate Defendants to rely on federal and state-court orders, and the thirty-day extension granted by Texas state authorities, in continuing to submit Medicaid claims." ECF No. 49 at 32. But this argument fails for two

reasons. First, it ignores the terminations sent by Texas and Louisiana would become effective 30 days after Defendants received the termination notices. ECF No. 2 Ex. A. ("If you do not request an Informal Hearing or an Administrative Appeal, your termination will become effective thirty (30) days . . . from the date of your receipt of this letter."); *Id.*, Ex. C ("If you do not request a hearing as discussed above, the effective date of your enrollment will be the 30th calendar day following your receipt of this Final Notice of Termination."). Second, the argument ignores the effect of the Fifth Circuit's ruling vacating the injunctions. Once vacated, Defendants allegedly knew of their obligation to repay the States. Their alleged failure to do so could constitute a "knowing" avoidance of this obligation. Thus, Relator plausibly alleges Defendants "knowingly" avoided their repayment obligations to the Texas and Louisiana Medicaid programs.

    c. *Relator plausibly alleges submission of a false claim under an implied false-certification theory.*

Title 31, Section 3729(a)(1)(A) of the United States Code attaches liability to "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Submission of a false-claim cause of action contains four elements: "(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due." *U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009).

An implied false-certification theory is viable when "the claim does not merely request payment, but also makes specific representations about the goods and services," and "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016). Liability turns on "whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's

11

payment decision." *Id.* A defendant can "be liable under the FCA for violating statutory or regulatory requirements, whether or not those requirements were designated in the statute or regulation as conditions of payment." *U.S. ex rel. Lemon v. Nurses to Go, Inc.*, 924 F.3d 155, 159–60 (5th Cir. 2019).

Here, Relator asserts the following to plausibly assert a claim under 31 U.S.C. § 3729(a)(1)(A):

- "By submitting Medicaid claims for payment for women's health services, the Planned Parenthood Defendants represented that they had complied with core state and federal Medicaid requirements," such that they were "qualified" and "had not violated any medical or ethical standards or state or federal laws in its provision of medical services." ECF No. 2 at 38, ¶ 115;

- "By submitting Medicaid claims that conveyed this information without disclosing their violation," the claims constituted material misrepresentations. *Id.* at 38, ¶¶ 115–116; and

- "Defendants knew or reasonably should have known that the Plaintiff States would deny their Medicaid claims and terminate their enrollment in the Medicaid program if they disclosed the violations." *Id.* at 38, ¶ 116.

Defendants assert Relator fails to plausibly plead the elements of "falsity" and "materiality" under the FCA. ECF No. 49 at 34. The Court disagrees. "[M]isrepresenting compliance with a condition of eligibility to even participate in a federal program when submitting a claim" can expose a defendant to liability under the implied false-certification theory. *Escobar*, 136 S. Ct. at 2002. Relator's Complaint plausibly alleges Defendants falsely certified their compliance with the statutory and regulatory requirements needed to participate in the Texas and Louisiana Medicaid programs and that compliance with those requirements was a payment condition. *See* ECF No. 2 at 33, ¶¶ 98–99.

Relator also plausibly pleads materiality. Materiality requires: (1) "the Government's decision to expressly identify a provision as a condition of payment"; (2) "evidence that the

12

defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement"; and (3) "noncompliance is [not] minor or insubstantial." *Lemon*, 924 F.3d at 160. "[I]f a requirement is labelled a condition of payment and it is violated, that alone does not conclusively establish materiality." *Id.* at 161. A violation — however — "is certainly probative evidence of materiality." *Id.* "When evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Escobar*, 136 S. Ct. at 2002.

Relator's allegations plausibly plead the three materiality factors. First, Relator's Complaint alleges Defendants agreed to comply with Texas's and Louisiana's Medicaid-program requirements upon enrollment. ECF No. 2 at 15–18, ¶¶ 37–46. Relator's claim is based on allegations that Defendants falsely certified their compliance with Medicaid program requirements — which Texas and Louisiana have identified as payment conditions. *Id.* In particular, Relator's Complaint alleges both Texas and Louisiana determined Defendants' medical practices violated medical and ethical standards. *Id.* at 31, ¶ 93; *Id.*, Exs. A & C.

As for the second factor, Relator alleges Texas terminated Defendants from the State's Medicaid program when it learned Defendants violated Medicaid requirements that Texas considered conditions of payment. *Id.* at 29, 31, ¶¶ 84, 91. In *Lemon*, the Fifth Circuit determined the "[r]elators raised a reasonable inference that the Government would deny payment if it knew about Defendants' alleged violations" when the relators alleged the United States Department of Health and Human Services's ("HHS") Office of the Inspector General had taken enforcement action against the defendants. 924 F.3d at 162. Like the allegations in *Lemon*, Relator's allegations — that Louisiana and Texas terminated Defendants from their Medicaid programs for violating

13

medical and ethical standards — support a reasonable inference that the United States government would deny payment if it knew about Defendants' alleged violations.

As for the third factor, the *Lemon* court concluded the government "would 'attach importance' to the underlying violations" because the court had determined the allegations were sufficient to find the government would deny payment. *Id.* at 163. Here, Relator alleges Texas and Louisiana did in fact terminate Defendants, and Defendants' noncompliance was substantial. ECF No. 2 at 29–31, ¶¶ 82, 84, 91–93. The Court finds the United States government would attach importance to the underlying violations as they are sufficient to find the federal government would deny reimbursement. Thus, Relator plausibly alleges the elements of falsity and materiality.

### 2. Texas plausibly pleads the elements of a "reverse" TMFPA violation.

Defendants assert Texas fails to plead the elements of an obligation to repay, scienter, and materiality as required by the TMFPA. The Court disagrees with all three assertions.

Under the TMFPA, a person commits an unlawful act if the person "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to [the State of Texas] under the Medicaid program." TEX. HUM. RES. CODE § 36.002(12). An "obligation" is defined as "a duty, whether or not fixed, that arises from . . . the retention of any overpayment." *Id.* § 36.001(7-a)(D). Texas alleges the following regarding Defendants' obligations to repay funds to the State:

- Planned Parenthood entered into provider agreements representing they would comply with the requirements of the Provider Manual and applicable laws. ECF No. 62, Ex. E;

- The Provider Manual informs providers, once they are terminated, they are no longer qualified Medicaid providers. ECF No. 22 at 8, ¶ 16. The Provider Agreement and Provider Manual communicate to providers obligated to repay the State for reimbursements for which they hold no entitlement. ECF No. 62, Exs. E & F;

- "Planned Parenthood was effectively terminated from Texas Medicaid, at the latest, by February 1, 2017." ECF No. 22 at 16, ¶ 37;

14

- "Planned Parenthood has received approximately $10 million in reimbursements from Texas Medicaid for services delivered after February 1, 2017, and before March 12, 2021." *Id.* at 16, ¶ 38; and

- "Planned Parenthood has not paid any of the $10 million back to Texas Medicaid." *Id.* at 16, ¶ 40.

Because of the effect of the state and federal injunctions preventing Planned Parenthood's immediate termination from Texas's Medicaid program, Defendants argue they had no legally imposed obligation to repay funds. ECF No. 51 at 23. But this argument ignores that the injunctions only preserved the status quo *while they were in place* as well as the case law holding retained overpayments are subject to recoupment once an injunction is lifted. Based on the above, the Court concludes Texas plausibly pleads an obligation.

As for the "knowingly" requirement, "[a] person acts 'knowingly' with respect to information if the person: (1) has knowledge of the information; (2) acts with conscious indifference to the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." TEX. HUM. RES. CODE § 36.0011(a). This definition does not require specific intent. *Id.* at 36.0011(b). To show knowledge, Texas pleads:

- Defendants were provided notice of the potential issue of overpayment with receipt of final termination letters. ECF No. 62, Ex. G;

- Under the Provider Manual and the regulations agreed to in the Provider Agreement, Defendants should have known they needed to repay any payments received after their terminations. *Id.*, Exs. E & G; and

- Planned Parenthood knew the final notices of termination letters were effective to terminate their contracts with the State because they argued they would be terminated because of the Final Notice of Termination letters when they sought a preliminary injunction in 2017. *Id.*, Ex. H at 11.

Defendants again argue their reliance on federal and state-court orders and the 30-day grace period allowed by Texas prevented them from "knowingly" acting. ECF No. 51 at 25. And again, this ignores the effect of Fifth Circuit precedent as well as the termination notices' language, which

Defendants relied on in arguing for a preliminary injunction in 2017. Based on the Court's review of the above, the Court finds Texas's Complaint plausibly pleads Defendants were put on notice about possible overpayment issues as early as 2016, Defendants had an obligation to repay reimbursements received between February 1, 2017, and March 12, 2021, after their terminations were final and unappealable under Texas law, and Defendants ignored their obligations. *See* ECF No. 62 at 23.

Materiality — on the other hand — is not an element required under the portion of the TMFPA, Section 36.002(12), relied on by the State, and Texas did not need to plead it. A Section 36.002(12) claim requires that a defendant "knowingly and improperly" avoids his obligation to pay money to Texas under the State's Medicaid program. *See* TEX. HUM. RES. CODE § 36.002(12). Contrast Section 36.002(12) with Section 36.002(4), which states a person commits an unlawful act if he "knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact."[2] Unlike Section 36.002(4), the portion of Section 36.002(12) relied on by Texas does not contain the "material" language. *Id.* § 36.002(12) ("A person commits an unlawful act if the person . . . knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program."). So, Texas need not plead materiality as a component of this claim.

Because Texas plausibly pleads an "obligation" and the "knowingly" requirement, Texas plausibly pleads a claim under the TMFPA, Section 36.002(12).

---

[2] *Cf.* 31 U.S.C. § 3729(a)(1)(G) (imposing liability when one "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay").

**B.  Relator's and Texas's Complaints Comply with Rule 9(b).**

A dismissal for failure to plead with particularity under Federal Rule of Civil Procedure 9(b) is treated as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). A claim brought under a fraud statute — such as the FCA — must comply with Rule 9(b). *U.S. ex rel. Nunnally v. W. Calcasieu Hosp.*, 519 F. App'x 890, 892 (5th Cir. 2013). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Pleading with particularity traditionally requires that "[a]t a minimum . . . a plaintiff [must] set forth the 'who, what, where, when, and how' of the alleged fraud." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (quoting *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)).

But in the FCA context, the Fifth Circuit "has[s] explained that Rule 9(b) is 'context specific and flexible.'" *Nunnally*, 519 F. App'x at 892 (quoting *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). "[A] plaintiff may sufficiently state with particularity the circumstances constituting fraud or mistake . . . . without including all the details of any single court-articulated standard — it depends on the elements of the claim at hand." *Id.* (quoting *Grubbs*, 565 F.3d at 188). The "time, place, contents, and identity standard is not a straitjacket." *Grubbs*, 565 F.3d at 190 (internal marks omitted). An FCA claim need only show the specifics of the fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as a part of that scheme. *Id.* at 189–90.

Defendants argue Relator's Complaint fails to comply with Rule 9(b) for three reasons: First, Defendants allege Relator makes blanket assertions against "Planned Parenthood," which are insufficient under Rule 9(b). ECF No. 49 at 39. Second, Relator fails to plead facts showing

17

PPFA is liable for its affiliates' acts. *Id.* at 41. Third, Relator does not plead presentment of a false claim with particularity. *Id.* at 42. As for Texas's Complaint, Defendants argue the State fails to plead the "who, what, when, where, and how of the alleged fraud," as required by Rule 9(b). ECF No. 51 at 27.

### 1. Relator plausibly pleads fraud with respect to PPGT, PPST, PPCC, and PPSA.

Defendants argue Relator fails to specifically attribute any wrongful conduct to PPGT, PPST, PPCC, and PPSA. Instead, Relator simply "lumps all defendants together as Planned Parenthood." ECF No. 49 at 40. But the Court disagrees. Relator's Complaint alleges:

- PPST and PPGT, "[a]s of October 2015 . . . were aware that Texas had initially determined they were not qualified and would be terminated from the Texas Medicaid program . . . yet continued to certify that they were in compliance with all state and federal laws every time they submitted Medicaid claims for reimbursement . . . ." ECF No. 2 at 36, ¶ 107;

- PPGT's and PPST's terminations became final on January 19, 2017, yet they continued to submit Medicaid claims for reimbursement and submitted they followed all state and federal laws and regulations. *Id.* at 36, ¶ 108; and

- Money received by PPGT and PPST under the now lifted injunctions are overpayments because they were not qualified providers and were not entitled to the money. *Id.* at 37, ¶ 110.

These excerpts demonstrate Relator plausibly pleads the "who, what, when, where, and how," of the fraud he alleges PPGT, PPST, PPCC, and PPSA perpetrated. The Complaint alleges those entities (*who*), from their final terminations from Texas's Medicaid program on January 19, 2017 to November 23, 2020 (*when* and *where*), continued to receive Medicaid payments during the pendency of injunctive relief. *Id.* at 36–37, ¶¶ 108, 110. Those payments — Relator alleges — became overpayments as courts vacated the injunctions, which Defendants failed to report or repay within 60 days of November 23, 2020. *Id.* at 37, ¶ 111. And by that date, Defendants became aware or should have become aware of the overpayments (*what* and *how*). *Id.*, ¶¶ 91–92, 107–111.

18

## 2. Relator plausibly pleads fraud with respect to PPFA.

Defendants argue Relator fails to plead facts demonstrating how PPFA allegedly directed and participated in its affiliates' alleged wrongdoings. ECF No. 49 at 41. The Court — however — finds Relator's Complaint plausibly alleges facts about PPFA's control and direction of its affiliates, as well as PPFA's involvement in its affiliates' violations of medical and ethical standards.

Relator asserts "PPFA provides significant monetary support to these affiliates as well as other types of support and control, such as directives, marketing, communications, requirements, standards, policies, and accreditation for affiliates providing medical care, insurance coverage, legal counsel and representation, and direct support for the provision of healthcare services." ECF No. 2 at 9, ¶ 16. Moreover, Paragraphs 101 through 104 of Relator's Complaint allege PPFA policies regarding research programs and fetal tissue donation apply to all of its affiliates, PPFA sets medical standards and guidelines for which its affiliates must comply, and PPFA concealed from the United States Senate Judiciary Committee that PPGC participated in a University of Texas Medical Branch ("UTMB") study by providing fetal tissue for $21,000 in payments. *Id.* at 34, ¶ 102.

In *Grubbs*, a relator brought a *qui tam* action against Memorial Hermann Baptist Beaumont Hospital, five of the hospital's psychiatric doctors, and two other doctors. 565 F.3d at 183. The Fifth Circuit held relator's complaint insufficient under Rule 9(b) as to the claims made against the defendant-hospital where the relator failed to plead the hospital was vicariously liable for the actions of its doctors and nurses. *Id.* at 192. Unlike *Grubbs*, Relator here pleads facts attributing liability to PPFA stemming from its affiliates' actions. Accepting the alleged facts as true, such allegations allow a reasonable inference that PPFA directed its affiliates' alleged wrongdoing.

19

**3. Relator plausibly pleads a claim under 31 U.S.C. § 3729(a)(1)(A) with particularity as required by Rule 9(b).**

A fraudulent presentment claim "requires proof only of the claim's falsity, not of its exact contents." *Id.* at 189. If a relator "cannot allege the details of an actually submitted false claim, [he] may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190. The Court agrees with Defendants that "Relator does not provide examples of any specific false claims, so he must provide 'reliable indicia that lead to a strong inference that false claims were actually submitted.'" ECF No. 49 at 43 (quoting *Grubbs*, 565 F.3d at 190).

Relator's Complaint alleges the details of a scheme. Defendants agreed to certain standards and regulations when they entered into provider agreements with Texas and Louisiana. ECF No. 2 at 15–18, ¶¶ 37–46. As a result of Relator's undercover investigation, Texas and Louisiana terminated Defendants from their Medicaid programs. *Id.* at 29–31, ¶¶ 82–85, 92. Those terminations — once final — resulted in the revocation of Defendants' status as "qualified" Medicaid providers. *Id.* at 35–36, ¶¶ 105–108. Despite the loss of their "qualified" statuses, Defendants continued to certify compliance with state and federal law each time they submitted Medicaid claims for reimbursement. *Id.* These allegations lay out the particular details of a scheme to submit false claims by failing to disclose noncompliance with Medicaid Provider Qualification Requirements. The scheme Relator alleges leads to a strong inference that Defendants submitted false claims for reimbursement.

These allegations highlight the particular details of Defendants' alleged scheme to submit false claims by failing to disclose noncompliance with Medicaid Provider Qualification Requirements. In *U.S. ex rel. Colquitt v. Abbot Laboratories*, a relator filed a *qui tam* action against his employer, Abbott Laboratories, alleging violations under the FCA's anti-kickback statute. 858

20

F.3d 365, 371 (5th Cir. 2017). Affirming the district court, the Fifth Circuit found relator's allegations insufficient under Rule 9(b) where the complaint "devote[d] a single, vague paragraph to the alleged kickback scheme." *Id.* at 372. Unlike the *Colquitt* complaint, Relator's Complaint includes 20 paragraphs outlining Defendants' Provider Agreements with Texas and Louisiana, Defendants' termination from the States' Medicaid programs, and Defendants' continued compliance despite no longer holding statuses as "qualified" Medicaid providers based on the terminations. *See* ECF No. 2 at 15, 29–31, 35–36, ¶¶ 37–46, 82–85, 92, 105–108.

One can also infer Defendants submitted false claims for reimbursement from Relator's allegations. In *Colquitt*, the Fifth Circuit reasoned a "strong inference that the named hospitals submitted claims to Medicare for vascular procedures using biliary stents could likely be drawn from Colquitt's allegations" where "[n]early every hospital in America participates in Medicare and would most likely have billed Medicare had they performed procedures using Abbott's stents on a person over age 65." 858 F.3d at 372. Here, Relator alleges Defendants continued to submit Medicaid claims for reimbursement despite their termination from Texas's and Louisiana's Medicaid programs. Such an allegation leads to a strong inference that Defendants continued to certify compliance with federal and state laws and regulations whenever they submitted Medicaid claims for reimbursement after their terminations.

Considering the above, the Court finds Relator's claim under 31 U.S.C § 3729(a)(1)(A) satisfies Rule 9(b).

### 4. Texas plausibly pleads PPFA perpetrated fraud with particularity.

Defendants argue Texas's Complaint "is utterly devoid of any allegations against PPFA" and "Texas cannot plead a claim against PPFA by lumping all defendants together." ECF No. 51 at 27–28. In its Complaint, Texas asserts PPFA directed and participated in its affiliates' alleged

wrongdoing. *See* ECF No. 22 at 10, ¶ 20 ("PPFA provides significant monetary support to these affiliates as well as other types of support and control, such as directives, marketing, communications, requirements, standards, policies, and accreditation for affiliates providing medical care, insurance coverage, legal counsel and representation, and direct support for the provision of healthcare services."). Texas also alleges PPFA reviews its affiliates' research contracts, approves their research programs and contracts, sets their training and certification requirements, and sets medical standards and guidelines that each affiliate must comply with. ECF No. 62, Ex. G.

A parent corporation may be held liable for acts of subsidiaries when an "alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management," and when the parent has interfered with the subsidiaries' operations in a way that surpasses control intrinsic to ownership. *United States v. Bestfoods*, 524 U.S. 51, 64–65 (1998); *see also United States v. Omnicare, Inc.*, No. 1:15-CV-4179 (CM), 2021 WL 1063784 at *14 (S.D.N.Y. Mar. 19, 2021).

Though not binding authority, *Omnicare* is persuasive here. In *Omnicare*, a relator filed a *qui tam* FCA action against Omnicare, Inc. and CVS Health Corp., alleging Omnicare "consistently dispensed prescription drugs to individuals living at long-term residential facilities that were not supported by valid prescriptions." *Id.* at *1. CVS sought dismissal of the federal government's complaint-in-intervention, arguing the government failed to "allege any type of veil-piercing or that CVS directly participated in the allegedly unlawful scheme perpetrated by Omnicare." *Id.* at *13. The New York district court disagreed. *Id.* at *14. Citing the rule in *Bestfoods*, the court found the government's allegations against CVS "more than sufficient" at the motion-to-dismiss stage where the government's complaint alleged CVS's active role in

overseeing Omnicare's operations and CVS's knowledge and involvement in state investigations of Omnicare. *Id.* at *13–14.

Like *Omnicare*, Texas's Complaint is more than sufficient at the motion-to-dismiss stage. The oversight Texas alleges interferes with PPFA affiliates' operations in a way that "surpasses the control exercised by a parent as an incident of ownership." *See* ECF No. 22 at 9–10, ¶¶ 19–20; ECF No. 62, Ex. G. Because Texas alleges such interference and control, the State pleads with particularity PPFA's liability for its affiliates' alleged failure to repay Medicaid funds to the State.

### C. The FCA's, TMFPA's, and LMAPIL's Public Disclosure Bars Do No Prohibit Counts I–IV of Relator's Complaint

Under the FCA, a court must dismiss an action or claim "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in certain ways. 31 U.S.C. § 3730(e)(4)(A). The methods of disclosure include: (1) "in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party"; (2) "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; and (3) "from the news media" unless the relator qualifies as an "original source." *Id.* The TMFPA and LMAPIL have similar provisions. *See* TEX. HUM. RES. CODE § 36.113(b); LA. REV. STAT. § 49:439.1(D)(1). An "original source" under the FCA is:

> an individual who either (i) prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) [(ii)] who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under [the FCA, Section 3730].

31 U.S.C. § 3730(e)(4)(B).

To determine whether the public disclosure bar applies, the Fifth Circuit applies a three-part test. *See U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 173

(5th Cir. 2004). First, a court must ask "whether there has been a public disclosure of allegations or transactions." *Id.* at 173. Second, the court asks "whether the qui tam action is based upon such publicly disclosed allegations." *Id.* Third, the Court asks "if so, whether the relator is the original source of the information." *Id.* The first two steps are often combined "because it allows the scope of the relator's action in step two to define the 'allegations or transactions' that must be publicly disclosed in step one." *U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011).

"A challenge under the FCA's public disclosure bar 'is necessarily intertwined with the merits and is, therefore, properly treated as a motion for summary judgment.'" *U.S. ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269, 273 (5th Cir. 2021) (quoting *Jamison*, 649 F.3d at 326). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

### 1. Relator's Complaint is not based on publicly disclosed information.

Defendants argue Relator bases Relator's two theories of FCA liability on publicly disclosed information. They assert Relator's false-certification theory is based on information in Texas's termination letters, Relator's journalistic investigation footage available on YouTube and elsewhere, and information in a United States House of Representatives Select Committee Report. ECF No. 49 at 22. Defendants also assert Relator's reverse false-claim theory relies on termination letters from Texas and Louisiana, the Fifth Circuit's *en banc* opinion in *Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc. v. Kauffman*. 981 F.3d 347 (5th Cir. 2020) (en banc); ECF No. 49 at 23. They also argue Relator "adds no original information, merely citing these public documents and alleging on information and belief that Defendants continued to submit claims and failed to report or return funds they had already received." ECF No. 49 at 23 (internal marks omitted). Both arguments fail.

24

The Complaint contains nearly fifty paragraphs describing the Relator's investigation into Planned Parenthood, disclosures to State governments, subsequent federal and state investigations, and informational bases for Relator's two theories of FCA liability. *See generally* ECF No. 2. Paragraphs 64 through 78 discuss the information gathered from Relator's journalistic investigation of Planned Parenthood. This investigation revealed PPFA and its affiliates were eager to obtain fetal tissue for procurement companies in exchange for payment, willing to modify abortion procedures in order to obtain more intact fetal tissue specimens, and willing to alter contracts with procurement companies to hide the quid pro quo nature of the contracts. *Id.* at 23–24, 26–29, ¶¶ 66–68, 75–78.

Paragraphs 79 through 105 describe Relator's disclosure of the above occurrences to government officials and law enforcement agencies, including the Attorney General of Texas. *Id.* at 29, ¶ 80. Based on the information Relator disclosed, the United States House of Representatives, the United States. Department of Justice, the Federal Bureau of Investigation, and State of Texas initiated investigations into Planned Parenthood's activities. *Id.* Relator also released undercover videos from his investigation to the public via YouTube. *Id.* at 29, ¶ 81. Based on these investigations, Texas and Louisiana terminated Planned Parenthood from their Medicaid programs. *Id.* at 29, 31, ¶¶ 82, 84, and 91.

Paragraphs 105 through 112 detail Relator's allegation that Planned Parenthood failed to disclose noncompliance with Medicaid Provider Qualification Requirements and to report or repay overpayments of funds. Relator alleges facts uncovered from Relator's investigation revealed PPGC permitted a researcher to perform abortions to harvest fetal tissue for her own research, failed to disclose the abortion provider's interest in the tissue to patients, used PPFA's misleading patient consent form to induce women to donate fetal tissue, and transferred fetal tissue to UTMB

for money — specifically, $21,000. *Id.* at 34–35, ¶¶ 102, 105. Relator also alleges PPGC never disclosed these violations to the HHS, Texas Health and Human Services Commission ("HHSC"), or Louisiana Department of Health ("LDH"). *Id.* Still, PPGC continued to certify its compliance with all federal and state laws and regulations when it would submit a Medicaid claim for reimbursement or reenroll as a Medicaid provider. *Id.*

Relator's Complaint alleges — despite their final terminations from the Texas and Louisiana Medicaid programs — Defendants continued to submit Medicaid claims for reimbursement, continually certifying their compliance with federal and state laws and regulations despite their disqualification. *Id.* at 35–36 ¶¶ 106–108. Relator also asserts Defendants received their overpayments due to their disqualification from the Medicaid programs, and he "learned that Planned Parenthood did not report or return any of these funds to the United States or the Plaintiff States after it became aware, or should have become aware, it had an obligation to do so within the statutorily required time period." *Id.* at 37, ¶¶ 110–111.

a. *Relator does not base the false-certification theory on any prior public disclosures.*

As detailed above, Relator "alleges that the facts Relator uncovered in Relator's investigation are evidence of Defendants' failure to disclose to HHS, HHSC, and LDH numerous violations of medical and ethical standards and laws and regulations, yet Defendants continued to falsely certify their compliance with all state and federal laws and regulations every time they submitted Medicaid claims for reimbursement." ECF No. 61 at 31. The public disclosures cited by Defendants do not detail any false certifications made by Defendants. ECF No. 49 at 22. Relator's false-certification theory is not based on the information in those disclosures. ECF No. 61 at 31. And Relator cannot do so; Defendants' false certifications were not publicly disclosed until Relator filed this action. Therefore, a genuine dispute exists as to whether Relator's false certification

theory is based on public information. Relator's public-disclosure theory survives the summary judgment standard applied here. *See Schweizer*, 9 F.4th at 273.

b. *Relator does not base the reverse-false claims theory on prior public disclosures.*

The termination letters and Fifth Circuit's *en banc* opinion in *Kauffman* contain information describing Planned Parenthood's termination from Texas's and Louisiana's Medicaid programs. ECF No. 2, Exs. A–C. In particular, those letters disclose the States' reasons for terminating Planned Parenthood. Yet those alleged public disclosures are not allegations forming the basis of Relator's reverse false claim. Relator instead forms his theory based on Defendants' alleged obligation to repay Medicaid funds received under the preliminary injunction and improper avoidance of that obligation. The Court agrees "Relator never publicly disclosed" any information related to Defendants' alleged failure to report or repay Medicaid funds after they became aware or should have become aware of their obligation to do so — at least not until Relator filed this suit. *See* ECF No. 61 at 32; ECF No. 2 at 37, ¶¶ 110–11.

**2. Relator qualifies as an "original source."**

One can qualify as an "original source" in two ways. First, an individual can qualify as an "original source" if he "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" before a prior "public disclosure under subsection (e)(4)(A)." 31 U.S.C § 3730(e)(4)(B). Second, he can qualify as an "original source" if he "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and "has voluntarily provided the information to the Government before filing an action." *Id.*

Defendants argue Relator bases Relator's allegations on information publicly disclosed to the news media, in the United States House of Representatives Select Committee Report, and in

final termination letters from Texas and Louisiana. ECF No. 49 at 22. Even if true, Defendants'
argument ignores Relator's allegation that Relator voluntarily disclosed this information to
"government officials and law enforcement entities, including the Texas Attorney General," before
uploading the information to YouTube. ECF No. 2 at 28–29 ¶¶ 79–81. It also ignores that the
uncovered information "prompted investigations by the U.S. House of Representatives, the U.S.
Department of Justice, the FBI, and by the State of Texas." *Id.* Because Relator "voluntarily
disclosed to the Government the information on which allegations or transactions in Relator's
claim[s] are based" before a prior "public disclosure" under subsection (e)(4)(A), Relator is an
"original source" defined by the first category. 31 U.S.C. § 3730(e)(4)(B).

Relator would also qualify as an "original source" under the second category because
Relator "ha[d] knowledge that is independent of and materially adds to publicly disclosed
allegations or transactions" and "ha[d] voluntarily provided the information to the Government
before filing an action." *Id.* "Knowledge is direct if it is 'derived from the source without
interruption or gained by the relator's own efforts rather than learned second-hand through the
efforts of others.'" *Jamison*, 649 F.3d at 332 (quoting *Reagan*, 348 F.3d at 177). The "investigation
or experience of the relator either must translate into some additional compelling fact, or must
demonstrate a new and undisclosed relationship between disclosed facts, that puts a government
agency 'on the trail' of fraud, where that fraud might otherwise go unnoticed." *Reagan*, 384 F.3d
at 179.

In *Jamison*, the Fifth Circuit held the relator's complaint did not "include particular
allegations against any defendant," but "merely listed almost 450 nursing homes, DME suppliers,
and their owners or employees, and it indicated generally that they participated in some of the
schemes." 649 F.3d. at 328. The court thus reasoned the relator was not a direct or independent

source because the complaint "merely listed a large group of possible defendants, without identifying specific allegations about any particular one," and "include[d] merely the general description of the fraud." *Id.* at 332. Unlike the complaint in *Jamison*, Relator's Complaint makes specific allegations against six defendants and provides more than general descriptions of the fraud. *See supra* at 16–21.

In *Reagan*, the Fifth Circuit held the relator did not qualify as an "original source" because her "extensive investigation did not put the government 'on the trail' of any new malfeasance, [but] only led her to re-tread the same ground . . . already covered, and to reach a different conclusion." *Reagan*, 384 F.3d at 168. Here — by contrast — Relator stands in a different position. As Relator and Defendants detail, *Relator's* journalistic investigation *triggered* inquiries by Texas, Louisiana, the United States House of Representatives, United States Senate, Department of Justice, and Federal Bureau of Investigations. ECF No. 2 at 28–29, ¶¶ 79–80; ECF No. 49 at 22–23. And unlike the relator in *Reagan*, Relator's investigation put the federal and state governments "on the trail" of Defendants' allegedly fraudulent conduct. Consequently, the Court finds Relator is an "original source" and the public-disclosure bar does not prohibit Relator's claims.

### D. Judicial Estoppel Does Not Prohibit Texas's Claim.

Defendants argue judicial estoppel bars Texas's assertions that the affiliate Defendants "have an obligation to repay amounts they received through Medicaid" during the pendency of the previously discussed injunctions and those Defendants "were terminated from Medicaid in 2017." ECF No. 51 at 18.

"Judicial estoppel 'prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.'" *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (quoting *Ergo Sci., Inc. v. Martin*, 73 F.3d 595,

600 (5th Cir. 1996)). The doctrine is designed "to prevent litigants 'from playing fast and loose with the courts.'" *Id.* (quoting *Ergo Science*, 73 F.3d at 600). Courts apply at least three, non-exhaustive factors to determine whether judicial estoppel applies. Courts consider whether: (1) "a party's later position is clearly inconsistent with its earlier position"; (2) "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled"; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001). The Fifth Circuit requires additional showings that "the position of the party to be estopped is clearly inconsistent with its previous one" and "that party must have convinced the court to accept that previous position." *Hall*, 327 F.3d at 396 (quoting *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 833 (5th Cir. 2000)).

The arguments Defendants present do not suggest judicial estoppel applies in this action. Defendants argue "Texas'[s] position [that Defendants are obligated to repay Texas Medicaid dollars received in reimbursements] is flatly contrary to the position it previously took before the Fifth Circuit," where "Texas acknowledged in moving to stay the district court injunction that 'it forced the State to retain [Affiliate Defendants] as qualified Medicaid providers and allowed them to provide medical services to Texas Medicaid recipients.'" ECF No. 51 at 19.

But Defendants' arguments conflate Texas's previous arguments with what the State argues to *this* Court. At the Fifth Circuit, Texas's motion averred the "State was forced to retain Planned Parenthood as a Medicaid provider under the federal district court's injunction and would be irreparably harmed unless the injunction was stayed." ECF No. 62, Ex. C at 3. Defendants construe this statement as a concession that they need not *repay* money received from Medicaid

30

reimbursements. ECF No. 51 at 19. Texas argues it did not take such a position — and the Court agrees. In summary, in sequence, Texas argued: (1) in the Fifth Circuit, "[the State] was forced to keep paying Planned Parenthood after it was terminated by operation of law"; and (2) in this Court, "[Defendants have] an obligation to repay that money, since the federal district court's injunction and the subsequent state court TRO have been vacated." ECF No. 62 at 14. "Texas has never taken the position that Planned Parenthood is excused from the obligation to repay funds it received after its final termination from the Texas Medicaid program." *Id.*

Defendants also argue Texas's allegation that Defendant affiliates were finally terminated from Texas's Medicaid program by February 1, 2017, contradicts the State's statements to a state court "that the terminations did not become effective until years later, after the federal court injunction had been lifted." ECF No. 51 at 20. Again, the Court disagrees. Texas argued to the state court it should not be precluded from fully implementing Planned Parenthood's final terminations "[b]ecause the terminations were set to take effect in January 2017 under state law, [and] the terminations became immediately effective once the mandate issued . . . . After the Fifth Circuit vacated the injunction there was nothing barring the effectiveness of the terminations or preventing HHSC from proceeding to fully implement them." ECF No. 62, Ex. D at 6–7, 13. Texas did not argue those terminations did not occur by February 1, 2017. Texas's position before this Court is "that while Texas was enjoined as a matter of fact from implementing Planned Parenthood's termination from Medicaid until the state court temporary restraining order was lifted in 2021, as a matter of Texas law, the Defendants' termination was final and unappealable no later than February 1, 2017." *Id.* at 14 (emphasis removed). Texas took that same position before the state court. *Id.* at Ex. D, 6–7.

Defendants also fail to show how Texas convinced the court to accept its previous —
supposedly inconsistent — position. "Absent success in a prior proceeding, a party's later
inconsistent position introduces no risk of inconsistent court determinations, and thus poses little
threat to judicial integrity." *New Hampshire*, 532 U.S. at 750 (internal marks omitted). The Fifth
Circuit did not grant the relief Texas requested in its stay. Instead, the Fifth Circuit left the
preliminary injunction in place and ultimately vacated the injunction on other grounds in its *en
banc* decision in *Kauffman*. 981 F.3d at 353–370. So, the Fifth Circuit did not accept Texas's
position. And Texas has not "derive[d] an unfair detriment" on Defendants through the allegations
the State's Complaint contains. *New Hampshire*, 532 U.S. at 751. Because Texas did not set forth
a position inconsistent with any representations made in prior proceedings, the State did not — as
Defendants claim — unfairly disadvantage Defendants. ECF No. 51 at 20-21. For these reasons,
the Court concludes judicial estoppel does not bar Texas's claims.

### E. Defendants' Various Jurisdictional Arguments

Defendants ask the Court to dismiss Relator's state-law claims for three reasons. All of
Defendants' arguments fail.

First, Defendants argue the Court should dismiss Relator's state-law claims — Counts III,
IV, and V — for the same reasons Relator's FCA claims should be dismissed. The Court declines
to dismiss Relator's state-law claims for the same reasons it declines to dismiss Relator's FCA
claims, as detailed above. *See supra* at 3–29.

Second, Defendants argue the Court should dismiss Relator's TMFPA claim — Count III
— because Texas intervened as to that count. "If the state proceeds with the action, the state has
the primary responsibility for prosecuting the action and is not bound by an act of the person

bringing the action." Tex. Hum. Res. Code § 36.107(a). "The person bringing the action has the right to continue as a party to the action, subject to the limitations set forth by [Section 36.107]." *Id.*

Texas elected to intervene in part, taking primary responsibility for the prosecution of claims under Count III of Relator's Complaint. ECF No. 11 at 6. Pursuant to Section 36.107(a), Relator continues to be a party to this claim, although Relator is not responsible for its prosecution. Relator remains responsible for prosecuting Relator's claims under Section 36.002(9) of the Texas Human Resources Code — Count V of Relator's Complaint — as well as Relator's FCA and LMAPIL claims.

Third, Defendant argues the TMFPA's "government-action bar" interdicts Relator's and Texas's claims under Texas law. The TMFPA bars actions "based on allegations or transactions that are the subject of a civil suit or an administrative penalty proceeding in which the state is already a party." Tex. Hum. Res. Code § 36.113(a). The TMFPA's government-action bar requires a court to:

> dismiss an action or claim under this subchapter, *unless opposed by the attorney general*, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed in a Texas or federal criminal or civil hearing in which the state or an agent of the state is a party, in a Texas legislative or administrative report, or other Texas hearing, audit, or investigation, or from the news media, unless the person bringing the action is an *original source* of the information.

*Id.* § 36.113(b) (emphasis added).

Defendants assert Relator's TMFPA claim is barred under these provisions because "the Texas Medicaid termination proceedings were 'civil money penalty proceedings.'" ECF No. 49 at 44–45; ECF No. 51 at 30. Defendants argue that administrative "civil money penalty proceedings" include any proceedings in which the government had the "capacity to levy" penalties, even if it "chose not to do so." *U.S. ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, LLC*, 531

F. Supp. 3d 247, 167–68 (D.D.C. 2021). But — as discussed above — Relator is an "original source" of the information at issue. Relator is therefore exempt from the TMFPA's "government-action bar." *See* TEX. HUM. RES. CODE. § 36.113(b). Additionally, the Attorney General of Texas "opposes dismissal based on TMFPA § 36.113(b)." ECF No. 62 at 30. Because both Section 36.113(b) exceptions are present here, the Court will not dismiss Relator's TMFPA claim.

### F. The Court will Dismiss Relator's Federal Conspiracy to Commit Health-Care Fraud Claim.

Relator asserts conspiracy to commit health care fraud under 18 U.S.C. § 1347 as well as the TMFPA's and LMAPIL's conspiracy provisions. Section 1347 imposes criminal liability on one who:

> knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program[.]"

Section 1347 is a federal criminal statute. "A private party has no right to enforce federal criminal statutes." *Balawajder*, 2000 U.S. App. LEXIS 40044, at *1. Relator may not seek to enforce Section 1347 against a private party. Thus, the Court **DISMISSES** the Relator's Section 1347 conspiracy claim. Relator also alleges conspiracy to commit health-care fraud under the conspiracy provisions of the TMFPA and LMAPIL. *See* TEX. HUM. RES. CODE § 36.002(9); LA. REV. STAT. § 46.438.3(D). These are civil statutes — so the *Balawajder* rule does not apply — and Relator may seek to enforce them against Defendants.

CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motions. The Court **DISMISSES** Relator's federal conspiracy to commit health-care fraud claim. Because of Texas's intervention, the state is primarily responsible for prosecuting Count III of Relator's Complaint. Relator is responsible for prosecuting all other claims alleged in the Complaint. Any relief not expressly granted in this Opinion and Order is **DENIED**.

**SO ORDERED**.

April **29**, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE