# EXHIBIT E

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *EX REL.* DOE, *et al.,* | § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. 2:21-CV-00022-Z |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., *et al.,* | § § § § | |
| *Defendants.* | § § | |

---

### RELATOR'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLANNED PARENTHOOD GULF COAST, INC.'S FIRST SET OF INTERROGATORIES TO RELATOR

---

To:   Defendant Planned Parenthood Gulf Coast, Inc., c/o Craig Margolis, Murad Hussain, Tirzah Lollar, Christopher Odell, Arnold & Porter Kaye Scholer LLP, 601 Massachusetts Ave., NW, Washington, DC 20001, Attorneys for Defendants Planned Parenthood Gulf Coast, Inc., Planned Parenthood Greater Texas, Inc., Planned Parenthood South Texas, Inc., Planned Parenthood Cameron County, Inc., Planned Parenthood San Antonio, Inc.

Relator Alex Doe serves these Supplemental Objections and Responses to Planned Parenthood Gulf Coast, Inc.'s First Set of Interrogatories to Relator.

### OBJECTIONS

1.     Relator objects to the Interrogatories, including the "Definitions" and "Instructions," where they exceed the requirements imposed by Federal Rule of Civil Procedure (FRCP) 33, other FRCPs, or elsewhere. Relator will respond to the Interrogatories in accordance with FRCP 33, other FRCPs, and applicable law.

2.      Relator objects to the Interrogatories where they seek disclosure of information protected by the attorney-client privilege, the work-product doctrine, the investigative-communications privilege, the common-interest privilege, and/or any other privileges and exemptions set forth in applicable law.

3.      Relator objects to the Interrogatories where they seek information not within Relator's possession, custody, or control.

4.      Relator objects to the Interrogatories where they call for information to be disclosed that is protected by the HIPAA Privacy Rule or is confidential by law.

5.      Relator objects to the Interrogatories where they are not properly limited to an appropriate time period. Answering Interrogatories outside of an appropriate time period will be overly broad, unduly burdensome, and neither relevant to any party's claim or defense, nor proportional to the needs of the case, under FRCP 26(b)(1).

6.      Defendants' definition of the term "Communication" is overly broad, vague, and answering Interrogatories by using this definition would be unduly burdensome. Defendants' definition of the term includes "the transmission or expression of any thought, word, statement, fact, thing, idea, opinion, document, instruction, demand, or question, whether written or oral, whether made in person, by telephone, in a meeting, transmitted electronically or telegraphically, or transmitted in any other fashion." Relator will interpret the terms "communication" consistent with applicable FRCPs, rules, law, and common usage.

7.     Defendants' definition of the term "Describe" is overly broad, vague, and answering Interrogatories by this definition or searching for and identifying "any document or communication" with this definition would be unduly burdensome. Defendants' definition of the term includes "to identify any document or communication concerning the item in question and to provide a complete factual summary chronologically setting forth the substance of, and identifying any person participating in, witnessing, or having knowledge of, whether firsthand or otherwise, any fact, action, occurrence, conduct, event, condition, or circumstance concerning the information in question." Relator will interpret the terms "describe" consistent with applicable FRCPs, rules, law, and common usage.

8.     Defendants' definition of the term "Document" is overly broad, vague, and answering Interrogatories using that definition would be unduly burdensome where the definition departs from the FRCPs and other applicable law; including but not limited to, for example, adding "any designated tangible things," to the definition of "document." Relator will interpret the term "document" consistent with FRCP 33 and other applicable FRCPs, rules, and law.

9.     Defendants' definition of the terms "Regarding," "relating to," "related to," "in relation to," or "relates to" is overly broad, vague, and answering Interrogatories using that definition would be unduly burdensome. Defendants' definition of the terms includes these unlimited descriptions: "relating in any way to, referring to, arising from, dealing with, consisting of, mentioning, discussing, describing, reflecting, concerning, memorializing, supporting, constituting,

evidencing, comprising, recording, or in any other way pertaining to the subject, either in whole or in part, whether directly or indirectly." Relator will interpret the terms "Regarding," "relating to," "related to," "in relation to," or "relates to" consistent with applicable FRCPs, rules, law, and common usage.

10.     Defendants' definition and use of the terms "Relator," "You," and "Your" is overly broad and neither relevant to any party's claim or defense, nor proportional to the needs of the case, under FRCP 26(b)(1). Answering Interrogatories using that definition would be unduly burdensome. These terms as defined by Defendants include persons and entities with no relation to this matter. The terms' vagueness and overbreadth make any Interrogatory with the terms as defined by Defendants exceed the scope of the specific claims and issues in this case and therefore makes those Interrogatories objectionable. Relator will interpret and respond to Interrogatories consistent with applicable FRCPs, rules, law, and common usage.

11.     Relator objects to all of Defendants' Instructions which exceed the requirements of FRCP 33, or other applicable Rules or law. Relator will answer the Interrogatories as required by FRCP 33, and other applicable Rules and law.

12.     The answers made at this time are without prejudice to Relator's rights to amend or supplement its answers as appropriate under the FRCPs or other rules or law.

13.     By answering these Interrogatories, Relator does not concede the relevance or admissibility of the information. Relator further does not waive, but instead, expressly preserves, the objections here.

14.     Relator incorporates by reference the objections above into the answers set forth below. The failure to repeat any of the objections above does not waive any objection to the specific Interrogatory.

15.     Relator intends to not produce documents which are privileged under the attorney-client, common interest, work-product, and government investigative privileges and protections. Any production of documents which are covered by the attorney-client, common interest, work product and government investigative privileges and protections is inadvertent under Federal Rule of Evidence (FRE) 502.

## INTERROGATORIES

### INTERROGATORY NO. 1

Identify each and every claim for payment submitted by each of the Affiliate Defendants that you contend was submitted in violation of the False Claims Act, the Texas Medicaid Fraud Prevention Act, or Louisiana Medical Assistance Programs Integrity Law.  For each claim, state the date of submission; the name of the Affiliate Defendant that submitted the claim; the amount of the claim submitted; the person(s) who submitted or signed the claim; identify the recipient of the claim; state the amount paid to Affiliate Defendants on the claim; describe in detail what is allegedly fraudulent about the claim; identify all evidence you have to support your assertion that the claim was fraudulent; and identify all persons with knowledge

concerning the allegedly fraudulent claim. This request does not seek patient names, patient dates of birth, patient marital status, insured names, insured dates of birth, insured marital status, or other patient information associated with the claims.

**ANSWER**:

Relator refers Defendants to the Expert Reports of Donald Lochabay and the documents cited therein and produced to Defendants. Those materials detail the name of the PPFA Affiliate Defendant that submitted the claim; the amount of the claim submitted; the recipient of the claim; and the amount paid to the PPFA Affiliate Defendant on the claim. A Medicaid provider who signs the Texas Provider Agreement "certifies its understanding of a willingness to comply with the terms of the Agreement," including that "any falsification, omissions, or misrepresentation in connection with the application for enrollment or with claims filed may result in all paid services declared as an overpayment." Complaint, ECF No. 2 at 16, ¶ 38. By signing this Agreement, a provider further "agrees that it has an affirmative duty to refund any overpayments, duplicate payments, and erroneous payments that are paid to the provider by Medicaid as soon as such payment is discovered or reasonably should have been known." Id. The Texas Medicaid Provider Procedures Manual states that providers must be enrolled to participate in the Texas Medicaid Program and to receive reimbursement for services provided to Medicaid recipients, meet all program requirements and licensing and certification requirements, and comply with all other requirements in accordance with all federal and state laws and rules

and regulations. In addition, the Texas Provider Manual states that a provider agrees to comply with all state and federal laws and regulations and policies established by the federal Centers for Medicare and Medicaid Services and the Texas Health & Human Services Commission. The Texas Provider Manual also informs providers of their responsibility for knowing the terms of the Texas Provider Agreement, program standards, statutes and penalties for violations. A Medicaid provider who signs the Louisiana Provider Agreement "certifies its understanding and willingness to comply with the terms of the Agreement and all policies in regulations," and further certifies its understanding "that any false claims, statements or documents, or concealment of a material fact, may be prosecuted under applicable federal and state laws including the provisions of the federal FCA and any Louisiana laws and rules pertaining to civil or criminal penalties for false claims and statements." Complaint, ECF No. 2 at 17–18, ¶ 43.  The Louisiana Medicaid Services Manual provides that—in order to receive reimbursement for healthcare services provided to Medicaid recipients—the provider must be enrolled to participate in the Louisiana Medicaid Program, meet all licensing and/or certification requirements inherent to the healthcare profession, and comply with all other requirements in accordance with all federal and state laws and Louisiana Bureau of Health Services Financing policies. The Louisiana Provider Manual further provides that when enrolled in the Louisiana Medicaid Program, a provider agrees to abide by all applicable state and federal laws and regulations and policies established by the federal Centers for Medicare and Medicaid Services and the

Louisiana Department of Health. It also informs providers that they are responsible for knowing the terms of the Louisiana Provider Agreement, program standards, statutes and penalties for violations. Federal regulations require that all Medicaid-provider claim forms be imprinted with the statements: "This is to certify that the foregoing information is true, accurate, and complete," and "I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." 42 C.F.R. § 455.18. Alternatively, the check for payment of a claim may be imprinted with the statement: "I understand in endorsing or depositing this check that payment will be from Federal and State funds and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." *Id.* at § 455.19. PPFA and the PPFA Affiliates were aware or should have been aware of these statements and certifications when they submitted claims and received payments from Texas and Louisiana Medicaid.

For claims submitted between 2010 and October 2015 in Louisiana, Defendant PPGC falsely certified their compliance with federal and state law and medical and ethical standards when they submitted the claims as required under the Louisiana Medicaid Provider Agreement. Defendant PPGC violated state and federal law and medical and ethical standards during this time period by permitting a researcher to perform abortions to harvest fetal tissue for her own research and failing to disclose the researcher's interest in the tissue to patients, using PPFA's inadequate and misleading patient consent form to induce women to donate fetal

tissue, and transferred the fetal tissue to the University of Texas Medical Branch for valuable consideration.

For claims submitted between 2010 and December 2016 in Texas, Defendant PPGC falsely certified their compliance with federal and state law and medical and ethical standards when they submitted the claims as required under the Texas Medicaid Provider Agreement. Defendant PPGC violated state and federal law and medical and ethical standards during this time period by permitting a researcher to perform abortions to harvest fetal tissue for her own research and failing to disclose the researcher's interest in the tissue to patients, using PPFA's inadequate and misleading patient consent form to induce women to donate fetal tissue, and transferred the fetal tissue to the University of Texas Medical Branch for valuable consideration.

For claims submitted between October 2015 and the present in Louisiana, Defendant PPGC was aware that it had been disqualified from the Louisiana Medicaid program yet continued to submit claims for reimbursement while certifying that they had not been disqualified from the program. For the claims submitted between December 2016 and the present in Louisiana, Defendant PPGC was aware that it had been disqualified from the Texas Medicaid program yet continued to submit claims for reimbursement in Louisiana while certifying that they had not been disqualified from Medicaid in another state.

For claims submitted between October 2015 and December 2016 in Texas, the PPFA Affiliates were aware that PPGC had been disqualified from the Louisiana

Medicaid program yet continued to submit claims for reimbursement in Texas while certifying that they and/or an Affiliate had not been disqualified from Medicaid in another state. For the claims submitted between December 2016 and January 2021 in Texas, the PPFA Affiliate Defendants were aware that they had been disqualified from the Texas Medicaid program yet continued to submit claims for reimbursement while certifying that they had not been disqualified from Medicaid. Because discovery is ongoing, Relator may further supplement this Response with additional documents and information, including documents and information produced by PPFA and the PPFA Affiliates in response to Relator's discovery requests, the Court's order compelling PPFA to produce all documents and communications concerning Texas and Louisiana Medicaid, and Relator's pending motions to compel against PPFA and the PPFA Affiliates.

**INTERROGATORY NO. 2:**

Identify each overpayment received by each of the Affiliate Defendants that you contend Affiliate Defendants were obligated to report and return, but did not. For each overpayment, identify any associated claim by stating the date of submission of the claim; the name of the Affiliate Defendant that submitted the claim, the amount of the claim; the person(s) who submitted or signed the claim; identify the recipient of the claim; state the amount paid to Affiliate Defendants on the claim; describe in detail what is allegedly fraudulent about the claim; identify the principal and material facts supporting your assertion that the claim was

fraudulent; and identify all persons with knowledge concerning the allegedly fraudulent claim. For each violation of the False Claims Act, the Texas Medicaid Fraud Prevention Act, and the Louisiana Medical Assistance Programs Integrity Law Act that you allege in this case, state the damages that you believe the Government, Texas, or Louisiana incurred as a result of the conduct you have alleged. Your answer should include a detailed description of how the damages are calculated, the facts supporting your contention that each Planned Parenthood Defendant is liable for those damages, and all persons with knowledge of the foregoing. This request does not seek patient names, patient dates of birth, patient marital status, insured names, insured dates of birth, insured marital status, or other patient information associated with the claims.

**ANSWER:**

Relator refers Defendants to the Expert Reports of Donald Lochabay and the documents cited therein and produced to Defendants. Those materials detail the name of the PPFA Affiliate that submitted the claim; the amount of the claim submitted; the recipient of the claim; and the amount paid to the PPFA Affiliate on the claim. The reimbursement for all claims made for services provided between October 2015 and the present in Louisiana, and December 2016 and January 2021 in Texas, constitute overpayments because the PPFA Affiliates were disqualified from the Texas and Louisiana Medicaid programs when these claims were submitted and the reimbursements received and thus were not "entitled" to the reimbursements. *See* 42 U.S.C. § 1320a-7k(D)(4)(B). Further, overpayments must be

"reported and returned" within "60 days after the date on which the overpayment was identified." *Id.* § 1320a-7k(d)(2). The Affiliate Defendants knew or should have known as of November 23, 2020 that the reimbursements received during this time period constituted overpayments, yet the PPFA Affiliates (1) did not repay the money within 60 days of that date, (2) have not ever repaid the money, and (3) PPGC continues to make claims and keep reimbursement for claims submitted in Louisiana. Relator also refers PPGC to Relator's answer to Interrogatory No. 1 above which discusses several provisions of the Texas and Louisiana Medicaid Provider Agreements, Texas and Louisiana Provider Manuals, and state and federal Medicaid rules and regulations which support Relator's allegations as to PPFA's and the PPFA Affiliates' liability. Because discovery is ongoing, Relator may further supplement this Response with additional documents and information, including documents and information produced by PPFA and the PPFA Affiliates in response to Relator's discovery requests, the Court's order compelling PPFA to produce all documents and communications concerning Texas and Louisiana Medicaid, and Relator's pending motions to compel against PPFA and the PPFA Affiliates.


**INTERROGATORY NO. 3:**

To the extent that information underlying your allegations in this case came from sources other than your own investigation as described in the Relator's Complaint, identify the sources from which your information is derived, describe what you learned from that source, and state when you consulted the source.

**ANSWER:**

This Interrogatory is overbroad and asks for information which is covered by the attorney-client, common interest, work product, and government investigative privileges and protections. Subject to Relator's objections and statements of privileges, Relator states that all of the information underlying Relator's allegations in this case came from Relator's investigation of Planned Parenthood, which began in or around 2013 and continued through February 5, 2021 when Relator filed his Complaint in this lawsuit. Relator's investigation included research regarding Planned Parenthood's business and corporate structure, research regarding fetal tissue policies and practices involving Planned Parenthood and other companies, numerous meetings with Planned Parenthood staff, attendance at Planned Parenthood and/or National Abortion Federation meetings or conferences, research and review of documents concerning Planned Parenthood's fetal tissue practices, and research and review of Planned Parenthood's enrollment and participation in Medicaid, including Medicaid funds and other government funds paid to Planned Parenthood. Because of the scope and breadth of Relator's investigation of Planned Parenthood, it is not possible for Relator to identify all of the sources of information that he learned during the course of his investigation, however, the names of many of the individuals who played a part in his investigation are included in the documents that Relator is producing in discovery in this lawsuit. In addition, Relator had a number of meetings and conversations with his counsel at Hacker Stephens LLP regarding the information and claims alleged in this lawsuit.

**INTERROGATORY NO. 4:**

Identify and describe in detail the specific parts of the Texas Medicaid Provider Procedures Manual and the Louisiana Medicaid Services Manual that you contend each of the Planned Parenthood Affiliates violated, and describe in detail how you believe that each of the Planned Parent Affiliates violated the Texas Medicaid Provider Procedures Manual and/or the Louisiana Medicaid Services Manual.

**ANSWER:**

The Texas Medicaid Provider Procedures Manual states that providers must be enrolled to participate in the Texas Medicaid Program and to receive reimbursement for services provided to Medicaid recipients, meet all program requirements and licensing and certification requirements, and comply with all other requirements in accordance with all federal and state laws and rules and regulations. In addition, the Texas Provider Manual states that a provider agrees to comply with all state and federal laws and regulations and policies established by the federal Centers for Medicare and Medicaid Services and the Texas Health & Human Services Commission. The Texas Provider Manual also informs providers of their responsibility for knowing the terms of the Texas Provider Agreement, program standards, statutes and penalties for violations.  The Louisiana Medicaid Services Manual provides that in order to receive reimbursement for healthcare services provided to Medicaid recipients, the provider must be enrolled to participate in the Louisiana Medicaid Program, meet all licensing and/or certification

requirements inherent to the healthcare profession, and comply with all other requirements in accordance with all federal and state laws and Louisiana Bureau of Health Services Financing policies. The Louisiana Provider Manual further provides that when enrolled in the Louisiana Medicaid Program, a provider agrees to abide by all applicable state and federal laws and regulations and policies established by the federal Centers for Medicare and Medicaid Services and the Louisiana Department of Health. It also informs providers that they are responsible for knowing the terms of the Louisiana Provider Agreement, program standards, statutes and penalties for violations. Relator also refers PPGC to Relator's answer to Interrogatory No. 1 above which discusses several provisions of the Texas and Louisiana Medicaid Provider Agreements, Texas and Louisiana Provider Manuals, and state and federal Medicaid rules and regulations which support Relator's allegations as to PPFA's and the PPFA Affiliates' liability. Because discovery is ongoing, Relator may further supplement this Response with additional documents and information concerning provisions of state and/or federal law and Medicaid rules or regulations, including documents and information produced by PPFA and the PPFA Affiliates in response to Relator's discovery requests, the Court's order compelling PPFA to produce all documents and communications concerning Texas and Louisiana Medicaid, and Relator's pending motions to compel against PPFA and the PPFA Affiliates.

<u>INTERROGATORY NO. 5:</u>

Identify and describe in detail the principal and material facts and documents known to you relating to any actions taken by each of the Planned Parenthood Affiliates to engage in or facilitate fetal tissue procurement or donation, or agree to engage in or facilitate such procurement or donation, including any and all facts relating to the Center for Medical Progress videos, that in your view renders each of the Planned Parenthood Affiliates unqualified to provide medical services under Medicaid, Texas Medicaid, or Louisiana Medicaid or violates generally accepted medical standards. As required by Instruction No. 8, you must provide a response for each of PPGC, PPST, PP Cameron County, and PP San Antonio.

<u>ANSWER:</u>

Relator is currently unaware that PPST, PP Cameron County, or PP San Antonio agreed to or did engage in or facilitate fetal tissue procurement or donation. As for PPGC, Relator and other investigators were invited in April 2015 to meet in person with PPGC's Research Director, Melissa Farrell, to discuss the possibility of entering into an agreement to provide fetal tissue from second-trimester abortions. The investigators recorded their meetings with Farrell and PPGC's abortion clinic Administrator Tram Nguyen. Farrell told Relator that PPGC's abortion doctors had participated in fetal tissue research and collected their own specimens. She identified a particular PPGC abortion doctor who would collect fetal tissue for her own research while performing abortions at PPGC. Farrell stated that the doctor would look at the patient schedule and pick the patients she wanted staff to get to consent to donate

16

fetal tissue based on whether she could use the fetal tissue for her research. This doctor would collect her own specimens during the abortion and take the fetal tissue "home with her in her cooler." Farrell told investigators that researchers and abortion doctors working at PPGC have targeted specific portions of fetal tissue and that PPGC's doctors are willing to alter abortion procedures to obtain better research specimens. For instance, Farrell stated that PPGC can get "creative" in performing the abortion procedure to obtain more intact liver, thymus, and neural (brain) tissue. She explained that PPGC was willing to explore how it could increase the chances of obtaining intact fetal specimens by altering the abortion procedure and confirmed that when abortion doctors in the past have needed an intact specimen, they can "make it happen." After discussing how changes to the abortion procedure should protect patient safety, Farrell also stated that abortion procedures have been altered in the past when their doctors have been involved in research: "Because some of our doctors in the past have [had] projects, and they're collecting the specimens so they do it in a way that they get the best specimen. So I know it can happen." She also said PPGC can be "flexible to do whatever" in terms of an abortion procedure. Nguyen also confirmed that PPGC could obtain intact liver, thymus, and neural tissue specimens. She stated, while laughing, that although PPGC doctors must sign a form stating that they did not "intend" to complete the abortion procedure by removing an intact fetus (because of the state and federal laws prohibiting partial-birth abortions), PPGC could nevertheless provide intact fetal specimens. During a conversation regarding what factors contribute to obtaining an intact thymus, Nguyen explained that

obtaining intact specimens depends on the amount of cervical dilation PPGC can achieve and the patient's pain tolerance. Nguyen stated that PPGC has done things that other people are "not necessarily comfortable with" in the context of fetal-tissue procurement. Nguyen also explained that these "other things" create more risk. Nevertheless, Nguyen explained PPGC was willing to take this risk because "it is for a good cause." When asked whether PPGC's doctors were experienced enough to provide intact fetal specimens, both Farrell and Nguyen confirmed that two particular PPGC doctors could alter the procedure to meet researchers' requests. Nguyen stated that these doctors are experienced in this area because they both have research backgrounds and one is actively engaged in research. Farrell also discussed "alter[ing]" PPGC's "process" to obtain "intact fetal cadavers" that will provide more than once specimen for research—for example, one fetus providing neural tissue as well as liver and thymus. PPGC officials told Relator that PPGC doctors do not use digoxin in their abortion procedures. Farrell asserted that even though PPGC is "already set up" to do the fetal-tissue procurement, "we will definitely need to work out, you know, something in terms of covering additional costs for additional . . . things related to it." Farrell explained how she uses a contract's language to make it seem that payments are going only to "administrative costs" rather than a *quid pro quo* payment for fetal specimens, which she admitted is "touchy" under federal law: "I'm very particular about working with the language of the budget and contract to where the language is specific to covering the administrative costs and not necessarily the per specimen. Because that borders on some language in the federal regs, it's a

little touchy." Yet Farrell agreed that researchers would not want to pay for unusable fetal specimens, and so PPGC's payment structure could be tied to successfully obtaining the desired fetal tissue while disguising the *quid pro quo*. Farrell discussed how she creates a profit margin in a budget, and how researchers can incentivize PPGC employees to enroll patients to donate fetal tissue through buying meals for the staff as a bonus and listing it under the nebulous category of "meeting cost." Farrell made PPGC's financial interest in its fetal tissue provision clear, despite their nonprofit status, when she replied to the investigator's statement, "I just don't want it to turn into a situation where it's not financially beneficial for you," by explaining, "We definitely want to do that. Because that's what staff and management need to see."

The Center for Medical Progress footage containing this information is located at:

- (1)     http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409071822-Redacted.mp4;

- (2)     http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409074648.mp4;

- (3)     http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409081515.mp4;

- (4)     http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409084341.mp4;

- (5) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409091208.mp4;

- (6) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409094034.mp4;

- (7) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409100901-Redacted.mp4;

- (8) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409103727.mp4;

- (9) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409110553.mp4;

- (10) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409113420.mp4;

- (11) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409120246.mp4;

- (12) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409123112-Redacted.mp4;

- (13) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409125940-Redacted.mp4;

- (14) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409131657.mp4;

- (15) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409134524-Redacted.mp4;

- (16)      http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409141350.mp4;

- (17)      http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409144217.mp4

**INTERROGATORY NO. 6:**

Describe in detail all investigations, reviews, or other inquiries conducted by you related to your allegations that each Affiliate Defendant engaged in improper conduct relating to fetal tissue procurement or donation, or agreed to engage in such conduct, or otherwise violated laws or regulations relating to medical research or fetal tissue procurement or donation or agreed to do so.  Your response should identify the persons involved in such investigations, reviews, or other inquiries, and describe each person's role in the investigation, reviews, or other inquiries.

**ANSWER:**

Relator along with the Center for Medical Progress engaged in an undercover investigation regarding Planned Parenthood's improper conduct relating to fetal tissue procurement or donation, or agreed to engage in such conduct, or otherwise violated laws or regulations relating to medical research or fetal tissue procurement or donation or agreed to do so. Sandra Merritt, Adrian Lopez, Brianna Baxter, and Anna Bettisworth assisted in Relator's investigation of Planned Parenthood at Relator's direction.

**INTERROGATORY NO. 7:**

Describe in detail the information you claim that you "voluntarily disclosed to the government prior to any public disclosure." Rel.'s Opp'n to Defs.' Mot. To Dismiss [Dkt. 61] at 26-27. Your response should identify the specific facts, allegations, and transactions that you claim you disclosed, to whom you disclosed them, through what means you disclosed them, any documents (including videos) through which you disclosed them, and when you disclosed them.

**ANSWER:**

This Interrogatory asks for communications between Relator and the government and seeks information which is covered by the attorney-client, common interest, work product, and government investigative privileges and protections. Subject to the foregoing objections, Relator states that Relator provided information and evidence concerning the material facts and allegations set forth in Relator's Complaint to the United States, Texas, and Louisiana beginning in May 2015 and including on February 5, 2021 before filing Relator's Complaint. On several occasions in May and June 2015, Relator spoke with the staff of various members of Congress to provide information from Relator's investigation of Planned Parenthood. On June 24, 2015, Relator attended an in-person meeting with various members of Congress to provide information from Relator's investigation of Planned Parenthood. These members of Congress included the Hon. Diane Black, Congresswoman from Tennessee, the Hon. Marsha Blackburn, Congresswoman from Tennessee, the Hon. Trent Franks, Congressman from Arizona, the Hon. Tim Murphy, Congressman from Pennsylvania,

and the Hon. Joe Pitts, Congressman from Pennsylvania. At that meeting, Relator provided information regarding Planned Parenthood's violations of state and federal laws. On or about July 1, 2015, Relator spoke on the phone with an official from the Texas Governor's Office, Andy Oldham, to provide information regarding Planned Parenthood's violations of state and federal laws. On or about July 4, 2015, Relator spoke on the phone with officials from the Texas Attorney General's Office to provide information regarding Planned Parenthood's violations of state and federal laws. These officials included Deputy Director of Law Enforcement David Maxwell. Relator provided the Texas Attorney General's Office with copies of recordings that Relator made at Planned Parenthood conferences or clinics. On several occasions between July 4, 2015 and February 5, 2021 Relator spoke with the staff of various members of Congress to provide information regarding Planned Parenthood's violations of state and federal laws. Relator disclosed Defendants' violations of the federal False Claims Act, the Texas Medicaid Fraud Prevention Act, and the Louisiana Medical Assistance Program Integrity Law as set forth in Relator's Complaint to the Louisiana Attorney General at 11:07 AM on February 5, 2021, to the United States Attorney for the Northern District of Texas at 11:10 AM on February 5, 2021, and to the Texas Attorney General at 11:13 AM on February 5, 2021. Planned Parenthood's violations of the federal False Claims Act, the Texas Medicaid Fraud Prevention Act, and the Louisiana Medical Assistance Program Integrity Law as set forth in Relator's Complaint were not publicly disclosed or publicly known until Relator's Complaint was unsealed by this Court on January 12, 2022. Non-privileged documents reflecting these disclosures to

the government are being produced by Relator. Additional non-privileged emails and documents evidencing the dates of Relator's disclosures of material facts and allegations in Relator's Complaint are also being produced by Relator. Relator will provide Defendants with a privilege log for any additional responsive relevant documents withheld for privilege.

## INTERROGATORY NO. 8:

Describe in detail the principal and material facts relevant to your contention that each of the Planned Parenthood Affiliates were "aware of or should have been aware of their obligation to repay the government." Rel.'s Opp'n to Defs.' Mot. To Dismiss [Dkt. 61] at 12-16.

### ANSWER:

A Medicaid provider who signs the Texas Provider Agreement "certifies its understanding of a willingness to comply with the terms of the Agreement," including that "any falsification, omissions, or misrepresentation in connection with the application for enrollment or with claims filed may result in all paid services declared as an overpayment." Complaint, ECF No. 2 at 16, ¶ 38. By signing this Agreement, a provider further "agrees that it has an affirmative duty to refund any overpayments, duplicate payments, and erroneous payments that are paid to the provider by Medicaid as soon as such payment is discovered or reasonably should have been known." *Id*. The PPFA Affiliates were aware or should have been aware of these statements and certifications to which the PPFA Affiliates agreed.

The Texas and Louisiana Medicaid Provider Procedure Manuals state (respectively) that providers must be enrolled to participate in the Texas and Louisiana Medicaid Program and to receive reimbursement for services provided to Medicaid recipients, must meet all program requirements and licensing and certification requirements, and must comply with all other requirements in accordance with all federal and state laws and rules and regulations. In addition, the Texas Provider Manual states that a provider agrees to comply with all state and federal laws and regulations and policies established by the federal Centers for Medicare and Medicaid Services and the Texas Health & Human Services Commission. The Texas Provider Manual also informs providers of their responsibility for knowing the terms of the Texas Provider Agreement, program standards, statutes and penalties for violations. The PPFA Affiliates were aware or should have been aware of these Texas Medicaid program requirements.

Federal regulations require that all Medicaid-provider claim forms be imprinted with the statements: "This is to certify that the foregoing information is true, accurate, and complete," and "I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." 42 C.F.R. § 455.18. Alternatively, the check for payment of a claim may be imprinted with the statement: "I understand in endorsing or depositing this check that payment will be from Federal and State funds and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." *Id*. At § 455.19. The PPFA Affiliates were aware or

should have been aware of these statements and certifications to which Defendant Affiliates agreed.

All PPFA Affiliates were parties to the litigation in *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Services, Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020), and thus knew or should have known that the Fifth Circuit vacated the Texas preliminary injunction (and overruled the decision upholding the Louisiana preliminary injunction). All PPFA Affiliates knew or should have known that their disqualification from Texas Medicaid became final on January 19, 2017 per the final termination letter from the State received by all Affiliate Defendants. PPGC knew or should have known that their disqualification from Louisiana Medicaid became final on October 15, 2015 per the final termination letter from the State received by PPGC. All PPFA Affiliates also knew or should have known of their obligation to repay overpayments because of the extensive Medicaid compliance training the PPFA Affiliates receive from PPFA, and because of the oversight of their own compliance officers.


**INTERROGATORY NO. 9:**

Identify by dates, locations, and names of institution or employer each and every place you have ever lived, studied, or worked, beginning with high school. Include in your response your reason for leaving each institution or employer, including whether you were terminated or asked to resign, and if so why.

**ANSWER:**

This Interrogatory is overbroad and not relevant because it seeks information that exceeds the scope of the specific claims and issues here. Specifically, this Interrogatory seeks information that is not relevant to Relator's claims that Defendants violated federal and state laws prohibiting falsification of Medicaid claims and retention of overpayments from improper Medicaid claims. Relator stands on Relator's objections to this Interrogatory.

**INTERROGATORY NO. 10:**

Identify each and every civil, criminal, or administrative proceeding in which you have been accused of fraud, misrepresentation, false statement, perjury, theft, any other act of dishonesty, or recording a person without permission. For each proceeding, identify the nature of the proceeding, the court or administrative tribunal, any case number assigned to the proceeding, and any judgment, decision, opinion, or outcome associated.

**ANSWER:**

This Interrogatory is overbroad and not relevant because it seeks information that exceeds the scope of the specific claims and issues here. Specifically, this Interrogatory seeks information that is not relevant to Relator's claims that Defendants violated federal and state laws prohibiting falsification of Medicaid claims and retention of overpayments from improper Medicaid claims. Relator stands on Relator's objections to this Interrogatory.

## INTERROGATORY NO. 11:

If you deny any of the Requests for Admission issued by any of the Defendants in this case, in full or in part, describe in detail the basis for your denial.

## ANSWER:

This Interrogatory asks for information regarding Requests for Admissions that have not been served or directed to Relator. Relator cannot provide information concerning the basis for another party's denial of a Request for Admission. This Interrogatory also calls for discrete subparts which will be treated as separate Interrogatories under the FRCP. Relator stands on Relator's objections to this Interrogatory.

Respectfully submitted.

/s/ Andrew B. Stephens
Andrew B. Stephens
Texas Bar No. 24079396
Heather Gebelin Hacker
Texas Bar No. 24103325
HACKER STEPHENS LLP
108 Wild Basin Road South, Suite 250
Austin, Texas 78746
(512) 399-3022
andrew@hackerstephens.com
heather@hackerstephens.com

**Attorneys for Relator**

28

**VERIFICATION**

I hereby certify under penalty of perjury that the foregoing answers are true and correct to the best of my knowledge, information and belief.

 

_____
Alex Doe

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2022, a true and correct copy of the foregoing document was sent by electronic mail to Defendants' counsel to the e-mail addresses below:

Leah Godesky
Danny Ashby
Justin Chapa
Amanda Santella
O'MELVENY & MYERS LLP
lgodesky@omm.com
dashby@omm.com
jchapa@omm.com
asantella@omm.com

**Attorneys for Defendant Planned Parenthood Federation of America, Inc.**

Craig Margolis
Murad Hussain
Tirzah Lollar
Christopher Odell
ARNOLD PORTER KAY SCHOLER LLP
Craig.Margolis@arnoldporter.com
Murad.Hussain@arnoldporter.com
Tirzah.Lollar@arnoldporter.com
Christopher.Odell@arnoldporter.com

**Attorneys for Defendants Planned Parenthood Federation of America, Inc., Planned Parenthood Gulf Coast, Inc., Planned Parenthood of Greater Texas, Inc., Planned Parenthood South Texas, Inc., Planned Parenthood Cameron County, Inc., and Planned Parenthood San Antonio, Inc.**

/s/ Andrew B. Stephens
Andrew B. Stephens