## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| United States of America<br>*ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| | § | |
| The State of Texas<br>*ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| | § | |
| The State of Louisiana<br>*ex rel.* ALEX DOE, Relator, | § | NO. 2:21-CV-22-Z |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| Planned Parenthood Federation of America, Inc., | § | |
| Planned Parenthood Gulf Coast, Inc., Planned | § | |
| Parenthood of Greater Texas, Inc., Planned | § | |
| Parenthood South Texas, Inc., Planned Parenthood | § | |
| Cameron County, Inc., Planned Parenthood San | § | |
| Antonio, Inc., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## DEFENDANTS' AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO RELATOR'S COMPLAINT

Defendants Planned Parenthood Gulf Coast, Inc., Planned Parenthood of Greater Texas, Inc., Planned Parenthood South Texas, Inc., (collectively, "Affiliate Defendants"), Planned Parenthood Cameron County, Inc., Planned Parenthood San Antonio, Inc., and Planned Parenthood Federation of America, Inc. (all together, "Defendants"), respectfully submit the following Amended Answer and Affirmatives Defenses ("Answer") to Relator Alex Doe's Complaint [Dkt. 2] ("Relator Complaint").

## DEFENDANTS' ANSWER

Defendants deny all allegations in the Relator Complaint except as specifically admitted, modified, or explained in this Answer, and demand strict proof of all allegations in the Relator Complaint that are not admitted in this Answer.  Further, as explained in Defendants' memorandum in support of their motion to dismiss the Relator Complaint [Dkt. 49],  the Relator Complaint contains improper group pleading, and Defendants deny all allegations in the Relator Complaint that contain such improper group pleading except as specifically admitted, modified, or explained in this Answer, and demand strict proof of all allegations in the Relator Complaint as to each Defendant that are not admitted in this Answer.  Headings in the Relator Complaint are not factual allegations and require no response.  To the extent a response is required, all statements in headings are denied.  Defendants answer the numbered paragraphs set forth in the Relator Complaint as follows:

1.      This is a civil fraud action brought on behalf of the United States and the States of Texas and Louisiana against Planned Parenthood to recover damages and civil penalties owed to the United States and the Plaintiff States as the result of Planned Parenthood having presented false or fraudulent claims for payment or approval under the Medicaid program, and having concealed or improperly avoided an obligation to repay money wrongfully obtained under the Medicaid program.

**Answer**: Paragraph 1 alleges legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 1. Defendants also specifically deny that they presented false or fraudulent claims for payment or approval under the Medicaid program or concealed or improperly avoided an obligation to repay money wrongfully obtained under the Medicaid program.

2.      Planned Parenthood owns and operates abortion facilities and health clinics in Texas and Louisiana with the purported purpose of providing medical services, delivering pharmaceuticals, providing counseling and educational services and materials for family planning and family planning preventative care, and providing medication and surgical abortions.  Planned Parenthood and its clinics are grantees of state and federal funds provided through state programs and/or directly through federal programs, including the Medicaid program..

**Answer:** Defendants admit that Affiliate Defendants have at some point received state and federal funds, including funds related to the Medicaid program. Defendants deny all remaining allegations in Paragraph 2.

3.      From at least 2010 and continuing through 2020, Planned Parenthood Defendants presented or caused to be presented thousands of false or fraudulent claims for payment for Medicaid services, received millions of dollars of payments from state and federal funds for these false or fraudulent Medicaid claims, and failed to report and pay to the government the money that Planned Parenthood received from these false claims after it knew or should have known that it was not entitled to keep the money.

**Answer:** Paragraph 3 alleges legal conclusions assertions to which no response is required; to the extent a response is required, Defendants admit that Affiliate Defendants continued to submit requests to Texas and Louisiana Medicaid for reimbursement of services delivered, and continued to receive such reimbursement, from February 1, 2017 through March 12, 2021.  Defendants further state that Affiliate Defendants did not submit requests for reimbursement to Texas Medicaid after March 12, 2021, when their terminations became final.  Defendants deny the remaining allegations in Paragraph 3.

4.      Relator learned from an undercover investigation that Planned Parenthood had violated and was continuing to violate numerous medical and ethical standards and state and federal laws that relate to the provision of medical services in a safe, legal, and ethical manner. Relater also learned through the undercover investigation that Planned Parenthood had engaged in a pattern or practice of submitting false or fraudulent claims for payment or approval under the Medicaid program while failing to meet several material conditions for payment.

**Answer:** Defendants deny the allegations in Paragraph 4.

5.      Relator contacted federal and state law enforcement and government officials and provided material non-public information and evidence of Planned Parenthood's violations of medical and ethical standards and state and federal laws.  Based on the information and evidence provided by Relater, the Plaintiff States determined that Planned Parenthood was not qualified to participate in the Medicaid program under applicable state and federal laws governing provider qualifications.  The Plaintiff States informed Planned Parenthood of their determination that Planned Parenthood was not qualified to participate in the Medicaid program and that its enrollment would be terminated.

**Answer:** Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the first two sentences of Paragraph 5 and therefore deny them. Defendants admit that the State of Louisiana Department of Health and Hospitals and Texas Health and Human Services Commission issued Notices of Termination to the Affiliate Defendants on September 15, 2015, and October 19, 2015, respectively, and that the Texas Health and Human Services Commission issued a Final Notice of Termination to the Affiliate Defendants on December 20, 2016.  Defendants deny all remaining allegations in Paragraph 5.

6.     Planned Parenthood failed to contest the Plaintiff States' determinations through state administrative proceedings granted under the Medicaid Act by the States to allow providers to dispute an incorrect or unfounded disqualification.  Planned Parenthood's termination from the Louisiana Medicaid program became final under state law on or about October 15, 2015.  Planned Parenthood's termination from the Texas Medicaid program became final under state law on January 19, 2017.

**Answer:** Defendants admit that Planned Parenthood Gulf Coast has not appealed Louisiana's Notice of Termination through the state administrative processes, but specifically deny that they did not "contest" the termination decision.  Defendants deny the remaining allegations in the first sentence of Paragraph 6. The second and third sentences of Paragraph 6 contain legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 6.  Defendants also specifically deny that the Affiliate Defendants' terminations became final in Louisiana on October 15, 2015, or in Texas on January 19, 2017.

7.     Planned Parenthood filed lawsuits in federal courts in Louisiana and Texas challenging the Plaintiff States' determination that Planned Parenthood was not a qualified provider under the Medicaid statutes and regulations and disputing the information and evidence that Relator had obtained and provided to the Plaintiff States.  The federal district courts in Louisiana and Texas issued preliminary injunctions on Planned Parenthood's claims.

**Answer**: Defendants state that Paragraph 5 refers to and characterizes public court documents, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the documents for a complete and accurate statement of their contents and admit that Affiliate Defendants filed lawsuits in the United States District Court for

the Middle District of Louisiana seeking to enjoin Affiliate Defendants' termination from the Louisiana Medicaid program (No. 3:15-cv-565) and in the United States District Court for the Western District of Texas seeking to enjoin Affiliate Defendants' termination from the Texas Medicaid program (No. 1:15-CV-01058).  Defendants admit that on October 29, 2015, the Middle District of Louisiana entered a preliminary injunction prohibiting Louisiana from terminating Defendant Planned Parenthood Gulf Coast from the Louisiana Medicaid program.  Defendants further admit that on February 21, 2017, the Western District of Texas entered a preliminary injunction prohibiting Texas from terminating the Affiliate Defendants' Medicaid Provider Agreements with Texas.  Defendants deny the remaining allegations in Paragraph 7.

8.      Planned Parenthood continued to submit claims for payment for Medicaid services even after the Plaintiff States had informed Planned Parenthood that they were not qualified to provide Medicaid services or receive payments of state or federal funds under the Medicaid program.  The Plaintiff States were forced to continue making payments to Planned Parenthood for these claims pursuant to the preliminary injunctions.  Thus, Planned Parenthood continued to submit claims for payments for Medicaid services while the Louisiana and Texas lawsuits were pending and received millions of dollars of payments of state and federal funds under the Medicaid program *after* the Plaintiff States had disqualified and terminated them from the Medicaid program.

**Answer**: Defendants admit that Affiliate Defendants continued to submit requests for reimbursement to Texas and Louisiana for Medicaid services delivered to patients, and continued to receive such reimbursement, during the pendency of the above-referenced litigation. Defendants further admit that Texas and Louisiana were required to continue making payments to Affiliate Defendants while they remained qualified Medicaid providers in those states pursuant to

temporary restraining orders and preliminary injunctions issued by the Middle District of Louisiana and Western District of Texas.  Defendants deny all remaining allegations in Paragraph 8.

9.      On January 17, 2019, the United States Court of Appeals for the Fifth Circuit vacated the preliminary injunction in the Texas case and discussed the information and evidence that Relator had provided to the States from the undercover investigation showing numerous violations of medical and ethical standards and state and federal laws, which the Plaintiff States had relied upon in determining that Planned Parenthood was not qualified to participate in the Medicaid program.  Judge Jones wrote separately to say that a prior decision in the Louisiana case was wrongly decided and the Court should grant *en banc* review to reconsider it.  On February 4, 2019, the *en banc* Fifth Circuit agreed to rehear the case on its own motion.

**Answer**: Defendants state that Paragraph 9 refers to and characterizes public court documents, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the documents for a complete and accurate statement of their contents and admit that, on January 17, 2019, a panel of the United States Court of Appeals for the Fifth Circuit vacated the Western District of Texas's preliminary injunction and remanded for the district court to limit its review to the agency record under an arbitrary-and-capricious standard. Defendants admit that the opinion included some discussion of videos taken by the Center for Medical Progress and "ensuing investigations."  Defendants admit that Judge Edith H. Jones wrote the majority opinion and also wrote a separate concurrence urging reconsideration by an *en banc* Fifth Circuit of the Court's prior decision in *Planned Parenthood Gulf Coast v. Gee*, 862 F.3d 445 (5th Cir. 2017).  Defendants admit that the Fifth Circuit *sua sponte* granted rehearing *en banc*, thereby vacating the prior panel decision, to decide whether Medicaid beneficiary plaintiffs had

7

the ability to enforce Medicaid's Free Choice of Provider provision through a private right of action.  Defendants deny all remaining allegations in Paragraph 9.

10.     On November 23, 2020, the *en banc* Fifth Circuit vacated the preliminary injunction in the Texas case, and reversed the Louisiana case.  Seven judges in the majority wrote separately, affirming Texas' determination that Planned Parenthood was not a qualified provider based on the information that Relator had provided to the state and federal governments.

**Answer**: Defendants state that Paragraph 10 refers to and characterizes a public court document, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents and admit that on November 23, 2020, the United States Court of Appeals for the Fifth Circuit, sitting *en banc*, vacated the Texas preliminary injunction.  Defendants deny that the decision reversed the Louisiana case and state that the Louisiana injunction remains in effect, *see* Order, *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, No. 15-cv-565 (M.D. La. Apr. 7, 2021) [Dkt. 121]. Defendants admit that Judge Jennifer Walker Elrod wrote a concurring opinion, joined by six other judges, to provide two additional reasons why the preliminary injunction should be vacated, including that "the plaintiffs' claims would fail on the merits."  Defendants deny all remaining allegations in Paragraph 10.

11.     Planned Parenthood therefore became aware no later than November 23, 2020 that it had knowingly presented or caused to be presented millions of dollars of false or fraudulent claims for payment or approval under the Medicaid program.  From at least January 2010 through 2015, Planned Parenthood violated the FCA, TMFPA, and LMAPIL by submitting claims and receiving payments from the United States and the Plaintiff States for Medicaid services while failing to comply with material requirements placed on Medicaid providers by the law.  And every

claim that Planned Parenthood submitted after its disqualification in 2015 or 2016 was a false or fraudulent claim that resulted in an overpayment of federal and state funds to Planned Parenthood. Planned Parenthood violated the FCA, TMFPA, and LMAPIL by failing to report or repay to the United States or the Plaintiff States within the statutorily required time period the overpayments that it had received under the Medicaid program.

**Answer**: Defendants deny the allegations in the first sentence of Paragraph 11. Defendants state that the remaining allegations in Paragraph 11 contain legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the remaining allegations in Paragraph 11. Defendant also specifically deny that they violated the False Claims Act ("FCA"), the Texas Medicaid Fraud Prevention Act ("TMFPA"), or the Louisiana Medical Assistance Programs Integrity Law ("LMAPIL").

12.     Relator learned that Planned Parenthood submitted claims and received payments from the federal government and the Plaintiff States of millions of dollars in state and federal Medicaid funds to which they are not entitled. Upon information and belief, Planned Parenthood did not report or return any of these funds to the United States or the Plaintiff States after it became aware, or should have become aware, it had an obligation to do so within the statutorily required time period. Prior to filing this lawsuit, Relator notified federal and state authorities of Planned Parenthood's illegal conduct. Planned Parenthood's violations of the FCA, TMFPA, and LMAPIL - by submitting false or fraudulent claims for payment under the Medicaid program, and by failing to return overpayments - were publicly unknown at this time and at the time this lawsuit was filed.

**Answer**: Defendants deny the allegations in the first sentence of Paragraph 12. Defendants admit that because Affiliate Defendants have no legal obligation to make any repayments, they have accepted and not returned reimbursements from the Texas and Louisiana Medicaid Programs

for services delivered during the pendency of the above-referenced litigation.  Defendants deny the remaining allegations in the second sentence of Paragraph 12.  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the third sentence of Paragraph 12 and therefore deny them.  Defendants deny the allegations in the fourth sentence of Paragraph 12 and also specifically deny that they violated the FCA, TMFPA, or LMAPIL.

13.     Relator Alex Doe is a citizen of the United States and a resident of the State of California.  From 2013 to 2015, Relator conducted an extensive undercover investigation of Planned Parenthood, including its medical services, abortion services, compliance with state and federal laws, fetal tissue donation and research program, internal business practices, corporate structure and affiliation, finances, and other information.  Relator brings this action based on direct, independent, unique, and personal knowledge obtained during and after the investigation of Planned Parenthood.  Relator voluntarily disclosed this information to the United States and the Plaintiff States prior to public disclosure and before filing this action.

**Answer**: Defendants admit that the Relator in this action is Alex Doe. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in the first sentence of Paragraph 13 and therefore deny them.  Defendants deny all remaining allegations in Paragraph 13.

14.     Relator has already experienced harassment, threats, intimidation, and retaliation, including retaliation by Planned Parenthood, and thus reasonably fears further harassment, threats, intimidation, and retaliation if Relator's identity is disclosed publicly in connection with this lawsuit.  Thus, Relator intends to shortly file a motion for protective order to permit Relator to

proceed in this case under a pseudonym and to allow safe disclosure of Relator's identity to other counsel in this case.

**Answer**: Defendants deny that they have harassed, threatened, intimidated, or retaliated against Relator.  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in the first sentence of Paragraph 14 and therefore deny them.  Defendants admit that, since the filing of the Relator Complaint, Relator filed a motion for a protective order to permit Relator to proceed under a pseudonym in this case, which the Court granted.  Defendants deny that such a protective order is warranted and have moved to unseal Relator's Notice of Identity and Revoke Relator's Protective Order [Dkt. 67].

15.     Defendants Planned Parenthood Federation of America, Planned Parenthood Gulf Coast, Inc., Planned Parenthood of Greater Texas, Inc., and Planned Parenthood South Texas, are a system of affiliated entities operating as and collectively referred to herein as "Planned Parenthood." Planned Parenthood provides women's health services and abortion services at clinics in the State of Texas and the State of Louisiana, including Medicaid services that are the subject of this action.

**Answer**: Defendants admit that the Affiliate Defendants are affiliates of Planned Parenthood Federation of America, Inc. ("PPFA"), a federation-style organization that licenses the Planned Parenthood name and mark to other, separate not-for-profit organizations that satisfy certain licensing criteria.  Defendants further admit that the Affiliate Defendants provide women's health services in the State of Texas and the State of Louisiana, including Medicaid services in Texas until March 2021 and in Louisiana, but deny that PPFA provides any such services. Defendants deny all remaining allegations in Paragraph 15.

16.     Defendant Planned Parenthood Federation of America, Inc. ("PPFA") is a New York corporation that has over 50 affiliate organizations that provide health care services and abortion services in every State, including the other Defendants in this case.  PPFA provides significant monetary support to these affiliates as well as other types of support and control, such as directives, marketing, communications, requirements, standards, policies, and accreditation for affiliates providing medical care, insurance coverage, legal counsel and representation, and direct support for the provision of healthcare services.

**Answer**: Defendants admit that Planned Parenthood Federation of America, Inc. is a non-profit corporation organized under the laws of New York and exempt from taxation under Section 501(c)(3) of the Internal Revenue Code, which has 49 affiliates—including Defendants Planned Parenthood Gulf Coast, Planned Parenthood of Greater Texas, and Planned Parenthood of South Texas—that operate health centers across the nation serving approximately 2.4 million patients each year and providing vital reproductive and women's health services.  Defendants further state that, in order to use the Planned Parenthood name and mark, affiliates must satisfy certain criteria established by PPFA.  Defendants deny all remaining allegations in Paragraph 16.

17.     PPFA maintains its executive and corporate administrative offices at 123 Williams Street, Tenth Floor, New York City, New York.

**Answer**: Defendants admit the allegations in Paragraph 17.

18.     Defendant Planned Parenthood Gulf Coast, Inc. ("PPGC") is a Texas corporation and an affiliate of PPFA that provides health services and abortion services at clinics in the State of Texas and health services at two clinics in the State of Louisiana.  PPGC and its clinics are grantees or recipients of federal funds provided through Texas and Louisiana programs and/or provided directly through United States programs.

12

**Answer**: Defendants admit that Planned Parenthood Gulf Coast, Inc. is an affiliate of PPFA, incorporated in Texas, that provides vital reproductive and women's health services in the States of Texas and Louisiana.  Defendants admit that Planned Parenthood Gulf Cost has received federal funds through Texas and Louisiana programs.  Defendants deny the remaining allegations in Paragraph 20.

19.     PPGC maintains its executive and corporate administrative offices at 4600 Gulf Freeway, Houston, Texas, and provides medical services at the following clinics: (1) Fannin Clinic in Houston, Texas; (2) Greenbriar Clinic in Stafford, Texas; (3) 1960 Clinic in Houston, Texas; (4) Southwest Clinic in Houston, Texas; (5) Lufkin Clinic in Lufkin, Texas; (6) Bryan Clinic in Bryan, Texas; (7) Huntsville Clinic in Huntsville, Texas; (8) Greenspoint Clinic in Houston, Texas; (9) Dickinson Clinic in Dickinson, Texas; (10) Rosenberg Clinic in Rosenberg, Texas; (11) Baton Rouge Clinic in Baton Rouge, Louisiana; and (12) New Orleans Clinic in New Orleans, Louisiana.

**Answer**: Defendants admit that Planned Parenthood Gulf Coast maintains its executive and corporate administrative offices at 4600 Gulf Freeway, Houston, Texas, and provides medical services at the following locations: Baton Rouge Health Center 3825 Government Street Baton Rouge, LA 70806; New Orleans Health Center 4636 S. Claiborne Avenue New Orleans, LA; Northville Health Center 9919 North Freeway, Suite 107 Houston, TX  77037; Northwest Health Center 13169 Northwest Freeway, Ste 115 Houston TX 77040-6326; Prevention Park Health Center 4600 Gulf Freeway, Ste. 100 Houston, TX 77023-3548; Southwest Health Center 5800 Bellaire Blvd. Bldg. 1b, Ste. 120 Houston, TX  77081-5537; Spring Health Center 4747 Louetta Road Spring, TX 77388; and Stafford Health Center 12614 Southwest Freeway, Ste. A Stafford, TX 77477.  Defendants deny all remaining allegations in Paragraph 19.

20.     Defendant Planned Parenthood of Greater Texas, Inc. ("PPGT") is a Texas corporation and an affiliate of PPFA that provides women's health services and abortion services at clinics in the State of Texas.  PPGT and its clinics are grantees or recipients of federal funds provided through Texas and Louisiana programs and/or provided directly through United States programs.

**Answer**: Defendants admit that Planned Parenthood of Greater Texas, Inc. is an affiliate of PPFA, incorporated in Texas, that provides vital reproductive and women's health services in the State of Texas.  Defendants admit that Planned Parenthood of Greater Texas has received federal funds through Texas programs.  Defendants deny the remaining allegations in Paragraph 20.

21.     PPGT maintains its executive and corporate administrative offices at 7424 Greenville Avenue, Dallas, Texas, and provides medical services at the following clinics: (1) Addison Health Center in Addison, Texas; (2) Arlington Health Center in Arlington, Texas; (3) Bedford Health Center in Bedford, Texas; (4) Cedar Hill Health Center in Cedar Hill, Texas; (5) North Dallas Shelburne Health Center in Dallas, Texas; (6) South Dallas Surgical Health Services Center in Dallas, Texas; (7) Lubbock Health Center in Lubbock, Texas; (8) Southeast Fort Worth Health Center in Fort Worth, Texas; (9) Southwest Fort Worth Health Center in Fort Worth, Texas; (10) Southwest Fort ·worth Surgical Health Services Center in Fort Worth, Texas; (11) Mesquite Health Center in Mesquite, Texas; and (12) Plano Health Center in Plano, Texas.

**Answer**: Defendants admit that Planned Parenthood of Greater Texas, Inc. maintains administrative offices at 201 E. Ben White Blvd, Austin, Texas 78704; 7424 Greenville Avenue, Suite 206, Dallas, Texas 75231; 700 West Highway 6, Waco, Texas 76712; 6464 John Ryan Drive, Fort Worth, Texas 76132; and 3716 22nd Pl, Lubbock, Texas 79410.   Defendants admit that

Planned Parenthood of Greater Texas, Inc. provides medical services at the following locations: Addison Health Center in Addison, Texas; Arlington Health Center in Arlington, Texas; Bedford Health Center in Bedford, Texas; Cedar Hill Health Center in Cedar Hill, Texas; Central Austin Health Center in Austin, Texas; Denton Health Center in Denton, Texas; Downtown Austin Health Center in Austin, Texas; El Paso Health Center in El Paso, Texas; Lubbock Health Center in Lubbock, Texas; Mesquite Health Center in Mesquite, Texas; North Austin Health Center in Austin, Texas; North Dallas Shelburne Health Center in Dallas, Texas; Paris Health Center in Paris, Texas; Plano Health Center in Plano, Texas; South Austin Health Center in Austin, Texas; Southeast Fort Worth Health Center in Fort Worth, Texas; Southwest Fort Worth Health Center in Fort Worth, Texas; Tyler Health Center in Tyler, Texas; Virtual Health Center in Dallas, Texas; and Waco Health Center in Waco, Texas.  Defendants deny all remaining allegations in Paragraph 21.

22.     Defendant Planned Parenthood of South Texas, Inc. is a Texas corporation and affiliate of PPFA that is a parent corporation of three other corporations, Defendant Planned Parenthood Cameron County, Defendant Planned Parenthood San Antonio (hereinafter referred to collectively as "PPST"), and Planned Parenthood South Texas Surgical Center, which provides women's health services and abortion services at clinics in the State of Texas.  PPST and its clinics are grantees or recipients of federal funds provided through Texas and Louisiana programs and/or provided directly through United States programs.

**Answer**: Defendants admit that Planned Parenthood of South Texas, Inc. is an affiliate of PPFA, incorporated in Texas, that provides vital reproductive and women's health services in the State of Texas.  Defendants admit that Planned Parenthood of South Texas, Inc. is a parent corporation of Planned Parenthood of Cameron County, Defendant Planned Parenthood of San

Antonio, and Planned Parenthood South Texas Surgical Center, which are not affiliates of PPFA. Defendants admit that Planned Parenthood of South Texas has received federal funds through Texas programs.  Defendants deny the remaining allegations in Paragraph 22.

23.     PPST maintains its executive and corporate administrative offices at 2140 Babcock Road, San Antonio, Texas and provides medical services at the following clinics: Planned Parenthood-Harlingen in Harlingen, Texas; Planned Parenthood-Southeast in San Antonio, Texas; Planned Parenthood-San Pedro 150 in San Antonio, Texas; Planned Parenthood-San Pedro in San Antonio, Texas, Planned Parenthood-Northeast in San Antonio, Texas; Planned Parenthood-Marbach in San Antonio, Texas; Planned Parenthood-South Texas Medical Center in San Antonio, Texas; and Planned Parenthood-Brownsville in Brownsville, Texas.

**Answer**: Defendants admit the allegations in Paragraph 23.

24.     This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345 because this civil action arises under the laws of the United States and the United States is a real party in interest.

**Answer**: Paragraph 27 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants admit that this Court has jurisdiction over Counts I, II, IV, and the non-dismissed portions of Count V of the Relator Complaint. Defendants deny that this Court has jurisdiction over Count III of the Relator Complaint. Defendants further state that the Court's jurisdiction over Counts IV and V is supplemental to its jurisdiction over Counts I and II, and dismissal of Counts I and II should result in the Court's declining to exercise jurisdiction over Counts IV and V.

25.     Relator brings this action under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* to recover treble damages, civil penalties, and costs of suit, including reasonable attorneys'

fees and expenses.  Relator brings this action and his claims on behalf of the United States pursuant to 31 U.S.C. §§ 3730(b) and 3730(e)(4), and Relator has satisfied all conditions precedent to his participation as Relator.  Pursuant to 31 U.S.C. § 3730(e)(4)(A), the allegations contained herein have not been publicly disclosed as defined by the federal False Claims Act, or alternatively, Relater qualifies as an "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).

**Answer**: Defendants admit that Relator brings this action under the federal False Claims Act, which is codified at 31 U.S.C. §§ 3729-33, and seeks to recover treble damages, civil penalties, and costs of suit, including reasonable attorneys' fees and expenses.  Defendants deny that Relator is entitled to such relief.  Defendants admit that Relator brings his claims under the False Claims Act under 31 U.S.C. § 3730(b).  Defendants deny that Relator has satisfied all conditions precedent to his participation as a Relator.  Defendants deny that Relator is an original source and that the allegations in the Relator Complaint have not been publicly disclosed within the meaning of 31 U.S.C. § 3730(e)(4).

26.    Relator has voluntarily provided to the Attorney General of the United States and the Acting United States Attorney for the Northern District of Texas, prior to filing this Complaint, a statement of substantially all material evidence and information in Relator's possession related to the claims.  Because the statement includes attorney-client communications and work product of Relator's attorneys and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in this litigation, Relator understands this disclosure to be confidential and privileged.

**Answer**: Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 26 and therefore deny them.

27.     This Court has jurisdiction over Relator's state law claims pursuant to 31 U.S.C. § 3732(b) because those claims arise from the same transaction or occurrence as Relator's claims under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

**Answer**: Paragraph 27 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants admit that the Court has jurisdiction over Count IV of the Relator Complaint, and the non-dismissed portions of Count V.  Defendants deny that this Court has jurisdiction over Count III of the Relator Complaint.  Defendants further state that the Court's jurisdiction over Counts IV and V is supplemental to its jurisdiction over Counts I and II, and dismissal of Counts I and II should result in the Court's declining to exercise jurisdiction over Counts IV and V.

28.     Additionally, this Court has supplemental jurisdiction over Relator's state law claims pursuant to 28 U.S.C § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution as Relator's claims under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

**Answer**: Paragraph 28 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants admit that the Court has jurisdiction over Count IV of the Relator Complaint, and the non-dismissed portions of Count V.  Defendants deny that this Court has jurisdiction over Count III of the Relator Complaint.  Defendants further state that the Court's jurisdiction over Counts IV and V is supplemental to its jurisdiction over Counts I and II, and dismissal of Counts I and II should result in the Court's declining to exercise jurisdiction over Counts IV and V.

29.     Pursuant to the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.102(a), and the Louisiana Medical Assistance Programs Integrity Law, La. Rev.

Stat.§ 46:439.l(D)(2), Relator has provided to the Attorneys General of Texas and Louisiana prior to filing this Complaint, a statement of substantially all material evidence and information in Relator's possession related to the claims.   Because the statement includes attorney-client communications and work product of Relator's attorneys and is submitted to the Attorneys General in their capacity as potential co- counsel in this litigation, Relater understands this disclosure to be confidential and privileged.

**Answer**: Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 29 and therefore deny them.

30.     Personal jurisdiction and venue are proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a), because one or more of the Defendants may be found in, resides in, or transacts business, or has committed any act proscribed by 31 U.S.C. §§ 3729 *et seq.* in this judicial district.   Specifically, at all times material and relevant, one or more of the Defendants did transact and do business at several abortion clinics or health clinics located within the Northern District of Texas.

**Answer**: Paragraph 30 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendant Planned Parenthood of Greater Texas admits that this Court has personal jurisdiction it.   Defendants deny the remaining allegations of Paragraph 30.

31.     Under 31 U.S.C. § 3730(b)(2), this Complaint is to be filed in-camera and remain under seal for a period of sixty (60) clays and shall not be served on Defendants until the Court so orders.   The federal government may elect to intervene and proceed with this lawsuit within sixty (60) days after it receives both the Complaint and the material evidence known to Relator at the time of his filing, establishing the existence of the false claims.   The Plaintiff States may elect to

intervene and proceed with this lawsuit within sixty (60) days after it receives both the Complaint and the material evidence known to Relator at the time of his filing, establishing the existence of the false claims.

**Answer**: Paragraph 31 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit that 31 U.S.C. § 3730(b)(2) states that "[a] copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information."  Defendants admit that the § 36.102 of the Texas Human Resources Code states that "the state may elect to intervene and proceed with the action not later than the 180th day after the date the attorney general receives the petition and the material evidence and information."  Defendants admit that § 46:439.1(F) of the Louisiana Revised Statutes states that "[t]he court shall allow the secretary or the attorney general to intervene and proceed with the qui tam action in the district court at any time during the qui tam action proceedings."  Defendants deny all remaining allegations in Paragraph 31.

32.    Pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.,* the Medicaid Program ("Medicaid") was established in 1965 as a joint federal and state program to provide financial assistance to individuals with low incomes to enable them to receive medical care.  Under Medicaid, each State establishes its own eligibility standards, provider qualifications,

and program administration in accordance with certain federal statutory and regulatory requirements. The State pays the healthcare providers for services rendered to Medicaid recipients, with the state obtaining the federal share of the Medicaid payments from accounts that draw on the United States Treasury. *See generally* 42 C.F.R. §§ 430.0-.30.

**Answer**: Paragraph 32 contains legal conclusions or assertions to which no response is required. Defendants further state that this paragraph refers to statutory and regulatory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit the allegations in Paragraph 32.

33.    Under Title XIX of the Social Security Act, each state must establish an agency to administer its Medicaid program according to federal guidelines. Texas administers its Medicaid program through the Health and Human Services Commission. Louisiana administers its Medicaid program through the Department of Health and Hospitals.

**Answer**: Paragraph 33 contains legal conclusions or assertions to which no response is required. Defendants further state that this paragraph refers to statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit the allegations in Paragraph 33.

34.    Federal law regarding Medicaid funding requires States receiving such funds to adopt State plans for medical assistance that contain specified content and are approved by the Secretary of the Health and Human Services. Federal law expressly restricts those entities qualified to provide Medicaid-covered family planning services to entities that are eligible for payments under a State Medicaid plan.

**Answer**: Paragraph 34 contains legal conclusions or assertions to which no response is required.  To the extent a response is required, Defendants state that this paragraph refers to unidentified provisions of "Federal law"; because Paragraph 34 does not identify such provisions, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore deny them.

35.    Each State has broad discretion to implement the Medicaid Act, as well as broad authority to define provider qualifications and to exclude providers on that basis.  If a provider is qualified to participate in a State Medicaid plan, it may submit claims for reimbursement by the State for services provided to Medicaid recipients.

**Answer**: Paragraph 35 contains legal conclusions or assertions to which no response is required.  To the extent a response is required, Defendants state that the first sentence of this paragraph appears to refer to legal requirements or authorities; because it does not identify such requirements or authorities, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 35 and therefore deny them.  Defendants admit that qualified Medicaid providers are entitled to submit claims for reimbursement by the State for services provided to Medicaid recipients.  Defendants otherwise deny the allegations in Paragraph 35.

36.    Consistent with federal law, and to ensure the safety of its Medicaid recipients, Texas and Louisiana law impose rigorous standards and requirements on Medicaid providers.  Both Texas and Louisiana require Medicaid providers to comply with federal and state laws and regulations and to ensure that its employees and agents provide services in compliance with accepted medical and ethical standards as a condition of receiving Medicaid reimbursements.

**Answer**: Paragraph 36 contains legal conclusions or assertions to which no response is required. To the extent a response is required, Defendants state that this paragraph appears to refer to legal requirements or authorities; because it does not identify such requirements or authorities, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 36 and therefore deny them.

37.     According to the Texas Health and Human Services Commission ("HHSC"), which oversees the Texas Medicaid Program, medical providers who desire to be eligible for Medicaid payments must complete a Texas Medicaid Provider Enrollment Application and enter into a written agreement with the State.  Federal Medicaid regulations likewise require such an agreement and mandate that all Texas providers must revalidate their enrollment in the Texas Medicaid Program every three or five years based on provider type.  Thus, Planned Parenthood was required, as a condition of enrollment and participation in the Texas Medicaid Program, to enter into a written HHSC Medicaid Provider Agreement ("Texas Provider Agreement"), and to periodically revalidate its enrollment.

**Answer**: Paragraph 37 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants admit the allegations in the first and second sentences of Paragraph 37.  Defendants admit that the Affiliate Defendants entered into written HHSC Medicaid Provider Agreements and periodically revalidated their enrollments as conditions of their enrollment and participation in the Texas Medicaid Program. Defendants deny all remaining allegations in Paragraph 37.

38.     By signing the Texas Provider Agreement, a provider certifies its understanding of and willingness to comply with the terms of the Agreement, as well as its understanding that concealment of a material fact or pertinent omissions may constitute fraud and may be prosecuted

under applicable federal and state law.  The provider further certifies its understanding and agreement that any falsification, omission, or misrepresentation in connection with the application for enrollment or with claims filed may result in all paid services declared as an overpayment. And the provider certifies and agrees that it has an affirmative duty to refund any overpayments, duplicate payments and erroneous payments that are paid to the provider by Medicaid as soon as such payment is discovered or reasonably should have been known.

**Answer**: Paragraph 38 contains legal conclusions or assertions to which no response is required.  Defendants further state that Paragraph 38 refers to and characterizes a document, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents and admit that the blank HHSC Medicaid Provider Agreement attached as Exhibit 2 to the Texas Complaint states that "[a]s condition for participation as a provider under the Texas Medical Assistance Program (Medicaid), the Provider (Provider) agrees to comply with all terms and conditions of this Agreement"; that "Provider understands that falsifying entries, concealment of a material fact, or pertinent omissions may constitute fraud and may be prosecuted under applicable federal and state law"; that "Provider understands and agrees that any falsification, omission, or misrepresentation in connection with the application for enrollment or with claims filed may result in all paid services declared as an overpayment and subject to recoupment, and may also result in other administrative sanctions that include payment hold, exclusion, debarment, termination of this Agreement, and monetary penalties"; and that "Provider has an affirmative duty to verify that payments received are for actual services rendered and medically necessary. Provider must refund any overpayments, duplicate payments and erroneous payments that are paid to Provider by Medicaid or a third party

as soon as any such payment is discovered or reasonably should have been known." Defendants deny the remaining allegations in Paragraph 38.

39.     The Texas Provider Agreement incorporates by reference the Texas Medicaid Provider Procedures Manual ("Texas Provider Manual") and mandates that providers comply with all requirements of the Provider Manual, as well as all state and federal laws governing or regulating Medicaid.  The Texas Provider Manual mandates that providers are responsible for the delivery of healthcare services in accordance with accepted medical community standards.

**Answer**: Defendants state that Paragraph 39 refers to and characterizes documents, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the documents for a complete and accurate statement of their contents and admit that the blank HHSC Medicaid Provider Agreement attached as Exhibit 2 to the Texas Complaint states that "Provider agrees to comply with all of the requirements of the [Texas Medicaid Provider Procedures Manual]," and that Section 1.10 of Texas's selected excerpts of the Texas Medicaid Provider Procedures Manual, January 2017, Volumes 1 & 2, attached as Exhibit 3 to the Texas Complaint, states that "providers are responsible for the delivery of health-care items and services to Medicaid clients in accordance with all applicable licensure and certification requirements and accepted health care professionals' community standards."  Defendants deny the remaining allegations in Paragraph 39.

40.     By signing the Texas Provider Agreement and enrolling in the Texas Medicaid Program, Planned Parenthood certified that it understood and would comply with all the requirements thereof.

**Answer**: Paragraph 40 contains legal conclusions or assertions to which no response is required.  Defendants further state that Paragraph 40 refers to and characterizes a document, which

speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents and admit that Affiliate Defendants signed HHSC Medicaid Provider Agreements.   Defendants deny all remaining allegations in Paragraph 40.

41.      According to the Louisiana Department of Health ("LDH"), which oversees the Louisiana Medicaid Program, medical providers who desire to be eligible for Medicaid reimbursements must complete a Louisiana Medicaid Provider Enrollment Packet and enter into a written agreement with the state.   Federal Medicaid regulations likewise require such an agreement and mandate that all Louisiana providers must revalidate their enrollment in the Louisiana Medicaid Program every three or five years based on provider type.   Thus, Planned Parenthood was required, as a condition of enrollment and participation in the Louisiana Medicaid Program, to enter into a written Louisiana Provider Agreement ("Louisiana Provider Agreement"), and to periodically revalidate its enrollment.

**Answer**: Paragraph 41 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants admit the allegations in the first and second sentences of Paragraph 41.   Defendants admit that the Planned Parenthood Gulf Coast entered into a written provider agreement with the state of Louisiana and periodically revalidated its enrollment as a condition of its enrollment and participation in the Louisiana Medicaid Program. Defendants deny all remaining allegations in Paragraph 41.

42.      The Louisiana Provider Agreement mandates that providers comply with all federal or state laws, regulations, policies, rules, criteria, or procedures, applicable to the Louisiana Medicaid Program.

**Answer**: Paragraph 42 refers to and characterizes a document, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents and admit that Louisiana's blank PE-50 Provider Agreement Addendum, publicly available online at https://www.lamedicaid.com/provweb1/provider_enrollment/Enrollment_Entities.pdf, states that "[t]he provider understands that it is a violation if they fail to comply with any or all federal or state laws, regulations, policies, rules, criteria, or procedures, applicable to the Medical Assistance Program or a program of the Medical Assistance Program in which the provider, provider-in-fact, agent of the provider, billing agent, affiliate or other person is participating." Defendants deny the remaining allegations in Paragraph 42.

43.     By signing the Louisiana Provider Agreement, a provider certifies its understanding of and willingness to comply with the terms of the Agreement and all policies and regulations. The provider further certifies its understanding that payment and satisfaction of all claims submitted to the Louisiana Medical Program will be paid and satisfied from federal and state funds, and that any false claims, statements or documents, or concealment of a material fact, may be prosecuted under applicable federal and state laws including the provisions of the federal FCA and any Louisiana laws and rules pertaining to civil or criminal penalties for false claims and statements.  The provider also agrees to report and refund any discovered overpayments within sixty (60) days of discovery.

**Answer**: Paragraph 43 contains legal conclusions or assertions to which no response is required.  Defendants further state that Paragraph 43 refers to and characterizes a document, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents and admit that Louisiana's blank

PE-50 Provider Agreement Addendum, publicly available online at https://www.lamedicaid.com/provweb1/ provider_enrollment/Enrollment_Entities.pdf, states that"[t]he provider understands that it is a violation if they fail to comply with any or all federal or state laws, regulations, policies, rules, criteria, or procedures, applicable to the Medical Assistance Program or a program of the Medical Assistance Program in which the provider, provider-in-fact, agent of the provider, billing agent, affiliate or other person is participating"; that "[t]he provider understands that all claims submitted to Louisiana Medicaid will be paid and satisfied from Federal and state funds, and that any falsification or concealment of a material fact, may be prosecuted under Federal and State laws"; and that "[t]he provider agrees to report and refund any discovered overpayments within sixty (60) days of discovery."  Defendants deny the remaining allegations in Paragraph 43.

44.     The Louisiana Medicaid Services Manual ("Louisiana Provider Manual") contains additional information to which all enrolled providers must adhere, and the terms and conditions for a provider to participate in the Louisiana Medicaid Program.

**Answer**: Defendants state that Paragraph 44 refers to and characterizes a document, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents and admit that Chapter 1 of the Louisiana Medicaid Services Manual, publicly available online at https://www.lamedicaid.com/provweb1/ Providermanuals/manuals/GIA/GIA.pdf, states that the "general information and administrative chapter" "contains information to which all enrolled providers must adhere. It encompasses the universal terms and conditions for a provider to deliver medical services and supplies to recipients of the Louisiana Medicaid Program." Defendants deny the remaining allegations in Paragraph 44.

45.     The Louisiana Provider Manual provides that in order to receive reimbursement for healthcare services provided to Medicaid recipients, the provider must be enrolled to participate in the Louisiana Medicaid Program, meet all licensing and/or certification requirements inherent to the healthcare profession, and comply with all other requirements in accordance with all federal and state laws and Louisiana Bureau of Health Services Financing policies.  The Louisiana Provider Manual further provides that when enrolled in the Louisiana Medicaid Program, a provider agrees to abide by all applicable state and federal laws and regulations and policies established by the federal Centers for Medicare and Medicaid Services ("CMS") and LDH.  It also informs providers that they are responsible for knowing the terms of the Louisiana Provider Agreement, program standards, statutes and penalties for violations.

**Answer**: Defendants state that Paragraph 45 refers to and characterizes document, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents and admit that Chapter 1 of the Louisiana Medicaid Services Manual, publicly available online at https://www.lamedicaid.com/provweb1/ Providermanuals/manuals/GIA/GIA.pdf, states that "[in order to receive reimbursement for these services and equipment, the provider must be enrolled to participate in Louisiana Medicaid, meet all licensing and/or certification requirements inherent to his/her profession and comply with all other requirements in accordance with the federal and state laws and BHSF policies"; that "[w]hen enrolled in the Medicaid Program, a provider agrees to abide by all applicable state and federal laws and regulations and policies established by the Centers for Medicare and Medicaid Services (CMS) and the Department of Health and Hospitals (DHH)"; and that "providers are responsible for knowing the terms of the provider agreement,

program standards, statutes and the penalties for violations."  Defendants deny the remaining allegations in Paragraph 45.

46.     By signing the Provider Agreement and enrolling in the Louisiana Medicaid Program, Planned Parenthood certified that it understood and would comply with all the requirements thereof.

**Answer**: Paragraph 46 contains legal conclusions or assertions to which no response is required.  Defendants further state that Paragraph 46 refers to and characterizes a document, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents and admit that Planned Parenthood Gulf Coast signed a Provider Agreement to enroll in the Louisiana Medicaid Program.  Defendants deny all remaining allegations in Paragraph 46.

47.     The FCA, 31 U.S.C. §§ 3729 *et seq.,* reflects Congress's goal to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), *available at* 1986 U.S.C.C.A.N. 5266.  The FCA establishes civil penalties and treble damages liability for an individual or entity that knowingly makes, uses, or causes to be presented, a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(l)(A).  An individual or entity violates this provision of the FCA by making an implied false certification if it submits a claim for payment and knowingly fails to disclose its noncompliance with a statutory, regulatory, or contractual requirement that renders the individual's representations about its services misleading.

**Answer**: Paragraph 47 contains legal conclusions or assertions to which no response is required.  Defendants further state that Paragraph 47 refers to and characterizes a document and statutory provision, which speak for themselves; to the extent a response is required, Defendants

respectfully refer the Court to the document and provision for a complete and accurate statement of their contents and admit that the quoted language appears in S. Rep. No. 99-345, at 1 (1986), *available at* 1986 U.S.C.C.A.N. 5266, and that the cited provision of the False Claims Act states that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person."  Defendants refer to and incorporate the Supreme Court's decision in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), for the standard that applies to implied false certification claims under the False Claims Act and deny Paragraph 47's characterization of that standard as inconsistent with *Escobar*. Defendants deny the remaining allegations in Paragraph 47.

48.    The FCA also establishes civil penalties and treble damages liability for an individual or entity that knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.  31 U.S.C. § 3729(a)(l)(G). An "obligation" under the FCA includes the "retention of any overpayment."  *Id.* § 3729(b)(3).

**Answer**: Paragraph 48 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit that 31 U.S.C. § 3729(a)(l)(G) states that "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government,  or knowingly conceals  or knowingly and  improperly  avoids  or  decreases

an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person."  Defendants admit that 31 U.S.C. § 3729(b)(3) defines "obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  Defendants deny all remaining allegations in Paragraph 48.

49.    Section 6402(a) of the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010), amended the Social Security Act by adding new provisions that address what constitutes an overpayment under the FCA in the context of a federal health care program.  Under this section, an overpayment is defined as "any funds that a person receives or retains under Title XVIII or XIX to which the person, after applicable reconciliation, is not entitled." *See* 42 U.S.C. § 1320a-7k(d)(4)(B).  In addition, this provision specifies in relevant part that an "overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified."  *Id.* § 1320a-7k(d)(2).  Failure to return an overpayment within 60 days after the date on which the overpayment was identified constitutes a reverse false claim actionable under the FCA.  31 U.S.C. § 3729(a)(l)(G).

**Answer**: Paragraph 49 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit that Section 6402(a) of the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119,

753-56 (2010) amended Part A of Title XI of the Social Security Act to add Section 1128J after

section 1128I.  Section 1128J, codified at 42 U.S.C. § 1320a-7k, defined "overpayment" to mean

"any funds that a person receives or retains under title XVIII or XIX to which the person, after

applicable reconciliation, is not entitled," and states that "[a]n overpayment must be reported and

returned under paragraph (1) by the later of—(A) the date which is 60 days after the date on which

the overpayment was identified; or (B) the date any corresponding cost report is due, if applicable."

Defendants admit that 31 U.S.C. § 3729(a)(l)(G) states that "any person who . . . knowingly makes,

uses, or causes to be made or used, a false record or statement material to an obligation to pay or

transmit money or property to the Government, or knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or transmit money or property to the

Government, is liable to the United States Government for a civil penalty of not less than $5,000

and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of

1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act

of that person."  Defendants deny all remaining allegations in Paragraph 49.

50.     The FCA also imposes liability on an individual or entity who conspires to commit

a violation of the FCA.  *Id.* § 3729(a)(l)(C).

**Answer**: Paragraph 50 contains legal conclusions or assertions to which no response is

required.  Defendants further state that this paragraph refers to a statutory provision, which speaks

for itself; to the extent a response is required, Defendants respectfully refer the Court to the

provision for a complete and accurate statement of its contents and admit that 31 U.S.C. §

3729(a)(l)(C) states that "any person who . . . conspires to commit a violation of subparagraph (A),

(B), (D), (E), (F), or (G) . . . is liable to the United States Government for a civil penalty of not

less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation

Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person."

51.     An individual or entity that violates the FCA is liable for a civil penalty of at least $5,500 and no more than $11,000 for each claim or overpayment, plus damages of three times the amount of each claim or overpayment.  *Id.* § 3729(a)(l).

**Answer**: Paragraph 51 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to a statutory provision, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the provision for a complete and accurate statement of its contents and admit that 31 U.S.C. § 3729(a)(l) states that a person who violates that subsection "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person."  Defendants deny all remaining allegations in Paragraph 51.

52.     The TMFPA establishes a cause of action for false claims in the Texas Medicaid Program.  Tex. Hum. Res. Code §§ 36.001 *et seq.*  The TMFPA provides that the Texas Attorney General or a private citizen may prosecute cases under the TMFPA in the name of the State of Texas.  *Id.* § 36.101.

**Answer**: Paragraph 52 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit that Texas Human Resources Code §§ 36.001 *et seq.* include provisions related to "Medicaid Fraud Prevention,"

including provisions related to actions by the Texas attorney general (under Subchapter B) and by private persons (under Subchapter C).  Defendants admit that § 36.101 states, in part, that "[a] person may bring a civil action for a violation of Section 36.002 for the person and for the state. The action shall be brought in the name of the person and of the state."

53.    The TMFPA establishes civil penalties and treble damages liability for an individual or entity that knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized.  *Id.* § 36.002(2).

**Answer**: Paragraph 53 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to a statutory provision, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the provision for a complete and accurate statement of its contents and admit that Texas Human Resources Code § 36.002(2) states that "[a] person commits an unlawful act if the person: . . . knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized."

54.    The TMFPA also establishes civil penalties and treble damages liability for an individual or entity that knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning (A) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, or (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program. *Id.* § 36.002(4).

**Answer**: Paragraph 54 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to a statutory provision, which speaks

for itself; to the extent a response is required, Defendants respectfully refer the Court to the provision for a complete and accurate statement of its contents and admit that Texas Human Resources Code § 36.002(4) states that "[a] person commits an unlawful act if the person . . . knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning: (A) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, . . . or (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program."

55.     The TMFPA was amended in 2013 to mirror 31 U.S.C. § 3729(a)(l)(G) and establishes civil penalties and treble damages liability for an individual or entity that knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state under the Medicaid program.  Tex. Hum. Res. Code § 36.002(12).  Failure to return any overpayment within 60 days after the date on which the overpayment was identified constitutes a reverse false claim actionable under the TMFPA.  *Id.*  The amendments to the TMFPA also impose liability on an individual or entity who conspires to commit a violation of the TMFPA.  *Id.* § 36.002(9).

**Answer**: Paragraph 55 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to a statutory provision, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the provision for a complete and accurate statement of its contents and admit that the TMFPA was amended in 2013, and those amendments included changes to § 36.002(12) such that the provision now mirrors  31 U.S.C. § 3729(a)(l)(G).  Defendants admit that Texas Human Resources Code § 36.002(12) states that "[a] person commits an unlawful act if the person . . .  knowingly makes,

uses, or causes the making or use of a false record or statement material to an obligation to pay or

transmit money or property to this state under the Medicaid program, or knowingly conceals or

knowingly and improperly avoids or decreases an obligation to pay or transmit money or property

to this state under the Medicaid program."  Defendants admit that Texas Human Resources Code

§ 36.001(7-a) defines "obligation" to mean "a duty, whether or not fixed, that arises from: (A) an

express or implied contractual, grantor-grantee, or licensor-licensee relationship; (B) a fee-based

or similar relationship; (C) a statute or regulation; or (D) the retention of any overpayment."

Defendants further admit that the 2013 amendments to the TMFPA included changes to §

36.002(9) such that the provision now states: "[a] person commits an unlawful act if the person . .

. conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12),

or (13)."

56.     An individual or entity that violates the TMFPA is liable for a civil penalty of at

least $5,500 and no more than $11,000 for each claim or overpayment, plus damages of three times

the amount of each claim or overpayment.  *Id.* § 36.052(3)(B).

**Answer**: Paragraph 56 contains legal conclusions or assertions to which no response is

required.  Defendants further state that this paragraph refers to a statutory provision, which speaks

for itself; to the extent a response is required, Defendants respectfully refer the Court to the

provision for a complete and accurate statement of its contents and admit that Texas Human

Resources Code Section 36.052(a) states that "(a) a person who commits an unlawful act is liable

to the state for . . . (3) a civil penalty of . . . (B) not less than $5,500 or the minimum amount

imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more

than $11,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that

amount exceeds $11,000, for each unlawful act committed by the person that does not result in

injury to a person described by Paragraph (A); and (4) two times the amount of the payment or the value of the benefit described by Subdivision (1)."  Defendants deny all remaining allegations in Paragraph 56.

57.    The Louisiana Medical Assistance Programs Integrity Law ("LMAPIL") establishes a cause of action for false claims in the Louisiana Medicaid Program.  La. Rev. Stat.§§ 46:438.1, .3.  The LMAPIL provides that the Louisiana Attorney General or a private citizen may prosecute cases under the LMAPIL in the name of the State of Louisiana.  *Id.* §§ 46:438.3, 439.1.

**Answer**: Paragraph 57 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provision for a complete and accurate statement of its contents and admit that Louisiana Revised Statute § 46:438.1 includes provisions related to "Civil actions authorized" and that § 46:438.1 includes provisions related to "False or fraudulent claim; misrepresentation."  Defendants admit that § 46:438.1(A), not § 46:438.3 as alleged, states that "[t]he secretary or the attorney general may institute a civil action in the courts of this state to seek recovery from persons who violate the provisions of this Part." Defendants admit that that § 46:439.1(A) states that "[a] private person may institute a civil action in the courts of this state on behalf of the medical assistance programs and himself to seek recovery for a violation of R.S. 46:438.2, 438.3, or 438.4 pursuant to the provisions of this Subpart."

58.    The LMAPIL establishes civil penalties and treble damages liability for an individual or entity that knowingly presents or causes to be presented a false or fraudulent claim. *Id.* §§ 46:438.3(A), 438.6(B).

**Answer**: Paragraph 58 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit that Louisiana Revised Statute § 46:438.6(B)(2) states that "[a]ny person who is found to have violated R.S. 46:438.3 shall be subject to a civil fine in an amount not to exceed three times the amount of actual damages sustained by the medical assistance programs as a result of the violation."  Defendants further state that the LMAPIL provides for civil penalties in § 46:438.6(C).

59.    The LMAPIL establishes civil penalties and treble damages liability for an individual or entity that knowingly conceals, avoids, or decreases an obligation to pay or transmit money or property to the medical assistance programs.  *Id.* § 46:438.3(C).  Failure to return any overpayment within 60 days after the date on which the overpayment was identified constitutes a reverse false claim actionable under the LMAPIL.  *Id.* § 46:438.3(C).

**Answer**: Paragraph 59 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit that Louisiana Revised Statute § 46:438.6(C)(1)(a) states that "[i]n addition to the actual damages provided in Subsection A of this Section and the civil fine imposed pursuant to Subsection B of this Section, the following civil monetary penalties shall be imposed on the violator: (a) Not less than five thousand five hundred dollars but not more than eleven thousand dollars for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act as contained in R.S. 46:438.2, 438.3, or 438.4."  Defendants admit that § 46:438.3(C) states that "No person shall

knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs." Defendants further state that the LMAPIL provides for treble damages in § 46:438.6(B)(2). Defendants deny the remaining allegations in Paragraph 59.

60.     The LMAPIL also imposes liability on an individual or entity who conspires to commit a violation of the LMAPIL.  *Id.* § 46:438.3(D).

**Answer**: Paragraph 60 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to a statutory provision, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the provision for a complete and accurate statement of its contents and admit that Louisiana Revised Statute § 46:438.3(D) states that "[n]o person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim."

61.     An individual or entity that violates the LMAPIL is liable for a civil penalty of at least $5,500 and no more than $11,000 for each claim or overpayment, plus damages of three times the amount of each claim or overpayment.  *Id.* § 46:438.6.

**Answer**: Paragraph 61 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to a statutory provision, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the provision for a complete and accurate statement of its contents and admit that Louisiana Revised Statute § 46:438.6(B)(2) states that "[a]ny person who is found to have violated R.S. 46:438.3 shall be subject to a civil fine in an amount not to exceed three times the amount of actual damages

sustained by the medical assistance programs as a result of the violation" and that §
46:438.6(C)(1)(a) states that "[i]n addition to the actual damages provided in Subsection A of this
Section and the civil fine imposed pursuant to Subsection B of this Section, the following civil
monetary penalties shall be imposed on the violator: (a) Not less than five thousand five hundred
dollars but not more than eleven thousand dollars for each false or fraudulent claim,
misrepresentation, illegal remuneration, or other prohibited act as contained in R.S. 46:438.2,
438.3, or 438.4."  Defendants deny all remaining allegations in Paragraph 61.

62.     Based on information Relator obtained while investigating the issue of fetal tissue
research, Relator believed that Planned Parenthood was providing fetal tissue from the abortions
they perform to researchers and/or tissue procurement companies.

**Answer**: Defendants lack knowledge or information sufficient to form a belief about the
truth or falsity of the allegations of the allegations in Paragraph 62 and therefore deny them.

63.     Upon information and belief, around twenty years ago, some Planned Parenthood
abortion clinics began providing fetal tissue to researchers and/or procurement companies,
including Planned Parenthood clinics in Kansas, California, and Texas.

**Answer**: Defendants admit that some Planned Parenthood-affiliated clinics that are not
defendants in this action have provided fetal tissue to researchers and/or tissue procurement
companies.  Defendants deny all remaining allegations in Paragraph 63.

64.     From 2013 to 2015, Relator conducted an undercover investigation to determine
whether Planned Parenthood's fetal tissue procurement practices were continuing, and if they were
legal and/or ethical.

**Answer**: Defendants deny the allegations in Paragraph 64.

65.     As part of the journalistic investigation, Relator and others attended abortion-related conferences and met with Planned Parenthood officials to discuss fetal tissue procurement. The investigators told Planned Parenthood officials they were representatives of a tissue procurement company modeled after companies that had done business with Planned Parenthood affiliates and sold fetal tissue obtained from Planned Parenthood.  During these interactions, the investigators wore hidden cameras to record the candid statements of Planned Parenthood officials regarding these activities.  The information described below in ¶¶ 66-78 was uncovered during the investigation.

**Answer**: Defendants deny that Relator conducted a journalistic investigation.  Defendants admit Relator and others attended conferences and met with officials from PPFA and other Planned Parenthood affiliates.  Defendants admit Relator and others posed as employees of a tissue procurement company during those conferences and meetings.  Defendants deny that Relator and others were investigators.  Defendants deny the remaining allegations in the second sentence of Paragraph 65 on the basis that Defendants lack knowledge or information sufficient to form a belief as to their truth or falsity.  Defendants admit Relator and others wore hidden cameras during interactions with PPFA staff members and staff members at other Planned Parenthood affiliates. Defendants deny all remaining allegations in Paragraph 65.

66.     These conversations revealed that PPFA officials as well as officials at individual PPFA affiliates were eager to obtain fetal tissue for procurement companies, and that PPFA officials expected monetary payments in return.

**Answer**: Defendants deny all allegations in Paragraph 66.

67.     During one lunch meeting, a PPFA official and abortion doctor joked that she "want[ed] a Lamborghini" when discussing the amount of money the procurement company would

pay for each fetal specimen Planned Parenthood obtained.  She haggled over the price offered, saying that seemed low and that she "would have to see what others were getting" before agreeing. She also discussed the possibility of modifying second-trimester abortion procedures to be "less crunchy" in order to obtain more intact specimens.

**Answer**: Defendants deny that the referenced speaker is or was a PPFA official or a PPFA abortion doctor.  Defendants admit only that the referenced speaker said the phrases "want[ed] a Lamborghini" and "less crunchy" during a lunch meeting.  Defendants deny that the phrase "would have to see what others were getting" is an accurate quotation.  Defendants deny all remaining allegations in Paragraph 67 and also specifically deny that the allegations accurately portray the conversation that occurred during the lunch meeting.

68.    During another lunch meeting with investigators, another PPFA official and abortion doctor discussed modifying second-trimester abortion procedures to obtain more intact specimens in greater detail: "So then you're just kind of cognizant of where you put your graspers, you try to intentionally go above and below the thorax, so that, you know, we've been very good at getting heart, lung, liver, because we know that, so I'm not gonna crush that part, I'm going to basically crush below, I'm gonna crush above, and I'm gonna see if I can get it all intact."

**Answer**: Defendants deny that the referenced speaker is or was a PPFA abortion doctor or official. Defendants admit only that the referenced speaker, a PPFA employee, said the quoted language during a lunch meeting.  Defendants deny all remaining allegations in Paragraph 68 and also specifically deny that the allegations accurately portray the conversation that occurred during the lunch meeting.

69.    During most second-trimester abortion procedures, the dilation-and-evacuation method is used.  That abortion method requires the doctor to use forceps to tear the fetus's body

43

into pieces, which results in the fetus's death.  For example, the doctor will reach into the uterus with the forceps and grasp some portion of the fetus-an arm or a leg, for instance.  The doctor will then use force to pull the forceps out of the mother.  The mother's cervix often creates traction with the rest of the fetus, which results in the limb grasped by the forceps to be torn away from the rest of the fetus's body.  If there is greater dilation of the cervix, that traction is absent, meaning that a pull of the forceps may result in delivery of the whole fetus.

**Answer**: Defendants admit the allegations in the first sentence of Paragraph 69. Defendants deny all remaining allegations in Paragraph 69 and also specifically deny that the allegations accurately describe a dilation-and-evacuation procedure.

70.    As a result, some doctors use a feticide, most commonly a drug called digoxin, to cause the fetus's death before it is extracted.  This helps to ensure that a fetus that may come out intact is not born alive and so that the doctor does not violate the federal Partial-Birth Abortion Ban, which prohibits killing a live fetus that has been delivered past a certain anatomical point. But digoxin compromises fetal tissue, so if the tissue is intended to be used in research, digoxin may not be used.  Thus, the more intact a fetus intended to be used in research is when it is extracted from the womb, the greater the chance the fetus is alive when that happens.

**Answer**: Defendants deny the allegations in the first sentence of Paragraph 70 on the basis that because they are vague and ambiguous, Defendants lack knowledge or information sufficient to form a belief about their truth or falsity.  Defendants deny all remaining allegations in Paragraph 70.

71.    Babies born at only 21 weeks' gestation have survived.  However, abortion is legal in Texas until 22 weeks' gestation (or 20 weeks post-fertilization).  *See* Tex. Health & Safety Code § 171.044.

**Answer**: Defendants deny the allegations in the first sentence of Paragraph 71 on the basis that because they are vague and ambiguous, Defendants lack knowledge or information sufficient to form a belief about their truth or falsity. Defendants admit that at the time of filing of the Relator Complaint abortion was legal in Texas until 22 weeks' gestation.

72.     After meeting officials from PPGC at conferences and discussing the procurement company's interest in obtaining fetal tissue from PPGC's abortions and PPGC's interest in providing it, Relator and other investigators were invited in April 2015 to meet in person with PPGC's Research Director, Melissa Farrell, to discuss the possibility of entering into an agreement to provide fetal tissue from second- trimester abortions.

**Answer**: Defendants admit Relator met PPGC staff and an official at PPFA conferences. Defendants admit Relator and another person met with PPGC's Director of Research, Melissa Farrell, in April 2015.  Defendants deny all remaining allegations in Paragraph 72.

73.     The investigators recorded their meetings with Farrell and PPGC's abortion clinic Administrator Tram Nguyen.

**Answer**: Defendants admit Relator and another person recorded their meetings with Melissa Farrell and Tram Nguyen without their knowledge or consent.  Defendants deny all remaining allegations in Paragraph 73.

74.     Farrell told investigators that their abortion doctors had participated in fetal tissue research and collected their own specimens.  She identified a particular PPGC abortion doctor who would collect fetal tissue for her own research while performing abortions at PPGC.  Farrell stated that the doctor would look at the patient schedule and pick the patients she wanted staff to get to consent to donate fetal tissue based on whether she could use the fetal tissue for her research.  This

doctor would collect her own specimens during the abortion and take the fetal tissue "home with her in her cooler."

**Answer**:  Defendants deny all allegations in Paragraph 74 and also specifically deny that the allegations accurately portray the conversation that occurred during the visit.

75.     Farrell told investigators that researchers and abortion doctors working at PPGC have targeted specific portions of fetal tissue and that PPGC's doctors are willing to alter abortion procedures to obtain better research specimens.  For instance, Farrell stated that PPGC can get "creative" in performing the abortion procedure to obtain more intact liver, thymus, and neural (brain) tissue.  She explained that PPGC was willing to explore how it could increase the chances of obtaining intact fetal specimens by altering the abortion procedure and confirmed that when abortion doctors in the past have needed an intact specimen, they can "make it happen." After discussing how changes to the abortion procedure should protect patient safety, Farrell also stated that abortion procedures have been altered in the past when their doctors have been involved in research: "Because some of our doctors in the past have [had] projects, and they're collecting the specimens so they do it in a way that they get the best specimen.  So I know it can happen." She also said PPGC can be "flexible to do whatever" in terms of an abortion procedure.

**Answer**: Defendants admit only that Farrell said the quoted language during Relator's PPGC visit.  Defendants deny all remaining allegations in Paragraph 75 and also specifically deny that the allegations accurately portray the conversation that occurred during the visit.

76.     Nguyen also confirmed that PPGC could obtain intact liver, thymus, and neural tissue specimens.  She stated, while laughing, that although PPGC doctors must sign a form stating that they did not "intend" to complete the abortion procedure by removing an intact fetus (because of the state and federal laws prohibiting partial- birth abortions), PPGC could nevertheless provide

intact fetal specimens.  During a conversation regarding what factors contribute to obtaining an intact thymus, Nguyen explained that obtaining intact specimens depends on the amount of cervical dilation PPGC can achieve and the patient's pain tolerance.  Nguyen stated that PPGC has done things that other people are "not necessarily comfortable with'' in the context of fetal-tissue procurement.  Nguyen also explained that these "other things" create more risk.  Nevertheless, Nguyen explained PPGC was willing to take this risk because "it is for a good cause."

**Answer**: Defendants admit only that Nguyen said the quoted language during Relator's PPGC visit.  Defendants deny all remaining allegations in Paragraph 76 and also specifically deny that the allegations accurately portray the conversation that occurred during the visit.

77.     When asked whether PPGC's doctors were experienced enough to provide intact fetal specimens, both Farrell and Nguyen confirmed that two particular PPGC doctors could alter the procedure to meet researchers' requests.  Nguyen stated that these doctors are experienced in this area because they both have research backgrounds and one is actively engaged in research. Farrell also discussed "alter[ing] PPGC's "process" to obtain "intact fetal cadavers" that will provide more than once specimen for research-for example, one fetus providing neural tissue as well as liver and thymus.  PPGC officials told Relator that PPGC doctors do not use digoxin in their abortion procedures.

**Answer**: Defendants admit only that Nguyen and Farrell said the quoted language during Relator's PPGC visit.  Defendants deny all remaining allegations in Paragraph 77 and also specifically deny that the allegations accurately portray the conversation that occurred during the visit.

78.     Farrell asserted that even though PPGC is "already set up" *to* do the fetal-tissue procurement, "we will definitely need to work out, you know, something in terms of covering

additional costs for additional ... things related to it." Farrell explained how she uses a contract's language to make it seem that payments are going only to "administrative costs" rather than a *quid pro quo* payment for fetal specimens, which she admitted is "touchy" under federal law: "I'm very particular about working with the language of the budget and contract to where the language is specific to covering the administrative costs and not necessarily the per specimen.  Because that borders on some language in the federal regs, it's a little touchy." Yet Farrell agreed that researchers would not want to pay for unusable fetal specimens, and so PPGC's payment structure could be tied to successfully obtaining the desired fetal tissue while disguising the *quid pro quo.* Farrell discussed how she creates a profit margin in a budget, and how researchers can incentivize PPGC employees to enroll patients to donate fetal tissue through buying meals for the staff as a bonus and listing it under the nebulous category of "meeting cost." Farrell made PPGC's financial interest in its fetal tissue provision clear, despite their nonprofit status, when she replied to the investigator's statement, "I just don't want it to turn into a situation where it's not financially beneficial for you," by explaining, "We definitely want to do that.  Because that's what staff and management need to see."

**Answer**:  Defendants admit only that Farrell said the quoted language during the PPGC visit.  Defendants deny all remaining allegations in Paragraph 78 and also specifically deny that the allegations accurately portray the conversation that occurred during the visit.

79.     Believing these statements provided evidence of wrongdoing, Relator provided the entire unedited video footage of these meetings to government officials and law enforcement entities, including the Texas Attorney General beginning in June 2015.  This footage, with redactions to protect patient privacy, is now available on the Fifth Circuit's website.  *See Planned*

*Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman,* 981 F.3d 347, 382 n.10 (5th Cir. 2020) (Elrod, J., concurring).

**Answer**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 79 and therefore deny them.  Defendants admit that the cited source contains links to Relator's video footage on the Fifth Circuit's website.

80.    The information about Planned Parenthood's activities uncovered by Relator's investigation prompted investigations by the U.S. House of Representatives, the U.S. Department of Justice, the FBI, and by the State of Texas.

**Answer**: Defendants admit Relator's videos led to an investigation by the U.S. House of Representatives.  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 80 and therefore deny them.

81.    Relator began releasing some of the undercover videos to the public via YouTube on July 14, 2015.  Relator posted both summary video reports and the full footage of the conversations with Planned Parenthood officials.  On August 4, 2015, Relator posted a summary report and full footage of the conversations with PPGC officials.

**Answer**: Defendants admit Relator began releasing edited videos via YouTube on July 14, 2015.   Defendants admit that Relator posted both edited videos and longer videos.  Defendants admit that on August 4, 2015, Relator posted an edited video of his conversations with PPGC employees and then, on August 7, 2015, Relator posted a longer video of his conversations with PPGC employees.  Defendants deny the remaining allegations in Paragraph 81.

82.    Based in part on PPGC's statements in the undercover videos, LDH notified PPGC on September 15, 2015 that PPGC would be excluded from the Louisiana Medicaid program because the State had determined PPGC was not a qualified Medicaid provider.  *See* Exhibit A.

**Answer**: Defendants state that Paragraph 82 refers to and characterizes a document, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents and admit that the State of Louisiana Department of Health and Hospitals issued a Notice of Termination to Planned Parenthood Gulf Coast on September 15, 2015—a copy of which is attached to the Relator Complaint at Exhibit A. Defendants deny the remaining allegations in Paragraph 82.

83.     PPGC did not challenge this determination in state administrative proceedings.  The termination became final under state law on October 15, 2015.  *See id.*

**Answer**:  Defendants admit that Planned Parenthood Gulf Coast has not appealed Louisiana's Initial Notice of Termination through the state administrative process. The second sentence of Paragraph 83 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 83.  Defendants also specifically deny that the Planned Parenthood Gulf Coast's termination became final in Louisiana on October 15, 2015.

84.     Based on PPGC's statements in the undercover videos, the Texas Office of the Inspector General (OIG) sent an initial notice of termination to PPGC, PPGT, and PPST on October 15, 2015.  *See* Exhibit B.  The letter stated that the video provided evidence that PPGC had violated state and federal law, and PPGC and its affiliates PPGT and PPST were therefore unqualified to provide Medicaid services in Texas.

**Answer**: Defendants state that Paragraph 84 refers to and characterizes documents, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the documents for a complete and accurate statement of their contents and admit that the State of Texas Health and Human Services Commission, Office of the Inspector General, issued Initial

Notices of Termination to Affiliate Defendants on October 15, 2015—copies of which are attached

to the Relator Complaint at Exhibit B that stated "Planned Parenthood Gulf Coast (PPGC)

committed and condoned numerous acts of misconduct captured on video." Defendants deny the

remaining allegations in Paragraph 84.

85.     PPGC, PPGT, and PPST did not challenge this initial determination in state

administrative proceedings.

**Answer**: Defendants admit that Affiliate Defendants did not appeal Texas's Initial Notices

of Termination through the state administrative process.

86.     Both Farrell and Nguyen were promoted to executive Vice President positions at

PPGC after the release of the videos.  Nguyen is still employed at PPGC.  Farrell was employed

by PPGC until late 2019, when she began working in senior leadership at a nearby clinical research

and tissue procurement company.  Planned Parenthood has never disclaimed Farrell and Nguyen's

statements on the video.  And additional information uncovered as a result of Relator's undercover

investigation showed that Farrell's statements about PPGC's history with fetal tissue procurement

were true.

**Answer**: Defendants admit that Farrell was promoted to Vice President of Research at

Planned Parenthood Gulf Coast in September 2017 before leaving Planned Parenthood Gulf Coast

in September 2019.  Defendants admit that Nguyen was promoted to Senior Director of Quality

Assurance and Abortion Access at Planned Parenthood Gulf Coast, while retaining her previous

title as well, in December 2020 and that Nguyen is still employed with Planned Parenthood Gulf

Coast.  Defendants lack knowledge or information sufficient to form a belief about the truth or

falsity of the remaining allegations in the third sentence of Paragraph 86 and therefore deny them.

Defendants deny the allegations in the fourth sentence on the basis that, because they are vague

and ambiguous, Defendants lack knowledge or information sufficient to form a belief about their truth or falsity.  Defendants deny the allegations in the fifth sentence of Paragraph 86.

87.     In 2010 and 2011, PPGC agreed to provide fetal tissue to NIH-funded researchers from the University of Texas Medical Branch ("UTMB").  In exchange for providing the tissue, which PPGC would obtain by getting abortion patients to donate it, UTMB paid Planned Parenthood approximately $21,000.

**Answer**: Defendants admit that in 2010 and 2011 PPGC through its internal research department participated in a study of first trimester placental tissue with NIH-funded researchers at the University of Texas Medical Branch under which PPGC received compensation from UTMB to reimburse the costs associated with collecting, storing, and donating placental tissue.  Abortions were performed by a separate, non-defendant Planned Parenthood affiliate, Planned Parenthood Center for Choice, and tissue was only donated if the patient chose to do so.  PPGC adhered to the requirements of UTMB's Institutional Review Board, including utilization of the Review Board's required informed consent form in addition to PPGC's supplemental informed consent form.  Defendants admit PPGC received approximately $21,000 under the contract for reasonable payments associated with the cost of its participation in the study.  Defendants deny that PPGC received any valuable consideration for or profited from its participation in the study.  Defendants deny the remaining allegations in Paragraph 87.

88.     The doctor named by Farrell as a doctor who would obtain her own tissue samples for her research while performing abortions at PPGC was a researcher involved in the UTMB study.

**Answer**: Defendants deny that one of the doctors involved with UTMB study was employed by and performed abortions at PPGC. Defendants deny all remaining allegations in Paragraph 88.

89.     In 2013, PPGC began negotiating with Baylor College of Medicine to provide second-trimester fetal cadavers for a research study.  In particular, the researcher wanted liver, thymus, CD34+ hematopoietic stem cells, lungs, kidneys, and skin tissue from second-trimester fetuses.

**Answer**: Defendants admit that in 2013 PPGC began discussions with Baylor College of Medicine about potential tissue donation to support a research project at Baylor.  Defendants deny the remaining allegations in Paragraph 89.

90.     PPGC and Baylor negotiated over the terms of the contract and the financial compensation that would be provided.  PPGC backed out of the negotiations after official investigations were prompted by the videos released from Relator's investigation.

**Answer**: Defendants admit PPGC and Baylor negotiated terms of a potential contract, including financial compensation for administrative work, time spent consenting patients, and providing a sterile set-up for collection.   Defendants admit that PPGC discontinued discussions with Baylor in the fall of 2015.  Defendants deny the remaining allegations in Paragraph 90.

91.     After further investigation, including close review of the undercover video, a transcript of the video, information provided in a referral from the U.S. House of Representatives Select Investigative Committee and in their Final Report, and consultation with a medical expert, OIG sent a final notice of termination to PPGC, PPGT, and PPST on December 20, 2016.  *See* Exhibit C.

**Answer**: Defendants state that Paragraph 91 refers to and characterizes documents, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the documents for a complete and accurate statement of their contents and admit that Texas Health of Human Services Commission, Office of Inspector General, issued Final Notices of Termination to Affiliate Defendants dated December 20, 2016. Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 91 and therefore deny them.

92.     PPGC, PPGT, and PPST never contested the termination in state administrative proceedings.  The termination became final under Texas law on January 19, 2017.  *See id.*

**Answer**: Defendants deny the allegations in the first sentence of Paragraph 92.  The second sentence of Paragraph 92 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 92.  Defendants also specifically deny that the Affiliate Defendants' terminations became final in Texas on January 19, 2017.  Defendants deny all remaining allegations in Paragraph 92.

93.     The notice explained several ways Texas had concluded that PPGC had violated federal and state law and medical and ethical standards and explained that state law permitted the termination of affiliates of entities that had engaged in such wrongdoing, which meant that PPGT and PPST would also be terminated.  *See id.*

**Answer**: Defendants state that Paragraph 93 is vague and ambiguous in that it does not specify whether it refers to Texas's Initial or Final Notice of Termination.  Defendants further state that Paragraph 93 refers to and characterizes documents, which speak for themselves; to the extent a response is required, and assuming that this allegation refers to Texas's Final Notices of Termination to Affiliate Defendants dated December 20, 2016, Defendants respectfully refer the

Court to the documents for a complete and accurate statement of their contents and admit that these Final Notices of Termination contained the purported bases for Texas's decision to exclude Affiliate Defendants from the Texas Medicaid Program and asserted that Planned Parenthood Gulf Coast had violate[d] accepted medical standards, as reflected in federal and state law" and that the other Affiliate Defendants should be excluded for their purported affiliation with Planned Parenthood Gulf Coast. Defendants deny the remaining allegations in Paragraph 93.

94.     Some of those regulations forbid researchers from taking "part in any decisions as to the timing, method, or procedures used to terminate [a] pregnancy made solely for the purposes of the research." 42 U.S.C. § 289g-l(c)(4); *see also* 45 C.F.R. § 46.204(i).  The undercover video footage obtained by Relater showed that PPGC has permitted doctors involved in fetal-tissue research to perform abortions to secure that fetal tissue.  *See* ¶ 74; Exhibit C.

**Answer**: Paragraph 94 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to and characterizes statutory and regulatory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit that 42 U.S.C. § 289g-l(c)(4) states that "[i]n research carried out under subsection (a), human fetal tissue may be used only if the individual with the principal responsibility for conducting the research involved makes a statement, made in writing and signed by the individual, declaring that the individual . . . has had no part in any decisions as to the timing, method, or procedures used to terminate the pregnancy made solely for the purposes of the research" and that 45 C.F.R. § 46.204(i) states that "[i]ndividuals engaged in the research [involving pregnant women or fetuses] will have no part in any decisions as to the timing, method, or procedures used to terminate a pregnancy."  Defendants deny the remaining allegations in Paragraph 94.

95.     Other regulations expressly forbid the alteration of the timing or method of an abortion for research purposes.  *See* 42 U.S.C. § 289g-l(b)(2)(A)(ii).  Many statements in the video indicate that PPGC doctors had done this.  For example, Farrell stated that researchers connected to PPGC have targeted specific fetal tissue in the past and that PPGC is willing to alter the abortion procedures to meet the needs of those researchers.  *See* ¶¶ 75-77; Exhibit C.

**Answer**: The first sentence of Paragraph 95 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to and characterizes a statutory provision, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the provision for a complete and accurate statement of its contents and admit that 42 U.S.C. § 289g-l(b)(2)(A)(ii) states that "[i]n research carried out under subsection (a), human fetal tissue may be used only if the attending physician with respect to obtaining the tissue from the woman involved makes a statement, made in writing and signed by the physician, declaring that—(A) in the case of tissue obtained pursuant to an induced abortion— . . . no alteration of the timing, method, or procedures used to terminate the pregnancy was made solely for the purposes of obtaining the tissue."  Defendants deny all remaining allegations in Paragraph 95.

96.     Still other regulations also prohibit the receipt of valuable consideration in exchange for fetal tissue.  *See* 42 U.S.C. § 289g-2(a); Tex. Penal Code § 48.03(b).  Farrell's discussion of the financial arrangements that would need to be made for PPGC to provide the fetal tissue to the procurement company and discussion of what she has done in the past indicates that PPGC has and will accept compensation above reimbursement for costs in providing fetal tissue, and that PPGC transfers fetal tissue in exchange for valuable consideration as a *quid pro quo* disconnected from any legally reimbursable costs.  *See* ¶ 78; Exhibit C.

**Answer**: The first sentence of Paragraph 96 contains legal conclusions or assertions to which no response is required.  Defendants further state that this paragraph refers to and characterizes statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit that 42 U.S.C. § 289g-2(a) states that "[i]t shall be unlawful for any person to knowingly acquire, receive, or otherwise transfer any human fetal tissue for valuable consideration if the transfer affects interstate commerce" and that  Tex. Penal Code § 48.03(b) states that "[a] person commits an offense if he or she knowingly or intentionally offers to buy, offers to sell, acquires, receives, sells, or otherwise transfers any human organ for valuable consideration." Defendants deny all remaining allegations in Paragraph 96.

97.    Other laws and regulations prohibit misrepresentations to law- enforcement officials.  *See, e.g.,* Tex. Penal Code § 37.08; 1 Tex. Admin. Code §§ 371.1603(g)(5), 371.1661(8); 42 U.S.C. § 1320a-7(b)(16).  The OIG received evidence from the U.S. House of Representatives Select Investigative Panel which documented a visit by the Texas Ranger Division of the Texas Department of Public Safety and discussions relating to PPGC's transactions with a researcher who was interested in obtaining fetal tissue.  The U.S. House Panel's evidence shows that PPGC, at that time, had been informed that the BCM's Independent Review Board had approved the researcher's fetal-tissue research proposal, but PPGC's General Counsel told the Texas Rangers that approval had not yet been obtained.  *See* Exhibit C.

**Answer**: The first sentence of Paragraph 97 contains legal conclusions or assertions to which no response is required.  Defendants further state that this sentence refers to and characterizes statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of

their contents and admit that Tex. Penal Code § 37.08 states that, in part, that "[a] person commits

an offense if, with intent to deceive, he knowingly makes a false statement that is material to a

criminal investigation and makes the statement to . . . a peace officer or federal special investigator

conducting the investigation"; that 1 Tex. Admin. Code § 371.1603(g)(5) states that "[w]hen

determining the seriousness, prevalence of error, harm, or potential harm of the violation, as

described in subsection (f) of this section, the OIG may consider multiple factors [including] . . .

attempted concealment of the act constituting a violation"; that 1 Tex. Admin. Code § 371.1661(8)

states that "[a] person is subject to administrative actions or sanctions if the person is convicted of

or engages in an act that constitutes under state or federal law . . . a criminal offense related to the

interference with or obstruction of any audit or investigation into an alleged criminal offense"; and

that 42 U.S.C. § 1320a-7(b)(16) states that "[t]he Secretary may exclude the following individuals

and entities from participation in any Federal health care program (as defined in section 1320a–

7b(f) of this title): . . . Any individual or entity that knowingly makes or causes to be made any

false statement, omission, or misrepresentation of a material fact in any application, agreement,

bid, or contract to participate or enroll as a provider of services or supplier under a Federal health

care program (as defined in section 1320a–7b(f) of this title), including Medicare Advantage

organizations under part C of subchapter XVIII, prescription drug plan sponsors under part D of

subchapter XVIII, medicaid managed care organizations under subchapter XIX, and entities that

apply to participate as providers of services or suppliers in such managed care organizations and

such plans."  Defendants state that the second and third sentences of Paragraph 97 refer to a

document, which speaks for itself; to the extent a response is required, Defendants respectfully

refer the Court to the document for a complete and accurate statement of its contents and admit

that the second and third sentences of Paragraph 97 refer to a portion of the U.S. House of

Representatives Select Investigative Panel Final Report.   Defendants deny all remaining allegations in Paragraph 97.

98.     As a condition of participating as a Medicaid provider in the Texas Medicaid program, Planned Parenthood agreed to comply with the requirements in Title 1, Part 15, Chapter 371 of the Texas Administrative Code, the Texas Medicaid Provider Procedures Manual, and all state and federal laws governing or regulating Medicaid.  As a condition of participation as a Texas Medicaid provider, Planned Parenthood also agreed that failing to comply with any applicable law, rule, or policy of the Medicaid program, or permitting circumstances that potentially threaten the health or safety of patients would be grounds for disqualification.

**Answer**: Defendants state that Paragraph 98 refers to and characterizes a document, which speaks for itself, and contains legal conclusions and assertions to which no response is required; to the extent a response is required, Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents and admit that Affiliate Defendants signed HHSC Medicaid Provider Agreements.  Defendants deny all remaining allegations in Paragraph 98.

99.     The findings outlined in the Texas termination letter and reflected in the undercover video obtained by Relator, and which were never contested by Planned Parenthood in state administrative proceedings related to the termination, are sufficient to implicate Planned Parenthood's provision of Medicaid services in a safe, competent, legal, and ethical manner.  *See Kauffman,* 981 F.3cl at 379-81 (Elrod, J., joined by Jones, Smith, Willett, Ho, Duncan, and Engelhardt, JJ., concurring); *see also id.at* 386 (agreeing as to PPGC) (Higginson, J., joined by Stewart and Costa, JJ., concurring in part).  That is a condition of remaining eligible to participate in the Medicaid program.

**Answer**: The first sentence of Paragraph 99, and its associated citations, contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 99.

100.    Further information uncovered in, or as a result of, Relator's investigation shows that PPFA directed and participated in its affiliates' wrongdoing.

**Answer**: Defendants deny the allegations in Paragraph 100.

101.    As Farrell stated in the video, PPFA policies, including those on research programs and fetal tissue donation, apply to all affiliates.  PPFA approves all affiliate research programs and research contracts.  PPFA also sets the medical standards and guidelines each affiliate is required to comply with.  PPFA also requires all affiliates to perform abortions.

**Answer**: Defendants deny the allegations in the first sentence of Paragraph 101 on the basis that because they are vague and ambiguous, Defendants lack knowledge or information sufficient to form a belief about their truth or falsity.  Defendants admit that, in order for affiliates to use the Planned Parenthood name and mark, affiliates must satisfy certain criteria, including some that pertain to their research programs and contracts; some that pertain to medical standards and guidelines; and some that pertain to the provision of abortions.  Defendants deny all remaining allegations in Paragraph 101.

102.    PPFA has made false statements to government investigators regarding Planned Parenthood's participation in fetal tissue harvesting.  During the Senate Judiciary Committee's investigation, PPFA stated that only four of its affiliates-all in California-had engaged in fetal-tissue donation between 2010 and 2015 and received funds in exchange.  But PPGC participated in the UTMB study and received approximately $21,000 in payments.

**Answer**: Defendants deny the first sentence of Paragraph 102.  Defendants admit that on August 27, 2015, PPFA told Congress that as of July 14, 2015, only four affiliates were involved in fetal tissue donation. Defendants admit that PPGC, through its internal research department, participated in a study of first trimester placental tissue with NIH-funded researchers at the University of Texas Medical Branch under which PPGC received approximately $21,000 from UTMB to reimburse the costs associated with collecting, storing, and donating placental tissue. Defendants deny all remaining allegations in Paragraph 102.

103.    PPFA's written policies and forms show that it violated the ethical principle of informed consent in its affiliates' fetal tissue procurement activities.  PPFA policies told doctors that they must attest that no "substantive" alterations to abortion procedures may be made to obtain fetal-tissue samples.  *Cf.* 42 U.S.C. § 289g- l(b)(2)(A)(ii) ("no alteration").  But the patient consent form states that *"no changes* will be made to the abortion procedure." In addition, PPFA's mandated fetal tissue donation consent form tells patients that fetal tissue has been used to cure illnesses like AIDS, cancer, and Parkinson's disease.  But Planned Parenthood admitted under oath that these claims are misleading.

**Answer**: Defendants deny the allegations in the first and second sentences of Paragraph 103.  Defendants further state that the second sentence of Paragraph 103 refers to a statutory provision, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the provision for a complete and accurate statement of its contents and admit that 42 U.S.C. § 289g- l(b)(2)(A)(ii) states that ""[i]n research carried out under subsection (a), human fetal tissue may be used only if the attending physician with respect to obtaining the tissue from the woman involved makes a statement, made in writing and signed by the physician, declaring that—(A) in the case of tissue obtained pursuant to an induced abortion— . . . no

alteration of the timing, method, or procedures used to terminate the pregnancy was made solely for the purposes of obtaining the tissue."  Defendants state that the third and fourth sentences of Paragraph 103 refer to a document, which speaks for itself; to the extent a response is required, Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents and deny the allegations in the third and fourth sentences of Paragraph 103 on the basis that, because they are vague and ambiguous, Defendants lack knowledge or information sufficient to form a belief about their truth or falsity.  Defendants deny all remaining allegations in Paragraph 103.

104.    PPFA continues to falsely claim Relator's undercover videos are misleading, deceptive, and/or heavily edited, despite having never offered any evidence showing that to be the case.  Upon information and belief, PPFA has instructed its affiliates to do so as well.

**Answer**: Defendants admits that PPFA maintains that Relator's "summary videos" are misleading, deceptive, and/or heavily edited.  Defendants deny all remaining allegations in Paragraph 104.

105.    As set forth above, PPGC began violating federal and state law in at least 2010-2011, when PPGC began provided fetal tissue to UTMB.  During that time, PPGC permitted a researcher to perform abortions to harvest fetal tissue for her own research, failed to disclose the abortion provider's interest in the tissue to patients, used PPFNs inadequate and misleading patient consent form to induce women to donate fetal tissue, and transferred the fetal tissue to UTMB for valuable consideration PPGC never disclosed these violations of law to HHS, HHSC, nor LDH, yet PPGC continued to certify it was in compliance with all state and federal laws and regulations every time it submitted a Medicaid claim for reimbursement, and each year it re-enrolled as a Medicaid provider.

**Answer**: Defendants deny all allegations in Paragraph 105.

106.     As of September 2015, PPGC was aware that Louisiana had determined that it was not qualified and would be terminated from the Louisiana Medicaid program because of the evidence obtained by Relator.  PPGC did not challenge that termination in state administrative procedures, and it became final on October 15, 2015.  Yet PPGC continued to submit Medicaid claims for reimbursement, and continued to certify that it was in compliance with all state and federal laws and regulations every time they submitted Medicaid claims for reimbursement and each time they re-enrolled as a Medicaid provider, despite their disqualification.

**Answer**: Defendants admit that the State of Louisiana Department of Health and Hospitals issued a Notice of Termination to Planned Parenthood Gulf Coast on September 15, 2015 that referenced information from videos taken by the Center for Medical Progress.  The second sentence of Paragraph 106 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants admit that Planned Parenthood Gulf Coast did not appeal Louisiana's Notice of Termination through the state administrative process and deny that Planned Parenthood Gulf Coast's termination became final in Louisiana on October 15, 2015.  Defendants admit that Planned Parenthood Gulf Coast continued to submit requests for reimbursement to Louisiana for Medicaid services delivered to patients, and continued to receive such reimbursement, during the pendency of the above-referenced litigation.  Defendants deny all remaining allegations in Paragraph 106.

107.     As of October 2015, PPGC, PPGT, and PPST were aware that Texas had initially determined they were not qualified and would be terminated from the Texas Medicaid program because of the evidence obtained by Relator.  PPGC, PPGT, and PPST did not challenge this initial decision, yet continued to certify that they were in compliance with all state and federal laws and

regulations every time they submitted Medicaid claims for reimbursement, and each time they re-enrolled as a Medicaid provider.

**Answer**: Defendants admit that the Texas Health and Human Services Commission issued Initial Notices of Termination to the Affiliate Defendants on October 19, 2015, that asserted that "Planned Parenthood Gulf Coast (PPGC) committed and condoned numerous acts of misconduct captured on video." Defendants admit that Affiliate Defendants continued to submit requests for reimbursement to Texas for Medicaid services delivered to patients, and continued to receive such reimbursement, during the pendency of the above-referenced litigation. Defendants deny all remaining allegations in Paragraph 106.

108.   As of December 2016, PPGC, PPGT, and PPST were aware that they had been terminated from the Texas Medicaid program. PPGC, PPGT, and PPST did not challenge that termination in state administrative procedures, and it became final on January 19, 2017. Yet PPGC, PPGT, and PPST continued to submit Medicaid claims for reimbursement, and continued to certify that they were in compliance with all state and federal laws and regulations every time they submitted Medicaid claims for reimbursement and each time they re-enrolled as a Medicaid provider, despite their disqualification.

**Answer**: Defendants admit that on December 20, 2016, Texas issued Final Notices of Termination to the Affiliate Defendants. The second sentence of Paragraph 108 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in the second sentence of Paragraph 108 and specifically deny that Affiliate Defendants' termination became final in Texas on January 19, 2017. Defendants admit that Affiliate Defendants continued to submit requests for reimbursement to Texas for Medicaid services delivered to patients, and continued to receive such reimbursement, during the

pendency of the above-referenced litigation. Defendants deny all remaining allegations in Paragraph 108.

109.    Federal courts in Texas and Louisiana entered temporary restraining orders followed by preliminary injunctions which required Texas and Louisiana to retain PPGC, PPGT, and PPST as Medicaid providers pending final resolution of Planned Parenthood's federal lawsuits against Texas and Louisiana, despite their final disqualification under state law.  The Fifth Circuit vacated the preliminary injunction in the Texas case on November 23, 2020.

**Answer**: Defendants admit that on October 18, 2015, the Middle District of Louisiana entered a temporary restraining order prohibiting Louisiana from terminating Planned Parenthood Gulf Coast's Medicaid Provider Agreement and then, on October 29, 2015, the court entered a preliminary injunction prohibiting Louisiana from terminating Planned Parenthood Gulf Coast from the Louisiana Medicaid program.  Defendants further admit that on January 19, 2017, the Western District of Texas issued a temporary restraining order prohibiting Texas from terminating the Affiliate Defendants, and then, on February 21, 2017, the court entered a preliminary injunction prohibiting Texas from terminating the Affiliate Defendants' Medicaid Provider Agreements with Texas. Defendants further admit that Texas and Louisiana were required to continue making payments to Affiliate Defendants while they remained qualified Medicaid providers in those states pursuant to these temporary restraining orders and preliminary injunctions.  Defendants admit that on November 23, 2020, the United States Court of Appeals for the Fifth Circuit, sitting *en banc*, vacated the Texas preliminary injunction.  Defendants deny all remaining allegations in Paragraph 109.

110.    All monies received by PPGC, PPGT, and PPST under the injunctions are overpayments because PPGC, PPGT, and PPST were not qualified providers and were thus not

entitled to the money.  The Medicaid statutes and regulations require providers to report and pay to the government any overpayments.

**Answer**: Paragraph 110 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 110.  Defendants admit that 42 U.S.C. § 1320a-7k, states that "[a]n overpayment must be reported and returned under paragraph (1) by the later of—(A) the date which is 60 days after the date on which the overpayment was identified; or (B) the date any corresponding cost report is due, if applicable."

111.    Relator learned that Planned Parenthood did not report or return any of these funds to the United States or the Plaintiff States after it became aware, or should have become aware, it had an obligation to do so within the statutorily required time period.  Specifically, Planned Parenthood did not report or repay the money it had received while it was disqualified within 60 days of November 23, 2020, the date it became aware, or should have become aware, of the overpayments.

**Answer**: Defendants deny all allegations in Paragraph 111 and also specifically deny that the Affiliate Defendants had an obligation to report or return funds that they received while they remained qualified Medicaid providers under Texas and Louisiana law during the pendency of the above-referenced litigation.

112.    Upon information and belief, Planned Parenthood still has not reported the overpayment, nor repaid any of these funds.

**Answer**: Defendants admit that because Affiliate Defendants have no legal obligation to make any repayments, they have accepted and not returned reimbursements from the Texas and

Louisiana Medicaid Programs for services delivered during the pendency of the injunctions. Defendants deny all remaining allegations in Paragraph 112.

113.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

**Answer**: Defendants repeat and reincorporate their answers to Paragraphs 1 to 112 as if set forth in full.

114.    The False Claims Act imposes liability upon any person who knowingly presents or causes to be presented false claims for payment or approval to the United States government. 31 U.S.C. § 3729(a)(l)(A).  When such false claims are discovered by private citizens, the False Claims Act allows those citizens to bring an action on behalf of the United States against the perpetrators.  31 U.S.C. § 3730(b)(l).  Relator brings this action pursuant to 31 U.S.C. § 3730(b)(l) and has provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).

**Answer**: The first two sentences of Paragraph 114 contain legal conclusions or assertions to which no response is required.  Defendants further state that Paragraph 114 refers to statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit that 31 U.S.C. § 3729(a)(l)(A) states that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person" and that 31 U.S.C. § 3730(b)(l) states, in part, that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name

of the Government."  Defendants admit that Relator brings this action under 31 U.S.C. §
3730(b)(l).  Defendants lack knowledge or information sufficient to form a belief as to the truth or
falsity of the remaining allegations in the last sentence of Paragraph 114 and therefore deny them.

115.    Through their conduct, the Planned Parenthood Defendants knowingly submitted,
or caused to be submitted, false claims for payment, as set forth above, in violation of 31 U.S.C. §
3729(a)(l)(A).  By submitting Medicaid claims for payment for women's health services, the
Planned Parenthood Defendants represented that they had complied with core state and federal
Medicaid requirements, specifically (1) that the Planned Parenthood Defendants were "qualified"
under state and federal law to provide medical services in a safe, legal, and ethical manner, and (2)
that the Planned Parenthood Defendants had not violated any medical or ethical standards or state
or federal laws in its provision of medical services.  By submitting Medicaid claims that conveyed
this information without disclosing their violations of medical and ethical standards and state and
federal laws, the Planned Parenthood Defendants' claims constituted misrepresentations.

**Answer**: Paragraph 115 contains legal conclusions or assertions to which no response is
required; to the extent a response is required, Defendants deny all allegations in Paragraph 115.

116.    These undisclosed violations were material to the Plaintiff States' decisions to pay
the Planned Parenthood Defendants' Medicaid claims.  The Planned Parenthood Defendants knew
or reasonably should have known that the Plaintiff States would deny their Medicaid claims and
terminate their enrollment in the Medicaid program if they disclosed the violations.  When Relator
provided information to the United States and the Plaintiff States disclosing the Planned
Parenthood Defendants' violations of medical and ethical standards and state and federal laws, the
Plaintiff States determined that the Planned Parenthood Defendants were not qualified to provide
Medicaid services and terminated their enrollment in the Medicaid program.

**Answer**: The first two sentences of Paragraph 116 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny all allegations in the first and second sentences of Paragraph 116.  Defendants admit that the State of Louisiana Department of Health and Hospitals and Texas Health and Human Services Commission issued Notices of Termination to the Affiliate Defendants and, in those letters, referenced videos taken by the Center for Medical Progress.  Defendants deny all remaining allegations in Paragraph 116.

117.    By reason of the Planned Parenthood Defendants' actions, the United States, the State of Texas, and the State of Louisiana have incurred and continue to incur damages.

**Answer**: Paragraph 117 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 117.

118.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

**Answer**: Defendants repeat and reincorporate their answers to Paragraphs 1 to 117 as if set forth in full.

119.    The False Claims Act imposes liability upon any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.  31 U.S.C. § 3729(a)(l)(G).  When such false claims are discovered by private citizens, the False Claims Act allows those citizens to bring an action on behalf of the United States against the perpetrators.  31 U.S.C. § 3730(b)(l).  Relator brings this action pursuant to 31 U.S.C.

§ 3730(b)(l) and has provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).

**Answer**: The first two sentences of Paragraph 119 contain legal conclusions or assertions to which no response is required.  Defendants further state that Paragraph 119 refers to statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit that 31 U.S.C. § 3729(a)(l)(G) states that "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person." and that 31 U.S.C. § 3730(b)(l) states, in part, that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government."  Defendants admit that Relator brings this action under 31 U.S.C. § 3730(b)(l).  Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in the last sentence of Paragraph 119 and therefore deny them.

120.    Through their conduct, the Planned Parenthood Defendants have received and retained millions of dollars of Medicaid overpayments to which Planned Parenthood is not entitled because their terminations became final on October 15, 2015 in Louisiana, and January 19, 2017 in Texas.  Planned Parenthood waived administrative review of the termination decisions and

failed otherwise contest the States' decisions in administrative proceedings. Thus, once the Fifth Circuit issued its November 23, 2020 opinion vacating the preliminary injunction requiring Texas to keep Planned Parenthood in its Medicaid program and overruling the decision upholding the preliminary injunction requiring Louisiana to keep Planned Parenthood in its Medicaid program, Planned Parenthood determined or should have determined that it improperly received Medicaid overpayments. Planned Parenthood has knowingly and improperly avoided its obligation to return the overpayments to the United States, the State of Texas, the State of Louisiana.

**Answer**: Paragraph 120 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny all allegations in Paragraph 120.

121.    By reason of the Planned Parenthood Defendants' actions, the United States, the State of Texas, and the State of Louisiana have incurred and continue to incur damages.

**Answer**: Paragraph 121 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 121.

122.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

**Answer**: Defendants repeat and reincorporate their answers to Paragraphs 1 to 121 as if set forth in full.

123.    The Texas Medicaid Fraud Prevention Act imposes liability upon an individual or entity who: (1) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized; (2) knowingly makes, causes to be made, induces, or seek to induce the making of a false statement or misrepresentation of material fact concerning (a) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, or (b) information

required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program; and/or (3) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state under the Medicaid program.  Tex. Hum. Res. Code §§ 36.002(2), (4), (12).

**Answer**: Paragraph 123 contains legal conclusions or assertions to which no response is required.  Defendants further state that Paragraph 123 refers to statutory provisions, which speak for themselves; to the extent a response is required, Defendants respectfully refer the Court to the provisions for a complete and accurate statement of their contents and admit that Texas Human Resources Code § 36.002(2) states that "[a] person commits an unlawful act if the person: . . . knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized"; that § 36.002(4) states that "[a] person commits an unlawful act if the person . . . knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning: (A) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, . . . or (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program"; and that § 36.002(12) states that "[a] person commits an unlawful act if the person . . . knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program."

124.    Relator brings this action in accordance with the civil action *qui tam* provision in Tex. Hum. Res. Code §§ 36.101 and .102 and has complied with all requirements therein.

**Answer**: Defendants admit that Relator brings this action under the civil action *qui tam* provisions of the Texas Human Resources Code.  Defendants deny that Relator has complied with all requirements therein.

125.    Through their conduct, the Planned Parenthood Defendants have knowingly concealed or failed to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized, as set forth above, in violation of Tex. Hum. Res. Code§ 36.002(2).

**Answer**: Paragraph 125 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 117.

126.    Through their conduct, the Planned Parenthood Defendants have knowingly made, caused to be made, induced, or sought to induce the making of a false statement or misrepresentation of material fact concerning (a) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, or (b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program, as set forth above, in violation of Tex. Hum. Res. Code § 36.002(4).

**Answer**: Paragraph 126 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 126.

127.    Through their conduct, the Planned Parenthood Defendants have knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit

money or property to the state under the Medicaid program, as set forth above, in violation of Texas Human Resources Code § 36.002(12).

**Answer**: Paragraph 127 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 127.

128.    By reason of the Planned Parenthood Defendants' actions, the State of Texas has incurred and continues to incur damages.

**Answer**: Paragraph 128 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 128.

129.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

**Answer**: Defendants repeat and reincorporate their answers to Paragraphs 1 to 128 as if set forth in full.

130.    The Louisiana Medical Assistance Programs Integrity Law imposes liability for an individual or entity who: (1) knowingly presents or causes to be presented a false or fraudulent claim; and/or (2) knowingly conceals, avoids, or decreases an obligation to pay or transmit money or property to the medical assistance programs.  La. Rev. Stat.§ 46:438.3(A), (C).

**Answer**: Paragraph 130 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants admit that La. Rev. Stat. § 46:438.3(A) states that "[n]o person shall knowingly present or cause to be presented a false or fraudulent claim" and that § 46:438.3 (C) states that "[n]o person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs."

131.    Relators bring this action in accordance with the civil action *qui tam* provision in La. Rev. Stat. §§ 46:439.1-.2 and have complied with all requirements therein.

**Answer**: Defendants admit that Relator brings this action under the civil action *qui tam* provisions of the Louisiana Revised Statutes.  Defendants deny that Relator has complied with all requirements therein.

132.    Through their conduct, the Planned Parenthood Defendants have knowingly presented, or caused to be presented, false or fraudulent claims to the State of Louisiana, as set forth above, in violation of La. Rev. Stat.§ 46:438.3(A).

**Answer**: Paragraph 132 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 132.

133.    Through their conduct, the Planned Parenthood Defendants have knowingly concealed, avoided, or decreased an obligation to pay or transmit money or property to the medical assistance programs, as set forth above, in violation of Louisiana Revised Statute § 46:438.3(C).

**Answer**: Paragraph 133 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 133.

134.    By reason of the Planned Parenthood Defendants' actions, the State of Louisiana has incurred and continues to incur damages.

**Answer**: Paragraph 134 contains legal conclusions or assertions to which no response is required; to the extent a response is required, Defendants deny the allegations in Paragraph 134.

135.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

**Answer**: Defendants repeat and reincorporate their answers to Paragraphs 1 to 134 as if set forth in full.

136.    A person engages in conspiracy to commit health care fraud if (1) two or more persons made an agreement to commit health care fraud; (2) the person knew the unlawful purpose of the agreement; and (3) the person joined in the agreement willingly, with the intent to further the unlawful purpose.

**Answer**: Paragraph 136 contains allegations related to a dismissed claim to which no response is required.

137.    PPFA, PPGT, PPST, and PPGC, through its agents, employees, and subsidiaries, knowingly and willingly agreed that PPGT, PPST, and PPGC would engage in the fraudulent acts described above and continue submitting claims for reimbursement by Texas Medicaid, and that PPGC would continue submitting claims for reimbursement by Louisiana Medicaid, despite committing acts that materially disqualified them from receiving Medicaid funds.

**Answer**: Paragraph 137 contains allegations related to a dismissed claim to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 137.

138.    PPFA, PPGT, PPST, and PPGC, through its agents, employees, and subsidiaries, knowingly and willingly agreed that PPGT, PPST, and PPGC would retain overpayments received despite their termination from the Texas and Louisiana Medicaid programs, and despite their statutory obligation to return overpayments.

**Answer**: Paragraph 138 contains allegations related to a dismissed claim to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 138.

139.    WHEREFORE, Relator prays that this Court enter judgment against the Defendants as follows:

i.      That the United States be awarded damages in the amount of three times the damages sustained by the United States as a result of the unlawful acts of Defendants complained of herein, as provided by the False Claims Act, 31 U.S.C. §§ 3729, *et seq.;*

ii.     That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented or caused to be presented to the United States;

iii.    That the State of Texas be awarded damages in the amount of each payment provided to Defendants under the Medicaid program as a result of the unlawful acts complained of herein, plus two times the damages sustained by the State of Texas as a result of such unlawful acts, as provided by the TMFPA, Tex. Hum. Res. Code §§ 32.001 *et seq.,* and 36.052(a) and (b);

iv.    That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented or caused to be presented to the State of Texas;

v.     That the State of Louisiana be awarded damages in the amount of each payment provided to Defendants under the Medicaid program as a result of the unlawful acts complained of herein, plus two times the damages sustained by the State of Louisiana as a result of such unlawful acts, as provided by the LMAPIL, La. Rev. Stat.§§ 46:438.3, *et seq.;*

vi.    That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented or caused to be presented to the State of Louisiana;

vii.   That pre- and post-judgment interest be awarded along with reasonable attorney fees, costs, and expenses incurred by Relator in bringing and prosecuting this case;

viii.  That the Court grant permanent injunctive relief to prevent any recurrence of the federal and state false claims and Medicaid fraud violations for which redress is sought in this Complaint;

ix.    That Relator Alex Doe be awarded the maximum amount allowed pursuant to the federal False Claims Act, the Texas Medicaid Fraud Prevention Act, and the Louisiana Medical Assistance Programs Integrity Law; and

x.     That this Court award such other and further relief as it deems equitable, just, and proper.

**Answer**: Defendants deny that Plaintiff is entitled to the relief requested in its Prayer for Relief or to any other relief.

## DEFENDANTS' AFFIRMATIVE DEFENSES

1.      For the reasons stated in Defendants' memorandum in support of their motion to dismiss the Relator's Complaint [Dkt. 49], the Relator's Complaint fails to state a claim upon which relief can be granted and fails to plead its allegations with particularity.

2.      The prayer for relief seeks to impose an excessive fine within the meaning of the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

3.      The prayer for relief seeks to impose an excessive fine within the meaning of Article 1, Section 13 of the Texas Constitution.

4.      Relator's claims against Defendants are barred, in whole or in part, under the applicable statutes of limitations and/or statutes of repose.

5.      Relator's claims against Defendants are barred, in whole or in part, under the public disclosure bar and the government action bar.

6.      Relator's claims against Defendants are barred, in whole or in part, under the government intervention bar.

7.      Defendants hereby give notice that they may rely upon other applicable affirmative defenses of which they become aware during discovery in this case and hereby reserve the right to further amend this Answer to assert any such defenses.

## DEMAND FOR JURY TRIAL

Defendants demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure as to all issues or claims for which a jury trial is allowed.

WHEREFORE, having fully answered the Relator Complaint, Defendants pray that the claims set forth therein be dismissed in total, that this Court award Defendants their costs and

attorneys' fees incurred in defending the claims in the Complaint and that this Court grant such further relief as its deems just and proper.

Dated: October 18,2022                            Respectfully submitted,

*/s/ Craig D. Margolis*
Craig D. Margolis
Craig.Margolis@arnoldporter.com
Tirzah S. Lollar
Tirzah.Lollar@arnoldporter.com
Paula Ramer
Paula.Ramer@arnoldporter.com
Christian Sheehan
Christian.Sheehan@arnoldporter.com
Emily Reeder-Ricchetti
Emily.Reeder-ricchetti@arnoldporter.com
Megan Pieper
Megan.Pieper@arnoldporter.com
Alyssa Gerstner
Alyssa.Gerstner@arnoldporter.com
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone: +1 202.942.6127
Fax: +1 202.942.5999

Christopher M. Odell
Texas State Bar No. 24037205
Christopher.Odell@arnoldporter.com
700 Louisiana Street, Suite 4000
Houston, TX 77002-2755
Telephone: +1 713.576.2400
Fax: +1 713.576.2499

Ryan Patrick Brown
Texas State Bar No. 24073967
ryan@ryanbrownattorneyatlaw.com
1222 S. Fillmore
Amarillo, TX 79101
Tel: (806) 372-5711
Fax: (806) 350-7716

*Attorneys for Defendants Planned Parenthood Gulf Coast, Inc., Planned Parenthood of Greater Texas, Inc., Planned Parenthood of South Texas, Inc., Planned Parenthood Cameron County, Inc., and Planned Parenthood San Antonio, Inc.*

**O'MELVENY & MYERS LLP**

*/s/ Danny S. Ashby*
DANNY S. ASHBY
Texas Bar No. 01370960
dashby@omm.com
JUSTIN R. CHAPA
Texas Bar No. 24074019
jchapa@omm.cm
MEGAN R. WHISLER
Texas Bar No. 24079565
mwhisler@omm.com
2501 N. Harwood Street, Suite 1700
Dallas, Texas 75201
T: (972) 360-1900
F: (972) 360-1901

LEAH GODESKY (*pro hac vice*)
lgodesky@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
T: (310) 553-6700
F: (310) 246-6779

Ryan Patrick Brown
Texas State Bar No. 24073967
ryan@ryanbrownattorneyatlaw.com
1222 S. Fillmore
Amarillo, TX 79101
Tel: (806) 372-5711
Fax: (806) 350-7716

*Attorneys for Defendant Planned Parenthood
Federation of America, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 18, 2022 the foregoing document was electronically filed with the Clerk of Court using CM/ECF as an exhibit to Defendants' concurrently filed *Motion for Leave*. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

<u>*/s/ Danny S. Ashby*</u>
Danny S. Ashby