**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| United States of America<br>*ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| | § | |
| The State of Texas | § | |
| *ex rel.* ALEX DOE, Relator, | § | NO. 2:21-CV-22-Z |
| | § | |
| The State of Louisiana | § | |
| | § | |
| *ex rel.* ALEX DOE, Relator, | § | |
| | § | |
|      Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| Planned Parenthood Federation of America, | § | |
| Inc., Planned Parenthood Gulf Coast, Inc., | § | |
| Planned Parenthood of Greater Texas, Inc., | § | |
| Planned Parenthood South Texas, Inc., | § | |
| Planned Parenthood Cameron County, Inc., | § | |
| Planned Parenthood San Antonio, Inc., | § | |
| | § | |
|      Defendants. | | |

## DEFENDANT PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.'S OPPOSITION TO RELATOR'S MOTION TO COMPEL PRODUCTION AND APPOINTMENT OF FORENSIC EXAMINER

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 3

  I.  Appointment Of A Forensic Examiner Is A Drastic And Intrusive Form Of Relief That Courts Impose Only in Extraordinary Circumstances. ...................................... 3

  II.  PPFA Has Complied With Its Discovery Obligations. .................................... 5

    A. PPFA's Document Productions Have Been Expansive and Burdensome. ........................ 5

    B. Relator Has Not Identified Any Material Deficiencies In PPFA's Production ................. 8

      1. Relator Identified No Deficiencies In The Parties' Pre-Motion Meet and Confers That PPFA Refused to Address. ......................................................... 8

      2. Relator's Motion Identifies No Material Deficiencies In PPFA's Production. .............. 9

        i.  Medicaid Director Orientation Manual ............................................... 10

        ii.  "Medicaid Toolkit" Documents ........................................................ 10

        iii.  Additional Custodians ..................................................................... 11

        iv.  PPFA Intranet & Google Docs ........................................................ 13

  III.  There Is No Basis for the Extraordinary Relief That Relator Seeks. ................. 13

    A. Relator's Requests Are Sweeping, Unjustified, and Unduly Burdensome. ..................... 14

    B. Appointment of a Forensic Examiner Is Not Warranted Because There Is No Discovery Misconduct By PPFA. ............................................................ 20

  IV.  The Court Should Order the Parties to Meet and Confer in Good Faith To Resolve The Dispute. ................................................................................. 24

CONCLUSION ...................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................ 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agerbrink v. Model Serv. LLC*,
   2017 WL 933095 (S.D.N.Y. Mar. 8, 2017) ..................................................... 10, 16

*Aminov v. Berkshire Hathaway Guard Ins. Companies*,
   2022 WL 818944 (E.D.N.Y. Mar. 3, 2022) ............................................................ 3

*Banc Pueyo, S.A. v. Lone Star Fund IX (U.S.), L.P.*,
   2020 WL 10046110 (N.D. Tex. Sept. 25, 2020) ..................................................... 9

*Belcastro v. United Airlines*,
   2019 WL 7049914 (N.D. Ill. Dec. 23, 2019) ........................................................ 5

*Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon*,
   2018 WL 2215510 (S.D.N.Y. May 15, 2018) ........................................................ 16

*Brown v. Bridges*,
   2015 WL 11121361 (N.D. Tex. Jan. 30, 2015) ................................................... 2, 22

*Contracom Commodity Trading Co. v. Seaboard Corp.*,
   189 F.R.D. 456 (D. Kan. 1999) .......................................................................... 22

*Crabtree v. Angie's List, Inc.*,
   2017 WL 413242 (S.D. Ind. Jan. 31, 2017) ......................................................... 19

*Delta T, LLC v. Williams*,
   337 F.R.D. 395 (S.D. Ohio 2021) ...................................................................... 17

*Diepenhorst v. City of Battle Creek*,
   2006 WL 1851243 (W.D. Mich. June 30, 2006) ..................................................... 4

*Dondi Props. Corp. v. Commercial Sav. & Loan Ass'n*,
   121 F.R.D. 284 (N.D. Tex. 1988) ...................................................................... 22

*Fay Ave. Props. v. Travelers Prop. Cas. Co. of Am.*,
   2013 WL 3746107 (S.D. Cal. July 15, 2013) ........................................................ 10

*Fed. Housing Fin. Agency v. HSBC N. Am. Hldgs. Inc.*,
   2014 WL 584300 (S.D.N.Y. Feb. 14, 2014) ......................................................... 15

*Freedman v. Weatherford Int'l Ltd.*,
   2014 WL 4547039 (S.D.N.Y. Sept. 12, 2014) ...................................................... 24

*Hyles v. New York City*,
   2016 WL 4077114 (S.D.N.Y. Aug. 1, 2016) ......................................................... 15

*In re EpiPen Marketing, Sales Practices & Antitrust Litig.*,
   2018 WL 1440923 (D. Kan. Mar. 15, 2018) ......................................................... 17

**TABLE OF AUTHORITIES**

*(continued)*

Page(s)

*In re Ford Motor Co.*,
345 F.3d 1315 (11th Cir. 2003) ........................................................ 3

*James v. Wash Depot Hldgs.*,
240 F.R.D. 693 (S.D. Fla. 2006) ...................................................... 14

*John B. v. Goetz*,
531 F.3d 448 (6th Cir. 2008) ............................................... 5, 11, 20

*Lawson v. Spirit AeroSystems, Inc.*,
2020 WL 1813395 (D. Kan. Apr. 9, 2020) ................................. 15, 19

*McCurdy Grp. v. Am. Biomedical Grp., Inc.*,
9 F. App'x 822 (10th Cir. 2001) ...................................................... 11

*McRae v. Dikran*,
2021 WL 1968391 (E.D. Cal. May 17, 2021) ................................. 14

*Memry Corp. v. Ky. Oil Tech., N.V*,
2007 WL 832937 (N.D. Cal. Mar. 19, 2007) .......................... 5, 11, 24

*Metro. Opera Ass'n v. Local 100, Hotel Emps. and Rest. Emps. Int'l Union*,
212 F.R.D. 178 (S.D.N.Y. 2003) ...................................................... 16

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
314 F. Supp. 3d 931 (N.D. Ill. 2018) ................................................ 4

*Nupson v. Schnader Harrison Segal & Lewis LLP*,
2021 WL 1293557 (E.D. Pa. Apr. 7, 2021) ...................................... 12

*Playboy Enters. Inc. v. Welles*,
60 F. Supp. 2d 1050 (S.D. Cal. 1999) .............................................. 23

*Powers v. Thomas M. Cooley L. Sch.*,
2006 WL 2711512 (W.D. Mich. Sept. 21, 2006) ............................... 4

*Procaps S.A. v. Patheon Inc.*,
2014 WL 11498061 (S.D. Fla. Dec. 30, 2014) .................................. 4

*Reinsdorf v. Skechers U.S.A., Inc.*,
296 F.R.D. 604 (C.D. Cal. 2013) .................................................... 16

*Roque v. City of Austin*,
2018 WL 5848988 (W.D. Tex. Nov. 7, 2018) .................................. 24

*Salazar v. Bocanegra*,
2012 WL 12893938 (D.N.M. July 27, 2012) .................................... 18

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Schreiber v. Friedman*,
 2017 WL 11508067 (E.D.N.Y. Aug. 15, 2017).........................................................................24

*Slocum v. Int'l Paper Co.*,
 2019 WL 8918747 (E.D. La. Mar. 15, 2019) ...........................................................................23

*Sony BMG Music Entm't v. Arellanes*,
 2006 WL 8201075 (E.D. Tex. Oct. 27, 2006) ..........................................................................18

*Sophia v. Chloe, Inc. v. Brighton Collectibles, Inc.*,
 2013 WL 5212013 (S.D. Cal. Sept. 13, 2013)....................................................................11, 23

*Strong v. Marathon Res. Mgmt Grp, LLC*,
 2019 WL 13094638 (W.D. Tex. Aug. 13, 2019).......................................................................24

*Tera II, LLC v. Rice Drilling D, LLC*,
 2022 WL 1114943 (S.D. Ohio Apr. 14, 2022) .........................................................................17

*Thompson v. Columbus Life Ins. Co.*,
 2007 WL 9725239 (D. Nev. Apr. 5, 2007)................................................................................22

*Tingle v. Hebert*,
 2018 WL 1726667 (M.D. La. Apr. 10, 2018).............................................................................3

*Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc.*,
 2022 WL 2316228 (N.D. Ill. June 28, 2022)...........................................................3, 5, 18, 23

*Treppel v. Biovail Corp.*,
 233 F.R.D. 363 (S.D.N.Y. 2006) .......................................................................................15, 17

*United States ex rel. McBride v. Halliburton Co.*,
 272 F.R.D. 235 (D.D.C. 2011)..................................................................................................12

*William A. Gross Constr. Assocs. v. Am. Mfrs. Mut. Ins. Co.*,
 256 F.R.D. 135 (S.D.N.Y. 2009) ..............................................................................................25

*Winfield v. City of New York*,
 2017 WL 5664852 (S.D.N.Y. Nov. 27, 2017)....................................................................16, 24

**Other Authorities**

The Sedona Principles: Third Edition, Best Practices Recommendations & Principles for
 Addressing Electronic Document Production,
 19 SEDONA CONF. J. 1 (2018) ..............................................................................................4

**Rules**

Fed. R. Civ. P. 1 ..............................................................................................................................3

iv

## TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

Fed. R. Civ. P. 26(b)(2)(C) ................................................................................................. 3

Fed. R. Civ. P. 26(g)(1)(B) ................................................................................................ 17

Fed. R. Civ. P. 34(a) ...................................................................................................... 3, 6

## PRELIMINARY STATEMENT

Planned Parenthood Federation of America, Inc. ("PPFA") has diligently complied with its discovery obligations.  PPFA attorneys spent **more than 10,000 hours**—at a cost of more than **$1 million**—searching for and producing nearly **90,000 documents totaling over 400,000 pages**. PPFA continues to search for and will soon produce additional documents, including those responsive to Relator's most recent production requests.  PPFA has been transparent about its collection and production process, explaining up front that it searched the custodial documents of sixteen specific PPFA executives and staff, and disclosing the broad search terms used to capture the universe of potentially responsive documents.  PPFA remains willing to consider any reasonable request Relator might have for additional information.

But Relator has once again come to this Court shooting from the hip.  Without any meaningful effort to meet and confer, Relator has asked this Court to order PPFA to produce documents not even remotely responsive to Relator's discovery requests (much less to the Court's discovery orders).  In furtherance of that effort, Relator asks the Court to take the extraordinary step of appointing a Relator-selected forensic examiner to take control of PPFA's electronic systems and run (at PPFA's expense) wide-ranging searches using three generic search terms that are wholly untethered to Relator's actual discovery requests.  *See* DE 220 at 15–18 (hereinafter "Mot.").  Those requests are totally baseless.

Reams of court precedent establish that granting a forensic examiner unfettered access to a party's electronic-data system is an extreme remedy reserved for only the most flagrant discovery violations.  Such an extraordinary measure may be warranted in cases where a party has flouted discovery orders and has clearly shown that it cannot be trusted to comply with its discovery obligations, but that is not the situation here.  This Court has already made clear that PPFA's

discovery positions in this case have been "substantially justified."  DE 187 at 2.  And PPFA has since moved mountains to promptly collect, process, host, review, and log hundreds of thousands of documents and produce to Relator tens of thousands of communications regarding Texas and Louisiana Medicaid and PPFA's relationship with the Affiliate Defendants.

It is thus unsurprising that Relator would attempt to swing for the fences with this Motion rather than meet and confer with PPFA in good faith as the Rules require.  Any "genuine effort[] to resolve the dispute by determining precisely what [Relator] is actually seeking; what responsive documents or information [PPFA] is reasonably capable of producing; and what specific, genuine objections or other issues, if any, cannot be resolved without judicial intervention," *Brown v. Bridges*, 2015 WL 11121361, at *4 (N.D. Tex. Jan. 30, 2015), would have revealed Relator's forensic-examination remedy as a solution in search of a problem.

Less than one month before the close of discovery, Relator seeks an unabashed do-over of their discovery strategy.  After six sets of Requests for Production to PPFA and apparent disappointment that there is not the slightest evidence that PPFA controlled or directed the Medicaid submissions at issue, Relator now resorts to a fishing expedition.  While Relator tries to characterize this Motion as following up on purported deficiencies in PPFA's court-ordered productions, Relator actually seeks to radically expand PPFA's discovery obligations.  Before this Motion, Relator's Requests for Production to PPFA and this Court's discovery orders were all cabined to documents relating to Texas and Louisiana Medicaid and the Affiliate Defendants.  But Relator now proposes that an examiner collect all documents that relate in ***any way*** to Medicaid or "payments" of ***any kind***—a late breaking and facially unreasonable request in view of the many dozens of Affiliates in states other than Texas and Louisiana with which PPFA often communicates.  Any "forensic examination" along the lines Relator proposes would take many

months of effort at extraordinary cost to PPFA and yield widely overbroad results.

There is no basis for the "invasive" and "extraordinary remedy" Relator seeks.  *Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc*., 2022 WL 2316228, at *2 (N.D. Ill. June 28, 2022).  PPFA should not have had to expend substantial additional resources establishing as much—especially amid its preparation to take and defend more than twenty-five depositions in the next six weeks.  The Court should deny the Motion and order Relator to reimburse PPFA the costs incurred in filing this Opposition.

## ARGUMENT

I.      **APPOINTMENT OF A FORENSIC EXAMINER IS A DRASTIC AND INTRUSIVE FORM OF RELIEF THAT COURTS IMPOSE ONLY IN EXTRAORDINARY CIRCUMSTANCES.**

Forensic examinations are highly intrusive and appropriate only in the rarest of circumstances, none of which are present here.  *See Aminov v. Berkshire Hathaway Guard Ins. Cos.*, 2022 WL 818944, at *1 (E.D.N.Y. Mar. 3, 2022); *see also Tingle v. Hebert*, 2018 WL 1726667, at *6 (M.D. La. Apr. 10, 2018) (indicating same); Fed. R. Civ. P. 26(b)(2)(C) (requiring courts to "limit the frequency or extent of discovery" where the discovery sought is "unreasonably cumulative or duplicative" or the burden and expense outweighs its likely benefit); Fed. R. Civ. P. 1 (the Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding").

While Rule 34(a) allows a party to request electronically stored information ("ESI"), it "does not grant unrestricted, direct access to a respondent's database compilations."  *In re Ford Motor Co.*, 345 F.3d 1315, 1316 (11th Cir. 2003); *see also* Fed. R. Civ. P. 34(a), Advisory Committee Notes, 2006 Amendments  (Rule 34(a) "is not meant to create a routine right of direct access to a party's electronic information system" so courts must "guard against undue intrusiveness resulting from inspecting or testing such systems").  That is why "[f]orensic

3

examination is generally regarded as a drastic step." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 314 F. Supp. 3d 931, 939 (N.D. Ill. 2018); *see also Procaps S.A. v. Patheon Inc.*, 2014 WL 11498061, at *3 (S.D. Fla. Dec. 30, 2014) ("Requiring forensic analysis of ESI is an unusual and 'drastic' remedy and is therefore the 'exception and not the rule.'" (citation omitted)).

Forensic examinations pose considerable concerns and risks to the responding party, such as (i) revealing trade secrets, highly confidential or private information, or confidential attorney-client or work-product communications; (ii) "unreasonably disrupting the ongoing business" of the responding party; (iii) "endangering the stability of operating systems, software applications, and electronic files if certain procedures or software are used inappropriately"; and (iv) "placing a responding party's computing systems at risk of a data security breach." The Sedona Principles: Third Edition, Best Practices Recommendations & Principles for Addressing Electronic Document Production, 19 SEDONA CONF. J. 1, 128–29 (2018) (hereinafter the "Sedona Principles").[1] The "expensive process" associated with a forensic examination "adds to the burden of litigation" and "results in the production of massive amounts of irrelevant, and perhaps privileged, information." *Powers v. Thomas M. Cooley L. Sch.*, 2006 WL 2711512, at *5 (W.D. Mich. Sept. 21, 2006); *see also Diepenhorst v. City of Battle Creek*, 2006 WL 1851243, at *4 (W.D. Mich. June 30, 2006) (request to image party's computer hard drive is an "expensive and intrusive process"); Sedona Principles at 129 ("Rule 34 inspections of ESI are likely to be particularly ineffective" and "less likely to be fruitful" than the responding party's identification and production of responsive information.).

For these reasons, courts have permitted direct access to an opposing party's ESI only in

---

[1] The Sedona Principles were developed to provide best-practice recommendations and principles for addressing electronic-document collection and production, and are regularly relied upon by federal courts. *See, e.g., John B. v. Goetz*, 531 F.3d 448, 460 (6th Cir. 2008).

extreme situations where the record establishes that the producing party has "intentionally destroyed relevant ESI in the past" or is "unwilling, or will refuse, to preserve and produce all relevant ESI in the future." *John B. v. Goetz*, 531 F.3d 448, 460 (6th Cir. 2008); *see also Belcastro v. United Airlines*, 2019 WL 7049914, at *2 (N.D. Ill. Dec. 23, 2019); *Memry Corp. v. Ky. Oil Tech., N.V*, 2007 WL 832937, at *3 (N.D. Cal. Mar. 19, 2007) (collecting cases). Even then, "[c]ourts are especially reluctant to permit direct inspection of ESI when the request is not proportional to the needs of the case, is unduly burdensome, or the information sought does not go to the heart of the matter." *Tireboots*, 2022 WL 2316228, at *2 (citations omitted). Importantly, courts require parties to first "employ[] less intrusive discovery methods before resorting to [the] more invasive measures" of a forensic examination. *Id*.; *see also* Fed. R. Civ. P. 34(a), Advisory Committee Notes, 2006 Amendments (Because "[i]nspection or testing of certain types of electronically stored information or of a responding party's electronic information system may raise issues of confidentiality or privacy," "[c]ourts should guard against undue intrusiveness resulting from inspecting or testing [electronic information] systems."). As explained below, the circumstances here come nowhere close to those in which a third-party forensic examination would be justified.

## II.   PPFA HAS COMPLIED WITH ITS DISCOVERY OBLIGATIONS.

### A.   PPFA's Document Productions Have Been Expansive and Burdensome.

On August 25, 2022, the Court ordered PPFA to produce documents relating to (i) Texas and Louisiana Medicaid,[2] and (ii) PPFA's relationship with the Affiliate Defendants.[3]   *See* DE

---

[2] RFP No. 7 in Relator's First Requests for Production sought "[a]ll documents and communications which Defendants have made or obtained concerning Texas Medicaid and/or Louisiana Medicaid."  Ex. 1 at 10.

[3] RFP Nos. 2 and 3 in Relator's Second Requests for Production sought (i) communications between PPFA and the Affiliate Defendants "concerning affiliation," and (ii) "[a]ll documents and communications concerning [PPFA's] relationship with any [Affiliate Defendant]."  Ex. 2 at 9.

153. PPFA thereafter identified the 16 current and former PPFA executives and employees most likely to be centrally involved in responsive communications:

| Custodian Name | Title |
|---|---|
| Cecile Richards | (Former) President, CEO |
| Vickie Barrow-Klein | Executive Vice President, Chief Operating Officer, and Chief Financial Officer |
| Kim Custer | Executive Vice President and Chief Federation Engagement & Impact Officer |
| Meagan Cavanaugh | (Former) National Director, Affiliate Services |
| Tamara Kramer | Director, Health Care Investment Program |
| Stephanie Shaw | (Former) Strategic Manager for Health Finance |
| Emily Stewart | (Former) Vice President of Public Policy |
| Teri Trivisonno | Vice President, Health Care Operations |
| Kelley Wall | National Director, Health Care Operations |
| Eric Ferrero | (Former) Vice President, Communications |
| Adrienne Verilli | Vice President, Communications & Culture |
| Emily Schifrin | National Director, Accreditation |
| Gillian Dean | (Former) Chief Medical Officer |
| Krishna Upadhya | Vice President, Quality Care and Health Equity |
| Carrie Flaxman | Senior Director, Public Policy Litigation & Law |
| Jennifer Sandman | Senior Director, Public Policy Litigation & Law |

To identify potentially responsive documents within those custodians' ESI, PPFA developed an exceedingly broad set of search terms designed to capture all documents relating to

Texas and Louisiana Medicaid, or to PPFA's relationship with the Affiliate Defendants.  PPFA searched and collected all documents and communications that include (i) the word "Medicaid" in combination with either "LA" or "TX" or "Louisiana" or "Texas"; (ii) all the names of the Affiliate Defendants' CEOs; (iii) the email suffixes used by the Affiliate Defendants (e.g., @ppgulfcoast.org); and (iv) commonly used abbreviations for the Affiliate Defendants (e.g., "PPGT" and "PPST").  *See* Second Decl. of Jeffrey A.N. Kopczynski ("Second Kopczynski Decl.") ¶ 3.  Together, these search terms ensured that PPFA collected all documents related to Texas and Louisiana Medicaid and PPFA's relationship with the Affiliate Defendants, as well as all documents related to Medicaid generally ***and*** the Affiliate Defendants.

When PPFA ran those search terms and phrases across the 16 custodians' ESI, the searches yielded more than 275,000 potentially responsive documents.  *See* Second Kopczynski Decl. ¶ 4. PPFA's review process thereafter proceeded in four parts:

- PPFA engaged a discovery vendor to process and host those documents for review;

- PPFA engaged more than 60 attorneys to conduct a manual linear review of approximately 90,000 documents.[4]

- PPFA deployed technology-assisted review ("TAR") document-analysis tools contemplated under the Electronically Stored Information Stipulation [DE 130-1]— including Brainspace continuous multi-modal learning ("CMML"), search models, and similar industry-standard automated workflows (collectively, "TAR Software")—to identify other responsive documents.

- PPFA reviewed, logged, and redacted documents for privilege and confidentiality.  On October 11, 2022, PPFA served a privilege log with ***2,267*** entries.

*See id.*

---

[4] As detailed in the September 27, 2022 declaration of Jeffrey Kopczynski, Esq. [DE 195-1], approximately 79,000 documents were individually reviewed between August 26 and September 9, 2022.  Decl. of Jeffrey A.N. Kopczynski ¶ 4.  Another approximately 10,000 documents were subsequently reviewed in connection with PPFA's privilege review.  *See* Second Kopczynski Decl. ¶ 4.

To date, PPFA's attorneys have spent **more than 10,000 attorney hours** on document review, redaction, and logging, and PPFA has produced nearly 90,000 documents spanning more than 400,000 pages. *See* Second Kopczynski Decl. ¶ 5. In addition to substantial attorneys' fees and costs, PPFA has also incurred significant e-discovery-vendor fees associated with processing and hosting a substantial volume of data for review and production. *See id*. ¶ 6. In all, PPFA has incurred well over $1 million in fees and costs complying with the document discovery in this matter. *See id*.

PPFA's collection and production methodology was fully disclosed to Relator. On September 8, 2022, PPFA sent Relator an email explaining that PPFA had utilized TAR Software in its review. *See* Ex. 3, Sept. 8, 2022 Email from L. Godesky. When Relator responded with a request that PPFA disclose its specific custodians and search terms, PPFA agreed to disclose both the following day. Consistent with that promise, on September 9, 2022, PPFA sent Relator a letter detailing its custodians and search parameters. *See* Ex. 4, Sept. 9, 2022 Letter to Hacker Stephens LLP, Ex. A, Table 1 & Table 2.

### B. Relator Has Not Identified Any Material Deficiencies In PPFA's Production.

#### 1. *Relator Identified No Deficiencies In The Parties' Pre-Motion Meet and Confers That PPFA Refused to Address.*

In the three weeks that followed PPFA's September 9 production, Relator raised no follow-up inquiries—let alone deficiencies—about PPFA's production until Relator requested a meet and confer on September 27, 2022 with no specific agenda.[5] The primary purpose of that conference turned out to be a request by Relator's counsel that PPFA disclose the custodians and search terms used to generate its document productions. *See* Decl. of Benjamin Zisk ("Zisk Decl.") ¶¶ 3, 5.

---

[5] The Motion also refers to a meet-and-confer on September 29. While counsel for PPFA was present for that meet-and-confer between Relator and the Affiliate Defendants, there was no discussion concerning PPFA's discovery responses or its production during that meeting.

When PPFA explained that custodian-and-search-term information was disclosed nearly three weeks earlier in its September 9 letter, ***Relator's counsel acknowledged they had not yet read the letter***. *See id.* ¶¶ 6–8. The only other specific inquiry from Relator's counsel during that conversation was a request for the production of documents from PPFA's intranet. *See id.* ¶ 11. PPFA responded that it was willing to conduct a supplemental search of the intranet, *see id.*, and PPFA shortly thereafter committed to doing exactly that in its timely responses to Relator's Sixth RFPs, *see* Ex. 5, PPFA Objs. & Resp. to Relator's Sixth RFPs (RFP No. 5). Relator's counsel otherwise vaguely complained that additional versions of certain documents should have been produced by PPFA, but when PPFA's counsel asked Relator's counsel to identify the documents in question, Relator's counsel declined to identify *any* specific documents they believed were missing. *See* Zisk Decl. ¶¶ 9–10. The next PPFA heard of any purported deficiency with its production was Relator's counsel's October 14, 2022 email announcing that Relator would be filing a motion that same day to seek a forensic-examination discovery sanction. *See* Ex. 6, Oct. 14, 2022 Email Chain with A. Stephens. When PPFA observed that the drastic action came "out of the blue" and asked to discuss the issue, Relator's counsel refused to further meet and confer. *See id.*

### 2. Relator's Motion Identifies No Material Deficiencies In PPFA's Production.

None of the four alleged issues identified in Relator's Motion (at 7–12) constitute a material deficiency warranting a supplemental search and production—let alone such a drastic sanction as the appointment of a forensic examiner.[6]

---

[6] The Motion also refers (at 8) to the ARMS Connect and Center for Affiliate Learning that is maintained by a third-party (ARMS). To the extent Relator means to suggest that PPFA is under some obligation to produce documents from ARMS, Relator is incorrect. Rule 34 only requires PPFA to produce documents within PPFA's possession, custody, or control. *See Banc Pueyo, S.A. v. Lone Star Fund IX (U.S.), L.P.*, 2020 WL 10046110, at *19 (N.D. Tex. Sept. 25, 2020).

i.      **Medicaid Director Orientation Manual**.  Amid the nearly 90,000 documents that PPFA has produced, Relator has identified only *one* specific document that they allege was not produced by PPFA and should have been—the Medical Director Orientation Manual.  But Relator's prejudice claim falls flat given that Relator says (at 8 n.1) they already have a copy of the Manual.  *See Fay Ave. Props. v. Travelers Prop. Cas. Co. of Am.*, 2013 WL 3746107, at *10 (S.D. Cal. July 15, 2013) (party "has suffered little if any prejudice throughout the discovery dispute, because the documents at issue were documents that [the party] already had in its possession").  And contrary to Relator's contention (at 9), PPFA's search terms *are* sufficiently broad to capture the Manual.  Although Relator's Motion neglects to acknowledge as much, PPFA's production *does* include a draft version of the Manual.  *See* Second Kopczynski Decl. ¶ 7 (citing PPFA00237614).  The final version of the Manual was not included in PPFA's production only because it is archived on PPFA's intranet and, as PPFA disclosed to Relator on September 9, PPFA's diligent search for responsive documents under the Court's August 26, 2022 order was limited to a search of 16 custodial files.  *See also* Sedona Principles at 91 (noting "it may be reasonable to limit initial searches to sources such as email messages and other information from the accounts of key witnesses in the litigation").  As already explained, however, once Relator raised concerns and Requests for Production specifically targeting PPFA's intranet, PPFA *agreed* to supplement its production.  To that end, PPFA has since located and produced the final version of the Manual to Relator.  *See Agerbrink v. Model Serv. LLC*, 2017 WL 933095, at *5 (S.D.N.Y. Mar. 8, 2017) ("[T]he fact that a party has located a single relevant document that the adversary failed to produce hardly demonstrates that the search was flawed.").

ii.     **"Medicaid Toolkit" Documents.**  Relator next complains (at 9–10) that PPFA supposedly did not produce "communications that relate to" the Medicaid Toolkit.  Relator is

wrong.  If Relator had raised this purported deficiency with PPFA during the meet-and-confer process, PPFA would have pointed Relator to the approximately 36 documents that PPFA produced regarding the drafting and revisions to the Toolkit.  *See* Second Kopczynski Decl. ¶ 8 (listing Bates numbers).  Moreover, courts have repeatedly held that "mere skepticism that an opposing party has not produced all relevant information is not sufficient to warrant drastic electronic discovery measures" like those Relator seeks here.  *Goetz*, 531 F.3d at 460; *see also McCurdy Grp. v. Am. Biomedical Grp., Inc*., 9 F. App'x 822, 831 (10th Cir. 2001) ("Although ABGI was apparently skeptical that MG produced copies of all relevant and nonprivileged documents from the hard drive(s), that reason alone is not sufficient to warrant such a drastic discovery measure."); *Sophia & Chloe, Inc. v. Brighton Collectibles, Inc*., 2013 WL 5212013, at *2 (S.D. Cal. Sept. 13, 2013) ("While this Court acknowledges plaintiff's suspicion that it is 'implausible' that nobody within defendant's organization sent or receive a single e-mail regarding the design or creation of the Toledo collection, 'mere skepticism that an opposing party has not produced all relevant information is not sufficient to warrant drastic electronic discovery measures.'" (citation omitted)).  As one court put it, "a mere desire to check that the opposition has been forthright in its discovery responses is not a good enough reason" for a court order compelling an exhaustive forensic examination.  *Memry Corp.*, 2007 WL 832937, at *3.

**iii.    Additional Custodians**.  In the more than 30 days between PPFA's September 9 disclosure of its custodians and Relator's October 14 Motion, Relator never once asked PPFA to add additional custodians to its production.  *See* Zisk Decl. ¶ 13.  The Motion's scattershot references to four potential additional custodians are insufficient to establish that PPFA's custodian-selection process was inadequate.  *First*, Relator complains vaguely (at 10) about the absence of documents relating to PPFA's Health Care Investment Program ("HCIP").   But as

11

Relator acknowledges (*see id.*), PPFA collected, reviewed, and produced documents from an HCIP director.  *See* Second Kopczynski Decl. ¶ 9.  PPFA also produced documents from the Strategic Manager for Health Finance, which was an HCIP role, as well as their supervisor (the Vice President of Public Policy).  Altogether, PPFA's production includes ***nearly 4,000 documents*** involving HCIP.  *See* Second Kopczynski Decl. ¶ 9.  Relator's speculation that there might be additional documents about HCIP in other custodians' files is not enough to warrant a supplemental search, much less a forensic examination.  *See Nupson v. Schnader Harrison Segal & Lewis LLP*, 2021 WL 1293557, at *8 (E.D. Pa. Apr. 7, 2021) (party "must also articulate a[ ] basis to believe that Defendants' search and production of responsive documents was inadequate; in other words, why they would be in possession of additional non-cumulative responsive information").

*Second*, Relator suggests that PPFA should have also searched the files of PPFA's Vice President of Health Outcomes and Performance Optimization, Katie Magill.  *See* Mot. at 11.  But PPFA collected, reviewed, and produced ***nearly 6,000 documents*** from Emily Schifrin, one of Ms. Magill's direct reports.  *See* Second Kopczynski Decl. ¶ 10.  PPFA determined that Ms. Magill's communications would likely be largely redundant of Ms. Schifrin's, and Relator has not articulated a reason to order another search.  *See United States ex rel. McBride v. Halliburton Co.*, 272 F.R.D. 235, 241 (D.D.C. 2011) ("Without any showing of the significance of the non-produced e-mails, let alone the likelihood of finding the 'smoking gun,' the [party's] demands [for additional custodians] cannot possibly be justified when one balances its cost against its utility.").

*Third*, Relator complains (at 11) that PPFA did not produce documents from PPFA's Associate Director of the Affiliate Clinical Operations Consulting-Business Operations Team, Cherie Stutesman.  But PPFA ***did*** collect, review, and produce ***nearly 20,000 documents*** from Teri

Trivisonno, to whom Ms. Stutesman reported during the relevant time period.  *See* Second Kopczynski Decl. ¶ 11.  Here, too, Relator offers no specific basis to believe the burden of adding yet another custodian to PPFA's production is warranted in view of the voluminous discovery already produced from other custodians with similar responsibilities.

*Finally*, Relator asserts that PPFA should have also produced documents from the Senior Director of Affiliate Financial Consulting, Rosemary Coluccio.  Mot at 11.  But Ms. Coluccio, like Ms. Stutesman, regularly worked with custodian Ms. Trivisonno, and PPFA has already produced ***nearly 4,000 documents*** involving Ms. Coluccio.  *See* Second Kopczynski Decl. ¶ 12.

  **iv.** **PPFA Intranet & Google Docs.**  Relator's assertion that PPFA "admitted that PPFA did not search or collect documents from PPFA's intranet" (at 11) is a red herring, because Relator omits that after Relator raised the issue, ***PPFA agreed to do so*** and will soon produce those documents in response to Relator's Sixth Requests for Production.  The Motion also notes that "other documents reference PPFA's use of Google Docs" (at 12), but Relator does not identify those documents or otherwise explain what Google Docs Relator is purportedly seeking or why they are relevant.  The Motion only cites to "Sealed App. 0170–0171," *see* Mot. at 12, which is the cover letter to PPFA's September 9 production.[7]

## III. THERE IS NO BASIS FOR THE EXTRAORDINARY RELIEF THAT RELATOR SEEKS.

  At bottom, Relator seeks the collection, processing, review, logging, redaction, and production of every document or communication from a 12-year period that refers to a "repayment" or "overpayment" (no matter the context) or mentions the word "Medicaid"—

---

[7] In addition to the sixteen custodian collections referenced above and in PPFA's September 9 cover letter, PPFA has conducted targeted electronic and hard-copy searches for non-custodial documents, such as accreditation files, grant agreements, financial documents, and policies and procedures responsive to Relator's various requests for production. *See* Second Kopczynski Decl. ¶ 13.

regardless whether the communication concerns the Affiliate Defendants or any alleged conduct relevant to the parties' claims and defenses—from all of PPFA's "on-premises and cloud-based computer systems, file storage locations, and databases . . . including personal computers and storage devices." Mot. at 16. Neither the scope of the discovery Relator seeks (*see infra* Section III.A) nor the means by which Relator seeks to obtain it (*see infra* Section III.B) is warranted or appropriate. The Court should deny Relator's overreaching request.

### A. Relator's Requests Are Sweeping, Unjustified, and Unduly Burdensome.

As a threshold matter, the relief Relator seeks is far broader—and completely untethered to—the documents requests that Relator actually served on PPFA. Relator requested and the Court ordered PPFA to produce documents ***relating to Texas and Louisiana Medicaid***. *See supra* n.2 (citing Relator's request for documents ***about Texas and Louisiana Medicaid***); *see also* DE 153 at 5 (granting motion to compel because "Relator reasonably limited the scope of discovery to … ***the Texas and Louisiana Medicaid programs***"). Relator's request that an examiner be appointed to now ***also*** run the more generic terms "Medicaid," "overpa*," and "repay*" across all PPFA databases and custodians is completely divorced from both Relator's Requests for Production and the Court's August 25, 2022 Order. The Motion should be denied for that reason alone. *See James v. Wash Depot Hldgs.*, 240 F.R.D. 693, 695 (S.D. Fla. 2006) ("[C]ourts have denied motions to compel the production of documents where the movant failed to make a formal discovery request." (collecting cases)); *see also McRae v. Dikran*, 2021 WL 1968391, at *2 (E.D. Cal. May 17, 2021) ("[B]ecause Plaintiff has not made any prior request for production of documents from either [defendant], there is nothing to compel."); *Fuggi v. Steadfast Ins. Co.*, 2006 WL 1760478, at *2 (M.D. Fla. June 23, 2006) ("The Court simply cannot compel a party to engage in discovery when he has not been served with the appropriate requests."); *Sithon Maritime Co. v. Holiday Mansion*, 1998 WL 182785, at *2–3 (D. Kan. Apr. 10, 1998) (denying motion to compel documents

requested only informally by letter); *Schwartz v. Marketing Pub. Co*., 153 F.R.D. 16, 21 (D. Conn. 1994) (same, where "neither of the first two categories of documents were requested in plaintiff's [RFPs]").

But even if one were to overlook the glaring absence of any Request for Production underlying the relief Relator seeks, the Motion should be denied as unjustified in view of the undue burden placed on PPFA and Relator's "apparent disincentive to meaningfully tailor [their] ESI demands to further the 'just, speedy, and inexpensive determination of this action.'" *Lawson v. Spirit AeroSystems, Inc*., 2020 WL 1813395, at *9 (D. Kan. Apr. 9, 2020) (quoting Fed. R. Civ. P. 1). "[T]here is no obligation on the part of a responding party to examine every scrap of paper in its potentially voluminous files in order to comply with its discovery obligations." *Treppel v. Biovail Corp*., 233 F.R.D. 363, 374 (S.D.N.Y. 2006). This Court recognized as much when Relator took a similar position with respect to the Affiliate Defendants, arguing that the Affiliate Defendants should collect every document or communication that mentions "Medicaid" because "there 'should be no limitation' on Affiliate Defendants' obligation to fully comply with the [Court's September 20] Order." Order [DE 213] at 5. The Court rejected that position, noting that the Court's prior Order "did not hold Affiliate Defendants are necessarily required to produce every document or communication from every individual or database associated with Affiliate Defendants during the 2010 to 2022 period which contains the word 'Medicaid.'" *Id*.

Rather, parties are expected to be "diligent and to act in good faith in producing documents in discovery," and "no one could or should expect perfection from this process." *Fed. Housing Fin. Agency v. HSBC N. Am. Hldgs. Inc*., 2014 WL 584300, at *2 (S.D.N.Y. Feb. 14, 2014). Courts repeatedly have explained that document discovery should be "reasonable and proportional" under the circumstances. *Hyles v. New York City*, 2016 WL 4077114, at *3 (S.D.N.Y. Aug. 1, 2016)

("[T]he standard is not perfection, or using the 'best tool,' but whether the search results are reasonable and proportional" (citing Fed. R. Civ. P. 26(g)(1)(B)); *Agerbrink*, 2017 WL 933095, at *5 ("The standard for evaluating discovery is reasonableness, not perfection."); *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 615 (C.D. Cal. 2013) ("[W]hile parties must impose a reasonable construction on discovery requests and conduct a reasonable search when responding to the requests, the Federal Rules do not demand perfection."); *Metro. Opera Ass'n v. Local 100, Hotel Emps. and Rest. Emps. Int'l Union*, 212 F.R.D. 178, 223 (S.D.N.Y. 2003) (Rule 26(g) requires a "reasonable inquiry under the circumstances").  That is especially true in cases—like this one—that involve ESI, which "present[s] special challenges," "including the substantial likelihood that the data possessed by the responding party is voluminous, stored in multiple formats, and is duplicative across custodians."  *Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon*, 2018 WL 2215510, at *7 (S.D.N.Y. May 15, 2018); *Winfield v. City of New York*,  2017 WL 5664852 at *7, 11 (S.D.N.Y. Nov. 27, 2017).

PPFA has already incurred substantial fees and costs—***more than $1 million***—associated with collecting, processing, hosting, reviewing, redacting, and logging hundreds of thousands of documents relating to Texas and Louisiana Medicaid and the Affiliate Defendants' participation in Medicaid generally—including ***more than 10,000 hours of attorney time***.  Now doubling back to collect, process, review, host, redact, and produce all documents that have anything to do with Medicaid or generic "overpayments" or "repayments"—when PPFA works with dozens of affiliates all around the country that function under numerous other distinct and unrelated state Medicaid programs and make various payments and repayments in wholly unrelated contexts— would be patently unreasonable and extraordinarily burdensome.  It would also be squarely at odds with  the  now-routine  recognition  that  "proportionality  considerations  [are]  particularly

16

significant" in the ESI context.  *In re EpiPen Marketing, Sales Practices & Antitrust Litig.*, 2018 WL 1440923, at *1 (D. Kan. Mar. 15, 2018); *see also Treppel*, 233 F.R.D. at 374 (observing that "[d]efined search strategies are even more appropriate in cases involving electronic data, where the number of documents may be exponentially greater").

Relator's proposal is nothing "like that ordered by other courts" cited by Relator (at 17–18).  In *Delta T, LLC v. Williams*, the movant's proposed search was "tailored and constrained" to terms that were "designed to generate only relevant communications"—and to which the defendants raised *no objection*.  337 F.R.D. 395, 401 (S.D. Ohio 2021).  *Tera II, LLC v. Rice Drilling D, LLC* is likewise inapposite; it addressed "ordinary document collection"—not electronic "'mirror imaging'" and the "higher burden for invasive collection of electronic information outlined in *Delta*" that is at issue here.  *See* 2022 WL 1114943 at *6 (S.D. Ohio Apr. 14, 2022).  The *Tera II* court simply ordered the plaintiffs to employ a third-party vendor to run targeted searches across plaintiffs' emails after the opposing party demonstrated specific deficiencies arising from several custodians' self-collection efforts.  *See id.* at *4–5.  Even then, the search terms were "designed to produce relevant information" by targeting communications concerning the subject matter at issue in the case.  *Id*. at *4.  Here, the Court has not even required Relator to do that with respect to their own documents.  *See* Order [DE 166] at 6–7.  And, in any event, PPFA has already adhered to e-discovery best practices and employed a professional e-discovery vendor as part of its document collection and review process, which involved no self-collection efforts by PPFA custodians.  *See* Second Kopczynski Decl. ¶ 4.

Courts have routinely ***rejected*** proposals like the one Relator advances here, which "would necessarily involve the examination and collection of more information than is required to support [Relator's] claim" and would inevitably capture confidential and personal information that is

wholly unrelated to the litigation. *Tireboots*, 2022 WL 2316228, at *3; *see also Goetz*, 531 F.3d at 457 (observing that "the mere imaging of the media, in and of itself, raises privacy and confidentiality concerns" and "[d]uplication, by its very nature, increases the risk of improper exposure, whether purposeful or inadvertent"); *Tucker v. Am Int'l Grp., Inc.*, 281 F.R.D. 85, 97 (D. Conn. 2012) (denying request for forensic examination; finding it would grant plaintiff "improper access to Marsh's proprietary business information" and "Marsh would necessarily bear the hefty expense involved in protecting confidential documents from disclosure"); *Salazar v. Bocanegra*, 2012 WL 12893938, at *2 (D.N.M. July 27, 2012) (forensic images, due to their broad nature, may include information irrelevant to the parties' claims or defenses); *Sony BMG Music Entm't v. Arellanes*, 2006 WL 8201075, at *1 (E.D. Tex. Oct. 27, 2006) (finding meritorious responding party's argument that a full forensic image of computer hard drive would sweep in irrelevant documents).

In fact, Relators' proposal would be an unprecedented, unlimited intrusion into PPFA's entire electronic systems—an effort that would take considerable time (if not months) and expense and might not even be practical given the breadth of the searches and the systems Relator wishes to harvest.  PPFA's enterprise IT environment is disaggregated and consists of numerous on-premise and cloud-based platforms, applications, and systems—amounting to many terabytes of data—and includes SQL databases, SaaS, DFS's, and legacy systems that either have limited or no built-in searching capabilities.  *See* Second Kopczynski Decl. ¶ 14.  In addition to those ESI sources, PPFA employs over 750 people, most of whom are assigned company workstations and reside all over the globe.  *See id*.  A forensic examination spanning all of these varied sources would take several months, and if large exports of these sources are required to run searches, it could cost hundreds of thousands of dollars in e-discovery processing and hosting fees.  *See id*.

Indeed, the fact that PPFA has already incurred over *$1 million* in fees and expenses to collect and produce documents from *16* custodians alone demonstrates the enormity of Relator's demand that PPFA collect and produce documents from over *700* custodians (in addition to numerous other non-custodial ESI sources).

Relator, meanwhile, has not demonstrated that any additional documents identified based on his new search parameters "will be more probative than any of the [documents] [Relator] already has in its possession." *Crabtree v. Angie's List, Inc.*, 2017 WL 413242, at *3 (S.D. Ind. Jan. 31, 2017); *see also Motorola*, 365 F. Supp. 3d at 926–27 (denying request for forensic examination where movant "has not explained how the evidence it suspects can be unearthed through a forensic examination . . . is necessary or more than marginally relevant—if that"). The reality is that any relevant documents captured in Relator's proposed collection—i.e., documents that relate to the Affiliate Defendants or Texas and Louisiana Medicaid—would likely be duplicative and cumulative of those that PPFA and the Affiliates have already collected and produced. *See Motorola*, 365 F. Supp. 3d at 927 (denying forensic examination request that "appears to be cumulative" and "significantly out of proportion to the needs of the case"); *see also Lawson*, 2020 WL 1813395, at *9 ("The court will not require Spirit to spend thousands [of dollars] more to review and ready for production documents that would appear to have marginal or duplicative benefit to the parties, if any benefit at all.").

In addition, Relator's proposed forensic examination would require a significant expenditure of resources by PPFA and would likely disrupt PPFA's business with slowdowns and interruptions to its IT system operations while those systems are being searched or copied. *See* Second Kopczynski Decl. ¶ 14. A wide-ranging sweep of this amount of data would also introduce significant cybersecurity risk that could increase PPFA's vulnerability to attacks on electronic-

19

information systems that PPFA takes significant lengths to protect.  *See id*.  "[C]ourts must consider the significant interests implicated by forensic imaging"—including "the significant privacy and confidentiality concerns present[ed]"—"before ordering such procedures."  *Goetz*, 531 F.3d at 460 (granting mandamus relief and vacating district court order requiring forensic imaging of computers).  Such interests are especially important given the number of anti-abortion individuals and organizations that regularly target PPFA's security.  *See* Decl. of Vickie Jan Barrow-Klein [DE 174-4] ¶¶ 5, 7, 9–10 (explaining that "PPFA's mission elicits strong opposition actors" who seek to obtain and reveal PPFA's internal documents and that PPFA undertakes significant measures to protect and secure sensitive and confidential documents).

### B. Appointment of a Forensic Examiner Is Not Warranted Because There Is No Discovery Misconduct By PPFA.

Even if the Court found that Relator's sweeping request for further discovery into "Medicaid" and "payments" were warranted, there are less intrusive means for Relator to obtain that additional discovery via the normal discovery process—not through the drastic sanction of emergency and unilateral appointment of a "forensic examiner" of Relator's choosing.

*First*, there is no evidence that PPFA has "intentionally destroyed relevant ESI in the past" or is "unwilling, or will refuse, to preserve and produce all relevant ESI in the future."  *Goetz*, 531 F.3d at 460.  The record demonstrates that PPFA engaged in an exhaustive and burdensome discovery process that required the initial collection, processing, hosting, and review of more than 275,000 documents and the ultimate production of 87,138 documents and more than 400,000 pages (and counting).  Kopczynski Decl. ¶ 4; *see also* Second Kopczynski Decl. ¶ 4.  Relator has not identified any unreasonable refusal by PPFA to consider supplemental searches.  In fact, Relator impliedly admits that Relator did not even attempt to meet and confer adequately with PPFA before bringing this purported emergency Motion.  *See* Mot. at 11 (asserting only that Relator "brought

20

*some* of these issues to PPFA's attention" (emphasis added)).  And when Relator did identify one issue with a degree of specificity—i.e., the absence of intranet searches—PPFA *agreed* to supplement its production with those documents.

Relator's attempt to impugn PPFA's discovery conduct is rife with inaccuracies.  The Motion's unsupported claim (at 11) that "Relator's counsel [previously] explained why [PPFA's] search terms and custodians were inadequate" is simply not true.  Relator's counsel never directed PPFA's attention to the Medical Director Orientation Manual, the Medicaid Toolkit, or any of the custodians identified in the Motion during the September 27, 2022 meet-and-confer (or in any other communication).  *See* Zisk Decl. ¶¶ 12–13.  Rather, Relator's counsel spoke in generalities while refusing to provide PPFA's counsel the information necessary to resolve any perceived issues.  *See id*. ¶¶ 9–10.  For example, Relator's counsel said generically that PPFA's production contained documents for which there exist more recent versions that PPFA did not produce.  *See id*.  But when PPFA's counsel indicated that it would be helpful to know *which* documents were of concern, Relator's counsel would only suggest that unspecified examples were included in Relator's opposition to PPFA's motions for protective order.  *See id*.  Yet, none of those filings included the Manual or the Medicaid Toolkit that Relator identified in the Motion.  *See id*. ¶ 12.

Nor did PPFA attempt to "shift the burden to Relator to identify every document that PPFA has failed to produce."  Mot. at 11.  PPFA has never demanded that Relator identify *every* document that Relator contends PPFA has failed to produce.  *See* Zisk Decl. ¶¶ 8–10.  PPFA merely needed more details about Relator's alleged concerns before PPFA could even try to address them.  Meeting and conferring in good faith is the process envisioned by the Northern District's seminal discovery case, which all attorneys admitted to the Court are required to read before seeking admission:

Local Rule 5.1(a)[8] implicitly recognizes that in general the rules dealing with discovery in federal cases are to be self-executing. The purpose of the conference requirement is to promote a frank exchange between counsel to resolve issues by agreement or to at least narrow and focus the matters in controversy before judicial resolution is sought. Regrettably over the years, in many instances the conference requirement seems to have evolved into a pro forma matter. . . .

The manner in which the conference is held and the length of the conference will be dictated by the complexity of the issues and the sound judgment of attorneys in their capacities as advocates as well as officers of the court, with the objective of maximizing the resolution of disputes without court intervention. Properly utilized Rule 5.1(a) promotes judicial economy while at the same time reducing litigants' expenses incurred for attorneys' time in briefing issues and in preparing and presenting pleadings.

*Dondi Props. Corp. v. Commercial Sav. & Loan Ass'n*, 121 F.R.D. 284, 289–90 (N.D. Tex. 1988).

Another court has since echoed the instruction that these obligations are not perfunctory:

When the dispute involves objections to requested discovery, parties do not satisfy the conference requirements simply by requesting or demanding compliance with the requests for discovery. The parties need to address and discuss the propriety of asserted objections. They must deliberate, confer, converse, compare views, or consult with a view to resolve the dispute without judicial intervention. They must make genuine efforts to resolve the dispute by determining precisely what the requesting party is actually seeking; what responsive documents or information the discovering party is reasonably capable of producing; and what specific, genuine objections or other issues, if any, cannot be resolved without judicial intervention.

*Brown*, 2015 WL 11121361, at *4 (quoting *Contracom Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 456, 459 (D. Kan. 1999)); *see also Thompson v. Columbus Life Ins. Co.*, 2007 WL 9725239, at *1 (D. Nev. Apr. 5, 2007) ("When initiating an informal conference the parties must present to each other the merits of their respective positions with the same specificity with which they would brief the discovery dispute. Only then are the parties in a position to assess the

---

[8] The requirement to meet and confer is now found in Local Rule 7.1.

relative strengths or weaknesses of their positions.").

Relator's hide-the-ball-then-ambush tactics do not advance discovery and unnecessarily burden the Court with discovery matters that the parties can—and should—first attempt to resolve among themselves. *See* Sedona Principles at 87 ("A requesting party that seeks production of ESI should, to the greatest extent practicable, clearly and specifically indicate each item or category of electronic information it seeks."). Follow-up requests for additional custodians and inquiries as to why particular documents were not produced are common in complex litigation, and typically resolved through measures far short of the appointment of a forensic examiner. *See, e.g.*, *Slocum v. Int'l Paper Co.*, 2019 WL 8918747, at *7 (E.D. La. Mar. 15, 2019) (holding that, "although there have been some deficiencies in [non-movant's] production, these can be remedied in other, more efficient ways" than granting movant unfettered access to non-movant's virtual server).

Indeed, "[c]ourts have advised movants in similar scenarios that 'less intrusive means . . . should be employed before resorting to [the] inherently intrusive measures'" that Relator seeks here. *Tireboots*, 2022 WL 2316228, at *3 (citation omitted); *see also McCurdy Grp.*, 9 F. App'x at 831 (party seeking discovery did "not explain[] why inspection of the zip drive and/or inspection of the hard drive by [the producing party] would not have been sufficient to satisfy its concerns"); *Sophia & Chloe, Inc.*, 2013 WL 5212013, at *2 (forensic examination "unwarranted" when plaintiff could "explore these topics through other written and oral discovery tools").

Relator cites cases that support the general proposition that a forensic examination may be appropriate in certain circumstances, but each is readily distinguishable from the context here. There is no credible reason to believe that PPFA ever deleted, spoliated, or hid any responsive discovery from Relator—let alone evidence to support such an accusation. *See Playboy Enters. Inc. v. Welles*, 60 F. Supp. 2d 1050, 1051 (S.D. Cal. 1999) (defendant "continued [her practice of

deleting emails after reading them] throughout the litigation, irrespective of whether the email [was] responsive to Plaintiff's request"); *see also Schreiber v. Friedman*, 2017 WL 11508067, at *5 (E.D.N.Y. Aug. 15, 2017) (record included "substantial evidence that at least some of the defendants ha[d] spoliated evidence [and] hid evidence" as well as "artifacts of wiping and deletion" that occurred "after the Court ordered these defendants to preserve their computers"). And Relator's identification of a single responsive document that was not produced in final form does not come close to warranting the appointment of a forensic examiner. *See Memry Corp.*, 2007 WL 832937 (party's identification of two nonproduced documents "out of thousands" in a "discovery-intensive case" did not justify appointing forensic examiner); *see also Winfield*, 2017 WL 5664852 at *11 (movant's identification of five documents incorrectly categorized as non-responsive insufficient to question accuracy and reliability of producing party's discovery process); *Freedman v. Weatherford Int'l Ltd*., 2014 WL 4547039, at *3 (S.D.N.Y. Sept. 12, 2014) (finding it "unsurprising that some relevant documents may have fallen through the cracks").

## IV.   THE COURT SHOULD ORDER THE PARTIES TO MEET AND CONFER IN GOOD FAITH TO RESOLVE THE DISPUTE.

To the extent Relator continues to believe that any of the issues raised in the Motion warrant further consideration, the Court should order the parties to meet and confer regarding those issues consistent with Local Rule 7.1 and this Court's Orders. *See* Second Am. Sched. Order [DE 192] at 5 ("The Court expects the parties to work in good faith to resolve discovery disputes."); *see also e.g.*, *Roque v. City of Austin*, 2018 WL 5848988, at *6 (W.D. Tex. Nov. 7, 2018) (ordering parties to meet and confer regarding appropriate custodians; *Strong v. Marathon Res. Mgmt Grp, LLC*, 2019 WL 13094638, at *2 (W.D. Tex. Aug. 13, 2019) (similar); *see also* Sedona Principles at 126 (recognizing that "if the requesting party is engaging in *meaningful* cooperation by providing *specific information*," the responding party can consider the information in evaluating its

production (emphasis added)).

PPFA has already agreed to the requested intranet search.  And while PPFA demonstrated that its custodian-identification process was reasonable and appropriate in scope, PPFA recognizes that Plaintiffs recently requested deposition testimony from one of the potential additional custodians identified for the first time in Relator's Motion—Rosemary Coluccio.  PPFA is therefore willing to meet and confer with Relator regarding proposed parameters for a supplemental search of Ms. Coluccio's custodial files.  And to the extent that Relator identifies any basis to believe that specific Google Docs are likely to contain responsive, non-duplicative information, PPFA would be willing to consider a supplemental search for such documents.  *See William A. Gross Constr. Assocs. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 135, 136 (S.D.N.Y. 2009) (stating that "the best solution in the entire area of electronic discovery is cooperation among counsel" (citing The Sedona Conference Cooperation Proclamation (available at www.TheSedonaConference.org))).

## CONCLUSION

The Court should deny Relator's request to appoint a forensic examiner and award PPFA all costs incurred in responding to the Motion pursuant to Federal Rule of Civil Procedure 37(a)(5)(B).

Dated:   October 26, 2022           **O'MELVENY & MYERS LLP**

*/s/  Danny S. Ashby*
DANNY S. ASHBY
Texas Bar No. 01370960
dashby@omm.com
JUSTIN R. CHAPA
Texas Bar No. 24074019
jchapa@omm.com
MEGAN R. WHISLER
Texas Bar No. 24079565
mwhisler@omm.com
2501 N. Harwood Street, Suite 1700
Dallas, Texas 75201
T: (972) 360-1900
F: (972) 360-1901

LEAH GODESKY (*pro hac vice*)
lgodesky@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
T: (310) 553-6700
F: (310) 246-6779

**RYAN BROWN ATTORNEY AT LAW**
RYAN PATRICK BROWN
Texas Bar No. 24073967
ryan@ryanbrownattorneyatlaw.com
1222 S. Fillmore St.
Amarillo, Texas 79101
T: (806) 372-5711
F: (806) 350-7716

*Attorneys for Defendant Planned Parenthood*
*Federation of America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2022, the foregoing document was electronically filed

and served upon all parties and counsel of record via the Court's CM/ECF system.

*/s/ Danny S. Ashby*
Danny S. Ashby