**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| United States of America<br>*ex rel.* ALEX DOE, Relator, | § <br> § <br> § | |
| | § | |
| The State of Texas<br>*ex rel.* ALEX DOE, Relator, | § <br> § <br> § | NO. 2:21-CV-22-Z |
| | § | |
| The State of Louisiana | § <br> § | |
| | § | |
| *ex rel.* ALEX DOE, Relator, | § <br> § | |
| | § | |
| Plaintiffs, | § <br> § | |
| | § | |
| v. | § <br> § | |
| | § | |
| Planned Parenthood Federation of America,<br>Inc., Planned Parenthood Gulf Coast, Inc.,<br>Planned Parenthood of Greater Texas, Inc.,<br>Planned Parenthood South Texas, Inc.,<br>Planned Parenthood Cameron County, Inc.,<br>Planned Parenthood San Antonio, Inc., | § <br> § <br> § <br> § <br> § <br> § | |
| | § | |
| Defendants. | | |

**PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.'S**
**RESPONSE TO ORDER TO SHOW CAUSE**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

RESPONSE TO ORDER TO SHOW CAUSE ..................................................... 2

    PPFA's Initial Disclosures................................................................................ 2

    PPFA's Litigation Holds.................................................................................. 3

    ARMS Connect and the Center for Affiliated Learning............................... 4

    PPFA's Intranet and Google Docs ................................................................ 6

    PPFA's Custodian Selections ........................................................................ 7

    PPFA's Search Terms .................................................................................... 15

    Alleged Omissions From PPFA's Productions............................................ 19

    Ability to Generate a "System Map." ......................................................... 22

CONCLUSION.................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Agerbrink v. Model Serv. LLC*,
  2017 WL 933095 (S.D.N.Y. Mar. 8, 2017) ........................................................................ 19, 20

*Banca Pueyo, S.A. v. Lone Star Fund IX (U.S.), L.P.*,
  2020 WL 10046110 (N.D. Tex. Sept. 25, 2020) ........................................................................ 4

*City of Rockford v. Mallinckrodt ARD Inc.*,
  326 F.R.D. 489 (N.D. Ill. 2018).................................................................................... 20, 21

*Ctr. for Biological Diversity v. EPA*,
  369 F. Supp. 3d 1 (D.D.C. 2019)............................................................................................ 18

*Eisai Inc. v. Sanofi–Aventis U.S., LLC*,
  2012 WL 1299379 (D.N.J. Apr. 16, 2012) ............................................................................ 10

*Enslin v. Coca-Cola Co.*,
  2016 WL 7042206 (E.D. Pa. June 8, 2016)............................................................................ 14

*Entergy Gulf States La., LLC v. La. Generating, LLC*,
  2021 WL 24686 (M.D. La. Jan. 4, 2021).................................................................................. 7

*Fed. Housing Fin. Agency v. HSBC N. Am. Holdings Inc.*,
  2014 WL 584300 (S.D.N.Y. Feb. 14, 2014)........................................................................... 21

*Firefighters' Ret. Sys. v. Citco Grp. Ltd.*,
  2018 WL 276941 (M.D. La. Jan. 3, 2018)................................................................................ 8

*Fort Worth Employees' Retirement Fund v. JP Morgan Chase & Co.*,
  297 F.R.D. 99 (S.D.N.Y. 2013) .............................................................................................. 14

*Freedman v. Weatherford Int'l Ltd.*,
  2014 WL 4547039 (S.D.N.Y. Sept. 12, 2014)....................................................................... 20

*Goodman v. Praxair Servs., Inc.*,
  632 F. Supp. 2d 494 (D. Md. 2009)...................................................................................... 4, 5

*Harrington Enters, Inc. v. Safety-Kleen Sys., Inc.*,
  2014 WL 12611318 (W.D. Mo. July 11, 2014)...................................................................... 14

*Hyles v. New York City*,
  2016 WL 4077114 (S.D.N.Y. Aug. 1, 2016).......................................................................... 21

*In re Diisocyanates Antitrust Litig.*,
  2022 WL 3042629 (W.D. Pa. Aug. 2, 2022) ........................................................................... 9

*In re NTL, Inc. Sec. Litig.*,
   244 F.R.D. 179 (S.D.N.Y. 2007) ................................................................................ 5

*Joe Hand Promotions, Inc. v. Canales*,
   2017 WL 3671090 (S.D. Tex. Mar. 7, 2017) ................................................................. 3

*Lawson v. Love's Travel Stops & Country Stores, Inc.*,
   2019 WL 7102450 (M.D. Pa. Dec. 23, 2019) ............................................................... 22

*Lawson v. Spirit AeroSystems, Inc.*,
   2020 WL 1813395 (D. Kan. Apr. 9, 2020) ................................................................... 17

*Lawson v. Spirit AeroSystems, Inc.*,
   2020 WL 3288058 (D. Kan. June 18, 2020) ................................................................. 16

*Lightsquared Inc. v. Deere & Co.*,
   2015 WL 8675377 (S.D.N.Y. Dec. 10, 2015) .............................................................. 13

*Mann v. City of Chicago*,
   2017 WL 3970592 (N.D. Ill. Sept. 8, 2017) ................................................................ 14

*Memry Corp. v. Kentucky Oil Tech., N.V*,
   2007 WL 832937 (N.D. Cal. Mar. 19, 2007) ............................................................... 20

*Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees & Restaurant Employees Int'l
   Union*,
   212 F.R.D. 178 (S.D.N.Y. 2003) .............................................................................. 20

*Moore v. Publicis Groupe*,
   287 F.R.D. 182 (S.D.N.Y. 2012) ......................................................................... 13, 20

*Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank*,
   2017 WL 2305398 (S.D.N.Y. May 18, 2017) ...................................................... 8, 10, 11

*Orchestrate HR, Inc. v. Blue Cross and Blue Shield of Kansas, Inc.*,
   2022 WL 834066 (D. Kan. Mar. 21, 2022) .............................................................. 8, 13

*PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership*,
   187 F.3d 988 (8th Cir. 1999) ................................................................................... 21

*Prasad v. George Wash. Univ.*,
   323 F.R.D. 88 (D.D.C. 2017) ................................................................................... 19

*Procaps S.A. v. Patheon Inc.*,
   2014 WL 11498060 (S.D. Fla. Dec. 1, 2014) ............................................................. 18

*Raine Grp. LLC v. Reign Capital, LLC*,
   2022 WL 538336 (S.D.N.Y. Feb. 22, 2022) ............................................................ 9, 17

*Reinsdorf v. Skechers U.S.A., Inc.*,
  296 F.R.D. 604 (C.D. Cal. 2013) .................................................................. 1, 20, 21

*Rocky Mountain Wild, Inc. v. United States Forest Serv.*,
  2021 WL 825985 (D. Colo. Mar. 4, 2021) ................................................................ 8

*Slocum v. Int'l Paper Co.*,
  2019 WL 8918747 (E.D. La. Mar. 15, 2019) ......................................................... 21

*Sugg v. Virtusa*,
  2020 WL 6585872 (D.N.J. Nov. 10, 2020) ............................................................ 10

*Treppel v. Biovail Corp.*,
  233 F.R.D. 363 (S.D.N.Y. 2006) ........................................................................... 21

*United States ex rel. McBride v. Halliburton Co.*,
  272 F.R.D. 235 (D.D.C. 2011) ............................................................................... 14

*WesternGeco LLC v. Ion Geophysical Corp.*,
  2010 WL 2266524 (S.D. Tex. June 2, 2010) ........................................................... 4

*William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*,
  256 F.R.D. 134 (S.D.N.Y. 2009) ........................................................................... 17

*Winfield v. City of New York*,
  2017 WL 5664852 (S.D.N.Y. Nov. 27, 2017) ........................................................ 20

*Zubulake v. UBS Warburg LLC*,
  220 F.R.D. 212 (S.D.N.Y. 2003) .......................................................................... 3, 4

*Zubulake v. UBS Warburg LLC*,
  229 F.R.D. 422 (S.D.N.Y. 2004) ............................................................................. 3

## Other Authorities

The Sedona Principles: Third Edition, Best Practices Recommendations & Principles For
  Addressing Electronic Document Production, 19 SEDONA CONF. J. 1 (2018) ............. *passim*

## Rules

Fed. R. Civ. P. 26(b) ......................................................................................... 14

Fed. R. Civ. P. 26(g)(1)(B) ................................................................................ 21

Fed. R. Civ. P. 37(e) ............................................................................................ 3

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Planned Parenthood Federation of America, Inc. ("PPFA"), by and through its undersigned counsel of record, and submits this Response to the Court's Order to Show Cause [DE 263].

## PRELIMINARY STATEMENT

"[W]hile parties must impose a reasonable construction on discovery requests and conduct a reasonable search when responding to the requests, the Federal Rules do not demand perfection." *Reinsdorf v. Skechers U.S.A., Inc*., 296 F.R.D. 604, 615 (C.D. Cal. 2013). Here, PPFA has done its very best—under the constraints of time and the limits of technology—to respond in good faith to Plaintiffs' document requests and this Court's orders. As described in its Opposition, PPFA has collected, searched, and reviewed almost 300,000 documents. DE 236 at 7. The process commenced with employee interviews to assess which custodians would possess the most unique, non-duplicative documents. Once PPFA identified appropriate custodians, it then collected complete email exports from those custodians' files—where most relevant electronic documents are typically kept—and also supplemented that effort with targeted searches from reasonably accessible non-custodial documents, including from PPFA's intranet and Google Docs. It then engaged a large team of contract lawyers, and data-science consultants guiding a technology-assisted-review, to identify responsive documents. The result was a production of 90,000 documents that, in the past three months alone, has cost PPFA more than $1 million in attorney and e-discovery vendor fees. Following those efforts, Relator identified only *one document* they believe should have been produced but was not—and PPFA promptly produced that document. Relator also complained for the first time in the forensic-examination motion about three purportedly missing custodians—and PPFA promptly agreed to meet and confer about conducting additional searches of their files.

1

Consistent with e-discovery best practices and the expectations of this Court, PPFA has been transparent with Plaintiffs throughout the discovery process.  PPFA disclosed to Relator the custodians whose documents PPFA searched as well as the terms that PPFA used to preliminarily identify a broad universe of potentially responsive documents for review.  But, despite having all the relevant information, Relator's counsel has never expressed any interest in discussing these particulars.  During the parties' September 27 meet-and-confer, Relator's counsel admitted that they had never read PPFA's September 9 production letter identifying the custodians and search terms.  PPFA's counsel directed them to the letter and encouraged Relator's counsel to reach back out if, after review, Relator's counsel had any concerns that the parties should discuss.  Relator never asked PPFA to add custodians or identified additional search terms that they wanted PPFA to use.

Instead of engaging in good-faith negotiations—i.e., the "cooperative efforts" that courts encourage to resolve routine ESI issues like these—Relator filed a motion seeking a draconian sanction that is reserved for serious discovery abuses that are a far cry from PPFA's conduct in this case.  As detailed below, PPFA has worked in good-faith to comply with its discovery obligations and this Court's orders, and respectfully submits its efforts do not warrant imposition of sanctions.

## RESPONSE TO ORDER TO SHOW CAUSE

**PPFA's Initial Disclosures.**  The Court asked PPFA to show cause as to the "extent to which Defendants made mandatory disclosures under the Federal Rule of Civil Procedure 26(a)(1)(A)."

Consistent with its obligations under Rule 26(a), PPFA, together with the Affiliate Defendants (together, "Defendants"), served initial disclosures on March 9, 2022, *see* Ex. A, and subsequently supplemented the disclosures on August 25, 2022, *see* Ex. B, October 6, 2022 *see*

Ex. C, and November 8, 2022, *see* Ex. D.  These disclosures were the result of careful due diligence, including ongoing investigation and discussions between counsel for PPFA and employees for PPFA, regarding the claims and defenses in this litigation, as required by Rule 26(a). *See Joe Hand Promotions, Inc. v. Canales*, 2017 WL 3671090, at *1 (S.D. Tex. Mar. 7, 2017).

Pursuant to Rule 26(a)(1)(A)(i), PPFA investigated and identified relevant witnesses that it may use to support its claims or defenses in this case—and did so in far more detail than Plaintiffs' Rule 26 disclosure.  *Compare* Ex. A at 2–5 *with* Ex. E at 2, Ex. G at 2–3 *and* Ex. F at 2–3.  PPFA also identified, pursuant to Rule 26(a)(1)(A)(ii), categories of potentially relevant evidence, which also are largely consistent with Plaintiffs' Rule 26 disclosures.  *Compare* Ex. A at 5–6 *with* Ex. E at 3, Ex. G. at 4, *and* Ex. F at 3–4.  Neither Plaintiff has ever raised any concerns regarding PPFA's disclosures.

**PPFA's Litigation Holds.**  The Court asked PPFA to address the "extent to which Defendants put in place a 'litigation hold' to ensure the preservation of relevant ESI and/or documents, *see e.g.*, *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217–18 (S.D.N.Y. 2003)."

As soon as the Court unsealed the Complaints and PPFA became aware of this litigation, PPFA developed and implemented a litigation hold to preserve potentially relevant evidence.  Throughout this case, and consistent with *Zubulake*'s prescriptions, PPFA has also continued to monitor and update its preservation efforts consistent with its legal obligations.  *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004).  PPFA's efforts to ensure that relevant evidence is preserved have been more than reasonable, and PPFA is informed and believes that there are no gaps in the preservation of ESI.  Fed. R. Civ. P. 37(e).  No party has suggested that any spoliation has occurred in this case.  *Cf. generally Zubulake*, 220 F.R.D. 212 (discussing duty to preserve documents to avert spoliation of evidence).

**ARMS Connect and the Center for Affiliated Learning.**   The Court asked PPFA to address "[w]hy documents located in ARMS Connect and Center for Affiliate Learning are not within Defendants' "control" for the purposes of Rule 34(a)(l), *see Goodman v. Praxair Servs.*, 632 F. Supp. 2d 494,515 (D. Md. 2009) ("Rule 34 'control' would not require a party to have legal ownership or actual physical possession of any documents at issue. Instead, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." (internal marks omitted))."

As an initial matter, PPFA respectfully clarifies that Relator never requested that PPFA search ARMS Connect or the Center for Affiliated Learning ("CAL") for responsive documents, and PPFA never agreed to do so.  PPFA also lacks "control" over the documents and content on ARMS Connect and CAL for purposes of Rule 34(a)(1).[1]

Connect and CAL are websites that are wholly-owned and operated by Affiliates Risk Management Services, Inc. ("ARMS"), which is a non-profit corporation in New York.  *See* Declaration of Kim Custer ¶ 4.  PPFA does not own or control ARMS.  *Id.* ¶ 5.  Nor does PPFA operate, manage, or supervise any aspect of ARMS's business.  *Id.*  ARMS has sole and exclusive control over the documents and other content that is hosted on its platforms, including ARMS Connect and CAL.  *Id.* ¶ 6.  As an ARMS customer, PPFA only has limited end-user access and rights to the documents and content on the ARMS Connect and CAL websites (e.g., ability to view the documents and content).  *Id.* ¶ 7.

---

[1] Courts in this District presume that a party does not have possession, custody, or control over a non-party's documents unless the requesting party shows otherwise, and Relator has made no attempt to do so here.  *See Banca Pueyo, S.A. v. Lone Star Fund IX (U.S.), L.P.*, 2020 WL 10046110, at *19 (N.D. Tex. Sept. 25, 2020) ("'Typically, ... to establish control over documents in the possession of a non-party," *the party seeking discovery* must show "that there is a relationship, either because of some affiliation, employment or statute, such that a party is able to command release of certain documents by the non-party person or entity in actual possession.'" (emphasis added; citation omitted)); *see also WesternGeco LLC v. Ion Geophysical Corp.*, 2010 WL 2266524, at *2 (S.D. Tex. June 2, 2010) (recent Fifth Circuit unanimous opinion "does counsel that—even assuming FGI does have access to documents in the possession of its affiliates—this is insufficient to establish possession, custody, or control . . . .").

In that respect, ARMS Connect and CAL are no different than any other subscription-based service that provides its customers with access to content. Digital subscribers to The New York Times, for example, are afforded access to the articles and content published on The New York Times website. Yet those subscribers are not deemed to have "control" over that content for purposes of Rule 34(a)(1), such that they would be required to collect and produce all articles on a certain topic relevant to a litigation.

So too here. PPFA is limited to end-user access and rights and therefore lacks "the right, authority, [and] practical ability to obtain [] documents" from ARMS. *Goodman*, 632 F. Supp. at 515 (defendants "did not have the sufficient legal authority or practical ability to ensure the preservation of documents prepared by" third-party contractor, but "undisputedly exercised control" over documents prepared by its own employees); *cf. In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (finding "control" where two entities had a "document sharing clause" requiring them to "make available … any documents that it needed to be able to comply with its legal obligations," and where defendant's CEO testified the company "had the practical ability to obtain any documents it needed").

PPFA has, however, searched for and produced documents concerning ARMS Connect and CAL that *are* in its possession, custody, and control. In response to Request No. 4 in Relator's Sixth Request for Production, PPFA performed a supplemental reasonable inquiry and diligent search for non-privileged documents and communications sent to, or received by, PPFA's Education Department involving ARMS Connect or CAL that relate to Texas Medicaid, Louisiana Medicaid, or the Affiliate Defendants' Medicaid submissions. Custer Decl. ¶ 8. PPFA produced documents from that supplemental search on October 28, 2022. *Id*. PPFA has also searched the

ARMS Connect and CAL websites and determined that they do not have content involving Medicaid, including Medicaid billing or reimbursements. *Id.* ¶ 7.

**PPFA's Intranet and Google Docs.**   The Court asked why PPFA "did not search or produce documents from [its] intranet or Google Docs."

In response to the Court's question, PPFA wishes to make clear that PPFA *has* conducted targeted collections and productions from its intranet and Google Drive (where documents from Google Docs reside).   PPFA has been transparent with Plaintiffs that it conducted targeted collections of non-custodial documents in response to specific requests for production, and Plaintiffs never raised any concern with that approach before filing the forensic-examination motion.   In response to each set of document requests, PPFA noted that "[t]o the extent that PPFA agrees to conduct a search for electronically stored information, it will search individual custodial email accounts and any shared electronic drive locations likely to contain such documents that may exist." *See, e.g,* Ex. H (PPFA's Objection to Definition No. 4, PPFA's Responses and Objections to Relator's First Requests for Production, at 4).   As a result of these good-faith efforts, PPFA produced more than 3,077 documents totaling more than 36,526 pages from non-custodial sources, including the intranet and Google Drive—and it did so before Relator filed the Motion.

The type of larger-scale search-and-collection effort that Relator appears to now be contemplating cannot be conducted on the PPFA intranet platform. The intranet is hosted by a third party and is a standalone product.   It functions as an application available through another third-party's software that secures that intranet against unauthorized access while also providing PPFA employees access to remote applications and software.   The majority of the content in the intranet resides within the third-party platform, and the intranet search platform only allows for simple queries, has search restrictions based upon employee job title and function, and cannot mass

export documents that are returned in the search results. As such, there is no forensically valid way to collect information without requiring a user to manually download every document or page from a search result. PPFA thus stands by its original good-faith efforts to perform targeted collections of the intranet—to which Plaintiffs already have access—while PPFA continues to investigate whether any additional information exists in the intranet that was not already identified by PPFA custodians and the extent to which this content can be exported.

Google Docs is a word processor that allows users to draft and edit documents online while collaborating with other users in real time on the Google ecosystem. It does not host or store any documents. Instead, documents that are created and edited in Google Docs reside on Google Drive. As with the intranet, Defendants have performed targeted searches and collections of potentially responsive materials from Google Drive, and those materials were produced as non-custodial documents under the custodian value "Planned Parenthood Federation of America, Inc."

**PPFA's Custodian Selections.** The Court asked PPFA to address its custodian selection, specifically (1) "Why PPFA's Senior Director of Affiliate Financial Consulting and VP of Health Outcomes and Performance Optimization's storage devices were not searched for responsive ESI and/or documents; (2) "Why PPFA only collected ESI from one director of the Health Care Investment Program" ('HCIP')"; and (3) "Why PPFA searched the ESI of Director of the Affiliate Clinical Consulting-Business Operations Team Terri Trivisonno but did not search the ESI of her direct report, Cherie Stutzman."

Given the two-week timeline and data-volume constraints that this discovery effort presented, PPFA made judgment calls in good faith about which key custodians would be most fruitful to collect—that is, which of them would possess the greatest quantities of responsive, unique, non-duplicative documents that PPFA could most quickly produce. *See* DE 195–1,

7

Kopczynski Decl. ¶¶ 3–5 (noting that document collection and processing for sixteen custodian accounts took six days, leaving PPFA only seven calendar days to review documents—inclusive of the holiday weekend—to meet September 9 production deadline).  PPFA's counsel based its decisions on diligent inquires within PPFA and remained open throughout the process (as it still does today) to adding custodians as the process unfolded.

In selecting its custodians, PPFA was guided by the best practices and recommendations as outlined in the Sedona Principles that "[d]istrict courts within the Fifth Circuit have acknowledged . . . are the leading authorities on electronic document retrieval and production." *Entergy Gulf States La., LLC v. La. Generating, LLC*, 2021 WL 24686, at *7 n.8 (M.D. La. Jan. 4, 2021); *see* The Sedona Principles: Third Edition, Best Practices Recommendations & Principles For Addressing Electronic Document Production, 19 SEDONA CONF. J. 1 (2018) (hereinafter the "Sedona Principles").

As this Court has already observed, parties to a litigation are not required to produce documents from every conceivable custodian.  *See* DE 213 at 5 (clarifying Court's order did not require Affiliate Defendants "to produce every document or communication from every individual or database associated with Affiliate Defendants"); *see Rocky Mountain Wild, Inc. v. United States Forest Serv.*, 2021 WL 825985, at *16 (D. Colo. Mar. 4, 2021) ("[I]t is not true that every custodian must produce responsive documents.").  Rather, in addressing custodian selection in the ESI context, courts have adopted the following guidelines from the Sedona Principles:

> First, "determining what is relevant and proportional under the circumstances for each matter often requires a highly fact-specific inquiry."  Second, absent agreement among the parties, the party who will be responding to discovery requests is entitled to select the custodians it deems "most likely to possess responsive information and to search the files of those individuals."  Third, unless the party's choice is "manifestly unreasonable or the requesting party demonstrates that the resulting production is deficient," the court should not dictate the designation of ESI custodians.  Fourth, the party seeking to compel the designation

of a particular additional ESI custodian has the initial threshold burden of showing that the disputed custodian's ESI likely includes information relevant to the claims or defenses in the case.

*Orchestrate HR, Inc. v. Blue Cross and Blue Shield of Kansas, Inc*., 2022 WL 834066, at *2 (D. Kan. Mar. 21, 2022); *see also Firefighters' Ret. Sys. v. Citco Grp. Ltd*., 2018 WL 276941, at *4 (M.D. La. Jan. 3, 2018) ("A responding party is generally entitled to select the custodians most likely to possess responsive information."); *Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank*, 2017 WL 2305398, at *2 (S.D.N.Y. May 18, 2017) (similar).

Consistent with those guidelines, PPFA engaged in the fact inquiry prescribed by the Sedona Principles to identify the custodians that it believed, in good faith, were "most likely to possess responsive information."  In producing documents responsive to Plaintiffs' requests, PPFA initially identified and produced documents from eight core custodians most likely to possess documents concerning the Affiliate Defendants' accreditation process and Texas and Louisiana Medicaid issues.  In response to the Court's August 25 Order expanding the scope of documents that PPFA would have to produce in response to Relator's requests for production, PPFA immediately doubled its custodian count to sixteen in a diligent effort to capture the documents and information encompassed by the Order.  In executing the expanded search, PPFA surveyed its executive leadership team to identify those sixteen current and former employees spanning varied corners of the organization, including health care, accreditation, legal services, policy work, and communications, to identify the custodians most likely to possess unique, non-duplicative documents responsive to Relator's requests concerning Texas or Louisiana Medicaid or PPFA's relationship with the Affiliate Defendants.[2]  *See* Sedona Principles at 91 (parties may reasonably

---

[2] Moreover, Relator only requested—and the Court ordered—PPFA to produce documents concerning its relationship with Affiliate Defendants and Texas Medicaid or Louisiana Medicaid, not Medicaid generally.  *See* DE 236 at 5 n.2.

"limit initial searches to sources such as email messages and other information from the accounts of key witnesses in the litigation").

PPFA did not include the other potential custodians identified for the first time in Relator's Motion because PPFA's interviews and due diligence indicated that those individuals' emails are more than likely to also exist in its other custodians' files:  that is, they were less likely to possess unique, relevant, and non-duplicative communications beyond those that would be produced from the sixteen selected custodians.  *See Raine Grp. LLC v. Reign Capital, LLC*, 2022 WL 538336, at *2 (S.D.N.Y. Feb. 22, 2022) ("When a party is  large entity, it is more likely there may be redundancies in sources of information and custodians or locations where relevant information is not likely to be found."); *see also*, *e.g., In re Diisocyanates Antitrust Litig*., 2022 WL 3042629, at *3 (W.D. Pa. Aug. 2, 2022) (denying request to add additional custodian whose documents were likely to be substantively duplicative of more senior custodians who worked on same team); *Sugg v. Virtusa*, 2020 WL 6585872, at *2 (D.N.J. Nov. 10, 2020) (similar; "Plaintiff has not demonstrated that either Canekeratne or Dhir has any unique knowledge beyond whatever the global heads and top executives may possess."); *Eisai Inc. v. Sanofi–Aventis U.S., LLC*, 2012 WL 1299379, at *9 (D.N.J. Apr. 16, 2012) (denying motion to compel discovery from additional custodians and accepting defendants' rationale for selection of its custodians to produce responsive, non-duplicative documents).

### Rosemary Coluccio, Senior Director of Affiliate Financial Consulting

PPFA did not select former-employee Rosemary Coluccio as a custodian, because PPFA reasonably believed that any potentially responsive documents in her possession were likely to be duplicative or cumulative of those in the possession of other custodians, including Teri Trivisonno, with whom Ms. Coluccio regularly worked, and Kimberly Custer, who oversees all work relating

to PPFA's affiliates as PPFA's Chief Federation Engagement and Impact Officer.  *See* DE 236 at 12.  PPFA's subsequent production of nearly 4,000 documents involving Ms. Coluccio suggests that good faith belief was well-founded.  DE 236–1, Kopczynski Decl. ¶ 12; *see also Mortg. Resolution Servicing*, 2017 WL 2305398, at *3 (denying request for additional custodian given "defendants' production already includes more than 5,300 email communications involving her" and "plaintiffs have not suggested a basis for believing that a search of her files would unearth new information of any significance").

### Cherie Stutesman, Associate Director of the Affiliate Clinical Operations Consulting-Business Operations Team.

PPFA did not search Cheryl Stutesman's documents because PPFA's due diligence led it to believe that the person to whom Ms. Stutesman reported during the relevant time period—Teri Trivisonno—was the witness most likely to have potentially responsive documents, and any potentially responsive documents in Ms. Stutesman's possession were likely to be cumulative or duplicative of Ms. Trivisonno's documents, particularly given that PPFA has made a voluminous production of documents (nearly 20,000 documents) from Ms. Trivisonno.  DE 236 at 12–13; DE 236–1, Kopczynski Decl. ¶ 12.

### Katie Magill, VP Health Outcomes & Performance Optimization

PPFA did not select VP of Health Outcomes and Performance Optimization, Katie Magill, as a custodian because PPFA determined that her direct report, Emily Schifrin, as the National Director of Accreditation and Evaluation, was more likely to have potentially responsive documents concerning PPFA's relationship with the Affiliate Defendants and Texas or Louisiana Medicaid.  Since it is common practice for employees to copy each other on emails, PPFA reasonably believed that any potentially responsive documents in Ms. Magill's possession were likely to be cumulative or duplicative of Ms. Schifrin's documents.  PPFA has produced nearly

11

6,000 documents from Ms. Schifrin's custodian files.  DE 236 at 12; DE 236–1, Kopczynski Decl. ¶ 12.

Furthermore, the fact that PPFA selected a manager as a custodian in one instance, and direct report in another instance, does not undercut the reasonableness (or consistency) of PPFA's efforts to identify the most appropriate custodians.  *Cf.* DE 242 at 5.  To the contrary, it shows that PPFA exercised judgment in its good faith efforts to identify those custodians most likely to have potentially responsive documents based on PPFA's due diligence and not solely based on an individual's position or title.  *See, e.g., Mortg. Resolution*, 2017 WL 2305398, at *3 (plaintiffs' "speculation" that potential custodian's "position as a senior executive might increase the relevance of his files is not a basis for designating him as a custodian" given "it is equally plausible to assume that because of his senior position, he would have less information about specific transactions than employees lower in the hierarchy").

### Custodians Related to Health Care Investment Program.

With respect to the Health Care Investment Program ("HCIP"), PPFA broadly collected from the three custodians involved in that program whom PPFA reasonably believed were most likely to possess unique, non-duplicative and potentially responsive documents.   Relator's concerns about there being only a single HCIP director on PPFA's custodian list who held the position for a discrete period of time is a red herring.  While Tamara Kramer did not become the HCIP Director until June 2021, she has worked on the HCIP team since August 2016.  Ms. Kramer was an HCIP Manager from August 2016 to July 2019, then HCIP Associate Director from July 2019 to June 2021, and now the HCIP Director since June 2021.  As PPFA previously explained in its Opposition, PPFA not only included Ms. Kramer (the current HCIP Director) on its custodian list, but also two other individuals involved with HCIP:  (1) Stephanie Shaw, Strategic Manager

12

for Health Finance, and (2) Emily Stewart, Vice President of Public Policy, to whom Ms. Kramer reported from August 2016 to July 2019.  *See* DE 236 at 12.  Furthermore, PPFA included Ms. Custer—who was Executive Vice President for Health Care before becoming Chief Federation Engagement and Impact Officer—as a custodian.  PPFA thus believed in good faith that the custodians it selected were most likely to have potentially responsive documents, and that adding additional HCIP custodians would be redundant.  Indeed, PPFA's production includes nearly 4,000 documents involving HCIP, so it is unclear what, if any, responsive documents Relator believes may have been inadvertently missed through PPFA's collection efforts.  DE 236–1, Kopczynski Decl. ¶ 12.

PPFA made each of its custodian-selection judgment calls in good faith and in effort to balance (1) the likelihood that custodial files would contain unique responsive material with (2) the time constraints and costs associated with the review and production required to meet the September 9, 2022 deadline ordered by the Court on August 25, 2022.  *See also Moore v. Publicis Groupe*, 287 F.R.D. 182, 192 (S.D.N.Y. 2012) ("Staging of discovery by starting with the most likely to be relevant sources (including custodians), without prejudice to the requesting party seeking more after conclusion of that first stage review, is a way to control discovery costs.").  As PPFA previously noted, the collection, search, and production of documents from these sixteen custodians alone returned more than 275,000 documents and required PPFA to deploy more than 60 attorneys and technology-assisted review document analysis tools to meet the September 9 production deadline.  DE 195–1, Kopczynski Decl. ¶ 4.  PPFA ultimately produced 74,846 documents on September 9 with a cover letter that identified to Plaintiffs the sixteen custodians that PPFA searched in connection with that production.  DE 195–1, Kopczynski Decl. ¶ 5.  And in the seven weeks that followed, Relator *never* suggested that PPFA's custodian selections were

13

deficient; Relator did not *once* ask PPFA to add any additional custodians; nor did Relator *ever* mention any of the titles or names referenced in Relator's Motion.

Instead of raising their concerns about custodians with PPFA, Relator filed a motion asserting that PPFA did not search other potential custodians who Relator believes are "extremely likely to have responsive documents." DE 220 at 10. Relator has never "'articulate[d] a basis . . . to find that ESI in the possession of the additional custodian[s] would be different from, and not simply duplicative of, information that [PPFA] has already produced." *Enslin v. Coca-Cola Co.*, 2016 WL 7042206, at *2 (E.D. Pa. June 8, 2016) (citation omitted); *see also Orchestrate HR*, 2022 WL 834066, at *5 (denying request to compel search of additional custodian); *Lightsquared Inc. v. Deere & Co.*, 2015 WL 8675377, at *5 (S.D.N.Y. Dec. 10, 2015) (similar); *Fort Worth Employees' Retirement Fund v. JP Morgan Chase & Co.*, 297 F.R.D. 99, 107 (S.D.N.Y. 2013) (similar; party moving to compel additional proposed custodians "must demonstrate that the additional requested custodians would provide unique relevant information not already obtained").

The mere assertion that an additional custodian "was 'knowledgeable' and possessed 'relevant information about the facts and claims at issue'" is simply not, without more, a sufficient basis for including them. *Enslin*, 2016 WL 7042206, at *2 (reaffirming denial of motion to compel party to search additional custodians); *see Harrington Enters., Inc. v. Safety-Kleen Sys., Inc.*, 2014 WL 12611318, at *2 (W.D. Mo. July 11, 2014) (denying custodian request; "Plaintiff has not given any reason as to why any of these custodians should be searched, aside from noting their positions with Defendant"). Nor has Relator provided a justification for the additional burden of searching, collecting, and reviewing ESI from these potential custodians, or the likely benefit it would yield, given that PPFA has already incurred more than $1 million searching, collecting, and producing more than 90,000 documents from sixteen custodians. Fed. R. Civ. P. 26(b) (requiring courts and

14

parties to balance costs and potential benefits of discovery); *see also Mann v. City of Chicago*, 2017 WL 3970592, at *5 (N.D. Ill. Sept. 8, 2017) ("[E]very additional custodian increases the risk of duplication of emails and the time and resources necessary to review emails.").  "Without any showing of the significance of the non-produced emails, let alone the likelihood of finding the 'smoking gun,'" courts routinely deny such vague demands for additional, duplicative custodians that "cannot possibly be justified when one balances its costs against its utility."[3]  *United States ex rel. McBride v. Halliburton Co.*, 272 F.R.D. 235, 241 (D.D.C. 2011).

Despite PPFA's significant and costly efforts to fully respond to Relator's requests, PPFA has nevertheless expressed its willingness—which remains—to discuss and consider Relator's desire for supplemental searches of additional custodians if Relator would meaningfully confer with PPFA to reach an agreement about them.  *See, e.g.*, DE 236 at 25 (stating that PPFA is "willing to meet and confer with Relator regarding proposed parameters for a supplemental search of Ms. Coluccio's custodial files" given Plaintiffs' recent request to depose her).  In fact, if Relator had engaged in a good faith meet and confer process on this topic before—or even after—filing the forensic-examination motion, the parties almost certainly could have resolved these issues by now.

**PPFA's Search Terms.**  The Court asked PPFA to address why PPFA "only search[ed] for 'Medicaid' in combination with certain terms—specifically, 'Medicaid & Texas OR Medicaid & Louisiana.'"

In addressing the effectiveness of the query above, PPFA respectfully requests that the Court recognize that PPFA did not merely limit its searches to the search string that the Court

---

[3] Relator's desire to depose Ms. Coluccio would not be sufficient grounds for adding her as an additional custodian, yet PPFA has already indicated that it would be willing to do so.  *See Enslin*, 2016 WL 7042206, at *4 ("Also unavailing is Enslin's contention that these four individuals must be added as custodians because Enslin has chosen to depose them. Enslin's subjective belief that the testimony of these four individuals is sufficiently important to his claims to warrant the time and expense of taking their depositions sheds no light on whether they are in possession of unique, responsive ESI that Defendants improperly failed to capture through their search methodology.").

outlines above.  Rather, PPFA made a good faith attempt—working with e-discovery experts—to build a patchwork of several queries so that, if one query did not capture potentially responsive documents, another query would do so.  DE 236–1, Kopczynski Decl. ¶ 3.  Concerned that an untethered search for the generic term "Medicaid" would yield such a broad set of false hits that it would make it more difficult to identify responsive documents,[4] PPFA "anchored" the generic term "Medicaid" with connectors designed to target potentially responsive documents that Relator had requested[5] and the Court compelled PPFA to produce—i.e., those  connected to Texas Medicaid and Louisiana Medicaid, not Medicaid generally:

> Relator reasonably limited the scope of discovery to the period alleged in Relator's Complaint, the parties to this lawsuit, the Texas and Louisiana Medicaid programs, and the allegations regarding PPFA's control and oversight. *See* ECF No. 2 at 3 (pleading allegations

Order, DE 153 at 5; *see also* DE 236–1, Kopczynski Decl. ¶ 3 (explaining PPFA's search queries); *Lawson v. Spirit AeroSystems, Inc*., 2020 WL 3288058, at *4 (D. Kan. June 18, 2020) (directing parties "to work together on search terms to try to achieve an 85% responsive rate" and refusing to "'run really broad search terms that end up in ridiculous numbers of unresponsive documents'" (citation omitted)).  In addition, PPFA created *other* queries that did not expressly use the term "Medicaid" but nonetheless yielded documents containing that term.  DE 236–1, Kopczynski Decl. ¶ 3.  Through those other search queries, PPFA produced approximately 3,000 documents that

---

[4] In terms of information retrieval, one might say that a broad search like this would obscure the "precision" with extremely noisy "recall."

[5] Even then, PPFA's connectors were quite broad.  PPFA did not search for "Medicaid w/2 Texas," which arguably would have been a more tailored approach for identifying responsive documents and communications concerning "Texas Medicaid."  PPFA instead searched for documents that referred to "Medicaid" AND "Texas."  If the words "Medicaid" and "Texas" merely appeared in a document or communication, then it was collected for review, even if those words had no proximate relationship within the document (i.e., even if they did not appear in the same sentence, paragraph, or even the same page in the document).

mention "Medicaid" but contain *no* reference to "Texas," "TX," "Louisiana," or "LA," in addition to more than 11,000 documents that refer to both Medicaid *and* Texas or Louisiana.

In searching for documents in this manner, PPFA reasonably believed it was acting consistent with its discovery obligations:

> Poorly crafted terms may return thousands of irrelevant documents and increase, rather than minimize the burden of locating relevant and responsive ESI. . . . Broad, general search terms . . . are typically not sufficiently targeted to find relevant documents. Modifiers are often needed to hone in on truly relevant documents. However, what modifiers are appropriate is often best left to specialists who can interpret "hit" reports and suggest refinements—not to the Court.

*Raine Grp.*, 2022 WL 538336, at *3; *see also William A. Gross Const. Assocs. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 135 (S.D.N.Y. 2009) ("'Whether search terms or "keywords" will yield the information sought is a complicated question involving the interplay, at least, of the sciences of computer technology, statistics and linguistics.  Given this complexity, for lawyers and judges to dare opine that a certain search term or terms would be more likely to produce information than the terms that were used is truly to go where angels fear to tread.'" (citation omitted)).

PPFA believed that a search for PPFA documents and communications that mention "Medicaid"—but not Louisiana, Texas, or an Affiliate Defendant in this case—would be disproportionate to the needs of the case and impose a burden that far outweighs any likely benefit. *See Lawson v. Spirit AeroSystems, Inc*., 2020 WL 1813395, at *9 (D. Kan. Apr. 9, 2020) (Given that "Spirit has spent approximately $600,000 in vendor fees and attorneys' fees relating to the TAR process, all to produce less than 10,000 responsive documents," "[t]he court will not require Spirit to spend thousands more to review and ready for production documents that would appear to have marginal or duplicative benefit to the parties, if any benefit at all."). Such a search would largely duplicate the effort PPFA has already undertaken to collect, review, and produce Medicaid-

17

related documents that concern (1) Texas or Louisiana or (2) the Affiliate Defendants.[6]  And, based on PPFA's knowledge of its operations and documents in its possession, such a broad "Medicaid" search untethered to Texas, Louisiana, or the Affiliate Defendants would simply return those very same documents *plus* large swaths of unrelated and irrelevant materials concerning Medicaid programs administered by *other* states and dozens of *other* PPFA affiliates.  *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 369 F. Supp. 3d 1, 13 (D.D.C. 2019) (accepting EPA's "obvious, common sense explanations" for not "searching for a generic terms . . . such as "Dow" without any limitation in EPA's search," given it "would have generated an even greater number of non-responsive records because Dow AgroSciences engages with EPA on many other different pesticides, herbicides, fungicides, and insecticide matters.").

For that reason, PPFA is differently situated from the Affiliate Defendants.  While one might infer that a document in the Affiliate Defendants' possession that mentions "Medicaid" probably relates to (1) the Affiliate Defendants, or (2) the Texas or Louisiana Medicaid programs in which the Affiliate Defendants participated, the inference cannot be extended to PPFA, given PPFA's nationwide operations and interactions with dozens of entities that participate in Medicaid programs across the country.

But, again, just as PPFA invited input from Relator in September, PPFA remains open to conferring with Relator regarding other search queries likely to return potentially responsive

---

[6] To be clear, PPFA broadly searched for documents and communications that concern, or were exchanged with, the Affiliate Defendants by running searches for documents and communications that refer to (1) an Affiliate Defendant by name, email domain, or acronym, or (2) key individuals from the Affiliate Defendants with whom PPFA staff commonly interacted.  Those searches were not limited or constrained by any subject matter and thus would have captured all documents or communications concerning every subject matter—including Medicaid—that were shared with Affiliate Defendants.  Thus, to the extent a "Medicaid" document or communication does not mention "Texas" or "Louisiana," but was shared with Affiliate Defendants, those communications and documents would have been collected and produced by PPFA.  Moreover, any such documents would be in the Affiliate Defendants' possession and the Affiliate Defendants are similarly producing Medicaid-related documents and Affiliate Defendants' communications with PPFA's email domain (@ppfa.org).

documents.  As another court noted, "complaints about search terms are the province of meet-and-confer discussions, Rule 16 conferences, or motions to compel or for a protective order early in discovery before production occurs or while it is occurring."  *Procaps S.A. v. Patheon Inc*., 2014 WL 11498060, at *37 (S.D. Fla. Dec. 1, 2014).  They are not grounds for sanctions.

**Alleged Omissions From PPFA's Productions**.  The Court asked PPFA to address "[h]ow the omissions from Defendant's production complies with [the] Court's orders, see ECF Nos., 153, 184, 213, and 215."

As a critical threshold matter, PPFA wishes to make clear that there were no omissions in its production related to the Medicaid Toolkit.  While Relator raised concerns that PPFA did not produce other drafts or versions of the Medicaid Toolkit beyond the 2011 version, 2019 draft, and 2020 version, no other drafts or versions of the Medicaid Toolkit exist.  Likewise, Relator's assertion that PPFA did not produce any communications concerning the Medicaid Toolkit is incorrect.  In responding to the Motion, PPFA identified, at minimum, 36 produced documents and communications that concern the drafting and revisions to the Toolkit.  *See* DE 236 at 11; *see* DE 216–1, Kopczysnki Decl. ¶ 8 (identifying 36 bates-labelled "communications and documents concerning the development of the PPFA Medicaid Toolkit, revisions to the Medicaid Toolkit, and communications between PPFA employees concerning the Toolkit").  Relator identified only one document that was inadvertently omitted from PPFA's production.[7]

Numerous courts have held that the identification of a single unproduced document—out of the tens-of-thousands of documents produced in this discovery-intensive case—does not establish any deficiency (let alone a *material* deficiency) or non-compliance with a party's discovery obligations.  *See, e.g.*, *Agerbrink v. Model Serv. LLC*, 2017 WL 933095, at *5 (S.D.N.Y.

---

[7] As PPFA previously noted, PPFA's production did include a draft version of the Manual.  *See* DE 236 at 10 (citing DE 236–1, Kopczynski Decl. ¶ 7).

Mar. 8, 2017) ("[T]he fact that a party has located a single relevant document that the adversary failed to produce hardly demonstrates that the search was flawed."); *Prasad v. George Wash. Univ.*, 323 F.R.D. 88, 94 (D.D.C. 2017) (holding plaintiff's "single example" of an unproduced responsive email "is not sufficient indication of an inadequate search"); *Winfield v. City of New York*, 2017 WL 5664852, at *11 (S.D.N.Y. Nov. 27, 2017) (movant's identification of five documents that were incorrectly categorized as non-responsive was insufficient to question the accuracy and reliability of the producing party's discovery process); *Memry Corp. v. Kentucky Oil Tech., N.V*, 2007 WL 832937, at *4 (N.D. Cal. Mar. 19, 2007) ("STC can only point to two missing emails out of thousands of documents produced in this discovery-intensive case.  While KOT's document production may not have been absolutely perfect, the flaws do not rise to the level of necessitating production of hard drives" for forensic examination.); *Freedman v. Weatherford Int'l Ltd.*, 2014 WL 4547039, at *3 (S.D.N.Y. Sept. 12, 2014) (finding it "unsurprising that some relevant documents may have fallen through the cracks" given the number of documents reviewed and produced).

To hold otherwise would impose upon PPFA a standard of perfection courts have repeatedly rejected as inconsistent with the Federal Rules of Civil Procedure.  "[T]he standard for evaluating discovery is *reasonableness*, not *perfection*."  *Agerbrink*, 2017 WL 933095, at *5 (emphasis added); *see, e.g.*, *City of Rockford v. Mallinckrodt ARD Inc.*, 326 F.R.D. 489, 492 (N.D. Ill. 2018) ("[D]isclosure of documents need not be perfect."); *Freedman*, 2014 WL 4547039, at *3; *Reinsdorf*, 296 F.R.D. at 615 ("[W]hile parties must impose a reasonable construction on discovery requests and conduct a reasonable search when responding to the requests, the Federal Rules do not demand perfection."); *Metro. Opera Ass'n v. Local 100, Hotel Employees & Restaurant Employees Int'l Union*, 212 F.R.D. 178, 223 (S.D.N.Y. 2003) (Rule 26(g) requires a

"reasonable inquiry under the circumstances."); *Moore*, 287 F.R.D. at 188 ("[T]he Federal Rules of Civil Procedure do not require perfection."). "[T]here is no obligation on the part of a responding party to examine every scrap of paper in its potentially voluminous files in order to comply with its discovery obligations." *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006). Parties instead are expected to be "diligent and to act in good faith in producing documents in discovery," and "no one could or should expect perfection from this process." *Fed. Housing Fin. Agency v. HSBC N. Am. Holdings Inc.*, 2014 WL 584300, at *2 (S.D.N.Y. Feb. 14, 2014). As one court noted, "without doubt, some relevant documents will be produced, and without doubt, some relevant documents will be missed and not produced. That is a known known." *Mallinckrodt*, 326 F.R.D. at 493.

PPFA worked hard and quickly in a good-faith effort to collect unique, non-duplicative documents through its custodial selections and search queries and its targeted searches for non-custodial documents, and PPFA's efforts were "reasonable and proportional" to the needs of the case. *Hyles v. New York City*, 2016 WL 4077114, at *3 (S.D.N.Y. Aug. 1, 2016) (noting discovery "standard is not perfection, or using the '"best" tool,' but whether the search results are reasonable and proportional" (citing Fed. R. Civ. P. 26(g)(1)(B)). Even if one document was inadvertently omitted, such "ordinary discovery errors" are an "improper" basis to "infer nefarious intent or bad faith." *PaineWebber Grp. v. Zinsmeyer Trusts P'ship*, 187 F.3d 988, 993 (8th Cir. 1999). "A party may comply in good faith its discovery obligations and yet there may be supplemental productions or even additional responsive documents that were inadvertently omitted." *Reinsdorf*, 296 F.R.D. at 615.

The singular omission identified by Relator could have been easily resolved had Relator simply brought it to PPFA's attention. *See Slocum v. Int'l Paper Co.*, 2019 WL 8918747, at *7

(E.D. La. Mar. 15, 2019) (concluding purported "deficiencies" in party's production were "largely the result of . . . plaintiffs' failure to specifically request the documents they seek"). Again, both the Sedona Principles and accompanying legal authority emphasize that ESI discovery is supposed to be a *collaborative effort*. *See Lawson v. Love's Travel Stops & Country Stores, Inc.*, 2019 WL 7102450, at *1 (M.D. Pa. Dec. 23, 2019) ("[T]he Sedona Principles' injunction that parties should collaborate in conducting electronic discovery underscores that cooperation is the keystone to any successful ESI discovery strategy"). If Relator had "engag[ed] in meaningful cooperation by providing specific information" regarding the Manual to PPFA, then PPFA could have timely addressed it—as PPFA subsequently did upon receipt of the Motion.[8] *See* Sedona Principles at 126 (recognizing that "if the requesting party is engaging in meaningful cooperation by providing specific information," the responding party can consider the information in evaluating its production).

Moreover, PPFA remains willing to conduct additional searches if Relator's counsel identifies additional documents that PPFA may have inadvertently omitted, despite PPFA's reasonable and good faith efforts to expansively collect unique, non-duplicative documents responsive to Relator's discovery requests. *See* Sedona Principles at 87 ("A requesting party that seeks production of ESI should, to the greatest extent practicable, clearly and specifically indicate each item or category of electronic information it seeks.").

**Ability to Generate a "System Map."** The Court asked "[i]f PPFA and Affiliate Defendants have the capacity and coordination necessary to generate a "system map" of all on-premise and off-premise sources of ESI within their possession, custody, or control - including

---

[8] PPFA likewise investigated the Motion's assertions surrounding the Medicaid Toolkit and determined they were not well-founded, because no other versions of the Toolkit exist and PPFA had, in fact, produced communications concerning revisions to the Toolkit.

servers, e-mail servers, Post Office Protocol (POP) servers, cloud-based systems, and ISP-based devices, to include mobile phones, smart phones, or other personal ESI devices."

PPFA does not have the capacity and coordination necessary to create a system map, nor would a system map be a useful tool in any event. A system map alone would not shed any light on whether the vast number of IT assets that PPFA maintains contain any user data or whether the data is potentially relevant to this litigation. *See* Declaration of Marina Spyrou ¶ 8.

The first step for creating a system map would be to generate a list of the hundreds of IT assets that PPFA maintains, including many that do not store data of the type the Court describes in its Order and would not be relevant to this litigation. *Id*. ¶ 9. For example, PPFA has an off-premise HR system containing individual employees' benefits information and elections; it also has a vast technology stack that supports fundraising and donor engagement, and multiple applications that provide back-end support to a variety of financial reporting systems. *Id*. PPFA's infrastructure also includes roughly 800 laptops, each identified by an electronic asset number, and PPFA supports various mobile devices. *Id*. In addition, PPFA's infrastructure supports applications for user education and women's health period tracking. *Id*. There is no way to eliminate these irrelevant systems from the effort to create a system map because, without identifying each and every system, it is not possible to focus on systems that the Court might find relevant.

Generating an inventory of all PPFA's computer assets also would be a very time consuming, manual process, and would only be the first step. *Id*. ¶ 10. The next step would involve interviewing several hundred employees, either who manage the IT asset (e.g., financial databases) or possesses and use it (e.g., laptops) to draft descriptions of the type of data that exists on each asset. Each PPFA employee with knowledge of each asset would need to describe the asset's

23

business purpose, whether it independently generates data, and if so, whether that data is stored in that asset or somewhere else. *Id*. ¶ 8. To be usable, a system map would need to be supplemented with some explanation from PPFA employees familiar with each asset describing what each of these assets contain, including for example, whether they store user-generated data, or whether they are mere reporting tools that draw data from back-end locations. *Id*. Presumably, a system map would also need to be supplement with some brief explanation of the type of data it stores (e.g., whether a SAP server cluster supports financial reporting data, human resources records, or cyber security incidents). *Id*.

As described in sections above, counsel for PPFA undertook a more tailored approach, proportionate to the needs of the case, to respond to discovery in this matter. Instead of focusing on hundreds of irrelevant IT systems and computers, PPFA targeted its diligence on employees that were likely to have relevant information or could point its counsel to relevant information. *Id*. ¶ 10. A broader effort to create a full-scale data map would take several weeks of diligence to create the asset list, identify the correct employees associated with each asset, schedule interviews, and create descriptions of each asset, including some—such as HR support systems—that have nothing to do with this matter. *Id*. ¶ 11.

## **CONCLUSION**

Based on the foregoing, PPFA has shown cause regarding PPFA's reasonable and good faith efforts to comply with its discovery obligations and this Court's orders in the above-captioned action and that imposition of sanctions or some other form of relief is not necessary.

Dated:   November 11, 2022

**O'MELVENY & MYERS LLP**

*/s/ Danny S. Ashby*
DANNY S. ASHBY
Texas Bar No. 01370960
dashby@omm.com
JUSTIN R. CHAPA
Texas Bar No. 24074019
jchapa@omm.com
MEGAN R. WHISLER
Texas Bar No. 24079565
mwhisler@omm.com
2501 N. Harwood Street, Suite 1700
Dallas, Texas 75201
T: (972) 360-1900
F: (972) 360-1901

LEAH GODESKY (*pro hac vice*)
lgodesky@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
T: (310) 553-6700
F: (310) 246-6779

**RYAN BROWN ATTORNEY AT LAW**
RYAN PATRICK BROWN
Texas Bar No. 24073967
ryan@ryanbrownattorneyatlaw.com
1222 S. Fillmore St.
Amarillo, Texas 79101
T: (806) 372-5711
F: (806) 350-7716

*Attorneys for Defendant Planned Parenthood
Federation of America, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 11, 2022, the foregoing document was electronically

filed and served upon all parties and counsel of record via the Court's CM/ECF system.

*/s/ Danny S. Ashby*
Danny S. Ashby