# Exhibit A

```
 1                      UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF TEXAS
 2                           AUSTIN DIVISION

 3   PLANNED PARENTHOOD OF GREATER    ) Docket No. A 15-CA-1058 SS
     TEXAS FAMILY PLANNING AND        )
 4   PREVENTATIVE HEALTH SERVICES,    )
     INC., ET AL                      )
 5                                    )
     vs.                              ) Austin, Texas
 6                                    )
     CHARLES SMITH, EXECUTIVE         )
 7   COMMISSIONER, TEXAS HEALTH AND   )
     HUMAN SERVICES COMMISSION, ET AL ) January 18, 2017

 8

 9                      TRANSCRIPT OF MOTION HEARING
                        BEFORE THE HONORABLE SAM SPARKS
10                           Volume 2 of 3

11   APPEARANCES:

12   For the Plaintiff:          Mr. Roger K. Evans
                                 Ms. Maithreyi Ratakonda
13                               Ms. Jennifer Sandman
                                 Planned Parenthood Federation
14                               Of America
                                 Public Policy Litigation & Law
15                               123 William Street, Ninth Floor
                                 New York, New York 10038
16
                                 Ms. Alice Clapman
17                               Planned Parenthood Federation
                                 Of America
18                               1110 Vermont Avenue, N.W., Suite 300
                                 Washington, D.C. 20005
19
                                 Mr. Thomas H. Watkins
20                               Husch Blackwell
                                 111 Congress Avenue, Suite 1400
21                               Austin, Texas 78701

22   For the Defendant:          Mr. Adam A. Biggs
                                 Mr. Andrew B. Stephens
23                               Mr. Patrick K. Sweeten
                                 Office of the Attorney General
24                               Of Texas
                                 300 West 15th Street, 9th Floor
25                               Austin, Texas 78701
```

1   **(Appearances Continued:)**

2   Court Reporter:              Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
3                                Austin, Texas 78701
                                 (512)391-8792

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.

```
 1                        I N D E X

 2                          Direct    Cross    Redirect  Recross
       Witnesses:

 3

 4     Stuart W. Bowen, Jr.   6         41

 5     Ted Spears            83         90        93        94

 6     Orlando C. Snead      96        114       132

 7     Leslie K.

 8     French Henneke       133        140       156

 9     Todd C. Giberson     157        165

10     Mikeal R. Love       169        182       188

11

12                                                       Page

13     Proceedings Adjourned                             197

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        E X H I B I T S

 2                                              Offered    Admitted
    Plaintiffs'
 3

 4   (None.)

 5

 6   Defendants'

 7   #2                                           23         26

 8   #61                                          36         36

 9   #68                                          35         35

10   #79                                          37         37

11   #81                                          38         38

12   #95                                         162        165

13   #180                                        164        165

14

15

16

17

18

19

20

21

22

23

24

25
```

```
09:01:43   1            THE COURT:  Are we through with the last witness?  Yes,
09:01:59   2    we are and you're waiting -- this is your witness.  Has counsel
09:02:04   3    got the information that I requested?
09:02:09   4            MS. SANDMAN:  Yes, your Honor.  I believe it's filed
09:02:12   5    already or will be very shortly.
09:02:15   6            MR. EVANS:  It's not ready, but it would be ready by
09:02:18   7    midday.
09:02:19   8            THE COURT:  That will be fine.  Be sure and give a copy
09:02:22   9    to opposing counsel.
09:02:23  10            How about the state?
09:02:24  11            MR. STEPHENS:  Your Honor, the state plans to call a
09:02:27  12    witness to address the availability of services.  The Court's
09:02:30  13    question on services available in the areas where Planned
09:02:31  14    Parenthood is located.
09:02:32  15            THE COURT:  That's good.  I'd like to hear it.  I still
09:02:34  16    want the number of clinics and the number of patients that you
09:02:41  17    see in those clinics.
09:02:43  18            MR. STEPHENS:  Okay.
09:02:44  19            THE COURT:  All right.  Call your witness.
09:02:47  20            MR. STEPHENS:  Your Honor, the state calls Stuart
09:02:49  21    Bowen.
09:02:58  22            THE COURT:  Be sworn, please.
09:03:00  23            (Witness sworn.)
09:03:12  24            THE COURT:  Tell us your full name, please, sir, and
09:03:16  25    spell your last.
```

| | | |
|---|---|---|
| 09:03:17 | 1 | THE WITNESS:  Stuart Waddington Bowen, Jr., B-O-W-E-N. |
| 09:03:22 | 2 | And it's S-T-U-A-R-T. |
| 09:03:24 | 3 | THE COURT:  You may proceed. |
| 09:03:25 | 4 | STUART W. BOWEN, JR., called by the Defendant, duly sworn. |
| 09:03:25 | 5 | DIRECT EXAMINATION |
| 09:03:25 | 6 | BY MR. STEPHENS: |
| 09:03:26 | 7 | Q.   Mr. Bowen, good morning. |
| 09:03:28 | 8 | A.   Good morning. |
| 09:03:28 | 9 | Q.   Where are you currently employed? |
| 09:03:30 | 10 | A.   The Texas Health and Human Services Commission. |
| 09:03:32 | 11 | Q.   And what is your position at the Texas Health and Human |
| 09:03:35 | 12 | Services Commission? |
| 09:03:36 | 13 | A.   Inspector General. |
| 09:03:37 | 14 | Q.   And the Office of the Inspector General is part of the Texas |
| 09:03:42 | 15 | Health and Human Services Commission, right? |
| 09:03:44 | 16 | A.   It is. |
| 09:03:45 | 17 | Q.   Could you briefly describe for the Court your work |
| 09:03:50 | 18 | experience prior to becoming the Inspector General? |
| 09:03:53 | 19 | A.   Yes.  I came to Texas in 1984, for the first time, to become |
| 09:03:59 | 20 | an Air Force officer.  I left Vanderbilt Law School after a year, |
| 09:04:03 | 21 | and then, after training at Lackland, went to Lowry Air Force |
| 09:04:08 | 22 | Base where I was trained as an intelligence officer, and then, |
| 09:04:11 | 23 | spent three years in the Federal Republic of Germany as an |
| 09:04:15 | 24 | indications warning officer, and then, leading NATO's air defense |
| 09:04:18 | 25 | analysis cell.  And then, came back to Texas, back to San Antonio |

09:04:22  1   and finished law school at St. Mary's.  Came to Austin to clerk

09:04:27  2   for Raul -- Justice Raul Gonzalez on the Texas Supreme Court.

09:04:31  3   Then spent a little over two-and-a-half years as an assistant

09:04:34  4   attorney general of Texas in administrative law litigation.  And

09:04:38  5   then, six years for Governor Bush on his legal staff, two years

09:04:42  6   in the White House as special assistant, and then, deputy

09:04:46  7   assistant, deputy staff secretary, and then, ten years as the

09:04:49  8   special inspector general for Iraq reconstruction.

09:04:53  9                  THE COURT:  Are you pulling your hair, Lily?

09:04:58  10                 COURT REPORTER:  Yes, sir.

09:05:00  11                 MR. STEPHENS:  A little slower.

09:05:01  12                 THE COURT:  This in law means slower.

09:05:04  13                 THE WITNESS:  I'm sorry.  I thought you meant shorten

09:05:06  14   it.  I'll slow down.

09:05:07  15   A.    And then, since concluding my time in Iraq, I've -- I spent

09:05:13  16   a year as consulting on Iraq with the U.S. Chamber and that

09:05:16  17   Center for Strategic and International Studies.  And then, in

09:05:20  18   February of 2015, I was appointed by Governor Abbott as Inspector

09:05:27  19   General.

09:05:28  20   Q.    (BY MR. STEPHENS) Mr. Bowen, you've been the Inspector

09:05:31  21   General for approximately 22 months?

09:05:33  22   A.    That's right.

09:05:33  23   Q.    What is the mission of the Inspector General's Office?

09:05:37  24   A.    Provided by statute.  Our job is to root out fraud, waste

09:05:42  25   and abuse through audits, inspections and investigations of all

09:05:49  1   of the funds appropriated, federal and state, for the delivery of

09:05:54  2   health and human services in the state of Texas.

09:05:58  3   Q.    And what is the IG's role with respect to Texas Medicaid?

09:06:04  4   A.    It's a very integral role.  I work very closely with the

09:06:08  5   executive commissioner, Charles Smith, and the entire Medicaid

09:06:14  6   CHIP division, the state Medicaid director, in coordinating on

09:06:20  7   our oversight work.  The executive commissioner is strongly

09:06:25  8   committed to transparency and accountability in the delivery of

09:06:29  9   health and human services in the state of Texas.

09:06:32  10           THE COURT:  Let's stay on track.  Let's have question

09:06:35  11  and answer.

09:06:36  12           THE WITNESS:  Yes, sir.

09:06:37  13           THE COURT:  Any editorial is --

09:06:40  14           THE WITNESS:  Yes, sir.

09:06:40  15           THE COURT:  -- going to get on my nerves.  Okay.

09:06:43  16           THE WITNESS:  Understood.

09:06:44  17  Q.    (BY MR. STEPHENS) Mr. Bowen, do you know what approximately

09:06:47  18  Texas Medicaid budget is?

09:06:49  19  A.    A little over 30 billion.

09:06:51  20  Q.    And do you know how many people are served by Texas

09:06:53  21  Medicaid?

09:06:54  22  A.    About 4.3 million.

09:06:57  23  Q.    And do you know approximately the amount of Medicaid funds

09:07:00  24  paid to Planned Parenthood in 2016?

09:07:03  25  A.    About 3.4 million.

| | | |
|---|---|---|
| 09:07:07 | 1 | Q.   How is the IG's responsibilities with respect to |
| 09:07:10 | 2 | investigating fraud, waste and abuse relate to Texas Medicaid? |
| 09:07:16 | 3 | A.   They relate to Texas -- |
| 09:07:17 | 4 | THE COURT:  Before you answer that question, the 3.4 |
| 09:07:21 | 5 | million paid out of the Medicare -- Texas Medicare budget, to |
| 09:07:28 | 6 | whom is it paid?  Is it paid to individual clinics that show |
| 09:07:34 | 7 | reimbursement?  Or is it paid -- how is it paid, do you know? |
| 09:07:39 | 8 | THE WITNESS:  It is paid through contractual agreements |
| 09:07:43 | 9 | with providers, and pursuant to those agreements, the funds are |
| 09:07:49 | 10 | -- as you've said, serve as a reimbursement for services |
| 09:07:53 | 11 | delivered. |
| 09:07:54 | 12 | THE COURT:  But how does it -- who makes the agreement? |
| 09:07:58 | 13 | I've been educated to some degree in this case that one entity |
| 09:08:06 | 14 | could have -- let's take Houston, for example.  It runs eight |
| 09:08:12 | 15 | separate clinics in the Houston area.  I'm not even sure what |
| 09:08:16 | 16 | that is yet.  But does each clinic make a claim for the Medicaid |
| 09:08:24 | 17 | reimbursement that that clinic has? |
| 09:08:27 | 18 | THE WITNESS:  It's actually driven by the member.  The |
| 09:08:30 | 19 | member in Medicaid can choose where they would like to have |
| 09:08:34 | 20 | services delivered, and they can choose among enrolled Medicaid |
| 09:08:38 | 21 | providers, and then, pursuant to that engagement, the billing |
| 09:08:45 | 22 | goes to the state and then, it's paid that way. |
| 09:08:50 | 23 | THE COURT:  Okay.  Let's ask it this way.  Let's say |
| 09:08:55 | 24 | I'm a person eligible for Medicaid and I go to the clinic in El |
| 09:09:06 | 25 | Paso, and I choose to go there because I live there, okay?  And |

| | | |
|---|---|---|
| 09:09:13 | 1 | then, the El Paso clinic provides the services and makes the |
| 09:09:19 | 2 | request or claim for reimbursement.  Rather than the company -- |
| 09:09:30 | 3 | the Planned Parenthood entity that has eight places, seven others |
| 09:09:39 | 4 | outside of El Paso.  I'm trying to figure out who makes the |
| 09:09:42 | 5 | claim.  Would it be the clinic wherein the services were |
| 09:09:45 | 6 | delivered by the person that chose to go there, or do you know? |
| 09:09:48 | 7 |        THE WITNESS:  Yeah.  It's through a Texas provider |
| 09:09:52 | 8 | number, and that is sort of the billing number like two -- |
| 09:09:57 | 9 |        THE COURT:  So it would go through -- |
| 09:09:59 | 10 |        THE WITNESS:  Through the provider -- |
| 09:10:00 | 11 |        THE COURT:  -- the clinic that provided the service. |
| 09:10:02 | 12 |        THE WITNESS:  That's right. |
| 09:10:03 | 13 |        THE COURT:  Thank you.  Sorry for the interruption. |
| 09:10:07 | 14 | Q.  (BY MR. STEPHENS) Mr. Bowen, I'd like to show you a copy of |
| 09:10:09 | 15 | Defendants' Exhibit 21, which was previously admitted into |
| 09:10:12 | 16 | evidence.  Can you see it on the screen? |
| 09:10:20 | 17 | A.  I can't see it on the screen.  It's -- I could see the |
| 09:10:26 | 18 | title. |
| 09:10:28 | 19 | Q.  Mr. Bowen, are you familiar with this document? |
| 09:10:31 | 20 | A.  Yes. |
| 09:10:31 | 21 | Q.  And could you describe to the Court what this document is? |
| 09:10:35 | 22 | A.  It is just what we were talking about, a provider agreement. |
| 09:10:40 | 23 | Q.  And who is the provider agreement between? |
| 09:10:43 | 24 | A.  Planned Parenthood Gulf Coast and state of Texas. |
| 09:10:50 | 25 | Q.  Okay.  Does the Medicaid provider agreement set forth the |

09:10:54  1    duties of the -- of the Texas Medicaid provider?

09:10:57  2    A.   It does.

09:10:59  3    Q.   Brian, could you zoom in on Section 1?

09:11:06  4         Mr. Bowen, in Section 1, are the responsibilities and

09:11:10  5    duties of the provider set forth under this agreement?

09:11:13  6    A.   They are.

09:11:15  7    Q.   And what are the obligations of the provider under a Texas

09:11:18  8    Medicaid provider agreement?

09:11:21  9    A.   To comply with all of the standards, rules, statutes

09:11:27  10   contained within federal and state law as well as the Medicaid

09:11:31  11   provider procedures manual.

09:11:35  12   Q.   And does the provider agreement -- the Medicaid provider

09:11:38  13   agreement set forth the actions or circumstances by which the

09:11:43  14   agreement may be terminated?

09:11:44  15   A.   It does.

09:11:46  16   Q.   Brian, could you go to Section 6.1?  And are those actions

09:11:53  17   or circumstances set forth in Section 6.1?

09:11:56  18   A.   They are.

09:11:57  19   Q.   And could you describe those circumstances for the Court in

09:12:00  20   which the agreement may be terminated?

09:12:03  21   A.   Yes.  Violation of -- a program violation, which is

09:12:07  22   tantamount to a violation of the rules standards in the federal

09:12:11  23   and state Medicaid laws as well as the Medicaid provider

09:12:16  24   agreements and Medicaid provider manual.

09:12:21  25   Q.   Did each of the Planned Parenthood providers involved in

09:12:23  1   this lawsuit enter into a Medicaid provider agreement with the

09:12:26  2   terms we just reviewed?

09:12:28  3   A.   They did.

09:12:31  4   Q.   Brian, could you bring up Defendants' Exhibit 20, which is

09:12:36  5   also previously admitted?

09:12:37  6        Mr. Bowen, are you familiar with this document?

09:12:39  7   A.   I am.

09:12:40  8   Q.   Could you describe this document for the Court?

09:12:43  9   A.   This is the cover of the Texas Medicaid Provider Procedures

09:12:48  10  Manual.

09:12:50  11  Q.   And does the Texas Medicaid Providers Manual provide

09:12:54  12  additional guidance regarding the rules that apply to Texas

09:12:57  13  Medicaid providers?

09:12:59  14  A.   It does.

09:13:04  15  Q.   And does it also provide additional guidance regarding those

09:13:08  16  rules and how they apply to providers?

09:13:10  17  A.   Yes.

09:13:11  18  Q.   Brian, could you go to Section 1, the italicized language?

09:13:18  19        Mr. Bowen, are you familiar with this section of the

09:13:21  20  Texas Medicaid Providers Manual?

09:13:22  21  A.   I am.

09:13:25  22  Q.   And could you describe how it sets forth the rules and

09:13:29  23  require -- that are required for compliance with Texas Medicaid?

09:13:32  24  A.   Yes.  It specifies and refers to the Texas Administrative

09:13:37  25  Code sanctions language relevant to my oversight work that

09:13:44   1   requires providers to comply with all that's laid out in this

09:13:50   2   manual with regard to the delivery of healthcare services through

09:13:56   3   the Texas Medicaid program.

09:13:58   4   Q.   Does it also require compliance with accepted medical

09:14:01   5   community standards?

09:14:02   6   A.   It does.

09:14:07   7   Q.   Mr. Bowen, does the IG have statutory authority to take

09:14:11   8   enforcement measures against Texas Medicaid providers?

09:14:14   9   A.   We do.

09:14:16   10   Q.   Okay.  Could you describe the IG's -- describe generally the

09:14:21   11   IG's statutory authority for enforcement measures against

09:14:24   12   providers?

09:14:24   13   A.   Yes.  We have the authority to engage in audits,

09:14:32   14   investigations and inspections with regard to all funds delivered

09:14:37   15   for -- with the support of delivery of health and human services

09:14:42   16   in the state of Texas, and pursuant to that, we carry out a

09:14:48   17   variety of oversight activities.

09:14:51   18   Q.   Brian, could you bring up Defendants' Exhibit 11, which is

09:14:54   19   previously admitted into evidence?

09:14:56   20        Mr. Bowen, are you familiar with Section 371.1603 of

09:15:02   21   the Texas Administrative Code?

09:15:03   22   A.   Yes, I am.

09:15:04   23   Q.   And does this provision authorize the IG to take enforcement

09:15:08   24   measures, or an affiliate of a provider, based on an

09:15:11   25   investigation or finding?

| | | |
|---|---|---|
| 09:15:13 | 1 | A.   It does. |
| 09:15:15 | 2 | Q.   Brian, could you bring up Defendants' Exhibit 5? |
| 09:15:22 | 3 | Mr. Bowen, are you familiar with this Section 371.1703 |
| 09:15:28 | 4 | of the Texas Administrative Code? |
| 09:15:29 | 5 | A.   Yes, I am. |
| 09:15:30 | 6 | Q.   And does this section give the IG authority to remove or |
| 09:15:36 | 7 | dis-enroll a Texas Medicaid provider? |
| 09:15:37 | 8 | A.   It does. |
| 09:15:40 | 9 | Q.   Brian, could you bring up Defendants' Exhibit 5, which was |
| 09:15:45 | 10 | also previously admitted into evidence?  Sorry, we have that up, |
| 09:15:50 | 11 | so let's scroll down to Section C6. |
| 09:15:55 | 12 | Mr. Bowen, does this section also provide the |
| 09:16:01 | 13 | circumstances under which the IG is authorized to terminate the |
| 09:16:05 | 14 | enrollment of a provider? |
| 09:16:06 | 15 | A.   Yes, it does. |
| 09:16:07 | 16 | Q.   Okay. |
| 09:16:08 | 17 | THE COURT:  I don't want to interrupt you making a |
| 09:16:09 | 18 | record, but I don't think there's an issue that the state cannot |
| 09:16:20 | 19 | withdraw a provider.  I mean, that's pretty first-grade law. |
| 09:16:29 | 20 | It's the reasons for it and, you know, you're just spinning your |
| 09:16:34 | 21 | wheels.  I know, I will assume everybody in the audience knows, |
| 09:16:40 | 22 | that the state can un-enroll a provider. |
| 09:16:42 | 23 | MR. STEPHENS:  This is my last question on the |
| 09:16:44 | 24 | statutory. |
| 09:16:44 | 25 | THE COURT:  That just shows you how slow I'm getting in |

09:16:48  1   my old age.  Go ahead.

09:16:49  2              MR. STEPHENS:  I'll move quickly with the last

09:16:51  3   question.

09:16:52  4   Q.   (BY MR. STEPHENS) A Medicaid provider can be -- enrollment

09:16:55  5   could be terminated for a program violation; is that right?

09:16:58  6   A.   Yes.

09:16:58  7   Q.   And a Medicaid provider could also be terminated if the

09:17:03  8   provider commits an act to which sanctions, damages, penalties,

09:17:06  9   or liability could be assessed.

09:17:07  10  A.   That's right.

09:17:12  11  Q.   Is Planned Parenthood a Texas Medicaid provider?

09:17:15  12  A.   Yes.

09:17:15  13  Q.   And in carrying out the IG's mission, did you conduct a

09:17:19  14  review of Planned Parenthood's activities?

09:17:21  15  A.   I did.

09:17:21  16  Q.   Could you describe generally the IG's review of Planned

09:17:27  17  Parenthood's activities?

09:17:27  18  A.   Yes.  In the summer of 2015, late summer, I was reviewing

09:17:35  19  some outstanding audit findings regarding Planned Parenthood.

09:17:41  20             MR. WATKINS:  Your Honor, we object.  There a number of

09:17:43  21  Planned Parenthood entities, and I can't tell which one he's

09:17:45  22  talking about.  He can't just talk about Planned Parenthood.  He

09:17:47  23  needs to talk about one of those ID numbers that he's supposed to

09:17:51  24  be investigating.  So we object to this.

09:17:52  25             THE COURT:  So your objection is what?

| | | |
|---|---|---|
| 09:17:54 | 1 | MR. WATKINS:  That he has not identified who the |
| 09:17:56 | 2 | witness is testifying about. |
| 09:17:58 | 3 | THE COURT:  I sustain that.  You may do that. |
| 09:18:00 | 4 | Q.  (BY MR. STEPHENS) Okay.  Mr. Bowen, could you describe, did |
| 09:18:03 | 5 | the IG conduct a review of Planned Parenthood Gulf Coast? |
| 09:18:06 | 6 | A.  Yes. |
| 09:18:07 | 7 | Q.  And did the IG conduct a review of Planned Parenthood |
| 09:18:11 | 8 | Greater Texas? |
| 09:18:12 | 9 | A.  Yes, we did. |
| 09:18:12 | 10 | Q.  And did the IG conduct a review of Planned Parenthood South |
| 09:18:17 | 11 | Texas? |
| 09:18:17 | 12 | A.  Yes, we did. |
| 09:18:18 | 13 | Q.  Okay.  Could you describe for the Court the substance |
| 09:18:22 | 14 | generally of those reviews? |
| 09:18:23 | 15 | A.  Well, regarding those three, there were outstanding audit |
| 09:18:27 | 16 | findings that had been accomplished, and I was in the process of |
| 09:18:29 | 17 | reviewing them and pursuing -- reopening them when the evidence, |
| 09:18:41 | 18 | specifically, a videotape, the evidence in this case, a videotape |
| 09:18:45 | 19 | of the demonstrated -- that was evidence of program violations |
| 09:18:49 | 20 | came into the possession of the agency. |
| 09:18:51 | 21 | Q.  And did you -- has the IG reviewed that video? |
| 09:18:56 | 22 | A.  Yes, with my legal staff and -- yes, we did. |
| 09:19:03 | 23 | Q.  And what was the result of the IG's review of the video and |
| 09:19:08 | 24 | Planned Parenthood's activities? |
| 09:19:09 | 25 | A.  We concluded that the evidence contained in that -- |

| | | |
|---|---|---|
| 09:19:13 | 1 | MR. WATKINS:  Objection, your Honor.  I can't tell |
| 09:19:14 | 2 | which Planned Parenthood he's talking about.  They don't get to |
| 09:19:17 | 3 | just lump them all together.  Some people are on the video and |
| 09:19:20 | 4 | some aren't.  I need to know which Planned Parenthood entity he |
| 09:19:23 | 5 | is reviewing and auditing and trying to testify about. |
| 09:19:26 | 6 | THE COURT:  And I would like to know which tape you're |
| 09:19:31 | 7 | talking about.  Are you talking about the eight-hour tape? |
| 09:19:34 | 8 | THE WITNESS:  Yes, sir. |
| 09:19:35 | 9 | THE COURT:  That answers one question.  So if you're |
| 09:19:42 | 10 | talking about the audit, I want you to specify which entity.  As |
| 09:19:49 | 11 | far as the video's concerned, I'll let you testify, of course, |
| 09:19:57 | 12 | what you saw, what you did. |
| 09:19:59 | 13 | THE WITNESS:  Yes, sir. |
| 09:20:00 | 14 | THE COURT:  All right. |
| 09:20:00 | 15 | A.   I'm not addressing the audit at all now.  I'm just |
| 09:20:03 | 16 | addressing the video and in that video, as we know, it involves |
| 09:20:08 | 17 | Planned Parenthood Gulf Coast. |
| 09:20:20 | 18 | Q.   (BY MR. STEPHENS) Mr. Bowen, did you issue a final notice of |
| 09:20:23 | 19 | termination to -- terminating Planned Parenthood Gulf Coast's |
| 09:20:28 | 20 | enrollment in Texas Medicaid? |
| 09:20:29 | 21 | A.   I did. |
| 09:20:30 | 22 | Q.   And did you issue a final notice of termination, terminating |
| 09:20:34 | 23 | Planned Parenthood Greater Texas' enrollment in Texas Medicaid? |
| 09:20:38 | 24 | A.   I did. |
| 09:20:38 | 25 | Q.   And did you issue a final notice of termination, terminating |

| | | |
|---|---|---|
| 09:20:41 | 1 | Planned Parenthood South Texas' enrollment in Texas Medicaid? |
| 09:20:44 | 2 | A.   I did. |
| 09:20:46 | 3 | Q.   Brian, could you bring up a copy of Defendants' Exhibit 1? |
| 09:20:49 | 4 | THE COURT:  Okay.  Before you go, go back and give me |
| 09:20:53 | 5 | that list, Lily.  I got the last two. |
| 09:20:53 | 6 | COURT REPORTER:  Planned Parenthood Gulf Coast, Planned |
| 09:21:16 | 7 | Parenthood Greater Texas, and then, South Texas. |
| 09:21:16 | 8 | THE COURT:  You may proceed. |
| 09:21:18 | 9 | Q.   (BY MR. STEPHENS) Mr. Bowen, did you issue this final notice |
| 09:21:22 | 10 | of termination on December 20th, 2016? |
| 09:21:23 | 11 | A.   I did. |
| 09:21:24 | 12 | Q.   Does the final notice of termination at Defendants' Exhibit |
| 09:21:26 | 13 | 1 set forth the basis for your decision to terminate these |
| 09:21:31 | 14 | entities from Texas Medicaid? |
| 09:21:33 | 15 | A.   It does. |
| 09:21:33 | 16 | Q.   Brian, could you go to page 2, I believe the second |
| 09:21:40 | 17 | paragraph?  Sorry, the second full paragraph.  The one below |
| 09:21:47 | 18 | that. |
| 09:21:51 | 19 | THE COURT:  If it helps you, counsel, I've got it right |
| 09:21:53 | 20 | here, and I read it at least six times. |
| 09:21:57 | 21 | MR. STEPHENS:  Okay. |
| 09:21:57 | 22 | THE COURT:  As a matter of fact, if you'll notice, I've |
| 09:21:59 | 23 | underlined a lot of it.  And I only say that to help you on time. |
| 09:22:07 | 24 | Okay. |
| 09:22:09 | 25 | Q.   (BY MR. STEPHENS) Mr. Bowen, in the letter -- in the |

| 09:22:12 | 1 | paragraph highlighted from this letter, you indicate that you |
|---|---|---|
| 09:22:15 | 2 | relied on the video; is that correct? |
| 09:22:17 | 3 | A.   That's right. |
| 09:22:18 | 4 | Q.   And you also indicate that you consulted with the IG's Chief |
| 09:22:22 | 5 | Medical Officer; is that right? |
| 09:22:24 | 6 | A.   That's correct. |
| 09:22:27 | 7 | Q.   Who is the IG's Chief Medical Officer? |
| 09:22:29 | 8 | A.   Dr. Ted Spears. |
| 09:22:31 | 9 | Q.   And what is his role at the IG? |
| 09:22:33 | 10 | A.   He is the chief advisor on all medical issues with regard to |
| 09:22:40 | 11 | the execution of our oversight program. |
| 09:22:43 | 12 | THE COURT:  And spell his last name. |
| 09:22:45 | 13 | THE WITNESS:  S-P-E-A-R-S. |
| 09:22:50 | 14 | THE COURT:  Thank you. |
| 09:22:51 | 15 | THE WITNESS:  You're welcome. |
| 09:22:52 | 16 | Q.   (BY MR. STEPHENS) Why did you consult with Dr. Spears in the |
| 09:22:55 | 17 | course of your review of the video and other evidence? |
| 09:22:59 | 18 | A.   That's our standard operating procedure.  He is the chief |
| 09:23:02 | 19 | advisor on medical issues such as these regarding program -- |
| 09:23:06 | 20 | potential program violations. |
| 09:23:07 | 21 | Q.   Did you ask Dr. Spears to watch the video referenced in this |
| 09:23:12 | 22 | paragraph of your letter? |
| 09:23:13 | 23 | A.   I did. |
| 09:23:14 | 24 | Q.   And do you know whether Dr. Spears watched the full video |
| 09:23:17 | 25 | referenced in this letter? |

| | | |
|---|---|---|
| 09:23:18 | 1 | A.   He did. |
| 09:23:18 | 2 | Q.   Did Dr. Spears give you his opinion regarding what he saw on |
| 09:23:27 | 3 | the video? |
| 09:23:28 | 4 | A.   Yes, he did. |
| 09:23:30 | 5 | THE COURT:  That answers the question. |
| 09:23:33 | 6 | Q.   (BY MR. STEPHENS) Did Dr. Spears' opinion inform your |
| 09:23:36 | 7 | decision that Planned Parenthood had violated medical and ethical |
| 09:23:40 | 8 | standards? |
| 09:23:40 | 9 | A.   It did. |
| 09:23:41 | 10 | Q.   Okay.  How did it inform your decision? |
| 09:23:45 | 11 | A.   Well, he is a doctor of long -- many years good standing, |
| 09:23:50 | 12 | over 30 years of practice here in Texas.  He is aware of and |
| 09:23:57 | 13 | understands the required medical and ethical standards of |
| 09:24:01 | 14 | practice in the state of Texas and thus, is qualified to offer |
| 09:24:08 | 15 | and advise -- offer his opinion and advise me on issues like |
| 09:24:11 | 16 | this. |
| 09:24:11 | 17 | MR. WATKINS:  Objection, your Honor.  It would be for |
| 09:24:13 | 18 | the Court to determine whether he's qualified to give an opinion. |
| 09:24:16 | 19 | THE COURT:  Well, that dawned on me when he said that, |
| 09:24:18 | 20 | but we'll just consider it. |
| 09:24:24 | 21 | Q.   (BY MR. STEPHENS) Mr. Bowen, have you reviewed the video |
| 09:24:27 | 22 | that is listed as Defendants' Exhibit 2? |
| 09:24:30 | 23 | A.   Yes. |
| 09:24:32 | 24 | Q.   And is the video listed as Defendants' Exhibit 2 the video |
| 09:24:36 | 25 | that is referred to in your December 20, 2016 final notice of |

09:24:40  1   termination letter?

09:24:41  2   A.    It is.

09:24:44  3   Q.    And is the video listed as Defendants' Exhibit 2 the video

09:24:49  4   that you relied on and cited in your letter as evidence that

09:24:52  5   Planned Parenthood violated accepted medical and ethical

09:24:56  6   standards?

09:24:56  7   A.    Yes.

09:24:58  8   Q.    Approximately how long is the video, listed as Defendants'

09:25:01  9   Exhibit 2, in reference to this letter?

09:25:02  10  A.    About eight-and-a-half hours.

09:25:05  11  Q.    And how many times did you watch the full video listed as

09:25:08  12  Defendants' Exhibit 2?

09:25:08  13  A.    Five times.  Sorry, five times.  And I've read a transcript

09:25:12  14  of it that many times, as well.

09:25:15  15  Q.    When you watched the video that's listed as Defendants'

09:25:19  16  Exhibit 2, did you see anything in the video that caused you to

09:25:22  17  question whether the video was a true and accurate reflection of

09:25:25  18  the events shown in the video?

09:25:27  19  A.    No, I didn't --

09:25:28  20        MR. WATKINS:  Objection, your Honor.  I don't think the

09:25:30  21  witness is qualified to determine whether or not a video is

09:25:33  22  adequate or accurate, or not.  I mean, that calls for special

09:25:36  23  testing, and he hasn't testified that he knows anything about

09:25:39  24  testing videos.

09:25:40  25        THE COURT:  He's not offered as an expert.  His

09:25:44   1   question is, did you see anything, and he said he did not see

09:25:46   2   anything.  That does not mean it was not there.  I suspect that

09:25:52   3   an expert could render a different opinion one way or the other.

09:25:56   4   But he has the right to testify what he saw.  Go ahead.

09:26:02   5   Q.   (BY MR. STEPHENS) Mr. Bowen, was there evidence in the video

09:26:06   6   that you relied on for purposes of your conclusion that the video

09:26:12   7   was a true and accurate reflection of the events depicted in the

09:26:17   8   video?

09:26:18   9   A.   Yes.

09:26:19   10   Q.   Okay.  And could you describe for the Court what you saw?

09:26:21   11          MR. WATKINS:  Same objection, your Honor.

09:26:23   12          THE COURT:  I sustain the objection and strike the

09:26:25   13   answer.

09:26:26   14   Q.   (BY MR. STEPHENS) Mr. Bowen, could you describe for the

09:26:29   15   Court what you saw in the video that demonstrated to you that it

09:26:33   16   was -- or what it demonstrated to you as to where the video was

09:26:37   17   taken?

09:26:38   18   A.   Yes.  At the outset of the video, it reveals the arrival of

09:26:48   19   the videographer at Planned Parenthood Gulf Coast, as you see,

09:26:54   20   the front of the building, it's marked.  The door is marked with

09:27:01   21   Planned Parenthood Gulf Coast and Planned Parenthood Center for

09:27:07   22   Choice, all the indicia that it's authentic with regard to it

09:27:12   23   being an actual video of that location and what's occurring

09:27:17   24   within that building substantiated in the video.

09:27:22   25   Q.   Did you see in the video employees introduce themselves?

| | | |
|---|---|---|
| 09:27:28 | 1 | A.   I did. |
| 09:27:29 | 2 | Q.   Okay.  And did they state their names on the video? |
| 09:27:32 | 3 | A.   They did. |
| 09:27:32 | 4 | Q.   And were you in the courtroom yesterday when Melissa Farrell |
| 09:27:36 | 5 | testified? |
| 09:27:36 | 6 | A.   I was. |
| 09:27:37 | 7 | Q.   Was -- and you saw Melissa Farrell? |
| 09:27:40 | 8 | A.   Yes. |
| 09:27:40 | 9 | Q.   And is that the same person that you saw in the video? |
| 09:27:44 | 10 | A.   Yes, it was.  It -- yes. |
| 09:27:50 | 11 | Q.   Do you recall whether Ms. Farrell introduced herself as the |
| 09:27:54 | 12 | director of research in the video? |
| 09:27:55 | 13 | A.   I do. |
| 09:27:56 | 14 | Q.   And do you recall her testimony yesterday saying that she's |
| 09:28:00 | 15 | the director of research at Planned Parenthood Gulf Coast? |
| 09:28:01 | 16 | A.   I do. |
| 09:28:05 | 17 | Q.   Judge, I would like to offer into evidence Defendants' |
| 09:28:08 | 18 | Exhibit 2, the video relied on by Mr. Bowen. |
| 09:28:12 | 19 | MR. WATKINS:  May I take the witness on voir dire for a |
| 09:28:14 | 20 | moment, your Honor? |
| 09:28:15 | 21 | THE COURT:  You may. |
| 09:28:16 | 22 | VOIR DIRE EXAMINATION |
| 09:28:17 | 23 | BY MR. WATKINS: |
| 09:28:17 | 24 | Q.   Exhibit 2 -- let me hand you Exhibit 2 that we're talking |
| 09:28:42 | 25 | about.  Now, do you know the dates and times when each of those |

| | | |
|---|---|---|
| 09:28:47 | 1 | videos was recorded? |
| 09:28:57 | 2 | A.   I recall I believe it was April 15, but I don't know the |
| 09:29:02 | 3 | precise times.  I remember in watching the video that there is a |
| 09:29:07 | 4 | date and timestamp that is chronologically synchronous from each |
| 09:29:16 | 5 | of these clips. |
| 09:29:18 | 6 | Q.   There are 17 videos identified on this list? |
| 09:29:23 | 7 | A.   That's correct. |
| 09:29:24 | 8 | Q.   Is it your testimony that all 17 of those were all taken the |
| 09:29:27 | 9 | same day? |
| 09:29:27 | 10 | A.   Yes. |
| 09:29:28 | 11 | Q.   Okay.  And did you take all 17 -- |
| 09:29:30 | 12 | A.   Well, I should say -- yes, yes, yes. |
| 09:29:33 | 13 | Q.   And if you take all 17 of these together, you get the |
| 09:29:37 | 14 | eight-and-a-half hours that you've talked about. |
| 09:29:38 | 15 | A.   Yes, sir. |
| 09:29:38 | 16 | Q.   Did you watch any other videos other than these 17? |
| 09:29:45 | 17 | A.   No.  These are the ones from the exhibits. |
| 09:29:49 | 18 | Q.   You didn't see any on YouTube? |
| 09:29:52 | 19 | A.   Well, I did see some on YouTube, but that's not what I |
| 09:29:56 | 20 | relied on for this letter. |
| 09:29:58 | 21 | Q.   And you're telling -- |
| 09:29:59 | 22 |       THE COURT:  Whoa, whoa.  You know, you've impressed me |
| 09:30:05 | 23 | as great background and smart, but when he said, did you see any |
| 09:30:11 | 24 | others, you should have caught on to this other. |
| 09:30:15 | 25 |       THE WITNESS:  Yes, sir.  You're right.  You're right. |

| | | |
|---|---|---|
| 09:30:16 | 1 | I didn't see any others that informed my decision. |
| 09:30:21 | 2 | THE COURT:  Okay.  Well -- |
| 09:30:22 | 3 | THE WITNESS:  That's what I should say. |
| 09:30:23 | 4 | THE COURT:  I suspect that the lawyer would ask you |
| 09:30:25 | 5 | that. |
| 09:30:26 | 6 | THE WITNESS:  Yes.  I did not see -- I did not rely on |
| 09:30:28 | 7 | any other videos for my decision. |
| 09:30:30 | 8 | THE COURT:  Now, let me tell you, you're not in charge |
| 09:30:35 | 9 | of the question. |
| 09:30:36 | 10 | THE WITNESS:  Yes, sir. |
| 09:30:37 | 11 | THE COURT:  Have you ever testified before? |
| 09:30:39 | 12 | THE WITNESS:  Yes, I have. |
| 09:30:39 | 13 | THE COURT:  I thought you had.  You know, they're in |
| 09:30:41 | 14 | charge of the questioning. |
| 09:30:42 | 15 | THE WITNESS:  Yes, sir. |
| 09:30:42 | 16 | THE COURT:  All right.  Just answer the question.  All |
| 09:30:45 | 17 | right. |
| 09:30:49 | 18 | Q.   (BY MR. WATKINS) I believe in your designation, did you not |
| 09:30:53 | 19 | state that watching the videos animated your decision? |
| 09:30:57 | 20 | A.   Yes, sir. |
| 09:30:58 | 21 | Q.   Okay.  Did anything that you watched on YouTube animate your |
| 09:31:02 | 22 | decision? |
| 09:31:03 | 23 | A.   No. |
| 09:31:03 | 24 | Q.   So it didn't bother you what you saw on YouTube.  You just |
| 09:31:07 | 25 | relied on this. |

09:31:08  1   A.   That's right.

09:31:09  2   Q.   And the first one you ever looked at was one of these

09:31:12  3   eight -- or one of the 17 on this page.  You didn't look at the

09:31:15  4   YouTube first, you didn't look at any other versions of those

09:31:18  5   videotapes, but five the time you looked at the one that animated

09:31:22  6   your decision.

09:31:24  7   A.   That's right.

09:31:25  8   Q.   Okay.  No further questions, your Honor.

09:31:27  9            THE COURT:  Do you have any objection to 2?

09:31:31  10           MR. WATKINS:  Well, we have objection based -- yes,

09:31:37  11  sir.  We have objections based on the lack of validity if he's --

09:31:44  12           THE COURT:  Validity, this is the testimony it's

09:31:47  13  something that he saw and formed the basis of his decision.  So I

09:31:52  14  don't think you can dream of a good enough objection to keep it

09:31:56  15  out.

09:31:57  16           MR. WATKINS:  Well, the question is --

09:31:58  17           THE COURT:  It's being tendered right now for something

09:32:01  18  he saw and was the basis of his opinion.

09:32:06  19           MR. WATKINS:  Our objection would be -- and I

09:32:07  20  understand what's going to happen to it.  Our objection is --

09:32:09  21           THE COURT:  So let's stop wasting time.

09:32:11  22           MR. WATKINS:  Yes, sir.

09:32:12  23           THE COURT:  All right.  I overrule any objection.  To

09:32:14  24  is in as -- 2 is in as something that he saw and made a

09:32:22  25  determination on.  Doesn't have anything to do with.

| | | |
|---|---|---|
| 09:32:44 | 1 | MR. STEPHENS:  Brian, could you bring up Defendants' |
| 09:32:46 | 2 | Exhibit 1? |
| 09:32:46 | 3 | THE COURT:  How is 2 going to be tendered? |
| 09:32:51 | 4 | MR. STEPHENS:  It's on a thumb drive. |
| 09:32:53 | 5 | THE CLERK:  I have it. |
| 09:32:54 | 6 | MR. STEPHENS:  It's on that.  I think that's called a |
| 09:32:56 | 7 | thumb drive. |
| 09:32:57 | 8 | THE COURT:  Beat me.  Okay. |
| 09:32:57 | 9 | DIRECT EXAMINATION (Resumed) |
| 09:33:03 | 10 | BY MR. STEPHENS: |
| 09:33:03 | 11 | Q.   Brian, could you go to page 2? |
| 09:33:13 | 12 | Mr. Bowen, in the final notice of termination letter -- |
| 09:33:17 | 13 | MR. WATKINS:  Your Honor, I'm going to make an |
| 09:33:19 | 14 | objection to if we're not going to look at it.  In other words, I |
| 09:33:23 | 15 | don't think they get to just stick the video into the record and |
| 09:33:25 | 16 | we don't know what parts they're relying on or what parts he |
| 09:33:28 | 17 | relied opinion.  And if they're going to offer eight-and-a-half |
| 09:33:30 | 18 | hours worth of video, I don't think we can do anything with it |
| 09:33:34 | 19 | unless we see the eight-and-a-half hours he looked at. |
| 09:33:37 | 20 | MR. STEPHENS:  The entire footage? |
| 09:33:40 | 21 | THE COURT:  The questions that the state wants to ask |
| 09:33:45 | 22 | are the state's questions.  Your objection is a statement, and I |
| 09:33:54 | 23 | overrule the statement.  You have full powers of |
| 09:33:57 | 24 | cross-examination and to show whatever erroneous reliance he may |
| 09:34:06 | 25 | have had.  I fear that I'm going to have to look at this eight |

| | | |
|---|---|---|
| 09:34:12 | 1 | hours.  So you might just assume that we're going to look at |
| 09:34:17 | 2 | eight hours. |
| 09:34:18 | 3 | MR. WATKINS:  All right. |
| 09:34:19 | 4 | THE COURT:  But, you know, I can't foresee what's going |
| 09:34:28 | 5 | to happen tomorrow, or the next day, or the next day.  But you |
| 09:34:33 | 6 | can cross-examine him.  He's already said that he relied on the |
| 09:34:39 | 7 | -- and I suspect he knows the history of that, or part of it, in |
| 09:34:43 | 8 | any event.  It's been all over the papers and I am aware of it, |
| 09:34:49 | 9 | too.  Just as Will Rogers said, I read it. |
| 09:34:53 | 10 | MR. WATKINS:  My objection, your Honor, is |
| 09:34:54 | 11 | specifically, they've got eight hours of time.  They've got |
| 09:34:57 | 12 | seven-and-a-half hours.  I don't think they get to use what's in |
| 09:35:00 | 13 | the eight hours of tape unless we watch it as part of their |
| 09:35:03 | 14 | seven-and-a-half hours.  That's what I've been thinking the whole |
| 09:35:05 | 15 | time.  And if the testimony is, he looked at the eight hours and |
| 09:35:10 | 16 | that formed his opinion and they've now offered the eight hours |
| 09:35:13 | 17 | into evidence, I don't see how we can do anything with it unless |
| 09:35:16 | 18 | we watch the eight hours as a part of their seven-and-a-half. |
| 09:35:18 | 19 | THE COURT:  Okay.  Well, you can make that argument. |
| 09:35:21 | 20 | MR. WATKINS:  Yes, sir. |
| 09:35:24 | 21 | THE COURT:  You can also cross it and find out exactly |
| 09:35:27 | 22 | what he relied on and what he didn't. |
| 09:35:32 | 23 | Q.  (BY MR. STEPHENS) Mr. Bowen, in your final notice of |
| 09:35:34 | 24 | termination letter, you state that you relied on the video, |
| 09:35:37 | 25 | Defendants' Exhibit 2, right? |

| | | |
|---|---|---|
| 09:35:38 | 1 | A.   That's right. |
| 09:35:39 | 2 | Q.   Okay.  Do you recall specific parts of the video that's |
| 09:35:43 | 3 | marked as Defendants' Exhibit 2 that demonstrated a history or |
| 09:35:49 | 4 | willingness to alter abortion procedures to procure fetal tissue? |
| 09:35:53 | 5 | A.   I do. |
| 09:35:53 | 6 | Q.   Mr. Bowen, I would like to show you part of the video marked |
| 09:36:01 | 7 | as Defendants' Exhibit 2, admitted as Defendants' Exhibit 2. |
| 09:36:06 | 8 | Brian, could you go to 7:59:02? |
| 09:36:11 | 9 | (Audio and video file played.) |
| 09:37:56 | 10 | Q.   Mr. Bowen, did you rely on that portion of the video? |
| 09:37:59 | 11 | A.   Yes, I did. |
| 09:38:00 | 12 | Q.   As the basis for your decision to terminate Planned |
| 09:38:03 | 13 | Parenthood's enrollment? |
| 09:38:03 | 14 | A.   Yes. |
| 09:38:04 | 15 | THE COURT:  Now, how are you going to identify that, |
| 09:38:08 | 16 | that one section? |
| 09:38:11 | 17 | MR. STEPHENS:  It's the timestamp, which I read into |
| 09:38:15 | 18 | the record, which is at 7:59:02. |
| 09:38:21 | 19 | THE COURT:  And when did it finish? |
| 09:38:23 | 20 | MR. STEPHENS:  At 8:00:43. |
| 09:38:28 | 21 | MR. WATKINS:  I'm sorry, say again. |
| 09:38:30 | 22 | MR. STEPHENS:  8:00:43. |
| 09:38:32 | 23 | MR. WATKINS:  Thank you. |
| 09:38:36 | 24 | THE COURT:  Okay.  The next one that you're going to |
| 09:38:42 | 25 | use, let's do the opening and conclusion. |

09:38:47  1          MR. STEPHENS:  Okay.  So each one, I'll identify at the

09:38:49  2    outset by the timestamp.

09:38:51  3          THE COURT:  Thank you.

09:38:52  4    Q.  (BY MR. STEPHENS) Brian, could you please bring up 8:00:54

09:38:58  5    to 8:01:50?

09:39:03  6          (Audio and video file played.)

09:40:06  7    Q.  Mr. Bowen, did you rely on that footage, as well?

09:40:08  8    A.  I did.

09:40:09  9    Q.  Brian, could you bring up 13:56:54 through 13:59:10?

09:40:22  10         (Audio and video file played.)

09:42:43  11   Q.  Mr. Bowen, is that also footage from Defendants' Exhibit 2

09:42:46  12   that you relied on?

09:42:49  13   A.  Yes, it is.

09:42:52  14   Q.  Brian, could you bring up 14:03:11 through 14:03:50 from

09:43:00  15   Defendants' Exhibit 2?

09:43:01  16         (Audio and video file played.)

09:43:40  17   Q.  Mr. Bowen, is that also footage from the video that you

09:43:44  18   relied on?

09:43:45  19   A.  Yes, it is.

09:43:46  20   Q.  Brian, could you bring up 14:17:03 through 14:17:55?

09:43:56  21         (Audio and video file played.)

09:44:52  22   Q.  Mr. Bowen, is that also footage that you relied on?

09:44:56  23   A.  Yes, it is.

09:45:00  24   Q.  Brian, could you bring up 14:20:10 through 14:20:56 from

09:45:07  25   Defendants' Exhibit 2?

| | | |
|---|---|---|
| 09:45:08 | 1 | (Audio and video file played.) |
| 09:45:59 | 2 | Q.   Mr. Bowen, is that also video footage that you relied on as |
| 09:46:04 | 3 | the basis for your final notice of termination letter? |
| 09:46:06 | 4 | A.   Yes, it is. |
| 09:46:08 | 5 | Q.   And Brian, could you bring up 14:24:57 through 14:25:26? |
| 09:46:29 | 6 | (Audio and video file played.) |
| 09:46:49 | 7 | Q.   Mr. Bowen, are those video clips that you relied on as the |
| 09:46:56 | 8 | basis for your decision that Planned Parenthood had altered |
| 09:47:01 | 9 | abortion procedures for research purposes? |
| 09:47:03 | 10 | A.   Yes. |
| 09:47:08 | 11 | Q.   And in the final notice of termination, you stated that |
| 09:47:10 | 12 | altering abortion procedures for research purposes violates |
| 09:47:14 | 13 | accepted medical and ethical standards; is that right? |
| 09:47:16 | 14 | A.   That's right. |
| 09:47:17 | 15 | Q.   And how did you reach your conclusion that altering abortion |
| 09:47:21 | 16 | standards -- abortion procedures violates accepted medical and |
| 09:47:27 | 17 | ethical standards? |
| 09:47:28 | 18 | A.   First, it violates the standards of -- expected of providers |
| 09:47:33 | 19 | in Texas pursuant to Dr. Ted Spears' opinion in this case.  It's |
| 09:47:38 | 20 | buttressed by federal law, which provides standards regarding |
| 09:47:43 | 21 | this, as well, a federal statute addressing fetal -- the fetal |
| 09:47:49 | 22 | tissue research area states exactly what -- exactly the standard. |
| 09:47:58 | 23 | Q.   Did federal law inform your judgment that altering abortion |
| 09:48:04 | 24 | procedures violates accepted medical and ethical standards? |
| 09:48:07 | 25 | A.   Yes, it did. |

| | | |
|---|---|---|
| 09:48:09 | 1 | Q.   Mr. Bowen, did you see evidence in the video, admitted as |
| 09:48:14 | 2 | Defendants' Exhibit 2, that researchers had performed abortions |
| 09:48:17 | 3 | at Planned Parenthood for the purpose of procuring fetal tissue |
| 09:48:20 | 4 | for their own research? |
| 09:48:22 | 5 | A.   I did. |
| 09:48:24 | 6 | Q.   Brian, could you bring up 8:04:08 through 8:05:35? |
| 09:48:33 | 7 | (Audio and video file played.) |
| 09:50:07 | 8 | Q.   Mr. Bowen, is that footage you relied on for your conclusion |
| 09:50:10 | 9 | that the video indicated that researchers had also performed |
| 09:50:14 | 10 | abortions at Planned Parenthood to procure fetal tissue for their |
| 09:50:18 | 11 | own research? |
| 09:50:18 | 12 | A.   Yes. |
| 09:50:20 | 13 | Q.   Brian, could you bring up 9:46:56 through 9:48:30? |
| 09:50:44 | 14 | (Audio and video file played.) |
| 09:51:29 | 15 | Q.   Mr. Bowen, did you also rely on the footage we just saw? |
| 09:51:33 | 16 | A.   Yes, I did. |
| 09:51:36 | 17 | Q.   Brian, could you bring up 14:30:19 through 14:30:59? |
| 09:51:59 | 18 | (Audio and video file played.) |
| 09:53:28 | 19 | Q.   Mr. Bowen, did the individual video clips we just saw inform |
| 09:53:33 | 20 | your judgment that Planned Parenthood violated accepted medical |
| 09:53:38 | 21 | and ethical standards? |
| 09:53:39 | 22 | A.   Yes, they did. |
| 09:53:39 | 23 | Q.   And did federal law inform your judgment that Planned |
| 09:53:42 | 24 | Parenthood violated medical and ethical standards by researchers |
| 09:53:46 | 25 | performing abortions to obtain fetal tissue for their own |

| | | |
|---|---|---|
| 09:53:49 | 1 | research? |
| 09:53:49 | 2 | A.   Yes, it did. |
| 09:53:53 | 3 | Q.   Mr. Bowen, in your final termination letter, you also |
| 09:53:56 | 4 | indicated that Planned Parenthood may be procuring fetal tissue |
| 09:54:00 | 5 | for valuable consideration.  Do you recall that? |
| 09:54:02 | 6 | A.   Yes. |
| 09:54:04 | 7 | Q.   What did you see in the video that indicated to you that |
| 09:54:08 | 8 | Planned Parenthood may be procuring fetal tissue for valuable |
| 09:54:11 | 9 | consideration? |
| 09:54:12 | 10 | A.   There were a number of exchanges in the course of the video |
| 09:54:18 | 11 | regarding remuneration for -- |
| 09:54:20 | 12 |         MR. WATKINS:  We object to this testimony because |
| 09:54:22 | 13 | there's nothing in the termination letter that talks about making |
| 09:54:27 | 14 | money, not being reimbursed.  That's not one of the grounds they |
| 09:54:31 | 15 | put in the termination letter; therefore, it's irrelevant. |
| 09:54:35 | 16 |         MR. STEPHENS:  I could bring up the termination letter. |
| 09:54:38 | 17 |         THE COURT:  I've read it several times.  Do you have |
| 09:54:41 | 18 | anything other than I can bring it up? |
| 09:54:42 | 19 |         MR. STEPHENS:  It says, potentially for valuable |
| 09:54:44 | 20 | consideration.  That was my question. |
| 09:54:49 | 21 |         THE COURT:  Well, I'll permit the answer. |
| 09:54:52 | 22 | A.   Yes.  There -- |
| 09:54:53 | 23 |         MR. WATKINS:  I'll object to the exhibit, Judge. |
| 09:55:25 | 24 |         I stand corrected, your Honor.  It's on page -- |
| 09:55:27 | 25 |         THE COURT:  I've already overruled the objection.  But |

| | | |
|---|---|---|
| 09:55:29 | 1 | I do like it in the record that you stand up. |
| 09:55:33 | 2 | MR. WATKINS:  Okay.  A little bit. |
| 09:55:36 | 3 | Q.   (BY MR. STEPHENS) Mr. Bowen, what did you see in the video |
| 09:55:39 | 4 | that indicated to you a willingness to procure fetal tissue for |
| 09:55:44 | 5 | valuable consideration? |
| 09:55:46 | 6 | A.   The term "financially beneficial" was repeatedly brought up |
| 09:55:50 | 7 | in the course of the dialogue.  And there were discussions about |
| 09:55:56 | 8 | how this engaging in this agreement might be financially |
| 09:56:03 | 9 | beneficial for Planned Parenthood Gulf Coast, and the fact that |
| 09:56:08 | 10 | that was an issue that the board was pushing and, indeed, there |
| 09:56:15 | 11 | was interest from Planned Parenthood Federation of America to |
| 09:56:18 | 12 | pursue such activities that were financially beneficial.  That |
| 09:56:26 | 13 | was the phrase. |
| 09:56:27 | 14 | Q.   Mr. Bowen, in your letter, you also indicated that you |
| 09:56:31 | 15 | relied on materials provided to the state by the United States |
| 09:56:36 | 16 | House of Representatives Select Investigative Panel; is that |
| 09:56:38 | 17 | right? |
| 09:56:38 | 18 | A.   That's right. |
| 09:56:41 | 19 | Q.   I'd like to show you a document of Defendants' Exhibit 68. |
| 09:56:51 | 20 | Mr. Bowen, are you familiar with this document? |
| 09:56:54 | 21 | A.   I am. |
| 09:56:55 | 22 | Q.   Could you describe this document for the Court? |
| 09:56:59 | 23 | A.   This was a referral from that House committee regarding |
| 09:57:03 | 24 | their investigation of these issues. |
| 09:57:06 | 25 | Q.   And what is the date of this document? |

| | | |
|---|---|---|
| 09:57:07 | 1 | A.    December 1st, 2016. |
| 09:57:10 | 2 | Q.    And did you receive a copy of this document? |
| 09:57:13 | 3 | A.    I did. |
| 09:57:14 | 4 | Q.    Did you review it? |
| 09:57:15 | 5 | A.    I did. |
| 09:57:16 | 6 | Q.    And is this the document that was cited in your December 20, |
| 09:57:21 | 7 | 2016 final notice of termination letter? |
| 09:57:24 | 8 | A.    Yes. |
| 09:57:26 | 9 | Q.    Your Honor, we offer -- state offers Defendants' Exhibit 68 |
| 09:57:32 | 10 | into evidence. |
| 09:57:32 | 11 | MR. WATKINS:  No objection. |
| 09:57:33 | 12 | THE COURT:  Received. |
| 09:57:36 | 13 | Q.    (BY MR. STEPHENS) Brian, could you bring up Defendants' |
| 09:57:40 | 14 | Exhibit 61? |
| 09:57:42 | 15 | Mr. Bowen, are you familiar with this document? |
| 09:57:44 | 16 | A.    I am. |
| 09:57:45 | 17 | Q.    And could you describe for the Court this document? |
| 09:57:51 | 18 | A.    This is the cover sheet to the Select Investigative Panel |
| 09:57:56 | 19 | report. |
| 09:57:58 | 20 | Q.    And, Brian, could you scroll down through the document |
| 09:58:04 | 21 | quickly?  To the last page. |
| 09:58:14 | 22 | Mr. Bowen, do you know how long this document is? |
| 09:58:18 | 23 | A.    Do I know how long it is? |
| 09:58:20 | 24 | Q.    How many pages? |
| 09:58:22 | 25 | A.    You have page 413 there.  Yes. |

| | | |
|---|---|---|
| 09:58:25 | 1 | Q.   And is this a document that you've reviewed? |
| 09:58:27 | 2 | A.   It is. |
| 09:58:29 | 3 | Q.   Your Honor, the state offers Defendants' Exhibit 61 into |
| 09:58:32 | 4 | evidence. |
| 09:58:39 | 5 | MR. WATKINS:  No objection if it's offered for the |
| 09:58:41 | 6 | purposes of something he reviewed. |
| 09:58:44 | 7 | THE COURT:  It's received. |
| 09:58:51 | 8 | Q.   (BY MR. STEPHENS) Mr. Bowen, in Defendants' Exhibit 1, the |
| 09:58:54 | 9 | final notice of termination letter, you also reference evidence |
| 09:58:57 | 10 | of misrepresentations uncovered by the United States House of |
| 09:59:02 | 11 | Representatives Select Investigative Panel. |
| 09:59:04 | 12 | A.   That's right. |
| 09:59:08 | 13 | Q.   Could you describe for the Court the nature of those |
| 09:59:11 | 14 | misrepresentations as referred to in your letter? |
| 09:59:15 | 15 | A.   Yes.  The report documents a visit by the Texas Ranger to |
| 09:59:22 | 16 | Planned Parenthood Gulf Coast discussions regarding contracting |
| 09:59:26 | 17 | activity between Planned Parenthood Gulf Coast and the Baylor |
| 09:59:30 | 18 | College of Medicine for the procurement of fetal tissue.  And the |
| 09:59:36 | 19 | Texas Ranger was told that the independent review board at Baylor |
| 09:59:42 | 20 | College of Medicine had not approved the offer from Planned |
| 09:59:48 | 21 | Parenthood Gulf Coast regarding engaging in fetal tissue |
| 09:59:52 | 22 | procurement.  That was not accurate. |
| 09:59:58 | 23 | Q.   Brian, could you bring up Defendants' Exhibit 79? |
| 10:00:06 | 24 | Mr. Bowen, is this a document that you reviewed and |
| 10:00:10 | 25 | relied on? |

| | | |
|---|---|---|
| 10:00:11 | 1 | A.   Yes, it is. |
| 10:00:14 | 2 | Q.   And could you read the subject line of this document? |
| 10:00:19 | 3 | A.   Pediatrics research proposal, Dr. Paust, Baylor College of |
| 10:00:24 | 4 | Medicine IRB approval obtained. |
| 10:00:26 | 5 | Q.   Your Honor, the state would offer Defendants' Exhibit 79 |
| 10:00:30 | 6 | into evidence. |
| 10:00:31 | 7 |         MR. WATKINS:  No objection. |
| 10:00:33 | 8 |         THE COURT:  It's received. |
| 10:00:34 | 9 | Q.   (BY MR. STEPHENS) Brian, could you scroll up the top of this |
| 10:00:37 | 10 | document? |
| 10:00:39 | 11 |         Mr. Bowen, could you describe the top e-mail as it |
| 10:00:43 | 12 | relates to the e-mail that you had just read the subject line |
| 10:00:47 | 13 | from? |
| 10:00:48 | 14 | A.   It's a response from Melissa Farrell at Planned Parenthood |
| 10:00:53 | 15 | Gulf Coast thanking Dr. Parikh for the news that the IRB had |
| 10:00:58 | 16 | approved the agreement. |
| 10:01:02 | 17 | Q.   Brian, could you go to Defendants' Exhibit 81 at page 4? |
| 10:01:12 | 18 |         Mr. Bowen, are you familiar with this document? |
| 10:01:16 | 19 | A.   I am. |
| 10:01:16 | 20 | Q.   Is this also a document that you reviewed and relied on as a |
| 10:01:19 | 21 | basis or as referenced in your December 20, 2016 final notice of |
| 10:01:24 | 22 | termination letter? |
| 10:01:25 | 23 | A.   It is. |
| 10:01:31 | 24 | Q.   Brian, could you focus on 3.17? |
| 10:01:36 | 25 |         Mr. Bowen, could you describe what you read in this |

| | | |
|---|---|---|
| 10:01:41 | 1 | report as it relates to the e-mails that we just saw? |
| 10:01:48 | 2 | A.   It is -- it's part of the Ranger's report and I think the -- |
| 10:01:59 | 3 | summarizing his interview with the representative from Gulf |
| 10:02:07 | 4 | Coast.  And the last sentence is -- he was told that the |
| 10:02:11 | 5 | institutional review board had not yet given approval for the |
| 10:02:14 | 6 | Baylor or Rice studies. |
| 10:02:17 | 7 | Q.   Okay.  When you stated in your December 20, 2016 letter that |
| 10:02:22 | 8 | evidence uncovered by the United States House of Representatives |
| 10:02:25 | 9 | Select Investigative Panel regarding misrepresentations supported |
| 10:02:30 | 10 | your decision, is this the document you were referring to? |
| 10:02:35 | 11 | A.   It is. |
| 10:02:36 | 12 | Q.   And was Defendants' Exhibit 79 also a document that you were |
| 10:02:40 | 13 | referring to? |
| 10:02:40 | 14 | A.   Yes. |
| 10:02:43 | 15 | Q.   Your Honor, the state would offer Defendants' Exhibit 81 |
| 10:02:45 | 16 | into evidence. |
| 10:02:46 | 17 | MR. WATKINS:  No objection. |
| 10:02:47 | 18 | THE COURT:  Received. |
| 10:02:49 | 19 | Q.   (BY MR. STEPHENS) Mr. Bowen, did you see anything in the |
| 10:03:00 | 20 | video, admitted as Defendants' Exhibit 2, that demonstrated that |
| 10:03:04 | 21 | Planned Parenthood Gulf Coast and Planned Parenthood Center for |
| 10:03:08 | 22 | Choice are affiliates? |
| 10:03:10 | 23 | A.   Yes, I did. |
| 10:03:12 | 24 | Q.   And what evidence did you see in the video that Planned |
| 10:03:15 | 25 | Parenthood Gulf Coast and Planned Parenthood Center For Choice |

| | | |
|---|---|---|
| 10:03:17 | 1 | are affiliates? |
| 10:03:19 | 2 | A.   They're co-located in the same building.  The signage at the |
| 10:03:24 | 3 | entryway links them together, the personnel working at the front |
| 10:03:33 | 4 | desk in the foyer and security all serve both entities, and just |
| 10:03:46 | 5 | in the building itself, they're close to one another. |
| 10:03:55 | 6 | Q.   Was there other evidence that was not in the video that |
| 10:03:59 | 7 | you've considered in reaching your decision that Planned |
| 10:04:02 | 8 | Parenthood Gulf Coast and Planned Parenthood Center For Choice |
| 10:04:04 | 9 | are affiliates? |
| 10:04:07 | 10 | A.   Yes.  Their website, for example, I think we saw yesterday, |
| 10:04:14 | 11 | shows the linkage between the two, but I had seen that before |
| 10:04:18 | 12 | that e-mailing one leads to another.  The Center For Choice goes |
| 10:04:25 | 13 | to Planned Parenthood Gulf Coast and -- and there were other |
| 10:04:33 | 14 | matters in the discussion between -- in the video that indicated |
| 10:04:40 | 15 | clear linkages between the director of research for Planned |
| 10:04:43 | 16 | Parenthood Gulf Coast and the activities of the Center For |
| 10:04:47 | 17 | Choice. |
| 10:04:47 | 18 | Q.   And, Mr. Bowen, did you also see evidence in the video or |
| 10:04:52 | 19 | did you review evidence -- other evidence that indicated that |
| 10:04:58 | 20 | Planned Parenthood Gulf Coast, Planned Parenthood Greater Texas, |
| 10:05:02 | 21 | and Planned Parenthood South Texas are affiliates? |
| 10:05:07 | 22 | A.   Yes.  There was discussion then.  Also, there's overlapping |
| 10:05:11 | 23 | leadership CEOs and board membership that interweaves some of |
| 10:05:16 | 24 | these affiliates, as well. |
| 10:05:17 | 25 | Q.   Okay.  And do you know whether they are all affiliates of |

| | | |
|---|---|---|
| 10:05:21 | 1 | Planned Parenthood Federation of America? |
| 10:05:23 | 2 | A.    They are.   They do -- that is indicated in the video, quite |
| 10:05:28 | 3 | clearly, that Planned Parenthood Federation of America provides |
| 10:05:32 | 4 | guidance, policies, and monitors, particularly with regard to |
| 10:05:38 | 5 | fetal tissue activity, every aspect of each of these affiliates. |
| 10:05:47 | 6 | Q.   Brian, could you bring up Defendants' Exhibit 2 at 8:05:44 |
| 10:05:54 | 7 | through 8:05:54? |
| 10:06:01 | 8 | (Audio and video file played.) |
| 10:06:16 | 9 | Q.   Mr. Bowen, is that video footage evidence that you relied on |
| 10:06:22 | 10 | as part of your conclusion that Planned Parenthood Gulf Coast, |
| 10:06:25 | 11 | Planned Parenthood Greater Texas, and Planned Parenthood South |
| 10:06:28 | 12 | Texas have had doctors that travel between the locations? |
| 10:06:33 | 13 | A.    Yes. |
| 10:06:36 | 14 | Q.   Brian, could you on Defendants' Exhibit 2 bring up 12:26:50 |
| 10:06:41 | 15 | through 12:27:35? |
| 10:06:45 | 16 | (Audio and video file played.) |
| 10:07:34 | 17 | Q.   Mr. Bowen, is that also footage or evidence that you relied |
| 10:07:39 | 18 | on in reaching your conclusion that Planned Parenthood Gulf |
| 10:07:43 | 19 | Coast, Planned Parenthood Greater Texas, and Planned Parenthood |
| 10:07:47 | 20 | South Texas are affiliates? |
| 10:07:47 | 21 | A.    Yes. |
| 10:07:50 | 22 | Q.   Mr. Bowen, as the Inspector General for the Texas Health and |
| 10:07:53 | 23 | Human Services Commission, in your judgment, did Planned |
| 10:07:57 | 24 | Parenthood violate medical and ethical standards? |
| 10:07:59 | 25 | A.    Yes. |

| | | |
|---|---|---|
| 10:08:00 | 1 | Q.   And do those violations of medical and ethical standards |
| 10:08:04 | 2 | amount to program violations that justified disenrollment from |
| 10:08:08 | 3 | the Texas Medicaid program? |
| 10:08:09 | 4 | A.   They do. |
| 10:08:11 | 5 | Q.   Pass the witness, your Honor. |
| 10:08:35 | 6 | CROSS-EXAMINATION |
| 10:08:35 | 7 | BY MR. WATKINS: |
| 10:08:53 | 8 | Q.   Mr. Bowen, let's see if we can agree on some basic |
| 10:09:02 | 9 | principles.  The state has no right to terminate a provider who |
| 10:09:04 | 10 | provides medical treatment if they are a qualified provider. |
| 10:09:11 | 11 | A.   Yes. |
| 10:09:12 | 12 | Q.   And we can agree that qualified means, quote, to be capable |
| 10:09:16 | 13 | of performing the needed medical services in a professionally |
| 10:09:20 | 14 | competent, safe, legal and ethical manner. |
| 10:09:23 | 15 | A.   Yes. |
| 10:09:24 | 16 | Q.   So the state can't kick somebody out if they're providing |
| 10:09:29 | 17 | abortions that way, right? |
| 10:09:31 | 18 | A.   If they're providing abortions that way? |
| 10:09:35 | 19 | Q.   Yes.  In a -- do you think the state just has a right to |
| 10:09:39 | 20 | stop people from performing abortions? |
| 10:09:42 | 21 | A.   I don't think that the Medicaid program funds the provision |
| 10:09:48 | 22 | of abortions. |
| 10:09:49 | 23 | Q.   All right.  So you're saying they're already kicked out. |
| 10:09:53 | 24 | You're not paying for abortions.  The state is not paying for |
| 10:09:57 | 25 | abortions? |

| | | |
|---|---|---|
| 10:09:57 | 1 | A.   I think that was -- that's already in the record. |
| 10:10:00 | 2 | Q.   Okay.  Well, and you agree with that.  You agree with that. |
| 10:10:03 | 3 | A.   Yes.  I believe that's in the record. |
| 10:10:05 | 4 | Q.   All right.  Now, the question then is, there are, however, |
| 10:10:09 | 5 | clinics which perform abortions that do not receive Medicaid |
| 10:10:13 | 6 | payments, right? |
| 10:10:14 | 7 | A.   That's right. |
| 10:10:15 | 8 | Q.   Okay.  And some of them, Planned Parenthood and some of them |
| 10:10:18 | 9 | aren't. |
| 10:10:18 | 10 | A.   That's right. |
| 10:10:19 | 11 | Q.   Okay.  Now, but is it legal to use fetal tissue for |
| 10:10:28 | 12 | research? |
| 10:10:30 | 13 | A.   Pursuant to law, yes. |
| 10:10:31 | 14 | Q.   Okay.  So we're agreed there's nothing wrong with using |
| 10:10:35 | 15 | fetal tissue for research. |
| 10:10:37 | 16 | A.   Within the prescribed limits identified by law. |
| 10:10:40 | 17 | Q.   Okay.  Now, is it legal to get reimbursed for providing |
| 10:10:45 | 18 | fetal tissue to a researcher, provided it is a reasonable |
| 10:10:49 | 19 | reimbursement for expenses? |
| 10:10:51 | 20 | A.   Pursuant to what the law permits, yes, sir. |
| 10:10:53 | 21 | Q.   Okay.  Now, you were talking about federal law which you let |
| 10:11:01 | 22 | inform some of your decisions, right? |
| 10:11:03 | 23 | A.   That's right. |
| 10:11:04 | 24 | Q.   Okay.  And you do know about 1396a(23), which gives to the |
| 10:11:08 | 25 | patient the right to choose the provider. |

| | | |
|---|---|---|
| 10:11:10 | 1 | A.   That's right. |
| 10:11:11 | 2 | Q.   Okay.  And the state can't stop that patient under federal |
| 10:11:15 | 3 | law from choosing a qualified provider. |
| 10:11:18 | 4 | A.   That's correct. |
| 10:11:19 | 5 | Q.   Now, on your letter of termination, let's look at it.  Now, |
| 10:11:36 | 6 | let me give you a copy. |
| 10:11:54 | 7 | Now, it's addressed, is it not, to three entities?  Is |
| 10:12:03 | 8 | that correct? |
| 10:12:03 | 9 | A.   It is. |
| 10:12:04 | 10 | Q.   All right.  Now, first of all, it's from the Office of the |
| 10:12:07 | 11 | Inspector General.  That's true? |
| 10:12:08 | 12 | A.   Yes, sir. |
| 10:12:09 | 13 | Q.   Okay.  And it's dated December 20, 2016? |
| 10:12:12 | 14 | A.   That's correct. |
| 10:12:13 | 15 | Q.   Okay.  And there are three, Gulf Coast, Greater Texas and |
| 10:12:20 | 16 | San Antonio, and that's also South Texas, right? |
| 10:12:23 | 17 | A.   That is correct. |
| 10:12:24 | 18 | Q.   Okay.  Now, each of those entities has other entities that |
| 10:12:30 | 19 | are part of that entity; is that correct? |
| 10:12:32 | 20 | A.   That's right. |
| 10:12:32 | 21 | Q.   Okay.  Now, you heard testimony that there was no power or |
| 10:12:37 | 22 | control between Planned Parenthood Gulf Coast and those other two |
| 10:12:41 | 23 | entities.  Did you hear that testimony? |
| 10:12:44 | 24 | A.   Yes. |
| 10:12:45 | 25 | Q.   Do you have anything to contradict that? |

| | | |
|---|---|---|
| 10:12:48 | 1 | A.   I'm sorry?  Please rephrase the question. |
| 10:12:50 | 2 | Q.   Okay.  I will. |
| 10:12:52 | 3 |      Is there any evidence that you know of that Planned |
| 10:12:55 | 4 | Parenthood Gulf Coast has any power or control over Greater |
| 10:13:00 | 5 | Texas? |
| 10:13:00 | 6 | A.   No. |
| 10:13:01 | 7 | Q.   Okay.  Is there any evidence that Greater Texas has any |
| 10:13:05 | 8 | power and control over Gulf Coast? |
| 10:13:07 | 9 | A.   No. |
| 10:13:08 | 10 | Q.   Is there any evidence that any one of these three has any |
| 10:13:11 | 11 | power or control over the other two? |
| 10:13:13 | 12 | A.   No. |
| 10:13:14 | 13 | Q.   Okay.  Can you give me the name of a doctor who might have |
| 10:13:18 | 14 | worked at more than one of these? |
| 10:13:22 | 15 | A.   Amna Dermish. |
| 10:13:25 | 16 | Q.   Okay.  And do you know what that doctor did at each clinic? |
| 10:13:31 | 17 | A.   I know the doctor worked at both.  I don't know the |
| 10:13:35 | 18 | specifics of that doctor's activities. |
| 10:13:37 | 19 | Q.   Okay.  Did that doctor work at both at the same time? |
| 10:13:41 | 20 | A.   That I don't know. |
| 10:13:42 | 21 | Q.   Okay.  There's nothing wrong, then, for a doctor to work at |
| 10:13:45 | 22 | one, leave that one and then, go work at another one, is there? |
| 10:13:48 | 23 | A.   Well, sure. |
| 10:13:50 | 24 | Q.   And you don't know whether that's what happened or not? |
| 10:13:52 | 25 | A.   That's right. |

| | | |
|---|---|---|
| 10:14:02 | 1 | Q.   I'm going to take a look at Defendants' Exhibit 68.  And I |
| 10:14:22 | 2 | can hand you Defendants' Exhibit 68.  Do you recognize that? |
| 10:14:31 | 3 | A.   Yes, I do. |
| 10:14:33 | 4 | Q.   Now, you testified that that was a referral from the |
| 10:14:37 | 5 | committee.  Is that a referral from the committee or referral |
| 10:14:41 | 6 | from just one person? |
| 10:14:45 | 7 | A.   This is a referral relevant to the committee report from the |
| 10:14:49 | 8 | chairman of the committee. |
| 10:14:50 | 9 | Q.   But it is from the chairman.  It's not from the committee. |
| 10:14:55 | 10 | A.   The chairman signed this.  Yes.  That's correct. |
| 10:14:57 | 11 | Q.   Okay.  And then, let's look at the last page, the paragraph |
| 10:15:01 | 12 | of the last page.  Do you see that sentence at the top of that |
| 10:15:08 | 13 | page? |
| 10:15:08 | 14 | A.   I do. |
| 10:15:10 | 15 | Q.   All right.  Based on the facts outlined above and the |
| 10:15:13 | 16 | supporting documents, I.  It doesn't say the committee.  It says |
| 10:15:22 | 17 | I. |
| 10:15:23 | 18 | A.   Yes, it does. |
| 10:15:24 | 19 | Q.   Now, do you know if the committee voted on this referral? |
| 10:15:27 | 20 | A.   I don't. |
| 10:15:29 | 21 | Q.   Do you know if the committee actually approved this referral |
| 10:15:32 | 22 | being sent out? |
| 10:15:33 | 23 | A.   I don't. |
| 10:15:34 | 24 | Q.   Okay.  It's I.  And she says -- oh, and by the way, this was |
| 10:15:38 | 25 | the same lady that referred to the Harris County District |

| | | |
|---|---|---|
| 10:15:41 | 1 | Attorney for the same sort of investigation and got them |
| 10:15:44 | 2 | indicted, that is, got the people indicted. |
| 10:15:47 | 3 | MR. STEPHENS:  Objection, your Honor. |
| 10:15:50 | 4 | THE COURT:  Is there a reason? |
| 10:15:51 | 5 | MR. STEPHENS:  It's not relevant to his decision to |
| 10:15:53 | 6 | terminate Planned Parenthood from Texas Medicare. |
| 10:15:55 | 7 | THE COURT:  Well, go find out.  The objection is |
| 10:15:58 | 8 | overruled. |
| 10:15:59 | 9 | Q.   (BY MR. WATKINS) Now, I urge -- |
| 10:16:02 | 10 | THE COURT:  Was there an answer to that question? |
| 10:16:04 | 11 | MR. WATKINS:  I don't think so. |
| 10:16:06 | 12 | A.   Please ask it again. |
| 10:16:07 | 13 | Q.   (BY MR. WATKINS) This is the same lady that made the |
| 10:16:09 | 14 | referral down to the Houston District Attorney's Office and got |
| 10:16:12 | 15 | the videographer indicted? |
| 10:16:14 | 16 | A.   Is that a question? |
| 10:16:15 | 17 | Q.   Yes. |
| 10:16:15 | 18 | A.   I don't know. |
| 10:16:16 | 19 | Q.   Okay.  I urge your office to conduct a thorough |
| 10:16:21 | 20 | investigation of whether or not PPGC, that's Gulf Coast, violated |
| 10:16:26 | 21 | these statutes, and if you agree to such violations, then take |
| 10:16:31 | 22 | appropriate action.  She asked you -- she's not telling you, you |
| 10:16:34 | 23 | ought to do something.  She's saying, here's this, please |
| 10:16:37 | 24 | investigate, right?  Just her.  Not the committee. |
| 10:16:43 | 25 | What investigation did you do? |

| | | |
|---|---|---|
| 10:16:46 | 1 | A.   This was a letter to the Attorney General of Texas, Ken |
| 10:16:52 | 2 | Paxton.   The letter was not directed to me to make investigation. |
| 10:16:59 | 3 | The report, however, was useful and informed my decisionmaking. |
| 10:17:04 | 4 | Q.   Well, now, my question to you is, you did not do any |
| 10:17:07 | 5 | investigation.   The Attorney General didn't ask you to |
| 10:17:09 | 6 | investigate in response to this letter. |
| 10:17:11 | 7 | A.   That's right. |
| 10:17:12 | 8 | Q.   So you didn't -- you, the IG, did no investigations after |
| 10:17:19 | 9 | December 1st, 2016, at the time that you did the termination, of |
| 10:17:23 | 10 | any of the allegations that were made in the committee report. |
| 10:17:27 | 11 | A.   That's right. |
| 10:17:34 | 12 | Q.   Now, were you the OIG that issued the termination notice |
| 10:17:45 | 13 | back in 2015? |
| 10:17:47 | 14 | A.   You mean you're referring to the October 19th letter? |
| 10:17:50 | 15 | Q.   Yes. |
| 10:17:51 | 16 | A.   Yes.   I signed the October 19th letter. |
| 10:17:55 | 17 | Q.   All right.   So you had made whatever allegations were in |
| 10:18:00 | 18 | that letter prior to the time you ever saw the congressional |
| 10:18:04 | 19 | report. |
| 10:18:06 | 20 | A.   Yes. |
| 10:18:06 | 21 | Q.   Okay.   And as you said, viewing this video animated your |
| 10:18:14 | 22 | intention to terminate or some language like that.   Do you |
| 10:18:18 | 23 | remember that? |
| 10:18:18 | 24 | A.   Yes. |
| 10:18:20 | 25 | Q.   Well, when did you first get the videos? |

| | | |
|---|---|---|
| 10:18:26 | 1 | A.   The agency, as I said, received the videos in September of |
| 10:18:34 | 2 | 2015. |
| 10:18:35 | 3 | Q.   Okay.  And when did you issue the first notice? |
| 10:18:40 | 4 | A.   October 19th. |
| 10:18:44 | 5 | THE COURT:  What year? |
| 10:18:45 | 6 | THE WITNESS:  Of 2015. |
| 10:18:47 | 7 | Q.   (BY MR. WATKINS) All right. |
| 10:18:48 | 8 | A.   It was not a notice of termination.  It began a process of |
| 10:18:52 | 9 | review.  Judge, just to be clear that there's a distinction |
| 10:18:59 | 10 | between the December 20th letter, which is a final notice of |
| 10:19:01 | 11 | termination, and the October 19th letter, which as the first |
| 10:19:04 | 12 | sentence of that letter states, effected a process, began a |
| 10:19:08 | 13 | process. |
| 10:19:10 | 14 | Q.   Well, unless something happened, they were going to |
| 10:19:12 | 15 | terminate. |
| 10:19:13 | 16 | A.   It began the process.  That's correct. |
| 10:19:15 | 17 | Q.   No, no.  That's not my question specifically. |
| 10:19:18 | 18 | Unless something changed the direction the state was |
| 10:19:20 | 19 | intending going on that day, they were going to get terminated |
| 10:19:23 | 20 | unless something else happened to stop it. |
| 10:19:25 | 21 | A.   That's right. |
| 10:19:26 | 22 | Q.   Okay.  Now, then, had you -- how many times had you viewed |
| 10:19:29 | 23 | the video prior to issuing that letter? |
| 10:19:32 | 24 | A.   The October 19th letter? |
| 10:19:34 | 25 | Q.   No. |

| | | |
|---|---|---|
| 10:19:35 | 1 | A.   Or the December 20th?  The December 20th letter, I viewed it |
| 10:19:38 | 2 | five times and also read -- have read a transcript. |
| 10:19:42 | 3 | Q.   On the October one in 2015, how many times have you viewed |
| 10:19:47 | 4 | it? |
| 10:19:48 | 5 | A.   I relied on legal staff that had viewed it and advised me on |
| 10:19:52 | 6 | it. |
| 10:19:52 | 7 | Q.   Okay. |
| 10:19:52 | 8 |      THE COURT:  Wait, wait.  Read the question back -- |
| 10:19:57 | 9 | A.   Yes.  I'm sorry.  I did not review that -- the video but |
| 10:20:01 | 10 | before the issuance of that letter.  I relied on legal staff that |
| 10:20:05 | 11 | had. |
| 10:20:05 | 12 | Q.   (BY MR. WATKINS) Okay.  So what they told you, did that |
| 10:20:08 | 13 | animate your interest to issue that letter? |
| 10:20:11 | 14 | A.   Yes. |
| 10:20:12 | 15 | Q.   Okay.  But you didn't do it yourself, right?  Now -- |
| 10:20:18 | 16 | A.   That's right.  I have since watched it. |
| 10:20:24 | 17 | Q.   Well, you watched it.  You, yourself, watched it after you |
| 10:20:27 | 18 | had already sent out the letter telling you were going to |
| 10:20:30 | 19 | terminate them. |
| 10:20:33 | 20 | A.   Yes.  I've watched it between -- between October 19th and |
| 10:20:38 | 21 | December 20th, I watched it five times. |
| 10:20:41 | 22 |      THE COURT:  Read the question back, Lily. |
| 10:20:49 | 23 |      (Last question read back.) |
| 10:20:52 | 24 |      THE COURT:  "Yes" or "No." |
| 10:20:56 | 25 |      THE WITNESS:  Yes. |

| | | |
|---|---|---|
| 10:20:58 | 1 | Q.   (BY MR. WATKINS) Now, then, between the time that you got |
| 10:21:02 | 2 | the -- well, before you issued the 2016 termination notice, you |
| 10:21:11 | 3 | know which one I'm talking about? |
| 10:21:12 | 4 | A.   Yes.  December 20th. |
| 10:21:14 | 5 | Q.   Right.  What investigations did your office do of the |
| 10:21:18 | 6 | Planned Parenthood entities that you sent that letter to? |
| 10:21:23 | 7 | A.   We engaged in a number of activities that included the |
| 10:21:30 | 8 | collection of documents.  We also engaged in forensic |
| 10:21:37 | 9 | investigations of billing practices and records, and we also |
| 10:21:48 | 10 | reviewed the video. |
| 10:21:49 | 11 | Q.   Did those investigations, prior to the issuance of the |
| 10:21:57 | 12 | December 2016, indicate to you that any doctor had altered an |
| 10:22:00 | 13 | abortion procedure to obtain fetal tissue? |
| 10:22:04 | 14 | A.   Based on the evidence identified in the video, yes. |
| 10:22:07 | 15 | Q.   Oh, which doctor is identified in the video of altering |
| 10:22:13 | 16 | abortion procedures in order to obtain fetal tissue? |
| 10:22:17 | 17 | A.   I don't know which doctor. |
| 10:22:20 | 18 | Q.   Well, my question to you, did you find anybody who had |
| 10:22:23 | 19 | actually done it?  Did you ever find anybody who actually altered |
| 10:22:27 | 20 | an abortion procedure to obtain fetal tissue for research?  Any |
| 10:22:31 | 21 | particular individual that was employed by Planned Parenthood? |
| 10:22:35 | 22 | A.   I understand the question.  I'm sorry.  And the answer's no. |
| 10:22:44 | 23 | Q.   Do you have any idea how many dollars -- tax dollars the |
| 10:22:48 | 24 | state of Texas spent on all of those investigations to try to |
| 10:22:51 | 25 | find that information and never found any of it? |

| | | |
|---|---|---|
| 10:22:54 | 1 | MR. STEPHENS:  Objection, your Honor.  This isn't |
| 10:22:55 | 2 | relevant. |
| 10:22:59 | 3 | THE COURT:  It's impressive. |
| 10:23:01 | 4 | MR. WATKINS:  And irritating to me, but I guess it's |
| 10:23:04 | 5 | not relevant, Judge. |
| 10:23:04 | 6 | THE COURT:  It is not.  I agree. |
| 10:23:10 | 7 | Q.  (BY MR. WATKINS) Now, then, we talked a bit about |
| 10:23:23 | 8 | misrepresentations, and I only heard one.  That was the |
| 10:23:28 | 9 | statements that the Texas Ranger made in his report about what |
| 10:23:33 | 10 | somebody said to him. |
| 10:23:33 | 11 | A.  That's right. |
| 10:23:34 | 12 | Q.  Okay.  No other misrepresentations.  All the hours and money |
| 10:23:38 | 13 | that you spent investigating Planned Parenthood, that's the |
| 10:23:42 | 14 | misrepresentation. |
| 10:23:43 | 15 | A.  Yeah.  That's right. |
| 10:23:45 | 16 | Q.  Now, do you know the difference between a misrepresentation |
| 10:23:49 | 17 | and a mistake? |
| 10:23:51 | 18 | A.  Yes, I do. |
| 10:23:52 | 19 | Q.  Okay.  And you can't kick somebody out of Medicaid for |
| 10:23:55 | 20 | making a mistake. |
| 10:23:57 | 21 | A.  That's right. |
| 10:23:58 | 22 | Q.  Okay.  And the difference between a mistake and a |
| 10:24:00 | 23 | misrepresentation is that you know what you're telling somebody |
| 10:24:03 | 24 | is wrong. |
| 10:24:05 | 25 | A.  That's right. |

| | | |
|---|---|---|
| 10:24:06 | 1 | Q.   Okay.  Now, if we go -- it's about the IRB, right? |
| 10:24:22 | 2 | A.   That's right. |
| 10:24:22 | 3 | Q.   And the statement that I remember you talking about is the |
| 10:24:32 | 4 | institutional review board had not yet given approval for the |
| 10:24:36 | 5 | Baylor or Rice study. |
| 10:24:37 | 6 | A.   That's right. |
| 10:24:38 | 7 | Q.   Did you interview the person who made that statement? |
| 10:24:41 | 8 | A.   I did not. |
| 10:24:42 | 9 | Q.   Did anybody investigate the state of mind of that speaker |
| 10:24:46 | 10 | that made that statement? |
| 10:24:47 | 11 | A.   No. |
| 10:24:48 | 12 | Q.   Do you have any idea whether she knew or didn't know that |
| 10:24:51 | 13 | that was wrong? |
| 10:24:53 | 14 | A.   I don't. |
| 10:24:54 | 15 | Q.   Okay.  So you don't know whether it's a mistake or a |
| 10:24:56 | 16 | misrepresentation. |
| 10:24:58 | 17 | A.   That's right. |
| 10:24:59 | 18 | Q.   And so, all of the misrepresentations allegations contained |
| 10:25:03 | 19 | in that termination letter and all of the publicity in the state |
| 10:25:06 | 20 | about misrepresentations is related only to something that you |
| 10:25:09 | 21 | don't know whether or not it's a misrepresentation. |
| 10:25:18 | 22 | A.   I don't know whether it was a mistake. |
| 10:25:20 | 23 | Q.   You don't know whether it was a misrepresentation. |
| 10:25:23 | 24 | A.   But I know it was an incorrect statement to a peace officer. |
| 10:25:26 | 25 | Q.   Well, now it's a mistake about what?  About the IRB? |

| | | |
|---|---|---|
| 10:25:32 | 1 | A.   About -- yes.  And, Judge, may I speak to that issue? |
| 10:25:40 | 2 | Q.   Let me ask the question.  What do you want to say about that |
| 10:25:42 | 3 | IRB? |
| 10:25:43 | 4 | THE COURT:  There's going to be plenty of cross. |
| 10:25:46 | 5 | THE WITNESS:  Okay.  Thank you. |
| 10:25:47 | 6 | Q.   (BY MR. WATKINS) What do you want to say about that IRB? |
| 10:25:48 | 7 | A.   Well, the fact -- well, as you well know, Mr. Watkins, that |
| 10:25:53 | 8 | the committee report has an extensive appendix relevant to |
| 10:25:59 | 9 | exchanges between the Baylor College of Medicine and Planned |
| 10:26:04 | 10 | Parenthood Gulf Coast, and that extensive history documents a -- |
| 10:26:13 | 11 | two years of negotiations on pursuing this agreement.  The offer |
| 10:26:18 | 12 | was made, the offer was accepted by the Baylor College of |
| 10:26:23 | 13 | Medicine after the IRB met. |
| 10:26:29 | 14 | It was certainly a legal matter.  Certainly something |
| 10:26:33 | 15 | that would require attention in the execution of a contract, and |
| 10:26:38 | 16 | therefore, it's not unreasonable to be concerned about that |
| 10:26:45 | 17 | statement that was made to a peace officer. |
| 10:26:49 | 18 | Q.   Okay.  Now, the IRB was on a study that was never contracted |
| 10:26:54 | 19 | for, right? |
| 10:26:59 | 20 | A.   The contract was disavowed.  Yes.  That's right. |
| 10:27:03 | 21 | Q.   Well, no.  Was the contract ever signed by Planned |
| 10:27:06 | 22 | Parenthood? |
| 10:27:06 | 23 | A.   It was not finally executed. |
| 10:27:09 | 24 | Q.   There's a difference between disavowed and there not ever |
| 10:27:13 | 25 | being a contract, isn't there?  I mean, you were just being cute |

| | | |
|---|---|---|
| 10:27:15 | 1 | when you said disavowed.  You know the contract was never entered |
| 10:27:18 | 2 | into, right? |
| 10:27:20 | 3 | A.   It was not finalized.  There was an offer, there was an |
| 10:27:23 | 4 | acceptance that Baylor College of Medicine thought they had, but |
| 10:27:25 | 5 | then, there wasn't -- they didn't. |
| 10:27:26 | 6 | Q.   So the study was never done. |
| 10:27:28 | 7 | A.   That's right. |
| 10:27:29 | 8 | Q.   And so, you say that there is a statement to a Texas Ranger |
| 10:27:35 | 9 | about whether or not an IRB was approved or not that you don't |
| 10:27:39 | 10 | know whether it was a mistake or not about a research project |
| 10:27:43 | 11 | that was never entered into and a research project that was never |
| 10:27:47 | 12 | done. |
| 10:27:47 | 13 |         MR. STEPHENS:  Objection, your Honor.  That's a |
| 10:27:49 | 14 | compound question. |
| 10:27:49 | 15 |         THE COURT:  Actually, it's an argument. |
| 10:27:52 | 16 |         MR. STEPHENS:  It's an argument. |
| 10:27:53 | 17 |         THE COURT:  Let's take a break.  Ten minutes. |
| 10:41:43 | 18 |         (Recess.) |
| 10:41:46 | 19 |         THE COURT:  Do you understand you're still under oath, |
| 10:41:48 | 20 | sir? |
| 10:41:48 | 21 |         THE WITNESS:  Yes, sir. |
| 10:41:49 | 22 |         THE COURT:  All right, sir.  You may proceed. |
| 10:41:51 | 23 | Q.   (BY MR. WATKINS) You are aware, are you not, of the |
| 10:42:01 | 24 | difference between abortion procedures and clinical procedures? |
| 10:42:04 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 10:42:05 | 1 | Q.   Okay.  And there's nothing wrong with altering clinical |
| 10:42:10 | 2 | procedures in order to provide research information to an |
| 10:42:13 | 3 | investigator? |
| 10:42:15 | 4 | A.   I think that's true. |
| 10:42:16 | 5 | Q.   Okay.  So, for example, on the first videotape, the first |
| 10:42:23 | 6 | clip, was there anything in that clip that you remember that told |
| 10:42:28 | 7 | you whether or not the comments that the speaker was making about |
| 10:42:31 | 8 | altering abortion procedures or altering clinical procedures -- |
| 10:42:35 | 9 |            MR. STEPHENS:  Objection, your Honor.  Could he refer |
| 10:42:37 | 10 | to which clip it is by the timestamp so that we know? |
| 10:42:42 | 11 |            MR. WATKINS:  7:59:02 to 8:00:43.  That was the first |
| 10:42:49 | 12 | clip. |
| 10:42:49 | 13 | A.   May we look at it again? |
| 10:42:51 | 14 | Q.   (BY MR. WATKINS) Sure.  Wait, before we do, at the time that |
| 10:42:57 | 15 | you viewed it, did you know the difference between altering |
| 10:43:00 | 16 | abortion procedures and altering clinical procedures? |
| 10:43:02 | 17 | A.   Yes. |
| 10:43:03 | 18 | Q.   Okay.  Where did you learn them? |
| 10:43:08 | 19 | A.   I have -- I think that, first of all, it's axiomatic. |
| 10:43:13 | 20 | Second of all, there was distinctive -- there was federal law |
| 10:43:17 | 21 | relevant to altering abortion procedures that, as you well know. |
| 10:43:23 | 22 | Sorry. |
| 10:43:24 | 23 | Q.   Let's look at it.  7:59:02 to 8:00:43. |
| 10:43:46 | 24 |            (Audio and video file played.) |
| 10:45:22 | 25 | Q.   She didn't answer that question, did she? |

| | | |
|---|---|---|
| 10:45:31 | 1 | A.   Well, to answer your earlier question -- |
| 10:45:32 | 2 | Q.   No, no, no, no.  She did not answer that last question.  The |
| 10:45:35 | 3 | video cut off before she answered. |
| 10:45:39 | 4 | A.   Well, that's true. |
| 10:45:40 | 5 | Q.   Okay.  Now, product of conception.  What is that? |
| 10:45:45 | 6 | A.   Those are fetal tissue remains. |
| 10:45:47 | 7 | Q.   All right.  And so, they can alter -- didn't that video clip |
| 10:45:52 | 8 | indicate that they can alter the procedures for the products of |
| 10:45:55 | 9 | conception and doesn't say anything about altering the abortion |
| 10:45:58 | 10 | procedures? |
| 10:45:59 | 11 | A.   I disagree. |
| 10:46:00 | 12 | Q.   Okay.  How -- what is it in that videotape -- |
| 10:46:03 | 13 | A.   We can watch it again.  The last 30 seconds, to me, clearly |
| 10:46:09 | 14 | indicated a discussion about altering the procedures.  She uses |
| 10:46:13 | 15 | that word "procedure."  I don't see she was talking about |
| 10:46:16 | 16 | clinical procedures when she says, alter the procedures to secure |
| 10:46:19 | 17 | specific fetal tissue. |
| 10:46:20 | 18 | Q.   Okay.  Well, I mean, you could have fetal tissue which |
| 10:46:25 | 19 | you've already extracted, right? |
| 10:46:27 | 20 | A.   But that's not what was going on here. |
| 10:46:29 | 21 | Q.   We'll get to that. |
| 10:46:31 | 22 | A.   Sorry.  Excuse me. |
| 10:46:32 | 23 | Q.   You could have fetal tissue that you've already extracted |
| 10:46:34 | 24 | and you have a certain standard procedure, right?  I mean, you're |
| 10:46:38 | 25 | going to do something with it.  Now, a researcher wants a |

| | | |
|---|---|---|
| 10:46:41 | 1 | particular part of that stuff because they're doing liver |
| 10:46:45 | 2 | research or they're doing something else.  You could alter the |
| 10:46:48 | 3 | clinical procedure in order to get the part of the product of |
| 10:46:50 | 4 | conception that has been extracted in order to give to the |
| 10:46:53 | 5 | researcher, right? |
| 10:46:55 | 6 | A.    You could. |
| 10:46:55 | 7 | Q.    Okay.  Let's look at the video.  Same clip. |
| 10:47:02 | 8 | (Audio and video file played.) |
| 10:48:48 | 9 | Q.    You cut it off before she answered. |
| 10:48:52 | 10 | A.    The last 25 seconds of that clip was referring to altering |
| 10:48:56 | 11 | an abortion procedure. |
| 10:48:57 | 12 | Q.    Okay.  What makes you say that? |
| 10:49:00 | 13 | A.    It was clear they were talking about high volume.  High |
| 10:49:05 | 14 | volume doesn't mean high volume altering of a procedure to |
| 10:49:09 | 15 | address fetal tissue remains.  High volume means how can you get |
| 10:49:16 | 16 | thymus -- liver thymus, whatever he was talking about, from the |
| 10:49:23 | 17 | products of conception, which is the phrase used at the |
| 10:49:27 | 18 | beginning. |
| 10:49:29 | 19 | And the question that Ms. Farrell was asked was not |
| 10:49:35 | 20 | about, can you alter your clinical procedures in an |
| 10:49:43 | 21 | already-aborted fetal tissue remains in order to access liver |
| 10:49:46 | 22 | thymus.  No.  That is not my -- if I'm wrong, I'll get corrected, |
| 10:49:51 | 23 | but my judgment, that it is reasonable to conclude, especially in |
| 10:49:56 | 24 | the context of all of these conversations that addresses this -- |
| 10:50:01 | 25 | this is not the only piece -- that this discussion and when the |

| | | |
|---|---|---|
| 10:50:08 | 1 | word "procedure" was used in that colloquy, the last 25 seconds, |
| 10:50:14 | 2 | they were not talking about the procedures of addressing |
| 10:50:18 | 3 | already-aborted fetal tissue remains.  They were addressing |
| 10:50:22 | 4 | abortion procedures. |
| 10:50:23 | 5 | Q.   And you're really not qualified by your education and |
| 10:50:25 | 6 | experience to make that determination, are you? |
| 10:50:27 | 7 | A.   I didn't make it -- |
| 10:50:28 | 8 | MR. STEPHENS:  Objection, your Honor.  He asked him the |
| 10:50:30 | 9 | question. |
| 10:50:30 | 10 | MR. WATKINS:  That's right.  And I've asked him the |
| 10:50:33 | 11 | question, I got his answer, and now I want to know if he's |
| 10:50:35 | 12 | qualified. |
| 10:50:37 | 13 | MR. STEPHENS:  He's trying to disqualify him from |
| 10:50:40 | 14 | answering the question that he asked. |
| 10:50:40 | 15 | THE COURT:  I don't think that's what he's trying to |
| 10:50:42 | 16 | do.  But let's ask the next question. |
| 10:50:44 | 17 | Q.   (BY MR. WATKINS) And who did you rely on to tell you that |
| 10:50:46 | 18 | that was what that last 25 seconds meant? |
| 10:50:51 | 19 | A.   We have a -- someone that is qualified, Dr. Ted Spears, who |
| 10:50:57 | 20 | is the Chief Medical Officer at the Inspector General whose job |
| 10:51:01 | 21 | it is to render exactly this kind of advice. |
| 10:51:03 | 22 | Q.   And what qualifications does Mr. Ted Spears have to give you |
| 10:51:07 | 23 | that advice? |
| 10:51:09 | 24 | A.   Well, he -- that is his mission.  I mean, he is a doctor, |
| 10:51:17 | 25 | more than 30 years of practice in the state of Texas, and he will |

| | | |
|---|---|---|
| 10:51:21 | 1 | be testifying today on exactly this topic. |
| 10:51:24 | 2 | Q.   He's an orthopedic surgeon. |
| 10:51:27 | 3 | A.   That's right. |
| 10:51:27 | 4 | Q.   He's a sports doctor. |
| 10:51:32 | 5 | A.   He understands -- |
| 10:51:33 | 6 | Q.   He is a sports doctor. |
| 10:51:36 | 7 | A.   Is that a question? |
| 10:51:36 | 8 | Q.   Yes.  Is he a sports doctor? |
| 10:51:38 | 9 | A.   Yes. |
| 10:51:39 | 10 | Q.   Okay.  Has he ever performed an abortion? |
| 10:51:43 | 11 | A.   No.  I don't believe so. |
| 10:51:44 | 12 | Q.   Has he ever been trained as a gynecologist or obstetrician? |
| 10:51:47 | 13 | A.   I don't know. |
| 10:51:48 | 14 | Q.   Okay.  So you relied on him telling you that that's what |
| 10:51:51 | 15 | that 25 seconds meant, and you have no idea if he knows anything |
| 10:51:55 | 16 | about what you asked him about. |
| 10:51:58 | 17 | A.   I've answered why he has the responsibility to advise me. |
| 10:52:04 | 18 | Q.   Well, we'll talk to him later when he gets the stand. |
| 10:52:13 | 19 | Now, you said you had opened some audits and then, the |
| 10:52:16 | 20 | video came along, and then, you never went back to the audits, |
| 10:52:19 | 21 | did you? |
| 10:52:20 | 22 | A.   No.  I didn't -- that's not what I said. |
| 10:52:22 | 23 | Q.   Oh, I'm sorry. |
| 10:52:24 | 24 | A.   What I said was, we were reviewing audit findings and |
| 10:52:29 | 25 | considering the reopening of audits pursuant to that review. |

| | | |
|---|---|---|
| 10:52:34 | 1 | Q.   Okay.  But then, the videos came out and you never went back |
| 10:52:37 | 2 | to that.  You didn't reopen it. |
| 10:52:40 | 3 | A.   We have not yet reopened it. |
| 10:52:42 | 4 | Q.   All right.  So there's nothing about those audits that's |
| 10:52:44 | 5 | involved in your decision to -- |
| 10:52:47 | 6 | A.   That's right. |
| 10:52:48 | 7 | Q.   Okay.  Let me show you what is Defendants' 23.  Do you |
| 10:53:19 | 8 | recognize Defendants' 23? |
| 10:53:24 | 9 | A.   May I have a minute to read it? |
| 10:53:26 | 10 | Q.   Yes. |
| 10:53:47 | 11 | MR. WATKINS:  Judge, I have hardcopies for the Court, |
| 10:53:49 | 12 | if you'd like. |
| 10:53:51 | 13 | THE COURT:  Is it admitted? |
| 10:53:55 | 14 | MS. WERNER:  Yes. |
| 10:53:57 | 15 | MR. WATKINS:  Yes.  It's pre-admitted. |
| 10:54:08 | 16 | A.   Yes.  It is an approval letter on an application for |
| 10:54:12 | 17 | enrollment. |
| 10:54:13 | 18 | Q.   (BY MR. WATKINS) All right.  And it's a state record. |
| 10:54:17 | 19 | A.   Yes. |
| 10:54:17 | 20 | Q.   From the OIG's Office, I'm sorry.  That's not right.  That's |
| 10:54:22 | 21 | wrong.  But it's about Planned Parenthood, right?  Gulf Coast? |
| 10:54:26 | 22 | A.   Yes. |
| 10:54:27 | 23 | Q.   And the date's October 17, 2016? |
| 10:54:29 | 24 | A.   Yes. |
| 10:54:30 | 25 | Q.   All right.  Now, let's read the part that's on the second |

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

| | | |
|---|---|---|
| 10:54:33 | 1 | paragraph. |
| 10:54:35 | 2 | HHSC has approved your application to become a Texas |
| 10:54:38 | 3 | state healthcare programs provider for a term ending October 13, |
| 10:54:44 | 4 | 2021, right? |
| 10:54:46 | 5 | A.   That's right. |
| 10:54:47 | 6 | Q.   You'd already seen the video by then, right? |
| 10:54:52 | 7 | A.   I had not. |
| 10:54:55 | 8 | Q.   But your staff had told you about it. |
| 10:54:58 | 9 | A.   Yes.  That's right. |
| 10:54:59 | 10 | Q.   Now, this decision in that sentence says, to approve your |
| 10:55:04 | 11 | application is based on a recommendation from the HHSC Office of |
| 10:55:09 | 12 | Inspector General.  That's you. |
| 10:55:12 | 13 | A.   Yes. |
| 10:55:13 | 14 | Q.   Okay.  So after you knew about the videos, after you'd been |
| 10:55:18 | 15 | told about the videos, you then approved them as a provider. |
| 10:55:23 | 16 | A.   Yes. |
| 10:55:24 | 17 | Q.   So whatever you had seen prior to October 17, 2016 had not |
| 10:55:31 | 18 | animated you to kick them out yet. |
| 10:55:33 | 19 | A.   That's right, pursuant to our previous discussion of what |
| 10:55:37 | 20 | the October 19th letter is, a beginning of a process, not a fait |
| 10:55:50 | 21 | accompli. |
| 10:55:50 | 22 | Q.   Let me hand you what is Defendants' No. 35.  Do you |
| 10:56:06 | 23 | recognize that? |
| 10:56:08 | 24 | A.   I do. |
| 10:56:09 | 25 | Q.   And that's Greater Texas, right? |

| | | |
|---|---|---|
| 10:56:11 | 1 | A.    Yes. |
| 10:56:11 | 2 | Q.    September 26, '16? |
| 10:56:14 | 3 | A.    Yes. |
| 10:56:18 | 4 | Q.    And you approved Greater Texas as a provider. |
| 10:56:23 | 5 | A.    That's right.  I did not approve them, but HHSC did. |
| 10:56:28 | 6 | Q.    Oh, well, remember the second sentence, to approve your |
| 10:56:32 | 7 | application is based on a recommendation.  So I misspoke.  You |
| 10:56:35 | 8 | didn't approve it, you just recommended it? |
| 10:56:38 | 9 | A.    May I explain? |
| 10:56:39 | 10 | Q.    Well, you recommended based, in part, on a recommendation |
| 10:56:43 | 11 | from the OIG, right? |
| 10:56:46 | 12 | A.    Yes. |
| 10:56:47 | 13 | Q.    That's what the document says. |
| 10:56:49 | 14 | A.    May I explain recommendation? |
| 10:56:52 | 15 | Q.    Okay.  What's recommendation? |
| 10:56:54 | 16 | A.    Thank you. |
| 10:56:56 | 17 |       We have a role in the process of enrollment of all |
| 10:57:01 | 18 | providers and that is to do background checks.  And so, we |
| 10:57:06 | 19 | fulfilled that process, ministerial role in the approval process |
| 10:57:12 | 20 | that is managed by HHSC. |
| 10:57:14 | 21 | Q.    Okay.  Now, I can go through several more, but it's fair to |
| 10:57:18 | 22 | say that a large number of the people that you're trying to |
| 10:57:22 | 23 | terminate, the entities that you're trying to terminate, you |
| 10:57:25 | 24 | approved them as providers after OIG had the videotapes. |
| 10:57:32 | 25 | A.    For good reason. |

| | | |
|---|---|---|
| 10:57:33 | 1 | Q.   I didn't ask you for good reason.  My question is, you |
| 10:57:36 | 2 | approved -- |
| 10:57:36 | 3 | A.   Yes. |
| 10:57:37 | 4 | Q.   -- of them, right? |
| 10:57:38 | 5 | A.   Yes. |
| 10:57:41 | 6 | Q.   Let's look at Plaintiffs' 17.  Do you recognize that? |
| 10:58:32 | 7 | A.   I do. |
| 10:58:33 | 8 | Q.   And that is from the U.S. Code, 42 U.S.C. 1396(a), correct? |
| 10:58:44 | 9 | A.   It is. |
| 10:58:45 | 10 | Q.   Okay.  And it says under the front page, a state plan for |
| 10:58:51 | 11 | medical assistance must, that's a mandatory word, right? |
| 10:58:55 | 12 | A.   Yes. |
| 10:58:55 | 13 | Q.   Okay.  And then, let's turn over to Section 23.  Do you |
| 10:59:09 | 14 | recognize Section 23 on the second page? |
| 10:59:11 | 15 | A.   May I have a minute to read it? |
| 10:59:13 | 16 | Q.   Certainly. |
| 11:00:06 | 17 | A.   Yes. |
| 11:00:07 | 18 | Q.   All right.  And what is that? |
| 11:00:09 | 19 | A.   It's the freedom of choice provision required under the |
| 11:00:13 | 20 | state plan. |
| 11:00:14 | 21 | Q.   And that means that the state of Texas is not supposed to |
| 11:00:17 | 22 | deny to a Medicaid-eligible recipient the right for that person |
| 11:00:22 | 23 | to choose the provider they want. |
| 11:00:24 | 24 | A.   That's right. |
| 11:00:25 | 25 | Q.   And you do know, then, that raising obstacles for those |

| | | |
|---|---|---|
| 11:00:30 | 1 | folks to be able to get to the provider of their choice would not |
| 11:00:34 | 2 | be nice. |
| 11:00:37 | 3 | MR. STEPHENS:  Objection, your Honor.  It's vague. |
| 11:00:41 | 4 | THE COURT:  Vague? |
| 11:00:43 | 5 | MR. STEPHENS:  It's argumentative.  Would not be nice. |
| 11:00:49 | 6 | A.   Right. |
| 11:00:50 | 7 | Q.   (BY MR. WATKINS) What? |
| 11:00:51 | 8 | A.   Yes. |
| 11:00:53 | 9 | Q.   So you didn't do any audit, you didn't reopen the audit. |
| 11:01:04 | 10 | The misrepresentation, that thing to the Texas Ranger, the |
| 11:01:11 | 11 | interpretations of these video clips was made by you, a lawyer, |
| 11:01:15 | 12 | based on the advice of an orthopod.  Do you think that justifies |
| 11:01:21 | 13 | denying these women the right to choose their own provider? |
| 11:01:33 | 14 | MR. STEPHENS:  Objection, your Honor.  It's |
| 11:01:35 | 15 | argumentative. |
| 11:01:38 | 16 | A.   I don't agree -- |
| 11:01:38 | 17 | THE COURT:  He can make the decision.  It's not |
| 11:01:41 | 18 | argument -- |
| 11:01:42 | 19 | A.   I don't agree with the premises of your question.  The |
| 11:01:45 | 20 | reason for the disenrollment of Planned Parenthood Gulf Coast in |
| 11:01:59 | 21 | this case is clearly and convincingly supported by the evidence |
| 11:02:03 | 22 | that came before me.  I judiciously and justly reviewed it.  I |
| 11:02:11 | 23 | was not dilatory, I was diligent.  That the time span reflected |
| 11:02:20 | 24 | that.  And the reason for the disenrollment is contained in that |
| 11:02:25 | 25 | video.  And that video, as I believe the Court will find, upon |

| | | |
|---|---|---|
| 11:02:31 | 1 | reviewing the many instances of evidence within it, demonstrably |
| 11:02:40 | 2 | shows a willingness to violate the medical and ethical standards |
| 11:02:45 | 3 | in Texas, standards buttressed by federal law. |
| 11:02:52 | 4 | THE COURT:  Want to read the question back to the |
| 11:02:54 | 5 | witness. |
| 11:03:15 | 6 | (Last question read back.) |
| 11:03:19 | 7 | A.   And that -- no.  But those aren't the right premises. |
| 11:03:25 | 8 | Q.   (BY MR. WATKINS) All right. |
| 11:03:26 | 9 | A.   Sorry. |
| 11:03:27 | 10 | Q.   I guess we'll talk about the other. |
| 11:03:29 | 11 | By the way, you indicate what you saw indicated a |
| 11:03:31 | 12 | willingness to violate, right?  It's what you just said. |
| 11:03:37 | 13 | A.   I don't believe I used the word "willingness" just now. |
| 11:04:31 | 14 | Q.   You did use the word "willingness." |
| 11:04:33 | 15 | A.   May I answer? |
| 11:04:35 | 16 | Q.   My question is, did you use the word "willingness"? |
| 11:04:37 | 17 | A.   Yes.  And by willingness, may I explain what I meant? |
| 11:04:40 | 18 | Q.   No.  I just want to know if you used it.  Is there a |
| 11:04:43 | 19 | difference between willingness and actually doing something? |
| 11:04:45 | 20 | A.   If I did use the word -- yes.  I take that I used the word |
| 11:04:51 | 21 | "willingness," based on what you just said.  And willingness |
| 11:04:55 | 22 | means, as evidenced in the video, the condoning of a practice |
| 11:05:04 | 23 | that is a program violation.  That's what willingness means. |
| 11:05:08 | 24 | Q.   Well, let's go back to your notice of termination. |
| 11:05:15 | 25 | Defendants' Exhibit 1 and Plaintiffs' Exhibit 1.  You have one up |

| | | |
|---|---|---|
| 11:05:20 | 1 | there, don't you? |
| 11:05:20 | 2 | A.    I do. |
| 11:05:28 | 3 | Q.    Let's go to page 3 -- I'm sorry, page 2. |
| 11:05:34 | 4 | A.    Yes. |
| 11:05:36 | 5 | Q.    The unedited video footage, do you see that paragraph? |
| 11:05:40 | 6 | A.    Yes. |
| 11:05:47 | 7 | Q.    The last sentence starts, HHSC-IG chief medical officer.  Do |
| 11:05:57 | 8 | you see that? |
| 11:05:58 | 9 | A.    You're on page 2 of 6? |
| 11:06:00 | 10 | Q.    Yes. |
| 11:06:02 | 11 | A.    The last sentence of which? |
| 11:06:03 | 12 | Q.    The paragraph that starts, the unedited video. |
| 11:06:06 | 13 | A.    Yes. |
| 11:06:06 | 14 | Q.    The last sentence starts, HHSC. |
| 11:06:08 | 15 | A.    Yes. |
| 11:06:10 | 16 | Q.    Chief medical officer.  That's Mr. Spears -- Dr. Spears that |
| 11:06:14 | 17 | we talked about before, right? |
| 11:06:15 | 18 | A.    That's right. |
| 11:06:15 | 19 | Q.    Okay.  Reviewed the video and concluded that your |
| 11:06:19 | 20 | willingness to engage in these practices.  Which practices are |
| 11:06:25 | 21 | you talking about? |
| 11:06:28 | 22 | A.    The practice evidenced in 3 in the next paragraph. |
| 11:06:32 | 23 | Q.    Okay.  And so, their willingness to engage in those |
| 11:06:37 | 24 | practices is your basis -- is one of the bases for kicking them |
| 11:06:41 | 25 | out? |

| | | |
|---|---|---|
| 11:06:41 | 1 | A.   Yes.  And willingness means condoning a practice that is a |
| 11:06:50 | 2 | program violation. |
| 11:06:53 | 3 | Q.   A willingness to condone? |
| 11:06:55 | 4 | A.   No.  Willingness -- I'm defining willingness.  And it may |
| 11:06:59 | 5 | have been inartfully chosen in this -- in my writing here. |
| 11:07:03 | 6 | THE COURT:  You're now amending your letter? |
| 11:07:05 | 7 | THE WITNESS:  I'm not amending it.  I'm explaining -- |
| 11:07:07 | 8 | THE COURT:  Okay.  Then answer the question.  I'm |
| 11:07:08 | 9 | perfectly able of determining what willingness -- |
| 11:07:12 | 10 | THE WITNESS:  Yes. |
| 11:07:12 | 11 | THE COURT:  What willingness means. |
| 11:07:14 | 12 | THE WITNESS:  Yes, sir. |
| 11:07:17 | 13 | Q.   (BY MR. WATKINS) All right.  Now, let's look at the next |
| 11:07:24 | 14 | paragraph, which you just referenced.  No. 1, a history.  How |
| 11:07:29 | 15 | many times do you know about? |
| 11:07:32 | 16 | A.   The video indicates that this particular condoning or |
| 11:07:40 | 17 | acceptance or practice of this practice has occurred before. |
| 11:07:46 | 18 | Q.   Well, if we're slicing and dicing the words, it says, a |
| 11:07:51 | 19 | history of deviating from accepted standards to procure samples. |
| 11:07:57 | 20 | A.   Yes. |
| 11:07:58 | 21 | Q.   You say that means procured from the pregnant woman, right? |
| 11:08:05 | 22 | That's what you're saying. |
| 11:08:09 | 23 | A.   I'm saying that the video evidence indicates that this has |
| 11:08:16 | 24 | been a practice. |
| 11:08:17 | 25 | Q.   No, sir.  I'm asking you at this point about the words. |

| | | |
|---|---|---|
| 11:08:21 | 1 | A.   Yes. |
| 11:08:22 | 2 | Q.   Because you want to redefine some words.  I'm asking you |
| 11:08:25 | 3 | what you meant by procure samples.  Because, see, my question to |
| 11:08:29 | 4 | you specifically is, if you've got three trays there of already |
| 11:08:34 | 5 | extracted material and you've got a researcher that wants one of |
| 11:08:38 | 6 | them, you could provide that one to the researcher. |
| 11:08:41 | 7 | MR. STEPHENS:  Objection, your Honor.  He's posing a |
| 11:08:43 | 8 | hypothetical.  It's not shown in the video.  It's not something |
| 11:08:46 | 9 | that's any part of the letter. |
| 11:08:47 | 10 | THE COURT:  Objection is overruled. |
| 11:08:51 | 11 | Q.   (BY MR. WATKINS) Couldn't you?  Couldn't procure there mean |
| 11:08:54 | 12 | that we've got four of these trays with stuff in it, one of them |
| 11:08:56 | 13 | happens to fit the research project and you pick it out, and that |
| 11:09:00 | 14 | would be procuring a sample, wouldn't it? |
| 11:09:04 | 15 | A.   But that is not what I intended or meant in using the word |
| 11:09:09 | 16 | "procure" there. |
| 11:09:10 | 17 | Q.   You meant way to procure it out of the woman's body. |
| 11:09:17 | 18 | A.   Yes. |
| 11:09:18 | 19 | Q.   Okay.  But you didn't say that. |
| 11:09:21 | 20 | All right.  Let's go No. 2.  A history of permitting |
| 11:09:25 | 21 | staff physicians to alter procedures to obtain targeted tissue |
| 11:09:30 | 22 | samples needed for their specific research. |
| 11:09:32 | 23 | Did you hear the testimony that the doctor performing |
| 11:09:35 | 24 | the abortion doesn't know whether it's going to be a research |
| 11:09:38 | 25 | project or not? |

| | | |
|---|---|---|
| 11:09:41 | 1 | A.    Yes. |
| 11:09:42 | 2 | Q.    Do you have any evidence other than a doctor who might be |
| 11:09:46 | 3 | doing research themselves, do you have any evidence that any |
| 11:09:49 | 4 | abortion provider ever knew that a particular abortion product |
| 11:09:55 | 5 | was going to be used for research at the time they were |
| 11:09:57 | 6 | performing the abortion? |
| 11:09:58 | 7 | A.    Yes. |
| 11:09:59 | 8 | Q.    What evidence is that? |
| 11:10:00 | 9 | A.    It's in the video, Dr. Reagan Theiler. |
| 11:10:02 | 10 | Q.    Okay.  And you say that the evidence -- is Dr. Theiler the |
| 11:10:07 | 11 | one that was doing her own research? |
| 11:10:11 | 12 | A.    She was doing her own research.  That's right. |
| 11:10:13 | 13 | Q.    All right.  Now, my question to you was, other than a doctor |
| 11:10:16 | 14 | that was doing their own research, do you know of any instance in |
| 11:10:21 | 15 | which a doctor -- any instance where a doctor performing an |
| 11:10:26 | 16 | abortion knew that it was going to be used -- that the product |
| 11:10:28 | 17 | was going to be used for research? |
| 11:10:35 | 18 | A.    I don't -- no.  I'm not aware of that. |
| 11:10:37 | 19 | Q.    All right.  Now, with Dr. Theiler, do you have any evidence |
| 11:10:40 | 20 | that she altered the abortion procedure because she was doing |
| 11:10:44 | 21 | research? |
| 11:10:44 | 22 | A.    I don't know. |
| 11:10:45 | 23 | Q.    Well, you don't have any evidence of any abortion doctor |
| 11:10:48 | 24 | that ever altered the abortion procedure in order to benefit |
| 11:10:52 | 25 | research, sir. |

| | | |
|---|---|---|
| 11:11:21 | 1 | A.   All right.  I'm sorry.  That was a statement.  Is that a |
| 11:11:24 | 2 | question? |
| 11:11:24 | 3 | Q.   Yeah.  It's a question. |
| 11:11:25 | 4 | A.   Okay.  It is a question that is right. |
| 11:11:31 | 5 | Q.   Thank you. |
| 11:11:33 | 6 |         Now, look at No. 3.  A willingness to convert normal |
| 11:11:39 | 7 | pregnancy to the breach position to ensure researchers to receive |
| 11:11:43 | 8 | intact specimen. |
| 11:11:45 | 9 | A.   Yes. |
| 11:11:47 | 10 | Q.   Which doctor converted normal pregnancy to the breach |
| 11:11:51 | 11 | position to ensure researchers to receive intact specimens? |
| 11:11:58 | 12 | A.   The evidence in the video does not specify a doctor. |
| 11:12:01 | 13 | Q.   So you have no evidence for this court of any doctor who |
| 11:12:05 | 14 | ever did that. |
| 11:12:05 | 15 | A.   That's right. |
| 11:12:07 | 16 | Q.   No. 4, an admission that we get what we need to do to alter |
| 11:12:12 | 17 | the standard of care where we are still maintaining patient |
| 11:12:16 | 18 | safety, still maintaining efficiency and clinic operations, but |
| 11:12:19 | 19 | we integrate research into it. |
| 11:12:20 | 20 |         Do you know whether that particular quote -- the lady |
| 11:12:24 | 21 | explained it from the stand the other day -- whether that |
| 11:12:26 | 22 | particular quote applied to altering abortion procedures or |
| 11:12:30 | 23 | altering clinical procedures? |
| 11:12:33 | 24 | A.   It applied in my judgment in viewing the video evidence that |
| 11:12:39 | 25 | -- to altering abortion procedures. |

| | | |
|---|---|---|
| 11:12:41 | 1 | Q.   All right.  And so, you discount her testimony that the |
| 11:12:45 | 2 | doctors didn't know whether or not there was going to be -- I |
| 11:12:50 | 3 | mean, you don't know of any.  We've already covered that.  So I'm |
| 11:12:52 | 4 | wondering how you know that a doctor altered the abortion |
| 11:12:55 | 5 | procedures to benefit research that they didn't know there was |
| 11:12:58 | 6 | going to be any research. |
| 11:13:04 | 7 | A.   This was based on the evidence in the video that Planned |
| 11:13:10 | 8 | Parenthood Gulf Coast condones a policy of altering abortion |
| 11:13:18 | 9 | procedures to obtain fetal tissue.  I think that's clearly |
| 11:13:21 | 10 | presented in the video. |
| 11:13:22 | 11 | Q.   All right.  So you're relying solely on the video, and you |
| 11:13:25 | 12 | can't give me the name of a doctor who ever did it. |
| 11:13:28 | 13 | A.   I'm relying on the director of research for Planned |
| 11:13:31 | 14 | Parenthood Gulf Coast. |
| 11:13:31 | 15 | Q.   All right.  So we're going to get all of this from Mr. Ted |
| 11:13:36 | 16 | Spears, right? |
| 11:13:39 | 17 |         MR. STEPHENS:  Objection, your Honor.  He said the |
| 11:13:41 | 18 | director of research for Planned Parenthood Gulf Coast. |
| 11:13:43 | 19 |         MR. WATKINS:  Ah, excuse me.  I misunderstood.  I |
| 11:13:46 | 20 | didn't listen to the answer and I know better than that. |
| 11:13:49 | 21 |         THE COURT:  Well, let's listen. |
| 11:13:51 | 22 | Q.   (BY MR. WATKINS) Now, let's see what we have to do about No. |
| 11:13:55 | 23 | 5.  That admission that Planned Parenthood gets requests for |
| 11:14:02 | 24 | information from our study sponsor on what the data they need |
| 11:14:06 | 25 | that is not our standard of care, that you provided -- is needed |

11:14:16   1    creating a separate research protocol or a template that can

11:14:19   2    include medically unnecessary testing.

11:14:23   3              Anything wrong with doing medically unnecessary testing

11:14:26   4    on the extraction, the product of conception that's already been

11:14:31   5    extracted?  You can do that, right?

11:14:33   6    A.    There -- I'm sorry, is your question, is there anything

11:14:36   7    wrong with unnecessary testing?

11:14:37   8    Q.    Yes.  Is there anything wrong with doing unnecessary

11:14:42   9    testing, quote, unquote, whatever that means, on extraction that

11:14:47   10   has already been extracted?  Can't you test a fetal tissue for

11:14:52   11   whatever you want to test it for?

11:14:57   12   A.    I think there's something wrong with doing unnecessary

11:15:00   13   testing, but you can test fetal tissue.  Yes.

11:15:02   14   Q.    Well, do you suppose that researchers that are working on

11:15:06   15   fetal tissue ever have a theory and then, they test it and it

11:15:08   16   doesn't work out, that's unnecessary testing, then, isn't it?

11:15:11   17   A.    Okay.  Just different interpretation of the word

11:15:13   18   "unnecessary."

11:15:13   19   Q.    Okay.  Well, let's pin that down.  There's nothing wrong

11:15:19   20   with doing whatever testing you're going to test on the fetal

11:15:23   21   tissue after it's been extracted.

11:15:25   22   A.    Deemed necessary, yes.

11:15:28   23   Q.    Deemed necessary by the researcher for their research

11:15:31   24   project.

11:15:31   25   A.    Right.

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 11:15:32 | 1  | Q.   Do you have any evidence that anybody ever did any testing       |
| 11:15:36 | 2  | on already extracted fetal tissue that was not necessary for the     |
| 11:15:40 | 3  | research they were doing?                                            |
| 11:15:44 | 4  | A.   It's -- that part of the finding is tied to the first part.      |
| 11:15:50 | 5  | Q.   I'm sorry.  I just thought it was listed there separate.         |
| 11:15:56 | 6  |      My question -- can I get an answer to the question?              |
| 11:16:00 | 7  | A.   To that particular question, no.                                |
| 11:16:02 | 8  | Q.   Okay.  You don't know then?                                      |
| 11:16:04 | 9  |      THE COURT:  Wait.  He asked another question, then you           |
| 11:16:08 | 10 | said no.  That means you refused to answer.                          |
| 11:16:11 | 11 |      THE WITNESS:  Oh, I'm sorry.                                     |
| 11:16:13 | 12 | A.   Yes, you can.                                                   |
| 11:16:14 | 13 | Q.   (BY MR. WATKINS) Yes, you can what?                              |
| 11:16:15 | 14 | A.   Yes, you can get an answer.  And would you mind rephrasing       |
| 11:16:18 | 15 | it, please?  I apologize.                                            |
| 11:16:24 | 16 | Q.   Is there anything wrong about doing any testing that you        |
| 11:16:26 | 17 | want to do to the already extracted fetal tissue?                    |
| 11:16:34 | 18 | A.   As a general matter, I think not.                               |
| 11:16:36 | 19 | Q.   All right.  Now, No. 6 here is a willingness to charge more      |
| 11:16:45 | 20 | than the cost incurred for procuring fetal tissue.  What do you      |
| 11:16:52 | 21 | base that on?                                                        |
| 11:16:54 | 22 | A.   Past contracting activity that was -- well, I said two          |
| 11:17:03 | 23 | things.  I'm sorry.  I'm happy to begin again.                       |
| 11:17:08 | 24 |      The video evidence indicates -- excuse me, that in this         |
| 11:17:17 | 25 | negotiation, in the colloquies that there's repeated discussion      |

| | | |
|---|---|---|
| 11:17:24 | 1 | about ensuring there's financial benefit. |
| 11:17:26 | 2 | Q.   Okay. |
| 11:17:27 | 3 | A.   And financial benefit as those various parts of the dialogue |
| 11:17:38 | 4 | reveal was something extended beyond just covering costs. |
| 11:17:44 | 5 | Q.   What?  I mean, they said they were going to get a financial |
| 11:17:49 | 6 | benefit.  What did they say that would be more than the cost? |
| 11:17:53 | 7 | A.   It was specifically identified in the language between the |
| 11:18:03 | 8 | parties in the video discussing that financial benefit. |
| 11:18:06 | 9 | Q.   In what way? |
| 11:18:09 | 10 | A.   They didn't -- I think the word "profit" was used. |
| 11:18:12 | 11 | Q.   Okay.  So you think there's something in that videotape that |
| 11:18:15 | 12 | says, we need to make a profit? |
| 11:18:17 | 13 | A.   I'm sorry.  Actually, I think the word "profit" was used. |
| 11:18:21 | 14 | That's right. |
| 11:18:21 | 15 | Q.   In what context? |
| 11:18:22 | 16 | A.   Regarding financial benefit. |
| 11:18:23 | 17 | Q.   All right.  So you think that if somebody views the |
| 11:18:26 | 18 | videotape, they're going to find somebody from a Planned |
| 11:18:29 | 19 | Parenthood entity that says, when we do this for research, we |
| 11:18:31 | 20 | have to make a profit? |
| 11:18:35 | 21 | A.   No.  I don't -- it's hypothetical.  I'm speaking to what I |
| 11:18:39 | 22 | viewed in the video. |
| 11:18:41 | 23 | Q.   No, sir.  I'm not asking a hypothetical.  I'm asking you, |
| 11:18:43 | 24 | are you telling this judge that if we review that videotape, |
| 11:18:47 | 25 | you're going to find a Planned Parenthood employee who's going to |

| | | |
|---|---|---|
| 11:18:50 | 1 | say, we need to make a profit on research fetal tissue? |
| 11:18:55 | 2 | A.   That statement is not in there.  No. |
| 11:18:56 | 3 | Q.   All right.  Now, it does say financial benefit. |
| 11:19:00 | 4 | A.   It does. |
| 11:19:01 | 5 | Q.   Yeah.  And it's a financial benefit to get some of your |
| 11:19:04 | 6 | expenses reimbursed, isn't it? |
| 11:19:07 | 7 | A.   Yes.  That's one interpretation. |
| 11:19:11 | 8 | Q.   Well, it's not an interpretation.  It is a -- |
| 11:19:13 | 9 | A.   Application. |
| 11:19:14 | 10 | Q.   It is a financial benefit to get reimbursed for your actual |
| 11:19:19 | 11 | reasonable expenses. |
| 11:19:20 | 12 | A.   Yes. |
| 11:19:21 | 13 | Q.   Thank you. |
| 11:19:26 | 14 |         Now, later down on that page, you list -- and do you |
| 11:19:37 | 15 | understand what I mean when you say, this is the affiliate |
| 11:19:39 | 16 | problem? |
| 11:19:40 | 17 | A.   Yes. |
| 11:19:41 | 18 | Q.   That you're trying to tag one person for somebody else's |
| 11:19:43 | 19 | stuff, right? |
| 11:19:45 | 20 | A.   Yes. |
| 11:19:46 | 21 | Q.   Okay.  You list nine things, right? |
| 11:19:58 | 22 | A.   Yes.  That's correct. |
| 11:19:59 | 23 | Q.   All right.  Nos. 3 through 8 have to do with the Federation, |
| 11:20:07 | 24 | right? |
| 11:20:07 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:20:07 | 1 | Q.   Okay.  Do you have any evidence that the Federation has done |
| 11:20:13 | 2 | anything wrong? |
| 11:20:14 | 3 | A.   No. |
| 11:20:15 | 4 | Q.   Okay.  So you're not trying to remove the Federation from |
| 11:20:19 | 5 | any Medicaid program in Texas, are you? |
| 11:20:22 | 6 | A.   I don't think that's at issue. |
| 11:20:24 | 7 | Q.   I didn't ask you if that was at issue. |
| 11:20:26 | 8 | A.   I'm sorry.  Yeah. |
| 11:20:27 | 9 | Q.   You're not trying to remove Federation from any Medicaid |
| 11:20:29 | 10 | program in Texas. |
| 11:20:31 | 11 | A.   That's right. |
| 11:20:32 | 12 | Q.   And you don't have any allegation in here that Federation |
| 11:20:35 | 13 | ever did anything wrong. |
| 11:20:37 | 14 | A.   That's right. |
| 11:20:37 | 15 | Q.   Okay.  So you cannot kick out those three entities based on |
| 11:20:42 | 16 | anything the Federation did. |
| 11:20:44 | 17 |       MR. STEPHENS:  Objection, your Honor.  Relevance. |
| 11:20:50 | 18 | Planned Parenthood Federation is not discussed in the letter. |
| 11:20:55 | 19 | And plaintiffs' counsel arguing issues not discussed in the |
| 11:21:00 | 20 | letter aren't relevant.  Objection to our discussions with Mr. |
| 11:21:03 | 21 | Bowen -- |
| 11:21:04 | 22 |       THE COURT:  This is cross-examination and I'll permit |
| 11:21:06 | 23 | the answer. |
| 11:21:08 | 24 | A.   Can you rephrase, please? |
| 11:21:10 | 25 | Q.   (BY MR. WATKINS) All right.  I used to be able to remember |

| | | |
|---|---|---|
| 11:21:14 | 1 | these things. |
| 11:21:21 | 2 | THE COURT:  Repeat the question, please. |
| 11:21:21 | 3 | (Last question read back.) |
| 11:21:24 | 4 | A.   I believe that's right. |
| 11:21:25 | 5 | Q.   (BY MR. WATKINS) Okay.  And so, whether or not the |
| 11:21:29 | 6 | affiliates in Texas are affiliated with Federation is simply |
| 11:21:33 | 7 | irrelevant to what you're trying to do. |
| 11:21:35 | 8 | A.   No.  I don't agree with that. |
| 11:21:37 | 9 | Q.   Well, you're not trying to kick the Federation out. |
| 11:21:41 | 10 | A.   That's right. |
| 11:21:42 | 11 | Q.   All right.  And there's nothing that the Federation did that |
| 11:21:48 | 12 | you could hold the three entities in Texas responsible for. |
| 11:21:53 | 13 | A.   That's right. |
| 11:21:54 | 14 | Q.   Okay.  So whether or not they're affiliated with the |
| 11:21:57 | 15 | Federation just doesn't have anything to do with your right to |
| 11:22:00 | 16 | exclude the three that -- the three entities we've been talking |
| 11:22:03 | 17 | about. |
| 11:22:07 | 18 | A.   I don't agree with that. |
| 11:22:09 | 19 | Q.   Okay.  What is it that the Federation does that you think |
| 11:22:12 | 20 | justifies your right to exclude those three entities from |
| 11:22:16 | 21 | Medicaid? |
| 11:22:17 | 22 | A.   It provides all the guidance regarding fetal tissue |
| 11:22:24 | 23 | research.  It tracks every fetal tissue research activity in the |
| 11:22:29 | 24 | state.  It provides the training.  It provides -- it certifies, |
| 11:22:35 | 25 | you know, it provides man -- there is manifold evidence -- |

| | | |
|---|---|---|
| 11:22:45 | 1 | manifest evidence of commonality among the affiliates to |
| 11:22:55 | 2 | demonstrate -- to substantiate their affiliation and not their |
| 11:22:59 | 3 | separateness.  That this cuts to whether they are an affiliate |
| 11:23:04 | 4 | under Texas law. |
| 11:23:07 | 5 | Q.   Well, my question -- I didn't make my question clear. |
| 11:23:10 | 6 | What difference does it make if these are affiliates of |
| 11:23:12 | 7 | Federation if they're not saying the Federation did anything |
| 11:23:15 | 8 | wrong? |
| 11:23:19 | 9 | A.   Because the issue is whether they are affiliates.  And our |
| 11:23:24 | 10 | rules provide that if you are affiliated with an entity -- |
| 11:23:30 | 11 | another entity in the state that exhibits a program violation, |
| 11:23:34 | 12 | then you may be subject to sanction. |
| 11:23:37 | 13 | Q.   Right.  So what is the program violation that Federation |
| 11:23:41 | 14 | committed that lets you do this to these entities? |
| 11:23:45 | 15 | A.   There isn't one. |
| 11:23:46 | 16 | Q.   Okay.  Now, so it doesn't matter whether they're affiliated |
| 11:23:50 | 17 | with the Federation. |
| 11:23:59 | 18 | A.   It does, but not for the reasons that the Federation did |
| 11:24:04 | 19 | anything wrong. |
| 11:24:06 | 20 | Q.   Well, what would be wrong with being affiliated with an |
| 11:24:09 | 21 | organization that didn't do anything wrong? |
| 11:24:11 | 22 | A.   There's nothing wrong with that.  The issue is whether these |
| 11:24:15 | 23 | entities are intrinsically and extensively affiliated in their |
| 11:24:21 | 24 | practice and engagement in their procedures and operation, and |
| 11:24:28 | 25 | the answer is yes, they are.  The finding is not that Planned |

| | | |
|---|---|---|
| 11:24:34 | 1 | Parenthood Federation of America did something wrong.  The |
| 11:24:36 | 2 | finding is that Planned Parenthood Gulf Coast did. |
| 11:24:39 | 3 | Q.    All right. |
| 11:24:40 | 4 | A.    And by virtue of that complex nexus within the state of |
| 11:24:49 | 5 | Texas, among these affiliates evidenced by the commonality of |
| 11:24:54 | 6 | practice, which is generated, managed, overseen and executed even |
| 11:25:00 | 7 | by the Federation undergirds the conclusion that the affiliate |
| 11:25:07 | 8 | provision in our rule is applicable here. |
| 11:25:11 | 9 | Q.    That you can hold one entity responsible for the misconduct |
| 11:25:14 | 10 | of another entity.  That's your rule, isn't it? |
| 11:25:17 | 11 | A.    That's it. |
| 11:25:17 | 12 | Q.    All right.  So if you're affiliated with the Federation and |
| 11:25:20 | 13 | they didn't do anything wrong, then you can't hold those three |
| 11:25:23 | 14 | entities responsible because they're affiliated with the |
| 11:25:28 | 15 | Federation. |
| 11:25:29 | 16 | A.    And I disagree. |
| 11:25:34 | 17 | Q.    Okay.  Well, we'll just let you disagree. |
| 11:25:37 | 18 | Now, you've got three others here.  In other words, |
| 11:25:40 | 19 | there's nine of them, and six of them have to do with whether or |
| 11:25:43 | 20 | not they're affiliated with the Federation. |
| 11:25:46 | 21 | A.    Yes. |
| 11:25:46 | 22 | Q.    All right.  Now, common identifying information among |
| 11:25:51 | 23 | affiliates.  What's that?  Number 1. |
| 11:26:01 | 24 | A.    The common insignia, the trademark. |
| 11:26:05 | 25 | Q.    Isn't it true that the state of Texas had always approved |

11:26:09   1    the separation of the abortion part of Planned Parenthood from

11:26:12   2    the clinical part?

11:26:16   3    A.   Yes.  That's required.

11:26:18   4    Q.   Okay.  Well, and you approved it.  You issued these IDs to

11:26:22   5    people based on the fact that these people were not performing

11:26:26   6    abortions.  You ratified the separation attempts that Planned

11:26:32   7    Parenthood did, right?

11:26:34   8    A.   That's right.

11:26:35   9    Q.   Okay.  Individual providers working across affiliates.  All

11:26:43   10   right.  We're talking about in this letter Gulf Coast, Greater

11:26:47   11   Texas and San Antonio, including the surgical center.

11:26:51   12        Name for me -- I've got to get the words right --

11:27:01   13   individual providers working across affiliates.  So name for me

11:27:04   14   every individual provider that worked back and forth between

11:27:09   15   these three entities.

11:27:10   16        MR. STEPHENS:  Asked and answered, your Honor.  He's

11:27:12   17   already asked him.

11:27:17   18   Q.   (BY MR. WATKINS) What I'm asking you about this particular

11:27:19   19   finding, I'm kind of interested in what did you rely upon to make

11:27:24   20   this finding --

11:27:24   21        THE COURT:  You can answer.

11:27:26   22   A.   As I said earlier, Dr. -- I'm sorry, I'm forgetting her name

11:27:31   23   now.

11:27:31   24   Q.   (BY MR. WATKINS) Just don't say it.  We know who you're

11:27:33   25   talking about.

| | | |
|---|---|---|
| 11:27:33 | 1 | A.   Okay. |
| 11:27:34 | 2 | Q.   And you don't know whether that worked simultaneously at any |
| 11:27:38 | 3 | of these. |
| 11:27:43 | 4 | A.   I believe there is -- there are indications in the video |
| 11:27:47 | 5 | that occurred, but I don't know. |
| 11:27:48 | 6 | Q.   All right.  Anybody else?  I mean, here's a big ol' finding |
| 11:27:53 | 7 | by the state of Texas that says that you're going to get these |
| 11:27:58 | 8 | folks moving back and forth.  And if that's the deal, I want to |
| 11:28:01 | 9 | know anybody else.  Are we talking about one doctor? |
| 11:28:06 | 10 | A.   I don't have any other names for you right now.  I believe |
| 11:28:12 | 11 | there was testimony yesterday about a doctor that worked at one |
| 11:28:16 | 12 | entity and then another.  But the answer to your question is, I |
| 11:28:21 | 13 | don't have any other names for you right now. |
| 11:28:22 | 14 | Q.   All right.  Now, we all know that in Travis County, there's |
| 11:28:25 | 15 | a bunch of hospitals. |
| 11:28:26 | 16 | A.   Yes. |
| 11:28:26 | 17 | Q.   We know doctors that do stuff in one hospital and then, go |
| 11:28:29 | 18 | do it at another hospital. |
| 11:28:31 | 19 | A.   That's right. |
| 11:28:32 | 20 | Q.   Does that make those hospitals affiliates? |
| 11:28:34 | 21 | A.   Does it, no. |
| 11:28:36 | 22 | Q.   All right.  Let's also talk about willingness, again, for a |
| 11:28:39 | 23 | minute.  Let's assume, for a moment -- this is a hypothetical -- |
| 11:28:42 | 24 | that there's a backboard of directors of three directors, all |
| 11:28:45 | 25 | right?  And one of those directors says, we're short of money, |

| | | |
|---|---|---|
| 11:28:49 | 1 | let's go rob a 7-Eleven and get the money for the bank, and the |
| 11:28:53 | 2 | other two say no, we can't do that.  Has that shown that that |
| 11:28:57 | 3 | bank is willing to rob the 7-Eleven? |
| 11:28:59 | 4 | A.   No. |
| 11:29:00 | 5 | Q.   All right.  So you have individuals here who you say have |
| 11:29:04 | 6 | done bad things that are willing to do bad things. |
| 11:29:06 | 7 | Do you have any indication that the board of directors |
| 11:29:08 | 8 | of any of these entities ever approved their willingness to do |
| 11:29:11 | 9 | those things? |
| 11:29:13 | 10 | A.   I don't. |
| 11:29:13 | 11 | Q.   All right.  If you'll give me a minute, Judge, I think I'm |
| 11:29:46 | 12 | about through.  Maybe not.  Pass the witness. |
| 11:30:19 | 13 | THE COURT:  Any redirect? |
| 11:30:22 | 14 | MR. STEPHENS:  No, your Honor. |
| 11:30:33 | 15 | THE COURT:  I have listened to recent testimony about |
| 11:30:41 | 16 | the Department of Health regulations, one of which requires |
| 11:30:49 | 17 | separation of the placenta from fetal tissue and requires |
| 11:30:59 | 18 | separating in the fetal tissue other -- I didn't like the word |
| 11:31:08 | 19 | "ornaments" but other materials that are not exactly fetal |
| 11:31:16 | 20 | tissue.  It makes -- does that make sense to you? |
| 11:31:19 | 21 | THE WITNESS:  Yes, sir. |
| 11:31:19 | 22 | THE COURT:  That has to be done post-removed. |
| 11:31:25 | 23 | THE WITNESS:  Yes. |
| 11:31:32 | 24 | THE COURT:  And it has to be done by the people who are |
| 11:31:39 | 25 | going to store before storing -- before freezing the fetal |

| | | |
|---|---|---|
| 11:31:46 | 1 | materials. |
| 11:31:47 | 2 | THE WITNESS:  Uh-huh.  Yes, sir. |
| 11:31:48 | 3 | THE COURT:  I also heard testimony that the regulation |
| 11:32:03 | 4 | in its definition of fetal tissue is that it is not human tissue. |
| 11:32:12 | 5 | I heard it three times and confirmed by the defendants' lawyers. |
| 11:32:28 | 6 | That is your department, isn't it? |
| 11:32:30 | 7 | THE WITNESS:  Yes, sir. |
| 11:32:30 | 8 | THE COURT:  You work in that department.  All right. |
| 11:32:34 | 9 | You may step down. |
| 11:32:46 | 10 | You may call your next witness. |
| 11:32:48 | 11 | MR. BIGGS:  At this time, defendants call Dr. Ted |
| 11:32:51 | 12 | Spears, your Honor. |
| 11:33:20 | 13 | THE COURT:  Come forward, sir, and be sworn. |
| 11:33:22 | 14 | (Witness sworn.) |
| 11:33:37 | 15 | THE COURT:  Good morning.  Would you tell us your full |
| 11:33:42 | 16 | name and spell your last, please, for the record? |
| 11:33:44 | 17 | THE WITNESS:  Yes.  My name is Ted Spears, S-P-E-A-R-S. |
| 11:33:49 | 18 | THE COURT:  You may proceed. |
| 11:33:50 | 19 | TED SPEARS, called by the Defendant, duly sworn. |
| 11:33:50 | 20 | DIRECT EXAMINATION |
| 11:33:50 | 21 | BY MR. BIGGS: |
| 11:33:51 | 22 | Q.   Thank you, your Honor. |
| 11:33:52 | 23 | Good morning, Dr. Spears.  How are you currently |
| 11:33:56 | 24 | employed? |
| 11:33:56 | 25 | A.   I'm the Chief Medical Officer for the Inspector General of |

| | | |
|---|---|---|
| 11:34:01 | 1 | the Health and Human Services of Texas. |
| 11:34:02 | 2 | Q.   What does the Inspector General's Office do exactly? |
| 11:34:03 | 3 | A.   The role and responsibility of the Inspector General is the |
| 11:34:07 | 4 | integrity, oversight of all of the public funds that are spent in |
| 11:34:13 | 5 | the state of Texas annually. |
| 11:34:15 | 6 | Q.   Does your office have any responsibilities regarding |
| 11:34:17 | 7 | Medicaid? |
| 11:34:18 | 8 | A.   Yes, it does. |
| 11:34:19 | 9 | Q.   Will you briefly describe how Medicaid is administered in |
| 11:34:23 | 10 | Texas? |
| 11:34:23 | 11 | A.   The policy development and review is provided by Health and |
| 11:34:28 | 12 | Human Services.  The Inspector General's role is, again, the |
| 11:34:32 | 13 | integrity, oversight of the programs under Health and Human |
| 11:34:37 | 14 | Services. |
| 11:34:37 | 15 | Q.   As the Chief Medical Officer, what are your |
| 11:34:41 | 16 | responsibilities? |
| 11:34:42 | 17 | A.   My primary responsibility is to provide medical advice and |
| 11:34:47 | 18 | medical direction for clinical matter -- clinical medical |
| 11:34:51 | 19 | matters. |
| 11:34:52 | 20 | Q.   Let's talk about what qualifies you to be the Chief Medical |
| 11:34:55 | 21 | Officer.  Where did you go to college? |
| 11:34:57 | 22 | A.   University of Texas undergraduate here. |
| 11:35:00 | 23 | Q.   Did you continue your education after graduating from |
| 11:35:02 | 24 | college? |
| 11:35:02 | 25 | A.   Yes, I did.  I went to University of Texas Medical Branch in |

| | | |
|---|---|---|
| 11:35:07 | 1 | Galveston, Texas. |
| 11:35:08 | 2 | Q.   Did you have any training following graduating from medical |
| 11:35:12 | 3 | school? |
| 11:35:12 | 4 | A.   Yes.  Following medical school, I pursued orthopedic |
| 11:35:16 | 5 | surgical training and did five-year orthopedic surgical |
| 11:35:21 | 6 | residency. |
| 11:35:21 | 7 | Q.   Did you have any further training after that? |
| 11:35:23 | 8 | A.   Yes.  I electively pursued postgraduate subspecialty |
| 11:35:28 | 9 | surgical training, called a fellowship training program, and I |
| 11:35:32 | 10 | performed two of those independently:  One in Houston at the |
| 11:35:37 | 11 | University of Texas Houston; the other in Dallas with a professor |
| 11:35:40 | 12 | at U.T. Southwestern. |
| 11:35:42 | 13 | Q.   Did those fellowships have any specific concentration? |
| 11:35:45 | 14 | A.   That's -- fellowships are when a doctor does a residency |
| 11:35:51 | 15 | within a specialty, whenever you do a fellowship, you're |
| 11:35:55 | 16 | subspecializing within that.  So, for instance, at the University |
| 11:35:58 | 17 | of Texas, I did a surgical fellowship for complex foot and ankle |
| 11:36:03 | 18 | problems, and then, after that, went to Dallas and performed a |
| 11:36:07 | 19 | complex knee reconstruction in sports medicine fellowship. |
| 11:36:11 | 20 | Q.   What did you do after completing your fellowship? |
| 11:36:13 | 21 | A.   I finally got a job, came back to Austin August of '86, and |
| 11:36:20 | 22 | have been in private practice until August of 2016. |
| 11:36:25 | 23 | Q.   Will you please just briefly describe your practice? |
| 11:36:30 | 24 | A.   My practice was a community orthopedic practice.  I was in |
| 11:36:38 | 25 | sole practice the entire 30 years and I have my own private |

| 11:36:44 | 1 | practice. |
|---|---|---|

11:36:44  1   practice.

11:36:45  2   Q.   Did you perform any surgeries in private practice?

11:36:47  3   A.   Yes.  Surgery is -- orthopedic surgery is the focus of

11:36:53  4   orthopedics, musculoskeletal.  And yes, I did a lot of surgery

11:36:58  5   over 30 years.

11:36:59  6   Q.   How many surgeries have you performed over that period?

11:37:01  7   A.   I think it would be conservative to estimate that I did 200

11:37:05  8   surgeries a year for 30 years, and not counting the time that I

11:37:09  9   spent in training and residency in the fellowship program where I

11:37:12  10   served as a secondary surgical assist.

11:37:15  11   Q.   Are you board-certified?

11:37:16  12   A.   Yes, I am.

11:37:17  13   Q.   What are you board-certified in specifically?

11:37:20  14   A.   I'm board-certified by the American Board of Orthopedic

11:37:23  15   Surgery.

11:37:23  16   Q.   How long have you been board-certified?

11:37:25  17   A.   Since July of 1992.

11:37:28  18   Q.   Do you have any affiliations with entities outside of your

11:37:34  19   private practice?

11:37:35  20   A.   Yes.  Over the years, I've served in a variety of positions

11:37:38  21   with the Texas Orthopedic Association, which is affiliated with

11:37:42  22   Texas Medical Association.  I have been an adjunct professor in

11:37:46  23   the department of kinesiology and exercise physiology for over

11:37:50  24   ten years, and a number of community clinics that I've done pro

11:37:56  25   bono that I enjoyed for the endurance community here in Austin.

|   |   |   |
|---|---|---|
| 11:37:59 | 1 | Q.   Through this training and practice experience, have you |
| 11:38:01 | 2 | become familiar with general medical and ethical standards of |
| 11:38:05 | 3 | surgery? |
| 11:38:05 | 4 | A.   I feel that I have. |
| 11:38:06 | 5 | Q.   How have you become familiar? |
| 11:38:08 | 6 | A.   Well, experience is probably the greatest teacher. |
| 11:38:12 | 7 | Certainly we have some superficial exposure in terms of academic |
| 11:38:15 | 8 | or didactic work, but really, it's a developmental thing.  It's |
| 11:38:22 | 9 | something that over time, you're presented with challenge after |
| 11:38:26 | 10 | challenge and you learn. |
| 11:38:29 | 11 | Q.   Let's turn to the facts of this dispute. |
| 11:38:32 | 12 |      Did the Inspector General ever ask you to watch the |
| 11:38:36 | 13 | eight-and-a-half hour Planned Parenthood Gulf Coast video? |
| 11:38:39 | 14 | A.   Yes. |
| 11:38:41 | 15 | Q.   Did you watch that video? |
| 11:38:42 | 16 | A.   Yes, I did. |
| 11:38:44 | 17 | Q.   Did you watch the video in its entirety? |
| 11:38:47 | 18 | A.   Every bit of it. |
| 11:38:49 | 19 | Q.   Did the Inspector General ever ask you for your medical |
| 11:38:52 | 20 | judgment regarding that video? |
| 11:38:54 | 21 | A.   Yes.  After I viewed the video -- he asked for my judgment. |
| 11:38:59 | 22 |      MR. WATKINS:  Objection, your Honor.  No foundation |
| 11:39:00 | 23 | that he's got any expertise relating to what was in the video. |
| 11:39:04 | 24 | He's an orthopedic surgeon.  He's a sports medicine man.  No |
| 11:39:07 | 25 | evidence that he's ever performed an abortion or ever seen one. |

| | | |
|---|---|---|
| 11:39:12 | 1 | He's not an OB, not a gynecologist, and he's not a pediatrician. |
| 11:39:16 | 2 | He has no relevance to the issues that they are asking him to |
| 11:39:20 | 3 | give the opinion on. |
| 11:39:23 | 4 | MR. BIGGS: Your Honor, we're not tendering Dr. Spears |
| 11:39:26 | 5 | as a expert in OB/GYN or abortion, specifically. We're asking |
| 11:39:30 | 6 | that he be considered for his role he played in IG Bowen's |
| 11:39:34 | 7 | decisionmaking. I believe the points that plaintiffs' counsel's |
| 11:39:38 | 8 | brought up could be explored thoroughly on cross. We're limiting |
| 11:39:41 | 9 | it simply to watching the video and moving forward. |
| 11:39:45 | 10 | THE COURT: Well, you're limiting it except that seems |
| 11:39:48 | 11 | to be the lawsuit, the video. But as I understand it, you're |
| 11:39:56 | 12 | limited to what he told the Inspector General. So I can take it |
| 11:40:02 | 13 | from the record that the Inspector General individually made the |
| 11:40:06 | 14 | decision to terminate them. |
| 11:40:10 | 15 | MR. BIGGS: Correct, your Honor. |
| 11:40:11 | 16 | THE COURT: Then I'll overrule your objection. You can |
| 11:40:15 | 17 | cross-examine on the testimony that what he did and what he told |
| 11:40:22 | 18 | the Inspector General. |
| 11:40:25 | 19 | Q. (BY MR. BIGGS) Did the Inspector General ever ask you for |
| 11:40:27 | 20 | your medical judgment regarding the video, Dr. Spears? |
| 11:40:30 | 21 | A. Yes, he did. |
| 11:40:31 | 22 | Q. Did you provide him with your judgment of that video? |
| 11:40:35 | 23 | A. Yes. |
| 11:40:36 | 24 | Q. What did you provide -- what did you state to the Inspector |
| 11:40:40 | 25 | General about your medical judgment? |

| | | |
|---|---|---|
| 11:40:43 | 1 | A.   I stated that it is my judgment -- |
| 11:40:45 | 2 |       MR. WATKINS:  Your Honor, that calls for an opinion |
| 11:40:47 | 3 | from an expert, and he's not qualified to give that opinion.  I |
| 11:40:50 | 4 | don't care who he told it to, it doesn't come in or help us in |
| 11:40:53 | 5 | any way in this case unless it's a qualified opinion about the |
| 11:40:57 | 6 | information that he's given. |
| 11:40:58 | 7 |       THE COURT:  Well, it's a two-way street, two-edged |
| 11:41:04 | 8 | knife, if you want to put it accurately.  If he's not qualified |
| 11:41:09 | 9 | and he gives a opinion that's relied on, then the opinion of the |
| 11:41:16 | 10 | person who accepts it's judgment may be wrong. |
| 11:41:22 | 11 |       MR. WATKINS:  I'll withdraw the objection, your Honor. |
| 11:41:24 | 12 |       THE COURT:  I still overrule it.  You may proceed. |
| 11:41:28 | 13 | Q.   (BY MR. BIGGS) Thank you, your Honor. |
| 11:41:29 | 14 |       What did you tell the Inspector General about the |
| 11:41:32 | 15 | video? |
| 11:41:33 | 16 | A.   It was my judgment that it deviated from the ethical norms |
| 11:41:37 | 17 | of medicine and surgical standards. |
| 11:41:42 | 18 | Q.   Will you explain what you meant by that? |
| 11:41:47 | 19 | A.   I as an orthopedic surgeon certainly do not sit in the |
| 11:41:52 | 20 | position to critique technical competence of a OB/GYN doctor, but |
| 11:41:58 | 21 | as a surgeon, which has been in that environment and with those |
| 11:42:04 | 22 | experiences, I feel that I have more than sufficient judgment to |
| 11:42:11 | 23 | be able to make judgments about surgical occurrences with |
| 11:42:17 | 24 | patients. |
| 11:42:19 | 25 | Q.   What specifically on the video raised these concerns that |

11:42:23  1   were the subject of your medical judgment?

11:42:26  2   A.   The repeated expressions by the director of research as to

11:42:32  3   willingness to make sure that any modification to the surgical

11:42:39  4   procedure could be done and would be something that they could

11:42:44  5   make happen.  And then, the reference to past performance on this

11:42:50  6   very thing where they had had doctors within their services

11:42:57  7   section where they had modified the procedures in the interest

11:43:02  8   not of the patient but in the interest of targeting valuable

11:43:08  9   tissues that were considered to be of value to the researchers.

11:43:12  10  Q.   Why did that raise concern for you?

11:43:16  11  A.   Because the priority was not the patient.  The priority in

11:43:22  12  that case was deviating from the primary concern about the

11:43:25  13  patient.  The patient that the doctor had that doctor-patient

11:43:32  14  contract with.

11:43:34  15  Q.   And after providing your medical judgment to the Inspector

11:43:39  16  General, have you had a chance to go back over and review the

11:43:42  17  materials, specifically, the video?

11:43:43  18  A.   I have.  I reviewed the transcript as well as my personal

11:43:47  19  notes.

11:43:48  20  Q.   As we sit here today, has your judgment of that video

11:43:52  21  changed at all?

11:43:53  22  A.   Not at all.

11:43:54  23  Q.   Pass the witness, your Honor.

11:44:01  24                       CROSS-EXAMINATION

11:44:01  25  BY MR. WATKINS:

| | | |
|---|---|---|
| 11:44:05 | 1 | Q.   Which doctor did you see in the video that said he altered |
| 11:44:10 | 2 | the abortion procedure for the purposes of obtaining fetal |
| 11:44:13 | 3 | tissue? |
| 11:44:13 | 4 | A.   I did not see a doctor in the video. |
| 11:44:16 | 5 | Q.   All right. |
| 11:44:17 | 6 | A.   I read in the transcript that was from Ms. Farrell's |
| 11:44:21 | 7 | testimony. |
| 11:44:22 | 8 | Q.   All right.  And I'm sorry.  I didn't understand that. |
| 11:44:26 | 9 | Wasn't in the video? |
| 11:44:26 | 10 | A.   I'm sorry?  I didn't understand your question.  I did not |
| 11:44:30 | 11 | see a doctor in the video that I'm aware of. |
| 11:44:33 | 12 | Q.   All right.  Do you know of any doctor from Planned |
| 11:44:36 | 13 | Parenthood who altered the abortion procedure in order to benefit |
| 11:44:41 | 14 | the extraction of fetal tissue? |
| 11:44:42 | 15 | A.   No.  The reference was made by Ms. Farrell that there had |
| 11:44:45 | 16 | been physicians in the facility that had done it previously.  She |
| 11:44:48 | 17 | did not mention their names. |
| 11:44:49 | 18 | Q.   Had altered the abortion procedures or had altered the |
| 11:44:55 | 19 | procedures in order to get the fetal tissue? |
| 11:44:58 | 20 | A.   My understanding, it was the abortion procedures because |
| 11:45:01 | 21 | there were references about changing the position of the fetus |
| 11:45:04 | 22 | within the uterus to be able to advantage targeting tissues. |
| 11:45:10 | 23 | Q.   Well, are there occasions when the position of the fetus has |
| 11:45:16 | 24 | changed when there is no research involved? |
| 11:45:18 | 25 | A.   I would have to defer that judgment to a OB/GYN doctor. |

| | | |
|---|---|---|
| 11:45:23 | 1 | Q.   All right.  So you don't know whether any, ever, change in |
| 11:45:28 | 2 | the position of the fetus at Planned Parenthood was ever done |
| 11:45:31 | 3 | solely for the purpose of benefitting research? |
| 11:45:34 | 4 | A.   I was interpreting what the director of research was stating |
| 11:45:39 | 5 | and how she was selling the facility to these would-be vendors. |
| 11:45:43 | 6 | Q.   I'm not asking you about your interpretation. |
| 11:45:45 | 7 | My question is, did you see anything in the video that |
| 11:45:48 | 8 | showed you that a surgeon had altered the abortion procedure for |
| 11:45:52 | 9 | the purpose of obtaining fetal tissue? |
| 11:45:55 | 10 | A.   No.  I did not. |
| 11:46:00 | 11 | Q.   Now, you don't believe that the previous witness has any |
| 11:46:04 | 12 | expertise in interpreting medical terms, do you? |
| 11:46:08 | 13 | A.   If the previous witness you're referring to Inspector |
| 11:46:12 | 14 | General Bowen? |
| 11:46:12 | 15 | Q.   Yes. |
| 11:46:13 | 16 | A.   And your question again was, sir? |
| 11:46:15 | 17 | Q.   You don't contend that he has any expertise in interpreting |
| 11:46:19 | 18 | medical terms or medical procedures. |
| 11:46:23 | 19 | A.   Probably not the medical procedures.  He's not been in that |
| 11:46:29 | 20 | environment.  But as any well-educated citizen, I think that |
| 11:46:34 | 21 | there's a level of understanding of medical terms.  Yes. |
| 11:46:38 | 22 | Q.   Mr. Bowen probably then would have the same ability to |
| 11:46:44 | 23 | interpret those medical terms as I would. |
| 11:46:46 | 24 | A.   Yes. |
| 11:46:49 | 25 | Q.   Now, and you just indicated that you can't tell me whether |

| | | |
|---|---|---|
| 11:46:55 | 1 | or not changing the position of the fetus was ever done for the |
| 11:46:59 | 2 | purpose of obtaining fetal tissue. |
| 11:47:01 | 3 | A.   That would have to be the opinion of an OB/GYN doctor with |
| 11:47:05 | 4 | that experience. |
| 11:47:05 | 5 | Q.   Pass the witness. |
| 11:47:22 | 6 | RE-DIRECT EXAMINATION |
| 11:47:22 | 7 | BY MR. BIGGS: |
| 11:47:25 | 8 | Q.   Dr. Spears, what is the role of the CMO?  Why is it |
| 11:47:32 | 9 | important to the Inspector General's Office? |
| 11:47:34 | 10 | A.   Well, the Inspector General's Office is charged with, again, |
| 11:47:39 | 11 | integrity, oversight of all public funds that are spent on any |
| 11:47:47 | 12 | health and human service in the state of Texas, and to be able to |
| 11:47:51 | 13 | do that, they need to have subject-matter experts. |
| 11:47:55 | 14 | Q.   Do they have experts in every single subspecialty at the |
| 11:48:00 | 15 | IG's Office? |
| 11:48:01 | 16 | A.   No.  That would be impractical. |
| 11:48:04 | 17 | Q.   Is it part of your duties to provide these opinions? |
| 11:48:08 | 18 | A.   That is my primary duty. |
| 11:48:11 | 19 | Q.   And what specifically qualifies you to provide these |
| 11:48:17 | 20 | opinions? |
| 11:48:17 | 21 | A.   The judgment that I made had to do not with the technical |
| 11:48:22 | 22 | performance of an abortion.  Again, I can see that I would have |
| 11:48:27 | 23 | no way of knowing what is proper to do in the technical |
| 11:48:32 | 24 | performance of an abortion procedure.  But in terms of that |
| 11:48:38 | 25 | contract, that relationship with the doctor and the patient, |

| | | |
|---|---|---|
| 11:48:42 | 1 | which is to do where the patient is the primary -- the primary |
| 11:48:48 | 2 | motivation for the patient's good immediately and in the |
| 11:48:53 | 3 | long-term over the years following.  That is a physician's |
| 11:48:58 | 4 | responsibility.  Not for some subordinate or not some other |
| 11:49:04 | 5 | motivation, but strictly for that patient's welfare. |
| 11:49:08 | 6 | Q.   Thank you.  Pass the witness, your Honor. |
| 11:49:11 | 7 | RE-CROSS EXAMINATION |
| 11:49:13 | 8 | BY MR. WATKINS: |
| 11:49:13 | 9 | Q.   Quickly. |
| 11:49:16 | 10 | Well, you could concede, would you not, that if an |
| 11:49:19 | 11 | abortion provider had provided -- in doing the abortion didn't |
| 11:49:23 | 12 | know if it was for research, then there wouldn't be any problem. |
| 11:49:28 | 13 | A.   Absolutely.  If there was no other motivation other than |
| 11:49:32 | 14 | singularly attentively caring for that patient's immediate and |
| 11:49:36 | 15 | future needs, then no. |
| 11:49:38 | 16 | Q.   All right.  And there can be in a doctor's mind another |
| 11:49:42 | 17 | purpose for the way he's doing the surgery, but if he doesn't -- |
| 11:49:46 | 18 | if he pays attention to the patient and only tends to the |
| 11:49:49 | 19 | patient, it's all right if he has some other motive, isn't there? |
| 11:49:52 | 20 | A.   Right.  As long as the patient is the primary focus of that |
| 11:49:55 | 21 | a surgical procedure in every step of that surgical procedure. |
| 11:49:58 | 22 | Q.   So an orthopod who's doing surgery wants to go play golf and |
| 11:50:02 | 23 | he'd like to do the thing really fast so he could make his tee |
| 11:50:06 | 24 | time, that's all right as far as his focus is doing it at the |
| 11:50:08 | 25 | speed that the patient requires. |

| | | |
|---|---|---|
| 11:50:10 | 1 | A.   No.  I don't believe that's all right. |
| 11:50:12 | 2 | Q.   You don't? |
| 11:50:12 | 3 | A.   No.  I don't believe that rushing through a surgery for |
| 11:50:16 | 4 | personal convenience or personal interest is okay. |
| 11:50:19 | 5 | Q.   Well, that wasn't my question. |
| 11:50:20 | 6 | My question is, the speed that he applied to that |
| 11:50:23 | 7 | operation was done solely -- was done for the purpose of the |
| 11:50:26 | 8 | patient.  It's okay for him to have another agenda. |
| 11:50:29 | 9 | A.   Yes.  I agree with that. |
| 11:50:36 | 10 | MR. BIGGS:  Nothing further from this witness, your |
| 11:50:38 | 11 | Honor. |
| 11:50:38 | 12 | THE COURT:  May the witness be excused? |
| 11:50:40 | 13 | MR. BIGGS:  Yes, your Honor. |
| 11:50:41 | 14 | MR. WATKINS:  Yes, your Honor. |
| 11:50:42 | 15 | THE COURT:  You may be excused. |
| 11:50:43 | 16 | THE WITNESS:  Thank you, Judge. |
| 11:50:51 | 17 | THE COURT:  Where are we? |
| 11:50:53 | 18 | MR. STEPHENS:  We have a witness we could call now, |
| 11:50:55 | 19 | unless the Court will take -- |
| 11:50:58 | 20 | THE COURT:  Well, we've only got nine minutes.  Is |
| 11:51:00 | 21 | it -- as we say in the business, is it a nine-minute witness? |
| 11:51:04 | 22 | MR. STEPHENS:  Not a nine-minute witness. |
| 11:51:06 | 23 | THE COURT:  Well, at least you're honest.  Most people |
| 11:51:08 | 24 | would say yes.  How many other witnesses do you have, three or |
| 11:51:12 | 25 | four? |

| | | |
|---|---|---|
| 11:51:13 | 1 | MR. STEPHENS:  As of now, I believe three. |
| 11:51:16 | 2 | THE COURT:  Three.  All right.  Okay. |
| 11:51:22 | 3 | MR. STEPHENS:  We may have four, your Honor.  For |
| 11:51:26 | 4 | today, I think we've identified three more. |
| 11:51:36 | 5 | THE COURT:  Okay.  We'll recess until 1:30.  1:30 |
| 11:51:40 | 6 | sharp. |
| 12:07:50 | 7 | (Lunch recess.) |
| 13:28:30 | 8 | THE COURT:  You may call your next witness. |
| 13:28:42 | 9 | MR. STEPHENS:  Your Honor, the state calls Professor |
| 13:28:44 | 10 | Carter Snead. |
| 13:28:53 | 11 | (Witness sworn.) |
| 13:29:11 | 12 | THE COURT:  Tell us your full name and spell your last, |
| 13:29:15 | 13 | please. |
| 13:29:16 | 14 | THE WITNESS:  My full name is Orlando Carter Snead. |
| 13:29:19 | 15 | Last name spelled, S-N-E-A-D. |
| 13:29:22 | 16 | THE COURT:  You may proceed. |
| 13:29:22 | 17 | ORLANDO C. SNEAD, called by the Defendant, duly sworn. |
| 13:29:22 | 18 | DIRECT EXAMINATION |
| 13:29:22 | 19 | BY MR. STEPHENS: |
| 13:29:24 | 20 | Q.   Good afternoon, Professor Snead. |
| 13:29:26 | 21 | Where are you currently employed? |
| 13:29:28 | 22 | A.   I'm a professor of law at the University of Notre Dame. |
| 13:29:32 | 23 | Q.   Could you briefly describe your educational background? |
| 13:29:35 | 24 | A.   I studied as an undergraduate at the -- at St. John's |
| 13:29:39 | 25 | College in Annapolis, Maryland.  I went to law school at |

| | | |
|---|---|---|
| 13:29:42 | 1 | Georgetown University by way of formal education. |
| 13:29:46 | 2 | Q.   And could you briefly also describe your employment |
| 13:29:51 | 3 | background? |
| 13:29:51 | 4 | A.   I'm sorry? |
| 13:29:51 | 5 | Q.   Your previous employment. |
| 13:29:54 | 6 | A.   After graduating from law school, I clerked on the U.S. |
| 13:29:57 | 7 | Court of Appeals for the Tenth Circuit, followed by a brief |
| 13:29:59 | 8 | period of time in private practice in Washington D.C.  Then I |
| 13:30:02 | 9 | became the general counsel of the President's Council on |
| 13:30:06 | 10 | Bioethics, served in that role from 2002 to 2005.  During that |
| 13:30:09 | 11 | time, I also served as the representative of the U.S. government |
| 13:30:13 | 12 | before the United Nations Education, Science and Culture |
| 13:30:17 | 13 | Organization for Bioethical Issues. |
| 13:30:20 | 14 |       I was the permanent observer for the U.S. government at |
| 13:30:24 | 15 | the Council of Europe for their steering committee on bioethics. |
| 13:30:27 | 16 | And then, I joined the faculty at the University of Notre Dame in |
| 13:30:30 | 17 | 2005 as an associate professor.  I was tenured and promoted to |
| 13:30:33 | 18 | full professor in 2011, after which I became the director of the |
| 13:30:37 | 19 | Notre Dame Center for Ethics and Culture. |
| 13:30:41 | 20 | Q.   And have you published journal articles regarding bioethical |
| 13:30:47 | 21 | issues? |
| 13:30:47 | 22 | A.   Yes.  I have articles, book chapters, commentaries.  I've |
| 13:30:52 | 23 | published between 40 and 50 articles, both in academic settings, |
| 13:30:56 | 24 | academic presses and the like. |
| 13:30:59 | 25 | Q.   As well as peer-reviewed journals? |

| | | |
|---|---|---|
| 13:31:02 | 1 | A.   Yes. |
| 13:31:02 | 2 | Q.   Brian, could you bring up Defendants' Exhibit 96, which has |
| 13:31:06 | 3 | been pre-admitted?  Professor Snead, is this a copy of your CV? |
| 13:31:11 | 4 | A.   It appears to be, yes. |
| 13:31:13 | 5 | Q.   And does it reflect your education, experience and |
| 13:31:18 | 6 | publications that you've published in journals? |
| 13:31:21 | 7 | A.   Yes, it does. |
| 13:31:22 | 8 | Q.   Your Honor, the state moves to qualify Professor Snead as an |
| 13:31:26 | 9 | expert in field of bioethics. |
| 13:31:29 | 10 | MS. CLAPMAN:  No objections. |
| 13:31:30 | 11 | THE COURT:  All right. |
| 13:31:31 | 12 | Q.   (BY MR. STEPHENS) Professor Snead, have you been asked to |
| 13:31:33 | 13 | offer an expert opinion in this case? |
| 13:31:35 | 14 | A.   I have. |
| 13:31:35 | 15 | Q.   And could you describe for the Court what materials you have |
| 13:31:39 | 16 | reviewed in forming your opinion? |
| 13:31:41 | 17 | A.   I reviewed the materials that were provided by the Attorney |
| 13:31:44 | 18 | General's Office that included an eight-and-a-half hour video, |
| 13:31:48 | 19 | which I watched, transcript of that video, which I reviewed on |
| 13:31:53 | 20 | several different occasions.  Also, the materials created by the |
| 13:31:58 | 21 | U.S. House of Representatives and the U.S. Senate, as well as the |
| 13:32:02 | 22 | pleadings in this case.  I, also, for my own reflection, reviewed |
| 13:32:07 | 23 | a variety of materials, both federal laws, federal regulations, |
| 13:32:13 | 24 | decisions of different federal bioethics advisory commissions, |
| 13:32:17 | 25 | and other scholarly materials to formulate an opinion on the |

| | | |
|---|---|---|
| 13:32:20 | 1 | question that you asked me about. |
| 13:32:21 | 2 | Q.   Did you also read the Fifth Circuit's opinion in <u>Planned</u> |
| 13:32:26 | 3 | <u>Parenthood vs. Gee</u>? |
| 13:32:27 | 4 | A.   I did.  Yes. |
| 13:32:29 | 5 | Q.   And do you recall the standard that the Fifth Circuit |
| 13:32:32 | 6 | applied for the definition of qualified? |
| 13:32:35 | 7 |          MS. CLAPMAN:  Objection.  This is calling for a legal |
| 13:32:37 | 8 | analysis. |
| 13:32:40 | 9 |          THE COURT:  I think he's asking for a definition and an |
| 13:32:45 | 10 | opinion we can all look up and read.  Ask your next question. |
| 13:32:49 | 11 | Q.   (BY MR. STEPHENS) Professor Snead, could you describe the |
| 13:32:54 | 12 | relationship between ethics and law as related to the issues in |
| 13:32:58 | 13 | this case? |
| 13:32:58 | 14 | A.   Sure.  The Texas Medical Association Board of Councilors has |
| 13:33:02 | 15 | a nice statement on this point in the relationship between law |
| 13:33:05 | 16 | and ethics, and obviously ethics and law are deeply connected to |
| 13:33:09 | 17 | one another.  The demands of that -- yes, sir. |
| 13:33:11 | 18 |          THE COURT:  Would you read the question to the witness, |
| 13:33:13 | 19 | please? |
| 13:33:30 | 20 |          THE WITNESS:  Sorry. |
| 13:33:30 | 21 |          (Last question read back.) |
| 13:33:34 | 22 |          THE WITNESS:  A more concise response is what you're |
| 13:33:35 | 23 | asking for, Judge. |
| 13:33:37 | 24 |          THE COURT:  I'm praying, actually. |
| 13:33:39 | 25 |          THE WITNESS:  I will -- I'll join you in that. |

13:33:41  1    A.    Yes.  The answer is yes.  The demands of ethics are more
13:33:44  2    stringent than the demands of law.  And moreover, the opinions --
13:33:47  3    I've based my opinion on not just studying ethical precepts but,
13:33:51  4    also, relevant federal regulations and federal laws that relate
13:33:55  5    to fetal tissue research which reflect why they shared ethical
13:33:59  6    principles.
13:33:59  7    Q.    Okay.  And what are some of the widely shared ethical norms
13:34:02  8    or ethical principles that apply in the area of fetal tissue
13:34:05  9    research?
13:34:05  10   A.    The first principle ethical good at issue in this case which
13:34:10  11   has already been discussed is the good of the patient obviously.
13:34:12  12   That's a cornerstone of medical ethics, but the singular focus
13:34:15  13   and the well-being and flourishing of the patient is what the
13:34:18  14   physician or the healthcare provider should attend to.  So the
13:34:20  15   good of the patient is the first.
13:34:21  16         If you study the development of this debate from the
13:34:24  17   early 1970s on fetal tissue research and you look at the opinions
13:34:28  18   of the advisory commissions and the legal standards, it's clear
13:34:31  19   that another important ethical good that emerges in this context
13:34:34  20   is safeguarding the integrity of the medical profession, the
13:34:38  21   reputation of the medical profession.
13:34:39  22         What gave rise to the entirety of the debate over fetal
13:34:42  23   tissue transplantation research in the early 1970s were reports
13:34:46  24   of experiments -- outlier experiments involving living fetuses
13:34:53  25   who were to be aborted, which were shocking to the conscience of

13:34:56  1  many, in fact, led Congress to convene hearings and pass the

13:34:59  2  National Research Act, and so on.  So preventing outlier medical

13:35:03  3  experimentation that calls into question the integrity of the

13:35:05  4  medical profession is an ethical good that matters in this

13:35:08  5  context.

13:35:08  6          A third is --

13:35:09  7          MS. CLAPMAN:  Your Honor, I'm sorry.  Could we please

13:35:12  8  instruct the witness --

13:35:12  9          THE COURT:  You understand when a lawyer stands, you

13:35:14  10  really ought to stop.

13:35:15  11          THE WITNESS:  I'll stop.  I'm a professor, not a

13:35:17  12  litigator.  I apologize.

13:35:18  13          THE COURT:  That's all right.

13:35:19  14          MS. CLAPMAN:  Instruct the witness not to answer in

13:35:20  15  narrative form.

13:35:22  16          THE COURT:  He is writing a book.

13:35:24  17          THE WITNESS:  That's what we do.  I apologize.

13:35:25  18          THE COURT:  No.  It's all right.  It's -- you know,

13:35:29  19  it's kind of mean for a law student and a graduate law student

13:35:33  20  and a lawyer to get a law professor on the stand.

13:35:36  21          THE WITNESS:  Mean to whom, your Honor?

13:35:38  22          THE COURT:  Well, it's -- you don't want me to answer

13:35:41  23  that.

13:35:41  24          THE WITNESS:  Okay.  I appreciate your solicitude.

13:35:44  25          THE COURT:  The whole point is, they're going to ask

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

13:35:46   1   you specific questions.  Have you ever been a witness before?

13:35:49   2          THE WITNESS:  Not in a courtroom, no, sir.  Before

13:35:51   3   Congress and state legislatures.

13:35:53   4          THE COURT:  Well, this is different.

13:35:55   5          THE WITNESS:  Seems different.

13:35:56   6          THE COURT:  They're going to ask you specific

13:35:58   7   questions, and your answer is just to be specific.

13:36:01   8          THE WITNESS:  Just to be precise.

13:36:02   9          THE COURT:  You don't have to say -- you know, if it's

13:36:04   10   a "Yes" or "No" question, you could say "Yes" or "No" because, I

13:36:08   11   guarantee you, they're going to have a lot of questions.  That

13:36:10   12   way the lawyers get to control what's in the record, which is

13:36:15   13   important from their client's standpoint.  You might be full of

13:36:21   14   really good information that they may not ever ask, but that's

13:36:24   15   their problem if they do.

13:36:26   16          But be as limiting as you can.  Answer the question.

13:36:30   17   We don't need to know about Plato or any of that stuff.  And I

13:36:36   18   guarantee you that the lawyers will be asking you enough

13:36:39   19   questions.

13:36:40   20          THE WITNESS:  Fill the time.

13:36:41   21          THE COURT:  Well, to help me along in making a

13:36:44   22   decision.

13:36:44   23          THE WITNESS:  Thank you, Judge.

13:36:45   24          THE COURT:  Yes, sir.

13:36:46   25   Q.   (BY MR. STEPHENS) Professor Snead, you had testified -- I'd

13:36:48   1   asked you about general ethical norms that apply in the area of

13:36:52   2   fetal tissue research, and I believe that you had testified

13:36:55   3   regarding patient safety and risks to the fetus; is that correct?

13:37:00   4   I think that's about as far as you'd gotten when we --

13:37:02   5   A.   I wouldn't classify it as risks to the fetus.  It's related

13:37:05   6   to preserving the integrity of the medical profession and its

13:37:09   7   reputation.

13:37:09   8   Q.   Is commercialization of fetal body parts also an ethical

13:37:13   9   norm?

13:37:13  10   A.   Yes.  There's a widespread opposition to creating a market

13:37:17  11   in any body parts, including fetal body parts.

13:37:20  12   Q.   Okay.  Is it another ethical concern in this area related to

13:37:27  13   the choice to have an ab -- the choice for an abortion should not

13:37:31  14   be influenced by research?

13:37:32  15   A.   That's also a consistent theme that runs throughout the

13:37:36  16   literature and the debates.

13:37:37  17   Q.   And are these ethical norms reflected in federal law?

13:37:40  18   A.   They are.

13:37:41  19   Q.   Okay.  How so?

13:37:44  20   A.   Well, the fetal tissue regulations -- well, the actual

13:37:49  21   statutory authority for fetal tissue research that's funded by

13:37:52  22   the federal government, 42 U.S.C. 289g-1, which has been

13:37:57  23   mentioned, I think, several times here.

13:37:59  24   Q.   I'm going to bring up Defendants' Exhibit 6, which is a copy

13:38:01  25   of 289g-1.  And you can continue.  You were describing the

13:38:17   1   ethical norms reflected in --

13:38:18   2   A.   Right.  So if you scroll down there and you can see --

13:38:22   3   you'll find that there is an injunction, there's a rule against

13:38:26   4   manipulating the timing, method of an abortion solely for the

13:38:30   5   sake of research, and I think the doctor has to affirm that he or

13:38:34   6   she did not do that in the abortion procedure.  And there's also

13:38:40   7   a statement that reflects the same concern where researchers have

13:38:43   8   to affirm that they were not involved in decisions relating to

13:38:46   9   the timing or method of the abortion, as well.

13:38:54   10   Q.   When you watched the video, you testified that you watched

13:38:58   11   the full video?

13:38:58   12   A.   I did.  Yes.

13:38:59   13   Q.   That's the video that's Defendants' Exhibit 2; is that

13:39:01   14   right?

13:39:01   15   A.   Yes.

13:39:03   16   Q.   When you watched the video that's been admitted as

13:39:06   17   Defendants' Exhibit 2, did you see any violations of the ethical

13:39:11   18   norm that there should be no alteration in the timing, method, or

13:39:15   19   procedure of an abortion solely for research?

13:39:17   20           MS. CLAPMAN:  Objection, your Honor.  This witness is

13:39:19   21   not qualified to analyze what was happening in the video in the

13:39:23   22   discussion about how products of conception are handled and

13:39:26   23   whether anything in that conversation indicated that abortion

13:39:30   24   methods were being -- both methods or procedures were being

13:39:33   25   changed.  So these questions can be asked in a hypothetical

13:39:36  1  manner, but this witness is not qualified to say whether or not

13:39:39  2  that video indicated any alterations of abortion procedures or

13:39:44  3  methods.

13:39:45  4          THE COURT:  Well, I don't -- I have not seen the video,

13:39:49  5  so I don't know.  Is there in the video copy of a procedure?

13:39:57  6          MR. STEPHENS:  What do you mean copy of a procedure?

13:39:59  7          THE COURT:  Do you have an abortion procedure, or the

13:40:02  8  handling of the tissue, or anything else?  I mean, I've just seen

13:40:07  9  one or two flicks of it.  You're asking him to draw a conclusion

13:40:11  10  over what he saw in the video.  I don't know what he saw in the

13:40:14  11  video, but I doubt seriously, because I would have heard about

13:40:19  12  it, that there was a procedure recorded.

13:40:22  13          MR. STEPHENS:  There was not a procedure recorded.

13:40:24  14          THE COURT:  Then I sustain the objection.

13:40:28  15  Q.   (BY MR. STEPHENS) Professor Snead, did you see any evidence

13:40:31  16  in the video indicating that Planned Parenthood has altered or is

13:40:40  17  willing to alter an abortion procedure for research purposes?

13:40:43  18          MS. CLAPMAN:  Same objection.  He's not qualified to

13:40:46  19  interpret that video in terms of the procedures being discussed

13:40:50  20  and what that meant.

13:40:53  21          THE COURT:  Question is whether they have altered or

13:40:57  22  willingness to alter.  That's going to be a question that I'm

13:41:04  23  going to have to decide, and I can tell you now, I've never known

13:41:10  24  but one person in this world who testified today who thought

13:41:16  25  willingness included accomplished facts.

| | | |
|---|---|---|
| 13:41:21 | 1 | Now, I think you can ask him questions about his |
| 13:41:26 | 2 | opinions, although I take it that they had absolutely nothing to |
| 13:41:31 | 3 | do with the termination letter.  So I'm not sure how material it |
| 13:41:36 | 4 | is.  But it's your time.  But I sustain the objection to the |
| 13:41:39 | 5 | question asked.  You're going to have to be specific as to what |
| 13:41:43 | 6 | you really are asking him. |
| 13:41:47 | 7 | As I understand, you're asking him right now a question |
| 13:41:51 | 8 | that those eight-and-a-half hours of video -- and I have no idea |
| 13:41:57 | 9 | what he's referring to nor you. |
| 13:41:58 | 10 | MR. STEPHENS:  Okay.  I can limit the scope of the |
| 13:42:01 | 11 | question. |
| 13:42:01 | 12 | THE COURT:  I feel competent you could. |
| 13:42:03 | 13 | MR. STEPHENS:  Okay. |
| 13:42:04 | 14 | Q.   (BY MR. STEPHENS) Professor Snead, were you in the courtroom |
| 13:42:07 | 15 | for Mr. Bowen's testimony this morning? |
| 13:42:09 | 16 | A.   Yes. |
| 13:42:09 | 17 | Q.   Did you see the video clips that I showed or that Mr. Bowen |
| 13:42:13 | 18 | -- that were shown during Mr. Bowen's direct examination? |
| 13:42:16 | 19 | A.   Yes, I did. |
| 13:42:17 | 20 | Q.   Okay.  And in those video clips, did you see what you would |
| 13:42:23 | 21 | consider, as a bioethics expert, any violations of ethical norms? |
| 13:42:27 | 22 | MS. CLAPMAN:  Same objection. |
| 13:42:29 | 23 | THE COURT:  I'm going to let him speak to it.  Go |
| 13:42:33 | 24 | ahead. |
| 13:42:33 | 25 | A.   So what concerned me from an ethical perspective in the |

| | | |
|---|---|---|
| 13:42:36 | 1 | videos that I saw were twofold.  One was -- |
| 13:42:38 | 2 | THE COURT:  No, no, no -- |
| 13:42:38 | 3 | THE WITNESS:  Okay.  Sorry. |
| 13:42:40 | 4 | MR. STEPHENS:  The clips. |
| 13:42:49 | 5 | THE COURT:  Read him the question. |
| 13:42:49 | 6 | (Last question read back.) |
| 13:42:51 | 7 | A.   Yes. |
| 13:42:53 | 8 | Q.   (BY MR. STEPHENS) Okay.  Could you describe the ethical |
| 13:42:56 | 9 | norms that you would consider to have been violated as shown in |
| 13:42:59 | 10 | those clips? |
| 13:43:00 | 11 | A.   It appeared to me that there was a representation by an |
| 13:43:05 | 12 | official in the clip, the director of research that her |
| 13:43:11 | 13 | organization had, many times in the past, modified abortion |
| 13:43:14 | 14 | procedures solely for the sake of research. |
| 13:43:18 | 15 | Q.   Okay.  And you testified that you watched the full video |
| 13:43:26 | 16 | that's been admitted as Defendants' Exhibit 2; is that right? |
| 13:43:28 | 17 | A.   That's correct. |
| 13:43:31 | 18 | Q.   Were there other specific instances or specific portions of |
| 13:43:39 | 19 | the video that you recall that I didn't show this morning that |
| 13:43:45 | 20 | you would consider as violating ethical norms? |
| 13:43:47 | 21 | A.   Yes. |
| 13:43:48 | 22 | Q.   Okay.  Could you -- Brian, could you show -- why don't you |
| 13:43:56 | 23 | first describe those for the Court. |
| 13:43:58 | 24 | THE COURT:  Well -- |
| 13:44:00 | 25 | MR. STEPHENS:  Or I could show the clips. |

13:44:01  1              THE COURT:  Do you know the answer?  Do you know his
13:44:05  2   answer?
13:44:06  3              MR. STEPHENS:  Yes.  I think he could describe --
13:44:09  4              THE COURT:  Okay.  Well, then, put it up there.
13:44:12  5   Q.  (BY MR. STEPHENS) Brian, could you play 14:10:50 through
13:44:17  6   14:12:45 from Exhibit 2?
13:44:22  7              (Audio and video file played.)
13:46:15  8   Q.  Brian, could you also show 14:33:12 through 14:33:31?
13:46:22  9              (Audio and video file played.)
13:46:36  10             MS. CLAPMAN:  Your Honor, if we could take the clips
13:46:40  11  individually, I don't understand why multiple clips would have to
13:46:42  12  be shown if -- the expert either saw a violation in the clip that
13:46:45  13  was shown or didn't see a violation.  That seems like in the vein
13:46:50  14  of a narrative answer.  That clip either reflected an ethical
13:46:54  15  violation or it didn't.
13:46:55  16             THE COURT:  Okay.
13:46:57  17             MS. CLAPMAN:  So I object to --
13:46:57  18             THE COURT:  He says he'll take them individually.
13:47:03  19  Q.  (BY MR. STEPHENS) Professor Snead, what ethical norms are
13:47:07  20  raised by the clip that we just saw?
13:47:09  21  A.   In that clip, you see the director of the Ambulatory
13:47:12  22  Surgical Center talking about the key variables in obtaining
13:47:16  23  specimens that are valuable or useful, in particular, for
13:47:19  24  research purposes only in the context of an abortion are not only
13:47:23  25  the dilation of the cervix of the patient but, also, the pain

| | | |
|---|---|---|
| 13:47:26 | 1 | tolerance of the patient.  And talks about the number of passes |
| 13:47:32 | 2 | of the forceps and the capacity -- the cooperation -- she uses |
| 13:47:35 | 3 | the word "cooperation" of the patient in light of the painful |
| 13:47:39 | 4 | nature of the procedure is a key factor in obtaining the specimen |
| 13:47:44 | 5 | that is preferred.  And that clearly shows or shows to me -- at |
| 13:47:49 | 6 | least appears to show to me a willingness to modify an abortion |
| 13:47:51 | 7 | procedure which causes additional discomfort to the patient |
| 13:47:54 | 8 | solely for the sake of research. |
| 13:47:55 | 9 | MS. CLAPMAN:  Objection, your Honor.  The witness is |
| 13:47:57 | 10 | offering medical testimony that he's not qualified to offer. |
| 13:48:00 | 11 | THE COURT:  He is and I sustain the objection and |
| 13:48:02 | 12 | strike the answer. |
| 13:48:11 | 13 | Q.  (BY MR. STEPHENS) Professor Snead, does the clip that you |
| 13:48:13 | 14 | just saw raise concerns solely from an ethical standpoint? |
| 13:48:18 | 15 | A.   Certainly.  It raises the concern of an assurance and a |
| 13:48:26 | 16 | backwards-looking comment regarding modifying an abortion |
| 13:48:29 | 17 | procedure that causes pain solely for the sake of research. |
| 13:48:32 | 18 | MS. CLAPMAN:  Same objection.  The witness is |
| 13:48:33 | 19 | continuing to offer medical opinion about how this discussion |
| 13:48:38 | 20 | should be interpreted that he's not qualified to interpret. |
| 13:48:41 | 21 | THE COURT:  Well, he's assuming that whatever |
| 13:48:45 | 22 | alteration and the real issue is, is there any evidence of an |
| 13:48:52 | 23 | alteration, but that's to be decided at a later time. |
| 13:48:59 | 24 | MS. CLAPMAN:  And we do not object to him offering |
| 13:49:03 | 25 | hypothetical -- I'm sorry, your Honor. |

| | | |
|---|---|---|
| 13:49:04 | 1 | THE COURT:  I get to say something once in a while. |
| 13:49:07 | 2 | And he's asking a question that is it an ethical violation to |
| 13:49:15 | 3 | cause pain in the procedure for the purpose of obtaining tissue. |
| 13:49:25 | 4 | I suspect that's really the doctor, but he's an ethics professor |
| 13:49:30 | 5 | from Notre Dame, so he can answer that question.  And he did |
| 13:49:35 | 6 | answer the question.  So let's ask the next question. |
| 13:49:39 | 7 | Q.   (BY MR. STEPHENS) Professor Snead, if a woman were to |
| 13:49:52 | 8 | consent to a procedure knowing that it might involve more pain, |
| 13:49:58 | 9 | then would that address ethical concerns? |
| 13:50:02 | 10 | A.   It would -- if there were robust informed consent, it might |
| 13:50:06 | 11 | very well cure concerns about patient well-being.  If there were |
| 13:50:10 | 12 | robust informed consent. |
| 13:50:11 | 13 | Q.   Okay.  Brian, could you bring up a copy of Defendants' |
| 13:50:14 | 14 | Exhibit 191? |
| 13:50:29 | 15 | Professor Snead, were you in the courtroom yesterday |
| 13:50:31 | 16 | when Ms. Farrell testified that Defendants' Exhibit 191 is the |
| 13:50:36 | 17 | consent form used by Planned Parenthood Gulf Coast? |
| 13:50:40 | 18 | A.   Yes. |
| 13:50:41 | 19 | Q.   Does this form used by Planned Parenthood Gulf Coast address |
| 13:50:45 | 20 | ethical concerns related to altering an abortion procedure in a |
| 13:50:49 | 21 | way that causes increased pain? |
| 13:50:53 | 22 | A.   This form doesn't advise a prospective patient of increased |
| 13:50:58 | 23 | pain.  In fact, it says that I understand there will be no |
| 13:51:03 | 24 | changes to how or when my abortion is done in order to get the |
| 13:51:06 | 25 | blood or the tissue.  Obviously the purpose of informed consent |

| | | |
|---|---|---|
| 13:51:10 | 1 | is to provide information about risks and benefits so that a |
| 13:51:14 | 2 | reasonable person can make a judgment.  And in my -- as applied |
| 13:51:18 | 3 | to a painful experience solely for the sake of research or |
| 13:51:22 | 4 | increasing pain solely for the sake of research, this form would |
| 13:51:25 | 5 | not be sufficient. |
| 13:51:27 | 6 | Q.   Brian, could you bring up a copy of Defendants' Exhibit 192? |
| 13:51:36 | 7 | Professor Snead, there was some confusion yesterday |
| 13:51:40 | 8 | about whether another form, I believe Defendants' Exhibit 192, is |
| 13:51:46 | 9 | also used by Planned Parenthood Gulf Coast in conjunction with |
| 13:51:49 | 10 | Defendants' Exhibit 191.  Do you recall that? |
| 13:51:53 | 11 | A.   Possibly, yes. |
| 13:51:54 | 12 | Q.   Okay.  If this form were used with Defendants' Exhibit 191, |
| 13:52:03 | 13 | would that address the ethical concerns raised and addressed in |
| 13:52:10 | 14 | relation to Defendants' Exhibit 191? |
| 13:52:12 | 15 | A.   Only if it's -- only if it clearly stated the additional |
| 13:52:17 | 16 | risks of pain and discomfort, which under this form, it says |
| 13:52:22 | 17 | there are no additional risks posed to the participant by |
| 13:52:25 | 18 | consent.  So this particular form, if it were used, an advance of |
| 13:52:28 | 19 | a study that would cause additional pain solely for the sake of |
| 13:52:31 | 20 | research, this would also be inadequate. |
| 13:52:38 | 21 | Q.   Was there evidence in the video that you saw that Planned |
| 13:52:41 | 22 | Parenthood has engaged in actual -- has engaged in actual |
| 13:52:45 | 23 | practices that violated ethical norms? |
| 13:52:47 | 24 | A.   There is conversation in the video, both by the director of |
| 13:52:51 | 25 | research and by the head of the Ambulatory Surgical Center, that |

13:52:56  1  one of the -- competitive advantages of Planned Parenthood Gulf

13:53:00  2  Coast for the supply of fetal tissue is they have great deal of

13:53:04  3  experience changing and altering the abortion procedure solely to

13:53:07  4  fit the needs of the researcher.

13:53:09  5  Q.   Okay.  And is there also evidence in the video that gives an

13:53:13  6  assurance or a willingness that Planned Parenthood will engage in

13:53:17  7  practices that violate ethical norms?

13:53:21  8  A.   I believe yes.  I believe the comments made by the --

13:53:25  9  especially made by the Ambulatory Surgical Center director naming

13:53:29  10  doctors who are trained and willing and able to do precisely

13:53:32  11  those things.

13:53:33  12          MS. CLAPMAN:  I'm sorry to interrupt the witness, but

13:53:35  13  he continues to mischaracterize the evidence and to give medical

13:53:38  14  testimony.

13:53:38  15          THE COURT:  Well, he's not just giving medical

13:53:40  16  testimony, he's able to -- well, you've been here the whole time?

13:53:51  17          THE WITNESS:  No, sir.  Not the whole time.

13:53:52  18          THE COURT:  So you haven't heard the testimony of what

13:53:55  19  actually the facts are.

13:53:55  20          THE WITNESS:  No, sir.  I was here -- I arrived after

13:53:58  21  lunch yesterday, and I've reviewed the pleadings in the case, as

13:54:01  22  well.

13:54:02  23          THE COURT:  Is he exempted from the rule?

13:54:05  24          MR. STEPHENS:  Your Honor, we have an agreement that

13:54:06  25  experts will be exempted from the rule.

| | | |
|---|---|---|
| 13:54:08 | 1 | THE COURT:  Might help, you know, if you tell the Court |
| 13:54:10 | 2 | what rules are being enforced in the Court's courtroom. |
| 13:54:16 | 3 | Okay.  He's testifying that the willingness and |
| 13:54:24 | 4 | assurances are what?  He's going to define willingness, like your |
| 13:54:32 | 5 | last witness? |
| 13:54:32 | 6 | MR. STEPHENS:  No.  I would ask him whether what he saw |
| 13:54:36 | 7 | in the video related to the willingness, whether that raises |
| 13:54:40 | 8 | concerns as to violations of ethical norms. |
| 13:54:42 | 9 | THE COURT:  And he saw it before the termination |
| 13:54:47 | 10 | letter? |
| 13:54:50 | 11 | MR. STEPHENS:  He did not see the video before the |
| 13:54:52 | 12 | termination letter. |
| 13:55:01 | 13 | THE COURT:  Then why is it relevant? |
| 13:55:04 | 14 | MR. STEPHENS:  Your Honor, because the Court will be |
| 13:55:09 | 15 | asked under the Fifth Circuit -- |
| 13:55:10 | 16 | THE COURT:  I've heard testimony.  I haven't heard one |
| 13:55:13 | 17 | word of testimony that any procedure involving tissue for -- in |
| 13:55:21 | 18 | research had occurred after 2012.  The termination is in 2015. |
| 13:55:31 | 19 | Now, he can look at a video and tell what they did in 2015?  I |
| 13:55:41 | 20 | mean, he's really a good witness. |
| 13:55:46 | 21 | MR. STEPHENS:  Your Honor -- |
| 13:55:47 | 22 | THE COURT:  Go ahead and ask your questions.  But I |
| 13:55:53 | 23 | think, really, you should keep in mind that I'm going to make the |
| 13:55:57 | 24 | determination.  I don't think that this gentleman is going to |
| 13:56:02 | 25 | help me make a determination as to whether or not the termination |

| | | |
|---|---|---|
| 13:56:07 | 1 | given under the circumstances that it was given by one person, a |
| 13:56:14 | 2 | nonmedical person with the support of your orthopedic doctor who |
| 13:56:21 | 3 | just testified, and that he had sufficient evidence to give it. |
| 13:56:25 | 4 | That's just part of it, but that is an important part. |
| 13:56:32 | 5 | And I'm interested primarily in what was done, not what |
| 13:56:36 | 6 | was willing to be done.  That's what I'm really concerned about. |
| 13:56:42 | 7 | And I think y'all should be concerned about it, all of you.  Ask |
| 13:56:48 | 8 | your next question. |
| 13:56:52 | 9 | MR. STEPHENS:  Actually, that was my last question, |
| 13:56:53 | 10 | your Honor.  So pass the witness. |
| 13:57:06 | 11 | CROSS-EXAMINATION |
| 13:57:09 | 12 | BY MS. CLAPMAN: |
| 13:57:09 | 13 | Q.   Good afternoon, Professor Snead. |
| 13:57:12 | 14 | A.   Hi. |
| 13:57:15 | 15 | Q.   You've advocated that all research involving embryonic or |
| 13:57:19 | 16 | fetal tissue is unethical, correct? |
| 13:57:21 | 17 | A.   No.  That's not correct.  I've not advocated research |
| 13:57:24 | 18 | involving fetal tissue is unethical.  I have raised ethical |
| 13:57:28 | 19 | concerns about embryonic stem cell research. |
| 13:57:34 | 20 | Q.   Could you please explain the difference to me? |
| 13:57:36 | 21 | A.   Sure.  Fetal tissue research is research on tissue that's |
| 13:57:42 | 22 | from an abortion that was procured entirely -- for entirely |
| 13:57:45 | 23 | different reasons than obtaining that tissue.  A woman decides to |
| 13:57:49 | 24 | get an abortion, and then, the remains of the fetus are -- become |
| 13:57:53 | 25 | research material.  That's, on its face, not objectionable so |

| | | |
|---|---|---|
| 13:57:58 | 1 | long as there's not a relationship between the choice for the |
| 13:58:00 | 2 | abortion and the obtaining of the tissue itself. |
| 13:58:04 | 3 | Embryonic stem cell research by contrast involves the |
| 13:58:08 | 4 | intentional sometimes creation but certainly intentional |
| 13:58:11 | 5 | destruction of the embryo solely for the sake of research.  So |
| 13:58:14 | 6 | it's a kind of total instrumentalization of a living organism for |
| 13:58:18 | 7 | the sake of research, as opposed to working with remains of an |
| 13:58:21 | 8 | organism that died for other reasons. |
| 13:58:23 | 9 | Q.   Okay.  So let's look at -- I'm going to hand you Plaintiffs' |
| 13:58:29 | 10 | Exhibit 246. |
| 13:59:04 | 11 | Do you recognize this piece? |
| 13:59:05 | 12 | A.   Yes. |
| 13:59:06 | 13 | Q.   And you wrote it? |
| 13:59:08 | 14 | A.   I did. |
| 13:59:08 | 15 | Q.   Okay.  Could you just read the title? |
| 13:59:10 | 16 | A.   I didn't choose the title, but the title is "Protect the |
| 13:59:13 | 17 | Weak and Vulnerable:  The Primacy of the Life Issue." |
| 13:59:15 | 18 | Q.   Okay.  And turning to page 2 of that, please.  Could you |
| 13:59:21 | 19 | please read the -- I should go old school. |
| 13:59:38 | 20 | On page 2, could you please read the sentence |
| 13:59:42 | 21 | asterisked? |
| 13:59:45 | 22 | THE COURT:  You are reading from something I am unaware |
| 13:59:51 | 23 | that it's in evidence. |
| 13:59:53 | 24 | MS. CLAPMAN:  It is Plaintiffs' Exhibit -- I'd like to |
| 13:59:59 | 25 | move it into evidence at this time. |

| | | |
|---|---|---|
| 14:00:01 | 1 | MR. STEPHENS:  Your Honor, we object on hearsay |
| 14:00:03 | 2 | grounds. |
| 14:00:03 | 3 | THE COURT:  Sustain the objection. |
| 14:00:05 | 4 | MS. CLAPMAN:  The witness has just testified that he |
| 14:00:08 | 5 | recognizes this document and that they are his own words. |
| 14:00:10 | 6 | THE COURT:  Well, that's nice.  He knows what he wrote, |
| 14:00:14 | 7 | I guess, but the document is a hearsay document. |
| 14:00:22 | 8 | MS. CLAPMAN:  Okay. |
| 14:00:23 | 9 | THE COURT:  Are you offering it for substantive |
| 14:00:25 | 10 | reasons? |
| 14:00:26 | 11 | MS. CLAPMAN:  No, your Honor. |
| 14:00:26 | 12 | THE COURT:  Okay.  Then ask him -- I'm not -- ask your |
| 14:00:34 | 13 | questions.  Just, you know, just ask -- |
| 14:00:37 | 14 | Q.   (BY MS. CLAPMAN) Professor Snead, did you write in this |
| 14:00:39 | 15 | article that abortion and embryo destructive research is nothing |
| 14:00:47 | 16 | short of a human catastrophe on an epic scale? |
| 14:00:52 | 17 | A.   That's an allusion of what I wrote.  That's take -- part of |
| 14:00:55 | 18 | a sentence combined with another part of a sentence.  What I |
| 14:00:59 | 19 | wrote -- so no.  I didn't write that in a contiguous sentence.  I |
| 14:01:03 | 20 | wrote something to that effect.  I'm happy -- I mean, I don't |
| 14:01:06 | 21 | want to answer -- I'm supposed to stop talking, right, Judge?  I |
| 14:01:09 | 22 | only answer the question that's asked? |
| 14:01:12 | 23 | THE COURT:  Well, you're a little late on stopping. |
| 14:01:15 | 24 | A.   I mean, I'm happy -- put it this way, I'm not embarrassed to |
| 14:01:17 | 25 | answer the question.  My view is that given the biological |

| | | |
|---|---|---|
| 14:01:23 | 1 | reality that the human organism's life begins following |
| 14:01:27 | 2 | fertilization, that principles of equality, rightly understood, |
| 14:01:31 | 3 | should apply equally to all human organisms at all stages of |
| 14:01:34 | 4 | development; and therefore, the elective and intentional killing |
| 14:01:38 | 5 | of human organisms at any stage of development is a kind of |
| 14:01:41 | 6 | unjust activity. |
| 14:01:42 | 7 | Q.   (BY MS. CLAPMAN) Okay.  Professor Snead, do you believe that |
| 14:01:45 | 8 | embryo destructive research is nothing short of a human |
| 14:01:48 | 9 | catastrophe on an epic scale? |
| 14:01:51 | 10 | A.   Do I believe that embryo destructive research is nothing |
| 14:01:54 | 11 | short of catastrophe, I believe that embryo destructive research |
| 14:01:57 | 12 | constitutes an unjust taking of life and that done -- |
| 14:02:02 | 13 | Q.   Professor Snead, I'm asking for a "Yes" or "No" answer at |
| 14:02:04 | 14 | this moment. |
| 14:02:05 | 15 | A.   Oh, I'm sorry. |
| 14:02:06 | 16 | Q.   I'm asking you if you believe that embryo destructive |
| 14:02:09 | 17 | research is nothing short of a human catastrophe on an epic |
| 14:02:12 | 18 | scale. |
| 14:02:13 | 19 | A.   I do.  Yes. |
| 14:02:14 | 20 | Q.   Okay.  And do you believe that fetal tissue -- use of fetal |
| 14:02:20 | 21 | tissue for scientific research is -- do you believe that embryo |
| 14:02:24 | 22 | destructive research for scientific -- let me start again. |
| 14:02:30 | 23 |         Do you believe that embryo destructive research is a |
| 14:02:33 | 24 | terrible injustice? |
| 14:02:34 | 25 | A.   Yes, I do. |

| | | |
|---|---|---|
| 14:02:35 | 1 | Q.    Okay.  And how do you define embryo destructive research? |
| 14:02:39 | 2 | A.    The intentional destruction of a living human embryo for the |
| 14:02:42 | 3 | purposes of just aggregating it to culture stem cells for use in |
| 14:02:48 | 4 | scientific research. |
| 14:02:53 | 5 | Q.    Do you believe that the performance of research on fetal or |
| 14:03:01 | 6 | embryonic tissue that is the product of an abortion is ethical? |
| 14:03:07 | 7 | A.    I believe that fetal tissue research practiced ethically can |
| 14:03:11 | 8 | be ethical.  Yes. |
| 14:03:30 | 9 | Q.    Professor Snead, you've published a lot of writing about |
| 14:03:32 | 10 | Planned Parenthood, correct? |
| 14:03:33 | 11 | A.    Some. |
| 14:03:34 | 12 | Q.    And I looked pretty hard, but I did not find anything |
| 14:03:38 | 13 | positive.  Would that be a fair characterization? |
| 14:03:40 | 14 | A.    I have not written anything positive.  That's correct. |
| 14:03:42 | 15 | Q.    Okay.  And you've been writing about Planned Parenthood |
| 14:03:44 | 16 | since before the CMP videos came out, correct? |
| 14:03:48 | 17 | A.    I don't know.  Oh, yes.  That is correct.  Yes. |
| 14:03:50 | 18 | Q.    Okay.  For example, you've criticized Planned Parenthood for |
| 14:03:54 | 19 | having a sexual freedom agenda, correct? |
| 14:03:57 | 20 |        MR. STEPHENS:  Objection -- |
| 14:03:58 | 21 | A.    I don't remember saying that. |
| 14:03:59 | 22 |        MR. STEPHENS:  -- it's not relevant. |
| 14:04:03 | 23 |        MS. CLAPMAN:  It goes to bias, your Honor. |
| 14:04:04 | 24 |        THE COURT:  Yeah, it does. |
| 14:04:05 | 25 | A.    I don't remember -- I may have written that.  I don't |

| | | |
|---|---|---|
| 14:04:07 | 1 | remember that phrase.  That doesn't sound like something I've |
| 14:04:09 | 2 | written, but it's possible that I said that. |
| 14:04:11 | 3 | Q.   (BY MS. CLAPMAN) Okay.  If I showed you a publication on |
| 14:04:13 | 4 | which you're listed as a coauthor, would that help you remember? |
| 14:04:16 | 5 | A.   It would.  Yes. |
| 14:04:30 | 6 | Q.   If you could turn, please, to page 4 and just review the |
| 14:04:38 | 7 | first sentence under Section 3.  Do you see where I am? |
| 14:04:45 | 8 | A.   Under Section 3, the sentence begins, it seems more? |
| 14:04:49 | 9 | Q.   Yes. |
| 14:04:50 | 10 | A.   Okay. |
| 14:04:51 | 11 | Q.   Please review it.  You just have to review that sentence. |
| 14:04:54 | 12 | A.   Okay.  I got it.  Yes. |
| 14:05:03 | 13 | Q.   Okay.  Does that refresh your recollection that you have |
| 14:05:06 | 14 | criticized Planned Parenthood for having a sexual freedom agenda? |
| 14:05:12 | 15 | A.   That sentence doesn't read like a criticism to me, actually. |
| 14:05:15 | 16 | I mean, it reads as an explanation, I think.  It's basically |
| 14:05:19 | 17 | saying -- the sentence is actually about -- not about Planned |
| 14:05:22 | 18 | Parenthood centrally.  It's about religious liberty and the |
| 14:05:26 | 19 | relationship of the state to religious liberty, and the |
| 14:05:30 | 20 | motivation to restrict religious speech or religious practice is |
| 14:05:36 | 21 | connected to an enthusiasm for autonomy -- sexual autonomy and |
| 14:05:43 | 22 | liberation, which I think fairly characterizes, in my judgment at |
| 14:05:47 | 23 | least, one of the core values of Planned Parenthood. |
| 14:05:51 | 24 | Q.   So you're not criticizing the sexual freedom agenda of |
| 14:05:55 | 25 | Planned Parenthood in this sentence? |

| | | |
|---|---|---|
| 14:05:57 | 1 | A.    Can I read the sentence?  The sentence says, it seems more |
| 14:05:59 | 2 | than a little likely that the degree to which this administration |
| 14:06:02 | 3 | is willing to silence or privatize religion is proportionate to |
| 14:06:06 | 4 | its passionate commitment to the population and sexual freedom |
| 14:06:10 | 5 | agendas of one of the administration's closest allies, the |
| 14:06:13 | 6 | Planned Parenthood Federation of America, the largest single |
| 14:06:17 | 7 | abortion provider in the United States. |
| 14:06:18 | 8 | Q.    Okay. |
| 14:06:18 | 9 | A.    So it's -- again, it's by way -- I think it's by way more of |
| 14:06:22 | 10 | explanation of the administration's motives rather than a |
| 14:06:25 | 11 | criticism as such of commitment to sexual autonomy as an |
| 14:06:30 | 12 | organizational principle or agenda. |
| 14:06:33 | 13 | Q.    Okay.  You've also said that in requiring contraceptive |
| 14:06:38 | 14 | coverage, President Obama has chosen the agenda of Planned |
| 14:06:44 | 15 | Parenthood over caring for the poor; is that correct? |
| 14:06:46 | 16 | A.    I'm sorry.  Where is that? |
| 14:06:49 | 17 | Q.    Is it correct that you have said in the past that in |
| 14:06:53 | 18 | requiring contraceptive coverage, President Obama has chosen the |
| 14:06:57 | 19 | agenda of Planned Parenthood over caring for the poor? |
| 14:07:00 | 20 | A.    I don't think that I said that.  I used that formulation and |
| 14:07:05 | 21 | if -- I may know what you're referring to, but could you show me |
| 14:07:09 | 22 | what you're looking at?  Or you don't have to, I guess. |
| 14:07:11 | 23 | Q.    I will.  I'm not trying to hide it from you. |
| 14:07:22 | 24 |       So if you turn to the third page of this, it's page 3 |
| 14:07:26 | 25 | of 4 at the top, and if you look at the top of that page and read |

| | | |
|---|---|---|
| 14:07:34 | 1 | -- I apologize for the poor quality of the printout, but do you |
| 14:07:38 | 2 | see the sentence that says, Snead said? |
| 14:07:41 | 3 | A.   I see, yeah.  It's a little hard to read.  Sorry.  It's |
| 14:07:46 | 4 | difficult to read.  The printout is difficult to read but it's -- |
| 14:07:51 | 5 | I see where it says, Snead said. |
| 14:07:53 | 6 | Q.   Okay.  So having reviewed that, do you recall saying that in |
| 14:07:59 | 7 | requiring contraceptive coverage, President Obama has, quote, |
| 14:08:03 | 8 | chosen the agenda of Planned Parenthood over caring for the poor? |
| 14:08:07 | 9 | A.   Maybe I'm not seeing what you're referring to because I |
| 14:08:11 | 10 | don't see those words on this part of the page. |
| 14:08:12 | 11 | Q.   I'm looking at the second to last page of the printout.  It |
| 14:08:16 | 12 | says 3 of 4. |
| 14:08:18 | 13 | A.   Oh, 3 of 4.  I'm sorry.  I was on page 2 of 4. |
| 14:08:21 | 14 | Q.   If you look at the top of that document, the first part of |
| 14:08:25 | 15 | the text.  It says -- |
| 14:08:26 | 16 | A.   Yes. |
| 14:08:27 | 17 | Q.   Okay.  So reading that sentence, does that refresh your |
| 14:08:30 | 18 | recollection that you have said, in the past, that President |
| 14:08:34 | 19 | Obama has, quote, chosen the agenda of Planned Parenthood over |
| 14:08:39 | 20 | caring for the poor when he required insurance coverage for |
| 14:08:42 | 21 | contraception? |
| 14:08:43 | 22 | A.   No.  What I was -- no.  It was not generally requiring |
| 14:08:46 | 23 | insurance coverage to cover contraception.  It was requiring |
| 14:08:47 | 24 | religious organizations to provide healthcare and social services |
| 14:08:51 | 25 | to do things that are contrary to their deeply held views and |

| | | |
|---|---|---|
| 14:08:54 | 1 | would, therefore, make them to close down and hurt the patient |
| 14:08:56 | 2 | population that they serve is what that is. |
| 14:08:59 | 3 | Q.   With that qualification, do you remember saying that |
| 14:09:01 | 4 | President Obama had, quote, chosen the agenda of Planned |
| 14:09:03 | 5 | Parenthood over caring for the poor? |
| 14:09:04 | 6 | A.   Yes. |
| 14:09:07 | 7 | Q.   And you've advocated in the past barring Planned Parenthood |
| 14:09:10 | 8 | from providing Medicaid care because of its abortion services and |
| 14:09:15 | 9 | abortion rights advocacy, correct? |
| 14:09:16 | 10 | A.   What I have said in the past is that -- |
| 14:09:19 | 11 | Q.   Please, "Yes" or "No"? |
| 14:09:20 | 12 | A.   Sure.  Can you -- |
| 14:09:23 | 13 | Q.   Yeah.  Have you advocated barring Planned Parenthood from |
| 14:09:27 | 14 | providing Medicaid care because of its abortion services and |
| 14:09:31 | 15 | abortion rights advocacy? |
| 14:09:33 | 16 | A.   Yes. |
| 14:09:34 | 17 | Q.   Okay.  In fact, when the Seventh Circuit told Indiana that |
| 14:09:42 | 18 | it could not de-fund Planned Parenthood, didn't you call that |
| 14:09:45 | 19 | decision deplorable? |
| 14:09:47 | 20 | A.   What I was referring to in that, it was not the decision -- |
| 14:09:50 | 21 | Q.   Please, "Yes" or "No"? |
| 14:09:51 | 22 | A.   Could I -- I don't think it was the decision was deplorable. |
| 14:09:54 | 23 | If it would help me remember if you showed me the language you're |
| 14:09:57 | 24 | referring to. |
| 14:09:58 | 25 | Q.   Sure.  Plaintiffs' Exhibit 241, please.  So this one's easy |

| | | |
|---|---|---|
| 14:10:24 | 1 | because it's one page. |
| 14:10:25 | 2 | A.   I could see it. |
| 14:10:27 | 3 | Q.   If you look towards the bottom, you will see you're quoted. |
| 14:10:29 | 4 | And does that refresh your recollection that you were calling the |
| 14:10:33 | 5 | decision or the outcome of that case deplorable? |
| 14:10:36 | 6 | A.   The outcome, not the decision of the case or the action of |
| 14:10:39 | 7 | the court.   The outcome -- |
| 14:10:41 | 8 | Q.   Okay -- |
| 14:10:41 | 9 | A.   -- was -- |
| 14:10:42 | 10 | Q.   -- that's what I asked. |
| 14:10:42 | 11 | A.   -- yes.   The outcome. |
| 14:10:44 | 12 | Q.   That's what I asked. |
| 14:10:45 | 13 |        And did you say that the outcome was, quote, a grim |
| 14:10:48 | 14 | reminder of the Obama administration's unswerving commitment to |
| 14:10:51 | 15 | Planned Parenthood, the nation's largest abortion provider? |
| 14:10:54 | 16 | A.   Yeah.   What I was referring to -- |
| 14:10:55 | 17 | Q.   I didn't ask for -- |
| 14:10:56 | 18 | A.   Sorry.   What's your question? |
| 14:10:57 | 19 | Q.   I'm asking, does this reflect your recollection that you did |
| 14:11:01 | 20 | say that? |
| 14:11:01 | 21 | A.   Yeah.   I would say that that -- |
| 14:11:02 | 22 | Q.   I'm not asking for explanation of that.   I'm just asking if |
| 14:11:05 | 23 | you recall saying that. |
| 14:11:07 | 24 | A.   Do I recall saying what? |
| 14:11:09 | 25 | Q.   Saying that the outcome in that case was a grim reminder of |

| | | |
|---|---|---|
| 14:11:13 | 1 | the Obama administration's unswerving commitment to Planned |
| 14:11:17 | 2 | Parenthood, the nation's largest abortion provider. |
| 14:11:20 | 3 | A.   That quote doesn't reflect what -- |
| 14:11:21 | 4 | Q.   Professor Snead, I'm not asking -- |
| 14:11:23 | 5 | A.   -- I'm sorry.  I'm not understanding what you're asking me. |
| 14:11:25 | 6 | Q.   Okay.  I'm not asking for your explanation of what you meant |
| 14:11:27 | 7 | when you said that. |
| 14:11:28 | 8 | A.   Uh-huh. |
| 14:11:28 | 9 | Q.   I'm asking if you remember saying that, now that you see the |
| 14:11:30 | 10 | article that quotes you saying that. |
| 14:11:32 | 11 | A.   I don't believe that I said that in response -- in modifying |
| 14:11:35 | 12 | the word "outcome."  But it's clearly in -- the reporter wrote |
| 14:11:39 | 13 | that down as the outcome was a reminder.  So that is -- there is |
| 14:11:44 | 14 | a document that has that in it.  But I believe that the reporter |
| 14:11:46 | 15 | misunderstood what I was saying.  Although that itself is -- |
| 14:11:49 | 16 | again, the statement itself should be unobjectionable, seems to |
| 14:11:54 | 17 | me. |
| 14:11:54 | 18 | Q.   And you believe that Planned Parenthood organizations -- and |
| 14:11:57 | 19 | you believed that Planned Parenthood organizations should lose |
| 14:12:00 | 20 | all federal funding before the CMP videos came out, correct? |
| 14:12:06 | 21 | A.   All federal funding? |
| 14:12:08 | 22 | Q.   Yes. |
| 14:12:10 | 23 | A.   That's an overbroad question.  If Planned Parenthood were |
| 14:12:15 | 24 | not the nation's largest abortion provider, there would be -- I |
| 14:12:18 | 25 | would have no concerns whatsoever about them receiving federal |

| | | |
|---|---|---|
| 14:12:21 | 1 | funding. |
| 14:12:22 | 2 | Q.   Okay.  So this article that we just looked at was from 2013, |
| 14:12:25 | 3 | before the CMP videos came out. |
| 14:12:27 | 4 | A.   Right.  Yes. |
| 14:12:28 | 5 | Q.   And you were criticizing the outcome, not the court. |
| 14:12:31 | 6 | A.   Yes. |
| 14:12:32 | 7 | Q.   For not allowing the state to bar Planned Parenthood from |
| 14:12:36 | 8 | Medicaid, correct? |
| 14:12:36 | 9 | A.   The state law -- that's not fair.  The state law in that |
| 14:12:39 | 10 | case was not -- banned all abortion providers in the state of |
| 14:12:42 | 11 | Indiana from receiving state taxpayer funding through Medicaid. |
| 14:12:44 | 12 | Q.   Okay.  So you were advocating in your comments to the press |
| 14:12:48 | 13 | that states should be allowed to bar all abortion providers from |
| 14:12:51 | 14 | Medicaid, correct? |
| 14:12:52 | 15 | A.   Yes.  That is correct. |
| 14:12:53 | 16 | Q.   Okay.  And you believe that abortion should be illegal, |
| 14:12:59 | 17 | correct? |
| 14:13:01 | 18 | A.   I wouldn't -- I think that's an overbroad statement.  I |
| 14:13:05 | 19 | think that the law should recognize and protect all living human |
| 14:13:09 | 20 | beings.  There are various stages of them -- |
| 14:13:12 | 21 | Q.   I'm sorry.  I'm going to cut you off because you're not |
| 14:13:14 | 22 | responding to my question.  If it's not correct, you can just say |
| 14:13:16 | 23 | no, and then, I will clarify. |
| 14:13:20 | 24 |       But I ask you not to -- |
| 14:13:22 | 25 | A.   Sure. |

| | | |
|---|---|---|
| 14:13:22 | 1 | Q.   -- answer a different question. |
| 14:13:23 | 2 | A.   Sure.  I apologize. |
| 14:13:24 | 3 | So the question you're asking is, do I believe abortion |
| 14:13:27 | 4 | should be illegal, I think the answer is, I think it depends. |
| 14:13:30 | 5 | It's more -- it's complicated -- it's a complicated question.  It |
| 14:13:33 | 6 | depends. |
| 14:13:33 | 7 | Q.   Under what circumstances do you believe it should be legally |
| 14:13:37 | 8 | permissible? |
| 14:13:37 | 9 | A.   I believe that -- well, I believe that abortion should be |
| 14:13:41 | 10 | treated in the same way any other kind of conflict of interest |
| 14:13:45 | 11 | between two human beings are adjudicated nor are there instances |
| 14:13:50 | 12 | in which -- |
| 14:13:50 | 13 | Q.   I'd like a concise answer that's not theoretical but |
| 14:13:53 | 14 | that's -- |
| 14:13:53 | 15 | A.   It's a complicated question.  It's an extraordinarily |
| 14:13:56 | 16 | complicated question.  It doesn't permit a one-sentence answer. |
| 14:13:58 | 17 | You're saying under what circumstances should abortion be legal? |
| 14:14:01 | 18 | Q.   Can you identify a particular circumstances where abortion |
| 14:14:03 | 19 | should be legal? |
| 14:14:05 | 20 | MR. STEPHENS:  She asked the question.  Can he answer |
| 14:14:07 | 21 | the question before she asks another question? |
| 14:14:11 | 22 | MS. CLAPMAN:  He's not answering the question and |
| 14:14:12 | 23 | that's my concern. |
| 14:14:13 | 24 | THE COURT:  I'll make that determination. |
| 14:14:15 | 25 | MR. STEPHENS:  She asked him when an abortion could |

| | | |
|---|---|---|
| 14:14:17 | 1 | be -- |
| 14:14:17 | 2 | THE COURT:  She asked him and he hadn't gotten around |
| 14:14:21 | 3 | to answering that part of it.  Can you advise the lady when you |
| 14:14:26 | 4 | think abortion is illegal? |
| 14:14:29 | 5 | THE WITNESS:  When abortion should be legal or illegal |
| 14:14:33 | 6 | is the question.  I apologize. |
| 14:14:34 | 7 | Q.   (BY MS. CLAPMAN) Legally permitted. |
| 14:14:35 | 8 | A.   Legally permitted, I think abortion should be legally |
| 14:14:38 | 9 | permitted in those circumstances that comport with other |
| 14:14:40 | 10 | principles of justification in the law for taking human life. |
| 14:14:44 | 11 | Q.   Okay.  Can you identify any concrete situations where that |
| 14:14:47 | 12 | would apply -- |
| 14:14:47 | 13 | A.   Sure.  An instance in which a woman's life is at issue is an |
| 14:14:52 | 14 | instance in which that could possibly -- but, again, it's a |
| 14:14:54 | 15 | highly complex question involving a variety of factors.  It's |
| 14:14:57 | 16 | hard to answer in the abstract. |
| 14:14:58 | 17 | Q.   Okay.  Any other concrete situations other than a woman's |
| 14:15:01 | 18 | life being in danger that you can see it being legally |
| 14:15:04 | 19 | permissible? |
| 14:15:04 | 20 | A.   Well, I would have to think about it more.  I mean -- again, |
| 14:15:07 | 21 | it's like when should it be legal to kill another person is your |
| 14:15:09 | 22 | question. |
| 14:15:10 | 23 | Q.   Okay.  So -- |
| 14:15:10 | 24 | A.   And there are about a million different answers to that |
| 14:15:13 | 25 | question. |

| | | |
|---|---|---|
| 14:15:13 | 1 | Q.   Okay.  So as you're sitting here now, other than a situation |
| 14:15:15 | 2 | where a woman's life is in danger, you cannot identify a concrete |
| 14:15:18 | 3 | situation where you think abortion should be legally permissible. |
| 14:15:22 | 4 | And I'd like a "Yes" or "No" answer, please. |
| 14:15:24 | 5 | A.   I don't under -- rephrase the question, please. |
| 14:15:26 | 6 | Q.   Sure.  As you're sitting here now, you cannot identify a |
| 14:15:29 | 7 | concrete situation other than where the woman's life is at risk |
| 14:15:34 | 8 | where it should be legally permissible for her to have an |
| 14:15:36 | 9 | abortion. |
| 14:15:37 | 10 | A.   Could you also -- |
| 14:15:38 | 11 |      MR. STEPHENS:  Judge, we object.  That's asked and |
| 14:15:40 | 12 | answered.  She asked him for a situation and he gave -- |
| 14:15:44 | 13 | A.   I think you're going to have -- I'm sorry.  Sorry, Judge. |
| 14:15:47 | 14 |      MS. CLAPMAN:  He gave one answer and I'm asking if |
| 14:15:49 | 15 | there are any other situations.  That hasn't been answered. |
| 14:15:51 | 16 |      MR. STEPHENS:  That's a different question. |
| 14:15:56 | 17 |      MS. CLAPMAN:  So it's not asked and answered. |
| 14:15:58 | 18 |      THE COURT:  I didn't sustain the objection.  He |
| 14:16:01 | 19 | withdrew the objection.  Ask the question again. |
| 14:16:03 | 20 | Q.   (BY MS. CLAPMAN) Okay.  So you've identified one concrete |
| 14:16:06 | 21 | situation. |
| 14:16:06 | 22 | A.   Yeah. |
| 14:16:07 | 23 | Q.   Where you believe that abortion should be legally permitted, |
| 14:16:10 | 24 | where the woman's life is at stake.  Sitting here today -- and I |
| 14:16:13 | 25 | realize you might want to think about it some more, but sitting |

14:16:17   1   here today, can you identify any other concrete situation where

14:16:19   2   you think abortion should be legally permitted?

14:16:22   3   A.   What do you mean by abortion?  Because that's actually a

14:16:27   4   complicated and vexed issue and -- in both medical practice and

14:16:28   5   in bioethics and in the law, for that matter.

14:16:30   6   Q.   Okay.  I mean termination of a pregnancy by a doctor or

14:16:37   7   medical professional.

14:16:38   8   A.   Termination of a pregnancy, there are lots of circumstances

14:16:41   9   in which termination of a pregnancy would be permissible or

14:16:46   10  legal, or should be legal or permissible.  If by preg -- you mean

14:16:52   11  by pregnancy, gestation of a human organism in utero?

14:16:58   12          THE COURT:  Let's ask it this way.

14:17:00   13          THE WITNESS:  Yeah.

14:17:01   14          THE COURT:  Do you believe that a choice of abortion is

14:17:22   15  a constitutional right?

14:17:24   16          THE WITNESS:  The Supreme Court certainly has held

14:17:26   17  that.  Absolutely, sir.

14:17:27   18          THE COURT:  Okay.  My question is, do you believe it?

14:17:31   19          THE WITNESS:  Do I believe that there is --

14:17:32   20          THE COURT:  Not what the Supreme Court says.  It's

14:17:35   21  binding on you, it's binding on me.  I have my own beliefs.  How

14:17:38   22  about you?

14:17:39   23          THE WITNESS:  Oh, are you asking me, does the

14:17:40   24  Constitution require or prevent the state from forbidding or

14:17:44   25  restricting abortion is what you're asking, Judge?

| | | |
|---|---|---|
| 14:17:46 | 1 | THE COURT:  No. |
| 14:17:48 | 2 | THE WITNESS:  I'm sorry.  I'm not -- |
| 14:17:50 | 3 | THE COURT:  I'm through asking questions. |
| 14:17:52 | 4 | THE WITNESS:  Not trying to be difficult. |
| 14:17:53 | 5 | THE COURT:  That's all right.  I have four sons, I'm |
| 14:17:55 | 6 | used to it. |
| 14:17:56 | 7 | Q.   (BY MS. CLAPMAN) Okay.  You've criticized the current U.S. |
| 14:18:01 | 8 | Supreme Court as ardently supporting maximal abortion rights, |
| 14:18:05 | 9 | correct? |
| 14:18:06 | 10 | A.   What year was that?  The current Supreme Court?  Current as |
| 14:18:09 | 11 | of when? |
| 14:18:10 | 12 | Q.   Current as in past two years. |
| 14:18:14 | 13 | A.   I think that's fair. |
| 14:18:16 | 14 | Q.   Okay.  And I'm going to hand you Plaintiffs' Exhibit 242. |
| 14:18:34 | 15 | Actually, I'm going to hold off on handing it to you.  Not |
| 14:18:37 | 16 | because I don't want to hand it to you yet. |
| 14:18:42 | 17 | Do you recall having called the U.S. Supreme Court's |
| 14:18:44 | 18 | recent Hellerstedt decision a, quote, devastating blow to the |
| 14:18:50 | 19 | inalienable dignity of unborn children and their mothers? |
| 14:18:53 | 20 | A.   Yes.  Absolutely. |
| 14:18:54 | 21 | Q.   Do you recall having called that same decision a |
| 14:18:57 | 22 | breathtaking misappropriation of power? |
| 14:19:00 | 23 | A.   Yes. |
| 14:19:01 | 24 | Q.   Okay.  You think that some forms of birth control should be |
| 14:19:10 | 25 | banned because they're really abortion, correct? |

14:19:14  1    A.    You have to be more specific.

14:19:16  2    Q.    Okay.  You think that emergency contraception is really

14:19:20  3    abortion, correct?

14:19:21  4    A.    Which form of emergency contraception are you talking about?

14:19:25  5    Q.    What's commonly known as the morning-after pill?

14:19:29  6    A.    I actually don't know the mechanism of action of the

14:19:30  7    morning-after pill.  I know that the Food and Drug Administration

14:19:33  8    has written in its own documentation that it might function by

14:19:38  9    inhibiting implantation, but I actually -- I don't know the

14:19:40  10   mechanism of actions.  So I'm not confident about the

14:19:43  11   morning-after pill and its mechanism of action.

14:19:45  12   Q.    Okay.  Do you recall having referred to emergency

14:19:49  13   contraception as killing an unborn child?

14:19:52  14          MR. STEPHENS:  Judge, objection.  Relevance.  This case

14:19:54  15   isn't about abortion being legal or illegal or the morning-after

14:19:58  16   pill.  It's about fetal tissue research and the Inspector

14:20:03  17   General's decision to terminate Planned Parenthood from money.

14:20:05  18   This is going well past the scope of bias, if that's the intent.

14:20:11  19          THE COURT:  This case is about whether the clinics and

14:20:18  20   Planned Parenthood did those things and justified the

14:20:25  21   termination.  There's no question -- there's no point in, you

14:20:30  22   know, continuing to cross-examination.  The witness has strong

14:20:34  23   feelings about things.  You've got a lot of things, but you've

14:20:39  24   covered that in two questions.

14:20:42  25          MS. CLAPMAN:  Okay.  No further questions.

| | | |
|---|---|---|
| 14:20:45 | 1 | THE COURT:  You're taking up your time.  Redirect. |
| 14:20:51 | 2 | RE-DIRECT EXAMINATION |
| 14:20:53 | 3 | BY MR. STEPHENS: |
| 14:20:53 | 4 | Q.   Professor Snead, do you consider yourself pro life? |
| 14:20:55 | 5 | A.   Yes. |
| 14:20:56 | 6 | Q.   Okay.  And in light of your views regarding Planned |
| 14:21:01 | 7 | Parenthood and abortion, can you be objective in offering an |
| 14:21:05 | 8 | opinion in this case? |
| 14:21:06 | 9 | A.   Yes, of course I can. |
| 14:21:08 | 10 | Q.   Okay.  And could you be objective in offering an opinion |
| 14:21:12 | 11 | about bioethics as they pertain to the issues of this case? |
| 14:21:16 | 12 | A.   Of course. |
| 14:21:16 | 13 | Q.   Okay.  And why is that?  Why can you do that? |
| 14:21:18 | 14 | A.   Well, again, what I've been asked to do is not to opine on |
| 14:21:22 | 15 | the -- I understand that the question of abortion is a divided |
| 14:21:27 | 16 | question -- a question that divides the country and divides |
| 14:21:29 | 17 | people in this courtroom.  And I understand that not everyone |
| 14:21:31 | 18 | agrees with me. |
| 14:21:32 | 19 | What I've been asked to do is not to talk about |
| 14:21:34 | 20 | abortion, but to talk about the application of ethical principles |
| 14:21:37 | 21 | that are codified in federal law, codified in federal regulations |
| 14:21:41 | 22 | and -- |
| 14:21:41 | 23 | MS. CLAPMAN:  I object to his answer as a narrative |
| 14:21:43 | 24 | form and not responsive to the question. |
| 14:21:48 | 25 | THE COURT:  Ask another question. |

| | | |
|---|---|---|
| 14:21:50 | 1 | Q.   (BY MR. STEPHENS) Professor Snead, why do ethical issues |
| 14:21:58 | 2 | matter in this case? |
| 14:22:00 | 3 | A.   The question, as I understand it, Judge, you just said |
| 14:22:04 | 4 | moments ago, is whether or not -- I mean, whether or not the |
| 14:22:08 | 5 | termination of the Medicaid contracts were legitimate or not, and |
| 14:22:11 | 6 | one of the grounds for termination is that the medical services |
| 14:22:15 | 7 | were provided in an unethical fashion following the Gee case, is |
| 14:22:18 | 8 | my understanding of what's going on. |
| 14:22:20 | 9 | MS. CLAPMAN:  This is a narrative answer. |
| 14:22:21 | 10 | MR. STEPHENS:  That's fine.  Pass the witness. |
| 14:22:25 | 11 | THE COURT:  Do you have any other questions? |
| 14:22:27 | 12 | MS. CLAPMAN:  No. |
| 14:22:28 | 13 | THE COURT:  May the witness be excused? |
| 14:22:30 | 14 | MR. STEPHENS:  Yes. |
| 14:22:31 | 15 | THE COURT:  You're excused. |
| 14:22:34 | 16 | THE WITNESS:  Thank you, Judge. |
| 14:23:08 | 17 | THE COURT:  Come up, please, ma'am. |
| 14:23:10 | 18 | (Witness sworn.) |
| 14:23:32 | 19 | THE COURT:  Tell us your full name and spell your last |
| 14:23:40 | 20 | name. |
| 14:23:40 | 21 | THE WITNESS:  My name is Leslie Kathleen French |
| 14:23:46 | 22 | Henneke, F-R-E-N-C-H, Henneke, H-E-N-N-E-K-E. |
| 14:23:51 | 23 | LESLIE K. FRENCH HENNEKE, called by the Defendant, duly sworn. |
| 14:23:51 | 24 | DIRECT EXAMINATION |
| 14:23:51 | 25 | BY MR. SWEETEN: |

| | | |
|---|---|---|
| 14:23:51 | 1 | Q.   Ms. Henneke, where do you work? |
| 14:23:53 | 2 | A.   I work at the Health and Human Services Commission. |
| 14:23:55 | 3 | Q.   And what is your position there? |
| 14:23:56 | 4 | A.   I am the Associate Commissioner for the Health, |
| 14:24:00 | 5 | Developmental, and Independent Services Department. |
| 14:24:01 | 6 | Q.   And how long have you been the associate commissioner there? |
| 14:24:05 | 7 | A.   Since September 1st, 2015. |
| 14:24:07 | 8 | Q.   Okay. |
| 14:24:08 | 9 |         THE COURT:  And, I'm sorry, I'm a little slow on |
| 14:24:10 | 10 | writing down.  You're the associate commissioner of what? |
| 14:24:13 | 11 |         THE WITNESS:  It's a long title.  Associate |
| 14:24:15 | 12 | Commissioner of Health, Developmental and Independent Services |
| 14:24:21 | 13 | Department. |
| 14:24:22 | 14 |         THE COURT:  Thank you. |
| 14:24:23 | 15 | Q.   (BY MR. SWEETEN) And so, you're relatively new in that |
| 14:24:25 | 16 | position? |
| 14:24:25 | 17 | A.   Yes. |
| 14:24:26 | 18 | Q.   Okay.  Part of that, though, have you worked on -- why don't |
| 14:24:30 | 19 | you tell us your experience with HHSC? |
| 14:24:35 | 20 | A.   Sure.  Before my current role, I was the Associate |
| 14:24:38 | 21 | Commissioner for the Women's Health Services Division at HHSC, |
| 14:24:41 | 22 | and prior to that, I was the Woman's Health Coordinator for HHSC, |
| 14:24:46 | 23 | beginning in October 2014. |
| 14:24:48 | 24 | Q.   Okay. |
| 14:24:49 | 25 |         THE COURT:  And for another slow one, HSC is what? |

```
14:24:52   1              THE WITNESS:  Health And Human Services Commission.  So
14:24:55   2   HHSC.
14:24:56   3   Q.   (BY MR. SWEETEN) What are your current job duties as the
14:25:01   4   Associate Commissioner for Health, Development and Independent
14:25:04   5   Services department?
14:25:05   6   A.   I manage 34 health programs that are not the Medicaid
14:25:07   7   program, and these programs serve clients between birth to end of
14:25:13   8   life.  So, for example, some of the programs include the early
14:25:16   9   childhood intervention program, the women's health programs, as
14:25:20  10   well as the guardianship programs.
14:25:22  11   Q.   Okay.  Now, you mentioned women's health programs, correct?
14:25:25  12   A.   Yes.
14:25:26  13   Q.   And can you tell us a little bit about what are those?
14:25:30  14   A.   The women's health programs within our department are three
14:25:33  15   programs, the Healthy Texas Women Program, the Family Planning
14:25:38  16   Program, and the Breast and Cervical Cancer Screening Program.
14:25:40  17   Q.   Who is served by those programs?
14:25:43  18   A.   All three programs serve women and some serve men of
14:25:47  19   reproductive age between the ages of 15 to 64 years old,
14:25:51  20   depending upon the program.
14:25:52  21   Q.   Okay.  Now, you've said something about the Healthy Texas
14:25:57  22   Women's Program.  Did I get that right?
14:25:59  23   A.   Yes.
14:25:59  24   Q.   Okay.  And can you tell us -- can you just describe what
14:26:02  25   that program is?
```

14:26:03   1   A.    So the Healthy Texas Women Program is a program for women

14:26:07   2   ages 15 to 44 years old who are in need of women's health or

14:26:12   3   family planning services, and it serves women up to 200 percent

14:26:16   4   of the federal poverty level.

14:26:18   5   Q.    Now, you said family planning program.  Is that one of the

14:26:22   6   programs?

14:26:22   7   A.    The family planning program is the second one in this health

14:26:25   8   program.

14:26:26   9   Q.    Tell us about that program.

14:26:27   10  A.    So that program serves men and women of reproductive age all

14:26:31   11  the way up to age 64 years old, and they are served up to 250

14:26:34   12  percent of federal poverty level.

14:26:37   13  Q.    Okay.  Now, do you sometimes -- at HHSC, do you sometimes

14:26:41   14  work with HHSC management that oversees Texas Medicaid?

14:26:44   15  A.    Yes.  I am one of four associate commissioners and my

14:26:48   16  counterpart is the Medicaid director, so we work very closely

14:26:52   17  together on many programs.

14:26:54   18  Q.    And what is her name?

14:26:55   19  A.    Jami Snyder.

14:26:56   20  Q.    Okay.  Can you just generally tell us the array of family

14:27:00   21  planning services available to Texas women under the Medicaid

14:27:02   22  program versus your program?

14:27:04   23  A.    They are very similar.  We see women's health and family

14:27:08   24  planning as being able to serve women in the reproductive age

14:27:11   25  lifespan.  So making sure that women have annual exams, pelvic

14:27:17  1  exams, family planning services, such as contraceptive, birth

14:27:21  2  control, screenings for sexually transmitted infections, that

14:27:25  3  screening treatment for those, as well as breast and cervical

14:27:29  4  cancer screenings and diagnostic tests.

14:27:33  5        We also do mammograms as well as immunizations and

14:27:37  6  cervical dysplasia treatment.

14:27:39  7  Q.   Now, if there's a patient you're eligible for Medicaid, are

14:27:42  8  you eligible for the Texas Women's Program?

14:27:44  9  A.   Yes.  You are able to be eligible for both.

14:27:49  10 Q.   Now, are you familiar with the services that are provided by

14:27:53  11 Planned Parenthood?

14:27:54  12 A.   Yes.

14:27:55  13 Q.   Okay.  And how do their services compare or differ from

14:28:00  14 those provided under the Texas program?

14:28:02  15 A.   They're the same women's health program services and family

14:28:07  16 planning services, except the Healthy Texas Women program also

14:28:09  17 provides some primary care benefits that we've seen impact

14:28:13  18 reproductive health, such as the screening, diagnosis and

14:28:17  19 treatment for hypertension, cholesterol and Diabetes.

14:28:20  20 Q.   Okay.  Are there other Medicaid providers who provide the

14:28:22  21 same services to Texas women as the services provided by Planned

14:28:26  22 Parenthood under Medicaid, to your knowledge?

14:28:27  23 A.   Yes.

14:28:28  24 Q.   Okay.  If Planned Parenthood were no longer a Texas Medicaid

14:28:33  25 provider, how would that affect Texas women's access to family

14:28:36   1   planning services?

14:28:39   2   A.   We would not see it -- a very difference and the reason why

14:28:42   3   is because Medicaid is -- everyone is -- in our programs is --

14:28:46   4   also must be a Medicaid provider.  So you have the Medicaid

14:28:49   5   women's health providers here and you have the general

14:28:51   6   revenue-funded women's health programs, they're a smaller niche.

14:28:55   7   But you have over 5,342 women's health providers throughout Texas

14:29:00   8   who are able and willing to serve any patients who may not be

14:29:03   9   able to get access and services elsewhere.

14:29:05   10   Q.   Okay.  Let me ask you about the last two years.  Has there

14:29:08   11   been an increase in enrolled providers during that time?

14:29:11   12   A.   Yes.  We had a unique experience over the last year because

14:29:15   13   of the mandatory requirement that all providers reenroll in

14:29:20   14   Medicaid, and because of that mandatory re-enrollment, HHSC

14:29:25   15   through all of our programs really did an outreach campaign for

14:29:28   16   all the providers across the state to make sure that they were

14:29:31   17   noticed about the re-enrollment.  So specifically about the

14:29:34   18   women's healthcare programs, we worked with doctors and providers

14:29:38   19   and --

14:29:38   20       THE COURT:  Little slower.  The court reporter is

14:29:41   21   starting to steam here.

14:29:44   22   A.   Sorry.  So we worked very closely with providers across

14:29:48   23   Texas to come and join Medicaid, as well as the women's health

14:29:52   24   programs.

14:29:53   25   Q.   (BY MR. SWEETEN) Okay.  Has there been a change in the types

| | | |
|---|---|---|
| 14:29:55 | 1 | of providers that are available since 2011? |
| 14:29:58 | 2 | A.    Yes.  Not only have we seen a tripling of the amount of |
| 14:30:03 | 3 | providers in the program, so in 2010, we had 1,647 providers. |
| 14:30:08 | 4 | And today, we have 5,342.  But we've also seen an increase in the |
| 14:30:13 | 5 | type of provider.  Because a lot of our providers have said, you |
| 14:30:16 | 6 | know, we really want to be able to serve the woman holistically |
| 14:30:20 | 7 | and being able to address issues that impact her reproductive |
| 14:30:22 | 8 | health. |
| 14:30:23 | 9 |         So with chronic diseases, they play a major role in |
| 14:30:26 | 10 | reproductive health, and so, we've accrued a lot more primary |
| 14:30:29 | 11 | care, internal doctors, as well as family doctors to the |
| 14:30:32 | 12 | programs. |
| 14:30:33 | 13 | Q.    Okay.  Now, I want to ask you some questions about some |
| 14:30:36 | 14 | numbers.  First of all, collectively, how many women were served |
| 14:30:39 | 15 | by the women's health programs in Texas last year? |
| 14:30:42 | 16 | A.    With the three programs, we've served approximately 363,000 |
| 14:30:46 | 17 | women. |
| 14:30:46 | 18 | Q.    Okay.  And I also want to ask you, how much was spent by the |
| 14:30:52 | 19 | state of Texas on these programs last year? |
| 14:30:54 | 20 | A.    On just those -- the general revenue programs, it was $210 |
| 14:30:59 | 21 | million last year. |
| 14:31:00 | 22 | Q.    Okay.  Now, with respect to women's health providers in the |
| 14:31:05 | 23 | areas of Planned Parenthood Gulf Coast, do you have any knowledge |
| 14:31:09 | 24 | about how many providers are within a five-mile radius of that |
| 14:31:13 | 25 | facility? |

14:31:15  1    A.   We've looked at some of them.  If you go to

14:31:19  2    healthytexaswomen.org, you can see an online provider lookup

14:31:22  3    which it can actually pinpoint providers in a very -- either a

14:31:25  4    five-mile, 10-mile or 20-mile radius.  And so, these are Medicaid

14:31:29  5    providers.  All of them have to be Medicaid providers to be on

14:31:32  6    this online provider lookup.  So www.healthytexaswomen.org.

14:31:37  7            And specifically with respect to a Planned Parenthood

14:31:40  8    clinic in the Houston area, we know that there's 357 providers in

14:31:45  9    a five-mile radius of the Houston clinic.

14:31:47  10   Q.   Okay.  Did you also look up the number of providers in a

14:31:52  11   five-mile radius of the PPST facility, Planned Parenthood South

14:32:00  12   Texas facility?

14:32:00  13   A.   South Texas.

14:32:03  14   Q.   Yes.  Sorry.  Planned Parenthood San Antonio?  Yeah.  San

14:32:08  15   Antonio center.

14:32:09  16   A.   I think there were 62 in that area.

14:32:11  17   Q.   Okay.  And then, did you also look up how many providers

14:32:15  18   were within a five-mile radius of the Planned Parenthood Greater

14:32:18  19   Texas facility?

14:32:19  20   A.   It was approximately around 50 providers in that area, too.

14:32:23  21   Q.   Okay.  Thank you.  Pass the witness.

14:32:35  22                        CROSS-EXAMINATION

14:32:41  23   BY MS. RATAKONDA:

14:32:41  24   Q.   Good afternoon, Ms. French.

14:32:44  25   A.   Hi.

| | | |
|---|---|---|
| 14:32:45 | 1 | Q.   So you testified about certain Texas programs that provide |
| 14:32:49 | 2 | coverage for family planning service, correct? |
| 14:32:51 | 3 | A.   Correct. |
| 14:32:53 | 4 | Q.   Do you agree that a patient who is enrolled in Medicaid is |
| 14:32:56 | 5 | ineligible for the Texas women's health program to also be |
| 14:33:00 | 6 | enrolled in that program at the same time? |
| 14:33:02 | 7 | A.   They're screened for whichever program is most appropriate |
| 14:33:05 | 8 | for them. |
| 14:33:06 | 9 | Q.   I'm sorry.  Can you -- |
| 14:33:07 | 10 | A.   They're screened.  There's an application process, and so, |
| 14:33:10 | 11 | they're screened for whichever program.  So -- |
| 14:33:12 | 12 | Q.   So can they be enrolled in both programs at the same time? |
| 14:33:15 | 13 | A.   They can't be enrolled in both programs.  Correct. |
| 14:33:18 | 14 | Q.   Okay.  Thank you. |
| 14:33:19 | 15 | And, in fact, you have policies in place to make sure |
| 14:33:21 | 16 | that patients are not enrolled in both programs at the same time, |
| 14:33:24 | 17 | right? |
| 14:33:24 | 18 | A.   Correct, because -- |
| 14:33:25 | 19 | Q.   Okay.  And -- |
| 14:33:26 | 20 | A.   -- people can go in and out of the programs based on their |
| 14:33:29 | 21 | life circumstances.  We want to make sure it's encompassing so |
| 14:33:32 | 22 | that you're able to be qualified for one or both. |
| 14:33:34 | 23 | Q.   Okay.  Thank you. |
| 14:33:35 | 24 | And so, these other -- this other program that you |
| 14:33:40 | 25 | mentioned, it's actually not relevant to a Medicaid patient's |

| | | |
|---|---|---|
| 14:33:44 | 1 | ability to access family planning services, correct?  Because if |
| 14:33:47 | 2 | they're in the Medicaid program, they can't also be in the Texas |
| 14:33:49 | 3 | women's health program; is that correct? |
| 14:33:51 | 4 | A.   It's not completely accurate because if you're in the |
| 14:33:55 | 5 | pregnant women's Medicaid program, you actually can be enrolled |
| 14:33:58 | 6 | in Healthy Texas Women program. |
| 14:34:00 | 7 | Q.   If you're not in that specific -- |
| 14:34:02 | 8 | MR. SWEETEN:  Your Honor, if the witness could just |
| 14:34:04 | 9 | finish her answer.  I think she was still completing it. |
| 14:34:07 | 10 | THE COURT:  Let her finish the answer. |
| 14:34:10 | 11 | MS. RATAKONDA:  Sure.  Go ahead. |
| 14:34:10 | 12 | THE COURT:  Ma'am, you just answer the question. |
| 14:34:12 | 13 | Q.   (BY MS. RATAKONDA) So except for the women who are |
| 14:34:16 | 14 | specifically in the pregnant women program, except for those |
| 14:34:20 | 15 | women, women who are in the Texas women's health program can't be |
| 14:34:25 | 16 | in the Medicaid program, correct? |
| 14:34:27 | 17 | A.   They can't be in Medicaid, but they could be in the family |
| 14:34:29 | 18 | planning program. |
| 14:34:29 | 19 | Q.   Okay.  Wouldn't you agree that there are several steps that |
| 14:34:33 | 20 | a patient has to take in order to enroll in a different publicly |
| 14:34:36 | 21 | funded health program? |
| 14:34:38 | 22 | A.   No, because it depends on which program you're in.  So if |
| 14:34:42 | 23 | you're in Healthy Texas Women there -- you can apply online.  So |
| 14:34:46 | 24 | there's a process to apply online.  But if you are in the family |
| 14:34:49 | 25 | planning program, you can also show up to the doctor's office and |

| | | |
|---|---|---|
| 14:34:51 | 1 | be served at that point in time.  So there's a different |
| 14:34:54 | 2 | eligibility system for the family planning program. |
| 14:34:57 | 3 | Q.   But you have to navigate this eligibility system, correct? |
| 14:35:00 | 4 | A.   Not for family planning.  No. |
| 14:35:03 | 5 | Q.   Didn't you just say that you have to go through certain |
| 14:35:06 | 6 | steps to -- |
| 14:35:06 | 7 | A.   For Healthy Texas Women, you do and for -- same with |
| 14:35:09 | 8 | Medicaid.  So the same application used for Healthy Texas Women |
| 14:35:13 | 9 | is the same application you would use for the Medicaid program. |
| 14:35:15 | 10 | Q.   So let's stick with the Healthy Texas Women's program.  So |
| 14:35:21 | 11 | the patient has to be screened in some way to determine |
| 14:35:23 | 12 | eligibility for this program, correct? |
| 14:35:25 | 13 | A.   Through the application process, yes. |
| 14:35:27 | 14 | Q.   Okay.  And if she wants to apply to this program, she would |
| 14:35:30 | 15 | have to terminate her enrollment in the Medicaid program, |
| 14:35:33 | 16 | correct? |
| 14:35:34 | 17 | A.   She would not be -- she's always screened for Medicaid first |
| 14:35:37 | 18 | before being placed into the Healthy Texas Women. |
| 14:35:40 | 19 | Q.   Okay.  And do patients routinely switch between Texas' |
| 14:35:44 | 20 | publicly funded health programs? |
| 14:35:47 | 21 | A.   Yes.  We've seen that. |
| 14:35:49 | 22 | Q.   Would you agree that there's a shortage of Medicaid |
| 14:35:52 | 23 | providers in Texas? |
| 14:35:53 | 24 | A.   No. |
| 14:35:54 | 25 | Q.   Would you agree that there are certain regions of Texas for |

| | | |
|---|---|---|
| 14:35:57 | 1 | which there is a shortage of Medicaid providers? |
| 14:35:59 | 2 | A.   No. |
| 14:36:00 | 3 | Q.   Would you agree that there's a shortage of Medicaid |
| 14:36:03 | 4 | providers who are willing to accept new patients? |
| 14:36:07 | 5 | A.   No. |
| 14:36:09 | 6 | Q.   Do you know how many Texas Medicaid providers are willing to |
| 14:36:13 | 7 | accept new patients in terms of percentage of Medicaid providers? |
| 14:36:16 | 8 | A.   I can't speak to the Medicaid, but I can tell you for our |
| 14:36:19 | 9 | programs that there's a requirement they see new patients.  And |
| 14:36:22 | 10 | so, that's part of being enrolled in our program that we ask all |
| 14:36:25 | 11 | doctors to see patients on a routine basis, and so, we require |
| 14:36:29 | 12 | them to see new patients. |
| 14:36:31 | 13 | Q.   But you can't speak to the Medicaid program. |
| 14:36:33 | 14 | A.   No.  That's not my expertise. |
| 14:36:36 | 15 | Q.   So you don't know how many Texas Medicaid providers are |
| 14:36:39 | 16 | willing to see new patients? |
| 14:36:41 | 17 | A.   Correct. |
| 14:36:41 | 18 | Q.   Okay.  Does Medicaid -- to your knowledge, does Medicaid |
| 14:36:46 | 19 | reimburse providers for the total cost of the medical services |
| 14:36:49 | 20 | they provide? |
| 14:36:52 | 21 | A.   The reimbursement structure's very similar to the other |
| 14:36:55 | 22 | women's health programs, and so, yes, you're able to bill for the |
| 14:36:59 | 23 | services you provide. |
| 14:37:00 | 24 | Q.   And are providers reimbursed for the total cost of all of |
| 14:37:05 | 25 | the services that they provide? |

14:37:07  1   A.   I think it would depend.  You'd have to ask providers about

14:37:10  2   that question.  But the providers that we've discussed, that

14:37:13  3   we've talked to and we have frequent dialogues with and that

14:37:17  4   we've designed programs so they can be made whole to see a

14:37:20  5   client, they have been -- said they said that they're very

14:37:23  6   pleased with how it's being run and how they're able to be

14:37:26  7   reimbursed for all the services they're providing.

14:37:28  8   Q.   Okay.  Can you be enrolled as a -- so you spoke about being

14:37:34  9   enrolled as a Medicaid provider.  Can you be enrolled as a

14:37:36 10   Medicaid provider and see no Medicaid patients?  Is that a

14:37:39 11   possibility?

14:37:41 12   A.   Not to my knowledge, no, because we encourage everybody to

14:37:45 13   see new patients in the Medicaid program if you're a Medicaid

14:37:47 14   provider.

14:37:48 15   Q.   So you encourage everyone to see patients?

14:37:50 16   A.   Uh-huh.

14:37:51 17   Q.   But is there any enforcement mechanism to that?

14:37:54 18   A.   There's no enforcement of a number of clients you have to

14:37:58 19   see, but if you're enrolled in Medicaid, especially since we just

14:38:00 20   went through Medicaid enrollment, everybody is seeing patients.

14:38:04 21   Q.   So every single Medicaid provider who's enrolled is seeing

14:38:08 22   Medicaid patients.  That's your testimony?

14:38:11 23   A.   In the Healthy Texas Woman and family planning program, yes.

14:38:15 24   Q.   What about Medicaid generally?

14:38:17 25   A.   I can't speak to all of Medicaid.  I can just speak to the

| | | |
|---|---|---|
| 14:38:20 | 1 | Medicaid providers who are also enrolled in our programs. |
| 14:38:24 | 2 | Q.   Okay.  So you're not familiar with other Medicaid providers, |
| 14:38:28 | 3 | whether they are required to see Medicaid patients? |
| 14:38:30 | 4 | A.   I believe they are, but I will refer that to others to |
| 14:38:36 | 5 | discuss.  So I can only talk about if you are a provider in our |
| 14:38:40 | 6 | programs, you are a Medicaid provider and you are also required |
| 14:38:44 | 7 | to see Medicaid providers -- patients. |
| 14:38:49 | 8 | Q.   But you're not sure. |
| 14:38:51 | 9 | A.   I cannot speak to the whole Medicaid system.  No. |
| 14:38:53 | 10 | Q.   Okay.  So did anyone ask you to analyze whether there would |
| 14:38:59 | 11 | be other providers available to see Planned Parenthood's Medicaid |
| 14:39:02 | 12 | patients if Planned Parenthood were to be terminated from the |
| 14:39:05 | 13 | Medicaid program? |
| 14:39:06 | 14 | A.   We're always looking at how we can better serve clients, so |
| 14:39:10 | 15 | we're always looking at ways to improve. |
| 14:39:12 | 16 | Q.   So did you do an analysis by region of the impact of |
| 14:39:15 | 17 | termination on Medicaid patients? |
| 14:39:17 | 18 | A.   I only did -- we were -- I was asked to look into the |
| 14:39:21 | 19 | Healthy Texas Women of where the several locations that were |
| 14:39:24 | 20 | mentioned earlier, if there were providers in Healthy Texas Women |
| 14:39:29 | 21 | and Medicaid in those areas.  So that was the numbers I gave |
| 14:39:31 | 22 | earlier. |
| 14:39:32 | 23 | Q.   So there were only certain regions that you looked at? |
| 14:39:34 | 24 | A.   Correct. |
| 14:39:34 | 25 | Q.   Okay.  So you're not sure of the impact on termination in |

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 14:39:39 | 1  | other regions in the state?                                            |
| 14:39:40 | 2  | A.   We could pull up healthytexaswomen.com right now, and we          |
| 14:39:44 | 3  | could go point-by-point for all those places.  But I know that we     |
| 14:39:48 | 4  | have done a tremendous amount of work recruiting providers to the      |
| 14:39:50 | 5  | programs over the last year.  And so, we know in Healthy Texas         |
| 14:39:53 | 6  | Women and in family planning, we have statewide access, which has      |
| 14:39:57 | 7  | actually tripled over the last four years.                             |
| 14:39:59 | 8  | Q.   Did you do any sort of study or analysis to see if other          |
| 14:40:03 | 9  | non-Planned Parenthood providers have the capacity to see more         |
| 14:40:06 | 10 | patients across the state?                                             |
| 14:40:07 | 11 | A.   We're always working with providers -- in the family             |
| 14:40:10 | 12 | planning program, we have contracts with providers, and so, we do      |
| 14:40:12 | 13 | know that they always have more capacity to take on new patients.      |
| 14:40:16 | 14 | Q.   And do you know if they actually take on new patients or are      |
| 14:40:19 | 15 | willing to take on new patients?                                       |
| 14:40:21 | 16 | A.   Based on our calls with them, yes.                                |
| 14:40:23 | 17 | Q.   Based on calls with how many of these patients -- providers?     |
| 14:40:26 | 18 | A.   We have 53 contractors that represent 201 clinics in the          |
| 14:40:30 | 19 | family planning program, so those providers are able to take on        |
| 14:40:33 | 20 | new patients.                                                          |
| 14:40:34 | 21 | Q.   And all of these providers have testified or stated that          |
| 14:40:37 | 22 | they would take on new patients and are taking on new patients.        |
| 14:40:41 | 23 | A.   Yes.                                                              |
| 14:40:41 | 24 | Q.   Every provider.                                                   |
| 14:40:42 | 25 | A.   Yes.                                                              |

| | | |
|---|---|---|
| 14:40:42 | 1 | Q.   That you've called. |
| 14:40:43 | 2 | A.   Yes. |
| 14:40:46 | 3 | Q.   Do you have any comparison of what services are available at |
| 14:40:51 | 4 | other non-Planned Parenthood Medicaid providers as compared to |
| 14:40:54 | 5 | the services currently available at Planned Parenthood clinics? |
| 14:41:00 | 6 | A.   Most of the Healthy Texas Woman as well as family planning |
| 14:41:04 | 7 | providers who are Medicaid providers can also see primary care |
| 14:41:07 | 8 | issues as well as the family planning services.  So we have other |
| 14:41:11 | 9 | doctors, internal medicine doctors, family doctors who can also |
| 14:41:15 | 10 | treat the other reproductive health issues that may present. |
| 14:41:18 | 11 | Q.   Are you familiar with the full range of services provided by |
| 14:41:22 | 12 | Planned Parenthood providers? |
| 14:41:23 | 13 | A.   Yes. |
| 14:41:24 | 14 | Q.   And do you know if all of these other Medicaid providers |
| 14:41:27 | 15 | that you've been referring to, if they offer the same full range |
| 14:41:31 | 16 | of services to patients? |
| 14:41:33 | 17 | A.   For women's health and family planning, they do. |
| 14:41:36 | 18 | Q.   The full -- including the same-day, long-acting reversible |
| 14:41:39 | 19 | contraception? |
| 14:41:40 | 20 | A.   Yes. |
| 14:41:41 | 21 | Q.   Every provider offers that? |
| 14:41:42 | 22 | A.   We've had a big issue with increasing access for long-acting |
| 14:41:45 | 23 | reversible contraceptive.  So yes, that's been the commitment of |
| 14:41:48 | 24 | our providers to make those available to patients. |
| 14:41:51 | 25 | Q.   And when you say commitment, do you mean that these |

| | | |
|---|---|---|
| 14:41:55 | 1 | providers are actually making these LARCs available to patients |
| 14:42:02 | 2 | -- are the same-day LARCs available to patients? |
| 14:42:04 | 3 | A.    For -- |
| 14:42:04 | 4 | Q.    Are the same-day LARCs available to patients? |
| 14:42:05 | 5 | A.    Same-day LARCs, whether -- sometimes it doesn't work for a |
| 14:42:06 | 6 | patient to have it on the same day, so they may want to come |
| 14:42:09 | 7 | back.  But we changed or Medicaid billing system over the last |
| 14:42:13 | 8 | year, and we launched the new LARC provider toolkit, which |
| 14:42:16 | 9 | actually provides a toolkit for patients and doctors to know how |
| 14:42:19 | 10 | and when is the best use of a LARC.  And so, we've seen a great |
| 14:42:23 | 11 | return and a lot of encouragement from clients who are real |
| 14:42:26 | 12 | excited about having LARCs. |
| 14:42:28 | 13 | So with our contracts with our providers that we |
| 14:42:32 | 14 | require that LARCs are available for patients. |
| 14:42:35 | 15 | Q.    So would you agree that if -- I'm sorry.  To stay on what |
| 14:42:40 | 16 | you said for a second, so how do you know that every single |
| 14:42:47 | 17 | provider -- Medicaid provider is -- has LARCs available, same-day |
| 14:42:53 | 18 | LARCs available for patients? |
| 14:42:54 | 19 | A.    Well, again, I can't testify to the whole Medicaid.  I can |
| 14:42:58 | 20 | just talk about the Medicaid providers who are also enrolled in |
| 14:43:02 | 21 | Healthy Texas Women and women's health -- family planning program |
| 14:43:05 | 22 | and they do.  They've made a commitment, they've signed up for |
| 14:43:07 | 23 | the programs, they want to participate, and part of that is |
| 14:43:09 | 24 | offering the array of contraception.  And LARC is, what we've |
| 14:43:12 | 25 | seen, the best scientific evidence for providing great birth |

```
14:43:16   1   control for women.  So it's been a big positive push that -- not
14:43:21   2   push, but it's been a big positive, you know, game-changer,
14:43:24   3   really, for women's health to have LARCs in the system.
14:43:27   4   Q.   And so, you can only speak to a small percentage of Medicaid
14:43:31   5   providers.  You said you can't speak to all Medicaid providers,
14:43:34   6   correct?
14:43:34   7   A.   Just the ones that overlap the 5,342.
14:43:38   8   Q.   Okay.  Would you agree that if women can't be seen as
14:43:41   9   quickly for family planning services, there may be more
14:43:44  10   unintended pregnancies?
14:43:47  11   A.   Maybe.
14:43:49  12   Q.   Would you agree that if women --
14:43:51  13        MR. SWEETEN:  Your Honor, foundation and it's outside
14:43:53  14   the scope of the direct.
14:43:58  15        THE COURT:  I'll sustain the objection.
14:44:02  16   Q.   (BY MS. RATAKONDA) What qualifies a woman for Medicaid?
14:44:09  17   A.   So there's an application process.  Yourtexasbenefits.com
14:44:13  18   where a woman fills out an application.  They have to be a
14:44:16  19   certain age, over 18 or older, and they have to be up to 185
14:44:22  20   percent of the federal poverty level.  And then, through that
14:44:25  21   application process, there's documentation that's required, you
14:44:28  22   know, whether you're an eligible citizen or immigrant for
14:44:32  23   services.
14:44:33  24   Q.   And aside from the federal poverty level figure that you
14:44:38  25   just mentioned, do these patients also have to have an additional
```

| | | |
|---|---|---|
| 14:44:42 | 1 | qualifying factor?  Are you familiar with that? |
| 14:44:52 | 2 | A.   I don't understand the question. |
| 14:44:54 | 3 | Q.   So you mentioned that a woman in order to qualify for |
| 14:44:57 | 4 | Medicaid, what was the federal poverty level? |
| 14:45:01 | 5 | A.   185 percent. |
| 14:45:03 | 6 | Q.   Okay.  And does she also have to have an additional |
| 14:45:07 | 7 | qualifying factor?  There's certain factors that she has to meet? |
| 14:45:11 | 8 | A.   Well, there's income verification, there's residency, |
| 14:45:17 | 9 | status.  There's multiple different qualifications, and then, you |
| 14:45:20 | 10 | have to have the documentation to prove it.  So if, for some |
| 14:45:23 | 11 | reason, a woman is not able to be enrolled through the Medicaid |
| 14:45:26 | 12 | system, they would be able to receive family planning services |
| 14:45:28 | 13 | through the family planning program because a citizenship is not |
| 14:45:32 | 14 | an issue for that program.  And, also, the federal poverty level |
| 14:45:36 | 15 | is up to 250 percent and not 185.  So it actually encompasses |
| 14:45:41 | 16 | more people who could qualify for that program. |
| 14:45:44 | 17 | Q.   So at 185 percent of the federal poverty level, these are |
| 14:45:47 | 18 | women living in poverty, correct? |
| 14:45:49 | 19 | A.   Yes. |
| 14:45:51 | 20 | Q.   And so, they may -- these women may have multiple jobs -- |
| 14:45:55 | 21 | A.   Yes. |
| 14:45:56 | 22 | Q.   -- correct?  And these women may be single parents. |
| 14:46:00 | 23 |        MR. SWEETEN:  Objection, your Honor.  She's asking -- |
| 14:46:02 | 24 | she's outside the scope.  She's talking about Medicaid.  We've |
| 14:46:05 | 25 | got Jami Snyder, her counterpart, who will be here to testify |

14:46:08  1   about those specific granular issues.  She's outside the scope.

14:46:12  2         THE COURT:  She did give direct testimony with regard

14:46:14  3   to the availability, and she's entitled to ask these questions.

14:46:19  4   Q.  (BY MS. RATAKONDA) I'm sorry.  I don't know if you answered

14:46:23  5   my last question, but some of these women may be single parents?

14:46:27  6   A.   Yes.  And I'll say the same -- but the same for our

14:46:30  7   programs, as well.  For Healthy Texas Women and family planning,

14:46:33  8   you know, the average client is a 27-year-old single mom with two

14:46:35  9   kids who's working more than one job, and so, that's the whole

14:46:39  10  reason why the legislature and the government invested in Healthy

14:46:42  11  Texas Women family planning is to make sure that all women have

14:46:45  12  access to these services.

14:46:47  13         So whether you qualify for Medicaid or not, you can

14:46:49  14  still qualify in Healthy Texas Women and family planning to

14:46:54  15  receive these services.

14:46:55  16  Q.  Would you agree that for these women who you had just

14:46:59  17  described as living in poverty, may have multiple jobs, may be

14:47:01  18  single parents, for these women, same-day access to services is

14:47:04  19  better than having to wait for a provider for an additional

14:47:06  20  appointment?

14:47:10  21  A.   We would all love same-day access.  And so, with the family

14:47:13  22  planning program, that is available.  And Healthy Texas Women, we

14:47:17  23  are, you know, helping, encouraging women to apply and being able

14:47:21  24  to provide services as soon as possible.

14:47:24  25  Q.  And would you agree that having evening or Saturday hours

14:47:27    1    makes it easier for these patients to obtain services?

14:47:30    2    A.    Yes, and a lot of our clinics do.

14:47:32    3    Q.    Do all of your Medicaid providers have these types of hours?

14:47:38    4    A.    I can't speak to all of them, but I can tell you with the

14:47:40    5    Healthy Texas Women family planning, the majority of them do.

14:47:44    6    Q.    Okay.  And would you agree that having bilingual staff and

14:47:48    7    translator services available can be important for Medicaid

14:47:51    8    patients to access services?

14:47:52    9    A.    Yes.

14:47:53   10    Q.    And do all providers have these services available for

14:47:56   11    patients?

14:47:57   12    A.    The majority of our providers do.

14:47:59   13    Q.    But not all of them.

14:48:00   14    A.    Again, I can't testify to all Medicaid providers.

14:48:04   15    Q.    So you testified or you spoke about LARC previously.  Is it

14:48:10   16    -- would you say it's an effective form of contraception?

14:48:13   17    A.    It is the number-one most effective form of contraceptive.

14:48:17   18    Q.    And wouldn't you agree that Medicaid providers who don't

14:48:21   19    specialize in family planning are less likely to have LARCs

14:48:26   20    onsite?

14:48:26   21    A.    It would depend upon what type of practice we're discussing.

14:48:31   22    So a lot of providers actually are with groups and they actually

14:48:36   23    will provide -- even though they, themselves, are a single

14:48:38   24    provider, they actually team up with other providers to have

14:48:41   25    same-day LARC access on hand.

14:48:43    1    Q.    So some of the providers who offer birth control through

14:48:46    2    Medicaid or reproductive healthcare, family planning may not be

14:48:52    3    their area of expertise, correct?

14:48:56    4    A.    Correct.  But most of the providers --

14:48:58    5    Q.    So, for example, what -- some of these providers can be

14:49:02    6    primary care providers.

14:49:03    7    A.    Yes, but because reproductive health is so intricately tied

14:49:08    8    now, especially with what we've seen with scientific advances in

14:49:11    9    the last ten years is that you can't treat one symptom without

14:49:14   10    treating another.  So really looking at a woman holistically and

14:49:17   11    seeing that, you know, her reproductive health could really

14:49:19   12    impact, you know, her ability to have kids in the future, her

14:49:23   13    Diabetes, her hypertension could also play a factor into her

14:49:26   14    reproductive health.

14:49:27   15          And so, it's seeing everything we've actually seen as a

14:49:29   16    positive improvement to open up family planning providers to

14:49:36   17    include, you know, primary care, internalists, specialists.

14:49:39   18    Q.    But you would agree that not all of these providers are

14:49:42   19    specialists in family planning care, correct?

14:49:45   20    A.    Correct.

14:49:45   21    Q.    Okay.  So -- and isn't it true that for specialists who are

14:49:52   22    not experts or whose areas of expertise is not family planning,

14:49:57   23    doesn't it -- don't these providers not -- may not be as

14:50:02   24    experienced in providing contraceptive counseling?  Could that be

14:50:06   25    possible?

| | | |
|---|---|---|
| 14:50:07 | 1 | MR. SWEETEN:  Objection, your Honor.  I think she's |
| 14:50:09 | 2 | asking a speculative question. |
| 14:50:11 | 3 | THE COURT:  Possible is pretty speculative. |
| 14:50:15 | 4 | Q.  (BY MS. RATAKONDA) So for family planning providers who are |
| 14:50:17 | 5 | not specialists -- or, I'm sorry, for Medicaid providers who are |
| 14:50:20 | 6 | not specialists in family planning care, do you think that they |
| 14:50:25 | 7 | offer -- or they're as experienced in contraceptive counseling as |
| 14:50:29 | 8 | specialists -- or as providers who are specialists in family |
| 14:50:32 | 9 | planning care? |
| 14:50:33 | 10 | MR. SWEETEN:  Same objection, your Honor. |
| 14:50:37 | 11 | MS. RATAKONDA:  I'm just asking about her knowledge, |
| 14:50:39 | 12 | your Honor. |
| 14:50:39 | 13 | THE COURT:  You're just asking a lot of questions, but |
| 14:50:41 | 14 | I don't see how that applies into the direct.  The direct was the |
| 14:50:46 | 15 | number of facilities that are available and that's what she's |
| 14:50:56 | 16 | testified to. |
| 14:50:58 | 17 | MS. RATAKONDA:  I'm trying to get a sense, your Honor, |
| 14:51:01 | 18 | of how -- Planned Parenthood is a specialist in family planning |
| 14:51:06 | 19 | care.  So I'm trying to get a sense of what other services are |
| 14:51:09 | 20 | available to Medicaid patients from providers who are not |
| 14:51:13 | 21 | specialists in family planning care. |
| 14:51:15 | 22 | THE COURT:  I understand that.  And this may not be the |
| 14:51:23 | 23 | right witness to get it.  She's in charge of the whole program, |
| 14:51:30 | 24 | so I don't know how she can compare.  Well, you could ask her |
| 14:51:33 | 25 | that. |

14:51:34    1           MS. RATAKONDA:  Okay.  I'll move on.

14:51:35    2           THE COURT:  You could ask her if she's familiar with

14:51:38    3   Planned Parenthood and compare the services.  I don't think she's

14:51:45    4   a witness you want to ask that to, but you certainly can.

14:51:49    5   Q.   (BY MS. RATAKONDA) Ms. French, isn't it true that the

14:51:58    6   women's health program was created by Texas in order to exclude

14:52:02    7   Planned Parenthood?

14:52:03    8           MR. SWEETEN:  Objection, your Honor.  She's asking a

14:52:05    9   question that this witness has no foundation to answer.

14:52:08   10           THE COURT:  Well, we'll find out.  Do you have any idea

14:52:12   11   one way or the other on that?

14:52:14   12   A.   It was before my time with HHSC, but I know that the program

14:52:17   13   was created in 2013 as actions based on the legislature in 2011.

14:52:23   14           MS. RATAKONDA:  All right.  I pass the witness.

14:52:27   15                    RE-DIRECT EXAMINATION

14:52:27   16   BY MR. SWEETEN:

14:52:31   17   Q.   Very briefly, Ms. French, are you confident that if the

14:52:40   18   patients served by Planned Parenthood are -- if there are

14:52:46   19   patients excluded by Planned Parenthood, that they can be served

14:52:48   20   by the Texas women's health program if a preliminary injunction

14:52:52   21   were to be granted?

14:52:54   22   A.   Yes.

14:52:55   23   Q.   Okay.  And why are you confident of this?

14:52:57   24   A.   Because of the changes we made in Healthy Texas Women and in

14:53:01   25   family planning, and because they can see more patients than just

| | | |
|---|---|---|
| 14:53:04 | 1 | what may be eligible for Medicaid.  And we are working to make |
| 14:53:08 | 2 | sure we're recruiting the best doctors into -- for OB/GYNs into |
| 14:53:14 | 3 | the programs.  We're confident that we have great access to these |
| 14:53:18 | 4 | programs for all women. |
| 14:53:19 | 5 | Q.   No further questions.  Thanks. |
| 14:53:28 | 6 | MS. RATAKONDA:  I pass the witness. |
| 14:53:29 | 7 | THE COURT:  May the witness be excused? |
| 14:53:31 | 8 | MR. SWEETEN:  Yes, your Honor. |
| 14:53:34 | 9 | THE COURT:  May the witness be excused? |
| 14:53:35 | 10 | MR. WATKINS:  Yes. |
| 14:53:36 | 11 | THE COURT:  Okay.  You may be excused, ma'am. |
| 14:53:42 | 12 | All right.  We'll take a ten-minute break. |
| 15:08:46 | 13 | (Recess.) |
| 15:08:55 | 14 | THE COURT:  You may call your witness. |
| 15:08:59 | 15 | MR. BIGGS:  Thank you, your Honor. |
| 15:09:00 | 16 | At this time, defendants call Todd Giberson. |
| 15:09:20 | 17 | (Witness sworn.) |
| 15:09:35 | 18 | THE COURT:  Tell us your full name and spell your last. |
| 15:09:40 | 19 | THE WITNESS:  Todd Craton Giberson, G-I-B-E-R-S-O-N. |
| 15:09:50 | 20 | THE COURT:  You may proceed. |
| 15:09:51 | 21 | TODD C. GIBERSON, called by the Defendant, duly sworn. |
| 15:09:51 | 22 | DIRECT EXAMINATION |
| 15:09:51 | 23 | BY MR. BIGGS: |
| 15:09:52 | 24 | Q.   Thank you, your Honor. |
| 15:09:53 | 25 | Good afternoon, Mr. Giberson.  How are you employed? |

| | | |
|---|---|---|
| 15:09:56 | 1 | A.    I work for the Office of the Attorney General. |
| 15:10:00 | 2 | Q.    And what particular division? |
| 15:10:02 | 3 | A.    It's called legal technical support.  We do a lot of inhouse |
| 15:10:08 | 4 | analysis for other divisions within the agency. |
| 15:10:11 | 5 | Q.    What is your particular title? |
| 15:10:14 | 6 | A.    Systems Analyst. |
| 15:10:15 | 7 | Q.    And as a Systems Analyst, what are your job duties? |
| 15:10:20 | 8 | A.    I actually have a variety of job duties from cartography and |
| 15:10:28 | 9 | programming, computer programming, application development, all |
| 15:10:33 | 10 | sorts of things. |
| 15:10:35 | 11 | Q.    What were you asked here to do in this particular case? |
| 15:10:39 | 12 | A.    We were supplied with documents and including some tax |
| 15:10:46 | 13 | documents, and we were charged to gather information from those |
| 15:10:50 | 14 | documents.  And I compiled two reports from the tax documents. |
| 15:11:00 | 15 | Q.    How did you go about compiling those reports? |
| 15:11:03 | 16 | A.    Well, in this case, there was no particular analysis |
| 15:11:07 | 17 | involved.  It was more just reading the forms and extracting |
| 15:11:12 | 18 | information from them and putting them in a spreadsheet. |
| 15:11:17 | 19 | Q.    That's it? |
| 15:11:19 | 20 | A.    That's basically it. |
| 15:11:20 | 21 | Q.    So essentially you just read the documents and put them on |
| 15:11:25 | 22 | the chart, right? |
| 15:11:26 | 23 | A.    Yes. |
| 15:11:29 | 24 | Q.    I'm going to show you Defendants' Exhibit 95.  Do you |
| 15:11:36 | 25 | recognize Exhibit 95? |

15:11:39  1    A.    Yes, I do.

15:11:40  2    Q.    What is Defendants' Exhibit 95?

15:11:44  3    A.    This is a spreadsheet that was -- that came from Schedule R

15:11:53  4    of the tax Form 990 where it lists transactions with other

15:11:59  5    related organizations.  So for one particular -- just looking at

15:12:04  6    the top one, Planned Parenthood Gulf Coast, their tax forms in

15:12:10  7    those three years showed a related organization, Planned

15:12:17  8    Parenthood Center for Choice, with a transaction between the two

15:12:21  9    entities, and the amount of the transaction, plus a code for the

15:12:26 10    transaction type.

15:12:28 11    Q.    Let me back you up.  This information came solely from the

15:12:31 12    tax returns, correct?

15:12:32 13    A.    Yes.

15:12:33 14    Q.    And these are tax returns that were for these particular

15:12:37 15    entities, weren't they?

15:12:39 16    A.    Yes.

15:12:40 17    Q.    Is any of this information not from those documents that you

15:12:46 18    reviewed?

15:12:48 19    A.    No.  Except for that entity ID code that we put there, but

15:12:52 20    the information itself is all from the tax form.

15:12:56 21    Q.    And all of these documents combined were a substantial

15:13:02 22    amount, weren't they?

15:13:03 23    A.    You mean all of the documents that you originally -- that

15:13:07 24    were provided to --

15:13:10 25    Q.    All the documents you considered for the analysis --

| | | |
|---|---|---|
| 15:13:11 | 1 | MR. WATKINS:  I'd like to get it offered. |
| 15:13:13 | 2 | THE COURT:  Pardon me? |
| 15:13:14 | 3 | MR. WATKINS:  We'd like to get it offered before they |
| 15:13:16 | 4 | keep explaining what it is.  It's not in evidence. |
| 15:13:18 | 5 | THE COURT:  No. |
| 15:13:19 | 6 | MR. BIGGS:  Your Honor, I'm asking for a foundation for |
| 15:13:21 | 7 | a 1006 summary, and I will offer it. |
| 15:13:23 | 8 | THE COURT:  Well, that's true, but you've been -- you |
| 15:13:27 | 9 | published it already. |
| 15:13:29 | 10 | MR. BIGGS:  I believe the parties discussed with the |
| 15:13:31 | 11 | Court that we -- |
| 15:13:32 | 12 | THE COURT:  That's right.  We did.  But I don't think |
| 15:13:34 | 13 | he's giving up on an objection. |
| 15:13:36 | 14 | MR. WATKINS:  That's right. |
| 15:13:37 | 15 | THE COURT:  That's the problem.  He's standing up and |
| 15:13:39 | 16 | it's not for his health.  But, you know, it would help me to know |
| 15:13:44 | 17 | what in the hell he's talking about. |
| 15:13:47 | 18 | MR. BIGGS:  Sure. |
| 15:13:48 | 19 | THE COURT:  Okay. |
| 15:13:49 | 20 | MR. WATKINS:  I do have an objection. |
| 15:13:50 | 21 | THE COURT:  All right. |
| 15:13:52 | 22 | MR. WATKINS:  I object to the document being admitted |
| 15:13:53 | 23 | for the purposes that -- may I take the witness on voir dire |
| 15:13:56 | 24 | about this document? |
| 15:13:57 | 25 | THE COURT:  Well, let's let counsel, it's his witness, |

15:14:00  1   let him speak a little -- let the witness speak a little English

15:14:06  2   as to what they're investigating and what its purpose was, or

15:14:12  3   something along that line.  I have absolutely no idea what -- I

15:14:15  4   don't even know that -- he said that Planned Parenthood Choice is

15:14:22  5   a related entity to what?  I mean, I assume and I don't know what

15:14:29  6   all of the statements are.  I don't know.  I can't intelligently

15:14:34  7   rule on your objection at this point.

15:14:38  8          MR. BIGGS:  I'll lay some more foundation, your Honor.

15:14:40  9          MR. WATKINS:  And I can't make an intelligent

15:14:42 10   objection.

15:14:44 11   Q.   (BY MR. BIGGS) This information, did it come from the tax

15:14:48 12   documents of Planned Parenthood in all its different versions in

15:14:54 13   this case?

15:14:54 14   A.   Yes.

15:14:55 15          THE COURT:  In all of its different versions.

15:14:58 16          MR. BIGGS:  All the different Planned Parenthood

15:15:00 17   entities in this case.

15:15:06 18   Q.   (BY MR. BIGGS) For example, the primary entity, is that the

15:15:09 19   entity whose tax return you gleaned the information from?

15:15:13 20   A.   Yes.

15:15:14 21   Q.   And tax year, did you glean that from that particular

15:15:20 22   entity's tax returns?

15:15:21 23   A.   Yes.

15:15:22 24   Q.   How were you able to determine what tax year you were

15:15:25 25   dealing with?

| | | |
|---|---|---|
| 15:15:25 | 1 | A.   It says -- the form itself tells you the year.  It says 2012 |
| 15:15:32 | 2 | or 2013 right on the front page of the tax return. |
| 15:15:37 | 3 | Q.   And the column titled "related organizations," is that a |
| 15:15:41 | 4 | term you made up, or is that in the tax forms themselves? |
| 15:15:44 | 5 | A.   No.  That is from the tax form that the Schedule R asks for |
| 15:15:51 | 6 | information about related organizations. |
| 15:15:53 | 7 | Q.   So based on your review of the documents, these were the |
| 15:15:57 | 8 | entities listed on those tax forms as related entities? |
| 15:16:02 | 9 | A.   Yes. |
| 15:16:03 | 10 | Q.   And transaction type, did you make up that code, or was that |
| 15:16:05 | 11 | also on the tax forms? |
| 15:16:06 | 12 | A.   No.  That's from the tax form. |
| 15:16:08 | 13 | Q.   And the last column, amount, did you calculate that amount, |
| 15:16:13 | 14 | or did you just pull it directly from those tax forms? |
| 15:16:15 | 15 | A.   I just pulled it directly from the tax form. |
| 15:16:19 | 16 | Q.   Your Honor, at this time, I would move Defendants' 95 into |
| 15:16:23 | 17 | evidence. |
| 15:16:24 | 18 |        MR. WATKINS:  Objection, your Honor.  Number one, |
| 15:16:25 | 19 | there's nothing in here having to do with compensation for fetal |
| 15:16:31 | 20 | tissue.  And, secondly, there's nothing that tells us nor will |
| 15:16:34 | 21 | the tax returns tell us what the transfers of the money between |
| 15:16:37 | 22 | one entity is for and what they're not for.  So unless we know |
| 15:16:41 | 23 | that, we have no idea what the relevance of those transactions |
| 15:16:44 | 24 | would be; so therefore, I object as the exhibit being irrelevant. |
| 15:16:48 | 25 |        THE COURT:  Well, I'm going to have to look at it to |

| | | |
|---|---|---|
| 15:16:54 | 1 | have any idea what y'all are talking about. |
| 15:16:56 | 2 | MR. BIGGS:  Would you like a paper copy of the exhibit, |
| 15:16:58 | 3 | your Honor? |
| 15:16:58 | 4 | THE COURT:  I think that would be good; then I can look |
| 15:17:00 | 5 | at it. |
| 15:17:01 | 6 | MR. BIGGS:  One moment, your Honor. |
| 15:17:03 | 7 | MR. WATKINS:  I've got one, Judge, if you'd like. |
| 15:17:05 | 8 | THE COURT:  Okay.  Either one.  Okay.  Well, it's |
| 15:18:36 | 9 | refreshing.  I have no earthly idea what this is supposed to be. |
| 15:18:46 | 10 | It looks like transfer of funds between several entities and the |
| 15:18:55 | 11 | entities -- well, I don't know if transfer of funds -- I don't |
| 15:18:59 | 12 | know.  Just shows a bunch of figures and it's broken into the |
| 15:19:08 | 13 | areas where there are multiple clinics, none of which are |
| 15:19:14 | 14 | involved in those calculations; or if they are involved in the |
| 15:19:19 | 15 | calculations, it's absorbed by the shell that they work under. |
| 15:19:25 | 16 | MR. BIGGS:  Your Honor, I don't believe -- I have not |
| 15:19:29 | 17 | seen any 990 forms from the individual clinics but just from the |
| 15:19:32 | 18 | parent organization.  So any absorption of the clinics would be |
| 15:19:38 | 19 | reflected in the one 990 filed with the federal government, is my |
| 15:19:43 | 20 | understanding. |
| 15:19:47 | 21 | THE COURT:  There wouldn't be a requirement of some |
| 15:19:51 | 22 | sort of IRS form for each of these clinics? |
| 15:19:57 | 23 | MR. BIGGS:  I am unaware.  I have no individualized |
| 15:20:01 | 24 | form for each one of them.  I do have it for the parent company. |
| 15:20:04 | 25 | THE COURT:  All right. |

| | | |
|---|---|---|
| 15:20:05 | 1 | MR. WATKINS:  My objection, your Honor, is that in each |
| 15:20:08 | 2 | of these instances, there's no showing of any transferred funds, |
| 15:20:13 | 3 | get a quick look, between Gulf Coast, Greater Texas and South |
| 15:20:17 | 4 | Texas, the three that they're trying to claim that are affiliated |
| 15:20:20 | 5 | with each other, and therefore, it's irrelevant.  It doesn't show |
| 15:20:23 | 6 | anything about anybody paying any money for fetal tissue; |
| 15:20:26 | 7 | therefore, the compilation on the tax return is irrelevant to any |
| 15:20:28 | 8 | issue in this case. |
| 15:20:29 | 9 | THE COURT:  He's offering it for the money showing |
| 15:20:32 | 10 | there that they could well afford to stay in operation.  That's |
| 15:20:35 | 11 | what they're showing it for and I'll admit it.  Let's just save |
| 15:20:40 | 12 | some time.  We're going to have to argue it, anyway.  Ninety-five |
| 15:20:46 | 13 | and what?  What was the other one? |
| 15:20:48 | 14 | MR. BIGGS:  The other one would be Defendants' Exhibit |
| 15:20:50 | 15 | 180, your Honor. |
| 15:20:52 | 16 | MR. WATKINS:  We object to 180 because these are the |
| 15:20:54 | 17 | salaries of the employees of the various entities, and whether |
| 15:20:58 | 18 | the salaries are low, high, or indifferent doesn't have anything |
| 15:21:00 | 19 | to do with any of the issues in the case. |
| 15:21:01 | 20 | THE COURT:  What does the salaries have anything to do? |
| 15:21:05 | 21 | MR. BIGGS:  It's showing that the managerial employees |
| 15:21:07 | 22 | of one entity are being paid by another one.  So the majority of |
| 15:21:10 | 23 | it, the CEO's salary is coming from Gulf Coast.  She's also the |
| 15:21:14 | 24 | CEO of, let's say, Center For Choice.  She's being paid $4,000 -- |
| 15:21:20 | 25 | or a minimal amount, like $4,900 by the entity that's supposed to |

| | | |
|---|---|---|
| 15:21:26 | 1 | be employing her and separation is -- the separation of these two |
| 15:21:28 | 2 | entities is obviously important in this case. |
| 15:21:31 | 3 | THE COURT:  All right.  Ninety-five and 180 are |
| 15:21:36 | 4 | admitted.  Of course, cross-examination of this witness is not |
| 15:21:39 | 5 | going to be able to indicate what you just said.  And you're not |
| 15:21:43 | 6 | a witness. |
| 15:21:46 | 7 | MR. BIGGS:  Pass the witness, your Honor. |
| 15:21:47 | 8 | THE COURT:  I admit the exhibit.  All right.  He passed |
| 15:21:53 | 9 | the witness. |
| 15:21:54 | 10 | MR. WATKINS:  Oh. |
| 15:21:58 | 11 | CROSS-EXAMINATION |
| 15:21:58 | 12 | BY MR. WATKINS: |
| 15:22:06 | 13 | Q.   Let's look first at Exhibit 95.  That's your exhibit, right? |
| 15:22:13 | 14 | A.   It is. |
| 15:22:14 | 15 | Q.   Everything on it was pulled from the tax returns of the |
| 15:22:17 | 16 | various entities that are listed here? |
| 15:22:19 | 17 | A.   Yes. |
| 15:22:19 | 18 | Q.   And the term "related organization" is a federal income tax |
| 15:22:22 | 19 | return. |
| 15:22:24 | 20 | A.   The income tax returns refer to related organizations. |
| 15:22:29 | 21 | Q.   I'm sorry.  My question is that the term "related |
| 15:22:32 | 22 | organizations" is a federal income tax term that is put on the |
| 15:22:36 | 23 | form by the Feds. |
| 15:22:38 | 24 | A.   Yes. |
| 15:22:39 | 25 | Q.   All right.  You don't have any idea whether that term is |

15:22:42  1  ever used in any terms of whether or not one corporation is

15:22:44  2  related to another for any kind of attribution of liability or

15:22:48  3  attribution of one conduct relating to the other entity.  All you

15:22:52  4  know is that it's a related organization under the federal income

15:22:55  5  tax term.

15:22:57  6  A.    That is correct.

15:22:58  7  Q.    All right.  Now, then, the -- let's go to Exhibit No. 180.

15:23:09  8  How was it created?

15:23:12  9  A.    I also extracted information from the tax forms.  There's a

15:23:19  10  section, Section 7 on the Form 990 that lists principal

15:23:29  11  compensated persons in the entity.  And so, I extract -- and they

15:23:36  12  have a listing of principals in the firm, including oftentimes

15:23:42  13  boards -- members of the board of directors who have received no

15:23:46  14  compensation, but there's a section of maybe five to seven people

15:23:51  15  that are listed as CEO or a vice-president of human resources

15:23:55  16  that show a salary.  And there are multiple columns showing where

15:24:02  17  -- I'm not seeing the form in front of me now, but I'll just

15:24:06  18  describe it.

15:24:07  19        Multiple columns on the tax form that show compensation

15:24:13  20  from that agency, the one submitting the tax form, compensation

15:24:19  21  from -- reportable compensation from a related agency, and then,

15:24:26  22  a third column which is just another estimate of compensation.  I

15:24:32  23  just used the two counts of reportable compensation and extracted

15:24:36  24  it from the various entities, whether Gulf Coast or Center For

15:24:42  25  Choice, in this case, and showed the amount of compensation that

15:24:47    1   was coming from the one entity, say, a primary entity providing

15:24:51    2   most of the salary, and then, a related agency -- entity

15:24:56    3   providing another part of the salary.

15:24:59    4            So when I put them together, you'll see that each two

15:25:09    5   sorted by person's name, year, and the two entities, you'll see

15:25:16    6   kind of a crisscross match between the amounts coming from one

15:25:20    7   entity or the other.

15:25:24    8   Q.   And it should be.  I mean, the two tax returns ought to be

15:25:29    9   mirror images of each other.

15:25:31   10   A.   And they are.

15:25:32   11   Q.   Okay.  Now, on Exhibit 180, there is nobody mentioned on 180

15:25:36   12   other than Planned Parenthood Gulf Coast and Planned Parenthood

15:25:39   13   Center For Choice, right?

15:25:40   14   A.   That's correct.

15:25:41   15   Q.   There's no showing of any funds flowing between Gulf Coast

15:25:45   16   and Greater Texas.

15:25:48   17   A.   Well, I can -- may I elaborate on that a little bit?

15:25:52   18   Q.   No.  My question on Exhibit 180, is there any showing of any

15:25:55   19   transfer of funds between Gulf Coast and Greater Texas?

15:25:57   20   A.   No.

15:25:58   21   Q.   Any showing of Gulf Coast and San Antonio?

15:26:02   22   A.   Right.

15:26:03   23   Q.   These are funds going between Gulf Coast and the other part,

15:26:07   24   and you don't know what this compensation was for.  The tax form

15:26:12   25   wouldn't show you.

| | | |
|---|---|---|
| 15:26:13 | 1 | A.   It just shows the amount. |
| 15:26:14 | 2 | Q.   Just shows the amount.  All right. |
| 15:26:17 | 3 | Now, let's go back to 95.  Exhibits 95, are there any |
| 15:26:26 | 4 | showings there of funds flowing between any of the three that I |
| 15:26:29 | 5 | just mentioned?  In other words, let's look at 1.0 at the top of |
| 15:26:35 | 6 | Defendants' 95.  Do you see what I'm talking about?  On Defendant |
| 15:26:40 | 7 | 95, over in the left hand, "entity ID 1.0."  Do you see that? |
| 15:26:44 | 8 | A.   Yes. |
| 15:26:44 | 9 | Q.   All right.  That is Planned Parenthood Gulf Coast, right? |
| 15:26:47 | 10 | A.   Yes. |
| 15:26:48 | 11 | Q.   All right.  And then, 1.1 is Center For Choice, right? |
| 15:26:52 | 12 | A.   Yes. |
| 15:26:52 | 13 | Q.   Okay.  So you've got funds flowing back and forth between |
| 15:26:58 | 14 | those entities, but nothing in there about Greater Texas Greater |
| 15:27:03 | 15 | Texas Surgical Center, Planned Parenthood of South Texas, |
| 15:27:06 | 16 | correct? |
| 15:27:07 | 17 | A.   Correct. |
| 15:27:07 | 18 | Q.   And that's true all the way down.  There's no showing of |
| 15:27:11 | 19 | funds flowing between Gulf Coast, Greater Texas and San Antonio. |
| 15:27:17 | 20 | A.   On these reports, that is correct. |
| 15:27:19 | 21 | Q.   All right.  No further questions, your Honor. |
| 15:27:25 | 22 | MR. BIGGS:  No redirect, your Honor. |
| 15:27:26 | 23 | THE COURT:  All right.  May the witness be excused? |
| 15:27:29 | 24 | MR. BIGGS:  By defense, your Honor. |
| 15:27:31 | 25 | THE COURT:  You may be excused, sir. |

| | | |
|---|---|---|
| 15:27:45 | 1 | MR. BIGGS:  Your Honor, at this time, defendants would |
| 15:27:47 | 2 | call Dr. Mikeal Love. |
| 15:28:15 | 3 | THE COURT:  If you'll come forward, please, sir.  This |
| 15:28:19 | 4 | is the clerk.  She's going to administer an oath to you. |
| 15:28:21 | 5 | (Witness sworn.) |
| 15:28:45 | 6 | THE COURT:  Tell us your full name and spell your last |
| 15:28:53 | 7 | name, please, sir. |
| 15:28:54 | 8 | THE WITNESS:  Okay.  My name is Mikeal Robert Love. |
| 15:29:13 | 9 | Spelling of my last name is L-O-V-E. |
| 15:29:17 | 10 | THE COURT:  Proceed. |
| 15:29:20 | 11 | MIKEAL R. LOVE, called by the Defendant, duly sworn. |
| 15:29:20 | 12 | DIRECT EXAMINATION |
| 15:29:20 | 13 | BY MR. BIGGS: |
| 15:29:21 | 14 | Q.   Good afternoon, Dr. Love. |
| 15:29:23 | 15 | Can you tell the Court how you are currently employed? |
| 15:29:26 | 16 | A.   I am a self-employed obstetrician and gynecologist here in |
| 15:29:32 | 17 | Austin, Texas. |
| 15:29:33 | 18 | Q.   Let's just get right into your background.  Where did you go |
| 15:29:38 | 19 | to medical school? |
| 15:29:39 | 20 | A.   University of Texas Health Science Center at San Antonio. |
| 15:29:43 | 21 | Q.   Did you graduate? |
| 15:29:44 | 22 | A.   Yes, I did. |
| 15:29:46 | 23 | Q.   When did you graduate? |
| 15:29:48 | 24 | A.   1988. |
| 15:29:50 | 25 | Q.   Did you continue your medical training after graduating from |

| | | |
|---|---|---|
| 15:29:54 | 1 | medical school? |
| 15:29:54 | 2 | A.   Yes, I did. |
| 15:29:55 | 3 | Q.   How did you continue your training? |
| 15:29:56 | 4 | A.   I went to an obstetrical and gynecologic residency at the |
| 15:30:02 | 5 | University of Louisville in Louisville, Kentucky. |
| 15:30:05 | 6 | Q.   Did your residency focus on any specific specialization? |
| 15:30:09 | 7 | A.   Obstetrics and gynecology. |
| 15:30:12 | 8 | Q.   And that was in Louisville, Kentucky? |
| 15:30:14 | 9 | A.   Yes. |
| 15:30:15 | 10 | Q.   Following your residency, what did you do? |
| 15:30:17 | 11 | A.   I moved to Austin and started a private practice. |
| 15:30:24 | 12 | Q.   You're currently in private practice? |
| 15:30:25 | 13 | A.   Yes, I am. |
| 15:30:26 | 14 | Q.   Would you briefly describe your practice? |
| 15:30:28 | 15 | A.   I'm a solo physician and my practice is basically as a |
| 15:30:33 | 16 | generalist OB/GYN.  We handle pregnancies as well as gynecologic |
| 15:30:40 | 17 | issues for women. |
| 15:30:41 | 18 | Q.   Are you board-certified? |
| 15:30:43 | 19 | A.   Yes, I am. |
| 15:30:44 | 20 | Q.   What are you board-certified in? |
| 15:30:45 | 21 | A.   Obstetrics and gynecology. |
| 15:30:47 | 22 | Q.   How long have you been board-certified? |
| 15:30:50 | 23 | A.   Twenty-two years. |
| 15:30:52 | 24 | Q.   Have you been affiliated with any hospitals? |
| 15:30:55 | 25 | A.   Yes, I have. |

| | | |
|---|---|---|
| 15:30:56 | 1 | Q.   What hospitals? |
| 15:30:57 | 2 | A.   Brackenridge and St. David's Medical Center. |
| 15:31:00 | 3 | Q.   Have you had any other management responsibilities besides |
| 15:31:03 | 4 | running your practice? |
| 15:31:05 | 5 | A.   Yes, I have. |
| 15:31:06 | 6 | Q.   And what are those? |
| 15:31:07 | 7 | A.   I was chairman of the medical care evaluation committee for |
| 15:31:11 | 8 | two years.  I was chief of the OB/GYN section for two years.  I |
| 15:31:18 | 9 | was the founding member and chairman of the CME committee at St. |
| 15:31:23 | 10 | David's for twelve years.  And I also served as the chairman for |
| 15:31:28 | 11 | the CME committee for TMA for their annual convention. |
| 15:31:34 | 12 | Q.   What was your role as the section chief? |
| 15:31:38 | 13 | A.   We would go over new policies, procedures, different issues |
| 15:31:46 | 14 | that may arise in the field of obstetrics and gynecology and make |
| 15:31:50 | 15 | sure that if we decided on a particular issue, that it had the -- |
| 15:31:59 | 16 | I guess, the quality standards that are necessary for good care. |
| 15:32:05 | 17 | Q.   As section chief, did you become familiar with medical and |
| 15:32:08 | 18 | ethical standards in that field? |
| 15:32:09 | 19 | A.   Yes. |
| 15:32:12 | 20 | Q.   Besides being section chief, do you have any other role at |
| 15:32:16 | 21 | St. David's? |
| 15:32:18 | 22 | A.   We did provide care to the indigent population for 15 years |
| 15:32:24 | 23 | through work at People's Community Clinic. |
| 15:32:28 | 24 | Q.   You mentioned earlier you were on a CME committee.  What is |
| 15:32:31 | 25 | a CME committee? |

15:32:33   1   A.   It's a committee that basically oversees continuing medical

15:32:39   2   education for the doctors on staff.

15:32:44   3   Q.   In that role, did you become familiar with medical and

15:32:47   4   ethical standards?

15:32:49   5   A.   Yes.  As the chairman, we have to review all of the material

15:32:53   6   that's presented for a CME to make sure that it meets the

15:32:58   7   criteria set forth by our governing board, as well as make sure

15:33:03   8   there's no commercial bias.

15:33:05   9   Q.   And you had that CME role also with the Texas Medical

15:33:08   10  Association?

15:33:09   11  A.   Yes.

15:33:10   12  Q.   Doctor, do you have any experience dealing with abortion

15:33:14   13  procedures?

15:33:14   14  A.   Yes.

15:33:16   15  Q.   Will you please explain to the Court your experience?

15:33:19   16  A.   We were taught abortion procedures, which is essentially

15:33:24   17  surgical procedures such as a D & C and D & E in residency.  We

15:33:28   18  were allowed to work with the outside providers.  And I worked

15:33:34   19  with one of the largest clinics in the Kentucky area, Louisville

15:33:40   20  and Lexington, and was able to observe their procedures over a

15:33:46   21  period of time.  In addition, we also do that with private

15:33:51   22  practice.

15:33:51   23  Q.   How many abortion procedures would you say you observed

15:33:54   24  during residency in Louisville?

15:33:57   25  A.   Observation, probably 3 to 400.

| | | |
|---|---|---|
| 15:34:01 | 1 | Q.   And you mentioned that you actually performed abortions in |
| 15:34:04 | 2 | your private practice? |
| 15:34:05 | 3 | A.   Yes. |
| 15:34:06 | 4 | Q.   Can you please explain the abortions that you perform in |
| 15:34:12 | 5 | your private practice? |
| 15:34:14 | 6 | A.   I do medically indicated termination. |
| 15:34:16 | 7 | Q.   What does medically indicated terminations mean? |
| 15:34:19 | 8 | A.   It's usually when the life of the mother is at risk or if |
| 15:34:24 | 9 | the fetus has already passed or died, I should say.  Not passed |
| 15:34:29 | 10 | out of the body, but it's, you know, no longer viable. |
| 15:34:33 | 11 | Q.   Are you familiar with the medical and ethical standards |
| 15:34:36 | 12 | surrounding abortion procedures? |
| 15:34:38 | 13 | A.   Yes. |
| 15:34:39 | 14 | Q.   How are you familiar with these standards? |
| 15:34:43 | 15 | A.   Well, not only do you have the education that you receive in |
| 15:34:47 | 16 | residency.  In addition, our governing body, American Congress of |
| 15:34:53 | 17 | Obstetrics and Gynecology, also puts out papers on medical |
| 15:34:57 | 18 | ethics, and as a physician in the state of Texas, you are |
| 15:35:02 | 19 | required to have so many hours of CME credit and medical ethics, |
| 15:35:07 | 20 | as well as it's just a part of your daily practice. |
| 15:35:11 | 21 | Q.   Have you had a chance to review the materials in this case? |
| 15:35:15 | 22 | A.   Yes. |
| 15:35:16 | 23 | Q.   What specifically have you been -- have you reviewed? |
| 15:35:20 | 24 | A.   I reviewed the eight hours of videotape, transcripts |
| 15:35:25 | 25 | associated with that video, as well as some laws that are federal |

| | | |
|---|---|---|
| 15:35:30 | 1 | in origin, as well as the consent form of Planned Parenthood Gulf |
| 15:35:39 | 2 | Coast. |
| 15:35:39 | 3 | Q.   Your Honor, at this time, defendants offer Dr. Mike Love as |
| 15:35:42 | 4 | an expert in the area of obstetrics and gynecology and medical |
| 15:35:46 | 5 | and ethical standards governing obstetrics and gynecological |
| 15:35:50 | 6 | procedures. |
| 15:35:52 | 7 | THE COURT:  Just to get this straight. |
| 15:35:54 | 8 | MS. CLAPMAN:  Your Honor, I would like to voir dire the |
| 15:35:59 | 9 | witness briefly to determine the scope of his testimony. |
| 15:36:01 | 10 | THE COURT:  Okay.  Just a minute. |
| 15:36:32 | 11 | You may voir dire the witness.  That just means she's |
| 15:36:38 | 12 | going to ask you some questions. |
| 15:36:39 | 13 | THE WITNESS:  Okeydoke. |
| 15:36:40 | 14 | THE COURT:  Have to establish that you're an expert to |
| 15:36:42 | 15 | give an opinion.  Go ahead. |
| 15:36:43 | 16 | VOIR DIRE EXAMINATION |
| 15:36:43 | 17 | BY MS. CLAPMAN: |
| 15:36:45 | 18 | Q.   Good afternoon, Dr. Love. |
| 15:36:47 | 19 | You mentioned that you performed abortions when |
| 15:36:50 | 20 | medically indicated.  When is the last time you did that? |
| 15:36:56 | 21 | A.   Probably within the last few months. |
| 15:36:58 | 22 | Q.   Okay.  And how often? |
| 15:37:02 | 23 | A.   As indicated.  I mean, I don't necessarily keep tally of |
| 15:37:06 | 24 | them, you know, just -- I don't keep a tally of my deliveries, |
| 15:37:11 | 25 | either, so I don't know. |

| | | |
|---|---|---|
| 15:37:11 | 1 | THE COURT:  This is cross-examination.  If you have any |
| 15:37:14 | 2 | voir dire questions, use them now. |
| 15:37:16 | 3 | Q.   (BY MS. CLAPMAN) Okay.  Dr. Love, have you performed D & E |
| 15:37:23 | 4 | procedures? |
| 15:37:24 | 5 | A.   Yes, I have in the past. |
| 15:37:26 | 6 | Q.   Okay.  What gestational age range? |
| 15:37:32 | 7 | A.   The latest I performed one was 19-and-a-half weeks. |
| 15:37:41 | 8 | Q.   And I didn't see on your CV any mention of any medical |
| 15:37:46 | 9 | research.  Have you engaged in any medical research? |
| 15:37:49 | 10 | A.   I've done some, yes, but none that was published. |
| 15:37:53 | 11 | Q.   Okay.  And I didn't see any IRB involvement.  Are you on any |
| 15:37:58 | 12 | IRBs? |
| 15:37:58 | 13 | A.   No, ma'am. |
| 15:37:59 | 14 | Q.   Okay. |
| 15:38:02 | 15 | MS. CLAPMAN:  Your Honor, we don't object to this |
| 15:38:03 | 16 | witness being qualified as an OB/GYN generally.  We would object |
| 15:38:10 | 17 | to his testifying to any research standards as beyond his |
| 15:38:17 | 18 | qualifications. |
| 15:38:18 | 19 | THE COURT:  All right.  That goes to weight.  I |
| 15:38:22 | 20 | overrule the objection. |
| 15:38:34 | 21 | MR. BIGGS:  May I inquire, your Honor? |
| 15:38:35 | 22 | THE COURT:  What? |
| 15:38:36 | 23 | MR. BIGGS:  I didn't know if I was waiting for you, |
| 15:38:38 | 24 | your Honor. |
| 15:38:38 | 25 | THE COURT:  You never wait for me.  Just go right |

15:38:41  1    ahead.

15:38:41  2                    <u>DIRECT EXAMINATION (Resumed)</u>

15:38:42  3    BY MR. BIGGS:

15:38:42  4    Q.    You stated, a moment ago, that you were able to view the

15:38:45  5    materials in this case.  Were you able to reach an opinion about

15:38:50  6    any ethical or medical standards that may be implicated by those

15:38:56  7    materials?

15:38:56  8    A.    Yes.

15:38:57  9    Q.    And what was that opinion?

15:38:59  10   A.    That there was a violation of medical and ethical standards

15:39:02  11   by Planned Parenthood Gulf Coast.

15:39:07  12   Q.    Let's talk about that.  What specifically did you see in the

15:39:13  13   materials that raise concerns about those standards?

15:39:16  14   A.    Okay.  In the video, the research director stated a

15:39:25  15   willingness to have the procedure altered in order to obtain

15:39:31  16   tissue for the procurement company that was in the video.

15:39:34  17            MS. CLAPMAN:  I'm going to object to this testimony

15:39:36  18   because this is testimony about research protocols that were

15:39:40  19   discussed in a research lab and -- oh, I apologize.  You did not

15:39:46  20   sustain my objection to scope.  I apologize.

15:39:50  21            THE COURT:  Well, I understand he's testifying about

15:39:54  22   what he thought the procedures we've been talking about, and I've

15:39:57  23   heard the testimony that they're not even the procedures that are

15:40:01  24   involved.  I understand that.  But he's entitled to give his

15:40:04  25   opinion one way or the other.

| | | |
|---|---|---|
| 15:40:08 | 1 | Q.   (BY MR. BIGGS) You may continue. |
| 15:40:09 | 2 | A.   And, also, the consent form basically made statements that |
| 15:40:14 | 3 | were -- could be construed as inaccurate. |
| 15:40:18 | 4 | Q.   Talk about the willingness -- |
| 15:40:20 | 5 | THE COURT:  Which -- did you just do one consent form? |
| 15:40:23 | 6 | THE WITNESS:  There was one consent form that basically |
| 15:40:25 | 7 | stated that there would be no alterations of the procedure at |
| 15:40:29 | 8 | all. |
| 15:40:30 | 9 | THE COURT:  You didn't get my question because I'm not |
| 15:40:33 | 10 | doing the questioning, but you said consent form.  I've been |
| 15:40:36 | 11 | listening to two consent forms.  Did you see just one? |
| 15:40:40 | 12 | THE WITNESS:  I saw several consent forms.  Yes, sir. |
| 15:40:46 | 13 | Q.   (BY MR. BIGGS) Let's talk first about the alteration -- |
| 15:40:49 | 14 | potential alteration of a procedure.  What about -- withdrawn. |
| 15:40:59 | 15 | The statements in the video, why specifically do those |
| 15:41:03 | 16 | raise concerns? |
| 15:41:05 | 17 | A.   Willingness to alter procedure basically confers intent, and |
| 15:41:13 | 18 | as a physician, we have a fiduciary relationship with the |
| 15:41:17 | 19 | patient.  In other words, we have a relationship that is based on |
| 15:41:21 | 20 | trust with the patient's best interest in mind.  Any time someone |
| 15:41:28 | 21 | is willing to alter a procedure to satisfy a secondary party, |
| 15:41:33 | 22 | then that relationship is then broken and that element of trust |
| 15:41:38 | 23 | can be lost. |
| 15:41:42 | 24 | There are complications that can arise from altering |
| 15:41:45 | 25 | the procedure. |

15:41:48  1   Q.   Let me stop there.

15:41:51  2          What complications can arise from altering a procedure?

15:41:58  3   A.   When you read perinatology text, they will list

15:42:01  4   complications such as incompetent cervix with the result of

15:42:04  5   preterm labor as a complication of cervical manipulation.

15:42:10  6   Q.   Let's decipher that.  What is cervical -- or is it

15:42:14  7   incompetent cervix?

15:42:15  8   A.   Incompetent cervix.  That's a cervix that doesn't -- is not

15:42:19  9   able to maintain the pregnancy.  The integrity of the collagen

15:42:24  10  tissue in the cervix has been damaged to the extent that when

15:42:29  11  pressure is put on the cervix, it begins to dilate prematurely,

15:42:34  12  and therefore, you can have premature deliveries of the infant,

15:42:40  13  possibly prior to viability, which could mean an unnecessary

15:42:44  14  loss, or a prolonged stay in the neonatal intensive care unit for

15:42:49  15  the infant.

15:42:51  16         Also, when you deliver early, there are risks and

15:42:53  17  complications associated with that, as well, for the infant.

15:42:58  18  Q.   And this comes from an overdilation?  Or explain that.

15:43:04  19  A.   Any time you manipulate the cervix through a mechanical

15:43:09  20  means, you possibly damage the tissue of the cervix, the collagen

15:43:17  21  matrix, and that can lead to the potential for cervical

15:43:22  22  incompetence and preterm labor.

15:43:25  23  Q.   Were there any statements on the video that indicated to you

15:43:29  24  that Planned Parenthood Gulf Coast staff had previously altered

15:43:36  25  procedures?

15:43:39  1   A.   I don't recall exactly saying that we have altered these

15:43:42  2   procedures in the past.  There may have been.

15:43:47  3   Q.   Do you remember a discussion about a researcher performing

15:43:50  4   abortions?

15:43:51  5   A.   Yes.

15:43:52  6   Q.   Please explain that to the Court.

15:43:53  7   A.   Well, the research director alluded to the fact that one of

15:43:56  8   the research professors did abortions and then, collected the

15:44:01  9   tissue to take it back to her research lab herself.

15:44:03  10  Q.   Does this raise any concerns?

15:44:04  11  A.   I think it raises ethical concerns because then, again, you

15:44:10  12  have interference in the patient-physician relationship.  You

15:44:14  13  have a conflict of interest, and a physician has the potential

15:44:20  14  not to be able to give complete duty to the patient.  It's the

15:44:26  15  obligation of the physician in this relationship to make sure

15:44:30  16  that whatever they do is in the best interest of the patient,

15:44:34  17  regardless of whatever else is going on.

15:44:37  18  Q.   Based on your review of the materials in this case,

15:44:40  19  including the videotape, what types of fetal tissue was being

15:44:44  20  requested of Planned Parenthood Gulf Coast?

15:44:47  21  A.   Liver, thymus, neural tissue.

15:44:53  22  Q.   How would one change an abortion procedure to obtain more

15:44:57  23  intact specimens of those particular organs?

15:45:00  24  A.   Most likely, they would dilate the cervix more than they

15:45:04  25  would if they were not trying to obtain intact specimens.

| | | |
|---|---|---|
| 15:45:08 | 1 | Q.   Without getting into too much detail, would you explain why |
| 15:45:11 | 2 | that's necessary? |
| 15:45:12 | 3 | MS. CLAPMAN:  Objection.  Calls for speculation. |
| 15:45:21 | 4 | THE COURT:  I'll allow the testimony. |
| 15:45:24 | 5 | A.   I'm sorry.  Could you repeat the question? |
| 15:45:28 | 6 | Q.   (BY MR. BIGGS) How would one change an abortion procedure to |
| 15:45:31 | 7 | obtain more intact specimens of those particular organs? |
| 15:45:35 | 8 | A.   You could dilate the cervix more to make sure that as you're |
| 15:45:39 | 9 | procuring those specimens, that you don't crush them with your |
| 15:45:42 | 10 | forceps or damage the tissue with your forceps.  Sometimes I know |
| 15:45:50 | 11 | that when I'm doing these procedures, I use an ultrasound to make |
| 15:45:53 | 12 | sure that I'm able to get all the tissue out.  You could use an |
| 15:45:56 | 13 | ultrasound to make sure that what you're grasping is not the |
| 15:46:00 | 14 | tissue that's needed. |
| 15:46:03 | 15 | Q.   How could those changes potentially impact the patient in |
| 15:46:07 | 16 | the future? |
| 15:46:08 | 17 | A.   Well, like further dilation of the cervix, again, you still |
| 15:46:13 | 18 | put the patient at risk in future pregnancies for the cervical |
| 15:46:17 | 19 | incompetence and possible preterm labor. |
| 15:46:22 | 20 | Q.   You mentioned informed consent earlier and there being an |
| 15:46:26 | 21 | issue with that.  Would you please explain to the Court what you |
| 15:46:29 | 22 | meant? |
| 15:46:29 | 23 | A.   Well, first of all, informed consent is a conversation |
| 15:46:33 | 24 | between the physician and the patient.  It's not just signing a |
| 15:46:37 | 25 | written piece of paper.  Informed consent is the physician |

15:46:40   1   sitting down and explaining in the language that the patient

15:46:43   2   understands the risks, benefits and complications of that

15:46:47   3   procedure.  It should not be done by a staff member or someone

15:46:51   4   who is not intimately familiar with the procedure, someone who

15:46:55   5   does not perform the procedure or take care of the complications.

15:46:58   6   That's the reason you should have a physician perform this

15:47:02   7   because --

15:47:03   8        MS. CLAPMAN:  I'm going to object to the relevance of

15:47:05   9   this testimony because there's no evidence that defendants relied

15:47:09  10   upon this analysis in terminating plaintiffs from Medicaid.

15:47:14  11        THE COURT:  Say that again.

15:47:15  12        MS. CLAPMAN:  I'm going to object to the relevance --

15:47:17  13        THE COURT:  I know that part.

15:47:18  14        MS. CLAPMAN:  That there's no evidence that defendants

15:47:23  15   -- there's no foundation, there's no evidence that defendants

15:47:25  16   consulted the witness' opinion in deciding to terminate Planned

15:47:30  17   Parenthood as the basis -- for Medicaid that this was any part of

15:47:32  18   the basis for the termination.

15:47:34  19        THE COURT:  Well, he's being asked about his opinion in

15:47:39  20   general terms.  I have not heard of any case anywhere like this

15:47:44  21   that occurred.  In fact, I haven't heard of anything that did

15:47:49  22   occur within the opinions of any of the witnesses.

15:47:53  23        You may proceed.

15:47:56  24        MR. BIGGS:  Thank you, your Honor.

15:48:01  25   A.   I'm not sure if I answered your question completely or not.

| | | |
|---|---|---|
| 15:48:20 | 1 | Q.    (BY MR. BIGGS) Can you briefly explain what you meant? |
| 15:48:22 | 2 | A.    So we talked about the physician obtaining informed consent. |
| 15:48:25 | 3 | In addition, on one of the written consent forms, it says the |
| 15:48:28 | 4 | procedure will not be altered in any way.  And the willingness to |
| 15:48:34 | 5 | alter the procedure to obtain tissue for research basically |
| 15:48:39 | 6 | violates that informed consent with the patient because they're |
| 15:48:44 | 7 | going to be something they haven't consented the patient for, and |
| 15:48:48 | 8 | that would be an ethical issue. |
| 15:48:55 | 9 | Q.    So essentially what you're telling the Court is, it's not |
| 15:49:01 | 10 | all right to tell a patient one thing and then, do another.  Is |
| 15:49:05 | 11 | that a fair assessment of what you said? |
| 15:49:06 | 12 | A.    Yes, it is. |
| 15:49:07 | 13 | Q.    Pass the witness, your Honor. |
| 15:49:15 | 14 |                     CROSS-EXAMINATION |
| 15:49:15 | 15 | BY MS. CLAPMAN: |
| 15:49:18 | 16 | Q.    I won't reintroduce myself. |
| 15:49:20 | 17 | A.    Okay. |
| 15:49:25 | 18 | Q.    You didn't see any instance in the video that you watched of |
| 15:49:27 | 19 | any abortion provider expressing the intent to alter a procedure, |
| 15:49:32 | 20 | did you? |
| 15:49:32 | 21 | A.    That's correct. |
| 15:49:34 | 22 | Q.    Were you present earlier in this case when Planned |
| 15:49:43 | 23 | Parenthood witnesses testified that abortion-providing physicians |
| 15:49:48 | 24 | do not know under the protocols of Planned Parenthood Gulf Coast |
| 15:49:52 | 25 | whether any particular patient has consented to donation when |

15:49:55  1    they perform the abortion procedure?

15:49:57  2    A.   No.  I was not.

15:49:58  3    Q.   Okay.  So you didn't consider that fact in formulating your

15:50:04  4    opinion, correct?

15:50:05  5    A.   No.  I did not.

15:50:06  6    Q.   And there's no evidence in those videos that any

15:50:19  7    abortion-providing physician increased dilation for purposes of

15:50:24  8    facilitating donation of fetal tissue, is there?

15:50:26  9    A.   Not directly, but it's implied.

15:50:30  10   Q.   If I could have a "Yes" or "No" answer, please.

15:50:34  11        There's no evidence in the videos that any

15:50:39  12   abortion-providing physician increased dilation for a patient for

15:50:43  13   research purposes, correct?

15:50:48  14   A.   I would say yes, there is.

15:50:53  15   Q.   What would that be?

15:50:54  16   A.   The research director alluded to the fact that that could be

15:50:58  17   done and they would be willing to do it, so to me, that gives

15:51:02  18   evidence that it could be done or has been done in the past,

15:51:05  19   since she stated that she worked very closely with the providers.

15:51:12  20   Q.   And you were not here when this witness testified about what

15:51:15  21   she meant when she talked about altering protocols for research

15:51:19  22   purposes, correct?

15:51:20  23   A.   No.  I was not.

15:51:21  24   Q.   Okay.  So you don't know whether she was referring to

15:51:24  25   altering the abortion procedure or increasing cervical dilation,

| | | |
|---|---|---|
| 15:51:28 | 1 | correct? |
| 15:51:28 | 2 | A.   No.   I just know what she said on the videotape. |
| 15:51:46 | 3 | Q.   Bear with me, please. |
| 15:52:05 | 4 | You're not aware of any studies or data showing that |
| 15:52:07 | 5 | abortion complication rates are higher for women who are donating |
| 15:52:11 | 6 | fetal tissue as compared to women who aren't, are you? |
| 15:52:15 | 7 | A.   No.   But I haven't done a -- |
| 15:52:17 | 8 | Q.   "Yes" or a "No," please. |
| 15:52:18 | 9 | A.   Okay.   No. |
| 15:52:19 | 10 | THE COURT:   That's the rules. |
| 15:52:21 | 11 | THE WITNESS:   Okay.   Thank you. |
| 15:52:22 | 12 | THE COURT:   If they want you to explain your answer, |
| 15:52:24 | 13 | they'll ask you again. |
| 15:52:25 | 14 | THE WITNESS:   All righty. |
| 15:52:26 | 15 | THE COURT:   Lawyers are full of questions. |
| 15:52:27 | 16 | THE WITNESS:   Okay. |
| 15:52:28 | 17 | THE COURT:   All right.   Just answer "Yes" or "No" if |
| 15:52:30 | 18 | you can. |
| 15:52:30 | 19 | THE WITNESS:   Yes, sir. |
| 15:52:32 | 20 | Q.   (BY MS. CLAPMAN) Do you personally believe it is ever |
| 15:52:38 | 21 | ethical to conduct medical research using embryonic or fetal |
| 15:52:43 | 22 | tissue from abortions? |
| 15:52:45 | 23 | A.   Yes. |
| 15:52:50 | 24 | Q.   Do you believe that abortion should be legally permitted? |
| 15:52:54 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 15:52:55 | 1 | Q.   Under what circumstances? |
| 15:52:58 | 2 | A.   In the life of the mother and other circumstances I'm sure |
| 15:53:01 | 3 | that could come up at some future point in time that I'm not |
| 15:53:05 | 4 | aware of. |
| 15:53:08 | 5 | Q.   You testified in the Texas legislature in favor of HB2, |
| 15:53:12 | 6 | correct? |
| 15:53:13 | 7 | A.   That's correct. |
| 15:53:14 | 8 | Q.   And, specifically, you testified that admitting privileges |
| 15:53:21 | 9 | for abortion providers were necessary for patient safety, |
| 15:53:25 | 10 | correct? |
| 15:53:25 | 11 | A.   That's correct. |
| 15:53:27 | 12 | Q.   And you also testified that admitting privileges were easy |
| 15:53:30 | 13 | to get, correct? |
| 15:53:31 | 14 | A.   That's correct. |
| 15:53:34 | 15 | Q.   Yet, are you aware that the United States Supreme Court |
| 15:53:38 | 16 | found that after HB2 went into effect, the number of abortion |
| 15:53:41 | 17 | providers fell by 50 percent? |
| 15:53:43 | 18 | A.   No.  I'm not. |
| 15:53:45 | 19 | Q.   Okay.  And are you aware that the Supreme Court also held |
| 15:53:48 | 20 | that the requirement -- |
| 15:53:49 | 21 | MR. BIGGS:  Objection.  Foundation, your Honor.  He |
| 15:53:51 | 22 | said he doesn't know what the Supreme Court held. |
| 15:53:53 | 23 | MS. CLAPMAN:  He said he didn't know that the Supreme |
| 15:53:55 | 24 | Court held a particular fact. |
| 15:53:56 | 25 | THE COURT:  I was here.  You can ask him that. |

| | | |
|---|---|---|
| 15:54:04 | 1 | Q.   (BY MS. CLAPMAN) And are you aware that the Supreme Court |
| 15:54:06 | 2 | held that the requirement for admitting privileges for abortion |
| 15:54:09 | 3 | providers offered no medical benefit? |
| 15:54:11 | 4 | A.   No.  I'm not aware of that. |
| 15:54:15 | 5 | Q.   And you also testified in the Texas legislature in favor of |
| 15:54:20 | 6 | a law requiring women to have an ultrasound and hear a |
| 15:54:24 | 7 | description of the embryo or fetus 24 hours before an abortion, |
| 15:54:27 | 8 | correct? |
| 15:54:28 | 9 | A.   Among other requirements, yes. |
| 15:54:32 | 10 | Q.   Have you advocated -- have you advocated for other |
| 15:54:37 | 11 | restrictions on abortion? |
| 15:54:40 | 12 | A.   Not restrictions, no. |
| 15:54:42 | 13 | Q.   Okay.  Have you ever advocated against any particular |
| 15:54:47 | 14 | restriction on abortion? |
| 15:54:48 | 15 | A.   No. |
| 15:54:51 | 16 | Q.   Do you consider yourself as having a moral obligation to |
| 15:54:55 | 17 | promote a culture of life? |
| 15:54:56 | 18 | A.   Yes. |
| 15:54:58 | 19 | Q.   And that's part of what has motivated you to support |
| 15:55:02 | 20 | abortion restrictions in the past, correct? |
| 15:55:04 | 21 | A.   Not necessarily. |
| 15:55:07 | 22 | Q.   That is not any part of what has motivated you? |
| 15:55:10 | 23 | A.   No.  What motivates me is the fact that there are two |
| 15:55:13 | 24 | separate standards.  One for women obtaining elective |
| 15:55:18 | 25 | abortions -- |

| | | |
|---|---|---|
| 15:55:18 | 1 | Q.   I'm sorry.  I just asked for a "Yes" or "No" question.  So |
| 15:55:20 | 2 | the answer is "No"? |
| 15:55:21 | 3 | MR. BIGGS:  I'd request -- |
| 15:55:22 | 4 | A.   I can't answer that question -- |
| 15:55:23 | 5 | THE COURT:  Hold on.  I think three is too many to |
| 15:55:29 | 6 | talk.  You ask a question, he's trying to object.  I'm going to |
| 15:55:34 | 7 | have you finish your answer. |
| 15:55:36 | 8 | A.   Okay.  You asked an open-ended question, and my answer is |
| 15:55:39 | 9 | that there are two sets of standards:  One for those obtaining |
| 15:55:43 | 10 | elective terminations of pregnancy versus those who obtain |
| 15:55:47 | 11 | medical-indicated terminations of pregnancy -- |
| 15:55:47 | 12 | Q.   (BY MS. CLAPMAN) With all due respect, I asked a "Yes" or |
| 15:55:50 | 13 | "No" question -- |
| 15:55:50 | 14 | MR. BIGGS:  Objection, your Honor -- |
| 15:55:51 | 15 | THE COURT:  I said he could finish it. |
| 15:55:53 | 16 | MS. CLAPMAN:  Okay.  Apologize. |
| 15:55:54 | 17 | A.   And my purpose in work with the Texas legislature is |
| 15:55:59 | 18 | actually to make sure that women have one set of standards, not |
| 15:56:02 | 19 | two, because as a physician, I think it's ridiculous that there |
| 15:56:07 | 20 | are two sets of standards because as a physician taking emergency |
| 15:56:11 | 21 | call, I take care of the complications from the surgical |
| 15:56:15 | 22 | abortions in the emergency room, and I have to deal with that |
| 15:56:19 | 23 | when the abortion provider is not able to have privileges.  So |
| 15:56:23 | 24 | there's nothing wrong with them having privileges to come in and |
| 15:56:25 | 25 | take care -- because the rest of us as surgical providers in |

15:56:29   1   whatever field have to maintain privileges to take care of our

15:56:32   2   own complications when they arise after surgery.  And there's

15:56:36   3   nothing wrong with having the same standard for all physicians

15:56:39   4   who perform surgical care for the individual, whether it's

15:56:43   5   elective termination, or a gallbladder, or brain surgery.

15:56:49   6              MS. CLAPMAN:  Pass the witness.

15:56:53   7                    <u>RE-DIRECT EXAMINATION</u>

15:56:53   8   BY MR. BIGGS:

15:56:58   9   Q.   Dr. Love, would it be reasonable to assume that a researcher

15:57:03   10  performing abortions for their own research needs would know that

15:57:06   11  the patient has donated fetal tissue?

15:57:09   12             MS. CLAPMAN:  Objection.  Calls for speculation.

15:57:15   13             THE COURT:  To that question, it would be gross --

15:57:19   14             MS. CLAPMAN:  And, I'm sorry, it's beyond the scope of

15:57:21   15  the direct or the cross because there's been no testimony about

15:57:23   16  research protocols.

15:57:37   17             THE COURT:  I don't recall any cross-examining on that.

15:57:44   18             MR. BIGGS:  Your Honor, may I be heard on this point?

15:57:46   19  I do believe she brought up whether or not he knew that if he

15:57:51   20  heard the testimony about research -- or about abortion providers

15:57:54   21  not knowing whether or not the individual has performed -- or has

15:57:58   22  donated tissue.  That was brought up on cross-examination, your

15:58:01   23  Honor.

15:58:02   24             MS. CLAPMAN:  It was a narrow factual question.  It

15:58:03   25  didn't reopen that issue.  The Court opened it.

15:58:09  1          THE COURT:  Well, I've heard testimony that consent and

15:58:16  2    then, there's a special consent for the collection of tissue -- I

15:58:24  3    don't know if the Doctor's seen that or not -- and that that's

15:58:30  4    not ever shown to the person that does the surgery.  And your

15:58:40  5    question is what?

15:58:41  6          MR. BIGGS:  Would it be reasonable to assume that a

15:58:43  7    researcher who's performing the abortion for their research needs

15:58:46  8    would know who had decided to donate fetal tissue.

15:58:52  9          MS. CLAPMAN:  That calls for speculation.

15:58:54  10          THE COURT:  The Lord might know that, but no witness is

15:58:57  11    going to know that, would it be reasonable to assume.

15:59:01  12          MR. BIGGS:  I'll move on, your Honor.

15:59:02  13          THE COURT:  Okay.

15:59:03  14    Q.   (BY MR. BIGGS) What statements specifically were the most

15:59:11  15    concern to you on that video?

15:59:16  16          MS. CLAPMAN:  This is beyond the scope of the cross,

15:59:18  17    your Honor.

15:59:18  18          THE COURT:  I sustain the objection.  I don't know that

15:59:22  19    it's totally beyond cross, but that question just asks for an

15:59:28  20    opinion on a statement.  So you're going to have to be more

15:59:32  21    specific on that.  He's been allowed to say what he thought after

15:59:36  22    looking at the video.

15:59:38  23    Q.   (BY MR. BIGGS) You were asked a lot about your own views,

15:59:42  24    your personal views.  Does that impact the opinions that you are

15:59:47  25    providing the Court with today?

| | | |
|---|---|---|
| 15:59:50 | 1 | A.   I'm sure it has some element there, however, you know, the |
| 15:59:55 | 2 | fact is that medical standards are a high standard.  It's a |
| 16:00:02 | 3 | privilege to be a physician and take care of patients, and my |
| 16:00:07 | 4 | feeling is that it doesn't matter who it is, whether it's Planned |
| 16:00:11 | 5 | Parenthood Gulf Coast or physicians in my own hospital, when they |
| 16:00:15 | 6 | abuse their privilege of being able to take care of patients, |
| 16:00:18 | 7 | then they should be held to -- accountable for their lack of |
| 16:00:23 | 8 | maintaining that standard. |
| 16:00:24 | 9 | MR. BIGGS:  Pass the witness, your Honor. |
| 16:00:28 | 10 | MS. CLAPMAN:  No further questions, your Honor. |
| 16:00:30 | 11 | THE COURT:  Did you see this video before December 20, |
| 16:00:35 | 12 | 2016? |
| 16:00:36 | 13 | THE WITNESS:  No, sir.  I have not. |
| 16:00:38 | 14 | THE COURT:  May the witness be excused? |
| 16:00:41 | 15 | MR. BIGGS:  By the defense, your Honor. |
| 16:00:44 | 16 | MS. CLAPMAN:  Yes, your Honor. |
| 16:00:44 | 17 | THE COURT:  You may be excused, sir. |
| 16:00:48 | 18 | Call your next witness. |
| 16:00:52 | 19 | MR. SWEETEN:  Your Honor, we have one more witness, |
| 16:00:57 | 20 | Jami Snyder from the Texas Medicaid.  I think she's going to be |
| 16:01:02 | 21 | ready in about five minutes or so.  We can get her in here pretty |
| 16:01:07 | 22 | quickly.  If we could just have a short -- a short break to get |
| 16:01:11 | 23 | her ready to come in and give the information, your Honor. |
| 16:01:13 | 24 | THE COURT:  Okay. |
| 16:01:14 | 25 | MR. WATKINS:  Your Honor, may we just approach during |

| 16:01:17 | 1 | that time? |
| 16:01:18 | 2 | THE COURT:  You may. |
| 16:01:30 | 3 | (At the bench, on the record.) |
| 16:01:33 | 4 | MR. WATKINS:  We need to approach, Judge, because I |
| 16:01:35 | 5 | don't understand something.  You asked us to do something to our |
| 16:01:37 | 6 | exhibit list and provide you with additional -- different exhibit |
| 16:01:40 | 7 | list than we did with more explanation in the column about what |
| 16:01:44 | 8 | the exhibit's about, and I'm trying to figure out how we do that. |
| 16:01:48 | 9 | Or do you still care about that? |
| 16:01:52 | 10 | THE COURT:  The exhibit list. |
| 16:01:54 | 11 | MR. WATKINS:  Yeah.  In other words, I understood that |
| 16:01:57 | 12 | you felt there was kind of a paucity.  Our exhibit list has a |
| 16:02:01 | 13 | column that tells you what that exhibit is. |
| 16:02:02 | 14 | THE COURT:  I think somebody did that.  Alexis. |
| 16:02:09 | 15 | THE CLERK:  Yes, sir. |
| 16:02:11 | 16 | THE COURT:  Did you -- you didn't ask anything about |
| 16:02:15 | 17 | the exhibit list.  You asked about the witness list, didn't you? |
| 16:02:17 | 18 | THE CLERK:  I asked about a witness list.  Yeah. |
| 16:02:19 | 19 | THE COURT:  Now, tell me about the exhibit list. |
| 16:02:21 | 20 | MR. WATKINS:  Well -- |
| 16:02:22 | 21 | THE COURT:  I told you what I wanted was the |
| 16:02:27 | 22 | breakdown -- there was some evidence but a breakdown between |
| 16:02:31 | 23 | these clinics and the patients they had that had -- and I don't |
| 16:02:40 | 24 | really care about how many procedures or how many enrolls.  I |
| 16:02:44 | 25 | just need to know the population of these clinics and, of course, |

| | | |
|---|---|---|
| 16:02:47 | 1 | the added population for -- I can add on the other.  That's one |
| 16:02:53 | 2 | of the things. |
| 16:02:55 | 3 | MR. WATKINS:  And we're doing that. |
| 16:02:57 | 4 | THE COURT:  And on theirs, I wanted -- they said they |
| 16:03:04 | 5 | had three state clinics, and I wanted to know the number and |
| 16:03:07 | 6 | location of their clinics. |
| 16:03:11 | 7 | MR. WATKINS:  Then I misunderstood and I'm not going to |
| 16:03:13 | 8 | spend any time enhancing our description of our exhibits.  I just |
| 16:03:17 | 9 | misunderstood what you wanted. |
| 16:03:19 | 10 | THE CLERK:  Excuse me, Judge.  Christie just reminded |
| 16:03:21 | 11 | me that you asked for a description for the exhibits that were |
| 16:03:29 | 12 | given. |
| 16:03:29 | 13 | THE COURT:  Yeah, well, this is not going to help us |
| 16:03:32 | 14 | very much, but I assume that the -- |
| 16:03:37 | 15 | THE CLERK:  Well, these things were going to be filed, |
| 16:03:41 | 16 | right? |
| 16:03:41 | 17 | MR. WATKINS:  Correct.  And we have additional ones, |
| 16:03:43 | 18 | both for us and for the state, where there's a more fulsome |
| 16:03:47 | 19 | description of each exhibit.  I could show that to the Court to |
| 16:03:50 | 20 | see if you think that's -- it's sufficient. |
| 16:03:54 | 21 | THE CLERK:  What they provided to me on the jump drive |
| 16:03:58 | 22 | is more descriptive and it shows -- |
| 16:04:02 | 23 | MR. SWEETEN:  What they provided or what we provided? |
| 16:04:06 | 24 | MR. BIGGS:  We did -- |
| 16:04:07 | 25 | MR. SWEETEN:  Oh, we both did.  Okay. |

```
16:04:07   1        MR. BIGGS:  We followed the Fifth Circuit's rules for
16:04:08   2   the naming.
16:04:08   3        THE CLERK:  Right.  And I can print that for the Court.
16:04:14   4   And I was actually going to print it for the CM/ECF exhibits.
16:04:25   5        THE COURT:  Well, the only thing I can say is, one of
16:04:29   6   the things I'm going to ask you tonight when you come back
16:04:33   7   tomorrow to make your statements is I want you to emphasize the
16:04:40   8   declarations that both of you have filed as to the importance and
16:04:44   9   the identity of that declaration by number or however you want to
16:04:50  10   do it.  The other is whatever exhibits that you're relying on,
16:04:56  11   then I'll probably need a better number, better description.
16:05:01  12        Just kind of like a jury trial when you have a thousand
16:05:05  13   exhibits and you tell the jury you want them to look at three or
16:05:09  14   four or five, as they say, the best exhibits, but, you know,
16:05:16  15   you've got hundreds of exhibits here and I have no idea what they
16:05:20  16   are.
16:05:23  17        You know, if this was -- this is a temporary injunction
16:05:27  18   is to see whether or not things will be set the same until you
16:05:36  19   could have some real discovery and get a trial.  I agreed to have
16:05:45  20   -- I gave y'all three days to make an intelligent decision on
16:05:48  21   that because I don't know when I could get you to trial.  I don't
16:05:53  22   know how long you're going to need to prepare for the trial.  But
16:05:59  23   I'll take all the description that y'all can give so that I
16:06:04  24   can --
16:06:05  25        MR. WATKINS:  I understand.
```

| | | |
|---|---|---|
| 16:06:06 | 1 | THE COURT:  -- select what we're doing. |
| 16:06:09 | 2 | MR. WATKINS:  Do you have any objection to us splitting |
| 16:06:10 | 3 | the statements tomorrow between more than one lawyer? |
| 16:06:14 | 4 | THE COURT:  No.  That's your business, but you do that |
| 16:06:26 | 5 | the way you want. |
| 16:06:27 | 6 | MR. WATKINS:  Okay.  Thank you, Judge. |
| 16:06:29 | 7 | MR. SWEETEN:  Thank you. |
| 16:06:36 | 8 | THE COURT:  Let me know when your witness is here. |
| 16:06:40 | 9 | MR. SWEETEN:  I think very shortly.  I'll check right |
| 16:06:43 | 10 | now. |
| 16:06:43 | 11 | THE COURT:  All right. |
| 16:06:44 | 12 | MR. WATKINS:  This is the additional stuff that you |
| 16:06:46 | 13 | wanted on clinics, and patients, and stuff like that there.  And |
| 16:06:51 | 14 | we also did what they do at each clinic. |
| 16:06:54 | 15 | THE COURT:  That's right.  The services. |
| 16:06:56 | 16 | MR. WATKINS:  Yeah. |
| 16:06:57 | 17 | THE COURT:  Yeah.  That's what I need.  Do that when |
| 16:07:02 | 18 | you make your statements tomorrow. |
| 16:07:03 | 19 | MR. WATKINS:  Oh, okay. |
| 16:15:36 | 20 | (Recess.) |
| 16:15:58 | 21 | THE COURT:  You may call your witness. |
| 16:16:00 | 22 | MS. SANDMAN:  Your Honor, if I may just briefly before |
| 16:16:03 | 23 | the Court proceeds with that. |
| 16:16:05 | 24 | THE COURT:  Sure. |
| 16:16:05 | 25 | MS. SANDMAN:  The state has just handed us a document |

16:16:07   1    which, I think, is responsive to the information that the Court

16:16:10   2    has requested from them, and they indicated that they proposed to

16:16:12   3    use that with this witness.  We have no objection to that, but my

16:16:16   4    request would be, can we continue with this witness tomorrow so

16:16:19   5    that we can have a chance to be familiar with the document

16:16:23   6    they're proposing to use with her, which wasn't previously

16:16:25   7    disclosed to us --

16:16:26   8                THE COURT:  This is their last witness.

16:16:29   9                MR. STEPHENS:  It is, your Honor.

16:16:30   10               THE COURT:  I'm going to finish tonight.

16:16:32   11               MS. SANDMAN:  Your Honor, we do have some rebuttal

16:16:34   12   witnesses that we will be calling tomorrow, but we think that

16:16:36   13   will be relatively short --

16:16:38   14               THE COURT:  In the nature of rebuttal, who are you

16:16:40   15   going to be calling?

16:16:41   16               MS. SANDMAN:  We have a rebuttal witness -- these were

16:16:43   17   both previously disclosed rebuttal witnesses --

16:16:46   18               THE COURT:  I saw that.  But I --

16:16:48   19               MS. SANDMAN:  One is --

16:16:49   20               THE COURT:  I've just assumed that you've put your --

16:16:51   21               MS. SANDMAN:  One is an --

16:16:53   22               THE COURT:  -- information first.

16:16:55   23               MS. SANDMAN:  One is an ethicist, your Honor,

16:16:57   24   responding to the issues that were raised by the state's

16:17:00   25   ethicist.  And one is a witness on irreparable injury in the

16:17:03  1  Medicaid program responding to the testimony just a few moments

16:17:05  2  ago, the additional testimony that we understand the state would

16:17:09  3  be eliciting now.

16:17:10  4       THE COURT:  Well, irreparable harm was an issue for

16:17:15  5  direct evidence.  I don't know why you would keep a rebuttal on

16:17:22  6  an element of temporary injunction.

16:17:27  7       MS. SANDMAN:  Your Honor, if I could clarify what I

16:17:28  8  intended to say there.  I should not have said irreparable

16:17:32  9  injury.  We believe that that has been established by our

16:17:34  10  testimony on direct as we're obligated to do.  However, we do

16:17:37  11  want the opportunity to bring in this witness to respond to the

16:17:40  12  additional information about the capability of other Medicaid

16:17:45  13  providers in the state to purportedly absorb our patients.  We

16:17:49  14  believe that is not correct, and we think that we are entitled to

16:17:53  15  opportunity to put this in through a rebuttal witness.

16:17:54  16       THE COURT:  Well, that was in your papers and in your

16:17:59  17  direct testimony.  I fully anticipated being able to listen to

16:18:07  18  both of you in the closing arguments because of the volume of

16:18:18  19  papers you put here and the, literally, hundreds of exhibits that

16:18:25  20  you've put in that I haven't seen.  Of course, it's okay with the

16:18:31  21  plaintiff because you'd like the injunction until I can get a

16:18:35  22  report out, but I fully intended to make up my mind on the

16:18:42  23  temporary injunction.

16:18:45  24       I could see it's impossible.  I couldn't even get

16:18:48  25  through the exhibits in a week.  But it just better be rebuttal.

| | | |
|---|---|---|
| 16:18:55 | 1 | If it's not, I'll sustain every objection they make.  Since we |
| 16:19:01 | 2 | will not finish tonight, put on yours, we'll see where we are. |
| 16:19:09 | 3 | You want to wait until tomorrow? |
| 16:19:13 | 4 | MS. SANDMAN:  Your Honor, only because this document |
| 16:19:14 | 5 | was -- what they're proposing to use with the witness was just |
| 16:19:17 | 6 | provided to us a few moments ago in response to the Court's |
| 16:19:20 | 7 | request.  So given that we're continuing until tomorrow, anyway, |
| 16:19:24 | 8 | my request would be that we have the opportunity to cross-examine |
| 16:19:27 | 9 | the witness, based on that document tomorrow.  Whether that means |
| 16:19:32 | 10 | the direct going tomorrow or the direct going today, my point is |
| 16:19:34 | 11 | we should have the opportunity to be familiar with the document. |
| 16:19:40 | 12 | THE COURT:  Y'all are familiar with all your other |
| 16:19:43 | 13 | documents? |
| 16:19:45 | 14 | MS. SANDMAN:  We're doing our best, your Honor. |
| 16:19:47 | 15 | THE COURT:  All right.  We'll recess till 9:00 in the |
| 16:19:50 | 16 | morning. |
| 16:19:54 | 17 | Counsel, it's important tomorrow that we have some time |
| 16:19:58 | 18 | for final discussions.  Now, I'm going to be in criminal court |
| 16:20:02 | 19 | sentencing, I don't know, how many?  A lot of people Friday.  So |
| 16:20:10 | 20 | I'm meeting with my probation officers on those tomorrow |
| 16:20:13 | 21 | afternoon.  So it's to both of your detriment if your closing |
| 16:20:22 | 22 | remarks are going to be ten minutes.  But that may be all that |
| 16:20:25 | 23 | you have. |
| 16:20:25 | 24 | (Proceedings adjourned.) |
| | 25 | |