**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| United States of America *ex rel.* ALEX DOE, Relator, | § § § § | |
| The State of Texas *ex rel.* ALEX DOE, Relator, | § § § § | CIVIL ACTION NO. 2:21-CV-00022-Z |
| The State of Louisiana *ex rel.* ALEX DOE, Relator, | § § § | Date:       January 6, 2022 |
| Plaintiffs, v. | § § § § | |
| Planned Parenthood Federation of America, Inc., Planned Parenthood Gulf Coast, Inc., Planned Parenthood of Greater Texas, Inc., Planned Parenthood South Texas, Inc., Planned Parenthood Cameron County, Inc., Planned Parenthood San Antonio, Inc., | § § § § § § § § § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF AFFILIATE DEFENDANTS' MOTION FOR**
**<u>SUMMARY JUDGMENT</u>**

ARNOLD & PORTER KAYE SCHOLER LLP

Tirzah S. Lollar
Tirzah.Lollar@arnoldporter.com
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone: +1 202.942.5000
Fax: +1 202.942.5999

| DOCUMENT NAME | APP. PAGE NO. |
|---|---|
| Intentionally skipped | App.027-29 |
| PPGC Initial Notice of Termination from Texas Medicaid (10/19/2015) | App.030-34 |
| PPST Initial Notice of Termination from Texas Medicaid (10/19/2015) | App.035-39 |
| PPGC Notices of Termination from Louisiana Medicaid (8/3/2015) | App.040-47 |
| Excerpts of Deposition of Stuart Bowen (12/9/2022) | App.048-79 |
| Excerpts of Texas Preliminary Injunction Hearing (1/18/2017) | App.080-171 |
| Excerpts of Deposition of Ted Spears (12/7/2022) | App.172-77 |
| Excerpts of Louisiana Preliminary Injunction Motion Hearing (9/2/2015) | App.178-79 |
| Excerpts of Louisiana Preliminary Injunction Motion Hearing (10/16/2015) | App.180-82 |
| United States Amicus Brief, *Planned Parenthood Gulf Coast, Inc. v. Gee* (2/17/2016) | App.183-205 |
| Wachino Letter to Texas (8/11/2016) | App.206-08 |
| Wachino Letter to Louisiana (8/11/2016) | App.209-11 |
| Washington Post Article (4/19/2016) | App.212-13 |
| Texas Motion to Stay District Court's Injunction Pending En Banc Consideration (2/1/2019) | App.214-31 |
| Texas's Supplemental Answers to PP Affiliates' First Set of Interrogatories (10/25/2022) | App.232-52 |
| Excerpts of Rule 30(b)(6) Deposition of Texas/HHSC (Zalkovsky) (12/6/2022) | App.253-83 |
| Texas's Response to Petition for Writ of Mandamus (2/23/2021) | App.284-302 |

| | |
|---|---|
| Termination of Planned Parenthood Clinics from Texas Medicaid (1/5/2021) | App.303 |
| Excerpts of Rule 30(b)(6) Deposition of Texas/HHSC (Goldstein) (12/7/2022) | App.304-24 |
| Termination of Provider Contract | App.325 |
| Chambliss email to Zalkovsky, et al, with HHSC letter to FFS patients (1/22/2021) | App.326-36 |
| Urgent Action Required Related to Planned Parenthood and MCO Call at 11a Today! (2/4/2021) | App.337 |
| Termination of Planned Parenthood Clinics from Texas Medicaid (3/19/2021) | App.338 |
| SAR (1/4/2021) | App.339 |
| SAR (3/16/2021) | App.340 |
| Planned Parenthood Enrollment Data (12/1/2022) | App.341-44 |
| Letter from TMHP to PPGT (11/30/2018) | App.345-49 |
| Declaration of Anne Marie Costello (11/17/2022) | App.350-52 |
| Supplemental Declaration of Anne Marie Costello (12/22/2022) | App.353-56 |
| Intentionally skipped | App.357-94 |
| Excerpts of Supplemental Expert Report Donald Lochabay for Louisiana (10/26/2022) | App.395-98 |
| Intentionally skipped | App.399-444 |
| LDH Responses to PPGC Revised Subpoena (9/28/2022) | App.445-48 |
| Excerpts of Rule 30(b)(6) Deposition of PPGC (12/1/2022) | App.449-50 |
| Excerpts of Rule 30(b)(6) Deposition of PPGT (12/6/2022) | App.451-53 |

| | |
|---|---|
| Excerpts of Rule 30(b)(6) Deposition of PPST/PPCC/PPSA (11/18/2022)[1] | App.454-55 |
| Excerpts of Temporary Injunction Hearing Transcript (2/24/2021) | App.456-57 |
| DOJ Statement of Interest (8/31/2015) | App.458-80 |
| Declaration of Melaney Linton | App.481-87 |
| Declaration of Polin Barraza | App.488-92 |
| Declaration of Ken Lambrecht | App.493-98 |
| Letter from PPGC/PPGT/PPST to Cecile Young (12/14/2020) | App.499-504 |
| Letter from Karen Ray to PPGC/PPGT/PPST (01/04/2021) | App.505-06 |

---

[1] Affiliate Defendants downgrade this page (457) of the Rule 30(b)(6) Deposition of PPST/PPCC/PPSA from "Confidential Information" to no confidentiality designation.

# OFFICE OF INSPECTOR GENERAL

### TEXAS HEALTH & HUMAN SERVICES COMMISSION

STUART W. BOWEN JR.
INSPECTOR GENERAL

October 19, 2015

#### **** NOTICE OF TERMINATION ****

*Via First Class Mail & CMRRR No. 7015 1730 0000 9897 1876*

Planned Parenthood Gulf Coast
Registered Agent: Melaney Linton
4600 Gulf Freeway
Houston, Texas 77023-354

Re:     Planned Parenthood Gulf Coast
        TPI Numbers:  0834095-01, 1126104-08, 1126104-09, 3035461-01, 1126104-05,
        1126104-04, 1126104-12, 1126104-14, 1126104-11, 1126104-10, 1126104-06, 0834095-
        02, 1126104-02, 1126104-07

Dear Provider:

Your receipt of this Notice of Termination effects a process to end your enrollment in the Texas Medicaid program. *See* 1 TEX. ADMIN. CODE § 371.1703(e) (2014). We have begun terminating your enrollment because, based on the evidence outlined below, you are liable, directly or by affiliation, for a series of serious Medicaid program violations. The State has determined that you and your Planned Parenthood affiliates are no longer capable of performing medical services in a professionally competent, safe, legal, and ethical manner.

Your termination and that of all your affiliates will not affect access to care in this State because there are thousands of alternate providers in Texas, including federally qualified health centers, Medicaid-certified rural health clinics, and other health care providers across the State that participate in the Texas Women's Health Program and Medicaid. Our women's health programs, mostly State-funded since 2013, have increased overall funding for women's health services and access to these services for women across the State.

Therefore, in connection with this Notice of Termination and out of respect for the patients who otherwise would receive Medicaid services from you and your affiliates, the State of Texas

---

PX-66

P_000877

APP.030

PPGC00153023

Notice of Termination
October 19, 2015
Page 2

requests your cooperation in informing all clients and potential clients about alternatives where
they can obtain Medicaid services from providers in good standing with the State. HHSC staff
will provide you with information you can share regarding those Medicaid providers.

## I. FINDINGS SUPPORTING TERMINATION

We have determined the bases for your termination are as follows:

A. Earlier this year, you committed and condoned numerous acts of misconduct
captured on video that reveal repeated program violations and breach the
minimum standards of care required of a Medicaid enrollee. You are being
terminated from the program because of these program violations, which
include, but are not limited to, the following:

1. The videos indicate that you follow a policy of agreeing to procure fetal
tissue even if it means altering the timing or method of an abortion. These
practices violate accepted medical standards, as reflected in federal law, and
are Medicaid program violations that justify termination. *See* 42 U.S.C. §
289g-1; 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

2. You failed to prevent conditions that would allow the spread of infectious
diseases among employees, as well as patients and the general public.
Specifically, you allowed individuals posing as commercial buyers of fetal
body parts to handle bloody fetal tissue while wearing only gloves. You did
not comply with mandatory "universal precautions," including the use of
"protective barriers," required whenever anyone handles "blood," "non-
intact skin," and "body fluids." *See* 25 TEX. ADMIN. CODE § 139.49; *see also*
29 CFR § 1910.1030. These program violations justify termination. *See* 1
TEX. ADMIN. CODE § 371.1659(2) and (6).

3. Your staff were not trained in infection control and barrier precautions with
regard to the handling of fetal blood and tissue or they failed to comply with
the minimum standards that mandatory training requires with regard to these
critical public health and safety issues. *See* 25 TEX. ADMIN. CODE §
139.49(b)(3). These program violations justify termination. *See* 1 TEX.
ADMIN. CODE § 371.1659(2) and (6).

As a Planned Parenthood affiliate, you have agreed to abide by mandatory medical
and operational standards established by the Planned Parenthood Federation of
America (PPFA) located in Washington, D.C. You are a legal affiliate of the PPFA
and of all similarly situated Planned Parenthood providers in Texas.

Our decision to terminate you and all affiliates in Texas finds support in the
extensive video evidence filmed at your facility and other Planned Parenthood
affiliates across the country, including video footage of the Medical Director of

Notice of Termination
October 19, 2015
Page 3

PPFA who appears to not only condone such program violations but also endorse them. This suggests that the program violations recorded at your facility reflect PPFA national policy or accepted practice, which explains in part their widespread occurrence across the country among Planned Parenthood affiliates.

B. My office has information suggesting that fraud and other related program violations have been committed by a number of Planned Parenthood affiliates enrolled in the Medicaid program in Texas, including you. For example, there is reliable information indicating a pattern of illegal billing practices by Planned Parenthood affiliates, including you, across the State.

Our prima facie case of fraud is supported by related cases involving fraudulent practices identified by Whistleblowers from inside the Texas Planned Parenthood network. These Whistleblowers alleged in federal court that Planned Parenthood encourages employees to knowingly file false claims. *See, e.g,* Settlement Agreement, *Reynolds v. Planned Parenthood Gulf Coast,* No. 9:09-cv-124 (E.D. Tex. July 25, 2013) (lawsuit by a health care assistant who worked at Planned Parenthood Gulf Coast for 10 years alleging Medicaid fraud); Memorandum Opinion and Order, *Carroll v. Planned Parenthood Gulf Coast,* 4:12-cv-03505 (S.D. Tex. May 14, 2014) (lawsuit by a former accounts-receivable manager at Planned Parenthood Gulf Coast alleging Medicaid fraud).

In *Reynolds,* a Planned Parenthood Whistleblower alleged sufficient evidence of fraud to assure the federal court handling the matter that the case was worth pursuing, after which Planned Parenthood promptly settled the lawsuit for $4.3 million. Furthermore, when the United States Department of Justice (DOJ) announced the 2013 settlement in *Reynolds,* it openly and compellingly criticized PPGC for "abuse of programs that are extremely important to the well-being of many American women." Further, the DOJ was "particularly grateful to the Whistleblower" who came forward for revealing that Planned Parenthood Gulf Coast had billed the Texas Medicaid program, Title XX, and the Women's Health Program "for items and services that were either medically unnecessary or were never actually provided."

The varied program violations by Planned Parenthood revealed in these two federal cases and the information my office has recently received regarding similar program violations supports this Notice of Termination. *See* 1 Tex. Admin. Code § 371.1653.

Our rules provide that if you are affiliated with a provider that commits program violations subjecting it to enrollment termination, then you, as an affiliate, are subject to the same enrollment termination. *See* 1 TEX. ADMIN. CODE § 371.1703(c)(7). The definitions section of our rule substantiates this position. It provides that an enrolled provider is an affiliate of another enrolled provider if it

Notice of Termination
October 19, 2015
Page 4

"shares any identifying information, including ... corporate or franchise name."
You share such identifying information with other affiliates about which a prima
facie case of fraud exists and are thus subject to termination. *See* 1 TEX. ADMIN.
CODE § 371.1607(3)(I). Your affiliation with Planned Parenthood entities in Texas
about which there is reliable evidence of fraud and other program violations - as
well as your participation in such - substantiates your termination as an enrollee in
the Medicaid program. *See* 1 TEX. ADMIN. CODE §§ 371.1703(c)(6), (c)(7), and
(c)(8).

## II. PROCESS

You may request an Informal Resolution Meeting (IRM) with my legal staff to discuss the
findings in this Notice of Termination.  If you wish to pursue an IRM, you must file a written
request with my office <u>on or before the 30th calendar day from the date you received this Notice
of Termination.</u>

Your request for an IRM must:

1.  Be sent by certified mail to my office at the address specified below;
2.  Include a statement as to the specific issues, findings, and legal authority in the Notice of
    Termination with which you disagree; and
3.  Be signed by you or your attorney.

In the alternative, you may submit, <u>within 30 calendar days of receipt of this Notice,</u> any
documentary evidence and written argument regarding whether this Notice of Termination is
warranted. *See* 1 TEX. ADMIN. CODE § 371.1613 (d). You must state the specific issues, findings,
and legal authority that support your contention that this Notice is improper.

In the further alternative, you may both request an IRM and submit documentary evidence and
written argument to contest this Notice of Termination.

## III. FINAL TERMINATION

If you fail to respond to this Notice of Termination <u>within 30 calendar days of receipt</u>, then we
will issue a Final Notice of Termination.  Alternatively, if the IRM fails to resolve the case, then
we will similarly issue a Final Notice of Termination. You have 15 days after receipt of the Final
Notice of Termination to request an administrative hearing to appeal the Final Notice before an
Administrative Law Judge at the Texas Health and Human Services Commission.

A.  The effective date of your final termination from the Medicaid program will be either:

1.  Upon the expiration of 15 calendar days after receipt of the Final Notice of
    Termination, if you do not timely request an administrative hearing before HHSC; or

Notice of Termination
October 19, 2015
Page 5

    2. The date of any final order issued by an HHSC Administrative Law Judge affirming the Final Notice of Termination.

B. Once the Final Notice of Termination becomes effective, the following events immediately occur:

    1. Your enrollment in the Medicaid program terminates;
    2. Your Texas Provider Identification Number is revoked; and
    3. Your enrollment in the Medicaid program of any other state may be subject to revocation.

If, after your termination from the Texas Medicaid program, you wish to enter the program again, you must apply for re-enrollment.

# NOTICE

**IF YOU DO NOT RESPOND TO THIS NOTICE WITHIN 30 CALENDAR DAYS FROM THE DATE YOU RECEIVED IT, WE WILL ISSUE A FINAL NOTICE OF TERMINATION.**

Requests for an IRM and/or the provision of additional documentary evidence and written argument should be mailed via certified mail to the following address:

    Texas Health and Human Services Commission
    Office of Inspector General
    Mail Code 1358
    P.O. 85200
    Austin, Texas 78708-5200

Respectfully yours,

Stuart W. Bowen, Jr.

P_000881

APP.034

PPGC00153027



# OFFICE OF INSPECTOR GENERAL
TEXAS HEALTH & HUMAN SERVICES COMMISSION

STUART W. BOWEN JR.
INSPECTOR GENERAL

October 19, 2015

**** **NOTICE OF TERMINATION** ****

*Via Regular Mail and CMRRR No. 7015 1730 0000 9397 2187*

Planned Parenthood South Texas Surgical Center - Family Planning Associates of San Antonio
Registered Agent: Jeffery Hons
2140 Babcock Road
San Antonio, Texas 78229-0000

Re:    Planned Parenthood South Texas Surgical Center - Family Planning Associates of San
       Antonio
       TPI Numbers: 1373391-01, 1373391-10, 2109696-01, 1373391-11, 3353781-01,
       1373391-12, 2120669-01, 1373391-04, 2100489-01, 2121964-01, 2866873-01, 2096414-
       01, 2103566-01

Dear Provider:

Your receipt of this Notice of Termination effects a process to end your enrollment in the Texas
Medicaid program. *See* 1 TEX. ADMIN. CODE § 371.1703(e) (2014). We have begun terminating
your enrollment because, based on the evidence outlined below, you are liable, directly or by
affiliation, for a series of serious Medicaid program violations. The State has determined that
you and your Planned Parenthood affiliates are no longer capable of performing medical services
in a professionally competent, safe, legal, and ethical manner.

Your termination and that of all your affiliates will not affect access to care in this State because
there are thousands of alternate providers in Texas, including federally qualified health centers,
Medicaid-certified rural health clinics, and other health care providers across the State that
participate in the Texas Women's Health Program and Medicaid. Our women's health programs,
mostly State-funded since 2013, have increased overall funding for women's health services and
access to these services for women across the State.

Therefore, in connection with this Notice of Termination and out of respect for the patients who
otherwise would receive Medicaid services from you and your affiliates, the State of Texas
requests your cooperation in informing all clients and potential clients about alternatives where

APP.035

PPST00000001

Notice of Termination
October 19, 2015
Page 2

they can obtain Medicaid services from providers in good standing with the State. HHSC staff will provide you with information you can share regarding those Medicaid providers.

## I. FINDINGS SUPPORTING TERMINATION

We have determined the bases for your termination are as follows:

A. Earlier this year, Planned Parenthood Gulf Coast (PPGC) committed and condoned numerous acts of misconduct captured on video that reveal repeated program violations and breach the minimum standards of care required of it as a Medicaid enrollee. PPGC is being terminated from the program because of these program violations, which include, but are not limited to, the following:

1. The videos indicate that PPGC follows a policy of agreeing to procure fetal tissue even if it means altering the timing or method of an abortion. These practices violate accepted medical standards, as reflected in federal law, and are Medicaid program violations that justify termination. *See* 42 U.S.C. § 289g-1; 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

2. PPGC failed to prevent conditions that would allow the spread of infectious diseases among employees, as well as patients and the general public. Specifically, it allowed individuals posing as commercial buyers of fetal body parts to handle bloody fetal tissue while wearing only gloves. PPGC did not comply with mandatory "universal precautions," including the use of "protective barriers," required whenever anyone handles "blood," "non-intact skin," and "body fluids." *See* 25 TEX. ADMIN. CODE § 139.49; *see also* 29 CFR § 1910.1030. These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

3. PPGC staff were not trained in infection control and barrier precautions with regard to the handling of fetal blood and tissue or they failed to comply with the minimum standards that mandatory training requires with regard to these critical public health and safety issues. *See* 25 TEX. ADMIN. CODE § 139.49(b)(3). These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

As a Planned Parenthood affiliate, you have agreed to abide by mandatory medical and operational standards established by the Planned Parenthood Federation of America (PPFA) located in Washington, D.C. You are a legal affiliate of the PPFA and of all similarly situated Planned Parenthood providers in Texas.

Our rules provide that if you are affiliated with a provider that commits program violations subjecting it to enrollment termination, then you, as an affiliate, are subject to the same enrollment termination. *See* 1 TEX. ADMIN. CODE § 371.1703(c)(7).

PPST00000002

Notice of Termination
October 19, 2015
Page 3

The definitions section of our rule substantiates the conclusion that you are an affiliate of PPGC. It provides that an enrolled provider is an affiliate of another enrolled provider if it "shares any identifying information, including … corporate or franchise name." You share such identifying information with PPGC and are thus subject to termination. *See* 1 TEX. ADMIN. CODE § 371.1607(3)(I).

Our decision to terminate all affiliates in Texas finds support in the extensive video evidence filmed at PPGC and other Parenthood affiliates across the country, including video footage of the Medical Director of PPFA who appears to not only condone such program violations but also endorse them. This suggests that the program violations recorded at PPGC reflect PPFA national policy or accepted practice, which explains in part their widespread occurrence across the country among Planned Parenthood affiliates.   As an affiliate of PPGC, you are now being terminated from the Medicaid program.   *See* 1 Tex. Admin. Code Sec. 371.1703(c)(7).

B.  My office has information suggesting that fraud and other related program violations have been committed by a number of Planned Parenthood affiliates enrolled in the Medicaid program in Texas. For example, there is reliable information indicating a pattern of illegal billing practices by Planned Parenthood affiliates across the State.

Our prima facie case of fraud is supported by related cases involving fraudulent practices identified by Whistleblowers from inside the Texas Planned Parenthood network. These Whistleblowers alleged in federal court that Planned Parenthood encourages employees to knowingly file false claims. *See, e.g,* Settlement Agreement, *Reynolds v. Planned Parenthood Gulf Coast*, No. 9:09-cv-124 (E.D. Tex. July 25, 2013) (lawsuit by a health care assistant who worked at Planned Parenthood Gulf Coast for 10 years alleging Medicaid fraud); Memorandum Opinion and Order, *Carroll v. Planned Parenthood Gulf Coast*, 4:12-cv-03505 (S.D. Tex. May 14, 2014) (lawsuit by a former accounts-receivable manager at Planned Parenthood Gulf Coast alleging Medicaid fraud).

In *Reynolds*, a Planned Parenthood Whistleblower alleged sufficient evidence of fraud to assure the federal court handling the matter that the case was worth pursuing, after which Planned Parenthood promptly settled the lawsuit for $4.3 million.  Furthermore when the United States Department of Justice (DOJ) announced the 2013 settlement in *Reynolds*, it openly and compellingly criticized PPGC for "abuse of programs that are extremely important to the well-being of many American women." Further, the DOJ was "particularly grateful to the Whistleblower" who came forward for revealing that PPGC had billed the Texas Medicaid program, Title XX, and the Women's Health

PPST00000003

Notice of Termination
October 19, 2015
Page 4

Program "for items and services that were either medically unnecessary or were never actually provided."

The varied program violations by Planned Parenthood revealed in these two federal cases and the information my office has recently received regarding similar program violations supports this Notice of Termination. *See* 1 Tex. Admin. Code § 371.1653. As per Paragraph A, *supra*, your affiliation with Planned Parenthood entities in Texas about which there is reliable evidence of fraud and other program violations substantiates your termination as an enrollee in the Medicaid program. *See* 1 TEX. ADMIN. CODE §§ 371.1703(c)(6), (c)(7), and (c)(8).

## II. PROCESS

You may request an Informal Resolution Meeting (IRM) with my legal staff to discuss the findings in this Notice of Termination. If you wish to pursue an IRM, you must file a written request with my office <u>on or before the 30th calendar day from the date you received this Notice of Termination</u>.

Your request for an IRM must:

1. Be sent by certified mail to my office at the address specified below;
2. Include a statement as to the specific issues, findings, and legal authority in the Notice of Termination with which you disagree; and
3. Be signed by you or your attorney.

In the alternative, you may submit, <u>within 30 calendar days of receipt of this Notice,</u> any documentary evidence and written argument regarding whether this Notice of Termination is warranted. *See* 1 TEX. ADMIN. CODE § 371.1613 (d). You must state the specific issues, findings, and legal authority that support your contention that this Notice is improper.

In the further alternative, you may both request an IRM and submit documentary evidence and written argument to contest this Notice of Termination.

## III. FINAL TERMINATION

If you fail to respond to this Notice of Termination <u>within 30 calendar days of receipt</u>, then we will issue a Final Notice of Termination. Alternatively, if the IRM fails to resolve the case, then we will similarly issue a Final Notice of Termination. You have 15 days after receipt of the Final Notice of Termination to request an administrative hearing to appeal the Final Notice before an Administrative Law Judge at the Texas Health and Human Services Commission.

A. The effective date of your final termination from the Medicaid program will be either:

APP.038

PPST00000004

Notice of Termination
October 19, 2015
Page 5

    1. Upon the expiration of 15 calendar days after receipt of the Final Notice of Termination, if you do not timely request an administrative hearing before HHSC; or

    2. The date of any final order issued by an HHSC Administrative Law Judge affirming the Final Notice of Termination.

B. Once the Final Notice of Termination becomes effective, the following events immediately occur:

    1. Your enrollment in the Medicaid program terminates;

    2. Your Texas Provider Identification Number is revoked; and

    3. Your enrollment in the Medicaid program of any other state may be subject to revocation.

If, after your termination from the Texas Medicaid program, you wish to enter the program again, you must apply for re-enrollment.

## NOTICE

__IF YOU DO NOT RESPOND TO THIS NOTICE WITHIN 30 CALENDAR DAYS FROM THE DATE YOU RECEIVED IT, WE WILL ISSUE A FINAL NOTICE OF TERMINATION.__

Requests for an IRM and/or the provision of additional documentary evidence and written argument should be mailed via certified mail to the following address:

    Texas Health and Human Services Commission
    Office of Inspector General
    Mail Code 1358
    P.O. 85200
    Austin, Texas 78708-5200

Respectfully yours,

Stuart W. Bowen, Jr.

PPST00000005

Bobby Jindal
GOVERNOR

Kathy H. Kliebert
SECRETARY

# State of Louisiana

Department of Health and Hospitals
Office of the Secretary

August 3, 2015

Planned Parenthood of Louisiana
ATTN: Melaney Linton
4018 Magazine St.
New Orleans, LA 70115

**Certified Mail, Return Receipt Requested (7012 1640 0001 7222 5655)**

Re:    Medicaid Provider Agreement
       Provider Number 91338

Dear Mrs. Linton:

As you are aware, in order to participate in the Louisiana Medicaid Program (Medicaid), providers are required to sign a Medicaid provider agreement with the Louisiana Department of Health and Hospitals (LDHH). Pursuant to La. R.S. 46:437.11, each such provider agreement shall be a voluntary contract between LDHH and the applicable health care provider. According to subsection (D)(1) of the statute, a provider agreement **SHALL** be terminable by either party 30 days after receipt of written notice. In accordance with this statute, please consider this your written notice that LDHH is exercising its right to terminate your provider agreement effective 30 days after your receipt of this notice.

After any and all local, state, or federal investigations of your entity have been concluded, LDHH expressly reserves the right to amend this notice and terminate your provider agreement immediately, and without written notice, if you become the subject of a sanction or of a criminal, civil, or departmental proceeding.

Pursuant to La. R.S. 46:107, you have an opportunity for a hearing at the state level based on this termination of your provider agreement. All final decisions in cases of appeal are rendered by the office of the secretary at the state level and such decisions exhaust your administrative remedy. Your request for an Administrative Appeal must be in writing and must set out the reasons for which you are seeking an appeal and the basis on which you disagree with the department's decision. All requests for an Administrative Appeal must be received within 30 calendar days of receipt of this letter.

APP.040
PPTHIRD00008193

Any such request must be sent to the address below:

Division of Administrative Law – HH Section
P.O. Box 4189
Baton Rouge, Louisiana 70821-4189
Phone: (225) 342-0443
Fax: (225) 219-9823

Please send a copy of any request for appeal to the Bureau of Legal Services at P.O. Box 3836, Baton Rouge, Louisiana 70821, Attention: Stephen Russo.

You may be represented by an attorney or authorized representative at the Administrative Appeal. Your attorney or authorized representative must file a written notice of representation identifying his/her name, address, and telephone number at the address given above.

If you have any questions regarding this correspondence, you may contact Stephen R. Russo, Executive Counsel at 225-342-1128.

Sincerely,

Kathy Kliebert
Secretary

Cc: Planned Parenthood Gulf Coast (7099 3400 0002 6023 8151)

**Bobby Jindal**
GOVERNOR

**Kathy H. Kliebert**
SECRETARY

# State of Louisiana

Department of Health and Hospitals

Office of the Secretary

August 3, 2015

Planned Parenthood of Houston
ATTN: Melaney Linton
4600 Gulf Fwy.
Houston, TX 77023

**Certified Mail, Return Receipt Requested (7012 1640 0001 7222 5594)**

Re: Medicaid Provider Agreement
    Provider Number 45802

Dear Mrs. Linton:

As you are aware, in order to participate in the Louisiana Medicaid Program (Medicaid), providers are required to sign a Medicaid provider agreement with the Louisiana Department of Health and Hospitals (LDHH). Pursuant to La. R.S. 46:437.11, each such provider agreement shall be a voluntary contract between LDHH and the applicable health care provider. According to subsection (D)(1) of the statute, a provider agreement **SHALL** be terminable by either party 30 days after receipt of written notice. In accordance with this statute, please consider this your written notice that LDHH is exercising its right to terminate your provider agreement effective 30 days after your receipt of this notice.

After any and all local, state, or federal investigations of your entity have been concluded, LDHH expressly reserves the right to amend this notice and terminate your provider agreement immediately, and without written notice, if you become the subject of a sanction or of a criminal, civil, or departmental proceeding.

Pursuant to La. R.S. 46:107, you have an opportunity for a hearing at the state level based on this termination of your provider agreement. All final decisions in cases of appeal are rendered by the office of the secretary at the state level and such decisions exhaust your administrative remedy. Your request for an Administrative Appeal must be in writing and must set out the reasons for which you are seeking an appeal and the basis on which you disagree with the department's decision. All requests for an Administrative Appeal must be received within 30 calendar days of receipt of this letter.

APP.042
PPTHIRD00008195

August 3, 2015
Page 2

Any such request must be sent to the address below:

Division of Administrative Law – HH Section
P.O. Box 4189
Baton Rouge, Louisiana  70821-4189
Phone: (225) 342-0443
Fax: (225) 219-9823

Please send a copy of any request for appeal to the Bureau of Legal Services at P.O. Box 3836, Baton Rouge, Louisiana  70821, Attention: Stephen Russo.

You may be represented by an attorney or authorized representative at the Administrative Appeal. Your attorney or authorized representative must file a written notice of representation identifying his/her name, address, and telephone number at the address given above.

If you have any questions regarding this correspondence, you may contact Stephen R. Russo, Executive Counsel at 225-342-1128.

Sincerely,

Kathy Kliebert
Secretary

Cc:  Planned Parenthood Gulf Coast (7012 1640 0001 7222 5693)

PPTHIRD00008196

**Bobby Jindal**
GOVERNOR

**Kathy H. Kliebert**
SECRETARY

# State of Louisiana
Department of Health and Hospitals
Office of the Secretary

August 3, 2015

Planned Parenthood
ATTN: Melaney Linton
4018 Magazine St.
New Orleans, LA 70115

**Certified Mail, Return Receipt Requested (7012 1640 0001 7222 5686)**

Re:     Medicaid Provider Agreement
        Provider Number 133673

Dear Mrs. Linton:

As you are aware, in order to participate in the Louisiana Medicaid Program (Medicaid), providers are required to sign a Medicaid provider agreement with the Louisiana Department of Health and Hospitals (LDHH). Pursuant to La. R.S. 46:437.11, each such provider agreement shall be a voluntary contract between LDHH and the applicable health care provider. According to subsection (D)(1) of the statute, a provider agreement **SHALL** be terminable by either party 30 days after receipt of written notice. In accordance with this statute, please consider this your written notice that LDHH is exercising its right to terminate your provider agreement effective 30 days after your receipt of this notice.

After any and all local, state, or federal investigations of your entity have been concluded, LDHH expressly reserves the right to amend this notice and terminate your provider agreement immediately, and without written notice, if you become the subject of a sanction or of a criminal, civil, or departmental proceeding.

Pursuant to La. R.S. 46:107, you have an opportunity for a hearing at the state level based on this termination of your provider agreement. All final decisions in cases of appeal are rendered by the office of the secretary at the state level and such decisions exhaust your administrative remedy. Your request for an Administrative Appeal must be in writing and must set out the reasons for which you are seeking an appeal and the basis on which you disagree with the department's decision. All requests for an Administrative Appeal must be received within 30 calendar days of receipt of this letter.

APP.044
PPTHIRD00008197

August 3, 2015
Page 2

Any such request must be sent to the address below:

Division of Administrative Law – HH Section
P.O. Box 4189
Baton Rouge, Louisiana  70821-4189
Phone: (225) 342-0443
Fax: (225) 219-9823

Please send a copy of any request for appeal to the Bureau of Legal Services at P.O. Box 3836, Baton Rouge, Louisiana  70821, Attention: Stephen Russo.

You may be represented by an attorney or authorized representative at the Administrative Appeal. Your attorney or authorized representative must file a written notice of representation identifying his/her name, address, and telephone number at the address given above.

If you have any questions regarding this correspondence, you may contact Stephen R. Russo, Executive Counsel at 225-342-1128.

Sincerely,

Kathy Kliebert
Secretary

Cc:  Planned Parenthood Gulf Coast (7012 1640 0001 7222 5679)

PPTHIRD00008198

**Bobby Jindal**
GOVERNOR

**Kathy H. Kliebert**
SECRETARY

# State of Louisiana

Department of Health and Hospitals
Office of the Secretary

August 3, 2015

Planned Parenthood
ATTN: Melaney Linton
3955 Government Street, Ste. 2
Baton Rouge, LA 70806

**Certified Mail, Return Receipt Requested (7012 1640 0001 7222 5662)**

Re:     Medicaid Provider Agreement
        Provider Number 133689

Dear Mrs. Linton:

As you are aware, in order to participate in the Louisiana Medicaid Program (Medicaid), providers are required to sign a Medicaid provider agreement with the Louisiana Department of Health and Hospitals (LDHH). Pursuant to La. R.S. 46:437.11, each such provider agreement shall be a voluntary contract between LDHH and the applicable health care provider. According to subsection (D)(1) of the statute, a provider agreement **SHALL** be terminable by either party 30 days after receipt of written notice. In accordance with this statute, please consider this your written notice that LDHH is exercising its right to terminate your provider agreement effective 30 days after your receipt of this notice.

After any and all local, state, or federal investigations of your entity have been concluded, LDHH expressly reserves the right to amend this notice and terminate your provider agreement immediately, and without written notice, if you become the subject of a sanction or of a criminal, civil, or departmental proceeding.

Pursuant to La. R.S. 46:107, you have an opportunity for a hearing at the state level based on this termination of your provider agreement. All final decisions in cases of appeal are rendered by the office of the secretary at the state level and such decisions exhaust your administrative remedy. Your request for an Administrative Appeal must be in writing and must set out the reasons for which you are seeking an appeal and the basis on which you disagree with the department's decision. All requests for an Administrative Appeal must be received within 30 calendar days of receipt of this letter.

Any such request must be sent to the address below:

Division of Administrative Law – HH Section
P.O. Box 4189
Baton Rouge, Louisiana  70821-4189
Phone: (225) 342-0443
Fax: (225) 219-9823

Please send a copy of any request for appeal to the Bureau of Legal Services at P.O. Box 3836, Baton Rouge, Louisiana  70821, Attention: Stephen Russo.

You may be represented by an attorney or authorized representative at the Administrative Appeal. Your attorney or authorized representative must file a written notice of representation identifying his/her name, address, and telephone number at the address given above.

If you have any questions regarding this correspondence, you may contact Stephen R. Russo, Executive Counsel at 225-342-1128.

Sincerely,

Kathy Kliebert
Secretary

Cc:  Planned Parenthood Gulf Coast (7012 1640 0001 7222 5549)

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                    AMARILLO DIVISION
    UNITED STATES OF AMERICA )(
 3  ex rel. ALEX DOE, Relator)(
                            )(
 4  THE STATE OF TEXAS      )(
    ex rel. ALEX DOE, Relator)(
 5                          )(
    THE STATE OF LOUISIANA  )(
 6  ex rel. ALEX DOE, Relator)(
                            )(
 7  VS.                     )(   CIVIL ACTION NO.:
                            )(   2:21-CV-00022-Z
 8  PLANNED PARENTHOOD      )(
    FEDERATION OF AMERICA,  )(
 9  INC., PLANNED PARENTHOOD )(
    GULF COAST, INC., PLANNED)(
10  PARENTHOOD OF GREATER   )(
    TEXAS, INC., PLANNED    )(
11  PARENTHOOD SOUTH TEXAS, )(
    INC., PLANNED PARENTHOOD )(
12  CAMERON COUNTY, INC.,   )(
    PLANNED PARENTHOOD SAN  )(
13  ANTONIO, INC.           )(
    *******************************************************
14            ORAL AND VIDEOTAPED DEPOSITION OF
                      STUART BOWEN
15                  December 9, 2022
    *******************************************************
16            ORAL AND VIDEOTAPED DEPOSITION OF
17  STUART BOWEN, produced as a witness at the instance of
18  the relators, and duly sworn, was taken in the
19  above-styled and numbered cause on the 9th day of
20  December, 2022, from 9:35 a.m. to 6:54 p.m., before
21  STEPHANIE DAVIS, CSR, in and for the State of Texas,
22  reported by oral stenograph, at 300 West 15th Street,
23  14th Floor, Austin, Texas, pursuant to the Federal
24  Rules of Civil Procedure and the provisions stated on
25  the record or attached herein.
```

Page 111

1      Q.   And, I mean, you agree with me, sir, that an
2  over- -- a provider's entitled to know what an
3  overpayment is and what an overpayment isn't?
4               MR. THOMPSON:  Objection to form.
5      A.   Yes.
6      Q.   And so the places for a provider to look, I
7  think you mentioned the Medicaid Manual.  Do I have
8  that right?
9      A.   Well, it's been six years since I've been
10  involved in this.  So I can't be very specific, but I
11  do regard that guide as an important one for
12  providers.
13     Q.   Fair enough.  And I know, sir, that you're
14  going from memory here.
15     A.   And also, something we haven't talked about
16  very much today, and that is, as I'm sure you know,
17  managed care is name of the game in Texas when it
18  comes to Medicaid.  So when it comes to payments and
19  participation and membership, 95 percent of it is done
20  through managed care organizations rather than, say,
21  20 years ago when it was directly with the state.
22     Q.   Okay.  And not to get into too much of
23  Medicaid minutiae, but I just want to make sure we're
24  all on the same page as to what you're saying, right?
25  So during the time that you were the IG, I believe

Page 112

1   what you're describing, right, is that Medicaid

2   reimbursements would typically flow through managed

3   care organizations 95 percent of the time?

4        A.   The process would pass through it, yes, and

5   the membership management, for example, frequently was

6   through managed care organizations.

7        Q.   Okay.  Did that include -- and I know these

8   may be not quite as much in favor now, but health

9   maintenance organizations, HMOs?

10       A.   I think it's another term for it.

11       Q.   Okay.  And so I believe then -- and I know

12  you're going from recollection, but from the time that

13  you were -- at the time you were IG, you were at about

14  95 percent or so would go through HMOs or other forms

15  of managed care?

16       A.   Over 90.

17       Q.   Over 90.  And I think -- I'm not going to

18  anticipate --

19       A.   Sorry.  I just overspoke again.  So I'm

20  doing it again.

21            THE COURT REPORTER:  That's okay.

22       A.   But I caught myself this time.

23       Q.   And just to pull the thread, Mr. Bowen, is

24  it that there might be guidance from those managed

25  care organizations as to what would constitute an

Page 113

1   overpayment?

2                   MS. ALLEN:  Object to form.

3        A.   Yes.

4        Q.   Okay.  Other sources in terms of -- from

5   your recollection, right, where a provider would look

6   to determine guidance as to what constitutes an

7   overpayment and what doesn't?

8                   MS. ALLEN:  Object to form.

9        A.   I don't -- nothing further comes to mind.

10       Q.   I think something you did mention again just

11  before the break is HHSC itself would be a source of

12  information as to whether or not there has been an

13  overpayment?

14       A.   Yes.

15       Q.   In fact, sir, isn't it true that there are

16  statutory requirements as to when the commission

17  identifies an overpayment, the requirement to give

18  notice to a provider?

19                  MS. ALLEN:  Object to form.

20       A.    To the best of my recollection, yes.

21       Q.   And let's -- and to be fair, again, sir, I

22  mean, I know it's been some time.  Let's look at at

23  least what we understand is the source of that

24  obligation and see if you recognize it.  So I'm going

25  to hand you what's been marked as Bowen Number 3 for

Page 114

1    purposes of the deposition.

2                    (Off the record conversation.)

3         Q.   All right.  So, sir, showing you -- let me

4    identify it for the record.  Excuse me.  All right.

5    So this is -- we're back to the Texas Government Code,

6    Title IV, Executive Branch, Subtitle 1, Health and

7    Human Services, Chapter 531, Health and Human Services

8    Commission.  So Chapter C, "Medicaid and other Health

9    and Human Service Fraud Abuse for Overcharges."  Did I

10   get all that right?

11        A.   Yes.

12        Q.   All right.  And this is the statute you

13   would have been familiar with when you were the IG?

14                    MS. ALLEN:  Object to form.

15        A.   Yes.

16        Q.   Do you recognize it, looking at it?

17        A.   Yes.

18        Q.   All right.  And the statute provides,

19   correct, that, "Either the commission or the Inspector

20   General's Office shall provide a provider with a

21   written notice of any proposed recoupment of an

22   overpayment or debt and any damages or penalties

23   relating to a proposed recoupment overpayment or debt

24   arising out of a fraud or abuse investigation."  Did I

25   get all that right?

Page 115

1          A.   Yes.

2          Q.   Okay.  Now, recoupment, that's just a word

3     for getting the money back, right?

4               MS. ALLEN:  Object to form.

5          A.   Yes.

6          Q.   Okay.  Applying to monies that have been

7     paid out by Medicaid that because of an overpayment

8     are due back from the provider.  Is that a fair

9     definition of recoupment?

10              MS. ALLEN:  Object to form.

11         A.   Yes.

12         Q.   And then notice, there's requirements

13    provided by statute as to what must be included in

14    such a notice, right?

15         A.   Yes.

16         Q.   Okay.  And by the way, just before we move

17    off, we talked a little bit about mandatory terms in

18    the statute earlier, right?  Use of the word "shall"

19    being a mandatory term; do you recall that?

20         A.   I do.

21         Q.   And that this provision includes that

22    mandatory language, correct?

23              MR. THOMPSON:  Objection to form.

24         A.   Yes.

25         Q.   Put another way, it's not discretionary.

Page 116

1  The Inspector General's Office is required by law to

2  provide this notice?

3              MR. THOMPSON:  Same objection.

4       A.   Yes.

5       Q.   Now, the requirements that are laid out are

6  the specific basis for an overpayment or debt, right?

7       A.   Yes.

8       Q.   Okay.  "Description of the facts and

9  supporting evidence," right?

10      A.   Yes.

11      Q.   "A representative sample of any documents

12  that form the basis for the overpayment or debt,"

13  right?

14      A.   Yes.

15      Q.   "The extrapolation methodology."  Did I read

16  that right?

17      A.   Yes.

18      Q.   And we haven't really talked about

19  extrapolation yet.  Maybe we can treat it very quickly

20  here.  Extrapolation, is it fair to say, is when, for

21  example, an investigation is focused on maybe, let's

22  say, a particular set of services or cases from a

23  provider and then extrapolating from that set to a

24  larger universe of claims submitted by that provider?

25              MS. ALLEN:  Object to form.

Page 117

 1        A.    Generally speaking.

 2        Q.    I mean, as a general definition, is that

 3   fair, sir?

 4              MS. ALLEN:  Object to form.

 5        A.    As I recall, extrapolation is a formula

 6   that's applied to a sample of errant billings, and

 7   from that -- because not all of the billings can be

 8   tracked down, a larger number is extrapolated, and

 9   then that's the penalty.

10        Q.    Okay.  And so insofar as a recoupment for an

11   overpayment involves extrapolation, that's -- the

12   methodology for extrapolation is supposed to be

13   included in the notice, right?

14        A.    That's right.

15        Q.    And the next requirement is a -- is a

16   related requirement about extrapolation methodology

17   and how it was used, right?

18              MS. ALLEN:  Object to form.

19        Q.    In (4)(a), sir.

20        A.    Yeah, I'm reading it.  I mean, yes, it's

21   correct.

22        Q.    The next requirement is "A calculation of

23   the overpayment or debt amount," right?

24        A.    Yes.

25        Q.    And just to make that sound simple, sir,

Page 118

1    that's HHSC telling the provider, Here's how much we

2    think you owe us back, right?

3                   MS. ALLEN:   Object to form.

4         A.    Right.

5         Q.    Okay.  And then, "The amount of damages and

6    penalties, if applicable," right?

7         A.    That's right.

8         Q.    Because damages and penalties can

9    theoretically be more than the overpayment itself,

10   right?

11        A.    Yes.

12        Q.    And it's supposed to also include "A

13   description of administrative and judicial due process

14   remedies including a provider's option to seek

15   informal resolution or administrative appeal," right?

16        A.    That's right.

17        Q.    Okay.  And then the statute goes on to talk

18   about informal resolutions.  Do I have that right?

19        A.    That's right.

20        Q.    What's informal resolution?

21        A.    That's a process -- it's a negotiated

22   settlement, process for a negotiated settlement.

23        Q.    So if the provider receives notice of an

24   overpayment, by law they're entitled to request with

25   your former office a discussion over whether or not

Page 119

1    there can be a negotiated resolution to the
2    overpayment?
3                    MR. THOMPSON:  Objection to form.
4         A.   That's right.
5         Q.   Okay.  And this may sound like it's stating
6    the obvious.  If they don't -- if the provider doesn't
7    receive a notice, they can't request an informal
8    discussion about a notice, right?
9                    MR. THOMPSON:  Object to the form.
10        A.   That's right.
11        Q.   Okay.  And to go on from there, the statute
12   refers to an administrative appeal from a recoupment,
13   correct?
14                   MS. ALLEN:  Object to form.
15        Q.   I'll refer you to Number 7, (A)(7), sir.
16        A.   Yes.
17        Q.   All right.  So the statute provides there's
18   actually also a right to seek an administrative appeal
19   hearing separate from informal resolution of a dispute
20   relating to an overpayment.  Do you agree with that?
21                   MS. ALLEN:  Object to form.
22        A.   Yes.
23        Q.   And these are also due process protections,
24   wouldn't you agree, for providers?
25                   MR. THOMPSON:  Objection to form.

Page 120

1      A.   Yes.

2      Q.   So that a provider's not left to guess, for

3   example, what might constitute an overpayment?

4           MS. ALLEN:   Object to form.

5      A.   Yes.

6      Q.   So a provider's not left to guess what the

7   amount of an overpayment might be?

8           MS. ALLEN:   Object to form.

9      A.   Yes.

10     Q.   So that a provider's not left to guess as to

11  how an overpayment's been calculated?

12          MS. ALLEN:   Object to form.

13     A.   Yes.

14     Q.   So that a provider's not left to guess as to

15  what the facts and circumstances underlying the

16  overpayment might be?

17          MS. ALLEN:   Object to form.

18     A.   Yes.

19     Q.   And those are all protections provided by

20  Texas state law to providers, right?

21          MS. ALLEN:   Object to form.

22     A.   That's correct.

23     Q.   Just give me one moment, please.  Now, one

24  of the powers of the inspector general is to terminate

25  a Medicaid provider's provider agreement; is that

Page 122

1    generally recall that terminations could occur for a

2    variety of reasons, conviction of a provider, severe

3    misconduct, fraud, and possibly even waste and abuse,

4    I mean, just depending on the gravity of the conduct.

5         Q.   Okay.  Let me see if I can -- and I know I

6    asked you to do it from memory.  So let me see if I

7    can help by, again, providing you another provision of

8    the code and see if you recognize it.  All right, sir?

9    And this is going to be Bowen Number 4 for the record.

10   So take a look at that, sir, please.

11        A.   Okay.

12        Q.   Does that look familiar to you, sir?

13        A.   Yes.

14        Q.   All right.  So let me -- let me just

15   identify it, though, for the record.  So this is a

16   provision of the Texas Administrative Code, correct?

17        A.   That's correct.

18        Q.   It's from Part 15 relating to the Texas

19   Health and Human Services Commission, right?

20        A.   That's right.

21        Q.   Further Chapter 371 relating to "Medicaid

22   and other Health and Human Services Fraud and Abuse

23   Program Integrity," correct?

24        A.   That's correct.

25        Q.   Further Subchapter (g), "Administrative

Page 123

1    Actions and Sanctions," right?

2        A.   Yes.

3        Q.   And of that, Division 3, "Administrative

4    actions and sanctions."  Did I get that right?

5        A.   Yes.

6        Q.   Okay.  And it's this particular provision,

7    this Section 371.1703, relating to "Termination of

8    enrollment or cancellation of contract."  Did I get

9    that right?

10       A.   Yes.

11       Q.   Okay.  Now, it states in (a) that, "The OIG

12   may terminate the enrollment or cancel the contract of

13   a person by debarment, suspension, revocation, or

14   other deactivation of participation as appropriate."

15   Did I read that right?

16       A.   Yes.

17       Q.   It goes on to also say, "The OIG may

18   terminate or cancel a person's enrollment or contract

19   if it determines that the person committed an act for

20   which a person is subject to administrative actions or

21   sanctions."  Did I read that right?

22       A.   Yes.

23       Q.   Okay.  So, sir, I want to make sure I have

24   your understanding of this provision and how you

25   applied it, not any specific instances at this point,

Page 124

1    but generally with respect to your termination

2    authority.  So you agree the first sentence goes into

3    the various means by which a provider's enrollment in

4    Medicaid can be terminated, right?

5                    MS. ALLEN:  Object to form.

6         A.   Yes.

7         Q.   Different methods, for example, debarment's

8    one, right?  You have to give a verbal answer.  I'm

9    sorry, sir.

10        A.   I'm sorry, yes.  I just thought you were

11   going to run through the list.

12        Q.   Well, I'm just doing them one by one.

13        A.   Okay.

14        Q.   Right?  So debarment, right?

15        A.   Yes.

16        Q.   Suspension, right?

17        A.   Yes.

18        Q.   Revocation, right?

19        A.   Yes.

20        Q.   Or other deactivation of participation,

21   right?

22        A.   Yes.

23        Q.   This provision -- that sentence in and of

24   itself doesn't provide any substantive grounds for

25   termination, but lays out the various types of

Page 125

1    termination.  Would you agree with me on that?

2                    MS. ALLEN:  Object to form.

3         A.   Yes.

4         Q.   And then the second sentence actually does

5    go in, at a high level, into the substance of what

6    type of determination you would have to make when you

7    were the IG in order to terminate a provider's

8    enrollment, right?

9         A.   Right.

10        Q.   Okay.  And there it says that you have to

11   "Make a determination that the person" -- let me stop

12   there.  A "person" here means a provider; is that

13   fair?

14        A.   Yes.

15        Q.   "That the provider committed an act for

16   which a person is subject to administrative actions or

17   sanctions," right?

18                    MR. THOMPSON:  Objection to form.

19        A.   Correct.

20        Q.   Okay.  Now, you yourself were involved in

21   criminal investigation prosecutions.  You testified to

22   that earlier, right?

23        A.   Yes.

24        Q.   Committing an act means actually doing

25   something; wouldn't you agree?

Page 126

1          MS. ALLEN:  Object to form.

2     A.   Yes.

3     Q.   It doesn't include thought crime, right?

4     A.   That's right.

5     Q.   Having bad thoughts is not committing an

6  act, is it?

7     A.   That's correct.

8     Q.   Okay.  A willingness to do something isn't

9  committing an act either; is it, sir?

10          MS. ALLEN:  Object to form.

11    A.   Depends what you mean by "willingness."

12    Q.   Well, sir, let me ask you this:  If I were

13 to tell you, I -- you know what I'm thinking, I might

14 go out and rob a bank.  Think I could be prosecuted

15 for bank robbery?

16          MR. THOMPSON:  Objection to form.

17    A.   No.

18    Q.   Right?  I've expressed a willingness that I

19 might go rob a bank, right?

20          MS. ALLEN:  Object to form.

21    A.   It's one definition of "willingness."

22    Q.   Okay.  But if I don't go out and rob that

23 bank, as far as you know as you sit here, right, I

24 can't be prosecuted for bank robbery, right?

25    A.   That's right.

Page 127

1      Q.   So in what circumstances do you believe,

2   sir, from your time as the IG that willingness to do

3   an act means committing an act?

4               MS. ALLEN:  Object to form.

5      A.   Well, willingness, for example, in a

6   conspiracy-type setting could be -- could be

7   considered criminal.

8      Q.   Conspiracy requires an overt act, right?

9      A.   Yes, but that overt act could be what looks

10   like consent.

11      Q.   Are you saying that -- sir, and I don't want

12   to get too far down a rabbit trail of criminal law,

13   but are you saying that conspiracy just means the

14   words themselves?  Two people agreeing to do something

15   is enough to charge a conspiracy?

16               MS. ALLEN:  Object to form.

17      Q.   Well, you did criminal law.  So I'm just

18   asking.  I want to make -- you brought up conspiracy.

19   I want to make sure I have your definition of it.

20               MS. ALLEN:  Object to form.

21      A.   Well, with some furtherance.

22      Q.   An actual overt act, right?

23      A.   Yes.

24      Q.   And the reason there's an overt act

25   requirement is to prevent thought crime from being

Page 128

1    prosecuted criminally, right?

2                    MS. ALLEN:  Object to form.

3                    MR. THOMPSON:  Object to form.  He's

4    not William Blackstone.

5                    MR. MARGOLIS:  Come on, Counsel.  You

6    know better than that.

7         A.   That's right.

8         Q.   Okay.  All right.  Same thing with attempt,

9    right, sir?  Attempt requires something beyond just

10   mere words of an intention to do a bad act, right?

11                   MS. ALLEN:  Object to form.

12        A.   Yes.

13        Q.   Okay.  Somebody has to actually do something

14   to have committed an act, right?

15                   MS. ALLEN:  Object to form.

16        A.   Yes.

17        Q.   Okay.  So you would agree with me that mere

18   willingness without -- that's not tied to conduct is

19   not committing an act, right?

20        A.   That definition --

21                   MS. ALLEN:  Object to form and object

22   to the extent that you're asking him to make legal

23   conclusions as a legal expert or as a lawyer.

24                   MR. MARGOLIS:  Obviously, Counsel,

25   that's not.  The objection's to form.  Obviously you

Page 129

1    know what I'm asking him.

2        Q.   Sir, you were the IG.  You applied the

3    statute.  I want to know what you understood.  So I

4    want to know whether or not you understood that

5    willingness to do an act not coupled to conduct would

6    constitute committing an act for purposes of 371.1703?

7                    MS. ALLEN:  Object to form.

8        A.   It would require some conduct.

9        Q.   Now, in terms of various grounds, and

10   there's a lot of different ground in here, sir, and

11   I'm not going read you every single provision of this

12   statute, but I do want to at least point us to what I

13   believe at least is the most relevant for the

14   discussion here today, but just to get a framework,

15   right?  From looking at this, there are mandatory

16   grounds for termination, and there are discretionary

17   grounds for termination, right?

18       A.   Correct.

19       Q.   Okay.  Mandatory grounds basically means you

20   have no choice but to terminate, right?

21                    MS. ALLEN:  Object to form.

22       A.   That's right.

23       Q.   Discretionary grounds -- I mean, it sounds

24   like it's stating the obvious, means you have some

25   discretion in whether to terminate or not terminate,

Page 145

1    services are actually being provided by a physician,

2    for example, right?

3              MS. ALLEN:  Object to form.

4         A.    That list does not.

5         Q.    What are accepted healthcare professionals

6    community standards, sir?  Did you understand the term

7    when you were an inspector general?

8         A.    Yes, I mean, they are defined by the

9    community health and services commission -- the Health

10   and Human Services Commission, and they are the

11   standards of appropriate practice, medical practice,

12   healthcare practice, within the respective fields

13   of -- of healthcare practice.

14        Q.    Do you think providers would be -- since

15   they're being held to compliance with those standards,

16   should have fair notice of what they are?

17             MS. ALLEN:  Object to form.

18        A.    Yes.

19        Q.    That's something you believed when you were

20   the inspector general, right?

21             MS. ALLEN:  Object to form.

22        A.    Yes.

23        Q.    Okay.  Where would I, as a provider, go look

24   to find those?

25             MS. ALLEN:  Object to form.

Page 146

1        A.    Those are -- standards of healthcare

2   practices are, I think, established in the community.

3   There's community standards.  There are standards

4   within HHSC.  There are professional standards,

5   practice standards by professional organizations.

6   There are a variety of sources.

7        Q.    Let's just, for a moment, sir, analogize it

8   to legal practice.  You know, as a lawyer, for

9   example, there are treatises that I can go look at to

10  try to determine what the standard of care is for a

11  lawyer.  Do you agree with that?

12       A.    Uh-huh.

13       Q.    You have to give me a verbal.  I'm sorry.

14       A.    Yes, yes.

15       Q.    Sorry, sir.  And I'm not trying to get under

16  your skin.  Just so you know that I have to do that.

17            There are restatements of the law, for

18  example, relating to lawyers that I can go look to as

19  a guide for how lawyers -- what the standard of care

20  is for legal services, right?

21       A.    That's correct.

22       Q.    Do you know if there's any such standards

23  that I can look for as a medical provider?

24                 MS. ALLEN:  Object to form.

25       A.    I'm no expert on how healthcare standards

Page 147

```
1   are established.
2       Q.   So when it says, "Community standards," what
3   community?
4               MS. ALLEN:  Object to form.
5       A.   The community -- the healthcare practices,
6   the healthcare practices of the respective
7   communities.
8       Q.   Yeah, but -- and I'm not trying to give you
9   a hard time, sir.  I just have to make sure I
10  understand, right?  I mean, we talked a little bit
11  before about circular definitions.  So I think I asked
12  you what community it is, and you said "Healthcare
13  practice communities."  So how do I define what the
14  community is?
15              MS. ALLEN:  Object to form.  Asked and
16  answered.
17              MR. MARGOLIS:  I don't think so,
18  Counsel.  That's what I'm trying to get is an answer.
19      Q.   How do I know what the community is?
20              MS. ALLEN:  Object to form.
21      A.   Well, there are established practices in
22  respective professions regarding certification, for
23  example, board certification in every medical
24  profession, just as there are in the legal profession,
25  and those practices are standardized through those
```

Page 171

1   mean Medicaid covered services or other --

2          A.    Yeah.

3          Q.    -- medical services?

4          A.    Yeah, the services --

5                MS. ALLEN:  Object to form.

6          A.    Sorry.  The services provided under

7   Medicaid.

8          Q.    Okay.  So what types of services did Planned

9   Parenthood provide under Medicaid?

10               MS. ALLEN:  Object to form.

11         A.    I don't -- I don't have a full list of

12  what -- what they provided, but -- but the issue was

13  here was their violation of accepted medical standards

14  as revealed by the videos, specifically regarding

15  fetal tissue procurement.

16         Q.    Is fetal tissue procurement a covered

17  service under Medicaid?

18               MS. ALLEN:  Object to form.

19         A.    No.

20         Q.    Are abortion services covered services under

21  Medicaid?

22               MR. THOMPSON:  Object to the form.

23         A.    No.

24         Q.    In fact, under federal law, they're

25  specifically excluded unless the health or life of the

Page 172

1    mother is affected at the time?

2         A.   That's correct.

3              MS. ALLEN:   Object to form.

4         Q.   It's something called the Hyde Amendment,

5    right?

6         A.   Yes.

7         Q.   In fact, the -- well, sorry.  Can you take

8    back out the Texas Medicaid Provider Procedures

9    Manual?

10        A.   Yes.

11        Q.   And I'm sorry, sir, I don't have the exhibit

12   number right there.  Do you have that?

13        A.   It's Exhibit 5.

14        Q.   Okay.  And I'm going to hope, but I could be

15   wrong, that this section is included.  You recall

16   earlier we were talking about some of the handbooks,

17   correct, in Volume 2?

18             MS. ALLEN:   Object to form.

19        A.   Did you say some of the handbooks?

20        Q.   Correct.

21        A.   Yes.

22        Q.   Okay.  Give me one second.  Sorry about the

23   paper shuffling on our side of the table here.

24             All right.  Do you have before you -- I just

25   want to make sure.  I don't know whether I have to

Page 179

1   get that right?

2          A.   Yes.

3          Q.   Okay.  And so what you found is that these

4   affiliates weren't qualified to provide Medicaid

5   covered services in a professionally competent, safe,

6   legal, and ethical manner; is that right?

7                    MS. ALLEN:  Object to form.  Asked and

8   answered.

9          A.   Yes.

10         Q.   Okay.  But your review of that was based on

11  procedures that were performed that were not covered

12  by Medicaid?

13                   MS. ALLEN:  Object to form.

14         Q.   Right?

15         A.   Yes, but were violative of state and federal

16  law.

17         Q.   Okay.  We'll get there.  I promise.  I just

18  want to make sure we're going in order here, right?

19  You made a determination that these affiliates weren't

20  competent to provide in a safe, legal, and ethical

21  manner Medicaid covered services based on a review of

22  services that are not covered by Medicaid?

23                   MS. ALLEN:  Object to form.

24         Q.   Is that right?

25         A.   What I found was that their practice of

Page 210

1          A.    I did not.

2          Q.    Okay.  And in (7), "Intentional,

3     premeditated, knowing, or grossly negligent act

4     constituting a violation."  Did I read that right?

5          A.    Yes.

6          Q.    Okay.  And so you concluded that Planned

7     Parenthood -- the Planned Parenthood -- let me be

8     clear.  Let me be clearer.  There are three

9     affiliates -- sorry, yeah, three Planned Parenthood

10    affiliates that are excluded in your letter, right?

11                   MS. ALLEN:  Object to form.

12         A.    That's right.

13         Q.    PPGC, correct?

14         A.    That's right.

15         Q.    PPST, correct?

16         A.    That's correct.

17         Q.    And PPGT, correct?

18         A.    That's correct.

19         Q.    All right.  The video only relates to PPGC,

20    correct?

21                   MR. THOMPSON:  Objection to form.

22         A.    Yes.

23         Q.    PPST and PPGT, you terminated based on your

24    decision that they were affiliated with PPGC?

25         A.    That's correct.

Page 211

1            MS. ALLEN:  Object to form.

2     Q.   You had no evidence that PPST in and of

3  itself did anything wrong, right?

4            MS. ALLEN:  Object to form.

5     A.   We have no videos from either of the other

6  affiliates.

7     Q.   Right, but that wasn't my question, sir.  I

8  asked you about evidence.  So now I'm going to ask

9  you:  Did you rely on any evidence, in your letter,

10  testified to at the hearing, of anything that PPST did

11  wrong?

12            MS. ALLEN:  Object to form.

13     A.   Other than the affiliate connection, no.

14     Q.   So what they did wrong is they were

15  affiliated with PPGC?

16            MS. ALLEN:  Object to form.

17     A.   That they shared those policies and

18  practices.

19     Q.   Well, now I'm confused, sir.  The practice,

20  you said, was altering abortions for fetal tissue

21  studies.

22     A.   Yes.

23     Q.   So you're saying that PPGT altered abortions

24  for studies?

25            MS. HACKER:  Object to form.

Page 243

```
 1              MR. THOMPSON:  Object to form.
 2       A.   It's one of nine indicia.  I didn't base it
 3    on this one alone.
 4       Q.   Okay.  Not a very strong indicia, would you
 5    agree with me, sir?
 6              MR. THOMPSON:  Objection to form.
 7       A.   I'm not going to rank order which are my
 8    strongest and weakest in this list, but I think
 9    collectively they support affiliation.
10       Q.   Let's talk about what a termination means.
11       A.   Yes.
12       Q.   Yeah.  The next letter, part of the scope of
13    termination, what a termination actually means, right?
14       A.   Yes.
15       Q.   Okay.  Once a termination becomes final,
16    sir, right?
17       A.   Yes.
18       Q.   That that provider cannot seek reimbursement
19    from the Medicaid program for Medicaid-covered
20    services; would you agree?
21              MS. ALLEN:  Object to form.
22       A.   Yes.
23       Q.   Once a termination becomes final, a provider
24    is required to reenroll the ones who participate in
25    Medicaid, right?
```

Page 244

1      A.   That's correct.

2      Q.   And then a termination, once it becomes

3  final, remains in effect until re-enrollment and

4  approval, right?

5              MS. ALLEN:   Object to form.

6      A.   That's correct.

7      Q.   As you sit here today, sir, you can't think

8  of any circumstances under which -- can you -- any

9  statutory or regulatory authority once a termination

10  becomes final to allow a provider to continue to

11  provide Medicaid-covered services and to be reimbursed

12  for them?

13              MR. THOMPSON:   Object to form.

14      Q.   Can you?

15      A.   I -- I -- I cannot.

16      Q.   All right.   Let's look at Congresswoman

17  Blackburn's letter.   So this is Bowen Number 15, sir.

18  This is the letter that you relied upon, in part, for

19  the termination, right?

20      A.   That's correct.

21      Q.   Okay.   For what did you rely upon it?   For

22  what purpose?   Other- -- speci- -- more specifically

23  than the termination generally?

24      A.   It buttressed what was revealed in the

25  videos regarding the practice of fetal tissue

Page 285

1          Q.   Dr. Spears didn't interview anybody either,

2     right?  Dr. Spears didn't interview anybody either,

3     right?

4          A.   No.

5          Q.   Okay.  And as you testified at the hearing,

6     you couldn't name a single doctor who had actually

7     altered an abortion procedure in order to obtain fetal

8     tissue, right?

9               MS. HACKER:  Object to form.

10         A.   That's right.

11         Q.   You can't name a single patient where that

12    happened, right?

13              MS. ALLEN:  Object to form.

14         A.   That's right.

15         Q.   Single date of service where that actually

16    happened, right?

17              MS. ALLEN:  Object to form.

18         A.   That's right.

19         Q.   Okay.  Nothing on the video where an

20    abortion procedure is actually being performed, right?

21         A.   That's correct.

22         Q.   On the video though, they show, right -- you

23    know, this -- I know this is somewhat graphic, I

24    understand that, but they show products of conception

25    after an abortion, right?

Page 288

1    if you'll turn, in the hearing, to line 5 of page 50:

2              "What investigations did your office do of

3    the Planned Parenthood entities that you sent the

4    letter to?"  Did I get that right?

5         A.   Yes.

6         Q.   That's an open-ended question, right?

7         A.   Yes.

8         Q.   And then you answer:

9              "We engaged in a number of activities that

10   included the collection of documents.  We also engaged

11   in forensic investigations of billing practices and

12   records.  And we also reviewed the video."

13             Right?

14        A.   Yes.

15        Q.   That's the investigation that you and your

16   office conducted, right?

17        A.   Yes.

18        Q.   Okay.  The termination was not based on a

19   forensic investigation of billing practices and

20   records, right?

21                  MS. HACKER:  Object to form.

22        A.   I'm sorry, ask again?

23        Q.   The terminations of Planned Parenthood was

24   not based on forensic investigation of billing

25   practices and records, correct?

Page 289

1      A.   That's correct.

2                MS. ALLEN:   Object to form.

3      Q.   Okay.  It wasn't based on any documents that

4    were collected either, right?

5                MS. ALLEN:   Object to form.

6      A.   That's correct.

7      Q.   It's just based on the video, right?

8                MS. ALLEN:   Object to form.

9      A.   And Dr. Spears' review of it.

10     Q.   Okay.  And I suppose, to be fair, the letter

11   from Congresswoman Blackburn that we all -- we just

12   talked about?

13     A.   Yes.  Yes.

14     Q.   That's it, right?

15               MS. ALLEN:   Object to form.

16     A.   Yes.

17     Q.   I believe it's your understanding that

18   Ms. Farrell made a series of statements.  I believe it

19   was you who put it that purports to establish a policy

20   of altering procedures in order to obtain fetal tissue

21   for studies?

22     A.   Yes.

23     Q.   Okay.  And beyond the fact that she had the

24   title of director of research, do you know what basis

25   she would have to make that statement?

```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                         AUSTIN DIVISION

 3  PLANNED PARENTHOOD OF GREATER     ) Docket No. A 15-CA-1058 SS
    TEXAS FAMILY PLANNING AND         )
 4  PREVENTATIVE HEALTH SERVICES,     )
    INC., ET AL                       )
 5                                    )
    vs.                               ) Austin, Texas
 6                                    )
    CHARLES SMITH, EXECUTIVE          )
 7  COMMISSIONER, TEXAS HEALTH AND    )
    HUMAN SERVICES COMMISSION, ET AL ) January 18, 2017

 8

 9                   TRANSCRIPT OF MOTION HEARING
                    BEFORE THE HONORABLE SAM SPARKS
10                        Volume 2 of 3

11  APPEARANCES:

12  For the Plaintiff:        Mr. Roger K. Evans
                              Ms. Maithreyi Ratakonda
13                            Ms. Jennifer Sandman
                              Planned Parenthood Federation
14                            Of America
                              Public Policy Litigation & Law
15                            123 William Street, Ninth Floor
                              New York, New York 10038
16
                              Ms. Alice Clapman
17                            Planned Parenthood Federation
                              Of America
18                            1110 Vermont Avenue, N.W., Suite 300
                              Washington, D.C. 20005
19
                              Mr. Thomas H. Watkins
20                            Husch Blackwell
                              111 Congress Avenue, Suite 1400
21                            Austin, Texas 78701

22  For the Defendant:        Mr. Adam A. Biggs
                              Mr. Andrew B. Stephens
23                            Mr. Patrick K. Sweeten
                              Office of the Attorney General
24                            Of Texas
                              300 West 15th Street, 9th Floor
25                            Austin, Texas 78701
```

1  **(Appearances Continued:)**

2  Court Reporter:              Ms. Lily Iva Reznik, CRR, RMR
                                501 West 5th Street, Suite 4153
3                               Austin, Texas 78701
                                (512)391-8792

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Proceedings reported by computerized stenography, transcript
    produced by computer.

6

| 09:03:17 | 1 | THE WITNESS:  Stuart Waddington Bowen, Jr., B-O-W-E-N. |

09:03:17   1          THE WITNESS:  Stuart Waddington Bowen, Jr., B-O-W-E-N.

09:03:22   2   And it's S-T-U-A-R-T.

09:03:24   3          THE COURT:  You may proceed.

09:03:25   4      STUART W. BOWEN, JR., called by the Defendant, duly sworn.

09:03:25   5                      DIRECT EXAMINATION

09:03:25   6   BY MR. STEPHENS:

09:03:26   7   Q.   Mr. Bowen, good morning.

09:03:28   8   A.   Good morning.

09:03:28   9   Q.   Where are you currently employed?

09:03:30  10   A.   The Texas Health and Human Services Commission.

09:03:32  11   Q.   And what is your position at the Texas Health and Human

09:03:35  12   Services Commission?

09:03:36  13   A.   Inspector General.

09:03:37  14   Q.   And the Office of the Inspector General is part of the Texas

09:03:42  15   Health and Human Services Commission, right?

09:03:44  16   A.   It is.

09:03:45  17   Q.   Could you briefly describe for the Court your work

09:03:50  18   experience prior to becoming the Inspector General?

09:03:53  19   A.   Yes.  I came to Texas in 1984, for the first time, to become

09:03:59  20   an Air Force officer.  I left Vanderbilt Law School after a year,

09:04:03  21   and then, after training at Lackland, went to Lowry Air Force

09:04:08  22   Base where I was trained as an intelligence officer, and then,

09:04:11  23   spent three years in the Federal Republic of Germany as an

09:04:15  24   indications warning officer, and then, leading NATO's air defense

09:04:18  25   analysis cell.  And then, came back to Texas, back to San Antonio

09:04:22  1   and finished law school at St. Mary's.  Came to Austin to clerk

09:04:27  2   for Raul -- Justice Raul Gonzalez on the Texas Supreme Court.

09:04:31  3   Then spent a little over two-and-a-half years as an assistant

09:04:34  4   attorney general of Texas in administrative law litigation.  And

09:04:38  5   then, six years for Governor Bush on his legal staff, two years

09:04:42  6   in the White House as special assistant, and then, deputy

09:04:46  7   assistant, deputy staff secretary, and then, ten years as the

09:04:49  8   special inspector general for Iraq reconstruction.

09:04:53  9        THE COURT:  Are you pulling your hair, Lily?

09:04:58  10       COURT REPORTER:  Yes, sir.

09:05:00  11       MR. STEPHENS:  A little slower.

09:05:01  12       THE COURT:  This in law means slower.

09:05:04  13       THE WITNESS:  I'm sorry.  I thought you meant shorten

09:05:06  14   it.  I'll slow down.

09:05:07  15   A.   And then, since concluding my time in Iraq, I've -- I spent

09:05:13  16   a year as consulting on Iraq with the U.S. Chamber and that

09:05:16  17   Center for Strategic and International Studies.  And then, in

09:05:20  18   February of 2015, I was appointed by Governor Abbott as Inspector

09:05:27  19   General.

09:05:28  20   Q.   (BY MR. STEPHENS) Mr. Bowen, you've been the Inspector

09:05:31  21   General for approximately 22 months?

09:05:33  22   A.   That's right.

09:05:33  23   Q.   What is the mission of the Inspector General's Office?

09:05:37  24   A.   Provided by statute.  Our job is to root out fraud, waste

09:05:42  25   and abuse through audits, inspections and investigations of all

09:05:49   1   of the funds appropriated, federal and state, for the delivery of

09:05:54   2   health and human services in the state of Texas.

09:05:58   3   Q.   And what is the IG's role with respect to Texas Medicaid?

09:06:04   4   A.   It's a very integral role.  I work very closely with the

09:06:08   5   executive commissioner, Charles Smith, and the entire Medicaid

09:06:14   6   CHIP division, the state Medicaid director, in coordinating on

09:06:20   7   our oversight work.  The executive commissioner is strongly

09:06:25   8   committed to transparency and accountability in the delivery of

09:06:29   9   health and human services in the state of Texas.

09:06:32   10          THE COURT:  Let's stay on track.  Let's have question

09:06:35   11   and answer.

09:06:36   12          THE WITNESS:  Yes, sir.

09:06:37   13          THE COURT:  Any editorial is --

09:06:40   14          THE WITNESS:  Yes, sir.

09:06:40   15          THE COURT:  -- going to get on my nerves.  Okay.

09:06:43   16          THE WITNESS:  Understood.

09:06:44   17   Q.   (BY MR. STEPHENS) Mr. Bowen, do you know what approximately

09:06:47   18   Texas Medicaid budget is?

09:06:49   19   A.   A little over 30 billion.

09:06:51   20   Q.   And do you know how many people are served by Texas

09:06:53   21   Medicaid?

09:06:54   22   A.   About 4.3 million.

09:06:57   23   Q.   And do you know approximately the amount of Medicaid funds

09:07:00   24   paid to Planned Parenthood in 2016?

09:07:03   25   A.   About 3.4 million.

| | | |
|---|---|---|
| 09:07:07 | 1 | Q.   How is the IG's responsibilities with respect to |
| 09:07:10 | 2 | investigating fraud, waste and abuse relate to Texas Medicaid? |
| 09:07:16 | 3 | A.   They relate to Texas -- |
| 09:07:17 | 4 | THE COURT:  Before you answer that question, the 3.4 |
| 09:07:21 | 5 | million paid out of the Medicare -- Texas Medicare budget, to |
| 09:07:28 | 6 | whom is it paid?  Is it paid to individual clinics that show |
| 09:07:34 | 7 | reimbursement?  Or is it paid -- how is it paid, do you know? |
| 09:07:39 | 8 | THE WITNESS:  It is paid through contractual agreements |
| 09:07:43 | 9 | with providers, and pursuant to those agreements, the funds are |
| 09:07:49 | 10 | as you've said, serve as a reimbursement for services delivered. |
| 09:07:54 | 11 | THE COURT:  But how does it -- who makes the agreement? |
| 09:07:58 | 12 | I've been educated to some degree in this case that one entity |
| 09:08:06 | 13 | could have -- let's take Houston, for example.  It runs eight |
| 09:08:12 | 14 | separate clinics in the Houston area.  I'm not even sure what |
| 09:08:16 | 15 | that is yet.  But does each clinic make a claim for the Medicaid |
| 09:08:24 | 16 | reimbursement that that clinic has? |
| 09:08:27 | 17 | THE WITNESS:  It's actually driven by the member.  The |
| 09:08:30 | 18 | member in Medicaid can choose where they would like to have |
| 09:08:34 | 19 | services delivered, and they can choose among enrolled Medicaid |
| 09:08:38 | 20 | providers, and then, pursuant to that engagement, the billing |
| 09:08:45 | 21 | goes to the state and then, it's paid that way. |
| 09:08:50 | 22 | THE COURT:  Okay.  Let's ask it this way.  Let's say |
| 09:08:55 | 23 | I'm a person eligible for Medicaid and I go to the clinic in El |
| 09:09:06 | 24 | Paso, and I choose to go there because I live there, okay?  And |
| 09:09:13 | 25 | then, the El Paso clinic provides the services and makes the |

09:09:19  1  request or claim for reimbursement.  Rather than the company --

09:09:30  2  the Planned Parenthood entity that has eight places, seven others

09:09:39  3  outside of El Paso.  I'm trying to figure out who makes the

09:09:42  4  claim.  Would it be the clinic wherein the services were

09:09:45  5  delivered by the person that chose to go there, or do you know?

09:09:48  6          THE WITNESS:  Yeah.  It's through a Texas provider

09:09:52  7  number, and that is sort of the billing number like two --

09:09:57  8          THE COURT:  So it would go through --

09:09:59  9          THE WITNESS:  Through the provider --

09:10:00  10         THE COURT:  -- the clinic that provided the service.

09:10:02  11         THE WITNESS:  That's right.

09:10:03  12         THE COURT:  Thank you.  Sorry for the interruption.

09:10:07  13 Q.  (BY MR. STEPHENS) Mr. Bowen, I'd like to show you a copy of

09:10:09  14 Defendants' Exhibit 21, which was previously admitted into

09:10:12  15 evidence.  Can you see it on the screen?

09:10:20  16 A.  I can't see it on the screen.  It's -- I could see the

09:10:26  17 title.

09:10:28  18 Q.  Mr. Bowen, are you familiar with this document?

09:10:31  19 A.  Yes.

09:10:31  20 Q.  And could you describe to the Court what this document is?

09:10:35  21 A.  It is just what we were talking about, a provider agreement.

09:10:40  22 Q.  And who is the provider agreement between?

09:10:43  23 A.  Planned Parenthood Gulf Coast and state of Texas.

09:10:50  24 Q.  Okay.  Does the Medicaid provider agreement set forthh the

09:10:54  25 duties of the -- of the Texas Medicaid provider?

| | | |
|---|---|---|
| 09:10:57 | 1 | A.   It does. |
| 09:10:59 | 2 | Q.   Brian, could you zoom in on Section 1? |
| 09:11:06 | 3 | Mr. Bowen, in Section I, are the responsibilities and |
| 09:11:10 | 4 | duties of the provider set forthh under this agreement? |
| 09:11:13 | 5 | A.   They are. |
| 09:11:15 | 6 | Q.   And what are the obligations of the provider under a Texas |
| 09:11:18 | 7 | Medicaid provider agreement? |
| 09:11:21 | 8 | A.   To comply with all of the standards, rules, statutes |
| 09:11:27 | 9 | contained within federal and state law as well as the Medicaid |
| 09:11:31 | 10 | provider procedures manual. |
| 09:11:35 | 11 | Q.   And does the provider agreement -- the Medicaid provider |
| 09:11:38 | 12 | agreement set forth the actions or circumstances by which the |
| 09:11:43 | 13 | agreement may be terminated? |
| 09:11:44 | 14 | A.   It does. |
| 09:11:46 | 15 | Q.   Brian, could you go to Section 6.1?  And are those actions |
| 09:11:53 | 16 | or circumstances set forth in Section 6.1? |
| 09:11:56 | 17 | A.   They are. |
| 09:11:57 | 18 | Q.   And could you describe those circumstances for the Court in |
| 09:12:00 | 19 | which the agreement may be terminated? |
| 09:12:03 | 20 | A.   Yes.  Violation of -- a program violation which is |
| 09:12:07 | 21 | tantamount to a violation of the rules standards in the federal |
| 09:12:11 | 22 | and state Medicaid laws as well as the Medicaid provider |
| 09:12:16 | 23 | agreements and Medicaid provider manual. |
| 09:12:21 | 24 | Q.   Did each of the Planned Parenthood providers involved in |
| 09:12:23 | 25 | this lawsuit enter into a Medicaid provider agreement with the |

09:12:26  1  terms we just reviewed?

09:12:28  2  A.    They did.

09:12:31  3  Q.    Brian, could you bring up Defendants' Exhibit 20, which is

09:12:36  4  also previously admitted?

09:12:37  5        Mr. Bowen, are you familiar with this document?

09:12:39  6  A.    I am.

09:12:40  7  Q.    Could you describe this document for the Court?

09:12:43  8  A.    This is the cover of the Texas Medicaid Provider Procedures

09:12:48  9  Manual.

09:12:50  10  Q.    And does the Texas Medicaid Providers Manual provide

09:12:54  11  additional guidance regarding the rules that apply to Texas

09:12:57  12  Medicaid providers?

09:12:59  13  A.    It does.

09:13:04  14  Q.    And does it also provide additional guidance regarding those

09:13:08  15  rules and how they apply to providers?

09:13:10  16  A.    Yes.

09:13:11  17  Q.    Brian, could you go to Section 1, the italicized language?

09:13:18  18        Mr. Bowen, are you familiar with this section of the

09:13:21  19  Texas Medicaid Providers Manual?

09:13:22  20  A.    I am.

09:13:25  21  Q.    And could you describe how it sets forth the rules and

09:13:29  22  require -- that are required for compliance with Texas Medicaid?

09:13:32  23  A.    Yes.  It specifies and refers to the Texas Administrative

09:13:37  24  Code sanctions language relevant to my oversight work that

09:13:44  25  requires providers to comply with all that's laid out in this

09:13:50  1  manual with regard to the delivery of healthcare services through

09:13:56  2  the Texas Medicaid program.

09:13:58  3  Q.   Does it also require compliance with accepted medical

09:14:01  4  community standards?

09:14:02  5  A.   It does.

09:14:07  6  Q.   Mr. Bowen, does the IG have statutory authority to take

09:14:11  7  enforcement measures against Texas Medicaid providers?

09:14:14  8  A.   We do.

09:14:16  9  Q.   Okay.  Could you describe the IG's -- describe generally the

09:14:21  10  IG's statutory authority for enforcement measures against

09:14:24  11  providers?

09:14:24  12  A.   Yes.  We have the authority to engage in audits,

09:14:32  13  investigations and inspections with regard to all funds delivered

09:14:37  14  for -- with the support of delivery of health and human services

09:14:42  15  in the state of Texas and pursuant to that, we carry out a

09:14:48  16  variety of oversight activities.

09:14:51  17  Q.   Brian, could you bring up Defendants' Exhibit 11, which is

09:14:54  18  previously admitted into evidence?

09:14:56  19       Mr. Bowen, are you familiar with Section 371.1603 of

09:15:02  20  the Texas Administrative Code?

09:15:03  21  A.   Yes, I am.

09:15:04  22  Q.   And does this provision authorize the IG to take enforcement

09:15:08  23  measures, or an affiliate of a provider, based on an

09:15:11  24  investigation or finding?

09:15:13  25  A.   It does.

09:15:15   1   Q.   Brian, could you bring up Defendants' Exhibit 5?

09:15:22   2        Mr. Bowen, are you familiar with this Section 371.1703

09:15:28   3   of the Texas Administrative Code?

09:15:29   4   A.   Yes, I am.

09:15:30   5   Q.   And does this section give the IG authority to remove or

09:15:36   6   dis-enroll a Texas Medicaid provider?

09:15:37   7   A.   It does.

09:15:40   8   Q.   Brian, could you bring up Defendants' Exhibit 5, which was

09:15:45   9   also previously admitted into evidence?  Sorry, we have that up,

09:15:50  10   so let's scroll down to Section C6.

09:15:55  11        Mr. Bowen, does this section also provide the

09:16:01  12   circumstances under which the IG is authorized to terminate the

09:16:05  13   enrollment of a provider?

09:16:06  14   A.   Yes, it does.

09:16:07  15   Q.   Okay.

09:16:08  16        THE COURT:  I don't want to interrupt you making a

09:16:09  17   record, but I don't think there's an issue that the state cannot

09:16:20  18   withdraw a provider.  I mean, that's pretty first-grade law.

09:16:29  19   It's the reasons for it and, you know, you're just spinning your

09:16:34  20   wheels.  I know, I will assume everybody in the audience knows,

09:16:40  21   that the state can un-enroll a provider.

09:16:42  22        MR. STEPHENS:  This is my last question on the

09:16:44  23   statutory.

09:16:44  24        THE COURT:  That just shows you how slow I'm getting in

09:16:47  25   any old age.  Go ahead.

| | | |
|---|---|---|
| 09:16:49 | 1 | MR. STEPHENS:  I'll move quickly with the last |
| 09:16:51 | 2 | question. |
| 09:16:52 | 3 | Q.   (BY MR. STEPHENS) A Medicaid provider can be -- enrollment |
| 09:16:55 | 4 | could be terminated for a program violation; is that right? |
| 09:16:58 | 5 | A.   Yes. |
| 09:16:58 | 6 | Q.   And a Medicaid provider could also be terminated if the |
| 09:17:03 | 7 | provider commits an act to which sanctions, damages, penalties or |
| 09:17:07 | 8 | liability could be assessed. |
| 09:17:07 | 9 | A.   That's right. |
| 09:17:12 | 10 | Q.   Is Planned Parenthood a Texas Medicaid provider? |
| 09:17:15 | 11 | A.   Yes. |
| 09:17:15 | 12 | Q.   And in carrying out the IG's mission, did you conduct a |
| 09:17:19 | 13 | review of Planned Parenthood's activities? |
| 09:17:21 | 14 | A.   I did. |
| 09:17:21 | 15 | Q.   Could you describe generally the IG's review of Planned |
| 09:17:27 | 16 | Parenthood's activities? |
| 09:17:27 | 17 | A.   Yes.  In the summer of 2015, late summer, I was reviewing |
| 09:17:35 | 18 | some outstanding audit findings regarding Planned Parenthood. |
| 09:17:41 | 19 | MR. WATKINS:  Your Honor, we object.  There a number of |
| 09:17:43 | 20 | Planned Parenthood entities, and I can't tell which one he's |
| 09:17:45 | 21 | talking about.  He can't just talk about Planned Parenthood.  He |
| 09:17:47 | 22 | needs to talk about one of those ID numbers that he's supposed to |
| 09:17:51 | 23 | be investigating.  So we object to this. |
| 09:17:52 | 24 | THE COURT:  So you're objection is what? |
| 09:17:54 | 25 | MR. WATKINS:  That he has not identified who the |

09:17:56   1   witness is testifying about.

09:17:58   2              THE COURT:  I sustain that.  You may do that.

09:18:00   3   Q.   (BY MR. STEPHENS) Okay.  Mr. Bowen, could you describe, did

09:18:03   4   the IG conduct a review of Planned Parenthood Gulf Coast?

09:18:06   5   A.   Yes.

09:18:07   6   Q.   And did the IG conduct a review of Planned Parenthood

09:18:11   7   Greater Texas?

09:18:12   8   A.   Yes, we did.

09:18:12   9   Q.   And did the IG conduct a review of Planned Parenthood South

09:18:17   10  Texas?

09:18:17   11  A.   Yes, we did.

09:18:18   12  Q.   Okay.  Could you describe for the Court the substance

09:18:22   13  generally of those reviews?

09:18:23   14  A.   Well, regarding those three, there were outstanding audit

09:18:27   15  findings that had been accomplished, and I was in the process of

09:18:29   16  reviewing them and pursuing -- reopening them when the evidence,

09:18:41   17  specifically, a videotape, the evidence in this case, a videotape

09:18:45   18  of the demonstrated -- that was evidence of program violations

09:18:49   19  came into the possession of the agency.

09:18:51   20  Q.   And did you -- has the IG reviewed that video?

09:18:56   21  A.   Yes, with my legal staff and -- yes, we did.

09:19:03   22  Q.   And what was the result of the IG's review of the video and

09:19:08   23  Planned Parenthood's activities?

09:19:09   24  A.   We concluded that the evidence contained in that --

09:19:13   25              MR. WATKINS:  Objection, your Honor.  I can't tell

| | | |
|---|---|---|
| 09:19:14 | 1 | which Planned Parenthood he's talking about.  They don't get to |
| 09:19:17 | 2 | just lump them all together.  Some people are on the video and |
| 09:19:20 | 3 | some aren't.  I need to know which Planned Parenthood entity he |
| 09:19:23 | 4 | is reviewing and auditing and trying to testify about. |
| 09:19:26 | 5 | THE COURT:  And I would like to know which tape you're |
| 09:19:31 | 6 | talking about.  Are you talking about the eight-hour tape? |
| 09:19:34 | 7 | THE WITNESS:  Yes, sir. |
| 09:19:35 | 8 | THE COURT:  That answers one question.  So if you're |
| 09:19:42 | 9 | talking about the audit, I want you to specify which entity.  As |
| 09:19:49 | 10 | far as the video's concerned, I'll let you testify, of course, |
| 09:19:57 | 11 | what you saw, what you did. |
| 09:19:59 | 12 | THE WITNESS:  Yes, sir. |
| 09:20:00 | 13 | THE COURT:  All right. |
| 09:20:00 | 14 | A.   I'm not addressing the audit at all now.  I'm just |
| 09:20:03 | 15 | addressing the video and in that video, as we know, it involves |
| 09:20:08 | 16 | Planned Parenthood Gulf Coast. |
| 09:20:20 | 17 | Q.   (BY MR. STEPHENS) Mr. Bowen, did you issue a final notice of |
| 09:20:23 | 18 | termination to -- terminating Planned Parenthood Gulf Coast's |
| 09:20:28 | 19 | enrollment in Texas Medicaid? |
| 09:20:29 | 20 | A.   I did. |
| 09:20:30 | 21 | Q.   And did you issue a final notice of termination, terminating |
| 09:20:34 | 22 | Planned Parenthood Greater Texas' enrollment in Texas Medicaid? |
| 09:20:38 | 23 | A.   I did. |
| 09:20:38 | 24 | Q.   And did you issue a final notice of termination, terminating |
| 09:20:41 | 25 | Planned Parenthood South Texas' enrollment in Texas Medicaid? |

09:20:44   1   A.    I did.

09:20:46   2   Q.    Brian, could you bring up a copy of Defendants' Exhibit 1?

09:20:49   3             THE COURT:  Okay.  Before you go, go back and give me

09:20:53   4   that list, Lily.  I got the last two.

09:20:53   5             COURT REPORTER:  Planned Parenthood Gulf Coast, Planned

09:21:16   6   Parenthood Greater Texas, and then, South Texas.

09:21:16   7             THE COURT:  You may proceed.

09:21:18   8   Q.    (BY MR. STEPHENS) Mr. Bowen, did you issue this final notice

09:21:22   9   of termination on December 20th, 2016?

09:21:23   10  A.    I did.

09:21:24   11  Q.    Does the final notice of termination at Defendants' Exhibit

09:21:26   12  1 set forth the basis for your decision to terminate these

09:21:31   13  entities from Texas Medicaid?

09:21:33   14  A.    It does.

09:21:33   15  Q.    Brian, could you go to page 2, I believe the second

09:21:40   16  paragraph?  Sorry, the second full paragraph.  The one below

09:21:47   17  that.

09:21:51   18            THE COURT:  If it helps you, counsel, I've got it right

09:21:53   19  here, and I read it at least six times.

09:21:57   20            MR. STEPHENS:  Okay.

09:21:57   21            THE COURT:  As a matter of fact, if you'll notice, I've

09:21:59   22  underlined a lot of it.  And I only say that to help you on time.

09:22:07   23  Okay.

09:22:09   24  Q.    (BY MR. STEPHENS) Mr. Bowen, in the letter -- in the

09:22:12   25  paragraph highlighted from this letter, you indicate that you

| 09:22:15 | 1 | relied on the video; is that correct? |
| 09:22:17 | 2 | A.   That's right. |
| 09:22:18 | 3 | Q.   And you also indicate that you consulted with the IG's Chief |
| 09:22:22 | 4 | Medical Officer; is that right? |
| 09:22:24 | 5 | A.   That's correct. |
| 09:22:27 | 6 | Q.   Who is the IG's Chief Medical Officer? |
| 09:22:29 | 7 | A.   Dr. Ted Spears. |
| 09:22:31 | 8 | Q.   And what is his role at the IG? |
| 09:22:33 | 9 | A.   He is the chief advisor on all medical issues with regard to |
| 09:22:40 | 10 | the execution of our oversight program. |
| 09:22:43 | 11 | THE COURT:  And spell his last name. |
| 09:22:45 | 12 | THE WITNESS:  S-P-E-A-R-S. |
| 09:22:50 | 13 | THE COURT:  Thank you. |
| 09:22:51 | 14 | THE WITNESS:  You're welcome. |
| 09:22:52 | 15 | Q.   (BY MR. STEPHENS) Why did you consult with Dr. Spears in the |
| 09:22:55 | 16 | course of your review of the video and other evidence? |
| 09:22:59 | 17 | A.   That's our standard operating procedure.  He is the chief |
| 09:23:02 | 18 | advisor on medical issues such as these regarding program -- |
| 09:23:06 | 19 | potential program violations. |
| 09:23:07 | 20 | Q.   Did you ask Dr. Spears to watch the video referenced in this |
| 09:23:12 | 21 | paragraph of your letter? |
| 09:23:13 | 22 | A.   I did. |
| 09:23:14 | 23 | Q.   And do you know whether Dr. Spears watched the full video |
| 09:23:17 | 24 | referenced in this letter? |
| 09:23:18 | 25 | A.   He did. |

| 09:23:18 | 1 | Q.   Did Dr. Spears give you his opinion regarding what he saw on |

09:23:18   1   Q.   Did Dr. Spears give you his opinion regarding what he saw on

09:23:27   2   the video?

09:23:28   3   A.   Yes, he did.

09:23:30   4          THE COURT:   That answers the question.

09:23:33   5   Q.   (BY MR. STEPHENS) Did Dr. Spears' opinion inform your

09:23:36   6   decision that Planned Parenthood had violated medical and ethical

09:23:40   7   standards?

09:23:40   8   A.   It did.

09:23:41   9   Q.   Okay.  How did it inform your decision?

09:23:45   10   A.   Well, he is a doctor of long -- many years good standing,

09:23:50   11   over 30 years of practice here in Texas.  He is aware of and

09:23:57   12   understands the required medical and ethical standards of

09:24:01   13   practice in the state of Texas and thus, is qualified to offer

09:24:08   14   and advise -- offer his opinion and advise me on issues like

09:24:11   15   this.

09:24:11   16          MR. WATKINS:   Objection, your Honor.  It would be for

09:24:13   17   the Court to determine whether he's qualified to give an opinion.

09:24:16   18          THE COURT:   Well, that dawned on me when he said that,

09:24:18   19   but we'll just consider it.

09:24:24   20   Q.   (BY MR. STEPHENS) Mr. Bowen, have you reviewed the video

09:24:27   21   that is listed as Defendants' Exhibit 2?

09:24:30   22   A.   Yes.

09:24:32   23   Q.   And is the video listed as Defendants' Exhibit 2 the video

09:24:36   24   that is referred to in your December 20, 2016 final notice of

09:24:40   25   termination letter?

```
09:24:41    1    A.    It is.
09:24:44    2    Q.    And is the video listed as Defendants' Exhibit 2 the video
09:24:49    3    that you relied on and cited in your letter as evidence that
09:24:52    4    Planned Parenthood violated accepted medical and ethical
09:24:56    5    standards?
09:24:56    6    A.    Yes.
09:24:58    7    Q.    Approximately how long is the video, listed as Defendants'
09:25:01    8    Exhibit 2, in reference to this letter?
09:25:02    9    A.    About eight-and-a-half hours.
09:25:05   10    Q.    And how many times did you watch the full video listed as
09:25:08   11    Defendants' Exhibit 2?
09:25:08   12    A.    Five times.  Sorry, five times.  And I've read a transcript
09:25:12   13    of it that many times, as well.
09:25:15   14    Q.    When you watched the video that's listed as Defendants'
09:25:19   15    Exhibit 2, did you see anything in the video that caused you to
09:25:22   16    question whether the video was a true and accurate reflection of
09:25:25   17    the events shown in the video?
09:25:27   18    A.    No, I didn't --
09:25:28   19          MR. WATKINS:  Objection, your Honor.  I don't think the
09:25:30   20    witness is qualified to determine whether or not a video is
09:25:33   21    adequate or accurate, or not.  I mean, that calls for special
09:25:36   22    testing, and he hasn't testified that he knows anything about
09:25:39   23    testing videos.
09:25:40   24          THE COURT:  He's not offered as an expert.  His
09:25:44   25    question is, did you see anything, and he said he did not see
```

09:25:46  1  anything.  That does not mean it was not there.  I suspect that

09:25:52  2  an expert could render a different opinion one way or the other.

09:25:56  3  But he has the right to testify what he saw.  Go ahead.

09:26:02  4  Q.  (BY MR. STEPHENS) Mr. Bowen, was there evidence in the video

09:26:06  5  that you relied on for purposes of your conclusion that the video

09:26:12  6  was a true and accurate reflection of the events depicted in the

09:26:17  7  video?

09:26:18  8  A.  Yes.

09:26:19  9  Q.  Okay.  And could you describe for the Court what you saw?

09:26:21  10     MR. WATKINS:  Same objection, your Honor.

09:26:23  11     THE COURT:  I sustain the objection and strike the

09:26:25  12  answer.

09:26:26  13  Q.  (BY MR. STEPHENS) Mr. Bowen, could you describe for the

09:26:29  14  Court what you saw in the video that demonstrated to you that it

09:26:33  15  was -- or what it demonstrated to you as to where the video was

09:26:37  16  taken?

09:26:38  17  A.  Yes.  At the outset of the video, it reveals the arrival of

09:26:48  18  the videographer at Planned Parenthood Gulf Coast, as you see,

09:26:54  19  the front of the building, it's marked.  The door is marked with

09:27:01  20  Planned Parenthood Gulf Coast and Planned Parenthood Center for

09:27:07  21  Choice, all the indicia that it's authentic with regard to it

09:27:12  22  being an actual video of that location and what's occurring

09:27:17  23  within that building substantiated in the video.

09:27:22  24  Q.  Did you see in the video employees introduce themselves?

09:27:28  25  A.  I did.

| | | |
|---|---|---|
| 09:27:29 | 1 | Q.   Okay.  And did they state their names on the video? |
| 09:27:32 | 2 | A.   They did. |
| 09:27:32 | 3 | Q.   And were you in the courtroom yesterday when Melissa Farrell |
| 09:27:36 | 4 | testified? |
| 09:27:36 | 5 | A.   I was. |
| 09:27:37 | 6 | Q.   Was -- and you saw Melissa Farrell? |
| 09:27:40 | 7 | A.   Yes. |
| 09:27:40 | 8 | Q.   And is that the same person that you saw in the video? |
| 09:27:44 | 9 | A.   Yes, it was.  It -- yes. |
| 09:27:50 | 10 | Q.   Do you recall whether Ms. Farrell introduced herself as the |
| 09:27:54 | 11 | director of research in the video? |
| 09:27:55 | 12 | A.   I do. |
| 09:27:56 | 13 | Q.   And do you recall her testimony yesterday saying that she's |
| 09:28:00 | 14 | the director of research at Planned Parenthood Gulf Coast? |
| 09:28:01 | 15 | A.   I do. |
| 09:28:05 | 16 | Q.   Judge, I would like to offer into evidence Defendants' |
| 09:28:08 | 17 | Exhibit 2, the video relied on by Mr. Bowen. |
| 09:28:12 | 18 | MR. WATKINS:  May I take the witness on voir dire for a |
| 09:28:14 | 19 | moment, your Honor? |
| 09:28:15 | 20 | THE COURT:  You may. |
| 09:28:16 | 21 | VOIR DIRE EXAMINATION |
| 09:28:17 | 22 | BY MR. WATKINS: |
| 09:28:17 | 23 | Q.   Exhibit 2 -- let me hand you Exhibit 2 that we're talking |
| 09:28:42 | 24 | about.  Now, do you know the dates and times when each of those |
| 09:28:47 | 25 | videos was recorded? |

| | | |
|---|---|---|
| 09:28:57 | 1 | A.   I recall I believe it was April 15, but I don't know the |
| 09:29:02 | 2 | precise times.   I remember in watching the video that there is a |
| 09:29:07 | 3 | date and timestamp that is chronologically synchronous from each |
| 09:29:16 | 4 | of these clips. |
| 09:29:18 | 5 | Q.   There are 17 videos identified on this list? |
| 09:29:23 | 6 | A.   That's correct. |
| 09:29:24 | 7 | Q.   Is it your testimony that all 17 of those were all taken the |
| 09:29:27 | 8 | same day? |
| 09:29:27 | 9 | A.   Yes. |
| 09:29:28 | 10 | Q.   Okay.  And did you take all 17 -- |
| 09:29:30 | 11 | A.   Well, I should say -- yes, yes, yes. |
| 09:29:33 | 12 | Q.   And if you take all 17 of these together, you get the |
| 09:29:37 | 13 | eight-and-a-half hours that you've talked about. |
| 09:29:38 | 14 | A.   Yes, sir. |
| 09:29:38 | 15 | Q.   Did you watch any other videos other than these 17? |
| 09:29:45 | 16 | A.   No.  These are the ones from the exhibits. |
| 09:29:49 | 17 | Q.   You didn't see any on YouTube? |
| 09:29:52 | 18 | A.   Well, I did see some on YouTube, but that's not what I |
| 09:29:56 | 19 | relied on for this letter. |
| 09:29:58 | 20 | Q.   And you're telling -- |
| 09:29:59 | 21 | THE COURT:  Whoa, whoa.  You know, you've impressed me |
| 09:30:05 | 22 | as great background and smart, but when he said, did you see any |
| 09:30:11 | 23 | others, you should have caught on to this other. |
| 09:30:15 | 24 | THE WITNESS:  Yes, sir.  You're right.  You're right. |
| 09:30:16 | 25 | I didn't see any others that informed my decision. |

| | | |
|---|---|---|
| 09:30:21 | 1 | THE COURT:  Okay.  Well -- |
| 09:30:22 | 2 | THE WITNESS:  That's what I should say. |
| 09:30:23 | 3 | THE COURT:  I suspect that the lawyer would ask you |
| 09:30:25 | 4 | that. |
| 09:30:26 | 5 | THE WITNESS:  Yes.  I did not see -- I did not rely on |
| 09:30:28 | 6 | any other videos for my decision. |
| 09:30:30 | 7 | THE COURT:  Now, let me tell you, you're not in charge |
| 09:30:35 | 8 | of the question. |
| 09:30:36 | 9 | THE WITNESS:  Yes, sir. |
| 09:30:37 | 10 | THE COURT:  Have you ever testified before? |
| 09:30:39 | 11 | THE WITNESS:  Yes, I have. |
| 09:30:39 | 12 | THE COURT:  I thought you had.  You know, they're in |
| 09:30:41 | 13 | charge of the questioning. |
| 09:30:42 | 14 | THE WITNESS:  Yes, sir. |
| 09:30:42 | 15 | THE COURT:  All right.  Just answer the question.  All |
| 09:30:45 | 16 | right. |
| 09:30:49 | 17 | Q.   (BY MR. WATKINS) I believe in your designation, did you not |
| 09:30:53 | 18 | state that watching the videos animated your decision? |
| 09:30:57 | 19 | A.   Yes, sir. |
| 09:30:58 | 20 | Q.   Okay.  Did anything that you watched on YouTube animate your |
| 09:31:02 | 21 | decision? |
| 09:31:03 | 22 | A.   No. |
| 09:31:03 | 23 | Q.   So it didn't bother you what you saw on YouTube.  You just |
| 09:31:07 | 24 | relied on this. |
| 09:31:08 | 25 | A.   That's right. |

09:31:09  1   Q.   And the first one you ever looked at was one of these

09:31:12  2   eight -- or one of the 17 on this page.  You didn't look at the

09:31:15  3   YouTube first, you didn't look at any other versions of those

09:31:18  4   videotapes, but five the time you looked at the one that animated

09:31:22  5   your decision.

09:31:24  6   A.   That's right.

09:31:25  7   Q.   Okay.  No further questions, your Honor.

09:31:27  8            THE COURT:  Do you have any objection to 2?

09:31:31  9            MR. WATKINS:  Well, we have objection based -- yes,

09:31:37  10  sir.  We have objections based on the lack of validity if he's --

09:31:44  11           THE COURT:  Validity, this is the testimony it's

09:31:47  12  something that he saw and formed the basis of his decision.  So I

09:31:52  13  don't think you can dream of a good enough objection to keep it

09:31:56  14  out.

09:31:57  15           MR. WATKINS:  Well, the question is --

09:31:58  16           THE COURT:  It's being tendered right now for something

09:32:01  17  he saw and was the basis of his opinion.

09:32:06  18           MR. WATKINS:  Our objection would be -- and I

09:32:07  19  understand what's going to happen to it.  Our objection is --

09:32:09  20           THE COURT:  So let's stop wasting time.

09:32:11  21           MR. WATKINS:  Yes, sir.

09:32:12  22           THE COURT:  All right.  I overrule any objection.  To

09:32:14  23  is in as -- 2 is in as something that he saw and made a

09:32:22  24  determination on.  Doesn't have anything to do with.

09:32:44  25           MR. STEPHENS:  Brian, could you bring up Defendants'

09:32:46   1   Exhibit 1?

09:32:46   2           THE COURT:  How is 2 going to be tendered?

09:32:51   3           MR. STEPHENS:  It's on a thumb drive.

09:32:53   4           THE CLERK:  I have it.

09:32:54   5           MR. STEPHENS:  It's on that.  I think that's called a

09:32:56   6   thumb drive.

09:32:57   7           THE COURT:  Beat me.  Okay.

09:32:57   8                   DIRECT EXAMINATION (Resumed)

09:33:03   9   BY MR. STEPHENS:

09:33:03  10   Q.   Brian, could you go to page 2?

09:33:13  11           Mr. Bowen, in the final notice of termination letter --

09:33:17  12           MR. WATKINS:  Your Honor, I'm going to make an

09:33:19  13   objection to if we're not going to look at it.  In other words, I

09:33:23  14   don't think they get to just stick the video into the record and

09:33:25  15   we don't know what parts they're relying on or what parts he

09:33:28  16   relied opinion.  And if they're going to offer eight-and-a-half

09:33:30  17   hours worth of video, I don't think we can do anything with it

09:33:34  18   unless we see the eight-and-a-half hours he looked at.

09:33:37  19           MR. STEPHENS:  The entire footage?

09:33:40  20           THE COURT:  The questions that the state wants to ask

09:33:45  21   are the state's questions.  Your objection is a statement, and I

09:33:54  22   overrule the statement.  You have full powers of

09:33:57  23   cross-examination and to show whatever erroneous reliance he may

09:34:06  24   have had.  I fear that I'm going to have to look at this eight

09:34:12  25   hours.  So you might just assume that we're going to look at

09:34:17  1    eight hours.

09:34:18  2                MR. WATKINS:  All right.

09:34:19  3                THE COURT:  But, you know, I can't foresee what's going

09:34:28  4    to happen tomorrow, or the next day, or the next day.  But you

09:34:33  5    can cross-examine him.  He's already said that he relied on the

09:34:39  6    -- and I suspect he knows the history of that, or part of it, in

09:34:43  7    any event.  It's been all over the papers and I am aware of it,

09:34:49  8    too.  Just as Will Rogers said, I read it.

09:34:53  9                MR. WATKINS:  My objection, your Honor, is

09:34:54  10   specifically, they've got eight hours of time.  They've got

09:34:57  11   seven-and-a-half hours.  I don't think they get to use what's in

09:35:00  12   the eight hours of tape unless we watch it as part of their

09:35:03  13   seven-and-a-half hours.  That's what I've been thinking the whole

09:35:05  14   time.  And if the testimony is he looked at the eight hours and

09:35:10  15   that formed his opinion and they've now offered the eight hours

09:35:13  16   into evidence, I don't see how we can do anything with it unless

09:35:16  17   we watch the eight hours as a part of their seven and a half.

09:35:18  18               THE COURT:  Okay.  Well, you can make that argument.

09:35:21  19               MR. WATKINS:  Yes, sir.

09:35:24  20               THE COURT:  You can also cross it and find out exactly

09:35:27  21   what he relied on and what he didn't.

09:35:32  22   Q.   (BY MR. STEPHENS) Mr. Bowen, in your final notice of

09:35:34  23   termination letter, you state that you relied on the video,

09:35:37  24   Defendants' Exhibit 2, right?

09:35:38  25   A.    That's right.

| 09:35:39 | 1 | Q.   Okay.  Do you recall specific parts of the video that's |
| 09:35:43 | 2 | marked as Defendants' Exhibit 2 that demonstrated a history or |
| 09:35:49 | 3 | willingness to alter abortion procedures to procure fetal tissue? |
| 09:35:53 | 4 | A.   I do. |
| 09:35:53 | 5 | Q.   Mr. Bowen, I would like to show you part of the video marked |
| 09:36:01 | 6 | as Defendants' Exhibit 2, admitted as Defendants' Exhibit 2. |
| 09:36:06 | 7 | Brian, could you go to 7:59:02? |
| 09:36:11 | 8 |        (Audio and video filed played.) |
| 09:37:56 | 9 | Q.   Mr. Bowen, did you rely on that portion of the video? |
| 09:37:59 | 10 | A.   Yes, I did. |
| 09:38:00 | 11 | Q.   As the basis for your decision to terminate Planned |
| 09:38:03 | 12 | Parenthood's enrollment? |
| 09:38:03 | 13 | A.   Yes. |
| 09:38:04 | 14 |        THE COURT:  Now, how are you going to identify that, |
| 09:38:08 | 15 | that one section? |
| 09:38:11 | 16 |        MR. STEPHENS:  It's the timestamp, which I read into |
| 09:38:15 | 17 | the record, which is at 7:59:02. |
| 09:38:21 | 18 |        THE COURT:  And when did it finish? |
| 09:38:23 | 19 |        MR. STEPHENS:  At 8:00:43. |
| 09:38:28 | 20 |        MR. WATKINS:  I'm sorry, say again. |
| 09:38:30 | 21 |        MR. STEPHENS:  8:00:43. |
| 09:38:32 | 22 |        MR. WATKINS:  Thank you. |
| 09:38:36 | 23 |        THE COURT:  Okay.  The next one that you're going to |
| 09:38:42 | 24 | use, let's do the opening and conclusion. |
| 09:38:47 | 25 |        MR. STEPHENS:  Okay.  So each one, I'll identify at the |

09:38:49   1   outset by the timestamp.

09:38:51   2          THE COURT:   Thank you.

09:38:52   3   Q.   (BY MR. STEPHENS) Brian, could you please bring up 8:00:54

09:38:58   4   to 8:01:50?

09:39:03   5          (Audio and video filed played.)

09:40:06   6   Q.   Mr. Bowen, did you rely on that footage, as well?

09:40:08   7   A.   I did.

09:40:09   8   Q.   Brian, could you bring up 13:56:54 through 13:59:10?

09:40:22   9          (Audio and video filed played.)

09:42:43   10  Q.   Mr. Bowen, is that also footage from Defendants' Exhibit 2

09:42:46   11  that you relied on?

09:42:49   12  A.   Yes, it is.

09:42:52   13  Q.   Brian, could you bring up 14:03:11 through 14:03:50 from

09:43:00   14  Defendants' Exhibit 2?

09:43:01   15         (Audio and video filed played.)

09:43:40   16  Q.   Mr. Bowen, is that also footage from the video that you

09:43:44   17  relied on?

09:43:45   18  A.   Yes, it is.

09:43:46   19  Q.   Brian, could you bring up 14:17:03 through 14:17:55?

09:43:56   20         (Audio and video filed played.)

09:44:52   21  Q.   Mr. Bowen, is that also footage that you relied on?

09:44:56   22  A.   Yes, it is.

09:45:00   23  Q.   Brian, could you bring up 14:20:10 through 14:20:56 from

09:45:07   24  Defendants' Exhibit 2?

09:45:08   25         (Audio and video filed played.)

| 09:45:59 | 1 | Q.   Mr. Bowen, is that also video footage that you relied on as |
| 09:46:04 | 2 | the basis for your final notice of termination letter? |
| 09:46:06 | 3 | A.   Yes, it is. |
| 09:46:08 | 4 | Q.   And Brian, could you bring up 14:24:57 through 14:25:26? |
| 09:46:29 | 5 | (Audio and video filed played.) |
| 09:46:49 | 6 | Q.   Mr. Bowen, are those video clips that you relied on as the |
| 09:46:56 | 7 | basis for your decision that Planned Parenthood had altered |
| 09:47:01 | 8 | abortion procedures for research purposes? |
| 09:47:03 | 9 | A.   Yes. |
| 09:47:08 | 10 | Q.   And in the final notice of termination, you stated that |
| 09:47:10 | 11 | altering abortion procedures for research purposes violates |
| 09:47:14 | 12 | accepted medical and ethical standards; is that right? |
| 09:47:16 | 13 | A.   That's right. |
| 09:47:17 | 14 | Q.   And how did you reach your conclusion that altering abortion |
| 09:47:21 | 15 | standards -- abortion procedures violates accepted medical and |
| 09:47:27 | 16 | ethical standards? |
| 09:47:28 | 17 | A.   First, it violates the standards of -- expected of providers |
| 09:47:33 | 18 | in Texas pursuant to Dr. Ted Spears' opinion in this case.  It's |
| 09:47:38 | 19 | buttressed by federal law which provides standards regarding |
| 09:47:43 | 20 | this, as well, a federal statute addressing fetal -- the fetal |
| 09:47:49 | 21 | tissue research area states exactly what -- exactly the standard. |
| 09:47:58 | 22 | Q.   Did federal law inform your judgment that altering abortion |
| 09:48:04 | 23 | procedures violates accepted medical and ethical standards? |
| 09:48:07 | 24 | A.   Yes, it did. |
| 09:48:09 | 25 | Q.   Mr. Bowen, did you see evidence in the video, admitted as |

09:48:14  1   Defendants' Exhibit 2, that researchers had performed abortions

09:48:17  2   at Planned Parenthood for the purpose of procuring fetal tissue

09:48:20  3   for their own research?

09:48:22  4   A.   I did.

09:48:24  5   Q.   Brian, could you bring up 8:04:08 through 8:05:35?

09:48:33  6        (Audio and video filed played.)

09:50:07  7   Q.   Mr. Bowen, is that footage you relied on for your conclusion

09:50:10  8   that the video indicated that researchers had also performed

09:50:14  9   abortions at Planned Parenthood to procure fetal tissue for their

09:50:18  10  own research?

09:50:18  11  A.   Yes.

09:50:20  12  Q.   Brian, could you bring up 9:46:56 through 9:48:30?

09:50:44  13       (Audio and video filed played.)

09:51:29  14  Q.   Mr. Bowen, did you also rely on the footage we just saw?

09:51:33  15  A.   Yes, I did.

09:51:36  16  Q.   Brian, could you bring up 14:30:19 through 14:30:59?

09:51:59  17       (Audio and video filed played.)

09:53:28  18  Q.   Mr. Bowen, did the individual video clips we just saw inform

09:53:33  19  your judgment that Planned Parenthood violated accepted medical

09:53:38  20  and ethical standards?

09:53:39  21  A.   Yes, they did.

09:53:39  22  Q.   And did federal law inform your judgment that Planned

09:53:42  23  Parenthood violated medical and ethical standards by researchers

09:53:46  24  performing abortions to obtain fetal tissue for their own

09:53:49  25  research?

09:53:49  1   A.    Yes, it did.

09:53:53  2   Q.    Mr. Bowen, in your final termination letter, you also

09:53:56  3   indicated that Planned Parenthood may be procuring fetal tissue

09:54:00  4   for valuable consideration.  Do you recall that?

09:54:02  5   A.    Yes.

09:54:04  6   Q.    What did you see in the video that indicated to you that

09:54:08  7   Planned Parenthood may be procuring fetal tissue for valuable

09:54:11  8   consideration?

09:54:12  9   A.    There were a number of exchanges in the course of the video

09:54:18 10   regarding remuneration for --

09:54:20 11             MR. WATKINS:  We object to this testimony because

09:54:22 12   there's nothing in the termination letter that talks about making

09:54:27 13   money, not being reimbursed.  That's not one of the grounds they

09:54:31 14   put in the termination letter; therefore, it's irrelevant.

09:54:35 15             MR. STEPHENS:  I could bring up the termination letter.

09:54:38 16             THE COURT:  I've read it several times.  Do you have

09:54:41 17   anything other than I can bring it up?

09:54:42 18             MR. STEPHENS:  It says, potentially for valuable

09:54:44 19   consideration.  That was my question.

09:54:49 20             THE COURT:  Well, I'll permit the answer.

09:54:52 21   A.    Yes.  There --

09:54:53 22             MR. WATKINS:  I'll object to the exhibit, Judge.

09:55:25 23             I stand corrected, your Honor.  It's on page --

09:55:27 24             THE COURT:  I've already overruled the objection.  But

09:55:29 25   I do like it in the record that you stand up.

09:55:33  1          MR. WATKINS:  Okay.  A little bit.

09:55:36  2   Q.   (BY MR. STEPHENS) Mr. Bowen, what did you see in the video

09:55:39  3   that indicated to you a willingness to procure fetal tissue for

09:55:44  4   valuable consideration?

09:55:46  5   A.   The term financially beneficial was repeatedly brought up in

09:55:50  6   the course of the dialogue.  And there were discussions about how

09:55:58  7   this engaging in this agreement might be financially beneficial

09:56:05  8   for Planned Parenthood Gulf Coast, and the fact that that was an

09:56:09  9   issue that the board was pushing and, indeed, there was interest

09:56:15  10  from Planned Parenthood Federation of America to pursue such

09:56:19  11  activities that were financially beneficial.  That was the

09:56:26  12  phrase.

09:56:27  13  Q.   Mr. Bowen, in your letter, you also indicated that you

09:56:31  14  relied on materials provided to the state by the United States

09:56:36  15  House of Representatives Select Investigative Panel; is that

09:56:38  16  right?

09:56:38  17  A.   That's right.

09:56:41  18  Q.   I'd like to show you a document of Defendants' Exhibit 68.

09:56:51  19          Mr. Bowen, are you familiar with this document?

09:56:54  20  A.   I am.

09:56:55  21  Q.   Could you describe this document for the Court?

09:56:59  22  A.   This was a referral from that house committee regarding

09:57:03  23  their investigation of these issues.

09:57:06  24  Q.   And what is the date of this document?

09:57:07  25  A.   December 1st, 2016.

| | | |
|---|---|---|
| 09:57:10 | 1 | Q.   And did you receive a copy of this document? |
| 09:57:13 | 2 | A.   I did. |
| 09:57:14 | 3 | Q.   Did you review it? |
| 09:57:15 | 4 | A.   I did. |
| 09:57:16 | 5 | Q.   And is this the document that was cited in your December 20, |
| 09:57:21 | 6 | 2016 final notice of termination letter? |
| 09:57:24 | 7 | A.   Yes. |
| 09:57:26 | 8 | Q.   Your Honor, we offer -- state offers Defendants' Exhibit 68 |
| 09:57:32 | 9 | into evidence. |
| 09:57:32 | 10 | MR. WATKINS:  No objection. |
| 09:57:33 | 11 | THE COURT:  Received. |
| 09:57:36 | 12 | Q.   (BY MR. STEPHENS) Brian, could you bring up Defendants' |
| 09:57:40 | 13 | Exhibit 61? |
| 09:57:42 | 14 | Mr. Bowen, are you familiar with this document? |
| 09:57:44 | 15 | A.   I am. |
| 09:57:45 | 16 | Q.   And could you describe for the Court this document? |
| 09:57:51 | 17 | A.   This is the cover sheet to the Select Investigative Panel |
| 09:57:56 | 18 | report. |
| 09:57:58 | 19 | Q.   And, Brian, could you scroll down through the document |
| 09:58:04 | 20 | quickly?  To the last page. |
| 09:58:14 | 21 | Mr. Bowen, do you know how long this document is? |
| 09:58:18 | 22 | A.   Do I know how long it is? |
| 09:58:20 | 23 | Q.   How many pages? |
| 09:58:22 | 24 | A.   You have page 413 there.  Yes. |
| 09:58:25 | 25 | Q.   And is this a document that you've reviewed? |

09:58:27  1   A.    It is.

09:58:29  2   Q.    Your Honor, the state offers Defendants' Exhibit 61 into

09:58:32  3   evidence.

09:58:39  4         MR. WATKINS:  No objection if it's offered for the

09:58:41  5   purposes of something he reviewed.

09:58:44  6         THE COURT:  It's received.

09:58:51  7   Q.    (BY MR. STEPHENS) Mr. Bowen, in Defendants' Exhibit 1, the

09:58:54  8   final notice of termination letter, you also reference evidence

09:58:57  9   of misrepresentations uncovered by the United States House of

09:59:02  10  Representatives Select Investigative Panel.

09:59:04  11  A.    That's right.

09:59:08  12  Q.    Could you describe for the Court the nature of those

09:59:11  13  misrepresentations as referred to in your letter?

09:59:15  14  A.    Yes.  The report documents a visit by the Texas Ranger to

09:59:22  15  Planned Parenthood Gulf Coast discussions regarding contracting

09:59:26  16  activity between Planned Parenthood Gulf Coast and the Baylor

09:59:30  17  College of Medicine for the procurement of fetal tissue.  And the

09:59:36  18  Texas Ranger was told that the independent review board at Baylor

09:59:42  19  College of Medicine had not approved the offer from Planned

09:59:48  20  Parenthood Gulf Coast regarding engaging in fetal tissue

09:59:52  21  procurement.  That was not accurate.

09:59:58  22  Q.    Brian, could you bring up Defendants' Exhibit 79?

10:00:06  23        Mr. Bowen, is this a document that you reviewed and

10:00:10  24  relied on?

10:00:11  25  A.    Yes, it is.

10:00:14    1    Q.    And could you read the subject line of this document?

10:00:19    2    A.    Pediatrics research proposal, Dr. Paust, Baylor College of

10:00:24    3    Medicine IRB approval obtained.

10:00:26    4    Q.    Your Honor, the state would offer Defendants' Exhibit 79

10:00:30    5    into evidence.

10:00:31    6              MR. WATKINS:  No objection.

10:00:33    7              THE COURT:  It's received.

10:00:34    8    Q.    (BY MR. STEPHENS) Brian, could you scroll up the top of this

10:00:37    9    document?

10:00:39   10              Mr. Bowen, could you describe the top e-mail as it

10:00:43   11    relates to the e-mail that you had just read the subject line

10:00:47   12    from?

10:00:48   13    A.    It's a response from Melissa Farrell at Planned Parenthood

10:00:53   14    Gulf Coast thanking Dr. Parikh for the news that the IRB had

10:00:58   15    approved the agreement.

10:01:02   16    Q.    Brian, could you go to Defendants' Exhibit 81 at page 4?

10:01:12   17              Mr. Bowen, are you familiar with this document?

10:01:16   18    A.    I am.

10:01:16   19    Q.    Is this also a document that you reviewed and relied on as a

10:01:19   20    basis or as referenced in your December 20, 2016 final notice of

10:01:24   21    termination letter?

10:01:25   22    A.    It is.

10:01:31   23    Q.    Brian, could you focus on 3.17?

10:01:36   24              Mr. Bowen, could you describe what you read in this

10:01:41   25    report as it relates to the e-mails that we just saw?

| | | |
|---|---|---|
| 10:01:48 | 1 | A.    It is -- it's part of the Ranger's report and I think the -- |
| 10:01:59 | 2 | summarizing his interview with the representative from Gulf |
| 10:02:07 | 3 | Coast.  And the last sentence is -- he was told that the |
| 10:02:11 | 4 | institutional review board had not yet given approval for the |
| 10:02:14 | 5 | Baylor or Rice studies. |
| 10:02:17 | 6 | Q.    Okay.  When you stated in your December 20, 2016 letter that |
| 10:02:22 | 7 | evidence uncovered by the United States House of Representatives |
| 10:02:25 | 8 | Select Investigative Panel regarding misrepresentations supported |
| 10:02:30 | 9 | your decision, is this the document you were referring to? |
| 10:02:35 | 10 | A.    It is. |
| 10:02:36 | 11 | Q.    And was Defendants' Exhibit 79 also a document that you were |
| 10:02:40 | 12 | referring to? |
| 10:02:40 | 13 | A.    Yes. |
| 10:02:43 | 14 | Q.    Your Honor, the state would offer Defendants' Exhibit 81 |
| 10:02:45 | 15 | into evidence. |
| 10:02:46 | 16 |        MR. WATKINS:  No objection. |
| 10:02:47 | 17 |        THE COURT:  Received. |
| 10:02:49 | 18 | Q.    (BY MR. STEPHENS) Mr. Bowen, did you see anything in the |
| 10:03:00 | 19 | video, admitted as Defendants' Exhibit 2, that demonstrated that |
| 10:03:04 | 20 | Planned Parenthood Gulf Coast and Planned Parenthood Center for |
| 10:03:08 | 21 | Choice are affiliates? |
| 10:03:10 | 22 | A.    Yes, I did. |
| 10:03:12 | 23 | Q.    And what evidence did you see in the video that Planned |
| 10:03:15 | 24 | Parenthood Gulf Coast and Planned Parenthood Center for Choice |
| 10:03:17 | 25 | are affiliates? |

| | | |
|---|---|---|
| 10:03:19 | 1 | A.   They're co-located in the same building.  The signage at the |
| 10:03:24 | 2 | entryway links them together, the personnel working at the front |
| 10:03:33 | 3 | desk in the foyer and security all serve both entities, and just |
| 10:03:46 | 4 | in the building itself, they're close to one another. |
| 10:03:55 | 5 | Q.   Was there other evidence that was not in the video that |
| 10:03:59 | 6 | you've considered in reaching your decision that Planned |
| 10:04:02 | 7 | Parenthood Gulf Coast and Planned Parenthood Center for Choice |
| 10:04:04 | 8 | are affiliates? |
| 10:04:07 | 9 | A.   Yes.  Their website, for example, I think we saw yesterday, |
| 10:04:14 | 10 | shows the linkage between the two, but I had seen that before |
| 10:04:18 | 11 | that e-mailing one leads to another.  The Center for Choice goes |
| 10:04:25 | 12 | to Planned Parenthood Gulf Coast and -- and there were other |
| 10:04:33 | 13 | matters in the discussion between -- in the video that indicated |
| 10:04:40 | 14 | clear linkages between the director of research for Planned |
| 10:04:43 | 15 | Parenthood Gulf Coast and the activities of the Center for |
| 10:04:47 | 16 | Choice. |
| 10:04:47 | 17 | Q.   And, Mr. Bowen, did you also see evidence in the video or |
| 10:04:52 | 18 | did you review evidence -- other evidence that indicated that |
| 10:04:58 | 19 | Planned Parenthood Gulf Coast, Planned Parenthood Greater Texas, |
| 10:05:02 | 20 | and Planned Parenthood South Texas are affiliates? |
| 10:05:07 | 21 | A.   Yes.  There was discussion then.  Also, there's overlapping |
| 10:05:11 | 22 | leadership CEOs and board membership that interweaves some of |
| 10:05:16 | 23 | these affiliates, as well. |
| 10:05:17 | 24 | Q.   Okay.  And do you know whether they are all affiliates of |
| 10:05:21 | 25 | Planned Parenthood Federation of America? |

10:05:23  1   A.   They are.   They do -- that is indicated in the video, quite

10:05:28  2   clearly, that Planned Parenthood Federation of America provides

10:05:32  3   guidance, policies, and monitors, particularly with regard to

10:05:38  4   fetal tissue activity, every aspect of each of these affiliates.

10:05:47  5   Q.   Brian, could you bring up Defendants' Exhibit 2 at 8:05:44

10:05:54  6   through 8:05:54?

10:06:01  7            (Audio and video filed played.)

10:06:16  8   Q.   Mr. Bowen, is that video footage evidence that you relied on

10:06:22  9   as part of your conclusion that Planned Parenthood Gulf Coast,

10:06:25  10  Planned Parenthood Greater Texas, and Planned Parenthood South

10:06:28  11  Texas have had doctors that travel between the locations?

10:06:33  12  A.   Yes.

10:06:36  13  Q.   Brian, could you on Defendants' Exhibit 2 bring up 12:26:50

10:06:41  14  through 12:27:35?

10:06:45  15           (Audio and video filed played.)

10:07:34  16  Q.   Mr. Bowen, is that also footage or evidence that you relied

10:07:39  17  on in reaching your conclusion that Planned Parenthood Gulf

10:07:43  18  Coast, Planned Parenthood Greater Texas, and Planned Parenthood

10:07:47  19  South Texas are affiliates?

10:07:47  20  A.   Yes.

10:07:50  21  Q.   Mr. Bowen, as the Inspector General for the Texas Health and

10:07:53  22  Human Services Commission, in your judgment, did Planned

10:07:57  23  Parenthood violate medical and ethical standards?

10:07:59  24  A.   Yes.

10:08:00  25  Q.   And do those violations of medical and ethical standards

| | | |
|---|---|---|
| 10:08:04 | 1 | amount to program violations that justified disenrollment from |
| 10:08:08 | 2 | the Texas Medicaid program? |
| 10:08:09 | 3 | A.   They do. |
| 10:08:11 | 4 | Q.   Pass the witness, your Honor. |
| 10:08:35 | 5 | CROSS-EXAMINATION |
| 10:08:35 | 6 | BY MR. WATKINS: |
| 10:08:53 | 7 | Q.   Mr. Bowen, let's see if we can agree on some basic |
| 10:09:02 | 8 | principles.  The state has no right to terminate a provider who |
| 10:09:04 | 9 | provides medical treatment if they are a qualified provider. |
| 10:09:11 | 10 | A.   Yes. |
| 10:09:12 | 11 | Q.   And we can agree that qualified means, quote, to be capable |
| 10:09:16 | 12 | of performing the needed medical services in a professionally |
| 10:09:20 | 13 | competent, safe, legal and ethical manner. |
| 10:09:23 | 14 | A.   Yes. |
| 10:09:24 | 15 | Q.   So the state can't kick somebody out if they're providing |
| 10:09:29 | 16 | abortions that way, right? |
| 10:09:31 | 17 | A.   If they're providing abortions that way? |
| 10:09:35 | 18 | Q.   Yes.  In a -- do you think the state just has a right to |
| 10:09:39 | 19 | stop people from performing abortions? |
| 10:09:42 | 20 | A.   I don't think that the Medicaid program funds the provision |
| 10:09:48 | 21 | of abortions. |
| 10:09:49 | 22 | Q.   All right.  So you're saying they're already kicked out. |
| 10:09:53 | 23 | You're not paying for abortions.  The state is not paying for |
| 10:09:57 | 24 | abortions? |
| 10:09:57 | 25 | A.   I think that was -- that's already in the record. |

10:10:00   1   Q.   Okay.  Well, and you agree with that.  You agree with that.

10:10:03   2   A.   Yes.  I believe that's in the record.

10:10:05   3   Q.   All right.  Now, the question then is, there are, however,

10:10:09   4   clinics which perform abortions that do not receive Medicaid

10:10:13   5   payments, right?

10:10:14   6   A.   That's right.

10:10:15   7   Q.   Okay.  And some of them, Planned Parenthood and some of them

10:10:18   8   aren't.

10:10:18   9   A.   That's right.

10:10:19   10   Q.   Okay.  Now, but is it legal to use fetal tissue for

10:10:28   11   research.

10:10:30   12   A.   Pursuant to law, yes.

10:10:31   13   Q.   Okay.  So we're agreed there's nothing wrong with using

10:10:35   14   fetal tissue for research.

10:10:37   15   A.   Within the prescribed limits identified by law.

10:10:40   16   Q.   Okay.  Now, is it legal to get reimbursed for providing

10:10:45   17   fetal tissue to a researcher provided it is a reasonable

10:10:49   18   reimbursement for expenses?

10:10:51   19   A.   Pursuant to what the law permits, yes, sir.

10:10:53   20   Q.   Okay.  Now, you were talking about federal law which you let

10:11:01   21   inform some of your decisions, right?

10:11:03   22   A.   That's right.

10:11:04   23   Q.   Okay.  And you do know about 1396a(23), which gives to the

10:11:08   24   patient the right to choose the provider.

10:11:10   25   A.   That's right.

| | | |
|---|---|---|
| 10:11:11 | 1 | Q.   Okay.   And the state can't stop that patient under federal |
| 10:11:15 | 2 | law from choosing a qualified provider? |
| 10:11:18 | 3 | A.   That's correct. |
| 10:11:19 | 4 | Q.   Now, on your letter of termination, let's look at it.   Now, |
| 10:11:36 | 5 | let me give you a copy. |
| 10:11:54 | 6 | Now, it's addressed, is it not, to three entities?   Is |
| 10:12:03 | 7 | that correct? |
| 10:12:03 | 8 | A.   It is. |
| 10:12:04 | 9 | Q.   All right.   Now, first of all, it's from the Office of the |
| 10:12:07 | 10 | Inspector General.   That's true? |
| 10:12:08 | 11 | A.   Yes, sir. |
| 10:12:09 | 12 | Q.   Okay.   And it's dated December 20, 2016? |
| 10:12:12 | 13 | A.   That's correct. |
| 10:12:13 | 14 | Q.   Okay.   And there are three, Gulf Coast, Greater Texas and |
| 10:12:20 | 15 | San Antonio, and that's also South Texas, right? |
| 10:12:23 | 16 | A.   That is correct. |
| 10:12:24 | 17 | Q.   Okay.   Now, each of those entities has other entities that |
| 10:12:30 | 18 | are part of that entity; is that correct? |
| 10:12:32 | 19 | A.   That's right. |
| 10:12:32 | 20 | Q.   Okay.   Now, you heard testimony that there was no power or |
| 10:12:37 | 21 | control between Planned Parenthood Gulf Coast and those other two |
| 10:12:41 | 22 | entities.   Did you hear that testimony? |
| 10:12:44 | 23 | A.   Yes. |
| 10:12:45 | 24 | Q.   Do you have anything to contradict that? |
| 10:12:48 | 25 | A.   I'm sorry?   Please rephrase the question. |

10:12:50   1   Q.   Okay.  I will.

10:12:52   2        Is there any evidence that you know of that Planned

10:12:55   3   Parenthood Gulf Coast has any power or control over Greater

10:13:00   4   Texas?

10:13:00   5   A.   No.

10:13:01   6   Q.   Okay.  Is there any evidence that Greater Texas has any

10:13:05   7   power and control over Gulf Coast?

10:13:07   8   A.   No.

10:13:08   9   Q.   Is there any evidence that any one of these three has any

10:13:11   10   power or control over the other two?

10:13:13   11   A.   No.

10:13:14   12   Q.   Okay.  Can you give me the name of a doctor who might have

10:13:18   13   worked at more than one of these?

10:13:22   14   A.   Amna Dermish.

10:13:25   15   Q.   Okay.  And do you know what that doctor did at each clinic?

10:13:31   16   A.   I know the doctor worked at both.  I don't know the

10:13:35   17   specifics of that doctor's activities.

10:13:37   18   Q.   Okay.  Did that doctor work at both at the same time?

10:13:41   19   A.   That I don't know.

10:13:42   20   Q.   Okay.  There's nothing wrong, then, for a doctor to work at

10:13:45   21   one, leave that one and then, go work at another one, is there?

10:13:48   22   A.   Well, sure.

10:13:50   23   Q.   And you don't know whether that's what happened or not?

10:13:52   24   A.   That's right.

10:14:02   25   Q.   I'm going to take a look at Defendants' Exhibit 68.  And I

| | | |
|---|---|---|
| 10:14:22 | 1 | can hand you Defendants' Exhibit 68.  Do you recognize that? |
| 10:14:31 | 2 | A.    Yes, I do. |
| 10:14:33 | 3 | Q.    Now, you testified that that was a referral from the |
| 10:14:37 | 4 | committee.  Is that a referral from the committee or referral |
| 10:14:41 | 5 | from just one person? |
| 10:14:45 | 6 | A.    This is a referral relevant to the committee report from the |
| 10:14:49 | 7 | chairman of the committee. |
| 10:14:50 | 8 | Q.    But it is from the chairman.  It's not from the committee. |
| 10:14:55 | 9 | A.    The chairman signed this.  Yes.  That's correct. |
| 10:14:57 | 10 | Q.    Okay.  And then, let's look at the last page, the paragraph |
| 10:15:01 | 11 | of the last page.  Do you see that sentence at the top of that |
| 10:15:08 | 12 | page? |
| 10:15:08 | 13 | A.    I do. |
| 10:15:10 | 14 | Q.    All right.  Based on the facts outlined above and the |
| 10:15:13 | 15 | supporting documents, I.  It doesn't say the committee.  It says |
| 10:15:22 | 16 | I. |
| 10:15:23 | 17 | A.    Yes, it does. |
| 10:15:24 | 18 | Q.    Now, do you know if the committee voted on this referral? |
| 10:15:27 | 19 | A.    I don't. |
| 10:15:29 | 20 | Q.    Do you know if the committee actually approved this referral |
| 10:15:32 | 21 | being sent out? |
| 10:15:33 | 22 | A.    I don't. |
| 10:15:34 | 23 | Q.    Okay.  It's I.  And she says -- oh, and by the way, this was |
| 10:15:38 | 24 | the same lady that referred to the Harris County District |
| 10:15:41 | 25 | Attorney for the same sort of investigation and got them |

| | |
|---|---|
| 10:15:44 | 1 |

indicted, that is, got the people indicted.

10:15:47   2          MR. STEPHENS:  Objection, your Honor.

10:15:50   3          THE COURT:  Is there a reason?

10:15:51   4          MR. STEPHENS:  It's not relevant to his decision to

10:15:53   5   terminate Planned Parenthood from Texas Medicare.

10:15:55   6          THE COURT:  Well, go find out.  The objection is

10:15:58   7   overruled.

10:15:59   8   Q.   (BY MR. WATKINS) Now, I urge --

10:16:02   9          THE COURT:  Was there an answer to that question?

10:16:04   10          MR. WATKINS:  I don't think so.

10:16:06   11   A.   Please ask it again.

10:16:07   12   Q.   (BY MR. WATKINS) This is the same lady that made the

10:16:09   13   referral down to the Houston District Attorney's Office and got

10:16:12   14   the videographer indicted?

10:16:14   15   A.   Is that a question?

10:16:15   16   Q.   Yes.

10:16:15   17   A.   I don't know.

10:16:16   18   Q.   Okay.  I urge your office to conduct a thorough

10:16:21   19   investigation of whether or not PPGC, that's Gulf Coast, violated

10:16:26   20   these statutes, and if you agree to such violations, then take

10:16:31   21   appropriate action.  She asked you -- she's not telling you, you

10:16:34   22   ought to do something.  She's saying, here's this, please

10:16:37   23   investigate, right?  Just her.  Not the committee.

10:16:43   24          What investigation did you do?

10:16:46   25   A.   This was a letter to the Attorney General of Texas, Ken

| | | |
|---|---|---|
| 10:16:52 | 1 | Paxton.  The letter was not directed to me to make investigation. |
| 10:16:59 | 2 | The report, however, was useful and informed my decision making. |
| 10:17:04 | 3 | Q.   Well, now, my question to you is, you did not do any |
| 10:17:07 | 4 | investigation.  The Attorney General didn't ask you to |
| 10:17:09 | 5 | investigate in response to this letter. |
| 10:17:11 | 6 | A.   That's right. |
| 10:17:12 | 7 | Q.   So you didn't -- you, the IG, did no investigations after |
| 10:17:19 | 8 | December 1st, 2016, at the time that you did the termination, of |
| 10:17:23 | 9 | any of the allegations that were made in the committee report. |
| 10:17:27 | 10 | A.   That's right. |
| 10:17:34 | 11 | Q.   Now, were you the OIG that issued the termination notice |
| 10:17:45 | 12 | back in 2015? |
| 10:17:47 | 13 | A.   You mean you're referring to the October 19th letter? |
| 10:17:50 | 14 | Q.   Yes. |
| 10:17:51 | 15 | A.   Yes.  I signed the October 19th letter. |
| 10:17:55 | 16 | Q.   All right.  So you had made whatever allegations were in |
| 10:18:00 | 17 | that letter prior to the time you ever saw the congressional |
| 10:18:04 | 18 | report. |
| 10:18:06 | 19 | A.   Yes. |
| 10:18:06 | 20 | Q.   Okay.  And as you said, viewing this video animated your |
| 10:18:14 | 21 | intention to terminate or some language like that.  Do you |
| 10:18:18 | 22 | remember that? |
| 10:18:18 | 23 | A.   Yes. |
| 10:18:20 | 24 | Q.   Well, when did you first get the videos? |
| 10:18:26 | 25 | A.   The agency, as I said, received the videos in September of |

10:18:34  1  2015.

10:18:35  2  Q.   Okay.  And when did you issue the first notice?

10:18:40  3  A.   October 19th.

10:18:44  4          THE COURT:  What year?

10:18:45  5          THE WITNESS:  Of 2015.

10:18:47  6  Q.   (BY MR. WATKINS) All right.

10:18:48  7  A.   It was not a notice of termination.  It began a process of

10:18:52  8  review.  Judge, just to be clear that there's a distinction

10:18:59  9  between the December 20th letter, which is a final notice of

10:19:01  10  termination, and the October 19th letter, which as the first

10:19:04  11  sentence of that letter states, effected a process, began a

10:19:08  12  process.

10:19:10  13  Q.   Well, unless something happened, they were going to

10:19:12  14  terminate.

10:19:13  15  A.   It began the process.  That's correct.

10:19:15  16  Q.   No, no.  That's not my question specifically.

10:19:18  17          Unless something changed the direction the state was

10:19:20  18  intending going on that day, they were going to get terminated

10:19:23  19  unless something else happened to stop it.

10:19:25  20  A.   That's right.

10:19:26  21  Q.   Okay.  Now, then, had you -- how many times had you viewed

10:19:29  22  the video prior to issuing that letter?

10:19:32  23  A.   The October 19th letter?

10:19:34  24  Q.   No.

10:19:35  25  A.   Or the December 20th?  The December 20th letter, I viewed it

| | | |
|---|---|---|
| 10:19:38 | 1 | five times and also read -- have read a transcript. |
| 10:19:42 | 2 | Q.   On the October one in 2015, how many times have you viewed |
| 10:19:47 | 3 | it? |
| 10:19:48 | 4 | A.   I relied on legal staff that had viewed it and advised me on |
| 10:19:52 | 5 | it. |
| 10:19:52 | 6 | Q.   Okay. |
| 10:19:52 | 7 | THE COURT:  Wait, wait.  Read the question back -- |
| 10:19:57 | 8 | A.   Yes.  I'm sorry I did not review that -- the video but |
| 10:20:01 | 9 | before the issuance of that letter.  I relied on legal staff that |
| 10:20:05 | 10 | had. |
| 10:20:05 | 11 | Q.   (BY MR. WATKINS) Okay.  So what they told you, did that |
| 10:20:08 | 12 | animate your interest to issue that letter? |
| 10:20:11 | 13 | A.   Yes. |
| 10:20:12 | 14 | Q.   Okay.  But you didn't do it yourself, right?  Now -- |
| 10:20:18 | 15 | A.   That's right.  I have since watched it. |
| 10:20:24 | 16 | Q.   Well, you watched it.  You, yourself, watched it after you |
| 10:20:27 | 17 | had already sent out the letter telling you were going to |
| 10:20:30 | 18 | terminate them. |
| 10:20:33 | 19 | A.   Yes.  I've watched it between -- between October 19th and |
| 10:20:38 | 20 | December 20th, I watched it five times. |
| 10:20:41 | 21 | THE COURT:  Read the question back, Lily. |
| 10:20:49 | 22 | (Last question read back.) |
| 10:20:52 | 23 | THE COURT:  "Yes" or "No." |
| 10:20:56 | 24 | THE WITNESS:  Yes. |
| 10:20:58 | 25 | Q.   (BY MR. WATKINS) Now, then, between the time that you got |

10:21:02   1   the -- well, before you issued the 2016 termination notice, you

10:21:11   2   know which one I'm talking about?

10:21:12   3   A.   Yes.   December 20th.

10:21:14   4   Q.   Right.   What investigations did your office do of the

10:21:18   5   Planned Parenthood entities that you sent that letter to?

10:21:23   6   A.   We engaged in a number of activities that included the

10:21:30   7   collection of documents.   We also engaged in forensic

10:21:37   8   investigations of billing practices and records, and we also

10:21:48   9   reviewed the video.

10:21:49   10   Q.   Did those investigations prior to the issuance of the

10:21:57   11   December 2016 indicate to you that any doctor had altered an

10:22:00   12   abortion procedure to obtain fetal tissue?

10:22:04   13   A.   Based on the evidence identified in the video, yes.

10:22:07   14   Q.   Oh, which doctor is identified in the video of altering

10:22:13   15   abortion procedures in order to obtain fetal tissue?

10:22:17   16   A.   I don't know which doctor.

10:22:20   17   Q.   Well, my question to you, did you find anybody who had

10:22:23   18   actually done it?   Did you ever find anybody who actually altered

10:22:27   19   an abortion procedure to obtain fetal tissue for research?   Any

10:22:31   20   particular individual that was employed by Planned Parenthood?

10:22:35   21   A.   I understand the question.   I'm sorry.   And the answer's no.

10:22:44   22   Q.   Do you have any idea how many dollars -- tax dollars the

10:22:48   23   state of Texas spent on all of those investigations to try to

10:22:51   24   find that information and never found any of it?

10:22:54   25             MR. STEPHENS:   Objection, your Honor.   This isn't

10:22:55 1   relevant.

10:22:59 2            THE COURT:  It's impressive.

10:23:01 3            MR. WATKINS:  And irritating to me, but I guess it's

10:23:04 4   not relevant, Judge.

10:23:04 5            THE COURT:  It is not.  I agree.

10:23:10 6   Q.   (BY MR. WATKINS) Now, then, we talked a bit about

10:23:23 7   misrepresentations, and I only heard one.  That was the

10:23:28 8   statements that the Texas Ranger made in his report about what

10:23:33 9   somebody said to him.

10:23:33 10  A.   That's right.

10:23:34 11  Q.   Okay.  No other misrepresentations.  All the hours and money

10:23:38 12  that you spent investigating Planned Parenthood, that's the

10:23:42 13  misrepresentation.

10:23:43 14  A.   Yeah.  That's right.

10:23:45 15  Q.   Now, do you know the difference between a misrepresentation

10:23:49 16  and a mistake?

10:23:51 17  A.   Yes, I do.

10:23:52 18  Q.   Okay.  And you can't kick somebody out of Medicaid for

10:23:55 19  making a mistake.

10:23:57 20  A.   That's right.

10:23:58 21  Q.   Okay.  And the difference between a mistake and a

10:24:00 22  misrepresentation is that you know what you're telling somebody

10:24:03 23  is wrong.

10:24:05 24  A.   That's right.

10:24:06 25  Q.   Okay.  Now, if we go -- it's about the IRB, right?

| | | |
|---|---|---|
| 10:24:22 | 1 | A.   That's right. |
| 10:24:22 | 2 | Q.   And the statement that I remember you talking about is the |
| 10:24:32 | 3 | institutional review board had not yet given approval for the |
| 10:24:36 | 4 | Baylor or Rice study. |
| 10:24:37 | 5 | A.   That's right. |
| 10:24:38 | 6 | Q.   Did you interview the person who made that statement? |
| 10:24:41 | 7 | A.   I did not. |
| 10:24:42 | 8 | Q.   Did anybody investigate the state of mind of that speaker |
| 10:24:46 | 9 | that made that statement? |
| 10:24:47 | 10 | A.   No. |
| 10:24:48 | 11 | Q.   Do you have any idea whether she knew or didn't know that |
| 10:24:51 | 12 | that was wrong? |
| 10:24:53 | 13 | A.   I don't. |
| 10:24:54 | 14 | Q.   Okay.  So you don't know whether it's a mistake or a |
| 10:24:56 | 15 | misrepresentation. |
| 10:24:58 | 16 | A.   That's right. |
| 10:24:59 | 17 | Q.   And so, all of the misrepresentations allegations contained |
| 10:25:03 | 18 | in that termination letter and all of the publicity in the state |
| 10:25:06 | 19 | about misrepresentations is related only to something that you |
| 10:25:09 | 20 | don't know whether or not it's a misrepresentation. |
| 10:25:18 | 21 | A.   I don't know whether it was a mistake. |
| 10:25:20 | 22 | Q.   You don't know whether it was a misrepresentation. |
| 10:25:23 | 23 | A.   But I know it was an incorrect statement to a peace officer. |
| 10:25:26 | 24 | Q.   Well, now it's a mistake about what?  About the IRB? |
| 10:25:32 | 25 | A.   About -- yes.  And, Judge, may I speak to that issue? |

10:25:40  1   Q.   Let me ask the question.  What do you want to say about that

10:25:42  2   IRB?

10:25:43  3              THE COURT:  There's going to be plenty of cross.

10:25:46  4              THE WITNESS:  Okay.  Thank you.

10:25:47  5   Q.   (BY MR. WATKINS) What do you want to say about that IRB?

10:25:48  6   A.   Well, the fact -- well, as you well know, Mr. Watkins, that

10:25:53  7   the committee report has an extensive appendix relate to

10:25:59  8   exchanges between the Baylor College of Medicine and Planned

10:26:04  9   Parenthood Gulf Coast, and that extensive history documents a --

10:26:13  10  two years of negotiations on pursuing this agreement.  The offer

10:26:18  11  was made, the offer was accepted by the Baylor College of

10:26:23  12  Medicine after the IRB met.

10:26:29  13             It was certainly a legal matter.  Certainly something

10:26:33  14  that would require attention in the execution of a contract, and

10:26:38  15  therefore, it's not unreasonable to be concerned about that

10:26:45  16  statement that was made to a peace officer.

10:26:49  17  Q.   Okay.  Now, the IRB was on a study that was never contracted

10:26:54  18  for, right?

10:26:59  19  A.   The contract was disavowed.  Yes.  That's right.

10:27:03  20  Q.   Well, no.  Was the contract ever signed by Planned

10:27:06  21  Parenthood?

10:27:06  22  A.   It was not finally executed.

10:27:09  23  Q.   There's a difference between disavowed and there not ever

10:27:13  24  being a contract, isn't there?  I mean, you were just being cute

10:27:15  25  when they said disavowed.  You know the contract was never

10:27:18  1  entered into, right?

10:27:20  2  A.   It was not finalized.   There was an offer, there was an

10:27:23  3  acceptance that Baylor College of Medicine thought they had, but

10:27:25  4  then, there wasn't -- they didn't.

10:27:26  5  Q.   So the study was never done.

10:27:28  6  A.   That's right.

10:27:29  7  Q.   And so, you say that there is a statement to a Texas Ranger

10:27:35  8  about whether or not an IRB was approved or not that you don't

10:27:39  9  know whether it was a mistake or not about a research project

10:27:43  10  that was never entered into and a research project that was never

10:27:47  11  done?

10:27:47  12          MR. STEPHENS:   Objection, your Honor.   That's a

10:27:49  13  compound question.

10:27:49  14          THE COURT:   Actually, it's an argument.

10:27:52  15          MR. STEPHENS:   It's an argument.

10:27:53  16          THE COURT:   Let's take a break.   Ten minutes.

10:41:43  17          (Recess.)

10:41:46  18          THE COURT:   Do you understand you're still under oath,

10:41:48  19  sir?

10:41:48  20          THE WITNESS:   Yes, sir.

10:41:49  21          THE COURT:   All right, sir.   You may proceed.

10:41:51  22  Q.   (BY MR. WATKINS) You are aware, are you not, of the

10:42:01  23  difference between abortion procedures and clinical procedures?

10:42:04  24  A.   Yes, sir.

10:42:05  25  Q.   Okay.   And there's nothing wrong with altering clinical

| | | |
|---|---|---|
| 10:42:10 | 1 | procedures in order to provide research information to an |
| 10:42:13 | 2 | investigator? |
| 10:42:15 | 3 | A.   I think that's true. |
| 10:42:16 | 4 | Q.   Okay.  So, for example, on the first videotape, the first |
| 10:42:23 | 5 | clip, was there anything in that clip that you remember that told |
| 10:42:28 | 6 | you whether or not the comments that the speaker was making about |
| 10:42:31 | 7 | altering abortion procedures or altering clinical procedures? |
| 10:42:35 | 8 | MR. STEPHENS:  Objection, your Honor.  Could he refer |
| 10:42:37 | 9 | to which clip it is by the timestamp so that we know? |
| 10:42:42 | 10 | MR. WATKINS:  7:59:02 to 8:00:43.  That was the first |
| 10:42:49 | 11 | clip. |
| 10:42:49 | 12 | A.   May we look at it again? |
| 10:42:51 | 13 | Q.   (BY MR. WATKINS) Sure.  Wait, before we do, at the time that |
| 10:42:57 | 14 | you viewed it, did you know the difference between altering |
| 10:43:00 | 15 | abortion procedures and altering clinical procedures? |
| 10:43:02 | 16 | A.   Yes. |
| 10:43:03 | 17 | Q.   Okay.  Where did you learn them? |
| 10:43:08 | 18 | A.   I have -- I think that, first of all, it's axiomatic. |
| 10:43:13 | 19 | Second of all, there was distinctive -- there was federal law |
| 10:43:17 | 20 | relevant to altering abortion procedures that, as you well know. |
| 10:43:23 | 21 | Sorry. |
| 10:43:24 | 22 | Q.   Let's look at it.  7:59:02 to 8:00:43. |
| 10:43:46 | 23 | (Audio and video filed played.) |
| 10:45:22 | 24 | Q.   She didn't answer that question, did she? |
| 10:45:31 | 25 | A.   Well, to answer your earlier question -- |

10:45:32   1   Q.   No, no, no, no.  She did not answer that last question.  The

10:45:35   2   video cut off before she answered.

10:45:39   3   A.   Well, that's true.

10:45:40   4   Q.   Okay.  Now, product of conception.  What is that?

10:45:45   5   A.   Those are fetal tissue remains.

10:45:47   6   Q.   All right.  And so, they can alter -- didn't that video clip

10:45:52   7   indicate that they can alter the procedures for the products of

10:45:55   8   conception and doesn't say anything about altering the abortion

10:45:58   9   procedures?

10:45:59   10   A.   I disagree.

10:46:00   11   Q.   Okay.  How -- what is it in that videotape --

10:46:03   12   A.   We can watch it again.  The last 30 seconds, to me, clearly

10:46:09   13   indicated a discussion about altering the procedures.  She uses

10:46:13   14   that word "procedure."  I don't see she was talking about

10:46:16   15   clinical procedures when she says, alter the procedures to secure

10:46:19   16   specific fetal tissue.

10:46:20   17   Q.   Okay.  Well, I mean, you could have fetal tissue which

10:46:25   18   you've already extracted, right?

10:46:27   19   A.   But that's not what was going on here.

10:46:29   20   Q.   We'll get to that.

10:46:31   21   A.   Sorry.  Excuse me.

10:46:32   22   Q.   You could have fetal tissue that you've already extracted

10:46:34   23   and you have a certain standard procedure, right?  I mean, you're

10:46:38   24   going to do something with it.  Now, a researcher wants a

10:46:41   25   particular part of that stuff because they're doing liver

10:46:45  1    research or they're doing something else.  You could alter the

10:46:48  2    clinical procedure in order to get the part of the product of

10:46:50  3    conception that has been extracted in order to give to the

10:46:53  4    researcher, right?

10:46:55  5    A.   You could.

10:46:55  6    Q.   Okay.  Let's look at the video.  Same clip.

10:47:02  7         (Audio and video filed played.)

10:48:48  8    Q.   You cut it off before she answered.

10:48:52  9    A.   The last 25 seconds of that clip was referring to altering

10:48:56  10   an abortion procedure.

10:48:57  11   Q.   Okay.  What makes you say that?

10:49:00  12   A.   It was clear they were talking about high volume.  High

10:49:05  13   volume doesn't mean high volume altering of a procedure to

10:49:09  14   address fetal tissue remains.  High volume means how can you get

10:49:16  15   thymus -- liver thymus, whatever he was talking about, from the

10:49:23  16   products of conception, which is the phrase used at the

10:49:27  17   beginning.

10:49:29  18        And the question that Ms. Farrell was asked was not

10:49:35  19   about, can you alter your clinical procedures in an

10:49:43  20   already-aborted fetal tissue remains in order to access liver

10:49:46  21   thymus.  No.  That is not my -- if I'm wrong, I'll get corrected,

10:49:51  22   but my judgment, that it is reasonable to conclude, especially in

10:49:56  23   the context of all of these conversations that addresses this --

10:50:01  24   this is not the only piece -- that this discussion and when the

10:50:08  25   word "procedure" was used in that colloquy, the last 25 seconds,

| | | |
|---|---|---|
| 10:50:14 | 1 | they were not talking about the procedures of addressing |
| 10:50:18 | 2 | already-aborted fetal tissue remains.  They were addressing |
| 10:50:22 | 3 | abortion procedures. |
| 10:50:23 | 4 | Q.   And you're really not qualified by your education and |
| 10:50:25 | 5 | experience to make that determination, are you? |
| 10:50:27 | 6 | A.   I didn't make it -- |
| 10:50:28 | 7 | MR. STEPHENS:  Objection, your Honor.  He asked him the |
| 10:50:30 | 8 | question. |
| 10:50:30 | 9 | MR. WATKINS:  That's right.  And I've asked him the |
| 10:50:33 | 10 | question, I got his answer, and now I want to know if he's |
| 10:50:35 | 11 | qualified. |
| 10:50:37 | 12 | MR. STEPHENS:  He's trying to disqualify him from |
| 10:50:40 | 13 | answering the question that he asked. |
| 10:50:40 | 14 | THE COURT:  I don't think that what he's trying to do. |
| 10:50:42 | 15 | But let's ask the next question. |
| 10:50:44 | 16 | Q.   (BY MR. WATKINS) And who did you rely on to tell you that |
| 10:50:46 | 17 | that was what that last 25 seconds meant? |
| 10:50:51 | 18 | A.   We have a -- someone that is qualified, Dr. Ted Spears, who |
| 10:50:57 | 19 | is the Chief Medical Officer at the Inspector General whose job |
| 10:51:01 | 20 | it is to render exactly this kind of advice. |
| 10:51:03 | 21 | Q.   And what qualifications does Mr. Ted Spears have to give you |
| 10:51:07 | 22 | that advice? |
| 10:51:09 | 23 | A.   Well, he -- that is his mission.  I mean, he is a doctor, |
| 10:51:17 | 24 | more than 30 years of practice in the state of Texas, and he will |
| 10:51:21 | 25 | be testifying today on exactly this topic. |

| | | |
|---|---|---|
| 10:51:24 | 1 | Q.   He's an orthopedic surgeon. |
| 10:51:27 | 2 | A.   That's right. |
| 10:51:27 | 3 | Q.   He's a sports doctor. |
| 10:51:32 | 4 | A.   He understands -- |
| 10:51:33 | 5 | Q.   He is a sports doctor. |
| 10:51:36 | 6 | A.   Is that a question? |
| 10:51:36 | 7 | Q.   Yes.  Is he a sports doctor? |
| 10:51:38 | 8 | A.   Yes. |
| 10:51:39 | 9 | Q.   Okay.  Has he ever performed an abortion? |
| 10:51:43 | 10 | A.   No.  I don't believe so. |
| 10:51:44 | 11 | Q.   Has he ever been trained as a gynecologist or obstetrician? |
| 10:51:47 | 12 | A.   I don't know. |
| 10:51:48 | 13 | Q.   Okay.  So you relied on him telling you that that's what |
| 10:51:51 | 14 | that 25 seconds meant, and you have no idea if he knows anything |
| 10:51:55 | 15 | about what you asked him about. |
| 10:51:58 | 16 | A.   I've answered why he has the responsibility to advise me. |
| 10:52:04 | 17 | Q.   Well, we'll talk to him later when he gets the stand. |
| 10:52:13 | 18 | Now, you said you had opened some audits and then, the |
| 10:52:16 | 19 | video came along, and then, you never went back to the audits, |
| 10:52:19 | 20 | did you? |
| 10:52:20 | 21 | A.   No.  I didn't -- that's not what I said. |
| 10:52:22 | 22 | Q.   Oh, I'm sorry. |
| 10:52:24 | 23 | A.   What I said was, we were reviewing audit findings and |
| 10:52:29 | 24 | considering the reopening of audits pursuant to that review. |
| 10:52:34 | 25 | Q.   Okay.  But then, the videos came out and you never went back |

60

| | | |
|---|---|---|
| 10:52:37 | 1 | to that.  You didn't reopen it. |
| 10:52:40 | 2 | A.   We have not yet reopened it. |
| 10:52:42 | 3 | Q.   All right.  So there's nothing about those audits that's |
| 10:52:44 | 4 | involved in your decision to -- |
| 10:52:47 | 5 | A.   That's right. |
| 10:52:48 | 6 | Q.   Okay.  Let me show you what is Defendants' 23.  Do you |
| 10:53:19 | 7 | recognize Defendants' 23? |
| 10:53:24 | 8 | A.   May I have a minute to read it? |
| 10:53:26 | 9 | Q.   Yes. |
| 10:53:47 | 10 | MR. WATKINS:  Judge, I have hardcopies for the Court, |
| 10:53:49 | 11 | if you'd like. |
| 10:53:51 | 12 | THE COURT:  Is it admitted? |
| 10:53:55 | 13 | MS. WERNER:  Yes. |
| 10:53:57 | 14 | MR. WATKINS:  Yes.  It's pre-admitted. |
| 10:54:08 | 15 | A.   Yes.  It is an approval letter on an application for |
| 10:54:12 | 16 | enrollment. |
| 10:54:13 | 17 | Q.   (BY MR. WATKINS) All right.  And it's a state record. |
| 10:54:17 | 18 | A.   Yes. |
| 10:54:17 | 19 | Q.   From the OIG's Office, I'm sorry.  That's not right.  That's |
| 10:54:22 | 20 | wrong.  But it's about Planned Parenthood, right?  Gulf Coast? |
| 10:54:26 | 21 | A.   Yes. |
| 10:54:27 | 22 | Q.   And the date's October 17, 2016? |
| 10:54:29 | 23 | A.   Yes. |
| 10:54:30 | 24 | Q.   All right.  Now, let's read the part that's on the second |
| 10:54:33 | 25 | paragraph.  HHSC has approved your application to become a Texas |

10:54:38  1   state healthcare programs provider for a term ending October 13,

10:54:44  2   2021, right?

10:54:46  3   A.   That's right.

10:54:47  4   Q.   You'd already seen the video by then, right?

10:54:52  5   A.   I had not.

10:54:55  6   Q.   But your staff had told you about it.

10:54:58  7   A.   Yes.   That's right.

10:54:59  8   Q.   Now, this decision in that sentence says, to approve your

10:55:04  9   application is based on a recommendation from the HHSC Office of

10:55:09  10  Inspector General.   That's you.

10:55:12  11  A.   Yes.

10:55:13  12  Q.   Okay.   So after you knew about the videos, after you'd been

10:55:18  13  told about the videos, you then approved them as a provider.

10:55:23  14  A.   Yes.

10:55:24  15  Q.   So whatever you had seen prior to October 17, 2016 had not

10:55:31  16  animated you to kick them out yet.

10:55:33  17  A.   That's right, pursuant to our previous discussion of what

10:55:37  18  the October 19th letter is, a beginning of a process, not a fait

10:55:50  19  accompli.

10:55:50  20  Q.   Let me hand you what is Defendants' No. 35.   Do you

10:56:06  21  recognize that?

10:56:08  22  A.   I do.

10:56:09  23  Q.   And that's Greater Texas, right?

10:56:11  24  A.   Yes.

10:56:11  25  Q.   September 26, '16?

```
10:56:14   1    A.    Yes.

10:56:18   2    Q.    And you approved Greater Texas as a provider.

10:56:23   3    A.    That's right.  I did not approve them, but HHSC did.

10:56:28   4    Q.    Oh, well, remember the second sentence, to approve your

10:56:32   5    application is based on a recommendation.  So I misspoke.  You

10:56:35   6    didn't approve it, you just recommended it?

10:56:38   7    A.    May I explain?

10:56:39   8    Q.    Well, you recommended based, in part, on a recommendation

10:56:43   9    from the OIG, right?

10:56:46  10    A.    Yes.

10:56:47  11    Q.    That's what the document says.

10:56:49  12    A.    May I explain recommendation?

10:56:52  13    Q.    Okay.  What's recommendation?

10:56:54  14    A.    Thank you.

10:56:56  15          We have a role in the process of enrollment of all

10:57:01  16    providers and that is to do background checks.  And so, we

10:57:06  17    fulfilled that process, ministerial role in the approval process

10:57:12  18    that is managed by HHSC.

10:57:14  19    Q.    Okay.  Now, I can go through several more, but it's fair to

10:57:18  20    say that a large number of the people that you're trying to

10:57:22  21    terminate, the entities that you're trying to terminate, you

10:57:25  22    approved them as providers after OIG had the videotapes.

10:57:32  23    A.    For good reason.

10:57:33  24    Q.    I didn't ask you for good reason.  My question is, you

10:57:36  25    approved --
```

| | | |
|---|---|---|
| 10:57:36 | 1 | A.   Yes. |
| 10:57:37 | 2 | Q.   -- of them, right? |
| 10:57:38 | 3 | A.   Yes. |
| 10:57:41 | 4 | Q.   Let's look at Plaintiffs' 17.  Do you recognize that? |
| 10:58:32 | 5 | A.   I do. |
| 10:58:33 | 6 | Q.   And that is from the U.S. Code, 42 U.S.C. 1396(a), correct? |
| 10:58:44 | 7 | A.   It is. |
| 10:58:45 | 8 | Q.   Okay.  And it says under the front page, a state plan for |
| 10:58:51 | 9 | medical assistance must, that's a mandatory word, right? |
| 10:58:55 | 10 | A.   Yes. |
| 10:58:55 | 11 | Q.   Okay.  And then, let's turn over to Section 23.  Do you |
| 10:59:09 | 12 | recognize Section 23 on the second page? |
| 10:59:11 | 13 | A.   May I have a minute to read it? |
| 10:59:13 | 14 | Q.   Certainly. |
| 11:00:06 | 15 | A.   Yes. |
| 11:00:07 | 16 | Q.   All right.  And what is that? |
| 11:00:09 | 17 | A.   It's the freedom of choice provision required under the |
| 11:00:13 | 18 | state plan. |
| 11:00:14 | 19 | Q.   And that means that the state of Texas is not supposed to |
| 11:00:17 | 20 | deny to a Medicaid-eligible recipient the right for that person |
| 11:00:22 | 21 | to choose the provider they want. |
| 11:00:24 | 22 | A.   That's right. |
| 11:00:25 | 23 | Q.   And you do know, then, that raising obstacles for those |
| 11:00:30 | 24 | folks to be able to get to the provider of their choice would not |
| 11:00:34 | 25 | be nice. |

| | | |
|---|---|---|
| 11:00:37 | 1 | MR. STEPHENS:  Objection, your Honor.  It's vague. |
| 11:00:41 | 2 | THE COURT:  Vague? |
| 11:00:43 | 3 | MR. STEPHENS:  It's argumentative.  Would not be nice. |
| 11:00:49 | 4 | A.   Right. |
| 11:00:50 | 5 | Q.   (BY MR. WATKINS) What? |
| 11:00:51 | 6 | A.   Yes. |
| 11:00:53 | 7 | Q.   So you didn't do any audit, you didn't reopen the audit. |
| 11:01:04 | 8 | The misrepresentation, that thing to the Texas Ranger, the |
| 11:01:11 | 9 | interpretations of these video clips was made by you, a lawyer, |
| 11:01:15 | 10 | based on the advice of an orthopod.  Do you think that justifies |
| 11:01:21 | 11 | denying these women the right to chose their own provider? |
| 11:01:33 | 12 | MR. STEPHENS:  Objection, your Honor.  It's |
| 11:01:35 | 13 | argumentative. |
| 11:01:38 | 14 | A.   I don't agree -- |
| 11:01:38 | 15 | THE COURT:  He can make the decision.  It's not |
| 11:01:41 | 16 | argument -- |
| 11:01:42 | 17 | A.   I don't agree with the premises of your question.  The |
| 11:01:45 | 18 | reason for the disenrollment of Planned Parenthood Gulf Coast in |
| 11:01:59 | 19 | this case is clearly and convincingly supported by the evidence |
| 11:02:03 | 20 | that came before me.  I judiciously and justly reviewed it.  I |
| 11:02:11 | 21 | was not dilatory, I was diligent.  That the time span reflected |
| 11:02:20 | 22 | that.  And the reason for the disenrollment is contained in that |
| 11:02:25 | 23 | video.  And that video, as I believe the Court will find, upon |
| 11:02:31 | 24 | reviewing the many instances of evidence within it, demonstrably |
| 11:02:40 | 25 | shows a willingness to violate the medical and ethical standards |

| | | |
|---|---|---|
| 11:02:45 | 1 | in Texas, standards buttressed by federal law. |
| 11:02:52 | 2 | THE COURT:  Want to read the question back to the |
| 11:02:54 | 3 | witness. |
| 11:03:15 | 4 | (Last question read back.) |
| 11:03:19 | 5 | A.   And that -- no.  But those aren't the right premises. |
| 11:03:25 | 6 | Q.   (BY MR. WATKINS) All right. |
| 11:03:26 | 7 | A.   Sorry. |
| 11:03:27 | 8 | Q.   I guess we'll talk about the other. |
| 11:03:29 | 9 | By the way, you indicate what you saw indicated a |
| 11:03:31 | 10 | willingness to violate, right?  It's what you just said. |
| 11:03:37 | 11 | A.   I don't believe I used the word "willingness" just now. |
| 11:04:31 | 12 | Q.   (BY MR. WATKINS) You did use the word "willingness." |
| 11:04:33 | 13 | A.   May I answer? |
| 11:04:35 | 14 | Q.   My question is, did you use the word "willingness"? |
| 11:04:37 | 15 | A.   Yes.  And by willingness, may I explain what I meant? |
| 11:04:40 | 16 | Q.   No.  I just want to know if you used it.  Is there a |
| 11:04:43 | 17 | difference between willingness and actually doing something? |
| 11:04:45 | 18 | A.   If I did use the word -- yes.  I take that I used the word |
| 11:04:51 | 19 | "willingness," based on what you just said.  And willingness |
| 11:04:55 | 20 | means, as evidenced in the video, the condoning of a practice |
| 11:05:04 | 21 | that is a program violation.  That's what willingness means. |
| 11:05:08 | 22 | Q.   Well, let's go back to your notice of termination. |
| 11:05:15 | 23 | Defendants' Exhibit 1 and Plaintiffs' Exhibit 1.  You have one up |
| 11:05:20 | 24 | there, don't you? |
| 11:05:20 | 25 | A.   I do. |

| | | |
|---|---|---|
| 11:05:28 | 1 | Q.   Let's go to page 3 -- I'm sorry, page 2. |
| 11:05:34 | 2 | A.   Yes. |
| 11:05:36 | 3 | Q.   The unedited video footage, do you see that paragraph? |
| 11:05:40 | 4 | A.   Yes. |
| 11:05:47 | 5 | Q.   The last sentence starts, HHSC-IG chief medical officer.  Do |
| 11:05:57 | 6 | you see that? |
| 11:05:58 | 7 | A.   You're on page 2 of 6? |
| 11:06:00 | 8 | Q.   Yes. |
| 11:06:02 | 9 | A.   The last sentence of which? |
| 11:06:03 | 10 | Q.   The paragraph that starts, the unedited video. |
| 11:06:06 | 11 | A.   Yes. |
| 11:06:06 | 12 | Q.   The last sentence starts, HHSC. |
| 11:06:08 | 13 | A.   Yes. |
| 11:06:10 | 14 | Q.   Chief medical officer.  That's Mr. Spears -- Dr. Spears that |
| 11:06:14 | 15 | we talked about before, right? |
| 11:06:15 | 16 | A.   That's right. |
| 11:06:15 | 17 | Q.   Okay.  Reviewed the video and concluded that your |
| 11:06:19 | 18 | willingness to engage in these practices.  Which practices are |
| 11:06:25 | 19 | you talking about? |
| 11:06:28 | 20 | A.   The practice evidenced in 3 in the next paragraph. |
| 11:06:32 | 21 | Q.   Okay.  And so, their willingness to engage in those |
| 11:06:37 | 22 | practices is your basis -- is one of the bases for kicking them |
| 11:06:41 | 23 | out? |
| 11:06:41 | 24 | A.   Yes.  And willingness means condoning a practice that is a |
| 11:06:50 | 25 | program violation. |

| | | |
|---|---|---|
| 11:06:53 | 1 | Q.   A willingness to condone? |
| 11:06:55 | 2 | A.   No.   Willingness -- I'm defining willingness.   And it may |
| 11:06:59 | 3 | have been inartfully chosen in this -- in my writing here. |
| 11:07:03 | 4 | THE COURT:   You're now amending your letter? |
| 11:07:05 | 5 | THE WITNESS:   I'm not amending it.   I'm explaining -- |
| 11:07:07 | 6 | THE COURT:   Okay.   Then answer the question.   I'm |
| 11:07:08 | 7 | perfectly able of determining what willingness -- |
| 11:07:12 | 8 | THE WITNESS:   Yes. |
| 11:07:12 | 9 | THE COURT:   What willingness means. |
| 11:07:14 | 10 | THE WITNESS:   Yes, sir. |
| 11:07:17 | 11 | Q.   (BY MR. WATKINS) All right.   Now, let's look at the next |
| 11:07:24 | 12 | paragraph, which you just referenced.   No. 1, a history.   How |
| 11:07:29 | 13 | many times do you know about? |
| 11:07:32 | 14 | A.   The video indicates that this particular condoning or |
| 11:07:40 | 15 | acceptance or practice of this practice has occurred before. |
| 11:07:46 | 16 | Q.   Well, if we're slicing and dicing the words, it says, a |
| 11:07:51 | 17 | history of deviating from accepted standards to procure samples. |
| 11:07:57 | 18 | A.   Yes. |
| 11:07:58 | 19 | Q.   You say that means procured from the pregnant woman, right? |
| 11:08:05 | 20 | That's what you're saying. |
| 11:08:09 | 21 | A.   I'm saying that the video evidence indicates that this has |
| 11:08:16 | 22 | been a practice. |
| 11:08:17 | 23 | Q.   No, sir.   I'm asking you at this point about the words. |
| 11:08:21 | 24 | A.   Yes. |
| 11:08:22 | 25 | Q.   Because you want to redefine some words.   I'm asking you |

11:08:25  1   what you meant by procure samples.  Because, see, my question to

11:08:29  2   you, specifically is, if you've got three trays there of already

11:08:34  3   extracted material and you've got a researcher that wants one of

11:08:38  4   them, you could provide that one to the researcher.

11:08:41  5           MR. STEPHENS:  Objection, your Honor.  He's posing a

11:08:43  6   hypothetical.  It's not shown in the video.  It's not something

11:08:46  7   that's any part of the letter.

11:08:47  8           THE COURT:  Objection is overruled.

11:08:51  9   Q.  (BY MR. WATKINS) Couldn't you?  Couldn't procure there mean

11:08:54  10  that we've got four of these trays with stuff in it, one of them

11:08:56  11  happens to fit the research project and you pick it out, and that

11:09:00  12  would be procuring a sample, wouldn't it?

11:09:04  13  A.  But that is not what I intended or meant in using the word

11:09:09  14  "procure" there.

11:09:10  15  Q.  You meant way to procure it out of the woman's body.

11:09:17  16  A.  Yes.

11:09:18  17  Q.  Okay.  But you didn't say that.

11:09:21  18          All right.  Let's go No. 2.  A history of permitting

11:09:25  19  staff physicians to alter procedures to obtain targeted tissue

11:09:30  20  samples needed for their specific research.

11:09:32  21          Did you hear the testimony that the doctor performing

11:09:35  22  the abortion doesn't know whether it's going to be a research

11:09:38  23  project or not?

11:09:41  24  A.  Yes.

11:09:42  25  Q.  Do you have any evidence other than a doctor who might be

11:09:46  1   doing research themselves, do you have any evidence that any

11:09:49  2   abortion provider ever knew that a particular abortion product

11:09:55  3   was going to be used for research at the time they were

11:09:57  4   performing the abortion?

11:09:58  5   A.    Yes.

11:09:59  6   Q.    What evidence is that?

11:10:00  7   A.    It's in the video, Dr. Reagan Theiler.

11:10:02  8   Q.    Okay.  And you say that the evidence -- is Dr. Theiler the

11:10:07  9   one that was doing her own research?

11:10:11  10  A.    She was doing her own research.  That's right.

11:10:13  11  Q.    All right.  Now, my question to you was, other than a doctor

11:10:16  12  that was doing their own research, do you know of any instance in

11:10:21  13  which a doctor -- any instance where a doctor performing an

11:10:26  14  abortion knew that it was going to be used -- that the product

11:10:28  15  was going to be used for research?

11:10:35  16  A.    I don't -- no.  I'm not aware of that.

11:10:37  17  Q.    All right.  Now, with Dr. Theiler, do you have any evidence

11:10:40  18  that she altered the abortion procedure because she was doing

11:10:44  19  research?

11:10:44  20  A.    I don't know.

11:10:45  21  Q.    Well, you don't have any evidence of any abortion doctor

11:10:48  22  that ever altered the abortion procedure in order to benefit

11:10:52  23  research, sir.

11:11:21  24  A.    All right.  I'm sorry.  That was a statement.  Is that a

11:11:24  25  question?

11:11:24   1   Q.   Yeah.  It's a question.

11:11:25   2   A.   Okay.  It is a question that is right.

11:11:31   3   Q.   Thank you.

11:11:33   4         Now, look at No. 3.  A willingness to convert normal

11:11:39   5   pregnancy to the breach position to ensure researchers to receive

11:11:43   6   intact specimen.

11:11:45   7   A.   Yes.

11:11:47   8   Q.   Which doctor converted normal pregnancy to the breach

11:11:51   9   position to ensure researchers to receive intact specimens?

11:11:58  10   A.   The evidence in the video does not specify a doctor.

11:12:01  11   Q.   So you have no evidence for this court of any doctor who

11:12:05  12   ever did that.

11:12:05  13   A.   That's right.

11:12:07  14   Q.   No. 4, an admission that we get what we need to do to alter

11:12:12  15   the standard of care where we are still maintaining patient

11:12:16  16   safety, still maintaining efficiency and clinic operations, but

11:12:19  17   we integrate research into it.

11:12:20  18         Do you know whether that particular quote -- the lady

11:12:24  19   explained it from the stand the other day -- whether that

11:12:26  20   particular quote applied to altering abortion procedures or

11:12:30  21   altering clinical procedures?

11:12:33  22   A.   It applied in my judgment in viewing the video evidence that

11:12:39  23   -- to altering abortion procedures.

11:12:41  24   Q.   All right.  And so, you discount her testimony that the

11:12:45  25   doctors didn't know whether or not there was going to be -- I

11:12:50   1   mean, you don't know of any.  We've already covered that.  So I'm

11:12:52   2   wondering how you know that a doctor altered the abortion

11:12:55   3   procedures to benefit research that they didn't know there was

11:12:58   4   going to be any research.

11:13:04   5   A.   This was based on the evidence in the video that Planned

11:13:10   6   Parenthood Gulf Coast condones a policy of altering abortion

11:13:18   7   procedures to obtain fetal tissue.  I think that's clearly

11:13:21   8   presented in the video.

11:13:22   9   Q.   All right.  So you're relying solely on the video, and you

11:13:25   10   can't give me the name of a doctor who ever did it.

11:13:28   11   A.   I'm relying on the director of research for Planned

11:13:31   12   Parenthood Gulf Coast.

11:13:31   13   Q.   All right.  So we're going to get all of this from Mr. Ted

11:13:36   14   Spears, right?

11:13:39   15        MR. STEPHENS:  Objection, your Honor.  He said the

11:13:41   16   director of research for Planned Parenthood Gulf Coast.

11:13:43   17        MR. WATKINS:  Ah, excuse me.  I misunderstood.  I

11:13:46   18   didn't listen to the answer and I know better than that.

11:13:49   19        THE COURT:  Well, let's listen.

11:13:51   20   Q.   (BY MR. WATKINS) Now, let's see what we have to do about No.

11:13:55   21   5.  That admission that Planned Parenthood gets requests for

11:14:02   22   information from our study sponsor on what the data they need

11:14:06   23   that is not our standard of care, that you provided -- is needed

11:14:16   24   creating a separate research protocol or a template that can

11:14:19   25   include medically unnecessary testing.

11:14:23  1        Anything wrong with doing medically unnecessary testing

11:14:26  2  on the extraction, the product of conception that's already been

11:14:31  3  extracted?  You can do that, right?

11:14:33  4  A.   There -- I'm sorry, is your question, is there anything

11:14:36  5  wrong with unnecessary testing?

11:14:37  6  Q.   Yes.  Is there anything wrong with doing unnecessary

11:14:42  7  testing, quote, unquote, whatever that means, on extraction that

11:14:47  8  has already been extracted?  Can't you test a fetal tissue for

11:14:52  9  whatever you want to test it for?

11:14:57 10  A.   I think there's something wrong with doing unnecessary

11:15:00 11  testing, but you can test fetal tissue.  Yes.

11:15:02 12  Q.   Well, do you suppose that researchers that are working on

11:15:06 13  fetal tissue ever have a theory and then, they test it and it

11:15:08 14  doesn't work out, that's unnecessary testing, then, isn't it?

11:15:11 15  A.   Okay.  Just different interpretation of the word

11:15:13 16  "unnecessary".

11:15:13 17  Q.   Okay.  Well, let's pin that down.  There's nothing wrong

11:15:19 18  with doing whatever testing you're going to test on the fetal

11:15:23 19  tissue after it's been extracted.

11:15:25 20  A.   Deemed necessary, yes.

11:15:28 21  Q.   Deemed necessary by the researcher for their research

11:15:31 22  project.

11:15:31 23  A.   Right.

11:15:32 24  Q.   Do you have any evidence that anybody ever did any testing

11:15:36 25  on already extracted fetal tissue that was not necessary for the

| | | |
|---|---|---|
| 11:15:40 | 1 | research they were doing? |
| 11:15:44 | 2 | A.   It's -- that part of the finding is tied to the first part. |
| 11:15:50 | 3 | Q.   I'm sorry.  I just thought it was listed there separate. |
| 11:15:56 | 4 |      My question -- can I get an answer to the question? |
| 11:16:00 | 5 | A.   To that particular question, no. |
| 11:16:02 | 6 | Q.   Okay.  You don't know then? |
| 11:16:04 | 7 |      THE COURT:  Wait.  He asked another question, then you |
| 11:16:08 | 8 | said no.  That means you refused to answer. |
| 11:16:11 | 9 |      THE WITNESS:  Oh, I'm sorry. |
| 11:16:13 | 10 | A.   Yes, you can. |
| 11:16:14 | 11 | Q.   (BY MR. WATKINS) Yes, you can what? |
| 11:16:15 | 12 | A.   Yes, you can get an answer.  And would you mind rephrasing |
| 11:16:18 | 13 | it, please?  I apologize. |
| 11:16:24 | 14 | Q.   Is there anything wrong about doing any testing that you |
| 11:16:26 | 15 | want to do to the already extracted fetal tissue? |
| 11:16:34 | 16 | A.   As a general matter, I think not. |
| 11:16:36 | 17 | Q.   All right.  Now, No. 6 here is a willingness to charge more |
| 11:16:45 | 18 | than the cost incurred for procuring fetal tissue.  What do you |
| 11:16:52 | 19 | base that on? |
| 11:16:54 | 20 | A.   Past contracting activity that was -- well, I said two |
| 11:17:03 | 21 | things.  I'm sorry.  I'm happy to begin again. |
| 11:17:08 | 22 |      The video evidence indicates -- excuse me, that in this |
| 11:17:17 | 23 | negotiation, in the colloquies that there's repeated discussion |
| 11:17:24 | 24 | about ensuring there's financial benefit. |
| 11:17:26 | 25 | Q.   Okay. |

| | | |
|---|---|---|
| 11:17:27 | 1 | A.    And financial benefit as those various parts of the dialogue |
| 11:17:38 | 2 | reveal was something extended beyond just covering costs. |
| 11:17:44 | 3 | Q.    What?  I mean, they said they were going to get a financial |
| 11:17:49 | 4 | benefit.  What did they say that would be more than the cost? |
| 11:17:53 | 5 | A.    It was specifically identified in the language between the |
| 11:18:03 | 6 | parties in the video discussing that financial benefit. |
| 11:18:06 | 7 | Q.    In what way? |
| 11:18:09 | 8 | A.    They didn't -- I think the word "profit" was used. |
| 11:18:12 | 9 | Q.    Okay.  So you think there's something in that videotape that |
| 11:18:15 | 10 | says, we need to make a profit? |
| 11:18:17 | 11 | A.    I'm sorry.  Actually, I think the word "profit" was used. |
| 11:18:21 | 12 | That's right. |
| 11:18:21 | 13 | Q.    In what context? |
| 11:18:22 | 14 | A.    Regarding financial benefit. |
| 11:18:23 | 15 | Q.    All right.  So you think that if somebody views the |
| 11:18:26 | 16 | videotape, they're going to find somebody from a Planned |
| 11:18:29 | 17 | Parenthood entity that says, when we do this for research, we |
| 11:18:31 | 18 | have to make a profit? |
| 11:18:35 | 19 | A.    No.  I don't -- it's hypothetical.  I'm speaking to what I |
| 11:18:39 | 20 | viewed in the video. |
| 11:18:41 | 21 | Q.    No, sir.  I'm not asking a hypothetical.  I'm asking you, |
| 11:18:43 | 22 | are you telling this judge that if we review that videotape, |
| 11:18:47 | 23 | you're going to find a Planned Parenthood employee who's going to |
| 11:18:50 | 24 | say, we need to make a profit on research fetal tissue? |
| 11:18:55 | 25 | A.    That statement is not in there.  No. |

| | | |
|---|---|---|
| 11:18:56 | 1 | Q.   All right.  Now, it does say financial benefit? |
| 11:19:00 | 2 | A.   It does. |
| 11:19:01 | 3 | Q.   Yeah.  And it's a financial benefit to get some of your |
| 11:19:04 | 4 | expenses reimbursed, isn't it? |
| 11:19:07 | 5 | A.   Yes.  That's one interpretation. |
| 11:19:11 | 6 | Q.   Well, it's not an interpretation.  It is a -- |
| 11:19:13 | 7 | A.   Application. |
| 11:19:14 | 8 | Q.   It is a financial benefit to get reimbursed for your actual |
| 11:19:19 | 9 | reasonable expenses. |
| 11:19:20 | 10 | A.   Yes. |
| 11:19:21 | 11 | Q.   Thank you. |
| 11:19:26 | 12 |        Now, later down on that page, you list -- and do you |
| 11:19:37 | 13 | understand what I mean when you say, this is the affiliate |
| 11:19:39 | 14 | problem? |
| 11:19:40 | 15 | A.   Yes. |
| 11:19:41 | 16 | Q.   That you're trying to tag one person for somebody else's |
| 11:19:43 | 17 | stuff, right? |
| 11:19:45 | 18 | A.   Yes. |
| 11:19:46 | 19 | Q.   Okay.  You list nine things, right? |
| 11:19:58 | 20 | A.   Yes.  That's correct. |
| 11:19:59 | 21 | Q.   All right.  Nos. 3 through 8 have to do with the Federation, |
| 11:20:07 | 22 | right? |
| 11:20:07 | 23 | A.   Yes. |
| 11:20:07 | 24 | Q.   Okay.  Do you have any evidence that the Federation has done |
| 11:20:13 | 25 | anything wrong? |

```
11:20:14   1   A.    No.

11:20:15   2   Q.    Okay.  So you're not trying to remove the Federation from

11:20:19   3   any Medicaid program in Texas, are you?

11:20:22   4   A.    I don't think that's at issue.

11:20:24   5   Q.    I didn't ask you if that was at issue.

11:20:26   6   A.    I'm sorry.  Yeah.

11:20:27   7   Q.    You're not trying to remove Federation from any Medicaid

11:20:29   8   program in Texas.

11:20:31   9   A.    That's right.

11:20:32  10   Q.    And you don't have any allegation in here that Federation

11:20:35  11   ever did anything wrong.

11:20:37  12   A.    That's right.

11:20:37  13   Q.    Okay.  So you cannot kick out those three entities based on

11:20:42  14   anything the Federation did.

11:20:44  15         MR. STEPHENS:  Objection, your Honor.  Relevance.

11:20:50  16   Planned Parenthood Federation is not discussed in the letter.

11:20:55  17   And plaintiffs' counsel arguing issues not discussed in the

11:21:00  18   letter aren't relate.  Objection to our discussions with Mr.

11:21:03  19   Bowen --

11:21:04  20         THE COURT:  This is cross-examination and I'll permit

11:21:06  21   the answer.

11:21:08  22   A.    Can you rephrase, please?

11:21:10  23   Q.    (BY MR. WATKINS) All right.  I used to be able to remember

11:21:14  24   these things?

11:21:21  25         THE COURT:  Repeat the question, please.
```

| | | |
|---|---|---|
| 11:21:21 | 1 | (Last question read back.) |
| 11:21:24 | 2 | A.   I believe that's right. |
| 11:21:25 | 3 | Q.   (BY MR. WATKINS) Okay.  And so, whether or not the |
| 11:21:29 | 4 | affiliates in Texas are affiliated with Federation is simply |
| 11:21:33 | 5 | irrelevant to what you're trying to do. |
| 11:21:35 | 6 | A.   No.  I don't agree with that. |
| 11:21:37 | 7 | Q.   Well, you're not trying to kick the Federation out. |
| 11:21:41 | 8 | A.   That's right. |
| 11:21:42 | 9 | Q.   All right.  And there's nothing that the Federation did that |
| 11:21:48 | 10 | you could hold the three entities in Texas responsible for. |
| 11:21:53 | 11 | A.   That's right. |
| 11:21:54 | 12 | Q.   Okay.  So whether or not they're affiliated with the |
| 11:21:57 | 13 | Federation just doesn't have anything to do with your right to |
| 11:22:00 | 14 | exclude the three that -- the three entities we've been talking |
| 11:22:03 | 15 | about. |
| 11:22:07 | 16 | A.   I don't agree with that. |
| 11:22:09 | 17 | Q.   Okay.  What is it that the Federation does that you think |
| 11:22:12 | 18 | justifies your right to exclude those three entities from |
| 11:22:16 | 19 | Medicaid? |
| 11:22:17 | 20 | A.   It provides all the guidance regarding fetal tissue |
| 11:22:24 | 21 | research.  It tracks every fetal tissue research activity in the |
| 11:22:29 | 22 | state.  It provides the training.  It provides -- it certifies, |
| 11:22:35 | 23 | you know, it provides man -- there is manifold evidence -- |
| 11:22:45 | 24 | manifest evidence of commonality among the affiliates to |
| 11:22:55 | 25 | demonstrate -- to substantiate their affiliation and not their |

| | | |
|---|---|---|
| 11:22:59 | 1 | separateness.  That this cuts to whether they are an affiliate |
| 11:23:04 | 2 | under Texas law. |
| 11:23:07 | 3 | Q.   Well, my question -- I didn't make my question clear. |
| 11:23:10 | 4 |        What difference does it make if these are affiliates of |
| 11:23:12 | 5 | Federation if they're not saying the Federation did anything |
| 11:23:15 | 6 | wrong? |
| 11:23:19 | 7 | A.   Because the issue is whether they are affiliates.  And our |
| 11:23:24 | 8 | rules provide that if you are affiliated with an entity -- |
| 11:23:30 | 9 | another entity in the state that exhibits a program violation, |
| 11:23:34 | 10 | then you may be subject to sanction. |
| 11:23:37 | 11 | Q.   Right.  So what is the program violation that Federation |
| 11:23:41 | 12 | committed that lets you do this to these entities? |
| 11:23:45 | 13 | A.   There isn't one. |
| 11:23:46 | 14 | Q.   Okay.  Now, so it doesn't matter whether they're affiliated |
| 11:23:50 | 15 | with the Federation. |
| 11:23:59 | 16 | A.   It does, but not for the reasons that the Federation did |
| 11:24:04 | 17 | anything wrong. |
| 11:24:06 | 18 | Q.   Well, what would be wrong with being affiliated with an |
| 11:24:09 | 19 | organization that didn't do anything wrong? |
| 11:24:11 | 20 | A.   There's nothing wrong with that.  The issue is whether these |
| 11:24:15 | 21 | entities are intrinsically and extensively affiliated in their |
| 11:24:21 | 22 | practice and engagement in their procedures and operation, and |
| 11:24:28 | 23 | the answer is yes, they are.  The finding is not that Planned |
| 11:24:34 | 24 | Parenthood Federation of America did something wrong.  The |
| 11:24:36 | 25 | finding is that Planned Parenthood Gulf Coast did. |

| | | |
|---|---|---|
| 11:24:39 | 1 | Q.   All right. |
| 11:24:40 | 2 | A.   And by virtue of that complex nexus within the state of |
| 11:24:49 | 3 | Texas, among these affiliates evidenced by the commonality of |
| 11:24:54 | 4 | practice, which is generated, managed, overseen and executed even |
| 11:25:00 | 5 | by the Federation undergirds the conclusion that the affiliate |
| 11:25:07 | 6 | provision in our rule is applicable here. |
| 11:25:11 | 7 | Q.   That you can hold one entity responsible for the misconduct |
| 11:25:14 | 8 | of another entity.   That's your rule, isn't it? |
| 11:25:17 | 9 | A.   That's it. |
| 11:25:17 | 10 | Q.   All right.   So if you're affiliated with the Federation and |
| 11:25:20 | 11 | they didn't do anything wrong, then you can't hold those three |
| 11:25:23 | 12 | entities responsible because they're affiliated with the |
| 11:25:28 | 13 | Federation. |
| 11:25:29 | 14 | A.   And I disagree. |
| 11:25:34 | 15 | Q.   Okay.   Well, we'll just let you disagree. |
| 11:25:37 | 16 | Now, you've got three others here.   In other words, |
| 11:25:40 | 17 | there's nine of them, and six of them have to do with whether or |
| 11:25:43 | 18 | not they're affiliated with the Federation. |
| 11:25:46 | 19 | A.   Yes. |
| 11:25:46 | 20 | Q.   All right.   Now, common identifying information among |
| 11:25:51 | 21 | affiliates.   What's that?   Number 1. |
| 11:26:01 | 22 | A.   The common insignia, the trademark. |
| 11:26:05 | 23 | Q.   Isn't it true that the state of Texas had always approved |
| 11:26:09 | 24 | the separation of the abortion part of Planned Parenthood from |
| 11:26:12 | 25 | the clinical part? |

11:26:16   1   A.   Yes.   That's required.

11:26:18   2   Q.   Okay.   Well, and you approved it.   You issued these IDs to

11:26:22   3   people based on the fact that these people were not performing

11:26:26   4   abortions.   You ratified the separation attempts that Planned

11:26:32   5   Parenthood did, right?

11:26:34   6   A.   That's right.

11:26:35   7   Q.   Okay.   Individual providers working across affiliates.   All

11:26:43   8   right.   We're talking about in this letter Gulf Coast, Greater

11:26:47   9   Texas and San Antonio, including the surgical center.

11:26:51  10        Name for me -- I've got to get the words right --

11:27:01  11   individual providers working across affiliates.   So name for me

11:27:04  12   every individual provider that worked back and forth between

11:27:09  13   these three entities.

11:27:10  14        MR. STEPHENS:   Asked and answered, your Honor.   He's

11:27:12  15   already asked him.

11:27:17  16   Q.   (BY MR. WATKINS) What I'm asking you about this particular

11:27:19  17   finding, I'm kind of interested in what did you rely upon to make

11:27:24  18   this finding --

11:27:24  19        THE COURT:   You can answer.

11:27:26  20   A.   As I said earlier, Dr. -- I'm sorry, I'm forgetting her name

11:27:31  21   now.

11:27:31  22   Q.   (BY MR. WATKINS) Just don't say it.   We know who you're

11:27:33  23   talking about.

11:27:33  24   A.   Okay.

11:27:34  25   Q.   And you don't know whether that worked simultaneously at any

11:27:38  1   of these.

11:27:43  2   A.   I believe there is -- there are indications in the video

11:27:47  3   that occurred, but I don't know.

11:27:48  4   Q.   All right.  Anybody else?  I mean, here's a big ol' finding

11:27:53  5   by the state of Texas that says that you're going to get these

11:27:58  6   folks moving back and forth.  And if that's the deal, I want to

11:28:01  7   know anybody else.  Are we talking about one doctor?

11:28:06  8   A.   I don't have any other names for you right now.  I believe

11:28:12  9   there was testimony yesterday about a doctor that worked at one

11:28:16  10  entity and then another.  But the answer to your question is, I

11:28:21  11  don't have any other names for you right now.

11:28:22  12  Q.   All right.  Now, we all know that in Travis County, there's

11:28:25  13  a bunch of hospitals.

11:28:26  14  A.   Yes.

11:28:26  15  Q.   We know doctors that do stuff in one hospital and then, go

11:28:29  16  do it at another hospital.

11:28:31  17  A.   That's right.

11:28:32  18  Q.   Does that make those hospitals affiliates?

11:28:34  19  A.   Does it, no.

11:28:36  20  Q.   All right.  Let's also talk about willingness, again, for a

11:28:39  21  minute.  Let's assume, for a moment -- this is a hypothetical --

11:28:42  22  that there's a backboard of directors of three directors, all

11:28:45  23  right?  And one of those directors says, we're short of money,

11:28:49  24  let's go rob a 7-Eleven and get the money for the bank, and the

11:28:53  25  other two say no, we can't do that.  Has that shown that that

11:28:57   1   bank is willing to rob the 7-11?

11:28:59   2   A.   No.

11:29:00   3   Q.   All right.  So you have individuals here who you say have

11:29:04   4   done bad things that are willing to do bad things.

11:29:06   5        Do you have any indication that the board of directors

11:29:08   6   of any of these entities ever approved their willingness to do

11:29:11   7   those things?

11:29:13   8   A.   I don't.

11:29:13   9   Q.   All right.  If you'll give me a minute, Judge, I think I'm

11:29:46  10   about through.  Maybe not.  Pass the witness.

11:30:19  11        THE COURT:  Any redirect?

11:30:22  12        MR. STEPHENS:  No, your Honor.

11:30:33  13        THE COURT:  I have listened to recent testimony about

11:30:41  14   the Department of Health regulations, one of which requires

11:30:49  15   separation of the placenta from fetal tissue and requires

11:30:59  16   separating in the fetal tissue other -- I didn't like the word

11:31:08  17   "ornaments" but other materials that are not exactly fetal

11:31:16  18   tissue.  It makes -- does that make sense to you?

11:31:19  19        THE WITNESS:  Yes, sir.

11:31:19  20        THE COURT:  That has to be done post-removed.

11:31:25  21        THE WITNESS:  Yes.

11:31:32  22        THE COURT:  And it has to be done by the people who are

11:31:39  23   going to store before storing -- before freezing the fetal

11:31:46  24   materials.

11:31:47  25        THE WITNESS:  Uh-huh.  Yes, sir.

| | | |
|---|---|---|
| 11:31:48 | 1 | THE COURT:  I also heard testimony that the regulation |
| 11:32:03 | 2 | in its definition of fetal tissue is that it is not human tissue. |
| 11:32:12 | 3 | I heard it three times and confirmed by the defendants' lawyers. |
| 11:32:28 | 4 | That is your department, isn't it? |
| 11:32:30 | 5 | THE WITNESS:  Yes, sir. |
| 11:32:30 | 6 | THE COURT:  You work in that department.  All right. |
| 11:32:34 | 7 | You may step down. |
| 11:32:46 | 8 | You may call your next witness. |
| 11:32:48 | 9 | MR. BIGGS:  At this time, defendants call Dr. Ted |
| 11:32:51 | 10 | Spears, your Honor. |
| 11:33:20 | 11 | THE COURT:  Come forward, sir, and be sworn. |
| 11:33:22 | 12 | (Witness sworn.) |
| 11:33:37 | 13 | THE COURT:  Good morning.  Would you tell us your full |
| 11:33:42 | 14 | name and spell your last, please, for the record? |
| 11:33:44 | 15 | THE WITNESS:  Yes.  My name is Ted Spears, S-P-E-A-R-S. |
| 11:33:49 | 16 | THE COURT:  You may proceed. |
| 11:33:50 | 17 | TED SPEARS, called by the Defendant, duly sworn. |
| 11:33:50 | 18 | DIRECT EXAMINATION |
| 11:33:50 | 19 | BY MR. BIGGS: |
| 11:33:51 | 20 | Q.   Thank you, your Honor. |
| 11:33:52 | 21 | Good morning, Dr. Spears.  How are you currently |
| 11:33:56 | 22 | employed? |
| 11:33:56 | 23 | A.   I'm the Chief Medical Officer for the Inspector General of |
| 11:34:01 | 24 | the Health and Human Services of Texas. |
| 11:34:02 | 25 | Q.   What does the Inspector General's Office do exactly? |

| 11:34:03 | 1 | A.    The role and responsibility of the Inspector General is the |

11:34:03  1   A.    The role and responsibility of the Inspector General is the

11:34:07  2   integrity, oversight of all of the public funds that are spent in

11:34:13  3   the state of Texas annually.

11:34:15  4   Q.    Does your office have any responsibilities regarding

11:34:17  5   Medicaid?

11:34:18  6   A.    Yes, it does.

11:34:19  7   Q.    Will you briefly describe how Medicaid is administered in

11:34:23  8   Texas?

11:34:23  9   A.    The policy development and review is provided by Health and

11:34:28  10  Human Services.   The Inspector General's role is, again, the

11:34:32  11  integrity, oversight of the programs under Health and Human

11:34:37  12  Services.

11:34:37  13  Q.    As the Chief Medical Officer, what are your

11:34:41  14  responsibilities?

11:34:42  15  A.    My primary responsibility is to provide medical advice and

11:34:47  16  medical direction for clinical matter -- clinical medical

11:34:51  17  matters.

11:34:52  18  Q.    Let's talk about what qualifies you to be the Chief Medical

11:34:55  19  Officer.   Where did you go to college?

11:34:57  20  A.    University of Texas undergraduate here.

11:35:00  21  Q.    Did you continue your education after graduating from

11:35:02  22  college?

11:35:02  23  A.    Yes, I did.   I went to University of Texas Medical Branch in

11:35:07  24  Galveston, Texas.

11:35:08  25  Q.    Did you have any training following graduating from medical

11:35:12  1  school?

11:35:12  2  A.   Yes.  Following medical school, I pursued orthopedic

11:35:16  3  surgical training and did five-year orthopedic surgical

11:35:21  4  residency.

11:35:21  5  Q.   Did you have any further training after that?

11:35:23  6  A.   Yes.  I electively pursued postgraduate subspecialty

11:35:28  7  surgical training, called a fellowship training program, and I

11:35:32  8  performed two of those independently.  One in Houston at the

11:35:37  9  University of Texas Houston.  The other in Dallas with a

11:35:40  10  professor at U.T. Southwestern.

11:35:42  11  Q.   Did those fellowships have any specific concentration?

11:35:45  12  A.   That's -- fellowships are when a doctor does a residency

11:35:51  13  within a specialty, whenever you do a fellowship, you're

11:35:55  14  subspecializing within that.  So, for instance, at the University

11:35:58  15  of Texas, I did a surgical fellowship for complex foot and ankle

11:36:03  16  problems, and then, after that, went to Dallas and performed a

11:36:07  17  complex knee reconstruction in sports medicine fellowship.

11:36:11  18  Q.   What did you do after completing your fellowship?

11:36:13  19  A.   I finally got a job, came back to Austin August of '86, and

11:36:20  20  have been in private practice until August of 2016.

11:36:25  21  Q.   Will you please just briefly describe your practice?

11:36:30  22  A.   My practice was a community orthopedic practice.  I was in

11:36:38  23  sole practice the entire 30 years and I have my own private

11:36:44  24  practice.

11:36:45  25  Q.   Did you perform any surgeries in private practice?

11:36:47  1   A.   Yes.   Surgery is -- orthopedic surgery is the focus of

11:36:53  2   orthopedics, musculoskeletal.   And yes, I did a lot of surgery

11:36:58  3   over 30 years.

11:36:59  4   Q.   How many surgeries have you performed over that period?

11:37:01  5   A.   I think it would be conservative to estimate that I did 200

11:37:05  6   surgeries a year for 30 years, and not counting the time that I

11:37:09  7   spent in training and residency in the fellowship program where I

11:37:12  8   served as a secondary surgical assist.

11:37:15  9   Q.   Are you board-certified?

11:37:16  10  A.   Yes, I am.

11:37:17  11  Q.   What are you board-certified in specifically?

11:37:20  12  A.   I'm board-certified by the American Board of Orthopedic

11:37:23  13  Surgery.

11:37:23  14  Q.   How long have you been board-certified?

11:37:25  15  A.   Since July of 1992.

11:37:28  16  Q.   Do you have any affiliations with entities outside of your

11:37:34  17  private practice?

11:37:35  18  A.   Yes.   Over the years, I've served in a variety of positions

11:37:38  19  with the Texas Orthopedic Association, which is affiliated with

11:37:42  20  Texas Medical Association.   I have been an adjunct professor in

11:37:46  21  the department of kinesiology and exercise physiology for over

11:37:50  22  ten years, and a number of community clinics that I've done pro

11:37:56  23  bono that I enjoyed for the endurance community here in Austin.

11:37:59  24  Q.   Through this training and practice experience, have you

11:38:01  25  become familiar with general medical and ethical standards of

11:38:05  1  surgery?

11:38:05  2  A.    I feel that I have.

11:38:06  3  Q.    How have you become familiar?

11:38:08  4  A.    Well, experience is probably the greatest teacher.

11:38:12  5  Certainly we have some superficial exposure in terms of academic

11:38:15  6  or didactic work, but really, it's a developmental thing.  It's

11:38:22  7  something that over time, you're presented with challenge after

11:38:26  8  challenge and you learn.

11:38:29  9  Q.    Let's turn to the facts of this dispute.

11:38:32  10          Did the Inspector General ever ask you to watch the

11:38:36  11  eight-and-a-half hour Planned Parenthood Gulf Coast video?

11:38:39  12  A.    Yes.

11:38:41  13  Q.    Did you watch that video?

11:38:42  14  A.    Yes, I did.

11:38:44  15  Q.    Did you watch the video in its entirety?

11:38:47  16  A.    Every bit of it.

11:38:49  17  Q.    Did the Inspector General ever ask you for your medical

11:38:52  18  judgment regarding that video?

11:38:54  19  A.    Yes.  After I viewed the video -- he asked for my judgment.

11:38:59  20          MR. WATKINS:  Objection, your Honor.  No foundation

11:39:00  21  that he's got any expertise relating to what was in the video.

11:39:04  22  He's an orthopedic surgeon.  He's a sports medicine man.  No

11:39:07  23  evidence that he's ever performed an abortion or ever seen one.

11:39:12  24  He's not an OB, not a gynecologist and he's not a pediatrician.

11:39:16  25  He has no relevance to the issues that they are asking him to

| | | |
|---|---|---|
| 11:39:20 | 1 | give the opinion on. |
| 11:39:23 | 2 | MR. BIGGS:  Your Honor, we're not tendering Dr. Spears |
| 11:39:26 | 3 | as a expert in OB/GYN or abortion, specifically.  We're asking |
| 11:39:30 | 4 | that he be considered for his role he played in IG Bowen's |
| 11:39:34 | 5 | decisionmaking.  I believe the points that plaintiffs' counsel's |
| 11:39:38 | 6 | brought up could be explored thoroughly on cross.  We're limiting |
| 11:39:41 | 7 | it simply to watching the video and moving forward. |
| 11:39:45 | 8 | THE COURT:  Well, you're limiting it except that seems |
| 11:39:48 | 9 | to be the lawsuit, the video.  But as I understand it, you're |
| 11:39:56 | 10 | limited to what he told the Inspector General.  So I can take it |
| 11:40:02 | 11 | from the record that the Inspector General individually made the |
| 11:40:06 | 12 | decision to terminate them. |
| 11:40:10 | 13 | MR. BIGGS:  Correct, your Honor. |
| 11:40:11 | 14 | THE COURT:  Then I'll overrule your objection.  You can |
| 11:40:15 | 15 | cross-examine on the testimony that what he did and what he told |
| 11:40:22 | 16 | the Inspector General. |
| 11:40:25 | 17 | Q.   (BY MR. BIGGS) Did the Inspector General ever ask you for |
| 11:40:27 | 18 | your medical judgment regarding the video, Dr. Spears? |
| 11:40:30 | 19 | A.   Yes, he did. |
| 11:40:31 | 20 | Q.   Did you provide him with your judgment of that video? |
| 11:40:35 | 21 | A.   Yes. |
| 11:40:36 | 22 | Q.   What did you provide -- what did you state to the Inspector |
| 11:40:40 | 23 | General about your medical judgment? |
| 11:40:43 | 24 | A.   I stated that it is my judgment -- |
| 11:40:45 | 25 | MR. WATKINS:  Your Honor, that calls for an opinion |

11:40:47  1   from an expert, and he's not qualified to give that opinion.  I

11:40:50  2   don't care who he told it to, it doesn't come in or help us in

11:40:53  3   any way in this case unless it a qualified opinion about the

11:40:57  4   information that he's given.

11:40:58  5          THE COURT:  Well, it's a two-way street, two-edged

11:41:04  6   knife, if you want to put it accurately.  If he's not qualified

11:41:09  7   and he gives a opinion that's relied on, then the opinion of the

11:41:16  8   person who accepts it's judgment may be wrong.

11:41:22  9          MR. WATKINS:  I'll withdraw the objection, your Honor.

11:41:24 10          THE COURT:  I still overrule it.  You may proceed.

11:41:28 11   Q.   (BY MR. BIGGS) Thank you, your Honor.

11:41:29 12          What did you tell the Inspector General about the

11:41:32 13   video?

11:41:33 14   A.   It was my judgment that it deviated from the ethical norms

11:41:37 15   of medicine and surgical standards.

11:41:42 16   Q.   Will you explain what you meant by that?

11:41:47 17   A.   I as an other orthopedic surgeon certainly do not sit in the

11:41:52 18   position to critique technical competence of a OB/GYN doctor, but

11:41:58 19   as a surgeon, which has been in that environment and with those

11:42:04 20   experiences, I feel that I have more than sufficient judgment to

11:42:11 21   be able to make judgments about surgical occurrences with

11:42:17 22   patients.

11:42:19 23   Q.   What specifically on the video raised these concerns that

11:42:23 24   were the subject of your medical judgment?

11:42:26 25   A.   The repeated expressions by the director of research as to

11:42:32   1   willingness to make sure that any modification to the surgical

11:42:39   2   procedure could be done and would be something that they could

11:42:44   3   make happen.  And then, the reference to past performance on this

11:42:50   4   very thing where they had had doctors within their services

11:42:57   5   section where they had modified the procedures in the interest

11:43:02   6   not of the patient but in the interest of targeting valuable

11:43:08   7   tissues that were considered to be of value to the researchers.

11:43:12   8   Q.   Why did that raise concern for you?

11:43:16   9   A.   Because the priority was not the patient.  The priority in

11:43:22   10   that case was deviating from the primary concern about the

11:43:25   11   patient.  The patient that the doctor had that doctor-patient

11:43:32   12   contract with.

11:43:34   13   Q.   And after providing your medical judgment to the Inspector

11:43:39   14   General, have you had a chance to go back over and review the

11:43:42   15   materials, specifically, the video?

11:43:43   16   A.   I have.  I reviewed the transcript as well as my personal

11:43:47   17   notes.

11:43:48   18   Q.   As we sit here today, has your judgment of that video

11:43:52   19   changed at all?

11:43:53   20   A.   Not at all.

11:43:54   21   Q.   Pass the witness, your Honor.

11:44:01   22                      CROSS-EXAMINATION

11:44:01   23   BY MR. WATKINS:

11:44:05   24   Q.   Which doctor did you see in the video that said he altered

11:44:10   25   the abortion procedure for the purposes of obtaining fetal

11:44:13   1   tissue?

11:44:13   2   A.   I did not see a doctor in the video.

11:44:16   3   Q.   All right.

11:44:17   4   A.   I read in the transcript that was from Ms. Farrell's

11:44:21   5   testimony.

11:44:22   6   Q.   All right.  And I'm sorry.  I didn't understand that.

11:44:26   7   Wasn't in the video?

11:44:26   8   A.   I'm sorry?  I didn't understand your question.  I did not

11:44:30   9   see a doctor in the video that I'm aware of.

11:44:33   10   Q.   All right.  Do you know of any doctor from Planned

11:44:36   11   Parenthood who altered the abortion procedure in order to benefit

11:44:41   12   the extraction of fetal tissue?

11:44:42   13   A.   No.  The reference was made by Ms. Farrell that there had

11:44:45   14   been physicians in the facility that had done it previously.  She

11:44:48   15   did not mention their names.

11:44:49   16   Q.   Had altered the abortion procedures or had altered the

11:44:55   17   procedures in order to get the fetal tissue?

11:44:58   18   A.   My understanding, it was the abortion procedures because

11:45:01   19   there were references about changing the position of the fetus

11:45:04   20   within the uterus to be able to advantage targeting tissues.

11:45:10   21   Q.   Well, are there occasions when the position of the fetus has

11:45:16   22   changed when there is no research involved?

11:45:18   23   A.   I would have to deter to that judgment to a OB/GYN doctor.

11:45:23   24   Q.   All right.  So you don't know whether any, ever, change in

11:45:28   25   the position of the fetus at Planned Parenthood was ever done

| | | |
|---|---|---|
| 11:45:31 | 1 | solely for the purpose of benefitting research? |
| 11:45:34 | 2 | A.   I was interpreting what the director of research was stating |
| 11:45:39 | 3 | and how she was selling the facility to these would-be vendors. |
| 11:45:43 | 4 | Q.   I'm not asking you about your interpretation. |
| 11:45:45 | 5 | My question is, did you see anything in the video that |
| 11:45:48 | 6 | showed you that a surgeon had altered the abortion procedure for |
| 11:45:52 | 7 | the purpose of obtaining fetal tissue? |
| 11:45:55 | 8 | A.   No.  I did not. |
| 11:46:00 | 9 | Q.   Now, you don't believe that the previous witness has any |
| 11:46:04 | 10 | expertise in interpreting medical terms, do you? |
| 11:46:08 | 11 | A.   If the previous witness you're referring to Inspector |
| 11:46:12 | 12 | General Bowen? |
| 11:46:12 | 13 | Q.   Yes. |
| 11:46:13 | 14 | A.   And your question again was, sir? |
| 11:46:15 | 15 | Q.   You don't contend that he has any expertise in interpreting |
| 11:46:19 | 16 | medical terms or medical procedures. |
| 11:46:23 | 17 | A.   Probably not the medical procedures.  He's not been in that |
| 11:46:29 | 18 | environment.  But as any well-educated citizen, I think that |
| 11:46:34 | 19 | there's a level of understanding of medical terms.  Yes. |
| 11:46:38 | 20 | Q.   Mr. Bowen probably then would have the same ability to |
| 11:46:44 | 21 | interpret those medical terms as I would. |
| 11:46:46 | 22 | A.   Yes. |
| 11:46:49 | 23 | Q.   Now, and you just indicated that you can't tell me whether |
| 11:46:55 | 24 | or not changing the position of the fetus was ever done for the |
| 11:46:59 | 25 | purpose of obtaining fetal tissue. |

11:47:01   1   A.   That would have to be the opinion of an OB/GYN doctor with

11:47:05   2   that experience.

11:47:05   3   Q.   Pass the witness.

11:47:22   4                    RE-DIRECT EXAMINATION

11:47:22   5   BY MR. BIGGS:

11:47:25   6   Q.   Dr. Spears, what is the role of the CMO?  Why is it

11:47:32   7   important to the Inspector General's Office?

11:47:34   8   A.   Well, the Inspector General's Office is charged with, again,

11:47:39   9   integrity, oversight of all public funds that are spent on any

11:47:47   10   health and human service in the state of Texas, and to be able to

11:47:51   11   do that, they need to have subject-matter experts.

11:47:55   12   Q.   Do they have experts in every single subspecialty at the

11:48:00   13   IG's Office?

11:48:01   14   A.   No.  That would be impractical.

11:48:04   15   Q.   Is it part of your duties to provide these opinions?

11:48:08   16   A.   That is my primary duty.

11:48:11   17   Q.   And what specifically qualifies you to provide these

11:48:17   18   opinions?

11:48:17   19   A.   The judgment that I made had to do not with the technical

11:48:22   20   performance of an abortion.  Again, I can see that I would have

11:48:27   21   no way of knowing what is proper to do in the technical

11:48:32   22   performance of an abortion procedure.  But in terms of that

11:48:38   23   contract, that relationship with the doctor and the patient,

11:48:42   24   which is to do where the patient is the primary -- the primary

11:48:48   25   motivation for the patient's good immediately and in the

11:48:53  1   long-term over the years following.  That is a physician's

11:48:58  2   responsibility.  Not for some subordinate or not some other

11:49:04  3   motivation, but strictly for that patient's welfare.

11:49:08  4   Q.   Thank you.  Pass the witness, your Honor.

11:49:11  5                    RE-CROSS EXAMINATION

11:49:13  6   BY MR. WATKINS:

11:49:13  7   Q.   Quickly.

11:49:16  8         Well, you could concede, would you not, that if an

11:49:19  9   abortion provider had provided -- in doing the abortion didn't

11:49:23 10   know if it was for research, then there wouldn't be any problem.

11:49:28 11   A.   Absolutely.  If there was no other motivation other than

11:49:32 12   singularly attentively caring for that patient's immediate and

11:49:36 13   future needs, then no.

11:49:38 14   Q.   All right.  And there can be in a doctor's mind another

11:49:42 15   purpose for the way he's doing the surgery, but if he doesn't --

11:49:46 16   if he pays attention to the patient and only tends to the

11:49:49 17   patient, it's all right if he has some other motive, isn't there?

11:49:52 18   A.   Right.  As long as the patient is the primary focus of that

11:49:55 19   a surgical procedure in every step of that surgical procedure.

11:49:58 20   Q.   So an orthopod who's doing surgery wants to go play golf and

11:50:02 21   he'd like to do the thing really fast so he could make his tee

11:50:06 22   time, that's all right as far as his focus is doing it at the

11:50:08 23   speed that the patient requires.

11:50:10 24   A.   No.  I don't believe that's all right.

11:50:12 25   Q.   You don't?

11:50:12   1   A.   No.  I don't believe that rushing through a surgery for

11:50:16   2   personal convenience or personal interest is okay.

11:50:19   3   Q.   Well, that wasn't my question.

11:50:20   4        My question is, the speed that he applied to that

11:50:23   5   operation was done solely -- was done for the purpose of the

11:50:26   6   patient.  It's okay for him to have another agenda.

11:50:29   7   A.   Yes.  I agree with that.

11:50:36   8        MR. BIGGS:  Nothing further from this witness, your

11:50:38   9   Honor.

11:50:38  10        THE COURT:  May the witness be excused?

11:50:40  11        MR. BIGGS:  Yes, your Honor.

11:50:41  12        MR. WATKINS:  Yes, your Honor.

11:50:42  13        THE COURT:  You may be excused.

11:50:43  14        THE WITNESS:  Thank you, Judge.

11:50:51  15        THE COURT:  Where are we?

11:50:53  16        MR. STEPHENS:  We have a witness we could call now,

11:50:55  17   unless the Court will take --

11:50:58  18        THE COURT:  Well, we've only got nine minutes.  Is

11:51:00  19   it -- as we say in the business, is it a nine-minute witness?

11:51:04  20        MR. STEPHENS:  Not a nine-minute witness.

11:51:06  21        THE COURT:  Well, at least you're honest.  Most people

11:51:08  22   would say yes.  How many other witnesses do you have, three or

11:51:12  23   four?

11:51:13  24        MR. STEPHENS:  As of now, I believe three.

11:51:16  25        THE COURT:  Three.  All right.  Okay.

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                      AMARILLO DIVISION

 3
     UNITED STATES OF AMERICA, )
 4   EX REL. ALEX DOE, RELATOR,)
                               )
 5   THE STATES OF TEXAS,      )
     EX REL. ALEX DOE, RELATOR,)CIVIL ACTION NO.
 6                             )2-21-CV-022-Z
     THE STATE OF LOUISIANA,   )
 7   EX REL. ALEX DOE, RELATOR,) CASE FILED UNDER SEAL
                               )
 8          PLAINTIFFS,        )
                               )
 9   V.                        )
                               )
10   PLANNED PARENTHOOD        )
     FEDERATION OF AMERICA,    )
11   INC., PLANNED PARENTHOOD  )
     GULF COAST, INC., PLANNED )
12   PARENTHOOD OF GREATER     )
     TEXAS, INC., PLANNED      )
13   PARENTHOOD SOUTH TEXAS,   )
     INC., PLANNED PARENTHOOD  )
14   CAMERON COUNTY, INC.,     )
     PLANNED PARENTHOOD SAN    )
15   ANTONIO, INC.,            )
                               )
16          DEFENDANTS.        )
17
18   ********************************************************
19           ORAL AND VIDEOTAPED DEPOSITION OF
20                      TED SPEARS
21                  DECEMBER 07, 2022
22   ********************************************************
23
24
25
```

Page 30

```
 1    that would be an amputation.
 2        Q.  Now, at the time you were in private practice --
 3    strike that.
 4        Do you consider yourself an expert in particular
 5    kinds of medicine?
 6        A.  Yes.
 7        Q.  And what are those?
 8        A.  Well, in orthopedics in general, but even more
 9    focused authority in sports medicine dealing with
10    repetitive use injuries in endurance athletes.
11        Q.  And is that based off of your sense of training
12    and experience?
13        A.  Yes.
14        Q.  Now, what year did you join the Office of the
15    Inspector General?
16        A.  2016.
17        Q.  And if I use OIG, are you going to understand
18    what I'm referring to?
19        A.  Yes.
20        Q.  Excellent.  That's a mouthful.  And what month in
21    2016 did you join the office?
22        A.  August.
23        Q.  And what brought you to OIG?
24        A.  I was offered the position after they had
25    resignation of their previous chief medical officer.  I
```

Page 69

1    Q.  And what is that?

2    A.  I would moonlight on the weekends in small

3    community emergency rooms.

4    Q.  And at what time period was that?

5    A.  That was from 1981 to 1985.

6    Q.  So after 1985, did you have any experience with

7    OBGYN procedures?

8    A.  No.

9    Q.  Have you ever assisted with an abortion

10   procedure?

11   A.  No.

12   Q.  Do you recall the length of the first trimester

13   of a pregnancy?

14   A.  I believe that -- yes, I believe that I know

15   that.

16   Q.  And what do you think it is?

17   A.  The first trimester?

18   Q.  Uh-huh.

19   A.  Three months.

20   Q.  And is that based off of your professional

21   experience or your personal experience?

22   A.  Based off education.

23   Q.  So that would be medical school?

24   A.  Yes.

25   Q.  And what are your personal views on abortion?

Page 71

1    A.  I believe that would be, as well as illegal.

2    Q.  (By Mrs. Reeder-Ricchetti) And would it be a

3    violation of accepted medical community standards?

4             MRS. ALLEN:  Object to form.

5    A.  If it were illegal.

6    Q.  (By Mrs. Reeder-Ricchetti) And actually I want to

7    -- I'm trying to understand the term accepted medical

8    community standards.  Is that the same thing as medical

9    orthodoxy?

10   A.  I wouldn't -- I wouldn't characterize the same as

11   exactly, but yes, I believe there would be overlap.

12   Q.  Okay.  So how would you define accepted medical

13   community standards?

14   A.  Practices of medicine that were accepted by the

15   preponderance of physicians according to state and

16   federal law in the normative standards of medicine that

17   are set out in rules by the Texas Medical Board.

18   Q.  And going back to medical ethics, if something is

19   illegal, is it, per se, a violation of medical ethics in

20   your opinion?

21            MRS. ALLEN:  Objection, form.

22   A.  Yes, I would say that would be correct.

23   Q.  (By Mrs. Reeder-Ricchetti) So say that there was

24   a law prohibiting a procedure that a patient needed,

25   would providing that procedure, even though it's in the

Page 111

1    I'm just asking the date of the communication.  I don't

2    want to know what was said, I just want to know the date

3    or roughly the time period.

4        Q.  (By Mrs. Reeder-Ricchetti) Was it before the

5    hearing where you testified that you learned your

6    opinion was a basis to terminate Planned Parenthood?

7        A.  Ask that again, please.

8        Q.  Do you recall testifying at a hearing in January

9    of 2017?

10       A.  Yes.

11       Q.  Did you learn before that hearing that your

12   opinion was a basis to terminate Planned Parenthood Gulf

13   Coast?

14       A.  No.

15       Q.  Sitting here today, do you think what you saw in

16   the video and Melissa Farrell's comments justifies the

17   termination --

18            MRS. HACKER:  Object to form.

19       Q.  (By Mrs. Reeder-Ricchetti) -- of the three

20   Planned Parenthood affiliates?

21            MRS. ALLEN:  Objection, form.

22            MRS. HACKER:  Object to form.

23       A.  That's outside of my opinion, experience, role.

24   I -- I don't have an opinion if it does or not.  I don't

25   know the legal basis for termination or exclusion,

Page 112

1    either one.

2       Q.  (By Mrs. Reeder-Ricchetti) You don't know the

3    legal basis for termination or exclusion?

4              MRS. ALLEN:  Objection, form, asked and

5    answered.

6       A.  Those terms still, in my mind, are confusing.  I

7    would have to reference some type of rule or code.

8       Q.  (By Mrs. Reeder-Ricchetti) And you don't have any

9    personal opinion as to whether Melissa Farrell's

10   comments in the video justified the termination of the

11   three Planned Parenthood affiliates?

12             MRS. ALLEN:  Object to form.

13             MRS. HACKER:  Object to form.

14      A.  No, I don't.

15             MRS. REEDER-RICCHETTI:  That's all.  I'll

16   pass the witness.

17             MRS. ALLEN:  And we do not have questions at

18   this time, so thank you.

19             MRS. HACKER:  No questions from Relator.

20             THE VIDEOGRAPHER:  Off the record at 3:11.

21          (Deposition concluded at 3:11 p.m.)

22             *-*-*SIGNATURE REQUESTED*-*-*

23

24

25

1          UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF LOUISIANA

3

4   PLANNED PARENTHOOD GULF COAST,
    INC.,ET AL                    : CIVIL ACTION
5
    VERSUS                        : NO. 15-565
6
    KATHY KLIEBERT                : HON. JOHN W. DEGRAVELLES
7
                                  : SEPTEMBER 02, 2015
8   ================================================================

9                    MOTION HEARING

10  ================================================================

11              A P P E A R A N C E S

12  FOR PLANNED PARENTHOOD GULF COAST INC.:

13      MS. CARRIE Y. FLAXMAN
        PLANNED PARENTHOOD FEDERATION OF AMERICA
14      1110 VERMONT AVENUE, NW
        SUITE 300
15      WASHINGTON, DC 20005

16

17  FOR KATHY KLIEBERT:

18      MR. STEPHEN R. RUSSO
        LOUISIANA DEPARTMENT OF HEALTH & HOSPITALS
19      POST OFFICE BOX 3836
        BATON ROUGE, LOUISIANA 70821-3836
20

21

22          REPORTED BY:  GINA DELATTE-RICHARD,CCR

23  _____

24              UNITED STATES COURTHOUSE
            BATON ROUGE, LOUISIANA 70801
25                (225) 389-3564

1   LOUISIANA; ONE IS IN BATON ROUGE OR ONE IS IN NEW ORLEANS.  I

2   CAN GIVE THE ADDRESSES --

3          THE COURT:  OKAY.

4          MS. FLAXMAN:  -- AS WELL IF YOU'D LIKE THEM.  THE

5   BATON ROUGE HEALTH CENTER IS AT 3955 GOVERNMENT STREET AND IN

6   NEW ORLEANS IT'S 4018 MAGAZINE STREET.

7          THE COURT:  ALL RIGHT.  THANK YOU.  I DON'T HAVE ANY

8   OTHER QUESTIONS.

9          MS. FLAXMAN:  THANK YOU.

10         THE COURT:  AND LET ME START WITH THE SAME QUESTION

11  THAT I STARTED WITH MS. FLAXMAN.  THERE IS NO QUESTION, I TAKE

12  IT, ABOUT THE COMPETENCY OF THESE TWO FACILITIES TO PROVIDE

13  MEDICAID SERVICES AND ADEQUATE CARE FOR THE PATIENTS THAT THEY

14  SERVE, WOULD YOU AGREE WITH THAT?

15         MR. RUSSO:  AT THIS TIME I WOULD AGREE WITH THAT,

16  YES, YOUR HONOR.

17         THE COURT:  OKAY.  GO FORWARD THEN.

18         MR. RUSSO:  YOUR HONOR --

19         THE COURT:  WAIT, IN FACT, LET ME STOP YOU AGAIN.  I

20  WANTED TO -- BECAUSE THIS SEEMS TO BE ESSENTIAL TO THE ISSUES

21  IN THIS CASE.  MS. KLIEBERT IN HER AFFIDAVIT SAYS, "THAT THE

22  SOLE REASON FOR THE DECISION TO TERMINATE THESE CONTRACTS IS

23  THE, QUOTE, "UTILIZATION OF THE STATUTORY PROVISIONS OF LARS

24  437.11(D)1."  WHAT DOES THAT MEAN?

25         MR. RUSSO:  BASICALLY WHAT THAT MEANS, YOUR HONOR,

1
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF LOUISIANA
2

3    PLANNED PARENTHOOD GULF COAST,
     INC.,ET AL                            : CIVIL ACTION
4
     VERSUS                                : NO. 15-565
5
     KATHY KLIEBERT                        : HON. JOHN W. DEGRAVELLES
6
                                           : OCTOBER 16, 2015
7    ================================================================

8                           MOTION HEARING

9    ================================================================

10                    A P P E A R A N C E S

11   BY PHONE:
     FOR PLANNED PARENTHOOD GULF COAST INC.:
12
         MS. CARRIE Y. FLAXMAN
13       PLANNED PARENTHOOD FEDERATION OF AMERICA
         1110 VERMONT AVENUE, NW
14       SUITE 300
         WASHINGTON, DC 20005
15
     BY PHONE:
16   FOR KATHY KLIEBERT:

17       MR. JIMMY ROY FAIRCLOTH, JR.
         FAIRCLOTH, MELTON & KEISER
18       105 YORKTOWN DRIVE
         ALEXANDRIA, LOUISIANA 71303
19

20

21              REPORTED BY: GINA DELATTE-RICHARD,CCR

22   _____

23                    UNITED STATES COURTHOUSE
                    BATON ROUGE, LOUISIANA 70801
24                         (225) 389-3564

25

1   INFORMATION THAT THAT'S NOT CORRECT?

2           MR. FAIRCLOTH:  I HAVE NO INFORMATION THAT THAT

3   ANSWER IS NOT CORRECT.

4           THE COURT:  ALL RIGHT.  MS. FLAXMAN, SINCE THE TIME

5   THAT WE WERE HERE LAST, ON THE LAST HEARING, HAS DHH OR

6   SECRETARY KLIEBERT OR ANYONE ELSE GIVEN TO YOUR CLIENT ANY

7   INDICATION THAT THE PLANNED PARENTHOOD FACILITIES IN LOUISIANA

8   ARE NOT PERFORMING WELL AND COMPETENTLY?

9           MS. FLAXMAN:  NO, YOUR HONOR.

10          THE COURT:  ALL RIGHT.  MR. FAIRCLOTH, ANY

11  INFORMATION TO SAY THAT THAT'S NOT CORRECT?

12          MR. FAIRCLOTH:  I -- ONE OF THE -- IN TERMS OF

13  PROFESSIONALLY COMPETENT, YOUR HONOR, I THINK THAT'S A TERM OF

14  ART.  THE STATUTES SPEAK TO QUALIFICATIONS AND I THINK THAT

15  THE LAW IS BROADER THAN SIMPLY PROFESSIONAL COMPETENCY AND

16  WE'VE GIVEN A REASON THAT I THINK MEET THE LEGAL DEFINITION OF

17  QUALIFY.  SO I WOULD ANSWER THE COURT THAT NO ADDITIONAL

18  REASONS HAVE BEEN GIVEN.

19          THE COURT:  LISTEN, MR. FAIRCLOTH, I UNDERSTAND YOUR

20  ANSWER, IT'S JUST NOT THE QUESTION I ASKED.  LISTEN CAREFULLY

21  TO MY QUESTION.  I'M NOT ASKING ABOUT QUALIFICATIONS.  THAT'S

22  A WHOLE DIFFERENT BAG OF SNAKES; OKAY?  I'M ASKING ABOUT

23  COMPETENCE.  HERE, AND MR. RUSSO SAID ON THE RECORD WHEN WE

24  WERE HERE LAST, THAT THE PLANNED PARENTHOOD GULF COAST

25  FACILITIES IN LOUISIANA WERE PERFORMING WELL AND COMPETENTLY,

1    AND I'M ASKING YOU DO YOU HAVE ANY INFORMATION THAT'S EVOLVED

2    SINCE MR. RUSSO MADE THAT STATEMENT ON THE RECORD THAT CHANGES

3    THAT STATEMENT?

4           **MR. FAIRCLOTH:**  I HAVE NO INFORMATION THAT WOULD

5    CHANGE IF MR. RUSSO MADE THAT STATEMENT, YOUR HONOR.

6           **THE COURT:**  ALL RIGHT.

7           AND THEN, MS. FLAXMAN, WITH RESPECT TO THE VIDEO

8    TAPES WHICH MR. RUSSO SAID WAS THE MOTIVE FOR ALL OF THIS, IS

9    THERE ANYONE IN THE VIDEO TAPES THAT WORKS FOR PLANNED

10    PARENTHOOD GULF COAST?

11           **MS. FLAXMAN:**  YES, YOUR HONOR, ONE OF THE VIDEO

12    TAPES.

13           **THE COURT:**  WHO IS IT?

14           **MS. FLAXMAN:**  SHE WORKS -- HER NAME IS MELISSA

15    FERELL AND SHE WORKS IN HOUSTON.  SHE --

16           **THE COURT:**  ALL RIGHT.  IS SHE -- I'M SORRY, GO

17    AHEAD.

18           **MS. FLAXMAN:**  SHE DOES NOT WORK AT ALL IN LOUISIANA.

19           **THE COURT:**  INSOFAR AS THE PLANNED PARENTHOOD

20    FACILITIES IN LOUISIANA, DOES THIS INDIVIDUAL HAVE ANYTHING TO

21    DO WITH THOSE FACILITIES?

22           **MS. FLAXMAN:**  I DON'T BELIEVE SHE DOES, YOUR HONOR.

23    SHE'S HEAD OF RESEARCH FOR THE ENTIRE AFFILIATE.  THERE MAY BE

24    SOME RESEARCH PROJECTS THAT HAVE HAD SOME RESEARCH DONE IN

25    LOUISIANA.  I CAN CONFIRM THAT ONE WAY OR ANOTHER, BUT THEY

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

PLANNED PARENTHOOD GULFCOAST, INCORPORATED;
JANE DOE #1; JANE DOE #2; and JANE DOE #3,

Plaintiffs-Appellees,

v.

REBEKAH GEE, Secretary, Louisiana Department of Health and Hospitals,

Defendant-Appellant.

———————————

On Appeal from the United States District Court
for the Middle District of Louisiana (No. 3:15-cv-00565)

———————————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

———————————

*Of Counsel:*

WILLIAM B. SCHULTZ
  *General Counsel*

GIA LEE
  *Deputy General Counsel*

JANICE L. HOFFMAN
  *Associate General Counsel*

BRIDGETTE KAISER
JEREMY KREISBERG
  *Attorneys*
  *Department of Health & Human Services*
  *Washington, D.C. 20201*

BENJAMIN C. MIZER
  *Principal Deputy Assistant*
  *Attorney General*

J. WALTER GREEN
  *United States Attorney*

MARK B. STERN
ALISA B. KLEIN
  *(202) 514-1597*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7235*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*

PPGC00606830

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ........................................................................1

STATEMENT..........................................................................................2

ARGUMENT ...........................................................................................7

I.  The Free Choice Of Providers Requirement Confers An
    Individual Right That Medicaid Beneficiaries May Enforce
    In A Section 1983 Action ................................................................7

II.  A State Does Not Have Unfettered Discretion To Disqualify
     Medicaid Providers .......................................................................9

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** <span style="float:right">**Page(s)**</span>

*Armstrong v. Exceptional Child Ctr., Inc.,*
   135 S. Ct. 1378 (2015) ...................................................................8, 9

*Atkins v. Rivera,*
   477 U.S. 154 (1986) .......................................................................2, 3

*Center for Special Needs Tr. Admin., Inc. v. Olson,*
   676 F.3d 688 (8th Cir. 2012) .............................................................8

*Gonzaga Univ. v. Doe,*
   536 U.S. 273 (2002) ...........................................................................7

*Harris v. McRae,*
   448 U.S. 297 (1980) ...........................................................................3

*Harris v. Olszewski,*
   442 F.3d 456 (6th Cir. 2006) ..........................................................7, 8

*O'Bannon v. Town Court Nursing Ctr.,*
   447 U.S. 773 (1980) ............................................... 3, 4, 9, 15

*Planned Parenthood Arizona, Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013),
   *cert. denied*, 134 S. Ct. 1283 (2014) .......................... 1, 4, 7, 9, 10, 11, 13, 14, 15

*Planned Parenthood Arkansas & Eastern Oklahoma v. Selig,*
   No. 4:15-cv-00566 (E.D. Ark. Oct. 2, 2015), *appeal pending*,
   No. 15-3271 (8th Cir.) ..................................................................... 2, 16

*Planned Parenthood of Indiana, Inc. v. Commissioner of the Indiana State*
   *Department of Health*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*,
   133 S. Ct. 2736 (2013) ............................................... 1, 4, 7, 8, 10, 11, 13, 14, 15

*Planned Parenthood Southeast, Inc. v. Bentley*, __ F. Supp. 3d __,
   2015 WL 6517875 (M.D. Ala. 2013) ............................................. 2, 16

APP.185

PPGC00606832

*S.D. ex rel. Dickson v. Hood*,
  391 F.3d 581 (5th Cir. 2004) ..................................................................................8

**Statutes:**

Social Security Act

42 U.S.C. § 1320a-7 .............................................................................. 5, 6, 11, 12
42 U.S.C. § 1320a-7(a) ...........................................................................................5
42 U.S.C. § 1320a-7(b) ...........................................................................................5
42 U.S.C. § 1320a-7(b)(4) .......................................................................................5
42 U.S.C. § 1320a-7(b)(4)(A) ................................................................................11
42 U.S.C. § 1320a-7(b)(6) .......................................................................................6
42 U.S.C. § 1320a-7(b)(8) .......................................................................................6
42 U.S.C. § 1320a-7(b)(15) .....................................................................................6
42 U.S.C. § 1320a-7a ..........................................................................................5, 6
42 U.S.C. § 1395cc(b)(2) .....................................................................................5, 6
42 U.S.C. § 1396 *et seq.* ........................................................................................2
42 U.S.C. § 1396a .....................................................................................................3
42 U.S.C. § 1396a(a)(10) .........................................................................................8
42 U.S.C. § 1396a(a)(23) ...................................................... 1, 3, 4, 7, 12, 13, 15
42 U.S.C. § 1396a(a)(23)(A) ...................................................................................9
42 U.S.C. § 1396a(a)(23)(B) ...................................................................................4
42 U.S.C. § 1396a(a)(30)(A) ...................................................................................8
42 U.S.C. § 1396a(p)(1) .................................................................... 5, 11, 13
42 U.S.C. § 1396a(p)(3) .......................................................................... 5, 11
42 U.S.C. § 1396b(a)(5) ...........................................................................................3
42 U.S.C. § 1396d(a)(4)(C) ......................................................................................4
42 U.S.C. § 1396d(b) ................................................................................................3
42 U.S.C. § 1396p(d)(4)(C) ......................................................................................8

42 U.S.C. § 1983 ......................................................................................................7

**Regulations:**

42 C.F.R. § 431.51(c)(2) ............................................................... 4, 10, 12, 13
42 C.F.R. § 455.101 ..................................................................................................4
42 C.F.R. § 1002.212 ..............................................................................................12
42 C.F.R. § 1002.213 ..............................................................................................12
42 C.F.R. § 1002.2001 ............................................................................................12

iii

## STATEMENT OF INTEREST

The United States respectfully submits this amicus brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure. The United States has a strong interest in the proper operation of the Medicaid program—which provides health care coverage to more than seventy million low-income persons who otherwise would likely be unable to afford health care services—and in ensuring that states administer their federally subsidized Medicaid programs in a manner that is consistent with the Medicaid statute.

This appeal concerns 42 U.S.C. § 1396a(a)(23), which gives Medicaid beneficiaries the right to obtain services from any qualified and willing provider of their choosing. The same provision, known as the "free choice of providers requirement," was at issue in *Planned Parenthood of Indiana, Inc. v. Commissioner of the Indiana State Department of Health*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2736 (2013), and *Planned Parenthood Arizona, Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1283 (2014), where the United States participated as amicus. In those cases, the Seventh and Ninth Circuits concluded that Indiana and Arizona violated the free choice of providers requirement by enacting laws that had the effect of excluding local Planned Parenthood organizations from their respective Medicaid programs for grounds unrelated to their fitness to perform needed services.

PPGC00606834

Recently, a number of states including Louisiana, Arkansas and Alabama

have sought to terminate local Planned Parenthood providers from their Medicaid

programs.  In each case, the district court concluded that the plaintiff Medicaid

beneficiaries are likely to succeed on their claim that the termination violates the

free choice of providers requirement.[1]  In this amicus brief, we set out the legal

principles that are generally applicable to such claims, and defer to the parties to

address the particular facts, circumstances and procedural posture of this case.[2]

## STATEMENT

The Medicaid program, established under Title XIX of the Social Security

Act, 42 U.S.C. § 1396 *et seq.*, is a cooperative program through which the federal

government provides financial assistance to states so that they may furnish medical

care to needy individuals.  "The Federal Government shares the costs of Medicaid

with States that elect to participate in the program."  *Atkins v. Rivera*, 477 U.S.

154, 156-57 (1986).  "In return, participating States are to comply with

---

[1] *See* ROA.886-965 (district court opinion); *Planned Parenthood Arkansas & Eastern Oklahoma v. Selig*, No. 4:15-cv-00566 (E.D. Ark. Oct. 2, 2015), *appeal pending*, No. 15-3271 (8th Cir.); *Planned Parenthood Southeast, Inc. v. Bentley*, __ F. Supp. 3d __, 2015 WL 6517875 (M.D. Ala. 2013).  Alabama did not appeal the preliminary injunction, and a permanent injunction was entered on the parties' joint motion.  *See Planned Parenthood Southeast, Inc. v. Bentley*, No. 2:15-cv-00620 (M.D. Ala.), Dkt. No. 70.

[2] We likewise defer to the parties to address issues such as ripeness, exhaustion, and irreparable harm.

2

APP.188

PPGC00606835

requirements imposed by the Act and by the Secretary of Health and Human Services." *Id.* at 157.

To be eligible for federal funds, a participating state must develop a plan for medical assistance that demonstrates compliance with the requirements of the Medicaid statute and regulations. *See* 42 U.S.C. § 1396a. If the Department of Health and Human Services (HHS) approves the state plan, the federal government reimburses the state for a percentage of qualified Medicaid expenses. The federal contribution rate varies depending on a state's per capita income, but federal funds pay at least 50% of the cost of providing medical assistance to Medicaid beneficiaries. *See id.* § 1396d(b). For family planning services, the federal government pays 90% of the cost of the services, whereas a state pays only 10% of the cost. *See id.* § 1396b(a)(5).[3]

Although state participation in the Medicaid program is voluntary, once a state elects to join the program, it must comply with federal requirements. The requirement at issue here is 42 U.S.C. § 1396a(a)(23), which gives Medicaid beneficiaries "the right to choose among a range of qualified providers, without government interference." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773,

---

[3] This case does not involve abortion services. *See* ROA.891. Moreover, the federal Hyde Amendment prohibits the use of Medicaid funding for abortions except where the pregnancy results from rape or incest or the life of the pregnant woman is at stake. *See Harris v. McRae*, 448 U.S. 297, 302 (1980).

APP.189

PPGC00606836

785 (1980) (emphasis omitted).  Subparagraph (B) of this provision establishes

additional protections for recipients of family planning services (which, as noted

above, are reimbursed at an enhanced federal rate).  Even in the context of

managed care, where a state otherwise may place certain limits on a Medicaid

beneficiary's free choice of providers, a state may not limit a beneficiary's free

choice of providers of family planning services.  *See* 42 U.S.C. § 1396a(a)(23)(B)

(cross-referencing § 1396d(a)(4)(C)).

Longstanding HHS regulations allow a state to establish "reasonable

standards relating to the qualifications of providers."  42 C.F.R. § 431.51(c)(2).

Consistent with Section 1396a(a)(23)'s free choice of providers requirement,

however, such standards must relate to a provider's fitness to perform the medical

services the patient requires—*i.e.*, its capability to perform the required services in

a professionally competent, safe, legal, and ethical matter—or to bill appropriately

for those services.  *See Planned Parenthood of Indiana, Inc. v. Commissioner of

the Indiana State Department of Health*, 699 F.3d 962, 978 (7th Cir. 2012);

*Planned Parenthood Arizona, Inc. v. Betlach*, 727 F.3d 960, 975 (9th Cir. 2013);

42 C.F.R. § 455.101.

The Medicaid statute also provides that in addition to any other authority, a

state may exclude from Medicaid any "individual or entity" "for any reason for

which the Secretary could exclude the individual or entity" from the Medicare

APP.190

PPGC00606837

program under 42 U.S.C. §§ 1320a-7, 1320a-7a, or 42 U.S.C. 1395cc(b)(2). *See*

42 U.S.C. § 1396a(p)(1), (3). These provisions require or permit the Secretary to

exclude a provider for specific reasons enumerated in the statute, after an

administrative hearing.

For example, an individual or entity must be excluded under Section 1320a-

7 if convicted of specified criminal offenses, such as a felony related to health care

fraud; a felony related to the unlawful manufacture or distribution of a controlled

substance; or a criminal offense related to the delivery of services under a federal

or state health care program or the neglect or abuse of patients. *See id.* § 1320a-

7(a). An individual or entity may also be excluded under that section if convicted

of other specified offenses, such as a misdemeanor related to health care fraud; an

offense related to the obstruction of an investigation or audit relating to offenses

for which exclusion is permitted; or an offense related to obstruction of an

investigation or audit relating to the use of funds received from a federal health

care program. *See id.* § 1320a-7(b). The Secretary may exclude any individual or

entity whose license to provide health care has been revoked or suspended by any

state licensing authority for reasons bearing on the individual's or entity's

professional competence, professional performance, or financial integrity. 42

U.S.C. § 1320a-7(b)(4). In addition, the Secretary may exclude any individual or

entity that the Secretary determines has submitted substantially excessive bills

APP.191

PPGC00606838

under Medicare or a state health care program without good cause, or has furnished items or services substantially in excess of the needs of patients or of a quality which fails to meet professionally recognized standards of health care. *See id.* § 1320a-7(b)(6).[4]

Reasons for termination of a Medicare provider agreement pursuant to 42 U.S.C. § 1395cc(b)(2) are also enumerated in the statute and, like the reasons for exclusion under Section 1320a-7, relate to the provider's compliance with program standards and financial integrity.

These provisions of the Social Security Act do not treat affiliated entities as a single entity. Instead, the provisions separately address the treatment of individuals and entities that are associated with sanctioned or excluded providers. Section 1320a-7(b)(8) allows the Secretary to exclude "[e]ntities controlled by a sanctioned individual" from federal health care programs, and Section 1320a-7(b)(15) allows the Secretary to exclude "[i]ndividuals controlling a sanctioned entity." Thus, a provider's affiliation with a sanctioned individual or entity is not, by itself, a sufficient basis to exclude the provider from a health care program under these provisions.

---

[4] Additional grounds for exclusion are set forth in Section 1320a-7 and in 42 U.S.C. § 1320a-7a, which also provides additional remedies.

APP.192

PPGC00606839

# ARGUMENT

### I.    The Free Choice Of Providers Requirement Confers An Individual Right That Medicaid Beneficiaries May Enforce In A Section 1983 Action.

The free choice of providers requirement, 42 U.S.C. § 1396a(a)(23), confers

an individual right that Medicaid beneficiaries may enforce in an action under

42 U.S.C. § 1983.  For the reasons stated by the three courts of appeals that

addressed the issue, the free choice of providers requirement meets the standard

established by *Gonzaga University v. Doe*, 536 U.S. 273 (2002), for determining

that a provision of Spending Clause legislation may be enforced in a Section 1983

action.  *See Planned Parenthood of Indiana, Inc. v. Commissioner of the Indiana

State Department of Health*, 699 F.3d 962, 972-77 (7th Cir. 2012); *Planned

Parenthood Arizona, Inc. v. Betlach*, 727 F.3d 960, 965-68 (9th Cir. 2013); *Harris

v. Olszewski*, 442 F.3d 456, 460-65 (6th Cir. 2006).

First, "the free-choice-of-provider statute unambiguously gives Medicaid-

eligible patients an individual right," that is, "the right to receive care from the

qualified provider of their choice."  *Planned Parenthood of Indiana*, 699 F.3d at

974.  "Second, the right is administrable and falls comfortably within the

judiciary's core interpretive competence."  *Ibid.*  "[T]he term 'qualified' as used in

§ 1396a(a)(23) unambiguously refers to the provider's fitness to render the medical

services required."  *Id.* at 980.  Third, "§ 1396a(a)(23) is plainly couched in

7

PPGC00606840

mandatory terms." *Id.* at 974. "It says that all states 'must provide' in their

Medicaid plans that beneficiaries may obtain medical care from any provider

qualified to perform the service." *Ibid.* Finally, "the Medicaid Act does not

'explicitly or implicitly foreclose the private enforcement of this statute through

§ 1983 actions.'" *Id.* at 975 (quoting *Harris*, 442 F.3d at 462). "That the Federal

Government may withhold federal funds to non-complying States is not

inconsistent with private enforcement." *Harris*, 442 F.3d at 463. Indeed, this

Court has held that another provision of the Medicaid statute, 42 U.S.C.

§ 1396a(a)(10), is enforceable under Section 1983. *See S.D. ex rel. Dickson v.*

*Hood*, 391 F.3d 581, 602-07 (5th Cir. 2004); *see also Center for Special Needs*

*Trust Admin., Inc. v. Olson*, 676 F.3d 688, 699-700 (8th Cir. 2012) (concluding

that 42 U.S.C. § 1396p(d)(4)(C) is enforceable under Section 1983).

Contrary to Louisiana's suggestion, these decisions were not overruled by

the Supreme Court's decision in *Armstrong v. Exceptional Child Center, Inc.*, 135

S. Ct. 1378 (2015). *Armstrong* was not a Section 1983 case, and it did not purport

to alter the framework established by *Gonzaga University* for determining whether

a provision of Spending Clause legislation may be enforced in a Section 1983

action. Moreover, the Court found the particular provision of the Medicaid statute

that was at issue in *Armstrong*—42 U.S.C. § 1396a(a)(30)(A)—to be "judicially

unadministrable." *Id.* at 1385. The Court explained that it was "difficult to

8

imagine a requirement broader and less specific than § 30(A)'s mandate that state

plans provide for payments that are 'consistent with efficiency, economy, and

quality of care,' all the while 'safeguard[ing] against unnecessary utilization of ...

care and services.'" *Ibid*.; *see also id.* at 1388 (Breyer, J., concurring) ("Reading

§ 30(A) underscores the complexity and nonjudicial nature of the rate-setting

task.").

"By contrast, the statutory term here, 'qualified,' is tethered to an objective

benchmark: 'qualified *to perform the service or services required.*'" *Planned*

*Parenthood Arizona*, 727 F.3d at 967-68 (quoting 42 U.S.C. § 1396a(a)(23)(A))

(court's emphasis). "This standard is not subjective or amorphous, and requires no

balancing." *Id*. at 968.

## II.    A State Does Not Have Unfettered Discretion To Disqualify Medicaid Providers.

Under the Medicaid statute, a beneficiary may obtain medical assistance

from any entity or person who is "qualified to perform the service or services

required" and "who undertakes to provide him such services." 42 U.S.C.

1396a(a)(23)(A). This free choice of providers requirement gives Medicaid

beneficiaries "the right to choose among a range of qualified providers, without

government interference." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773,

785 (1980) (emphasis omitted).

9

Long standing HHS regulations provide that a state may set "reasonable standards relating to the qualifications of providers." 42 C.F.R. § 431.51(c)(2). For example, states have primary responsibility for licensing health care practitioners within their jurisdictions. Consistent with the free choice of providers requirement, however, a state does not have unfettered discretion to determine provider qualifications. The Seventh Circuit concluded that, "[r]ead in context, the term 'qualified' as used in § 1396a(a)(23) unambiguously relates to a provider's fitness to perform the medical services the patient requires." *Planned Parenthood of Indiana*, 699 F.3d at 978. It reasoned that "[t]o be 'qualified' in the relevant sense is to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." *Ibid.* The Ninth Circuit adopted the same reasoning. *See Planned Parenthood Arizona*, 727 F.3d at 969 ("We agree with the Seventh Circuit that '[r]ead in context, the term "qualified" as used in § 1396a(a)(23) unambiguously relates to a provider's ... capab[ility] of performing the needed medical services in a professionally competent, safe, legal, and ethical manner.'") (quoting *Planned Parenthood of Indiana*, 699 F.3d at 978). And as the Seventh and Ninth Circuits held, when a state adopts a legal standard that required termination of a provider on grounds unrelated to its fitness to perform services that Medicaid beneficiaries require, individual beneficiaries are denied their right under Section 1396a(a)(23) and may bring suit to enforce that

10

right under Section 1983. *Id.* at 972; *see Planned Parenthood of Indiana*, 699 F.3d at 980.

As noted above, the Medicaid statute also authorizes a state to exclude an individual or entity from Medicaid for any reason for which the Secretary could exclude the individual or entity from the Medicare program. 42 U.S.C. § 1396a(p)(1), (3) (cross-referencing 42 U.S.C. § 1320a-7). As discussed above, these enumerated grounds for exclusion include, for example, a conviction of specified criminal offenses, or a determination that the provider furnished items or services of a quality that failed to meet professionally recognized standards of health care. These grounds for termination are not exhaustive, and there is no dispute that a state has primary responsibility for licensing the medical practitioners that operate within its jurisdiction. *See Planned Parenthood of Indiana*, 699 F.3d at 980. Indeed, Section 1320a-7 expressly acknowledges that states have such licensing authority; it provides that that the Secretary may exclude from Medicare any individual or entity "whose license to provide health care has been revoked or suspended by any State licensing authority . . . for reasons bearing on the individual's or entity's professional competence, professional performance, or financial integrity." 42 U.S.C. § 1320a-7(b)(4)(A).

Here, however, the state licensing authority did not revoke PPGC's license (or that of its professionals) to practice medicine, and there is no contention that

11

PPGC00606844

PPGC is unfit to perform the services it provides to Medicaid beneficiaries—

services such as gynecological exams, cervical pap smears, breast exams, and

contraceptive counseling.  The State's termination letter of September 15, 2015,

relied on grounds that would be legally insufficient to exclude a provider under

Section 1320a-7 and that letter, standing alone, does not establish that the State has

made a proper determination to exclude PPGC for cause or otherwise properly

determined that PPGC is unqualified to perform the required services within the

meaning of 42 U.S.C. § 1396a(a)(23) and 42 C.F.R. § 431.51(c)(2).  For example,

whereas Section 1320a-7 authorizes the exclusion of a provider that has been

*convicted* of health care fraud, the Louisiana termination letter relied on

*allegations* of health care fraud in a pending case and on a settlement of a False

Claims Act case brought by a relator in which PPGC expressly disclaimed liability.

*See* ROA.953-55 (district court opinion).[5]

---

[5] When a state initiates an exclusion on grounds set forth in 42 U.S.C.
§ 1320a-7, HHS regulations provide that it must give the entity written notice of its
intent, the basis for the proposed exclusion, and the potential effect of an
exclusion.  42 C.F.R. § 1002.212 (incorporating 42 C.F.R. § 1001.2001).  Before
imposing an exclusion, the state agency must give the individual or entity the
opportunity to submit documents and written argument against the exclusion.  42
C.F.R. § 1002.213.  If the state agency determines that an exclusion is warranted, it
must provide notice of its decision in a specified form, and the exclusion takes
effect 20 days from the date of the notice.  42 C.F.R. § 1002.2001 (incorporated by
42 C.F.R. § 1002.212).  The excluded entity also must be afforded any additional
appeals rights that would otherwise be available under procedures established by
the State.  42 C.F.R. § 1002.213.  Here, the State maintains that it provides an

*Continued on next page.*

PPGC00606845

The Seventh and Ninth Circuits correctly rejected the argument that a state's adoption of grounds for excluding a provider from the state Medicaid program must be treated as a conclusive determination that the provider is not "qualified" within the meaning of Section 1396a(a)(23).  As the Seventh Circuit explained, a state cannot circumvent the free choice of providers requirement "by simply labeling any exclusionary rule as a 'qualification.'"  *Planned Parenthood of Indiana*, 699 F.3d at 978.  "This would open a significant loophole for restricting patient choice, contradicting the broad access to medical care that § 1396a(a)(23) is meant to preserve."  *Ibid.*; *see also Planned Parenthood Arizona*, 727 F.3d at 970 (rejecting "Arizona's position that states can preclude Medicaid beneficiaries from choosing otherwise appropriate service providers by defining certain classes of providers as 'unqualified,' for § 1396a(a)(23) purposes, 'for any reason supplied by State law'").  That concern applies whether the exclusion is imposed through an across-the-board rule or through the termination of individual provider agreements under a standard that is unrelated to the fitness of the provider to perform needed Medicaid services.  Indeed, the state-law exclusions in the Seventh and Ninth

---

opportunity for an informal and then a formal hearing to a provider that is subject to termination.

APP.199

PPGC00606846

Circuit cases would have been implemented through the termination of individual provider agreements.[6]

The Seventh Circuit was likewise correct in rejecting the argument that *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980), makes each state the conclusive arbiter of a provider's qualifications. As the Seventh Circuit explained, the Supreme Court's decision in *O'Bannon* did not involve the basis for a substantive challenge to a provider's disqualification. *See Planned Parenthood of Indiana*, 699 F.3d at 977. Instead, *O'Bannon* addressed a procedural due process claim. *See ibid.*

In *O'Bannon*, the U.S. Department of Health, Education and Welfare (HEW), the predecessor to HHS, notified a nursing home that it no longer met the statutory and regulatory standards for skilled nursing facilities and that, consequently, its Medicare provider agreement would not be renewed. 447 U.S. 775-76. The HEW notification explained that a skilled nursing facility is required to be in compliance with eighteen specified conditions, and that a survey performed by the Pennsylvania Department of Health found that the facility did not comply with seven identified conditions. *See id.* at 776 n.3. Shortly after HEW

---

[6] *See Planned Parenthood of Indiana*, 699 F.3d at 970 (Indiana law required the cancelation of contracts); *Planned Parenthood Arizona*, 727 F.3d at 965 (Arizona informed the local Planned Parenthood organization that it intended to "terminate [its] provider participation agreement").

APP.200

PPGC00606847

terminated the nursing home from Medicare, the state agency terminated the home

from Medicaid as required by federal regulations.  *See id.* at 776 n.4.  The plaintiff

nursing home residents argued that they had a due process right to a pre-

termination hearing on the issue of whether the home's Medicare and Medicaid

provider agreements should be renewed.  They relied in part on

Section 1396a(a)(23), which, they urged, gave them a protected property interest in

remaining in their nursing home.  Rejecting that procedural due process claim, the

Supreme Court explained that Section 1396a(a)(23) gives beneficiaries "the right

to choose among a range of *qualified* providers, without government interference,"

but does not "confer a right on a recipient to enter an unqualified home and

demand a hearing to certify it, nor does it confer a right on a recipient to continue

to receive benefits for care in a home that has been decertified."  *Id.* at 785.

Like the Seventh and Ninth Circuit cases, "[t]his is not a due-process case."

*Planned Parenthood of Indiana*, 699 F.3d at 977.  As in those cases, the

beneficiaries here "are not suing for violation of their *procedural* rights; they are

making a *substantive* claim" that the termination of PPGC violates

Section 1396a(a)(23) by denying them the ability to obtain covered medical care

from a qualified provider of their choosing.  *Ibid.*

In a typical provider termination, such as the one underlying *O'Bannon*,

beneficiaries will have no plausible claim that they have been denied their right to

15

choose a "qualified" provider.  Indeed, beneficiaries will not prevail if a provider is terminated under valid standards and on the basis of supporting evidence.

But just as the free choice of providers requirement would be rendered a nullity if states were permitted to define "qualified" in any manner they chose, it would also be effectively nullified if states could use individualized proceedings to exclude providers for no reason or for an invalid reason, or without any supporting evidence.  Here, the termination letters that prompted this lawsuit did not give *any* reason for Louisiana's decision to exclude PPGC from the Medicaid program.  *See* ROA.895.  And although the State substituted new termination letters while this lawsuit was pending, to the extent that that the newly offered reasons were, standing alone, insufficient on their face under federal law or lacked any supporting evidence, the beneficiaries adequately alleged a violation of their right under Section 1396a(a)(23) to obtain family planning services from any qualified and willing provider of their choosing.[7]

---

[7] Similarly, Arkansas first terminated the local Planned Parenthood organization (PPH) without giving any reason for the termination, and then, after the lawsuit was filed, substituted a second letter that failed to make any actual determination regarding the actual fitness of PPH to perform services.  *See Planned Parenthood Arkansas & Eastern Oklahoma v. Selig*, No. 4:15-cv-566, Order at 8 (E.D. Ark. Oct. 2, 2015) (second termination letter stated that "there is evidence that [PPH] and/or its affiliates are acting in an unethical manner and engaging in what appears to be wrongful conduct").  *See also Planned Parenthood Southeast, Inc. v. Bentley*, __ F. Supp. 3d __, 2015 WL 6517875, at *3 (M.D. Ala.

*Continued on next page.*

PPGC00606849

Respectfully submitted,

*Of Counsel:*

WILLIAM B. SCHULTZ
  *General Counsel*

GIA LEE
  *Deputy General Counsel*

JANICE L. HOFFMAN
  *Associate General Counsel*

BRIDGETTE KAISER
JEREMY KREISBERG
  *Attorneys*
  *Department of Health & Human Services*
  *Washington, D.C. 20201*

FEBRUARY 2016

BENJAMIN C. MIZER
  *Principal Deputy Assistant*
  *Attorney General*

J. WALTER GREEN
  *United States Attorney*

  /s/ Alisa B. Klein
ALISA B. KLEIN
MARK B.STERN
  *(202) 514-1597*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7235*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*

---

2013) (Alabama's termination letter to PPSE did not provide any reason for the termination).

APP.203

PPGC00606850

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2016, I electronically filed the foregoing brief by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.


/s/ Alisa B. Klein
ALISA B. KLEIN

APP.204

PPGC00606851

## CERTIFICATE OF COMPLIANCE

I hereby certify that this amicus brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.  I further certify that this amicus brief complies with the type-volume limitation of Fed. R. App. P. 29(d) because it contains 3,788 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

/s/ Alisa B. Klein
ALISA B. KLEIN

-A2-

PPGC00606852

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



August 11, 2016

Gary Jessee, Associate Commissioner for Medicaid/CHIP
Texas Health and Human Services Commission
4900 Lamar Boulevard
Austin, TX 78751

Dear Associate Commissioner Jessee:

This letter is in response to recent actions taken by the State of Texas to terminate its Medicaid provider agreements with Planned Parenthood Gulf Coast (PPGC). As previously discussed with the state on August 4, 2016, the Centers for Medicare & Medicaid Services (CMS) would like to remind the state of its obligation to remain in compliance with the "free choice of provider" requirements specified in section 1902(a)(23) of the Social Security Act (the Act). In addition, the state is obligated to ensure beneficiary access to covered services under section 1902(a)(30)(A) of the Act. As highlighted below, CMS seeks a response from the state detailing its compliance with those requirements.

Under federal law, at section 1902(a)(23) of the Act, a Medicaid beneficiary may obtain medical services "from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services." This provision is often referred to as the "any willing provider" or "free choice of provider" provision. While states maintain the authority to establish reasonable standards for provider qualifications (in accordance with 42 C.F.R. § 431.51(c)(2)), any willing provider that is qualified to provide covered services according to the reasonable standards established by the state must be allowed to provide such services to Medicaid beneficiaries. For further discussion of the "Free Choice of Provider Provisions," see State Medicaid Director Letter #16-005, published on April 19, 2016.

In addition, CMS is concerned about the effect  termination of the provider agreement with PPGC would have on Texas Medicaid beneficiaries' access to women's health services within the state. Section 1902(a)(30)(A) of the Act requires that states have methods and procedures to ensure that there are sufficient providers so that care and services are available to Medicaid beneficiaries "at least to the extent that such care and services are available to the general population in the area." It is not clear that this access requirement would be met for beneficiaries in several areas in Texas without the participation of PPGC, absent other changes in Texas's program.

Although states have authority to terminate providers from participating in Medicaid, this authority is limited to circumstances implicating the fitness of the provider to perform covered medical services or appropriately bill for them. States must terminate those providers that have committed certain types of fraud or other criminal acts related to involvement with the Medicare, Medicaid or the Children's Health Insurance Program (CHIP) programs. States must also terminate providers subject to federal disbarment or exclusion determinations. As explained in

TXPP_0207273

Page 2 – Gary Jessee, Associate Commissioner for Medicaid/CHIP

the April 2016 guidance, states must have a valid reason for terminating a provider, related to the provider's ability to render covered services or to properly bill for those services – reasons, for instance, that bear on the individual's or entity's professional competence, professional performance, or financial integrity.

We are unaware of any basis for Texas to terminate PPGC's provider agreements, which would be consistent with these limited reasons for excluding providers from Medicaid participation. Therefore, we ask that you provide information to CMS documenting the state's basis for termination, including documentation and supporting evidence that answers the following questions:

1. How do the allegations relied on in the notice of termination relate to the fitness of the provider to furnish covered services or its ability to appropriately bill for them in accordance with the approved state plan?

2. Has the state terminated other types of providers for similar allegations?

3. Does the state have evidence that the provider has committed fraud or criminal action, was in material non-compliance with relevant requirements, or had material issues concerning its fitness to perform covered services or appropriately bill for them?  If so, please provide that evidence.

4. How will the state's actions affect access to women's health services in the state, including the state's ability to comply with the requirements set forth in section 1902(a)(30)(A)?

To the extent that Texas' actions conflict with federal law, CMS may take further actions to protect Medicaid beneficiaries using its authority under section 1904 of the Act, as implemented at 42 Code of Federal Regulations (CFR) 430.35 and 42 CFR Part 430, Subpart D.  Please submit a response to this letter explaining the reasons for the termination of PPGC, and the state's analysis of access issues, by September 6, 2016.  Absent a response by this date indicating how Texas is in compliance with section 1902(a)(23), CMS may initiate a compliance action that could result in the withholding of federal funds.

Should the state have any questions or wish to discuss the federal requirements applicable to this matter, please feel free to contact me at (410)786-3870.

Sincerely,

Vikki Wachino

TXPP_0207274

Page 3 – Gary Jessee, Associate Commissioner for Medicaid/CHIP

Director

TXPP_0207275

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



August 11, 2016

Ms. Jen Steele, Medicaid Director
State of Louisiana
Department of Health and Hospitals
628 N. 4th Street
PO Box 91030
Baton Rouge, LA 70821-9030

Dear Director Steele:

This letter is in response to recent actions taken by the State of Louisiana to terminate its Medicaid provider agreements with Planned Parenthood Gulf Coast (PPGC). As previously discussed with the state on August 4, 2016, the Centers for Medicare & Medicaid Services (CMS) would like to remind the state of its obligation to remain in compliance with the "free choice of provider" requirements specified in section 1902(a)(23) of the Social Security Act (the Act). In addition, the state is obligated to ensure beneficiary access to covered services under section 1902(a)(30)(A) of the Act. As highlighted below, CMS seeks a response from the state detailing its compliance with those requirements.

Under federal law, at section 1902(a)(23) of the Act, a Medicaid beneficiary may obtain medical services "from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services." This provision is often referred to as the "any willing provider" or "free choice of provider" provision. While states maintain the authority to establish reasonable standards for provider qualifications (in accordance with 42 C.F.R. § 431.51(c)(2)), any willing provider that is qualified to provide covered services according to the reasonable standards established by the state must be allowed to provide such services to Medicaid beneficiaries. For further discussion of the "Free Choice of Provider Provisions," see State Medicaid Director Letter #16-005, published on April 19, 2016.

In addition, CMS is concerned about the effect the termination of the provider agreement with PPGC would have on Louisiana Medicaid beneficiaries' access to women's health services within the state. Section 1902(a)(30)(A) of the Act requires that states have methods and procedures to ensure that there are sufficient providers so that care and services are available to Medicaid beneficiaries "at least to the extent that such care and services are available to the general population in the area." It is not clear that this access requirement would be met for beneficiaries in several areas in Louisiana without the participation of PPGC, absent other changes in Louisiana's program.

Although states have authority to terminate providers from participating in Medicaid, this authority is limited to circumstances implicating the fitness of the provider to perform covered medical services or appropriately bill for them. States must terminate those providers that have

PPGC00000182

Page 2 – Ms. Jen Steele, Medicaid Director

committed certain types of fraud or other criminal acts related to involvement with the Medicare, Medicaid or the Children's Health Insurance Program (CHIP) programs.  States must also terminate providers subject to federal disbarment or exclusion determinations.  As explained in the April 2016 guidance, states must have a valid reason for terminating a provider, related to the provider's ability to render covered services or to properly bill for those services – reasons, for instance, that bear on the individual's or entity's professional competence, professional performance, or financial integrity.

We are unaware of any basis for Louisiana to terminate PPGC's provider agreements, which would be consistent with these limited reasons for excluding providers from Medicaid participation.   Therefore, we ask that you provide information to CMS documenting the state's basis for termination, including documentation and supporting evidence that answers the following questions:

1.   Why does the state believe that there were violations of La R.S. 46:437.11 and 46:437.14?

2.   Has the state terminated other types of providers for similar violations of these provisions?

3.   How do the state provisions located at La R.S. 46:437.11 and 46:437.14 relate to the fitness of the providers to furnish covered services or its ability to appropriately bill for them in accordance with the approved state plan?

4.   Why does the state believe that there were violations of the State's Administrative Code Title 50?

5.   How does the State's Administrative Code Title 50 relate to the fitness of the providers to furnish covered services or its ability to appropriately bill for them in accordance with the approved state plan?

6.   Does the state have evidence that the provider has committed fraud or criminal action, was in material non-compliance with relevant requirements, or had material issues concerning its fitness to perform covered services or appropriately bill for them?  If so, please provide that evidence.

7.   How will the state's actions affect access to women's health services in the state, including the state's ability to comply with the requirements set forth in section 1902(a)(30)(A)?

To the extent that Louisiana's actions conflict with federal law, CMS may take further actions to protect Medicaid beneficiaries using its authority under section 1904 of the Act, as implemented at 42 Code of Federal Regulations (CFR) 430.35 and 42 CFR Part 430, Subpart D.  Please submit a response to this letter explaining the reasons for the termination of PPGC, and the state's analysis of access issues, by September 6, 2016.  Absent a response by this date indicating how Louisiana is in compliance with section 1902(a)(23), CMS may initiate a compliance action that could result in the withholding of federal funds.

PPGC00000183

Should the state have any questions or wish to discuss the federal requirements applicable to this matter, please feel free to contact me at (410)786-3870.

Sincerely,

Vikki Wachino
Director

The Washington Post

*Democracy Dies in Darkness*

**POST NATION**

# Obama officials warn states about cutting Medicaid funds to Planned Parenthood

By Lena H. Sun

April 19, 2016 at 11:00 a.m. EDT

*This post has been updated.*

The Obama administration on Tuesday warned officials in all 50 states that actions to end Medicaid funding of Planned Parenthood may be out of compliance with federal law.

Ten states have taken action or recently passed legislation to cut off Medicaid funding to Planned Parenthood after antiabortion activists released covertly filmed video in the summer purporting to show that the women's health organization and abortion provider illegally sold fetal tissue for a profit. Planned Parenthood supporters have criticized the videos as deceptively edited, and multiple state investigations have turned up no wrongdoing on the part of the organization.

The 10 states are Alabama, Arkansas, Arizona, Florida, Louisiana, Kansas, Missouri, Oklahoma, Texas and Wisconsin.

The Medicaid defunding is part of a broader set of actions that have been taken by 24 states against Planned Parenthood since July, advocates said. In recent months, courts have blocked efforts to restrict access to care at Planned Parenthood in Alabama, Arkansas, Louisiana and Utah.

Cecile Richards, president of Planned Parenthood Federation of America, said in a statement that in recent months, "These political attacks on our patients have gone from a simmer to full rolling boil."

She added: "What they couldn't do in Congress, they're now trying to do state by state, and jeopardizing care for more than half a million people."

Federal health officials said the letter from the Centers for Medicare and Medicaid Services is being sent to all state Medicaid offices to clarify that terminating certain providers from Medicaid is only justifiable if those providers are unable to perform covered medical services or can't bill for those services. The guidance emphasizes that states cannot target providers for impermissible reasons and are required to treat similar types of providers equitably.

"CMS is sending a letter to all states to ensure they have a clear understanding of their obligation to follow longstanding Medicaid law guaranteeing that beneficiaries have the right to receive covered services, including family planning services, from any qualified and willing provider of their choice," according to Marissa Padilla, a spokeswoman for the federal Health and Human Services department.

CMS has communicated with the individual state Medicaid offices in the past, but this is the first time the agency has warned all the states collectively, officials said.

Federal law prohibits federal Medicaid dollars from being spent on abortion services except in extraordinary circumstances, such as when the woman's life is in danger, or in cases of rape or incest.

**Read more:**

After Planned Parenthood closures, poor women started having babies

No. 17-50282

# In the United States Court of Appeals for the Fifth Circuit

────────

PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING
AND PREVENTATIVE HEALTH SERVICES, INC., ET AL.;

*Plaintiffs-Appellees*,

*v.*

CHARLES SMITH, IN HIS OFFICIAL CAPACITY AS EXECUTIVE COM-
MISSIONER OF HHSC, ET AL.,

*Defendants-Appellants.*

────────

On Appeal from the United States District Court
for the Western District of Texas, Austin Division,
No. 1:15-cv-01058

────────

## MOTION TO STAY THE DISTRICT COURT'S INJUNCTION PENDING EN BANC CONSIDERATION

────────

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

KYLE D. HAWKINS
Solicitor General
kyle.hawkins@oag.texas.gov

HEATHER GEBELIN HACKER
Assistant Solicitor General

ANDREW B. STEPHENS
Assistant Attorney General

*Counsel for Appellants*

PPFA00424268

# TABLE OF CONTENTS

Table of Authorities ......................................................................ii

Introduction ................................................................................ 1

Background ................................................................................. 2

Argument .................................................................................... 3

    I. In Declaring the Injunction Unlawful, This Court Has Already Decided That the State Will Succeed on the Merits of its Appeal. ................................................................................ 5

    II. The Plaintiffs Will Not Be Irreparably Harmed Absent a Stay. ........5

    III.    No Other Parties Will Be Irreparably Harmed. .........................7

    IV.    The State Will Be Irreparably Harmed Absent a Stay, and the Public Interest Favors Texas's Ability to Terminate Provider Agreements with an Organization That No Longer Is Qualified Under the Texas Medicaid Program. .........................................9

Conclusion ................................................................................. 12

Certificate of Conference .......................................................... 13

Certificate of Service ................................................................. 13

Certificate of Compliance .......................................................... 14

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barber v. Bryant*,
    833 F.3d 510 (5th Cir. 2016) .................................................................7

*Barsky v. Bd. of Regents of Univ. of N.Y.*,
    347 U.S. 442 (1954) .............................................................................. 10

*City of El Cenizo v. Texas*,
    No. 17-50762, 2017 WL 4250186 (5th Cir. Sept. 25, 2017)
    (per curiam) ..........................................................................................4

*City of Meridian v. Algernon Blair, Inc.*,
    721 F.2d 525 (5th Cir. 1983) .................................................................7

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. 1981) .................................................................7

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) .................................................................7

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ............................................................................ 10

*Maryland v. King*,
    567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .................................. 10

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
    434 U.S. 1345 (1977) (Rehnquist, J., in chambers) .................................. 10

*Nken v. Holder*,
    556 U.S. 418 (2009) ....................................................................*passim*

*ODonnell v. Goodhart*,
    900 F.3d 220 (5th Cir. 2018) .................................................................7

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
    734 F.3d 406 (5th Cir. 2013) .............................................................. 4, 5

PPFA00424270

*Planned Parenthood of Gulf Coast, Inc. v. Gee*,
    862 F.3d 445 (5th Cir. 2017) ................................................................ 1, 2

*Veasey v. Abbott*,
    870 F.3d 387 (5th Cir. 2017) (per curiam) ...................................... 4, 9, 10

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) .............................................................................. 10

## Statutes

42 U.S.C.A.
    § 1396a(a)(9)(A) ..................................................................... 10
    § 1396a(a)(9)(B) ...................................................................... 10
    § 1396a(a)(23) ................................................................ 1, 2, 3, 11

## Other Authorities

Fed. R. App. P. 8(a)(2) ............................................................. 1, 4

iii

# Introduction

The district court entered a preliminary injunction to prevent a Texas agency from terminating the Medicaid provider agreements of Texas Planned Parenthood affiliates. This Court has now held, in a unanimous judgment, that the district court's preliminary injunction is unlawful. *See* App. 29. The Court explained that the district court applied the wrong legal standard, and that its "procedure was incompatible with the proper standard." *See* App. 22-29. Further, the district court improperly considered materials outside the record. *See* App. 22, 23, 27, 29. For these reasons, the Court held that "the basis for [the] preliminary injunction cannot be sustained." App. 29.

The State has now sought en banc review of an antecedent question: Whether the qualified-provider provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(23), allows private individuals to bring an action to challenge a state agency's determination that a service provider is not "qualified" under that statute. The State has asked the en banc Court to overrule *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. 2017).

Whether and how the en banc Court chooses to resolve that threshold question cannot rehabilitate the district court's manifestly unlawful injunction. The State therefore moves the Court to stay that injunction pending resolution of the pending petition for rehearing en banc and any related proceedings that might follow. *See* Fed. R. App. P. 8(a)(2). In light of the panel's decision unequivocally declaring the injunction unlawful, a stay is easily warranted. *See Nken v. Holder*, 556 U.S. 418 (2009).

1

PPFA00424272

# BACKGROUND

In early 2015, over eight hours of undercover video was filmed at Planned Parenthood Gulf Coast's facility in Houston, Texas. ROA.5846-6208 (video transcript); ROA at DX-2 (video footage). This video footage demonstrated violations of accepted medical and ethical standards in numerous ways, and the Texas Health and Human Services Commission Office of Inspector General (OIG) determined that Texas Planned Parenthood affiliates could no longer could serve as qualified providers in the Texas Medicaid program. *See* ROA.1210-11. As a result, OIG terminated their provider agreements. ROA.1209-14.

The Texas Planned Parenthood affiliates ("Provider Plaintiffs") and several individual plaintiffs brought suit to challenge that termination. Following a hearing, ROA.22-23, the district court below determined that the plaintiffs had satisfied the criteria necessary to obtain a preliminary injunction blocking the termination, ROA.3776-3819. The State appealed, raising two main issues: first, that the plaintiffs lack a private right of action; and second, that the district court's injunction was unlawful. *See* App. 12.

The panel determined that under *Gee*, 862 F.3d at 459-60, the individual plaintiffs have a private right of action under 42 U.S.C. § 1396a(a)(23), and that it was "constrained" by *Gee*'s conclusion, App. 2. But the panel vacated the injunction, holding that the district court abused its discretion by reviewing OIG's termination decision de novo, rather than under arbitrary-and-ca-

2

PPFA00424273

pricious review, and by considering evidence outside of the administrative record. App. 17, 29. The court remanded the case to the district court for application of the correct standard to the evidence in the administrative record alone. App. 29. Judge Jones wrote a separate concurrence to outline the reasons that *Gee*'s holding was incorrect, and requested rehearing en banc to "reconsider whether Section 1396a(a)(23) creates a private right of action on behalf of Medicaid patients to challenge the termination of their providers' contracts by the States." App. 36 (Jones, J., concurring). The State has requested en banc review for the same issue.

Under the district court's injunctive relief, which was issued in January 2017, the State has been forced to retain the Provider Plaintiffs as qualified Medicaid providers and allow them to provide medical services to Texas Medicaid recipients. ROA.3776-3819. Under the injunction, the State has already been forced to pay the Provider Plaintiffs millions of dollars in Medicaid service reimbursement funds. *See* ROA.4315 (in 2016, Texas paid approximately $3.4 million to the Provider Plaintiffs in Medicaid reimbursements).

## ARGUMENT

The Court should stay the district court's injunction pending the resolution of the en banc petition and any subsequent related proceedings. "An appellate court's power to hold an order in abeyance while it assesses the legality of the order has been described as 'inherent.'" *Nken*, 556 U.S. at 426 (citation omitted). The Supreme Court has set out a four-part test for assessing whether to stay a district court order pending appeal. *See id.*; *Veasey v. Abbott*,

PPFA00424274

870 F.3d 387, 391 (5th Cir. 2017) (per curiam). The first consideration is "whether the stay applicant has made a strong showing that he is likely to succeed on the merits." *Nken*, 556 U.S. at 426. The second is "whether the applicant will be irreparably injured absent a stay." These first two factors "are the most critical." *Id*. at 434. Less "critical," but still relevant, are "whether issuance of the stay will substantially injure the other parties interested in the proceeding," and "where the public interest lies." *Id*. at 426; *see also City of El Cenizo v. Texas*, No. 17-50762, 2017 WL 4250186, at *1-2 (5th Cir. Sept. 25, 2017) (per curiam) (adopting *Nken* four-part test).

In light of the panel decision declaring the district court's preliminary injunction unlawful, the injunction should be stayed while further appellate proceedings unfold. In particular, the panel's decision declaring the injunction invalid establishes that the State—not plaintiffs—are likely to prevail on the merits. Plaintiffs face no irreparable harm if the district court's unlawful order is stayed. No other parties face irreparable injury. And the public interest squarely lies with allowing Texas to immediately remove an unethical and unqualified provider from its Medicaid program.[1]

---

[1] Fed. R. App. P. 8(a)(2) allows the State to seek a stay in this Court where moving in the district court "would be impracticable." *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410-11 (5th Cir. 2013). That standard is met here because this Court already has exercised its appellate jurisdiction and determined that the district court's injunction is unlawful. In addition, the Court is currently considering the State's pending petition to rehear a portion of this case en banc. Under these circumstances, this Court is best positioned to determine whether to stay the district court's unlawful injunction pending the remainder of any appellate proceedings. *See id.* (staying district court's injunction pending appeal despite no request for stay in the district court).

APP.221

PPFA00424275

## I. In Declaring the Injunction Unlawful, This Court Has Already Decided That the State Will Succeed on the Merits of its Appeal.

The panel decision already held the district court's injunction is unlawful. The district court strayed from the record, applied the wrong legal standard, and failed to follow proper procedures. *See* App. 22-29. This Court has thus already established not just that the State is *likely* to succeed on the merits of its appeal, but rather, that the State *has succeeded* and *will continue to succeed* in establishing that the injunction cannot stand. *See Nken*, 556 U.S. at 426. As this "most critical" factor is now conclusively resolved, the Court should not permit a clearly unlawful injunction to persist any longer. *See id.*[2]

## II. The Plaintiffs Will Not Be Irreparably Harmed Absent a Stay.

The district court's injunction was issued on behalf of the individual plaintiffs only. ROA.3796, 3932. Even if plaintiffs could make a "strong showing that their interests would be harmed by staying the injunction, given the State's likely success on the merits, this is not enough, standing alone, to outweigh the other factors." *Abbott*, 734 F.3d at 419.

But there is no evidence in the record that the individual plaintiffs will be unable to receive medical care at the facility of their choice if the State ceases to provide Medicaid payments to the Provider Plaintiffs—especially when these providers have not stated that they will refuse to serve these individuals

---

[2] Even if the district court had applied the correct legal standard, the plaintiffs still could not prevail. The only probative evidence in the administrative record is the undercover videos, and that evidence leaves no doubt that the State's termination decision was proper. *See* App. 7-10.

APP.222

PPFA00424276

or individuals similarly situated if they do not receive Medicaid reimburse-ment. Thus, the individual plaintiffs cannot establish irreparable harm. *See Nken*, 556 U.S. at 426.

At the preliminary-injunction hearing, Planned Parenthood Greater Texas (PPGT) CEO Ken Lambrecht testified that their doors will stay open even if they do not get Medicaid funds from Texas. ROA.4124. Planned Parenthood South Texas (PPST) CEO Jeffrey Hons was asked directly whether PPST will provide care to Medicaid patients even if Medicaid funds are withheld, and he refused to give a yes or no answer:

> Q. So you will be able to provide care for some of the individuals if Medicaid funds are withheld?

> A. We'll just have to wait and see, won't we?

ROA.4297. The Provider Plaintiff CEOs have, at most, testified that they might have to make changes to their operations if their Medicaid provider agreements are terminated. ROA.4114, 4133-34, 4302. That is not enough to establish that the individual plaintiffs will actually suffer irreparable harm should Provider Plaintiffs' termination from Texas Medicaid become effec-tive.

Because this Court has already declared that the State succeeds on the merits of its appeal, and because no individual plaintiff will suffer irreparable harm from a stay of the injunction, the two "most critical" *Nken* factors con-clusively favor the State. 556 U.S. at 426; *see also ODonnell v. Goodhart*, 900

6

PPFA00424277

F.3d 220, 223 (5th Cir. 2018) ("The first two factors are the most critical."

(citing *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016)).

## III. No Other Parties Will Be Irreparably Harmed.

Nor is there any evidence in the record to demonstrate that Provider
Plaintiffs will suffer irreparable harm if the district court's improper prelimi-
nary injunction is stayed pending en banc resolution. If the Provider Plaintiffs
are terminated from the Texas Medicaid program, they may experience lower
revenue, but this Court has squarely held that such "monetary injury" does
not support injunctive relief. *See Deerfield Med. Ctr. v. City of Deerfield Beach,*
661 F.2d 328, 338 (5th Cir. 1981) ("An injury is 'irreparable' only if it cannot
be undone through monetary remedies."); *City of Meridian v. Algernon Blair,
Inc.*, 721 F.2d 525, 529 (5th Cir. 1983) (same). The fact that an economic injury
may be rectified weighs "heavily against a claim of irreparable harm." *Dennis
Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012).

That is especially so where, as here, Medicaid plays an insignificant role
in the Provider Plaintiffs' finances. In 2013, PPGT had total revenue of
$33,922,566 and net assets of $41,839,154. ROA.8688. PPGT received
$950,000 in reimbursements from Texas Medicaid in 2016. ROA.4123-24. In
2013, PPST had total revenue of $4,252,525 and net assets of $3,749,103.
ROA.8295. PPST received $350,000 in reimbursements from Texas Medi-
caid in 2016. ROA.4289. In 2013, PPGC had total revenue of $19,667,024 and
net assets of $43,548,729. ROA.7966. In 2016, the total revenue for PPGC's

7

PPFA00424278

research department alone was $2.5 million dollars—more than the $2.2 million that they received that year in reimbursements from Texas Medicaid. ROA.4236, 4135.

Nothing in the record suggests that the loss of this revenue would leave Provider Plaintiffs wholly unable to continue their operations. In fact, Provider Plaintiffs have insisted in sworn testimony that the opposite is true. *See* ROA.4114, 4133-34, 4302 (testimony of Provider Plaintiff CEOs that at most, they might change their operations if their Medicaid provider agreements are terminated); ROA.4124 (testimony that Planned Parenthood Greater Texas will remain in operation even without Texas Medicaid funds).

Nor will Medicaid patients be left without available providers for the services they seek. In Texas, there are 141,000 providers enrolled in the Medicaid program, including 29,000 primary-care physicians and over 3,300 obstetrician/gynecologists. ROA.4511, 4515. These other providers together perform 99.7% of all Medicaid services in the State. ROA.4518.

There are also other health programs funded by the State that Medicaid recipients may participate in. Texas spends an additional $210 million annually on women's-health programs that cover family-planning services for individuals between the ages of 15 and 64, depending on the program. ROA.4442, 4446. In 2016, Texas women's-health programs served approximately 363,000 women. ROA.4446. The providers in these programs offer the same services as Planned Parenthood clinics, including pelvic exams, contracep-

APP.225

PPFA00424279

tives, sexually-transmitted-infection screenings, and breast- and cervical-can-cer screenings and diagnostic tests. ROA.4443-44. These programs also pro-vide additional services to care for conditions found to affect reproductive health and not provided by Planned Parenthood, such as the screening, diag-nosis, and treatment of hypertension, cholesterol, and diabetes. ROA.4444. Provider Plaintiffs are thus not necessary to providing services to Medicaid recipients, and in fact, nearly all Medicaid recipients are already receiving ser-vices elsewhere, *see* ROA.4518. No irreparable harm will result from termina-tion of Provider Plaintiffs' Medicaid provider agreements.

## IV. The State Will Be Irreparably Harmed Absent a Stay, and the Public Interest Favors Texas's Ability to Terminate Provider Agreements with an Organization That No Longer Is Qualified Under the Texas Medicaid Program.

By contrast, both the State and Medicaid recipients will suffer irreparable harm if the State is forced to continue complying with an unlawful injunction. And keeping the invalid injunction in place is contrary to the public's interest. "Because the State is the appealing party, its interest and harm merge with that of the public." *Veasey*, 870 F.3d at 391 (citing *Nken*, 556 U.S. at 435).

Unless the preliminary injunction is stayed, the State will be forced to keep the Provider Plaintiffs as Medicaid providers, despite the State's deter-mination that they violated medical and ethical standards, *see* ROA.1209-14, which is likely to be upheld, *see* p.7 n.2 *supra*. When a State is enjoined from enforcing the law, "the State necessarily suffers the irreparable harm of deny-ing the public interest in the enforcement of its laws." *Veasey*, 870 F.3d at 391

APP.226

PPFA00424280

(citing *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers));
*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)
(Rehnquist, J., in chambers). Medical providers hold a special position of trust
in our society and therefore must adhere to the highest standards of account-
ability. A medical provider that is willing to transgress medical and ethical
standards should not continue to receive the benefit of state or federal monies,
and staying the preliminary injunction will allow the State to fulfill its obliga-
tion under federal law and protect the integrity of the Medicaid program,
which is in the public's interest. *See* 42 U.S.C.A. § 1396a(a)(9)(A), (B); *see
also Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("There can be no doubt
the government 'has an interest in protecting the integrity and ethics of the
medical profession.'" (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731
(1997)); *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954) (the
State has "legitimate concern for maintaining high standards of professional
conduct" in the practice of medicine).

In addition to the irreparable harm of being unable to protect the integrity
of the Medicaid program, and potential harm to Medicaid recipients who may
receive services from an unqualified, unethical provider, the State will also be
forced continue to pay the Provider Plaintiffs for Medicaid services provided
until the petition for rehearing en banc is resolved. Based on the current rate
of requests for reimbursement, that could total an additional 1.7 million dollars
for every six months the Provider Plaintiffs remain forcibly qualified Medicaid

PPFA00424281

providers. *See, e.g.*, ROA.4315 (in 2016, Texas paid approximately $3.4 million to the Provider Plaintiffs in Medicaid reimbursements).

There is no justification for continuing to prevent the State from terminating these providers when this Court has already determined that the district court's preliminary-injunction order was improper. *See* App. 29. The State's petition for rehearing en banc, just like Judge Jones's request for rehearing in her concurrence, *see* App. 36, asks the Court to review the issue of whether there is a private right of action under the qualified-provider provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(23). Whether and how the Court might resolve that issue cannot rehabilitate the district court's manifestly unlawful injunction, and thus, the injunction should be stayed to prevent continuing harm to the State, Medicaid recipients, and the public's interest.

PPFA00424282

## CONCLUSION

This Court should grant the State's motion and stay the district court's preliminary injunction pending resolution of the petition for en banc review and any subsequent related proceedings.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Kyle D. Hawkins
KYLE D. HAWKINS
Solicitor General

HEATHER GEBELIN HACKER
Assistant Solicitor General

ANDREW B. STEPHENS
Assistant Attorney General

*Counsel for Appellants*

APP.229

PPFA00424283

## CERTIFICATE OF CONFERENCE

Prior to filing, my office conferred with Jennifer Sandman and Thomas Watkins, counsel for Appellees. Ms. Sandman stated that Appellees oppose this motion and will be filing a written opposition.

/s/ Kyle D. Hawkins
KYLE D. HAWKINS

## CERTIFICATE OF SERVICE

On February 1, 2019, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Kyle D. Hawkins
KYLE D. HAWKINS

APP.230

PPFA00424284

## CERTIFICATE OF COMPLIANCE

This Motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2729 words, excluding the parts of the brief exempted by Rule 27(a)(2)(B); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Kyle D. Hawkins
KYLE D. HAWKINS

APP.231

PPFA00424285

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX DOE, Relator, | § § § | |
| THE STATE OF TEXAS, *ex rel.* ALEX DOE, Relator, | § § § | |
| THE STATE OF LOUISIANA, *ex rel.* ALEX DOE, Relator, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 2:21-CV-00022-Z |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD GULF COAST, INC., PLANNED PARENTHOOD OF GREATER TEXAS, INC., PLANNED PARENTHOOD SOUTH TEXAS, INC., PLANNED PARENTHOOD CAMERON COUNTY, INC., PLANNED PARENTHOOD SAN ANTONIO, INC., | § § § § § § § § § § § § | |
| Defendants. | § § | |

## STATE OF TEXAS'S SUPPLEMENTAL OBJECTIONS, STATEMENTS OF PRIVILEGES, AND ANSWERS TO DEFENDANTS THE PLANNED PARENTHOOD AFFILIATES' FIRST SET OF INTERROGATORIES

To:   Christopher M. Odell, Arnold & Porter, 700 Louisiana Street, Suite 4000, Houston, TX 77002-2755; Tirzah S. Lollar, Craig D. Margolis, Christian Sheehan, Emily Reeder-Ricchetti, Megan Pieper and Alyssa Gerstner, Arnold & Porter, 601 Massachusetts Ave, NW, Washington, DC 20001-3743; Paula Ramer, Arnold & Porter, 250 West 55th Street, New York, New York 10019-9710; and Ryan Patrick Brown, Blackburn Brown LLP, 1222 S. Filmore, Amarillo, Texas 79101.

The State of Texas serves these supplemental objections, statements of privileges, and answers to Defendants' First Set of Interrogatories.

After meeting and conferring with the Defendants, in an attempt to resolve the issues on which the parties disagree, and pursuant to the Court's order on Defendant PPFA's motion to compel, and other Orders and filings in this case, the State of Texas serves these Supplemental Objections, Statements of Privileges, and Answers to Defendants the Planned Parenthood Affiliates' First Set of Interrogatories. The State does not waive, and hereby expressly reserves, its right to assert any and all objections as to the Defendant's First Set of Interrogatories, including but not limited to, the Defendant's definitions and any Interrogatory not included in this Supplemental Response.

2

## SUPPLEMENTAL ANSWERS TO INTERROGATORIES

INTERROGATORY NO. 4

Identify and describe in detail the principal and material facts that form the basis for Texas's termination of each of the Planned Parenthood Affiliates from Texas Medicaid. Your response should include the basis of your contention that the affiliate: (A) is not qualified to provide medical services under Texas Medicaid, including but not limited to all laws, regulations, policies, agreements, manuals, or other guidance that you contend each of the Planned Parenthood Affiliates violated; (B) engaged in practices that violated generally accepted medical standards, including which generally accepted medical standards you contend were violated and how they were violated; and/or (C) engaged in misrepresentations about its activity relating to fetal tissue procurements, including identifying any such misrepresentations.

**OBJECTIONS:**

**Not Relevant to Texas TMFPA claims. Texas's Complaint in Intervention is brought under Section 36.002(12) of the TMFPA, alleging the Defendants knowingly and improperly avoided an obligation to repay money owed to Texas Medicaid. The "termination of each of the Planned Parenthood Affiliates" is not an issue for Texas's TMFPA claim. "Termination of each of the Planned Parenthood Affiliates" was decided as a matter of law when the Defendants failed to properly exercise their administrative remedies under Texas law. This has been recognized by the Fifth Circuit and the Honorable Judge Lora Livingston in Travis County District Court. This question, therefore, asks for information that is irrelevant to the State's TMFPA claim or to defenses to the State's claim in this case.**

**Improper collateral attack of decided issues. This Interrogatory is an improper collateral attack of Defendants' termination from Texas Medicaid, which has been decided as a matter of law and which is not an issue in this case. This issue was decided as a matter of law when the Defendants failed to properly exercise their administrative remedies under Texas law. This has been recognized by the Fifth Circuit and the Honorable Judge Lora Livingston in Travis County District Court.**

3

**ANSWER:**

**Without waiving any of the State's Objections or Claims of Privilege, the State answers: The immediate basis for the termination of each of the Planned Parenthood Affiliates from Texas Medicaid was that the Defendants failed to exercise their administrative remedies after receiving multiple rounds of detailed letters notifying each PPH Affiliate of the reasons for their impending termination, and the process for challenging the allegations described in those letters. Texas Medicaid through the Texas Health and Human Services Commission—Office of Inspector General ("HHSC-OIG") sent preliminary notice of termination letters to the Planned Parenthood Affiliates in or about September 2015, and final notice of termination letters in or about December 2016. These letters laid out the facts, reasoning, and law behind the PPH Affiliates' impeding termination. *See e.g.* Bates numbers PPGC00000013 - PPGC00000017 (preliminary notices); Bates numbers PPGC00000018 - PPGC00000023 (final notices). After the PPH Affiliates failed to exercise their administrative remedies to challenge those notices, their terminations became final by operation of Texas law. The Affiliates had a chance to challenge any contentions underlying the termination of each of the Planned Parenthood Affiliates from Texas Medicaid and failed to do so when they failed to exercise their administrative remedies.**

**Federal Rule of Evidence 201 permits a court to take judicial notice and adjudicate a fact if it is not subject to reasonable dispute. Accordingly, the following facts, which outline the foundation of this case, are not in dispute: Defendants failed to exercise their administrative remedies to appeal from final notice of termination letters issued by HHSC-OIG in December 2016, rendering Defendants' terminations final and unappealable under Texas law by the end of January 2017. Dkt. 22 at 2-6. Defendants instead sought relief in both the Western District of Texas and the state district court of Travis County, Texas, where they obtained now-vacated injunctive relief temporarily preventing Texas from implementing the final and unappealable terminations. *Id.* As described in the State's Expert's Reports and produced materials in this case, Defendants received more than $8 million for services delivered to Medicaid patients between February 1, 2017 (the date by which Defendants' terminations were final and unappealable by operation of Texas law) and March 12, 2021 (the date of the state court's final order) and have failed to pay or transmit those funds back to Texas despite the obligation to do so. *Id.***

**It is the State's position that the issues in this case can largely be resolved as a matter of law.**

**The Termination Notices of each of the Planned Parenthood Affiliates speak for themselves.**

**Please also see the State's Complaint in Intervention and its description of facts and other details. The burden of deriving or ascertaining any relevant answers to the discrete subparts of this Interrogatory from the discovery production described above and from the State's Complaint in Intervention is substantially the same for the Defendants as it is for the State. Designated discovery has not been completed.**

INTERROGATORY NO. 5

Identify and describe in detail the principal and material facts that form the basis of your contention that PPGT, PPST, PP Cameron County, and PP San Antonio are each "a person that is affiliated with a person who commits a program violation" under 1 Tex. Admin. Code Sec. 371.1703(c)(7) and/or are otherwise not qualified to provide medical services under Texas Medicaid.

**OBJECTIONS:**

**Not Relevant to Texas's TMFPA claim. Texas's Complaint in Intervention is brought under Section 36.002(12) of the TMFPA, alleging the Defendants knowingly and improperly avoided an obligation to repay money owed to  Texas Medicaid. The "commission of program violations" is not an issue for Texas's TMFPA claim. The termination of the Defendants as Medicaid providers was decided as a matter of law when the Defendants failed to exercise their administrative remedies. This has been recognized by the Fifth Circuit and the Honorable Judge Lora Livingston in Travis County District Court. This question, therefore, asks for information that is irrelevant to the State's TMFPA claim or to defenses to the State's claim in this case.**

**Improper collateral attack of decided issues. This Interrogatory is an improper collateral attack of Defendants' termination from Texas Medicaid, which has been decided as a matter of law and which is not an issue in this case. This issue was decided when Defendants failed to exercise their administrative remedies and were terminated as Texas Medicaid providers as**

5

a matter of law. This has been recognized by the Fifth Circuit and the Honorable Judge Lora Livingston in Travis County District Court.

**ANSWER:**

Without waiving any of the State's Objections or Claims of Privilege, the State answers: Texas Medicaid through HHSC-OIG sent preliminary notice of termination letters to the Planned Parenthood Affiliates in or about September 2015, and final notice of termination letters in or about December 2016. *See e.g.* Bates numbers PPGC00000013 - PPGC00000017 (preliminary notices); Bates numbers PPGC00000018 - PPGC00000023 (final notices). The PPH Affiliates were terminated as Texas Medicaid providers when the PPH Affiliates failed to exercise their administrative remedies to challenge their terminations. The Affiliates had a chance to challenge any contentions underlying the termination of each of the Planned Parenthood Affiliates from Texas Medicaid and did not do so.

Federal Rule of Evidence 201 permits a court to take judicial notice and adjudicate a fact if it is not subject to reasonable dispute. Accordingly, the following facts, which show that Defendants are not qualified to provide medical services under Texas Medicaid are not in dispute: Defendants failed to exercise their administrative remedies to appeal from final notice of termination letters issued by HHSC-OIG in December 2016, rendering Defendants' terminations final and unappealable, and rendering Defendants not qualified to provide medical services under Texas Medicaid, as a matter of Texas law by the end of January 2017. Dkt. 22 at 2-6. Defendants instead sought relief in both the Western District of Texas and the state district court of Travis County, Texas, where they obtained now-vacated injunctive relief temporarily preventing Texas from implementing the final and unappealable terminations. *Id.* As described in the State's Expert's Reports and produced materials in this case, Defendants received more than $8 million for services delivered to Medicaid patients between February 1, 2017 (the date by which Defendants' terminations were final and unappealable by operation of Texas law) and March 12, 2021 (the date of the state court's final order) and have failed to pay or transmit those funds back to Texas despite the obligation to do so. *Id.*

It is the State's position that the issues in this case – and especially Defendants' disqualification to provide medical services under Texas Medicaid -- can

6

**largely be resolved as a matter of law.**

**Please also see the State's Complaint in Intervention and its description of facts and other details. The burden of deriving or ascertaining any relevant answers to the discrete subparts of this Interrogatory from the discovery production described above and from the State's Complaint in Intervention is substantially the same for the Defendants as it is for the State. Designated discovery has not been completed.**

INTERROGATORY NO. 6

State when you were first contacted by Relator, the Center for Medical Progress, or third parties acting on Relator's behalf regarding allegations that any Planned Parenthood Affiliate was improperly engaged in fetal tissue procurement or otherwise violating laws or regulations related to medical research or to fetal tissue procurement. Describe in detail the information provided to you by Relator, the Center for Medical Progress, or third parties acting on Relator's behalf, including but not limited to any documents or other evidence that was provided to you.

**OBJECTION:**

**Not Relevant to Texas's TMFPA claim. Texas's Complaint in Intervention is brought under Section 36.002(12) of the TMFPA, alleging the Defendants knowingly and improperly avoided an obligation to repay money owed to Texas Medicaid. When the "Relator, the Center for Medical Progress, or third parties" first contacted the State, and "fetal tissue" are not relevant to the State's TMFPA claim or to defenses to the State's claim in this case.**

**STATEMENTS OF PRIVILEGES:**

**Core Work Product, Common Interest, and Attorney/Client: This Interrogatory inquiring into when Texas was first contacted by "Relator, The Center for Medical Progress, or third parties acting on Relator's behalf regarding allegations" of "fetal tissue procurement or otherwise violating laws or regulations related to medical research or to fetal tissue procurement" asks for information which is covered by the attorney- client, common interest, and work product privileges and protections. This is especially true with the almost unlimited definitions of "related to," and "you."**

7

Government Code Medicaid Investigative Privilege. This Interrogatory inquiring into when Texas was first contacted by "Relator, The Center for Medical Progress, or third parties acting on Relator's behalf regarding allegations" of "fetal tissue procurement or otherwise violating laws or regulations related to medical research or to fetal tissue procurement" especially with its overbreadth, asks for information which is privileged under the Government Code Medicaid Investigative Privilege. Texas Government Code § 531.102(k) and Texas Government Code § 531.1021(g) ("All information and materials subpoenaed or compiled by the [OIG] office in connection with an audit or investigation or by the office of the attorney general in connection with a Medicaid fraud investigation are confidential and not subject to disclosure under Chapter 552, and not subject to disclosure, discovery, subpoena, or other means of legal compulsion for their release to anyone other than the office or the attorney general or their employees or agents involved in the audit or investigation conducted by the office or the attorney general, except that this information may be disclosed to the state auditor's office, law enforcement agencies, and other entities as permitted by other law.").

**ANSWER:**

Without waiving any of the State's Objections or Claims of Privilege, the State answers:   The State was first contacted by Relator on or about May 2015 regarding allegations in Relator's Complaint. The State was further informed of those allegations before the Complaint was filed, and when the Complaint was filed, on February 5, 2022. Texas was aware of the amount of Medicaid funds the Planned Parenthood Affiliates have received but was unaware of the facts alleged in Relator and Texas's complaint regarding the Planned Parenthood Affiliates' liability under the TMFPA until Relator's Disclosure to Texas. Please also see the Relator's filings and discovery produced in this case including, but not limited to: the Relator's Answers and Supplemental Answers to PP Federation of America's First Set of Interrogatories number 6, 7, 12, and 15; the Relator's Answers and Supplemental Answers to Planned Parenthood Gulf Coast's First Set of Interrogatories number 7. Please also see the State's Complaint in Intervention and its description of facts and other details. The burden of deriving or ascertaining any relevant answers to the discrete subparts of this Interrogatory from the discovery production described above and from the State's Complaint in Intervention and other filings is substantially the same for the Defendants as it is for the State. Designated discovery has not been completed.

8

INTERROGATORY NO. 7

Describe in detail your communications with the Government, if any, regarding the qualifications of each of the Planned Parenthood Affiliates to provide Medicaid or Texas Medicaid services, whether each of the Planned Parenthood Affiliates engaged in practices that violated generally accepted medical standards and if so which ones, whether each of the Planned Parenthood Affiliates engaged in misrepresentations about its activity relating to fetal tissue procurements and if so which misrepresentations, Texas's termination of each of the Planned Parenthood Affiliates from Texas Medicaid, and whether the termination of each of the Planned Parenthood Affiliates from Texas Medicaid violates Medicaid's free choice of provider requirement. Your response should include, but not be limited to, a detailed description of any response from Texas to the August 11, 2016 letter from Vikki Wachino, Director, Centers for Medicare & Medicaid Services, addressed to Gary Jessee, Associate Commissioner for Medicaid/CHIP, Texas Health and Human Services Commission (attached as Ex. A).

**OBJECTIONS:**

**Not relevant to Texas's TMFPA claim. Texas's Complaint in Intervention is brought under Section 36.002(12) of the TMFPA, alleging the Defendants knowingly and improperly avoided an obligation to repay money owed to Texas Medicaid. Neither the State's communication with "the Government" (whatever that means), or Defendants' "qualifications" and possible "misrepresentations," "generally accepted medical standards," "fetal tissue," Defendants' terminations from Texas Medicaid, nor "Medicaid's free choice of provider requirement" are relevant to the State's TMFPA claim or to defenses to the State's claim in this case.**

**Lacking specificity. It is unclear what the term "the Government" means in this Interrogatory which is directed to the State, which is a "Government."**

**Improper collateral attack of decided issues. This Interrogatory is an improper collateral attack of Defendants' termination from Texas Medicaid, which has been decided as a matter of law and which is not an issue in this case. This issue was decided when Defendants failed to exercise their administrative remedies. This has been recognized by the Fifth Circuit and the Honorable Judge Lora Livingston in Travis County District Court.**

9

**Overbroad.** This request is overbroad because of the objectionably very broad definition of "your" here which encompasses untold persons and entities who have nothing to do with any claims or defenses in this case.

**STATEMENTS OF PRIVILEGES:**

**Core Work Product, Common Interest, and Attorney/Client:** This Interrogatory inquiring into "your communications with the Government" "regarding" Defendants': "qualifications to provide Medicaid or Texas Medicaid services," engaging "in practices that violated generally accepted medical standards" and misrepresentations about "fetal tissue procurements," Texas's termination of Defendants, and "whether the termination of each of the Planned Parenthood Affiliates from Texas Medicaid violates Medicaid's free choice of provider requirement" asks for information which is covered by the attorney-client, common interest, and work product privileges and protections. This is especially true with the almost unlimited definition of "your."

**Government Code Medicaid Investigative Privilege.** This Interrogatory inquiring into "your communications with the Government" "regarding" Defendants' "qualifications to provide Medicaid or Texas Medicaid services," engaging "in practices that violated generally accepted medical standards" and misrepresentations about "fetal tissue procurements," Texas's termination of Defendants, and "whether the termination of each of the Planned Parenthood Affiliates from Texas Medicaid violates Medicaid's free choice of provider requirement," especially with its overbreadth, asks for information which is privileged under the Government Code Medicaid Investigative Privilege. Texas Government Code § 531.102(k) and Texas Government Code § 531.1021(g) ("All information and materials subpoenaed or compiled by the [OIG] office in connection with an audit or investigation or by the office of the attorney general in connection with a Medicaid fraud investigation are confidential and not subject to disclosure under Chapter 552, and not subject to disclosure, discovery, subpoena, or other means of legal compulsion for their release to anyone other than the office or the attorney general or their employees or agents involved in the audit or investigation conducted by the office or the attorney general, except that this information may be disclosed to the state auditor's office, law enforcement agencies, and other entities as permitted by other law.").

10

**ANSWER:**

**A) Without waiving any of the State's Objections or Claims of Privilege, the State refers to its response to INTERROGATORY No. 4, above, and answers: Defendants were terminated from Texas Medicaid as a matter of law because Defendants did not exercise their administrative remedies. The facts surrounding Defendants' termination from Medicaid (for which the Court may take judicial notice under FRE 201) are not in dispute: Defendants failed to exercise their administrative remedies to appeal from the final notice of termination letters issued by HHSC-OIG in December 2016, rendering Defendants' terminations final and unappealable, as a matter of Texas law by the end of January 2017. Dkt. 22 at 2-6. Defendants instead sought relief in both the Western District of Texas and the state district court of Travis County, Texas, where they obtained now-vacated injunctive relief temporarily preventing Texas from implementing the final and unappealable terminations. *Id.* As described in the State's Expert's Reports and produced materials in this case, Defendants received more than $8 million for services delivered to Medicaid patients between February 1, 2017 (the date by which Defendants' terminations were final and unappealable by operation of Texas law) and March 12, 2021 (the date of the state court's final order) and have failed to pay or transmit those funds back to Texas despite the obligation to do so. *Id.***

**B) It is the State's position that the issues in this case – and especially Defendants' disqualification to provide medical services under Texas Medicaid -- can largely be resolved as a matter of law.**

**C) Although irrelevant to Texas's TMFPA claim in this case, Texas HHSC Medicaid & CHIP Associate Commissioner Jami Snyder wrote a December 2, 2016 response to the August 11, 2016 letter from Centers for Medicare & Medicaid Services (CMS) Director Vikki Wachino to Texas HHSC Associate Commissioner for Medicaid & CHIP Gary Jessee. *See* 12.2.2016 letter at Bates no. TXPP_0189218-0189219. In the December 2, 2016 letter Ms. Snyder discussed the "pending litigation in federal court" requesting an injunction related to Planned Parenthood Gulf Coast's termination as a Medicaid provider. *Id.* at 1. Ms. Snyder assured Ms. Wachino and CMS that "[r]egardless of the final resolution" of that lawsuit "the investigation of PPGC and any resulting administrative action has not and will not affect access to care, as Texas maintains a robust network of qualified providers." *Id.* Ms. Snyder also detailed that "HHSC has established network adequacy standards for its contracted managed care organizations, ensuring member access to**

11

**providers offering women's healthcare services in every region of the state."** *Id*.
**She further detailed that "more providers are available to serve this population**
**today than in previous years, and that those "[p]roviders include physicians,**
**federally qualified health centers, Medicaid-certified rural health clinics, and**
**other health care providers across the State[.]"** *Id*. **Ms. Snyder reassured Ms.**
**Wachino and CMS that "[t]hese providers constitute an extraordinary**
**expansion in access to women's healthcare that match and increase the kind of**
**services PPGC and its affiliates have provided."** *Id*. **at 2.**

**D) Additionally, using agreed search terms the State has searched for and is**
**producing non-privileged communications with the federal government, if**
**any, "regarding the qualifications of each of the Planned Parenthood**
**Affiliates to provide Medicaid or Texas Medicaid services." Please also see the**
**State's Complaint in Intervention and its description of facts and other**
**details. The burden of deriving or ascertaining any relevant answers to the**
**discrete subparts of this Interrogatory from the discovery production**
**described above and from the State's Complaint in Intervention is**
**substantially the same for the Defendants as it is for the State. Designated**
**discovery has not been completed.**

INTERROGATORY NO. 9

Identify each person with knowledge of the principal and material facts relevant to
the allegations in your Complaint, including but not limited to, your allegations that
any of the Planned Parenthood Affiliates are not qualified to provide medical
services under Texas Medicaid, whether any of the Planned Parenthood Affiliates
engaged in practices that violated generally accepted medical standards and if so
which ones, whether any of the Planned Parenthood Affiliates engaged in
misrepresentations about its activity relating to fetal tissue procurements and if so
which misrepresentations, that Texas's decision to terminate each of the Planned
Parenthood Affiliates' participation in Texas Medicaid was justified, that each of
the Planned Parenthood Affiliates were effectively terminated from Texas
Medicaid, at the latest, by February 1, 2017, that each of the Planned Parenthood
Affiliates were obligated to repay to Texas Medicaid dollars it received in
reimbursements, that each of the Planned Parenthood Affiliates were effectively
terminated from Texas Medicaid, at the latest, by February 1, 2017. Your response
should describe the facts about which each person has knowledge.

12

**OBJECTIONS:**

**Not relevant to Texas's TMFPA claim. Texas's Complaint in Intervention is brought under Section 36.002(12) of the TMFPA, alleging the Defendants knowingly and improperly avoided an obligation to repay money owed to Texas Medicaid. Neither Defendants' "qualifications" and possible "misrepresentations," "generally accepted medical standards," "fetal tissue," nor "Medicaid's free choice of provider requirement," let alone any person's knowledge of such, are relevant to the State's TMFPA claim or to defenses to the State's claim in this case.**

**Improper collateral attack of decided issues. This Interrogatory is an improper collateral attack of Defendants' termination from Texas Medicaid, which has been decided as a matter of law and which is not an issue in this case. This issue was decided when Defendants failed to exercise their administrative remedies. This has been recognized by the Fifth Circuit and the Honorable Judge Lora Livingston in Travis County District Court.**

**ANSWER:**

**Without waiving any Objections, see the State's Complaint in Intervention, the State's other filings in this case, including the State's Response to RFP 1. The burden of deriving or ascertaining any relevant answers to the discrete subparts of this Interrogatory is substantially the same for the Defendant as it is for the State. Designated discovery has not been completed.**

**Generally, the allegations in the State's Complaint in Intervention do not require persons with knowledge of facts to support them. Federal Rule of Evidence 201 permits a court to take judicial notice and adjudicate a fact if it is not subject to reasonable dispute. Accordingly, the following facts, which show that Defendants were effectively terminated from Texas Medicaid are not in dispute: Defendants failed to exercise their administrative remedies to appeal from final notice of termination letters issued by HHSC-OIG in December 2016, rendering Defendants' terminations final and unappealable, and effectively terminating Defendants from Texas Medicaid, as a matter of Texas law by the end of January 2017. Dkt. 22 at 2-6. Defendants instead sought relief in both the Western District of Texas and the state district court of Travis County, Texas, where they obtained now-vacated injunctive relief temporarily preventing Texas from implementing the final and unappealable terminations. *Id*. As described in the State's Expert's Reports and produced**

13

materials in this case, Defendants received more than $8 million for services delivered to Medicaid patients between February 1, 2017 (the date by which Defendants' terminations were final and unappealable by operation of Texas law) and March 12, 2021 (the date of the state court's final order) and have failed to pay or transmit those funds back to Texas despite the obligation to do so. *Id*.

It is the State's position that the issues in this case – and especially Defendants' effective termination as providers from Texas Medicaid -- can largely be resolved as a matter of law.

Support for the State's allegations in its Complaint in Intervention that Planned Parenthood Affiliates "are not qualified to provide medical services under Texas Medicaid" is found throughout the Complaint and in 1 Tex. Admin. Code § 371.1705(e), which reads in part: "If, after the effective date of an exclusion, an excluded person submits or causes to be submitted claims for services or items furnished within the period of exclusion, the person may be subject to civil monetary penalty liability." ECF 22 at 8.

There are no allegations in the State's Complaint in Intervention that any Defendants "engaged in practices that violated generally accepted medical standards."

There are no allegations in the State's Complaint in Intervention about misrepresentations or any other "activity relating to fetal tissue procurements."

Please also see Texas's pleadings, and discovery responses, including, but not limited to, Texas's disclosures.

INTERROGATORY NO. 14

Describe in detail your efforts, if any, to determine whether providers under Texas Medicaid have engaged in fetal tissue procurement that, in your view, might render them unqualified to provide medical services under Texas Medicaid or might violate generally accepted medical standards. Your response should describe the extent to which Texas Medicaid providers are informed of any such efforts. Your response should also identify any Texas Medicaid providers identified as a result of these efforts and describe in detail Texas's consideration of potentially terminating such providers, whether such providers were terminated, whether such

14

providers asked or required to repay amounts reimbursed under Texas Medicaid, and the amounts returned, if any.

**OBJECTIONS:**

**Not Relevant to Texas's TMFPA claim. Texas's Complaint in Intervention is brought under Section 36.002(12) of the TMFPA, alleging the Defendants knowingly and improperly avoided an obligation to repay money owed to Texas Medicaid. "Fetal tissue," and "generally accepted medical standards," are not part of Texas's Complaint in Intervention and are not relevant to the State's TMFPA claim or to defenses to the State's claim in this case.**

**Improper collateral attack of decided issues. This Interrogatory is an improper collateral attack of Defendants' termination from Texas Medicaid, which has been decided as a matter of law and which is not an issue in this case. This issue was decided when Defendants failed to exercise their administrative remedies. This has been recognized by the Fifth Circuit and the Honorable Judge Lora Livingston in Travis County District Court.**

**STATEMENT OF PRIVILEGE:**

**Government Code Medicaid Investigative Privilege. This Interrogatory inquiring into "your efforts, if any, to determine whether providers under Texas Medicaid have engaged in fetal tissue procurement" asks for information which is privileged under the Government Code Medicaid Investigative Privilege. Texas Government Code § 531.102(k) and Texas Government Code § 531.1021(g) ("All information and materials subpoenaed or compiled by the [OIG] office in connection with an audit or investigation or by the office of the attorney general in connection with a Medicaid fraud investigation are confidential and not subject to disclosure under Chapter 552, and not subject to disclosure, discovery, subpoena, or other means of legal compulsion for their release to anyone other than the office or the attorney general or their employees or agents involved in the audit or investigation conducted by the office or the attorney general, except that this information may be disclosed to the state auditor's office, law enforcement agencies, and other entities as permitted by other law.").**

15

**ANSWER:**

**Generally, HHSC-OIG investigates allegations that might render Texas Medicaid providers unqualified to provide medical services. These allegations may originate in various sources. Any information concerning wrongdoing by a provider generally receives a preliminary investigation and if there is cause for additional concern, it may proceed to a full-scale investigation.**

**Individualized investigations as to all Texas Medicaid providers are not conducted to determine whether those providers have engaged in fetal tissue procurement.**

INTERROGATORY NO. 15

Describe in detail why Texas granted the Grace Period, including but not limited to its basis for its apparent assertion that granting the Grace Period is not inconsistent with its contention in the Texas Complaint that the Planned Parenthood Affiliates were obligated to repay Texas Medicaid dollars that it received during the Grace Period.

**OBJECTION:**

**Not relevant to Texas's TMFPA claim. Texas's Complaint in Intervention is brought under Section 36.002(12) of the TMFPA, alleging the Defendants knowingly and improperly avoided an obligation to repay money owed to Texas Medicaid. Texas's Complaint in Intervention does not seek payment of civil remedies by Defendants or any recovery of Texas Medicaid dollars paid to Defendants for services delivered during the Grace Period. This makes facts regarding that Grace Period not relevant to any of the State's claims or to defenses to the State's claims in this case.**

**ANSWER:**

**The State of Texas granted the Grace Period to help facilitate continuity of care for Medicaid clients who received Medicaid health services from the Defendants and needed to be transitioned to other providers. The State is not seeking payment of civil penalties by Defendants or any recovery of Texas Medicaid dollars paid to Defendants for services delivered during the Grace Period.**

16

RESPECTFULLY SUBMITTED,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN E. COWLES**
Deputy Attorney General for Civil
Litigation

*/s/ Raymond Charles Winter*
**RAYMOND CHARLES WINTER**
Chief, Civil Medicaid Fraud Division
State Bar No. 21791950

**AMY S. HILTON**
Assistant Attorney General
General Litigation Division
State Bar No. 24097834

Office of the Attorney General
P.O. Box 12548, Capitol Station Austin,
Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667
Raymond.Winter@oag.texas.gov
Amy.Hilton@oag.texas.gov

**Attorneys for State of Texas**

17

## CERTIFICATE OF SERVICE

I certify that on **October 25, 2022**, a true and correct copy of the foregoing document was sent by electronic mail to Defendants' counsel to the e-mail addresses below:

Christopher Mohr Odell   christopher.odell@arnoldporter.com

Tirzah Lollar                     tirzah.lollar@arnoldporter.com

Craig D Margolis             craig.margolis@arnoldporter.com

Christian Sheehan           christian.sheehan@arnoldporter.com

Emily Reeder-Ricchetti   emily.reeder-ricchetti@arnoldporter.com

Megan Pieper                   megan.pieper@arnoldporter.com

Paula Ramer                     paula.ramer@arnoldporter.com

Alyssa Gerstner               alyssa.gerstner@arnoldporter.com

Danny S Ashby               dashby@omm.com

Justin Roel Chapa          jchapa@omm.com

Leah Godesky                  lgodesky@omm.com

Megan Whisler               mwhisler@omm.com

Ryan Patrick Brown        brown@blackburnbrownlaw.com

**Attorneys for Defendants**


                                        */s/ Raymond Charles Winter*
                                        **Raymond Charles Winter**

18

## VERIFICATION

**STATE OF TEXAS**              §
                                 §
**COUNTY OF TRAVIS**            §

     I, Jeffrey Goldstein, Legal Assistant III for the HHS Office of the Inspector General, after having been first duly sworn, state on my oath that I have read the foregoing STATE OF TEXAS'S SUPPLEMENTAL OBJECTIONS, STATEMENTS OF PRIVILEGES, AND ANSWERS TO DEFENDANTS THE PLANNED PARENTHOOD AFFILIATES' FIRST SET OF INTERROGATORIES and verify the responses to *Interrogatory Nos.4 and 14*. These Responses are correct as they pertain to the Texas Medicaid Program to the best of my knowledge, information and belief.

_____
Duly Authorized Representative
of the State of Texas

Sworn to and subscribed before me this the 25th day of October, 2022.

_____
Notary Public

My Commission Expires:



CHARLENE GARNER
Notary Public-State of Texas
Notary ID #132066930
Commission Exp. JUNE 24, 2023
**Notary without Bond**

APP.250

# VERIFICATION

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF TRAVIS** | § |

I, David Drew Wright, Assistant Attorney General for the Office of the Texas Attorney General, after having been first duly sworn, state on my oath that I have read the STATE OF TEXAS'S SUPPLEMENTAL OBJECTIONS, STATEMENTS OF PRIVILEGES, AND ANSWERS TO DEFENDANTS THE PLANNED PARENTHOOD AFFILIATES' FIRST SET OF INTERROGATORIES and verify the responses to *Interrogatories Nos. 5, 6, 7 paragraphs (A), (B), and (D), and 9* under Federal Rule of Civil Procedure 33(b)(1)(B) as they pertain to the Texas Medicaid Program to the best of my knowledge, information and belief.

Duly Authorized Representative
of the State of Texas

Sworn to and subscribed before me this the 25 day of October , 2022.

Diana Reed
Notary Public

My Commission Expires:

DIANA REED
Notary Public-State of Texas
Notary ID #125347114
Commission Exp. JULY 29, 2026
Notary without Bond

APP.251

## VERIFICATION

**STATE OF TEXAS**              §
                               §
**COUNTY OF TRAVIS**           §

    I, Emily Zalkovsky, Texas Deputy State Medicaid Director, after having been first duly sworn, state on my oath that I have read the foregoing STATE OF TEXAS'S SUPPLEMENTAL OBJECTIONS, STATEMENTS OF PRIVILEGES, AND ANSWERS TO DEFENDANTS THE PLANNED PARENTHOOD AFFILIATES' FIRST SET OF INTERROGATORIES and verify the responses to *Interrogatory Nos 7 paragraph (C) and 15*. These Responses  are correct as they pertain to the Texas Medicaid Program to the best of my knowledge, information and belief.


                                                   Duly Authorized Representative
                                                   of the State of Texas


Sworn to and subscribed before me this the 25 day of October , 2022.

AMY LUTON
Notary Public-State of Texas
Notary ID #13299395-6
Commission Exp. MARCH 10, 2025
Notary Public

My Commission Notary without Bond

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                    AMARILLO DIVISION
 3   United States of America    *
     ex rel. ALEX DOE, Relator,  * CIVIL ACTION NO. 2:21-CV-
 4                               * 00022-Z
                                 *
 5   The State of Texas          *
     ex rel. ALEX DOE, Relator   *
 6                               *
     The State of Louisiana      *
 7   ex rel. ALEX DOE, Relator   *
                                 *
 8           Plaintiffs,         *
     V.                          *
 9                               *
     Planned Parenthood          *
10   Federation of America,      *
     Inc., Planned Parenthood    *
11   Gulf Coast, Inc., Planned   *
     Parenthood of Greater       *
12   Texas, Inc., Planned        *
     Parenthood South Texas,     *
13   Inc., Planned Parenthood    *
     Cameron County, Inc.,       *
14   Planned Parenthood San      *
     Antonio, Inc.,              *
15                               *
             Defendants          *
16
17      ********************************************
18          ORAL AND VIDEOTAPED DEPOSITION OF
19       TEXAS HEALTH AND HUMAN SERVICES COMMISSION
20               AND THE STATE OF TEXAS
21             30(b)(6) EMILY ZALKOVSKY
22                 DECEMBER 6, 2022
23      ********************************************
24
25
```

Page 31

1   whether any portion of that would have to be returned to

2   the federal government?

3                  MR. BRISSENDEN:  Object to the form of the

4   question.  Object, it calls for a legal conclusion.

5   Object to the scope.  It's well beyond the scope of the

6   topic that this witness has been designated to testify to

7   in the capacity as a 30(b)(6) witness.

8       A.  I don't know.

9       Q.  Okay.  So there are two types of Medicaid

10  claims in Texas.  Is that correct?

11      A.  I don't understand the question.

12      Q.  Sure.  Let me ask it a little -- let me ask it

13  a little bit differently.

14          So is it fair to say that there are claims that

15  go through Managed Care Organizations, and then there's

16  also Fee For Service claims?

17      A.  That's correct.

18      Q.  Are there any others in that group?

19      A.  No.  Those are the two.

20      Q.  Okay.  And for the Managed Care claims, is it

21  correct that the State pays a third-party health insurer

22  a monthly premium for each Medicaid beneficiary the MCO

23  covers?

24      A.  That's correct.

25      Q.  And the MCA pays -- sorry.  And the MCO pays

Page 40

```
 1                   MR. ASHBY:  -- Vague.  Objection; form,
 2        ambiguous.
 3                   MS. KRIEG:  -- what did you want to say?
 4                   MR. ASHBY:  And the statement was, you're
 5        coaching the witness.  Form is fine.
 6                   MR. BRISSENDEN:  Let's do this.  I was not
 7        at these other depositions, but I am here today.  So
 8        let's -- Tirzah's going to go forward.  We're approaching
 9        a break probably in another hour, so we've got -- in
10        about ten minutes or 15 minutes.
11                   Tirzah is going to ask perfect questions.
12        I will keep my objections to minimum and form, and only
13        if I really need to assert an objection.  It's certainly
14        not for purposes of coaching and -- the witness.  That's
15        not the purpose.  And we'll -- at the break you said Amy
16        Hilton was there, so we'll see if we can talk with Amy at
17        the break and gain an understanding since we weren't part
18        of those depos.
19                   Does that sound okay?
20                   MR. ASHBY:  Sure.
21                   MR. BRISSENDEN:  All right.
22        Q.  Okay.  So you were talking about the rates that
23        are set by the actuaries.  So I'm sorry.  Tell me again
24        what the rates are.
25        A.  The rates are the rates that the -- what I was
```

Page 41

```
 1    talking about was our rates that the State pays the
 2    health plans and we call the per member, per month.
 3         Q.  Okay.  And the State pays that rate, the per
 4    member, per month, the same rate, regardless of how many
 5    times the patient sees any given provider.  Is that
 6    right?
 7         A.  That is correct for that -- that provider and
 8    that patient in real time.  Those services and rates paid
 9    are used to set rates for future years, so it does have
10    an impact on future year rates, is what --
11         Q.  Okay.
12         A.  -- I was trying to say.
13         Q.  But in the given year, Texas is going to pay
14    out the same per member, per month rate, regardless of
15    how many times that patient sees a given provider.
16    Right?
17         A.  That's correct.
18         Q.  Okay.  Thank you.  So under a Fee For Service
19    model, a doctor who treats a Medicaid beneficiary submits
20    a reimbursement request to the State.  Is that right?
21         A.  That's correct.
22         Q.  Okay.  And the State then pays the provider?
23         A.  That's correct.  And I'll clarify that it's our
24    administrative services contractor, TMHP, working on
25    behalf of the State that pays the provider.  But yes.
```

Page 42

1        Q.   Was TMHP the State's contractor in 2015?

2        A.   Yes.

3        Q.   Okay.  And has TMHP been the State's contractor

4   from 2015 to current day?

5        A.   Yes.

6        Q.   Great.

7             MR. BRISSENDEN:  Object to form.

8        Q.   I'd like to ask you about the Planned

9   Parenthood Texas affiliates' participation in Texas

10  Medicaid.  Is that a topic you're prepared to testify

11  about today?

12       A.   Yes.

13       Q.   Okay.  So when I refer to the Texas affiliates,

14  I'm referring to the five Planned Parenthood affiliates

15  that are named as defendants in this case, and that's

16  Planned Parenthood Gulf Coast, Planned Parenthood of

17  Greater Texas, Planned Parenthood South Texas, Planned

18  Parenthood Cameron County and Planned Parenthood San

19  Antonio.

20            Is it all right with you if I use the shorthand

21  "Texas affiliates" to refer to those five companies?

22       A.   Yes.

23       Q.   Great.  Thank you.  That will, again, save us

24  some time.  So the Texas affiliates terminate -- sorry.

25            What is the effective date of the Texas

Page 43

1    affiliates' termination from Texas Medicaid?

2         A.   The effective date is February 1st, 2017.

3         Q.   So is there -- what's the Master Provider File?

4         A.   Can you tell me which topic you're on?

5         Q.   I'm on Topic 3 under the HHSC notice.

6         A.   Okay.  Thank you.

7         Q.   Sure.

8         A.   Sorry.  Could you repeat the question?

9         Q.   Sure.  Are you familiar with a -- what a Master

10   Provider File is?

11        A.   Yes.

12        Q.   Okay.  What is that?

13        A.   That is a file that contains a record of all

14   enrolled Medicaid providers.  And it's a file that the

15   State -- or TMHP sends to the health plans to reflect the

16   current status of all Medicaid-enrolled providers.

17        Q.   And when you say health plans, what do you

18   mean?

19        A.   The Managed Care plans.

20        Q.   The MCOs that we --

21        A.   Yes.

22        Q.   -- were just talking about?

23        A.   Yes.  We say MCOs.

24        Q.   Okay.  Great.  And I think you said this, but

25   let's just be sure.  Would you agree that the majority of

Page 44

1    claims for Texas Medicaid go through MCOs as opposed to

2    Fee For Service?

3              MR. BRISSENDEN:  Object to form.

4         A.  Yes, I would agree.

5         Q.  Okay.  Great.  So it's pretty important that

6    the MCOs know which providers are enrolled.  Right?

7              MS. STEPHENS:  Object to form.

8         A.  Correct.

9         Q.  Isn't it true that the Texas affiliates were on

10   the MPF well past February of 2017?

11        A.  That is correct.

12        Q.  Okay.  Into March of 2021?

13        A.  Let me check.  That is correct.

14        Q.  Okay.  What's -- are you familiar with the

15   acronym SAR, S-A-R?

16        A.  I am.

17        Q.  Okay.  What's a SAR?

18        A.  It's stands for, I believe, State Action

19   Request.

20        Q.  And what is that?

21        A.  That is a way for the State to give direction

22   to TMHP to take an action.

23        Q.  And I should have asked.  Just give me a high

24   level of what TMHP does as the State's Medicaid

25   contractor.

Page 47

1    date, as the providers are not enrolled in Texas

2    Medicaid.

3              Did I read that correctly?

4         A.   That is what it says.

5         Q.   Okay.  Was there ever a notice that went out to

6    the MCOs that Planned -- that Texas affiliates had been

7    terminated as of the date that you provided,

8    February 1st, 2017?

9         A.   I'll just consult a couple of things.  No.

10        Q.   It goes on to say that, MCOs should update

11   their systems to deny claims for the date of service

12   after March 10, 2021.  The PDC for these providers will

13   be reflected on the Master Provider File.

14             Did I read that correctly?

15        A.   That's correct.

16        Q.   Okay.  So the Texas affiliates were on the

17   Master Provider File through March 10th, 2021.  Right?

18        A.   That's correct.

19        Q.   Okay.  Okay.  Were you going to say something?

20        A.   Just one second.

21        Q.   Sure.  Which tab are you looking at, please?

22        A.   Okay.  I'm looking at Tab 1.  And I would like

23   to add to what I just said, that we had another -- we

24   sent a termination notice about Planned Parenthood to the

25   health plans in January 2021 with some similar

Page 50

1   clinics' participation in the Medicaid program, closed

2   quote.

3          Did I read that correctly?

4      A.  That's correct.

5      Q.  It goes on to say, Please pause all efforts to

6   transition current Planned Parenthood Medicaid clients to

7   new providers until further notice.  Please manually

8   update your systems to allow for payment of these claims.

9   The Master Provider File will be updated no later than

10  February 10th, 2021.

11         Did I read that correctly?

12     A.  Correct.

13     Q.  So this is essentially a notice to the health

14  plans saying that you can continue to reimburse Planned

15  Parenthood's Medicaid claims after February 3rd, 2021,

16  not withstanding the January 2021 notice at Tab 1.

17  Correct?

18             MR. BRISSENDEN:  Object to form.

19             MR. STEPHENS:  Form.

20     A.  That's correct.

21     Q.  So we're going to talk about the effective date

22  of the termination.  I know you gave me a February 1st,

23  2017 date.  But would you agree that the Texas affiliates

24  provided services under Medicaid from 2015 to March of

25  2021 -- I'll actually stop right there.  Provided health

Page 51

1    care services to Medicaid patients from 2015 to March

2    of -- March 10th of 2021?

3                    MR. STEPHENS:  Objection to form.

4         A.  That's correct.

5         Q.  And the Texas affiliates received reimbursement

6    for those services under Medicaid.  Correct?

7         A.  I cannot say that they received reimbursement

8    for every service.

9         Q.  Sure.  Kind of day to day, there might be some

10   billing issues that will get resolved in the normal

11   course.  Is that what you were alluding to?

12        A.  Yes.  Or that they may have billed for

13   something that wasn't -- wasn't necessarily paid.

14        Q.  Right.  But there were no -- let me put it

15   another way.  There were no firm stoppages that the

16   plans -- the Texas affiliates should receive no

17   reimbursement from Medicaid services from 2015 to

18   March 10th, 2021.

19        A.  That's correct.  To my knowledge.

20                    MR. BRESSENDEN:  Tirzah, we've been going

21   for about an hour.  Is this a good stopping point for --

22                    MS. LOLLAR:  I'd like to go a little bit

23   longer.  I think -- if the witness is comfortable.  Let

24   me ask the witness.

25                    THE WITNESS:  That's okay.  I think a

Page 52

1    little while, probably -- I mean --

2              MR. BRISSENDEN:  Let's go for -- is this a

3    good breaking point on a topic?  Are you going to get

4    into a new topic?

5              MS. LOLLAR:  I'm not.  I'm just --

6              MR. BRISSENDEN:  Okay.

7              MS. LOLLAR:  If we stop every hour, we're

8    going to be here until 8:00 o'clock, and I'm trying to

9    avoid that.  So I'm still on the same topic of

10   enrollment.  Let's see if we can do another 15 or

11   20 minutes.  It will just pay dividends later today.

12             If you're comfortable, ma'am.

13             THE WITNESS:  I'm okay with 15 or 20.

14   Q.  So sticking with the topic of the defendants'

15   participation in Texas Medicaid, I'm handing what you I

16   think we've marked as Exhibit 6.

17             (Exhibit No. 6 marked)

18   Q.  So is this a document that you've seen before?

19   A.  I do not believe I've seen it, so I would like

20   to read it.

21   Q.  Okay.  You're free to read it all.  I'm going

22   to tell you I'm going to ask you about the top two

23   paragraphs.

24   A.  Okay.  I've read it all.

25   Q.  Okay.  Great.  So are you familiar with this

Page 53

1   type of document?

2        A.   I do not know if I've seen one of these before.

3        Q.   Okay.   But you're aware that providers have to

4   periodically go through a -- I don't know, a new up -- or

5   reenrollment process for Texas Medicaid.   Is that fair?

6        A.   That's correct.

7        Q.   Okay.   And even though you haven't seen this

8   document, do you agree that this document appears to be

9   part of that process?

10              MR. BRISSENDEN:   Object to form.

11              MR. STEPHENS:   Object to form.

12        A.   This does appear to be part of the enrollment

13   process, yes.

14        Q.   Okay.

15        A.   Or related to the enrollment process.

16        Q.   Got it.   Okay.   And what's your understanding

17   of the re-enrollment requirement?

18        A.   Can you be more specific?

19        Q.   Well, I asked you -- I asked you, I don't know

20   my exact question, but something along the lines of isn't

21   it true that enrolled providers have to periodically

22   reenroll or re -- or update their provider status, and I

23   think you said yes.

24        A.   Yes.

25        Q.   And my question is, what's your understanding

Page 54

1   of that process?

2        A.  My understanding of that process, and again,

3   I'm not -- I don't know all the details, is that

4   providers submit information that is the same or similar

5   to that that they did during their initial enrollment, so

6   information that is included on the enrollment

7   application, and that they are to go through various kind

8   of checks and screenings that are part of that process.

9        Q.  Okay.  And who from -- which agencies within

10  Texas are involved in the process?

11       A.  To my knowledge, HHSC is involved as the

12  administrator of Medicaid, as well as the Office of

13  Inspector General.  They have a piece in that, as well.

14       Q.  Okay.  And, in fact, if you look at the second

15  paragraph, it says that, HHSC has approved your

16  application to become a Texas State Health Care Programs

17  Provider for a term ending September 1st, 2020.  Do you

18  see that?

19       A.  I do see that.

20       Q.  Okay.  But you would agree with me, this is

21  dated August 31st, 2018.  Even though it says the

22  application is approved to become a provider, Planned

23  Parenthood Gulf Coast, Inc. was already in the program

24  prior to August of 2018?

25            MR. BRISSENDEN:  Object to form.

Page 55

1          A.  Let me just check something up to confirm.

2          Q.  Sure.  Would you mind telling me which tab

3     you're looking at?

4          A.  Yeah.  This is Tab 50, although on the index I

5     think it might say that it's 49.

6          Q.  Is your tab -- my Tab 50 is an excerpt from the

7     TMPPM.  You must be on the one that has --

8          A.  I'm sorry.  This is Tab -- no, this is my

9     Tab 50.

10         Q.  Okay.

11         A.  So it might be before that in yours.  I'm

12    trying to figure out what went on with these tabs.  The

13    title is Planned Parenthood Enrollment Data.

14         Q.  Is it -- let's do this maybe a little

15    differently.  So at my Tab -- the document you have in

16    front of you, reading across the top line, is it PensNpi

17    Npi org name, et cetera?

18         A.  Yes.

19         Q.  And just for the record, so that's Tab 50 in

20    your binder?

21         A.  Yes.

22         Q.  All right.  That's Tab 49 in ours.  Maybe we

23    can do a little checking on the break.

24              So sorry, please continue.

25         A.  Okay.  Let me just check that.

Page 56

```
 1              MR. BRISSENDEN:  For the record, I
 2     suggested a break.
 3              MS. LOLLAR:  See, then we would have gotten
 4     through this question and we would have had to have taken
 5     another break.
 6         A.  Okay.  So yes.  The information I have shows
 7     that Planned Parenthood Gulf Coast was enrolled prior to
 8     that date.
 9         Q.  Okay.  And what is the document we're both
10     looking at in Exhibit 5?
11         A.  This is a document pulled from the Provider
12     Enrollment System that shows the initial enrollment dates
13     of various Planned Parenthood providers.
14         Q.  So what did you look at in order to answer the
15     question I posed, which was, was Planned Parenthood Gulf
16     Coast, Inc. a provider prior to August of 2018?
17         A.  I looked at the lines that say Planned
18     Parenthood Gulf Coast, Inc., which has, as you can see,
19     several different lines, and what enrollment date was
20     listed.  The C21 Enrollment Date column, what was listed
21     there.
22         Q.  Okay.  So would you understand for each row
23     where Planned Parenthood Gulf Coast is listed, other than
24     the first, that those would be reenrollment dates?
25         A.  No.  My understanding of that is that they are
```

Page 98

1   they have to do to be a qualified enrolled provider and

2   what they can and can't bill for.

3         Q.  The TAC is the Texas Administrative Code?

4         A.  Yes.

5         Q.  Anything else other than the rules and

6   regulations and the provider agreement in the Texas

7   Administrative Code?

8         A.  I have nothing else to add to that.

9         Q.  Okay.  You would agree that there was no

10  recoupment action initiated?

11              MR. BRISSENDEN:  Object to form.

12        A.  Can you restate that?

13        Q.  You would agree with me that there was no

14  recoupment action initiated seeking to recover the

15  amounts that the Texas affiliates received during the

16  pendency of the federal injunction?

17        A.  This -- other than this lawsuit.  I just wanted

18  to ask for clarification.

19        Q.  Sure.  Correct.  You would agree with me that

20  there was no recoupment action initiated by HHSC to

21  recover amounts the affiliates received during the

22  pendency of the federal injunctions, other than this

23  lawsuit.  Correct?

24        A.  There is no separate action aside from the

25  lawsuit and the regulations laid out in the provider

Page 99

1    agreement in the TAC.

2         Q.  And just so I'm clear, so you view this lawsuit

3    as a recoupment action?

4         A.  Yes.  The State is requesting the funds back.

5         Q.  And I think you testified this morning that

6    you -- well, let me just ask you again.  Are you

7    knowledgeable about the specifics of what a recoupment

8    action is?

9              MR. BRISSENDEN:  Object to form.

10        A.  Yeah.  I don't understand the question.  Can

11   you provide more detail?

12        Q.  What's a recoupment action?

13        A.  Generally --

14             MR. BRISSENDEN:  Object to form and scope.

15        Q.  You can go ahead.

16        A.  Can you tell me which topic you're on?

17        Q.  I mean, we talked about this morning about

18   general overview of the administration of Texas Medicaid,

19   and I think you told me that you didn't know anything

20   about recoupment beyond it being an action to recover

21   money or potentially to, like, take a credit.  That's all

22   I was trying to refresh on.

23             Do you recall that testimony?

24        A.  Yes, I do.

25        Q.  Okay.  So do you know anything about recoupment

Page 101

1            THE VIDEOGRAPHER:  Excuse me,

2    Ms. Zalkovsky.  The mic just fell --

3            THE WITNESS:  Yeah, I just noticed that.

4        Q.  Yeah.  If I told you that under Texas

5    Administrative Code 371.1, recoupment was defined as --

6    sorry.  Recoupment of overpayment.  A sanction imposed to

7    recover funds provided to -- let me start that again.

8        Recoupment of overpayment.  A sanction imposed

9    to recover funds paid to a provider or person to which

10   the provider or person was not entitled.

11       A.  Yeah.  I actually have that, so let me -- I

12   think I have that part of TAC.  So let me get it so I can

13   look at it, too.

14            MR. BRISSENDEN:  Which section is that, to

15   help the witness?

16            MS. LOLLAR:  It's 371.1.  You have a copy.

17       A.  I'm sorry.  Could you read that again?

18       Q.  I will give it to you, but it is a long section

19   of the code.  I'm only going to ask you about recoupment.

20       A.  Can you --

21       Q.  I'm handing you what we've marked as

22   Exhibit 13.

23            (Exhibit No. 13 marked)

24       Q.  And you'll see that Recoupment of Overpayment

25   is referenced on the page ending in Bates 18.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

APP.270

1    A.   This is the definition section.

2    Q.   Correct.  So my only question for you is, you

3  would agree with me that under TAC, recoupment of an

4  overpayment is a sanction.  Right?

5          MR. BRISSENDEN:  Object to the form and

6  scope.

7    A.   Yeah.  I can't answer that, because this is

8  specific to the OIG's TAC, and I'm not a representative

9  of the OIG.  And in Texas Medicaid at HHSC, we sometimes

10  use recoupment to mean other things or broader things.

11   Q.   So HHSC sometimes uses -- uses recoupment more

12  broadly than just a sanction?

13   A.   That is correct.  In my understanding.

14   Q.   And I apologize, I know you probably said this

15  this morning.  But so what is HHSC's understanding of

16  what a recoupment is?

17          MR. BRISSENDEN:  Object to the form and

18  scope.

19   Q.   As HHSC uses the term.  That's all I'm trying

20  to get.

21          MR. BRISSENDEN:  Same objection.

22   A.   Can you be specific about in what -- in what --

23  maybe relate it to what topics we may use it or program

24  or kind of in what capacity we may use it in your

25  question?

1      Q.  I'm just trying to follow up on what you said.

2  So you said the IG's definition is too narrow, that HHSC

3  uses it more broadly.  So I'm just following up on that

4  to get from you the more broad use of the term

5  "recoupment" by HHSC.

6             MR. BRISSENDEN:  Same objection.

7      A.  I really can't answer that question accurately

8  without knowing more about I feel like the context of

9  what we would be asking it in relation to.

10     Q.  Well, just give me some examples.  You clearly

11  had something in mind when you said that HHSC uses it

12  more broadly than the IG does.

13            MR. BRISSENDEN:  Same objection.

14     A.  We may talk about it related to, oh, we found a

15  mistake in the way a provider was billing or in a way

16  that they were coding something and you need to recoup.

17         We also may talk about it in relation to

18  providers who are being what we call recouped if

19  someone's Managed Care enrollment changes.  So it is a

20  broader or different definition in that case than what

21  you have asked about.

22     Q.  Thank you.  So -- okay.  That's fine.  Thank

23  you for that clarification.  All right.

24          MS. Krieg:  Tirzah, we've only had one

25  break, and it's well past noon.  Any chance we could have

Page 108

1    Medicaid dollars that it received during the grace
2    period.
3            Did I read that correctly?
4        A.  That is correct.
5        Q.  And then the answer, which you verified, is,
6    The State of Texas granted the grace period to help
7    facilitate continuity of care for Medicaid clients who
8    received Medicaid health services from the defendants and
9    needed to be transitioned to other providers.  The State
10   is not seeking payment of civil penalties by defendants
11   or any recovery of Texas Medicaid dollars paid to
12   defendants for services delivered during the grace
13   period.
14       A.  Yes, that's correct.
15       Q.  Okay.
16       A.  Yes.
17       Q.  So just for the record, Is the State seeking
18   recovery of any Medicaid dollars paid to the Texas
19   affiliates for services delivered during the grace
20   period?
21       A.  No.
22       Q.  Thank you.  I just want to confirm.  I think we
23   covered this earlier, but it's -- no.  That's okay.
24   That's okay.
25            Well, let me just ask.  The first time that

Page 109

1    Texas Medicaid informed the health care providers about

2    potential termination of the Planned Parenthood

3    affiliates in Texas was January of 2021.  Correct?

4                   MR. BRISSENDEN:  Object to form.

5         A.  Can you clarify the -- who we were notifying?

6         Q.  I think you were using the term health care

7    providers, the MCOs?

8         A.  Health plans.

9         Q.  Health plans.

10        A.  Yeah.

11        Q.  Sorry.

12        A.  That's correct.  January 4th, 2021.

13        Q.  Okay.  And just for the record, since I mangled

14   it a little bit, January 21st, 2021 was the first time

15   that Texas Medicaid informed health care plans about the

16   potential termination of the Texas affiliates.  Correct?

17                   MR. STEPHENS:  Object to the form.

18        A.  That's correct.

19        Q.  Okay.  Thank you.  HHSC also sent notices to

20   the patients regarding Planned Parenthood's termination.

21   Correct?

22        A.  That is correct.

23        Q.  Okay.  In January of 2021?

24        A.  I do not have that notice in front of me, so I

25   can't verify the date.

Page 112

1      Q.  Okay.  So this was HHSC letting Fee For Service

2   patients know that if they see Planned Parenthood in

3   Texas, they could continue to see Planned Parenthood

4   until February 3rd, 2021, but afterwards needed to find

5   another provider.

6             MR. BRISSENDEN:  Object to the form and

7   scope.

8      Q.  Is that correct?

9      A.  That's correct.

10     Q.  Okay.  Thank you.  And HHSC also made phone

11  calls to Fee For Service clients.  Right?

12     A.  I believe it was TMHP who may have called the

13  clients and not HHSC, but I believe that's correct.

14     Q.  Okay.  And why did -- why did -- why HHSC have

15  TMHP call the Fee For Service clients?

16     A.  We wanted to make sure that we were ensuring

17  continuity of care in this case.  And so given the, you

18  know, relatively quick -- you know, the fast time line

19  these were on, we wanted to make sure that all the

20  clients understood what was happening and that they would

21  need to find a new provider, and we could help them find

22  a new provider if they needed it.

23     Q.  So you guys did not just rely on Planned

24  Parenthood to notify patients.

25     A.  That's correct.  We notified our clients.

Page 114

1          Q.   Okay.   And if they're enrolled, they can
2    provide health care services, correct, under Medicaid?
3          A.   That's correct.
4          Q.   And if they're enrolled, then they can seek
5    reimbursement for the services that they provide under
6    Medicaid, provided that they're legitimate services, the
7    coding is accurate and they were actually provided.   Is
8    that fair?
9          A.   I would say that's correct, if they have
10   complied with the provision in the Provider Agreement,
11   TAC and the TMPPM, that, again, put the onus on the
12   provider to, you know, make sure they're a qualified
13   provider, that they're not, you know -- that there hasn't
14   been a change and they haven't reported that to us yet,
15   they might be still on a file, et cetera, so they have to
16   comply with those rules still.
17         Q.   Okay.   But from Texas's perspective and HHSC's
18   perspective, the Texas affiliates were enrolled in Texas
19   Medicare during the grace period.   Correct?
20         A.   That's correct.
21         Q.   So the request that HHSC received was to
22   either -- and I'm looking at Exhibit 16.
23         A.   Right.
24         Q.   To either be permitted to continue to serve
25   Texans and Medicaid -- correct?   I'm looking, if it

Page 115

1   helps, at the very first paragraph of the first page.  So

2   just the first paragraph.  We write in light of the

3   COVID-19 public health crisis facing Texas to ask the

4   Texas Health and Human Services Commission, HHSC, to

5   allow the Planned Parenthood providers, I've shortened

6   that, to continue serving Texans insured through the

7   Medicaid program.

8           Did I read that correctly?

9       A.  Yes, that's correct.

10      Q.  Okay.  So the first request was let us stay in

11  the program.  Right?

12      A.  That's right.

13      Q.  And then it said, At a minimum, it is

14  imperative that HHSC permit a brief period so that

15  Planned Parenthood providers can provide continuity of

16  care throughout the holiday season and the current crises

17  point of the pandemic.

18          Did I read that correctly?

19      A.  Yes.

20      Q.  Okay.  So HHSC understood that if the grace

21  period was granted, that the Texas affiliates would

22  continue to see Medicaid patients.  Correct?

23      A.  During the grace period.

24      Q.  During grace period.  And is that correct?

25      A.  That's correct.

Page 123

1    than Planned Parenthood.  Correct?

2         A.   Let me think about this.

3              MR. BRISSENDEN:  Object to form and to

4    scope.

5         A.   Not that I can recall.

6         Q.   Okay.  HHSC was under no legal obligation to

7    grant the Texas affiliates the grant -- the grace period.

8    Correct?

9         A.   I believe that's correct.

10        Q.   There was no statute or regulation that

11   required them to grant it.  Right?

12        A.   That's correct.

13        Q.   Nothing in the Texas Medicaid Provider

14   Agreement required it?

15        A.   Let me just double check that.

16        Q.   Are you looking at Tab 48 of Exhibit 5?

17        A.   Yes.

18        Q.   Okay.

19        A.   I'd say that's correct.

20        Q.   Okay.  And there was nothing in the TMPPM that

21   required it, either.  Right?

22        A.   That is correct.

23        Q.   Did OIG have to make a recommendation regarding

24   whether to grant the grace period?

25             MR. BRISSENDEN:  Object to form and to

Page 133

1    2021.  Correct?

2         A.  Correct.

3         Q.  MCOs should deny claims with dates of service

4    as of this date, as the providers are not enrolled in

5    Texas Medicaid.  MCOs should update their system to deny

6    claims with a date of service after March 10th, 2021.

7    The PDC for these providers will be reflected on the

8    Master Provide File.

9              Did I read that correctly?

10        A.  Yes.

11        Q.  You would agree with me that HHSC never told

12   the MCAs -- MCOs to seek repayment of amounts that the

13   MCOs had paid to the Texas affiliates for claims for

14   services prior to March 10th, 2021.  Correct?

15              MR. BRISSENDEN:  Object to form.

16        A.  I would give a similar answer to what I have

17   before, which is the Provider Procedure Manual, the

18   Provider Agreement and the TAC apply to providers who are

19   who are also contracted with the health plan and enrolled

20   in Medicaid, and they know what they have to comply with

21   as far as overpayments.

22        Q.  So -- but my question is a little bit

23   different.  So my question is about did HHSC ever tell

24   the MCOs you should go collect amounts that you paid to

25   Planned Parenthood for services prior to March 10th,

Page 134

1   2021?

2        A.  We did not give a notice like that, no.

3        Q.  Okay.

4             MS. LOLLAR:  I think this is good time for

5   a break.

6             THE VIDEOGRAPHER:  Off the record.  The

7   time is 2:09.

8             (Recess from 2:09 p.m. to 2:28 p.m.)

9             THE VIDEOGRAPHER:  We're back on the record

10  at 2:28 p.m.

11       Q.  (By Ms. Lollar)  Okay.  Just a couple of more

12  questions about the grace period.  So the reason that

13  HHSC granted the grace period was to ensure continuity of

14  care and to allow time for Planned Parenthood patients to

15  transition to new providers.  Is that correct?

16       A.  That's correct.

17       Q.  Okay.  No other reasons for the grace period?

18       A.  Not that I'm aware of.

19       Q.  Okay.  As the corporate representative to speak

20  about the grace period.  Correct?

21       A.  That's right.

22       Q.  Okay.  And it's important to HHSC that an

23  enrolled provider provide health care services consistent

24  with generally accepted medical and ethical standards.

25  Correct?

Page 138

1      A.   I don't think I can answer the legal question.

2      Q.   Do you think HHSC would allow a provider to

3  remain enrolled, even if it was going to provide services

4  in an illegal manner?

5                 MR. BRISSENDEN:  Object to form and to

6  scope.

7      A.   No.  I believe HHSC would not allow a provider

8  to remain enrolled if they were not going to deliver

9  those services in a legal, ethical, safe manner.

10     Q.   And HHSC didn't do that with respect to the

11  grace period.  Right?

12                MR. STEPHENS:  Object to form.

13                MR. BRISSENDEN:  Object to form and scope.

14     A.   In this particular case, we were trying to

15  ensure a continuity of care for Planned Parenthood

16  clients.

17     Q.   I have a question about one of the docs in your

18  binder.

19     A.   Sure.

20     Q.   Tab 22, please.

21     A.   Okay.

22     Q.   And this is, again, Exhibit 5.  Correct?

23     A.   Yes.  22 is Exhibit 5.

24     Q.   Okay.  And this is a declaration of a Kathryn

25  Scheib?

Page 140

1    Q.  Okay.  So you are familiar with the

2  reenrollment process.  Correct?

3    A.  I'm not very familiar with the details.  I have

4  big -- a big picture understanding of the reenrollment

5  process, or the timing around that and what the purpose

6  of it is.

7    Q.  Okay.  What's the purpose of it?

8    A.  It's to ensure every, you know, so often --

9  again, the -- as I mentioned before, the number of years

10  depends on provider kind of risk level.  But to ensure

11  the providers are still -- we still have the correct

12  information, that they're still in good standing and able

13  to be enrolled in the Medicaid program.

14    Q.  All right.  And here Ms. Scheib, this is a

15  Declaration in Support of Defendant's Motion to Clarify

16  the Preliminary Injunction Order and Judgment.

17        Do you see that in the caption?

18    A.  Yes.

19    Q.  Okay.  And Texas was on the defense side in the

20  preliminary injunction hearing.  Correct?

21    A.  That is correct.

22    Q.  Okay.  So Texas was seeking clarification from

23  the Court about whether they could disenroll certain

24  Planned Parenthood providers who had failed to submit the

25  required paperwork for reenrollment.  Is that right?

Page 221

1          A.   Okay.

2          Q.   This is Tab 40 in Exhibit 5, for the record.

3     Okay.  Are you at Tab 40?

4          A.   I am.

5          Q.   Tell me what that is.

6          A.   This is a SAR, otherwise we call it a State

7     Action Request, from HHSC to TMHP asking TMHP to put a

8     Payment Denial Code -- just a minute, let me read this.

9     Okay.  Asking TMHP to put a payment -- two different

10    Payment Denial Codes on the following provider, Planned

11    Parenthood Association of Cameron and Willacy County,

12    Planned Parenthood Gulf Coast, Greater Texas, of North

13    Texas, of Central Texas, West Texas, San Antonio, South

14    Texas Surgical Center and Trust of South Texas, effective

15    February 4th, 2021 for the providers and associated TPIs,

16    NPIs and Tax IDs in the attached Excel spreadsheet, which

17    I do not have the attachment, as well as TPI suffixes.

18               (Court reporter clarifications)

19          Q.   Okay.  And why did you include this Tab 40 in

20    your notebook?

21          A.   This was included to -- just for me to have a

22    record of the various actions the State took in response

23    to the actions in this case.  You know, and we have

24    corresponding notices for the health plans where we would

25    say we're going to terminate Planned Parenthood, then

CAUSE NO. D-1-GN-21-000528

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| PLANNED PARENTHOOD OF | § | |
| GREATER TEXAS FAMILY PLANNING | § | |
| AND PREVENTATIVE HEALTH | § | |
| SERVICES, INC., PLANNED | § | |
| PARENTHOOD OF GREATER TEXAS, | § | TRAVIS COUNTY, TEXAS |
| INC., PLANNED PARENTHOOD SAN | § | |
| ANTONIO, PLANNED PARENTHOOD | § | |
| CAMERON COUNTY, PLANNED | § | |
| PARENTHOOD SOUTH TEXAS | § | |
| SURGICAL CENTER, and PLANNED | § | |
| PARENTHOOD GULF COAST, | § | |
| | § | |
| *Relators.* | § | 261ST JUDICIAL DISTRICT |

---

## RESPONSE IN OPPOSITION TO ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION

---

Respondents Sylvia Hernandez Kauffman, Inspector General; the Office of Inspector General; Cecile Erwin Young, Executive Commissioner of Texas Health and Human Services Commission; and Texas Health and Human Services Commission (collectively "Respondents") file this Response in Opposition to the Original Petition for Writ of Mandamus, Application for Temporary Restraining Order, Temporary Mandatory Injunction, and Permanent Mandatory Injunction (the "Petition") recently filed by the following Relators: Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc., Planned Parenthood of Greater Texas, Inc., Planned Parenthood San Antonio, Planned Parenthood Cameron County,

APP.284

Planned Parenthood South Texas Surgical Center, and Planned Parenthood Gulf Coast (collectively "Planned Parenthood").

## I.  INTRODUCTION

Planned Parenthood's lawsuit is a transparent and meritless attempt to revive the state administrative process that it deliberately abandoned four years ago. Planned Parenthood was duly notified of its termination from the Medicaid program in 2016. But rather than invoke the administrative process to review that decision, Planned Parenthood chose only to file suit in federal court. Having lost most of its claims there, it now attempts to manufacture a controversy where none exists so it can avail itself of the administrative process that it allowed to expire long ago. Its claim lacks any basis in law or fact. The Court should deny Planned Parenthood's request for a temporary injunction.

## II.  BACKGROUND

### A.    Legal Framework

Under the federal Medicaid Act, States use federal and state funds to reimburse healthcare providers' costs in providing medical care to certain categories of individuals. *See NFIB v. Sebelius*, 567 U.S. 519, 575 (2012). As a condition of participating in Medicaid, States must provide an administrative process for providers to challenge their exclusion or termination from the Medicaid program. 42 C.F.R. §§ 1002.210, 1002.213. Texas has done so. Section 32.034(a) of the Texas Human Resources Code requires "reasonable notice and an opportunity for hearing

APP.285

if one is requested" before a Medicaid contract is terminated. And the Texas Administrative Code sets out the requirements for a termination notice:

> (1) a description of the termination;
>
> (2) the basis for the termination;
>
> (3) the effect of the termination;
>
> (4) the duration of the termination;
>
> (5) whether re-enrollment will be required after the period of termination; and
>
> (6) a statement of the person's right to request an informal resolution meeting or an administrative hearing regarding the imposition of the termination unless the termination is required under 42 C.F.R. § 455.416.

1 Tex. Admin. Code § 371.1703(e).

A provider may request an administrative hearing upon receipt of a final notice of termination. *Id.* § 371.1615(b)(2). But the provider does not have unlimited time to act—the request for a hearing must be received within 15 days after the provider received its final notice:

> A person may request an administrative hearing after receipt of a final notice of termination in accordance with § 371.1615 of this subchapter (relating to Appeals) unless the termination is required under 42 C.F.R. § 455.416. The OIG must receive the written request for a hearing no later than the 15 days after the date the person receives the notice.

*Id.* § 371.1703(f)(2).

If the provider does not timely request an administrative hearing, the termination becomes "final and unappealable." *Id.* § 371.1615(c). Specifically, the termination becomes "final" 30 calendar days after service of the final notice if no request for appeal has been timely received. *Id.* § 371.1617(a)(1); *see also id.* § 371.1703(g)(8) ("Unless otherwise provided in this section, the termination becomes

final as provided in § 371.1617(a) of this subchapter (relating to Finality and Collections).").

Thus, under Texas administrative law, a Medicaid provider who receives a final notice that its contract will be terminated has 15 days from receipt of the Final Notice to request an administrative appeal. Otherwise, the termination becomes final 30 days from receipt of the Final Notice.

## B.    The December 2016 Final Notice of Termination

On December 20, 2016, the Office of Inspector General ("OIG") sent a Final Notice of Termination of Enrollment to the Planned Parenthood entities who are plaintiffs here. PP Ex. B (the "December 2016 Final Notice").[1] As explained in the Final Notice, OIG was terminating the contracts based on evidence showing Planned Parenthood was not qualified to provide medical services in a professionally competent, safe, legal, and ethical manner. *Id.* at 1-4. The Final Notice emphasized the 15-day deadline to appeal OIG's decision in bold, stating:

> You may appeal this enrollment termination. In order to do so, **HHSC-OIG must <u>receive</u> a written request from you asking for an administrative hearing before HHSC's appeals division on or before the 15th calendar day from the date you receive this notice.** 1 Tex. Admin. Code § 371.1703(f)(2).

*Id.* at 4. The Final Notice included the mailing address for HHSC-OIG, as well as instructions regarding what the request for an administrative hearing must contain. *Id.* at 4-5. The Final Notice then repeated the deadline:

---

[1] For clarity of reference, Respondents will cite Exhibits attached to Planned Parenthood's Petition as "PP Ex." and will cite Exhibits attached to this Response as "Resp. Ex."

**IF HHSC-OIG DOES NOT RECEIVE A WRITTEN RESPONSE TO THIS NOTICE WITHIN 15 CALENDAR DAYS FROM THE DATE YOU RECEIVE IT, YOUR FINAL NOTICE OF TERMINATION WILL BE UNAPPEALABLE.**

*Id.* at 5.

According to declarations filed in federal district court, the Planned Parenthood entities received the Final Notice as early as December 22, 2016, and no later than December 28, 2016. Resp. Ex. 1 (Planned Parenthood federal declarations) at 2 ¶ 2, 3 ¶ 23, 6 ¶ 34, 10 ¶ 15. Thus, under the law described above regarding the 15-day limit on appealing the termination decision, some Planned Parenthood providers had until January 6, 2017, to request an administrative hearing, and others had until January 12, 2017. *See* 1 Tex. Admin. Code § 371.1703(f)(2). None of them did. Thus, in accordance with Texas law, their terminations from Medicaid became final as a matter of law 30 days from the date they received the notice: January 21, 2017 for some, and January 27, 2017 for others. *See* 1 Tex. Admin. Code § 371.1617(a)(1).

## C.    The Federal Lawsuit

Despite being notified of their administrative-appeal options, Planned Parenthood, joined by multiple Jane Does, chose to seek relief only in federal district court, claiming they could challenge OIG's decision under the Medicaid Act. *See Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Smith*, No. 1:15-CV-01058-SS (W.D. Tex.). In their motion for a preliminary injunction, they advised the district court that they needed relief by January 21, 2017, as the termination would take effect that day. Resp. Ex. 2 (Planned Parenthood

APP.288

federal motion) at 32 ("if Defendants' termination is allowed to take effect (which without order from this Court it will on January 21)"); *see also id.* at 3, 19 (stating Planned Parenthood would have to turn away patients as soon as January 21, 2017).

On January 19, 2017, the district court entered an order that "temporarily enjoined" HHSC and OIG "from terminating the [Planned Parenthood] Plaintiffs' Medicaid provider agreements until February 21, 2017." Resp. Ex. 3 (federal district court order) at 2. On February 21, 2017, the district court preliminarily enjoined HHSC and OIG "from terminating the [Planned Parenthood] Plaintiffs' Medicaid Provider Agreements." *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 1000 (W.D. Tex. 2017). Planned Parenthood did not seek, nor did the district court order, any alteration, stay, or tolling of its state-law administrative deadlines, including the express deadline for requesting an administrative appeal, which had already passed regardless.

The State appealed the injunction to the Fifth Circuit and, following en banc review, the court vacated the district court's preliminary injunction. *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 350 (5th Cir. 2020) (en banc). That decision took effect on December 15, 2020, when the Fifth Circuit's mandate issued, vacating the preliminary injunction. Resp. Ex. 4 (Fifth Circuit mandate). Thus, on December 15, 2020, there was no longer an injunction prohibiting HHSC from implementing the termination of Planned Parenthood's Medicaid provider agreements. Because the

terminations were set to take effect in January 2017 under state law, the terminations became immediately effective once the mandate issued.

**D.     The January 2021 Letter**

Once the termination of a Medicaid contract is final, there is still a practical process for implementing or carrying out the termination that takes time. For example, billing programs must be updated to stop paying bills submitted by the terminated entities after a particular date. Also, Managed Care Organizations ("MCOs") must be notified, so they can begin helping clients transition to new providers. Various other logistical procedures require time and effort before a termination becomes fully implemented as a matter of practical reality.

On December 14, 2020, one day before the Fifth Circuit's mandate issued, Planned Parenthood sent a letter to HHSC making two requests: (1) that it be allowed to remain in Medicaid, and (2) that it be given a 6-month grace period to transition its patients to new providers. PP Ex. C. HHSC responded to Planned Parenthood's requests in a letter dated January 4, 2021. PP Ex. E (the "January 2021 letter"). In it, HHSC (1) denied Planned Parenthood's request to remain in the Medicaid program, (2) advised Planned Parenthood that it could no longer accept new Medicaid clients, and (3) permitted a 1-month grace period, until February 3, 2021, to allow Planned Parenthood's patients to transition to new Medicaid providers. *Id.* at 1-2. It also advised Planned Parenthood that patients who were members of an MCO would be notified by their MCO of the need to transition to a new provider. *Id.* at 2.

APP.290

### E.    Current Lawsuit

On February 3, 2021, the last day of the grace period, Planned Parenthood filed this mandamus action against Respondents. Planned Parenthood argued that the January 2021 letter was the real termination letter and that it did not comply with the relevant administrative requirements. Planned Parenthood therefore asks the Court to issue a writ of mandamus, compelling Respondents to issue a new Final Notice of Termination so that Planned Parenthood may take the administrative appeal that it chose not to take in December 2016.

## III.  ARGUMENT & AUTHORITIES

Despite receiving a Final Notice of Termination over four years ago (December 2016) and being notified over four weeks ago that the grace period would end on February 3 (the January 2021 letter), Planned Parenthood waited until February 3 to file its petition for mandamus and request for a TRO and temporary injunction. Its arguments lack merit, and its dilatory conduct should not be rewarded.

To obtain a temporary injunction, Planned Parenthood must plead and prove three elements: (1) a cause of action against Respondents; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Planned Parenthood is not entitled to relief, as demonstrated by its own evidence.

### A.    Cause of action

A court may issue mandamus relief to compel a public official to perform a ministerial act. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 793 (Tex. 1991).

APP.291

Planned Parenthood asks the Court to issue a writ of mandamus commanding Respondents to issue a letter terminating it (again) from the Medicaid program. Pet. at 15-16. Termination notices are issued by OIG, 1 Tex. Admin. Code § 371.1703(a), yet Planned Parenthood has joined HHSC and Executive Commissioner Young as Respondents, Pet. ¶¶ 7-8. Planned Parenthood has not identified any ministerial duty which HHSC or Executive Commissioner Young has failed to perform. Thus, Planned Parenthood has not stated a cause of action against HHSC or Executive Commissioner Young.

## B.   Probable right to the relief sought

To be entitled to mandamus relief, Planned Parenthood must show that Respondents failed to perform a ministerial act—not an act that involves the use of discretion. *Anderson*, 806 S.W.2d at 793. Moreover, Planned Parenthood must demonstrate that it diligently sought mandamus relief and did not sleep on its rights. *Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993). Planned Parenthood has failed at all levels.

### 1.   Planned Parenthood complains about discretionary acts.

"An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion." *Anderson*, 806 S.W.2d at 793. On the face of relevant regulations, whether to terminate the contract of a Medicaid provider is a discretionary act. As the regulations provide, "OIG *may* terminate" a provider's contract. 1 Tex. Admin. Code § 371.1703(a) (emphasis added); *see also id.* § 371.1703(c)(6), (7) ("OIG *may*

terminate") (emphasis added). Thus, Planned Parenthood's demand that OIG send it a termination notice refers to a discretionary duty, not a ministerial one.

Planned Parenthood argues that it may demand the issuance of a new, compliant notice because the December 2016 Final Notice "failed to accurately reflect" the description, effect, and duration of the termination as required by the Texas Administrative Code. Pet. ¶ 31 (citing 1 Tex. Admin. Code § 371.1703(e)). Not only are such charges baseless, *see infra* section III.B.2.a, but they also do not demonstrate a failure to perform a ministerial duty. At most, Planned Parenthood's claim that the December 2016 Final Notice "fail[s] to accurately reflect" certain issues reveals a disagreement over the language used to explain the description, effect, and duration of the termination. But the regulations do not "spell out" the specific words that must be used such that "nothing is left to the exercise of discretion." *See Anderson*, 806 S.W.2d at 793. OIG was free to choose the language it used to comply with the law.

This is not an instance in which Respondents failed to send any notice at all before terminating Medicaid contracts. As Planned Parenthood's own federal filings show, it was fully aware that the December 2016 Final Notice would effectively terminate its Medicaid provider agreements. Resp. Ex. 1 at 2 ¶ 2, 3 ¶ 23, 5 ¶ 2, 6 ¶ 34, 8 ¶ 2, 10 ¶ 15. Planned Parenthood's only claim now is that the December 2016 Final Notice was not "accurately" worded, which identifies nothing more than a discretionary act. Thus, this claim of Planned Parenthood does not show that Respondents failed to perform a ministerial act.

### 2.    The December 2016 Final Notice met all legal standards.

Even if Planned Parenthood were complaining about a ministerial act (which it is not), it would still not be entitled to relief because it can point to no legal deficiency in the December 2016 Final Notice. Respondents properly terminated Planned Parenthood's provider agreements through the December 2016 Final Notice, and Planned Parenthood has no colorable argument to the contrary. Its arguments about HHSC statements in 2021 do not change the legal effect of the Final Notice from 2016. Planned Parenthood's provider agreements were terminated as a matter of law and cannot be revived by this lawsuit.

### a.    The December 2016 Final Notice satisfies section 371.1703(e).

Planned Parenthood's argument that the December 2016 Final Notice failed to meet the relevant legal requirements is noticeably short on facts and law. Set next to the requirements, the Final Notice plainly and amply passes legal muster.

| Elements of Final Notice from § 371.1703(e) | December 2016 Final Notice (PP Ex. B) |
|---|---|
| A description of the termination | Pages 1-2, explaining that OIG is terminating specific Medicaid provider agreements because of its conclusion that the providers were not qualified to provide services in a professionally competent, safe, legal, and ethical manner |
| The basis for the termination | Pages 1-4, describing the program violations committed by Planned Parenthood and the affiliation of other providers that warrant termination |
| The effect of the termination | Page 4, numbered list stating what specifically will happen as a result of the termination |

Page **11** of **19**

| The duration of the termination | Page 5, stating that "[t]his enrollment termination is permanent" |
| Whether enrollment will be required | Page 5, stating that "[i]f you want to participate as a provider in the Texas Medicaid program in the future, you will be required to submit a new provider enrollment application" |
| A statement of the person's right to request an informal resolution meeting or an administrative hearing regarding the imposition of the termination | Pages 4 & 5, entitled "Appeal Process," and describing the process and timing of any appeal |

Planned Parenthood has no grounds to argue that the December 2016 Final Notice was in any way insufficient. Indeed, to obtain a preliminary injunction in 2017, Planned Parenthood told a federal court that it would be terminated from Medicaid as a result of the Final Notice. Resp. Ex. 1 at 2 ¶ 2, 3 ¶ 23, 5 ¶ 2, 6 ¶ 34, 8 ¶ 2, 10 ¶ 15. Those admissions conclusively demonstrate that Planned Parenthood (1) knew the December 2016 Final Notice was effective to terminate its contracts and (2) voluntarily chose not to appeal the Final Notice. Had Planned Parenthood chosen to request an administrative appeal, the termination would not have become effective in January 2017, as Planned Parenthood told the federal court it would be. If Planned Parenthood would have "timely filed a written request for an administrative hearing, the effective date of termination [would have been] the date the hearing officer's or administrative law judge's decision to uphold the termination [became] final." *See* 1 Tex. Admin. Code § 371.1703(g)(7). The fact that Planned Parenthood told the federal court it would be terminated in January 2017 as a result of the December 2016 Final Notice means that Planned Parenthood both understood the legal effect of the Final Notice and decided not to seek an administrative appeal.

As explained above, Planned Parenthood had 15 days from receipt of the December 2016 Final Notice to request an administrative appeal. 1 Tex. Admin. Code § 371.1703(f)(2). Otherwise, the termination would become final in 30 days. *Id.* § 371.1617(a)(1). Planned Parenthood chose not to request an administrative hearing, those deadlines passed, and the termination became final as a matter of law in January 2017. But for the federal-court injunction, Planned Parenthood would have ceased receiving Medicaid reimbursements in 2017. After the Fifth Circuit vacated the injunction, there was nothing barring the effectiveness of the terminations or preventing HHSC from proceeding to fully implement them.

### b.  Planned Parenthood's contrary arguments lack merit.

Planned Parenthood essentially ignores the December 2016 Final Notice and instead argues that (1) the January 2021 letter from HHSC was the real, noncompliant termination notice, and (2) a notification from HHSC to MCOs undermines HHSC's position. Neither argument has any merit.

As to Planned Parenthood's argument that the January 2021 letter was not a Final Notice, Respondents agree—because the January 2021 letter did not need to be a notice of termination, was not intended to be such, and does not even purport to be such on its face. As demonstrated in Planned Parenthood's own exhibits, the January 2021 letter was sent in response to Planned Parenthood's request that it be allowed to remain in Medicaid or else be given a lengthy grace period. PP Exs. C, E.[2] HHSC

---

[2] These exhibits also demonstrate that Planned Parenthood understood the December 2016 Final Notice terminated its Medicaid contracts—there would have been no need

Page **13** of **19**

was under no obligation to reply to Planned Parenthood's request but chose to do so anyway. Its decision to confirm that Planned Parenthood would no longer be in Medicaid and to extend a one-month grace period did not magically reinstate the provider agreements, nor could it possibly have done so. The agreements were terminated as a matter of law as a result of the December 2016 Final Notice. Nothing Planned Parenthood requested and nothing Respondents said in response could undo that.

Planned Parenthood also points to a notice that HHSC sent to the MCOs advising them that Planned Parenthood would be terminated as of January 4, 2021, with a 30-day grace period. PP Ex. G.[3] This simple notice to MCOs was part of HHSC's practical efforts to implement the termination of Planned Parenthood, but it could not have had and was not intended to have any legal effect on the actual termination of Planned Parenthood, which had already become effective long before HHSC took the practical step of communicating that termination to the MCOs.

### 3. Planned Parenthood's delay renders relief unavailable.

Finally, Planned Parenthood's inexplicable and lengthy delay in seeking mandamus relief from the December 2016 Final Notice makes such relief inappropriate. Mandamus is an extraordinary remedy that is not issued as a matter of right, but at the discretion of the court. *Callahan v. Giles*, 137 Tex. 571, 575, 155

---

to ask to remain in Medicaid or for a grace period had Planned Parenthood believed the December 2016 Final Notice was ineffective.
[3] The MCO notice incorrectly stated January 4, "2020" instead of "2021," PP Ex. G, but there is no question that the intended date was 2021.

S.W.2d 793, 795 (1941). That discretion is largely controlled by equitable principles, including the fundamental concept that "[e]quity aids the diligent and not those who slumber on their rights." *Rivercenter Assocs.*, 858 S.W.2d at 367 (quoting *Callahan*, 137 Tex. at 576, 155 S.W.2d at 795).

In *Rivercenter Associates*, the Texas Supreme Court denied mandamus because the party waited over four months before seeking relief. *Id.* at 367-68. Only a few months ago, the Court denied mandamus because the party waited ten weeks. *In re Hotze*, No. 20-0739, 2020 WL 5919726, at *2-3 (Tex. Oct. 7, 2020). Planned Parenthood waited ***over four years***, until the eve of the expiration of the grace period when many patients had likely been transitioned to new providers, to assert for the first time ever that the December 2016 Final Notice was somehow defective. Such an inexcusable and gargantuan delay renders mandamus relief unavailable.

This is especially true given that Planned Parenthood had a state administrative process available to it to challenge any deficiency in the December 2016 Final Notice. But it had to act within 15 days of receipt of the Final Notice. 1 Tex. Admin. Code §§ 371.1615(b)(2), 371.1703(f)(2). Planned Parenthood chose not to do so. Allowing it to raise any alleged deficiencies by mandamus, four years after its administrative-appeal deadline expired, would create a loophole in the exhaustion-of-administrative-remedies doctrine. A party could ignore all administrative deadlines and simply file a mandamus action at some point in the future based on a perceived flaw in the agency's process. This undermines one of the fundamental purposes of requiring exhaustion—to discourage disregard of the agency's

procedures. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Mandamus should not be used to avoid the consequences of missing (deliberately, here) state administrative deadlines.

## C.    Probable, imminent, and irreparable injury in the interim

Planned Parenthood has not shown any probable, imminent, or irreparable injury to itself. The main injury about which Planned Parenthood complains is that it believes some of its patients might not have transitioned to a new Medicaid provider yet. PP Ex. K ¶¶ 8, 10; PP Ex. L ¶¶ 11-13; PP Ex. M ¶¶ 8-10. But its evidence consists largely of vague hearsay, speculation, and a news article in which people hypothesize what "may" happen, while doing nothing to determine what "will" happen. *Id.* There is no evidence of how many women would be impacted, especially given that Planned Parenthood and the MCOs spent the month of January (the one-month grace period) transitioning patients to new providers.

Regardless, any alleged injury to remaining clients who perhaps have not yet been transferred to a new provider is plainly not an irreparable injury to *Planned Parenthood*. At most, Planned Parenthood claims that it will lose money and that its "mission" will be impacted by its inability to serve Medicaid clients. Pet. ¶ 49. But the Planned Parenthood entities are not-for-profit organizations, PP Ex. K ¶ 2; PP Ex. L ¶ 2; PP Ex. M ¶ 2, and there is no evidence that the termination of their Medicaid contracts will cause them financial difficulties. Furthermore, Planned Parenthood points to no law that a general sense of "mission" can possibly support an irreparable injury.

## IV.  CONCLUSION

Planned Parenthood received ample notice of termination as required by law over four years ago. There is no basis in law or fact to revive those administrative proceedings at this late date. Planned Parenthood cannot show that it meets *any* of the required elements for obtaining the extraordinary mandamus relief it seeks, meaning that temporary injunctive relief should be denied.

For all the foregoing reasons, as well as any additional reasons that may be presented at a hearing on Planned Parenthood's request for a temporary injunction, Respondents request this Court to deny Planned Parenthood's request for a temporary injunction, deny all Planned Parenthood's requests for other relief, and dismiss the Petition with prejudice.

APP.300

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief - General Litigation Division

          */s/ Benjamin S. Walton*
**BENJAMIN S. WALTON**
Texas Bar No. 24075241
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 – Phone
(512) 320-0667 – Fax
benjamin.walton@oag.texas.gov

***Counsel for Respondents***

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document was served on February 23, 2021, via the court's e-service system on the following counsel of record:

Thomas H. Watkins
HUSCH BLACKWELL LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456 – Phone
(512) 479-1101 – Fax
tom.watkins@huschblackwell.com

***Counsel for Relators***

_____/s/ Benjamin S. Walton_____
**BENJAMIN S. WALTON**
Assistant Attorney General

01/04/2021

## Termination of Planned Parenthood Clinics from Texas Medicaid

**This notice was updated Jan. 5 to include an attached resource.**

**Background:**

As of January 4, 2021, Planned Parenthood of North Texas, PlannedParenthood of South Texas and Planned Parenthood Gulf Coast have been terminatedas providers in Texas Medicaid. These providers have been notified in writingthat they cannot accept any new Medicaid clients and that there will be a30-day grace period (until February 3, 2021) provided to ensure that theircurrent Medicaid clients can be transitioned to new providers. Please followyour normal procedures to transition these clients to new providers.

**Key Details:**

The payment denial code (PDC) for these providers is effectiveFebruary 4, 2021. Claims with dates of service as of this date should be deniedas the provider is not enrolled in Texas Medicaid. MCOs should update theirsystems to deny claims with a date of service after February 3rd. ThePDC for these providers will be reflected on the master provider file.

**Additional Information**:

Please reference the attached PDF forassociated TPI, NPI and Tax identification information.

**Resource:**

Planned Parenthood NPI TPI and Tax ID (Attached)

## Contact:

Please contact your MCCO monitoring team, with copy to Camisha Banks at camisha.banks@hhs.texas.gov, with question regarding this notice.

**Attachment:** Planned Parenthood NPI TPI and Tax ID.pdf

**Type:** Informational

**To:** CHIP; CMDS; DMO; MMP; STAR; STAR+PLUS; STARHEALTH; STAR_KIDS

**From:** MCCO

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                     AMARILLO DIVISION
 3    United States of America     *
      ex rel. ALEX DOE, Relator,   * CIVIL ACTION NO. 2:21-CV-
 4                                 * 00022-Z
                                   *
 5    The State of Texas           *
      ex rel. ALEX DOE, Relator    *
 6                                 *
      The State of Louisiana       *
 7    ex rel. ALEX DOE, Relator    *
                                   *
 8            Plaintiffs,          *
      V.                           *
 9                                 *
      Planned Parenthood           *
10    Federation of America,       *
      Inc., Planned Parenthood     *
11    Gulf Coast, Inc., Planned    *
      Parenthood of Greater        *
12    Texas, Inc., Planned         *
      Parenthood South Texas,      *
13    Inc., Planned Parenthood     *
      Cameron County, Inc.,        *
14    Planned Parenthood San       *
      Antonio, Inc.,               *
15                                 *
              Defendants           *
16
17       *********************************************
18          ORAL AND VIDEOTAPED DEPOSITION OF
19       TEXAS HEALTH AND HUMAN SERVICES COMMISSION
20             AND THE STATE OF TEXAS
21            30(b)(6) JEFFREY GOLDSTEIN
22              DECEMBER 7, 2022
23       *********************************************
24
25
```

Page 23

1      Q.  Okay.  So Tab 3 is the set of the initial

2  Notices of Termination that were issued to the Texas

3  affiliates.  Is that right?

4      A.  That is correct.

5      Q.  Okay.  Now, there was a final notice issued

6  about 14 months later.  Correct?

7      A.  Correct.

8      Q.  Okay.  And that's December 20th, 2016?

9      A.  Yes, ma'am.

10      Q.  Okay.  And that's at Tab 4?

11      A.  Yes, ma'am.

12      Q.  Okay.  Some of the reasons for the termination

13  listed in the October 2015 notice do not appear in the

14  December 2016 notice.  Does that mean that the State was

15  no longer proceeding for any reasons listed in the

16  October notice that did not appear in the December

17  notice?

18      A.  Generally what would happen is because there

19  was additional documentation produced by your client, if

20  it answered some of the issues from the initial notice

21  and took those issues out, they would not be in the final

22  notice.

23      Q.  Meaning -- what do you mean, "took those issues

24  out"?

25      A.  They would -- if it answered the issue that was

Page 24

1    raised in the initial notice and made that issue no

2    longer a viable issue, then it would not be in the final

3    notice.

4         Q.  Made that issue no longer a concern for the

5    OIG?

6              MS. KRIEG:  Objection; form.  Objection;

7    privileged to the extent that you're asking with respect

8    to decisions made in the course of an investigation under

9    the Texas Medicaid Fraud Investigation Privilege.

10             MS. LOLLAR:  Are you instructing him not to

11   answer that question?

12             MS. KRIEG:  If the witness can provide any

13   nonprivileged information in response to the question,

14   the witness may proceed.

15        A.  I'm sorry.  With the objections, could you --

16        Q.  I was just trying to understand.  You said that

17   if -- information that had been provided made the issue

18   no longer a viable issue.  What did you mean by "viable

19   issue"?

20             MS. KRIEG:  Objection; form.

21             MS. LOLLAR:  You can say "same objection."

22        A.  I meant that if an issue comes up in a contract

23   termination that involved some documentation shows that

24   that issue is no longer a valid issue, that it's been

25   answered, then it would not show up in the final notice.

Page 25

1        Q.   Okay.   And I'm sorry.   I just want to make sure

2    I understand what you mean by "valid issue."   Is it fair

3    to say that when you say "valid issue," meaning that it's

4    no longer a valid basis for the termination?

5        A.   It would no longer be a valid basis for that

6    termination.   Yes.

7        Q.   Thank you.   So focusing on the October 2015

8    terminations -- termination notices, on Page 2 under

9    Findings Supporting the Termination, there's a reference

10   to, Earlier this year, Planned Parenthood Gulf Coast,

11   PPGC, committed and condoned numerous acts of misconduct

12   captured on video that revealed repeated program

13   violations and breached the minimum standards of care

14   required of it as a Medicaid enrollee.

15           Do you see that?

16       A.   Yes.

17       Q.   So one of the bases for the termination as of

18   October 2015 was the video?

19       A.   Yes, ma'am.

20       Q.   And that was the video that was taken in

21   October of 2015 at PPGC's facilities?

22       A.   Yes, ma'am.

23       Q.   It goes on to say under A-2 that, PPGC failed

24   to prevent conditions that would allow the spread of

25   infectious diseased.

Page 104

1    Organizations and -- what's a DMO?

2          A.   A Dental Managed Care Organization.

3          Q.   Okay.  So she described to you the procedure

4    for OIG to notify Managed Care Organizations and Dental

5    Managed Organizations when a provider's contract has been

6    terminated?

7          A.   Yes.

8          Q.   Okay.  And when it says litigation, that's --

9          A.   Litigation is the section that I'm in.  It's

10   Office of the Chief Counsel.  The litigation division

11   sends the State Action Request, the SAR, to TMHP to

12   terminate the provider, and then they apply whatever

13   procedural code goes on there to show that they're

14   terminated.

15               And then Ms. Fee also told me afterwards she --

16   she puts in the information that CMS then gets --

17         Q.   Got it.

18         A.   -- also.

19         Q.   And what's a PDC?

20         A.   That's the -- I'm not sure what that stands

21   for, but that's -- the TMHP puts a code that says they're

22   terminated.

23         Q.   Could it be Payment Denial Code?

24         A.   Yes, Payment Denial Code.  Thank you very much.

25         Q.   Okay.  And I see that Ms. Fee provided

Page 122

1    Medicaid Act 42 USC 1396a, Paragraph (a), Paragraph (23);

2    whether and how the Court might resolve that issue cannot

3    rehabilitate the district court's manifestly unlawful

4    injunction, and thus the injunction should be stayed to

5    prevent continuing harm to the State, Medicaid recipients

6    and the public interest.

7         Did I read all that correctly?

8         A.  Yes, you did.

9         Q.  And having read that entire section, do you

10   agree with me that the word "repay" is never in there

11   once?

12              MS. KRIEG:  Object to the form.

13        A.  The document speaks for itself.

14        Q.  Can you point me to any contemporaneous --

15   contemporaneous document from -- let me strike that.

16        Can you point me to any -- any document from the

17   2017 to 2020 time period where Texas or HHSC stated their

18   expectation that if the injunction was lifted, that

19   Planned Parenthood would have to repay the Medicaid

20   reimbursements they received during the pendency of the

21   injunction?

22              MS. KRIEG:  Objection; form.  Objection

23   scope.

24              You can answer in your individual capacity,

25   if you know.

Page 123

1        A.  I have not seen any specific documents.

2        Q.  And Texas Topic 33, sir.  It should be noted --

3    are you there, sir?

4        A.  Yes.

5        Q.  You would agree with me that topic -- you would

6    agree with me, sir, that Topic 33 on the Texas 30(b)(6)

7    notice is Texas's understanding at the time that the

8    federal and State court injunctions -- sorry.  I should

9    use the actual document.  Let me ask it a different way.

10        You understand, sir, that one of the topics for

11    which you were designated to testify today is Texas's

12    understanding at the time that the federal and State

13    court injunctions were in effect for the Medicaid

14    termination litigation of whether the Planned Parenthood

15    Texas affiliates would be required to repay Medicaid

16    reimbursement for services provided during the pendency

17    of those injunctions.  Right?

18        MS. KRIEG:  Object to the form.

19        A.  Yes.

20        Q.  Okay.  And just so I'm clear, as corporate

21    representative for Texas and HHSC, you can't point me to

22    any document from the time when the federal and State

23    court injunctions were in effect that demonstrates that

24    Texas expected that the Planned Parenthood Texas

25    affiliates would be required to repay Medicaid

Page 124

1   reimbursement for services they received during the

2   pendency of those injunctions?

3            MS. KRIEG:  Object to the form.  Object to

4   scope.

5       A.  What I would say is the statute's explanation

6   of overpayment would clearly show that it would be

7   expected that a provider would have to repay an

8   overpayment, as well as the Texas Administrative Code

9   Section 371.1711 specify that overpayments will be

10  recouped.

11      Q.  Anything else?

12      A.  I believe there's a section in the TMPPM, also.

13  And I believe there's provisions within the -- where is

14  that?  371.1605.  Provider's responsibility to know what

15  is in the TMPPM State statutes, the federal statutes and

16  provider agreements.

17      Q.  Anything else?

18      A.  That would do it.

19      Q.  Okay.  So you said the statute on overpayment.

20  What statute is that?

21      A.  The -- let's see.  The definition of

22  "overpayment" is under 371.1.  And then --

23      Q.  And that's -- sorry.  That's tab what of your

24  binder?

25      A.  That is under Tab 12 of Exhibit 28.

1      Q.   Okay.

2      A.   The -- and then again, the Tab 13 under

3   Exhibit 28 is 371.1711, which is specifically talking

4   about recoupment of overpayment.  And then today we --

5   Exhibit 30 that was introduced today was Texas

6   Administrative Code 371.1605 describing provider

7   responsibility.

8      Q.   Okay.  And I think you also mentioned the Texas

9   Medicaid Provider Procedures Manual.  Was there a

10  particular part of that?

11     A.   If you'll give me a moment just to double check

12  here.

13     Q.   Sure.

14     A.   Under Section -- Tab 5 of Exhibit 28.

15     Q.   Yes.

16     A.   Under -- starting on Page 1-47 under 5, Program

17  Compliance, and on Page 1-48 K, Failing to repay or make

18  arrangements that are satisfactory to the commission to

19  repay, identified overpayments or other erroneous

20  payments or assessments identified by the commission or

21  any Texas Medicaid or other HHSC program operating

22  agency.

23     Q.   Okay.  Anything else from this manual?

24     A.   No.

25     Q.   Okay.  You would agree with me that Texas

Page 126

1    Medicaid never identified any overpayments that the

2    Planned Parenthood affiliate defendants had received

3    during the pendency of the federal and State court

4    injunctions.  Correct?

5                    MS. KRIEG:  Objection to the scope.  Object

6    to the form.

7         A.  I would not agree.

8         Q.  Okay.

9         A.  Based on this action.

10        Q.  Anything beyond this action?

11                   MS. KRIEG:  Object to the form.  Object to

12   the scope.

13        A.  Not that I'm aware of.

14        Q.  Okay.  And just so I'm clear, so Texas and HHSC

15   contend that they identified overpayments received by the

16   Texas Planned Parenthood affiliates through the lawsuit

17   about which you are testifying today.  Right?

18        A.  Correct.

19                   MS. KRIEG:  Objection to form.

20                   THE WITNESS:  Sorry.

21        Q.  That's what you meant when you said "this

22   action"?

23        A.  Correct.

24        Q.  All right.  And I know we talked earlier about

25   the federal injunction entered by Judge Sparks.  You're

Page 130

1      A.   Correct.

2      Q.   Okay.  And Texas understands that pursuant to

3   the regulations at 42 CFR Part 43 -- sorry.  Let me try

4   that again.

5           Texas understands that pursuant to the

6   regulations at 42 CFR Part 433 Subpart F, except in

7   limited circumstances involving bankruptcy or

8   out-of-business providers, states are required to return

9   the federal share of any identified provider

10  overpayments, regardless of whether the State has

11  recovered such overpayments from the provider.

12          Do you understand that?

13              MS. KRIEG:  Object to the form.  Object to

14  scope.

15     A.   Yes.

16     Q.   Has Texas repaid any money to the federal

17  government that it determined was an overpayment paid to

18  the Planned Parenthood Texas affiliates?

19              MS. KRIEG:  Object to the form.  Object to

20  the scope.

21     A.   I do not know that.

22     Q.   Sitting here today, you don't have any evidence

23  that Texas actually has repaid any money that it

24  paid out -- any -- sorry.

25          Sitting here today, as a corporate

Page 131

1   representative for the State of Texas, you don't have any

2   evidence that Texas has returned the federal share of any

3   identified overpayments that were made to the Planned

4   Parenthood Texas affiliates.  Correct?

5              MS. KRIEG:  Object to the form.  Object to

6   the scope.

7        A.  That's correct.

8        Q.  Okay.  So you mentioned overpayment.  What's an

9   overpayment?

10             MS. KRIEG:  Object to the form.

11       A.  In Exhibit 28, Tab 12, the definition under

12  Texas Administrative Code 371.1(55) is, The amount paid

13  by Medicaid or other HHS program or the amount collected

14  or received by a person by virtue of the provider's

15  participation in Medicaid or other HHS program that

16  exceeds the amount to which the provider or person is

17  entitled under Section 1902 of the Social Security Act or

18  other State of federal status for a service or item

19  furnished within the Medicaid or other HHS programs.  And

20  this includes, A, any funds collected or received in

21  excess of the amount to which the provider is entitled,

22  whether obtained through error, misunderstanding, abuse,

23  misapplication, misuse, embezzlement, improper retention

24  or fraud.

25       Q.  And the State in this action contends that the

Page 132

1    amounts that the Planned Parenthood Texas affiliates

2    received during the pendency of the federal and State

3    court injunctions were overpayments?

4              MS. KRIEG:  Object to the form.

5        A.  Actually under the Texas Medicaid Fraud

6    Prevention Act, it spells out the civil remedies that may

7    be obtained.  And that includes -- let's see, I think I

8    have that in here.  Let's see.  Where is that?  That is

9    under, on Exhibit 28, Tab 7.  Section 36.052 spells out

10   the civil remedies that are obtainable in this Texas

11   Medicaid Fraud Prevention Act proceeding.

12       Q.  Okay.  So are you saying that Texas does not

13   contend that the amounts the Planned Parenthood Texas

14   affiliates received during the injunctions were

15   overpayments?

16             MS. KRIEG:  Object to the form.  Misstates

17   testimony.

18       A.  They would still be overpayments under the TAC.

19   But the way to recoup them would be to -- to re -- to get

20   them back into the system would be through Section 36.052

21   in this case, since this is being brought as a Texas

22   Medicaid Fraud Prevention Act matter.

23       Q.  So Texas's view is they are overpayments, and

24   the mechanism for Texas to recover them is through

25   Section 36.052 of the Texas Medicaid Fraud Prevention

Page 133

1   Act?

2       A.  Yes.

3       Q.  What is a recoupment?

4           MS. KRIEG:  Object to the form.

5       A.  A recoupment is a recovery of money that was

6   wrongfully paid.

7       Q.  Is it -- is a recoupment a specific type of

8   action under Texas law?

9           MS. KRIEG:  Object to the form.

10      A.  Yes.

11      Q.  And what do you --

12      A.  Under Tab 13 of Exhibit 28.

13      Q.  Uh-huh.

14      A.  It's Section 371.1711 entitled Recoupment of

15  Overpayments and Debts.

16      Q.  Okay.  And this -- basically this section, TAC

17  371.1711, describes how OIG can recoup money from a

18  provider if OIG determines the provider committed an act

19  for which the provider is subject to administrative

20  actions or sanctions.  Right?

21          MS. KRIEG:  Object to the form.  Calls for

22  a legal conclusion.

23      Q.  Is that right, sir?

24      A.  That's partially correct.

25      Q.  Okay.

Page 147

1          THE WITNESS:  I'm sorry.

2     A.   It's based on the fact that there was an

3  injunction in place preventing OIG and HHSC from

4  terminating your client's enrollment into -- in Medicaid.

5     Q.   Are you aware that OIG had the ability to

6  recommend conditional approval of a provider?

7          MS. KRIEG:  Objection; form.  Objection;

8  scope.

9     A.   I was not aware of that.

10     Q.   Do you have any reason, sitting here today, to

11  say -- to suggest that OIG could not have given

12  conditional approval?

13          MS. KRIEG:  Objection; form.  Objection;

14  scope.

15     A.   I have nothing that would prevent -- have

16  prevent -- sorry, it's getting late.  I know of nothing.

17     Q.   Okay.  Would you defer to Mr. Bowen and

18  Dr. Spears on the question of how allegations relied

19  in -- relied on in the December 2016 Final Notice of

20  Termination relate to the fitness of the Planned

21  Parenthood Texas affiliates to furnish covered services

22  or their ability to appropriately bill for them in

23  accordance with Texas's Medicaid plan?

24          MS. KRIEG:  Objection; form.  Objection;

25  scope.

Page 162

1  bond?

2            THE REPORTER:  I'm sorry.  Can you say that

3  again?

4      Q.  Are you familiar with a surety bond?

5            MS. KRIEG:  Object to the form.  Object to

6  the scope.

7      A.  I'm familiar with surety bonds, yes.

8      Q.  What's your understanding of what a surety bond

9  is?

10     A.  It's to ensure that if the insured is found to

11  have to pay something out, that they would be -- there

12  would be a fund for the payment.

13     Q.  If someone is found -- say that again.

14     A.  Basically if your insured under the surety bond

15  is found to owe money, that the surety bond would be the

16  backup to make sure that it's paid.

17     Q.  Okay.  It's something that the OIG can require

18  a provider to file, so that if subsequently that provider

19  is found to have been involved in a program violation,

20  that surety bond would cover the penalties associated

21  with the program violation?

22            MS. KRIEG:  Object to the form.  Object to

23  the scope.

24     A.  Yes.  That's my understanding.

25     Q.  Okay.  Did the OIG have the Planned Parenthood

Page 163

1   affiliates provide a surety bond during the pendency of

2   the injunction?

3            MS. KRIEG:  Object to the scope.

4        Q.  Sorry.  The injunctions?

5            MS. KRIEG:  Object to the scope.

6        A.  I do not know.

7        Q.  Sitting here today, you're not aware of that

8   happening.  Right?

9            MS. KRIEG:  Object to the scope.

10       A.  That's correct.

11       Q.  You're aware that OIG has the ability under the

12  Texas Government Code to request that the Office of the

13  Attorney General obtain an injunction to prevent a person

14  from disposing of an assert identified by the OIG as

15  potentially subject to recovery by the OIG due to the

16  provider's fraud, waste or abuse.  Right?

17           MS. KRIEG:  Object to the form.  Object to

18  the scope.

19       A.  I would have to actually see the provision.

20       Q.  In your personal capacity, are you familiar

21  with that ever happening in your work with the OIG?

22       A.  No.

23       Q.  Okay.

24           (Exhibit No. 42 marked)

25       Q.  I'm handing you what we've marked as

Page 164

1   Exhibit 42.

2        A.   Okay.

3        Q.   Okay.  And you see under (c)(2) --

4        A.   Yes.

5        Q.   -- that, In performing functions and duties

6   otherwise provided by law, the OIG may request that the

7   OAG, that's the Office of Attorney General, obtain an

8   injunction to prevent a person from disposing of an asset

9   identified by the OIG as potentially subject to recovery

10  by the OIG due to a person's fraud, waste or abuse.

11  Right?

12            MS. KRIEG:  Object to scope.

13       A.   Yeah, I see it says that.

14       Q.   Okay.  I'm going to show you one other code

15  provision.  I'm marking as this -- I'm sorry.  I'm doing

16  a poor job.

17            Exhibit 42 is what section of the code?

18       A.   1 Texas Administrative Code, Section 371.11.

19       Q.   Okay.  And if I misspoke and referred that --

20  referred to that as a section of the Government Code, I

21  apologize.  This is from the TAC.  Right?

22       A.   Correct.

23       Q.   All right.  Now I will show you Exhibit 43.

24            (Exhibit No. 43 marked)

25       A.   Thank you.

Page 165

1    Q.  Okay.  And what is Exhibit 43?

2            MS. KRIEG:  Object to scope.

3    A.  Exhibit 43 is 1 Texas Administrative Code,

4    Section 371.25 entitled Injunction to Prevent Disposing

5    of Assets and Application to Debts.

6    Q.  Okay.  And this states that, Based on the

7    results of investigative findings and evidence that

8    potential fraud, waste or abuse exists and a potential

9    overpayment penalty or damage has been identified, a

10   method that may be used by the OIG as a fiduciary for the

11   State is injunctive relief.  The purpose of the

12   injunctive relief is to ensure assets remain to reimburse

13   the State money owed, such as recoupment of overpayments

14   and assessed damages and penalties.  The OIG may request

15   that the attorney general obtain an injunction to prevent

16   a provider or person from disposing of an asset

17   identified by the OIG as potentially subject to recovery

18   by the OIG due to the provider's or person's fraud, waste

19   or abuse.

20           Did I read that correctly?

21   A.  Yes.

22   Q.  And on behalf of Texas, you're not aware of the

23   OIG ever requesting that the Office of Attorney General

24   obtain an injunction to prevent the Texas Planned

25   Parenthood affiliates from disposing of any of the

Page 166

1  Medicaid reimbursements they received during the pendency

2  of the federal or State or court injunctions.  Right?

3            MS. KRIEG:  Object to the form.  Object to

4  the scope.

5       A.  Correct.

6       Q.  And Mr. Goldstein, just to be clear, you're

7  testifying here on behalf of Texas today regarding Topic

8  14?

9       A.  Of which --

10      Q.  Of the Texas notice.

11      A.  Yes.

12      Q.  All right.  And Texas Topic 14 is Texas's

13 knowledge and understanding for -- it was a typo,

14 recoupments of overpayments, including under C, Texas's

15 knowledge of efforts by THHSC or any other agency in the

16 State of Texas to obtain recoupment of overpayments from

17 any Texas Medicaid provider.  Correct?

18      A.  Correct.

19      Q.  Was any part of the review or audit of the

20 Planned Parenthood Texas affiliates ever considered

21 criminal by the OIG?

22      A.  Not to my knowledge.

23      Q.  Just to be very clear, Texas is not aware of

24 any Medicaid fraud investigation conducted by OIG of the

25 Planned Parenthood Texas affiliates?  I think you've

Page 167

1    answered that, but I just want to be clear.

2              MS. KRIEG:  Objection; form.

3         A.   That's correct.

4         Q.   Apart from the litigation about which you're

5    here to testify today, did the OIG ever send any of the

6    Planned Parenthood affiliates written notice of the

7    overpayment that you've testified that Texas had

8    identified had been made to the Planned Parenthood

9    affiliate defendants?

10             MS. KRIEG:  Object to the form.

11        A.   No.

12             MS. LOLLAR:  Let's take a quick break.

13             THE VIDEOGRAPHER:  Going off the record.

14   The time is 3:29.

15             (Recess from 3:29 p.m. to 3:43 p.m.)

16             THE VIDEOGRAPHER:  Back on the record.  The

17   time is 3:43.

18             MS. HACKER:  Before you start, I just

19   wanted to note for the record that I came back in shortly

20   before of the break at about 3:20, but I didn't want to

21   interrupt.

22             MS. LOLLAR:  Thanks, Heather.

23        Q.   Okay, Mr. Goldstein.  I just wanted to follow

24   up on a few things, so I just want to make sure your

25   testimony is clear.

## Termination of Provider Contract

What is the procedure to notify MCOs/DMOs when a Provider's contract has been terminated?

Litigation sends a SAR to TMHP with the instructions to terminate the provider. TMHP applies a PDC on the providers NPI/TPI/Tax then enters the provider on the Exclusion/Termination list on their website. TMHP maintains a termination and exclusion list on their website and updates the list monthly. MCO/DMOs are required to review the list monthly for terminated providers.

Who does the notification? TMHP

| Message | |
|---|---|
| From: | Chambliss,Caryl (HHSC) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EE99F262521B4CDFBAC0DE7002B37911-CCHAMBLISS0] |
| Sent: | 1/22/2021 10:45:41 PM |
| To: | Zalkovsky,Emily (HHSC) [Emily.Zalkovsky@hhs.texas.gov]; Erwin,Michelle (HHSC) [Michelle.Erwin@hhs.texas.gov]; Scheib,Katherine (HHSC) [Katherine.Scheib@hhs.texas.gov] |
| Subject: | FW: [EXTERNAL] RE: Planned Parenthood letter |
| Attachments: | L00626 - Termination of Planned Parenthood_Source.docx; Planned Parenthood Letter Mailing List and Phone Numbers.zip |

So after all the data was pulled, there were only 37 clients that will receive a letter. Jason indicated below how they pulled the data to ensure only individuals with FFS Medicaid in February would receive the letter.

Please see below.

Thanks!

*Caryl*
Director
Operations Management Claims Administrator
Medicaid/CHIP Division
Office (512) 438-3770 Cell (512) 586-0760

**From:** Massey, Jason [mailto:jason.massey@tmhp.com]
**Sent:** Friday, January 22, 2021 4:32 PM
**To:** Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>
**Cc:** Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

Caryl –

I just wanted to wrap a couple things up regarding the Planned Parenthood letter so that you've got a summary for SAR 107941-1.

1) Attached is the approved letter.
2) Attached is the final mailing list. I believe you spoke with Jeremy earlier, and he indicated that the final client count would less than 100 clients. The final count of clients is 37. We arrived at this number based on the following criteria:
   a. Pulled all tax IDs indicated in the SAR
   b. Pulled all claims for those TPIs from 1/1/2020 through 1/20/2021
   c. Selected the distinct clients from that list that had active Program 100 (Medicaid) eligibility in Feb 2021, but NOT active Program 200 (Managed Care) in Feb 2021.
   **Note:** The mailing list is password protected. I'll send a separate email with the password.
3) We have approved proofs of the letters, and our print vendor will be mailing these letters first class tomorrow (1/23/2021).

Let me know if you have any questions.

**Jason Massey**
Communications Support Associate Manager
Texas Medicaid & Healthcare Partnership (TMHP)



EXHIBIT
tabbies
15

TXPP_0237837

12357-B Riata Trace Parkway, Austin, TX 78727
Phone: 512.506.7057
Mobile: 512.517.4227

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>
**Sent:** Friday, January 22, 2021 10:11 AM
**To:** Massey, Jason <jason.massey@tmhp.com>; Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>; Cramer,Kellen W (HHSC) <Kellen.Cramer@hhs.texas.gov>
**Cc:** Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>; Thompson, Jacob <jacob.thompson@tmhp.com>; Zalkovsky,Emily (HHSC) <Emily.Zalkovsky@hhs.texas.gov>; Erwin,Michelle (HHSC) <Michelle.Erwin@hhs.texas.gov>; Scheib,Katherine (HHSC) <Katherine.Scheib@hhs.texas.gov>; Wear, Matthew <matthew.wear@tmhp.com>; Macias, Eduardo <eduardo.macias@tmhp.com>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

This message is from an EXTERNAL SENDER - be CAUTIOUS, particularly with links and attachments.

Thanks so much Jason.

Thanks!
*Caryl*
Director
Operations Management Claims Administrator
Medicaid/CHIP Division
Office (512) 438-3770 Cell (512) 586-0760

**From:** Massey, Jason [mailto:jason.massey@tmhp.com]
**Sent:** Friday, January 22, 2021 10:03 AM
**To:** Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>; Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>; Cramer,Kellen W (HHSC) <Kellen.Cramer@hhs.texas.gov>
**Cc:** Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>; Thompson, Jacob <jacob.thompson@tmhp.com>; Zalkovsky,Emily (HHSC) <Emily.Zalkovsky@hhs.texas.gov>; Erwin,Michelle (HHSC) <Michelle.Erwin@hhs.texas.gov>; Scheib,Katherine (HHSC) <Katherine.Scheib@hhs.texas.gov>; Wear, Matthew <matthew.wear@tmhp.com>; Macias, Eduardo <eduardo.macias@tmhp.com>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

Caryl –

I just wanted to follow-up and let you know that the letter has been sent to the printer. They have acknowledged receipt and are working on proofs for our approval. I've attached a finished copy of the letter in English and Spanish. I'll follow-up once we have confirmation the letters have been mailed.

Let me know if you have any questions.

**Jason Massey**
Communications Support Associate Manager
Texas Medicaid & Healthcare Partnership (TMHP)

TXPP_0237838

12357-B Riata Trace Parkway, Austin, TX 78727
Phone: 512.506.7057
Mobile: 512.517.4227

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>
**Sent:** Thursday, January 21, 2021 6:08 PM
**To:** Massey, Jason <jason.massey@tmhp.com>; Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>; Cramer,Kellen W (HHSC) <Kellen.Cramer@hhs.texas.gov>
**Cc:** Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>; Cleavenger, Annie <Annie.Cleavenger@tmhp.com>; Thompson, Jacob <jacob.thompson@tmhp.com>; Zalkovsky,Emily (HHSC) <Emily.Zalkovsky@hhs.texas.gov>; Erwin,Michelle (HHSC) <Michelle.Erwin@hhs.texas.gov>; Scheib,Katherine (HHSC) <Katherine.Scheib@hhs.texas.gov>; Wear, Matthew <matthew.wear@tmhp.com>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

This message is from an EXTERNAL SENDER - be CAUTIOUS, particularly with links and attachments.

Thanks so much!

Thanks!
*Caryl*
Director
Operations Management Claims Administrator
Medicaid/CHIP Division
Office (512) 438-3770 Cell (512) 586-0760

**From:** Massey, Jason [mailto:jason.massey@tmhp.com]
**Sent:** Thursday, January 21, 2021 5:23 PM
**To:** Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>; Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>; Cramer,Kellen W (HHSC) <Kellen.Cramer@hhs.texas.gov>
**Cc:** Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>; Cleavenger, Annie <Annie.Cleavenger@tmhp.com>; Thompson, Jacob <jacob.thompson@tmhp.com>; Zalkovsky,Emily (HHSC) <Emily.Zalkovsky@hhs.texas.gov>; Erwin,Michelle (HHSC) <Michelle.Erwin@hhs.texas.gov>; Scheib,Katherine (HHSC) <Katherine.Scheib@hhs.texas.gov>; Wear, Matthew <matthew.wear@tmhp.com>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

Caryl –

I think we're in good shape. There are 411 clients on the mailing list. The letter has been translated, and we're just doing a final peer review of the Spanish text. I'll send a final copy of the letter that includes the English and Spanish text to you no later than tomorrow morning so that you have it for your records.

We're on track to meet the printer's deadline to have the letters in the mail by Saturday.

**Jason Massey**

Communications Support Associate Manager
Texas Medicaid & Healthcare Partnership (TMHP)
12357-B Riata Trace Parkway, Austin, TX 78727
Phone:  512.506.7057
Mobile: 512.517.4227

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>
**Sent:** Thursday, January 21, 2021 5:04 PM
**To:** Massey, Jason <jason.massey@tmhp.com>; Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>; Cramer,Kellen W (HHSC) <Kellen.Cramer@hhs.texas.gov>
**Cc:** Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>; Cleavenger, Annie <Annie.Cleavenger@tmhp.com>; Thompson, Jacob <jacob.thompson@tmhp.com>; Zalkovsky,Emily (HHSC) <Emily.Zalkovsky@hhs.texas.gov>; Erwin,Michelle (HHSC) <Michelle.Erwin@hhs.texas.gov>; Scheib,Katherine (HHSC) <Katherine.Scheib@hhs.texas.gov>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

This message is from an EXTERNAL SENDER - be CAUTIOUS, particularly with links and attachments.

And thank you for putting this on a fast track.

Thanks!
*Caryl*
Director
Operations Management Claims Administrator
Medicaid/CHIP Division
Office (512) 438-3770 Cell (512) 586-0760

**From:** Massey, Jason [mailto:jason.massey@tmhp.com]
**Sent:** Thursday, January 21, 2021 4:13 PM
**To:** Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>; Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>; Cramer,Kellen W (HHSC) <Kellen.Cramer@hhs.texas.gov>
**Cc:** Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>; Cleavenger, Annie <Annie.Cleavenger@tmhp.com>; Thompson, Jacob <jacob.thompson@tmhp.com>; Zalkovsky,Emily (HHSC) <Emily.Zalkovsky@hhs.texas.gov>; Erwin,Michelle (HHSC) <Michelle.Erwin@hhs.texas.gov>; Scheib,Katherine (HHSC) <Katherine.Scheib@hhs.texas.gov>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

Caryl –

Thank you. We'll work on preparing the Spanish translation. This will only be going to FFS clients, and the count will be between 400 and 500 clients. I'll have an exact count for you later tonight.

Thank you for the quick turnaround.

**Jason Massey**
Communications Support Associate Manager
Texas Medicaid & Healthcare Partnership (TMHP)
12357-B Riata Trace Parkway, Austin, TX 78727
Phone: 512.506.7057
Mobile: 512.517.4227

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>
**Sent:** Thursday, January 21, 2021 3:34 PM
**To:** Massey, Jason <jason.massey@tmhp.com>; Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>; Cramer,Kellen W (HHSC) <Kellen.Cramer@hhs.texas.gov>
**Cc:** Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>; Cleavenger, Annie <Annie.Cleavenger@tmhp.com>; Thompson, Jacob <jacob.thompson@tmhp.com>; Zalkovsky,Emily (HHSC) <Emily.Zalkovsky@hhs.texas.gov>; Erwin,Michelle (HHSC) <Michelle.Erwin@hhs.texas.gov>; Scheib,Katherine (HHSC) <Katherine.Scheib@hhs.texas.gov>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

This message is from an EXTERNAL SENDER - be CAUTIOUS, particularly with links and attachments.

Good afternoon,

Legal was able to get to this right away and did not make changes.  Please see attached final letter.  Please let me know once the letters get sent out on Saturday.  Can you tell me how many clients you are mailing this to and that it is only going out to those in FFS?

Thanks!
*Caryl*
Director
Operations Management Claims Administrator
Medicaid/CHIP Division
Office (512) 438-3770 Cell (512) 586-0760

**From:** Massey, Jason [mailto:jason.massey@tmhp.com]
**Sent:** Thursday, January 21, 2021 3:27 PM
**To:** Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>; Cramer,Kellen W (HHSC) <Kellen.Cramer@hhs.texas.gov>; Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>
**Cc:** Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>; Cleavenger, Annie <Annie.Cleavenger@tmhp.com>; Thompson, Jacob <jacob.thompson@tmhp.com>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

Thank you, Kathie (and Kellen).

-Jason

TXPP_0237841

**From:** Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>
**Sent:** Thursday, January 21, 2021 3:06 PM
**To:** Cramer,Kellen W (HHSC) <Kellen.Cramer@hhs.texas.gov>; Massey, Jason <jason.massey@tmhp.com>;
Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>
**Cc:** Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>; Cleavenger, Annie
<Annie.Cleavenger@tmhp.com>; Thompson, Jacob <jacob.thompson@tmhp.com>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

This message is from an EXTERNAL SENDER - be CAUTIOUS, particularly with links and attachments.

All,

Caryl needs to run this by our legal one more time and will issue the FINAL.

Thanks,

Kathie

**From:** Cramer,Kellen W (HHSC)
**Sent:** Thursday, January 21, 2021 3:05 PM
**To:** Massey, Jason <jason.massey@tmhp.com>; Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>;
Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>
**Cc:** Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>; Cleavenger, Annie
<Annie.Cleavenger@tmhp.com>; Thompson, Jacob <jacob.thompson@tmhp.com>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

Hi Caryl and Jason,

See attached. This is a clean copy of the draft with Change Management's and HHS
Editorial's edits incorporated.

Please let me know if you have any questions or concerns with the changes.

Thanks,

Kellen Cramer
MCS Change Management
Kellen.Cramer@hhs.texas.gov

**From:** Massey, Jason <jason.massey@tmhp.com>
**Sent:** Thursday, January 21, 2021 12:14 PM
**To:** Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>
**Cc:** Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>; Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy
<jeremy.york@tmhp.com>; Cramer,Kellen W (HHSC) <Kellen.Cramer@hhs.texas.gov>; Cleavenger, Annie

TXPP_0237842

<Annie.Cleavenger@tmhp.com>; Thompson, Jacob <jacob.thompson@tmhp.com>
**Subject:** RE: [EXTERNAL] RE: Planned Parenthood letter

Kathie –

Attached are 3 files:
- **L00626 – Termination of Planned Parenthood _Draft 1_Tracked.docx**: This is the initial draft. The language provided by the state was unaltered with the exception of referring to 3 Planned Parenthood providers as a collective since there are actually tax IDs associated with 9 Planned Parenthood providers.
- **L00626 – Termination of Planned Parenthood _Plain Language_Draft 1_Tracked.docx**: This draft includes additional revisions to the language provided by the state to address plain language concerns.
- **L00626 – Termination of Planned Parenthood _Plain Language_Draft 1_Clean.docx**: This is a clean copy of the letter with our with the plain language edits.

There are a few things I want to point out.
- This is on HHSC letterhead. We requested a copy of updated letterhead when the last Executive Commissioner left, but updated letterhead was not available at the time. The name in the header is a graphic, no editable text. If you've got current letterhead, we can move this to a new template. If you prefer we Photoshop the graphic to remove the Executive Commissioner name altogether, we can do that as well.
- We pulled the phone number to call from the *How to Find a Medicaid Doctor* section within Your Health Care Guide (https://www.tmhp.com/sites/default/files/file-library/medicaid/Your-Health-Care-Guide-2020-en.pdf).
- Typically, we would provide more directive language for client letters. For example, we would normally state, "If *you* need to find a new provider, *you* can call…" We know that the state has been cautious about sending correspondence that may indicate someone is seeking certain services. In the HTW space, I believe that we don't seek TPL/other insurance to avoid the possibility that someone else in the household becomes aware that a family member is obtaining HTW services. It's a safety thing, so we wrote this as if it could be going to a broader group, not directed at the individual.
- We know that we are working on a very aggressive timeline. In order to meet Stephanie's goal of printing and mailing these on Saturday, we need to have a finished product (approved English and Spanish) by 10:00 a.m. tomorrow. The Spanish translation is dependent on finalized English text today. We will be handling the translation.

If you've got questions and find that it would better for us to collaborate in real time, just give me a call. I can organize a meeting through Teams, pull in our editors, and share screens if necessary.

**Jason Massey**
Communications Support Associate Manager
Texas Medicaid & Healthcare Partnership (TMHP)
12357-B Riata Trace Parkway, Austin, TX 78727
Phone:  512.506.7057
Mobile: 512.517.4227

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>
**Sent:** Thursday, January 21, 2021 9:11 AM
**To:** Massey, Jason <jason.massey@tmhp.com>

TXPP_0237843

**Cc:** Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>; Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>; Cramer,Kellen W (HHSC) <Kellen.Cramer@hhs.texas.gov>
**Subject:** [EXTERNAL] RE: Planned Parenthood letter

This message is from an EXTERNAL SENDER - be CAUTIOUS, particularly with links and attachments.

Jason,

Your team needs to plan to do the translation.  HHS Comms won't be able to turn it around on our timelines and it's my understanding you all have been doing translating and HHS Comms had just been doing quality/consistency checks?  Let me know if I am incorrect and Spanish translation is not in your scope.

Thanks,

Kathie

**From:** Massey, Jason <jason.massey@tmhp.com>
**Sent:** Wednesday, January 20, 2021 6:46 PM
**To:** Haydon,Kathie (HHSC) <Kathie.Haydon@hhs.texas.gov>
**Cc:** Chambliss,Caryl (HHSC) <Caryl.Chambliss@hhs.texas.gov>; Olivo, Yvonne <yvonne.olivo@tmhp.com>; York, Jeremy <jeremy.york@tmhp.com>
**Subject:** Planned Parenthood letter

Kathie –

I'm sure you've been given a heads up that TMHP has been tasked with drafting a letter to send to clients receiving services from Planned Parenthood. We received the SAR today, which includes some language drafted by an attorney on the state side. We'll have a draft of the proposed language to you tomorrow by close of business. We'll shoot for earlier in the day if possible. I don't think this will complicated. This is our starting point:

> **Subject:** Termination of Planned Parenthood Clinics from Texas Medicaid
>
> Dear [Client Name]:
>
> As of January 4, 2021, Planned Parenthood of North Texas, Planned Parenthood of South Texas and Planned Parenthood Gulf Coast have been terminated as providers in Texas Medicaid.
>
> These providers have been notified in writing that they cannot accept any new Medicaid clients and that there will be a 30-day grace period (until February 3, 2021) provided to ensure that their current Medicaid clients can be transitioned to new providers.
>
> <Insert text here that explains how a client can find a new provider.>
>
> <Insert standard closing text that refers to the client helpline for questions.>

The highlighted text is what was drafted by the attorney. We have been instructed to include this language. We'll likely provide you with two drafts—one that does not alter the text provided, and one with suggested changes to the

highlighted text to align with plain language standards. Typically, client communication is handled by Tara Maxwell's group with coordination from Change Management. We'll let you coordinate with Tara if necessary unless you provide alternate direction.

Let me know if you have questions. Again, expect a draft from us on Thursday (1/21).

**Jason Massey**
Communications Support Associate Manager
Texas Medicaid & Healthcare Partnership (TMHP)
12357-B Riata Trace Parkway, Austin, TX 78727
Phone: 512.506.7057
Mobile: 512.517.4227

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Sent secure via TLS.
Sent secure via TLS.
Sent secure via TLS.
Sent secure via TLS.
Sent secure via TLS.
Sent secure via TLS.
Sent secure via TLS.

TXPP_0237845



**TEXAS**
Health and Human
Services

**Texas Health and Human Services Commission**

**Cecile Erwin Young**
*Executive Commissioner*

January 23, 2021

«[Client Name]»
«[Address 1]»
«[Address 2]»
«[City, State ZIP]»

**Subject:** Planned Parenthood will no longer be a Texas Medicaid provider

Dear «[Client Name]»:

Planned Parenthood will soon stop being a Texas Medicaid provider. This means they cannot accept Texas Medicaid clients.

**If Planned Parenthood is your current provider, you must find a new one.**

- If you currently go to Planned Parenthood for your health care, you can continue to see this provider until Feb. 3, 2021.

- To find a new provider, call the Medicaid Help Line at 800-335-8957 or search online at https://opl.tmhp.com/.

If you have any questions about this letter, call the Medicaid Help Line at 800-335-8957, 7 a.m. to 7 p.m., Central Time, Monday through Friday.

APP.335   TXPP_0237846



**TEXAS**
Health and Human
Services

Texas Health and Human Services Commission
_____

**Cecile Erwin Young**
*Executive Commissioner*

23 de enero de 2021

«[Client Name]»
«[Address 1]»
«[Address 2]»
«[City, State ZIP]»

**Asunto:** Planned Parenthood dejará de ser proveedor de Texas Medicaid

Estimado «[Client Name]»:

La organización Planned Parenthood pronto dejará de ser proveedor de Texas Medicaid, lo cual significa que no aceptará clientes de Texas Medicaid.

**Si actualmente Planned Parenthood es proveedor suyo, deberá buscar nuevo proveedor de servicios.**

- Si actualmente consulta Planned Parenthood para su atención médica, puede continuar sus consultas hasta el 3 de febrero de 2021.

- Para encontrar un nuevo proveedor de servicios, llame a la Línea de Ayuda de Medicaid al 800-335-8957 o haga una búsqueda en línea en https://opl.tmhp.com/.

Si tiene cualquier pregunta sobre esta carta, llame a la Línea de Ayuda de Medicaid al 800-335-8957, de 7 a.m. a las 7 p.m., hora del centro, de lunes a viernes.

APP.336   TXPP_0237847

02/04/2021

## Urgent Action Required Related to Planned Parenthood and MCO Call at 11a Today!

**Background:**

Pursuant to a court order issued late on February 3, 2021,  please "do not directly or indirectly terminate or otherwise interfere with the  Planned Parenthood Clinics' participation in the Medicaid program."

**Action Required:**

Please pause all efforts to transition current Planned  Parenthood Medicaid clients to new providers until further notice.

Please manually update your systems to allow for payment of  these claims. The Master Provider File will be updated no later than February  10, 2021.

HHSC will hold a call to provide additional operational  direction and answer questions today, February 4 at 11:00 am.  Conference  call line: (877) 820-7831.  Access code: 521298

## Contact:

Contact your MCCO monitoring team and copy to camisha.banks@hhs.texas.gov.

## Attachment:

Planned Parenthood NPI TPI and Tax ID.pdf

## Type: Action Required

## To: CHIP; MMP; STAR; STAR+PLUS; STARHEALTH; STAR_KIDS

## From: MCCO

TXPP_0206675

03/19/2021

**Termination of Planned Parenthood Clinics from Texas Medicaid**

**Background:**

Planned Parenthood Clinics have been terminated as providers in TexasMedicaid. Their termination was effective March 11, 2021. These providers havebeen notified in writing that they cannot accept any new Medicaid clients.

**Action:**

The payment denial code (PDC) for these providers was effective March11, 2021. MCOs should deny claims with dates of service as of this date as theproviders are not enrolled in Texas Medicaid. MCOs should update their systemsto deny claims with a date of service after March 10, 2021. The PDC for theseproviders will be reflected on the master provider file.

HHSC requests that MCOs provide notice to all current plan members whoreceived services from a Planned Parenthood provider over the last 12 months.Please notify your Managed Care Compliance & Operations (MCCO) monitoringteam of an expected date for completion of the mailings.

**Additional Information:**

Please reference the attached PDF forassociated TPI, NPI and Tax identification information.

**Resources:**

Planned Parenthood NPI TPI and Tax ID(Attached)

**Contact:**

Please contact your MCCO monitoring team, with a copy to Camisha Banks at camisha.banks@hhs.texas.gov, with any questions about this notice.

**Attachment:** Planned Parenthood NPI TPI and Tax ID.PDF

**Type:** Informational

**To:** CHIP; STAR; STAR+PLUS; STARHEALTH; STAR_KIDS

**From:** MCCO

TXPP_0206613

| | |
|---|---|
| SAR No.: | 107690-1 |
| Date: | 01/04/2021 03:40:41 PM |
| Author of Memo: | Fee, Cheryl |
| Email: | cheryl.fee@hhs.texas.gov |
| Phone Number: | 5124912894 |
| Contract No: | 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-00001 |
| Program Type: | 100Z-HHSC-OIG-Sanctions |
| Contract Section Title (KRS): | Provider (PRV)-Enrollment |
| Correspondence Type: | Directional/ Instructional |
| Contract Requirement No.: | PRV-0279 |
| Subject: | Termination of Planned Parenthood Association of Cameron & Willacy County, Planned Parenthood of Gulf Coast, Planned Parenthood of Greater Texas, Planned Parenthood of North Texas, Planned Parenthood of San Antonio, Planned Parenthood South Texas Surgical Center |
| Response Required: | Yes |
| Processing: | Rush |

| Memo No | Due Date | Revised Due Date |
|---|---|---|
| 1 | 01/15/2021 | |

**REASON FOR RUSH:** The following instructions need to be implemented immediately.

HHS-IG/Litigation is requesting ACS-TMHP to do the following:

- **Please apply PDC 48 [Provider terminated due to action by OIG] and PDC 49 [Provider is not enrolled] to Planned Parenthood Association of Cameron & Willacy County, Planned Parenthood of Gulf Coast, Planned Parenthood of Greater Texas, Planned Parenthood of North Texas, Planned Parenthood of Central Texas, Planned Parenthood of West Texas, Planned Parenthood of San Antonio, Planned Parenthood South Texas Surgical Center and Planned Parenthood Trust of South Texas effective February 4, 2021, for the providers and associated TPIs, NPIs and Tax IDs in the attached excel spreadsheet, as well as any TPI suffixes.**
- **Please provide written notification that this SAR request has been completed.**

**PLEASE NOTE:** Any external delivery required must be delivered to HHS-IG, Attn: Connie Frias, phone (512) 491-4080, 11501 Burnet Road, Building 902, Austin, Texas 78758. The delivery will be accepted by the IG Lobby receptionist.

If you have any questions please call the originator at cheryl.fee@hhs.texas.gov or (337) 563-9369.

Thank you,

Cheryl Fee

Attachment

**To:** Carla Tatum, Angela Kilcollins, Danielle Simonsen, Ketan Shah
**Cc:** Delores Thomas, Ashleigh T. Smith, Peggy L. Sephus, Ben Kimberlin, Patricia A. Jackson, James M. Alexander, Carlie Ward, Mcats Vendoradmin, Tracy Traxler, Sharon Strasser, Melissa Steely, Erik E. Cary

01/06/2021 18:40:30

APP.339

| | |
|---|---|
| **SAR No.:** | 107690-10 |
| **Date:** | 03/16/2021 05:03:57 PM |
| **Author of Memo:** | Fee, Cheryl |
| **Email:** | cheryl.fee@hhs.texas.gov |
| **Phone Number:** | 5124912894 |
| **Contract No:** | 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-00001 |
| **Program Type:** | 100Z-HHSC-OIG-Sanctions |
| **Contract Section Title (KRS):** | Provider (PRV)-Enrollment |
| **Correspondence Type:** | Directional/ Instructional |
| **Contract Requirement No.:** | PRV-0279 |
| **Subject:** | Termination of Planned Parenthood Association of Cameron & Willacy County, Planned Parenthood of Gulf Coast, Planned Parenthood of Greater Texas, Planned Parenthood of North Texas, Planned Parenthood of San Antonio, Planned Parenthood South Texas Surgical Center |
| **Response Required:** | Yes |
| **Processing:** | Rush |

| Memo No | Due Date | Revised Due Date |
|---|---|---|
| 6 | 03/23/2021 | |

Immediately, HHSC/OIG is instructing TMHP to place a payment denial code 48 (provider terminated - OIG) and payment denial code 49 (provider is not enrolled) on the provider's Medicaid file effective March 11, 2021. Please see the attachment to SAR 107690 for the list of provider NPIs, TPIs and Tax IDs. If any claims have been paid for dates of service on or after March 11, 2021, please reprocess and deny the claim.

Should you have any questions, please do not hesitate to contact Cheryl Fee at (337) 563-9369 or cheryl.fee@hhs.texas.gov.

Thank you,

Cheryl Fee

**To:** Carla Tatum
**Cc:** Mcatsstateadmin M. Mcatsstateadmin, Delores Thomas, Ashleigh T. Smith, Peggy L. Sephus, Ben Kimberlin, Patricia A. Jackson, James M. Alexander, Carlie Ward, Mcats Vendoradmin, Tracy Traxler, Sharon Strasser, Melissa Steely, Erik E. Cary, Angela Kilcollins, Danielle Simonsen, Ketan Shah

03/16/2021 17:04:45

APP.340

| PemsNpi | NpiOrgName | PemsPracticeType | PemsTpi | Disenrolled | C21EnrollmentDate | C21PtspDate |
|---|---|---|---|---|---|---|
| 1003812165 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON & WILLACY C( Group | 126959902 | TRUE | 1996-05-10 | 1994-12-01 |
| 1003812165 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON & WILLACY C( Group | 126959904 | TRUE | 1977-01-01 | 1977-01-01 |
| 1003812165 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON & WILLACY C( Facility | 126959909 | TRUE | 2002-07-19 | 2002-01-01 |
| 1003908807 | PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER | Group | 137339110 | TRUE | 1991-07-05 | 1991-07-03 |
| 1104959790 | PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING & F Facility | 176952301 | TRUE | 2005-12-16 | 2004-12-15 |
| 1245322577 | PLANNED PARENTHOOD GULF COAST, INC. | Group | 112610402 | TRUE | 1977-01-01 | 1977-01-01 |
| 1245388396 | PLANNED PARENTHOOD GULF COAST, INC. | Facility | 112610404 | TRUE | 2002-06-01 | 2002-01-01 |
| 1255489399 | PLANNED PARENTHOOD GULF COAST, INC. | Facility | 112610407 | TRUE | 2002-06-11 | 2002-01-01 |
| 1265524086 | PLANNED PARENTHOOD SAN ANTONIO | Group | 212196401 | TRUE | 2010-08-02 | 2010-08-01 |
| 1316039456 | PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER | Group | 137339101 | TRUE | 1977-01-01 | 1977-01-01 |
| 1326044488 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON & WILLACY C( Group | 217805501 | TRUE | 2011-02-28 | 2010-09-01 |
| 1376833053 | PLANNED PARENTHOOD SOUTH TEXAS | Facility | 286687301 | TRUE | 2012-02-06 | 2011-08-15 |
| 1396837100 | PLANNED PARENTHOOD SAN ANTONIO | Facility | 335378101 | TRUE | 2014-09-09 | 2013-05-19 |
| 1396837100 | PLANNED PARENTHOOD SAN ANTONIO | Group | 335378102 | TRUE | 2017-02-20 | 2015-10-25 |
| 1437207578 | PLANNED PARENTHOOD GULF COAST, INC. | Facility | 112610414 | TRUE | 2002-06-11 | 2002-01-01 |
| 1457621864 | PLANNED PARENTHOOD GULF COAST, INC | Facility | 303546101 | TRUE | 2012-10-24 | 2011-03-19 |
| 1487746202 | PLANNED PARENTHOOD SAN ANTONIO | Group | 212066901 | TRUE | 2010-07-27 | 2010-08-01 |
| 1518068121 | PLANNED PARENTHOOD SAN ANTONIO | Group | 210048901 | TRUE | 2010-05-05 | 1991-07-03 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219703 | TRUE | 1977-01-01 | 1977-01-01 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219706 | TRUE | 2013-05-22 | 2013-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219708 | TRUE | 2013-05-22 | 2012-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219709 | TRUE | 2013-05-22 | 2012-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219710 | TRUE | 2013-05-22 | 2012-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219711 | TRUE | 2013-05-22 | 2012-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219712 | TRUE | 2016-07-18 | 2015-04-01 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911201 | TRUE | 2012-09-12 | 2012-03-29 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911202 | TRUE | 2012-11-21 | 2011-11-21 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911203 | TRUE | 2012-11-21 | 2011-11-21 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911204 | TRUE | 2012-11-21 | 2011-11-21 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911205 | TRUE | 2012-11-21 | 2011-11-21 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911206 | TRUE | 2013-05-20 | 2013-03-25 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911207 | TRUE | 2013-05-23 | 2013-03-25 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911208 | TRUE | 2013-05-23 | 2013-03-25 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911209 | TRUE | 2013-05-30 | 2012-04-12 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 314780301 | TRUE | 2013-05-23 | 2012-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 314858701 | TRUE | 2013-05-24 | 2012-01-22 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315038501 | TRUE | 2013-05-30 | 2012-04-18 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315048401 | TRUE | 2013-05-30 | 2012-04-29 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315496501 | TRUE | 2013-06-11 | 2013-03-25 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315644001 | TRUE | 2013-06-13 | 2012-04-18 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315917001 | TRUE | 2013-06-20 | 2012-04-12 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315939401 | TRUE | 2013-06-21 | 2013-03-25 |

| NPI | Name | Type | Number | Flag | Date 1 | Date 2 |
|---|---|---|---|---|---|---|
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315940201 | TRUE | 2013-06-21 | 2013-03-25 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 389885001 | TRUE | 2018-11-29 | 2017-09-20 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 417254601 | TRUE | 2020-12-12 | 2019-10-27 |
| 1699823740 | PLANNED PARENTHOOD GULF COAST, INC. | Facility | 112610411 | TRUE | 2002-06-11 | 2002-01-01 |
| 1760488829 | PLANNED PARENTHOOD CAMERON COUNTY | Group | 216436001 | TRUE | 2011-01-10 | 2009-12-09 |
| 1760573000 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON AND WILLACY | Group | 216434501 | TRUE | 2011-01-10 | 2009-12-09 |
| 1790833846 | PLANNED PARENTHOOD GULF COAST, INC. | Facility | 281503701 | TRUE | 2011-09-01 | 2011-05-01 |
| 1810076540 | PLANNED PARENTHOOD OF GREATER TAXES SURGICAL HEALTH SER | Group | 112610408 | TRUE | 2002-06-11 | 2002-01-01 |
| 1811474158 | PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER | Group | 127219705 | TRUE | 1991-05-20 | 1991-04-15 |
| 1861540916 | PLANNED PARENTHOOD GULF COAST, INC | Facility | 396069201 | TRUE | 2019-05-14 | 2018-02-22 |
| 1881742922 | PLANNED PARENTHOOD GULF COAST, INC. | Group | 112610406 | TRUE | 2002-06-01 | 2002-01-01 |
| 1881742922 | PLANNED PARENTHOOD GULF COAST, INC. | Group | 083409504 | TRUE | 2016-08-03 | 2015-04-01 |
| 1942358098 | PLANNED PARENTHOOD GULF COAST, INC. | Facility | 394453001 | TRUE | 2019-04-01 | 2017-09-20 |
| 1962581546 | PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING & F | Group | 112610409 | TRUE | 2002-06-11 | 2002-01-01 |
| 1972651016 | PLANNED PARENTHOOD GULF COAST, INC | Facility | 127219702 | TRUE | 1991-05-20 | 1991-04-15 |
| 1982795258 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON AND WILLACY | Group | 112610413 | TRUE | 2002-06-11 | 2002-01-01 |
| | | | 281506001 | | 2011-09-01 | 2011-05-01 |

| PemsNpi | NpiOrgName | PemsPracticeType | PemsTpi | Disenrolled | C21EnrollmentDate | C21PtspDate |
|---|---|---|---|---|---|---|
| 1003812165 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON & WILLACY Ct | Group | 126959902 | TRUE | 1996-05-10 | 1994-12-01 |
| 1003812165 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON & WILLACY Ct | Group | 126959904 | TRUE | 1977-01-01 | 1977-01-01 |
| 1003812165 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON & WILLACY Ct | Facility | 126959909 | TRUE | 2002-07-19 | 2002-01-01 |
| 1003908807 | PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER | Group | 137339110 | TRUE | 1991-07-05 | 1991-07-03 |
| 1104959790 | PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING & F | Facility | 176952301 | TRUE | 2005-12-16 | 2004-12-15 |
| 1245322577 | PLANNED PARENTHOOD GULF COAST, INC. | Group | 112610402 | TRUE | 1977-01-01 | 1977-01-01 |
| 1245388396 | PLANNED PARENTHOOD GULF COAST, INC. | Facility | 112610404 | TRUE | 2002-06-01 | 2002-01-01 |
| 1255489399 | PLANNED PARENTHOOD GULF COAST, INC. | Facility | 112610407 | TRUE | 2002-06-11 | 2002-01-01 |
| 1265524086 | PLANNED PARENTHOOD SAN ANTONIO | Group | 212196401 | TRUE | 2010-08-02 | 2010-08-01 |
| 1316039456 | PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER | Group | 137339101 | TRUE | 1977-01-01 | 1977-01-01 |
| 1326044488 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON & WILLACY Ct | Group | 217800501 | TRUE | 2011-01-28 | 2010-09-01 |
| 1376833053 | PLANNED PARENTHOOD SOUTH TEXAS | Facility | 286687301 | TRUE | 2012-02-06 | 2011-08-15 |
| 1396837100 | PLANNED PARENTHOOD SAN ANTONIO | Facility | 335378101 | TRUE | 2014-09-09 | 2013-05-19 |
| 1396837100 | PLANNED PARENTHOOD SAN ANTONIO | Group | 335378102 | TRUE | 2017-02-20 | 2015-10-25 |
| 1437207578 | PLANNED PARENTHOOD GULF COAST, INC. | Facility | 112610414 | TRUE | 2002-06-11 | 2002-01-01 |
| 1457621864 | PLANNED PARENTHOOD GULF COAST, INC | Facility | 303546101 | TRUE | 2012-10-24 | 2011-03-19 |
| 1487746202 | PLANNED PARENTHOOD SAN ANTONIO | Group | 212066901 | TRUE | 2010-07-27 | 2010-08-01 |
| 1518068121 | PLANNED PARENTHOOD SAN ANTONIO | Group | 210048901 | TRUE | 2010-05-05 | 1991-07-03 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219703 | TRUE | 1977-01-01 | 1977-01-01 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219706 | TRUE | 2013-05-22 | 2012-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219708 | TRUE | 2013-05-22 | 2012-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219709 | TRUE | 2013-05-22 | 2012-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219710 | TRUE | 2013-05-22 | 2012-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219711 | TRUE | 2013-05-22 | 2012-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 127219712 | TRUE | 2016-07-18 | 2015-04-01 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911201 | TRUE | 2012-09-12 | 2012-03-29 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911202 | TRUE | 2012-11-21 | 2011-11-21 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911203 | TRUE | 2012-11-21 | 2011-11-21 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911204 | TRUE | 2012-11-21 | 2011-11-21 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911205 | TRUE | 2012-11-21 | 2011-11-21 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911206 | TRUE | 2013-05-20 | 2013-03-25 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911207 | TRUE | 2013-05-23 | 2013-03-25 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911208 | TRUE | 2013-05-23 | 2013-03-25 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 299911209 | TRUE | 2013-05-30 | 2012-04-12 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 314780301 | TRUE | 2013-05-23 | 2012-01-14 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 314858701 | TRUE | 2013-05-24 | 2012-01-22 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315038501 | TRUE | 2013-05-30 | 2012-04-18 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315048401 | TRUE | 2013-05-30 | 2012-04-29 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315496501 | TRUE | 2013-06-11 | 2013-03-25 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315644001 | TRUE | 2013-06-13 | 2012-04-18 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315917001 | TRUE | 2013-06-20 | 2012-04-12 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315939401 | TRUE | 2013-06-21 | 2013-03-25 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 315940201 | TRUE | 2013-06-21 | 2013-03-25 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 389885001 | TRUE | 2018-11-29 | 2017-09-20 |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS | Group | 417254601 | TRUE | 2020-12-12 | 2019-10-27 |
| 1699823740 | PLANNED PARENTHOOD GULF COAST, INC. | Facility | 112610411 | TRUE | 2002-06-11 | 2002-01-01 |
| 1699944843 | PLANNED PARENTHOOD CAMERON COUNTY | Group | 216436001 | TRUE | 2011-01-10 | 2009-12-09 |
| 1760488829 | PLANNED PARENTHOOD CAMERON COUNTY | Group | 216434501 | TRUE | 2011-01-10 | 2009-12-09 |
| 1760573000 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON AND WILLACY | Group | 281503701 | TRUE | 2011-09-01 | 2011-05-01 |
| 1790833846 | PLANNED PARENTHOOD GULF COAST, INC, | Facility | 112610408 | TRUE | 2002-06-11 | 2002-01-01 |
| 1811076540 | PLANNED PARENTHOOD OF GREATER TAXES SURGICAL HEALTH SEF | Group | 127219705 | TRUE | 1991-05-20 | 1991-04-15 |
| 1811474158 | PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER | Group | 396069201 | TRUE | 2019-05-14 | 2018-02-22 |
| 1861540916 | PLANNED PARENTHOOD GULF COAST, INC | Facility | 112610406 | TRUE | 2002-06-01 | 2002-01-01 |
| 1881742922 | PLANNED PARENTHOOD GULF COAST, INC. | Group | 083409504 | TRUE | 2016-08-03 | 2015-04-01 |
| 1881742922 | PLANNED PARENTHOOD GULF COAST, INC. | Group | 394453001 | TRUE | 2019-04-01 | 2017-09-20 |
| 1942358098 | PLANNED PARENTHOOD GULF COAST, INC. | Facility | 112610409 | TRUE | 2002-06-11 | 2002-01-01 |
| 1962581546 | PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING & F | Group | 127219702 | TRUE | 1991-05-20 | 1991-04-15 |
| 1972651016 | PLANNED PARENTHOOD GULF COAST, INC | Facility | 112610413 | TRUE | 2002-06-11 | 2002-01-01 |
| 1982795258 | PLANNED PARENTHOOD ASSOCIATION OF CAMERON AND WILLACY | Group | 281506001 | TRUE | 2011-09-01 | 2011-05-01 |

TEXAS MEDICAID & HEALTHCARE PARTNERSHIP
**TMHP** A STATE MEDICAID CONTRACTOR

PO Box 200795
Austin, TX 78720-0795
Fax: 1-512-514-4214

November 30, 2018

PLANNED PARENTHOOD OF GREATER TEXAS
1511 E MISSOURI AVE SUITE B
EL PASO TX 79902-5615

RE: Texas State Health-Care Programs Provider Application      Reference #: 6593405

Dear PLANNED PARENTHOOD OF GREATER TEXAS,

This letter is in response to the application for enrollment of GEORGE MASSINGILL as a provider in Texas State Health-Care Programs, dated 9/20/2018. The Texas Medicaid & Healthcare Partnership (TMHP) handles the provider enrollment process on behalf of the Texas Health and Human Services Commission (HHSC).

HHSC has approved your application to become a Texas State Health-Care Programs provider for a term ending on 11/28/2023. HHSC's decision to approve your application is based in part on a recommendation from the HHSC Office of Inspector General (OIG). OIG's authority to make enrollment recommendations is found in Title 1 of the Texas Administrative Code (TAC) Chapter 371. HHSC's authority to make enrollment decisions is found in 1 TAC Chapter 352. Please note, at the end of this term, the Texas Provider Identifier (TPI) assigned to you will automatically terminate without advance notice. Accordingly, in order to participate beyond the contract term, it will be your responsibility to re-enroll within the given timeframe.

Texas Medicaid providers must adhere to the claims-filing deadlines described in the *Texas Medicaid Provider Procedures Manual*, Claims Filing section. All claims for services that are rendered to Texas Medicaid clients who do not have Medicare benefits are subject to a filing deadline of either 95 days from the date of service for in-state providers or 365 days from the date of service for out-of-state providers. If you are a returning provider that was issued the same Texas Provider Identifier (TPI) that was previously assigned to you, these deadlines also apply to you.

An exception is made for newly enrolled providers that are issued a new TPI. If you have been issued a new TPI, your claims must be received within 95 days of the date on which your new TPI was issued, and within 365 days of the date of service.

TMHP must receive all claims for the Children with Special Health Care Needs (CSHCN) Services Program within the required filing deadlines, regardless of enrollment status. Claims that are filed by a provider who has not yet received a provider identifier will be denied; however, if the provider has met the claim filing deadlines, the claims can be resubmitted or appealed after the CSHCN Services Program provider identifier has been assigned. The resubmitted claim may be considered for payment if TMHP receives it within 120 days of the date of denial. All other providers must adhere to the claims-filing deadlines described in the *CSHCN Services Program Provider Manual*, Claims Filing chapter.

Thank you for your participation in Texas State Health-Care Programs. If you have any questions or need assistance, please call the TMHP Contact Center at 1-800-925-9126 or the TMHP-CSHCN Services Program Contact Center at 1-800-568-2413.

www.tmhp.com



* 1 5 5 6 9 7 7 6 *

Page 1 of 1

PPGT00255586

**TMHP**   TEXAS MEDICAID & HEALTHCARE PARTNERSHIP
**A STATE MEDICAID CONTRACTOR**

Provider Enrollment
PO Box 200795
Austin, TX 78720-0795
Fax: 1-512-514-4214

November 30, 2018

PLANNED PARENTHOOD OF GREATER TEXAS
1511 E MISSOURI AVE SUITE B
EL PASO TX 79902-5615

Dear Planned Parenthood Of Greater Texas:

This letter contains your new provider enrollment information. Please review this information and notify TMHP if any changes are required. Your new enrollment information is:

| | |
|---|---|
| Group Name: | Planned Parenthood Of Greater Texas |
| Texas Provider Identifier (TPI) Base: | 3898850 |
| TPI Suffix: | 01 |
| Enrollment Date: | 11/29/2018 |
| Effective Date: | 9/20/2017 |
| National Provider Identifier (NPI) or Atypical Provider Identifier (API): | 1528147204 |
| Primary Taxonomy: | 261QA0005X |
| Secondary Taxonomy(s): | |
| Benefit Code: | FP3 |

A list of the newly enrolled performing providers in your group is enclosed with this letter.

You may have a benefit code to identify your provider type and program enrollment. Your benefit code is required for claims filing, prior authorization, and other transactions with TMHP. The table below explains your benefit code designation.

| Benefit Code | Benefit Code Description | Benefit Code | Benefit Code Description |
|---|---|---|---|
| CA1 | County Indigent Health Care Program (CIHCP) | EP1 | Texas Health Steps (THSteps) Medical |
| CCP | Comprehensive Care Program | FP3 | Department of State Health Services (DSHS) Family Planning (FP) |
| CSN | Children with Special Health Care Needs (CSHCN) Services Program | HA1 | Hearing Aid Dispensers |

www.tmhp.com                                                L00174



*  1  5  5  6  9  7  7  6  *

APP.346

PPGT00255587

**TMHP   A STATE MEDICAID CONTRACTOR**

| Benefit Code | Benefit Code Description | Benefit Code | Benefit Code Description |
|---|---|---|---|
| DEI | Texas Health Steps (THSteps) Dental | MA1 | Maternity |
| DM2 | Durable Medical Equipment — Home Health Services (DMEH) | MH2 | Mental Health (MH) Case Management |
| DM3 | Children with Special Health Care Needs (CSHCN) Services Program Durable Medical Equipment | TB1 | Tuberculosis (TB) Clinics |
| ECI | Early Childhood Intervention (ECI) Provider | | |

If you have any questions or need assistance, call the TMHP Contact Center at 1-800-925-9126 or the TMHP CSHCN Services Program Contact Center at 1-800-568-2413.

Enclosures


*1 5 5 6 9 7 7 6*

APP.347

PPGT00255588


**TMHP**    **A STATE MEDICAID CONTRACTOR**

**Performing Provider Information**

| | |
|---|---|
| Name: | Traditional Medicaid |
| Texas Provider Identifier (TPI) Base: | 1337511 |
| TPI Suffix: | 13 |
| National Provider Identifier (NPI) or Atypical Provider Identifier (API): | 1902812977 |
| Primary Taxonomy: | 261QA0005X |
| Secondary Taxonomy: | |
| Benefit Code: | FP3 |
| Enrollment Date: | 11/29/2018 |
| Effective Date: | 9/20/2017 |
| Provider Name: | George Massingill |
| Provider Type: | Family planning clinic |


APP.348

PPGT00255589

**TMHP** TEXAS MEDICAID & HEALTHCARE PARTNERSHIP
**A STATE MEDICAID CONTRACTOR**

Dear Provider:

Welcome to the Texas State Health-Care Programs. TMHP is the claims administrator for Texas Medicaid and the Children with Special Health Care Needs (CSHCN) Services Program. TMHP enrolls providers, processes health-care claims, publishes Texas Medicaid and CSHCN Services Program policy and procedures, and conducts provider education and training. TMHP offers a variety of ways to access program information, services, and help.

**Online Resources Available on the TMHP Website**

Visit the TMHP website at www.tmhp.com for access to all Texas Medicaid and CSHCN Services Program web based applications, provider portals, publications, forms, announcements, training opportunities, and fee schedules. The following information and applications are available on www.tmhp.com:

- **Banner Messages and Website Articles**—Website articles and weekly Electronic Remittance and Status (ER&S) Report banner messages provide information about upcoming changes to Texas Medicaid and CSHCN Services Program policies and procedures.

- **Provider Procedures Manuals**—The *Texas Medicaid Provider Procedures Manual* (TMPPM) and the *CSHCN Services Program Provider Manual* are comprehensive guides to Texas Medicaid and CSHCN Services Program benefits, policies, and procedures. Both manuals are available as both Hypertext Markup Language (HTML) and Portable Document Format (PDF) files.

- **My Account**—My Account provides access to TMHP online applications, including:

  - **Prior Authorization (PA) on the Portal**—PA on the Portal is a web-based application that allows providers to submit, extend, or revise prior authorization requests. Providers can also upload supporting documents, check request statuses, correct deficiencies, and verify client eligibility.

  - **Provider Information Management System (PIMS)**—PIMS helps providers maintain their account and demographic information. The information in PIMS populates the TMHP Online Provider Lookup (OPL), a tool that helps clients locate providers by specialty and location.

- **TexMedConnect**—TexMedConnect is a web-based application for claims filing, eligibility verification, claims status inquiry, ER&S reports, appeals, and more.

- **Electronic Data Interchange (EDI)**—Providers can use third-party software and billing agents to access the TMHP EDI Gateway.

**Telephone Contact Centers and Automated Inquiry System (AIS)**

Providers can call the TMHP Contact Center at 1-800-925-9126 or the TMHP-CSHCN Services Program Contact Center at 1-800-568-2413, Monday through Friday, 7 a.m. to 7 p.m. Central time. Both contact centers have a 24 hour automated inquiry system (AIS) for information about claims, payment status, and client eligibility.

**Provider Relations Office Visits and Individualized Assistance**

TMHP provider relations representatives help providers with program information, problem resolution, office visits, and training. Providers can find contact information for regional provider relations representatives on www.tmhp.com.

---



*15569776*

APP.349

PPGT00255590

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-26-12
Baltimore, Maryland  21244-1850



---

### Declaration of Anne Marie Costello

I, Anne Marie Costello, declare as follows:

1.  My name is Anne Marie Costello.  I am over 21 years of age, and I have personal knowledge of the matters stated herein.  My statements in this declaration are based upon my experience and general knowledge gained during my employment with the Center for Medicaid and CHIP Services (CMCS), a component within the Centers for Medicare & Medicaid Services in the Department of Health and Human Services.

2.  I have been employed by CMCS for approximately 12 years, and currently serve as the Deputy Director for the Center, a role that I've had for almost 3 years.

3.  CMCS is charged with administering the Medicaid program and serves as CMS's focal point for assistance with formulation, coordination, integration, and implementation of all national program policies and operations relating to Medicaid, the Children's Health Insurance Program (CHIP), and the Basic Health Program (BHP). CMCS works in partnership with states, assists state agencies in successfully carrying out their responsibilities for effective program administration and protecting beneficiaries, and, as necessary, supports states in correcting problems and improving the quality of their operations. CMCS also identifies and proposes modifications to program measures; regulations; laws; and policies to reflect changes or trends in the health care industry, program objectives, and beneficiaries' needs.

### TERMINATION OF PLANNED PARENTHOOD DEFENDANTS BY TEXAS AND LOUISIANA MEDICAID

4.  Federal law requires that each state Medicaid plan provide that Medicaid beneficiaries may obtain medical services "from any institution, agency, community, pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services."  Social Security Act § 1902(a)(23)(A) (42 U.S.C. § 1936a(a)(23)(A)). This is referred to as the "free choice of provider" requirement.

5.  The statute sets forth additional, specific protection for beneficiaries of family planning services, providing that "an enrollment of an individual eligible for medical assistance in [certain managed care entities] shall not restrict the choice of the qualified person from whom the individual may receive" family planning services.  Social Security Act § 1902(a)(23)(B) (42 U.S.C. § 1936a(a)(23)(B)).

PPTHIRD00008860

6. This statutory requirement is implemented in federal regulation at 42 C.F.R. § 431.51, which requires state Medicaid plans to allow a beneficiary to obtain Medicaid services from any institution, agency, pharmacy, person, or organization that is (i) qualified to furnish services, and (ii) willing to furnish them to the particular beneficiary.  States must comply with this federal requirement notwithstanding any state law to the contrary.

7. In order to comply with the statutory free choice of provider requirement, any actions taken by a state to terminate a provider's participation as a Medicaid provider or otherwise limit the provider's ability to furnish services to beneficiaries must relate to the fitness of a provider to safely perform covered services or to properly bill for those services.

8. Accordingly, termination of a provider for reasons unrelated to the fitness of the provider to safely perform covered services or properly bill for such services is a violation of federal Medicaid law.

9. States are not permitted to terminate or exclude providers from their Medicaid programs solely on the basis of the range of medical services they provide.  Specifically, while federal law prohibits federal Medicaid funding of abortion services except in certain specified circumstances, states may not terminate or exclude qualified health care providers from furnishing covered services on the basis that they separately provide abortion services (not funded by federal Medicaid dollars) as part of their scope of practice.

10. States also are not permitted to terminate or exclude providers from their Medicaid programs on the basis of evidence relating to the conduct of affiliated entities.  Rather, in order to comply with the free choice of provider requirement, a provider termination must be based on evidence relating to the specific provider's fitness to perform or properly bill for services.

11. After learning of the actions taken by the Texas and Louisiana Medicaid programs to terminate the enrollment of the Planned Parenthood defendants, CMS wrote to those programs on August 11, 2016, advising that we were unaware of any basis for the termination of the defendants that would be consistent with the free choice of provider requirement.  We indicated that, absent further information showing that the termination reasons related to the fitness of the providers to furnish covered services or appropriately bill for them, the states might be subject to a compliance action for violation of federal law.

12. Upon review of the responses from Texas and Louisiana to our August 2016 letters, the factual findings in the district court orders granting the preliminary injunctions, the discussions of those findings in the opinions from the 5th Circuit panels and en banc court regarding those injunctions, and the factual allegations in Relator's complaint in this case, it remains our view that the terminations at issue in this case were unlawful.  In the absence of evidence that the defendants were terminated for reasons related to their ability to safely furnish covered services and properly bill for them, it remains the conclusion of CMS that those terminations violated the federal free choice of provider requirement.

PPTHIRD00008861

## PROVIDER OBLIGATION TO RETURN PAYMENTS MADE PURSUANT TO INJUNCTION

13. Each state is responsible for overseeing Medicaid payments to its providers and ensuring the appropriateness of such payments.  As part of this responsibility, states often lead the identification and recovery of Medicaid provider overpayments.

14. When a Medicaid provider overpayment is identified or recovered, states are required to follow existing regulatory procedures for returning the applicable federal share.  Pursuant to the regulations at 42 C.F.R. Part 433, subpart F, except in limited circumstances involving bankruptcy or out of business providers, states are required to return the federal share of any identified provider overpayments regardless of whether the state has recovered such overpayments from the provider.

15. Upon information and belief, the alleged provider overpayments in this case include payments made by Texas and Louisiana to the defendants for covered services furnished to Medicaid beneficiaries during a time period in which state or federal court injunctions required the states to continue those providers' enrollment as Medicaid providers, and payments made by Texas to certain defendants during a "grace period" after the federal injunction was vacated, during which the Texas Medicaid program expressly authorized those providers to continue furnishing covered services to Medicaid beneficiaries.

16. CMS has not taken any action to recover from Texas or Louisiana the federal share of the payments made to the defendants for covered services furnished during the pendency of the injunctions and grace period.

17. I declare under penalty of perjury the foregoing is true and correct to the best of my knowledge and belief.

Anne Marie Costello

Executed this 17th day of November, in 2022 in Brooklyn, NY.

PPTHIRD00008862

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-26-12
Baltimore, Maryland   21244-1850



CENTERS FOR MEDICARE & MEDICAID SERVICES
**CENTER FOR MEDICAID & CHIP SERVICES**

---

### Supplemental Declaration of Anne Marie Costello

I, Anne Marie Costello, declare as follows:

1. My name is Anne Marie Costello.  I am over 21 years of age, and I have personal knowledge of the matters stated herein.  My statements in this declaration are supplemental to those in my previous declaration executed on November 17, 2022. Paragraphs 1-17 in that declaration, included as Attachment A to this declaration, are incorporated by reference herein.

2. As stated in paragraph 14 of Attachment A, when a Medicaid provider overpayment is identified or recovered, states are required to follow existing regulatory procedures for returning the applicable federal share of such overpayment.  Except in certain limited circumstances involving bankruptcy or out of business providers, states are required to return the federal share of any identified overpayments regardless of whether the state has recovered such overpayments from the provider.

3. States are expected to report the return of the federal share of provider overpayments as part of their quarterly Medicaid expenditure reporting to CMS on the Form CMS-64, specifically form 64.9O, Overpayment Adjustments.

4. Based upon our review of the Form CMS-64 submitted by Texas and Louisiana for FY2021 Q1 through FY2022 Q4 (for the time period October 1, 2020 – September 30, 2022), we have not identified the return of any overpayments relating to payments to the defendants for covered services furnished during the pendency of the injunction and grace period, nor has either state indicated the return of such overpayments.

5. I declare under penalty of perjury the foregoing is true and correct to the best of my knowledge and belief.


_____
Anne Marie Costello

Executed this 22nd day of December, 2022 in Brooklyn, NY

PPTHIRD00009329

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-26-12
Baltimore, Maryland   21244-1850



---

### Declaration of Anne Marie Costello

I, Anne Marie Costello, declare as follows:

1. My name is Anne Marie Costello.  I am over 21 years of age, and I have personal knowledge of the matters stated herein.  My statements in this declaration are based upon my experience and general knowledge gained during my employment with the Center for Medicaid and CHIP Services (CMCS), a component within the Centers for Medicare & Medicaid Services in the Department of Health and Human Services.

2. I have been employed by CMCS for approximately 12 years, and currently serve as the Deputy Director for the Center, a role that I've had for almost 3 years.

3. CMCS is charged with administering the Medicaid program and serves as CMS's focal point for assistance with formulation, coordination, integration, and implementation of all national program policies and operations relating to Medicaid, the Children's Health Insurance Program (CHIP), and the Basic Health Program (BHP). CMCS works in partnership with states, assists state agencies in successfully carrying out their responsibilities for effective program administration and protecting beneficiaries, and, as necessary, supports states in correcting problems and improving the quality of their operations. CMCS also identifies and proposes modifications to program measures; regulations; laws; and policies to reflect changes or trends in the health care industry, program objectives, and beneficiaries' needs.

### TERMINATION OF PLANNED PARENTHOOD DEFENDANTS BY TEXAS AND LOUISIANA MEDICAID

4. Federal law requires that each state Medicaid plan provide that Medicaid beneficiaries may obtain medical services "from any institution, agency, community, pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services."  Social Security Act § 1902(a)(23)(A) (42 U.S.C. § 1936a(a)(23)(A)). This is referred to as the "free choice of provider" requirement.

5. The statute sets forth additional, specific protection for beneficiaries of family planning services, providing that "an enrollment of an individual eligible for medical assistance in [certain managed care entities] shall not restrict the choice of the qualified person from whom the individual may receive" family planning services.  Social Security Act § 1902(a)(23)(B) (42 U.S.C. § 1936a(a)(23)(B)).

PPTHIRD00009326

6. This statutory requirement is implemented in federal regulation at 42 C.F.R. § 431.51, which requires state Medicaid plans to allow a beneficiary to obtain Medicaid services from any institution, agency, pharmacy, person, or organization that is (i) qualified to furnish services, and (ii) willing to furnish them to the particular beneficiary.  States must comply with this federal requirement notwithstanding any state law to the contrary.

7. In order to comply with the statutory free choice of provider requirement, any actions taken by a state to terminate a provider's participation as a Medicaid provider or otherwise limit the provider's ability to furnish services to beneficiaries must relate to the fitness of a provider to safely perform covered services or to properly bill for those services.

8. Accordingly, termination of a provider for reasons unrelated to the fitness of the provider to safely perform covered services or properly bill for such services is a violation of federal Medicaid law.

9. States are not permitted to terminate or exclude providers from their Medicaid programs solely on the basis of the range of medical services they provide.  Specifically, while federal law prohibits federal Medicaid funding of abortion services except in certain specified circumstances, states may not terminate or exclude qualified health care providers from furnishing covered services on the basis that they separately provide abortion services (not funded by federal Medicaid dollars) as part of their scope of practice.

10. States also are not permitted to terminate or exclude providers from their Medicaid programs on the basis of evidence relating to the conduct of affiliated entities.  Rather, in order to comply with the free choice of provider requirement, a provider termination must be based on evidence relating to the specific provider's fitness to perform or properly bill for services.

11. After learning of the actions taken by the Texas and Louisiana Medicaid programs to terminate the enrollment of the Planned Parenthood defendants, CMS wrote to those programs on August 11, 2016, advising that we were unaware of any basis for the termination of the defendants that would be consistent with the free choice of provider requirement.  We indicated that, absent further information showing that the termination reasons related to the fitness of the providers to furnish covered services or appropriately bill for them, the states might be subject to a compliance action for violation of federal law.

12. Upon review of the responses from Texas and Louisiana to our August 2016 letters, the factual findings in the district court orders granting the preliminary injunctions, the discussions of those findings in the opinions from the 5th Circuit panels and en banc court regarding those injunctions, and the factual allegations in Relator's complaint in this case, it remains our view that the terminations at issue in this case were unlawful.  In the absence of evidence that the defendants were terminated for reasons related to their ability to safely furnish covered services and properly bill for them, it remains the conclusion of CMS that those terminations violated the federal free choice of provider requirement.

PPTHIRD00009327

**PROVIDER OBLIGATION TO RETURN PAYMENTS MADE PURSUANT TO INJUNCTION**

13. Each state is responsible for overseeing Medicaid payments to its providers and ensuring the appropriateness of such payments.  As part of this responsibility, states often lead the identification and recovery of Medicaid provider overpayments.

14. When a Medicaid provider overpayment is identified or recovered, states are required to follow existing regulatory procedures for returning the applicable federal share.  Pursuant to the regulations at 42 C.F.R. Part 433, subpart F, except in limited circumstances involving bankruptcy or out of business providers, states are required to return the federal share of any identified provider overpayments regardless of whether the state has recovered such overpayments from the provider.

15. Upon information and belief, the alleged provider overpayments in this case include payments made by Texas and Louisiana to the defendants for covered services furnished to Medicaid beneficiaries during a time period in which state or federal court injunctions required the states to continue those providers' enrollment as Medicaid providers, and payments made by Texas to certain defendants during a "grace period" after the federal injunction was vacated, during which the Texas Medicaid program expressly authorized those providers to continue furnishing covered services to Medicaid beneficiaries.

16. CMS has not taken any action to recover from Texas or Louisiana the federal share of the payments made to the defendants for covered services furnished during the pendency of the injunctions and grace period.

17. I declare under penalty of perjury the foregoing is true and correct to the best of my knowledge and belief.

Anne Marie Costello

Executed this 17th day of November, in 2022 in Brooklyn, NY.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

THE UNITED STATES OF AMERICA, THE
STATE OF TEXAS, AND THE STATE OF
LOUISIANA, EX REL DOE.,
Plaintiffs,

v.

PLANNED PARENTHOOD FEDERATION
OF AMERICA, INC., ET AL.
Defendants.

CAUSE NO. 2:21-CV-022-Z

### SUPPLEMENTAL EXPERT REPORT OF DONALD E. LOCHABAY, JR.
### FOR THE STATE OF LOUISIANA



October 26, 2022

## INTRODUCTION

### Scope of Retention

1.  I have been retained by the Relator in connection with the litigation styled United States of America, et al., v. Planned Parenthood Federation of America, Inc., et al. I submitted an expert report on July 1, 2022 ("Initial Report") in which I opined on the Louisiana Medicaid program expenditures and potential unlawful acts related to Planned Parenthood services that the State is seeking to recover.  In this Supplemental Report, I am updating my expenditure and unlawful act calculations based on recently provided information allowing me to identify the program funding source associated with the previously identified claims paid to Planned Parenthood.

2.  The information and conclusions contained in my Initial Report are incorporated by reference in this Supplemental Report.  This Supplemental Report does not stand alone and should be reviewed in conjunction with my Initial Report. Revised exhibits are reflected with a "-R" suffix.

3.  The analyses upon which I have based my opinions outlined in this report have been performed by me or by individuals working under my direction and supervision.

4.  An updated Attachment B to this report includes additional testimony since my previous report submission on July 1, 2022.

### Information Considered

5.  Supplemental Attachment C provides a list of the additional documents and information considered, reviewed, and/or relied upon in preparing my report and supporting analyses. Selected pages from the documents and information considered may be used as exhibits during trial. Additionally, I may prepare

1

graphical or illustrative trial exhibits based on the documents and information considered and/or my analyses thereof.  Further, I may supplement and amend the opinions in this report in response to additional information received or to address issues raised by other witnesses.

## ANALYSIS & OPINIONS

**A. Based on my review of newly produced Louisiana Medicaid claims data, my updated calculation of Medicaid expenditures made to Planned Parenthood is $7.49 million.**

6.  In my Initial Report, I quantified the Medicaid expenditures made under both fee-for-service and managed care arrangements to Planned Parenthood. My report included both Medicaid expenditures and potential number of unlawful acts and penalties associated with Medicaid payments to Planned Parenthood for services delivered on or after October 15, 2015, which Relator alleges is the date Planned Parenthood's Medicaid termination was effective by operation of Louisiana law. The revised claims data provided to me included detail needed to refine my analysis of the Planned Parenthood services reimbursed by the Louisiana Medicaid Program.

7.  The additional fields appended to the previously produced claims data has allowed me to update my analysis to remove claims not paid entirely by the Medicaid program.[1]  This data was filtered to remove claim lines that did not result in any payment under the Medicaid program.   A detailed breakdown of the date filter and other filters applied to claims data can be found in **Exhibit 2-R**.

8.  This Supplemental Report includes a summary of managed care claims the state is seeking to recover, aggregated by procedure code in **Exhibit 3-R** and by

---

[1] Claims paid by programs not considered Medicaid (Title XIX of the Social Security Act) have been removed from the expenditures reflected in this Supplemental report.

2

National Drug Code in **Exhibit 4-R**. I have also provided an updated summary of fee-for-service claims and managed care expenditures the State is seeking to recover by month as **Exhibit 5-R**.

9. Based on the latest data and information provided to me, I have aggregated the Louisiana Medicaid program expenditures related to Planned Parenthood services that the Relator is seeking to recover on behalf of the State of Louisiana.   See summary below and **Exhibit 6-R**.[2]

| Type | # of Records | # of Claims (a) | Fee-For-Service | Managed Care Organization | Total Paid |
|---|---|---|---|---|---|
| **Fee-For-Service** | 12,233 | 6,395 | $ 501,362.61 | $         - | $   501,362.61 |
| **Managed Care Organizations** | 167,286 | 86,072 | $         - | $ 6,992,677.88 | $ 6,992,677.88 |
| **Total** | 179,519 | 92,467 | $ 501,362.61 | $ 6,992,677.88 | $ 7,494,040.49 |

**B. Based on my review of the updated Louisiana Medicaid claims data, I have updated the number of potentially unlawful acts under my various scenarios.**

10. As mentioned in my Initial Report, I understand that civil penalties can be calculated based on a variety of methodologies.  At the direction of counsel, I have calculated the number of potentially unlawful acts, for which penalties may apply.[3]  It is my understanding that Relator may not be seeking an award at the high end of my range calculated in Scenario 1.  I calculated the number of potentially unlawful acts and penalties under the following three scenarios:

   a. <u>**Scenario 1** - **Number of Paid Claims Not Reimbursed to Louisiana Medicaid by Planned Parenthood:**</u> I have been advised by Counsel that a potentially unlawful act was identified as each claim paid by Louisiana Medicaid for services provided by Planned Parenthood after October 15,

---

[2] I have been advised that Planned Parenthood is still submitting claims and receiving Medicaid funds in Louisiana under a preliminary injunction, which will continue to increase the amount of Louisiana Medicaid expenditures the Relator is seeking to recover.

[3] La. R.S. 46:438.6(C)(b)(3).

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ALEX DOE, Relator, *et al.*, | ) ) ) |
| Plaintiffs | ) ) ) |
| v. | ) ) |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., *et al.*, | ) ) ) ) |
| Defendants. | ) |

Civil Action No. 2:21-22

**NON-PARTY LOUISIANA DEPARTMENT OF HEALTH'S**
**RESPONSES AND OBJECTIONS**
**TO DEFENDANT PLANNED PARENTHOOD GULF COAST, INC.'S**
**REVISED SUBPOENA**

Pursuant to the Federal Rules of Civil Procedure, non-party State of Louisiana Department of Health ("LDH" or the "Department") hereby provides its responses and objections to the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action ("the Subpoena") issued by Defendant Planned Parenthood Gulf Coast, Inc. ("PPGC").

On September 12, 2022, PPGC propounded revised subpoena requests to LDH. Without waiving the General Objections, Objections to Specific Definitions, and Objections raised to each specific request in the original *Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of a Premises in a Civil Action* dated August 5, 2022, and incorporating the objections herein, LDH answers as follows to PPGC's revised subpoena requests:

**RESPONSES AND OBJECTIONS TO SPECIFIC REQUESTS**

**ORIGINAL REQUEST NO. 13:**

All documents and communications relating to federal court injunctions and/or the effects of

1

PPTHIRD00009218

federal court injunctions related to the potential termination of any Planned Parenthood Defendant's participation in Medicaid, Texas Medicaid, and/or Louisiana Medicaid.

**REVISED REQUEST NO. 13:**

- Any external communications by LDH about the federal court injunction related to PPGC's participation in Louisiana Medicaid.

- Documents reflecting any nonprivileged guidance LDH provided (internally or externally) about the U.S. District Court for the Middle District of Louisiana federal court injunction related to PPGC's participation in Louisiana Medicaid.

**RESPONSE TO REVISED REQUEST NO. 13:**

To the best of LDH's knowledge, information, and belief there are no documents

responsive to Revised Request No. 13.

**ORIGINAL REQUEST NO. 16**

All documents and communications related to whether any Planned Parenthood Defendant had an obligation to repay any amount paid by Medicaid, Texas Medicaid, and/or Louisiana Medicaid to any Planned Parenthood Affiliate.

**REVISED REQUEST NO. 16**

Nonprivileged documents identifying those Medicaid providers that LDH recommended for repayment or recoupment sanctions from January 1, 2015 to present, and the rationale for each, and amount recouped.

**RESPONSE TO REVISED REQUEST NO. 16:**

To the best of LDH's knowledge, information, and belief there are no documents

responsive to Revised Request No. 16.

**ORIGINAL REQUEST NO. 17:**

All documents and communications relating to whether Medicaid, Texas Medicaid, and/or Louisiana Medicaid could or should seek recoupment of amounts reimbursed to any Planned Parenthood Defendant from 2010 to the present.

**REVISED REQUEST NO. 17**

Nonprivileged documents reflecting any guidance or procedures (internal or external) about what circumstances trigger a repayment or recoupment remedy involving a Louisiana Medicaid provider.

APP.446

PPTHIRD00009219

**RESPONSE TO REVISED REQUEST NO. 17:**

Please refer to the following documents:

- Louisiana Revised Statutes 46:437.11 and 46:437.14.

- Louisiana Administrative Code 50:I.4147; 50:I.4161; 50:I.4163; 50:I.4167.

- Louisiana Medicaid Provider Manual, General Information and Administration, Chapter 1.3.

**ORIGINAL REQUEST NO. 19:**

All documents and communications related to termination by the United States, Texas, and/or Louisiana of any Medicaid, Texas Medicaid, or Louisiana Medicaid provider on basis that the entity was not a qualified provider, including but not limited to whether any terminated Medicaid provider was asked or obligated to return amounts reimbursed under Medicaid.

**REVISED REQUEST NO. 19**

- All nonprivileged documents explaining the rationale for termination of PPGC instead of some other sanction or consequence set forth in La. Admin Code Title 50, sections 4145 or 4161.

- Internal nonprivileged guidance documents addressing what sanction or consequence to impose on a provider including but not limited to when to impose a termination sanction instead of some other available sanction or consequence set forth in La. Admin Code Title 50, sections 4145 and 4161.

**RESPONSE TO REVISED REQUEST NO. 19:**

To the best of LDH's knowledge, information, and belief there are no documents responsive to Revised Request No. 19. Further answering, LDH submits that Louisiana Administrative Code 50:I.4165 controls on this issue.

**REQUEST NO. 25:**

All documents and communications relating to Louisiana Department of Health's evaluation of the Center for Medical Progress videos, including but not limited to your response(s) to those videos and any public official or other public agency's response(s) to those videos.

APP.447

PPTHIRD00009220

**REVISED REQUEST NO. 25:**

- All nonprivileged documents identifying what statements and admissions made in the Center for Medical Progress ("CMP") videos referenced on page 2 of the September 15, 2015 termination/revocation letters caused LDH to believe that PPGC's letters of July 24, 2015 and August 14, 2015 contained alleged misrepresentations.

- Any external communications by LDH related to the CMP videos referenced on page 2 of the September 15, 2015 termination/revocation letters.

**RESPONSE TO REVISED REQUEST NO. 25:**

To the best of LDH's knowledge, information, and belief there are no documents responsive to Revised Request No. 25.

Dated: September 28, 2022          Respectfully submitted:

Stanley J. Bordelon II, La. Bar No. 33022
Michelle Y. Christopher, La. Bar No. 25619
Kimberly L. Sullivan, La. Bar No. 27540
**Attorneys for the Louisiana Department of Health**
628 North Fourth Street (70821)
Post Office Box 3836
Baton Rouge, Louisiana 70821-3836
Telephone: (225) 342-4090
Facsimile: (225) 342-2232
Email: michelle.christopher@la.gov

APP.448

PPTHIRD00009221

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA,          §
Ex rel. ALEX DOE, Relator,
                                   §
THE STATE OF TEXAS,
Ex rel. ALEX DOE, Relator,         §    Civil Action No.
                                        2:21-CV-00022-Z
v.
                                   §
PLANNED PARENTHOOD
FEDERATION OF AMERICA, INC.,       §
PLANNED PARENTHOOD GULF
COAST, INC., PLANNED               §
PARENTHOOD OF GREATER
TEXAS, INC., PLANNED               §
PARENTHOOD SOUTH
TEXAS, INC., PLANNED               §
PARENTHOOD CAMERON
COUNTY, INC., PLANNED              §
PARENTHOOD SAN ANTONIO,
INC.,                              §
 Defendants.


VIDEO DEPOSITION OF
PLANNED PARENTHOOD GULF COAST
THROUGH ITS REPRESENTATIVE
ALFRED CURTIS


Arnold & Porter LLP
700 Louisiana Street
Suite 4000
Houston, Texas

December 1, 2022                              9:12 a.m.



Page 234

1    A.    No.

2    Q.    Did Planned Parenthood Gulf Coast consider any

3    of the reimbursements it received from Texas Medicaid,

4    during the pendency of the federal court injunction or

5    the state court TRO, as an overpayment?

6    A.    No.

7    Q.    Can you find Exhibit 6, please?

8    A.    I have it.

9    Q.    Okay.  And Exhibit 6 is an excerpt from the

10   Texas Medicaid provider procedures manual from January,

11   2016?

12   A.    Correct.

13   Q.    Okay.  Let me get you to the right page... okay.

14   Pardon me.  Can you please turn to the page ending in

15   Bates 18717?

16   A.    Okay.

17   Q.    Okay.  And the last paragraph on that page

18   states, "As stated in" -- a Texas code provision --

19   "the following is a non-exclusive list of grounds or

20   criteria for the inspector general's administrative

21   enforcement and/or referral for criminal, civil, or

22   licensure or certification investigation and judicial

23   action regarding program violations by any provider or

24   person."  Did I read that correctly?

25   A.    Yes.



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

```
UNITED STATES OF AMERICA,      )
ex rel. Alex Doe, Relator,     )
                               )
THE STATE OF TEXAS,            )
ex rel. Alex Doe, Relator,     )
                               )
THE STATE OF LOUISIANA,        )
ex rel. Alex Doe, Relator,     )
                               )
         Plaintiffs            )CIVIL ACTION NO. 2:21-CV-00022-Z
v.                             )
                               )
PLANNED PARENTHOOD FEDERATION  )
OF AMERICA, INC., PLANNED      )
PARENTHOOD GULF COAST, INC.,   )
PLANNED PARENTHOOD OF GREATER  )
TEXAS, INC., PLANNED           )
PARENTHOOD SOUTH TEXAS, INC.,  )
PLANNED PARENTHOOD CAMERON      )
COUNTY, INC., PLANNED          )
PARENTHOOD SAN ANTONIO, INC.,  )
                               )
         Defendants.           )
```
------------------------------------------------------------

ORAL & VIDEO DEPOSITION OF KEN LAMBRECHT

December 6, 2022
---------------------------------------------------

Oral & video deposition of KEN LAMBRECHT, produced as

a witness at the instance of the plaintiffs, and

duly sworn, was taken on the 6th day of December, 2022,

before Patrick Stephens, Certified Court Reporter, at

303 Colorado Street, Suite 2750, Austin, TX 78701.



1   Medicaid-managed care organizations or does the state actually

2   -- or TMHP actually take money out of your account?

3                  MR. ODELL:  Objection, form and scope.

4   BY THE WITNESS (resuming):

5       A    And, again, though I did significant research, I

6   didn't go into that level of detail on exactly the payment and

7   the recoupment and who precisely did that.

8       Q    Okay.  But so I guess in general, the process we've

9   been talking about, recoupment, that's something that happens

10  occasionally as part of just being in Medicaid and with

11  insurance companies.

12      A    Yes.

13      Q    Okay.

14      A    As just as a standard, if you ask any healthcare

15  administrator in any large practice.

16      Q    Okay.  Had PPGT ever prepared for the contingency of

17  Texas Medicaid seeking to recoup money that PPGT received under

18  the preliminary injunction in the Texas Medicaid litigation?

19                 MR. ODELL:  Objection, form.

20  BY THE WITNESS (resuming):

21      A    Knowing that we -- the short answer is no because we

22  were very, very careful not to bill when we didn't have the

23  legal right to do so.

24      Q    Okay.  So PPGT never thought as part of the

25  contingencies for anything that there was a possibility that



 1  the state could seek to recoup some of that money?

 2             MR. ODELL:  Same objection.

 3  BY THE WITNESS (resuming):

 4      A     Again, because we served within the dates of service

 5  that we were allowed per notices and sought legal advice along

 6  the way, the short answer is no.  We believed that what we were

 7  paid was legitimately paid.  If there's a one-off claim, that's

 8  different, but -- but, no, we believe we accurately paid [sic]

 9  for services rendered while an existing provider.

10      Q     Okay.  I understand your testimony that PPGT believed

11  that it had properly billed, but I'm asking whether PPGT knew

12  or understood that there could be a possibility that Texas

13  Medicaid may recoup or seek to recoup the money that PPGT has

14  received under the Medicaid program.

15             MR. ODELL:  Objection, scope and form.  You may

16  answer.

17  BY THE WITNESS (resuming):

18      A     There's no level to which our governor and others in

19  the state will go to to politically attack the patients served

20  by Planned Parenthood.  So the short answer to that is you

21  never know even when you're following every rule to the letter

22  of the rule.

23             MS. HACKER:  Okay.  I'm going to move to strike

24  the nonresponsive portion of that answer.

25  BY MS. HACKER (resuming):



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA,        )
ex rel. Alex Doe, Relator,       )
                                 )
THE STATE OF TEXAS,              )
ex rel. Alex Doe, Relator,       )
                                 )
THE STATE OF LOUISIANA,          )
ex rel. Alex Doe, Relator,       )
                                 )
         Plaintiffs              )CIVIL ACTION NO. 2:21-CV-00022-Z
v.                               )
                                 )
PLANNED PARENTHOOD FEDERATION    )
OF AMERICA, INC., PLANNED        )
PARENTHOOD GULF COAST, INC.,     )
PLANNED PARENTHOOD OF GREATER    )
TEXAS, INC., PLANNED             )
PARENTHOOD SOUTH TEXAS, INC.,    )
PLANNED PARENTHOOD CAMERON       )
COUNTY, INC., PLANNED            )
PARENTHOOD SAN ANTONIO, INC.,    )
                                 )
         Defendants.             )
----------------------------------------------------------

ORAL & VIDEO DEPOSITION OF POLIN BARRAZA – VOLUME II

November 18, 2022
----------------------------------------------------

        Oral & video deposition of Polin Barraza, produced as

a witness at the instance of the plaintiffs, and

duly sworn, was taken on the 18th day of November, 2022,

before Patrick Stephens, Certified Court Reporter, at

112 East Pecan Street, Suite 1010, San Antonio, TX 78205.



 1  that we -- that they've overpaid on another claim and they're

 2  recouping that claim --

 3       Q    Okay.

 4       A    -- or part of that claim.

 5       Q    Got it.  And did PPST ever receive such a notice from

 6  Texas Medicaid stating that the amounts that PPST had received

 7  during the pendency of the federal and state court injunctions

 8  were considered overpayments?

 9       A    No.

10       Q    Same question with respect to Planned Parenthood

11  San Antonio.

12       A    No.

13       Q    Same question with respect to Planned Parenthood

14  Cameron County.

15       A    No.

16       Q    Did Planned Parenthood South Texas believe that the

17  amounts of reimbursements it received from Texas Medicaid during

18  the pendency of the federal and the state court injunctions were

19  overpayments?

20       A    No.

21       Q    Same question for Planned Parenthood San Antonio.

22       A    No.

23       Q    Same question for Planned Parenthood Cameron County.

24       A    No.

25       Q    Ms. Barraza, you got a lot of questions over the last



1                    __REPORTER'S RECORD__

2         __TRIAL COURT CAUSE NO.  D-1-GN-21-000528__

3

4    IN RE:                    X IN THE DISTRICT COURT
                               X
5    PLANNED PARENTHOOD OF     X
     GREATER TEXAS FAMILY      X
6    PLANNING AND PREVENTATIVE X
     HEALTH SERVICES, INC.,    X
7    PLANNED PARENTHOOD OF     X
     GREATER TEXAS, INC.,      X TRAVIS COUNTY, TEXAS
8    PLANNED PARENTHOOD SAN    X
     ANTONIO, PLANNED PARENTHOOD X
9    CAMERON COUNTY, PLANNED   X
     PARENTHOOD SOUTH TEXAS    X
10   SURGICAL CENTER, and      X
     PLANNED PARENTHOOD GULF   X
11   COAST,                    X
                               X
12           *Relators.*       X 261ST JUDICIAL DISTRICT

13

14       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

15         **TEMPORARY INJUNCTION HEARING**

16       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

17          BE IT REMEMBERED that on the 24th day of

18   February 2021, the following proceedings came on to be

19   heard in the above-entitled and numbered cause before

20   the Honorable Lora J. Livingston, Judge presiding, held

21   in Austin, Travis County, Texas, via Zoom

22   Videoconference.

23          Proceedings reported by Stenographic Method.

24   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

25

1   hearing according to the regulation at that time.

2              Instead, they voluntarily chose to forgo

3   their right to an administrative hearing of that final

4   notice of termination and instead to pursue only their

5   federal court litigation.  And the federal court

6   litigation started happening -- well, let's see.  The

7   first TRO that was entered by the federal district court

8   was entered after the administrative deadline to request

9   a TRO hearing had already run.  So the plaintiffs could

10  have requested a State administrative proceeding and

11  they didn't.  And so all of that became final, as far as

12  State administrative law is concerned, in January 2017.

13             The State then was prohibited from

14  implementing the practical effect of that legal

15  termination by the federal court's injunction that

16  prohibited the State from moving forward with that.

17             So as the record shows, you'll see that we

18  waited until that injunction was vacated by the 5th

19  Circuit before we started putting the termination into

20  effect.  Such as sending out notices to the MCO that

21  they needed to transition the patients -- the clients to

22  new providers.  Such as cutting off the billing cycles,

23  et cetera.

24             After we started putting all of that in

25  process in December and January, the past couple of

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| **PLANNED PARENTHOOD GULF COAST, INC., ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | Civ. Action No. 3:15cv00565-JWD-SCR |
| | ) | |
| **KATHY KLIEBERT**, *Secretary, Louisiana Department of Health and Hospitals*, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## STATEMENT OF INTEREST OF THE UNITED STATES

The United States has strong interests in the proper operation of the Medicaid program—which provides health care coverage to more than seventy million low income people who otherwise would likely be unable to afford health care services—and in ensuring that the States administer their federally-subsidized Medicaid programs in a manner that is consistent with the Medicaid statute.  Pursuant to 28 U.S.C. § 517, the United States respectfully submits this Statement of Interest to advise the Court of its view that, thus far, Louisiana has not proffered sufficient reasons to terminate Planned Parenthood Gulf Coast, Inc. ("PPGC") from its Medicaid program, and that terminating PPGC from its Medicaid program without providing any justification related to PPGC's qualifications to provide medical services would violate Louisiana's obligations under the Medicaid statute's "free choice of provider" provision, 42 U.S.C. § 1396a(a)(23).[1]  The United States further advises the Court of its view that Medicaid beneficiaries may enforce their statutory right under § 1396a(a)(23) to their choice of a qualified provider through a private action under 42 U.S.C. § 1983.

Louisiana receives federal funds under the Medicaid program and is thus bound by the requirements imposed by the Medicaid Act.  The Act's free choice of provider provision, 42 U.S.C. § 1396a(a)(23), gives Medicaid beneficiaries the right to receive covered services from any qualified provider that is willing to perform the services, free of interference from the State.  Moreover, Congress singled out beneficiaries of family planning services—such as those offered by PPGC—for additional protection under § 1396a(a)(23).  Thus, "a state Medicaid plan must allow any given Medicaid [beneficiary] to seek family planning care from any and all providers, subject to only two limitations: (1) the provider is 'qualified to perform the service or

---

[1]    28 U.S.C. § 517 allows "any officer of the Department of Justice . . . to attend to the interests of the United States in a suit pending in a court of the United States."  *See Rosado v. Wyman*, 397 U.S. 397, 406-07 (1970) ("Whenever possible the district courts should obtain the views of [Department of Health and Human Services].").

APP.459

services required' and (2) the provider 'undertakes to provide [the patient] such services.'"

*Planned Parenthood Arizona Inc. v. Betlach*, 727 F.3d 960, 969 (9th Cir. 2013).  As explained below, a Medicaid beneficiary's right under the free choice of provider provision can be enforced, as here, under § 1983.

Here, terminating PPGC from its Medicaid program without providing any justification related to PPGC's qualifications to perform or bill for medical services would violate Louisiana's obligations under the Medicaid statute by denying Medicaid beneficiaries of their right to obtain medical care from the qualified providers of their choice.  Louisiana argues that the State Medical Assistance Programs Integrity Law ("MAPIL"), La. Rev. Stat. Ann. 46:437.11, authorizes it to terminate PPGC's Medicaid provider agreements with or without cause and that, once these agreements are terminated, PPGC is no longer a "qualified provider" for purposes of § 1396a(a)(23).  But States do not have unfettered discretion to determine that a provider is not "qualified" for purposes of federal Medicaid law.  Crucially, they cannot evade the statutory mandate of § 1396a(a)(23) through the simple expedient of incorporating "at-will" termination provisions into their Medicaid provider agreements.  To conclude otherwise would not only strip the Medicaid Act's free choice of provider provision of all meaning, but also would contravene clear congressional intent to give Medicaid beneficiaries the right to receive covered services from any qualified and willing provider.

Louisiana's interpretation of its obligations under § 1396a(a)(23) is inconsistent with the plain language of the statute and the overwhelming weight of authority.  Moreover, it conflicts with the considered and longstanding views of the United States Department of Health and Human Services (HHS), the agency to whom Congress explicitly delegated authority to interpret and apply the Medicaid statute.  For decades, HHS has repeatedly and consistently interpreted the "qualified"

language in § 1396a(a)(23) to prohibit a State from denying access to a provider for reasons

unrelated to the ability of that provider to perform Medicaid-covered services or to properly bill for

those services.  HHS's interpretation of § 1396a(a)(23) is entitled to *Chevron* deference.  And it is,

in any event, the only reasonable reading of the statute.  That interpretation has been affirmed by

the only two Courts of Appeals to have considered the issue in very similar contexts.

BACKGROUND

## I.      The Medicaid Program

The Medicaid program, established under Title XIX of the Social Security Act, 42 U.S.C.

§§ 1396 *et seq*., "is a cooperative federal-state program through which the Federal Government

provides financial assistance to States so that they may furnish medical care to needy

individuals."  *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990).  "The Federal Government

shares the costs of Medicaid with States that elect to participate in the program."  *Atkins v.*

*Rivera*, 477 U.S. 154, 156-57 (1986).  "In return, participating States are to comply with

requirements imposed by the Act and by the Secretary of Health and Human Services."  *Id.*

To be eligible for federal funds, a participating State must develop a "plan for medical

assistance" that demonstrates compliance with the Medicaid statute's requirements and submit it

to the Secretary of Health and Human Services for approval.  *See* 42 U.S.C. § 1396a; *Wilder*, 496

U.S. at 502.  If the Secretary approves the State plan, the federal government reimburses the

State for a percentage of qualified Medicaid expenses.  The federal contribution rate varies

depending on a State's per capita income, but federal funds pay at least 50% of the cost of

providing medical assistance to Medicaid beneficiaries.  *See* 42 U.S.C. § 1396d(b).  The federal

contribution rate may be even higher for particular services.  For family planning services (such

as contraception and associated gynecological examinations provided to women of child-bearing

3

years), the federal government pays 90% of the cost of the services, whereas a State pays only 10% of the cost. *See* 42 U.S.C. § 1396b(a)(5).

Although State participation in the Medicaid program is voluntary, "once a State elects to join the program, it must administer a state plan that meets federal requirements." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004). Among other requirements, the State plan "must" provide that beneficiaries have the freedom to receive services from the qualified and willing provider of their choice. 42 U.S.C. § 1396a(a)(23). This free choice of provider provision is broken into two parts. Under subparagraph (A), "any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services." *Id.* § 1396a(a)(23)(A); *see also* 42 C.F.R. § 431.51(b)(1). There is a narrow exception to freedom of choice that permits a State to establish "reasonable standards relating to the qualifications of providers." 42 C.F.R. § 431.51(c)(2). As explained in more detail below, HHS has long taken the position that any State-imposed qualification-related standard must be related to the ability of the providers to perform services or to properly bill for those services.

Subparagraph (B) establishes additional protections for beneficiaries of family planning services (which, as noted above, are reimbursed at an enhanced federal rate). It provides that "an enrollment of an individual eligible for medical assistance in a primary care case-management system . . . a medicaid managed care organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive" family planning services. 42 U.S.C. § 1396a(a)(23)(B) (cross-referencing § 1396d(a)(4)(C)). Thus, even in the context of managed care, where a State otherwise may place certain limits on a Medicaid beneficiary's free

4

choice of provider, a State may not limit a beneficiary's free choice of provider of family

planning services. 42 U.S.C. § 1396a(a)(23)(B); *see also* 42 U.S.C. § 1396n(b).

The statute also contains enforcement mechanisms. HHS, through the Centers for

Medicare & Medicaid Services (CMS), reviews the State's plan including any plan amendments

and determines whether the State plan complies with statutory and regulatory requirements. *See*

42 U.S.C. § 1316(a)(1), (b). If the State does not act in compliance with an approved plan, or if

an approved plan no longer complies with the requirements of the Act, the Secretary may initiate

an enforcement action. *See* 42 U.S.C. § 1396c; 42 C.F.R. § 430.35. In addition, HHS itself may

seek injunctive relief to compel compliance with provisions of the Act. *See, e.g.*, *Wyandotte*

*Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). Finally, many provisions of the

Medicaid statute, including the free choice of provider provision, are enforceable through

individual lawsuits under § 1983. *See Betlach*, 727 F.3d at 966; *Planned Parenthood of Ind.,*

*Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 968 (7th Cir. 2012); *Harris v.*

*Olszewski*, 442 F.3d 456, 461 (6th Cir. 2006); *Women's Hosp. Found. v. Townsend*, No. Civ. 07-

711-JJB-DLD, 2008 WL 2743284, at *8 (M.D. La. July 10, 2008).

## II.     Louisiana's Medicaid Program

Louisiana participates in Medicaid through an approved State plan under which it

provides family planning services and family planning-related services to eligible beneficiaries.

*See* State Plan Transmittal Number 14-13 (effective July 1, 2014) (attached as Ex. A); 42 U.S.C.

§ 1396d(a)(4)(C). One of the State Plan's "primary goals" of family planning services is "to

increase access to services" so as to "allow improved reproductive and physical health, improved

perinatal outcomes, and reduction in the number of unintended pregnancies." Ex. A. at 4.

Consistent with the free choice of provider provision, the State Plan provides that family

planning services may be delivered "through any enrolled Medicaid provider whose scope of

practice includes family planning services." *Id.*

ARGUMENT

As explained below, Louisiana has not thus far proffered sufficient reasons to terminate

PPGC's Medicaid provider agreements.  If Louisiana terminates PPGC from participation in its

Medicaid program without providing any justification related to PPGC's qualifications to

perform or bill for medical services, the State would violate the rights of Medicaid beneficiaries

to receive medical care from the qualified providers of their choice.[2]  Louisiana incorrectly

asserts that this Court lacks subject matter jurisdiction because Medicaid beneficiaries do not

have private rights of action to vindicate their § 1396a(a)(23) rights.  But as this Court and every

Court of Appeals to have considered the question has concluded, § 1396a(a)(23) creates a private

right of action enforceable through § 1983.  Louisiana further argues that it retains broad

authority to evade the requirements of § 1396a(a)(23) through operation of state contract law.

This argument is wholly without merit, as it would drain § 1396a(a)(23) of all meaning.  Finally,

HHS's long-held view that any State qualification standards must relate to providers' ability to

render services or properly bill for them is an eminently reasonable interpretation of the

Medicaid statute and is entitled to *Chevron* deference.

**I.      The Free Choice of Provider Requirement Confers Individual Rights That Medicaid Beneficiaries May Enforce in § 1983 Actions.**

As an initial matter, Louisiana is not correct that Medicaid beneficiaries lack a private

right of action to enforce their § 1396a(a)(23) rights.  Indeed, Louisiana's argument has been

squarely rejected by this Court and by every circuit to have considered the issue.  As discussed at

---

[2]      Plaintiffs' brief explains that PPGC provides a range of basic medical services to women in medically-underserved areas.  *See* Mem. at 3, 5.

APP.464

length by this Court in *Townsend*, 2008 WL 2743284, at *8, the Ninth Circuit in *Betlach*, 727

F.3d at 966, the Seventh Circuit in *Planned Parenthood of Indiana*, 699 F.3d at 968, and the

Sixth Circuit in *Harris*, 442 F.3d at 459, Congress granted Medicaid beneficiaries rights under

§ 1396a(a)(23), which are enforceable in private actions under § 1983.[3]

Section 1983 creates a federal remedy against anyone who, under color of state law,

deprives "any citizen of the United States . . . of any rights, privileges, or immunities secured by

the Constitution and laws."  42 U.S.C. § 1983.  The Supreme Court has established a three-part

test to determine whether a federal statutory provision creates a private right enforceable under

§ 1983: 1) "Congress must have intended that the provision in question benefit the plaintiff,"

2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague

and amorphous that its enforcement would strain judicial competence," and 3) "the statute must

unambiguously impose a binding obligation on the States."  *Blessing v. Freestone*, 520 U.S. 329,

340-41 (1997).  If these requirements are met, "the right is presumptively enforceable" in an

action under § 1983.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002).  A defendant may

overcome this presumption by demonstrating that Congress foreclosed private enforcement

either expressly "or impliedly, by creating a comprehensive enforcement scheme that is

incompatible with" individual private lawsuits.  *Id.* at 284 n.4.  "Gauged by this test, Medicaid's

freedom-of-choice provision creates enforceable rights that a Medicaid beneficiary may

vindicate through § 1983."  *Harris*, 442 F.3d at 461.

---

[3]      Louisiana argues that *Betlach*, 727 F.3d 960, and *Planned Parenthood of Ind.*, 699 F.3d 962, "are inapplicable" because they "addressed state statutes that excluded abortion providers as a 'class,' something Louisiana has not done."  Opp'n at 11-12.  This distinction is entirely irrelevant.  Section 1396a(a)(23) is violated whenever a beneficiary is denied her right to receive covered Medicaid services from "any" qualified provider of her choice willing to provide the services; it does not matter whether that provider was excluded from the Medicaid program on an individualized or class-wide basis.

APP.465

First, in providing "any individual eligible for medical assistance" with free choice of the provider of that assistance, § 1396a(a)(23) uses the kind of "individually focused terminology" that "unambiguously confer[s]" an "individual entitlement" under the law. *Harris*, 442 F.3d at 461 (quoting *Gonzaga*, 536 U.S. at 283); *Townsend*, 2008 WL 2743284, at *8. Second, the right of a Medicaid-eligible individual to select from among a range of qualified providers without government interference is "administrable and falls comfortably within the judiciary's core interpretive competence." *Planned Parenthood of Ind.*, 699 F.3d at 974; *see also Townsend*, 2008 WL 2743284, at *8 ("[T]he plain language of the provision is sufficiently clear to allow for judicial enforcement."). Third, the statute is "couched in mandatory, rather than precatory, terms," as it instructs that a State "must" provide this freedom of choice. *Harris*, 442 F.3d at 461; *see also Townsend*, 2008 WL 2743284, at *8. Thus, § 1396a(a)(23) satisfies the *Blessing* and *Gonzaga* tests, *Townsend*, 2008 WL 2743284, at *8, and "unambiguously gives Medicaid-eligible patients an individual right" enforceable under § 1983. *Planned Parenthood of Ind.*, 699 F.3d at 968; *see also Betlach*, 727 F.3d at 966; *Harris*, 442 F.3d at 461.

Contrary to Louisiana's contention, the Supreme Court's recent decision in *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015), does not compel a different result. Louisiana overstates both the scope of the Court's holding in *Armstrong* and its relevance in this case.

In *Armstrong*, several Medicaid providers alleged that Idaho's Medicaid payment rates violated § 30(A) of the Medicaid Act, which requires State plans to:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

APP.466

42 U.S.C. § 1396a(a)(30)(A).  The providers did not assert any claim under § 1983, but instead sought to bring their claims directly under the Supremacy Clause, or in equity.  *See Armstrong*, 135 S. Ct. at 1386 n.*.  After rejecting the providers' argument that the Supremacy Clause confers a private right of action, the Court held that the Medicaid Act implicitly precludes private enforcement of § 30(A) and that, therefore, the providers could not invoke the Court's equitable powers.  In reaching this conclusion, the Court explained that two aspects of § 30(A), taken together, indicate congressional intent to preclude equitable relief.  First, the sole remedy Congress provided for a State's failure to comply with § 30(A) is the withholding of Medicaid funds by the Secretary of HHS.  *Id.* at 1385.  This fact "might not, by itself, preclude the availability of equitable relief," the Court noted.  *Id.*  But when coupled with "the judicially unadministrable nature of § 30(A)'s text," the Court found sufficient evidence to conclude that Congress had implicitly precluded private enforcement of § 30(A).  *See id.* ("The sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy, § 1396c, shows that the Medicaid Act precludes private enforcement of § 30(A) in the courts.").

Louisiana's reliance on *Armstrong* is misplaced.  The availability of a private remedy under § 1983 is a question of congressional intent, determined by reference to the particular statutory provision at issue.  *See Suter v. Artist M.*, 503 U.S. 347, 358 n.8 (1992) (explaining that each federal statute "must be interpreted on its own terms"); *see also Blessing*, 520 U.S. at 342 (explaining that a court must "ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights").  Thus, the Court's conclusion in *Armstrong* that a Medicaid provider cannot enforce § 30(A) through an action in

9

equity has little bearing on whether a beneficiary can enforce a separate provision of the

Medicaid statute, the free choice of provider requirement, through an action under § 1983.

The free choice of provider provision differs from § 30(A) in at least two crucial respects.

First, while § 30(A) lacks the "sort of rights-creating language needed to imply a private right of

action," *Armstrong*, 135 S. Ct. at 1387, § 1396a(a)(23) "unambiguously" confers on Medicaid

patients the "right to receive care from the qualified provider of their choice." *Planned*

*Parenthood of Ind.*, 699 F.3d at 974. Specifically, § 1396a(a)(23) requires all State Medicaid

plans to provide that "*any individual* eligible for medical assistance . . . may obtain such

assistance from any institution, agency, community pharmacy, or person, qualified to perform

the service or services required." 42 U.S.C. § 1396a(a)(23) (emphasis added). "Medicaid

patients are the obvious intended beneficiaries" of this provision, which "does not simply set an

aggregate plan requirement, but instead establishes a personal right to which all Medicaid

patients are entitled." *Planned Parenthood of Ind.*, 699 F.3d at 974. *See also Betlach*, 727 F.3d

at 966 ("While express use of the term 'individuals' or 'persons' or similar terms is not essential

to finding a right for § 1983 purposes, usually such use is sufficient for that purpose."). Thus, as

this Court has held, while § 30(A) "speaks only in terms of policy and practice and is not

concerned with individuals or a particular class of individuals, . . . the Freedom of Choice

Provision speaks directly to the eligible 'individuals' under Medicaid and ensures their ability to

personally seek medical assistance." *Townsend*, 2008 WL 2743284, at *8.

Second, whereas the *Armstrong* Court found § 30(A) to be "judicially unadministrable,"

noting that "[i]t is difficult to imagine a requirement broader and less specific than § 30(A)'s

mandate," *Armstrong*, 135 S. Ct. at 1385, the free choice of provider provision, in contrast,

supplies "concrete and objective standards for enforcement," *Betlach*, 727 F.3d at 967. As

explained above, § 1396a(a)(23) provides that any individual Medicaid beneficiary is free to

choose any provider so long as the provider (1) is "qualified to perform the service or services

required," and (2) "undertakes to provide [the beneficiary] such services."  42 U.S.C.

§ 1396a(23)(A).  Thus, in contrast to § 30(A)'s "broad" and "judgment-laden standards,"

*Armstrong*, 135 S. Ct. at 1385, the free choice of provider provision supplies "objective criteria,

well within judicial competence to apply," *Betlach*, 727 F.3d at 967.[4]

      Citing *Armstrong*, Louisiana further argues that "Congress impliedly foreclosed a § 1983

action by creating a comprehensive enforcement scheme" under 42 U.S.C. § 1396c.  Opp'n at

10.  Section 1396c authorizes HHS to withhold Medicaid funds from a State whose Medicaid

plan fails to conform to the statutory criteria.  *See* 42 U.S.C. § 1396c.  But while § 1396c

represents one means of enforcing the Medicaid statute's requirements, it surely is not the only

means.  *See Wilder*, 496 U.S. at 521-22 (rejecting the contention that the Secretary's authority to

"curtail federal funds to States whose plans are not in compliance with the Act" warrants the

inference that Congress precluded any private enforcement of Medicaid Act requirements under

§ 1983).  For example, as the Supreme Court recently explained, "[t]he fact that the Federal

Government can exercise oversight of a federal spending program and even withhold or

withdraw funds . . . does not demonstrate that Congress has 'displayed an intent not to provide

the more complete and more immediate relief that would otherwise be available under *Ex parte

Young*.'"  *Va. Office for Prot. and Advocacy v. Stewart*, 131 S. Ct. 1632, 1639 (2011) (quoting

---

[4]      The Court in *Armstrong* did not address the third prong of the *Blessing/Gonzaga* test, but, as noted above,
§ 1396a(a)(23) clearly meets this requirement, as it "is plainly couched in mandatory terms," requiring that all States
"must provide" in their Medicaid plans that beneficiaries may obtain medical care from any provider qualified to
perform the service.  *See Townsend*, 2008 WL 2743284, at *8; *Planned Parenthood of Ind.*, 699 F.3d at 974.

APP.469

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002)).[5]  Indeed, the Courts

of Appeals have repeatedly concluded that many Medicaid Act requirements may be enforced

through § 1983 actions, notwithstanding HHS's administrative enforcement powers under

§ 1396c.  *See, e.g.*, *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 602-07 (5th Cir. 2004)

(concluding that § 1396a(a)(10) can be enforced under § 1983).[6]  Thus, while § 1396c may

"suggest[ ]" that Congress intended to preclude other methods of enforcing § 30(A), *Armstrong*,

135 S. Ct. at 1385, it does not demonstrate congressional intent to foreclose all other avenues of

relief for violations of other provisions in the Medicaid statute, especially where Congress has

used rights-creating language, as in § 1396a(a)(23).[7]

In short, because § 1396a(a)(23) evinces unambiguous congressional intent to create a

right of action for Medicaid beneficiaries—and the Supreme Court's holding in *Armstrong* does

not suggest otherwise—it is enforceable under § 1983.

---

[5]  The doctrine of *Ex parte Young* "normally allows federal courts to award prospective relief against state officials for violations of federal law."  *Stewart*, 131 S. Ct. at 1634.

[6]  *See also Doe v. Kidd*, 501 F.3d 348, 355-57 (4th Cir. 2007) (§ 1396a(a)(8)); *Watson v. Weeks*, 436 F.3d 1152, 1159-62 & n.8 (9th Cir. 2006) (§ 1396a(a)(10)); *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 190-93 (3d Cir. 2004) (§§ 1396a(a)(8), 1396a(a)(10), 1396d(a)(15)); *Rabin v. Wilson-Coker*, 362 F.3d 190, 201-02 (2d Cir. 2004) (§ 1396r-6); *Gean v. Hattaway*, 330 F.3d 758, 772-73 (6th Cir. 2003) (§ 1396a(a)(3)).  *See also Cruz v. Zucker*, No. 14-cv-4456 (JSR), 2015 WL 4548162, at *11 (S.D.N.Y. July 29, 2015) (§§ 1396a(a)(10)(A), 1396a(a)(10)(B), 1396a(a)(43)).

[7]  Indeed, the text of the Medicaid statute itself recognizes that many of the statute's provisions will be enforceable through a private action.  After the Supreme Court held in *Suter*, 530 U.S. at 363, that a certain provision (not otherwise relevant here) of the Social Security Act could not be enforced through a § 1983 action, Congress responded with legislation clarifying that a provision of the Act "is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan."  42 U.S.C. § 1320a-2.  Congress specified that its legislation "is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements."  *Id.*; *see also* 42 U.S.C. § 1320a-10.  The accompanying legislative history explained that "[t]he intent of the provision is to assure that individuals who have been injured by a State's failure to comply with the Federal mandates of the State plan titles of the [SSA] are able to seek redress in the federal courts to the extent they were able to prior to [*Suter*]."  H.R. CONF. REP. No. 103-761, at 926 (1994).

## II. Terminating PPGC from Louisiana's Medicaid Program Without Cause Would Violate Medicaid's Free Choice of Provider Requirement.

Through the free choice of provider provision, Congress required States to allow Medicaid beneficiaries to choose among qualified medical providers without interference from the State.  Louisiana, however, claims that under state contract law, it has essentially limitless authority to restrict beneficiaries' freedom of choice.  Specifically, Louisiana argues that MAPIL's at-will termination clause authorizes the State to terminate PPGC's participation in its Medicaid program without cause, rendering it no longer "qualified" under § 1396a(a)(23).  Louisiana's position conflicts with the plain text of § 1396a(a)(23) and would render numerous provisions of the Medicaid statute meaningless.  Moreover, it conflicts with HHS's longstanding interpretation of the free choice of provider provision, to which deference is owed.

### A. States Do Not Have Unfettered Discretion To Exclude Providers from the Medicaid Program.

Section 1396a(a)(23)(A) is meant to provide real, not illusory, protection for Medicaid beneficiaries against State interference in their choice of provider.[8]  In addition, Congress singled out family planning services—such as those provided by PPGC—for particular protection, providing that even in the managed care setting, the State "shall not restrict the choice of the qualified person from whom the individual may receive" family planning services.  42 U.S.C. § 1396a(a)(23)(B); *see also* 42 U.S.C. § 1396n(b) (providing that "[n]o waiver under [§ 1396n] may restrict the choice of the individual in receiving" family planning services).  Thus, Congress clearly intended that there be no restrictions on access by Medicaid beneficiaries to the qualified and willing family planning providers of their choice.  *See Betlach*, 727 F.3d at 969.

---

[8]   Plaintiffs' brief indicates that PPGC provides Medicaid beneficiaries with routine physical exams, contraception and contraceptive counseling, screening for breast cancer, screening and treatment for cervical cancer, testing and treatment for certain sexually transmitted infections, pregnancy testing and counseling, and certain procedures including biopsies and colposcopies.  *See* Mem. at 3.

From this sweeping mandate, Congress carefully delineated several narrow exceptions when a beneficiary might not be able to obtain services from the provider of his or her choice. For example, the statute provides that a State may deny payment to a person or entity convicted of a felony.  *See* 42 U.S.C. § 1396a(a)(23).  Or, a State may—if the Secretary allows it—limit beneficiary choice to providers that meet certain "reimbursement, quality, and utilization standards," but only so long as those standards "are consistent with access, quality, and efficient and economic provision of covered care and services" and "such restriction does not discriminate among classes of providers on grounds unrelated to their demonstrated effectiveness and efficiency in providing those services."  42 U.S.C. § 1396n(b)(4).  Or, "a State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary could exclude the individual or entity from participation" in Medicare, such as conviction for a crime related to the program or to patient neglect or abuse.  42 U.S.C. § 1396a(p)(1); 42 U.S.C. § 1320a-7.

Louisiana does not argue that its termination of PPGC's participation in its Medicaid program falls within any of these carefully constructed exceptions or that PPGC is otherwise "unqualified" in any conventional sense.  Instead, Louisiana argues that by virtue of state contract law, it has unfettered discretion to terminate PPGC's Medicaid provider agreement, with or without cause.[9]  Once PPGC's provider agreements are terminated, Louisiana reasons, PPGC is no longer a "qualified provider" for purposes of § 1396a(a)(23).  Under Louisiana's interpretation, a State could terminate a provider's agreement for reasons entirely unrelated to the ability of the provider to perform services or to properly bill for those services—or for no reason at

---

[9]      MAPIL provides that "[u]nless the provider agreement is terminated by the Secretary for cause as provided in Paragraph (2) of this Subsection, a health care provider agreement shall be effective for a stipulated period of time, shall be terminable by either party thirty days after receipt of written notice, and shall be renewable by mutual agreement."  La. Rev. Stat. Ann. 46:437.11, subsection D(1).

APP.472

all—and the federal government would be required to support that choice. That is not what Congress intended. Louisiana's rationale flatly contradicts the plain text of § 1396a(a)(23) and would effectively nullify numerous provisions of the Medicaid statute pertaining to the statutory guarantee that Medicaid beneficiaries be permitted to select the qualified provider of their choice.

> B. Louisiana's Interpretation of its Obligations under the Free Choice of Provider Provision is Unreasonable.

Louisiana's expulsion of competent Medicaid providers from its Medicaid program without cause, solely by virtue of MAPIL's terminable-at-will provision, would render beneficiaries' rights under § 1396a(a)(23) illusory and would violate federal law. As explained above, States do not have carte blanche to expel competent family planning providers from their Medicaid programs. But Louisiana argues that it is authorized to exclude PPGC from its Medicaid program, regardless of whether the exclusion furthers any other objective of the Medicaid program. Indeed, it appears that the State has yet to provide any reason at all for terminating PPGC's Medicaid provider agreement. Louisiana's interpretation of its obligations under § 1396a(a)(23) is both implausible on its face and impossible to reconcile with the cases that have interpreted the free choice of provider requirement. *See, e.g.*, *Chisholm v. Hood*, 110 F. Supp. 2d 499 (E.D. La. 2000). As the Seventh Circuit has explained, "[i]f the states are free to set any qualifications they want—no matter how unrelated to the provider's fitness to treat Medicaid patients—then the free-choice-of-provider requirement could be easily undermined by simply labeling any exclusionary rule as a 'qualification.' This would open a significant loophole for restricting patient choice, contradicting the broad access to medical care that § 1396a(a)(23) is meant to preserve." *Planned Parenthood of Ind.*, 699 F.3d at 978. Louisiana's position is particularly untenable with respect to providers of family planning services such as

PPGC because of the additional protections provided to beneficiaries of family planning services.  *See* 42 U.S.C. § 1396a(a)(23)(B).

Not only does Louisiana's interpretation of § 1396a(a)(23) eviscerate the free choice of provider guarantee, it renders the specific exceptions to this provision entirely meaningless. Louisiana's interpretation thus violates the cardinal principle of statutory interpretation "that a court should give effect, if possible, to every clause and word of a statute."  *Moskal v. United States*, 498 U.S. 103, 109 (1990).  For example, if a State had unfettered authority to exclude providers from Medicaid, Congress would not have specified that a State may exclude a provider convicted of a felony for an offense that is inconsistent with the best interests of Medicaid beneficiaries.  It is not plausible that Congress went to the effort to mandate that States provide beneficiaries with the right to select their providers (particularly and expressly in the context of family planning services), carefully defined the exceptions to this rule, but then left States essentially unlimited residual authority to curtail beneficiary choice.

Trying to avoid the absurd consequences of its interpretation, Louisiana invents a new rule—untethered to any statutory text—that the free choice of provider provision is satisfied so long as the State's restriction does not eliminate *all* choice.  *See* Opp'n at 7 ("[I]ndividual recipients are not entitled to a particular Medicaid provider.").  As Louisiana argues, the State "is indeed offering freedom of choice required by the statute" because "[t]here are 2,010 qualified providers that provide the same and additional medical services than those provided by the Plaintiff's two locations in Louisiana."  *Id.* at 9.  But Louisiana's contention that the free choice of provider requirement is satisfied if patients of PPGC can obtain family planning services from other providers "inverts what the statute says."  *Planned Parenthood of Ind.*, 699 F.3d at 979. "Section 1396a(a)(23) does not simply bar the states from ending *all* choice of providers, it

16

guarantees to every Medicaid beneficiary the right to choose *any* qualified provider." *Id.* Indeed, "[t]here is no exception to the free-choice-of-provider requirement for 'incidental' burdens on patient choice" of qualified providers. *Betlach*, 727 F.3d at 975.[10]

Nor does 42 U.S.C. § 1396a(p)(1), cited by Louisiana, change the result here. That section provides: "In addition to any other authority, a State may exclude any individual or entity [from participating in its Medicaid program] for any reason for which the Secretary could exclude the individual or entity from participation in [Medicare]." 42 U.S.C. § 1396a(p)(1). To be sure, § 1396a(p)(1) "contemplates that states have the authority to suspend or to exclude providers from state health care programs for reasons other than those upon which the Secretary of HHS has authority to act." *Guzman v. Shewry*, 552 F.3d 941, 949 (9th Cir. 2009). But § 1396a(p)(1) is not a sweeping grant of authority that allows the States to disqualify any provider from participating in Medicaid for reasons unrelated to the purposes of the Medicaid Act. Rather, as the Ninth Circuit explained, § 1396a(p)(1) is a "standard savings clause" which "signals only that what follows is a non-exclusive list" and "does not imply that the states have an unlimited authority to exclude providers for any reason whatsoever." *Betlach*, 727 F.3d at 972. Notably, the provision refers to "any *other* authority" (emphasis added), followed by a provision providing States with authority to exclude providers on specified grounds. "This sequence indicates that the Medicaid Act itself must provide that 'other' authority, just as it supplies the 'authority' covered by the rest of the subsection. Were it otherwise—were States

---

[10]     Moreover, Plaintiffs' brief notes the difficulty that many Medicaid beneficiaries face in accessing basic medical care in the areas PPGC serves. As Plaintiffs explain, in at least one of these medically-underserved areas, PPGC is the largest provider of medical services to women. *See* Mem. at 6.

free to exclude providers as they see fit—then the bulk of § 1396a(p)(1) itself would be

unnecessary, as the 'authority' it supplies would be superfluous." *Id.*[11]

       C.   <u>HHS's Interpretation of the Free Choice of Provider Provision is Entitled to
Deference.</u>

Louisiana's interpretation of its obligations under the free choice of provider provision is not

only implausible but also conflicts with the longstanding view of HHS, the agency charged by

Congress to administer the Medicaid program.  For decades—as reflected in regulations interpreting

§ 1396a(a)(23), CMS's Medicaid Manual, and its review of State Medicaid plan amendments—

HHS has consistently interpreted the "qualified" language in § 1396a(a)(23) to prohibit a State from

denying access to a provider for reasons unrelated to the ability of that provider to perform

Medicaid-covered services or to properly bill for those services.  This longstanding interpretation is

entitled to deference under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).

Under its broad statutory authority to promulgate regulations regarding Medicaid, 42

U.S.C. § 1302(a), HHS issued a regulation explaining that States may "[s]et[] reasonable

standards relating to the qualifications of providers."  42 C.F.R. § 431.51(c)(2); *see also* CMS,

State Medicaid Manual § 2100 (attached as Ex. B) (States may "impos[e] reasonable and

objective qualification standards" for providers).  In specific contexts where CMS has applied

the freedom of choice provision, CMS has long made clear that "reasonable and objective"

qualifications must be related to the ability of health care providers to provide those services, or

---

[11]      The cases that Louisiana cites provide no support for its position.  "In *First Medical Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46 (1st Cir. 2007), for instance, the First Circuit simply recognized the point we have just made—that states may exclude providers from participating in Medicaid for reasons not listed in § 1396a(p)(1)."  *Planned Parenthood of Ind.*, 699 F.3d at 979.  "*Vega-Ramos*, moreover, involved a conflict-of-interest rule applicable only in Puerto Rico; the First Circuit had no reason to consider the effect of the free-choice-of-provider requirement, which does not apply to Puerto Rico's Medicaid program."  *Id.* (citing 42 U.S.C. § 1396a(a)(23)(B)).  Additionally, *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980) rejected a due process claim, but in construing the statute, the Court acknowledged that § 1396a(a)(23) "gives recipients the right to choose among a range of qualified providers, without government interference," and "[by] implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified."  *Id.* at 785.

appropriately bill for them. Consistent with this understanding of the freedom of choice

provision, HHS has not hesitated to disapprove State plan amendments that impose restrictions

on providers unrelated to their fitness to provide or properly bill for Medicaid services.[12]

Louisiana's interpretation of the freedom of choice provision—that a State may exclude

any provider for any reason or no reason at all based on a terminable at will provision in state

law—is not even a plausible reading of the statute, and is certainly not compelled by the text of

the provision. Moreover, it undermines the provision's intent. Therefore, unless the Secretary's

interpretation is impermissible or unreasonable, this Court must defer to the Secretary's

interpretation. *See Hood*, 391 F.3d at 598 (holding that CMS interpretation of relevant statutory

provisions, as embodied in its approval of State Medicaid plans, is entitled to *Chevron*

deference).[13] HHS's longstanding interpretation—that the statutory language "qualified to

---

[12]      It has long been HHS policy, in the context of targeted case management services (a type of medical assistance covered under Medicaid), that States may set only those qualifications upon providers that are "reasonably related to the case management functions that a provider is expected to perform [and that] reasonable provider qualifications are necessary to assure that case managers are capable of rendering services of acceptable quality." State Medicaid Manual § 4302.2; *see also* 42 Fed. Reg. 64345 (Nov. 16, 1977) (citing the freedom of choice clause, and adopting regulation forbidding States from refusing to reimburse Indian health care providers, stating "HEW does not find it to be proper and efficient admin[istration] to arbitrarily refuse to enter into provider agreements with a class of provider, or with a provider or providers that are owned by a specific governmental entity, private entity or otherwise"). In the family planning context, in 2012 HHS disapproved an Indiana State plan amendment that would have prohibited the State Medicaid agency from entering into a contract or grant with providers that perform abortions or operate facilities where abortions are performed, except for hospitals or ambulatory surgical centers. CMS, Decision of the Administrator Disapproving the Indiana State Plan Amendment 11-011 (2012).

[13]      As the D.C. Circuit has explained, Congress explicitly granted the Secretary authority to review and approve State Medicaid plans for medical assistance. *See Pharm. Research & Mfrs. of Am. v. Thompson*, 362 F.3d 817, 822 (D.C. Cir. 2004). "In carrying out this duty, the Secretary is charged with ensuring that each state plan complies with a vast network of specific statutory requirements." *Id.* "Through this 'express delegation of specific interpretive authority,' . . . the Congress manifested its intent that the Secretary's determinations, based on interpretation of the relevant statutory provisions, should have the force of law." *Id.* (quoting *United States v. Mead*, 533 U.S. 218, 229 (2001)). "The Secretary's interpretations of the Medicaid Act are therefore entitled to *Chevron* deference." *Id. See also Pharm. Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644, 680 (2003) (granting *Chevron* deference to Secretary's determination of whether State Medicaid program is consistent with Medicaid's objectives); *Hood*, 391 F.3d at 598 (citing *Thompson*). Moreover, even HHS's "relatively informal CMS interpretations of the Medicaid Act, such as the State Medicaid Manual" are "entitled to respectful consideration in light of the agency's significant expertise, the technical complexity of the Medicaid program, and the exceptionally broad authority conferred upon the Secretary under the Act." *Id.* at 590 n.6. In any event, for the reasons discussed above, the Medicaid statute unambiguously forecloses Louisiana's position, and there is thus no need for the Court to address

provide the service" means competent to provide the service and bill for it—is eminently

reasonable.  It is supported by the common meaning of "qualified," as meaning "fitted (as by

training or experience) for a given purpose."  Merriam-Webster's Dictionary 1077 (11th Ed.

2003).  Moreover, the agency's interpretation recognizes the role for States to set reasonable

restrictions related to a providers' ability to provide competent and skilled services, while

declining to read the free choice of provider provision out of the statute altogether, as Louisiana

desires.  HHS's interpretation of the freedom of choice provision under authority delegated to it

by Congress is therefore entitled to deference.

CONCLUSION

The United States has substantial interests in assuring that the States administer their

federally-subsidized Medicaid programs in a manner that is consistent with federal law.  In

accordance with the principles set forth herein, the Government respectfully submits that

application of the appropriate principles of law in this matter supports the conclusions that

Medicaid beneficiaries may enforce the requirements of the Medicaid statute's free choice of

provider requirement, 42 U.S.C. § 1396a(a)(23), through an action under § 1983, and that

terminating PPGC from its Medicaid program without providing any justification related to

PPGC's qualifications to perform medical services would violate Louisiana's obligations under

§ 1396a(a)(23).

Respectfully submitted this 31st day of August, 2015,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

---

CMS's interpretation of the free choice of provider requirement.  *See Planned Parenthood of Ind.*, 699 F.3d at 980
("*Chevron* deference is triggered only when a statute is ambiguous").

20

APP.478

SHEILA M. LIEBER
Deputy Director, Federal Programs Branch

JOEL MCELVAIN
Assistant Director, Federal Programs Branch

*/s/ Megan A. Crowley*
MEGAN A. CROWLEY
(N.Y. Bar No. 4930376)
Trial Attorney
United States Department of Justice
Civil Division − Federal Programs Branch
20 Massachusetts Avenue NW
Washington, D.C. 20001
Email: megan.a.crowley@usdoj.gov
Telephone: (202) 305-0754
Fax: (202) 616-8470

*Attorneys for the United States*

21

**CERTIFICATE OF SERVICE**

I certify that on August 31, 2015, a copy of the foregoing Statement of Interest was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all parties/counsel of record by operation of the court's electronic filing system.

_/s/ Megan A. Crowley_
MEGAN A. CROWLEY

APP.480

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

|  |  |  |
|---|---|---|
| United States of America<br>*ex rel.* ALEX DOE, Relator, | § § § § § § § | CIVIL ACTION NO.<br>2:21-CV-00022-Z |
| The State of Texas<br>*ex rel.* ALEX DOE, Relator, | § § § § | |
| The State of Louisiana<br>*ex rel.* ALEX DOE, Relator,<br>        Plaintiffs, | § § § § | |
| v. | § § | |
| Planned Parenthood Federation of America, Inc.,<br>Planned Parenthood Gulf Coast, Inc., Planned<br>Parenthood of Greater Texas, Inc., Planned<br>Parenthood South Texas, Inc., Planned Parenthood<br>Cameron County, Inc., Planned Parenthood San<br>Antonio, Inc., | § § § § § § § § | |
|         Defendants. | § § | |

## DECLARATION OF MELANEY LINTON

I, Melaney Linton, declare and state as follows:

1.     I am currently the President and Chief Executive Officer of Planned Parenthood
Gulf Coast, Inc. ("PPGC").  I have held this position since 2012.  From 2007 to
2012, I was Chief Operating Officer of PPGC.  I am over the age of 18 and have
personal knowledge of the matters herein.  If called upon to testify, I could and
would testify thereto.

2.     I make this declaration in support of Defendants' Motions for Summary Judgment.

PPGC Overview

3.      PPGC is a Texas not-for-profit corporation, headquartered in Houston, Texas. From 2010 to March 2021 (except for a brief pause in late 2020/early 2021), PPGC operated health centers in Southeast Texas and the Houston metropolitan area that provided services through the Texas Medicaid program.

4.      From 2010 to the present, PPGC has operated health centers in Louisiana that provided services through the Louisiana Medicaid program.

5.      PPGC has its own bylaws, articles of incorporation, board of directors, employees, management structure, and tax filings, bank accounts, phone numbers, business addresses, facilities, and operations.  It also has its own national provider numbers and Texas provider numbers (when PPGC was enrolled in Texas Medicaid).  It does not share any of these with Planned Parenthood of Greater Texas, Inc. ("PPGT"), or Planned Parenthood South Texas, Inc., or with PPST's subsidiaries Planned Parenthood San Antonio, Inc. ("PPSA") or Planned Parenthood Cameron County ("PPCC") (collectively referred to as "PPST").

6.      As the CEO of PPGC and *ex oficio* member of the Board of the Planned Parenthood Federation of America, Inc. ("PPFA"), I am familiar with PPGC's relationship with PPFA.  While PPGC is an affiliate member of PPFA, PPFA does not control or direct the business operations of PPGC, nor did PPFA cause the submission of PPGC's claims for reimbursement under Texas Medicaid nor does it cause the submission of PPGC's claims for reimbursement under Louisiana Medicaid.  PPGC itself controls and directs its business operations, and is responsible for its submission of claims for reimbursement under Texas and Louisiana Medicaid.

2

PPGC is not a subsidiary or franchisee of PPFA, and PPGC has its own management, board, and finances.

7.   PPFA does not pay the salary of any PPGC employee.  Employees of PPGC do not report to PPFA.  PPFA does not direct PPGC to submit Medicaid claims or participate in PPGC's submission of Medicaid claims.

<u>PPGC's Participation in the Texas and Louisiana Medicaid Programs</u>

8.   PPGC billed for and received reimbursement for healthcare services provided under Texas Medicaid from 2010 to on or about March 10, 2021, except for a brief pause in late 2020/early 2021.  I am not aware of PPGC ever seeking or receiving reimbursement from Texas Medicaid for any abortion services in this time period.

9.   PPGC billed for and received reimbursement for healthcare services under Louisiana Medicaid from 2010 to the present.  PPGC never performed abortion services in Louisiana.

<u>PPGC Had No Reason to Think It Would be Required to Repay Amounts it Received under Texas or Louisiana Medicaid During the Pendency of the Injunctions or TROs</u>

10.   Although the federal injunction in *Planned Parenthood Gulf Coast, Inc., v. Kleibert*, No. 3:15-cv-565 (M.D. La.) ("federal Louisiana injunction"), was lifted on November 10, 2022, PPGC remains a provider in good standing in the Louisiana Medicaid program.  PPGC received remittances from Louisiana MCOs for Medicaid services as recently as December 2022.

11.   Louisiana has not requested or sought recoupment or recovery from PPGC of amounts PPGC received from Louisiana Medicaid for services provided during the pendency of the federal Louisiana injunction.  Louisiana did not impose on PPGC

3

an arrangement to repay amounts PPGC had received from Louisiana Medicaid for services provided during the pendency of the federal Louisiana injunction.

12.   Louisiana did not seek a temporary restraining order or injunction to prevent PPGC from transferring property or to protect the business during the pendency of the Louisiana injunction.   Louisiana did not require PPGC to post a bond or other security to cover amounts PPGC received from Louisiana Medicaid for services provided during the pendency of the Louisiana injunction.

13.   Texas did not require PPGC to file with HHSC-OIG a surety bond to cover amounts PPGC received from Texas Medicaid for services provided during the pendency of the Texas injunctions and temporary restraining orders.   Nor did Texas obtain an injunction to prevent PPGC from using any money that PPGC received from Texas Medicaid for services provided during the pendency of the Texas injunctions and temporary restraining orders.

14.   PPGC understands that an overpayment is an amount that PPGC received from Medicaid to which PPGC was not entitled.   Other than ordinary course of business requests for recoupment, neither Texas nor Louisiana has ever identified any overpayment that they expected PPGC to repay for amounts PPGC received from Texas or Louisiana Medicaid for healthcare services provided during the pendency of the injunctions and TROs.

15.   After Texas and Louisiana initiated efforts to terminate PPGC's Medicaid enrollment in 2015, PPGC became aware that the Obama Administration had warned state officials that actions to end Medicaid funding of Planned Parenthood affiliates may violate federal law and that CMS would be sending letters to all states

4

reminding them of their obligation to follow the "free choice of provider" requirement under federal law that all Medicaid beneficiaries have the right to receive covered family planning services from any qualified and willing provider of their choice.  *See, e.g.,* App. 212-13 The Washington Post, Obama Officials Warn States About Cutting Medicaid Funds to Planned Parenthood (Apr. 19, 2016). PPGC was also aware that the Department of Justice filed a Statement of Interest in the Louisiana district court and an Amicus Brief in the Fifth Circuit generally supporting PPGC's position that its potential termination from Louisiana Medicaid violated the federal free choice of provider requirement.  App. 458-80, Statement of Interest of U.S., *Planned Parenthood Gulf Coast, Inc., v. Kleibert*, No. 3:15-cv-565 (M.D. La.) [Dkt. 24-1]; App. 183-205, U.S. Amicus Br., *Planned Parenthood Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. Feb. 17, 2016), Dkt. 513384431.

16. PPGC never considered the amounts it received from Texas or Louisiana Medicaid for healthcare services provided during the pendency of the injunctions and TROs to be "overpayments," that is, amounts that PPGC received to which it was not entitled.  To the contrary, PPGC provided legitimate healthcare services to patients enrolled in Texas and Louisiana Medicaid and was reimbursed for those services. After Texas and Louisiana sought to terminate PPGC's participation in their respective State Medicaid programs, injunctions and TROs were put in place that permitted PPGC to provide and be reimbursed for these services.  PPGC never even considered until the Complaints in this lawsuit were made public that anyone might claim that PPGC was obligated to repay amounts it received from Texas or Louisiana Medicaid for healthcare services provided during the pendency of the

5

injunctions and TROs and that failure to do so (despite that neither Texas nor Louisiana asked for the money back) somehow constituted Medicaid fraud.

17.     Indeed, Louisiana Medicaid has permitted PPGC to remain in the program even now that the federal Louisiana injunction has been vacated.  And PPGC received a remittance from Texas Medicaid in Fall 2021 for services provided in July 2020. Sealed App. 20-21, TMHP eRemittance (Aug. 27, 2021) (TMHP August 2021 remittance to PPGC for services provided in July 2020).

6

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 5, 2023 in Houston, Texas.

Melaney Linton

APP.487

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| United States of America<br>*ex rel.* ALEX DOE, Relator,<br><br>The State of Texas<br>*ex rel.* ALEX DOE, Relator,<br><br>The State of Louisiana<br>*ex rel.* ALEX DOE, Relator,<br><br>    Plaintiffs,<br><br>v.<br><br>Planned Parenthood Federation of America,<br>Inc., Planned Parenthood Gulf Coast, Inc.,<br>Planned Parenthood of Greater Texas, Inc.,<br>Planned Parenthood South Texas, Inc.,<br>Planned Parenthood Cameron County, Inc.,<br>Planned Parenthood San Antonio, Inc.,<br><br>    Defendants. | § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 2:21-CV-00022-Z |

**<u>DECLARATION OF POLIN BARRAZA</u>**

I, Polin Barraza, declare and state as follows:

1. I am currently employed by Planned Parenthood South Texas, Inc. ("PPST") as Senior Vice President and Chief Operating Officer. I have been the Chief Operating Officer since 2013. From 2010 to 2012, I was Senior Vice President-Healthcare & Compliance. I also currently volunteer at PPST subsidiaries Planned Parenthood San Antonio, Inc. ("PPSA") as President and Board Chair, a position I have held since 2019, and at Planned Parenthood Cameron County, Inc. ("PPCC") as President, a position I have served in since 2020. For ease of reference, I refer to PPST, PPSA, and PPCC collectively as "PPST" in this declaration. I am over the age of 18 and have personal knowledge of the matters herein or

have acquired such knowledge by personally examining business records kept in the ordinary course of PPST's, PPSA's, and PPCC's business.  If called upon to testify, I could and would testify thereto.

2. I make this declaration in support of Defendants' Motions for Summary Judgment.

PPST Overview

3. PPST is a Texas not-for-profit corporation, headquartered in San Antonio, Texas.  From 2010 to March 2021 (except for a brief pause in late 2020/early 2021), PPST operated health centers in the San Antonio area that provided services through the Texas Medicaid program.

4. PPST has its own bylaws, articles of incorporation, board of directors, employees, management structure, and tax filings, bank accounts, phone numbers, business addresses, facilities, and operations.  It also has its own national provider numbers and Texas provider numbers (when PPST was enrolled in Texas Medicaid).  It does not share any of these with Planned Parenthood of Greater Texas, Inc. ("PPGT"), or Planned Parenthood Gulf Coast ("PPGC").

5. PPST does not, and has not ever, engaged in fetal or placental tissue donation or procurement for research.  PPST officials do not appear on the April 2015 video at a PPGC facility that is referenced in the Texas HHSC-OIG October 2015 and December 2016 notices of termination that were issued to PPST.  Before that video was made public in 2015, PPST was not aware that PPGC had facilitated the donation of tissue for research purposes or had discussed doing so in the future.

6. As the Senior Vice President and Chief Operating Officer of PPST, I am familiar with PPST's relationship with PPFA.  While PPST is an affiliate member of PPFA, PPFA does

2

not control or direct the business operations of PPST, nor did PPFA cause the submission of PPST's claims for reimbursement under Texas Medicaid.  PPST itself controls and directs its business operations, and is responsible for its submission of claims for reimbursement under Texas Medicaid.  PPST is not a subsidiary or franchisee of PPFA, and PPST has its own management, board, and finances.

7.  PPFA does not pay the salary of any PPST employee.  Employees of PPST do not report to PPFA.  PPFA does not direct PPST to submit Medicaid claims or participate in PPST's submission of Medicaid claims.

PPST's Participation in Texas Medicaid

8.  PPST billed for and received reimbursement for healthcare services provided under Texas Medicaid from 2010 to on or about March 10, 2021, except for a brief pause in late 2020/early 2021.  I am not aware of PPST ever seeking reimbursement from Texas Medicaid for any abortion services in this time period.

PPST Had No Reason to Think It Would be Required to Repay Amounts it Received under Texas Medicaid During the Pendency of the Injunction or TRO

9.  Texas did not require PPST to file with HHSC-OIG a surety bond to cover amounts PPST received from Texas Medicaid for services provided during the pendency of the Texas injunctions and temporary restraining orders.  Nor did Texas obtain an injunction to prevent PPST from using any money that PPST received from Texas Medicaid for services provided during the pendency of the Texas injunctions and temporary restraining orders.

10. PPST understands that an overpayment is an amount that PPST received from Medicaid to which PPST was not entitled.  Other than ordinary course of business requests for recoupment, Texas never identified any overpayment that it expected PPST to repay for

3

amounts PPST received from Texas Medicaid for healthcare services provided during the pendency of the injunctions and TROs.

11. After Texas initiated efforts to terminate PPST's Medicaid enrollment in 2015, PPST became aware that the Obama Administration had warned state officials that actions to end Medicaid funding of Planned Parenthood affiliates may violate federal law and that CMS would be sending letters to all states reminding them of their obligation to follow the "free choice of provider" requirement under federal law that all Medicaid beneficiaries have the right to receive covered family planning services from any qualified and willing provider of their choice. *See, e.g.*, App. 212-13, The Washington Post, Obama Officials Warn States About Cutting Medicaid Funds to Planned Parenthood (Apr. 19, 2016). PPST was also aware that the Department of Justice filed a Statement of Interest in the Louisiana district court and an Amicus Brief in the Fifth Circuit generally supporting PPGC's position that its potential termination from Louisiana Medicaid violated the federal free choice of provider requirement. App.458-80 Statement of Interest of U.S., *Planned Parenthood Gulf Coast, Inc., v. Kleibert*, No. 3:15-cv-565 (M.D. La.) [Dkt. 24-1]; App.183-205, U.S. Amicus Br., *Planned Parenthood Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. Feb. 17, 2016), Dkt. 513384431.

12. PPST never considered the amounts it received from Texas Medicaid for healthcare services provided during the pendency of the injunctions and TROs to be "overpayments," that is, amounts that PPST received to which it was not entitled. To the contrary, PPST provided legitimate healthcare services to patients enrolled in Texas Medicaid and was reimbursed for those services. After Texas sought to terminate PPST's participation in Texas Medicaid, injunctions and TROs were put in place that permitted PPST to provide

4

and be reimbursed for these services.  PPST never even considered until the Complaints in this lawsuit were made public that anyone might claim that PPST was obligated to repay amounts it received from Texas Medicaid for healthcare services provided during the pendency of the injunctions and TROs and that failure to do so (despite that Texas did not ask for the money back) somehow constituted Medicaid fraud.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 5, 2022 in San Antonio, Texas.

_____
Polin Barraza

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| United States of America<br>*ex rel.* ALEX DOE, Relator,<br><br>The State of Texas<br>*ex rel.* ALEX DOE, Relator,<br><br>The State of Louisiana<br>*ex rel.* ALEX DOE, Relator,<br><br>　　　Plaintiffs,<br><br>v.<br><br>Planned Parenthood Federation of America,<br>Inc., Planned Parenthood Gulf Coast, Inc.,<br>Planned Parenthood of Greater Texas, Inc.,<br>Planned Parenthood South Texas, Inc.,<br>Planned Parenthood Cameron County, Inc.,<br>Planned Parenthood San Antonio, Inc.,<br><br>　　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 2:21-CV-00022-Z |

## DECLARATION OF KEN LAMBRECHT

I, Ken Lambrecht, declare and state as follows:

1. I am the President and Chief Executive Officer ("CEO") of Planned Parenthood of Greater Texas, Inc. ("PPGT"). I have served in this position for PPGT since its formation in 2012. I am over the age of 18 and have personal knowledge of the matters herein or have acquired such knowledge by personally examining business records kept in the ordinary course of PPGT's business. If called upon to testify, I could and would testify thereto.

2. I make this declaration in support of Defendants' Motions for Summary Judgment.

PPGT Overview

3.  PPGT is a Texas not-for-profit corporation, headquartered in Dallas, Texas.  PPGT and its predecessor organizations have provided Medicaid care in Texas for decades. From 2012 to 2018, we provided family planning services and other preventive care to Medicaid beneficiaries at health centers in Central, East, and North, Texas.  Starting in 2018, through March 2021 (except for a brief pause in late 2020/early 2021), we provided family planning services and other preventive care to Medicaid beneficiaries at health centers in those regions, as well as West Texas.

4.  PPGT has its own bylaws, articles of incorporation, board of directors, employees, management structure, tax filings, bank accounts, phone numbers, business addresses, facilities, and operations.  It also has its own national provider numbers and Texas provider numbers (when PPGT was enrolled in Texas Medicaid).  It does not share any of these with Planned Parenthood of Gulf Coast, Inc. ("PPGC"), Planned Parenthood South Texas, Inc. ("PPST"), or with PPST's subsidiaries Planned Parenthood San Antonio, Inc. ("PPSA") or Planned Parenthood Cameron County ("PPCC") (collectively referred to as "PPST").

5.  PPGT does not, and has not ever, engaged in fetal or placental tissue donation or procurement for research.  PPGT officials do not appear on the April 2015 video at a PPGC facility that is referenced in the Texas HHSC-OIG October 2015 and December 2016 notices of termination that were issued to PPGT.  Before that video was made public in 2015, PPGT was not aware that PPGC had facilitated the donation of tissue for research purposes or had discussed doing so in the future.

6.  As the CEO of PPGT, I am familiar with PPGT's relationship with PPFA.  While PPGT is an affiliate of PPFA, PPFA does not control or direct the business operations of PPGT, nor

2

did PPFA cause the submission of PPGT's claims for reimbursement under Texas Medicaid.  PPGT itself controls and directs its business operations, and is responsible for its submission of claims for reimbursement under Texas Medicaid.  PPGT is not a subsidiary or franchisee of PPFA, and PPGT has its own management, board, and finances.

7. PPFA does not pay the salary of any PPGT employee.  Employees of PPGT do not report to PPFA.  PPFA does not direct PPGT to submit Medicaid claims or participate in PPGT's submission of Medicaid claims.

<u>PPGT's Participation in the Texas Medicaid Program</u>

8. PPGT billed for and received reimbursement for healthcare services provided under Texas Medicaid from 2012 to on or about March 10, 2021, except for a brief pause in late 2020/early 2021.  I am not aware of PPGT ever seeking reimbursement from Texas Medicaid for any abortion services in this time period.

<u>PPGT Had No Reason to Think It Would be Required to Repay Amounts it Received under Texas Medicaid During the Pendency of the Injunctions or TROs</u>

9. Texas did not require PPGT to file with HHSC-OIG a surety bond to cover amounts PPGT received from Texas Medicaid for services provided during the pendency of the Texas injunctions and temporary restraining orders.  Nor did Texas obtain an injunction to prevent PPGT from using any money that PPGT received from Texas Medicaid for services provided during the pendency of the Texas injunctions and temporary restraining orders.

10. PPGT understands that an overpayment is an amount that PPGT received from Medicaid to which PPGT was not entitled.  Other than ordinary course of business requests for recoupment, Texas never identified any overpayment that it expected PPGT to repay for amounts PPGT received from Texas Medicaid for healthcare services provided during the pendency of the injunctions and TROs.

3

11. After Texas initiated efforts to terminate PPGT 's Medicaid enrollment in 2015, PPGT became aware that the Obama Administration had warned state officials that actions to end Medicaid funding of Planned Parenthood affiliates may violate federal law and that CMS would be sending letters to all states reminding them of their obligation to follow the "free choice of provider" requirement under federal law that all Medicaid beneficiaries have the right to receive covered family planning services from any qualified and willing provider of their choice. *See, e.g.*, App. 212-13 The Washington Post, Obama Officials Warn States About Cutting Medicaid Funds to Planned Parenthood (Apr. 19, 2016). PPGT was also aware that the Department of Justice filed a Statement of Interest in the Louisiana district court and an Amicus Brief in the Fifth Circuit generally supporting PPGC's position that its potential termination from Louisiana Medicaid violated the federal free choice of provider requirement. App. 458-80 Statement of Interest of U.S., *Planned Parenthood Gulf Coast, Inc., v. Kleibert*, No. 3:15-cv-565 (M.D. La.) [Dkt. 24-1]; App. 183-205, U.S. Amicus Br., *Planned Parenthood Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. Feb. 17, 2016), Dkt. 513384431.

12. PPGT never considered the amounts it received from Texas Medicaid for healthcare services provided during the pendency of the injunctions and TROs to be "overpayments," that is, amounts that PPGT received to which it was not entitled. To the contrary, PPGT provided legitimate healthcare services to patients enrolled in Texas Medicaid and was reimbursed for those services. After Texas sought to terminate PPGT's participation in Texas Medicaid, injunctions and TROs were put in place that permitted PPGT to provide and be reimbursed for these services. PPGT never even considered until the Complaints in this lawsuit were made public that anyone might claim that PPGT was obligated to repay

4

amounts it received from Texas Medicaid for healthcare services provided during the pendency of the injunctions and TROs and that failure to do so (despite that Texas did not ask for the money back) somehow constituted Medicaid fraud.

13. Indeed, PPGT received a remittance from Texas Medicaid in Fall 2022 for services provided in May 2020.  Sealed App. 25-26, Email from Tina Lieser, VP of Healthcare Operations, RevTell Revenue Cycle Intelligence to Sheila McKinney, PPGT (Dec. 7, 2022)(transmitting TMHP remittance to PPGT's contractor in November 2022  for  services provided in May 2020).

5

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 5, 2023 in Austin, Texas.

Ken Lambrecht

6

**Planned Parenthood®**
Planned Parenthood South Texas

**Planned Parenthood®**
Care. No matter what.
Planned Parenthood of Greater Texas

**Planned Parenthood®**
Care. No matter what.
Planned Parenthood Gulf Coast

December 14, 2020

Executive Commissioner Cecile Young
Texas Health and Human Services Commission
4900 N. Lamar Boulevard
Austin, TX 78751
P.O. Box 13247

Dear Executive Commissioner Young:

We write in light of the COVID-19 public health crisis facing Texas, to ask the Texas Health and Human Services Commission ("HHSC") to allow Planned Parenthood of Greater Texas, Planned Parenthood South Texas, and Planned Parenthood Gulf Coast (collectively, "Planned Parenthood providers") to continue serving Texans insured through the Medicaid program. At minimum, it is imperative that HHSC permit a brief grace period so that Planned Parenthood providers can provide continuity of care throughout the holiday season and the current crisis point of the pandemic.

### The Shortage of Texas Medicaid Providers in the Current Public Health Crisis and Planned Parenthood's Essential Role

As HHSC is well aware, Texas is one of the hardest-hit states in the worst public health crisis to face this country since the flu pandemic of 1918–19. More than 1.2 million Texans have been infected with COVID-19, and more than 23,000 have died from it.[1] As Governor Abbott has repeatedly recognized, including as recently as December 6, 2020, COVID-19 "poses an imminent threat of disaster for all counties in the State of Texas."[2] Indeed, on December 10, 2020, 12,211 new coronavirus cases were reported in Texas—a figure exceeding July's record high.[3] Hospitalization rates are currently highest in Northern and Western Texas, where many rural hospitals are "overwhelmed" and have "reported difficulty transferring patients to bigger, better-

---

[1] *COVID Data Tracker*, CDC, https://covid.cdc.gov/covid-data-tracker/ (last visited Dec. 11, 2020).

[2] Tex. Proclamation (Dec. 6, 2020), https://gov.texas.gov/uploads/files/press/DISASTER_renewing_covid19_disaster_proclamation_IMAGE_12-06-2020.pdf; *see also* Tex. Exec. Order GA 28 (June 26, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-28_targeted_response_to_reopening_COVID-19.pdf.

[3] Tex. Trib. Staff, *Coronavirus in Texas*, Tex. Trib. (Dec. 11, 2020), https://archive.org/details/httpsapps.texastribune.orgfeatures2020texas-coronavirus-cases-map.

PPGC00007438

equipped facilities in larger cities."[4] The virus has had a disproportionate toll on Black and Latinx Texans, who have died at rates higher than their share of the state's population.[5]

For decades, Planned Parenthood providers have been an essential part of the public health safety net in Texas, providing high-quality and accessible preventative health care to Texans insured through the Medicaid program. Since January 2017, when the Medicaid termination was first scheduled to go into effect, Texas's Planned Parenthood providers have provided more than 51,000 health care visits to approximately 24,000 Medicaid patients. Indeed, in those four years, Planned Parenthood's 30 health centers across the state have provided over 44,000 tests for sexually transmitted infections (including HIV screenings), more than 2,100 cancer screenings, more than 52,000 units of contraception (including hormonal birth control and long-acting reversible contraception), and more than 4,400 annual well visits to Medicaid-insured Texans, without any claim of wrongdoing by HHSC.

Texas has some of the most stringent Medicaid requirements in the country: to be eligible, a patient must not only have a low income, but also have dependent children or a disability that keeps them from working.[6] And the income restrictions are strict; for example, to qualify for Medicaid a single woman with a dependent child must have a monthly income of under $196, well below the federal poverty guideline.[7] Texas Medicaid patients are therefore an especially vulnerable population, who already face severe obstacles in accessing health care.

Moreover, it is well-documented that people of color in the United States are disproportionately unable to access quality health care due to the intersections of racism, sexism, classism, xenophobia, and other systemic barriers, making them more likely to rely on Medicaid.[8] Policies

---

[4] Shawn Mulcahy, *"We Are in a Very Dangerous Place": White House COVID-19 Task Force Pleads with Texas Health Officials to Warn the Public*, Tex. Trib. (Dec. 3, 2020), https://www.texastribune.org/2020/12/03/texas-coronavirus-white-house/.

[5] Emma Platoff & Carla Astudillo, *Across Texas and the Nation, the Novel Coronavirus is Deadlier for People of Color*, Tex. Trib. (July 30, 2020), https://www.texastribune.org/2020/07/30/texas-coronavirus-deaths/.

[6] Sophie Novak, *Who Really Gets Government Benefits in Texas?*, Tex. Observer (June 22, 2017), https://www.texasobserver.org/who-gets-benefits-texas-medicaid-cuts/; Shannon Najmabadi & Edgar Walters, *They Lost Their Jobs and Insurance in the Pandemic. Now They're Slipping Through Texas' Health Care Safety Net*, Tex. Trib. (May 22, 2020), https://www.texastribune.org/2020/05/22/texas-medicaid-health-insurance-coronavirus/.

[7] Tex. Health and Hum. Servs., *Medicaid for Parents & Caretakers*, https://hhs.texas.gov/services/health/medicaid-chip/programs-services/children-families/medicaid-parents-caretakers (last visited Dec. 11, 2020). The 2020 Federal Poverty Guideline for a family of two is $17,240 per year, or about $332 per week. *See* U.S. Dep't of Health and Hum. Servs., 2020 Poverty Guidelines (Jan. 21, 2020), https://aspe.hhs.gov/2020-poverty-guidelines.

[8] Hannah Katch et al., *Medicaid Works for Women–But Proposed Cuts Would Have Harsh, Disproportionate Impact*, Ctr. on Budget & Policy Priorities (May 11, 2017),

2

that restrict Medicaid access, therefore, exacerbate these systemic barriers for Black and Latinx communities—the same groups who have been disproportionately affected by the COVID-19 crisis.

In part because of low reimbursement rates and onerous reimbursement policies, Texas suffers from a shortage of willing Medicaid providers. According to the Texas Medical Association, in 2014, only 34 percent of physicians were willing to take on new Medicaid patients.[9] Planned Parenthood providers know this first-hand, from the hours staff spend on the phone trying to find providers who will accept a referral to begin lifesaving medical care when patients receive a positive result from a cancer screening, or when Medicaid patients require referrals for other urgent care. In the pandemic, this crisis has only worsened, as economic turmoil and sky-high unemployment rates[10] have increased the number of Texans eligible for Medicaid.[11]

Planned Parenthood health centers, in Texas and across the country, serve an outsized role in meeting the health care needs for those who are enrolled in federally funded health programs like Medicaid. More than half of Planned Parenthood health centers provide care to underserved patient communities in Health Professional Shortage Areas, Medically Underserved Areas, or Rural

---

https://www.cbpp.org/research/health/medicaid-works-for-women-but-proposed-cuts-would-have-harsh-disproportionate-impact; David R. Williams & Toni D. Rucker, *Understanding and Addressing Racial Disparities in Health Care*, 21 Health Care Fin. Rev. 75 (2000); UCLA Ctr. for Health Policy Rsch. & Henry J. Kaiser Fam. Found., *Racial and Ethnic Disparities in Access to Health Insurance and Health Care* (Apr. 2000), https://www.kff.org/wp-content/uploads/2013/01/racial-and-ethnic-disparities-in-access-to-health-insurance-and-health-care-report.pdf.

[9] Ashley Lopez, *Texas Lawmakers Look for the Cure to Fewer Doctors Taking Medicaid Patients*, KUT 90.5 (Mar. 9 2016), https://www.kut.org/health/2016-03-09/texas-lawmakers-look-for-the-cure-to-fewer-doctors-taking-medicaid-patients.

[10] Tex. Workforce Comm'n, *Unemployment Rate Is 8.3 Percent in September* (Oct. 16, 2020), https://www.twc.texas.gov/unemployment-rate-83-percent-september; Anna Novak & Mitchell Ferman, *Texans Have Filed More Than 3.9 Million Unemployment Claims During the Coronavirus Pandemic*, Tex. Trib. (Dec. 10, 2020), https://apps.texastribune.org/features/2020/texas-unemployment/; Chris Mathews, *Texas Weekly Unemployment Claims Reach Lowest Level Since March–But Still Much Higher Than Normal*, Austin Bus. J. (Nov. 13, 200), https://www.bizjournals.com/austin/news/2020/11/13/texas-unemployment-claims-november-7-coronavirus.html; Erika Esquivel, *West Texas Unemployment Claims Increase in November*, KFOX14 (Nov. 24, 2020), https://kfoxtv.com/news/local/west-texas-unemployment-claims-increase-in-november; Diana Zoga & Eva Parks, *Up to 830,000 Texans Impacted by Expiring Unemployment Benefits*, NBCDFW (Dec. 3, 2020), https://www.nbcdfw.com/news/nbc-5-responds/up-to-830000-texans-impacted-by-expiring-unemployment-benefits/2496079/.

[11] Shannon Najmabadi & Edgar Walters, *They Lost Their Jobs and Insurance in the Pandemic. Now They're Slipping Through Texas' Health Care Safety Net*, Tex. Trib. (May 22, 2020), https://www.texastribune.org/2020/05/22/texas-medicaid-health-insurance-coronavirus/ ("In Texas and the other states that rejected Medicaid expansion, one-third of the newly jobless are estimated to get Medicaid, with 40% becoming uninsured.").

PPGC00007440

Areas.[12] Planned Parenthood health centers are also considerably more likely to offer Medicaid patients a broader range of birth control methods than other providers.[13] In a study of Community Health Centers, 69 percent reported referring their patients to family planning providers, like Planned Parenthood health centers, for family planning care.[14] Indeed, Planned Parenthood Providers have continued to conduct STI testing and treatment for Medicaid patients in Texas while the pandemic has strained the capacity of other health care providers to offer these services across the country.

For many young women of reproductive age in Texas, Planned Parenthood is their only source of health care. Planned Parenthood designs its services around the reality that patients with low incomes face grave barriers to health care such as childcare and work obligations, limited transportation, and inflexible work schedules, and strive to accommodate these restrictions by offering evening and weekend hours, walk-in appointments, short wait times, bilingual staff or translation services, and same-day contraceptive services. Patients choose Planned Parenthood for its uniquely non-judgmental, high-quality and accessible care.

During this public health crisis, it is more important than ever that patients have access to uninterrupted health care. When people can't access Medicaid coverage or are unable to see the provider they know and trust, they may simply forgo critical health care. Indeed, Texas has gone down this road before with the Texas Women's Health Program in 2013; a study in the *New England Journal of Medicine* showed that blocking patients from going to Planned Parenthood providers in Texas was associated with a 35 percent decline in women in publicly funded programs using the most effective methods of birth control and a dramatic 27 percent increase in births among women who had previously accessed injectable contraception through those programs.[15] In other words, women who could not financially afford health care at other places were not able to receive health care at all.[16]

---

[12] Planned Parenthood Federation of America, *The Irreplaceable Role of Planned Parenthood Health Centers* (Jan. 2019), https://www.plannedparenthood.org/uploads/filer_public/33/63/3363814b-938e-4ad5-87d2-57ee98790766/190117-irreplaceable-role-pp-v01.pdf.

[13] *Id.*

[14] Susan Wood et al., George Washington University School of Public Health and Health Services, *Health Centers and Family Planning: Results of a Nationwide Study*, at 26 (Mar. 7, 2013), http://www.rchnfoundation.org/wp-content/uploads/2013/04/Health_Centers_and_Family_Planning-final-1.pdf.

[15] Amanda J. Stevenson et al., *Effect of Removal of Planned Parenthood from the Texas Women's Health Program*, New Eng. J. Med. (Mar. 3, 2016), https://www.nejm.org/doi/full/10.1056/NEJMsa1511902.

[16] *Id.*

4

PPGC00007441

## The Medicaid Terminations

As HHSC is aware, over the past four years Texas has sought to terminate the Planned Parenthood Providers from the Medicaid program not because of any failure to provide high-quality health care, but because of a widely-debunked video about Planned Parenthood Gulf Coast made by a discredited group determined to end abortion access, even using unlawful tactics to pursue their goal. Indeed, those responsible for the video are currently awaiting trial on multiple felony charges in California for actions related to the smear campaign.[17]

Following the release of the unlawfully-recorded videos, a Harris County grand jury looked at the allegations made against Planned Parenthood Gulf Coast and found no wrongdoing. Likewise, investigations in at least 13 states concluded that Planned Parenthood engaged in no wrongdoing,[18] and eight other states declined to investigate at all, citing lack of evidence. What's more, none of the many heavily partisan congressional investigations[19]—including a select panel created for that sole purpose—concluded that any Planned Parenthood provider violated any laws or ethical obligations.[20]

At any rate, two of the three Texas Planned Parenthood providers (Planned Parenthood Greater Texas and Planned Parenthood South Texas) do not even appear on the discredited video. Texas has nevertheless sought to terminate them from Medicaid on the basis that they share the name "Planned Parenthood"—despite the grave public health harms such termination would cause, particularly during the COVID-19 pandemic.

---

[17] Moreover, in November 2019, a jury empaneled by a federal district court found that the Center for Medical Progress (CMP) and those who manufactured the discredited campaign broke multiple state and federal laws in their efforts to discredit Planned Parenthood. The jury awarded Planned Parenthood both compensatory and punitive damages, totaling more than $2 million, for the injuries that CMP and its co-conspirators caused. The trial court made clear that the only people who engaged in wrongdoing were those behind the smear campaign, explaining that "[t]he 'evidence' defendants actually gathered and then published as a result of the conduct the jury found was illegal did not itself show any illegal conduct by Planned Parenthood or plaintiff affiliates." *See* Order Resolving Unfair Competition Claim & Entering Judgment, *Planned Parenthood Federation of America v. Center for Medical Progress*, Case No. 16-cv-00236 (N.D. Cal. Apr. 29, 2020), https://www.plannedparenthood.org/uploads/filer_public/69/55/69556c 3a-cc90-4017-b43794a8857562f1/1073_order_resolving_unfair_comp_claim_and_entering_judgment _1.pdf.

[18] Kate Sarna, *Growing List of Planned Parenthood Investigations Hyped by Conservative Media Clears Organization of Any Wrongdoing*, Media Matters (Aug. 24, 2015), https://www.mediamatters.org/researc h/2015/08/24/growing-list-of-planned-parenthood- investigation/205116.

[19] Emily Crockett, *Congress Has Spent 15 Months "Investigating" Planned Parenthood Using McCarthy-Like Tactics*, Vox (Dec. 7, 2016), https://www.vox.com/2016/4/29/11469044/congress-planned-parenthood-witch-hunt-fetal-tissue-scientists.

[20] Meredith Wadman, *Fact-Checking Congress's Fetal Tissue Report*, Science Magazine (Jan. 5, 2017), https://www.sciencemag.org/news/2017/01/fact-checking-congress-s-fetal-tissue-report.

App. 503

PPGC00007442

\* \* \*

For these reasons, in light of the five years that have passed since the claimed wrongdoing in the videos (which two of the three Planned Parenthood providers were not on) and the high-quality services the Planned Parenthood providers have provided to approximately 24,000 Medicaid patients since then, we ask that you allow us to remain in the Medicaid program so that our skilled clinicians can continue providing medical care to the most vulnerable Texans during this public health crisis.

In the alternative, at minimum, we respectfully request a six-month grace period to allow our patients to take care of urgent health needs during this crisis stage of this pandemic, and to allow us to help our patients attempt to find new providers willing to accept new patients insured through Medicaid. The well-being of patients is our top priority and we fear that abruptly discontinuing services will leave patients with nowhere else to turn during a pandemic that has pushed the capacity of our health care system to the brink. We would very much like to continue to serve these patients, but hope that, at a minimum, we can work with HHSC to establish a smooth transition period for the thousands of Texans we serve every year through the Medicaid program.

Respectfully,

Ken Lambrecht
President & CEO, Planned
Parenthood Greater Texas

Jeffrey Hons
President & CEO, Planned
Parenthood South Texas

Melaney Linton
President & CEO, Planned
Parenthood Gulf Coast

Cc:   Stephanie Stephens, Deputy Executive Commissioner Medicaid/CHIP
      Karen Ray, HHSC Chief Counsel
      Patrick Sweeten, Associate Deputy Attorney General for Special Litigation
      Adam Biggs, Special Litigation Counsel

App. 504

PPGC00007443

**TEXAS**
Health and Human
Services

**Texas Health and Human Services Commission**

**Cecile Erwin Young**
*Executive Commissioner*

January 4, 2021

Mr. Ken Lambrecht
President & CEO
Planned Parenthood Greater Texas
Via e-mail: Ken.Lambrecht@ppgt.org

Mr. Jeffrey Hons
President & CEO
Planned Parenthood South Texas
Via e-mail: Jeffrey.Hons@ppsouthtexas.org

Ms. Melaney Linton
President & CEO
Planned Parenthood Gulf Coast
*Via e-mail*: Melaney.Linton@ppgulfcoast.org

Re: Termination of Planned Parenthood Clinics from Texas Medicaid

Dear Mr. Lambrecht, Mr. Hons, and Ms. Linton:

The Texas Health and Human Services Commission received your letter dated
December 14, 2020, expressing your requests (1) to continue in the Medicaid
program, or in the alternative, (2) for your Medicaid patients to be granted a grace
period to find other providers. Your request to continue in the Medicaid program is
denied, as the Fifth Circuit Court of Appeal's December 15, 2020, mandate vacated
the District Court's injunction against the termination of your clinics from the
Medicaid program.

Your alternative request for a grace period will be granted in part. Your clinics may
no longer accept any new Medicaid clients. There will be a 30-day grace period
(from the date of this letter, or until February 3, 2021) to ensure that current

P.O. Box 13247 · Austin, Texas 78711-3247 · 512-424-6500 · *hhs.texas.gov*

App. 505

Mr. Ken Lambrecht
Mr. Jeffrey Hons
Ms. Melaney Linton
January 4, 2021
Page 2


Medicaid clients receiving services at your clinics can be transitioned to new providers.

Your clients who are members of a Managed Care Organization (MCO) will be notified by their MCO of the process to transition to a new provider. If your clients have questions, please have them reach out to their MCO member services help line for assistance.  Clients who are not members of an MCO may search for a new provider on the TMHP website at:
http://opl.tmhp.com/ProviderManager/AdvSearch.aspx?_ga=2.258477834.1204048620.1609338635-1213096652.1609338635.

Sincerely,

Karen Ray
Digitally signed by Karen
Ray
Date: 2021.01.04
11:15:55 -06'00'

Karen Ray
Chief Counsel

PPGC00007462