**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

UNITED STATES OF AMERICA, *ex rel.* §
ALEX DOE, Relator, THE STATE OF §
TEXAS, *ex rel.* ALEX DOE, Relator, THE §
STATE OF LOUISIANA, *ex rel.* ALEX DOE, §
Relator, §
                                   §
     Plaintiffs, §
                                   §
v. §
                                   §
PLANNED PARENTHOOD FEDERATION §
OF AMERICA, INC., PLANNED §
PARENTHOOD GULF COAST, INC., §
PLANNED PARENTHOOD OF GREATER §
TEXAS, INC., PLANNED PARENTHOOD §
SOUTH TEXAS, INC., PLANNED §
PARENTHOOD CAMERON COUNTY, §
INC., PLANNED PARENTHOOD SAN §
ANTONIO, INC., §
                                   §
     Defendants. §

No. 2:21-cv-022-Z

Date:     January 27, 2023

ORAL ARGUMENT REQUESTED

**PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.'S
OPPOSITION TO TEXAS'S MOTION FOR SUMMARY JUDGMENT AND
RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 3

I.     Because Plaintiffs Are Asserting Direct, Not Derivative, Liability for PPFA, Many of the Purportedly Undisputed Facts They Cite Are Irrelevant. ...................................................................................................... 3

     A.    Only Direct Liability Is at Issue Here. ....................................................... 3

     B.    Plaintiffs' Assertions That PPFA "Extensively Directs the Operations of the Affiliate Defendants" Are an Impermissible Attempt to Circumvent the Stringent Standard for Piercing the Corporate Veil. ............................................................................................ 6

II.    The Undisputed Facts Do Not Support Holding PPFA Directly Liable on a Reverse-False-Claims or Implied-False-Certification Theory. ............................ 7

     A.    PPFA Cannot Be Held Directly Liable for Reverse False Claims. ............ 7

          1.    The reverse-false-claims provisions only apply to parties who directly avoided their own payment obligation, which Plaintiffs cannot establish for PPFA. ................................................. 7

          2.    Even if PPFA could be held indirectly liable, Plaintiffs have produced no evidence that PPFA caused the Affiliate Defendants to avoid an obligation. ............................................... 10

               (1)    A lawyer cannot be held liable to a third party for actions taken within the scope of representation. ............ 11

               (2)    Every part of the "strategy" Plaintiffs claim L&L "masterminded" fell within the scope of L&L's representation of the Affiliate Defendants. ...................... 14

               (3)    L&L's actions cannot be imputed to PPFA. .................... 19

          3.    Plaintiffs have not established that PPFA knowingly and improperly avoided any obligation to pay the government. ........ 21

     B.    PPFA Cannot Be Held Directly Liable for Implied False Certification. .............................................................................................. 23

          1.    Causal liability under the FCA and LMAPIL requires affirmative participation in the submission of the claims at issue. ............................................................................................. 24

          2.    Plaintiffs have presented no evidence that PPFA affirmatively participated in the Affiliate Defendants' submission of the claims at issue. ............................................... 27

III.   Even if PPFA Could Be Held Directly Liable, Plaintiffs Cannot Recover Per-Claim Penalties From PPFA. ...................................................................... 32

CONCLUSION .................................................................................................................. 35

**TABLE OF CONTENTS**
**(continued)**

**Page**

CERTIFICATE OF SERVICE ..................................................................................................... 37

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alliance Dev., Inc. v. St. Paul Mercury Ins. Co.*,
  2012 WL 112612 (S.D. Tex. Jan. 11, 2012) ...................................................... 11, 12

*Alpert v. Riley*,
  2008 WL 304742 (S.D. Tex. Jan. 31, 2008) ........................................ 12, 14, 15, 17

*City of N. Miami, Fla. v. Berger*,
  828 F. Supp. 401 (E.D. Va. 1993) ............................................................... 13

*Duke v. Wells Fargo Bank N.A.*,
  2018 WL 1157957 (N.D. Tex. Mar. 2, 2018) ............................................... 11, 15

*Harris v. Olszewski*,
  442 F.3d 456 (6th Cir. 2006) ............................................................... 16

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
  2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) ............................................... 13

*Junot v. Lee*,
  372 So. 2d 707 (La. Ct. App. 1979) ....................................................... 12, 15

*Lodge Constr., Inc. v. United States*,
  158 Fed. Cl. 23 (2022) ................................................................... 33

*Lusk v. Foxmeyer Health Corp.*,
  129 F.3d 773 (5th Cir. 1997) ............................................................. 20

*Martinez v. Donna Ind. Sch. Dist.*,
  2006 WL 8442182 (S.D. Tex. Mar. 31, 2006) ............................................. 12, 15

*Morse Diesel Int'l, Inc., v. United States*,
  79 Fed. Cl. 116 (2007) ................................................................... 33

*Ottah v. Bracewell LLP*,
  2021 WL 5910065 (S.D.N.Y. Dec. 10, 2021) ............................................... 15

*Planned Parenthood Ariz. Inc. v. Betlach*,
  727 F.3d 960 (9th Cir. 2013) ............................................................. 16

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*,
  699 F.3d 962 (7th Cir. 2012) ............................................................. 16

*Planned Parenthood of Kan. v. Andersen*,
  882 F.3d 1205 (10th Cir. 2018) ........................................................... 16

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Planned Parenthood S. Atl. v. Kerr*,
  27 F.4th 945 (4th Cir. 2022) ............................................................... 16

*Quinn v. Workforce 2000, Inc.*,
  887 F. Supp. 131 (E.D. Tex. 1995) ........................................................ 5

*Russello v. United States*,
  464 U.S. 16 (1983) .......................................................................... 8

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ......................................................................... 22

*Smith v. United States*,
  287 F.2d 299 (5th Cir. 1961) ............................................................. 10

*Sondes v. Sears, Roebuck & Co.*,
  501 So.2d 829 (La. Ct. App. 1986) .................................................. 12, 15

*United States ex rel. Baker v. Cmty. Health Sys., Inc.*,
  2014 WL 10212574 (D.N.M. May 16, 2014) ................................... 5, 20, 21

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
  290 F.3d 1301 (11th Cir. 2002) .......................................................... 30

*United States ex rel. Fields v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist.*,
  2018 WL 3008297 (E.D. Mo. June 15, 2018) ......................................... 25

*United States ex rel. Franklin v. Parke-Davis*,
  147 F. Supp. 2d 39 (D. Mass. 2001) .................................................... 25

*United States ex rel. Hagood v. Sonoma Cnty. Water Agency*,
  929 F.2d 1416 (9th Cir. 1991) .......................................................... 22

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
  498 F. Supp. 2d 25 (D.D.C. 2007) ................................... 24, 25, 26, 31

*United States ex rel. Lamers v. City of Green Bay*,
  168 F.3d 1013 (7th Cir. 1999) .......................................................... 22

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
  530 F. Supp. 2d 888 (S.D. Tex. 2008) .................................................. 33

*United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.*,
  2021 WL 2003016 (D. Mass. May 19, 2021) ..................................... 31, 34

*United States ex rel. Osinek v. Permanente Med. Grp., Inc.*,
  2022 WL 16943886 (N.D. Cal. Nov. 14, 2022) ........................................ 5

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States ex rel. Proctor v. Safeway, Inc.*,
    2023 WL 178393 (U.S. Jan. 13, 2023) (mem.) ........................................................ 22

*United States ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) .......................................................................... 22, 23

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
    355 F.3d 370 (5th Cir. 2004) ................................................................................ 10

*United States ex rel. Schaengold v. Mem'l Health, Inc.*,
    2014 WL 6908856 (S.D. Ga. Dec. 8, 2014) ........................................................... 26

*United States ex rel. Schutte v. SuperValu Inc.*,
    2023 WL 178398 (U.S. Jan. 13, 2023) (mem.) ........................................................ 22

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*,
    214 F.3d 1372 (D.C. Cir. 2000) ............................................................................ 23

*United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*,
    472 F.3d 702 (10th Cir. 2006) ....................................................................... passim

*United States ex rel. Williams v. McKesson Corp.*,
    2014 WL 3353247 (N.D. Tex. July 9, 2014) ...................................................... 22, 24

*United States ex rel. Wuestenhoefer v. Jefferson*,
    105 F. Supp. 3d 641 (N.D. Miss. 2015) .................................................................. 24

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ...................................................................................... passim

*United States v. Bornstein*,
    423 U.S. 303 (1976) ........................................................................................... 33

*United States v. Caremark, Inc.*,
    634 F.3d 808 (5th Cir. 2011) ................................................................................ 10

*United States v. Exec. Health Res., Inc.*,
    196 F. Supp. 3d 477 (E.D. Pa. 2016) ................................................... 24, 25, 26, 27

*United States v. Hangar One, Inc.*,
    563 F.2d 1155 (5th Cir. 1977) .............................................................................. 21

*United States v. Krizek*,
    111 F.3d 934 (D.C. Cir. 1997) ......................................................................... 33, 34

*United States v. Napper*,
    2021 WL 4992651 (M.D. Tenn. Oct. 27, 2021) .................................................. 22, 24

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Omnicare, Inc.*,
  2021 WL 1063784 (S.D.N.Y. Mar. 19, 2021) .................................................. 4, 31

*United States v. Pres. & Fellows of Harvard Coll.*,
  323 F. Supp. 2d 151 (D. Mass. 2004) ....................................................... 24, 25, 31

*United States v. Vargas-Soto*,
  35 F.4th 979 (5th Cir. 2022) ................................................................. 8

*United States. ex rel. Hendrickson v. Bank of Am., N.A.*,
  343 F. Supp. 3d 610 (N.D. Tex. 2018) ................................................... 22

*Univ. Health Servs., Inc. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016) ........................................................................ 21

*Williams v. Thaler*,
  2013 WL 1249773 (E.D. Tex. Mar. 26, 2013) ......................................... 13

*Wis. Cent. Ltd. v. United States*,
  138 S. Ct. 2067 (2018) ..................................................................... 8

**Statutes**

31 U.S.C. § 3729(a)(1)(A) .................................................................. 8, 23

31 U.S.C. § 3729(a)(1)(B) ................................................................... 8

31 U.S.C. § 3729(a)(1)(D) ................................................................... 8

31 U.S.C. § 3729(a)(1)(G) ............................................................... 8, 9, 10

31 U.S.C. § 3729(b)(1)(A) ................................................................. 21

31 U.S.C. § 3729(b)(3) ....................................................................... 9

La. Rev. Stat. § 46:437.3(11) ............................................................. 21

La. Rev. Stat. § 46:437.3(16) ......................................................... 9, 10

La. Rev. Stat. § 46:438.3(A) ............................................................. 23

La. Rev. Stat. § 46:438.3.C .......................................................... 8, 10

Tex. Hum. Res. Code § 36.001(7-a) .................................................. 9, 10

Tex. Hum. Res. Code § 36.0011(a) ................................................... 21

Tex. Hum. Res. Code § 36.002(12) .................................................. 8, 10

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...... 8

Restatement (Third) of the Law Governing Lawyers (2000) ................................................ passim

S. Rep. No. 111-104 (2009) .............................................................................................................. 8

**INTRODUCTION**

PPFA's motion for summary judgment showed that it cannot be held liable even if the Court declines to grant the Affiliate Defendants judgment as a matter of law.  ECF No. 385. Plaintiffs' summary-judgment motion confirms the point.

Plaintiffs spend pages and pages on the myriad ways they contend PPFA exercised "control" over the Affiliate Defendants.  But the extent of any such "control" is not only sharply disputed but entirely irrelevant.  As the Supreme Court explained in *United States v. Bestfoods*, 524 U.S. 51 (1998), the level of control a parent exercises over a subsidiary (or a membership organization exercises over its members) is relevant only when a party seeks to hold the parent liable for the subsidiary's actions through a theory of derivative liability, such as veil-piercing or alter ego.  Yet Plaintiffs expressly do not rely on any theory of derivative liability—presumably because, as PPFA's summary-judgment motion explained, they could not possibly satisfy the heightened standards necessary to defeat the strong presumption of corporate separateness. Instead, Plaintiffs argue that PPFA is *directly* liable under reverse-false-claims and implied-certification theories.  But PPFA's alleged exercise of control over the Affiliate Defendants is irrelevant to direct liability.  All that matters is the extent to which PPFA itself engaged in the prohibited conduct—i.e., the extent to which PPFA itself avoided a payment obligation to the government, or submitted or caused the Affiliate Defendants to submit impliedly false claims for Medicaid reimbursement.  And there is no evidence at all that PPFA directly engaged in any conduct that could result in reverse-false-claims or implied-certification liability.

Plaintiffs' reverse-false-claims theory as to PPFA is premised entirely on the assertion that the Affiliate Defendants' lawyers from PPFA's "Litigation & Law" Department ("L&L")—a captive law firm that provides legal advice both to PPFA and its affiliates—provided the Affiliate Defendants legal advice that "caused" them to knowingly and improperly avoid their alleged

payment obligations to the government.[1]  That theory fails as a matter of law for two basic reasons.  First, the statutory language on which Plaintiffs rely does not reach conduct that "causes" other parties to violate the FCA or its state analogues.  Rather, the plain terms of these statutes limit liability to persons who themselves failed to comply with their own payment obligation to the government.  And it is undisputed that PPFA itself is not a Medicaid provider and thus had no payment obligation to the government.  Second, and in any event, the law is quite clear that an attorney cannot be held liable to a non-client based on legal advice provided to a client within the scope of the representation.  Holding otherwise would undermine the attorney-client relationship and dramatically expand potential liability far beyond the FCA—indeed, to any context in which lawyers advise clients or litigate on their behalf.  Here, there can be no dispute that all the conduct that Plaintiffs say caused the Affiliate Defendants to fail to comply with their alleged payment obligations to the government was legal advice that L&L attorneys (whom Plaintiffs erroneously conflate with PPFA) provided within the scope of their representations.  The reverse-false-claims theory thus fails as to PPFA as a matter of law.

So too do Relator's new implied-false-certification theories.  Again, it is undisputed that PPFA is not a Medicaid provider and thus does not submit its own Medicaid claims, so PPFA could not have submitted any claims that were false, impliedly or otherwise.  And to show that PPFA "caused" the Affiliate Defendants to submit such false claims, Plaintiffs would have to offer evidence that PPFA was involved in the claim-submission process on a per-claim level.  But all the purported evidence on which Plaintiffs rely is that (i) L&L provided the Affiliate Defendants with legal advice, which cannot create liability for the reasons discussed and has nothing to do

---

[1] For the reasons explained in the Affiliate Defendants' concurrently-filed opposition, which PPFA joins in full, Plaintiffs have not met their burden to show that the Affiliate Defendants violated the FCA.  PPFA cannot be held liable for causing a violation that did not occur.

with the submission of individual claims, and (ii) PPFA provided high-level guidance about Medicaid requirements, which again does not establish any participation by PPFA in the Affiliate Defendants' claim-submission processes. Plaintiffs' false-certification theory thus also fails as a matter of law. Plaintiffs' motion for summary judgment against PPFA should be denied, and PPFA's motion for summary judgment should be granted.

## ARGUMENT

## I. Because Plaintiffs Are Asserting Direct, Not Derivative, Liability for PPFA, Many of the Purportedly Undisputed Facts They Cite Are Irrelevant.

For the reasons laid out in PPFA's motion for summary judgment, Plaintiffs cannot hold PPFA liable by piercing the corporate veil. *See* ECF No. 385 at 18-23. Plaintiffs appear to agree. They instead assert that PPFA is *directly* liable for any alleged violations committed by the Affiliate Defendants. *See* ECF No. 391 at 76 ("PPFA is liable for its own actions and role in causing the Affiliate Defendants to avoid their obligation to repay the overpayments and in filing false claims."). Yet most of the purportedly undisputed facts Plaintiffs cite to support holding PPFA liable are irrelevant to their direct-liability arguments. When the dispute is narrowed to the legal theories at issue and the facts relevant to those theories, it becomes clear that Plaintiffs have not carried their burden to show that PPFA is liable for either reverse false claims or implied false certification.

### A. Only Direct Liability Is at Issue Here.

There is no question that Plaintiffs are asserting direct, not derivative, liability for PPFA. As they did in their motion-to-dismiss briefing, *see* ECF No. 62 at 27, Plaintiffs argue that "[w]here 'the parent [corporation] is directly a participant in the wrong complained of,' it is thus '*directly liable* for its own actions.'" ECF No. 391 at 88 (quoting *United States v. Bestfoods*, 524 U.S. 51, 64-65 (1998) (emphasis added)); *see also id.* at 89 (citing *United States v. Omnicare, Inc.,* 2021

3

WL 1063784, at *13 (S.D.N.Y. Mar. 19, 2021), in which the government "concede[d] that its basis for holding CVS liable does not depend on a veil-piercing or alter-ego theory" and argued direct liability instead).

*Bestfoods*, on which Plaintiffs rely, explains the difference between direct and derivative liability. That case addressed when a parent corporation can be held directly liable for the operation of a polluting facility under CERCLA. *Bestfoods*, 524 U.S. at 65. The district court had held that a parent corporation could be directly liable based on its "actual participation in and control over a subsidiary's functions and decision-making," even when this participation and control would not justify piercing the corporate veil under common law. *Id.* at 58-59. The en banc court of appeals reversed, holding that "[w]here a parent corporation is sought to be held liable [under CERCLA] based upon the extent of its control of its subsidiary which owns the facility, the parent will be liable only when the requirements necessary to pierce the corporate veil [under state law] are met." *Id.* at 59 (citation omitted). The Supreme Court agreed, holding that it is "when (but only when) the corporate veil may be pierced" that "a parent corporation [can] be charged with derivative CERCLA liability for its subsidiary's actions." *Id.* at 63-64.

*Bestfoods* went on to hold that, even where the corporate veil may not be pierced, a parent company may still be held *directly* liable, but only "for *its own* actions." *Id.* at 64 (emphasis added). Accordingly, a parent company can be directly liable as an "operator" under CERCLA only when its operation of the facility "is evidenced by participation in the activities of the facility, *not the subsidiary*." *Id.* at 65-68 (emphasis added). The Court criticized the district court for "rest[ing] its analysis on [the parent's] relationship with [the subsidiary], premising liability on little more than '[the parent's] 100-percent ownership of [the subsidiary]' and '[the parent's] active participation in, and at times majority control over, [the subsidiary's] board of directors.'" *Id.* at

4

68 (citation omitted). To keep "direct liability for the parent's operation of the facility … distinct from derivative liability for the subsidiary's own operation," the direct-liability inquiry should focus on "the relationship between [the parent] and the … facility itself." *Id.* at 67-68.

Because Plaintiffs did not plead any theory of derivative liability and do not argue one now—and in fact rely only on cases that explicitly disclaim derivative liability—the only question presented by Plaintiffs' summary-judgment motions is whether PPFA is directly liable for reverse false claims or implied false certification. *See Quinn v. Workforce 2000, Inc.*, 887 F. Supp. 131, 135 (E.D. Tex. 1995) ("the 'basis for disregarding the corporate fiction … is an independent ground of recovery that must be specifically pleaded or waived'") (citation omitted). Unlike in *Bestfoods*, Plaintiffs do not bring their claims under CERCLA, PPFA is not a "parent" company, and the Affiliate Defendants are not its "subsidiaries," *see* ECF No. 385 at 8-9, 18-19. Nevertheless, *Bestfoods* provides guidance as to the direct-liability inquiry here. *See United States ex rel. Osinek v. Permanente Med. Grp., Inc.*, 2022 WL 16943886, at *4 (N.D. Cal. Nov. 14, 2022) (relying on *Bestfoods* in assessing allegations of misconduct by parent corporation for purpose of direct FCA liability). Just as direct liability under CERCLA hinges on the relationship between the parent company and the liability-creating facility, direct liability under the FCA, TMFPA, and LMAPIL hinges on the relationship between PPFA and the allegedly avoided payment obligation (*see* Section 3729(a)(1)(G)) or between PPFA and the allegedly false claims at issue (*see* Section 3729(a)(1)(A)). *See United States ex rel. Baker v. Cmty. Health Sys., Inc.*, 2014 WL 10212574, at *26-28 (D.N.M. May 16, 2014) (denying summary judgment as to parent corporation based on evidence suggesting that corporation was "directly involved in the allegedly fraudulent scheme which resulted in the illegal receipt of federally funded Medicaid payments") (quoting *Bestfoods*, 524 U.S. at 69). Direct liability does *not* hinge on PPFA's relationship with the Affiliate

Defendants.  The question is not whether PPFA "extensively directs the operations of the Affiliate Defendants," ECF No. 391 at 88, but whether PPFA extensively directed the FCA, TMFPA, and LMAPIL violations allegedly committed by those defendants.

**B.    Plaintiffs' Assertions That PPFA "Extensively Directs the Operations of the Affiliate Defendants" Are an Impermissible Attempt to Circumvent the Stringent Standard for Piercing the Corporate Veil.**

Much of the evidence on which Plaintiffs rely is irrelevant to this question.[2]  The details of PPFA's relationship with the Affiliate Defendants—including the accreditation process, membership dues, and the vast majority of services the affiliates can obtain through PPFA, *see* ECF No. 391 at 89-98—have no bearing on whether PPFA knowingly avoided an obligation to pay the government or actively participated in the Affiliate Defendants' submission of the Medicaid claims at issue.  Plaintiffs' alleged evidence concerning what they characterize as "PPFA's extensive involvement in and control of the operations of the Affiliate Defendants' businesses and provision of medical services" would only be relevant if Plaintiffs were attempting to satisfy the heightened standard necessary to pierce the corporate veil.  But Plaintiffs wisely do not attempt to do so.  *See* ECF No. 385 at 18-23 (explaining why any effort to establish derivative liability would fail).  And any control PPFA might have over the Affiliate Defendants is simply irrelevant to whether PPFA *directly* violated the statutes at issue, which is the only basis of liability for which Plaintiffs actually argue.  Just as in *Bestfoods*, what matters is not evidence of PPFA's alleged control over the Affiliate Defendants, but rather whether PPFA directly (i) knowingly and improperly avoided an obligation to pay the government, or (ii) knowingly caused the Affiliate Defendants to submit false claims.  Plaintiffs have offered no evidence that PPFA did either.

---

[2] Because so many of the "undisputed" facts Plaintiffs cite in support of their PPFA arguments are irrelevant to the legal questions, PPFA has not disputed each of them in the body of this brief.  It has, however, filed a separate Response to Plaintiffs' "Statement of Undisputed Facts."

## II.    The Undisputed Facts Do Not Support Holding PPFA Directly Liable on a Reverse-False-Claims or Implied-False-Certification Theory.

### A.    PPFA Cannot Be Held Directly Liable for Reverse False Claims.

Plaintiffs argue that PPFA is liable under the FCA, TMFPA, and LMAPIL because it "helped the Affiliate Defendants avoid their obligation to repay money to Texas and Louisiana Medicaid."  ECF No. 391 at 76; *see also id.* at 73 ("PPFA is liable because it 'caused' … the unlawful retention of overpayments.").  For the reasons stated in the Affiliate Defendants' motion for summary judgment and brief in opposition, which PPFA joins in full, the Affiliate Defendants had no obligation to pay the government money as a matter of law and, even if they did, the undisputed record precludes any finding that the Affiliate Defendants knowingly and improperly avoided that obligation.  *See* Aff. Defs. Opp. at I; ECF No. 384-1 at 34-50.  That would preclude judgment against PPFA as well.

But the reverse-false-claims theory fails as to PPFA for three additional reasons.  First, even if there were a dispute of material fact as to whether the Affiliate Defendants knowingly and improperly avoided an obligation, the reverse-false-claims provisions only apply to a defendant who avoided its own payment obligation, and PPFA cannot be held liable when it is undisputed that PPFA did not itself owe an obligation to pay the government.  Second, even if PPFA could be indirectly liable for reverse false claims by causing a third party to avoid a payment obligation, Plaintiffs have produced no evidence that PPFA caused the Affiliate Defendants to do so.  And third, Plaintiffs have produced no evidence that PPFA acted with the requisite scienter.

1.    The reverse-false-claims provisions only apply to parties who directly avoided their own payment obligation, which Plaintiffs cannot establish for PPFA.

Plaintiffs' reverse-false-claims theory is premised on the assertion that PPFA "caused" the Affiliate Defendants to avoid a payment obligation.  But the FCA, TMFPA, and LMAPIL do not

apply to parties who "cause" others to avoid an obligation; they only apply to parties who knowingly and improperly avoid their own obligation to pay the government.

Section 3729(a)(1)(G) creates liability for:

> any person who …. knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or **knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government**[.]

31 U.S.C. § 3729(a)(1)(G) (emphasis added); *see also* Tex. Hum. Res. Code § 36.002(12); La. Rev. Stat. § 46:438.3.C.  Plaintiffs ground their reverse-false-claims theory solely on the second, bolded clause of this provision, as well as analogous language in the TMFPA and LMAPIL.  ECF No. 391 at 45; ECF No. 2 ¶¶ 120, 127, 133; ECF No. 22 ¶¶ 39-41.  Congress added Section 3729(a)(1)(G)'s second clause in 2009 in an attempt to "close[] [a] loophole" in the prior version of the FCA, which did not reach "actions to conceal, avoid, or decrease an obligation *directly to* the Government."  S. Rep. No. 111-10, at 14 (2009) (emphasis added).

The first clause of Section 3729(a)(1)(G)—which existed before the 2009 amendment—creates liability for someone who "causes to be made or used" a false record or statement material to an obligation to pay the government.  *See also* 31 U.S.C. §§ 3729(a)(1)(A), (B), (D) (using similar language to create causal liability). The second clause, which is stated in the disjunctive, markedly does *not* create liability for someone who "causes" another person to avoid or decrease an obligation.  Courts must give effect to that difference in language.  *See United States v. Vargas-Soto*, 35 F.4th 979, 992 (5th Cir. 2022) (courts "usually presume differences in language like this convey differences in meaning," and that a "material variation in terms suggests a variation in meaning") (quoting *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071 (2018) and Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one

8

section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)).  The second clause of Section 3729(a)(1)(G) thus cannot be read to extend to defendants who cause another party to avoid an obligation.  Because the party who owes the obligation is the only one who can "avoid" it, the only way to be liable under the second clause is to "knowingly and improperly avoid[] or decreas[e]" one's own obligation.  *See* 31 U.S.C. § 3729(a)(1)(G).

The question thus is not whether PPFA caused Affiliate Defendants to avoid *their* repayment obligation, but rather whether PPFA itself owed and avoided *its own* repayment obligation.  The answer to that question is no, because PPFA did not have any obligation at all. The FCA defines "obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  *Id.* § 3729(b)(3); *see also* Tex. Hum. Res. Code § 36.001(7-a) and La. Rev. Stat. § 46:437.3(16) (similar).  Plaintiffs argue that "Defendants[']" obligations arose "under statutes and regulations that governed *their participation in* the Medicaid program, including statutes and regulations they expressly agreed to comply with as a condition to *participating in* the Medicaid program."  ECF No. 391 at 55 (emphasis added).  But PPFA undisputedly did *not* participate in Medicaid, *see* ECF No. 387-1 at 142-43, 269-70, and Plaintiffs identify no source of an independent obligation for PPFA, ECF No. 391 at 75-76.  Indeed, Plaintiffs concede that their theory is only that "PPFA helped the Affiliate Defendants avoid *their* obligation to repay money to Texas and Louisiana Medicaid."  *Id.* at 76 (emphasis added).  That theory fails as a matter of law.

In support of this purported "indirect reverse false claim theory of liability," Plaintiffs cite cases that either did not involve reverse false claims, *see United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004) (involving equivalents of Sections 3729(a)(1)(A) and (a)(1)(B)); *Smith v. United States*, 287 F.2d 299, 304 (5th Cir. 1961) (involving equivalent of Section 3729(a)(1)(A)), or that interpreted the pre-2009 version of the reverse-false-claims provision and relied on its causal-liability language, *see United States v. Caremark, Inc.*, 634 F.3d 808, 814-15 (5th Cir. 2011).  ECF No. 391 at 76.  Plaintiffs cite no authority supporting indirect liability under the second clause of Section 3729(a)(1)(G), and PPFA is aware of none.

Nor does Plaintiffs' argument that the TMFPA and LMAPIL do not limit reverse-false-claim liability to "providers" salvage their claims.  ECF No. 391 at 75-76.  The problem with Plaintiffs' claims under all three statutes is not that the statutes limit liability to providers, but that they require a direct obligation in the form of an "established duty" traceable to a particular contract, statute, or regulation.  Tex. Hum. Res. Code § 36.001(7-a); La. Rev. Stat. § 46:437.3(16). Because Plaintiffs can point to no such source of a duty for PPFA, it cannot show that PPFA had an obligation to pay the government.  Summary judgment must thus be denied on Plaintiffs' claims against PPFA under 31 U.S.C. § 3729(a)(1)(G), Tex. Hum. Res. Code § 36.002(12), and La. Rev. Stat. § 46:438.3.C.

       2.     Even if PPFA could be held indirectly liable, Plaintiffs have produced no evidence that PPFA caused the Affiliate Defendants to avoid an obligation.

Even if Section 3729(a)(1)(G) could somehow be read to create indirect liability for causing another person to avoid that person's obligation to pay the government, Plaintiffs' assertion that PPFA "mastermind[ed] and orchestrat[ed]" a legal "strategy … to enable Affiliate Defendants to continue to seek reimbursement from Texas and Louisiana Medicaid after the effective date of their terminations," ECF No. 391 at 76-77, is precluded as a matter of law.  All

of Plaintiffs' assertions about how PPFA "caused" the Affiliate Defendants to avoid their obligation to repay Medicaid funds are predicated on L&L's legal representation of the Affiliate Defendants. *See id.* at 76-88. But a lawyer providing advice within the scope of her client representation cannot be held liable by a third party for actions the client takes based on that advice. Indeed, under Plaintiffs' theory, *any* lawyer representing a defendant in any number of administrative proceedings and/or FCA litigation—not to mention any other context—could be liable to a third party for the advice she provides. This is not the law.

> (1)     A lawyer cannot be held liable to a third party for actions taken within the scope of representation.

"A lawyer, like other agents, is not as such liable for acts of a client that make the client liable." Restatement (Third) of the Law Governing Lawyers § 56 (2000). "As a general rule, attorneys are immune from civil liability to non-clients for actions taken in connection with representing a client." *Duke v. Wells Fargo Bank N.A.*, 2018 WL 1157957, at *3 (N.D. Tex. Mar. 2, 2018). The common-law protections are especially vigorous in Texas, which "has long authorized attorneys to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages." *Alliance Dev., Inc. v. St. Paul Mercury Ins. Co.*, 2012 WL 112612, at *3 (S.D. Tex. Jan. 11, 2012) (citation omitted). An attorney may thus "'assert any of his client's rights without being personally liable for damages to the opposing party,' and '[u]nder Texas law, attorneys cannot be held liable for wrongful litigation conduct.'" *Id.* (citation omitted).

One exception to the rule is where "an attorney knowingly participates in fraudulent activities outside the scope of his legal representation of the client." *Id.* (citation omitted). But "[a]ctions that fall within the context of an attorney's duty to represent their client in litigation"— that is, those that "require the professional training, skill, and authority of an attorney"—"have

been considered insufficient to form the basis of a fraud claim against an attorney by a non-client." *Id.* (citation omitted). Courts thus do not apply the fraud exception to "acts taken and communications made to facilitate the rendition of legal services," such as "the filing of lawsuits and pleadings" and "the providing of legal advice upon which the client acted"—even where the plaintiff "allege[s] that this conduct was fraudulent." *Alpert v. Riley*, 2008 WL 304742, at *17 (S.D. Tex. Jan. 31, 2008) (citation omitted); *see also Martinez v. Donna Ind. Sch. Dist.*, 2006 WL 8442182, at *9 (S.D. Tex. Mar. 31, 2006) (rejecting allegations that attorney defendants "orchestrated a sham lawsuit against [plaintiff], concealed information in the suit, and trumped up reasons for [plaintiff's] termination in the suit").

Louisiana similarly protects lawyers from liability for "alleged wrongs committed while acting on [a client's] behalf," as long as the lawyer was acting within "the scope of his authority as [the client's] attorney." *Sondes v. Sears, Roebuck & Co.*, 501 So.2d 829, 832 (La. Ct. App. 1986). An attorney acts within the scope of his authority whenever he "urges a position" in support of his client, even one that "has little or no chance of winning." *Junot v. Lee*, 372 So. 2d 707, 710 (La. Ct. App. 1979). Given "changing jurisprudence"—including splits of authority and positions once thought unwinnable that are now good law—courts "must avoid second-guessing an attorney" by imposing third-party liability based on the presumed merits of the attorney's arguments. *Id.* "To hold that an attorney who files pleadings, numerous or otherwise, in support of his client's position has acted overzealously in his client's behalf, and therefore is liable in damages to the other litigant or litigants because those pleadings have little or no merit, would result in an undesirable chilling effect on the attorney's efforts to properly represent and support his client." *Id.*

Plaintiffs have not cited a single case addressing an attorney's liability for causing a client's federal FCA violation. This argument is so far-fetched that PPFA has likewise found no authority directly on point. In an analogous context, a federal court has held that an attorney does not "make or cause to be made false or misleading statements" under Section 18 of the Securities Exchange Act by "drafting, preparing and reviewing [her client's] SEC filings." *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, 2007 WL 2615928, at *12 (S.D.N.Y. Sept. 10, 2007). The court reasoned that "[i]n no sense can an attorney giving legal advice to a person or corporation making a statement, or assisting in its drafting, be understood to 'cause' the statement to be made" because an attorney does not "control" her client. *Id.*; *see also Williams v. Thaler*, 2013 WL 1249773, at *14 (E.D. Tex. Mar. 26, 2013) ("Once an attorney counsels his client, it is ultimately the client's choice whether to follow that advice."). A similar rationale drove a different federal court's holding that an attorney was not liable as an "operator" under CERCLA because his role was "completely subordinate" to his clients, who had "[u]ltimate decisionmaking authority" over the polluting facility. *City of N. Miami, Fla. v. Berger*, 828 F. Supp. 401, 410, 412 (E.D. Va. 1993). Holding otherwise "would impermissibly broaden the scope of CERCLA liability to include all lawyers who provide legal services to landfill owners and operators." *Id.* at 412.

Plaintiffs argue that by representing the Affiliate Defendants as they contested Texas and Louisiana's termination decisions, L&L "caused" the Affiliate Defendants to avoid an obligation to repay Medicaid funds received during the pendency of those proceedings. ECF No. 391 at 78-79. By this logic, *any* lawyer or law firm (including those who represented the Affiliate Defendants in the termination litigation alongside L&L) who represents a client who chooses to contest a government decision that affects the client's entitlement to government funds—whether termination from a government program, a regulation changing the government's payment

13

methodology, or the results of a government audit—could be liable for reverse false claims.  But the same lawyer would be subject to disciplinary action for not fully and faithfully representing her client's best interests.  *See Alpert*, 2008 WL 304742, at *14  ("If an attorney could be held liable to an opposing party for statements made or actions taken in the course of representing his client, he would be forced constantly to balance his own potential exposure against his client's best interest.") (citation omitted).  This Court should reject this absurd result and attack on long-standing protections for the attorney-client relationship and deny Plaintiffs summary judgment on reverse false claims as to PPFA.

(2)    Every part of the "strategy" Plaintiffs claim L&L "masterminded" fell within the scope of L&L's representation of the Affiliate Defendants.

Any action L&L took on behalf of the Affiliate Defendants therefore cannot result in "causing" liability unless it falls outside the scope of L&L's representation.  But every one of the actions Plaintiffs highlight indisputably fall within that scope, and thus cannot be the basis for liability.

Plaintiffs rely on four different categories of legal advice that L&L gave the Affiliate Defendants while representing them in the Medicaid termination proceedings: (i) pursuing relief in federal court instead of administrative forums; (ii) requesting a "grace period" from Texas after the federal injunction in Texas was vacated; (iii) filing suit in Texas state court at the end of the grace period; and (iv) opposing Louisiana's motion to vacate the federal injunction in Louisiana after the Fifth Circuit's en banc ruling in the Texas case.  ECF No. 391 at 78-79.  Plaintiffs additionally argue that L&L "*continues* to represent and assist Affiliate Defendants" in the instant action.  *Id.* at 79.  Even if any of these actions were unsupported by law (which they were not), each was litigation conduct fully protected by the common law.  Plaintiffs cannot premise a lawsuit against PPFA on the idea that it was somehow wrongful for L&L to "steer[ ] Affiliate Defendants

14

…. into lengthy legal battles in the Middle District of Louisiana and the Western District of Texas," ECF. No. 391 at 78, simply because Plaintiffs dislike that the federal district courts deciding those cases granted injunctions allowing Affiliate Defendants to remain in the Medicaid programs.

Because advising how and where to seek relief and which motions to file are "acts taken and communications made to facilitate the rendition of legal services," the conduct Plaintiffs assert is protected under Texas law.  *Alpert*, 2008 WL 304742, at *17; *see also Duke*, 2018 WL 1157957, at *3; *Martinez*, 2006 WL 8442182, at *9.  Summary judgment should thus be denied as to PPFA on the TMFPA Section 36.002(12) claim.  The same rationale requires denial of summary judgment as to PPFA on the LMAPIL Section 46:438.3.C claim.  *See Sondes*, 501 So.2d at 832; *Junot*, 372 So.2d at 709-10.

The Texas and Louisiana doctrines also require denial of summary judgment on Plaintiffs' FCA Section 3729(a)(1)(G) claim.  *See Ottah v. Bracewell LLP*, 2021 WL 5910065, at *10 (S.D.N.Y. Dec. 10, 2021) (applying New York attorney-liability law to federal claim).  Even if those doctrines did not apply, the same outcome is required under first principles and general common-law limitations:

> [A] lawyer may not counsel or assist a client in conduct that the lawyer knows to be criminal or fraudulent or in violation of a court order with the intent of facilitating or encouraging the conduct, but the lawyer may counsel or assist a client in conduct when the lawyer reasonably believes:
>> (a) that the client's conduct constitutes a good-faith effort to determine the validity, scope, meaning, or application of a law or court order; or
>> (b) that the client can assert a nonfrivolous argument that the client's conduct will not constitute a crime or fraud or violate a court order.

Restatement (Third) of the Law Governing Lawyers § 94 (2000).  Plaintiffs seem to be arguing that, by counseling the Affiliate Defendants during the termination proceedings, L&L "assist[ed] … in conduct that [it knew] to be … fraudulent."  *Id.*  They must thus show that L&L did not

reasonably believe those proceedings to be "a good-faith effort to determine the validity" of the terminations or supported by "a nonfrivolous argument." *Id.* This they cannot do.

Plaintiffs cite no evidence that L&L acted frivolously or in bad faith when it provided any of the advice or made any of the filings discussed above. As for L&L's purported advice to seek relief in court rather than through administrative avenues, Plaintiffs merely recount the procedural history of the Texas and Louisiana district-court actions and cite evidence showing that L&L represented the Affiliate Defendants in those actions. ECF No. 391 at 79-82. They cite nothing to support the argument that this advice was given to improperly "continue to receive Medicaid funds to which Planned Parenthood was not entitled," *id.* at 82—and in fact cite testimony from PPGT's CEO that "[i]t was a *legal* strategy decision at the time focusing on the federal courts first," *id.* at 81 (citing ECF No. 390-3 at 621) (emphasis added).

Attempting to frame this legal strategy as improper is especially preposterous given that the federal and state courts agreed with L&L's arguments and granted the Affiliate Defendants injunctive relief for substantial periods of time. *See* ECF No. 384-1 at 20-22. The Texas action ultimately failed in the Fifth Circuit for lack of jurisdiction—a point on which the Fourth, Sixth, Seventh, Ninth, and Tenth Circuits all disagree. *See Planned Parenthood S. Atl. v. Kerr*, 27 F.4th 945 (4th Cir. 2022), *cert. pet. pending*; *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*, 569 U.S. 1004 (2012) (mem.); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013), *cert. denied*, 571 U.S. 1198 (2014) (mem.); *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 638 (2018) (mem.). The en banc ruling did not disturb the district court's findings on the merits. *See* ECF No. 384-1 at 22.

And at no point has any court or regulator ever concluded that any of the positions L&L took on behalf of the Affiliate Defendants were frivolous or in bad faith.

Plaintiffs' only argument regarding the Travis County action is that it was "meritless," ECF No. 391 at 86, which, as just discussed, is untrue and would not support liability even if it were. *See* Restatement (Third) of the Law Governing Lawyers § 94 ("A lawyer who proceeds reasonably to advise a client with the intent of providing the client with legal advice on how to comply with the law does not act wrongfully, even if … a tribunal later determines that the lawyer's advice was incorrect."). And Plaintiffs cite nothing in support of their argument that L&L "maneuver[ed]" to "prolong the [Louisiana] preliminary injunction and milk it to obtain additional Medicaid revenue PPGC was not entitled to." *Id.* at 87. The only citations in this sub-section are to filings in the Louisiana action, which are core attorney conduct that can by no means show bad faith. *See Alpert*, 2008 WL 304742, at *17. This argument is also undercut by the fact that, despite the Fifth Circuit's en banc ruling in the Texas case, PPGC remains an enrolled provider in Louisiana Medicaid today. ECF No. 384-1 at 28.

The closest Plaintiffs come to arguing that L&L acted in bad faith is with respect to seeking a grace period—they say that "[a]lthough the stated purpose of the 'grace period' was to allow Affiliate Defendants to transition their patients to new Medicaid providers, the evidence reveals that this was merely pretext to allow Affiliate Defendants to continue to bill Texas Medicaid as a stopgap measure before additional legal action could be pursued." ECF No. 391 at 82. First, Plaintiffs misrepresent the purpose of the grace period and ignore evidence demonstrating that Affiliate Defendants in fact did take steps to transition patients during that period. As the Affiliate Defendants explained to Texas and Texas admitted it understood, the reason for the grace-period request was to "provide continuity of care" and "allow … patients to take care of urgent health

17

needs."  ECF No. 390-3 at 640, 676; *see also* ECF No. 383 at 222 ("The State of Texas granted

the Grace Period to help facilitate continuity of care for Medicaid clients who received Medicaid

health services from the Defendants …."); ECF No. 390-2 at 162 (asking Texas for "a brief grace

period so that Planned Parenthood providers can provide continuity of care throughout the holiday

season and the current crisis point of the pandemic").  While Plaintiffs cite an email from PPFA's

Director of Healthcare Operations purportedly "express[ing] her *reluctance* to refer patients to

other providers," ECF No. 391 at 84 (citing ECF No. 390-13 at 97), the email is directly followed

by a reply from PPFA's Vice President of Healthcare Operations saying that "Affiliates are all

working [on referring] folks who want referred" (sic), ECF No. 390-13 at 97.  This aligns with

evidence showing that PPGC began providing patients with "a list of [other] providers" beginning

"in December of 2020, after the 5th Circuit lifted the injunction,"  ECF No. 390-3 at 270, and

prepared "[t]alking points for patients" as part of efforts to help its Medicaid patients transition to

other providers, *id.* at 326.  *See also id.* at 119 (COO of PPST testifies that "[w]e didn't take on

any new patients [during the grace period] and we also were trying to help them find a new

provider."); Aff. Defs. Opp. at 9-10 (¶ 28).

     Even if L&L's "assistance to Affiliate Defendants in requesting the grace period from

HHSC was motivated by a desire to further delay HHSC from implementing Affiliate Defendants'

terminations and obtain additional Medicaid revenue," as Plaintiffs claim, ECF No. 391 at 85, this

would not amount to bad faith.  A lawyer is obligated to "proceed in a manner reasonably

calculated to advance a client's lawful objectives, as defined by the client after consultation."

Restatement (Third) of the Law Governing Lawyers § 16 (2000).  Nothing about pursuing a

stipulated solution to delay the implementation of the terminations and allow patients to continue

receiving care from their chosen provider for as long as possible amounts to an unlawful objective.

Moreover, Plaintiffs' fraud argument, such as it exists, rests on the assumption that claims submitted during and after the grace period were fraudulent.  For the reasons discussed in the Affiliate Defendants' brief in opposition, Plaintiffs have not met their burden to show that, by submitting these claims, the Affiliates knowingly and improperly avoided an obligation.  Aff. Defs. Opp. at I.

(3) L&L's actions cannot be imputed to PPFA.

Moreover, Plaintiffs wrongly conflate L&L with PPFA.  L&L is a captive law firm that provides legal counsel to affiliates, as well as to PPFA, about certain public-policy-related legal matters that further their shared mission.  ECF No. 376 at 2; ECF No. 387-1 at 49.  In keeping with L&L's separate duties of loyalty to PPFA and to each affiliate, PPFA's bylaws mandate that confidential affiliate information "shall not be shared with … PPFA personnel outside of [L&L]" without their "prior consent."  ECF No. 387-1 at 50.

Kim Custer, a corporate witness for PPFA, testified that PPFA does not "make any decisions around what" representation L&L provides to the affiliates, and that when L&L does undertake such representation, the affiliates are L&L's "clients and they have attorney-client privilege."  ECF No. 390-3 at 365.  Information L&L shared with PPFA about its representation of the Affiliate Defendants in the Medicaid termination proceedings "was either public information … or information that the affiliate may have requested that they communicate with" PPFA.  *Id.* "The affiliates are the sole deciders" and "the sole authority" when it comes to "litigation strategy with [L&L]."  *Id.* at 366; *see also id.* at 368 ("PPFA does not get involved with [the affiliates'] litigation, with their legal strategy. That is completely, completely within their discretion.").

It is a "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."  *Bestfoods*, 524 U.S. at 69 (quoting *Lusk v.*

19

*Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997)).  Plaintiffs bear the burden of rebutting the "presumption …. that the directors are 'wearing their subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Baker*, 2014 WL 10212574, at *26 (quoting *Bestfoods*, 524 U.S. at 69).  The presumption may be rebutted by evidence that parent officials "were directly involved in the allegedly fraudulent conduct," for example, by writing memos and emails outlining the scheme and registering concerns about its legality; approving fraudulent payments; editing statements by the subsidiary in order to cover up the scheme; and encouraging would-be whistleblowers to "leave it alone." *Id.* at *26-28.

Plaintiffs have not met their burden to rebut the presumption that L&L attorneys "change hats" when representing the Affiliate Defendants versus PPFA.  While Plaintiffs claim that "L&L attorneys provided updates to PPFA about the [termination] litigation," ECF No. 391 at 77, the cited testimony shows those updates were limited to "information that was publicly available after the affiliate made decisions on courses of action," ECF No. 390-3 at 368.  And the testimony by PPFA's corporate representative that "PPFA would always consider the implication or the impact … of any action on the federation as a whole" is sandwiched between her clear statements that "PPFA does not step in and make decisions for the affiliates," who must "make their own legal decision[s]," and that considering the impact of a particular decision on the federation "is not advising or making decisions for the affiliates." *Id.* at 367.  As for an email Plaintiffs cite from PPFA's Assistant Director for State Policy Media describing the Texas termination act as "the case we're filing in Texas against efforts to block our patients' access to care through Medicaid," ECF No. 391 at 81 (quoting ECF No. 390-13 at 249), this email was both mistaken—PPFA was not a plaintiff in the Texas action, *see Planned Parenthood of Greater Tex. v. Smith*, No. 1:15-cv-01058 (W.D. Tex.), ECF No. 1—and is contradicted by the other evidence described above establishing

the firewall between L&L and PPFA.  This evidence comes nowhere close to the evidence in *Baker* that the parent corporation had actively devised the fraudulent scheme and urged its subsidiary to cover it up.

Plaintiffs have not shown that any actions L&L took when representing the Affiliate Defendants were in fact on behalf of PPFA, *see Bestfoods*, 524 U.S. at 69-70; *Baker*, 2014 WL 10212574, at *26, or "for the purpose of benefitting" PPFA, ECF No. 391 at 78 (quoting *United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir. 1977)).  Because the conduct Plaintiffs highlight was by L&L, not PPFA, and was appropriate legal representation required by L&L's duty of loyalty, the Court should deny summary judgment as to PPFA on Plaintiffs' Section 3729(a)(1)(G) claim.

> 3.    Plaintiffs have not established that PPFA knowingly and improperly avoided any obligation to pay the government.

Even if the statutory and regulatory schemes could somehow be construed to impose a repayment obligation on PPFA or the Affiliate Defendants, and even if PPFA could be held indirectly liable for causing the Affiliate Defendants to avoid that obligation, summary judgment must still be denied because Plaintiffs have not demonstrated PPFA's scienter as a matter of law.

The FCA defines "knowingly" as acting with "actual knowledge," "deliberate ignorance," or "reckless disregard."  31 U.S.C. § 3729(b)(1)(A); *see also* Tex. Hum. Res. Code § 36.0011(a) and La. Rev. Stat. § 46:437.3(11) (similar).  This "rigorous" scienter requirement, *Univ. Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016), is lacking as a matter of law when the defendant is accused of violating an ambiguous regulatory scheme.  That is because "FCA liability does not attach when a defendant reasonably, yet erroneously, interprets its legal

obligations."[3]  *United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 636 (N.D. Tex. 2018); *see also United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015) ("[T]he FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation" or "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations."); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007) ("a defendant who merely adopts" a reasonable interpretation of a regulatory scheme is not "a knowing or reckless violator").[4]

Even if the Medicaid scheme could somehow be read to impose a repayment obligation on PPFA, at the very least it could *also* reasonably be construed *not* to impose such an obligation. Because PPFA does not provide medical services, file Medicaid claims, or receive Medicaid payments, *see* ECF No. 387-1 at 58-62, 142-43, construing the ACA, Texas, and Louisiana law not to impose a repayment obligation, even if ultimately incorrect, could only be viewed as an "innocent, good-faith mistake about the meaning of an applicable rule or regulation."  *Purcell*, 807 F.3d at 287.  The reasonableness of PPFA's construction is confirmed by the fact that neither Texas nor Louisiana ever sought to recoup Medicaid funds from PPFA.  ECF No. 387-1 at 144, 277-78,

---

[3] Courts use "the FCA's well-defined legal requirements" to analyze claims under analogous provisions of the TMFPA and LMAPIL.  *United States ex rel. Williams v. McKesson Corp.*, 2014 WL 3353247, at *4 (N.D. Tex. July 9, 2014) (applying FCA cases to TMFPA claim); *United States v. Napper*, 2021 WL 4992651, at *5 (M.D. Tenn. Oct. 27, 2021) (Section 46:438.3 of LMAPIL is "modeled on the FCA.").

[4] The Supreme Court recently granted certiorari on "[w]hether and when a defendant's contemporaneous subjective understanding or beliefs about the lawfulness of its conduct are relevant to whether it 'knowingly' violated the False Claims Act."  *United States ex rel. Schutte v. SuperValu Inc.*, 2023 WL 178398 (U.S. Jan. 13, 2023) (mem.); *United States ex rel. Proctor v. Safeway, Inc.*, 2023 WL 178393 (U.S. Jan. 13, 2023) (mem.).  Even if PPFA's subjective understanding did matter, Plaintiffs have presented no evidence that PPFA (or the Affiliate Defendants) ever suspected that it might be obligated to pay the government any money related to the claims at issue.  PPFA and the Affiliate Defendants, on the other hand, have presented evidence that they did *not* believe they owed Texas or Louisiana an obligation to repay any Medicaid funds.  *See* ECF No. 387-1 at 174-75; ECF No. 384-1 at 48 n.26. And even if there were evidence to the contrary, FCA case law has long held that "'[t]o take advantage of a disputed legal question … is to be neither deliberately ignorant nor recklessly disregardful.'"  *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (citation omitted); *see also United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999).

285-86, 313.  As a matter of law, PPFA cannot be held liable for violating what is at most an ambiguous obligation to pay the government.  *See, e.g.*, *Purcell*, 807 F.3d at 283-84; *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1377-78 (D.C. Cir. 2000) (affirming summary judgment for defendant where relator's theory hinged on "open" legal question that precluded showing of scienter).

And even if *Caremark*'s theory of indirect liability were expanded, in spite of the statutory text, to the knowing and improper avoidance of an obligation, Plaintiffs have presented no evidence that PPFA acted with the necessary scienter in allegedly helping the Affiliate Defendants avoid their purported obligation to pay the government.  For the reasons discussed above, *see supra* II.A.2, PPFA reasonably assumed that L&L's representation of the Affiliate Defendants in the termination proceedings would not somehow "cause" the Affiliate Defendants to submit false claims.

### B.    PPFA Cannot Be Held Directly Liable for Implied False Certification.

Plaintiffs agree that PPFA does not submit Medicaid claims.  ECF No. 387-1 at 142-43.  In order to be liable for implied false certification, then, PPFA must have "cause[d]" the Affiliate Defendants to submit false or fraudulent claims.  *See* 31 U.S.C. § 3729(a)(1)(A); La. Rev. Stat. § 46:438.3(A).[5]  As explained in the Affiliate Defendants' opposition, Plaintiffs have failed to meet their burden to show that the Affiliate Defendants submitted any false or fraudulent claims.  Aff. Defs. Opp. at III.  But even if they had, Plaintiffs have wholly failed to produce evidence that PPFA caused the submission of such claims or that it acted with the requisite scienter.

---

[5] Relator's claims under the TMFPA are no longer in this case. *See* ECF No. 71 at 35 (holding that "the state is primarily responsible for prosecuting Count III of Relator's Complaint"); ECF No. 141 at 6-7 (noting that Texas's "Complaint in Intervention supersedes Relator's TMFPA complaint and asserts the only live TMFPA claim in this action—Texas's 36.002(12) allegation").

1.  Causal liability under the FCA and LMAPIL requires affirmative participation in the submission of the claims at issue.

"To 'cause' the presentation of false claims under the FCA, some degree of participation in the claims process is required." *United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 681 (N.D. Miss. 2015) (citing *United States v. Pres. & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 186-87 (D. Mass. 2004)); *see also United States v. Exec. Health Res., Inc.,* 196 F. Supp. 3d 477, 513 (E.D. Pa. 2016) (noting that "[n]umerous courts have held that some level of direct involvement in causing the submission of false claims to the government is necessary for direct liability under the FCA" and collecting cases).[6]  Participation requires "an 'affirmative act' going beyond 'mere passive acquiescence.'" *Wuestenhoefer*, 105 F. Supp. 3d at 681 (quoting *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714-15 (10th Cir. 2006, *abrogated on other grounds by Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019))).  "[M]erely '[b]eing a parent corporation of a subsidiary that commits a FCA violation, without some degree of participation by the parent in the claims process, is not enough to support a claim against the parent for the subsidiary's FCA violation.'" *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 59-60 (D.D.C. 2007) (citation omitted).

Plaintiffs dispute the affirmative-act requirement, relying on a Massachusetts district court's statement that "a defendant may be liable if it operates under a policy that causes others to present false claims to the government." ECF No. 391 at 74 (quoting *Harvard Coll.*, 323 F. Supp. 2d at 187).[7]  But *Harvard College* does not discuss the affirmative-act requirement, and in fact *supports* PPFA's argument that "mere passive acquiescence" is insufficient to establish causal

---

[6] *Williams*, 2014 WL 3353247, at *4; *Napper*, 2021 WL 4992651, at *5.

[7] Plaintiffs appear to have mistakenly omitted a citation to *Harvard College*.  PPFA has determined that the three "*id.*" citations at the bottom of page 62 of Plaintiffs' brief (ECF page 74) are to this case.

liability. *Sikkenga*, 472 F.3d at 715. *Harvard College* considered causal liability under the then-equivalent of Section 3729(a)(1)(A) for two Harvard employees who worked on a USAID-funded Russia program and allegedly made investments that violated federal conflict-of-interest requirements. 323 F. Supp. 2d at 159. The court granted summary judgment against one employee based on the fact that he had personally approved expenses, invoices, and financial reports, demonstrating that he had "in effect delegated authority to [Harvard] to file claims with the government." *Id.* at 187-88 & n.30. The court noted that the invoices and reports established "a nexus between the submission of a false [claim] and [the defendant's] role in causing claims to be presented to USAID." *Id.* at 188 n.31. By contrast, the court granted summary judgment in favor of the other employee because "[h]e did not take any actions to have claims submitted to the government," by approving expenses or otherwise. *Id.* at 188. The court noted that "even if [this defendant] knew or should have known about the claims process, and even if he knew that false claims were going to be submitted, his failure to take steps to ensure that Harvard discontinued the submission of the claims does not constitute 'causation' under the False Claims Act." *Id.* at 189.[8]

Subsequent cases have cited *Harvard College* for the proposition that "[t]o establish causation, [the plaintiff] must present some evidence that [the defendant] took some action and had some degree of participation in the claims submission process." *United States ex rel. Fields v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist.*, 2018 WL 3008297, at *2 (E.D. Mo. June 15, 2018); *see also Exec. Health Res.*, 196 F. Supp. 3d at 514. Sufficient participation may be shown by evidence that the parent "was directly involved in the process of finalizing the cost report and billing the government." *Hockett*, 498 F. Supp. 2d at 62. The evidence in *Hockett* included

---

[8] Plaintiffs' citation to *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39 (D. Mass. 2001), *see* ECF No. 391 at 75, is similarly unavailing. *Parke-Davis* involved the pre-2009 equivalent of Section 3729(a)(1)(B), which is not at issue in this case, and discussed causation only in the context of an intervening cause, an argument that PPFA does not make here. 147 F. Supp. 2d at 46, 52-53.

(i) testimony that an official of the parent company had "instructed an employee who was preparing the amended cost report to obscure the true nature of the cost overstatements in the original cost report"; (ii) "[c]orrespondence with the Medicare fiscal intermediary regarding [the subsidiary's] cost report [that] was conducted on [parent company] letterhead" and played "a central part in consummating the fraud, and then attempting to cover it up"; and (iii) frequent, detailed correspondence between officials at the parent and subsidiary regarding the need to increase the billing rate at issue in the litigation.  *Id.* at 62-63.  *See also Sikkenga*, 472 F.3d at 715 (allegations that defendant agreed to circumvent Medicare requirements and assured laboratory submitting fraudulent claims that it "would continue to accept … claims coded with the disputed … code" were "affirmative acts" causing submission of fraudulent claims).

By contrast, allegations that a non-profit health system was "involved in setting up [] compensation arrangements" at a subsidiary hospital that allegedly violated a federal statute (and thus the FCA, through a false-certification theory) were insufficient to show that the parent company was "*directly involved* with the submission of, or causing the submission of, falsely certified cost reports to the Government."  *United States ex rel. Schaengold v. Mem'l Health, Inc.*, 2014 WL 6908856, at *14 (S.D. Ga. Dec. 8, 2014).  Likewise for allegations that a payment-certification company's parent corporations had "benefitted from [the subsidiary] financially," had "knowledge of [the subsidiary's] practices," had "overlapping employees, managers or officers," "performed joint marketing efforts," and "had knowledge of the relevant Medicare and Medicaid standards with which [the subsidiary] needed to comply," which were "too far removed to establish direct involvement in a scheme subject to FCA liability."  *Exec. Health Res.*, 196 F. Supp. 3d at 512-14.

2.   Plaintiffs have presented no evidence that PPFA affirmatively participated in the Affiliate Defendants' submission of the claims at issue.

Despite acknowledging that they must show that PPFA had "direct involvement in [the Affiliate Defendants'] claims process," ECF No. 391 at 75, nowhere do Plaintiffs explain what PPFA's alleged involvement with that process actually was.  In addition to their lengthy recitation of L&L's legal representation of the Affiliate Defendants, *see supra* II.A.2(2)—none of which can serve as the basis for FCA liability for the reasons already explained, and none of which bears on PPFA's participation in those defendants' submission of Medicaid claims in any event—Plaintiffs devote nearly nine pages to arguing that PPFA "controls virtually all aspects of [the Affiliate Defendants'] business operations and provision of medical services as a condition of allowing the Affiliates to use the Planned Parenthood brand and be a member of the Federation."  ECF No. 391 at 89-98.  Yet barely any of these factual assertions have anything to do with whether PPFA controls the Affiliate Defendants' submission of Medicaid claims, much less the claims at issue in this litigation.  Since Plaintiffs are not arguing derivative liability, *see supra* I.A, the rest of these assertions are noise.  *See Exec. Health Res.*, 96 F. Supp. 3d at 512-14.

The only assertions Plaintiffs make that even marginally bear on PPFA's alleged participation in the Affiliate Defendants' claims process are that (i) PPFA "assists Affiliates with their revenue cycle, among other things, which includes Medicaid billing," ECF No. 391 at 21; *see also id.* at 91, 93; (ii) PPFA "prepares materials and information for compliance documents and training [for the Affiliate Defendants], such as billing issues," *id.* at 96; (iii) PPFA advises the Affiliate Defendants on "Medicaid rules and regulations," *id.*; and (iv) PPFA's Health Care Investment Program ("HCIP") provides "technical assistance to PPFA Affiliates on issues such as

27

Medicaid" and funding for "Medicaid and healthcare billing consultants," *id.* at 97.[9]  None of these broad assertions, even if true, come anywhere close to establishing the direct involvement required by the case law.  At most, they show that PPFA provides high-level guidance on national Medicaid trends, new federal regulations, and general Medicaid-related best practices.  They do not link PPFA to the Texas or Louisiana Medicaid rules or regulations at issue in this litigation, to the claims submitted by the Affiliate Defendants to Texas or Louisiana Medicaid during the relevant time period—or even to the Affiliate Defendants' submission of any claim for payment at any time.

The revenue-cycle evidence Plaintiffs cite establishes only that PPFA provided high-level information about how Medicaid works—*not* that it "assists Affiliates with … Medicaid billing." *Id.* at 21.  The "Medicaid Toolkit" Plaintiffs cite, *id.* at 97, explains what Medicaid tends to cover, ECF No. 390-10 at 125-27; how CMS and various states incentivize innovation in Medicaid reimbursement, *id.* at 128-37; common issues the affiliates run into when negotiating reimbursement rates, *id.* at 138-46; and examples of affiliates who successfully navigated reimbursement challenges, *id.* at 146-48.  It discusses Medicaid at the federal level and, aside from some state-specific examples (Texas excluded), does not provide any detail about state Medicaid programs.  Read in context, the Medicaid Toolkit makes clear that the *affiliates* are the ones who manage their claims processes, with generalized advice from PPFA about how the program typically works at the federal level.  The same is true for PPFA's "Revenue Cycle Toolkit," which

---

[9] Among Plaintiffs' various immaterial assertions are (i) that PPFA's affiliates pay membership dues that are "calculated based on a percentage of the PPFA Affiliates' operating expenses, which includes expenses incurred in the provision of Medicaid services," ECF No. 391 at 90, and (ii) that PPFA provided "'Gap Funding' to Affiliates terminated from Medicaid, which would have to be paid back to PPFA if the Affiliate was able to resume receiving Medicaid funds," *id.* at 96.  Since neither of these assertions have anything to do with PPFA's alleged participation in the Affiliate Defendants' claim-submission process, PPFA does not address them here, aside from to say that (i) if receiving membership dues from the affiliates equates to "receiv[ing] … Medicaid funds," *id.* at 91, then every employee or vendor of the affiliates would also be a recipient of said funds, and (ii) PPFA's corporate representative testified that repayment of the "Gap" funds was expected but not required, ECF No. 390-3 at 363.

28

explains "industry-standard best practices" related to revenue-cycle management in light of upheaval in the industry due to the Affordable Care Act. *Id.* at 178. This toolkit emphasizes that it is not a "handbook or a policy and procedure manual" and warns affiliates to "consult legal counsel familiar with the applicable regulatory scheme in [their] jurisdiction[s] before implementing coding, billing or collection practices." *Id.*

In any event, all Plaintiffs have established about the toolkits is that they existed—there is no evidence that any of the Affiliate Defendants relied on them during the time period in question, much less that they were tied to any wrongful claim submission. In fact, Tamara Kramer, the director of HCIP, testified that neither toolkit is "intended to help with … billing of specific Medicaid claims." ECF No. 390-3 at 570. And testimony from PPFA's Vice President of Health Care Operations, meanwhile, establishes only that PPFA employs a single "revenue cycle subject matter expert[]," who, at an affiliate's request, evaluates that affiliate's "key performance indicators related to revenue cycle" to identify "opportunities where there might be revenue left on the table or [to] enhanc[e] the billing department." *Id.* at 917. Plaintiffs have pointed to no evidence that this expert ever advised any of the Affiliate Defendants regarding the claims at issue.

Plaintiffs have likewise overstated what the record shows as to PPFA's advice on "billing issues" and "Medicaid rules and regulations." ECF No. 391 at 96. There is no evidence that PPFA provides the affiliates with "compliance documents and training, such as billing issues," *id.*, as Plaintiffs assert. In the cited testimony, in response to a question about whether PPFA has "prepared any materials or information that is part of compliance documents or trainings" (sic), PPFA's Vice President of Healthcare Operations gave an example of a new cost-transparency regulation (unrelated to this litigation) that an affiliate had asked for PPFA's input on. ECF No. 390-3 at 941. Plaintiffs' counsel—not PPFA's witness—characterized this regulation as "a billing

issue." *Id.*  And while PPFA hosts webinars and phone calls for affiliates related to Medicaid issues that recur across states—for example, navigating a government audit, ECF No. 390-10 at 155, or an overview of new federal regulations, *id.* at 165-66—these trainings had nothing to do with any individual affiliate's claims process, and certainly not about the Medicaid claims at issue in this case.

As for HCIP, Plaintiffs do little more than gesture at the mere existence of the program to support their argument that it was founded in order to "provide technical assistance to PPFA Affiliates on issues such as Medicaid."  ECF No. 391 at 97 (citing ECF No. 390-8 at 369-401, a 40-page report on the program after its first year).  The specific evidence they do cite shows how PPFA works with the affiliates to improve access to health care, with PPFA advocating for high-level policies and the affiliates independently negotiating reimbursement rates with states.  ECF No. 390-10 at 234-36.  If PPFA assists an affiliate with such advocacy efforts, it is in the form of providing background materials or talking points to support the affiliate's conversations with state officials.  ECF No. 390-3 at 572-75.  In support of their assertion that "PPFA provided direct grant funding to the Texas and Louisiana PPFA Affiliates to pay for Medicaid and healthcare billing consultants with expertise in state Medicaid policy," ECF No. 391 at 97-98, Plaintiffs cite deposition testimony about a single grant agreement that "included references to relationship building in Louisiana, with specific payors, on both Medicaid and commercial."  ECF No. 390-3 at 578.

Together, this evidence shows that PPFA advised the affiliates on high-level Medicaid trends and best practices.  Plaintiffs have produced no evidence that PPFA played any role in any of the Affiliate Defendants' submission of the claims at issue (or any claims at all) to the government—"the *sine qua non* of a False Claims violation."  *United States ex rel. Clausen v. Lab.*

*Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002).  The abstract advice Plaintiffs cite is a far cry from the parent company's micro-management of its subsidiary's cost reports in *Hockett*, 498 F. Supp. 2d at 62-63, the liable defendant's approval of particular expenses and invoices in *Harvard College*, 323 F. Supp. 2d at 187-88, or the *Sikkenga* defendant's explicit agreement to continue participating in a fraudulent scheme, 472 F.3d at 715.  All of these cases involved a "nexus" between the defendant's actions and the *specific claims at issue*—not merely the submitting entity's general participation in Medicaid.  *See Harvard Coll.*, 323 F. Supp. 2d at 188 n.31.

Plaintiffs rely on *United States v. Omnicare, Inc.*, 2021 WL 1063784 (S.D.N.Y. Mar. 19, 2021), and *United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.*, 2021 WL 2003016 (D. Mass. May 19, 2021), for the proposition that a parent company's failure to "remedy" unlawful conduct by a subsidiary "is enough to show direct involvement" in the claims process.  ECF No. 391 at 89.  But the parent-company defendants in both of those cases were actively alerted to the fraudulent conduct.  In *Omnicare*, the government alleged that "'CVS's Director of Regulatory Affairs was made aware' of a [state] investigation that had alerted [CVS's subsidiary] and CVS of medications being dispensed without valid prescriptions, and that they were serious violations of state law."  2021 WL 1063784, at *13.  "CVS compliance staff were involved in responding to the investigations" and "conducted an audit of [the subsidiary's] 'Revenue Process'" that confirmed the problem.  *Id.*  Nevertheless, CVS "failed to take any steps to remedy the situation."  *Id.* Likewise, in *Martino-Fleming*, two employees of the parent company received a report confirming the ongoing nature of the compliance issue but failed to take any action to address it, even though they sat on the subsidiary's board.  2021 WL 2003016, at *130.

31

Ignoring an active red flag is the type of affirmative act courts require to hold a third party liable for "causing" the submission of false claims. *See Sikkenga*, 472 F.3d at 715. But Plaintiffs have produced no evidence of a similar red flag here. As discussed in the Affiliate Defendants' brief and above, *see* Aff. Defs. Opp. at III; *supra* II.A.3, PPFA had no reason to believe that the claims the Affiliate Defendants submitted while the injunctions were in place (or during the Texas grace period) were fraudulent.[10] And even if there were a disputed issue of material fact as to the Affiliate Defendants' scienter, the undisputed record shows an *absence* of red flags for PPFA. From PPFA's perspective, some of its affiliates had obtained injunctions preventing Medicaid terminations in Texas and Louisiana from taking effect. Because PPFA does not direct affiliates to submit Texas or Louisiana Medicaid claims or instruct them as to whether to make repayments to Texas or Louisiana Medicaid, ECF No. 383 at 373-74, 380-81, 385-86; ECF No. 387-1 at 135-36, 164, 169, 259-60, 262, it had no reason or occasion to consider the legal status of any claims those affiliates submitted during the pendency of these injunctions.

Despite more than six months of discovery and 140 hours of depositions, Plaintiffs have produced no evidence that PPFA had any inkling the Affiliate Defendants' claims might be false—much less that they actually were false. *Omnicare* and *Martino-Fleming* thus do not support Plaintiffs' argument that PPFA was "directly involved" in the Affiliate Defendants' claims processes.

### III. Even if PPFA Could Be Held Directly Liable, Plaintiffs Cannot Recover Per-Claim Penalties From PPFA.

Plaintiffs' direct-liability theory limits the penalties it can recover from PPFA under the FCA, TMFPA, and LMAPIL. Relator seeks summary judgment on $566,434,197 in civil penalties

---

[10] For the same reasons, Plaintiffs have failed to produce any evidence that PPFA "knowingly" caused false claims to be submitted, as required for a violation of 31 U.S.C. § 3729(a)(1)(A) and La. Rev. Stat. § 46:438.3(A).

under the TMFPA and $1,244,046,510 in civil penalties under the LMAPIL and FCA.  ECF No. 390 at 3-4.  Relator offers no briefing in support of this request, which Texas does not join.  For the reasons described in the Affiliates' opposition brief, this request is not properly before the Court.  Aff. Defs. Opp. at V.  Even if it were, however, it would fail as a matter of law as to PPFA.

As far as PPFA can tell, Relator's request is based on the premise that every Medicaid payment the Affiliate Defendants received during the pendency of the injunctions and did not repay counts as a separate violation of the FCA, TMFPA, and LMAPIL.  "The False Claims Act … does not set any specific formula for imposing civil penalties."  *Morse Diesel Int'l, Inc., v. United States*, 79 Fed. Cl. 116, 124 (2007); *see also United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 530 F. Supp. 2d 888, 900 (S.D. Tex. 2008) (the "calculation of the forfeitures, both in number and amount, is not automatic").  Rather, to determine the number of independent violations that a defendant has committed—and thus the number of times a statutory penalty may be awarded—"the focus in each case [must] be upon the specific conduct of the person from whom the Government seeks to collect the statutory [penalties]."  *United States v. Bornstein*, 423 U.S. 303, 313 (1976); *see also Lodge Constr., Inc. v. United States*, 158 Fed. Cl. 23, 62 (2022) ("The number of penalties to be assessed depends on the 'acts' that violated the False Claims Act and does not necessarily correspond to the number of claims submitted.").  In *Bornstein*, for example, the Supreme Court concluded that a subcontractor's delivery of three shipments of falsely-branded electron tubes caused the primary contractor to submit 35 false invoices to the government.  423 U.S. at 307.  But the Court reversed the district court's award of 35 penalties against the subcontractor, holding that the FCA "penalizes a person for his own acts, not for the acts of someone else," and that the subcontractor had committed only "three acts which caused [the primary contractor] to sub[m]it false claims to the Government."  *Id.* at 312-13; *see also United*

33

*States v. Krizek*, 111 F.3d 934, 939 (D.C. Cir. 1997) (penalties correspond to "causative acts" committed by defendant).

As discussed above, Relator argues that PPFA is liable for reverse false claims because it "masterminded" a legal strategy that caused the Affiliate Defendants to avoid repaying Medicaid funds to the government, ECF No. 391 at 88-89, and for affirmative false claims because it "knew about the [Affiliate Defendants'] allegedly unlawful acts" and failed to "fix" them, *id.* at 98-99 (quoting *Martino-Fleming*, 2021 WL 2003016, at *130). Just as the three shipments in *Bornstein* did not support 35 claims' worth of penalties, this alleged conduct does not support penalties on 45,181 claims in Texas and 99,230 claims in Louisiana, ECF No. 391 at 105.

Relator has argued that PPFA engaged in at most five distinct "causative acts" for reverse false claims, *Krizek*, 111 F.3d at 939, based on the five categories of legal advice Plaintiffs claim L&L provided the Affiliate Defendants. *See* ECF No. 391 at 78-79; *supra* II.A.2(2). As for affirmative false claims, Relator has argued at most three red flags that PPFA allegedly ignored: that PPFA "[i] 'understood that [the Affiliates'] revenues were tied to Medicaid,' [ii] 'understood that Medicaid had requirements in terms of licensure and qualification,' [and] [iii] knew about the allegedly unlawful acts, … 'but failed to [fix them].'" ECF No. 391 at 98-99 (quoting *Martino-Fleming*, 2021 WL 2003016, at *130). At $12,537 per claim, *see* ECF No. 390 at 3-4, this amounts to a maximum of $100,296 penalties against PPFA—not the $566 million and $1.2 billion Relator seeks, *id. See Krizek*, 111 F.3d at 940 (noting unfairness that would result from "definition of claim [that would permit the government] to seek an astronomical $81 million worth of damages for alleged actual damages of $245,392").[11] For this reason, the Court should deny summary judgment on civil penalties as to PPFA.

---

[11] For the reasons briefly explained in the Affiliate Defendants' brief (which PPFA joins), any such award against the Affiliate Defendants or PPFA would be unconstitutional. *See* Aff. Defs. Opp. at VI.

## CONCLUSION

For the foregoing reasons, in addition to the reasons laid out in PPFA's own motion for summary judgment as well as the Affiliate Defendants' motion for summary judgment and brief in opposition, PPFA respectfully requests that the Court enter an order denying Plaintiffs' motions for summary judgment as to PPFA and granting PPFA's motion for summary judgment on all claims.

Dated:  January 27, 2023

Respectfully submitted,

O'MELVENY & MYERS LLP

By:    */s/ Danny S. Ashby*

DANNY S. ASHBY
Texas Bar No. 01370960
dashby@omm.com
MEGAN R. WHISLER
Texas Bar No. 24079565
mwhisler@omm.com
2501 N. Harwood Street, Suite 1700
Dallas, Texas 75201
T: (972) 360-1900
F: (972) 360-1901

LEAH GODESKY (*pro hac vice*)
lgodesky@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
T: (310) 553-6700
F: (310) 246-6779

RYAN BROWN ATTORNEY AT LAW
RYAN PATRICK BROWN
Texas Bar No. 24073967
ryan@ryanbrownattorneyatlaw.com
1222 S. Fillmore St.
Amarillo, Texas 79101
T: (806) 372-5711
F: (806) 350-7716

*Attorneys for Defendant Planned Parenthood*

35

*Federation of America, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2023, a copy of the foregoing was served pursuant to

the Court's ECF system.

/s/ *Danny S. Ashby*

Danny S. Ashby