**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| United States of America | § | |
| *ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| The State of Texas | § | CIVIL ACTION NO. 2:21-CV-00022-Z |
| *ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| The State of Louisiana | § | |
| *ex rel.* ALEX DOE, Relator, | § | Date:        January 27, 2023 |
| | § | |
|    *Plaintiffs*, | § | |
| v. | § | |
| Planned Parenthood Federation of America, | § | |
| Inc., Planned Parenthood Gulf Coast, Inc., | § | |
| Planned Parenthood of Greater Texas, Inc., | § | |
| Planned Parenthood South Texas, Inc., Planned | § | |
| Parenthood Cameron County, Inc., Planned | § | |
| Parenthood San Antonio, Inc., | § | |
|    *Defendants*. | § | |

**MEMORANDUM IN OPPOSITION TO**
**TEXAS'S MOTION FOR SUMMARY JUDGMENT AND**
**RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**................................................................................................................1

**RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**.............................3

   A.  Defendants ................................................................................................ 4

   B.  Affiliate Defendants' Enrollment as Medicaid Providers.................................................. 5

   C.  Calculation of the Amounts Received by Affiliate Defendants from Texas
and Louisiana Medicaid and the Number of Claims Submitted. ...................................... 13

**ARGUMENT** ....................................................................................................................14

**I.**    **Summary Judgment on Plaintiffs' Reverse FCA Claims Should Be Denied** .............14

   A.  Plaintiffs Cannot Establish that Defendants had a Repayment Obligation .................... 15

       i.   The Texas Terminations did not Take Effect Until
the Expiration of the Grace Period ................................................................ 15

       ii.  Louisiana Never Terminated PPGC from Medicaid ...................................... 20

       iii.  The Fifth Circuit's Mandate Did Not Create an "Established Duty"
for Defendants to Return Money to the Government ..................................... 21

   B.  Plaintiffs Cannot Establish Scienter for their Reverse False Claims ............................... 25

       i.   Plaintiffs Offer No Evidence that Defendants "Recklessly Disregarded"
an Overpayment Obligation ......................................................................... 25

       ii.  Plaintiffs Cannot Establish that Defendants Knowingly and Improperly Avoided
or Decreased An Obligation to Return Money to the Government............................ 32

**II.**   **Partial Summary Judgment on the Non-Intervened TMFPA Claims Should
Be Denied** ........................................................................................................34

**III.**  **Relator's Motion for Partial Summary Judgment on Newly-Asserted Implied
False Certification Claims is Baseless** ................................................................34

   A.  Relator Cannot Establish Implied False Claims Liability for Claims
During the Pendency of the Injunction ............................................................... 35

   B.  Relator Cannot Establish Implied False Claims Liability for Claims
During the Texas "Grace Period" ...................................................................... 38

   C.  PPGC Did Not Make an "Implied False Certification" to Louisiana ............................... 41

**IV.**  **Summary Judgment Should be Denied on Relator's Conspiracy Claims** .................42

**V.**   **Summary Judgment Should be Denied on Relator's Damages and Penalty
Requests.** ...........................................................................................................45

**VI.**  **Summary Judgment Should be Denied on Defendants' Excessive Fines
Defense** ............................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10 Ring Precision, Inc. v. Jones*,
    722 F.3d 711 (5th Cir. 2013) ................................................................18

*Ainsworth v. Moffett Eng'g, Ltd.*,
    716 F.3d 174 (5th Cir. 2013) ..................................................................1

*Aminoil, Inc., v. EPA*,
    599 F. Supp. 69 (C.D. Cal. 1984) .........................................................30

*Atkins v. Parker*,
    472 U.S. 115 (1985) ...............................................................................19

*Bader v. Wernert*,
    178 F. Supp. 3d 703 (N.D. Ind. 2016) ..................................................23

*In re Bayou Shores SNF, LLC*,
    828 F.3d 1297 (11th Cir. 2016) .............................................................24

*U.S. ex rel. Becker v. Tools & Metals, Inc.*,
    2009 WL 855651 (N.D. Tex. 2009) .......................................................34

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) ...............................................................................48

*U.S. ex rel. Brooks v. Stevens-Henager College, Inc.*,
    359 F. Supp.3d 1088 (D. Utah 2019) ........................................34, 35, 36

*U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
    741 F.3d 390 (4th Cir. 2013) .................................................................48

*U.S. ex rel. Burlbaw v. Orenduff*,
    548 F.3d 931 (10th Cir. 2008) ...............................................................28

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...............................................................................45

*Cheffer v. Reno*,
    55 F.3d 1517 (11th Cir. 1995) .........................................................46, 47

*Chicago v. Shalala*,
    189 F.3d 598 (7th Cir. 1999) .................................................................19

ii

*Children's Hosp. Assoc. of Tex. v. Azar*,
  507 F. Supp. 3d 249 (D.D.C. 2020) ...................................................................24

*Clarke v. U.S.*,
  915 F.2d 699 (D.C. Cir. 1990) .........................................................................30

*U.S. ex rel. Complin v. N.C. Baptist Hosp.*,
  818 F. App'x 179 (4th Cir. 2020) ....................................................................26

*U.S. ex rel. Coppock v. Northrup Grumman Corp.*,
  2003 WL 21730668 (N.D. Tex. July 22, 2003) .................................................43

*U.S. ex rel. DeKort v. Integrated Coast Guard Sys.*,
  475 F. App'x 521 (5th Cir. 2012) ....................................................................35

*Downes v. Brindamour*,
  2023 WL 166834 (Tex. Jan. 12, 2023) .............................................................20

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982)....................................................................................29, 30

*U.S. ex. rel. Fago v. M&T Motg. Corp.*,
  518 F. Supp. 2d 108 (D.D.C. 2007) .................................................................46

*U.S. ex rel. Farmer v. Houston*,
  523 F.3d 333 (5th Cir. 2008) ...............................................................26, 37, 43

*Fernandez-Vargas v. Gonazales*,
  548 U.S. 30 (2006)..........................................................................................19

*Fiber Sys. Int'l, Inc. v. Applied Optical Sys., Inc.*,
  2009 WL 85900962 (E.D. Tex. Jun. 24, 2009)..................................................22

*Fire Prot. Serv., Inc. v. Survitec Survival Prods.*,
  649 S.W.3d 197 (Tex. 2022)............................................................................19

*U.S. ex rel. Fisher v. Ocwen Loan Servicing, LLC*,
  2016 WL 3031713 (E.D. Tex. May 25, 2016)....................................................47

*Fontenot v. Upjohn Co.*,
  780 F.2d 1190 (5th Cir. 1986) .........................................................................14

*Gee v. PPGC*,
  139 S. Ct. 408 (2018)................................................................................31, 50

*Golan v. FreeEats.com, Inc.*
  930 F.3d 950 (8th Cir. 2019) ...........................................................................50

*Gonzalez v. Planned Parenthood of L.A.*,
  2012 WL 2412080 (C.D. Cal. Jun. 26, 2012) ........................................................36

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
  607 F.3d 453 (7th Cir. 2010) .................................................................................23

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  579 U.S. 93 (2016) ..........................................................................................28, 37

*U.S. ex rel. Harman v. Trinity Indus., Inc.*,
  872 F.3d 645 (5th Cir. 2017) .................................................................................38

*U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
  842 F.3d 430,436-38 (6th Cir. 2016) ...............................................................15, 32

*Hays v. Hoffman*,
  325 F.3d 982 (8th Cir. 2003) .................................................................................48

*U.S. ex rel. Hendrickson v. Bank of Am. N.A.*,
  343 F. Supp. 3d 610 (N.D. Tex. 2018) ...................................................................28

*Indus. Insulation Grp, LLC v. Sproule*,
  2009 WL 10694151 (S.D. Tex. Apr. 16, 2009) ......................................................23

*U.S. ex rel. Jehl v. GGNSC Southhaven, LLC*,
  2021 WL 2815974 (N.D. Miss. July 6, 2021) ........................................................47

*John v. La.*,
  757 F.2d 698 (5th Cir. 1985) .................................................................................45

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
  160 F. Supp. 3d 253 (D.D.C. 2016) .......................................................................22

*Lodge Constr., Inc. v. U.S.*,
  158 Fed. Cl. 23 (Cl. Ct. 2022) ...............................................................................46

*Longoria v. Paxton*,
  585 F. Supp. 3d 907 (W.D. Tex. 2022) ..................................................................29

*U.S. ex rel. Lutz v. BlueWave Healthcare Cons., Inc.*,
  2018 WL 11282049 (D.S.C. May 23, 2018) ...........................................................48

*U.S. ex rel. McLain v. Fluor Enterprises, Inc.*,
  2015 WL 5321692 (E.D. La. Sept. 11, 2015) .........................................................46

*Md. Dep't of Hum. Res. v. Dep't of Agric.*,
  976 F.2d 1462 (4th Cir. 1992) .........................................................................24, 25

*Mead Johnson & Co. v. Abbott Lab.*,
  209 F.3d 1032 (7th Cir. 2000) .......................................................................23

*Merck Sharp & Dohme Corp. v. Albrecht*,
  139 S.Ct. 1668 (2019) (Alito, J., concurring) ........................................18

*Mr. Smoky's BBQ, LLC v. U.S.*,
  2014 WL 24152 (D. Ariz. Jan. 2, 2014) ...................................................28

*Nat'l Kidney Patients Ass'n v. Sullivan*,
  958 F.2d 1127 (D.C. Cir. 1992) ...........................................................24, 25

*Nat'l Maritime Union v. Aquaslide "N" Dive Corp.*,
  737 F.2d 1395 (5th Cir. 1984) ...................................................................30

*New Orleans Home for Incurables v. Greenstein*,
  911 F. Supp. 2d 386 (E.D. La. 2012) ......................................................23

*Okla. Op. Co. v. Love*,
  252 U.S. 331 (1919) ......................................................................................30

*Olson v Fairview Health Servs. of Minn.*,
  831 F.3d 1063 (8th Cir. 2016) ...................................................................32

*Overbey v. Portable Mud Sys.*,
  2021 WL 5230858 (W.D. Tex. Aug. 6, 2021) ........................................45

*Paez v. Wal-Mart Stores Texas, LLC*,
  2022 WL 3216343 (W.D. Tex. Aug. 9, 2022) ........................................45

*Parker v. Time Warner Entertainment Co.*,
  331 F.3d 13 (2d Cir. 2003) (Newman, J., concurring) ........................50

*Peterson v. Weinberger*,
  508 F.2d 45 (5th Cir. 1975) .......................................................................47

*Philips v. Chas. Schreiner Bank*,
  894 F.2d 127 (5th Cir. 1990) .....................................................................22

*Philips v. Noot*,
  728 F.2d 1175 (8th Cir. 1984) ...................................................................19

*Planned Parenthood of Kan. v. Anderson*,
  882 F.3d 1205 (10th Cir. 2018) .................................................................32

*Planned Parenthood of Kan. v. Mosier*,
  2016 WL 3597457 (D. Kan. July 5, 2015) ..............................................23

*PPGC v. Gee*,
862 F.3d 445 (5th Cir. 2017) ...................................................................9, 12, 31, 37

*PPGC v. Gee*,
876 F.3d 699 (5th Cir. 2017) ......................................................................................31

*PPGC v. Kliebert*,
141 F. Supp. 3d 604 (M.D. La. 2015) ............................................................. *passim*

*PPGT Surg. Health Serv. v Abbott*,
748 F.3d 583 (5th Cir. 2014) .....................................................................................19

*PPGT v. Kauffman*,
981 F.3d 347 (5th Cir. 2020) ........................................................................... *passim*

*PPGT v. Smith*,
236 F. Supp. 3d 974 (W.D. Tex. 2017)............................................................ *passim*

*U.S. ex rel. Proctor v. Safeway*,
30 F.4th 649 (7th Cir. 2022) ....................................................................25, 28, 32

*U.S. ex rel. Proctor v. Safeway, Inc.*,
2023 WL 178393 (Jan. 13, 2023) .....................................................................25, 26

*Rabin v. Wilson-Coker*,
362 F.3d 190 (2nd Cir. 2014).....................................................................................19

*U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg. Healthcare Sys.*,
274 F. Supp. 2d 824 (S.D. Tex. 2003) ..............................................................42, 43, 44

*Regeneron Pharms., Inc. v. HHS.*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020)..........................................................................28

*rel. Ruscher v. Omnicare*,
2014 WL 2618158 (S.D. Tex. June 12, 2014) ...........................................................34

*Riquelme Valdes v. Leisure Res. Grp.*,
810 F.2d 1345 (5th Cir. 1987) ...................................................................................43

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007)......................................................................................................26

*San Francisco Tech., Inc. v. Dial Corp.*,
2011 WL 941152 (N.D. Cal. Mar. 17, 2011)..............................................................47

*U.S. ex rel. Schutte v. Supervalu, Inc.*,
2023 WL 178398 (Jan. 13, 2023) ..............................................................................26

*U.S. ex rel. Sibley v. Univ. of Chi. Med. Ctr.*,
    44 F.4th 646 (7th Cir. 2022) ..............................................................32

*U.S. ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*,
    843 F.3d 1033 (5th Cir. 2016) ............................................................25

*Sprint Commc'ns Co. v. CAT Commc'ns, Int'l, Inc.*
    356 F.3d 335 (3d Cir. 2003)................................................................22

*St. Louis, I.M. & S. Ry. Co. v. Williams*,
    251 U.S. 63 (1919)..............................................................................48

*Sterling Trust Co. v. Adderley*,
    168 S.W.3d 835 (Tex. 2005)...............................................................26

*Sturgeon v. Pharmeria Corp.*,
    438 F. Supp. 3d 246 (E.D. Pa. 2020) .................................................36

*Tex. Bd. of Chiropractic Exam'rs. v. Tex. Med. Ass'n*,
    375 S.W.3d 464 (Tex. App. 2012) ......................................................10

*Tex. v. Am. Blastfax, Inc.*,
    154 F. Supp.2d 892 (W.D. Tex. 2001)................................................50

*Texas v. Biden*,
    554 F. Supp. 3d 818 (N.D. Tex. 2021) ...............................................18

*Haw. ex rel. Torricer v. Liberty Dialysis-Haw.-LLC*,
    512 F. Supp. 3d 1096 (D. Haw. 2021) ...............................................35

*Trinity Med. Servs., LLC v. Merge Healthcare Sols., Inc.*,
    2020 WL 97162 (M.D. La. Jan. 8, 2020)...........................................26

*TSO Prod. Corp. v. Alliance Res. Corp.*,
    509 U.S. 443 (1993)............................................................................48

*U.S. v. Bajakajian*,
    524 U.S. 321 (1998)................................................................48, 49, 50

*U.S. v. Bornstein*,
    423 U.S. 303 (1976)............................................................................45

*U.S. v. Cabrera-Diaz*,
    106 F. Supp.2d 234 (D.P.R. 2000)......................................................47

*U.S. v. Compassionate Home Servs., Inc.*,
    2018 WL 11321934 (E.D. N.C. Jul. 30, 2018) ..................................48

*U.S. v. HCA Health Servs. of Okla., Inc.*,
  2011 WL 4590791 (N.D. Tex. Sept. 30, 2011)....................................................21

*U.S. v. Hill*,
  393 F. App'x 162 (5th Cir. 2010) ........................................................................10

*U.S. v. Kruse*,
  101 F. Supp. 2d 410 (E.D. Va. 2000) ...................................................................47

*U.S. v. Levesque*,
  546 F.3d 78 (1st Cir. 2008)...................................................................................49

*U.S. v. Mackby*,
  339 F.3d 1013 (9th Cir. 2003) ..............................................................................48

*U.S. v. Sci. Apps. Int'l Corp.*,
  626 F.3d 1257 (D.C. Cir. 2010) ............................................................................45

*United Healthcare Ins. Co. v. Azar*,
  330 F. Supp. 3d 173 (D.D.C. 2018) ......................................................................27

*United Healthcare Ins. Co. v. Becerra*,
  16 F.4th 867 (D.C. Cir. 2021) ...............................................................................27

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
  579 U.S. 176 (2016)........................................................................29, 38, 39, 42

*W.R. Grace & Co. v. Int'l Union of the Un. Rubber, Cork,*
  *Linoleum & Plastic Workers of Am.*,
  461 U.S. 757 (1983)..............................................................................................22

*Wadley S. Ry. Co. v. Ga.*,
  235 U.S. 651 (1915)........................................................................................30, 31

*Walsh v. East Penn Mfg. Co.*,
  555 F. Supp. 3d 89 (E.D. Pa. 2021) ......................................................................20

**Statutes**

31 U.S.C. § 3729.........................................................................14, 21, 25, 26

42 U.S.C. § 1320a-7k(d)(2) ........................................................................27

La. R.S. § 46:437.3 ...............................................................................21, 25, 26

La. R.S. § 46:437.4 ....................................................................................24, 25

La. R.S. § 46:437.5 .........................................................................................21

La. R.S. § 46.437.6 ..........................................................................................21

La. R.S. § 46.437(11)(A) ...............................................................................20

La. R.S. § 46:437.13 .......................................................................................21

La. R.S. 46:438.3 .......................................................................................15, 32

La. R.S. § 46:438.5 ...................................................................................24, 25

La. R.S. § 46:440:14 .................................................................................24, 25

La. R.S. § 46:440:14 .................................................................................24, 25

Tex. A.C. § 361.115 ........................................................................................20

Tex. A.C. § 371.1703 ..................................................................8, 9, 15, 16, 18

Tex. A.C. § 371.1705 ......................................................................................15

Tex. A.C. § 371.1707 ......................................................................................15

Tex. A.C. § 371.1711 ......................................................................................24

Tex. H.R.C. § 36.001(7-a) ..............................................................................21

Tex. H.R.C. § 36.0011(a) ..........................................................................25, 26

Tex. H.R.C. § 36.002 ......................................................................................32

Tex. H.R.C. § 36.107 ......................................................................................35

28 Tex. A.C. § 3.102(a) ..................................................................................19

28 Tex. A.C. § 5.4906 .....................................................................................20

37 Tex. A.C. § 344.864 ...................................................................................20

**Other Authorities**

42 C.F.R. § 408.8 ............................................................................................19

42 C.F.R. § 433.316 ........................................................................................24

42 C.F.R. § 447.45(f)(1)(i) ...............................................................................9

83 Fed. Reg. 56015-02 (Nov. 9, 2018) ..........................................................19

84 Fed. Reg. 71674-01, 71703-07 (Dec. 27, 2019) .......................................19

87 Fed. Reg. 79542 (Dec. 27, 2022) .............................................................................27

Fed. R. Civ. P. 26 ..........................................................................................................13

Fed. R. Civ. P. 56 ......................................................................................................1, 45

Fed. R. Civ. P. 65 ..........................................................................................................23

L. R. 56.5(a) ...................................................................................................................45

Tex. App. R. Proc. 26.3 ................................................................................................20

Pursuant to Federal Rule of Civil Procedure 56, Defendants Planned Parenthood Gulf Coast, Inc. ("PPGC"), Planned Parenthood of Greater Texas, Inc. ("PPGT") Planned Parenthood South Texas, Inc. ("PPST"); Planned Parenthood Cameron County, Inc. ("PPCC"); and Planned Parenthood San Antonio, Inc. ("PPSA") (collectively, "Affiliate Defendants")[1] submit this memorandum in opposition to Plaintiffs' Motion or Partial Summary Judgment (Dkt. 391).

## INTRODUCTION

Texas's Motion for Summary Judgment and Relator's Partial Motion for Summary Judgment, Dkt. 391, seek to impose punitive fraud liability because Affiliate Defendants retained reimbursements they received for providing medical care to Texas's and Louisiana's most vulnerable citizens, consistent with federal injunctions that explicitly authorized them to do so. Texas and Relator's (collectively, "Plaintiffs") novel theory of "reverse false claims" liability under the federal False Claims Act ("FCA"), Texas Medicaid Fraud Prevention Act ("TMFPA"), and Louisiana Medical Assistance Programs Integrity Law ("LMAPIL") lacks any basis in law or evidence. To prevail on summary judgment, Plaintiffs must show no genuine issue of material fact that Affiliate Defendants had an "established duty" to pay the government, which they knowingly and improperly concealed, avoided, or decreased. Plaintiffs fail on all fronts.

First, Plaintiffs assert the Fifth Circuit's *en banc* decision "established" a duty to repay, but the opinion itself says no such thing. As Plaintiffs concede, the decision related only to patients' standing to challenge "free-choice-of-provider" under Medicaid and said nothing about the merits, much less whether there was a duty to repay monies for services rendered.[2] Perhaps the opinion

---

[1] For ease of reference, PPST and its subsidiaries, PPSA and PPCC, are collectively referred to as "PPST" for purposes of this brief.

[2] Plaintiffs cite, Dkt. 391 at 22, to a concurrence in which a minority of the judges sitting *en banc* offered views as to the propriety of the terminations. But, a concurrence by definition is not a holding of the Court. *Cf. Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 178 (5th Cir. 2013) ("The

provided grounds for federal or state government to exercise *discretion* to seek repayment, yet no government agency did so. On these undisputed facts, Plaintiffs cannot demonstrate an established obligation to repay, let alone that Defendants "knowingly and improperly" avoided it. Accordingly, the Court should deny Plaintiffs' motions for summary judgment on their reverse false claim theories.

Relator also offers three previously unpled "alternative" implied false certification theories, based on claims submitted during the pendency of the Texas injunction and a period following the Fifth Circuit's vacatur ("Grace Period"), as well as PPGC's reimbursements from Louisiana Medicaid. Relator's attempt to inject new theories at the summary judgment stage—after the close of discovery and more than eight months after the deadline for amending pleadings—should be rejected.[3] But even if the Court were to consider the new theories, they fail as a matter of law on the undisputed record. For each new theory, Relator has failed to demonstrate falsity, scienter, or materiality. Relator cannot show falsity or scienter because they have not identified a specific representation on a claim for payment even tangentially related to the purported "false certifications," nor have they proffered evidence establishing that the supposed "representation" was objectively false when made, let alone that Affiliate Defendants *knew* it was false. On materiality, Relator cannot escape (and does not meaningfully address) the undisputed fact that the States knew of the various alleged "misrepresentations" at the time they were made, or at the very least have since become aware of them, and never withheld payment or pursued recoupment of Affiliate Defendants' claims on that basis.

---

reasoning of a Supreme Court opinion that does not command a majority vote is not binding precedent."). Even if it were, the concurrence too said nothing about an obligation to repay. *See generally PPGT v. Kauffman*, 981 F.3d 347 (5th Cir. 2020).

[3] *See* Dkt. 315 (denying Defendants' motion for leave to amend answers in part based on timeliness and finding of prejudice to Plaintiffs).

Finally, Plaintiffs' motion for summary judgment with respect to damages and penalties is premature and unsupported. Even if this was not the case, Plaintiffs' pursuit of $1.2 to $1.8 **billion** in damages for Affiliate Defendants' provision of approximately $16.5 million in healthcare to Medicaid beneficiaries, and for which the government suffered no harm, is manifestly unjust and would be unconstitutional.

For these reasons, the Court should deny Plaintiffs' Motions.

## RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS[4]

2.      This paragraph is not material, but it is disputed that Texas has a "robust Medicaid network." When the Affiliate Defendants tried to help their patients find new providers during the Grace Period, they were often unsuccessful. *E.g.*, Sealed Supp. App. 769, PPST 30(b)(6) Dep. 220:14-23 (the providers PPST contacted were not accepting new Medicaid patients). This paragraph also describes aspects of the Texas Medicaid program as of 2017 and does not attempt to address any potential changes in the subsequent six years.

3.      ROA.6273 does not support the proposition that a Texas Medicaid provider must adhere to accepted medical and ethical standards. It is also disputed that there is an objective measure by which to judge compliance with "accepted medical and ethical standards" or "accepted medical community standards." *See* Dkt. 382, SOF ¶ 11. This paragraph is misleading to the extent it suggests Affiliate Defendants were terminated because of circumstances indicating that the health or safety of patients was at risk. *Id.*, SOF ¶ 9 (no evidence any provider actually altered an abortion procedure to facilitate research), SOF ¶ 21 (HHSC would not allow a provider to remain enrolled if they were not going to deliver services in a legal, ethical, and safe manner).

---

[4] Because Plaintiffs did not number the paragraphs in their Statement of Undisputed Facts, Affiliate Defendants attach a courtesy copy of their Statement of Facts with numbers added to assist the Court in reviewing Affiliate Defendants' responses to the Statement of Facts. Sealed Supp. App. 735-60. Numbered paragraphs not addressed here are not disputed.

**A. Defendants**[5]

14.     It is immaterial, but disputed, that PPGC operated Planned Parenthood Center for Choice ("PPCFC"). Rather, PPCFC and PPGC were two separate entities with a Management & Services Agreement between the two. Supp. App. 544, Linton Dep. 115:7-14. PPCFC operated a surgical center in a separate suite in the same building as PPGC's Houston Gulf Freeway facility. Supp. App. 545, Linton Dep. 116:70-25. It is immaterial, but this paragraph provides no support for the claim that PPGT operated Planned Parenthood Greater Texas Surgical Health Services in PPGT's facilities.

15.     This paragraph mischaracterizes the relationship between the Affiliate Defendants and PPFA. Affiliate Defendants are not "Planned Parenthood entities," but are affiliate members of PPFA, which is a membership organization. Dkt. 387-1, PPFA App. at 180-81. However, each Affiliate Defendant is a separate company, with separate bylaws, articles of incorporation, boards of directors, employees, management structure, and tax filings, bank accounts, phone numbers, business addresses, facilities, and operations. Dkt. 382, SOF ¶ 2. It is not material, but the statement that the Affiliate Defendants' CEOs and other officers have served on PPFA's Board of Directors and other boards, commissions, working groups, and committees of PPFA lacks support beyond indicating that PPGT's CEO has served on certain PPFA boards and committees and PPGT's former CFO served on PPFA's Fiduciary Committee.

16.     This paragraph is immaterial and provides no support for the assertion that PPGT provides telehealth services to PPGC and PPST's patients.

---

[5] PPFA's response to Plaintiffs' statement of facts, including paragraphs 8-13, is included in PPFA's Opposition to Plaintiffs' Motion for Summary Judgment.

**B.  Affiliate Defendants' Enrollment as Medicaid Providers**

17.    The assertions in this paragraph regarding the percentage of Texas and Louisiana Medicaid patients who Affiliate Defendants serve is immaterial. This paragraph also describes aspects of the Texas and Louisiana Medicaid programs as of 2017 and does not attempt to address any potential changes in the subsequent six years.

18.    This paragraph is immaterial because false claims liability does not attach to an alleged "willingness" to violate the law or other requirements. *See* Dkt. 382 at 45-47. It also inaccurately reflects the conversations Relator had with PPGC doctors and staff. For example, while certain PPGC staff discussed the possibility of working with Relator's fake tissue-procurement company to provide tissue from abortions for research, they never verified PPGC's ability to obtain intact or mostly intact fetuses through changing the way abortion procedures were performed. *E.g.*, Supp. App. 550, Tr. of Video at 31:5-33:1 (discussing potential to alter post-procedure tissue processing to obtain intact specimens for research). Nor did they express a desire for monetary compensation for the specimens. *E.g.*, Supp. App. 553, Tr. of Video at 50: 24-51:12 (need to know costs of facilitating donation to develop budget to cover those costs).

19.    This paragraph is immaterial because Defendants have not moved for summary judgment on the public disclosure bar. It also misrepresents Relator's contacts with law enforcement. For example, Relator provided the PPGC video and other information to Texas in early July 2015, not May or early June. *See,* e.g., Sealed Supp. App. 784-86 (describing Relator's initial contact with Texas in early July 2015).

20.    This paragraph is undisputed, but PPGC contends the Louisiana Department of Health's (LDH's) reasons for seeking to terminate or revoke the provider agreements were invalid.

21.     This paragraph incorrectly states that PPFA made decisions regarding PPGC's course of action in contesting Louisiana's attempts to terminate its provider agreements and that PPGC's patients obtained a preliminary injunction "through PPFA." PPFA's Public Policy Litigation & Law ("Lit & Law") "operates as a captive law firm" and "represented Affiliate Defendants in the underlying litigation relating to Texas's and Louisiana's efforts to terminate Affiliate Defendants from participating in their respective programs." Dkt. 376 at 2. Lit & Law, as well as PPGC's outside counsel, provided legal advice to PPGC, but PPGC alone decided to contest the proposed termination in federal court. Supp. App. 517-18, PPGC 30(b)(6) Dep. 14:2-15:11; *see also* Dkt. 382, SOF ¶¶ 10-19.[6] Similarly, PPGC's patients alone obtained the federal injunction that "enjoined [Louisiana] from terminating any of its Medicaid provider agreements with [PPGC,]" which would "remain in force *until notified by this Court*." *PPGC v. Kliebert*, 141 F. Supp. 3d 604, 653 (M.D. La. 2015) (emphasis added). PPGC's termination never became final because Louisiana withdrew the termination notices effective October 13, 2022, which was before the court vacated the injunction on November 10, 2022. Dkt. 382, SOF ¶ 19. Louisiana has continued to pay PPGC's claims from 2010 to the present.. *Id.* at ¶ 4.

22.     This paragraph incorrectly states that PPFA made decisions regarding Affiliate Defendants' course of action in contesting Texas's attempts to terminate their provider agreements. Lit & Law, as well as Affiliate Defendants' respective outside counsel, provided legal advice to Affiliate Defendants, but Affiliate Defendants alone decided to contest the proposed termination in federal court. Supp. App. 517-18, PPGC 30(b)(6) Dep. 14:2-15:11; *id.* at 540, Linton Dep. 53:3-19; Sealed Supp. App. 771, PPST 30(b)(6) Dep. 244:10-25; *id.* at 781-82, Lambrecht Dep. 116:4-

---

[6] PPGC chose not to exercise its right to contest the Louisiana's letter through the means described in the State's letter in 2015, but PPGC did contest the allegations in the State's letter in federal court. App. 546-48, Linton Dep. 186:1-188:1.

117:11; *see also* Dkt. 382, SOF ¶¶ 10-19.[7] It is immaterial, but disputed that PPGC never notified LDH of the termination letter it received from Texas. *See* Supp. App. 616-18, PPGC Letters to LDH (Dec. 23, 2020) (referencing "notice of termination of PPGC's Texas Medicaid contracts").[8]

23.     The cited material at ROA.4326 does not support the statement that HHSC-Office of Inspector General's ("HHSC-OIG") Chief Medical Officer informed the Inspector General that in his opinion, the video demonstrated that PPGC violated accepted medical and ethical standards.[9]

24.     This paragraph misrepresents the bases for the Texas Final Notices of Termination. The Final Notices did not state that the termination was based on a determination that the video indicated that PPGC violated accepted medical and ethical standards. Rather, they stated that based on the video, the HHSC-OIG's Chief Medical Officer concluded that PPGC's "willingness" to engage in certain practices violated generally accepted medical standards. Rel. Compl., Ex. B; *see also* Dkt. 382, SOF ¶ 9 (notices based on "willingness" to alter abortion procedures, but HHSC had no evidence any provider altered a procedure). While the Final Notices stated that the terminations were also based on a misrepresentation to law enforcement officials, the former Inspector General testified that this was about whether the Baylor Institutional Review Board had approved a study (not PPGC activity) and that he did not know whether it was a misrepresentation

---

[7] Affiliate Defendants chose not to exercise their right to contest the State's letter through the means described in the State's letter in 2015, but Affiliate Defendants did contest the allegations in the State's letter in federal court. Supp. App. 528, PPGT 30(b)(6) Dep. 134:6-10; *id.* at 538, Linton Dep. 41:20-42:4 (PPGC); Sealed Supp. App. at 766-67, PPST 30(b)(6) Dep. 189:22-190:25.; *id.* at 762, PPGC 30(b)(6) Dep. 84:20-24.

[8] There is no question that LDH was aware of the Texas termination proceedings. For example, LDH sought a stay of the Louisiana proceedings pending the Fifth Circuit's ruling in the Texas termination litigation. Supp. App. 608-09, LDH Mot. (Dkt. 109) at 1, *Kliebert*, No. 3:15-cv-565 (M.D. La. Mar. 28, 2019). And the settlement agreement recently signed by LDH referenced both the Fifth Circuit's ruling in the Texas termination litigation and *this* case. Sealed App. 011-12, 15. Similarly, HHSC was aware of the Louisiana termination proceedings. *E.g.,* Dkt. 390-2, Pls. App. 875-76, 896, Mot. (Dkt. 5-2), *Smith*, No. 1:15-cv-01058 (W.D. Tex. Nov. 23, 2015).

[9] There are no pages numbered 8883-93 in the *Kauffman* ROA.

or a mistake. App. 127-28, Mot. Hr'g. Tr. 51:6-52:16, *Smith*, No. 1:15-cv-01058 (W.D. Tex. Jan. 18, 2017).

25.     The statements regarding the Final Notices are undisputed, but Affiliate Defendants chose to contest the terminations in federal court. *See* Dkt. 382, SOF ¶¶ 10-19. It is immaterial, but disputed that PPGC never notified LDH of Texas's termination letter. Resp. ¶ 22.

26.     This paragraph incorrectly states that Affiliate Defendants' patients obtained a preliminary injunction "through PPFA." Lit & Law, as well as Affiliate Defendants' respective outside counsel, provided legal advice to Affiliate Defendants (Supp. App. 517-18, PPGC 30(b)(6) Dep. 14:16-15:11; Supp. App. 541, Linton Dep. 58:6-23; Supp. App. 529-31, PPGT 30(b)(6) Dep. 135:3-137:11; Sealed Supp. App. 772-74, PPST 30(b)(6) Dep. 246:6-17; 248:16-249:18), but Affiliate Defendants and their patients obtained the federal injunction that "enjoined [Texas] from terminating [Affiliate Defendants'] Medicaid Provider Agreements[,]" which would "remain in force *until further ordered*." *PPGT v. Smith,* 236 F. Supp. 3d 974, 1000 (W.D. Tex. 2017) (emphasis added). It is also disputed that the terminations became final on January 19, 2017[10] or by February 1, 2017. On January 19, 2017, at the conclusion of a three-day evidentiary hearing, the federal court in Texas entered an order prohibiting the termination of the Affiliate Defendants' enrollment in Texas Medicaid until February 21, 2017. *Id.* at 987. The preliminary injunction was entered on February 21, 2017. *Id.* at 1000. Section 371.1703(g) of the Texas Administrative Code does not support the proposition that the terminations became effective in January or February 2017. Rather, once a provider is terminated from Medicaid, it may not receive reimbursements during the termination (Tex. A.C. § 1703(g)(2)) and must re-enroll in order to participate (*id.* § 1703(g)(3)). *See also* Dkt. 382, SOF ¶ 21. Affiliate Defendants were not terminated as of January

---

[10] Texas alleges that the terminations became effective February 1, 2017. Dkt. 382, SOF ¶ 26.

or February 2017 because Texas was enjoined from terminating them (*Smith*, 236 F. Supp. at 987; *cf.* Supp. App. 601-02, Mot. (Dkt. 108), *Smith*, 1:15-cv-01058-LY (W.D. Tex. Mar. 13, 2017)), and later permitted them to see Medicaid patients and receive reimbursement during in early 2021 without first re-enrolling. Dkt. 382, SOF ¶¶ 6, 20-23.

27.     This paragraph incorrectly suggests that *PPGT v. Kauffman*, 981 F.3d 347 (5th Cir. 2020), "overruled the Louisiana case." Rather, *Kauffman* overruled the panel decision in *PPGC v. Gee*, 862 F.3d 445 (5th Cir. 2017), and held that Affiliate Defendants' patients had no private right of action to challenge the terminations on the grounds that they violated Medicaid's free choice of provider requirement. *Kauffman*, 981 F.3d at 357. The Fifth Circuit did not reach the merits or disturb the Louisiana and Texas courts' detailed factual findings that there was no evidence to support Affiliate Defendants' terminations from Medicaid. Dkt. 382, SOF ¶¶ 18-19.

28.     It is disputed that PPFA drafted the letter Affiliate Defendants sent to HHSC regarding the Grace Period. Lit & Law, as counsel to the Affiliate Defendants, was involved in the drafting of the letter, not PPFA. Supp. App. 542-43, Linton Dep. 67:4-68:7. This paragraph is misleading to the extent it suggests that Affiliate Defendants requested and HHSC agreed to a Grace Period solely to help their patients find new providers. Affiliate Defendants sought and HHSC agreed to a Grace Period to continue to provide care to patients in light of the COVID-19 pandemic. Dkt. 382, SOF ¶¶ 20, 22-23. Indeed, HHSC knew that Affiliate Defendants were providing healthcare to its Medicaid patients and seeking reimbursement for those services. Dkt. 382, SOF ¶ 23; *see also* 42 C.F.R. § 447.45(f)(1)(i) (requirement to conduct a "prepayment claims review" before paying Medicaid claims, including verification that "the provider was authorized to furnish the service at the time the service was furnished."); Supp. App. 508-09, Exnicious Decl. ¶ 7 (Affiliate Defendants billed for services using associated CPT codes; there is no CPT code for

transitioning a patient from one Medicaid provider to another); *id.* at 514, McKinney Decl. ¶ 6 (same), *id.* at 511-12, Barraza Decl. ¶ 6 (same).[11] PPGC did not need to request a "grace period" in Louisiana because PPGC has never been terminated from Louisiana Medicaid. Dkt. 382, SOF ¶ 34. It is not material but disputed that Affiliate Defendants made no effort to transition patients to new providers other than referring them to HHSC's website and that they only encouraged patients to come in so Affiliate Defendants could bill for services.[12] *See,* e.g., Supp. App. 519-24, PPGC 30(b)(6) Dep. 21:16-24:12, 248:13-249:1; *id.* 532-34, PPGT 30(b)(6) Dep. 210:22-212:7; Sealed Supp. App. 768-70, 778-79, PPST 30(b)(6) Dep. 219:8-221:14, 464:17-465:5; *id.* 783, Lambrecht Dep. 135:14-:22; Supp. App. 612, PPGC Medicaid Talking Points; *id.* 620, PPGC Medicaid Patient Letter; *id.* 725-30, PPGT Medicaid Email. Affiliate Defendants billed for and received reimbursement from Texas Medicaid for services provided during the Grace Period as follows: PPGC ($14,142.71); PPGT ($24,473.24), PPST ($19,010.13). Supp. App. 509, Exnicious Decl. ¶ 8, *id.* 515, McKinney Decl. ¶ 7, *id.* 512, Barraza Decl. ¶ 7.[13]

29.     The description of Affiliate Defendants' arguments in their petition to Travis County is disputed but immaterial; Affiliate Defendants argued that Texas was required to provide proper notice of termination to Affiliate Defendants since they had been participating in Texas Medicaid long after the prior notice, including during the Grace Period. Supp. App. 621-719, Pet.,

---

[11] The Medicaid system works by reimbursing medical providers for approved services that they provide to Medicaid patients. In order for providers to receive reimbursement, they submit 'superbills' to Medicaid that include Current Procedural Terminology ("CPT") codes for the medical services provided." *U.S. v. Hill*, 393 F. App'x 162, 163-64 (5th Cir. 2010). Each CPT code is an alphanumeric identifier corresponding to a procedure or service *Id.*; *see also Tex. Bd. of Chiropractic Exam'rs. v. Tex. Med. Ass'n*, 375 S.W.3d 464, 482-33 (Tex. App. 2012).

[12] Plaintiffs' cited "evidence" does not support their assertions.

[13] Affiliate Defendants were focused on providing care to their patients, not increasing revenue. In fact, at least one Affiliate Defendant continued to see Medicaid patients between issuance of the Fifth Circuit's mandate and granting of the grace period, but provided charity care and did not bill for the services. Sealed Supp. App. 776-77, PPST 30(b)(6) Dep. 462:14-463:5.

*In re PPGT*, No. D-1-GN-21-000528 (Travis Cty., Tex. Feb. 3, 2021). This paragraph misrepresents the purpose of the temporary restraining orders ("TROs") issued in Travis County. The TRO was issued because "immediate and irreparable harm" would result to Affiliate Defendants before a hearing could be held and in order to maintain the status quo, which was that Affiliate Defendants "continue to participate in the Medicaid program." Tex. Compl. Ex. 1. It is not material, but disputed that Affiliate Defendants did nothing to help their patients find other providers.[14] *Supra*, Resp. ¶ 28. It is disputed that Affiliate Defendants continued billing Texas Medicaid for services provided until March 12, 2021; they did not bill after March 10, 2021. App. 483 (Linton Decl. ¶ 8), 490 (Barraza Decl. ¶ 8), 495 (Lambrecht Decl. ¶ 8).

30.     This paragraph lacks support. It is disputed that PPFA, on behalf of Affiliate Defendants, asked the Texas district court to stay the case pending potential filing, and, if filed, disposition of a Petition for a Writ of Certiorari; Affiliate Defendants alone sought the stay, which Texas did not oppose. Dkt. 390-4, Pls. App. 2698-702. It is also disputed that PPFA voluntarily dismissed the case; Affiliate Defendants voluntarily dismissed the case once the deadline to file a Petition for a Writ of Certiorari had passed. *Id.* at 2723-25.

31.     It is immaterial and disputed that the legal claims underlying the federal preliminary injunction and state temporary restraining order in Texas were found to be without merit. Rather, the Fifth Circuit did not reach the federal district court's detailed factual findings that there was no evidence to support the terminations (Dkt. 382, SOF ¶ 18), nor did the Travis County court, which held that the deadline to file an administrative appeal had passed while noting the underlying facts gave the court "great pause" and that there was "some evidence that the justification [for the terminations] is faulty." Dkt. 390-2, Pls. App. 1091-92.

---

[14] The cited material does not support these statements.

32.     It is undisputed that PPGC never stopped billing Louisiana for Medicaid services. The remainder of this paragraph is immaterial. It is also disputed that PPGC failed to inform Louisiana about the Texas termination. *Supra*, Resp. ¶ 22. PPGC's December 23, 2020 letter to LDH was sent eight days after the Fifth Circuit issued the mandate that vacated the preliminary injunction (Supp. App. 614-15, Judgment, *Kauffman*, No. 17-50282 (5th Cir. Dec. 15, 2020)) and stated that PPGC was "not currently participating in the Texas Medicaid program." Supp. App. 616-19, PPGC Letters to LDH (Dec. 23, 2020). It is also disputed that PPGC was obligated to provide any description of the Fifth Circuit's ruling to LDH in December 2020. *Cf.* 50 La. A.C. § 4147A(4), (8) (requiring notice of termination from Medicaid in another state).[15] As stated above, it is disputed that the Fifth Circuit in *Kauffman* overruled the Louisiana case; it merely held that Affiliate Defendants' patients had no private right of action to challenge terminations on the ground that they violated Medicaid's free choice of provider requirement. Resp. ¶ 27.[16]

33.     This paragraph is immaterial and is disputed to the extent it suggests PPGC had an obligation to notify LDH of Fifth Circuit's *en banc* decision in *Kauffman* or HHSC's letter of January 4, 2021 granting a one-month Grace Period. Resp. ¶ 32.

34.     This paragraph is immaterial. It is also disputed to the extent it suggests that PPGC was obligated to provide notice to LDH other than its letters of December 23, 2020 and March 22, 2021. Supp. App. 616-19 & 725-32, PPGC Letters to LDH.

---

[15] PPGC notified LDH of its termination from Texas Medicaid once it went into effect. Supp. App. 725-32, PPGC Letters to LDH (Mar. 22, 2021).

[16] LDH also was certainly aware of the Fifth Circuit's decision since the Louisiana district court case (in which it was a party) was stayed pending a decision in the *en banc* rehearing of *Kauffman* and another case pending in the Fifth Circuit. Supp. App. 611, Order (Dkt. 114), *Gee,* No. 3:15-cv-565 Order (M.D. La. May 17, 2019).

35. This paragraph is immaterial and disputed to the extent it suggests that PPFA or PPGC was obligated to update the Louisiana court after the Fifth Circuit's ruling in *Kauffman*. It is also immaterial and disputed that PPFA, on behalf of PPGC, opposed Louisiana's request to lift the stay after the Fifth Circuit's ruling; PPGC opposed the request. Supp. App. 733-34, Order (Dkt. 121), *Phillips*, No. 3:15-cv-565 (M.D. La. Apr. 7, 2021).

### C. Calculation of the Amounts Received by Affiliate Defendants from Texas and Louisiana Medicaid and the Number of Claims Submitted

37. It is disputed that Lochabay calculated the number of "false claims" submitted by Affiliate Defendants. Whether the claims, made for services Affiliate Defendants provided to Texas Medicaid recipients while Affiliate Defendants were enrolled as Texas Medicaid providers, are false is the central dispute of this matter. Dkt. 390-2 at Pls. App. 1102-05, Lochabay Decl. ¶¶ 10, 23 (calculated number of potential TMFPA unlawful acts), Pls. App. 1213-15, Lochabay Decl. ¶¶ 8, 19 (calculated number of potential LMAPIL unlawful acts)). Further, it is disputed that PPGC submitted $8,059,229 in claims to Louisiana Medicaid. Lochabay appears to have updated his calculations for the Louisiana claims without seeking leave to file a supplemental report or providing any workpapers or underlying data, in violation of Federal Rule of Civil Procedure Rule 26(a)(2)(B) and the Court's scheduling order (Dkt. 346 ¶ 5). *Compare* Dkt. 390-2, Pls. App. 1275 (Supp. Lochabay Rep. identifying $7,494,040) *with id.* at 1215 (Lochabay Decl. identifying $8,059,229). Defendants object to the late disclosure of this calculation, without support, that they have been unable to validate. Further, the amount of any potential damages and civil remedies is disputed by Defendants' expert Louis Rossiter. Supp. Sealed Supp. App. 799-800, Rossiter Expert Rep. ¶¶ 19-21 (Oct. 16, 2022) (there are no economic damages; Lochabay failed to: appropriately measure costs incurred by the States for claims paid to MCOs, consider the value that the State programs received from services provided by the Affiliate Defendants, and did not account for

costs that would have been incurred by Texas and Louisiana Medicaid absent the services provided by Affiliate Defendants).

38.     This paragraph mischaracterizes the testimony of Curtis and Rossiter. Curtis, on behalf of PPGC, merely testified that PPGC deferred to the $7,686,55017 and $4,551,314 that Lochabay calculated PPGC received from Louisiana and Texas Medicaid. Sealed Supp. App. 763-64, PPGC 30(b)(6) Dep. 211:1-212:12. Rossiter similarly agreed with Lochabay's calculation that Affiliate Defendants received $7.6 million (not Lochabay's revised $8 million figure) from Louisiana Medicaid and $8.96 million from Texas Medicaid, respectively. Dkt. 390-3, Pls. App. 2090-2173, Rossiter Dep. 121:11-123:21, 210-19-211-20. There is no support for the last sentence and it is disputed that damages or penalties are owed in connection with PPGC's claims submitted to Louisiana Medicaid since PPGC was never terminated. Dkt. 382, SOF ¶¶ 4, 19, 34.

## **ARGUMENT**

### I.     **Summary Judgment on Plaintiffs' Reverse FCA Claims Should Be Denied**

To prevail on summary judgment, Plaintiffs must "establish beyond peradventure all of the essential elements of the claim." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194-95 (5th Cir. 1986). For Plaintiffs' reverse FCA claims, they must show that there is no genuine dispute of material fact that Defendants had an obligation to repay money to the government that they "knowingly and improperly" (or in the case of Louisiana, "knowingly") avoided. 31 U.S.C. § 3729(a)(1)(G); Tex. H.R.C. § 36.002 ("knowingly and improperly"); La. R.S. § 46:438.3 ("knowingly"); *U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430,436-38 (6th Cir. 2016). Plaintiffs fall far short.

---

[17] Lochabay subsequently reduced his calculation from $7,686,550 from his initial July 1, 2022 expert report (App.1243) to $7,494,040 in his October 26, 2022 supplemental report (App.1275).

### A.  Plaintiffs Cannot Establish that Defendants had a Repayment Obligation

First and foremost, Plaintiffs must establish that the reimbursements received by Affiliate Defendants from Texas and Louisiana Medicaid during the pendency of the injunction were "overpayments." To do so, at a minimum, Plaintiffs must establish that Affiliate Defendants' Medicaid terminations were effective as of February 1, 2017. They cannot. The undisputed facts show that HHSC considered Affiliate Defendants' enrollments as continuing through March 2021, and that LDH has *never* terminated PPGC.[18] Accordingly, Affiliate Defendants were entitled to reimbursement for the services provided to Medicaid beneficiaries. The payments Affiliate Defendants lawfully received for these covered services were not overpayments when received, nor did they magically become overpayments after the Fifth Circuit's *en banc* ruling. Plaintiffs thus are not entitled to summary judgment on their reverse false claim theories; Defendants are. *See* Dkt. 382, 385.

### i.  The Texas Terminations did not Take Effect Until the Expiration of the Grace Period

Plaintiffs argue that "under state law," Affiliate Defendants' terminations became "final and unappealable" 30 days after Affiliate Defendants received the HHSC-OIG "Final Notice of Termination" letter, or "no later than February 1, 2017." Dkt. 391 at 18. But the passage of an administrative appeal deadline does not mean that a government action has actually gone into effect. By Texas's own admission elsewhere, Texas did not start to effectuate the terminations

---

[18] Plaintiffs' briefing repeatedly and incorrectly conflates termination from Texas Medicaid with "exclusion" from Texas Medicaid. This is not a matter of semantics. Under Texas law, the terms are not legally interchangeable and are distinguished through a series of provisions. Supp. App. at 536, Texas 30(b)(6) Dep. (Goldstein) at 94:9-22; *compare* 1 Tex. A.C. § 371.1703 (termination) *with* 1 Tex. A.C. §§ 371.1705, 1707 (mandatory and permissive exclusion). Even if the statutes cited by Plaintiffs addressed termination, they lend no support for the argument that Affiliate Defendants had an established obligation to repay following the Fifth Circuit's vacatur.

until after the *en banc* decision in 2020, Dkt. 382, SOF ¶ 24, and even then forestalled the terminations until after so-called "Grace Period." *Id.* at SOF ¶¶ 22, 26.

To participate in Texas Medicaid, a healthcare provider enters into a HHSC "Provider Agreement" through an "enrollment application," and thereafter periodically renews its enrollment. Dkt. 391 at 3; Dkt. 382, SOF ¶ 28; 1 Tex. A.C. § 371.1703. Upon a termination's "effective date," HHSC is required to "terminate[] or cancel[]" Provider Agreements associated with the terminated entity. 1 Tex. A.C. § 31.1703. Here, by Texas's own admission, it "waited until [Judge Sparks'] injunction was vacated by the Fifth Circuit before [HHSC] started putting the termination into effect." Dkt. 382, SOF ¶ 24 n. 11.

Indeed, Texas has repeatedly put forth alternatives as to when the "terminations" took place contrary to their position here. For example, in March 2017—weeks after Plaintiffs contend Affiliate Defendants had already been "terminated"—Texas assured a federal judge that it had "no plans to terminate any of the [Affiliate Defendants' Provider] agreements at this time[.]" *See* Supp. App. 601-02, Mot. (Dkt. 108), *Smith*, 1:15-cv-01058-LY (W.D. Tex. Mar. 13, 2017). Texas was true to its word and then some: although state law permitted HHSC to provide only conditional approval to re-enrollment, between February 1, 2017 and March 11, 2021, HHSC repeatedly approved Affiliate Defendants' enrollments without qualification or condition. Dkt. 382, SOF ¶ 28. The notifications of re-enrollment did not so much as mention the termination notifications or injunction. *Id.*; *see also* Sealed App. 18-19; App. 341-49. Rather, each informed Affiliate Defendants that "HHSC has approved your application" "based in part on a recommendation from [HHSC-OIG]."[19] *Id*. Moreover, HHSC first notified Texas Medicaid's contracted Managed Care

---

[19] Judge Sparks' order provided that Texas was "PRELIMINARILY ENJOINED from terminating" Affiliate Defendants' Medicaid Provider Agreements. *Smith*, 236 F. Supp. 3d at 1000; Dkt. 382, SOF ¶ 16. By its plain terms, it did not foreclose Texas from exercising its right

Organizations (MCOs) that Affiliate Defendants had been terminated on January 4, 2021. *See* Dkt. 382, SOF ¶¶ 25-27; *see also* App. 258-61, 274 (Texas 30(b)(6) 43:9-5:20, 109:13-18); 303, 337-40 (Example Notifications). Texas Medicaid fee-for-service patients received a similar notification later that month. Dkt. 382, SOF ¶ 22.

Equally significant, HHSC's decision to allow Affiliate Defendants to continue to bill Medicaid after the Fifth Circuit's mandate confirms the terminations were *not* effective February 1, 2017. After the vacatur of the injunction, HHSC voluntarily agreed to grant Affiliate Defendants a Grace Period from the termination beginning January 4, 2021. Dkt. 382, SOF ¶¶ 20-24; Resp. ¶ 28. HHSC did not impose any restrictions as to what services Affiliate Defendants could provide Medicaid beneficiaries, including the procedures for which it could bill Texas Medicaid. Resp. ¶ 28. Nor can Texas explain why the Grace Period would be needed if Affiliate Defendants were not going to provide, and receive reimbursement for, care to Medicaid beneficiaries. Underscoring this point, Texas instructed MCOs not to implement a "payment denial code" until the end of the Grace Period. *See* Dkt. 382, SOF ¶ 26.

Texas recognizes the dilemma posed by the Grace Period by excluding it from its TMFPA claim, *id.* SOF ¶ 23, but it means far more than that. Texas law does not provide for a "grace period." A provider is either terminated or it is not. Texas therefore *could not* have lawfully reimbursed Affiliate Defendants for claims submitted during the Grace Period if they had been terminated years earlier. Resp. ¶ 26. The law is explicit that once a termination is effectuated and a provider agreement is cancelled or nullified, the provider's eligibility for Medicaid reimbursement can be restored *only* through reenrollment. *Id.* (citing Tex. A.C. § 371.1703(g)(2)

---

to grant only conditional approval while the injunction was on appeal, require a surety bond, or ask the Texas Attorney General to obtain an injunction preventing Affiliate Defendants from disposing of reimbursements received under the injunction. *See* Dkt. 382, SOF ¶ 46.

(once an agreement is terminated, *no* services are re-imbursed by Medicaid); *id.* at (g)(3) (no participation prior to re-enrollment); *id.* at (h)(1) (procedures for reinstatement of enrollment upon "good cause," including OIG "written findings")). At a minimum, Plaintiffs posit Affiliate Defendants' terminations became effective upon the Fifth Circuit's *en banc* ruling; however, Texas did not follow the procedures necessary for re-enrollment of a terminated provider. Dkt. 382, SOF ¶ 21; *supra*, Resp. ¶ 26. Yet, Texas still allowed Affiliate Defendants to provide services to Medicaid beneficiaries and paid their claims during the Grace Period.

Perhaps Texas is suggesting (joined by Relator) that allowing the Grace Period was *ultra vires* and therefore has no legal effect on the supposedly already effective termination. But "[i]n the absence of clear and convincing evidence to the contrary, '[a] presumption of regularity attaches to the actions of Government agencies,'" under which courts assume that executive agencies are discharging their duties lawfully and consistently. *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 725 (5th Cir. 2013) (quoting *USPS v. Gregory*, 534 U.S. 1, 10 (2001)).[20] By excluding the Grace Period claims from its own case, Texas recognizes the bind it is in—the terminations by virtue of state law could not have been effective at a minimum until March 2021, when the Grace Period was over.[21]

---

[20] *See also Merck Sharp & Dohme Corp. v. Albrecht*, 139 S.Ct. 1668, 1684 (2019) (Alito, J., concurring); *cf. Texas v. Biden*, 554 F. Supp. 3d 818, 829 (N.D. Tex. 2021) (noting presumption generally applied to agency procedures).

[21] Similarly, Texas cannot claim that the Grace Period was a temporary "reinstatement" of Affiliate Defendants' supposedly terminated Provider Agreements. Not only does state law not provide for such a temporary "reinstatement," but Texas previously said precisely the opposite. *See* App. 297, (Texas brief stating that the "grace period did not magically reinstate the provider agreements, nor could it possibly have done so").

Moreover, the usual and common understanding of the term "grace period" supports Defendants.[22] For example, a provision of the Texas code establishing insurance policy requirements requires a "grace period" after a payment deadline, "during which period the policy shall remain in full force and effect." 28 Tex. A.C. § 3.102(a). Medicare regulations define "grace period" as the period between which a payment is due and "the termination date" of a beneficiary's supplemental policy. 42 C.F.R. § 408.8.[23] Courts have similarly used the term to describe the time between when a legal requirement is imposed and its implementation. *See, e.g.*, *Fernandez-Vargas v. Gonazales*, 548 U.S. 30, 45-46 (2006) (describing period between law's enactment and when it became "effective and enforceable"); *PPGT Surg. Health Serv. v Abbott*, 748 F.3d 583, 596 (5th Cir. 2014) (discussing "grace period" for abortion providers to comply with newly-enacted admitting requirement provisions); *Rabin v. Wilson-Coker*, 362 F.3d 190, 191 (2nd Cir. 2014) (describing "grace period" immediately following beneficiary's Medicaid termination, during which beneficiary "will remain eligible for Medicaid" before "having their benefits terminated."); *Philips v. Noot*, 728 F.2d 1175, 1176-77 (8th Cir. 1984) (same); *Fire Prot. Serv., Inc. v. Survitec Survival Prods.*, 649 S.W.3d 197, 205 (Tex. 2022) (citing cases regarding "constitutionally required grace periods" "between a statute's enactment and effective date").[24] A "grace period" can also describe what is, in practical effect, the extension of a deadline. *See, e.g., Downes v.*

---

[22] Although Affiliate Defendants first used the term "grace period"—which is relevant to scienter and discussed *infra* at 25-34—HHSC used the same term in its correspondence back to Affiliate Defendants allowing it. Dkt. 382, SOF ¶ 20 (citing App. 505-06).

[23] *See also* Pub. L. 117-328, 136 Stat 4459, 5300 (Dec. 29, 2022) (provision providing for a two-year "grace period" after enactment preserved the status quo for certain businesses); 83 Fed. Reg. 56015-02, 56023 (Nov. 9, 2018) (CMS proposed rule referencing "grace periods" between the deadline for "payment of any premium due" and termination of health insurance); 84 Fed. Reg. 71674-01, 71703-07 (Dec. 27, 2019) (same).

[24] *See also, e.g., Atkins v. Parker*, 472 U.S. 115, 130 (1985); *Chicago v. Shalala*, 189 F.3d 598, 601 (7th Cir. 1999) (describing period between enactment of statute making certain classes of persons ineligible for food stamps and termination of those benefits).

*Brindamour*, 2023 WL 166834, at *1 (Tex. Jan. 12, 2023) (describing Texas Appellate Rule of Procedure 26.3, which allows court to "extend the time to file a notice of appeal" by 15 days).[25]

In each of these examples, the "grace period" serves to extend the time before a legal requirement is implemented or enforced. Under any sensible interpretation of the term, the Grace Period here delayed implementation of the termination. In other words, the termination of the Affiliate Defendants did not become effective until after the Grace Period concluded.

### ii.    Louisiana Never Terminated PPGC from Medicaid

Like Texas, Louisiana law provides that LDH "shall make payments" for services "rendered to recipients to any person who has a provider agreement in effect with the department." La. R.S. § 46.437(11)(A). And also like Texas, PPGC maintained valid Louisiana Provider Agreements for the entirety of the period at issue because the termination never took effect. Dkt. 382, SOF ¶¶ 12, 19. After PPGC and the other *Kliebert* plaintiffs entered into a settlement agreement with LDH, LDH withdrew the termination notices effective October 13, 2022, and the Louisiana court vacated the injunction on November 10, 2022. Dkt. 382, SOF ¶ 19; *see also* Sealed App. 11-17.[26] LDH was aware of this lawsuit at the time of settlement, including Plaintiffs' reverse false claims legal theories. Resp. ¶ 22, n. 7; *id.* ¶ 32, n. 14; *see also* Dkt. 8 (Relator's proof of service served on March 8, 2021); Dkt. 318 at 8 (describing Defendants' efforts to obtain discovery

---

[25] *See also, e.g.*, *Walsh v. East Penn Mfg. Co.*, 555 F. Supp. 3d 89, 102 (E.D. Pa. 2021) (describing five minute "grace period" after the start of an employee's shift); 1 Tex. A.C. § 361.115 (describing HHSC "grace period" after premium due date); 28 Tex. A.C. § 5.4906 (providing for "grace period" after payment due date); 37 Tex. A.C. § 344.864(d)(2) (law enforcement certification expires after "certification period plus any applicable grace period").

[26] The settlement agreement states that ███████████████████████████ ███████████. A "withdrawal" is commonly defined as a "taking back" of something, or a "retraction" or "revocation." *Withdrawal*, Merriam-Webster Dictionary, New Ed. (2022). Irrespective of the settlement agreement itself, the termination has never gone into effect.

from LDH). Nonetheless, LDH has never sought recoupment and PPGC remains a provider in good standing. Dkt. 382, SOF ¶¶ 19, 34-36.[27]

Importantly, Plaintiffs' Motion also fails to address the simple fact of PPGC's continued enrollment in Louisiana Medicaid.[28] As in Texas, there is no process to "withdraw" a termination once effected, and LDH continued to reimburse PPGC for services provided to Medicaid recipients from 2010 to the present. Dkt. 382, SOF ¶ 34. LDH has never withheld payment based on an identified overpayment or sought repayment or recoupment related to this matter, *id.* at SOF ¶¶ 34-36. *Id.* at SOF ¶ 34. There is simply no supporting evidence for Plaintiffs' repeated assertion that PPGC was terminated from Louisiana Medicaid as of October 15, 2015.

### iii. The Fifth Circuit's Mandate Did Not Create an "Established Duty" for Defendants to Return Money to the Government

As discussed in Affiliate Defendants' summary judgment motion, Dkt. 382, the Fifth Circuit's *en banc* decision denied patients standing to challenge "free choice of provider" under Medicaid. Dkt. 382, SOF ¶ 18; *Kauffman*, 981 F.3d at 370. It did not address the merits of the underlying terminations, nor did it remotely address (much less decide) whether Affiliate Defendants had an obligation, *i.e.* an "established duty," to return payments received during the pendency of the injunction. *Id.*; 31 U.S.C. § 3729(b)(3); Tex. H.R.C. § 36.001(7-a); La. R.S. § 46:437.3(16). An "established duty" exists only where there is "a 'clear' obligation or liability to the government." *U.S. v. HCA Health Servs. of Okla., Inc.*, 2011 WL 4590791, at *8 (N.D. Tex.

---

[27] LDH also did not take any actions during the pendency of the injunction to protect the funds paid to PPGC, Dkt. 382, SOF ¶ 47; despite statutes providing them mechanisms to do so. La. R.S. § 46:437.13(B)(3)(b), 46:437.6; 50 La. A.D.C. Pt 1, §§ 4177, 4181, 4187. In addition, state law requires that "[a]t minimum" a settlement "agreed to by the parties" "for which recovery may be sought on behalf of the medical assistance programs" requires the settlement to "cover[] the estimated loss sustained by the medical assistance programs." La. R.S. § 46.437.5.

[28] *See also* Sealed App. at 12 (signed settlement agreement stating that "██████████████████ ████████████████████████████████████████████████ .")

Sept. 30, 2011)). Since the Fifth Circuit's decision did not address the terminations, it certainly could not, as a matter of law, create a "clear obligation" to repay. This silence, coupled with the lack of security bonds, meant that the vacatur—*at most*—created a *possibility* the government *might* seek restitution or recoupment. *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 269 (D.D.C. 2016) ("A considerable body of case law confirms that the Government's ability to pursue reimbursement . . . does not constitute an 'obligation.'"). The fact that neither HHSC nor LDH did so speaks volumes.

Further, as also addressed in Affiliate Defendants' motion, neither Texas nor Louisiana obtained an injunction bond. Dkt. 382, SOF ¶ 12; ¶ 16, n.10, ¶ 47. This fact is significant because "in the absence of a[n injunction] bond," there is no relief for "[a] party injured by the issuance of an injunction later determined to be erroneous." *W.R. Grace & Co. v. Int'l Union of the Un. Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 770 n.14 (1983); *Philips v. Chas. Schreiner Bank*, 894 F.2d 127, 131, n.6 (5th Cir. 1990). While the amount of a bond may be increased while the injunction is still in effect, *see, e.g. Fiber Sys. Int'l, Inc. v. Applied Optical Sys., Inc.*, 2009 WL 85900962, at *4-5 (E.D. Tex. Jun. 24, 2009), bedrock principles against "unexpected and unanticipated liability" bar retroactive increases. A defendant is limited to the amount of the bond, even if its damages end up being greater. *Phillips*, 894 F.2d at 131; *Sprint Commc'ns Co. v. CAT Commc'ns, Int'l, Inc.* 356 F.3d 335, 341-43 (3d Cir. 2003). Even where a bond is granted, the wrongfully enjoined party is not automatically entitled to recover it. *Fiber Sys.*, 2011 WL 13136000, at *1 (citing cases applying a "rebuttable presumption" that a "wrongfully enjoined party is entitled to have the bond executed").

Neither state obtained an injunction bond. Dkt. 382, SOF ¶ 12; ¶ 16, n.10. Somewhat ironically, HHSC did request a bond from the district court—in the amount of $350,000—a minute

sum as compared to the $1.2 and $1.8 billion sought in this action.[29] Supp. App. 595-96, Opp. (Dkt. 70), *Smith*, 1:15-cv-01058-LY (W.D. Tex. Jan 12, 2017) (requesting bond to cover the approximate "amount that Texas reimburses Planned Parenthood over a one-year period."). The court denied the bond, reasoning that "[r]egardless of whether this Court enjoined the termination of [Affiliate Defendants], Texas would still have an obligation to reimburse some providers for the services" required by Medicaid beneficiaries. *Smith*, 236. F. Supp. 3d at 999-1000.[30] Texas never challenged this determination. It did not request reconsideration of the bond denial, did not renew its request due to the passage of time,[31] did not appeal it directly[32] and did not include a challenge to the denial in its injunction appeal. *See generally* Dkt., *Smith*, 1:15-cv-01058-LY (W.D. Tex.); *Kauffman*, 981 F.3d 347. The Fifth Circuit's decision was entirely silent as to the absence of a bond for the vacated injunctive relief. *Kauffman*, 981 F.3d 347. Louisiana never even sought an injunction bond. Dkt. 382, SOF ¶¶ 12, 47. Without such a bond, there was no "automatic" repayment obligation (indeed, as noted, even the bond itself confers only a *presumption* of entitlement to repayment).

---

[29] Injunction bonds are set in an amount sufficient to cover "all costs and damages that may accrue in the event of injunction being improperly issued." Fed. R. Civ. P. 65(c).

[30] The court was in good company in this regard; "other courts that have considered the potential harm to the government or administrative agencies, have found that injunctive relief to enjoin the termination of a provider agreement would not harm those public institutions." *New Orleans Home for Incurables v. Greenstein*, 911 F. Supp. 2d 386, 409-13 (E.D. La. 2012) ("[LDH] would have to pay the same amount for benefits of these patients regardless of who their Medicaid provider happens to be."); *see also, e.g., Planned Parenthood of Kan. v. Mosier*, 2016 WL 3597457, at *25 (D. Kan. July 5, 2015) ("find[ing] no evidence of financial harm" to state from enjoining Medicaid termination), *rev. in part on other grounds*, 882 F.3d 1205 (10th Cir. 2018); *Bader v. Wernert*, 178 F. Supp. 3d 703, 745 (N.D. Ind. 2016) (enjoining Medicaid termination without bond because "there is no danger that the opposing party will incur any damages").

[31] The State could have taken an immediate appeal of the denial but failed to do so. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 455-56 (7th Cir. 2010).

[32] *E.g., Mead Johnson & Co. v. Abbott Lab.*, 209 F.3d 1032, 1033-34 (7th Cir. 2000); *cf. Indus. Insulation Grp, LLC v. Sproule*, 2009 WL 10694151, at *1, *3 (S.D. Tex. Apr. 16, 2009) (increasing bond from $500 to $1,000,000 on party motion).

Further, Plaintiffs' claim that Affiliate Defendants had a "clear and established" legal obligation to repay is contrary to well-established principles of equity. Cases that have permitted recovery in the absence of a bond have done so in narrow circumstances, emphasizing that restitution is discretionary and jurisdiction lies solely with the court that issued or vacated the injunction. *See* Dkt. 382 at 23-24 (citing cases). Neither Texas nor Louisiana sought such restitution. *See generally* Dkt., *Smith*, 1:15-cv-01058-LY (W.D. Tex.); Dkt., *Kliebert*, 3:15-cv-565 (M.D. La.). Nor did they seek recoupment administratively, Dkt. 382, SOF ¶¶ 30-36, in contrast to the cases relied on by Plaintiffs (Dkt. 391 at 51). *See In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1327-28 (11th Cir. 2016) (order reversing injunction "allow[ed] the Government to try and recover payments made"); *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1136-37 (D.C. Cir. 1992) (vacating judgment so HHS could apply "recoupment procedures" and noting that "[w]hen those procedures have run their full course, [HHS] may, if not content with the outcome, seek judicial relief in an appropriate forum."); *Md. Dep't of Hum. Res. v. Dep't of Agric.*, 976 F.2d 1462, 1467, 1485 (4th Cir. 1992) (remanding so that federal government could pursue "its statutory and equitable remedies to recover the overissuances"); *Children's Hosp. Assoc. of Tex. v. Azar*, 507 F. Supp. 3d 249, 252 (D.D.C. 2020) (citing statutes with procedures by which "the federal government may recoup federal funds").[33] Here, the applicable recoupment provisions require the agency to provide notice to the provider of the amount of the overpayment, how it was calculated, and the extrapolation methodology used. *See generally* 42 C.F.R. § 433.316; 1 Tex. A.C. § 371.1711; La. R.S. §§ 46:437.4, 46:440:14, 46:438.5. A provider may challenge the determination,

---

[33] As with the other authority cited by Plaintiffs, *Azar* addresses the government's ability to pursue *recoupment* of money paid during a later-reversed injunction. *See Azar*, 507 F. Supp. 3d at 251-52. It does not purport to establish or even suggest a repayment obligation exists absent a recoupment action.

in which case an administrative appeals process follows. *Id.*; *Sullivan*, 958 F.2d at 1137 (noting

judicial relief unavailable until recoupment procedures "run their full course").[34]

Because neither Texas nor Louisiana took any action whatsoever to seek recoupment, even

today the question of repayment remains speculative and contingent on numerous intervening

events.[35] A "potential or contingent" liability, *especially* when it is contingent on the government's

exercise of discretionary authority, cannot provide the basis for reverse false claims liability. *Cf.*

*U.S. ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1039-40 (5th Cir. 2016);

*see also* Dkt. 382 at 25-26 (citing cases). Put another way, "[t]he False Claims Act does not assess

liability through ambush." *U.S. ex rel. Proctor v. Safeway*, 30 F.4th 649, 662-63 (7th Cir. 2022)

(internal citations and quotations omitted), *cert grated*, 2023 WL 178393 (Jan. 13, 2023).

### B.  Plaintiffs Cannot Establish Scienter for their Reverse False Claims

#### i.  Plaintiffs Offer No Evidence that Defendants "Recklessly Disregarded" an Overpayment Obligation

Plaintiffs also must demonstrate no genuine dispute as to scienter—that is, that any

reasonable juror must conclude based on the evidence that Defendants "knowingly conceal[ed]"

or "knowingly and improperly avoid[ed] or decrease[d]" an obligation to repay the government.

*See* 31 U.S.C. § 3729(b)(1)(A); Tex. H.R.C. § 36.011(a); La. R.S. 46:437.3. Without a shred of

such evidence, Plaintiffs attempt to redefine the scienter requirement by arguing that Affiliate

---

[34]Not only did Plaintiffs bring this case without regard to these requirements, but it is undisputed that Affiliate Defendants did not even receive informal notice of the possibility of recoupment. Dkt. 382, SOF ¶¶ 30-32, 34-36, 41-42, 46-48. Neither state communicated an intent to recoup funds in any form, or made efforts to ensure that Affiliate Defendants did not dispose of funds received from Medicaid during the pendency of the injunctions and temporary restraining orders.

[35] Even had the states sought recoupment, they may very well have not succeeded. As noted, there are equitable considerations intwined with the question of recoupment, including whether the States would have been "unjustly enriched" by the fact that thousands of their citizens received treatment for which the State would not have to pay. *See Md. Dep't of Hum. Res.*, 976 F.2d at 1482 ("The equitable nature of restitution ordinarily permits a court to award 'restitution upon the reversal of a judgment' to the extent of one party's unjust enrichment.") (citing *Atlantic Coast Line R.R. Co. v. Florida*, 295 U.S. 301, 310 (1935)).

Defendants "knew *or should have known*" that reimbursements received during the pendency of the injunctions were overpayments. *See, e.g.* Dkt. 391 at 34, 46 (emphasis added).

A defendant acts "knowingly" under the FCA only if it (1) "has actual knowledge" of falsity; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A); Tex. H.R.C. § 36.0011(a); La. R.S. § 46:437:3. The "loosest standard of knowledge," reckless disregard (*U.S. ex rel. Complin v. N.C. Baptist Hosp.*, 818 F. App'x 179, 184 (4th Cir. 2020)), is still a high bar; "mere negligence or even gross negligence" is insufficient. *U.S. ex rel. Farmer v. Hous.*, 523 F.3d 333, 338 (5th Cir. 2008); *cf. Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 841 (Tex. 2005) (discussing requirements for "reckless disregard.").[36] As previously discussed (Dkt. 382 at 31, 36-37), the Supreme Court has interpreted an analogous scienter requirement to require proof of "an unjustifiably high risk of harm that either is known or so obvious that it reasonably should have been known." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 48 (2007) (interpreting scienter under Fair Credit Reporting Act).[37]

---

[36] This is instructive given that "gross negligence" is already a high bar. For example, Louisiana law defines gross negligence as "willful, wanton, and reckless conduct that falls between intent to do wrong and ordinary negligence. It is substantially and appreciabl[y] higher in magnitude than ordinary negligence" and does not include "honest mistake." *Trinity Med. Servs., LLC v. Merge Healthcare Sols., Inc.*, 2020 WL 97162, at *15 (M.D. La. Jan. 8, 2020); *see also* Tex. Civ. Prac. § 41.001 (defining "gross negligence" as one that "when viewed objectively" at the time of its occurrence "involves an extreme degree of risk" including "conscious indifference").

[37] As this Court is aware, Dkt. 409, the Supreme Court recently granted certiorari to review *Safeco*'s applicability to the FCA. *U.S. ex rel. Proctor v. Safeway, Inc.*, 2023 WL 178393 (Jan. 13, 2023); *U.S. ex rel. Schutte v. Supervalu, Inc*., 2023 WL 178398 (Jan. 13, 2023). The Court will hear argument in April 2023 and is likely to issue a decision by June. Defendants have reviewed Plaintiffs' filing on this issue (Dkt. 411) and are considering their options with respect to the appropriate path forward, including a potential motion to stay. Defendants will advise the Court as to their position early next week.

Under any standard, "reckless disregard" is *not* synonymous with a failure to exercise "reasonable diligence." The Affordable Care Act (ACA) requires Medicare and Medicaid providers to report and return overpayments within 60 days "after the date on which the overpayment was *identified*." 42 U.S.C. § 1320a-7k(d)(2) (emphasis added). To implement this requirement for certain Medicare programs, CMS issued a rule defining "identified" as when the recipient "determines, 'or should have determined through the exercise of reasonable diligence'" that it had received an overpayment. *United Healthcare Ins. Co. v. Azar*, 330 F. Supp. 3d 173, 191-92 (D.D.C. 2018) (quoting 42 C.F.R. § 422.326(c)). A federal district court subsequently vacated the rule, citing concerns that it improperly imposed a "negligence standard" for "a purported False Claims Act enforcement mechanism." *Id.* at 182, 192. The D.C. Circuit affirmed this aspect of the court's decision. *United Healthcare Ins. Co. v. Becerra*, 16 F.4th 867, 880-81 (D.C. Cir. 2021). Just last month, CMS issued a proposed definition of "identified overpayment" for Medicare Parts A, B, C, and D, "adopting and codifying, by reference, the knowledge standard" of the FCA into the ACA provision, thereby recognizing more than mere negligence is required. 87 Fed. Reg. 79542, 79452-79699 (Dec. 27, 2022).

To try to meet this high burden, Plaintiffs can only point to Defendants' awareness of various provisions related to return of overpayments (*see, e.g.*, Dkt. 391 at 36-38, 43), and *Heckler v. Community Health Services of Crawford County*'s admonition that those participating in government programs have "a duty to familiarize themselves with the [program's] legal requirements." Dkt. 391 at 51-52 (citing 467 U.S. 51, 64-65 (1984)). But there is no question as to whether Affiliate Defendants were aware of a provider's obligation to return overpayments; the

questions here are whether the payments at issue were overpayments at all, and whether Affiliate

Defendants *knew* or were *reckless* to that fact.[38]

Critically, even if the Court were to find that each Affiliate Defendant had a duty to repay,

"reasonable but erroneous interpretation[s] of legal obligations" cannot establish scienter. *U.S. ex*

*rel. Hendrickson v. Bank of Am. N.A.*, 343 F. Supp. 3d 610, 636 (N.D. Tex. 2018), *aff'd*, 779 F.

App'x 250 (5th Cir. 2019). Courts have squarely held that the defendant must be put "on notice

that its conduct is unlawful" through sufficiently specific guidance, *Proctor*, 30 F. 4th at 660, and

that courts should not "look to facts that the defendant neither knew nor had reason to know at the

time [the defendant] acted." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 106 (2016)

(explaining that "culpability is generally measured against the knowledge of the actor at the time

of the challenged conduct" and discussing *Safeco*'s recklessness standard). As Plaintiffs recently

obliquely acknowledged in their supplemental brief, Dkt. 411 at 5-6, there is no authority in any

federal or state statute, regulation, or guidance document suggesting that Affiliate Defendants had

a repayment duty in the specific circumstances here.

Further, Plaintiffs' remarkable assertion tha ███████████████████████████

███████████████████ Dkt. 391 at 51-52, challenges the very foundation of our legal system,

and is in itself grounds to deny summary judgment. Injunctions are court orders with the force of

law on which parties rely when ordering their affairs.[39] It is one thing for improperly enjoined

---

[38] Plaintiffs' reliance on *Heckler* is also misguided because it is not a fraud case. Although the government was eventually permitted to pursue recoupment of the funds at issue, the *Heckler* Court did not suggest that the defendants' mistaken belief that they were entitled to the reimbursements was fraudulent. *Id.* at 56-57, 62-63. Given its very different context, courts have rejected attempts to use *Heckler* as the FCA's baseline for reckless disregard. *See, e.g.*, *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 956-57 (10th Cir. 2008).

[39] *See, e.g.*, *Regeneron Pharms., Inc. v. HHS.*, 510 F. Supp. 3d 29 (S.D.N.Y. 2020) (injunction barring implementation of new Medicare pricing formula); *Mr. Smoky's BBQ, LLC v. U.S.*, 2014

defendants later to seek damages pursuant to a bond or equitable restitution after an injunction is vacated, *supra* at 23-25, but quite another for the party that acted under an injunction to be *punished* for acting in accordance with the terms of a judicial decree. *See, e.g.*, *Longoria v. Paxton*, 585 F. Supp. 3d 907, 933-34 (W.D. Tex. 2022) (noting defendants "cite[d] no controlling authority" to support argument that would "render preliminary injunctive relief meaningless" by punishing parties "for acting in reliance on the injunction and judicial pronouncement"), *vacated on other grounds,* 2022 WL 2208519 (5th Cir. Jun. 21, 2022). Yet that would be the precise result if any of Plaintiffs' theories are allowed to prevail. It bears repeating that this is not an action for recoupment or equitable restitution. The FCA is an "essentially punitive statute," *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 182 (2016), as are the TMFPA and LMAPIL. This action seeks to *punish* Defendants, not restore Texas and Louisiana to their positions had the injunctions not been issued.

In urging the Court to hold Defendants liable regardless, Plaintiffs heavily rely upon Justice Stevens's concurrence in *Edgar v. MITE Corp.,* 457 U.S. 624 (1982). *See* Dkt. 391 at 49–50.[40] But the Justices in that case were sharply divided, and no one else on the Court joined Justice Stevens' argument. Rather, Justices Marshall and Brennan supported a presumption that "that an injunction secures permanent protection from penalties" for actions taken in reliance on it, reasoning that it was "improper" for "the State to penalize action taken while the injunction was in effect." *MITE*,

---

WL 24152 (D. Ariz. Jan. 2, 2014) (preliminary injunction mandating that restaurant continue to be eligible to accept food stamps).

[40] *MITE* is also inapposite as it concerned the retroactive application of a statute to conduct. Here, Plaintiffs are not arguing for retroactive application of a statute. As Texas recognized in its opposition to Affiliate Defendants' petition for mandamus in Travis County, there is a *process* required "before a termination becomes fully implemented as a matter of practical reality." App. 290. Plaintiffs' argument requires that the vacatur had the effect of retroactively completing all aspects of that administrative process no later than February 1, 2017.

457 U.S. at 657-58. Then-Justice Rehnquist likewise speculated that a court may conclude that an injunction "constitutes a defense" to enforcement action. *Id.* at 666. The D.C. Circuit has since indicated that prosecutions for conduct committed under an injunction are likely foreclosed by a "strong legal argument[]" as to the defendant's lack of "the state of mind necessary for a violation." *Clarke v. U.S.*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc).[41]

Plaintiffs also fail to grapple with the immense constitutional problems their position presents. *In Ex parte Young*, the Supreme Court held that a statute was unconstitutional to the extent it prescribed fines for violating a law "[t]he necessary effect and result" of which was "to preclude a resort to the courts (either state or Federal) for the purpose of testing [the law's] validity." 209 U.S. 123, 146-48 (1908).[42] Just so here—that parties could be subject to treble damages and penalties for seeking judicial relief against government action creates a chilling effect conflicting with the "fundamental proposition that under the Constitution penalties cannot be collected if they operate to deter an interested party from testing the validity of legislative rates or orders legislative in their nature." *Wadley S. Ry. Co. v. Ga.*, 235 U.S. 651, 662 (1915).

Moreover, to accept Plaintiffs' argument would be "akin to an *ex post facto* law," as it seeks to punish Affiliate Defendants "for an act done when the legality" of the Affiliate

---

[41] Further illustrating that the law does not treat vacatur of an injunctive order as if it "never existed," *contra* Dkt. 391. at 50; Dkt. 411 at 4, it is well-established that a party may be convicted of contempt for violating an injunction while it is in effect, even if the injunction is later vacated "for lack of jurisdiction." *See, e.g.*, *Nat'l Maritime Union v. Aquaslide "N" Dive Corp.*, 737 F.2d 1395, 1399-1400 (5th Cir. 1984).

[42] *See also Okla. Op. Co. v. Love*, 252 U.S. 331, 336–37 (1919) ("But the penalties which may possibly be imposed, if he pursues this course without success, are such as might well deter even the boldest and most confident. . . . Obviously a judicial review beset by such deterrents does not satisfy the constitutional requirements."); *Aminoil, Inc., v. EPA*, 599 F. Supp. 69, 75 (C.D. Cal. 1984) ("The threat of excessive penalties and treble damages may appear so debilitating to alleged responsible parties that compliance with the administrative order is the only feasible alternative" that renders the right to judicial review "merely nominal and illusory." (citation omitted)).

Defendants' terminations "ha[d] not been authoritatively determined." *Wadley*, 235 U.S. at 662. It conflicts with the understanding long-ago articulated by the Supreme Court—that one who challenges an order subsequently held to be valid is only "subject to penalties for any subsequent violations of what had thus been judicially established to be a lawful order—though not so in respect of violations prior to such adjudication." *Id.* at 669 (emphasis added); *see also id.* at 668.

Here, a federal district court entered the Texas injunction in a lengthy opinion that examined the testimony and evidence in dispute, relying heavily on the Fifth Circuit's decision in *Gee. See generally Smith*, 236 F. Supp. 3d at 988-99. At the time that the Texas injunction was issued, it was a matter of *binding Fifth Circuit law* that individual plaintiffs could challenge a termination as violating Medicaid's free-choice-of-provider requirements, and that a state could not terminate a provider for reasons "devoid of any factual support or linkage" to its qualifications as a healthcare provider. *Gee*, 862 F.3d at 469-70. Until the Fifth Circuit's November 2020 opinion, *Gee* was precedent for which the Fifth Circuit had rejected rehearing *en banc* (*PPGC v. Gee*, 876 F.3d 699 (5th Cir. 2017)), and the Supreme Court declined review (*Gee v. PPGC*, 139 S. Ct. 408 (2018)). Further, the subsequent binding decision requiring vacatur did not address the merits of the termination, and thus left undisturbed the district court's detailed factual findings that there was no evidence to support Affiliate Defendants' termination from Medicaid. Dkt. 382, SOF ¶ 18; Resp. ¶ 27.

Further, as discussed in Affiliate Defendants' summary judgment motion, the objective reasonableness of Affiliate Defendants' position is underscored not only by the injunctions, but also by Texas and Louisiana's conduct (*see, e.g.* Resp. ¶ 21, 28[43]), the federal government's

---

[43] *See also* Dkt. 382, SOF ¶ 17 (Texas represented to the Fifth Circuit that it would face "*irreparable* harm if the State [was] forced to continue" paying Affiliate Defendants.").

assertions that the terminations were unjustified (Dkt. 382, SOF ¶¶ 14-15, 29), and numerous court decisions which had joined in Judge Sparks' finding that terminations based on the "undercover videos" violated the free-choice-of provider requirement. *See, e.g.*, *Kliebert*, 141 F. Supp. 3d at 652-53; *Planned Parenthood of Kan. v. Anderson*, 882 F.3d 1205, 1234-35 (10th Cir. 2018). It is also not "reckless" for Defendants to "███████████████████████████████████

███████████████ *Contra* Dkt. 391 at 51. There is no authoritative agency guidance so much as implying that payments that were legitimate when made can retroactively become "overpayments."[44] Particularly given Texas's failure to follow its own recoupment procedures prior to joining this action, or Louisiana's decision not to seek repayment in any fashion, it was objectively reasonable for Affiliate Defendants to conclude that the vacatur did not in itself render the reimbursements it had received "overpayments" requiring return. *Cf. Proctor*, 30 F. 4th at 652-53; *see also* Dkt. 382 at 31-32. [45]

### ii. Plaintiffs Cannot Establish that Defendants Knowingly and Improperly Avoided or Decreased an Obligation to Return Money to the Government

Even if Plaintiffs could establish that Affiliate Defendants acted "knowingly" as to whether overpayments existed, to prevail Plaintiffs must also prove that Affiliate Defendants "improperly avoid[ed] or decrease[d]" their obligation to return them. *See Harper*, 842 F.3d at 436-38, *U.S. ex rel. Sibley v. Univ. of Chi. Med. Ctr.*, 44 F.4th 646, 657 (7th Cir. 2022); Tex. H.R.C. § 36.002(12) ("knowingly and improperly"); La. R.S. 46:438.3 ("knowingly"). "Without fraud, punitive damages—a mandatory penalty of up to $10,000 for each claim and treble damages—would seem an unreasonable levy against individuals guilty only of 'knowingly' receiving an overpayment

---

[44] *See also* Dkt. 382 at 32-33 (discussing CMS rule that payments "proper at the time the payment was made do not become overpayments at a later time." ).

[45] The fact that the injunction was issued on behalf of the individual plaintiffs is irrelevant. Whatever the basis for the injunction, it had the legal effect of enjoining terminations of Affiliate Defendants' Provider Agreements while it was in place. *Supra* at 28-31.

from the government fisc." *Olson v Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1074 (8th Cir. 2016). Here, there is nothing even approaching fraud.

First, it is undisputed that Texas and Louisiana were fully aware of the administrative "termination" deadline and that Affiliate Defendants continued to submit claims for reimbursement past that date. The states themselves pay the claims and maintain claims data to show it. *See, e.g.* Dkt. 390-2, Pls. App. 1130-31 (Lochabay ¶ 14-16) (describing claims data); *id.* 1137-46 (Lochabay exhibits describing Affiliate Defendants' claims data). There was no deception and nothing prevented the government from pursuing a recoupment remedy to recover the purported "overpayments," either before or after the Fifth Circuit's mandate. But to date, neither the federal nor state governments have done so.

Second, undisputed evidence establishes Affiliate Defendants' diligent efforts to submit claims only when they were eligible, and good-faith belief that the terminations had not gone into effect in February 2017. Dkt. 382, SOF ¶ 40. Not a single document or any testimony shows that Defendants knew that the funds they lawfully received during the pendency of the injunctions were overpayments that Affiliate Defendants were obligated to return. In fact, the evidence demonstrates the opposite; by definition one cannot "postpone" a termination they believed already occurred or "stay" in a program that they believe they are already terminated from.[46] *See, e.g.*, Dkt. 390-13, Pls. App. 6156 (email citing goal to "*Delay* [Affiliate Defendants'] termination through any and all legal pathways") (emphasis added).

---

[46] Further, given that it would have been unlawful for HHSC to provide the Grace Period to an already-terminated provider, HHSC's agreement to the request further supported a good-faith belief that there was no repayment obligation. As a practical matter, it is reasonable for a State's citizens and entities to assume that government officials are following the law.

Absent evidence that Affiliate Defendants knowingly and improperly avoided an obligation to repay, Plaintiffs' reverse false claims theory is inviable. After all, the purpose of reverse false claims liability is to "ensure that a person who makes a false statement to avoid paying money owed to the Government is equally liable under the FCA as if that person had submitted a false claim to receive money[.]" *U.S. e rel. Ruscher v. Omnicare*, 2014 WL 2618158, at *28 (S.D. Tex. June 12, 2014). Because that is plainly not the case here, Plaintiffs' Motion must be denied.

## II.    Partial Summary Judgment on the Non-Intervened TMFPA Claims Should Be Denied

Relator's request for summary judgment should be denied as to the non-intervened TMFPA claims as to conspiracy and implied false certification because Relator cannot prosecute those claims following Texas's intervention—a proposition with which Texas expressly agreed. *See* Dkt. 141 at 2-3 (Relator's TMFPA claims "are no longer viable" following Texas's intervention). Those claims should be dismissed accordingly. *See, e.g.*, *U.S. ex rel. Brooks v. Stevens-Henager College, Inc.*, 359 F. Supp.3d 1088, 1120–25 (D. Utah 2019) (holding relator does not retain an independent right to prosecute non-intervened claims); *U.S. ex rel. Becker v. Tools & Metals, Inc.*, 2009 WL 855651, at *6 (N.D. Tex. 2009) (same); *cf.* Dkt. 71 at 35 (Court noting Texas is primarily responsible for prosecuting the TMFPA claims in Relator's complaint).

## III.    Relator's Motion for Partial Summary Judgment on Newly-Asserted Implied False Certification Claims is Baseless

Relator separately moves for summary judgment on the "alternative" theory of implied false certification on three bases, none of which were pled in the Complaint: (1) Affiliate Defendants' "misrepresentations" as to whether they were a "qualified" Texas Medicaid provider after January 19, 2017; (2) Affiliate Defendants' "misrepresentations" during the Texas Grace Period; and (3) PPGC's "misrepresentations" to LDH after PPGC was terminated from Louisiana Medicaid on October 15, 2015 "and/or" it was terminated from Texas Medicaid on January 19, 2017. Dkt. 391 at 53. To prevail, Relator must demonstrate that for each time period, there is no

genuine issue of material fact as to all three elements of falsity, scienter, and materiality. Relator's Motion is transparently deficient in every regard.

Relator cannot raise at summary judgment a theory of liability that was not properly raised in their Complaint. *U.S. ex rel. DeKort v. Integrated Coast Guard Sys.*, 475 F. App'x 521, 522 (5th Cir. 2012). Doing so unfairly prejudices Defendants who have litigated this case based on the theories actually pled, and is alone enough reason to deny Relator's motion.[47] Further, two of Relator's new theories arise under the TMFPA's implied false certification provision. Dkt. 389 at 2. As discussed above, Relator cannot prosecute non-intervened TMFPA claims and is only entitled to "continue as a party to the action" with respect to the TMFPA allegations. Tex. H.R.C. § 36.107(a). Relator cannot evade this restriction by concocting new theories of liability at summary judgment, particularly here where, as Relator recognizes (Dkt. 391 at 53), those theories are adverse to those of the real-party-in-interest.[48] *Supra* at 34; *cf. Brooks*, 359 F. Supp.3d at 1122, n. 16 (citing *Becker*, 2009 WL 855651, at *14).

## A. Relator Cannot Establish Implied False Claims Liability for Claims During the Pendency of the Injunction

Relator newly asserts that, in submitting Medicaid claims during the pendency of the injunctions, Affiliate Defendants impliedly represented that they were "qualified" and had not violated state or federal laws in their provision of medical services. Dkt. 391 at 56. Relator claims

---

[47] *See* Dkt. 315 (denying Defendants' motion for leave to amend answers in part based on timeliness and finding of prejudice to Plaintiffs). Should the Court allow Relator's unpled theories to proceed, Affiliate Defendants reserve the right to file a separate cross-motion for summary judgment. Had Affiliate Defendants had any notice of them, Affiliate Defendants would have done so already.

[48] *See also Haw. ex rel. Torricer v. Liberty Dialysis-Haw.-LLC*, 512 F. Supp. 3d 1096, 1119-20 (D. Haw. 2021) (citing "substantial authority holding that an actionable reverse false claim cannot be based on a defendant's failure to refund the same payment that was obtained by an actionable false claim.")

████████████████████████████████████████████████████.” *Id.* As noted above, this theory directly contravenes the reverse false claims theory pled in both Relator and Texas's Complaints.[49]

There are fundamental problems with Relator's theory on multiple fronts. As an initial matter, Relator has not identified a representation on the claim for payment even tangentially related to the purported "false certifications." Dkt. 382 at 40-41 (citing cases). And broad language in a provider agreement regarding compliance with "all applicable state and federal laws and regulations" and "medical or ethical standards," Dkt. 391 at 56, "does not constitute a certification of compliance for the purposes of the FCA." *Gonzalez v. Planned Parenthood of L.A.*, 2012 WL 2412080, at *7 (C.D. Cal. Jun. 26, 2012).

More fundamentally, Relator cannot establish that claims submitted during the pendency of the injunctions were false. *See* Dkt. 382 at 42-43. Texas and Louisiana purported to terminate Affiliate Defendants as "unqualified," yet Affiliate Defendants successfully challenged these terminations on the merits in federal district court in both states, that is, until the Fifth Circuit's *en banc* decision changed the legal landscape. And these had not been close calls—the federal district court in Austin concluded there was not a "scintilla of evidence" that the Affiliate Defendants were unqualified. *Smith*, 236 F. Supp. 3d at 989-90, 997; Dkt. 382, SOF ¶ 16, n. 10. The Louisiana

---

[49] Although reverse false claims and implied false claims liability can be pled "in the alternative" in the first instance, *cf. Sturgeon v. Pharmeria Corp.*, 438 F. Supp. 3d 246 (E.D. Pa. 2020), Relator cannot argue that was the case here, given that these allegations were not pled at all. *See generally* Dkt. 2, Compl. Nor can Relator argue they are "implied." Relator did not plead any scienter allegations as to Affiliate Defendants' "knowing" submission of false claims following the injunctions, *see* Dkt. 2, Compl. ¶ 116. Further, Relator's expert did not identify any "unlawful act" premised on the knowing submission of false claims during the injunctions. Rather, Relator asked their expert to assume the failure to repay each claim after the injunction's vacatur was an "unlawful act." *See generally* Dkt. 390-2, Pl. Appx. 1129, 1131, 1134–1136 (Lochabay Tex. Rep.); *id.* at 1239, 1241, 1243–45 (Lochabay La. Rep.).

federal district court made similar findings, *Kliebert*, 141 F. Supp. 3d at 648-49, which were affirmed by a Fifth Circuit panel in 2017, more than three years before the *en banc* decision on which Relator relies. *Gee*, 862 F.3d 445. The panel held both that there was a private right of action to enforce Medicaid's free-choice-of-provider requirement and that the plaintiffs were substantially likely to succeed in proving that Louisiana's attempted termination of PPGC was unlawful. *Id.* at 462-65. On the latter point, the *Gee* court found no evidence that PPGC was unqualified to provide medical services to Medicaid patients. *See, e.g.*, *id.* at 466 (rejecting LDH's argument that "PPGC is unqualified simply because state law says so.").[50]

These merits decisions were never reversed on appeal. Resp. ¶ 27. Rather, in 2020 the *en banc* Fifth Circuit departed not only from its own prior precedent, but also from the views of several other circuits in holding that there is no private right of action to enforce Medicaid's free choice of provider requirement. *Kauffman*, 981 F.3d at 365, 368-70 (overruling prior holding and discussing contrary holdings in five other circuits). Critically, in false certification cases, the elements of falsity and knowledge are measured at the time of claim submittal. *Farmer*, 523 F.3d at 339; *cf Halo*, 579 U.S. at 105. Unless the Affiliate Defendants had the benefit of prophecy or a time machine, they could not have reasonably anticipated at the time the claims were submitted, pursuant to injunctions, that the injunctions would be vacated. And in any event, the later vacatur did not even establish that, in fact, Affiliate Defendants were "unqualified" to provide medical services. Despite the assertions in Texas's termination notice, Texas testified at deposition that the State would not have provided the Grace Period if there were concerns about Affiliate Defendants' ability to provide care in a "legal, ethical, and safe manner." Dkt. 382, SOF ¶ 21. The federal

---

[50] Indeed, counsel for LDH represented during the district court proceedings that there was "no question . . . about the competency of [PPGC] to provide Medicaid services and adequate care for the patients they serve." Dkt. 382, SOF ¶ 13.

government has also consistently taken the position that the Texas terminations "violated the federal free choice of provider rule." *Id.* at SOF ¶¶ 14-15, 29. Given these facts, Affiliate Defendants reasonably believed that they remained "qualified" Medicaid providers throughout the pendency of the injunction.

Finally, Relator has not produced any evidence to meet the "rigorous" materiality requirements for affirmative false claims. *Escobar*, 579 U.S. at 181. Nor could they. This Court has the "benefit of hindsight," *cf. U.S. ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 663 (5th Cir. 2017) (citations omitted), and any express or implied certifications regarding whether the Affiliate Defendants were "qualified" were clearly not material to the States' decision to pay when the States were *fully aware* of the termination determinations and Affiliate Defendants' purported waiver of administrative appeal. The fact that Texas granted a 30-day Grace Period and PPGC remains eligible to receive Louisiana Medicaid funds demonstrates that any of these "implied false certifications" were not material to their payment decisions." *Id.* at 668.

**B.   Relator Cannot Establish Implied False Claims Liability for the Texas "Grace Period"**

Relator next raises yet another new theory: that Affiliate Defendants made false representations to HHSC related to the Grace Period. Even if Relator were permitted to rely on this unpled Grace Period theory, it fails as a matter of law. Once again, Relator has failed to identify any representation that Affiliate Defendants made on a claim for payment that was false due to their purported "failure to disclose noncompliance with a particular condition of eligibility." *Escobar*, 579 U.S. at 190 (implied false certification requires "specific representations" about goods or services provided); *see also* Dkt. 382 at 39-41 (citing cases). Rather, Relator argues that Defendants made ███████████████████" without identifying what the representations even are (or who made them, or when they took place). Dkt. 391 at 57-58. Indeed, it is unclear if Relator is focused on statements allegedly made to obtain the Grace Period, or to receive reimbursement

during it. *Id.* Nor does Relator identify any applicable "certification" associated with the "representations." *Id.* These barebones allegations would have been insufficient to meet the Rule 9(b) pleading standard had they been pled.

Relator's new theory is also wholly unsupported by the evidence. It is undisputed that Affiliate Defendants' requested a "grace period" to "provide continuity of care" and "allow . . . patients to take care of urgent health needs." Dkt. 382, SOF ¶ 20. Texas subsequently granted a 30-day Grace Period to permit Affiliate Defendants to "ensure that current Medicaid clients receiving services at your clinics can be transitioned to new providers." App. 505-06; Dkt. 382, SOF ¶ 20. Texas did not provide even *de minimis* guidance as to what that meant, and as noted above, imposed no restriction as to the services that Affiliate Defendants could provide during this "transition." Resp. ¶ 28. And in this litigation, Texas has admitted that it "granted the Grace Period to help facilitate continuity of care for Medicaid clients who received Medicaid health services from the Defendants." Dkt. 382, SOF ¶ 20.

In the absence of any limitations on the types of Medicaid-covered services that Affiliate Defendants could provide, it was entirely reasonable to provide the gamut of services to meet patient needs. Resp. ¶ 28. There is no question that HHSC was aware of the services Affiliate Defendants were providing; after all, the CPT codes are provided with the billing data on which Texas Medicaid (*id.*) and HHSC and the MCOs paid the claims (Dkt. 382, SOF ¶ 4). Had Texas believed that Affiliate Defendants went beyond the scope of services Texas expected them to provide during the Grace Period, presumably it would have declined to pay those claims or provided Affiliate Defendants some direction. But that never happened. The evidence thus unequivocally demonstrates that the Grace Period allowed Affiliate Defendants to continue providing and billing for services *simpliciter*.

Moreover, Relator's description of supposedly "undisputed facts" is misleading and inaccurate. In one particularly egregious example, Relator falsely states that the Grace Period was prompted by Affiliates Defendants' request that Texas "███████████████████████████ ████████████████████████████████. Dkt. 391 at 69. That is not true. The evidence Relator cites shows Affiliate Defendants requested to "*remain* in the Medicaid program" and "continue providing medical care," or, at minimum, obtain a six-month "grace period" to serve patients and help them find new providers. Dkt. 390-2, Pls. App. at 802-806. This is far from semantic—the request itself demonstrates that Affiliate Defendants believed they *remained* in Medicaid. It is also undisputed that HHSC subsequently granted the request in part, permitting a "30-day grace period" through February 3, 2021. Dkt. 382, SOF ¶ 20.

Relator also boldly claims that Affiliate Defendants ██████████" to transition their patients, and instead ████████████████████████████████████████ ███████████████████ Dkt. 391 at 20; *see also id.* at 57-58. Yet there is no evidence for this bald assertion. The evidence cited flatly contradicts it. *See* Dkt. 391 at 20 (citing Dkt. 390-3, Pls. App. at 1427 (PPST tried to help patients find new providers); 1577-78 (PPGC's efforts to help find patients new providers)). The closest Relator comes is cherry-picked deposition testimony that one Affiliate Defendant CEO could not remember the *specific* actions taken to transition patients. That same witnesses was adamant that their Affiliate had in fact taken steps to do so. *Id.* (citing Dkt. 390-3, Pls. App. at 1985-86 ("I don't recall the details, but I do know that we were working to try to help our patients find providers.")).[51] Worse, Relator disregarded testimony and

---

[51] A fuzzy memory about an event does not establish that it did not occur, particularly where the witness states otherwise. Just two weeks later, that same individual testified as PPGT's corporative representative about their efforts to assist patients, including "reach[ing] out to other community health providers" on patients' behalf. *See* Resp. ¶ 38.

documentary evidence that flatly contradicts their assertion of "undisputed fact" and demonstrates Affiliate Defendants' efforts to transition patients during the Grace Period. Resp. ¶ 38 (citing testimony and documentary evidence).

### C.  PPGC Did Not Make an "Implied False Certification" to Louisiana

Finally, Relator introduces yet another new theory of liability, this time specific to PPGC and Louisiana. Relator asserts that every claim submitted by PPGC to Louisiana Medicaid after February 1, 2017 was false because LDH's "program rules and requirements" required PPGC to "report" its (and its "affiliates" PPGT and PPST) termination from Texas Medicaid, and cease "affiliation" with other "terminated" entities. Dkt. 391 at 60-61. For the reasons already discussed, the Court should summarily reject this unpled theory. Were the Court to consider it, however, it also lacks any basis in fact or law.

First, Relator's theory incorrectly assumes that PPGC's termination from Texas Medicaid was effective February 1, 2017 (*see* Dkt. 391 at 58-60), notwithstanding a federal injunction providing otherwise. This cannot stand, for the reasons discussed above. Further, as also discussed above, the Texas district court's injunction and Texas's conduct both while the injunction was in effect and during the Grace Period preclude scienter. It was objectively reasonable for PPGC to believe that Affiliate Defendants were not "terminated" from Texas Medicaid until after the Grace Period expired.[52] *Supra* at 25-34. And it is undisputed that in the spring of 2021, once PPGC's

---

[52] Relator also assumes, without citing to any law or evidence, that PPGT and PPST were "affiliates" of PPGC under Louisiana law. They are not. *Compare* La. ADC Pt. 1, § 4103 (defining "Affiliate" as one that can "directly or indirectly" influence or control" the other provider or has the power to do so) *with* Dkt. 382, SOF ¶¶ 2-3.

termination from Texas Medicaid became effective, PPGC provided notice to LDH. Dkt. 382, SOF ¶¶ 22, 34.[53]

Moreover, the evidence shows that even if PPGC were required to provide notice earlier than it did, the lack of formal notice was immaterial to Louisiana's payment. Louisiana cannot seriously contend that it was unaware of the Texas termination proceedings. *See* Resp. ¶ 22, n. 4; ¶ 32, n. 14. And there can be no dispute that Louisiana is aware of Affiliate Defendants' Texas terminations *now*, and yet PPGC remains a provider in good standing with Louisiana Medicaid. Dkt. 382, SOF ¶ 19. This, in addition to Louisiana's decision to enter into a settlement agreement for its termination litigation without requiring recoupment of any funds (*id.*, SOF ¶ 19), as well as their choice not to intervene in this action (*id.*, SOF ¶ 34 n. 15), and continued payment of PPGC for Medicaid services (*id.*, SOF ¶ 34), conclusively demonstrates that Affiliate Defendants' termination from Texas Medicaid, or any alleged failure to provide LDH regular updates about the status of the termination proceedings, was immaterial. *Escobar*, 579 U.S. at 195 (payment "in full despite its actual knowledge that certain requirements were violated" is "very strong evidence that those requirements were not material").

## IV.   Summary Judgment Should be Denied on Relator's Conspiracy Claims

Relator's conspiracy claims try to have it both ways. Relator asserts on the one hand that Affiliate Defendants should be treated as subsidiaries of PPFA (*see, e.g.* Dkt. 391 at 63, 76-77), but contends on the other that Affiliate Defendants and PPFA conspired together. These theories, which are not pled in the alternative, are irreconcilable. "In th[e Fifth C]ircuit, it is a matter of law that a parent corporation cannot conspire with its own subsidiary." *U.S. ex rel. Reagan v. E. Tex.*

---

[53] PPGC's communications with LDH with respect to the Fifth Circuit's vacatur further underscore their lack of scienter—as soon as PPGC was aware of a potential termination from Texas Medicaid, it informed LDH. *See* Resp. ¶¶ 22, 34.

*Med. Ctr. Reg. Healthcare Sys.*, 274 F. Supp. 2d 824, 856 (S.D. Tex. 2003). This rule applies equally to "various 'components' and 'subsidiaries' of the same 'parent.'" *Id.* Therefore, were the Court to hold (which it should not) that Affiliate Defendants are subsidiaries or components of PPFA, the conspiracy claims must be dismissed.

These claims further fail because "secondary liability for conspiracy . . . cannot exist without a viable underlying claim." *U.S. ex rel. Coppock v. Northrup Grumman Corp.*, 2003 WL 21730668, at *14 (N.D. Tex. July 22, 2003). Here, as set forth in their affirmative briefing, Defendants are entitled to summary judgment on all of Plaintiffs' underlying false claims counts, *see* ECF Nos. 382, 385, meaning Relator's attendant conspiracy claims must also fall.

Even if Plaintiffs' underlying claims remained viable, the result would be the same. As Relator acknowledges, *see* ECF No. 391 at 87, proving a false claims conspiracy requires evidence that the alleged conspirators shared a "specific intent to defraud" the government. *Farmer*, 523 F.3d at 343. "To establish such a 'meeting of the minds,'" Relator "must provide proof that [Defendants] each intended to commit Medicare fraud, and that they entered into an agreement with that specific objective." *Reagan*, 274 F. Supp. 2d at 857; *Riquelme Valdes v. Leisure Res. Grp.*, 810 F.2d 1345, 1351 (5th Cir. 1987) (specific intent to defraud "must be established by full, clear, satisfactory, and convincing testimony"). None of Relator's three conspiracy theories could reasonably support the conclusion that PPFA or Affiliate Defendants intended to commit Medicaid fraud—much less that there was any agreement to do so.

First, Relator asserts that Defendants conspired to use the court system ███████████ ████████████████████████████████████ " even though they ██████ " the injunctive relief they requested was "unsupported." Dkt. 391 at 87-88. Yet Relator points to no evidence indicating that Defendants knew anything of the sort. Instead, it is undisputed that, at the time, federal courts in

Texas and Louisiana saw Affiliate Defendants' requests as meritorious—which is why they were granted, and the Louisiana decision was initially affirmed by the Fifth Circuit. *See* Dkt. 382, SOF ¶¶ 12, 16. Nor does Relator identify any evidence of an agreement with or among Defendants to avoid an obligation to remit Medicaid "overpayments." To the contrary, the undisputed evidence establishes that Defendants did not consider the reimbursements they received during the pendency of the injunctions to be "overpayments." *Id.* ¶¶ 39–40.

Relator's second theory—that Defendants "conspired to violate" the TMFPA and LMAPIL "███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ (Dkt. 391 at 88)—is equally deficient. Once again, the undisputed record, set out in Defendants' affirmative briefing (Dkt. 382) and also discussed *supra* at 25-34, contradicts what Relator asserts Defendants "knew" at the relevant time. Under these circumstances, no jury could reasonably conclude that Defendants conspired to submit claims during the injunction with an intent to defraud Medicaid. Because Relator does not and cannot establish that any Defendant was "aware of the [alleged] harm or wrongful conduct [to be committed] at the *inception* of the [alleged] combination or agreement," this theory fails as a matter of law. *Reagan*, 274 F. Supp. 2d at 857.

Finally, Relator attempts to piggyback a new conspiracy theory onto the newly-asserted theory of implied false claims liability for the Grace Period, by arguing that Defendants conspired to violate the TMFPA by using a post-termination ████████████████████████████ ████████████████████████████████████████████s. Dkt. 391 at 88. This theory,

too, is unsupported by the record. Resp. ¶ 28 (discussing efforts to ensure continuity of care and help find patients new providers).[54] It must also be denied.

## V.   Summary Judgment Should be Denied on Relator's Damages and Penalty Requests

In their Motion (but not in their brief in support of the Motion), Relator purported also to move for summary judgment on damages, civil fines, civil penalties, attorneys' fees, costs, and expenses. *See* Dkt. 389 at 2–3. Texas did not join. *See* Dkt. 388. Relator's conclusory assertion of entitlement to damages and civil penalties, in a cover motion, without a supporting brief, is insufficient to seek summary judgment on that issue. *See generally* Dkt. 391; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion"); *Paez v. Wal-Mart Stores Texas, LLC*, 2022 WL 3216343, at *1 (W.D. Tex. Aug. 9, 2022) (party's failure "explain why the court should do as [they] ask[]" by "develop[ing] their arguments with citations to law and record evidence" constitutes waiver); Fed. R. Civ. P. 56(c) (party asserting that a fact cannot be genuinely disputed must support the assertion through cites to the record); L. R. 56.5(a) ("A summary judgment motion . . . must be accompanied by a brief that sets forth the argument and authorities on which the party relies in support" including "the elements of each claim").

Defendants are not required to "guess" at the moving party's basis for summary judgment in order to oppose it. *Cf. John v. La.*, 757 F.2d 698, 708 (5th Cir. 1985) ("If the moving party fails to discharge [its] burden, summary judgment must be denied—even if the nonmoving party has not responded to the motion."). Even if Relator had provided any support whatsoever, a

---

[54] The undisputed facts also show that Affiliate Defendants sought and received modest amounts from Texas Medicaid during the Grace Period, Resp. ¶ 28, providing no support for Relator's new theory that Affiliate Defendants used the Grace Period as a means to boost revenue. Affiliate Defendants were focused on providing care to patients, not increasing revenue. *Id.* n.12.

determination of damages and penalties would be premature since there has been no judgment of liability and numerous genuine disputes of material fact exist both as to the existence and amount of damages and penalties.[55] *See, e.g.*, *Overbey v. Portable Mud Sys.*, 2021 WL 5230858, at *6 (W.D. Tex. Aug. 6, 2021) (summary judgment on damages premature "[g]iven that the issue of liability and damages ha[d] yet to be determined"); *U.S. ex rel. McLain v. Fluor Enterprises, Inc.*, 2015 WL 5321692, at *10 (E.D. La. Sept. 11, 2015) (summary judgment premature because of damages questions on "the value of the goods or services" provided). The Motion must be denied.

## VI.   Summary Judgment Should be Denied on Defendants' Excessive Fines Defense

Relators' request for summary judgment on Defendants' Excessive Fines defense is similarly premature. Here, the Excessive Fines defense is not a pure legal question appropriate for summary judgment. It is an as-applied challenge implicated by one of Plaintiffs' three distinct theories for calculating civil penalties—specifically, a fact-intensive and highly contested, novel theory in which *every claim* submitted by Affiliate Defendants is a separate violation of the FCA, TMFPA, or LMAPIL *See* Dkt. 390-2, Pl. App. 1134–1136 (Lochabay Tex. Rep.); *id.* 1243–1245 (Lochabay La. Rep.). As discussed above, the question of damages and penalties is not before the

---

[55] For example, Relator appears to assume that the amount of damages must be the full amount of payments made to Affiliate Defendants, but that is true "only where the government proves that it received no value from the product delivered." *U.S. v. Sci. Apps. Int'l Corp.*, 626 F.3d 1257, 1278-79 (D.C. Cir. 2010). Relator, who has the burden of proof on damages, offers no evidence at all for their figures, which Defendants' expert thoroughly rebutted. *See, e.g.,* Dkt. 390-3, Pl. App. 2119, 2123; Resp. ¶ 37. Relator's civil-penalties figures likewise are premised on the suggestion that every claim for payment is a separate FCA violation, but that too is wrong—"the focus" of penalties in an FCA case is "the specific conduct of the person from whom the Government seeks to collect the statutory [penalties]," *U.S. v. Bornstein*, 423 U.S. 303, 313 (1976), and "does not necessarily correspond to the number of claims submitted," *Lodge Constr., Inc. v. U.S.*, 158 Fed. Cl. 23, 62 (Cl. Ct. 2022). Relator has offered no evidence explaining Relator's exorbitant (and unconstitutional, *see infra*) theory, and the fact that Plaintiffs' own expert identified three different possible statutory-penalty calculations, *see generally* Dkt. 390-2, Pls. App. 1124-66 (Lochabay Tex. Rep.); *id.* at 1234-1270 (Lochabay La. Rep.), *id.* at 1167-95 (Lochabay Supp. Tex. Rep.), confirms that there are at least disputed facts on that question.

Court because Relator did not properly raise it, and in any case is premature. Likewise, the Court does not need to—indeed, *cannot*—address Defendants' affirmative defense unless and until the Court reaches penalties. *See, e.g.*, *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995) (excessive fines defense not ripe for disposition "until the imposition, or immediately impending imposition, of a challenged punishment or fine"); *U.S. ex rel. Fago v. M&T Mtg. Corp.*, 518 F. Supp. 2d 108, 124 (D.D.C. 2007) (declining to weigh in on excessive fines argument raised at summary judgment, explaining "[t]he question of whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case," requiring the court to first determine "the contours of the offense") (citing *U.S. v. Bajakajian*, 524 U.S. 321, 334 (1998)).[56]

If or when the Court is called upon to evaluate the constitutionality of Plaintiffs' per-claim-penalty theory, Affiliate Defendants will show that it is not only fundamentally inconsistent with Plaintiffs' reverse false claims theory of liability, but would be unconstitutional if applied here. Some of these issues are briefly touched on below to illustrate that this is not a "purely legal issue which [the Court] can decide in the abstract without further factual development" as well as fuller consideration of the legal authority (or lack of legal authority) supporting each party's respective positions. *Cheffer*, 55 F.3d at 1524.

First, contrary to Relator's assertion, Dkt. 391 at 89, courts have held that imposition of FCA penalties can violate the Excessive Fines Clause. *See, e.g.*, *U.S. v. Cabrera-Diaz*, 106 F. Supp.2d 234, 242 (D.P.R. 2000) (holding that civil penalty for each of 455 false claims would be

---

[56] *See also U.S. ex rel. Fisher v. Ocwen Loan Servicing, LLC*, 2016 WL 3031713, at *10 (E.D. Tex. May 25, 2016) (denying as "premature" relator's motion for summary judgment on defendants' affirmative defense challenging constitutionality of damages award); *San Francisco Tech., Inc. v. Dial Corp.*, 2011 WL 941152, at *4 (N.D. Cal. Mar. 17, 2011) (denying motion based on excessive fines defense because "the Court has not yet imposed a fine or even concluded that" the defendant committed a violation")..

"excessive"); *U.S. ex rel. Jehl v. GGNSC Southhaven, LLC*, 2021 WL 2815974, at *6 (N.D. Miss. July 6, 2021) (per-claim $6 million penalty would be an "unjustifiably harsh penalty" for false certification claims based on lapse in licensing for an otherwise qualified nurse); *cf. U.S. v. Kruse*, 101 F. Supp. 2d 410, 414 (E.D. Va. 2000) (refusing to impose a $10,000 per-occurrence penalty under the Anti-Kickback Statute because it "impose[d] an impermissible punishment"). In fact, several courts have cited Excessive Fines concerns as grounds for rejecting a penalty calculation in favor of one that poses no such constitutional problems. *See, e.g.*, *Peterson v. Weinberger*, 508 F.2d 45, 55 (5th Cir. 1975) (affirming "sound discretion" in entering a civil penalty on only 50 of 120 false claims—over the government's objection "where the imposition of forfeitures might prove excessive and out of proportion to the damages sustained by the Government."); *Hays v. Hoffman*, 325 F.3d 982, 993 (8th Cir. 2003) (rejecting per-claim penalty "laced with Excessive Fines Clause implications"). The government and relators in *qui tam* litigation have also staved off looming Eighth Amendment challenges by requesting entry of a lower award—including in the majority of cases cited by Plaintiffs. *See, e.g.*, *U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 406 (4th Cir. 2013); *U.S. v. Mackby*, 339 F.3d 1013 (9th Cir. 2003); *U.S. v. Compassionate Home Servs., Inc.*, 2018 WL 11321934, at *1 (E.D. N.C. Jul. 30, 2018). *U.S. ex rel. Lutz v. BlueWave Healthcare Cons., Inc.*, 2018 WL 11282049, at *6 & n.4 (D.S.C. May 23, 2018). If the Court is asked to adjudicate damages and penalties, it should reject Plaintiffs' proposal to assess penalties in a manner that would yield a constitutionally suspect result.

Plaintiffs' per-claim penalty calculation would also result in a civil penalty award that is grossly excessive and wholly disproportionate to the alleged misconduct. "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality. The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed

to punish." *Bajakajian*, 524 U.S. at 334.[57] To make that determination, courts consider, among other things, other authorized penalties authorized by the legislature and the magnitude of the harm caused by the defendant. *See id.* at 337–40. The defendant's ability to pay is also relevant. *See U.S. v. Levesque*, 546 F.3d 78, 83–84 (1st Cir. 2008).

Plaintiffs' per-claim penalty request *exponentially* exceeds any other penalties that any legislature has authorized for similar conduct. Plaintiffs argue that the legislature also authorized penalties vis-à-vis the damages multipliers under the FCA, TMFPA, and LMAPIL. *See* Dkt. 391 at 92. But that comparison hardly helps them when the civil penalties they seek dwarf those other penalties. Even if Plaintiffs' figures are correct (and they are not), Plaintiffs cannot explain how the legislature's authorization of a $24 million treble damages penalty supports entry of a $1.244 *billion* civil penalty—an amount that is **51** times greater—for retaining $8 million in Louisiana Medicaid funds.[58] Nor do Plaintiffs articulate how Affiliate Defendants' retention of $8.9 million in Texas Medicaid funds supports entry of a $566 million civil penalty that is **31** times more than the "other" penalty that the legislature authorized for $18 million in double damages. The disparity between the two penalties shows that Plaintiffs' per-claim penalty request is a grossly excessive penalty and far beyond any legitimate goal of deterrence or retribution. *See Bajakajian*, 524 U.S. at 338–39 & n.14.[59]

---

[57] In addition, the Due Process Clauses of the Fifth and Fourteenth Amendments "impose substantive limits 'beyond which penalties may not go.'" *TSO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 453–54 (1993) (citation omitted). While the legislature has "a wide latitude of discretion" to prescribe statutory penalties, legislative enactments can transcend due process limitations if "the penalty prescribed is so severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66–67 (1919); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 n. 22 (1996).

[58] The $8 million figure for Louisiana claims is disputed. *See* Resp. ¶¶ 37, 38.

[59] *See also Campbell*, 538 U.S. at 425 (explaining that a single-digit multiplier is "more likely to comport with due process, while still achieving the [government's] goals of deterrence and retribution" and that a 4-to-1 ratio "might be close to the line of constitutional impropriety.").

Finally, the imposition of a combined $1.8 ***billion*** civil penalty also would be shocking and wholly disproportionate to any "harm" caused by Affiliate Defendants' retention of approximately $16.5 million in Medicaid funds openly received over a multi-year period. *Timbs*, 139 S. Ct. at 689.[60] Unlike the cases on which Relator relies, the per-claim penalties that Plaintiffs seek to assess are not the "result of [Affiliate Defendants] *repeated* . . . instances of fraud." *Thayer*, 1 F.4th at 1314 (emphasis added); *cf, e.g.*, *id*. at 1316; *Tuomey*, 792 F.3d at 389. Here, Affiliate Defendants lawfully and openly received the Medicaid funds under court injunctions; the alleged "fraudulent" conduct is that sixty days after entry of the Fifth Circuit's mandate, Affiliate Defendants had an obligation to repay Medicaid funds and they did not do so. *See generally* Dkt. 22, Texas Compl.; Dkt. 2, Relator Compl. ¶¶ 109-12. That cannot reasonably be characterized as anything more than a one-time violation. This would be particularly unjust because the States cannot prove any actual loss; it is undisputed that the Affiliate Defendants provided the services for which they were paid. *Cf. Bajakajian*, 524 U.S. at 339.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court deny Texas's Motion for Summary Judgment and Relator's Partial Motion for Summary Judgment.

---

Putting aside that Plaintiffs' single damages and multipliers are not actually entirely compensatory, the ratio of punitive damages to compensatory damages for retaining Texas Medicaid funds would be **21-to-1**, and the ratio for retaining Louisiana Medicaid funds would be **38.5-to-1**. These far exceed those that courts deemed constitutional in Plaintiffs' cases.

[60] *See also, e.g.*, *Golan v. FreeEats.com, Inc*. 930 F.3d 950, 962–63 (8th Cir. 2019) (holding "[$]1.6 billion" award, based on $500-per-violation provision, was "a shockingly large amount" that would violate the Due Process Clause because it was "wholly disproportionate to the offense and obviously unreasonable"); *Parker v. Time Warner Entertainment Co*., 331 F.3d 13, 26 (2d Cir. 2003) (Newman, J., concurring) ($1,000-per-subscriber statutory penalty could lead to $12 billion total penalty that would pose due process concerns).

Dated:  January 27, 2023

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By:     /s/ Tirzah S. Lollar
     Tirzah S. Lollar
     Tirzah.Lollar@arnoldporter.com
     Craig D. Margolis
     Craig.Margolis@arnoldporter.com
     Christian Sheehan
     Christian.Sheehan@arnoldporter.com
     Emily Reeder-Ricchetti
     Emily.Reeder-Ricchetti@arnoldporter.com
     Megan Pieper
     Megan.Pieper@arnoldporter.com
     Alyssa Gerstner
     Alyssa.Gerstner@arnoldporter.com
     601 Massachusetts Ave, NW
     Washington, DC 20001-3743
     Telephone: +1 202.942.6127
     Fax: +1 202.942.5999

     Paula Ramer
     Paula.Ramer@arnoldporter.com
     250 West 55th Street
     New York, New York 10019-9710
     T: +1 212.836.8474

     Christopher M. Odell
     Texas State Bar No. 24037205
     Christopher.Odell@arnoldporter.com
     700 Louisiana Street, Suite 4000
     Houston, TX 77002-2755
     Telephone: +1 713.576.2400
     Fax: +1 713.576.2499

     Ryan Patrick Brown
     Texas State Bar No. 24073967
     brown@blackburnbrownlaw.com
     1222 S. Fillmore
     Amarillo, TX 79101

Tel: (806) 371-8333
Fax: (806) 350-7716

*Attorneys for Defendants Planned*
*Parenthood Gulf Coast, Inc., Planned*
*Parenthood of Greater Texas, Inc.,*
*Planned Parenthood South Texas, Inc.,*
*Planned Parenthood Cameron County,*
*and Planned Parenthood San Antonio*

### CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of January, 2023, I caused the foregoing to be served by email through the Court's Electronic Case Filing system upon all attorneys of record.


*/s/ Tirzah S. Lollar*
Tirzah S. Lollar