**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| United States of America | § | |
| *ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| The State of Texas | § | CIVIL ACTION NO. 2:21-CV-00022-Z |
| *ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| The State of Louisiana | § | |
| *ex rel.* ALEX DOE, Relator, | § | Date:        January 6, 2023 |
| | § | |
| *Plaintiffs*, | § | ORAL ARGUMENT REQUESTED |
| v. | § | |
| Planned Parenthood Federation of America, | § | |
| Inc., Planned Parenthood Gulf Coast, Inc., | § | |
| Planned Parenthood of Greater Texas, Inc., | § | |
| Planned Parenthood South Texas, Inc., Planned | § | |
| Parenthood Cameron County, Inc., Planned | § | |
| Parenthood San Antonio, Inc., | § | |
| *Defendants*. | § | |

**<u>MEMORANDUM IN SUPPORT OF AFFILIATE DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ....................................................4

I.      The Parties and This Litigation..........................................................................4

II.     Affiliates Defendants' Enrollment in Texas and Louisiana Medicaid................5

        A.      Attempts by Texas and Louisiana to Terminate Affiliate Defendants ..................5

        B.      Affiliate Defendants Initiated Litigation to Prevent the Terminations ..................7

        C.      HHSC Granted Affiliate Defendants a Grace Period to Remain Enrolled ...........10

        D.      HHSC's Notices to MCOs and Re-Enrollment of Affiliate Defendants ..............12

III.    CMS Has Not Requested Repayment or Recoupment ......................................14

IV.     Texas Has Not Requested Repayment or Recoupment .....................................14

V.      Louisiana Has Not Requested Repayment or Recoupment ...............................16

VI.     Affiliate Defendants Had No Obligation to Repay Monies Received From Texas
        or Louisiana Medicaid During the Pendency of the Injunctions or TROs ........17

VII.    Neither Texas nor Louisiana Has Returned the Federal Share of Any
        "Overpayment" Paid to Affiliate Defendants ...................................................18

VIII.   Neither Texas Nor Louisiana Took Any Action to Ensure They Would Receive
        Repayment ......................................................................................................19

LEGAL STANDARDS ....................................................................................................20

I.      Summary Judgment .........................................................................................20

II.     Federal False Claims Act and State Analogues .................................................20

ARGUMENT ...................................................................................................................21

I.      Defendants Are Entitled to Summary Judgment on Plaintiffs' Reverse FCA
        Claims .............................................................................................................22

        A.      Defendants Had No Obligation to Repay Amounts Received While the
                Injunctions Were Pending.......................................................................22

i

1.  Vacatur of the Texas Injunction Did Not Create a Repayment Obligation ...................................................................23

a.  There Can Be No Obligation Without An Injunction Bond Or Order From The Court With Jurisdiction Over The Injunction ...........................23

b.  A State's Discretionary Authority To Seek Recoupment, By Itself, Does Not Create An "Established Duty" to Pay ........................................24

2.  No Obligation to Repay Arose Under the ACA's 60-Day Rule ...............27

B.  Defendants Did Not Act With the Requisite Scienter ...........................................31

1.  It Was Objectively Reasonable for Affiliate Defendants to Conclude They Were Entitled to Keep the Medicaid Payments They Received While the Injunctions Were in Effect ........................................................31

2.  The Government's Knowledge of the Facts Underlying Plaintiffs' Reverse FCA Claims Negates Scienter ........................................................36

II.  Defendants Are Entitled To Summary Judgment on Relator's Affirmative FCA and LMAPIL Claims Because Relator Cannot Establish Falsity, Materiality, or Scienter ........................................................................................................................38

A.  Relator Cannot Establish Falsity.........................................................................39

1.  There Is No Evidence That Affiliate Defendants' Claims Contained Specific Representations That Were Rendered Impliedly False...............39

2.  Relator Cannot Establish Objective Falsity ...............................................41

a.  Alleged Noncompliance with "Medical and Ethical Standards" Cannot Give Rise to an Objective Falsehood ...........................................42

b.  FCA Liability Does Not Attach to a Willingness to Violate the Law or Other Requirements .................................................................................45

3.  Relator Cannot Establish Falsity as to PPGT or PPST .............................47

B.  Relator Cannot Establish that Affiliate Defendants Possessed the Requisite Scienter ................................................................................................................48

C.  The Undisputed Evidence Demonstrates That Defendants' Alleged Violations Were Not Material to Any Government's Payment Decision.............49

1.  Affiliate Defendants' Alleged Violations Were Not Material to the United States' Payment Decisions ..............................................................49

2.      Texas and Louisiana's Failure to Recoup Funds Paid to Affiliate Defendants Demonstrates Immateriality....................................................50

3.      Relator Cannot Establish Materiality for Claims Paid By MCOs ............52

III.    Affiliate Defendants Are Entitled to Summary Judgment on Relator's Conspiracy Claims Under the TMFPA and LMAPIL ...........................................................53

IV.     Relator's Claims Are Barred In Part By Statutes of Repose ...............................................54

CONCLUSION..............................................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*,
  249 U.S. 134 (1919)..................................................................................................24

*U.S. ex rel. Armstrong v. Andover Subacute & Rehab Ctr. Servs.*,
  2020 WL 7640535 (D.N.J. Dec. 22, 2020)..............................................................52

*U.S. ex rel. Bachert v. Triple Canopy, Inc.*,
  321 F. Supp. 3d 613 (E.D. Va. 2018) ......................................................................51

*U.S. ex rel. Bailey v. Ector Cnty. Hosp.*,
  386 F. Supp. 2d 759 (W.D. Tex. 2004).....................................................................44

*U.S. ex rel. Barrick v. Parker-Migliorini Int'l*,
  LLC, 878 F.3d 1224 (10th Cir. 2017)......................................................................22

*U.S. ex rel. Barron v. Deloitte & Touche, LLP*,
  2009 WL 10670806 (W. D. Tex. Feb. 11, 2009)......................................................39

*U.S. ex rel. Becker v. Westinghouse Savannah River Co.*,
  305 F.3d 284 (4th Cir. 2002) ...................................................................................37

*U.S. ex rel. Bennett v. Medtronic, Inc.*,
  747 F. Supp. 2d 745 (S.D. Tex. 2010) ................................................................39, 41

*Boudreaux v. Swift Transp. Co.*,
  402 F.3d 536 (5th Cir. 2005) ...................................................................................20

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)..................................................................................................30

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................................................20

*U.S. ex rel. Colquitt v. Abbott Labs.*,
  858 F.3d 365 (5th Cir. 2017) ...................................................................................37

*Continuum Co. v. Incepts, Inc.*,
  873 F.2d 801 (5th Cir. 1989) ...................................................................................23

*U.S. ex rel. Customs Fraud Investigation, LLC v. Victaulic Co.*,
  839 F.3d 242 (3d Cir. 2016)......................................................................................37

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ...................................................................35

*U.S. ex rel. Farmer v. City of Hous.*,
    523 F.3d 333 (5th Cir. 2008) ...........................................................20, 53

*Gonzalez v. Planned Parenthood of L.A.*,
    2012 WL 2412080 (C.D. Cal. June 26, 2012) ........................................40

*U.S. ex rel. Graves v. ITT Educ. Servs.*,
    284 F. Supp. 2d 487 (S.D. Tex. 2003) ...................................................24

*Greenwood Cnty v. Duke Power Co.*,
    107 F.2d 484 (4th Cir. 1939) ..................................................................24

*H & R Block, Inc. v. McCaslin*,
    541 F.2d 1098 (5th Cir. 1976) ................................................................23

*U.S. ex rel. Hagood v. Sonoma Cnty. Water Agency*,
    929 F.2d 1416 (9th Cir. 1991) ................................................................37

*U.S. ex rel. Harman v. Trinity Indus. Inc.*,
    872 F.3d 645 (5th Cir. 2017) ..................................................................49

*U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
    842 F.3d 430 (6th Cir. 2016) ..................................................................32

*U.S. ex rel. Hendrickson v. Bank of Am., N.A.*,
    343 F. Supp. 3d 610 (N.D. Tex. 2018) .............................................31, 48

*Hickman v. Spirit of Athens, Ala.*,
    985 F.3d 1284 (11th Cir. 2021) ..............................................................41

*U.S. ex rel. Hobbs v. MedQuest Assocs., Inc.*,
    711 F.3d 707 (6th Cir. 2013) ..................................................................47

*U.S. ex rel. Howard v. Caddell Constr. Co., Inc.*,
    2021 WL 1206584 (E.D.N.C. Mar. 30, 2021) ......................................25

*In re J.D. Jewell, Inc.*,
    571 F.2d 928 (5th Cir. 1978) ..................................................................23

*U.S. ex rel. Jamison v. McKesson Corp.*,
    784 F.Supp. 2d 664 (N.D. Miss. 2011) ............................................42, 48

*U.S. ex rel. Kelly v. Serco, Inc.*,
    846 F.3d 325 (9th Cir. 2017) ..................................................................40

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
   160 F. Supp. 3d 253 (D.D.C. 2016) ................................................................24

*U.S. ex rel. Longhi v. United States*,
   575 F.3d 458 (5th Cir. 2009) ........................................................................20

*Longoria v. Paxton*,
   585 F. Supp. 3d 907 (W.D. Tex. 2022)..........................................................30

*U.S. ex rel. MacDowell v. Synnex Corp.*,
   No. C 19-00173 WHA, 2019 WL 4345951 (N.D. Cal. Sept. 12, 2019)................52

*U.S. ex rel. Marcy v. Rowan Cos.*,
   520 F.3d 384 (5th Cir. 2008) ........................................................................26

*U.S. ex rel. Mason v. State Farm Mut. Auto. Ins. Co.*,
   No. CV07-297-S-EJL, 2009 WL 10678747 (D. Idaho Aug. 18, 2009)................27

*U.S. ex rel. Mbabazi v. Walgreen Co.*,
   No. CV 19-2192, 2021 WL 4453600 (E.D. Pa. Sept. 28, 2021) .........................52

*U.S. ex rel. McBride v. Halliburton Co.*,
   848 F.3d 1027 (D.C. Cir. 2017).....................................................................51

*U.S. ex rel. Morton v. A Plus Benefits*,
   139 F. App'x 980 (10th Cir. 2005) ................................................................44

*Olson v. Fairview Health Servs. of Minn.*,
   831 F.3d 1063 (8th Cir. 2016) ............................................................25, 37, 38

*U.S. ex rel. Petras v. Simparel, Inc.*,
   857 F.3d 497 (3d Cir. 2017).............................................................22, 24, 38

*U.S. ex rel. Petratos v. Genentech, Inc.*,
   855 F.3d 481 (3d Cir. 2017).............................................................49, 50

*Planned Parenthood of Greater Tex. v. Kauffman*,
   981 F.3d 347 (5th Cir. 2020) ........................................................................10

*Planned Parenthood of Greater Tex. v. Smith*,
   236 F. Supp. 3d 974 (W.D. Tex. 2017)......................................................9, 10, 29

*Planned Parenthood Gulf Coast, Inc. v. Gee*,
   862 F.3d 445 (5th Cir. 2017) .....................................................................8, 9, 15

*Planned Parenthood Gulf Coast, Inc. v. Kliebert*,
   141 F. Supp. 3d 604 (M.D. La. 2015)..........................................................8, 29

*Polansky v. Exec. Health Res., Inc.*,
    422 F. Supp. 3d 916 (E.D. Pa. 2019) ....................................................52

*U.S. ex rel. Porter v. Magnolia Health Plan, Inc.*,
    810 F. App'x 237 (5th Cir. 2020) ........................................................49

*Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*,
    784 F.2d 674 (5th Cir. 1986) ...............................................................42

*U.S. ex rel. Proctor v. Safeway, Inc.*,
    30 F.4th 649 (7th Cir. 2022) .........................................................31, 33

*U.S. ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) .............................................................31

*Rader v. Cowart*,
    543 F. App'x 358 (5th Cir. 2013) .......................................................20

*U.S. ex rel. Ramsey-Ledesma v. Censeo Health, LLC*,
    2016 WL 5661644 (N.D. Tex. Sept. 30, 2016) ...................................53

*U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*,
    200 F. Supp. 2d 673 (S.D. Tex. 2002) ................................................42

*Ruckh v. Salus Rehab., LLC*,
    963 F.3d 1089 (11th Cir. 2020) ..........................................................40

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) ..............................................................................36

*Samsung Elecs. Am., Inc. v. Yang Kun Chung*,
    2017 WL 635031 (N.D. Tex. Feb. 16, 2017) ......................................53

*U.S. ex rel. Schutte v. Supervalu Inc.*,
    9 F.4th 455 (7th Cir. 2021) .................................................................31

*U.S. ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*,
    843 F.3d 1033 (5th Cir. 2016) ................................................22, 25, 26

*U.S. ex rel. Sirls v. Kindred Healthcare, Inc.*,
    469 F. Supp. 3d 431 (E.D. Pa. 2020) ..................................................52

*U.S. ex rel. Smith v. Wallace*,
    723 F. App'x 254 (5th Cir. 2018) ..................................................40, 41

*U.S. ex rel. Sparks v. IntegraCare Home Health Servs.*,
    2017 WL 11711732 (E.D. Tex. July 6, 2017) .....................................47

*Spay v. CVS Caremark Corp.*,
  875 F.3d 746. (3d Cir 2017) ................................................................37

*U.S. ex rel. Steury v. Cardinal Health, Inc.*,
  625 F.3d 262 (5th Cir. 2010) ...............................................................41

*Sturgeon v. Pharmerica Corp.*,
  438 F. Supp. 3d 246 (E.D. Pa. 2020) ...................................................26

*Tenth Ward Road Dist. No. 11 of Avoyelles Parish v. Tex. & Pac. Ry. C*o.,
  12 F.2d 245 (5th Cir. 1926) .............................................................23, 24

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ...............................................................35

*Tri v. J.T.T.*,
  162 S.W.3d 552 (Tex. 2005) .................................................................53

*In re UAL Corp.*,
  412 F.3d 775 (7th Cir. 2005) ................................................................24

*United States v. AseraCare, Inc.*,
  938 F.3d 1278 (11th Cir. 2019) ...............................................41, 44, 45

*United States v. Kernan Hosp.*,
  880 F. Supp. 2d 676 (D. Md. 2012) ......................................................42

*United States v. McNinch*,
  356 U.S. 595 (1958) .............................................................................49

*United States v. Planned Parenthood of Heartland, Inc.*,
  2016 WL 7474797 (S.D. Iowa June 21, 2016) .....................................44

*United States v. Southland Mgmt. Corp.*,
  326 F.3d 669 (5th Cir. 2003) ...............................................37, 41, 42, 44

*United States v. Strock*,
  982 F.3d 51 (2d Cir. 2020) ...................................................................26

*Waldmann v. Fulp*,
  259 F. Supp. 3d 579 (S.D. Tex. 2016) ..................................................46

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*,
  2016 WL 3449833 (N.D. Tex. June 20, 2016) ..........................39, 41, 44

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*,
  778 F. Supp. 2d 709 (N.D. Tex. 2011) ..................................................42

*Wenner v. Tex. Lottery Comm'n,*
  123 F.3d 321 (5th Cir. 1997) .......................................................................................29, 30

*U.S. ex rel. Williams v. McKesson Corp.,*
  2014 WL 3353247 (N.D. Tex. July 9, 2014) ...............................................................53

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.,*
  525 F.3d 370 (4th Cir. 2008) .......................................................................................42, 44

*U.S. ex rel. Yannacopoulos v. General Dynamics.,*
  652 F.3d 818 (7th Cir. 2011) .......................................................................................42

*FTC ex rel. Yost v. Educare Centre Servs., Inc.,*
  2020 WL 4334117 (W.D. Tex. Apr. 3, 2020).............................................................35

*U.S. ex rel. Zayas v. AstraZeneca Biopharm., Inc.,*
  2017 WL 1378128 (E.D.N.Y. Apr. 17, 2017) .............................................................26

*U.S. ex rel. Zissa v. Santa Barbara Cty.,*
  2019 WL 3291579 (C.D. Cal. Mar. 12, 2019) ............................................................51

**Statutes**

31 U.S.C. § 3729(a)(1)(A) ........................................................................................20, 38

31 U.S.C. § 3729(a)(1)(G) ..............................................................................21, 22, 31, 37

31 U.S.C. § 3729(b)(3) ...............................................................................................2, 22

31 U.S.C. § 3731(b)(2) ...............................................................................................54

42 U.S.C. § 1230a-7 ...................................................................................................9

42 U.S.C. § 1320a–7a(1) ............................................................................................27

42 U.S.C. §§ 1320a-7k(d)(1)-(2) ...............................................................................27

42 U.S.C. § 1320a-7k(d)(3) ........................................................................................27

42 U.S.C. § 1320a-7k(d)(4)(B) ..........................................................................17, 27, 30

Affordable Care Act...........................................................................................*passim*

False Claims Act ................................................................................................*passim*

La. R.S. § 437.6 ...........................................................................................................30

La. Rev. Stat. § 46:437.3(16) ..................................................................................2, 22

vi

La. Rev. Stat. § 46:437.11 ................................................................................28

La. Rev. Stat. § 46:438.3 ....................................................................21,22, 31

La. Rev. Stat. § 439.1.B ....................................................................................54

Louisiana Medical Assistance Programs Integrity Law ............................ *passim*

Tex. Gov't Code § 531.120 .........................................................................14, 33

Tex. Hum. Res. Code. Ann. 36.001 ..................................................................21

Tex. Hum. Res. Code § 36.001(7-a) ..............................................................2, 22

Tex. Hum. Res. Code § 36.002(12)
    ................................................................................................21, 22, 31, 52

Tex. Hum. Res. Code § 36.107 ..........................................................................54

Texas Medicaid Fraud Prevention Act ..................................................... *passim*

**Other Authorities**

42 C.F.R. § 433.312(a) ......................................................................................34

42 C.F.R. § 433.316(b) ......................................................................................33

42 C.F.R. § 433.320 ..........................................................................................34

81 Fed. Reg. 7654, 7658 (2016) .......................................................................33

81 Fed. Reg. at 7658 .........................................................................................33

87 Fed. Reg. 27,515 (May 9, 2022) ..................................................................38

1 Tex. Admin. Code § 371.1719 .......................................................................26

Black's Law Dictionary (11th ed. 2019) ...........................................................38

Fed. R. Civ. P. 30(b)(6) ............................................................................ *passim*

Fed. R. Civ. P. 56 .......................................................................................1, 20

La. Admin. Code Pt. 1 § 4161(A)(10) ...............................................................26

La. Admin. Code § 4103(A) ..............................................................................33

La. Admin. Code § 4161(A) ..............................................................................30

S. Rep. 111-10 (2009) .......................................................................................38

Tex. Admin. Code § 371.23(1) ......................................................................................30

Tex. Admin Code § 371.1703(g) ..................................................................................28

Tex. Admin. Code § 371.1703(g)(2) .............................................................................11

Texas Administrative Code section 371.1(73)...............................................................18

Pursuant to Federal Rule of Civil Procedure 56, Defendants Planned Parenthood Gulf Coast, Inc. ("PPGC"); Planned Parenthood of Greater Texas, Inc. ("PPGT"); Planned Parenthood South Texas, Inc. ("PPST"); Planned Parenthood Cameron County, Inc. ("PPCC"); and Planned Parenthood San Antonio, Inc. ("PPSA") (collectively, "Affiliate Defendants")[1] submit this memorandum in support of their motion for summary judgment.

## INTRODUCTION

This case presents an entirely novel theory of "Medicaid fraud" under the federal False Claims Act ("FCA"), the Texas Medicaid Fraud Prevention Act ("TMFPA"), and the Louisiana Medical Assistance Programs Integrity Law ("LMAPIL"). Relator Alex Doe and the State of Texas (collectively, "Plaintiffs") seek to impose treble damages and enormous per-claim penalties for conduct that was expressly authorized by two separate federal courts and where the federal agency responsible for administering the Medicaid program has taken the consistent position that the Affiliate Defendants did nothing wrong (indeed, that the underlying terminations were unlawful). After extensive research, Affiliate Defendants have located no case with remotely similar circumstances imposing fraud liability. As discussed further below, Plaintiffs' claims fail under established law and the Court should grant Affiliate Defendants summary judgment.

***Reverse False Claims.*** Plaintiffs allege that Affiliate Defendants violated the "reverse false claims" provisions of the federal FCA, TMFPA, and LMAPIL by failing to repay Medicaid payments that Affiliate Defendants received for cancer screenings, birth control, and other preventative healthcare services provided during the pendency of injunctions that prohibited Affiliate Defendants' termination from Medicaid and authorized them to continue providing and

---

[1] For ease of reference, PPST and its subsidiaries, PPSA and PPCC, are collectively referred to as "PPST" for purposes of this brief.

being reimbursed for those services.[2]  Affiliate Defendants are entitled to summary judgment on Plaintiffs' reverse FCA claims because Affiliate Defendants did not have an "obligation" to repay the funds, nor did they "knowingly" and "improperly" avoid such an obligation.

Under the relevant statutes, a repayment "obligation" exists only where there is "an established duty" to pay.  31 U.S.C. § 3729(b)(3); Tex. Hum. Res. Code § 36.001(7-a); La. Rev. Stat. § 46:437.3(16).  The Fifth Circuit's 2020 *en banc* decision vacating the Texas injunction did not establish a duty for Affiliate Defendants to return the funds they received for the medical care they provided.  Indeed, it did not address the underlying merits whatsoever, holding only that patients had no standing to enforce the Medicaid "free choice of provider" rule, thereby effectively reversing two prior panel decisions.  A duty to repay monies for qualified services provided to qualifying beneficiaries during the injunctions was contingent on future events – if the States sought administrative recoupment or if a court otherwise ordered restitution or an injunction bond. None of that happened here; there was no restitution order or injunction bond, which make sense, given that Texas and Louisiana were not financially harmed by reimbursing Affiliate Defendants for medical care they undisputedly provided to patients whose care was covered by the Medicaid program and for which the States would have had to pay a different Medicaid provider absent the injunctions.  Moreover, Texas and Louisiana never even notified Affiliate Defendants of the *possibility* of repayment, let alone pursued formal recoupment.  And Louisiana's attempted termination of PPGC from Medicaid *never* took effect; PPGC has remained a Medicaid provider in that State from at least 2010 to the present.  Nor did the Affordable Care Act ("ACA") create a

---

[2] Abortion services are not covered under Medicaid except in extremely rare circumstances.  App. 70-71, Bowen Dep. 171:20-172:2.   Affiliate Defendants are not aware of having sought reimbursement from Texas Medicaid for any abortion services.  App. 483,  Linton Decl. ¶ 8; App. 495, Lambrecht Decl. ¶ 8; App. 490, Barraza Decl. ¶ 8.  And while PPGC provided healthcare services in Louisiana, it never performed abortions in Louisiana.  App. 483, Linton Decl. ¶ 9.

repayment obligation:  Affiliate Defendants were entitled to receive Medicaid payments while the injunctions – and, by extension, their Medicaid provider agreements – remained in effect.  There was thus no "overpayment" that could trigger a repayment obligation.

Even if such a duty were imposed, Affiliate Defendants did not "knowingly and improperly" fail to meet it because it was objectively reasonable for Affiliate Defendants to believe there was no repayment obligation and no authoritative guidance warned them away from that position.  There is no authoritative guidance – indeed, no guidance whatsoever – from either of the States or the federal government that suggests, let alone clearly states, that payments, lawful when received, could retroactively become "overpayments."  In fact, the only guidance the Centers for Medicare and Medicaid Services ("CMS") has issued reinforced the reasonableness of Affiliate Defendants' view, stating that payments cannot retroactively become overpayments.  Further, the States' conduct supports the reasonableness of Affiliate Defendants' view.  Federal and State Medicaid regulations expressly require that states notify a provider of an overpayment and remit the overpayment to CMS irrespective of whether the State has recovered that money from the provider.  Texas and Louisiana issued no such notice, which is strong evidence that they shared Affiliate Defendants' view that there was no repayment obligation.  Indeed, Texas recently paid at least two of the Affiliate Defendants *additional* monies for services provided during the pendency of the injunctions even after the Fifth Circuit *en banc* decision and after this case was brought.

***Implied False Certification.***  Affiliate Defendants are also entitled to summary judgment on Relator's FCA and LMAPIL implied false certification claims because Relator cannot establish the essential elements of falsity, scienter, and materiality.[3]  Relator must establish each element as

---

[3] The Court held that, following Texas's intervention, Texas is primarily responsible for prosecuting the TMFPA claims asserted in Count III of Relator's Complaint.  *See* Dkt. 71 at 35; *see also id.* at 33 (indicating that Relator only remains responsible for prosecuting the TMFPA

to *each* defendant; PPST and PPGT had *no* involvement in the facts underlying Relator's false certification claim, so there are no facts demonstrating falsity or scienter as to PPGT or PPST.

Relator cannot establish falsity because (1) there is no evidence that any Affiliate Defendant's Medicaid reimbursement requests contained specific representations about the medical services provided that were rendered impliedly false by a failure to disclose alleged noncompliance, and (2) neither alleged violations of "medical and ethical standards" nor an alleged "willingness" to violate other "state and federal laws" satisfy the FCA's "objective falsity" requirement. Relator cannot establish scienter for the same reasons. And finally, Relator cannot establish materiality because, to this day, neither Texas nor Louisiana has taken any steps to recoup monies paid to Affiliate Defendants before (or after) the initiation of the termination proceedings, and Louisiana has allowed PPGC to remain in its Medicaid program to this day.

*Conspiracy*.   Relator's conspiracy claims fail because Relator cannot establish any underlying "fraud" and there is no evidence of an agreement to defraud the government.

For these reasons and as discussed further below, the Court should grant Affiliate Defendants summary judgment on all claims in Plaintiffs' complaints.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.     The Parties and This Litigation

1.      Relator filed their complaint on February 5, 2021. Dkt. 2. Texas filed its complaint in intervention on January 6, 2022. Dkt. 22. The United States declined to intervene, Dkt. 18, and Louisiana has thus far also declined to intervene.

---

conspiracy claim in Count V of Relator's Complaint).  Because Texas's "Complaint in Intervention supersedes Relator's TMFPA complaint and asserts the only live TMFPA claim in this action—Texas's 36.002(12) allegation"—"the TMFPA claims originally brought by Relator that Texas did not include in its Complaint in Intervention," including Relator's affirmative TMFPA claims, "are no longer viable."  Tex. Opp'n to Mot. to Compel, Dkt. 141 at 2-3.

2.      Each Affiliate Defendant is a separate company, with separate bylaws, articles of incorporation, boards of directors, employees, management structures, tax filings, bank accounts, phone numbers, business addresses, facilities, and operations.  App. 482, Linton Decl. ¶ 5; App. 494, Lambrecht Decl. ¶ 4; App. 489, Barraza Decl. ¶ 4.  PPGC, PPGT, and PPST each has its own national Medicaid provider number and Texas provider number (for the period they were enrolled in Texas Medicaid).  *Id.*

3.      Affiliate Defendants provide healthcare services in separate, non-overlapping geographic regions in Texas.  Rel. Compl. ¶¶ 19, 21, 23; App. 482, Linton Decl. ¶ 3; App. 494, Lambrecht Decl. ¶ 3; App. 489, Barraza Decl. ¶ 3.  PPGC also provides healthcare services in Louisiana.  Rel. Compl. ¶ 19; App. 482, Linton Decl. ¶ 4.

## II.     Affiliates Defendants' Enrollment in Texas and Louisiana Medicaid

4.      Affiliate Defendants billed for and received reimbursement for healthcare services provided under Texas Medicaid from 2010[4] to on or about March 10, 2021, except for a brief pause in late 2020/early 2021.  App. 261-62, Texas/HHSC Rule 30(b)(6) (Zalkovsky) at 50:21-51:19; App. 483, Linton Decl. ¶ 8; App. 495, Lambrecht Decl. ¶ 8; App. 490, Barraza Decl. ¶ 8.  PPGC billed for and received reimbursement for healthcare services under Louisiana Medicaid from 2010 to the present.  App. 483, Linton Decl. ¶ 9.

### A.     Attempts by Texas and Louisiana to Terminate Affiliate Defendants

5.      In April 2015, Relator ███████████████████████████████ gained entry to a PPGC facility and ████████ recorded their discussions with certain PPGC staff regarding the possibility of PPGC entering into an agreement to facilitate the donation of fetal tissue for research purposes.  Sealed App. 6-10, Doe Dep. 152:7-153:2, 155:4-9, 156:16-157:18;

---

[4] PPGT formed and began billing Medicaid in 2012.  App. 493, 495, Lambrecht Decl. ¶¶ 1, 8.

Rel. Comp. ¶¶ 65, 72-73.  PPGT and PPST do not appear on the April 2015 video, have never facilitated the donation of tissue for research purposes for any of their patients, and were not aware that PPGC had done so.  App. 73-74, Bowen Dep. 210:6-211:6; App. 494, Lambrecht Decl. ¶ 5; App. 489, Barraza Decl. ¶ 5.

6.      Later that year, Relator publicly released the video footage, including through YouTube.  Rel. Compl. ¶¶ 78-81.  After the April 2015 release of the PPGC video, Texas and Louisiana attempted to terminate all of the Affiliate Defendants' enrollment in those States' Medicaid programs.  Rel. Compl. ¶¶ 82, 84.

7.      On or about September 15, 2015, the Louisiana Department of Health ("LDH") issued notices of termination to PPGC that referenced the video.  Rel. Compl. Ex. A.[5]

8.      On or about October 19, 2015, the Texas Health & Human Services Commission, Office of Inspector General ("HHSC-OIG") issued notices of termination to PPGC, PPGT, and PPST that referenced the video.  Rel. Compl., Ex. B., Letter from Stuart Bowen, Inspector General, HHSC, to PPGT; App. 30-34, Bowen Letter to PPGC; App. 35-39, Bowen Letter to PPST.  On December 20, 2016, HHSC-OIG issued final notices of termination to PPGC, PPGT, and PPST that also referenced the video.  Rel. Compl., Ex. C.[6]

9.      HHSC-OIG's final termination decision was based solely on the April 2015 PPGC video, HHSC-OIG's Chief Medical Officer's review of it, and a letter from Congresswoman Marcia Blackburn urging the Texas Attorney General to conduct an investigation into whether PPGC violated Texas law.  App. 78-79, Bowen Dep. 288:18-289:12.  The final notices focused on

---

[5] LDH had issued prior notices of termination to PPGC on or about August 3, 2015, but these were rescinded on or about September 14, 2015.  App. 40-47, Letters from Kathy Kliebert, Secretary, La. Dept. of Health and Hospitals to Melaney Linton, CEO, PPGC (Aug. 3, 2015).

[6] Any reasons in the initial notices that do not appear in the final notices were no longer a valid basis for the terminations.  Texas/HHSC Rule 30(b)(6) (Goldstein) Dep. 23:12-25:6.

what Texas perceived as PPGC's "willingness" to alter abortion procedures to obtain usable tissue for research that allegedly violated "generally accepted medical standards," despite that abortion services are not even covered by Medicaid (App. 72, Bowen Dep. 179:3-16).  Rel. Compl., Ex. C.[7] Yet HHSC-OIG had no evidence that any provider actually altered an abortion procedure to facilitate research.  App. 126, Mot. Hr'g 50:17-21 (Bowen), *Planned Parenthood of Greater Tex. v. Smith*, No. 1:15-CV-01058 (W.D. Tex. Jan. 18, 2017); App. 77, Bowen Dep. 285:5-21.  PPGT and PPST's terminations were based on their alleged affiliation with PPGC.  Rel. Compl., Ex. C.

**B.    Affiliate Defendants Initiated Litigation to Prevent the Terminations**

10.    Following receipt of the notices of termination, Affiliate Defendants and certain Medicaid beneficiaries promptly filed suit in federal court seeking to enjoin their termination from the state Medicaid programs.  *See* First Am. Compl., *Planned Parenthood Gulf Coast, Inc., v. Kliebert*, No. 3:15-cv-565 (M.D. La. Oct. 7, 2015) [Dkt. 43]; Compl., *Planned Parenthood of Greater Tex. v. Traylor*, No. 1:15-CV-01058 (W.D. Tex. Nov. 23, 2015) [Dkt. 1].

11.    During these proceedings, Texas officials testified that PPGC failed to comply with "medical and ethical standards"; these witnesses included Stuart Bowen (the then-Inspector General for HHSC-OIG) and Dr. Ted Spears (the HHSC-OIG Medical Director whose specialty was in sports medicine and has never assisted with an abortion), whose opinion formed a basis for the terminations.  App. 82-159, 159-71, Mot. Hr'g 6:4-83:7 (Bowen), 83:9-95:14 (Spears); *Smith*, No. 1:15-CV-01058 (W.D. Tex. Jan. 18, 2017); App. 173-74, Spears Dep. 30:4-13, 69:9-11.[8] Bowen and Spears have taken inconsistent positions on the meaning of "medical and ethical

---

[7] Bowen testified that committing an act for purposes of the Texas provision regarding termination of enrollment would require some conduct; merely "having bad thoughts is not committing an act."  App. 59-66, Bowen Dep. 122:6-129:8 (committing an act does not include "thought crime").

[8] Spears, however, testified that he has no opinion as to whether the PPGC video justified the termination of the Affiliate Defendants.  *See* App. 176-77, Spears Dep. 111:8-112:1.

standards." *Compare* App. 67-69, Bowen Dep. 145:5-146:6; 147:2-7 (sources for such standards include "community standards, . . . standards within HHSC[,] professional standards, [and] practice standards by professional organizations;" "community standards" are "healthcare practices of the respective communities"), *with* App. 175, Spears Dep. 71:6-17 ("accepted medical community standards" are "[p]ractices of medicine that were accepted by the preponderance of physicians according to state and federal law in the normative standards of medicine that are set out in rules by the Texas Medical Board").[9]

12.     After first entering a temporary restraining order, the U.S. District Court for the Middle District of Louisiana entered a preliminary injunction, prohibiting Louisiana from terminating PPGC from Medicaid.  *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 652 (M.D. La. 2015) (granting injunction and denying bond since none was requested). The Fifth Circuit affirmed this decision in June 2017.  *Planned Parenthood Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. 2017), *en banc reh'g denied*, 876 F.3d 699.

13.     During these proceedings, counsel for LDH represented to the district court that there was "no question . . . about the competency of [PPGC's] two [healthcare] facilities [in Louisiana] to provide Medicaid services and adequate care for the patients they serve."  App. 179, Mot. Hr'g at 12:10-16 (Sept. 2, 2015), *Kliebert*, No. 3:15-cv-565 [Dkt. 46-4]; App. 181-82, Mot. Hr'g at 22:19-23:5 (Oct. 16, 2015), *Kliebert*, No. 3:15-cv-565 [Dkt. 59].

14.     As part of the appellate proceedings in *Gee*, on February 17, 2016, the United States filed an amicus brief in the Fifth Circuit explaining that the Medicaid statute's "free choice of provider rule" (the basis for the Louisiana injunction) limits the circumstances under which a State

---

[9] Relator's position is that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Sealed App. 2-5, Doe Dep. 83:3-86:6.

8

can terminate a Medicaid provider.  The United States noted, among other things, that Louisiana had relied on *allegations* of health care fraud whereas 42 U.S.C. § 1230a-7 authorizes exclusion of a provider that has been *convicted* of such fraud.  App. 198-192, U.S. Amicus Br. at 3-6, 9-16, *Planned Parenthood Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. Feb. 17, 2016).

15.     On or about August 11, 2016, the CMS Director sent letters to LDH and HHSC reminding the States that under the free choice of provider requirement their authority to terminate providers from Medicaid "is limited to circumstances implicating the fitness of the provider to perform covered medical services or appropriately bill for them" and stating that CMS was "unaware of any basis for [the States] to terminate [Affiliate Defendants'] provider agreements." App. 206-08, Letter from Wachino, CMS Director to Jessee, HHSC Associate Comm'r (Aug. 11, 2016); App. 209-11, Letter from Wachino to Steele, LDH Medicaid Dir. (Aug. 11, 2016).  Based on a Washington Post article, Affiliate Defendants were aware that CMS would be sending these letters to the States.  App. 484-85, Linton Decl. ¶ 15 (citing App. 212-13, The Washington Post, Obama Officials Warn States About Cutting Medicaid Funds to Planned Parenthood (Apr. 19, 2016)); App. 496, Lambrecht Decl. ¶ 11 (same); App. 491, Barraza Decl. ¶ 11 (same).

16.     In the Texas proceedings, after reviewing the entire video and a three day evidentiary hearing, on February 21, 2017, the U.S. District Court for the Western District of Texas entered a preliminary injunction (also based on the free choice of provider requirement), prohibiting Texas from terminating Affiliates Defendants' Medicaid Provider Agreements. *Planned Parenthood of Greater Tex. v. Smith*, 236 F. Supp. 3d 974, 1000 (W.D. Tex. 2017).[10]

---

[10] The court's detailed 42-page opinion concluded there was "no evidence" that "PPGC violated any medical or ethical standard," not "even a scintilla of evidence" that Affiliate Defendants were unqualified, and Mr. Bowen's termination "decision had nothing to do with the [Affiliate Defendants'] qualifications." *Smith*, 236 F. Supp. 3d at 989-90.  As to PPGT and PPST, the court found that their "affiliation" with PPGC, in the absence of a showing of ownership or control, did

17.     Texas appealed and subsequently represented to the Fifth Circuit that Texas would face "irreparable harm if the State is forced to continue complying with an unlawful injunction" and "forced to continue to pay [Affiliate Defendants] for Medicaid services provided until the petition for rehearing en banc is resolved."  App. 226-28, Texas Mot. to Stay Injunction Pending En Banc Consideration at 9-11, *Smith*, No. 1:15-cv-01058 (5th Cir. Feb 1, 2019), Dkt. 172.

18.     The Fifth Circuit ultimately held after a panel decision on *en banc* review that no private right of action exists to allow Medicaid patients to enforce Medicaid's free choice of provider provision, and vacated the Texas preliminary injunction.  *Planned Parenthood of Greater Tex. v. Kauffman*, 981 F.3d 347, 370 (5th Cir. 2020).  This procedural ruling did not disturb the district court's findings that there was no evidence of wrongdoing by the Affiliate Defendants.  *Id*.

19.     The Louisiana injunction remained in place until it was vacated on November 10, 2022, after PPGC and the other *Kliebert* plaintiffs entered into a settlement agreement with LDH after which the termination was withdrawn and PPGC voluntarily dismissed its case. Sealed App. 11-17, LDH/PPGC Settlement Agreement (Nov. 4, 2022); *Kliebert*, No. 3:15-cv-565 [Dkts. 131, 132].  Although the injunction has been vacated, PPGC remains a provider in good standing in Louisiana Medicaid.  App. 483, Linton Decl. ¶ 10.

**C.     HHSC Granted Affiliate Defendants a Grace Period to Remain Enrolled**

20.     After the Texas injunction was vacated, Affiliate Defendants asked HHSC to reconsider the termination, or, in the alternative, to "permit a [six-month] grace period so that Planned Parenthood providers c[ould] provide continuity of care throughout the holiday season and the [then] current crisis point of the pandemic."  App. 499-504, Letter from PPGT, PPST, &

---

not render them unqualified.  *Id.* at 997.  The district court further declined Texas's request for an injunction bond.  *Id.* at 999-1000 (injunction "will not harm Texas's budget" because Texas would still have to reimburse other providers for the services that Medicaid beneficiaries require).

PPGC to Cecile Young, Exec. Comm'r, HHSC at 1, 6 (Dec. 14, 2020).  HHSC denied the request

to reconsider, but granted a one-month grace period through February 3, 2021 "to help facilitate

continuity of care for Medicaid clients who received Medicaid health services from the [Affiliate]

Defendants and needed to be transitioned to other providers."  App. 505-06, Letter from Karen

Ray, Chief Counsel, HHSC to PPGT, PPST, & PPGC (Jan. 4, 2021); App. 247, Tex. Suppl. Objs.

& Answers to Affiliate Defs. 1st Set of Interrogs. (Oct. 25, 2022) (Interrog. 15).

21.    HHSC was under no legal obligation to grant a grace period.    App. 278,

Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. 123:6-22; App. 296-97, Tex. Resp. to Pet. For Writ

of Mandamus at 13-14, *In re Planned Parenthood of Greater Tex. Family Planning & Prev. Health*

*Servs., Inc., et. al*, No. D-1-GN-21-00528, (Dist. Ct. Travis Cty., Tex. Feb. 23, 2021) ("HHSC was

under no obligation to reply to Planned Parenthood's request but chose to do so anyway.").

"HHSC would not allow a provider to remain enrolled [in Texas Medicaid] if [the provider was]

not going to deliver [healthcare] services in a legal, ethical, and safe manner."    App. 281,

Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. 138:2-16.  Indeed, Texas law does not provide for

a terminated provider to be allowed a "grace period" under which it continues to provide services

to Medicaid patients and to bill and to be paid by the State.    App. 75, Bowen Dep. 243:10-22

(HHSC Inspector General who issued terminations notices to Affiliate Defendants agreeing that

once a termination becomes final, a provider cannot seek reimbursement from the Medicaid for

Medicaid-covered services), 244:2-15; Tex. Admin. Code § 371.1703(g)(2).

22.    HHSC sent letters to its fee-for-service Texas Medicaid patients informing the

patients that they could "continue to see [Planned Parenthood for their healthcare] until February

3rd, 2021."  App. 275, Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. 112:1-9 (testifying about

App. 326-6, Chambliss email to Zalkovsky, with att. HHSC letter to FFS patients (Jan. 22, 2021)).

11

23.     During the grace period, Affiliate Defendants were enrolled in Texas Medicaid and HHSC knew the affiliates were continuing to provide covered services for which the State paid. App. 276-77, Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. 114:1-10, 115:20-21.   In this litigation, Texas "is not seeking payment of civil penalties . . . or any recovery of Texas Medicaid dollars paid to Defendants for services delivered during the Grace Period."   App. 247, Tex. Answers to Interrogs. (Interrog. 15).

24.     On February 3, 2021, Affiliate Defendants filed a mandamus request and motion for TRO in Travis County District Court.  Texas Compl ¶ 7.  In related briefing, Texas took the position that the terminations had not become "effective" until the mandate from the Fifth Circuit had issued on December 15, 2020.  Tex. Resp. in Opp. to Pet. for Writ of Mandamus at 6-7, *In re Planned Parenthood of Greater Tex. Family Planning  & Prev. Health Servs., Inc.*, No. D-1-GN-21-000528 (Dist. Ct. Travis Cty., Tex. Feb. 23, 2021).[11]  The state court issued a TRO prohibiting Affiliate Defendants' termination from Texas Medicaid, but subsequently denied Affiliate Defendants' mandamus request on March 12, 2021.  *Id.* ¶ 7 & Ex. 1.

**D.     HHSC's Notices to MCOs and Re-Enrollment of Affiliate Defendants**

25.     The majority of claims submitted to Texas Medicaid are claims submitted by Managed Care Organizations ("MCOs") where Texas pays the MCO, a private third-party health insurer, a fixed monthly premium for each Medicaid beneficiary the MCO covers, regardless of how many times the patient beneficiary sees a provider.  App. 254-56, 258-59, Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. 31:14-24, 40:22-41:17, 43:24-44:4; App. 49-50, Bowen Dep. 111:15-112:16.  Accordingly, it is important that the MCOs know which providers are enrolled.  App. 259,

---

[11] App. 457, Temp. Inj. Hr'g at 41:17-20 (Dist. Ct. Travis Cty., Tex. Feb. 24, 2021) (Counsel for Texas: "So as the record shows, you'll see that we waited until that [federal] injunction was vacated by the Fifth Circuit before we started putting the termination into effect.").

Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. 44:5-11.

26.     In January 2021, Texas for the first time informed MCOs about the potential termination of Affiliate Defendants.  App. 273-74, *Id.* at 108:25-109:18.  A January 5 notice stated that the payment denial code for Affiliate Defendants was effective February 4 (App. 303, Termination of Planned Parenthood Clinics (Jan. 5, 2021));[12] a February 4 notice directed MCOs to "pause all efforts to transition current Planned Parenthood Medicaid clients to new providers until further notice" (App. 337, Urgent Action Required Related to Planned Parenthood (Feb. 4, 2021) (to allow for the grace period)); and a March 19 notice stated that Affiliate Defendants had "been terminated . . . effective March 11, 2021" (App. 338, Termination of Planned Parenthood Clinics (March 19, 2021)).[13]  Texas now claims the terminations were effective February 1, 2017, but it has never notified MCOs that Affiliate Defendants had been terminated as of this date. Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. 42:25-43:2, 47:5-9.

27.     HHSC through its contractor Texas Medicaid Healthcare Provider ("TMHP") sends the MCOs a Master Provider File ("MPF") listing all enrolled Medicaid providers.  *Id.* at 43:9-23. The Affiliate Defendants were on the MPF into March 2021.  *Id.* at 44:10-13.

28.     From December 2016 through March 2021, HHSC re-enrolled Affiliate Defendants in Texas Medicaid on multiple occasions.  *See* App. 263-67, Texas/HHSC Rule 30(b)(6) (Zalkovsky) 52:17-56:21 (App. 341-44, Planned Parenthood Texas Medicaid Enrollment Data

---

[12] TMHP applies a Payment Denial Code on a terminated provider and then enters the provider on the Exclusion/Termination list of TMHP's website, which MCOs are required to review monthly. App. 308, Texas/HHSC Rule 30(b)(6) (Goldstein) Dep. 104:19-24 (testifying regarding App. 325, Termination of Provider Contract).

[13] The notices to MCOs were consistent with the State Action Requests ("SARs") that HHSC issued to TMHP advising TMHP that the terminations of the Affiliate Defendants were effective as of February 4, 2021 and later, March 11, 2021.  Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. 44:14-22, 221:2-17; App. 339, SAR (Jan. 4, 2021); App. 340, SAR (Mar. 16, 2021).

(Dec. 1, 2022)); *e.g.,* Sealed App. 18, Letter from TMHP to PPGC (Aug. 31, 2018) ███████

███████████████).[14]  The purpose of the re-enrollment process is to ensure, among

other things, that the provider is in good standing and able to be enrolled in Medicaid.  App. 282,

Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. 140:1-13.   HHSC's decision to approve each

Affiliate Defendants' application was "based in part on a recommendation from the HHSC Office

of Inspector General (OIG)."  *Id.*  There was nothing preventing HHSC-OIG from recommending

conditional approval of Affiliate Defendants during the pendency of the injunctions.  App. 318,

Texas/HHSC Rule 30(b)(6) (Goldstein) Dep. 147:10-16.   HHSC-OIG instead recommended

approval.  *E.g.*, Sealed App. 18, Letter from TMHP to PPGC (Aug. 31, 2018) (approval based in

part on recommendation from HHSC-OIG).

### III.    CMS Has Not Requested Repayment or Recoupment

29.    Despite knowing the facts underlying Relator's claims and the related litigation,

CMS believes Affiliate Defendants' terminations violated the federal free choice of provider rule

and never initiated any recoupment action or sought to recover the federal share of payments made

to Affiliate Defendants during the injunctions.  App. 351-52, Costello Decl. ¶¶ 12, 16.

### IV.    Texas Has Not Requested Repayment or Recoupment

30.    Texas law requires HHSC to notify a provider of a potential overpayment.  Tex.

Gov't Code § 531.120; App. 51-58, Bowen Dep. 113:15-20, 114:3-120:22 (notice is mandatory,

not discretionary; notice requirements are due process protections so a provider is not left to guess

"what might constitute an overpayment," "what the amount of an overpayment might be," "how

an overpayment's been calculated," or "what the facts and circumstances underlying the

---

[14] *See also* Sealed App. 19, Letter from TMHP to PPSA (Feb. 21, 2017) (re-enrolling PPSA clinic);
App. 345-49, Letter from TMHP to PPGT (Nov. 30, 2018) (re-enrolling PPGT clinic).

overpayment might be").

31.     HHSC did not notify Affiliate Defendants that the amounts received under the injunction were an overpayment and initiated no action to recoup those monies.  Instead, Texas has maintained that its intervention in a relator-brought case is its effort at recoupment, although the Texas Government Code makes no provision for seeking recoupment in this manner. App. 268-69, Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. 98:13-99:44 (no recoupment or other action other than lawsuit); App. 315-17, 324, Texas/HHSC Rule 30(b)(6) (Goldstein) Dep. 131:25-133:2 (Texas claims amounts Affiliate Defendants received during injunctions were overpayments, which Texas is seeking to recover through this case); 167:4-11 (apart from this lawsuit, OIG never sent Affiliate Defendants written notice of any overpayment).

32.     As late as Fall 2022 – long after *Gee* and while this case was in active litigation – HHSC reimbursed Affiliate Defendants for Medicaid services provided during the injunctions on claims submitted before March 2021.  *See, e.g.,* Sealed App. 25-26, Email from RevTell to PPGT (Dec. 7, 2022) (transmitting TMHP remittance to PPGT's contractor in November 2022 for services provided in May 2020); Sealed App. 20-21, Letter from TMHP to PPGC (Aug. 27, 2021) (TMHP August 2021 remittance to PPGC for services provided in July 2020).

33.     In this litigation, Texas intervened only as to the reverse TMFPA section 12 claim and has not requested repayment of any Medicaid reimbursements made to Affiliate Defendants for services provided prior to February 2017.  Tex. Compl. ¶ 3; *see also* Sealed App. 24, Lochabay Supp. Expert Report for Texas at ¶ 5 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

15

## V.      Louisiana Has Not Requested Repayment or Recoupment

34.      PPGC has remained enrolled in, submitted reimbursement requests to, and received reimbursement from Louisiana Medicaid from 2010 to the present.  App. 483, Linton Decl. ¶ 9. Louisiana has not requested repayment or sought recoupment or recovery from PPGC of amounts PPGC received from Louisiana Medicaid for services provided during the pendency of the Louisiana injunction.  App. 483-84, Linton Decl. ¶ 11.[15]  Louisiana did not impose an arrangement to repay amounts PPGC had received from Louisiana Medicaid for services provided during the pendency of the Louisiana injunction.  *Id*.

35.      It has been the policy of the LDH to refrain from seeking recoupment of payments made to a Medicaid provider who properly rendered medically necessary services to qualified Louisiana Medicaid beneficiaries during the period in which a court of competent jurisdiction enjoined LDH from taking action to suspend, exclude, terminate, or otherwise prevent a provider's continued participation in the Louisiana Medicaid program.  *See, e.g.*, App. 446, LDH's Resps. & Objs. to PPGC's Revised Subpoena at 2 (Sept. 28, 2022) (Request No. 16: LDH has no non-privileged documents identifying Medicaid providers that LDH recommended for repayment or recoupment sanction from January 1, 2015 to the present).

36.      And, when recently settling with PPGC, LDH did not require PPGC to repay the amounts PPGC received from Louisiana Medicaid for services provided during the pendency of the Louisiana injunction.  App. 483-84, 486, Linton Decl. ¶¶ 10-11, 17; Sealed App. 11-17, LDH/PPGC Settlement Agreement (Nov. 4, 2022).

---

[15] Louisiana did not intervene in this suit and Relator's expert has not assessed potential damages arising from Louisiana claims for payment prior to October 2015.  App. 397, Lochabay Supp. Expert Report for Relator at ¶¶ 6-7 (quantifying expenditures associated with Medicaid payments to PPGC "for services delivered on or after October 15, 2015, which Relator alleges is the date Planned Parenthood's Medicaid termination was effective by operation of Louisiana Law").

**VI.    Affiliate Defendants Had No Obligation to Repay Monies Received From Texas or Louisiana Medicaid During the Pendency of the Injunctions or TROs**

37.    Under the Patient Protection and Affordable Care Act ("ACA"), an overpayment is "[a]ny funds that a person receives or retains under subchapter XVII or XIX to which the person, after applicable reconciliation, is not entitled under such subchapter." 42 U.S.C. § 1320a-7k(d)(4)(B).  Under the ACA, an overpayment must be reported and returned within "60 days after the date of which the overpayment was identified" or "the date any corresponding cost report is due, if applicable." *Id.* § 1320a-7k(d)(2).

38.    There are no facts or circumstances present to support a finding that the monies Affiliate Defendants received for Medicaid services provided during pendency of the injunctions and TROs constituted an "overpayment" under the ACA that they were obligated to repay.  *See* Dkt. 121 at 5-7 (declining to reconsider determination that Plaintiffs adequately pled existence of a repayment obligation because "overpayments are identified by the facts and circumstances present in . . . specific situations" (citations omitted)).

39.    None of the Affiliate Defendants ever identified an "overpayment" of amounts they had received from Texas Medicaid or Louisiana Medicaid.  App. 450, PPGC Rule 30(b)(6) Dep. 234:2-6; App. 485-86, Linton Decl. ¶ 16; App. 452-53, PPGT Rule 30(b)(6) Dep. 176:16-177:9; App. 496-97, Lambrecht Decl. ¶ 12; App. 455, PPST Rule 30(b)(6) Dep. 457:16-24; App. 491-92, Barraza Decl. ¶ 12.

40.    Affiliate Defendants did not subjectively believe nor had they any objective reason to believe that they would be required to repay amounts they received under Texas or Louisiana Medicaid during the pendency of the injunctions or the TROs.  App. 483-86, Linton Decl. ¶¶ 10-17; App. 495-97, Lambrecht Decl. ¶¶ 9-13; App. 490-92, Barraza Decl. ¶¶ 9-12.

41.    Neither HHSC nor any other Texas agency identified any overpayment relating to

17

the terminations of the Affiliate Defendants prior to Texas's intervention in this suit in January 2022.  Texas/HHSC Rule 30(b)(6) (Goldstein) Dep. 123:20-126:23.[16]

42.     No Louisiana agency has ever identified an overpayment related to the PPGC notice of termination that was later withdrawn pursuant to the settlement.  App. 484, Linton Decl. ¶ 14.

## VII.   Neither Texas nor Louisiana Has Returned the Federal Share of Any "Overpayment" Paid to Affiliate Defendants

43.     When a Medicaid provider overpayment is identified, states are required to return to CMS the applicable federal share of the overpayment.  App. 352, Costello Decl. ¶ 14; App. 353, Costello Supp. Decl. ¶ 2.  Except in limited circumstances involving bankruptcy of out-of-business providers, states are required to return the federal share of any identified overpayments regardless of whether the state has recovered such overpayments from the provider.  *Id.*

44.     Neither Texas nor Louisiana has returned the federal share of any identified overpayments that were made to the Affiliate Defendants.  App. 353, Costello Supp. Decl. ¶¶ 3-4; *see also* App. 314-15, Texas/HHSC Rule 30(b)(6) (Goldstein) Dep. 130:5-131:7.  CMS has not identified the return of any alleged overpayments relating to payments to the Affiliate Defendants for covered services furnished during the pendency of the injunction, nor has Texas or Louisiana indicated the return of such overpayments.  *Id.*

---

[16] None of the code or manual provisions pointed to by the Texas/HHSC corporate representative support the witness's contention that there was a document from the time the injunctions were in place (before Texas's intervention) demonstrating that Texas expected the Affiliate Defendants to repay Medicaid reimbursement they received for services they provided during the pendency of the injunctions.  App. 270-72, Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. at 101:4-103:23 (citing Texas Administrative Code ("TAC") section 371.1(73) (defining "Recoupment of overpayment" as a "*sanction imposed* to recover funds" (emphasis added))); TAC section 371.1711 ("The *OIG may recoup* from any person . . ." (emphasis added)), TAC section 371.1605 (silent on overpayments or recoupment); Texas Medicaid Provider Procedures Manual, Section 1.10, ¶5a (silent on overpayments or recoupment), ¶5k ("[f]ailing to repay . . . *identified* overpayments or other erroneous payments or assessments *identified* by the commission or any Texas Medicaid or other HHS program operating agency" (emphasis added)).

45.     HHSC never told the MCOs to collect or recoup amounts they had paid to Affiliate Defendants.  App. 279-80, Texas/HHSC Rule 30(b)(6) (Zalkovsky) Dep. 133:22-134:2.  HHSC told the MCOs on March 19, 2021 that they should deny Affiliate Defendants' Medicaid claims with dates of service as of March 11, 2021 with no suggestion that claims with dates of service prior to this date should be rejected or recouped.  App. 338, Termination of Planned Parenthood Clinics from Texas Medicaid (March 19, 2021).

## VIII.   Neither Texas Nor Louisiana Took Any Action to Ensure They Would Receive Repayment

46.     Texas HHSC-OIG did not require Affiliate Defendants to file with HHSC-OIG a surety bond to cover amounts Affiliate Defendants received from Texas Medicaid for services provided during the pendency of the Texas injunctions and TROs.  App. 319-20, Texas/HHSC Rule 30(b)(6) (Goldstein) Dep. 162:4-163:10.  HHSC-OIG did not request that the Texas Office of Attorney General obtain an injunction to prevent Affiliate Defendants from disposing of any money that Affiliate Defendants received from Texas Medicaid for services provided during the pendency of the Texas injunctions and temporary restraining orders.  *Id.* 163:25-166:5.

47.     Louisiana did not seek a temporary restraining order or injunction to prevent PPGC from transferring property or to protect the business during the pendency of the Louisiana injunction.  App. 484, Linton Decl. ¶ 12.  Louisiana did not require PPGC to post a bond or other security, or increase the bond or other security already posted as a condition of continued enrollment in Medicaid during the pendency of the Louisiana injunction.

48.     There is no contemporaneous evidence reflecting any belief or expectation by Texas or Louisiana that they were entitled to repayment of amounts paid to Affiliate Defendants while they remained enrolled in Medicaid pursuant to injunctions and temporary restraining orders. *See, e.g.*, App. 309-10, Texas/HHSC Rule 30(b)(6) (Goldstein) Dep. 122:16-123:1; 123:10-19.

19

## LEGAL STANDARDS

### I.    Summary Judgment

The Court "shall grant summary judgment" when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Though the 'court must draw all justifiable inferences in favor of the non-moving party,' a genuine dispute about a material fact exists only 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *U.S. ex rel. Farmer v. City of Hous.*, 523 F.3d 333, 337 (5th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial,' and 'mandates the entry of summary judgment' for the moving party." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  To survive summary judgment, the non-moving party must "go beyond the pleadings," *Celotex*, 477 U.S. at 322, and identify "proffered evidence" creating a genuine issue for trial, *Rader v. Cowart*, 543 F. App'x 358, 360-61 (5th Cir. 2013).  The non-movant cannot rely on "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quotation marks and citations omitted).

### II.    Federal False Claims Act and State Analogues

The FCA imposes liability for the submission of false claims to the federal government. To survive summary judgment on a claim brought under 31 U.S.C. § 3729(a)(1)(A), a plaintiff must establish that a reasonable jury could conclude: "(1) . . . there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (quoting

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)).  In addition, under the "reverse false claims" provision, 31 U.S.C. § 3729(a)(1)(G), the plaintiff must demonstrate that a reasonable jury could conclude that  the defendant "knowingly and improperly" avoided "an obligation to repay" funds to the government.

The affirmative false claims provisions of the LMAPIL has similar requirements.[17]  La. Rev. Stat. § 46:438.3 (liability for "knowingly" violating statute); *id.* § 46:437.3(7), (13) (materiality requirement).  Both the TMFPA and the LMAPIL contain "reverse false claim" provisions that are substantially the same as the federal FCA.  Tex. Hum. Res. Code. § 36.002 (12) (liability for a reverse false claim when defendant "knowingly and improperly" avoids obligation to pay); La. Rev. Stat. § 46:438.3 (liability for "knowingly" avoiding obligation to pay).

## **ARGUMENT**

The Court should grant Defendants summary judgment on all claims because no reasonable jury could find for Plaintiffs on several essential elements.  First, Plaintiffs' "reverse" false claims theories under the federal FCA, TMFPA, and LMAPIL fail because the undisputed evidence demonstrates that Defendants had no obligation to repay amounts received while the injunctions were pending and, in any event, did not act with the requisite scienter.  Second, Relator's implied false certification claims under the FCA and LMPAPIL fail because Relator cannot establish any of the essential elements of those claims: falsity, materiality, or scienter.  Third, Relator's TMFPA and LMAPIL conspiracy claims fail both because Relator cannot establish any underlying "fraud" and because there is no evidence of an agreement to defraud the government.

---

[17] Relator's implied false certification claims under the TMFPA are no longer part of this case. *See* Dkt. 71 at 33; Dkt. 141 at 2-3.  But the TMFPA has similar falsity and scienter requirements. *See* Tex. Hum. Res. Code. Ann. 36.001.

## I.    Defendants Are Entitled to Summary Judgment on Plaintiffs' Reverse FCA Claims

To prevail on their reverse FCA claims under the federal FCA, TMPFA, and LMAPIL, Plaintiffs must prove Affiliate Defendants (1) had an "obligation" to pay money to the United States, Texas, and Louisiana; (2) "knowingly" avoided their repayment obligation; and (3) for the FCA and TMFPA, that the avoidance was "improper." *See* 31 U.S.C. § 3729(a)(1)(G); Tex. Hum. Res. Code § 36.002(12); La. Rev. Stat. § 46:438.3(C).  The undisputed evidence demonstrates that Plaintiffs cannot satisfy these elements, so Defendants are entitled to summary judgment.

### A.    Defendants Had No Obligation to Repay Amounts Received While the Injunctions Were Pending

The threshold requirement for a reverse false claim is that the defendant had a legal "obligation" to pay money to the government.  The FCA, TMFPA, and LMAPIL consistently define "obligation" as "an established duty" to pay.  31 U.S.C. § 3729(b)(3); Tex. Hum. Res. Code § 36.001(7-a); La. Rev. Stat. § 46:437.3(16).  Although the amount of the obligation need not be fixed, liability attaches only if the defendant failed to satisfy an existing, current legal obligation to pay the government. *See U.S. ex rel. Simoneaux v. E.I. duPont de Nemours & Co*., 843 F.3d 1033, 1036–40 (5th Cir. 2016); *U.S. ex rel. Petras v. Simparel, Inc*., 857 F.3d 497, 506 (3d Cir. 2017).  "[T]he term [obligation] does *not* include a duty that is dependent on a future discretionary act," *Petras*, 857 F.3d at 505, or "obligations to pay that are merely potential or contingent," *U.S. ex rel. Barrick v. Parker-Migliorini Int'l*, LLC, 878 F.3d 1224, 1231 (10th Cir. 2017).

Contrary to Plaintiffs' assertion, no repayment obligation arose upon the Fifth Circuit's decision vacating the Texas injunction.  Indeed, the Fifth Circuit's *en banc* opinion did not address the underlying merits of the dispute, much less whether Affiliate Defendants were required to repay monies.  Even if vacatur of the injunction created a contingent *possibility* of repayment (which itself is questionable), it did not create the sort of *established*, non-contingent duty to pay

22

that could support a reverse false claim theory.  Nor did the ACA create a repayment obligation for Medicaid funds received while the injunctions were pending and Affiliate Defendants remained actively enrolled in Louisiana and Texas Medicaid because Affiliate Defendants were "entitled" to receive payments for services provided to Medicaid patients during that period.  There was therefore no "overpayment" that triggered a repayment obligation under the ACA.

> ### 1. Vacatur of the Texas Injunction Did Not Create a Repayment Obligation
>
> #### a. There Can Be No Obligation Without An Injunction Bond Or Order From The Court With Jurisdiction Over The Injunction

The Fifth Circuit long ago established the "simple[] and plain[] rule" that "unless a bond has been executed upon the granting of an injunction, the person enjoined can have no [subsequent] recovery" against the party that sought a later-vacated injunction.  *In re J.D. Jewell, Inc*., 571 F.2d 928, 933 (5th Cir. 1978); *see also Tenth Ward Road Dist. No. 11 of Avoyelles Parish v. Tex. & Pac. Ry. C*o., 12 F.2d 245, 247 (5th Cir. 1926) ("Without a bond no damages can be recovered at all" in cases "in the United States courts."); *cf. Continuum Co. v. Incepts, Inc*., 873 F.2d 801, 803 (5th Cir. 1989) ("the amount of the bond 'is the limit of the damages the defendant can obtain for a wrongful injunction'").  The Texas and Louisiana district courts imposed no bond, SOF ¶¶ 12, 16, and consequently entered no order requiring payment.[18]  Affiliate Defendants thus had no obligation to repay based on vacatur of the Texas injunction.

Despite these well-established principles, Plaintiffs allege that Texas and Louisiana are

---

[18] Even if a bond had been executed, an obligation to pay damages would not have arisen unless and until the district court exercised its discretion to award damages against the bond.  *See H & R Block, Inc. v. McCaslin*, 541 F.2d 1098, 1099 (5th Cir. 1976) (defendant's assertion that "he deserves reimbursement for damages sustained because of the wrongful issuance of the temporary injunction" failed because "[t]he awarding of damages pursuant to an injunction bond rests in the sound discretion of the court's equity jurisdiction").

entitled to repayment as "restitution" for now-vacated injunctions.  But there is no automatic right to restitution.  *Greenwood Cnty v. Duke Power Co.*, 107 F.2d 484, 488 (4th Cir. 1939) ("Restitution is not of mere right.  It is ex gratia, resting in the exercise of a sound discretion[.]").  And while some courts have recognized that there "might be" a narrowly circumscribed exception to the bond requirement for a party to seek "restitution" from a wrongful injunction, *see, e.g.*, *In re UAL Corp.*, 412 F.3d 775, 779-80 (7th Cir. 2005), that exception – and any resulting "duty" to repay – requires an order from a court with jurisdiction over the injunction at issue.  *See, e.g.*, *Tenth Ward*, 12 F.2d at 247; *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 145 (1919) (restitution may be awarded if made "part of a judgment of reversal"); Restatement (First) of Restitution § 74 cmt. A (restitution possible based only on order from reversing court or court responsible for injunction).  Here, neither the Fifth Circuit nor the Texas and Louisiana district courts that entered the injunctions ordered restitution, and Affiliate Defendants therefore had no established duty to repay amounts received under the injunctions as "restitution."  *See Petras*, 857 F.3d at 506 (no obligation to pay under reverse FCA provision absent occurrence of triggering events).

> **b.**     **A State's Discretionary Authority To Seek Recoupment, By Itself, Does Not Create An "Established Duty" to Pay**

Plaintiffs also allege that Affiliate Defendants had an obligation to repay because Texas or Louisiana had the right to seek recoupment under state law.  But even if those States *could have* sought recoupment (which is dubious), "[a] considerable body of case law confirms that the Government's ability to pursue reimbursement . . . does not constitute an 'obligation.'"  *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 269 (D.D.C. 2016) (collecting cases); *see, e.g.*, *U.S. ex rel. Graves v. ITT Educ. Servs.*, 284 F. Supp. 2d 487, 508-09 (S.D. Tex. 2003) (even if the government has "the ability to sue for reimbursement of previously funded moneys, *that potential* does not arise to an 'obligation to pay' that would support a reverse [FCA] claim")

24

(emphasis added), *aff'd*, 111 F. App'x 296 (5th Cir. 2004).[19]   Rather, the possibility of a recoupment action gives rise only to *a potential and contingent* liability to repay funds if demanded.  *See, e.g.*, *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1074 (8th Cir. 2016); *U.S. ex rel. Howard v. Caddell Constr. Co., Inc.*, 2021 WL 1206584, at *31-32 (E.D.N.C. Mar. 30, 2021).   In *Olson*, for example, the relator alleged that the defendant hospital avoided an obligation to repay funds that the hospital improperly received for certain services.  831 F.3d at 1066-68.  The Eighth Circuit affirmed the dismissal of the FCA claim on the ground that, until the relevant state agency issued a notice of recovery, the defendant merely had a potential liability, not an "established duty" to repay the funds received under a statutory exemption.  *Id.* at 1074.

Indeed, the States' discretionary authority to seek recoupment is indistinguishable from the government's discretionary authority to impose a penalty, which the Fifth Circuit has squarely held does not create a repayment obligation under the reverse FCA provision.   In *Simoneaux*, the court concluded that "[w]here . . . a regulatory penalty has not been assessed and the government has initiated no proceeding to assess it, there is no established duty to pay."  843 F.3d at 1039.  The

---

[19] The cases previously cited by Plaintiffs in briefing on the motion to dismiss stand only for the proposition that the government might, in circumstances very different from those presented here, be able to seek recoupment for funds paid under an injunction.  *See* Dkt. 71 at 8-9 (citing *In re Bayou Shores SNF, LLC*, 828 F.3d 1287, 1327-28 (11th Cir. 2016) (court characterizing as holding "after reversing [a bankruptcy court's] injunction preventing [a] health-care provider's termination[, that] the government *could try* to recover payments made pursuant to [the injunction]" (emphasis added)); *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1137 (D.C. Cir. 1992) (court characterizing as holding in rate dispute context that "a Medicaid provider *may* be liable" to repay government funds if government pursues recoupment and "to the extent that [recoupment] . . . [was] properly applicable to overpayments of the sort involved" (emphasis added)); *Md. Dep't Hum. Res. v. U.S. Dep't Agric.*, 976 F.2d 1462, 1480 (4th Cir. 1992) (court characterizing as holding in context of dispute over methodology to calculate food stamp eligibility that "injunction cannot deprive government of *right to seek* statutorily provided remedies to recoup improperly paid funds" (emphasis added))).  None held that the government actually has a right to recover, let alone that a Medicaid provider must unilaterally return, funds the government has not attempted to recover.

court acknowledged that "the fact that further government action is required to collect a fine or penalty does not, standing alone, mean that a duty is not established." *Id.* at 1040. But absent such government action, a duty can be established *only* where the fine is *mandatory* because in that circumstance, the "obligation" has already been established. *Id.* In contrast, where applicable law gives the government "discretion to decide to assess no penalty," there is no established duty to pay and thus no obligation. *Id.*; *see also U.S. ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 391 (5th Cir. 2008) ("[W]hen potential fines depend on intervening discretionary governmental acts, they are not sufficient to create 'obligations to pay' under the False Claims Act." (citations omitted)).

There is no dispute that Texas and Louisiana have discretion not to pursue administrative recoupment of Medicaid funds. *See* 1 Tex. Admin. Code § 371.1719 (HHSC "OIG *may* recoup an overpayment" (emphasis added)); 50 La. Admin. Code Pt. 1 § 4161(A)(10) (including recoupment on list of sanctions that "may be imposed"). Neither State exercised that discretionary authority to pursue recoupment here.[20] SOF ¶¶ 30-36. *Simoneaux*'s reasoning mandates the conclusion that where (as here), the law gives the government discretion to pursue (or not pursue) recoupment, there is no established duty that supports a reverse false claim. *See also, e.g.*, *U.S. ex rel. Zayas v. AstraZeneca Biopharm., Inc.*, 2017 WL 1378128, at *3 (E.D.N.Y. Apr. 17, 2017) (stipulated penalties under corporate integrity agreement were not an "obligation" to pay because they were "not automatically imposed; rather, the government must choose to impose [them] and defendants may appeal" to administrative law judge); *Sturgeon v. Pharmerica Corp.*, 438 F. Supp.

---

[20] Texas has suggested that this case is its recoupment action. But that cannot be. The government cannot "manufacture" an obligation through a FCA suit. *Cf. United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (government cannot "manufacture materiality" through FCA litigation). And, even if this case were somehow to "manufacture" recoupment, it cannot retroactively create an obligation to pay before the suit was even filed. In other words, the reverse FCA contemplates a fixed, non-contingent duty to pay monies that pre-existed the filing of a FCA case.

3d 246, 279 (E.D. Pa. 2020) (liquidated damages stipulated to in a contract are not an "obligation" under the FCA because there is "no 'established duty' until the government exercises its discretion to demand payment" by bringing a breach of contract suit to enforce the clause); *U.S. ex rel. Mason v. State Farm Mut. Auto. Ins. Co.*, No. CV07-297-S-EJL, 2009 WL 10678747, at *5 (D. Idaho Aug. 18, 2009) (reverse false claim plaintiff "must show the obligation owed is mandatory, rather than discretionary"). Accordingly, the Fifth Circuit's *en banc* decision vacating the injunctions did not create an "established duty" to pay money to the government and thus did not create an "obligation" under the reverse false claim provisions of the federal FCA, TMFPA, and LMAPIL.

### 2.     No Obligation to Repay Arose Under the ACA's 60-Day Rule

Plaintiffs separately assert that a repayment "obligation" arose under the ACA. That, too, is wrong. The ACA requires "a person [who] has received an overpayment . . . [to] . . . report and return the overpayment" within 60 days "after the date on which the overpayment was identified," 42 U.S.C. §§ 1320a-7k(d)(1)-(2), and "[a]ny overpayment retained" after that deadline constitutes an "obligation" for purposes of the FCA. 42 U.S.C. § 1320a-7k(d)(3). An "overpayment," in turn, is defined as "any funds that a person receives or retains under [Medicaid or Medicare] *to which the person*, after applicable reconciliation, *is not entitled*." *Id*. § 1320a-7k(d)(4)(B) (emphasis added). To establish an "obligation" under the ACA, then, Plaintiffs must prove that Affiliate Defendants received "overpayments" – i.e., funds to which they were not entitled – while the injunctions preventing their termination from Medicaid were in effect.

Plaintiffs cannot make such a showing because Medicaid providers are entitled to keep Medicaid funds they properly receive for services lawfully provided while they remain Medicaid providers. The ACA provides that a claim is "improperly filed" when a provider submits a claim for services furnished "during a period in which the person was excluded from the Federal health care program." 42 U.S.C. § 1320a–7a(1). That necessarily means that a claim is *properly* filed

and the provider is "entitled" to payments for that claim when the provider is *not* excluded from the program.  Texas and Louisiana law similarly provide that Medicaid providers are entitled to payment for services provided while they are enrolled.  The Texas Code states that "*[o]nce a person's enrollment agreement or contract is terminated*, no items or services furnished are reimbursed by the Medicaid . . . *during the period of termination or cancellation*" and that a person "may be liable to repay" payments received for claims submitted "*after the effective date* of the termination or cancellation" for services "furnished within the period of termination."  Tex. Admin Code § 371.1703(g) (emphasis added).  That provision is properly read to say that providers are entitled to funds for services rendered while they remain enrolled in Texas Medicaid – i.e., before a termination becomes effective.  Louisiana law similarly provides that LDH "shall make payments for good, services, or supplies rendered" while the provider "has a provider agreement in effect with the department."  La. Rev. Stat. § 46:437.11.

Here, it is undisputed that Affiliate Defendants continued to lawfully serve Texas Medicaid patients and bill for the services provided while the injunctions were in effect (and during the grace period).  SOF ¶¶ 4, 16, 20, 23, 24, 32 .  It is further undisputed that at all times relevant to this case, PPGC was and remains an approved Medicaid provider in Louisiana.  SOF ¶¶ 4, 12, 19, 34.  Because Affiliate Defendants were "entitled" to the funds received for services provided while they remained approved Medicaid providers by virtue of court orders, those payments were not overpayments.  And because they were not overpayments, Affiliate Defendants had no obligation under the ACA to return the payments.

Plaintiffs contend that Affiliate Defendants' terminations became "final and unappealable" under state law 30 days after Texas and Louisiana issued notices of the States' intention to terminate Affiliate Defendants' Medicaid Provider agreements.  But even if that were true, it does

not matter:  The fact that a state agency's decision is administratively "final" as a matter of state law simply means it cannot be challenged through the state regulatory process.  It does not mean that the agency action has gone into effect.  Here, federal court orders enjoined the terminations from taking effect.  *See Smith*, 236 F. Supp. 3d at 1000 ("Defendants . . . are PRELIMINARILY ENJOINED from terminating the Provider Plaintiffs' Medicaid Provider Agreements."); *Kliebert*, 141 F. Supp. 3d at 653 (similar).  The effect of the injunctions was to maintain the status quo: Affiliate Defendants remained approved Medicaid providers in Texas and Louisiana that were permitted to serve Medicaid patients and bill for the services provided.  *See Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) ("issuance of a prohibitory injunction freezes the status quo"); *Smith*, 236 F. Supp. 3d at 998-88 (injunction permitted Affiliate Defendants to provide Medicaid services in Texas); *Kliebert*, 141 F. Supp. 3d at 611 (same, for Louisiana).  The Texas terminations did not take effect until the injunction was lifted and the grace period expired (SOF SOF ¶ 24 & n. 11); the Louisiana termination has never taken effect (SOF ¶ 34).

As discussed in Defendants' motion to dismiss briefing, the Fifth Circuit's decision in *Wenner* makes clear that an injunction "maintain[s] the legality of . . . activities performed while the injunction was in effect," and therefore a person is entitled to rely on and "operate[] under the protection of [an] injunction."  123 F.3d at 325, 327.  This Court noted that *Wenner* was not fully dispositive of whether an "obligation" exists here because it did not involve the overpayment of government funds or the right to recover overpayments and there may be mechanisms for a party to recover amounts lost because of an injunction.  Dkt. 71 at 8.  But, as discussed above, none of those mechanisms was used here—there was no injunction bond,[21] restitution order, or recoupment

---

[21] The States also did not avail themselves of other potential mechanisms for recovering payments: TX HHSC-OIG could have, for example, required Affiliate Defendants to file a surety bond with OIG or asked the Texas Attorney General's office to seek an injunction preventing the Affiliates

action.   What *Wenner* does unquestionably establish is the legality of Affiliate Defendants' conduct during the periods covered by the injunctions.   From the dates the injunctions were entered through March 10, 2021 in Texas,[22] and at all times from 2010 through the present in Louisiana, Affiliate Defendants were "entitled" to provide healthcare services to Medicaid patients and to receive payment for those services.   *See* 42 U.S.C. § 1320a-7k(d)(4)(B); SOF ¶¶ 12, 16, 19, 20, 23, 24, 32, 34.

Plaintiffs' contention that Affiliate Defendants can be retroactively stripped of their "entitle[ment]" to those payments would "render preliminary injunctive relief meaningless."  *See Longoria v. Paxton*, 585 F. Supp. 3d 907, 933-34 (W.D. Tex. 2022) (penalizing a party for "conduct undertaken during the pendency of . . . [a] preliminary injunction" would effectively create a penalty "for acting in reliance on the injunction and judicial pronouncements"), *vacated on other grounds*, 2022 WL 2208519 (5th Cir. June 21, 2022).   "Retroactivity is not favored in the law," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), and Plaintiffs have not cited a single case, statute, regulation, or agency guidance document (and Defendants are aware of none) that even suggests that, under the ACA, a payment to which a healthcare provider was "entitled" at the time it was received can retroactively be converted into an overpayment.   Accordingly, the

---

from spending the money. Tex. Admin. Code § 371.23(1) (OIG may require surety bond), § 371.11(c)(2) (OIG may request OAG obtain injunction), § 371.25 ("OIG may request that the Attorney General obtain an injunction to prevent a provider . . . from disposing of an asset identified by the OIG as potentially subject to recovery by the OIG due to the provider's . . . fraud, waste, or abuse."). Texas did neither. SOF ¶ 46. LDH could have sought a TRO or injunction preventing PPGC from transferring property, required PPGC to post a bond or security, or imposed an arrangement to pay. La. R.S. § 437.6 (TRO or inunction), La. Admin. Code § 4161(A) (bond or security), § 4187(A) (arrangement to repay may be imposed as sanction). Louisiana did none of these. SOF ¶¶ 34, 47.

[22] There was a brief period between when the mandate issued from the Fifth Circuit and Affiliate Defendants were notified of the grace period, during which Affiliate Defendants did not bill Texas Medicaid, *see* SOF ¶ 4, 20.

amounts Affiliate Defendants received for Medicaid services provided during the injunctions were not "overpayments" and thus Affiliate Defendants had no obligation to repay those amounts.

## B. Defendants Did Not Act With the Requisite Scienter

Defendants also are independently entitled to summary judgment on Plaintiffs' reverse FCA claims because Plaintiffs cannot show that Defendants "knowingly and improperly" avoided a repayment obligation. *See* 31 U.S.C. § 3729(a)(1)(G); *accord* Tex. Hum. Res. Ann. § 36.002 (12) ("knowingly and improperly"); La. Rev. Stat § 46:438.3 ("knowingly"). Even if the Court were ultimately to conclude that Affiliate Defendants had a repayment obligation, at a minimum, it was objectively reasonable for Affiliate Defendants to interpret relevant state and federal law to reach the opposite conclusion, and no authoritative guidance warned them away from that position. Further, although subjective intent is irrelevant where a defendant's conduct is objectively reasonable, Affiliate Defendants also subjectively believed that they were entitled to payments they received for services provided under the injunctions. And finally, the government's knowledge of all material facts underlying Plaintiffs' reverse FCA claims negates scienter.

### 1. It Was Objectively Reasonable for Affiliate Defendants to Conclude They Were Entitled to Keep the Medicaid Payments They Received While the Injunctions Were in Effect

Courts have consistently held that a party does not violate the FCA if it acts in accordance with an objectively reasonable interpretation of the applicable legal requirements and no authoritative guidance (specifically, circuit court precedent or controlling guidance from the relevant agency) warned it away from that interpretation. *U.S. ex rel. Proctor v. Safeway, Inc.*, 30 F.4th 649, 652-53, 658 (7th Cir. 2022) (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 & n.20 (2007)); *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288 (D.C. Cir. 2015); *U.S. ex rel. Schutte v. Supervalu Inc.*, 9 F.4th 455, 465 (7th Cir. 2021) (collecting cases); *U.S. ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 636 (N.D. Tex. 2018) ("FCA liability does

not attach when a defendant reasonably, yet erroneously, interprets its legal obligations.").  Here, Affiliate Defendants reasonably concluded that they were entitled to retain the Medicaid payments they received under the injunctions, and there was no authoritative guidance that even hinted otherwise, let alone warned them away from their objectively reasonable position.  Accordingly, Plaintiffs cannot establish the "knowledge" element of their reverse FCA claims.  *See U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 436 (6th Cir. 2016) (explaining that the FCA's "knowingly" scienter requirement requires a plaintiff to prove "awareness of both an obligation to the [government] *and* [defendants'] violation of that obligation").

As discussed, courts have consistently held that vacatur of an injunction requires repayment only where there is an injunction bond or court order requiring repayment.  In the absence of either, it was objectively reasonable for Affiliate Defendants to conclude that the Fifth Circuit's *en banc* decision did not in itself require repayment.[23]  Plaintiffs have not identified authoritative guidance to the contrary.

For the reasons already discussed, it was also objectively reasonable to conclude that Affiliate Defendants were "entitled" to payments received for healthcare services provided to Medicaid patients while enrolled as Medicaid providers, and thus that those payments were not "overpayments" under the ACA.  There is no authoritative guidance that suggests – let alone clearly states – that a payment that was legitimate when made can retroactively become an "overpayment."  In fact, the only guidance CMS has issued on the question of retroactivity states

---

[23] That is particularly true since the Fifth Circuit did not vacate the Texas injunction on the merits or disturb the district court's detailed factual findings that there was no evidence to support Affiliate Defendants' termination from Medicaid.  SOF ¶ 18.  Instead, it held that the plaintiffs lacked standing because there was no private right of action to enforce the free choice of provider requirement.  *Id.*  The Fifth Circuit never held that Affiliate Defendants' terminations from Texas Medicaid were proper or justified.

that "payments that were proper at the time the payment was made do not become overpayments at a later time." 81 Fed. Reg. 7654, 7658 (2016). Although this addressed the effect of changes in coverage decisions, Dkt. 121 at 6, it is the only guidance CMS has issued addressing a remotely analogous circumstance, and it supports the reasonableness of Affiliate Defendants' conduct.[24]

Were there any doubt about the reasonableness of Affiliate Defendants' conduct, Texas's and Louisiana's own actions confirm it. As an initial matter, Texas law does not permit a terminated Medicaid provider to bill and be paid for covered services. SOF ¶ 21. The mere fact of the "grace period" made it objectively reasonable for Affiliate Defendants to believe that their termination was not in effect until its conclusion and after the attendant Texas TRO and mandamus proceedings had concluded.[25]

Further, Federal Medicaid regulations provide that if a State becomes aware of an overpayment, it must "must notify the provider in writing of any overpayment it discovers in accordance with State agency policies and procedures and must take reasonable actions to attempt to recover the overpayment in accordance with State law and procedures." 42 C.F.R. § 433.316(b); *see also* Tex. Gov. Code § 531.120 (HHSC "*shall provide* a provider with written notice of any proposed recoupment of an overpayment or debt . . ." (emphasis added)); *see also* La. Admin. Code § 4103(A) ("Identified Overpayment" is amount "that has been *identified* in a final administrative adjudication or order" (emphasis added)). With respect to Texas, the Inspector

---

[24] CMS's statement that "[p]roviders and suppliers should analyze the facts and circumstances present in their situation to determine whether an overpayment exists," 81 Fed. Reg. at 7658, does not warn Affiliate Defendants away from their otherwise objectively reasonable view. It provides no specificity as to which "facts and circumstances" *would* constitute an overpayment. *See Proctor*, 30 F.4th at 660 (guidance must be "sufficiently specific" to "put the defendant on notice that its conduct is unlawful"). But regardless, there are no such facts and circumstances. SOF ¶ 38.

[25] Indeed, Texas's granting of a "grace period" to a terminated Medicaid provider would be entirely *ultra vires*.

General at the time of the terminations testified that this requirement is a due process protection for providers to have fair notice of any obligation to repay. SOF ¶ 30. Though Louisiana was not required to testify because of sovereign immunity (Dkt. 336), there is no reason to view Louisiana law differently. Texas and Louisiana were, of course, aware of the termination notices, the injunctions, and the Fifth Circuit's decision vacating the Texas injunction, but neither State provided any "overpayment" notice to Affiliate Defendants as required by law. SOF ¶¶ 30-36, 41, 42.

Medicaid regulations further require a participating State to return to CMS the applicable federal share of an overpayment within a year of identifying it, regardless of whether the State has received any payment from the provider. *See* SOF ¶ 43-44; 42 C.F.R. § 433.320; 42 C.F.R. § 433.312(a) ("The State Medicaid agency must refund the Federal share of overpayments at the end of the 1-year period following discovery in accordance with the requirements of this subpart, whether or not the State has recovered the overpayment from the provider"). Again, it is undisputed that neither Texas nor Louisiana returned to CMS any purported overpayment made to Affiliate Defendants during the pendency of the injunctions (or at any time since). *See* SOF ¶¶ 43-44. That neither Texas or Louisiana took any of the steps mandated by law to return overpayments is strong evidence that the States shared Affiliate Defendants' view that the amounts paid to Affiliate Defendants under the injunctions were not overpayments and that repayment was not required. At a minimum, the evidence supports the objective reasonableness of Affiliate Defendants' conduct.

In addition, Texas-HHSC continued to maintain Affiliate Defendants on its Master Provider File, which keeps a record of all enrolled providers, through March 2021. SOF ¶ 27. And it continued to re-enroll each Affiliate Defendant in Texas Medicaid through the date of their

termination in March of 2021, and communicated to Affiliate Defendants in the notices that the revalidation of their enrollments was "based in part on a recommendation from the HHSC Office of Inspector General (OIG)."   SOF ¶ 28.   Although HHSC-OIG could have recommended "conditional approval" under the state law, it placed no conditions on its approval of Affiliate Defendants' re-enrollment.  *Id.*  And as already discussed at length, following the vacatur of the injunction, HHSC granted a "grace period" and issued notices to MCOs to defer the effective date of termination and continue payments until the last injunction (a TRO issued by the Travis County Court) expired on March 10, 2021.  SOF ¶¶ 20-26.  These additional actions by Texas further supported the reasonableness of Affiliate Defendants' belief that they were not required to return the amounts received during the pendency of the injunctions.

So too did statements made by Texas during the termination litigation.  At no point in the years of litigation did Texas indicate that Affiliate Defendants would have to repay the funds if the injunction was subsequently lifted.  SOF ¶ 48.  Texas argued to the Fifth Circuit that the injunction "prevent[ed] a Texas agency from terminating [Affiliate Defendants'] Medicaid provider agreements" and, absent a stay, Texas would be "irreparabl[y]" harmed if "forced to continue to pay the [Affiliate Defendants] for Medicaid services."  SOF ¶ 17.  Harm is irreparable only if no "mechanism . . . exists . . . to recover the costs . . . incur[red] if the [challenged action] is invalidated on the merits."  *Texas v. EPA*, 829 F.3d 405, 433-34 (5th Cir. 2016); *accord Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) ("It is . . . well-established that an injury is irreparable only if it cannot be undone through monetary remedies."); *FTC ex rel. Yost v. Educare Centre Servs., Inc.*, 2020 WL 4334117, at *3 (W.D. Tex. Apr. 3, 2020) ("[T]he Fifth Circuit recognizes monetary injuries as irreparable when they arise in the absence of an available remedy by which the movant can later recovery monetary damages." (quotation marks omitted)).

35

By asserting that it would be irreparably harmed, Texas took a clear position that it would not be able to recover those funds in the event the injunction was lifted. And in litigation related to the Texas terminations, Texas agreed that the terminations did not take effect until the federal injunction was lifted. *See* SOF ¶ 24 n.11. It cannot be objectively unreasonable for Affiliate Defendants to take the same position once advocated by the State itself.

With respect to Louisiana, PPGC has been enrolled in Louisiana Medicaid from 2010 through the present and continues to provide, and be reimbursed for, services. SOF ¶¶ 19, 34. Because there is no evidence PPGC's Medicaid Provider Agreement was terminated, even under Plaintiffs' theory, there was no overpayment. And certainly it was objectively reasonable for PPGC to believe it was entitled to keep all Medicaid payments it received from Louisiana during the relevant time period, particularly since the settlement of the termination litigation did not require PPGC to repay any monies, that LDH has a longstanding policy of not seeking recoupment in similar circumstances, and even today Louisiana has never sought recoupment. SOF ¶ 34-36.[26]

## 2.  The Government's Knowledge of the Facts Underlying Plaintiffs' Reverse FCA Claims Negates Scienter

Plaintiffs cannot establish scienter for yet another reason: It is undisputed that the United States, Texas, and Louisiana knew all the relevant facts underlying Plaintiffs' reverse FCA claims.

---

[26] Where a defendant acts in accordance with an objectively reasonable interpretation of applicable legal requirements, evidence of subjective intent is irrelevant. *Safeco*, 551 U.S. at 70 n.20. Were subjective intent relevant, however, the undisputed evidence shows that Affiliate Defendants did not believe they had any obligation to repay amounts received under the injunctions. Witnesses consistently testified that Affiliate Defendants determined that they were entitled to payment for services rendered while they remained actively enrolled in Texas and Louisiana Medicaid, SOF ¶¶ 39-40; that they knew CMS had taken the position that the terminations were unlawful, SOF ¶ 15; that they were actively enrolled in, and had not been terminated from, Texas Medicaid until March 10, 2021, SOF ¶ 4; that PPGC has never been terminated from Louisiana Medicaid, SOF ¶¶ 4, 34; and that they were not required to return payments that they received under the injunctions, SOF ¶¶ 31, 32, 34, 36. Thus, even setting aside the "objective reasonableness" standard, the undisputed facts demonstrate that Defendants did not act with the requisite scienter.

More specifically, they knew that Texas and Louisiana issued notices of termination to Affiliate Defendants; the termination notices stated that they would become administratively final 30 days after issuance if not challenged through state administrative processes; Affiliate Defendants did not pursue state administrative challenges; Affiliate Defendants instead pursued injunctive relief in federal court and obtained injunctions preventing Texas and Louisiana from terminating Affiliate Defendants' provider agreements; Affiliate Defendants sought and received Medicaid reimbursement during the pendency of the injunctions; the Fifth Circuit vacated the Texas injunction on procedural grounds; and Affiliate Defendants never paid back the amounts received from Medicaid for medical care provided under the injunctions. SOF ¶¶ 4-14, 16-20, 23-24, 26.

Government knowledge of the allegedly wrongful conduct can negate scienter under the FCA. *U.S. ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 380 (5th Cir. 2017).[27] That is particularly true under the reverse FCA provision, which is designed to penalize "fraudulent conduct" arising from "failure to disclose" information to the government. *U.S. ex rel. Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1074 (8th Cir. 2016) (absent "fraudulent conduct . . . there can be no reverse liability under § 3729(a)(1)(G)"); *see U.S. ex rel. Customs Fraud Investigation, LLC v. Victaulic Co.*, 839 F.3d 242, 255-56 (3d Cir. 2016) (reverse FCA liability is intended to "change

---

[27] *See also Spay v. CVS Caremark Corp.*, 875 F.3d 746. (3d Cir 2017) ("[W]hen the government knows and approves of the facts underlying an allegedly false claim prior to presentment, an inference arises that the claim was not knowingly submitted, regardless of whether the claim itself is actually false."); *U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 286-89 (4th Cir. 2002) (government's "full knowledge of the material facts underlying any representations implicit in [the defendant's] conduct negate[d] any knowledge that [the defendant] had regarding the truth or falsity of those representations"); *U.S. ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) ("[T]he knowledge possessed by officials of the United States may be highly relevant. Such knowledge may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth."); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (en banc) (Jones, J., concurring) (concluding that parties' dealings, including government's knowledge and acquiescence in the defendant's actions, is "highly relevant" to show that defendant did not act "knowingly").

[the] value proposition" so a defendant with superior knowledge that would otherwise "decline to mention" an overpayment will disclose it). Indeed, Congress made clear that reverse FCA liability attaches only when "an overpayment is knowingly and improperly retained, *without notice to the Government about the overpayment*." S. Rep. 111-10, at 441 (2009) (emphasis added).

By contrast, where the government is aware of the supposed overpayment and does nothing, there is no fraud and it cannot be "knowing" and "improper" for the defendant to retain the funds. *See Petras*, 857 F.3d at 500 (where nothing is hidden, there is no "fraudulent effort[] to reduce or avoid an obligation to pay the Government" and thus no reverse FCA violation); Black's Law Dictionary (11th ed. 2019) ("improper" means "fraudulent or otherwise wrongful"). And "[w]ithout fraud, punitive damages—a mandatory penalty of up to $10,000 for each claim and treble damages—would seem an unreasonable levy against individuals guilty only of 'knowingly' receiving an overpayment from the government fisc." *Olson*, 831 F.3d at 1074.[28] Here, it is undisputed that the United States, Texas, and Louisiana were aware of all material facts creating the supposed repayment obligation and that Affiliate Defendants had not repaid the funds. No government agency sought repayment or notified Defendants of any potential obligation to repay. The government's knowledge prevents Plaintiffs from establishing scienter on their reverse FCA claims and Defendants are entitled to summary judgment for that reason as well.

## II.   Defendants Are Entitled To Summary Judgment on Relator's Affirmative FCA and LMAPIL Claims Because Relator Cannot Establish Falsity, Materiality, or Scienter

Relator alleges that Defendants violated 31 U.S.C. § 3729(a)(1)(A) (and an analogous provision of the LMAPIL) by submitting claims for Medicaid reimbursement while failing to disclose "their violations of medical and ethical standards and state and federal laws." Rel. Compl.

---

[28] The mandatory per-claim penalty is now $12,537 to $25,076. *See* Civil Monetary Penalties Inflation Adjustments for 2022, 87 Fed. Reg. 27,515 (May 9, 2022).

¶ 115.  The Court should grant Defendants summary judgment because the undisputed evidence demonstrates that Relator cannot establish the essential elements of falsity, scienter, and materiality as to any Affiliate Defendant – much less to PPGT and PPST, which Relator does not allege violated medical or ethical standards or state and federal laws.

**A.      Relator Cannot Establish Falsity**

**1.      There Is No Evidence That Affiliate Defendants' Claims Contained Specific Representations That Were Rendered Impliedly False**

"Evidence of an actual false claim is the '*sine qua non* of a False Claims Act violation.'" *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 2016 WL 3449833, at *16 (N.D. Tex. June 20, 2016) (citing *Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002)).  "[T]o be actionable under the FCA, the claim for payment must be demonstrably false or fraudulent," which requires "direct proof that the claims for money or property are actually false." *U.S. ex rel. Barron v. Deloitte & Touche, LLP*, 2009 WL 10670806, at *11 (W. D. Tex. Feb. 11, 2009) (quotations and citations omitted).  The FCA recognizes two types of falsity – factual falsity and legal falsity. *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 765 (S.D. Tex. 2010).  Relator does not allege that Affiliate Defendants' claims for reimbursement were factually false because there is no dispute that Affiliate Defendants actually provided the services for which they billed Medicaid.  Relator instead relies on a theory of implied legal falsity – that Affiliate Defendants submitted claims for payment under Medicaid without disclosing their noncompliance with "medical and ethical standards and state and federal laws."

The Supreme Court and Fifth Circuit have set forth clear requirements for an implied false certification theory: a plaintiff must present evidence that Affiliate Defendants' claims "do[] not merely request payment, but also *make[] specific representations* about the goods or services provided" and Affiliate Defendants' "failure to disclose noncompliance with material statutory,

regulatory, or contractual requirements make[] those representations misleading half-truths."  Dkt. 71 at 11 (citing *Escobar*, 579 U.S. at 190) (emphasis added); *U.S. ex rel. Smith v. Wallace*, 723 F. App'x 254, 256 (5th Cir. 2018) (affirming summary judgment where relator provided no evidence "that the claims included 'specific representations' that were 'misleading half-truths'"); *see* Dkt. 71 at 11 (describing requirements for implied false certification theory); *accord Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1103-04 (11th Cir. 2020); *U.S. ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 332-33 (9th Cir. 2017).  Put another way, the mere act of submitting a claim while in violation of some other standard or law cannot, on its own, trigger FCA liability. *See Gonzalez v. Planned Parenthood of L.A.*, 2012 WL 2412080, at *9 (C.D. Cal. June 26, 2012) (no falsity without showing particular "claims or statements were *false* (as opposed to non-compliant or illegal)").

Therefore, to survive summary judgment, Relator must point to something Affiliate Defendants said on the claims themselves that was rendered a misleading half-truth by Affiliate Defendants' failure to disclose their alleged violations of "medical and ethical standards and state and federal law."  Relator, however, has not identified any representation Affiliate Defendants made on a claim for payment and instead points to boilerplate language in Medicaid Provider Agreements and manuals, which purport to require compliance with "all applicable state and federal laws and regulations" and "medical or ethical standards."  Rel. Compl. ¶ 38-46, 115-16. But "general sweeping language" in a Medicaid provider agreement that a provider "agrees to comply with all federal laws and regulations" "does not constitute a certification of compliance for the purposes of the FCA."  *Gonzalez*, 2012 WL 2412080, at *7; *see Escobar*, 579 U.S. at 192.

This Court held in denying Defendants' motions to dismiss that "'misrepresenting compliance with a condition of eligibility to even participate in a federal program when submitting a claim' can expose a defendant to liability under the implied false-certification theory."  Dkt. 71

40

at 12 (quoting *Escobar*, 579 U.S. at 192).  But again, the claim for payment must contain a representation that is rendered a misleading half-truth by the failure to disclose noncompliance with a particular condition of eligibility.  The FCA is not "a general enforcement device for federal statutes, regulations, and contracts."  *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010).  "[L]iability under the [FCA] arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures."  *Hickman v. Spirit of Athens, Ala.*, 985 F.3d 1284 (11th Cir. 2021) (quotation marks omitted).

Because the FCA "attaches liability . . . to the claim for payment," *Bennett*, 747 F. Supp. 2d at 765, Relator must demonstrate that a genuine dispute exists as to whether Affiliate Defendants' *claims for payment* were false because those claims made "specific representations about the goods or services provided" that were "misleading half-truths." *Escobar*, 579 U.S. at 190.  Relator's failure to identify a single representation on Affiliate Defendants' claims – let alone one that was rendered impliedly false by noncompliance with "medical and ethical standards" or "state and federal laws" in the context of tissue donation – requires summary judgment for Defendants.  *See Wallace*, 723 F. App'x at 256; *see also Southland*, 326 F.3d 669, 675 (no FCA liability if there are "no false claims"); *Vista*, 2016 WL 3449833, at *20, *25 (citing cases).  To establish falsity, Relator "must be able to link this evidence of improper [conduct] to the *specific* . . . claims at issue."  *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1305 (11th Cir. 2019) (emphasis added); *accord Vista*, 2016 WL 3449833, at *21 (relator lacked "sufficient evidence tying the alleged scheme to particular records or claims").  Relator has not and cannot do so here, where the claimed misconduct relates to a service outside the Medicaid program.  SOF ¶ 9.

### 2.    Relator Cannot Establish Objective Falsity

Even if there were evidence of a specific misrepresentation on Affiliate Defendants'

claims, Relator's implied false certification theory fails for the additional reason that Relator cannot show that any representation was objectively false.

### a.    Alleged Noncompliance with "Medical and Ethical Standards" Cannot Give Rise to an Objective Falsehood

The FCA requires an "objective" falsehood.  *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 200 F. Supp. 2d 673, 679 (S.D. Tex. 2002), *rev'd on other grounds*, 355 F.3d 370 (5th Cir. 2004); *accord United States v. Kernan Hosp.*, 880 F. Supp. 2d 676, 688 (D. Md. 2012) (FCA liability cannot attach "[w]ithout the missing link in the chain—the objective and verifiable falsehood"); *U.S. ex rel. Yannacopoulos v. General Dynamics.*, 652 F.3d 818, 836 (7th Cir. 2011) (falsity requires "an objective falsehood"—mere differences in interpretation or breach of contractual duties do not satisfy the standard).  Courts therefore grant summary judgment when a plaintiff's "contention . . . rests not on an objective falsehood, as required by the FCA, but rather on its subjective interpretation of Defendants' regulatory duties."  *U.S. ex rel. Jamison v. McKesson Corp.*, 784 F.Supp. 2d 664, 676 (N.D. Miss. 2011).  A statement is objectively false only if it may "be[] adjudged true or false in a way that . . . admit[s] of empirical verification." *Wilson*, 525 F.3d at 377; *accord Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986) (stating that "[a]ctions for fraud or misrepresentation must be based on objective statements of fact, not expressions of personal opinion" and "[a] statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification"). Subjective "expressions of opinion" or "judgments about which reasonable minds may differ" are not "false" for purposes of the FCA.  *Riley*, 355 F.3d at 376; *Southland*, 326 F.3d at 671-72, 675 (affirming dismissal in case that sought to impose FCA liability for representation that a property was "decent, safe, and sanitary" as it "is a meaningful and useful description of homes . . . , but it is not precise or measurable"); *see, e.g., U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp.

42

2d 709, 718 (N.D. Tex. 2011) ("FCA complaint about the exercise of [professional] judgment must be predicated on the presence of an objectively verifiable fact at odds with the exercise of that judgment").

Here, while Texas and Louisiana provider manuals state that Medicaid providers must comply with "medical and ethical standards," there is no objective measure provided by law, regulation, or agency guidance by which to judge a Medicaid provider's compliance with that requirement. Deposition testimony in this case proves the point, as even Plaintiffs' own witnesses could not agree on what it means to comply with "medical and ethical standards." Relator's position is that █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

SOF ¶ 11 n.9. Bowen and Spears – the Texas officials primarily responsible for Defendants' termination – struggled to define "accepted medical and ethical standards" or to identify outer limits on what could constitute a violation. Bowen testified that "a variety of sources" set forth standards, including "community standards, . . . standards within HHSC[,] professional standards, [and] practice standards by professional organizations." *Id.* And Bowen circularly described "community standards" as "the healthcare practices of the respective communities." *Id.* Spears defined "accepted medical community standards" as "[p]ractices of medicine that were accepted by the preponderance of physicians according to state and federal law in the normative standards of medicine that are set out in rules by the Texas Medical Board." *Id.* That Relator and Texas officials could not agree on a definition of "medical and ethical standards," or even what particular sources a provider should consult to assess their compliance, demonstrates a representation of compliance with such standards cannot be objectively true or false.

The FCA requires a more objective measure than "I know it when I see it." Courts have

thus consistently refused to impose FCA liability based on vague and amorphous "requirements" similar to those at issue here. *See, e.g.*, *United States v. Planned Parenthood of Heartland, Inc.*, 2016 WL 7474797, at *16-17 (S.D. Iowa June 21, 2016) (rejecting FCA liability premised on Provider Manual requirement that "conduct meet existing standards of professional practice" even though Manual specifically directed that "Medicaid will not pay" for services that did not "meet existing standards of professional practice" because "[t]he purpose of the FCA is to combat fraud, not to impose quality of care standards in the medical field"); *U.S. ex rel. Bailey v. Ector Cnty. Hosp.*, 386 F. Supp. 2d 759, 766 (W.D. Tex. 2004) (no FCA liability for claims related to "quality of [medical] care" because relator could not "show the Defendants' services were so deficient as to be worthless" and was "not qualified . . . to give an opinion" on the subjective course of treatment); *accord Southland*, 326 F.3d at 671-672 (noting "[t]here will be wide difference of opinion of what is, and what is not, decent, safe, or sanitary"); *Vista*, 2016 WL 3449833, at *17 (following *U.S. ex rel. Morton v. A Plus Benefits*, 139 F. App'x 980, 982-83 (10th Cir. 2005)).

That Texas ultimately determined, based on a video recorded in April 2015, that PPGC displayed a "willingness" to alter abortion procedures in violation of "generally accepted medical standards," SOF ¶ 9, does not mean Affiliate Defendants' purported prior certifications of compliance with "medical and ethical standards" were *objectively* false. In *AseraCare*, for example, the Eleventh Circuit held there was no objective falsity based on a disagreement between experts about a physician's medical judgment as to whether certain hospice care was necessary. *AseraCare, Inc.*, 938 F.3d at 1281. The court reasoned that in such a "battle of experts," there is no objective measure for determining which view is correct; the jury is simply being asked to decide which *opinion* is more persuasive. *Id.* at 1288-89; *see also Wilson*, 525 F.3d at 377 (no FCA liability when relator's "assertion rest[ed] not on an objective falsehood, as required by the

44

FCA, but rather on [the] subjective interpretation of . . . contractual duties").

Here, although Texas terminated Affiliate Defendants based on PPGC's purported violation of medical standards, CMS disagreed with that determination.  In August 2016, CMS sent letters to LDH and HHSC reminding the States that their authority to terminate providers from Medicaid "is limited to circumstances implicating the fitness of the provider to perform covered medical services" and CMS was "unaware of any basis . . . to terminate [the] provider agreements." SOF ¶ 15.  The district court similarly disagreed with Texas's determination, concluding there was not "even a scintilla of evidence" of medical or ethical violations.  SOF ¶ 16 n.10.  And no medical expert has concluded that the Affiliate Defendants' purported violation of medical standards warranted termination.  Plaintiffs proffer no such expert, and the HHSC-OIG Medical Director testified that he has no opinion as to whether the PPGC video justified the termination of the Affiliate Defendants.  *See* SOF ¶ 11 n.8.  This disagreement between expert regulatory and judicial bodies about Affiliate Defendants' ability to competently provide care is akin to the "battle of the experts" at issue in *AseraCare*.  There is no objective measure by which a jury can conclude that PPGC's purported certification of compliance with medical and ethical standards (which expressed the same view as CMS and the district court) are objectively false.

Further, Louisiana *never* made any finding that PPGC violated "medical and ethical standards."  In fact, during a hearing related to the Louisiana injunction, counsel for LDH stated there was "no question" about PPGC's "competency" to provide adequate medical care to Medicaid patients.  SOF ¶ 13.

### b.   FCA Liability Does Not Attach to a Willingness to Violate the Law or Other Requirements

Because alleged noncompliance with "medical and ethical standards" cannot give rise to FCA liability, to survive summary judgment, Relator must demonstrate that a genuine dispute of

material fact exists as to whether Affiliate Defendants violated state or federal law.  But there is

no evidence that any defendant actually violated the law; as witnesses have uniformly testified, at

most, the evidence shows a purported *willingness* on the part of isolated PPGC employees to

engage in future conduct that could run afoul of the law.[29]

As this Court previously recognized, implied false certification "[l]iability turns on

'whether the defendant knowingly *violated a [legal] requirement.*'"  Dkt. 71 at 11 (emphasis

added) (quoting *Escobar*, 579 U.S. at 190).  Relator's ability to prove an *actual* violation of a

statutory, regulatory, or contractual requirement therefore is a precondition to liability under the

implied false-certification theory.  *See also id.* ("A defendant can 'be liable under the FCA *for

violating statutory or regulatory requirements*[.]'" (quoting *U.S. ex rel. Lemon v. Nurses to Go,

Inc.*, 924 F.3d 155, 159–60 (5th Cir. 2019))); *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 597 (S.D.

Tex. 2016) (implied false-certification requires that a party "submit[] a claim to the government

and fail[] to disclose a violation of relevant statutes, regulations, or contract requirements").

Here, even the HHSC Inspector General who made the termination decision testified Texas

had no evidence that PPGC ever altered a medical procedure for the purpose of obtaining fetal

tissue.  SOF ¶ 9.  And he could not name a single patient, procedure, date of service, or any other

detail of a procedure in which PPGC otherwise violated the law.[30]  *See id.*  Instead, taken in the

light most favorable to Plaintiffs, the record shows at most that Texas terminated PPGC because

---

[29] The Texas termination was based on statements made in a video.  *See* SOF ¶¶ 8-9.  Defendants submit that the videos were misleading, and did not show even a willingness to violate the law. The Court, however, need not reach that issue to grant Defendants summary judgment.  Defendants note that the Inspector General who made the termination acknowledged throughout his deposition that Texas law requires actual violations of law or medical standards to take administrative action, including termination, rather than a mere "willingness" to do so.  SOF ¶ 9 & n.7.

[30] Further, Affiliate Defendants are not aware of any evidence adduced by Relator in discovery that would fill the gaps admitted by Bowen that would prove *actual* violations of law.

Texas concluded that PPGC was willing to violate a statutory, regulatory, or contractual requirement in the future. *See* SOF ¶ 9 n.7. But willingness to violate a requirement sometime in the future, even if true, does not give rise to liability under the FCA. Relator must prove that a violation actually occurred at the time the claim was submitted. *See* 1 John T. Boese, Civil False Claims and Qui Tam Actions, at § 2.03 (5th ed. 2022) ("Before FCA liability may be imposed, the plaintiff in an FCA case has the burden of proving that the claim actually is false, which in many cases means that the underlying alleged contractual, statutory, or regulatory violation occurred."); *id.* ("[T]he foundation for the false certification theory is 'noncompliance with material statutory, regulatory, or contractual requirements . . . .'" (quoting *Escobar*, 579 U.S. at 181)); *cf. U.S. ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 718-19 (6th Cir. 2013) (dismissing claim that defendant failed to comply with a requirement when government could cite no regulation with which defendant actually failed to comply); *U.S. ex rel. Sparks v. IntegraCare Home Health Servs.*, 2017 WL 11711732, at *9 (E.D. Tex. July 6, 2017) (dismissing relator's implied false-certification claim when she failed to explain how the defendant's conduct amounted to a Medicare violation).

To expand FCA liability to "thought crime," *see* SOF ¶ 9 n.7, based on a purported "willingness" to violate the law in the absence of evidence of any actual violation, would stretch implied false-certification theory—and the FCA—beyond any reasonable limit and indeed would quite likely have constitutional ramifications under the Due Process Clause.

### 3. Relator Cannot Establish Falsity as to PPGT or PPST

Relator alleges that Affiliate Defendants' claims were impliedly false because they failed to disclose violations of "medical and ethical standards" and state and federal law. Those purported violations are based on PPGC's alleged conduct related to fetal tissue research discussed in "undercover videos" filmed by Relator. However, it is undisputed that PPGT and PPST officials do not appear in the videos, those entities did not participate in fetal or placental tissue research,

47

and there is no evidence that they otherwise violated "medical and ethical standards" or any state or federal law.  PPGT and PPST are separate corporations that operate independently of PPGC in separate, non-overlapping geographical regions.  SOF ¶¶ 2, 3.

PPGC and PPST were terminated from Texas Medicaid based solely on their purported affiliation with PPGC.  SOF ¶ 9.  That supposed affiliation, however, does not affect the truth or falsity of prior claims for payment.  Relator must identify facts that create a genuine dispute for *each* element as to *each* defendant.  Simply put, because there is not even an allegation (much less evidence) that PPGT or PPST committed any violations, their claims could not have been false.

**B.      Relator Cannot Establish that Affiliate Defendants Possessed the Requisite Scienter**

Relator cannot establish scienter for the same reasons Relator cannot establish falsity:  "If the regulations were thoroughly unclear, as a matter of law, the FCA's knowledge and falsity requirements have not been met."  *Jamison*, 784 F. Supp. 2d at 677 (citing *Southland*, 326 F.3d at 684 (Jones, J., concurring) ("Where there are legitimate grounds for disagreement over the scope of the contractual or regulatory provision, and the claimant's actions are in good faith, the claimant can not be said to have knowingly presented a false claim.")).  Relator has presented no evidence that PPGC knew its certifications were false – and indeed, Relator cannot do so.

Moreover, PPGT and PPST did not participate in any tissue studies, SOF ¶ 5, and Relator has not alleged that they violated federal or state laws, *see* Dkt. 2.  Relator has not alleged, and has offered no evidence, that PPGT or PPST had any knowledge of PPGC's supposedly unlawful conduct.  Without specific allegations showing that *each* Affiliate Defendant knowingly violated federal or state law, Relator's implied false certification claim fails as to that defendant. *See Hendrickson*, 343 F. Supp. 3d at 635.  PPGT and PPST are entitled to summary judgment on Relator's implied false certification claims.

### C.    The Undisputed Evidence Demonstrates That Defendants' Alleged Violations Were Not Material to Any Government's Payment Decision

The FCA's materiality standard is "demanding" and must be strictly enforced. *Escobar*, 579 U.S. at 194. The Supreme Court made clear in *Escobar* that a violation is not material "merely because the government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment" or that it "would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 195. And "broad boilerplate language" requiring a contractor to follow all federal and state laws is insufficient to establish the compliance with each and every one of those laws is material to payment. *U.S. ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 242 (5th Cir. 2020). What matters is the "likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193. If the government pays "a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* at 195; *see U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017) (payment "after [government] learns of the alleged fraud substantially increases the burden on the [plaintiff] in establishing materiality"). Here, uncontroverted evidence shows that Defendants' alleged violations of medical and ethical standards and state and federal law were not material and thus Defendants are entitled to summary judgment for that reason too.

### 1.    Affiliate Defendants' Alleged Violations Were Not Material to the United States' Payment Decisions

The FCA protects the federal fisc, *United States v. McNinch*, 356 U.S. 595, 599 (1958), so it is the United States' "materiality decision that ultimately matters." *U.S. ex rel. Petratos v. Genentech, Inc.*, 855 F.3d 481, 491 (3d Cir. 2017) (rejecting argument that "where the fraud is first directed at an intermediary," materiality depends on the actions of "the *initial* recipient of the misrepresentation and not . . . the [federal] Government" (emphasis in original)). Indeed, this

Court has recognized that the key question about the "underlying violations" is whether "the *federal government* would deny reimbursement." Dkt. 71 at 14 (emphasis added); *id.* (determining that, at the pleading stage, Relator had pleaded facts that could support "a reasonable inference that the *United States* government would deny payment if it knew about Defendants' alleged violations" (emphasis added)).  Thus, Relator cannot establish materiality on their FCA claims if the relevant federal agency, CMS, would have considered the alleged violations immaterial.

CMS has shown time and again, however, that the federal government *would pay* Affiliate Defendants' claims, despite knowledge of the facts underlying this lawsuit.  Throughout the Texas and Louisiana termination litigation, the United States took the consistent position that Affiliate Defendants could not lawfully be terminated from Texas or Louisiana Medicaid.  *See* SOF ¶¶ 14-15.  Despite knowing the facts underlying Relator's claims and the related litigation, CMS never initiated any recoupment action or sought to recover funds from Affiliate Defendants.  SOF ¶ 29. And now, the federal government has not only declined to intervene in the instant litigation, but it continues to take the position that Texas's and Louisiana's terminations of Affiliate Defendants were not lawful.  SOF ¶¶ 1, 29.  Because the federal government's position is that there was no lawful basis on which to remove Affiliate Defendants from Medicaid,  the supposed "violations" alleged by Relator were not material to CMS's decision about whether to pay claims for Medicaid services provided by Affiliate Defendants. That resolves the materiality inquiry.

### 2. Texas and Louisiana's Failure to Recoup Funds Paid to Affiliate Defendants Demonstrates Immateriality

Although Texas and Louisiana sought to terminate Affiliate Defendants from continued participation in Medicaid, neither State ever attempted to seek repayment of funds Affiliate Defendants received.  The States' decisions, made with full knowledge of the circumstances underlying Relator's allegations here, conclusively demonstrate that Affiliate Defendants' alleged

noncompliance was not material to payment for services provided while Affiliate Defendants were approved Medicaid providers.  *See, e.g.*, *U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1029 (D.C. Cir. 2017) (affirming grant of summary judgment for lack of materiality where no government agency "disallowed or challenged any of the amounts [the contractor] *had billed* for . . . services under [the contract]" (emphasis added)); *U.S. ex rel. Bachert v. Triple Canopy, Inc.*, 321 F. Supp. 3d 613, 620-21 (E.D. Va. 2018) (granting partial summary judgment for defendant under *Escobar* where government reviewed the alleged fraud and "never asked for any money back from defendant"); *U.S. ex rel. Zissa v. Santa Barbara Cty.*, 2019 WL 3291579, at *6 (C.D. Cal. Mar. 12, 2019) (no materiality where government did not attempt to "recoup funds").

Moreover, despite the States' issuance of termination notices, they continued to pay Affiliate Defendants for additional Medicaid services provided.  Setting aside payments made for services provided under the injunction, Texas continued to *voluntarily* pay Affiliate Defendants for services provided during the grace period.  Indeed, Texas has continued to process and pay claims to Affiliate Defendants even after the filing of this litigation (including as recently as recently as Fall 2022) for services that had been provided when Affiliate Defendants were enrolled as providers.  SOF ¶ 32.  This further demonstrates that any alleged violations were not material to Texas's decision to pay Affiliate Defendants for services actually provided.  And Louisiana entered into a settlement agreement with PPGC that declined to claw back a single dollar PPGC had received from Medicaid and allowed PPGC to remain in Medicaid going forward.  SOF ¶¶ 19, 36.[31]

---

[31] There also is no evidence that Affiliate Defendants knew the alleged violations were material, especially based on Texas's and Louisiana's conduct and CMS's position on the terminations.  *See Escobar*, 579 U.S. at 181. ("What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision.").

Finally, Texas's decision not to intervene as to Relator's implied false certification claims and Louisiana's decision not to intervene at all is further evidence of immateriality.[32] *See Polansky v. Exec. Health Res., Inc.*, 422 F. Supp. 3d 916, 938–39 (E.D. Pa. 2019) ("Post-*Escobar*, numerous federal courts have found insufficient FCA materiality where the government investigated a relator's allegations but chose not to intervene[.]"); *U.S. ex rel. Armstrong v. Andover Subacute & Rehab Ctr. Servs.,* 2020 WL 7640535, at *5 (D.N.J. Dec. 22, 2020); *U.S. ex rel. MacDowell v. Synnex Corp.*, No. C 19-00173 WHA, 2019 WL 4345951, at *4 (N.D. Cal. Sept. 12, 2019) (decision not to intervene "weighs toward finding a lack of materiality").

### 3.    Relator Cannot Establish Materiality for Claims Paid By MCOs

With respect to claims paid by Medicaid managed care organizations ("MCOs"), courts have held there is no FCA liability absent evidence that the submission affected the government's rate of reimbursement to the MCOs.  That is, "to assert an FCA claim in the fixed-rate context, Relators must allege facts plausibly showing a connection between the false claims and the increase in payouts." *U.S. ex rel. Mbabazi v. Walgreen Co.*, No. CV 19-2192, 2021 WL 4453600, at *6 (E.D. Pa. Sept. 28, 2021) (quotation marks and citation omitted); *see U.S. ex rel. Sirls v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 445 (E.D. Pa. 2020) (there is "a lack of materiality and . . . FCA liability cannot attach without 'a causal relationship between the alleged falsehood and amount the government paid'").  When, as here (SOF ¶¶ 16 n.10 (injunction will not harm Texas budget) & 25), a reimbursement is paid to the MCO at a "predetermined rate," liability cannot attach as "there is no FCA liability where a falsely-claimed service or item does not affect the rate of reimbursement." *Id.*  There is no evidence here that could give rise to liability for fixed-

---

[32] Texas intervened only under a reverse false claims theory under Texan Human Resources Code § 36.002(12), and only for claims from February 1, 2017 through March 2021. *See* Dkt. 22.

rate payments made to MCOs.  Relator has not even tried to show that the government paid more to the MCOs for Affiliate Defendants' claims than it would have otherwise paid for those same services.  *See id.* Without such evidence, Relator's allegations related to Affiliate Defendants' claims for fixed-rate services paid by MCOs fail for lack of materiality.

## III.    Affiliate Defendants Are Entitled to Summary Judgment on Relator's Conspiracy Claims Under the TMFPA and LMAPIL

Relator's state law conspiracy claims also fail as a matter of law.  To survive summary judgment, Relator must proffer evidence of "the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the government]" and "at least one act performed in furtherance of that agreement."  *Farmer*, 523 F.3d at 343; *see also U.S. ex rel. Williams v. McKesson Corp.*, 2014 WL 3353247, at *4 (N.D. Tex. July 9, 2014) (evaluating analogous state law provisions "under the FCA's well-defined legal requirements").  Proving an agreement requires evidence of "a preconceived plan or a time and place at which [defendants] had a meeting of the minds regarding the object of the conspiracy."  *Samsung Elecs. Am., Inc. v. Yang Kun Chung*, 2017 WL 635031, at *3 (N.D. Tex. Feb. 16, 2017).  Relator must also "demonstrate that the defendants shared a specific intent to defraud the government."  *U.S. ex rel. Ramsey-Ledesma v. Censeo Health, LLC*, 2016 WL 5661644, at *11 (N.D. Tex. Sept. 30, 2016).  "Negligence alone" is not enough.  *Farmer*, 523 F.3d at 343; *see also Tri v. J.T.T.*, 162 S.W.3d 552, 557 (Tex. 2005) ("[M]erely proving a joint 'intent to engage in the conduct that resulted in the injury' is not sufficient[.]").

Here, Relator has not identified any evidence of an agreement between Affiliate Defendants to violate the law, let alone an act performed in furtherance of such an agreement.  Nor does the record permit a reasonable jury to find that Affiliate Defendants shared a specific intent to defraud Medicaid.  Accordingly, the Court should grant Affiliate Defendants' summary

judgment on Relator's state law conspiracy claims.[33]

## IV.   Relator's Claims Are Barred In Part By Statutes of Repose

In addition, Relator's claims are barred in part by the FCA and LMAPIL's non-waivable ten-year statutes of repose.[34]  *See*  31 U.S.C. § 3731(b)(2); La. Rev. Stat. § 439.1.B.  To the extent Relator alleges that Affiliate Defendants violated the FCA and LMAPIL "*from at least 2010* and . . . through 2020*," the statutes of repose bar any claims for violations that occurred ten years before Relator filed their Complaint on February 5, 2021.  Rel. Compl. ¶ 3. Accordingly, summary judgment is warranted on Relator's claims for alleged violations prior to February 5, 2011.[35]

## CONCLUSION

For these reasons, Defendants respectfully request that the Court grant summary judgment for Defendants and against Plaintiffs on each count in Plaintiffs' complaints.

---

[33] Alternatively, the Court should, at minimum, grant Affiliate Defendants summary judgment on Relator's TMFPA conspiracy claim because Texas's intervention precludes Relator from pursuing that claim.  Although Defendants previously argued—and the Court agreed—that Texas's intervention precluded Relator from separately pursuing the TMFPA claims alleged in Count III of Relator's Complaint, *see* Mtn to Dismiss, Dkt. 49 at 34; Order, Dkt. 71 at 35, Defendants' arguments overlooked the TMFPA conspiracy claim in Count V.  Because Texas's intervention precludes Relator from pursuing the TMFPA claim in Count V for the same reasons that Relator is precluded from pursuing the TMFPA claims in Count III, *see* Tex. Hum. Res. Code § 36.107, and Texas has not elected to pursue that claim through its Complaint in Intervention, the TMFPA conspiracy claim in Count V should be dismissed for this additional reason.

[34] As explained in Defendants' Partial Motion for Reconsideration or Clarification on Defendants' Motion for Leave to File Amended Answers (Dkt. 378), a statute-of-repose defense is not waivable and can be raised regardless of whether included in an answer.

[35] Because Texas intervened as to Count III of Relator's Complaint, Relator's implied false certification claims under the TMFPA are no longer part of the case. Dkts. 71 at 33; 141 at 2-3.

Dated:  January 6, 2023

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By:   */s/ Tirzah S. Lollar*
Tirzah S. Lollar
Tirzah.Lollar@arnoldporter.com
Craig D. Margolis
Craig.Margolis@arnoldporter.com
Christian Sheehan
Christian.Sheehan@arnoldporter.com
Emily Reeder-Ricchetti
Emily.Reeder-Ricchetti@arnoldporter.com
Megan Pieper
Megan.Pieper@arnoldporter.com
Alyssa Gerstner
Alyssa.Gerstner@arnoldporter.com
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone: +1 202.942.6127
Fax: +1 202.942.5999

Paula Ramer
Paula.Ramer@arnoldporter.com
250 West 55th Street
New York, New York 10019-9710
T: +1 212.836.8474

Christopher M. Odell
Texas State Bar No. 24037205
Christopher.Odell@arnoldporter.com
700 Louisiana Street, Suite 4000
Houston, TX 77002-2755
Telephone: +1 713.576.2400
Fax: +1 713.576.2499

Ryan Patrick Brown
Texas State Bar No. 24073967
brown@blackburnbrownlaw.com
1222 S. Fillmore
Amarillo, TX 79101

55

Tel: (806) 371-8333
Fax: (806) 350-7716

*Attorneys for Defendants Planned*
*Parenthood Gulf Coast, Inc., Planned*
*Parenthood of Greater Texas, Inc.,*
*Planned Parenthood South Texas, Inc.,*
*Planned Parenthood Cameron County,*
*and Planned Parenthood San Antonio*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of January, 2023, I caused the foregoing to be served by email through the Court's Electronic Case Filing system upon all attorneys of record.

*/s/ Tirzah S. Lollar*
Tirzah S. Lollar
