## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* ALEX DOE, Relator, | § <br> § <br> § | |
| THE STATE OF TEXAS,<br>*ex rel.* ALEX DOE, Relator, | § <br> § <br> § | |
| THE STATE OF LOUISIANA,<br>*ex rel.* ALEX DOE, Relator, | § <br> § <br> § <br> § | |
| Plaintiffs, | § <br> § | |
| v. | § <br> § | Civil Action No. 2:21-CV-00022-Z |
| PLANNED PARENTHOOD<br>FEDERATION OF AMERICA, INC.,<br>PLANNED PARENTHOOD GULF<br>COAST, INC., PLANNED<br>PARENTHOOD OF GREATER<br>TEXAS, INC., PLANNED<br>PARENTHOOD SOUTH TEXAS,<br>INC., PLANNED PARENTHOOD<br>CAMERON COUNTY, INC.,<br>PLANNED PARENTHOOD SAN<br>ANTONIO, INC., | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | |
| Defendants. | § <br> § | |

## MEMORANDUM IN SUPPORT OF TEXAS'S MOTION
## FOR SUMMARY JUDGMENT AND RELATOR'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ......................................................... 1

   I.   Factual Background ................................................................................. 1

      A.   The Medicaid Program .................................................................... 1

          1.   Texas Medicaid ........................................................................ 2

          2.   Louisiana Medicaid ................................................................. 5

      B.   Defendants ....................................................................................... 7

          1.   Planned Parenthood Federation of America ......................... 7

          2.   PPFA Affiliate Defendants .................................................... 10

      C.   The PPFA Affiliate Defendants' Enrollment as Medicaid Providers ........... 11

          1.   Relator's investigation ........................................................... 13

          2.   PPGC's termination from Louisiana Medicaid .................... 14

          3.   The Affiliate Defendants' termination from Texas Medicaid ................... 14

          4.   Litigation History .................................................................. 19

          5.   Texas "Grace Period" ............................................................ 19

          6.   Continued Billing in Louisiana ............................................. 21

      D.   Calculation of the amounts received by PPFA Affiliate Defendants from Texas and Louisiana Medicaid and the number of claims submitted .......... 24

   II.  Legal Framework ................................................................................... 25

      A.   The False Claims Act ..................................................................... 25

      B.   The Texas Medicaid Fraud Prevention Act .................................. 28

      C.   The Louisiana Medical Assistance Program Integrity Law ......... 29

   III. Procedural History ................................................................................ 31

STANDARD OF REVIEW ................................................................................ 32

ARGUMENT ..................................................................................................... 33

   I.   Defendants Are Liable Under the Reverse-False-Claims Provisions of the FCA, TMFPA, and LMAPIL. ................................................................. 33

      A.   Defendants avoided their "obligation" to repay money to the Government. ..................................................................................... 34

          1.   Texas ....................................................................................... 36

i

2.  Louisiana ............................................................................... 39

B.  Defendants "knowingly and improperly" avoided their obligation to repay the Government. ........................................................................ 40

1.  Texas ..................................................................................... 42

2.  Louisiana ............................................................................... 45

C.  The now-vacated preliminary injunctions provide no defense to liability. .. 47

1.  The preliminary injunctions and Travis County TRO did not change the finality of the Affiliate Defendants' termination under state law ....... 47

2.  Defendants can be liable for violating the law during the pendency of the now-vacated preliminary injunctions and the Travis County TRO. ... 48

3.  It is reckless disregard for Defendants to rely on the vacated injunctions to deny knowledge of their obligation to repay. ...................... 51

II.  Defendants Violated the FCA, TMFPA, and LMAPIL Under the Implied-False-Certification Theory of Liability. ..................................................... 53

A.  The claims submitted in Texas and Louisiana after the Affiliate Defendants' terminations became final were impliedly false. ...................... 55

B.  The claims filed by the Affiliate Defendants in Texas during the "grace period" were impliedly false. ........................**Error! Bookmark not defined.**

C.  The claims filed by PPGC in Louisiana after it was terminated from Texas Medicaid were impliedly false. ............................................... 58

III.  PPFA is Liable for the Violations of the FCA, TMFPA, and LMAPIL ............ 61

A.  PPFA is not required to be a Medicaid provider to be liable under the FCA, TMFPA, and LMAPIL. .......................................................... 63

B.  PPFA is liable for its own actions and role in causing the Affiliate Defendants to avoid their obligation to repay the overpayments and in filing false claims. ................................................................. 64

1.  PPFA's "Litigation & Law" Department .................................... 65

2.  PPFA was directly involved in the Affiliate Defendants' unlawful acts and efforts to retain and maximize their Medicaid revenue. ............. 66

a.  PPFA crafted and executed the strategy to prolong the Affiliate Defendants' participation in Medicaid and avoid repayment of funds by pursuing federal litigation instead of their administrative rights. ... 67

b.  PPFA helped Affiliate Defendants request a grace period from Texas as pretext to allow Affiliate Defendants to continue to bill Texas Medicaid and further media strategies. .................................. 70

c.   PPFA assisted Affiliate Defendants in filing an unsuccessful lawsuit in Travis County District Court which relied on theories for which they had "no authority." .................................................................................. 73

d.   PPFA participated in PPGC's efforts to conceal the true facts of their termination and their affiliates' Texas terminations from LDH and the Middle District of Louisiana in an effort to maximize Medicaid revenue. ............................................................................... 74

e.   PPFA continues to assist Affiliate Defendants' ongoing efforts to avoid paying money back to Texas and Louisiana Medicaid. ............. 75

C.   PPFA is also liable because it extensively directs the operations of the Affiliate Defendants. ........................................................................ 76

1.   Accreditation and Evaluation by PPFA ............................................. 77

2.   National Program Support (NPS) and PPFA Services for Affiliates ........ 78

3.   Business Operations and Financial Consulting ................................. 79

4.   PPFA's Healthcare Services Department and and Healthcare Operations Team ........................................................................... 79

5.   PPFA's Health Care Investment Program ........................................ 82

IV.   The Undisputed Facts Show that Planned Parenthood is Liable for Conspiracy to Commit Healthcare Fraud under Texas and Louisiana Law ... 87

V.   Relator and Texas Are Entitled to Summary Judgment on Defendants' Affirmative Defense ......................................................................... 89

CONCLUSION .................................................................................... 96

CERTIFICATE OF SERVICE .................................................................. 98

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ................................................................. 32, 33

*Arkadelphia Milling Co v. St. Louis S.W. Ry. Co.,*
    249 U.S. 134 (1919) ...................................................................... 51

*Avco Corp. v. U.S. Dep't of Justice,*
    884 F.2d 621 (D.C. Cir. 1989)......................................................... 25

*Beal v. Doe,*
    432 U.S. 438 (1977) ........................................................................ 2

*Brittmon v. Upreach, LLC,*
    285 F. Supp. 3d 1033 (S.D. Ohio 2018)........................................... 53

*Children's Hospital Association of Texas v. Azar,*
    507 F.Supp.3d 249 (D.D.C. 2020)......................................... 44, 51, 53

*Citizens Protecting Mich. Constitution v. Sec'y of State,*
    921 N.W.2d 247 ............................................................................ 49

*Colony Nat'l Ins. Co. v. Specialty Trailer Leasing, Inc.,*
    620 F. Supp. 2d 786 (N.D. Tex. 2009) ........................................ 32, 33

*Dillow v. Home Care Network, Inc.,*
    No. 1:16-cv-612, 2017 WL 749196 (S.D. Ohio Feb. 27, 2017) ................ 53

*Edgar v. MITE Corp.,*
    457 U.S. 624 (1982) ............................................................ 49, 50, 51

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,*
    559 U.S. 280 (2010) ...................................................................... 26

*Greater Dall. Home Care All. v. United States,*
    10 F. Supp. 2d 638 (N.D. Tex. 1998) ............................................... 52

*Harris v. McRae,*
    448 U.S. 297 (1980) ..................................................................... 1, 2

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.,*
    467 U.S. 51 (1984) ................................................................... 41, 42

*In re Bayou Shores SNF, LLC,*
   828 F.3d 1297 (11th Cir. 2016) .............................................................. 52

*In re Xerox Corp.,*
   555 S.W.3d 518 (Tex. 2018).................................................... 28, 29, 93

*Intern. Paper Co. v. Frame,*
   67 Fed. Appx. 251 (5th Cir. 2003) ........................................................ 90

*Kane ex rel. United States v. Healthfirst, Inc.,*
   120 F. Supp. 3d 370 (S.D.N.Y. 2015) .................................................. 35

*Khadr v. United States,*
   529 F.3d 1112 (D.C. Cir. 2008)............................................................. 51

*Legg's Estate v. Commissioner,*
   114 F.2d 760 (4th Cir. 1940) ................................................................. 51

*Lewis-Ramsey v. Evangelical Lutheran Good Samaritan Soc'y,*
   215 F. Supp. 3d 805 (S.D. Iowa 2016)................................................. 53

*Little v. Liquid Air Corp.,*
   37 F.3d 1069 (5th Cir. 1994) ................................................................. 32

*Md. Dep't Hum. Res. v. U.S. Dep't Agric.,*
   976 F.2d 1462 (4th Cir. 1992) .............................................................. 52

*Mine Workers v. Coronado Coal Co.,*
   259 U.S. 344 (1922) ............................................................................... 78

*N. Mem'l Med. Ctr. v. Gomez,*
   59 F.3d 735 (8th Cir. 1995) ................................................................... 41

*Nat'l Kidney Patients Ass'n v. Sullivan,*
   958 F.2d 1127 (D.C. Cir. 1992)............................................................. 52

*Okpalobi v. Foster,*
   244 F.3d 405 (5th Cir. 2001) ................................................................. 48

*Pers. Care Prods., Inc. v. Hawkins,*
   635 F.3d 155 (5th Cir. 2011) .......................................................... 39, 52

*Planned Parenthood Gulf Coast, Inc. v. Kliebert,*
   141 F. Supp. 3d 604 (M.D. La. 2015) .................................................. 48

*Planned Parenthood of Greater Tex. Family Planning & Preventative Health Services, Inc. v. Smith,*
    236 F. Supp. 3d 974 (W.D. Tex. 2017) .................................................................... 48

*Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman,*
    981 F.3d 347 (5th Cir. 2020) ................................................... 19, 22, 68, 70

*Ray v. County of Los Angeles,*
    935 F.3d 703 (9th Cir. 2019) ................................................................. 53

*Ruppert v. Ruppert,*
    134 F.2d 497 (D.C. Cir. 1942) ............................................................... 51

*Sahara Health Care, Inc. v. Azar,*
    349 F. Supp. 3d 555 (S.D. Tex. 2018) ................................................ 52, 53

*Sahara Health Care, Inc. v. Azar,*
    975 F.3d 523 (5th Cir. 2020) ................................................................. 45

*Schindler Elevator Corp. v. United States ex rel. Kirk,*
    563 U.S. 401 (2011) .......................................................................... 62, 63

*Smith v. United States,*
    287 F.2d 299 (5th Cir. 1961) ................................................................. 64

*Spong v. Fid. Nat. Prop. & Cas. Ins. Co.,*
    787 F.3d 296 (5th Cir. 2015) ................................................................. 41

*U.S. ex rel. Doe v. Planned Parenthood Fed. Of Am., Inc.,*
    No. 2:21-CV-022-Z, 2022 WL 1290907 (N.D. Tex. Apr. 4, 2022) .................... 65

*U.S. ex rel. Drakeford v.Tuomey,,*
    797 F.3d 364 (4th Cir. 2015) ................................................................. 95

*U.S. ex. rel. Riley v. St. Luke's Episcopal Hosp.,*
    355 F.3d 370 (5th Cir. 2004) ................................................................. 65

*U.S. ex rel. Grubbs v. Kanneganti,*
    565 F.3d 180 (5th Cir. 2009) ................................................................. 88

*U.S. ex rel. Heesch v. Diagnostic Physicians Group, P.C.,*
    No. CIV.A. 11-0364-KD-B, 2014 WL 2155363 n.2 (S.D. Ala. May 22, 2014) ......... 54

vi

*U.S. ex rel. Longhi v. Lithium Power Technologies, Inc.*,
   530 F. Supp. 2d 888 (S.D. Tex. 2008) .................................................................. 25, 26

*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V,*
   741 F.3d 390 (4th Cir. 2013) ....................................................................... 91, 94, 95

*United States ex rel. Farmer v. City of Houston,*
   523 F.3d 333 (5th Cir. 2008) ..................................................................................... 88

*United States ex rel. Franklin v. Parke-Davis,*
   147 F. Supp. 2d 39 (D. Mass. 2001) ......................................................................... 63

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.,*
   498 F. Supp. 2d 25 (D.D.C. 2007)............................................................................. 63

*United States ex rel. Lemon v. Nurses To Go, Inc.,*
   924 F.3d 155 (5th Cir. 2019) ............................................................................... 55, 57

*United States ex rel. Long v. SCS Bus. & Tech. Inst.,*
   999 F. Supp. 78 (D.D.C. 1998).................................................................................. 63

*United States ex rel. Longhi v. Lithium Power Techs., Inc.,*
   575 F.3d 458 (5th Cir. 2009) ............................................................................... 32, 92

*United States ex rel. Lutzv. BlueWave Healthcare Consultants, Inc.,,*
   2018 WL 11413969 (D.S.C. May 23, 2018) ............................................................. 95

*United States ex rel. Marcus v. Hess,*
   317 U.S. 537 (1943) ................................................................................................... 62

*United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.,*
   No. CV 15-13065-PBS, 2018 WL 4539684 (D. Mass. Sept. 21, 2018)..................... 63

*United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.,*
   No. 15-CV-13065-PBS, 2021 WL 2003016 (D. Mass. May 19, 2021).......... 78, 79, 87

*United States v. Anghaie,*
   633 F. App'x 514 (11th Cir. 2015) ..................................................................... 92, 93

*United States v. Bajakajian,*
   524 U.S. 321 (1998) ................................................................................................... 90

*United States v. Bestfoods,*
   524 U.S. 51 (1998) ................................................................................ 63, 65, 77, 78

*United States v. Bornstein,*
    423 U.S. 303 (1976) ................................................................ 25

*United States v. Caremark,*
    634 F.3d 808 (5th Cir. 2011) ................................... 64, 65, 67, 77

*United States v. Griswold,*
    24 F. 361 (D. Or. 1885) .......................................................... 26

*United States v. Hangar One, Inc.,*
    563 F.2d 1155 (5th Cir. 1977) ................................... 66, 67, 77

*United States v. Mackby,*
    261 F.3d 821 (9th Cir.2001) ................................................... 65

*United States v. Middle Ga. Family Rehab, LLC,* Civ. A.,
    No. 5:18-cv-378, 2022 WL 2127831 (M.D. Ga. 2022) ............... 97

*United States v. Omnicare, Inc.,*
    No. 1:15-CV-4179 (CM), 2021 WL 1063784 (S.D.N.Y. Mar. 19, 2021) ............ 65, 78

*United States v. Ridglea State Bank,*
    357 F.2d 495 (5th Cir. 1966) .................................................. 67

*United States v. Rogan,*
    517 F.3d 49 (7th Cir. 2008) .................................................... 93

*United States v. Rogan,*
    No. 02 C 3310, 2006 WL 8427270 (N.D. Ill. Oct. 2, 2006)....................... 41

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
    136 S. Ct. 1989 (2016) ............................................... 55, 56, 57

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens,*
    529 U.S. 765 (2000) .......................................................... 27, 94

*Walmart, Inc. v. United States Dep't of Justice,*
    517 F. Supp. 3d 637 .............................................................. 97

*Williams v. Hosp. Serv. Dist. of W. Feliciana Par., Louisiana,*
    250 F. Supp. 3d 90 (M.D. La. 2017) ........................................ 88

*Winsness v. Yocom,*
    433 F.3d 727 (10th Cir. 2006) .......................................... 49, 50

*Yates v. Pinellas Hematology & Oncology,*
  21 F.4th 1288 (11th Cir. 2021) ............................................................ 91, 92, 93, 94

**Statutes and Constitutional Provisions**

Social Security Act § 1900, 42 U.S.C. § 1396 ............................................. 30
Social Security Act § 1902, 42 U.S.C. § 1396a ........................................... 34
Social Security Act § 1128B(a)(3), 42 U.S.C. § 1320a-7b ........................ 43
15 U.S.C. § 15(a) .......................................................................................... 93
18 U.S.C. § 1347 ........................................................................................... 32
18 U.S.C. § 1964(c) ...................................................................................... 93
28 U.S.C. § 2461 ..................................................................................... 31, 97
31 U.S.C. § 3729(b)(3) ................................................................................. 34
31 U.S.C. § 3729(a)(1) ..................................................................... 27, 96, 97
31 U.S.C. § 3729(a)(1)(A) ............................................................................ 54
31 U.S.C. § 3729(a)(1)(C) ............................................................................ 87
31 U.S.C. § 3729(a)(1)(G) ............................................................................ 33
31 U.S.C. § 3729(a)(7) .................................................................................. 64
31 U.S.C. § 3729(b)(1)(A) ............................................................................ 40
31 U.S.C. § 3729(b)(1)(B) ............................................................................ 40
31 U.S.C. § 3729 ............................................................................................. 1
35 U.S.C. § 284 ............................................................................................. 93
42 U.S.C. § 7, Subch. XIX .............................................................................. 1
42 U.S.C. § 289g-1(b)(2)(A)(ii) .................................................................... 17
42 U.S.C. § 289g-1(b)(2)(C)(i) ...................................................................... 18
42 U.S.C. § 1320a-7k(d)(4)(B) ...................................................... 34, 35, 37, 40
42 U.S.C. § 1396a ............................................................................................ 2
42 U.S.C. § 1396a(a)(61) ................................................................................ 4
42 U.S.C. § 1396h(a), (b)(2), (b)(4) ............................................................ 28
42 U.S.C. § 3729(a) ...................................................................................... 27
La. R.S. § 6:437.14(A)(1), (12) ...................................................................... 7
La. R.S. § 46:437.11 ....................................................................................... 7
La. R.S. § 46:437.11(A) ........................................................................... 39, 40
La. R.S. § 46:437.11(B) ................................................................................... 6
La. R.S. § 46:437.2(A) .................................................................................. 29
La. R.S. § 46:437.3 ................................................................................... 41, 47
La. R.S. § 46:437.3(16) ................................................................................. 34
La. R.S. § 46:438.3 ........................................................................................ 64
La. R.S. § 46:438.3(A) .............................................................................. 54, 62
La. R.S. § 46:438.3(C) .............................................................................. 33, 36
La. R.S. § 46:438.6 ........................................................................................ 93
La. R.S. § 437.11(A), (B) ................................................................................ 6
La. R.S. § 46:437.1 .................................................................................... 1, 29
Tex. Bus. & Comm. Code § 17.50(b) ........................................................... 93
Tex. Hum. Res. Code § 36.001(7-a) ....................................................... 34, 64
Tex. Hum. Res. Code § 36.002(3) .......................................................... 58, 64

Tex. Hum. Res. Code § 36.002(9) ............................................................. 87
Tex. Hum. Res. Code § 36.002(12) ..................................................... passim
Tex. Hum. Res. Code § 36.011(a) .............................................................. 41
Tex. Hum. Res. Code § 36.052(a)(3)(A) ..................................................... 97
Tex. Hum. Res. Code § 36.052(a)(3)(B) ..................................................... 96
Tex. Hum. Res. Code § 36.052(a)(4) ........................................................... 96
Tex. Hum. Res. Code § 36.101(a) .............................................................. 28
Tex. Hum. Res. Code §§ 36.001 ........................................................... 1, 28
Tex. Hum. Res. Code §§ 36.002(2), (4) ............................................... 54, 55
Tex. Hum. Res. Code §§ 36.052(a), 36.007 ................................................ 29
Tex. Hum. Res Code § 36.0011(a) ............................................................. 46
Tex. Penal Code § 37.08 ........................................................................... 17
Tex. Penal Code § 48.02(b) ...................................................................... 18
U.S. Const. amend. VIII ............................................................................ 90

**Regulations**

1 Tex. Admin. Code § 371.1(55) .......................................................... 35, 37
1 Tex. Admin. Code § 371.1605(b)(1) ......................................................... 3
1 Tex. Admin. Code § 371.1655(4) ................................................. 35, 36, 38
1 Tex. Admin. Code § 371.1703(c)(6)-(8) .............................................. passim
1 Tex. Admin. Code § 371.1705(e)(5) ........................................................ 36
1 Tex. Admin. Code § 371.1617(a)(1), 371.1703(g)(8) ............................... 37
1 Tex. Admin. Code § 371.1703(g)(8) ........................................................ 37
1 Tex. Admin. Code § 371.1661 ................................................................. 17
1 Tex. Admin. Code § 371.1655(24) ........................................................... 17
1 Tex. Admin. Code § 1320a-7k(d)(2) ........................................................ 35
28 C.F.R. § 85 .......................................................................................... 96
28 C.F.R. § 85.5 ....................................................................................... 97
28 C.F.R. § 85.3(a)(9) ............................................................................... 27
45 C.F.R. § 46.204(i) ................................................................................ 17
50 La. Admin. Code Pt I, § 4115(D) ................................................. 39, 40, 52
50 La. Admin. Code Pt I, § 4147 ........................................................ 50, 59, 60
50 La. Admin. Code Pt I, § 4169(A) ............................................................ 46

**Rules**

Fed. R. Civ. P. 56 ..................................................................................... 32
Fed. R. Civ. P. 56(a) ................................................................................. 32
Fed. R. Civ. P. 56(c)(1)(A)-(B) .................................................................. 32

**Other Authorities**

87 Fed. Reg. 27513 (May 9, 2022) ............................................................. 94
S. Rep. No. 99-345 (1986) ......................................................................... 41

Douglas Laycock, *Federal Interference with State Prosecutions: The Need for Prospective Relief,*
1977 Sup. Ct. Rev. 193 (1977) ................................................................ 52

Joel Hesch, *Understanding the Revised Reverse False Claims Provision and Why No Proof of a False Claim is Required,*
53 UIC J. Marshall L. Rev. 461 (2021) ................................................... 43

## INTRODUCTION

Relator Alex Doe moves for partial summary judgment against defendants Planned Parenthood Federation of America, Inc. ("PPFA"), Planned Parenthood Gulf Coast, Inc. ("PPGC"), Planned Parenthood of Greater Texas, Inc. ("PPGT"), and Planned Parenthood South Texas, Inc. ("PPST") (collectively, "Planned Parenthood"), on claims that Planned Parenthood violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (FCA), the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001 *et seq.* (TMFPA), and the Louisiana Medical Assistance Programs Integrity Law, La. R.S. §§ 46:437.1 *et seq.* (LMAPIL). The State of Texas moves for summary judgment on its claim that Planned Parenthood violated the reverse-false claim provision of the TMFPA, Tex. Hum. Res. Code § 36.002(12). There is no genuine dispute that Planned Parenthood submitted claims and received payments of millions of dollars of state and federal Medicaid funds after Planned Parenthood was disqualified and terminated from the Texas and Louisiana Medicaid programs. And there is no genuine dispute that Planned Parenthood failed to repay those Medicaid funds after it should have known the funds constituted an overpayment under federal and state law. Defendants are thus liable under the FCA, the TMFPA, and LMAPIL.

## STATEMENT OF UNDISPUTED FACTS

### I.   Factual Background

#### A. The Medicaid Program

Congress enacted the Medicaid Act in 1965 to expand access to health care for low-income individuals and families. *See* 42 U.S.C. Ch. 7, Subch. XIX; *Harris v. McRae*, 448 U.S. 297, 301 (1980). The Act creates a federal-state partnership for the

1

delivery of medical services. *Harris*, 448 U.S. at 301. Under that partnership, the individual States develop a "State plan for medical assistance." 42 U.S.C. § 1396a. Each state thus administers its own version of a Medicaid program and designs its own benefit structure that the federal government must approve, which it does through the Centers for Medicare and Medicaid Services (CMS). *See generally* 42 U.S.C. § 1396a. States are given "broad discretion . . . to determin[e] the extent of medical assistance." *Beal v. Doe*, 432 U.S. 438, 444 (1977). A requirement of a state's participation in Medicaid is that it implements appropriate measures to curb fraud, waste, and abuse in the program. *See id.* The federal government, in turn, makes payments to states to pay for half or more of their costs in furnishing services to recipients. *Id.* Texas and Louisiana, like every other state, have chosen to participate in the Medicaid program.

### 1. Texas Medicaid

In Texas, funding for Medicaid represents roughly twenty-five percent (25%) of the State's annual budget. Appx. 1-6 (Zalkovsky Decl. ¶4). The Texas Medicaid program is the third largest in the country with an annual budget of approximately $30 billion. Appx.1-6 (Zalkovsky Dec. ¶4). More than 4 million Texans are enrolled in the program. Appx.1-6 (Zalkovsky Dec. ¶4). Texas has a robust Medicaid network covering 4.3 million beneficiaries. ROA.4510, *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, No. 17-50282 (5th

Cir. filed Apr. 4, 2017).[1] Texas Medicaid recipients have access to 141,000 providers, including 29,000 primary care physicians and over 3,300 obstetrician/gynecologists. ROA.4511, 4515. To provide the required Medicaid services, Texas enters into provider agreements with physicians and facilities whereby those providers treat Medicaid patients in exchange for reimbursement from the State. All Texas Medicaid providers are required to execute a standard Medicaid provider agreement, which states that providers must comply with all requirements in the State's provider manual plus state and federal Medicaid rules. ROA.6553.

Texas Medicaid providers are required to be knowledgeable of and to comply with all state and federal Medicaid laws, rules, and regulations. 1 Tex. Admin. Code § 371.1605(b)(1); *see also* Appx.1-6 (Zalkovsky Decl. ¶ 12-13). Texas Medicaid rules require providers to be knowledgeable regarding the HHSC Medicaid Provider Agreement and the portions of the Texas Medicaid Provider Procedure Manual (TMPPM) applicable to the services being provided as well as portions applicable to all providers regardless of the services being provided. 1 Tex. Admin. Code § 371.1605(b)(2), (3); Appx. 1895-1950 (Lambrecht (PPGT) Depo. 31:9–12); Appx. 1309-1429 (Barraza (PPST, PPSA, and PPCC) Depo. 29:7–24). Consistent with federal law, and to ensure the safety of its Medicaid recipients, Texas law imposes rigorous standards and requirements on Medicaid providers. All Medicaid providers must adhere to accepted medical and ethical standards. *See* ROA.6273 (a provider

---

[1] All cites herein to "ROA" are to the record on appeal in *Kauffman*. The entire ROA was produced as REL_000004-REL_008885.

violates Texas Medicaid rules when it fails to provide healthcare services to Medicaid clients in accordance with "accepted medical community standards"). Providers who fail to do so are unqualified to participate in the Texas Medicaid program. *See* ROA.6555 (providers may be terminated for failure to comply with the provisions of the provider agreement or any applicable Medicaid rules, or "any circumstances indicating that the health or safety of clients is or may be at risk"). Providers must further ensure that all their employees and agents comply with these requirements. ROA.6553.

The Texas Health and Human Services Commission (HHSC) administers the state Medicaid plan. The HHSC Office of the Inspector General (OIG) is charged with maintaining program integrity and "operat[ing] a Medicaid fraud and abuse control unit." 42 U.S.C. § 1396a(a)(61); *see also* ROA.4314-15 (describing OIG role). To combat fraud and waste, state law authorizes OIG to take enforcement actions against a Texas Medicaid provider or terminate a provider's agreement when OIG establishes "by prima facie evidence" that a provider has committed a "program violation"; is "affiliated" with a provider that commits a program violation; or commits "an act for which sanctions, damages, penalties, or liability could be assessed by the OIG." 1 Tex. Admin. Code § 371.1703(c)(6)-(8). OIG may impose such sanctions, including termination of provider agreements, when the provider "fails to provide an item or service to a recipient in accordance with accepted medical community standards or standards required by statute, regulation, or contract, including statutes and standards that govern occupations." *Id.* § 371.1659(2). Texas law also

permits the termination of affiliates of terminated entities. 1 Tex. Admin. Code §§ 371.1703(c)(7), 1605(a) (providers responsible for own actions plus actions of "affiliates, employees, contractors, vendors, and agents")).

### 2. Louisiana Medicaid

Louisiana spends almost $13 billion on Medicaid annually.[2] Louisiana has a much smaller population than Texas[3] but has expanded Medicaid. Louisiana's Medicaid program currently covers nearly 1.9 million recipients[4] and encompasses 27,229 fee-for-service providers[5] serving approximately 8% of enrollees,[6] but most Louisiana Medicaid services are provided through managed care organizations, which includes 58,836 providers.[7] The Louisiana Department of Health (LDH) (formerly the Louisiana Department of Health and Hospitals (LDHH)) administers Louisiana's Medicaid Program and its Program Integrity Section is charged with assuring the programmatic and fiscal integrity of the program. The Louisiana Medical Assistance Program Integrity Law (LMAPIL) as well as state regulations govern the program.

---

[2] La. Dep't of Health, "Louisiana Medicaid 2020 Annual Report" 15, *available at* https://ldh.la.gov/assets/medicaid/AnnualReports/MedicaidAnnualReport2020.pdf.

[3] According to the U.S. Census Bureau, Louisiana has approximately 4.6 million residents and Texas has approximately 30 million residents. *See* U.S. Census Bureau, "Quick Facts: Louisiana," https://www.census.gov/quickfacts/LA; U.S. Census Bureau, "Quick Facts: Texas," https://www.census.gov/quickfacts/fact/table/TX/PST045222.

[4] *Id.* at 9.

[5] *Id.* at 52.

[6] *Id.* at 38.

[7] *Id.* at 47.

In accordance with federal law, Louisiana also requires participating Medicaid providers to adhere to strict standards. Each provider must complete an Enrollment Packet and Provider Agreement. Appx.2254-2334; 2439-2570; 2571. Louisiana provider agreements "require the health care provider to comply fully with all federal and state laws and rules pertaining to the medical assistance programs, to licensure, if required, and the practice of medicine." La. R.S. § 46:437.11(B). "Each provider agreement shall be a voluntary contract between the department and the health care provider in which the health care provider agrees to comply with federal and state laws and rules pertaining to the medical assistance programs when furnishing goods, services, or supplies to a recipient and the department agrees to pay a sum, determined by fee schedule, payment methodology, or other method, for the goods, services, or supplies provided to the recipient." *Id.* § 46:437.11(C).

Once a provider is enrolled, they are warned that they "are responsible for obtaining and using the Provider Manual of Policy and Procedures for your program and the General Information and Administration Provider Manual (Chapter One of the Medicaid Services Manual) from the Louisiana Medicaid Website." Appx.2571; 2439-2441. Louisiana also instructs providers that "[p]rovider participation in the Medicaid Program is voluntary. When enrolled in the Medicaid Program, a provider agrees to abide by all applicable state and federal laws and regulations and policies established by the [CMS] and [LDHH]." *Id.*; *see also* La. R.S. § 437.11(A), (B). Providers "are responsible for knowing the terms of the provider agreement, program standards, statutes, and penalties for violations," and the "providers' signature on

the . . . Provider Agreement serves as an agreement to abide by all policies and regulations." Appx.2344. Providers must provide services in accordance with the "appropriate standard of care." Appx.2345. LDHH may deny or revoke enrollment as a provider if the provider "fails to meet any condition of enrollment" or for "misrepresentation," among other things. La. R.S. § 6:437.14(A)(1), (12). The Department may also "terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding." La. R.S. § 46:437.11.

### B. Defendants

### 1. Planned Parenthood Federation of America

Planned Parenthood Federation of America (PPFA) is a nonprofit corporation with nearly $400 million in annual revenue and $500 million in assets. Appx.4026; 4027. PPFA refers to itself as "Planned Parenthood" and purports to be "the nation's leading women's health care provider and advocate and a trusted, nonprofit source of primary and preventive care for women, men, and young people in communities across the United States."[8] According to PPFA, "[e]ach year, Planned Parenthood's hundreds of health centers provide affordable birth control, lifesaving cancer screenings, testing and treatment for sexually transmitted infections (STIs), and other essential care to 2.4 million patients."[9] Also according to PPFA, "[n]ationally,

---

[8] *See* Comment on FR Doc # 2020-23888, Comment ID HHS-OS-2020-0012-0138, *available at* https://www.regulations.gov/comment/HHS-OS-2020-0012-0138.
[9] *Id.*

nearly half of Planned Parenthood patients utilize the Medicaid program to access family planning services and other essential primary and preventive health care."[10] "Planned Parenthood's health centers also provide abortion."[11]

PPFA's health centers are operated by its 49 Affiliates. Appx.1645–46 (Custer (PPFA) Depo. 29:7–30:2). PPFA closely governs the operations of its Affiliates through its rigorous accreditation process, which Affiliates must satisfy to maintain their standing within the Federation and use the valuable "Planned Parenthood" name and mark. *See generally* Appx.2727-4021. The accreditation process involves a detailed review by a PPFA committee that evaluates the Affiliate based on numerous factors: board operations, financial health, diversity, equity, and inclusion, human resources, clinical services, informed consent, minors, medical records, regulatory clinical compliance, life safety and security, research, information technology, mission compliance, public affairs, ancillary organizations, development, and education. *Id.* If Affiliates fail to meet PPFA's standards, they are required to undertake corrective actions or risk losing their status as a Planned Parenthood entity. Appx.2728. The PPFA brand is extremely valuable, and it is unlikely that any of the affiliates would be able to stay in business if they did not have access to the PPFA brand or PPFA resources. Appx.1957 (Lambrecht Depo. 25:8-9).

PPFA also has a large Healthcare Division which assists Affiliates with respect to their clinical operations. Appx. 1638-1703 (Custer (PPFA) Depo. 179:24-182:1).

---

[10] Comment on FR Doc # 2020-23888, *supra* n. 8.
[11] *Id.*

The Division has approximately 70 employees. Appx. 1683 (Custer Depo. 181:4-11). The Health Services Division includes physicians who develop and maintain PPFA's Medical Standards and Guidelines, a detailed set of rules each affiliate must follow as they provide medical services to patients. Appx.4875; Appx.1689 (Custer Depo. 203:8-17); Appx.1698 (Custer Depo. 238:16-25-239:14); Appx.2052 (Linton Depo. 123:6-20); Appx.1387 (Barraza Depo. 306:8-19); Appx. 4943-4976. Affiliates' compliance with the Medical Standards and Guidelines is one of the elements of performance affiliates are evaluated on during PPFA's accreditation review. Appx.2754, 2755, 2766, 2774, 2798, 2815, 2825, 2849, 2866, 2876. PPFA also employs physicians that run PPFA's Research Department, which approves research funded by PPFA or that takes place at any PPFA Affiliates. Appx.4875-4876.

The Healthcare Division also has a Business Operations Team which assists Affiliates with their revenue cycle, among other things, which includes Medicaid billing. Appx.1542 (Coluccio Depo. 12:6-21); Appx.4869; see also, e.g., Appx.4977-5009; Appx.5037-5055; Appx.4391-4570.

PPFA also gives a significant amount of money to the Affiliates each year, and the Affiliates in turn pay dues, or "National Program Support," which is determined according to the Affiliates' operating expenses and is required to maintain membership in the Federation and use of the Planned Parenthood name. Appx.1684 (Custer Depo. 183:1-7); Appx.1436 (Barrow-Klein Depo. 24:13-18); Appx.5067-5068; Appx.2749. If an Affiliate has a larger operation and provides more services, it pays more to PPFA. *Id.* PPFA provides a significant number of services and benefits to the

Affiliates, such as consulting services, security, webinars, IT services, collaborative fundraising, website hosting on Planned Parenthood Online (PPOL), national conferences, communications assistance, crisis management, media, state and federal policy advocacy, technical assistance, financial consulting, legal support, education and training, marketing, and many other services. Appx.4863-4878; Appx.1701-1702 (Custer Depo. 252:8-254:10; 255:8-15). PPFA gave over $250 million dollars to the Affiliates in grants and awards over the past two years. Appx.4027; Appx.4041. There are thousands of financial transactions between the Affiliates and PPFA each year. See e.g., Appx.4572-4821. PPFA also shares revenue with the Affiliates through fundraising. Appx.2012 (Lambrecht 244:21-245:7); Appx.4141-4142; Appx.1685-1686 (Custer Depo. 188:6-10; 191:5-16).

To be a PPFA Affiliate, Affiliates must also be insured by Affiliate Risk Management Services (ARMS), a company that only insures PPFA entities and affiliates. Appx.2749; Appx.5214-5219. ARMS' sole member, Policyholders' Trust, is a PPFA-related company and is controlled by PPFA Affiliate CEOs and PPFA directors "to ensure that the organization will always support" PPFA and the PPFA Affiliates. *Id.*; Appx.5212-5219.

### 2. PPFA Affiliate Defendants

PPFA has three Affiliates that operate medical clinics in Texas and Louisiana. Defendant Planned Parenthood Gulf Coast (PPGC) operates in both states. Dkt. 81 at 12. It maintains administrative offices in Houston, and provides medical services in Houston, Spring, and Stafford, Texas. *Id.* at 13. PPGC also provides medical

services in New Orleans and Baton Rouge, Louisiana. *Id.* PPGC also operated Planned Parenthood Center for Choice (PPCFC), which provided abortions inside PPGC's Houston facility. Appx.2050 (Linton Depo. 115:7-116:25). Defendant Planned Parenthood of Greater Texas (PPGT) operates health centers in Texas. *Id.* at 14. It maintains administrative offices in Austin, Dallas, Waco, Fort Worth, and Lubbock, and provides medical services in Addison, Arlington, Austin, Bedford, Cedar Hill, Dallas, Denton, El Paso, Lubbock, Fort Worth, Mesquite, Paris, Plano, Tyler, and Waco, Texas. *Id.* at 14-15. PPGT also operated Planned Parenthood of Greater Texas Surgical Health Services (PPGTSHS), which provided abortions in PPGT's facilities. Defendant Planned Parenthood of South Texas, Inc. (PPST) operates health centers in Texas. *Id.* at 15-16. PPST is the parent corporation of Defendants Planned Parenthood of Cameron County (PPCC) and Planned Parenthood of San Antonio (PPST), as well as Planned Parenthood South Texas Surgical Center. *Id.* PPST maintains administrative offices in San Antonio and provides medical services in Harlingen, San Antonio, and Brownsville, Texas. *Id.* at 19.

The PPFA Affiliate Defendants are all Planned Parenthood entities and members of PPFA, so they are all required to go through PPFA's accreditation process in order to retain those privileges. Appx.2727-4021. The Affiliate Defendants' CEOs and other officers have served on PPFA's Board of Directors and on other boards, commissions, working groups, and committees of PPFA. Appx.5145-5146; Appx.5147-5149. Every Planned Parenthood Affiliate CEO is part of the Affiliate Chief Executive Council (ACEC), a corporation whose 49 members are the PPFA Affiliate CEOs.

11

Appx.1480 (Barrow-Klein Depo. 200:6-201:12). That corporation is the sole shareholder of another corporation called 416 Holdings, Inc. Appx.1480 (Barrow-Klein Depo. 198:2-200:5). In turn, 416 Holdings owns two subsidiary corporations: Afaxys, a generic contraception manufacturer and group purchasing organization, and Kaleido, a telehealth technology company. *Id.*; Appx.1482 (Barrow-Klein Depo. 208:8-22). Kaleido was developed by PPFA and given to 415 Holdings. *Id.* The PPFA Affiliates prescribe and distribute Afaxys drugs to its patients. *Id.*

The three PPFA Affiliate Defendants also share an ancillary political organization, Planned Parenthood Texas Votes. Appx.1999 (Lambrecht Depo. 190:6-191:9, 15-19). PPTV must be accredited by PPFA. Appx.4014-4015. The PPFA Affiliates also work together to provide telehealth services to their patients, with PPGT providing telehealth services to PPGC and PPST's patients.

### C. The PPFA Affiliate Defendants' Enrollment as Medicaid Providers

PPGC, PPGT, and PPST were all enrolled as providers in Texas Medicaid. Appx.3 (Zalkovsky Decl., ¶ 11); Appx.1902 (30(b)(6) Deposition of K. Lambrecht (PPGT)) at 26:3–29:8, Appx.1580-1581 (30(b)(6) Deposition of A. Curtis (PPGC)) at 32:7–35:15. Collectively, the PPFA Affiliate Defendants served only 0.3% of all Texas Medicaid patients. ROA.4518. PPGC is also enrolled as a provider in Louisiana

Medicaid. Appx.2439-2585. It serves less than 0.4% of Louisiana's Medicaid population annually. [12]

### 1. Relator's investigation

Between 2013 and 2015, Relator and others participated in an undercover investigation of Planned Parenthood entities related to their involvement in the fetal tissue procurement industry. Appx.1097-1099. During that investigation, Relator met with various PPFA officials who discussed the possibility of working with tissue procurement companies to provide fetal cadavers from abortions for research. *Id.* These officials verified Planned Parenthood's ability to provide intact or mostly intact fetuses through changing the way abortion procedures were performed and expressed a desire for monetary compensation for those fetuses. *Id.* Relator also met with PPGC officials who expressed similar willingness to provide fetal cadavers and modify procedures to obtain more intact specimens, claimed that they had done so in the past, and took Relator to their laboratory to show Relator fetal body parts from a recent second-trimester abortion in a Pyrex dish to demonstrate the kinds of specimens they could provide. *Id.* PPGC officials also stated that they previously had a researcher who would obtain tissue samples for her research from abortions she performed, which is a violation of federal law if not disclosed and consented to by the patient. *Id.* PPGC officials also stated that their ability to obtain more intact fetal

---

[12]   *See* Planned Parenthood Gulf Coast, "Louisiana Impact Report," *available at* https://www.plannedparenthood.org/uploads/filer_public/f1/77/f177c890-5432-418e-81dd-43b867dd53 eb/2018_louisiana_impact_report.pdf (62% of annual visits covered by Medicaid, 13,185 unduplicated patients served in 2017-2018). Louisiana's Medicaid program has nearly 1.9 million people enrolled. *See* n. 1 & 2 *supra.*

specimens depended in part on the pain tolerance of the patient and laughed about whether obtaining intact specimens would violate the federal and state partial-birth abortion bans, which they said they could get around by saying they didn't intend for it to happen.[13] *Id.*

Relator and other investigators wore a hidden camera and captured all these candid conversations on video. *Id.* The PPGC video was over eight hours in length. *Id.* Relator provided the footage and other information to law enforcement officials, believing that it demonstrated unlawful conduct. *Id.* Relator provided the PPGC video and other information to Texas in late May or early June 2015, and this information was shared with Louisiana by Texas. *Id.* Both States opened investigations of Planned Parenthood. The Department of Justice and the U.S. Congress also opened investigations into Planned Parenthood's activities. Relator began publicly releasing this footage in July 2015. *Id.* Before filing this lawsuit, Relator disclosed material facts and evidence related to the claims asserted to the Attorney General of the United States, the Acting United States Attorney for the Northern District of Texas, and the Attorneys General of Texas and Louisiana. *Id.*

### 2.  PPGC's termination from Louisiana Medicaid

Louisiana opened an investigation of PPGC in 2015. Appx.2671-2683; Appx.2684-2695. On September 15, 2015, the Louisiana Department of Health and

---

[13] The federal and state partial-birth abortion bans prohibit the delivery of a live fetus past a certain anatomical mark. 18 U.S.C. § 1531; Tex. Health & Safety Code § 171.102; La. R.S. § 14:32.11. If no drugs are used to cause the death of the fetus before the abortion procedure is performed, a second-trimester fetus delivered mostly intact would likely be alive.

Hospitals sent letters to PPGC informing it of the State's intent to terminate or revoke PPGC's Medicaid provider agreements. Appx.2684-2695. The letter listed several reasons for the termination: (1) Failing to inform LDHH, as required by state law, of PPGC's settlement of a False Claims Act case with the Department of Justice in 2013 for $4.3 million, of PPGC's involvement as a defendant in other False Claims Act cases, and of other PPFA Affiliates' involvement as defendants in False Claims Act cases; (2) PPGC's misrepresentations to LDHH during Louisiana's investigation, which were contradicted by Relator's video evidence; and (3) The pending investigations of PPGC by Louisiana, though Louisiana elected not to pursue immediate termination on this basis. *Id.* The letter notes that PPGC was entitled to administrative review of the decision, which would be suspensive, and as part of that process, PPGC could first request an Informal Hearing within 15 calendar days and present documents/evidence and inquire further as to the basis of the termination. *Id.* If the outcome of the Informal Hearing was not satisfactory to PPGC, PPGC could request an Administrative Appeal within 30 days, which would also be suspensive. *Id.*

PPGC chose not to exercise their right to contest the State's letter and did not request a hearing within the timeframe specified by the letter and state law. Appx.2069 (Linton Depo. 190:1-191:2). PPGC and PPFA instead chose to file suit in Louisiana federal court, with PPFA representing PPGC and several of PPGC's purported patients. Complaint, *Planned Parenthood Gulf Coast, Inc., v. Kliebert*, No. 3:15-cv-00565 (M.D. La. Aug. 25, 2015), Dkt. 1 at 16. PPGC's *patients*, through PPFA,

obtained a preliminary injunction that did not impact the State's decision that PPGC's actions violated state law; rather, it temporarily prevented the State from giving effect to PPGC's termination, which became final by operation of state law 30 days from PPGC's receipt of the letter, on or around October 15, 2015. *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 636 (M.D. La. 2015); *see also* 50 La. Admin. Code Pt I, §§ 4203, 4211, Appx.2684-2695. PPGC continued to file claims for reimbursement with Louisiana Medicaid, and the State was forced to continue paying those claims due to the preliminary ruling of the federal district court. Appx.1211-1308; *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 653 (M.D. La. 2015).

### 3.  The Affiliate Defendants' termination from Texas Medicaid

Meanwhile, Texas began its own investigation of Planned Parenthood. Based on an initial assessment of the video and other information, the Texas Office of Inspector General determined that Planned Parenthood did not comply with Texas Medicaid requirements. Accordingly, OIG sent a preliminary Notice of Termination to the Affiliate Defendants on October 19, 2015 that began the process of terminating their Medicaid provider agreements. ROA.1202-06, 1239-43, 1310-14. That letter notified the Affiliate Defendants that they could (1) request an informal resolution meeting to address the initial findings in the Notice, and/or (2) submit evidence and argument to OIG regarding whether the Notice was warranted. ROA.1205-06, 1242-43, 1313-14. Affiliate Defendants did neither. Affiliate Defendants and PPFA instead chose to file a lawsuit on November 23, 2015 on behalf of Affiliate Defendants and

16

ten of their anonymous patients in federal court challenging the preliminary notice under the qualified-provider provision. ROA.31-59. Those proceedings were stayed pending the conclusion of the termination process. ROA.777-81. PPGC never notified LDHH of the termination letter it received from Texas, nor did PPGC ever notify HHSC of the termination letter it received from Louisiana.

During this process, the Texas Inspector General conducted an audit investigation of the Defendant Affiliates. He watched the entire unedited video several times, in addition to reviewing a transcript of the video the same number of times. ROA.4328, 4356. The Inspector General also consulted with OIG's Chief Medical Officer, who also reviewed the unedited video footage and informed the Inspector General that in his opinion, the video demonstrated that PPGC violated accepted medical and ethical standards. ROA.4326. Meanwhile, the U.S. House of Representatives and U.S. Senate both investigated Planned Parenthood. *See* Majority Staff Report of S. Comm. on Judiciary, 114th Cong., Human Fetal Tissue Research: Context and Controversy (Comm. Print 2016), https://perma.cc/F9MF-3ZBU; ROA.7328-7798 (U.S. House Select Investigative Panel report); ROA.8883. OIG received additional evidence attached to a referral letter from the U.S. House Select Investigative Panel. ROA.1210, 4341-42; ROA.8883-93. As in Louisiana, the Affiliate Defendants chose not to submit any evidence during the administrative process or engage in that process at all.

Shortly thereafter, on December 20, 2016, OIG sent the Affiliate Defendants a Final Notice of Termination of all provider agreements associated with them. Appx.

17

867-72. The Final Notice stated that the termination was based on statements in the video indicating that the Affiliate Defendants violated accepted medical and ethical standards in numerous ways. *Id.* The Final Notice explained that the termination was also based on a misrepresentation to Texas law-enforcement officials about PPGC's activity related to fetal-tissue procurement, as documented in the House Panel's referral letter. *Id.* (citing, *e.g.*, Tex. Penal Code § 37.08; 1 Tex. Admin. Code §§ 371.1661, 371.1655(24)).

The Final Notice stated that Affiliate Defendants had the option to ask for an administrative hearing to appeal the termination. *Id.* The Notices also stated that if no hearing was requested in writing within 15 days of receipt, the termination would become final and unappealable on the 30th day after receipt of the Notice. *Id.* Affiliate Defendants again chose not to request a hearing or exercise their state-law right to contest the State's findings in an administrative proceeding. PPGC never notified LDHH of the Final Notice of Termination it received from Texas.

As in Louisiana, the Affiliate Defendants' *patients*, through PPFA, then obtained a preliminary injunction. *See Planned Parenthood of Greater Tex. Family Planning & Preventative Health Services, Inc. v. Smith*, 236 F. Supp. 3d 974, 988 (W.D. Tex. 2017). That injunction that did not impact the State's decision that the Affiliate Defendants were disqualified from providing Medicaid services under state law, but instead temporarily prevented the State from giving effect to the termination of the Affiliate Defendants, which became final by operation of state law 30 days from receipt of the letter, on or around January 19, 2017 (but certainly no later than

18

February 1, 2017). 1 Tex. Admin. Code § 371.1703(g). Affiliate Defendants continued to file claims for reimbursement with Texas Medicaid, and the State was forced to continue paying those claims due to the preliminary ruling of the federal district court. Appx. 1100-1210 (Lochabay Decl.); *Smith*, 236 F. Supp. 3d at 988.

### 4. Litigation History

The Louisiana and Texas federal cases continued through the litigation process over the next several years, and the Affiliate Defendants continued billing Medicaid in both States during that time. *See* Appx.1211-1308. (Lochabay Decl.). The federal termination litigation culminated in a decision by the en banc United States Court of Appeals for the Fifth Circuit, which was issued on November 23, 2020. *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020). That decision expressly overruled the Louisiana case and vacated the preliminary injunction in the Texas case. *Id.* at 370. The Court held that the patients had no right of action to challenge the termination of the Affiliate Defendants. *Id.* at 353. The Affiliate Defendants continued to bill for Texas Medicaid services provided until the Court's mandate was issued two weeks later on December 15, 2020. PPGC did not stop billing Louisiana Medicaid, even after the mandate was issued.

### 5. Texas "Grace Period"

The day before the Fifth Circuit's mandate was issued, the Affiliate Defendants, in a letter drafted by PPFA, wrote to Texas HHSC requesting that Texas rescind the termination or grant a "grace period" of six months to allow Affiliate

19

Defendants' patients to find new providers in light of the COVID-19 pandemic. Appx.002038 (Linton Depo. 67:12–68:7); Appx.000802–07. PPGC did not make a similar request to LDH but continued to bill for Medicaid services in Louisiana. On January 4, 2021, HHSC sent a letter to the Affiliate Defendants allowing a 30-day "grace period" until February 3, 2021 for the explicit purpose of ensuring that existing Planned Parenthood patients can be transitioned to new providers. Appx.000809–11. Beyond referring patients who asked to the Medicaid provider finder on HHSC's website, the Affiliate Defendants made no effort to transition its Texas patients to new providers. Appx.001577–78 (Curtis Depo. 21:23–22:25); Appx.001985 (Lambrecht Depo. 134:10–23, 141:2–11); Appx.001427 (Barraza Depo. (PPGC, PPST, PPCC) 465:1–466:19. Instead, it encouraged patients to come in for services during the "grace period" so the Affiliate Defendants could bill for those services. Appx.001577–78 (Curtis Depo. 21:23–22:25); Appx.001985 (Lambrecht Depo. 134:10–23, 141:2–11); Appx.001427 (Barraza Depo. (PPGC, PPST, PPCC) 465:1–466:19).

The day before the "grace period" expired, Affiliate Defendants filed a lawsuit in Travis County District Court in Austin. The Affiliate Defendants argued that the "grace period" they asked Texas to give them somehow rescinded the termination notices and required Texas to re-terminate the Affiliates. A Texas trial judge issued a temporary restraining order enjoining the State from giving effect to the termination of the Affiliate Defendants until they had exhausted their administrative and appellate remedies. Appx. 814 (Goldstein Decl., ¶ 14). Nonetheless, Affiliate Defendants were aware that this relief would be brief yet continued to bill for

Medicaid services in Texas and did nothing to warn their patients they would need to find other providers soon. Appx.001577–78 (Curtis Depo. (PPGC) 21:23–24:21; 121:2–10); Appx.001985 (Lambrecht Depo 134:10–23). On March 10, 2021, the Texas judge denied the relief sought by the Affiliate Defendants, stating that there was no authority that a federal injunction stayed state administrative deadlines, and that the Affiliate Defendants "selected the federal courts as the forum to contest the merits of their claims, and they are now not able to revive their administrative remedies as the deadline to seek that relief has long since passed." Appx.001092. The Affiliate Defendants kept billing Texas Medicaid for services provided until March 12, 2021. Dkt. 81 at 3.

Meanwhile, PPFA, on behalf of the Affiliate Defendants, asked the Texas federal district court to stay their case after it was remanded so that they could file a petition for writ of certiorari at the Supreme Court. Once that deadline passed with no petition filed, PPFA voluntarily dismissed its case on May 13, 2021. CITE (Linton Depo Ex 26).

Affiliate Defendants admit that they never paid back the money they received under the Texas federal preliminary injunction, nor under the state temporary restraining order, even though both orders were vacated and the legal claims underlying them found to be without merit. Dkt. 81 at 9-10.

### 6. Continued Billing in Louisiana

PPGC never stopped billing Louisiana for Medicaid services, even though it failed numerous times to fulfill its obligation to inform Louisiana about being

terminated from participation in federal funding programs in other states. PPGC never notified Louisiana that it was terminated from Texas Medicaid as of December 15, 2020, as it knew and acknowledged by ceasing to bill Texas Medicaid on that date. Appx.002696–97. On December 23, 2020, thirty-one days after the Fifth Circuit's en banc ruling, PPGC sent a letter to LDH notifying it of that ruling and acknowledging its obligation to do so under 50 La. Admin. Code § 4147A(4). Appx.002696–97. The letter was sent by PPGC's General Counsel and Chief Compliance Officer. *Id*. But PPGC never informed LDH that the Fifth Circuit overruled the decision upholding the Louisiana preliminary injunction, therefore eliminating its legal basis, even though it knew that to be true. *Id*.; Appx.001627 (Curtis Depo. (PPGC) 219:15–220:15). Instead, the letter made it seem that the ruling's import was limited to the Texas termination. *Id*.

PPGC states that it is "not currently participating in the Texas Medicaid program" because of "a politically motivated notice of termination of PPGC's Texas Medicaid contracts arising from long-debunked videos made by opponents of abortion." *Id*. But PPGC did not inform LDH that seven Fifth Circuit judges disagreed with its claim that that the video was "debunked," nor that it admitted in court that it had no evidence to support such a claim. Appx.002696–97; s*ee Kauffman*, 981 F.3d at 379-83 (Elrod, J., concurring, joined by Jones, Smith, Willett, Ho, Duncan, and Engelhardt, JJ.) (nothing that video evidence "substantially supported the conclusion that Planned Parenthood had violated state and federal regulations concerning the safe, legal, and ethical furnishing of medical care."); *id*.at 380 n. 8 (noting that

Planned Parenthood "entered no evidence into the administrative record or the district court record indicating that this video was deceptively edited or otherwise unreliable. On appeal, [Planned Parenthood] d[id] not identify any evidence in the district court record showing that the videos are unreliable, and they admitted at oral argument that they provided no such evidence.")[14] The letter continues to dispute the factual basis for the Texas termination and claims that PPGC and its patients continue to "vigorously contest and challenge" this termination and that the termination is not "final." *Id*. It also claims that it is "unclear" whether Texas's termination is "in effect." *Id*. PPGC also did not notify LDH once it received HHSC's letter on January 4, 2021, which made clear that the termination was final as of December 15, 2020. Appx.00809–11.

On March 22, 2021, PPGC wrote again to LDH to "update its notice" of December 23. But it did not inform LDH of the Travis County District Court's ruling. *See* Appx. 2712. Instead, it only repeats verbatim the claims described above. *Id*. It also continued to claim that PPGC and its patients continue to "vigorously contest and challenge" this termination and that the termination is therefore not "final." *Id*. But PPGC admitted that it did nothing else to "vigorously contest and challenge" the Texas termination after the Travis County ruling. Appx.002712. PPGC never updated LDH after it dismissed its federal lawsuit in Texas. In fact, PPGC never sent any other update to LDH regarding its termination from Texas Medicaid. *Id*.

---

[14] Planned Parenthood now denies that it considers the video to be misleading, deceptive, or heavily edited. Dkt. 81 at 62.

Nor did PPFA, on behalf of PPGC, update the Louisiana federal district court with the Fifth Circuit's ruling. Instead, when Louisiana moved to vacate the preliminary injunction, which PPGC knew no longer had any valid legal basis, PPFA and PPGC opposed the request and urged the Court to keep the baseless injunction in place—and it did. Order, *Kliebert*, No. 3:15-cv-00565 (M.D. La. Apr. 7, 2021), Dkt. 121. The State later again requested the injunction to be lifted, and this time, on October 10, 2022, PPFA and PPGC simply noted that it did not oppose the request. Appx. 2726. On November 9, 2022, PPGC dismissed the Louisiana case, Notice of Voluntary Dismissal, *Kliebert*, No. 3:15-cv-00565 (M.D. La. Nov. 9, 2022), Dkt. 131, and on November 10, 2022, the Court vacated the preliminary injunction and dismissed the case, Order, *Id.* (M.D. La. Nov. 10, 2022), Dkt. 132.

PPGC admits that it has never returned any of the money it received under the preliminary injunction in Louisiana. Dkt. 81 at 9-10.

### D. Calculation of the amounts received by PPFA Affiliate Defendants from Texas and Louisiana Medicaid and the number of claims submitted.

Relator and Texas retained Donald E. Lochabay, Jr. as an expert in this case. Mr. Lochabay, based on data received from Texas and Louisiana Medicaid's third-party claims processors, calculated the number of claims submitted by the Affiliate Defendants in Texas and Louisiana. *See* Appx.1211-1308. (Lochabay Decl.) Mr. Lochabay determined that the Affiliate Defendants submitted 45,181 false claims to the Texas Medicaid program and 99,230 false claims to the Louisiana Medicaid program. Appx.001106 (Lochabay Decl. ¶23), Appx.001216 ((Lochabay Decl. ¶ 19). There was $8,962,162 in false claims submitted to the Texas Medicaid program and

$8,059,229 in false claims submitted to the Louisiana Medicaid program. Appx.001105 (Lochabay Decl. ¶22), Appx.001215 (Lochabay Decl. ¶ 18).

Defendants did not dispute Mr. Lochabay's calculations through May 2022. (Curtis Depo 210:21-212:12); *see also* Appx. 002121; 002143 (Depo. of Defendants' Expert Louis Rossiter, 122:5–123:21, Rossiter 210:19-211:20) (Defendants' expert acknowledging his replication and confirmation of Lochabay's calculations of payments under both fee-for-service and managed care using the same sets of Medicaid claims data used by Lochabay). Mr. Lochabay also noted that the Louisiana numbers (for both claims submitted and amount received) would have to be recalculated before trial because PPGC continued to bill Louisiana Medicaid after the dates of his reports.

## II.   Legal Framework

### A. The False Claims Act

The False Claims Act (FCA) "is the government's primary litigative tool for the recovery of losses sustained as the result of fraud against the government." *Avco Corp. v. U.S. Dep't of Justice,* 884 F.2d 621, 622 (D.C. Cir. 1989). The FCA, which was referred to as the "Abraham Lincoln Act," "was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War." *United States v. Bornstein*, 423 U.S. 303, 309 (1976); *U.S. ex rel. Longhi v. Lithium Power Technologies, Inc.*, 530 F. Supp. 2d 888, 891 (S.D. Tex. 2008). The original FCA imposed civil and criminal liability for several types of fraud on the government, subjecting violators to double damages, forfeiture, and up to five years' imprisonment. Act of Mar. 2, 1863, ch. 67, 12 Stat. 696. And "[s]ince its enactment during the Civil

25

War, the [FCA] has authorized both the Attorney General and private *qui tam* relators to recover from persons who make false or fraudulent claims for payment to the United States." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 (2010). The *qui tam* provision was important because Congress recognized the government's limited resources for combatting fraud. *See, e.g.*, *United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885). In 1986, Congress made substantial amendments to the FCA with the goal of making it a "more effective deterrent" and provided "better incentives for relators combined with harsher penalties for violators." *Longhi*, 530 F. Supp. 2d at 891. Since the 1986 amendments, settlements and judgments under the FCA now total more than $70 billion, with $5.6 billion in the 2021 fiscal year alone.[15] Health care fraud is the leading source of those settlements and judgments, and the vigorous pursuit of health care fraud not only restores funds to programs like Medicaid, but also "prevents billions more in losses by deterring others who might try to cheat the system for their own gain."[16]

A person or company violates the FCA if he or it:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

---

[15] U.S. Dep't of Justice, "Justice Department's False Claims Act Settlements and Judgments Exceed $5.6 Billion in Fiscal Year 2021," https://www.justice.gov/opa/pr/justice-department-s-false-claims-act-settlements-and-judgments-exceed-56-billion-fiscal-year.
[16] *Id.*

26

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1).

Congress also has increased the FCA's civil penalties so that liability is "essentially punitive in nature." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000). Defendants are subjected to treble damages plus minimum civil penalties of $12,537 per false claim. 42 U.S.C. § 3729(a); 28 C.F.R. § 85.3(a)(9) (adjusting penalties for inflation).

In light of the FCA's demonstrable benefits, many states, including Texas and Louisiana, have enacted their own false claims statutes that largely mirror the federal version, and in some instances, specifically target Medicaid/Medicare fraud. The federal government not only encourages but incentivizes states to do so: "[I]f a State has in effect a law relating to false or fraudulent claims" that is "at least as effective in rewarding and facilitating qui tam actions for false or fraudulent claims as" the FCA and "contains a civil penalty that is not less than the amount of the civil

27

penalty authorized" by the FCA, then the federal government will decrease the state's share of fiscal responsibility for its Medicaid program "by 10 percentage points." 42 U.S.C. § 1396h(a), (b)(2), (b)(4).

## B. The Texas Medicaid Fraud Prevention Act

Enacted in 1995, the Texas Medicaid Fraud Prevention Act (TMFPA) is a public welfare statute and "a powerful tool for targeting fraud against the Texas Medicaid program and securing the program's integrity." *In re Xerox Corp.*, 555 S.W.3d 518, 525 (Tex. 2018). Like the FCA, "[t]he TMFPA . . . imposes harsh administrative and financial sanctions to punish and, thereby, prevent Medicaid fraud." *Id.* at 526. Also like the FCA, the TMFPA allows for *qui tam* actions to be brought on behalf of the State. Tex. Hum. Res. Code § 36.101(a). After a *qui tam* action is filed, the State may intervene and conduct the action itself or decline, which allows the relator bringing the action to proceed. *Id.* § 36.104.

The TMFPA proscribes certain conduct—termed "unlawful acts." *See id.* § 36.002(1)-(13). Of relevance here, the TMFPA penalizes anyone who "[k]nowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases and obligation to pay or transmit money or property to this state under the Medicaid program." *Id.* § 36.002(12). Under the TMFPA, an "obligation" means "a duty, whether or not fixed, that arises from: (A) an express or implied contractual, grantor-grantee, or licensor-licensee relationship; (B) a fee-based or similar relationship; (C) a statute or regulation; or (D) the retention of any overpayment." *Id.* § 36.001.

Proof of one or more unlawful acts entitles Texas to recover civil remedies, which include:

- The amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party;

- Two times the amount of the payment or the value of the benefit;

- Interest on the amount of the payment or the value of the benefit;

- A civil penalty of not less than $5,000 and not more than $10,000;[17] and

- Fees, expenses, and costs reasonably incurred in obtaining civil remedies including court costs, reasonable attorney's fees, witness fees, and deposition fees.

Tex. Hum. Res. Code §§ 36.052(a), 36.007. The Texas Supreme Court has noted that the TMFPA's civil remedies are not "damages" but "penalties." *Xerox*, 555 S.W.3d at 534.

### C. The Louisiana Medical Assistance Program Integrity Law

The Louisiana Medical Assistance Program Integrity Law (LMAPIL), La. R.S. § 46:437.1 *et seq.*, was enacted in 1997 "to combat and prevent fraud and abuse committed by some health care providers participating in the medical assistance programs and by other persons and to negate the adverse effects such activities have on fiscal and programmatic integrity." La. R.S. § 46:437.2(A). LMAPIL, like the FCA and TMFPA, allows for *qui tam* actions to be filed by private individuals on behalf of

---

[17] This number must be adjusted for inflation. *See* Tex. Hum. Res. Code 36.052(a)(3)(B).

the State. *Id.* § 46:439.1(A). The Secretary or the Attorney General may intervene. *Id.* § 46:439.1(F); 46:439.2(B).

LMAPIL includes an array of fraud-related provisions, including ones modeled on the FCA. LMAPIL provides that:

A. No person shall knowingly present or cause to be presented a false or fraudulent claim.

B. No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

C. No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

D. No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

E. (1) No person shall knowingly submit a claim for goods, services, or supplies which were medically unnecessary or which were of substandard quality or quantity.

*Id.* § 46:438.3.

A claim is defined as including "any request or demand . . . made against medical assistance programs for payment." *Id.* § 46:437.3(6). A payment is defined as "the payment to a health care provider from medical assistance funds pursuant to a claim, or the attempt to seek payment for a claim." *Id.* § 46:437.3(18). "Medical assistance programs" refers to Medicaid, Title XIX of the Social Security Act, "and other programs operated by and funded in the department which provide payment to

health care providers." *Id.* § 46:437.3(14). If a person commits an act prohibited by section 46.438.3, the State may recover:

- Actual damages, or "the difference between what the medical assistance programs paid, or would have paid, and the amount that should have been paid had not a violation of this Part occurred plus interest at the maximum rate of legal interest provided by R.S. 13:4202 from the date the damage occurred to the date of repayment[,]" *id.* § 46:438.6(A);

- A civil fine, which is "an amount not to exceed three times the amount of actual damages sustained by the medical assistance programs as a result of the violation," *id.* § 46:438.6(B);

- A civil monetary penalty, "[n]ot less than five thousand five hundred dollars but not more than eleven thousand dollars for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act . . . interest on the amount of the civil fine imposed . . . at the maximum rate of legal interest . . . from the date the damage occurred to the date of repayment," and "adjusted according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. 2461." *id.* § 46:438.6(C);

- Costs, expenses, fees, and attorney fees, *id.* § 46:438.6(D).

Any recovery of "actual damages" or a "civil fine" under LMAPIL is considered "civil liquidated damages" and is "remedial, but not retroactive, in nature." *Id.* § 46.438.6(E).

## III.  **Procedural History**

Relator filed this action under seal on February 5, 2021, asserting claims under the FCA, the TMFPA, and LMAPIL on behalf of the United States, Texas, and Louisiana. Dkt. 1. On November 1, 2021, Texas notified the Court of its election to intervene in the suit. Dkt. 16. On November 3, 2021, the United States declined to intervene. Dkt. 18. On January 6, 2022, Texas filed its Complaint in Intervention. Dkt. 22. Texas intervened on one of Relator's claims under the TMFPA, the reverse

false claim under Tex. Hum. Res. Code § 36.002(12). Dkt. 22 at 15-17. Louisiana has neither elected nor declined to intervene. The Court unsealed the case on January 12, 2022. Dkt. 27. On February 14, 2022, Defendants filed motions to dismiss Relator's and Texas's complaints. Dkt. 48-51. Those motions were denied (except as to Relator's claim under 18 U.S.C. § 1347) on April 29, 2022. Dkt. 71. Trial is currently set for April 24, 2023. *See* Dkt. 346.

## STANDARD OF REVIEW

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate if the moving party demonstrates that "'there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 465 (5th Cir. 2009) (quoting Fed. R. Civ. P. 56). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986). The movant may establish the absence of a genuine dispute of material fact by citing to materials in the record, or by showing that the record materials do not establish a genuine dispute or that the adverse party cannot create one, Fed. R. Civ. P. 56(c)(1)(A)-(B), but the moving party need not prove all facts or "'negate the elements of the nonmovant's case.'" *Colony Nat'l Ins. Co. v. Specialty Trailer Leasing, Inc.*, 620 F. Supp. 2d 786, 789 (N.D. Tex. 2009) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

The nonmovant is entitled to reasonable inferences, but such inferences must be the sensible outgrowth of "specific facts," and cannot be based on "conclusory allegations, improbable inferences, and unsupported speculation." *Colony Nat'l*, 620 F. Supp. 2d at 788. If "the evidence [from the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted" for the moving party. *Anderson*, 477 U.S. at 248 (citations omitted).

## ARGUMENT

### I.    Defendants Are Liable Under the Reverse-False-Claims Provisions of the FCA, TMFPA, and LMAPIL.

The FCA imposes liability on any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The TMFPA makes it unlawful to "knowingly conceal[ ] or knowingly and improperly avoid[ ] or decrease[ ] an obligation to pay or transmit money or property to [the State of Texas] under the Medicaid program." Tex. Hum. Res. Code § 36.002(12). And the LMAPIL states, "[n]o person shall . . . knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs." La. R.S. § 46:438.3(C).

Here, the undisputed facts establish that the Affiliate Defendants directly received money they were not entitled to from Texas and Louisiana—by virtue of their termination from Medicaid in both States—under the preliminary injunctions issued by the federal district courts that were later vacated. As a matter of law, the Affiliate Defendants thus had an obligation to return that money to Texas and Louisiana within 60 days because it is an overpayment as defined by federal, Texas,

and Louisiana law. But the undisputed facts show that the Affiliate Defendants have *never* returned that money even though they knew, or should have known, that they had to return it. The Affiliate Defendants are thus liable for violating the reverse-false-claims provisions of the FCA, TMFPA, and LMAPIL. The undisputed facts also establish that Affiliate Defendants' conduct was directed and controlled by PPFA, and PPFA even received some of the overpayment. Thus, PPFA is also liable as a matter of law. Relator is entitled to summary judgment on Relator's reverse false claims under the FCA, TMFPA, and LMAPIL, and Texas is entitled to summary judgment under the TMFPA.

### A. Defendants avoided their "obligation" to repay money to the Government.

The FCA, TMFPA, and LMAPIL all define an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. 3729(b)(3); *see also* Tex. Hum. Res. Code § 36.001(7-a) (substantially similar); La. R.S. § 46:437.3(16) (substantially similar).

The federal Patient Protection and Affordable Care Act (ACA) defines an overpayment to include "[a]ny funds that a person receives or retains under subchapter XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such subchapter." 42 U.S.C. § 1320a-7k(d)(4)(B). Texas law defines "overpayment" as

> [t]he amount paid by Medicaid or other HHS program or the amount collected or received by a person by virtue of the provider's participation

34

in Medicaid or other HHS program that exceeds the amount to which the provider or person is entitled under §1902 of the Social Security Act or other state or federal statutes for a service or item furnished within the Medicaid or other HHS programs. This includes: (A) any funds collected or received in excess of the amount to which the provider is entitled, whether obtained through error, misunderstanding, abuse, misapplication, misuse, embezzlement, improper retention, or fraud.

1 Tex. Admin. Code § 371.1(55).

Under the ACA, an overpayment must be reported and returned within "60 days after the date on which the overpayment was identified" or "the date any corresponding cost report is due, if applicable." *Id.* § 1320a-7k(d)(2). "A failure to return an overpayment within 60 days constitutes a 'reverse false claim' actionable under the FCA." Dkt. 71 at 7 (citing *id.* § 1320a-7k(d)). The same is true under Texas and Louisiana law. *See* 1 Tex. Admin. Code § 371.1655(4) (a provider who fails to repay an overpayment within 60 days is subject to administrative sanctions); LDH, "Enrollment Packet for the Louisiana Medical Assistance Program, Basic Enrollment Packet for Entities/Businesses" at 12, Form PE-50, *available at* https://www.lamedicaid.com/provweb1/provider_enrollment/enrollment_entities.pdf (provider "agrees to report and refund any discovered overpayments within sixty (60) days of discovery").

Here, the funds the Affiliate Defendants received during the pendency of the vacated preliminary injunctions constitute overpayments because the Affiliate Defendants were disqualified and terminated from the Texas and Louisiana Medicaid programs during that time period and were thus not entitled to the money. The Affiliate Defendants should have refunded the money they received back to the States within 60 days of when they knew or should have known they were not entitled to the

money, but they did not do so. "[T]o retain—to not return—an overpayment constitutes a violation of the FCA." *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015); *see also* Tex. Hum. Res. Code § 36.002(12); La. R.S. § 46:438.3(C).

### 1. Texas

Only qualified providers enrolled in the Texas Medicaid program are eligible to receive reimbursement for covered services provided to Texas Medicaid recipients. Appx. 3 (Zalkovsky Decl. ¶ 9). A provider whose Medicaid credentials are terminated and who is no longer a "qualified" provider is no longer eligible to seek or receive Medicaid reimbursement. 1 Tex. Admin. Code § 371.1705(e)(5) ("If, after the effective date of an exclusion, an excluded person submits or causes to be submitted claims for services or items furnished within the period of exclusion, the person may be subject to civil monetary penalty liability"); Appx. 72 (Zalkovsky Decl. Exh. B) (Provider Agreement § 11.1(f) (2016) (failing to meet program enrollment requirements result in no longer being eligible to participate in the Medicaid program and termination from the program); Appx. 614 (Zalkovsky Decl. Exh. Q-1) (TMPPM) § 1.10, p. 1-44 (program violations may include billing or causing claims to be submitted by a person excluded from Texas Medicaid); Appx. 1907 (Lambrecht (PPGT) Depo. 46:9–15). A provider who receives reimbursement from Texas Medicaid to which it is not entitled is obligated to remit those payments back to the State. 1 Tex. Admin. Code § 371.1703 (failure to repay overpayments to the Medicaid program is grounds for termination of provider agreement; *id.* § 371.1655(4) (a provider who fails to repay an

36

overpayment within 60 days is subject to administrative sanctions); ); *see also* Appx.71 (Zalkovsky Decl. Exh. B) (Provider Agreement § 1.3.7 (2016)); Appx.776 (Zalkovsky Decl. Exh. V-1) (TMPPM) § 1.10, p. 54; Appx.1581 (Curtis Depo. 35:7–18); Appx.1905 (Lambrecht (PPGT) Depo. 40:4–15); Appx.1315 (Barraza Depo. 25:3–18).

As discussed above, *see* pp. 15-16, 18 *supra,* the Affiliate Defendants elected not to contest their termination in state administrative proceedings. They instead chose to pursue relief in federal court. But under Texas law, if no administrative appeal is requested, the termination becomes final 30 days from receipt of the Final Notice. App.814 (Goldstein Decl. ¶8); *see also* 1 Tex. Admin. Code 371.1703(f)(2); 1 Tex. Admin. Code §§ 371.1617(a)(1), 371.1703(g)(8). Thus, the Affiliate Defendants' termination from Texas Medicaid became effective by operation of state law no later than February 1, 2017. *Id.* While federal and state court injunctions temporarily prevented the State from implementing the terminations, they did nothing to alter or reverse the State's findings and determination that the Affiliate Defendants should be terminated from Texas Medicaid. *See* Part I.C *infra.* Because the Affiliate Defendants had been terminated by the State no later than February 1, 2017, they were not "entitled" to any Texas Medicaid funds received after that date. *See* 42 U.S.C. § 1320a-7k(d)(4)(B); 1 Tex. Admin. Code § 371.1(55).

The Texas Provider Agreements and TMPPM state that providers are obligated to repay the State for reimbursements for which they hold no entitlement. Appx.5 (Zalkovsky Decl. ¶18); *see also* Appx.1581 (Curtis Depo. 35:7–18); Appx.1905 (Lambrecht (PPGT) Depo. 40:4–15); Appx.1315 (Barraza Depo. 25:3–18). By signing

the Provider Agreements, Affiliate Defendants agreed they have an affirmative duty to refund any overpayments, duplicate payments, and erroneous payments that are paid to the provider by Medicaid as soon as such payment was discovered or reasonably should have been known. Appx.5 (Zalkovsky Decl. ¶18 (Provider Agreement § 1.3.7 (2016–2021) ("Provider must refund any overpayments, duplicate payments and erroneous payments that are paid to Provider by Medicaid or a third party as soon as any such payment is discovered or reasonably should have been known"))). Failure to return identified overpayments are program violations. *See* Appx.796 (Zalkovsky Decl. Exh. W-1) (TMPPM) § 1.11 ("Failing to repay . . . identified overpayments or other erroneous payments or assessments identified by the commission or any Texas Medicaid or other HHSC program operating agency" is identified as a program violation). And the Texas Medicaid rules state that a provider who "submits or causes to be submitted claims for services or items furnished during a period of termination . . . may be liable to repay any submitted claims." 1 Tex. Admin. Code § 371.1703(g)(5); *id.* §§ 371.1655(3) and (4) ("A person is subject to administrative actions or sanctions if the person . . . (3) fails to repay overpayments or other assessments after receiving written notice of the overpayment or of delinquency by the OIG or any HHSC program or HHSC agency; (4) fails to repay overpayments within 60 calendar days of self-identifying or discovery of an overpayment was made to the person by [the Medicaid program].").

The Affiliate Defendants were terminated from Texas Medicaid no later than February 1, 2017, and thus had no entitlement under state or federal Medicaid rules

to any funds received after that date. Those funds are thus overpayments that the Affiliate Defendants is obligated to return but failed to do so.

### 2. Louisiana

Likewise, in Louisiana, there is no entitlement to payments by the State for Medicaid services provided when a provider lacks an effective provider agreement. LDH "shall make payments from medical assistance programs funds for goods, services, or supplies rendered to recipients to any person *who has a provider agreement in effect with the department*, [and] who is complying with all federal and state laws and rules pertaining to the medical assistance programs . . ." La. R.S. § 46:437.11(A) (emphasis added). "A person has no property interest in any payments or reimbursements from Medicaid which are determined to be an overpayment or are subject to payment review." 50 La. Admin. Code Pt I, § 4115(D); *accord Pers. Care Prods., Inc. v. Hawkins*, 635 F.3d 155, 159 (5th Cir. 2011). Moreover, "[p]roviders only have a right to receive payment for valid claims. Payment of a bill or claim does not constitute acceptance by the department or its fiscal intermediary that the bill or claim is a valid claim." *Id.* § 4115(B). In order to receive reimbursement for services provided to Medicaid eligible recipients, "the provider must be enrolled to participate in Louisiana Medicaid . . . and comply with all other requirements in accordance with the federal and state laws and [Bureau of Health Services Financing] policies." Appx. 2343. LDH may impose sanctions if a provider "submit[s] bills or claims for payment or reimbursement to the Louisiana Medicaid Program on behalf of a person or entity which is serving out a period of exclusion from Medicaid . . ."). Appx. 2365.

PPGC elected not to contest the State's findings or its termination in state administrative proceedings. It instead chose to pursue relief in federal court. But under Louisiana law, because no administrative appeal was requested, PPGC's termination became final by operation of state law 30 days from PPGC's receipt of the letter, on or around October 15, 2015. Appx. 2684. While a federal court injunction temporarily prevented the State from implementing the termination, it did nothing to alter or reverse the State's findings and determination that the Affiliate Defendants should be terminated from Texas Medicaid. *See* Part I.C, *infra*. Because PPGC had been terminated by Louisiana as of October 15, 2015, PPGC was not "entitled" to any Louisiana Medicaid funds received after that date. *See* 42 U.S.C. § 1320a-7k(d)(4)(B); *see also* La. R.S. § 46:437.11(A); 50 La. Admin. Code Pt I, § 4115(D). Those funds are thus overpayments that PPGC is obligated to return but failed to do so.

### B. Defendants "knowingly and improperly" avoided their obligation to repay the Government.

Under the FCA, the term "knowingly" includes (1) actual knowledge of the information; (2) deliberate ignorance of the truth or falsity of the information; or (3) reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A). The FCA expressly states that "the terms 'knowing' and 'knowingly' require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B). "The 1986 Amendments to the FCA, which added the scienter requirement, were not intended to create a burdensome obligation. Rather, the appropriate test is whether the defendant's actions were 'reasonable and prudent under the circumstances.'" *United States v.*

40

*Rogan*, No. 02 C 3310, 2006 WL 8427270, at *19 (N.D. Ill. Oct. 2, 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008) (quoting S. Rep. No. 99-345, at 21 (1986), reprinted in 1986 U.S.C.C.A.N. 5161, 5286).

The definitions of "knowingly" are virtually identical under Texas and Louisiana law. *See* Tex. Hum. Res. Code § 36.011(a) ("A person acts 'knowingly' with respect to information if the person: (1) has knowledge of the information; (2) acts with conscious indifference to the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."); La. R.S. § 46:437.3 ("'[K]nowingly' means that the person has actual knowledge of the information or acts in deliberate ignorance or reckless disregard of the truth or falsity of the information.") The undisputed facts show that Defendants acted with the requisite scienter—that is, they were aware or should have been aware of their obligation to repay the government, and they have "knowingly" avoided it. And as a matter of law, the Affiliate Defendants were duty-bound to know Medicaid policies and laws, both in the federal context as well as in Texas and Louisiana. *See N. Mem'l Med. Ctr. v. Gomez*, 59 F.3d 735, 739 (8th Cir. 1995) (participants in the Medicaid program have "a duty to familiarize themselves with the legal requirements" of participation) (citing *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 64–65 (1984)); *see also Spong v. Fid. Nat. Prop. & Cas. Ins. Co.*, 787 F.3d 296, 308 (5th Cir. 2015) (citing *Heckler* and holding that "[a]s a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement"). "Protection of the public fisc requires that those who seek public funds act with

41

scrupulous regard for the requirements of law; [Planned Parenthood] could expect no less than to be held to the most demanding standards in [their] quest for public funds. This is consistent with the general rule that those who deal with the Government are expected to know the law . . . ."). *Heckler*, 467 U.S. at 63–66.

### 1. Texas

Texas sent a final notice of termination to Defendants on December 20, 2016 informing Defendants of their termination from the Texas Medicaid program and that the termination would be final under Texas law 30 days from receipt if Defendants did not file an administrative appeal. Appx. 814 (Goldstein Decl., ¶ 8c) ("If you do not request a hearing as discussed above, the effective date of your enrollment termination will be the 30th calendar day following your receipt of this Final Notice of Termination."). Defendants did not challenge their termination from the Texas Medicaid program through the state administrative process and that the termination therefore became final under state law on January 19, 2017, or no later than February 1, 2017. Appx. 814 (Goldstein Decl., ¶ 10, 11). But even if Planned Parenthood could have thought that the temporary injunctions entitled it to the money at the time, they were aware on November 23, 2020, the date the Fifth Circuit vacated the Texas district court's preliminary injunction, that they received overpayments while terminated or disqualified from the Texas Medicaid program and were aware, or should have become aware, of their obligation to repay those funds. "A defendant has requisite knowledge once it becomes aware that it is not entitled to retain the funds, even if at the time it obtained them it lacked knowledge that it was

not entitled to them." Joel Hesch, *Understanding the Revised Reverse False Claims Provision and Why No Proof of a False Claim is Required*, 53 UIC J. Marshall L. Rev. 461, 491 (2021).

Defendants were aware of and certified their obligation to comply with all applicable laws and regulations concerning participation in the Medicaid program, including their obligation to repay funds they received during a period of termination. By signing the Texas Provider Agreement, Defendants certified and agreed to an affirmative duty to refund any overpayments, duplicate payments, and erroneous payments that were paid by Medicaid as soon as such payments were discovered or reasonably should have been known. Appx. 5 (Zalkovsky Decl., ¶ 19). Moreover, State statutes informed Defendants of their obligation to repay the Medicaid funds they received after being notified of their termination or disqualification from the Texas Medicaid program. 1 Texas Administrative Code § 371.1703(g)(5) states that if a Medicaid provider submits, or causes to be submitted, claims after termination or cancellation the provider "may be liable to repay any submitted claims or subject to civil monetary penalty liability under § 1128A(a)(1)(D), and criminal liability under § 1128B(a)(3) of the Social Security Act in addition to sanctions or penalties by the OIG." As a defense to liability, Defendants cannot disclaim knowledge of their obligations under statutes and regulations that governed their participation in the Medicaid program, including statutes and regulations they expressly agreed to comply with as a condition to participating in the Medicaid program.

Defendants knew or should have known that the terminations were effective 30 days after they received the notices of termination.[18] But at minimum, they should have known that once the Fifth Circuit's opinion in *Kauffman* was issued in November 2020, there was no legal basis for them to keep the money.

Nor can the Travis County TRO absolve Defendants of knowledge. Although they obtained a temporary restraining order (that lasted less than six weeks), the Court ultimately concluded that the only issue before it was "limited to a determination of the available administrative remedy, if any" the Defendants were "entitled to, following the lifting of the federal court's preliminary injunction." Appx. 1091-1092 (J. Livingston Mar. 10, 2021 Letter Ruling at 1–2). The rest of the Court's order held that the federal injunction did not change the relationship of the parties, the adequacy of the HHSC-OIG's termination notices, or the deadlines for administrative remedies. To the contrary, the Court held that:

> Relators cite no authority for the proposition that a court injunction requires the OIG to re-notice its termination; that a pending federal court case or injunction tolls the deadline to administratively appeal the determination; or that it can now challenge the propriety of the December 20, 2016, termination letter in a state administrative proceeding. The evidence does not support a finding that Respondents withdrew or abandoned their December 20, 2016, termination, or a finding that the December 15, 2020, and January 4, 2021, letters qualify as new terminations.

---

[18] Just one week after the Fifth Circuit vacated the preliminary injunction as to Defendants' termination from the Texas Medicaid program, *Children's Hospital Association of Texas v. Azar*, 507 F.Supp.3d 249 (D.D.C. 2020) held that the effective date of a challenged Medicaid rule was the originally scheduled effective date and not the date on which the mandate issued for the court of appeals' judgment reversing the district court's holding that the rule was invalid.

*Id.* In other words, the Affiliate Defendants had *no authority* to support a belief that somehow their terminations were not in effect after the federal injunction was vacated as a matter of state law. They took their chance when, as the Travis County District Court wrote, they "selected the federal courts as the forum to contest the merits of their claims, and they are now not able to revive their administrative remedies as the deadline to seek that relief has long since passed." *Id*. And the Affiliate Defendants "cannot complain about lacking due process when . . . foregoing [administrative process] was its own choice." *Sahara Health Care, Inc. v. Azar*, 975 F.3d 523, 533 (5th Cir. 2020). The Affiliate Defendants knew they had been terminated from Texas Medicaid and they were not entitled to keep the money they received. Despite that, they did not return it. At a minimum, Affiliate Defendants acted and continue to act "with conscious indifference to the truth or falsity of the information," or "in reckless disregard of the truth or falsity of the information" in their continued refusal to acknowledge the import of the Fifth Circuit's ruling. Tex. Hum. Res Code § 36.0011(a).

### 2. Louisiana

Defendant PPGC knew it had been terminated from the Louisiana Medicaid program on September 15, 2015 and knew that the termination would be effective October 15, 2015 if it did not file an administrative appeal. Appx. 2684 ("If you do not request an Informal Hearing or an Administrative Appeal, your termination will become effective thirty (30) days (including Saturdays and Sundays) from the date of your receipt of this letter."). PPGC admittedly did not challenge its termination from

the Louisiana Medicaid program through the state administrative process within the required time frame, Appx. 2684, so the termination therefore became final under state law on or around October 15, 2015. 50 La. Admin. Code Pt I, § 4169(A). PPGC's CEO also admitted it was aware on November 23, 2020, the date the Fifth Circuit vacated the Texas district court's preliminary injunction and overruled the Louisiana case, that the ruling would also affect the preliminary injunction in Louisiana and PPGC's standing in Louisiana Medicaid. Appx. 2706. Thus, even if PPGC could have reasonably thought that the federal preliminary injunction entitled it to the money it received, it was actually aware on November 23, 2020 that the Fifth Circuit vacated the Texas district court's preliminary injunction and overruled the Louisiana case, which eliminating any legal basis for the preliminary injunction. Hesch, *supra* p. 43 at 491.

Thus, PPGC and PPFA was aware, or should have been aware, that PPGC received overpayments while terminated or disqualified from the Louisiana Medicaid program and were aware, or should have become aware, of PPGC's obligation to repay those funds. PPFA and PPGC knew, or should have known, about the 60-day repayment rule. *See* Part I.A *supra*. PPGC was advised and represented during this entire process by PPFA. *See* Part III.B. *infra*. Both PPGC and PPFA were aware, or should have been aware by virtue of the provider agreement signed by Ms. Linton, that a preliminary injunction does not prevent the State from recouping or otherwise pursuing repayment of funds paid during the pendency of that preliminary order. App. 2506 ("I also understand that any claims for payment with a date of service

46

during a period of exclusion will be subject to recoupment in addition to other fines, penalties, or restitution resulting from the criminal prosecution (LA R.S. 14.126.3.1)."). At minimum, by disregarding the fact that they were not entitled to the money they had received under the preliminary injunction, PPGC and PPFA "act[ed] in deliberate ignorance or reckless disregard of the truth or falsity of the information." La. R.S. § 46:437.3.

### C. The now-vacated preliminary injunctions provide no defense to liability.

### 1. The preliminary injunctions and Travis County TRO did not change the finality of the Affiliate Defendants' termination under state law.

Planned Parenthood has contended that it is not liable for retaining the overpayments because it was entitled to the funds it received by the preliminary injunctions. *See, e.g.,* Dkt. 71 at 10. But both the Texas and Louisiana preliminary injunctions were entered only on behalf of Planned Parenthood's *patients. See Smith*, 236 F. Supp. 3d at 988; *Kliebert*, 141 F. Supp. 3d at 636. They contained identical language which only temporarily enjoined the State Defendants from *effecting* the termination of Planned Parenthood's provider agreements. *Compare Kliebert*, 141 F. Supp. 3d at 653 ("Defendant, and all those acting in concert with her, are PRELIMINARILY ENJOINED from terminating any of its Medicaid provider agreements with Planned Parenthood Gulf Coast Inc., including, but not limited to, Provider Numbers 91338, 133689, 45802, and 133673.") *with Smith*, 236 F. Supp. 3d at 1000 ("Defendants, their employees, agents, and successors, and all others acting in concert or participating with them are PRELIMINARILY ENJOINED from

47

terminating the Provider Plaintiffs' Medicaid Provider Agreements."). This was the language requested by PPFA. *See* Proposed Order Granting Preliminary Injunction, *Kliebert*, Dkt. 4-7 (M.D. La. Aug. 25, 2015); Proposed Order Granting Preliminary Injunction, *Smith*, Dkt. 58-5 (W.D. Tex. Jan. 4, 2017). Nothing in the preliminary injunctions themselves suggests that the operation of state law with respect to the terminations was frozen or invalid during the pendency of the injunction, and it would be especially foolhardy for Defendants to rely on an injunction to immunize their conduct when it was not even issued on their behalf.

But regardless of the language of the injunctions themselves, "[a]n injunction enjoins a defendant, not a statute." *Okpalobi v. Foster*, 244 F.3d 405, 426 n.34 (5th Cir. 2001) (en banc) (plurality op.). Texas and Louisiana law governing when the terminations became final remained operative. Federal courts do not have the power to "purge from the statute books." *Winsness v. Yocom*, 433 F.3d 727, 728 (10th Cir. 2006). "There is no procedure in American law for courts or other agencies of government" to amend or annul a statute. *Id.* Courts have "no power to make the law disappear." *Citizens Protecting Mich. Constitution v. Sec'y of State*, 921 N.W.2d 247, 270 n. 149 (Mich. 2018). And according to state law, the Affiliate Defendants' terminations were final as of October 15, 2015 in Louisiana and no later than February 1, 2017 in Texas.

> **2. Defendants can be liable for violating the law during the pendency of the now-vacated preliminary injunctions and the Travis County TRO.**

The issuance of an injunction against enforcement of a statute also does not formally suspend a statute or confer immunity or preemptive pardons on those who choose to violate the law at a time when an injunction is in effect. Instead, the law remains, and those who violate it remain subject to penalties if the judiciary vacates its injunction and permits enforcement to resume. Thus, the preliminary injunctions did not carve out any exception to or immunity from state law for the payments Defendants received after termination. *See Edgar v. MITE Corp.*, 457 U.S. 624, 653 (1982) (Stevens, J., concurring) ("There simply is no constitutional or statutory authority that permits a federal judge to grant dispensation from a valid state law."); *id.* 649–50 (Stevens, J., concurring) ("The preliminary injunction did not purport to provide permanent immunity for violations of the statute that occurred during its effective period. It merely provided that the Secretary of State was enjoined from . . . invoking, applying, or enforcing the . . . Act' against MITE. . . . Moreover, the preliminary injunction was entered without any declaration that the Illinois statute was unconstitutional. There simply is no basis on which to conclude that the preliminary injunction issued by the District Court should be construed as having granted MITE permanent immunity from future proceedings brought under the Illinois statute."). Nor can state officials, through their compliance with a court order, somehow modify state law or its applicability to Defendants. *See, e.g.*, *Winsness*, 433 F.3d at 728; 50 La. Admin. Code Pt I, § 4147 ("Neither the secretary, director of BHSF, or any other person can waive or alter a requirement or condition established by statute.")

49

Even a permanent injunction does not somehow erase or change state law. But Defendants had only a *preliminary* injunction entered at an early stage of a case based only on *likelihood* of success. "Since a final judgment declaring a state statute unconstitutional would not grant immunity for actions taken in reliance on the court's decision, certainly a preliminary injunction—which on its face does nothing more than temporarily restrain conduct—should not accomplish that result." *Edgar*, 457 U.S. at 651–52. And vacated injunctions have no legal force, no longer bind the parties, and provide no relief here to Defendants. "[A] final judgment declaring a state statute unconstitutional would not grant immunity for actions taken in reliance on the court's decision" because "every litigant is painfully aware of the possibility that a favorable judgment of a trial court may be reversed on appeal," as happened here. *Edgar*, 457 U.S. at 651 (Stevens, J., concurring).

The effect of the Fifth Circuit's ruling vacating the injunction and reversing the Louisiana case "is not that the [district courts'] decision is bad law but that it *never* was the law." *Ruppert v. Ruppert*, 134 F.2d 497, 500 (D.C. Cir. 1942) (emphasis added) (citations omitted); *accord Legg's Estate v. Commissioner*, 114 F.2d 760, 764 (4th Cir. 1940) ("Decisions are mere evidences of the law, not the law itself; and an overruling decision is not a change of law but a mere correction of an erroneous interpretation.") "If a court of appeals overrules a district court, then that district court decision is rendered a 'legal nullity' and 'requires that it be treated thereafter as though it never existed.'" *Children's Hosp. Ass'n of Tex. v. Azar*, 507 F. Supp. 3d

249, 255 (D.D.C. 2020) (quoting *Khadr v. United States*, 529 F.3d 1112, 1115-16 (D.C. Cir. 2008)).

Put simply, the vacated preliminary injunctions do not change the status of the overpayments, and failure to timely return those funds violates the law. Relator and Texas may thus seek to recover those funds now. As this Court already recognized, "American jurisprudence recognizes the 'principle, long established and of general application, that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby.'" Dkt. 71 at 8 (quoting *Arkadelphia Milling Co v. St. Louis S.W. Ry. Co.*, 249 U.S. 134, 145 (1919)). Thus, "[c]ourts across the country have relied on this longstanding principle to hold that a party may be liable for funds received under a court order or injunction later vacated." *Id.* at 8-9 (citing *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1327-28 (11th Cir. 2016); *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1127-28 (D.C. Cir. 1992); *Md. Dep't Hum. Res. v. U.S. Dep't Agric.*, 976 F.2d 1462, 1467 (4th Cir. 1992); Douglas Laycock, *Federal Interference with State Prosecutions: The Need for Prospective Relief*, 1977 Sup. Ct. Rev. 193, 209 (1977)).

### 3. It is reckless disregard for Defendants to rely on the vacated injunctions to deny knowledge of their obligation to repay.

Defendants cannot reasonably rely on a vacated injunction to protect them from recoupment of overpayments. They have no property interest in payments to which they are not entitled. 50 La. Admin. Code Pt I, § 4115(D); *Pers. Care Prods., Inc. v. Hawkins*, 635 F.3d 155, 159 (5th Cir. 2011); *accord Sahara Health Care, Inc.*

51

*v. Azar*, 349 F. Supp. 3d 555, 572 (S.D. Tex. 2018), *aff'd,* 975 F.3d 523 (5th Cir. 2020) ("[T]he Court aligns with Fifth Circuit precedent to find Plaintiff has no reasonable expectation or entitlement to be paid on a 'bad claim' resulting in recoupment of Plaintiff's reimbursements or otherwise denied claim for reimbursement. Plaintiff is not entitled to hang onto property to which Plaintiff was never entitled."); *Greater Dall. Home Care All. v. United States*, 10 F. Supp. 2d 638, 646 (N.D. Tex. 1998) (holding that a provider is "not entitled to retain . . . overpayments, for they have no property interest in Medicare overpayments").

Defendants' reliance on the injunctions as a shield to liability for not repaying funds fails. As in *Azar*, Planned Parenthood was

> aware that [the States[]] had appealed the [courts'] decision[s] and that the [Fifth] Circuit had the authority to reverse the decision. . . In this situation, other courts have likewise reasoned that 'a party who relies upon the wrong interpretation of the law should not be rewarded over a party who relies upon the correct interpretation.' *Dillow v. Home Care Network, Inc.*, No. 1:16-cv-612, 2017 WL 749196, at *4 (S.D. Ohio Feb. 27, 2017); *see also Lewis-Ramsey v. Evangelical Lutheran Good Samaritan Soc'y*, 215 F. Supp. 3d 805, 810 (S.D. Iowa 2016) ('[I]t strikes the Court as far more 'unfair' to allow Defendant to escape liability for nearly a year's worth of overtime wages based on a district court decision that was ultimately deemed to be error.').

507 F. Supp. 3d at 259. And Defendants' decision to rely on a *preliminary* injunction was simply reckless. *Azar*, 507 F. Supp. 3d at 256, 258. Even if the district courts had issued *permanent* injunctions, their overruling on appeal and the retroactivity rule would require "adoption of the legal fiction that a former judicial decision was never really the law in the first place." *Id.* at 257 (quoting *Brittmon v. Upreach, LLC*, 285 F. Supp. 3d 1033, 1040 (S.D. Ohio 2018)). To find otherwise in a case like this would mean that Medicaid providers could always circumvent the administrative process,

forum shop, and "drag out the appellate process to avoid compliance for as long as possible. . . [A]n erroneous [injunction] cannot postpone [the effective date of termination] until an appellate court corrects the error sometime in the future." *Ray v. Cnty. of Los Angeles*, 935 F.3d 703, 715 (9th Cir. 2019); *see also Sahara*, 349 F. Supp. 3d at 579 ("The Court has no interest in leaving itself and other courts vulnerable to forum shopping and in supplementing an already established, complex statute. Additionally, the Court refuses to partake in aiding the construction of a provider's Trojan horse.").

## II.   Defendants Violated the FCA, TMFPA, and LMAPIL Under the Implied-False-Certification Theory of Liability.

Relator cannot recover the same damages, civil fines, and civil penalties twice, even though Relator brings claims for relief under two different theories of liability. *E.g.*, *U.S. ex rel. Heesch v. Diagnostic Physicians Group, P.C.*, No. CIV.A. 11-0364-KD-B, 2014 WL 2155363, at *10 n.2 (S.D. Ala. May 22, 2014). Thus, as an alternative to the reverse-false-claim theory, Relator is also entitled to partial summary judgment on Relator's implied-false-certification claims related to claims submitted by Defendants (1) in Texas after January 19, 2017, when the Affiliate Defendants' termination was final; (2) during the "grace period" in Texas, and (3) submitted by PPGC in Louisiana after PPGC was terminated from Medicaid on October 15, 2015 and/or after it was terminated from Texas Medicaid on January 19, 2017.

The undisputed facts show that the Affiliate Defendants knowingly submitted false claims for payment in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A) and LMAPIL, La. R.S. § 46:438.3(A). The undisputed facts also establish that PPFA

"caused" the Affiliate Defendants to submit false claims. The FCA and LMAPIL impose liability on a provider who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729 (a)(1)(A); La. R.S. § 46:438.3(A). Relator asserts claims under the FCA and LMAPIL under the "implied false certification" theory of liability. Under this theory, liability attaches when two conditions are met: (1) "the claim does not merely request payment, but also makes specific representations about the goods and services provided;" and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those misrepresentations misleading half-truths." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016). Liability does not turn on whether such requirements were expressly designated as conditions of payment. *Id.* at 1996. Rather, liability turns on "whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id.* "Whether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry." *Id.* at 2001. Thus, "the Supreme Court made clear that defendants could be liable under the FCA for violating statutory or regulatory requirements, whether or not those requirements were designated in the statute or regulation as conditions of payment." *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 159-60 (5th Cir. 2019) (citing *Escobar*). The pertinent inquiry, then, is not whether a defendant made an affirmative or express false statement. Rather, it is whether, by submitting a claim, a defendant knowingly and falsely implied that it was entitled to

54

payment when it was not because it violated applicable statutes and regulations, which would disqualify it from payment.

The TMFPA is broader in scope and imposes liability for "unlawful acts" where a provider "(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized" and "(4) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning: (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program." Tex. Hum. Res. Code §§ 36.002(2), (4).

The undisputed facts show that the Affiliate Defendants knowingly concealed or failed to disclose information that permitted them to receive a benefit or payment under the Texas Medicaid program that was not authorized or that was greater than the benefit or payment authorized.   In addition, the undisputed facts show the Affiliate Defendants knowing made or caused to be made a false statement or misrepresentation of material fact concerning information required to be provided by federal or state law, rule regulation or provider agreement pertain to the Texas Medicaid program.   The undisputed facts also establish that PPFA "caused" the Affiliate Defendants to knowingly make false statements and misrepresentations of material facts in violation of Tex. Hum. Res. Code § 36.002(2).

**A. The claims submitted in Texas and Louisiana after the Affiliate Defendants' terminations became final were impliedly false.**

55

The States determined that Planned Parenthood was not qualified to provide Medicaid services and terminated their enrollment in the Medicaid program— Louisiana on October 15, 2015, and Texas no later than February 1, 2017. The Affiliate Defendants continued to file claims for reimbursement after these dates and the State was forced to pay them—not because Defendants were suddenly qualified or because the States' decisions were nullified, *see* Part I.C *supra*, but because federal courts had temporarily enjoined the States from giving *effect* to the terminations. The preliminary injunctions did not immunize Defendants from False Claims Act liability. *See* Part I.C *supra*. Nor did that limited and temporary relief absolve Planned Parenthood from liability for the improper claims it submitted under the injunctions. *See* Part I.C *supra*.

By submitting Medicaid claims, the Affiliate Defendants represented that they had complied with core state and federal Medicaid requirements, specifically (1) that the Planned Parenthood Defendants were "qualified" under state and federal law, and (2) that the Planned Parenthood Defendants had not violated state or federal laws in its provision of medical services. Both of those implications were false because the States had determined otherwise, and Planned Parenthood failed to dispute those determinations in administrative proceedings. And compliance with these laws was obviously a material requirement, since both Texas and Louisiana removed the Affiliate Defendants from their Medicaid programs after it discovered what it determined to be wrongful conduct. *Escobar*, 136 S. Ct. at 1989; *Lemon*, 924 F.3d at 163.

**B. The claims submitted by the Affiliate Defendants in Texas during the "grace period" were impliedly false and constitute benefits or payments received on behalf of another person under the Medicaid program, in violation of the TMFPA.**

Even if submitting false claims during the pendency of the injunctions did not give rise to false-certification liability, Defendants are liable for the false claims submitted in Texas during the so-called "grace period."[19]

In a December 2020 letter drafted and spearheaded by PPFA and signed by PPST, PPGT, and PPGC, the Affiliates claimed that they suddenly needed more time to help their patients find other Medicaid providers, even though the evidence shows that they knew they would probably be out of Medicaid after the Fifth Circuit's opinion came down yet said nothing to their patients to prepare them for that eventuality. *See* Part III.B.2. The Affiliates requested that Texas either let them *back in* to Medicaid—which acknowledges that they knew they were *out* of Medicaid at this time—or give them a six-month "grace period" so they could ensure their patients have other providers. Appx. 802-807 . Texas granted a one-month period expressly so that the Affiliates could transition their existing patients to new providers. Appx. 810-11. But the evidence shows that the Affiliates instead used the time to bill for as many services as they could and did virtually nothing to help their patients find new providers. *See* Part III.B.2.b *infra*. The Affiliates' representations to Texas— facilitated by PPFA—were therefore false. And they were clearly material, because

---

[19] Texas does not seek recovery or summary judgment regarding the "grace period," but Relator maintains that claim.

transitioning patients to other providers was the express reason Texas permitted one month of Medicaid eligibility, despite the Affiliates' disqualification and termination. Absent that request, the Affiliates' termination would have been effectuated by the State as soon as the preliminary injunction was lifted by the Texas federal trial court.

Further, Defendants' conduct violates Tex. Hum. Res. Code § 36.002(3), which states that it is an unlawful act for a person to "knowingly appl[y] for and receive[] a benefit or payment on behalf of another person under the Medicaid program and convert[] any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received." Defendants received a "benefit" on behalf of their patients—a "grace period" to help them find other providers—but "convert[ed]" that benefit to a use other than for the patients' benefit—billing Medicaid and obtaining additional revenue—which was not a "benefit of the person on whose behalf it was received." *Id.* The patients seen during the "grace period" may have received Medicaid services from the Affiliates, but they did not receive the benefit Texas granted, which was aid in transitioning to a new provider.

### C. The claims filed by PPGC in Louisiana after it was terminated from Texas Medicaid were impliedly false.

Additionally, even if submitting false claims during the pendency of the injunctions did not give rise to false certification liability, PPFA and PPGC are still liable for the false claims submitted in Louisiana after PPGC was terminated from Texas Medicaid. The evidence shows that PPGC totally disregarded their obligation under state law to immediately report to the State conditions that affected their, or

their affiliates', Medicaid enrollment in other states. Louisiana law states that it is a violation for Medicaid providers to:

- fail to comply with "any or all policies, criteria, or procedures of the Medical Assistance Program," 50 La. Admin. Code Pt. I, § 4147(A)(2),

- fail to comply with "one or more of the terms or conditions contained in the provider's provider agreement or any and all forms signed by or on behalf of the provider setting forth the terms and conditions applicable to participation in the Medical Assistance Program," *id.* § 4147(A)(3),

- "fail[] to disclose any other information which is required under this regulation, or other departmental regulations, rules, policies, criteria, or procedures," *id.* § 4147(A)(4),

- "be[] excluded, suspended, or otherwise terminated from participation in Medicaid or other publicly funded health care or insurance programs of this state or any other state or territory of the United States," *id.* § 4147(A)(8),

- "employ, contract with, or otherwise affiliate with any person who has been excluded, suspended, or otherwise terminated from participation in Medicaid or other publicly funded health care or health insurance programs of this state or another state or territory of the United States," *id.,*

- "employ, contract with, or otherwise affiliate with any person who has been excluded from Medicaid or other publicly funded health care or health insurance programs of this state or any other state or territory of the United States during the period of exclusion or suspension,"

- and fail to fulfill their "affirmative duty" "within 10 working days of when the provider knew or should have known of any violation of this provision" to:
  - "inform [the Bureau of Health Services Financing] in writing of any such exclusions or suspensions on the part of the provider, provider-in-fact, their agents or their affiliates;
  - not hire, contract with, or affiliate with any person or entity who has been excluded or suspended from any Medicaid or other publicly funded health care or health insurance programs;
  - and terminate any and all ownership, employment and contractual relationships with any person or entity that has been

> excluded or suspended from any Medicaid or other publicly funded health care or health insurance programs."

*Id.* at § 4147(A)(8)(a), (b).

The Louisiana Provider Agreement that PPGC's CEO, Melaney Linton, personally signed on behalf of PPGC states that she "certifies and agrees" and "understand[s] that it is [her] responsibility to ensure that neither I, nor any . . . affiliate(s) are not now or have ever been denied enrollment; suspended or excluded from . . . Medicaid . . . in any state; employed by a corporation . . . that is now or has ever been suspended or excluded from . . . Medicaid . . . in any state." It further states that she "will report any of the above conditions to Program Integrity at the Department of Health and Hospitals . . . upon discovery once enrolled." Linton Depo. Ex 10 at REL_051196, 11. The Agreement further states, and Ms. Linton attested by her signature, that:

> I understand that it [is] my responsibility to ensure that I have disclosed on this form if I . . . or any Affiliate, have ever: been denied enrollment from . . . Medicaid . . .; been suspended or excluded from . . . Medicaid . . .; been terminated from participation from . . . Medicaid . . .; been employed by a corporation . . . that is now or has ever been suspended or excluded from . . . Medicaid . . . in any other state; . . . .

> I understand that I shall report any of the above conditions to [LDHH] . . . and once enrolled, I understand that upon discovery of any of the above conditions, it is my responsibility to report them in writing to [LDHH], Program Integrity Section . . . .

> I understand if . . . I have ever been denied enrollment or been excluded, terminated from participation, suspended, or voluntarily withdrawn to avoid disciplinary action from any federally funded healthcare program, I am required to submit this information and the requested documentation.

> I understand that I am being placed on notice of Louisiana state law, R.S. 14:126:3.1 entitled "Unauthorized participation in medical

assistance programs." I understand that this criminal statute means that if I, or any . . . affiliates . . . are excluded now or become excluded in the future or have been terminated from participation in Medicaid . . . it is a crime to "participate" in any medical assistance program. . . .

I also understand that this crime can be punishable as a felony for up to five (5) years imprisonment with or without hard labor, as well as a maximum fine of $20,000; and

I also understand that any claims for payment with a date of service during a period of exclusion will be subject to recoupment in addition to other fines, penalties, or restitution resulting from the criminal prosecution (LA R.S. 14.126.3.1).

Linton Depo and Ex 10 at REL_051259, 11.

It is undisputed that PPGC and Ms. Linton failed to report their termination from Texas Medicaid to LDHH, failed to report their affiliates' termination from Texas Medicaid, and failed to fulfill their obligation to cease affiliation with the other Texas affiliates after their termination from Texas Medicaid. Thus, every claim PPGC filed in Louisiana after the Texas termination became final no later than February 1, 2017, or at minimum after March 12, 2021 when the state court temporary restraining order was lifted, was a false claim because PPGC was not in compliance with program rules and requirements. PPFA employees provided legal advice and counsel to PPGC during this time, so PPFA is liable for "causing" false claims to be made by PPGC. La. R.S. § 46:438.3(A). *See* Part III *infra*.

### III.   PPFA is Liable for the Violations of the FCA, TMFPA, and LMAPIL.

PPFA has previously asserted that it cannot be liable for Medicaid fraud because it is not a Medicaid provider. But the undisputed facts here show that PPFA is liable because it "caused" the submission of false claims and the unlawful retention of overpayments. Moreover, PPFA is also liable because of the extensive control PPFA

has over the business operations of the Affiliates, including its Medicaid billing practices and compliance with state and federal law.

PPFA represents itself as "the nation's leading women's health care provider" and claims to provide medical services, including Medicaid services, through its health clinics operated by Affiliates. *See* n. 8 *supra*. The fact that PPFA claims it is not a Medicaid provider because it does not directly contract with States to provide Medicaid services is irrelevant to its liability under the FCA, TMFPA, and LMAPIL. The purpose of the FCA, for instance, is "to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943), *superseded by statute on other grounds as recognized in Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 412 (2011). "To 'cause' the presentation of false claims under the FCA, some degree of participation in the claims process is required." *Id.* at 186-87. But the FCA does not always require an "affirmative act" to impose liability. For example, "a defendant may be liable if it operates under a policy that causes others to present false claims." *Id.* at 187. Moreover,

> [w]here the defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes "a course of conduct that allowed fraudulent claims to be presented to the federal government."

*Id.* (quoting *United States ex rel. Long v. SCS Bus. & Tech. Inst.*, 999 F. Supp. 78, 91 (D.D.C. 1998)). A defendant may be liable where the submission of false claims by

another entity was the foreseeable result of a business practice. *See, e.g.*, *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 52 (D. Mass. 2001). And "[a] parent may be liable for the submission of false claims by a subsidiary where the parent had direct involvement in the claims process." *United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, No. CV 15-13065-PBS, 2018 WL 4539684, at *5 (D. Mass. Sept. 21, 2018) (*citing, e.g.*, *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 62–63 (D.D.C. 2007) (pointing out the "frequency and level of detail" of communication between subsidiary and corporate officials as well as the parent's involvement in fraudulent activity); *United States v. Bestfoods*, 524 U.S. 51, 68 (1998) (holding, under different statute, that parent company may be liable when it operates a facility, as evidenced by parent's participation in the activities of the facility)).

### A. PPFA is not required to be a Medicaid provider to be liable under the FCA, TMFPA, and LMAPIL.

PPFA cannot escape liability even if it is not a party to a Medicaid provider agreement. The plain language of section 36.002(12) of the TMFPA makes no reference to a "provider" and does not otherwise limit who can commit an unlawful act under that provision. *Compare* Tex. Hum. Res. Code § 36.002(12) (not limiting scope of unlawful conduct to any particular actor) *with id.* at § 36.002(10) (limiting scope of unlawful conduct to "a managed care organization"). Indeed, even if one were to interpret Section 36.002(12) in such a manner, the TMFPA takes a broad interpretation of a "provider," extending it to include "a person . . . that provides a product or service to a provider or to a fiscal agent[.]" *Id.* at § 36.001(9)(B). Nor can

63

PPFA escape liability under LMAPIL for similar reasons. *See* La. R.S. § 46:438.3 (referring also to a "person," not a provider).

Federal law also supports holding PPFA liable. The Fifth Circuit has long recognized the indirect reverse false claim theory of liability in the FCA. *See Smith v. United States*, 287 F.2d 299 (5th Cir. 1961). The Court accepted the indirect reverse false claim theory because "the False Claims Act applies even where there is no direct liability running from the Government to the claimant." *Smith*, 287 F.2d at 304. Indeed, the Fifth Circuit has continued to observe that the FCA does not require a defendant to "impair the *defendant's* obligation; instead, it requires that the [defendant] impair '*an* obligation to pay or transmit money or property to the Government.'" *United States v. Caremark*, 634 F.3d 808, 817 (5th Cir. 2011) (quoting 31 U.S.C. § 3729(a)(7)) (reversing summary judgment for defendant and holding that defendant could be liable for reverse false claim for impairing third party's obligation to return money to the government) (emphasis in original). Simply put, "'a person need not be the one who actually submitted the claim forms in order to be liable.'" *U.S. ex. rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (quoting *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir.2001)).

### B. PPFA is liable for its own actions and role in causing the Affiliate Defendants to avoid their obligation to repay the overpayments and in filing false claims.

PPFA helped the Affiliate Defendants avoid their obligation to repay money to Texas and Louisiana Medicaid by masterminding and orchestrating a strategy— implemented by PPFA's in-house litigation attorneys in their "Litigation & Law" Department ("L&L"), and other PPFA employees, in furtherance of PPFA's mission—

to enable Affiliate Defendants to continue to seek reimbursement from Texas and Louisiana Medicaid after the effective date of their terminations and continue in their refusal to return those funds. *See Caremark*, 634 F.3d at 817.

### 1.  PPFA's "Litigation & Law" Department

PPFA's L&L attorneys provide representation to PPFA and Planned Parenthood affiliates on public policy matters that further PPFA's mission. Appx.1699 (Custer Depo. 246:3–22). PPFA's public policy mandate is set in consultation with PPFA's Senior Vice President for Policy, Advocacy and Campaigns. Appx.1440 (Barrow-Klein (PPFA) Depo. 38:4–19). The attorneys in the "Litigation & Law" Department are PPFA employees, and the head of L&L reports directly to PPFA's Senior Vice President for Policy, Advocacy and Campaigns. Appx.1438 and 1453 (Barrow-Klein (PPFA) Depo. 32:16–20, 93:7–94:8). PPFA pays the salaries of L&L attorneys and any costs incurred by L&L during its representation of Planned Parenthood affiliate entities. Appx.1449 (Barrow-Klein (PPFA) Depo. 75:16–76:11). During their representation of Affiliate Defendants in the underlying termination litigation, L&L attorneys provided updates to PPFA about the litigation. Appx.1676 (Custer Depo. 151:1–7). PPFA's corporate representative admitted that when L&L attorneys represent an affiliate entity, "PPFA would always consider the implication or the impact … of any action on the federation as a whole[.]" Appx.1675 (Custer Depo. 148:23–149:7).

PPFA is liable under the FCA, TMFPA, and LMAPIL because of the involvement of their own employees who act in furtherance of PPFA's mission.

Appx.1700 (Custer Depo. 246:3–22). "[A] corporation will be liable for violations of the False Claims Act if its employees were acting within the scope of their authority and for the purpose of benefitting the corporation." *United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir. 1977) (citing *United States v. Ridglea State Bank*, 357 F.2d 495 (5th Cir. 1966)). The Fifth Circuit rejects the notion that corporate liability under the FCA can only attach through the conduct of employees with "substantial authority and broad responsibility." *Id.*

### 2. PPFA was directly involved in the Affiliate Defendants' unlawful acts and efforts to retain and maximize their Medicaid revenue.

PPFA's representation of Affiliate Defendants in the underlying termination litigation and related matters helped Affiliate Defendants to avoid fulfilling their obligation to repay money to Texas and Louisiana Medicaid, rendering PPFA liable under the FCA, TMFPA, and LMAPIL. *Caremark*, 634 F.3d at 817; Tex. Hum. Res. Code § 36.002(12). First, upon learning that Affiliate Defendants were facing termination proceedings initiated by LDH and the Texas HHSC-OIG, PPFA steered Affiliate Defendants away from the prescribed administrative appeals and into lengthy legal battles in the Middle District of Louisiana and the Western District of Texas. Second, after learning that Fifth Circuit had vacated the preliminary injunction that prohibited Texas from implementing the terminations, PPFA helped Affiliate Defendants craft a request to HHSC for a "grace period" for the purpose of transitioning their patients to new Medicaid providers—mere pretext to allow Affiliate Defendants to continue to bill Texas Medicaid temporarily. Third, on the last

66

day of the HHSC "grace period," PPFA assisted Affiliate Defendants in filing an unsuccessful lawsuit in Travis County District Court, asserting legal theories for which they had "no authority." Fourth, PPFA participated in PPGC's efforts to conceal the true facts of their termination and their affiliates' Texas terminations from LDH and the Middle District of Louisiana in an effort to maximize Medicaid revenue. Fifth, PPFA *continues* to represent and assist Affiliate Defendants in their ongoing efforts to withhold money that they are legally obligated to return to the Texas and Louisiana Medicaid programs.

> **a. PPFA crafted and executed the strategy to prolong the Affiliate Defendants' participation in Medicaid and avoid repayment of funds by pursuing federal litigation instead of their administrative rights.**

PPFA's L&L attorneys provided legal counsel to Affiliate Defendants during the Louisiana investigation and LDH-initiated termination proceedings. PPFA's L&L attorneys also provided legal counsel to Affiliate Defendants when HHSC-OIG initiated termination proceedings against them. As set forth above, Texas and Louisiana law provide only one avenue for a provider facing termination to appeal the termination decision: an administrative appeal. *Kauffman*, 981 F.3d at 362; *see also* 50 La. Admin. Code Pt I, §§ 4211, 4213. Nevertheless, PPFA steered Affiliate Defendants away from exercising their administrative appeal rights and filed unsuccessful lawsuits in the Middle District of Louisiana and the Western District of Texas. Through this maneuver, Affiliate Defendants obtained preliminary injunctions that permitted them to seek reimbursement from Texas and Louisiana Medicaid for years.

As Defendants' privilege logs reveal, PPGC began preparing for litigation over Medicaid termination in Louisiana as early as June 2015, well before the termination notice was sent.[20] *See, e.g.*, Appx. 5880 (Affil. Ds' Revised Third Priv. Log, Line 3939) (reflecting June 12, 2015 email regarding "legal hold for LA Medicaid termination"). LDHH sent investigatory letters in July and August 2015. Appx. 2671. PPFA was involved during this time. *See, e.g.*, Appx. 5882 (Affil. Ds' Revised Third Priv. Log, Line 3976) (reflecting Aug. 7, 2015 email from PPFA's C. Flaxman to PPGC regarding "potential next steps in LA Medicaid termination litigation"). PPFA, on behalf of PPGC, filed suit in the Middle District of Louisiana on August 25, 2015. Complaint, *Kliebert*, No. 3:15-cv-00565 (M.D. La. Aug. 25, 2015), Dkt. 1. PPFA attorneys Carrie Flaxman and Melissa Cohen signed the Complaint, identifying their employer as PPFA. *Id.* at 16.

Similarly, in Texas, almost immediately after the HHSC-OIG issued the preliminary Notice of Termination to Affiliate Defendants on October 19, 2015, PPFA's L&L attorneys began their representation of Affiliate Defendants. *See, e.g.*, Appx. 5677 (Affil. Ds' Revised Third Priv. Log, Line 1197) (reflecting October 21, 2015 email from PPFA's H. Krasnoff to Affiliate Defendant employees and others regarding "requesting and providing legal advice re: representation for Texas Medicaid termination"). Ultimately, Affiliate Defendants commenced their action in

---

[20] Louisiana first sent a notice of at-will termination on August 3, 2015, but that was rescinded on September 14, 2015. LDHH sent a notice of termination for cause on September 15, 2015. First Amended Complaint, *Kliebert*, (M.D. La. Oct. 7, 2015), Dkt. 43 at 9.

the Western District of Texas on November 23, 2015. Appx. 842-861 (Western District Complaint). PPFA attorneys Jennifer Sandman, Alice Clapman, and Richard Muniz signed the Complaint, identifying their employer as PPFA. Appx. 842-861 (Western District Complaint). *Id.*

PPFA led and directed both federal court actions. On November 22, 2015, PPFA Assistant Director for State Policy Media, Danielle Wells, emailed PPFA CEO Cecile Richards and others, attaching "a briefing for the press call tomorrow afternoon related to the case *we're* filing in Texas against efforts to block *our* patients' access to care through Medicaid." Appx. 6278 (Wells–Richards, Nov. 22, 2015 email, PPFA00354976) (emphasis added). The briefing attached to her email describes the purpose of the press call:

> YOU will be leading a press call to announce that *PPFA and 10 co-plaintiff Jane Doe's* [sic] will be filing suit against the State of Texas and their efforts to ban more than 13,500 Medicaid patients seen by Planned Parenthood Texas affiliates.

*Id.* (emphasis added); *see also* Appx.1680 (Custer Depo. 168:16–23) (acknowledging that press briefing "did not say that the affiliates are filing suit against the State of Texas"). Confirmation that PPFA made the decision to eschew the prescribed administrative appeals in favor of the Western District action came on March 12, 2021, when PPGT COO Sheila McKinney wondered:

> Do either of you recall why we did not ask for an administrative hearing 5 years ago when we were first informed we were going to be excluded from the Medicaid program? I am sure we had legal advice, but I have no memory of the rationale.

Appx.6148. In response, PPGT CEO Ken Lambrecht confirmed that "[i]t was a legal strategy decision at the time focusing on the federal courts first." *Id.*; *see also*

Appx.1355 (Barraza Depo. 184:7–14) (confirming that PPST had communications with PPFA "about not responding to this final notice of termination"); Appx. 1913 (Lambrecht Depo. 72:24–73)(stating that "filing litigation . . . was the priority at the time").

Ultimately, the Fifth Circuit vacated the preliminary injunction entered by the Western District in November 2020 and overruled the Louisiana case. The court recognized that federal law requires states participating in the Medicaid program to "provide an avenue for a provider to appeal a determination that it is not 'qualified'" and that Texas provides "an administrative procedure for such appeals." *Kauffman*, 981 F.3d at 362. The decision by PPFA to drive Affiliate Defendants into federal litigation with Texas and Louisiana was contrary to law and was done to continue to receive Medicaid funds to which Planned Parenthood was not entitled.

### b. PPFA helped Affiliate Defendants request a grace period from Texas as pretext to allow Affiliate Defendants to continue to bill Texas Medicaid and further media strategies.

After the Fifth Circuit vacated the preliminary injunction that precluded Texas from implementing Affiliate Defendants' terminations from Texas Medicaid, PPFA assisted Affiliate Defendants in their December 2020 request for a "grace period" from HHSC. Appx. 802-807 (Dec. 14, 2020 Letter, PPGC00000024). Although the stated purpose of the "grace period" was to allow Affiliate Defendants to transition their patients to new Medicaid providers, the evidence reveals that this was merely pretext to allow Affiliate Defendants to continue to bill Texas Medicaid as a stopgap measure before additional legal action could be pursued.

Following the Fifth Circuit's ruling, Affiliate Defendants immediately consulted with PPFA regarding "next steps." *See, e.g.*, Appx.6142-43 (indicating that "PPGT is working with Planned Parenthood Federation of America (PPFA) legal counsel regarding next steps in the courts and with the new administration in early 2021"); Appx.6295 (indicating that J. Hons is "in communication with our litigation team at PPFA"). On December 14, 2020, the three Affiliate Defendant CEOs signed a letter to HHSC's Executive Commissioner requesting "a six-month grace period . . . to allow us to help our patients attempt to find new providers willing to accept new patients insured through Medicaid." Appx. 802-807. PPFA's L&L attorneys assisted Affiliate Defendants in crafting and delivering that request to HHSC. Appx. 6151 (stating that "the three TX affiliates worked with our lit/law team to send a letter to the [HHSC] . . . grant a transition period").

HHSC granted a 30-day period on January 4, 2021 for the express purpose of "ensur[ing] that current Medicaid clients receiving services at your clinics can be transitioned to new providers." Appx. 809-11 (Jan. 4, 2021 email, PPST00000294). HHSC's approval was delivered to PPFA attorney Jennifer Sandman as well as the three Affiliate Defendant CEOs. *Id.*

Despite representations crafted by PPFA in the "grace period" request, the evidence reveals that neither PPFA nor Affiliate Defendants utilized the "grace period" for the stated purpose of transitioning patients to other providers. On January 6, 2021, PPFA Director of State Media Campaigns Bonyen Lee-Gilmore indicated that the Grace Period "bought [Affiliate Defendants] some time to continue

71

seeing patients for another month." Appx. 6293. In fact, Ms. Lee-Gilmore described

PPFA's intent:

> For now, we are going to try and milk a few more stories out of this and the framing will be "Abbott is giving Medicaid patients 30 days to scramble and find new providers in a system that already has a provider shortage."

*Id.* On January 25, 2021, PPFA Director of Healthcare Operations Regan Clawson

expressed her *reluctance* to refer patients to other providers and "connect the

affiliates essentially to a competitor." Appx. 6126 (R. Clawson Jan. 25, 2021 email,

PPFA00005182). Similarly, testimony from Affiliate Defendants failed to uncover any

plans to transition their Medicaid patients to new providers. *See, e.g.*, Appx. 1985

(Lambrecht Depo. at 134:10–23) (unable to recall "any specific steps PPGT took to

transition their Medicaid patients to new providers"); Appx. 1364 (Barraza Depo.

219:8–221:21) (confirming that PPST performed no outreach to patients other than

communications with patients physically present in a PPST health center);

Appx.1577 (Curtis Depo. 21:23–22:25) (confirming that PPGC performed no outreach

to patients other than to those patients physically present in a PPGC health center).

It is clear that PPFA did not treat the "grace period" as a period of transition,

but rather as a gambit to plan its next maneuver to get more Medicaid revenue. For

instance, on January 28, 2021, PPGT Chief External Affairs Officer Sarah Wheat

expressed her belief that "PPFA wants to keep this litigation going" because "the

lawsuit and on-going news coverage of patients impacted supports PPFA's

conversations with the new [Biden] Administration." Appx. 6160 (Wheat–McKinney,

Jan. 28, 2021 email, PPGT00113950). Similarly, on February 2, 2021, PPFA VP of

Organizing and Engagement Campaigns Jenny Lawson provided a "Texas Medicaid Update" in which she identified among the "Goals for this week" to "*Delay termination* through any and all legal pathways." Appx. 6156 (Lawson–Brown, Feb. 2, 2021 email, PPFA00352514) (emphasis in original). The next day, Affiliate Defendants filed a second lawsuit against Texas in Travis County District Court. Appx. 6179 (Original Petition/Travis County, Feb. 3, 2021, PPGC00147321). Thus, PPFA's assistance to Affiliate Defendants in requesting the grace period from HHSC was motivated by a desire to further delay HHSC from implementing Affiliate Defendants' terminations and obtain additional Medicaid revenue.

### c. PPFA assisted Affiliate Defendants in filing an unsuccessful lawsuit in Travis County District Court which relied on theories for which they had "no authority."

On the last day of the "grace period" (i.e., February 3, 2021), PPFA's L&L attorneys assisted Affiliate Defendants in filing an unsuccessful lawsuit in Travis County District Court. Appx. 6179 (Original Petition/Travis County, Feb. 3, 2021, PPGC00147321). Although Affiliate Defendants obtained a temporary restraining order that permitted them to seek reimbursement from Texas Medicaid for roughly six additional weeks, the trial court ultimately denied their application for injunctive relief, noting their legal theories had "no authority." Appx.1091-92.

As Defendants' privilege logs reveal, PPFA worked with Affiliate Defendants in early February 2021 on the petition to be filed in Travis County. *See, e.g.*, Appx. 6052 (Affil. Ds' First Priv. Log, Lines 277–78) (reflecting February 1, 2021 email from PPFA L&L attorney J. Sandman to Affiliate Defendant employees and others

regarding "providing legal advice re: draft mandamus petition in TX Medicaid termination litigation" and attaching a draft petition). Affiliate Defendants' Original Petition for Writ of Mandamus sought to compel HHSC and the HHSC-OIG to issue new notices of termination to Affiliate Defendants following the conclusion of the "grace period." Appx. 6179./

This gambit was transparently meritless. By letter ruling dated March 10, 2021, Judge Livingston denied Affiliate Defendants' Application for Temporary Mandatory Injunction and Petition for Writ of Mandamus. Appx. 1091-92. Judge Livingston not only found Affiliate Defendants' legal positions lacking, but that Affiliate Defendants cited "no authority" to support them:

> In that context, [Affiliate Defendants] *cite no authority* for the proposition that a court injunction requires the OIG to re-notice its termination; *that a pending federal court case or injunction tolls the deadline to administratively appeal the termination*; or that it can now challenge the propriety of the December 20, 2016, termination letter in a state administrative proceeding.

*Id.* (emphasis added). Thus, assisting Affiliate Defendants in filing a meritless lawsuit shows a continued desire to maximize Medicaid revenue even though it had been clear for months that the Affiliate Defendants were entitled to none.

### d. PPFA participated in PPGC's efforts to conceal the true facts of their termination and their affiliates' Texas terminations from LDH and the Middle District of Louisiana in an effort to maximize Medicaid revenue.

PPFA L&L attorneys also represented PPGC in the Louisiana federal court action. *See* Complaint, *Kliebert*, No. 3:15-cv-00565 (M.D. La. Aug. 25, 2015), Dkt. 1.

74

Despite the fact that both PPFA and PPGC *knew* the Fifth Circuit opinion overruled the Louisiana case, rendering the still-pending preliminary injunction without legal basis and giving "the green light" for Louisiana to finally effectuate PPGC's termination, PPFA engaged in further maneuvering to nonetheless prolong the preliminary injunction and milk it to obtain additional Medicaid revenue PPGC was not entitled to. PPFA did not update the Louisiana federal district court with the Fifth Circuit's ruling. Instead, when Louisiana moved to vacate the preliminary injunction, PPFA *opposed* the request and urged the Court to keep the baseless injunction in place—and it did. Louisiana later again requested the injunction to be lifted, and this time, on October 10, 2022, PPFA simply noted that PPGC did not oppose the request. On November 9, 2022, PPGC dismissed the Louisiana case, Notice of Voluntary Dismissal, *Kliebert*, No. 3:15-cv-00565 (M.D. La. Nov. 9, 2022), Dkt. 131, and on November 10, 2022, the Court vacated the preliminary injunction and dismissed the case, Order, *Id.* (M.D. La. Nov. 10, 2022), Dkt. 132.

The result was that for nearly a year after it was known to PPFA and PPGC that the preliminary injunction had no legal basis and should be vacated, PPGC continued to bill Louisiana Medicaid and PPFA continued to support that effort in court.

### e. PPFA continues to assist Affiliate Defendants' ongoing efforts to avoid paying money back to Texas and Louisiana Medicaid.

PPFA *continues* to represent and assist Affiliate Defendants in their ongoing efforts to withhold money that they are legally obligated to return to the Texas and Louisiana Medicaid programs. Although PPFA attorneys have not appeared in this

action, several Affiliate Defendant witnesses have testified that PPFA attorneys represent and provide counsel to Affiliate Defendants in this action. *See, e.g.*, Appx. 1631 (Curtis Depo. 237:21–238:4 (acknowledging that PPFA's "Jen Sandman represents PPGC, in this litigation, in conjunction with Arnold & Porter"); Appx. 1930 (Lambrecht Depo.140:11–21) (confirming that Ms. Sandman is "among our lawyers" "in this litigation").

* * *

Because PPFA masterminded and orchestrated a strategy that enabled Affiliate Defendants to seek reimbursement from Texas Medicaid after the effective date of their terminations from the program and continue in their refusal to return those funds, PPFA's own conduct subjects it to liability under the TMFPA for impairing Affiliate Defendants' obligation to repay funds to Texas Medicaid. Tex. Hum. Res. Code § 36.002(12); *Caremark*, 634 F.3d at 817; *Hangar*, 563 F.2d at 1158.

### C. PPFA is also liable because it extensively directs the operations of the Affiliate Defendants.

As this Court already recognized, a parent corporation may be held liable for the acts of subsidiaries when an "alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management." Dkt. 71 at 22 (quoting *United States v. Bestfoods*, 524 U.S. 51, 64 (1998)). Where "the parent is directly a participant in the wrong complained of," it is thus "directly liable for its own actions." *Bestfoods*, 524 U.S. at 64–65. The general "rule" is that "the parent 'corporation is [itself] responsible for the wrongs committed by its agents in the course of its business.'" *Id.* at 65 (quoting *Mine Workers v. Coronado Coal Co.*, 259 U.S. 344, 395

(1922)). And where a parent company "oversee[s] . . .operations" of a subsidiary, *United States v. Omnicare, Inc.*, No. 1:15-CV- 4179 (CM), 2021 WL 1063784, at *13 (S.D.N.Y. Mar. 19, 2021), is aware of investigations and unlawful conduct but does not remedy it, *id.*, and engaged in "audit[s]" of a subsidiary's "Revenue Process," *id.* that is enough to show direct involvement, *see id.* For instance, in *Martino-Fleming*, the District of Massachusetts held that a claim could go to trial against a private-equity firm, a majority shareholder of a for-profit mental health provider and Medicaid service provider, even though the firm obviously did not directly provide the Medicaid services nor bill for them. *United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.*, No. 15-CV-13065-PBS, 2021 WL 2003016, at *130 (D. Mass. May 19, 2021). The Court noted that the firm "understood that [the provider's] revenues were tied to Medicaid," "understood that Medicaid had requirements in terms of licensure and qualification," knew about the allegedly unlawful acts, and "had the power to fix the regulatory violations which caused the presentation of false claims but failed to do so." *Id.*

Though the Affiliate Defendants are separately incorporated, PPFA controls virtually all aspects of their business operations and provision of medical services as a condition of allowing the Affiliates to use the Planned Parenthood brand and be a member of the Federation.

## 1. Accreditation and Evaluation by PPFA

PPFA requires the Affiliate Defendants to be "accredited" through a rigorous appraisal of their policies, practices, and programs to assess compliance with PPFA's

standards. *See* Appx.002727-003151. These standards address every aspect of the Affiliate Defendants' business, including delivery of healthcare services, financial performance, board government, staffing and training, trademark protection, information management, human resources, and risk and quality management. *Id.* PPFA review managers and program experts conduct a review of all required board, administrative, and financial documents; human resources, IT, education, and HIPAA security materials; and the Affiliate Defendants' medical manual. These individuals also conduct interviews with key affiliate staff. PPFA's on-site review team, composed of PPFA accreditation managers and a team of health care professionals, reviews additional documents, interviews key staff members and the board chair, observes clinical services and patient education sessions, reviews medical records, completes health center assessments, and assesses personnel records and security systems for adherence to PPFA standards. Appx.002728. If an affiliate fails to meet PPFA's standards, PPFA may require the affiliate to implement a corrective action plan or revoke the affiliate's accreditation. *Id.* Since 2015, PPFA has completed several comprehensive accreditation reviews of each of the Affiliate Defendants. *See* Appx.003152-004021.

## 2. National Program Support (NPS) and PPFA Services for Affiliates

Once an affiliate is accredited by PPFA, it becomes a member of the Federation but must pay PPFA to maintain that standing. That required payment is the NPS, which is calculated based on a percentage of the PPFA Affiliates' operating expenses, which includes expenses incurred in the provision of Medicaid services. Appx.001467

(PPFA Barrow-Klein Depo. 147:11-150:10). If a PPFA Affiliate provides additional Medicaid services, it will incur additional operating expenses which increases the amount of its NPS payments to PPFA. There are no requirements or restrictions on the sources of funds that PPFA Affiliates use to make their NPS payments to PPFA. Appx.001468 (PPFA Barrow-Klein Depo. 151:5-17). Thus, PPFA has received and continues to receive Medicaid funds through the NPS payments from the PPFA Affiliates because Medicaid funds are part of the PPFA Affiliates' revenue. In other words, the PPFA Affiliates received Medicaid funds from Texas Medicaid and/or Louisiana Medicaid and paid a percentage of those Medicaid funds to PPFA as part of the NPS payments to PPFA. Defendants' expert Louis Dudney admitted that the PPFA Affiliates have paid Medicaid funds to PPFA as part of their NPS payments. Appx.001792 (Dudney Depo. 199:8-201:7).

### 3.  Business Operations and Financial Consulting

The PPFA Business Operations Team is a group of approximately 15 subject matter experts who advise affiliates on services, revenue cycle, administration, financial consulting, and other operational issues. Appx.001542 (Coluccio Depo. 12:6-21). Former PPFA Senior Director of Affiliate Financial Consulting Rosemary Coluccio testified that she and her team from PPFA travelled to Lubbock, Midland, San Antonio, Austin, and Houston to provide financial and business consulting services, including revenue cycle, to the PPFA Texas and Louisiana affiliates. Appx.001543–55 (Coluccio Depo. 14:23-18:15; 20:13-21:12).

Coluccio's team built "partnerships" with the PPFA Affiliates. Appx.001544 (Coluccio Depo. 18:18-19:22). All of the consulting services PPFA provides to the PPFA Affiliates are funded by PPFA and the salaries of the team members are paid by PPFA. *Id.* (Coluccio Depo. 19:23-20:12). PPFA also provides IT consulting services, HR consulting services and clinical consulting to the PPFA Affiliates in Texas and Louisiana. Appx.001544–45 (Coluccio Depo. 21:7-23:2).

### 4. PPFA's Healthcare Services Department and and Healthcare Operations Team

The PPFA Chief Healthcare Officer supervises the Vice President of Healthcare Operations and oversees the PPFA Health Care Operations Team, PPFA Patient Experience Team, CAPS Team, and a PPFA team that includes clinical quality improvement, health equity, public health outcomes, and medical standards and guidelines. Appx.002227 (Trivisonno Depo. 98:18-100:1). There are approximately 70-100 PPFA employees who make up the Healthcare Services Department of PPFA. The Healthcare Operations Team is part of that Department. The Healthcare Operations Team is a team of subject matter experts who are employed by PPFA and focus on clinical operations, efficiency, and financial support. Appx.002222–23 (Trivisonno Depo. 81:18-82:13). These subject matter experts are part of a Clinical Operations Team or Financial Support Team. Appx.002223 (Trivisonno Depo. 82:23-83:19). Clinical Operations Team is comprised of ten to twelve individuals who have subject matter expertise in clinical operations, health center flow, health center scheduling, online appointment scheduling, and telehealth. Appx.002223–24 (Trivisonno Depo. 85:1-89:20). The Clinical Operations Team works

to improve health center flow to increase access to healthcare for PPFA patients, works with the PPFA Digital Products Team on online appointment scheduling to make scheduling more seamless for patients, and provides expertise on telehealth to set up telemedicine abortion and work in partnership with PPFA Affiliates to develop a roadmap for telehealth service delivery and to expand telehealth services to find new PPFA patients. Appx.002223–24 (Trivisonno Depo. 85:1-89:9).

The PPFA Financial Support Team includes subject-matter experts in healthcare finance and revenue cycle who are responsible for reviewing the PPFA Affiliates' Quarterly Annual Financial Reports (QAFR) and providing technical assistance to PPFA Affiliates on matters such as providing new healthcare services like gender-affirming hormone therapy or midlife services. Appx.002224–25 (Trivisonno Depo. 89:9-91:14; 92:13-93:3). These PPFA subject-matter experts provide financial expertise to other PPFA employees who are responsible for reviewing Quarterly Annual Financial Reports (QAFRs) to ensure that PPFA Affiliates comply with the PPFA-mandated financial benchmarks and metrics. Appx.002226 (Trivisonno Depo. 94:1-96:8). The Clinical Operations Team revenue cycle experts review key performance indicators related to healthcare service delivery to identify opportunities to increase revenue or enhance healthcare billing. Appx.002225 (Trivisonno Depo. 93:4-25). Another member of the PPFA Healthcare Operations Team focuses on strategic initiatives and projects and serves as a liaison between the PPFA Clinical Operations Team and the PPFA policy team concerning healthcare policy issues that have clinical impact and could provide opportunities for

81

PPFA to deliver healthcare services to more patients. Appx.002226–27 (Trivisonno 96:24-98:3).

The PPFA clinical quality improvement team reviews certain indicators for healthcare services to determine what is working well and what can be improved clinically to improve healthcare and health outcomes for PPFA patients. Appx.002227 (Trivisonno Depo. 100:6-20). The PPFA patient experience team looks at patient and employee experience to determine what can be improved and areas of opportunity to improve PPFA patient experience. Appx.002227 (Trivisonno Depo. 100:21-101:6). The PPFA Consortium of Abortion Providers (CAPS) team is focused on the provision of abortion and improving access to abortion. Appx.002227–28 (Trivisonno Depo. 101:11-102:4). The PPFA Medical Standards and Guidelines team is responsible for developing, reviewing, and updating guidelines for providing healthcare to PPFA patients. Appx.002228 (Trivisonno Depo. 103:1-104:5). The PPFA health equity team is responsible for ensuring the equitable delivery of healthcare to PPFA patients. Appx. 002227 (Trivisonno Depo. 104:6-19). And the PPFA health outcomes team focuses on what PPFA Affiliates should be doing to mitigate risks for both patients and staff. Appx.002228 (Trivisonno Depo. 104:20-105:2).

PPFA commits significant resources to expanding its health care services and building new healthcare facilities throughout the country. PPFA receives donations from outside funders to pay for the construction of new PPFA healthcare facilities, conducts financial analysis and market research for new potential PPFA healthcare facilities, and performs extensive design and construction review of nearly every

detail of proposed PPFA healthcare facilities. Appx.002240–42 (Trivisonno Depo. 150:10-151:5, 9-13, 23-25; 152:1-10; 153:16-155:9, 19-25; 156:1-11; 157:5-13, 19-25; 158:1-161:5); Appx.005155–56. Since 2014, PPFA has published and distributed a book called the "PPFA Building Book for Health Centers" providing comprehensive design and construction information, potential floor plans for different kinds of PPFA health centers, color schemes, and other design considerations involved in constructing new PPFA healthcare facilities. Appx.002246 (Trivisonno Depo. 174:20-176:18; 176:24-177:3, 7-12, 17-20); Appx.005188–89. PPFA's Vice President of Health Care Operations, Teri Trivisonno, compared PPFA's Building Book and design goals as similar to that of Starbucks, describing them as "the things that make it so when you go into a Starbucks you know you're at a Starbucks even if you never saw a Starbucks sign." Appx.002246 (Trivisonno Depo. 174:20-175:7). PPFA provides loans for short-term assistance to PPFA Affiliates. Appx.002242 (Trivisonno Depo. 161:17-20). PPFA also provides direct financial support and investment in projects to expand Planned Parenthood's healthcare services. Aoox,992245 (Trivisonno Depo. 172:5-21; Appx.005186–87. For example, PPFA provides direct funding to PPFA Affiliates to expand services to provide gender-affirming hormone care and limited primary care. *Id*. PPFA's healthcare service expansion projects are overseen by the PPFA Healthcare Operations Team. *Id*. PPFA has recently explored options for mail order pharmacies to provide direct-to-patient medication abortion to PPFA's patients. Appx.002247 (Trivisonno Depo. 178:21-180:21; 181:9-11); Appx.005190–24.  PPFA partnered with PPFA Affiliates to develop an electronic health records system and

provided webinars and other guidance concerning electronic health data standards. Appx.002249–50 (Trivisonno Depo. 189:9-190:23); Appx.005196–97. PPFA performs risk assessments concerning federal funding PPFA and the PPFA Affiliates receive for healthcare services. Appx.002250 (Trivisonno Depo. 192:10-193:14); Appx.005196–97.

PPFA also assists Affiliates in staying abreast of changes in laws and policies. It reviews and analyzes changes in federal policies concerning distribution of pharmaceuticals to its patients, including 340B drug pricing. Appx.002247–48 (Trivisonno 181:13-182:23; 182:1-184:20; 185:9-11); Appx.005194–95. PPFA's Health Care Operations Team prepares materials and information for compliance documents and training, such as billing issues and pricing disclosures for medical services delivered to PPFA's patients. Appx.002249 (Trivisonno 187:7-25). PPFA regularly hosts webinars for Affiliates, including for Medicaid Auditing and Compliance and new Medicaid rules and regulations. Appx.005015–16; Appx.005025–5043. PPFA also hosted Monthly Policy Update Call for PPFA Affiliate CEOs where PPFA discussed issues such as Medicaid defunding and Medicaid waivers. (Lambrecht Ex. 24). PPFA provided advice and guidance to PPGT regarding Medicaid rules and regulations. (Lambrecht Ex. 26). PPFA also formed a Defund Action Team and organized a program to provide "Gap Funding" to Affiliates terminated from Medicaid, which would have to be paid back to PPFA if the Affiliate was able to resume receiving Medicaid funds. Appx.005032–34.

PPFA Regional Campaign Directors are responsible for partnering and working with PPFA Affiliates on matters concerning healthcare policy and advocacy issues in regions of the country where PPFA and the PPFA Affiliates provides healthcare services. Appx.002250–51 (Trivisonno Depo. 193:18-24; 194:3-6). PPFA Health Care Operations Team members provide state-level advocacy concerning strategic issues and projects that impact PPFA and the PPFA Affiliates' business, including participation in Medicaid. Appx.002251–52 (Trivisonno Depo. 195:4-12, 23-25; 196:1-4, 17-25; 197:1-4, 9-12, 23-25; 198:1-4, 12-14); Appx.005159–5162. In fact, PPFA developed a comprehensive communications strategy and lobbying campaign to address PPGC's exclusion from Louisiana Medicaid, challenge PPGC's termination from Louisiana Medicaid, and lobby the Governor of the State of Louisiana for Medicaid funding. *Id*.

### 5. PPFA's Health Care Investment Program

PPFA also created and funded a program called the Health Care Investment Program (HCIP) to provide technical assistance to PPFA Affiliates on issues such as Medicaid. Appx.004874; *see generally* Appx.004390-004570. Tamara Kramer, the HCIP's current director, is considered knowledgeable on Medicaid. Appx.001656 (Custer Depo. 72:8-22). One of the main goals of the HCIP was to maximize Medicaid revenue for the Affiliates. Appx.005094–96. PPFA's HCIP Team publishes a "Medicaid Toolkit" that advises best practices on billing. Appx.004979, 004978. Through the HCIP, PPFA provided direct grant funding to the Texas and Louisiana PPFA Affiliates to pay for Medicaid and healthcare billing consultants with expertise

in state Medicaid policy. Appx.001883–001886 (Kramer Depo. 173:5-174:12, 182:1-184:13). In 2018, after PPGC had been terminated Texas and Louisiana Medicaid, PPFA nonetheless entered into agreements to assist PPGC in efforts to build relationships with payors in Texas and Louisiana for Medicaid services. Appx.001886 (Kramer Depo 182:17-183:17). In addition, PPFA's HCIP team partnered with PPFA Affiliates to provide guidance and talking points for meetings with state Medicaid officials. Appx.001880 (Kramer Depo. 161:19-23). The HCIP team also provided a letter drafted by PPFA for PPGC to submit to LDH. Appx.001883 (Kramer Depo. 169:21-172:19).

\* \* \*

PPFA's extensive involvement in and control of the operations of the Affiliate Defendants' businesses and provision of medical services, including Medicaid services, provides an additional basis for liability. Aside from PPFA lawyers, many other PPFA employees were involved in the Affiliate Defendants' business operations and PPFA expressly sought to maximize Medicaid reimbursements. PPFA employees were also involved in preventing Medicaid "defund" measures and responding to them in conjunction with Affiliates. Because of the degree of control and information sharing, PPFA, like the private-equity firm in *Martino-Fleming*, "understood that [the Affiliates'] revenues were tied to Medicaid," "understood that Medicaid had requirements in terms of licensure and qualification," knew about the allegedly unlawful acts, and "had the power to fix the regulatory violations which caused the

86

presentation of false claims but failed to do so." *Martino-Fleming v. S. Bay Mental Health Centers*, No. 15-CV-13065-PBS, 2021 WL 2003016, at *130.

### IV. The Undisputed Facts Show that Planned Parenthood is Liable for Conspiracy to Commit Healthcare Fraud under Texas and Louisiana Law.

The TMFPA imposes liability on a party who "conspires to commit a violation" of the TMFPA. Tex. Hum. Res. Code § 36.002(9). The LMAPIL imposes liability on a person who "conspire[s] to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim." La. R. S. § 46.438.3(D); *see also* 31 U.S.C. § 3729(a)(1)(C) (False Claims Act). To prove a conspiracy, a relator must show the existence of an unlawful agreement to get a false or fraudulent claim paid and at least one act performed in furtherance of the agreement. *U.S. ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 193 (5th Cir. 2009) (citations omitted). The conspirators must share a specific intent to defraud the government. *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). It is not necessary, however, to show that a violation of the statutes was actually committed by all defendants, only that a false claim was submitted. *See Williams v. Hosp. Serv. Dist. of W. Feliciana Par., Louisiana*, 250 F. Supp. 3d 90, 96 (M.D. La. 2017).

Here, the undisputed facts show that Defendants are liable for conspiracy to commit healthcare fraud in three ways. First, as described above, *see* Part III.B.2. *supra*, PPFA, along with PPST, PPGT, and PPGC, conspired to violate the TMFPA by agreeing that PPST, PPGT, and PPGC would not return the overpayments they

received under the vacated preliminary injunctions and would continue to use the courts, either by asking through PPFA for relief they knew was unsupported or by avoiding updating the court as to developments directly impacting the legal basis for their claims, to extend the amount of time they could bill Medicaid under preliminary or temporary injunctions, even though they knew or were recklessly indifferent to the fact that they were no longer Medicaid providers under state law. PPFA and PPGC conspired to violate LMAPIL in the same way.

Second, PPFA, along with PPST, PPGT, and PPGC, conspired to violate the TMFPA by agreeing that PPST, PPGT, and PPGC would continue to file claims for reimbursement under the Texas Medicaid program even after it knew that the State's termination of its Medicaid provider agreements was final. *See* Part II.A *supra*. PPFA and PPGC conspired to violate LMAPIL in the same way. *See* Part II.B *supra*.

Third, as described above, *see* Part III.B.2.d *supra*, PPFA, along with PPST, PPGT, and PPGC, conspired to violate the TMFPA by telling the State of Texas that it needed a "grace period" to remain in Texas Medicaid even after termination to transition their patients to other providers. This was done through a letter drafted by PPFA and signed by PPST, PPGT, and PPGC. Thus aided by PPFA, PPST, PPGT, and PPGC then instead used the grace period instead to bill for as many services as they could. PPST, PPGT, and PPGC waited until after the grace period had ended to help their patients find new providers, and even then, only by referring patients to HHSC's website.

While Relator cannot recover damages and penalties under this claim that are duplicative to Relator's other claims, Defendants' liability for conspiracy renders all Defendants jointly and severally liable for the entire judgment. *Intern. Paper Co. v. Frame*, 67 F. App'x 251, at *5 (5th Cir. 2003).

## V.   Relator and Texas Are Entitled to Summary Judgment on Defendants' Affirmative Defense.

Defendants assert an affirmative defense under the Excessive Fines Clause of the Eighth Amendment. Dkt. 81 at 78. Aside from the fact that it is not a complete defense to liability, this affirmative defense is meritless. Courts have repeatedly awarded significant civil penalties in False Claims Act cases, and no court has held that any fine under the FCA violates the Excessive Fines Clause. Whether the civil penalties that Defendants face here violate the Excessive Fines Clauses necessarily calls for a legal conclusion and thus involves no issues of material fact. Defendants' affirmative defense under the Excessive Fines Clause is therefore properly decided on a motion for summary judgment.

The Eighth Amendment prohibits the government from imposing "excessive fines." U.S. Const. amend. VIII. The Supreme Court has concluded that a civil penalty could violate the clause. *United States v. Bajakajian*, 524 U.S. 321 (1998). The Court held that civil fines violate the constitution when: (1) the forfeiture is "punitive"; and (2) a full forfeiture "would be grossly disproportional to the gravity of the offense." *Id.* at 324, 334. But since *Bajakajian*, *no* case has rejected False Claims Act penalties on this basis. Courts look to several, non-exhaustive factors to determine whether a penalty was excessive, such as (i) whether the defendant is in the class of persons at

89

whom the statute was mainly directed; (ii) how the imposed penalties compare to other penalties authorized by the legislature; and (iii) the harm caused by the defendant.

In *Yates v. Pinellas Hematology & Oncology*, the Eleventh Circuit held that the Excessive Fines Clause allows False Claims Act awards predominated by penalties. 21 F.4th 1288 (11th Cir. 2021). There, the Court reviewed the judgment of $1,179,266, which consisted of $2,266 in treble damages and $1,177,000 in civil penalties. The district court found 214 false claims with economic damage of $755 and entered judgment of $755 times three, plus 214 times $5,500, for a total award of $1,179,226. The Eleventh Circuit concluded that the damages and penalties did not violate the Excessive Fines Clause. *Id*. at 1314. The court noted that the penalties imposed were the smallest possible under the FCA and that penalties falling below the maximum receive a "strong presumption of constitutionality." *Id*. (internal citations omitted). It then becomes the defendant's obligation to rebut that presumption of constitutionality. *Id*.

The Court in *Yates* further found that the defendant was among those at whom the FCA is directed, that the FCA treble damages were like those authorized in other suits, and that the FCA penalties were only half the potential maximum penalties and compared favorably to other penalties for violating the FCA. 21 F.4th at 1314–15. In addition, the Court found that the harm to the government was considerable and rejected the defendant's attempt to equate the harm to the damages assessment, holding that "[f]raud harms the United States in ways untethered to the value of any

ultimate payment." *Id.* at 1316. "For instance, we have explained that when the United States is defrauded, the government has been damaged to the extent that such corruption causes a diminution in the public's confidence in the government." *Id.* (internal citations omitted); *see also U.S. v. Mackby*, 339 F.3d F.3d 1013, 1019 (9th Cir. 2003) ("Fraudulent claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system."); *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V*, 741 F.3d 390, 409 (4th Cir. 2013) (fraud "shakes the public's faith in the government's competence and may encourage others similarly situated to act in a like fashion."). Finally, the Court considered the deterrent effect of a monetary award, finding that it properly balanced the need to deter potential fraudsters with the gravity of the conduct. The Court concluded that "substantial penalties serve as a powerful mechanism to dissuade repeated violations of the FCA." *Yates*, 21 F.4th at 1316 (cleaned up).

Likewise, the penalties involved here do not violate the Excessive Fines Clause because (i) Defendants are in the class of persons at whom the FCA is mainly directed; (ii) the penalties track other penalties authorized by the legislature; and (iii) Defendants' actions defrauding the government caused significant harm warranting the potential penalties. As to the first factor, Defendants are nonprofit health care providers that rely on the government-funded Medicaid program for funding, and thus the class of persons at which the FCA, TMFPA, and LMAPIL are directed. "The FCA imposes liability on any person who defrauds or conspires to defraud the United States" and "is the United States' primary litigative tool for combatting fraud against

it and is intended to reach all fraudulent attempts to cause the Government to pay our [sic] sums of money." *Yates*, 21 F.4th at 1314–15 (cleaned up). "[B]y submitting fraudulent claims," Defendants are "squarely in the FCA's crosshairs." *See id.* at 1315.

Second, the penalties imposed by the FCA, TMFPA, and LMAPIL follow other penalties imposed by the legislatures. Plaintiffs seek treble damages (under the FCA), civil penalties (under TMFPA), actual damages and civil fines (under LMAPIL), and civil penalties. As the Texas Supreme Court noted in *Xerox*, the TMFPA's civil remedies are not "damages" but "penalties." *Id.* at 534. The Louisiana statute differentiates between "actual damages" and the trebled "civil fine." La. R.S. § 46:438.6. Any recovery of "actual damages" or a "civil fine" under LMAPIL is considered "civil liquidated damages" and is "remedial." *Id.* § 46.438.6(E).

Treble damages are a common penalty authorized in both state and federal legislation to deter or punish harmful conduct. Congress authorizes treble damages in other statutes, including under "18 U.S.C. § 1964(c) (authorizing treble damages in a civil RICO suit); 15 U.S.C. § 15(a) (same for violations of the Clayton Act); 35 U.S.C. § 284 (same for patent infringement)." *Yates*, 21 F.4th at 1315. Texas and Louisiana likewise have statutes authorizing treble damages. *See, e.g.*, Tex. Bus. & Comm. Code § 17.50(b) (authorizing treble damages for violating the Texas Deceptive Trade Practices Act); La. Rev. S. 51 § 1409 (Authorizing treble damages under the Louisiana Unfair Trade Practices and Consumer Protection Law). Indeed, "[t]he very idea of treble damages reveals an intent to punish past, and to deter future, unlawful

92

conduct, not to ameliorate the liability of wrongdoers." *Xerox*, 555 S.W.3d at 527. As the Supreme Court noted, "the FCA imposes damages that are essentially punitive in nature." *Stevens*, 529 U.S. at 784.

As to the statutory penalties, the penalties requested here are lower than the maximum penalties under the FCA, TMFPA, and LMAFIL. The current minimum penalty for violating the FCA is $12,537 per violation, with a maximum penalty of $25,076 per violation. *See* 87 Fed. Reg. 27513 (May 9, 2022). Plaintiffs have requested civil penalties at the statutory minimum of $12,537 per violation—*half* of the maximum penalty allowed by law.

Finally, as to the third factor, Defendants' wrongdoing has caused significant damage. Defendants have submitted 45,181 false claims to the Texas Medicaid program and 99,230 false claims to the Louisiana Medicaid program during the relevant period. Defendants' actions are precisely those meant to be prohibited by these statutes, yet Defendants engaged in a pattern of wrongdoing, resulting in over 140,000 violations of these statutes. The penalties (detailed below) are therefore proportionate to the damage done by Defendants.

Moreover, the civil penalties involved here have been calculated in a manner identical to the fines in *Yates* and other FCA cases. There are many False Claims Act cases with significant civil penalties. A single fraudulent scheme can involve thousands of False Claims Act penalties and each penalty can be tens of thousands of dollars. For instance, in *Bunk*, government contractors submitted 9,136 invoices under contracts they obtained through bid-rigging. 741 F.3d at 400. The Government

chose not to prove any damages at all and instead established 9,136 False Claims Act penalties. *Id.* Therefore, even at the minimum penalty amount, the defendant faced over $50 million in FCA penalties. *Id.* at 400–01. The government later agreed to accept $24 million in settlement. *Id.* at 401.

Health care fraud in particular can also generate significant False Claims Act penalties. For example, in *U.S. ex rel. Drakeford v. Tuomey,* a hospital compensated its physicians in a way that violated the Stark Law against physician self-referrals. 797 F.3d 364, 386 (4th Cir. 2015). The district court found that the hospital violated the Stark Law and thus the False Claims Act. *Id.* at 373. It further found that the defendant had submitted 21,730 false claims to Medicare with a total value of $39,313,065. *Id.* The district court assessed 21,730 civil False Claims Act penalties and awarded $119,515,000 in FCA penalties along with treble damages. *Id.* at 384. The Fourth Circuit held that the award did not violate the Excessive Fines Clause and affirmed the judgment. *Id.* at 387. In *United States ex rel. Lutz v. BlueWave Healthcare Consultants, Inc.,* a jury convicted defendants of violating the Anti-Kickback Statute to procure laboratory tests. 2018 WL 11413969, at *1 (D.S.C. May 23, 2018). Subsequently, the jury found that the defendants had presented over 35,000 claims, damaging the government by approximately $17 million. *Id.* The Court noted that the government could have sought 38,887 False Claims Act penalties for a total of between $213,878,500 and $427,757,000 but requested FCA penalties of $5000 and for only 11,500 of the claims. *Id.* at *5 and n. 4. The Court imposed statutory penalties of over $63 million. *Id.* at *5.

94

Here, Defendants here have engaged in a multi-year scheme, resulting in Defendants submitting 45,181 false claims to the Texas Medicaid program and 99,230 false claims to the Louisiana Medicaid program. Appx.001106 (Lochabay Decl. ¶23), Appx.001216 ((Lochabay Decl. ¶ 19). There was $8,962,162 in false claims submitted to the Texas Medicaid program and $8,059,229 in false claims submitted to the Louisiana Medicaid program. Appx.001105 (Lochabay Decl. ¶22), Appx.001215 (Lochabay Decl. ¶ 18). The relevant statutes authorize additional damages, resulting in an additional two times the actual damages in damages for false claims submitted to Texas Medicaid ($17,924,324) and an additional three times the actual damages for false claims submitted to Louisiana Medicaid ($24,177,687). Tex. Hum. Res. Code § 36.052(a)(4), Tex. Hum. Res. Code § 36.052(a)(4) and 31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1).

Because of the staggering number of violations committed by Defendants, the civil penalties authorized by the FCA, TMFPA, and LMAFIL are also high. But these penalties are proportionate to the number of violations committed by Defendants, and in line with other FCA cases. The statutory *minimum* civil penalty authorized for false claims submitted to the Texas Medicaid program is $12,537,[21] meaning that the minimum penalty for Defendants' submission of 45,181 false claims submitted to the Texas Medicaid program is $566,434,197. *See* Tex. Hum. Res. Code

---

[21] The 2022 inflation adjusted penalty is $12,537. 28 C.F.R. Part 85, May 9, 2022. The penalty amount will likely increase and require an update by the date of trial. Penalties for violations are assessed at the time of judgment. *See* 28 C.F.R. § 85.5; *cf. Walmart, Inc. v. U.S. Dep't of Justice*, 517 F. Supp. 3d 637 (E.D. Tex. 2021).

§ 36.052(a)(3)(B), 31 U.S.C. § 3729(a)(1), and 28 U.S.C. § 2461; *see also* Appx.001106 (Lochabay Decl. ¶23). The minimum penalty of $12,537 per violation also applies to false claims submitted to the Louisiana Medicaid program, meaning that Defendants' 92,567 false claims result in a minimum civil penalty of $1,244,046,510. *See* La. R.S. § 46.438.6(C)(1)(a), 31 U.S.C. § 3729(a)(1), and 28 U.S.C. § 2461; *see also* Appx.001216 (Lochabay Decl. ¶19). As in *Yates*, Plaintiffs request the smallest penalty authorized by law, and such penalty comes with a "strong presumption of constitutionality," which Defendants must rebut. 21 F.4th at 1314 (internal citations omitted). The damages and penalties requested here are authorized by statute and directly correlate to the number of violations committed by Defendants.

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment on Relator's claims and summary judgment on Texas's claim.

Respectfully submitted.

/s/ Heather Gebelin Hacker
Heather Gebelin Hacker
Texas Bar No. 24103325
Andrew B. Stephens
Texas Bar No. 24079396
HACKER STEPHENS LLP
108 Wild Basin Road South, Suite 250
Austin, Texas 78746
(512) 399-3022
heather@hackerstephens.com
andrew@hackerstephens.com

***Attorneys for Relator***

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

/s/ Amy Snow Hilton
Christopher D. Hilton
Chief, General Litigation Division
Texas Bar No. 24087727
Amy Snow Hilton
Assistant Attorney General
General Litigation Division
Texas Bar No. 24097834

Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667
Christopher.Hilton@oag.texas.gov
Amy.Hilton@oag.texas.gov

***Attorneys for State of Texas***

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2022, the foregoing document was filed and
served via CM/ECF on all counsel of record.

<u>/s/ Heather Gebelin Hacker</u>
Heather Gebelin Hacker