# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| | § | |
| THE STATE OF TEXAS,<br>*ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| | § | |
| THE STATE OF LOUISIANA,<br>*ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 2:21-CV-00022-Z |
| | § | |
| PLANNED PARENTHOOD | § | |
| FEDERATION OF AMERICA, INC., | § | |
| PLANNED PARENTHOOD GULF | § | |
| COAST, INC., PLANNED | § | |
| PARENTHOOD OF GREATER | § | |
| TEXAS, INC., PLANNED | § | |
| PARENTHOOD SOUTH TEXAS, | § | |
| INC., PLANNED PARENTHOOD | § | |
| CAMERON COUNTY, INC., | § | |
| PLANNED PARENTHOOD SAN | § | |
| ANTONIO, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 2

I.   Planned Parenthood Is Not Entitled to Summary Judgment on Plaintiffs'
    Claims Under the Reverse-False-Claims Provisions of the FCA, TMFPA, and
    LMAPIL. ......................................................................................................... 2

    A.  Under the reverse-false-claims provisions of the FCA, TMFPA, and
       LMAPIL, Planned Parenthood had an obligation to repay the Medicaid
       funds after the Fifth Circuit's ruling in *Kauffman*. ...................................... 2

      1.  Planned Parenthood's Failure to Post a Bond During the Medicaid
         Termination Litigation Does Not Negate Planned Parenthood's Obligation
         to Repay ............................................................................................... 3

      2.  Planned Parenthood was not entitled to the Medicaid funds it received
         after termination from Texas and Louisiana Medicaid. ............................. 7

      3.  Planned Parenthood had an obligation to repay the Medicaid funds at
         issue under the FCA, TMFPA, and LMAPIL. .......................................... 9

    B.  Under the reverse-false-claims provisions of the FCA, TMFPA, and
       LMAPIL, Planned Parenthood knowingly and improperly avoided their
       obligation to repay Medicaid funds. ......................................................... 16

      1.  It was not objectively reasonable for Planned Parenthood to keep the
         Medicaid funds paid after termination from Texas and Louisiana
         Medicaid. ........................................................................................... 17

        a.  Even if *SuperValu* applies, Defendants would still be liable under the
           FCA because they did not rely on any objectively reasonable
           interpretation of law and authoritative guidance cautioned them
           otherwise. ..................................................................................... 17

        b.  Whether Texas and Louisiana have returned the federal portion of
           Planned Parenthood's overpayment is irrelevant to Planned
           Parenthood's liability. ................................................................... 20

      2.  Any "government knowledge" of Planned Parenthood's obligation to repay
         cannot negate the scienter element. ......................................................... 22

        a.  Equitable defenses such as waiver cannot defeat the claims here. ........ 23

        b.  Planned Parenthood's "government knowledge" argument does not
           preclude liability. .......................................................................... 25

II.  Planned Parenthood Is Not Entitled to Summary Judgment on Relator's Implied-False-Certification Claims. ................................................................ 28

A.  The claims submitted by Planned Parenthood were false. ........................... 29

   1.  Claims submitted after February 5, 2011 ................................................. 30

   2.  Claims submitted after termination in Texas and Louisiana ................... 32

   3.  Claims submitted during the Texas "grace period" ................................. 33

   4.  Claims filed in Louisiana after PPGC was terminated from Texas Medicaid ................................................................................................. 36

B.  Planned Parenthood's claims violated conditions material to payment. ..... 39

III. PPFA Is Not Entitled to Summary Judgment Because It Is Directly Liable for Its Own Actions in Causing the Affiliate Defendants to Avoid Their Obligation to Repay the Medicaid Funds and in Filing Impliedly False Claims. .............. 44

A.  Liability under the FCA, TMFPA, and LMAPIL is not limited to parties to a Medicaid provider agreement or direct recipients of Medicaid funds. .......... 45

B.  PPFA is liable for its own actions in causing the Affiliate Defendants to avoid their obligation to repay Medicaid and in filing false claims. ............. 48

   1.  PPFA's "Litigation & Law" Department was directly involved in the Affiliates' unlawful acts, and their involvement furthered PPFA's mission. ................................................................................................. 48

   2.  PPFA was directly involved in the Affiliate Defendants' unlawful acts and efforts to retain and maximize Medicaid revenue. ................................... 49

      a.  PPFA acted knowingly when it directed the Affiliate Defendants to forego the administrative process in favor of litigation. .......................... 51

      b.  PPFA acted knowingly when it helped the Affiliate Defendants request a "grace period" as a pretext to continue to bill Texas Medicaid and advance media strategies to its own benefit. ........................................... 53

      c.  PPFA acted knowingly when it assisted the Affiliate Defendants in filing a meritless lawsuit in Travis County to obtain more Medicaid revenue. ................................................................................................. 55

      d.  PPFA acted knowingly when it directed and participated in PPGC's efforts to conceal the true facts of the Texas terminations from LDH and the Middle District of Louisiana in an effort to maximize Medicaid revenue. ................................................................................................. 56

C.  PPFA is liable because it exercises extensive control over the operations of the Affiliate Defendants. ............................................................................. 57

   1.  Accreditation and Evaluation by PPFA ................................................... 58

2.  PPFA's continuing involvement with all aspects of the Affiliate
Defendants' business. .................................................................. 60

IV. Texas and Louisiana Paid More to Managed Care Organizations for Planned
Parenthood's Claims Because Planned Parenthood Should Have Received
Nothing Because They Were Terminated. ...................................................... 61

V.  Planned Parenthood Is Not Entitled to Summary Judgment on Relator's
Conspiracy Claims.................................................................................. 62

CONCLUSION.......................................................................................... 62

CERTIFICATE OF SERVICE ....................................................................... 64

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) .................................................................................... 31

*Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.,*
249 U.S. 134 (1919) .................................................................................... 14

*Bowen v. Georgetown Univ. Hosp.,*
488 U.S. 204 (1988) .................................................................................... 13

*Butler v. Eaton,*
141 U.S. 240 (1891) .................................................................................... 13

*California v. Texas,*
141 S.Ct. 2104 (2021) .................................................................................. 7

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .................................................................................... 62

*Children's Hosp. Ass'n of Tex. v. Azar,*
507 F. Supp. 3d 249 (D.D.C. 2020) ................................................... *passim*

*Crowley v. Local No. 82, Furniture & Piano,*
679 F.2d 978 (1st Cir. 1982) ........................................................................ 6

*Edgar v. MITE Corp.,*
457 U.S. 624 (1982) ............................................................................... 32, 33

*Fed. Recovery Servs., Inc. v. United States,*
72 F.3d 447 (5th Cir. 1995) ........................................................................ 29

*Fort Defiance Indian Hospital Bd. v. Becerra,*
No. CIV 22-0098, 2022 WL 1690040 (D. N.M. May 26, 2022) ................. 5

*General Elec. Supply Co. v. Utley-James of Tex., Inc.,*
857 F.2d 1010 ............................................................................................ 23

*Gonzalez v. Planned Parenthood of L.A.,*
2012 WL 2412080 (C.D. Cal. June 26, 2012) ........................................... 30

*Green v. Humana at Home, Inc.,*
No. 16-cv-7586 (AJN), 2017 WL 9916832 (S.D.N.Y. Sept. 29, 2017) ............... 15, 16

*GTE S., Inc. v. Morrison,*
  199 F.3d 733 (4th Cir. 1999) ................................................................. 15

*Guaranty Trust Co. of N.Y. v. United States,*
  304 U.S. 126 (1938) ............................................................................ 24

*Harper v. Via. Dep't of Taxation,*
  509 U.S. 86 (1993) ........................................................................ 13, 15

*Holliday v. Bd. of Sup'rs of LSU Agr. & Mech. Coll.,*
  149 So. 3d 227 (La. 2014) .................................................................. 24

*Hutchins v. Prasifka,*
  450 S.W.2d 829 (Tex. 1970) .............................................................. 24

*In re Bayou Shores SNF, LLC,*
  828 F.3d 1297 (11th Cir. 2016) ......................................................... 62

*In re J.D. Jewell, Inc.,*
  571 F.2d 928 (5th Cir. 1978) ................................................................ 4

*In re S.A.P.,*
  156 S.W.3d 574 (Tex. 2005) .............................................................. 24

*In re Xerox Corp.,*
  555 S.W.3d 518 (Tex. 2018) ........................................................ 4, 28

*Instant Air Freight v. C.F. Air Freight,*
  882 F.2d 797 ......................................................................................... 6

*Janvey v. Alguire,*
  647 F.3d 585 (5th Cir. 2011) ............................................................. 14

*Kaepa, Inc. v. Achilles Corp.,*
  76 F.3d 624 (5th Cir. 1996) .................................................................. 6

*Kane ex rel. United States v. Healthfirst, Inc.,*
  120 F. Supp. 3d 370 (S.D.N.Y. 2015) ......................................... 10, 16

*Khadr v. United States,*
  529 F.3d 1112 (D.C. Cir. 2008) ..................................................... 13, 19

*LaLonde v. Gosnell,*
  593 S.W.3d 212 (Tex. 2019) .............................................................. 23

*Michigan American Fed'n of State Cnty. & Mun. Employees Council 25, Local 1640
v. Matrix Human Servs.,*
589 F.3d 851 (6th Cir. 2009) ...................................................................... 6

*Mine Workers v. Coronado Coal Co.,*
259 U.S. 344 (1922) ..................................................................................... 58

*Monroe Division, Litton Business Systems, Inc. v. De Bari,*
562 F.2d 30 (10th Cir. 1977) ......................................................................... 6

*National Kidney Patients Association v. Sullivan,*
958 F.2d 1127 (D.C. Cir. 1992)..................................................................... 5

*Navajo Health Foundation-Sage Memorial Hosp., Inc., v. Burwell,*
100 F. Supp. 3d 1122 (D. N.M. 2015).......................................................... 5

*Nazari v. State,*
561 S.W.3d ............................................................................................. 25, 28

*Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs.,
Inc. v. Kauffman,*
981 F.3d 347 (5th Cir. 2020) ........................................................... *passim*

*Planned Parenthood of Greater Tex. Family Planning & Preventative Services, Inc.
v. Smith,*
236 F. Supp. 3d 974 (W.D. Tex. 2017) ....................................................... 4

*Planned Parenthood of Gulf Coast, Inc. v. Gee,*
862 F.3d 445 (5th Cir. 2017) ........................................................................ 2

*Polansky v. Exec. Health Res., Inc.,*
422 F. Supp. 3d 916 (E.D. Pa. 2019)......................................................... 43

*Ray v. Cnty. of Los Angeles,*
935 F.3d 703 (9th Cir. 2019) ...................................................................... 15

*Reata Constr. Corp. v. City of Dall.,*
197 S.W. 3d 371, 375, 378 (Tex. 2006)...................................................... 15

*Schindler Elevator Corp. v. United States ex rel. Kirk,*
563 U.S. 401 (2011) .................................................................................... 48

*Smith v. United States,*
287 F.2d 299 (5th Cir. 1961) ...................................................................... 46

*State v. Durham*,
  860 S.W.2d 63 (Tex. 1993) ...................................................................... 24

*Tagaeva v. BNV Home Care Agency, Inc.*,
  No. 16-cv-6869 (RRM) (RLM), 2018 WL 1320661 (E.D.N.Y. Mar. 13, 2018) ......... 15

*Temple Univ. v. White*,
  941 F.2d 201 (3d Cir. 1991) ...................................................................... 6

*Tenth Ward Rd. Dist. No. 11 of Avoyelles Parish v. Tex. & Pac. Ry. Co.*,
  12 F.2d 245 (5th Cir. 1926) ...................................................................... 4

*U.S. ex. rel. Riley v. St. Luke's Episcopal Hosp.*,
  355 F.3d 370 (5th Cir. 2004) .................................................................... 47

*U.S. ex rel. Becker v. Westinghouse Savannah River Co.*,
  305 F.3d 284 (4th Cir. 2002) .................................................................... 27

*U.S. ex rel. Frey v. Health Management Systems, Inc.*,
  No., 2021 WL 4502275 .......................................................................... 47

*U.S. ex rel. Garbe v. Kmart Corp.*,
  73 F. Supp. 3d 1002 (S.D. Ill. 2014) ......................................................... 47

*U.S. ex rel. Hagood v. Sonoma Cnty. Water Agency*,
  929 F.2d 1416 (9th Cir. 1991) .................................................................. 27

*U.S. ex rel. Koch v. Koch Indus., Inc.*,
  57 F.Supp.2d 1122 (N.D. Okla. 1999) ....................................................... 47

*U.S. ex rel. Parikh v. Citizens Med. Ctr.*,
  302 F.R.D. 416 (S.D. Tex. 2014) .............................................................. 25

*U.S. ex rel. Spay v. CVS Caremark Corp.*,
  913 F. Supp. 2d 125 (E.D. Penn. 2012) ..................................................... 47

*U.S. ex rel. Wallace v. Exactech, Inc.*,
  No. 2:18-cv-01010-LSC, 2020 WL 4500493 (N.D. Ala. 2020) ......................... 47

*U.S. W. Commc'ns., Inc. v. Jennings*,
  304 F.3d 950 (9th Cir. 2002) ................................................................... 15

*United States ex rel. Bennett v. Biotronik, Inc.,*
   876 F.3d 1011 (9th Cir. 2017) ........................................................................ 28

*United States ex rel. Colquitt v. Abbott Labs.,*
   858 F.3d 365 (5th Cir. 2017) ..................................................................... 25, 26

*United States ex rel. Cressman v. Solid Waste Servs., Inc.,*
   2018 WL 1693349 (E.D. Pa. 2018) ................................................................ 43

*United States ex rel. Fallon v. Accudyne Corp.,*
   97 F.3d 937 (7th Cir. 1996) ........................................................................... 29

*United States ex rel. Kennedy v. Novo A/S,*
   5 F.4th 47 (D.C. Cir. 2021) ............................................................................ 27

*United States ex rel. Ketroser v. Mayo Found.,*
   729 F.3d 825 (8th Cir. 2013) ......................................................................... 29

*United States ex rel. Lemon v. Nurses To Go, Inc.,*
   924 F.3d 155 (5th Cir. 2019) ..................................................................... 30, 31

*United States ex rel. Marcus v. Hess,*
   317 U.S. 537 (1943) ....................................................................................... 47

*United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.,*
   No. 15-CV-13065-PBS, 2021 WL 2003016 (D. Mass. May 19, 2021) ..................... 58

*United States ex rel. Merena v. Smith Kline Beecham Corp.,*
   205 F.3d 97 (3d Cir. 2000) ............................................................................. 29

*United States ex rel. Ormsby v. Sutter Health,*
   444 F. Supp. 3d 1010 (N.D. Cal. 2020) .......................................................... 28

*United States ex rel. Petratos v. Genentech Inc.,*
   855 F.3d 481 (3d Cir. 2017) ........................................................................... 43

*United States ex rel. Schutte v. SuperValu Inc.,*
   9 F.4th 455 (7th Cir. 2021) ....................................................................... 17, 18

*United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.,*
   843 F.3d 1033 (5th Cir. 2016) ................................................................... 11, 12

*United States ex rel. Spay v. CVS Caremark Corp.,*
   875 F.3d 746 (3d Cir. 2017) ........................................................................... 27

*United States ex rel. White v. Mobile Care EMS & Transport, Inc.,*
  No. 1:15-cv-555, 2021 WL 6064363 (S.D. Ohio Dec. 21, 2021) .............................. 61

*United States v. Bestfoods,*
  524 U.S. 51 (1998) ................................................................................. 57

*United States v. Bollinger,*
  775 F.3d 255 (5th Cir. 2014) ........................................................... 25, 26

*United States v. Caremark,*
  634 F.3d 808 (5th Cir. 2011) .............................................. 46, 47, 48, 49

*United States v. Cushman & Wakefield, Inc.,*
  275 F. Supp. 2d 763 (N.D. Tex. 2002) .................................................... 24

*United States v. Hangar One, Inc.,*
  563 F.2d 1155 (5th Cir. 1977) ................................................................ 49

*United States v. Mackby,*
  261 F.3d 821 (9th Cir.2001) ................................................................... 47

*United States v. Nashville, C. & S. L. Ry.,*
  118 U.S. 120 (1886) ................................................................................ 24

*United States v. Omnicare, Inc.,*
  No. 1:15-CV- 4179 (CM), 2021 WL 1063784 (S.D.N.Y. Mar. 19, 2021) ................ 58

*United States v. Ridglea State Bank,*
  357 F.2d 495 (5th Cir. 1966) ................................................................. 49

*United States v. Sanford-Brown, Ltd.,*
  840 F.3d 445 (7th Cir. 2016) ................................................................. 43

*United States v. Southland Mgmt. Corp.,*
  288 F.3d 665 (5th Cir. 2002) ................................................................. 24

*United States v. Southland Mgmt. Corp.,*
  326 F.3d 669 (5th Cir. 2003) ........................................................... 25, 26

*United States v. Thompson,*
  98 U.S. 486 (1878) ................................................................................ 24

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
   136 S. Ct. 1989 (2016) ............................................................................. 30
*Wenner v. Tex. Lottery Comm'n,*
   123 F.3d 321 (5th Cir. 1997) ................................................................... 12

*Whole Woman's Health v. Jackson,*
   210 L. Ed. 2d 1014 (Sept. 1, 2021) ............................................................ 7

## Statutes

31 U.S.C. § 3127(a)(7) ................................................................................ 47
31 U.S.C. § 3127(a)(1)(g) ...................................................................... 4, 47
31 U.S.C. § 3729 ........................................................................................... 1
31 U.S.C. § 3729(b)(3) .......................................................................... 9, 20
31 U.S.C. § 3729(1) ...................................................................................... 4
31 U.S.C. § 3729(a)(7) ............................................................................... 46
31 U.S.C. § 3729(b)(1) ............................................................................... 50
31 U.S.C. § 3730 ........................................................................................ 28
31 U.S.C. § 3730(b)(4)(A) ......................................................................... 42
31 U.S.C. § 3730(c)(3) ............................................................................... 43
31 U.S.C. § 3730(c)(5) ........................................................................... 5, 27
31 U.S.C. § 3730(d) ................................................................................... 42
42 U.S.C. § 1320a-7k ........................................................................... 10, 12
42 U.S.C. § 1320a-7k(d)(1) ....................................................................... 10
42 U.S.C. § 1320a-7k(d)(2) ............................................................. 3, 10, 28
42 U.S.C. § 1320a-7k(d)(4)(B) ......................................................... 3, 9, 20
42 U.S.C. § 1396h(a) ................................................................................. 20
42 U.S.C. § 1396h(b) ........................................................................... 20, 21
La. R.S. § 46:437.1 ...................................................................................... 1
La. R.S. § 46:437.3 .................................................................................... 50
La. R.S. § 46:437.3(16) ......................................................................... 9, 20
La. R.S. § 46:437.11(A) ......................................................................... 8, 31
La. R.S. § 46:437.12(7) ......................................................................... 3, 10
La. R.S. § 46:438.1 ...................................................................................... 5
La. R.S. § 46:438.3 .................................................................................... 46
La. R.S. § 46:438.3(C) ........................................................................ 10, 46
La. R.S. § 46:438.6 ...................................................................................... 4
Tex. Gov't Code § 531.120 ................................................................... 5, 11
Tex. Hum. Res. Code § 36.001 .................................................................... 1
Tex. Hum. Res. Code § 36.001(7-a) ............................................... 9, 20, 45
Tex. Hum. Res. Code § 36.001(9)(B) ....................................................... 46
Tex. Hum. Res. Code § 36.0011(b) ........................................................... 50
Tex. Hum. Res. Code § 36.002(10) ........................................................... 46
Tex. Hum. Res. Code § 36.002(12) ..................................................... *passim*
Tex. Hum. Res. Code § 36.109(a) ........................................................ 5, 27

**Rules**

Fed. R. Civ. P. 26(a)(1)..................................................................................... 22
Fed. R. Civ. P. 37(c)(1)..................................................................................... 22
Fed. R. Civ. P. 56(c)(2)..................................................................................... 22
Fed. R. Civ. P. 65 ............................................................................................. 14
Fed. R. Civ. P. 65(c) ..................................................................................... 4, 6
LSA-C.C.P. art. 3608 ........................................................................................ 14

**Regulations**

1 Tex. Admin. Code § 371.1(55)..................................................................... 3, 9
1 Tex. Admin. Code § 371.1605(b)(1) ............................................................... 31
1 Tex. Admin. Code § 371.1655(4)....................................................... 3, 10, 11, 28
1 Tex. Admin. Code § 371.1659(2)..................................................................... 31
1 Tex. Admin. Code § 371.1705(e)(5)............................................................... 2, 8
42 C.F.R. § 433 ........................................................................................... 20, 21
42 C.F.R. § 433.312(a)(1)-(2) ............................................................................ 21
42 C.F.R. § 433.320(a)(4) .................................................................................. 21
50 La. Admin. Code Pt I, § 4147(A)(4) ............................................................ 36
50 La. Admin. Code Pt I, § 4211 ...................................................................... 51
50 La. Admin. Code Pt I, § 4213........................................................................ 51
Medicare Program; Reporting and Returning of Overpayments,
  81 Fed. Reg. 7654-01 (Feb. 12, 2016)................................................ 10, 11, 19, 28

**Other Authorities**

U.S. Dep't of Justice, Justice Manual 4-4.111-DOJ Dismissal of a Civil *Qui Tam*
  Action, *available at* justice.gov/jm/jm-4-4000-commercial-litigation#4-4.111....... 42

Comment on FR Doc # 2020-23888, Comment ID HHS-OS-2020-0012-0138,
  *available at* https://www.regulations.gov/comment/HHS-OS-2020-0012-0138. .... 44

**INTRODUCTION**

Defendants Planned Parenthood Federation of America, Inc. ("PPFA"), Planned Parenthood Gulf Coast, Inc. ("PPGC"), Planned Parenthood of Greater Texas, Inc. ("PPGT"), and Planned Parenthood South Texas, Inc. ("PPST") (collectively, "Planned Parenthood") move for summary judgment on Relator and Texas's claims that Planned Parenthood violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (FCA), the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001 *et seq.* (TMFPA), and the Louisiana Medical Assistance Programs Integrity Law, La. R.S. §§ 46:437.1 *et seq.* (LMAPIL). While Relator and Texas agree that there is no genuine dispute as to the material facts in this case, the material facts show that Plaintiffs, not Planned Parenthood, are entitled to judgment as a matter of law, as explained in Plaintiffs' briefing supporting their summary judgment motions. Dkt. 391. There is no genuine dispute that Planned Parenthood submitted claims and received payments of millions of dollars of state and federal Medicaid funds they were not entitled to because Planned Parenthood was disqualified and terminated from the Texas and Louisiana Medicaid programs. And there is no genuine dispute that Planned Parenthood failed to repay those Medicaid funds after it should have known the funds constituted an overpayment under federal and state law. There is further no genuine dispute that PPFA is directly liable because of its own involvement in the Affiliate Defendants' wrongful acts. Defendants are thus liable under the FCA, TMFPA, and LMAPIL, and Planned Parenthood's cross-motions for summary judgment should be denied.

1

# ARGUMENT

I.   **Planned Parenthood Is Not Entitled to Summary Judgment on Plaintiffs' Claims Under the Reverse-False-Claims Provisions of the FCA, TMFPA, and LMAPIL.**

    A.   **Under the reverse-false-claims provisions of the FCA, TMFPA, and LMAPIL, Planned Parenthood had an obligation to repay the Medicaid funds after the Fifth Circuit's ruling in *Kauffman*.**

The Fifth Circuit's ruling in *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020) determined that because there was no private right of action to challenge the Affiliate Defendants' termination from Texas Medicaid, the district court erred in entering a preliminary injunction. The Court both vacated that injunction and overruled *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. 2017), which had previously granted a similar preliminary injunction based on the same non-existent right of action. *Kauffman*, 981 F.3d at 358, 368. The Affiliate Defendants admit that they never contested either state's findings in an administrative procedure. Appx. 2686; *see also* Appx. 1594 (Curtis (PPGC) Depo. 86:1-15), 6148.[1] Thus, in the wake of *Kauffman*, it was clear that the Affiliate Defendants were not entitled to the money they received under the preliminary injunctions, because without the injunctions, the States would have ceased reimbursing them for Medicaid services years earlier. State law and the Medicaid provider agreements make clear that providers have no entitlement to funds received during a period of exclusion. *See*

_____

[1] Plaintiffs' Appendix was filed under seal at Dkt. 390 and includes pages Appx. 1-6295. Plaintiffs file a Supplemental Appendix with this response, which includes pages Appx. 6296-7771.

1 Tex. Admin. Code § 371.1705(e)(5); Appx. 2365, 2506. And the injunctions themselves did nothing to stop the operation of state law, which made the terminations final within 30 days of receipt of a termination notice—they merely temporarily prevented state officials from enforcing that law. *See* Dkt. 391 at 47-48. If a Medicaid provider receives money it is not entitled to, it constitutes an overpayment under federal and state law. *See* 42 U.S.C. § 1320a-7k(d)(4)(B); 1 Tex. Admin. Code § 371.1(55).  And federal and state law place the burden on providers to detect and report overpayments, even if the government has not identified them as such or instituted a recoupment action. *See* 42 U.S.C. § 1320a-7k(d)(2); 1 Tex. Admin. Code § 371.1655(4); La. R.S. § 46:437.12(7); Appx. 5595-5607. Federal and state law, of which Planned Parenthood was aware, Appx. 5578-85, 6403-06, 6413-18, 6324, 6437-38, 6482-83, also clearly states that providers are required to repay overpayments within 60 days of the date they are discovered or should have been discovered, *see* 42 U.S.C. § 1320a-7k(d)(2); 1 Tex. Admin. Code § 371.1655(4); La. R.S. § 46:437.12(7). These indisputable facts and relevant law show that Planned Parenthood violated the reverse-false-claim provisions of the FCA, TMFPA, and LMAPIL. Thus, Plaintiffs, not Defendants, are entitled to summary judgment on this claim. No argument raised by Defendants supports a contrary result.

   1. **Planned Parenthood's Failure to Post a Bond During the Medicaid Termination Litigation Does Not Negate Planned Parenthood's Obligation to Repay.**

Planned Parenthood first contends that it had no obligation to repay the Medicaid funds because the district courts failed to impose a bond after Planned

Parenthood refused to do so.[2] Affiliate Defs.' Memo. at 23-24 (Dkt. 382). This argument is meritless. Defendants' obligation to repay a Medicaid overpayment arises from federal and state law, not an order to repay from the district courts in those cases. That fact distinguishes this case from the cases relied on by Planned Parenthood, which involve attempts at recovery in the *same litigation* without an independent statutory basis for recovery. *See In re J.D. Jewell, Inc.*, 571 F.2d 928, 933 (5th Cir. 1978); *Tenth Ward Rd. Dist. No. 11 of Avoyelles Parish v. Tex. & Pac. Ry. Co.*, 12 F.2d 245, 247 (5th Cir. 1926).[3] Planned Parenthood also admits that there is an exception to the bond requirement for restitution but argues that would require an order from the same court that issued the injunction. The government's right of recovery here, however, does not arise from an order from those district courts regarding damages, restitution, or otherwise—it arises from federal and state law not at issue in the termination litigation. Plaintiffs here are not making claims for restitution—their claims arise independently under the FCA, TMFPA, and LMAPIL. And recoupment of government funds is not the same as restitution—it is an

---

[2] Texas requested a bond in the Western District, but the Court denied the request. *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Services, Inc.* v. *Smith*, 236 F. Supp. 3d 974, 999-1000 (W.D. Tex. 2017). Similarly, Texas sought, and obtained, a bond in the Travis County action.

[3] Moreover, if Planned Parenthood is contending that the lack of a bond in the termination cases prevents recovery here (and not just the existence of an obligation), at minimum that could not apply to civil fines and civil penalties. See Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.") (emphasis added); 31 U.S.C. § 3729(1) (liability for civil penalties as distinct from damages); *In re Xerox Corp.*, 555 S.W.3d 518, 534 (Tex. 2018) (recovery of civil remedies under the TMFPA are not damages); La. R.S. § 46.438.6 (LMAPIL recovery includes civil fines and civil penalties).

4

independent action governed by different law. *See* Tex. Gov't Code § 531.120; La. R.S. § 46:438.1. Nor does the fact that Texas and Louisiana did not seek restitution in those cases limit recovery here, as the government is free to pursue alternative remedies to recover its money. 31 U.S.C. § 3730(c)(5); Tex. Hum. Res. Code § 36.109(a).

Further, when the government seeks to recover its own funds that a recipient was not entitled to keep, case law indicates that the government is not limited by the amount of the bond. In *National Kidney Patients Association v. Sullivan*, 958 F.2d 1127, 1134-37 (D.C. Cir. 1992), the D.C. Circuit held that HHS could recover more than the amount of the bond in that case because injunction bonds only cap the amount of *damages* and HHS could still recover restitution. Further, the Court noted that HHS intended to recoup what it viewed as overpayments received by the Medicare provider in that case, the process for which is established by "elaborate procedures" under "Medicare legislation," and stated that once "those procedures have run their full course," the provider could later "seek judicial relief in an appropriate forum"—*i.e.* not *that* forum. *Id.* at 1137. In other words, the government's efforts to recover its money through other proceedings was not limited by the bond. In some cases, courts decline to require a bond precisely *because* the government can use recoupment proceedings later. *Fort Defiance Indian Hosp.Bd. v. Becerra*, No. CIV 22-0098, 2022 WL 1690040, at *59 (D. N.M. May 26, 2022); *Navajo Health Foundation-Sage Memorial Hosp., Inc., v. Burwell*, 100 F. Supp. 3d 1122, 1192 (D. N.M. 2015).

Further, as a prudential matter, bonds are required to ensure that a wrongfully enjoined party could recover, even if the other party could no longer pay. If the party seeking the injunction refuses to post a bond, as Planned Parenthood did here, it seems that they should not get the benefit of any limitation of future liability that it could have been entitled to had it posted a bond. It would be grossly inequitable to allow a party that refused to post a bond to avoid making the enjoined party whole, even if it has the funds to do so. Courts have allowed wrongly enjoined parties to recover where there was no bond issued. *See, e.g., Michigan American Fed'n of State Cnty. & Mun. Employees Council 25, Local 1640 v. Matrix Human Servs.*, 589 F.3d 851 (6th Cir. 2009) (involving a federal law that permitted recovery only in relation to a bond set according to the statute); *Monroe Division, Litton Business Systems, Inc. v. De Bari*, 562 F.2d 30 (10th Cir. 1977).

Disallowing any financial recovery by a party wrongly enjoined because the district court required no bond is also inequitable because a district court has discretion to waive Fed. R. Civ. P. 65(c)'s requirement altogether. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). The district court can also waive the bond requirement where it would be a financial hardship to the party benefitting from the injunction or in non-commercial or public interest cases. *Crowley v. Local No. 82, Furniture & Piano,* 679 F.2d 978 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984); *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991); *Instant Air Freight v. C.F. Air Freight*, 882 F.2d 797, 803 n.8 (3d Cir. 1989). The district court's waiver of a bond requirement at a preliminary stage of the case cannot totally preclude a party

from recovering losses sustained from a vacated injunction after determination on the merits.

### 2. Planned Parenthood was not entitled to the Medicaid funds it received after termination from Texas and Louisiana Medicaid.

Both Louisiana and Texas determined that Planned Parenthood was no longer a qualified Medicaid provider and terminated their provider agreements. Those terminations became final under state law 30 days after receipt of the notices of termination, as Planned Parenthood did not appeal those terminations in the state's administrative process, which would have legally suspended the terminations. Planned Parenthood argues that the preliminary injunctions issued by the district courts in the Texas and Louisiana termination litigation in federal court "enjoined the terminations from taking effect." Dkt. 382 at 29. But that misunderstands the law. "[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves." *Whole Woman's Health v. Jackson*, 210 L. Ed. 2d 1014 (Sept. 1, 2021) (citing *California v. Texas*, 141 S.Ct. 2104, 2115-16 (2021)). Texas and Louisiana law governing when the terminations became final remained operative— the power of the federal court's injunction was limited to enjoining state officials from implementing the termination by refusing to reimburse Planned Parenthood if it billed for Medicaid services. Indeed, those termination notices were not dissolved with the district court's preliminary rulings—they remained in effect and the States

were free to enforce them once the Fifth Circuit's mandate was issued.[4] And a Texas court rejected this argument under state law when Planned Parenthood attempted to argue a new termination was needed:

> Relators *cite no authority for the proposition that a court injunction requires the OIG to re-notice its termination*; that a pending federal court case or injunction tolls the deadline to administratively appeal the determination; or that it can now challenge the propriety of the December 20, 2016, termination letter in a state administrative proceeding. *The evidence does not support a finding that Respondents withdrew or abandoned their December 20, 2016, termination*, or a finding that the December 15, 2020, and January 4, 2021, letters qualify as new terminations.

Appx. 1091-92 (emphasis added).

Because Planned Parenthood had no valid provider agreement during the pendency of the preliminary injunctions, it was not entitled to the money it received as a matter of law. A provider whose Medicaid credentials are terminated and who is no longer a "qualified" provider is no longer eligible to seek or receive Medicaid reimbursement. *See* 1 Tex. Admin. Code § 371.1705(e)(5) ("If, after the effective date of an exclusion, an excluded person submits or causes to be submitted claims for services or items furnished within the period of exclusion, the person may be subject to civil monetary penalty liability"); La. R.S. § 46:437.11(A) (LDH "shall make payments from medical assistance programs funds for goods, services, or supplies rendered to recipients to any person *who has a provider agreement in effect with the*

---

[4] Even though *Kauffman* overruled *Gee* and held that the plaintiffs had no private right of action, the district court in the Louisiana case refused to lift the preliminary injunction at that time even though there was no remaining legal basis for it. The injunction was lifted after the State asked a second time and after PPGC dismissed its lawsuit in November 2022.

*department*, [and] who is complying with all federal and state laws and rules pertaining to the medical assistance programs . . .” (emphasis added)); *see also* Dkt. 391 at 37-41.

### 3. Planned Parenthood had an obligation to repay the Medicaid funds at issue under the FCA, TMFPA, and LMAPIL.

The FCA, TMFPA, and LMAPIL all define an “obligation” as “an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.” 31 U.S.C. 3729(b)(3); *see also* Tex. Hum. Res. Code § 36.001(7-a) (substantially similar); La. R.S. § 46:437.3(16) (substantially similar). The federal Patient Protection and Affordable Care Act (ACA) defines an overpayment to include “[a]ny funds that a person receives or retains under subchapter XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such subchapter.” 42 U.S.C. § 1320a-7k(d)(4)(B). Texas law defines “overpayment” as

> [t]he amount paid by Medicaid or other HHS program or the amount collected or received by a person by virtue of the provider’s participation in Medicaid or other HHS program that exceeds the amount to which the provider or person is entitled under §1902 of the Social Security Act or other state or federal statutes for a service or item furnished within the Medicaid or other HHS programs. This includes: (A) any funds collected or received in excess of the amount to which the provider is entitled, whether obtained through error, misunderstanding, abuse, misapplication, misuse, embezzlement, improper retention, or fraud.

1 Tex. Admin. Code § 371.1(55). As discussed above, Planned Parenthood was not entitled to the Medicaid funds it received during the preliminary injunctions. Thus, the funds are overpayments as a matter of law. 42 U.S.C. § 1320a-7k(d)(4)(B); 1 Tex.

Admin. Code § 371.1(55). Planned Parenthood does not dispute that it has not repaid these funds. Dkt. 81 at 9-10. But "to retain—to not return—an overpayment constitutes a violation of the FCA." *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015); *see also* 42 U.S.C. § 1320a-7k(d)(1); Tex. Hum. Res. Code § 36.002(12); La. R.S. § 46:438.3(C). Not only that, but federal and state law establish a duty for the recipient to *report and return* overpayments within 60 days of identification without any state action. 42 U.S.C. § 1320a-7k(d)(2); 1 Tex. Admin. Code § 371.1655(4); La. R.S. § 437.12(7); "Enrollment Packet for the Louisiana Medical Assistance Program, Basic Enrollment Packet for Entities/Businesses" at 12, Form PE-50, *available at* https://www.lamedicaid.com/ provweb1/provider_enrollment/enrollment_entities.pdf; *see also* Medicare Program; Reporting and Returning of Overpayments, 81 Fed. Reg. 7654-01, 7664 (Feb. 12, 2016) ("section 1128J(d) of the [ACA] requires a person to report and return overpayments they have received. Thus, providers and suppliers have a clear duty to undertake *proactive* activities to determine if they have received an overpayment or risk potential liability for retaining such overpayment." (emphasis added)). And further, "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of Title 31) for purposes of [the False Claims Act]." 42 U.S.C.A. § 1320a-7k.

Planned Parenthood nevertheless claims that it is entitled to summary judgment because it somehow had no obligation to repay the Medicaid funds received

under the preliminary injunctions. Planned Parenthood first argues that even if the States could have recouped the amounts paid under the injunctions, that does not itself give rise to an obligation to repay because the State's authority to recoup is discretionary. Dkt. 382 at 24-27. As stated above, Planned Parenthood was not entitled to those funds because they had no valid provider agreements and had been terminated by operation of state law, and that was clear by November 2020. Because Planned Parenthood received funds they were not entitled to, they constituted overpayments. Overpayments may be recouped by the States, but the States' recoupment is not necessary for there to be an obligation to repay. *See* Medicare Program; Reporting and Returning of Overpayments, 81 Fed. Reg. 7654-01, 7668 ("Providers and suppliers cannot rely on . . . the OIG to point out their overpayments for them—providers and suppliers are obligated to identify the overpayments they have received.").[5] And as the Fifth Circuit held, "the fact that further governmental action is required to collect a fine or penalty does not, standing alone, mean that a

---

[5] Planned Parenthood claims that "Texas law requires HHSC to notify a provider of a potential overpayment." Dkt. 382 at 14. But Texas Government Code § 531.120 does not require HHSC to notify a provider of a potential overpayment. It requires HHSC to notify a provider of a "proposed recoupment of an overpayment." This section governs notice and provides procedural guidance for providers against whom HHSC intends to seek recoupment. This is separate from the affirmative obligation a provider has to return payments that it received but was not entitled to. *See* 1 Tex. Admin. Code §§ 371.1655(3) and (4) ("A person is subject to administrative actions or sanctions if the person . . . (3) fails to repay overpayments or other assessments after receiving written notice of the overpayment or of delinquency by the OIG or any HHSC program or HHSC agency; (4) fails to repay overpayments within 60 calendar days of self-identifying or discovery of an overpayment was made to the person by [the Medicaid program]."). Also, under the Texas Medicaid Provider Agreement, and the TMPPM, providers are required to (1) monitor their claims and reimbursements for accuracy; (2) identify any payments received to which they were not entitled; and (3) refund that overpayment to Medicaid. Appx. 5 (Zalkovsky Decl. ¶18); *see also* Appx. 1581 (Curtis (PPGC) Depo. 35:7–18); Appx. 1905 (Lambrecht (PPGT) Depo. 40:4–15); Appx. 1315 (Barraza (PPST) Depo. 25:3–18).

duty is not established." *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1039–40 (5th Cir. 2016). Planned Parenthood's *affirmative* obligation to report and repay overpayments is not the same as a regulatory penalty that has not yet been assessed by the government. *See id.* The applicable statutes are in fact explicit that retention of an overpayment creates an obligation. *See, e.g.*, 42 U.S.C. § 1320a-7k.

Planned Parenthood contends that the 60-day rule cannot create an obligation because the terminations were not effective, but as discussed above, that argument misunderstands what a federal court injunction can do with respect to state law. Planned Parenthood again cites *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) for the proposition that Planned Parenthood was entitled to rely on the injunction. Dkt. 382 at 29. But as this Court already noted, *Wenner* is inapplicable because it involved the validity of a lottery ticket when purchased and does not "involve the overpayment of government funds, the obligation to repay government funds, or the right to recover overpayment." Dkt. 71 at 8. And Planned Parenthood's argument disregards the Court's determination that "[c]ourts across the country have . . . h[e]ld that a party may be liable for funds received under a court order or injunction later vacated." Dkt. 71 at 8 (collecting cases). It also disregards that even if Planned Parenthood were "entitled" to receive reimbursement for services provided during the preliminary injunctions because state officials were forced to pay it, it does not follow that they are entitled to *keep* that money after those temporary rulings were vacated and there was no legal basis for entitlement to the money. *See* Dkt. 71

12

at 15 ("[T]his argument ignores that the injunctions only preserved the status quo *while they were in place* as well as the case law holding retained overpayments are subject to recoupment once an injunction is lifted.").

Planned Parenthood further contends that holding them responsible for not returning the funds they received under the preliminary injunctions would "retroactively strip[]" them of an entitlement and "render preliminary injunctive relief meaningless." Dkt. 382 at 30. But while it is true that "[r]etroactivity is not favored in the law," Dkt. 382 at 30 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)), *judicial decisions* presumptively apply retroactively, *Harper v. Via. Dep't of Taxation*, 509 U.S. 86, 97 (1993), and Planned Parenthood's argument "conflate[s] the retroactivity principles of regulations and statutes," *Children's Hosp. Ass'n of Tex. v. Azar*, 507 F. Supp. 3d 249, 255 (D.D.C. 2020). "*Bowen* did not address the situation here, where the dispute instead centers on the retroactive effect and operation of a judicial decision." *Id.*

Preliminary injunctions are, by definition, temporary rulings made before a determination on the merits. Claiming an "entitlement" on such shaky ground is dubious, but regardless, all parties understand that a preliminary injunction may later be vacated, either by the district court after determination on the merits, or by an appellate court. And when that happens, "that district court decision is rendered a "legal nullity" and "requires that it be treated thereafter as though it never existed." *Khadr v. United States*, 529 F.3d 1112, 1115-16 (D.C. Cir. 2008) (quoting *Butler v. Eaton*, 141 U.S. 240, 244 (1891)). It is indeed a risky proposition for a litigant to

13

request a preliminary injunction that requires someone else to pay them, as "a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby." *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 145 (1919); *accord, e.g.*, LSA-C.C.P. art. 3608. But that is the nature of such temporary injunctions, and injunctions typically do not issue to require the exchange of money but instead require the demonstration of irreparable injury absent the injunction (which generally does not include monetary harm). *See* Fed. R. Civ. P. 65; *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).

In *Azar*, an analogous dispute arose when Medicaid providers sued to block a CMS Rule that reduced the payments received by hospitals that serve a large number of low-income patients. 507 F. Supp. 3d at 252. The district court entered summary judgment for the providers and permanently enjoined CMS from enforcing the rule as illegal under the Administrative Procedure Act. *Id.* at 253. CMS appealed, and while the appeal was pending, the CMS website stated that in light of the district court's opinion, the new Rule would not be enforced. *Id.* The D.C. Circuit later reversed the district court's judgment and reinstated the Rule. *Id.* The parties then returned to the district court and requested clarification on the Rule's effective date. *Id.* at 254. The providers contended that it should be the same day as the D.C. Circuit's mandate was issued, but CMS argued that the Rule should be effective as of the originally scheduled effective date three years earlier. *Id.*

14

Th court agreed with CMS and concluded that *Harper* "compels the conclusion that the D.C. Circuit's reinstatement of the Final Rule should apply with full retroactive effect." *Id.* at 254. The court noted that "the majority of federal courts faced with circumstances closely mirroring the procedural posture in this case have applied *Harper*'s retroactivity principles and have concluded that an agency rule that is vacated but ultimately reinstated on appeal has an effective date as of the agency's initially scheduled date." *Id.* at 255 (citing *Ray v. Cnty. of Los Angeles*, 935 F.3d 703 (9th Cir. 2019); *U.S. W. Commc'ns., Inc. v. Jennings*, 304 F.3d 950, 957 (9th Cir. 2002); *GTE S., Inc. v. Morrison*, 199 F.3d 733, 740 (4th Cir. 1999); *Tagaeva v. BNV Home Care Agency, Inc.*, No. 16-cv-6869 (RRM) (RLM), 2018 WL 1320661, at *3 (E.D.N.Y. Mar. 13, 2018); *Green v. Humana at Home, Inc.*, No. 16-cv-7586 (AJN), 2017 WL 9916832, at *8 (S.D.N.Y. Sept. 29, 2017)). The providers argued that even if *Harper* applied, equity favored disregarding it because CMS "'effectively ratified this Court's vacatur and shifted the effective date of the Final Rule themselves' by posting the statement on the Medicaid website," the providers "relied on this statement and the fact that [CMS] did not seek a stay of the vacatur, and paid [the providers] more than $100 million in DSH interim payments while the Final Rule was vacated" that would then be recouped. *Id.* at 257-58, 259. But the court recognized that "equitable considerations are largely irrelevant when considering the retroactivity of judicial decisions." *Id.* at 258. As *Harper* stated, "to prevent the selective application of federal law, courts 'can scarcely permit 'the substantive law [to] shift and spring' according to 'the particular equities of [individual parties'] claims' of actual reliance on an old

15

rule and of harm from a retroactive application of the new rule.'" *Id.* (quoting *Harper*, 509 U.S. at 97). Because the providers' harms arose from their reliance on the old rule, "the [c]ourt w[ould] not be swayed by such arguments" because they are insufficient to overcome the rule of retroactivity. *Id.*

According to the reasoning in *Azar*, even if the district courts had entered *permanent* injunctive relief and *final judgment* entitling Planned Parenthood to remain in Medicaid, if that ruling is later vacated, the terminations are effective on the original date in the letters. Planned Parenthood's reliance on the preliminary rulings is insufficient to overcome the presumption that the Fifth Circuit's ruling would apply retroactively. Because Planned Parenthood's terminations were effective as of October 19, 2015 in Louisiana and no later than February 1, 2017 in Texas, the funds Planned Parenthood received under the injunctions are overpayments that they had a duty to report and repay within 60 days. They failed to do so and are liable under the reverse-false-claims provisions of the FCA, TMFPA, and LMAPIL. *Kane*, 120 F. Supp. 3d at 394.

### B. Under the reverse-false-claims provisions of the FCA, TMFPA, and LMAPIL, Planned Parenthood knowingly and improperly avoided their obligation to repay Medicaid funds.

Planned Parenthood contends that even if the Court determines they had a repayment obligation, they did not "knowingly and improperly" avoid that obligation. They make only two arguments to that end. First, Planned Parenthood argues that it was objectively reasonable for them to conclude that they could keep the money, which negates scienter. Dkt. 382 at 31-36; Dkt. 385 at 14. Second, they assert that

government knowledge of their wrongful conduct, which also negates scienter. Neither argument has merit.

### 1. It was not objectively reasonable for Planned Parenthood to keep the Medicaid funds paid after termination from Texas and Louisiana Medicaid.

#### a. Even if *SuperValu* applies, Defendants would still be liable under the FCA because they did not rely on any objectively reasonable interpretation of law and authoritative guidance cautioned them otherwise.

As discussed in Plaintiffs' Supplemental Brief (Dkt. 411), *United States ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455 (7th Cir. 2021), should not apply to Relator's FCA claims and it has no applicability to Relator and Texas's state-law claims. But even if it did, Planned Parenthood still cannot escape liability because they did not rely on any "objectively reasonable" interpretation of law to justify their avoidance of their obligation to repay the Medicaid funds they received while terminated. *Id.* at 464. As discussed in Plaintiffs' Memorandum in support of their summary judgment motions (Dkt. 391 at Part I.C) and the Supplemental Brief, Planned Parenthood can point to *no law* that shows that they were entitled to keep the money they received under the preliminary injunctions once those preliminary rulings were vacated and/or overruled. The Affiliate Defendants' terminations under state law were valid as of October 19, 2015 (in Louisiana) and no later than February 1, 2017 (in Texas), the preliminary injunctions had no legal basis or force, and Planned Parenthood can point to no other authority justifying their actions and otherwise negating the facts showing that they knew or should have known of their obligation to repay, which

17

meets the scienter requirement under the FCA, TMFPA, and LMAPIL for reverse-false-claim liability.

What's more, even if there were some legal argument or basis that could justify Planned Parenthood's actions, it was not *reasonable* for them to rely on it because the indisputable evidence shows that Defendants *knew* that their federal-court gambit would not be suspensive and could not erase or delay the effectiveness of their termination, *yet chose to do that rather than engage in a suspensive administrative process*. And under *SuperValu*, even an objectively reasonable interpretation of law supporting a defendant's actions only allows them to avoid liability if there is "no authoritative guidance caution[ing] defendants against it." *Id.* Such guidance "must come from a governmental source—either circuit court precedent or guidance from the relevant agency." *Id.* at 471.

In an email dated September 14, 2015, PPFA employee Carrie Flaxman directly asked this question to the Louisiana Department of Health (LDH): "Secretary Kliebert's letters to Ms. Linton state that the termination action will take effect after the termination of all 'administrative and/or legal proceedings.' Does this 'stay' apply if PPFC elects to continue in federal court?" Appx. 6311. LDH counsel responds that "the suspensive nature only applies if you proceed through administrative process. . . . [M]y client does not believe you have an 'election' to continue in federal court. The administrative avenue is the agreed upon process to protect your clients rights." Appx. 6310-11. Ms. Flaxman also asks for confirmation that the termination dates for PPGC are October 17 and 18, 2015. Appx. 6311. LDH responds: "You are

18

correct if Planned Parenthood does not exercise their right to an informal hearing or an administrative appeal." Appx. 6311.

The Affiliates also knew that an administrative appeal in Texas would be suspensive. Appx. 6305. The Texas termination letter from HHSC-OIG had similar language about the effectiveness of the termination if no appeal was requested. Appx. 814 (Goldstein Decl., ¶ 8c); 867-72. The Fifth Circuit's opinion in November 2020 certainly qualifies as "authoritative guidance" that the only (temporary) basis for Planned Parenthood to continue receiving and retaining Medicaid funds from Texas and Louisiana was gone. *Kauffman*, 981 F.3d 347. And the retroactivity of legal judgments and the legal effect of a vacated injunction—a "'legal nullity'"—is well established. *Azar*, 507 F. Supp. 3d at 255 (quoting *Khadr*, 529 F.3d at 1115-16). Further, "authoritative guidance" from CMS establishes that it is unreasonable for Defendants to believe that an obligation to repay the money would only arise after Texas or Louisiana sent a notice of overpayment or filed a recoupment action. 81 Fed. Reg. 7654-01, 7664. In December 2020, the Affiliates belatedly tried to pursue an administrative appeal of their termination, but OIG denied it and informed the Affiliates on January 4, 2021 that their deadline had expired. Appx. 6300. If that were not enough, HHSC's January 4, 2021 letter in response to Planned Parenthood's request to remain *in* the Medicaid program, Appx. 807—which shows they knew they were *not in*—communicated that the 2017 terminations were now in effect, *see* Appx.810-11. And further, as the Travis County District Court pointed out, Planned Parenthood could point to *no authority* showing otherwise. Appx. 1091-92.

> **b. Whether Texas and Louisiana have returned the federal portion of Planned Parenthood's overpayment is irrelevant to Planned Parenthood's liability.**

Affiliate Defendants also argue that because Texas and Louisiana have not yet returned to CMS the federal share of an "overpayment," Affiliate Defendants bear no liability under the TMFPA and LMAPIL. Dkt. 382 at 46. But this argument is a red herring, is unsupported by admissible evidence, and is a misreading of applicable federal regulations.[6] First, recoveries under the TMFPA and LMAPIL—and the subsequent sharing of the same with the federal government—are governed by Section 1909 of the Social Security Act, not Part 433 of Title 42 of the Code of Federal Regulations. Federal law incentivizes states to enact analogues to the FCA that meet certain requirements, and governs how compliant states must share recoveries with the federal government:

> [I]f a State has in effect a law relating to false or fraudulent claims that meets the requirements of subsection (b), the Federal medical assistance percentage with respect to *any amounts recovered under a State action brought under such law*, shall be decreased by 10 percentage points.

42 U.S.C. § 1396h(a) (emphasis added). The TMFPA and LMAPIL meet the necessary requirements. *See* 42 U.S.C. § 1396h(b). Importantly, Section 1396h(a) contemplates the federal share being determined and paid once amounts are recovered—not when unlawful conduct is discovered. 42 U.S.C. § 1396h(a). This is customary in all TMFPA and LMAPIL actions. Affiliate Defendants' argument is inapposite.

---

[6] Moreover, this argument ignores that Affiliate Defendants' "obligation" to repay funds to Texas and Louisiana Medicaid arises not only from the retention of an overpayment, but also from its express contractual relationship with Texas and Louisiana as a Medicaid provider. *See* 31 U.S.C. 3729(b)(3); Tex. Hum. Res. Code § 36.001(7-a); La. R.S. § 46:437.3(16).

Second, CMS issued a guidance document to State Medicaid Directors titled "Extended Period for Collection of Provider Overpayments" that addresses the deadline for the State to pay the federal share of any "overpayment" under Section 6506 of the Affordable Care Act.[7] It says that "when a State has been unable to recover overpayments due to fraud within one year of discovery because of ongoing judicial or administrative process, the State will have until 30 days after the conclusion of judicial administrative processes to recover such overpayments before making the adjustment to the federal share." *Id.* In other words, CMS guidance establishes that Texas and Louisiana are not obligated to return the federal share of the Medicaid funds that Plaintiffs seek to recover until 30 days after this litigation concludes.

Third, even if Texas's TMFPA action were subject to Part 433 of Title 42 of the Code of Federal Regulations, Affiliate Defendants greatly overstate the nature of a state's obligation to return the federal share of overpayments to CMS. While federal regulations do generally provide a process by which a participating state must reimburse CMS the federal share of identified overpayments within one year, *see* 42 C.F.R. § 433.312(a)(1)-(2), that duty is not absolute. A state's failure to return an identified overpayment within one year merely subjects the state to additional payments of interest for as long as it fails to pay the federal share. 42 C.F.R. § 433.320(a)(4). None of these federal regulations, however, suggests that a state's

---

[7]    https://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/SMD10014.pdf    (last visited January 26, 2023).

failure to reimburse CMS bears on the legal question of whether a defendant must reimburse the state.

Fourth, even if Texas's or Louisiana's reimbursement (or lack thereof) to CMS bore on any justiciable issue in this case, Affiliate Defendants rely only on inadmissible record evidence to substantiate their argument that Texas has failed to reimburse CMS. For this proposition, Affiliate Defendants cite the declarations of Anne Marie Costello. *See* Dkt. 383 at 325-31. Ms. Costello claims to be employed by CMS, but her declarations are inadmissible hearsay because the testimony cannot be presented in a form that would be admissible in evidence at trial. Fed. R. Civ. P. 56(c)(2). Ms. Costello cannot be called to testify at trial because she was never disclosed as a person likely to have discoverable information as required by Rule 26(a)(1) of the Federal Rules of Civil Procedure during discovery. Affiliate Defendants may not rely on an undisclosed witness in a motion for summary judgment unless it can demonstrate that its failure to disclose the witness was either substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). Affiliate Defendants' failure is not substantially justified—they served their Third Supplemental Initial Disclosures on November 8, 2022, nine days before Ms. Costello's first declaration, and could have disclosed her then. Moreover, their failure is not harmless—Plaintiffs were deprived of the opportunity to depose Ms. Costello about her testimony, which is directly contradicted by the CMS guidance document discussed above. Affiliate Defendants have failed to present admissible evidence to support this argument.

### 2. Any "government knowledge" of Planned Parenthood's obligation to repay cannot negate the scienter element.

Planned Parenthood argues they are entitled to summary judgment because "the United States, Texas and Louisiana knew all the relevant facts underlying Plaintiffs' reverse FCA claims." Dkt. 382 at 48. They claim that because the government knew of the relevant facts but did not "[seek] repayment or notif[y] Defendants of any obligation to repay," Texas and Relator cannot establish the scienter element of its cause of action. *Id.* at 49-50. While Planned Parenthood refuses to recognize this lawsuit as Texas's effort to hold Affiliate Defendants liable for their unlawful conduct, and that the *qui tam* causes of action in the FCA, TMFPA and LMAPIL mean that relators would enforce Medicaid fraud laws instead of the government, this argument fails under both state and federal law.

### a. Equitable defenses such as waiver cannot defeat the claims here.

Affiliate Defendants' argument—that the government's cause of action should be foreclosed because it did not take some additional action to preserve it—boils to an assertion that the government waived its cause of action.[8] Waiver is the voluntary or intentional relinquishment of a known right. *See General Elec. Supply Co. v. Utley-James of Tex., Inc.*, 857 F.2d 1010, 1013 n. 1 (5th Cir. 1988); *LaLonde v. Gosnell*, 593 S.W.3d 212, 218-19 (Tex. 2019). But Affiliate Defendants cannot assert waiver—or any other equitable defense—against the government in this action. The rule *nullum*

---

[8] So, too, is Affiliate Defendants' contention that Texas and Louisiana did not require Affiliate Defendants to file a surety bond covering amounts reimbursed for services provided during the pendency of the various injunctions and TROs or seek a TRO to injunctive relief to prevent them from transferring property. *See* Dkt. 382 at 31, ¶46.

*tempus occurrit regi*—the statute of limitations does not run against the sovereign—is explained historically as a vestige of the privileges of the English king. *Guaranty Trust Co. of N.Y. v. United States*, 304 U.S. 126, 132 (1938). Its survival in this country has been attributed to the policy that the public interests should not be prejudiced by the negligence of public officers. *United States v. Nashville, C. & S. L. Ry.*, 118 U.S. 120 (1886); *United States v. Thompson*, 98 U.S. 486 (1878). For that reason, equitable defenses like waiver, and "estoppel against the government [are] impermissible." *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 682 (5th Cir. 2002) (applying, in an FCA case, the "longstanding presumption that estoppel against the government is impermissible"); *United States v. Cushman & Wakefield, Inc.*, 275 F. Supp. 2d 763, 774 (N.D. Tex. 2002) (striking ratification and waiver defenses in FCA case). Like the United States, Texas and Louisiana generally enjoy sovereign immunity from equitable defenses, like waiver, when they litigate in their sovereign capacity. *In re S.A.P.*, 156 S.W.3d 574, 577 (Tex. 2005) (holding that "equitable estoppel generally does not apply to governmental entities"); *State v. Durham*, 860 S.W.2d 63, 67 (Tex. 1993) ("[T]he State in its sovereign capacity, unlike ordinary litigants, is not subject to the defenses of limitations, laches, or estoppel."); *Hutchins v. Prasifka*, 450 S.W.2d 829, 836 (Tex. 1970) ("The general rule has been in this state that when a unit of government is exercising its governmental powers, it is not subject to estoppel."); *cf. Holliday v. Bd. of Sup'rs of LSU Agr. & Mech. Coll.*, 149 So. 3d 227, 228 (La. 2014) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that

24

defense.")  The Texas Supreme Court has echoed these principles and held that while Texas may be subject to defensive claims that are "germane to" affirmative claims for "money damages,"[9] Texas continues to enjoy sovereign immunity when it enforces the TMFPA. *Nazari v. State*, 561 S.W.3d 495, 502, 510 (Tex. 2018). Nor may equitable defenses be asserted against a qui tam relator. *See U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 302 F.R.D. 416, 420 (S.D. Tex. 2014) (no estoppel-based affirmative defense is available against the relator in a non-intervened case).

### b. Planned Parenthood's "government knowledge" argument does not preclude liability.

"The inaptly named 'government knowledge defense' is the principle that under some circumstances, the government's knowledge of the falsity of a statement or claim can defeat FCA liability on the ground that the claimant did not act 'knowingly,' because the claimant knew that the government knew of the falsity of the statement and was willing to pay anyway." *United States v. Bollinger*, 775 F.3d 255, 263 (5th Cir. 2014) (quoting *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (en banc) (Jones, J., specially concurring)) (internal quotation marks omitted). Affiliate Defendants, however, largely ignore that government *acquiescence*—not merely knowledge—is required for a defendant to properly rely on the defense. *See United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 379 (5th Cir. 2017).

---

[9] *See Reata Constr. Corp. v. City of Dall.*, 197 S.W.3d 371, 375, 378 (Tex. 2006).

In *Colquitt*—a case cited by Affiliate Defendants—the relator brought an FCA action against his former employers under false certification and false presentment theories, arising out "off-label" use of Abbott's medical stents. 858 F.3d at 369. At trial, Abbott presented evidence that "everyone involved—the FDA, Medicare, doctors and hospitals—knew" about Abbott's "off-label" practices. *Id.* The jury returned a verdict against the relator. *Id.* On appeal, the relator argued that the trial court erred by refusing to give the jury relator's proposed jury instruction regarding the inapplicability of the "government knowledge" defense. *Id.* at 379. While the Court rejected the relator's categorical assertion that the "government knowledge" defense *never* applies to a suit under the FCA, the Court's discussion of the defense, citing other Fifth Circuit precedent, makes clear that government *acquiescence*—not merely knowledge—is required for a defendant to rely on the defense. *Id.* at 379-80. The Court stated:

> The instruction misstates the law; government knowledge can be a defense to an FCA suit. *See United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 263 (5th Cir. 2014). In *Bollinger*, the court said that "under some circumstances, the government's knowledge of the falsity of a statement or claim can defeat FCA liability on the ground that the claimant did not act 'knowingly,' because the claimant knew that the government knew of the falsity of the statements *and was willing to pay anyway.*" *Id.* (quoting *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (en banc) (Jones, J., specially concurring)).

*Id.* at 379 (emphasis added); *see also Southland*, 326 F.3d at 682 (Jones, J., specially concurring) ("The government's knowledge *and acquiescence* in its contractor's actions in many of these cases was highly relevant to show that the contractor did

26

not submit payment claims in deliberate ignorance or reckless disregard of their truth or falsity.") (citation omitted) (emphasis added).[10]

Here, Texas did not acquiesce to Affiliate Defendants' conduct. By contrast, it filed a Complaint in Intervention in this action and pursued a cause of action under the TMFPA. *See* Tex. Hum. Res. Code § 36.002(12).[11] It also did not acquiesce in Defendants' violations because it complied with a court order.[12] Nor did Louisiana. Affiliate Defendants attempt to distract from this by claiming that the government did not "seek repayment or notif[y] Defendants of any potential obligation to repay." Dkt. 382 at 50. But Affiliate Defendants cite no authority to suggest that a "government knowledge" defense can be triggered by the government's choice of one remedy to the exclusion of another in seeking redress of unlawful conduct. The government is explicitly permitted to pursue alternative remedies. *See* 31 U.S.C. § 3730(c)(5); Tex. Hum. Res. Code § 36.109(a); *see also, e.g., United States ex rel.*

---

[10] The other cases cited by Affiliate Defendants in footnote 27 (Dkt. 382 at 37) similarly fail to establish Affiliate Defendants' entitlement to summary judgment in this case. *See United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 748-49 (3d Cir. 2017) (disagreeing with trial court's reliance on government knowledge inference doctrine); *U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 288 (4th Cir. 2002) (acknowledging that government "had at least as much knowledge as" defendant and instructed defendant to engage in the complained-of conduct); *U.S. ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (acknowledging that "[t]hat the relevant government officials know of the falsity is not in itself a defense").

[11] The government's choice not to intervene in a case may be done for many reasons that have nothing to do with the merits, however, so that choice is not dispositive. The FCA, TMFPA, and LMAPIL all permit relators to proceed with a case even if the government declines to intervene, so intervention is not necessary to making out a claim under those laws.

[12] Planned Parenthood claims that Texas Medicaid paid reimbursements to Affiliates "as late as Fall 2022." Dkt. 382 at 15. But this is a red herring. The documents show (1) the claims were for services rendered during a time when Texas was mandated by court to pay reimbursements to Affiliates; and (2) that there were processing errors preventing immediate payment when the claims were initially submitted. *See* Dkt. 384-2 at App.020, 025. This is merely evidence of automated claims processes operating in accordance with the court order in place at the time these services were rendered and not evidence of acquiescence.

*Kennedy v. Novo A/S*, 5 F.4th 47, 54 (D.C. Cir. 2021) (noting that the FCA's "alternate remedy" provision "gives the government options for resolving the types of false and fraudulent claims that are the *raison d'etre* of the False Claims Act"); *Xerox*, 555 S.W.3d at 521 (stating that Texas law allows Medicaid fraud to "be redressed in criminal, administrative, or civil proceedings"); *Nazari*, 561 S.W.3d at 521 (Lehrmann, J., concurring in part and dissenting in part) (stating that Texas is entitled to choose which vehicle it utilizes to pursue claims arising out of the Medicaid program). Nor is a requirement that the government notify a recipient of an overpayment a prerequisite to reverse-false-claim liability under any of the applicable statutes. 81 Fed. Reg. 7654-01, 7668; 42 U.S.C. § 1320a-7k(d)(2); 1 Tex. Admin. Code § 371.1655(4).

## II.   Planned Parenthood Is Not Entitled to Summary Judgment on Relator's Implied-False-Certification Claims.

Planned Parenthood moves for summary judgment only on Relator's implied-false-certification claims under the FCA and LMAPIL and not Relator's claims under the TMFPA. Dkt. 382 at 38.[13] Relator asserts implied-false-certification claims as an

---

[13] Planned Parenthood makes a bare assertion in a footnote that Relator no longer has any claims under the TMFPA other than the claim under Tex. Hum Res. Code § 36.002(12) because that is the only claim Texas intervened in. Dkt. 382 at 54 n.34. But Relator's position is that is incorrect. Planned Parenthood points to nothing in the TMFPA or Texas law that indicates this would be the case, and Texas did not move to dismiss Relator's other claims. And by analogy, "[n]othing in § 3730 suggests that the government's intervention bars the Relator from pursuing claims beyond those in the government's complaint, and the weight of authority suggests that Relator can." *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1074 (N.D. Cal. 2020). Section 3730 does not require the government—on intervention—to pursue all of the relator's claims. *United States ex rel. Bennett v. Biotronik, Inc.*, 876 F.3d 1011, 1020 (9th Cir. 2017) (after the government intervenes in an FCA

alternative to Relator's claims under the reverse-false-claim provisions of those laws. Planned Parenthood cannot show entitlement to summary judgment for implied false claims submitted (1) in Texas and Louisiana after February 5, 2011[14] for failing to comply with medical and ethical standards; (2) in Texas after January 19, 2017, when the Affiliate Defendants' termination was final; (3) during the "grace period" in Texas, and (4) submitted by PPGC in Louisiana after PPGC was terminated from Medicaid on October 15, 2015 and/or after it was terminated from Texas Medicaid by February 1, 2017.

## A. The claims submitted by Planned Parenthood were false.

Planned Parenthood argues that Relator cannot establish falsity because Relator cannot "point to something Affiliate Defendants said on the claims

---

case, the case may include "claims [the government] chooses not to prosecute or settle"). As then-Judge Samuel Alito wrote:

> When a qui tam action is filed, the government may "proceed with the action," §§ 3730(b)(2) and (4) (emphasis added) or "decline to take over the action," § 3730(b)(4)(B) (emphasis added), but the government often decides to take over only certain claims in a multi-claim action, and we are aware of no decision holding that this is improper.

*United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 102 (3d Cir. 2000) (emphasis in original). Indeed, the government need not intervene at all, and the relator can prosecute the case. 31 U.S.C. § 3730(b)(4)(B). The statute and case law thus contemplate that the government can pursue some or all of the relator's claims, and the relator can pursue claims when the government does not. Courts regularly allow relators to pursue their separate claims after the government's intervention. *See, e.g., United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 826 (8th Cir. 2013) (the relator filed an FCA case, the government intervened in part and settled the intervened claim, and the relator then filed an amended complaint asserting additional claims against the defendant); *United States ex rel. Fallon v. Accudyne Corp.*, 97 F.3d 937, 938 (7th Cir. 1996) ("The Attorney General took over the prosecution of Count I, *see* 31 U.S.C. § 3730(b)(4)(A), but left Count II in the hands of the relators."); *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 449 n.1 (5th Cir. 1995) ("The United States elected to intervene in that portion of the suit against [some] defendants but declined to intervene against [another defendant]. Although the United States' intervention vested it with control of the litigation against [the first group of defendants], [relator] retained the authority to proceed against [the other defendant] on its own.").

[14] Relator does not dispute Planned Parenthood's argument that the statute of repose prevents recovery on claims submitted earlier than ten years before the filing of this suit on February 5, 2021. *See* Dkt. 382 at 54.

themselves that was a rendered a misleading half-truth." Dkt. 382 at 40. Planned Parenthood also claims that noncompliance with legal requirements and the provider agreements cannot give rise to liability, citing pre-*Escobar*, out-of-circuit precedent. Dkt. 382 at 40 (citing *Gonzalez v. Planned Parenthood of L.A.*, 2012 WL 2412080, at *7 (C.D. Cal. June 26, 2012), *see also* Dkt. 382 at 42-43 (citing pre-*Escobar* cases). But as the Fifth Circuit has said, "the Supreme Court [in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016)] made clear that defendants could be liable under the FCA for violating statutory or regulatory requirements, whether or not those requirements were designated in the statute or regulation as conditions of payment." *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 159-60 (5th Cir. 2019). As this Court recognized, "'misrepresenting compliance with a condition of eligibility to even participate in a federal program when submitting a claim' can expose a defendant to liability under the implied false-certification theory." Dkt. 71 at 12 (quoting *Escobar*, 136 S. Ct. at 2002). The pertinent inquiry, then, is not whether a defendant made an affirmative or express false statement. Rather, it is whether, by submitting a claim, a defendant knowingly and falsely implied that it was entitled to payment when it was not because it violated applicable statutes and regulations, which would disqualify it from payment.

### 1. Claims submitted after February 5, 2011

As Texas determined when it terminated the Affiliate Defendants' provider agreements, the Affiliates committed program violations through its history of unethical practices related to fetal tissue procurement, which were inconsistent with accepted medical standards and federal law. Appx. 868. The practices at issue were

governed by PPFA policies, were approved by PPFA, and all Defendants were affiliated with each other and were required to adhere to PPFA policies. Appx. 869. Louisiana also determined that PPGC violated Louisiana program requirements by failing to notify LDH of false claims suits against PPGC and its affiliates for submitting false claims. Appx.2684-2695. The Affiliate Defendants never disputed these administrative findings of program violations and violations of law in administrative proceedings before their terminations became final and therefore waived their right to challenge these determinations.[15] Thus, the Affiliate Defendants indisputably billed Medicaid while committing program violations—*i.e.* violating "statutory and regulatory requirements"—and did not disclose those violations, making those claims impliedly false. *Lemon*, 924 F.3d at 161. Both Texas and Louisiana require, as a condition of participation, that providers must comply with all federal and state laws, including appropriate standards of care. Appx. 2344, 2345,

---

[15] Planned Parenthood's attempt to relitigate these findings in this litigation by pointing to deposition testimony given by former state officials several years after the fact should be disregarded. *See* Dkt. 382 at 43. To the extent that Planned Parenthood could now dispute these findings, that would only indicate that there are disputed material facts that would defeat summary judgment for Planned Parenthood on these claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986). It is also worth noting, in response to Planned Parenthood's insistence that it did nothing wrong, that seven Fifth Circuit judges concluded that the termination letter "pointed to 'substantial evidence' of the [Affiliate Defendants'] violations of [state and federal] regulations." *Kauffman*, 981 F.3d at 379 (Elrod, J., concurring, joined by Jones, Smith, Willett, Ho, Duncan, and Engelhardt, JJ.). As to Planned Parenthood's contention (at 46-47) that violating medical ethics is too malleable a standard to give rise to false claims liability because people disagree on what that means, it's safe to say that most people would agree—and it would certainly be possible for a jury to find—that subjecting a patient to more pain without their consent in order to get better tissue specimens for researchers and failing to disclose a doctor's conflict of interest are unethical. *See, e.g.* ROA.4417-18, 4487-88, 4489, 6159-60, *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, No. 17-50282 (5th Cir. filed Apr. 4, 2017). And again, Texas already determined that Planned Parenthood *did* violate medical ethics, and Planned Parenthood did not dispute that finding, which then became unappealable.

2571, 2439-2441; La. R.S. §§ 437.11(A), (B) (Louisiana); Appx. 3-4; 1 Tex. Admin. Code §§ 371.1605(b)(1), 371.1659(2) (Texas). And these violations were obviously material because the States terminated the Affiliates from Medicaid once they were discovered.

### 2.  Claims submitted after termination in Texas and Louisiana

The States determined that the Affiliate Defendants were not qualified to provide Medicaid services and terminated their enrollment in the Medicaid program—Louisiana on October 15, 2015, and Texas no later than February 1, 2017. The Affiliate Defendants do not dispute that they continued to file claims for reimbursement after these dates and the State was forced to pay them—not because Defendants were suddenly qualified or because the States' decisions were nullified, but because federal courts had temporarily enjoined the States from giving *effect* to the terminations. Submitting claims that imply that Defendants were qualified and had valid provider agreements when they did not is obviously "false." *See* Appx. 6504 (PPGT CFO acknowledging that "there are penalties for us billing when we are excluded from the [Medicaid] program.").

Further, the preliminary injunctions did not immunize Defendants from liability for submitting false claims. *See Edgar v. MITE Corp.*, 457 U.S. 624, 653 (1982) (Stevens, J., concurring) ("There simply is no constitutional or statutory authority that permits a federal judge to grant dispensation from a valid state law."); *id.* 649–50 (Stevens, J., concurring) ("The preliminary injunction did not purport to provide permanent immunity for violations of the statute that occurred during its effective period. It merely provided that the Secretary of State was enjoined from . . .

invoking, applying, or enforcing the . . . Act' against MITE. . . . Moreover, the preliminary injunction was entered without any declaration that the Illinois statute was unconstitutional. There simply is no basis on which to conclude that the preliminary injunction issued by the District Court should be construed as having granted MITE permanent immunity from future proceedings brought under the Illinois statute."). Nor did that limited and temporary relief absolve Planned Parenthood from liability for the improper claims it submitted under the injunctions. "Since a final judgment declaring a state statute unconstitutional would not grant immunity for actions taken in reliance on the court's decision, certainly a preliminary injunction—which on its face does nothing more than temporarily restrain conduct—should not accomplish that result." *Edgar*, 457 U.S. at 651–52.

### 3.  Claims submitted during the Texas "grace period"

Even if submitting false claims during the pendency of the injunctions did not give rise to false-certification liability, all Defendants are liable for the false claims submitted in Texas during the so-called "grace period."[16]

In a December 2020 letter drafted and spearheaded by PPFA and signed by PPST, PPGT, and PPGC, the Affiliates claimed that they needed more time to help their patients find other Medicaid providers. Appx. 802–07. The indisputable evidence reveals that neither PPFA nor Affiliate Defendants utilized the "grace period" for the stated purpose of transitioning patients to other providers. On

---

[16] Texas does not seek recovery or summary judgment regarding the "grace period," but Relator maintains that claim.

January 6, 2021, PPFA Director of State Media Campaigns Bonyen Lee-Gilmore indicated that the Grace Period "bought [Affiliate Defendants] some time to continue seeing patients for another month." Appx. 6293. Ms. Lee-Gilmore went on:

> For now, we are going to try and milk a few more stories out of this and the framing will be "Abbott is giving Medicaid patients 30 days to scramble and find new providers in a system that already has a provider shortage."

*Id.* On January 25, 2021, PPFA Director of Healthcare Operations Regan Clawson expressed her *reluctance* for the Affiliates to refer patients to other providers and "connect the affiliates essentially to a competitor." Appx. 6126. Similarly, testimony from Affiliate Defendants failed to uncover any plans to transition their Medicaid patients to new providers. *See, e.g.*, Appx. 1985 (Lambrecht Depo. at 134:10–23) (unable to recall "any specific steps PPGT took to transition their Medicaid patients to new providers"); Appx. 1364 (Barraza (PPST) Depo. 219:8–221:21) (confirming that PPST performed no outreach to patients other than communications with patients physically present in a PPST health center); Appx.1578 (Curtis (PPGC) Depo. 21:23–22:25) (confirming that PPGC performed no outreach to patients other than to those patients physically present in a PPGC health center).

Planned Parenthood did not treat the "grace period" as a period of transition, but rather as a gambit to plan its next maneuver to get more Medicaid revenue. For instance, on January 28, 2021, PPGT Chief External Affairs Officer Sarah Wheat expressed her belief that "PPFA wants to keep this litigation going" because "the lawsuit and on-going news coverage of patients impacted supports PPFA's conversations with the new [Biden] Administration." Appx. 6160. Similarly, on

February 2, 2021, PPFA VP of Organizing and Engagement Campaigns Jenny Lawson provided a "Texas Medicaid Update" in which she identified among the "Goals for this week" to "*Delay termination* through any and all legal pathways." Appx. 6156 (emphasis in original). The next day, Affiliate Defendants filed a second lawsuit against Texas in Travis County District Court before the "grace period" expired. Appx. 6179-6277. Thus, PPFA's assistance to Affiliate Defendants in requesting the grace period from HHSC was motivated by a desire to further delay HHSC from implementing Affiliate Defendants' terminations and obtain additional Medicaid revenue, not to transition patients like they represented to HHSC.

The Affiliates requested that Texas either let them *back in* to Medicaid—which acknowledges that they knew they were *out* of Medicaid at this time—or give them a six-month "grace period" so they could ensure their patients have other providers. Appx.802-07. Texas granted a one-month period expressly so that the Affiliates could transition their existing patients to new providers. Appx. 810-11. But the evidence shows that the Affiliates instead used the time to bill for as many services as they could and did virtually nothing to help their patients find new providers. The Affiliates' representations to Texas were therefore false. And they were clearly material, because transitioning patients to other providers was the sole reason Texas permitted one month of Medicaid reimbursement, despite the Affiliates' disqualification and termination. Absent that request, the Affiliates' termination would have been effectuated by the State as soon as the preliminary injunction was lifted by the Texas federal trial court.

### 4. Claims filed in Louisiana after PPGC was terminated from Texas Medicaid

Even if submitting false claims during the pendency of the injunctions did not give rise to false certification liability, PPFA and PPGC are still liable for the false claims submitted in Louisiana after PPGC was terminated from Texas Medicaid. The indisputable evidence shows that PPGC totally disregarded their known obligation under state law to immediately report to the State conditions that affected their, or their affiliates', Medicaid enrollment in other states. The Louisiana Provider Agreement that PPGC's CEO, Melaney Linton, personally signed on behalf of PPGC states that she "certifies and agrees" and "understand[s] that it is [her] responsibility to ensure that neither I, nor any . . . affiliate(s) are not now or have ever been denied enrollment; suspended or excluded from . . . Medicaid . . . in any state; employed by a corporation . . . that is now or has ever been suspended or excluded from . . . Medicaid . . . in any state." It further states that she "will report any of the above conditions to Program Integrity at the Department of Health and Hospitals . . . upon discovery once enrolled." Appx. 2440, 2443; Appx. 2053-54 (Linton Depo. 129:18-130:24); Appx. 2060-61 (Linton Depo. 156:2-160:8); *see also* Appx. 2506, 2570.

PPGC never notified Louisiana that it was terminated from Texas Medicaid as of December 15, 2020, as it knew and acknowledged by ceasing to bill Texas Medicaid on that date. Appx. 2696–97. On December 23, 2020, thirty-one days after the Fifth Circuit's en banc ruling, PPGC sent a letter to LDH notifying it of that ruling and acknowledging its obligation to do so under 50 La. Admin. Code § 4147A(4). Appx. 2696–97. The letter was sent by PPGC's General Counsel and Chief Compliance

Officer. *Id.* But PPGC never informed LDH that the Fifth Circuit overruled the decision upholding the Louisiana preliminary injunction, therefore eliminating its legal basis, even though it knew that to be true. *Id.*; Appx. 1627 (Curtis Depo. (PPGC) 219:15–220:15); Appx. 2707. Instead, the letter made it seem that the ruling's import was limited to the Texas termination. Appx. 2696-97. PPGC states that it is "not currently participating in the Texas Medicaid program" because of "a politically motivated notice of termination of PPGC's Texas Medicaid contracts arising from long-debunked videos made by opponents of abortion." *Id.* But PPGC did not inform LDH that seven Fifth Circuit judges disagreed with its claim that that the video was "debunked," nor that it admitted in court that it had no evidence to support such a claim. Appx. 2696–97; s*ee Kauffman*, 981 F.3d at 379-83 (Elrod, J., concurring, joined by Jones, Smith, Willett, Ho, Duncan, and Engelhardt, JJ.) (noting that video evidence "substantially supported the conclusion that Planned Parenthood had violated state and federal regulations concerning the safe, legal, and ethical furnishing of medical care."); *id.*at 380 n. 8 (noting that Planned Parenthood "entered no evidence into the administrative record or the district court record indicating that this video was deceptively edited or otherwise unreliable. On appeal, [Planned Parenthood] d[id] not identify any evidence in the district court record showing that the videos are unreliable, and they admitted at oral argument that they provided no such evidence.")[17] The letter disputes the merits of the Texas termination and claims

---

[17] Planned Parenthood denies that it considers the video to be misleading, deceptive, or heavily edited. Dkt. 81 at 62.

that PPGC and its patients continue to "vigorously contest and challenge" this termination and that the termination is not "final." *Id*. It also claims that it is "unclear" whether Texas's termination is "in effect." *Id*. PPGC also did not notify LDH once it received HHSC's letter on January 4, 2021, which made clear that the termination was final as of December 15, 2020. Appx. 809–11.

On March 22, 2021, PPGC wrote again to LDH to "update its notice" of December 23. But it did not inform LDH of the Travis County District Court's ruling. *See* Appx. 2712. Instead, it only repeats verbatim the claims described above. *Id*. It also continued to claim that PPGC and its patients continue to "vigorously contest and challenge" this termination and that the termination is therefore not "final." *Id*. But PPGC admitted that it did nothing else to "vigorously contest and challenge" the Texas termination after the Travis County ruling. Appx. 2712. PPGC never updated LDH after it dismissed its federal lawsuit in Texas. In fact, PPGC never sent any other update to LDH regarding its termination from Texas Medicaid. *Id*.; Appx. 1628 (Curtis (PPGC) Depo. 224:20-25); Appx. 2076-77 (Linton Depo. 219:25-220:9, 222:11-16, 224:10-18).

Nor did PPFA, on behalf of PPGC, update the Louisiana federal district court with the Fifth Circuit's ruling. Instead, when Louisiana moved to vacate the preliminary injunction, which PPGC knew no longer had any valid legal basis, PPFA and PPGC opposed the request and urged the Court to keep the baseless injunction in place—and it did. Order, *Planned Parenthood Gulf Coast, Inc., v. Kliebert*, No. 3:15-cv-00565 (M.D. La. Apr. 7, 2021), Dkt. 121; *see also* Appx. 2072-73 (Linton Depo.

38

205:11-206:1), 2707. The State later again requested the injunction to be lifted, and this time, on October 10, 2022, PPFA and PPGC simply noted that it did not oppose the request. Appx. 2726. On November 9, 2022, PPGC dismissed the Louisiana case, Notice of Voluntary Dismissal, *Kliebert*, No. 3:15-cv-00565 (M.D. La. Nov. 9, 2022), Dkt. 131, and on November 10, 2022, the Court vacated the preliminary injunction and dismissed the case, Order, *Id.* (M.D. La. Nov. 10, 2022), Dkt. 132.

It is therefore undisputed that PPGC and Ms. Linton failed to report their termination from Texas Medicaid to LDHH, failed to report their affiliates' termination from Texas Medicaid, and failed to fulfill their obligation to cease affiliation with the other Texas affiliates after their termination from Texas Medicaid. Thus, every claim PPGC filed in Louisiana after the Texas termination became final no later than February 1, 2017, or at minimum after March 12, 2021 when the state court temporary restraining order was lifted, was a false claim because PPGC was not in compliance with program rules and requirements it agreed to abide by as a condition of payment when it signed the provider agreements. These violations are also material because the State had already terminated PPGC for similar reasons: its history of failure to disclose required information to LDH and providing misleading information. Appx. 2684-2695.

### B. Planned Parenthood's claims violated conditions material to payment.

As an initial matter, Affiliate Defendants' contention (at 49-50) that the only consideration is whether the *federal government* would pay a claim is incorrect. It is not surprising that they cite no authority (aside from misinterpreting the Court's

decision on the motions to dismiss) because that would make no sense in the Medicaid context, where the federal government does not pay claims to providers, the States do. The State also determines the eligibility of providers. *See Kauffman*, 981 F.3d at 368; *id.* at 376-77 (Elrod, J., concurring) ("The majority correctly concludes, consistent with *O'Bannon*, that a provider is qualified if and only if the state has deemed that provider qualified to participate in Medicaid.")

Despite their dishonesty in obtaining the "grace period," Planned Parenthood now argues that the fact that it was granted shows that their violations over the previous several years are not material. Dkt. 382 at 51. Affiliate Defendants misrepresent the nature of the intervening "grace period" afforded them by Texas. *See* Dkt. 382 at 23, ¶21; *see also* Appx. 810-11. During this time, Texas did not view Affiliate Defendants as enrolled providers. In fact, the letter granting Affiliate Defendants the "grace period" contained an express denial of Affiliate Defendants' "request to continue in the Medicaid program" and citation to the Fifth Circuit's mandate vacating the injunction against termination. Appx. 810-11. And the "grace period" was given for one month (instead of the requested six) for the benefit of patients, not for Planned Parenthood. *Id*.

Planned Parenthood further argues (at 51-52) that because Louisiana recently allowed them back into Medicaid seven years after their initial termination at the behest of PPFA's lawyers and lobbyists' extensive political pressure campaign, Appx. 5159-62, their conduct giving rise to false claims liability here is not material. But LDH is not aware of the evidence discovered during this case about PPGC's repeated

failure to fulfill its obligation to report to LDH any change in Medicaid enrollment status in other states or by its affiliates because of the Court's protective order. LDH would likely not have made the same decision had they been apprised of the entire history of PPGC's misleading and untruthful behavior toward the Medicaid program in that state, given that its previous reasons for terminating PPGC was its history of failure to disclose required information to LDH and for providing misleading information. Regardless, the settlement agreement means nothing as to PPGC's past actions, as it explicitly says that LDH only "prospectively" withdraws the termination notices. Defs. Sealed App. 12. Nor does it have any effect on this case:

> "[t]he Parties agree that this Settlement Agreement does not resolve and shall have no effect on any and all claims, causes of action, and/or allegations which have or may be brought, filed and/or investigated by other agencies or instrumentalities, including, but not limited to, the Louisiana Department of Justice, Office of the Attorney General, state licensing boards, any relator, or agencies of the United States government, or any penalties, whether civil, criminal and/or administrative, which may be imposed by another agency or court in connection with its review of PPGC. *The Parties specifically acknowledge that this Settlement Agreement does not resolve and shall have no effect on U.S. ex rel. Doe et al. v. Planned Parenthood Federation of America, et al., United States District Court for the Northern District of Texas docket number 2:21-cv-22.*

Defs. Sealed App. 14-15 (emphasis added). LDH therefore expressly allowed for PPGC's liability in this case to be unhindered and also left open the possibility that the Office of the Attorney General or a relator could pursue claims against PPGC for their actions related to this case. And as discussed above, the fact that the states have not initiated recoupment actions, *see* Dkt. 382 at 62-63, does not absolve Defendants

41

of liability.[18] The whole point of the qui tam provisions of the FCA, TMFPA, and LMAPIL are to enable private citizens to aid the government in recovering its money. They would be unnecessary if liability were dependent upon the government first taking action to recover that money.

Planned Parenthood's attempt to bootstrap the United States' declination of intervention[19] into evidence of the merits of this case should also be disregarded. As mentioned above, the government may have any number of reasons for declining to intervene. For example, only one criterion out of seven that DOJ uses to decide whether to *dismiss* a qui tam case involves the merits of the claim. *See* U.S. Dep't of Justice, Justice Manual 4-4.111-DOJ Dismissal of a Civil *Qui Tam* Action, *available at* justice.gov/jm/jm-4-4000-commercial-litigation#4-4.111.   Certainly limited government resources is also a significant reason to decline intervention, since upon intervention, the government has primary responsibility for prosecuting the case. *See* 31 U.S.C. § 3730(b)(4)(A). That would have nothing to do with the claims' merits. Inferring that a qui tam case has no merit because the government decided not to intervene rewrites the statute, which gives relators the right to continue prosecution

---

[18] Planned Parenthood claims that it is an undisputed fact that LDH has a "policy" "to refrain from seeking recoupment of payments made to a Medicaid provider who properly rendered medically necessary services to qualified Louisiana Medicaid beneficiaries during the period in which a court of competent jurisdiction enjoined LDH from taking action to suspend, exclude, terminate, or otherwise prevent a provider's continued participation in the Louisiana Medicaid program." Dkt. 382 at 16. But all they rely on for this "fact" is LDH's responses and objections to Planned Parenthood's subpoena where LDH says it has no documents.

[19] Louisiana has neither intervened nor declined to intervene. Dkt. 71 at 3.

of the suit and increases their share of the recovery if the government decides not to intervene. 31 U.S.C. § 3730(c)(3), (d).

The cases cited by Planned Parenthood are not binding on this court, but in any event, they involve other reasons why the courts found the materiality element was not satisfied. Thus, non-intervention cannot defeat other evidence of materiality. For example, *Polansky v. Exec. Health Res., Inc.,* 422 F. Supp. 3d 916, 938-39 (E.D. Pa. 2019) claims that "numerous federal courts have found insufficient FCA materiality where the government investigated a relator's allegations but chose not to intervene." But the cases it cites determined that materiality was met for other reasons, not just non-intervention. *See, e.g., United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017) (finding materiality not satisfied because "there are no factual allegations showing that CMS would not have reimbursed these claims had these alleged reporting deficiencies been cured. Petratos does not dispute this finding, which dooms his case."); *United States ex rel. Cressman v. Solid Waste Servs., Inc.*, 2018 WL 1693349, *6 (E.D. Pa. 2018) (finding that materiality was not met because "record evidence shows that the government agencies to whom Plaintiff has submitted invoices for payment since the . . . Violation have continued to pay Defendant for the waste pickup services performed . . ."); *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) (relator "offered no evidence that the government's decision to pay . . . would likely or actually have been different had it known of [the] alleged noncompliance with Title IV regulations.").

43

### III.   PPFA Is Not Entitled to Summary Judgment Because It Is Directly Liable for Its Own Actions in Causing the Affiliate Defendants to Avoid Their Obligation to Repay the Medicaid Funds and in Filing Impliedly False Claims.

PPFA is liable under the FCA, TMFPA, and LMAPIL for its own actions and involvement in Affiliate Defendants' violations of those statutes. PPFA bases its entitlement to summary judgment on the mistaken assertion that it cannot be liable as a matter of law because it is "not a health care provider, does not participate in Medicaid, never received Medicaid payments, and thus never had an obligation to pay or repay the government." Dkt. 385 at 1. But PPFA's motion fails because it misstates the law defining an obligation to pay and ignores established Fifth Circuit precedent recognizing indirect reverse-false-claim liability.[20] PPFA also argues that it is not derivatively liable for the Affiliate Defendants' actions, Dkt. 385 at 12-17, but Plaintiffs' claims against PPFA do not depend on derivative liability. PPFA is *directly* liable for violating the TMFPA because it knowingly and improperly avoided or decreased Affiliate Defendants' obligation to repay money to Texas Medicaid. Tex. Hum. Res. Code § 36.002(12).[21] PPFA knowingly advised Affiliate Defendants to

---

[20] PPFA claims that it is undisputed that it "not a health care provider and does not provide health care services." Dkt. 385 at 4. But its own representations to the federal government contradict this statement. PPFA refers to itself as "Planned Parenthood" and purports to be "the nation's leading women's health care provider and advocate and a trusted, nonprofit source of primary and preventive care for women, men, and young people in communities across the United States." Appx. 7329-37; *accord See* Comment on FR Doc # 2020-23888, Comment ID HHS-OS-2020-0012-0138, *available at* https://www.regulations.gov/comment/HHS-OS-2020-0012-0138. PPFA also has a large "Healthcare Services" division. *See* Dkt. 391 at 7-9, 80-85.

[21] Section 36.002(12) of the TMFPA states it is a violation of the statute if a person: "knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program[.]" Tex. Hum. Res. Code 36.002(12).

eschew the administrative processes for challenging their terminations and to instead pursue federal and state court actions against Texas and Louisiana to prolong their receipt of Medicaid funds even though they had been terminated, even though PPFA knew that those actions would not prevent the terminations from becoming final under state law. PPFA orchestrated, planned, and executed the entire scheme that permitted Affiliate Defendants to continue receiving Texas Medicaid reimbursements to which they were not entitled and to avoid their obligation to repay those funds as required by law.

### A. Liability under the FCA, TMFPA, and LMAPIL is not limited to parties to a Medicaid provider agreement or direct recipients of Medicaid funds.

PPFA contends that it "cannot have an obligation to repay money it never received." Dkt. 385 at 7. But as a factual matter, PPFA cannot establish that it never received Medicaid funds. Defendants' expert Louis Dudney admitted that the Affiliates have paid Medicaid funds to PPFA as part of their National Program Support payments. Appx. 1792 (Dudney Depo. 199:8-201:7).

In any event, PPFA need not be a provider or the direct recipient of funds from Texas Medicaid to be liable under the FCA, TMFPA, or LMAPIL, and PPFA cites no authority supporting the proposition that receipt of funds is a prerequisite to liability. *See generally* Dkt. 385. That is likely because the law clearly states otherwise, defeating PPFA's argument that liability for non-providers is not clear. Dkt. 385 at 8-9. The plain language of section 36.002(12) of the TMFPA makes no reference to a "provider" and does not otherwise limit who can commit an unlawful act under that provision. *Compare* Tex. Hum. Res. Code § 36.002(12) (not limiting scope of unlawful

conduct to any particular actor) *with id.* at § 36.002(10) (limiting scope of unlawful conduct to "a managed care organization"). Indeed, even if one were to interpret Section 36.002(12) in such a manner, the TMFPA takes a broad interpretation of a "provider," extending it to include "a person . . . that provides a product or service to a provider or to a fiscal agent[.]" *Id.* at § 36.001(9)(B). Nor can PPFA escape liability under LMAPIL for similar reasons. *See* La. R.S. § 46:438.3 (referring also to a "person," not a provider).

Federal law also supports holding PPFA liable. The Fifth Circuit has long recognized the indirect reverse-false-claim theory of liability in the FCA. *See Smith v. United States*, 287 F.2d 299 (5th Cir. 1961).[22] The Court accepted the indirect reverse-false-claim theory because "the False Claims Act applies even where there is no direct liability running from the Government to the claimant." *Id.* at 304. Indeed, the Fifth Circuit has continued to observe that the FCA does not require a defendant to "impair the *defendant's* obligation; instead, it requires that the [defendant] impair '*an* obligation to pay or transmit money or property to the Government.'" *United States v. Caremark*, 634 F.3d 808, 817 (5th Cir. 2011) (emphasis in original) (quoting 31 U.S.C. § 3729(a)(7)) (reversing summary judgment for defendant and holding that defendant could be liable for reverse false claim for impairing third party's obligation to return money to the government). Simply put, "'a person need not be the one who

---

[22] While the TMFPA and FCA employ different language in some respects, here, the parallel FCA provision to TMFPA section 36.002(12) is nearly identical, and case law interpreting the FCA is instructive. *See* 31 U.S.C. § 3729(a)(7). LMAPIL is also nearly identical to the FCA. La. R.S. § 46:438.3(C).

actually submitted the claim forms in order to be liable.'" *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (quoting *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001)).

Other courts have also recognized that a defendant need not be a provider or a direct recipient of funds to be liable under the FCA. *E.g.*, *U.S. ex rel. Garbe v. Kmart Corp.*, 73 F. Supp. 3d 1002, 1012, n.4 (S.D. Ill. 2014) ("Notably, however, the statute does not require that the statement impair *the defendant's* obligation; instead, it requires that the statement impair "*an* obligation to pay or transmit money or property to the government." (citing 31 U.S.C. § 3127(a)(7) & (a)(1)(g))); *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 173 (E.D. Penn. 2012) (recognizing "other courts allow liability for such indirect reverse false claims where a defendant knowingly makes a false statement that it knows could cause a third party to impair its obligation to the government" (citing *Caremark*, 634 F.3d at 817)); *U.S. ex rel. Koch v. Koch Indus., Inc.*, 57 F. Supp. 2d 1122, 1128–29 (N.D. Okla. 1999); *U.S. ex rel. Frey v. Health Mgmt. Sys., Inc.*, No. 3:19-cv-0920-B, 2021 WL 4502275, at *4 (N.D. Tex. 2021) (relying on *Caremark* and other precedent in recognition of liability under an indirect reverse false claims theory for establishing the element of an obligation); *U.S. ex rel. Wallace v. Exactech, Inc.*, No. 2:18-cv-01010-LSC, 2020 WL 4500493, at *21 (N.D. Ala. 2020). In sum, the purpose of the statute is "to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943),

*superseded by statute on other grounds as recognized in Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 412 (2011).

> **B. PPFA is liable for its own actions in causing the Affiliate Defendants to avoid their obligation to repay Medicaid and in filing false claims.**

PPFA helped the Affiliate Defendants avoid their obligation to repay money to Texas and Louisiana Medicaid by masterminding and orchestrating a strategy—implemented by PPFA's in-house litigation attorneys in their "Litigation & Law" Department ("L&L"), and other PPFA employees, in furtherance of PPFA's mission—to enable Affiliate Defendants to continue to seek reimbursement from Texas and Louisiana Medicaid after the effective date of their terminations and continue in their refusal to return those funds. *See Caremark*, 634 F.3d at 817.

> **1. PPFA's "Litigation & Law" Department was directly involved in the Affiliates' unlawful acts, and their involvement furthered PPFA's mission.**

PPFA's L&L attorneys provide representation to PPFA and Planned Parenthood affiliates on public policy matters that further PPFA's mission. Appx.1699 (Custer (PPFA) Depo. 246:3–22). PPFA's public policy mandate is set in consultation with PPFA's Senior Vice President for Policy, Advocacy and Campaigns. Appx.1440 (Barrow-Klein (PPFA) Depo. 38:4–19). The attorneys in the "Litigation & Law" Department are PPFA employees, and the head of L&L reports directly to PPFA's Senior Vice President for Policy, Advocacy and Campaigns. Appx.1438, 1453 (Barrow-Klein (PPFA) Depo. 32:16–20, 93:7–94:8). PPFA pays the salaries of L&L attorneys and any costs incurred by L&L during its representation of Planned

Parenthood affiliate entities. Appx.1449 (Barrow-Klein (PPFA) Depo. 75:16–76:11). During their representation of Affiliate Defendants in the underlying termination litigation, L&L attorneys provided updates to PPFA about the litigation. Appx.1676 (Custer Depo. 151:1–7). PPFA's corporate representative admitted that when L&L attorneys represent an affiliate entity, "PPFA would always consider the implication or the impact … of any action on the federation as a whole[.]" Appx.1675 (Custer Depo. 148:23–149:7).

PPFA is liable under the FCA, TMFPA, and LMAPIL because of the involvement of their own employees acting in furtherance of PPFA's mission. Appx. 1700 (Custer Depo. 246:3–22). "[A] corporation will be liable for violations of the False Claims Act if its employees were acting within the scope of their authority and for the purpose of benefitting the corporation." *United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir. 1977) (citing *United States v. Ridglea State Bank*, 357 F.2d 495 (5th Cir. 1966)). The Fifth Circuit rejects the notion that corporate liability under the FCA can only attach through the conduct of employees with "substantial authority and broad responsibility." *Id.*

### 2. PPFA was directly involved in the Affiliate Defendants' unlawful acts and efforts to retain and maximize Medicaid revenue.

PPFA's representation of Affiliate Defendants in the underlying termination litigation and related matters helped Affiliate Defendants to avoid fulfilling their obligation to repay money to Texas and Louisiana Medicaid, rendering PPFA liable under the FCA, TMFPA, and LMAPIL. *Caremark*, 634 F.3d at 817.

First, upon learning that Affiliate Defendants were facing termination proceedings initiated by LDH and the Texas HHSC-OIG, PPFA steered Affiliate Defendants away from the prescribed administrative appeals and into lengthy legal battles in the Middle District of Louisiana and the Western District of Texas. Second, after learning that Fifth Circuit had vacated the preliminary injunction that prohibited Texas from implementing the terminations, PPFA helped Affiliate Defendants craft a request to HHSC for a "grace period" for the purpose of transitioning their patients to new Medicaid providers—mere pretext to allow Affiliate Defendants to continue to bill Texas Medicaid temporarily. Third, on the last day of the HHSC "grace period," PPFA assisted Affiliate Defendants in filing an unsuccessful lawsuit in Travis County District Court, asserting legal theories for which they had "no authority." Fourth, PPFA participated in PPGC's efforts to conceal the true facts of their termination and their affiliates' Texas terminations from LDH and the Middle District of Louisiana in an effort to maximize Medicaid revenue. Fifth, PPFA *continues* to represent and assist Affiliate Defendants in their ongoing efforts to withhold money that they are legally obligated to return to the Texas and Louisiana Medicaid programs.

These actions demonstrate that PPFA acted with the requisite culpable mental state. Plaintiffs need only show that PPFA acted with actual knowledge, conscious or deliberate indifference, or reckless disregard of the truth or falsity of information, a standard that is easily satisfied by PPFA's actions here. 31 U.S.C. § 3729(b)(1); Tex. Hum. Res. Code § 36.0011(b); La. R.S. § 46:437.3.

### a. PPFA acted knowingly when it directed the Affiliate Defendants to forego the administrative process in favor of litigation.

PPFA's L&L attorneys provided legal counsel to Affiliate Defendants during the Louisiana investigation and LDH-initiated termination proceedings. PPFA's L&L attorneys also provided legal counsel to Affiliate Defendants when HHSC-OIG initiated termination proceedings against them. As set forth above, Texas and Louisiana law provide only one avenue for a provider facing termination to appeal the termination decision: an administrative appeal. *Kauffman*, 981 F.3d at 362; *see also* 50 La. Admin. Code Pt I, §§ 4211, 4213. Nevertheless, PPFA steered Affiliate Defendants away from exercising their administrative appeal rights and filed unsuccessful lawsuits in the Middle District of Louisiana and the Western District of Texas.

Strategy decisions were also made by and shared within PPFA. *E.g.*, Appx. 1917, 1929 (Lambrecht Depo. (PPGT) 88:21–24, 134:6–135:23, 136:3–137:5) (confirming the decision to pursue litigation rather than the administrative process was a legal strategy decision and that PPFA L&L attorneys represented PPGT in that litigation). Almost immediately after the HHSC-OIG issued the preliminary Notice of Termination to Affiliate Defendants on October 19, 2015, PPFA's L&L attorneys began their representation of Affiliate Defendants. *See, e.g.*, Appx. 5677 (Affil. Ds' Revised Third Priv. Log. Line 1197) (reflecting October 21, 2015 email from PPFA's H. Krasnoff to Affiliate Defendant employees and others regarding

"requesting and providing legal advice re: representation for Texas Medicaid termination.").

Ultimately, Affiliate Defendants commenced their action in the Western District of Texas on November 23, 2015. Appx. 842-61. PPFA attorneys Jennifer Sandman, Alice Clapman, and Richard Muniz signed the Complaint, identifying their employer as PPFA. *Id.* The day before the lawsuit was filed, PPFA Assistant Director for State Policy Media emailed the PPFA CEO and others sending "a briefing for the press call tomorrow afternoon related to the case *we're* filing in Texas against efforts to block *our* patients' access to care through Medicaid." Appx. 6278 (emphasis added). The briefing attached to her email describes the purpose of the press call:

> YOU will be leading a press call to announce that *PPFA and 10 co-plaintiff Jane Doe's* [sic] will be filing suit against the State of Texas and their efforts to ban more than 13,500 Medicaid patients seen by Planned Parenthood Texas affiliates.

*Id.* (emphasis added); *see also* Appx.1680 (Custer Depo. 168:16–23) (acknowledging that press briefing "did not say that the affiliates are filing suit against the State of Texas").

As Defendants' privilege logs reveal, PPGC began preparing for litigation over Medicaid termination in Louisiana as early as June 2015, well before the termination notice was sent. *See, e.g.*, Appx. 5880 (Affil. Ds' Revised Third Priv. Log, Line 3939) (reflecting June 12, 2015 email regarding "legal hold for LA Medicaid termination"). LDHH sent investigatory letters in July and August 2015. Appx. 2671. PPFA was involved during this time. *See, e.g.*, Appx. 5882 (Affil. Ds' Revised Third Priv. Log, Line 3976) (reflecting Aug. 7, 2015 email from PPFA's C. Flaxman to PPGC regarding

"potential next steps in LA Medicaid termination litigation"). PPFA, on behalf of PPGC, filed suit in the Middle District of Louisiana on August 25, 2015. Complaint, *Kliebert*, No. 3:15-cv-00565 (M.D. La. Aug. 25, 2015), Dkt. 1. PPFA attorneys Carrie Flaxman and Melissa Cohen signed the Complaint, identifying their employer as PPFA. *Id.* at 16.

Confirmation that PPFA made the decision to eschew the prescribed administrative appeals in favor of the Western District action came on March 12, 2021, when PPGT COO Sheila McKinney wondered:

> Do either of you recall why we did not ask for an administrative hearing 5 years ago when we were first informed we were going to be excluded from the Medicaid program? I am sure we had legal advice, but I have no memory of the rationale.

Appx. 6148. In response, PPGT CEO Ken Lambrecht confirmed that "[i]t was a legal strategy decision at the time focusing on the federal courts first." *Id.*; *see also* Appx. 1355 (Barraza (PPST) Depo. 184:7–14) (confirming that PPST had communications with PPFA "about not responding to this final notice of termination").

PPFA's scheme ultimately allowed the Affiliate Defendants to obtain preliminary injunctions so they could continue seeking reimbursement from Texas and Louisiana Medicaid for years.

> ### b. PPFA acted knowingly when it helped the Affiliate Defendants request a "grace period" as a pretext to continue to bill Texas Medicaid and advance media strategies to its own benefit.

PPFA's efforts to continue to help the Affiliates receive Medicaid funds to which they were not entitled persisted after the Fifth Circuit vacated the preliminary

injunction. Following the Fifth Circuit's ruling, Affiliate Defendants immediately consulted with PPFA regarding "next steps." *See, e.g.*, Appx. 6142-43 ("PPGT is working with Planned Parenthood Federation of America (PPFA) legal counsel regarding next steps in the courts and with the new administration in early 2021"); Appx. 6295 (PPST's CEO is "in communication with our litigation team at PPFA"). On December 14, 2020, the three Affiliate Defendant CEOs signed a letter to HHSC's Executive Commissioner requesting "a six-month grace period . . . to allow us to help our patients attempt to find new providers willing to accept new patients insured through Medicaid." Appx. 802-07. PPFA's L&L attorneys assisted Affiliate Defendants in crafting and delivering that request to HHSC. Appx. 6151 (stating that "the three TX affiliates worked with our lit/law team to send a letter to the [HHSC] . . . grant a transition period").

HHSC granted a 30-day period on January 4, 2021, for the express purpose of "ensur[ing] that current Medicaid clients receiving services at your clinics can be transitioned to new providers." Appx. 809-11. HHSC's approval was delivered to PPFA attorney Jennifer Sandman as well as the three Affiliate Defendant CEOs. *Id.* But despite representations crafted by PPFA in the "grace period" request, the evidence reveals that neither PPFA nor Affiliate Defendants utilized the "grace period" for the stated purpose of transitioning patients to other providers. *See* Part II.A.3 *supra*.

### c. PPFA acted knowingly when it assisted the Affiliate Defendants in filing a meritless lawsuit in Travis County to obtain more Medicaid revenue.

PPFA again acted knowingly to interfere with Affiliate Defendants' obligation to repay Texas Medicaid following the Fifth Circuit's vacatur of injunctive relief in November 2020. The Fifth Circuit opinion notified PPFA and the Affiliates that their lawsuit was without merit. *Kauffman*, 981 F.3d at 362 (finding that Texas was in compliance with federal requirement to provide an administrative procedure for provider appeal of a Medicaid termination, thus rejecting Defendants' arguments to the contrary). *Id*. Nevertheless, PPFA drafted and filed meritless pleadings in state court in Travis County. Appx. 6179-6277.

The evidence shows this course of action, too, was crafted and perpetuated by PPFA. As Defendants' privilege logs reveal, PPFA worked with Affiliate Defendants in early February 2021 on the petition to be filed in Travis County. *See, e.g.*, Appx. 6052 (Affil. Ds' First Priv. Log, Lines 277–78) (reflecting Feb. 1, 2021 email from PPFA attorney J. Sandman to Affiliate Defendant employees and others regarding "providing legal advice re: draft mandamus petition in TX Medicaid termination litigation" and attaching a draft petition). On January 28, 2021 (six days before the state court filing), executive leadership at PPGT sent an email saying that "PPFA wants to keep this litigation going" because "the lawsuit and on-going new coverage of patients impacted supports PPFA's conversations with the new [Biden] Administration." Appx. 6160. PPFA's Vice President of Public Policy testified that PPFA regularly used litigation as a tool for political influence. Appx. 2181 (Stewart

Depo. 26:22–27:7, 28:13–29:7) (confirming PPFA attorney Carrie Flaxman forwarded her the initial notice of termination on the same day it was issued to Affiliate Defendants and explaining that this was a common practice because she would use affiliates' litigation to advocate with the current administration and to push politically for support of PPFA's goal of increased access to family planning under Medicaid).

Despite Defendants' efforts, their state court action was also unsuccessful. Appx. 1091-92. In its letter ruling, the court expressly informed Affiliate Defendants that its legal position was meritless and unsupported by any legal authority. *Id.* Despite adverse rulings by multiple courts, PPFA continues to assist Affiliate Defendants in their ongoing refusal to repay the Medicaid programs.

> **d. PPFA acted knowingly when it directed and participated in PPGC's efforts to conceal the true facts of the Texas terminations from LDH and the Middle District of Louisiana in an effort to maximize Medicaid revenue.**

PPFA attorneys also represented PPGC in the Louisiana federal court action. *See* Complaint, *Kliebert*, No. 3:15-cv-00565 (M.D. La. Aug. 25, 2015), Dkt. 1. Even though both PPFA and PPGC *knew* the Fifth Circuit opinion overruled the Louisiana case, rendering the still-pending preliminary injunction without legal basis and giving "the green light" for Louisiana to finally effectuate PPGC's termination, PPFA engaged in further maneuvering to nonetheless prolong the preliminary injunction and milk it to obtain additional Medicaid revenue PPGC was not entitled to. PPFA did not update the Louisiana federal district court with the Fifth Circuit's ruling. Instead, when Louisiana moved to vacate the preliminary injunction, PPFA *opposed*

the request and urged the Court to keep the baseless injunction in place—and it did. Louisiana later again requested the injunction to be lifted, and this time, on October 10, 2022, PPFA simply noted that PPGC did not oppose the request. On November 9, 2022, PPGC dismissed the Louisiana case, Notice of Voluntary Dismissal, *Kliebert*, No. 3:15-cv-00565 (M.D. La. Nov. 9, 2022), Dkt. 131, and on November 10, 2022, the Court vacated the preliminary injunction and dismissed the case, Order, *Id.* (M.D. La. Nov. 10, 2022), Dkt. 132.

The result was that for nearly a year after it was known to PPFA and PPGC that the preliminary injunction had no legal basis and should be vacated, PPGC continued to bill Louisiana Medicaid and PPFA continued to support that effort in court. PPFA also spearheaded efforts to create a public campaign and try to pressure Louisiana Governor John Bel Edwards to let PPGC stay in Medicaid despite the Fifth Circuit's ruling, which they knew meant that PPGC was no longer entitled to be a Louisiana Medicaid provider. Appx. 5159-61. PPFA employees even noted that PPGC wasn't "working hard enough" to stay in Medicaid. Appx. 5159.

### C. PPFA is liable because it exercises extensive control over the operations of the Affiliate Defendants.

As this Court already recognized, a parent corporation may be held liable for the acts of subsidiaries when an "alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management." Dkt. 71 at 22 (quoting *United States v. Bestfoods*, 524 U.S. 51, 64 (1998)). Where "the parent is directly a participant in the wrong complained of," it is thus "directly liable for its own actions." *Bestfoods*, 524 U.S. at 64–65. The general "rule" is that "the parent 'corporation is

[itself] responsible for the wrongs committed by its agents in the course of its business.'" *Id.* at 65 (quoting *Mine Workers v. Coronado Coal Co.*, 259 U.S. 344, 395 (1922)). And where a parent company "oversee[s] . . .operations" of a subsidiary, *United States v. Omnicare, Inc.*, No. 1:15-CV- 4179 (CM), 2021 WL 1063784, at *13 (S.D.N.Y. Mar. 19, 2021), is aware of investigations and unlawful conduct but does not remedy it, *id.*, and engaged in "audit[s]" of a subsidiary's "Revenue Process," *id.* that is enough to show direct involvement, *see id.* For instance, in *Martino-Fleming*, the District of Massachusetts held that a claim could go to trial against a private-equity firm, a majority shareholder of a for-profit mental health provider and Medicaid service provider, even though the firm obviously did not directly provide the Medicaid services nor bill for them. *United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.*, No. 15-CV-13065-PBS, 2021 WL 2003016, at *130 (D. Mass. May 19, 2021). The Court noted that the firm "understood that [the provider's] revenues were tied to Medicaid," "understood that Medicaid had requirements in terms of licensure and qualification," knew about the allegedly unlawful acts, and "had the power to fix the regulatory violations which caused the presentation of false claims but failed to do so." *Id.* Here, PPFA is liable because it exerted extensive control over Affiliate Defendants in virtually all areas of the Affiliates' operations, was aware of investigations and unlawful conduct, and not only failed to remedy it, but in fact perpetuated it.

## 1. Accreditation and Evaluation by PPFA

PPFA requires the Affiliate Defendants to be "accredited" through a rigorous appraisal of their policies, practices, and programs to assess compliance with PPFA's standards. *See* Appx. 2727-3151. This accreditation process involved two PPFA employees working on site at the affiliate's health care center for two full weeks to personally observe compliance with all PPFA accreditation standards. Appx. 2728. It would then take PPFA up to four additional weeks to review the findings and create a Final Affiliate Accreditation Report. *Id.* This process was completed for a new healthcare center seeking accreditation for the first time and accreditation was reappraised every three years thereafter to ensure ongoing compliance with PPFA's policies, practices, and programs. Appx. 2727. The template for this review was 50 pages long (Appx. 2777–2827) with a completed report spanning 84 pages or more. *See, e.g.,* Appx. 3028–3111 (2017 Accreditation Report for PPGC).

PPFA's control through this accreditation process covered areas such as the form and substance of an affiliate's bylaws and affiliate practices surrounding hiring, fundraising, diversity, attendance policies for board meetings (Appx. 2777–79), compliance with PPFA-established profit margins, what percentage of revenue may come from government funding, annual financial audits, asset protection plans (Appx. 2785–86), which insurance carrier the affiliate must use (Appx. 2789), who could be hired as a medical provider and how they would be trained (Appx. 2799–2806), property maintenance obligations (Appx. 2817–19), and whether, how, and at what levels affiliates must participate in public affairs activities (Appx. 2823). And PPFA required that "all activities, programs, services, and pronouncements of the

affiliate or ancillary corporation(s) conform to the PPFA mission and purpose." Appx. 2822.

## 2. PPFA's continuing involvement with all aspects of the Affiliate Defendants' business.

After the six-week gauntlet of accreditation has been passed, PPFA continues its oversight and control over its affiliates—including the Affiliate Defendants—by offering various services and programs to assist them in their ongoing conformity to PPFA's rigorous standards. As detailed in Plaintiffs' brief in support of their motions for summary judgment (Dkt. 391 at 78–86), PPFA controlled affiliates through "free"[23] consulting services which directed affiliates' conduct in business, finance, information technology, human resources, and clinical healthcare operations. Appx. 1544 (Collucio Depo. 21:7–23:2); 2223-24 (Trivisonno Depo. (82:1–89:9). Although PPFA denies being a healthcare provider (Dkt. 385 at 1), it also managed a team responsible for clinical quality improvement, which monitored healthcare services its affiliates provided to patients and identified ways to clinically improve patient health outcomes. Appx. 2227 (Trivisonno Depo. (100:6–101:6). It also developed and enforced Medical Standards and Guidelines, which governed all aspects of the Affiliate health centers' provision of clinical services. Appx. 7338-7771. PPFA's intimate involvement with every aspect of Affiliates' businesses from administrative practices to patient

---

[23] These services, which are available to affiliates as a benefit of membership, are funded entirely by PPFA and the salaries and expenses of the consulting team in providing services to affiliates are all paid by PPFA. Appx. 236 (Collucio Depo. 17:9–20:11).

health outcomes belies its efforts to minimize its own legal liability for wielding such control over its affiliates.

### IV. Texas and Louisiana Paid More to Managed Care Organizations for Planned Parenthood's Claims Because Planned Parenthood Should Have Received Nothing Because They Were Terminated.

Affiliate Defendants contend that there can be no FCA liability without a demonstration that "the government paid more to the MCOs for Affiliate Defendants' claims than it would have otherwise paid for those same services." Dkt. 382 at 65. They cite no binding authority supporting this proposition. Regardless, that the "government may not *pay* more, but the Defendants may *receive* more of the federal funds" is enough for an FCA claim. *United States ex rel. White v. Mobile Care EMS & Transport, Inc.*, No. 1:15-cv-555, 2021 WL 6064363, at *14 (S.D. Ohio Dec. 21, 2021) (emphasis in original). Defendants do not dispute that they received more money due to billing Texas and Louisiana Medicaid during the pendency of the injunctions and have retained that money even after the Fifth Circuit's decision in *Kauffman*. Accordingly, even if Defendants' actions did not affect the government's rate of reimbursement to the MCOs, it is uncontested that Defendants themselves "have received more money as a result of" their unlawful acts." *Id.* at *14. Defendants' conduct "tended to influence" the payments they received, which "is enough for an FCA claim." *Id.* (internal quotation marks omitted). And Defendants should have received (and the States should have paid them) *zero* dollars because they had been terminated.

Moreover, the Eleventh Circuit has recognized that the government is entitled to recover funds paid when it is required to pay a provider who is out of compliance

with applicable regulations. *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1328 n.55 (11th Cir. 2016). Even if the government would have spent the same money for the care of the same Medicaid patients, which cannot be assumed, that is irrelevant. "The Government is not seeking to claw back the money merely to pocket the funds or to avoid paying for the care of [the providers'] patients;" it is seeking to recover the payment to providers who failed to comply with applicable regulations. *Id.*

## V. Planned Parenthood Is Not Entitled to Summary Judgment on Relator's Conspiracy Claims.

Planned Parenthood's entire argument as to Relator's conspiracy claims is that "Relator has not identified any evidence of an agreement between Affiliate Defendants to violate the law." Dkt. 382 at 53; *accord* Dkt. 385 at 18.[24] That is not sufficient to negate an element of Relator's claim, so summary judgment should be denied. "It is not enough to move for summary judgment . . . with a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986) (White, J., concurring). Moreover, Relator has identified numerous facts that show Planned Parenthood's liability for conspiracy. *See* Dkt. 391 at 87-89; *see also id.* at 66-76.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions for summary judgment.

---

[24] As stated above, *see* n. 13 *supra*, Relator retains a conspiracy claim under the TMFPA despite the State's non-intervention on that claim.

Respectfully submitted.

/s/ Heather Gebelin Hacker
Heather Gebelin Hacker
Texas Bar No. 24103325
Andrew B. Stephens
Texas Bar No. 24079396
HACKER STEPHENS LLP
108 Wild Basin Road South, Suite 250
Austin, Texas 78746
(512) 399-3022
heather@hackerstephens.com
andrew@hackerstephens.com

**Attorneys for Relator**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

/s/ Amy Snow Hilton
Christopher D. Hilton
Chief, General Litigation Division
Texas Bar No. 24087727
Amy Snow Hilton
Assistant Attorney General
General Litigation Division
Texas Bar No. 24097834

Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667
Christopher.Hilton@oag.texas.gov
Amy.Hilton@oag.texas.gov

**Attorneys for State of Texas**

63

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2023, the foregoing document was filed and served via CM/ECF on all counsel of record.

<u>/s/ Heather Gebelin Hacker</u>
Heather Gebelin Hacker