**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| United States of America<br>*ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| The State of Texas<br>*ex rel.* ALEX DOE, Relator, | § | CIVIL ACTION NO.<br>2:21-CV-00022-Z |
| | § | |
| The State of Louisiana<br>*ex rel.* ALEX DOE, Relator, | § | Date:   January 27, 2022 |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| Planned Parenthood Federation of America, Inc.,<br>Planned Parenthood Gulf Coast, Inc., Planned<br>Parenthood of Greater Texas, Inc., Planned<br>Parenthood South Texas, Inc., Planned Parenthood<br>Cameron County, Inc., Planned Parenthood San<br>Antonio, Inc., | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF AFFILIATE DEFENDANTS' OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

ARNOLD & PORTER KAYE SCHOLER LLP

Tirzah S. Lollar
Tirzah.Lollar@arnoldporter.com
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone: +1 202.942.5000
Fax: +1 202.942.5999

| DOCUMENT NAME | APP. PAGE NO. |
|---|---|
| Declaration of Ronda Exnicious (1/26/2023) | App.507-09 |
| Declaration of Polin Barraza (1/26/2023) | App.510-12 |
| Declaration of Sheila McKinney (1/26/2023) | App.513-15 |
| Excerpts of Rule 30(b)(6) Deposition of PPGC (12/1/2022) | App.516-24 |
| Excerpts of Rule 30(b)(6) Deposition of PPGT (12/6/2022) | App.525-34 |
| Excerpts of Rule 30(b)(6) Deposition of Texas Health and Human Services Commission (Goldstein) (12/7/2022) | App.535-36 |
| Excerpts of Deposition of Melaney Linton (12/10/2022) | App.537-48 |
| Excerpts of Transcription of Video Files (4/9/2015) | App.549-54 |
| Texas's Response in Opposition to PI  (1/12/2017) | App.555-97 |
| Texas's Motion to Clarify PI Order and Judgment (3/13/2017) | App.598-607 |
| *Kliebert*, Motion to Stay Proceedings (3/28/2019) | App.608-10 |
| *Kliebert*, Order Staying Proceedings Pending 5th Circuit Rulings (5/17/2019) | App.611 |
| PPGC talking points for patients re TX Medicaid Exclusion with transition advice (11/24/2020) | App.612-13 |
| *Smith* 5th Circuit Judgment (12/15/2020) | App.614-15 |
| PPGC Medicaid Notification Letter to Louisiana (Coniglio) (12/23/2020) | App.616-17 |
| PPGC Medicaid Notification Letter to Louisiana (LeBlanc) (12/23/2020) | App.618-19 |
| PPGC Medicaid Patient Letter (2/1/2021) | App.620 |
| Petition for Writ of Mandamus, Temporary Restraining Order, Temporary Injunction, and Permanent Injunction (2/3/2021) | App.621-719 |
| Temporary Restraining Order—Signed (2/3/2021) | App.720-24 |
| PPGT email to staff—Talking Points re Medicaid termination (2/5/2021) | App.725-30 |
| PPGC Medicaid Notification to Louisiana (Coniglio) (3/22/2021) | App.731 |
| PPGC Medicaid Notification to Louisiana (LeBlanc) (3/22/2021) | App.732 |
| *Kliebert* Order (4/7/2021) | App.733-734 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| United States of America<br>*ex rel.* ALEX DOE, Relator,<br><br>The State of Texas<br>*ex rel.* ALEX DOE, Relator,<br><br>The State of Louisiana<br>*ex rel.* ALEX DOE, Relator,<br><br>     Plaintiffs,<br><br>v.<br><br>Planned Parenthood Federation of America,<br>Inc., Planned Parenthood Gulf Coast, Inc.,<br>Planned Parenthood of Greater Texas, Inc.,<br>Planned Parenthood South Texas, Inc.,<br>Planned Parenthood Cameron County, Inc.,<br>Planned Parenthood San Antonio, Inc.,<br><br>     Defendants. | § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 2:21-CV-00022-Z |

## DECLARATION OF RONDA EXNICIOUS

I, Ronda Exnicious, declare and state as follows:

1. I am currently employed by Planned Parenthood Gulf Coast, Inc. ("PPGC") as Vice President of Revenue Cycle Management.  I have performed the functions of my current position for PPGC, under various titles, since 2014.  I am over the age of 18 and have personal knowledge of the matters herein or have acquired such knowledge by personally examining records produced by the Plaintiffs in this litigation regarding PPGC's Texas Medicaid claims.  If called upon to testify, I could and would testify thereto.

2. I make this declaration in support of Defendants' Opposition to Plaintiffs' Motions for Summary Judgment.

3. From the time I joined PPGC in 2014 to March 2021 (except for a brief pause in late 2020/early 2021), PPGC operated health centers in Southeast Texas and the Houston metropolitan area that provided services through the Texas Medicaid program.

4. On January 4, 2021, Texas Health & Human Services Commission ("HHSC") granted a one-month grace period through February 3, 2021 for PPGC and the other Affiliate Defendants to continue to see their existing Medicaid patients and assist them in transitioning to new providers.  Dkt. 383, App. 505-506, Letter from Karen Ray, Chief Counsel, HHSC, to PPGT, PPST, & PPGC (Jan. 4, 2021).

5. PPGC does not have reasonable access to its claims data from prior to May 3, 2021, because that data is kept in two separate databases, neither of which is currently in use.  The previous two databases are legacy systems that are not accessible for claims data reporting/exportation without significant infrastructure investment.  In addition, no current PPGC employee has the expertise to be able to run accurate reports of information from those databases.

6. I have reviewed the Texas Medicaid claims records submitted by Texas and the Managed Care Organizations ("MCOs") participating in Texas Medicaid to Plaintiffs' expert Daniel Lochabay ("Texas's records"), which indicate that during the January 4, 2021 to February 3, 2021 grace period ("the Grace Period"), PPGC had 125 Medicaid encounters with patients for which we received reimbursement from Texas Medicaid or the MCOs participating in Texas Medicaid.

7. There is a Current Procedural Terminology ("CPT") code associated with each item or service provided under Medicaid.  I am not aware of any Medicaid service or CPT code for transitioning a patient from one Medicaid provider to another.  Texas's records indicate

2

that during the Grace Period, PPGC billed for and was reimbursed for Medicaid services such as STD testing, urinalysis, pregnancy tests, and birth control prescriptions, injections, and devices.  A description of the services performed with corresponding CPT code was provided HHSC's Medicaid contractor, Texas Medicaid & Healthcare Partnership, or the MCOs participating in Texas Medicaid when PPGC submitted its claims for reimbursement.

8.   Texas's records indicate that during the Grace Period, PPGC received reimbursement from Texas Medicaid or the MCOs participating in Texas Medicaid for $14,143 for the services provided.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 26, 2023 in Beaver Creek, Colorado.

*Ronda Exnicious*
_____
Ronda Exnicious

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

United States of America                              §
*ex rel.* ALEX DOE, Relator,                          §
                                                      §
                                                      §
The State of Texas                                    §
*ex rel.* ALEX DOE, Relator,                          §          CIVIL ACTION NO. 2:21-CV-00022-Z
                                                      §
                                                      §
The State of Louisiana                                §
*ex rel.* ALEX DOE, Relator,                          §
                                                      §
                                                      §
     Plaintiffs,             §
                                                      §
v.                                                    §
                                                      §
                                                      §
Planned Parenthood Federation of America,             §
Inc., Planned Parenthood Gulf Coast, Inc.,            §
Planned Parenthood of Greater Texas, Inc.,            §
Planned Parenthood South Texas, Inc.,                 §
Planned Parenthood Cameron County, Inc.,              §
Planned Parenthood San Antonio, Inc.,                 §
                                                      §
     Defendants.             §

## DECLARATION OF POLIN BARRAZA

I, Polin Barraza, declare and state as follows:

1. I am currently employed by Planned Parenthood South Texas, Inc. ("PPST") as Senior
   Vice President and Chief Operating Officer.  I have been the Chief Operating Officer since
   2013.  From 2010 to 2012, I was Senior Vice President-Healthcare & Compliance.  I also
   currently volunteer at PPST subsidiaries Planned Parenthood San Antonio, Inc. ("PPSA")
   as President and Board Chair, a position I have held since 2019, and at Planned Parenthood
   Cameron County, Inc. ("PPCC") as President, a position I have served in since 2020.  I
   refer to PPST, PPSA, and PPCC collectively as "PPST" in this declaration.  I am over the
   age of 18 and have personal knowledge of the matters herein or have acquired such

knowledge by personally examining business records kept in the ordinary course of PPST's business.  If called upon to testify, I could and would testify thereto.

2. I make this declaration in support of Defendants' Opposition to Plaintiffs' Motions for Summary Judgment.

3. From 2010 to March 10, 2021 (except for a brief pause in late 2020/early 2021), PPST operated health centers in the San Antonio area that provided services through the Texas Medicaid program.

4. On January 4, 2021, Texas Health & Human Services Commission ("HHSC") granted a one-month grace period through February 3, 2021 for PPST and the other Texas Affiliate Defendants to continue to see their existing Medicaid patients and assist them in transitioning to new providers.  Dkt. 383, App. 505-506, Letter from Karen Ray, Chief Counsel, HHSC, to PPGT, PPST, & PPGC (Jan. 4, 2021).

5. PPST's records ("our records") indicate that during the January 4, 2021 to February 3, 2021 grace period ("the Grace Period"), PPST saw 68 Medicaid clients.  All of these Medicaid clients were enrolled through Managed Care Organizations ("MCOs").

6. There is a Current Procedural Terminology ("CPT") code associated with each item or service provided under Medicaid.  I am not aware of any Medicaid service or CPT code for transitioning a patient from one Medicaid provider to another.  Our records indicate that during the Grace Period, PPST provided the Medicaid services such as STD testing, urinalysis, pregnancy tests, breast and pelvic exams, and birth control prescriptions, injections, and devices.  A description of the services performed with corresponding CPT code was provided HHSC's Medicaid contractor, Texas Medicaid & Healthcare

2

Partnership, or the MCOs participating in Texas Medicaid, when PPST submitted its claims for reimbursement.

7. Our records indicate that during the Grace Period, PPST sought and received reimbursement from the MCOs participating in Texas Medicaid for $19,010.13 for the services provided.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 26, 2023 in San Antonio, Texas.

_____

Polin Barraza

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| United States of America<br>*ex rel.* ALEX DOE, Relator, | § § § | |
| The State of Texas<br>*ex rel.* ALEX DOE, Relator, | § § § | CIVIL ACTION NO. 2:21-CV-00022-Z |
| The State of Louisiana<br>*ex rel.* ALEX DOE, Relator, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| Planned Parenthood Federation of America,<br>Inc., Planned Parenthood Gulf Coast, Inc.,<br>Planned Parenthood of Greater Texas, Inc.,<br>Planned Parenthood South Texas, Inc.,<br>Planned Parenthood Cameron County, Inc.,<br>Planned Parenthood San Antonio, Inc., | § § § § § § § | |
| Defendants. | § § | |

## DECLARATION OF SHEILA MCKINNEY

I, Sheila McKinney, declare and state as follows:

1. I am a current employee and former Chief Operating Officer of Planned Parenthood of Greater Texas, Inc. ("PPGT"). I served as Chief Operating Officer from 2013 to April 2022. I am over the age of 18 and have personal knowledge of the matters herein or have acquired such knowledge by personally examining business records kept in the ordinary course of PPGT's business. If called upon to testify, I could and would testify thereto.

2. I make this declaration in support of Defendants' Opposition to Plaintiffs' Motions for Summary Judgment.

3.  From 2012 to 2018, PPGT provided family planning services and other preventive care to Medicaid beneficiaries at health centers in Central, East, and North Texas.  Starting in 2018, through March 10, 2021 (except for a brief pause in late 2020/early 2021), PPGT provided family planning services and other preventive care to Texas Medicaid beneficiaries at health centers in those regions, as well as West Texas.

4.  On January 4, 2021, Texas Health & Human Services Commission ("HHSC") granted a one-month grace period through February 3, 2021 for PPGT and the other Affiliate Defendants to continue to see their existing Texas Medicaid patients and assist them in transitioning to new providers.  Dkt. 383, App. 505-506, Letter from Karen Ray, Chief Counsel, HHSC, to PPGT, PPST, & PPGC (Jan. 4, 2021).

5.  PPGT's records ("our records") indicate that during the January 4, 2021 to February 3, 2021 grace period ("the Grace Period"), PPGT saw 178 Texas Medicaid patients.

6.  There is a Current Procedural Terminology ("CPT") code associated with each procedure or service provided under Medicaid.  I am not aware of any Medicaid service or CPT code for transitioning a patient from one Medicaid provider to another.  Our records indicate that during the Grace Period, PPGT provided Medicaid services such as STD testing, pregnancy tests, breast exams, and birth control prescriptions, injections, and devices.  A description of the services performed with corresponding CPT code was provided to HHSC's Medicaid contractor, Texas Medicaid & Healthcare Partnership, or the Managed Care Organizations ("MCOs") participating in Texas Medicaid when PPGT submitted its claims for reimbursement.

2

7. Our records indicate that during the Grace Period, PPGT received reimbursement from Texas Medicaid or the MCOs participating in Texas Medicaid for $24,473.24 for the services provided.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 26, 2023 in Katy, Texas.

*Sheila McKinney*
Sheila McKinney (Jan 26, 2023 20:13 CST)
_____
Sheila McKinney

3

App.515

Page 1

                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
                       AMARILLO DIVISION

UNITED STATES OF AMERICA,       §
Ex rel. ALEX DOE, Relator,

                                §
THE STATE OF TEXAS,
Ex rel. ALEX DOE, Relator,      §    Civil Action No.
                                     2:21-CV-00022-Z
v.

                                §
PLANNED PARENTHOOD
FEDERATION OF AMERICA, INC.,     §
PLANNED PARENTHOOD GULF
COAST, INC., PLANNED             §
PARENTHOOD OF GREATER
TEXAS, INC., PLANNED             §
PARENTHOOD SOUTH
TEXAS, INC., PLANNED             §
PARENTHOOD CAMERON
COUNTY, INC., PLANNED            §
PARENTHOOD SAN ANTONIO,
INC.,                           §
 Defendants.


                   VIDEO DEPOSITION OF
               PLANNED PARENTHOOD GULF COAST
                THROUGH ITS REPRESENTATIVE
                      ALFRED CURTIS


                   Arnold & Porter LLP
                   700 Louisiana Street
                      Suite 4000
                    Houston, Texas
December 1, 2022                          9:12 a.m.



App.516

Page 14

1    A.   I did.

2    Q.   What did Ms. Linton desc- -- how did she

3  describe PPGC's state of mind and which direction to go?

4    A.   She reminded me of how we make all decisions,

5  and that is with our mission and vision at the

6  forefront, and our patients at the forefront, and she

7  said that we had -- they -- at the time, they did what

8  was in the best interest of our patients.

9    Q.   And what decision are you referring to that was

10  in the best interest of the patients?

11    A.   The decision to continue to fight and litigate.

12    Q.   And that includes the decision not to pursue the

13  administrative appeal process that HHSC offered; is that

14  right?

15    A.   That is correct.

16    Q.   You said that you discussed with Ms. Linton how

17  PPGC came to make those decisions.  Without divulging

18  communications with counsel, what did Ms. Linton

19  describe to you in terms of how PPGC made their

20  decisions to litigate?

21    A.   She said we follow the same process that we

22  still follow today, which is:  We consult as a senior

23  leadership team, and then we talk it over with our

24  board, and we make the decision to go whichever route as

25  a team.



Page 15

```
1     Q.   And that was how PPGC decided to pursue

2   litigation, and not the administrative process outlined

3   by HHSC?

4     A.   It's in consultation with senior leadership

5   team, our board.  We also consulted with attorneys at

6   litigation and law.

7     Q.   Were there any other attorneys, other than

8   litigation and law, that PPGC consulted with at the time

9   of making those decisions?

10             MS. LOLLAR:     Objection; form, scope.

11     A.   Yes, I believe.

12   BY MS. HILTON:

13     Q.   Do you know who those people were?

14             MS. LOLLAR:     Objection; scope.

15     A.   I can't name them off the top of my head right

16   now.

17   BY MS. HILTON:

18     Q.   Is that information that you would be able to

19   find out if you had documents in front of you?

20             MS. LOLLAR:     Objection; form, scope.

21     A.   Yes.

22   BY MS. HILTON:

23     Q.   You said you discussed, with Ms. Linton PPGC's

24   operations at the time that they were deciding whether

25   to litigate or pursue the administrative option; is that
```



App.518

1    A.   How we were seeing patients, what we were doing

2  in terms of messaging the patients, what were we doing

3  at our health centers operationally.

4    Q.   Okay.  When you say whether PPGC could see

5  patients, are you talking about Medicaid patients?

6    A.   Yes.

7    Q.   And when you refer to "messaging to patients",

8  are you referring to messaging to patients about

9  whether or not PPGC could accept Medicaid patients?

10    A.   Yes.

11    Q.   How did PPGC determine that they could continue

12  to see Medicaid patients?

13           MS. LOLLAR:     Objection to form.

14    A.   What do you mean?

15  BY MS. HILTON:

16    Q.   Well, let me just ask you, what was PPGC's

17  operational plan with respect to seeing patients during

18  the course of the Texas Medicaid litigation?

19           MS. LOLLAR:     Objection to form.

20    A.   We would continue to see Medicaid patients as

21  long as we were legally able to do so, period.

22  BY MS. HILTON:

23    Q.   Did any part of that operational plan include a

24  plan to transition patients to other providers?

25    A.   Yes.



1      Q.    What were the details of that plan?

2      A.    If we were ultimately excluded from Medicaid,

3   we would work with patients to find them other

4   providers by providing them a list of providers in the

5   area and, in some cases, potentially even doing warm

6   handoffs.

7      Q.    What's a warm handoff?

8      A.    Where we would contact the provider -- contact

9   another provider on their behalf, and sort of hand them

10  off.

11     Q.    Did PPGC ever provide a list of providers --

12  other providers to patients as a result of being

13  excluded from Medicaid?

14     A.    Yes.

15     Q.    When was that?  Let me clarify.  When -- when

16  did PPGC begin to provide that list?

17     A.    It was in December of 2020, after the 5th

18  Circuit lifted the injunction.

19     Q.    How was that list disseminated?

20     A.    They were -- it was printed on car- -- little

21  handout cards that we gave to patients at the health

22  centers.

23     Q.    Was that list ever disseminated to patients

24  other than just in person at the health center?

25     A.    Not that I can recall.



Page 23

1    Q.    Approximately how many warm handoffs did PPGC

2   do?

3            MS. LOLLAR:     Objection; scope.

4    A.    I wouldn't have that number.

5   BY MS. HILTON:

6    Q.    Is there someone who would?

7            MS. LOLLAR:     Sorry, same objection to

8   scope.

9    A.    I don't know that anyone would know it off the

10   top of their head.

11   BY MS. HILTON:

12   Q.    Is it something -- is that a number that's

13   maintained anywhere at PPGC?

14           MS. LOLLAR:     Objection; scope.

15   A.    I don't think so.

16   BY MS. HILTON:

17   Q.    Other than the warm handoffs or the list

18   provided to patients of other providers, was there

19   anything else that PPGC did to transition patients to

20   other providers?

21   A.    What do you mean?

22   Q.    Were there any other efforts that PPGC took to

23   transition patients to other providers?

24   A.    We... So, outside of direct communications

25   with patients, so as patients were making appointments,



Page 24

1    we would let them know at the time that they were

2    making an appointment that if we couldn't see Medicaid

3    patients, if you needed help finding another provider, I

4    think there was probably a website or something you

5    could point to.

6         I don't know the website specifically, but --

7    but it was more just direct communications with

8    patients either at the time they made their appointment

9    or if they showed up to the health center.

10   Q.   So you're referring to over-the-phone or

11   in-person communications?

12   A.   Uh-huh.  Yes.

13   Q.   Thanks.  When did PPGC begin telling patients

14   that they could no longer see Medicaid patients?

15             MS. LOLLAR:      Objection to form.

16   A.   After the 5th Circuit lifted the injunction.

17   BY MS. HILTON:

18   Q.   Did PPGC continue to bill for Medicaid services

19   provided to patients after the 5th circuit lifted the

20   injunction?

21   A.   Not immediately after, no.

22   Q.   But then, at some point, they resumed?

23   A.   Yes.

24   Q.   When was that?

25   A.   When we received a grace period from the State.



Page 248

```
 1        A.   I am.

 2        Q.   To tab 434, the title is, "PAC and health center

 3   talking points, Texas Medicaid exclusion, November 24th,

 4   2020."  Did I read that correctly?

 5        A.   Yes.

 6        Q.   Okay.  And then if you look in your notes for

 7   Topic 52, still on that same page in the middle of the

 8   page, do you see a reference to Tab 434?

 9        A.   I do.

10        Q.   Okay.  And what does it say?

11        A.   "Talking points for patients."  It shows cannot

12   used Medicaid payment after December 14.

13        Q.   Okay.  So Exhibit 40 -- 434, were talking

14   points that Planned Parenthood Gulf Coast used with its

15   patients around November 24th, 2020; is that right?

16        A.   Correct.

17        Q.   Okay.  And do you see the third paragraph from

18   the bottom, there's a section, "How can I find another

19   provider in the Medicaid program"?

20        A.   Yes.

21        Q.   Okay.  Were these talking parts -- pardon me.

22   Were these talking points part of Planned Parenthood

23   Gulf Coast's efforts in the November-December time

24   frame to help its patients identify other Medicaid

25   providers?
```



Page 249

1     A.   Yes.

2     Q.   You can put the binder Exhibit 21 to the side.

3  I'm handing you what was previously marked as Exhibit

4  24.  Could you please turn to Tab 302?  Are you there,

5  sir?

6     A.   I am.

7     Q.   And Tab 302 is an excerpt from the Louisiana

8  Medicaid Provider Manual?

9     A.   Yes.

10    Q.   Is this a document that you reviewed in

11 preparation for your deposition today?

12    A.   Yes.

13    Q.   If you look at the page ending in 690?  Are you

14 there?

15    A.   I am.

16    Q.   Do you see a section entitled, "Provider

17 requirements"?

18    A.   Yes.

19    Q.   Okay.  And just as an example, in the second

20 paragraph, it says, "Therefore providers are

21 responsible for knowing the terms of the provider

22 agreement, program standards, statutes and the

23 penalties for violations."

24        "The provider signature on the provider

25 enrollment packet PE-50 addendum, provider agreement



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA,      )
ex rel. Alex Doe, Relator,     )
                               )
THE STATE OF TEXAS,            )
ex rel. Alex Doe, Relator,     )
                               )
THE STATE OF LOUISIANA,        )
ex rel. Alex Doe, Relator,     )
                               )
          Plaintiffs           )CIVIL ACTION NO. 2:21-CV-00022-Z
v.                             )
                               )
PLANNED PARENTHOOD FEDERATION  )
OF AMERICA, INC., PLANNED      )
PARENTHOOD GULF COAST, INC.,   )
PLANNED PARENTHOOD OF GREATER  )
TEXAS, INC., PLANNED           )
PARENTHOOD SOUTH TEXAS, INC.,  )
PLANNED PARENTHOOD CAMERON      )
COUNTY, INC., PLANNED          )
PARENTHOOD SAN ANTONIO, INC.,  )
                               )
          Defendants.          )
----------------------------------------------------------------

ORAL & VIDEO DEPOSITION OF KEN LAMBRECHT

December 6, 2022
----------------------------------------------------

          Oral & video deposition of KEN LAMBRECHT, produced as

a witness at the instance of the plaintiffs, and

duly sworn, was taken on the 6th day of December, 2022,

before Patrick Stephens, Certified Court Reporter, at

303 Colorado Street, Suite 2750, Austin, TX 78701.



1    A    I believe it was in 2021, so it was on January 23rd,

2  2021.

3    Q    And what are you -- what are you referencing there,

4  sir?

5    A    I am referencing a document -- (reviewing).  I'm --

6  I'm referencing a series of documents about our interpretation

7  at the time of what we were doing to try to take care of our

8  patients and ensure compliance with the law, and -- and we were

9  -- there is a correspondence internally about how to

10  communicate with our patients about whether or not we have the

11  requested reprieve of 30 -- of six months, which the state

12  ended up coming back with 30 days.  It was during that period

13  of time.

14    Q    So your -- your testimony that you were able to bill

15  Medicaid into 2021, is that based on any official

16  communications with the state?

17           MR. ODELL:  Objection, form and scope.

18  BY THE WITNESS (resuming):

19    A    I'm not sure how to answer that question other than

20  the final termination from the state was a Health and Human

21  Services letter -- let me look.  (Reviewing.)  The Texas

22  response to our grace period was on January 4th, 2021, and

23  because they responded to the grace period that we were allowed

24  to provide care then, but we're still terminated.  We were

25  planning for the last days of the program and trying to follow



App.526

1  the strictest interpretation of the law while helping our

2  patients find where they can get care and trying -- trying to

3  provide the care that we could, because most of them are living

4  in crisis.

5              MR. MOORE:  I'll object to the nonresponsive

6  portion of the answer.

7  BY MR. MOORE (resuming):

8      Q    You can set that document aside.

9      A    (Complies with request.)

10             MR. MOORE:  At this time, the State will pass

11 the witness.  Let's go off the record for just a few minutes.

12             VIDEOGRAPHER:  Off the record at 1:23 [sic].

13             (A recess is taken from 1:25 p.m. to 1:35 p.m.)

14             VIDEOGRAPHER:  We're on the record at 1:33.

15                      CROSS-EXAMINATION

16 BY MS. HACKER:

17     Q    Good afternoon, Mr. Lambrecht.

18     A    Good afternoon.

19     Q    It's good to see you again.  My name is

20 Heather Hacker.  We've met before.  I'm just going to have a

21 few more questions for you, and I think that it will be an

22 earlier night tonight than the one we had last time, so...

23     A    (Crosstalk.)

24             MR. ODELL:  Don't get us all excited --

25             MS. HACKER:  Yeah, I'll --



 1  little more specific.

 2      A    Okay.

 3      Q    So after you received the initial notice of

 4  termination in 2015, did PPGT decide to file a federal lawsuit?

 5      A    Yes.

 6      Q    Okay.  So when PPGT decided to challenge the Texas

 7  Medicaid termination in federal court, did you -- did PPGT know

 8  that there was a deadline to request an administrative hearing?

 9      A    Because it was in the letter, we know there -- yes,

10  and we filed litigation instead.

11      Q    Okay.  So let me give you what I'm going to mark as

12  exhibit -- PPGT Exhibit Number 29.

13      A    Thank you.

14      Q    Okay.  And so that document is Bates stamped PPGT-

15  00010059; is that right?

16      A    Yes.

17      Q    Okay.  And you can take a second to look at that.

18      A    (Reviewing.)

19      Q    Okay.  What is this document?

20      A    It is an E-mail exchange between Sheila McKinney with

21  the original E-mail coming to me on my cell phone on March

22  12th, 2021, regarding the Medicaid administrative hearing.

23      Q    Okay.  Now, on the back of that document,

24  Ms. McKinney is asking if you know why we did not ask -- why

25  we, meaning PPGT -- did not ask for an administrative hearing



 1  five years ago; is that right?

 2      A    Yes.

 3      Q    Okay.  And then you responded:  It was a

 4  legal-strategy decision at that time focusing on the federal

 5  courts first.  Is that right?

 6      A    Yes.

 7      Q    Okay.  So PPGT made a legal-strategy decision to file

 8  a federal lawsuit rather than go through the administrative

 9  process after it received the termination notice; is that

10  right?

11              MR. ODELL:  Objection, scope.

12  BY THE WITNESS (resuming):

13      A    We filed litigation believing it was a politically

14  motivated termination and not based in any form of fact.

15      Q    Okay.  And it was a legal-strategy decision to do

16  that rather than an administrative process; is that right?

17      A    It was --

18              MR. ODELL:  Same objection.

19  BY THE WITNESS (resuming):

20      A    It was a legal-strategy decision as well as doing

21  what we felt we had to do to center our patients in our

22  conversation, and our patients being anybody that wants access

23  to care.

24      Q    Okay.  And you also said that you wonder if your

25  attorneys realize there was a deadline to request the



 1  administrative hearing; is that right?

 2       A     I do -- yes, I wrote that.

 3       Q     Okay.  And by, Our attorneys, who are you referring

 4  to?

 5               MR. ODELL:  Objection, scope.

 6  BY THE WITNESS (resuming):

 7       A     Our attorneys at the time could have been a

 8  combination of state attorneys and our litigation and law

 9  counsel.

10       Q     I'm sorry.  What was the first one you said?

11       A     Yeah.  We may have had local attorneys.  I don't

12  remember exactly --

13       Q     Okay.

14       A     -- but we have -- we have local attorneys often and

15  we also consult with litigation and law -- the litigation and

16  law division that serves the affiliates.

17       Q     Okay.  Which attorneys filed the federal lawsuit?

18               MR. ODELL:  Objection, scope.  You can answer.

19  BY THE WITNESS (resuming):

20       A     I would have to look back at -- at that, but I --

21       Q     Sure, please.

22       A     (Reviewing.)  This is -- and forgive me.  May I

23  clarify?  Are you wanting to know as of the date of this letter

24  or back in '15?

25       Q     So I'm asking which attorneys filed the federal



 1  lawsuit.

 2      A    In '15?

 3      Q    Yes.

 4      A    Okay.  Thank you.  (Reviewing.)  I believe it was

 5  litigation and law.

 6           MR. ODELL:  And I'll object to the scope.

 7  BY THE WITNESS (resuming):

 8      A    Husch Blackwell and -- which was our local counsel --

 9      Q    Uh-huh.

10      A    -- Tom Watkins, who's a saint, and Jones -- and Jones

11  (ph) and litigation and law.

12      Q    Okay.  So for the record, which binder number is that

13  that you're looking in?

14      A    This is Binder Number 4.

15      Q    Okay.  And which tab are you on?

16      A    The tab I'm looking at is 412.

17      Q    Okay.  And does that document have a Bates stamp on

18  it?

19      A    I don't understand what a Bates stamp is.

20      Q    The -- the --

21           MR. ODELL:  It does not.

22  BY MS. HACKER (resuming):

23      Q    -- little -- the number on the bottom.

24           MS. HACKER:  Okay.

25           MR. ODELL:  I'm looking at it.  It does not.



 1     Q    And I think you made reference in your testimony
 2  earlier today to the decision from the Fifth Circuit Court of
 3  Appeals in December of 2000 -- or November of 2020; is that
 4  right?
 5     A    I believe so, yes.
 6     Q    And to your understanding, what was the effect of the
 7  decision by the Fifth Circuit Court of Appeals?
 8     A    That we could no longer be in the Medicaid program.
 9     Q    Okay.  It reversed the injunction of the district
10  court.
11     A    Yes.
12     Q    And did the Fifth Circuit Court of Appeals' decision
13  take effect on or about December 14 of 2020?
14     A    Yes.
15     Q    And I believe you testified that PPGT and the other
16  affiliates then sought a grace period.
17     A    Yes.
18     Q    And what was the purpose of the grace period sought
19  by PPGT from the state of Texas?
20     A    It was to give patients time to access services while
21  they still had access and to educate them and try to help them
22  find new Medicaid providers.
23     Q    Was one of the goals also to assist in continuity of
24  care for those patients?
25                MS. HACKER:  Object to the form.



 1  BY THE WITNESS (resuming):

 2      A    Yes.

 3      Q    And do you have an understanding of what continuity

 4  of care means in this context?

 5      A    In relation to reproductive healthcare, our biggest

 6  concern would be individuals that are on certain methods of

 7  birth control and ensuring that they can stay on that method of

 8  birth control, so if individuals wanted long-acting reversible

 9  contraception or emergency contraception, we would -- or

10  Depo-Provera, which is the 90-day method of -- 90-or-after-day

11  method of birth control, we would have wanted to provide that

12  to help provide continuity of care to the next provider.

13      Q    And Did PPGT in fact provide that care to its Texas

14  Medicaid patients during the grace period?

15      A    Yes.

16      Q    And did PPGT make any efforts to assist its Texas

17  Medicaid patients in finding new Medicaid coverage during the

18  grace period?

19              MR. MOORE:  Objection, form.

20  BY THE WITNESS (resuming):

21      A    Right.  Any Medicaid providers -- for their new

22  providers, yes.

23      Q    I screwed up that question.  Let me start over.

24  During the grace period that was granted by the state of Texas,

25  did PPGT make any efforts to assist its Medicaid patients in



```
 1  finding new providers?

 2              MR. MOORE:  Objection, form.

 3  BY THE WITNESS (resuming):

 4      A    Yes, we did.  We provided a list to patients.  In

 5  certain instances we would make calls or reach out to other

 6  community health providers seeing if they would accept our

 7  patients as an existing patient of their practice.

 8      Q    You were asked some questions about an

 9  enrollment-application denial dated March 24th, 2021, which was

10  Exhibit 31 to your deposition.  Do you recall that?

11      A    I do.

12      Q    Do you have that in front of you, Exhibit 31,

13  Mr. Lambrecht?

14      A    I believe I do.  (Reviewing.)  Yes.

15      Q    And you were asked questions by the plaintiffs about

16  this denial document.  Do you know when Planned Parenthood of

17  Greater Texas submitted the application for enrollment that's

18  referenced here?

19      A    No, I do not.

20      Q    Do you know if it was months earlier than this date?

21      A    It could have been.

22      Q    Do enrollment-application decisions with the state of

23  Texas in your experience sometimes take months to process?

24      A    Yes.

25      Q    Okay.  So might this enrollment application have been
```

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF TEXAS
 2                    AMARILLO DIVISION
 3   United States of America    *
     ex rel. ALEX DOE, Relator,  * CIVIL ACTION NO. 2:21-CV-
 4                               * 00022-Z
                                 *
 5   The State of Texas          *
     ex rel. ALEX DOE, Relator   *
 6                               *
     The State of Louisiana      *
 7   ex rel. ALEX DOE, Relator   *
                                 *
 8            Plaintiffs,        *
     V.                          *
 9                               *
     Planned Parenthood          *
10   Federation of America,      *
     Inc., Planned Parenthood    *
11   Gulf Coast, Inc., Planned   *
     Parenthood of Greater       *
12   Texas, Inc., Planned        *
     Parenthood South Texas,     *
13   Inc., Planned Parenthood    *
     Cameron County, Inc.,       *
14   Planned Parenthood San      *
     Antonio, Inc.,              *
15                               *
             Defendants          *
16
17      *********************************************
18         ORAL AND VIDEOTAPED DEPOSITION OF
19      TEXAS HEALTH AND HUMAN SERVICES COMMISSION
20            AND THE STATE OF TEXAS
21           30(b)(6) JEFFREY GOLDSTEIN
22              DECEMBER 7, 2022
23      *********************************************
24
25
```

Page 94

1          A.  And that gets reported to the federal, and then

2     the feds report that to the State, and all states are

3     supposed to -- the State is supposed to abide by when we

4     get a federal notice that somebody has been excluded.

5          Q.  And then the State is supposed to exclude that

6     person, as well, from the State program.  Is that right?

7          A.  That's correct.

8          Q.  Okay.

9          A.  But this deals with exclusion, and we're

10    dealing with termination.

11         Q.  What's the difference between exclusion and

12    termination?

13         A.  Exclusion generally is -- you're excluded for a

14    certain period of time.  For example, you lose your

15    license.  You get -- you can -- you're eligible for

16    reinstatement upon reinstatement of your license.  You

17    could be excluded for anywhere from one year to I guess

18    permanent exclusion.

19         Q.  Okay.  And how does termination differ?

20         A.  Termination is of a contract.  They are similar

21    in regards to the due process, but it's differentiated in

22    the TAC sections, also.

23         Q.  Okay.  And the termination for the Planned

24    Parenthood Texas affiliates were terminations of their

25    relevant provider agreements.  Is that right?

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                     AMARILLO DIVISION

 3
    UNITED STATES OF        *
 4  AMERICA, ex rel. ALEX   *
    DOE, Relator,           *
 5                          *
    THE STATE OF TEXAS, ex  *
 6  rel. ALEX DOE, Relator, *
                            *
 7  THE STATE OF LOUISIANA, *
    ex rel. ALEX DOE,       *
 8  Relator,                *
                            *
 9  VS.                     * CIVIL ACTION NO.
                            *    2:21-CV-00022-Z
10                          *
    PLANNED PARENTHOOD      *
11  FEDERATION OF AMERICA,  *
    INC., PLANNED PARENTHOOD*
12  GULF COAST, INC.,       *
    PLANNED PARENTHOOD OF   *
13  GREATER TEXAS, INC.,    *
    PLANNED PARENTHOOD SOUTH*
14  TEXAS, INC., PLANNED    *
    PARENTHOOD CAMERON      *
15  COUNTY, INC, PLANNED    *
    PARENTHOOD SAN ANTONIO, *
16  INC.                    *

17

18       ***************************************************
                ORAL AND VIDEOTAPED DEPOSITION OF
19                    MS. MELANEY LINTON
                     DECEMBER 10TH, 2022
20       ***************************************************

21

22  ORAL AND VIDEOTAPED DEPOSITION of MS. MELANEY LINTON,

23  produced as a witness at the instance of the Relator,

24  and duly sworn, was taken in the above-styled and

25  numbered cause on the 10TH of DECEMBER, 2022, from
```

MAGNA>
LEGAL SERVICES

```
 1       A.    Yes.

 2       Q.    And it's dated October 19th, 2015?

 3       A.    Yes.

 4       Q.    And is this one of the documents that

 5   you reviewed in preparation for your deposition?

 6       A.    Yes.

 7       Q.    Okay.  As I understand it,

 8   Planned Parenthood Gulf Coast had made a decision

 9   not to pursue administrative remedies in response

10   to this initial Notice of Termination, correct?

11       A.    We decided to file a lawsuit in federal court.

12       Q.    Okay.  My question, though, was, there was

13   a decision made not to pursue administration remedies,

14   correct?

15             MR. ASHBY:  Objection; form.

16       A.    At that time, we decided to file a

17   federal lawsuit.

18             MS. KENNEDY:  Okay.  Objection;

19   nonresponsive.

20       Q.    (BY MS. KENNEDY)  Did you pursue any of

21   your administrative remedies as set forth in the notice?

22       A.    Not at that time.

23       Q.    Okay.  And after receiving the initial

24   Notice of Termination, what steps did Planned Parenthood

25   Gulf Coast take with respect to a response, if any,
```



 1  to that notice?

 2            MS. LOLLAR:  Objection to form.

 3       A.   Our response was the federal lawsuit that

 4  we filed.

 5       Q.   (BY MS. KENNEDY)  And when did

 6  Planned Parenthood Gulf Coast make the decision to

 7  file a federal lawsuit?

 8       A.   I don't recall the exact date

 9  without refreshing my memory looking at the documents,

10  but sometime within the next few weeks of receiving

11  this letter.

12       Q.   Okay.  And I want to focus on the --

13  the decision to file the lawsuit and when that decision

14  was made.  So that you're clear on my answer [sic], I am

15  not asking you when the lawsuit was filed.

16            Do you have an answer as you sit here

17  today about when that decision to file the lawsuit

18  rather than pursue administrative remedies was made?

19       A.   At some point in the weeks after we received

20  this termination.  I don't have a specific recollection

21  in this moment of when the decision was made.

22       Q.   Do you know whether or not the decision

23  was made prior to receiving the final

24  Notice of Termination?

25            MS. LOLLAR:  Objection to form.





App.539

Melaney Linton                                              December 10, 2022
                                                                    Page 53

```
 1      Q.    Okay.

 2      A.    I don't recall any that they were involved in.

 3      Q.    Okay.  Was the response to the initial

 4 Notices of Termination that were sent to

 5 Planned Parenthood Gulf Coast and Planned Parenthood

 6 South Texas and Planned Parenthood Greater Texas

 7 a coordinated response?

 8                  MS. LOLLAR:  Objection; form.

 9      A.    Each affiliate -- my affiliate made its

10 own decision about how to proceed.

11      Q.    (BY MS. KENNEDY)  And Planned Parenthood

12 Gulf Coast chose to proceed with litigation, correct?

13      A.    Yes.

14      Q.    And Planned Parenthood Greater Texas

15 chose to proceed with litigation, correct?

16      A.    Yes.

17      Q.    And Planned Parenthood South Texas

18 chose to proceed with litigation, correct?

19      A.    Yes.

20      Q.    Okay.  And Planned Parenthood Gulf Coast

21 understood that if it failed to pursue

22 its administrative remedies that the termination

23 would become final and non-appealable, correct?

24                  MS. LOLLAR:  Objection; form.

25                  MS. KENNEDY:  Objection; form.
```



 1  any information provided to the Board was provided by

 2  counsel or in the presence of counsel, you should

 3  not provide that information.

 4      A.   All the information was provided either

 5  by counsel or in the presence of counsel.

 6      Q.   (BY MS. KENNEDY)  Okay.  And you --

 7  your understanding is that there was a

 8  Preliminary Injunction issued in the federal court

 9  litigation, correct?

10      A.   Yes.

11      Q.   Okay.  And that Planned Parenthood

12  Federation of America Lit and Law attorneys

13  represented PPGC in that federal court action, correct?

14      A.   Yes.  And we may have had another -- another --

15  we usually have a number of local legal counsel.  As

16  I recall, we had Texas counsel in that case, as well.

17      Q.   Okay.  And how did Planned Parenthood

18  Gulf Coast come to retain the Lit -- the

19  Litigation and Law attorneys for the federal court

20  litigation?

21      A.   That would have been a conversation that

22  my in-house general counsel had with the attorneys

23  at PPFA Litigation and Law.

24      Q.   Okay.  And the federal court granted

25  the Preliminary Injunction on January 19th of 2017.  Do



```
 1   in this matter.
 2       Q.   (BY MS. KENNEDY)  Were the Planned Parenthood
 3   Federation of -- of America -- I will get it right.
 4               Were the Planned Parenthood
 5   Federation of America Litigation and Law attorneys
 6   involved in the drafting of the letter requesting
 7   the grace period?
 8               MS. LOLLAR:  Ms. Linton, you can answer
 9   that with a, "Yes," or, "No," if you know, but
10   nothing beyond that.
11       A.   I don't recall.
12       Q.   (BY MS. KENNEDY)  Let me hand you what
13   I am marking as Exhibit 5 to your deposition,
14   Ms. Linton.
15               (Linton Exhibit No. 5 was marked.)
16       Q.   (BY MS. KENNEDY)  Do you recognize what we've
17   marked as Exhibit 5?
18       A.   Yes.
19               MS. KENNEDY:  And for the record, Exhibit
20   5 is PPST0000294 through 296.
21       Q.   (BY MS. KENNEDY)  And, Ms. Linton, do you see
22   that you're a recipient of this e-mail from Karen Ray
23   dated January 4th, 2021?
24       A.   Yes.
25       Q.   And do you also see that Jennifer Sandman
```



 1  with PPFA.org is also a recipient of this e-mail

 2  from Karen Ray?

 3      A.   Yes.

 4      Q.   Does that help refresh your recollection as

 5  to whether Ms. Sandman was involved in the drafting

 6  of the request for a grace period?

 7      A.   Yes.

 8      Q.   Okay.  And, in fact, the Litigation and Law

 9  counsel was coordinating a Texas-wide strategy

10  regarding the responses to the Notices for Termination

11  and the federal court litigation; isn't that correct?

12           MS. LOLLAR:  Objection; form.

13      A.   If they were, it would have been because

14  after we had each wanted to work with them, we

15  would have asked them to do that part of that.

16      Q.   (BY MS. KENNEDY)  Is that your recollection

17  as far as PPGC is concerned?

18           MS. LOLLAR:  Objection to form.

19      A.   My general counsel would have been a part

20  of more of those conversations than I would have been.

21      Q.   (BY MS. KENNEDY)  All right.  My question is,

22  do you have a recollection?

23      A.   I have some recollection.

24      Q.   And what is that recollection?

25      A.   That there were some discussions.



1        Q.    Okay.  Okay.  So there -- could you describe --
2   okay.  Let me back up.
3                     I believe that Mr. Curtis testified
4   last week that Planned Parenthood Center for Choice has
5   been dissolved.  Is that correct?
6        A.    It is in the process of being dissolved.
7        Q.    Okay.  And could you explain the relationship
8   between PPGC and Planned Parenthood Center for Choice?
9   Or I will refer to it as, "PPCFC."
10       A.    Would you define, "relationship"?
11       Q.    How do those two entities interact, and
12  how are they related?
13       A.    The -- there is a Management &
14  Services Agreement between the two entities.
15       Q.    Uh-huh.
16       A.    The officers of the PP Gulf Coast Board
17  serve as the Board of Planned Parenthood
18  Center for Choice.  And I serve as the president
19  of Planned Parenthood Center for Choice.
20       Q.    Okay.  And are -- do -- Planned Parenthood
21  Center for Choice, did their activities take place
22  within PPGC facilities?
23                     MS. LOLLAR:  Objection; form.
24       A.    Can you restate the question?
25       Q.    (BY MS. HACKER)  Uh-huh.



App.544

```
 1                    Did PPCFC's activities take place within
 2    PPGC's facilities?
 3                    MS. LOLLAR:  Same objection.
 4         A.   Can you define, "within"?
 5         Q.   (BY MS. HACKER)  Sure.  So I will give an
 6    example.
 7                    I believe that there was an
 8    Ambulatory Surgical Center that was affiliated
 9    with PPCFC.  Is that right?
10         A.   Can you define, "affiliated"?
11         Q.   Is there -- okay.  So there is an
12    Ambulatory Surgical Center located within
13    PPGC's facility on Gulf Freeway; is that right?
14         A.   No.
15         Q.   Okay.  Was there at -- at some point?
16         A.   Yes.
17         Q.   Okay.  And when there was an ASC there, was
18    that operated by PPGC or PPCFC?
19         A.   PPCFC.
20         Q.   But that was located within PPGC's facility
21    on the Gulf Freeway; is that right?
22         A.   It was a separate suite.
23         Q.   Yes.
24                    In -- in the building, right?
25         A.   In the same building.
```



App.545

1    Q.   Okay.  In the first paragraph, it says, "Based

2    on the initial findings of Louisiana's investigation

3    into Planned Parenthood Gulf Coast (PPGC), you are

4    hereby notified that the Department of Health

5    and Hospitals (DHH) is hereby terminating/revoking the

6    PPGC agreement above.  This action is being taken

7    pursuant to Louisiana R.S. 46:437.11 and 46:437.14.

8    This action will take effect following final

9    determination, judgment, completion, withdraw from, or

10   termination of all administrative and/or legal

11   proceedings in this matter.  Such proceedings include,

12   but are not limited to, informal hearings,

13   administrative appeals, appeals for judicial review,

14   appellate judgments, and/or denials of writ

15   applications."

16             Did I read that right?

17   A.   Yes.

18   Q.   Okay.  After PPGC received this letter,

19   PPGC filed a federal lawsuit in Louisiana; is that

20   right?

21   A.   Yes.

22   Q.   Okay.  Did PPGC ever request or participate

23   in informal hearings for administrative appeals

24   in Louisiana?

25   A.   Yes.



```
 1      Q.    Okay.  Regarding this termination?

 2      A.    Yes.

 3      Q.    Okay.  And when was that?

 4      A.    Sometime in the last year or so.

 5      Q.    Okay.  Like, the last few months?

 6                  MS. LOLLAR:  Objection; form.

 7      A.    Can you repeat the question, please?

 8      Q.    (BY MS. HACKER)  Was it sometime in the

 9  last few months, do you remember, that you

10  participated in an informal hearing or

11  administrative appeal in Louisiana in regards to this

12  letter?

13                  MS. LOLLAR:  Same objection.

14      A.    To the best of my recollection, it was

15  earlier than that.

16      Q.    (BY MS. HACKER)  Okay.  But it wasn't in 2015,

17  right?

18      A.    That is correct.

19      Q.    Okay.  It would have been in either

20  2021 or 2022.  Is that fair?

21      A.    Can you restate the question, please?

22      Q.    Sure.  Yeah.

23                  It would have been in either 2021 or 2022

24  that you participated in an informal hearing

25  or administrative appeal in Louisiana regarding
```



 1  this letter.  Is that fair?

 2      A.   Yes.

 3      Q.   Okay.  And in the second paragraph of this

 4  letter, it discusses I believe it's in the

 5  other False Claims Act cases that PPGC was involved in;

 6  is that right?

 7      A.   Yes.

 8      Q.   And that was part of the basis for

 9  Louisiana's termination of PPGC's Medicare

10  Provider Agreement in Louisiana?

11            MR. ASHBY:  Objection; nonresponsive.

12            MS. LOLLAR:  Objection; form.

13      A.   That's what the letter says.

14      Q.   (BY MS. HACKER)  Okay.  It states a few lines

15  down from the top of the second paragraph that -- in the

16  sentence beginning, "Further," "Further, under that

17  same administrative code, PPGC had an affirmative duty

18  to inform BHSF in writing of this violation.  Since DHH

19  through BHSF was not informed in writing within

20  ten working days of when the provider knew or should

21  have known of the violation, this constitutes a

22  separate violation."

23            Is that correct?

24            MS. LOLLAR:  Objection; form.

25      Q.   (BY MS. HACKER)  Did I read that correctly?



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

PLANNED PARENTHOOD OF GREATER *
TEXAS FAMILY PLANNING AND      *
PREVENTATIVE HEALTH SERVICES,  *
INC., ET AL                    *
    Plaintiffs             *     CIVIL ACTION NO.
                           *     1:15-CV-01058
vs.                            *
                           *
CHRIS TRAYLOR, ET AL           *
    Defendants             *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
TRANSCRIPTION OF VIDEO FILES LABELED
FNND0569_20150409071822, FNND0569_20150409074648,
FNND0569_20150409081515, FNND0569_20150409084341,
FNND0569_20150409091208, FNND0569_20150409094034,
FNND0569_20150409100901, FNND0569_20150409103727,
FNND0569_20150409110553, FNND0569_20150409113420,
FNND0569_20150409120246, FNND0569_20150409123112,
FNND0569_20150409125940, FNND0569_20150409131657,
FNND0569_20150409134524, FNND0569_20150409141350
AND FNND0569_20150409144217
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIBED BY: SALLY REIDY

TRANSCRIPTION DATE:  DECEMBER 2, 2016

PPGC00147431

 1 all sent away once a week for incineration.

 2         SUSAN TANNENBAUM:  Okay, okay.

 3         MELISSA FARRELL:  That's the scope of all of

 4 it.

 5         SUSAN TANNENBAUM:  So this is kind of an

 6 avenue off but this is something in -- this is of late

 7 that I saw.  And I don't know that much about this

 8 area, this is more of Robert's, but we're asking for

 9 intact specimens.  And the technician took a hose and

10 was just full-force spraying.  And Robert said, well,

11 you know, could you be losing things.

12         ROBERT SARKIS:  Yes.  I mean or not just even

13 losing but there's two -- I mean there's basically two

14 considerations for, you know, when we're trying to get

15 the particular, you know, organ types or tissue types

16 requested.  I mean one factor for specimen quality is,

17 you know, the nature of the procedure itself, are you

18 doing an eye pass or you doing electrical suction, are

19 you doing a D&E, is it breech presentation --

20         MELISSA FARRELL:  Yes.

21         ROBERT SARKIS:  -- stuff like that.  But then

22 what we're realizing, you know, as we're observing some

23 of the processes here is there's kind of another mode

24 too.  When they're doing the regular POC check and

25 they're blasting with the hose.  You could have a lot

 1 of, you know, stuff still sitting in the body cavity

 2 but you're blasting it with the --

 3                MELISSA FARRELL:  Yeah.

 4                ROBERT SARKIS:  -- fire hose and it's going

 5 all over.  And then you dump it all in the light dish

 6 and, you know, then you've got to play find the liver

 7 for, you know, for --

 8                MELISSA FARRELL:  Right.

 9                SUSAN TANNENBAUM:  But (indiscernible) have --

10                ROBERT SARKIS:  -- an hour after that.

11                SUSAN TANNENBAUM:  -- no idea that --

12                MELISSA FARRELL:  Yeah.

13                ROBERT SARKIS:  And --

14                MELISSA FARRELL:  Well, so under the scope of

15 where we probably have an edge over other

16 organizations, our organization has been doing research

17 for many, many, many years and we've had studies in

18 which the company or in the case of the investigator

19 has a specific need for a certain portion of the

20 products of conception, and we bake that into our

21 contract and our protocol, that we follow this.  So we

22 deviate from our standard in order to do that.

23                So, you know, we can do it in a way that we're

24 still verifying that everything is there for the safety

25 of the patient, but then we still maintain the

1  integrity of that sample.

2           SUSAN TANNENBAUM:  Okay.

3           MELISSA FARRELL:  So, yeah, that's definitely

4  something we can do.  But as far as this is our

5  standard process, I'm telling you this so then we can

6  get creative about when and where and under what

7  conditions can we interject something that is specific

8  to the tissue --

9           SUSAN TANNENBAUM:  So that --

10          MELISSA FARRELL:  -- procurement needs, yeah.

11          SUSAN TANNENBAUM:  Sorry.  That goes to my,

12  perfect for my next can you get creative.

13          MELISSA FARRELL:  Uh-huh.

14          SUSAN TANNENBAUM:  Can you alter if we say we

15  need a liver.

16          ROBERT SARKIS:  Or not just liver/thymus but,

17  you know, let's say neural tissue is --

18          MELISSA FARRELL:  Right, the neural tissue is

19  what we --

20          ROBERT SARKIS:  -- very difficult because --

21          SUSAN TANNENBAUM:  Could you --

22          MELISSA FARRELL:  -- you know, specifically in

23  the past.

24          SUSAN TANNENBAUM:  -- adjust the procedure if

25  you knew, okay, they need high volume of this, could

```
 1  --
 2                   (End of Video FNND0569_20150409074648)
 3                   (Begin of Video FNND0569_20150409081515)
 4            MELISSA FARRELL:   -- sometimes the procedures
 5  are longer.  So then anything that we piggyback off to
 6  that for collection purposes obviously, you know, would
 7  have to reflect that additional time cost --
 8            SUSAN TANNENBAUM:  Right.
 9            MELISSA FARRELL:   -- administrative burden.
10            SUSAN TANNENBAUM:  So that our compensation
11  that's higher to you for our specific specimens intact
12  could be --
13            MELISSA FARRELL:  Yeah.
14            SUSAN TANNENBAUM:  -- built in to that.
15            MELISSA FARRELL:  And that's something that
16  getting more information about it, you know, as intact
17  as you need, how we're going to do that.  Then from
18  there getting -- when I'm working with our clinical
19  trials and all of our specimen collection, additional
20  specimen collection needs I'm pretty bullish about
21  getting as much information as I can prior to
22  budgeting.
23            SUSAN TANNENBAUM:  I see.
24            MELISSA FARRELL:  Because I can't budget
25  effectively and correctly if I don't have all the
```

PPGC00147480

1 information, and otherwise I'm budgeting blindly.  And

2 I have an expression, I say you can't budget for crazy.

3 I need to know everything that's involved, have it in

4 writing so I can sit down with the parties that are

5 actually doing the work and say, okay, guys, let's work

6 this out now.  And then we will even go so far is to

7 have time trials when we go up there with a stopwatch

8 and timed how much

9 -- so we can at least know what our cost is.  Because,

10 you know, I think in terms of budgeting, if you don't

11 even know your costs how can you develop a budget to

12 cover that.

13          ROBERT SARKIS:  Right.

14          SUSAN TANNENBAUM:  Okay.

15          MELISSA FARRELL:  So, yeah.

16          SUSAN TANNENBAUM:  Well, I want to tell this

17 to you that this might prevent some of your crazy --

18          MELISSA FARRELL:  Good.

19          SUSAN TANNENBAUM:  -- that if you run into

20 crazy I want you to come, feel free to come back to me

21 and say, you know, for that request, to match those

22 requests we need a little more for that specimen --

23          MELISSA FARRELL:  Right.

24          SUSAN TANNENBAUM:  -- that you come back to me

25 and say what you're compensating for that, we want to

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING AND PREVENTATIVE HEALTH SERVICES, INC., et al., | § § § § § | |
| Plaintiffs, | § § | Civil Action No.1:15-cv-01058-SS |
| v. | § § | |
| CHARLES SMITH, et al., | § § | |
| Defendants. | § | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

States have the right to terminate a provider's Medicaid agreement for reasons bearing on that provider's qualifications, and "qualified" means "to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." *Planned Parenthood of Gulf Coast, Inc., v. Gee*, 837 F.3d 477, 495 (5th Cir. 2016). The termination of Planned Parenthood's Medicaid provider agreements in Texas is attributable to the mounting evidence that they engage in gross violations of medical and ethical standards. On multiple occasions, Planned Parenthood has engaged in misrepresentation and obfuscation in order to conceal their activities. After they were caught on an undercover video[1] trying to arrange a

---

[1] DX-2(a).

Page 1

deal with a tissue procurement company for fetal tissue, Planned Parenthood began repeating the baseless claim that the videos were deceptively edited, fraudulent, and discredited as if it were a fact. It is not—as the evidence in this case shows[2]—and neither are so many of the other baseless claims that Planned Parenthood continues to make regarding their activities related to fetal tissue donation, their corporate structure, and their dependence on Medicaid funds.

Here are the facts, which are borne out by the raw, unedited video footage shot at Planned Parenthood Gulf Coast ("PPGC"), the exhibits submitted by the Defendants, and the testimony to be presented at the hearing on January 17-19, 2017. Planned Parenthood has provided fetal tissue specimens to researchers for several years. They have professed a willingness to alter abortion procedures to obtain better, more intact specimens. Never mind that federal law governing fetal tissue research forbids altering procedures solely for research purposes. Planned Parenthood physicians have performed abortions, harvested fetal tissue from those abortions for their own published research without telling patients about their conflict of interest, and, in at least one instance, took the fetal tissue "home in their cooler."[3]

Planned Parenthood has gone to great lengths to mislead the public about the grisly reality exposed by the video footage. These efforts to distort the truth have not been limited to the public at-large, but also extend to a Texas Ranger, the United States Senate Committee on the Judiciary; and the Fifth Circuit Court of Appeals.

---

[2] *Id.*; DX-190.
[3] DX-2(a).

Page 2

Plaintiffs argue that their termination is politically motivated, but once again, reality contradicts their claims. The termination of Planned Parenthood's Medicaid provider agreements is motivated by considerations of medical and ethical standards in addition to human decency. The fact that Planned Parenthood is willing to disregard medical and ethical standards compels the OIG to terminate their Medicaid agreements. As a result, Plaintiffs cannot show that they are entitled to a preliminary injunction against that termination, and their motion should be denied.

## STATEMENT OF FACTS

In mid-2015, the Center for Medical Progress ("CMP") began releasing a series of undercover videos filmed at various Planned Parenthood locations, including the Houston headquarters of PPGC. This video captured a discussion between PPGC employees and individuals posing as representatives from a biomedical company seeking aborted fetal tissue for research.[4] During the hours of footage, PPGC employees, most notably the director of research, expressed a willingness to alter the timing, method, and procedures for surgical abortions based upon the needs of the researchers.[5]

On October 19, 2015, the Health and Human Services Office of the Inspector General ("OIG") issued non-final Notice of Termination letters to Planned Parenthood Gulf Coast (PPGC"), Planned Parenthood Greater Texas ("PPGT"), and Planned Parenthood South Texas ("PPST") based on a series of program violations under both

---

[4] *Id.*
[5] *Id.*

Page 3

state and federal law. The Provider plaintiffs elected not to participate in the administrative process that follows such a notice and filed the instant lawsuit along with several Jane Doe plaintiffs, requesting a preliminary injunction. But since a final determination to terminate the provider agreements had not been made, the parties agreed to stay the case pending a final determination.

Due to the need for further investigation into the underlying violations, the OIG did not issue a Final Notice of Termination of Enrollment ("Final Notice") until late last year.[6] On December 20, 2016, OIG issued the Final Notice of Termination for failure to provide medical services in a professionally competent, safe, legal, and ethical manner. The Final Notice explains that the unedited video footage displayed "that Planned Parenthood follows a policy of agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion."[7] The Final Notice continues that Planned Parenthood's "practices violate accepted medical standards, as reflected in federal and state law, and are Medicaid program violations that justify termination."[8]

The Final Notice also explains that the OIG has "evidence that [Planned Parenthood] engaged in misrepresentations about [its] activity related to fetal tissue procurements, as revealed by evidence provided by the House Investigative Panel."[9] The House Investigative Panel was a group within the United States House of

---

[6] DX-1.
[7] *Id.*
[8] *Id.*
[9] *Id.*

Representatives charged with investigating the fetal tissue procurement industry.[10] After investigating PPGC, on December 1, 2016, the Panel made a referral to the Attorney General of Texas requesting further investigation.[11] Attached to the referral was copious evidence that was consistent with and supportive of the OIG's decision to terminate the Medicaid contracts of Planned Parenthood. The other Texas Planned Parenthood affiliates were terminated based on evidence of affiliation with PPGC and Planned Parenthood Federation of America ("PPFA"), as permitted by state law. The termination is to take effect on January 21, 2017.

On December 30, 2016, Planned Parenthood and several Jane Does requested the Court enjoin the termination. Currently, this matter is set for an evidentiary hearing on January 17-19, 2017.

## ARGUMENT

Four equitable factors govern a preliminary injunction motion: (1) whether there is a substantial likelihood that the movant will prevail on the merits; (2) whether there is a substantial threat that irreparable injury will result if the injunction is not granted; (3) whether the threatened injury outweighs the threatened harm, if any, to the non-movant; and (4) whether granting the preliminary injunction will serve the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). The *movant* must clearly carry the burden of persuasion with respect to each factor. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan*

---

[10] DX-68.
[11] *Id.*

Page 5

*Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003); *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (providing that a preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion").

If the movant fails to establish any of the four perquisites, injunctive relief will not be granted. *Women's Med. Ctr. Of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Even when a movant satisfies each of the four prerequisites, the decision whether to grant or deny a preliminary injunction remains within the discretion of the district court. *Id.* Stated differently, the award of preliminary relief is never "strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," but is rather "a matter of sound judicial discretion" and careful balancing of the interests of—and possible injuries to—the respective parties. *Yakus v. United States,* 321 U.S. 414, 440 (1944). Granting a preliminary injunction should be the exception rather the rule. *Miss. Power & Light Co.*, 760 F.2d at 621.

It is the Plaintiffs' motion, and therefore the Plaintiffs' burden to show that each of the four prongs of the test above are met. But Plaintiffs cannot make such a showing in the face of the substantial evidence the State will provide to support its termination of Planned Parenthood's Medicaid provider agreements. Thus, the motion for preliminary injunction should be denied.

Page 6

I.      **Plaintiffs Cannot Show a Likelihood of Success on the Merits.**

In order to carry their burden in showing that they are entitled to a preliminary injunction, the Plaintiffs must show they are likely to succeed on the merits of their claims. *Jackson Women's Health*, 760 F.3d at 452. The standards of the underlying substantive law inform the likelihood of success analysis. *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990).

A. **The Law Allows States to Terminate Medicaid Provider Agreements for Reasons Based on the Provider's Qualifications.**

The Medicaid program, created by Title XIX of the Social Security Act, is a program "through which the federal government provides financial aid to states that furnish medical assistance to eligible low-income individuals." *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 585-86 (5th Cir. 2004). "Spending clause legislation like Medicaid 'is much in the nature of a contract.'" *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1387 (2015) (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Similarly, Medicaid providers must live up to certain obligations, as well. *See* 42 U.S.C. § 1320a-7. When providers fail to do so, the Secretary of HHS may exclude them under certain mandatory and permissive grounds in the Social Security Act. *Id.*

The hallmark of programs like Medicaid is the concept of cooperative federalism. Under such programs, the federal and state governments each contribute funds to the program and work cooperatively together to administer the program and its funds. Administrative authority flows both ways between the states and the federal government. Section 1002.2 of the Medicaid regulations recognizes a state's

Page 7

authority to exclude a Medicaid provider as a state contractor "for any reason or period authorized by State law," expressly contemplating states filling in any gaps in the program's administration not addressed by the federal statutes *See* 42 C.F.R. § 1002.2(b). And federal law authorizes the Secretary to exclude providers who have been excluded on state law grounds, illustrating the complementary nature of determining provider eligibility under the regulatory scheme. 42 U.S.C. § 1320a-7(b)(5).

The free-choice-of-provider provision in the Medicaid Act states that beneficiaries may obtain medical care from any entity or person who is "qualified to perform the service or services required" and "who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23); *see also Gee,* 837 F.3d at 489.[12] The Medicaid statute itself, however, does not define the term "qualified." *See id.* at 492. Thus, defining what it means to be a "qualified" provider has been left up to the states. The Fifth Circuit has interpreted the term "qualified" in the Medicaid act to mean "capable of performing the needed medical services in a professionally competent,

---

[12] Texas does *not* concede that 42 U.S.C. § 1396a(a)(23) provides an individual with a private right of action. While the panel opinion in *Gee* came to the opposite conclusion, the Fifth Circuit is still considering whether to grant en banc review of that opinion. A response to the petition for rehearing en banc was requested by the court and was filed Oct. 11, 2016. In another case in the Fifth Circuit involving the Medicaid program, the court held that that the Medicaid Act's Equal Access provision did not confer individual private rights that are enforceable under § 1983. *See Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697 (5th Cir. 2007) (refusing to allow Medicaid recipients to sue under § 1983 to enforce the Section 1396a(a)(30)). This intracircuit conflict creates a reasonably likelihood that the court may grant rehearing. Moreover, regardless of whether there is a private right of action for the Jane Doe plaintiffs under §1396(a)(23), Planned Parenthood lacks a right of action as providers, as they are clearly not the intended beneficiaries of the provision, *see Armstrong*, 135 S. Ct. at 1387. The *Gee* opinion addressed only the claims of the individual plaintiffs, not the provider plaintiffs. 837 F.3d at 485, 485 n.7. This argument will be discussed more fully in Defendants' forthcoming motion to dismiss.

Page 8

safe, legal, and ethical manner." *Id.* What "professionally competent, safe, legal, and ethical" means in particular is defined by state law.

Consistent with this framework, Texas law sets forth grounds for termination based on provider qualifications. Under 1 Tex. Admin. Code § 371.1703(c)(8), OIG may terminate a Medicaid provider that the OIG establishes by prima facie evidence commits an act for which "sanctions, damages, penalties, or liability could be or are assessed by the OIG." § 371.1659(2) allows for sanctions where the provider "fails to provide an item or service to a recipient in accordance with accepted medical community standards or standards required by statute, regulation, or contract, including statutes that govern occupations." Broadly under *Gee*, and specifically under state law, then, adherence to medical ethics and the standard of care are directly related to a provider's qualifications to provide Medicaid services.

1.   **Planned Parenthood is not qualified as a Medicaid provider under the law due to evidence that they are willing to violate medical and ethical standards.**

1 Texas Admin. Code § 371.1659(2) and § 371.1703(c)(3) authorizes the OIG to terminate a Medicaid provider where the provider "fails to provide services in accordance with accepted medical community standards or standards required by statute, regulation, or contract, including statutes that govern occupations." And based on *Gee,* a Medicaid provider that fails to provide medical services in an ethical manner is not qualified for purposes of 42 U.S.C. §1396a(a)(23). Thus, broadly under *Gee*, and specifically under state law, adherence to medical and ethical standards directly relate to a provider's qualifications to provide Medicaid services.  And based

Page 9

App.563

on the evidence here, Planned Parenthood has failed to adhere to medical and ethical standards in the provision of medical services to patients.   Their termination is therefore justified.

### a. Willingness to alter an abortion to target fetal tissue for research violates medical and ethical standards.

Modifying an abortion procedure solely for research purposes is a direct violation of federal law, regardless of whether or not the modification increased risk or discomfort to the patient.   42 U.S.C. § 289g-1[13] states that human fetal tissue may only be used for research if "no alteration to the timing, method, or procedures used to terminate the pregnancy was made solely for the purposes of obtaining the tissue." The law informs medical and ethical standards, and if medical providers are willing to engage in practices that violate the law, they also breach those standards.[14] There are numerous instances in the video footage that show a willingness on behalf of PPGC's research and medical staff to alter or modify abortion procedures in order to obtain better specimens for researchers. Moreover, the PPGC employees also state that their physicians are not only willing to do so in the future, but may have done so in the past.

The video shows that PPGC is willing to deviate from standard processes to procure samples that meet a researcher's needs. Specifically, the video shows that

---

[13] Plaintiffs assert in a footnote that 42 U.S.C. § 289g-1 pertains only to "transplantation of fetal tissue" and is therefore irrelevant. *See* Pls. Prelim. Inj. Mot. at 15 n.10; Fine Decl. ¶13. But the National Institutes of Health (NIH) does not interpret the statute in such a limited manner. *See* "Reminder of Legal Requirements Regarding the Acquisition and Use of Human Fetal Tissue for Research Purposes," NOT-OD-15-143 (Aug. 14, 2015) (citing § 289g-1 and 2 and making no mention of transplantation).
[14] *See* anticipated expert testimony of Professor Orlando Snead and Dr. Mikeal Love.

Page 10

Planned Parenthood has permitted, in at least a few instances, staff physicians to alter procedures to get the samples they need for their own outside research. For example, at least one fetal tissue researcher worked at PPGC and performed abortions to procure fetal tissue for her own research. Melissa Farrell, PPGC's Director of Research, states that the researcher "knows what's involved in modifying what we need to do to get you the specimens that are intact because she's done it." She also states that this researcher was doing procedures at PPGC, selecting specific patients on the schedule and asking staff to try to enroll them based on the samples she wanted, and obtaining specimens for her own research.[15] Farrell even stated that this researcher would collect her own specimens and then "take it home with her in her cooler."[16] Farrell's statements not only display a willingness to alter the standard of care for a non-medical reason, but they also implicate prohibitions on researchers performing abortions and obtaining fetal tissue for their own research. 45 C.F.R. § 46.204 ("Pregnant women or fetuses may be involved in research if all of the following conditions are met . . . [i]ndividuals engaged in the research will have no part in any decisions as to the timing, method, or procedures used to terminate a pregnancy . . . .").

Farrell also states that Planned Parenthood is willing to "get creative" and deviate from standard procedures in order to obtain the specimens researchers desire:

> Well, so under the scope of where we probably have an edge over other organizations, our organization has been doing research for many, many, many years and we've had studies in which the company or in the

---

[15] DX-2(a).
[16] *Id.*

> case of the investigator has a specific need for a certain portion of the
> products of conception, and we bake that into our contract and our
> protocol, that we follow this. So we deviate from our standard in order
> to do that. So, you know, we can do it in a way that we're still verifying
> that everything is there for the safety of the patient, but then we still
> maintain the integrity of that sample.  So yeah, that's definitely
> something we can do.  But as far as this is our standard process, I'm
> telling you this so then we can get creative about when and where and
> under what conditions can we interject something that is specific to the
> tissue procurement needs.[17]

That is not the only time Farrell indicates Planned Parenthood's willingness

to change the procedure or standard of care in order to provide research specimens,

and Farrell also makes multiple assurances that the doctors are willing and able to

do it. Farrell stated:

> Yeah, I think we can [obtain intact 18-22 week neural specimens].  I
> mean some of it is really outside—some of it will be happenstance.
> Because, you know, sometimes as the procedure is happening, the
> procedure itself for the removal is generally standardized, and so just
> depending on the patient's anatomy, how many weeks, other—where it's
> placed in the uterus.  We're going to be potentially be able to have some
> that will be more or less intact and then some that will not be.  So and
> we—but it's something we can look at exploring how we can make that
> happen so we have a higher chance.  It will probably also require a little
> bit of input from the doctors.  Because the doctors are the ones acting,
> directly doing that, and you know, when it matters, you know in the case
> of the when it matters and the physicians also need an intact specimen,
> they can make it happen.[18]

Acknowledging that they cannot put the patients at increased risk, she states

that doctors are still willing to change the procedure to ensure the best specimens

and have done it that way before for their own research, so she is confident they will

do so:

---

[17] *Id.*

[18] *Id.*

Page 12

Obviously the change in procedure will have to be where it's not going to put the patient at more risk, prolong the procedure putting her at more risk, and altering the procedure where we leave content in the patient, which obviously we're trying to get, we want everything, yeah. It's you know—and that's something we'll have to discuss, you know, with the docs and see how they can do it.  Because some of our doctors in the past have projects, and they're collecting the specimens so they do it in a way that they get the best specimen.  So I know it can happen.[19]

Farrell further states on the video that "we get what we need to do—to alter the standard of care—where we are still maintaining patient safety, still maintaining efficiency in clinic operations, but we integrate research into it."[20]

These statements demonstrate a willingness to deviate from medical and ethical standards based upon a research motivation.[21]  Texas has the right to hold Medicaid providers to minimum medical and ethical standards, and a stated willingness to deviate from the standard provides a sound basis for termination under state law.

**b. Failing to obtain informed consent by patients undergoing abortion procedures and donating fetal tissue violates medical and ethical standards.**

Evidence of another significant violation of medical and ethical standards by Planned Parenthood in the context of fetal tissue research came to light when the House Select Investigative Panel released its full report on December 30, 2016. The evidence attached to the report includes a copy of PPFA's policy on fetal tissue research and their required consent form.[22]  As both witnesses from Planned

_____

[19] *Id.*
[20] *Id.*
[21] At the upcoming hearing, Defendants' experts will testify in detail as to ethical concerns and the standard of care in relation to the statements made in the video on this subject.
[22] DX-68; DX-64; DX-65.

Page 13

App.567

Parenthood before the House Committee agree,[23] this form is not sufficient to obtain informed consent.

First, related to Section I(A)(2)(a) above, even if it were acceptable within the standard of care and the law for Planned Parenthood physicians to alter or modify an abortion procedure to obtain a better fetal tissue specimen for researchers, it would still be a violation of medical and ethical standards for them to do so because the required consent form unequivocally states, "I understand there will be *no* changes to how or when my abortion is done in order to get my blood or the tissue."[24] Thus, *any* modification to the procedure for research purposes, regardless of whether it increases risk for the patient, would breach the medical and ethical standards because there would be a lack of fully informed consent for the procedure.

It should also be noted that PPFA's policy contains a much broader statement than the consent form on the subject of alterations to the procedure.  In contrast to the consent form it references, PPFA's policy states that "no *substantive* alteration in the timing of terminating the pregnancy or of the method used was made for the purpose of obtaining the blood and/or tissue."[25] Thus, on their faces, PPFA's documents related to fetal tissue research allow the doctor to make changes to the procedure so long as he or she believes they are not "substantive," but tells the patient that *no* changes whatsoever will be made.  This discrepancy violates medical and

---

[23] DX-68; DX-66; DX-67.
[24] *Id.*
[25] DX-64 (emphasis added).

Page 14

ethical standards—Planned Parenthood cannot tell their patients one thing and then do something else when their patients are under anesthesia.

Finally, Planned Parenthood's required consent form contains a misleading statement, which further violates medical and ethical standards. The form states at the top, "Research using the blood from pregnant women and tissue that has been aborted has been used to treat and find a cure for such diseases as diabetes, Parkinson's disease, Alzheimer's disease, cancer, and AIDS."[26] As Planned Parenthood's first witness in the House proceedings pointed out, "To my knowledge there is no cure for AIDS. So that is probably an inaccurate statement . . . I told you I am not an ethicist, but a consent form should not have an incorrect statement."[27]

A consent form for tissue donation which promises treatments and cures for notable diseases using that tissue violates medical and ethical standards because it has the danger of inducing someone to donate based on a false pretense. Additionally, making inaccurate claims in a consent form results in the patient not being fully informed of the risks and benefits of the procedure. It is a breach of medical and ethical standards for a physician to perform a procedure without obtaining informed consent, and Planned Parenthood's standard forms are inadequate for that purpose.[28]

---

[26] DX-65.
[27] *Id.* at Ex. 8.37.
[28] At the upcoming hearing, Defendants' experts will testify in greater detail regarding medical ethics and the standard of care in relation to informed consent procedures.

Page 15

**2.    Planned Parenthood's misrepresentations and misleading statements are consistent with and support termination.**

Ethical behavior and truthfulness are also defined by state law to relate to a provider's qualifications. In more than one regulation, state law allows for the termination of providers who are dishonest in their dealings with the state. 1 Tex. Admin. Code § 371.1651(15) (provider subject to administrative action if the provider makes a false statement, misrepresentation or omission of a pertinent fact on, or fails to fully or correctly complete or execute a provider enrollment application, agreement, or any doc requested as a prerequisite for Medicaid); *id.* § 371.1655(7) and (24) (provider may be terminated for failure to establish effective compliance program for detecting criminal/civil/administrative violations that promotes quality of care; provider may be terminated for failure to prevent, obstruct, impede, or attempts to prevent a state agency from conducting necessary duties).

Here, there is evidence that Planned Parenthood made a false statement to law enforcement officials, which further calls into question Planned Parenthood's qualifications. There is also evidence that Planned Parenthood has attempted to mislead other governmental entities. This willingness to manipulate the truth and omit pertinent facts is consistent with and further supports termination.

**a. Engaging in conduct that may be criminal justifies termination of the Medicaid provider's agreement.**

Where a provider engages in activity that constitutes a crime, regardless of whether there is a conviction, state law allows for termination on that basis. 1 Tex. Admin. Code § 371.1661(8) states that a provider "is subject to administrative actions

Page 16

or sanctions if the person is convicted of or engages in an act that constitutes under state or federal law a criminal offense related to the interference with or obstruction of any audit or investigation into an alleged criminal offense." 1 Tex. Penal Code §37.08(a) makes it a crime to "with intent to deceive . . . knowingly make[] a false statement that is material to a criminal investigation and make[] the statement to a peace officer or federal special investigator conducting the investigation; or any employee of a law enforcement agency that is authorized by the agency to conduct the investigation and the actor knows is conducting the investigation."

Between October 31, 2013 and October 13, 2015, Farrell corresponded with individuals at Baylor College of Medicine ("BCM") regarding the procurement of fetal tissue specimens for a research study.[29] Drafts of a contract were exchanged and Farrell apparently assisted the researchers in the process of obtaining Institutional Review Board ("IRB")[30] approval for the study, which they pursued in reliance on the agreement they had made with PPGC.[31] On November 17, 2014, Farrell received an email from Supriya Parikh ("Parikh") with the subject line, "FW: Pediatrics Research Proposal- Dr Paust/Baylor College of Medicine- IRB Approval Obtained."[32] Parikh states in the email, "I would like to thank you for your support through our IRB review process. We heard back from the IRB today and like we discussed, the study does not constitute human subjects research."[33] Farrell responded the same day,

---

[29] DX-72-80(a).
[30] Institutional Review Board approval is required by federal law whenever there are research studies done with human subjects. *See* http://www.baylor.edu/research/irb/index.php?id=926196.
[31] DX-72-80(a).
[32] DX-79.
[33] *Id.*

Page 17

stating, "Thank you!"[34]  In June and early July 2015, the parties exchanged further emails about the contract.[35] A few days after Farrell's last email about the IRB approval and contract, the first of the series of undercover videos relating to Planned Parenthood's fetal tissue research activities was released on July 14, 2015. On October 15, 2015, Dr. Paust sent an email to Farrell asking if they needed to make changes to the contract in light of recent events, referring to the release of the videos.[36] On November 4, 2015, Farrell responded by denying that the parties were on the cusp of executing the contract.[37]

On October 22, 2015, Texas Ranger Daron Parker, Houston Police Department Homicide Division Sergeant Chris Hassig, and Assistant District Attorneys Anshu "Sunni" Mitchell, Inger Chandler, and Melissa Hervey, visited PPGC's headquarters as part of an investigation.[38] PPGC's general counsel Katie Beth Gottlieb and criminal attorney Josh Schaffer were also present. Gottlieb led the investigators on a tour of the facility and answered virtually all of their questions. In response to questions from investigators about their participation in fetal tissue research, Gottlieb stated:

> [T]he last collected fetal tissue specimen collected by GCPP [Gulf Coast Planned Parenthood] for a scientific study was on 07-26-2011, for the University of Texas Medical Branch [("UTMB")].  GCPP was recently approached by the Baylor College of Medicine and Rice University for fetal tissue studies.  The Institutional Review Board had not yet given approval for the Baylor or Rice studies.[39]

---

[34] *Id.*
[35] *Id.*
[36] DX-80(a).
[37] *Id.*
[38] DX-81.
[39] *Id.*

Page 18

The statement that the IRB had not given approval for the BCM study was false. PPGC knew it had IRB approval.[40] Making matters worse, after the release of the videos, Farrell tried to deny she had even negotiated the contract to provide fetal tissue specimens.

Notably, Planned Parenthood did not even respond to this basis for termination in their motion, describing it only as "unspecified 'evidence' of unidentified 'misrepresentations'" and dismissing it as a "cryptic and vague allegation."[41] Yet the Final Termination letter makes clear that the evidence of misrepresentations uncovered in the Select Investigative Panel investigation was "consistent with and supportive of th[e] termination."[42] The Panel's initial findings were made public the day after Planned Parenthood received the Final Notice of Termination, and well before Plaintiffs filed the instant motion.[43] The Panel's initial findings go into detail about the above evidence—all of the emails between Farrell and BCM, the evidence that PPGC knew the study had IRB approval, the Ranger's report containing the false statement about IRB approval—and concludes that this evidence indicates a possible violation of Texas law, citing the same penal code provision as above.[44] PPGC was also in possession of this letter, as indicated in paragraph 33 and Exhibit H of the declaration of PPGC CEO Melaney Linton.

---

[40] *Id.*
[41] Pls. Prelim. Inj. Mot. at 26, 18.
[42] DX-1 at 2.
[43] https://energycommerce.house.gov/sites/republicans.energycommerce.house.gov/files/documents/114/letters/20161221TX%20AG%20%28PPGC%29%20REDACTED.pdf
[44] DX-68.

Page 19

App.573

Nothing about this is "cryptic"— apparently, Planned Parenthood simply had no response to it.

### b. Planned Parenthood has made misrepresentations and misleading statements about the issues germane to this action.

Planned Parenthood has also made misrepresentations and misleading statements about the issues in this action, which are relevant to its qualifications. As an initial matter, PPGC has stated, in its brief and elsewhere, that it does not have the video relied upon by the OIG.[45]  This statement is categorically false.

Specifically, Josh Schaffer, PPGC's criminal defense attorney, stated in a sworn affidavit that as soon as PPGC became the subject of a criminal investigation related to the videos, he "made it a priority to try to obtain the raw, unedited, complete video footage that [David] Daleiden had recorded at PPGC on April 9, 2015."[46] He further stated that former Assistant District Attorney Mitchell, the prosecutor charged with investigating PPGC, obtained the unedited footage directly from David Daleiden's attorney and then promptly gave it to Schaffer on December 18, 2015.[47] Schaffer then gave the video to Gottlieb, PPGC's general counsel.[48] Thus, contrary to PPGC's assertion, the unedited footage has evidently been in PPGC's possession for over a year.

---

[45] *See* Pls. Prelim. Inj. Mot. at 26 (stating that the OIG's "justification for termination is especially inadequate when this video – the supposedly unedited version of which the Attorney General has yet to provide to Plaintiffs – is the only 'evidence' of wrongdoing Defendants can come up with . . . .").
[46] DX-106 at 34.
[47] *Id.* at 35-36.
[48] *Id.* at 36.

App.574

Additionally, Planned Parenthood's claim that the videos in question are "fraudulent and deceptively edited" has been repeated ad nauseam. PPGC has continued to claim this even in the briefing to this Court, despite also insisting it has not seen the raw footage. What Planned Parenthood omits is that even the "full footage" versions of the videos posted on YouTube were verified through an independent, highly reputable, professional digital forensic group with clients like 3M, Amazon, Intel, Lexis Nexis, Oracle, and Toshiba[49] to be authentic and not edited except for removing non-pertinent footage such as bathroom visits. This was determined by comparing them to the raw, unedited footage.

This kind of misrepresentation has occurred in other contexts specifically related to Planned Parenthood's activities in the area of fetal tissue research. For example, in the *Gee* litigation, Linton stated several times in a declaration and the attached exhibits that PPGC "does not currently participate in any fetal tissue donation programs," and denied receiving remuneration in exchange for fetal tissue.[50] The Fifth Circuit took this to mean that "PPGC does not perform any abortions or operate any fetal tissue donation programs." *Gee*, 837 F.3d at 497-98. But it appears that during this time period, and even to this day, PPGC advertises on their website that they provide donated fetal tissue for clinical research.[51]

---

[49] DX-3; *see also* https://www.coalfire.com/Solutions/Coalfire-Labs/Digital-Forensics; https://www.coalfire.com/About.
[50] Decl. of Melanie Linton, *Planned Parenthood Gulf Coast, et al. v. Kliebert* (M.D. La. Oct. 9, 2015) (No.3:15-cv-00565) (ECF No. 46-1) ("Linton Gee Decl.") ¶21, Ex. H, Ex. F at 3, Ex. H at 2.
[51] DX-120-127.

Page 21

Further, during the Senate Judiciary Committee's investigation, Planned Parenthood stated through counsel that only four of its affiliates—all in California— had engaged in fetal tissue donation between 2010-2015 and received funds in exchange.[52] Yet PPGC engaged in fetal tissue donation between 2010-2011 during the UTMB study and received $21,000 in payments.[53]

Finally, Planned Parenthood has also attempted to mislead courts about their corporate structure. In the *Gee* litigation, the Fifth Circuit believed that "PPGC does not perform any abortions or operate any fetal tissue donation programs"[54] because Linton, again, made several misleading statements in a declaration and the attached exhibits—namely in copies of the letters that PPGC wrote in response to the Louisiana Department of Health and Hospitals' inquiries. These statements created the impression that PPGC could not be guilty of any malfeasance related to fetal tissue research because it had no access to fetal tissue, and PPCFC could not be guilty of any malfeasance related to fetal tissue because it engaged in no donation programs. Both of these impressions are inaccurate.

Linton claimed that PPCFC "does not have fetal tissue donation programs in Texas currently," and PPGC "does not provide abortion services."[55] In response, LDHH asked, "are you defining PPCFC as a fully standalone entity that is not an affiliate, subsidiary or associate of PPGC?" PPGC/PPCFC's answer: "PPGC and

---

[52] https://www.grassley.senate.gov/sites/default/files/judiciary/upload/22920%20-%20FTR.pdf at Ex. 11-12.
[53] DX-70.
[54] *Gee*, 837 F.3d at 497-98.
[55] Linton Gee Decl. Ex. F at 2.

Page 22

App.576

PPCFC are both Texas non-profit corporations.  Neither entity is a subsidiary of the other, and the entities have no members or owners in common.  Other relationships between the entities are purely contractual in nature."[56]  As non-profit corporations, Planned Parenthood affiliates have no "owners," and Planned Parenthood affiliates have no "members," which begs the question of why Linton made that statement unless it was to create the impression that PPGC and PPCFC are more independent from one another than they are.

In this case, Linton slightly modified her claim. In paragraph 5 of her declaration, she states, "PPGC does not provide abortions. PPGC has a facilities and services agreement with a separate organization, [PPCFC], which does.  PPCFC rents space in a building owned by PPGC and operates the PPCFC Ambulatory Surgical Center. I am President and CEO of both organizations, but each has its own board of directors, bylaws, and staff."[57]

The truth is that PPGC and PPCFC essentially operate as one entity.[58] The two organizations share the same address.[59] They share the same building.[60] As Linton now admits, she is President and CEO of both entities.[61] The board members and directors of PPCFC are the same as board members and directors of PPGC.[62]

---

[56] Linton Gee Decl., Ex. F at 2.
[57] Linton Decl. ¶5.
[58] PPGT and PPST appear to operate in a similar fashion in conjunction with their abortion subsidiaries.  *See* DX-142-149; DX-88; DX-91; DX-93; DX-164-166; DX-173; DX-177-178.
[59] DX-112-114; DX-130-132.
[60] DX-2.
[61] Linton Decl. ¶5.
[62] DX-112-114; DX-130-132.

Page 23

PPGC and PPCFC share executive staff.[63] PPCFC and PPGC also state that they are related entities on their Internal Revenue Service Form 990s.[64]

In practice, there is also limited functional separation between PPCFC and PPGC's operations. Even though PPCFC is purportedly the abortion provider, PPGC, not PPCFC, advertised for new employees to assist with abortions.[65] Abortions are performed inside PPCFC's ambulatory surgical center ("ASC"), located inside PPGC's building.[66]  PPGC, not PPCFC, negotiates and enters into agreements with research entities to procure fetal tissue.[67] PPGC also receives the funds for that procurement.[68] The PPGC website advertises that it, not PPCFC, provides donated fetal tissue for clinical research.[69] Farrell is an employee of PPGC, not PPCFC, yet she negotiates agreements to procure fetal tissue from abortions with outside parties.[70] For purposes of fetal tissue procurement, the two entities operate as one unit, and Planned Parenthood's statements to the contrary are misleading.

These efforts to obscure their activities related to fetal tissue procurement raise serious questions as to the qualifications of Planned Parenthood with respect to the Medicaid program, as they indicate unethical behavior that is consistent with and supportive of  the termination.

---

[63] *Id.*
[64] DX-132 at Part IV, Line 34.
[65] DX-128-129.
[66] DX-2.
[67] DX-71; DX-78.
[68] DX-70-71.
[69] DX-120-127.
[70] DX-72-80(a).

Page 24

### c. Accepting money in exchange for fetal tissue not tied to reimbursing the actual costs of providing such tissue arguably violates the law and violates medical and ethical standards.

42 U.S.C. § 289g-2(a) states that "[i]t shall be unlawful for any person to knowingly acquire, receive, or otherwise transfer any human fetal tissue for valuable consideration if the transfer affects interstate commerce."  "Valuable consideration" does not include "reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue." § 289g-2(e).  Tex. Penal Code § 48.02(b) makes it a misdemeanor if someone "knowingly or intentionally offers to buy, offers to sell, acquires, receives, sells, or otherwise transfers any human organ for valuable consideration." The statute defines "human organ" to include fetal tissue. *Id*. at § 48.02(c). The statute also defines "valuable consideration" to exclude "a fee paid to a physician or to other medical personnel for services rendered in the usual course of medical practice or a fee paid for hospital or other clinical services," and "reimbursement of legal or medical expenses incurred for the benefit of the ultimate receiver of the organ." *Id*. at §48.02(a).

On the video, Farrell asserts that even though PPGC is "already set up" to do the tissue procurement, "we will definitely need to work out, you know, something in terms of covering additional costs for additional things related to it."[71] She also explains how she uses the language of the contract to make seem that payments are going only to "administrative costs" rather than a compensation for specimens, which

---

[71] DX-2; DX-2(a).

she admits is "touchy" under federal law: "I'm very particular about working with the language of the budget and contract to where the language is specific to covering the administrative costs and not necessarily the per specimen. Because that borders on some language in the federal regs, it's a little touchy."[72]

She also makes it clear that Planned Parenthood cares about the bottom line in terms of providing the donated tissue:

> Well, I know – that's another thing that is –you know, a lot of folks – I get this mainly from academic institutions. They see Planned Parenthood, oh, they're nonprofit, that means you're nonbudget. And they will come to us with, you know, budgets that are, quite frankly, insulting. You know, like really? I mean where in the United States can you – a consent form, you know, eight-page consent form for this amount of money and it takes 30 minutes to administer that to a patient. So, you know, again with the understanding that, you know, just because we're nonprofit does not mean we're fiscally unstable.[73]

Farrell also states in the video that she goes to lengths to determine what their costs are so she can cover them in the contract, but in practice, Planned Parenthood Witness #2 (which is seems is likely Farrell, given the content of her testimony and her location at PPGC) admitted to Congress that her calculations were not tied to reimbursing actual costs but instead are "basically back-of-the-envelope type calculations."[74]  The invoices PPGC issued to UTMB reflect that as well.  The "per consent" costs and "administrative fees" are perfectly round numbers—$50 per consent in advance,[75] $2,000 annual "administrative fee",[76] $1,500 for CITI training

---

[72] *Id.*
[73] *Id.*
[74] DX-62.
[75] DX-60; DX-70.
[76] *Id.*

Page 26

of new staff in both 2010 and 2011,[77] $25 per consent obtained in 2010,[78] $150 "consent payment" in 2010-2011.[79] Only one entry on the invoices to UTMB appears to be a reimbursement of an actual cost: "reimbursement for study supplies" in the amount of $574.98.[80]

PPGC continued to obtain payment this way. During the negotiations with Baylor three years later in 2014, the price apparently settled on (as reflected in multiple drafts of the contract between the parties) was $5,750 for 25 consents, which comes out to $230 per consent.[81] This included $50 per consent for staff time, including consents for which no sample is obtained, plus a $2,000 administrative fee, which includes "Surgical Services and Research Management oversight, consent storage, and supply storage.[82] This list is not all inclusive."[83] It also purportedly included $100 per consent for "sterile procedure room set-up and sample collection," but this was also not an exclusive list of potential costs.[84]

The Senate Judiciary Committee examined this issue, and the Majority Staff Report details how PPFA admitted that its affiliates failed to obtain accounting to document their actual costs of procuring fetal tissue per PPFA's policy.[85] According to the report, PPFA also admitted that its affiliates were engaging in fetal tissue

---

[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] DX-78.
[82] *Id.*
[83] *Id.*; DX-72-80.
[84] *Id.*
[85] *See* https://www.judiciary.senate.gov/imo/media/doc/2016-12-13%20MAJORITY%20REPORT%20-%20Human%20Fetal%20Tissue%20Research%20-%20Context%20and%20Controversy.pdf

research programs in order "to increase their revenues."[86] When asked to provide an accounting, PPFA's affiliates attempted to belatedly justify their costs by "shoehorn[ing] a vast array of indirect or tenuously related costs into § 289g-2's exception, including attributing several thousands of dollars in costs to amorphous "General Administrative & Medical Overhead."[87]

The Majority Staff Report went on to state:

> As noted above, interpreting § 289g-2's exception this broadly would clearly be at odds with the primary purpose of the law, which is apparent from the legislative history. Any company could simply shift unrelated costs into such categories to hide actual profits obtained from the transactions—the very scenario Senator Smith described when trying to resolve the issue in 1999. Accordingly, there is reason to question whether Planned Parenthood fully complied with federal requirements relating to fetal tissue transfer payments. As noted above, when PPFA learned that its affiliates had failed to comply with the policies it had in place to prevent breaking the law, PPFA reportedly contacted the affiliates and then modified PPFA accreditation reviews in a manner that facilitated the continuation of those fetal tissue payments. PPFA's and the affiliates' actions may implicate the federal criminal conspiracy statute, 18 U.S.C. § 371.[88]

From the documentation we have without discovery, it does not appear that Planned Parenthood is making extraordinarily large sums of money by selling fetal tissue. But it does appear that they have been accepting payments not tied to the reimbursement of actual costs, which indicates a likelihood of "valuable consideration" being received. Given the grave moral concerns related to the existence of any financial incentive to procure fetal tissue, which prompted Congress

---

[86] *Id*. at 49.
[87] *Id*. at 52.
[88] *Id*. at 52-53.

Page 28

to pass §289g-2 in the first place,[89] accepting remuneration not tied to reimbursement is unethical and breaches the standard of care, which does not contemplate a market of any sort for human body parts.[90]  The evidence illustrating Planned Parenthood's practice of exchanging fetal tissue for money not tied to actual costs therefore provides an additional basis for termination of their Medicaid provider agreements.

### 3. Texas's termination of Planned Parenthood's Medicaid provider agreements is in full accordance with Fifth Circuit precedent, and cases coming to different conclusions in other jurisdictions are distinguishable.

Planned Parenthood makes much of the fact that other courts have granted injunctions against the termination of their Medicaid contracts in other states. But not only does the termination of their contracts in Texas fully comport with the Fifth Circuit's opinion in *Gee*, the legal and factual bases for termination are greater than those in those other states, rendering other courts' conclusions about the likelihood of success on the merits at a preliminary stage of the case far from dispositive.

In *Gee*, PPGC (who had two non-abortion clinics in Louisiana at the time) challenged Louisiana's at-will termination of their provider agreements. 837 F.3d at 484. After the case was filed, Louisiana revoked their notice of termination and argued the case was moot. *Id*. The next day, the state issued a new notice of termination on three grounds: two qui tam False Claims Act claims against PPGC, "misrepresentations" in PPGC's correspondence with LDHH, and an investigation of

---

[89] *See Id*. at 8-28.

[90] At the upcoming hearing, Defendants' expert witnesses will testify in greater detail regarding this subject.

Page 29

PPGC by LDHH and the Louisiana OIG.[91] *Id.* The Fifth Circuit concluded that while states have the authority to create regulations regarding the qualifications of Medicaid providers and may terminate providers consistent with federal and state law, they simply do not "have an unlimited authority to exclude providers for any reason whatsoever." *Id.* at 494.

The *Gee* panel was convinced that the individual plaintiffs had shown a likelihood of success on the merits because, according to the Court, the state failed to include any explanation of the alleged "misrepresentations" in either their termination letter or its briefing, and it found that the mere initiation of an investigation and settlement of the FCA cases without admission of liability were not evidence of any wrongdoing which would call into question PPGC's qualifications as a provider. *Id.* at 496-98. The court concluded that "[a]t the most, LDHH has simply pasted the labels of 'fraud' and 'misrepresentations' on PPGC's conduct, and then insisted that these labels should insulate its termination actions from any § 1396a(a)23 challenges." *Id.* at 499. Given the lack of evidence put forward by the state, the court concluded the termination was not based on PPGC's qualifications as a provider,[92] and it therefore held that termination of Planned Parenthood's Medicaid provider agreements for reasons unrelated to their qualifications likely violated the free-choice-of-provider provision of § 1396a(a)(23). *Id.* at 498-99.

---

[91] Of note: LDHH stated that the PPGC video was not a basis for their decision to terminate. Transcript of Mot. Hr'g at 35 - 36, *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F.Supp.3d 604 (2015) (No. 59-00565) ECF No. 59.

[92] Significantly, LDHH conceded that PPGC was competent to render the relevant medical services. *Gee*, 837 F.3d at 492.  OIG makes no such concession in this case.

Page 30

By contrast, in this case, as detailed above, OIG has put forth specific evidence substantiating the termination under state law, for reasons bearing directly on Planned Parenthood's qualifications as a Medicaid provider as defined by *Gee* and state law. *Gee* expressly allowed for a different outcome where the termination is based on provider qualifications. In a section of the opinion titled, "Limits of Our Opinion," the panel "emphasize[d] the unique circumstances of the instant case," and affirmed that "[s]tates undoubtedly must be able to terminate provider agreements in cases of criminal activity, fraud and abuse, and other instances of malfeasance." *Id.* at 498-99. It also stated, "the general grounds for termination invoked by LDHH— fraud, misrepresentations, and investigations—will often relate to a provider's qualifications." *Id.* at 499. Because OIG has given specific grounds for termination supported by evidence relating directly to Planned Parenthood's qualifications to provide medical services in a "professionally competent, safe, legal, and ethical manner," the termination is wholly consistent with *Gee*.

Cases involving Planned Parenthood's termination in other jurisdictions are distinguishable for similar reasons. At the outset, none of the other states have based their termination decision on video evidence filmed in their state—Texas is unique in that respect. In *Planned Parenthood Southeast, Inc., v. Bentley*, the Governor of Alabama decided to terminate the provider agreement of Planned Parenthood's Alabama affiliate after he watched one of the videos released by CMP. 141 F. Supp. 3d 1207, 1213 (M.D. Ala. 2015). In *Bentley*, the "narrow question before the court [wa]s whether the Medicaid Act allows a State to terminate a provider agreement

Page 31

App.585

based on no reason other than the existence of a contractual at-will termination provision like the one in P[lanned Parenthood Southeast's]." *Id.* at 1220. The court concluded that "[t]he answer to that narrow question is 'no.'" *Id.* But as Defendants have already discussed at length, the termination in this case was for cause.

In *Planned Parenthood of Kansas v. Mosier*, the decision to terminate was based in part on the videos, but they were not offered into evidence. No. 2:16-cv-02284, 2016 WL 3597457, *4 (D. Kan. Jul. 5, 2016). As none of the activities depicted took place within Kansas, the court determined that the state would have to justify termination based solely on affiliation. *Id.* at *18-19. It appears that Kansas law, unlike the law in Texas, did not permit termination based on affiliation. *Id.* at *21 n. 121.

Similarly, in *Planned Parenthood Arkansas and Eastern Oklahoma v. Selig*, the court entered a preliminary injunction on the basis that the Planned Parenthood affiliates in that case did not perform surgical abortions and therefore could not be involved in fetal tissue donation, and affiliation alone did not suffice. Prelim. Inj. Order on Behalf of Patient Class, No. 4:15-cv-00566, ECF No. 127 (E.D. Ark. Sept. 29, 2016). But it does not appear that there was a state law basis for termination based on affiliation. *See id.* at 14-16.

The video at issue in this case was filmed at a Texas Planned Parenthood facility. All of the Texas Planned Parenthood affiliates perform surgical abortions, so the issue of fetal tissue donation is pertinent to all of them.[93] In addition, Texas law

---

[93] DX-144, DX-176.

Page 32

permits termination of a Medicaid provider based on affiliation, as explained in Section I(B) *infra*. The grounds for termination of the providers here are directly related to their qualifications as providers. Thus, the above cases are unpersuasive.

### B. The Law Permits OIG to Terminate Affiliates of Unqualified Medicaid Providers.

Based on the above, there is clearly enough evidence to support termination of PPGC and PPCFC. But there is also an adequate basis under federal and state law for terminating the rest of the Planned Parenthood affiliates in Texas. 42 C.F.R. § 1001.1001(a)(1)(i)(C) provides that the OIG "may exclude an entity if . . . [a] person with a relationship with such entity . . . [h]as been excluded from participation in Medicare or any of the State health care programs."

Plaintiffs appear to assert that because federal law does not interpret affiliation as broadly as state law, that the affiliates' termination under state law is somehow improper. To the extent they are attempting to make a preemption argument, it must fail because (1) Plaintiffs have not made a preemption claim, nor challenged the state law provisions at issue; and (2) Medicaid's statutory and regulatory scheme contemplates cooperative administration of the program, with authority to terminate provider agreements on both sides of the equation, leaving room for states to act even where the federal government does not.[94]

Moreover, there can be nothing improper about the termination of all the Texas affiliates in this case where HHS has expressly interpreted the Medicaid statutes to

---

[94] *See* Part I(A) *supra*.

allow for the termination of entire corporate entities, not just the offending individual

or entity. Plaintiffs cite HHS guidance to support their narrow interpretation of 42

C.F.R. §1001.1001 as merely an attempt to prevent an excluded provider from

continuing to receive funds from a corporate entity they own or have substantial

interest in, and that corporate entities on a whole cannot be excluded for other

reasons. "Health Care Programs: Fraud and Abuse; Amendments to OIG Exclusion

and CMP Authorities Resulting from Public Law 100-93," 57 Fed. Reg. 3298-01, 3309

(Jan. 29, 1992). But the same document supports the idea that entire corporate

entities may be terminated:

> The statute contemplates excluding an entity that has a substantial relationship with a sanctioned individual. While it may often be possible to target only one offending subsidiary or site for exclusion, we believe that there are situations where *an entire corporate entity* may be found to have a substantial relationship with one individual who deals primarily with one of its subsidiaries. In deciding whether to exclude an *entire corporate network* or one isolated subsidiary, we intend to evaluate the nature and extent of the relationship and determine what parties were actually at fault for engaging in a relationship with a sanctioned individual, as well as which entities the sanctioned individual actually controls. The OIG will always consider whether the interests of the programs and their beneficiaries are furthered by excluding an *entire corporate network*.

*Id*. (emphasis added).

The same document also refutes the idea that the Medicaid statutes limit the

States' authority to exclude entities from Medicaid for reasons pursuant to state law,

or that an existing basis for termination or sanction in the federal statutes or

regulations prevent a state from imposing stricter requirements:

> This comment appears to refer to § 1002.2(b), which simply states that nothing in the regulations limit a State's own authority to exclude an

Page 34

individual or entity from Medicaid for any reason or period authorized by State law.  State agencies may prosecute and sanction providers on their own initiative when State law authorizes them to do so.  Nothing in section 1128(d) of the Act or its legislative history indicates that the Federal statutory provisions governing the length of exclusions were intended to supplant State law provisions governing exclusions from State health care programs.  In fact, section 1128(d)(3)(B)(ii) provides that 'a State health care program may provide for a period of exclusion which is longer than the period of exclusion under title XVIII (Medicare)."

*Id.* at 3322. Given the cooperative federalism model of Medicaid, the evidence of complementary authority in the statutes themselves, as well as agency interpretations consistent with those ideas, Plaintiffs' attempt to limit OIG in acting pursuant to state law in administering the Texas Medicaid program must fail.

### 1. Texas law allows for the termination of affiliates of unqualified providers.

The evidence available at this time, as well as the evidence that will be presented at the hearing, justifies the termination of the provider agreements for all Texas affiliates. There is evidence of wrongdoing by PPGC and PPCFC.  There is also evidence of a substantial relationship between PPGC/PPCFC and other the Texas affiliates by virtue of their affiliation with PPFA.  As a result, termination of all Texas affiliates is supported by state law.

1 Tex. Admin. Code § 371.1703(c)(7) provides that "[W]hen the OIG establishes the following by prima facie evidence, the OIG may terminate or cancel the enrollment or contract from Medicaid, CHIP, or any other HHS program of . . . a

Page 35

person that is affiliated with a person who commits a program violation." An

"affiliate" is someone who:

> (A) *has a direct or indirect ownership interest (or any combination thereof) of five percent or more in the person*;
> (B) is the owner of a whole or part interest in any mortgage, deed of trust, note or other obligation secured (in whole or in part) by the entity whose interest is equal to or exceeds five percent of the value of the property or assets of the person;
> (C) *is an officer or director of the person, if the person is a corporation;*
> (D) is a partner of the person, if the person is organized as a partnership;
> (E) is an agent or consultant of the person;
> (F) *is a consultant of the person and can control or be controlled by the person or a third party can control both the person and the consultant;*
> (G) is a managing employee of the person, that is, a person (including a general manager, business manager, administrator or director) who exercises operational or managerial control over a person or part thereof, or directly or indirectly conducts the day-to-day operations of the person or part thereof;
> (H) *has financial, managerial, or administrative influence over the operational decisions of a person;*
> (I) *shares any identifying information with another person, including tax identification numbers, social security numbers, bank accounts, telephone numbers, business addresses, national provider numbers, Texas provider numbers, and corporate or franchise names; or*
> (J) has a former relationship with another person as described in subparagraphs (A)-(I) of this definition, but is no longer described, because of a transfer of ownership or control interest to an immediate family member or a member of the person's household of this section within the previous five years if the transfer occurred after the affiliate received notice of an audit, review, investigation, or potential adverse action, sanction, board order, or other civil, criminal, or administrative liability.

1 Tex. Admin. Code § 371.1(3) (emphasis added).

The fact that the Texas affiliates are all being represented in this lawsuit by

the same legal counsel, and particularly by a lawyer from PPFA, should be the Court's

first indication that they share a sufficiently close relationship. But there is also

App.590

documentary evidence that shows that PPFA is sufficiently connected to the affiliates as to justify the termination of all the entities.

PPFA has characteristics of a franchise operation, with affiliates paying annual dues. In exchange for these payments, affiliates can hold themselves out to the public by using the franchise name "Planned Parenthood."[95]  This connection is sufficient under state law to link all the entities in this action. *See id.* § 371.1(I) (defining an affiliate as someone who "shares any identifying information with another person, including . . . corporate or franchise names ").

Furthermore, PPFA exercises functional control over the affiliate entities.  For example, affiliates are "bound by PPFA's standards of affiliation and bylaws."[96] These standards give PPFA control over, among other things, how affiliates generate revenue, engage in research, and structure their clinical programs.[97] In fact, since 2013, PPFA has required that all affiliates provide abortions regardless if the affiliates wanted to or not. This top-down control exercised by PPFA over its affiliates provides a sufficient basis for the OIG to terminate the provider agreement of not just PPGC/PPCFC, but each of the affiliates. *See id.* § 371.1(F) (defining an affiliate as someone who *"*can control or be controlled by the person or a third party can control both the person and the consultant"); *Id.* at § 371.1(H) *(*defining an affiliate as someone who *"*has financial, managerial, or administrative influence over the operational decisions of a person").

---

[95] *See e.g.* DX-115; DX-119; DX-148; DX-85 at 4.
[96] DX-159 at ¶ 8.
[97] DX-85 at 4 and 12.

Page 37

## II.   Plaintiffs Have Failed to Show Irreparable Harm Absent a Preliminary Injunction.

To satisfy the requirement of showing irreparable harm absent an injunction, Plaintiffs must assert "more than an unfounded fear." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.) Courts will not issue a preliminary injunction "simply to prevent the possibility of some remote future injury." *Id.* Instead, the plaintiff must show a "presently existing actual threat." *Id.; see also Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) ("We agree . . . that the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.") (internal citations omitted). Planned Parenthood and the Jane Doe plaintiffs cannot make such a showing and therefore are not entitled to an injunction.

### A. Medicaid Funds Represent a Small Percentage of Planned Parenthood's Overall Multi-Million Dollar Budget.

Planned Parenthood claims that it will suffer irreparable harm because it "rel[ies] on public funding, and loss of Medicaid funds will significantly impact [the] operating budgets."[98] This assertion, like so many others made by Planned Parenthood, is misleading. Specifically, the fear of a significant impact on the budget is unfounded because the amount paid by Medicaid is *de minimis* in view of the total 30 billion dollar Medicaid expenditure.[99] For instance, in 2013, PPGC reported

---

[98] Pls. Prelim. Inj. Mot. at 31.
[99] *See* expected testimony of Lesley French, Associate Commissioner, Health, Development and Independent Services at Texas Health and Human Services Commission. (HHSC).

Page 38

$19,667,024 in total revenue.[100]  PPGC also reported net assets of $43,548,729.[101] In contrast, PPGC's annual report for 2012-2013 attributed only $1,017,712 or 4% to "Government Contracts for Medical Services", which includes Medicaid.[102]  Clearly, the Provider plaintiffs are economically viable.[103] It appears unlikely that the loss of Medicaid would cause much harm, if any at all, to their ability to operate.

Moreover, contrary to Plaintiffs' alarmist claims that terminating Planned Parenthood's Medicaid provider agreements will precipitate a women's health crisis in Texas, women's health in Texas is generously provided for by several state-funded programs: the Texas Women's Health Program, Family Planning Program, and Expanded Primary Heath Care Program. As the state's witnesses will testify, these three programs provide family planning services to low-income women including pelvic examinations, sexually transmitted disease screening and treatment, HIV screening,  health screenings for diabetes, high blood pressure, and cholesterol, breast and cervical cancer screenings, and contraceptives. Moreover, as the state's witnesses will testify, these three programs are available to more women than those eligible for services through Medicaid because the Texas programs are available to low-income women whose income is higher than the federal poverty level, which is the cut-off for the program administered through Medicaid. Hence, the Court should

---

[100] DX-113 at 1.
[101] Id.
[102] DX-111 at 4.
[103] DX-165 (reporting total revenue of $33,922,566 and net assets of $41,839,154 for PPGT); DX-142 (reporting total revenue of $4,252,525 and net assets of $3,749,103 for PPST).

deny the requested relief because the Plaintiffs have failed to show a presently existing threat that services will cease absent the injunction.

### III.   The Public Interest is Served Through Denial of the Injunction Because it Protects Patients from Providers With a History of Violating Medical and Ethical Standards.

To obtain a preliminary injunction, the movant also has the burden to show that if granted, the injunction would not be adverse to public interest. *Star Satellite, Inc. v. Biloxi,* 779 F.2d 1074, 1079 (5th Cir.1986). If no public interest supports granting preliminary relief, such relief should ordinarily be denied, "even if the public interest would not be harmed by one." Wright & Miller § 2948.4. "Consequently, an evaluation of the public interest should be given considerable weight in determining whether a motion for a preliminary injunction should be granted." *Id.*

It is clearly in the public interest to allow OIG to terminate an unqualified provider that has shown a repeated willingness to engage in behavior that violates medical and ethical standards. The state should not have to wait until it is too late before it can act to protect Medicaid recipients and taxpayers. Medical providers hold a special position of trust in our society and therefore must adhere to the highest standards of accountability. A medical provider that is willing to transgress medical and ethical standards should not receive the benefit of state or federal monies, and denying the request for an injunction will allow the state to protect the integrity of the Medicaid program, which is in the public's interest. As discussed above, Planned Parenthood provides such a small percentage of overall Medicaid services in the state, and other state programs provide virtually identical services for the same patient

App.594

population, so terminating Planned Parenthood as a provider will not cause harm to the public.  The injunction should be denied.

## IV.    Even if the Court were Inclined to Issue an Injunction, a Bond Must Be Required.

Federal Rule of Civil Procedure Rule 65(c) states that a preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The analysis turns on the damages, if any, that the state would sustain during the period that a wrongfully issued preliminary injunction remained in effect. Wright & Miller § 2954.

If OIG were enjoined in this case, the state would have to continue reimbursing Planned Parenthood. Planned Parenthood argues that these reimbursements would have no effect on the state budget because another Medicaid provider would take its place. This ignores, however, Texas's sovereign interest in ensuring that Medicaid providers comply with the requirements in the Texas Administrative Code, the Texas Medicaid Provider Procedures Manual, and other state and federal laws governing or regulating Medicaid. Wrongfully compelling the state to fund Planned Parenthood, in violation of the state's legitimate authority over the administration of the Medicaid program within its borders, therefore harms Texas even if it reimburses another organization that complies with federal and state law. Accordingly, Planned Parenthood should be required to post a bond equivalent to the amount that Texas reimburses Planned Parenthood over a one-year period, which amounts to ten percent of the proceeds that Planned Parenthood receives under the Medicaid program. 42

App.595

U.S.C. § 1396b(a)(5). Planned Parenthood received approximately 3.5 million dollars from Texas Medicaid in 2016. Thus, an appropriate bond amount is approximately $350,000.

## CONCLUSION

Because Plaintiffs cannot satisfy their burden of meeting all four prerequisites for a preliminary injunction, Plaintiffs' motion for preliminary injunction should be denied.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

/s/ Andrew B. Stephens
ANDREW B. STEPHENS
Texas Bar No. 24079396
AMANDA J. COCHRAN-MCCALL
Texas Bar No. 24069526
ADAM A. BIGGS
Texas Bar No. 24077727
Assistant Attorneys General

Office of the Attorney General
300 West 15th Street
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2120 (phone)

Page 42

App.596

(512) 320-0667 (fax)

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF | § | |
| GREATER TEXAS FAMILY PLANNING | § | |
| AND PREVENTATIVE HEALTH | § | |
| SERVICES, INC., et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No.1:15-cv-01058-SS |
| v. | § | |
| | § | |
| CHARLES SMITH, et al., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' OPPOSED MOTION TO CLARIFY THE PRELIMINARY
INJUNCTION ORDER AND JUDGMENT UNDER RULE 60(a), OR AMEND
UNDER RULE 52(b) OR RULE 59(e)**

Defendants hereby request that the Court clarify its January 21, 2017 Order granting Plaintiffs' motion for preliminary injunction and the subsequently issued Order of Judgment (collectively, "Orders") as to the scope of the injunctive relief granted. Defendants respectfully disagree with the Court's conclusion that the entry of a preliminary injunction was warranted in this case, but that conclusion is not at issue in this motion. Rather, Defendants only seek clarification as to the scope of the injunctive relief granted to the Plaintiffs, and request that the Court correct its Orders to reflect what Defendants believe is the intended—and proper—scope of the injunction.

As currently written, the Orders enjoin Defendants from "terminating the Provider Plaintiffs' Medicaid Provider Agreements." On its face, this would seem to prohibit Defendants from terminating the Provider Plaintiffs' agreements for any

1

reason whatsoever, which prevents Defendants from fulfilling their responsibilities under federal and state law regarding the administration of the Texas Medicaid program. Specifically, there are provider agreements associated with Planned Parenthood that must be terminated under federal statutes because the providers failed to re-enroll. Apparently, these provider agreements are associated with Provider Plaintiff affiliates which no longer exist. But due to the broad language of the injunction, however, the Defendants are unsure whether they may terminate the agreements and request that the Court clarify the injunction to address this ambiguity.

Moreover, Defendants believe that based on the Orders as a whole, the Court intended the injunction to apply to the bases for termination at issue in the case. Defendants request that the Court amend its Orders to clarify this and provide more "explicit notice of the precise conduct that is outlawed," as is required by Fed. R. Civ. P. 65(d). *Ala. Nursing Home Ass'n v. Harris*, 617 F.2d 385, 387-88 (5th Cir. 1980).

## I.     The Court Should Clarify the Order and Judgment Under Fed. R. Civ. P. 60(a) to Limit the Terms of the Injunction to The Bases of Termination at Issue in the Case.

Rule 60(a) allows a district court to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment." The Fifth Circuit has looked to three criteria to determine whether a mistake can be corrected under Rule 60(a): "(1) the nature of the mistake; (2) the district court's intent in entering the original judgment; and (3) the effect of the correction on the parties' substantial rights." *Rivera v. PNS Stores, Inc.,* 647 F.3d 188, 193 (5th Cir. 2011). There is "substantial overlap between these three criteria." *Id.* Each is but "a slightly different way of expressing the core idea that resort to Rule 60(a) may be had when 'the judgment simply has not accurately reflected the way in which the rights and obligations of the parties have in fact been adjudicated.'" *Id.* (quoting *Bernstein v.*

2

*Lefrak (In re Frigitemp Corp.)*, 781 F.2d 324, 327 (2d Cir. 1986)). Rule 60(a) "finds application where the record makes apparent that the court intended one thing but by merely clerical mistake or oversight did another." *Id.* (quoting *Dura-Wood Treating Co., Div. of Roy O. Martin Lumber Co. v. Century Forest Industries, Inc.*, 694 F.2d 112, 114 (5th Cir. 1982)).

> ### A.   Injunctive relief must be specific as to what actions are being enjoined and must go no further in burdening the Defendants as is necessary to address the Plaintiffs' harm.

Federal Rule of Civil Procedure 65(d)(1) requires that an order granting an injunction must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." "The Supreme Court has repeatedly emphasized that 'the specificity provisions of Rule 65(d) are no mere technical requirements.'" *Scott v. Schedler*, 826 F.3d 207, 212 (5th Cir. 2016) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). "The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Id.*

Defendants intend to comply with this Court's preliminary injunction, pending further action by this Court or the Fifth Circuit. But clarification is required for Defendants to ascertain exactly what actions are prohibited. *Scott*, 826 F.3d at 208 (emphasizing need "to prevent uncertainty and confusion on the part of those faced with injunctive orders"). Based on the Court's analysis in the Order granting the preliminary injunction, Defendants believe that the Court intended to enjoin terminating the Provider Plaintiffs' agreements based on the reasons at issue in the case—i.e. the reasons stated in the Final Notice of Termination and in the course of

these proceedings. If that is true, the Court should amend its Orders to clarify its intent.

Aside from Rule 65's requirement of specificity, this clarification is needed for several reasons. First, Defendants are obligated by federal law to terminate the provider agreements of Medicaid providers who did not re-enroll in the Texas Medicaid program by February 1, 2017. *See* 42 C.F.R. § 455.414; Ex. A (Declaration of Katherine J. Scheib). The provider agreements are not between the State and the Provider Plaintiff entities; rather, many provider locations have their own TPI number and agreement. *Id.* at ¶ 6. Several of the TPI numbers listed in the Notice of Final Termination that are associated with the Plaintiffs have not complied with renewal requirements. *Id.* at ¶ 7. Defendants' counsel conferred with Plaintiffs' counsel regarding this matter, and on March 7, 2017, Plaintiffs' counsel stated that these provider agreements are associated with Provider Plaintiff affiliates which no longer exist and therefore do not intend to remain enrolled in the Texas Medicaid program. Because these affiliates did not re-enroll as required, Defendants are required by law to terminate their provider agreements. But due to the broad language of the injunction, Defendants are unsure whether they may terminate the provider agreements and request that the Court clarify the injunction to address this ambiguity.

As participants in the federal Medicaid program, the State also has mandatory statutory obligations in the administration of the program which require the State to be permitted to terminate providers for reasons specified under federal law. Several grounds for termination listed in the federal Medicaid statutes and regulations *require* termination for certain reasons. *See, e.g.,* 42 U.S.C. § 1396a(p)(2); 42 C.F.R. § 455.416. The State has no plans to terminate any of the Provider Plaintiffs' agreements at this time (other than as explained above for non-renewal), but its legal obligations require that it be able to do so when the law requires.

4

Furthermore, as this Court acknowledged in its Order granting the preliminary injunction, the State has the authority to terminate providers for reasons outlined in federal and state law. Dkt. 100 at 8-9. While the Court has determined for purposes of the preliminary injunction that Defendants may not terminate the Plaintiffs' provider agreements for the reasons at issue in this case, the State must be permitted to terminate the agreements of the Plaintiffs, just like any other Medicaid provider, for other reasons. *See*, *e.g.*, 42 U.S.C. § 1320a-7(b).  Again, the State currently has no plans to terminate any of the Providers' agreements, outside of what has been stated above, but the State's authority to do so when appropriate under the law is unquestionable. The injunction should be clarified to respect this crucial role of the State in administering the Medicaid program in Texas and complying with the law regarding its obligations to ensure program integrity.

II.    **In the Alternative, if the Court Did Intend to Broadly Enjoin Defendants From Terminating Plaintiffs' Provider Agreements for Any Reason Whatsoever, the Scope of the Injunction is Not Supported By the Law and Should Be Amended Pursuant to Fed. R. Civ. P. 52(b) or 59(e).**

If the Court did intend to enjoin Defendants from terminating Provider Plaintiffs' Medicaid agreements for any reason, the injunction is overbroad as a matter of law and this Court should amend its judgment pursuant to either Rule 52(b) or Rule 59(e) to properly narrow the scope of the injunction. Rule 52(b) permits the Court to make additional findings of fact or law or to amend the original findings forming the basis of its judgment. Fed. R. Civ. P. 52(b). The main purpose of Rule 52 is to provide the appellate court with a correct understanding of the findings of fact that served as the basis for the district court's conclusions of law and its judgment. 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2582 (3d ed. 2017). Rule 52 permits the Court "to correct manifest errors of law or fact or, in some limited situations, to present newly discovered evidence." *Fontenot v. Mesa*

5

*Petroleum Co.,* 791 F.2d 1207, 1219 (5th Cir. 1986). Rule 59(e) permits the Court to alter or amend its judgment when there is an intervening change in law, new evidence, or to correct a manifest error of law or fact. *Demahy v. Schwarz Pharma, Inc.,* 702 F.3d 177 (5th Cir. 2012).

Here, enjoining Defendants from terminating Provider Plaintiffs' Medicaid provider agreements for *any* reason—in other words, engaging in conduct not at issue in the lawsuit—is plainly overbroad, especially in light of the additional evidence set forth above regarding some of the Provider Plaintiff affiliates who have chosen not to re-enroll and Defendants' obligations under federal law to terminate non-compliant providers. Thus, amendment of the judgment is required.

### A. The Court should amend its Orders based on the evidence that immediate termination of some of the Provider Plaintiffs' agreements is required by federal law.

If the Court did intend to broadly enjoin the Defendants from terminating Provider Plaintiffs' agreements for any reason, the Court should amend its Orders in light of the evidence regarding Defendants' obligation to terminate some of the Provider Plaintiffs' agreements to allow Defendants to comply with the law. As also explained above, as administrators of the Texas Medicaid program, Defendants must also be able to terminate provider agreements—including those associated with the Provider Plaintiffs—for reasons required by federal law in the future. The Court should amend its Orders to allow for HHSC to fulfill its obligations under federal law as the administrator of the Texas Medicaid program.

### B. The Court should amend its Orders because the injunction is overbroad as a matter of law, since Plaintiffs lack standing to receive relief beyond that which addresses their own claims of harm.

In addition to the need to amend the Orders to allow Defendants to comply with the law, the Orders should also be amended because the injunction is overbroad. "'[T]he scope of injunctive relief is dictated by the extent of the violation established'"

6

by the Plaintiffs. *John Doe #1 v. Veneman,* 380 F.3d 807, 818 (5th Cir. 2004) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also Lewis v. Casey,* 518 U.S. 343, 357 (1996) (the scope of an injunction "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established"). "The district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *Veneman,* 380 F.3d at 818; *see also Fiber Sys. Int'l, Inc. v. Roehrs,* 470 F.3d 1150, 1159 (5th Cir. 2006) (the "'scope of injunctive relief is dictated by the extent of the violation established,' and an injunction must be narrowly tailored to remedy the specific action necessitating the injunction.") "We … remind the district court that its injunction may not encompass more conduct than was requested or exceed the legal basis of the lawsuit." *Scott,* 826 F.3d at 214.

The basis of Plaintiffs' claim is the Final Notice of Termination, which sets forth the bases for termination of the Provider Plaintiffs' Medicaid agreement. As stated above, the Court did not question the State's authority to terminate Medicaid provider agreements for reasons related to the provider's qualifications, or for other reasons required by state or federal law. The Plaintiffs have no standing to challenge any reason for termination other than those at issue in this lawsuit, and preventing Defendants from complying with their statutory obligations does nothing to remedy the specific harm allegedly suffered by Plaintiffs. The Individual Plaintiffs' right to the qualified provider of their choice cannot override federal requirements for enrollment, which themselves determine qualifications for providers. In other words, a provider is not "qualified" if it has not complied with the statutory requirements to maintain their enrollment as a Medicaid provider, and the Individual Plaintiffs accordingly have no right to use their Medicaid coverage at that provider.

Limiting the injunction to its proper scope based on the Court's ruling— enjoining Defendants from terminating the Provider Plaintiffs agreements on the basis of the grounds at issue in this lawsuit, as stated in the Notice of Final

Termination—causes no harm to the Individual Plaintiffs. In contrast, it harms Defendants by placing them on the horns of a dilemma: either comply with this Court's injunction, or forego compliance with federal statutes. Thus, in the event the Court did intend to broadly enjoin Defendants as stated, the injunction is erroneous as a matter of established law and should be amended.

## CONCLUSION

Defendants respectfully request that the Court clarify that the Orders granting a Preliminary Injunction operate only to prohibit Defendants from terminating Plaintiffs' Medicaid provider agreements based on the reasons in the Final Termination letter at issue in the case.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

/s/ Andrew B. Stephens
ANDREW B. STEPHENS
Texas Bar No. 24079396
AMANDA J. COCHRAN-MCCALL
Texas Bar No. 24069526
ADAM A. BIGGS
Texas Bar No. 24077727
Assistant Attorneys General

8

Office of the Attorney General
300 West 15th Street
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2120 (phone)
(512) 320-0667 (fax)

*Attorneys for Defendants*

App.606

## CERTIFICATE OF SERVICE

I certify that on March 13, 2017, this document was served through the Court's

CM/ECF Document Filing System or through e-mail, upon the following counsel of

record:

Thomas H. Watkins
Husch Blackwell LLP
111 Congress Ave., Suite 1400
Austin, TX  78701
(512) 472-5456
(512) 479-1101 (fax)

Jennifer Sandman
Mai Ratakonda
Planned Parenthood Federation of America
434 W. 33rd Street
New York, NY  10001
212-261-4584
212-247-6811 (fax)

Richard Muniz
Alice Clapman
Planned Parenthood Federation of America
1110 Vermont Ave., NW, Suite 300
Washington, DC  20005
202-973-4997
202-296-3480 (fax)


/s/ Andrew B. Stephens
ANDREW B. STEPHENS
Assistant Attorney General

10

App.607

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

PLANNED PARENTHOOD GULF
COAST, INC.; JANE DOE #1; JANE
DOE #2; AND JANE DOE #3,                            NO. 3:15-cv-00565-JWD-RLB
                          *Plaintiffs*
VERSUS

REBEKAH GEE, SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS,
                          *Defendant*

**MOTION TO STAY PROCEEDINGS**

NOW INTO COURT, through undersigned counsel, comes Defendant, Rebekah Gee, in her official capacity as Secretary of the Louisiana Department of Health and Hospitals, who respectfully moves for an Order granting a stay of proceedings pending *en banc* rehearing of *Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc. v. Smith*, 914 F.3d 994 (5th Cir. 2019) (granting rehearing *en banc*) ("*PPGT*") on the grounds that (1) rehearing in *PPGT* will determine the validity of the Fifth Circuit's ruling on appeal of this Court's Order denying Defendant's Motion to Dismiss (Rec. Doc. 64) and granting Plaintiffs Motion for a Preliminary Injunction (Rec. Doc. 45) ("Ruling on Preliminary Injunction"); (2) given the interwoven claims, as alleged, it would be an inefficient use of judicial and litigant resources to proceed with motion practice and discovery on the constitutional claims *not* addressed in the Ruling on Preliminary Injunction prior to the Fifth Circuit's decision in *PPGT*; and (3) a stay will cause no substantial hardship to the Plaintiffs as the preliminary injunction issued by the Court remains in place, all as is more fully set forth in the Memorandum in support of this motion.

WHEREFORE Defendant, Rebekah Gee, in her official capacity as Secretary of the

1

Louisiana Department of Health and Hospitals, prays that this motion be granted.  A proposed order is attached.

Respectfully submitted,

**FAIRCLOTH MELTON SOBEL & BASH, LLC**

By: _____ /s/ Jimmy R. Faircloth, Jr._____
Jimmy R. Faircloth, Jr. (La. #20645)
jfaircloth@fairclothlaw.com
Brook Landry Villa (La. #31988)
bvilla@fairclothlaw.com
9026 Jefferson Hwy., Suite 200
Baton Rouge, LA 70809
Phone:  225-343-9535
Fax:  225-343-9538

*And*

JEFF LANDRY
ATTORNEY GENERAL
Elizabeth B. Murrill (La. #20685)
murrille@ag.louisiana.gov
Solicitor General
State of Louisiana
P.O. Box 94005
Baton Rouge, LA 70804-9005
Phone 225-326-6700
Fax: 225-326-6099

**ATTORNEYS FOR DEFENDANT, REBEKAH GEE, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of March, 2019, that above and foregoing Unopposed Motion to Stay Proceedings was electronically filed by using the CM/ECF System.

_____ /s/ Jimmy R. Faircloth, Jr._____
Jimmy R. Faircloth, Jr.

2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

PLANNED PARENTHOOD GULF
COAST, INC.; JANE DOE #1; JANE
DOE #2; AND JANE DOE #3,                              NO. 3:15-cv-00565-JWD-RLB
               *Plaintiffs*

VERSUS

KATHY KLIEBERT, SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS,
               *Defendant*

## **ORDER**

Before the Court is Defendant's Motion to Stay Proceedings.

**IT IS ORDERED** that Defendant's Motion is **GRANTED** and that all proceedings before this Court are stayed pending *en banc* rehearing of *Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc. v. Smith*, 914 F.3d 994 (5th Cir. 2019).

Signed in Baton Rouge, Louisiana, this _____ day of _____ 2019.

               _____
               **JUDGE JOHN W. deGRAVELLES**
               **UNITED STATES DISTRICT COURT**
               **MIDDLE DISTRICT OF LOUISIANA**

1

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **PLANNED PARENTHOOD GULF COAST, INC., ET AL.** | |
| | **CIVIL ACTION** |
| **VERSUS** | |
| | **NO. 15-565-JWD-RLB** |
| **REBEKAH GEE, SECRETARY, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS** | |

**ORDER**

Having carefully considered the *Motion to Stay Proceedings* (Doc. 109) (the "*Motion*")

filed by Defendant Rebekah Gee, in her official capacity as Secretary of the Louisiana Department

of Health and Hospitals, as well as the law, the record, and the other arguments and submissions

of the parties (including Plaintiffs' opposition (Doc. 110) and Defendant's reply (113)),

**IT IS ORDERED** that the *Motion* is **GRANTED** and that all proceedings before this Court

are stayed and administratively closed pending decisions in the *en banc* rehearing of *Planned*

*Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc. v. Smith*, 914

F.3d 994 (5th Cir. 2019), and the appeal in *Planned Parenthood Gulf Coast, Inc. v. Gee*, No. 18-

30699 (5th Cir.) ("*Gee II*"), after which time the parties shall file a motion to lift the stay.

Signed in Baton Rouge, Louisiana, on May 17, 2019.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

1

App.611

PAC and Health Center Talking Points: Texas Medicaid Exclusion
November 24, 2020

**What happened with Medicaid?**
On Monday, November 23, a federal court ruled that Texas will be able to exclude Planned Parenthood from the state's Medicaid program. **As a result, patients will no longer be able to use their Medicaid coverage to pay for services at Planned Parenthood health centers in Texas after December 14, 2020 — but we can see you until then.** This is a blatantly political attack from extremist politicians in Texas. We know your health care is essential, and we are doing everything in our power to continue providing that care and to fight back against these attacks.

**I'm in the Medicaid program — so can I still come to PPGC?**
**YES.** This ruling has not yet taken effect. You can use your Medicaid coverage to pay for services at Planned Parenthood in Texas **until December 14, 2020.**

**Does the same apply to Louisiana?**
**NO.** Right now, we are still in Medicaid in both Texas and Louisiana, and this decision only impacts Planned Parenthood health centers in Texas **after December 14.**

**What will happen after it takes effect? What if I need an appointment then?**
We are sorry to tell you that because of political attacks on Planned Parenthood, you will not be able to use Medicaid to pay for services at Planned Parenthood health centers in Texas after December 14, **but we can see you until then.**
After December 14, if you are enrolled in Medicaid and you choose to get your health care at Planned Parenthood in Texas, you will have to pay for services out-of-pocket. Some discounts may be available, and you also have the option to transfer to a different provider who has not been excluded from Medicaid.

**Why were you excluded from the Medicaid program?**
This is a purely political attack by extremist politicians in Texas, part of an ongoing, larger campaign against Planned Parenthood. We take pride in being an excellent health care provider for all people — that will never change. We follow all laws and regulations and the highest medical standards. We have done nothing wrong. Even so, Planned Parenthood is a frequent target of these kinds of political attacks that unfortunately impact patients' ability to access care. We will never stop fighting back.

**How can I find another provider in the Medicaid program?**
The most important thing is that you get the care you need, and we understand that you may need to seek care elsewhere after December 14. Contact the customer service phone number on the back of your insurance card, visit www.tmhp.com, or call the Texas Medicaid Hotline at 1-800-252-8263 to find other providers in your area.

We know it's frustrating that political attacks are impacting your health care at Planned Parenthood. We're fighting hard to continue providing care for our patients and we will update you if anything changes. Thank you for choosing Planned Parenthood.

**What else can I do?**
If you're comfortable, we encourage you to share your story on our website and through the story forms available in our health centers.

App.612

PPGC00324597

You can call Texas Governor Greg Abbott and tell him not to block care to Medicaid patients at Planned Parenthood. Tell him Texans need more health care during a pandemic, not less. His phone number is 512-463-2000 or you can send him a message by visiting gov.texas.gov.

PPGC00324598

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————

No. 17-50282

—————

United States Court of Appeals
Fifth Circuit

**FILED**

November 23, 2020

Lyle W. Cayce
Clerk

PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING
AND PREVENTATIVE HEALTH SERVICES, INCORPORATED; PLANNED
PARENTHOOD SAN ANTONIO; PLANNED PARENTHOOD CAMERON
COUNTY; PLANNED PARENTHOOD GULF COAST, INCORPORATED;
PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER; JANE
DOE, I; JANE DOE 2; JANE DOE 4; JANE DOE 7;
JANE DOE 9; JANE DOE 10; JANE DOE 11,

                                        Plaintiffs—Appellees,

v.

SYLVIA HERNANDEZ KAUFFMAN, in her official capacity as Inspector
General of HHSC; CECILE ERWIN YOUNG, in her official capacity as
Executive Commissioner of HHSC,

                                        Defendants—Appellants.

———————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:15-CV-1058

———————————

App.614

Before OWEN, Chief Judge, and JOLLY, JONES, SMITH, STEWART, DENNIS, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, COSTA, WILLETT, HO, DUNCAN, ENGELHARDT, Circuit Judges.*

JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is VACATED.

IT IS FURTHER ORDERED that appellees pay to appellants the costs on appeal to be taxed by the Clerk of this Court.

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, SMITH, WILLETT, HO, DUNCAN, and ENGELHARDT, Circuit Judges, concurring.

JAMES C. HO, Circuit Judge, joined by STUART KYLE DUNCAN, Circuit Judge, concurring.

STEPHEN A. HIGGINSON, Circuit Judge, joined by STEWART and COSTA, Circuit Judges, concurring in part and dissenting in part, partially joined by DENNIS and GRAVES, Circuit Judges.

JAMES L. DENNIS, Circuit Judge, joined by JAMES E. GRAVES, Circuit Judge, dissenting.

---

* JUDGE OLDHAM is recused and did not participate in the decision. JUDGE WILSON joined the court after this case was submitted and did not participate in the decision.

2

**Planned Parenthood®**
Care. No matter what.

4600 Gulf Freeway
Houston, TX 77023
p: 713.522.6240
www.ppgulfcoast.org

Planned Parenthood Gulf Coast

December 23, 2020

**SENT VIA USPS CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Jarrod Coniglio
Medicaid Program Integrity Section Chief
Louisiana Department of Health
Program Integrity Section
P.O. Box 91030
Baton Rouge, Louisiana 70821-9030

Re:     Texas Medicaid Program Participation

Mr. Coniglio:

Out of an abundance of caution, I am writing to provide notice, pursuant to 50 La. Admin. Code § 4147A(4) and 4147A(8), that Planned Parenthood Gulf Coast, Inc. ("PPGC") is not currently participating in the Texas Medicaid program.  This is because of a politically motivated notice of termination of PPGC's Texas Medicaid contracts arising from long-debunked videos made by opponents of abortion.  While a recent decision of the U.S. Court of Appeals for the Fifth Circuit resulted in the reversal of a preliminary injunction on December 16, 2020 that had prevented PPGC from being terminated from Texas Medicaid, PPGC and its patients continue to vigorously contest and challenge the termination from the Texas program, including in an administrative appeal, as well as in ongoing federal litigation; therefore, termination is not final.  Moreover, it remains unclear whether Texas Health and Human Services Commission ("HHSC") believes the termination is currently in effect, and PPGC is making efforts to clarify its status in the Medicaid program.

To be clear, PPGC has not been debarred, suspended, or excluded from any program.  The Texas HHSC OIG issued notices of termination of PPGC's Medicaid participation agreement based on accusations of violating the Texas Medicaid requirements.  A federal district court in Texas found those accusations unsupported—a finding the Fifth Circuit's opinion did not address.

Any Texas termination is limited to the Texas Medicaid program and does not affect PPGC's license or ability to continue to provide high-quality medical care to its patients.  PPGC remains committed to providing healthcare—including critical and time-sensitive preventive services and medical screenings—to its patients in Texas and Louisiana.

Sincerely,

*Kathryn E. Gottlieb*

Katie Beth Gottlieb, JD, MPH
General Counsel & Chief Compliance Officer
Planned Parenthood Gulf Coast, Inc.

App.616



4600 Gulf Freeway
Houston, TX 77023
p: 713.522.6240
www.ppgulfcoast.org

Planned Parenthood Gulf Coast

CC: Tara LeBlanc
Interim Medicaid Executive Director
Louisiana Department of Health
Bureau of Health Services Financing
628 N. 4th Street, 769
Baton Rouge, Louisiana 70802

PPGC00000031

**Planned Parenthood®**
Care. No matter what.

4600 Gulf Freeway
Houston, TX 77023
p: 713.522.6240
www.ppgulfcoast.org

Planned Parenthood Gulf Coast

December 23, 2020

**SENT VIA USPS CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Tara LeBlanc
Interim Medicaid Executive Director
Louisiana Department of Health
Bureau of Health Services Financing
628 N. 4th Street, 769
Baton Rouge, Louisiana 70802

Re:    Texas Medicaid Program Participation

Ms. LeBlanc:

Out of an abundance of caution, I am writing to provide notice, pursuant to 50 La. Admin. Code § 4147A(4) and 4147A(8), that Planned Parenthood Gulf Coast, Inc. ("PPGC") is not currently participating in the Texas Medicaid program.  This is because of a politically motivated notice of termination of PPGC's Texas Medicaid contracts arising from long-debunked videos made by opponents of abortion.  While a recent decision of the U.S. Court of Appeals for the Fifth Circuit resulted in the reversal of a preliminary injunction on December 16, 2020 that had prevented PPGC from being terminated from Texas Medicaid, PPGC and its patients continue to vigorously contest and challenge the termination from the Texas program, including in an administrative appeal, as well as in ongoing federal litigation; therefore, termination is not final.  Moreover, it remains unclear whether Texas Health and Human Services Commission ("HHSC") believes the termination is currently in effect, and PPGC is making efforts to clarify its status in the Medicaid program.

To be clear, PPGC has not been debarred, suspended, or excluded from any program.  The Texas HHSC OIG issued notices of termination of PPGC's Medicaid participation agreement based on accusations of violating the Texas Medicaid requirements.  A federal district court in Texas found those accusations unsupported—a finding the Fifth Circuit's opinion did not address.

Any Texas termination is limited to the Texas Medicaid program and does not affect PPGC's license or ability to continue to provide high-quality medical care to its patients.  PPGC remains committed to providing healthcare—including critical and time-sensitive preventive services and medical screenings—to its patients in Texas and Louisiana.

Sincerely,

Katie Beth Gottlieb, JD, MPH
General Counsel & Chief Compliance Officer
Planned Parenthood Gulf Coast, Inc.

App.618



4600 Gulf Freeway
Houston, TX 77023
p: 713.522.6240
www.ppgulfcoast.org

Planned Parenthood Gulf Coast

CC:
Jarrod Coniglio
Medicaid Program Integrity Section Chief
Louisiana Department of Health
Program Integrity Section
P.O. Box 91030
Baton Rouge, Louisiana 70821-9030

App.619

PPGC00000033

**Dear (Patient Name),**

**A recent federal court ruling, that is a direct result from continued political attacks, allows the state of Texas to cut off Medicaid patients from receiving health care at a Planned Parenthood health center.  On February 3, 2021, Medicaid patients will no longer be able to use their coverage to pay for preventive health care services at our health centers.**

This court decision fails you and thousands of Texas Medicaid patients by jeopardizing your access to preventive health care like wellness visits, birth control, cancer screenings, testing and treatment for STIs, and other preventive health care. It is especially devastating in the middle of a pandemic. We know that the Medicaid network needs more providers, not fewer, and that it may be difficult for you to find a new health care provider. **We encourage you to contact us to make an appointment before February 3, for an in-person or telehealth visit.** You can schedule an appointment online (www.plannedparenthood.org/book) or by calling 1-800-230-7526.

We understand that the Medicaid health care network is already stretched and that finding a new provider may be very difficult for you.  We have included a list of other health care providers who accept Medicaid. We hope that you are able to find a new, trusted provider. If you are having difficulty finding a new Medicaid provider or need additional support accessing health care, please reach out to our Care Coordination team by email at PPGCPCCareCoordination@ppgulfcoast.org.

Planned Parenthood believes everyone deserves access to expert, affordable health care. If you would like more information about this decision or would like to share your thoughts on this terrible decision, please visit www.ppgulfcoast.org/medicaid. We are grateful you chose Planned Parenthood as your trusted provider, and wish you well.

Sincerely,
Care Coordination Team
Planned Parenthood Gulf Coast

PPGC00621581

CAUSE NO. _____

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT OF |
| | § | |
| PLANNED PARENTHOOD OF GREATER | § | |
| TEXAS FAMILY PLANNING AND | § | |
| PREVENTATIVE HEALTH SERVICES, INC., | § | |
| PLANNED PARENTHOOD OF GREATER | § | |
| TEXAS, INC., PLANNED PARENTHOOD SAN | § | |
| ANTONIO, PLANNED PARENTHOOD | § | TRAVIS COUNTY, TEXAS |
| CAMERON COUNTY, PLANNED | § | |
| PARENTHOOD SOUTH TEXAS SURGICAL | § | |
| CENTER, and PLANNED PARENTHOOD | § | |
| GULF COAST, | § | |
| | § | |
| *Relators.* | § | _____ JUDICIAL DISTRICT |

**ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION
FOR TEMPORARY RESTRAINING ORDER, TEMPORARY MANDATORY
INJUNCTION, AND PERMANENT MANDATORY INJUNCTION**

TO THE HONORABLE JUDGE OF THIS COURT:

Relators, Planned Parenthood of Greater Texas Family Planning and Preventative Health

Services, Inc. ("PPGT") and Planned Parenthood of Greater Texas, Inc.; Planned Parenthood San

Antonio, Planned Parenthood Cameron County, and Planned Parenthood South Texas Surgical

Center (collectively, "PPST"); and Planned Parenthood Gulf Coast ("PPGC") (PPGT, Planned

Parenthood of Greater Texas, Inc., PPST, and PPGC are, collectively, the "Providers"),

respectfully ask this Court to grant mandamus relief directing Sylvia Hernandez Kauffman,

Inspector General, the Office of Inspector General (jointly, the "OIG"); and Cecile Young, the

Executive Commissioner of the Texas Health and Human Services Commission, and the Texas

Health and Human Services Commission (jointly, "HHSC") to provide proper notice of

termination to Providers based on the OIG and HHSC's intent to terminate Providers from

participation in the Medicaid program.

ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TRO, TEMPORARY
MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION

App.621

PPGC00147321

In support of this Original Petition for Writ of Mandamus, Application for Temporary Restraining Order, Temporary Mandatory Injunction, and Permanent Mandatory Injunction, Providers show the Court as follows:

## I.   INTRODUCTION

**A.   Nature of the Dispute.**

1.      HHSC sent Providers a letter on January 4, 2021, informing Providers that HHSC would allow them to continue to provide services in the Medicaid program through February 3, 2021, at which time Providers would be terminated from the program.

2.      In response, Providers requested that HHSC and the OIG comply with the statutory and regulatory mandates requiring them to issue a proper notice of termination under Tex. Hum. Res. Code § 32.034 and 1 Tex. Admin. Code § 371.1703(e) because, under a proper notice of termination, Providers would be entitled to request an informal resolution meeting or an administrative hearing regarding the imposition of the termination.

**B.   Respondents.**

3.      Respondents are the Texas Health and Human Services Commission, its Executive Commissioner Cecile Young, the Office of Inspector General, and its Inspector General Sylvia Hernandez Kauffman. The Texas Health and Human Services Commission is the "single state agency" with the chief responsibility for the Medicaid program in Texas. *See* Tex. Gov't. Code § 531.021. The Office of the Inspector General has the duty under the Texas Administrative Code to issue a proper termination notice. *See* 1 Tex. Admin. Code § 371.1703.

**C.   Respondents' Action or Omission from which Relators Seek Relief.**

4.      HHSC has failed to respond to Providers' request for a proper notice of termination and has failed to issue the same to Providers. The OIG has failed to comply with its regulatory

ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TRO, TEMPORARY
MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION                    PAGE 2

App.622

PPGC00147322

obligation to issue a proper notice of termination. Providers seek a writ of mandamus to compel HHSC and the OIG to perform this ministerial act.

## II.     DISCOVERY CONTROL PLAN

5.      Providers invoke Discovery Control Plan Level 3 under Texas Rule of Civil Procedure 190.4.

## III.     PARTIES

6.      Relators, the Planned Parenthood Providers, are Texas not-for-profit corporations that have collectively provided family planning and other preventative care through the Medicaid program at several health centers in Texas for decades.

7.      Respondent, the Texas Health and Human Services Commission, is a state agency that may be served with process through its Executive Commissioner, Cecile Young, at 4900 N. Lamar, Austin, Texas 78751.

8.      Respondent Cecile Young is the Executive Commissioner of the Texas Health and Human Services Commission and may be served with process at her office at 4900 N. Lamar, Austin, Texas 78751.

9.      Respondent, the Office of Inspector General, is a state agency that may be served with process through its Inspector General, Sylvia Hernandez Kauffman, at P.O. Box 85200, Austin, Texas 78708.

10.     Respondent Sylvia Hernandez Kauffman is the Inspector General and may be served with process at her office at P.O. Box 85200, Austin, Texas 78708.

## IV.     JURISDICTION & VENUE

11.     District courts have authority under Tex. Gov't Code § 24.011 to issue writs of mandamus, including a writ of mandamus to compel public officials to perform a ministerial act.

ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TRO, TEMPORARY
MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION                    PAGE 3

App.623

PPGC00147323

*See* Tex. Const. Art. V, § 8. District courts also have authority under Article V, §§ 1 and 8 of the Texas Constitution to interpret statutes and issue declaratory judgments regarding the parties' relative rights and duties. Declaratory relief is proper under Tex. Civ. Prac. & Rem. Code § 37.001 *et. seq.*

12.     Venue is proper in Travis County, Texas, because the Respondents, who are public officials or state agencies, reside or conduct business in Travis County, Texas. *See* Tex. Civ. Prac. & Rem. Code § 15.002(a)(3).

## V.     BACKGROUND & FACTS

13.     For decades, the Planned Parenthood Providers have been an essential part of the public health safety net in Texas, providing high-quality and accessible preventative health care to Texans insured through the Medicaid program.

14.     In 2015, HHSC sought to terminate Providers from participation in the Medicaid program, not because they failed to provide high-quality health care services, but because of the political opportunity presented by an unlawfully filmed and widely debunked video made by a radical anti-abortion group. HHSC first informed Providers that they were being terminated from Medicaid on October 19, 2015, because of, among other reasons, allegedly unlawful conduct related to willingness to facilitate patients' donation of fetal tissue for research. Copies of the 2015 Notices of Termination are attached as **Exhibit A**.

15.     Two of the three Providers did not even appear on the video at issue. Instead, HHSC sought to terminate them because, while they are separate and independent entities, they share the name "Planned Parenthood" with the provider on the video. *See* Ex. A (stating that entities may be terminated for sanctionable conduct by an entity "sharing any identifying information including . . . corporate or franchise name.").

ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TRO, TEMPORARY
MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION                    PAGE 4

App.624

PPGC00147324

16.     On November 23, 2015, Providers filed suit in federal court and moved for a preliminary injunction. *See* Case No. 1:15-CV-01058, styled *Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc. et al v. Charles Smith et al*, in the United States District Court for the Western District of Texas, Austin Division.

17.     HHSC then changed course, claiming litigation was premature because it "had not yet actually decided termination was in order." Order Granting Motion for Preliminary Injunction, Case No. 1:15-CV-01058, ECF No. 100. The Court dismissed the pending preliminary injunction motion and stayed the case pending issuance of a final termination notice, and the case "remained dormant for nearly a year." *Id.*

18.     During that year, HHSC did not rescind the termination letters, but instead, various Texas agencies, including HHSC, the Harris County District Attorney, the Texas Rangers and Houston Police Department, the State Attorney General's Office, and the Department of State Health Services conducted investigations of the Providers. Five federal congressional committees also launched investigations. None of these investigations found any evidence of wrongdoing.[1]

19.     Fourteen months after its initial notice, on December 20, 2016, HHSC issued a Final Notice of Termination to each provider, again based on claims of wrongdoing connected to the discredited video (which related to only one of the three Providers). Copies of the Final Notices are attached as **Exhibit B**.

20.     Providers then renewed their request for a preliminary injunction, which was granted by the federal district court on February 21, 2017. *See* Order Granting Motion for Preliminary Injunction, Case No. 1:15-CV-01058, ECF No. 100. Following a three-day

---

[1]     *See* Jennifer Bendery, *GOP Probe into Planned Parenthood Funding Comes Up Empty*, The Huffington Post (Oct. 12, 2015), http://www.huffingtonpost.com/entry/jason-chaffetz-planned-parenthoodfunding_us_5616ed01e4b0dbb8000de134.

PPGC00147325

evidentiary hearing, the district court concluded there was "not . . . even a scintilla of evidence" of wrongdoing by any of the Providers and that the terminations likely violated the Medicaid Act's Free Choice of Provider clause. *Id.* at 38–39, 35.

21.     HHSC appealed and, on appeal, a Fifth Circuit panel held that existing law required it to recognize a private right of action to enforce the Free Choice of Provider clause.[2] The en banc Fifth Circuit later reversed that decision, and on December 15, 2020, issued a mandate directing the district court to vacate the preliminary injunction. *See Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 370 (5th Cir. 2020).

22.     On December 14, 2020, Providers wrote a letter to the Commissioner requesting that—given the current public health crisis presented by the COVID-19 pandemic and the critical role Providers play in Texas's public health safety net—HHSC permit Providers to continue to participate in the Medicaid program or, in the alternative, provide a grace period of at least six months to allow Providers to continue serving patients during this time of crisis and to assist patients in transitioning their care to other providers. A copy of the December 14, 2020 letter is attached as **Exhibit C**.

23.     The next day, counsel for Providers sent a letter to HHSC and the OIG, detailing that the December 20, 2016 notice of termination had been enjoined by the federal court and seeking a new, proper notice of termination should HHSC and the OIG desire to continue the termination action. A copy of the December 15, 2020 letter is attached as **Exhibit D**. In an excess

---

[2]  *See Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc v. Smith*, 913 F.3d 551, 560 (5th Cir.), *reh'g en banc granted sub nom. Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc. v. Smith*, 914 F.3d 994 (5th Cir. 2019), *and on reh'g en banc sub nom. Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020).

ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TRO, TEMPORARY MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION                    PAGE 6

App.626

PPGC00147326

of caution, counsel for Providers also requested a formal appeal of the termination to the extent HHSC believed the 2016 notice of termination continued to have legal effect. *See* Ex. D.

24.     HHSC responded to Providers on January 4, 2021, informing Providers that it would allow them to continue to provide services in the Medicaid program for 30 days from the date of the letter (through February 3, 2021), after which time Providers would be terminated from the program. A copy of the January 4, 2021 HHSC letter is attached as **Exhibit E**. The OIG also responded to Providers' counsel on January 4, 2021, informing Providers' counsel that the deadline to appeal had expired. A copy of the January 4, 2021 OIG letter is attached as **Exhibit F**.

25.     On information and belief, on the same date, HHSC also issued a notice to Medicaid Managed Care Organizations that Providers "have been terminated as providers in Texas Medicaid" "[a]s of January 4, 2020," again with a 30 day grace period to provide patient care through February 3, 2021. A copy of the MCO Notices is attached as **Exhibit G**. This notification did not mention any earlier termination. HHSC's January 4, 2021 letter appears to constitute a new notice of termination, as it states that Providers may participate in the Medicaid program until February 4, 2021.

26.     Logically, then, Providers were not, and have not been, terminated from the program before February 4, 2021, given they were still participating, and allowed to participate by HHSC, in the Medicaid program.[3]

27.     The letter, however, does not comply with Texas statutory or regulatory requirements. Texas Human Resources Code § 32.034 provides for cancellation of Medicaid provider contracts, reasonable notice and an opportunity for a hearing, and authority for HHSC to

---

[3]     As discussed *infra*, HHSC's position is that OIG's termination of Providers from the Medicaid program was effective in January 2017. This position is flawed—if Providers were terminated from Medicaid in 2017, HHSC would have no reason or need to send a notice of termination letter in January 2021 stating that Providers may participate in the Medicaid program until February 2021.

App. 627

PPGC00147327

adopt regulations to implement the statute. Tex. Hum. Res. Code § 32.034 ("The executive commissioner shall adopt rules consistent with Chapter 2001, Government Code, to implement this section").

28.     These statutory duties were implemented and adopted through Texas Administrative Code Chapter 371, Subchapter G, which includes regulatory requirements HHSC must follow when it takes administrative actions against providers who participate in the Medicaid program. Among other requirements, the regulation spells out the situations in which HHSC and the OIG may or must terminate a provider from the Medicaid program and the procedures they must follow when they do so.

29.     Specifically, when the OIG or HHSC terminates a provider from the program, it must provide a proper notice of termination that includes six specified items:

> (1) a description of the termination;
> (2) the basis for the termination;
> (3) the effect of the termination;
> (4) the duration of the termination;
> (5) whether re-enrollment will be required after the period of termination; and
> (6) a statement of the person's right to request an informal resolution meeting or an administrative hearing regarding the imposition of the termination unless the termination is required under 42 C.F.R. §455.416.

1 Tex. Admin. Code § 371.1703(e).

30.     Providers, through their counsel, sent a letter to HHSC on January 19, 2021, demanding that HHSC comply with its regulatory obligation to issue a proper notice of termination containing all required elements. A copy of the January 19, 2021 letter is attached as **Exhibit H**. On January 29, 2021, counsel for Providers sent a follow-up letter regarding the deficiency of the attempted termination notice. A copy of the January 29, 2021 letter is attached as **Exhibit I**.

---

ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TRO, TEMPORARY
MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION                          PAGE 8

App.628

PPGC00147328

31.     HHSC responded to Providers' requests for a proper notice of termination on February 1, 2021, claiming that the OIG's December 2016 letter was the proper notice of termination and that "the termination became final 30 days after receipt of the notice, in January 2017." A copy of the February 1, 2021 letter is attached as **Exhibit J**. However, the December 20, 2016 Notice of Termination could not serve as the basis for the current termination action because, among other things, it failed to accurately reflect a "description", the "effect", or the "duration" of the termination, and therefore failed to comply with Tex. Human Resources Code § 32.034, or 1 Tex. Admin. Code § 371.1703(e).

## VI.     REQUEST FOR WRIT OF MANDAMUS

32.     Providers reallege and incorporate by reference the allegations contained in the paragraphs above as if fully stated herein.

33.     A writ of mandamus is appropriate to compel public officials or state agencies to perform a ministerial act. *Hawkins v. Cmty. Health Choice, Inc.*, 127 S.W.3d 322, 326 (Tex. App.—Austin 2004, no pet.) (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 793 (Tex. 1991)). "An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion." *Anderson*, 806 S.W.2d at 793.

34.     Providers request that this Court issue a writ of mandamus to Respondents, compelling them to issue a proper notice of termination that complies with 1 Tex. Admin. Code § 371.1703(e). HHSC and OIG have not included the six enumerated regulatory requirements in their notice. Nor have they provided any reason for their failure to do so. Further, this regulation provides no discretion to HHSC or the OIG. HHSC and the OIG have a clear legal duty to issue a proper notice of termination.

ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TRO, TEMPORARY
MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION                                            PAGE 9

App.629

PPGC00147329

35.     Providers are entitled to the performance of the OIG and HHSC's duty. Because these public officials and state agencies have failed to act in compliance with the regulation, mandamus relief is necessary and proper to compel the OIG and HHSC to perform this ministerial act.

## VII.    REQUEST FOR DECLARATORY JUDGMENT

36.     Providers reallege and incorporate by reference the allegations contained in the paragraphs above as if fully stated herein.

37.     Under Texas Civil Practice and Remedies Code Chapter 37, Providers request and are entitled to a declaratory judgment that: (1) HHSC and the OIG cannot terminate Providers from the Medicaid program without proper notice under the Texas Administrative Code; and (2) that the January 4, 2021 letter from HHSC to Providers does not constitute proper notice of termination under the Texas Administrative Code.

## VIII.   APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION

38.     Providers reallege and incorporate by reference the allegations contained in the paragraphs above as if fully stated herein.

39.     Pursuant to Texas Rule of Civil Procedure 680 *et seq.* and Texas Civil Practice & Remedies Code § 65.011, Providers seek a temporary restraining order ("TRO") and a temporary mandatory injunction to enjoin HHSC and the OIG from terminating Providers from the Medicaid program until the Court rules on the request for writ of mandamus and/or Providers have exhausted their administrative and appellate remedies relating to the termination. This Application for a TRO and temporary mandatory injunction is supported and verified by the Declarations of Jeffrey Hons (**Exhibit K** attached and incorporated herein by reference), Ken Lambrecht (**Exhibit L** attached

ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TRO, TEMPORARY
MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION                                          PAGE 10

App.630

PPGC00147330

and incorporated herein by reference), and Melaney Linton (**Exhibit M** attached and incorporated herein by reference).

40.      "To obtain a temporary injunction, the applicant[s] must ordinarily plead and prove three specific elements: (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim." *Texas Health & Human Servs. Comm'n v. Advocates for Patient Access, Inc.*, 399 S.W.3d 615, 629 (Tex. App.—Austin 2013, no pet.) (*citing Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 629 (Tex. 2002)). "The applicant[s] [are] not required to establish that [they] will prevail on final trial; rather, the only question before the trial court is whether the applicant[s] [are] entitled to preservation of the status quo pending trial on the merits." *Id.* (*citing Walling v. Medcalfe*, 863 S.W.2d 56, 57 (Tex. 1993)).

41.      The "'[s]tatus quo is defined as 'the last, actual, peaceable, non-contested status which preceded the pending controversy.'" *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 577 (Tex. App.—Austin 2000, no pet.) (quoting *Transp. Co. of Texas v. Robertson Transp., Inc.*, 152 Tex. 551, 261 S.W.2d 549, 553–54 (1953)). Here, the "last, actual, peaceable non-contested status which preceded the pending controversy" was Provider's participation in the Medicaid program.

42.      "If any act of [HHSC or the OIG] alters the relationship between [HHSC, the OIG,] and [Providers], and [Providers] contest[] the action, the status quo cannot be the relationship as it exists *after* the action." *Benavides ISD v.* Guerra, 681 S.W.2d 246, 249 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.). Providers contest HHSC's act of attempting to terminate Providers from the Medicaid program without a proper notice of termination. The status quo *cannot* be such that HHSC can continue with its termination of Providers from the Medicaid program on February 4, 2021. The status quo is Providers' continued participation in the Medicaid program. Importantly,

---

PPGC00147331

if Providers are successful on their request for a writ of mandamus and are granted an administrative hearing, Providers' Medicaid agreements would not be terminated until the final outcome of the administrative action.

**A.      Providers have a right of action against HHSC and the OIG and a probable right to relief.**

43.      To show a probable right of recovery, applicants must merely present evidence that would tend to sustain the cause of action. *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 197 (Tex. App.—Fort Worth 2005, no pet.).

44.      As discussed above, Providers have a probable right of recovery against HHSC and the OIG after a hearing on the writ of mandamus because they failed to perform a ministerial duty by complying with the Texas Administrative Code's clear and unequivocal requirements for a proper notice of termination when terminating a provider from the Medicaid program. Accordingly, Providers show a probable right to be entitled to a writ of mandamus and a declaratory judgment against HHSC and the OIG for the failure to comply with their regulatory obligations.

**A.      Providers will suffer a probable, imminent, and irreparable injury if immediate injunctive relief is not granted.**

45.      "'Probable injury' includes the elements of imminent harm, irreparable injury, and no adequate remedy at law." *Cold Spring Granite Co. v. Karrash*, 96 S.W.3d 514, 516 (citing *Univ. of Tex. Med. School v. Than*, 834 S.W.2d 425, 428 (Tex. App.—Houston [1st Dist.] 1992, no writ)).

46.      "An injury is irreparable if the injured part[ies] cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TRO, TEMPORARY MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION                    PAGE 12

App.632

PPGC00147332

47.     With respect to the adequacy of a remedy at law, "[i]t is not enough for some legal remedy to exist, but the remedy at law must be as practicable, available, and effectual as the remedy at equity." *Liberty Mut. Ins. Co. v. Mustang Tractor & Equip. Co.*, 812 S.W.2d 663, 666 (Tex. App.—Houston [14th Dist.] 1991, no writ).

48.     Providers will suffer immediate and irreparable injury if HHSC terminates Providers from participating in the Medicaid program. Since 2017, when the Medicaid termination was first scheduled to go into effect, Providers have provided more than 51,000 health care visits to approximately 24,000 Medicaid patients. During this public health crisis, it is more important than ever that patients have access to uninterrupted health care. By cutting off Providers' participation in the Medicaid program, HHSC will interfere with Providers continuing to provide medical care to the most vulnerable Texans during this public health crisis.

49.     Terminating Providers from the Medicaid program before the Court rules on the request for writ of mandamus, or before Providers have exhausted their administrative and appellate remedies relating to the termination, will cause immediate and irreparable damage to Providers. Specifically, even if Providers are subsequently able to resume providing services in the Medicaid program because of relief from this Court, Providers' patients who were unable to obtain care at Providers in the interim will remain confused about their ability to do so, causing patients who prefer to obtain care at Providers to nevertheless attempt to obtain care elsewhere if they are able to do so, or forego care altogether; Providers will lose reimbursements for services they would otherwise have provided; and Providers' mission of providing care to underserved patients will be irreparably harmed.

50.     Further, Providers need to allow their patients to take care of urgent health needs during this crisis stage of the pandemic and, at the least, help their patients attempt to find new

ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TRO, TEMPORARY
MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION                                                    PAGE 13

App.633

PPGC00147333

providers willing to accept new patients insured through Medicaid. Abruptly discontinuing services on February 4, 2021 will leave Providers' patients with nowhere else to turn during a pandemic that has pushed the capacity of our health care system to the brink. It is Providers' mission to care for these patients, and termination from Medicaid would be denying Providers' their mission.

51.     Providers cannot continue to serve their patients insured through Medicaid if HHSC's attempt to terminate them from the program is allowed to take effect on February 4, 2021, as a result of HHSC's improper notice of termination and failure to comply with its regulatory obligations. Additionally, as stated above, if Providers are successful on their request for a writ of mandamus and are granted an administrative hearing, the terminations would not take effect until the final outcome of the administrative action. Allowing those terminations to go into effect now would leave Providers without an adequate remedy at law. Such terminations based on an insufficient notice would cause grave public health harms, specifically during the COVID-19 pandemic. Such damages cannot be measured by any pecuniary standard.

**B.      Because of the OIG and HHSC's failure to comply with its regulatory obligations, mandatory injunctive relief is necessary to preserve the status quo.**

52.     As detailed above, the status quo is Providers' continued participation in the Medicaid program. *See Benavides ISD*, 681 S.W.2d at 249. HHSC will alter the status quo when it improperly stops permitting Providers to provide services in the Medicaid program on February 4, 2021. Because of HHSC's insufficient notice of termination that will alter the status quo, a mandatory injunction is appropriate in this case:

> Generally, the preservation of the status quo can be accomplished by an injunction prohibitory in form, but it sometimes happens that the [status] quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury on complainant. In such a case, courts of equity issue mandatory writs

---

PPGC00147334

> before the case is heard on its merits. This character of cases has been repeatedly held to constitute an exception to the general rule that temporary injunction may not be resorted to [] obtain all relief sought in the main action; such temporary injunction may be mandatory in character.

*Rhodia, Inc. v. Harris Cty.*, 470 S.W.2d 415, 419–20 (Tex. Civ. App.—Houston [1st Dist.] 1971). HHSC will alter the status quo by no longer permitting Providers to provide care in the Medicaid program—an action that will be done in violation of the Texas Administrative Code's requirements. Thus, the current "condition of rest is exactly what will inflict the irreparable injury" on Providers. *Id.* A mandatory injunction is appropriate to prevent HHSC's conduct from inflicting such irreparable injury on Providers.

**C.   Additional Factors.**

53.   Providers ask the Court to grant their request for a temporary restraining order and schedule the hearing for a temporary mandatory injunction. Providers further request that a permanent mandatory injunction be ordered on the final hearing of this cause requiring and enjoining HHSC and the OIG from attempting to terminate or otherwise hinder Providers' participation in the Medicaid program before Providers have exhausted their administrative and appellate remedies relating to the termination.

54.   Neither HHSC nor the OIG will suffer harm as a result of the requested temporary restraining order, temporary mandatory injunction, and permanent mandatory injunction.

55.   Providers request a bond in an amount to be determined by the Court.

### IX.   CONCLUSION & PRAYER

For all the reasons stated above, Relators Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc., Planned Parenthood of Greater Texas, Inc., Planned Parenthood San Antonio, Planned Parenthood Cameron County, Planned Parenthood

---

ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TRO, TEMPORARY
MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION                                   PAGE 15

App.635

PPGC00147335

South Texas Surgical Center, and Planned Parenthood Gulf Coast request that upon hearing, this

Court issue the following:

(a)   a temporary restraining order, temporary mandatory injunction, and permanent mandatory injunction enjoining Respondents Cecile Young, in her capacity as Executive Commissioner of the Texas Health and Human Services Commission, the Texas Health and Human Services Commission, Sylvia Hernandez Kauffman, in her capacity as Inspector General, and the Office of the Inspector General from terminating Providers from the Medicaid program until Providers have exhausted their administrative and appellate remedies relating to the termination;

(b)   a writ of mandamus compelling HHSC and the OIG to comply with their regulatory obligations to issue a proper notice of termination under 1 Tex. Admin. Code § 371.1703(e);

(c)   a declaratory judgment that neither HHSC nor OIG can terminate Providers from the Medicaid program without proper notice under 1 Tex. Admin. Code § 371.1703(e) and that the January 4, 2021 letter from HHSC to Providers does not constitute proper notice of termination under 1 Tex. Admin. Code § 371.1703(e); and

(d)   all other and further relief, general and special, legal and equitable, to which Providers may be justly entitled.

Respectfully submitted,

**HUSCH BLACKWELL LLP**
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456
(512) 479-1101 (fax)

By:  _/s/ Thomas H. Watkins_
Thomas H. Watkins
Texas Bar No. 20928000
tom.watkins@huschblackwell.com

**ATTORNEY FOR RELATORS**

App.636

PPGC00147336

# EXHIBIT A

PPGC00147337



# OFFICE OF INSPECTOR GENERAL

TEXAS HEALTH & HUMAN SERVICES COMMISSION

STUART W. BOWEN JR.
INSPECTOR GENERAL

October 19, 2015

#### **\*\*\*\* NOTICE OF TERMINATION \*\*\*\***

*Via Regular Mail and CMRRR No. 7015 1730 0000 9397 2170*

Planned Parenthood Association of Cameron and Willacy
Registered Agent: Jeffery Hons
2140 Babcock Road
San Antonio, Texas 78229-0000

Re:

TPI Numbers:  1269599-11, 1269599-07, 2164360-01, 1269599-10, 2164345-01,
1269599-06, 2187189-01, 2815037-01, 2815060-01

Dear Provider:

Your receipt of this Notice of Termination effects a process to end your enrollment in the Texas Medicaid program. *See* 1 TEX. ADMIN. CODE § 371.1703(e) (2014).  We have begun terminating your enrollment because, based on the evidence outlined below, you are liable, directly or by affiliation, for a series of serious Medicaid program violations.  The State has determined that you and your Planned Parenthood affiliates are no longer capable of performing medical services in a professionally competent, safe, legal, and ethical manner.

Your termination and that of all your affiliates will not affect access to care in this State because there are thousands of alternate providers in Texas, including federally qualified health centers, Medicaid-certified rural health clinics, and other health care providers across the State that participate in the Texas Women's Health Program and Medicaid. Our women's health programs, mostly State-funded since 2013, have increased overall funding for women's health services and access to these services for women across the State.

Therefore, in connection with this Notice of Termination and out of respect for the patients who otherwise would receive Medicaid services from you and your affiliates, the State of Texas requests your cooperation in informing all clients and potential clients about alternatives where

App.638

PPGC00147338

Notice of Termination
October 19, 2015
Page 2

they can obtain Medicaid services from providers in good standing with the State. HHSC staff will provide you with information you can share regarding those Medicaid providers.

## I. FINDINGS SUPPORTING TERMINATION

We have determined the bases for your termination are as follows:

A. Earlier this year, Planned Parenthood Gulf Coast (PPGC) committed and condoned numerous acts of misconduct captured on video that reveal repeated program violations and breach the minimum standards of care required of it as a Medicaid enrollee. PPGC is being terminated from the program because of these program violations, which include, but are not limited to, the following:

1. The videos indicate that PPGC follows a policy of agreeing to procure fetal tissue even if it means altering the timing or method of an abortion. These practices violate accepted medical standards, as reflected in federal law, and are Medicaid program violations that justify termination. *See* 42 U.S.C. § 289g-1; 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

2. PPGC failed to prevent conditions that would allow the spread of infectious diseases among employees, as well as patients and the general public. Specifically, it allowed individuals posing as commercial buyers of fetal body parts to handle bloody fetal tissue while wearing only gloves. PPGC did not comply with mandatory "universal precautions," including the use of "protective barriers," required whenever anyone handles "blood," "non-intact skin," and "body fluids." *See* 25 TEX. ADMIN. CODE § 139.49; *see also* 29 CFR § 1910.1030. These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

3. PPGC staff were not trained in infection control and barrier precautions with regard to the handling of fetal blood and tissue or they failed to comply with the minimum standards that mandatory training requires with regard to these critical public health and safety issues. *See* 25 TEX. ADMIN. CODE § 139.49(b)(3). These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

As a Planned Parenthood affiliate, you have agreed to abide by mandatory medical and operational standards established by the Planned Parenthood Federation of America (PPFA) located in Washington, D.C. You are a legal affiliate of the PPFA and of all similarly situated Planned Parenthood providers in Texas.

Our rules provide that if you are affiliated with a provider that commits program violations subjecting it to enrollment termination, then you, as an affiliate, are subject to the same enrollment termination. *See* 1 TEX. ADMIN. CODE § 371.1703(c)(7).

PPGC00147339

Notice of Termination
October 19, 2015
Page 3

The definitions section of our rule substantiates the conclusion that you are an affiliate of PPGC. It provides that an enrolled provider is an affiliate of another enrolled provider if it "shares any identifying information, including ... corporate or franchise name." You share such identifying information with PPGC and are thus subject to termination. *See* 1 TEX. ADMIN. CODE § 371.1607(3)(I).

Our decision to terminate all affiliates in Texas finds support in the extensive video evidence filmed at PPGC and other Parenthood affiliates across the country, including video footage of the Medical Director of PPFA who appears to not only condone such program violations but also endorse them. This suggests that the program violations recorded at PPGC reflect PPFA national policy or accepted practice, which explains in part their widespread occurrence across the country among Planned Parenthood affiliates.   As an affiliate of PPGC, you are now being terminated from the Medicaid program.   *See* 1 Tex. Admin. Code Sec. 371.1703(c)(7).

B. My office has information suggesting that fraud and other related program violations have been committed by a number of Planned Parenthood affiliates enrolled in the Medicaid program in Texas. For example, there is reliable information indicating a pattern of illegal billing practices by Planned Parenthood affiliates across the State.

Our prima facie case of fraud is supported by related cases involving fraudulent practices identified by Whistleblowers from inside the Texas Planned Parenthood network. These Whistleblowers alleged in federal court that Planned Parenthood encourages employees to knowingly file false claims. *See, e.g*, Settlement Agreement, *Reynolds v. Planned Parenthood Gulf Coast*, No. 9:09-cv-124 (E.D. Tex. July 25, 2013) (lawsuit by a health care assistant who worked at Planned Parenthood Gulf Coast for 10 years alleging Medicaid fraud); Memorandum Opinion and Order, *Carroll v. Planned Parenthood Gulf Coast*, 4:12-cv-03505 (S.D. Tex. May 14, 2014) (lawsuit by a former accounts-receivable manager at Planned Parenthood Gulf Coast alleging Medicaid fraud).

In *Reynolds*, a Planned Parenthood Whistleblower alleged sufficient evidence of fraud to assure the federal court handling the matter that the case was worth pursuing, after which Planned Parenthood promptly settled the lawsuit for $4.3 million.  Furthermore when the United States Department of Justice (DOJ) announced the 2013 settlement in *Reynolds*, it openly and compellingly criticized PPGC for "abuse of programs that are extremely important to the well-being of many American women." Further, the DOJ was "particularly grateful to the Whistleblower" who came forward for revealing that PPGC had billed the Texas Medicaid program, Title XX, and the Women's Health

PPGC00147340

Notice of Termination
October 19, 2015
Page 4

Program "for items and services that were either medically unnecessary or were never actually provided."

The varied program violations by Planned Parenthood revealed in these two federal cases and the information my office has recently received regarding similar program violations supports this Notice of Termination. *See* 1 Tex. Admin. Code § 371.1653. As per Paragraph A, *supra*, your affiliation with Planned Parenthood entities in Texas about which there is reliable evidence of fraud and other program violations substantiates your termination as an enrollee in the Medicaid program. *See* 1 TEX. ADMIN. CODE §§ 371.1703(c)(6), (c)(7), and (c)(8).

## II. PROCESS

You may request an Informal Resolution Meeting (IRM) with my legal staff to discuss the findings in this Notice of Termination. If you wish to pursue an IRM, you must file a written request with my office <u>on or before the 30th calendar day from the date you received this Notice of Termination</u>.

Your request for an IRM must:

1. Be sent by certified mail to my office at the address specified below;
2. Include a statement as to the specific issues, findings, and legal authority in the Notice of Termination with which you disagree; and
3. Be signed by you or your attorney.

In the alternative, you may submit, <u>within 30 calendar days of receipt of this Notice,</u> any documentary evidence and written argument regarding whether this Notice of Termination is warranted. *See* 1 TEX. ADMIN. CODE § 371.1613 (d). You must state the specific issues, findings, and legal authority that support your contention that this Notice is improper.

In the further alternative, you may both request an IRM and submit documentary evidence and written argument to contest this Notice of Termination.

## III. FINAL TERMINATION

If you fail to respond to this Notice of Termination <u>within 30 calendar days of receipt</u>, then we will issue a Final Notice of Termination. Alternatively, if the IRM fails to resolve the case, then we will similarly issue a Final Notice of Termination. You have 15 days after receipt of the Final Notice of Termination to request an administrative hearing to appeal the Final Notice before an Administrative Law Judge at the Texas Health and Human Services Commission.

A. The effective date of your final termination from the Medicaid program will be either:

PPGC00147341

Notice of Termination
October 19, 2015
Page 5

    1. Upon the expiration of 15 calendar days after receipt of the Final Notice of Termination, if you do not timely request an administrative hearing before HHSC; or

    2. The date of any final order issued by an HHSC Administrative Law Judge affirming the Final Notice of Termination.

B. Once the Final Notice of Termination becomes effective, the following events immediately occur:

    1. Your enrollment in the Medicaid program terminates;

    2. Your Texas Provider Identification Number is revoked; and

    3. Your enrollment in the Medicaid program of any other state may be subject to revocation.

If, after your termination from the Texas Medicaid program, you wish to enter the program again, you must apply for re-enrollment.

## NOTICE

**<u>IF YOU DO NOT RESPOND TO THIS NOTICE WITHIN 30 CALENDAR DAYS FROM THE DATE YOU RECEIVED IT, WE WILL ISSUE A FINAL NOTICE OF TERMINATION.</u>**

Requests for an IRM and/or the provision of additional documentary evidence and written argument should be mailed via certified mail to the following address:

    Texas Health and Human Services Commission
    Office of Inspector General
    Mail Code 1358
    P.O. 85200
    Austin, Texas 78708-5200

Respectfully yours,

Stuart W. Bowen, Jr.

PPGC00147342



# OFFICE OF INSPECTOR GENERAL
TEXAS HEALTH & HUMAN SERVICES COMMISSION

STUART W. BOWEN JR.
INSPECTOR GENERAL

October 19, 2015

#### \*\*\*\* NOTICE OF TERMINATION \*\*\*\*

*Via Regular Mail and CMRRR No. 7015 1730 0000 9397 2187*

Planned Parenthood South Texas Surgical Center - Family Planning Associates of San Antonio
Registered Agent: Jeffery Hons
2140 Babcock Road
San Antonio, Texas 78229-0000

Re: Planned Parenthood South Texas Surgical Center - Family Planning Associates of San Antonio
TPI Numbers: 1373391-01, 1373391-10, 2109696-01, 1373391-11, 3353781-01, 1373391-12, 2120669-01, 1373391-04, 2100489-01, 2121964-01, 2866873-01, 2096414-01, 2103566-01

Dear Provider:

Your receipt of this Notice of Termination effects a process to end your enrollment in the Texas Medicaid program. *See* 1 TEX. ADMIN. CODE § 371.1703(e) (2014). We have begun terminating your enrollment because, based on the evidence outlined below, you are liable, directly or by affiliation, for a series of serious Medicaid program violations. The State has determined that you and your Planned Parenthood affiliates are no longer capable of performing medical services in a professionally competent, safe, legal, and ethical manner.

Your termination and that of all your affiliates will not affect access to care in this State because there are thousands of alternate providers in Texas, including federally qualified health centers, Medicaid-certified rural health clinics, and other health care providers across the State that participate in the Texas Women's Health Program and Medicaid. Our women's health programs, mostly State-funded since 2013, have increased overall funding for women's health services and access to these services for women across the State.

Therefore, in connection with this Notice of Termination and out of respect for the patients who otherwise would receive Medicaid services from you and your affiliates, the State of Texas requests your cooperation in informing all clients and potential clients about alternatives where

Notice of Termination
October 19, 2015
Page 2

they can obtain Medicaid services from providers in good standing with the State. HHSC staff will provide you with information you can share regarding those Medicaid providers.

## I. FINDINGS SUPPORTING TERMINATION

We have determined the bases for your termination are as follows:

A. Earlier this year, Planned Parenthood Gulf Coast (PPGC) committed and condoned numerous acts of misconduct captured on video that reveal repeated program violations and breach the minimum standards of care required of it as a Medicaid enrollee. PPGC is being terminated from the program because of these program violations, which include, but are not limited to, the following:

1. The videos indicate that PPGC follows a policy of agreeing to procure fetal tissue even if it means altering the timing or method of an abortion. These practices violate accepted medical standards, as reflected in federal law, and are Medicaid program violations that justify termination. *See* 42 U.S.C. § 289g-1; 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

2. PPGC failed to prevent conditions that would allow the spread of infectious diseases among employees, as well as patients and the general public. Specifically, it allowed individuals posing as commercial buyers of fetal body parts to handle bloody fetal tissue while wearing only gloves. PPGC did not comply with mandatory "universal precautions," including the use of "protective barriers," required whenever anyone handles "blood," "non-intact skin," and "body fluids." *See* 25 TEX. ADMIN. CODE § 139.49; *see also* 29 CFR § 1910.1030. These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

3. PPGC staff were not trained in infection control and barrier precautions with regard to the handling of fetal blood and tissue or they failed to comply with the minimum standards that mandatory training requires with regard to these critical public health and safety issues. *See* 25 TEX. ADMIN. CODE § 139.49(b)(3). These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

As a Planned Parenthood affiliate, you have agreed to abide by mandatory medical and operational standards established by the Planned Parenthood Federation of America (PPFA) located in Washington, D.C. You are a legal affiliate of the PPFA and of all similarly situated Planned Parenthood providers in Texas.

Our rules provide that if you are affiliated with a provider that commits program violations subjecting it to enrollment termination, then you, as an affiliate, are subject to the same enrollment termination. *See* 1 TEX. ADMIN. CODE § 371.1703(c)(7).

PPGC00147344

Notice of Termination
October 19, 2015
Page 3

The definitions section of our rule substantiates the conclusion that you are an affiliate of PPGC. It provides that an enrolled provider is an affiliate of another enrolled provider if it "shares any identifying information, including … corporate or franchise name." You share such identifying information with PPGC and are thus subject to termination. *See* 1 TEX. ADMIN. CODE § 371.1607(3)(I).

Our decision to terminate all affiliates in Texas finds support in the extensive video evidence filmed at PPGC and other Parenthood affiliates across the country, including video footage of the Medical Director of PPFA who appears to not only condone such program violations but also endorse them. This suggests that the program violations recorded at PPGC reflect PPFA national policy or accepted practice, which explains in part their widespread occurrence across the country among Planned Parenthood affiliates.  As an affiliate of PPGC, you are now being terminated from the Medicaid program.   *See*  1 Tex. Admin. Code Sec. 371.1703(c)(7).

B. My office has information suggesting that fraud and other related program violations have been committed by a number of Planned Parenthood affiliates enrolled in the Medicaid program in Texas. For example, there is reliable information indicating a pattern of illegal billing practices by Planned Parenthood affiliates across the State.

Our prima facie case of fraud is supported by related cases involving fraudulent practices identified by Whistleblowers from inside the Texas Planned Parenthood network. These Whistleblowers alleged in federal court that Planned Parenthood encourages employees to knowingly file false claims. *See, e.g*, Settlement Agreement, *Reynolds v. Planned Parenthood Gulf Coast*, No. 9:09-cv-124 (E.D. Tex. July 25, 2013) (lawsuit by a health care assistant who worked at Planned Parenthood Gulf Coast for 10 years alleging Medicaid fraud); Memorandum Opinion and Order, *Carroll v. Planned Parenthood Gulf Coast*, 4:12-cv-03505 (S.D. Tex. May 14, 2014) (lawsuit by a former accounts-receivable manager at Planned Parenthood Gulf Coast alleging Medicaid fraud).

In *Reynolds*, a Planned Parenthood Whistleblower alleged sufficient evidence of fraud to assure the federal court handling the matter that the case was worth pursuing, after which Planned Parenthood promptly settled the lawsuit for $4.3 million.  Furthermore when the United States Department of Justice (DOJ) announced the 2013 settlement in *Reynolds*, it openly and compellingly criticized PPGC for "abuse of programs that are extremely important to the well-being of many American women." Further, the DOJ was "particularly grateful to the Whistleblower" who came forward for revealing that PPGC had billed the Texas Medicaid program, Title XX, and the Women's Health

Program "for items and services that were either medically unnecessary or were never actually provided."

The varied program violations by Planned Parenthood revealed in these two federal cases and the information my office has recently received regarding similar program violations supports this Notice of Termination. *See* 1 Tex. Admin. Code § 371.1653. As per Paragraph A, *supra*, your affiliation with Planned Parenthood entities in Texas about which there is reliable evidence of fraud and other program violations substantiates your termination as an enrollee in the Medicaid program. *See* 1 TEX. ADMIN. CODE §§ 371.1703(c)(6), (c)(7), and (c)(8).

## II. PROCESS

You may request an Informal Resolution Meeting (IRM) with my legal staff to discuss the findings in this Notice of Termination. If you wish to pursue an IRM, you must file a written request with my office on or before the 30th calendar day from the date you received this Notice of Termination.

Your request for an IRM must:

1. Be sent by certified mail to my office at the address specified below;
2. Include a statement as to the specific issues, findings, and legal authority in the Notice of Termination with which you disagree; and
3. Be signed by you or your attorney.

In the alternative, you may submit, within 30 calendar days of receipt of this Notice, any documentary evidence and written argument regarding whether this Notice of Termination is warranted. *See* 1 TEX. ADMIN. CODE § 371.1613 (d). You must state the specific issues, findings, and legal authority that support your contention that this Notice is improper.

In the further alternative, you may both request an IRM and submit documentary evidence and written argument to contest this Notice of Termination.

## III. FINAL TERMINATION

If you fail to respond to this Notice of Termination within 30 calendar days of receipt, then we will issue a Final Notice of Termination. Alternatively, if the IRM fails to resolve the case, then we will similarly issue a Final Notice of Termination. You have 15 days after receipt of the Final Notice of Termination to request an administrative hearing to appeal the Final Notice before an Administrative Law Judge at the Texas Health and Human Services Commission.

A. The effective date of your final termination from the Medicaid program will be either:

PPGC00147346

Notice of Termination
October 19, 2015
Page 5

   1. Upon the expiration of 15 calendar days after receipt of the Final Notice of Termination, if you do not timely request an administrative hearing before HHSC; or

   2. The date of any final order issued by an HHSC Administrative Law Judge affirming the Final Notice of Termination.

B. Once the Final Notice of Termination becomes effective, the following events immediately occur:

   1. Your enrollment in the Medicaid program terminates;

   2. Your Texas Provider Identification Number is revoked; and

   3. Your enrollment in the Medicaid program of any other state may be subject to revocation.

If, after your termination from the Texas Medicaid program, you wish to enter the program again, you must apply for re-enrollment.

## NOTICE

**IF YOU DO NOT RESPOND TO THIS NOTICE WITHIN 30 CALENDAR DAYS FROM THE DATE YOU RECEIVED IT, WE WILL ISSUE A FINAL NOTICE OF TERMINATION.**

Requests for an IRM and/or the provision of additional documentary evidence and written argument should be mailed via certified mail to the following address:

   Texas Health and Human Services Commission
   Office of Inspector General
   Mail Code 1358
   P.O. 85200
   Austin, Texas 78708-5200

Respectfully yours,

Stuart W. Bowen, Jr.

App.647



# OFFICE OF INSPECTOR GENERAL
TEXAS HEALTH & HUMAN SERVICES COMMISSION

STUART W. BOWEN JR.
INSPECTOR GENERAL

October 19, 2015

**\*\*\*\* NOTICE OF TERMINATION \*\*\*\***

*Via First Class Mail & CMRRR No. 7015 1730 0000 9897 1876*

Planned Parenthood Gulf Coast
Registered Agent: Melaney Linton
4600 Gulf Freeway
Houston, Texas 77023-354

Re:     Planned Parenthood Gulf Coast
        TPI Numbers: 0834095-01, 1126104-08, 1126104-09, 3035461-01, 1126104-05,
        1126104-04, 1126104-12, 1126104-14, 1126104-11, 1126104-10, 1126104-06, 0834095-
        02, 1126104-02, 1126104-07

Dear Provider:

Your receipt of this Notice of Termination effects a process to end your enrollment in the Texas Medicaid program. *See* 1 TEX. ADMIN. CODE § 371.1703(e) (2014). We have begun terminating your enrollment because, based on the evidence outlined below, you are liable, directly or by affiliation, for a series of serious Medicaid program violations. The State has determined that you and your Planned Parenthood affiliates are no longer capable of performing medical services in a professionally competent, safe, legal, and ethical manner.

Your termination and that of all your affiliates will not affect access to care in this State because there are thousands of alternate providers in Texas, including federally qualified health centers, Medicaid-certified rural health clinics, and other health care providers across the State that participate in the Texas Women's Health Program and Medicaid. Our women's health programs, mostly State-funded since 2013, have increased overall funding for women's health services and access to these services for women across the State.

Therefore, in connection with this Notice of Termination and out of respect for the patients who otherwise would receive Medicaid services from you and your affiliates, the State of Texas

---

App.648

PPGC00147348

Notice of Termination
October 19, 2015
Page 2

requests your cooperation in informing all clients and potential clients about alternatives where they can obtain Medicaid services from providers in good standing with the State. HHSC staff will provide you with information you can share regarding those Medicaid providers.

## I. FINDINGS SUPPORTING TERMINATION

We have determined the bases for your termination are as follows:

A. Earlier this year, you committed and condoned numerous acts of misconduct captured on video that reveal repeated program violations and breach the minimum standards of care required of a Medicaid enrollee. You are being terminated from the program because of these program violations, which include, but are not limited to, the following:

1. The videos indicate that you follow a policy of agreeing to procure fetal tissue even if it means altering the timing or method of an abortion. These practices violate accepted medical standards, as reflected in federal law, and are Medicaid program violations that justify termination. *See* 42 U.S.C. § 289g-1; 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

2. You failed to prevent conditions that would allow the spread of infectious diseases among employees, as well as patients and the general public. Specifically, you allowed individuals posing as commercial buyers of fetal body parts to handle bloody fetal tissue while wearing only gloves. You did not comply with mandatory "universal precautions," including the use of "protective barriers," required whenever anyone handles "blood," "non-intact skin," and "body fluids." *See* 25 TEX. ADMIN. CODE § 139.49; *see also* 29 CFR § 1910.1030. These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

3. Your staff were not trained in infection control and barrier precautions with regard to the handling of fetal blood and tissue or they failed to comply with the minimum standards that mandatory training requires with regard to these critical public health and safety issues. *See* 25 TEX. ADMIN. CODE § 139.49(b)(3). These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

As a Planned Parenthood affiliate, you have agreed to abide by mandatory medical and operational standards established by the Planned Parenthood Federation of America (PPFA) located in Washington, D.C. You are a legal affiliate of the PPFA and of all similarly situated Planned Parenthood providers in Texas.

Our decision to terminate you and all affiliates in Texas finds support in the extensive video evidence filmed at your facility and other Planned Parenthood affiliates across the country, including video footage of the Medical Director of

PPGC00147349

Notice of Termination
October 19, 2015
Page 3

PPFA who appears to not only condone such program violations but also endorse
them. This suggests that the program violations recorded at your facility reflect
PPFA national policy or accepted practice, which explains in part their widespread
occurrence across the country among Planned Parenthood affiliates.

B.  My office has information suggesting that fraud and other related program
violations have been committed by a number of Planned Parenthood affiliates
enrolled in the Medicaid program in Texas, including you. For example, there
is reliable information indicating a pattern of illegal billing practices by
Planned Parenthood affiliates, including you, across the State.

Our prima facie case of fraud is supported by related cases involving
fraudulent practices identified by Whistleblowers from inside the Texas
Planned Parenthood network. These Whistleblowers alleged in federal court
that Planned Parenthood encourages employees to knowingly file false claims.
*See, e.g*, Settlement Agreement, *Reynolds v. Planned Parenthood Gulf Coast*,
No. 9:09-cv-124 (E.D. Tex. July 25, 2013) (lawsuit by a health care assistant
who worked at Planned Parenthood Gulf Coast for 10 years alleging Medicaid
fraud); Memorandum Opinion and Order, *Carroll v. Planned Parenthood Gulf
Coast*, 4:12-cv-03505 (S.D. Tex. May 14, 2014) (lawsuit by a former accounts-
receivable manager at Planned Parenthood Gulf Coast alleging Medicaid
fraud).

In *Reynolds*, a Planned Parenthood Whistleblower alleged sufficient evidence
of fraud to assure the federal court handling the matter that the case was worth
pursuing, after which Planned Parenthood promptly settled the lawsuit for $4.3
million. Furthermore, when the United States Department of Justice (DOJ)
announced the 2013 settlement in *Reynolds*, it openly and compellingly
criticized PPGC for "abuse of programs that are extremely important to the
well-being of many American women." Further, the DOJ was "particularly
grateful to the Whistleblower" who came forward for revealing that Planned
Parenthood Gulf Coast had billed the Texas Medicaid program, Title XX, and
the Women's Health Program "for items and services that were either
medically unnecessary or were never actually provided."

The varied program violations by Planned Parenthood revealed in these two
federal cases and the information my office has recently received regarding
similar program violations supports this Notice of Termination. *See* 1 Tex.
Admin. Code § 371.1653.

Our rules provide that if you are affiliated with a provider that commits program
violations subjecting it to enrollment termination, then you, as an affiliate, are
subject to the same enrollment termination. *See* 1 TEX. ADMIN. CODE
§ 371.1703(c)(7). The definitions section of our rule substantiates this position. It
provides that an enrolled provider is an affiliate of another enrolled provider if it

PPGC00147350

Notice of Termination
October 19, 2015
Page 4

"shares any identifying information, including ... corporate or franchise name."
You share such identifying information with other affiliates about which a prima
facie case of fraud exists and are thus subject to termination. *See* 1 TEX. ADMIN.
CODE § 371.1607(3)(I). Your affiliation with Planned Parenthood entities in Texas
about which there is reliable evidence of fraud and other program violations - as
well as your participation in such - substantiates your termination as an enrollee in
the Medicaid program. *See* 1 TEX. ADMIN. CODE §§ 371.1703(c)(6), (c)(7), and
(c)(8).

## II. PROCESS

You may request an Informal Resolution Meeting (IRM) with my legal staff to discuss the
findings in this Notice of Termination.  If you wish to pursue an IRM, you must file a written
request with my office <u>on or before the 30th calendar day from the date you received this Notice
of Termination.</u>

Your request for an IRM must:

1. Be sent by certified mail to my office at the address specified below;
2. Include a statement as to the specific issues, findings, and legal authority in the Notice of
   Termination with which you disagree; and
3. Be signed by you or your attorney.

In the alternative, you may submit, <u>within 30 calendar days of receipt of this Notice,</u> any
documentary evidence and written argument regarding whether this Notice of Termination is
warranted. *See* 1 TEX. ADMIN. CODE § 371.1613 (d). You must state the specific issues, findings,
and legal authority that support your contention that this Notice is improper.

In the further alternative, you may both request an IRM and submit documentary evidence and
written argument to contest this Notice of Termination.

## III. FINAL TERMINATION

If you fail to respond to this Notice of Termination <u>within 30 calendar days of receipt</u>, then we
will issue a Final Notice of Termination.  Alternatively, if the IRM fails to resolve the case, then
we will similarly issue a Final Notice of Termination. You have 15 days after receipt of the Final
Notice of Termination to request an administrative hearing to appeal the Final Notice before an
Administrative Law Judge at the Texas Health and Human Services Commission.

A. The effective date of your final termination from the Medicaid program will be either:

1. Upon the expiration of 15 calendar days after receipt of the Final Notice of
   Termination, if you do not timely request an administrative hearing before HHSC; or

Notice of Termination
October 19, 2015
Page 5

   2. The date of any final order issued by an HHSC Administrative Law Judge affirming the Final Notice of Termination.

B. Once the Final Notice of Termination becomes effective, the following events immediately occur:

   1. Your enrollment in the Medicaid program terminates;
   2. Your Texas Provider Identification Number is revoked; and
   3. Your enrollment in the Medicaid program of any other state may be subject to revocation.

If, after your termination from the Texas Medicaid program, you wish to enter the program again, you must apply for re-enrollment.

## NOTICE

**IF YOU DO NOT RESPOND TO THIS NOTICE WITHIN 30 CALENDAR DAYS FROM THE DATE YOU RECEIVED IT, WE WILL ISSUE A FINAL NOTICE OF TERMINATION.**

Requests for an IRM and/or the provision of additional documentary evidence and written argument should be mailed via certified mail to the following address:

   Texas Health and Human Services Commission
   Office of Inspector General
   Mail Code 1358
   P.O. 85200
   Austin, Texas 78708-5200

Respectfully yours,

Stuart W. Bowen, Jr.

PPGC00147352





# OFFICE OF INSPECTOR GENERAL

TEXAS HEALTH & HUMAN SERVICES COMMISSION

STUART W. BOWEN JR.
INSPECTOR GENERAL

October 19, 2015

#### **** NOTICE OF TERMINATION ****

*Via Regular Mail and CMRRR No. 7015 1730 0000 9397 2194*

Planned Parenthood of Greater Texas / Planned Parenthood of North Texas / Planned Parenthood of Texas
Registered Agent: Kenneth Lambrecht
7424 Greenville Ave.
Suite 206
Dallas, Texas 75231-4534

Re:     Planned Parenthood of Greater Texas / Planned Parenthood of North Texas / Planned Parenthood of Texas
TPI Numbers:   1272197-03, 1272197-07, 1272197-10, 2999112-01, 2999112-02, 2999112-03, 2999112-05, 2999112-08, 2999112-09, 3147803-01, 3150484-01, 3150385-01, 3159402-01, 1272197-05, 1272197-02, 1364812-13, 1364812-06, 1122699-01, 1122699-06, 1131914-07, 1131914-05, 1131914-08, 1131914-06

Dear Provider:

Your receipt of this Notice of Termination effects a process to end your enrollment in the Texas Medicaid program. *See* 1 TEX. ADMIN. CODE § 371.1703(e) (2014). We have begun terminating your enrollment because, based on the evidence outlined below, you are liable, directly or by affiliation, for a series of serious Medicaid program violations. The State has determined that you and your Planned Parenthood affiliates are no longer capable of performing medical services in a professionally competent, safe, legal, and ethical manner.

Your termination and that of all your affiliates will not affect access to care in this State because there are thousands of alternate providers in Texas, including federally qualified health centers, Medicaid-certified rural health clinics, and other health care providers across the State that participate in the Texas Women's Health Program and Medicaid. Our women's health programs, mostly State-funded since 2013, have increased overall funding for women's health services and access to these services for women across the State.

Therefore, in connection with this Notice of Termination and out of respect for the patients who otherwise would receive Medicaid services from you and your affiliates, the State of Texas

---

App.653

PPGC00147353

Notice of Termination
October 19, 2015
Page 2

requests your cooperation in informing all clients and potential clients about alternatives where they can obtain Medicaid services from providers in good standing with the State. HHSC staff will provide you with information you can share regarding those Medicaid providers.

## I. FINDINGS SUPPORTING TERMINATION

We have determined the bases for your termination are as follows:

A. Earlier this year, Planned Parenthood Gulf Coast (PPGC) committed and condoned numerous acts of misconduct captured on video that reveal repeated program violations and breach the minimum standards of care required of it as a Medicaid enrollee. PPGC is being terminated from the program because of these program violations, which include, but are not limited to, the following:

1. The videos indicate that PPGC follows a policy of agreeing to procure fetal tissue even if it means altering the timing or method of an abortion. These practices violate accepted medical standards, as reflected in federal law, and are Medicaid program violations that justify termination. *See* 42 U.S.C. § 289g-1; 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

2. PPGC failed to prevent conditions that would allow the spread of infectious diseases among employees, as well as patients and the general public. Specifically, it allowed individuals posing as commercial buyers of fetal body parts to handle bloody fetal tissue while wearing only gloves. PPGC did not comply with mandatory "universal precautions," including the use of "protective barriers," required whenever anyone handles "blood," "non-intact skin," and "body fluids." *See* 25 TEX. ADMIN. CODE § 139.49; *see also* 29 CFR § 1910.1030. These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

3. PPGC staff were not trained in infection control and barrier precautions with regard to the handling of fetal blood and tissue or they failed to comply with the minimum standards that mandatory training requires with regard to these critical public health and safety issues. *See* 25 TEX. ADMIN. CODE § 139.49(b)(3). These program violations justify termination. *See* 1 TEX. ADMIN. CODE § 371.1659(2) and (6).

As a Planned Parenthood affiliate, you have agreed to abide by mandatory medical and operational standards established by the Planned Parenthood Federation of America (PPFA) located in Washington, D.C. You are a legal affiliate of the PPFA and of all similarly situated Planned Parenthood providers in Texas.

Our rules provide that if you are affiliated with a provider that commits program violations subjecting it to enrollment termination, then you, as an affiliate, are

App.654

PPGC00147354

Notice of Termination
October 19, 2015
Page 3

subject to the same enrollment termination. *See* 1 TEX. ADMIN. CODE § 371.1703(c)(7).

The definitions section of our rule substantiates the conclusion that you are an affiliate of PPGC. It provides that an enrolled provider is an affiliate of another enrolled provider if it "shares any identifying information, including ... corporate or franchise name." You share such identifying information with PPGC and are thus subject to termination. *See* 1 TEX. ADMIN. CODE § 371.1607(3)(I).

Our decision to terminate all affiliates in Texas finds support in the extensive video evidence filmed at PPGC and other Parenthood affiliates across the country, including video footage of the Medical Director of PPFA who appears to not only condone such program violations but also endorse them. This suggests that the program violations recorded at PPGC reflect PPFA national policy or accepted practice, which explains in part their widespread occurrence across the country among Planned Parenthood affiliates. As an affiliate of PPGC, you are now being terminated from the Medicaid program. *See* 1 Tex. Admin. Code Sec. 371.1703(c)(7).

B. My office has information suggesting that fraud and other related program violations have been committed by a number of Planned Parenthood affiliates enrolled in the Medicaid program in Texas. For example, there is reliable information indicating a pattern of illegal billing practices by Planned Parenthood affiliates across the State.

Our prima facie case of fraud is supported by related cases involving fraudulent practices identified by Whistleblowers from inside the Texas Planned Parenthood network. These Whistleblowers alleged in federal court that Planned Parenthood encourages employees to knowingly file false claims. *See, e.g*, Settlement Agreement, *Reynolds v. Planned Parenthood Gulf Coast*, No. 9:09-cv-124 (E.D. Tex. July 25, 2013) (lawsuit by a health care assistant who worked at Planned Parenthood Gulf Coast for 10 years alleging Medicaid fraud); Memorandum Opinion and Order, *Carroll v. Planned Parenthood Gulf Coast*, 4:12-cv-03505 (S.D. Tex. May 14, 2014) (lawsuit by a former accounts-receivable manager at Planned Parenthood Gulf Coast alleging Medicaid fraud).

In *Reynolds*, a Planned Parenthood Whistleblower alleged sufficient evidence of fraud to assure the federal court handling the matter that the case was worth pursuing, after which Planned Parenthood promptly settled the lawsuit for $4.3 million. Furthermore when the United States Department of Justice (DOJ) announced the 2013 settlement in *Reynolds*, it openly and compellingly criticized PPGC for "abuse of programs that are extremely important to the well-being of many American women." Further, the DOJ was "particularly grateful to the Whistleblower" who came forward for revealing that PPGC had

Notice of Termination
October 19, 2015
Page 4

billed the Texas Medicaid program, Title XX, and the Women's Health Program "for items and services that were either medically unnecessary or were never actually provided."

The varied program violations by Planned Parenthood revealed in these two federal cases and the information my office has recently received regarding similar program violations supports this Notice of Termination. *See* 1 Tex. Admin. Code § 371.1653. As per Paragraph A, *supra*, your affiliation with Planned Parenthood entities in Texas about which there is reliable evidence of fraud and other program violations substantiates your termination as an enrollee in the Medicaid program. *See* 1 TEX. ADMIN. CODE §§ 371.1703(c)(6), (c)(7), and (c)(8).

## II. PROCESS

You may request an Informal Resolution Meeting (IRM) with my legal staff to discuss the findings in this Notice of Termination. If you wish to pursue an IRM, you must file a written request with my office <u>on or before the 30th calendar day from the date you received this Notice of Termination</u>.

Your request for an IRM must:

1. Be sent by certified mail to my office at the address specified below;
2. Include a statement as to the specific issues, findings, and legal authority in the Notice of Termination with which you disagree; and
3. Be signed by you or your attorney.

In the alternative, you may submit, <u>within 30 calendar days of receipt of this Notice,</u> any documentary evidence and written argument regarding whether this Notice of Termination is warranted. *See* 1 TEX. ADMIN. CODE § 371.1613 (d). You must state the specific issues, findings, and legal authority that support your contention that this Notice is improper.

In the further alternative, you may both request an IRM and submit documentary evidence and written argument to contest this Notice of Termination.

## III. FINAL TERMINATION

If you fail to respond to this Notice of Termination <u>within 30 calendar days of receipt</u>, then we will issue a Final Notice of Termination. Alternatively, if the IRM fails to resolve the case, then we will similarly issue a Final Notice of Termination. You have 15 days after receipt of the Final Notice of Termination to request an administrative hearing to appeal the Final Notice before an Administrative Law Judge at the Texas Health and Human Services Commission.

A. The effective date of your final termination from the Medicaid program will be either:

PPGC00147356

Notice of Termination
October 19, 2015
Page 5

1. Upon the expiration of 15 calendar days after receipt of the Final Notice of Termination, if you do not timely request an administrative hearing before HHSC; or
2. The date of any final order issued by an HHSC Administrative Law Judge affirming the Final Notice of Termination.

B. Once the Final Notice of Termination becomes effective, the following events immediately occur:

1. Your enrollment in the Medicaid program terminates;
2. Your Texas Provider Identification Number is revoked; and
3. Your enrollment in the Medicaid program of any other state may be subject to revocation.

If, after your termination from the Texas Medicaid program, you wish to enter the program again, you must apply for re-enrollment.

## NOTICE

**IF YOU DO NOT RESPOND TO THIS NOTICE WITHIN 30 CALENDAR DAYS FROM THE DATE YOU RECEIVED IT, WE WILL ISSUE A FINAL NOTICE OF TERMINATION.**

Requests for an IRM and/or the provision of additional documentary evidence and written argument should be mailed via certified mail to the following address:

Texas Health and Human Services Commission
Office of Inspector General
Mail Code 1358
P.O. 85200
Austin, Texas 78708-5200

Respectfully yours,

Stuart W. Bowen, Jr.

# EXHIBIT B

App.658

PPGC00147358



# OFFICE OF INSPECTOR GENERAL
TEXAS HEALTH & HUMAN SERVICES COMMISSION

STUART W. BOWEN, JR.
INSPECTOR GENERAL

December 20, 2016

***** **FINAL NOTICE OF TERMINATION OF ENROLLMENT** *****

*Via First Class Mail and CMRRR Nos. 7011 2970 0004 0129 1228, 7011 2970 0004 0129 1235, 7011 2970 0004 0129 1242, 7011 2970 0004 0129 1259, 7011 2970 0004 0129 1266 and 7011 2970 0004 0129 1273*

Planned Parenthood Gulf Coast
Registered Agent: Melaney Linton
4600 Gulf Freeway
Houston, Texas 77023-3548

Planned Parenthood of Greater Texas / Planned Parenthood of North Texas
Registered Agent: Kenneth Lambrecht
7424 Greenville Avenue, Suite 206
Dallas, Texas 75231-4534

Planned Parenthood San Antonio / Planned Parenthood South Texas Surgical Center / Planned Parenthood Association of Cameron and Willacy County
Registered Agent: Jeffrey Hons
2140 Babcock Road
San Antonio, Texas 78229-0000

Re:     Planned Parenthood Final Notice of Termination

Dear Provider:

## I. FINAL NOTICE OF TERMINATION

This notice is to inform you that the Texas Health and Human Services Commission's Office of Inspector General (HHSC-IG) is hereby terminating the enrollment of the following providers and associated Texas Provider Identification (TPI) numbers from the Texas Medicaid program: Planned Parenthood Gulf Coast, Planned Parenthood of Greater Texas, Planned Parenthood of North Texas, Planned Parenthood San Antonio, Planned Parenthood South Texas Surgical Center, and Planned Parenthood Association of Cameron and Willacy County (hereafter Planned Parenthood, you, or your). 1 Tex. Admin. Code § 371.1703(e) (2016). *See* Attachment A for list of TPI numbers. Because of the violations listed below, HHSC-IG finds that you are not qualified

App.659

PPGC00147359

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **2** of **6**

to provide medical services in a professionally competent, safe, legal and ethical manner under the relevant provisions of state and federal law pertaining to Medicaid providers.

The basis for your termination and the termination of your affiliates stems from an extensive undercover video obtained by the Center for Medical Progress at the Planned Parenthood Gulf Freeway facility in April 2015, which contains evidence that Planned Parenthood violated state and federal law. The evidence arises from detailed discussions with the Planned Parenthood Gulf Coast's staff. In addition, the United States House of Representatives' Select Investigative Panel (House Investigative Panel) uncovered evidence consistent with and supportive of this termination.[1]

The unedited video footage indicates that Planned Parenthood follows a policy of agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion. These practices violate accepted medical standards, as reflected in federal and state law, and are Medicaid program violations that justify termination. *See* 42 U.S.C. § 289g-1; 42 U.S.C. § 289g-2; 1 Tex. Admin. Code § 371.1659(2) and (6); 1 Tex. Admin. Code § 371.1661; 1 Tex. Admin. Code § 371.1703(c)(6); 1 Tex. Admin. Code § 371.1605(a); 1 Tex. Admin. Code § 371.1603(g)(5) and (7). The HHSC-IG's Chief Medical Officer reviewed the video and concluded that your willingness to engage in these practices violates generally accepted medical standards, and thus you are not qualified to provide medical services in a professionally competent, safe, legal and ethical manner.

The video reveals numerous violations of generally accepted standards of medical practice. Examples include:

1. a history of deviating from accepted standards to procure samples that meet researcher's needs;

2. a history of permitting staff physicians to alter procedures to obtain targeted tissue samples needed for their specific outside research;

3. a willingness to convert normal pregnancies to the breech position to ensure researchers receive intact specimens;

4. an admission that "we get what we need to do to alter the standard of care where we are still maintaining patient safety, still maintaining efficiency in clinic operations, but we integrate research into it";

5. an admission that Planned Parenthood gets requests for "information from our study sponsor on what data they need that is not our standard of care," and that you provide what

---

[1] On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel, a bipartisan panel, to conduct a full and complete investigation of the medical practices of abortion providers and the practices of entities that procure and transfer fetal tissue. On December 1, 2016, the Investigative Panel referred its evidence to the Texas Attorney General.

App.660

PPGC00147360

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page 3 of 6

    is needed by creating a separate research protocol or template that can include medically unnecessary testing; and

6.  a willingness to charge more than the costs incurred for procuring fetal tissue.

In addition, HHSC-IG has evidence that you engaged in misrepresentations about your activity related to fetal tissue procurements, as revealed by evidence provided by the House Investigative Panel. These misrepresentations show that you are not qualified to provide medical services in a professionally competent, safe, legal and ethical manner, and thus they support this termination. *See* 1 Tex. Admin. Code § 371.1661; 1 Tex. Penal Code § 37.08; 1 Tex. Admin. Code § 371.1603(g)(6); 42 U.S.C. § 1320a-7(b)(5); 42 U.S.C. § 1320a-7(b)(16); 1 Tex. Admin Code § 371.1651(15); 1 Tex. Admin. Code § 371.1655(7); 1 Tex. Admin. Code. § 371.1655(24); 1 Tex. Admin. Code § 371.1605(a).

In the *HHSC Medicaid Provider Agreement*, you agreed to comply with all of the requirements in Title 1, Part 15, Chapter 371 of the Texas Administrative Code, the Texas Medicaid Provider Procedures Manual, and all state and federal laws governing or regulating Medicaid. You further acknowledged in that agreement that failing to comply with any applicable law, rule, or policy of the Medicaid program or permitting circumstances that potentially threaten the health or safety of a client would be grounds for termination of your enrollment.

Your misconduct is directly related to whether you are qualified to provide medical services in a professionally competent, safe, legal and ethical manner. Your actions violate generally accepted medical standards, as reflected in state and federal law, and are Medicaid program violations that justify termination.

HHSC-IG rules provide that if you are affiliated with a provider that commits a program violation subjecting it to enrollment termination, then the affiliate is also subject to enrollment termination. *See* 1 Tex. Admin. Code §371.1703(c)(7); 1 Tex. Admin. Code §371.1605(a). Furthermore, the video and other evidence provide numerous indicia of affiliation, including:

1.  common identifying information among affiliates;

2.  individual providers working across affiliates;

3.  a requirement that affiliates follow protocols and procedures prescribed by the Planned Parenthood Federation of America;

4.  a requirement that affiliates report research studies to the Planned Parenthood Federation of America;

5.  Planned Parenthood Federation of America provides for the legal review of research contracts;

6.  Planned Parenthood Federation of America requires training for affiliates;

7.  Planned Parenthood Federation of America provides certification of affiliates;

App.661

PPGC00147361

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **4** of **6**

8. Planned Parenthood Federation of America centralizes the oversight, use, and review of research projects; and

9. Planned Parenthood affiliates may use research agreements at one affiliate to facilitate additional research at other affiliates.

## II. SCOPE OF TERMINATION

The termination of your enrollment means that:

1. Your contract with the Texas Medicaid program will be nullified on the effective date of the termination. 1 Tex. Admin. Code § 371.1703(g)(1);

2. The TPI Number(s) related to your contract will become ineffective on the effective date of the termination;

3. No items or services furnished under your TPI will be reimbursed by the Medicaid program, after your enrollment is terminated. 1 Tex. Admin. Code § 371.1703(g)(2);

4. You will be required to re-enroll in the Texas Medicaid program, if you wish to participate as a Texas Medicaid provider. 1 Tex. Admin. Code § 371.1703(g)(3);

5. Your enrollment or contract in the Medicare program may be subject to termination. 1 Tex. Admin. Code § 371.1703(g)(4);

6. Your enrollment or contract in the Medicaid program of any other state may be subject to termination. *Id.*; and

7. This termination will remain in effect until such time as you re-enroll and are approved to participate as a Texas Medicaid provider.

## III. APPEAL PROCESS

You may appeal this enrollment termination. In order to do so, **HHSC-IG must <u>receive</u> a written request from you asking for an administrative hearing before HHSC's appeals division on or before the 15th calendar day from the date you receive this notice.** 1 Tex. Admin. Code § 371.1703(f)(2).

All submissions, including your request for an administrative hearing, should be mailed to:

Texas Health and Human Services Commission
Office of Inspector General
Mail Code 1358
P.O. Box 85200
Austin, Texas 78708-5200

App.662

PPGC00147362

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **5** of **6**

Pursuant to 1 Tex. Admin. Code §§ 371.1615(b)(2) and (4), any request for an administrative hearing must:

1. be sent by certified mail to the address specified above;

2. include a statement as to the specific issues, findings, and/or legal authority in the notice letter with which you disagree;

3. state the bases for your contention that the specific issues or findings and conclusions of HHSC-IG are incorrect;

4. be signed by you or your attorney; and

5. arrive at the address specified above on or before the 15th calendar day from the date you receive this Final Notice of Termination.

**IF HHSC-IG DOES NOT RECEIVE A WRITTEN RESPONSE TO THIS NOTICE WITHIN 15 CALENDAR DAYS FROM THE DATE YOU RECEIVE IT, YOUR FINAL NOTICE OF TERMINATION WILL BE UNAPPEALABLE.**

## IV. TERM OF ENROLLMENT TERMINATION

The effective date of this enrollment termination depends upon whether you choose to appeal:

- If you do not request a hearing as discussed above, the effective date of your enrollment termination will be the 30th calendar day following your receipt of this Final Notice of Termination. 1 Tex. Admin. Code §§ 371.1615(c), 371.1617(a)(1), 371.1703(g)(8); or

- If you request an administrative hearing, then the effective date will be the date the administrative law judge's decision to uphold your enrollment termination becomes final. 1 Tex. Admin. Code § 371.1703(g)(7).

This enrollment termination is permanent. If you want to participate as a provider in the Texas Medicaid program in the future, you will be required to submit a new provider enrollment application. 1 Tex. Admin. Code § 371.1703(g)(3).

Respectfully yours,

Stuart W. Bowen, Jr.
Inspector General

Attachment

---

P. O. Box 85200, Austin, Texas 78708 • (512) 491-2000

App.663

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **6** of **6**

Attachment A

These are the TPIs that Texas Medical Health Partnership reports as affiliated with Planned
Parenthood and which are believed to be active:
2164345-01, 2164360-01, 1269599-06, 1269599-07, 1269599-10, 1269599-11, 2187189-01,
2815037-01, 2815060-01, 1126104-02, 1126104-04, 1126104-06, 1126104-07, 1126104-08,
1126104-09, 1126104-14, 3035461-01, 0834095-01, 0834095-02, 0834095-04, 1126104-05,
1126104-10, 1126104-11, 1126104-12, 1122699-01, 1122699-06, 1272197-02, 1272197-03,
1272197-05, 1272197-07, 1272197-10, 1272197-12, 1364812-06, 1364812-13, 2999112-01,
2999112-02, 2999112-03, 2999112-05, 2999112-08, 2999112-09, 3147803-01, 3150385-01,
3150484-01, 3159402-01, 2100489-01, 2120669-01, 2121964-01, 2096414-01, 2103566-01,
2109696-01, 3353781-01, 1373391-01, 1373391-10, 1373391-04, 1373391-11, 1373391-12,
2866873-01

App.664

PPGC00147364

# EXHIBIT C

PPGC00147365

**Planned Parenthood**®
Planned Parenthood South Texas

**Planned Parenthood**®
Care. No matter what.
Planned Parenthood of Greater Texas

**Planned Parenthood**®
Care. No matter what.
Planned Parenthood Gulf Coast

December 14, 2020

Executive Commissioner Cecile Young
Texas Health and Human Services Commission
4900 N. Lamar Boulevard
Austin, TX 78751
P.O. Box 13247

Dear Executive Commissioner Young:

We write in light of the COVID-19 public health crisis facing Texas, to ask the Texas Health and Human Services Commission ("HHSC") to allow Planned Parenthood of Greater Texas, Planned Parenthood South Texas, and Planned Parenthood Gulf Coast (collectively, "Planned Parenthood providers") to continue serving Texans insured through the Medicaid program. At minimum, it is imperative that HHSC permit a brief grace period so that Planned Parenthood providers can provide continuity of care throughout the holiday season and the current crisis point of the pandemic.

### The Shortage of Texas Medicaid Providers in the Current Public Health Crisis and Planned Parenthood's Essential Role

As HHSC is well aware, Texas is one of the hardest-hit states in the worst public health crisis to face this country since the flu pandemic of 1918–19. More than 1.2 million Texans have been infected with COVID-19, and more than 23,000 have died from it.[1] As Governor Abbott has repeatedly recognized, including as recently as December 6, 2020, COVID-19 "poses an imminent threat of disaster for all counties in the State of Texas."[2] Indeed, on December 10, 2020, 12,211 new coronavirus cases were reported in Texas—a figure exceeding July's record high.[3] Hospitalization rates are currently highest in Northern and Western Texas, where many rural hospitals are "overwhelmed" and have "reported difficulty transferring patients to bigger, better-

---

[1] *COVID Data Tracker*, CDC, https://covid.cdc.gov/covid-data-tracker/ (last visited Dec. 11, 2020).

[2] Tex. Proclamation (Dec. 6, 2020), https://gov.texas.gov/uploads/files/press/DISASTER_renewing_ covid19_disaster_proclamation_IMAGE_12-06-2020.pdf; *see also* Tex. Exec. Order GA 28 (June 26, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-28_targeted_response_to_reopening_COVID-19.pdf.

[3] Tex. Trib. Staff, *Coronavirus in Texas*, Tex. Trib. (Dec. 11, 2020), https://archive.org/details/httpsapps. texastribune.orgfeatures2020texas-coronavirus-cases-map.

App.666

PPGC00147366

equipped facilities in larger cities."[4] The virus has had a disproportionate toll on Black and Latinx Texans, who have died at rates higher than their share of the state's population.[5]

For decades, Planned Parenthood providers have been an essential part of the public health safety net in Texas, providing high-quality and accessible preventative health care to Texans insured through the Medicaid program. Since January 2017, when the Medicaid termination was first scheduled to go into effect, Texas's Planned Parenthood providers have provided more than 51,000 health care visits to approximately 24,000 Medicaid patients. Indeed, in those four years, Planned Parenthood's 30 health centers across the state have provided over 44,000 tests for sexually transmitted infections (including HIV screenings), more than 2,100 cancer screenings, more than 52,000 units of contraception (including hormonal birth control and long-acting reversible contraception), and more than 4,400 annual well visits to Medicaid-insured Texans, without any claim of wrongdoing by HHSC.

Texas has some of the most stringent Medicaid requirements in the country: to be eligible, a patient must not only have a low income, but also have dependent children or a disability that keeps them from working.[6] And the income restrictions are strict; for example, to qualify for Medicaid a single woman with a dependent child must have a monthly income of under $196, well below the federal poverty guideline.[7] Texas Medicaid patients are therefore an especially vulnerable population, who already face severe obstacles in accessing health care.

Moreover, it is well-documented that people of color in the United States are disproportionately unable to access quality health care due to the intersections of racism, sexism, classism, xenophobia, and other systemic barriers, making them more likely to rely on Medicaid.[8] Policies

---

[4] Shawn Mulcahy, *"We Are in a Very Dangerous Place": White House COVID-19 Task Force Pleads with Texas Health Officials to Warn the Public*, Tex. Trib. (Dec. 3, 2020), https://www.texastribune.org/2020/12/03/texas-coronavirus-white-house/.

[5] Emma Platoff & Carla Astudillo, *Across Texas and the Nation, the Novel Coronavirus is Deadlier for People of Color*, Tex. Trib. (July 30, 2020), https://www.texastribune.org/2020/07/30/texas-coronavirus-deaths/.

[6] Sophie Novak, *Who Really Gets Government Benefits in Texas?*, Tex. Observer (June 22, 2017), https://www.texasobserver.org/who-gets-benefits-texas-medicaid-cuts/; Shannon Najmabadi & Edgar Walters, *They Lost Their Jobs and Insurance in the Pandemic. Now They're Slipping Through Texas' Health Care Safety Net*, Tex. Trib. (May 22, 2020), https://www.texastribune.org/2020/05/22/texas-medicaid-health-insurance-coronavirus/.

[7] Tex. Health and Hum. Servs., *Medicaid for Parents & Caretakers*, https://hhs.texas.gov/services/health/medicaid-chip/programs-services/children-families/medicaid-parents-caretakers (last visited Dec. 11, 2020). The 2020 Federal Poverty Guideline for a family of two is $17,240 per year, or about $332 per week. *See* U.S. Dep't of Health and Hum. Servs., 2020 Poverty Guidelines (Jan. 21, 2020), https://aspe.hhs.gov/2020-poverty-guidelines.

[8] Hannah Katch et al., *Medicaid Works for Women–But Proposed Cuts Would Have Harsh, Disproportionate Impact*, Ctr. on Budget & Policy Priorities (May 11, 2017),

App.667

PPGC00147367

that restrict Medicaid access, therefore, exacerbate these systemic barriers for Black and Latinx communities—the same groups who have been disproportionately affected by the COVID-19 crisis.

In part because of low reimbursement rates and onerous reimbursement policies, Texas suffers from a shortage of willing Medicaid providers. According to the Texas Medical Association, in 2014, only 34 percent of physicians were willing to take on new Medicaid patients.[9] Planned Parenthood providers know this first-hand, from the hours staff spend on the phone trying to find providers who will accept a referral to begin lifesaving medical care when patients receive a positive result from a cancer screening, or when Medicaid patients require referrals for other urgent care. In the pandemic, this crisis has only worsened, as economic turmoil and sky-high unemployment rates[10] have increased the number of Texans eligible for Medicaid.[11]

Planned Parenthood health centers, in Texas and across the country, serve an outsized role in meeting the health care needs for those who are enrolled in federally funded health programs like Medicaid. More than half of Planned Parenthood health centers provide care to underserved patient communities in Health Professional Shortage Areas, Medically Underserved Areas, or Rural

---

https://www.cbpp.org/research/health/medicaid-works-for-women-but-proposed-cuts-would-have-harsh-disproportionate-impact; David R. Williams & Toni D. Rucker, *Understanding and Addressing Racial Disparities in Health Care*, 21 Health Care Fin. Rev. 75 (2000); UCLA Ctr. for Health Policy Rsch. & Henry J. Kaiser Fam. Found., *Racial and Ethnic Disparities in Access to Health Insurance and Health Care* (Apr. 2000), https://www.kff.org/wp-content/uploads/2013/01/racial-and-ethnic-disparities-in-access-to-health-insurance-and-health-care-report.pdf.

[9] Ashley Lopez, *Texas Lawmakers Look for the Cure to Fewer Doctors Taking Medicaid Patients*, KUT 90.5 (Mar. 9 2016), https://www.kut.org/health/2016-03-09/texas-lawmakers-look-for-the-cure-to-fewer-doctors-taking-medicaid-patients.

[10] Tex. Workforce Comm'n, *Unemployment Rate Is 8.3 Percent in September* (Oct. 16, 2020), https://www.twc.texas.gov/unemployment-rate-83-percent-september; Anna Novak & Mitchell Ferman, *Texans Have Filed More Than 3.9 Million Unemployment Claims During the Coronavirus Pandemic*, Tex. Trib. (Dec. 10, 2020), https://apps.texastribune.org/features/2020/texas-unemployment/; Chris Mathews, *Texas Weekly Unemployment Claims Reach Lowest Level Since March–But Still Much Higher Than Normal*, Austin Bus. J. (Nov. 13, 200), https://www.bizjournals.com/austin/news/2020/11/13/texas-unemployment-claims-november-7-coronavirus.html; Erika Esquivel, *West Texas Unemployment Claims Increase in November*, KFOX14 (Nov. 24, 2020), https://kfoxtv.com/news/local/west-texas-unemployment-claims-increase-in-november; Diana Zoga & Eva Parks, *Up to 830,000 Texans Impacted by Expiring Unemployment Benefits*, NBCDFW (Dec. 3, 2020), https://www.nbcdfw.com/news/nbc-5-responds/up-to-830000-texans-impacted-by-expiring-unemployment-benefits/2496079/.

[11] Shannon Najmabadi & Edgar Walters, *They Lost Their Jobs and Insurance in the Pandemic. Now They're Slipping Through Texas' Health Care Safety Net*, Tex. Trib. (May 22, 2020), https://www.texastribune.org/2020/05/22/texas-medicaid-health-insurance-coronavirus/ ("In Texas and the other states that rejected Medicaid expansion, one-third of the newly jobless are estimated to get Medicaid, with 40% becoming uninsured.").

PPGC00147368

Areas.[12] Planned Parenthood health centers are also considerably more likely to offer Medicaid patients a broader range of birth control methods than other providers.[13] In a study of Community Health Centers, 69 percent reported referring their patients to family planning providers, like Planned Parenthood health centers, for family planning care.[14] Indeed, Planned Parenthood Providers have continued to conduct STI testing and treatment for Medicaid patients in Texas while the pandemic has strained the capacity of other health care providers to offer these services across the country.

For many young women of reproductive age in Texas, Planned Parenthood is their only source of health care. Planned Parenthood designs its services around the reality that patients with low incomes face grave barriers to health care such as childcare and work obligations, limited transportation, and inflexible work schedules, and strive to accommodate these restrictions by offering evening and weekend hours, walk-in appointments, short wait times, bilingual staff or translation services, and same-day contraceptive services. Patients choose Planned Parenthood for its uniquely non-judgmental, high-quality and accessible care.

During this public health crisis, it is more important than ever that patients have access to uninterrupted health care. When people can't access Medicaid coverage or are unable to see the provider they know and trust, they may simply forgo critical health care. Indeed, Texas has gone down this road before with the Texas Women's Health Program in 2013; a study in the *New England Journal of Medicine* showed that blocking patients from going to Planned Parenthood providers in Texas was associated with a 35 percent decline in women in publicly funded programs using the most effective methods of birth control and a dramatic 27 percent increase in births among women who had previously accessed injectable contraception through those programs.[15] In other words, women who could not financially afford health care at other places were not able to receive health care at all.[16]

---

[12] Planned Parenthood Federation of America, *The Irreplaceable Role of Planned Parenthood Health Centers* (Jan. 2019), https://www.plannedparenthood.org/uploads/filer_public/33/63/3363814b-938e-4ad5-87d2-57ee98790766/190117-irreplaceable-role-pp-v01.pdf.

[13] *Id.*

[14] Susan Wood et al., George Washington University School of Public Health and Health Services, *Health Centers and Family Planning: Results of a Nationwide Study*, at 26 (Mar. 7, 2013), http://www.rchnfoundation.org/wp-content/uploads/2013/04/Health_Centers_and_Family_Planning-final-1.pdf.

[15] Amanda J. Stevenson et al., *Effect of Removal of Planned Parenthood from the Texas Women's Health Program*, New Eng. J. Med. (Mar. 3, 2016), https://www.nejm.org/doi/full/10.1056/NEJMsa1511902.

[16] *Id.*

4

App.669

PPGC00147369

**The Medicaid Terminations**

As HHSC is aware, over the past four years Texas has sought to terminate the Planned Parenthood Providers from the Medicaid program not because of any failure to provide high-quality health care, but because of a widely-debunked video about Planned Parenthood Gulf Coast made by a discredited group determined to end abortion access, even using unlawful tactics to pursue their goal. Indeed, those responsible for the video are currently awaiting trial on multiple felony charges in California for actions related to the smear campaign.[17]

Following the release of the unlawfully-recorded videos, a Harris County grand jury looked at the allegations made against Planned Parenthood Gulf Coast and found no wrongdoing. Likewise, investigations in at least 13 states concluded that Planned Parenthood engaged in no wrongdoing,[18] and eight other states declined to investigate at all, citing lack of evidence. What's more, none of the many heavily partisan congressional investigations[19]—including a select panel created for that sole purpose—concluded that any Planned Parenthood provider violated any laws or ethical obligations.[20]

At any rate, two of the three Texas Planned Parenthood providers (Planned Parenthood Greater Texas and Planned Parenthood South Texas) do not even appear on the discredited video. Texas has nevertheless sought to terminate them from Medicaid on the basis that they share the name "Planned Parenthood"—despite the grave public health harms such termination would cause, particularly during the COVID-19 pandemic.

---

[17] Moreover, in November 2019, a jury empaneled by a federal district court found that the Center for Medical Progress (CMP) and those who manufactured the discredited campaign broke multiple state and federal laws in their efforts to discredit Planned Parenthood. The jury awarded Planned Parenthood both compensatory and punitive damages, totaling more than $2 million, for the injuries that CMP and its co-conspirators caused. The trial court made clear that the only people who engaged in wrongdoing were those behind the smear campaign, explaining that "[t]he 'evidence' defendants actually gathered and then published as a result of the conduct the jury found was illegal did not itself show any illegal conduct by Planned Parenthood or plaintiff affiliates." *See* Order Resolving Unfair Competition Claim & Entering Judgment, *Planned Parenthood Federation of America v. Center for Medical Progress*, Case No. 16-cv-00236 (N.D. Cal. Apr. 29, 2020), https://www.plannedparenthood.org/uploads/filer_public/69/55/69556c 3a-cc90-4017-b43794a8857562f1/1073_order_resolving_unfair_comp_claim_and_entering_judgment _1.pdf.

[18] Kate Sarna, *Growing List of Planned Parenthood Investigations Hyped by Conservative Media Clears Organization of Any Wrongdoing*, Media Matters (Aug. 24, 2015), https://www.mediamatters.org/researc h/2015/08/24/growing-list-of-planned-parenthood- investigation/205116.

[19] Emily Crockett, *Congress Has Spent 15 Months "Investigating" Planned Parenthood Using McCarthy-Like Tactics*, Vox (Dec. 7, 2016), https://www.vox.com/2016/4/29/11469044/congress-planned-parenthood-witch-hunt-fetal-tissue-scientists.

[20] Meredith Wadman, *Fact-Checking Congress's Fetal Tissue Report*, Science Magazine (Jan. 5, 2017), https://www.sciencemag.org/news/2017/01/fact-checking-congress-s-fetal-tissue-report.

App.670

PPGC00147370

* * *

For these reasons, in light of the five years that have passed since the claimed wrongdoing in the videos (which two of the three Planned Parenthood providers were not on) and the high-quality services the Planned Parenthood providers have provided to approximately 24,000 Medicaid patients since then, we ask that you allow us to remain in the Medicaid program so that our skilled clinicians can continue providing medical care to the most vulnerable Texans during this public health crisis.

In the alternative, at minimum, we respectfully request a six-month grace period to allow our patients to take care of urgent health needs during this crisis stage of this pandemic, and to allow us to help our patients attempt to find new providers willing to accept new patients insured through Medicaid. The well-being of patients is our top priority and we fear that abruptly discontinuing services will leave patients with nowhere else to turn during a pandemic that has pushed the capacity of our health care system to the brink. We would very much like to continue to serve these patients, but hope that, at a minimum, we can work with HHSC to establish a smooth transition period for the thousands of Texans we serve every year through the Medicaid program.

Respectfully,

Ken Lambrecht
President & CEO, Planned
Parenthood Greater Texas

Jeffrey Hons
President & CEO, Planned
Parenthood South Texas

Melaney Linton
President & CEO, Planned
Parenthood Gulf Coast

Cc:   Stephanie Stephens, Deputy Executive Commissioner Medicaid/CHIP
      Karen Ray, HHSC Chief Counsel
      Patrick Sweeten, Associate Deputy Attorney General for Special Litigation
      Adam Biggs, Special Litigation Counsel

App.671

PPGC00147371

# EXHIBIT D

App.672

PPGC00147372

# HUSCH BLACKWELL

Michael R. Crowe
Partner

111 Congress Avenue, Suite 1400
Austin, TX 78701
Direct:  512.703.5737
Fax:     512.480-5041
michael.crowe@huschblackwell.com

December 15, 2020

*Via Certified Mail*
*Return Receipt Requested*

Texas Health and Human Services Commission
Office of Inspector General
Mail Code 1358
PO Box 85200
Austin, Texas 78708

> RE:   Planned Parenthood of Greater Texas, Planned Parenthood of Greater Texas
> Family Planning and Preventative Health Services, Planned Parenthood San Antonio,
> Planned Parenthood South Texas Surgical Center, Planned Parenthood Cameron County,
> Planned Parenthood Gulf Coast
> APPEAL OF TERMINATION

To Whom It May Concern:

Husch Blackwell, LLP (the "Firm") represents Planned Parenthood of Greater Texas, Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Planned Parenthood San Antonio, Planned Parenthood South Texas Surgical Center, Planned Parenthood Cameron County, and Planned Parenthood Gulf Coast (collectively, the "Providers") in connection with a letter dated December 20, 2016, as well as a letter dated October 19, 2015, (together, the "Notices of Termination"), copies of which are attached) from the Texas Health and Human Services Commission Office of Inspector General ("OIG") purporting to terminate the enrollment of Providers from the Texas Medicaid program and Texas Provider Identification Numbers associated with them. The termination action was subsequently enjoined by a federal district court. Recently, the 5th Cir. reversed that preliminary injunction, and mandate from that order issued today.

If the OIG desires to continue the termination action described in the Notice of Termination, we presume it will issue required notice pursuant to HRC 32.034 and 1 TAC 371.1703(e) to effectuate the termination process that was never completed in 2016.

**HOWEVER, IN AN EXCESS OF CAUTION, TO THE EXTENT HHSC MAY BELIEVE THE 2016 NOTICE OF TERMINATION TO CONTINUE TO HAVE LEGAL EFFECT,**

HB: 4828-4150-7028.2

App.673

**HUSCH BLACKWELL**

**THE PROVIDERS HEREBY REQUEST A FORMAL APPEAL OF THE TERMINATION.
The basis for the appeal is as follows:**

The Providers dispute that they committed any wrongful conduct and/or program violations described in the Notices of Termination. The Providers dispute that the facts alleged in the Notice of Termination actually occurred and/or that those facts, as applied to the laws and program requirements in question, support a conclusion that wrongful conduct and/or program violations occurred. In the alternative, the Providers dispute whether the facts, as applied to the laws and program requirements in question, support the termination, including but not limited to because the Providers dispute their termination for the conduct of "affiliated" Providers and further dispute the validity of any provision purporting to authorize such termination. In the alternative, the Providers, based on information and belief, assert that the OIG failed to comply with applicable laws necessary for it to impose the termination action. Finally, the Providers dispute the lawfulness of effectuating this termination process, which was initiated in 2015 and 2016, in light of the current public health crisis and given that in the years since the allegations in the Notices of Termination Providers have provided high-quality Medicaid services without claim of wrongdoing by OIG.

All future communications relating to this matter should be directed to:

> Husch Blackwell LLP
> Attn:  Michael R. Crowe
> 111 Congress Ave., Ste. 1400
> Austin, Texas 78701
> Direct Phone No.:      512-703-5737
> Facsimile No.:      512-480-5041
> michael.crowe@huschblackwell.com

who will act as the lead attorney of the Firm on behalf of the Providers.

If you have any questions or comments regarding this matter, please feel free to contact the undersigned.

Sincerely,

MICHAEL R. CROWE

Encls.

cc:      Providers

Page 2 of 2

HB: 4828-4150-7028.2

PPGC00147374



# OFFICE OF INSPECTOR GENERAL
TEXAS HEALTH & HUMAN SERVICES COMMISSION

STUART W. BOWEN, JR.
INSPECTOR GENERAL

December 20, 2016

***** **FINAL NOTICE OF TERMINATION OF ENROLLMENT** *****

*Via First Class Mail and CMRRR Nos. 7011 2970 0004 0129 1228, 7011 2970 0004 0129 1235, 7011 2970 0004 0129 1242, 7011 2970 0004 0129 1259, 7011 2970 0004 0129 1266 and 7011 2970 0004 0129 1273*

Planned Parenthood Gulf Coast
Registered Agent: Melaney Linton
4600 Gulf Freeway
Houston, Texas 77023-3548

Planned Parenthood of Greater Texas / Planned Parenthood of North Texas
Registered Agent: Kenneth Lambrecht
7424 Greenville Avenue, Suite 206
Dallas, Texas 75231-4534

Planned Parenthood San Antonio / Planned Parenthood South Texas Surgical Center / Planned Parenthood Association of Cameron and Willacy County
Registered Agent: Jeffrey Hons
2140 Babcock Road
San Antonio, Texas 78229-0000

Re:     Planned Parenthood Final Notice of Termination

Dear Provider:

## I. FINAL NOTICE OF TERMINATION

This notice is to inform you that the Texas Health and Human Services Commission's Office of Inspector General (HHSC-IG) is hereby terminating the enrollment of the following providers and associated Texas Provider Identification (TPI) numbers from the Texas Medicaid program: Planned Parenthood Gulf Coast, Planned Parenthood of Greater Texas, Planned Parenthood of North Texas, Planned Parenthood San Antonio, Planned Parenthood South Texas Surgical Center, and Planned Parenthood Association of Cameron and Willacy County (hereafter Planned Parenthood, you, or your). 1 Tex. Admin. Code § 371.1703(e) (2016). *See* Attachment A for list of TPI numbers. Because of the violations listed below, HHSC-IG finds that you are not qualified

PPGC00147375

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **2** of **6**

to provide medical services in a professionally competent, safe, legal and ethical manner under the relevant provisions of state and federal law pertaining to Medicaid providers.

The basis for your termination and the termination of your affiliates stems from an extensive undercover video obtained by the Center for Medical Progress at the Planned Parenthood Gulf Freeway facility in April 2015, which contains evidence that Planned Parenthood violated state and federal law. The evidence arises from detailed discussions with the Planned Parenthood Gulf Coast's staff. In addition, the United States House of Representatives' Select Investigative Panel (House Investigative Panel) uncovered evidence consistent with and supportive of this termination.[1]

The unedited video footage indicates that Planned Parenthood follows a policy of agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion. These practices violate accepted medical standards, as reflected in federal and state law, and are Medicaid program violations that justify termination. *See* 42 U.S.C. § 289g-1; 42 U.S.C. § 289g-2; 1 Tex. Admin. Code § 371.1659(2) and (6); 1 Tex. Admin. Code § 371.1661; 1 Tex. Admin. Code § 371.1703(c)(6); 1 Tex. Admin. Code § 371.1605(a); 1 Tex. Admin. Code § 371.1603(g)(5) and (7). The HHSC-IG's Chief Medical Officer reviewed the video and concluded that your willingness to engage in these practices violates generally accepted medical standards, and thus you are not qualified to provide medical services in a professionally competent, safe, legal and ethical manner.

The video reveals numerous violations of generally accepted standards of medical practice. Examples include:

1. a history of deviating from accepted standards to procure samples that meet researcher's needs;

2. a history of permitting staff physicians to alter procedures to obtain targeted tissue samples needed for their specific outside research;

3. a willingness to convert normal pregnancies to the breech position to ensure researchers receive intact specimens;

4. an admission that "we get what we need to do to alter the standard of care where we are still maintaining patient safety, still maintaining efficiency in clinic operations, but we integrate research into it";

5. an admission that Planned Parenthood gets requests for "information from our study sponsor on what data they need that is not our standard of care," and that you provide what

---

[1] On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel, a bipartisan panel, to conduct a full and complete investigation of the medical practices of abortion providers and the practices of entities that procure and transfer fetal tissue. On December 1, 2016, the Investigative Panel referred its evidence to the Texas Attorney General.

App.676

PPGC00147376

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page 3 of 6

       is needed by creating a separate research protocol or template that can include medically unnecessary testing; and

6. a willingness to charge more than the costs incurred for procuring fetal tissue.

In addition, HHSC-IG has evidence that you engaged in misrepresentations about your activity related to fetal tissue procurements, as revealed by evidence provided by the House Investigative Panel. These misrepresentations show that you are not qualified to provide medical services in a professionally competent, safe, legal and ethical manner, and thus they support this termination. *See* 1 Tex. Admin. Code § 371.1661; 1 Tex. Penal Code § 37.08; 1 Tex. Admin. Code § 371.1603(g)(6); 42 U.S.C. § 1320a-7(b)(5); 42 U.S.C. § 1320a-7(b)(16); 1 Tex. Admin Code § 371.1651(15); 1 Tex. Admin. Code § 371.1655(7); 1 Tex. Admin. Code. § 371.1655(24); 1 Tex. Admin. Code § 371.1605(a).

In the *HHSC Medicaid Provider Agreement*, you agreed to comply with all of the requirements in Title 1, Part 15, Chapter 371 of the Texas Administrative Code, the Texas Medicaid Provider Procedures Manual, and all state and federal laws governing or regulating Medicaid. You further acknowledged in that agreement that failing to comply with any applicable law, rule, or policy of the Medicaid program or permitting circumstances that potentially threaten the health or safety of a client would be grounds for termination of your enrollment.

Your misconduct is directly related to whether you are qualified to provide medical services in a professionally competent, safe, legal and ethical manner. Your actions violate generally accepted medical standards, as reflected in state and federal law, and are Medicaid program violations that justify termination.

HHSC-IG rules provide that if you are affiliated with a provider that commits a program violation subjecting it to enrollment termination, then the affiliate is also subject to enrollment termination. *See* 1 Tex. Admin. Code §371.1703(c)(7); 1 Tex. Admin. Code §371.1605(a). Furthermore, the video and other evidence provide numerous indicia of affiliation, including:

1. common identifying information among affiliates;

2. individual providers working across affiliates;

3. a requirement that affiliates follow protocols and procedures prescribed by the Planned Parenthood Federation of America;

4. a requirement that affiliates report research studies to the Planned Parenthood Federation of America;

5. Planned Parenthood Federation of America provides for the legal review of research contracts;

6. Planned Parenthood Federation of America requires training for affiliates;

7. Planned Parenthood Federation of America provides certification of affiliates;

App.677

PPGC00147377

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **4** of **6**

8. Planned Parenthood Federation of America centralizes the oversight, use, and review of research projects; and

9. Planned Parenthood affiliates may use research agreements at one affiliate to facilitate additional research at other affiliates.

## II. SCOPE OF TERMINATION

The termination of your enrollment means that:

1. Your contract with the Texas Medicaid program will be nullified on the effective date of the termination. 1 Tex. Admin. Code § 371.1703(g)(1);

2. The TPI Number(s) related to your contract will become ineffective on the effective date of the termination;

3. No items or services furnished under your TPI will be reimbursed by the Medicaid program, after your enrollment is terminated. 1 Tex. Admin. Code § 371.1703(g)(2);

4. You will be required to re-enroll in the Texas Medicaid program, if you wish to participate as a Texas Medicaid provider. 1 Tex. Admin. Code § 371.1703(g)(3);

5. Your enrollment or contract in the Medicare program may be subject to termination. 1 Tex. Admin. Code § 371.1703(g)(4);

6. Your enrollment or contract in the Medicaid program of any other state may be subject to termination. *Id*.; and

7. This termination will remain in effect until such time as you re-enroll and are approved to participate as a Texas Medicaid provider.

## III. APPEAL PROCESS

You may appeal this enrollment termination. In order to do so, **HHSC-IG must <u>receive</u> a written request from you asking for an administrative hearing before HHSC's appeals division on or before the 15th calendar day from the date you receive this notice.** 1 Tex. Admin. Code § 371.1703(f)(2).

All submissions, including your request for an administrative hearing, should be mailed to:

Texas Health and Human Services Commission
Office of Inspector General
Mail Code 1358
P.O. Box 85200
Austin, Texas 78708-5200

App.678

PPGC00147378

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **5** of **6**

Pursuant to 1 Tex. Admin. Code §§ 371.1615(b)(2) and (4), any request for an administrative hearing must:

1. be sent by certified mail to the address specified above;

2. include a statement as to the specific issues, findings, and/or legal authority in the notice letter with which you disagree;

3. state the bases for your contention that the specific issues or findings and conclusions of HHSC-IG are incorrect;

4. be signed by you or your attorney; and

5. arrive at the address specified above on or before the 15th calendar day from the date you receive this Final Notice of Termination.

**IF HHSC-IG DOES NOT RECEIVE A WRITTEN RESPONSE TO THIS NOTICE WITHIN 15 CALENDAR DAYS FROM THE DATE YOU RECEIVE IT, YOUR FINAL NOTICE OF TERMINATION WILL BE UNAPPEALABLE.**

## IV. TERM OF ENROLLMENT TERMINATION

The effective date of this enrollment termination depends upon whether you choose to appeal:

- If you do not request a hearing as discussed above, the effective date of your enrollment termination will be the 30th calendar day following your receipt of this Final Notice of Termination. 1 Tex. Admin. Code §§ 371.1615(c), 371.1617(a)(1), 371.1703(g)(8); or

- If you request an administrative hearing, then the effective date will be the date the administrative law judge's decision to uphold your enrollment termination becomes final. 1 Tex. Admin. Code § 371.1703(g)(7).

This enrollment termination is permanent. If you want to participate as a provider in the Texas Medicaid program in the future, you will be required to submit a new provider enrollment application. 1 Tex. Admin. Code § 371.1703(g)(3).

Respectfully yours,

Stuart W. Bowen, Jr.
Inspector General

Attachment

App.679

PPGC00147379

Planned Parenthood
Final Notice of Termination
December 20, 2016
Page **6** of **6**

Attachment A

These are the TPIs that Texas Medical Health Partnership reports as affiliated with Planned
Parenthood and which are believed to be active:
2164345-01, 2164360-01, 1269599-06, 1269599-07, 1269599-10, 1269599-11, 2187189-01,
2815037-01, 2815060-01, 1126104-02, 1126104-04, 1126104-06, 1126104-07, 1126104-08,
1126104-09, 1126104-14, 3035461-01, 0834095-01, 0834095-02, 0834095-04, 1126104-05,
1126104-10, 1126104-11, 1126104-12, 1122699-01, 1122699-06, 1272197-02, 1272197-03,
1272197-05, 1272197-07, 1272197-10, 1272197-12, 1364812-06, 1364812-13, 2999112-01,
2999112-02, 2999112-03, 2999112-05, 2999112-08, 2999112-09, 3147803-01, 3150385-01,
3150484-01, 3159402-01, 2100489-01, 2120669-01, 2121964-01, 2096414-01, 2103566-01,
2109696-01, 3353781-01, 1373391-01, 1373391-10, 1373391-04, 1373391-11, 1373391-12,
2866873-01

App.680

PPGC00147380

# EXHIBIT E

PPGC00147381



**Texas Health and Human Services Commission**

Cecile Erwin Young
*Executive Commissioner*

January 4, 2021

Mr. Ken Lambrecht
President & CEO
Planned Parenthood Greater Texas
Via e-mail: Ken.Lambrecht@ppgt.org

Mr. Jeffrey Hons
President & CEO
Planned Parenthood South Texas
Via e-mail: Jeffrey.Hons@ppsouthtexas.org

Ms. Melaney Linton
President & CEO
Planned Parenthood Gulf Coast
*Via e-mail*: Melaney.Linton@ppgulfcoast.org

Re: Termination of Planned Parenthood Clinics from Texas Medicaid

Dear Mr. Lambrecht, Mr. Hons, and Ms. Linton:

The Texas Health and Human Services Commission received your letter dated December 14, 2020, expressing your requests (1) to continue in the Medicaid program, or in the alternative, (2) for your Medicaid patients to be granted a grace period to find other providers.  Your request to continue in the Medicaid program is denied, as the Fifth Circuit Court of Appeal's December 15, 2020, mandate vacated the District Court's injunction against the termination of your clinics from the Medicaid program.

Your alternative request for a grace period will be granted in part.  Your clinics may no longer accept any new Medicaid clients.  There will be a 30-day grace period (from the date of this letter, or until February 3, 2021) to ensure that current

Mr. Ken Lambrecht
Mr. Jeffrey Hons
Ms. Melaney Linton
January 4, 2021
Page 2

Medicaid clients receiving services at your clinics can be transitioned to new providers.

Your clients who are members of a Managed Care Organization (MCO) will be notified by their MCO of the process to transition to a new provider. If your clients have questions, please have them reach out to their MCO member services help line for assistance.  Clients who are not members of an MCO may search for a new provider on the TMHP website at: http://opl.tmhp.com/ProviderManager/AdvSearch.aspx?_ga=2.258477834.120404 8620.1609338635-1213096652.1609338635.

Sincerely,


Karen Ray
Chief Counsel

# EXHIBIT F

PPGC00147384



# OFFICE OF INSPECTOR GENERAL

## TEXAS HEALTH & HUMAN SERVICES COMMISSION

SYLVIA HERNANDEZ KAUFFMAN
INSPECTOR GENERAL

January 4, 2021

**VIA CERTIFIED MAIL NO.: 7020 0640 0000 9309 6268**
**AND VIA FIRST CLASS MAIL**
**AND VIA ELECTRONIC MAIL:** Michael.Crowe@huschblackwell.com
Michael R. Crowe
Husch Blackwell LLP
111 Congress Ave., Ste. 1400
Austin, Texas 78701

> **Re:**   Planned Parenthood of Greater Texas, OIG Case No.
> 2020D04235
> Planned Parenthood of Greater Texas Family Planning and
> Preventative Health Services
> Planned Parenthood San Antonio, OIG Case No. 2020D04237
> Planned Parenthood South Texas Surgical Center, OIG Case No.
> 2020D04236
> Planned Parenthood Cameron County, OIG Case No. 2020D0439
> Planned Parenthood Gulf Coast, OIG Case No. 2020D04234
> APPEAL OF TERMINATION

Dear Mr. Crowe,

On December 21, 2020, we received your request for an appeal. However, your deadline to appeal has expired. Therefore, your request for an appeal is denied.

Sincerely,

Sylvia H. Kauffman

Sylvia Hernandez Kauffman
Inspector General

PPGC00147385

# EXHIBIT G

PPGC00147386

**All MCOs & DMOs: Termination of Planned Parenthood Clinics from Texas Medicaid**

**Background:**

As of January 4, 2020, Planned Parenthood of North Texas, Planned Parenthood of South Texas and Planned Parenthood Gulf Coast have been terminated as providers in Texas Medicaid. These providers have been notified in writing that they cannot accept any new Medicaid clients and that there will be a 30-day grace period (until February 3, 2021) provided to ensure that their current Medicaid clients can be transitioned to new providers. Please follow your normal procedures to transition these clients to new providers.

**Key Details:**

The payment denial code (PDC) for these providers is effective February 4, 2021. Claims with dates of service as of this date should be denied as the provider is not enrolled in Texas Medicaid. MCOs should update their systems to deny claims with a date of service after February 3rd. The PDC for these providers will be reflected on the master provider file.

**Contact:**

Please contact your MCCO monitoring team, with copy to Camisha Banks at camisha.banks@hhs.texas.gov, with question regarding this notice.

---

**All MCOs: Additional Monoclonal Antibody Therapy Procedure Codes Approved for COVID-19 Treatment**

**Background:**

Effective December 3, 2020, for dates of service on or after November 9, 2020, procedure codes Q0239 and M0239 have been added for Texas Medicaid.

Effective December 15, 2020, for dates of service on or after November 21, 2020, procedure codes Q0243 and M0243 have been added for Texas Medicaid.

**Key Details:**

On November 9, 2020, the FDA issued emergency use authorization of the monoclonal antibody therapy drug Bamlanivimab for treatment of mild-to-moderate COVID-19. Effective December 3, 2020, for dates of service on or after November 9, 2020, procedure codes Q0239 (Bamlanivimab) and M0239 (administration of Bamlanivimab) have been added for Texas Medicaid.

On November 21, 2020, the FDA issued emergency use authorization of the monoclonal antibody therapy drug Casirivimab and Imdevimab for treatment of mild-to-moderate COVID-19. Effective December 15, 2020, for dates of service on or after November 21, 2020, procedure codes Q0243 (Casirivimab and Imdevimab) and M0243 (administration of Casirivimab and Imdevimab) have been added for Texas Medicaid.

PPGC00147387

- Procedure codes Q0239 and Q0243 are informational only while being distributed to providers free of charge.

- Procedure codes M0239 and M0243 are a benefit for clients who are 12 years of age and older, weigh at least 40kg and restricted to diagnosis code U071.

- Procedure code M0239 and M0243 are a benefit for the following providers and places of service:

| | |
|---|---|
| Office | Physician, Physician Groups, Physician Assistant, Nurse Practitioner, Clinical Nurse Specialist |
| Outpatient Hospital | Hospital Providers |

Denied claims for procedure codes Q0239 and M0239 with dates of service on or after November 9, 2020 and denied claims for procedure codes Q0243 and M0243 with dates of service on or after November 21, 2020, must be automatically reprocessed for appropriate payment no later than March 5, 2021 and providers may receive an additional payment. MCOs should also waive the 95-day filing deadline for any claims that were not submitted prior to these codes being established. No interest is due to providers in either scenario.

***Note:*** *Providers are not required to appeal the claims unless they are denied for other reasons after the claims reprocessing is complete.*

**Resources**:

Medicare Monoclonal Antibody COVID-19 Infusion Program Instruction

**Contact:**

Suzanne.Lakin@hhsc.state.tx.us

PPGC00147388

# EXHIBIT H

PPGC00147389

# HUSCH BLACKWELL

Michael R. Crowe
Partner

111 Congress Avenue, Suite 1400
Austin, TX 78701
Direct: 512.703.5737
Fax:    512.480-5041
michael.crowe@huschblackwell.com

January 19, 2021

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED
  AND ELECTRONIC MAIL
Karen Ray
Chief Counsel
Texas Health and Human Services Commission
4900 N. Lamar
Austin, Texas 78751
Karen.ray@hhsc.state.tx.us

> RE:    Planned Parenthood of Greater Texas, Planned Parenthood of Greater Texas
> Family Planning and Preventative Health Services, Planned Parenthood San Antonio,
> Planned Parenthood South Texas Surgical Center, Planned Parenthood Cameron County,
> Planned Parenthood Gulf Coast
> APPEAL OF TERMINATION

Dear Ms. Ray:

Husch Blackwell, LLP (the "Firm") represents Planned Parenthood of Greater Texas, Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Planned Parenthood San Antonio, Planned Parenthood South Texas Surgical Center,  Planned Parenthood Cameron County, and Planned Parenthood Gulf Coast (collectively, the "Providers") in connection with a letter dated January 4, 2021, from the Texas Health and Human Services Commission ("HHSC") purporting to terminate the enrollment of the Providers from the Texas Medicaid program.

If HHSC desires to engage in the termination action described in the Notice of Termination, we presume it will issue the required notice pursuant to Tex. Human Resources Code  §32.034 and 1 TAC §371.1703(e) to effectuate the termination process.

**However, in an excess of caution, to the extent HHSC or a court determinates that the January 4, 2021, letter constituted valid notice of termination, the Providers hereby request a formal appeal of the termination.  The basis for the appeal is as follows:**

The Providers dispute that they committed any wrongful conduct and/or program violations that would give rise to a termination from the Medicaid program. The Providers dispute that there

App.690

HUSCH BLACKWELL

are any facts that actually occurred that would give rise to a termination and/or that those facts, as applied to the laws and program requirements in question, support a conclusion that wrongful conduct and/or program violations occurred. In the alternative, the Providers dispute whether the facts, as applied to the laws and program requirements in question, support the termination, including but not limited to because the Providers dispute their termination for the conduct of "affiliated" Providers and further dispute the validity of any provision purporting to authorize such termination. In the alternative, the Providers, based on information and belief, assert that HHSC failed to comply with applicable laws necessary for it to impose the termination action. The Providers dispute the lawfulness of HHSC effectuating this termination process. The Providers further assert that even if it were held otherwise lawful to terminate any or all of the Providers on the basis of facts or allegations as of the October 2015 or December 2016 letters, HHSC's January 4, 2021, decision to remove the Providers from the program is arbitrary and capricious because HHSC will bar thousands of Texans from their established provider, during the COVID-19 pandemic and at a time when patients insured through Medicaid face grave difficulties in obtaining timely access to healthcare,– especially in light of the five years of care that Providers have provided to tens of thousands of Medicaid patients without incident since January of 2017.

If you have any questions or comments regarding this matter, please feel free to contact the undersigned.

Sincerely,

Michael R. Crowe

cc:    Providers

Page 2 of 2

# EXHIBIT I

PPGC00147392

# HUSCH BLACKWELL

Michael R. Crowe
Partner

111 Congress Avenue, Suite 1400
Austin, TX 78701
Direct: 512.703.5737
Fax: 512.479.1101
michael.crowe@huschblackwell.com

January 29, 2021

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED
  AND ELECTRONIC MAIL
Karen Ray
Chief Counsel
Texas Health and Human Services Commission
4900 N. Lamar
Austin, Texas 78751
Karen.ray@hhsc.state.tx.us

Re:  Termination of Planned Parenthood Clinics from Texas Medicaid:

Dear Ms. Ray:

I hope this finds you well. I am writing to follow up on my letter of January 19, 2021, a copy of which is attached. Neither I nor my clients (the Planned Parenthood Providers) have heard back from Texas Health and Human Services Commission ("HHSC") regarding the issues raised in my letter. Please know that if there is no response from HHSC to the January 19 letter on or before February 1, 2021, we will assume that neither HHSC nor the Office of Inspector General will be sending the Planned Parenthood Providers a termination notice pursuant to Tex. Human Resources Code §32.034, and its implementing regulation, 1 Tex. Admin. Code § 371.1703(e), or otherwise docketing an administrative hearing.

If you have any questions or comments regarding this issue, please feel free to contact me at any time.

Sincerely,

Michael R. Crowe

Enc.

Cc:    Providers

HB: 4843-0927-5610.1

Husch Blackwell LLP

PPGC00147393

# HUSCH BLACKWELL

Michael R. Crowe
Partner

111 Congress Avenue, Suite 1400
Austin, TX  78701
Direct:  512.703.5737
Fax:      512.480-5041
michael.crowe@huschblackwell.com

January 19, 2021

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED
  AND ELECTRONIC MAIL
Karen Ray
Chief Counsel
Texas Health and Human Services Commission
4900 N. Lamar
Austin, Texas 78751
Karen.ray@hhsc.state.tx.us

>  RE:     Planned Parenthood of Greater Texas, Planned Parenthood of Greater Texas
>  Family Planning and Preventative Health Services, Planned Parenthood San Antonio,
>  Planned Parenthood South Texas Surgical Center, Planned Parenthood Cameron County,
>  Planned Parenthood Gulf Coast
>  APPEAL OF TERMINATION

Dear Ms. Ray:

Husch Blackwell, LLP (the "Firm") represents Planned Parenthood of Greater Texas, Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Planned Parenthood San Antonio, Planned Parenthood South Texas Surgical Center,  Planned Parenthood Cameron County, and Planned Parenthood Gulf Coast (collectively, the "Providers") in connection with a letter dated January 4, 2021, from the Texas Health and Human Services Commission ("HHSC") purporting to terminate the enrollment of the Providers from the Texas Medicaid program.

If HHSC desires to engage in the termination action described in the Notice of Termination, we presume it will issue the required notice pursuant to Tex. Human Resources Code  §32.034 and 1 TAC §371.1703(e) to effectuate the termination process.

**However, in an excess of caution, to the extent HHSC or a court determinates that the January 4, 2021, letter constituted valid notice of termination, the Providers hereby request a formal appeal of the termination.  The basis for the appeal is as follows:**

The Providers dispute that they committed any wrongful conduct and/or program violations that would give rise to a termination from the Medicaid program. The Providers dispute that there

HB: 4843-4394-3128.2

App.694

PPGC00147394

HUSCH BLACKWELL

are any facts that actually occurred that would give rise to a termination and/or that those facts, as applied to the laws and program requirements in question, support a conclusion that wrongful conduct and/or program violations occurred. In the alternative, the Providers dispute whether the facts, as applied to the laws and program requirements in question, support the termination, including but not limited to because the Providers dispute their termination for the conduct of "affiliated" Providers and further dispute the validity of any provision purporting to authorize such termination. In the alternative, the Providers, based on information and belief, assert that HHSC failed to comply with applicable laws necessary for it to impose the termination action.  The Providers dispute the lawfulness of HHSC effectuating this termination process. The Providers further assert that even if it were held otherwise lawful to terminate any or all of the Providers on the basis of facts or allegations as of the October 2015 or December 2016 letters, HHSC's January 4, 2021, decision to remove the Providers from the program is arbitrary and capricious because HHSC will bar thousands of Texans from their established provider, during the COVID-19 pandemic and at a time when patients insured through Medicaid face grave difficulties in obtaining timely access to healthcare,– especially in light of the five years of care that Providers have provided to tens of thousands of Medicaid patients without incident since January of 2017.

If you have any questions or comments regarding this matter, please feel free to contact the undersigned.

Sincerely,

MICHAEL R. CROWE

cc:    Providers

Page 2 of 2

PPGC00147395

# EXHIBIT J

PPGC00147396

**TEXAS**
Health and Human
Services

———————————— **Texas Health and Human Services Commission**

**Cecile Erwin Young**
*Executive Commissioner*

February 1, 2021

VIA CERTIFIED MAIL, RECEIPT REQUESTED & ELECTRONIC MAIL

Michael R. Crowe
Husch Blackwell
111 Congress Avenue, Ste 1400
Austin, TX 78701
michael.crowe@huschblackwell.com

Dear Mr. Crowe,

This letter is in response to your letters dated January 19, 2021 and January 29, 2021.

The Office of Inspector General (OIG) issued Planned Parenthood a final notice of termination in December 2016. The final notice stated that if OIG did not receive a written request for an administrative hearing within 15 calendar days from the date of receipt, the final notice of termination would become unappealable. 1 Tex. Admin. Code § 371.1703(f)(2). Planned Parenthood failed to request an administrative hearing; therefore, the termination became final 30 days after receipt of the notice, in January 2017.[1] *Id.* § 371.1617(a)(1).

Planned Parenthood elected not to appeal the administrative matter and instead pursued its claims in federal court. The federal lawsuit did not alter or extend any of the administrative deadlines.

Sincerely,

Karen Ray
Chief Counsel

_____

[1] Planned Parenthood's Application for Temporary Restraining Order and Preliminary Injunction filed in federal court on January 4, 2017, included affidavits that three registered agents received the final notice of termination on different dates but all on or before December 28, 2016.

PPGC00147397

# EXHIBIT K

PPGC00147398

CAUSE NO. _____

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT OF |
| | § | |
| PLANNED PARENTHOOD OF GREATER | § | |
| TEXAS FAMILY PLANNING AND | § | |
| PREVENTATIVE HEALTH SERVICES, INC., | § | |
| PLANNED PARENTHOOD OF GREATER | § | |
| TEXAS, INC., PLANNED PARENTHOOD SAN | § | |
| ANTONIO, PLANNED PARENTHOOD | § | TRAVIS COUNTY, TEXAS |
| CAMERON COUNTY, PLANNED | § | |
| PARENTHOOD SOUTH TEXAS SURGICAL | § | |
| CENTER, and PLANNED PARENTHOOD | § | |
| GULF COAST, | § | |
| | § | |
| *Relators*. | § | _____ JUDICIAL DISTRICT |

**DECLARATION OF JEFFREY HONS IN SUPPORT OF
RELATORS' ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION
FOR TEMPORARY RESTRAINING ORDER, TEMPORARY MANDATORY
INJUNCTION, AND PERMANENT MANDATORY INJUNCTION**

"I, Jeffrey Hons, declare the following:

1.      I am President and CEO of Relator Planned Parenthood South Texas, which is the

sole member of three controlled subsidiaries that provide Medicaid services to Texas patients:

Planned Parenthood San Antonio, Planned Parenthood Cameron County, and Planned Parenthood

South Texas Surgical Center. (For simplicity, I will refer to these subsidiaries, collectively, as

"PPST.") I am ultimately responsible for the leadership and management of these organizations,

and therefore am familiar with our operations and finances, including the services we provide and

the communities we serve. I submit this declaration in support of Relators' Original Petition for

Writ of Mandamus, Application for Temporary Restraining Order, Temporary Mandatory

Injunction, and Permanent Mandatory Injunction.

2.      PPST, a not-for-profit organization, is headquartered in San Antonio. PPST

operates eight health centers in Texas that provide services through the Medicaid program. These

services include a range of family planning and other preventive health services, including physical exams, contraception and contraceptive counseling, screening for breast cancer, screening and treatment for cervical cancer, screening for sexually transmitted infections ("STIs"), pregnancy testing and counseling, and certain procedures including biopsies and colposcopies.

3.      Planned Parenthood South Texas Surgical Center currently provides abortions at two health centers and one ambulatory surgical center. Texas does not pay for abortions through Medicaid except in extremely narrow circumstances.

4.      Starting in 2015 and continuing in 2016, the Texas Health and Human Services Commission ("HHSC") sought to terminate PPST and other Planned Parenthood affiliates (together, "Providers") from participation in the Medicaid program in response to an illegally filmed and thoroughly discredited video produced by a radical anti-abortion group (despite that the video related to a different Planned Parenthood organization that is not part of PPST). Because an injunction blocked that termination from taking effect, however, PPST was able to continue to provide high-quality Medicaid care in Texas.  That injunction was vacated in December 2020.

5.      In calendar year 2020, PPST provided over 2750 visits to over 1800 Medicaid patients, including over 3050 STI tests and over 2675 units of contraception. In calendar year 2019, PPST provided 2177 visits to 1519 Medicaid patients, including 2529 STI tests and 2146 units of contraception. In calendar year 2018, PPST provided 2216 visits to 1571 Medicaid patients, including 2595 STI tests and 2746 units of contraception.

6.      Before the injunction was vacated, Providers wrote a letter to the HHSC Commissioner requesting that—given the current public health crisis presented by the COVID-19 pandemic and the critical role Providers play in Texas's public health safety net—HHSC permit Providers to continue to participate in the Medicaid program or, in the alternative, provide a grace

App.700

PPGC00147400

period of at least six months to allow Providers to continue serving patients during the pandemic and to assist patients in transitioning their care to other providers.

7.       HHSC responded to Providers on January 4, 2021, informing them that HHSC would allow Providers to continue to provide services through the Medicaid program through February 3, 2021, after which they would be terminated from the program.

8.       Unless PPST obtains a temporary restraining order or temporary mandatory injunction preventing the Medicaid termination from taking effect until the Court rules on Relators' request for a writ of mandamus directing HHSC and the OIG to issue a proper notice of termination, as of February 4, 2021, patients will no longer be able to obtain Medicaid Services at PPST. If Medicaid patients are not able to obtain care at PPST they will be immediately and irreparably harmed, as they will be forced to end their established relationship with health care providers at PPST's health centers and attempt to obtain care elsewhere—a particular challenge at a time when many Texas health care providers are unable or unwilling to accept new Medicaid patients.[1] These patients will be prevented from obtaining care from the health care provider of their choice, if they are able to obtain replacement care at all. During the COVID-19 public health crisis, it is more important than ever that patients have access to uninterrupted health care. By cutting off PPST's participation in the Medicaid program, HHSC threatens the most vulnerable Texans' access to basic medical care during a pandemic.

9.       Terminating PPST from the Medicaid program will also cause immediate and irreparable damage to PPST itself. It is part of PPST's mission to serve as a safety-net provider for

---

[1] Shannon Najmabadi, *Low-income Texans struggle to find new doctors as state officials boot Planned Parenthood off Medicaid*, The Texas Tribune (Jan. 19, 2021), https://www.texastribune.org/2021/01/19/texas-planned-parenthood-medicaid/ (citing statement by the president of the Texas Association of Obstetricians and Gynecologists that a large number of providers listed as participating in the Medicaid program online may not be taking new patients).

3

PPGC00147401

Texas patients, particularly patients with urgent health needs during this crisis stage of the pandemic, and preventing PPST from providing that care by terminating it from Medicaid will directly undermine PPST's mission. At the very least, HHSC should allow sufficient time for PPST's patients to attempt to find new providers willing to accept new patients insured through Medicaid. Discontinuing services on February 4, 2021 will abruptly cut off PPST's doctor-patient relationship, leaving our patients without a provider or any time to identify a new provider and secure an appointment for continued care with the new provider, if indeed this can be accomplished at all.

10.     Though PPST has provided its patients with information to assist them in locating a new Medicaid provider in anticipation of the February 4, 2021 termination, I know that for many it will be difficult or impossible for them to locate an alternate Medicaid provider who is able to accept new patients. We know from patients that they have had trouble finding providers accepting new patients, especially for the provision of contraceptives. The Texas Tribune has reported that Texas has a scarcity of providers accepting new Medicaid patients due to the state's low reimbursement rates, and that even providers who are accepting new Medicaid patients may not be able to see patients for two or three months or more, a delay made even worse by the COVID-19 pandemic.[2] And due to years of underfunding, federally funded Title X clinics lack the capacity to absorb thousands of new clients.[3] Given these obstacles, the thirty-day period that HHSC allotted for patients to connect with new sources of care is woefully insufficient.

11.     I am concerned that after February 4, our Medicaid patients will experience the same drastic drop-off in access to basic health services that patients experienced in 2013, when

---

[2] *Id.*
[3] *Id.*

App.702

PPGC00147402

Texas terminated Planned Parenthood affiliates from the Women's Health Program: according to a study in the *New England Journal of Medicine*,[4] researchers observed a 35% drop in Texas women accessing long-acting reversible contraceptives, the most effective methods of birth control, and a 27% increase in Medicaid-covered childbirths among women who had previously been able to access injectable contraceptives through the program.[5] Overall, without Planned Parenthood affiliates' participation, the state health program served nearly 40% fewer patients.[6]

12.     Moreover, even if PPST is eventually able to resume providing Medicaid services due to judicial relief or otherwise, PPST patients who were forced to seek care elsewhere may not realize that they can return to PPST, causing them to forgo care altogether, or to obtain care elsewhere even though they would prefer to obtain care from PPST. In turn, PPST will lose reimbursements for services it would otherwise have provided.

13.     In sum, terminating PPST from Texas's Medicaid program on February 4, 2021 will exacerbate what is already a public health disaster.

---

[4] Amanda J. Stevenson et al., *Effect of Removal of Planned Parenthood from the Texas Women's Health Program*, 374 N. Engl. J. Med. 853-860 (March 3, 2016), https://www.nejm.org/doi/full/10.1056/NEJMsa1511902.

[5] Mary Tuma, *The Five-Year Campaign to Take Away Health Care From Texans*, Rewire News Group (Jan. 25, 2021), https://rewirenewsgroup.com/article/2021/01/25/the-five-year-campaign-to-take-away-health-care-from-texans/.

[6] *Id.*

5

My name is Jeffrey Paul Hons. My date of birth is March 11, 1965. My address is 2140 Babcock Road, San Antonio, TX 78229, USA.

I declare under penalty of perjury that the foregoing is true and correct."

Executed in Nueces County, State of Texas, on the 3rd day of February, 2021.

Jeffrey Hons
Jeffrey Hons (Feb 3, 2021 08:15 CST)

Jeffrey Hons, Declarant

6

App.704

PPGC00147404

# EXHIBIT L

PPGC00147405

CAUSE NO. _____

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT OF |
| | § | |
| PLANNED PARENTHOOD OF GREATER | § | |
| TEXAS FAMILY PLANNING AND | § | |
| PREVENTATIVE HEALTH SERVICES, INC., | § | |
| PLANNED PARENTHOOD OF GREATER | § | |
| TEXAS, INC., PLANNED PARENTHOOD SAN | § | |
| ANTONIO, PLANNED PARENTHOOD | § | TRAVIS COUNTY, TEXAS |
| CAMERON COUNTY, PLANNED | § | |
| PARENTHOOD SOUTH TEXAS SURGICAL | § | |
| CENTER, and PLANNED PARENTHOOD | § | |
| GULF COAST, | § | |
| | § | |
| *Relators.* | § | _____ JUDICIAL DISTRICT |

**DECLARATION OF KEN LAMBRECHT IN SUPPORT OF
RELATORS' ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION
FOR TEMPORARY RESTRAINING ORDER, TEMPORARY MANDATORY
INJUNCTION, AND PERMANENT MANDATORY INJUNCTION**

"I, Ken Lambrecht, declare the following:

1.      I am President and CEO of Relator Planned Parenthood of Greater Texas, Inc., as well as of its related entity, Planned Parenthood of Greater Texas Family Planning and Preventative Health Services. For the sake of simplicity I will refer to both collectively as "PPGT." I am responsible for the management of these organizations and therefore am familiar with our operations and finances, including the services we provide and the communities we serve. I submit this declaration in support of Relators' Original Petition for Writ of Mandamus, Application for Temporary Restraining Order, Temporary Mandatory Injunction, and Permanent Mandatory Injunction.

2.      PPGT is a Texas not-for-profit corporation headquartered in Dallas. PPGT and its predecessor organizations have provided Medicaid care in Texas for decades. We provide family planning services and other preventative care to Medicaid beneficiaries at seventeen health centers

App.706

PPGC00147406

in Texas, offering a range of family planning and other health services including physical exams, contraception (including long-acting reversible contraception ("LARCs")) and contraceptive counseling, clinical breast exams, screening and treatment for cervical cancer, testing for certain sexually transmitted infections ("STIs"), pregnancy testing and counseling, and certain procedures such as biopsies and colposcopies. Patients insured through Medicaid choose PPGT because of its specialization in family planning, evidence-based practices, and up-to-date technology, and because PPGT is known as a provider of high-quality, non-judgmental, culturally sensitive medical care.

3.      A related entity of PPGT, PPGT Surgical Health Services, provides abortion at five health centers in Texas. Texas does not pay for abortions through Medicaid except in extremely narrow circumstances.

4.      The Texas Health and Human Services Commission ("HHSC") notified PPGT on January 4, 2021, that it intends to terminate PPGT from the Medicaid program effective February 4, 2021. Unless enjoined, this termination will prevent PPGT from providing basic and preventative health care services through the Medicaid program to the over 3000 Medicaid beneficiaries who rely on us each year for family planning and other basic care, thereby irreparably harming those patients as well as PPGT itself.

5.      HHSC first sought to terminate PPGT and other Planned Parenthood affiliates (together, "Providers") from participation in the Medicaid program in 2015, in response to a now-debunked video produced by a radical anti-abortion group that baselessly accused an affiliate other than PPGT of wrongdoing. Because an injunction blocked that termination from taking effect, however, PPGT was able to continue to provide high-quality care to Texans insured through Medicaid.  That injunction was vacated in December 2020.

2

PPGC00147407

6.      In calendar year 2018, PPGT provided over 5000 healthcare visits to 2885 Medicaid beneficiaries, including 1500 well-woman visits, 1800 STI/HIV tests, and 3454 units of contraception. In calendar year 2019, PPGT provided over 4400 healthcare visits to 2621 Medicaid beneficiaries, including over 700 well-woman visits, 1200 STI/HIV tests, and 3101 units of contraception. In calendar year 2020, PPGT provided over 3630 healthcare visits to 2159 Medicaid beneficiaries, including 640 STI/HIV tests and 2374 units of contraception.

7.      In anticipation of the injunction being vacated, and given the COVID-19 public health crisis and Providers' role as safety-net providers for Texas patients hit hardest by the pandemic, Providers wrote a letter to the HHSC Commissioner requesting that HHSC allow Providers to remain in the Medicaid program. Providers alternatively asked HHSC to provide a grace period of at least six months so that Providers could continue serving patients during the pandemic and assist patients in finding other Medicaid providers.

8.      HHSC responded to Providers on January 4, 2021, informing them that HHSC would allow Providers to continue to provide services through the Medicaid program through February 3, 2021, after which they would be terminated from the program.

9.      If PPGT is forced to stop providing Medicaid services services for thousands of Texas Medicaid beneficiaries will be disrupted, depriving these patients of continuity of care as well as access to their chosen provider.

10.     Medicaid patients are extremely vulnerable to begin with, even without this additional hardship. Texas has some of the most stringent Medicaid requirements in the country: in addition to having a low income, an individual must also possess a special characteristic, such as having dependent children or a disability that keeps them from working, to be eligible for Medicaid. And the income eligibility requirements are strikingly low: for example, a single woman

3

PPGC00147408

with a dependent child qualifies for Medicaid only if she has a monthly income of under $196, well below the federal poverty guideline.[1] Texas Medicaid patients therefore already face severe obstacles in accessing health care. These are the patients whose care the February 4 termination will disrupt.

11.     Moreover, if HHSC succeeds in excluding PPGT and other Providers from Medicaid and those patients are no longer able to obtain care at PPGT, many patients may have a hard time finding the services they need at all (let alone from their preferred provider). In part because of low reimbursement rates and onerous reimbursement policies, Texas suffers from a shortage of willing Medicaid providers generally. In recent years, according to a survey by the Texas Medical Association,[2] the provider network available to Texas Medicaid patients has declined to just over 40% of practicing physicians and only 30% of obstetrician-gynecologists.[3] This shortage is a particular problem for family planning services. The need for publicly supported family planning services is great in Texas, which regularly ranks among the worst states for reproductive care.

12.     Other Medicaid providers are already stretched thin, with some not taking any non-pregnant Medicaid patients and others having long wait-times. Many providers offer more limited services than PPGT and other Planned Parenthood affiliates; for example, they do not offer LARCs, which are the most effective forms of birth control, or lifesaving cancer screening procedures, such

---

[1] Tex. Health and Hum. Servs., *Medicaid for Parents & Caretakers*, https://hhs.texas.gov/ services/health/medicaid-chip/programs-services/children-families/medicaid-parents-caretakers (last visited Feb. 2, 2021).

[2] Texas Medical Association, *Survey of Texas Physicians 2016*, available at https://www.texmed.org/uploadedFiles/Current/2016_Advocacy/2016_Physician_Survey_Findin gs.pdf.

[3] Shannon Najmabadi, *Low-income Texans struggle to find new doctors as state officials boot Planned Parenthood off Medicaid*, The Texas Tribune (Jan. 19, 2021), https://www.texastribune.org/2021/01/19/texas-planned-parenthood-medicaid/.

4

as colposcopies. Indeed, other Medicaid providers sometimes refer their patients to our health centers for those services.

13.     If PPGT is forced to stop providing care in the Medicaid program, this situation will worsen. I fear the remaining providers will be simply unable to absorb our patients, leaving those patients without access to critical medical services. During the COVID-19 public health crisis, it is particularly crucial that patients have uninterrupted access to basic health care. But when people cannot obtain Medicaid coverage for their health care or are unable to see known, trusted providers, they may simply forgo critical health care altogether.

14.     Terminating PPGT from the Medicaid program will also cause immediate and irreparable damage to PPGT itself. Turning away Medicaid patients fundamentally defeats the core of PPGT's mission: to be there for underserved women and men who need our help staying healthy and planning their families and future. At the very least, PPGT should be allowed to help our patients find alternate providers of Medicaid-covered care. Discontinuing services on February 4, 2021 will abruptly cut off PPGT's efforts to assist our patients in this way.

15.     Finally, the February 4 termination threatens to permanently alienate PPGT's patients from PPGT, even if PPGT is eventually able to resume providing Medicaid services at some point in the future. Once patients have stopped obtaining care from PPGT, they may have no way of knowing when PPGT is once again an option for them, leading them to continue to seek care elsewhere even if they prefer to obtain it at PPGT, or to forgo care altogether if they have not been able to find other acceptable alternatives. In turn, PPGT will suffer losses in the form of reimbursements it would otherwise have received had these patients remained in PPGT's care.

16.     Terminating PPGT from Texas's Medicaid program on February 4, 2021 will cause serious, irreparable harm to PPGT and its patients at a time when access to quality health

PPGC00147410

care is more important than ever.

6

App.711

PPGC00147411

My name is Ken _____ Lambrecht. My date of birth is Nov. 10, 1970

My address is 7424 Greenville Ave #206 Dallas TX 75231 USA

I declare under penalty of perjury that the foregoing is true and correct."

Executed in Travis _____ County, State of TX _____ on the 2nd day of

February, 2021

Ken Lambrecht

Ken Lambrecht, Declarant

7

App.712

PPGC00147412

# EXHIBIT M

PPGC00147413

CAUSE NO. _____

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT OF |
| | § | |
| PLANNED PARENTHOOD OF GREATER | § | |
| TEXAS FAMILY PLANNING AND | § | |
| PREVENTATIVE HEALTH SERVICES, INC., | § | |
| PLANNED PARENTHOOD OF GREATER | § | |
| TEXAS, INC., PLANNED PARENTHOOD SAN | § | |
| ANTONIO, PLANNED PARENTHOOD | § | TRAVIS COUNTY, TEXAS |
| CAMERON COUNTY, PLANNED | § | |
| PARENTHOOD SOUTH TEXAS SURGICAL | § | |
| CENTER, and PLANNED PARENTHOOD | § | |
| GULF COAST, | § | |
| | § | |
| *Relators.* | § | _____ JUDICIAL DISTRICT |

## DECLARATION OF MELANEY LINTON IN SUPPORT OF RELATORS' ORIGINAL PETITION FOR WRIT OF MANDAMUS, APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY MANDATORY INJUNCTION, AND PERMANENT MANDATORY INJUNCTION

Melaney Linton declares the following:

1.      I am President and CEO of Plaintiff Planned Parenthood Gulf Coast, Inc. ("PPGC"). I am responsible for the management of PPGC and therefore am familiar with our operations and finances, including the services we provide and the communities we serve. I submit this declaration in support of Relators' Original Petition for Writ of Mandamus, Application for Temporary Restraining Order, Temporary Mandatory Injunction, and Permanent Mandatory Injunction.

2.      PPGC is a Texas not-for-profit corporation headquartered in Houston. We operate six health centers in the Houston Metropolitan area that provide services through the Medicaid program. These health centers provide a range of family planning services and other preventive care, including physical exams, contraception and contraceptive counseling (including long-acting reversible contraception or "LARCs"), screening for breast cancer, screening and treatment for

cervical cancer, screening and treatment for sexually transmitted infections ("STIs"), pregnancy testing and counseling, and certain procedures, including biopsies and colposcopy.[1] PPGC has a facilities and services agreement with a separate organization, Planned Parenthood Center for Choice, Inc. ("PPCFC"), which provides abortion services at two health centers.

3.      Starting in 2015 and continuing in 2016, the Texas Health and Human Services Commission ("HHSC") sought to terminate PPGC and other Planned Parenthood affiliates (together, "Providers") from participation in the Medicaid program in response to thoroughly discredited accusations of wrongdoing from a radical anti-abortion group. Due to an injunction blocking that termination from taking effect, however, PPGC has been able to continue to provide high-quality Medicaid care in Texas. That injunction was vacated on appeal in December 2020.

4.      In calendar year 2018, PPGC provided over 7500 visits to over 4000 patients enrolled in the Texas Medicaid program, including over 7900 STI tests (including over 1200 HIV screenings). In calendar year 2019, PPGC provided over 6800 visits to over 3900 patients enrolled in the Texas Medicaid program, including over 8700 STI tests (including over 1900 HIV screenings). PPGC provided care to 3000 Medicaid patients in calendar year 2020.

5.      On December 14, 2020, knowing the injunction would shortly be vacated, Providers wrote a letter to the HHSC Commissioner requesting that, given the COVID-19 public health crisis, HHSC permit Providers to continue to participate in the Medicaid program or, in the alternative, provide a grace period of at least six months to allow Providers to continue serving patients during the pandemic and to assist patients in transitioning their care to other providers.

6.      HHSC responded to Providers on January 4, 2021, informing them that HHSC

---

[1] Colposcopy is a medical diagnostic procedure to examine the cervix as well as the vagina and vulva, and is used to detect pre-malignant and malignant lesions.

App.715

PPGC00147415

would allow Providers to continue to provide services through the Medicaid program through February 3, 2021, after which they would be terminated from the program.

7.      Given this January 4, 2021 letter, unless PPGC obtains a temporary restraining order or temporary mandatory injunction preventing the Medicaid termination from taking effect, as of February 4, 2021 PPGC will no longer be able to provide basic and preventive health care services through the Medicaid program to the 3000-plus Texas women and men who depend on us for these services each year, thereby irreparably harming those patients as well as PPGC's own mission.

8.      Many of our Medicaid patients will find it much more difficult—or perhaps impossible—to obtain elsewhere the medical services we provide to them. The pool of providers who participate in Medicaid in Texas is already limited; I do not believe that there are adequate alternative providers to provide care to this many additional people, and I do not believe that the few alternative providers will be able to deliver services as promptly or effectively as our health centers do. Other Medicaid providers are already stretched thin, even with PPGC providing care. If PPGC and other Planned Parenthood Medicaid providers in Texas are forced to stop providing care to thousands of Medicaid patients each year, I fear the remaining providers will be simply unable to absorb these patients, leaving them without access to critical medical services or with increased wait times at the remaining Medicaid provider sites. Already, we see Medicaid patients who are experiencing urgent symptoms (such as bleeding, irregular discharge, or pelvic pain) but were told by their regular provider that they could not have an appointment for months.

9.      One patient who previously received care through Medicaid at PPGC has publicly shared her story of attempting to find a new Medicaid provider upon learning of PPGC's imminent

3

Medicaid termination.[2] A mother of two, this patient requires regular screenings as a result of human papilloma virus ("HPV"), a sexually transmitted disease that can lead to cervical cancer. When the patient's abusive partner cut her off of her private health insurance plan, the patient enrolled in Medicaid.[3] She first came to PPGC because it was the only place that did not require her to wait months for a highly time-sensitive screening appointment. Indeed, the patient has found Planned Parenthood health centers to be the only sites where she is able to access same-day appointments as a Medicaid patient.[4]

10.    Now that PPGC and other Planned Parenthood affiliates face the February 4, 2021 termination from the Medicaid program, the patient has been calling other providers in an attempt to find a new provider of routine, time-sensitive screenings. But the providers she has spoken to have told her she would need to wait up to six months for the next available appointment.[5] Given the high-risk nature of the patient's HPV and the need for regular checkups, this delay is not only frustrating, but dangerous.

11.    Even for patients without such urgent treatment needs, the COVID-19 public health crisis has made it more vital than ever for patients to have prompt access to high-quality health care. This is especially so for Black and Latina Texans, who have been hit disproportionately hard by the pandemic.[6]

---

[2] Shannon Najmabadi, *Low-income Texans struggle to find new doctors as state officials boot Planned Parenthood off Medicaid*, The Texas Tribune (Jan. 19, 2021), https://www.texastribune.org/2021/01/19/texas-planned-parenthood-medicaid/.

[3] Mary Tuma, *The Five-Year Campaign to Take Away Health Care From Texans*, Rewire News Group (Jan. 25, 2021), https://rewirenewsgroup.com/article/2021/01/25/the-five-year-campaign-to-take-away-health-care-from-texans/.

[4] Najmabadi, *supra* note 1.

[5] *Id.*

[6] Emma Platoff & Carla Astudillo, *Across Texas and the Nation, the Novel Coronavirus is Deadlier for People of Color*, Tex. Trib. (July 30, 2020), https://www.texastribune.org/2020/07/30/texas-coronavirus-deaths/.

4

PPGC00147417

12.     Additionally, if PPGC can no longer provide care to Medicaid patients, one of the most underserved populations in Texas, it will cause immediate harm to PPGC's mission, which is to protect and improve the health of underserved individuals, and to enable our patients to plan their families and protect their health and well-being. At the very least, PPGC should be allowed sufficient time to help our patients attempt to find new providers willing to accept new patients insured through Medicaid. Terminating PPGC from Medicaid on February 4, 2021 will abruptly cut off PPGC's efforts to help our patients with this process.

13.     PPGC has been contacting other Texas Medicaid providers in an attempt to find new sources of care for our Medicaid patients. Unfortunately, thus far our providers and staff have had significant trouble finding Medicaid providers who are able to see patients within a reasonable amount of time, if at all. Many providers are only accepting new Medicaid patients if they are pregnant; others do not offer the particular health care services our patients have been receiving at PPGC. I am certain that we will not be able to find alternative care for all of our Medicaid patients by February 4, 2021, and I am deeply concerned about what our patients are going to do when they can no longer obtain care from PPGC and have nowhere else to go.

App.718

PPGC00147418

My name is Melaney Amber Linton. My date of birth is December 30, 1959. My address is 4600 Gulf Freeway, Houston, Texas, 77023, USA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, State of Texas, on the 2nd day of February, 2021.

_____
Melaney Linton, Declarant

6

PPGC00147419

**CAUSE NO. D-1-GN-21-000528**

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT OF |
| | § | |
| PLANNED PARENTHOOD OF GREATER | § | |
| TEXAS FAMILY PLANNING AND | § | |
| PREVENTATIVE HEALTH SERVICES, INC., | § | |
| PLANNED PARENTHOOD OF GREATER | § | |
| TEXAS, INC., PLANNED PARENTHOOD SAN | § | |
| ANTONIO, PLANNED PARENTHOOD | § | TRAVIS COUNTY, TEXAS |
| CAMERON COUNTY, PLANNED | § | |
| PARENTHOOD SOUTH TEXAS SURGICAL | § | |
| CENTER, and PLANNED PARENTHOOD | § | |
| GULF COAST, | § | |
| | § | |
| *Relators.* | § | 53RD JUDICIAL DISTRICT |

## ORDER GRANTING RELATORS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND SETTING HEARING ON TEMPORARY MANDATORY INJUNCTION

On February __3rd__, 2021, the Court considered the Application for Temporary Restraining Order filed by Relators, Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc., Planned Parenthood of Greater Texas, Inc., Planned Parenthood San Antonio, Planned Parenthood Cameron County, Planned Parenthood South Texas Surgical Center, and Planned Parenthood Gulf Coast (collectively, the "Providers") in the above-referenced case against Sylvia Hernandez Kauffman, Inspector General, the Office of Inspector General (jointly, the "OIG"); and Cecile Young, the Executive Commissioner of the Texas Health and Human Services Commission, and the Texas Health and Human Services Commission (jointly, "HHSC").

It appears from the specific facts set forth in the verified Application for Temporary Restraining Order, and the evidence submitted to the Court, if any, that immediate and irreparable harm will result to Providers before notice can be served on the OIG and HHSC and a hearing can be held on Providers' request for a temporary restraining order unless the OIG and HHSC are restrained as requested in Providers' Application for a Temporary Restraining Order.

---

ORDER GRANTING RELATORS' APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND SETTING HEARING FOR TEMPORARY MANDATORY INJUNCTION

PPGC00147420

Specifically, it appears to the Court from the Application and accompanying exhibits that Providers are, at future trial, likely to succeed in establishing:

1.  HHSC sent Providers a letter dated January 4, 2021, wherein HHSC informed Providers that they may continue to provide services in the Medicaid program through February 3, 2021, after which time Providers would be terminated from the program.

2.  The January 4, 2021 letter did not include the six specified items required under the Texas Administrative Code for a proper notice of termination, *i.e.*, (i) a description of the termination, (ii) the basis for the termination; (iii) the effect of the termination; (iv) the duration of the termination; (v) whether re-enrollment will be required after the period of termination; and (vi) a statement of the person's right to request an informal resolution meeting or an administrative hearing regarding the imposition of the termination unless the termination is required under 42 C.F.R. §455.416.

3.  Providers contested the termination letter from HHSC and have identified and disclosed to the OIG and HHSC the deficiencies in the letter.

4.  The status quo between the OIG, HHSC, and Providers is such that Providers continue to participate in the Medicaid program.

5.  HHSC's attempt to terminate Providers from the Medicaid program will take effect on February 4, 2021. An insufficient notice of termination that fails to comply with regulatory requirements would cut off Providers from providing services in the Medicaid program. Thus, HHSC will disrupt the status quo by improperly terminating Providers from the program.

6.  Terminating Providers from the Medicaid program before the Court rules on the

ORDER GRANTING RELATORS' APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND SETTING HEARING FOR TEMPORARY MANDATORY INJUNCTION                    PAGE 2

App.721

PPGC00147421

request for writ of mandamus, or before Providers have exhausted their administrative and appellate remedies relating to the termination, will cause immediate and irreparable damage to Providers.

7.    Specifically, even if Providers are subsequently able to resume providing services in the Medicaid program because of relief from this Court, Providers' patients who were unable to obtain care at Providers in the interim will remain confused about their ability to do so, causing patients who prefer to obtain care at Providers to nevertheless attempt to obtain care elsewhere if they are able to do so, or forego care altogether; Providers will lose reimbursements for services they would otherwise have provided; and Providers' mission of providing care to underserved patients will be irreparably harmed.

8.    Further, Providers need to allow their patients to take care of urgent health needs during this crisis stage of the pandemic and, at the least, help their patients attempt to find new providers willing to accept new patients insured through Medicaid. Abruptly discontinuing services on February 4, 2021 will leave Providers' patients with nowhere else to turn during a pandemic that has pushed the capacity of our health care system to the brink. It is Providers' mission to care for these patients, and termination from Medicaid would be denying Providers' their mission.

9.    Providers cannot continue to serve their patients insured through Medicaid if HHSC's attempt to terminate them from the Medicaid program is allowed to take effect on February 4, 2021, as a result of HHSC's improper notice of termination and failure to comply with its regulatory obligations. If Providers are successful on their request for a writ of mandamus and are granted an administrative hearing, the terminations would not take effect until the final outcome of the administrative

ORDER GRANTING RELATORS' APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND SETTING HEARING FOR TEMPORARY MANDATORY INJUNCTION                    PAGE 3

App.722

PPGC00147422

action.

10. Allowing those terminations to go into effect now would leave Providers without an adequate remedy at law. Such terminations based on an insufficient notice would cause grave public health harms, specifically during the COVID-19 pandemic. Such damages cannot be measured by any pecuniary standard.

11. Unless the OIG and HHSC are immediately enjoined, Providers will suffer immediate and irreparable injury for which there is no adequate remedy at law.

12. In short, the Court finds that absent a temporary injunction: (i) Providers will be terminated from the Medicaid program without a proper notice of termination; (2) HHSC's improper termination of Providers' participation in the Medicaid program will prevent Providers from caring for their patients or helping their patients attempt to find new providers; (3) HHSC's improper termination of Providers' participation in the Medicaid program will result in patients obtaining care elsewhere or foregoing care altogether, which is incalculable.

Accordingly, **IT IS ORDERED THAT** the Clerk of this Court issue forthwith a Temporary Restraining Order to continue in effect until the conclusion of the hearing on the Application for Temporary Mandatory Injunction to be held in this cause, or until such further order of this Court, restraining or enjoining HHSC, the OIG, and anyone acting under their direction or control or in concert with HHSC or the OIG, including, but not limited to, their officers, directors, employees, agents, servants, independent contractors, attorneys, representatives, and those persons or entities in active concert or participation with them, from directly or indirectly terminating or otherwise interfering with Providers' participation in the Medicaid program.

This Order is conditioned, however, upon Providers either filing with the Clerk of this

ORDER GRANTING RELATORS' APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND SETTING HEARING FOR TEMPORARY MANDATORY INJUNCTION                    PAGE 4

App.723

PPGC00147423

Court a bond in the amount of $200.00 executed by a sufficient surety, payable to HHSC, and otherwise conditioned as the law requires, or depositing that amount with the Clerk of this Court in the form of cash or cashier's check or check issued by a bank chartered by the United States government or any state in the United States that is insured by the Federal Deposit Insurance Corporation, in at least the amount of the total deposit. The cash deposit in lieu of bond shall be deemed payable and conditioned in the same manner as a bond under Texas Rule of Civil Procedure 684. Once the order becomes effective, it shall remain in effect for fourteen (14) days or until further order of this Court.

**IT IS FURTHER ORDERED** that Providers' Application for Temporary Mandatory Injunction shall be heard in this Court on the 17th day of February, 2021, at 9:00 a.m., in the Travis County District Court to be assigned under the local rules.  Further instructions regarding remote proceedings for this hearing will be

**IT IS FURTHER ORDERED** that the Clerk of this Court issue notice for service on Respondents Sylvia Hernandez Kauffman, Inspector General, the Office of Inspector General, Cecile Young, the Executive Commissioner of the Texas Health and Human Services Commission, and the Texas Health and Human Services Commission, notifying them of the time commanding them to appear and show cause why the Temporary Mandatory Injunction prayed for in Providers' Application for Temporary Mandatory Injunction should not be granted.

**IT IS SO ORDERED.**

SIGNED this the 3rd day of February 2021, at 4:43p.m.


JUDGE PRESIDING
MAYA GUERRA GAMBLE

---

**ORDER GRANTING RELATORS' APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND SETTING HEARING FOR TEMPORARY MANDATORY INJUNCTION**                    **PAGE 5**

PPGC00147424

| From: | Watson, Beth </O=PPGT/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WATSON, BETH> |
|---|---|
| To: | PPGT_Health_Center_Staff |
| CC: | PPGTREGIONALSandRQM |
| Sent: | 2/5/2021 2:31:44 PM |
| Subject: | Talking Points \| More time for Medicaid care at Planned Parenthood. |
| Attachments: | TPs on Medicaid service deadlineFeb5.docx |

Good afternoon,

Please see the attached talking points for the revised deadline for PPGT to provide services to established patients with Medicaid. The most recent deadline of February 3 has been pushed to **Wednesday, February 17**. That means patients enrolled in Medicaid can continue to make appointments at PPGT through February 17. As we continue to fight this ban in court, <u>it is possible the deadline date will continue to change</u>.

We are particularly concerned about time-sensitive birth control coverage for Medicaid patients who have trouble locating a new provider. Please encourage eligible patients to set an appointment for services including LARCs, before the February 17th deadline.

Below is the email sent to Medicaid patients this afternoon notifying them of the update.

**Beth Watson** *(she/ her/hers)*
*Vice President of Health Services*
Planned Parenthood of Greater Texas

**From:** Planned Parenthood Of Greater Texas [mailto:info@ppgt.org]
**Sent:** Friday, February 5, 2021 2:16 PM
**To:** Watson, Beth <Beth.Watson@ppgt.org>
**Subject:** More time for Medicaid care at Planned Parenthood.

EXTERNAL: This email originated outside of Planned Parenthood of Greater Texas. **DO NOT CLICK** links or attachments unless you recognize the sender and know the content is safe.

App.725

PPGT00010404



*Para leer este mensaje en espanol haga* *clic aqui.*

Dear Friend,

In January, you received an email from us about Texas Governor Greg Abbott blocking Texans enrolled in Medicaid from receiving care at Planned Parenthood. We continue to fight for your access to Medicaid covered healthcare at Planned Parenthood, and this week we received news that the most recent deadline of February 3 has been pushed back to **Wednesday, February 17, 2021.**

As we continue to defend your access to healthcare at Planned Parenthood in the courts, this date may continue to change. We will update you by email, but we also encourage you to check ppgreatertx.org/Medicaid for the latest

App.726

PPGT00010405

updates and information.

**Your birth control coverage is important and time-sensitive.** You may want to take steps now to ensure you don't have a gap in birth control while seeking a new Medicaid provider.

Call us at 1-800-230-PLAN today to schedule:

- a Depo shot for three months of birth control coverage
- an appointment for "whoops proof" long-acting reversible birth control method such as an IUD or implant
- annual wellness exam, screening for sexually transmitted infections (STIs) and other healthcare services

**Call us at 1-800-230-PLAN to schedule your appointment today.**

While we cannot accept new Medicaid patients currently, if you are an established Planned Parenthood patient enrolled in Medicaid we welcome the opportunity to provide your healthcare before February 18.

Starting February 18, you will need to seek healthcare at a different provider. To find a new Medicaid provider, you can:

- Contact the customer service phone number on the back of your insurance card.
- Call the Texas Medicaid Hotline at 1-800-252-8263.
- Visit www.tmhp.com to find other providers in your area.
- Visit the Planned Parenthood's website to learn more about this important issue.

Planned Parenthood stands with you. We will continue to advocate for Medicaid patients to access healthcare wherever they choose.

**In this together,**
G. Sealy Massingill, M.D.
Chief Medical Officer
Planned Parenthood of Greater Texas

PPGT00010406

**How to Take Action**



### Share your story

Have you used Medicaid to pay for your healthcare appointments at Planned Parenthood? Please share if you count on Planned Parenthood for your healthcare appointments.

### Contact Governor Abbott

Tell Texas Governor Greg Abbott not to block care for Medicaid patients at Planned Parenthood—people need more access to health care during a pandemic, not less.

*Copyright © 2021 Planned Parenthood of Greater Texas, All rights reserved.*
You are receiving this email because you opted in.

**Our mailing address is:**
Planned Parenthood of Greater Texas
201 E Ben White Blvd Bldg B
Austin, TX 78704-7301

App.728

PPGT00010407

Add us to your address book

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.

PPGT00010408

**Planned Parenthood**
**Talking Points – Medicaid service deadline change**
**February 2021**

As we continue working through the courts to protect healthcare access at Planned Parenthood for Medicaid patients, the deadline for when we can no longer serve patients through Medicaid has changed. We know this may cause additional confusion and distress for patients seeking care. Please refer to these talking points and resources when communicating with patients.

- The most recent deadline of February 3 has been pushed to <u>**Wednesday, February 17**</u>. That means patients enrolled in Medicaid can continue to make appointments at Planned Parenthood through February 17.

- Only current Planned Parenthood patients enrolled in Medicaid can make appointments. We are not allowed to accept new Medicaid patients at this time.

- Starting February 18, patients will need to seek care at another Medicaid provider. We encourage them to begin that process ASAP. To locate another Medicaid provider:
  - Contact the customer service phone number on the back of their insurance card.
  - Call the Texas Medicaid Hotline at <u>1-800-252-8263</u>.
  - Visit <u>www.tmhp.com</u> to find other providers in their area.

- We are particularly concerned about time-sensitive birth control coverage for Medicaid patients who have trouble locating a new provider. Please encourage eligible patients to set an appointment for Depo shots, "whoops-proof" long-acting, reversible contraception such as IUDs and implants, along with other important reproductive healthcare, before the deadline.

- As we continue to fight this ban in court, <u>it is possible the deadline date will continue to change</u>. Please encourage patients to check their email and visit **ppgreatertx.org/Medicaid** for the latest information and guidance.

- IF PATIENTS ARE ESPECIALLY ANGRY OR MOTIVATED ABOUT THIS SITUATION, please encourage them to visit **ppgreatertx.org/Medicaid**. At the bottom of that page patients have the option to:
  - Contact Governor Abbott to ask him to not block Medicaid patients from seeking healthcare at Planned Parenthood
  - Share their Medicaid patient story at Planned Parenthood – why it is important to them; why they are worried about losing that access.

PPGT00010409

**Planned Parenthood®**
Care. No matter what.

4600 Gulf Freeway
Houston, TX 77023
p: 713.522.6240
www.ppgulfcoast.org

Planned Parenthood Gulf Coast

March 22, 2021

**SENT VIA FEDEX TRACKING NUMBER: XXXXXXXXXXXXXXXXXXXXXXXX**

Jarrod Coniglio
Medicaid Program Integrity Section Chief
Louisiana Department of Health
Program Integrity Section
P.O. Box 91030
Baton Rouge, Louisiana 70821-9030

Re:      Texas Medicaid Program Participation

Mr. Coniglio:

Out of an abundance of caution, I am writing to update the notice, pursuant to 50 La. Admin. Code § 4147A(4) and 4147A(8), dated December 23, 2020, regarding Planned Parenthood Gulf Coast, Inc. ("PPGC")'s participation in the Texas Medicaid program.  PPGC is not currently participating in the Texas Medicaid program.  This is because of a politically motivated notice of termination of PPGC's Texas Medicaid contracts arising from long-debunked videos made by opponents of abortion.  While a recent decision of the U.S. Court of Appeals for the Fifth Circuit resulted in the reversal of a preliminary injunction on December 16, 2020 that had prevented PPGC from being terminated from Texas Medicaid, PPGC and its patients continue to vigorously contest and challenge the termination from the Texas program; therefore, the termination is not final.

Any Texas termination is limited to the Texas Medicaid program and does not affect PPGC's license or ability to continue to provide high-quality medical care to its patients.  PPGC remains committed to providing healthcare—including critical and time-sensitive preventive services and medical screenings—to its patients in Texas and Louisiana.

Sincerely,

Katie Beth Gottlieb, JD, MPH
General Counsel & Chief Compliance Officer
Planned Parenthood Gulf Coast, Inc.

Cc: Tara LeBlanc
Interim Medicaid Executive Director
Louisiana Department of Health
Bureau of Health Services Financing
628 N. 4th Street, 769
Baton Rouge, Louisiana 70802

App.731

PPGC00000036



4600 Gulf Freeway
Houston, TX 77023
p: 713.522.6240
www.ppgulfcoast.org

Planned Parenthood Gulf Coast

March 22, 2021

**SENT VIA FEDEX TRACKING NUMBER: XXXXXXXXXXXXXXXXXXXXXXXX**

Tara LeBlanc
Interim Medicaid Executive Director
Louisiana Department of Health
Bureau of Health Services Financing
628 N. 4th Street, 769
Baton Rouge, Louisiana 70802

Re:     Texas Medicaid Program Participation

Ms. LeBlanc:

Out of an abundance of caution, I am writing to update the notice, pursuant to 50 La. Admin. Code § 4147A(4) and 4147A(8), dated December 23, 2020, regarding Planned Parenthood Gulf Coast, Inc. ("PPGC")'s participation in the Texas Medicaid program.  PPGC is not currently participating in the Texas Medicaid program.  This is because of a politically motivated notice of termination of PPGC's Texas Medicaid contracts arising from long-debunked videos made by opponents of abortion.  While a recent decision of the U.S. Court of Appeals for the Fifth Circuit resulted in the reversal of a preliminary injunction on December 16, 2020 that had prevented PPGC from being terminated from Texas Medicaid, PPGC and its patients continue to vigorously contest and challenge the termination from the Texas program; therefore, the termination is not final.

Any Texas termination is limited to the Texas Medicaid program and does not affect PPGC's license or ability to continue to provide high-quality medical care to its patients.  PPGC remains committed to providing healthcare—including critical and time-sensitive preventive services and medical screenings—to its patients in Texas and Louisiana.

Sincerely,

Katie Beth Gottlieb, JD, MPH
General Counsel & Chief Compliance Officer
Planned Parenthood Gulf Coast, Inc.

Cc: Jarrod Coniglio
Medicaid Program Integrity Section Chief
Louisiana Department of Health
Program Integrity Section
P.O. Box 91030
Baton Rouge, Louisiana 70821-9030

PPGC00000037

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **PLANNED PARENTHOOD GULF COAST, INC.** | |
| | **CIVIL ACTION** |
| **VERSUS** | |
| | **NO. 15-565-JWD-RLB** |
| **COURTNEY PHILLIPS, in her official capacity as Secretary of the Louisiana Department of Health** | |

**ORDER**

This matter comes before the Court on the *Motion to Vacate the Preliminary Injunction* (Doc. 115) (the "*Motion*") filed by Defendant Dr. Courtney Phillips, in her official capacity as Secretary of the Louisiana Department of Health. Plaintiff Planned Parenthood Gulf Coast, Inc. opposes the motion, (Doc. 116), and Defendant has filed a reply, (Doc. 119). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.

For the following reasons, Defendant's motion is denied. This Court granted Defendant's earlier *Motion to Stay Proceedings* (Doc. 109) and ordered that:

> [A]ll proceedings are stayed and administratively closed pending decisions in the *en banc* rehearing of *Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc. v. Smith*, 914 F.3d 994 (5th Cir. 2019), <u>and</u> the appeal in *Planned Parenthood Gulf Coast, Inc. v. Gee*, No. 18- 30699 (5th Cir.) ("*Gee II*"), after which time the parties shall file a motion to lift the stay.

(Doc. 114 at 1 (emphasis in original).) As Defendant concedes, no ruling has been issued in *Gee II*. (*See* Doc. 115-1 at 1.) Thus, the requirements to lift the stay have not been satisfied.

Further, regardless of the ruling in *Planned Parenthood of Greater Texas Family Planning & Preventative Health Services, Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020) (en banc), the

App.733

Court sees little reason to vacate the injunction (which necessarily requires a limited lifting of the stay) until the legal landscape of this case is fully clarified by a decision in *Gee II*.  This is particularly true given the facts that (1) vacating the injunction could cause the Court (and the parties) to expend considerable time and resources to try and decide the constitutional issues before a decision in *Gee II*, despite the fact that a ruling in *Gee II* could render such time and expense unnecessary, and (2) oral argument was heard in *Gee II* on January 9, 2019, so a ruling will presumably be issued soon. (*Gee II*, Doc. 69.)

Accordingly,

**IT IS ORDERED** that the *Motion to Vacate the Preliminary Injunction* (Doc. 115) filed by Defendant Dr. Courtney Phillips, in her official capacity as Secretary of the Louisiana Department of Health, is **DENIED.**

Signed in Baton Rouge, Louisiana, on <u>April 7, 2021</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**