**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| United States of America | § | |
| *ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| The State of Texas | § | CIVIL ACTION NO. 2:21-CV-00022-Z |
| *ex rel.* ALEX DOE, Relator, | § | |
| | § | |
| The State of Louisiana | § | |
| *ex rel.* ALEX DOE, Relator, | § | Date:          February 21, 2023 |
| | § | |
| *Plaintiffs*, | § | |
| v. | § | |
| Planned Parenthood Federation of America, | § | |
| Inc., Planned Parenthood Gulf Coast, Inc., | § | |
| Planned Parenthood of Greater Texas, Inc., | § | |
| Planned Parenthood South Texas, Inc., Planned | § | |
| Parenthood Cameron County, Inc., Planned | § | |
| Parenthood San Antonio, Inc., | § | |
| *Defendants*. | § | |

**REPLY MEMORANDUM IN SUPPORT OF**
**<u>AFFILIATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

ARGUMENT ..................................................................................................... 2

I.   **The Court Should Grant Summary Judgment on Plaintiffs'
     Reverse False Claims Theory** ............................................................... 2

     A.   Affiliate Defendants Had No Obligation to Repay Money to the Government .......... 3

          1.   Affiliate Defendants' Medicaid Provider Agreements Remained in Effect
               Until State Officials Implemented the Terminations .......................................... 3

          2.   The Fifth Circuit's Vacatur Did Not Create an "Established Duty" to Repay ... 8

     B.   Affiliate Defendants Did Not Act With the Requisite Scienter ................................. 9

          1.   Affiliate Defendants' Position is Objectively Reasonable .............................. 10

          2.   The States' Knowledge Negates Scienter ....................................................... 14

II.  **Affiliate Defendants are Entitled to Summary Judgment on Relator's
     Implied False Claims** .................................................................................. 16

     A.   Relator Does Not Oppose Summary Judgment as to PPST and PPGT .................... 16

     B.   The Court's Prior Ruling Regarding Relator's TMFPA Claims Requires
          Summary Judgment for Affiliate Defendants on Those Claims .............................. 17

     C.   Relator's Remaining Implied False Certification Claims
          Fail on the Merits ..................................................................................................... 18

          1.   Relator Cannot Establish Falsity ..................................................................... 18

          2.   Relator Cannot Establish Materiality ............................................................... 21

III. **Defendants Are Entitled to Summary Judgment on Relator's
     Conspiracy Claims** ...................................................................................... 24

CONCLUSION ................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Austin v. Kroger Texas, L.P.*,
   864 F.3d 326 (5th Cir. 2017) ...............................................................25

*Bacchus Imports, Ltd. v. Dias*,
   468 U.S. 263 (1984).................................................................................7

*In re Bayou Shores SNF, LLC*,
   828 F.3d 1297 (11th Cir. 2016) ...........................................................24

*U.S. ex rel. Beck v. St. Joseph Health Sys.*,
   2021 WL 7084164 (N.D. Tex. Nov. 30, 2021).....................................17

*U.S. ex rel. Becker v. Tools & Metals, In*c.,
   2009 WL 855651 (N.D. Tex. Mar. 31, 2009) .......................................18

*U.S. ex rel. Burke v. Rec. Press, Inc.*,
   816 F.3d 878 (D.C. Cir. 2016) .......................................................14, 15

*Children's Hosp. Ass'n of Texas v. Azar*,
   507 F. Supp. 3d 249 (D.D.C. 2020)....................................................6, 7

*Children's Hosp. Ass'n of Texas v. Azar*,
   933 F.3d 764 (D.C. Cir. 2019) ...............................................................6

*Christensen v. Harris Cnty.*,
   529 U.S. 576 (2000)...............................................................................11

*U.S. ex rel. Colquitt v. Abbott Lab'vs*,
   858 F.3d 365 (5th Cir. 2017) ................................................................14

*U.S. ex rel. Complin v. N.C. Baptist Hosp.*,
   818 F. App'x 179 (4th Cir. 2020) .........................................................11

*U.S. ex rel. Farmer v. Houston*,
   525 F.3d 333 (5th Cir. 2008) ................................................................10

*Fed. Recovery Servs., Inc. v. U.S.*,
   72 F.3d 447 (5th Cir. 1995) ..................................................................17

*FTC v. Neora LLC*,
   2022 WL 3213540 (N.D. Tex. Aug. 8, 2022)........................................17

*Harper v. Virginia Dep't of Taxation*,
    509 U.S. 86 (1993) ........................................................................................6, 7

*U.S. ex rel. Hopper v. Anton*,
    91 F.3d 1261 (9th Cir. 1996) ...............................................................................24

*U.S. ex rel. Janssen v. Lawrence Mem. Hosp.*,
    949 F.3d 533 (10th Cir. 2020) .............................................................................19

*PPGT v. Kauffman*,
    981 F.3d 347 (5th Cir. 2020) ...........................................................................7, 22

*U.S. ex rel. Kennedy v. Avetis Pharm., Inc.*,
    2008 WL 5211021 (N.D. Ill. Dec. 10, 2008) ......................................................24

*U.S. ex rel. King v. Solvay S.A.*,
    823 F. Supp.2d 472 (S.D. Tex. 2011) ..................................................................25

*U.S. ex rel. Lamers v. Green Bay*,
    168 F.3d 1013 (7th Cir. 1999) .............................................................................15

*U.S. ex rel. Lemon v. Nurses to Go, Inc.*,
    924 F.3d 155 (5th Cir. 2018) ...............................................................................18

*U.S. ex rel. Lisitza v. Par Pharma. Co.*,
    276 F. Supp. 779 (N.D. Ill. 2017) .......................................................................18

*U.S. ex rel. Martinez v. KPC Healthcare Inc.*,
    2017 WL 10439030 (C.D. Cal. June 8, 2017) .....................................................24

*U.S. ex rel. Mbabazi v. Walgreen Co.*,
    2021 WL 4453600 (E.D. Pa. Sept. 28, 2021) ......................................................24

*Moore v. LaSalle Corr., Inc.*,
    2020 WL 6389183 (W.D. La. Oct. 30, 2020) ......................................................14

*O'Neal v. Cargill, Inc.*,
    178 F. Supp. 3d 408 (E.D. La. 2016) ..................................................................17

*Olson v. Fairview Health Servs. of Minn.*,
    831 F.3d 1063 (8th Cir. 2016) .............................................................................16

*U.S. ex rel. Ormsby v. Sutter Health*,
    444 F. Supp. 3d 1010 (N.D. Cal. 2020) ..............................................................18

*U.S. ex rel. Porter v. Magnolia Health Plan*,
    810 F. App'x 237 (5th Cir. 2020) ........................................................................19

*PPGC v. Kliebert*,
    141 F. Supp. 3d 604 (M.D. La. 2015)..............................................................................4, 5, 6

*PPGT v. Smith*,
    236 F. Supp. 3d 974 (W.D. Tex. 2017).................................................................................4

*U.S. ex rel. Proctor v. Safeway, Inc.*,
    30 F. 4th 649 (7th Cir. 2022) ...............................................................................10, 12, 13

*U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*,
    355 F.3d 370 (5th Cir. 2004) ...............................................................................................21

*Safeco Ins. Co. of Am. V. Burr*,
    551 U.S. 47 (2007)...........................................................................................9, 10, 11, 12

*Safeco. Van Straaten v. Shell Oil Prods. Co.*,
    678 F.3d 486 (7th Cir. 2012) ...............................................................................................11

*Savers Fed. Sav. & Loan Ass'n v. Reetz*,
    888 F.2nd 1497, 1501 (5th Cir. 1989) ...........................................................................16, 17

*U.S. ex rel. Schutte v. SuperValu, Inc*.,
    9 F.4th 455 (7th Cir. 2021) .............................................................................................7, 11, 12

*Signor v. Safeco Ins. Co. of Ill.*,
    2021 WL 4990314 (S.D. Fla. Apr. 16, 2021) .........................................................................14

*U.S. ex rel. Stephens v. Tissue Science Lab., Inc.*,
    664 F. Supp. 2d 1310 (N.D. Ga. 2009) ...................................................................................23

*U.S. v. Hughes Helicopter Co*.,
    1993 WL 841192 (C.D. Cal. Aug. 25, 1993)...........................................................................15

*U.S. v. Kindred Healthcare*,
    469 F. Supp. 3d 431 (E.D. Pa. 2020) ...................................................................19, 20, 24

*U.S. v. Shoup*,
    2017 WL 4535285 (N.D. Tex. Sept. 8, 2017)..........................................................................17

*U.S. v. Southland Mgmt. Corp*.,
    326 F.3d 669 (5th Cir. 2003) ...............................................................................................16

*Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*,
    579 U.S. 176 (2016)....................................................................................1, 18, 19, 23

*Watts v. Hosp. Ventures, LLC*,
    2008 WL 220798 (M.D. Ala. Jan. 25, 2008) .........................................................................14

*U.S. ex rel. White v. Mobile Care EMS & Transport, Inc.*,
    2021 WL 6064363 (S.D. Oh. Dec. 21, 2021) ........................................................................23

*U.S. ex rel. Wilson v. KBR*,
    525 F.3d 370 (4th Cir. 2008) ........................................................................21

*U.S. ex rel. Zemplenyi v. Grp. Health Cooperative*,
    2011 WL 814261 (W.D. Wash. Mar. 3, 2011) ........................................................................24

**Statutes**

False Claims Act ........................................................................ *passim*

1 U.S.C. § 3729 ........................................................................9

La. R.S. § 46:437.3 ........................................................................9

Tex. H.R.C. § 36.001 ........................................................................9

**Other Authorities**

42 C.F.R. § 433.316 ........................................................................13

Fed. R. Civ. P. 26 ........................................................................14

Fed. R. Civ. P. 56 ........................................................................3

## INTRODUCTION

Plaintiffs fail to mount a serious challenge to Affiliate Defendants' motion for summary judgment. Plaintiffs trot out the same arguments that allowed them to survive a motion to dismiss, but now they can no longer rely on allegations and conclusory assertions—they must come forward with *evidence* supporting their claims. They have none. There is no genuine dispute of material fact and Affiliate Defendants are entitled to judgment as a matter of law.

**Reverse False Claims.** Plaintiffs do not cite *any* authority holding that a payment that was lawful when made (which the payments Affiliate Defendants received during the pendency of the injunctions indisputably were) can retroactively become an overpayment that a Medicaid provider has an affirmative obligation to return. To the contrary, every case cited makes clear that additional action is required, either by a court or the government, to recover payments made under an injunction. For this reason, the Court should hold that Affiliate Defendants did not have an established "obligation" to pay money to the government. At a minimum, however, in light of the absolute dearth of authority supporting Plaintiffs' theory and considerable authority to the contrary, Affiliate Defendants' position that repayment was not required was objectively reasonable. And because authoritative guidance did not warn Affiliate Defendants away from that position, Plaintiffs cannot establish that Affiliate Defendants acted with the requisite scienter. Finally, if the Court were to reach subjective intent, the undisputed facts make clear that Affiliate Defendants never even considered that they might have had an obligation to repay.

**Implied False Certification.** Relator's arguments on implied false certification fly in the face of black letter False Claims Act ("FCA") law. Supreme Court precedent explicitly requires Relator to identify "specific representations" on the claim that are rendered misleading half-truths, but Relator has identified none. *Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 190 (2016) (addressing the "two conditions" that must be satisfied for an "implied certification

theory").   Further, Relator cannot establish objective falsity because, as Texas previously explained, "medical and ethical standards" are "fluid," "subjective," and subject to "discretion." Sec. Supp. App. 889, Tex. Mot., Dkt. 99, *PPGC v. Smith*, 1:15-cv-01058-LY (W.D. Tex. Feb. 17, 2017).   Alleged noncompliance with such fuzzy standards cannot give rise to an objective falsehood.  Moreover, the Court should grant PPST and PPGT summary judgment on the implied false certification claims since Relator did not respond to Affiliate Defendants' argument that Relator's failure to allege that PPST and PPGT violated the law or medical and ethical standards is fatal to those claims.

Finally, Relator cannot establish materiality for any of the claims.  Relator cannot establish materiality for claims paid by MCOs, and the federal government has left no doubt about where it stands on Relator's remaining claims; it disagrees with the States' determination that there was a basis to terminate Affiliate Defendants from Medicaid.  It is harder to envision a more clear-cut case of immateriality.  Even if Texas and Louisiana's conduct is considered, it too demonstrates that irrespective of what they may have thought about Affiliate Defendants' future participation in Medicaid, any past alleged violations were not material to payment for services already provided.

***Conspiracy.***  Relator fails to meaningfully respond to Affiliate Defendants' motion on Relator's conspiracy claims, arguing only that Affiliate Defendants failed to meet their burden. Affiliate Defendants more than met their burden, and without any substantive opposition from Relator, their motion should be granted.

## <u>ARGUMENT</u>

## I.  The Court Should Grant Summary Judgment on Plaintiffs' Reverse False Claims Theory

To proceed to trial on their reverse false claims theory, Plaintiffs must establish there is a genuine dispute of material fact as to whether Affiliate Defendants (1) had an "obligation" to pay

money to the United States, Texas, and Louisiana, and (2) "knowingly and improperly" (or in the case of Louisiana, "knowingly") avoided that obligation.  They have not come close to doing so.

### A.  Affiliate Defendants Had No Obligation to Pay Money to the Government

1.    **Affiliate Defendants' Medicaid Provider Agreements Remained in Effect Until State Officials Implemented the Terminations**

Plaintiffs assert that Affiliate Defendants "had no valid [Medicaid] provider agreement[s] during the pendency of the preliminary injunctions" and therefore were "not entitled to the money [they] received as a matter of law."  Dkt. 415 at 8.  That is just not true.  Texas and Louisiana provided notice of their *intent* to effectuate the termination of Affiliate Defendants' Provider Agreements.  Two federal courts expressly prohibited the States from doing so, Dkt. 382, SOF ¶¶ 12, 16,[1] and the Texas inunction's vacatur simply allowed Texas to resume the as-yet incomplete termination.  Texas completed that process in March 2021, and thus Affiliate Defendants could not (and did not) submit Medicaid reimbursement requests after that date.  Dkt. 417, Supp. SOF ¶ 29.  However, until then, Affiliate Defendants' Texas Medicaid Provider Agreements were valid and Affiliate Defendants were entitled to receive reimbursement.  Louisiana never completed the termination and PPGC continues to participate in Louisiana Medicaid.  Dkt. 382, SOF ¶ 19.

Plaintiffs assert that "federal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves."  Dkt. 415 at 7 (quoting *Whole Women's Health v. Jackson*, 210 L. Ed. 2d 1014 (Sept. 1, 2021)).  That is precisely the point.  Courts enjoined Texas and Louisiana officials from terminating Affiliate Defendants' Medicaid Provider Agreements, and did so *before* the expiration of the thirty-day appeal period set forth in the termination notices.[2]

---

[1]  Because Plaintiffs do not even attempt to dispute the facts contained in Affiliate Defendants' Statement of Undisputed Facts (Dkt. 391), the Court should consider those facts undisputed and grant summary judgment to Affiliate Defendants.  Fed. R. Civ. P. 56(e)(2), (3).

[2]  Thirty days from the date of the Louisiana termination notice was October 19, 2015.  While Plaintiffs argue that the termination was "effective" October 15, 2015, *see, e.g.* Dkt. 415 at 32, this

*PPGC v. Kliebert*, 141 F. Supp. 3d 604, 653 (M.D. La. 2015); *PPGT v. Smith*, 236 F. Supp. 3d 974, 1000 (W.D. Tex. 2017).  Until termination of their agreements actually took effect, Affiliate Defendants remained lawful Medicaid providers entitled to bill and receive payment.

Texas's conduct throughout and after the termination litigation confirms that it shared Affiliate Defendants' understanding that the terminations could be effectuated only through further *acts* of state officials.  Two months after the terminations supposedly became effective, Texas stated that it had "no plans to terminate any of the [Affiliate Defendants' Medicaid Provider] Agreements at this time."  Dkt. 418, Supp. App. 601.  Texas could not possibly have made that representation if the agreements had already been terminated.  Instead, Texas would have said that it had no plans to *enforce* the terminations at this time.  Other statements by Texas similarly make clear that Affiliate Defendants would not actually be *out* of Medicaid absent additional action by Texas officials.  *E.g.*, Dkt. 383, App. at 290 (Texas briefing noting "[o]nce the termination of a Medicaid contract is final, there is still a practical process for implementing or carrying out the termination that takes time[,]" including "[v]arious logistical procedures . . before a termination becomes fully implemented as a matter of practical reality."); *id.* at 296 (arguing that the vacatur meant that nothing "prevent[ed] HHSC from proceeding to fully implement [the terminations].").  At Texas's 30(b)(6) deposition, it explained that provider enrollment is managed by a HHSC contractor, Texas Medicaid & Healthcare Partnership ("TMHP"), and that HHSC provides TMHP "direction to take action" through "State Action Request[s]" ("SARs"), "asking TMHP to put a

---

is incorrect.  On October *16,* 2015, Louisiana argued in federal court that PPGC lacked standing to challenge the terminations because "their contract has not been terminated" and that PPGC had until the following Monday (October 19) to participate in the state administrative process).  Sec. Supp. App 923, Mot. Tr., Dkt. 59, *PPGC v. Smith* (Oct. 16, 2015).  A TRO was entered on October 18, 2015, followed by a preliminary injunction on October 29.  Thirty days from the date of the Texas final termination notices was January 20, 2017.  A TRO was entered on January 19, 2017, followed by a preliminary injunction on February 21.

Payment Denial Code" on a provider's Medicaid file. *Id.*. at App. 259-60, 283 and Sec. Supp. App at 993 (Tex. 30(b)(6) (Zalkovsky) Dep. 44:14-45:3); Dkt. 383, App. 308 (Tex. 30(b)(6) (Goldstein) Dep. 104:9-24); Sec. Supp. App. at 995 (Tex. 30(b)(6) (Goldstein) Dep. 96:12-20).

The evidence further demonstrates that Texas officials did not even *start* the process to implement Affiliate Defendants' termination until several months after the Fifth Circuit's vacatur, years after the termination notices were issued.  *See* Dkt. 382, SOF ¶¶ 26-27.[3]  HHSC *unconditionally* re-enrolled Affiliate Defendants in Medicaid numerous times after February 1, 2017. *Id.* at SOF ¶ 28.  Then, of course, there is the Grace Period, which Texas could not lawfully have granted had Affiliate Defendants' Provider Agreements been terminated years earlier.  Dkt. 417 at 17-18.  Texas's grant of the 30-day Grace Period in 2021 is fundamentally at odds with its conclusory assertion that the terminations became effective in 2017, and Plaintiffs' opposition to summary judgment on their reverse false claims does not address the Grace Period at all.

In Louisiana, PPGC has maintained an unbroken line of valid Provider Agreements from 2010 to present.  *E.g.*, Dkt. 382, SOF ¶¶ 4, 12, 19, 34; Dkt. 417, SOF ¶¶ 21, 28, 31, 38; Dkt. 419-2 at 20-21 (discussing PPGC's settlement with LDH and continued enrollment in Louisiana Medicaid).[4]  While LDH notified PPGC of its purported Medicaid "termination," the termination never took effect before, during, or after the *Kliebert* injunction enjoining Louisiana officials from

---

[3] Texas did not inform MCOs or beneficiaries of the impending terminations until January 2021. Dkt. 382, SOF ¶¶ 22, 26-27.  That month, HHSC issued the first in a series of SARs to TMHP culminating in a direction to implement "payment denial codes" for Affiliate Defendants as of the "effective" date of termination, which HHSC itself identified as March 11, 2021. *E.g.*, Dkt. 383, App. 339-40.  It is also undisputed that Affiliate Defendants remained on Texas's "Master Provider File" ("MRF") listing all enrolled Medicaid providers through March 2021. Dkt. 382, SOF ¶ 27.

[4] There is also evidence showing that CMS did not consider PPGC's termination "final" in October 2015.  In August 2016, CMS issued a letter noting concerns about the impact that termination of PPGC's provider agreement "*would have*" on Medicaid beneficiaries. Dkt. 383, App. at 209-11. CMS perceived termination as a potential *future* event, contingent on further action by the State.

"terminating any of [PPGC's] Provider Agreements." *Kliebert*, 141 F. Supp. 3d at 653.[5]  Plaintiffs do not, and cannot, point to any evidence otherwise.

The fact that further government action was required to effectuate the intended terminations distinguishes this case from *Children's Hosp. Ass'n of Texas v. Azar*, 507 F. Supp. 3d 249 (D.D.C. 2020).  There, the district court addressed *reinstatement* of an HHS Final Rule establishing the methodology for hospitals to calculate particular "costs," which would in turn determine their funding eligibility.  Nearly a year *after* the Rule went into effect, the district court entered summary judgment for plaintiffs and vacated it.  *Id.* at 251.  The D.C. Circuit reversed and "reinstate[d] the 2017 Rule."  *Children's Hosp. Ass'n of Texas v. Azar*, 933 F.3d 764, 774 (D.C. Cir. 2019).  The district court was then asked to decide the Rule's effective date—the original date long before the district court's order vacating it, or the date on which the D.C. Circuit's mandate issued.  The court ultimately held, based on *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993), that the Rule was effective as of the original effective date.  *Azar*, 507 F. Supp. 3d at 258.

This case shares no similarities to those where courts have declared a statute, regulation, or rule invalid.  The *Harper* Court explained that "[w]hen this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."  509 U.S. at 97.  That means that,

---

[5]  The September 15, 2015 letter expressly stated that LDH had "elected to . . . not pursue immediate termination" and that the termination would "take effect following final determination, judgment, completion, withdrawal from, or termination of all administrative and or legal proceedings in this matter." Rel. Compl., Ex. A.  Louisiana repeatedly emphasized that the termination was not yet final.  *Supra* n. 2; *see also* Sec. Supp. App. 898, La. Mot., *PPGC v. Kliebert*, Dkt. 53-1 (M.D. La. Oct. 14, 2015) ("To date, there has been no final determination."); *id.* at 905-06 ("The termination of PPGC's provider contract has not gone into effect. [. . . ] That PPGC's contracts *may* be terminated [. . . ] is speculative and insufficient to establish standing.") (emphasis added)).

when a court concludes that a rule is valid, as in *Azar*, that determination applies retroactively. That principle has no application here. The courts did not declare any statute, rule, or regulation invalid that was subsequently held valid on appeal. *Cf. Azar*, 507 F. Supp. 3d at 257. The federal courts simply enjoined Texas and Louisiana from effectuating a specific enforcement action—that is, terminating Affiliate Defendants' Provider Agreements *before* the administrative appeal periods expired and *before* officials effectuated the terminations. Whether and when an enforcement action is effectuated is not implicated by *Harper* or *Azar*.[6]

In addition, because the terminations had not become effective before the injunctions entered, there was nothing to reinstate. The effect of the Fifth Circuit's 2020 decision simply removed any barrier to Texas "proceeding to fully implement [the terminations]," as Texas previously acknowledged. Dkt. 383, App. 296; *see also* Dkt. 382, SOF ¶ 24 n. 11 (quoting Texas statement). Texas cannot turn back time and effectuate an enforcement action that did not occur. *Kauffman* did not address the merits or status of the underlying agency action, and the *Azar* court's determination that an agency rule was always effective under *Harper* says nothing about when the States terminated Affiliate Defendants from Medicaid (if at all, in the case of Louisiana).[7]

Nor does the Travis County Court opinion support Plaintiffs' position. It held only that Texas was not required to re-notice the termination and that the administrative appeal deadline had

---

[6] Applying the principles from *Harper* and *Azar* merely means that *Kauffman*'s holding—that Medicaid beneficiaries have no private right of action to enforce the free-choice-of-provider provision—would retroactively deprive a Medicaid beneficiary of a private right of action.

[7] Even if *Azar* somehow applied, that decision does not constitute "authoritative guidance" to warn Affiliate Defendants away from their objectively reasonable interpretation that they had not been terminated during the pendency of the injunctions. *U.S. ex rel. Schutte v. SuperValu, Inc.*, 9 F.4th 455, 471 (7th Cir. 2021) (authoritative guidance must come from a "circuit court"). Nor did it warn them away from their view that they had no repayment obligation. *See id.*; *see also Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 276-77 (1984) (declining to order automatic tax refund after ruling that tax was unconstitutional and that decision applied retroactively because of outstanding questions, including extent of taxpayers' injury, and remanding to address remedy).

passed, meaning that Texas could *proceed* with effectuating the terminations. Dkt. 417, Supp. SOF ¶¶ 29-31 (citing Dkt. 390-2, Pls. App. 1091-92).  But it is one thing to say that the "termination notices were not dissolved with" the injunction, *see* Dkt. 415 at 7, and quite another to say that the yet-to-take effect terminations came into force notwithstanding a federal court order.  The Texas state court held only the former.  *Id.*  It did *not* hold that the terminations actually went into effect years earlier, nor did it determine that Affiliate Defendants had an obligation to repay the reimbursements they received.

Finally, Plaintiffs' assertion that the Texas and Louisiana injunctions were retroactively rendered legal nullities cannot be squared with other statements in their brief.  Plaintiffs dismiss Texas's continued reimbursement of Medicaid claims into the Fall of 2022, stating that "the claims were for services rendered during a time when Texas was mandated by court [order] to pay reimbursements to Affiliates."  Dkt. 415 at 27 n.12.  But by that time, the injunction was vacated, which—according to Plaintiffs—warrants treating it as if it never existed.  If that was true, there was no reason for Texas to continue to reimburse claims submitted during the injunction.  Texas's continued payment even after this litigation was filed makes clear it believed the injunctions were valid while in effect, and were not retroactively stripped of validity after the fact.

### 2. The Fifth Circuit's Vacatur Did Not Create an "Established Duty" to Repay

Plaintiffs admit that the Fifth Circuit's decision itself did not create a repayment obligation. Dkt. 415 at 4.  Vacatur of an injunction does not impose an affirmative duty to pay money to the prevailing party; such an obligation arises only if the reviewing court orders payment on an injunction bond or equitable relief.  *See* Dkt. 382 at 23-30 (citing cases); Dkt. 417 at 22-25 (same).[8]

---

[8]  Contrary to Plaintiffs' assertion, Affiliate Defendants never argued that the lack of an injunction bond "negates" a repayment obligation.  *See* Dkt. 415 at 3-7.  Affiliate Defendants simply noted

Since none of that happened, Plaintiffs' sole argument is that the payments Affiliate Defendants received retroactively became "overpayments" that they had an affirmative obligation to return. Plaintiffs cite *no authority*—no case, no statute, no regulation, and no agency guidance—for the proposition that a payment that was lawful when made can become an overpayment after the fact. And the limited authority that exists addressing the right to recover payments made under a later-vacated injunction indicates that affirmative governmental action is required. *See* Dkt. 417 at 24 (discussing cases). Because no such action was taken here, any repayment obligation was contingent on events that never occurred. As a matter of black letter law, a contingent obligation cannot trigger reverse false claims liability.[9] Dkt. 382 at 22-23; Dkt. 417 at 25.

## B.  Affiliate Defendants Did Not Act With the Requisite Scienter

At a minimum, Affiliate Defendants are entitled to summary judgment on Plaintiffs' reverse false claims theories because they did not act with the requisite scienter. There is no dispute that whether a Medicaid provider has an affirmative obligation to return reimbursements paid during a later-vacated injunction presents a matter of first impression. Although Affiliate Defendants believe they are correct that no "obligation" existed, this plainly is a situation where the law is "less-than-pellucid." *Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 70 (2007). It is therefore precisely the type of case to which the *Safeco* objective reasonableness test applies. Because it was objectively reasonable for Affiliate Defendants to conclude that they had no obligation to refund reimbursements received during the injunctions and they were not warned

---

that vacatur of an injunction triggers a repayment obligation only if additional events occur, one of which could be an order requiring payment on an injunction bond.

[9]  Plaintiffs also argue that the FCA, TMFPA, and LMAPIL create an "independent statutory basis" for the government's "right of recovery." Dkt. 415 at 4-5. But damages and penalties are only available *after* an overpayment "obligation" has been established, and the defendant knowingly avoids it. *See* 1 U.S.C. § 3729(b)(3); Tex. H.R.C. § 36.001(7-a); La. R.S. § 46:437.3(16). These statutes cannot—and do not purport to— independently establish an obligation to the government.

away from that position by authoritative guidance, the Court must grant Affiliate Defendants summary judgment.   Moreover, the States' knowledge of and acquiescence to Affiliate Defendants' retention of the reimbursements independently negates scienter.

### 1.       Affiliate Defendants' Position is Objectively Reasonable

Courts across the country, including in this Circuit, have applied *Safeco*'s rule to hold that that a false claims defendant lacks scienter if it acts in accordance with an objectively reasonable interpretation of the applicable legal requirements, and no authoritative guidance warned it away from its interpretation.[10] *E.g.*, *U.S. ex rel. Proctor v. Safeway, Inc.*, 30 F. 4th 649, 652-53 (7th Cir. 2022); Dkt. 382 at 31-32 (collecting cases).   Plaintiffs' claims unmistakably fail under that test. The law does not clearly show that an injunction's vacatur, standing alone, can retroactively render funds received under it "overpayments" that must be immediately returned.   Affiliate Defendants' construction of the law is reasonable.   The reasonableness of their position is underscored by the States' conduct both during and following the termination litigation, but Affiliate Defendants will not rehash those arguments here.   *See* Dkt. 382 at 31-38; Dkt. 417 at 27-32.

Plaintiffs argue that Affiliate Defendants' interpretation was not reasonable because they actually "*knew* that their federal court gambit would not be suspensive and could not erase or delay the effectiveness of their termination."   Dkt. 415 at 18.   Even if this was true (and it is not, *see* Dkt. 382, SOF ¶ 40), *Safeco* expressly precludes inquiry into a defendant's subjective beliefs.[11]

---

[10]   Plaintiffs also misstate the scienter standard in arguing that they need only show that Affiliate Defendants "knew or should have known" of their obligation to repay.   Dkt. 415 at 17.   To satisfy the lowest scienter standard, reckless disregard, a plaintiff must show the defendant was aware of a *substantial* risk and consciously disregarded it.   *E.g.*, *U.S. ex rel. Farmer v. Houston*, 525 F.3d 333, 338, n. 9 (5th Cir. 2008) (citing cases).

[11]   A brief stay is warranted by the recent grant of certiorari to review *Safeco*'s applicability to the FCA.   Dkt. 422 & Dkt. 430.   However, even if the Supreme Court holds that subjective knowledge can be considered in FCA cases where there was an objectively reasonable interpretation, Plaintiffs still could not establish scienter.   *See* Dkt. 382 at 31-38; Dkt. 417 at 27-32.

The Supreme Court explained: "Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Safeco*, 551 U.S. at 70 n.20. "Congress could not have intended such a result for those who followed an interpretation that could reasonably have found support in the courts, *whatever their subjective intent may have been*." *Id.* (emphasis added). That rule makes sense. If the law is ambiguous, a party may *think* it knows what it requires, but absent authoritative guidance interpreting the law, it cannot *actually know* what is required. *E.g.*, *U.S. ex rel. Schutte v. SuperValu, Inc.*, 9 F.4th 455, 468 (7th Cir. 2021). Therefore, Plaintiffs' reliance on Affiliate Defendants' supposed "actual knowledge" is entirely unsupported.

To the extent Plaintiffs argue that the email exchange between a PPFA Lit & Law employee and LDH counsel constituted authoritative guidance that should have warned Affiliate Defendants away from their position, that is wrong too. Authoritative guidance can come from one of two sources—"either circuit court precedent or guidance from the relevant agency." *Id.* at 471. To be authoritative, agency guidance must be "binding on the [agency]." *Safeco*, 551 U.S. at 70 & n.19. Only "an interpretation contained in . . . a formal adjudication or notice-and-comment rulemaking" suffices to bind a regulated party to an agency's interpretation of an ambiguous law. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). "[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law," are insufficient, *id.*, and therefore are not "authoritative guidance" under *Safeco*. *Van Straaten v. Shell Oil Prods. Co.*, 678 F.3d 486, 488 (7th Cir. 2012) (agency bulletin not authoritative); *U.S. ex rel. Complin v. N.C. Baptist Hosp.*, 818 F. App'x 179, 184 n.6 (4th Cir. 2020) ("non-precedential and non-binding" agency decision insufficient). If agency manuals are insufficient, certainly an email

11

exchange with an agency lawyer about what his "client . . . believe[s]," *see* Dkt. 415 at 18, does not come close to what *Safeco* requires.[12]  It is also contrary to the position that LDH took before the Fifth Circuit, where LDH contended that whether "PPGC's contracts may be terminated" (and PPGC deemed disqualified) was "purely speculative."  Sec. Supp. App. 952, *PPGC v. Kliebert*, No. 15-30987, Dkt. No. 22-2 (5th Cir. Jan. 8, 2016)

Moreover, even if the email exchange Plaintiffs rely on were authoritative, it still would not be enough because it is not "sufficiently specific" to warn Affiliate Defendants.  *Schutte*, 9 F.4th at 471.  It addresses agency counsel's view about whether a federal lawsuit would be suspensive as a matter of state law.  It does not address whether PPGC—the only Affiliate Defendant that received funds from Louisiana Medicaid—would have an obligation to repay amounts received from Louisiana in the event an injunction was entered.  It is dated before an injunction was entered and *five years* before the Fifth Circuit's decision that Plaintiffs allege gave rise to the repayment obligation.  It does not have the "high level of specificity" with respect to repayment that would be required to warn PPGC.  *Id.*

Plaintiffs identify several other sources of purported authoritative guidance.  First, they point to the Fifth Circuit's 2020 *en banc* decision.  But the majority addressed justiciability and standing, not the underlying merits—much less whether there was an obligation to repay funds paid under the injunctions.  It was not "specific enough to put [Affiliate Defendants] on notice that [retaining the funds] [wa]s unlawful."  *See Proctor*, 30 F.4th at 661.  Although some judges offered views about the terminations' merits in a concurrence (that did not discuss repayment), a concurrence is not binding and therefore not authoritative guidance.

---

[12]  It also could not possibly have warned PPST or PPGT away from their reasonable interpretation of their own legal obligations, because neither were contracted with Louisiana Medicaid.

Second, Plaintiffs assert that a CMS document "establishes that it is unreasonable for Defendants to believe that an obligation to repay would only arise after Texas or Louisiana sent a notice of overpayment or filed a recoupment action." Dkt. 415 at 19 (citing 81 Fed. Reg. 7654-01, 7664). But Plaintiffs do not identify any statement that stands for that proposition. *Id.*

Third, Plaintiffs argue that Texas's letter granting the Grace Period "communicated that the 2017 terminations were now in effect." Dkt. 415 at 19. But not only is that not what the letter said, it was *entirely silent* as to repayment. It did not so much as suggest that Affiliate Defendants would be required to repay amounts received under the injunction or forthcoming Grace Period.

Finally, Plaintiffs incorrectly argue that the States' failure to return the federal portion of Affiliate Defendants' supposed overpayments is irrelevant. Dkt. 415 at 20-22. Plaintiffs contend that Part 433 of Title 42 of the Code of Federal Regulations does not apply to recoveries under the TMFPA and LMAPIL, but that is contrary to the authority on which they rely, *see* Dkt. 415 at 21 (citing 2010 CMS guidance document discussing provisions in part 433), as well as the regulations themselves, which expressly contemplate state-level enforcement action for overpayments. *See, e.g.*, 42 C.F.R. § 433.316. Further, while there is an exception to the one-year return rule, it does not apply here. A state's deadline to return overpayments is tolled by administrative or judicial process only in situations where the state is "*unable* to recover overpayments due to fraud." 42 C.F.R. § 433.316(d)(2) (emphasis added). There is no evidence that the States have been unable to recover the alleged overpayments. The evidence shows that they never tried.[13]

---

[13] Affiliate Defendants properly relied on the Costello declaration. Plaintiffs argue that Costello "was never disclosed as a person likely to have discoverable information," Dkt. 415 at 22, but that is not true. Defendants disclosed CMS as a potential witness on March 9 and again on August 25, 2022. Sec. Supp. App. 1007. Affiliate Defendants produced the declaration on November 22 (five days after CMS submitted it in response to Affiliate Defendants' *Touhy* request and subpoena), Sec. Supp. App. 1013, Prod. Letter, and thereafter disclosed Costello out of an abundance of caution. *See* Pls. Supp. App. 1017; Aff. Defs.' Fifth Supp. Disclosures (Dec. 2, 2022). Affiliate

## 2.   The States' Knowledge Negates Scienter

Plaintiffs argue that the government's knowledge does not preclude liability because (i) the government has "sovereign immunity" and did not waive it, and (ii) the government knowledge inference only applies when the government acquiesces in the defendant's conduct, which it did not do here.[14]   Dkt. 415 at 22-28.   But Affiliate Defendants do not contend that the government's knowledge supports a waiver defense.   Rather "government knowledge can be a defense to an FCA suit" because it shows that the government *agreed* with the defendant, demonstrating that the defendant lacked the requisite scienter to violate the law.   *E.g.*, *U.S. ex rel. Colquitt v. Abbott Lab'vs*, 858 F.3d 365, 379-80 (5th Cir. 2017); *U.S. ex rel. Burke v. Rec. Press, Inc.*, 816 F.3d 878, 881 (D.C. Cir. 2016).   Moreover, the record indisputably demonstrates both government knowledge *and* acquiescence in Affiliate Defendants' retention of the Medicaid funds.

---

Defendants' disclosure via production was "timely" from when Affiliate Defendants "learn[ed]" of Costello's identity.   Fed. R. Civ. P. 26(e)(1)(A).   Relator downloaded that production on November 22, and Texas on November 23.   Sec. Supp. App. 1015, Download Rep. (reflecting downloads in GMT time).   Affiliate Defendants thereafter, as an additional measure, disclosed Costello by name on December 2, when depositions were still underway (in fact, more than ten depositions were noticed to occur *after* the disclosure).   Second Supp. App. 1017.   Where a witness's identity was disclosed through a declaration's production, there is "no obligation to provide supplemental or corrective information" because the witness was "made known to the parties . . . during the discovery process[.]"   Fed. R. Civ. P. 26(e) advisory committee note; *e.g.*, *Signor v. Safeco Ins. Co. of Ill.*, 2021 WL 4990314, at *3 (S.D. Fla. Apr. 16, 2021) (holding there is "no obligation to supplement [a party's] initial disclosures" to include a witness whose "identity was made known during discovery" and, even if there were such an obligation, the failure to meet it would be "harmless" if the party seeking to exclude the witness waited until summary judgment to seek relief); *Moore v. LaSalle Corr., Inc.*, 2020 WL 6389183, at *8 (W.D. La. Oct. 30, 2020) (noting that a witness was disclosed to the other party "through the filing of his Declaration"); *Watts v. Hosp. Ventures, LLC*, 2008 WL 220798, at *2 (M.D. Ala. Jan. 25, 2008) (similar). Accordingly, the declaration may be considered at summary judgment and Costello may testify at trial.

[14]   Although Plaintiffs' argument focuses exclusively on Texas, *see* Dkt. 415 at 27-28, the knowledge of all relevant government bodies establishes Affiliate Defendants' lack of scienter, and so Affiliate Defendants discuss the government's knowledge more broadly.

The undisputed material facts show LDH has not terminated PPGC from Louisiana Medicaid nor requested repayment. *See* SOF ¶ 34. Texas repeatedly indicated Affiliate Defendants remained Medicaid-eligible, and acted consistent with that position before and after the Fifth Circuit's *en banc* decision. *E.g.,* SOF ¶¶ 17, 24, 26–27, 31. No reasonable jury could conclude that Affiliate Defendants "knowingly and improperly avoid[ed]" a repayment obligation by openly retaining Medicaid payments with the government's full knowledge. *See U.S. ex rel. Lamers v. Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999) ("The notion that the [government] was somehow being duped by the [defendant]" when the government had knowledge of the relevant facts "is absurd."); *U.S. v. Hughes Helicopter Co.*, 1993 WL 841192, *14 (C.D. Cal. Aug. 25, 1993) (no scienter where "[defendant] did not hide, and the Army was fully aware of," issues).

Relator identifies no contrary evidence as to Louisiana, and that Texas filed a Complaint in Intervention merely evidences Texas's adoption of a litigation position that is at odds with its prior conduct. It is also beside the point whether the government paid pursuant to court orders and whether it could have (*but did not*) pursue "alternative remedies." The government knowledge inference is triggered because the government's conduct—undertaken with knowledge of all relevant facts—was consistent with Affiliate Defendants' understanding that they were entitled to retain the Medicaid reimbursements. *See U.S. ex rel. Burke v. Rec. Press, Inc.*, 816 F.3d 878, 881 (D.C. Cir. 2016) (testimony and evidence indicating that the government agreed with defendant bears on the defendant's state of mind). The inference focuses on the *effect* of the government's knowledge on the defendant's mental state, and here, the States never gave any indication to Affiliate Defendants that they were doing anything wrong in retaining the reimbursements. *Id.*

More fundamentally, Plaintiffs fail to acknowledge how the government's knowledge undermines their specific reverse-false-claim theories. Reverse-false-claim liability attaches to

"an overpayment [that] is knowingly and improperly retained, *without notice to the Government about the overpayment*," S. Rep. 111-10 (2009) (emphasis added), which is not the case here. Even if a party's retention of an overpayment is sufficient to sustain a recoupment action, that fact alone is not sufficient to impose reverse-false-claim liability. "[T]he punitive treble damages and penalties afforded by civil FCA Actions are not interchangeable with [alternative] remedies." *U.S. v. Southland Mgmt. Corp.*, 326 F.3d 669, 684 (5th Cir. 2003) (J., Jones, specially concurring). To recover FCA remedies, Plaintiffs must prove that Affiliate Defendants engaged in the type of "fraudulent conduct" that warrants *penalties*, and no reasonable jury could conclude that Affiliate Defendants' violation of an alleged repayment obligation was fraudulent *when it is undisputed that the government knew of their non-payment in every particular. See, e.g.*, *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1074 (8th Cir. 2016).

## II. Affiliate Defendants are Entitled to Summary Judgment on the Implied False Claims[15]

### A.      Relator Does Not Oppose Summary Judgment as to PPST and PPGT

Affiliate Defendants moved for summary judgment on Relator's implied false certification claims as to PPST and PPGT on the basis that Relator does not allege that they violated medical and ethical standards or state and federal law. Dkt. 382 at 47-48. Plaintiffs have not opposed Affiliate Defendants' motion as to those claims, and so the Court should grant PPST and PPGT summary judgment. "[E]ven a pleaded theory [is] waived when it [is] not raised in opposition to a motion for summary judgment." *Savers Fed. Sav. & Loan Ass'n v. Reetz*, 888 F.2nd 1497, 1501

---

[15]   Because Plaintiffs' Motion for Partial Summary Judgment was the first time Relator raised implied false claims theories for claims submitted *following* the injunctions and during the Grace Period, Defendants' Motion did not address those claims. Parties, of course, cannot move for summary judgment on theories of which they are unaware. Had Affiliate Defendants had any notice of Relator's meritless unpled theories at the time that their Motion was filed, they would have moved on those theories as well. *See* Dkt. 417 at 35-42. Should the Court allow Relator's unpled theories to proceed, Affiliate Defendants reserve the right to seek summary judgment.

(5th Cir. 1989); *O'Neal v. Cargill, Inc.*, 178 F. Supp. 3d 408, 416 (E.D. La. 2016); *U.S. ex rel. Beck v. St. Joseph Health Sys.*, 2021 WL 7084164, at 10 (N.D. Tex. Nov. 30, 2021).

Affiliate Defendants' motion set out clear and now undisputed evidence that Relator cannot establish that PPST and PPGT submitted claims that were impliedly false. Dkt. 382 at 47-48. There is no evidence that PPST or PPGT participated in fetal tissue donation or was aware of PPGC's supposed misconduct, Dkt. 382, SOF ¶¶ 2, 3, 5, 9; *id.* at 47-48, and even if Relator had established their "affiliation" with PPGC, that supposed "affiliation" does not affect the truth or falsity of PPGT's and PPST's own claims for payment. Relator did not raise any argument in opposition, and has now waived the right to "offer evidence or legal argument" in support of liability. *U.S. v. Shoup*, 2017 WL 4535285, at *3 (N.D. Tex. Sept. 8, 2017).[16]

### B. The Court's Prior Ruling Regarding Relator's TMFPA Claims Requires Summary Judgment for Affiliate Defendants on Those Claims

Relator (Dkt. 415 at 28 n.13) repeats the same arguments and authorities from their briefing on the motion to dismiss, *see* Dkt. 61 at 29–30, that this Court already rejected. Dkt. 71 at 35 (explaining that "[b]ecause of Texas's intervention, [Texas] is primarily responsible for prosecuting Count III of Relator's Complaint," and "Relator is responsible for prosecuting all other claims alleged in the Complaint"); *id.* at 33 (explaining, while Relator continues to be a party, it is not responsible for the prosecution of claims under Count III). In addition to being law of the case, *see FTC v. Neora LLC*, 2022 WL 3213540, at *4 (N.D. Tex. Aug. 8, 2022), that determination was correct and should extend to the TMFPA claim asserted in Count V of Relator's Complaint.[17]

---

[16]   The Court should also grant summary judgment for PPGT and PPST on all claims related to Louisiana because they never participated in Louisiana Medicaid.

[17]   Relator's reliance on out-of-circuit cases that did not address the effect of intervention is unavailing. This case is unlike ones where a relator is permitted to pursue claims against *other defendants* for which the government did not intervene. *See Fed. Recovery Servs., Inc. v. U.S.*, 72 F.3d 447, 449 n.1 (5th Cir. 1995) ("Although the United States' intervention vested it with control

### C. Relator's Remaining Implied False Certification Claims Fail on the Merits

#### 1.     Relator Cannot Establish Falsity

Relator first incorrectly argues that Affiliate Defendants' submission of claims while "commit[ing] a program violation" in itself can support FCA liability.  Dkt. 415 at 30.  *Escobar*, however, "rejected the notion that submitting a claim equates with representing a legal entitlement to payment," and made clear that "omissions can be a basis for liability" only if the omission "render[s] the defendant's representations misleading *with respect to the goods or services provided*.'"  *U.S. ex rel. Lisitza v. Par Pharma. Co*., 276 F. Supp. 779, 790-801 (N.D. Ill. 2017) (quoting *Escobar*, 579 U.S. at 187) (emphasis in original)); *see also* Dkt. 382 at 40 (citing pre- and post-*Escobar* cases establishing that the act of submitting a claim while in violation of the law or a program requirement is not in itself a basis for FCA liability).  For example, in both *Escobar* and the Fifth Circuit decision on which Relator chiefly relies, *U.S. ex rel. Lemon v. Nurses to Go, Inc.*, 924 F.3d 155, 157-58 (5th Cir. 2018), the implied misrepresentations went directly to the truth of statements on the claim forms—specifically, whether the claim accurately described the treatment provided and billed for.  *See Escobar*, 579 U.S. at 183-85 (defendants sought reimbursement for specific services provided by unlicensed practitioners, when the code used on the claim implied that practitioners were qualified); *Lemon*, 924 F.3d at 157-58 (defendant claimed reimbursement for particular services that were not performed in accordance with regulatory requirements).

In contrast, Relator cannot point to a single specific representation on a claim submitted by Affiliate Defendants, much less link it to Affiliate Defendants' alleged misconduct.  There is no

---

of the litigation against [group of defendants], [relator] retained the authority to proceed against [other defendant] on its own."); *U.S. ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1074 (N.D. Cal. 2020) (similar).  Relator has no separate TMFPA claim against Defendants, *see U.S. ex rel. Becker v. Tools & Metals, In*c., 2009 WL 855651, at *6 (N.D. Tex. Mar. 31, 2009)—a proposition with which Texas agrees, *see* Dkt. 141 at 2-3; *see also* Tex. H.R.C. § 36.107(a).

dispute that the services for which Affiliate Defendants billed were necessary and reasonable. Lacking any basis in the claims themselves, Relator instead relies on language requiring compliance with "medical and ethical standards" in the Medicaid Provider Agreements and in a State manual.  Relator presents no evidence that Affiliate Defendants' claims for payment included a specific representation that was rendered impliedly false by PPGC's alleged noncompliance with such standards.  That is unsurprising; PPGC's purported noncompliance with standards governing abortion procedures ineligible for Medicaid reimbursement is wholly untethered from Affiliate Defendants' claims for unrelated, Medicaid-covered services such as STD testing and cancer screenings.  *Cf. U.S. ex rel. Janssen v. Lawrence Mem. Hosp*., 949 F.3d 533, 544-45 (10th Cir. 2020) (affirming dismissal where allegations relied on "generic regulatory requirements" requiring providers to maintain accurate medical records); *U.S. v. Kindred Healthcare*, 469 F. Supp. 3d 431, 450 (E.D. Pa. 2020) (references to "boilerplate language conditioning payment under Medicare and Medicaid on compliance with all laws and regulations" are not sufficient under *Escobar*).[18]

Relator also fails to meaningfully address Affiliate Defendants' argument that there is no objective standard by which to measure whether a Medicaid provider was in compliance with "medical and ethical standards" or demonstrated a "willingness" to violate the law.  The best Relator can muster is that "most people would agree—and it would certainly be possible for a jury to find—that subjecting a patient to more pain without their consent in order to get better tissue specimens for research and failing to disclose a doctor's conflict of interest are unethical."  Dkt. 415 at 31 n. 15.  But there are two problems with Relator's theory.  First, there is absolutely no

---

[18]  Relator's reliance on boilerplate provisions in Medicaid Provider Agreements also supports summary judgment for Affiliate Defendants on materiality.  *See, e.g.*, *U.S. ex rel. Porter v. Magnolia Health Plan*, 810 F. App'x 237, 242 (5th Cir. 2020) (boilerplate language requiring compliance with "all laws" is the "same type of language *Escobar* found too general to support an FCA claim") (internal quotation and citation omitted).

evidence that those things ever occurred.  What the evidence actually shows is that witnesses, both in this litigation and in the testimony cited by Relator's brief, consistently testified that that they could not identify a single instance where an abortion procedure was actually altered by any of Affiliate Defendants' physicians, let alone that a procedure increased a patient's pain.  *See* ROA 4489-90; Dkt. 382, SOF ¶ 9.  Since HHSC had no evidence that an abortion procedure was altered, Dkt. 382 SOF ¶ 9, the termination notices instead focused on PPGC's purported "willingness" to alter procedures to obtain usable tissue.  *Id.*  Relator relies on the same evidence, and therein lies Relator's other fundamental deficiency.  A purported "willingness" to violate "medical and ethical standards" is far too fuzzy to give rise to an objective falsehood.  Dkt. 382 at 41-43.  Indeed, Texas previously argued in the termination litigation that "[w]hile what is 'legal' may be fairly concrete (though in some cases can be reasonably debatable), the rest of the standard —professional competence, safety, and ethics—*is certainly more fluid and involves a 'subjective, individualized assessment' involving discretion*."  Sec. Supp. App. 889, Tex. Mot., Dkt. 99, *PPGC v. Smith,* 1:15-cv-01058-LY (Feb. 17, 2017) (emphasis added).  Without an objective falsehood, Relator's implied false certification claim fails and Affiliate Defendants are entitled to summary judgment.

Relator complains that, in pointing out Texas officials' ill-defined and ambiguous definitions of "medical and ethical standards" and the lack of evidence showing that Affiliate Defendants actually violated them, Affiliate Defendants are "attempt[ing] to relitigate" the termination "findings" which "indicate[s] that there are disputed material facts that would defeat summary judgment." Dkt. 415 at n.15.[19]  But Affiliate Defendants' motion does not depend on any

---

[19] Relator also incorrectly minimizes this testimony by characterizing it as that of "former state officials." Dkt. 415 at 31, n.15.  Of the two officials quoted, only one is a "former official," and he was the head of HHSC when the Notices of Termination were issued.  The other, Dr. Spears, advised Inspector General Bowen on the terminations in 2016 in his capacity as HHSC's Chief Medical Officer.  To Affiliate Defendants' knowledge, he is still in that position.

factual dispute regarding whether PPGC violated "medical and ethical standards" or "appropriate standards of care." Dkt. 415 at 31. That is because the FCA *precludes* liability based on "expressions of opinion" or "judgments about which reasonable minds may differ." *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004); *see also* Dkt. 382 at 42-43 (citing additional cases). Whether a supposed "willingness" to violate the law or "medical and ethical standards" was an appropriate basis for Texas to terminate Affiliate Defendants from Medicaid is not the issue. The issue is whether Affiliate Defendants' purported implied representations of compliance were *objectively* false. The dramatically different conclusions that various judges, federal officials, state agencies, and elected representatives have reached as to whether PPGC's conduct "violated" those amorphous standards highlight that they inherently involve "subjective interpretation" of contractual duties, *U.S. ex rel. Wilson v. KBR*, 525 F.3d 370, 377 (4th Cir. 2008), and cannot be penalized under the FCA, TMFPA, or LMAPIL.

### 2. Relator Cannot Establish Materiality

Relator's materiality arguments focus principally on the effect of the United States' decision not to intervene in this case. *See* Dkt. 415 at 41-43. While the United States' declination is significant, it is only one piece of the materiality picture. The undisputed evidence, taken as a whole, leaves no genuine dispute that PPGC's alleged noncompliance was immaterial.

To begin, Relator argues that it "make[s] no sense" to consider the United States' views because "the federal government does not pay claims" in the Medicaid context. *Id.* at 39-40. Relator does not cite a single FCA case that has disregarded the views of the federal government (where it remains the real-party-in-interest and stands to recover the overwhelming majority of any judgment). As this Court recognized, echoing other courts, the key materiality question is whether "the *federal government* would deny reimbursement" if it had knowledge of the alleged violations. Dkt. 71 at 14 (emphasis added).

21

The federal government has left no doubt where it stands.  For eight years and across multiple administrations, it has maintained that there was no lawful basis to terminate Affiliate Defendants from Medicaid.  Dkt. 382, SOF 1, 14-15, 29.  The statement of interest filed in this case makes clear that federal law "limit[s] State authority to terminate provider participation to only those circumstances implicating the fitness of the provider to perform covered medical services or appropriately bill for them" and reiterates that CMS "has been unable to identify Texas's and Louisiana's basis for termination related to" Affiliate Defendants' qualifications to provide Medicaid services.  Dkt. 437 at 6-8.  CMS reached this conclusion after reviewing the *same* evidence on which Relator relies, in addition to the "discussion of [Texas's] findings in the opinions from the Fifth Circuit panel and *en banc* court regarding the injunction."  *Id.* at 8.[20]

Relator also leaves largely unaddressed Louisiana's and Texas's *voluntary* payment of Affiliate Defendants' claims even after they became aware of the alleged "misconduct" underlying Relator's allegations.  Relator argues that "obviously" the alleged misrepresentations were material because both States attempted to terminate Affiliate Defendants after they became aware of the PPGC videos.  Dkt. 415 at 44.  But this is a red herring.  Louisiana withdrew the termination notices and PPGC has continuously remained a Louisiana Medicaid provider since 2010.  Dkt. 382, SOF ¶ 34.  At most, the Texas termination proceedings reflect the State's position on Affiliate Defendants' qualifications to provide services to Medicaid beneficiaries *going forward*.  It says nothing about whether Texas considered Affiliate Defendants' supposed violations material to payment for claims that had already been submitted for services already provided.  Instead, the evidence clearly demonstrates *immateriality* as to the prior claims.  There is no evidence that either

---

[20] The United States also correctly notes that "[t]he Fifth Circuit's 2020 *en banc* decision vacating the injunction in Texas did not address what it means for a provider to be qualified or whether the terminations at issue were lawful."  Dkt. 437 at 6 (citing *Kauffman*, 981 F.3d at 353).

State sought recoupment, or even suggested there would be a basis to do so. And Texas has expressly declined to argue in this litigation that "Defendants 'submitted claims' that were 'fraudulent' in violation of the TMFPA[.]"). Sec. Supp. App. 1026, Tex. Resp. to Aff. Defs. First Set of Interrogatories ("First ROGs"); *see also id.* at 1026-27 (("Texas does not allege that Defendants submitted claims to Texas in violation of the TMFPA."). On this record, there is no genuine dispute as to materiality, even if the States' views are considered.

Finally, with respect to claims paid by MCOs, Affiliate Defendants are entitled to summary judgment on materiality on another, separate basis, because Relator cannot establish that the States paid more to the MCOs that they would have otherwise. In opposition, Relator relies on a single out-of-circuit district court opinion, *see* Dkt. 415 at 61 (citing *U.S. ex rel. White v. Mobile Care EMS & Transport, Inc.*, 2021 WL 6064363, at *14 (S.D. Oh. Dec. 21, 2021)), that is both legally and factually distinct. In *White*, the court denied a *motion to dismiss* allegations that the defendant billed for medically unnecessary and unrequired services. 2021 WL 6064363, at *14. To the extent that that case can be read to permit FCA liability even where there is no evidence of a causal relationship between the alleged falsehood and the amount paid by the government, it is plainly contrary to *Escobar*'s admonishment that alleged misrepresentations *must* be material to the "[g]overnment's *payment* decision in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 192; *see generally id.* at 191-93.[21] *White* notably does not cite a single case to support its cursory discussion, which stands apart not only from the Supreme Court's holding in *Escobar*, but also from numerous other courts across the country that have examined this specific question. *Compare White*, 2021 WL 6064363, at *13-14 *with, e.g., U.S. ex rel. Stephens v. Tissue Science*

---

[21] In addition, unlike *White*, the Court has a fully developed (and undisputed) record establishing that MCOs receive a fixed sum for each covered Medicaid beneficiary. Dkt. 382, SOF ¶ 25.

*Lab., Inc.*, 664 F. Supp. 2d 1310, 1317-19 (N.D. Ga. 2009), *and U.S. ex rel. Mbabazi v. Walgreen Co.*, 2021 WL 4453600, at *6 (E.D. Pa. Sept. 28, 2021).[22]   The law overwhelmingly supports summary judgment for Affiliate Defendants as to all of claims paid by MCOs.

Relator also cites *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1328 n.55 (11th Cir. 2016) to support a sweeping argument that the government is "entitled" to recover funds.  *See* Dkt. 415 at 61-62.  Relator drastically overstates *In Bayou Shores*' relevance to this case.  First, there is no indication whatsoever that *In re Bayou Shores* concerned reimbursements from MCOs, rather than direct payments.  828 F.3d at 1327-28.  Even if this is put aside, Relator relies wholly on non-binding dicta in a footnote supporting the Eleventh Circuit's observation that *if* the court found that the lower court lacked jurisdiction, the government could "*try* and *recover* payments made" during the injunction.  *Id.* (emphasis added).  At most, *In re Bayou* blesses the government's ability to *try* to *recoup* payments to a provider that it was previously prevented from terminating.  *Id.*[23]  It is silent as to whether such an attempt would be successful, let alone if the government is *entitled* to those funds.  *Id.*

## III.   Defendants Are Entitled to Summary Judgment on Relator's Conspiracy Claims

The Court should grant Affiliate Defendants summary judgment on Relator's conspiracy claims.   While Relator contends that Affiliate Defendants' motion was "conclusory" and

---

[22]   *See also U.S. ex rel. Martinez v. KPC Healthcare Inc.*, 2017 WL 10439030, at *5 (C.D. Cal. June 8, 2017); *U.S. ex rel. Zemplenyi v. Grp. Health Cooperative*, 2011 WL 814261, at *2 (W.D. Wash. Mar. 3, 2011); *U.S. ex rel. Kennedy v. Avetis Pharm., Inc.*, 2008 WL 5211021, at *3 (N.D. Ill. Dec. 10, 2008); *accord Kindred Healthcare*, 469 F. Supp. 3d 4 at 445 (explaining that in fixed-rate reimbursement cases, "courts have held that there is no FCA liability where a falsely-claimed service or item does not affect the rate of reimbursement"); *cf. U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265-66 (9th Cir. 1996) (school's regulatory non-compliance did not violate the FCA since federal funding used a per-student formula, so the district did not make a "false statement which caused the United States to provide an improper benefit").
[23]   *Bayou Shores* is also distinguishable because the regulations prompting the attempted termination were *directly relevant* to the reimbursed services.

insufficient, the Fifth Circuit rejected that same argument in *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).  The Fifth Circuit explained that "while . . . a movant cannot support a motion for summary judgment with a conclusory assertion that the nonmovant has no evidence to support his *case*, a movant may support a motion for summary judgment by pointing out that there is no evidence to support a *specific element* of the nonmovant's claim."  *Id*. at 335 n.10 (emphasis in original).  Consistent with *Austin*, Affiliate Defendants discharged their burden by "pointing out" that Relator lacked evidence to support conspiracy's three "specific element[s]"—specific intent to defraud, an agreement, and an act in furtherance of such an agreement, *id.*; *see* Dkt. 382 at 53.  The burden thus shifted to Relator to present supporting evidence for those three elements. *Austin*, 864 F.3d at 336.  Relator has not carried that burden.  Affiliate Defendants are entitled to judgment on any conspiracy theories premised on "pre-termination" conduct because Relator did not present any evidence concerning such theories, and there is no proof of an agreement to "defraud."  *See, e.g.*, *U.S. ex rel. King v. Solvay S.A.*, 823 F. Supp.2d 472, 516-17 (S.D. Tex. 2011). Second, Relator's "post-termination" conspiracy theories fail for the reasons stated in Affiliate Defendants' Opposition.  *See* Dkt. 417 at 42–45.  Summary judgment should be entered in favor of Defendants in full on Relator's conspiracy claims.

## <u>CONCLUSION</u>

For these reasons and those discussed in Affiliate Defendants' Motion for Summary Judgment, Dkt. 382, and Affiliate Defendants' Opposition to Plaintiffs' Partial Motion for Summary Judgment, Dkt. 417, Defendants respectfully request that the Court grant summary judgment for Defendants.

Dated:  February 21, 2023

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By:  /s/ Tirzah S. Lollar

     Tirzah S. Lollar
     Tirzah.Lollar@arnoldporter.com
     Craig D. Margolis
     Craig.Margolis@arnoldporter.com
     Christian Sheehan
     Christian.Sheehan@arnoldporter.com
     Emily Reeder-Ricchetti
     Emily.Reeder-Ricchetti@arnoldporter.com
     Megan Pieper
     Megan.Pieper@arnoldporter.com
     Alyssa Gerstner
     Alyssa.Gerstner@arnoldporter.com
     601 Massachusetts Ave, NW
     Washington, DC 20001-3743
     Telephone: +1 202.942.6127
     Fax: +1 202.942.5999

     Paula Ramer
     Paula.Ramer@arnoldporter.com
     250 West 55th Street
     New York, New York 10019-9710
     T: +1 212.836.8474

     Christopher M. Odell
     Texas State Bar No. 24037205
     Christopher.Odell@arnoldporter.com
     700 Louisiana Street, Suite 4000
     Houston, TX 77002-2755
     Telephone: +1 713.576.2400
     Fax: +1 713.576.2499

     Ryan Patrick Brown
     Texas State Bar No. 24073967
     brown@blackburnbrownlaw.com

1222 S. Fillmore
Amarillo, TX 79101
Tel: (806) 371-8333
Fax: (806) 350-7716

*Attorneys for Defendants Planned*
*Parenthood Gulf Coast, Inc., Planned*
*Parenthood of Greater Texas, Inc.,*
*Planned Parenthood South Texas, Inc.,*
*Planned Parenthood Cameron County,*
*and Planned Parenthood San Antonio*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 21st day of February, 2023, I caused the foregoing to be served by email through the Court's Electronic Case Filing system upon all attorneys of record.


*/s/ Tirzah S. Lollar*
Tirzah S. Lollar