# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX DOE, Relator, | § § § | |
| THE STATE OF TEXAS, *ex rel.* ALEX DOE, Relator, | § § § | |
| THE STATE OF LOUISIANA, *ex rel.* ALEX DOE, Relator, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 2:21-CV-00022-Z |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD GULF COAST, INC., PLANNED PARENTHOOD OF GREATER TEXAS, INC., PLANNED PARENTHOOD SOUTH TEXAS, INC., PLANNED PARENTHOOD CAMERON COUNTY, INC., PLANNED PARENTHOOD SAN ANTONIO, INC., | § § § § § § § § § § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' REPLY IN SUPPORT OF
## TEXAS'S MOTION FOR SUMMARY JUDGMENT AND
## RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................ 2

I. The Court Should Grant Summary Judgment on Plaintiffs' Reverse False Claims. ............................................................................................................... 2

   A. Defendants had an obligation to repay the money received under the preliminary injunctions. ............................................................................ 2

      1. Even if Defendants' termination from Texas Medicaid did not become final until March 2021, Defendants still did not repay the overpayment within 60 days as required by law. ............................................................. 3

      2. PPGC was terminated from Louisiana Medicaid. ....................................... 4

      3. Planned Parenthood had an obligation to repay the Medicaid funds at issue under the FCA, TMFPA, and LMAPIL. ............................................... 7

   B. Defendants knew or should have known that they received an overpayment. ............................................................................................. 10

   C. A preliminary ruling cannot create a permanent entitlement, nor does it absolve an individual of liability if the injunction is vacated. ..................... 17

   D. Defendants "knowingly concealed or knowingly and improperly avoided" an obligation to pay the Medicaid funds back to the States. ...................... 19

II. Relator Retains Non-Intervened Claims Under the TMFPA. ......................... 20

III. As an Alternative to Plaintiffs' Reverse False Claims, the Court Should Grant Partial Summary Judgment on Relator's Implied-False-Certification Claims. ............................................................................................................ 22

   A. Relator's implied-false-certification claims were properly pleaded. ............. 22

   B. Relator is entitled to partial summary judgment on the implied-false-certification claims. ................................................................................... 24

      1. Defendants made false representations to obtain the "grace period." ...... 25

      2. PPGC repeatedly misled LDH as to their termination in Texas in violation of Louisiana program requirements PPGC agreed to abide by as a condition of participation. ............................................................. 28

IV. PPFA Is Directly Liable Under the FCA, TMFPA, and LMAPIL. ................... 30

   A. PPFA is liable for reverse-false claims. ....................................................... 30

1. The reverse-false-claims provisions of the FCA, TMFPA, and LMAPIL expressly allow for indirect liability. ........................................... 30

B. PPFA is directly liable under Relator's implied-false-certification claims. . 37

C. PPFA acted with the requisite scienter. ....................................... 39

V. Relator Is Entitled to Summary Judgment on the Conspiracy Claims Under the TMPFA and LMAPIL. ..................................................... 39

VI. The Court Should Grant Summary Judgment on Plaintiffs' Requests for Damages, Civil Remedies, and Civil Penalties Because They Are Determined by Liability. ................................................................... 41

A. Summary judgment on damages, civil remedies, and civil penalties is appropriate because they are legal questions, not fact questions, in this case. .......................................................................................... 41

B. In this case, the measure of damages under the FCA and civil remedies under TMFPA and LMAPIL is the full amount the Defendants were paid by Texas and Louisiana Medicaid. ........................................... 45

C. Defendants are liable for civil penalties calculated on a per-claim basis. ... 46

VII. The Court Should Grant Summary Judgment on Defendants' Affirmative Defense. ............................................................................................ 48

CONCLUSION ............................................................................................ 51

CERTIFICATE OF SERVICE ...................................................................... 53

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Blanchard 1986, Ltd. v. Park Plantation, LLC,*
   553 F.3d 405 (5th Cir. 2008) ................................................................... 18

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988) ............................................................................. 12

*California v. Texas,*
   141 S. Ct. 2104 (2021) ......................................................................... 18

*City of San Antonio v. Hartman,*
   201 S.W.3d 667 (Tex. 2006) .................................................................. 12

*Clarke v. U.S.,*
   915 F.2d 699 (D.C. Cir.1990) ................................................................ 19

*Farmer v. Brennan,*
   511 U.S. 825 (1994) ............................................................................. 11

*Fed. Recovery Servs., Inc. v. United States,*
   72 F.3d 447 (5th Cir. 1995) ................................................................... 20

*Hays v. Hoffman,*
   325 F.3d 982 (8th Cir. 2003) ................................................................. 49

*Hill v. F.C.C.,*
   496 Fed. Appx. 396 (5th Cir. 2012) ........................................................ 46

*In re Xerox Corp.,*
   555 S.W.3d 518 (Tex. 2018) .............................................................. 41, 44

*Kane ex rel. United States v. Healthfirst, Inc.,*
   120 F. Supp. 3d 370 (S.D.N.Y. 2015) ....................................................... 8

*La Union del Pueblo Entero v. Fed. Emergency Mgmt. Agency,*
   141 F. Supp. 3d 681 (S.D. Tex. 2015) ..................................................... 24

*Lamb Eng'g & Const. Co. v. United States,*
   58 Fed. Cl. 106 (2003) .......................................................................... 47

*Malouf v. State ex rels. Ellis,*
    656 S.W.3d 402 (Tex. App.—El Paso 2022, pet. filed) ...................................... 12, 15

*Mortgages, Inc. v. U.S. District Court for District of Nev.,*
    934 F.2d 209 (9th Cir.1991) ................................................................... 40

*Olson v. Fairview Health Servs. of Minn.,*
    831 F.3d 1063 (8th Cir. 2016) ................................................................ 19

*Peterson v. Weinberger,*
    508 F.2d 45 (5th Cir. 1975) ................................................................... 49

*Planned Parenthood of Greater Tex. Surg. Health Servs. v. City of Lubbock, Tex.,*
    542 F. Supp. 3d 465 (N.D. Tex. 2021) ..................................................... 18

*Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs.,*
    *Inc. v. Kauffman,*
    981 F.3d 347 (5th Cir. 2020) ................................................................. 25

*Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs.,*
    *Inc v. Smith,*
    913 F.3d 551 (5th Cir. 2019) ................................................................. 24

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.,*
    No. 6:20-CV-00176, 2022 WL 17489170 (E.D. Tex. Dec. 7, 2022) ........................ 17

*Riley v. St. Luke's Episcopal Hosp.,*
    252 F.3d 749 (5th Cir. 2001) ................................................................. 21

*Save Our Cemeteries, Inc. v. Archdiocese of New Orleans, Inc.,*
    568 F.2d 1074 (5th Cir. 1978) ............................................................... 23

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ........................................................................... 19

*U.S. ex rel. Bahrani v. Conagra, Inc.,*
    465 F.3d 1189 (10th Cir. 2006) ............................................................... 9

*U.S. ex rel. Becker v. Tools & Metals, Inc.,*
    2009 WL 855651 (N.D. Tex. 2009) .......................................................... 21

*U.S. ex rel. Jehl v. GGNSC Southhaven, LLC,*
   2021 WL 2815974 (N.D. Miss. Jul. 6, 2021) ........................................................... 49

*U.S. ex rel. Longhi v. United States,*
   575 F.3d 458 (5th Cir. 2009) ....................................................................................... 46

*U.S. ex rel. Pogue v. Am. Healthcorp, Inc.,*
   914 F. Supp. 1507 (M.D. Tenn. 1996) ...................................................................... 47

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
   20 F. Supp. 2d 1017 (S.D. Tex. 1998) ....................................................................... 47

*U.S. v. Cabrera-Diaz,*
   106 F. Supp. 2d 234 (D.P.R. 2000) ............................................................................ 49

*U.S. v. Kruse,*
   101 F. Supp. 2d 410 (E.D. Va. 2000) ........................................................................ 49

*U.S. v. Pres. & Fellows of Harvard Coll.,*
   323 F. Supp. 2d 151 (D. Mass. 2004) ........................................................................ 38

*United States ex rel. Bennett v. Biotronik, Inc.,*
   876 F.3d 1011 (9th Cir. 2017) ..................................................................................... 20

*United States ex rel. Bias v. Tangipahoa Parish Sch. Bd.,*
   816 F.3d 315 (5th Cir. 2016) ....................................................................................... 31

*United States ex rel. Brooks v. Stevens-Henager College, Inc.,*
   359 F. Supp. 3d 1088 (D. Utah 2019) ....................................................................... 21

*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V,*
   741 F.3d 390 (4th Cir. 2013) ....................................................................................... 43

*United States ex rel. Drakeford v. Tuomey,*
   792 F.3d 364 (4th Cir. 2015) ............................................................................... 36, 45

*United States ex rel. Drummond v. BestCare Lab. Services, L.L.C.,*
   950 F.3d 277 (5th Cir. 2020) ............................................................................... 10, 22

*United States ex rel. Fallon v. Accudyne Corp.,*
   97 F.3d 937 (7th Cir. 1996) ......................................................................................... 20

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
498 F. Supp. 2d 25 (D.D.C. 2007) ................................................................ 38

*United States ex rel. Ketroser v. Mayo Found.*,
729 F.3d 825 (8th Cir. 2013) ...................................................................... 20

*United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*,
507 F. Supp. 3d 734 (W.D. Tex. 2020) ........................................................ 12

*United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*,
No. SA-17-CV-00317-XR, 2023 WL 139319 at *17 (W.D. Tex. Jan. 9, 2023) ........ 50

*United States ex rel. Ormsby v. Sutter Health*,
444 F. Supp. 3d 1010 (N.D. Cal. 2020) ................................................. 20, 21

*United States ex rel. Rauch v. Oaktree Med. Ctr., P.C.*,
No. 6:15-CV-01589-DCC, 2020 WL 1065955 (D.S.C. Mar. 5, 2020) .................... 21

*United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*,
794 F.3d 457 (5th Cir. 2015) ...................................................................... 31

*United States ex rel. Wuestenhoefer v. Jefferson*,
105 F. Supp. 3d 641 (N.D. Miss. 2015) ...................................................... 37

*United States v. Aerodex*,
469 F.2d 1003 (5th Cir.1972) .................................................................... 40

*United States v. Bestfoods*,
524 U.S. 51 (1998) .............................................................................. 31, 37

*United States v. Caremark, Inc.*,
634 F.3d 808 (5th Cir. 2011) ...................................................................... 30

*United States v. Hughes*,
585 F.2d 284 ............................................................................................ 40

*United States v. Killough*,
848 F.2d 1523 (11th Cir. 1988) .................................................................. 45

*United States v. Krizek*,
111 F.3d 934 (D.C. Cir. 1997) .................................................................... 11

*United States v. Lippert,*
    148 F.3d 974 (8th Cir. 1998) ........................................................................ 46

*United States v. Mackby,*
    339 F.3d 1013 (9th Cir. 2003) ...................................................................... 45

*United States v. Omnicare, Inc.,*
    No. 1:15-CV- 4179 (CM), 2021 WL 1063784 (S.D.N.Y. Mar. 19, 2021) ................. 22

*United States v. Ricard,*
    922 F.3d 639 (5th Cir. 2019) ....................................................................... 11

*United States v. Rogan,*
    517 F.3d 449 (7th Cir. 2008) ................................................................. 45, 46

*United States v. Bajakajian,*
    524 U.S. 321 (1998) .................................................................................. 49

*Whole Woman's Health v. Jackson,*
    141 S. Ct. 2494 (2021) .............................................................................. 18

*Williams v. Hosp. Serv. Dist. of W. Feliciana Par., La.,*
    250 F. Supp. 3d 90 (M.D. La. 2017) ............................................................. 40

*Yates v. Pinellas Hematology & Oncology, P.A.,*
    21 F.4th 1288 (11th Cir. 2021) .......................................................... 45, 46, 50

**Statutes**

31 U.S.C. § 3729 ........................................................................................... 1

31 U.S.C. § 3729(a) ...................................................................................... 44

31 U.S.C. § 3729(a)(1)(A) .............................................................................. 43

31 U.S.C. § 3729(a)(1)(C) .............................................................................. 40

31 U.S.C. § 3729(a)(1)(G) ............................................................... 3, 31, 43, 47

31 U.S.C. § 3729(a)(7) .................................................................................... 9

31 U.S.C. § 3729(b)(1)(A) .............................................................................. 10

31 U.S.C. § 3729(b)(3) ............................................................................ 7, 9, 47

42 U.S.C. § 1320a-7a(a) ................................................................................... 48

42 U.S.C. § 1320a-7k ........................................................................................ 9

42 U.S.C. § 1320a-7k(d)(1) ............................................................................... 8

42 U.S.C. § 1320a-7k(d)(2) ............................................................................ 3, 8

42 U.S.C. § 1320a-7k(d)(4)(B) ....................................................................... 8, 9

La. R.S. § 46:437.1 ........................................................................................... 1

La. R.S. § 46:437.3 .......................................................................................... 11

La. R.S. § 46:437.3(16) ............................................................................... 7, 47

La. R.S. § 46:438.3(C) ........................................................................... 8, 31, 47

La. R.S. § 46:438.6(B)(1) ............................................................................... 44

La. R.S. § 46:438.6(C) ............................................................................. 44, 46

La. R.S. § 46:439.2(B)(5) ................................................................................. 6

La. R.S. § 437.12(7) ......................................................................................... 8

Tex. Hum. Res. Code § 36.001 ......................................................................... 1

Tex. Hum. Res. Code § 36.001(7-a) ............................................................ 7, 47

Tex. Hum. Res. Code § 36.001(a) ................................................................... 10

Tex. Hum. Res. Code § 36.002(9) ................................................................... 40

Tex. Hum. Res. Code § 36.002(12) ...................................................... 8, 31, 47

Tex. Hum. Res. Code § 36.052(a) ................................................................... 44

Tex. Hum. Res. Code § 36.052(a)(3)(B) .......................................................... 46

Tex. Hum. Res. Code § 36.052(b) ................................................................... 45

Tex. Pen. Code § 71.01 ................................................................................... 41

## Regulations

1 Tex. Admin. Code § 371.1(55) ...................................................................... 8

1 Tex. Admin. Code § 371.1655(4) ............................................................... 3, 8

1 Tex. Admin. Code § 371.1703(g)(5) ........................................................... 15

50 La. Admin. Code Pt I, § 4115 .................................................................. 15

Medicare Program; Reporting and Returning of Overpayments,
    81 Fed. Reg. 7654-01 (Feb. 12, 2016) ..................................................... 8

## Rules

Fed. R. Civ.P. 15(a)(2) ................................................................................ 35

Fed. R. Civ. P. 16(b)(4) ............................................................................... 35

Fed. R. Civ. P. 56(c) .................................................................................... 40

Fed. R. App. P. 3(c)(1)(B) ........................................................................... 12

## Other Authorities

Douglas Laycock, *Federal Interference with State Prosecutions: The Need for
    Prospective Relief*,
    1977 Sup. Ct. Rev. 193 ........................................................................... 19

Jonathan F. Mitchell, *The Writ-Of-Erasure Fallacy*,
    104 Va. L. Rev. 933 (2018) ..................................................................... 19

## INTRODUCTION

Defendants Planned Parenthood Federation of America, Inc. ("PPFA"), Planned Parenthood Gulf Coast, Inc. ("PPGC"), Planned Parenthood of Greater Texas, Inc. ("PPGT"), and Planned Parenthood South Texas, Inc. ("PPST") (collectively, "Planned Parenthood") are desperate to relitigate the merits of their termination from Texas and Louisiana Medicaid. But Planned Parenthood's opportunity to do so expired years ago, they knowingly chose to forego it, and as a result, the States' findings were left uncontested. The terminations were final a month after the notices were received as a matter of state law and Planned Parenthood's attempt to get federal courts to overturn the States' decisions failed. While it is understandable that Planned Parenthood now wants a second bite at the apple, a Texas court already confirmed that was not possible under State law. The underlying merits of Planned Parenthood's terminations are thus completely irrelevant to whether or not they violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (FCA), the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001 *et seq.* (TMFPA), and the Louisiana Medical Assistance Programs Integrity Law, La. R.S. §§ 46:437.1 *et seq.* (LMAPIL).

The question in *this lawsuit* is whether Defendants violated those statutes by retaining money they were obligated to repay because they had been terminated, or by continuing to bill for Medicaid services even though their terminations meant they were no longer qualified to provide those services. Defendants try to claim that the vacated preliminary injunctions in their federal court litigation absolve them of any

1

liability now, but it is hornbook law that vacated injunctions are treated as though they never existed. And even if it were possible for Defendants to use those vacated preliminary rulings to justify their initial receipt of the funds, they cannot justify keeping those funds once that rationale disappeared. Defendants' argument that it was the State's responsibility to warn them about the consequences of their actions by notifying them of an overpayment is completely inconsistent with the law and with explicit guidance from CMS.

As Planned Parenthood acknowledges, there are few material facts at issue here. But they are undisputed, and this case mostly turns on legal, not factual, issues. There is no genuine dispute that Planned Parenthood submitted claims and received payments of millions of dollars of state and federal Medicaid funds they were not entitled to because Planned Parenthood was disqualified and terminated from the Texas and Louisiana Medicaid programs. And there is no genuine dispute that Planned Parenthood failed to repay those Medicaid funds after it should have known the funds constituted an overpayment under federal and state law. There is further no genuine dispute that PPFA is directly liable because of its own involvement in the Affiliate Defendants' wrongful acts. Nothing Defendants have offered in response changes those undisputed facts and the legal conclusion that follows.

## ARGUMENT

### I. The Court Should Grant Summary Judgment on Plaintiffs' Reverse False Claims.

#### A. Defendants had an obligation to repay the money received under the preliminary injunctions.

Defendants dispute what is obvious on the face of their termination notices: their terminations were final on October 19, 2015 in Louisiana and no later than February 1, 2017 in Texas. Appx. 867-72, 2684-2695. Nothing in the preliminary injunctions changed that fact, as the Travis County District Court determined the last time Planned Parenthood attempted this argument, and as Defendants knew directly from the Louisiana Department of Health (LDH) in 2015. Appx. 1091-92, 6310-11. Plaintiffs have already explained why this argument is incorrect. *See* Dkt. 391 at 47-53; Dkt. 415 at 2, 7-9.

1. **Even if Defendants' termination from Texas Medicaid did not become final until March 2021, Defendants still did not repay the overpayment within 60 days as required by law.**

Defendants spend several pages arguing instead that the termination in Texas was not final until after the "grace period" ended, and then after the TRO from the Travis County court expired, which was in March 2021. But recipients are liable if they fail to repay an overpayment within 60 days of when they *knew or should have known* they were not entitled to the money, not within 60 days of a technical termination date. 31 U.S.C. § 3729(a)(1)(G); 42 U.S.C. §§ 1320a-7k(d)(2); *see also* 1 Tex. Admin. Code § 371.1655(4) (a provider who fails to repay an overpayment within 60 days is subject to administrative sanctions); LDH, "Enrollment Packet for the Louisiana Medical Assistance Program, Basic Enrollment Packet for Entities/Businesses" at 12, Form PE-50, available at https://www.lamedicaid.com/provweb1/provider_enrollment/enrollment_entities.pdf. Defendants knew or should have known as soon as the Fifth Circuit ruled on November 23, 2020 that the federal

injunction was about to be vacated and that they had no legal basis to claim continued entitlement to the funds received, which triggered their repayment obligation. They cannot pretend they came into such knowledge only when, in their view, the terminations were technically enforced.

But even assuming *arguendo* that Defendants are correct that their Texas termination was not final until the Travis County District Court dismissed their case, that does not help Defendants because they do not dispute that they have never repaid the funds. Dkt. 81 at 66-67. Nor do they dispute that they knew they were out of Texas Medicaid as of March 10, 2021. *See, e.g.,* Appx. 1627 (Curtis (PPGC) Depo. 221:22-25). Regardless of whether Defendants' termination from Texas Medicaid was enforced in December 2020 or March 2021, Defendants still did not repay the funds within 60 days and are still in violation of the False Claims Act. The only difference would be that Defendants would not have to repay the amount of funds they received between January 4, 2021 and March 10, 2021 and would not be liable for the civil penalties for claims filed in that time period (assuming they were not liable under the implied-false-certification provision, *see* Dkt. 391 at 57-58, 70-73).[1]

## 2. PPGC was terminated from Louisiana Medicaid.

Defendants claim (at 20-21) that Relator has no evidence that PPGC was terminated from Louisiana Medicaid as of October 2015. But their termination notices dated September 15, 2015 state:

---

[1] Defendants state that PPGC received $14,142.71, PPGT received $24,473.24, and PPST received $19,010.13 during the grace period. Dkt. 419 at 10.

> You are entitled to an administrative review of this action and it is suspensive if you avail yourself of same. . . . If you do not request an Informal Hearing or an Administrative Appeal your termination will become effective thirty (30) days including Saturdays and Sundays from the date of your receipt of this letter.

Appx. 2685, 2586. Moreover, PPFA asked LDH on behalf of PPGC and LDH answered this precise question: "Secretary Kliebert's letters to Ms. Linton state that the termination action will take effect after the termination of all 'administrative and/or legal proceedings.' Does this 'stay' apply if PPGC elects to continue in federal court?" Appx. 6311. LDH counsel responded that "the suspensive nature only applies if you proceed through administrative process. . . . [M]y client does not believe you have an 'election' to continue in federal court. The administrative avenue is the agreed upon process to protect your clients rights." Appx. 6310-11. PPFA also asks for confirmation that the termination dates for PPGC are October 17 and 18, 2015. Appx. 6311. LDH responds: "You are correct if Planned Parenthood does not exercise their right to an informal hearing or an administrative appeal." Appx. 6311. PPGC admits that it did not engage in an administrative appeal within 30 days of receipt. Appx. 2069 (Linton Depo. 190:1-191:2); Dkt. 81 at 50.

Defendants' claims about the settlement agreement in Louisiana (at 20-21) are false. The agreement states that the termination notices are only "prospectively" withdrawn—thus, it expressly has no impact on the effectiveness of the termination before the date of the agreement. Defs. Sealed App. 12. That means that PPGC was terminated from Louisiana Medicaid pursuant to state law by October 19, 2015, when its termination became final according to Louisiana, Appx. 6310-11, until the agreement was executed on November 4, 2022. Further, if Defendants are attempting

to use the agreement in order to argue against liability under LMAPIL, Defendants violated the law by attempting to secure a settlement of this case with LDH without involving the Relator and making an end-run around this Court's required approval of any settlement. *See* La. R.S. § 46:439.2(B)(5) ("If the qui tam plaintiff objects to a settlement of the qui tam action proposed by the secretary or the attorney general, the court may authorize the settlement only after a hearing to determine whether the proposed settlement is fair, adequate, and reasonable under the circumstances."). Perhaps that is why LDH added language making clear that that agreement has no import in this case, and even leaving the door open for penalties to be imposed against PPGC now or in the future:

> "[t]he Parties agree that this Settlement Agreement does not resolve and shall have no effect on any and all claims, causes of action, and/or allegations which have or may be brought, filed and/or investigated by other agencies or instrumentalities, including, but not limited to, the Louisiana Department of Justice, Office of the Attorney General, state licensing boards, any relator, or agencies of the United States government, or any penalties, whether civil, criminal and/or administrative, which may be imposed by another agency or court in connection with its review of PPGC. *The Parties specifically acknowledge that this Settlement Agreement does not resolve and **shall have no effect** on U.S. ex rel. Doe et al. v. Planned Parenthood Federation of America, et al., United States District Court for the Northern District of Texas docket number 2:21-cv-22.*

Defs. Sealed App. 14-15 (emphases added).

The fact that Louisiana was forced to continue paying PPGC under what PPGC *knew* as of November 2020 was an invalid injunction does not mean that PPGC bears no consequences for its knowing action to continue to receive money and retain money they knew they were not entitled to. *See* Appx. 2707 (Linton writing on March 12, 2021 that "[w]e have been expecting Louisiana to [ask the district court to vacate the

6

preliminary injunction] since a recent ruling from the Fifth Circuit Court of Appeals gave them the green light to do this."); Appx. 2069-70 (Linton Depo. 192:3-15, 194:3-195:10); Appx. 1628 (Curtis (PPGC) Depo. 222:2-17). In fact, it means the opposite, as the law disallows recipients of government funds to receive or keep those funds if it knows it is not entitled to them.

### 3. Planned Parenthood had an obligation to repay the Medicaid funds at issue under the FCA, TMFPA, and LMAPIL.

Defendants argue that "the Fifth Circuit's mandate did not create an "established duty" for Defendants to return money to the government." Dkt. 419 at 21 (cleaned up). But the "established duty" comes from the FCA, TMFPA, and LMAPIL. The Fifth Circuit's ruling served to make it clear to Defendants when that duty became operative, as that was the date Defendants knew that the preliminary injunctions had no basis in law and would be vacated, and that is therefore the date that Defendants should have known that they received funds they were not entitled to—i.e., the date they should have known they received an overpayment.

The FCA, TMFPA, and LMAPIL all define an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. 3729(b)(3); *see also* Tex. Hum. Res. Code § 36.001(7-a) (substantially similar); La. R.S. § 46:437.3(16) (substantially similar). As discussed above, Planned Parenthood was not entitled to the Medicaid funds it received during the preliminary injunctions because their terminations were final under state law. Thus, the funds are

overpayments as a matter of law. 42 U.S.C. § 1320a-7k(d)(4)(B); 1 Tex. Admin. Code § 371.1(55). Planned Parenthood does not dispute that it has not repaid these funds. Dkt. 81 at 9-10. But "to retain—to not return—an overpayment constitutes a violation of the FCA." *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015); *see also* 42 U.S.C. § 1320a-7k(d)(1); Tex. Hum. Res. Code § 36.002(12); La. R.S. § 46:438.3(C).

Not only that, but federal and state law establish an affirmative duty for the recipient to *report and return* overpayments within 60 days of identification without any state action. 42 U.S.C. § 1320a-7k(d)(2); 1 Tex. Admin. Code § 371.1655(4); La. R.S. § 437.12(7); "Enrollment Packet for the Louisiana Medical Assistance Program, Basic Enrollment Packet for Entities/Businesses" at 12, Form PE-50, *available at* https://www.lamedicaid.com/provweb1/provider_enrollment/enrollment_entities.pdf; *see also* Medicare Program; Reporting and Returning of Overpayments, 81 Fed. Reg. 7654-01, 7664 (Feb. 12, 2016) ("section 1128J(d) of the [ACA] requires a person to report and return overpayments they have received. Thus, providers and suppliers have a clear duty to undertake *proactive* activities to determine if they have received an overpayment or risk potential liability for retaining such overpayment." (emphasis added)). And further, "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as

defined in section 3729(b)(3) of Title 31) for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7k. [2]

Defendants contend (at 22) that because the Fifth Circuit's opinion did not tell them they had to repay the money, they had no obligation to repay. But that argument overlooks the above law establishing their duty. And Plaintiffs already responded to Defendants' meritless argument that the obligation was only contingent or dependent upon further action by the government, and that the States were required to tell Defendants that it received an overpayment. *See* Dkt. 415 at 9-12. Even if there was government discretion involved in whether recoupment action would be taken, that does not mean that there is no obligation to repay if no recoupment is taken. *See U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th Cir. 2006) (holding that even if USDA officials allegedly had discretion in whether to charge a fee, "we are not convinced that this alleged discretion takes the obligation to pay the fees outside the scope of § 3729(a)(7)."). That is especially so where the statute makes clear that recipients of government funds have a duty to themselves detect and refund overpayments.

Plaintiffs have also responded to Defendants' incorrect argument that the absence of an injunction bond in the Texas and Louisiana federal court litigation limits their liability here. Dkt. 415 at 3-7. Defendants now contend (at 23) that

---

[2] The definition of "overpayment" itself contemplates that providers must consider not only the fact that they received the money in the first place but make a "reconciliation" later. 42 U.S.C. § 1320a-7k(d)(4)(B).

"without such a bond, there was no 'automatic' repayment obligation." But whether Defendants had an obligation to repay government funds under the False Claims Act is an entirely different matter, nor could the presence or absence of a bond in a different case involving different law limit the government's recovery of its money in this case. Defendants cite no contrary authority.

### B. Defendants knew or should have known that they received an overpayment.

Defendants hyperbolically claim that Plaintiffs have not a "shred" of evidence meeting the scienter requirement. Dkt. 419 at 25. But Defendants do not dispute that they were aware of all the legal requirements regarding overpayments and the 60-day rule. Dkt. 419 at 27. Nor could they. *See* Appx. 5578-85, 6403-06, 6413-18, 6324, 6437-38, 6482-83. As the Fifth Circuit held when affirming summary judgment over the provider's argument that there was no evidence they knew their billing practices were wrong, the provider's "indisputable violation of the statute makes this an open-and-shut case" and no genuine issue of material fact exists when "there is no plausible reading of the CMS Manual that could support the defendants' billing practices." *United States ex rel. Drummond v. BestCare Lab. Services, L.L.C.*, 950 F.3d 277, 281 (5th Cir. 2020).

Plaintiffs are not "attempt[ing] to redefine the scienter requirement" by arguing that Defendants knew ("actual knowledge") or should have known ("deliberate ignorance of the truth or falsity of the information" or "reckless disregard of the truth or falsity of the information") that they received money they were not entitled to. 31 U.S.C. § 3729(b)(1)(A); Tex. Hum. Res. Code § 36.001(a); La. R.S.

10

§ 46:437.3. This is consistent with the way courts have interpreted these terms. "[D]eliberate ignorance" means that a defendant is "subjective[ly] aware[]" of a substantial risk that his statement may be false, and avoids taking steps to confirm the statement's truth or falsity. *United States v. Ricard*, 922 F.3d 639, 656 (5th Cir. 2019); *cf. Voluntary Ignorance, Black's Law Dictionary* (11th ed. 2019) ("[A]n unknowing or unaware state resulting from the neglect to take reasonable steps to acquire important knowledge."). And "reckless disregard" means that a defendant disregards a "high risk" of falsity "that is either known or so obvious that it should be known," *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The FCA reckless-disregard standard "is intended to reach the 'ostrich-with-its-head-in-the-sand' problem where government contractors hide behind the fact that they were not personally aware that such overcharges may have occurred." *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (citation omitted).

The United States' position is that "[a]s used in the FCA, the words "knowing" and "knowingly" encompass circumstances in which persons subjectively believe they are submitting false claims to the government; are aware of a substantial risk that their claims are false but deliberately avoid taking readily available steps to obtain clarification; or act in reckless disregard of known or obvious facts indicating a high likelihood of falsity." Br. of the United States as Amicus Curiae 9, *U.S. ex rel. Schutte*

11

*v. SuperValu Inc.*, No. 21-1326 (U.S. Dec. 6, 2022).[3] "By covering all three states of mind, Congress cast a net broad enough to reach those who act in bad faith *or without an appropriate degree of care*, even where claims for payment implicate ambiguous legal conditions." *Id.* at 11 (emphasis added). And under Texas law, "[t]he Texas Supreme Court has said [conscious indifference and reckless disregard] 'require proof that a party knew the relevant facts but did not care about the result.'" *Malouf v. State ex rels. Ellis*, 656 S.W.3d 402, 412 (Tex. App.—El Paso 2022, pet. filed) (quoting *City of San Antonio v. Hartman*, 201 S.W.3d 667, 672 n.19 (Tex. 2006)).

Plaintiffs are not relying on the "reasonable diligence" strawman that Defendants erect.[4] See Dkt. 419 at 26-27. Rather, scienter is met here because the indisputable evidence shows that Defendants were "aware of a substantial risk that their claims are false but deliberately avoid[ed] taking readily available steps to obtain clarification; or act[ed] in reckless disregard of known or obvious facts indicating a high likelihood of falsity," Br. of the United States at 9. In addition to the

---

[3] As already explained, the precise question to be answered in *Supervalu*—whether an FCA defendant can escape liability, even if there is subjective evidence of the requisite intent, by showing that their action was consistent with an incorrect but objectively reasonable interpretation of law—is not at issue here because there is no objectively reasonable interpretation of law to justify Defendants' failure to repay the funds received under the preliminary injunctions, nor, in the alternative, to justify their continued billing even after they knew they were disqualified. *See* Dkt. 411, 415 at 17-19. Thus, as the Western District of Texas held, "[t]he cases that [defendant] cites in support of its proposition that no summary judgment can be had where the defendant's interpretation of a statute or regulation is reasonable do not control here. The point is simple; the applicable statute is the FCA, which unambiguously commands all government contractors not to submit false claims." *United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 770 (W.D. Tex. 2020).
[4] Defendants' reference (at 27) to a proposed rule removing a "reasonable diligence" requirement, in any event, has no force of law and no applicability here. Nor would it, even if adopted, since regulations cannot apply retroactively without express Congressional authorization. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

plain language of the relevant statutes, the evidence summarized below, which Defendants either do not or cannot dispute, shows that Defendants were aware of facts that made it "substantial[ly]" or "high[ly] likel[y]" that they could not keep the funds paid under the vacated injunctions, yet admit they have never repaid them (Dkt. 81 at 9-10), much less within 60 days:

- Defendants *knew* their Louisiana termination would be final as of October 17 and 18, 2015 as stated in their termination letters, Appx. 2684-2695, as Louisiana told them in September 2015, Appx. 6311, and further *knew* that those dates would not change because of federal court action, Appx. 6310-11;

- Defendants *knew* their Texas terminations would be final within 30 days of receipt of the final notices of termination if no administrative appeal was requested, Appx. 867-72, ████ █ ████ ████████████████████████████████████████████ ██████████████████████████████████████████████ Appx. 6506, they *knew* an administrative appeal would suspend their termination, Appx. 6305, and they understood that if the terminations were suspended through an administrative appeal they could provide services while the appeal was pending, Appx. 6305; but Defendants did not administratively appeal, Dkt. 81 at 50, 51, Appx. 2686; *see also* Appx. 1594 (Curtis (PPGC) Depo. 86:1-15), 6148, and instead made the "strateg[ic] decision to go to federal court, Appx.6148, *see also* Appx. 1969 (Lambrecht Depo. 72:24–73:3), despite the above guidance from Texas and Louisiana;

- Defendants *knew* in 2019 that they would likely be out of Medicaid, Appx. 9188, and *knew* in November 2020 that the preliminary rulings forcing the States to continue reimbursing them had no basis in law and would be vacated, Appx. 2707;

- Preliminary injunctions are by definition only temporary rulings before discovery and trial on the merits, and the legal nullity of vacated injunctions and the retroactivity of legal decisions is a basic concept in law, *see* Dkt. 71 at 15, Dkt. 391 at 47-53, Dkt. 415 at 13-16;

- Defendants continued billing even after the *Kauffman* opinion was issued, Appx. 6122-25, 6143-45, 6878-81, but stopped billing Texas Medicaid on the day the Fifth Circuit's mandate was issued, Appx. 2696–97;

- Defendants sent a letter to HHSC requesting a "grace period" before their termination was enforced, Appx. 802-07, 6173-78, which they knew was a "last-ditch effort" and that when the injunctions were lifted, that would "officially allow [the State] to enforce the law," Appx. 6151;

- Defendants *knew* HHSC denied their belated attempt to administratively appeal their termination on January 4, 2021, Appx. 6300, 6139-41;

- PPGT *knew* that even during the "grace period," "we're still terminated." Appx. 1920 (Lambrecht (PPGT) Depo. 101:21-24);

- PPGC *knew* that their claim that their terminations were not final in Texas was completely without legal basis no later than March 12, 2021, Appx. 1091-92, 2704-11, 6146-47.

The above undisputed facts were enough to suggest at least a substantial risk that Defendants were not entitled to keep the money based on Defendants' previous actions and knowledge:

- Defendants are required, as a condition of enrollment, to know and comply with all Medicaid laws and regulations, including clearly stated federal and state laws regarding overpayments, Dkt. 391 at 3-7, and Defendants in fact expressly agreed to that condition, Appx. 5 (Zalkovsky Decl., ¶ 19). Appx. 2053-54 (Linton Depo. 129:18-130:2), Appx. 7-114 (PPGC Texas Medicaid Provider Agreements), 115-330, 445-596 (PPST Texas Medicaid Provider Agreements), 331-444 (PPGT Texas Medicaid Provider Agreements), 597-788 (Texas Medicaid Provider Manuals), 2439-2670 (PPGC Louisiana Medicaid Provider Agreements), 2335-2438 (Louisiana Medicaid Provider Manuals);

- Defendants *knew* that "CMS has stated that self identified overpayments must be turned around within 60 days of discovery along with an explanation of the overpayment," Appx. 5578; *see also* Appx. 5580-81, 5582-83, 5584-85, 5644-51, 5652-58, 6313-14, 6315-16, 6317-18, 6319-21, 6324, 6403-04, 6405-06, 6407, 6411, 6413-14, 6415-16, 6417-18, 6422-24, 6426, 6437-38, 6482-83, 6568-69;

- Defendants *knew* that "there are penalties for us billing when we are excluded from the program," Appx. 5577, 6504;

- Defendants *knew* that it was legally questionable to continue seeing patients after termination. As PPGT's CFO stated, "Please let me know what the attorneys say about the legality of our providing services to

14

Medicaid patients after the date of termination. Once we know that we need to have a[] . . . discussion to determine what we will do operationally if and when that date comes and [if] we can legally . . . see those patients. I am not quite as confident as Ken [Lambrecht, PPGT CEO] that we will win the overall fight and I am also not comfortable assuming we will get paid for any claims that happen after termination," Appx. 6132, 6503, 1733; 6503, 1733, and "Does this letter mean we will stop seeing Medicaid patients on the date it says we are terminated? Have we received legal guidance on how to handle this operationally?" Appx. 9190, Appx. 1727-28. PPFA Executive Vice President Kim Custer stated, "I'm assuming we are appealing – just trying to learn if that means the termination is 'paused' during that process," Appx. 6505;

- Defendants *knew* that just because Medicaid reimbursements or other government funds are paid to them does not mean that they are always entitled to keep them, *e.g.* 1 Tex. Admin. Code § 371.1703(g)(5); 50 La. Admin. Code Pt I, § 4115, App. 2506, 5640, 5641-43, 5638-39 (PPGT financial statements disclosing potential liabilities for Medicaid overpayments), 6439, 6441-43, 6444-45, 9191-92 (PPST reserved cash in a separate account in the event PPST has to return PPP loan money);

- Defendants have in fact had to repay other Medicaid reimbursements in the past, Appx. 1372 (Barraza (PPST) Depo. 253:14-22), 5587-88, 5589, 5590-94, 5640, 5641-43 (PPGT received overpayment of federal and state funds and repaid the amount to Texas), 6429, 6430, 6434-35, 6439, 6500-02, 6506-07;

- Defendant PPGT gave back PPP loan money after government officials questioned their eligibility to receive it without any final determination by the government, Appx. 2015 (Lambrecht Depo. 255:3-256:15), 7025-38.

The evidence also shows that despite the above knowledge, Defendants "did not care about the result" of their actions, *Malouf*, 656 S.W. 3d at 412, deliberately avoided steps to obtain clarification, took additional steps to try to prevent the States from enforcing the valid terminations, and even took steps to conceal their termination from Louisiana, and had financial motives for doing so:

- PPGT CEO Ken Lambrecht admitted that he *did not even read* the termination letter from Texas when PPGT received it and has *never* "read it in its totality," Appx. 1965 (Lambrecht Depo. 57:1-12);

15

- Defendants knew that if they had any questions about their entitlement to Medicaid reimbursement they could call the Provider Relations hotline in either State, and they had done so many times in the past, Appx. 9210-19; they also had direct communication with general counsel for both HHSC and LDH and had asked clarifying questions before, Appx. 810-11, 6310-11;

- Defendants knew about the state and federal OIG Self-Disclosure Protocols for disclosing potential overpayments, that self-disclosure would allow Defendants to potentially avoid prolonged investigation and litigation and the associated costs, and that timely self-disclosure would suspend Defendants' obligation to report and return overpayments until a settlement agreement is entered into or Defendants withdraw or are removed from the self-disclosure protocol, Appx. 5659-74, 5595, 5596, 5597, 5598-5605, 5606, 5607, 5608-36, 5661; 6569-70;

- Defendants' strategy was explicitly to "delay termination," Appx. 6156, and "keep this litigation going" and "stay in the Medicaid fight" "to get the attention of the Biden administration," Appx. 6160, 6974, and "force TX to put PP back in Medicaid," Appx. 9220, 9224;

- Defendants attempted to hide their final termination from Texas Medicaid from LDH,[5] Dkt. 391 at 58-61, Dkt. 415 at 36-39, while at the same time pressuring the Louisiana Governor to let them back into Medicaid, Appx. 5159-61;

- Defendants would be in financial jeopardy without Medicaid funds. PPGC would have to close its doors unless it can get Medicaid funds, Appx. 5159, and if PPST lost Medicaid funds "four of seven health centers will fall," Appx. 5287;

- Defendants even contemplated working around their termination from Medicaid by getting new TPI/NHI numbers for their physicians so they could keep their patients while they tried to convince the Biden Administration to somehow get them back into Medicaid in Texas and Louisiana, and by setting up new non-explicitly Planned Parenthood entities that would still be governed by PPFA's Medical Standards & Guidelines so they could be insured by PPFA's insurance company ARMS, Appx. 5286-88, 9228.

---

[5] Defendants claim that regardless of PPGC's misleading letters, LDH knew about the details of the Texas termination and PPGC's efforts to mislead them. Dkt. 419 at 42. But government knowledge must be "actual" and proved with evidence. *See Peripheral Vascular Assocs.*, 507 F. Supp. 3d at 766.

This indisputable evidence thus shows that Defendants "knowingly" violated the FCA, the TMFPA, and LMAPIL.

### C. A preliminary ruling cannot create a permanent entitlement, nor does it absolve an individual of liability if the injunction is vacated.

Defendants continue to claim that vacated preliminary rulings entitled them to keep the Medicaid funds forever and that otherwise, there would be "immense constitutional problems." Dkt. 419 at 30. But this is just more histrionics. Vacated injunctions have no legal effect. *See* Dkt. 415 at 13-16; *accord R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, No. 6:20-CV-00176, 2022 WL 17489170, at *18 (E.D. Tex. Dec. 7, 2022).

As the Court has already explained, "this argument ignores that the injunctions only preserved the status quo *while they were in place* as well as the case law holding retained overpayments are subject to recoupment once an injunction is lifted." Dkt. 71 at 15. A temporary ruling cannot create a permanent entitlement, as the case law recognizes. *See* Dkt. 391 at 37-53, Dkt. 415 at 13-16, 19. Plaintiffs' reverse false claims do not seek "to punish Affiliate Defendants for an act done when the legality of the Affiliate Defendants' terminations had not been authoritatively determined." Dkt. 419 at 30-31 (citation omitted). Affiliate Defendants' failure to pay back the Medicaid funds took place *after* it had been "authoritatively determined" that the preliminary injunctions were contrary to law.

The plain language of the district courts' injunctions as requested by Defendants only prevented state officials from enforcing the Affiliate Defendants' terminations. Dkt. 391 at 47-48. They were silent about any permanent entitlement

17

to funds, nor did they "enjoin the terminations" themselves. *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (citing *California v. Texas*, 141 S. Ct. 2104, 2115–16 (2021)). Nor could they have. *See, e.g., Blanchard 1986, Ltd. v. Park Plantation, LLC*, 553 F.3d 405, 407 (5th Cir. 2008) (federal courts are generally from granting injunctions to stay state proceedings.) Further, the fact that Texas and Louisiana did not pursue recoupment is irrelevant to Defendants' liability. Dkt. 415 at 3, 5, 11 & n.5, 19, 42 n.18.

Defendants' claims that holding them accountable would punish them for "seeking judicial relief against government action," or chill others from doing so, Dkt. 419 at 30, are equally meritless. As spelled out clearly in state law and in the termination letters Defendants received, Defendants were welcome to exercise their right to seek administrative and then judicial relief that *would have* legally suspended the terminations and prevented many of the problems present here. But Defendants strategically chose to litigate in federal court instead, knowing full well that choice would not suspend their terminations.[6]

Nor do Relator's alternative implied-false-certification claims create a constitutional crisis. At most, the preliminary injunctions might factor in determining whether Defendants met the scienter requirement while filing impliedly false claims; they do not stand as a permanent bar to liability. *See* Jonathan F.

---

[6] Nor were Defendants entitled to a federal forum for their complaints. *See Planned Parenthood of Greater Tex. Surg. Health Servs. v. City of Lubbock, Tex.*, 542 F. Supp. 3d 465, 486 (N.D. Tex. 2021) ("It is simply not the case that because someone might suffer a burden on their constitutional rights, the person is granted an automatic entrance into federal court.").

Mitchell, *The Writ-Of-Erasure Fallacy*, 104 Va. L. Rev. 933, 987 (2018) ("No one gets an immunity from civil or criminal penalties by violating a statute at a time when the executive or the judiciary has chosen not to enforce it."); Douglas Laycock, *Federal Interference with State Prosecutions: The Need for Prospective Relief*, 1977 Sup. Ct. Rev. 193, 209 ("If the final judgment holds the statute valid, dissolves the interlocutory injunction, and denies permanent relief, state officials would be free to prosecute any violation within the limitations period."); *cf. Steffel v. Thompson*, 415 U.S. 452 at 470 (1974) ("If a declaration of total unconstitutionality *is affirmed* by this Court, it follows that this Court stands ready to reverse any conviction under the statute. If a declaration of partial unconstitutionality *is affirmed* by this Court, the implication is that this Court will overturn particular applications of the statute" (emphasis added)).[7]

### D. Defendants "knowingly concealed or knowingly and improperly avoided" an obligation to pay the Medicaid funds back to the States.

The only scienter requirement under the FCA, TMFPA, and LMAPIL is that a defendant "knowingly" violate the statutes. There is no extra "fraud" requirement, as Defendants appear to be arguing (at 32-33), because the statutes themselves define Medicaid fraud. The case cited by Defendants discusses the fact that the FCA is a fraud statute, which is why it noted that its large damages, fines, and civil penalties would be unreasonable if it were not. *Olson v. Fairview Health Servs. of Minn.*, 831

---

[7] Defendants' citation to *Clarke v. U.S.*, 915 F.2d 699, 701 (D.C. Cir.1990) is not to the contrary. There, as the Court considered the mootness of an injunction, the Government conceded that the injunction would be a defense to prosecution under the law at issue.

F.3d 1063, 1074 (8th Cir. 2016). Defendants' remaining arguments under this section simply rehash the argument that they cannot be liable unless there is evidence that they had actual knowledge of their violation of the statutes, which is not required.

## II.     Relator Retains Non-Intervened Claims Under the TMFPA.

Planned Parenthood contends that Relator may no longer pursue non-intervened TMFPA claims but cites no Texas or statutory authority for that proposition. *See* Dkt. 419 at 34. As Relator has already explained, Texas did not move to dismiss those claims. And by analogy to the FCA, which contains similar language regarding "actions," "[n]othing in § 3730 suggests that the government's intervention bars the Relator from pursuing claims beyond those in the government's complaint, and the weight of authority suggests that Relator can." *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1074 (N.D. Cal. 2020); *see also United States ex rel. Bennett v. Biotronik, Inc.*, 876 F.3d 1011, 1020 (9th Cir. 2017) (after the government intervenes in an FCA case, the case may include "claims [the government] chooses not to prosecute or settle").

Courts regularly allow relators to pursue their separate claims after the government's intervention. *See, e.g., United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 826 (8th Cir. 2013); *United States ex rel. Fallon v. Accudyne Corp.*, 97 F.3d 937, 938 (7th Cir. 1996); *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 449 n.1 (5th Cir. 1995) ("The United States elected to intervene in that portion of the suit against [some] defendants but declined to intervene against [another defendant]. . . . [relator] retained the authority to proceed against [the other defendant] on its own."); *cf. Peripheral Vascular Assocs.*, 507 F. Supp. 3d at 773 (rejecting argument

that Relator's pursuit of non-intervened FCA claims is unconstitutional and citing *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001)).

Defendants cite *U.S. ex rel. Becker v. Tools & Metals, Inc.*, 2009 WL 855651 at *6 (N.D. Tex. 2009), to support this argument. But *Becker* merely determined that where the government has intervened, the relator has no right to pursue *a duplicative claim* under the FCA. *Id.* at *5-*6. The only other authority cited by Defendants—*United States ex rel. Brooks v. Stevens-Henager College, Inc.*, 359 F. Supp. 3d 1088 (D. Utah 2019)—has been expressly disregarded by other courts as an outlier with poor reasoning. As noted in *Ormsby*, *Brooks* is "*the only case . . .* where a district court held that relators have no right to maintain the non-intervened portion of an FCA case after the government intervenes." 444 F. Supp. 3d at 1076 (emphasis added). After discussing the deficiencies in *Brooks*' reasoning, *Ormsby* concludes: "Given the clear weight of authority that allows a relator to pursue non-intervened claims, the court follows that approach (and not *Brooks*) as persuasive. The government can pursue some or all of a relator's claims, and a relator can pursue claims that government does not." *Id.* at 1077. *Brooks* was also roundly rejected by the District of South Carolina: "[T]he reasoning of *Brooks* is circular and fundamentally misunderstands how an FCA case proceeds." *United States ex rel. Rauch v. Oaktree Med. Ctr., P.C.*, No. 6:15-CV-01589-DCC, 2020 WL 1065955, at *8 (D.S.C. Mar. 5, 2020). *Rauch* also found that *Brooks* "is an outlier in a large body of FCA case law. Indeed, the Court is aware of *no case law*—other than *Brooks*—that holds that a relator may not litigate non-intervened claims." *Id.* at *9 (emphasis added).

21

Defendants' argument that Relator cannot pursue implied-false-certification claims under the TMFPA because they are "adverse to . . . the real-party-in-interest" is equally wrong. Dkt. 419 at 35. As Relator has already explained, the implied-false-certification claims are alternatives to the reverse-false-claims, not competing theories. Relator is not trying to recover on both claims, *see* Dkt. 391 at 53; *see also Drummond*, 950 F.3d at 284. Thus, Relator could recover on the implied-false-certification claims if the Court does not award the same civil remedies and penalties to Texas and Relator on the reverse-false-claims; the implied-false-certification claims therefore do not prevent Texas from obtaining judgment. In fact, if Texas and Relator did not recover under the reverse-false-claim theory but Relator did under implied-false-certification, that would not be "adverse" to Texas, as it would recover its share of the Medicaid money, an obvious benefit. Defendants' contention that the implied-false-certification claims "directly contravene[] the reverse false claim theory," Dkt. 419 at 36," is incorrect. *See United States v. Omnicare, Inc.*, No. 1:15-CV- 4179 (CM), 2021 WL 1063784, at *12 (S.D.N.Y. Mar. 19, 2021).

III. **As an Alternative to Plaintiffs' Reverse False Claims, the Court Should Grant Partial Summary Judgment on Relator's Implied-False-Certification Claims.**

A. **Relator's implied-false-certification claims were properly pleaded.**

Defendants assert that the Court cannot grant summary judgment on these claims because they were not pleaded in Relator's Complaint, but that is untrue. As this Court held, Relator's implied-false-certification claims were adequately pleaded in the Complaint specifically enough to satisfy the rules. Dkt. 71 at 20-21; s*ee* Dkt. 2 at ¶¶ 3, 8, 47, 53, 58, 107, 108, 115-17, 125-27, 132-34. Defendants claim that "Relator

newly asserts, in that submitting Medicaid claims during the pendency of the injunctions, Affiliate Defendants impliedly represented that they were 'qualified.'" Dkt. 419 at 35. But that's exactly what Relator pleaded. *See* Dkt. 2 at ¶¶ 106-07.

Relator requests partial summary judgment on the impliedly false claims that Defendants submitted (1) in Texas after January 19, 2017, when the Affiliate Defendants' termination was final; (2) during the "grace period" in Texas, and (3) submitted by PPGC in Louisiana after PPGC was terminated from Medicaid on October 15, 2015 and/or after it was terminated from Texas Medicaid on January 19, 2017. Those claims submitted by Defendants are subsets of the claims at issue in implied-false certification claims pleaded in the Complaint. *See* Dkt. 2 at ¶¶ 3, 8, 47, 53, 58, 107, 108, 115-17, 125-27, 132-34. Relator is permitted to ask for partial summary judgment on parts or subsets of Relator's claims and is also permitted to move for summary judgment based on facts that surfaced during discovery, like the facts regarding Defendants' dishonesty about the grace period and PPGC's misleading conduct toward LDH after being terminated from Texas Medicaid. "Motions for summary judgment are designed to pierce the allegations in the pleadings, thereby permitting the court to determine whether a factual basis actually exists for the petitioner's claims." *Save Our Cemeteries, Inc. v. Archdiocese of New Orleans, Inc.*, 568 F.2d 1074, 1077 (5th Cir. 1978). In other words, motions for summary judgment are decided on evidence, rather than limited to the allegations in the complaint. *Id.* The new facts supporting Relator's claims do not constitute unpleaded claims. They are the same claims, just supported by additional facts. And

*contra* Dkt. 419 at n. 47, Defendants moved for summary judgment on Relator's implied-false certification claims under the FCA and LMAPIL. Dkt. 382 at 38.[8]

## B. Relator is entitled to partial summary judgment on the implied-false-certification claims.

Defendants claim that Relator cannot establish that their claims were false, again citing pre-*Escobar* case law. Dkt. 419 at 36; *but see* Dkt. 415 at 29. They point to the now-vacated decision of the district court in the Texas case that there was no evidence supporting termination, claiming Defendants were really qualified despite the State's uncontested conclusion that they were not. But as the Fifth Circuit panel pointed out when vacating the preliminary injunction, the district court's conclusion was erroneous, as it "occurred only after the district court credited the plaintiffs' witnesses' self-serving testimony about their videotaped statements, while asymmetrically refusing to consider OIG's post-termination evidence. None of the plaintiffs' evidence, moreover, was ever presented to the agency through the standard administrative procedures or judicial review required by the Medicaid statutes." *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc v. Smith*, 913 F.3d 551, 563 (5th Cir. 2019). Proper review by the district court would have been on the agency record with an abuse-of-discretion standard, and Defendants submitted no evidence to the agency. *Id.* at 569. They cannot now argue that the termination decision was wrong *several years* after they waived their right

---

[8] Even if the Court were to find that these are unpleaded claims, "[a] response to a motion for summary judgment raising a new claim may be treated as a motion to amend the complaint and, if the applicable standard is met, see, e.g., Fed.R.Civ.P. 15(a)(2), 16(b)(4), may be granted." *La Union del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 141 F. Supp. 3d 681, 701 (S.D. Tex. 2015).

to contest those findings. And Defendants' claims submitted under the auspices of qualification when they knew they had been terminated and no court had vacated that termination are, unequivocally, false. Defendants did not need a "time machine" to discern that, Dkt. 419 at 37; it was obvious. Further, Defendants' attempt (at 37) to conflate their qualification to provide medical services in a general sense with the States' determination that they were not qualified to participate in the Medicaid program should be disregarded. The law "make[s] clear that a state agency may determine that a Medicaid provider is unqualified and terminate its Medicaid provider agreement even if the provider is lawfully permitted to provide health services to the general public." *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 369 (5th Cir. 2020).

### 1. Defendants made false representations to obtain the "grace period."

Defendants told Texas that they needed more time because of the COVID-19 pandemic (despite knowing since at least 2019 that they would likely be out of Medicaid) to transition their patients to other providers after the *Kauffman* decision was issued. Based on that representation, Texas offered a 30-day "grace period" before it would begin enforcing Defendants' terminations for that express purpose. But the evidence shows that Defendants made only *de minimus* efforts to do so only for patients that physically came to their clinics during that 30-day period, and instead used the "grace period" to obtain more Medicaid funds, ready another meritless legal challenge, and attack Governor Abbott in the media. The evidence

goes far beyond "cherry-picked deposition testimony" from "one Affiliate Defendant CEO" who simply couldn't recall details of what they did to help patients:

- Polin Barraza, as PPST's corporate representative, testified that PPST's "understanding" of the grace period "was that we were going to file one more time to see if we could get—and that we could see patients if they could rule in our favor with the state court," Appx. 1426 (Barraza (PPST) Depo. 463:6-12);

- Ms. Barraza confirmed that "unless a patient came into one of the [PPST] clinics, there was no communication other than the website from [PPST] to Medicaid patients to transition them to other providers." Appx. 1364 (Barraza (PPST) Depo. 221:15-21).

- Ms. Barraza admitted that the day the "grace period" was granted, she emailed others at PPST stating, "let's plan on how we can message patients that we can still accept their Medicaid until 2/3/2021. *We need to act swiftly so we can capture as much Medicaid revenue as possible*," with no mention of transitioning patients. Appx. 1365 (Barraza (PPST) Depo. 222:7-224:12) (emphasis added); *accord id.* at 224:19-225:16 (discussing another document and agreeing the focus is on billing and not on transitioning patients); Appx. 9240.

- Ms. Barraza admitted that PPST continued treating Medicaid patients during the Travis County TRO's pendency and *did not* transition them to other providers because they were still trying to use the courts to get into Medicaid:

> Q: And so during the pendency of this Travis County lawsuit, Planned Parenthood South Texas continued to treat Medicaid patients; correct?
>
> A: That is correct.
>
> Q: And these were patients that South Texas *had not transitioned to other providers*; correct?
>
> A: Correct.
>
> Q: And South Texas sought reimbursement from Texas Medicaid for those services, correct?
>
> A: Correct.
>
> Q: And why did they do that?

26

> A: This was our last fight. You know, we were hoping that we would continue to be inside of Medicaid.

Appx. 1366 (Barraza (PPST) Depo. 228:8-20) (emphasis added).

- Similarly, Alfred Curtis, as PPGC's corporate representative, testified that PPGC's "operational plan" with respect to continuing to see patients was that "[w]e would continue to see Medicaid patients as long as we were legally able to do so, period," and that only "[i]f we were ultimately excluded from Medicaid, we would work with patients to find them other providers." Appx. 1577-78 (Curtis (PPGC) Depo. 21:23-22:25).

- PPGC also testified that its efforts to transition patients were limited to giving cards listing other providers only "to patients at the health centers," did not recall giving that information to other patients, and if a patient called to make an appointment,

> we would let them know at the time that they were making an appointment that if we couldn't see Medicaid patients, if you needed help finding another provider, I think there was probably a website or something you could point to. I don't know the website specifically, but—but it was more just direct communications with patients either at the time they made their appointment or if they showed up at the health center.

Appx. 1578 (Curtis (PPGC) Depo. 22:11-25, 23:24-24:12); *see also* Appx. 1602 (121:2-10) (PPGC had no knowledge of any "warm" or direct handoffs of its patients to other Medicaid providers between November 23, 2020 and January 1, 2021).

- Mr. Lambrecht, CEO of PPGT, testified:

> A: After the Fifth Circuit ruling, yes, the intent was to give [patients] the ability to stay with us as we helped them find care.

> Q: And that was part of the request for a grace period?

> A: Yes. And I believe it was granted, but only for a month.

> Q: At this point, December 14th, 2020, do you recall if PPGT had begun putting any plans in place to transition their Medicaid patients to new providers?

> A: I don't recall the details, but I do know that we were working to try to help our patients find providers. I don't know what that working definition means, I don't know if it was internal or had

27

progressed, but I know there was discussion after the Fifth Circuit ruling of how do we help our patients who can't come to us anymore.

Q: Do you recall any specific steps that PPGT took to transition their Medicaid patients to new providers?

A: You know, the short answer is, I don't recall. My operation staff would have to remind me. . . .

Q: But as you sit here today, you cannot recall a single, specific effort that PPGT took to transition Medicaid patients to new providers? . . . .

A: So I believe, and again, this is seven years ago, I believe we created . . . Sorry, this is 2020. Sorry, sorry, this is two years ago, it feels like seven in a pandemic, this is two years ago going on three. What month is this, December, so two years ago. So—what I recall us doing is continuing to serve Medicaid patients, but at some point we stopped submitting claims.

Appx. 1985 (Lambrecht Depo. 134:3-135:16).

This is all in contrast to what PPGT, PPST, and PPGC told Texas to get the "grace period." *See* Appx. 807. Relator has already discussed the evidence showing that Defendants hesitated to refer patients to "competitors," intended to use the "grace period" to obtain favorable media attention, attack perceived adversaries, and gain the attention of the Biden Administration. Dkt. 391 at 57-58, 70-73, Dkt. 415 at 33-35, Appx. 7311. Defendants do not appear to dispute those facts. *See generally* Dkt. 419 at 10, 40-41.

### 2. PPGC repeatedly misled LDH as to their termination in Texas in violation of Louisiana program requirements PPGC agreed to abide by as a condition of participation.

PPGC repeatedly misled LDH about their Texas termination and failed to update LDH as required as a condition of participation in Louisiana Medicaid. *See* Dkt. 391 at 21-24, 58-61, 74-75; Dkt. 415 at 36-39. Defendants claim that PPGC did

communicate their termination from Texas Medicaid to LDH, but the evidence they cite (at 41-42)—paragraphs 22 and 34 of their Statement of Facts (Dkt. 382)—does not show that.[9] That does not amount to a genuine dispute. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."). Moreover, deposition testimony from both PPGC and Melaney Linton, PPGC CEO, establishes the opposite. *See* Appx. 2076 (Linton Depo. 219:20-220:6) (cannot recall any other updates being sent to LDH between December 23, 2020 and March 22, 2021), Appx. 2077 (at 222:11-16) (not sure there were any other updates sent to LDH between March 22, 2021 and May 7, 2021); *id.* (at 224:10-18) (same between March 22, 2021 and May 13, 2021); *id.* (at 224:19-24) (same between May 13, 2021 and December 30, 2021); Appx. 1628 (Curtis (PPGC) Depo. 223:20-225:8) (PPGC did not know of any other letters or updates it submitted to LDH after March 22, 2021); *cf.* Appx. 7156-57 (PPFA strategy to avoid media coverage of PPFA filing motion to dismiss Medicaid case in May 2021 because "avoiding media attention will also help us with the LA Medicaid case."). Nor is Relator aware of any document produced that establishes this, and Defendants point to none. PPGC also admitted its auditing processes do not test whether PPGC has submitted true and accurate information to the State of Louisiana for purposes of enrollment in Medicaid. Appx. 1621 (Curtis (PPGC) Depo. 194:25-195:25).

---

[9] If Defendants meant paragraphs 22 and 34 on pages 6-7 and 12 of their Response (Dkt. 419), those paragraphs also do not meaningfully dispute Relator's contentions—they admit that the only communications were the December 2020 and March 2021 letters (Appx. 2696-97 and 2712) and simply dispute that any further notice was required. They do not even attempt to defend the misleading content of those letters.

Further, Defendants cannot seriously dispute that updating LDH as to termination status was a condition of participation (and thus material). *See* Appx. 2506, 2570. And Defendants offer no evidence, other than the irrelevant settlement agreement, to show that LDH was supposedly aware that PPGC misled them and failed to comply with the provider agreement.

## IV. PPFA Is Directly Liable Under the FCA, TMFPA, and LMAPIL.

### A. PPFA is liable for reverse-false claims.

#### 1. The reverse-false-claims provisions of the FCA, TMFPA, and LMAPIL expressly allow for indirect liability.

PPFA contends that the Fifth Circuit's precedent on indirect-reverse-false claims is inapplicable because it analyzed a pre-amendment version of 31 U.S.C. § 3729(a)(1)(G). Dkt. 414 at 8. But regardless of whether the word "causes" is in both clauses of subsection G, the statute does not specify that the "obligation" must be that of the person violating the statute.[10] Thus, it is still true that "[t]he statute does not require that the [act] impair the defendant's obligation; instead, it requires that the [act] impair "an obligation to pay or transmit money or property to the Government," *United States v. Caremark, Inc.*, 634 F.3d 808, 817 (5th Cir. 2011), because the statute says "an obligation," not "*their* obligation." *See* 31 U.S.C. § 3729(a)(1)(G); *accord* Tex.

---

[10] As already noted, Dkt. 415 at 45, Defendants' expert admitted that PPFA has received Medicaid funds themselves via the Affiliates. Appx. 1792 (Dudney Depo. 199:8-201:7). PPFA and the Affiliates share significant amounts of revenue—$650 million to affiliates nationwide since 2018, Appx. 4056, and $67 million to the Affiliate Defendants here since 2014, Appx. 4054; *see also* Appx. 1503, 1492-1504, 1504-1510, 1511-1524, 1715-19, 4113-37; 4388-89, 4571-4821. Defendants also share donations. *See* Appx. 4141-42, 6766-68, 6987-92 (PPFA shared fundraising campaign for the Affiliate Defendants' litigation against State of Texas), 4860, 5056-5065.

Hum. Res. Code § 36.002(12); La. R.S. § 46:438.3(C). And because the second clause of subsection (G) was added, and parallel language ("an obligation") was used in both clauses, it is probable that Congress intended both clauses to have the same effect. That is especially so because in 2009, Congress *expanded* FCA liability by both increasing the range of plaintiffs and the class of defendants. *United States ex rel. Bias v. Tangipahoa Parish Sch. Bd.*, 816 F.3d 315, 323–24 (5th Cir. 2016). And "[b]ecause the FCA is 'remedial,' its provisions are to be construed 'broadly to effectuate its purpose." *Id.* at 324 (quoting *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 468 (5th Cir. 2015)). Regardless, without delving into legislative intent, the plain language still provides for indirect liability, which allows for PPFA's liability for their involvement with the Affiliates' avoidance of their obligation to repay the overpayments. This is consistent with the Supreme Court's recognition that "a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility" without the need to pierce the corporate veil. *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). And if anything, because the text of the second clause of subsection (G) expressly allows for indirect liability without requiring the person to "cause" the "avoidance" like in the first clause, the standard for the requisite involvement to trigger liability is *more lenient* than that in the first clause, which does not help PPFA.

To establish direct liability, the relevant question is how PPFA "operates the [affiliate] facilit[ies]," as "evidenced by participation in the activities of the

facilit[ies]." *Id.* at 67. The relevant question is *not*—as Defendants would have it—"whether PPFA extensively directed the FCA, TMFPA, and LMAPIL violations allegedly committed by the [Affiliates]," but how PPFA "directed . . . the facility's activities." *Id.* at 71; Dkt. 414 at 14. But by either standard, Plaintiffs readily show that here. And the evidence cited below and previously is relevant for that purpose.

Even if it were true PPFA is not a "parent" company, Dkt. 414 at 13, its connection to the Affiliates is characterized by an even closer degree of operational control. PPFA *is* the Affiliates: PPFA "is a membership organization where the majority of the members are representative of the different members . . . . which is the majority over the directors of PPFA." Appx. 1320 (Barraza Depo. 45:12–15). "PPFA's membership is not only PPFA but also includes the 49 affiliates and their related entities" and the affiliates in turn control 114 ancillary entities. Appx. 1514 (Barrow-Klein Depo. 102:5–104:9); *see also* Appx. 6775. PPFA and the Affiliates share the same work and the same mission. Appx. 1434–444 (Custer Depo. 17:20–18:7). PPFA-developed or affiliate-CEO controlled entities provides products and prescription drugs to the affiliates, Appx. 1525-26, 4158-66, 4167-4213, 4216-21, 4259, 7042-62. PPFA exerts operational control over its affiliates at all levels: from accreditation, procedures offered at the facilities, insurance, retirement plans and using electronic records instead of hard-copy charts, to the whole-organization strategy to respond to the termination notices. *See, e.g.*, Appx. 2727-3151, 4143-4157, 4863-4878, 4888-4942, 5208, 5228, 5301, 5212-13, 5219, 5289-5303, 5451-5519, 7088,

7141-55, 7315-28, 9230. PPFA is liable regardless of the involvement of its employees in the "Litigation & Law" division.

PPFA also argues that Plaintiffs' claims against PPFA premised on PPFA lawyers' involvement are not viable because lawyers cannot be liable for the acts of a client. Dkt. 414 at 11-12. But Plaintiffs do not seek to have the *lawyers* held liable—rather, PPFA, the lawyers' non-law-firm employer. As explained below, the evidence establishes that the PPFA lawyers were not acting solely on behalf of the Affiliates but were also acting in adherence to their "mandate" from PPFA, in furtherance of PPFA's overall mission, and engaged in litigation for the apparent benefit of PPFA. Thus, the logic behind PPFA's liability would not apply to "*any* lawyer or law firm . . . who represents a client who chooses to contest a government decision that affects the client's entitlement to government funds," contrary to PPFA's claim. Dkt. 414 at 13. Such potential liability would be limited only to parent companies employing lawyers who work in this unconventional manner.

As an initial matter, non-lawyer employees of PPFA were involved in the strategy employed to maximize Medicaid services and revenues. *See, e.g.,* Appx. 6637 (PPFA EVP "suggest[ing] a way to consider . . . affil[iates] more likely to be able backbill" and proposing that affiliates repay PPFA for funds given to them during Medicaid "limbo" period). PPFA directed Planned Parenthood's media response to the termination notices and leveraged it for national political influence and further the goals of the national organization. Appx.001441 (Custer Depo. 44:16–45:18), Appx. 2181-82 (Stewart Depo. 26:22-27:7, 28:13-29:25); *see also* Appx. 6160 (PPGT executive

expressing her understanding that PPFA wanted to keep the Texas litigation going

so PPFA could use it for leverage on the national political stage). And PPFA itself

benefitted from the Affiliates providing more Medicaid services, as it would increase

the Affiliates' operating expenses, and thereby increase the Affiliates' mandatory

payments to PPFA. Appx. 1684 (Custer Depo. 185:12-16), Appx. 6967 (payment to

PPFA by each Affiliate is a percentage of the Affiliate's prior year operating

expenses). PPFA employs a large team of experts just to help Affiliates maximize

their Medicaid revenue. Appx. 5078-79, 5320, 5357, 5360, 6849-67, 6604-34, 6635,

6653-61, 6672-91, 4388-89, 4884-87, 5072-75, 5078-79, 5122-26, 5150-51, 5152-53,

5154, 5163-85, 5130-35, 1713. PPFA provides guidance to affiliates on Medicaid

compliance. *See, e.g.,* Appx. 5017-24, 5436-40, 5644-58, 6714-6759, 6764-65, 6813-48,

6872-73. PPFA also created a $15 million "Medicaid Gap Fund" to help Affiliates

continue to provide Medicaid services "during a potential gap in Medicaid

reimbursement and litigation period," and a condition of those grants is that they be

paid back if Medicaid funding is restored. Appx. 4138-40, 5128-29, 6508-11, 6637.

Indeed, PPFA and its affiliates receive nearly $500 million in federal and state

Medicaid funds each year. Appx. 6665-71, 7772-8083.

PPFA's arguments that PPFA's lawyers, who work in a division of PPFA

reporting to the Chief Experience Officer of PPFA (a non-lawyer) are independent

and a "captive law firm" fall flat, given the deep mutual involvement between PPFA

non-lawyers in "Litigation & Law" and the PPFA lawyers in PPFA-mission work. *See*

Appx. 1438 (Custer Depo. 30:16–20), 9242-9345 (describing L&L place within CXO

department), Appx. 2181 (Stewart Depo 26:10–33:18), 6713. PPFA lawyers do not hold positions with the Affiliates (or "subsidiaries", Dkt. 414 at 19)—they are at all times employed by, paid by, and supervised by PPFA. Appx. 1452-58 (Barrow-Klein Depo. 86:10-111:6). Indeed, PPFA's "*mandate* for the Lit and Law team" is that they are *prohibited* from representing Affiliates in "other forms of litigation" not approved by PPFA and they cannot represent any clients other than PPFA and PPFA Affiliates. Appx. 1440 (Custer (PPFA) Depo. 38:4–22), 1452 (Custer (PPFA) Depo. 87:6–17). PPFA's corporate representative testified that the PPFA Litigation & Law group advises the affiliates "on public policy matters *to further the mission*." Appx. 1672 (Custer (PPFA) Depo. 137:3–9) (emphasis added). Defendants' Medical Legal Advisory Panel (MLAP) "comprised of ARMS staff, Claims attorneys, and PPFA Medical Services team, meets regularly to review claims brought against PP affiliates. Cases are analyzed and discussed with members of the panel from clinical, legal and insurance perspectives to determine financial reserves and next steps to settle or defend a given claim or suit." Appx. 9235. While PPFA's corporate representative initially insisted that PPFA only knew about Affiliates' litigation strategy after their decision became public information Appx.001677-68 (Custer Depo. 156:2:–157:15, 160:21–161:21), when confronted with documentation, she admitted that PPFA knew the Affiliates were going to file suit in the Western District *before* filing. Appx. 1679 (Custer (PPFA) Depo. 162:2–163:19).

PPFA also asserts that because its attorney employees directed Planned Parenthood's response to the termination notices, PPFA cannot be liable. Dkt. 414 at

19. But that ignores the fact that "consultation with a lawyer confers no automatic immunity from the legal consequences of conscious fraud." *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 381 (4th Cir. 2015) (citation omitted). While Planned Parenthood contends there is nothing "unlawful" about their attorneys "pursuing a stipulated solution to delay the implementation of the terminations," Dkt. 414 at 26, the evidence demonstrates that PPFA influenced and determined what Litigation & Law's legal advice would be. *See Tuomey*, 792 F.3d at 381. For example, PPST consulted with PPFA lawyers and determined *not* to respond to either the initial or final notices of termination, even though PPST was not in the undercover videos and disagreed with the State's conclusion that PPST was an "affiliate" of PPGC and PPST. Appx. 1354, 1355–56 (Barraza Depo. 180:7-24, 184:7–14, 188:11). Instead, PPFA was "very much interested in ensuring that the [Planned Parenthood] brand was being protected" and that the Affiliates would "protect[] each other" by not challenging their own termination notices. Appx. 1442 (Custer Depo. 48:9–49:3). In exchange for putting up a unified front, PPFA offered its Affiliates access to a multi-million-dollar fund to compensate them for any Medicaid losses incurred during the pendency of the litigation. Appx. 5128-29.

PPFA contends that Plaintiffs "bear the burden of rebutting the 'presumption . . . . that the directors are 'wearing their subsidiary hats' and not their 'parent hats' when acting for the subsidiary." Dkt. 414 at 28 (citation omitted). While the Supreme Court has not detailed all the ways in which a dual officer may be found to be acting on behalf of the parent, the Court noted: "[I]t is prudent to say only that

the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." *Bestfoods*, 524 U.S. at 70 n.13. Here, it was plainly contrary to the interests of the Affiliates *not* to contest their notices of termination in favor of protecting the national brand, yet that was what PPFA lawyers told them to do. Further showing a lack of independence, PPFA employees continue to represent the Affiliates in *this* litigation, Appx. 1631-32 (Curtis Depo. 237:21–238:4); Appx. 1930 (Lambrecht (PPGT) Depo.140:11–21), and even the Affiliates' non-PPFA counsel has a connection with PPFA. See Appx. 1933 (Lambrecht (PPGT) Depo. 150:21-151:22) (Affiliate lead counsel married to PPFA lawyer Flaxman).

### B. PPFA is directly liable under Relator's implied-false-certification claims.

PPFA disputes their liability under the implied-false-certification provisions of the FCA, TMFPA,[11] and LMAPIL. Relator agrees that there must be "some degree of participation" by PPFA in the claims filed by the Affiliate Defendants. Dkt. 414 at 24 (quoting *United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 681 (N.D. Miss. 2015)). That is more than satisfied here. PPFA quotes from cases

---

[11] PPFA notes in a footnote that Relator has no remaining TMFPA implied-false-certification claim, Dkt. 414 at 23. n.5, but that is incorrect and unsupported by the law. *See* Part II *supra*.

involving different factual scenarios and finding no liability because certain factors are *not* present, *see* Dkt. 414 at 25-26. But those have limited value because the specific kinds of activities that satisfy the requirement often depend upon the type of case and are not universal. Where a defendant files claims for services not provided or overbilling, it seems correct that a parent would need to have some familiarity with those claims or with the process the subsidiary used to produce such claims in order to know such claims were false or acquiesce in them. *See United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 62-63 (D.D.C. 2007).

But here, PPFA cannot reasonably deny that it was both aware and involved in the impliedly false claims the Affiliates submitted when they were disqualified and therefore not in compliance with program requirements. Those claims were not false because of some technicality not readily apparent to someone not deeply involved— they were false because the Affiliates had been terminated from Medicaid, as PPFA well knew, yet PPFA continued to encourage the Affiliates to file claims and did not take steps to ensure that the Affiliates stopped filing claims despite its indisputably detailed knowledge about the Medicaid program and billing procedures and the detailed oversight it exercised during the accreditation process, *see* Appx. 2727-2729, 2741-3027, which occurred for all the Affiliate Defendants multiple times during the relevant time period, Appx. 3028-3210, 3290-3353, 3447-3661, 3738-3903; Appx.1713 (affiliates required to provide financial data to PPFA on a quarterly basis); *accord U.S. v. Pres. & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 187-88 (D. Mass. 2004) (holding there was sufficient evidence to tie a defendant to the claims process where

the defendant did not review actual claims, but approved related expenses, saw monthly and quarterly reports, and was aware that the project was funded by the United States.). That is why this case is not much like the cases that PPFA discusses. PPFA knew that its Affiliates had been terminated yet failed to take any action to stop the Affiliates from continuing to submit false claims. It is unnecessary for Relator to prove that PPFA "controlled" the technical submission of claims.

PPFA was also involved in the Affiliates' decision to seek a "grace period" from Texas purportedly for patient need but then use it to "milk" negative press coverage of the Texas Governor to benefit PPFA. Appx. 6293, *see also* Appx. 6156, 6160. Moreover, PPFA cannot deny that it was deeply involved with PPGC's decisions to mislead LDH in violation of their provider agreement and state law and avoid their obligation of candor to the court in advocating that a federal court keep a legally baseless injunction in place and not apprising that court of relevant new facts. *See* Appx. 7156-57. Because PPFA was aware that the Affiliates were submitting Medicaid claims while terminated, encouraged them to do so, and did not remedy the situation, PPFA is liable.

### C. PPFA acted with the requisite scienter.

As discussed above, Relator is not required to prove that PPFA had actual knowledge that the Affiliates' claims were false or had specific intent to violate the statutes. It is enough to show, as Relator has, that PPFA knew of the relevant facts suggesting there was an issue yet did nothing. *See* Part I.B. *supra*.

### V. Relator Is Entitled to Summary Judgment on the Conspiracy Claims Under the TMPFA and LMAPIL.

As Relator has stated before, recovery of the same funds, damages, and penalties under different claims is not permitted. *See* Dkt. 391 at 53, 89. While Relator cannot recover damages and penalties under the conspiracy claims that are duplicative to Relator's other claims, Defendants' liability for conspiracy renders all Defendants jointly and severally liable for the entire judgment. *Mortgages, Inc. v. U.S. District Court for District of Nev.*, 934 F.2d 209, 212 (9th Cir.1991); *United States v. Hughes*, 585 F.2d 284, 286 n. 2 (7th Cir.1978); *United States v. Aerodex*, 469 F.2d 1003, 1013 (5th Cir.1972). As to PPFA, if the Court determines that PPFA's involvement does not meet the standard for direct involvement in the Affiliate Defendants' Medicaid fraud and thus violations of the FCA, TMFPA, and LMAPIL of their own, *see* Part IV *supra*, PPFA at minimum had enough involvement to meet the standard for conspiracy, which does not require a violation to be committed by all conspirators. *See Williams v. Hosp. Serv. Dist. of W. Feliciana Par., La.*, 250 F. Supp. 3d 90, 96 (M.D. La. 2017); *see* Dkt. 391 at 66-76, 87-89, Dkt. 415 at 48-57.

Defendants cite only federal law in their response (at 43), but Relator's claims are under State law. The TMFPA imposes liability on a party who "conspires to commit a violation" of the TMFPA. Tex. Hum. Res. Code § 36.002(9). The LMAPIL imposes liability on a person who "conspire[s] to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim." La. R.S. § 46.438.3(D); *see also* 31 U.S.C. § 3729(a)(1)(C) (False Claims Act). Neither the TMFPA nor LMAPIL defines "conspires." But in the criminal context, "'[c]onspires to commit'

means that a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement. An agreement constituting conspiring to commit may be inferred from the acts of the parties." Tex. Pen. Code § 71.01.[12] Defendants do not dispute that they agreed together to commit the acts that Plaintiffs allege violates the TMFPA and LMAPIL—i.e., conduct that "constitute[s] the offense." They merely dispute that there is an "offense" at all. *See* Dkt. 419 at 43-44. But if the Court determines that Defendants' actions violated the TMFPA and LMAPIL, Defendants' undisputed agreement to engage in those acts constitutes a conspiracy to violate the statutes. *See* Dkt. 391 at 87-88.

## VI. The Court Should Grant Summary Judgment on Plaintiffs' Requests for Damages, Civil Remedies, and Civil Penalties Because They Are Determined by Liability.

### A. Summary judgment on damages, civil remedies, and civil penalties is appropriate because they are legal questions, not fact questions, in this case.

Defendants claim that Plaintiffs failed to support their request for summary judgment on damages, civil remedies,[13] and civil penalties. Dkt. 419 at 45. But Relator's motion for partial summary judgment and Plaintiffs' joint brief in support of summary judgment spells out the amount of damages, civil remedies, and civil

---

[12] *Black's* defines "conspire" as "to engage in a conspiracy; to join in a conspiracy." *Conspire*, *Black's Law Dictionary* (11th ed. 2019). "[C]onspiracy," in turn, is defined as "[a]n agreement by two or more persons to commit an unlawful act, coupled with an intent to achieve the agreement's objective, and (in most states) action or conduct that furthers the agreement[.]" *Conspiracy*, *id.*

[13] The TMFPA awards civil remedies and civil penalties and not "damages." *In re Xerox Corp.*, 555 S.W.3d 518, 534 (Tex. 2018).

penalties. Dkt.389, 391 at 24-25, 95-96.[14] The amount of money Texas Medicaid paid to the Affiliates is not disputed, and Defendants did not dispute the amount of money that Louisiana Medicaid paid to PPGC through May 2022. Appx. 1625 (Curtis (PPGC) Depo. 210:21-212:17). As Plaintiffs' expert Donald Lochabay, Jr. noted in his expert report, which was served on Defendants, PPGC was still billing and being paid by Louisiana Medicaid at the time of his report and he would update his report and calculations with further data received from the same original source, Louisiana's fiscal intermediary. Appx. 1243, *see also* Appx. 1213. It is unclear why, if Defendants had no genuine dispute with Mr. Lochabay's data, methodology, and calculations through May 2022, they would now claim to dispute his calculations when he merely updated the numbers with more recent data obtained from the same source and calculated them using the same methodology. Nonetheless, Defendants cite to no evidence that raises a genuine dispute of the facts set forth in Mr. Lochabay's reports.[15] Nor is the number of claims submitted to both Texas and Louisiana disputed. Appx. 1625 (Curtis (PPGC) Depo. 210:21-212:17). And as Defendants' expert Louis Rossiter admitted, he did not dispute Mr. Lochabay's calculations, nor

---

[14] Defendants' claim that Texas "did not join" the request for civil remedies just because it did not spell out these amounts in their motion like Relator did is therefore incorrect. Dkt. 419 at 45. In any event, Texas does join the request for civil remedies under section 36.052 of the TMPFA. *See* Dkt. 389 ("Relator, in conjunction with the State of Texas, seeks summary judgment on civil fines, civil penalties, attorneys' fees, costs, and expenses").

[15] Defendants could have tried to challenge these amounts by submitting their own data if Mr. Lochabay's calculations were incorrect, but they have not done so, nor have they updated their discovery responses with data showing the current amount they received. Indeed, Defendants' expert, Mr. Rossiter, replicated Mr. Lochabay's calculations and arrived at the same amounts.

did he have any basis to. *See* Appx. 2121 (Rossiter Depo. 123:1-21); 2143 (Rossiter Depo. 210:19-211:20).

What Defendants contend are disputes of fact are actually disputes of *law*. As Mr. Lochabay made clear, he was not giving any legal opinion as to what "damages" are in this case, how to calculate TMPFA civil remedies, or whether there were in fact unlawful acts, he was simply quantifying the payments made and calculating civil penalties based on the reported number of claims. Appx. 1102, 1238-40, Dkt. 386 at 297 (Lochabay Depo. 153:22-24). Unlike a traditional damages analysis, Plaintiffs do not have to "prove" damages—they are provided by statute, no "guessing" required. Dkt. 419 at 45; *but see* Dkt. 389 (spelling out violations and corresponding statutory penalties, damages, and fines).[16]

Under the FCA, if a defendant is found liable for violating one of the prohibitions (including 31 U.S.C. § 3729(a)(1)(A) (implied false certifications) and § 3729(a)(1)(G) (reverse false claims)), the defendant "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of that person." 31 U.S.C. § 3729(a)(1). Under LMAPIL, "[a]ny person who is found to have violated R.S. 46:438.2 shall be subject to a civil fine in an amount not to exceed ten thousand

---

[16] Nor do Plaintiffs have to prove damages at all to recover civil penalties. *See e.g. United States ex rel. Bunk v. Gosselin World Wide Moving, N.V*, 741 F.3d 390, 409 (4th Cir. 2013).

dollars per violation, or an amount equal to three times the value of the illegal remuneration, whichever is greater." La. R.S. § 46:438.6(B)(1). LMAPIL also states:

> [i]n addition to the actual damages provided in Subsection A of this Section and the civil fine imposed pursuant to Subsection B of this Section, the following civil monetary penalties shall be imposed on the violator: Not less than five thousand five hundred dollars but not more than eleven thousand dollars for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act as contained in R.S. 46:438.2, 438.3, or 438.4,

adjusted for inflation, plus interest. La. R.S. § 46:438.6(C).

Under the TMFPA, a person who commits an unlawful act is liable to the state for: "(1) the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act," plus interest, along with

> (3) a civil penalty of: . . . (B) not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $11,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $11,000, for each unlawful act committed by the person that does not result in injury to a person described by Paragraph (A); and (4) two times the amount of the payment or the value of the benefit described by Subdivision (1).

Tex. Hum. Res. Code § 36.052(a). Indeed, "the civil remedy in Section 36.052(a) is always fixed at the payment amount." *In re Xerox Corp.*, 555 S.W.3d at 534.

Those statutory definitions, cited by Relator's motion, do not require any proof from Plaintiffs aside from the amount of money received by the Defendants and the number of claims submitted, which Plaintiffs provided and which was all their expert testified to. Defendants' disputes—whether damages should be reduced by any value received by the State and whether payments to MCOs should be considered, *see* Dkt.

44

419 at 13-14—are legal questions, which is what makes summary judgment proper. *See* Dkt. 415 at 61-62 (addressing MCO issue).[17]

### B. In this case, the measure of damages under the FCA and civil remedies under TMFPA and LMAPIL is the full amount the Defendants were paid by Texas and Louisiana Medicaid.

Defendants' legal argument that damages must be reduced by any "value" received by the Government, Dkt. 419 at 46 n.55, is incorrect in any event. The "value" was provided to patients, not the Government. As the Eleventh Circuit has held:

> In the context of a product or service that is provided to the United States, courts have indeed measured damages by comparing the market value of the delivered product or service with that of the product or service that was promised. . . . But in the context of Medicare claims, where no product or service is provided to the United States, courts have measured damages as the difference between what the government paid and what it would have paid had the defendant's claim been truthful and accurate.

*Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1304 (11th Cir. 2021). "The rationale is that, had the defendant truthfully admitted that it was non-compliant, the United States would not have paid." *Id.* Other circuits are in accord. *See, e.g., United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 386 (4th Cir. 2015); *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008); *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003); *United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988). *Rogan*'s reasoning has been cited favorably by the Fifth Circuit. *See*

---

[17] The TMPFA's provisions permitting the Court to consider various mitigating factors when deciding what civil penalty to levy in the statutory range is irrelevant where, as here, Plaintiffs are only requesting the statutory minimum. *See* Tex. Hum. Res. Code § 36.052(b).

*Hill v. F.C.C.*, 496 Fed. Appx. 396, 404 n.14 (5th Cir. 2012). And the Fifth Circuit held that "where there is no tangible benefit to the government and the intangible benefit is impossible to calculate, it is appropriate to value damages in the amount the government actually paid to the Defendants. . . .the proper amount of damages . . . was the entire amount the Defendants received." *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 473 (5th Cir. 2009).

Where there is no genuine dispute of material fact, summary judgment is proper. *Id.* at 465. That includes awards of damages or civil remedies under the FCA, TMFPA, and LMAPIL. *See, e.g. Longhi*, 575 F.3d at 462 (affirming the district court's grant of summary judgment on liability and damages); *United States v. Lippert*, 148 F.3d 974, 976 (8th Cir. 1998) (same).

### C. Defendants are liable for civil penalties calculated on a per-claim basis.

Defendants' contention (at 46) that a per-claim penalty is a "novel theory" is totally false. Once again, the statutory text demonstrates otherwise. Tex. Hum. Res. Code § 36.052(a)(3)(B) (mandating penalty for "each unlawful act,"); *id.* §36.002 (defining "unlawful acts"); La. R.S. § 46:438.6(C) "Not less than five thousand five hundred dollars but not more than eleven thousand dollars *for each* false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act . . ."). Numerous courts have rejected Defendants' argument in the FCA context as well. *See, e.g., Yates*, 21 F.4th at 1297 (upholding award of civil penalty on each false claim, stating that "the FCA mandated the imposition of treble damages and statutory penalties of between $5,500 and $11,000 per false claim."); *Rogan*, 517 F.3d

at 453 (defendant liable for each of the 1,812 false claims it submitted under Medicare/Medicaid); *Lamb Eng'g & Const. Co. v. United States*, 58 Fed. Cl. 106, 111 (2003) ("Lamb contends, however, that these four incidents should be treated for purposes of any civil penalty as a single violation. Lamb provides no legal basis for this position. Moreover, it is clear that each certification was a separate and independent act. Each certification was separately signed and accompanied an additional progress billing."); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1048 (S.D. Tex. 1998) (discussing legislative history showing that Congress intended the FCA to cover "each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulations...."); *U.S. ex rel. Pogue v. Am. Healthcorp, Inc.*, 914 F. Supp. 1507, 1511 (M.D. Tenn. 1996) (same).

Nor is a per-claim penalty inconsistent with a reverse-false claim theory. The amounts Defendants were paid were not paid in one lump sum; they were paid over several years on a per-claim basis, as is standard for Medicaid. An overpayment would thus also be measured on a per-claim basis, and the statutes penalize retention of overpayments. 31 U.S.C. §§ 3729(a)(1)(G), 3729(b)(3); Tex. Hum. Res. Code §§ 36.002(12), 36.001(7-a); La. R.S. §§ 46:437.3(16), 46:438.3(C). In this case, there is only one large amount of overpayment in each State at issue, but that is because Defendants are liable for the entire amount they received after the terminations. Each overpayment, however, is made up of tens of thousands of individual claims.

And holding providers accountable for failing to pay back each claim is consistent with the overall purpose of the FCA, TMFPA, and LMAPIL. If the penalty grows larger with the more claims that are submitted and not repaid, it incentivizes providers to pay overpayments back quickly, or to timely self-disclose potential overpayments using state or federal self-disclosure protocols to potentially avoid prolonged investigation and litigation, and the costs associated with each. Appx. 5659-74, 5598-605, 5608-36. If their liability were limited only to one civil penalty, providers would lack the same incentive, as the amount of damages would be fixed.[18] Moreover, if Congress or the State legislatures had intended to calculate civil penalties differently for violations of the reverse false claims provisions of the FCA, TMFPA, or LMAPIL, they could have expressed that intent in the relevant statutory language, as Congress did in the context of administrative penalties in the Medicaid Act. *See* 42 U.S.C. § 1320a-7a(a). And because of PPFA's involvement with the Affiliates' violation of the reverse-false-claim provision and the implied-false certification provisions, a per-claim analysis would apply just the same to PPFA as it would to the Affiliates, as they participated in the same violations, *see* Part IV *supra*.

## VII. The Court Should Grant Summary Judgment on Defendants' Affirmative Defense.

Defendants argue that summary judgment on their excessive-fines defense is "premature" because the Court has not awarded damages, civil remedies or civil

---

[18] Defendants claim that their failure to pay back the overpayment within 60 days is a "one time violation." Dkt. 419 at 50. But this brief is being filed on February 21, 2023, *years* after the 60-day deadline, yet Defendants still have not paid the money back.

penalties. Dkt. 419 at 46. But it is timely because as explained above, damages and civil penalties are prescribed by statute and may be awarded on summary judgment.

Defendants assert (at 47) that Plaintiffs are incorrect that "since [*United States v.*] *Bajakajian,* [524 U.S. 321 (1998)], no case has rejected False Claims Act penalties" as unconstitutionally excessive fines, Dkt. 391 at 89. But none of the cases Defendants cite support that claim. *See U.S. v. Cabrera-Diaz*, 106 F. Supp. 2d 234, 242 (D.P.R. 2000) (recognizing that awarding civil penalties is mandatory, but holding that the court has discretion to decline where it finds them "excessive," citing an abrogated case); *U.S. ex rel. Jehl v. GGNSC Southhaven, LLC*, 2021 WL 2815974, at *6 (N.D. Miss. Jul. 6, 2021) (mentioning the possibility of mandatory excessive fines as a reason to dismiss relator's case, but declining to do so); *U.S. v. Kruse*, 101 F. Supp. 2d 410, 414 (E.D. Va. 2000) (finding that "[e]ven if the Eighth Amendment is triggered by the Anti–Kickback statute, the penalties as applied in this case are not unconstitutionally excessive with respect to either the gravity of the offense or the damages suffered by the government."); *Hays v. Hoffman*, 325 F.3d 982, 993 (8th Cir. 2003) (rejecting the approach of a "layman" with "no first-hand knowledge" in tabulating the number of false claims as an "unsubstantiated guess"); *Peterson v. Weinberger*, 508 F.2d 45, 55 (5th Cir. 1975) (pre-*Bajakajian,* noting that "the Government tacitly admit[ted] that the court may exercise discretion where the imposition of forfeitures might prove excessive and out of proportion to the damages sustained by the Government" in dicta).

Defendants further complain that the civil penalties here would amount to 51 times greater than the damages award under LMAPIL and 31 times greater than the civil remedies amount under TMPFA. Dkt. 419 at 49. Plaintiffs arrive at smaller numbers.[19] Regardless, Defendants are silent about *Yates*, where the Eleventh Circuit upheld a civil penalty that amounted to *519 times* the damages award against an Eighth Amendment challenge. 21 F.4th at 1306, 1314. Defendants do not engage with any other case cited by Plaintiffs that awarded large civil penalties. *Compare* Dkt. 419 at 48-50 *with* Dkt. 391 at 89-96. Nor do Defendants offer any source of discretion for the Court in reducing fees, nor do they consider the fact that Plaintiffs are asking only for the statutory minimum here, which comes with a "strong presumption of constitutionality." *Yates*, 21 F.4th at 1314. Finally, Defendants argue that their ability to pay is relevant, Dkt. 419 at 49, but fail to offer evidence showing they cannot pay a large judgment. *See United States ex. rel. Montcrieff v. Peripheral Vascular Assocs.*, No. SA-17-CV-00317-XR, 2023 WL 139319 at *17 (W.D. Tex. Jan. 9, 2023). They certainly can, in any event.[20]

---

[19] Plaintiffs calculate that based on the data in Mr. Lochabay's expert report and declaration (and in Dkt. 389), civil penalties are 21 times the civil remedies amount in Texas and 38.6 times the amount in Louisiana.

[20] According to their audited financial statements, PPFA has $479 million in assets, Appx. 4026, 8088, over $400 million in annual revenue, Appx. 4027, 8089, and at least $325 million in "financial assets [that] could readily be made available," Appx. 4049, 8110-11. PPFA's assets and annual revenue have increased significantly since 2012. Appx. 1511-24, 4078-4112, 4022-53, 4082-83, 4822-59, 8084-8424. PPGC has $50 million in assets and $23 million in annual revenue. Appx. 8425-8705. PPGT has $69 million in assets and $38 million in annual revenue. Appx. 8706-8989. PPST has $15 million in assets and $11 million in annual revenue. Appx. 8990-9186.

## CONCLUSION

The Court should grant Texas's motion for summary judgment and Relator's motion for partial summary judgment.

Respectfully submitted.

/s/ Heather Gebelin Hacker
Heather Gebelin Hacker
Texas Bar No. 24103325
Andrew B. Stephens
Texas Bar No. 24079396
HACKER STEPHENS LLP
108 Wild Basin Road South, Suite 250
Austin, Texas 78746
(512) 399-3022
heather@hackerstephens.com
andrew@hackerstephens.com

***Attorneys for Relator***

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

/s/ Amy Snow Hilton
Christopher D. Hilton
Chief, General Litigation Division
Texas Bar No. 24087727
Amy Snow Hilton
Assistant Attorney General
General Litigation Division
Texas Bar No. 24097834

Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

51

(512) 463-2120 / Fax (512) 320-0667
Christopher.Hilton@oag.texas.gov
Amy.Hilton@oag.texas.gov

***Attorneys for State of Texas***

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2023, the foregoing document was filed and served via CM/ECF on all counsel of record.

<u>/s/ Heather Gebelin Hacker</u>
Heather Gebelin Hacker