```
 1                  IN THE UNITED STATES DISTRICT COURT

 2               FOR THE NORTHERN DISTRICT OF TEXAS

 3                        AMARILLO DIVISION

 4   UNITED STATES OF AMERICA,    )   2:21-cv-00022-Z
     ex rel. ALEX DOE, Relator,   )
 5                                 )
     THE STATE OF TEXAS, ex rel.  )    Tuesday, August 15, 2023
 6   ALEX DOE, Relator,           )    10:07 a.m. - 4:38 p.m.
                                   )
 7   THE STATE OF LOUSIANA, ex     )
     rel. ALEX DOE, Relator,      )
 8                                 )
                  Plaintiffs,      )    SUMMARY JUDGMENT HEARING
 9                                 )
     VS.                           )
10                                 )
     PLANNED PARENTHOOD            )
11   FEDERATION OF AMERICA,        )
     INC., PLANNED PARENTHOOD      )
12   GULF COAST, INC., PLANNED     )
     PARENTHOOD OF GREATER         )
13   TEXAS, INC., PLANNED          )
     PARENTHOOD SOUTH TEXAS,       )
14   INC., PLANNED PARENTHOOD      )
     CAMERON COUNTY, INC.,         )
15   PLANNED PARENTHOOD SAN        )
     ANTONIO, INC.,                )
16                                 )
                  Defendants.      )
17

18
                       TRANSCRIPT OF PROCEEDINGS
19
              BEFORE THE HONORABLE MATTHEW J. KACSMARYK
20
                    UNITED STATES DISTRICT JUDGE
21

22   A P P E A R A N C E S:

23   FOR RELATOR:            HACKER STEPHENS, LLP
                             BY:  HEATHER GEBELIN HACKER, ESQ.
24                           BY:  ANDREW B. STEPHENS, ESQ.
                             108 Wild Basin Road South, Suite 250
25                           Austin, Texas 78746
```

```
 1   A P P E A R A N C E S (CONTINUED):

 2   FOR STATE OF TEXAS:      OFFICE OF THE ATTORNEY GENERAL
                              BY:  WILLIAM DAVID WASSDORF, ESQ.
 3                            P.O. Box 12548 (MC-019)
                              Capitol Station
 4                            Austin, Texas 78711

 5   FOR PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.:

 6                            O'MELVENY & MYERS, LLP
                              BY:  ANTON METLITSKY, ESQ.
 7                            7 Times Square
                              New York, New York 10036
 8

 9   FOR THE PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.:

10                            O'MELVENY & MYERS, LLP
                              BY:  DANNY S. ASHBY, ESQ.
11                            2501 North Harwood Street, Suite 1700
                              Dallas, Texas 75201
12

13   FOR PLANNED PARENTHOOD GULF COAST, INC.; PLANNED PARENTHOOD OF
     GREATER TEXAS, INC.; PLANNED PARENTHOOD SOUTH TEXAS, INC.;
14   PLANNED PARENTHOOD CAMERON COUNTY, INC.; PLANNED PARENTHOOD SAN
     ANTONIO, INC.:
15
                              ARNOLD & PORTER KAYE SCHOLER, LLP
16                            BY:  CRAIG D. MARGOLIS, ESQ.
                              BY:  MEGAN PIEPER, ESQ.
17                            BY:  TIRZAH LOLLAR, ESQ.
                              601 Massachusetts Avenue NW
18                            Washington, DC 20001

19

20

21   COURT REPORTER:          SHAYNA MONTGOMERY, RMR, CRR
                              United States Court Reporter
22                            205 SE 5th Ave, Room 133
                              Amarillo, Texas 79101
23                            (806) 468-3816

24
     Proceedings reported by mechanical stenography and transcript
25   produced by computer.
```

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

1              P R O C E E D I N G S

2              THE COURT:  The Court calls Civil Action Number

3    2:21-CV-022-Z, United States of America vs. Planned Parenthood

4    Federation of America, et al., for hearing on the pending

5    motions for summary judgment.

6              Are the parties ready to proceed?

7              MS. HACKER:  Yes, Your Honor.

8              MR. MARGOLIS:  Good morning, Your Honor, yes.

9              THE COURT:  And for the defendants?

10             MR. ASHBY:  Yes, Your Honor.

11             THE COURT:  Okay.  So let's take care of the

12   Coronavirus finding and then we'll proceed.

13             The Court is holding this pretrial conference in the

14   midst of the COVID-19 Coronavirus pandemic pursuant to the

15   Twelfth Amended Special Order Number 13-9 signed by Chief

16   Judge Godbey.  This Court expressly concludes and hereby finds

17   that this hearing may be conducted in person without seriously

18   jeopardizing public health and safety and cannot be further

19   delayed without serious harm to the interest of justice.

20             This Court is also open to the public, including an

21   overflow room equipped with a live audio stream, and the Court

22   separately ensured that half of the remaining gallery space was

23   available to members of the media if necessary; the other half

24   are for members of the general public.

25             Also, any disrupters will be immediately escorted by

1    the marshals off the premises, and counsel shall notify the

2    Court if they anticipate or discern that there's any

3    disruption.

4             So on housekeeping, counsel may speak from the

5    lectern or they may speak from counsel table.  I just ask that

6    we have a one-argument, one-attorney rule.  So please designate

7    to the Court who is speaking on which issue for which party.

8             I'll ask at this time that plaintiff, relator

9    counsel, identify the attorneys who will be speaking for that

10   party.

11            MS. HACKER:  Good morning, Your Honor.  My name is

12   Heather Hacker.  I represent the relator.  I will be arguing on

13   behalf of both relator and Texas this morning.  I will also be

14   joined by Mr. Wassdorf, who is an attorney for the State of

15   Texas, and he will be arguing for 15 minutes this morning.

16            THE COURT:  Okay.  You may divide your time however

17   you choose.  I just ask that you identify yourself as the

18   speaker and the party for which you represent.

19            Now, for PPFA and the affiliate defendants, I'll just

20   ask that counsel identify themselves and who will be speaking

21   for which parties.

22            MR. MARGOLIS:  Good morning, Your Honor.

23   Craig Margolis.  I represent the affiliate defendants and I

24   will be speaking on behalf of the affiliate defendants this

25   morning.

1      MR. ASHBY:  Good morning, Your Honor.  Danny Ashby

2  for PPFA, along with Anton Metlitsky.  He will be speaking,

3  addressing the summary judgment issues; I'll be addressing the

4  pretrial publicity issues.

5      THE COURT:  Okay.  So today's conference will cover

6  the parties' pending motions for summary judgment as those

7  issues are listed in ECF Document Number 513.  So I'll ask that

8  the parties orient their arguments around those issues.  The

9  Court will be asking questions relevant to those issues as

10  identified in that order.  This conference will not address any

11  pending motions or anything relevant to the sealing or

12  unsealing of documents.  Those motions remain pending, but I am

13  not inviting argument on those.  The Court will adjudicate

14  those separately, and I don't anticipate that the parties

15  should waste any time arguing about sealing and unsealing

16  documents.  We'll take those up in turn but not at today's

17  hearing.

18      So as discussed in the scheduling order, plaintiffs

19  and defendants will each be afforded two hours to present their

20  argument.  This time will include answers to any questions from

21  the Court and the Court's question.  My law clerks will be

22  keeping time.  So we'll use the time clock methodology.  If at

23  any point you need a time check to better allocate your time,

24  just ask for a time check from my courtroom deputy or the law

25  clerks and we can provide that.

1              Now, the plaintiffs and defendants will be

2    responsible for allocating their own time per individual party

3    and per attorney, and again I'll just ask that you orient your

4    argument towards those nine questions presented in the

5    scheduling order ECF Document Number 513.  Plaintiffs do have

6    the right to reserve time for rebuttal.

7              Now, as a warning to any attorneys who thought that

8    they were going to read from their outline for two hours, this

9    will more resemble an oral argument at the Fifth Circuit.  So I

10   know that we have attorneys who are experienced at appellate

11   arguments, so this will more resemble an appellate argument.

12   If I'm interrupting you at any point, it's not because I

13   disagree or that I'm attempting to be rude, it's only I'm

14   trying to move on to questions that the Court needs answered.

15   So if I'm interrupting you that is not because you're doing a

16   bad job, it's just trying to make good use of time and ask

17   questions that matter to the Court.

18             And I believe, Ms. Hacker, did you state that you are

19   reserving 15 minutes in rebuttal?

20             MS. HACKER:  No, Your Honor.  We would like to

21   reserve 30 minutes for rebuttal.

22             THE COURT:  Okay.  So I'll instruct my CRD and clerks

23   to make that allocation, and we'll notify you when you're

24   approaching that point in your time.  Are you asking a

25   particular time check at any intervals:  five minutes, two

1    minutes, one minute?

2              MS. HACKER:  Your Honor, it would be helpful to us if

3    we could have a time check at one hour and 15 minutes.  That's

4    approximately when I'll hand over to the State of Texas.

5              THE COURT:  Okay.  I'll instruct my CRD and clerks to

6    advise me to advise you when you're approaching that point.

7              So at this time the plaintiffs may proceed with their

8    portion of the case.  As stated in the scheduling order, we

9    will break at that one-hour-15-minute interval to allow

10   defendants time to reassemble the courtroom and use the

11   courtroom technology if necessary.

12             At this point, Ms. Hacker, you may proceed.

13             MS. HACKER:  Thank you, Your Honor.

14             And just as a note of clarification, I intend to

15   argue for approximately an hour and 15 minutes.  Then I will

16   hand the lectern over to the State of Texas for 15 minutes, and

17   we would like to reserve our remaining time or 30 minutes for

18   rebuttal.

19             THE COURT:  And this will be Mr. Wassdorf, is that

20   correct?

21             MS. HACKER:  Yes, Your Honor.

22             THE COURT:  Okay.  Please proceed.

23             MS. HACKER:  Just a couple of other logistical notes,

24   we have included citations to materials from the summary

25   judgment record in our slides, both to the ECF page number as

1    the Court requested and to the page number in the plaintiffs'

2    appendix.  We have those documents, any documents that are

3    cited in our presentation, prepared and can bring them up on

4    the screen if the Court wishes to delve deeper into any of

5    those that are cited.

6              I will proceed through the argument with those

7    questions -- the questions that the Court gave us in the order

8    as an outline unless the Court has other questions.

9              I also have a printout of our slides, a hard copy, if

10   the Court would like to have that for its use.

11             THE COURT:  Okay.  If you can present that to the

12   CRD, I'll distribute that to the clerks and we'll make

13   reference to that as necessary.

14             MS. HACKER:  Yes, Your Honor.  With those notes, I'll

15   get started.

16             There have been over 500 filings in this case to

17   date, hundreds of pages of summary judgment briefing and

18   thousands of pages of evidence submitted to the Court, but the

19   essence of this case is quite simple and the material facts are

20   not in genuine dispute.  Planned Parenthood Federation of

21   America's Texas and Louisiana affiliates were Medicaid

22   providers.  They provided services to less than a half a

23   percent of Medicaid recipients in each state.  They were

24   terminated as providers by the states from both programs for

25   failing to comply with program requirements and did not contest

1    these terminations in administrative proceedings, resulting in
2    the terminations becoming final.
3              These affiliates, along with PPFA, obtained
4    preliminary injunctions in federal courts to prevent the states
5    from enforcing these terminations that were later overruled and
6    vacated.  During the pendency of the preliminary injunctions
7    Planned Parent had continued to bill Medicaid and received over
8    $17 million in Medicaid funds despite being terminated from the
9    programs.  Yet, once the Fifth Circuit determined that these
10   injunctions were legally baseless, Planned Parenthood did not
11   repay this money it had received that it was not entitled to.
12             Instead, Planned Parenthood began a series of
13   maneuvers to try to avoid the states' enforcement of their
14   terminations for as long as possible so they could get as much
15   taxpayer money as they could.  They expressly prolonged this so
16   that PPFA's purposes would be served so that they could, quote,
17   "milk the situation from media coverage, attack and pressure
18   the state's governors to let them back into Medicaid and get
19   the attention of the Biden Administration."
20             But Planned Parenthood admits that it never paid the
21   money back, not just not within 60 days of when it should have
22   known it was obligated to as required by the law, but never.
23   As a result, Planned Parenthood is liable for Medicaid fraud
24   under the federal False Claims Act, the Texas Medicaid Fraud
25   Prevention Act, and the Louisiana Medical Assistance Integrity

```
1    Law.
2            THE COURT REPORTER:  I'm sorry, counsel.  Can you
3    please slow down for me?
4            MS. HACKER:  Sorry.  That was the Louisiana Medical
5    Assistance Program Integrity Law.
6            These laws impose strict penalties for noncompliance
7    in order to deter fraud on the government.  Given the large
8    amount of money and hundreds of thousands of claims at issue,
9    these laws mandate severe penalties, not just repayment of the
10   taxpayer money Planned Parenthood received, but also treble
11   damages, civil remedies and a $12,000 penalty per claim filed.
12   As plaintiffs have demonstrated, Planned Parenthood is liable
13   under all three laws and the Court should grant summary
14   judgment to the plaintiffs and impose the mandatory civil
15   remedies and civil penalties required by those laws.
16           THE COURT:  Now, Ms. Hacker, what is your best case
17   to support the argument that affiliate defendants have an
18   obligation to return overpayments?  I'm just instructing staff
19   here to make certain that opposing counsel can see your outline
20   as it's presented on that screen.
21           Now, assuming Arkadelphia is your best case but
22   without prejudice to case selection, what's your best case to
23   support your argument that there is an obligation to return
24   overpayments?
25           MS. HACKER:  Well, I think the statutes make clear
```

1    the definition of the overpayment.  And I will --

2         THE COURT:  And is there any case that you can cite

3    to in your briefing where FCI liability has been opposed under

4    facts similar to this case, specifically the odd procedural

5    history of this case where we have a federal court preliminary

6    injunction followed by Fifth Circuit vacatur and there's an

7    argument about that chronology and the effect of various

8    injunctions and court interventions?  Is there a case this

9    Court should look to other than Arkadelphia in deciding the

10   effect of that procedural history on a pending claim that's

11   subject to FCA repayment?

12        MS. HACKER:  I think the National Kidney Patients

13   case is a good one, Your Honor, and also the Children's

14   Hospital vs. Azar case that we discussed in our briefing.  That

15   case in particular -- you know, these facts are a little bit

16   unique, but the Azar case in particular is very instructive

17   here because the -- there was an injunction.  I believe it

18   actually may have even been a permanent injunction that was

19   issued by a court against a rule, and as the parties proceeded

20   through the litigation, the recipient kept getting Medicaid

21   funds or may have been Medicare funds in that case under that

22   injunction but then it was overruled on appeal.

23        And so the parties went back to the district court to

24   ask when the rule was considered to have gone into effect.

25   Would it have been after the appellate court's mandate, or

1   would it have been at the time that the rule originally would
2   have gone into effect.  Because what was at stake was all the
3   money, the extra money, that the recipient received as a result
4   of the rule being enjoined.  The court said that the rule was
5   in effect as of the original date, and the injunctions did not
6   affect that date.  So in essence, the recipient would have been
7   required to pay back the money that it received while the
8   injunction was pending.

9        THE COURT:  So let's talk about another period in
10  that chronology, the grace period that both parties reference
11  in their briefs to this Court.  Why did the affiliate
12  defendants have to return funds during that grace period and
13  also what of defendants' argument that Texas could not have
14  lawfully reimbursed affiliate defendants because they're
15  terminated from the relevant federal programs?

16       MS. HACKER:  Yes, Your Honor.  In terms of the grace
17  period, that actually is not included within our reverse false
18  claim.  That is included within relator's implied false
19  certification claim.  So those two requests for relief do not
20  overlap.

21       As far as whether or not they could have lawfully
22  received reimbursement during that time, I'm not aware of any
23  law that prevented that.  The state exercised its discretion in
24  allowing Planned Parenthood, based on their representation, to
25  transition their patients to other providers.  That was the

1    explicit purpose of the grace period, and it was only for 30

2    days.

3              THE COURT:  Okay.  And so I'm trying to establish a

4    baseline chronology.  I know the parties disagree on the legal

5    effect of various court interventions and that the pendency of

6    injunctive relief and the rest, but here under the ACA, I

7    believe the obligation to return overpayments at a minimum

8    starts within 60 days.  So here I'm referencing 42 U.S.C.

9    Section 1320a-7(k).  And I'm also looking forward to the Fifth

10   Circuit's Kauffman decision in trying to decide a starting

11   point for potential liability.

12             I understand the 60-day period has a bit of a

13   statutory anchor that's an easy baseline to set, but if federal

14   injunctions do not stay administrative deadlines, why wasn't

15   their deadline to return overpayments even earlier than that?

16   How is this all supposed to work while we have competing

17   statutes and competing court interventions?  What chronology do

18   you propose this Court to use in setting a timeline?

19             MS. HACKER:  So the timeline that we propose is 60

20   days from when the defendants knew or should have known they

21   were not entitled to the money, and so we believe that would

22   have been on November 23rd, 2020.  That was when the Fifth

23   Circuit's en banc decision was announced and that decision

24   vacated the Texas preliminary injunction and overruled the case

25   affirming the Louisiana preliminary injunction.

```
1              So it was at that point that there was essentially no
2   excuse for Planned Parenthood to not know that the funds that
3   they received during the pendency of those preliminary rulings
4   would need to be returned to the government pursuant to the
5   Medicaid rules and regulations.
6              THE COURT:  Okay.  So I think I have your argument
7   there on chronology and how these intervening injunctions and
8   vacatur's work and the timing of the obligation to repay.  I
9   didn't see -- I know we'll get to scienter on various claims
10  later.  I didn't see any briefing on improperly.  So everybody
11  is dealing with this quasi-criminal statute that deals with a
12  knowingly scienter requirement, but what about the improperly
13  part of that?  Does that do any work for plaintiffs' claims in
14  this case?  I didn't notice any briefing by either side on the
15  second part of that knowingly and improperly standard.
16             MS. HACKER:  Your Honor, I'm not aware of any case
17  law that expressly examines the word "improperly" within the
18  statute, but I think that just based on a reading of all three
19  of the statutes the word improperly could just be -- I think
20  that the statute itself defines what was -- what would be
21  improper conduct.  So I don't think it imposes any other
22  obligation or requirement to show liability.
23             And if -- the word improperly actually only appears
24  in the False Claims Act and the TMFPA; it is not in the LMAPIL.
25  So --
```

```
 1              THE COURT:  Okay.  Understood.  So I wanted to clear
 2    that hurdle before turning to that knowingly standard.  What is
 3    your best evidence now that the Court has spent time going
 4    through exhibits that were attached to motions and appendices?
 5    What is your best evidence at this MSJ phase that defendants
 6    knowingly violated the FCA, and you can identify exhibits using
 7    the reference points the Court ordered the parties to follow.
 8              MS. HACKER:  Yes, Your Honor.
 9              So just by way of introduction to this point, we'd
10    like to note that the Supreme Court in June in the Schutte case
11    specified that to satisfy the scienter requirement of the False
12    Claims Act, either actual knowledge deliberate and ignorance or
13    recklessness will suffice.
14              THE COURT:  And so if I have to look at various
15    e-mails and documents produced during discovery, where do I
16    find that knowing violation of the FCA?
17              MS. HACKER:  Yes, Your Honor.  I apologize.  I'm
18    getting there.
19              THE COURT:  Oh, there's a lot of evidence in this
20    case, so I understand it's voluminous and you can take your
21    time.
22              MS. HACKER:  Yeah.  So first of all, Medicaid
23    providers are legally required to know all Medicaid-related
24    policies and laws of each state, so both the affiliates and
25    PPFA are aware of all of those things.  Specifically, the facts
```

1    relevant to the liability here, Planned Parenthood knew that

2    they had been terminated.  They consciously chose not to

3    contest those terminations in State proceedings.

4            And so, Brian, if you could pull up this document,

5    please.

6            So -- so this is a document -- this is an e-mail

7    exchange between PPFA counsel and the Louisiana Department of

8    Health.

9            And, Brian, if you could pull up the relevant

10   language.

11           THE COURT:  And this is ECF Document 482-1, page 15

12   of 553.

13           MS. HACKER:  This is ECF 519-1 at 14 through 17.

14           THE COURT:  Okay.  Please proceed.

15           MS. HACKER:  So this document shows that Planned

16   Parenthood expressly asked the Louisiana Department of Health

17   when their termination date was.  Louisiana Department of

18   Health then responds and says, "Yes, you are correct.  The

19   termination date is October 17th if you do not exercise your

20   right to an informal hearing or administrative appeal."

21           Brian, could you pull up the next language?

22           So then PPFA follows that inquiry up with the fact

23   that she says, "The letters to Ms. Linton state that the

24   termination action will take effect after the termination of

25   all administrative and/or legal proceedings."  So in other

1    words, the administrative action would be suspensive on the

2    termination.  Does this stay apply if PPGC elects to continue

3    in federal court.

4            Could you pull up the next language, Brian?

5            And LDH's response is that the suspensive nature only

6    applies if you proceed through the administrative process.  If

7    your client forgoes that clear avenue of affording your client

8    clear full due process, I don't believe my client can make that

9    commitment.  More clear, my client does not believe you have an

10   election to continue in federal court.  The administrative

11   avenue is the agreed-upon process to protect your client's

12   rights.

13           So this document demonstrates that Planned Parenthood

14   knew that if they did not contest the findings in the

15   administrative procedure, the termination would become final

16   and that the federal proceeding would have no impact on that.

17           Next, even before Planned Parenthood received a final

18   notice of termination, they knew that there are penalties for

19   billing Medicaid when they're excluded from the program and

20   they knew that it was legally questionable for them to continue

21   seeing patients after termination.

22           Would you bring up that document, please?

23           So here's an e-mail from Sheila McKinney, who works

24   for PPGT or did at that time, and she's stating, "There are

25   penalties for us billing when we are excluded from the program,

1  so we do not want that."

2         And then this is also an e-mail between employees of

3  PPGT.  She says, "Please let me know what the attorneys say

4  about the legality of our providing services to Medicaid

5  patients after the date of termination.  I am not quite as

6  confident as Ken that we will win the overall fight."  Ken is a

7  reference to Ken Lambrecht, the CEO of PPGT.  "And I am also

8  not comfortable assuming we will get paid for any claims that

9  happen after termination."

10        Could you go to the next one?

11        And then Ms. McKinney responds, "PPFA attorneys are

12 going to talk with me this afternoon and I will keep you

13 posted."  Planned Parenthood also knew that receipt of

14 reimbursement does not mean continued entitlement.  They had

15 been subject to recoupments before and one affiliate even

16 returned PPP loan money after their eligibility was publicly

17 questioned but the government had not made any determinations

18 on that point.

19        They also knew that once the Fifth Circuit ruled in

20 Kauffman and then injunctions were vacated, that the states

21 could enforce the terminations, and that's demonstrated by the

22 e-mail reference there.  And the legal nullity of invalid

23 injunctions and the retroactivity of courts' decisions is long

24 established black-letter law.

25        Additionally, if there was any question that they

1  should have paid the money back, Planned Parenthood simply just

2  recklessly disregarded it.  For example, the PPGT CEO testified

3  that he didn't even read the termination letter and still

4  hasn't read the whole thing.

5          Could you pull up that document, please?

6          This is an excerpt from Mr. Lambrecht's deposition

7  stating that fact.

8          Moreover, if there were any questions about their

9  eligibility to keep these funds, they could have called the

10  provider relations hotline in both states.  They had done so

11  before many times and they knew also about the self-disclosure

12  protocols for possible overpayments.  Instead, they took

13  unreasonable risks assuming they would never be held

14  accountable for keeping taxpayer money they weren't legally

15  entitled to.  This goes to some of the things I mentioned in my

16  introduction.

17          The defendants' strategy was explicitly to delay

18  termination and keep this litigation going, stay in the

19  Medicaid fight to get the attention of the Biden administration

20  and force Texas to put Planned Parenthood back in Medicaid.

21  Planned Parenthood also never reported and even attempted to

22  hide their termination from Texas Medicaid from the Louisiana

23  Department of Health because, quote, "The attention on that

24  fact would impact their efforts to pressure the governor to let

25  them back into Medicaid."  Those are PPFA's efforts.

1          They even contemplated working around their

2     termination for Medicaid by getting new TPI numbers for their

3     physicians so they could keep their patients and also set up

4     new nonexplicitly Planned Parenthood entities that would still

5     be nevertheless governed by PPFA's medical standards and

6     guidelines and insured by PPFA's captive insurance company.

7          THE COURT REPORTER:  Counsel, can you please slow

8     down for me?

9          MS. HACKER:  Sorry, yes.

10         Your Honor, there are additional facts that are

11    discussed in our briefing, but we felt that those were the most

12    prominent ones that quite simply demonstrate the knowledge

13    requirement is satisfied here.

14         THE COURT:  Okay.  So is it enough to hold that

15    affiliate defendants knowingly violated the FCA at the summary

16    judgment phase, or do we have a remaining fact issue where

17    there's conflicting evidence and briefing to this Court about

18    the effect of some of these e-mails, transcripts?  I have my

19    own flagged e-mails that relate to the knowingly standard that

20    applies in an FCA case.  Is there enough here to tip the scales

21    for summary judgment, or are we dealing with a lingering fact

22    issue for the jury?

23         MS. HACKER:  So, Your Honor, I think the e-mail

24    evidence, the documentary evidence, simply bolsters the facts

25    that are set forth that are really indisputable and that would

```
 1   be the facts that I originally discussed.  And these are
 2   just -- you know, their requirement to be aware of all the laws
 3   and regulations, the fact that injunctions don't -- especially
 4   not preliminary injunctions don't immunize you from having to
 5   pay back money you received under that injunction, that's
 6   black-letter law.  All the things on this slide here are things
 7   that they all either knew, we have to presume that they knew
 8   because of the requirements or they should have known and that
 9   is all enough to satisfy the knowledge standard.
10          So I think the e-mail -- the various e-mails that we
11   discussed support the fact that they knew or should have known,
12   but these facts in particular I think are enough to demonstrate
13   that the requirement is satisfied.
14          THE COURT:  Okay.  So looking at the implied false
15   certification theory which is briefed by both parties, I want
16   to make certain that I'm using the correct terminology and that
17   the record's clear.  Here I'm referencing that second -- I'm
18   sorry, the first clause of 31 U.S.C. Section 3729(a)(1)(G),
19   Clause 1, sometimes referred to as implied false certification,
20   focusing on the relator's allegations for claims submitted
21   before the termination notice was sent.
22          So here I think the correct chronology is sometime
23   between approximately 2011 and 2015.  What disclosures to the
24   states Texas and Louisiana should have been made in these
25   claims but were not, and if you can cite some analogs from
```

1    jurisprudence that could serve as guide points to what would be
2    material to either Texas or Louisiana in deciding whether those
3    certifications were impliedly false.
4         MS. HACKER:  Yes, Your Honor.  I'd like to start by
5    pointing the Court to 31 U.S.C. 3729(a)(1)(A), which is the
6    statute for the implied false certification, the language of
7    the first clause of subsection (G) is similar.  But the FCA and
8    LMAPIL both impose liability on a provider who knowingly
9    presents or causes to be presented a false or fraudulent claim
10   for payment or approval.
11        The TMFPA is a little bit broader in scope and
12   authorizes liability for anyone who knowingly makes, causes to
13   be made, induces or seeks to induce the making of a false
14   statement or representation of material fact.  The rest of that
15   language is there.  In terms of the 2011 to 2015 claims, the
16   relator did not request summary judgment on those claims, but
17   Planned Parenthood did ask for summary judgment on those.
18        So the -- those claims were impliedly false because
19   every time the provider submits claims to the government they
20   have to certify that they are in compliance with all Medicaid
21   rules and regulations.  If they are not in compliance, then
22   that -- that affirmation is then false.  So in United States ex
23   rel Lemon vs. Nurses To Go, the Fifth Circuit said that the
24   Supreme Court made clear that defendants could be liable under
25   the FCA for violating statutory or regulatory requirements,

1    whether or not those requirements were designated in the

2    statute or regulation as conditions of payment.

3          So the termination notices in both Texas and

4    Louisiana recount the states' findings that Planned Parenthood

5    was not in compliance with program requirements.  That was in

6    fact the reason for their termination from both programs.

7    Planned Parenthood did not contest those determinations.  So

8    those determinations stand.  We have determinations uncontested

9    from both Texas and Louisiana that Planned Parenthood violated

10   program requirements.

11         THE COURT:  The violations of program requirements,

12   do they relate back to the video that relator presented or are

13   there other noncompliance issues that should have been

14   disclosed?  Is it just the videos or are there other

15   noncompliance bases for the determinations of both Louisiana

16   and Texas?  Am I just looking at the videos or are there other

17   noncompliance issues that should have been disclosed in those

18   initial certifications?  I just want to know like what is the

19   body of evidence, what exhibits reflect that they were in

20   noncompliance.  Is it just the videos?

21         MS. HACKER:  So in the Texas letter of termination,

22   it -- all of the claims -- or all of the reasons they were not

23   in compliance stem back to -- and this is the final notice of

24   termination -- stem back to the evidence that was shown in the

25   videos -- or the video, excuse me.  The Louisiana letter did

1    reference the video but also referenced additional, I believe,

2    nondisclosure violation -- or disclosure violations.  They were

3    various facts that they were supposed to have disclosed to

4    Louisiana -- the Louisiana Department of Health, and they did

5    not do so.  So that was an additional basis for Louisiana's

6    decision to exclude them from the Medicaid program --

7            THE COURT:  Okay.  So how does this Court test

8    materiality in a Byzantine managed care, post ACA medical

9    regime where there's bills going out, bills coming in,

10   everybody who has been through the health care labyrinth

11   understands that there are delays, there are explanation of

12   benefits?  There's this entire Byzantine architecture of health

13   care billing.  All of us have navigated it in our personal

14   lives.

15           What -- what should this Court look at in deciding

16   what is material in a system that includes paperwork,

17   reimbursements, overpayments, all the paperwork that's going in

18   and out of these various agencies and reimbursements, like what

19   is the lynchpin of materiality?  What's the statutory and

20   jurisprudential lodestar for the Court?

21           MS. HACKER:  So it goes back to the fact that the

22   Medicaid providers are required to be in compliance and certify

23   their compliance with all the state laws and regulations.  And

24   there is that requirement because of the fact that Your Honor

25   mentioned because providing these services is very complicated.

1    It -- you know, it's difficult for the government to have

2    enough resources to verify that everyone is following all of

3    the rules and all of that.  And so it places the burden on the

4    provider to continually certify that they are in compliance

5    with all of those requirements.

6         Now, there could be an argument that you know there

7    may be some technical requirements that might not be material

8    if the state continued to reimburse the Medicaid provider even

9    though that requirement wasn't being met.  I think that

10   presents some complications in terms of what the False Claims

11   Act is designed to do and the burden it places on the provider.

12   But nevertheless, assuming that that were true, we know that

13   these facts here were material because as soon as the states

14   discovered them they terminated both -- in both states.  They

15   terminated Planned Parenthood in both states.

16        So those were material conditions of payment

17   according to Texas and according to Louisiana.

18        THE COURT:  Okay.  So in searching for guidance and

19   materiality, the Court identified out-of-circuit authority in

20   United States and Harrison vs. Westinghouse.  So this is 352

21   F.3d 908.  There, the Fourth Circuit explains that the tests

22   for determining materiality is whether the false statement has

23   a natural tendency to influence agency action or is capable of

24   agency action on the potential effect of the false statement

25   when it is made, not the actual effect of the false statement

1   when it is discovered.

2           And when the court in the Fourth Circuit it further

3   explains, quote, "Courts give effect to the FCA by holding a

4   party liable if the false statement it makes in an attempt to

5   obtain government funding has a natural tendency to influence

6   or is capable of influencing the government's funding decision,

7   not whether it actually influenced the Government not to pay in

8   a particular case."

9           Is this an accurate restatement of plaintiffs'

10  understanding of materiality and how this Court should give

11  weight to any continued payments that the government made

12  post-termination?

13          MS. HACKER:  So Your Honor, the way -- the way that I

14  would interpret the language that Your Honor just read is that

15  even if the -- even if the government continued to pay the

16  claims, if it was something had they known they would not have,

17  that would be sufficient to show materiality.  But we don't

18  even have to make that leap here because we know what would

19  have happened once they found out they did terminate them for

20  those reasons.  So there should be no question that those were

21  material to continued payment.

22          THE COURT:  Well, with regards to one of the

23  affiliate defendants here, specifically, Planned Parenthood

24  Gulf Coast -- so I'll refer to this party as PPGC -- couldn't a

25  reasonable juror find that based on PPGC's current enrollment

1    in Louisiana Medicaid, despite the state's knowledge of the

2    facts that caused the termination, that nondisclosures made by

3    at least that affiliate defendant were not material, they

4    weren't material enough to cause a discontinuation of Medicaid

5    services?  How should the Court weigh that and also how should

6    the Court determine if this is a fact issue for the jury at

7    this MSJ phase?

8            MS. HACKER:  So Your Honor, if a provider is excluded

9    from Medicaid, they can reapply to participate and the fact

10   that here Planned Parenthood was excluded from Louisiana

11   Medicaid for several years, I believe, from 2015 until November

12   of last year, that was a severe penalty for a provider for the

13   issues that Louisiana found in the termination letter were

14   sufficient to terminate them from the program.  So the fact

15   that seven years later the state decided that they had had

16   enough punishment and was going to allow them back in based on

17   their representation that they would follow the rules, that

18   doesn't necessarily mean that those things were not material to

19   their termination seven years before.  That's just the state's

20   exercise of its discretion to allow them back in if they've

21   claimed that they've -- you know -- have rectified the problems

22   that were there previously.

23           THE COURT:  So I think I have your answer now on

24   Louisiana and its various termination and Medicaid enrollment

25   decisions.  What about Texas?  So here, there was a grace

1    period extended.  I have a briefing from plaintiffs that this

2    Court should not infer too much from the grace period and

3    exhibits that plaintiffs argue reflect that defendants abused

4    the grace period, does it matter that, you know, there's

5    e-mails reflecting that certain defendants or at least actors

6    representing those defendants wanted to milk a few more

7    stories?  I think you called out some of those e-mails here.

8    Does it matter that those alleged misrepresentations did not

9    directly correlate to the claims for reimbursement?

10            So to the extent that there is a disconnect between

11   the internal evidence reflecting an ulterior motive for

12   continued operations on the part of various defendants, does it

13   matter that that does not directly relate to the stated basis

14   for certification or claim for reimbursement?  Does that

15   mismatch matter, and what is the Court to do with materiality

16   analysis during this grace period where plaintiffs have now

17   presented evidence that there was an ulterior motive, and again

18   this is plaintiffs' argument.  What am I to do with the Texas

19   decisions during that grace period and the materiality analysis

20   where your evidence doesn't necessarily match the basis for

21   reimbursement?

22            MS. HACKER:  Yes.

23            THE COURT:  Does it matter?

24            MS. HACKER:  Yeah.  Just going to pull up those

25   documents real quickly.

1           THE COURT:  So I have in the exhibits that are in the

2    record, they were attachments to briefing, a series of e-mails

3    reflecting defendants' internal discussion of various

4    termination points, whether the pursuit of administrative

5    remedies, what was the relevant tolling event, for lack of a

6    better term, but I don't see a lot of connective tissue between

7    the correspondence in those e-mails and the basis for Texas and

8    Louisiana terminating defendants.  You know, whether they had,

9    you know, a media component to their decision making, an

10   administrative law component, I don't see exhibits that reflect

11   a cover-up or anything that directly relates to those videos

12   that -- or the lynchpin of the termination decision.  Does that

13   matter for materiality analysis when I'm weighing the e-mails

14   that were disclosed during discovery and attached to relator's

15   briefing?

16           MS. HACKER:  So I would think of the claims during --

17   if I understand Your Honor's question correctly -- I would

18   think of the claims during the grace period as different than

19   the claims that were made between 2011 and 2015, in terms of

20   the falsity of those claims.  So for example, in the -- in the

21   letter that PPFA drafted and the affiliates sent to Texas, they

22   requested a grace period of reimbursement for the benefit of

23   their patients so they could transition the patients to another

24   provider.

25           And then, Texas, in turn, granted a one-month grace

1    period for that express purpose of ensuring that current

2    Medicaid clients receiving services at your clinics can be

3    transitioned to new providers.  So I think the way to look at

4    this is, you know, the Medicaid program itself is sort of a

5    contractual agreement between the provider and the state.  The

6    state agrees -- or the provider agrees to provide certain

7    services in accordance with rules and regulations, and in

8    exchange, the state agrees to reimburse the provider for those

9    services that are provided.

10             Here, this is essentially kind of a contract where

11   the agreed upon basis for reimbursement was to allow Planned

12   Parenthood to transition their patients to other providers

13   during the 30-day period that Texas gave them.

14             Now what the evidence then shows is that they made

15   virtually no effort to do that.  Instead, they tried to get as

16   much Medicaid revenue as possible.  Only if a patient came into

17   the clinic and tried to schedule another appointment were they

18   then told actually we're going to be out of Medicaid in a

19   month.  So the express purpose that the Court -- or that the

20   state allowed them to even do this, they did not fulfill that

21   condition of the agreement.

22             And so by asserting that they needed this period to

23   transition their patients and then not doing that, that

24   assertion they made to the state was the false statement.

25             THE COURT:  Okay.  Thank you for that clarification.

```
 1   I have your argument on that point.
 2            I now want to turn to the portion of defendants'
 3   briefing to this Court construing the actual clause-by-clause
 4   text of Section 3729(a)(1)(G).  Somebody on defendants' team
 5   purchased a copy of Scalia and Garner's Reading Law Manual, and
 6   I say that with all affection.  Justice Scalia was my professor
 7   at one point during a summer course.  So I recognize this type
 8   of argument, this aversion of textualism, and it's an argument
 9   I don't see in any of the available FCA analysis, at least at
10   the circuit level.
11            So here there is a -- a novel argument that Section
12   3729(a)(1)(G) Clause 1 includes the term causes, but Clause 2
13   does not.  Is PPFA correct that it could not be held liable for
14   causing affiliates to submit false claims under Clause 1?  This
15   would be the implied false certification theory but not for
16   causing the reverse false claims which would arise under Clause
17   2.  And I don't know of any canon that Justice Scalia would use
18   to resolve this jump ball, but that is an interesting argument.
19   I could not find an analogous circuit opinion in or outside the
20   Fifth Circuit.  So I'll give you opportunity to argue your
21   textualism case for how this Court should deal with this
22   post-2009 reconstruction of this clause.
23            And for record purposes, you can refer to Clause 1
24   and Clause 2.  I think all attorneys in the room, the clerks
25   and the Court will know what you're referencing, and that may
```

```
1    make life easier for my court reporter who was not a false
2    claims expert before today.  So you can refer to Clause 1 and
3    Clause 2, and tell me what I'm supposed to do with this
4    proposed textualist analysis of that causation language.
5            MS. HACKER:  Yes, Your Honor.  I believe that the
6    defendants' argument is that PPFA cannot be held directly
7    liable under Clause 2 because it did not itself have an
8    obligation to repay.  And there's the Fifth Circuit precedent
9    of Caremark that the court affirmed the theory of indirect
10   reverse false claims liability.  And so I don't believe -- I
11   don't believe there is any further case law examining this
12   purported distinction because, to be frank, it doesn't really
13   matter.
14           The statement that the Fifth Circuit made is still
15   true because that second clause of 3729(a)(1)(G) states that
16   it's -- to avoid or -- you have liability for avoiding or
17   decreasing an obligation to pay, not your obligation to pay.
18   So it doesn't necessarily have to be the obligation of PPFA.
19   If they avoided or decreased someone else's obligation to pay,
20   then that would satisfy the plain language of that second
21   clause.
22           THE COURT:  Okay.  So as an Appellate Division AUSA,
23   I had to wrestle with a line of cases written by Justice Scalia
24   dealing with various constructions of proceeds and money
25   laundering statutes and the rest.  And there were instances
```

1    where Justice Scalia would invoke the rule of lenity to resolve

2    an ambiguity.  Here, if there is an ambiguity between Clause 1

3    and Clause 2, and whether causation analysis properly affixes

4    to Clause 2, is there a canon in that book that I can flip to

5    that decides who wins the jump ball?

6           MS. HACKER:  So if Your Honor is asking about whether

7    the word "cause" should be imputed to the second clause, I

8    think that that is dispelled -- and forgive me, I just switched

9    off that slide but I'll get back to it.

10          THE COURT:  And I understand the Caremark argument --

11          MS. HACKER:  Yeah.

12          THE COURT:  -- versus causation, but is there a canon

13    that tells me what to do when we have quasi-criminal

14    liability -- and I know this is a statute that sort of lies at

15    the estuary between, you know, mixing criminal and civil

16    concepts -- but is there any sort of canon that dictates to the

17    Court how to resolve this in a False Claims Act case?  If it

18    were pure criminal law we would invoke the rule of lenity, I

19    would be ordered to put my thumb on the scale favoring

20    defendant for all the reasons known to counsel.  Is there a

21    similar canon or rule of construction the Court can invoke or

22    look to in deciding a potential ambiguity in this

23    quasi-criminal statutory context?  I couldn't find one, so I'll

24    be candid.  If you know of one, if you have find -- if you can

25    find analogous case law that helps, that's what I'm inviting

1    now.  Is there any sort of textualist analysis of similar

2    statutes where we have, you know, an element like causation in

3    Clause 1 but not Clause 2?  Are there any canons the Court

4    should look to to resolve this, or are we just dealing with

5    Caremark and other FCA case law?

6              MS. HACKER:  Your Honor, I think as to whether causes

7    should be imputed to the second clause, I think that you don't

8    have to look any farther than the word "or."  The word or in

9    between Clause 1 and Clause 2 disjoins those two clauses and so

10   the plain reading is that each clause stands independently on

11   its own.  And as far as a canon, I can't think of one right now

12   but I can't remember the name of the case but I know there was

13   a fairly recent Fifth Circuit case where the court did a

14   textual analysis of a criminal statute and I believe the use of

15   the words "and" and "or" may have played into that decision but

16   I can't remember all the details.

17             THE COURT:  Disjunctive versus conjunctive.

18             MS. HACKER:  Yes.

19             THE COURT:  Okay.  So any post-2009 cases that find

20   the sort of indirect liability for a Clause 2 reverse false

21   claim if that's available to either counsel for plaintiffs or

22   defendants -- I'll instruct almost like a 28(j) letter --

23   you're allowed to submit supplemental briefing on that.  That

24   will be an exception to the standing orders on the briefing

25   schedule.  So this is open to either side.  If there are any

1    post-2009 claims that give additional analysis maybe after, you

2    know, the Supreme Court has now decided, shoot, I'll instruct

3    counsel to advise the Court of those cases.

4            So I'm not going -- I'm not going to make you argue

5    in a vacuum anymore on that textualism point.

6            MS. HACKER:  Okay.

7            THE COURT:  So some of your arguments in this -- in

8    this category of control in what PPFA did vis-a-vis affiliates

9    caused the Court to consider the various standards for

10   sanctions.  So if the decision to steer affiliates away from

11   administrative appeals, and the various legal decisions that

12   are reflected in the e-mails submitted as evidence, would any

13   of that conduct be sanctionable under Rule 11B or other

14   sanction rules that we have in federal court?  If it doesn't

15   rise to the level of a sanction and there was never any motion

16   for sanctions, do you still have theory of fraud?  I think the

17   answer is yes, but here I have arguments from both plaintiffs

18   that the decision to steer away from administrative appeal

19   crafting the request for the grace period, the filing of the

20   lawsuit in Travis County District Court, those e-mails are

21   to -- plaintiffs asked this Court to construe those as relevant

22   to scienter, knowledge, that there is an evasion or an aversion

23   of legal requirements.  If all this is going on, is any of this

24   sanctionable and what should the Court make of the fact that

25   nobody got sanctioned for doing any of those?

```
1          MS. HACKER:  Your Honor, before I begin my answer
2    could I get a time check, please?
3          THE COURT:  Oh.  25 minutes remain.
4          MS. HACKER:  Of the hour and 15 minutes?
5          THE COURT:  That's correct.
6          MS. HACKER:  Thank you.
7          So I think that the filing of a baseless lawsuit I
8    suppose could be sanctionable.  The avoiding -- giving a
9    relevant update to a federal court, specifically the federal
10   court in Louisiana, and when presented with the question of
11   whether the legally baseless injunction should remain not being
12   candid with the court and the fact that that injunction was
13   legally baseless, that could also be sanctionable.  But whether
14   or not the parties in those cases asked or did not ask for the
15   attorneys to be sanctioned in those cases, I don't believe that
16   that has any relevance on their culpability under the False
17   Claims Act.
18         THE COURT:  Okay.  So the Court shouldn't infer too
19   much from the fact that nobody filed for sanctions and this
20   could also be a function of discovery.  Nobody knew of these
21   sort of reasons for filing suit until we got into discovery.
22   So, I just added a note on sanctions but it doesn't sound like
23   it's of much import in this case.
24         So moving to the tail end of the pending motions and
25   complaints, let's talk about the conspiracy claim.  I don't
```

1    believe Texas has joined this claim so I believe that you're

2    the correct attorney to answer the question.  It's the Court's

3    understanding that relator can prove defendant shared specific

4    intent to defraud the government through circumstantial

5    evidence, that that must be established by clear satisfactory

6    and convincing testimony.  If you had to point to the clear

7    satisfactory and convincing testimony as a smoking gun in this

8    case, where would you direct the Court's attention in the

9    Court's analysis of the pending conspiracy claim?

10            MS. HACKER:  So I would say, Your Honor, that -- I

11   wouldn't say that there is just one smoking gun here related to

12   conspiracy.  I would say that it's more instructive to look at

13   the evidence as a whole in terms of PPFA's coordination and

14   work with the affiliates.  From way back even before there was

15   a final termination notice in either state, so as far as back

16   as 2015 all the way through the present, PPFA was involved with

17   everything that the affiliates did to try to avoid their

18   obligation to repay.  They were right there alongside them.

19            And, you know, we know how closely from all of the

20   evidence as well, we know how closely PPFA controls the

21   operations of the affiliates.  But even more specifically, PPFA

22   was involved in this -- in dealing with this defund effort as a

23   national organization, there was a national response to this.

24            And I think perhaps some of the most pertinent

25   evidence of that is that PPFA advised the affiliates to not

1    challenge their terminations in the state proceedings because

2    it was better for the alliance or the affiliation -- or the

3    affiliated -- sorry, what am I trying to say -- the

4    federation -- it was better for the federation as a whole that

5    they stick together even though that was plainly against the

6    interest of the individual affiliates.

7            For example, there was testimony from Pauline Barraza

8    from PPST that she did not believe -- they were -- they were

9    not featured in the video.  She did not believe that it was

10   correct that they would be an affiliate of PPGT or PPGC.  Yet

11   they did not challenge that conclusion.  That was the basis for

12   them being terminated.  They didn't challenge that conclusion

13   because PPFA said it would not be in the interest of the

14   federation as a whole.

15           So this was a coordinated effort between all of them,

16   everything that happened after that was as a result of this

17   coordination.

18           THE COURT:  Okay.  And so that we can get through the

19   remaining two bullet points in the Court's schedule or

20   itinerary for this argument, give me your best argument on

21   excessive fines under the Eighth Amendment.  You know, of

22   course, this is not assuming anything of the Court's decision

23   on summary judgment, but looking forward to Eighth Amendment

24   issues, excessive fines and using criminal law terminology,

25   does the Court have discretion to downwardly vary, or is this a

1  statutory minimum that must apply as a multiplier in every case
2  where liability affixes?
3         MS. HACKER:  Your Honor, I do not see any -- in the
4  plain text of the statutes I do not see any discretion to
5  adjust the civil penalties or the damages.  Those amounts are
6  set in the statute in terms of there is a minimum.  So a
7  penalty per claim cannot go below the minimum just according to
8  the plain terms of the statute.  And as far as our best
9  argument as to excessive fines I think the Court need not look
10  past binding Fifth Circuit precedent in the Newel case, Newel
11  vs. USEPA 231 F.3d 204 at 210.  The Court said there no matter
12  how excessive in lay terms the administrative fine may appear,
13  if the fine does not exceed the limits prescribed by the
14  statute authorizing it, the fine does not author -- the fine
15  does not violate the Eighth Amendment.
16         And I think a lot of the complaint as to the
17  potential penalties here being an excessive fine relate to the
18  overall amount of the penalty but that's not necessarily the
19  way that you would analyze this for Eighth Amendment purposes.
20  You look at the penalty per claim, and $12,000 as a penalty can
21  certainly not be considered excessive.  Multiple federal courts
22  have analyzed fines in that way.
23         And that's in keeping with that precedent.  As well,
24  even though several courts have been asked, multiple appellate
25  courts have upheld large fines under the FCA, and there is no

1    opinion, no federal court opinion or Texas opinion or Louisiana

2    opinion for that matter -- finding that fines and penalties

3    under these statutes violate the excessive fines -- or violate

4    the Eighth Amendment --

5              THE COURT:  Okay.  So in researching that issue prior

6    to the hearing, the Court identified some out-of-circuit

7    authority.  Should we ever reach this point, I'll likely order

8    additional or supplemental briefing and I want counsel for both

9    plaintiff and defendant to be aware of these out-of-circuit

10   authorities.  The Gosselin case, G-O-S-S-E-L-I-N, 741 F.3d 390,

11   the Yates vs. Pinellas Hematology case, 21 F.4th 1288, that's

12   an Eleventh Circuit case from 2021.  And then, also, Mackby,

13   M-A-C-K-B-Y, 261 F.3d at 821.  So I know there are many more

14   summary judgment issues and arguments to address but just as a

15   preview for potential supplemental briefing, the Court is

16   trying to do the analysis on what the Eighth Amendment requires

17   and how we define the relevant multipliers and denominators in

18   arriving at that result, and if necessary, how that should be

19   charged to a jury.

20             So those are some cases that came up in the Westlaw

21   search.  You should add those to your inventory of Eighth

22   Circuit research cases as well.

23             So I believe that brings us to the end of the

24   identified questions.  Counsel are instructed to address,

25   specifically, pretrial publicity, national and local

1    advertisements, potential jury pool taint.  Does counsel for

2    plaintiffs propose any least restrictive means as a corrective

3    measure or, if this case goes to jury, is a potential taint of

4    the jury pool addressable through voir dire?

5            MS. HACKER:  Your Honor, before I begin to answer

6    that question, I just want to note that the -- I don't know

7    what's going on with this -- that the fine -- or the cases that

8    Your Honor mentioned in relation to excessive fines, I am

9    familiar with those cases and I can discuss them today if you

10   want me to.

11           THE COURT:  Okay.  Let me give you a final time check

12   so that I get your answer on that last point.

13           MS. HACKER:  Okay.

14           THE COURT:  Yeah.  So you have 15 minutes remaining.

15   You can allocate your time as you see fit.

16           MS. HACKER:  Okay.  I'll go ahead and answer the

17   pretrial publicity question first, and then I can turn to the

18   excessive fines issue and discussion of those -- those

19   precedents.

20           So we are aware that Planned Parenthood has been

21   engaging in advertising in the local area of the court.

22           Brian, if you could -- my understanding is that this

23   is a billboard that is placed here locally in Amarillo.  Now,

24   as the Court mentioned, there are some measures that the Court

25   can take that are looked at as least restrictive measures that

1    can control extensive publicity and limit potential jury pool

2    taint.  As the Court mentioned, that would be thorough voir

3    dire, detailed jury questions, sequestering the jury.  Other

4    more restrictive measures would include a gag order on the

5    parties and counsel.  A gag order on the press or restricting

6    access to proceedings.  Those latter two options I think are

7    draconian and are probably not warranted in a civil case.

8         The Supreme Court has allowed gag orders on parties

9    and lawyers before, but those do have to satisfy strict

10   scrutiny according to the Fifth Circuit.  Such orders can only

11   be imposed if the Court determines that extra-judicial

12   commentary by those individuals would present a substantial

13   likelihood of prejudicing the Court's ability to conduct a fair

14   trial, and it would have to be narrowly tailored in the least

15   restrictive means available.

16        THE COURT:  This is why I gave you that terminology.

17   The last time I was an attorney on the other side of the bench

18   in this courtroom I was an AUSA.  It was a National Security

19   Division case involving Foreign Intelligence Surveillance Act

20   materials and we did have a gag order in place.  And I'm

21   assuming I'll also hear from defense counsel that neither party

22   is asking for something as draconian as a gag order.  But I am

23   familiar with that extreme in a very different setting, in a

24   National Security Division setting.  But I did want to invite

25   argument from both parties should this case proceed to trial.

1    So I think I have your argument on that.  If you want to pivot

2    back to some of the excessive fine Eighth Amendment points you

3    wanted to address.

4            MS. HACKER:  Yes, Your Honor.  The cases that the

5    Court mentioned:  Yates, Bunk, Mackby, all of those cases

6    support and actually refute the defendants' arguments that the

7    government wasn't really harmed here, and that's why the fines

8    were excessive.

9            So in particular, the Bunk case stated that:  "For

10   purposes of our Eighth Amendment analysis the concept of harm

11   need not be confined strictly to the economic realm.  The

12   prevalence of contractor scams shakes the public's faith and

13   the government's competence, and may encourage others similarly

14   situated to act in a like fashion.  We made the proper point 50

15   years ago.  No proof is required to convince one that, to the

16   government, a false claim successful or not is always costly.

17   Just as surely against this loss the government may protect

18   itself, though the damage be not explicitly or nicely

19   ascertainable."

20           And as a further example there, the Bunk case

21   actually awarded zero dollars in damages, but over a million

22   dollars in penalties.  So as a proportion the penalties were a

23   million times what the damages were there.

24           In the Yates case similarly the Court awarded $755 in

25   damages and $24 million in penalties.  And also explicitly

1    rejected an excessive fines argument.  The Yates case also

2    states that because we are only asking for the statutory

3    minimum here, the penalty is given a strong presumption of

4    constitutionality.  And as far as the issue that I mentioned

5    earlier with respect to whether you look at this as a total

6    award or whether you look at this on a per claim basis for the

7    Eighth Amendment analysis, those cases that I just mentioned

8    also support that argument.

9         In addition I would point the Court to U.S. vs.

10   Tuomey, which is a Fourth Circuit case, 792 F.3d 364.  In that

11   case the court said, "While the penalty is certainly severe,

12   it's meant to reflect the sheer breadth of the fraud

13   perpetrated upon the federal government."

14        In the case that the Bunk case was referencing

15   earlier, the Toepleman case from 1959 in the Fourth Circuit,

16   the court said, "For a single false claim the civil penalty

17   would not seem exorbitant.  Furthermore, even when multiplied

18   by a plurality of impostures, it still would not appear

19   unreasonable when balanced against the expense of the constant

20   treasury vigil that they necessitate."

21        And the Bunk case as well looks at this exact issue

22   and says, you know, "It's inevitable, in view of the vast

23   number of government contracts, many of prodigious size and

24   sophistication, that we would confront FCA actions involving

25   thousands of invoices, thus exposing culpable defendants to

1    millions of dollars of liability for civil penalties.  We are

2    entirely comfortable with that proposition."

3            So the case law that the Court mentions, I think, in

4    addition to other case law that I have just outlined, supports

5    the argument that the damages and penalties here in civil

6    remedies under the Texas Medicaid Fraud Prevention Act are not

7    violations of the Eighth Amendment.

8            THE COURT:  Okay.  And was the Gosselin case from the

9    Fourth Circuit in your briefing to the Court?

10           MS. HACKER:  I don't recall, Your Honor.

11           THE COURT:  Okay.  Well, I wanted to apologize

12   because I think I stated that it came up in the Court's

13   independent research.  If that was in your briefing, I missed

14   it.  So with apologies to counsel if you already had Gosselin

15   in your inventory of cases.  But that's -- that is a case that

16   the Court was aware of and is looking at.  So with that I'll

17   allow you to close with any arguments on your portion, and then

18   of course Mr. Wassdorf has reserved 15 minutes.

19           MS. HACKER:  Your Honor, with that I think I will

20   pass the podium to Mr. Wassdorf.

21           THE COURT:  And am I pronouncing your name correctly?

22           MR. WASSDORF:  Yes, Your Honor.

23           THE COURT:  Okay.  Mr. Wassdorf, you may approach the

24   podium.  How about we take a brief five-minute break to allow

25   you to set up to allow for any breaks and refreshments.  If

```
 1   counsel require water you can always have that at the table,
 2   but this'll be a good natural break.  We'll resume with
 3   Mr. Wassdorf's argument at 11:30.  So I'm feeling generous
 4   today.  I'm going to give you ten minutes with all the
 5   attorneys we have assembled, and all the bottles of water and
 6   the small restroom facility we have, we might require ten
 7   minutes.  So please return.  The Court stands in recess until
 8   11:30.  Counsel are instructed to reappear at that time.
 9              (Off the record at 11:21 a.m.)
10              (On the record at 11:41 a.m.)
11              THE COURT:  And, Mr. Wassdorf, you may proceed.
12              And again the Court is back on the record, case
13   Number 2:21-CV-022-Z, for continuation of the hearing on the
14   pending motions for summary judgment.
15              Mr. Wassdorf, you may proceed and you have 15
16   minutes.
17              MR. WASSDORF:  Thank you, Your Honor.
18              There is no one that knows this case, the evidence or
19   the law better than Ms. Hacker, and so I'm not going to stand
20   here and pretend to be able to better inform you of -- about
21   the case.  However, Your Honor, I do believe Texas has a unique
22   perspective in this case that cannot be forgotten.  We are
23   joined in this room by an army of lawyers.  There are many
24   parties in this case, two states, the federal government and so
25   many statutes I can't even remember at this point.
```

1          But from Texas' perspective, this is a very simple

2    case.  Planned Parenthood and its affiliates were terminated as

3    providers under the Texas Medicaid program.  They chose not to

4    appeal that decision.  Yet in the preceding months -- or

5    succeeding months and years they continued to bill Texas

6    Medicaid 45,181 times for a total of $8.9 million.  To date,

7    not a single one of those claims has been repaid.

8          That by the basic facts meets the requirements of the

9    reverse false claims theory of liability under the Texas

10   Medicaid Fraud Prevention Act and this Court should find so.  A

11   couple of specific things I did want to point out.  As this

12   Court has already recognized, the TMFPA is a simpler statute

13   than the FCA.  It does not include the materiality requirement

14   that the FCA does and so that analysis is not required here.

15         With respect to the Court's questions regarding

16   control, the provision of the TMFPA we're talking about here

17   doesn't require control.  It requires someone to avoid or

18   decrease an obligation to pay, not their obligation to pay.

19   And so I think that can get around the control issue to some

20   extent.  To the extent that PPFA caused to -- caused the

21   affiliates to either avoid or decrease the repayment of their

22   obligations, PPFA is equally liable to that of the affiliates.

23         A couple of other points that the Court raised that I

24   wanted to clarify is, you know, on the excessive fines issue,

25   Ms. Hacker has already spoken on that, but I just wanted to add

1    that likewise to the case law regarding the federal False

2    Claims Act, there is no case law that has been applied in Texas

3    that would find any fines under the TMFPA to be excessive.

4              THE COURT:  And that was one of the questions.

5              MR. WASSDORF:  Yes, sir.

6              THE COURT:  I know counsel for both Texas and relator

7    were tasked with being prepared for the nine issues identified

8    in the Court's order, and I intended to ask Texas specifically

9    if there were any controlling Texas Supreme Court cases Eighth

10   Amendment analysis to its statute.  I'm assuming from your

11   representations to the Court that the Texas Attorney General's

12   Office is unaware of any authority applying Texas law in an

13   Eighth Amendment context to disallow the trebling of damages or

14   any of the multipliers that would apply under the Texas

15   statute, is that correct?

16             MR. WASSDORF:  That is correct, Your Honor.  And in

17   re Xerox, the Court didn't directly address the Eighth

18   Amendment, but it did point out similar to the federal case law

19   that Ms. Hacker has cited, that the remedy here is not related

20   to the loss to the state -- the monetary loss to the state, but

21   is related to the fraud itself.  And as Ms. Hacker pointed out

22   to the Court, that a $12,000 penalty for a single fraudulent

23   claim is not excessive pursuant to the Eighth Amendment.

24             The last issue that I wanted to point out to the

25   Court is the way that relators have sought judgment in this

```
 1   case.  I just wanted to clarify, they have sought judgment
 2   accounting for the relator's fee and the attorney's fees.
 3   Texas believes that that is proper in the post judgment context
 4   and that the judgment, if the Court were to grant judgment,
 5   should be for the full amount to the state of Texas and that we
 6   would then address the relator's share and attorney's fees in
 7   post judgment proceedings.
 8             THE COURT:  And should the Court determine at the
 9   summary judgment phase that it can decide liability on the
10   pending claims by plaintiff and relator, is there a way to
11   divide that damage award at the summary judgment phase and
12   allow certain claims to proceed to jury trial, for example,
13   reimbursing to Texas the amounts owed on the face and then a
14   jury doing the work on FCA damages.  Is there any division of
15   damages that you could foresee or invite from this Court at
16   this summary judgment phase, or is all of that done in post
17   judgment briefing or argument to the Court?
18             MR. WASSDORF:  I believe that Texas' claims stand
19   alone here and could be entirely determined at summary
20   judgment.
21             THE COURT:  Okay.  And make your best case for why
22   the Court could follow that division of labor at this summary
23   judgment phase.
24             MR. WASSDORF:  Your Honor, I do not have a case that
25   supports that.
```

1          THE COURT:  So you'd just be relying on the statutory

2     text and how different elements arising under that Texas

3     statutory regime differ from the arguments I've heard from Ms.

4     Hacker on the federal version of that statute?

5          MR. WASSDORF:  Yes, Your Honor.

6          THE COURT:  Okay.  So you're standing on the

7     statutory text.  Okay.  I'll invite argument from Texas on any

8     of the remaining nine issues reflected in that ECF Document

9     513, the order setting hearing.  Are there any other Texas

10    centric or Texas specific arguments that you would present to

11    this Court that differ from the briefing and argument received

12    from Ms. Hacker?

13         MR. WASSDORF:  No, Your Honor.  I'm just looking at

14    my points regarding the Court's points and I think we've

15    covered that largely.  With respect to the obligation to return

16    overpayments, I just wanted to point out that the Texas

17    Medicaid provider manual, the provider agreements themselves

18    that the defendants entered into, state regulations and the

19    state statute all obligate Planned Parenthood to return any

20    overpayments, which is a number that they have not contested,

21    the number of claims and the dollar amount that the expert in

22    this case has identified.  I'm sure they would disagree over --

23    whether that obligation exists.

24         THE COURT:  Yeah, as a function of liability.  But as

25    a function of just arithmetic, the parties are not in

1    disagreement about the claims submitted, the numerosity of

2    that, there's no disagreement on that basic arithmetic.

3            MR. WASSDORF:  Correct.

4            THE COURT:  It's just a disagreement about the legal

5    theories of liability, the facts that are briefed to the Court.

6    But nobody disagrees on the claim number and what that starting

7    number is, is that correct.

8            MR. WASSDORF:  Correct, Your Honor.

9            THE COURT:  Okay.  And anything else that

10   distinguishes the Texas statute from the federal statute, and

11   your argument from Ms. Hacker's?  Anything regarding scienter,

12   the mental state required, anything that would set apart Texas'

13   argument from what I have from relator in this case?

14           MR. WASSDORF:  The definition of "knowingly" does

15   vary slightly from that in the False Claims Act.  I'm not sure

16   that it's material.  There is no case law interpreting that

17   difference, you know, knowledge versus -- in the TFMPA versus

18   actual knowledge under the FCA.  And then I believe it's

19   conscious indifference versus --

20           THE COURT:  As often the case in our federal system

21   where there's a federal statute and a state statute that mimic

22   each other, is it correct that for the most part the Texas

23   Supreme Court has echoed federal FCA jurisprudence in

24   construing the clauses of the Texas statute with the exception

25   of materiality, is that correct?

1           MR. WASSDORF:  They -- it has been recognized as an
2   analogous statute but not identical.  Where the language
3   differs materially it should be interpreted differently.
4           THE COURT:  Okay.  And I think you've already
5   identified materiality analysis, correct.
6           MR. WASSDORF:  Yes, Your Honor.
7           THE COURT:  Okay.  So I'll allow you your final five
8   minutes to wrap up, but I think this -- this case was well
9   briefed by all counsel involved.  I think I understand the
10  differences between your brief and Ms. Hacker's.  Anything else
11  you would want to close with?  You may do so at this time
12  before the Court anticipates a break for lunch.
13          MR. WASSDORF:  We'll reserve any additional time for
14  rebuttal, Your Honor.
15          THE COURT:  Okay.  Thank you, Mr. Wassdorf.  You may
16  return to counsel table.
17          At this point, I will excuse the parties and counsel
18  for a lunch break.  As directed, the defendant may reconfigure
19  this courtroom in whatever form suits your argument.  You may
20  avail yourself of courtroom technology.  Just be mindful of the
21  sight lines that apply to opposing counsel so they have view of
22  anything that's presented on screen.  I'm going to allow for an
23  hour-and-a-half lunch break, and you will have access to this
24  room for the duration of that break to reconfigure the
25  courtroom.  I'll instruct defendants' counsel to confer with my

```
 1  law clerks about ECF numbers and pages to make certain when
 2  you're calling the Court's attention to a document by ECF that
 3  it's matching the same numbering system that we're using at the
 4  bench here.
 5          So with that final instruction, I'll dismiss counsel
 6  and the parties for the lunch break, and you are ordered to
 7  reappear promptly at 1:30 for the remainder of this summary
 8  judgment hearing.
 9          (Off the record at 11:56 a.m.)
10          (On the record at 1:36 p.m.)
11  THE COURT:  The Court is back on the record in Civil
12  Case Number 2:21-CV-022-Z for continuation of the hearing on
13  the pending motions for summary judgment.
14          At this time, defendants may approach the podium or
15  they may argue from counsel table, whatever's most comfortable.
16  And who will begin for the defendants?
17  MR. MARGOLIS:  Thank you, Your Honor.  I am
18  Craig Margolis.  I will begin for the affiliate defendants.
19  Like our colleagues on the plaintiffs' side, we have some
20  slides, if I could hand up --
21  THE COURT:  Okay.  You may approach.
22  MR. MARGOLIS:  -- copies.
23          We may not look at all of these, Your Honor, in the
24  course of the argument but we'll flash the ones certainly on
25  the screen that we will refer to.
```

1            THE COURT:  Okay.

2            MR. MARGOLIS:  And in terms of housekeeping, Your

3    Honor, I intend to take 90 minutes -- well, let's put it this

4    way:  No more than 90 minutes.  I would ask that we would

5    reserve 30 minutes for my colleagues from the federation to

6    make whatever arguments are appropriate.  My arguments will be

7    directed largely to the affiliates, but of course insofar as

8    they apply to the federation as well, then, you know, we would

9    ask that you consider those as arguments.

10           THE COURT:  And then for the federation this would be

11   Mr. Metlitsky.

12           MR. MARGOLIS:  Yeah.  It's Mr. Metlitsky and perhaps

13   Mr. Ashby to talk about pretrial, some of the issues of

14   pretrial publicity that you raised in your order.

15           THE COURT:  And are you asking a time check?

16           MR. MARGOLIS:  Yes, please, Your Honor.  And if it's

17   not too much trouble, may I have two?  One at 60 minutes and

18   one at 75 minutes.

19           THE COURT:  Okay.

20           MR. MARGOLIS:  Just to make sure, I want to make sure

21   of course I cover everything that's of interest to Your Honor.

22           THE COURT:  Okay.  So the clerk will keep the time

23   and we'll apprise you of those -- of those time intervals.  You

24   may proceed.

25           MR. MARGOLIS:  Thank you, Your Honor, and may it

1    please the Court.

2            So, Your Honor, first, let me begin with first

3    principles.  We are not here on a recoupment action.  We're not

4    here on a restitution action.  We're not here because the

5    plaintiffs are seeking recovery on an injunction bond which of

6    course was never existed.  We're here because this is a False

7    Claims Act case.  I think Your Honor put it very well, this is

8    quasi-criminal.  It's in the estuary between the civil law and

9    the criminal law, and, frankly, Your Honor, it's an awfully

10   salty estuary at that.  This is an estuary where we're talking

11   about exposing the defendants to -- putting aside for a moment

12   the question of collateral consequences of which there can be

13   many for enrolled Medicaid providers, but we're talking about

14   the prospect of punitive penalties that the plaintiffs have

15   requested in excess of a billion dollars from these nonprofit

16   entities.  And then the question comes for what conduct.

17           Let's start with the Reverse False Claims Act claim.

18   The conduct here is that the defendant affiliates, pursuant to

19   court orders in Louisiana, and that's PPGC specific, Your

20   Honor, and in Texas for all three of the affiliates, saw --

21   I'll give a ballpark number, Your Honor -- thousands of needy

22   Texans and needy Louisianans.  I'll say Louisiana citizens in

23   case I'm mispronouncing.

24           Saw those patients, provided they're eligible

25   patients, no dispute.  Medicaid beneficiaries.  Eligible

1   services, no dispute; cervical cancer screenings, STD

2   treatments, well-health visits, medical treatments are all

3   covered by family planning provisions in the Medicaid act.  And

4   did so only during the pendency of injunctions or with respect

5   to Texas, a grace period allowed by the state.  That is what

6   the plaintiffs are alleging, that it was fraudulent when the

7   court later, and talking about Kauffman, which we'll get to, of

8   course, Your Honor, a little more detail later, when the Fifth

9   Circuit en banc made a ruling, not on the merits of the

10  underlying dispute but whether there's a prior rate of action

11  under Section 1983 to enforce free choice of provider.

12          That when the Fifth Circuit then vacated those

13  injunctions and after the expiration of any other court orders

14  in Texas, there appeared an obligation to pay the money back

15  absent any request from the state that subjects the affiliates

16  to penalties and liability at fraud for not paying that money

17  back.

18          And in Louisiana, as we'll talk about in a little

19  more detail, Your Honor, there was never a termination before

20  the terminations were withdrawn by the state.

21          It might be helpful, Judge, we prepared some

22  timelines.  I think you had asked previously about timelines

23  and we have a couple.  Again, you know, we may or may not refer

24  to them in the course of the argument, but I wanted to provide

25  them for your reference.  It's actually Slides Number 1 and 2.

1    One is for Texas and one is for Louisiana.  And maybe we can

2    leave the Texas timeline up there if it's all right with Your

3    Honor while I argue in case there's something that's relevant

4    as a reference for the Court, there will be some other slides

5    as we proceed.

6              THE COURT:  You may use the demonstrative that way.

7              MR. MARGOLIS:  Thank you, Your Honor.

8              So let's start of course, as we always should, I know

9    you had referenced Justice Scalia with what the statute

10   actually requires and we're talking about now the Reverse False

11   Claims Act.  So what are the problems with the plaintiffs'

12   theories that entitled the affiliates to summary judgment?  I

13   believe we would have agreement, Your Honor, that they cannot

14   proceed under either the Texas False Claims Act -- sorry,

15   Reverse False Claims Act, frankly, the Louisiana state False

16   Claims Act equivalent, or certainly the federal False Claims

17   Act, if the providers were not terminated which is in the case

18   of Louisiana.  There's certainly no obligation to pay the money

19   back.  And then in the context of Texas the question would then

20   become, which I think is -- there's no dispute, that any

21   services were provided after the terminations in Texas.

22             So the question is before the terminations took

23   place, was there any obligation to pay the money back?

24             What I heard from the state in particular was not

25   even a mention of the word "injunction" during the state's

1    argument, treated as if there was never a court order, that my

2    clients were providing services when they had already been

3    terminated from Medicaid.  The relator's counsel mentioned the

4    injunctions but paid them short shift.  The injunctions, Your

5    Honor, are not an esoteric legal concept.  They're not a legal

6    construct.  The injunctions are fact and we're here on summary

7    judgment.  These injunctions actually existed as a matter of

8    fact.

9          I will use a -- well, actually, let me get back to

10   that for a second.  But it's not as if these injunctions

11   magically disappeared as if they never took place which seems

12   to be something upon which the Texas and the relators must

13   rely.  In order for this Court to proceed, the Court would have

14   to find that it's as once Kauffman en banc issued its decision

15   and its mandate.  It's as if the injunctions as a matter of

16   fact never happened.

17         I think you had started, Your Honor, by asking my

18   colleague on the relators side, what's their best case for a

19   circumstance remotely like this.  There isn't one.  I mean,

20   Your Honor, I hesitate to ever represent in case in the

21   millions of cases that exist out there in the ether that there

22   might be something, but we looked pretty hard and we haven't

23   found a single case.

24         THE COURT:  So I think -- I think I mentioned -- I

25   think I mentioned Arkadelphia, so there the Supreme Court and

1  again I know this opinion is now over a century old.  The court

2  there said, quote, "A party against whom an erroneous judgment

3  or decree has been carried into effect is entitled in the event

4  of a reversal to be restored by its adversary to which he is

5  lost thereby."  Arkadelphia appears throughout the briefing.

6          Is it your case that because a bond didn't issue or

7  there was an absence of an injunction bond, that the statutory

8  entitlement to recover overpayments is suspended for the

9  duration of that injunction as long as a bond doesn't issue?  I

10  mean are you leaning on that branch, or is there -- am I

11  misunderstanding the way this was briefed to the Court?

12          MR. MARGOLIS:  No, Your Honor, you're correct.  But

13  in part.  So let me make sure and of course, Your Honor, if

14  it -- if there's anything that we've imparted in the briefing,

15  it's -- it would be it's not clear, then that's something of

16  course I want to -- that's our fault and I want to correct.

17          It's in part true, Your Honor.  I mean there is a

18  case that we've cited from the Fifth Circuit that says in terms

19  of an action for damages the -- if an injunction is preliminary

20  injunction is later vacated, that the damages are limited to

21  the amount of the bond.  And here, Your Honor, there were no

22  bonds issued.  The state -- actually, Mr. Stevens on behalf of

23  the state, asked Judge Sparks for an injunction bond only in

24  the amount of $300,000, I believe it was, Your Honor.  Perhaps

25  $350,000.

1           And it was denied because Judge Sparks found that

2    these Medicare beneficiaries would -- Medicaid, excuse me,

3    beneficiaries would receive services from some other providers

4    so the state wasn't financially harmed.

5           In Louisiana the state didn't even ask for an

6    injunction bond.  Now, there is that line of cases -- if there

7    was an injunction bond there are cases that say that damages

8    are limited to the amount of the injunction bond.

9           Arkadelphia stands for something different.  That's

10   restitution.  That was an older case probably in a case before

11   there was a complete merger of law and equity.  But that case

12   is talking about the equitable remedy of restitution.  It's

13   obviously not a False Claims Act case.

14          And in Arkadelphia, what the court held is that there

15   is the ability to seek restitution.  Potentially independent

16   and apart from an injunction or an action to recover damages on

17   an injunction bond.  But a restitution action, as Your Honor

18   well knows, is very different from the False Claims Act case

19   and why it matters is that it's contingent.  There are

20   equitable arguments that come into play -- if we were here on

21   an action for restitution, Judge, which of course the state

22   never brought, very important to note.  The state, which has of

23   course been aware of the circumstances from the start, never

24   brought an action for recoupment, never brought an action for

25   restitution.  Louisiana, the same.

1            But if we were here on a restitution claim, Planned

2    Parenthood would have any number of arguments as to why there

3    shouldn't be restitution.  Not the least of which is that it

4    continued to see patients and provided covered services and

5    that the state would reap a windfall if those monies had to be

6    paid back.  The point, though, Judge, is because we're not here

7    on a restitution action, we're here on a False Claims Act case,

8    the point which we'll get back to, is that the Reverse False

9    Claims Act requires an established obligation.

10            THE COURT:  And that was going to be my next question

11   because in the papers and in the argument, plaintiffs here

12   discuss this established duty to return overpayments.  What

13   else was needed to create a duty in this context?  So if

14   plaintiffs are incorrect that this is a statutory duty and the

15   burden falls on the providers under a reverse false claim, what

16   else other than a termination letter, what else is required

17   before this Court can find that you did have an established

18   duty?

19            MR. MARGOLIS:  Well, Your Honor, I think I would

20   answer the question this way:  There's nothing in the

21   termination letters themselves that speak whatsoever to

22   recoupment or repayment.  We have -- we have a slide on it.  I

23   could show the Court if you would like.  There's --

24            THE COURT:  You can move forward to that slide.

25            MR. MARGOLIS:  Sure.  There's authority under the

```
 1    Texas code in terms of how the state can get money back if
 2    there's been an overpayment.  So it says, first of all, the OIG
 3    may recoup an overpayment.  The inspector general did not.
 4    It's important because that's an administrative remedy, Judge,
 5    that actually provides the affiliates in this instance with
 6    significant due process protections.
 7           Mr. Bowen, the inspector general at the time who
 8    issued the termination notices, admitted at deposition that
 9    these are important due process protections to the providers,
10    only some of which are actually mentioned here, to ensure that
11    the provider knows that it has an obligation, has an
12    opportunity to pay the money back, that it actually even has
13    the ability to ask for an informal adjudication by statute.
14           These are mandatory terms.  Texas didn't do any of
15    that here.
16           And this last provision of the Texas Administrative
17    Code, it says what?  "If after the effective date of the
18    termination, a person submits "claims for services," so this is
19    under the relators and the state's theory, Your Honor.  We're
20    not conceding this question about whether we were terminated on
21    the date of the notice.  We obviously dispute that vigorously.
22           THE COURT:  Assuming arguendo, yes.
23           MR. MARGOLIS:  And it goes on to say the person may
24    be liable to repay.  That's discretion.  That's Simonow, Your
25    Honor.  That's the Simonow case.  It depends on a subsequent
```

1    event.  It depends in some form or fashion of the state taking

2    some type of action in this circumstance, in the circumstance

3    of a termination.  Some subsequent action that triggers an

4    obligation to repay.  And that's why it's so different, Your

5    Honor, from the -- and we're going to talk a little bit again,

6    Your Honor, and I don't mean to jump around but I want to be

7    responsive to your immediate questions.  It's so different from

8    the Affordable Care Act 60-day rule.

9          In that instance, you're talking about when a

10   provider -- I'm going to give a, you know, sort of a

11   run-of-the-mill factual circumstance, a provider realizes that

12   either intentionally or by error they build, let's say, for

13   patients they've never seen.  There's no entitlement there.

14   There's not -- we're not talking about an injunction that's

15   then later lifted and whether or not there's a termination

16   where the state may or may not seek recoupment or restitution

17   or -- we're talking about they've received money that they were

18   never entitled to.

19         And if they identify that, they have 60 days to pay

20   it back.  That's what the ACA stands for.  And after they

21   identify it, if they don't pay it back within 60 days, it

22   becomes an obligation for purposes of the Reverse False Claims

23   Act, the federal Reverse False Claims Act.  That's all the ACA

24   does.  That's all the weight it provides to this case.  So if I

25   could get back for a moment, Judge -- so Arkadelphia does not

1    stand for the proposition that when an injunction is later

2    lifted there's an automatic obligation to repay.  Frankly, I'm

3    not sure why there'd be a need for the federal rule of

4    procedure that provides for injunction bonds if there's an

5    automatic requirement to repay.  There needs to be an action to

6    recover and then there needs to be a judicial -- a judicial

7    decision, an exercise of judgment in some way or another.

8              A case for which they -- on which they rely, National

9    Kidney Patients vs. Sullivan, 958 F.2d 1127, it only speaks to

10   the DC circuit, Your Honor.  It only speaks to the presumptive

11   recovery on an injunction bond, a presumption of recovery.  And

12   this is where there's an injunction bond, not like this case

13   where there is none.  And it goes on to talk a little bit about

14   restitution and it talks about the possibility of seeking

15   restitution or recoupment based on an injunction that was later

16   lifted.  It certainly never speaks in terms of absolutes, that

17   there's a requirement to disgorge monies that you obtained

18   during the pendency of on injunction.

19             Your Honor, there's a case -- another case in which

20   they rely.  They didn't -- I believe mentioned in argument but

21   we sure would like to because we think, frankly, it's more to

22   our benefit than the government's.  I say the government's,

23   Your Honor, I should be more precise, the relator and the

24   state.

25             I am also, Your Honor, in times a criminal defense

1    lawyer so if I -- if I devolve to government --

2            THE COURT:  On most days, I'm looking at an AUSA and

3    an AFPD on opposing sides so I slip into the same.

4            MR. MARGOLIS:  Not the FPD, Your Honor, but I once

5    had the role of being a criminal assistant, so --

6            THE COURT:  I made the mistake too.

7            MR. MARGOLIS:  -- if I -- if I devolve into saying

8    government, of course, the U.S. has not intervened here so what

9    I'm meaning to say is Texas and the relators.

10           THE COURT:  Understood.

11           MR. MARGOLIS:  Thank you.

12           So if we could talk for a moment about Bayou Shores,

13   that's slide 14.  So, Judge, the language of this case is

14   interesting and important.  It's from the Eleventh Circuit from

15   2016.  And in this cases it's not a False Claims Act case but

16   it's similar factual circumstances in the sense that there was

17   a termination.  There was a termination from Medicare and

18   Medicaid of a provider.  That provider then went to bankruptcy

19   court.  And the question arose and I believe the bankruptcy

20   court at least stayed or even vacated the terminations.

21           And so there was a question about whether or not

22   there was jurisdiction in the bankruptcy court to do that.  And

23   the Eleventh Circuit ultimately concluded there was no

24   jurisdiction.  It's really the Kauffman circumstance, Your

25   Honor, right?  The injunctions are vacated because there's --

1   not because of the merits but because en banc no private right

2   of action under Section 1983.

3          But what does the court say?  Does the court actually

4   hold that there's an affirmative obligation to then pay all

5   that money back?  Absolutely not.  What it actually says is a

6   holding that there was no subject matter jurisdiction would

7   allow the government to go forward with its efforts to

8   terminate, allow the government to try and recover payments,

9   nothing automatic about it by virtue of the vacatur of the

10  injunction.

11         And these facts, Your Honor, if I might I'd like to

12  point the Court to the language of the injunctions themselves

13  that were issued by Judge Sparks in Texas and Judge

14  deGravelles -- I checked with a colleague of mine in Louisiana

15  to make sure I would pronounce the judge's name properly.

16  Judge deGravelles in the Middle District of Louisiana.  The

17  relators characterized in the injunction as if it was an

18  injunction to prevent -- I'm trying to put exactly how they put

19  it, enforcing the terminations or taking acts to enforce the

20  terminations, as if the terminations exist somewhere out there

21  in the ether and the only thing that was enjoined is whether or

22  not the -- whether or not state officials could take action to

23  enforce them.

24         That is not what the injunctions say.  The injunction

25  language is very clear.  The injunction is to prevent the

1    actual termination of the Medicaid provider agreements with

2    Judge Sparks on top.  On the bottom, enjoin from terminating

3    any of the provider agreements.  And, Your Honor, at this point

4    in time, there is the 30-day clocks or whatever you actually

5    time limit -- well, I believe it's 30 days in both states.

6    They have not run; it's undisputed.

7              This is not an Azar circumstance, Judge.  This is a

8    circumstance where it's an agency action that has been stopped

9    by an injunction.  But counsel -- and with respect, I --

10   counsel for the relators had said there was an injunction in

11   Azar.  We checked.  There was no injunction in Azar.  No

12   injunction was ever issued in Azar.

13             Judge Sullivan, Emmet Sullivan in the district of DC

14   was faced with the question of Harper retroactivity and how to

15   apply it.  Harper judicial retroactivity.  Not with respect to

16   an agency action, Your Honor.  But with respect to a rule that

17   he had held was vacated under the Administrative Procedures Act

18   and the DC circuit disagreed with him.  And so then the

19   question was what's the effective date of that regulation?

20             Azar doesn't touch on an injunction whatsoever.

21   Neither does Harper.  We've looked very closely too, Your

22   Honor, and we have not found a single circumstance when

23   judicial retroactivity as announced in Harper has ever been

24   applied in this way.  And certainly a federal False Claims Act

25   case -- well, and also a state False Claims Act case, we would

```
1    submit respectfully, is not the place to do it to apply Harper
2    judicial retroactivity to treat an injunction that existed as a
3    matter of fact as if it never existed.
4          THE COURT:  So let's turn -- I know that we have
5    multiple courts involved in your two timelines, Texas and
6    Louisiana, but let's jump forward to the one relevant to Texas
7    and then --
8          MR. MARGOLIS:  Sure.
9          THE COURT:  -- Judge Livingston in Travis County
10   District Court.  So there Judge Livingston found no authority
11   holding that a federal injunction stayed administrative
12   deadlines that apply and the remedies that the client has to
13   pursue.  Do you continue to argue that the federal injunction's
14   in place?  So here there's one from the Western District of
15   Texas and then one from the Middle District of Louisiana.  The
16   Court finds that your chronologies and your PowerPoint have
17   accurately depicted those relevant timelines.
18         Is it still your argument, even though it didn't sway
19   Travis County District Court, that the effect of those
20   injunctions -- I'm assuming you've given me your best argument
21   and your best case for the argument that those injunctions do
22   have preclusive effect.
23         MR. MARGOLIS:  Well, Your Honor, I think that -- I
24   wanted to make sure we're clear as to what the decision in
25   Travis County actually stood for by Judge Livingston.  It's
```

1    not -- the issue before the court there was whether or not the

2    Texas affiliates were entitled to a further state remedy,

3    right.  In other words, whether or not there was --

4              THE COURT:  I think the court there is also looking

5    for maybe the unicorn in this case, like which case can we cite

6    on the plaintiffs' side, defendants' side or the court's side

7    that involves this exact chronology of injunctions and court

8    interventions in an FCA case.  So we're all strained to find

9    the case.  And Judge Livingston found at least at the tail end

10   of this chronology that there was no authority for the idea

11   that a TRO or a PI in place by a United States District Court

12   tolled or delayed the administrative deadlines that apply under

13   the FCA.  She couldn't find authority for that.

14             I don't think I have found it in the briefs but I

15   think I've heard it today, your argument.  Is it the Simonow

16   case you think is your best case for that concept, that -- at

17   least in this concept -- context of a FCA case and specifically

18   a reverse false claim case, your best case is Simonow, I

19   believe it was?

20             MR. MARGOLIS:  It's one of them, Your Honor, yes.

21             THE COURT:  Okay.  Give me your best cases for the

22   concept, that for the intervening period in these dotted lines

23   depicted on your demonstrative both for Texas and Louisiana,

24   that those injunctions toll or delay or in any way have any

25   sort of preclusive effect on the administrative remedies that

1    you're obligated to pursue to keep your claim alive under the

2    FCA.

3          MR. MARGOLIS:  Well, Your Honor, I just want to make

4    sure that -- I'd like to try to disentangle two concepts.

5          THE COURT:  Okay.

6          MR. MARGOLIS:  If I might.

7          The TRO action didn't relate to whether there are

8    administrative remedies under FCA that had to be exhausted one

9    way or another.  The TRO action was a pretty narrow question of

10   Texas administrative law which was, could the affiliates

11   continue to challenge their terminations administratively.  And

12   Judge Livingston said no.  It had nothing to do with an

13   obligation to repay or not repay monies that were obtained

14   pursuant to the prior injunction.  She just found as a matter

15   of state law I can't find a reason to say -- even though she

16   did say she was troubled by the facts in the underlying

17   terminations.

18         And she did issue a TRO, Your Honor, so again we take

19   issue with the characterization that this is a meritless or

20   frivolous case that was filed.  But what she did find

21   ultimately in dissolving the TRO is I don't find that the state

22   clock was suspended for purposes of obtaining administrative

23   review.

24         It really said nothing about the False Claims Act and

25   an obligation to repay.  For an obligation to repay, it's

1    Simonow and the many cases -- other cases, you know, very good

2    case that has a long exegesis, Your Honor, on Reverse False

3    Claims Act precedent is the Tailwind case; it's actually the

4    Lance Armstrong case is sometimes the way people refer to it as

5    a fairly scholarly dissertation on how Reverse False Claims Act

6    liability works, and I would recommend that to the Court.

7           But it's the -- that obligation under the Reverse

8    False Claims Act can't be contingent.  It can't depend on some

9    further action by some other body.  So even -- you know, I

10   believe going back to the motion to dismiss point, Your Honor,

11   if we even have a slide on Simonow, if I could please have it.

12          You know, we cited it at the motion to dismiss, and

13   of course, we're not here to reargue motion to dismiss, Judge.

14   But Your Honor had pointed out that there was one part of the

15   opinion that I wanted to make sure we just fully cite here,

16   right?

17          The holding is contingent, penalties are not

18   obligations under the FCA.  We say it's no different from

19   contingent debts, which is what this would be and that's what

20   the Lance Armstrong case is about.  And what it goes on to say

21   is to be clear, the fact that further governmental action is

22   required to collect a fine or penalty does not, standing alone,

23   mean that a duty is not established.  I believe we cited that

24   sentence.  But then it goes on to talk about the circumstance,

25   customs duties.  There's no government action required to

1    collect customs duties.  You affirmatively owe them.  That's
2    the example the court uses, right?
3            So if there's some -- and then it goes on to say,
4    "The distinction as a customs laws imposed a duty to pay."  And
5    we've quoted it here.  It says, "The duty to pay" -- here,
6    they're talking about penalties -- "is not established until
7    the penalties were assessed."  That goes back to the point,
8    Your Honor, until there's a restitution action, there's an
9    injunction bond where there's been an action for damages, there
10   is no affirmative obligation to pay back monies that have been
11   obtained through an injunction that's later vacated - --
12           THE COURT:  Okay.  So I have your argument on that.
13           Let's maybe begin at the beginning and now I'm
14   apologizing to counsel for jumping around.
15           MR. MARGOLIS:  -- no.
16           THE COURT:  What is the effective date of
17   termination?  So here the Court reviewed attachments to both
18   sets of briefs filed.  There's an e-mail from January 4, 2021.
19   It's from affiliate's counsel to HHSC.  It's a colloquy about
20   effective dates of termination.  I believe this may be found at
21   ECF Number 482-1 at 3.  And the question is posed to Texas HHSC
22   for the record, what is the effective date of termination?  So
23   I believe that's at page 3.
24           MR. MARGOLIS:  Your Honor, I think that's an e-mail
25   that was referred to by opposing counsel, I believe.  Can we

1   please have the slide on that?  I want to make sure we're

2   talking about the same exhibit.

3          THE COURT:  Yeah.  So here, I have it, and this is

4   why I instructed counsel to coordinate with the law clerks to

5   make sure we were using the same ECF watermark here, I have it

6   as 482-1 at 3.

7          MR. MARGOLIS:  We've got it, Your Honor, although, I

8   apologize, we have it 482-1 and we have it at pages 14 through

9   17.

10          THE COURT:  Oh, you are correct.  You are correct.

11          MR. MARGOLIS:  But I'm almost sure it's the same

12   e-mail, Your Honor.

13          THE COURT:  Yeah, I know.  That's right.

14          MR. MARGOLIS:  Okay.

15          THE COURT:  So I have it as ECF Document 482-1, but

16   maybe page 3.  Page 14 of 553.

17          MR. MARGOLIS:  Sure.  So a couple of points to raise

18   here on this e-mail, Your Honor.  First of all, it's Louisiana,

19   it's not Texas.  I just want to make sure it's clear on that.

20   This is Carrie Flaxman who's representing the Gulf Coast

21   affiliate.

22          THE COURT:  And so she's corresponding here with

23   LA.gov officials.

24          MR. MARGOLIS:  Right.

25          THE COURT:  Okay.

1          MR. MARGOLIS:  That's Louisiana.

2          THE COURT:  Okay.

3          MR. MARGOLIS:  And the question that she's asking --

4     and this is an e-mail between lawyers -- and this is going to

5     be important, Your Honor.  I think, again, what they're using

6     it for wasn't to try to establish the effective -- the

7     termination date.  And I'll just tell you just to jump ahead,

8     there was no termination of Louisiana.  So -- and we'll get to

9     that.

10         But the question isn't the effective date or

11    termination, whether there was a termination in Louisiana.

12    It's a exchange between lawyer to lawyer and it's asking for

13    the state's position, right.

14         So, what do we have is the question.  The question, I

15    believe, that's being responded to in Question 2, Secretary

16    Kliebert's letter to Ms. Linton -- Ms. Linton is the CEO of

17    PPGC -- states "The termination action will take effect after

18    the termination of all administrative and/or legal proceedings?

19    Does this state if PPGC elects to continue in federal court?"

20         So it's the question as a matter of Louisiana

21    administrative law, will we -- because there was still time

22    left on their administrative appeal clock.  So as lawyers do,

23    asking the lawyer for the state, what's the state's view if we

24    go the federal court route, does that mean that we get to have

25    additional time on our clock?  What's your view on that as a

1    matter of administrative appeal?

2          And what's the state's answer?  It's -- first of all,

3    fairly equivocal, Your Honor -- it's my understanding, and I

4    will double-check with clients, is that the suspension nature

5    only applies if you receive through administrative process.  If

6    your client forgoes that clear avenue affording your client

7    clear full due process, I don't believe my client can make the

8    commitment.

9          The question -- I don't think -- I can't tell you

10   that Louisiana's going to allow you to have extra time if you

11   go the federal injunction route.  But what -- this is a

12   sentence that again, with respect to my colleague, she skipped

13   over when she showed you this.  It was on her slide, she didn't

14   even read it, the red line underlined part.  The client would,

15   of course, follow any court orders.  And this is before the

16   injunction was entered by Judge deGravelles.

17          So what is counsel for the state saying?  As a matter

18   of administrative law, I don't know that my client's going to

19   give you more time.  But if you get an injunction, of course

20   we're going to follow it.

21          As a matter of scienter, Your Honor, which is again

22   how the relator used it as, it's pretty powerful.  It's not the

23   state saying, Oh, you will be terminated.  And, you know, an

24   injunction -- I mean, you know, Your Honor, I use this term

25   because Judge Smith used it in Simonow, with apologies to the

1  Court.  This is not Schrodinger's injunction.  Judge Smith used

2  Schroedinger's penalties in Simonow.  It's not an injunction

3  that exists and then doesn't exist and then exists, it's not

4  Schroedinger's terminations that exist and then don't exist and

5  then they exist.  These either happen as matters of fact or

6  they don't.  They're not legal constructs.

7       So here, the state's lawyer is saying -- I mean,

8  almost what better evidence would there be if scienter in our

9  favor or lack of scienter -- the state is saying, well, we

10 don't know we'll give you more time, but we'll follow court

11 orders, meaning, not going to be terminated.  And the proof is

12 in the pudding, Your Honor.  Louisiana didn't terminate.  Judge

13 Rabble -- Judge Rabble, I'm sorry.  Judge Grav --

14       THE COURT:  DeGravelles.

15       MR. MARGOLIS:  DeGravelles.  Thank you.  I sometimes

16 trip over the Cajun names.

17       THE COURT:  I can't imagine what people have done

18 with my last name, so I'm --

19       MR. MARGOLIS:  Judge deGravelles.

20       THE COURT:  -- very, very lenient on

21 mispronunciations.

22       MR. MARGOLIS:  I appreciate that, Judge.  And I tried

23 so hard to get it right as I told you.

24       So Judge deGravelles had an injunction in effect all

25 the way through -- going to use my Louisiana timeline, Your

1    Honor, to make sure we're on the same page -- all the way

2    through November 10 of 2022 is when it was dissolved on joint

3    motion, basically, by the state of Louisiana and PPGC pursuant

4    to a settlement agreement.

5            And the -- with -- sorry.  The termination notice was

6    withdrawn.  The settlement agreement says "prospectively

7    withdrawn."  We can accept that language, Judge, even though if

8    I'm not entirely sure what it means.  The reason that we can

9    accept that language is because the injunction was in place.

10   The injunction remained in place until the dismissal pursuant

11   to the settlement, and then the termination notice was

12   withdrawn.  Today PPGC is a provider in good standing in

13   Louisiana Medicaid.

14           The only way that the plaintiffs can proceed with

15   this Louisiana Reverse False Claims Act claim is that if you

16   treat that injunction as if it was a total fiction.  Now let me

17   ask -- let me address an issue because I think a question was

18   raised again about whether or not this issue of continuing the

19   injunction after Kauffman was frivolous in some form or fashion

20   or -- it was not.  The reason it was not is because Louisiana

21   before Kauffman came out en banc, filed for a stay based on two

22   issues.  One was whether Kauffman will -- let's wait and see

23   what the Fifth Circuit's going to do en banc with respect to

24   private right of action.

25           The other issue had to do with sovereign immunity.

1    The state asked for two issues.  So they came back to Judge

2    deGravelles, and they said, well, Kauffman's out.  Judge

3    deGravelles reminded the state, well, hold on a second.  You

4    said there were two issues and the sovereign immunity issue

5    hasn't been resolved yet.

6              So that injunction continued pursuant to Louisiana's

7    request.  The stay of the case -- the injunction continued to

8    an effect until the parties mutually agreed to lift it.  And

9    the notice of termination was withdrawn.

10             There's another provision in the settlement agreement

11   in case it comes up, Your Honor, and I -- it appears to have to

12   have been drafted in some way with respect to concerted action

13   between the -- either the state or the relators and the state

14   of Louisiana, which is obviously not here.  They didn't

15   intervene.  It says the injunction -- the settlement agreement

16   will have no effect in this case or words to that effect.  Even

17   if you were to treat the settlement agreement as if it never

18   happened, which seems to be why the language was included,

19   you're still left with facts.  A fact:  The termination

20   continued until it was lifted by Judge deGravelles.  Fact:  The

21   notices of terminations were withdrawn.

22             So there was no termination in Louisiana, full stop.

23   Now if I could address Texas, Your Honor, because I think, you

24   know, we started down this road when was -- when were the

25   affiliates --

1              THE COURT:  That's right, and so --

2              MR. MARGOLIS:  -- terminated from Texas?

3              THE COURT:  I know I will hear from the federation

4    for a different attorney but here, as counsel for the

5    affiliates, I want to make sure I understand the import of the

6    e-mails that were attached, and I'll run through those and I'll

7    identify them by ECF and let me know how the Court should read

8    that evidence at this stage of summary judgment as it relates

9    to scienter and the reverse false claims.

10             So there is an e-mail dated December 2nd, 2015.  I

11   believe this is at ECF Document 475-13.  And this is from an

12   employee that states that she was, quote, "Not comfortable

13   assuming we will get paid for any claims that happened after

14   termination."  There's a letter attached as ECF Number 475-13.

15   There, it's a letter dated December 15, 2020.  It's from

16   affiliate counsel, I believe, to Texas HHSC, stating that a

17   formal appeal of the 2016 termination was done, quote, "In an

18   excess of caution."

19             There's also attached to the plaintiffs' kit of

20   evidence an e-mail from November 25th, 2020.  This is from a

21   Planned Parenthood employee.  I believe this is the PPST

22   affiliate.  They were awaiting Fifth Circuit ruling.  I believe

23   this document is at ECF Number 475-13, quote, "As we feared, it

24   is an unfavorable ruling."  That affiliate feared that the

25   unfavorable ruling may affect the payments that were at issue.

1            There's another e-mail chain at ECF Number 482-1, and

2    the colloquy there starts in a question/answer format, and, you

3    know, consistent with the Court's orders on redaction, I'm not

4    referencing any staff by name.  But here it is based on my read

5    of the e-mail, a PPFA senior staff attorney:

6            "Question:  Does this stay apply if PPGC elects to

7    continue in federal court?

8            "Answer:  My understanding -- and I'll double-check

9    with the clients -- is that the suspensive nature only applies

10   if you proceed through administrative process."

11           And then at the bottom, "You are correct if Planned

12   Parenthood does not exercise the right to an informal hearing

13   or an administrative appeal that the termination is effective

14   as of October 17, for the other providers October 18."

15           So all of these e-mails reflect an ongoing dialogue

16   about the effect of administrative remedies and whether that

17   triggers an FCA obligation to repay.  Is plaintiffs' reading of

18   these e-mails and the way that this has been briefed to this

19   Court incorrect, and if so how?

20           MR. MARGOLIS:  Yes, Your Honor.  And I will admit up

21   front, I don't have each of the e-mails in front of me, so if I

22   misspeak --

23           THE COURT:  I believe I only cited from e-mails

24   attached to the plaintiffs' briefing.  But if there's a

25   particular one I can repeat a citation.

1          MR. MARGOLIS:  Well, yes, Your Honor, I'm not asking

2    you to do so.  I was just only apologizing in advance if I --

3          THE COURT:  So there intends to be -- there appears

4    to be this internal dialogue among counsel and affiliates and

5    legal officers.  And everybody seems to agree that they need to

6    pursue administrative remedies and that the stays don't have

7    the sort of effect depicted in your chronology here or in your

8    briefs.  I'll allow you to argue against that construction of

9    this series of evidence.

10          MR. MARGOLIS:  All right.  Well, Your Honor, I mean I

11   appreciate it.  I believe the answer for each of those is

12   similar to answers I've previously given with respect to the

13   e-mail we've already looked at with Louisiana.  Each of those

14   e-mails have to do with administrative remedies and whether or

15   not there's a suspension as a matter of administrative law for

16   their right to continue with appeals, right.  I don't believe

17   any of them speak to whether the injunctions, they didn't

18   consider themselves to be subject to injunctions or not subject

19   to injunctions that allow them to remain in the program, much

20   less do they speak to any obligation to repay monies that have

21   already been paid out during the pendency of a court order.

22          Because that's the intent that's required here,

23   right.  The intent that's required here -- even if, let's

24   assume, hypothetically, which we don't believe there is, that

25   there was ever a question about, you know, what would happen

1    later if a Court were to disagree that we can remain in the

2    program, which I don't believe those e-mails stand for, but

3    let's for sake of hypothesis say that they do.

4         None of them speak with the intent that's required

5    under the Reverse False Claims Act, which is, Did we think we

6    would have to pay money back that we obtained during the

7    pendency of those injunctions much less the grace period, which

8    we haven't talked about, Your Honor, but it's critically

9    important that we do.

10        So it's not the scienter that matters for purposes of

11   the False Claims Act.  The scienter that matters for purposes

12   of the False Claims Act is whether or not people at the

13   affiliates believed -- either actually believe -- we actually

14   have a Schutte slide.  Can I have the Schutte slide, please,

15   Your Honor.

16        Oh, I'm asking you.  I'm sorry.  I'm asking -- what I

17   meant to do is ask my colleagues.  I'm going to show you the

18   Schutte slide, Your Honor.

19        THE COURT:  Oh, yeah.  I'm sorry.  I sometimes call

20   this SuperValu and sometimes Schutte.  What is the convention

21   now?

22        MR. MARGOLIS:  I think it's Schutte because I was at

23   argument, Your Honor, but you know what, you can always call it

24   SuperValu if it's easier.  That one we know we're pronouncing

25   properly.

1          THE COURT:  Okay.  For record purposes, let's just

2    all refer to Schutte, which is S-C-H-U-T-T-E, the case recently

3    decided by the Supreme Court.  You may proceed.

4          MR. MARGOLIS:  Okay.  And actually, it's not this --

5    I mean, well, let's go back because there is a temporal aspect

6    that's important.  I mean, obviously, we're talking about here

7    the Reverse False Claims Act but we think it's the same

8    principle that would apply, right?  You don't measure intent

9    after the fact.  You measure intent at the time the claims were

10   submitted.  So, you know, again the question would be, Is there

11   any evidence at the time these claims are actually being

12   submitted pursuant to injunction?  That people thought they

13   would have to pay the money back.

14         But if we could look at now what the Supreme Court

15   actually said about intent, you know the three flavors of

16   intent under the federal False Claims Act, Your Honor, but

17   again we're not talking about materiality here which I

18   understand there's a distinction under Texas law.  I think Your

19   Honor already correctly identified and both Louisiana and Texas

20   interpret their False Claims Act consonantly with the federal

21   False Claims Act.  Actual knowledge.  Did any of our folks

22   actually believe they had to pay money back?  Not a scintilla

23   of evidence of that, Your Honor.  Not a scintilla.

24         Deliberate ignorance or reckless disregard.  Did

25   anybody intentionally avoid taking steps -- well, actually,

1    before we even get that, is there any evidence that anybody was

2    aware of a substantial risk that they had to pay that money

3    back.  Not a scintilla of evidence of that either, Your Honor.

4    These e-mails as we've already talked about relate to questions

5    about the suspensive effect or not in terms of administrative

6    remedies, not -- with respect to termination, not whether or

7    not monies have to be paid back.

8              Reckless disregard is similar.  Folks who are

9    conscious of a substantial and unjustifiable risk they're going

10   to have to pay it back.  Conscious of it.  There's -- I submit,

11   Your Honor, no testimony in this case whatsoever.  In fact,

12   there's the opposite, including declarations from the CEOs of

13   each of the three affiliates, that anybody even conceived of

14   the possibility that they would have to pay the money back when

15   they remained in the program pursuant to court order and the

16   grace period, Your Honor, when we're talking about Texas.

17             Let me just briefly touch on "improperly."  Judge,

18   you know, we -- and we can understand the briefing was

19   voluminous, so in case the Court missed it, we did actually

20   brief, though briefly, what improperly means for purposes of

21   the --

22             THE COURT:  You briefly briefed?

23             MR. MARGOLIS:  Briefly briefed, Your Honor.

24             THE COURT:  You briefly briefed, okay.

25             MR. MARGOLIS:  It's page 50 of ECF 468, but just

1    again to invoke Justice Scalia in textualism, and could I

2    have -- so let's start with the dictionary definition because

3    the statute doesn't otherwise define improperly.  Here's what

4    Black's Law Dictionary has to say about fraudulent or otherwise

5    wrongful.  Now, let me have the text, please, of the federal

6    Reverse False Claims Act.

7            So we have the word "knowingly" three times and it

8    also appears in the affirmative False Claims Act, Your Honor.

9    So submitting claims.  It's statutorily defined knowingly

10   separately.  Knowingly makes uses or causes to be made or used.

11   So that's affirmative act of some kind, right?  Knowingly

12   conceals an affirmative act of some kind.  Knowingly and

13   improperly avoids or decreases.  We don't think there's anybody

14   who's alleging here that we decreased an obligation to pay.

15   That would be as if we thought we had to pay X and we actually

16   paid X minus Y.

17           So what we're left with is knowingly and properly

18   avoids.  Now, Your Honor, I'll submit avoids is an action verb

19   in some form or fashion so mere retention is not enough.  But

20   let's put that aside for a second.  Canons of statutory

21   construction compel this Court to not read improperly as if

22   it's not in the statute.  You're supposed to avoid surplusage.

23           THE COURT:  I knew that was coming.

24           MR. MARGOLIS:  Especially when Congress uses the word

25   over and over again.  It's not like Senator Grassley missed

1    knowingly; he wrote the False Claims Act in 1986, the

2    amendments.  This comes in 2009.  It's actually an amendment; I

3    think that's sponsored by Senator Kyle then of Texas.  And uses

4    the word -- and let's avoid the legislative history, Your

5    Honor, because I know that it can be suspect.  I'm trying to

6    follow Justice Scalia's rules.  He does make a floor statement

7    about it, however, but I'm not even going to get into it.

8              The word has to do some work.  So it's not just

9    enough that you know that you're holding on to money.  It has

10   to be that it was improper for you to do it.  Some type of

11   fraudulent or wrongful intent associated with that.  That is

12   utterly lacking in this case.  About paying the money back.

13             THE COURT:  Okay.  So let me go -- and this --

14   this -- and I thank you for highlighting the prior question

15   about the construction this Court should give to the qualifier

16   improperly.  So in looking through the evidence submitted by

17   counsel, there are a series of e-mails again that just repeat

18   that there is an assumption that -- I think this is an e-mail

19   from December 2nd, 2015, ECF 475-13, "not comfortable assuming

20   we will get paid for any claims that happen after termination."

21   There seems to be an -- a discomfort or a disquiet with whether

22   these claims will be valid moving forward.

23             Is that explained by the chronology that you've set

24   out in these demonstratives that we're simply talking about

25   lawyers talking with their clients about which administrative

1    remedies trigger which obligations, or is this the sort of

2    scienter evidence that the plaintiffs represent and if we are

3    to give a -- you know, if we're to make new law in construing

4    the term improperly, does this not reflect some improper

5    motives during some of the periods at issue whether injunctions

6    are at place or otherwise.  Like is this not the type of

7    evidence this Court should look to in deciding if any of this

8    was improper?

9         MR. MARGOLIS:  We respectfully submit no.  You're

10   probably not surprised by my answer, Your Honor.  I mean, the

11   reason is that it's not whether there's a question out there in

12   the ether about whether it's improper.  The Supreme Court has

13   cautioned as recently as Escobar and maybe even as recently as

14   Schutte, Justice Thomas wrote both.  It's not a general

15   anti-wrongdoing, anti-fraud statute.  Improper is relating to

16   avoiding an obligation to pay or transmit money or property to

17   the government.

18        So what is it modifying?  Did Planned Parenthood

19   improperly -- the affiliates here improperly avoid an

20   obligation to pay money.  All of those e-mails, again as we've

21   submitted to you, relate to suspensive effect as a matter of

22   administrative law as to the terminations and not one -- I

23   think there's at least the one that raises the question about,

24   Are we going to continue to get paid.  Not one relates to, Do

25   we have to pay any money back.  It's not even a suggestion.

1    And I would submit that if the plaintiffs had any evidence of

2    anything close to that they would use it.

3            They deposed a large number of people.  If they had a

4    single deposition, a single snippet of evidence that they could

5    point to that said Ah-ha, so and so knows or suspected they

6    would have to pay money back if the injunctions, you know, were

7    later lifted, you'd see it.  We wouldn't be left to guess.

8    Again it's a fraud case.

9            THE COURT:  So I have your argument on that.  And

10   that's most pertinent to the reverse false claims but before

11   turning to implied false certification and your arguments

12   there, one of this government knowledge defense -- the

13   principle that the government's knowledge of the falsity of the

14   claim can defeat FCA liability?  It's almost like a

15   ratification defense.

16           MR. MARGOLIS:  Yeah.  And to be -- Your Honor, I want

17   to make sure that we -- I'm going to refer at least to Colquitt

18   and from the Fifth Circuit from 2017.  It's not properly

19   understood.  It's not a --

20           THE COURT:  That's exactly the case I'm referring to.

21           MR. MARGOLIS:  Okay, perfect.

22           THE COURT:  How did we have both knowledge and

23   acquiescence or explain to me how Colquitt can apply here --

24           MR. MARGOLIS:  Sure.

25           THE COURT:  -- and what acquiescence you discern in

1    the actions of Texas in this case, not Louisiana but Texas.

2              MR. MARGOLIS:   Sure.   And I'll do that, Your Honor.

3              And I just -- make sure I'm stating it accurately

4    legally.   It's really because it helps to show the defendant

5    reasonably believed that in this instance it would be they

6    didn't have to pay any money back, right?   So it's the fact

7    that if the government knew about it and they didn't do

8    anything about it, it's reasonable for the defendants to

9    believe they didn't have to do anything about it.   I believe

10   that's -- I just want to make sure I'm being clear in terms of

11   how we would rely on Colquitt, right?

12             It's the grace period, Your Honor.   And let's please

13   talk about the grace period.   It's critically important.   Let's

14   start -- I mean I -- Your Honor, we have a slide.   I don't know

15   if it's worth showing you.   We -- from the briefs, we gave you

16   numerous instances both in the Texas code and in cases where

17   the word "grace period" is used.   And when the word grace

18   period is used, it is used to essentially delay something.

19   It's like the difference between -- let's take it in the

20   insurance context.   You stop paying insurance premiums and you

21   have a grace period of X period of time before your insurance

22   coverage lapses.   That's what a grace period is.

23             It's basically saying after a certain event, we're

24   going to continue to provide you, in my instant study used,

25   insurance benefits.   There's no dispute the grace period was

1    entirely voluntary by the state of Texas.  And, Your Honor, it

2    proves that Planned Parenthood was not terminated in Texas

3    before the grace period.  If it was, Texas had no authority for

4    the grace period under -- as a matter of statute.

5           Let's start with our request for the grace period,

6    please, and I'm going to ask my friends here to bring up the

7    letters.  Can I have a time check while they do that?  I want

8    to make sure.  I don't -- that's where I worry.

9           THE COURT:  You have 33 minutes remaining.

10          MR. MARGOLIS:  All right.  Thank you, Your Honor.  I

11   appreciate that.

12          There's been characterizations in terms of what

13   Planned Parenthood actually asked for the affiliates as part of

14   the grace period.  I want to make sure it's absolutely clear

15   from the exhibit itself, and the reference, Your Honor, is here

16   on the slide.  It's ECF 467 at 390 to 397.  So what's the

17   request?  A six-month grace period to allow our patients to

18   take care of urgent health needs during this crisis stage of

19   the pandemic.  That's critical.  It's cast by my friends on

20   plaintiffs' side as if it's just a transition, it's just a

21   transition.  That's not what they requested.  We requested can

22   we continue to see Medicaid patients for six months.

23          Earlier they had asked can we remain in Medicaid.

24   Critically important from a scienter perspective, Judge.  I

25   think there's a brief from our friends who characterize it as a

1    get back into Medicaid.  That is not what the request says.  So

2    I would ask the Court to look at the exhibit.

3            It says remain in Medicaid.  If you're not going to

4    let us remain on Medicaid, six-month grace period, take care of

5    urgent health needs and to allow us to help our patients

6    attempt to find new providers.  I think our letter doesn't even

7    mention the word transition.  Here's the response from Texas:

8    Your alternative request for a grace period will be granted in

9    part.  What's the restriction?  Don't take any new Medicaid

10   patients.  There will be a 30-day grace period from the date of

11   the letter to ensure the current clients receiving services at

12   your clinics can be transitioned to new providers.

13           It doesn't even say you must transition them.  The

14   idea of the grace period is, We're not going to leave these

15   patients high and dry through what's essentially a sudden

16   termination.

17           So we receive the grace period from HHSC.  There's no

18   legal authority under the Texas code to give us a grace period

19   if we've already been terminated.  Zero.  And if I could have

20   the code provisions, please.

21           Mr. Bowen admitted as much, the former inspector

22   general.  So a couple of examples here on this slide, Your

23   Honor.  Texas administrative code, a person's enrollment

24   agreement is nullified on the effective date of the

25   termination.  If our provider agreement was nullified before

1    the grace period, we can't have a grace period.

2           Once a person's enrollment agreement is terminated,

3    no services furnished are reimbursed by Medicaid during the

4    period of termination or cancellation.  Well, we were providing

5    services and we were being paid for them.

6           The critical, Your Honor, here's the notice of

7    termination, the final notice upon which plaintiffs so heavily

8    rely.  We will be required to reenroll if you wish to

9    participate as a Medicaid provider.  Your Honor, there's no

10   reenrollment here.  There is no evidence, not a scintilla that

11   the affiliates ever sought reenrollment.  Why would the

12   affiliates -- and there's a whole process for reenrollment by

13   statute.  There was no reenrollment here.

14          And, of course, we know that Texas, the state itself,

15   has said they're not even seeking any civil penalties or

16   recovery for services delivered during the grace period.

17   There's more evidence, Your Honor, what did the state of Texas

18   itself during a 30(b)(6) admit at deposition, which is a

19   binding admission for purposes of this case?  They said it both

20   in -- on behalf of the state and on behalf of HHSC.  This is

21   ECF 467 at 251 through 52 and 256.

22          "Question:  The Texas affiliates were enrolled in

23   Texas Medicare" -- should be Medicaid, Your Honor, but --

24   "Medicare during the grace period, correct?

25          "Answer:  That's correct."

1              That alone means we weren't terminated, Judge.  That

2    alone means we weren't terminated.

3              "HHSC understood that if a grace period was granted,

4    the Texas affiliates would continue to see Medicaid patients,

5    right, during the grace period?

6              "During the grace period, is that correct?

7              "That's correct."

8              Goes on to say, "Would you allow a provider to remain

9    enrolled even if it was going to provide services in a legal

10   manner?

11             "No.  I believe HHSC would not allow a provider to

12   remain enrolled if they were not going to deliver those

13   services in a legal, ethical, safe manner.

14             "Didn't do that with respect to the grace period?

15             "We were trying to ensure a continuity of care for

16   Planned Parenthood clients."

17             There's your government knowledge defense among other

18   things, Your Honor.  As a matter of state law, before we even

19   get into scienter, why would the affiliates remotely think that

20   they had been terminated before the grace period when they get

21   the grace period?  Not in evidence.  I mean, again this is not

22   Schrodinger's termination.  It doesn't exist and then disappear

23   and then come back.  It's not alive and dead at the same time.

24             So absent any reenrollment, absent any meeting of any

25   of the requirements, the state said, Stay in the program 30

1    more days, see patients.  And this issue about supposedly we

2    didn't transition patients even if that remotely matters, Your

3    Honor, we did.  And there's evidence.  There's testimony from I

4    believe one of the CEOs that they handed out cards to patients

5    who came in saying, you know, you're going to need a new

6    provider.  There was one witness for PPGT, Mr. Lambrecht --

7    probably shouldn't have said his name in open court.  The CEO

8    of PPGT, who testified that he couldn't remember.  He knew

9    there were efforts to transition but he just couldn't remember

10   as he sat there that day what they were.

11         Trans -- even again just to chase this theory for one

12   more second, Judge, that the relators put up about

13   transitioning, there's no objective measure of transitioning.

14   So they may subjectively believe we didn't do enough to

15   transition but there's no evidence that there was no effort to

16   transition.  And for what it's worth, Judge, there's no such

17   thing as a CPT code for transitioning.  You don't bill Medicaid

18   to transition.  There's no evidence that the affiliates billed

19   for transitioning.

20         We billed for the health care services that we

21   provided to needy Texans during that 30-day period.  And then

22   after that 30-day period or perhaps just before the expiration

23   Your Honor, I want to make sure I don't misspeak on the

24   chronology, went and sought the -- the action in state court,

25   so I got a TRO, that TRO was lifted.

1              And this idea that there's evidence that we were

2    trying to stay in Medicaid, yes, of course, the affiliates were

3    trying to stay in Medicaid.  We dispute the idea it's because

4    we were trying to line our pockets.  The evidence collectively

5    shows for the grace period that the affiliates billed less than

6    $100,000 altogether.

7              But even if -- I mean, so we would say, of course,

8    and as witnesses testified it was because we wanted to continue

9    to serve needy Texans.  There's even evidence that one of the

10   affiliates continued to serve needy Texans without billing for

11   it.  That's not consistent with lining pockets.  But, Your

12   Honor, just for a moment, let's assume -- let's hypothesize

13   this is a for-profit corporation.  Certainly here, that's not

14   even an improper motive.  It's not true in this case but

15   attempting to increase your revenues is not improper.

16             So I think, Your Honor, we've hopefully disabused

17   this sort of lying about the grace period and shown you what

18   the actual import of the grace period is.  It proves there's no

19   termination.

20             Another key piece of evidence, Your Honor, what to do

21   with the managed care organizations and how they acted.  Very

22   quick, managed care organizations, over 90 percent under

23   Medicaid.  These beneficiaries are members of the MCOs, and so

24   I won't -- I won't take time arguing it but I wanted to make

25   sure we at least preserve it.  There's a whole separate issue,

1    of course, about given the way that MCOs work, which we

2    briefed, whether there really can be any false claims here

3    because the MCOs aren't paid for the state based on services;

4    they're paid on the state based on capitation and per patient.

5           But here's what I want to focus about -- focus on.

6    Okay.  So let's take this slide down.  The slide that I want on

7    to get to is to show the instructions that the state actually

8    issued to the MCOs about when to stop payment.  Right, the MCOs

9    work for the state.  So the MCOs will take their instructions

10   from the state as to when to stop billing.  Texas notified the

11   MCOs on March 19th of '21 were terminated effective March 11th.

12          So that shows not only government knowledge and again

13   it's important for scienter purposes, but that shows where

14   Texas believed the actual terminations took place.  Not the

15   legal fiction that's being advanced before Your Honor but as a

16   matter of fact, is when they told the MCOs to stop paying.

17   Also important, what did the state represent to the Fifth

18   Circuit?  This is pending on bank.  It's the first bullet, Your

19   Honor.  They use future sense.  They were attempting to lift

20   the injunction pending on bank review.  And they argued there

21   is no justification for continuing to what, prevent the state

22   from terminating.

23          Again, it's not Schrodinger's termination, Judge.

24   Here they've told the Fifth Circuit stay these injunctions that

25   are preventing us from actually terminating these affiliates.

1           Okay.  So, Judge, that's the evidence that shows you

2    as a matter of fact in Texas the terminations didn't actually

3    happen until March of 2021, more specifically March 10th of

4    2021.  And what happens then.  The affiliates stop billing

5    Medicaid.  There's no evidence of a single bill being submitted

6    after the deadline.  Not one.  Evidence again not of improper

7    purpose but of actually following the law.  They stopped

8    billing when they were told to stop billing.

9           THE COURT:  Okay.  So let's turn to implied false

10   certification theories at issue in the case.  So here if you

11   turn to the Kauffman opinion from the Fifth Circuit and

12   specifically Judge Elrod's concurring opinion, there's -- I

13   note that there's no evidence of deceptive editing or that the

14   video is unreliable as a basis -- as a bases for termination.

15          Did I miss anything in the briefing or the evidence

16   that would -- that would draw that conclusion into question?

17   And I wouldn't entice disagreement with a Fifth Circuit judge,

18   but is there anything that I'm missing in the evidence or in

19   the argument before the Court that would suggest that this was

20   not a basis for termination, that there was some deceptive

21   editing or anything that would affect the weight both Texas and

22   Louisiana give to the videos at issue?

23          MR. MARGOLIS:  So let's put aside whether the

24   question of deceptive editing for a moment, Your Honor.  To our

25   mind, the issue is whether the videos were sufficient in order

```
 1    to terminate.  Which I think, frankly, is not for an implied
 2    false certification with respect to the court, it's not really
 3    the right question and I'll explain why in a moment.
 4           But with ample respect to Judge Elrod and not meant
 5    as a criticism, it's a concurrence.  It's not even joined by a
 6    majority of the en banc court.  It's seven judges, I believe,
 7    and I believe Judge Dennis joined by another one of his
 8    colleagues would have gone the other way.  And the majority
 9    opinion, the actual opinion of the court itself, says
10    absolutely nothing about the merits of the underlying
11    termination.  And in fact even in Judge Elrod's concurrence,
12    there it's couched in the context of administrative law.  It's
13    not independently whether or not for purposes of a fraud case
14    this would render claims impliedly false.  It's couched in
15    terms of is -- was Texas' termination decision as a matter of
16    administrative law arbitrary and capricious.
17           That's the only context in which it comes up.
18           THE COURT:  So how is this Court supposed to
19    determine what you characterize as objective falsity?  So I
20    take it that your view is the Court -- this Court should lean
21    on CMS' view of your qualification as a provider.  I also have
22    plaintiffs' arguments.  So if this Court is tasked with
23    ascertaining objective falsity, how exactly should the Court
24    weigh that in the context of implied false certification theory
25    and whether representations to Texas and Louisiana were
```

1    material?  Should I lean on CMS?  Should I lean on what the

2    court said about your qualifications in Kauffman.  What

3    would -- what would defendants have this Court do in trying to

4    ascertain the objective falsity of alleged misrepresentations

5    or certifications made to the states Louisiana and Texas.

6              MR. MARGOLIS:  And thank you for the question, Your

7    Honor.  Again we'll start with first principles right under --

8    well, it's actually not Escobar but other cases that have

9    certainly held objective falsity requirements, including I

10   believe the Fifth Circuit had referred to it -- I'll get it.

11   Oh, well, I'll get it, Your Honor.  Riley, I think, talks about

12   it in the context of judgments about which reasonable minds may

13   differ.  We already know reasonable minds differ.  You've got

14   Judge Sparks who found not a scintilla of evidence to support

15   the terminations.  You have Judge deGravelles who used similar

16   language with respect to calling -- well, we could put the

17   quote up very quickly but calling it, you know, raising

18   questions and concerns about the underlying -- whether or

19   not -- sorry, the videos provided the evidence.

20             The apparent fragility -- this is the quote, I'm

21   sorry, Your Honor.  "The apparent fragility of the second

22   termination letter stated reasons raise another specter for not

23   one appears to be a supported factual allegations of the kind

24   of fraud and ill practice with which the Louisiana False Claims

25   Act is concerned."  Judge Livingston, "Great cause by the

1    underlying facts."  You have jurists who are disagreeing about

2    whether or not these -- the video presented a basis for a

3    termination substantively.  So what is -- again if we're

4    talking about an objective yardstick, there's some pretty

5    compelling evidence here.  There's no objective yardstick.  But

6    I'll go further, Judge.  Both Mr. Bowen and Dr. Spears at

7    depositions couldn't point to any specific underlying medical

8    ethics.

9              THE COURT:  And that was my next question, whether

10   failure to disclose to the states Louisiana and Texas certain

11   ethical shortcomings would be the sort of predicate for an

12   implied false certification claim, and if ethics are not

13   enough, what is enough?

14             MR. MARGOLIS:  Okay.  So couple of things there, Your

15   Honor.  Now, to be clear, first of all, we don't concede for a

16   moment that there actually was any violation.  In fact,

17   Mr. Bowen, under questioning actually by me, admitted there was

18   no evidence of any actual violation.  And if I could have --

19   and I'm worried about my time, Your Honor, but if I may

20   continue to --

21             THE COURT:  You have 15 minutes remaining.

22             MR. MARGOLIS:  All right.  Thank you.

23             If I could have -- so let's see what Mr. Bowen had to

24   say.  He wrote the termination letter.  You watched the videos,

25   I believe he testified multiple times.  So he was asked a

1    series of questions about whether there was an actual

2    violation, an actual violation.

3           Name a single doctor who altered an abortion

4    procedure to obtain fetal tissue?  Can't do it.  Single

5    patient.  Can't do it.  Single date of service where it

6    actually happened, can't do it.  Nothing on the video where an

7    abortion procedure is actually being performed, that's correct.

8           So I believe where he left it was a willingness to do

9    these things, these alleged acts but not an actual violation.

10   The False Claims Act requires an actual violation of some kind,

11   an actual violation of an objective standard that renders a

12   claim false.

13          Could I have the slide that shows Escobar, please?

14   Because again we're talking about an implied false

15   certification claim here, Your Honor, and there's been

16   representations from my colleagues about these -- again, using

17   the word "representation" twice; it's a little bit like briefly

18   briefs.

19          Representations or arguments from my colleagues about

20   the representations on the bills.  Your Honor, they don't --

21   haven't given you a single bill to look at.  We're at summary

22   judgment.

23          Where is the bill that supposedly includes these

24   representations on it?  They represent to you that every time a

25   provider bills they have certified that they're following the

1    entire universe of regulations.  I would -- when we're -- in a

2    world where we're concerned about overreach of the regulatory

3    state if we're talking about the Medicare/Medicaid rules, I

4    don't know that you could see me if I was going to print them

5    out and put them out in front of me.  And they just blithely

6    assert when you bill you certify you've complied with

7    everything without showing you a single representation that

8    actually does that.  Not one.  Not even a bill.  Not even in

9    evidence.  Not one.

10           So what did Escobar when Escobar recognized implied

11   false certification theory, you know, Judge -- Justice

12   Thomas -- excuse me -- was fairly specific about what it means

13   and what it doesn't mean.  Where a defendant makes

14   representations in submitting a claim but admits violations of

15   statutory regulatory contractual requirements, those admissions

16   can be the basis for liability if they render the defendants'

17   representations misleading with respect to what, the goods and

18   services provided.

19           Your Honor, this is Medicaid.  Abortion services

20   aren't reimbursable.  So here you're saying that without giving

21   you a single bill, without showing you a single representation,

22   they're saying that we made representations that are apparently

23   false, not related to the services that actually were provided,

24   so things like cervical cancer screenings as we've talked

25   about, well health visits, et cetera.  But services aren't even

1  covered by Medicaid.  And they can't give you a single

2  violation that actually happened.  No evidence of one.  Just

3  concerns and willingness.

4        Again we're not here to debate whether or not that

5  may or may not justify a termination.  We've already shown you

6  multiple jurists who raised questions about whether really it

7  would justify a termination as a matter of law, and obviously

8  you heard from the federal government that says we don't

9  believe it would, but that's not what this is about.  We're in

10 a False Claims Act case, it's a fraud case.  So principles of

11 fair notice and to prevent us from being subjected to unfair

12 liability, that's why the objective falsity requirement exists.

13       Now, Your Honor, I want to make sure because you

14 raised Westinghouse as a materiality point but I -- I'm very

15 familiar with the case so I wanted to make sure I at least

16 address it because I don't think it's something we talked about

17 before.

18       So Westinghouse, it's implied -- I'm sorry -- it's a

19 fraudulent inducement case from the Fourth Circuit.  First of

20 all, there's no fraudulent inducement claim here at all, but be

21 that as it may, it included in a definition of materiality.

22 And with respect to the court and suggested at least in that

23 case, maybe even if the agency did something that's completely

24 contrary to the allegation in materiality, they might still be

25 materiality.

1           That's pre-Escobar.  The Fourth Circuit didn't have

2     the benefit of Escobar.  Justice Thomas -- and again this was

3     because there were a lot of concerns about how implied false

4     certification could subject defendants to who knows what.

5     Raise the question of materiality.  And not only said it was a

6     vigorous requirement, said it had to be enforced significantly.

7     So you have to look to the actual conduct of the recipients of

8     the representations.

9           So what did they actually do?  And I'll give you one

10    better, Your Honor, I'll give you another Supreme Court justice

11    although it was before he was on the bench.  In U.S. ex rel.

12    McBride v. Halliburton in the DC circuit, then Judge Kavanaugh

13    now Justice Kavanaugh had said and held we -- post Escobar, we

14    have the benefit of hindsight.  We can go and actually look at

15    what the states actually did.  We don't just guess about

16    whether it's something that could influence them or not.

17          And so what do we have as evidence here?  We have the

18    grace period.  We have testimony from the state where the state

19    says -- as I think we've already shown you -- we would never

20    have allowed the grace period if we thought these were unsafe

21    providers or they were unethical.  They weren't going to

22    provide the services in a legal safe and ethical manner.  I

23    believe is the actual testimony.  That's what the state has

24    told you.

25          THE COURT:  So what are the post Escobar -- as I

1    looked through the table of cases for both plaintiffs and

2    defendants, what are the bookends for the post Escobar cases,

3    deciding this materiality question where you have an implied

4    false certification claim and it's rooted in the idea that you

5    failed to disclose to the relevant governmental entities

6    something that would have affected your qualification to serve?

7    But to use my father's corporation as an example.

8    Lockheed Martin has multiple divisions, some dealing with UAV,

9    some dealing with the Joint Strike Fighter program.

10              If one of those divisions has an ethical violation

11   because they were doing something in the land armament division

12   that was unknown to the aerospace division, at what -- what are

13   the bookends advising this Court of how much connective tissue

14   and how strong that connective tissue must be between the

15   failed disclosure and conduct and the services performed?  At

16   what point -- what are the bookends, the most tenuous example

17   of connective tissue to the strongest example, what -- what

18   would defendants point this Court to -- to try to navigate that

19   spectrum post Escobar, if you understand the question.

20              MR. MARGOLIS:  So, Your Honor --

21              THE COURT:  That was a terribly long question.

22              MR. MARGOLIS:  No, it's fine.  I mean, I actually do

23   a lot of work with defense contractors, so they're not with

24   Lockheed.  So at least I'm familiar with what you're

25   discussing.  I think that Justice Thomas actually in the first

1    instance of giving you some of that guidance that we've shown
2    you.  In order to make this doctrine not limitless, the alleged
3    misrepresentations have to be tied to the bills -- sorry, the
4    actual services or goods that are being billed.  So to use your
5    example, gosh, I don't know Lockheed well enough, but to use an
6    example of -- I'm just going to use hypothetical.  So they've
7    done something -- alleged they've done something wrong or
8    something unethical with respect to the Joint Strike Fighter.
9    And they're providing goods and services with respect to an
10   entirely different program.  You look to what are the
11   representations on that bill that are being alleged to be
12   false.
13          So that other program and is there some sense in
14   which the alleged misrepresentations or ethical lapses on the
15   Joint Strike Fighter would have any impact with respect to this
16   entire other program?  It's not really any impact; that's too
17   broad.  It's whether or not it would cause them not to pay the
18   claims, not to pay the claims; that's what we're talking about
19   because it's the False Claims Act, right.
20          I mean, here's a good example, Your Honor, and it's
21   one -- they rely on and actually I think it's more helpful to
22   us than not and it's a Lemon.  They cite Lemon from the Fifth
23   Circuit as if it's a qualifications case.  It actually fits
24   very neatly in Escobar.  So the bills in Lemon were about --
25   oh, gosh, Your Honor, I'm sorry, I'm having a mental lapse.

1    It's hospice services.

2          So the claim is submitted for hospice services and

3    then the question in the allegation was that none of the

4    underlying requirements necessary to provide hospice services

5    were met.  For example, a face-to-face-actual meeting with a

6    patient.

7          Well, if you bill for a hospice service, you were

8    implying that you've met the requirements necessary to bill for

9    a hospice service.  And so in that instance, the Fifth Circuit

10   again fairly straightforwardly said, again, this is Escobar;

11   this makes sense.  If you're going to bill, when you bill for

12   hospice service, you're impliedly representing you've done the

13   things you need to do in order to bill for a hospice service.

14   It's really the simplest is if you bill for a gun -- I mean the

15   simplest example of a defense contractor situation.  If you

16   provide a gun, you bill for a gun, you're representing the gun

17   shoots.  That's an implied representation that the gun

18   shoots -- not that some helicopter doesn't fly or there's some

19   ethical lapse relating to the FCPA -- I'm just giving you a

20   hypothetical -- that's the gun shoot.

21         Here, the services are --

22         THE COURT:  So before it was Lockheed Martin, it was

23   general dynamics.  They have an electric boat division that

24   makes submarines, they have a land division that makes the M1A

25   rooms, and they obviously have a tactical fighter division that

1    made the F16 and other aircraft.  It's your reading of Escobar

2    that this Court should look to the tether of the bill itself

3    and the service provided, and because we're dealing with

4    multi-tiered defendant corporations, if there isn't connective

5    tissue between the service provided, the bills submitted and

6    the division, it may not matter that electric boat has

7    submarine problems with the DOD and land division does not

8    vis-a-vis the M1.  And I -- I'm only seizing this metaphor

9    because you stated that you have some experience with defense

10   contractors.

11          But in a world where there is just volume after

12   volume after volume of regulation and requirements that the

13   materiality inquiry has to be that precise and you think

14   Escobar has been applied that way to multi-tier organizations

15   such as your own client in this case.

16          MR. MARGOLIS:  Yes, Your Honor.  I mean, let's take

17   the example again to pull the thread a little further on the

18   defense contractors, the federal acquisition regulation.

19   It's -- it's multiple volumes.  It's immense.  Before you even

20   get to the defense federal acquisition regulation supplement,

21   et cetera, if you bill every time -- every time you bill you're

22   not billing that you're complying with everything in that book

23   or those books.  So in order to make it to avoid due process

24   concerns, it's -- again, we'll get back to the salty estuary.

25   This is a quasi-criminal statute.  They have to be tied to what

```
 1    you're actually billing for.  So your example, the submarine
 2    division maybe there could be a False Claims Act claim maybe
 3    depending on what was billed by GD for the submarine division
 4    in their submarine bills.  But not for these other unrelated
 5    programs.
 6              And, Your Honor, let's take the facts of this case.
 7    We haven't talked about this much yet.  You know, multi-tiered
 8    organization, I think my colleagues will have something to say
 9    about that certainly with respect to PPFA, but all you have
10    here is evidence of which we would disagree with but in terms
11    of potential affiliation between the affiliates for purposes of
12    termination, but PPST and PPGT never participated even in a
13    fetal tissue study.  So they're being alleged to have submitted
14    implied false certification claims for something that not only
15    can they not prove that PPGC ever did but they would concede
16    that PPST and PPGT never did.
17              Let's take Louisiana.  PPGC doesn't provide abortions
18    in Louisiana.  Never -- to my knowledge, never has, certainly
19    not to the relevant period.
20              So again there are significant concerns with this
21    expansive view of implied false certification liability.  Your
22    Honor, can I at least address conspiracy and excessive fines in
23    passing?  I mean, I want to make sure I answer all your
24    questions.  I don't want the red light to suddenly come on.
25              THE COURT:  Yes, right.  And we don't have the
```

1    stoplight in this courtroom so I apologize for that.  So you

2    have two minutes --

3            MR. MARGOLIS:  Oh, not at all.  I just wanted to make

4    sure I gave you what -- yeah.

5            THE COURT:  You have two minutes remaining.  I'll

6    extend your time to allow you to get to those two points, but I

7    do want your last statement to the Court raises the issue of

8    control and affiliate defendants versus PPFA.

9            MR. MARGOLIS:  Sure.

10           THE COURT:  So we've heard some textualism

11   construction of this 3729(a)(1)(G) statute which has two

12   clauses and now I'll hear your argument for why that section in

13   its first clause does not give rise to sort of indirect

14   liability from the work of affiliates or at least why these

15   plaintiffs haven't shown cause there.  I know and I have your

16   argument about why that terminology of cause and causation

17   doesn't apply with equal force to the second clause or Clause

18   2, but let me hear your best argument on why this Court should

19   not find that you caused -- that PPFA did not in any way cause

20   the affiliates who did the wrongful conduct.  Explain to me why

21   I should divide up affiliate liability that way.

22           MR. MARGOLIS:  Sure.  Your Honor, and I'm by no means

23   dodging but since I don't represent the federation, I don't

24   want to steal Mr.  Metlitsky's thunder.

25           THE COURT:  We can take it up then.

1              MR. MARGOLIS:  I think we can state with respect to

2    the affiliates, there's no evidence before you that any of the

3    affiliates control one another, right.  So I believe the

4    undisputed evidence is they're separate entities.  They are

5    part of the same membership organization.  They have a

6    common -- you know, share a common brand.  But I don't --

7    there's no evidence in the record that -- and I'm speaking for

8    the affiliate that even one of them caused any of the others to

9    not pay an obligation.

10             THE COURT:  Okay.  So I have that argument and I

11   assume you would disagree with Ms. Hacker on an obligation to

12   pay versus defendants' obligation to pay.

13             MR. MARGOLIS:  Yes.

14             THE COURT:  That's their construction of care mark.

15   I assume you disagree with that.  I have your briefing on that,

16   so I'll allow you --

17             MR. MARGOLIS:  Mr. Metlitsky is going to address that

18   I think a little bit more.

19             THE COURT:  Okay.  So I'll allow you to close with

20   the last two items in your two minutes.

21             MR. MARGOLIS:  Thank you, Your Honor.

22             All right.  So I mean, one other point I think I need

23   to raise, it's a procedural point but it's an important one

24   because we've been talking about the separate affiliates and we

25   moved under implied false certification for summary judgment in

1   our favor for PPGT and PPST, they didn't oppose it.  There is

2   nothing in their oppositions that opposes our motions for

3   summary judgment based on what we've already talked about,

4   which is they didn't actually do anything.  They didn't violate

5   anything.  So we think that's enough grounds in and of itself

6   procedurally under Fifth Circuit precedent, Savers Federal

7   Savings & Loan Association vs. Reetz, to find at least in favor

8   of those two affiliates, although we think we're entitled to

9   far more than that, obviously.

10         Okay.  Your Honor, there's one other -- if I can beg

11  the Court's indulgence, there's one other piece of evidence I

12  think it's important that I point out.  It's going to be

13  Slide 39.  It's one last issue.  There's an allegation here

14  that somehow PPGC lied to Louisiana and didn't tell Louisiana

15  that they had been terminated from Texas, right?  We disagree

16  with that because there's evidence in terms of disclosures that

17  were made to Louisiana about the Texas proceedings, but here's

18  what's most important from a materiality standpoint.  And

19  remember, Your Honor, as we've already discussed Louisiana,

20  withdraw its termination notices.  They withdraw, there was no

21  termination.

22         Even if we didn't tell them, the relator and the

23  state did.  The relator filed a complaint on February 2nd of

24  2021, and they -- here we've got their complaint, relator

25  voluntarily disclosed this information to the United States and

1    the plaintiff states.  They gave them a copy of their

2    complaint.  Their complaint says we were terminated.  It has

3    all the theories that we're talking about before you, and

4    Louisiana was told by the relator.  And what did the state do?

5    They withdrew the termination.

6            We've got in September 19th, 2022.  This is part of a

7    motion, by now it's Louisiana that's attempting to lift the

8    injunction that was in effect.  What did they say to Louisiana

9    on September 19th, 2022?  In short, PPG's termination by Texas

10   is completely final.  And what did the state of Louisiana do

11   after that?  They withdrew the termination.  They have an

12   insurmountable materiality.  And it's an unpled theory, Your

13   Honor, it's not even in their complaint.  But this theory that

14   we lied to Louisiana about Texas and therefore that's false or

15   fraudulent.  Well, we know what actually happens when the state

16   is told, and when the state is told, they withdraw the

17   termination notices.

18           Okay.  Conspiracy, very quickly, Your Honor, I mean,

19   first of all, there's no -- unlike criminal 18 U.S.C. 371,

20   which from your time I'm sure, you know, as prosecutor and of

21   course as a judge hearing lots of criminal cases and myself as

22   a prosecutor, it's an offense that exists in and of itself.

23   But that's not true if it's civil conspiracy and not under the

24   False Claims Act, so they have to be underlying violations, and

25   we think we've hopefully persuaded you, but there are no

1    underlying violations so there can be no conspiracy.

2            But even more importantly, Your Honor, unlike other

3    aspects of the civil False Claims Act, and I believe you've

4    alluded that -- to this in your questioning.  There has to be

5    an agreement to violate the law.  There has to be an agreement

6    to submit false or fraudulent claims.  There has to be an

7    agreement by two or more persons to not pay monies back that

8    they know that they have to pay back.  There's no evidence of

9    that.  There's absolutely no evidence of that.

10           We're not talking about individuals who work at the

11   affiliates because you can't conspire with yourself.  There's

12   no evidence that any of the affiliates conspired with each

13   other to not pay money back that they knew they had to pay back

14   and there's no evidence that the affiliates conspired with the

15   federation.  You know, there you need an actual specific

16   agreement to violate the False Claims Act and there's no such

17   evidence in this case.

18           Lastly, on excessive fines, Your Honor, I can make

19   this very brief, it's premature.  I mean until you -- again, I

20   mean, if we have persuaded you we'll never reach the point

21   of -- the question of excessive fines, but in any event, there

22   are all kinds of questions that would have to be resolved to

23   get to excessive fines.  What -- how many -- how many penalties

24   are there?  How many -- and we're talking about Reverse False

25   Claims Act liability, it probably will not surprise the Court

1    that our assertion is if there is even a valid theory here,

2    which we obviously don't believe.  There's only one violation.

3           They say that the obligation arose -- it arose, I

4    guess, presumably, when Kauffman was vacated, so there's one

5    failure to pay the money back, not thousands.  I would

6    factor --

7           THE COURT:  I've already mentioned that, you know, in

8    the event we cross this bridge the Court will likely order

9    supplemental briefing --

10          MR. MARGOLIS:  Right.

11          THE COURT:  -- and so I assume that you'll have

12   arguments about the denominator, the multiplier and other

13   points.

14          MR. MARGOLIS:  And In re Xerox, Your Honor, just to

15   avoid any doubt, specifically does refer to constitutional

16   limitations under the Texas State Constitution Excessive Fines

17   Provision applied to civil penalties like the Texas False

18   Claims Act.  So in case it matters, we just want to make it

19   clear that actually the Texas does apply excessive fines to --

20          THE COURT:  I have your argument.  Thank you for

21   excellent briefing and oral argument.  The Court will now

22   recess for five minutes to allow Mr. Metlitsky to set up and

23   prepare his argument.  I believe you have preserved 30 minutes

24   of time, is that correct?

25          MR. METLITSKY:  25.

1          THE COURT:  Okay, 25.  So let's take a brief break.

2     Let's reset the courtroom for that, and then we'll resume

3     promptly at 3:25.

4          MR. MARGOLIS:  Thank you for the additional time,

5     Your Honor.

6          THE COURT:  Okay.  Sure thing.  The red light was on,

7     but I gave you every indication I was indulging it.  So no

8     violation, no harm, no foul.

9          MR. MARGOLIS:  I appreciate it.

10          THE COURT:  So let's take that brief recess and then

11     resume promptly at 3:25.

12          (Off the record at 3:16 p.m.)

13          (On the record at 3:30 p.m.)

14          THE COURT:  And the Court is back on the record in

15     2:21-CV-022-Z for continuation of the hearing on the pending

16     motions for summary judgment.

17          Mr. Metlitsky, you may proceed and you have 30

18     minutes on the clock.

19          MR. METLITSKY:  Thank you, Your Honor.  And if I

20     could get a time check at 20 minutes with five minutes left in

21     my time, I'm going to give Mr. Ashby five minutes also.  Thank

22     you, Your Honor.  May it please the Court.

23          The first thing I want to say is just, as you know,

24     and I want to make clear that we join in all of the affiliate's

25     arguments, and since our liability depends, in part, on their

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

1    liability, we hope you rule in their favor which would require

2    ruling in our favor.  I'm here to talk about arguments that are

3    unique to PPFA, independent of the arguments concerning the

4    affiliates.

5            And I wanted to start with I think the question you

6    sort of ended with, about evidence of control and its relevance

7    to the causing liability.  And just as a clerical point, I

8    think the other side would agree with me.  I think for the

9    implied false certification they're relying on (a)(1)(A), not

10   (a)(1)(G) which includes similar causation language.  But the

11   result is the same either way.

12           The answer to your question is no.  Evidence of

13   control is not relevant to that question -- or evidence of

14   general control.  But before getting to that I just want to

15   sort of make clear that their evidence of control is, I would

16   say, overstated, really nonexistent because it doesn't account

17   for the way that PPFA is organized.  All agree that PPFA and

18   its affiliates are separate corporations.  PPFA is a membership

19   organization.  The affiliates are members of PPFA.  Nobody

20   argues that there's any kind of veil piercing or anything like

21   that.  Their argument is just there's corporate separateness

22   but there is nevertheless some amount of control that they

23   think is relevant to -- to PPFA's direct liability.

24           The problem with that is they're using a construct --

25   they're assuming a construct like a parent-subsidiary

1    relationship in which the parent ultimately dominates the sub,

2    right.  And so it can exercise control just as a matter of

3    fact.  The problem is that's not true of this organization.

4    Affiliates also exercise control over PPFA.  In fact, they

5    exercise substantial control.  Most important, they are the

6    ones that can amend the bylaws, can amend all the rules.

7             So they have ultimate authority over the scope of

8    PP -- what PPFA can do.  Now their main evidence of control is

9    the fact that PPFA runs this accreditation process to ensure

10   that the affiliates are complying with the standards of

11   affiliation.  But that's by virtue of the bylaws which -- over

12   which the affiliates have ultimate control, and they also have

13   ultimate control over the standards of affiliation themselves.

14            So the fact that the affiliates have delegated to

15   PPFA authority to conduct the accreditation process doesn't

16   really make sense as evidence of control in any -- any relevant

17   way, since the affiliates ultimately have the control.  But so

18   I think as a factual matter you shouldn't look at that kind of

19   evidence of control.

20            But now assume, forget everything I just said so that

21   I can answer your question.  If you think there is evidence of

22   control, which again, we disagree with, the answer to the

23   question is no.  I think the basic -- evidence of control of

24   let's say a subsidiary which this is not, but assume it was,

25   evidence of control of subsidiary goes only to derivative

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

 1   liability, not to the parent's direct liability.  That

 2   principle is set forth in Best Foods.  And the quote -- I think

 3   the best quote from page 68 is just "Control of a subsidiary,

 4   if extensive enough, that is, if it rises to the level of veil

 5   piercing, gives rise to indirect liability, not direct

 6   liability."

 7           And the reason that's so is because the doctrine of

 8   corporate separateness assumes a substantial level of control,

 9   the natural kind of control that a parent exercises over a sub,

10   and nevertheless says the parent cannot be held liable unless

11   you cross the threshold into veil-piercing land, right.

12           And so if you allowed evidence of control of a

13   subsidiary to establish the parent's liability when that

14   evidence of control does not cross the line into veil piercing,

15   you would be undermining the principle of corporate

16   separateness.

17           Now I don't think that completely answers your

18   question because Congress, of course, can alter that rule if it

19   wants to, and I'm understanding your question to be whether

20   that causation language affects that -- that result.  And the

21   answer to that is no for two reasons.  The first is sort of a

22   doctrinal reason, the second is a sort of a first principles

23   reason.  So the doctrinal reason is just that it's undisputed

24   what the standard for causing a false claim is.  I think we

25   actually agree with the other side about that.

1          We quote from the Hockett case from the BBC.  The
2    question is whether the -- whether the parent was directly
3    involved in submitting false claims or causing them to be
4    submitted, that is directly involved in the claims process.
5    And I'm quoting from that case again.  "Being a parent
6    corporation of a subsidiary that commits an FCA violation
7    without some degree of participation by the parent in the
8    claims process, is not enough to support a claim against the
9    parent."

10         So evidence of control over the subsidiary, sort of
11   general evidence of control, is just irrelevant to whether the
12   parent has caused the subsidiary to file a false claim.  You
13   need evidence of actual participation in the claims process,
14   and I can get back to that in more detail when we talk about
15   the implied false certification claim.

16         The sort of bigger picture first principles argument
17   is, as I said before, the effect of looking at evidence of
18   control -- general control over a subsidiary to hold the parent
19   liable, if it doesn't cross the threshold into veil piercing,
20   would have the effect of sort of diluting the protections of
21   corporate separateness, and as Best Foods held, you don't
22   assume, absent a very clear statement that Congress intended
23   not just to abrogate some common law rule, but really the most
24   fundamental rule in all of American corporate law.

25         So that's our basic answer to that question.

1          Now, the other question that is relevant to PPFA
2    really is just, you know, can PPFA be held liable for the
3    reverse false claims allegations and the implied false claims.
4    So I'll start with the reverse false claims.  Their theory is
5    that PPFA caused the affiliates, the affiliate defendants to
6    avoid their obligation to pay the government by crafting, you
7    know, they allege by crafting a litigation strategy that was
8    meant to principally get an injunction in federal court to
9    preclude termination from Medicaid rather than using the state
10   Medicaid administrative procedures.  That's the basic outline
11   of the theory as I understand it.
12          There are several problems with that, and the first
13   one is that statutory one that you -- that you mentioned
14   before.  As the Court knows, there are two separate sections as
15   my friend on the other side said.  I'm talking about now
16   (a)(1)(G).  They're two separate clauses in (a)(1)(G) that are
17   separated by the word "or" so they're independent.  One uses
18   causation language, that is language that creates third-party
19   liability, and one that does not use that language.  And
20   there's a fundamental canon of construction we cited Scalia and
21   Garner, I think the case that's routinely cited from the
22   Supreme Court is Russello against the United States.  And the
23   canon is simply that when Congress uses particular language in
24   one provision of a statute and excludes that language from
25   another provision of the same statute, the Court should assume

1  that the inclusion and exclusion was deliberate such that you

2  should not apply that language to the part of the statute where

3  it doesn't exist.

4          And that's crucial -- that's particularly crucial in

5  this case because the Caremark case that they were relying on,

6  it was construing the previous statute that had that causation

7  language applying to the entire clause.  Congress amended that

8  statute to again separate -- separate it out into two clauses

9  divided by the word "or" disjunctive, to use that language in

10 one clause and not in the other one, and so you just have to

11 assume that if Congress intended for liability of a party that

12 causes somebody to do something under the first clause, they do

13 not mean -- they do not intend to create liability for somebody

14 who causes somebody else to avoid an obligation under the

15 second clause.  If they did intend that they would have applied

16 the causation language to the second clause --

17          THE COURT:  That's certainly the canon.

18          MR. METLITSKY:  -- yeah.

19          THE COURT:  But what -- what other contemporaneous

20 documents without inquiry into any subjective legislator

21 intent, what other contemporaneous documents would point to

22 that Congressional purpose?  Is there anything in legislation

23 that was before committees that suggested that this -- this

24 disjunctive division of causation was intended to remedy some

25 confusion --

1              MR. METLITSKY:  Yes.

2              THE COURT:  -- in the courts?  What is your best

3    argument beyond just mere canons that the Court should read

4    that or so strictly?

5              MR. METLITSKY:  Yes.  So I mean, there's not much in

6    the legislative history but there's a little bit.

7              THE COURT:  I was avoiding the term "legislative

8    history" because it gets you in trouble.

9              MR. METLITSKY:  There's not much in the -- you know,

10   the committee reports.  But there is a little bit.  The idea

11   was that Congress wanted to make clear that it was -- that a

12   failure to -- the previous clause really by its term applied to

13   statements that led to the avoidance and other things of

14   obligations to pay the government, right.  And Congress wanted

15   to make clear that there was also a -- it was also a violation

16   to just fail to pay the government.  No state -- that's what

17   we're talking about in this case, right.  Just there was an

18   obligation to pay and it was avoided.  The defendant.  And that

19   is a direct sort of relationship between the payer and the

20   government.

21             You can imagine why you might want to have causation

22   liability for statements because, for example, you might have

23   an innocent party.  The guilty party makes a statement that

24   causes the innocent party to do something that deprives the

25   government of money.  But it's strange to think of somebody

1    innocently avoiding a direct obligation to pay.  And so, you

2    know, that's the best I can do.  I think the better argument is

3    the canons and it's not just through solo canon.  You asked

4    earlier was there some kind of rule of lenity type rule that

5    would apply to a civil statute like this, a sort of penal civil

6    statute like this, and the answer is yes.

7           So the -- you know, and we can do a 28(j) letter, we

8    just researched this a little bit over the lunch hour.  But I

9    think one of the principal federal cases is the Commissioner of

10   Internal Revenue against Acker; it's 361 U.S. 87 at page 91.

11   This was a provision involving the tax code obviously.  But it

12   was a penal provision.  It included penalties and the Court

13   held that someone is not subject to a penalty unless the words

14   of the statute plainly impose it.

15          There's also a Western District of Texas case

16   applying that same rule to Texas civil penal statute -- you

17   know, civil penalty statutes that -- the cite there is 348 F.

18   Supp. 3d 594 at 599.  And there is a Louisiana case, 268 F.

19   Supp. 3d 1132 at 1150.  So if the Court had any doubt about it

20   after applying the Rizzolo canon and all the rest of it, I

21   think that canon would resolve it.

22          So that's our first argument, just as a statutory

23   matter.  The reverse false claim against PPFA is precluded.

24          The second argument is that even if there was

25   causation liability, this wouldn't count as causation

1    liability.  Again, the argument is that lawyers in the

2    litigation law department which -- which the other side says is

3    synonymous with PPFA devised the litigation strategy and

4    advised their clients, the affiliate defendants, to do several

5    things principally, to file an injunction in federal court to

6    prevent their termination from Medicaid rather than using the

7    state administrative process.

8              And so there are several problems with that.  The

9    first just as a matter of law, a legal strategy developed by

10   lawyers can't cause their clients to do anything because it's

11   just legal advice.  The clients ultimately decide.  And there

12   is a case I think that's pretty much on point.  It's not about

13   the False Claims Act.  But it's about one of the securities

14   fraud statute which penalizes causing false statements in a

15   proxy.  The case is called Adelphia Communications, we cite it

16   in our brief.  And the Court says in no sense can an attorney

17   give legal advice to a person or corporation making a statement

18   or assisting in its drafting be understood to cause the

19   statement to be made because they're just acting as a lawyer.

20   And the client makes the ultimate decision.  And here, if you

21   needed any more, there is deposition testimony from

22   representatives from at least three of the affiliates saying

23   that it was their decision to take this route.  And I'll

24   cite -- I'll cite the docket numbers, 475-3 at 46 to 49, that's

25   PPST.  PPGC is 484 at 13.  And PPGT is 484 at 25.

1              So not only is just as a matter of law, it seems to
2    me this theory is precluded as a matter of fact.  There is
3    undisputed testimony that it was ultimately the affiliates'
4    decision.
5              Second, it seems to me like there's a disconnect
6    between the legal strategy that, you know, they rely on and the
7    reverse false claim.  Because the legal strategy is all about
8    preventing the termination of the affiliates from Medicaid.
9    But the reverse false claim is not about that.  The reverse
10   false claim is as they describe it, 60 days after the
11   injunction was vacated the affiliates were required to, you
12   know, pay back the money, right.  If you agree with that
13   theory, none of the -- none of the legal strategy that they
14   describe, you know -- you know, getting an injunction, getting
15   a grace period and all that has anything to do with repaying
16   the money.  So that's just an independent reason why it's just
17   sort of a non-sequitur, their theory of causation liability.
18             Third, as we describe at length in the briefs, it's
19   just sort of black-letter law that legal advice can't serve as
20   the source of liability and that's all they're talking about
21   here.  And then fourth, all of this relies on the proposition
22   that the litigation and law department is PPFA and that just is
23   not so.  The litigation law department is within PPFA in the
24   sense that it is employed by PPFA.  But it's expressed in the
25   bylaws that they can represent PPFA.  They can represent

1   affiliates.  And when they represent affiliates, they have an

2   attorney-client relationship with the affiliates which, for

3   example, means that they can't divulge confidential information

4   without consent.

5            And that is a totally ordinary way of dealing with

6   legal advice in a corporate family.  You know, it's in-house --

7            THE COURT:  What do you make of Hanger 1 then?  So I

8   believe it's cited in plaintiffs' brief.  The test isn't

9   necessarily lawyers working in-house versus out-house, although

10  the practice of law often feels like an out-house.  I'm making

11  up a terminology here.  There, and I believe this is at 563

12  F.2d 1158, the relevant inquiry is scope of authority.  Where

13  someone less than an officer is involved, corporate criminal

14  liability is imposed only where the criminal employee has a

15  position of substantial responsibility and broad authority.  So

16  citing to this Court your corporate taxonomy, which I'll take

17  you at your word, how is it that those decision-makers in the

18  litigation and law department or the law and litigation

19  department do not exercise a position of substantial

20  responsibility and broad authority?

21           MR. METLITSKY:  So that's not our argument.  Our

22  argument is just that it's totally customary for -- in a

23  corporate family.  Just think of a parent sub for purposes

24  of -- because that's -- we all understand that.  You can have

25  officer -- shared officers, shared directors, shared accounting

1    departments and shared legal departments.  And the presumption

2    from Best Food is that these people could all be double-hatted,

3    and that they're acting appropriately, wearing the appropriate

4    hat at the appropriate time unless there's some evidence that

5    they're not.  In other words, unless there's some evidence that

6    they're -- in this case, that they're actually representing

7    PPFA when they're purporting to represent one of the

8    affiliates.

9            And the -- and I think they recognize that because

10   that's the sort of crux of their answer in the reply brief.

11   But their only evidence that -- that the -- that the lawyers in

12   this department were actually representing PPFA rather than the

13   affiliates is that it would have been better for the affiliates

14   to go through the administrative process rather than to seek a

15   district court injunction.  But, first of all, that's just the

16   legal strategy call, you know.  I don't know why they think

17   they're right about that.  The injunction was successful, you

18   know, initially and they're not representing that the

19   administrative process would have been successful.

20           But even more important, there is testimony from PPST

21   itself, a representative from PPST that they themselves decided

22   that it was better for them to go to court rather than through

23   the -- than through the administrative process, because they

24   said the administrative process was, quote, "not a friendly

25   environment" and we didn't think that we were going to be

1    heard.  This is 475-3 at 46.  And that they had, quote, "not

2    favorable outcomes" going that route before.  That's the same

3    cite at 49.  They made -- the affiliates themselves made a

4    reasoned decision that going for the injunction was better for

5    them than going for -- than going through the administrative

6    process.

7            And so that's their -- that's their only evidence

8    that the lawyers in this department were representing PPFA

9    rather than the affiliates and it just seems to me to fall

10   apart on the actual record.  Parenthetically, it was their only

11   evidence that they cited of conspiracy.

12           So, you know, each of those is an independent basis

13   to reject causation even if you think there is causation

14   liability.

15           And then the last point is lack of scienter.  You

16   know, PPFA there's just no evidence, no reason to believe that

17   PPFA would have understood that affiliates would have had a

18   repayment obligation for funds received during the pendency of

19   an injunction, the whole point of which was to preclude their

20   termination from Medicaid, especially when the state of

21   Texas -- as Mr. Margolis pointed out, the state of Texas told

22   the Fifth Circuit that it was irreparable harm to continue with

23   this injunction because they would have to continue making

24   Medicaid payments while it was in place.

25           And certainly there was no possible way that they

1    could have understood that providing legal advice to seek a
2    federal court injunction or a grace period or something like
3    that could somehow count as a failure to satisfy a repayment
4    obligation to the government.  That is such a novel -- I mean,
5    there's nothing like that anywhere in any case.  And the idea
6    that anybody would have had that in their head seems to me to
7    be totally outlandish, and there is certainly no evidence to
8    support it.
9              So that's our argument on reverse false claim as to
10   PPFA.  As to implied false certification, you know, there's the
11   underlying question about whether there were, in fact, implied
12   false certifications.  Then there's the question of whether
13   PPFA could be liable under that causing language, right.  So I
14   started going through the relevant standard earlier.  The
15   question is whether PPFA was directly involved in the actual
16   claims process and there just is no -- there just weren't.
17   There's no evidence that they were.  The other side cites the
18   accreditation process, which has nothing at all to do with the
19   filing of state Medicaid claims.
20             They cite various, you know, guidance documents like
21   the Medicaid Toolkit.  You can look at these documents.  One of
22   them is at 475-10 at 119.  Another one is at 177.  What you'll
23   see is that they're just basic explanations of how Medicaid --
24   Medicaid and mostly federal Medicaid works.  Had nothing to do
25   with the actual claims process.  And that is the kind of

1    evidence that courts have required in the past to hold a parent

2    liable for its subsidiary's false claims.  So, for example, in

3    the Hockett case, the parent company was, quote, "directly

4    involved in the process of finalizing the cost report and

5    billing the government."  Whereas, you have other cases like

6    U.S. against Executive Health.  This is a EDPA case 196 F.Supp.

7    3d 477, which is a lot like this case.  You know, there, the

8    parent benefitted from the subsidiary financially.  They had

9    knowledge of the subsidiary's practices overlapping employees.

10   They performed joint marketing efforts.  They importantly had

11   knowledge of the relevant Medicaid -- Medicare and Medicaid

12   standards with which the sub needed to comply, but no liability

13   because they weren't actually involved in the claims process

14   itself.

15            THE COURT:  So -- and you do have five minutes left.

16   I wanted to give you that warning.  So you're joining

17   Mr. Margolis in following some of the defense contractor

18   analogies that we discussed that this Court should tether its

19   understanding of corporate control and parent subsidiary

20   liability to claims processing.

21            MR. METLITSKY:  Yes, that's exactly right.

22            THE COURT:  You have to have the fingerprints of the

23   parent on the claims as they're processing.

24            MR. METLITSKY:  Exactly.  Exactly.  Because otherwise

25   you have the problem that we discussed at the very beginning,

1    which is you're holding the parent liable for just ordinary

2    interaction with a subsidiary.  Again, parent sub is not really

3    at all what's going on here.  But even if you think it were,

4    you would be holding the parent liable for just normal

5    interaction without finding veil piercing.

6           So that's our argument on causation.  That applies to

7    both the implied false certification claim, you know,

8    pretermination letters and the one post the termination

9    letters.  There's also a scienter problem for the

10   pretermination letters.  This is the one having to do with the

11   videos.  They don't have any evidence that PPFA itself knew

12   anything about that.  The only thing they cite is Texas'

13   termination letter, which isn't evidence of anything.  And then

14   the period of termination, I'm not totally sure I completely

15   understand that claim.  But the -- they're talking about claims

16   that were made when the injunctions were in place, right.

17          And since you're looking at scienter at the time that

18   the claims were made, I don't see how PPFA or really anybody

19   could have known that those claims were false at the time

20   because the entire theory depends on the injunction being

21   reversed.  If the injunction had been upheld, I assume none of

22   us would be here, right.  Right.  Otherwise, their theory is

23   totally outlandish, right.  The only way any of this works

24   even, you know, possibly is because the original injunction

25   that precluded termination was reversed.

1          And when you're judging falsity at the time the claim

2    was made, this was during the pendency of the original

3    injunction, how could there be any scienter?  You'd have to be

4    clairvoyant to know that the injunction was going to be

5    reversed.

6          So that's our argument for PPFA on implied false

7    certification.  I don't know how much time I have left.

8          THE COURT:  I'll give you two minutes to conclude

9    with any issues that are left unaddressed by those incorporated

10   by reference --

11         MR. METLITSKY:  Yes.

12         THE COURT:  -- to Mr. Margolis' --

13         MR. METLITSKY:  Yes.  So the only other PPFA-specific

14   issue, there's a question about the number of violations.  And

15   Mr. Margolis touched on it, you know, it's not every single

16   claim.  You know, the reverse false certification theory, for

17   example, would be one failure to repay the government.  But in

18   all events, the per claim penalty theory can't possibly apply

19   to PPFA because PPFA did not file claims.  Everybody agrees

20   PPFA did not file claims.

21         And so the rule -- this is a case called U.S. against

22   Bornstein from the Supreme Court.

23         THE COURT:  Could you spell that?  Could you spell

24   that for the court reporter?

25         MR. METLITSKY:  Yes, B-O-R-N-S-T-E-I-N.  It's 423

```
1    U.S. at 313.  The focus in each case has to be upon the
2    specific conduct of the person from whom the government seeks
3    to collect the statutory penalties, okay.  And the question is,
4    what causative acts did that person engage in?  How much
5    causative acts did that person engage in?  So on their own
6    theory of reverse false claim, I guess it would be this setting
7    up a litigation strategy.  I think that's -- I don't know, one
8    act.  I don't know how many acts but it's like one or two,
9    something like that.
10           As to the implied false certification theory, again I
11   don't totally understand their theory, but it can't possibly be
12   every claim, because again PPFA didn't file a claim.  They
13   would have to demonstrate what causative act PPFA engaged in
14   that resulted that caused the filing of these claims and that
15   would be one violation.  So --
16           THE COURT:  Okay.  And I'm assuming you would join
17   Mr. Margolis' request that this Court order supplemental
18   briefing should we ever approach the --
19           MR. METLITSKY:  Oh, yeah.  Totally premature to get
20   into this at this point.  I just wanted to get that on the
21   record.
22           THE COURT:  Okay.  Understood.  Thank you for your
23   argument, and thank you for your briefs to this point.
24           All right.  Five minutes remaining on the clock for
25   this side of the courtroom.
```

1          Mr. ASHBY:  Thank you, Your Honor.

2          Danny Ashby for PPFA.  May it please the Court.  May

3    be able to get back four of these minutes.

4          So I'm just addressing pretrial publicity, and I

5    think as I heard from plaintiffs' counsel, they don't think a

6    gag order is appropriate.  We certainly agree with that.  There

7    are other ways to address that in terms of, you know, jury

8    selection, jury instructions --

9          THE COURT:  If we get to that --

10         Mr. ASHBY:  -- questionnaires.

11         THE COURT:  Yeah, I was going to mention

12   questionnaires.  If we get do that point, we've had some

13   high-profile cases in this courthouse from Oprah and the

14   cattleman's case to some of my FISA cases when I was an AUSA.

15   One solution is a questionnaire.  We can maybe cut down on a

16   potential jury pool taint that way.  I do want to admonish

17   counsel from DC, Austin and Dallas that this isn't a division

18   with the standing jury pool.  And so we have to approximate the

19   number of prospective jurors summoned each month.  And so if

20   we're going to do things like propose questionnaires and we get

21   deep into the litigation, just plan for the logistics of that.

22   I'll want to preview that for the clerk's office because we

23   actually have to send out the summons, we have to send out the

24   questionnaire.

25         We did a lot of this work during COVID.  So if there

1    are lesser restrictive means available that the parties can

2    agree to, if we get this far into litigation, that's a step

3    that may be unfamiliar to those of you practicing in the Dallas

4    division or in the Western District of Texas.  We actually have

5    to send out the summons, and we have to do head counts on the

6    front end.  So --

7              Mr. ASHBY:  Understood, Your Honor.

8              THE COURT:  The questionnaire, I wanted -- thank you

9    for reminding the Court about questionnaires.  That's something

10   that we'll want to front load if we get that deep into

11   litigation.

12             Mr. ASHBY:  That's all I have then unless the Court

13   has any questions.

14             THE COURT:  Okay.  So you're not asking for a prior

15   restraint of the press?

16             Mr. ASHBY:  Correct.

17             THE COURT:  Okay.  That's good.

18             Mr. ASHBY:  Absolutely.

19             THE COURT:  I wasn't going to do that anyway.

20             Mr. ASHBY:  Thank you, Your Honor.  I appreciate it.

21             THE COURT:  I used to teach First Amendment law, like

22   we're not going to do that.  I just I wanted to flag this issue

23   should this continue into litigation.  I know it's contentious.

24   I know there's a lot of advertising, and there's a lot of media

25   attention.  I'll just ask your guidance from both sides of the

1    equation, plaintiff and defendant.  So at this time, let me

2    confer with my clerks and let's see if we have questions

3    remaining from the Court.

4              (Pause in proceedings.)

5              THE COURT:  Okay.  So by my count, I believe

6    plaintiffs here have reserved 30 minutes of their time for

7    rebuttal.  Is there a division between the attorneys sitting at

8    the table of that time?

9              MS. HACKER:  I'll be taking all 30 minutes, Your

10   Honor, but I would request a brief recess before I begin just

11   so I can get myself organized a little bit.

12             THE COURT:  Okay.  Well, I was hoping that everybody

13   could make their Southwest flight either to Austin or Dallas or

14   DC.  I was trying to move efficiently but that makes sense.  So

15   let's recess briefly for another five minutes.  That'll allow

16   counsel to gather their notes and also to interface with the

17   technology if necessary.  I hate shuttling in and out but I

18   understand all of you worked very hard to be here.  So I want

19   to make sure that you're set up properly.  So let's take

20   another brief five-minute recess, and we'll turn for the final

21   30 minutes of rebuttal argument.  At that point, I'll dismiss

22   you so you can make your flights.  That's the Court's intention

23   at least.

24             (Off the record at 4:03 p.m.)

25             (On the record at 4:12 p.m.)

1          THE COURT:  And we are back on the record in Civil

2     Case Number 2:21-cv-022-Z for continuation of the hearing on

3     the pending motions for summary judgment.

4          And, Ms. Hacker, you have reserved 30 minutes for

5     rebuttal.  You may take as much of that time as you need and

6     allocate it.  If I interrupt you, it's only because I have

7     questions to ask.  You may proceed.

8          MS. HACKER:  May I request before I begin a

9     warning -- a time check at five minutes left?

10         THE COURT:  Okay.

11         MS. HACKER:  Thank you.

12         THE COURT:  You will receive it at the five minute

13     remaining mark.

14         MS. HACKER:  Thank you.

15         Your Honor, I just wanted to take some time to

16     respond to some of the assertions made by my friends on the

17     other side.  I apologize if this is a bit disjointed but these

18     are all the bits and pieces left to address here.

19         The first point I'd like to address is the

20     argument -- or I guess the emphasis by Mr. Margolis on the fact

21     that there is no case like this one, and I'd like to actually

22     first apologize for misstating that there was an injunction in

23     the Kane case.  I was confusing that case with a different one.

24         But I think the easiest explanation for the fact that

25     there's no case like this one is because Medicaid providers use

1   the administrative procedures that they are afforded.  And

2   frankly, no one is foolish enough to not do that because the

3   consequences of doing that are so severe.  As the Fifth Circuit

4   pointed out the first time they overruled Judge Sparks, if you

5   don't challenge the suspension or the termination in the

6   administrative proceedings, there is nothing in the

7   administrative record in your favor.  And so when you go up on

8   judicial review, you don't get to make the case at that time or

9   even if you choose to go to federal court instead, that

10  judicial review is only on the administrative record.  And if

11  you skip that whole process, you've got no evidence in your

12  favor.

13          So it would make sense that no one else would have

14  made that choice.

15          Secondly, Mr. Margolis placed a lot of emphasis on

16  the fact that, you know, if the state hasn't asked for the

17  money back and all of this, there's some sort of due process

18  problem here.  Well, the first due process that the defendants

19  are afforded is in challenging the termination itself if they

20  think it's baseless.  All they have to do is ask for an

21  informal hearing.  And you can't really complain about a lack

22  of due process if you don't even engage in the process that you

23  are afforded.

24          The other point I wanted to address on that issue is

25  that, you know, yes, there are lots of regulations and rules in

1    the Medicaid program.  They are very onerous and for good

2    reason because the state -- or the government spends a lot of

3    money on Medicaid and Medicare.  So it expects providers to

4    fulfill those requirements.  If -- if you can't abide by all

5    the rules, then don't take the money.  It's a contract between

6    the government and the provider and the provider is asserting

7    that they can, in fact, follow all of those rules and that is

8    in fact what it states in the provider agreements for both

9    Texas and Louisiana.

10         And addressing the point about recoupment

11   specifically, the idea that there can be no overpayment -- or

12   liability for retaining an overpayment unless the state tries

13   to recoup the money first or ask for it back, that's just

14   incorrect as a matter of law.  The federal regulations

15   specifically state that providers and suppliers have a clear

16   duty to undertake proactive activities to determine if they

17   have received an overpayment or risk potential liability for

18   retaining such overpayment.

19         And then in another spot, the regulations say

20   providers and suppliers cannot rely on the OIG to point out

21   their overpayments for them.  Providers and suppliers are

22   obligated to identify the overpayments they have received.

23         Basically, the rule that they're advocating for here

24   that there has to be some sort of recoupment or restitution

25   before you could be liable here, that would basically totally

```
 1   nullify the reverse false claims provision.  No one could ever
 2   be liable for retaining an overpayment if that was -- if that
 3   was the rule.  And incidentally, the bond -- the rule regarding
 4   bonds that they would advocate for means that if a judge denied
 5   a bond on a preliminary injunction, that would foreclose the
 6   other party even if it was later found that the injunction was
 7   wrongly issued.  That would totally foreclose that other party
 8   forever from being able to get the money back that they had to
 9   pay under that injunction and that's just incorrect according
10   to the law.
11          Moving on to the issue of whether the terminations
12   were effective or not, the injunctions themselves, federal
13   courts do not have authority, generally speaking, to stay state
14   proceedings.  Federal courts can enjoin state officials from
15   acting.  And that's what the effect of the injunctions was
16   here.  They enjoined the state officials from enforcing the
17   terminations.  And for authority on the point that I just
18   mentioned that they don't have authority to stay state
19   proceedings, that's the Blanchard case cited in our reply
20   brief.
21          The termination happens by operation of law and in
22   fact Planned Parenthood knew that lifting the injunctions would
23   mean that the state could then enforce the terminations.
24          Brian, could you bring up ECF 518-13 at 122.  And if
25   you could pop out that language for me.
```

1        So there at the bottom of this paragraph here

2   beginning at the -- with the -- at the same time, "At the same

3   time we are waiting for a federal district court to lift the

4   injunction which will officially allow HHSC to enforce the

5   law."  And this is an e-mail from PPFA employee.

6        Moving on to the -- the issue of the Louisiana

7   injunction, there were -- it's true that Louisiana had asked

8   for a stay based on two reasons, a case involving sovereign

9   immunity that was pending and also the -- the Kauffman case,

10  the en banc proceedings there.  However, as Louisiana made

11  clear when they asked the court to lift the injunction, the --

12  it makes no sense to keep the injunction in place because of

13  the second issue because the first issue took care of the

14  whole -- the whole issue, right?  The en banc court said that

15  there was no cause of action.  There cannot be an injunction

16  based on the likelihood of success on a cause of action that

17  doesn't exist.

18        So regardless of the outcome of the case on sovereign

19  immunity, it would have no import on that case any longer given

20  that their underlying cause of action was now gone.

21        Additionally, Planned Parenthood also understood the

22  Kauffman case to have that effect on the Louisiana injunction

23  regardless of this sovereign immunity case.

24        So, Brian, could you bring up ECF 518-4 at 454.  And

25  if you could pop out the language there.  This is an e-mail

1    from Melaney Linton who's the CEO of PPGC.

2            So if you go down to the next paragraph at the end of

3    that one.  So where it starts -- where the wording starts -- is

4    bold there -- "Unfortunately, Louisiana Department of Health

5    asks the Court to allow them to move forward with blocking

6    Medicaid patients access to Planned Parenthood.  We have been

7    expecting Louisiana to take this action since a recent ruling

8    from the Fifth Circuit Court of Appeals gave them the green

9    light to do this."

10           Moving on to the issue of this argument about the

11   word "improper" in the statute.  What that kind of reminds me

12   of is that there -- and I think we said this in the briefing.

13   I think the defendants are kind of trying to read in an extra

14   requirement into the law.  In other words, that it has to be

15   fraudi/fraud in order for you to be liable.  But the statute

16   itself defines what fraud is.  And retention of an overpayment

17   is improper under the statutes.  So you kind of take care of

18   that by the fact that you've retained an overpayment.

19           THE COURT:  It would be nice, though, if the

20   Section B definitions provided terminology for what improperly

21   means in this context or if courts had -- I mean, we have

22   definitions of material obligation knowing, knowingly, claim

23   but nothing regarding improperly.  But it doesn't sound like

24   counsel for plaintiff or defendant can point to any circuit

25   level authority instructing the Court's construction of that

1    additional language.  It's just canons at this point.  Is that
2    correct?
3              MS. HACKER:  Yeah, I think so.  And, you know, I
4    think that the Court if it looks at, you know, one of the
5    important principles in statutory construction is not to look
6    at a statute in isolation but to look at all of the statutes
7    included, the context of it.  And I think the context of it
8    would indicate that retention of an overpayment is an improper
9    act that the False Claims Act intends to punish.
10             THE COURT:  Yeah.  Before you can invoke rules of
11   lenity or related concepts, you have to find an ambiguity
12   first.  And so contemporaneous statutes and documents, you
13   know, whether this was, you know, part of a, you know, coherent
14   government code, like, you got to have the ambiguity first
15   before you get to whip out Scalia's favorite toolkit of canons.
16   So, yeah, I understand your point on that and you're arguing
17   that it's not in fact ambiguous.
18             MS. HACKER:  No, that's right.
19             THE COURT:  Okay.  All right.  You may proceed.
20             MS. HACKER:  Speaking to the issue of the grace
21   period, what the grace period meant is that the state would
22   delay its enforcement of the termination.  It didn't mean that
23   they were not terminated and in fact as I think the Court knows
24   and recognizes, Judge Livingston's opinion from the Travis
25   County District Court supports this.  But if -- they also made

1  a lot of the fact that there was no statutory authorization for

2  Texas to even allow this grace period, and now I'm taking off

3  my Texas hat for a moment and speaking only as relator's

4  counsel, but if there is no statutory authorization for it,

5  perhaps it was an ultra vires action, but that doesn't have

6  anything to do with the issues in this case, I don't think.

7  They were just saying we will delay enforcement of this

8  termination so that you can transition your patients.

9         The issue of whether the video provided a basis for

10 termination, again they never contested that.  If they had

11 evidence to suggest that that was insufficient, the time to

12 raise that would have been in the administrative proceedings.

13 At this point they've now waived it.  And the important point I

14 think about the Fifth Circuit's conclusion is, yes, Judge Elrod

15 wrote a concurring opinion but one thing that she pointed out

16 was that there was no evidence submitted by Planned Parenthood

17 and they admitted that they had provided no evidence to show

18 that the video was somehow unreliable evidence.

19         So the conclusion of the state that the evidence was

20 sufficient to show program violations, whether that be through

21 actual violations or the willingness to engage in unethical

22 conduct itself being a violation, the state's conclusion was

23 that was sufficient to justify termination and that conclusion

24 was not disturbed because they did not challenge it at the

25 appropriate time.

1          Moving on to the issue of whether the facts

2    surrounding the Texas termination were disclosed to Louisiana.

3          Brian, if you could pull up ECF 518-4 at 253.

4          So actually, Brian, could you back out of that detail

5    real quick.  Just go to the main document and then if you could

6    zoom in on number -- Paragraph Number 14.  It's down at the

7    bottom there.  So this is part of the agreement that PPGC

8    signed when they enrolled in the Medicaid program as a

9    provider.  And as you can see under paragraph 14, it states, "I

10   understand that I shall report any of the above conditions to

11   the Department of Health and hospitals, and once enrolled I

12   understand upon discovery of any of the above conditions, it is

13   my responsibility to report them immediately in writing to DHH

14   program integrity section" and it gives the address.

15         And I believe, Your Honor, if you look at the letters

16   that PPGC did eventually send to what is now called LBH but at

17   that time was called DHH, that is in fact the address where

18   they sent those letters.  So that is an acknowledgement of this

19   obligation here.

20         Now, Brian, if you could go to that other language,

21   please.

22         So this document clearly imposes the obligation to --

23   for the provider to disclose to the Department of Health, not

24   to the Louisiana Department of Justice or anybody else, but to

25   the Louisiana Department of Health, these things.  And it is

1    such an important obligation that it says here in this

2    agreement that if they continue to provide Medicaid services or

3    participate in the program when they have been terminated from

4    another state's program, it is a crime to continue

5    participating in the Louisiana Medicaid program.  A crime

6    that's punishable as a felony for up to five years'

7    imprisonment and she also notes here in the last paragraph, "I

8    understand that any claims for payment with a date of service

9    during a period of exclusion will be subject to recoupment.  In

10   addition to other fines, penalties, or restitution, resulting

11   from the criminal prosecution."

12          So this is a serious obligation with serious

13   consequences for noncompliance and they did not comply with

14   this requirement.

15          THE COURT:  So what of this defense contract metaphor

16   that the Court teased out?  You can choose a different

17   corporate structure or sector if you want, neither side

18   disagrees that managed care before and after the ACA involves

19   voluminous requirements.  I asked defendant counsel to identify

20   sort of the bookends of connective tissue necessary to connect

21   FCA liability where the provider services are arguably distinct

22   and different from what another division does even if that

23   division is accused of ethical violations.  I think I got

24   during defendants' portion their reading of Escobar.

25          What other cases should the Court look to and this is

1    essentially materiality analysis to decide whether the claims

2    submitted and other divisions or portions of the corporate

3    architecture can be rendered liable under the FCA?  At some

4    point, the connective tissue is too tenuous.  At some point in

5    an over-bureaucratized sector, we have to have some due process

6    principles obtained if their reading of Escobar is wrong or if,

7    you know, of other cases that argue against the sort of

8    corporate layering and structuring that I heard from defense

9    counsel, let me know.

10           Is their reading of Escobar wrong, are there other

11   cases where the certification was this mismatched to the

12   service provided?  Can you think of example cases.  I know

13   we've talked Escobar to death but other instances where -- and

14   I used defense contractor illustrations only because it's

15   familiar to me and they're some of our larger contractors, but

16   at some point it becomes too attenuated.

17           Are defense -- are the defense attorneys correct in

18   reading Escobar to require something as specific as a

19   division's participation in the actual claim processing and if

20   not, how far out can we get before we run afoul of due process

21   principles?  And we're only here because this is that strange

22   quasi-criminal realm and, you know, the Supreme Court and the

23   Fifth Circuit have advised that we be cautious about extending

24   liability in perpetuity for every certification signed when

25   that could involve hundreds of regulatory obligations.  So if

1     they misread Escobar as applied to this case let -- you know,

2     I'll hear your argument on that.  And then any cases where

3     there is an arguable mismatch between the certification and the

4     service provided.  What's your best case for that kind of

5     mismatched dynamic in an FCA setting?

6            MS. HACKER:  So if I understand the Court's question

7     correctly, I think we discussed some of these cases in our

8     reply brief.  But the case that comes to mind immediately is

9     the Harvard College case and there, even though the defendant

10    had no involvement in the actual claims process, he was

11    involved in reviewing and auditing the financial activities of

12    the entity.  And so that was deemed enough for liability if I

13    remember that case correctly.

14           And so here we have extensive involvement of PPFA in

15    the affiliates' financials in their Medicaid participation.  So

16    even if PPFA was not the one hitting submit on the claim, they

17    were well aware of all of the claims activity that was going on

18    here.  And I think -- and I think we -- you know, make this

19    caveat in the reply brief, you know, if you -- it kind of

20    depends on the facts, right?  You know, what kind of implied

21    false certification case you're talking about?  If you're

22    talking about an instance where a Medicaid provider is

23    overbilling or billing for services not provided, it would make

24    sense that the other defendant you're trying to hold liable

25    would have to have some knowledge of, you know, the particulars

1    of that falsity.

2            But here we don't even have to get into that, you

3    know, granular basis because we know that PPFA knew of the

4    false basis for the submission of claims.  They knew that they

5    had been terminated from Medicaid in Louisiana and Texas; they

6    knew that they were continuing to submit claims.  The

7    affiliates all underwent the rigorous accreditation process

8    which includes a financial audit several times during the

9    pendency of the injunction.

10           So PPFA was well aware of this.  And PPFA's

11   involvement in the response to the terminations and the

12   litigation and all of that, they were well aware of all of

13   these facts.  So there's not really any -- I think the -- the

14   issue of, you know, Does the right hand know what the left hand

15   is doing, that doesn't really come into play here because they

16   did know and you can't really -- you can't really argue that

17   they didn't know of the basis for the false claims here.

18           THE COURT:  Okay.  I think I have your argument on

19   that.  You're approaching the five-minute mark, so I'll allow

20   you to close with whatever arguments remain of your rebuttal.

21           MS. HACKER:  Yes, Your Honor.  I think I just have a

22   couple of quick little clarifications that I just wanted to

23   offer for the Court.  In terms of the statutory interpretation.

24   I just wanted to offer that the Kane case, which is 120 F.

25   Supp. 370 recounts the history of the false claims -- or excuse

1    me -- of the reverse false claims provision in the False Claims

2    Act.  It might be helpful to the Court.

3            I also wanted to clarify for the Court just to

4    make -- make clear and avoid any confusion but the implied

5    false certification claims that we're making, Number one, it's

6    the -- the post-termination claims in both Texas and Louisiana.

7    So Texas 2017 to 2021 and Louisiana 2015 to 2022.  The second

8    category would be the claims submitted in the Texas grace

9    period.  And the third category would be Louisiana post-Texas

10   termination claims which would be February 2017 to November

11   2022, so those are some different subsets there.

12           The claims under the first and third ones largely

13   overlap with the claims at issue under the reverse false claim

14   theory.  So those are alternative arguments.  The only one that

15   doesn't overlap is the implied false certification claims under

16   the grace period.  That would not be encompassed under the

17   reverse false claims theory.

18           And then just one little clean-up item.  I believe

19   that in our briefing we stated that the excessive fines defense

20   was an affirmative defense, but what I realize the Court had

21   already held that it was not an affirmative defense.  I believe

22   in its ruling on the motion for reconsideration on their motion

23   to amend the complaint -- or excuse me, reamend their answer,

24   so I just wanted to clean that up.

25           But with that, unless the Court has any further

1    questions, we would ask the Court to grant the plaintiffs'
2    motion for summary judgment.
3              THE COURT:  Okay.  With that, the Court will take
4    this case under advisement.  I have your briefs.  I now have
5    your arguments.  The Court will also finally adjudicate pending
6    motions on various sealing and unsealing.  I don't know that
7    those orders will be for terminus but those will be
8    forthcoming.
9              So I have your case.  I have your arguments.  Thank
10   you for traveling great distances to be here.  And the Court
11   finds that this case was well briefed and well argued, and I
12   have what I need to decide at least this portion of the case.
13             So with that, counsel are excused, parties are
14   excused, and the Court stands adjourned for the remainder of
15   the day.
16             COLLECTIVE:  Thank you, Your Honor.
17             (The proceedings adjourned at 4:38 p.m.)
18                            ----
19
20
21
22
23
24
25

1          C E R T I F I C A T E

2          I, Shayna Montgomery, United States Court Reporter for

3    the United States District Court in and for the Northern

4    District of Texas, Amarillo Division, hereby certify that the

5    above and foregoing contains a true and correct transcription

6    of the proceedings in the above entitled and numbered cause.

7          WITNESS MY HAND on this 17th day of August, 2023.

8

9                              /s/Shayna Montgomery
                               SHAYNA MONTGOMERY, RMR, CRR
10                             United States Court Reporter
                               205 SE 5th Ave, Room 133
11                             Amarillo, Texas 79101
                               (806) 468-3816
12

13

14

15

16

17

18

19

20

21

22

23

24

25