# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX DOE, Relator, | § § § | |
| THE STATE OF TEXAS, *ex rel.* ALEX DOE, Relator, | § § § | |
| THE STATE OF LOUISIANA, *ex rel.* ALEX DOE, Relator, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 2:21-CV-00022-Z |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD GULF COAST, INC., PLANNED PARENTHOOD OF GREATER TEXAS, INC., PLANNED PARENTHOOD SOUTH TEXAS, INC., PLANNED PARENTHOOD CAMERON COUNTY, INC., PLANNED PARENTHOOD SAN ANTONIO, INC., | § § § § § § § § § § § § § | |
| Defendants. | § | |

# RELATOR'S OPPOSITION TO DEFENDANTS'
# MOTION FOR JUDGMENT ON THE PLEADINGS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ................................................................................... 1

LEGAL STANDARD.............................................................................. 2

BACKGROUND .................................................................................... 4

ARGUMENT ......................................................................................... 5

   I.     The Court Should Summarily Deny Defendants' Motion. ............................ 5

     A.  Defendants' motion is untimely. .................................................. 5

     B.  Defendants failed to show good cause............................................ 6

   II.    The False Claims Act Is Not Unconstitutional. ................................... 9

     A.  *Qui tam* statutes in our tradition date back to the 14th century and were part of American law both before and after the Constitution was ratified. ........................................................... 10

     B.  The FCA's *qui tam* provisions are consistent with the Appointments Clause. ............................................................................. 11

     C.  The *qui tam* provisions of the FCA are consistent with the Take Care Clause. ............................................................................. 16

   III.   The TMFPA does not violate the Texas Constitution. .......................... 18

   IV.   The LMAPIL does not violate the Louisiana Constitution........................ 22

CONCLUSION................................................................................... 25

CERTIFICATE OF SERVICE ............................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Agey v. Am. Liberty Pipe Line Co.*,
172 S.W.2d 972 (Tex. 1943) ............................................................................ 21, 22

*Al - Khawaldeh v. Tackett*,
No. 1:20-CV-1079-RP, 2021 WL 5986053 (W.D. Tex. Dec. 16, 2021), *report and recommendation adopted*, No. 1:20-CV-1079-RP, 2022 WL 2718537 (W.D. Tex. Jan. 20, 2022) ...................................................................................................... 6

*American Liberty Pipe Line Co. v. Agey*,
167 S.W.2d 580 (Tex. App. 1942) ........................................................................ 18

*Argo v. Woods*,
399 F. App'x 1 (5th Cir. 2010) ..................................................................... 1, 3, 6

*Auffmordt v. Hedden*,
137 U.S. 310 (1890) ............................................................................................. 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 3

*Bowsher v. Synar*,
478 U.S. 714 (1986) ............................................................................................. 13

*Brittan Commc'ns. Int'l Corp. v. Sw. Bell Tel. Co.*,
313 F.3d 899 (5th Cir. 2002) ............................................................................... 4

*Buckley v. Valeo*,
424 U.S. 1 (1976) ......................................................................................... 14, 15

*Crompton Greaves, Ltd. v. Shippers Stevedoring Co.*,
No. CIV.A. H-08-1774, 2011 WL 5920930 (S.D. Tex. Nov. 28, 2011) ...................... 6

*Ellis v. Clarksdale Pub. Utilities*,
No. 21-60885, 2023 WL 3302839 (5th Cir. May 8, 2023) ................................... 3, 6

*Fisher v. Dall. Cnty.*,
No. 3:12-CV-3604-D, 2014 WL 4797006 (N.D. Tex. 2014) ...................................... 6

*Geiserman v. Macdonald*,
893 F.2d 787 (5th Cir. 1990) ................................................................................. 3

*Guidry v. Roberts*,
335 So. 2d 438 (La. 1976) .................................................................................... 23

*Hughes v. The Tobacco Inst., Inc.*,
  278 F.3d 417 (5th Cir. 2001) ......................................................................... 3

*Johnson v. Johnson*,
  385 F.3d 503 (5th Cir. 2004) ........................................................................ 3

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018) ................................................................................ 14

*Marsh v. Chambers*,
  463 U.S. 783 (1983) .................................................................................... 13

*Mistretta v. United States*,
  488 U.S. 361 (1989) .................................................................................... 13

*Nixon v. Adm'r of Gen. Servs.*,
  433 U.S. 425 (1977) .................................................................................... 16

*Olivarez v. T-Mobile USA, Inc.*,
  997 F.3d 595 (5th Cir. 2021) .................................................................... 2, 7

*Planned Parenthood of Greater Tex. Surg. Health Servs. v. Tex. Right to Life*,
  Cause No. D-1-GN-21-004632 (53rd Dist. Ct., Travis County, Tex. Sept. 20,
  2021) ........................................................................................................... 18

*Reliance Ins. Co. v. Louisiana Land & Expl. Co.*,
  110 F.3d 253 (5th Cir. 1997) .................................................................... 1, 3

*Riggins v. Walter*,
  279 F.3d 422 (7th Cir. 1995) ........................................................................ 3

*Riley v. St. Luke's Episcopal Hosp.*,
  252 F.3d 749 (5th Cir. 2001) ..................................... 8, 11, 13, 14, 16, 17

*Rockwel v. Parker Drilling Mgmt. Services, Ltd.*,
  No. CV H-19-1054, 2020 WL 11563093 (S.D. Tex. Dec. 15, 2020)............. 6

*Rockwell Int'l Corp. v. United States*,
  549 U.S. 457 (2007) .................................................................................... 10

*Rollins v. Home Depot USA*,
  8 F.4th 393 (5th Cir. 2021) ...................................................................... 9-10

*Sea–Land Services, Inc. v. D.I.C., Inc.*,
  102 F.R.D. 252 (S.D. Tex. 1984) .................................................................. 6

*Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*,
  912 F.3d 805 (5th Cir. 2019) .............................................................. 3, 6, 8, 9

*State Through Bd. of Ethics for Elected Officials v. Green*,
  545 So. 2d 1031 (La. 1989) ........................................................................ 24

*State Through Bd. of Ethics for Elected Officials v. Green*,
    566 So. 2d 623 (La. 1990) ............................................................... 23, 24

*State v. Stephens*,
    663 S.W.3d 45 (Tex. Crim. App. 2021) ...................................................... 19

*U.S. ex rel. Proctor v. Safeway, Inc.*,
    No. 22-111 (U.S. 2023) ...................................................................... 4

*U.S. ex rel. Schutte v. SuperValu Inc.*,
    No. 21-1326 (U.S. 2023), ..................................................................... 4

*United States ex rel. Kelly v. Boeing Co.*,
    9 F.3d 743 (9th Cir. 1993) ........................................................ 11, 16, 17

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
    985 F.2d 1148 (2d Cir. 1993) ......................................................... 16, 17

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943) .......................................................................... 17

*United States ex rel. Polukoff v. St. Mark's Hosp.*,
    895 F.3d 730 (10th Cir. 2018) ........................................................... 8, 10

*United States ex rel. Ritchie v. Lockheed Martin Corp.*,
    558 F.3d 1161 (10th Cir. 2009) ............................................................ 16

*United States ex rel. Stone v. Rockwell Int'l Corp*,
    282 F.3d 787 (10th Cir. 2002) ...................................................... 11, 14, 16

*United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*,
    41 F.3d 1032 (6th Cir. 1994) .................................................... 11, 15, 16, 17

*United States v. Germaine*,
    99 U.S. 508 (1879) ........................................................................... 13

*United States v. Hartwell*,
    73 U.S. (6 Wall.) 385  (1868) ................................................................ 13

*United States v. Maurice*,
    26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15-747) ...................................... 13

*United States, ex rel. Polansky v. Executive Health Res., Inc.*,
    599 U.S. 419 (2023) ........................................................................ 4, 8

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
    529 U.S. 765 (2000) ............................... 10, 11, 12, 13, 14, 16, 17, 18

*Wisconsin v. Pelican Ins. Co.*,
    127 U.S. 265 (1888) .......................................................................... 13

*Yates v. Pinellas Hematology & Oncology, P.A.*,
   21 F.4th 1288 (11th Cir. 2021) ................................................................. 12, 15, 17

*Zywczyk v. Syndicated Office Sys., LLC*,
   No. 5-17-CV-00771-FB-RBF, 2019 WL 2565283 (W.D. Tex. Feb. 7, 2019), *report and
   recommendation adopted*, No. CV SA-17-CA-0771-FB, 2019 WL 2565261 (W.D.
   Tex. Mar. 8, 2019) ................................................................................................. 6

## Constitutional Provisions

U.S. Const.

   art. II ............................................................................................................... 1, 4

   art. II, § 2 ...................................................................................................... 11, 14

   art. II, § 3 ........................................................................................................... 16

   art. III ................................................................................................................ 12

La. Const.

   art. II ............................................................................................................. 1, 23

   art. II, § 1 ........................................................................................................... 22

   art. II, § 2 ........................................................................................................... 22

Tex. Const.

   art. II .................................................................................................................. 1

   art. II, § 1 ........................................................................................................... 19

   art. IV ................................................................................................................ 19

   art. IV, § 22 .................................................................................................. 19, 20

   art. V ............................................................................................................. 1, 21

   art. V, § 8 ........................................................................................................... 21

   art. V, § 21 .................................................................................................. 19, 21

## Statutes

31 U.S.C.

   § 3730(b) ............................................................................................................ 14

   § 3730(b)(2) ........................................................................................................ 15

   § 3730(b)(4)(A) ................................................................................................... 15

§ 3730(c) .................................................................................................. 15

§ 3730(c)(1) ............................................................................................. 15

§ 3730(c)(3) ............................................................................................. 15

§ 3730(c)(4) ............................................................................................. 15

§ 3730(c)(5) ............................................................................................. 15

La. R.S.

§ 46.438.1 ................................................................................................ 23

§ 46.439.2 ................................................................................................ 23

§ 46:439.1(A) ........................................................................................... 22

Tex. Gov't Code

§ 402.021 ................................................................................................. 20

§ 402.0212 ............................................................................................... 20

Tex. Hum. Res. Code

§ 36.101 ........................................................................................ 19, 20, 21

§ 36.102 ................................................................................................... 22

§ 36.104 .............................................................................................. 21, 22

§ 36.105 ................................................................................................... 20

§ 36.107 ................................................................................................... 22

§ 36.108 ................................................................................................... 22

§ 36.109 ................................................................................................... 22

**Rules**

Fed. R. Civ. P.

12(b)(6) ..................................................................................................... 3

12(c) ................................................................................................... 3, 5, 6

16(b) ................................................................................................... 1, 2, 3

16(b)(3)(A) ................................................................................................ 2

16(b)(4) ................................................................................................. 2, 5

L.R. 56.7 ................................................................................................... 6

**Other Authorities**

John P. Elwood, Allon Kedem, Tirzah S. Lollar, Michael A. Rogoff, and Andrew
Tutt, *Supreme Court's* Polansky *Decision Presents the Prospect of a Constitutional
Defense to* Qui Tam *Cases*, June 20, 2023,
https://www.arnoldporter.com/en/perspectives/blogs/fca-qui-
notes/posts/2023/06/supreme-court-polansky-decision ............................................. 7

*The History and Development of Qui Tam*, 1972 Wash. U. L.Q. 81 (1972),
*available at* https://openscholarship.wustl.edu/law_lawreview/vol1972/iss1/7 ........ 10

Tirzah S. Lollar, *A Busy FCA Term for the Supreme Court: On the Heels of
Argument on (c)(2)(A), April Hearing Set in Pair of Scienter Cases*, Feb. 13, 2023,
https://www.arnoldporter.com/en/
perspectives/blogs/fca-qui-notes/posts/2023/02/a-busy-fca-term-for-the-supreme-
court .............................................................................................................................. 7

## INTRODUCTION

"District judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case." *Reliance Ins. Co. v. Louisiana Land & Expl. Co.*, 110 F.3d 253, 258 (5th Cir. 1997). The Court should deny Defendants' Motion for Judgment on the Pleadings ("Motion") (Dkt. 533) as untimely. The Motion is a dispositive motion, and thus, under the Court's operative Scheduling Order (Dkt. 346), was required to be filed no later than January 6, 2023, nine months ago. A motion under Federal Rule of Civil Procedure 12(c) may only "be brought after the dispositive motions deadline if the moving party complies with the requirements of Rule 16(b)," *Argo v. Woods*, 399 F. App'x 1, 3 (5th Cir. 2010), yet Defendants offer no argument as to how their motion satisfies the good-cause standard of Rule 16. Nor can they, as the constitutional arguments they are now belatedly trying to cram into the district court record are not new. The Fifth Circuit rejected arguments that the False Claims Act is unconstitutional a decade ago, like every other court of appeals to consider it. And there has been no change in law that would excuse Defendants' failure to timely raise this argument, nor the state law arguments. Even if they were new, Defendants had numerous opportunities to raise them before September 1, yet give no explanation as to why they waited so long. The Court should thus deny this motion as untimely without getting into the merits.

Though Defendants failed to timely raise the arguments presented by their Motion, and thus forfeited them, they are also meritless. Every appeals court to have considered the issue, including the Fifth Circuit, has rejected the Defendants' belated arguments. The text, history, and tradition of Article II of the U.S. Constitution, Article II, IV and V of the Texas Constitution, and Article II of the Louisiana

1

Constitution do not support Defendants' contentions. *Qui tam* actions have existed in our legal tradition since the 14th century. And *qui tam* statutes existed in American law both before and after the Constitution was ratified. Thus, it could hardly have been understood at the time the Constitution was ratified that it precluded these longstanding features of our legal tradition. The FCA dates to the Civil War and is a critical means of accountability for government contractors. Given today's astronomical amount of federal funding, especially in Medicaid, the government alone cannot enforce the law to the level needed to ensure compliance and prevent massive waste and fraud. The FCA, TMFPA, and LMAPIL are critical means of protecting the public fisc. It is easy to see why entities like Planned Parenthood, which receives over $500 million in federal funding alone each year, would want to eliminate a significant means of accountability for adherence to the law when taking taxpayer funds. But Planned Parenthood's desire to evade accountability for their actions cannot make the FCA (nor TMPFA and LMAPIL) unconstitutional.

## LEGAL STANDARD

To assist in the speedy and efficient resolution of cases, Federal Rule of Civil Procedure 16(b) requires courts to enter a scheduling order that "limits the time to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(3)(A). Once in place, the scheduling order may only be modified "for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The good cause standard requires a showing by the movant that "the deadlines cannot reasonably be met despite the diligence of the party needing the extension." *Olivarez v. T-Mobile USA, Inc.*, 997 F.3d 595, 602 (5th Cir. 2021), *cert. denied*, 2021 WL 5869440 (U.S. Dec. 13, 2021). To determine good cause, courts consider four factors: "(1) the

explanation for the failure to timely [comply with the scheduling order]; (2) the importance of the [modification]; (3) potential prejudice in allowing the [modification]; and (4) the availability of a continuance to cure such prejudice." S*pringboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 819 (5th Cir. 2019), *as revised* (Jan. 29, 2019), *as revised* (Feb. 14, 2019) (citation omitted).

This applies to motions under Rule 12(c). *Ellis v. Clarksdale Pub. Utilities*, No. 21-60885, 2023 WL 3302839, at *2 n.3 (5th Cir. May 8, 2023) (citing *Argo*, 399 F. App'x at 3, *Reliance Ins.*, 110 F.3d at 257); *accord Riggins v. Walter*, 279 F.3d 422, 427–28 (7th Cir. 1995). Although Rule 12(c) permits any party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial," a Rule 12(c) motion still may only "be brought after the dispositive motions deadline if the moving party complies with the requirements of Rule 16(b) and if it will not delay trial." *Argo*, 399 F. App'x at 3. "Consistent with the authority vested in the trial court by [R]ule 16, [the Fifth Circuit] gives the trial court 'broad discretion to preserve the integrity of the scheduling order.'" *Ellis*, 2023 WL 3302839, at *2 n.3 (quoting *Geiserman v. Macdonald*, 893 F.2d 787, 790 (5th Cir. 1990)).

A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004) (citation omitted). "[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Hughes v. The Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001) (citation omitted). The Court must accept the factual allegations in the pleadings as true, *id.*, and a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Pleadings should be construed

3

liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of material fact and only questions of law remain." *Brittan Commc'ns. Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 904 (5th Cir. 2002).

## BACKGROUND

Defendants did not plead unconstitutionality of the underlying statutes as a defense in their Answers, nor even in their proposed Amended Answers. Dkt. 81, 226-2, 226-3. *United States, ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419 (June 16, 2023), was argued in the U.S. Supreme Court on December 6, 2022. During oral argument, the Justices discussed the argument that the FCA is unconstitutional under Article II. *See id.*, Tr. of Oral Arg. at 5:18-8:15, 56:1-58:21, 59:19-60:2, 79:24-80:7. Pursuant to the dispositive motion deadline in the Court's Scheduling Order, the parties filed cross-motions for summary judgment on January 6, 2023. Dkt. 381, 385, 388, 389. Those motions were fully briefed as of February 21, 2023. Dkt. 435, 438, 440. Defendants did not include any argument that the FCA, TMFPA, or LMAPIL are unconstitutional. *See* Dkt. 382, 385, 414, 417, 435, 438. The case was stayed, at Defendants' request, pending the Supreme Court's resolution of consolidated cases *U.S. ex rel. Schutte v. SuperValu Inc.*, No. 21-1326 (U.S. Jan. 13, 2023), and *U.S. ex rel. Proctor v. Safeway, Inc.*, No. 22-111 (U.S. Jan. 13, 2023). Dkt. 446. Defendants did not request a stay pending the decision in *Polansky*. *Id.* Pursuant to the Court's order, the parties filed supplemental briefing on the applicability of the Court's ruling in those cases on June 4, 2023, but Defendants did not include any argument as to the constitutionality of the FCA, TMPFA, and LMAPIL. Dkt. 456. The opinion in *Polansky* was issued on June 16, 2023. The Court held oral argument on the summary judgment motions on August 15, 2023. Dkt. 528. Defendants did not

4

make any argument during the hearing that the FCA, TMFPA, and LMAPIL are unconstitutional. *See generally* MSJ Hearing Tr., Dkt. 527. Defendants filed their Motion for Judgment on the Pleadings, asserting for the first time that the FCA, TMFPA, and LMAPIL are unconstitutional, on September 1, 2023. Dkt. 533, 534.

## ARGUMENT

### I.    The Court Should Summarily Deny Defendants' Motion.

#### A. Defendants' motion is untimely.

Defendants proceed as if they are permitted to file a Rule 12(c) motion at any time. *See* Dkt. 534 at 15. But the Court set a deadline for dispositive motions in its Scheduling Order: "All motions that would dispose of all or any part of this case, including motions for summary judgment, shall be filed by **January 6, 2023**." Dkt. 346 at 3 (emphasis in original). The relief Defendants request is complete dismissal— thus, their motion "would dispose of all . . . of this case." *Id.*; *see also* Dkt. 533 at 2. It is therefore untimely under the Scheduling Order, which "shall control the disposition of this case unless it is modified by the Court upon a showing of good cause and by leave of court." Dkt. 346 at 11 (citing Fed. R. Civ. P. 16(b)(4)). Defendants also attempt to make additional summary judgment arguments in their brief (for example, in footnote 5, citing a case it appears they have never cited before) which is blatantly improper and a transparent attempt to preserve extra arguments for appeal that were not properly raised before this Court.[1] The Court has been generous and has already given the Defendants numerous chances to make their summary judgment

---

[1] This is a practice that Defendants have repeatedly engaged in. For example, instead of filing a brief "explaining the Supreme Court's decision [in *Schutte*] within 3 calendar days of the decision," Dkt. 446 at 3, Defendants filed a nineteen-page brief amounting to a summary-judgment surreply, Dkt. 456. And after the Court invited supplemental briefing on any post-2009 cases that find indirect liability for a clause 2 reverse false claim, *see* MSJ Hearing Tr. at 34:19-25, PPFA filed a brief acknowledging there were none but making additional arguments. Dkt. 531.

arguments, culminating in an all-day hearing. And Defendants' new arguments are not part of the summary judgment record under the Court's rules. *See* L.R. 56.7.

The Court would be well within its discretion to enforce its Scheduling Order and deny the Motion. Numerous courts have rejected attempts to file Rule 12(c) or similar motions after the dispositive motion deadline, and appellate courts have affirmed.[2]

### B. Defendants failed to show good cause.

The first factor that courts consider in whether a showing of good cause has been made is "the explanation for the failure to timely [comply with the scheduling order]." *Springboards*, 912 F.3d at 819. The only attempt Defendants make to explain their tardiness pertains to their nearly three-month delay in filing the Motion after the opinion in *Polansky*, which they try to use as justification for their motion. Even

---

[2] *See, e.g., Ellis*, 2023 WL 3302839, at *2 (affirming decision to strike 12(c) motion filed three weeks after the dispositive motion deadline); *Argo*, 399 F. App'x at *2 (affirming denial of 12(c) motion filed three months after dispositive motion deadline as untimely); *Al - Khawaldeh v. Tackett*, No. 1:20-CV-1079-RP, 2021 WL 5986053, at *5 (W.D. Tex. Dec. 16, 2021), *report and recommendation adopted*, No. 1:20-CV-1079-RP, 2022 WL 2718537 (W.D. Tex. Jan. 20, 2022) (denying leave to designate a responsible party where motion was filed eight months after dispositive motion deadline and where movant did not demonstrate good cause); *Rockwel v. Parker Drilling Mgmt. Services, Ltd.*, No. CV H-19-1054, 2020 WL 11563093, at *3 (S.D. Tex. Dec. 15, 2020) (striking untimely affirmative defenses and denying untimely motion for summary judgment and alternative 12(c) motion for failure to demonstrate good cause); *Zywczyk v. Syndicated Office Sys., LLC*, No. 5-17-CV-00771-FB-RBF, 2019 WL 2565283, at *2 (W.D. Tex. Feb. 7, 2019), *report and recommendation adopted*, No. CV SA-17-CA-0771-FB, 2019 WL 2565261 (W.D. Tex. Mar. 8, 2019) (striking 12(c) motion as untimely when filed one month after the dispositive motion deadline and where the defendant failed to explain how it met "Rule 16's fairly stringent 'good cause' standard which requires [the movant] to give a persuasive reason why the dates originally set by the scheduling order for the filing of dispositive motions could not reasonably be met despite the diligence of the party seeking the extension." (cleaned up)); *Crompton Greaves, Ltd. v. Shippers Stevedoring Co.*, No. CIV.A. H-08-1774, 2011 WL 5920930, at *3 (S.D. Tex. Nov. 28, 2011) (denying untimely motion for leave to designate responsible party (and therefore denying motion to strike as moot) for failure to demonstrate good cause); *Sea–Land Services, Inc. v. D.I.C., Inc.*, 102 F.R.D. 252, 253–54 (S.D. Tex. 1984) (denying defendant's Rule 12(c) motion filed seven months after motion cut-off date because there was no showing of good cause); *cf. Fisher v. Dall. Cnty.*, No. 3:12-CV-3604-D, 2014 WL 4797006, at *9 (N.D. Tex. 2014) (holding that "when a party files a Rule 12(c) motion, the opposing party does not file an intervening pleading (e.g., an amended complaint) that is subject to challenge for failure to state a claim on which relief can be granted, and the party files a second Rule 12(c) motion that is addressed to the same pleading that is the subject of the first Rule 12(c) motion, the second motion is successive and can be denied on that basis.").

assuming for the moment that *Polansky* had some effect on these proceedings, Defendants' only excuse is that they "endeavored to file this motion as soon as they reasonably could while preparing for the hearing on the parties' summary judgment motions." Dkt. 533 at 2. The Court did not even set a summary-judgment hearing until August 2, 2023. Dkt. 513. What were Defendants and their numerous attorneys doing between June 16 and August 2?

This argument could have been raised well before September 1. Affiliate Defendants' counsel wrote and published a blog post on June 20 analyzing *Polansky* and asserting that "it may be advisable for FCA defendants to begin immediately to raise an Article II defense in *qui tam* motions to dismiss."[3] That post also noted defense counsel's belief that "Chief Justice Roberts … hinted at his sympathy towards the Article II argument during oral argument."[4] As noted above, oral argument in *Polansky* was held in December 2022.[5] Yet Defendants did not raise this argument until September 1 despite numerous earlier opportunities, including in summary judgment briefing and at the summary judgment hearing. *See* Background, *supra.* The Court previously held that Relator's two lawyers had no excuse for delay in filing a motion to compel despite numerous briefing deadlines and a Fifth Circuit argument in the intervening period. Dkt. 507 at 4. Defendants have no valid excuse for their delay, and this falls far short of meeting Rule 16's good cause standard. *Olivarez*, 997 F.3d at 602.

---

[3] John P. Elwood, Allon Kedem, Tirzah S. Lollar, Michael A. Rogoff, and Andrew Tutt, *Supreme Court's* Polansky *Decision Presents the Prospect of a Constitutional Defense to* Qui Tam *Cases*, June 20, 2023, https://www.arnoldporter.com/en/perspectives/blogs/fca-qui-notes/posts/2023/06/supreme-court-polansky-decision.

[4] *Id.*

[5] Defense counsel was aware of the argument even earlier than June, if not the day it was argued. *See* Tirzah S. Lollar, *A Busy FCA Term for the Supreme Court: On the Heels of Argument on (c)(2)(A), April Hearing Set in Pair of Scienter Cases*, Feb. 13, 2023, https://www.arnoldporter.com/en/perspectives/blogs/fca-qui-notes/posts/2023/02/a-busy-fca-term-for-the-supreme-court.

Defendants' motion falls even further from the mark given that the *raison d'etre* of their motion is the Supreme Court's decision in *Polansky*. Defendants point not to the opinion of the Court nor to any change in law. Instead, they cite the *dissent* of Justice Thomas and a brief concurring opinion by Justice Kavanaugh (joined by Justice Barrett) stating that he believes the Court "should consider the competing arguments in an appropriate case" presenting the question of whether *qui tam* provisions violate Article II of the United States Constitution. *Polansky*, 599 U.S. at 442 (Kavanaugh, J., concurring). That does not announce a change in law justifying a belated argument, nor a new argument. As Defendants acknowledge, the en banc Fifth Circuit considered and rejected the argument that the FCA is unconstitutional over a decade ago. *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc). As Justice Thomas noted, this argument has been considered "for decades." *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting). And litigants have raised this very issue within the last few years. *See, e.g., United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 740 n.7 (10th Cir. 2018) (rejecting unconstitutionality argument made for the first time on appeal as forfeited); *cert. dismissed sub nom. Intermountain Health v. U.S. ex rel. Polukoff*, 139 S. Ct. 2690 (2019).

*Polansky* also says nothing about the Louisiana and Texas Constitutions. These are not new arguments prompted by a change in law, nor arguments that could not have been made before. Most of the cases Defendants rely on for their state-law arguments are decades old. Because Defendants have no valid excuse for their delay, and because they cannot point to an important reason why they should be permitted to make these arguments at this late date, the first two factors weigh against them. *Springboards*, 912 F.3d at 819. With respect to the third factor, there is prejudice to

Plaintiffs. *Id.* It is unfair to allow Defendants to continue making additional arguments after protracted litigation on the cusp of a decision on cross-motions for summary judgment, especially arguments that Defendants contend would require dismissal of the entire case that they had numerous opportunities to raise before.

Defendants' delay in filing their motion is inexcusable and they failed to even attempt to meet the good-cause standard for deviating from the Scheduling Order. The numerous cases cited above support denying Defendants' motion as untimely.

## II.    The False Claims Act Is Not Unconstitutional.

The previous section demonstrates that Defendants' motion is untimely and they have failed to show good cause for raising their arguments at this late date despite numerous earlier opportunities. The Court is completely within its considerable discretion to enforce its Scheduling Order. The Court should not entertain the merits of Defendants' arguments and should not allow Defendants to have a second bite at the apple in preserving these belated arguments for appeal. They have already been forfeited and it is prejudicial to Plaintiffs to hold otherwise. But even if the Court were to nevertheless consider the merits of Defendant's arguments, Defendants' motion should be denied on that basis as well. Defendants lob a mere three pages of argument into their brief to claim that unbeknownst to the men who wrote the Constitution, the Supreme Court, and every court of appeals to consider the question, somehow the FCA's *qui tam* provisions violate the Constitution. Defendants dodge the mountain of historical evidence that shows the opposite, and their barely formed arguments fail.[6]

---

[6] Apparently, Defendants intend to save their fully formed arguments to raise on appeal. *See* Dkt. 534 at 11 n.2, 33 n.10. None of these arguments are properly preserved, *see* Part I *supra*. But arguments made for the first time on appeal are forfeited. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir.

**A.** ***Qui tam*** **statutes in our tradition date back to the 14th century and were part of American law both before and after the Constitution was ratified.**

*Qui tam* is short for "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," which means "who pursues this action on our Lord the King's behalf as well as his own." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007). *Qui tam* has roots in the formative stages of English law. *Qui tam* actions originated around the end of the 13th century, when private individuals who had suffered injury began bringing actions in the royal courts on both their own and the Crown's behalf. *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 774 (2000). Suit in this dual capacity was a way to get private claims into the respected royal courts, which generally entertained only matters involving the Crown's interests. *Id.* at 774–75. Starting in the 14th century, as the royal courts began to extend jurisdiction to suits involving wholly private wrongs, the common-law *qui tam* action gradually fell into disuse and Parliament began enacting statutes that explicitly provided for *qui tam* suits. *Id.* The first *qui tam* statute was enacted by Parliament in 1400.[7] *Qui tam* statutes were generally of two types: (1) those that allowed injured parties to sue in vindication of their own interests (as well as the Crown's), and (2) those that allowed informers to obtain a portion of the penalty as a bounty for their information, even if they had not suffered an injury themselves. *Stevens*, 529 U.S. at 775. Over the centuries, *qui tam* relators were permitted to bring both civil and criminal actions. And by the 17th century, "the *qui tam* concept had wide acceptance in England."[8]

---

2021); *accord Polukoff*, 895 F.3d at 740 n.7 (rejecting unconstitutionality argument made for the first time on appeal as forfeited).

[7] *The History and Development of Qui Tam*, 1972 Wash. U. L.Q. 81, 86 (1972), *available at* https://openscholarship.wustl.edu/law_lawreview/vol1972/iss1/7.

[8] *History and Development of* Qui Tam, *supra* n. 6, at 90.

As the Supreme Court has noted, "[q]ui tam actions appear to have been as prevalent in America as in England," both "before and after the framing of the Constitution." *Stevens*, 529 U.S. at 776. The colonies passed "several informer statutes expressly authorizing *qui tam* suits." *Id.* And "immediately after the framing, the First Congress enacted a considerable number of informer statutes." *Id. Qui tam* suits, therefore, are deeply rooted in this country's legal tradition. Because *qui tam* statutes both pre- and post-dated the Constitution, the original public meaning of the Appointments and Take Care clauses would not have excluded *qui tam* statutes, and the Framers would have understood *qui tam* to be consistent with those provisions.

## B. The FCA's *qui tam* provisions are consistent with the Appointments Clause.

The Appointments Clause specifies the permissible means of appointing "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States," to public offices "established by Law." U.S. Const. art. II, § 2, Cl. 2. It also states that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* Defendants argue that the FCA's *qui tam* provisions are inconsistent with the Appointments Clause. But every court of appeals to address that issue, including the *en banc* Fifth Circuit, has rejected such a challenge. See *United States ex rel. Stone v. Rockwell Int'l Corp*, 282 F.3d 787, 804–05 (10th Cir. 2002), *cert. denied on constitutional issue*, 548 U.S. 941 (2006), *rev'd on other grounds*, 549 U.S. 457 (2007); *Riley*, 252 F.3d at 757–58; *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 757–59 (9th Cir. 1993), *cert.*

*denied*, 510 U.S. 1140 (1994); *see also Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1312 (11th Cir. 2021) (relying on the rationale of this authority in a case where Article II arguments were not presented).

In *Stevens*, the Supreme Court held that *qui tam* relators have Article III standing to pursue actions under the FCA. *See* 529 U.S. at 771–78. The Court did not decide whether the Act's *qui tam* provisions comport with the Appointments Clause. *See id.* at 778 n.8. But in at least two respects, the Court's analysis in *Stevens* shows that Defendants' Appointments Clause argument lacks merit. First, in holding that the FCA's *qui tam* provisions are consistent with Article III, *Stevens* expressly declined to rely on the theory that a private relator sues as an "agent of the United States." *Id.* at 772. The Court instead observed that the relator's statutory entitlement to a share of any ultimate recovery gives him a concrete personal stake in the disposition of the suit, *id.*, and concluded that "[t]he FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim," *id.* at 773. After addressing standing, *Stevens* held that the FCA does not authorize relators to pursue *qui tam* actions against States because, among other things, actions pursued by relators are "private suit[s]" brought by "private parties." *Id.* at 780–81 n.9, 786 n.17. The core premise of Defendants' Appointments Clause challenge—that the FCA's *qui tam* provisions make relators federal officers—is inconsistent with *Stevens*' emphasis on the relator's personal, private stake in the litigation and rejection of the notion that relators are "agents" of the government.

Second, as explained above, *Stevens* observed that, "immediately after the framing, the First Congress enacted a considerable number of informer statutes," some of which (like the FCA) "provided both a bounty and an express cause of action."

12

529 U.S. at 776–77. That historical evidence bears directly on the Appointments Clause question because legislation "passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, is contemporaneous and weighty evidence of its true meaning," *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (quoting *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888)); *accord Bowsher v. Synar*, 478 U.S. 714, 723–24 (1986) (giving weight to the conclusion of the First Congress that the legislative branch should have no role in the removal of Executive officers); *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (explaining that "'traditional ways of conducting government give meaning' to the Constitution" (citation omitted)); *Riley*, 252 F.3d at 752 (finding it "logically inescapable that the same history that was conclusive on the Article III question in *Stevens* with respect to *qui tam* lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning this statute."

In addition to the guidance from *Stevens*, *qui tam* relators do not possess the practical indicia to qualify as federal officers subject to the Appointments Clause. The concept of an "office" "embraces the ideas of tenure, duration, emolument, and duties." *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1868); *see Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890) (merchant appraiser did not hold an office where his position was "without tenure, duration, continuing emolument, or continuous duties, and he act[ed] only occasionally and temporarily"); *United States v. Germaine*, 99 U.S. 508, 511–12 (1879) (surgeon did not hold an office where he was "only to act when called on by the Commissioner of Pensions in some special case"). An office is also not personal; rather, its "duties continue, though the person be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15-747) (Marshall,

13

C.J.). Under the FCA, the role of relators is limited in time and scope, confined to a particular case, and fundamentally personal in nature, stemming from their capacity as a plaintiff pursuing what is essentially a partially assigned claim. *See Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) ("[A]n individual must occupy a 'continuing' position established by law to qualify as an officer."). Also, "[r]elators are not entitled to the benefits of officeholders, such as drawing a government salary." *Stone*, 282 F.3d at 805; *see Riley*, 252 F.3d at 757–58 (noting that relators "are not subject to either the benefits or the requirements associated with offices of the United States"). And neither a relator nor their attorney in *qui tam* litigation has any duty to subordinate the relator's interest to that of the government if a conflict between those interests arises. Rather, the task of representing the United States in FCA litigation is entrusted to DOJ attorneys. It is also notable that the FCA does not purport to "establish[] by Law" an "Office[]" of informer or relator, U.S. Const. art. II, § 2, cl. 2. Nor does the Act otherwise express an intent that relators should be treated as federal officers. To the contrary, the FCA provision that authorizes *qui tam* suits is entitled "Actions By Private Persons." 31 U.S.C. § 3730(b).

Defendants attempt an analogy to the Federal Election Commission members held to be "Officers of the United States" in *Buckley v. Valeo*, 424 U.S. 1 (1976). Dkt. 534 at 30-31. But there are critical differences. The positions in *Buckley* were not personal, were not limited to a single case, and were endowed with "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights." *Buckley*, 424 U.S. at 140. A *qui tam* relator bears none of those indicia of being a federal officer. She is instead merely a "private part[y]" pursuing one civil case in her own personal interest. *Stevens*, 529 U.S. at 786 n.17;

*see Taxpayers Against Fraud*, 41 F.3d at 1041 ("Although a relator may sue in the government's name, the relator is not vested with governmental power."). An FCA relator is not empowered to "administ[er] and enforce[] . . . public law" in the constitutional sense. *Buckley*, 424 U.S. at 141. A relator is more like a plaintiff who asserts a private right of action under a federal statute, such as Title VII or the Sherman Act, than an agency official who litigates on behalf of the Government. Congress's decision to authorize private lawsuits may often rest in part on its belief that such actions will vindicate a societal interest in deterring and remedying violations of federal law. As with plaintiffs who sue under other federal statutes, the potential for *qui tam* relators to furnish practical assistance in the enforcement of federal law does not transform them into "Officers of the United States" whose selection is governed by the Appointments Clause.

*Buckley* also emphasized the FEC's "extensive rulemaking and adjudicative powers" which allowed it to bring civil enforcement actions without any "concurrence of or participation by the Attorney General," and "the decision not to seek judicial relief . . . appear[ed] to rest solely with the Commission." *Id.* at 110–11. But under the FCA's *qui tam* provisions, a relator's filing suit (or not filing suit) does not limit the ability of DOJ to pursue a claim on behalf of the United States. As the Eleventh Circuit has stated, the United States has "considerable authority over intervened and non-intervened *qui tam* actions." *Yates*, 21 F.4th at 1312. The FCA statute contains numerous provisions showing this to be the case. *See, e.g.,* 31 U.S.C. §§ 3730(b)(2), 3730(b)(4)(A), 3730(c), 3730(c)(1), 3730(c)(3), 3730(c)(4), 3730(c)(5).

*Qui tam* relators therefore do not exercise the United States' prosecutorial authority. And, as noted above, private parties' pursuit of *qui tam* litigation is also

15

consistent with longstanding historical practice, which is strong evidence that the Framers did not view *qui tam* relators as "Officers" who must be appointed pursuant to the Appointments Clause.

### C. The *qui tam* provisions of the FCA are consistent with the Take Care Clause.

For similar reasons, the *qui tam* provisions of the FCA are also consistent with the constitutional separation of powers, including the Take Care Clause, which states that the President "shall take Care that the laws be faithfully executed." U.S. Const. art. II, § 3. In assessing whether legislation "disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977). Regardless of whether the United States intervenes in a particular suit, relators' conduct of *qui tam* litigation does not prevent the President from carrying out his constitutional functions—a point on which courts have long agreed. *See Stone*, 282 F.3d at 805–07; *Riley*, 252 F.3d at 752–57; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 749-57*; see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154–55 (2d Cir. 1993).

As explained above, *qui tam* relators are private litigants. *See Stevens,* 529 U.S. at 772. Although it is the United States whose injury underlies an FCA suit, the relator has standing because of his independent stake: she has a "concrete private interest in the outcome of the suit" that arises from Congress's "partial assignment of the Government's damages claim" to her. *Id.* at 772–73; *see also United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1167 (10th Cir. 2009) (holding that a would-be relator had validly released potential future *qui tam* claims she could

16

personally bring because "the relator has an interest in some part of the civil action apart from the Government"). And as with the Appointments Clause, the fact that a relator's suit may also vindicate a federal interest in remedying and deterring fraud does not change the constitutional analysis. As the *en banc* Fifth Circuit explained when it rejected a separation-of-powers challenge to the *qui tam* provisions, the Take Care Clause "does not require Congress to prescribe litigation by the Executive as the exclusive means of enforcing federal law." *Riley*, 252 F.3d at 753. Instead, as the Sixth Circuit noted, "[o]ur current statutory framework includes many laws that authorize individuals to act as 'private attorneys-general,' bringing causes of action for the common weal," *Taxpayers Against Fraud*, 41 F.3d at 1041, such as Title VII and the Sherman Act.

And, again, courts have also correctly recognized that historical evidence helps establish that the *qui tam* provisions are consistent with the constitutional separation of powers. *See, e.g., Riley*, 252 F.3d at 752–53. "Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943); *see also Stevens*, 529 U.S. at 774–77. Courts rejecting separation-of-powers challenges to the *qui tam* provisions have also recognized that the United States retains control over *qui tam* suits. *See Riley*, 252 F.3d at 753-57; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 753–55; *Kreindler & Kreindler*, 985 F.2d at 1155; *cf. Yates*, 21 F.4th at 1312.

As explained above, the Executive's constitutional authority is not impaired when "private part[y]" relators file suit to vindicate their personal interests,

consistent with "the long tradition of *qui tam* actions in England the American Colonies." *Stevens*, 529 U.S. at 774, 786 & n.17.

### III.   The TMFPA does not violate the Texas Constitution.

The Court should disregard both state law arguments as arguments that could have been raised before. The Court should reject Defendants' repeated attempts to make additional arguments, even after they've been given many chances to do so and could have made the arguments before.[9] Even if the Court were to credit Defendants' *Polansky* argument as a justification for their motion being brought three months after the decision and nine months after the dispositive motion deadline, *Polansky* does not have anything to do with state constitutions. Moreover, this is not the first time that Planned Parenthood has argued that a *qui tam* provision violates the separation of powers provision of the Texas Constitution. They made the same argument in the state court Texas Heartbeat Act litigation in 2021, so they cannot say that they were unaware of it.[10] Moreover, the case they primarily rely on, *American Liberty Pipe Line Co. v. Agey*, 167 S.W.2d 580 (Tex. App. 1942), is far from new. It is *80 years old*. In fact, there is no Texas case Defendants cite for this argument that is newer than that—most are *older*.

In any event, Defendants' argument fails. First, it disregards the text of the separation-of-powers provision in the Texas Constitution (which is quite different from the Appointments and Take Care Clauses of the U.S. Constitution):

---

[9] Yet another example of Defendants trying to throw more belated arguments in—now they include an argument regarding Relator's implied-false-certification claims under state law that clearly could have been raised during summary judgment briefing. Dkt. 534 at 16 n. 5. The Court must draw a line to prevent this abusive tactic, which is highly prejudicial to Plaintiffs. In any event, the State could have chosen to dismiss Relator's additional claims rather than allow Relator to proceed, but it did not.
[10] Plaintiffs' Mot. for Summary J. 23-26, *Planned Parenthood of Greater Tex. Surg. Health Servs. v. Tex. Right to Life*, Cause No. D-1-GN-21-004632 (53rd Dist. Ct., Travis County, Tex. Sept. 20, 2021).

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, *being of one of these departments*, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

Tex. Const. art. II, § 1 (emphasis added). The provision prohibits individuals in one of the "three distinct departments" of Texas government from exercising the powers "properly attached to either of the other[]" departments. *Id.* TMFPA relators are not "of one of these departments" and "exercis[ing] any power properly attached to either of the others" when they sue. They are "private persons." Tex. Hum. Res. Code § 36.101. By the provision's plain text, then, there is no violation of this constitutional provision even if one could somehow claim that TMFPA relators wield "executive" power (which they do not), as they are not part of any of the other "departments" of the government. *Cf. State v. Stephens*, 663 S.W.3d 45, 51 (Tex. Crim. App. 2021), *reh'g denied*, 664 S.W.3d 293 (Tex. Crim. App. 2022) (holding that the power to criminally prosecute (which the CCA said fell under the judicial branch) could not constitutionally be given by the Legislature to the Attorney General (an executive branch official)).

Defendants also point to Article IV, section 22 and Article V, section 21, claiming that allowing private parties to bring suit to recover wrongfully obtained Medicaid funds violates these provisions as well. Article IV governs the executive branch. In Article IV, section 22, the Texas Constitution states that the Attorney General "shall represent the state in all suits and pleas in the Supreme Court of the State in which the State may be a party," "take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power … not authorized by law," and "perform such other duties as may be required by law."

19

This case is obviously not in the "Supreme Court of the State," so the Attorney General's power to bring suit under the TMFPA and represent the State comes from his "other duties" authority under section 22 rather than the provision that Defendants cite. Section 22 assumes the Attorney General's authority would be further governed by statute ("required by law"). And so it is. *See, e.g.,* Tex. Gov't Code § 402.021 ("The attorney general shall prosecute and defend all actions in which the state is interested before the supreme court and courts of appeals."). It is also governed by the TMFPA, which gives the Attorney General the power to bring suit on behalf of the State under subchapter B. And the TMFPA, in subchapter C, *also* provides for actions by "private persons." Tex. Hum. Res. Code § 36.101.

That Relator's counsel argued on behalf of both Plaintiffs at the MSJ hearing does not make Relator's counsel the State's counsel any more than Affiliate Defendants' counsel was PPFA's counsel when he made arguments for both PPFA and the Affiliate Defendants. Regardless, Defendants seem to be arguing that the State could never have non-state attorneys represent it consistent with the Texas Constitution. The logical conclusion of that argument would be that the State could never hire outside legal counsel, which is obviously not the case. The Attorney General's implied authority includes the right to hire outside counsel. In fact, the Office of the Attorney General acts as the gatekeeper for all outside counsel hired by non-constitutional officers of the State. *See* Tex. Gov't Code § 402.0212. And the TMFPA itself expressly provides that "[t]he attorney general may contract with a private attorney to represent the state in an action under this subchapter with which the state elects to proceed." Tex. Hum. Res. Code § 36.105. Notably, this section is in subchapter C, which governs TMFPA actions brought by "private persons."

Defendants also claim that the *qui tam* provision of the TMFPA violates Article V, section 21. Article V governs the judicial branch. That provision states:

> A County Attorney, for counties in which there is not a resident Criminal District Attorney, shall be elected by the qualified voters of each county, who shall be commissioned by the Governor, and hold his office for the term of four years. . . . The County Attorneys shall represent the State in all cases in the District and inferior courts in their respective counties; but if any county shall be included in a district in which there shall be a District Attorney, the respective duties of District Attorneys and County Attorneys shall in such counties be regulated by the Legislature. . . .

Tex. Const. art. V, § 21. Again, the plain language shows that Defendants' argument is incorrect. This action is not a "case[] in the District court and inferior courts in their respective counties," so it is unclear how this provision applies here or precludes this TMPFA action.[11]

Further, the language from the 1942 court of appeals case that Defendants principally rely on is dicta. When the Texas Supreme Court later ruled in the same case, it made clear that it was "not necessary for this Court to here decide whether the Legislature was prohibited by the Constitution from permitting such suit to be filed without joinder of the Attorney General, or some county or district attorney, and we express no opinion upon that question." *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972, 974 (Tex. 1943). The Court's decision came down to the statutory text at issue, which did not provide "for such person to institute and prosecute such a suit in the name of the State without the joinder of the Attorney General or some district or county attorney." *Id.* That is not the case here. *See* Tex. Hum. Res. Code §§ 36.101, 36.104. And because the TMFPA provides numerous means for the involvement of

---

[11] "District court" is read in context of Article V, which refers to *state* district courts. *See* Tex. Const. art. V, § 8.

21

the State in a relator's suit, which would also include determining how and whether the suit is litigated (and by whom), it is consistent with *Agey*'s general statement that "[t]he Attorney General is the chief law officer of the State, and it is incumbent upon him to institute in the proper courts proceedings to enforce or protect any right of the public that is violated. . . He has the right to investigate the facts and exercise his judgment and discretion regarding the filing of a suit." 172 S.W.2d at 974. *See* Tex. Hum. Res. Code §§ 36.102, 36.104, 36.107, 36.108, 36.109.[12]

## IV.    The LMAPIL does not violate the Louisiana Constitution.

Defendants' arguments regarding the Louisiana Constitution fail for similar reasons—they rely on decades-old cases for this "new" argument and overstate their import here. Article II, section 1 of the Louisiana Constitution states that, "[t]he powers of government of the state are divided into three separate branches: legislative, executive, and judicial." And Article II, section 2 states that, "[e]xcept as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others." Thus, section 2 applies explicitly to "these branches," and "any person holding office in one of them." *Id.* A LMAPIL relator is neither a "branch" of Louisiana government, nor do they "hold[] office in one of them." LMAPIL's provisions do not create an "office" for a relator—rather, they consistently refer to the relator as a "private person." La. R.S. § 46:439.1(A).

Given that, it is no surprise that the cases Defendants rely on are off base. *Guidry v. Roberts*, for example, involved election "reporting officials and supervisory committees designated by the statute [that] were exercising powers entrusted to the

---

[12] The other cases discussed by Defendants are ably explained by Texas and do not support Defendants' arguments either.

executive branch, but they were appointed by the legislature not the governor." 335 So. 2d 438, 440 (La. 1976). In other words, *Guidry* was looking at government officials appointed by one branch of government allegedly exercising powers of another branch of government, falling squarely within the text of Article II. *Guidry* therefore did not concern the question of whether anyone else, other than the executive branch, could exercise executive power. And *Guidry* rejected the argument that the separation of powers was violated by allowing the committees to investigate potential violations, holding that "we cannot read our state's separation of powers provision as inflexibly prohibiting to none but the executive branch the power to receive election-finance reports and complaints of election-law violations, to evaluate them, and to forward to prosecutorial officers any violations suspected as a result." *Id.* at 446.

LMAPIL is consistent with this. A LMAPIL relator, like a relator under the TMFPA and the FCA, must disclose to the government the facts underlying the claim before filing the civil case, the case remains under seal while the government investigates, and the government decides whether to intervene or permit the relator to litigate the case. *See* La. R.S. § 46.439.2. The LMAPIL also gives the Department of Health and the Attorney General the authority to initiate LMAPIL cases without any relator assistance. La. R.S. § 46.438.1; *cf. Guidry*, 335 So. 2d at 447 (holding that limiting the power of district attorneys to prosecute violations of the statute to "only such violations as the supervisory committee discovers or receives" violates the separation of powers).

Defendants also discuss *State Through Bd. of Ethics for Elected Officials v. Green*, 566 So. 2d 623 (La. 1990). In that case, the Louisiana Supreme Court was again examining committees created by the Campaign Finance Disclosure Act. When

analyzing Article II, the Court stated that this provision "prohibits a person holding office in one branch of government from exercising power belonging to another branch." *Id.* at 625. The Court *reversed* its prior conclusion (in *State Through Bd. of Ethics for Elected Officials v. Green*, 545 So. 2d 1031 (La. 1989)) that the committee's "authority to exercise the exclusive executive function of enforcing the campaign finance disclosure laws by filing suit to exact punishment of those who violated that law" violated separation of powers. *Green*, 566 So. 2d at 624. Instead, the Court upheld the law because the Legislature retained no significant control over the officials it appointed to the committee, so it could not be said that the Legislature was usurping executive power. The Court noted that:

> A system for legislative appointment of the Board of Ethics for Elected Officials could violate the constitutional prohibition if the system allowed *the Legislature to exercise executive functions* through its controlled appointees. The key focus of the constitutional determination is on *the degree of control over the appointees* contained in the particular statutory scheme under review.

*Id.* (emphasis added). Concluding that the law "contains significant restraints on legislative control over the actions of the Board," *id.*, the Court concluded that the law "does not unconstitutionally infringe on [Article II]'s prohibition against the Legislature's exercising power belonging to the executive branch," *id.* at 626. Here, even if a relator could be conceived of as an "officer" appointed by the Legislature under LMAPIL (which would contradict the plain language of the statute), the Legislature retains *no* control over relators, and thus does not usurp governmental power from another branch, which is the focus of Article II. And as explained above, the executive branch *does* retain control over suits brought by *qui tam* relators under LMAPIL.

24

**CONCLUSION**

Based on the foregoing, Relator respectfully requests that this Court deny Defendants' Motion for Judgment on the Pleadings (Dkt. 533).

Respectfully submitted.

/s/ Heather Gebelin Hacker
Heather Gebelin Hacker
Texas Bar No. 24103325
Andrew B. Stephens
Texas Bar No. 24079396
HACKER STEPHENS LLP
108 Wild Basin Road South, Suite 250
Austin, Texas 78746
(512) 399-3022
andrew@hackerstephens.com
heather@hackerstephens.com

*Attorneys for Relator*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2023, this document was electronically filed and served via the Court's CM/ECF system.

/s/ Heather Gebelin Hacker
Heather Gebelin Hacker