UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| United States of America*, et al., ex rel.* Doe,<br><br>                    Plaintiffs,<br><br>        v.<br><br>Planned Parenthood Federation of America, Inc., Planned Parenthood Gulf Coast, Inc., Planned Parenthood of Greater Texas, Inc., Planned Parenthood South Texas, Inc., Planned Parenthood Cameron County, Inc., Planned Parenthood San Antonio, Inc.,<br><br>                    Defendants. | CIVIL ACTION No. 2:21-CV-00022-Z |

## BRIEF OF *AMICUS CURIAE* ANTI-FRAUD COALITION IN SUPPORT OF *QUI TAM* RELATORS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………………iii

INTEREST OF *AMICUS CURIAE*……………………………………………………………1

INTRODUCTION………………………………………………………………………...2

ARGUMENT…………………………………………………………………………...4

I.      Since 1863 the False Claims Act's Public-Private Partnership Has Functioned
        Successfully to Protect the Federal Treasury From Fraud and to Serve the Public
        Interest Through Enhanced Enforcement of Laws That Protect the Health and
        Safety of Citizens....................................................................................................................4

II.     The Unanimous Acceptance Of *Qui Tam* Actions By All Three Branches Of
        Government For Over Two Hundred Years Firmly Establishes Their
        Constitutionality....................................................................................................................9

        A.      Every Appellate Court to Have Considered the Question Has Concluded
                That the *Qui Tam* Provisions of the FCA Are Constitutional.................................9

        B.      Congress has Employed the *Qui Tam* Mechanism Since the Founding of
                the Country.................................................................................................................12

        C.      The Executive Branch Has Supported the Constitutionality of the Qui Tam
                Provisions.................................................................................................................14

III.    The Unanimous View of the Three Branches is Supported by the FCA's
        Structure, Which Provides the Executive Branch Extensive Control Over *Qui Tam*
        Actions.................................................................................................................................14

        A.      The FCA *Qui Tam* Provisions Do Not Violate the Appointments Clause. ...........14

        B.      The FCA *Qui Tam* Provisions Do Not Violate the Take Care Clause.................16

CONCLUSION......................................................................................................................18

## TABLE OF AUTHORITIES

### CASES

*Bowsher v. Synar*, 478 U.S. 714 (1986) ................................................................................ 12, 13

*Buckley v. Valeo*, 424 U.S. 1 (1976). ......................................................................................... 16

*Clinton v. City of New York*, 524 U.S. 417 (1998) .................................................................... 12

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. __,
139 S.Ct. 1507 (2019) ...................................................................................... 3, 11, 15

*Coleman v. Miller,* 307 U.S. 433 (1939) .................................................................................... 19

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC,*  591 U.S.  ___, 140 S. Ct.
1649 (2020) .............................................................................................................. 13

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) .................................... 13

*Humphrey's Ex'r v. U.S.*, 295 U.S. 602 (1935) .......................................................................... 15

*Marvin v. Trout*, 199 U.S. 212 (1905) ....................................................................................... 12

*Morrison v. Olsen,* 487 U.S. 654 (1988) .................................................................................... 16

*Myers v. United States*, 272 U.S. 52 (1926) ............................................................................... 12

*Polansky v. Exec. Health Res.*, 17 F.4th 376 (3d Cir. 2021) ....................................................... 10

*Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc) ...................... *passim*

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,  591 U.S. __, 140 S. Ct. 2183 (2020) ............. 13, 16

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (2000) ............................................ 19

*Stuart v. Laird*, 5 U.S. 299 (1803) ............................................................................................. 12

*The Laura*, 114 U.S. 411 (1885) ................................................................................................ 12

*U.S. v. Curtiss-Wright Export Corporation*, 299 U.S. 304 (1936) .............................................. 12

*United States ex rel. Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, (D.D.C. 1998) ...... 9

*United States ex rel. Chandler v. Hektoen Inst. for Med. Research*, 35 F. Supp. 2d 1078 (N.D. Ill.
(1999) ......................................................................................................................... 9

*United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835 (7th Cir. 2020) ................... 11

*United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611 (W.D. Wis. 1995); ................. 9

*United States et al. ex rel. Karadsheh v. Fata et al.*, 2:13-cv-13333 (E.D. Mich. 2013) ................. 6

*United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993), *cert. denied*, 510 U.S. 1140 (1994) ............................................................................................................................ *passim*

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148 (2d Cir. 1993) ............................................................................................ *passim*

*United States ex rel. Moldex-Metric v. 3M Company*, Case No. 3:16-cv-1533-MBS (D.S.C.). .... 7

*United States ex rel. Phillips v. Pediatric Servs. of Am., Inc.*, 123 F. Supp. 2d 990 (W.D.N.C. 2000) ...................................................................... 9

*United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023) ......................................................................................... 16, 17

*United States ex rel. Robinson v. Northrop Corp.*, 824 F. Supp. 830 (N.D. Ill. 2001).................. 9

*United States ex rel. Sharp v. Consolidated Medical Trans.*, 2001 WL 1035720 (N.D. Ill. 2001) 9

*United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002)...................... 9

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994). .9

*United States ex rel. Westrick v. Second Chance Body Armor Inc., et al.*, 1:04-cv-00280 (D.D.C. 2004) ........................................................................................................................ 7

*United States v. Patel*, 17 F. Supp. 3d 814 (N.D. Ill. 2014), *aff'd*, 778 F.3d 607 (7th Cir. 2015).. 6

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000)........................................................................................... *passim*

*Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288 (11th Cir. 2021)................ 11, 19

## STATUTES

False Claims Act, ch. 67, 12 Stat. 696-99 (1863). ....................................................... 4

31 U.S.C. § 3730(b)(1) ...................................................................................... 18

31 U.S.C. § 3730(b)(2) ....................................................................................... 5

31 U.S.C. §3730(b)(4)(A). ................................................................................. 17

31 U.S.C. § 3730(c)(1)......................................................................................... 5

31 U.S.C. § 3730(c)(2)................................................................................. 5, 17, 18

31 U.S.C. § 3730(c)(3)...................................................................................... 18

31 U.S.C. § 3730(c)(4)...................................................................................... 18

31 U.S.C. § 3730(c)(5)..............................................................................................17

31 U.S.C. § 3730(h).................................................................................................. 5

18 U.S.C. § 962.........................................................................................................13

25 U.S.C. § 201.........................................................................................................13

28 U.S.C. § 593(e).....................................................................................................18

28 U.S.C. §596(b)(2)..................................................................................................18

46 U.S.C. § 723, now codified at 46 U.S.C. § 80103(b) ............................................13

Act of August 5, 1861, ch. 45, § 11, 12 Stat. 292, 296-97........................................13

Act of February 20, 1792, ch. 7, § 25, 1 Stat. 232, 239,
    reenacted Act of March 3, 1845, ch. 43, § 17, 5 Stat. 732, 738.............................13

Act of July 8, 1870, ch. 230, § 39, 16 Stat. 198, 203,
    reenacted Act of May 21, 1872, ch. 177, § 3, 17 Stat. 136, 137.............................13

Act of March 22, 1794, ch. 11, §§ 2, 4, 1 Stat. 347, 349,
    reenacted Act of March 26, 1804, ch. 38, § 10, 2 Stat. 283, 286, Act of March 2, 1807, ch. 22,
    § 3, 2 Stat. 426, 426, Act of March 4, 1909, ch. 321, §§ 254-57, 35 Stat. 1088, 1138-40.......13

## **OTHER AUTHORITIES**

13 Op. O.L.C. 207 (1989)..........................................................................................14

20 Op. O.L.C. 124 (1996)..........................................................................................14

Cong. Globe, 37th Cong., 3d Sess. 956 (1863)........................................................... 4

S. Rep. No. 99-345 (1986).......................................................................................4, 5

Richard A. Bales, A Constitutional Defense of Qui Tam, 2001 Wis. L. Rev. 381 (2001)...........13

Bret Boyce, The Constitutionality of the Qui Tam Provisions of the False Claims Act Under
    Article II, 24 False Claims Act and Qui Tam Q.Rev. 10 (Oct. 2001). .....................................16

Evan Caminker, The Constitutionality of Qui Tam Actions, 99 Yale L.J. 341, 364 - 66 (1989); 16

Peter Shane, Returning Separation-of-Powers Analysis to Its Normative Roots: The
    Constitutionality of Qui Tam Actions and Other Private Suits to Enforce Civil Fines, 30 Env't.
    L. Rep. 11,081 (Dec. 2000); ....................................................................................16

https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-2-billion-
    fiscal-year-2022 (statements of Principal Deputy Assistant Attorney General Boynton)......... 3

https://www.justice.gov/usao-edwa/pr/providence-health-services-agrees-pay-227-million-resolve-liability-medically ............................................................................................ 5

https://www.justice.gov/opa/pr/detroit-area-doctor-sentenced-45-years-prison-providing-medically-unnecessary-chemotherapy ...................................................................... 6

https://www.justice.gov/opa/pr/biogen-inc-agrees-pay-900-million-settle-allegations-related-improper-physician-payments ......................................................................... 6

https://www.justice.gov/opa/pr/3m-company-agrees-pay-91-million-resolve-allegations-it-supplied-united-states-defective-dual ...................................................................... 7

https://www.justice.gov/opa/pr/booz-allen-agrees-pay-37745-million-settle-false-claims-act-allegations. ............................................................................................. 7

https://www.justice.gov/opa/pr/honeywell-pay-335-million-alleged-false-claims-zylon-bullet-proof-vests ............................................................................................. 7

https://www.justice.gov/opa/pr/justice-department-s-false-claims-act-settlements-and-judgments-exceed-56-billion-fiscal-year .................................................................... 8

https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-2-billion-fiscal-year-2022 .................................................................................... 8

https://www.justice.gov/d9/press-releases/attachments/2023/02/07/fy2022_statistics_0.pdf ........ 8

https://www.taf.org/fbtn2023-sept18 ....................................................................... 8

https://www.washingtonpost.com/national-security/2023/07/21/booz-allen-lawsuit-false-charges/. ................................................................................................. 8

## RULES

Fed. R. Crim. Pro. 48(a) ..................................................................................... 18

## TREATISES

3 Sir William Blackstone, Commentaries on the Laws of England *161 ..................................... 12

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 2, cl. 2 ............................................................................... 14

U.S. Const. art. I, § 8, cl. 18............................................................................... 19

## INTEREST OF *AMICUS CURIAE*

The Anti-Fraud Coalition ("TAF Coalition") is a nonprofit, public interest organization dedicated to combating fraud against the government and protecting public resources through public-private partnerships.  TAF Coalition is committed to preserving effective anti-fraud legislation at the federal and state levels.  The organization has worked to publicize the *qui tam* provisions of the federal False Claims Act ("FCA"), has participated in litigation as a *qui tam* relator and as an *amicus curiae*, including on the foundational issues presented in this case, and has provided testimony to Congress about ways to improve the FCA.  TAF Coalition is supported by whistleblowers and their counsel, by membership dues and fees, and by private donations.  TAF Coalition is the 501(c)(3) arm of Taxpayers Against Fraud, which was founded in 1986.  TAF Coalition has a strong interest in defending the FCA and ensuring its proper interpretation and application.

TAF Coalition's interest in this case is in defending the FCA's *qui tam* provisions against renewed attacks that they somehow violate the Constitution by impermissibly encroaching on the Executive Branch's powers.  All three branches of the government have supported the *qui tam* provisions of the FCA, which is the government's primary weapon against fraud.  In 2000, the Supreme Court held, based on the history and structure of the FCA, that *qui tam* relators have standing under Article III, and those same factors demonstrate that the Act does not violate the Take Care Clause or the Appointments Clause.  Indeed, every appellate court that has addressed the issue has concluded that the Act does not violate these provisions, and a chorus of district courts in other jurisdictions have likewise upheld the statute against such challenges.  Nothing that the Defendants in this case raises provides any reason to depart from these decisions or to call into question the constitutionality of the FCA.

## INTRODUCTION

Congress enacted the False Claims Act in 1863 to combat widespread fraud on the Treasury. Drawing on a procedural mechanism well-known to the Framers of the Constitution, the Act enlists private citizens to aid in this endeavor, authorizing them to file "*qui tam*" suits on behalf of the United States against those who submit false claims for payment to the United States. Persons initiating such actions are known as "relators" and are awarded a share of any recovery obtained through settlement or trial. Since Congress amended the law in 1986 in ways that enhanced Executive Branch control over *qui tam* cases brought under the Act, those cases have helped return over $72 billion to the government and had an even greater deterrent effect.

Notwithstanding the law's history, in the immediate aftermath of the 1986 amendments, courts across the country were presented with arguments that the FCA's *qui tam* provisions were unconstitutional, either because they violated Article II and the separation of powers, or because relators lacked standing under Article III. Every appellate court that considered those challenges upheld the FCA's constitutionality. These courts concluded that the Act does not offend the separation of powers because the Executive Branch retains sufficient control over *qui tam* litigation and because *qui tam* relators, who pursue only an individual case, are not officers of the United States and do not exercise government power such that they need to be appointed in accordance with Article II. These courts also concluded that relators have standing under Article III, a conclusion that the Supreme Court affirmed, finding history "well nigh conclusive" on that question.[1] And more recently, in construing a provision of the FCA that referenced "an official of the United States," the Supreme Court held that relators are private persons, not officials of the United States, and are not charged with responsibility to investigate or prosecute FCA cases.[2]

---

[1] *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 776-77 (2000) (noting that the First Congress adopted a *qui tam* provision).

[2] *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. __, 139 S.Ct. 1507, 1514 (2019).

This unanimous view of the constitutionality of the Act's *qui tam* provisions is well-supported by both the history and structure of the FCA. Congress grounded the Act in an ancient and effective procedure for increasing the likelihood of detecting and deterring fraud against the federal Treasury, and has worked with the Executive Branch to improve both the Act's effectiveness and to calibrate Executive Branch control over *qui tam* actions. The Executive Branch has supported the constitutionality of the *qui tam* provisions in court, as it has in this case, and has repeatedly emphasized that "the False Claims Act remains one of the most important tools for ensuring that public funds are spent properly and advance the public interest."[3] The Department of Justice has also expressed gratitude for "the hard work and courage of those private citizens who bring evidence of fraud to the Department's attention, often putting at risk their careers and reputations," and observed that the Department's "ability to protect citizens and taxpayer funds continues to benefit greatly from their actions."[4]

In light of the support of the statute by all three branches of government, together with the history and structure of the FCA, the contention that the *qui tam* provisions of the FCA are unconstitutional is untenable. This Court should join the chorus of judicial opinions rejecting such challenges.

---

[3] https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-2-billion-fiscal-year-2022 (statements of Principal Deputy Assistant Attorney General Boynton).

[4] *Id.*

**ARGUMENT**

I.    <u>Since 1863 the False Claims Act's Public-Private Partnership Has Functioned Successfully to Protect the Federal Treasury from Fraud and to Serve the Public Interest Through Enhanced Enforcement of Laws That Protect the Health and Safety of Citizens.</u>

In 1863, the federal government, in its fight for the survival of the Union, was spending more money than it ever had and buying more goods than it had ever had in order to mobilize, equip, feed, and arm federal troops.  Unscrupulous contractors sought to take advantage of this flood of federal money.  As Senator Henry Wilson of Massachusetts noted during debates on the proposed FCA, although Congress's "Halls have rung with denunciations of the frauds of contractors upon the Government of the United States," and although "[t]he Government is doing what it can to stop these frauds and punish those who commit them," it was not enough.[5]  To supplement the government's efforts to combat rampant fraud, Congress proposed "a reward to the informer who comes into court" to provide information about fraud against the government.[6]  In discussing the proposed law, Senator Jacob Howard of Michigan confidently stated that the *qui tam* aspects of the law allowing private citizens to bring suits to prosecute fraud on behalf of the United States were "open to no serious objection."[7]  The bill passed and was signed into law.[8]

Over the next hundred years, several "restrictive" court decisions "thwart[ed] the effectiveness of the statute" [9] and undermined the effectiveness of this public-private partnership.  After extensive hearings and with the input of the Executive Branch,[10] Congress amended the law in 1986 to make it "a more useful tool against fraud in modern times."[11]  The 1986 amendments

---

[5]  *See* Cong. Globe, 37th Cong., 3d Sess. 956 (1863).

[6]  Senator Jacob Howard of Michigan noted that the typical informer would be one who "betrays his coconspirator," but, the law was "not confined to that class."  *Id.* at 955.

[7]  *Id.*

[8]  False Claims Act, ch. 67, 12 Stat. 696-99 (1863).

[9]  S. Rep. No. 99-345, at 3 (1986).

[10]  *Id.* at 10-13 (noting that various Department of Justice officials, including Associate Deputy Attorney General and Assistant Attorney General, "expressed strong support for the amendments to the False Claims Act.").

[11]  *Id.* at 1.

gave the government enhanced investigatory and litigation tools to detect false claims.  At the same time, Congress determined that "only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds."[12]  To that end, it reinvigorated the public-private partnership that formed the core of the 1863 Act by both providing relators a greater stake in cases brought under the Act and enhancing the government's control over such cases.  Among other things, the government was given the right to intervene and assume responsibility for the case, as well as the right to settle or dismiss a case over the relator's objections, subject to some judicial oversight.[13]  For relators, the bounty for successful cases was increased and given a set floor, they were entitled to remain a party when the government assumed responsibility for their case, and they were provided protection from retaliation.[14]

The post-amendment public-private partnership embodied in the FCA has made a tremendous impact on combating fraud and protecting the public from harm.  In the field of healthcare, actions initiated by relators have brought serious concerns about patient harm to the government's attention.  For example, in 2022, the government intervened in and settled for $22 million a *qui tam* action in which a whistleblower alleged that two physicians at a large health care and hospital system billed for services never performed, billed for botched spinal surgeries, and falsified diagnoses to justify more complex and higher risk—and higher paying—spinal surgeries.[15]  In highlighting the importance of the public-private partnership, the U.S. Attorney for the Eastern District of Washington noted her "special appreciation for our close collaboration and partnership with the Washington Medicaid Fraud Control Division and with the whistleblower and his team, as well as the exceptional investigative work performed by HHS-OIG, Office of Personnel Management OIG, and Defense Criminal Investigative Service."[16]

---

[12]  *Id.*

[13]  *Id.* at 11-12; 31 U.S.C. § 3730(b)(2), (c)(2)(B).

[14]  S. Rep. No. 99-345, at 12 (1986); 31 U.S.C. §§ 3730(d), (c)(1), (h).

[15]  *See* https://www.justice.gov/usao-edwa/pr/providence-health-services-agrees-pay-227-million-resolve-liability-medically.

[16]  *Id.*

Whistleblowers have also been instrumental in identifying particularly egregious instances of healthcare providers taking advantage of vulnerable populations. In one example, a whistleblower filed a 2013 *qui tam* action alleging that a Michigan physician submitted false claims for chemotherapy, oncological treatment services, and diagnostic tests.[17] In 2015, the physician pleaded guilty to providing medically unnecessary chemotherapy to hundreds of patients and defrauding Medicare and private insurance of roughly $34 million; he was then sentenced to 45 years in prison.[18] Government prosecutors and investigators described the physician's conduct as "startling," "abhorrent," and "heinous;" the Chief of the IRS Criminal Investigations team described it as "the most egregious case of fraud and deception that I have ever seen in my career."[19] The government's effort to stop this misconduct was made possible by a whistleblower filing a *qui tam* action.

In addition to protecting patients, whistleblowers have furthered the public's interest in integrity in the healthcare industry. For example, in 2013, a whistleblower filed a lawsuit alleging that a large pharmaceutical company paid kickbacks to health care professionals to prescribe its drugs, in violation of the Anti-Kickback Statute.[20] After the government declined to intervene, the whistleblower litigated the case for almost a decade, ultimately settling the matter, with the United States' consent, for $900 million.[21] As the U.S. Attorney for Massachusetts noted in announcing the settlement, the "matter is an important example of the vital role that whistleblowers and their attorneys can play in protecting our nation's public health care programs."[22]

---

[17] *See United States et al. ex rel. Karadsheh v. Fata et al.*, 2:13-cv-13333 (E.D. Mich. 2013).

[18] https://www.justice.gov/opa/pr/detroit-area-doctor-sentenced-45-years-prison-providing-medically-unnecessary-chemotherapy.

[19] *Id.*

[20] The Anti-Kickback Statute was passed "to prevent abuses of the Medicare payment system and preserve the integrity of physicians' medical judgment." *United States v. Patel*, 17 F. Supp. 3d 814, 830 (N.D. Ill. 2014), *aff'd*, 778 F.3d 607 (7th Cir. 2015).

[21] https://www.justice.gov/opa/pr/biogen-inc-agrees-pay-900-million-settle-allegations-related-improper-physician-payments.

[22] *Id.*

Whistleblowers have not only been essential in promoting the safety and integrity of the healthcare system, but also in protecting law enforcement and military personnel. For example, a whistleblower lawsuit filed in 2004 raised concerns about defective body armor containing Zylon fibers that was sold to federal, state, and local police agencies. The suit alleged that the fibers used in the armor rapidly degraded, putting police officers at risk,[23] and a subsequent investigation by the National Institute of Justice found that the more than half of the vests made with Zylon fibers "could not stop bullets that they had been certified to stop."[24] The whistleblower's suit led to over $136 million in recoveries against over a dozen individuals and entities involved in the sale of the defective body armor.[25] Another whistleblower lawsuit resulted in a $9.1 million settlement against a defense contractor that a whistleblower alleged knowingly sold defective earplugs to the military, likely causing significant hearing loss and tinnitus to thousands of soldiers and putting millions more at risk.[26]

Whistleblowers are also responsible for uncovering fraud and abuse in procurement contracting, including earlier this year, when a multinational government contractor paid over $377 million dollars to resolve claims that for at least a decade, in violation of federal contracting rules, it misallocated certain costs associated with non-governmental contracts to contracts with the government.[27] The DOJ remarked that this settlement was the one of the largest procurement fraud settlements in the history of the FCA. The whistleblower in this case, a former U.S. Marine

---

[23] *See United States ex rel. Westrick v. Second Chance Body Armor Inc., et al.*, 1:04-cv-00280 (D.D.C. 2004).

[24] https://www.justice.gov/opa/pr/former-second-chance-body-armor-president-settles-false-claims-act-case-related-defective.

[25] *See* https://www.justice.gov/opa/pr/honeywell-pay-335-million-alleged-false-claims-zylon-bullet-proof-vests.

[26] https://www.justice.gov/opa/pr/3m-company-agrees-pay-91-million-resolve-allegations-it-supplied-united-states-defective-dual; *see also United States ex rel. Moldex-Metric v. 3M Company*, Case No. 3:16-cv-1533-MBS (D.S.C.).

[27] https://www.justice.gov/opa/pr/booz-allen-agrees-pay-37745-million-settle-false-claims-act-allegations.

Corps officer, faced enormous odds to come forward to expose fraud in government contracting that would likely not have come to light without her.[28]

In the area of customs fraud, whistleblowers have been integral to preventing violations of customs duties and tariffs. Over the past decade, the government has recovered over $220 million dollars in FCA cases alleging customs fraud, including allegations of undervaluation, anti-dumping, and avoidance of marking duties. Out of the total of 43 customs fraud FCA cases in the past 10 years, 42 of them were *qui tam* cases.[29] These are only a few of the ways in which the False Claims Act and its *qui tam* provisions have succeeded in ending harmful practices and protecting federal programs.[30]

In addition to protecting the public from harm and ensuring the integrity of federal programs, since the 1986 amendments, *qui tam* lawsdhjnysuits originated by whistleblowers have resulted in more than $50 billion for the federal government (out of $72 billion in total recoveries under the Act).[31] While most of these recoveries resulted from suits in which the government intervened, over $4.7 billion has come from non-intervened suits that whistleblowers and their counsel pursued on their own.[32] The public-private partnership embodied in the FCA has been a vital force for redressing and preventing fraud on the government and the key to its success has been the *qui tam* provisions. As Congress recognized, without the information provided by individuals who are aware of fraud and are incentivized to pursue it, the government would not likely have learned of these alleged frauds, and the resources the private sector brings to assist the government have been critical in effectively pursuing these cases. Congress concluded that the

---

[28] https://www.washingtonpost.com/national-security/2023/07/21/booz-allen-lawsuit-false-charges/.

[29] https://www.taf.org/fbtn2023-sept18/.

[30] For additional examples of the range of programs and services in which FCA enforcement initiated by relators have been successful, *see, e.g.,* https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-2-billion-fiscal-year-2022; https://www.justice.gov/opa/pr/justice-department-s-false-claims-act-settlements-and-judgments-exceed-56-billion-fiscal-year.

[31] https://www.justice.gov/d9/press-releases/attachments/2023/02/07/fy2022_statistics_0.pdf.

[32] *Id.*

*qui tam* provisions were necessary to protect the Treasury and the public. As demonstrated below, its choice was also proper.

## II.  The Unanimous Acceptance Of *Qui Tam* Actions By All Three Branches Of Government For Over Two Hundred Years Firmly Establishes Their Constitutionality.

The FCA is modeled on a method of law enforcement that has been in existence since the founding of the country, and the Act itself is over 150 years old. Throughout the Act's history, Congress and the Executive Branch have worked together to enhance the Act's effectiveness, and courts have repeatedly rejected challenges to the Act's structure. In light of that experience, Defendant's efforts to revive such challenges ring hollow.

### A.  Every Appellate Court to Have Considered the Question Has Concluded That the *Qui Tam* Provisions of the FCA Are Constitutional.

The five Courts of Appeal that have addressed Article II challenges to the constitutionality of the FCA's *qui tam* provision have all rejected those challenges.[33]  District courts outside of those circuits have also unanimously rejected such challenges.[34]

---

[33]  *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (*en banc*) (in non-intervened case, rejecting both Take Care and Appointments Clause challenges); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993), *cert. denied*, 510 U.S. 1140 (1994) (in non-intervened case, rejecting both Take Care and Appointments Clause challenges); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148 (2d Cir. 1993) (in non-intervened case, rejecting separation of powers challenge); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002) (rejecting both Take Care and Appointments Clause challenges); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994). The Defendant notes only the contrary views of one of the judges sitting en banc in *Riley*, but ignores that thirteen other judges on that panel considered the statute constitutional.

[34]  *See United States ex rel. Phillips v. Pediatric Servs. of Am., Inc.*, 123 F. Supp. 2d 990, 994 (W.D.N.C. 2000); *United States ex rel. Sharp v. Consolidated Medical Trans.*, 2001 WL 1035720 , *11 (N.D. Ill. 2001) (with respect to the Take Care clause, "… we are persuaded by the reasoning in the second *Riley* decision which comports with our own previous decisions, as well as all other authority on this question"); *United States ex rel. Robinson v. Northrop Corp.*, 824 F. Supp. 830, 838 (N.D. Ill. 2001) ("[L]ike every other court to consider separation-of-powers challenges to *qui tam* suits under the FCA, this court concludes that the *qui tam* provisions do not encroach upon Executive Branch prerogatives."); *United States ex rel. Chandler v. Hektoen Inst. for Med. Research*, 35 F. Supp. 2d 1078, 1081 (N.D. Ill. 1999) ("This court follows the vast majority of courts that have considered this issue and finds that the FCA does not run afoul of the separation of powers doctrine"); *United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 623-624 (W.D. Wis. 1995); *United States ex rel. Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, 165 (D.D.C. 1998) ("These arguments [that the

These Courts have held that the Take Care Clause "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law,"[35] and have rejected arguments that only executive officers may initiate litigation in the name of the United States.[36] As the Sixth Circuit explained in *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.,* Congress crafted the FCA's procedures "with particular care to maintain the primacy of the Executive Branch in prosecuting false-claims actions, even when the relator has initiated the process."[37]   And when the government declines to intervene and take over an FCA lawsuit, Congress has permissibly granted relators the right, subject to "substantial [executive] control over the litigation," to prosecute FCA cases.[38]

The circuit courts have also dispensed with Appointments Clause arguments.  As the Fifth Circuit succinctly stated in *Riley*, the Appointments Clause arguments "hold[] even less vitality than the arguments made about the Take Care Clause, given that *qui tam* relators are not officers of the United States."[39]   Nor does the Constitution require relators to be officers.  Although "relators sue in the name of the government[, that] does not vest them with any governmental powers; they conduct litigation under the FCA with only the resources of private plaintiffs."[40] Consistent with that view, the Supreme Court, in the unanimous 2019 opinion in *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, held that a relator is "a private person" and not

---

FCA is unconstitutional] have been rejected by almost every federal district court and every federal circuit court to address them.…").

[35]  *Riley*, 252 F.3d at 753 (emphasis in original).

[36]  *Kelly*, 9. F.3d at 754 n.13.

[37]  41 F.3d at 1041; *see also Kelly*, 9 F.3d at 754 (concluding that a relator's unilateral ability to bring a lawsuit does not violate the Take Care clause because the government has a slightly qualified right to end the same suit); *see also Polansky v. Exec. Health Res.*, 17 F.4th 376, 387 n.12 (3d Cir. 2021) (addressing but not deciding Take Care questions and noting that *qui tam* statutes' "deep historical roots suggest that … a lack of direct control [over FCA actions by the executive branch] was not considered an unconstitutional flaw at the founding."), *aff'd on other grounds, United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023).

[38]  *Kreindler & Kreindler*, 985 F.2d at 1155.

[39]  *Riley*, 252 F.3d at 757.

[40]  *Kelly*, 9 F.3d at 758.

"appointed as an officer of the United States" and does not have responsibility to investigate or prosecute FCA cases.[41]

Although the Supreme Court has not ruled on an Article II challenge to the FCA, the Supreme Court has held that *qui tam* relators have standing under Article III of the Constitution, based on the existence of *qui tam* actions both before and at the time of the Framing of the Constitution.[42] Two Justices expressed the view that "[t]he historical evidence [that supports a finding of Article III standing] … is also sufficient to resolve the Article II question…."[43]

The Eleventh Circuit has not directly addressed an Article II challenge to the FCA, but it has cited favorably to and relied upon the reasoning in the above-referenced cases to evaluate other Constitutional questions impacting FCA enforcement.[44] It has also recognized that the government "possesses significant procedural rights that allow it to decide whether to intervene" and "exercises sufficient control in non-intervened *qui tam* actions," while "the relator has primary responsibility to assert the rights of the United States only because the latter allows it to do so by declining to intervene."[45] These same factors have been relied upon by other Circuits to uphold the Constitutionality of the FCA's *qui tam* provisions.

---

[41] *Cochise Consultancy*, 139 S. Ct. at 1514.

[42] *See Stevens*, 529 U.S. at 778.

[43] *Stevens*, 529 U.S. at 801 (Stevens, J., dissenting with Justice Souter and finding history conclusive as to Article II); *see also Riley*, 252 F.3d at 752 ("… it is logically inescapable that the same history that was conclusive on the Article III question in Stevens with respect to qui tam lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning the statute.").

[44] *See Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1310-1313 (11th Cir. 2021) (declining to take a position on the Take Care and Appointments Clause questions but citing favorably to the reasoning in the decisions referenced above in deciding whether FCA penalties violated the Eighth Amendment's restriction on excessive fines). Other Circuits that have not directly addressed the issue have strongly suggested a lack of serious doubt as to the FCA's constitutionality. *See, e.g.*, *United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 847 (7th Cir. 2020) (*Qui tam* statutes' "ancient pedigree, however, together with their widespread use at the time of the Founding, suggests that the False Claims Act as a whole is not in imminent danger of unconstitutionally usurping the executive power.").

[45] *Yates*, 21 F.4th at 1310.

**B.      Congress has Employed the *Qui Tam* Mechanism Since the Founding of the Country.**

In enacting the FCA in 1863, Congress modeled the statute on a procedural mechanism that had been in use for centuries.  The *qui tam* mechanism was well-known in England since the Middle Ages when such statutes authorized private persons to bring actions in the name of the King in exchange for a share of the recovery.[46]  And this form of law enforcement was familiar to those who settled this country.  "*Qui tam* actions appear to have been as prevalent in America as in England, at least in the period immediately before and after the framing of the Constitution…. Moreover, immediately after the framing, the First Congress enacted a considerable number of informer statutes."[47]

While some such laws provided only a reward for bringing information to the government, others authorized the individual to pursue the case.[48]  That the drafters of the Constitution adopted *qui tam* laws permitting private persons to assist the Executive Branch in enforcing laws is a powerful indication that such provisions do not violate that same document.  With respect to the structure of government, which are the issues implicated here, the Supreme Court has always assigned "great weight" to the historical understandings of "the men who were contemporary with [the Constitution's] formation."[49]

---

[46] *Marvin v. Trout*, 199 U.S. 212, 225 (1905) ("Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the formation of our government. … The right to recover the penalty or forfeiture granted by statute is frequently given to the first common informer who brings the action, although he has no interest in the matter whatever except as such informer.") (citing cases); *see also* 3 Sir William Blackstone, Commentaries on the Laws of England *161.

[47] *Stevens*, 529 U.S. at 776-77 (citing statutes).

[48] *Id.*

[49] *The Laura*, 114 U.S. 411, 416 (1885).  *See also, e.g.*, *Clinton v. City of New York*, 524 U.S. 417 (1998) (presidential veto power); *Bowsher v. Synar*, 478 U.S. 714, 723-24 (1986) (removal of officer); *U.S. v. Curtiss-Wright Export Corporation*, 299 U.S. 304, 322 (1936) (President's authority in foreign relations); *Myers v. U.S.*, 272 U.S. 52, 136 (1926) (removal of officers); *Stuart v. Laird*, 5 U.S. 299, 309 (1803) (assignment of judges).

Congress continued to enact and reenact *qui tam* laws well beyond the First Congress.[50] And in addition to the False Claims Act, three other such laws remain in effect.[51]

The Supreme Court found this history of the *qui tam* mechanism "well nigh conclusive" on the question of whether *qui tam* relators had standing under Article III of the Constitution.[52] That history, together with the structure of the FCA, led the Court to conclude unanimously that relators were permitted to bring a suit based on an assignment of the government's injury. *Id.* While the Court did not decide the Article II questions, which were not before it, the history that supported the provision's constitutionality under Article III also supports that the provisions do not violate Article II. The Supreme Court's precedents have looked to history in evaluating Article II questions as well,[53] and it stands to reason that the same history supports the constitutionality of

---

[50] Adoption of such laws did not end in 1794 as Defendant suggests. *See, e.g.*, Richard A. Bales, A Constitutional Defense of Qui Tam, 2001 Wis. L. Rev. 381, 439 n.38 (2001) (citing additional statutes including: Act of February 20, 1792, ch. 7, §25, 1 Stat. 232, 239 (providing that informer could sue for penalties under postal statute and keep half)(reenacted Act of March 3, 1845, ch. 43, § 17, 5 Stat. 732, 738); Act of March 22, 1794, ch. 11, §§ 2, 4, 1 Stat. 347, 349 (providing that individual could prosecute on government's behalf for slave trading)(reenacted Act of March 26, 1804, ch. 38, § 10, 2 Stat. 283, 286, Act of March 2, 1807, ch. 22, § 3, 2 Stat. 426, 426, Act of March 4, 1909, ch. 321, §§ 254-57, 35 Stat. 1088, 1138-40); Act of May 3, 1802, ch. 48, § 4, 2 Stat. 189, 191 (providing that individual could prosecute on government's behalf for employment of other than a "free white person" in postal service); Act of August 5, 1861, ch. 45, § 11, 12 Stat. 292, 296-97 (providing that individual could sue import assessor acting without taking oath, and keep half the fine); Act of July 8, 1870, ch. 230, § 39, 16 Stat. 198, 203 (providing that individual could sue on government's behalf for unlawful contracting with Indians)(reenacted Act of May 21, 1872, ch. 177, § 3, 17 Stat. 136, 137).

[51] 25 U.S.C. § 201 (penalties for violation of laws protecting commercial interests of Native Americans); 18 U.S.C. § 962 (forfeitures of vessels privately armed against friendly nations); 46 U.S.C. 723, now codified at 46 U.S.C. § 80103(b) (forfeiture of vessels taking undersea treasure from the Florida Coast).

[52] *Stevens,* 529 U.S. at 777.

[53] *See, e.g., Seila L. LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. __, 140 S. Ct. 2183, 2197 (2020); *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv.*, LLC, 591 U.S. __, 140 S. Ct. 1649, 1665 (2020); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010); *Bowsher v. Synar,* 478 U.S. 714, 723 (1986).

13

the *qui tam* mechanism under both Articles addressing the roles of different branches of the government.[54]

        **C.**    **The Executive Branch Has Supported the Constitutionality of the *Qui Tam* Provisions.**

The FCA's *qui tam* provisions have also been supported by the Executive Branch, which has defended their constitutionality in court, as the State of Texas has here.[55]  That the Executive Branch does not view the law as unduly encroaching on its powers is further indication that the alleged encroachment does not rise to the level of constitutional concern.

**III.**    **The Unanimous View of the Three Branches is Supported by the FCA's Structure, Which Provides the Executive Branch Extensive Control Over *Qui Tam* Actions.**

        **A.**    **The FCA *Qui Tam* Provisions Do Not Violate the Appointments Clause.**

The Appointments Clause of Article II requires that officers of the United States be appointed by the President or the President's appointees.[56]  But as numerous courts have recognized, relators are private persons and they do not possess the traditional hallmarks of office,

---

[54] *Stevens*, 529 U.S. at 863 (Stevens, J. dissenting) ("[The historical evidence summarized by the Court] together with the evidence that private prosecutions were commonplace in the 19th century, ... is also sufficient to resolve the Article II question"); *Riley*, 252 F.3d at 752 ("[W]e are persuaded that it is logically inescapable that the same history that was conclusive on the Article III question in *Stevens* with respect to qui tam lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning this statute.").

[55] *See, e.g.,* Brief of the United States in Opp. to Pet. for Cert., *Rockwell Int'l Corp. v. U.S. ex rel. Stone*, No. 05-1272, at 18-23 (2006) (rejecting argument that *qui tam* provisions violate Article II).  Defendant cites to an Office of Legal Counsel opinion to support that the "United States [has] recognized the conflict between Article II … and the FCA's delegation of authority to private citizens," (Doc. 234, at 4) without noting that that opinion was subsequently disavowed.  20 Op. O.L.C. 124, 146, n.65 (1996).  The editorial note to the earlier opinion states that the opinion does not reflect the opinion of the Department of Justice. 13 Op. O.L.C. 207, 207 *Editor's Note (1989).

[56] *See* U.S. Const. art. II, § 2, cl. 2 (providing that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments").

such as tenure, salary and continuing duties.[57]  As the Ninth Circuit explained in *Kelly*, a relator does not have primary responsibility for enforcing the laws of the United States because: (1) the government may assume control of the relator's case; (2) the government may restrict his participation; and (3) the relator's limited authority extends to only one case.[58]  Such a temporary relationship has never been thought to create the position of officer of the United States.[59]

Indeed, in *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, the Supreme Court rejected the argument that a relator was "the official of the United States charged with responsibility to act in the circumstances" as that phrase is used in section 3731(b) governing the statute of limitations for FCA cases.[60]  The Court concluded that a relator is not an official of the United States in "the ordinary sense of that phrase," as a relator is not appointed as an officer and is not employed by the United States.[61]  In addition, the Court noted, a relator has no responsibility to investigate or prosecute a FCA case.[62]

*Buckley v. Valeo*,[63] upon which the Defendant relies, does not contradict this conclusion. The commissioners in *Buckley*, in addition to being appointed by Congress, were salaried individuals, who occupied a position with tenure, and had ongoing responsibility over the administration of the Federal Election Campaign Act.  They had all the hallmarks of officers and exercised significant authority under the laws of the United States.  In contrast, a relator, who is not appointed, has a much more limited role.  A relator brings a case and receives no benefits apart from any reward, and the litigation can be taken over by the government.  For those reasons, every

---

[57]  *Riley*, 252 F.3d at 757- 58; *Gen. Elec. Co*., 41 F.3d at 1041; *Kelly*, 9 F.3d at 759; *Stone*, 282 F.3d at 805.

[58]  *Kelly*, 9 F.3d at 758

[59]  *See*, *e.g., Humphrey's Ex'r v. U.S*., 295 U.S. 602 (1935) (recognizing that independent agency, with authority to bring cases to prevent unfair competition, was not subject to control by the Executive).

[60]  139 S.Ct. at 1514.

[61]  *Id*.

[62]  *Id.*

[63]  424 U.S. 1 (1976).

court of appeals that has considered *Buckley* has concluded that it does not pose any problem for *qui tam* actions.[64]

### B.     The FCA *Qui Tam* Provisions Do Not Violate the Take Care Clause.

The FCA *qui tam* provisions also do not violate the Take Care Clause.  The history of amendments to the FCA has been one of increasing government control over *qui tam* litigation. Prior to 1986, the FCA did not provide the Department of Justice a right to intervene and assume responsibility for the case, nor did it provide the Department of Justice with dismissal authority. The Supreme Court recently confirmed that the Department of Justice has the ability to exercise control over a *qui tam* case by the appropriate use its statutory dismissal power.[65]

Contrary to the Defendant's suggestion that *Morrison v. Olsen,*[66] supports its position that the *qui tam* provisions unconstitutionally intrude on the Executive Branch's powers, the Circuit courts have unanimously concluded that *Morrison*, which upheld the independent counsel statute, supports the constitutionality of the *qui tam* provisions.  Applying the *Morrison* Court's approach to the *qui tam* provisions, courts have concluded that, taken as a whole, the *qui tam* provisions interfere far less with the Executive Branch's prerogatives than the independent counsel provisions did.[67]

The *qui tam* provisions provide the Executive Branch substantial means for controlling *qui tam* litigation.  The Attorney General may intervene in a *qui tam* case and assume control over the litigation.[68]  The government may settle or dismiss the action "notwithstanding the objections of

---

[64] *Qui tam* relators are also unlike the director of the Consumer Financial Protection Bureau, who "wield[ed] vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy."  *Seila Law LCC,* 140 S.Ct. at 2191.

[65] *United States ex rel. Polansky v. Executive Health Resources Inc.*, 599 U.S. 419, 437 (2023).

[66] 487 U.S. 654 (1988).

[67] *See Riley*, 252 F.3d at 754; *Kelly*, 9 F.3d at 752; *Kreindler & Kreindler*, 985 F.2d at 1155; *see also* Peter Shane, Returning Separation-of-Powers Analysis to Its Normative Roots: The Constitutionality of Qui Tam Actions and Other Private Suits to Enforce Civil Fines, 30 Env't. L. Rep. 11,081 (Dec. 2000); Evan Caminker, The Constitutionality of Qui Tam Actions, 99 Yale L.J. 341, 364 - 66 (1989); Bret Boyce, The Constitutionality of the Qui Tam Provisions of the False Claims Act Under Article II, 24 False Claims Act and Qui Tam Q.Rev. 10 (Oct. 2001).

[68] 31 U.S.C. §3730(b)(4)(A).

the person initiating the action,"[69] and may elect to pursue the allegations in an alternative forum.[70] Even when the government does not intervene in a *qui tam* case, it retains substantial control over the case. The government may seek to restrict the relator's discovery if it would interfere with a criminal investigation or prosecution by the government.[71] The government may intervene at a later point in the case for "good cause"[72] and the case may not be settled or dismissed without the Attorney General's consent.[73]

   Although the FCA may lack one or more attributes of the independent counsel statute that *Morrison* upheld, courts have declined to apply *Morrison* as a checklist of mandatory requirements. While, unlike the independent counsel statute, the FCA does not permit the Executive Branch to control initiation of a case, courts have not found this distinction significant. The independent counsel statute delegated authority for criminal prosecutions of the President's closest advisors, whereas the *qui tam* provisions authorize only representation in civil fraud cases. And while the government cannot control the initiation of a *qui tam* suit, once an action has begun, "the government has greater authority to limit the conduct of the prosecutor and ultimately end the litigation in a *qui tam* action than it [had] in an independent counsel's action."[74] The government may dismiss a *qui tam* action over the objections of a relator.[75] Although such a dismissal is subject to judicial review,[76] this does not mean the Executive's power to dismiss has been undermined. As the Supreme Court held in *Polansky*, "the Government's views are entitled to substantial deference.... If the Government offers a reasonable argument for why the burdens of continued litigation outweigh its benefits, the court should grant the motion. And that is so even

---

[69] *Id.,* § 3730(c)(2)(A), (B).

[70] *Id.,* § 3730(c)(5).

[71] *Id.,* § 3730(c)(4).

[72] *Id*., § 3730(c)(3).

[73] *Id*., § 3730(b)(1).

[74] *Kelly*, 9 F.3d at 754.

[75] 31 U.S.C. 3730(c)(2)(A).

[76] 31 U.S.C. § 3730(b).

if the relator presents a credible assessment to the contrary."[77]  The government's power to settle or dismiss many types of cases, including criminal cases, is also subject to judicial review.[78]

In contrast, under the independent counsel statute, the Attorney General had no authority to terminate a particular investigation until the investigation was completed or substantially completed.[79]  Although the Attorney General was authorized to remove a particular independent counsel upon a showing of "good cause" and subject to judicial review, such a removal would not end the investigation because the removed independent counsel could be replaced with another counsel.[80]  As the Ninth Circuit concluded in *Kelly*, "because the Executive Branch has power, albeit somewhat qualified, to end *qui tam* litigation, it is not significant that it cannot prevent its start."[81]

## CONCLUSION

The FCA is a tremendously successful federal law with long and deep roots in our nation's legal history—and reaching back even before that.  The three branches of government have supported its constitutionality and nothing the Defendant has raised calls the basis for that support into question.  The Court should affirm the constitutionality of the FCA's *qui tam* provisions and deny the Motion for Judgment on the Pleadings.

Respectfully submitted,


_____/s/*Jacklyn DeMar*_____
Jacklyn DeMar
The Anti-Fraud Coalition
1220 19th St. NW, Suite 501
Washington DC
(202) 296-4838
jdmar@taf.org

---

[77] 599 U.S. at 437-38.

[78] *See, e.g.*, Fed. R. Crim. Pro. 48(a).

[79] 28 U.S.C. §596(b)(2).

[80] 28 U.S.C. § 593(e).

[81] *Kelly*, 9 F.3d at 754.