IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA, *et al.*,

     Plaintiffs,

v.

PLANNED PARENTHOOD
FEDERATION OF AMERICA, *et al.*,

    Defendants.

2:21-CV-022-Z

## MEMORANDUM OPINION AND ORDER

Before the Court are parties' competing motions for summary judgment. Plaintiffs filed their motions for summary judgment ("Motions") (ECF Nos. 473, 474), on January 6, 2023. Defendants filed their motions for summary judgment ("Cross-Motions") (ECF Nos. 465, 470), on the same day. Having found that Affiliate Defendants are obligated to return the Medicaid overpayments to Texas and Louisiana and that the Planned Parenthood Federation of America is entitled to summary judgment on Affiliate Defendants' alleged reverse false claims, the Court **GRANTS** the Motions and Cross-Motions **IN PART**.[1]

### BACKGROUND

Planned Parenthood Federation of America ("PPFA") is a nonprofit corporation with nearly $400 million in annual revenue and $500 million in assets. ECF No. 391 at 19. Healthcare centers branded as "Planned Parenthood" are owned and operated by PPFA's 49 affiliates. *Id.* at 20; ECF No. 414-1 at 6. Several of those affiliates operate clinics in Texas and/or Louisiana: Planned Parenthood Gulf Coast ("PPGC"), Planned Parenthood of Greater Texas ("PPGT"),

---

[1] This Order likewise disposes of Defendants' Motion for Judgment on the Pleadings (ECF No. 533) and Plaintiffs' Motions to Strike Defendants' Motion for Judgment on the Pleadings (ECF No. 536) and for Leave (ECF No. 552).

Planned Parenthood of Cameron County ("PPCC"), Planned Parenthood South Texas ("PPST"), and Planned Parenthood of San Antonio ("PPSA") (collectively, "Affiliate Defendants"). *Id*. at 1.

Between 2013 and 2015, Relator Alex Doe engaged in an undercover investigation of Planned Parenthood's procurement and sale of fetal tissue. *Id.* at 25. During the investigation, Relator met and recorded conversations with various PPFA and PPGC employees who discussed the possibility of providing fetal cadavers for research and altering abortion procedures to provide intact or mostly intact specimens. *Id.* During one such meeting, a PPFA employee jokingly said she "want[ed] a Lamborghini" when discussing the price per specimen. ECF No. 2 at 24. That employee also discussed the possibility of altering abortion procedures to be "less crunchy" to obtain more intact specimens. *Id.* Similarly, a different PPFA employee said:

> So then you're just kind of cognizant of where you put your graspers, you try to intentionally go above and below the thorax, so that, you know, we've been very good at getting heart, lung, liver, because we know that, so I'm not gonna crush that part, I'm going to basically crush below, I'm gonna crush above, and I'm gonna see if I can get it all intact.

ECF No. 81 at 43. On another occasion, PPGC employees escorted Relator on a laboratory tour to demonstrate the types of specimens they could procure. ECF No. 391 at 25. Among the specimens displayed, Relator viewed fetal body parts from a recent second-trimester abortion in a Pyrex dish. *Id.* These PPGC employees stated they could avoid federal and state partial-birth abortion laws by claiming they did not *intend* to procure intact or mostly intact specimens. *Id.* at 26.

Wearing a hidden camera, Relator captured these conversations on video and provided the footage to Texas in late May or early June of 2015. *Id.*[2] Texas then shared the information with Louisiana, and both states — along with the Department of Justice and the United States Congress — opened investigations into Planned Parenthood. *Id.*

---

[2] The videos "were authentic and not deceptively edited." *Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 380 n.8 (5th Cir. 2020) (Elrod, J., concurring).

On September 15, 2015, the Louisiana Department of Health and Hospitals ("LDH") sent letters informing PPGC of the State's intent to terminate or revoke PPGC's Medicaid provider agreements. *Id.* at 26–27. Those letters noted that PPGC was entitled to an administrative review of the decision within 30 days. *Id.* at 27. Nevertheless, PPGC declined to request an administrative hearing and instead filed suit in Louisiana federal court, with PPFA representing PPGC and several of PPGC's patients. *Id.* These PPGC patients obtained a preliminary injunction that temporarily prevented Louisiana from giving effect to PPGC's termination. *See id.* at 28; *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604 (M.D. La. 2015). Thus, PPGC continued to file claims for Medicaid reimbursement while the injunction was pending and was paid by the State. *Id.*

After Texas conducted its investigation, the Texas Office of the Inspector General ("OIG") sent a preliminary Notice of Termination to Affiliate Defendants on October 19, 2015. *Id.* That letter also notified Affiliate Defendants of their right to an administrative appeal, and — as in Louisiana — they chose not to engage in the administrative process. *Id.* at 29. OIG sent the Affiliate Defendants a Final Notice of Termination of all provider agreements on December 20, 2016, and Defendants obtained a preliminary injunction in the Western District of Texas[3] on February 21, 2017. *Id.* at 29–31. Defendants thereafter continued to file claims for reimbursement with Texas Medicaid that were paid by the state due to the injunction. *Id.* at 31.

The federal termination litigation culminated on November 23, 2020, with an en banc decision by the United States Court of Appeals for the Fifth Circuit. *See Kauffman*, 981 F.3d 347. That decision held that the individual beneficiary plaintiffs had no right of action to challenge

---

[3] *See Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974 (W.D. Tex. 2017). Because the court found the individual beneficiary plaintiffs had a right of action, it did not decide whether the affiliate providers also had such a right. *Id.* at 988.

Affiliate Defendants' termination and vacated the injunction. *Id.* at 368–70. After Affiliate Defendants asked Texas for a six-month "grace period" to remain a participant in the Medicaid program, Texas sent a letter on January 4, 2021, denying that request but allowing 30 days for Affiliate Defendants to transition patients to new providers. ECF No. 391 at 32. The day before that period expired, Affiliate Defendants filed a lawsuit in Travis County District Court in Austin, Texas and obtained a temporary restraining order ("TRO"). *Id.* On March 10, 2021, Judge Livingston denied the requested relief after finding no authority that a federal injunction stays administrative deadlines. *Id.* at 33. Affiliate Defendants billed Texas Medicaid for services until March 10 or 12 of 2021. *See* ECF Nos. 81 at 3, 417 at 22. They have not paid back the money received during the preliminary injunctions or under the state court's TRO. ECF No. 391 at 33.

On February 5, 2021, Relator filed the instant *qui tam* action against Defendants, alleging that they violated state and federal law by (1) falsely certifying their compliance with Texas and Louisiana Medicaid rules and regulations and by (2) failing to repay the government millions of dollars of Medicaid funds that they knew or should have known they were obligated to repay. *See generally* ECF No. 2. To those ends, Relator seeks civil penalties and treble damages under the False Claims Act ("FCA"), the Texas Medicaid Fraud Prevention Act ("TMFPA"), and the Louisiana Medical Assistance Programs Integrity Law ("LMAPIL") on behalf of the United States, Texas, and Louisiana. *Id.* On November 1, 2021, Texas notified the Court of its election to intervene in the suit. ECF No. 16. On November 3, 2021, the United States declined to intervene. ECF No. 18. Louisiana has neither elected nor declined to intervene.

Plaintiffs' expert Donald E. Lochabay, Jr. determined that Affiliate Defendants submitted 45,181 false claims to the Texas Medicaid program and 99,230 false claims to the Louisiana

Medicaid program.[4] ECF No. 391 at 36. Plaintiffs allege there were $8,962,161 in false claims submitted to the Texas Medicaid program and $8,059,229 in false claims submitted to the Louisiana Medicaid program. *Id.* at 36–37. The current minimum penalty for violating the FCA is $12,537 per violation, with a maximum penalty of $25,076 per violation. *See Civil Monetary Penalties Inflation Adjustments for 2022*, 87 Fed. Reg. at 27515 (May 9, 2022).

### LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if its existence or non-existence "might affect the outcome of the suit under the governing law," and the dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Similarly, "[o]n cross-motions for summary judgment, the Court review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Texas v. Rettig*, 987 F.3d 518, 526 (5th Cir. 2021). And importantly, courts cannot make "credibility determinations" when considering conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. If "reasonable minds could differ as to the import of the evidence" on a disputed allegation, the court must deny the motion. *Id.* at 250.

### ANALYSIS

### A. Affiliate Defendants' Liability for Submitting "Reverse False Claims"

"In a reverse False Claims Act suit, there is no improper payment by the government to a defendant, but rather [] an improper reduction in the defendant's liability to the government."

---

[4] Mr. Lochabay noted that the Louisiana numbers for claims submitted and amounts received would require recalculation before trial because PPGC continued to bill Louisiana Medicaid after the dates of his reports. *Id.* at 37.

*United States ex rel. Marcy v. Rowan Cos., Inc.*, 520 F.3d 384, 390 (5th Cir. 2008); *United States ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*, 626 F. Appx. 528, 534 (5th Cir. 2015). Accordingly, any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" may be liable. 31 U.S.C. § 3729(a)(1)(G); *see also Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015) ("[T]o retain — to not return — an overpayment constitutes a violation of the FCA.").[5]

The term "obligation" means "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based relationship, from statute or regulation, or the retention from any overpayment." 31 U.S.C. § 3729(b)(3); *see also* TEX. HUM. RES. CODE § 36.001(7-a); La. R.S. § 46437.3(16) (substantially similar). Meanwhile, the federal Patient Protection and Affordable Care Act ("ACA") defines an "overpayment" to include "[a]ny funds that a person receives or retains under subchapter XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such subchapter." 42 U.S.C. § 1320a-7k(d)(4)(B). Thus, the failure to return an overpayment within 60 days constitutes a reverse false claim. *See* 42 U.S.C. § 1320a-7k(d); 1 TEX. ADMIN. CODE § 371.1655(4).

In Texas, a provider whose Medicaid credentials are terminated is no longer eligible to seek or receive Medicaid reimbursement. *See* 1 TEX. ADMIN. CODE §§ 371.1705(e)(5), 371.1703, 371.1655(4). Importantly, termination becomes effective 30 days from receipt of the Final Notice if no administrative appeal is requested. *Id.* at §§ 371.1703(f)(2); 371.1617(a)(1), 371.1703(g)(8). And a provider who submits or causes to be submitted claims for services furnished during

---

[5] The TMFPA and LMAPIL contain nearly identical provisions. *See* TEX. HUM. RES. CODE § 36.002(12); La. R.S. § 46:438.3(C).

a termination period may be liable to repay any submitted claims. *Id.* at §§ 371.1703(g)(5), 371.1655(3)-(4). Similar provisions exist in Louisiana. ECF No. 390-4 at 431.

Here, Affiliate Defendants opted not to contest their termination in state administrative proceedings and instead pursued relief in federal court. Thus, Plaintiffs argue termination from Texas Medicaid became effective by operation of state law 30 days from receipt of the Final Notice — "on around January 19, 2017 (but certainly no later than February 1, 2017)." ECF No. 391 at 30–31.[6] Similarly, Relator argues the Louisiana termination became final by operation of state law "on or around October 15, 2015." *Id.* at 5; 50 La. Admin Code Pt I, § 4169(A).

Parties moved for summary judgment on the alleged reverse false claims. *See* ECF No. 391 at 45; ECF No. 382 at 34. Plaintiffs argue the funds Affiliate Defendants received during the pendency of the vacated preliminary injunctions constitute "overpayments" because they were terminated from the Medicaid programs during that period and therefore not entitled to the money. ECF No. 391 at 47. Further, Plaintiffs contend this conduct constitutes reverse false claims because Affiliate Defendants did not refund the money within 60 days of knowing they were not entitled to it — at a minimum, 60 days after the Fifth Circuit's decision in *Kauffman. Id.* at 56. Thus, the Court must ascertain whether: (1) Affiliate Defendants had an "obligation" to remit these payments; and (2) if so, whether they "knowingly and improperly" avoided such obligations.

### 1. Affiliate Defendants had an obligation to return the overpayments

"Obligations" must be "established duties," but they need not be "fixed" and can arise from a list of sources, including statutes and regulations. *United States ex rel. Simoneaux v. E.I. duPont*

---

[6] Affiliate Defendants argue that Plaintiffs incorrectly conflate "termination" with "exclusion" from Texas Medicaid. ECF No. 417 at 26 n.18 (comparing 1 TEX. ADMIN. CODE § 371.1703 with Section 371.1705). To the extent there is a meaningful difference, the latter statute makes clear that "exclusion" becomes effective on the date of "termination" — thus, Affiliate Defendants are incorrect to suggest that they had yet to be "excluded" from Texas Medicaid when their administrative appeal deadline had passed. *See* 1 TEX. ADMIN CODE § 371.1705(e)(1)(B).

*de Nemours & Co.*, 843 F.3d 1033, 1037 (5th Cir. 2016). Here, Plaintiffs argue Defendants'

obligation to return overpayments arose from state and federal law and provider agreements.

*See* ECF Nos. 391 at 49–52, 415 at 20 ("Because Planned Parenthood had no valid provider

agreement during the pendency of the preliminary injunctions, it was not entitled to the money it

received as a matter of law."). Affiliate Defendants do not dispute the validity of the relevant laws

and agreements but aver that vacatur of the *Smith* injunction in *Kauffman* did not create a

repayment obligation. ECF No. 382 at 35. The Court disagrees.

To begin, American jurisprudence recognizes "the principle, long established and of

general application, that a party against whom an erroneous judgment or decree has been carried

into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he

has lost thereby." *Arkadelphia Milling Co v. St. Louis S.W. Ry. Co.*, 249 U.S. 134, 145 (1919).

Courts have relied on this principle for more than a century to permit recovery of payments in

similar contexts.[7] Indeed, "[t]he fairness principle at issue should be obvious — a party who relies

upon the wrong interpretation of the law should not be rewarded over a party who relies upon the

correct interpretation." *Dillow v. Home Care Network, Inc.*, No. 1:16-CV-612, 2017 WL 749196,

---

[7] *See, e.g., Baltimore & O.R. Co. v. United States*, 279 U.S. 781, 786 (1929) ("When the erroneous decree was reversed and the invalid order was set aside, the law raised an obligation against each of the west side [rail]roads to make restitution of the payments made by the east side roads in compliance with the order."); *Ex parte Lincoln Gas & Elec. Light Co.*, 256 U.S. 512, 518 (1921) (holding it was proper to require gas company to refund overcharges collected from gas consumers during injunction); *All. for Water Efficiency v. Fryer*, 892 F.3d 280, 285 (7th Cir. 2018) (courts have inherent equitable powers to award restitution when a victorious appellant "seek[s] to recover what he lost while living under an erroneous judgment"); *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1327–28 (11th Cir. 2016) (rejecting argument that dissolvement of an injunction mooted the case because the government could still "recover [Medicaid] payments" made during the injunction); *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134–37 (D.C. Cir. 1992) (vacating order that purported to prevent HHS from recovering payments made to Medicare provider under a preliminary injunction); *Md. Dep't of Hum. Res. v. United States Dep't of Agric.*, 976 F.2d 1462, 1480–83 (4th Cir. 1992) (vacating preliminary injunction barring the USDA from recouping food stamp over-issuances or imposing penalties during the pendency of the litigation); *Turner v. McMahon*, 830 F.2d 1003, 1007–09 (9th Cir. 1987), *cert. denied*, 488 U.S. 818 (1988) ("Congress intended that overpayments must be recouped without restriction."); *Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212, 228 (8th Cir. 1970) (applying the "general principle" that "a party who obtains a benefit from an improperly issued injunction has the duty to restore that benefit to those who have been injured by the injunction").

at *4 (S.D. Ohio Feb. 27, 2017). To hold contrarily would be to misunderstand the relationship between interpretive decisions and the law: "Decisions are mere evidences of the law, not the law itself; and an overruling decision is not a change of law but a mere correction of an erroneous interpretation." *Legg's Est. v. Comm'r of Internal Revenue*, 114 F.2d 760, 764 (4th Cir. 1940).

Further, "[i]t has long been well established that the reversal of a lower court's decision sets aside that decision, leaves it 'without any validity, force, or effect,' and requires that it be treated thereafter as though it never existed." *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008) (quoting *Butler v. Eaton*, 141 U.S. 240, 244 (1891)).[8] Hence, "[t]he interlocutory injunction is not a complete remedy" — and if the final judgment dissolves the injunction and denies permanent relief, "state officials would be free to prosecute any violation within that limitations period." Douglas Laycock, *Federal Interference with State Prosecutions: The Need for Prospective Relief*, 1977 SUP. CT. REV. 193, 209 (1977).

Additionally, "[a]n injunction enjoins a defendant, not a statute." *Okpalobi v. Foster*, 244 F.3d 405, 426 n.34 (5th Cir. 2001); *see also Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) ("[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves."). That is because there "is no constitutional or statutory authority that permits a federal judge to grant dispensation from a valid state law." *Edgar v. MITE Corp.*, 457 U.S. 624, 653 (1982) (Stevens, J., concurring). In other words, an injunction may not strip an agency of its power to exercise lawful authority conferred through statute. *See Md. Dep't of Hum. Res.*, 976 F.2d at 1480. Accordingly, the injunctions did not "purge from the statute books" the

---

[8] This holding from *Khadr* also explains why Defendants' repeated assertions that *Kauffman* "did not disturb the district court's findings that there was no evidence of wrongdoing by the Affiliate Defendants" are incorrect. ECF No. 382 at 22.

relevant laws governing the termination of Affiliate Defendants' status as Medicaid providers. *Winsness v. Yocom*, 433 F.3d 727, 728 (10th Cir. 2006).[9]

Defendants'[10] counterargument chiefly relies on the Fifth Circuit's decision in *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997). There, a Pennsylvania court enjoined the Department of Justice from enforcing newly enacted federal law against Pic-A-State, a corporation that purchased out-of-state lottery tickets on behalf of customers. *Id.* at 323. While the injunction was in effect, Wenner bought two winning Texas lottery tickets from a Pic-A-State outlet in Pennsylvania. *Id.* When the Texas Lottery Commission ("TLC") refused to honor his claim, alleging violations of both federal and Texas law, the Pennsylvania court rejected Pic-A-State's constitutional challenge and dissolved the injunction on its own accord. *Id.* at 324.

Wenner then sought a declaratory judgment that his winning ticket was valid, and the Fifth Circuit held that the contract arising from the purchase was not unenforceable — reversing the district court's grant of summary judgment in favor of TLC. *Id.* at 324-25. Thus, Defendants argue that the *Wenner* holding "unquestionably establish[es]" the legality of their conduct during the periods covered by the injunctions." ECF No. 382 at 42.

Important to the Fifth Circuit's analysis, however, was that "the injunction was correctly and legally issued." *See Wenner*, 123 F.3d at 326, 325 ("[A] legally issued injunction froze the status quo."); *see also Kidney Patients*, 958 F.2d at 1129 ("[F]or obvious reasons the law draws a vital distinction in this context between a valid and an invalid decree."). But that was not the case

---

[9] Courts have also applied this rationale in other contexts. *See, e.g.*, *Children's Hosp. Ass'n of Tex. v. Azar*, 507 F. Supp. 3d 249, 258 (D.D.C. 2020) (holding the effective date of an administrative rule was the originally scheduled date — not the date on which the district court's holding that the rule is invalid was reversed); *see also Ray v. Cnty. of Los Angeles*, 935 F.3d 703, 715 (9th Cir. 2019) ("[A]n erroneous vacatur cannot postpone a rule's effective date until an appellate court corrects the error sometime in the future.").

[10] Because PPFA joined Affiliate Defendants' briefing in full, the Court will use the collective "Defendants" where appropriate to spare the reader from unnecessarily reading "Affiliate Defendants' *ad nauseam*. But such phrasing should not be construed as an indicator of collective liability, except for the Court's discussion of the conspiracy claims in Section D, *infra*.

here. In vacating the Texas injunction, the Fifth Circuit held that Medicaid beneficiaries have *no right* to challenge a state's determination that a provider is unqualified. *Kauffman*, 981 F.3d at 353; *see also Nutritional Support Servs., L.P. v. Miller*, 826 F. Supp. 467, 470 (N.D. Ga. 1993) (Carnes, J.) (concluding provider plaintiffs have no enforcement right under the same statute).[11]

Additionally, the *Wenner* court weighed equitable considerations in reaching its result and concluded that TLC benefitted from the injunction in various ways. 123 F.3d at 327. Contrarily, Wenner was an "unsuspecting and unknowing" patron who was unaware of the injunction when he bought his lottery tickets. *Id.* Given that context, the court concluded that adopting TLC's position would be "wholly inequitable." *Id.* But again, that is not the case here. "The Government is not seeking to claw back the money merely to pocket the funds or to avoid paying for the care of [Affiliate Defendants'] patients." *Bayou Shores*, 828 F.3d at 1328 n.55. "Rather, the Government (as required by statute) will not pay a facility . . . that fails to comply with health and safety regulations." *Id.* "In other words, while the Government may be required to pay for the care of [Affiliate Defendants'] patients, it reasonably wants to pay someone other than [Affiliate Defendants] for that service." *Id.*

Furthermore, *Wenner* did not involve the overpayment of government funds, the obligation to repay government funds, or statutory entitlements to recover overpayments. Nor can *Wenner* contradict the *Arkadelphia* principle that a party is entitled "in the event of a reversal, to be restored by his adversary to that which he has lost thereby." 249 U.S. at 145. Thus, *Wenner*'s holding that an injunction "freezes the status quo" should not be applied here, where Affiliate Defendants had

---

[11] The district court in *Smith* was also likely wrong on the merits. *Compare Smith*, 236 F. Supp. 3d at 998 (stating the Inspector General did not have "even a scintilla of evidence" to conclude the providers were not qualified), *with Kauffman*, 981 F.3d at 382 (Elrod, J., concurring) (stating — with six other judges joining — that the record "substantially supported the conclusion that Planned Parenthood had violated state and federal regulations concerning the safe, legal, and ethical furnishing of medical care").

no right to challenge their terminations in federal court in the first place and the district court's assessment of the merits was dubious. 123 F.3d at 326. And even if *Wenner* establishes the legality of Affiliate Defendant's submission of claims during the pendency of the injunction, it still does not establish they had a right to *keep* the money after the erroneous injunction was vacated.

Consequently, Affiliate Defendants' terminations were final as of January 19, 2017, in Texas (the "Texas Termination") and PPGC's termination from Louisiana Medicaid was final as of October 15, 2015 (collectively, the "Termination Dates").[12] As Affiliate Defendants admit, "[a] provider is either terminated or it is not." ECF No. 417 at 28. And Judge Livingston agreed when she found Defendants "cite[d] *no authority* for the proposition that a court injunction requires the OIG to re-notice its termination; that a pending federal court case or injunction tolls the deadline to administratively appeal the termination; or that [they] can now challenge the propriety of the [termination letters] in a state administrative proceeding." ECF No. 390-2 at 452 (emphasis added). At a minimum, there was no legal basis to keep the money after the Fifth Circuit's *Kauffman* opinion was issued in November 2020.[13] Accordingly, Affiliate Defendants were not entitled to the payments and were obligated to return them at least within 60 days of the *Kauffman* decision. No other argument advanced by Defendants convinces the Court otherwise.

---

[12] Affiliate Defendants maintain that Louisiana "never" terminated PPGC from Medicaid. ECF No. 417 at 31. The reason is that PPGC and LDH reached a settlement agreement on October 13, 2022, in which LDH agreed to "prospectively withdraw" the termination notice. *Id.* A *prospective* withdrawal of a termination notice means nothing as to PPGC's *prior* status as a Medicaid provider. In addition, the settlement agreement expressly states that it "does not resolve and shall have no effect on" this case. ECF No. 382-2 at 17. Defendants stress that the settlement agreement states that "PPGC, at all times relevant, participated in the Louisiana Medicaid Program as a provider of family planning and other preventative health services to Medicaid patients." ECF No. 417 at 32 n.28. But it is undisputed that PPGC "participated" in Louisiana Medicaid. The question is whether that participation was lawful.

[13] Even if Defendants' termination from Texas Medicaid did not become final until March 2021 — after the Texas "grace period" and TRO from the Travis County Court expired — Defendants still did not repay the overpayments within 60 days as required by law. *See* 31 U.S.C. § 3729(a)(1)(G); 42 U.S.C. § 1320a-7k(d)(2).

    *a. The absence of an injunction bond does not bar a statutory entitlement to recover overpayments.*

In *In re J.D. Jewell, Inc.*, the Fifth Circuit held that "unless a bond has been executed upon the granting of an injunction, the person enjoined can have no recovery against the moving party." 571 F.2d 928, 933 (5th Cir. 1978); *see also* FED. R. CIV. P. 65(c). This rule is otherwise known as the "malicious prosecution" standard. *See Cappaert Enterprises v. Citizens & S. Int'l Bank of New Orleans*, 564 F. Supp. 214, 218 (E.D. La. 1983). That is, "[i]f no security has been furnished, the enjoined party can recover only by showing either that the applicant for injunctive relief filed maliciously and without probable cause or that the applicant has been unjustly enriched as a result of obtaining the relief." *Id.* at n.4.[14]

Here, Defendants rely on *J.D. Jewell* to argue they have no repayment obligation because neither the Texas nor Louisiana district court imposed a bond or entered an order requiring payment. *See* ECF No. 382 at 35. But "restitution following a wrongful injunction is recoverable separately from damages and is not constrained by the entry of an injunction bond." *Aurora Chi. Lakeshore Hosp. v. Azar*, No. 18-CV-8162, 2019 WL 8231646, at *1 (N.D. Ill. Mar. 4, 2019).[15] Thus, "the need for a bond is limited to the recovery of damages and has no application to a claim for restitution of amounts subsequently found to have been undue." *Newfield House, Inc. v. Mass. Dep't of Pub. Welfare*, 651 F.2d 32, 39 n.12 (1st Cir. 1981).

---

[14] The *J.D. Jewell* principle was originally enunciated by the Supreme Court in *Russell v. Farley*, 105 U.S. 433 (1881). The Court was "governed in the matter by general principles and usages of equity" because there was "no act of Congress or rule" of the Court that had ever been passed or adopted on the subject. *Russell*, 105 U.S. at 441; *see also U. S. Steel Corp. v. United Mine Workers of Am.*, 456 F.2d 483, 490 (3d Cir. 1972) ("It was once very much in doubt whether an equity court could ever award damages.").

[15] *See also Kidney Patients*, 958 F.2d at 1137 ("Any restitution principle would be severely undermined if its enforcement depended on the parties' prior agreement as to the precise amounts involved."); *Coyne-Delany Co. v. Cap. Dev. Bd. of State of Ill.*, 717 F.2d 385, 393 (7th Cir. 1983) ("Another exception might be where the plaintiff was seeking restitution rather than damages.") (citing *Mitchell v. Riegel Textile, Inc.*, 259 F.2d 954 (D.C. Cir. 1958)); *Dornan v. Sheet Metal Workers' Int'l Ass'n*, 810 F. Supp. 856, 859 (E.D. Mich. 1992) ("[*Russell*] does not stand for the proposition that a court cannot grant restitution for an erroneous injunction.").

13

More specifically, "equity may not interfere with a[n] . . . agency's statutory authority to recover overpayments made under a subsequently invalidated court order." *Md. Dep't of Hum. Res.*, 976 F.2d at 1481 (citing *Kidney Patients*, 958 F.2d at 1134–37). And a "statutory entitlement forecloses any equitable attempt, whether by injunction or otherwise," to bar Plaintiffs from recovering those overpayments. *Id.* In other words, Affiliate Defendants' obligation to repay overpayments arose from federal and state law — not an order to repay from district courts. Indeed, sometimes courts decline to require a bond precisely because the government *can* recover the money later. *See, e.g.*, *Fort Defiance Indian Hosp. Bd., Inc. v. Becerra*, No. CIV 22-0098 JB/CG, 2022 WL 1690040, at *59 (D.N.M. May 26, 2022).

Even if the "malicious prosecution" standard were relevant, Affiliate Defendants have arguably been unjustly enriched. *See Mitchell*, 259 F.2d at 956 ("As soon as the [over]payments were made, unjust enrichment was complete."); *Caldwell v. Puget Sound Elec. Apprenticeship & Training Tr.*, 824 F.2d 765, 767 (9th Cir. 1987) ("Refunding the front pay simply puts the parties back where they were before the district court made its initial legal error."). But *J.D. Jewell* is inapplicable here, where Plaintiffs have a *statutory* entitlement to recover overpayments. Accordingly, Affiliate Defendants had an obligation to return those overpayments.

    *b. There is no general "demand requirement" on the part of the government before FCA liability can attach.*

Defendants next argue a state's discretionary authority to seek recoupment, by itself, does not create an "established duty" to pay. ECF No. 382 at 36 (citing *United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 269 (D.D.C. 2016)). In other words, where a regulatory statute imposes "only a duty to obey the law," the duty to pay regulatory penalties is not "established" until the penalties are assessed. *Simoneax*, 843 F.3d at 1040. But "the fact that further governmental action is required to collect a fine or penalty does not, standing alone, mean

that a duty is not established." *Id.* at 1039-40. Thus, Defendants' cases stand for a rejection of "an extraordinarily broad construction of the FCA" that would attach reverse FCA liability "from the violation of any federal statute or regulation that imposes penalties." *Id.* at 1039.

Plaintiffs' construction of the FCA is not so extraordinary. Here, the "established duty" arises from the FCA's mandate to return payments to which Affiliate Defendants were not entitled. *See* 42 U.S.C. § 1320a-7k(d) ("If a person has received an overpayment, the person *shall* . . . report and return the overpayment") (emphasis added); *United States ex rel. Mason v. State Farm Mut. Auto. Ins. Co.*, No. CV07-297-S-EJL, 2009 WL 10678747, at *5 (D. Idaho Aug. 18, 2009) ("A plaintiff must show the obligation owed is mandatory, rather than discretionary."); *United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prod., Inc.*, 370 F. Supp. 2d 993, 1000 (N.D. Cal. 2005). It would be strange to hold that Affiliate Defendants have no obligation to return payments received *after they were terminated* from the Medicaid programs despite the law mandating the same. And this fact alone distinguishes this case from Defendants' cited authority.

Defendants' argument essentially posits a "demand requirement" on the part of the government before reverse FCA liability can attach. *See* ECF No. 382 at 37. But no such requirement is found anywhere in the text of the FCA or the respective state statutes. Nor does due process require such notice. *See Rosas v. McMahon*, 945 F.2d 1469, 1474 (9th Cir. 1991) ("Nothing in *Goldberg v. Kelly* limits the state . . . from recouping excess payments made before the notice was given."). Indeed, a demand requirement would defeat the purpose of allowing "private *qui tam* relators to recover from persons who make false or fraudulent claims for payment to the United States." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 (2010); *see also ACLU v. Holder*, 673 F.3d 245, 253 (4th Cir. 2011) (Congress accounted for "the government's limited resources" under the FCA). And it would

contradict the plain language of the FCA which explains that an "obligation" can arise "from statute or regulation, or the retention from any overpayment." 31 U.S.C. § 3729(b)(3).

An argument similar to Defendants' was also rejected by the Southern District of New York in *Kane*, 120 F. Supp. 3d 370. According to Title 42 U.S.C. § 1320a-7k(d)(2)(A), overpayments must be returned by "the date which is 60 days after the date on which the overpayment was identified." The defendants in *Kane* argued that "identified" means "classified with certainty." *Id.* at 384. In their view, "Congress deliberately used 'identified' in order to exempt from FCA liability those healthcare providers who recklessly fail to uncover or remain deliberately ignorant of an overpayment." *Id.* at 386. Hence, a contrary interpretation "would impose an unworkable burden on healthcare providers to require reporting and returning within sixty days of the identification of *potential* overpayments." *Id.* at 388.

The court rejected that argument, reasoning instead that the defendants' interpretation "would make it all but impossible to enforce the reverse false claims provision of the FCA in the arena of healthcare fraud." *Id.* at 390. In its view, "[p]ermitting a healthcare provider that requests and receives an analysis showing over 900 likely overpayments to escape FCA liability by simply ignoring the analysis altogether and putting its head in the sand would subvert Congress's intent in amending § 3729(a)(1)(G)." *Id.* Further, the defendants' interpretation "would impose an unworkably stringent burden on plaintiffs at the pre-discovery stage." *Id.* Thus, "[b]y requiring providers to self-report overpayments and imposing a relatively short deadline for repayments, violation of which risks the severe liability of the FCA, Congress intentionally placed the onus on providers, rather than on the Government, to quickly address overpayments and return any wrongly collected money." *Id.* at 391. The same is true here — the onus was on Affiliate Defendants to identify overpayments and return the money. They did not.

16

In sum, the mere fact that "Texas and Louisiana have discretion not to pursue administrative recoupment of Medicaid funds" does not mean Defendants had no obligation to return overpayments received after being terminated from Medicaid. ECF No. 382 at 38; *see also* 81 Fed. Reg. at 7668 ("Providers and suppliers cannot rely on . . . the OIG to point out their overpayments for them — providers and suppliers are obligated to identify the overpayments they have received."). A contrary holding would defy the plain text of the statute and thereby defeat the purposes of the reverse false claims provision of the FCA.

    *c.  No retroactivity concerns are implicated in this case.*

Defendants next argue the payments cannot "retroactively" become overpayments because "[r]etroactivity is not favored in the law." ECF No. 382 at 42 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1998)). But "[i]n determining whether a statute applies retroactively, we should concern ourselves with the statute's actual operation on regulated parties, not with retroactivity as an abstract concept or as a substitute for fairness concerns." *Vartelas v. Holder*, 566 U.S. 257, 277 (2012) (Scalia, J., dissenting). Here, there is no dispute that Affiliate Defendants' alleged conduct occurred *after* the relevant statutes were enacted. And "the general principle is that a decision of a court of appellate jurisdiction overruling a former decision *is* retrospective in its operation, and the effect is not that the former decision is bad law but that it never was the law." *Ruppert v. Ruppert*, 134 F.2d 497, 500 (D.C. Cir. 1942) (emphasis added); *see also Azar*, 507 F. Supp. 3d at 258 ("[E]quitable considerations are largely irrelevant when considering the retroactivity of judicial decisions.").

Nevertheless, Defendants aver that if they can be "retroactively" stripped of their entitlement to the payments, it would "render preliminary injunctive relief meaningless." ECF No. 382 at 42 (quoting *Longoria v. Paxton*, 585 F. Supp. 3d 907, 934 (W.D. Tex. 2022), *vacated and*

17

*remanded on other grounds*, No. 22-50110, 2022 WL 2208519 (5th Cir. June 21, 2022)). But the court in *Longoria* relied on Justice Marshall's dissenting opinion in *Edgar*, 585 F. Supp. 3d. at 934, which would "treat any federal judge's preliminary injunction restraining enforcement of a state statute on federal grounds as a grant of immunity with respect to any conduct undertaken while the injunction was outstanding," *id.* at 647–48 (Stevens, J., concurring).

Granting such immunity is not within the powers of federal judges. That is because a preliminary injunction "on its face does nothing more than temporarily restrain conduct." *Id.* at 651. And "every litigant is painfully aware of the possibility that a favorable judgment of a trial court may be reversed on appeal." *Id.*; *see also* Jonathan F. Mitchell, *The Writ-Of-Erasure Fallacy*, 104 VA. L. REV. 933, 987 (2018) ("No one gets an immunity from civil or criminal penalties by violating a statute at a time when the executive or the judiciary has chosen not to enforce it."). Therefore, Defendants' retroactivity argument misses the mark.

> ### d. The "grace period" granted by Texas did not postpone the effective date of Affiliate Defendants' terminations.

Defendants insist that the "grace period" — obtained after the injunction was vacated — "delayed implementation of the termination." ECF No. 417 at 31. But a federal district court's grant of a preliminary injunction does not affect a provider's termination date made effective by the operation of valid state law. Nor do Defendants explain how a "grace period" can so informally govern what is otherwise controlled by state law.

The injunction only temporarily restrained state officials from acting as if Affiliate Defendants had been terminated from Medicaid. And the 30-day transitional phase after the injunction was vacated was merely an agreement to act that way for a short while longer. That agreement — which expressly denied Affiliate Defendants' request to remain a participant in

Medicaid — did not somehow delay Affiliate Defendants' effective termination date.[16] And despite whatever the "usual and common understanding" of the term "grace period" is, the one here did not restore Medicaid provider agreements that had been terminated years earlier. ECF No. 417 at 30. As the Court explained, Texas law provides that the date of termination and the date of exclusion from Medicaid are one and the same.

To recap, there can be no question that Affiliate Defendants had an obligation to return the Medicaid payments after the injunctions were vacated. Those temporary rulings did not grant Affiliate Defendants "immunity" to bill for as many services as they could before the injunctions were vacated without the possibility of ever having to pay back those funds. The *Smith* injunction did not even purport to do so. And even if it did, such an order would have constituted reversible error. *See Kidney Patients*, 958 F.2d at 1134–37; *Md. Dep't of Hum. Res.*, 976 F.2d at 1480–83.

Defendants maintain that there is no guidance "so much as implying that payments that were legitimate when made can retroactively become 'overpayments.'" ECF No. 417 at 43. But pursuant to the statutory text, the term "overpayment" means "*any* funds" that a person "receives or retains" "to which the person . . . is not entitled." 42 U.S.C. Section 1320a-7k(d)(4)(B). (emphasis added). And here, "the use of the adjective 'any' indicates that Congress intended that overpayments must be recouped without restriction." *Turner*, 830 F.2d at 1007.[17] For these reasons, the Court finds that Defendants had an obligation to repay the government payments they received as a matter of law.

---

[16] It is possible that the granting of this request might have been *ultra vires. See* ECF No. 417 at 28 ("Texas therefore *could not* have lawfully reimbursed Affiliate Defendants for claims submitted during the Grace Period if they had been terminated years earlier."); 1 Tex. Admin. Code § 371.1703(g)(2). But even if that is true, it would only confirm Affiliate Defendants were in fact terminated from Medicaid.

[17] *See also Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 95 (D.D.C. 2014) ("Congress intended the relevant triggering 'obligation' to be defined broadly."); 1 Tex. Admin Code § 371.1(55) (defining "overpayment" to include "any funds" that are "received in excess of the amount to which the provider is entitled, whether obtained through error, misunderstanding, abuse, misapplication, misuse, embezzlement, improper retention, or fraud").

## 2. *A reasonable juror could find Affiliate Defendants "knowingly and improperly" avoided repayment obligations*

The terms "knowing" and "knowingly" mean that a person: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A).[18] "In short, either actual knowledge, deliberate ignorance, or recklessness will suffice." *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1400 (2023).[19] "First, the term 'actual knowledge' refers to whether a person is 'aware of' information." *Id.* "Second, the term 'deliberate ignorance' encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Id.* "And, third, the term 'reckless disregard' similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Id.* at 1400–01;[20] *see also Farmer v. Brennan*, 511 U.S. 825, 836 (1994); Black's Law Dictionary 784 (5th ed. 1979); Restatement (Third) of Torts § 10, Comment *c*. Lastly, the terms "knowing" and "knowingly" require no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1)(B).[21]

---

[18] The definitions of "knowingly" are nearly identical under Texas and Louisiana law. *See* TEX. HUM. RES. CODE § 36.011(a); La. R.S. § 46:437.3.

[19] "On their face and at common law, the FCA's standards focus primarily on what [defendants] thought and believed." *SuperValu*, 143 S. Ct. at 1400. As such, the focus is not "on *post hoc* interpretations that might have rendered their claims accurate. It is instead on what the defendant knew when presenting the claim." *Id.* at 1401. Thus, the Court does "not look to legal interpretations that [defendants] did not believe or have reason to believe at the time they submitted their claim." *Id.* at 1403.

[20] The "reckless disregard" standard "is intended to reach the 'ostrich-with-his-head-in-the-sand' problem where [defendants] hide behind the fact they were not personally aware that such overcharges may have occurred." *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997). "In some civil contexts, a defendant may be called 'reckless' for acting in the face of an unjustifiably high risk of illegality that was so obvious that it should have been known, even if the defendant was not actually conscious of that risk." *SuperValu*, 143 S. Ct. at 1401 n.5.

[21] "The 1986 Amendments to the FCA, which added the scienter requirement, were not intended to create a burdensome obligation." *United States v. Rogan*, No. 02 C 3310, 2006 WL 8427270, at *19 (N.D. Ill. Oct. 2, 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008). Thus, an FCA relator can establish the scienter element of his claim through circumstantial evidence. *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008). But this *mens*

Thus, to survive summary judgment, Plaintiffs must raise a genuine dispute of material fact that Affiliate Defendants acted with either: (1) actual knowledge; (2) deliberate ignorance; or (3) reckless disregard. 31 U.S.C. § 3729(b)(1)(A)-(B); *see SuperValu*, 143 S. Ct. at 1400 ("In short, either actual knowledge, deliberate ignorance, or recklessness will suffice."). And even if statutory or regulatory phrases relevant to a legal obligation are facially ambiguous, this does not preclude a finding of scienter under the FCA because Affiliate Defendants could have "learned their correct meaning." *SuperValu*, 143 S. Ct. at 1402.[22]

### a. *A reasonable juror could find Defendants' reliance on the vacated injunction to avoid returning overpayments was at least reckless.*

By signing the provider agreements, Affiliate Defendants agreed to an affirmative duty to refund any overpayments. *See* ECF Nos. 390-1 at 5, 390-4 at 253 (signed provider agreement certifying "I also understand that any claims for payment with a date of service during a period of exclusion will be subject to recoupment in addition to other fines, penalties, or restitution"). Defendants had a duty to familiarize themselves with Medicaid policies and laws, *see, e.g.*, *Spong v. Fid. Nat. Prop. & Cas. Ins. Co.*, 787 F.3d 296, 308 (5th Cir. 2015), and state statutes also informed Defendants of their obligation to repay the Medicaid funds. *See, e.g.*, 1 Tex. Admin. Code § 371.1703(g)(5). Secondary sources provide similar guidance. *See, e.g.*, Joel D. Hesch, *Understanding the Revised Reverse False Claims Provision of the False Claims Act and Why No Proof of a False Claim Is Required*, 53 UIC J. Marshall L. Rev. 461, 491 (2021) ("A defendant

---

*rea* requirement "is not met by mere negligence or even gross negligence." *United States ex rel. Farmer v. City of Hous.*, 523 F.3d 333, 338 (5th Cir. 2008).

[22] The FCA does not reach "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288 (D.C. Cir. 2015). But a defendant may be liable when its interpretation "borders on the frivolous." *Com. Contractors, Inc. v. United States*, 154 F.3d 1357, 1366 (Fed. Cir. 1998); *see also United States ex rel. Drummond v. BestCare Lab'y Servs., L.L.C.*, 950 F.3d 277, 281 (5th Cir. 2020) ("[T]here is no plausible reading of the CMS Manual that could support the defendants' billing practices.").

has requisite knowledge once it becomes aware that it is not entitled to retain the funds, even if at the time it obtained them it lacked knowledge that it was not entitled to them.").

Defendants suggest it is beyond the pale "for the party that acted under an injunction to be *punished* for acting in accordance with the terms of a judicial decree." ECF No. 417 at 40. But it is not their acting in accordance with a judicial decree that exposes them to FCA liability — rather, it is the failure to return funds to which they were not entitled after that decree was vacated.[23] Case law makes clear that equitable principles cannot interfere with a state's statutory entitlement to recover funds paid under an injunction issued erroneously after a provider's termination from Medicaid has become final under state law. And Judge Livingston too informed Defendants that Texas had not withdrawn or abandoned its prior termination and that the letters from December 2020 and January 2021 did not "qualify as new terminations." ECF No. 390-2 at 452. Defendants "selected the federal courts as the forum to contest the merits of their claims, and they are now not able to revive their administrative remedies as the deadline to seek that relief has long since passed." *Id.*

Likewise, some evidence suggests Affiliate Defendants acted with the requisite scienter. To begin, they do not dispute they were aware of all the legal requirements and the 60-day rule. They knew their Louisiana termination would be final as of October 2015 and that those dates would not change because of federal court action. *See* ECF No. 440 at 23. And the same is true for Affiliate Defendants' terminations from Texas Medicaid — but they continued billing even after *Kauffman. Id.* They knew they were "still terminated" during the "grace period." *Id.* at 24. They knew their belated attempt to administratively appeal their Texas terminations

---

[23] It is also for this reason Defendants are wrong to assert that subjecting them to damages and penalties "creates a chilling effect" on seeking judicial relief against government action. ECF No. 417 at 41.

was denied. *Id.* And they knew their claims that their Texas terminations were not final failed because there was no legal basis for those claims. *Id.*

Further, Affiliate Defendants had no property interest in Medicaid reimbursements to which they were not entitled. *See, e.g.*, *Pers. Care Prod., Inc. v. Hawkins*, 635 F.3d 155, 158–59 (5th Cir. 2011). Affiliate Defendants even admit that *Kauffman* could have provided grounds for the federal or state government to seek repayment. *See* ECF No. 417 at 12–13.[24] And they also admit this is "plainly" a situation where the law is "less-than-pellucid." ECF No. 438 at 15. This illustrates that they could have been aware of the risk they could be wrong.

Thus, a reasonable juror could conclude Affiliate Defendants' reliance on the vacated injunctions to avoid repayment obligations amounts to "act[ing] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(iii).[25] If Plaintiffs can make this showing, "then it does not matter whether some other, objectively reasonable interpretation" of "obligation" or "overpayment" would justify their actions. *SuperValu*, 143 S. Ct. at 1404. In any case, there is likely no other objectively reasonable interpretation because: (1) more than a century's worth of case law has consistently required a party who benefitted from an erroneous injunction to restore to their adversary what was lost; and (2) Defendants have essentially *no authority* to support their position — as Judge Livingston found. ECF No. 391 at 33.

 *b.  Defendants' other rationales do not withstand scrutiny.*

As noted, Defendants attach much significance to the fact that Texas extended a one-month "grace period" following the vacatur of the Texas injunction. ECF No. 382 at 45. But this fact did

---

[24] Defendants suggest elsewhere that the States "may very well have not succeeded" because the States would have been "unjustly enriched." ECF No. 417 at 36 n.34. It is doubtful that would be the case. *See Bayou Shores*, 828 F.3d at 1328 n.55. And to even suggest there was a possibility the States *could* have succeeded undermines Affiliate Defendants' argument that they had no obligation or lacked the requisite scienter requirement.

[25] Plaintiffs cite myriad other examples of Affiliate Defendants' subjective knowledge. *See* ECF No. 440 at 23–26. The Court has also considered these facts but need not mention them all here.

not make it objectively reasonable to believe the termination was not in effect. Defendants argued in the Travis County District Court that the "grace period" rescinded the termination notices and required Texas to re-terminate Affiliate Defendants. ECF No. 391 at 32. Again, however, Judge Livingston found no authority to support that proposition. And the "grace period" was granted solely "to ensure that current Medicaid services at [the] clinics can be transitioned to new providers." ECF No. 390-2 at 170–71. It was also conditioned on the clinics no longer accepting "any new Medicaid clients," *id.* at 170, and did not authorize Defendants to use the time to bill for as many services as they could. Whatever the purpose of the "grace period" was, it was not a re-enrollment into a terminated provider agreement.

Additionally, Defendants contend their conduct was objectively reasonable because Texas and Louisiana did not provide any notice of overpayment. ECF No. 382 at 46. At least in Texas, written notice is necessarily required for sanctions to be imposed. *Compare* 1 TEX. ADMIN. CODE § 371.1655(4) (permitting sanctions if a person "fails to repay overpayments within 60 calendar days of self-identifying or discovering an overpayment that was made"), *with* § 371.1655(3) (permitting sanctions if a person "fails to repay overpayments or other assessments after receiving written notice of the overpayment"). But in any case, the Court explained why the government's lack of notice to return overpayments does not relieve a provider of its obligations, as "[t]he impetus for the authorization of qui tam actions was the truism that governments have limited resources." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1313 (11th Cir. 2021). And the onus is on providers to identify and return overpayments. *See Kane*, 120 F. Supp. at 391.

Likewise, Defendants aver that their position was objectively reasonable because Texas and Louisiana have not returned to CMS its share of the overpayments as required by 42 C.F.R.

§ 433.316(b). ECF No. 382 at 45. But whether a state has fulfilled its obligations to the federal government has no bearing on whether a provider has knowledge of overpayments. And in any case, the federal share is determined and paid once amounts are recovered — not when unlawful conduct is discovered. 42 U.S.C. § 1396h(a).

Next, Defendants argue their conduct was reasonable because Texas's position in the termination litigation essentially adopted Defendants' current position. That is, because Texas argued it would be "irreparably harmed" if forced to continue paying Defendants for Medicaid services, it admitted that no mechanism exists to recover the money. ECF 382 at 47. Otherwise, the harm would not be truly "irreparable." But the mere fact that Texas opposed the injunction does not constitute an effective waiver of any argument in future litigation that payments made during the pendency of the injunction can be recovered. Indeed, it is unknown whether Texas was contemplating these supposed implications of its irreparable harm argument when opposing the injunction. Either way, Texas would have been objectively wrong to believe that it had no statutory entitlement to seek recoupment. And Defendants even admit that Texas has such a mechanism. *See* ECF No. 417 at 36 n.35.

Finally, Defendants aver that the government's knowledge of the allegedly wrongful conduct negates scienter under the FCA. *Id.* at 48–50 (citing *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 380 (5th Cir. 2017)). The so-called "government knowledge defense" is the principle "that under some circumstances, the government's knowledge of the falsity of a statement or claim can defeat FCA liability on the ground that the claimant did not act 'knowingly,' because the claimant knew that the government knew of the falsity of the statement and was willing to pay anyway." *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 263 (5th Cir. 2014). This argument ignores the fact that the main reason Texas and Louisiana were "willing to pay"

was because the now-vacated injunctions or because of — in Texas's case — a short "grace period" with a narrow purpose. And Defendants' assertion that "[n]o government agency sought repayment" is wrong because "Texas is seeking to recover through this case." ECF No. 382 at 50, 27. Additionally, it is not merely government knowledge but rather knowledge *and acquiescence* that establishes the defense. *See, e.g.*, *Colquitt*, 858 F.3d at 379–80. Here, Texas did not acquiesce in Defendants' alleged violations.

In sum, a reasonable juror could conclude it was at least reckless for Affiliate Defendants to rely on temporary rulings that were later vacated to avoid their obligations to return overpayments. Defendants have not cited a single case where a state or federal agency was denied a statutory entitlement to recover payments made during the pendency of an erroneous injunction. Affiliate Defendants should have been "painfully aware of the possibility" that they would have to return the money in the event the injunctions were vacated and had no good reason not to. *Edgar*, 457 U.S. at 651 (Stevens, J., concurring).

That said, when a state of mind is an essential element of the nonmoving party's claim, "it is less fashionable to grant summary judgment because a party's state of mind is inherently a question of fact which turns on credibility." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991); *see also United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 770 (W.D. Tex. 2020) ("Even though a court may grant summary judgment when the intent element is clearly met, those cases are few and far between."). Accordingly, summary judgment on Affiliate Defendants' liability for reverse FCA claims should be denied. The Court finds that Affiliate Defendants had an obligation to return overpayments and that a genuine dispute a material fact exists as to whether they "knowingly and improperly" avoided those obligations.

## B. Affiliate Defendants' Liability Under the "Implied False Certification" Theory

The FCA also imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Courts consider four elements in determining whether an FCA violation has occurred: (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019).

Under the "implied false certification" theory, liability under the FCA attaches when: (1) "the claim does not merely request payment, but also makes specific representations about the goods or services provided"; and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 190 (2016). The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* "In other words, the Supreme Court made clear that defendants could be liable under the FCA for violating statutory or regulatory requirements, whether or not those requirements were designated in the statute or regulation as conditions of payment." *Nurses To Go, Inc.*, 924 F.3d at 159–60.

Here, Relator argues — as an alternative to the reverse false claims theory — that by submitting Medicaid claims after the Termination Dates, Affiliate Defendants represented that they: (1) were "qualified" under state and federal law; and (2) had not violated state or federal

27

laws in their provision of medical services. ECF No. 391 at 68. [26] Relator contends those representations were false "because the States had determined otherwise, and [Defendants] failed to dispute those determinations in administrative proceedings" and that "compliance with these laws were obviously a material requirement, since both Texas and Louisiana removed the Affiliate Defendants from their Medicaid programs after [Texas and Louisiana] discovered what [they] determined to be wrongful conduct." *Id.*

Accordingly, Relator argues Defendants are liable under this theory for claims submitted: (1) to Texas and Louisiana *after* February 5, 2011, but *before* the Termination Dates for failing to comply with medical and ethical standards; [27] (2) to Texas *after* the Texas Termination; (3) during the "grace period" in Texas after the *Smith* injunction was vacated; and (4) to Louisiana by PPGC after it was terminated from Medicaid on October 15, 2015, and/or after the Texas Termination. ECF No. 415 at 41. And, as forementioned, surviving summary judgment requires that Relator establish — at the least — a genuine dispute of material fact as to the falsity, scienter, and materiality elements on each claim for each phase.

---

[26] Defendants contend that "Relator cannot raise at summary judgment a theory of liability that was not properly raised in their Complaint." ECF No. 417 at 46. But this theory of liability *was* raised in the complaint, even if the specific words "implied false certification" were not used. *See* ECF No. 2 at 37–39.

[27] Defendants argue the FCA and LMAPIL's ten-year statutes of repose bar Relator's claims for alleged violations before February 5, 2011. ECF No. 382 at 66 (citing 31 U.S.C. § 3731(b)(2); La. R.S. § 439.1.B.). This date is significant because the complaint alleges Defendants presented false or fraudulent claims for payment for Medicaid services "[f]rom *at least 2010* and continuing through 2020." ECF No. 2 at 3 (emphasis added). But a statute of repose "is measured not from the date on which the claim accrues but instead from the date of the *last culpable act or omission of the defendant*." *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014) (emphasis added); *see also United States ex rel. Tracy v. Emigration Improvement Dist.*, No. 21-4059, 2022 WL 16570934, at *3 (10th Cir. Nov. 1, 2022) (examining 31 U.S.C. § 3731(b)(2) and concluding the ten-year period started to run when the defendant "submitted the last claim"). In other words, the FCA's statute of repose would not bar claims for alleged violations that occurred before February 5, 2011. This is because the last culpable act or omission of Defendants allegedly occurred on March 10 or 12 of 2021. *See* ECF Nos. 81 at 3; 417 at 22. Thus, Relator's claims would not be barred by the statute of repose until ten years after the last alleged violation occurred — no earlier than March 10, 2031. *See Tracy*, 2022 WL 16570934, at *3. And because Defendants admit the statute of repose in the LMAPIL "mirrors the language" of its FCA counterpart, the same applies. ECF No. 378 at 6. Therefore, Relator's claims are not barred by any statute of repose in this case. But because Relator does not dispute Defendants' statute of repose defense for claims submitted before February 5, 2011, Relator has waived those claims. *See* ECF No. 415 at 41 n.14. The Court's analysis of these claims is therefore limited to the period from February 5, 2011, to the Termination Dates.

### 1. Affiliate Defendants are not entitled to summary judgment for claims submitted before the Termination Dates

To participate in their Medicaid programs, Texas and Louisiana require that providers comply with both federal and state laws and the relevant standards of care. La. R.S. §§ 437.11(A), (B); 1 Tex. Admin. Code §§ 371.1605(b)(1), 371.1659(2). Relator alleges Affiliate Defendants violated these requirements through "its history of unethical practices related to fetal tissue procurement, which were inconsistent with accepted medical standards and federal law." ECF No. 415 at 42. Further, Relator claims Affiliate Defendants waived their right to challenge these determinations by failing to dispute them in administrative proceedings. *Id.* at 43. Hence, Affiliate Defendants "indisputably billed Medicaid while committing program violations" and did not disclose those violations — thereby making those claims impliedly false. *Id.*; *see also Lemon*, 924 F.3d at 161–62. In light of this evidence, the Court finds that Plaintiffs have established a genuine dispute of material fact as to the element of falsity on these claims.

Concerning scienter, the FCA's requirement defines "knowingly" to mean that a person has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." *SuperValu Inc.*, 143 S. Ct. at 1399. Here, Defendants' conscious decision to continue billing Medicaid contemporaneously with their alleged conduct could — at the least — be deemed reckless, and therefore presents a genuine question of material fact as to the element of scienter.

Concerning materiality, Defendants make much of Texas Inspector General Dr. Stuart Bowen's use of the word "willingness" in his deposition testimony from prior litigation. But his deposition in this case clarified that his use of the word was "inartfully chosen" and that the video indicated the practice of altering abortion procedures to obtain fetal tissue had occurred before. *See* ECF No. 383 at 118. Furthermore, a reasonable juror could find that "subjecting a patient to

more pain without their consent to get better tissue specimens" is unethical, *id.*, and that "these violations were obviously material because the States terminated the Affiliates from Medicaid once they were discovered," *id.* at 44. Accordingly, the parties are not entitled to summary judgment on these claims.

### 2. Parties are not entitled to summary judgment for claims submitted after the Termination Dates

Relator argues here that submitting claims "that imply that Defendants were qualified and had valid provider agreements when they did not is obviously 'false.'" ECF No. 415 at 44. But Defendants aver that "the mere act of submitting a claim while in violation of some other standard or law cannot, on its own, trigger FCA liability." ECF No. 382 at 52. That is incorrect. While it is true that "not every undisclosed violation of an express condition of payment automatically triggers liability," such nondisclosures *will* trigger liability where the noncompliance is "material." *Escobar*, 579 U.S. at 190. Hence, the Supreme Court in *Escobar* found the defendant's theory of FCA liability was absurd because it implied "misrepresenting compliance with a condition of eligibility *to even participate* in a federal program when submitting a claim would not" trigger liability. *Id.* at 192 (emphasis added).

But the Supreme Court contemplated that such nondisclosures could be "material," and for good reason — the fact that a provider is not eligible to participate in Medicaid could obviously "hav[e] a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at 190. Additionally, Defendants' argument that their representations of noncompliance with medical and ethical standards were not "objectively false" falls short. *Id.* at 54. Both Texas and Louisiana determined Affiliate Defendants were unqualified as providers and failed to comply with federal and state laws as well as rules, policies, and procedures of the Medicaid program. *See* ECF No. 2 at 48, 61. Defendants' disagreements with these findings —

which they did not administratively appeal — do not justify representations of compliance. The same can be said for CMS's disagreement with the States' decisions. Nor is CMS's position on the merits of this case dispositive as to the FCA's materiality requirement.

Defendants further insist that "Relator must point to something Affiliate Defendants said on the claims themselves," yet Relator "has not identified any representation Affiliate Defendants made on a claim for payment." *Id.* at 52. This too misses the point, because "a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." *Escobar*, 579 U.S. at 190 n.4; *see also Olson v. Fairview Health Servs. Of Mn.*, 831 F.3d 1063, 1074 (8th Cir. 2016) ("Action intended or known to be likely to prevent another from learning a fact is equivalent to an assertion that the fact does not exist."). In other words, the relevant inquiry here is what is *missing* from the claims — namely, that Affiliate Defendants were not qualified to participate in Medicaid because they were found by Texas and Louisiana to have violated state and federal regulations. Thus, the Court finds that questions of material fact exist as to both the elements of falsity and materiality on these claims.

Concerning scienter, Defendants' arguments ignore the significance of the Termination Dates and proceed as if Plaintiffs' claims rest on mere alleged violations of — or a willingness to violate — "general sweeping language" in Medicaid provider agreements requiring providers to "comply with all federal laws and regulations." ECF No. 382 at 52. But that is not the case. Rather, a reasonable juror could find Affiliate Defendants are liable for not disclosing in their submitted claims the fact that they were terminated from Medicaid for noncompliance with various material requirements.[28] By arguing such nondisclosures are not "material," Defendants take the position that a terminated Medicaid provider does not submit "misleading half-truths" when failing to

---

[28] The Court addresses PPGC's liability separately below.

disclose that they are terminated. *Escobar* does not support this conclusion. Nor does the Supreme Court's recent ruling in *SuperValu*. *See* 143 S. Ct. at 1403 ("[A] person might be liable for falsely stating that 'the plumbing work that I did on your house complied with state law.'"). Thus, parties are not entitled to summary judgment on these claims.[29]

### 3. *Parties are not entitled to summary judgment for claims submitted during the Texas "grace period"*

Here, Relator argues that Affiliate Defendants are liable for false claims submitted during the Texas "grace period" because "the indisputable evidence reveals that neither PPFA nor Affiliate Defendants utilized the 'grace period' for the stated purpose of transitioning patients to other providers." ECF No. 415 at 45. Instead, "the evidence shows that the Affiliates used the time to bill for as many services as they could and did virtually nothing to help their patients find new providers." *Id.* at 47. This evidence is sufficient to establish that there is a genuine question of material fact as to the element of falsity.

As for scienter, evidence suggests Affiliate Defendants' use of the "grace period" was to "[buy] some time to continue seeing patients for another month" and "milk a few more stories" out of it to frame Governor Abbott as "giving Medicaid patients 30 days to scramble and find new providers in a system that already has a provider shortage." ECF No. 415 at 46; *see also* ECF No. 440 at 36 (PPST representative stating, "We need to act swiftly so we can capture as much Medicaid revenue as possible"). Thus, there is a genuine dispute of material fact as to scienter.

---

[29] If Relator ultimately prevails under both theories, there can be "ultimately only one recovery" where alternate theories establish liability for the same claims. *United States ex rel. Heesch v. Diagnostic Physicians Grp., P.C.*, No. CIV.A. 11-0364-KD-B, 2014 WL 2155363, at *10 n.2 (S.D. Ala. May 22, 2014). Some courts have held that reverse false claims "cannot be based on a defendant's failure to *refund* the *same* payment that was obtained by an actionable false claim." *See Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC*, 512 F. Supp. 3d 1096, 1119 (D. Haw. 2021) (collecting cases). Assuming these holdings are correct, that is not the case here. The reason is that Plaintiffs could prevail on the reverse false claims theory even if Defendants prevail on Plaintiffs' implied false certification theory of FCA liability. In other words, even if Defendants had made all the relevant material disclosures to the government, that would still not entitle them to keep the money they were not entitled to.

Lastly, Relator argues that Affiliate Defendants' representations to Texas "were clearly material, because transitioning patients to other providers was the sole reason Texas permitted one month of Medicaid reimbursement, despite the Affiliates' disqualification and termination." ECF No. 415 at 47. And Relator avers that, absent that request, "the Affiliates' termination would have been effectuated by the State as soon as the preliminary injunction was lifted by the Texas federal trial court." *Id.* In light of Relator's evidence, the Court finds a genuine issue of material fact exists as to materiality. Thus, parties are not entitled to summary judgment on these claims.

### 4. *Parties are not entitled to summary judgment for claims filed by PPGC in Louisiana after termination from Texas Medicaid*

Relator argues that — at a minimum — PPGC is liable for false claims submitted in Louisiana after PPGC was terminated from Texas Medicaid. ECF No. 391 at 70. That is because PPGC "disregarded their obligation under state law to immediately report to the State conditions that affected their, or their affiliates', Medicaid enrollment *in other states*." *Id.* at 70–71 (emphasis added); 50 La. Admin. Code Pt. I, § 4147(A)(2)–(4), (8). If true, "every claim PPGC filed in Louisiana after the Texas termination became final . . . was a false claim because PPGC was not in compliance with program rules and requirements." *Id.* at 73.

Defendants' main contention rests on arguments the Court has already rejected.[30] And Defendants also argue PPGC *did* provide notice of its termination from Texas Medicaid to LDH in the spring of 2021, which Relator disputes. But in any case, doing so would not preclude liability for claims submitted before that notice but after the termination from Texas Medicaid. Accordingly, the Court finds that a genuine issue of material fact exists as to falsity.

---

[30] *See* ECF No. 417 at 52 ("Relator's theory incorrectly assumes that PPGC's termination from Texas Medicaid was effective February 1, 2017."); *id.* ("It was objectively reasonable for PPGC to believe that Affiliate Defendants were not 'terminated' from Texas Medicaid until after the Grace Period expired."); *see also* ECF No. 390-2 at 170 (January 2021 letter from Texas expressly denying Affiliate Defendants' "request to continue in the Medicaid program").

As to scienter, the Louisiana Provider Agreement that PPGC's CEO, Melaney Linton, personally signed on behalf of PPGC states that she "certifies and agrees" and "understand[s] that it is [her] responsibility to ensure that neither I, nor any . . . affiliate(s) are not now or have ever been denied enrollment; suspended or excluded from . . . Medicaid . . . in any state; employed by a corporation . . . that is now or has ever been suspended or excluded from . . . Medicaid . . . in any state." ECF No. 415 at 48. It further states that she "will report any of the above conditions to Program Integrity at the Department of Health and Hospitals . . . upon discovery once enrolled." *Id.* This evidence — in concert with the fact that PPGC never notified Louisiana that it was terminated from Texas Medicaid as of December 15, 2020 or informed LDH that the Fifth Circuit overruled the decision upholding the Louisiana preliminary injunction — is sufficient to establish a genuine issue of material fact as to the element of scienter. *See id.* at 48–49.

Concerning materiality, Defendants argue the nondisclosures are immaterial because "there can be no dispute that Louisiana is aware of Affiliate Defendants' Texas terminations *now*, and yet PPGC remains a provider in good standing with Louisiana Medicaid." ECF No. 417 at 53. Contrarily, Relator argues the alleged violations were material "because the State had already terminated PPGC for similar reasons: its history of failure to disclose required information to LDH and providing misleading information." ECF No. 415 at 51. Relator further contends that LDH would likely not have allowed PPGC back into Medicaid "had they been apprised of the entire history of PPGC's misleading and untruthful behavior," and that LDH "expressly allowed for PPGC's liability in this case to be unhindered[,] [leaving open] the possibility that the Office of the Attorney General or a relator could pursue claims . . . ." *Id.* at 53. In light of this evidence, the Court finds that a genuine issue of material fact exists as to the element materiality. Accordingly, parties are not entitled to summary judgment on these claims.

### 5. *Claims paid by Managed Care Organizations*

The Court now addresses the issue of Managed Care Organizations ("MCOs"). Most of the claims submitted to Texas Medicaid are claims submitted by MCOs where Texas pays the MCO — a private third-party health insurer — a fixed monthly premium for each Medicaid beneficiary the MCO covers, regardless of how many times the patient beneficiary sees a provider. ECF No. 382 at 25. Defendants contend there can be no FCA liability without a demonstration that "the government paid more to the MCOs for Affiliate Defendants' claims than it would have otherwise paid for those same services." ECF No. 382 at 65; *see also United States ex rel. Mbabazi v. Walgreen Co.*, No. CV 19-2192, 2021 WL 4453600, at *6 (E.D. Pa. Sept. 28, 2021) ("[T]o assert an FCA claim in the fixed-rate context, Relator[] must allege facts plausibly showing a connection between the false claims and the increase in payouts — *i.e.*, the causal chain that affected payment from the program."). Because Plaintiffs have not made this showing, Defendants argue the allegations related to Affiliate Defendants' claims for fix-rate services paid by MCOs fail for lack of materiality. *Id.*

The Court is unpersuaded by this argument for two reasons. First, Defendants cite no binding authority to support this proposition. Second, even if the government "may be required to pay for the care" of Planned Parenthood's patients, "it reasonably wants to pay someone other" than Planned Parenthood for that service. *Bayou Shores*, 828 F.3d at 1328 n.55.[31] Accepting Defendants' argument "would mean that any government program that involved a fixed annual contribution from the Government would be completely immune from claims of abuse." *United States v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 442 (E.D. Pa. 2004).

---

[31] *See also United States ex rel. White v. Mobile Care EMS & Transp., Inc.*, No. 1:15-CV-555, 2021 WL 6064363, at *13 (S.D. Ohio Dec. 21, 2021) ("To be sure, the federal government may not *pay* more, but the Defendants may *receive* more of the federal funds" than they were entitled to.).

Contrarily, Congress "plainly regarded a false claim as causing a loss to the United States . . . notwithstanding that the false claim would not lead to an additional pay-out of federal funds." *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 739 (D.C. Cir. 1998). Lastly, "[w]hether or not the United States Government would be out *additional* money beyond that already appropriated . . . it would suffer a loss if the money appropriated for legitimate purposes were instead wasted on a false claim." *Id.*

Therefore, the mere fact that the reimbursements paid to the MCOs were at a "predetermined rate" does not necessarily mean the submission of any impliedly false claims was immaterial. ECF No. 382 at 64. Accordingly, Defendants are not entitled to summary judgment on the claims paid by MCOs.

### C. PPFA's Liability for Causing Affiliate Defendants' Alleged FCA Violations

"[A] person need not be the one who actually submitted the claim forms in order to be liable." *Riley*, 355 F.3d at 378 (internal marks omitted). Rather, the FCA imposes liability on a person who:

> knowingly makes, uses, *or causes to be made* or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]

31 U.S.C. § 3729(a)(1)(G) (emphasis added); *see also* La. R.S. 46:438:3(A) ("No person shall knowingly present or cause to be presented a false or fraudulent claim."); Tex. Hum. Res. Code § 36.002(4), (12). The purpose of the "causes" provision is "to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, 334 F. Supp. 3d 394, 406 (D. Mass. 2018) ("*Martino-Fleming I*"). Here, Relator argues PPFA is liable under both the reverse false claims

theory and implied false certification theory because it "caused" the submission of false claims and the unlawful retention of overpayments. ECF No. 391 at 46, 73–74. The Court finds that PPFA is not entitled to summary judgment under the implied false certification theory but is entitled to summary judgment under the reverse false claims theory.

### 1. PPFA could be held liable for "causing" a false record or statement material to "an" obligation to pay money to the government — not necessarily "their" obligation

PPFA insists that it "is not a health care provider, does not participate in Medicaid, never received Medicaid payments, and thus never had any obligation to pay or repay the government." ECF No. 385 at 7. PPFA does not submit any claims to Texas's or Louisiana's Medicaid programs, nor does it assess Medicaid compliance of its affiliates. *Id.* at 10. PPFA further maintains that because the ACA's definition of "overpayment" references any funds that a "person" receives or retains, and because the ACA defines "person" as a "provider of services, supplier, medicaid managed care organization . . . Medicare Advantage organization . . . or [prescription drug plan] sponsor," PPFA has no obligation to pay the government because it is *not* a "person." *Id.* at 14 (citing 42 U.S.C. § 1320a-7k(d)(4)(B), (C)).

This argument is unpersuasive. PPFA need not be a "person" under the ACA in order to *cause* a "person" to submit false claims under the FCA. Indeed, the FCA applies "*even where there is no direct liability running from the Government to the claimant*." *United States v. Caremark, Inc.*, 634 F.3d 808, 817 (5th Cir. 2011) (emphasis in original). Thus, "[t]he statute does not require that the statement impair the *defendant's* obligation; instead, it requires that the statement impair '*an* obligation to pay or transmit money or property to the Government.'" *Id.* (quoting 31 U.S.C. § 3729(a)(7)).[32] Section 3729(a)(1)(G) likewise refers to "an obligation" and should therefore be

---

[32] Section 3729(a)(7) was the pre-2009 version of Section 3729(a)(1)(G). Section 3729(a)(7) imposed liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or

read the same way. Accordingly, PPFA's motion for summary judgment as to the alleged FCA violations under the implied false certification theory fails.

### 2. *PPFA cannot be held liable for Affiliate Defendants' alleged reverse false claims*

Similarly, PPFA argues Section 3729(a)(1)(G)'s use of the word "causes" does not apply to the reverse FCA provision — the statute's second clause following the disjunctive "or," which attaches liability to any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." ECF No. 414 at 16.[33] Thus, PPFA avers that it could not be liable for "causing" any reverse FCA violations by Affiliate Defendants. *Id.*

Here, the Court agrees that PPFA's argument is supported by the plain text of the statute. *See Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) ("[W]hen we're engaged in the business of interpreting statutes we presume differences in language like this convey differences in meaning.").[34] It is one thing to hold that a *mens rea* term such as "knowingly" can "travel" through to the end of a sentence. *See Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009). But it is another thing to hold a term like "causes" should similarly travel through, despite the statute being disjoined by an "or" and the second clause having its own *mens rea* term.

Further, the Fifth Circuit's holding in *Caremark* that there can be indirect liability for *reverse* false claims is not controlling because it applied the pre-2009 version of the statute. *See* 634 F.3d at 815 n.6. And Plaintiffs do not cite any post-2009 cases that hold there can be

---

decrease an obligation to pay or transmit money or property to the Government." The 2009 amendments added a second clause that affects the reach of the reverse FCA provision, which is discussed below.

[33] *See* 31 U.S.C. § 3729(a)(1)(G) (imposing liability on any person who "knowingly makes, uses, or *causes* to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly *avoids or decreases an obligation to pay* or transmit money or property to the Government") (emphasis added).

[34] *See also United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1226 (10th Cir. 2017) ("[T]he reverse-false-claims provision creates liability for wrongfully *avoiding* payments that should have been made to the government. But, crucially, liability under the reverse-false-claims provision requires the existence of an 'obligation' — defined as an 'established duty' — to pay money to the government.").

indirect liability for reverse false claims under Section 3729(a)(1)(G) — rather, Plaintiffs insist only that the FCA should be construed "broadly" and that "it is probable that Congress intended both clauses to have the same effect." ECF No. 440 at 41. That proposition is not immediately clear to the Court — it is entirely possible that Congress wanted to narrow the pool of persons that could be held liable for reverse false claims. But regardless, speculation over Congress's intent cannot overcome clear statutory text. PPFA is therefore entitled to summary judgment on the alleged reverse FCA violations.

### 3. *PPFA's liability for causing the submission of false claims can be supported by evidence of policies and business practices within its control*

Plaintiffs chiefly argue PPFA caused Affiliate Defendants' alleged FCA violations through its extensive control over Affiliate Defendants. ECF No. 415 at 70. That control is evidenced by PPFA's "rigorous" accreditation and evaluation process which addresses "every aspect" of Affiliate Defendants' business. ECF No. 391 at 89–90. Among other things, PPFA provides consulting services to Affiliate Defendants through its "Business Operations Team," "Healthcare Operations Team," "Clinical Operations Team," "Financial Support Team," and "Medical Standards and Guidelines Team." *Id.* at 91–94.

PPFA admits that it "provides high-level guidance on national Medicaid trends, new federal regulations, and general Medicaid-related best practices." ECF No. 414 at 36. PPFA also provides loans and direct funding to Affiliate Defendants, and Medicaid payments were a source of cash used by Affiliate Defendants to pay dues to PPFA. *See* ECF Nos. 391 at 95, 390-3 at 484. Further, PPFA performs risk assessments concerning federal funding Affiliate Defendants receive, ECF No. 391 at 96, assists Affiliate Defendants "in staying abreast of changes in laws and policies," *id.,* and has a "Health Care Investment Program" through which it provides direct funding to Affiliate Defendants to pay for Medicaid and healthcare billing consultants. *Id.*

at 97. And PPFA also formed a "Defund Action Team" to provide "Gap Funding" to Affiliates terminated from Medicaid. ECF No. 391 at 96.

PPFA contends that "any control PPFA might have over the Affiliate Defendants is simply irrelevant to whether PPFA *directly* violated the statutes at issue, which is the only basis of liability for which Plaintiffs actually argue." ECF No. 414 at 14. That is because "the level of control a parent exercises over a subsidiary (or a membership organization exercises over its members) is relevant only when a party seeks to hold the parent liable for the subsidiary's actions through a theory of derivative liability, such as veil-piercing or alter ego." ECF No. 414 at 9 (citing *United States v. Bestfoods*, 524 U.S. 51 (1988)).

The Supreme Court's decision in *Bestfoods* does not help PPFA. There, the relevant statute attached liability to "any person who at the time of the disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). The Court did indeed hold that parent control of the subsidiary would *not* give rise to direct liability under the statute. *See Bestfoods*, 524 U.S. at 68 ("The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary."). However, the Court also suggested the parent corporation might have been directly liable where its agent "actively participated in and exerted control" over a variety of environmental matters and issued directives to its subsidiary regarding responses to regulatory inquiries. *Id.* at 72. This is similar to what Relator alleges. *See* ECF No. 440 at 47 ("Relator agrees that there must be 'some degree of participation' by PPFA in the claims filed by the Affiliate Defendants.").

Additionally, this case differs from *Bestfoods* because of the relevant statutory language in Section 3729(a)(1)(G). That provision's inclusion of the word "causes" indicates liability can

attach for an "indirect false claim" — meaning the FCA does not always require an "affirmative act" to impose liability. *Caremark*, 634 F.3d at 815; *United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, No. CV 15-13065-PBS, 2018 WL 4539684, at \*4 (D. Mass. Sept. 21, 2018) ("*Martino-Fleming II*"). Again, "a person need not be the one who actually submitted the claim forms in order to be liable." *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001). And "most courts agree that the FCA covers 'indirect mulcting of the government.'" *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 187 (D. Mass. 2004) (quoting *United States v. Lagerbusch,* 361 F.2d 449, 449 (3d Cir. 1966)).

Thus, if a person "knowingly participates in a scheme that, if successful, would ultimately result in the submission of a false claim to the government, he has caused those claims to be submitted." *Martino-Fleming I*, 334 F.Supp.3d at 406 (citing *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243–44 (3d Cir. 2004)). Put another way:

> Where the defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant *or disclose the false claims to the United States*, the defendant's ostrich-like behavior itself becomes a course of conduct that allowed fraudulent claims to be presented to the federal government.

*Hanover Ins. Co. v. Dunbar Mech. Contractors, LLC*, 964 F.3d 763, 768 (8th Cir. 2020).[35]

Hence, PPFA can be "directly" liable under Section 3729(a)(1)(G) for "indirectly" causing Affiliate Defendants' submission of false claims without resort to derivative liability. And this could be shown by evidence that PPFA "operat[ed] under a policy" that caused Affiliate Defendants to submit false claims. *Fellows of Harvard Coll.*, 323 F. Supp. 2d at 187.

---

[35] *See also Riley*, 355 F.3d 370 at 378 ("The FCA applies to anyone who knowingly assists in causing the government to pay claims grounded in fraud."); *Martino-Fleming II*, 2018 WL 4539684, at \*4 ("A defendant may be liable where the submission of false claims by another entity was the foreseeable result of a business practice.").

Accordingly, while PPFA's "control" over Affiliate Defendants would not suffice to show that PPFA *itself* "made or used" false records or statements material to an obligation — a reasonable juror could find evidence of a policy, practice, or "ongoing business relationship" that indirectly caused Affiliate Defendants to submit false claims. *Hanover*, 964 F.3d at 768.

Similarly, Relator further alleges PPFA "mastermind[ed] and orchestrat[ed] a strategy" to enable Affiliate Defendants to continue seeking reimbursement from Texas and Louisiana Medicaid after the Termination Dates and continue refusing to return those funds. ECF No. 391 at 76–77. According to Relator, PPFA "steered Affiliate Defendants away from the prescribed administrative appeals and into lengthy legal battles" in federal courts, *id.* at 78,[36] and helped craft the request for the "grace period" — allegedly "mere pretext" to allow Affiliate Defendants to continue to bill Texas Medicaid, *id.* PPFA then assisted in filing the unsuccessful lawsuit in Travis County District Court — asserting legal theories for which they had "no authority" — on the last day of the "grace period." *Id.* at 79.[37]

Relator also alleges PPFA participated in PPGC's efforts "to conceal the true facts of their termination and their affiliates' Texas terminations from LDH and the Middle District of Louisiana" to maximize Medicaid revenue.[38] *Id.* And PPFA "*continues* to represent and assist Affiliate Defendants in their ongoing efforts" to withhold the money. *Id.*

---

[36] A 2021 email shows PPGT's officers wondering why they did not pursue administrative remedies five years earlier. *See* ECF No. 390-13 at 119. The answer: a "legal strategy decision" — though no one in the email chain seems to understand the rationale. *Id.*

[37] Six days before the state court filing, executive leadership at PPGT sent an email stating, "PPFA wants to keep this litigation going" because "the lawsuit and on-going new coverage of patients impacted supports PPFA's conversations with the new [Biden] Administration." ECF No. 415 at 67.

[38] Relator alleges PPFA did not update the Louisiana federal district court on the Fifth Circuit's vacatur of the Texas injunction and continued to urge the court "to keep the baseless injunction in place — and it did." ECF No. 391 at 87. "The result was that for nearly a year after it was known to PPFA and PPGC that the preliminary injunction had no legal basis and should be vacated, PPGC continued to bill Louisiana Medicaid and PPFA continued to support that effort in court." *Id.*

PPFA avers that this argument "is precluded as a matter of law." ECF No. 414 at 18. Because Plaintiffs' arguments are predicated on PPFA's "Litigation & Law" Department's ("L&L") representation of Affiliate Defendants, PPFA relies on the "litigation privilege," which authorizes attorneys to "practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages." *All. Dev., Inc. v. St. Paul Mercury Ins. Co.*, No. 4:11-CV-03234, 2012 WL 112612, at *3 (S.D. Tex. Jan. 11, 2012). But the allegations do not purport to attach personal liability to the individual L&L lawyers' representation of Affiliate Defendants. Rather, because the attorneys are PPFA's employees, PPFA could be held liable if they "were acting within the scope of their authority and for the purpose of benefitting" PPFA. *United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir. 1977).

Additionally, "liability of a corporation for a False Claims Act violation may arise from the conduct of employees other than those with 'substantial authority and broad responsibility.'" *Id.* In other words, Section 3729(a)(1) broadly attaches liability to "any person" who violates one of its subjections. And "statements involving some legal analysis remain actionable if they 'carry with [them] by implication' an assertion about 'facts that justify' the speaker's statement." *SuperValu*, 143 S. Ct. at 1403 (internal marks omitted).[39] Hence, nothing in Section 3729(a)(1) purports to preclude liability if the person who "causes" the submission of false claims just so happens to be a lawyer.

To recap, a reasonable juror could conclude that PPFA caused Affiliate Defendants' submissions of false claims through various means. For these reasons, the Court finds that genuine disputes of material facts exist as to whether "PPFA's scheme ultimately allowed the Affiliate

---

[39] For example, "a person might be liable for falsely stating that 'the plumbing work that I did on your house complied with state law.'" *SuperValu*, 143 S. Ct. at 1403. Hence, while the Supreme Court assumed without deciding "misrepresentations of law are not actionable" under the FCA, the Court noted "the rule has significant limits on its own terms." *Id.*

Defendants to obtain preliminary injunctions so they could continue seeking reimbursement from Texas and Louisiana Medicaid for years" after they were terminated for violating medical and ethical standards. ECF No. 415 at 65. Accordingly, parties are not entitled to summary judgment on PPFA's liability for causing the submission of impliedly false claims.

### D. Parties Are Not Entitled to Summary Judgment on Relator's Conspiracy Claims

The TMFPA imposes liability on a party who "conspires to commit a violation" of the TMFPA. TEX. HUM. RES. CODE § 36.002(9); *see also* 31 U.S.C. § 3729(a)(1)(C) (imposing liability on any person who "conspires to commit a violation of" the FCA). Likewise, the LMAPIL imposes liability on a person who "conspire[s] to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim." La. R.S. § 46.438.3(D).[40] To prove an FCA conspiracy, Relator must show: "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009). As part of that showing, Relator must demonstrate that Defendants "shared a specific intent to defraud the Government." *United States ex rel. Farmer v. City of Hous.*, 523 F.3d 333, 343 (5th Cir. 2008). And "[a]lthough circumstantial evidence may often be used to show intent, this element must be established by full, clear, satisfactory, and convincing testimony." *Riquelme Valdes v. Leisure Res. Grp., Inc.*, 810 F.2d 1345, 1351 (5th Cir. 1987).

Here, Relator alleges Defendants are liable for conspiracy to commit healthcare fraud in at least three ways. First, Defendants allegedly conspired to violate the TMFPA by agreeing that PPST, PPGT, and PPGC would not return overpayments received under the vacated preliminary

---

[40] Relator may still pursue these claims despite Texas's partial intervention and decision not to prosecute these claims. *See United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1075 (N.D. Cal. 2020) (collecting cases).

injunctions — either by asking for relief they knew had no basis in law or by avoiding updating the court as to developments directly impacting the legal basis for their claims. ECF No. 391 at 99–100. Second, Affiliate Defendants continued to file claims for reimbursement in Texas even after they knew the State's termination of the Medicaid provider agreements was final. *Id.* at 100.[41] And third, Defendants allegedly conspired by telling Texas they needed a "grace period" to transition patients but instead used the time "to bill for as many services as they could." *Id.* "This was done through a letter drafted by PPFA and signed by PPST, PPGT, and PPGC." *Id.*

Defendants argue there is no evidence of an agreement to violate the law, an act performed in such an agreement, or a specific intent to defraud Medicaid. ECF No. 382 at 65. But it is "not enough to move for summary judgment . . . with a conclusory assertion that the plaintiff has no evidence . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986) (White, J., concurring). Furthermore, "Relator has identified numerous facts that show Planned Parenthood's liability for conspiracy," ECF No. 415 at 65, and "Defendants do not dispute that they agreed together to commit the acts that Plaintiffs allege violates the TMFPA and LMAPIL" — they "merely dispute that there is an 'offense' at all," ECF No. 440 at 51. Therefore, summary judgment is inappropriate.

### E. Plaintiffs Are Not Entitled to Summary Judgment on Defendants' Excessive Fines Defense

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. Thus, the Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 328 (1998). And while the Excessive Fines Clause applies only to "fines," — *i.e.*, "payment[s] to a sovereign as punishment for some offense," *id.* at 327, FCA monetary

---

[41] Relator alleges PPFA and PPGC conspired to violate the LMAPIL in the same way. ECF No. 391 at 100.

awards are considered "fines" because FCA treble damages and statutory penalties "are essentially punitive . . . ." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000).

Here, Plaintiffs move for summary judgment as to Defendants' affirmative defense under the Excessive Fines Clause. ECF No. 391 at 201. However, "whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case." *United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 124 (D.D.C. 2007) (quoting *Bajakaijan*, 524 U.S. at 336 n.1). Thus, "the contours of the offense must first be established before a court can determine if the fine imposed is unconstitutionally excessive." *Id.*

Likewise, there exists "numerous undecided questions of fact that must be determined at trial, including the appropriate amount of statutory penalties" that may be awarded. *Id.*; *see also Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995) ("The parties do not raise a purely legal issue which we can decide in the abstract without further factual development."). Accordingly, Plaintiffs are not entitled to summary judgment on Defendants' Excessive Fines defense. And for similar reasons, Relator's motion for summary judgment on "civil fines, civil penalties, attorneys' fees, costs and expenses" should be also denied. *See* ECF No. 389 at 3.

**SEALING**

Lastly, the Court finds that this Order should be and now is **SEALED**. In *Binh Hoa Le v. Exeter Fin. Corp.*, the Fifth Circuit held that "[t]he public's right of access to judicial records is a fundamental element of the rule of law" and that "[p]roviding public access to judicial records is the duty and responsibility of the Judicial Branch." 990 F.3d 410, 417 (5th Cir. 2021).[42] There, the Court of Appeals took issue with a wide range of documents being indefinitely sealed merely on

---

[42] Writing for the court, Judge Willett observed that "the working presumption is that judicial records should not be sealed." *Binh Hoa Le*, 990 F.3d at 419. That is why this Court has undergone the exhaustive "case-by-case, document-by-document, line-by-line balancing of the public's common law right of access against the interests favoring nondisclosure." *Id.* (internal marks omitted).

46

the parties' request. "In other words, the parties decided unilaterally what judicial records to keep secret, and their decision was permanent." *Id.* at 420.

That is not the case here. First, this Court's decision to seal any filing in this case has been made on a document-by-document basis and is justified independently of any request by the parties. *See, e.g.*, ECF Nos. 27, 526. Second, that justification is predicated either on this Court's motivation to prevent jury pool taint — and thereby serve the interests of justice — and/or to protect the identity and physical safety of the parties and their employees, given the unique and delicate subject matter at hand. *See, e.g.*, ECF Nos. 79, 124. Third, adequately addressing the legal issues discussed *supra* required that the Court make use of content contained in sealed documents. And in doing so, the Court exhaustively reviewed each piece of information used and determined — on an individual basis — whether its inclusion was necessary to the exposition of this Order.

Finally, all orders sealing documents in this case were not — and are not — intended to be permanent. Rather, as soon as the Court deems that unsealing a particular filing can be done without substantial risk to any of the foregoing factors, it will do so out of recognition that "[j]udicial records belong to the American people." *Id.* at 417.

CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Motions and Cross-Motions **IN PART**. Affiliate Defendants are obligated to return overpayments and PPFA is entitled to summary judgment on Affiliate Defendants' alleged reverse false claims.

**SO ORDERED**.

October 23, 2023

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE